This document is scheduled to be published in the
Federal Register on 10/07/2024 and available online at
**https://federalregister.gov/d/2024-22602**, and on **https://govinfo.gov**

**Billing Code**

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208 and 235**

**[CIS No. 2778-24; Docket No: USCIS-2024-0006]**

**RIN 1615-AC92**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

**[A.G. Order No.  6053-2024]**

**RIN 1125-AB32**

**Securing the Border**

**AGENCY:**  U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland

Security ("DHS"); Executive Office for Immigration Review ("EOIR"), Department of Justice

("DOJ").

**ACTION:**  Final rule; request for comments.

**SUMMARY:**  On June 3, 2024, the President signed a Proclamation under sections 212(f) and

215(a) of the Immigration and Nationality Act ("INA") suspending and limiting the entry of

certain noncitizens into the United States during emergency border circumstances.  DHS and

DOJ ("the Departments") issued a complementary interim final rule ("IFR") shortly thereafter.

This final rule responds to public comments received on the IFR, makes certain revisions to the

regulatory text, and seeks comment on potential changes to the Circumvention of Lawful

Pathways rule as well as changes that parallel modifications made by the subsequent

Proclamation.

**DATES:** *Effective date:* This rule is effective at 12:01 a.m. eastern daylight time on October 1, 2024.

*Comment period for solicited comments:* Comments on the extended and expanded applicability of the Circumvention of Lawful Pathways rebuttable presumption in Section IV of this preamble and changes that parallel modifications made by the subsequent Proclamation described in Section II.C.1 of this preamble must be submitted on or before [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE *FEDERAL REGISTER*].

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket*: To view comments on the IFR that preceded this rule, search for docket number USCIS-2024-0006 on the Federal eRulemaking Portal at *https://www.regulations.gov*.

*Comment period for solicited additional comments:* You may submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov*, to DHS Docket Number USCIS-2024-0006. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage device, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov*, please contact the Regulatory Coordination Division, Office of Policy and Strategy, USCIS, DHS, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, DHS; telephone (202) 447–3459 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, DOJ, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Public Participation

II. Executive Summary

A. Background and Purpose

1. Basis for the IFR

    2. The Departments' Experience with the IFR

  B. Legal Authority

  C. Changes from the IFR to Final Rule

    1. Changes to the IFR's Thresholds

    2. Clarifying Changes to Regulatory Text

    3. Other Technical Changes

  D. Rule Provisions

  E. Severability

III. Public Comments and Responses

  A. Legal Authority and Background

    1. Legality Concerns

      a. General Comments on Domestic Law

      b. Statutory Conditions and Limitations on Asylum Eligibility

      c. Expedited Removal

      d. General Comments on International Law

      e. UNHCR Guidelines on International Protection

  f.  2000 Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children

 2.  Justification and Statements on Need for the Rule

  a.  Rule Is Unjustified, Unsubstantiated, or Arbitrary

  b.  Lack of Resources Does Not Justify the Rule

  c.  Rule Does Not Acknowledge Factors Contributing to Migration

  d.  Other Comments Related to the Departments' Justification

B.  General Feedback on the IFR

 1.  General Support

 2.  General Opposition

  a.  Negative Impacts on Noncitizens and Others

   i.  Conflicts with Humanitarian Values

   ii.  Procedural and Due Process Concerns

    (1)  General Concerns

    (2)  Access to Counsel, Unrepresented Applicants, and the Ability or Time to Prepare

    (3)  Noncitizens' Ability to Have Their Claims Heard

    (4)  Issues with Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations

    (5)  Fairness or Risks Associated with Process

   iii.  Impacts on Specific Vulnerable Populations, Discrimination Concerns

   iv.  Impacts on Criminal Enforcement

   v.  Negative Impacts on Other Affected Entities

  b.  Negative or Minimal Impacts on Immigration System and Government Operations

   i.  Undermines the Administration's Promises and Goals

   ii.  Similarity to Actions of Past Administration

      iii.  Would Be Ineffective or Not Achieve Its Intended Outcomes

   c.  Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety

   d.  Other General Opposition

C.  Provisions of the Rule

  1.  Limitation on Asylum Eligibility

   a.  Proclamation Exceptions — Section 3(b) of Proclamation

      i.  Legal Concerns Related to CBP One and the Lack of Exceptions

      ii.  Wait Times for CBP One Appointments

      iii.  Availability of and Access to CBP One Appointments and Concerns about Discrimination

   b.  Regulatory Exception — Exceptionally Compelling Circumstances

   c.  Implementation by CBP Officers

   d.  Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR

   e.  Family Unity Provisions

  2.  Manifestation of Fear Standard

   a.  Legality Concerns

   b.  Concerns about the Efficiency and Complexity of the Manifestation Standard

   c.  Implementation Guidance and Accuracy of Manifestation to Identify Fear of Return

   d.  Trauma Impacting Manifestation and Vulnerable Populations

   e.  A Manifestation of Fear Does Not Sufficiently Align with a Valid Claim for Asylum

   f.  Noncitizens May Not Understand Their Legal Right to Seek Asylum

  3. "Reasonable Probability" Screening Standard for Statutory Withholding of Removal and CAT Protection

      4.  Other Comments on the Regulatory Provisions

         a.  Application to Mexican Nationals

         b.  Adequacy of Statutory Withholding of Removal and CAT Protection

         c.  Requests for Reconsideration

  D.  Other Issues Relating to the Rule

      1.  Scope of the Rule and Implementation

         a.  Concerns That the Encounter Thresholds Are Too Low or Arbitrary

         b.  Concerns Regarding Exceptions from the Encounter Thresholds

         c.  Other Concerns About the Encounter Thresholds

      2.  Other Comments on Issues Relating to the Rule

  E.  Statutory and Regulatory Requirements

      1.  Administrative Procedure Act

         a.  Foreign Affairs Exception

         b.  Good Cause Exception

         c.  Length and Sufficiency of Comment Period

      2.  Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)

      3.  Alternatives

         a.  Address Root Causes of Migration

         b.  Prioritize Funding and Other Resources

         c.  Further Expand Refugee Processing or Other Lawful Pathways

         d.  Expand Asylum Merits Process

         e.  Other Congressional Action

         f.  Additional Suggested Measures or Revisions

  F.  Out of Scope

IV.  Requests for Comments

A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule with That of the Proclamation and This Rule

B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption

V. Regulatory Requirements

    A. Administrative Procedure Act

    B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)

        1. Effects Under a Without-IFR Baseline

        2. Effects Under a With-IFR Baseline

        3. Discontinuation Analysis Under a Without-IFR Baseline

        4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption

    C. Regulatory Flexibility Act

    D. Unfunded Mandates Reform Act of 1995

    E. Congressional Review Act

    F. Executive Order 13132 (Federalism)

    G. Executive Order 12988 (Civil Justice Reform)

    H. Family Assessment

    I. Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments)

    J. National Environmental Policy Act

    K. Paperwork Reduction Act

**List of Abbreviations**

| | |
|---|---|
| AO | Asylum Officer |
| AMI | Asylum Merits Interview |

| | |
|---|---|
| APA | Administrative Procedure Act |
| BIA | Board of Immigration Appeals (DOJ, EOIR) |
| CAT | Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment |
| CBP | U.S. Customs and Border Protection |
| CBP One app | CBP One mobile application |
| CDC | Centers for Disease Control and Prevention |
| CHNV | Cuba, Haiti, Nicaragua, and Venezuela |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| EOIR | Executive Office for Immigration Review |
| ERO | Enforcement and Removal Operations |
| FARRA | Foreign Affairs Reform and Restructuring Act of 1998 |
| FERM | Family Expedited Removal Management |
| FY | Fiscal Year |
| HSA | Homeland Security Act of 2002 |
| ICE | U.S. Immigration and Customs Enforcement |
| IFR | Interim Final Rule |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act of 1996 |
| IJ | Immigration Judge |
| INA or the Act | Immigration and Nationality Act |
| LGBTQI+ | Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex |
| MPP | Migrant Protection Protocols |
| NGO | Non-Governmental Organization |
| NEPA | National Environmental Policy Act of 1969 |
| NTA | Notice to Appear |

| OFO | Office of Field Operations |
| OHSS | Office of Homeland Security Statistics |
| POE | Port of Entry |
| RFA | Regulatory Flexibility Act |
| SWB | Southwest Land Border |
| TCO | Transnational Criminal Organization |
| TVPA | Trafficking Victims Protection Act of 2000 |
| UC | Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2) |
| UDHR | Universal Declaration of Human Rights |
| UIP | U.S. Customs and Border Protection Unified Immigration Portal |
| UMRA | Unfunded Mandates Reform Act of 1995 |
| UNHCR | United Nations High Commissioner for Refugees |
| USBP | U.S. Border Patrol |
| USCIS | U.S. Citizenship and Immigration Services |
| USCG | U.S. Coast Guard |

**I. Public Participation**

Interested persons are invited to submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble by submitting relevant written data, views, comments, and arguments by the deadline stated above.  To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action.  Comments must be submitted in English, or an English translation must be provided.  Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS-2024-0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov*, and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov*.

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov*, referencing USCIS Docket No. USCIS-2024-0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

*A. Background and Purpose*

1. Basis for the IFR

On June 3, 2024, the President signed Proclamation 10773 ("June 3 Proclamation")[1] under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and suspending and limiting the entry of such noncitizens. 89 FR 48487, 48487–91 (June 7, 2024). The June 3 Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border of the United States, including

---

[1] As discussed in Section II.C.1 of this preamble, the President has since issued a proclamation amending portions of the June 3 Proclamation. That amending proclamation is referred to as the "September 27 Proclamation" in this preamble. Where the preamble refers to "the Proclamation" without specifying a date, it is referring to Proclamation 10773 as amended by the September 27 Proclamation.

any warranted limitations and conditions on asylum eligibility.  *Id.* at 48492.  The Departments

subsequently promulgated an IFR, effective June 5, 2024, "designed to implement the policies

and objectives of the Proclamation by enhancing the Departments' ability to address historic

levels of migration and efficiently process migrants arriving at the southern border during

emergency border circumstances."[2]  Securing the Border, 89 FR 48710, 48718 (June 7, 2024)

("the IFR").

The June 3 Proclamation and the IFR explain that, since 2021, as a result of political and

economic conditions globally, there have been substantial levels of migration throughout the

Western Hemisphere, including at the southwest land border ("SWB").  89 FR at 48487; *id.* at

48711 & n.3.  In December 2023, migration levels at the SWB surged to the highest monthly

total on record.[3]  *Id.* at 48712 n.5.  DHS assessed that the surge in late 2023 was likely the result

of a number of factors, including the growing understanding by smugglers and migrants that

DHS's capacity to impose consequences at the border is limited by the lack of resources and

tools made available by Congress and the Government of Mexico's operational constraints

caused by a lack of funding at the end of the 2023 calendar year, which limited its ability to

enforce its own immigration laws.  *Id.* at 48725 & n.115.

These sustained high encounter rates outstripped the Departments' abilities—based on

available resources—to deliver timely decisions and consequences in significant numbers for

those without a legal basis to remain in the United States.  89 FR at 48714.  Due to its funding

shortfall, DHS lacked adequate resources such as sufficient USCIS asylum officers ("AOs") to

---

[2] The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed the Department of Homeland Security's ("DHS's") capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States.  *See* 89 FR at 48711 & n.2.

[3] There were nearly 302,000 U.S. Customs and Border Protection ("CBP") encounters at and between ports of entry ("POEs") along the southwest land border ("SWB") in December 2023, higher than any previous month on record. Office of Homeland Security Statistics ("OHSS") analysis of July 2024 OHSS Persist Dataset [Encounters Fiscal Year ("FY") 2000–2024]; 89 FR at 48714 n.21; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* (last updated Sept. 6, 2024), *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (SWB encounters from FY 2014 through December 2023).  OHSS figures are generally rounded throughout this preamble.

conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides."

*Id.*  These factors limited DHS's ability to conduct credible fear interviews for individuals in

U.S. Customs and Border Protection ("CBP") custody and to process and hold individuals in

U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal

process.  *Id.*  The substantial migration throughout the hemisphere, combined with inadequate

resources and tools to keep pace, limited DHS's ability to impose timely consequences through

expedited removal, the main consequence Congress has made available at the border under title 8

authorities.  89 FR at 48713–14.  Consistent with past practice prior to the Title 42 public health

Order, individuals who are subject to but cannot be processed under expedited removal due to

resource constraints are instead generally released, after screening and vetting, pending removal

proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"),

before an immigration judge ("IJ").

These higher encounter rates also place significant strain on the immigration courts.

Recently, despite significant increases in the total number of IJs and case completions since

Fiscal Year ("FY") 2021, newly initiated cases have far outpaced such completions.[4]  Placing

more noncitizens in section 240 removal proceedings before an IJ—rather than processing

eligible noncitizens through the expedited removal process—only further contributes to the

immigration court backlog, and those cases can take several years to conclude.[5]  This strain is

---

[4] *See* Executive Office of Immigration Review ("EOIR"), *Adjudication Statistics: New Cases and Total Completions* (July 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline*; EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (July 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline.*

[5] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID-19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated during that time were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer.  OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, EOIR's Strategic Context, Current Operating Environment*, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited Sept. 20, 2024) ("EOIR . . . suffered operational setbacks during the COVID-19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent.  While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt.").  Although EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving unaccompanied children ("UCs").  *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen*

also particularly acute in light of EOIR's current underfunding.  Rather than increase funding to support IJ team hiring, EOIR's FY 2024 budget was $16 million less than in FY 2023 and was $94.3 million less than its inflation-adjusted funding requirements (referred to as "Current Services").[6]

The Departments reasoned that their capacity to predictably deliver timely decisions and consequences is jeopardized by emergency border circumstances, which, left unmitigated, further add to the incentives and motivations for migrants to make the dangerous journey to the SWB, regardless of their ultimate likelihood of success on an asylum or protection application, and that the current immigration and asylum systems had become a driver for irregular migration[7] throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations ("TCOs").  89 FR at 48714.  Despite the Departments' efforts to address these substantial levels of migration, strengthen the consequences in place at the border, and enhance the overall functioning of the immigration system, including through the Circumvention of Lawful Pathways rule, 88 FR 31314 (May 16, 2023), these circumstances still existed as a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.  89 FR at 48711–13, 48715.

In the absence of congressional action, and consistent with the President's direction in the June 3 Proclamation to consider issuing regulations, the Departments adopted the provisions in

---

*Child (UAC) Case Completion and Case Pending Time* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,254 days); EOIR, *Median Completion Times for Detained Cases* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 46 days in the second quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[6] *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, 138 Stat. 25, 133; EOIR, *FY 2024 Budget Request at a Glance*, *https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf*.

[7] As used in this preamble, "irregular migration" refers to the movement of people into another country unlawfully or without authorization.  With respect to the United States' borders, the term "irregular" is used in this preamble to refer to physically entering between POEs or otherwise entering without documents sufficient for lawful admission, unless entering with advance authorization to travel or at a pre-scheduled time and place to present at a POE.

the IFR, which were intended to address the emergency border circumstances and to substantially improve the Departments' ability to deliver timely decisions and consequences during such circumstances. *See* 89 FR at 48710. The IFR established a limitation on asylum eligibility that applies to certain individuals who enter irregularly across the southern border during emergency border circumstances and revised certain procedures applicable to the expedited removal process during such periods to reduce the time required to apply consequences to those individuals and remove noncitizens who do not have a legal basis to remain in the United States. *Id.* at 48715. The IFR was expected to achieve several benefits: reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; protect against overcrowding in border facilities; and reduce the ability of exploitative TCOs and smugglers to operate. *Id.* at 48745, 48767.

2. The Departments' Experience with the IFR

The IFR's limitation on asylum eligibility and revised procedures are working as intended, though as discussed below, the Departments have determined that modest adjustments to the threshold calculations are warranted. As explained in the paragraphs that follow, in the weeks since June 5, 2024, U.S. Border Patrol ("USBP") encounters between the ports of entry ("POEs") have dropped markedly. Although the Departments believe that this has occurred for a range of reasons, one important reason is that the rule itself has significantly shifted incentives at the southern border. As explained further below, and consistent with the explanation provided in the IFR, the rule has, at least in part, significantly improved DHS's ability to place into expedited removal a majority of single adults and individuals in family units encountered by USBP; to avoid large-scale releases of such individuals into the United States pending section 240 removal proceedings; and to allow for swift resolution of such individuals' cases and, where appropriate, their removal. *See id.* At the same time, the Departments have continued to implement the

largest expansion of lawful, safe, and orderly pathways and processes[8] for individuals to come to the United States and to uphold the United States' non-refoulement obligations under international law.

In the period between June 5, 2024, and August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and IFR have fallen 59 percent from the level of average daily encounters during the immediate post-pandemic period, i.e., the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023,[9] and before the IFR entered into effect on June 5, 2024.[10]  This dramatic decrease in encounters has spanned multiple demographic categories.  For instance, DHS has observed a drop in encounters of family units, a demographic category that presents particular operational challenges.  During the immediate post-pandemic period, DHS experienced an average of about 2,000 daily encounters of individuals in family units.[11]  Since the Departments issued the IFR, that daily average has dropped 70 percent to about 600 individuals in family units encountered daily.[12]  Other significant drops in encounter numbers occurred with single adults and unaccompanied children ("UCs").[13]

---

[8] The terms "lawful pathways," "lawful, safe, and orderly pathways," "lawful pathways and processes," and "lawful, safe, and orderly pathways and processes," as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner, including to seek asylum and other forms of protection or other immigration benefits for which they may be eligible.

[9] While the rule's effective date was May 11, 2023, 88 FR at 31314, the rule only applies to noncitizens who enter the United States "[s]ubsequent to the end of implementation of the Title 42 public health Order[,]" 8 CFR 208.33(a)(1)(ii), which expired at 11:59 p.m. on May 11, 2023, *see* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Security Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border*.  Therefore, the Circumvention of Lawful Pathways rule began to apply on May 12, 2023.

[10] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on September 3, 2024 (Summary Statistics tab).  There was an average of about 2,100 total encounters per day (including all demographic groups) between POEs at the SWB from June 5, 2024, to August 31, 2024, compared to around 5,100 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024.  *Id.*

[11] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[12] OHSS analysis data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[13] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

In contrast to processing before the IFR, DHS is now placing the majority of single adults and individuals in family units encountered by USBP at the SWB into expedited removal. Between June 5, 2024, and August 31, 2024, DHS placed 59 percent of these noncitizens into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order.[14]  In the pre-pandemic period,[15] DHS placed 41 percent of such noncitizens into expedited removal proceedings.[16]  The decrease in the number of encounters at the SWB directly enabled DHS's increased placement rate of noncitizens into expedited removal proceedings.  Because encounter levels have decreased, DHS is able to use its operational resources to refer a higher percentage of noncitizens into expedited removal proceedings and deliver timely consequences in a greater proportion of cases.[17]  The IFR is remedying the negative effects of the previously sustained high encounter numbers described in the IFR and in this rule.  *See, e.g.*, 89 FR at 48749 ("In order to

---

[14] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[15] Throughout this preamble the "pre-pandemic period" refers to FY 2014 to FY 2019.

[16] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).  DHS reinstated removal orders for a larger share of single adults and individuals in family units during the pre-pandemic period (26 percent during the pre-pandemic period compared to 14 percent under the interim final rule ("IFR")), which is unsurprising given that the Departments are seeing fewer repeat encounters as a result of the higher proportion of non-Mexicans/non-northern Central Americans—with more limited migration histories—as a share of total encounters.  *Id.*; 89 FR at 48721 n.49.  Notably, the sum of reinstatements and expedited removals is still higher during the IFR (a combined 73 percent) than it was during the pre-pandemic period (67 percent).  OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[17] The most effective way to deliver timely consequences to noncitizens who enter irregularly is through the expedited removal system, but DHS's capacity to use that system on a large scale is subject to resource constraints.  One such constraint is space to hold noncitizens in DHS custody during the expedited removal process.  Because noncitizens in expedited removal are subject to detention, including during the pendency of their credible fear proceedings, the use of expedited removal may lead to an increase in the time that an individual spends in CBP custody.  This is particularly the case when the individual is receiving their credible fear interview while in CBP custody.  When there are high numbers of individuals placed in expedited removal, the number of individuals who remain in CBP custody for a lengthier period can increase rapidly, leading to overcrowded conditions.  In addition, given the nature of CBP facilities—which are designed for short-term temporary holding—CBP endeavors to move all individuals out of custody in an expeditious manner and to avoid overcrowding.

Thus, if high encounter levels result in a significant number of individuals in CBP custody, or if those individuals have been in custody for a significant period of time, CBP may lose optionality: having lost the capacity to place additional noncitizens into the expedited removal process, CBP generally must take steps to release some individuals from custody to ensure safe and sanitary conditions and appropriate time in custody.  In cases when release is appropriate or warranted, CBP generally issues an individual a Notice to Appear ("NTA") before an immigration judge ("IJ") prior to their release from custody.  Although in some circumstances transfer of such noncitizens to U.S. Immigration and Customs Enforcement ("ICE") for detention for the duration of the credible fear process is possible, the ability to do so is dependent on the availability of space in ICE's already significantly strained detention network.  Therefore, when ICE detention space is unavailable, noncitizens must then be processed by CBP through non-expedited removal pathways.

maximize the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain in the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims.").

Relatedly, the IFR has also significantly reduced the percentage of noncitizens encountered between POEs at the SWB who are released into the United States pending completion of their section 240 removal proceedings. For instance, from June 5, 2024, through August 31, 2024, USBP placed 25 percent of noncitizens encountered at the SWB into section 240 removal proceedings.[18] This is down 41 percentage points from the immediate post-pandemic period, when USBP placed 66 percent of such noncitizens into section 240 removal proceedings, translating to a reduction of over 60 percent.[19] Similarly, between June 5, 2024, and August 31, 2024, 33 percent of all noncitizens encountered at the SWB were sent to Enforcement and Removal Operations ("ERO"); this figure is up from 19 percent during the immediate post-pandemic period.[20]

The IFR's change to how DHS immigration officers identify and refer noncitizens for credible fear interviews has resulted in a reduction of such referrals. Under the IFR, during emergency border circumstances, instead of asking specific questions about fear or providing lengthy advisals, DHS refers a noncitizen for such an interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to the noncitizen's country or the country of removal. From June 5, 2024, through August 31, 2024, 27 percent of noncitizens encountered between POEs at the SWB and processed for expedited removal indicated an intention to apply for

---

[18] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[19] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[20] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

asylum or a fear of persecution or torture, compared with a 37 percent fear-claim rate during the pre-pandemic period and 57 percent during the immediate post-pandemic period.[21]  In the IFR, DHS explained that based on its extensive experience administering the expedited removal process, it concluded that the affirmative questions asked under steady state operations are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.  89 FR at 48743.[22]  The shift to a manifestation standard has, as intended, reduced the gap between high rates of referrals and screen-ins and historic ultimate grant rates as well as increased processing efficiency for DHS, and noncitizens who manifest or claim a fear, or who indicate an intention to apply for asylum, still have their claims adjudicated as required by the INA.

The shift to a "reasonable probability" standard for screening for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S 85,[23] has further reduced the difference between high screen-in rates and historically low ultimate grant rates of protection or relief.  Overall, of those USBP has referred for credible fear interviews, the comprehensive screen-in rate has dropped to 57 percent, compared to 83 percent during the pre-pandemic period and 62 percent during the immediate post-pandemic period.[24]  Of USBP

---

[21] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[22] From FY 2014 through 2019, of total SWB encounters processed for expedited removal and then referred to section 240 proceedings, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief.  89 FR at 48743 n.219; OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab).  During that same period, 37 percent of SWB encounters processed for expedited removal claimed fear, and 76 percent of those who claimed fear were screened in and referred to section 240 removal proceedings.  OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[23] In this preamble, consistent with the IFR, the Departments generally refer to protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") as "CAT protection."  *See, e.g.*, 89 FR at 48716.

[24] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).  Data for immediate post-pandemic and IFR periods are limited to SWB encounters between POEs. The comprehensive screen-in rate includes positive determinations issued by U.S. Citizenship and Immigration Services ("USCIS"), cases where an IJ vacated USCIS's negative determination, and cases administratively closed

encounters screened by USCIS under the rule's "reasonable probability" standard, the screen-in rate has decreased to approximately 48 percent[25] compared to 76 percent[26] under the "significant possibility" standard during the pre-pandemic period, and approximately 51 percent[27] for those screened under the Circumvention of Lawful Pathway rule's lower "reasonable possibility" standard.[28]  The Departments believe the lower screen-in rate under the IFR better aligns with the percentage of noncitizens who have historically been granted protection or relief.  That is to say, noncitizens screened under the higher "reasonable probability" standard that receive positive findings are more likely to have meritorious claims in ultimate adjudications.

As a result of the IFR, DHS is able to more quickly remove a greater percentage of those who do not have a legal basis to remain in the United States.  In the pre-pandemic period, the median processing time for a noncitizen encountered by USBP with a negative fear determination in expedited removal was 75 days from encounter to removal.[29]  During the immediate post-pandemic period, this metric dropped to 44 days.[30]  From June 5, 2024, through August 31, 2024, the metric dropped again to 32 days.[31]  Similarly, the processing time from when a noncitizen is referred for a credible fear interview to when the noncitizen receives a fear

---

by USCIS in which a discretionary NTA was issued.  For cases processed under either the Circumvention of Lawful Pathways rule or the IFR, the comprehensive screen-in rate encompasses cases where USCIS or an IJ determined that the noncitizen was found not subject to the Circumvention of Lawful Pathways rule's rebuttable presumption or the IFR's limitation on asylum eligibility under the significant possibility standard, in addition to cases screened-in under the "reasonable possibility" or "reasonable probability" standards, as applicable.

[25] OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening - STB tab, Line 9 divided by Line 8).  Data are limited to SWB encounters between POEs.

[26] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab).  Data are limited to SWB encounters between POEs.

[27] OHSS analysis of July 2024 Persist Dataset (Fear Screening - CLP tab, Line 13 divided by Line 12).  Data are limited to SWB encounters between POEs.

[28] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).  Although in the preamble to the IFR, DHS anticipated that the manifestation approach "will likely lead to a higher proportion of those referred having colorable claims for protection[,]" *see* 89 FR at 48743, USCIS screen-in rates have dropped slightly, as noted above, *see* OHSS analysis of June 2024 Enforcement Lifecycle dataset, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Historic ERCF Results, Fear Screening – STB, and Fear Screening – CLP tabs).  There could be multiple reasons for this development, including the effects of the "manifestation" and "reasonable probability" provisions, which are difficult to disentangle.

[29] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Summary Statistics tab).

[30] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[31] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

determination is down 58 percent compared to the immediate post-pandemic period and down 71 percent compared to the pandemic period.[32]  The Departments attribute the decreased processing time to key provisions of the IFR.  For instance, the manifestation of fear provision has resulted in streamlined processing and a lower percentage of individuals indicating fear, thereby shortening the average processing time as those who do not indicate fear do not receive a screening by an AO or review by an IJ prior to removal.  Then, for those who indicate fear, following a minimum consultation period that DHS reduced through separate guidance,[33] AOs, supervisory AOs, and IJs have been applying the IFR's reasonable probability screening standard.  In addition, between June 5, 2024, and August 31, 2024, 32 percent of all noncitizens encountered at the SWB were removed or returned to their home country or to Mexico directly from USBP custody.[34]  This is double the rate of repatriations from USBP custody (16 percent) that occurred during the immediate post-pandemic period.[35]  Overall, from June 5, 2024, through August 31, 2024, DHS has removed or returned 70 percent of single adults and individuals in family units encountered by USBP.[36]  This contrasts with a 28-percent rate during the immediate

---

[32] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[33] The Immigration and Nationality Act ("INA") requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to [duly prescribed] regulations."  INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); *see* INA 103(a), 8 U.S.C. 1103(a); 6 U.S.C. 557.  Under those regulations, including during circumstances in which the measures in the IFR apply, consultation shall be at no expense to the Government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, . . . and shall not unreasonably delay the process."  8 CFR 235.3(b)(4)(ii), 235.15(a).  The regulations do not require that the noncitizen be allowed a particular amount of time to consult with the person or persons of their choosing.  *Id.*  On June 4, 2024, to support implementation of the Proclamation and IFR, as a matter of internal policy, USCIS reduced the minimum consultation period for noncitizens subject to the rule's provisions from at least 24 hours to at least 4 hours beginning at the time ICE or CBP provides the noncitizen with the opportunity to consult and continuing only during the hours of 7 a.m. and 7 p.m. local time.  *See* Memorandum for Jennifer B. Higgins, Deputy Dir., USCIS, from Ted Kim, Assoc. Dir., Refugee, Asylum, and Int'l Operations Directorate, USCIS, *Re: Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply* (June 4, 2024).

[34] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[35] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[36] DHS encountered 165,000 single adults and individuals in family units between June 4, 2024, and August 31, 2024, and had repatriated 119,000 of them as of September 3, 2024.  OHSS analysis of data downloaded from UIP on Sept. 3, 2024 (IFR Details tab).

post-pandemic period.[37]  Viewed in terms of daily averages, under the IFR through August 31, 2024, there have been about 1,880 daily encounters of single adults and individuals in family units.[38]  And DHS has averaged about 1,320 total daily repatriations and 580 releases from CBP custody pending immigration proceedings over that time frame.[39]

Faster repatriations free up DHS resources and capacity for processing new arrivals, allowing for further increases in the use of expedited removal and fewer releases pending completion of section 240 removal proceedings.  These successes disrupt the "vicious cycle" the Departments sought to counteract in issuing the IFR.  89 FR at 48714; *see id.* at 48751 ("This reality contributes to the vicious cycle . . . in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.").

Meanwhile, noncitizens have continued to use lawful, safe, and orderly pathways and processes to seek entry to the United States.  For example, the use of the CBP One mobile application ("CBP One app") to schedule an appointment at a SWB POE is an available tool that permits noncitizens to present themselves at the border in a lawful, safe, and orderly manner. From June 5, 2024, through August 31, 2024, approximately 123,500 noncitizens with CBP One appointments presented at SWB POEs and were accordingly processed outside of the procedures set forth in the IFR.[40]  *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); section 3(b)(v)(D) of the Proclamation.  During the pre-pandemic period, approximately 300 encounters were processed at SWB POEs per day.[41]  Since the launch of the CBP One app in January 2023, approximately

---

[37] During that time period, there were 1.87 million such encounters with noncitizens other than UCs, of which 511,000 noncitizens were repatriated.  OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab).

[38] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab).

[39] *Id.*

[40] *Id.*

[41] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

1,500 encounters have been processed at SWB POEs each day (with and without CBP One appointments).[42]  And from the start of FY 2024 through August 31, 2024, that average increased to approximately 1,700 per day.[43]  Other lawful pathways that continue to be available include expanded parole processes for specific populations and demographics such as nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), which allow certain individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;[44] the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other services, access to information and referrals for humanitarian and family parole processes, labor pathways, expedited refugee processing, and other lawful, safe, and orderly pathways for eligible individuals to the United States and other countries;[45] country-specific family reunification parole processes for certain nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras who have qualifying U.S. citizen relatives in the United States;[46] and temporary nonimmigrant worker visas, which provide employment opportunities for eligible individuals.[47]

Thus, the provisions of the IFR and other measures taken to assist in the IFR's implementation are effective tools in managing levels of irregular migration that, absent key policy interventions like this rule, severely strain the Departments' abilities to safely, effectively, and humanely enforce and administer U.S. immigration laws.  The historically high level of

---

[42] *Id.*  On June 30, 2023, CBP announced the expansion of available appointments for noncitizens through the CBP One mobile application ("CBP One app") to 1,450 per day, up from 1,250.  Cumulatively, the expansion to 1,450 appointments represented a nearly 50 percent increase from May 12, 2023, when CBP processed 1,000 appointments per day.  *See* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day*.

[43] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[44] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last reviewed/updated Aug. 29, 2024), *https://www.uscis.gov/CHNV* .

[45] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas*, *https://www.state.gov/safe-mobility-initiative/* (last visited Aug. 23, 2024).

[46] *See* USCIS, *Family Reunification Parole Processes* (last reviewed/updated Sept. 10, 2024), *https://www.uscis.gov/FRP*.

[47] *See* USCIS, *Temporary (Nonimmigrant) Workers* (last reviewed/updated July 24, 2024), *https://www.uscis.gov/working-in-the-united-states/temporary-nonimmigrant-workers*.

encounters that DHS experienced in the months before the IFR's implementation has decreased markedly, and DHS's ability to expeditiously process noncitizens and deliver swift consequences to those who do not establish a legal basis to remain in the United States has therefore improved significantly.

## B. Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the CAT.  The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.[48]

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to certain other officers.  INA 103(a)(1), 8 U.S.C. 1103(a)(1).  The INA grants the Secretary the authority to establish regulations and take other actions that the Secretary deems "necessary for carrying out" the Secretary's authority under the immigration laws.  INA 103(a)(3), 8 U.S.C. 1103(a)(3); see also 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]."  INA 103(g)(1), 8 U.S.C. 1103(g)(1); see also 6 U.S.C. 521(a).  In addition, under the HSA, the

---

[48] The Homeland Security Act of 2002 ("HSA") further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General."  116 Stat. at 2274 (codified at 6 U.S.C. 522).

Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the immigration laws.  INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings.  These adjudications are conducted by IJs within DOJ's EOIR.  *See* 6 U.S.C. 521(a); INA 103(g)(1), 8 U.S.C. 1103(g)(1); 8 CFR 1240.1.  With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court.  INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal v. Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes).  The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions.  *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland v. Ming Dai*, 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA).  And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling."  INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities.  Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A).  INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A).  Section 208 thereby authorizes the Secretary and the Attorney General to "establish[]" "requirements and

procedures" to govern asylum applications. *Id.*  The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum."  INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[49]  The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs.  *See* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2); *see also, e.g.*, INA 235(b)(1)(B)(iii)(III), (B)(iv), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (B)(iv), (C).

The INA and HSA grant DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in expedited removal proceedings, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear.  INA 103(a)(1), (a)(3), 8 U.S.C. 1103(a)(1), (a)(3); INA 208(b)(1)(A), (d)(1), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (d)(1), (d)(5)(B); INA 235(b)(1)(B),  8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b)(3) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS); 6 U.S.C. 557 (providing that references to any officer from whom functions are transferred under the HSA are to be understood as referring to the Secretary of Homeland Security).  Within DHS, AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted, all

---

[49] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS.  6 U.S.C. 251, 271(b)(3), (5), 557.

of which are subject to review by a supervisory AO. *See* 8 CFR 208.2(a), 208.9, 208.14(b), 208.30(b), (e)(6)(i), (e)(8). The INA grants IJs the authority to review AO negative credible fear determinations. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33.1 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning ("refouling") "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

Because the Refugee Protocol is not self-executing,[50] Congress implemented these non-refoulement obligations through the INA, as amended by the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("Refugee Act"). *See* 8 U.S.C. 1253(h) (1952); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 174–77 (1993) (describing the history of the statutory withholding provision and the Refugee Act amendments). The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[51] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The

---

[50] *E.g.*, *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation." (citations omitted)).

[51] *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 426–27 (1999); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees[,]" which the Court found aligned with the discretionary provision in section 208 of the INA, 8 U.S.C. 1158).

INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3).  *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT, which is likewise not self-executing.[52]  The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") delegates to the Departments the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention."  Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681 (codified at 8 U.S.C. 1231 note).  Consistent with FARRA, DHS and DOJ have implemented in the Code of Federal Regulations the United States' obligations under Article 3 of the CAT.  *See, e.g.*, 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), amended by 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, although the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures. This recognition that section 212(f) does not affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades.[53]  That longstanding

---

[52] *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011) ("This multilateral treaty is non-self-executing and thus does not itself create any rights enforceable in U.S. courts." (citation omitted)).

[53] In 1984, then-Assistant Attorney General for the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States.  And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws[,]" including "expedited-removal proceedings" where they could "raise any claims for protection[.]"  *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 FR 55934, 55940 (Nov. 9, 2018).  Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations were understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum.  Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (updated Feb. 21, 2024).  At the same time, nothing in the proclamations or the INA has precluded the Departments from considering as an adverse discretionary criterion that a noncitizen is described in a section 212(f) proclamation.

understanding follows from the text and structure of the governing statutes.  Section 212(f) provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."  INA 212(f), 8 U.S.C. 1182(f).  Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only within its "sphere."  *Trump v. Hawaii*, 585 U.S. 667, 683–84, 695 (2018).  Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States."  *Id.* at 695.  Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[54]  First enacted in the Refugee Act, the asylum statute today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States[,] . . . irrespective of such alien's status, may apply for asylum."  INA 208(a)(1), 8 U.S.C. 1158(a)(1).  The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States."[55]  *Id.*  As a result, the power under section 212(f) to suspend

---

[54] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States.  *Cf., e.g.*, *Sale*, 509 U.S. at 164 n.13, 174–77, 187–88 (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have "extraterritorial application" to migrants who were not physically present); *Hawaii*, 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) "does not allow the President to expressly override particular provisions of the INA[,]" while emphasizing the particular "sphere[ ]" in which it operates).

[55] Section 212(f) of the INA, 8 U.S.C. 1182(f), contrasts with 42 U.S.C. 265, which authorizes the Centers for Disease Control and Prevention ("CDC") to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health."  During the COVID-19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued a public health Order invoking section 265 to expel certain noncitizens generally without title 8 protections, including asylum applications.  As the final rule implementing section 265 explained, that provision originates in a "broad public health statute" that Congress intended to "operate[] separately and independently of the immigration power" and authorizes the CDC "to temporarily suspend the effect of any law[ ] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign*

"entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[56]

This rule, as discussed in the IFR and this preamble, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims.  INA 103(a)(1), (a)(3), (g), 8 U.S.C. 1103(a)(1), (a)(3), (g); INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B);  INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

## C.  Changes from the IFR to Final Rule

The Departments issued the IFR, effective June 5, 2024, adopting provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuated three key changes to eligibility for asylum and the expedited removal process for noncitizens who are encountered at the southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June 3 Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances, that is considered during

---

*Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes*, 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265's predecessor was intended to suspend immigration if public health required it).  The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration[.]"  Br. for Appellants at 41–43, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) (No. 21-5200); *see Huisha-Huisha*, 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC Order on the ground that it improperly suspended migrants' right to apply for asylum).  Section 265 is a public-health authority under the Public Health Service Act.  Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[56] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule.  *Cf. United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for "any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe[,]" the Attorney General could issue regulations governing entry during such an emergency to "deny [certain noncitizens] a hearing . . . in special cases" notwithstanding the ordinary exclusion hearing provisions governing entry).  This does not mean, however, that the President is prohibited from invoking section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

credible fear screenings in addition to its application during adjudications on the merits; (2) rather than asking specific questions of every noncitizen encountered and processed for expedited removal, providing general notice regarding the process for seeking asylum, statutory withholding of removal, or CAT protection and referring a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because they could not establish a significant possibility that they are not subject to or are exempt from the limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and CAT protection under a "reasonable probability" standard.

Following careful consideration of public comments received and the Departments' experiences implementing the IFR's provisions since early June 2024, the Departments have made modifications to the regulatory text adopted in the IFR, as described below.  The rationale for the provisions adopted in the IFR and the reasoning provided in the IFR's preamble remain valid, except as distinguished in this regulatory preamble.

1.  Changes to the IFR's Thresholds

On September 27, 2024, the President issued a proclamation amending the June 3 Proclamation.  *See* Presidential Proclamation of September 27, 2024, *Amending Proclamation 10773* ("September 27 Proclamation").  Following the issuance of the IFR, the Departments have closely monitored its implementation and results across the southern border.  The Departments recommended to the President adjustments to the Proclamation based on their experiences implementing the Proclamation and IFR.  Following those recommendations, the President issued the September 27 Proclamation, which amended section 2 of the June 3 Proclamation in two ways.  First, section 2(a) of the June 3 Proclamation provided that the suspension and limitation on entry would be discontinued at 12:01 a.m. eastern time on the date that is 14-

calendar-days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters between POEs.  As amended by the September 27 Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters between POEs for 28-consecutive-calendar-days before the 14-calendar-day waiting period is triggered.[57]  Second, the September 27 Proclamation deleted section 2(c) of the June 3 Proclamation, which provided that UCs[58] from non-contiguous countries shall not be included in calculating the number of encounters for purposes of section 2(a) and 2(b) of the June 3 Proclamation.

The Departments are implementing changes in this final rule that parallel those made in the September 27 Proclamation.  Specifically, the Departments are revising §§ 208.13(g) and 1208.13(g) to refer to "the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section."  Paragraph (h) of each section now defines "Presidential Proclamation of June 3, 2024" as referring to "Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024[ ]" for the purpose of §§ 208.13(g), 208.35, and 235.15 (in the case of § 208.13(h)) and §§ 1208.13(g) and 1208.35 (in the case of § 1208.13(h)).  The Departments are also making conforming changes in §§ 208.35, 235.15, and 1208.35.  To ensure that the rule can function even if the September 27 Proclamation were rendered inoperative by court order, and consistent with the September 27 Proclamation, the Departments have also included a severability clause in both §§ 208.13(h) and  1208.13(h).

The Departments believe that shifting to the 28-consecutive-calendar-day requirement for this rule, in parallel with the changes made in the September 27 Proclamation, is necessary to ensure that the rule's measures discontinue only once there has been a durable and sustained decrease in encounters at the southern border such that the emergency border circumstances have

---

[57] As an illustration, for any given day, DHS will calculate the average number of encounters for that day and the prior 6 calendar days i.e., the 7-consecutive-calendar-day average.  If that average remains below 1,500 for 28 consecutive calendar days, the 14-day waiting period will begin.

[58] In this preamble, as in the Proclamation, the terms "unaccompanied children" or "UCs" have the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

in fact abated.  Premature and frequent discontinuations of the rule's measures, as discussed below, would increase the risk of sizeable and disruptive surges and could undermine the message the Departments intend the rule to send, which is to discourage noncitizens from utilizing irregular migration and the services of smugglers and TCOs to enter the United States. In the IFR, the Departments explained that at 1,500 daily encounters between POEs, "DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries."  89 FR at 48752.  The Departments further explained that "[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained."  89 FR at 48749 n.248.  The changes made here further both purposes.

Requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters for 28 consecutive calendar days instead of one calendar day will guard against a circumstance in which the threshold for discontinuation is met solely due to a short-term, erratic decrease (such as a short-term holiday downturn[59] or a decrease due to an extreme weather event) that does not signal a meaningful reduction in overall migration pressures.  Such short-term decreases could force the provisions of the rule to trigger on and off more frequently, causing operational strain while also signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided by waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing. Moreover, if the Departments had opted for a substantially smaller number of consecutive days,

---

[59] Short-term decreases that are not associated with changes in the fundamental drivers of migration have been especially notable during the end-of-year holiday season.  From FY 2013 through FY 2024, SWB encounters fell by an average of 42 percent in the two weeks between December 23 and January 5, only to be followed by an average increase of 41 percent in the two weeks between January 5 and January 18.  *See* OHSS analysis of July 2024 Persist Dataset (USBP Encounters - Holiday Dip tab).  Although the January rebound was less dramatic in 2023 and 2024, this historic pattern suggests that if average encounters heading into the holidays are even as low as the mid-2000s— well above the intended threshold for discontinuation of emergency circumstances—a short-term decrease could push the 7-day average number of encounters below 1,500 even though the fundamental drivers of high levels of migration have not changed.  A metric based on a 7-day average would trigger a discontinuation of emergency circumstances in this scenario, but the likely January rebound means a 28-day metric would not.

there is a significant risk that the rule would deactivate due to a transient drop due to holidays, weather, or another cause, which can lead to several weeks of uncharacteristically low encounters. At the same time, a 28-day period is still a short enough period to ensure a timely response when an actual, sustained downturn occurs. The Departments have therefore decided that 28 days strikes an appropriate balance.

The Departments' experience since the IFR's implementation has informed their view that the limited changes made by this rule are necessary to provide greater assurance that a decrease is likely to be sustained and to guard against costly toggling of the rule when a brief decrease proves not to be sustained. For one thing, this experience highlights the risk that under an approach that looks only to a 7-consecutive-calendar-day average, the rule might discontinue even though a reduction is unlikely to be sustained. Comparing the week ending June 4, 2024, to the week ending August 31, 2024, the Departments observed (as expected) a significant decrease in encounters at the southern border, but Mexico's government reported a much smaller decrease in encounters within Mexico.[60] This trend suggests that even though the IFR has affected incentives for migrants to try to cross the U.S. border, migrants continue to travel towards the U.S. border in large numbers, and that even if the 7-consecutive-calendar-day average dropped below 1,500 encounters, that drop likely would not be sustained given the large and growing population of migrants in Mexico who could relatively quickly reach the U.S. border. Moreover, if the IFR's provisions did deactivate, that large and growing population in Mexico would be a ready target for smugglers and TCOs, increasing the risk of a surge following a discontinuation that does not reflect a truly sustained decrease in migration flows.

Adding this rule's 28-consecutive-day requirement reduces those concerns by providing for greater stability. With that change, the rule's provisions will not be discontinued unless there

---

[60] *See* OHSS analysis of data downloaded from UIP on September 3, 2024, and data provided by the Government of Mexico as of August 31, 2024 (Mexican Enforcement tab) (showing that comparing the week ending June 4, 2024, to the week ending August 31, 2024, total Mexican enforcement apprehensions dropped 19 percent, while total U.S. Border Patrol ("USBP") encounters dropped 48 percent).

has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days.  The Departments expect that this change, coupled with the IFR's 14-day waiting period after the Secretary makes the factual determination necessary to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy.  Although the Departments recognize that this change does not eliminate the risk of the rule discontinuing even when regional migration flows remain high, they assess that this rule's approach better balances this risk against this rule's purpose as an exceptional measure to address emergency border circumstances that should not apply when encounters have fallen for a sustained period.  The Departments further discuss later in this subsection why the rule's approach appropriately balances those considerations.

The Departments' concern is also consistent with some of the public comments received on the IFR.  For instance, one commenter remarked that some migrants had concluded that they should congregate near the border in preparation for the Proclamation and IFR's measures to discontinue.  Other commenters expressed concern regarding potential misunderstandings about the threshold for discontinuation.  Given the reality that a surge remains possible, the Departments seek to avoid a situation where the emergency measures in this rule are discontinued prematurely.

The Departments note that the existing 14-day waiting period before discontinuation once this threshold is reached will continue to help the Departments complete processing of noncitizens encountered during emergency border circumstances and to confirm that a sustained downward trend in encounters has been achieved.  *See* 89 FR at 48749 n.248.  At the same time, under the prior standard for discontinuation, a rapid shift between discontinuing and reactivating

the rule's provisions would remain possible.[61]  Such a shift would pose significant operational challenges.

Experience with the IFR suggests that rapidly switching between the rule's provisions discontinuing and reactivating would result in harmful operational burdens.  For instance, upon implementation of the Proclamation and IFR, the Departments had to prioritize processing of individuals encountered prior to June 5.  Therefore, USBP was unable to immediately maximize processing of the desired number of noncitizens through expedited removals.[62]  USBP took 6 days to ramp up processing for expedited removal under the IFR, from about 60 encounters processed under the rule on June 5 to about 1,500 on June 10, which was the first day that a majority of encounters were  processed for expedited removal under the rule.[63]  Similarly, USBP released an average of about 930 post-June 4 encounters per day between June 5 and June 17, including 8 days of over 1,000 releases, before releases fell to an average of about 510 per day between June 18 and August 31, including an average of about 410 per day in August.[64]  And although ICE repatriated approximately 38,500 single adults and members of family units from June 5 through July 31, 2024, only around 15,400 (40 percent) of them were encountered by USBP after June 4, 2024.[65]  The rest were pre-June 5th USBP SWB encounters and pre- and post-June 5th Office of Field Operations ("OFO") encounters (39 percent) or non-SWB encounters and interior enforcement (21 percent).[66]  USCIS did not complete its first credible

---

[61] From FY 2013 through FY 2019, there were 2,014 days where the 7-consecutive-calendar-day average of USBP encounters (including encounters of UCs from non-contiguous countries) was below 1,500.  OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).  Of those 2,014 days, 1,813 days (90 percent of the total) were also part of a period of time when the 7-consecutive-calendar-day average had remained below 1,500 for 28 consecutive days.  *Id.*  Thus, considering hypothetical lower-bound thresholds for the period FY 2013 through FY 2019, switching from the IFR's approach to this rule's approach would have reduced the number of below-threshold days by only 10 percent.  *Id.*  While it is too early in the post-IFR period to know the precise reduction in volatility it has brought about, requiring the 7-day average to remain below 1,500 encounters for 28 consecutive days may have a broadly similar effect.

[62] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[63] *Id.*

[64] *Id.*

[65] OHSS analysis of July 2024 Persist Dataset (IFR Ramp Up tab).

[66] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

fear interview under the IFR until June 9, 2024, and completed an average of about 20 interviews per day for the first two weeks after June 4, compared to an average of roughly 330 per day in the month of August.[67]  EOIR did not conduct its first review of an adverse credible fear determination under the IFR until June 11, 2024, and averaged approximately 9 reviews per day in the first 3 weeks after June 4 compared to an average of about 90 per day in August.[68]  The lag between the rule's activation and the Departments' ability to fully avail themselves of the rule's efficiencies means that when the provisions of the rule discontinue and then reactivate, the Departments' abilities to deliver timely decisions and consequences consistent with the rule's purpose may be unnecessarily impaired.

In addition, although the Departments continue to believe that the burden of shifting between applying this rule and the Circumvention of Lawful Pathways rule is warranted when there has been a sustained reduction in irregular migration, such a burden is much harder to justify in the context of a short-lived reduction in encounters followed by very high levels of encounters.  For instance, USCIS required time to provide training, procedures, and guidance to the field before its staff could process credible fear referrals under the IFR.  Additionally, EOIR required time to ensure IJs have sufficient docket capacity for any increase in credible fear reviews in response to any increased number of expedited removal cases.  EOIR also required time to provide training to IJs who conduct credible fear reviews or who adjudicate cases involving individuals who enter the United States while the Proclamation and rule are in effect.  To be sure, subsequent reactivation of the rule's measures will be easier given that the Departments' personnel will have become familiar with the rule's provisions.  Nonetheless, reactivation will always require resources and coordination within the workforce necessitating the need to ensure that discontinuations and reactivations do not occur with undue frequency.[69]

---

[67] *Id.*

[68] *Id.*

[69] The Departments acknowledge that they have not made a similar change to require 28 consecutive days of a 7-day average of encounters above 2,500 for the rule's provisions to be reactivated.  The absence of a similar requirement

The Departments have also determined that it is appropriate and necessary to include UCs from non-contiguous countries in the encounter calculations relevant to discontinuing and continuing or reactivating the provisions of this rule, in parallel with the changes made in the September 27 Proclamation.  Under the June 3 Proclamation and the IFR, the thresholds for such discontinuation and continuation or reactivation did not include encounters of such UCs.  But as some commenters on the IFR correctly noted, excluding such encounters results in an unrealistic assessment of the Departments' resources and capabilities.  All UCs (regardless of whether they came from a contiguous country or a non-contiguous country) require a greater proportion of resources to process and hold safely in CBP facilities and merit inclusion in the threshold calculations to accurately reflect this reality.  For example, UCs in CBP custody generally must be referred to the Department of Health and Human Services' Office of Refugee Resettlement and transferred to its care within 72 hours after determining that the noncitizen is a UC, absent exceptional circumstances.  8 U.S.C. 1232(b)(3); *see also* 6 U.S.C. 279.  Because of this, UCs are generally prioritized for processing in CBP facilities.  The processing and treatment of UCs also include a number of other unique legal and policy requirements, such as conducting a thorough screening for trafficking and any claims of fear of return.[70]  During their time in custody, UCs receive medical screenings and child-appropriate activities and humanitarian supplies.  They also must generally be held separately from unrelated adults, impacting CBP's holding capacity.  This means that DHS must expend resources to quickly process, refer, and transfer UCs to the Office of Refugee Resettlement's care.  This time-consuming and resource-intensive process must always be followed for UCs encountered at the southern border, regardless of whether emergency border circumstances are present.

---

prior to reactivation reflects the operational exigencies in a circumstance where there has been a 7-consecutive-calendar-day average of more than 2,500 encounters.  *See* 89 FR at 48749 n.248.  The Departments have determined that those operational exigencies require the rule's provisions to be reactivated and outweigh the resources and coordination that reactivation requires.

[70] *See* 8 U.S.C. 1232(a)(2)(A)(ii).

In addition, UCs who are nationals or habitual residents of a contiguous country may, in certain circumstances, be permitted to withdraw their applications for admission and voluntarily return to their respective countries of nationality or habitual residence.  *See* 8 U.S.C. 1232(a)(2). To determine whether such an outcome is permissible, such UCs are screened for indicators of trafficking or credible evidence that they are at risk of being trafficked upon return, whether they are able to make an independent decision to withdraw their applications, and whether they have any fear of return owing to a credible fear of persecution.  *See* 8 U.S.C. 1232(a)(2)(A), (a)(4). However, as a matter of longstanding policy, CBP screens all UCs—even those from non-contiguous countries—in this manner.

Because one of the primary purposes of the rule is to alleviate undue strain on the limited resources of the border security and immigration systems, the Departments found that they must consider the operational burden that results from all UC encounters at the border.  That is why UC encounters from all countries, not just from contiguous countries, should be considered by the Secretary when making a factual determination that average daily encounters at the southern border have exceeded or fallen below the requisite thresholds contained in the rule and the Proclamation.

Also informing the Departments' decision to reconsider the IFR's approach is that in recent months, encounters of UCs from non-contiguous countries have grown relative to other encounters.  That growth, which adds operational burdens separate from those inherent in the processing of individuals for expedited removal, increases the distorting effects of excluding these UCs.  Specifically, the Departments had observed from June 2023 through May 2024 that rates of encounters of UCs from non-contiguous countries had generally accounted for about 6.5 percent of total encounters of all non-contiguous nationalities, and comprised about 15 percent of encounters of nationals of El Salvador, Guatemala, and Honduras.[71]  However, while encounters

---

[71] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

of UCs from non-contiguous countries have decreased in absolute terms since June 2024, such encounters have not decreased in proportion with the decreases seen among single adults and individuals in family units. Rather, the UCs' share of total non-contiguous encounters has increased to 8.9 percent, including 24 percent of all encounters of nationals of El Salvador, Guatemala, and Honduras.[72] As a result, the share of total encounters attributable to UCs from non-contiguous countries increased from 4.6 percent from June 2023 to May 2024 to 6.4 percent from June 2024 to August 2024, and the share of all UCs increased from 6.2 percent to 9.4 percent.[73]

With the two changes just described, the rule will continue to serve the purposes that the IFR pursued from the start. First, the rule continues to target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered; Section III.D.1 of this preamble describes why the rule's thresholds continue to reflect those circumstances, accounting for the inclusion of UCs from non-contiguous countries.

Second, the rule will continue to deactivate when a decrease in encounters means that those emergency border circumstances no longer exist. Although the change to require that the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive days appropriately ensures that the rule does not deactivate prematurely, the rule will continue to deactivate where a decrease is likely to be genuinely sustained. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as natural disasters, economic changes, and political instability. However, the Departments believe, based on past experience, that the Departments may experience an average daily

---

[72] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab). While the monthly average single adult encounters fell 53 percent between June 2023May 2024 and June 2024August 2024, and the monthly average number of encounters of individuals in family units fell 69 percent, encounters of non-contiguous UCs fell just 42 percent, and encounters of UCs overall fell just 37 percent. *Id.*

[73] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam status tab).

encounter rate below 1,500 for 28 consecutive days.  In fact, from FY 2013 through FY 2019, the 7-consecutive-calendar-day USBP encounter average was below 1,500 encounters for 28 consecutive days 71 percent of the time.[74]  Even since the IFR was promulgated, encounters have dropped to levels indicating that the threshold in section 2(a) of the Proclamation will be met if migration dynamics change for a sustained period.  If, consistent with the June 3 Proclamation, one excludes UCs from non-contiguous countries, the Departments have observed 40 separate days between June 5, 2024, and August 31, 2024, with encounters within 15 percent of 1,500 (i.e., below 1,725).[75]  And if, consistent with the September 27 Proclamation, one includes such UCs, the Departments have observed 15 such days.[76]  These single-day figures suggest that the threshold for discontinuation, as revised, will be met if migration dynamics change for a sustained period.

## 2.  Clarifying Changes to Regulatory Text

This final rule also makes clarifying changes to the regulatory text.  In §§ 208.35(b)(2) and 1208.35(b)(2)(iii), the Departments removed from the definition of "reasonable probability" the clause: "that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal."  The Departments believe that the remaining definition of "reasonable probability"—"substantially more than a reasonable possibility, but somewhat less than more likely than not"—accurately defines the reasonable probability standard.  The deleted clause describes what the AO or IJ is assessing for rather than what the standard means, so it need not be part of the standard's definition.

## 3.  Other Technical Changes

---

[74] *See* OHSS analysis of July 2024 OHSS Persist Dataset (Trigger Analysis tab).  The Departments rely on data from FY 2013 through FY 2019 and not data from the pandemic period given the unique circumstances dictating migratory trends during the latter time.

[75] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters tab).

[76] *See id.*

The final rule also implements two technical changes. First, the rule replaces the term "alien" with "noncitizen" where it appears in 8 CFR 1208.35. *See* 8 CFR 1001.1(gg). Second, the rule amends 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) as well as the provisions of the Circumvention of Lawful Pathways rule at 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) to update the cross-references to the definition of "victim of a severe form of trafficking in persons." Specifically, the rule replaces the cross-references to 8 CFR 214.11 with cross-references to 8 CFR 214.201. This change recognizes that on August 28, 2024, after the Departments published the IFR, DHS's rule Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 89 FR 34864 (Apr. 30, 2024),[77] became effective, which moved the definition of "victim of a severe form of trafficking in persons" from § 214.11 to § 214.201. *See id.* at 34931–32.

## D. Rule Provisions

The rule contains the following key provisions:

- The rule applies to certain individuals who seek asylum, statutory withholding of removal, or CAT protection during emergency border circumstances giving rise to this rule and to the suspension and limitation on entry under the June 3 Proclamation, as amended by the September 27 Proclamation. *See* 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35.

- The rule establishes that those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute

---

[77] *See also* 89 FR 68081 (Aug. 23, 2024) (making corrections).

medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201.  *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a).  Exceptionally compelling circumstances may also be established for noncitizens in section 240 removal proceedings or the asylum merits interview ("AMI") process under specified conditions to ensure family unity.  *See* 8 CFR 208.35(c), 1208.35(c).

- The rule also establishes that, during emergency border circumstances, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the June 3 Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, and protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to their country or the country of removal.  *See* 8 CFR 235.15.

- The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet an exception.  Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the

Circumvention of Lawful Pathways rule.  The "reasonable probability" standard is defined to mean substantially more than a "reasonable possibility" but somewhat less than more likely than not.  8 CFR 208.35(b), 1208.35(b).

*E.  Severability*

As stated in 8 CFR 208.13(h), 208.35(b)(3), 208.35(e), 235.15(g), 1208.13(h), 1208.35(b)(4), and 1208.35(e), the Departments intend for the provisions of the rule to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the other provisions will remain in effect as to any other person or circumstance.[78] *See* 89 FR at 48757–59.  During emergency border circumstances, the Departments' abilities to refer and safely process noncitizens through expedited removal is overwhelmed and prevents the border security and immigration systems from delivering timely decisions and consequences to noncitizens arriving at the southern border.  *See* 89 FR at 48714.  Consequently, each provision of the rule is designed to function sensibly without the others, and the Departments intend for them to be severable so that each can operate independently.

For example, the Departments intend for the "reasonable probability" screening standard to be used—even in the absence of a limitation on asylum eligibility, the manifestation of fear procedures, or the Proclamation—to screen for statutory withholding of removal and CAT protection claims if a noncitizen was otherwise unable to establish a credible fear of persecution for asylum purposes due to the Lawful Pathways rebuttable presumption.  8 CFR 208.35(b)(3), 1208.35(b)(4); *see* 8 CFR 208.35(b)(2), (e), 1208.35(b)(2), (e), 235.15(g); 89 FR at 48757.  That approach ensures that, during emergency border circumstances, the Departments will continue to be able to benefit from the higher screening standard, even without the limitation on asylum eligibility this rule adopts.

---

[78] Courts have uniformly held that the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule."  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988).

To maintain operational flexibility, DHS similarly intends for manifestation of fear procedures under 8 CFR 235.15 to remain in effect, even without a limitation on asylum eligibility, the reasonable probability standard, or the Proclamation.  *See* 8 CFR 235.15(g).  As with the reasonable probability standard, allowing for the continued use of the manifestation of fear provisions absent the other portions of the rule or Proclamation ensures that such a tool remains available to the Departments during emergency border circumstances.

Finally, the Departments intend for the limitation on asylum eligibility to be severable from the manifestation of fear procedures, the reasonable probability standard, and the Proclamation because the limitation on asylum eligibility operates independently of those provisions and the Proclamation, and in the absence of those tools would likewise continue to be an important tool for addressing emergency border circumstances at the southern border.  *See* 8 CFR 208.35(e), 1208.35(e).

## III.  Public Comments and Responses

The Departments received 1,067 comments on the IFR, the majority of which expressed opposition.  A range of governmental and non-governmental entities, public officials, and private persons submitted comments.  The Departments summarize and respond to the public comments below.

### A.  Legal Authority and Background

### 1.  Legality Concerns

#### a.  General Comments on Domestic Law

*Comment:*  Commenters asserted that the rule violates domestic law and emphasized that U.S. law allows noncitizens to apply for asylum regardless of where they entered the United States.  Some commenters described a fundamental right to apply for asylum for anyone inside the United States and stated that analysis of an asylum application should focus on the applicant's reasonable fear of persecution rather than manner of entry, criticizing what a commenter characterized as a categorical exclusion of those "apprehended between ports of

entry from asylum eligibility, barring narrow exceptions." Commenters asserted that entering the United States either through a POE or across the southern border between POEs and asking for asylum constitutes a "lawful pathway." Other commenters stated that the Departments should not and cannot categorically deny asylum for reasons unrelated to the merits of the claim itself. One commenter claimed that the rule effectively closes the border and asserted that closing the border is unconstitutional.

Although some commenters agreed that the rule is within the scope of the Departments' authority and is consistent with the INA, other commenters claimed that the rule would violate the Refugee Act of 1980 and the INA, specifically section 208 of the INA, 8 U.S.C. 1158. Commenters claimed that the rule conflicts with the plain language of these provisions, which permit a noncitizen "physically present in the United States" to apply for asylum. Refugee Act of 1980, 94 Stat. at 105; INA 208(a)(1), 8 U.S.C. 1158(a)(1). Commenters asserted that the INA does not require those seeking protection to apply before entering or at a POE or to schedule an appointment through a website or app in order to make an application, but instead allows applications from anywhere along the border. Commenters also stated that, although Congress gave the Attorney General and the Secretary authority to impose additional limitations on asylum eligibility, such limitations must be consistent with legislation and congressional intent. Along the same lines, a commenter stated that the IFR undermines the separation of powers between Congress and the Executive Branch because it is Congress, not the Executive Branch, that enacts laws, and the IFR rewrites the INA.

*Response:* The Departments disagree that this rule is inconsistent with U.S. law or congressional intent. The rule does not effectively close the border, require the Departments to turn away migrants at the southern border, or categorically deny all asylum applications filed by noncitizens who enter the United States across the southern border. Nor does the rule prohibit any noncitizen from seeking protection solely because of the manner or location of their entry into the United States. Rather, the rule is a limitation on asylum eligibility, as authorized by

sections 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), and the

Departments' other discretionary authorities, *e.g.*, sections 103(a)(3), (g)(2), and 208(b)(1)(A) of

the INA, 8 U.S.C. 1103(a)(3), (g)(2), and 1158(b)(1)(A).  Given these authorities for the

Departments to act, the Departments disagree that the IFR (or the final rule) violates the principle

of separation of powers.

The rule's limitation on asylum eligibility does not prevent anyone from pursuing a claim

for asylum, nor does it categorically foreclose eligibility for asylum.  The Departments have

authority to impose limitations on asylum eligibility.  As explained above, the INA authorizes

the Secretary and the Attorney General to establish, by regulation, "additional limitations and

conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for

asylum."  INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C.

1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for

any other conditions or limitations on the consideration of an application for asylum not

inconsistent with [the INA]").  And section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A),

authorizes the Secretary or the Attorney General to grant asylum in their discretion.  The INA

also provides the Secretary and the Attorney General authority to publish regulations governing

their respective roles regarding apprehension, inspection and admission, detention and removal,

withholding of removal, deferral of removal, and release of noncitizens encountered in the

interior of the United States or at or between POEs.  *See* INA 103(a)(3), (g)(2),

235(b)(1)(B)(iii)(III), (B)(iv), (C), 241(a)(3), (d)(2)(B), 8 U.S.C. 1103(a)(3), (g)(2),

1225(b)(1)(B)(iii)(III), (B)(iv), (C), 1231(a)(3), (d)(2)(B); *see also* INA 208(b)(1)(A), 8 U.S.C.

1158(b)(1)(A).

Consistent with these authorities, the Departments have promulgated other limitations or

conditions on asylum eligibility, including some provisions that Congress later adopted and

codified in the INA.  *See* Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392,

37392 (June 2, 1980) (imposing firm resettlement bar); Aliens and Nationality; Asylum and

Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990)

(promulgating 8 CFR 208.14(c) (1990), which provided for mandatory regulatory bars to asylum

for those convicted in the United States of a particularly serious crime or those who constitute a

danger to the security of the United States while retaining a prior regulatory bar to asylum for

noncitizens who were firmly resettled in a third country prior to arriving in the United States);

Asylum Procedures, 65 FR 76121, 76134 (Dec. 6, 2000) (providing that an applicant does not

have a well-founded fear of persecution if they could avoid persecution by internally relocating);

*see also, e.g.*, *Afriyie v. Holder*, 613 F.3d 924, 934–36 (9th Cir. 2010) (discussing internal

relocation), *overruled on other grounds by Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th

Cir. 2017) (en banc); *Yang v. INS*, 79 F.3d 932, 935–36 (9th Cir. 1996) (holding that the

regulatory firm resettlement limitation was a permissible exercise of the Attorney General's

authority under the asylum statute).  Restraining the Departments' authority to promulgate

additional limitations and conditions on the ability to establish eligibility for asylum consistent

with section 208 of the INA, 8 U.S.C. 1158, would be contrary to Congress' intent that the

Departments' only constraint be that additional limitations and conditions are consistent with

section 208, 8 U.S.C. 1158, and "this chapter."   INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C.

1158(b)(2)(C), (d)(5)(B); *see also DHS v. Thuraissigiam*, 591 U.S. 103, 112 (2020) (recognizing

that the "theme" of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

("IIRIRA") "was to protect the Executive's discretion from undue interference by the courts"

(alteration and internal quotation marks omitted)); *R–S–C v. Sessions*, 869 F.3d 1176, 1187 (10th

Cir. 2017) (reasoning that the "delegation of authority" in section 208(b)(2)(C) of the INA, 8

U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of

section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444–

45 (1987); Circumvention of Lawful Pathways, 88 FR 11704, 11740 (Feb. 23, 2023).

       The rule is within the scope of the Departments' authority and does not conflict with the

statutory requirement that noncitizens "physically present in the United States" be permitted to

apply for asylum because it adds a limitation on asylum eligibility as permitted under section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B). The limitation is not a sweeping categorical bar that would preclude a grant of asylum solely based on manner of entry, which some courts have found to conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). *E.g.*, *East Bay Sanctuary Covenant v. Biden (East Bay III)*, 993 F.3d 640, 669–70 (9th Cir. 2021) (concluding that a prior regulation that enacted a bar on asylum eligibility for those who entered the United States between designated POEs was "effectively a categorical ban" on migrants based on their method of entering the United States, in conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)).

Under this rule—and contrary to commenter assertions—manner of entry alone is never dispositive. Rather, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Specifically, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established, or shown exceptionally compelling circumstances, when it is essential that noncitizens use such pathways to ensure the Government's ability to manage the border.

Limitations and conditions on asylum eligibility do not need to directly relate to whether a noncitizen satisfies the definition of a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A), but instead can embrace policy considerations that justify a finding of ineligibility. *See, e.g.*, *Zheng v. Mukasey*, 509 F.3d 869, 871 (8th Cir. 2007) (noting

that IIRIRA included several provisions, including the one-year bar, "intended to reduce delays and curb perceived abuses in removal proceedings"); *Ali v. Reno*, 237 F.3d 591, 594 (6th Cir. 2001) (recognizing that asylum law "was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives" (internal quotation marks and citation omitted)); *Matter of Negusie*, 28 I&N Dec. 120, 125 (A.G. 2020) (discussing the persecutor bar, and noting that Congress intended to make "certain forms of immigration relief," including asylum, "unavailable to persecutors"), *stayed by Matter of Negusie*, 28 I&N Dec. 399, 399 (A.G. 2021); *Singh v. Nelson*, 623 F. Supp. 545, 556 (S.D.N.Y. 1985) ("[A]ttempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories" of noncitizens who are not lawfully present.).

In sum, as with other conditions and limitations imposed by section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with meritorious asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that will overwhelm the Departments' ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. In seeking to enhance the overall functioning of the immigration system and to improve processing of asylum applications, the Departments are, in the exercise of their authority to promulgate limitations on asylum eligibility and in recognition of the limited resources provided by Congress, electing to implement a limitation on asylum eligibility that places greater weight on manner of entry. This limitation on asylum eligibility is expected to disincentivize irregular migration by those unlikely to establish exceptionally compelling circumstances during times when encounters exceed certain benchmarks and therefore challenge the Departments' ability to swiftly process single adults and individuals in family units encountered by USBP at the SWB through expedited removal. See Section II.A.2 of this preamble for further discussion of the Departments' experience with the IFR.

*Comment:*  Commenters claim that the rule violates the principles of non-refoulement and nondiscrimination in the Refugee Act and other U.S. laws.  Some commenters claimed the rule conflicts with congressional intent to create a uniform procedure for noncitizens applying for asylum regardless of manner of entry.

*Response:*  The Departments disagree that the rule conflicts with U.S. law or congressional intent.  The rule does not violate the principles of non-refoulement and nondiscrimination.  And the rule does not conflict with what commenters describe as a congressional intent to create a uniform procedure for noncitizens applying for asylum.  *See Cazun v. Att'y Gen. U.S.*, 856 F.3d 249, 258 (3d Cir. 2017).  The Departments may create additional substantive limitations and conditions on asylum eligibility—as Congress itself has done, and as Congress expressly authorized the Departments to do.  INA 208(b)(2)(A), (b)(2)(C), 8 U.S.C. 1158(b)(2)(A), (b)(2)(C).  Moreover, all noncitizens to whom the rule applies are subject to the same procedures for adjudicating their asylum claims as those who are not subject to the rule.  The United States has implemented its non-refoulement obligations through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (which is referred to as statutory withholding of removal) and the regulations implementing U.S. obligations under Article 3 of the CAT at 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, and 1208.18.  The INA's provision in section 208, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible.  *See, e.g.*, *Cardoza-Fonseca*, 480 U.S. at 441.

*Comment:*  Commenters asserted that, under *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987), manner of entry may not be the dispositive factor in deciding whether a noncitizen is eligible for asylum.  Similarly, commenters argued that *Matter of Pula* is binding precedent and precludes consideration of manner of entry over all other factors.  A commenter claimed that manner of entry can only be considered in determining whether a noncitizen merits asylum as a matter of discretion and not in determining whether the noncitizen is eligible for asylum.

*Response:*  The rule is consistent with historical consideration of manner of entry as a relevant factor in considering whether to grant asylum as a matter of discretion.  In *Matter of Pula*, the BIA identified—as relevant factors as to whether a noncitizen warrants the favorable exercise of discretion in granting asylum—the noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry"; whether they "passed through any other countries or arrived in the United States directly"; "whether orderly refugee procedures were in fact available to help" in any transit countries; and whether they "made any attempts to seek asylum before coming to the United States."  19 I&N Dec. at 473–74.  The BIA explained that section 208(a) of the INA, 8 U.S.C. 1158(a), required the Attorney General to establish procedures for adjudicating applications filed by any noncitizen, "irrespective of such alien's status," but the BIA did not preclude consideration of the manner of entry in assessing whether to grant asylum.  *Id.* at 473.  The BIA also stated that while the manner of entry could "be a serious adverse factor, . . . it should not be considered in such a way that the practical effect is to deny relief in virtually all cases."  *Id.* at 473.  The BIA cautioned against placing "too much emphasis on the circumvention of orderly refugee procedures" as "the danger of persecution should generally outweigh all but the most egregious of adverse factors."  *Id.* at 473–74.

While the Departments acknowledge that the rule places greater weight on manner of entry under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry.  Both how much weight to place on that factor and whether to do so in weighing asylum eligibility fall well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C).  *Cf. Lopez v. Davis*, 531 U.S. 230, 243–44 (2001) (government can rely on rulemaking to "resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority" (quoting *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991)); *Reno v. Flores*, 507 U.S. 292, 313 (1993) (noting that INS need not "forswear use of

reasonable presumptions and generic rules" even where the statute "requires some level of individualized determination" (citations and quotation marks omitted)).

Under this rule, manner of entry, standing alone, is never dispositive. Rather, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States has established when it is essential that noncitizens use such pathways to ensure the United States' ability to manage the border. And even during these situations, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

In line with *Matter of Pula*, then, the rule considers factors other than manner of entry. And, like *Matter of Pula*, this rule provides for consideration of manner of entry in assessing eligibility for some asylum seekers in "a way that the practical effect is" not "to deny relief in virtually all cases." 19 I&N Dec. at 473. Rather, the manner of entry reduces the availability of relief only in limited circumstances—during emergency border circumstances described in the Proclamation and this rule—and only for those unable to establish exceptionally compelling circumstances.

The Departments also recognize that the specific analysis discussed in *Matter of Pula* (considering manner of entry in the discretionary decision of whether to grant asylum) is distinct from how this rule considers manner of entry (as part of provisions governing asylum eligibility). *See* 19 I&N Dec. at 472. The Departments, in exercising their broad discretion to issue regulations adopting additional limitations on asylum eligibility, are not bound to consider

manner of entry only as a factor contributing to whether a particular noncitizen warrants a favorable exercise of discretion. While *Matter of Pula* allows manner of entry to be one factor in the consideration of whether a noncitizen merits a grant of asylum as a matter of discretion, it does not purport to restrict the Departments from considering a noncitizen's manner of entry in assessing eligibility. *Id.* at 473–74.

Moreover, while *Matter of Pula* considered manner of entry for purposes of a discretionary grant whereas the rule considers manner of entry as a limitation on asylum eligibility, adjudicators are not precluded from considering the same facts when evaluating both eligibility and discretion. Indeed, it is possible for a single fact to be relevant to both determinations. *See Kankamalage v. INS*, 335 F.3d 858, 864 (9th Cir. 2003) (concluding that a conviction did not render a noncitizen ineligible for asylum, but stating that the Board was "not prohibited from taking into account Kankamalage's robbery conviction when it decides whether or not to grant asylum as a matter of discretion"); *Matter of Jean*, 23 I&N Dec. 373, 385 (A.G. 2002) (concluding that even a noncitizen who "qualifies as a 'refugee'" and whose criminal conviction did "not preclude her eligibility" for asylum could nevertheless be "manifestly unfit for a *discretionary* grant of relief").

The Departments conclude that this rule does not conflict with *Matter of Pula*, which remains the applicable standard for discretionary determinations in the absence of a regulation that otherwise governs the discretionary determination. *See, e.g.*, *Thamotar v. U.S. Att'y Gen.*, 1 F.4th 958, 970–71 (11th Cir. 2021) (observing that discretionary asylum determinations continue to be governed by *Matter of Pula*); *Hussam F. v. Sessions*, 897 F.3d 707, 718 (6th Cir. 2018) (stating that "circumvention [of proper immigration procedures] may be taken into account as a 'serious adverse factor'" (quoting *Matter of Pula*, 19 I&N Dec. at 473)); *see also Andriasian v. INS*, 180 F.3d 1033, 1043–44 (9th Cir. 1999) (finding that reliance on certain *Matter of Pula* factors was inappropriate once regulations controlling discretionary denials of asylum on the basis of a petitioner's stay or opportunity to stay in a third country had been promulgated). And

the Departments view *Matter of Pula* as providing support for the proposition that it is lawful to consider manner of entry for asylum applicants.

### b.  Statutory Conditions and Limitations on Asylum Eligibility

*Comment:*  Commenters stated that the rule would be inconsistent with or would otherwise render superfluous the statutory firm-resettlement bar and safe-third-country bar.  *See* INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

*Response:*  This rule is within the Departments' broad authority to create new limitations on asylum eligibility, and the Departments disagree that the rule conflicts with any of the exceptions to a noncitizen's ability to apply for asylum or limitations on a noncitizen's eligibility for a grant of asylum under section 208(a)(2) or (b)(2) of the INA, 8 U.S.C. 1158(a)(2) or (b)(2).

The INA's firm-resettlement provision precludes a noncitizen who "was firmly resettled in another country prior to arriving in the United States" from demonstrating eligibility for asylum.  INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *see also* 8 CFR 208.15, 1208.15 (2020).[79]  The INA's safe-third-country provision prohibits a noncitizen from applying for asylum if the noncitizen "may be removed, pursuant to a bilateral or multilateral agreement" to a safe third country in which the noncitizen would not be subject to persecution and "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

The rule does not conflict with or otherwise render the firm-resettlement bar or safe-third-country bar superfluous; instead, this rule and the statutory bars apply independently.

First, this rule has a different scope.  In contrast to those statutory bars, this limitation on asylum eligibility only applies to those who enter the United States during emergency border circumstances.  *See* 8 CFR 208.35(a)(1), 1208.35(a)(1).  Additionally, unlike those who are

---

[79] These regulations were amended by *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 FR 80274 (Dec. 11, 2020), but the amendments were preliminarily enjoined.  *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 969 (N.D. Cal. 2021).  This order remains in effect, and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment—is currently effective.

subject to the firm-resettlement or safe-third-country bars, those who are subject to this limitation

on asylum eligibility are not categorically barred from applying for asylum or from being eligible

for asylum, as application of the rule's limitation on asylum eligibility will be considered on a

case-by-case basis, including to determine if exceptional circumstances apply to overcome this

limitation.

      The rule also serves a different purpose than those statutory bars.  The INA's firm

resettlement and safe-third-country provisions limit asylum eligibility and applications,

respectively, for noncitizens who have available sustained protection in another country, and

they help protect against forum shopping.  *See Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 55–56

(1971) (noting that the concept of firm resettlement is historically rooted in the notion of

providing "a haven for the world's homeless people" while encouraging "other nations to do

likewise"); *see also Maharaj v. Gonzales*, 450 F.3d 961, 988–89 (9th Cir. 2006) (en banc)

(O'Scannlain, J., concurring in part and dissenting in part) (recognizing that the firm-

resettlement provision protects against forum shopping, an issue "that our immigration laws have

long sought to avoid").  The limitation on asylum eligibility adopted in this rule, by contrast,

seeks to streamline the Departments' processing of noncitizens while upholding all screening and

protection requirements, thereby conserving limited resources during the emergency border

circumstances described in the Proclamation and this rule and allowing for enough resources to

continue to process lawful cross-border trade and travel and noncitizens who present in a safe

and orderly manner at a POE.  The rule is also designed to encourage noncitizens to use lawful,

safe, and orderly pathways to the United States during emergency border circumstances or to

wait until such circumstances have abated, to the extent possible.  Thus, the limitation has a

different object and purpose, and it is consistent with those statutory provisions.

      Moreover, the INA permits the Attorney General and the Secretary to create new

eligibility limitations and does not limit this authority from overlapping with existing statutory

conditions.  *See R–S–C*, 869 F.3d at 1187 (noting that Congress's delegation of authority in

section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of the right to seek asylum); *cf. Hawaii*, 585 U.S. at 690–91 (recognizing that the existence of the Visa Waiver Program "did not implicitly foreclose the Executive from imposing tighter restrictions" in "similar" areas).

Indeed, section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), provide no subject-matter limit other than requiring any regulation be "consistent with" section 208 of the INA, 8 U.S.C. 1158, and the INA generally. *See R–S–C*, 869 F.3d at 1187 n.9. The limitation on asylum eligibility established by this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a whole, and the INA generally, and it is consistent with the firm-resettlement and safe-third-country bars in particular.

*c. Expedited Removal*

*Comment:* Several commenters claimed that the rule conflicts with the expedited removal process created by Congress in IIRIRA. Commenters noted that the statutory framework provides for preliminary screening of noncitizens in credible fear interviews, where noncitizens may apply for asylum after demonstrating a "significant possibility" that the noncitizen could establish eligibility for asylum. In this regard, one commenter asserted that Congress had intended the "significant possibility" standard to be a "low screening standard," but that the IFR "would convert the preliminary screening into a full adjudication" of whether the IFR applied and would eliminate the "significant possibility" standard "entirely for all asylum seekers covered[,] . . . forc[ing] them to meet an even higher 'reasonable probability' standard." Commenters asserted that the rule's requirement that noncitizens instead show a "reasonable probability" of persecution or torture is in conflict with this statutory framework. Commenters further asserted that the rule effectively creates a new legal framework by which to

evaluate asylum claims in conflict with the statutory process.  One commenter claimed that the rule unlawfully shuts down the U.S. asylum system.

*Response:*  The Departments disagree that the rule conflicts with the expedited removal process created by Congress.  The expedited removal process is applicable to certain noncitizens arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation required for admission.  INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i).  Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution."  *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings.  *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B).  But Congress has not provided for such a screening for statutory withholding of removal or CAT protection.  In the absence of a statutory process for screening for potential eligibility for statutory withholding of removal and CAT protection, the Departments have also used the credible fear screening process to identify potentially valid claims for such protection.  *See generally* 8 CFR 208.30, 1003.42, 1208.30 (providing for screenings for potential eligibility for statutory withholding of removal and CAT protection alongside screening for potential asylum eligibility).  If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to an AO to determine whether the noncitizen has a credible fear of persecution or torture in the country of nationality or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 208.30(e)(2), 235.3(b)(4); *id.* 208.13(b)(1)–(2), 1208.13(b)(1)–(2) (defining the grounds for asylum

eligibility); *id.* 208.16(b)–(c), 1208.16(b)–(c) (defining the grounds for statutory withholding of removal and CAT protection).  A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum."  INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v).

Just as the statute is silent on the availability of screening procedures for statutory withholding of removal and CAT protection, it is also silent on the standard applied during such screenings.  By regulation, the Departments have applied the "significant possibility" standard to also screen for potential eligibility for statutory withholding of removal and CAT protection, *see* 8 CFR 208.30(e)(2)–(3), 1003.42(d): AOs must determine whether "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility . . . for withholding of removal under section 241(b)(3) of the Act," 8 CFR 208.30(e)(2), and whether the noncitizen "shows that there is a significant possibility that the alien is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17," 8 CFR 208.30(e)(3).  If the AO determines that the noncitizen does not have a credible fear of persecution or torture in the proposed country of removal, the noncitizen may request that an IJ review that determination.  *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.16(b)–(c), 208.30(g), 208.33(b)(2)(v), 1208.16(b)–(c), 1208.30(g).

To the extent commenters allege that the Departments are not applying the "significant possibility" standard to screen for asylum eligibility—such as for application of the limitation on asylum eligibility—the commenters are mistaken.  Under this rule, the AO or IJ determines whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet the exception for exceptionally compelling circumstances.  The "significant possibility"

standard applies by statute, section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v), and the regulation does not in any way displace that standard, by its terms or otherwise. The Departments did not explicitly include this language in the regulation itself. This is because the provisions regarding credible fear screenings at 8 CFR 208.35(b) and 1208.35(b)(2) generally explain the order of operations—instructing the AO or IJ to consider the limitation first before considering the rest of the asylum claim. In other rules adopting conditions and limitations on asylum eligibility, the Departments have consistently used the regulatory text to explain the order of operations for consideration of the limitations during credible fear screenings without explicitly restating the applicable statutory standard,[80] while at the same time explaining that the "significant possibility" standard applies in the preamble.[81] Deviating from the Departments' practice here could wrongly imply that, in other regulations pertaining to the credible fear process, the default standard of proof for AO and IJ determinations is something other than the "significant possibility" standard. To avoid that unwanted implication, the Department declines to modify the text of §§ 208.35 and 1208.35 as well. The "reasonable probability" standard does not affect or change the "significant possibility" standard used to screen for asylum eligibility, which, as discussed above, is set by statute and remains in effect for asylum claims in the

---

[80] For example, under the Circumvention of Lawful Pathways rule, "[t]he asylum officer shall first determine whether the alien is covered by the presumption . . . and, if so, whether the alien has rebutted the presumption[.]" 8 CFR 208.33(b)(1); *see also* 8 CFR 1208.33(b)(2) ("The immigration judge shall first determine whether the alien is covered by the presumption at 8 CFR 208.33(a)(1) and 1208.33(a)(1) and, if so, whether the alien has rebutted the presumption in accordance with 8 CFR 208.33(a)(3) and 1208.33(a)(3)."); *Asylum Eligibility and Procedural Modifications*, 84 FR 33829, 33843–45 (July 16, 2019) (interim final rule amending and adding provisions at 8 CFR 208.30(e)(5)(ii) through(iii), 1003.42(d)(2) and(3), and 1208.30(g)(1)(i) through (ii), providing the order of operations for applying two now-rescinded bars to asylum eligibility); 88 FR at 31319; *id.* at 31449 (adding amendatory instructions to remove regulatory provisions added to implement the bars to asylum eligibility adopted in two prior rules).

[81] *See, e.g.*, 89 FR at 48755 (explaining that, during the credible fear interview, "the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the [rule's] limitation on asylum eligibility"); *id.* at 48757–58 (discussing the application of the "significant possibility" standard under the rule during IJ review of a negative credible fear determination); 84 FR at 33837 ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear."); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 FR 55934, 55943 (Nov. 9, 2018) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

credible fear process.  Accordingly, the Departments disagree with the claim that the use of the "reasonable probability" standard for the purposes of screening for potential eligibility for statutory withholding of removal and CAT protection would eliminate, or in any way affect, the "significant possibility" standard as it applies to screening for asylum eligibility.

The Departments also disagree that the rule's application of the "reasonable probability" standard to screen for potential eligibility for statutory withholding of removal or CAT protection is inconsistent with the "significant possibility" standard under the expedited removal statute.  As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications."  88 FR at 11742.  Section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening standards and procedures are to be employed in determining potential eligibility for statutory withholding of removal or CAT protection, and the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions.  *See, e.g.*, INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2).  Accordingly, the Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and CAT protection.  As further discussed in Section III.C.3 of this preamble, the Departments continue to believe that during the emergency border circumstances described in the IFR and this rule, the "reasonable probability" screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection and better captures the population of noncitizens with potentially valid claims for such protection. *See* 89 FR at 48745–47.

Thus, despite the claims of some commentators, the rule does not effectively shut down the U.S. asylum system or deviate from applicable statutory standards.  Noncitizens still may seek asylum and protection in the United States.

### d.  General Comments on International Law

*Comment:*  Commenters generally asserted that the rule violates international law.  A commenter wrote that seeking asylum is a human right guaranteed by international law and the rule unjustly denies people this right.  In this regard, a commenter asserted that the use of emergency border circumstances as a justification for promulgating the rule is insufficient to justify violating international law and that the lack of a time frame or sunset provision denies access to migrants seeking asylum and places them at risk of refoulement.  Commenters claimed that the rule imposes prohibited penalties on asylum seekers, bars refugees from a path to citizenship, and impermissibly discriminates based on manner of entry, race, and nationality.  A commenter stated that regulations that deny access to asylum based on arbitrary factors that do not relate to a person's status as a refugee are inconsistent with the Refugee Convention and that the United States has an obligation under the Convention to provide a "fair and efficient refugee status determination procedure" to individuals in the U.S. asylum process.

Commenters were concerned that the rule violates the United States's non-refoulement obligations under the Refugee Convention (through the Refugee Protocol) and Article 3 of the CAT.  For example, commenters predicted many noncitizens would not be able to satisfy the comparatively higher standards of proof for statutory withholding of removal and CAT protection claims and that, in turn, would lead to the refoulement of persons who, if not for the rule's limitation on asylum eligibility, would have been granted asylum.  Several of these commenters also asserted that statutory withholding of removal and CAT protection are insufficient to satisfy the United States's non-refoulement obligations because they afford lesser protection than asylum.  Commenters expressed apprehension that the rule would result in the turning away of migrants who seek refuge at the southern border.

Another commenter wrote that the rule is consistent with U.S. commitments under the Refugee Protocol and the CAT, reasoning that neither is self-executing and therefore the United States is bound only by its own law implementing these treaties.  The commenter acknowledged

that the United States implements its non-refoulement obligations through the withholding of removal statute at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). Another commenter, however, asserted that the argument that asylum is discretionary under U.S. law and therefore the rule does not violate the Refugee Protocol is incorrect as a matter of international law, even if true under domestic law, because parties to the Refugee Convention must provide asylum and protection from refoulement to those who meet the definition of "refugee."

*Response:* This rule is consistent with the United States' international treaty obligations. Three primary documents govern the rights of refugees and corresponding obligations of states in international law: the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. 88 FR at 31384. Together, these documents provide a framework for states to provide protection to noncitizens fleeing persecution or torture and establish the principle of non-refoulement, which prohibits states from returning refugees to territories in specific circumstances. *Id.*

These treaties, however, do not prescribe or impose any particular minimum procedures for implementation of non-refoulement obligations. Although the United States is a party to the 1967 Refugee Protocol[82] and the CAT, these treaties are not directly enforceable in U.S. law. *See INS v. Stevic*, 467 U.S. 407, 428 & n.22 (1984); *Al-Fara v. Gonzales*, 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011) (explaining that the CAT "is non-self-executing and thus does not itself create any rights enforceable in U.S. courts"). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations. The Refugee Convention's non-refoulement obligation is contained in Article 33.1, which prohibits contracting states from returning a

---

[82] *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 169 n.19 (1993) ("Although the United States is not a signatory to the [1951 Refugee] Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951." (citation omitted)).

refugee to a territory "where his life or freedom would be threatened" on account of an enumerated ground. 19 U.S.T. at 6276, 189 U.N.T.S. at 176. The United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. *See Cardoza-Fonseca*, 480 U.S. at 429, 440–41. The CAT's non-refoulement provision is in Article 3, which prohibits the return of a person to a country where there are "substantial grounds for believing" the person will be tortured. S. Treaty Doc. No. 100-20 at 20, 1465 U.N.T.S. 85, 114. The United States has implemented its obligations under Article 3 of the CAT through regulations. *See* FARRA, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681–761, 2681–822 (codified at 8 U.S.C. 1231 note); *see also, e.g.*, 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18. The rule does not change or limit ultimate eligibility for statutory withholding of removal or CAT protection. Instead, applicants subject to the rule's limitation on asylum eligibility will be screened for potential eligibility for statutory withholding of removal and CAT protection under a "reasonable probability" standard, which is lower than the ultimate statutory or regulatory standard of proof for those forms of protection.

The rule will limit asylum eligibility for some noncitizens. But, as the Supreme Court has explained, asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34[,]" which provides that contracting countries "shall as far as possible facilitate the assimilation and naturalization of refugees." *Cardoza-Fonseca*, 480 U.S. at 441 (quoting Refugee Convention art. 34, 19 U.S.T. at 6276, 189 U.N.T.S. at 176); *see also* United Nations High Commissioner for Refugees ("UNHCR"), *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 16 para. 25 (2019 ed.) ("[T]he granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol"). Article 34 "is precatory; it does not require the implementing authority actually to grant asylum

to all those who are eligible." *Cardoza-Fonseca*, 480 U.S. at 441. Because the limitation on

asylum eligibility does not affect ultimate eligibility for statutory withholding of removal or

protection under the CAT regulations, the rule is consistent with U.S. non-refoulement

obligations under the Refugee Protocol (incorporating, among other things, Article 33 of the

Refugee Convention) and the CAT. *See R–S–C*, 869 F.3d at 1188 n.11 (explaining that "the

Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to

countries where the alien will experience persecution—is given full effect by the Attorney

General's withholding-only rule"); *Cazun v. Att'y Gen. U.S.*, 856 F.3d 249, 257 & n.16 (3d Cir.

2017); *Ramirez-Mejia v. Lynch*, 813 F.3d 240, 241 (5th Cir. 2016).

      The Departments agree that asylum is an important form of protection and acknowledge

that the right to seek asylum has been recognized under the Universal Declaration of Human

Rights ("UDHR"), art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). The UDHR is a

nonbinding human rights resolution of the UN General Assembly, and thus it does not impose

legal obligations on the United States. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 734–35

(2004) ("[T]he [UDHR] does not of its own force impose obligations as a matter of international

law.").

      Moreover, although the rule creates a limitation on eligibility for asylum, the rule does

not bar those seeking asylum from taking part in procedures that protect them from refoulement.

Under the rule, all noncitizens processed for expedited removal who manifest a fear of return,

express an intention to apply for asylum or protection, or express a fear of persecution or torture

or a fear of return to their country or the country of removal are referred for a credible fear

interview. Even in those cases where the AO determines that the noncitizen has not established a

significant possibility that they could ultimately demonstrate by a preponderance of the evidence

that they are not subject to the limitation on asylum eligibility or are excepted from it, the

noncitizen may still demonstrate credible fear by showing a reasonable probability of persecution

or torture. Similarly, even if found ineligible for asylum by an IJ due to the application of the

limitation on asylum eligibility, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

The rule is also consistent with the Refugee Convention and the corresponding obligations under international law, including the specific provisions cited by commenters. The rule does not violate the nondiscrimination requirement in Article 3 of the Refugee Convention. Article 3 prohibits discrimination on the basis of "race, religion or country of origin." 19 U.S.T. at 6264, 189 U.N.T.S. at 156. The rule does not discriminate on the basis of any of the protected characteristics described in Article 3. This rule is limited to the southern border because that is the U.S. border where emergency circumstances exist. The Departments acknowledge that this limitation will affect those noncitizens with easier access to the southern border and not those with easier access to other borders of the United States. However, the rule does not treat such noncitizens differently on that basis; the rule applies equally based on the actions of a noncitizen during emergency border circumstances. Specifically, the application of this rule is limited to those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances. For the same reason, the rule does not violate other antidiscrimination principles described in other international human rights treaties, including the International Convention on the Elimination of All Forms of Racial Discrimination, arts. 2–5, Dec. 21, 1965, T.I.A.S. No. 94-1120, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights, arts. 2–3, Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171.

Similarly, the rule is consistent with Article 31.1 of the Refugee Convention, which prohibits states from "impos[ing] penalties" on refugees based on "illegal entry or presence" if such refugees are "coming directly from a territory where their life or freedom was threatened" and "present themselves without delay to the authorities and show good cause for their illegal entry or presence." 19 U.S.T. at 6275, 189 U.N.T.S. at 174. As the commentary to the Refugee

Convention explains, the term "penalties" in Article 31.1 refers "to administrative or judicial convictions on account of illegal entry or presence, not to expulsion."  UNHCR, *The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary by Dr. Paul Weis* 219, *https://www.unhcr.org/us/media/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul-weis*; *see Cazun*, 856 F.3d at 257 & n.16 (rejecting argument that the reinstatement bar on asylum was a "penalty" within the meaning of Article 31.1).  The rule does not change any rules or policies relating to detention or convictions for unlawful entry or presence.  The Departments acknowledge that the Ninth Circuit concluded in *East Bay III*, 993 F.3d at 674, that the bar to asylum at issue in that case violated Article 31.1 of the Refugee Convention because it imposed a "penalty."  As described in the IFR, the rule here does not create a categorical bar to asylum, but instead a limitation on asylum eligibility, and *East Bay III* accordingly does not address the lawfulness of this rule.  89 FR at 48735.  Moreover, the Ninth Circuit's conclusion was erroneous because the denial of discretionary relief is not a penalty within the meaning of Article 31.1.  *Id.* at 48736.

*Comment:*  One commenter asserted that the IFR conflicts with the United States Supreme Court's decisions in *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804), which generally states that ambiguous U.S. statutes should be interpreted to avoid conflicts with international law where possible, and *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987), which explained that "one of Congress' primary purposes" when passing the Refugee Act of 1980 "was to bring United States refugee law into conformance with the 1967 [Refugee Protocol]."

*Response:*  The Departments disagree with the commenter that the IFR conflicts with *Charming Betsy* or *Cardoza-Fonseca*.[83]  As explained above, the rule is consistent with the United States' obligations under international law, specifically the Refugee Convention, the

---

[83] For purposes of this response, the Departments assume *arguendo* that the *Charming Betsy* canon applies with respect to non-self-executing treaties.  *See, e.g.*, *Saleh v. Bush*, 848 F.3d 880, 891 n.9 (9th Cir. 2017) (noting that the question remains unsettled).

Refugee Protocol, and the CAT.  The rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection and is consistent with the United States' non-refoulement obligations.  Moreover, the rule does not prohibit any person from seeking asylum or, more importantly for purposes of U.S. non-refoulement obligations, from seeking or obtaining statutory withholding of removal or CAT protection.  All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview.  Even in cases in which the AO determines that the noncitizen is subject to the limitation on eligibility for asylum, the noncitizen may still receive a positive credible fear determination by showing a reasonable probability of persecution or torture.  Similarly, after applying for asylum before an IJ, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

### e.  UNHCR Guidelines on International Protection

*Comment:*  Commenters stated that the rule violates UNHCR statements and guidelines and the right to seek asylum guaranteed by Article 14 of the UDHR.  Commenters also claimed that the pre-screening procedures in expedited removal proceedings are contrary to UNHCR guidelines and that adjudicators must instead provide full and individualized assessments of each asylum case.

*Response:*  The Departments agree that asylum is an important protection in international law and acknowledge that the right to seek asylum has been recognized under article 14 of the UDHR.  However, the UDHR is a nonbinding human rights resolution of the UN General Assembly and does not impose legal obligations on the United States.  *See Sosa*, 542 U.S. at 734–35 ("[T]he [UDHR] does not of its own force impose obligations as a matter of international law.").  Moreover, UNHCR's interpretations of, or recommendations regarding, the Refugee Convention and Refugee Protocol are "not binding on the Attorney General, the BIA, or United States courts."  *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999).  UNHCR's Handbook on

Procedures and Criteria for Determining Refugee Status "itself disclaims such force, explaining

that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is

incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Id.* at 427–

28 (quoting *Cardoza-Fonseca*, 480 U.S. at 439 n.22). Such guidance "may be a useful

interpretative aid," *id.* at 427, but it does not impose obligations on the United States.

*Comment:* Commenters stated that the rule violates the Refugee Convention because the

exclusion grounds in Article 1(F) of the Refugee Convention are exhaustive, yet the rule creates

an exclusion ground not found in Article 1(F). The commenters acknowledged that the rule's

limitation on asylum eligibility contains an exception but asserted that the exception is

insufficient to comply with the Refugee Convention. Along the same lines, a commenter

asserted that such exclusionary grounds should only be considered after an assessment of

whether the noncitizen is a "refugee" and be balanced against the need for protection itself, as is

the order of procedures in a full merits hearing.

*Response:* The Departments disagree with the commenters' characterization of the

limitation on asylum eligibility in this rule as a ground of exclusion like those in Article 1(F) of

the Refugee Convention. Article 1(F) of the Refugee Convention provides that the provisions of

the Convention "shall not apply to any person with respect to whom there are serious reasons for

considering that" they have: (1) "committed a crime against peace, a war crime, or a crime

against humanity"; (2) "committed a serious non-political crime outside the country of refuge

prior to [their] admission to that country as a refugee"; or (3) "been guilty of acts contrary to the

purposes and principles of the United Nations." As explained above, the United States has

implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through

the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3),

rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. This rule's

limitation on asylum eligibility does not extend to statutory withholding of removal and therefore

does not implicate the application of the Convention's exclusion grounds to the mandatory non-

refoulement obligation of Article 33. *See R–S–C*, 869 F.3d at 1188 n.11 (explaining that "the

Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to

countries where the alien will experience persecution—is given *full effect* by the Attorney

General's withholding-only rule" (emphasis added)). Nor does the rule restrict who qualifies as

a refugee. *Cf.* INA 101(a)(42), 8 U.S.C. 1101(a)(42) (excluding those who "ordered, incited,

assisted, or otherwise participated in the persecution of any person on account of" a protected

ground from the "refugee" definition); UNHCR, *UNHCR Statement on Article 1F of the 1951*

*Convention* at 1 (July 2009), *https://www.unhcr.org/us/media/unhcr-statement-article-1f-1951-*

*convention* (providing that the exclusion grounds "exclude a person from being a refugee where

there are serious reasons for considering that she/he has committed certain heinous acts").

       In any event, the exclusion clauses of Article 1(F) of the Refugee Convention do not limit

the United States from adopting additional or different limitations on asylum eligibility.

Congress has implemented Article 1(F) in establishing mandatory bars to eligibility for statutory

withholding of removal. *See* INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B). Congress adopted

certain parallel bars to asylum eligibility, *see, e.g.*, INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A),

but also authorized the Departments to establish additional limitations on asylum eligibility, *see*

INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As discussed earlier in this preamble, the asylum

statute implements the precatory provision in Article 34 of the Convention, but neither the

mandatory nor the precatory provisions of the Convention and Protocol are directly enforceable

in U.S. law. *See Stevic*, 467 U.S. at 428 & n.22; *Al-Fara*, 404 F.3d at 743 ("The 1967 Protocol is

not self-executing, nor does it confer any rights beyond those granted by implementing domestic

legislation." (citations omitted)). Instead, the United States has implemented its obligations

through domestic legislation and implementing regulations, and the Protocol "serves only as a

useful guide in determining congressional intent in enacting the Refugee Act." *Barapind v.*

*Reno*, 225 F.3d 1100, 1107 (9th Cir. 2000) (citations omitted). Thus, the Refugee Protocol does

not circumscribe the United States' prerogative to establish limitations on asylum eligibility that extend beyond the exclusion grounds described in Article 1(F).

### f.  2000 Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children

*Comment:*  A commenter stated that the rule conflicts with the United States' obligations under the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2237 U.N.T.S. 319 ("Trafficking Protocol"), and the Trafficking Victims Protection Act of 2000 ("TVPA"), 22 U.S.C. 7101 *et seq.*, because the rule will not prevent human trafficking and will instead drive trafficking networks further underground and make people more vulnerable to exploitation.  The commenter stated that the reality of human movement and escape from harm will drive people to take other routes and reported that they had handled cases involving individuals who were mistreated after being forced to take on large debts to pay smuggling networks to seek safety in the United States.  The commenter also claimed the rule will exacerbate violent crime, which increases asylum seekers' vulnerabilities to trafficking.

*Response:*  The Departments disagree that the rule conflicts with U.S. obligations under the Trafficking Protocol or the TVPA.  At the outset, the Departments note that the Trafficking Protocol is separate from the Refugee Convention and Refugee Protocol; the Trafficking Protocol explicitly disclaims any impact upon those agreements or on the non-refoulement principle they contain.  *See* Trafficking Protocol art. 14(1) ("Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including . . ., in particular, where applicable, the 1951 Convention and the 1967 Protocol relating to the Status of Refugees and the principle of non-refoulement as contained therein.").

In addition, the rule is consistent with the Trafficking Protocol and TVPA.  Nothing in the IFR or the rule is implicated by or conflicts with the provisions of the Trafficking Protocol, none of which relate to limitations on asylum eligibility.  Moreover, the IFR and this rule remain

in line with the purpose of the Trafficking Protocol in protecting and assisting the victims of human trafficking,[84] as they specify that any person who can demonstrate by a preponderance of the evidence that they are a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.201 will thereby show exceptionally compelling circumstances, and will therefore not be subject to the rule's limitation on asylum eligibility.  Similarly, the IFR and this rule are entirely consistent with the TVPA, which provides immigration relief to certain victims of a severe form of trafficking in persons who assist law enforcement (or meet certain exceptions), Pub. L. No. 106-386, sec. 107(e), 114 Stat. 1464, 1477, but does not otherwise implicate immigration authorities under title 8.

Regarding the commenter's concerns about smuggling and trafficking, the Departments believe the most helpful approach to prevent migrants from falling victim to smugglers and traffickers is to both discourage attempts to enter the United States irregularly and, ultimately, to increase the availability of lawful pathways for migration.

This rule is expected to continue to reduce irregular migration, which benefits human smuggling and trafficking organizations.  The rule is also expected to reduce human trafficking and smuggling by reducing overall flows of migrants, thereby allowing the Departments to better manage their limited resources while delivering consequences more swiftly through expedited removal for those without a legal basis to remain.  *Id.* at 48762, 48766–67.

Moreover, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals.  *Id.* at 48744.  They are trained to identify potential trafficking victims or victims of crimes and to take appropriate follow up action.  *Id.*  The commenter's prediction that the rule may increase asylum seekers' vulnerabilities to trafficking is speculative and ignores CBP immigration officers' training and experience in combating and preventing human trafficking.  Additionally, without this rule,

---

[84] Trafficking Protocol art. 2.b, 2237 U.N.T.S. at 344.

incentives for irregular migration would likely increase, which would likely exacerbate the very vulnerabilities about which the commenter expressed concern, including by driving more migrants into the hands of human traffickers promising a pathway to the United States. *See id.* at 48714–15.

Regarding the commenter's concerns about the safety of noncitizens attempting to enter the United States, one cause of recent surges in irregular migration is smugglers and migrants' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. *Id.* at 48714. The Departments assess that the IFR has significantly increased the ability to deliver timely decisions and consequences, combating contrary messaging and perceptions. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. Additional discussion of the rule's incentive effects is found at Sections III.A.2 and III.B.2 of this preamble.

2. Justification and Statements on Need for the Rule

*a. Rule Is Unjustified, Unsubstantiated, or Arbitrary*

*Comment:* Several commenters argued that the Departments' reliance on the success of the Circumvention of Lawful Pathways rule to justify the IFR is erroneous because the evidence regarding the high levels of encounters at the border does not support implementing such "extreme" measures as those contained in the IFR. One commenter stated that the Departments cannot argue that the Circumvention of Lawful Pathways rule has been successful at alleviating the stress on the border and immigration systems while at the same time arguing that the measures in the IFR are needed to address the surge in high levels of migration at the southern border. Another commenter argued that (1) the increase in encounters prior to the end of the Title 42 public health Order does not necessarily mean that encounters would have remained high after the Title 42 public health Order ended, and (2) it is implausible that the Circumvention of Lawful Pathways rule led to higher encounters prior to its implementation and lower encounters after its implementation, as most migrants did not know what the Circumvention of

Lawful Pathways rule was before it was implemented.  Thus, the commenter claimed, it is more likely that the end of the Title 42 public health Order was the reason for higher encounters prior to its end and lower encounters after its end.  The commenter concluded that, as there is insufficient evidence to support the asserted success of the Circumvention of Lawful Pathways rule, a fundamental justification of the IFR, it is not justifiable to institute more stringent processes under the IFR.

Another commenter similarly took issue with the effectiveness of the Circumvention of Lawful Pathways rule, stating that it is well understood that the Title 42 public health Order drove border crossings to record highs, and the end of the Title 42 public health Order would therefore have led to a substantial decrease in border crossings without further policy changes.  However, the commenter said the Departments claimed, without any evidence, that crossing levels under the Title 42 public health Order were somehow predictive of crossing levels after the Title 42 public health Order ended; the commenter said this assertion is contrary to the record.

*Response:*  The Departments disagree with commenters' claim that there is not enough evidence demonstrating the Circumvention of Lawful Pathways rule's impact on encounters at the SWB.  In the first month following the implementation of the Circumvention of Lawful Pathways rule, encounters between POEs along the SWB decreased by 69 percent compared to their peak just before the end of the Title 42 public health Order.[85]  The Departments believe that overall encounters would not have decreased after the end of the Title 42 public health Order absent their implementation of policy changes, including the Circumvention of Lawful Pathways rule, to address the level of irregular migration.  The Departments agree with commenters that the Title 42 public health Order increased repeat crossing attempts, but as noted in the Circumvention of Lawful Pathways rule, repeat crossings were a contributing factor, but not the

---

[85] *See* Decl. of Blas Nuñez-Neto ¶ 13, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176-2).

only reason, for the increase in overall encounters: for example, unique encounters with nationals of countries outside of Mexico and Northern Central America were also rising also increased in each of FYs 2022–2024, as compared with the pre-pandemic period.[86]  In addition to the overall increase in encounters and unique encounters, several other factors caused the Departments to project a spike in average daily encounters in the run-up to the end of the Title 42 public health Order, including: (1) the prospect that DHS would no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order; (2) the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere; (3) the unprecedented recent growth in migration from countries of origin not previously typically encountered; (4) the already large number of migrants in proximity to the SWB; and (5) the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order.  *See* 89 FR at 48723; *see also* 88 FR at 31316. Consistent with their projections, the Departments planned for, and briefly observed, a very significant spike in average daily encounters.  *See* 89 FR at 48723.  Had these levels of migration persisted without the incentives put in place by the Circumvention of Lawful Pathways rule, encounters may have exceeded even the very high levels of irregular migration that the Departments observed under that rule.  *See id.* at 48723–24.  The Departments believe the Circumvention of Lawful Pathways rule mitigated the overall impact on the border security and immigration systems that would have been caused by an expected surge following the end of processing under the Title 42 public health Order.  This is evidenced by the sharp initial drop CBP saw in overall encounters at the SWB in the weeks following the expiration of the Title 42 public health Order and when the Circumvention of Lawful Pathways rule went into effect.[87]

---

[86] Unique USBP SWB encounters of nationals of countries other than Mexico and Northern Central America were more than 30 times higher in each of FY 2022-FY 2024 (through May 2024) than in the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset (USBP Encounters by Citizenship tab).

[87] Average daily CBP SWB encounters fell 68 percent from their May 12, 2023, level in the first 11 days after the CLP rule went into effect and remained at similar low levels throughout May and June 2024.  OHSS analysis of July 2024 OHSS Persist Dataset (Encounters FY2000-2024 tab).

Instead of seeing a surge of migrants arriving at the border following the end of the Title 42 public health Order, there was a precipitous drop that lasted through June 2023.[88]  At about the same time DHS assessed, and public reporting confirmed, that DHS messaging about the Circumvention of Lawful Pathways rule and associated measures were effective in dissuading potential migrants from attempting to cross the U.S. border due to the disincentives created by that rule.[89]

The Departments recognize that while the Circumvention of Lawful Pathways rule is a valuable tool available to the Departments to reduce irregular migration, it is not, by itself, able to mitigate all the factors influencing migration trends.  Despite the success of the Circumvention of Lawful Pathways rule and complementary measures, for much of the immediate post-pandemic period until issuance of the IFR, border encounters remained higher than the Departments' abilities to consistently deliver timely decisions and consequences.[90]  Therefore, even if the evidence supporting the Circumvention of Lawful Pathways rule's success was inconclusive (which the Departments do not believe), the Departments would have adopted the

---

[88] *Id.*  In July 2023, total monthly CBP SWB encounters remained below 200,000.  While total encounters increased from August 2023 through December 2023, the same increase occurred between August 2022 and December 2022 while the Title 42 public health Order was still in place, suggesting that these surges are more consistent with seasonal migration trends that changes in U.S. immigration policy cannot unilaterally mitigate.  *Id.*

[89] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush*, Wash. Post (May 12, 2023), *https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/; see also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted*, PBS (May 11, 2023), *https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted*; Decl. of Blas Nuñez-Neto ¶ 22, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176-2); *Testimony of Blas Nuñez-Neto Before U.S. House of Representatives Committee on Homeland Security Subcommittee on Border Security and Enforcement on "Examining DHS' Failure to Prepare for the Termination of Title 42"* (June 6, 2023), *https://www.congress.gov/118/meeting/house/115908/witnesses/HHRG-118-HM11-Wstate-Nuez-NetoB-20230606.pdf*.

[90] Total daily SWB encounters averaged about 5,700/day in April and May 2024 and USBP SWB encounters averaged about 4,100/day, compared to averages of 1,600 and 1,300/day, respectively, in the pre-Pandemic period (OHSS analysis of July 2024 Persist Dataset (Encounters FY2000-2024 tab).  In late 2023, while the Title 42 public health Order was in place, total encounters at the SWB reached all-time highs.  OHSS's analysis of July 2024 Persist Dataset (Encounters FY2000-2024 tab) shows that total SWB encounters reached over 242,000 in November 2023 and over 301,000 in December 2023.  Total SWB encounters for the month of May 2023 were approximately 207,000.  This was the month the Title 42 public health Order ended and when the Circumvention of Lawful Pathways rule went into effect.  Total SWB encounters for the following month (June 2023) dropped precipitously to 145,000 encounters, but total SWB encounters climbed back to 233,000 in August 2023 and remained at highly elevated levels through December 2023.

IFR in response to the high number of migrants subsequently arriving at the southern border, overwhelming the Departments' resources and preventing them from delivering timely decisions and consequences to those who lack a lawful basis to remain.

The rule is a tailored approach designed to substantially improve the Departments' abilities to process noncitizens more expeditiously and deliver timely decisions and consequences to most noncitizens who cross between POEs into the United States during emergency border circumstances. As discussed in Section II.A.2 of this preamble, the IFR is working as intended. DHS is placing into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB, the rule has reduced the percentage of noncitizens encountered at the SWB who are released, and DHS is more quickly removing a greater percentage of those without a legal basis to remain in the United States than during the immediate post-pandemic period, which in turn discourages additional crossings.[91] Since promulgating the IFR, USBP has placed 59 percent of noncitizen single adults and individuals in family units encountered at the SWB into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order,[92] and 41 percent in the pre-pandemic period.[93]

---

[91] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP August 6, 2024, for encounters since May 1, 2024 (Summary Statistics tab). For encounters under the IFR through July 31, 2024, 34 percent of bookouts of single adults and individuals in family unit were releases, compared to 64 percent in the immediate post-pandemic period. Thirty percent of bookouts from CBP custody were repatriations, up from 16 percent during the immediate post-pandemic period. Overall, DHS repatriated an average of approximately 1,370 noncitizens encountered at the SWB per day during the first two months of enforcement under the IFR, up from approximately 1,360 in the immediate post-pandemic period. *Id.* This marginal increase understates the actual impact of the IFR, however, given the sharp drop in encounters: repatriations of noncitizens encountered at the SWB as a share of SWB encounters were equivalent to 26 percent in the immediate post-pandemic period compared to 62 percent under the IFR—a rate that is also slightly higher than the pandemic period (58 percent, only 5 percent of which were title 8 repatriations) and the pre-pandemic period (61 percent, at a time of much lower encounters and when Mexicans and Northern Central Americans accounted for over 90 percent of USBP encounters). *Id.* For public reporting suggesting that migrants are aware of the IFR and that it has discouraged attempts to cross into the United States irregularly, see Mariana Martínez Barbra & Caterina Morbiato, *US Border Policy Spurred Migrant Camps Hundreds of Miles Away in Mexico's Capital*, Associated Press, Sept. 1, 2024, *https://apnews.com/article/mexico-migrants-asylum-cbp-app-camps-22b49fabf6e4d7d25d2873d0637544fe*.

[92] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab).

[93] *Id.*

While more noncitizens without a legal basis to remain in the United States were removed under the Circumvention of Lawful Pathways rule than in the pre-pandemic period, the Departments recognize that the volume of noncitizens arriving at the SWB remained beyond the Departments' capacity to timely process given the resources provided by Congress.[94]  As explained in the IFR's preamble, once the Departments resumed widespread processing under their title 8 authorities, it became clear that, even with the Circumvention of Lawful Pathways rule's expanded measures to impose consequences along the SWB, substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to meaningfully address the historic levels of encounters at the southern border. *See* 89 FR at 48713.

The Departments did not and have not represented that the Circumvention of Lawful Pathways Rule would singlehandedly resolve migratory pressures in the region; the Departments only represent that it would reduce the number of daily encounters at the SWB that, absent intervention, were predicted to materialize in a post-Title 42 public health Order surge.  The pre-IFR status quo of the broken immigration and asylum systems had become a driver for irregular migration throughout the region and an increasingly lucrative source of income for dangerous TCOs.  *See* 89 FR at 48714.  Without adequate countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.  *See id.*  All of these factors, taken together, pose significant threats to the safety and security of migrants exploited into making the

---

[94]  OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab).  Although sustained high encounter rates outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers in the immediate post-pandemic period, between May 12, 2023, and June 4, 2024, CBP placed into expedited removal an average of about 920 individuals encountered between POEs each day on average, and USCIS conducted more than 206,000 credible fear interviews, a record number.  *Id.* Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 796,000 noncitizens who did not have a legal basis to remain in the United States, the vast majority of whom crossed the SWB.  *Id.*  USBP encounters at the SWB decreased by 16 percent compared to the previous 12 months, to an average of 5,100 per day for the period from May 12, 2023, to June 4, 2024, *id.*, and border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule and complementary measures.  April 2023 OHSS Encounter Projection.

dangerous journey to the SWB and the U.S. communities through which many such migrants transit.  *See id.* at 48715.

Moreover, the Departments do not expect the Circumvention of Lawful Pathways rule or this rule to solve every migration problem in the region.  Its provisions cannot account for every factor impacting the unprecedented level of migration occurring in the Western Hemisphere, which is why the Departments have instituted complementary measures such as creating lawful, safe, and orderly pathways.  Thus far, as discussed in Section II.A of this preamble, this rule has demonstrated that it helps meet its goal of allowing the Departments to deliver timely decisions and consequences during emergency border circumstances.

*Comment:*  Several commenters argued that the rule's characterization of the situation at the border as an "emergency" is arbitrary.  Commenters took issue with the rule's use of the daily encounter thresholds to identify the existence of emergency border circumstances.  One commenter argued that the circumstances that give rise to "emergency border circumstances" and so trigger the provisions of the rule have been met for quite some time and are not a uniquely emergent circumstance but a reflection of an increase in migration globally.  Another claimed that rather than starting with an assessment of need, looking at the number of asylum seekers and the capacities of other countries in the region, the Departments began with the current level and allocation of resources in the United States and "work[ed] backwards from there."

Commenters also argued that the rule is arbitrary because it invokes emergency authority while simultaneously asserting that border crossings are down.  One commenter argued that the existence of this emergency is undercut by an almost 50 percent drop in unauthorized border crossings since December 2023, a period during which the Departments' threshold has nonetheless been met.  Citing to a statement in Section III.B.2 of the IFR's preamble, a commenter stated the Departments "concede" that the rule was based on a fear of a future emergency rather than a current one.

Finally, one commenter wrote that if a unilateral declaration of an emergency is all that is required for a Federal agency to violate statutes and court decisions, then the Executive Branch could call everything an "emergency." The commenter claimed that the IFR's limitation on asylum eligibility violates section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), and is indistinguishable from prior regulations that imposed limitations on asylum eligibility that some courts have held unlawful. The commenter also claimed that the rule violates section 235 of the INA, 8 U.S.C. 1225, because it conditions a noncitizen's access to a credible fear interview on the ability to obtain a CBP One appointment. The commenter argued that labeling the situation at the southern border an emergency does not allow the Departments to disregard these statutes and court decisions.

*Response:* The Departments disagree that the numerical encounter thresholds are arbitrary and do not reflect the existence of "emergency" circumstances at the southern border. As explained in the IFR, emergency border circumstances exist when "encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States." 89 FR at 48711. Thus, an emergency border circumstance is a function of high levels of encounters combined with resource constraints that substantially limit DHS's ability to place eligible noncitizens into expedited removal, the primary consequence-delivery mechanism Congress has made available to the Departments for managing border encounters under title 8. *Id.* at 48714. When southern border encounters exceed DHS's ability to process noncitizens for expedited removal, DHS generally must release those noncitizens pending section 240 removal proceedings, a process that can take several years to conclude. *Id.* The comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against the irregular migration of noncitizens without strong claims for asylum, and this disincentive is diminished when noncitizens are placed into section 240 removal proceedings, which may take several years to conclude.

Given the resources made available by Congress, the Departments determined that the daily encounter thresholds described in the June 3 Proclamation and this rule are a reasonable proxy for when such emergency border circumstances exist. *See* 89 FR at 48749–54. Specifically, when daily encounters average less than 1,500 for a sustained period, DHS anticipates that it "would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries." *Id.* at 48752. In contrast, when daily encounters exceed 2,500, "DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level." *Id.* For example, as noted in the IFR, during the FY 2013 to FY 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, an average of 210 individuals were released each day in months in which daily encounters were between 1,500 and 2,500, while approximately 1,300 individuals were released each day in months in which daily encounters exceeded 2,500, with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.* (footnote omitted). And as discussed below in Section III.D.1 of this preamble, the Departments' demonstrated capacity during the immediate post-pandemic period confirms that these thresholds reflect current operational capacity. If Congress provides significant additional resources, the Departments may then reevaluate whether the current thresholds still serve as a reasonable proxy for when such emergency border circumstances exist.

Relatedly, the Departments disagree with commenters' suggestion that it was arbitrary to rely on the United States' own processing capacity and challenges as a justification for the rule without any consideration of the capacities of other countries in the region to address heightened migration. The Departments acknowledge that since 2021, due to political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, which have severely strained the capacities of immigration systems in countries throughout the region. *See* 89 FR at 48722. The United States Government has been working to

address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[95] including by working closely with partner countries across the Western Hemisphere.[96]  The Departments do not believe it would be appropriate to defer this rulemaking until foreign partners have developed enough capacity to absorb all irregular migrants, or to measure whether an emergency exists at the southern border by reference to whether such migrants have what commenters would view as sufficient opportunities to resettle elsewhere. Instead, the rule is part of the United States' efforts to act as a regional leader in responding to increased migratory flows.  *See* Section III.E.1.a of this preamble.  Moreover, the rule is structured to complement those regional efforts, as success in reducing push factors and in promoting alternatives to migration to the United States would contribute to decreasing encounter levels and alleviating emergency border circumstances.  The rule permissibly responds to existing challenges at our southern border by providing effective safeguards that improve the Departments' ability to enforce the United States' immigration laws during periods of heightened migration by creating an incentive for noncitizens to use the lawful, safe, and orderly pathways that the Departments have put in place while simultaneously imposing swift consequences on those who do not have a legal basis to remain in the United States.  *See* Section II.A.2 of this preamble.  And this ability to impose consequences quickly, combined with a historic expansion of lawful pathways, is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region.  *See id*. at 48759–60.

The Departments further note that the United States Government is working with regional partners in a concerted and historic effort via the groundbreaking Los Angeles Declaration on Migration and Protection to address the shared challenge of irregular migration that has strained

---

[95] *See, e.g.*, The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[96] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala*.

the resources of countries throughout the region.[97]  The United States has taken steps to address

migratory flows throughout the region by encouraging foreign partners to increase their

enforcement efforts, integrate migrants residing in their territories, expand lawful pathways and

processes, and channel intending migrants into those pathways.[98]  The United States is also

working to address the root causes of migration, such as a lack of opportunity, poor government

and corruption, crime, and violence in countries across the region and the world.[99]  However,

these measures will take time to have significant impacts and have not been in effect long

enough to alleviate the stress that high encounters impose on the United States border security

and immigration systems.  *See id.* at 48727.  In the face of these challenges to the United States'

own border and immigration systems, however, the Departments believe that it is appropriate to

act at the southern border while pursuing efforts to address the root causes of migration more

broadly.

Second, the Departments disagree that, prior to implementation of the IFR, there had not

been emergency circumstances at the southern border.  During the immediate post-pandemic

period, average daily encounters were at levels that significantly exceeded the Departments'

capacity to impose consequences on most noncitizens who crossed irregularly at the southern

border.[100]  As the June 3 Proclamation explains, the border security and immigration systems are

badly strained and have been for many years.  89 FR at 48490.  DHS processing facilities

frequently become overcrowded, forcing DHS to release into the United States noncitizens who

---

[97] *See* The White House, *Press Release: Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[98] *Id.*

[99] *See* Marcela X. Escobari, *FPC Briefing: Migration Policy and the Biden-Harris Administration's Root Cause Strategy* (June 22, 2023), *https://www.state.gov/briefings-foreign-press-centers/migration-policy-and-the-biden-harris-admins-root-causes-strategy; see also* The White House, *Fact Sheet: Strategy to Address the Root Causes of Migration in Central America* (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-strategy-to-address-the-root-causes-of-migration-in-central-america/.*

[100] OHSS analysis of July 2024 OHSS Persist Dataset (Summary Statistics tab) (reflecting that average daily encounters were over 5,100 per day during the immediate post-pandemic period).  From May 12, 2023 through June 4, 2024, USBP referred a daily average of about 860 individuals encountered at the SWB into the expedited removal process.  *See id.* (Imm Post-Pandemic ERCF tab).

could otherwise be processed for expedited removal, and place them into section 240 removal

proceedings, the resolution of which can take years given the pre-existing backlog.  By the end

of the first half of FY 2024, despite EOIR being on pace to complete a record number of cases

during FY 2024 and DHS maximizing expedited removal as much as resources allow, EOIR had

received over 1 million initial receipts, some of which could have been processed for expedited

removal had there been sufficient resources to do so, increasing the pending caseload before

EOIR to over 3.1 million cases.[101]  The Departments believe that releasing individuals who may

otherwise be referred for expedited removal may inadvertently incentivize increased irregular

migration and the exploitation of the asylum system, especially by human smugglers who

encourage migrants to claim fear once they are encountered by USBP as it will allow them to

remain in the United States for years pending resolution of their case and, where appropriate,

removal.  88 FR at 31326.  Moreover, maximizing credible fear screening capacity pulls

resources away from USCIS processing cases in the affirmative asylum backlog, which had

reached over 1.25 million cases as of the third quarter of FY 2024.[102]  This vicious cycle is

exactly the circumstance to which the rule is responding.[103]  The decrease in encounter levels

after December 2023 was not an indication that emergency border circumstances had abated or

the IFR was not warranted, because encounters remained well above the daily encounter

thresholds that, as described above, the Departments determined reflect the existence of

emergency border circumstances.[104]  *See* 89 FR at 48752.  That DHS had anticipated an increase

---

[101] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline*.  Initial receipts equal removal, deportation, exclusions, asylum-only, and withholding only cases.

[102] USCIS, *Asylum Division Monthly Statistics Report: Fiscal Year 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx*.

[103] 89 FR at 48489 ("Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border.  The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.").

[104] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024.

in migration absent the IFR was not a concession that the rule was unnecessary. Rather, that projection reflected the urgent need to take immediate action, without which encounters would have increased, and the emergency border circumstances that existed at the time that the IFR was issued would have continued to worsen. *See* 89 FR at 48726. Given that daily encounters persistently remain above 1,500—and could rise above 1,500 again, even if they decline for a time—the IFR is currently and will remain an important policy tool.

Finally, the Departments disagree with one commenter's suggestion that the Departments are characterizing the situation at the southern border as an emergency to avoid complying with their legal obligations under the INA and certain court decisions. The commenter is incorrect because the rule is fully compliant with relevant provisions of the INA and applicable judicial decisions. For the reasons discussed in Section III.A.1 of this preamble, the rule is fully consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). Moreover, for the reasons discussed in Section III.C.1.a.i. of this preamble, the Departments also disagree that the rule conditions noncitizens' access to the credible fear process on the ability to obtain CBP One appointments in violation of section 235 of the INA, 8 U.S.C. 1225. Finally, for the reasons discussed in the IFR, *see* 89 FR at 48735–39, and Section III.A of this preamble, the Departments disagree with commenters' comparison between this rule and prior regulatory actions imposing a limitation on asylum eligibility that some courts have ruled unlawful.

*Comment:* Several commenters argued that the Departments justified the rule using mischaracterizations of asylum grant rates resulting from positive credible fear determinations. Commenters took issue with the Departments' reference to a "small proportion" of noncitizens in the credible fear process who are likely to be granted asylum, stating that the Departments

---

(Encounters FY2000-2024 tab). With the exception of the pandemic period (March 2020 – May 2023), total SWB encounters for January 2024 and for FY 2024Q2 were the highest for the month of January and for Quarter 2 of the fiscal year since FY 2000, including over 4,000 average daily USBP encounters in January and nearly 5,000 in February (CBP SWB Encounter FY 2000-24 tab and Encounters FY2000-2024 tab). *See also* OHSS analysis of July 2024 OHSS Persist Dataset (USBP Encounters - Holiday Dip tab) (showing that encounters tend to dip immediately after each New Year before increasing again by the end of January).

artificially deflated the grant rate by including cases where there was no decision on the merits—such as cases where the asylum application was withdrawn or not adjudicated, or the case was administratively closed—in calculating the proportion of cases where asylum was granted. Commenters argued that "'the majority of people who establish a credible fear of persecution are granted asylum' when their asylum claim is adjudicated," quoting a statistic claiming that 55 percent of noncitizens whose cases were decided on the basis of their asylum claim after a positive credible fear determination were ultimately granted asylum in FY 2022 and 2023.

Commenters said that the EOIR denial rate in cases originating from a credible fear claim is an unreliable indicator of meritless asylum claims because a denial could result from factors that have nothing to do with the underlying merits of the case, including: noncitizens' lack of timely access to counsel, translation issues, noncitizens' lack of familiarity with the statutory 1-year bar to filling an asylum application after entering the United States, and the significant discretion provided to IJs by law.

One commenter took issue with the Departments' claim that an increase in positive credible fear determinations was evidence that meritorious asylum claims were still making it through the initial screening process, saying that those subject to the Circumvention of Lawful Pathways rule's presumption of ineligibility for asylum are three times more likely to receive negative credible fear determinations than individuals not subject to the presumption. The commenter said it has documented examples of individuals subjected to the Circumvention of Lawful Pathways rule in expedited removal who were wrongfully ordered removed or refouled, outcomes that the commenter stated will only become more frequent under the IFR. The commenter concluded that the available evidence makes clear that many, if not most, people subject to the IFR will have plausible, or even grantable, claims for humanitarian relief.

A commenter alleged that the Departments' focus on the gap between historical credible fear interview screen-in rates and asylum grant rates is "willfully blind to reality." The commenter stated that the Departments "simply ignore the fact that," even before the IFR, such

screen-in rates had declined dramatically, and that historical asylum grant rates were for a population of people seeking asylum that, by the IFR's own admission, looked very different—and included many more single Mexican men seeking to work—than the current population of people seeking asylum. The commenter further objected that the Departments' focus on the gap between screen-in rates and merits rates ignores the fact that credible fear interviews are intended to be evaluated at a lower standard; according to the commenter, a screening interview is not, and cannot be, a merits adjudication.

*Response:* The Departments disagree that they have mischaracterized the data related to the percentage of EOIR asylum grants in cases originating from the credible fear process. The data consistently show that only a small percentage of cases referred for section 240 removal proceedings before EOIR after a credible fear determination ultimately result in a grant of asylum.[105]

In the IFR, the Departments noted that from FY 2014 through FY 2019, of the total SWB encounters with positive credible fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n. 219. The Departments included the underlying data in the IFR docket.[106] The Departments acknowledge that the denominator includes cases where there was no decision on the merits of the asylum claim, such as, for example, applications that were withdrawn or not adjudicated, or where the case was administratively closed, terminated, or dismissed.[107] The Departments disagree, however, that this approach is misleading. The cited statistic demonstrates that the number of noncitizens who are placed in section 240 removal proceedings after the expedited removal process greatly exceeds the number of noncitizens who are ultimately granted relief or protection. Even if one

---

[105] *See, e.g.*, EOIR, Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline*; *see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results Tab)

[106] *See* OHSS Data Spreadsheet Data for Securing the Border IFR, tab 219 (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003*.

[107] *See id.*; *see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

excludes cases involving termination, dismissal, or administrative closure as well as in absentia removal orders, DHS and EOIR data show that from 2014 through 2019, of the total SWB encounters referred to EOIR after being processed for expedited removal, only 33 percent of EOIR case completions ultimately resulted in a grant of relief on the merits.[108]  The rate increases slightly to 36 percent if the "relief rate" is defined as all EOIR findings of non-removability and grants of asylum, statutory withholding of removal, CAT protection, cancellation of removal, and adjustment of status, divided by the sum of those grants and removal orders not issued in absentia.[109]  Whether one uses the 18 percent, 33 percent, or 36 percent figure, the data demonstrate that historically there is a significant disparity between positive credible fear findings and ultimate grants of relief in section 240 removal proceedings.[110]

The Departments disagree with the statistical approach presented by at least one commenter who claimed that the majority of people (55 percent in FY 2023 and 2024) who establish a credible fear are ultimately granted asylum when their asylum claim is adjudicated. The commenter seems to have arrived at this statistic by dividing the number of asylum grants by the total number of grants and denials from a chart provided on EOIR's website.[111]  But the EOIR chart also demonstrates that a large percentage of completed cases resulting from a positive credible fear determination involve noncitizens who never filed asylum applications once placed in section 240 removal proceedings or who abandoned or withdrew their applications.[112]  The Departments believe that it is inaccurate to exclude these cases in assessing

---

[108]  Relief on merits rate is defined as EOIR grants of asylum, conditional grants of asylum, or adjustment of status under statutory provisions divided by the sum of those grants of relief plus removal orders not issued in absentia. OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[109]  *See id.*

[110]  *See id.*

[111]  *See* Human Rights First, Correcting the Record: The Reality of U.S. Asylum Process and Outcomes (Nov. 2023) *https://humanrightsfirst.org/wp-content/uploads/2023/11/US-Asylum-process-and-outcomes-Fact-Sheet_Nov-2023.pdf* (citing EOIR, *Adjudication Statistics: Asylum Decisions and Filing Rates in Cases Originating with a Credible Fear Claim* (Oct. 12, 2023), *https://www.justice.gov/eoir/page/file/1062976/download*).

[112]  *See, e.g.*, EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline* (last visited Sept. 2, 2024).

the disparity between positive credible fear findings and ultimate relief because the noncitizens in these cases did not actually pursue an asylum claim during section 240 removal proceedings even though the opportunity to pursue such a claim was the sole reason they were placed in section 240 removal proceedings rather than being removed on an expedited removal order. Instead, relying on the most recent version of the EOIR chart cited by the commenter, if one includes these cases, which are numerous, in the denominator (and excludes cases where the asylum application was not adjudicated or the case was administratively closed), the ultimate grant rates for cases reflect a much smaller percentage than commenter's representation of the ultimate asylum grant rate. As EOIR's adjudication statistics reflect, the asylum grant rates of cases completed by EOIR in FYs 2022 and 2023 that originated with a credible fear claim were just 23 percent and 18 percent, respectively.[113]

The Departments cited these data to demonstrate the general point that there is a significant disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings, which can take years to resolve. *See* 89 FR at 48743 n.219 (noting that from FY 2014 through FY 2019, of the total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief). That reality, as well as the length of time it can take before a removal takes place after a removal order is final, creates a strong incentive for some number of migrants without potentially meritorious claims to make the dangerous journey to the southern border to claim fear in order to take their chances on being allowed to remain in the United States for a lengthy period. And that risk is magnified by Congress's failure to provide the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during periods of high encounters. The rule's limitation on asylum eligibility is intended in part to

---

[113] *See id.*

reduce this incentive and encourage migrants with meritorious asylum claims to use the lawful,

safe, and orderly pathways that the United States Government has provided.  *See* 89 FR at

48732.

      Regarding commenters' concerns that the data cited include noncitizens whose asylum

applications may have been denied for reasons unrelated to the meritoriousness of their

underlying claim—such as noncitizens' lack of access to counsel, translation issues, noncitizens'

lack of knowledge about the one-year bar, and IJ discretion—the Departments disagree that these

potential issues would undermine the Departments' reliance on DHS and EOIR data to

demonstrate the disparity between positive credible fear determinations and ultimate relief in

section 240 removal proceedings.  The factors cited by commenters exist in the absence of the

rule and are not impacted by the rule.  Furthermore, the Departments' procedures aimed at

mitigating these concerns remain unchanged and are expected to continue mitigating those

concerns.  For example, all AOs are trained to elicit testimony and, even with this rule's changes

to the credible fear screening process, the type of information sought to be elicited during a

credible fear interview and IJ review is generally well within a noncitizen's knowledge, such that

having an attorney is not necessary to secure a positive outcome.  *See* Section III.B.2.a.ii of this

preamble.  USCIS also has language access policies in place to ensure that noncitizens have an

interpreter for a language they understand during credible fear interviews and procedures to

address interpretation and rare language issues.  *See* 8 CFR 208.30(d)(5).  Additionally, EOIR

provides interpreters for noncitizens in section 240 removal proceedings.[114]  Those long existing

procedures remain in place under this rule.  Nor have any of the procedural requirements for

filing an asylum application changed, including the requirement that noncitizens must generally

file their application within one year of their arrival in the United States, *see* section 208(a)(2)(B)

of the INA, 8 U.S.C. 1158(a)(2)(B), and must show that they should be granted relief in the

---

[114] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6,
2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

exercise of discretion. *See Delgado v. Mukasey*, 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum.").

The Departments agree that credible fear screenings are not meant to mirror ultimate merits adjudications and that, by design, these screenings will result in some noncitizens being screened in who ultimately are not granted asylum or protection. However, the number of noncitizens who are granted asylum or other protection following a screening necessarily reflects the effectiveness of those screenings; the gap between the screen-in rate and the rate of those granted asylum or other protection matters. With a screening standard that is more likely to identify meritorious claims, the Departments expect to see a higher share of screened in noncitizens ultimately granted relief or protection. While a credible fear screening in the expedited removal process takes place shortly after entry into the United States, the ultimate adjudication of an asylum (or other protection) claim may be months or years later. The outcome of the screening compared with the outcome of the asylum application's ultimate adjudication on the merits is an important measure of the credible fear interview's effectiveness at ensuring that meritorious asylum claims proceed in the application process because only cases that could be viable should continue on in the process.

Finally, the Departments acknowledge that, as with all screening mechanisms, there is some risk under the rule that a meritorious case might not proceed to a credible fear screening or a merits adjudication. The Departments believe that during emergency border circumstances, the rule's provisions strike an appropriate balance, and that the rule's benefits outweigh any potential marginal increase in the likelihood that a meritorious case would be missed or would fail under the rule's procedures, as discussed in more detail in Section III.C.3 of this preamble. The Departments reiterate that nothing in this rule prevents a noncitizen from raising a fear claim. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of

return to their country or the country of removal are referred for a credible fear interview.  For the reasons discussed in Section III.C.2 of this preamble, DHS believes that the manifestation standard will continue to provide noncitizens with an adequate opportunity to seek relief and protection in the United States.  Moreover, under the rule, those referred for a credible fear screening will continue to have an opportunity to have their claims assessed by an AO in a non-adversarial interview and will be able to seek IJ review of the AO's decision.  Although many noncitizens may be subject to the limitation on asylum eligibility under this rule, during the credible fear interview and IJ review (if elected), they will still be screened for potential eligibility for statutory withholding of removal and CAT protection.  In sum, as explained in the IFR, the Departments expect that these provisions will continue to produce accurate outcomes, although the Departments believe that the rule continues to be necessary and appropriate to address emergency border circumstances even if this expectation turns out to be misplaced in close cases.  89 FR at 48750 n.250.

Indeed, as discussed in Section II.A.2 of this preamble, the Departments believe that the IFR is working to reduce the gap between high rates of referrals and screen-ins and the historically low percentage of those who are ultimately granted protection or relief, while still providing noncitizens with opportunities to raise and have their claims considered.  The Departments believe that the difference between the positive credible fear rate during the pre-pandemic period and the rate under the IFR is attributable to the rule's limitation on asylum eligibility and the higher "reasonable probability" screening standard for statutory withholding of removal and CAT claims, which, as the Departments explained in the IFR, is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

*Comment:* At least one commenter argued that the IFR is arbitrary and capricious because the Departments impermissibly use the availability of pathways not related to asylum or humanitarian relief as justification for reducing asylum access. The commenter stated that the availability of lawful pathways is not a factor that Congress intended the agencies to consider as a basis for limiting asylum.

*Response:* The Departments disagree with the assertion that the rule impermissibly relies on the availability of lawful, safe, and orderly pathways to reduce access to asylum. As an initial matter, the Departments note that the primary purpose of the rule's temporary limitation on asylum eligibility is to reduce the daily number of entrants by discouraging irregular migration during periods when the border security and immigration systems are over capacity and unable to effectively process noncitizens through expedited removal. *See* 89 FR at 48731–32. Because section 3(b)(v)(D) of the Proclamation contains an exception for arrivals at the SWB under a process approved by the Secretary, and because this rule's limitation on asylum eligibility excepts those who are described in section 3(b) of the Proclamation, the limitation will also not apply to such arrivals. *See id.* at 48754. In this way, the Proclamation and the rule continue to maintain incentives for noncitizens seeking protection to use the safe, lawful, and orderly process that the United States has provided. *See id.* at 48730–31 (stating that "applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration pathways, or not undertake the dangerous journey north to begin with"); *see also id.* at 48754 (explaining that the rule "provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways"). Indeed, the use of such pathways and tools to access those pathways, like the CBP One app, is critical for promoting efficient border processing especially during emergency border circumstances. *See id.* at 48737 ("During emergency border circumstances [the] use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources." (citations omitted)); *see also* 88 FR at 31317–18 (explaining the benefits of having noncitizens pre-

schedule appointments using the CBP One app).  However, contrary to the commenter's claim, the rule does not impose a limitation on asylum eligibility based solely on the availability of such pathways.  Rather, the rule's limitation applies to noncitizens who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation.  *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a).  And even during these situations, the rule provides an exception for noncitizens (including those who do not use the lawful, safe, and orderly pathways) who demonstrate exceptionally compelling circumstances.  *See* 8 CFR 208.35(a)(2), 1208.35(a)(2).

In any event, Congress did not preclude the Departments from considering a noncitizen's use of lawful pathways and processes as a factor when establishing conditions and limitations on asylum.  As described in Section III.A.1.a of this preamble, in *Matter of Pula*, the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for discretionary asylum determinations, 19 I&N Dec. at 472–73, and this rule merely takes such circumvention into account to determine eligibility.  And exactly how much weight to put on that factor and whether to do so in weighing asylum eligibility falls well within the broad discretion conferred by section 208 of the INA, 8 U.S.C. 1158, including section 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).  For the reasons discussed in Section III.A.1 of this preamble and in the IFR, *see* 89 FR at 48733–38, this rule's limitation on asylum eligibility is consistent with the statute, a proper exercise of the Departments' authority, and distinguishable from the prior regulations that some courts have found invalid.

*Comment:*  One commenter disagreed with the Departments' assertion that the IFR will undermine TCOs' ability to incentivize migrants to utilize irregular migration methods.  The commenter argued that the IFR will instead have the opposite effect of forcing many migrants to use irregular routes, thus strengthening the organized smuggling operations and TCOs the agencies seek to combat.  The commenter also argued that the IFR makes the "bizarre assertion

that *new* measures punishing vulnerable people are necessary because" smuggling operations have ways to avoid existing asylum restrictions.

    *Response:* The Departments disagree that the IFR will incentivize irregular migration and thereby strengthen organized smuggling operations and TCOs. The IFR has enhanced the disincentives to crossing irregularly, reducing the overall number of encounters between POEs. Through August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and the IFR have fallen 59 percent from the level of average daily encounters during the "immediate post-pandemic period," i.e., the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before the IFR entered into effect on June 5, 2024.[115] This rule addresses the reality of unprecedented migratory flows, the systemic costs those flows impose, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. The procedures in place before the publication of the IFR resulted in the release of a high proportion of migrants into the United States to await section 240 removal proceedings, creating a vicious cycle in which exploitative smuggling networks could effectively advertise that border crossers were likely to remain in the United States upon arrival, encouraging higher encounter numbers, which in turn led to more releases. *See* 89 FR at 48714–15. This created a situation in which large numbers of migrants—regardless of their ultimate likelihood of success on an asylum or protection application—were subject to exploitation and risks to their lives by the networks that drove their movements north. *See id.* In contrast, the Departments believe that the reduction in migration resulting from this rule will, over time, weaken the TCOs that prey on migrants for profit by starving such TCOs of funding.

    The IFR does not "punish[] vulnerable people," as the commenter alleges. The Departments explained that although heightened enforcement efforts by the United States and

---

[115] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab). There were, on average, 2,077 encounters per day (including all demographic groups) between POEs at the SWB from June 5 through August 31, 2024, compared to 5,119 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

Mexico helped to mitigate very high levels of irregular migration, "[s]muggling networks are adaptable, responding to changes put in place.  Despite their immediate effectiveness, such changes [in enforcement efforts] are not enough—and will almost certainly have diminished effect over time.  The reality is that the scale of irregular migration over the past two years has strained the funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs."  89 FR at 48726.  The Departments further stated that "[w]ithout the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States."  *Id.*

The rule is consistent with concern for vulnerable people and the Departments' operational capacity to administer and enforce the immigration laws.  As a means of preventing migrants from falling prey to smuggling and other criminal organizations, the Departments have discouraged attempts to enter the United States without inspection while increasing the availability of lawful pathways.  The limitation on asylum eligibility contained in the rule undercuts claims made to migrants by TCOs and smugglers that simply arriving at the border will result in them being released into the United States.  Additionally, the Departments believe that increasing the availability of lawful pathways for migration helps discourage attempts to enter the United States without inspection by providing individuals with options that do not involve putting their lives in the hands of smugglers.  The Departments believe that this balanced approach—expanded lawful pathways to enter the United States, coupled with conditions on asylum eligibility for those who fail to exercise those pathways and the swift imposition of immigration consequences when individuals do not establish a legal basis to remain in the United States—will continue to decrease attempts to irregularly enter the United States, and thereby reduce reliance on smugglers and human traffickers.

*Comment:*  A commenter argued that the IFR fails to account for the effect of existing and contemporaneously promulgated policies, such as EOIR's "recent arrivals docket."

*Response:* The IFR is one of several tools that the Departments employ to encourage the use of safe, orderly, and lawful processes for accessing the border and to maintain a manageable operational capacity to adequately deliver timely decisions and consequences to noncitizens encountered at the southern border who do not establish a legal basis to remain. The Departments are not aware of any evidence that the recent arrivals docket or any other recent procedural changes in case processing could have, on their own, addressed the record high levels of migration that the Departments have contended with in recent years. Such changes offer important efficiency benefits but by themselves do not adequately address problems such as the large number of non-meritorious claims for asylum and related protection.

For example, as the Departments announced on May 16, 2024, the recent arrivals docket applies to certain noncitizen single adults.[116] For cases on the recent arrivals docket, IJs will generally aim to render a final decision within 180 days, which is substantially longer than the expedited removal process.[117] The recent arrivals docket provides efficient case processing procedures for removal proceedings, which are, as a general matter, designed to be more comprehensive proceedings for the full adjudication of claims,[118] as compared with expedited removal, which is designed to quickly screen out those who cannot demonstrate a sufficient

---

[116] Press Release, *DHS, DHS and DOJ Announce "Recent Arrivals" Docket Process for More Efficient Immigration Hearings* (May 16, 2024), *https://www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration* ("Recent Arrivals Docket Announcement").

[117] Credible fear interviews generally take place close in time to when a noncitizen arrives in the United States. *See* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i) (providing that AOs "shall conduct interviews" of noncitizens who indicate either an intention to apply for asylum or a fear of persecution "at a port of entry or at such other place designated by the Attorney General"). If the noncitizen is not found to have a credible fear, the noncitizen may request review by an IJ, but such review must take place "in no case later than 7 days after the date" of the AO's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). DHS data show a median processing time from credible fear referral to result of 8 days in the pre-pandemic period; 17 days during the pandemic period; 12 days during the immediate post-pandemic period; and 5 days during the IFR period. *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[118] Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: the rights to representation at no expense to the Government, to a reasonable opportunity to examine and present evidence, and to cross-examine witnesses, INA 240(b)(4)(A)–(B), 8 U.S.C. 1229a(b)(4)(A)–(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(i)-(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the Board of Immigration Appeals ("BIA"), 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of certain decisions in the appropriate U.S. Court of Appeals, *see generally* INA 242, 8 U.S.C. 1252. For these reasons, the completion goals for cases on the recent arrivals docket remain subject to case-specific circumstances and procedural protections, including allowing time for noncitizens to seek representation where needed. *See* Recent Arrivals Docket Announcement.

likelihood of ultimate success on the merits.  Thus, the recent arrivals docket is not as efficient as either expedited removal proceedings generally or expedited removal proceedings undertaken pursuant to this rule.  Accordingly, the recent arrivals docket is best considered as a complementary measure to this rule for those who are not subject to or cannot be processed under expedited removal despite the resource-saving measures laid out in this rule.  Similarly, while the Departments are constantly making efforts to maximize the efficiency of their procedures, all such changes are inadequate, on their own, to accommodate the high volumes of encounters that make this rule necessary.

*Comment:*  Citing 89 FR at 48724 nn.99–100 as an example, a commenter objected that the Departments' reliance on an undisclosed data analysis with unknown assumptions as a basis for projecting future trends is arbitrary.

*Response:*  The Departments included in the rulemaking docket extensive data supporting the IFR, including an explanation of assumptions underlying certain projections.[119]  As DHS explained in the IFR, the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances.  *See* 89 FR at 48727 n.127.  The period leading up to the IFR was characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (i.e., the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID-19 pandemic, and uncertainty generated by border-related litigation, among other factors.  *Id.*  Nonetheless, the Departments included ample basis for their assessment that the IFR was needed and did not rely exclusively on internal projections as a basis for the rule.  *See, e.g.*, 89 FR at 48726 (explaining that "between January and April, 2024, [UNCHR] tracked 139,000 irregular entries [through the Darién jungle], up from 128,000 for the same months in 2023 and a seven-fold increase over

---

[119] *See* OHSS Data Spreadsheet, *Data for Securing the Border IFR* (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

migration levels during that period in 2022," and that "[p]ast unprecedented migration surges [described in the IFR] bolster . . . the need for this rulemaking"). Further, the Departments note that they are including in the docket extensive data supporting this final rule, including data related to the impact of the IFR, the changes made in this final rule, and the request for comment discussed in Section IV of this preamble, as well as detailed explanations of certain projections.

*b. Lack of Resources Does Not Justify the Rule*

*Comment:* Some commenters stated that the Departments' justification of the IFR based on the lack of resources and congressional funding needed to effectively and efficiently meet process demands for migrants and those in the U.S. asylum process is not a valid basis for the Departments' purportedly disregarding their legal obligations to migrants when managing asylum claims and upending the asylum system. A commenter similarly stated that resource constraints should have no relationship to the treatment of newly arriving migrants whose right to remain has not yet been assessed.

Another commenter said that the IFR is arbitrary and capricious because, while the agencies argue that the IFR is required because of a lack of funding, they provided no analysis to justify that conclusion. The commenter stated that the primary reason USCIS lacks enough AOs is that USCIS faces challenges with hiring and retention. The commenter stated that the agency underpays officers, forces them to work 60-hour weeks, and routinely requires them to apply new and illegal requirements in credible fear interviews, all while ignoring their primary duty of conducting asylum adjudications. The commenter stated that CBP has the ability under current resources to greatly expand its capacity at POEs, but that CBP and DHS simply refuse to take that step. Another commenter similarly said that the IFR repeatedly invokes resource constraints as the reason to deny access to asylum, yet CBP is the nation's largest Federal law enforcement agency, and it has "seriously understated" its processing capacity in the past. A few commenters said that real solutions to alleviate conditions at the southern border include operational

efficiency, better resource allocation, and increasing resources to meet demand and fairly process applications.

One commenter said the rule is motivated by the Departments' concern that too many people are seeking asylum, rather than whether individuals are eligible. Further, this commenter wrote that, without any monitoring of the consequences of removal, it is unclear if the IFR's supposed efficiency is in the best interests of the United States, which include a commitment to upholding human rights and providing humanitarian aid.

*Response:* With respect to the claim that the rule's reliance on resource and funding constraints and efficiency concerns are impermissible bases to disregard legal obligations to migrants seeking asylum and protection, the Departments first reiterate that the rule does not violate any legal obligations to migrants, as explained in Section III.A.1 of this preamble and in the IFR. *See* 89 FR at 48733–39. This rule is consistent with U.S. domestic law and with the United States's treaty obligations. The United States implements its non-refoulement obligations through statutory withholding of removal and CAT protection. Even when the threshold for emergency border circumstances has been reached, these forms of protection remain available. From June 5, 2024, through August 31, 2024, 27 percent of those encountered between ports of entry at the SWB and placed into expedited removal were referred for a credible fear interview, and over half of individuals referred for credible fear interviews under the IFR have ultimately been screened in.[120] Those who have not received such determinations have either been determined to have not manifested a fear of removal or have been determined to have not shown a significant possibility that they could ultimately demonstrate by a preponderance of the evidence eligibility for asylum in light of the rule's limitation on asylum eligibility or a reasonable probability of persecution or torture.

---

[120] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab and IFR ERCF tab).

In addition, the Departments disagree with commenters' assertion that it is impermissible to consider resource constraints and lack of funding as supporting the need for the IFR and this rule. Congress provided the Departments with broad discretionary authority under section 208 of the INA, 8 U.S.C. 1158, including expressly conferring discretion to impose limitations on asylum eligibility. INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B). Nothing in the INA explicitly or implicitly forecloses the Departments from considering the impact of resource constraints when exercising their discretionary authorities. For this reason, as explained in Section II.A.1 of this preamble and in the IFR, *see* 89 FR at 48731–49, the rule's changes to certain expedited removal procedures and the credible fear process are a lawful exercise of the Departments' authorities and are consistent with the INA.

Indeed, resources and funding cannot be separated from the safe, effective, and humane enforcement and administration of our immigration laws. The Departments can only function with the resources provided to them by Congress. While the Departments carefully utilize the resources that they are given, they are inadequate in the face of substantial and unprecedented global migration. As explained in the IFR, these constraints prevent the border and immigration systems from properly functioning to provide timely relief for those who warrant it and timely consequences for those without a legal basis to remain when encounters reach the thresholds identified in the rule. *See* 89 FR at 48730 (discussing the impact of resource limitations); *see also id.* at 48752 (explaining that "[g]iven current resources[] . . . there is a limit on how many people can be put through the process—and that limit directly informs the 1,500 threshold").

The rule is carefully tailored to address these challenges and is therefore a reasonable exercise of the Departments' discretionary authorities. By shifting to a manifestation standard for fear claims, and heightening the screening standard for withholding and CAT protection, DHS will be able to devote more of its limited resources to more effectively and quickly processing migrants, and the Departments will be able to focus on those claims that are more likely to have merit. *See id.* at 48744–45. The limitation on asylum eligibility disincentivizes

attempts at entry, thereby easing stress on DHS resources, while also providing an efficient way to address claims of fear raised by individuals who do not fall within the exception to the limitation. *See* 89 FR at 48731–33. At the same time, the rule does not foreclose asylum eligibility for noncitizens who are in circumstances that require immediate action: It includes an exception for exceptionally compelling circumstances, including for noncitizens (or members of their families with whom they are traveling) who experience an acute medical emergency, face an imminent and extreme threat to life or safety, or are a "victim of a severe form of trafficking in persons." *See* 89 FR at 48732–33. And those referred to the credible fear process will continue to be screened for potential eligibility for statutory withholding of removal and protection under the CAT. Thus, the rule allows the Departments to use their limited resources more effectively to administer and enforce the nation's immigration laws, while also reducing incentives for migrants to make the dangerous journey to the southern border in the hope that the overwhelmed and under-resourced immigration system will not be able to expeditiously process them for removal. In sum, the rule is needed to support the effective "operation of the immigration system" during emergency border circumstances. *Judulang v. Holder*, 565 U.S. 42, 55 (2011).

Contrary to commenters' claim, the IFR fully explains the funding shortfall facing the Departments and how it has severely hampered their abilities to effectively and efficiently process noncitizens at the southern border and deliver timely decisions and consequences to those without a legal basis to remain. *See* 89 FR at 48728–30. Under current appropriations, DHS will, at best, be able only to sustain most of its current operations and will not be able to expand capacity along the southern border or increase its ability to deliver consequences through referrals into expedited removal. *See id*. at 48729. Because of the funding shortfall, in the circumstances in which the measures enacted by this rule apply, DHS simply lacks sufficient personnel and facility resources to safely detain a majority of border crossers for the time needed to complete the expedited removal process, which forces DHS to release noncitizens pending

prolonged processing pathways outside of expedited removal.  *See id.* at 48752.  This renders DHS unable to swiftly process migrants and impose consequences on those who fail to establish a legal basis to remain in the United States, which in turn leads to higher encounter rates.  *See id.*

These resource constraints are not unique to front-line officials.  In recent years, EOIR adjudicators have completed a record number of cases.[121]  However, the drastic increase in the number of newly initiated cases—composed in large part of cases that could have been processed through expedited removal if DHS resources allowed, *id.* at 48751 ("Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[.]")—has significantly outpaced even these record numbers of case completions, thus increasing the pending caseload before EOIR.[122]

Similarly, USCIS has experienced a dramatic increase in credible fear referrals.  USCIS received an estimated 137,000 credible fear referrals resulting from SWB encounters in FY 2023, up from an average of about 52,000 from 2010 to 2019 and an average of about 5,700 from 2005 to 2009.[123]  However, as the Departments explained in the IFR, USCIS does not have enough AOs to keep pace with the number of noncitizens who could be referred for credible fear interviews, much less keep pace with new affirmative asylum receipts or the existing affirmative backlog.  89 FR at 48730.  The USCIS affirmative asylum application backlog has reached over 1.25 million cases.[124]  Despite its growing affirmative asylum backlog, USCIS must continue to assign AOs to certain caseloads (some of which are included in the affirmative asylum backlog and some of which are not) that must be staffed to meet processing time frames established by statute, regulation, settlement agreement, court order, or litigation need, including: reasonable

---

[121] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline*; *see also* 89 FR at 48751 (noting that due to its resource constraints, "the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[]" (footnote omitted)).

[122] *Id.*

[123] *See* OHSS analysis of Asylum Pre-Screening Officer ("APSO") Global and OHSS Persist Datasets current as of June 30, 2024 (Historic CFIs tab).

[124] USCIS, *Asylum Division Monthly Statistics Report. Fiscal Year 2024. June 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx*.

fear screenings; Operation Allies Welcome affirmative asylum cases; affirmative asylum cases subject to litigation; and Safe Third Country Agreement screenings. With a focus on credible fear screenings and while having to address the required caseloads mentioned above, AOs are unavailable to fully support efforts to reduce the affirmative asylum backlog. If there is a surge in credible fear referrals, USCIS would be forced to detail and train additional staff from other parts of the agency, further affecting the overall immigration system.

USCIS has filled 850 out of 1,011 available AO positions as of August 15, 2024. USCIS is working diligently to avoid a gap between the number of AOs on board and the number of available positions, but some gap in these numbers persists, in part due to the time it takes to hire and receive security clearances for individuals to come on board as AOs. As of August 15, 2024, USCIS has a total of approximately 702 permanent AOs fully trained and certified to complete its workloads, including credible fear screening, reasonable fear screening, and affirmative asylum adjudication. Given that the ebb and flow of hiring and the number of credible fear referrals prior to the implementation of the IFR required far more officers to maintain pace, USCIS has trained staff members from across the agency to serve temporarily on detail as AOs and conduct credible fear interviews consistent with the statute. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). As of August 15, 2024, USCIS had a total of 807 credible fear trained AOs (702 permanent staff and 105 detailees, who are trained to conduct credible fear screenings only). Given the need to address the Departments' various required workloads mentioned above, 511 AOs are currently assigned to work exclusively on credible fear cases. With this number of available AOs and accounting for some fluctuation, USCIS can generally complete credible fear determinations for an average of 650 individuals daily Monday through Friday and an average of 200 individuals daily on Saturday and Sunday. Workload priorities related to border enforcement, statutory requirements, and litigation obligations, along with insufficient resourcing allocations from Congress, continue to affect USCIS's ability to staff at appropriate levels. Accordingly, these funding shortfalls, combined with high encounter levels at the southern

border, necessitate this rule's limitation on asylum eligibility and its changes to the credible fear

referral process and screening standard for statutory withholding of removal and CAT protection

to ensure the Departments are able to deliver timely decisions and consequences using the

resources provided. *See* 89 FR at 48729–31.

DHS disagrees with the claim that USCIS's resource challenges are due to hiring and

staff retention problems caused by working conditions and underpay, rather than Congress's

failure to provide the agency with sufficient resources. Resource challenges at USCIS are not a

novel issue. Nearly 96 percent of USCIS's funding is from filing fees, not from congressional

appropriations. Fees for adjudication and naturalization services are set at a level to "ensure

recovery of the full costs of providing all such services, including the costs of similar services

provided without charge to asylum applicants or other immigrants." INA 286(m), 8 U.S.C.

1356(m). On April 1, 2024, DHS implemented a new fee schedule for USCIS-processed

immigration benefits, which will generate approximately an additional $1 billion annually; the

schedule includes a new asylum program surcharge for employment-based petitioners. 89 FR

6194, 6205, 6391 (Jan. 31, 2024). While the new fee rule does provide for increased funding for

the Refugee, Asylum, and International Operations Directorate,[125] keeping pace with USCIS's

protection screening and affirmative asylum workloads requires additional funding, as reflected

in the President's FY 2025 Budget.[126] As DHS explained in proposing the new fee schedule, the

new fee schedule was created based on historical data and the additional funding provided by the

new fee schedule may not be sufficient to cover the increased costs of the asylum program,

including credible fear processing, if encounters exceed historic rates. 88 FR 402, 432–38 (Jan.

4, 2023). Even with the very limited appropriations provided by Congress to USCIS, the

---

[125] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176*.

[126] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/*.

President's budget requests demonstrate the need to supplement USCIS's ability to address credible fear screenings. The President's FY 2024 budget request to Congress sought funds necessary to complete up to 150,000 credible fear determinations.[127] A supplemental request in October 2023 sought congressional funding for 1,600 AOs.[128] Congress failed to provide resources to address credible fear screenings with respect to these appropriation requests. Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget[129] would impose a burden on other filers. *See* 89 FR at 48729. USCIS takes workforce retention seriously, but any concern about pay, hours, or workload does not obviate the systemic obstacles in running an underfunded program with limited resources.

With regard to the specific comments regarding CBP's ability and capacity to process noncitizens at POEs on the SWB, DHS disagrees that it has the resources to meaningfully expand that capacity under current conditions. CBP has finite resources available at POEs, all of which must be distributed both to processing of noncitizens and to implementing CBP's other priority missions, including facilitating lawful trade and travel and protecting national security interests.[130] That said, CBP has taken steps to increase the number of noncitizens processed at POEs, including through tools such as the CBP One app, which has helped CBP to maximize its limited resources as it permits noncitizens to pre-schedule appointments and mitigates long

---

[127] *See* DHS, *FY 2024 Budget-in-Brief* 74 (2024), *https://www.dhs.gov/publication/fy-2024-budget-brief* (last visited Sep. 3, 2024).

[128] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.

[129] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.

[130] *See, e.g.*, Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, CBP, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/document/guidance/guidance-management-and-processing-undocumented-non-citizens-southwest-border-land*.

waiting times at POEs.[131]  The Departments welcome additional resources from Congress, but must respond to emergency border circumstances with the resources currently available.[132]

Finally, the Departments disagree that this rule is motivated by a concern that too many people are seeking asylum.  The rule is intended to address the very high levels of irregular migration that the Departments have recently observed, without discouraging those with valid claims from applying for asylum or other protection.  By managing flows more effectively, the rule will help ensure the continued effective, humane, and efficient processing of migrants who arrive at the southern border during emergency border circumstances.

Moreover, the Departments disagree with the suggestion that the rule is not in the best interests of the United States.  On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and suspending and limiting the entry of such noncitizens.  89 FR at 48490–91. The Departments determined that the IFR was necessary to respond to the emergency border circumstances discussed in the Proclamation.  *Id.* at 48715.  Exercising their authorities, including under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Secretary and the Attorney General determined that during emergency border circumstances, it is in the "best interests of the country . . . to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to

---

[131] *Id.*  During the pre-pandemic period, CBP's Office of Field Operations ("OFO") processed around 330 people per day.  From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed approximately four-and-a-half times that number of people daily.  *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[132] *See* Letter for the Hon. Patrick McHenry, Speaker Pro Tempore of the U.S. House of Representatives, from Shalanda D. Young, Dir., Off. of Mgmt. & Budget, *Re: Critical National Security Funding Needs for FY 2024* (Oct. 20, 2023), *https://www.whitehouse.gov/omb/briefing-room/2023/10/20/letter-regarding-critical-national-security-funding-needs-for-fy-2024/* ("This request includes resources for an additional 1,300 border patrol agents to work alongside the 20,200 agents already funded in the FY2024 Budget; 375 immigration judge teams to strengthen the immigration court system—the largest incremental request ever; [and] 1,600 asylum officers to speed up processing of asylum claims[.]").

prioritize processing of noncitizens who do not enter in violation of it." *Id.* at 48737 (alteration, citation, and internal quotation marks omitted). At this time, the Secretary and the Attorney General continue to believe that this rule's limitation on asylum eligibility is in the best interests of the United States and that it should continue to apply, while encounter levels remain above the thresholds in the rule (i.e., during emergency border circumstances), to noncitizens who enter across the southern border and who are not described in section 3(b) of the Proclamation, unless such noncitizens demonstrate that exceptionally compelling circumstances exist.

The Departments further disagree with the assertion of commenters that, without monitoring the consequences of removal, it is unclear if the IFR's improvement to systemic efficiency is in the best interests of the United States. The Departments believe that the present rulemaking strikes the appropriate balance between facilitating efficiency during times when emergency border circumstances are present and upholding the commitment of the United States to protecting human rights and honoring its non-refoulement obligations. Indeed, the credible fear screening process itself is designed to make a case-by-case determination related to the consequences of removal and whether those potential consequences warrant allowing a noncitizen to remain in the United States to pursue an asylum or related protection claim. While it is not feasible for the United States to monitor the exact consequences of removal in every individual case, AOs and IJs routinely use country conditions information, including Department of State Country Reports on Human Rights Practices, to inform their evaluation of potential consequences of removal as part of the credible fear determination, as part of their statutory obligation to consider "such other facts as are known" to them in the credible fear of persecution determination (INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)); likewise, they are required by regulation to consider "evidence of gross, flagrant or mass violations of human rights within the country of removal" and "any other relevant information regarding conditions in the country of

removal" in any evaluation of protection under the CAT, 8 CFR 208.16(c)(3)(iii)-(iv).[133]  The

present rulemaking does not change the types of evidence AOs and IJs rely on, such as human

rights monitoring reports relating to the potential consequences of removal to a particular

country, in making credible fear determinations at the higher "reasonable probability" of

persecution or torture standard.

### c.  Rule Does Not Acknowledge Factors Contributing to Migration

*Comment:*  Some commenters argued that the Departments failed to analyze to what

extent migration patterns are shaped by U.S. immigration enforcement system incentive

structures relative to other factors, such as the many reasons people are forced to flee their

homes.

These commenters disagreed with what they characterized as the Departments' decision

to impose further consequences on individuals seeking protection.  Some commenters argued

that many factors contribute to the number of border encounters, including dire conditions in

migrants' countries of origin and their personal circumstances, and that while the IFR

acknowledges that various push factors such as violence, persecution, poverty, human rights

abuses, climate change, and others contribute to current migratory patterns, it does not fully

engage with them and instead "assumes, without foundation, that the perceived incentives,

responsive to U.S. enforcement measures, single-handedly shape migration patterns," despite

ample United States Government and academic analyses that demonstrate that U.S. enforcement

measures are only one of several factors informing patterns of migration.

Similarly, another commenter stated that, although the IFR asserts that insufficient

enforcement leads to high encounter levels, it is more plausible that the world is experiencing

---

[133] USCIS RAIO Directorate, *Officer Training: Credible Fear of Persecution and Torture Determinations* 19–20 (May 9, 2024) ("Additionally, pursuant to the statutory definition of 'credible fear of persecution,' the asylum officer must take account of 'such other facts as are known to the officer.'  Such 'other facts' include relevant country conditions information.  Similarly, country conditions information should be considered when evaluating a credible fear of torture.  The Convention Against Torture and implementing regulations require consideration of '[e]vidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and [o]ther relevant information regarding conditions in the country of removal.'" (quoting 8 CFR 208.16(c)(3)(iii)–(iv))).

high levels of displacement and international migration and that the United States is a desirable destination for migrants. The commenter added that such global pressures would be more productively met with policies that directly address the desire, ability, and opportunities for people to migrate, rather than imposing harsher enforcement.

*Response:* The Departments agree that many factors that are outside the U.S. Government's control influence migration patterns, including push factors. The Departments have never asserted that U.S. enforcement measures singlehandedly shape migration patterns. Economic and political instability around the world is fueling the highest levels of migration since World War II, including in the Western Hemisphere. 88 FR at 11704. However, the effects of these factors and U.S. immigration enforcement are complementary to each other. They can both simultaneously and separately influence migrants' decisions regarding when, how, and where to migrate. The Departments believe that ensuring the timely enforcement of consequences for noncitizens who enter the United States irregularly without a legal basis to remain in the United States is a powerful tool for addressing the situation at the southern border, particularly when combined with the expanded availability of lawful pathways. This view is supported by the success of the IFR in reducing levels of irregular migration as further discussed in Section II.A.2 of this preamble. Timely enforcement of consequences is but one approach to respond to the specific issue of incentivizing the use of lawful, safe, and orderly pathways and disincentivizing migrants from utilizing dangerous, irregular migration routes along the southern border. This rule was designed to address encounters on our SWB, not to singlehandedly reshape migration patterns throughout the region.

### d. Other Comments Related to the Departments' Justification

*Comment:* Commenters suggested that high encounter levels are due to the Biden Administration's border security and immigration regulatory and policy efforts. One commenter disagreed with the Departments' assigning blame for the border crisis to Congress's failure to appropriate additional funding to the Departments, instead stating that it is the Administration's

consistent "abdication of border security and immigration enforcement[]" that has resulted in the sustained high rate of encounters since 2021. The commenter said DHS must implement additional deterrence policies to discourage "illegal immigration" across the SWB.

*Response:* The Departments disagree that the Administration's regulatory and policy efforts have led to the emergency border circumstances. Rather, the Departments believe that the COVID-19 global pandemic upended travel throughout the world, forcing many noncitizens to delay their journeys to the United States. This was further exacerbated by the implementation of the Title 42 public health Order, which quickly expelled noncitizens who were crossing the border back into Mexico without applying an immigration consequence. *See* 88 FR at 31335 (discussing lack of immigration consequences associated with expulsions under the Title 42 public health Order). These factors contributed greatly to the significant surge in migration immediately following the end of the COVID-19 pandemic period. Since 2021, the United States Government has taken a series of significant steps to strengthen consequences for irregular entry at the southern border in response to record levels of encounters there. The Circumvention of Lawful Pathways rule created disincentives for irregular border crossings and is a critical component of the Government's regional strategy. DHS also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful, safe, and orderly pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal.[134] In the immediate post-pandemic period, DHS maximized the use of expedited removal given its limited resources, placing an average of 900 individuals encountered between POEs at the SWB into the process each day between May 12, 2023, and June 4, 2024, and conducting an average of 490 credible fear interviews daily, both of which are record highs.[135] Between May 12, 2023, and June 4, 2024,

---

[134] *See* Decl. of Blas Nuñez-Neto ¶ 20, *M.A. v. Mayorkas*, No. 23-cv-1843 (D.D.C. Oct. 27, 2023) (Dkt. 53-1).

[135] OHSS analysis of June 2024 Enforcement Lifecycle data (Immediate Post-Pandemic ERCF tab); OHSS analysis

DHS removed or returned more than 794,000 noncitizens who did not have a legal basis to remain in the United States, the majority of whom crossed the SWB.[136]  Average daily removals and returns during the immediate post-pandemic period exceeded daily rates for every FY since 2010.[137]  The majority of all individuals encountered at the SWB from FY 2021 to FY 2023 were removed, returned, or expelled.[138]

Unfortunately, despite maximizing the usage of resources available to the Departments, these efforts have not been as effective as they could have been had Congress provided the tools and resources needed to address substantial levels of migration impacting the southern border. Encounter levels increased toward the end of 2023,[139] and December 2023 saw the highest level of encounters between POEs in history,[140] as increasing numbers of people migrated through the Western Hemisphere.  89 FR at 48713.  The Departments' inability, given a lack of sufficient resources, to deliver timely decisions and consequences through expedited removal for those without a legal basis to remain creates incentives for further irregular migration and creates further strain on the border security and immigration systems.  *See id.* at 48713–14.  The IFR was needed to respond to this emergency situation, and it is having its intended effect as discussed in Section II.A.2 of this preamble.  However, only Congress can provide the resources and authorities that the Departments need to ensure durable solutions to heightened levels of global migration and the impact it has on the border security and immigration systems.

*B.  General Feedback on the IFR*

1.  General Support

---

of APSO Global and OHSS Persist Datasets (Historic CFIs tab).

[136] *Id.*

[137] OHSS 2022 Yearbook of Immigration Statistics (OHSS YB Table 39 tab) (listing past repatriations).

[138] OHSS analysis of June 2024 Enforcement Lifecycle data (Enforcement Lifecycle 6.2024 tab).

[139] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024, for July 2024 (Encounters FY 2000-2024 tab).

[140] *Id.*

*Comment:*  Some commenters approved of the rule's limitation on asylum eligibility, reasoning that the U.S. asylum system is being "abused" and "exploit[ed]."  A commenter stated that the Federal Government should stop permitting undocumented immigrants to stay in the country while their asylum claims are processed, as many exploit the system to remain for years, and that daily border crossings pose national security risks.  That commenter also stated that the United States has housing and job shortages, so allowing immigrants to take housing and jobs is hurting America.  Another commenter thanked the Departments for implementing this rule and asked that all enforcement mechanisms be deployed to uphold it.

*Response:*  The Departments agree that maintaining border security is critical and that the rule will have benefits for the U.S. border security and immigration systems.  Specifically, the United States Government has better ensured timely decisions and consequences for irregular entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States in decades.  *See, e.g.*, 89 FR at 48712–13; *id.* at 48721–26 (discussing the increase in migration at the SWB, consistent with global trends and regional United States Government efforts); 88 FR at 11716–18 (discussing United States Government measures to offer alternative pathways to address the root causes of migration, improve the asylum system, and address the pernicious role of smugglers).  This approach has allowed DHS to process noncitizens arriving at the southern border for removal in record numbers and with record efficiency.  89 FR at 48713, 48727.

This rule has improved DHS's ability to place into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB and to swiftly issue decisions and impose consequences that have proven effective to disincentivize noncitizens who do not have a strong claim for asylum or other protection from entering the United States to pursue such claims.  *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746.  This rule is also designed to identify more effectively those with a fear of return, and, for noncitizens who have manifested or expressed a fear of return, to screen out and swiftly remove those whose

claims have a low likelihood of succeeding on the merits. *See* 89 FR at 48743–46. As a result, the Departments believe that this rule will also improve the overall functioning and efficiency of the immigration system by reducing strains on EOIR and USCIS resources and allowing DHS to remove more noncitizens through expedited removal, rather than adding them to the backlogged immigration courts.

2. General Opposition

*a. Negative Impacts on Noncitizens and Others*

*i. Conflicts with Humanitarian Values*

 *Comment:* Several commenters expressed opposition to the IFR based on general humanitarian and moral concerns, with some commenters urging the Departments to reconsider or rescind the rule. Commenters addressed the general right to seek asylum and the United States' obligations to protect those seeking asylum. For example, commenters emphasized that people have the right to migrate and seek asylum, which commenters described as a human right. Commenters stated the Administration should provide rights to those in the U.S. asylum process. Commenters also stated that people have a right to work and live in a safe environment with their families so that they can enjoy a better life. Several commenters stated that the IFR denies the right to seek asylum or that it harms those with the right to asylum. Commenters stated that the United States has a responsibility or moral obligation to welcome noncitizens who might make claims of asylum, that the United States should provide protection to those who seek it, and that turning them away is unconscionable. Some commenters suggested that the United States should welcome all people, regardless of their origin or when or how they arrive. Commenters stated that the United States has contributed to the conditions or push factors that promote migration and that it should share the responsibility for the geopolitical and climatic conditions it has created, especially since the response of the United States may shape how other countries react to humanitarian crises.

*Response:*  The Departments agree that the United States has certain legal obligations to protect those present in the United States who fear persecution or torture in their home countries or countries of removal and recognize the importance of offering migrants the opportunity to seek protection from removal.  *See* 89 FR at 48759.  But as explained more fully in Section III.A.1 of this preamble, this rule does not run afoul of those obligations or otherwise undermine the commitment of the United States to adhering to international law principles concerning non-refoulement.  *See also id.* at 48716–17, 48735–36.  The Departments have instead exercised their authority to adopt a limitation on asylum eligibility and an exception to that limitation in certain circumstances.  *See id.* at 48718.  As discussed more fully in Section III.A.1 of this preamble, this framework comports with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), which permits limitations and conditions on asylum as long as they are consistent with the INA.

Any noncitizen who is physically present in the United States may apply for asylum, but there is no right for a noncitizen to enter the United States or to be processed in a particular manner.  *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right.  Admission of aliens to the United States is a privilege granted by the sovereign United States Government.").  No individual present in the United States will be denied the opportunity to seek asylum or protection in the United States under this rule.

In particular, this rule does not preclude noncitizens who cross the southern border from seeking asylum.  Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview, as appropriate.  *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4).  Also, noncitizens in section 240 removal proceedings have the opportunity to present information asserting fear of or concern about potential removal.  *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4).  Although many individuals may be ineligible for asylum under this rule,

they may seek to establish that they are subject to the rule's exception for exceptionally compelling circumstances, and they may also still seek statutory withholding of removal and CAT protection in the United States.

The purpose of this rule is to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances.  89 FR at 48718.  Consistent with that purpose, the rule limits eligibility for asylum during such circumstances and ensures that the process is not overwhelmed by those with nonviable claims in the expedited removal process who will add to an already-large backlog.  Those referred to an IJ will become part of the backlog of pending immigration cases before EOIR, which at the end of the third quarter of FY 2024 was over 3.46 million cases.[141] Continuing to process non-viable claims will also exacerbate USCIS's asylum backlog, which, based on case filings through August 31, 2024, was over 1.3 million cases.[142]

*Comment:*  Commenters wrote that the IFR contradicts U.S. values and history. Commenters stated that the United States is a nation of immigrants and is built on a history of welcoming migrants.  Some commenters described the IFR's limitations on asylum as contrary to U.S. values and democracy and termed it "un-American."  Commenters stated that the IFR does not treat noncitizens with dignity and respect.  Many commenters emphasized the desire for any process to be "welcoming, transparent, humanitarian, and fair;" one commenter specifically expressed concern for "the dignity, safety, and human rights of asylum seekers;" and another expressed concern for those people "seeking safety and the American dream."  Another commenter emphasized that immigrants "are human beings and deserve to be treated as such." Many commenters generally desired policies that "welcome immigrants."  Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that

---

[141] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (July 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline*.  Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding-only cases.

[142] *See* OHSS analysis of USCIS Global data as of September 10, 2024.

noncitizens provide value to U.S. communities and that immigrants have enriched the United States. Commenters emphasized their own status as descendants of immigrants and expressed a desire for fairness in welcoming noncitizens at all borders. Commenters argued that the IFR undermines the historic commitment of the United States to protecting those who seek refuge. At least one commenter described the IFR as "authoritarian."

Commenters also addressed moral concerns related to the IFR or the immigration system overall. One commenter stated that immigrants are not "a problem;" rather it is "our immigration system that is the problem." Some described the IFR, or denying asylum, as "immoral," "inhumane," "cruel," "unjust" or "unfair," or "xenophobi[c]." Commenters asserted that the United States should have an accessible, diverse, safe, welcoming, dignified, fair, and balanced immigration system. Commenters stated that the United States should not make it harder for those fleeing danger to seek protections. Commenters stated that the United States should treat immigrants and refugees with respect, dignity, and compassion while defending human life. Commenters stated that Mexico and Latin America are neighbors of the United States and should be treated with goodwill. One commenter stated that asylum seekers from Mexico should be given the full rights of citizens. One commenter stated that there is no real border security or immigration crisis, but rather the concept has been created to distract Americans from certain political agendas, and that the "real crisis" is climate change.

*Response:* The United States is both a nation of immigrants and a nation of laws. The Departments are charged with administering and enforcing those laws and endeavor to do so humanely. The Departments agree that the historical openness of the United States to immigration has enriched our culture, expanded economic opportunities, and enhanced our influence around the world. However, the Departments reject the contention that the IFR's limitation on asylum eligibility and other provisions are inconsistent with American values, fairness, and showing respect for immigrants.

The United States has a long tradition of accepting and welcoming refugees. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g.*, *Stevic*, 467 U.S. at 409 ("For over 30 years the Attorney General has possessed statutory authority to withhold the deportation of an alien upon a finding that the alien would be subject to persecution in the country to which he would be deported."). Under this rule, the United States will continue to offer such protection. The rule is designed to implement the Proclamation's policies and objectives by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718. The rule enhances the Departments' ability to manage high levels of irregular migration to the United States during emergency border circumstances and allows the Departments to quickly deliver decisions and consequences to those who cross the southern border irregularly and are unable to establish a legal basis to remain, while upholding domestic and international protection obligations. *Id.* at 48731.

Without a policy in place to ensure lawful, safe, and orderly processing of migrants entering the United States, the number of migrants would exceed DHS's already limited resources and facilities. Over the past several years, the border security and immigration systems have experienced extreme strain, with a dramatic increase in the number of noncitizens attempting to cross the SWB between POEs. 89 FR at 48722. Despite the meaningful impact of the Circumvention of Lawful Pathways rule and related measures, encounter levels continued to exceed DHS's capacity to, as appropriate, effectively and safely process, detain, and remove noncitizens. *Id.* at 48727. As explained in the IFR, the Departments believed that, without meaningful policy change, encounters between POEs would continue to rise and surpass DHS's capacity and abilities based on available resources. *Id.* at 48726. The Departments disagree with the sentiment that the rule is unnecessary, as it responds to this urgent situation. The Departments reiterate that the goal of the rule is not to discourage migrants with valid claims

from applying for asylum or other protection, but rather to discourage the unprecedented level of irregular migration while at the same time maintaining access to lawful, safe, and orderly pathways to enter the United States. The Departments have determined that the benefits to the overall functioning and efficiency of the immigration system at our southern border justify the rule; applying the rule is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws and to reduce the role of exploitative and dangerous smuggling and human trafficking networks.

The rule does not render noncitizens to whom it applies categorically ineligible for asylum, nor does it alter their ultimate eligibility for withholding or CAT protection. To ensure that particularly vulnerable migrants are not unduly burdened by the rule, the Departments have included an exception to the limitation on asylum eligibility that will allow some migrants to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And even those ineligible for asylum may continue to seek statutory withholding of removal and CAT protection. A noncitizen who seeks to maintain eligibility for asylum can also utilize one of several lawful, safe, and orderly pathways to the United States, including use of the CBP One app, or, for some noncitizens, refugee resettlement, parole processes, family reunification, and labor pathways. Indeed, as noted above, the CBP One app has permitted the United States Government to process nearly five times more individuals at land border POEs each day than it did on an average day in the six years preceding the pandemic—providing an important avenue for individuals who may wish to access protection in the United States to so in a safe and orderly manner.[143] The Safe Mobility Initiative, which includes Safe Mobility Offices in several countries in the Western Hemisphere, processes and educates migrants about the aforementioned pathways.[144] By reducing migration flows to a reasonable rate, the rule will reduce strains on limited Federal

---

[143] OHSS analysis of July 2024 OHSS Persist Dataset (OFO Encounters tab).

[144] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas*, *https://www.state.gov/safe-mobility-initiative/* (last visited Sept. 24, 2024).

Government immigration processing and enforcement resources; preserve the Departments'

continued ability to safely, humanely, and effectively enforce and administer the immigration

laws; and reduce the role of exploitative TCOs and smugglers.  89 FR at 48767.  Finally, as

explained in Section III.A.1 of this preamble, the rule is fully consistent with the Departments'

authority and obligations under section 208 of the INA, 8 U.S.C. 1158.

ii.  Procedural and Due Process Concerns

(1)  General Concerns

*Comment:*  A commenter stated that the IFR does not violate noncitizens' due process

rights because asylum is a discretionary benefit to which noncitizens have no inherent due

process interest; instead, they have only the procedural rights guaranteed by statute.  Because the

IFR preserves all procedural statutory protections, the commenter stated, the IFR complies with

due process.  The commenter further stated that regulatory bars to asylum do not alter the basic

procedural protections, such as the opportunity to be heard, for noncitizens who make credible

fear claims.

Other commenters urged the Departments to rescind the IFR entirely.  Some commenters

expressed general concern that the IFR would violate or undermine due process protections.  One

commenter said that U.S. immigration law is already confusing, citing research that it said

showed that 55.9 percent of noncitizen respondents did not understand the requirements and

processes for accessing United States territory.  The commenter further stated that noncitizens

arriving at the southern border will not be able to understand the procedures for seeking asylum

or protection given the IFR's complexity.

Commenters discussed the importance of due process in the asylum system, as required

by international human rights law, and said that the United States has a duty to ensure that

noncitizens receive a fair trial and fully understand their rights.  Similarly, one commenter stated

that noncitizens who express the desire to seek asylum have a due process right to information

about their rights and obligations, including deadlines and appeals, the interview process, and

their right to legal representation.  Such safeguards, the commenter wrote, would ensure that noncitizens receive the necessary guidance for pursuing their asylum claims.

Commenters wrote that fair and efficient asylum procedures are even more important for noncitizens with particular vulnerabilities, such as UCs.  Commenters stated that the IFR would hamper consistent application of the law and result in arbitrary application of the law, thus severely restricting access to asylum and humanitarian protections.

*Response:*  The Departments disagree that the rule violates the Due Process Clause of the Fifth Amendment or impermissibly restricts access to asylum.  Noncitizens who are encountered in close vicinity to and immediately after crossing the border and are placed in expedited removal proceedings, including those in the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute."[145]  *Thuraissigiam*, 591 U.S. at 140; *see also Mendoza-Linares v. Garland*, 51 F.4th 1146, 1148 (9th Cir. 2022) (concluding that "an arriving immigrant caught at the border . . . 'has no constitutional rights regarding his application' for asylum" (quoting *Thuraissigiam*, 591 U.S. at 139)).  As discussed above in Section III.A 1 of this preamble, the changes in this rule are consistent with the INA.  They thus comply with the Due Process Clause with respect to noncitizens in expedited removal proceedings.[146]

---

[145] Courts also have held that noncitizens do not have an underlying property or liberty interest in a grant of asylum to which the protections of the Due Process Clause attach.  *See, e.g.*, *Jin v. Mukasey*, 538 F.3d 143, 157 (2d Cir. 2008) (holding that "an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum"); *Ticoalu v. Gonzales*, 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief, and asylum is a discretionary form of relief." (citation and internal quotation omitted)); *Mudric v. Att'y Gen.*, 469 F.3d 94, 99 (3d Cir. 2006) (holding that an 8-year delay in processing the petitioner's asylum application was not a constitutional violation because the petitioner "had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived"); *cf. Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003) ("Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause.").  Notably, UCs are excepted from expedited removal and have other rights under the nation's immigration laws.  *See generally* 8 U.S.C. 1232.  Procedural concerns related to UCs are addressed later in this section.

[146] Although this rule's limitation on asylum eligibility also applies in section 240 removal proceedings, even if noncitizens in those proceedings had an interest protected by the Due Process Clause, the application of the limitation would not violate the Due Process Clause because, as noted below, noncitizens in such proceedings are entitled to all the procedural protections such proceedings normally entail.  *See Pouhova v. Holder*, 726 F.3d 1007, 1011 (7th Cir. 2013) (citing section 240(b)(4) of the INA, 8 U.S.C. 1229a(b)(4), and explaining that "[a]ny proceeding that meets the requirements of the statute also satisfies constitutional due process").

Contrary to commenters' assertions, the rule ensures that noncitizens receive a fair process.  Indeed, although the rule changes some procedures, as discussed throughout this preamble, it leaves much of the process unaltered.  Specific comments concerning the rule's manifestation of fear standard and related changes to the process for determining whether a noncitizen should be referred to an AO for a credible fear interview are addressed in Section III.C.2 of this preamble.  The Departments address commenters' concerns about the rule's consistency with international obligations in Section III.A.1 of this preamble.

First, with respect to one commenter's claim that noncitizens do not understand the requirements for accessing United States territory because U.S. immigration law is confusing, the Departments are aware of no statutory requirement that notice regarding any of the INA's provisions be provided to individuals outside the United States, including those who may be subject to expedited removal provisions or this rule's limitation on asylum eligibility upon arrival.  In addition, to the extent the commenter's objection is to the complexity of the INA, that concern is a matter for Congress to address.

Second, under the rule, DHS is continuing to provide noncitizens who are subject to expedited removal with notice of their ability to raise a claim of fear of persecution or torture.  DHS is using signs and videos that are reasonably designed to ensure that noncitizens in its custody are aware of their right to request asylum or protection.  As discussed further in Section III.C.2 of this preamble, these signs and videos are provided in languages that are common to the large majority of noncitizens encountered by CBP at the southern border.  ICE likewise provides information in a number of languages to detainees being processed under the rule.[147]  And the signs provide a simple instruction to noncitizens that, if they fear persecution or torture if they

---

[147] *See* Memorandum for Daniel A. Bible, Exec. Assoc. Dir., Enforcement and Removal Operations, ICE, from Patrick J. Lechleitner, Deputy Dir. and Senior Off. Performing the Duties of the Dir., ICE, *Re: Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border*, and Interim Final Rule,* Securing the Border 5 (June 4, 2024) ("These signs must be posted in English and Spanish. [Enforcement and Removal Operations ('ERO')] will have additional translations available in facility law libraries in the following languages . . . ."); ICE, *National Detainee Handbook* 7, 15, 25 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf.*

are removed from the United States, they should tell an immigration officer and an AO will conduct an interview and ask the noncitizens questions about any fear they may have. Individuals who do not speak one of the languages are provided with language access services consistent with CBP's existing language assistance policies. These procedures are consistent with DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).

Moreover, to the extent that commenters have expressed due process concerns about the manifestation standard, the Departments reiterate that the expedited removal statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if the noncitizen has a fear of persecution or torture. *See* 89 FR at 48740. Instead, the statute provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As discussed in detail in Section III.C.2 of this preamble, the statute does not place any affirmative obligation on the Government to question noncitizens about intent to seek relief or fear in their home countries, nor does it define what circumstances constitute the requisite indication of intent or fear; to the contrary, the onus under the statute is on the noncitizen to "indicate[]" either of the circumstances warranting referral. Because the Departments' procedures comply with the statute, they comport with due process. *See Thuraissigiam*, 591 U.S. at 139–40.

Third, noncitizens who manifest or express a fear and who are referred for a credible fear interview will receive additional information about the credible fear process that has the same types of procedural and substantive information as that provided in the Form M-444, which is used for those not subject to the rule's expedited removal procedures and during times when this rule's provisions do not apply. 89 FR at 48739–40. The new "Information About Credible Fear Interview Sheet" informs the noncitizen that the noncitizen may consult with another person, including a legal service provider, and is provided to the noncitizen along with an EOIR-maintained list of pro bono legal service providers. It gives the noncitizen information about the

credible fear interview itself, including that an interpreter will be provided, if needed or requested. It explains that the noncitizen may request a male or female interpreter or AO and may speak to the AO separately from the noncitizen's family. It highlights the importance of telling the AO about the noncitizen's fear of harm and that this may be the only opportunity to do so. The information sheet notifies the noncitizen of the right to have an IJ review a negative fear determination and gives details about the steps following a positive determination.

Individuals in the credible fear process maintain the right to consult with an attorney or other person or persons of their choosing before their interview, and such persons may be present for the interview itself. 8 CFR 235.15(b)(4)(i)(B). Asylum seekers also may present evidence relevant to their claim during their interviews. 89 FR at 48746 & n.239. Additionally, USCIS provides interpreter services at the agency's expense to noncitizens who cannot proceed effectively in English. 8 CFR 208.30(d)(5). And noncitizens may request review of a negative fear determination before an IJ. *Compare* 8 CFR 208.30(g)(1) (providing the standard process for requesting IJ review in credible fear proceedings), *with* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those subject to the rule and unable to show that the exception to the limitation on asylum eligibility applies). The rule requires noncitizens to respond affirmatively when asked whether the noncitizen would like to request such review, rather than providing review if the noncitizen does not respond, but IJ review remains available in all cases with a negative credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1). The rule is thus fully consistent with the Departments' legal authority and obligations.

In addition, the rule provides several procedural protections to ensure that asylum applicants receive a full and fair hearing before an IJ and that the limitation on asylum eligibility applies only to noncitizens properly within the scope of 8 CFR 208.35(a) and 1208.35(a). During the credible fear review, an IJ will evaluate de novo whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the

evidence that the limitation on asylum eligibility does not apply or that the noncitizen meets the exception.  8 CFR 208.35(b)(2)(v), 1208.35(b).  Even where an IJ determines that the noncitizen has not met that burden, if the noncitizen demonstrates a reasonable probability of persecution or torture in the country or countries of removal, the noncitizen will have an opportunity to apply for statutory withholding of removal, protection under the CAT regulations, or any other form of relief or protection for which the noncitizen is eligible in section 240 removal proceedings, including asylum.  8 CFR 1208.33(b)(2)(ii), 1208.35(b)(2)(iii).  These standards help to ensure the outcome of the process delineated in the rule is not predetermined and that noncitizens potentially subject to the limitation on asylum eligibility receive sufficient opportunity for consideration and review of threshold eligibility determinations to satisfy any putative due process rights they may have.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks omitted)).

Nor does the rule violate any procedural due process rights noncitizens may have in section 240 removal proceedings.  For those placed in section 240 removal proceedings, the rule's limitation on asylum eligibility will be litigated in those proceedings before an IJ with all the procedural rights that apply in such proceedings.  *See Pouhova*, 726 F.3d at 1011; *see also Rehman v. Gonzales*, 441 F.3d 506, 508 (7th Cir. 2006) ("Any proceeding that meets [the requirements of section 240 of the INA, 8 U.S.C. 1229a, and the INA's implementing regulations,] satisfies the Constitution as well.").

Additionally, the Departments disagree with comments characterizing the IFR as resulting in unfair procedures that are especially harmful to those with particular vulnerabilities, such as UCs, individuals with mental health issues or intellectual capacity challenges, and victims of violence, torture, or other traumatic experiences.  Nothing in the IFR changes the longstanding framework establishing that UCs are not subject to expedited removal.  *See* 8 U.S.C. 1232(a)(5)(D).  UCs are also specifically excepted from the Proclamation's suspension

and limitation on entry under section 3(b) of the Proclamation and, accordingly, the IFR's

limitation on asylum eligibility.  89 FR at 48487; 8 CFR 208.35(a)(1), 1208.35(a)(1).  Moreover,

the process outlined in the IFR does not prohibit USCIS from exercising its discretion to issue

notices to appear ("NTAs") and place noncitizens, including those who are unable to testify or

who speak a rare language, in section 240 removal proceedings, where they can request asylum.

*See* 8 CFR 208.30(b); *see also Matter of E–R–M– & L–R–M–*, 25 I&N Dec. 520, 523 (BIA

2011) (finding that the INA provides DHS with "discretion to put aliens in section 240 removal

proceedings even though they may also be subject to expedited removal").  Additionally, EOIR

has established a specialized juvenile docket at each immigration court with an established

caseload of children's cases; has issued guidance to its adjudicators regarding special

considerations and procedures for cases involving children, including UCs; and has provided

training to IJs on cases involving children, including UCs.[148]

     Noncitizens in section 240 removal proceedings have a wide range of well-established

statutory and regulatory rights, including the following: the right to representation at no expense

to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to

examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C.

1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)–(iii); the right to

file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA,

8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of a final removal order in the

appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252.  Additionally, EOIR provides

interpreters for noncitizens in section 240 removal proceedings.[149]  And safeguards are provided

to those who are not competent to participate in their proceedings, *see Matter of Matter of M–A–*

*M–*, 25 I&N Dec. 474, 481–82 (BIA 2011), which may include termination of the proceedings

---

[148] *See* EOIR, *Director's Memorandum 24–01, Children's Cases in Immigration Court* (Dec. 21, 2023),
*https://www.justice.gov/d9/2023-12/dm-24-01_1.pdf.*

[149] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6, 2023),
*https://www.justice.gov/eoir/book/file/1586686/dl.*

where "[f]undamentally fair proceedings are not possible because the noncitizen is mentally

incompetent and adequate safeguards are unavailable," 8 CFR 1003.1(m)(1)(i)(B),

1003.18(d)(1)(i)(B).

The Departments also disagree with commenters' assertion that the IFR would lead to

disparate or arbitrary application of the law.  USCIS AOs and supervisory AOs have received the

same training and materials related to applying the IFR across offices and jurisdictions.  Asylum

staff nationwide use Global, a cloud-based case management system,[150] which includes interview

guides, forms, and instructions—including specific interview guides, forms, and instructions to

implement the IFR—to ensure consistency in procedures and substantive guidelines.  Moreover,

the IFR does not change the fact that all credible fear determinations issued by USCIS are

reviewed by a supervisory AO prior to being served on a noncitizen, 8 CFR 208.30(e)(8),

another important safeguard to ensure quality and consistency within and between offices.

Additionally, IJs are career employees who are selected through a competitive process.[151]

The Director of EOIR has authority to order "comprehensive, continuing training and support"

directed at "promot[ing] the quality and consistency of adjudications."  8 CFR 1003.0(b)(1)(vii).

And the Chief IJ has the authority to "[p]rovide for appropriate training of the immigration

judges and other [Office of the Chief Immigration Judge] staff on the conduct of their powers

and duties."  8 CFR 1003.9(b)(2).  Regulations also require IJs to "resolve the questions before

them in a timely and impartial manner consistent with the [INA] and regulations."  8 CFR

1003.10(b).  To that end, all IJs receive ongoing training to facilitate the implementation of new

policies and procedures, such as the IFR.[152]  EOIR's Legal Education and Research Services

Division also offers nationwide legal training for IJs and "regularly distributes new information

---

[150] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division*, at 4 (2018),
*https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

[151] EOIR, *Make a Difference – Apply for an Immigration Judge Position* (last updated Sept. 17, 2024),
*https://www.justice.gov/eoir/Adjudicators* (describing application process and core position requirements for IJ
position).

[152] *See, e.g.*, EOIR, *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022),
*https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

within EOIR that includes relevant legal developments and policy changes from U.S.

government entities and international organizations."[153]

(2)  Access to Counsel, Unrepresented Applicants, and the Ability or Time to Prepare

*Comment:*  Commenters stated that access to counsel is a due process right.  Commenters

also discussed statutory and regulatory requirements that provide noncitizens eligible for a

credible fear interview the right to consult with legal counsel and said that the recent change to a

minimum 4-hour consultation period prior to a credible fear interview—which DHS made via

guidance—would effectively deny noncitizens that right.

One commenter additionally stated that less than 3 percent of migrants in expedited

removal were able to obtain legal representation.  Other commenters said that less than 1 percent

were able to find representation in the credible fear process.  A commenter stated that in 2023,

35 percent of represented individuals had their negative fear determinations vacated, compared

to just 15 percent of unrepresented noncitizens.  Commenters emphasized that any immigration

solution should include procedures for asylum seekers to access legal representation.

Another commenter said that a 2010 study found that 54 percent of noncitizens with

representation were granted asylum, compared to 11 percent of noncitizens without

representation.  Another commenter said that noncitizens with representation were twice as

likely to receive a grant of asylum as their unrepresented counterparts.  The commenter said that

such data indicate that, as a result of the IFR and reduced access to counsel, applicants with

meritorious claims who would have otherwise been referred to full hearings will be denied.

Commenters stated that many noncitizens do not understand the function and purpose of

a credible fear interview without speaking with an attorney, particularly those who speak

languages not included on orienting signs.  Commenters explained that a majority of noncitizens

do not have legal representation and thus may struggle to effectively present their cases,

---

[153] EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division.*

particularly if they do not speak English. Commenters also stated that, without legal counsel, many noncitizens will not understand the process nor the legal grounds for their asylum claims. Commenters stated that access to counsel significantly affects asylum outcomes and that less access to counsel is particularly troubling considering that noncitizens must now meet a new, higher standard for protection screenings. One commenter stated that the rule will worsen the issues that already exist in expedited removal proceedings, adding that children and adults are routinely denied access to legal advice if they get referred for fear screenings. Commenters who provide legal services also claimed that they have been excluded from credible fear interviews and subsequent credible fear review hearings before IJs.

Another commenter stated that the availability of legal information and representation at the outset of the asylum process increases efficiency, discourages frivolous claims, reduces the number of appeals and repeat claims, and shortens the time required to determine a claim.

Several commenters stated that noncitizens face significant barriers to obtaining legal representation during the credible fear process. A commenter stated that noncitizens in custody already face insurmountable hurdles to access legal counsel, such as knowing how to contact a lawyer, knowing where they are being detained, having access to a phone, and being given enough information to understand the credible fear process. Another commenter stated that having only 4 hours would make it impossible for providers to meet with clients before credible fear interviews, stating that legal representatives often face barriers to accessing clients within 48 hours, much less 4. The commenter discussed such barriers, stating that legal representatives frequently wait 24 to 48 hours for their interviews with their clients to be scheduled and may be barred from including translators or interpreters in those interviews. Some commenters stated that immigration advocates and attorneys face numerous issues in trying to provide legal consultations, such as being unable to physically access detention facilities or obtain the requisite signatures from their clients. Another commenter added that advocates lack access to private

meeting rooms and experience long waits to meet with clients, malfunctioning technology, and unsafe or uncomfortable environments.

Several commenters stated that the rule would effectively eliminate access to legal representation because noncitizens would have only 4 hours to find and consult with a lawyer before an initial hearing.  Commenters emphasized that they viewed a 4-hour window as troubling in light of the newly increased standards noncitizens must meet.  Commenters stated that it takes more than 4 hours to adequately prepare a noncitizen for the credible fear process. Commenters stated that noncitizens will not have the time or resources to contest arguments and present evidence before the credible fear screenings.  Commenters believed that the 4-hour window will lead to greater rates of refoulement.  Commenters stated that the 4-hour window may fall on a weekend or after business hours, when legal service providers and aid organizations are closed.  Commenters asserted that noncitizens will lose access to legal counsel because the United States does not provide free counsel for noncitizens, and 4 hours is not enough time for individuals to retain counsel.  Commenters stated that the rule's restrictions are arbitrary and impermissible, not supported by evidence, and will lead to the denial of otherwise meritorious asylum claims.  Commenters stated that counsel would not be able to access their clients physically or telephonically in a 4-hour window.

Commenters stated that, by reducing noncitizens' ability to secure counsel and connect with communities, the IFR will prevent individuals from becoming aware of other protections from which they could potentially benefit.

*Response:*  The rule does not deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause.  The Supreme Court has held that the rights of individuals seeking asylum at the border are limited to "only those rights regarding admission that Congress has provided by statute."  *Thuraissigiam*, 591 U.S. at 140.  The INA provides that a noncitizen "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General," provided

that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). This statutory right to consult does not attach until a noncitizen becomes eligible for a credible fear interview, and it does not guarantee an absolute right to retain counsel. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). The regulations implementing expedited removal elaborate that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 CFR 235.3(b)(4)(ii).

Moreover, because this rule does not alter procedures governing consultation or representation, commenters' concerns regarding those issues—including that the minimum 4-hour consultation period violates section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), or is unreasonable—are outside the scope of this rulemaking. Procedures regarding consultation and representation are governed by other DHS regulations, guidance, and policies.

Nevertheless, insofar as commenters' concerns relate to the Departments' decision to adopt the changes made by the IFR and this rule, DHS's changes to the consultation period do not undermine the Departments' decision to promulgate this rule. Those changes aim to address the same emergency border circumstances as this rule—specifically, DHS determined that shortening the minimum consultation period would reduce the risk that DHS's processing capacity would become overwhelmed by increasing DHS's ability to impose consequences swiftly, which in turn lowers incentives for additional irregular migration. DHS's 4-hour minimum consultation period, moreover, continues to allow sufficient time for individuals to make multiple phone calls and have in-depth conversations. DHS is not aware of any data supporting the assertion that this approach has decreased the effective availability of consultation. Finally, even if this approach had some adverse effect on noncitizens' ability to consult, the Departments would still find it necessary and appropriate to adopt this rule's

changes, including the two changes to the portions of the removal process that follow consultation—the asylum limitation and the reasonable probability standard.

The Departments start by explaining how the consultation process works. Once a noncitizen is referred to USCIS for a credible fear interview pursuant to 8 CFR 235.15(b)(4), the rule ensures that the noncitizen receives information about that interview and the right to consult with a person or persons of the noncitizen's choosing. Specifically, all those referred for a credible fear interview receive a written "Information About Credible Fear Interview Sheet" describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of any negative fear determination an AO enters; and the consequences of a failure to establish a credible fear of persecution or torture. 8 CFR 235.15(b)(4)(i)(B). This written disclosure is available in English, Spanish, Haitian Creole, and Portuguese, and the noncitizen is also provided with a list of pro bono legal service providers. If the noncitizen does not speak one of these languages, then language access services are provided to orally communicate the written material in a language understood by the noncitizen.[154] As stated in the "Information About Credible Fear Interview Sheet," the minimum 4-hour consultation period begins at the time a noncitizen who has been referred to USCIS for a credible fear interview has access to a phone or another opportunity to consult with an individual of the noncitizen's choosing, and the minimum 4-hour period runs only between the hours of 7 a.m. and 7 p.m. This period is calculated in local time. Procedurally, a noncitizen is scheduled for a credible fear interview only after the minimum consultation period has elapsed, regardless of whether the noncitizen used the phone or consulted with anyone during that period.

---

[154] *See, e.g.*, ICE, *2019 National Detention Standards for Non-Dedicated Facilities*, Foreword (2019), *https://www.ice.gov/detain/detention-management/2019* ("Generally, all written materials provided to detainees must be translated into Spanish and other frequently encountered languages. Oral interpretation or other language assistance must be provided to any detainee who speaks a language in which written material has not been translated or who is illiterate."); ICE, *2011 Operations Manual ICE Performance-Based National Detention Standards*, Standard 2.13 (2011), *https://www.ice.gov/detain/detention-management/2011* ("Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.").

The "Information About Credible Fear Interview Sheet" further explains that the noncitizen may have a consultant of the noncitizen's choice participate in the interview with USCIS by telephone, and an EOIR-maintained list of pro bono legal service providers who may be able to speak with the noncitizen is also provided.  The information sheet instructs noncitizens to ask a DHS officer for assistance if they want to call someone.  Individuals who manifest fear in CBP custody and go through the credible fear process in CBP custody are provided access to a phone in order to telephonically consult with any individual of their choosing, including legal counsel, and do not need to ask CBP employees to do so.  After manifesting a fear, when a phone becomes available, such noncitizens are brought to the phone and given at least 4 hours in which to use it.  If a noncitizen requests use of a phone after the end of the noncitizen's consultation period, but before the noncitizen's interview occurs, the noncitizen is afforded the opportunity to access a phone unless it is not operationally feasible to provide such access (such as because of a lack of available personnel to escort the noncitizen to the consultation area).  The phone booths in which such consultations occur are private, closed, confidential booths and include an EOIR-maintained list of pro bono legal service providers.[155]

Those detained noncitizens who go through the credible fear process in ICE custody generally have direct access to phones (without having to interact with facility staff to request access, for instance) and have access to a free call platform that includes telephone numbers of legal service providers who are listed on the EOIR-maintained list of pro bono legal service providers, in accordance with ICE detention standards.[156]  Beyond telephone access, visits between a legal representative and a detained noncitizen are confidential and not subject to

---

[155] *See* USBP, *6.4.24 USBP Field Guidance*, at 4.

[156] ICE, *Attorney Information and Resources: Communicating with Your Client or Prospective Client* (last updated Aug. 9, 2024), https://www.ice.gov/detain/attorney-information-resources.  Telephone access and use may be limited in the event of emergencies (for instance, escapes, escape attempts, disturbances, fires, power outages) or other events that disrupt orderly facility operations.  If such disturbances occur, officers are responsible for ensuring that the minimum 4-hour consultation period is afforded.

auditory supervision.[157]  Private consultation rooms may be available for these meetings.[158]  To facilitate improved access to legal resources and representation, ICE has also expanded its Virtual Attorney Visitation program, which facilitates confidential attorney-client conversations through virtual technology.[159]

Commenters' arguments concerning the minimum 4-hour consultation period, first, miss that Congress did not provide an unqualified right to consultation or representation during the credible fear process.  Rather, noncitizens may consult "according to regulations prescribed by" the Secretary, and "[s]uch consultation . . . shall not unreasonably delay the process."  *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).  And those regulations specify that "consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained."  8 CFR 235.3(b)(4)(ii).  "Read together, the text of these provisions provides noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained."  *Las Americas Immigr. Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 25 (D.D.C. 2020); *cf.* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III) (providing that IJ review of an AO's negative credible fear determination "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination").

DHS, moreover, moved to the 4-hour minimum consultation period for credible fear referrals for noncitizens covered by the IFR to address the emergency border circumstances described in the President's June 3 Proclamation based on a determination that operational imperatives necessitated this change in order to avoid unreasonable delays to the process in the

---

[157] *Id.*

[158] *Id.*

[159] ICE, *Virtual Attorney Visitation Program* (last updated Aug. 16, 2024), *https://www.ice.gov/detain/detention-facilities/vav*.

context of these emergency border circumstances—exactly the type of determination that Congress authorized DHS to make.  Under DHS's guidance that applies outside of the context of emergency border circumstances, noncitizens are not interviewed until at least 24 hours after the noncitizen's acknowledgement of receipt of the Form M-444,[160] unless the noncitizen, at the noncitizen's request, voluntarily waives the consultation period.  Even if a noncitizen consults at the start of that 24-hour period, the noncitizen's credible fear interview is not conducted until after that period ends.

The 4-hour approach allows a swifter cadence of scheduling noncitizens for credible fear interviews.  This minimum 4-hour consultation period thus enables credible fear screenings to take place in a more efficient manner and reduces the time noncitizens remain in custody; in turn, those improvements mitigate overcapacity issues in DHS facilities, free up detention space to allow for greater expedited-removal processing capacity over time, and help to avoid situations in which DHS must issue NTAs to individuals otherwise eligible for expedited removal and release them pending section 240 removal proceedings—in turn delaying the imposition of consequences for those without a legal basis to remain in the United States and creating incentives for additional arrivals at the border.  Conversely, a longer minimum consultation period would delay credible fear screenings, increase the amount of time noncitizens remain in immigration detention, and contribute to a situation where DHS's capacity could quickly become overwhelmed, including potentially requiring the release of individuals into section 240 removal proceedings instead of processing such individuals under expedited removal due to resource constraints—thus delaying the imposition of consequences for those without a legal basis to remain and creating incentives for more irregular migration.

The Departments disagree with the conclusion drawn by certain commenters that a shortened minimum consultation period effectively eliminates access to counsel or that the hours

---

[160] *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023).

during which the consultation period runs make it practically impossible for noncitizens to reach

attorneys or consultants. To the contrary, the minimum 4-hour period that DHS has adopted

allows sufficient time for individuals to make multiple phone calls and have in-depth

conversations prior to the credible fear interview. *Cf. Las Americas Immigr. Advoc. Ctr.*, 507 F.

Supp. 3d at 12–14, 30.

The difference between DHS's 24-hour approach and its approach during these

emergency border circumstances is also less significant in practice than certain commenters

suggested. For example, the consultation period during emergency border circumstances begins

to run only when the individual is provided access to a phone and confers access during at least

that 4-hour period; the 24-hour period, by contrast, begins when a noncitizen acknowledges

receipt of the Form M-444, and the noncitizen does not necessarily have access to a phone

immediately at that point. For those who express a fear in CBP custody, under either approach,

CBP generally takes a noncitizen to a phone booth once during the noncitizen's time in custody

for consultation, and CBP generally will accommodate requests for additional phone access

when operationally feasible. In addition, a significant share of the 24-hour period occurs

overnight, when fewer people are likely be available to take calls. Under the 4-hour approach,

by contrast, the clock runs only during daytime hours.

The 4-hour period is also a minimum, and noncitizens may receive greater time. For

example, for noncitizens in CBP custody, if a noncitizen requests access to a phone booth after

the consultation, but the interview has not yet occurred, the agent or officer would in the normal

course facilitate another call, to the extent operationally feasible. For noncitizens in ICE custody,

noncitizens are generally housed in areas with phones that they may use at any time. Hence,

noncitizens have phone access even during times when the 4-hour consultation period is tolled,

as well as in circumstances in which the noncitizen's credible-fear interview is delayed for a

longer time than the 4-hour minimum. The result is that noncitizens in ICE custody will often

have more than 4 hours of phone access. Requests to reschedule the credible fear interview may

be accommodated for reasons that constitute extraordinary circumstances, such as serious illness of the noncitizen's consultant or serious facility issues that prevented the noncitizen from contacting a consultant.

The Departments acknowledge that the period includes Saturdays, Sundays, holidays, and periods outside of traditional business hours (7 a.m. to 9 a.m. and 5 p.m. to 7 p.m.). And while the Departments recognize that it may be more difficult for detained noncitizens to connect with the person or persons with whom they wish to consult during these times, this concern again does not undermine the Departments' decision to adopt the changes in the IFR and this rule. DHS's 24-hour approach also includes Saturdays, Sundays, and holidays.[161] Although DHS's 4-hour approach uses a shorter window during those periods than its 24-hour approach, the Departments have already explained why that change makes less of a practical difference than some commenters suggest. Moreover, although DHS's approach during emergency border circumstances may sometimes result in some or all of the 4-hour period falling outside of traditional business hours, noncitizens may reach out to individuals in different time zones during these periods. For those who manifest fear in CBP custody, CBP provides noncitizens with a list of legal service providers operating in multiple time zones.[162] For those who manifest fear in ICE custody, ICE provides noncitizens with a list of legal service providers who service the area in which the noncitizen is detained and ICE will, upon request, provide the noncitizen a list of providers in additional States identified by the noncitizen. In addition, DHS's 24-hour approach also does not guarantee that noncitizens would have access to phones during traditional business hours (for example, when the period falls over a weekend or holiday).[163] Excluding

---

[161] *See* DHS, *M-444 Information About Credible Fear Interview* (May 10, 2023) (noting that the interview will occur no earlier than 24 hours after receipt of the form without mention of any tolling or stoppage).

[162] *See, e.g.*, *EOIR, List of Pro Bono Legal Service Providers (Noncitizens in U.S. Customs and Border Protection Custody)* (July 2024), *https://www.justice.gov/eoir/page/file/1582586/dl*.

[163] The consultation period also was not tolled for weekends, holidays, or periods outside of normal business hours under the 48-hour approach that predated the 24-hour approach. *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023) ("Under the current policy, credible fear interviews have generally taken place at least 48

weekends, holidays, and periods outside of traditional business hours would thus mark a significant change in DHS's practice that could lead to unreasonable delays. And because CBP continues to encounter individuals and to take them into custody 24 hours a day and 7 days a week, that change would be inconsistent with the imperative to facilitate the prompt operation of the expedited removal process, especially during the emergency border circumstances when this rule applies.

In addition, when a noncitizen receives a negative credible fear determination, the noncitizen also has an additional opportunity to consult before review of that determination by an IJ (if requested). INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). Noncitizens can obtain counsel or consult with other individuals of their choosing and seek to introduce new evidence before IJs, allowing for additional consultation beyond the initial 4 hours. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42(c). That additional consultation opportunity further reinforces the Departments' view that the minimum 4-hour consultation period prior to the credible fear interview does not undermine their decision to adopt the changes made by the IFR and this rule.

In response to comments alleging that legal representatives have been excluded from credible fear interviews, the Departments again note that neither this rule nor the consultation period policy changes the procedures and regulations governing attorney participation during credible fear interviews. Under existing regulations, all noncitizens are afforded the opportunity to have a person or persons of their choosing present, including by phone, during their credible fear interview. 8 CFR 208.30(d)(4). In any case where USCIS has received a properly executed G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, prior to the credible fear interview, asylum office staff notify the attorney or accredited representative of the scheduled interview date and time, and the AO must call the attorney or representative before

---

hours after the time of the noncitizen's arrival at the detention facility, unless the noncitizen specifically requests to be interviewed more quickly.").

beginning the interview so the attorney or representative may be present.  If the AO is unable to reach the attorney or accredited representative, the AO documents this in the interview notes and asks the noncitizen if the noncitizen would like to proceed without the attorney or accredited representative present.  Guidance instructs that, where a properly executed Form G-28 is on file, asylum office staff will attempt to ensure that the attorney or accredited representative is present at the interview if the noncitizen desires such a person's presence.  Further, as long as it does not unreasonably delay the process, the asylum office has discretion to reschedule interviews on a case-by-case basis to ensure that an attorney or accredited representative may attend.  At the beginning of the credible fear interview, if it has not already been established through a Form G-28, the AO asks the noncitizen if the noncitizen has an attorney or consultant and verifies whether the noncitizen received a list of free or low-cost legal service providers.  If the noncitizen does not have an attorney or consultant present, the AO reminds the noncitizen that the noncitizen may have an attorney or consultant present during the interview and asks the noncitizen if the noncitizen wants to continue with the interview without an attorney or consultant present.  In addition, as noted above, if a noncitizen requests to reschedule the interview for reasons that constitute extraordinary circumstances, such as illness of the noncitizen's consultant or technical issues that prevented the noncitizen from contacting a consultant, such requests may be accommodated.  If there are individual instances where commenters believe legal representatives have been excluded from a credible fear interview contrary to the wishes of a noncitizen, commenters should lodge those complaints through the proper channels,[164] but the Departments emphasize that the present rule does not change the regulatory provisions that govern who may be present during the credible fear interview or impact how asylum office staff ensure those provisions are enforced.

---

[164] *See* USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct*; *see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint*.

As for the credible fear interview itself, as discussed more fully below in Section III.C.3 of this preamble, even with the heightened screening standard for those found not to have a significant possibility of demonstrating eligibility for asylum under this rule's limitation on asylum eligibility, the type of information sought to be elicited during a credible fear interview is well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. 89 FR at 48747–48. Indeed, even after implementation of the IFR, the experience of DHS has been that noncitizens who do not have an attorney or consultant present during the credible fear interview are often able to successfully satisfy the "reasonable probability" screening standard.[165] Additionally, under the IFR and this rule, a noncitizen may request IJ review of an AO's negative credible fear determination, which provides an additional layer of protection, including for those noncitizens who are unable to consult with an attorney.

With respect to commenters' reliance on data that purport to show that few noncitizens are able to secure the assistance of counsel during the credible fear process and that those who do receive better outcomes, the Departments note that such data fail to take into account any screening that may occur by legal service providers to determine the perceived validity of the claim before agreeing to provide representation to a noncitizen. Even assuming some instances of improved results for those with counsel, due process "does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979). Moreover, as discussed in Section II.A.2 of this preamble, 51 percent of SWB encounters between POEs referred to the credible fear process under the rule—including many who did not have an attorney or consultant present during the credible fear interview—have received a positive result.[166]

---

[165] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[166] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

With regard to commenter concerns about lack of privacy during credible fear interviews, DHS notes that these interviews are conducted "separate and apart from the general public."  8 CFR 208.30(d).  The Departments are mindful of their duties under 8 CFR 208.6 and 1208.6 to prevent unauthorized disclosure of records pertaining to any credible fear determination, and AOs are required to explain these confidentiality requirements to noncitizens prior to credible fear interviews.[167]  For those going through the consultation and credible fear process in CBP custody, noncitizens consulting with an attorney or other individual before a credible fear interview do so in a private phone booth.  USCIS contract interpreters conducting telephonic interpretation are bound by the confidentiality requirements protecting all credible fear determinations pursuant to 8 CFR 208.6[168] and must pass all required DHS background checks applicable to contractors.[169]  All AOs receive training on working with interpreters, which includes explaining confidentiality, assessing competency, and recognizing other factors that may affect the accuracy of interpretation.[170]  AOs are trained to elicit all relevant testimony during credible fear interviews[171] and will not preemptively issue negative credible fear determinations due to phone connectivity issues.  And all AOs receive training on interviewing survivors of torture and other severe trauma.[172]

---

[167] *See* USCIS, *RAIO Directorate – Officer Training: Interviewing – Introduction to the Non-Adversarial Interview* 19–20 (Apr. 24, 2024); USCIS, *RAIO Directorate – Officer Training: Interviewing – Working With An Interpreter* 14, 30 (Apr. 24, 2024).

[168] *See* USCIS, *RAIO Directorate – Officer Training: Interviewing – Working With An Interpreter* 14, 30 (Apr. 24, 2024); *see also* USCIS, *Credible Fear Procedures Manual* sec. III.E.3.d (May 10, 2023), https://www.uscis.gov/sites/default/files/document/guides/CredibleFearProceduresManual.pdf.

[169] *See* DHS, *Fact Sheet: Contractor Fitness at DHS*, *https://www.dhs.gov/sites/default/files/publications/personnel_security_contractor_fitness_fact_sheet_new.pdf* (last visited Sept. 20, 2024).

[170] USCIS, *RAIO Directorate – Officer Training: Interviewing – Working with an Interpreter* 14, 17–22, 24, 30, 43–44 (Apr. 24, 2024).

[171] USCIS, *RAIO Directorate – Officer Training: Interviewing – Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information."); *id.* at 12 ("It is your duty to fully and fairly develop the record by eliciting information from the interviewee, probing for additional information, and following up on the interviewee's statements.").

[172] USCIS, *RAIO Directorate – Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

The Departments therefore decline to amend in this rule existing practices with respect to credible fear proceedings based on commenters' concerns about noncitizens' ability to obtain and consult with counsel.  Nothing in the rule alters noncitizens' existing ability to consult with persons of their choosing prior to the credible fear interview, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), or prior to IJ review of a negative credible fear determination, *see* 8 CFR 1003.42(c).  The Departments believe that any minimal adverse impact on the ability to retain counsel resulting from the rule and changes in DHS's practices are outweighed by the significant benefits to efficiency that the rule and DHS's changed practices promote.  In addition, the Departments do not believe that the limitation on asylum eligibility or the heightened "reasonable probability" standard applied to those who do not establish a credible fear of persecution for asylum purposes due to the limitation require significant development prior to the credible fear interview.  At the screening stage, the information pertinent to the limitation— including the existence of exceptionally compelling circumstances—and the reasons for the noncitizen's fear of persecution or torture are reasonably expected to be within the noncitizen's personal knowledge at the time of the credible fear interview.  *See* 89 FR at 48747–48.  And as explained in the IFR, AOs and IJs are trained on and have extensive experience eliciting such information from noncitizens.  *Id.* at 48747–48 & nn.241–44.  The Departments do not seek to diminish the importance of being able to consult with a person or persons of the noncitizen's choosing during the screening process as provided by statute, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), but the Departments also do not believe that the information required for the screening process under the IFR and this rule is such that the screening interviews must be significantly delayed to allow for greater consultation time.  Doing so in the context of emergency border circumstances would "unreasonably delay the process."  INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).

As to commenters' arguments that ensuring legal representation increases efficiency, discourages frivolous claims, shortens the time required to determine a claim, and reduces the

number of appeals and repeat claims, the Departments note that even assuming those claims are true, ensuring legal representation for all noncitizens would impose extraordinary burdens on DHS and would undermine the speed that Congress sought to achieve in the expedited removal system.  Moreover, because Congress refrained from creating an unqualified right to legal representation, the approach adopted in this rule accords with the statute and is a reasonable exercise of the Departments' discretion.  *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv) (providing the noncitizen only an opportunity to "consult" with a person prior to a credible fear interview).

(3)  Noncitizens' Ability to Have Their Claims Heard

*Comment:*  Commenters stated that a quota system would deny vulnerable individuals and families the opportunity to have their claims fairly considered, in contravention of U.S. and international law.  Similarly, a commenter stated that, by imposing a cap on daily asylum claims and automatically denying asylum to those who exceed the limit, the IFR "nullifies fundamental rights that the United States is obligated to uphold."  The commenter wrote that this "blanket denial" would deviate from due process principles under U.S. and international law that mandate non-refoulement and the individualized assessment of asylum claims.  Commenters also stated that the IFR strips away the humane aspects of the asylum system.

*Response:*  The Departments do not believe that the rule affords noncitizens an insufficient opportunity to have their asylum or protection claims heard, and the rule's limitation on eligibility includes no automatic "blanket denials" based on quotas or caps.  Instead, during the emergency border circumstances described in the Proclamation, in the IFR, and in this rule— which relate to encounter levels as described in Section III.D.1 of this preamble—the rule's provisions (which are consistent with U.S. domestic and international law, as discussed in Section III.A.1 of this preamble) impose a limitation on asylum eligibility (with an appropriate exception) and changes to the expedited removal and credible fear process aimed at providing the Departments a greater ability to deliver timely decisions and consequences to noncitizens

encountered along the southern border. The rule does so while ensuring that those in expedited removal proceedings who fear removal continue to have their fear claims heard.

First, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Such referrals occur irrespective of how many noncitizens have presented at the border or sought protection on a given day.

Second, this rule does not change the longstanding procedural protections that are provided to noncitizens during these credible fear interviews. Credible fear interviews are conducted in a non-adversarial manner,[173] and all AOs are trained in non-adversarial interview techniques to facilitate their duty to elicit relevant and useful information—in effect, to help the noncitizen meet their burden through testimony alone.[174] 8 CFR 208.1(b). AOs are also trained to consult country conditions information, which often provides context to a noncitizen's claim. *Id.* In evaluating whether a noncitizen has shown a credible fear, AOs are instructed by statute to take into account the credibility of the statements made by the noncitizen and such other facts as are known to the AO. INA 235(b)(1)(B)(ii)–(iii), 8 U.S.C. 1158(b)(1)(B)(ii)–(iii). Just as a noncitizen's testimony alone without corroboration may be sufficient to establish the noncitizen meets the definition of a refugee where it is credible, persuasive, and refers to specific facts, INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii), a noncitizen's testimony alone, in the credible fear context, may meet the burden to demonstrate a credible fear of persecution or torture.[175]

---

[173] USCIS, *RAIO Directorate – Officer Training: Interviewing – Introduction to the Non-Adversarial Interview* 13–15 (Apr. 24, 2024). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

[174] *See, e.g.*, USCIS, *RAIO Directorate – Officer Training: Interviewing – Eliciting Testimony* 11–12 (Apr. 24, 2024).

[175] *See* USCIS, *RAIO Directorate – Officer Training: Credible Fear of Persecution and Torture Determinations* 19

Accordingly, insofar as it is part of a credible fear determination, credible testimony and evidence available to the AO alone may be sufficient to demonstrate a significant possibility that the noncitizen could show that the noncitizen is eligible for the "exceptionally compelling circumstances" exception to this rule's limitation on asylum eligibility. The procedures outlined above do not depend on how many noncitizens have presented at the border or have sought protection on a given day.

Third, all negative credible fear determinations are reviewed by a supervisory AO prior to becoming final, *see* 8 CFR 208.30(e)(8), and, consistent with the sole statutorily provided mechanism for review of negative credible fear determinations, *see* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), noncitizens may request review of a negative credible fear determination before an IJ, *see* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those described in the Proclamation and unable to show that the rule's exception to the limitation on asylum eligibility applies).

Unlike the process that applies to negative credible fear determinations under 8 CFR 208.30(g)(1)(i), during which a noncitizen's refusal or failure to request or decline IJ review is treated as a request for IJ review, noncitizens under the present rule must indicate whether they desire IJ review when asked, *see* 8 CFR 208.35(b)(2)(iv). When serving the negative credible fear determination, USCIS staff read the contents of the Form I-869SBIFR, Record of Negative Credible Fear and Reasonable Probability Finding and Request for Review by Immigration Judge for Noncitizens Subject to the Limitation on Asylum Eligibility Pursuant to 8 CFR 208.35(a), to the noncitizen in a language the noncitizen understands, using an interpreter if needed.[176] The Form I-869SBIFR includes a statement that the noncitizen may request that an IJ review the negative determination and that, if the noncitizen does not request IJ review, the

---

(May 9, 2024); *see also Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 46–47 (D.D.C. 2020) (asylum officer ("AO") cannot require an applicant to provide corroborating evidence at the credible fear stage where the applicant's testimony is otherwise found credible).

[176] Following issuance of this rule, the form will be designated I-869SB instead of I-869SBIFR.

noncitizen will not receive review by an IJ and may be removed from the United States immediately. The noncitizen then must check one of two boxes on the I-869SBIFR indicating either that the noncitizen requests IJ review or does not request IJ review. The noncitizen will be referred to an IJ for review of a negative determination only where the noncitizen requests such review. 8 CFR 208.35(b)(2)(iv)–(v). Under the IFR and this rule, IJ review remains available in all cases with a negative credible fear determination, and such review includes an opportunity for the noncitizen to be heard and questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1) and (2). Additionally, while it is not equivalent to another level of review, USCIS retains the sole discretion to reconsider its own negative credible fear determination following IJ concurrence. 8 CFR 208.35(b)(2)(v)(B). Thus, the rule maintains review of any negative credible fear determination by a supervisory AO prior to service and, following service of a negative credible fear determination, the opportunity to have an IJ review the finding de novo. *See* 8 CFR 1208.35(b)(1).

As discussed above in this section of the preamble, the Departments believe these processes are adequate in light of the high levels of training received by adjudicators and the high volume of cases before the Departments.

(4) Issues with Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations

*Comment:* Several commenters expressed concern with the conduct of AOs during credible fear interviews and suggested that AOs are ill-equipped to conduct the analysis the rule requires, including applying the "exceptionally compelling circumstances" exception to the limitation and screening fear claims at a higher evidentiary standard. Some commenters stated that they are aware of instances where AOs have failed to comply with established guidelines during credible fear interviews and that translation issues, such as Indigenous language speakers being interviewed in Spanish, exist in some cases. One commenter recounted examples of noncitizens who, the commenter believes, were wrongly issued negative credible fear

determinations; the commenter said that noncitizens' statements were incorrectly translated by interpreters and that noncitizens were not adequately asked about their experiences or were interrupted by AOs during screenings.  Other commenters discussed alleged violations of the credible fear interview procedures experienced by noncitizens, such as alleged failures to address language barriers, that prevent noncitizens from adequately telling their stories, resulting in refoulement.

An organizational commenter discussed its experience with clients who it contends were wrongfully deported and returned to violence, stating that the rule will only increase the frequency with which USCIS errs in conducting credible fear screenings and IJs err in reviewing credible fear determinations.  Commenters emphasized that hearings take place shortly after noncitizens have endured lengthy and traumatic journeys to reach the United States and asserted that they take place while noncitizens are in detention facilities with deplorable conditions.  Commenters stated that the harm caused by the IFR will be exacerbated by expedited removal policies such as conducting credible fear interviews while noncitizens are in CBP custody.  A commenter stated that courts have questioned the reliability of credible fear interviews because of the expedited and stressful nature of the process.

*Response:*  The Departments take any allegations of misconduct by AOs or other government officials seriously, and there are existing channels available to report any such alleged misconduct.[177]  To the extent that commenters suggested that examples where they believe AOs failed to follow existing guidance related to credible fear screenings or failed to conduct a fair credible fear interview are representative of AOs generally and are grounds for reasoning that AOs are ill-equipped to perform credible fear screenings under the current rule, the Departments disagree with these assertions and find them unpersuasive.  Instances where commenters believe AOs failed to conduct credible fear interviews fairly should be reported

---

[177] *See* USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint.*

through the proper channels and will be addressed on a case-by-case basis, but these anecdotal complaints do not dissuade the Departments from concluding that AOs are capable of performing their duties under this rule. These complaints about AO conduct in specific credible fear interviews do not undermine the statutorily prescribed role of AOs to conduct credible fear interviews and make credible fear determinations, and the Departments are confident, for the reasons explained above, that AOs have the necessary training and expertise to fulfill that role.

As discussed in Section III.A.1.c of this preamble, the rule operates within the expedited removal and credible fear screening process established by section 235 of the INA, 8 U.S.C. 1225, and comports with all statutory requirements. Under the credible fear statutory framework, AOs conduct credible fear screening interviews. INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i). By definition, AOs are individuals who have had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of asylum applications under section 208 of the INA, 8 U.S.C. 1158. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). They are supervised by officers who meet the same training requirements and have had substantial experience adjudicating asylum applications. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). AOs conducting credible fear interviews do so in a non-adversarial manner, beginning with ensuring the noncitizen understands the purpose of the interview, that the noncitizen has a right to have a legal representative or other person of the noncitizen's choosing present during the interview, and that the noncitizen understands the interpreter, where applicable. 8 CFR 208.30(d). USCIS has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures in place that all AOs must follow to address instances where rare language interpreters may not be available, including issuing a discretionary NTA in certain circumstances. After the noncitizen has received an NTA, the noncitizen's language barrier can be addressed in proceedings before an IJ. At the beginning of a credible fear interview, AOs explain to noncitizens the confidentiality provisions governing credible fear interviews pursuant

to 8 CFR 208.6, including that the AO and interpreter will keep the noncitizen's information and testimony confidential. The AO verifies that the noncitizen is comfortable proceeding with the interpreter and the AO of the given gender. AOs also ask noncitizens if there are any issues that could affect their ability to testify, such as a language barrier or health issue, and deal with any such issue according to established procedures. All credible fear determinations, including those in which the IFR limitation on asylum eligibility applies, are reviewed by supervisory AOs before becoming final and being served on the noncitizen, and this will remain true under the final rule. 8 CFR 208.30(e)(8). Supervisory review includes ensuring that AOs follow all applicable procedures and guidelines related to language access and other issues that could impede the noncitizen's ability to effectively communicate during a credible fear interview.

As already explained, AOs are specifically trained on eliciting testimony, working with interpreters, engaging in cross-cultural communication, detecting possible victims of trafficking, and interviewing vulnerable populations, including survivors of torture and other severe trauma. In addition to receiving specialized training on interviewing and eliciting testimony, AOs are trained on and well-versed in applying substantive asylum law in both full asylum adjudications and in screening determinations. As explained in the IFR, AOs and supervisory AOs have the training and experience necessary to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage. 89 FR at 48748. AOs frequently assess physical and psychological harm when adjudicating asylum applications and are trained to do so in a sensitive manner.[178] AOs may also evaluate harm resulting from the unavailability of necessary medical care or specific medications when assessing "other serious harm" under 8 CFR

---

[178] For example, AOs adjudicate cases involving forms of persecution like female genital mutilation, forced abortion, and forced sterilization. *See Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); INA 101(a)(42)(B), 8 U.S.C. 1101(a)(42)(B); *see also* USCIS, *RAIO Directorate – Officer Training: Gender-Related Claims* 23–27 (Apr. 24, 2024).

208.13(b)(1)(iii)(B) in full asylum adjudications.[179]  When conducting a credible fear interview where the IFR's limitation on asylum eligibility applies, AOs' questioning will necessarily include information related to whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception, regardless of whether the noncitizen affirmatively raises the issue.  Since May 11, 2023, when the Circumvention of Lawful Pathways rule went into effect, AOs and supervisory AOs have evaluated the exceptionally compelling circumstances grounds for rebutting the presumption of asylum ineligibility under that rule, including the enumerated examples of an acute medical emergency, imminent and extreme threat to life or safety, and satisfying the definition of a victim of a severe form of trafficking in persons.  8 CFR 208.33(a)(3).  The enumerated examples mirror the enumerated examples of exceptionally compelling circumstances that except noncitizens from the limitation on asylum eligibility under the IFR and this rule, *see* 8 CFR 208.35(a)(2), so not only have AOs and supervisory AOs been implementing this approach since the IFR was implemented, but they also already had considerable experience in eliciting testimony related to the "exceptionally compelling circumstances" exception and determining whether that exception applied in the context of the Circumvention of Lawful Pathways rule.  Likewise, IJs have extensive experience and training in applying such concepts to individual cases under the Circumvention of Lawful Pathways rule and the IFR.[180]  Accordingly, the Departments believe that IJs and AOs will continue to fairly and competently examine the facts

---

[179] *See* USCIS, *RAIO Directorate – Officer Training: Definition of Persecution and Eligibility Based on Past Persecution* 56–57 (Apr. 24, 2024).

[180] *See* 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1)–(2) (Chief IJ's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory authorities" and "[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties"); EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions.  LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

and circumstances of each individual's case to determine whether the individual has established a significant possibility that the individual would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the individual satisfies the rule's exception.

The Departments consider the commenters' concerns about the quality of determinations unfounded. USCIS AOs and supervisory AOs have received the same thorough training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use the Global case management system,[181] which includes updated interview guides, forms, and instructions for processing cases under the IFR to ensure consistency in procedures and substantive guidelines. All credible fear determinations, as noted above, are subject to review by a supervisory AO, 8 CFR 208.30(e)(8), and IJ (if requested), INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), and determinations made in section 240 removal proceedings are subject to administrative appeal and judicial review.

Regarding concerns about noncitizens going through the credible fear process while in CBP custody, the Departments disagree with the contention that such a process causes or exacerbates harm. Noncitizens who are going through the credible fear process in CBP custody are given at least 4 hours between 7 a.m. and 7 p.m. to telephonically consult with an individual of their choosing, including legal counsel, before their credible fear interview. Additionally, the noncitizens are afforded privacy for these consultations, which occur in a private phone booth. These phones and phone booths are also used to conduct the credible fear interview.

Additionally, to the extent that commenters have generalized concerns about conditions in CBP custody, such comments are outside the scope of this rule. DHS notes, however, that it is committed to providing safe, sanitary, and humane conditions to all individuals in custody, and that it is committed to transferring individuals out of CBP custody in an expeditious manner.

---

[181] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division*, at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

The Departments further note that one anticipated effect of this rule is to reduce the risk of overcrowding in DHS detention facilities. *See* 89 FR at 48742 (noting that "[h]igh [encounter] numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded . . . [which] creates health and safety concerns for noncitizens and Government personnel").

(5)  Fairness or Risks Associated with Process

*Comment:*  Commenters stated that the rule would undermine the commitment of the United States to providing refuge for those fleeing persecution and violence and exacerbate the humanitarian crisis at the southern border.  Other commenters stated that the rule would increase refoulement and that the Departments did not adequately consider this consequence. Commenters asserted that the rule could cause arbitrary denials of asylum, thus placing noncitizens back into harm's way and resulting in life-threatening outcomes.  A commenter asserted that the IFR ignores the realities of initial fear screenings (including that individuals have often experienced a long and difficult journey, undergo screenings within days of arrival, and may face barriers to accessing counsel and language services) and establishes an even higher screening standard that may prevent noncitizens from factually presenting claims before an AO. A commenter stated that a decline in positive credible fear determinations under the Circumvention of Lawful Pathways rule is a result of an orchestrated effort to reduce the screen-in rate by erecting barriers to eligibility and attorney consultation and eroding due process protections, not the result of the appropriate screening out of claims that would in fact be non-meritorious, as suggested by the Departments in the IFR.

Some commenters discussed the existing difficulties that noncitizens in CBP custody have in obtaining what they need, such as a pen and paper to write down essential information, access to counsel, and access to private phone services.  Some commenters stated that they have witnessed failures by USCIS and EOIR to notify attorneys of their clients' interviews and immigration court reviews.

*Response:*  The present rule complies with all statutory and regulatory requirements related to access to counsel, including the right of a noncitizen to access counsel at no cost to the Government, the right to consult with a person of the noncitizen's choosing prior to the credible fear interview, and the right to have a person of the noncitizen's choosing (including a legal representative) present during the interview, provided it will not cause unreasonable delay.  INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4).  Moreover, in addition to protecting the procedural safeguards guaranteed by statute, the rule also ensures the United States honors its non-refoulement obligations under international law by screening for statutory withholding and protection under regulations implementing the CAT, even where a noncitizen is subject to the rule's limitation on asylum eligibility and cannot establish that the rule's exception applies under the significant possibility standard.  8 CFR 208.35(b)(2).  Contrary to commenters' assertions that noncitizens may be prevented from presenting factual claims to an AO where they are subject to the IFR's limitation on asylum eligibility, AOs elicit testimony, and noncitizens have the opportunity to present testimony and other evidence relevant to a potential persecution or torture claim, even where the limitation applies and no exception is established during the credible fear interview; this allows the AO to effectively screen the noncitizen for a reasonable probability of persecution or torture.  8 CFR 208.35(b)(2)(i).  Indeed, the experience of USCIS with the IFR since its implementation illustrates that noncitizens are still able to meet the higher reasonable probability standard in approximately 48 percent of cases where the IFR's limitation on asylum eligibility applies and no exception is established during the credible fear interview.[182]

Further, while a commenter suggested that the drop in the overall screen-in rate under the Circumvention of Lawful Pathways rule resulted from barriers to eligibility or to counsel and the erosion of due process rights, as opposed to screening out more potentially non-meritorious cases under the higher "reasonable possibility" standard in the IFR, *see* 89 FR at 48746, a more

---

[182] OHSS analysis of data pulled from CBP UIP on September 3, 2024 (Fear Screening - STB tab).

granular examination of the various screen-in rates undermines the commenter's assertion.  In fact, SWB encounter credible fear screen-in rates for screenings conducted by USCIS under the significant possibility standard remain consistent or increase when comparing (1) interviews that took place in the pre-pandemic period (76 percent positive); (2) interviews that took place under the Circumvention of Lawful Pathways rule where the presumption of asylum ineligibility applied but an exception was established (79 percent positive) or the presumption was rebutted (86 percent positive); and (3) interviews that took place under the IFR where the IFR's limitation on asylum eligibility applied but the IFR's exception was applicable (81 percent positive).[183]  If anything, then, the screen-in rate at the significant possibility standard is higher under the Circumvention of Lawful Pathways rule and under the IFR, notwithstanding commenters' claims that factors such as difficulty in accessing counsel necessarily reduce screen-in rates.  Rather, USCIS screen-in rates for USBP encounters effectively drop only when AOs apply the higher substantive standards, dropping (1) to approximately 51 percent for cases screened at the reasonable possibility standard where the Circumvention of Lawful Pathways presumption of asylum eligibility applies and no exception or rebuttal is established; and (2) to approximately 48 percent for cases screened at the reasonable probability standard where the IFR's limitation on asylum eligibility applies and no exception is established.[184]  Accordingly, the analysis provided by the Departments in the IFR concluding that the drop in screen-in rates under the higher "reasonable possibility" standard relates to the merits of the potential claim, *see* 89 FR at 48746, remains supported and is only further bolstered by the experience of the Departments in implementing the IFR.

The IFR acknowledges that the rule's manifestation of fear and reasonable probability standards may increase the risk that some noncitizens with meritorious claims may not be

---

[183] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Summary Statistics tab; Fear Screening - CLP tab; Fear Screening - STB tab).

[184] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Fear Screening - CLP tab and Fear Screening - STB tab).

referred for credible fear interviews or may not receive a positive credible fear determination. 89 FR at 48767. It also explains that there may be costs to noncitizens that result from their removal—indeed, such costs are likely. *Id.* Thus, the Departments did consider these risks, and they have continued to consider these risks in finalizing this rule.

The Departments weighed the fact that, despite the protections preserved by the rule, the available exception, and the training and expertise of DHS personnel, the changes to the credible fear process adopted may result in the denial of asylum when such an asylum claim otherwise may have been granted. *Id.* at 48750 n.250. As with all screening mechanisms, there is some risk that a case that might otherwise lead to a grant of asylum might not proceed to a merits adjudication, *id.*, but as discussed in Sections III.C.2.c and III.B.2.a.ii of this preamble, DHS personnel have significant experience and training in recognizing and interviewing noncitizens with protection claims, which the Departments believe will minimize the frequency of such cases. Regardless, in light of the emergency border circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate, necessary, and legally permissible. *Id.* And given the emergency border circumstances facing the Departments and the gap between high rates of referrals and screen-ins during the immediate post-pandemic period and historic ultimate grant rates, as described in Section II.A.2 of this preamble, the Departments believe the rule's provisions are appropriate and justified even if certain close cases result in imperfect outcomes. *Id.* As with other conditions and limitations imposed under section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with valid asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that would overwhelm DHS's ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. The Departments have determined that these important policies outweigh whatever marginal impact on meritorious claims the rule might have.

DHS serves noncitizens with all the necessary documents related to their credible fear determination, 8 CFR 208.30(f)–(g), which for noncitizens in detention may be served through a telephone call by USCIS, during which information on the noncitizen's determination is relayed in a language that the noncitizen understands, while CBP or ICE personnel physically provide the documents to a noncitizen.  While any person may consult with a noncitizen in the credible fear process, DHS provides copies of documents only to legal representatives who have completed a fully executed Form G-28.[185]  Although commenters expressed concern about the burden of obtaining consent and a signature from a detained noncitizen, the Departments must balance the sensitive nature of credible fear interviews and the importance of confidentiality pursuant to the nondisclosure provisions in 8 CFR 208.6.

With regard to the comment about noncitizens in CBP custody having difficulties obtaining items such as pen and paper, or having access to counsel or to private phone booths, the Departments disagree with the commenters' characterizations.  Noncitizens who are going through the credible fear process in CBP custody are provided with pen and paper, and they are afforded a period of time to consult with an individual of their choosing, which occurs in a private phone booth, as discussed in this section.[186]  These phones and phone booths are also used to conduct the credible fear interview.

*iii.  Impacts on Specific Vulnerable Populations, Discrimination Concerns*

*Comment:*  Many commenters expressed concern that the rule would disproportionately harm vulnerable groups, including Black individuals, Indigenous individuals, and People of Color ("BIPOC"), those who are HIV positive, and people with disabilities.  For example, a commenter remarked that the Departments did not analyze the effect the rule has on particularly vulnerable populations such as Black migrants.  A commenter voiced concern about the impact

---

[185] DHS, *Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative* 1, 4 (Sep. 17, 2018), *https://www.uscis.gov/sites/default/files/document/forms/g-28instr.pdf*.

[186] To the extent that commenters have concerns regarding compliance with this policy, DHS notes that such complaints about noncompliance can be addressed under the process described in Section III.C.2.c of this preamble.

the rule could have on predominantly BIPOC communities, remarking that the rule perpetuates harmful political rhetoric about these communities and the border that can lead to long-term detrimental effects and violence.  While sharing specific examples of the way the IFR has impacted members of BIPOC communities, another commenter raised concern for the discrimination these populations may face under the rule while seeking asylum and waiting for an appointment.  A commenter stated that the rule would prevent fair and equal access to lifesaving protections and lead to the unnecessary deaths of individuals who are denied entry and returned to dangerous and unsafe countries.  Therefore, the commenter urged, the rule should be rescinded in its entirety.

*Response:*  The Departments are committed to the equal treatment of all persons, and this rule does not distinguish between individuals based on race, nationality, ethnicity, or any other protected characteristic.  The Departments also acknowledge that certain populations, including members of BIPOC communities, may have unique vulnerabilities or face unique issues in their country of origin or countries of transit, and agree that the United States has certain legal obligations to protect noncitizens present in the United States who fear harm in their home countries.  But as explained more fully in Section III.A.1 of this preamble, the rule ensures that noncitizens may continue to seek asylum or other protection in the United States.  The Departments note that the rule and its exception apply equally to noncitizens who enter during the times when emergency border circumstances are present, regardless of nationality, race, ethnicity, or other demographics of concern identified by the commenters.  Further, as explained in this section, adjudicators receive training to help them identify members of vulnerable communities and account for the harms such individuals may face.  And, to the extent that members of certain communities may face greater risks because of their membership in those communities, the Departments believe that the "exceptionally compelling circumstances" exception will afford a means to seek asylum or protection when those risks manifest as specific threats to the individuals in question.

*Comment:*  Several commenters expressed concern regarding the separation of families and the treatment of trafficking victims.  A commenter generally supported allowing united families to escape persecution and cross the border together.  Other commenters raised concern that the IFR and associated policy changes routinely separate families and often complicate or prevent family reunification.  Another commenter wrote that the rule is likely to impose negative impacts on family wellbeing and result in family separations, as the commenter reasoned the changes in policy would incentivize an increase in the arrival of UCs because families are unable to seek or receive protection by crossing the border together.  One commenter also expressed concern that the rule puts children at risk to migrate alone.  Another commenter elaborated that family unity and reunification is fundamental to our Nation's immigration policies and the foundational principles of a Catholic social teaching.  The commenter voiced concern that the effects of this rule would be similar to the effects of the Migrant Protection Protocols ("MPP") and the Title 42 public health Order, which, the commenter stated, "led families to 'self-separate' at the border" because either the adults decided the conditions in Mexico were too dangerous for the children to continue to wait with them or the adults were injured or had disappeared.  The commenter urged the Departments to rescind the rule entirely, arguing that the policy changes undermine families' ability to seek humanitarian protection.

Additionally, a commenter stated that the rule's exemption for survivors of trafficking is inadequate.  The commenter wrote that survivors could be returned to trafficking situations when the new heightened credible fear standard fails to trigger safeguards codified in the TVPA.

*Response:* The Departments have designed the rule with a goal of keeping families together.  As described in Section III.C.1.e of this preamble, the Departments have adopted family unity provisions that apply during both AMIs and section 240 removal proceedings.  *See* 8 CFR 208.35(c), 1208.35(c).  Additionally, if one member of a family unit traveling together is excepted from the limitation on asylum eligibility based on exceptionally compelling circumstances, then the entire family unit is excepted.  *See* 8 CFR 208.35(a)(2)(i),

1208.35(a)(2)(i). Accordingly, commenters are incorrect that the rule disallows families from obtaining relief or protection together.

Additionally, the Departments believe that the safeguards in place for victims of human trafficking are sufficient. A noncitizen who is a victim of a severe form of trafficking in persons as defined in 8 CFR 214.201 is excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and is also separately excepted from the provisions of this rule. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1) (excepting from the limitation on asylum eligibility noncitizens described in section 3(b) of the Proclamation); 8 CFR 235.15(a) (excepting from the manifestation provision noncitizens described in section 3(b) of the Proclamation). Noncitizens who meet that definition are also excepted from the limitation on asylum eligibility as having established exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C). In practice, these two provisions provide two significant safeguards and work alongside section 3(b) of the Proclamation and 8 CFR 235.15(a) to ensure that noncitizens are not subject to the suspension and limitation on entry or any of the rule's provisions if they meet the definition of a victim of a severe form of trafficking.

*Comment:* A commenter raised concern for non-Mexicans under the rule being removed and left stranded in Mexico without migration documents or resources. The commenter explained that undocumented individuals removed to Mexico are vulnerable to arrest, detention, and potential deportation by Mexican immigration authorities. The commenter stated that this process has been a dangerous and unsafe practice that results in human rights violations and that government officials in Mexico have confirmed this practice will continue and potentially expand under the rule.

*Response:* This rule does not change the statutory and regulatory process for designating the country to which a noncitizen may be removed. To the extent that a greater number of noncitizens may be removed through the operation of this rule—some of whom may be removed to Mexico rather than their home countries, consistent with country of removal designation

authorities—the Departments note that noncitizens may assert claims of fear of harm in Mexico

and that the rule explicitly provides that noncitizens are screened for fear of harm in their

"designated country or countries of removal."  8 CFR 208.35(b)(2)(ii); *see also* 8 CFR

208.35(b)(2)(iii).

    The Departments acknowledge that noncitizens other than Mexicans who are removed to

Mexico may be subject to Mexican immigration law.  However, the Departments disagree that

being returned to Mexico is necessarily unsafe, whether because of actions by the Government of

Mexico or otherwise.  Over the last several years, the Government of Mexico has made

exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its

borders.  For instance, Mexico's Federal Public Defender's office provides legal counseling and

support to asylum seekers and migrants who file claims with Mexico's Commission for Refugee

Assistance, and the office has expanded its specialized staff and increased its visits to migration

stations.  88 FR at 31411.  Further, not only is Mexico a party to the 1951 Convention[187] relating

to the Status of Refugees and its 1967 Refugee Protocol,[188] but also Mexico's Constitution

includes a right to seek and receive asylum from political persecution.  *See* Mex. Const. art. 11.

In fact, the available grounds to qualify for asylum are broader in Mexico than in the United

States.  *See* 88 FR at 31411 (explaining that Mexico has joined the Cartagena Declaration on

Refugees, which expands the definition of "refugee," "thus providing some who may apply for

protection, such as asylum, with more grounds on which to make their claim than they would

have in the United States").  And applicants who do not qualify for asylum in Mexico are

automatically considered for complementary protection if they possess a fear of harm in their

country of origin, or if there is reason to believe that they will be subjected to torture or to cruel,

---

[187] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Convention Relating to the Status of Refugees*, *https://treaties.un.org/doc/Publication/MTDSG/Volume%20I/Chapter%20V/V-2.en.pdf* (last visited Sept. 24, 2024).

[188] *See* United Nations Treaty Collection*, Chapter V: Refugees and Stateless Persons: Protocol Relating to the Status of Refugees*, *https://treaties.un.org/doc/Publication/MTDSG/Volume%20I/Chapter%20V/V-5.en.pdf* (last visited Sept. 24, 2024).

inhuman, or degrading treatment, but do not meet the "refugee" definition; those granted

complimentary protection are able to regularize their status.[189]

    *Comment:*  Multiple commenters expressed concerns for the health and safety of women

and noncitizens from Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex

("LGBTQI+") communities.  For example, one commenter voiced concern for the asserted lack

of equal opportunity and the Departments' asserted lack of analysis of the effect of the rule on

particularly vulnerable populations, such as LGBTQI+ migrants.  Another commenter wrote that

the rule erroneously separates the imminent threat the noncitizen suffer at the border from their

future threat of persecution upon return, especially for those noncitizens fleeing from Mexico

who identify as LGBTQI+.  The commenter wrote that violence towards members of the

LGBTQI+ community can happen randomly and unexpectedly, and hence that noncitizens would

be unable to predict or articulate the violent risks they may face when seeking refuge in the

United States.  In addition, the commenter voiced concern for the disproportionate impacts of the

rule on LGBTQI+ community members from Mexico and the "Northen Triangle" countries of

Guatemala, Honduras, and El Salvador because, the commenter asserted, these countries have

long and documented histories of severe violence against the LGBTQI+ population.  Citing

research, the commenter wrote that 4,385 claims of fear were related to LGBTQI+ status and

98.4 percent of the interviews resulted in positive determinations for fear of persecution.  In

conclusion, the commenter urged that it is imperative for the United States to remain a haven for

all people fleeing danger and violence, especially LGBTQI+ migrants and therefore requested

that the IFR be immediately rescinded.  This commenter further expressed concern that the IFR

was contrary to President Biden's February 2021 memorandum on advancing the human rights

of LBGTQI+ persons around the world, which included an explicit instruction to the

---

[189] 88 FR at 11721 & n.144 (citing Government of Mexico, *Ley sobre Refugiados, Protección Complementaria y Asilo Político* (Jan. 27, 2011),
*https://www.gob.mx/cms/uploads/attachment/file/211049/08_Ley_sobre_Refugiados__Protecci_n_Complementaria _y_Asilo_Pol_tico.pdf*).

Departments of State and Homeland Security to "enhance their ongoing efforts to ensure that LGBTQI+ refugees and asylum seekers have equal access to protection and assistance, particularly in countries of first asylum."

Citing experts on gender-based violence in Mexico, a commenter stated that violence against asylum seekers who are women or members of LGBTQI+ communities is endemic in many parts of the country. While sharing specific examples involving both LGBTQI+ community members and women, a commenter raised concern about the violence these populations may face under the rule while seeking asylum. For example, the commenter shared that migrant girls, adolescents, and women have either witnessed or been victims of exploitation, sexual violence, kidnapping, and human trafficking both in transit and while waiting in Mexico. The commenter also remarked that the rule adds new barriers that further endanger LGBTQI+ individuals, such as lack of access to safe housing, employment, and medical care.

Another commenter asserted that the rule arbitrarily and unlawfully prevents women, children, families, and LGBTQI+ community members from seeking safety in the form of asylum based on border encounter numbers that are unrelated to the individuals' need for protection. The commenter wrote that the result would be to severely harm the health and safety of those who would otherwise merit protection.

*Response:* The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries and recognize the importance of offering noncitizens the opportunity to seek protection from removal from the United States based on a likelihood of future persecution or torture. 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble and in the IFR, this rule complies with all such obligations and does not deny anyone the ability to apply for asylum or other protection in the United States. *See id.* at 48716–17, 48735–36.

The rule does not prevent noncitizens with valid claims from seeking asylum or other protection. To the extent that, as commenters asserted, women and members of the LGBTQI+

community do in fact face a greater risk of violence, those individuals would necessarily have a greater ability to establish that exceptionally compelling circumstances exist that would except them from the rule's limitation on asylum eligibility.  To be clear, generalized risks of violence would not be sufficient to establish such circumstances, but insofar as such generalized risks manifest as specific threats to women and members of the LGBTQI+ community, the rule affords an avenue for those individuals to remain eligible for asylum.  8 CFR 208.35(a)(2), 1208.35(a)(2).  And the rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection.  A noncitizen who seeks to apply for asylum can also schedule arrival at a POE under a process approved by the Secretary, including by using the CBP One app, and avoid application of the rule.  8 CFR 208.35(a)(1), 1208.35(a)(1); Proclamation sec. 3(b)(v); 89 FR at 48737.

    This rule does not preclude noncitizens who cross the southern border from seeking asylum or protection.  Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate.  *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4).  AOs receive mandatory, specific training on screening and adjudicating gender-related claims.[190]  This training includes information about violence against women (including domestic violence), and guidance on interview considerations specific to gender-based claims.[191]  AOs also receive training on screening and adjudicating claims relating to LGBTQI+ noncitizens.[192]  This training includes information about types of harm that may be directed at LGBTQI+ individuals, as well as guidance on interview considerations

---

[190] USCIS, *RAIO Directorate – Officer Training: Gender-Related Claims* (Apr. 24, 2024).

[191] *E.g.*, *id.* at 15–20, 42.

[192] USCIS, *RAIO Directorate – Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Apr. 24, 2024).

specific to LGBTQI+ claims.[193]  AOs are trained to recognize the sensitive nature of these claims and to pursue appropriate lines of inquiry.[194]  AOs also receive training on country of origin information specific to LGBTQI+ issues, while recognizing that LGBTQI+ country-of-origin information may sometimes be difficult to find.[195]

Additionally, the Departments recognize the sensitive nature of credible fear interviews, especially for vulnerable populations, including LGBTQI+ noncitizens.  For example, for those going through the credible fear process in CBP custody, CBP has taken steps to protect the privacy of noncitizens during their interviews.  These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. Additionally, ICE provides similar reasonable access to legal counsel for those who are detained in ICE custody during the credible fear process.[196]

*Comment:*  Commenters stated that many immigrants today are Punjabi-speaking Sikhs seeking protection due to the worsening human rights conditions under India's current administration.  The commenters stated that these immigrants may face hardships such as language barriers and difficulty accessing employment opportunities and resources upon arrival. Commenters stated that the rule would exacerbate language-barrier issues.  Specifically, a commenter stated that the requirement to express a fear of persecution explicitly and proactively in order to be referred for a credible fear screening, and the limited time to seek legal advice from a language-accessible attorney, would prevent many Sikh noncitizens from understanding their legal rights or the need to express their credible fear.  The commenters wrote that it is critical for the Sikh community and many other populations fleeing persecution to have the

---

[193] *E.g.*, *id.* at 18–19, 27–34.

[194] *Id.* at 28–30, 37–38, 49.

[195] *Id.* at 43–44, 50.

[196] ICE, *Access to Due Process: Fiscal Year 2023 Report to Congress* 2–3 (Feb. 20.2024), *https://www.dhs.gov/sites/default/files/2024-04/2024_0220_ice_access_to_due_process.pdf.*

opportunity to seek asylum and requested clarification on how the Government intends to address the concerns of religious minorities who would be impacted by the rule.

*Response:*  The Departments disagree that the rule will exacerbate language-barrier issues.  For those who are going through the credible fear process in CBP custody, CBP provides language assistance services for those who do not speak English, consistent with CBP's Language Access Plan.[197]  CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language.  *See* 89 FR at 48741.  In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages, including Punjabi.[198]  With respect to the signs and videos in CBP facilities that provide general information about the ability to express a fear, individuals who are unable to read those signs or communicate effectively in one of the languages in which the sign and video are presented are read the contents of the sign and video in a language they understand.  *See* 89 FR at 48741.

The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries, including those who are fleeing for religious reasons, and recognize the importance of offering noncitizens the opportunity to seek protection from removal.  But as explained more fully in Section III.A.1 of the preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States and meets all such legal obligations.  *See also id.* at 48716–17, 48735–36.  Further, although commenters asserted generally that religious minorities would be harmed by the IFR and DHS's policy changes, the

---

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf*; CBP, *Supplementary Language Access Plan* (Feb. 7, 2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf*; DHS, *I Speak... Language Identification Guide*, *https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 24, 2024); DHS, *I Speak... Indigenous Language Identification Poster*, *https://www.dhs.gov/sites/default/files/publications/Habla%20Poster_12-9-16.pdf* (last visited Sept. 24, 2024); *see also* DHS, *DHS Language Access Resources* (last updated July 17, 2023), *https://www.dhs.gov/publication/dhs-language-access-materials*.

commenters provided no specific reason to believe that the IFR and policy changes would disproportionately impact any particular religious groups other than the Punjabi-speaking Sikhs discussed above.

*Comment:*  Commenters discussed the rule's impact on noncitizens with fewer financial resources and means.  For example, a commenter wrote that the rule would further disadvantage those noncitizens with fewer financial resources because these noncitizens are less likely to pursue alternative routes to safety.  A few commenters expressed concern for noncitizens with physical and mental health disabilities.  And a commenter remarked that individuals with cognitive issues, disabilities, and language barriers are less likely to effectively articulate fears to border officials.

*Response:*  The Departments agree that the United States has certain legal obligations to protect from removal those who fear specific types of harm upon removal and recognize the importance of offering noncitizens the opportunity to seek protection from removal, including noncitizens with fewer financial resources, noncitizens with physical and mental health disabilities, and noncitizens with cognitive issues, disabilities, and language barriers.  But as explained more fully in Section III.A.1 of this preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States.  *See also id.* at 48716–17, 48735–36.  Further, there is no fee to download or use the CBP One app to schedule an appointment and thereby avoid the IFR's limitation on asylum eligibility,[199] and DHS has designed the CBP One app to be accessible to people with disabilities.  Additionally, the Departments note that, depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the "exceptionally compelling circumstances" standard, or, as discussed previously, AOs may exercise their discretion to issue an NTA to place such noncitizens into section 240 removal proceedings as appropriate, where additional procedural safeguards are

---

[199] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone* (explaining in response to frequently asked questions that "the CBP One™ mobile application is FREE and available to everyone who has access to a mobile device").

available to noncitizens. For example, during section 240 removal proceedings, IJs may more fully consider whether a noncitizen demonstrates indicia of mental incompetency and, if so, what procedural safeguards are appropriate. *See Matter of M–A–M–*, 25 I&N Dec. at 481–83. Additionally, CBP officers may determine that such noncitizens are excepted from the suspension and limitation on entry (and thus that the provisions of this rule do not apply) under Section 3(b)(vi) or (vii) of the Proclamation.

*iv.  Impacts on Criminal Enforcement*

*Comment:*  Commenters stated that they are concerned that noncitizens would face criminal charges if they attempted to return to the United States following removal under the rule. One commenter stated that an increased number of expedited removal orders would inevitably lead more noncitizens to attempt to reenter the United States after their removal, potentially subjecting them to felony charges and two years of imprisonment, and that noncitizens should not be deemed criminals and incarcerated for seeking asylum in the United States. Another commenter stated that charging noncitizens criminally would decrease their access to humanitarian relief and increase the risk that criminal organizations would target those noncitizens.

*Response:*  The Departments are committed to the fair, evenhanded enforcement of the law as Congress has enacted it. The Departments agree that, in appropriate cases, noncitizens who have been removed pursuant to an expedited removal order may be subject to criminal charges if they attempt to unlawfully reenter the United States. *See* INA 276(a), 8 U.S.C. 1326(a). Because the rule will allow the Departments to predictably and swiftly impose consequences on noncitizens who enter the United States without a legal basis to remain, the Departments believe noncitizens will be disincentivized from attempting to enter without a legal basis to remain or to reenter after being removed. Nevertheless, for the relatively few who

choose nevertheless to reenter unlawfully, congressionally enacted criminal penalties remain an important tool to enforce the law.[200]

*v. Negative Impacts on Other Affected Entities*

*Comment:*  Commenters stated that the rule would impose more burdens on nonprofit organizations, legal-service providers, and communities near the border.  One commenter believed that the increase in negative fear determinations would cause legal-service providers to dedicate significant resources to preparing clients for and representing them in hearings before IJs and potential requests for reconsideration to USCIS.  The commenter also alleged that the Departments have failed to consider reliance interests such as those of legal-service providers that prepare informational material, employ internal protocols, and deliver client services predicated on access to asylum and on access to clients in custody; the commenter stated that their organization would need to understand the changes effected by the rule, train staff and pro bono volunteers on those changes, and rewrite published legal information in multiple languages.  Another commenter stated that its presentations would become longer and more complex to explain the effect of the rule's limitation on asylum eligibility, the exceptionally compelling circumstances needed to overcome it, and the new, heightened "reasonable probability" standard in credible fear interviews.  The commenter asserted that the rule would also affect its staff's ability to provide services to callers of its hotline and its clients' ability to understand the legal issues involved.

*Response:*  The Departments decline to modify the rule in response to the commenters' concerns.  The concerns raised are not unique to immigration.  Any change to any law or policy regulating the public requires providers who practice in the relevant area to adapt—they must

---

[200] Even so, although convictions for certain "particularly serious crimes" may render noncitizens ineligible for asylum or withholding of removal, unlawful reentry alone is not necessarily a particularly serious crime.  *See* INA 208(b)(2)(A)(ii), 8 USC 1158(b)(2)(A)(ii); INA 241(b)(3)(B)(ii), 8 USC 1231(b)(3)(B)(ii); *Matter of N–A–M–*, 24 I&N Dec. 336, 342 (BIA 2007) ("Where, as in the instant case, a conviction is not for an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction.").

learn the new law and advise clients accordingly.  To facilitate the transition to the new

provisions, since the Proclamation and IFR came into force, DHS personnel have regularly made

themselves available to answer questions about these policies and the Departments'

implementation activities, made information about these policies public on the Departments'

websites,[201] and proactively engaged a variety of stakeholder groups to promote understanding of

the rule.  The Departments believe that any purported costs that nonprofit organizations and

legal-service providers assert they will bear in adapting to the changes effected by the rule are

outweighed by the interest in reducing the current levels of encounters and allowing the

Departments to invest more of their limited resources into predictably and swiftly delivering

consequences to noncitizens who cross the border without a lawful basis to remain in the United

States.  *See* 89 FR at 48714.  Although returning to the status quo before the IFR may eliminate

some of the asserted burdens to which the commenters object, that status quo would perpetuate

the vicious cycle in which the border security and immigration systems cannot deliver timely

decisions and consequences to those encountered at the southern border who lack a lawful basis

to remain in the United States, ultimately incentivizing more noncitizens to attempt to cross the

border.  *See id.*  Conversely, a decrease in encounters at the southern border could be expected to

allow organizations like the commenters to allocate more resources to each of their individual

clients, allowing them to serve their clients more effectively.

   The Departments also disagree that the rule will burden communities near the border.  To

the contrary, the rule will free resources to allow DHS to more effectively patrol the border and

interdict smugglers and TCOs.[202]  Moreover, the rule enables the delivery of predictable, swift

consequences to noncitizens who cross the border without a legal basis to remain in the United

States.  That will disincentivize such noncitizens from attempting to cross the border, depriving

---

[201] *See, e.g.*, CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024),
*https://www.cbp.gov/about/mobile-apps-directory/cbpone*.

[202] *See* 89 FR at 48729–30.

smugglers and TCOs of opportunities to perpetuate their illegal operations. *See* 89 FR at 48730. In these ways, this rule is expected to reduce smuggler and TCO activity in border communities, ultimately reducing the harms that those activities bring to those communities. Additionally, the same incentives are expected to ultimately lower the number of noncitizens present in border communities, further reducing the burdens on those communities.

### b.  Negative or Minimal Impacts on Immigration System and Government Operations

### i.  Undermines the Administration's Promises and Goals

*Comment:*  Some commenters urged the Administration to keep its promises, stating that "[w]e are all immigrant[s]."  Specifically, one commenter stated that the Administration "has not upheld its promise to safeguard the legal right to asylum and protect individuals from persecution, violations of due process, and family separation."  Other commenters asserted that the Administration issued the Proclamation for political reasons, including using it as a political tool and for reelection purposes, while another commenter stated that the rule will not be effective in achieving the Administration's perceived political messaging or in "sway[ing]" right-wing individuals.  And a third commenter argued that the Democratic Party supported discriminatory ideas like those found in the rule despite claiming to disagree with such policies.

Along the same lines, commenters stated that the rule is inconsistent with the Administration's goal of creating a just immigration system and goes against the Administration's promise to not deny asylum for noncitizens fleeing persecution and violence. One commenter claimed that the Administration had "previously pledged to restore the United States' 'moral standing in the world and our historic role as a haven for refugees and asylum seekers, and those fleeing violence and persecution,'" but that the rule "is misaligned with the values promised by this administration, including promises to end Trump-era restrictions on asylum seekers."  Other commenters asserted that the Departments sought to curtail the rights of noncitizens arriving at the border by shutting them out of the asylum process based "solely" on how they arrived in the United States, even though the Administration had previously called on

agencies to review expedited removal procedures to make them fairer. Another commenter expressed concern regarding what they alleged was a shift in the Administration's "rhetoric" and support for "fear-based restrictions" on asylum, instead of proposing measures to overhaul and ameliorate the asylum process, which they said was "sadly a very different stance" from the Administration's position a few years ago. A few commenters urged the Administration to expand the asylum system and to not close the southern border.

*Response:* The Departments agree that the United States has a long tradition of accepting and welcoming refugees and note that in the past few years, the United States Government has taken steps to significantly expand refugee admissions worldwide,[203] including for refugees from Latin America and the Caribbean. *See* 89 FR at 48712; 88 FR at 31333, 31341. However, without a policy in place to ensure lawful, safe, and orderly processing of noncitizens entering the United States during emergency border circumstances, the number of noncitizens in such circumstances would exceed DHS's already limited resources and facilities. *See* 89 FR at 48711–15. As explained in the IFR and under this rule, noncitizens seeking protection in the United States will still be able to do so, either before USCIS or in removal proceedings before EOIR, subject to the rule's provisions.

The Departments have determined that the changes effected by the IFR and the rule during emergency border circumstances will allow for better management of the limited resources Congress has provided to the Departments. Specifically, noncitizens intending to seek asylum are encouraged to do so using lawful pathways and processes, which facilitate the orderly processing of claims. In addition, the changes in the IFR and this rule permit the Departments to swiftly screen noncitizens not likely to establish eligibility for relief or protection, as well as to efficiently identify and process valid claims. The combined effect of the changes has reduced

---

[203] U.S. Dep't of State, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024*, at 6 (2023), *https://www.state.gov/wp-content/uploads/2023/11/FY-2024-USRAP-Report-to-Congress_FINAL-Accessible-11.02.2023.pdf.*

the percentage of noncitizens placed in section 240 removal proceedings,[204] where cases may take years to resolve.[205]  In addition to reducing the impact on EOIR operations, reducing the number of noncitizens in removal proceedings reduces ancillary benefit requests to USCIS, *see* 8 CFR 208.7 (employment authorization for pending asylum applicants), and alleviates the burden on ICE of removing non-detained noncitizens who receive final orders of removal at the conclusion of section 240 removal proceedings but who do not comply with their orders, *see, e.g.*, 8 CFR 241.4(f)(7) (in considering whether to recommend further detention or release of a noncitizen, an adjudicator must consider "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal").

The Departments reiterate that a noncitizen may avoid application of the limitation on asylum eligibility if the noncitizen establishes by a preponderance of the evidence that exceptionally compelling circumstances exist.  *See* 8 CFR 208.35(a)(2), 1208.35(a)(2).  The Departments recognize that some noncitizens who would otherwise be granted asylum may not be eligible due to this rule.  However, because such noncitizens remain able to seek statutory withholding of removal and CAT protection, the Departments believe that this rule strikes the appropriate balance between the need to protect those who wish to seek protection in the United States and the need to use resources effectively during emergency border circumstances.

Moreover, the Departments have determined that responding to emergency border circumstances is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws, as well as to reduce the role of exploitative and dangerous smuggling and human trafficking networks.  *See* 89 FR at 48714, 48723, 48726, 48767.  One cause of recent surges in irregular migration is smugglers' and noncitizens' growing understanding that DHS's capacity to impose consequences at the border is

---

[204] OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[205] *See* OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab).

limited by the lack of resources and tools that Congress has made available.  Indeed, this rule

follows congressional inaction limiting DHS's capacity to impose such consequences despite the

Departments' repeated attempts to obtain the legislative framework and resources required to

address unprecedented levels of irregular migration.  In early February 2024, a bipartisan group

of Senators proposed reforms of the country's asylum laws that would have provided new

authorities to significantly streamline and speed up immigration enforcement proceedings and

immigration adjudications for individuals encountered at the border, including those who are

seeking protection, while preserving principles of fairness and humane treatment.[206]  89 FR at

48729.  Critically, the proposal included more than $20 billion in additional resources for DHS,

DOJ, and other departments to implement those new authorities.[207]  *Id.*  However, Congress

failed to move forward with this bipartisan legislative proposal.[208]  *Id.*  It also failed to pass the

emergency supplemental funding requests that the Administration submitted.  *Id.*  Although

Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls

significantly short of what DHS requires to deliver timely consequences and avoid large-scale

releases pending section 240 removal proceedings.  *Id.*

In light of congressional inaction, this rule is designed to address historic levels of

migration and efficiently process migrants arriving at the southern border during emergency

border circumstances with the resources and tools Congress did make available.  As discussed in

Section II.A.2 of this preamble, the Departments assess that this rule significantly increases their

ability to deliver timely decisions and consequences.  Accordingly, the Departments reject

commenters' claim that the Departments' basis for promulgating the rule is political.  Rather, the

---

[206] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[207] Deirdre Walsh & Claudia Grisales, *Negotiators Release $118 Billion Border Bill as GOP Leaders Call It Dead in the House*, NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[208] Stephen Groves, Rebecca Santana & Mary Clane Jalonick, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance*, AP News (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

Departments believe that the rule will continue to reduce irregular migration by allowing the Departments to better manage their limited resources while delivering consequences more swiftly through expedited removal for those without a legal basis to remain in the United States.

*ii. Similarity to Actions of Past Administration*

*Comment:*  Some commenters stated that the rule was akin to the asylum-related rulemaking and policies of the prior Administration, which, the commenters said, denied noncitizens their "legal right to request asylum in the United States" and were "struck down" by Federal courts.  Specifically, one commenter stated that the prior Administration "provided [a] similar rationale" for its policies: "to alleviate the mass illegal immigration crises along the Southern border by discouraging the submission of fraudulent or otherwise meritless asylum claims."  And another commenter asserted that the rule was similar to the prior Administration's interim final rule entitled Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR"), in that it is "again barring people crossing between ports from accessing asylum protections for no legitimate reason beyond false optics of border 'control' that unlawfully penalize and seek to deter those who need access to protection."  A number of commenters criticized the rule as an insufficient break from prior immigration policies that the commenters described as "inhumane," "cruel[]," and "punishing."  Some commenters claimed that the Administration was "walking back promises to protect fair asylum processes" since revoking Title 42.  And another commenter stated that the Administration's echoing of "reactionary measures" of the prior Administration "during a looming election season" was a "cynical approach" that would foster "division and xenophobia," fail to address the root causes of immigration issues, and "alienat[e] an electorate that values fairness and justice for immigrants."

*Response:*  The Departments disagree that the rule is indistinguishable from or too similar to the asylum-related rulemakings and policies commenters cited.  The Proclamation Bar IFR, for instance, imposed a categorical eligibility bar for noncitizens crossing the southern border

outside a POE.  *See* 83 FR at 55935; *cf. East Bay III*, 993 F.3d at 669–70.  By contrast, this rule does not operate as a categorical bar on asylum eligibility based on manner of entry.  Instead, the rule provides a limitation on asylum eligibility for certain noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances.  *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a).  Importantly, then, noncitizens may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist.  *See* 8 CFR 208.35(a)(2), 1208.35(a)(2).  Such circumstances necessarily exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.201.  8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).  Noncitizens may also be excepted from the limitation if, during section 240 removal proceedings or the asylum merits process, they meet the family unity exception.  *See* 8 CFR 208.35(c), 1208.35(c).  As discussed in further detail in Section III.C.1.e of this preamble, under the family unity provision, the following noncitizens may be treated as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those who (1) are found eligible for statutory withholding of removal or CAT withholding; (2) would be eligible for asylum but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) have a qualifying spouse or child.  *See id*.  The Departments believe that the distinctions between this rule and the Proclamation Bar IFR are of legal significance, and those distinctions are discussed at length in the IFR.  *See* 89 FR at 48735–36.

    In addition, the rule is designed to implement policies distinct from those motivating the Proclamation Bar IFR.  This rule seeks to enhance the Departments' ability to address historic

levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718, 48726–31. The rule is intended to better manage already strained resources, thereby protecting against overcrowding in border facilities and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. *See* 89 FR at 48767. In that vein, the Proclamation Bar IFR differed in important respects from this rule. *See* 89 FR at 48734–36, 48738 (explaining that this rule does not treat the manner of entry as dispositive in determining asylum eligibility, contains an exception that accounts for varied circumstances, and is narrowly tailored to address the emergency border circumstances described in the Proclamation and this rule and thus does not allow for implementation of future proclamations or orders).

Moreover, this rule is a response to emergency border circumstances that did not exist when the Proclamation Bar IFR was promulgated. 89 FR at 48726–28. Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution, poverty, human rights abuses, the impacts of climate change, and other factors. *Id.* at 48726. The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[209] including by working closely with partner countries across the Western Hemisphere.[210] *Id.* at 48727. But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. *Id.*

*iii. Would Be Ineffective or Not Achieve Its Intended Outcomes*

---

[209] *See, e.g.*, The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[210] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala*.

*Comment:*  Commenters expressed opposition to the rule, claiming that the rule would decrease, not increase, the efficiency of USCIS management of asylum cases and could lead to further backlogs and inefficiencies for AOs and immigration courts, complicating the asylum process.  One commenter believed that the rule would "exacerbate efficiency issues by requiring operational changes to compensate for elimination of the preliminary screening to notify noncitizens of the expedited removal process and the need to affirmatively express their fear of persecution or torture."  Some commenters asserted that the Departments have created an "unworkable, convoluted, and unfair" system at the border, which CBP officers and AOs will not be prepared to adapt to.  Commenters claimed that the rule would create additional administrative burdens by requiring officers, applicants, stakeholders, and judges to apply multiple tests in one proceeding.  Further, commenters stated that having to track, identify, and apply different standards would be more complex for all those involved.

Other commenters stated that the rule would exacerbate conditions at the southern border and would increase the number of migrants who enter between POEs, further straining resources and escalating the current humanitarian crisis.  A commenter stated that the rule may cause migrants to be turned away if they walked up to a POE, and thus, it would "inadvertently encourage desperate individuals to resort to dangerous methods to reach safety."  One commenter voiced concern that the rule would have an adverse effect on the asylum process because the rule would cause a foundational shift in the U.S. asylum system, causing access to asylum to be the exception rather than the norm.  Another commenter claimed that decades of deterrence policies have "proven that punitive policies do not reduce irregular migration—they only increase chaos, confusion, and human suffering."  (Emphasis omitted.)

Other commenters claimed that the rule would be ineffective at achieving its intended goals for managing the border.  One commenter stated that people were coming to the United States because they had no choice, so securing the border would not solve the problem. Similarly, a commenter stated that the rule would be like playing "whack-a-mole, except with

real live people, most of whom would not undertake such a dangerous, difficult journey to the border if they felt they could stay where they were." Furthermore, a commenter stated that, without additional resources, the Government will have no way of fully implementing its own policy. Commenters cited an article stating that "it is hard to say with confidence whether this regulation will work as the administration intends."[211] One commenter stated that the Proclamation did not address the actual needs of asylum seekers, nor did it address the problem that has led the U.S. immigration system to be "broken." This commenter described a "broken legal system that takes years to process cases, leading individuals to live in limbo and without important legal rights." Along the same lines, another commenter stated that turning away noncitizens is evidence of a faulty immigration system and, thus, there are better solutions than turning away those asking for help.

Other commenters asserted that the rule had not substantiated its aim of incentivizing a sustained drop in the number of encounters at the southern border. While citing a study, one commenter stated that any change in border policy triggers a short-term drop in encounters, regardless of the intent of the policy change. The commenter also stated that the rule has not provided an adequate explanation for the assumption that it would achieve its objective of reducing the number of encounters at the border. And while referencing another study, another commenter elaborated that policies that limit access to POEs increase irregular crossings by noncitizens who cannot wait in Mexico, which they stated was also confirmed by DHS's Office of Inspector General. Conversely, another commenter remarked that, while there has been a temporary drop in encounters immediately after the issuance of the IFR, the IFR would be ineffective in deterring migrants in the long term because of the rule's exceptions and loopholes. Lastly, another commenter expressed concern that "[a]s written, the [IFR] simply continues the status quo by encouraging mass illegal immigration and abuse of our asylum system."

---

[211] Am. Immigr. Council, *Analysis of the President's 212(f) Proclamation & Interim Final Rule Restricting Asylum* 2 (2024), *https://www.americanimmigrationcouncil.org/research/american-immigration-council-analysis-presidents-212f-proclamation-and-interim-final-rule*.

*Response:* The Departments disagree that the rule decreases the efficiency of management of asylum claims. The Departments recognize that the rule may require additional time for AOs and IJs during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and noncitizens' fear claims. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the IFR has resulted in significantly reduced irregular migration and has allowed the Departments to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. *See* Section II.A.2 of this preamble. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be accompanied by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule. And as discussed in Section III.C.3 of this preamble, AOs and IJs are specifically trained to apply multiple tests in the same proceedings; any claim that these trained and skilled professionals would be burdened by multiple tests is unfounded. Moreover, any burdens imposed by the rule on CBP officers and agents have been accompanied by a substantial reduction in other resource burdens due to a substantial reduction in encounters at the southern border caused by this rule.

The Departments agree with commenters that the immigration system is badly in need of additional resources and efficiencies. This rule is not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade. However, the Departments disagree that these fundamental challenges mean this rule will be ineffective in achieving its aims. Given the absence of reforms by Congress, the Departments are working within the legal framework and with the resources

provided by Congress to ensure the functioning of the border security and immigration systems during emergency border circumstances.  After the implementation of the Proclamation and IFR, the Departments saw a significant decrease in encounters along the southern border, which has allowed the Departments to more efficiently process noncitizens through expedited removal, delivering timely decisions and consequences and discouraging irregular migration.  In other words, commenters are incorrect that the rule would lead to an increase in encounters between POEs and decreased efficiencies in the process.

Notably, in addition to the decrease in encounters, operations at POEs have remained largely steady over this time.  For example, vehicle wait times at POEs on the SWB have not shown changes from typical monthly fluctuations.  The numbers of vehicle occupants and pedestrians entering the United States with lawful status have remained aligned with normal entry data.  In particular, between August 2023 and May 2024—the last month before implementation of the IFR—the average wait time across all SWB POEs (passenger vehicle, pedestrian, and truck cargo) was 32 minutes for vehicles, 15 minutes for cargo trucks, and 9 minutes for pedestrians.  From June 2024 through July 2024, the average wait times were 34 minutes for vehicle traffic, 9 minutes for truck cargo, and 7 minutes for pedestrians.

With respect to the suggestion that the rule would inadvertently encourage desperate individuals to resort to dangerous methods to reach safety (such as crossing between POEs), the Departments note that the rule creates no such incentive; experience shows that the IFR has improved DHS's capacity to swiftly deliver consequences to those who cross between POEs and do not have a lawful basis to remain, including through the use of expedited removal.  *See* Section II.A.2 of this preamble.  Notably, the comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against irregular migration of noncitizens who cross between POEs without viable claims for asylum.  In addition, the rule, by adopting the exceptions contained in section 3(b) of the Proclamation, complements and

incentivizes the use of lawful, safe, and orderly pathways and processes for individuals to come to the United States.

With respect to the claim that this rule will yield at most a short-term reduction in encounters as noncitizens decide that they cannot wait in Mexico, the Departments note that thus far, encounters have not increased to the levels that were seen in the years leading up to the IFR. *See* Section II.A.2 of this preamble.  Moreover, in the Departments' experience, migrants are sensitive to the incentives created by national policy,[212] and the Departments see an imperative to act in the face of the challenging problem of very high levels of irregular migration.  Even if the rule's effects did not last indefinitely, moreover, that would not be a reason to depart from the rule's approach now—when its approach is having its intended effect.

The Departments do assess that ensuring that the reduction in border encounters is sustained will require not just the rule itself but work on the confluence of factors that also contribute to high levels of irregular migration.  And in parallel with this rule, the Administration is working to address those factors.[213]  For instance, the United States Government is working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[214] including through working closely with partner countries across the Western Hemisphere.[215]  89 FR at 48727; *see* Section II.A.2 of this preamble.  Additionally, increased access to lawful, safe, and orderly pathways will continue to complement one of the

---

[212] *See, e.g.*, Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.*

[213] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and*; U.S. Agency for Int'l Dev., *U.S. Strategy to Address the Roots Causes of Migration in Central America - FY 2022 USAID Results*, *https://www.usaid.gov/central-america-and-mexico-regional-program/fy-2022-root-causes-strategy-results* (last visited Sept. 15, 2024).

[214] *See, e.g.*, The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[215] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

rule's goals of discouraging irregular migration where appropriate.[216]  While these and other

parallel measures are necessary complements to the rule, they cannot substitute for the rule:

These efforts will take time to have significant impacts and will not alleviate the stress that the

border security and immigration systems are currently experiencing, as described in the

Proclamation, the IFR, and this rule.  89 FR at 48727.

*c.  Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety*

　　　*Comment:*  Commenters expressed general concern that the IFR would negatively impact

the U.S. workforce and economy, stating that the United States needs immigrants to bolster the

workforce and address labor shortages, that the United States was built on the labor of

immigrants, and that reliance on immigrant labor continues today.  They argued that restricting

immigration into the United States exacerbates population shortages, and that closing borders to

immigrants negatively impacts the food supply chain because a significant portion of agricultural

workers and food processing employees are immigrants.  One commenter specified that migrants

are currently needed because "the reproductive birthrate here has declined" and "replacement" of

economic contributors is "essential to avoid complete replacement by 'artificial intelligence.'"

　　　*Response:*  The Departments do not dispute the importance and contributions of

immigrants to the economy.  As noted in Section V.B. of this preamble (in which the

Departments describe the estimated effects of the rule pursuant to Executive Order 12866), the

expected effect of this rule is primarily to reduce incentives for irregular migration and illegal

smuggling activity.  This rule does not inhibit or prevent regular migration into the United States.

In particular, the Departments have been clear that the IFR does not apply to any noncitizen who

has a valid visa or other lawful permission to seek entry or admission into the United States or

presents at a POE pursuant to a pre-scheduled time and place.  89 FR at 48715; *see also* 8 CFR

---

[216] *See, e.g.*, Ezra Klein, *The Real 'Border Czar' Defends the Biden-Harris Record*, N.Y. Times (Sept. 13, 2024), *https://www.nytimes.com/2024/09/13/opinion/ezra-klein-podcast-alejandro-mayorkas.html* (interview response of Secretary of Homeland Security Alejandro Mayorkas explaining that one "leg[] of the stool" for decreasing encounters is presenting migrants with "alternative means of accessing humanitarian relief in the United States," including "the lawful pathways that we have built").

208.35(a), 1208.35(a) (excepting from the limitation on asylum eligibility noncitizens who are excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation).  Additionally, this rule does not change or place any restrictions on those who may be eligible for employment authorization within the United States.  The Departments recognize that there may be an impact on some people who attempt to enter the United States irregularly and who are removed after their entry, but the Departments find that the limitation on asylum eligibility is, on balance, an appropriate response to surges in irregular migration during emergency border circumstances.  For those whom this rule renders ineligible for asylum but who ultimately receive statutory withholding of removal or CAT protection, another effect would be the increased frequency with which those subject to this rule who are present in the United States are required to renew their employment authorization and a reduced ability for their family to immigrate to the United States.

Additionally, as noted in the IFR, 89 FR at 48712 & nn.10–13, over the past several years the United States Government has implemented a historic expansion of lawful pathways and processes to come to the United States, including:

- The CHNV parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;

- The Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other things, information and referrals to humanitarian or family reunification parole processes, labor pathways, and expedited refugee processing for eligible individuals;[217]

---

[217] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas*, *https://www.state.gov/safe-mobility-initiative/* (last visited Sep. 20, 2024); The White House, *Fact Sheet: Biden-Harris Administration on World Refugee Day Celebrates a Rebuilt U.S. Refugee Admissions Program* (June 20, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/20/fact-sheet-biden-harris-administration-on-world-refugee-day-celebrates-a-rebuilt-u-s-refugee-admissions-program/.*

- The expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;

- Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024; and

- Expanding access to labor pathways.

More specifically, recognizing the significant contributions noncitizens make to the U.S. economy, the United States Government significantly expanded access to labor pathways to maintain strong economic growth and meet labor demand in the United States. Our efforts to expand access to labor pathways have yielded results. In FY 2023, the United States issued 442,000 H-2A and H-2B nonimmigrant worker visas globally.[218] Similarly, in FY 2023, the United States issued 265,777 H-1B specialty occupation visas,[219] the highest number of visas issued or otherwise utilized in decades.[220] Furthermore, the United States also issued more than 192,000 employment-based immigrant visas in 2023—far above the pre-pandemic number—and ensured that no employment-based visas went unused for the second year running.[221]

The Departments believe that these new or expanded lawful pathways, and particularly employment-based pathways, are effective ways to address labor shortages and encourage lawful migration. The Departments also believe that, by reducing migrants' incentives to use human smugglers and traffickers to enter the United States, this rule will reduce the likelihood that newly arrived migrants will be subjected to labor trafficking. The Departments further reiterate that noncitizens who avail themselves of any of the lawful, safe, and orderly pathways

---

[218] U.S. Dep't of State, *Worldwide Visa Operations: Update*, *https://travel.state.gov/content/travel/en/News/visas-news/worldwide-visa-operations-update.html* (last updated Jan. 2, 2024).

[219] U.S. Dep't of State, *Nonimmigrant Visa Statistics*, *https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics.html* (last visited Aug. 27, 2024) (see the "FY2019-2023 Detail Table (PDF)" under "Nonimmigrant Visas by Individual Class of Admission (e.g. A1, A2, etc.)").

[220] *Id.* (see the "FY1997-2023 NIV Detail Table (Excel spreadsheet)" under "Nonimmigrant Visa Issuances by Visa Class and by Nationality" showing issuance totals of H-1B specialty occupation visas).

[221] USCIS, *Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade* (Feb. 9, 2024), *https://www.uscis.gov/EOY2023.*

recognized in this rule will not be subject to the limitation on asylum eligibility or the other provisions of the rule.

*Comment:* Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. While citing a 2024 article, a commenter stated that the IFR would subject noncitizens who cross the border irregularly to expedited removal and further criminalization through criminal prosecution, costing taxpayers over $7 billion to incarcerate migrants charged or convicted with unauthorized entry or reentry crimes.

*Response:* The Departments emphasize that neither the IFR nor this rule requires DHS to refer noncitizens it encounters at the border for prosecution for unauthorized entry or other immigration-related offenses. It is incorrect to cite expedited removal as the vehicle leading to mass incarceration and criminal prosecution of migrants. To the contrary, expedited removal is a process that allows DHS officials to quickly remove certain noncitizens encountered at the border. While it is true that noncitizens will spend some time in custody pending completion of the expedited removal process (and for a credible fear determination where referred), such custody is not for purposes of criminal prosecution. Although the Departments recognize commenters' concerns regarding the amount of taxpayer funds used to incarcerate migrants who are charged and convicted with unauthorized entry or reentry crimes, that is not at issue here. And in any event, as discussed in Section V.B of this preamble, the Departments expect that the rule will result in significantly reduced irregular migration. Accordingly, the Departments expect AOs and IJs to conduct a smaller number of credible fear cases than AOs and IJs would otherwise be required to handle in the absence of this rule, with the possibility of attendant savings of Government resources.

### d. Other General Opposition

*Comment:* Several comments urged the Departments not to close the SWB.

*Response:*  The rule does not close the SWB.  It adds a limitation on asylum eligibility and alters the process for those individuals described in section 3(a) of the Proclamation who are not described in section 3(b) of the Proclamation, but it does not "close" the border.

Additionally, the rule does not impose any changes to asylum eligibility or processing of noncitizens who use lawful, safe, and orderly pathways to seek entry to the United States. Noncitizens who use the CBP One app to pre-schedule an appointment at a SWB POE to present themselves at the border in a safe, orderly, and lawful manner are excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and so are excepted from the limitation on asylum eligibility and changes to expedited removal processing.  This exception is significant.  From June 5, 2024, through August 31, 2024, 123,600 noncitizens with CBP One appointments presented at POEs and were accordingly processed outside of the IFR's provisions and will be excepted from the limitation on asylum eligibility if they choose to apply for asylum.[222]  *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D).  During the pre-pandemic period, approximately 330 encounters were processed at SWB POEs per day.[223]  Since January 2023 through August 2024, approximately 1,500 encounters have been processed at SWB POEs per day.[224]  And since the start of FY 2024 through August 2024, that average has increased to approximately 1,700 per day.[225]

C.  *Provisions of the Rule*

1.  Limitation on Asylum Eligibility

a.  *Proclamation Exceptions — Section 3(b) of Proclamation*

*Comment:*  Commenters raised a number of concerns regarding the exceptions to the Proclamation's suspension and limitation on entry, including the exceptions for UCs; those

---

[222] OHSS analysis data downloaded from UIP on September 3, 2024 (IFR Details tab).

[223] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[224] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[225] *Id.*

permitted to enter based on the totality of the circumstances; and those permitted to enter based on operational considerations.

As an initial matter, a majority of commenters supported the Proclamation's exclusion of UCs from the suspension and limitation on entry or from provisions of the rule.  However, some commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry, without also providing an exception for family units, would lead families traveling together to choose to "self-separate" at the border and send the children across unaccompanied because conditions in Mexico are too dangerous for children to wait with their parents until the family can cross together.  Similarly, commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry would encourage the trafficking and exploitation of children.  Commenters stated that the rule, without an additional family-unit exception, would therefore result in the separation of families.

Another commenter opposed the Proclamation's exception for UCs.  This commenter stated that noncitizens, including those who pose security risks, would attempt to pose as UCs to evade the Proclamation's suspension and limitation on entry.

Additionally, some commenters opposed the exceptions in sections 3(b)(vi) and 3(b)(vii) of the June 3 Proclamation, which provide that the suspension and limitation on entry will not apply to a noncitizen if a CBP immigration officer determines that the noncitizen is permitted to enter either based on the totality of the circumstances or based on operational considerations. Commenters expressed concern that these exceptions are vague and subjective and should not be left to the discretion of CBP immigration officers.

Specifically, commenters asserted that the Proclamation does not provide any standards or make clear how CBP officers will determine when someone is excepted based on the totality of the circumstances or operational considerations.  Commenters also stated that CBP immigration officers may not be properly equipped to apply the Proclamation's exceptions,

which would result in arbitrary decision-making and removals in violation of non-refoulement principles.

Other commenters stated that the Proclamation's exceptions were overly broad and would authorize CBP immigration officers to use them as a "loophole" to permit large populations of noncitizens to enter the country based on the "totality of the circumstances" or due to "operational considerations." These commenters stated that, as a result, overbroad use of these exceptions will result in fewer noncitizens being removed and will not change the status quo of large numbers of noncitizens crossing the border.

Lastly, commenters expressed concern that noncitizens excepted under section 3(b)(vi) or 3(b)(vii) of the June 3 Proclamation based on the totality of the circumstances or for operational considerations and who are subsequently placed into immigration court proceedings will be unable to demonstrate that they are not subject to the rule's provisions in immigration court.

*Response:* Any comments opposing provisions of the Proclamation, as opposed to the parallel provisions of the rule, are outside of the scope of this rule. President Biden issued the Proclamation by the authority vested in the President by the INA. *See* INA 212(f), 8 U.S.C. 1182(f); INA 215(a), 8 U.S.C. 1185(a); 89 FR 48487. Under section 3(d) of the Proclamation, the President directed the Secretary and Attorney General to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions to such asylum eligibility limitations and conditions that they determine are warranted. The Departments lack authority to amend the exceptions to the Proclamation's suspension and limitation on entry, as set forth in section 3(b) of the Proclamation, and any proposal to do so would be outside the scope of this rule. At the same time, the Departments may depart from the Proclamation's section 3(b) exceptions in determining which exceptions to this rule's limitation on asylum eligibility are warranted to the

extent they are adopted in this rule, and the Departments have responded to comments suggesting such exceptions below.

To the extent that commenters suggest excepting family units from the rule's limitation on asylum eligibility, the Departments reiterate that excepting all family units could incentivize families to bring their children on the often-perilous journey to the United States.  *See* 89 FR at 48757.  Such a broad exception would also be at odds with the Proclamation and rule's goals in addressing emergency border circumstances.  *See id.* at 48726–31 ("Need for These Measures").

Further, the Departments do not believe that the rule will meaningfully incentivize the "self-separation" of families.  Because UCs are already excluded from expedited removal by statute, *see* 8 U.S.C. 1232(a)(5)(D), the Departments do not expect based on their experience implementing border enforcement and asylum that excepting UCs, but not family units, from the limitation on asylum eligibility would lead to increased incentives to "self-separate."  Rather, in the time since the IFR took effect, average daily encounters of UCs at the SWB have actually decreased by 37 percent.[226]

Moreover, on balance, the Departments believe that the important interests of protecting the statutorily recognized vulnerabilities of UCs, while maintaining the fundamental goals of the rule in addressing emergency border circumstances, outweigh any consequences of claimed incentives for noncitizens to "self-separate" at the border.  Notably, the Departments emphasized the importance of maintaining family unity in the IFR and crafted a number of exceptions to the limitation to preserve family unity and avoid family self-separations.  *See* 8 CFR 208.35(a)(2), 208.35(c), 1208.35(a)(2), 1208.35(c); *see also* 89 FR at 48733 (explaining that the rule contains exceptions that "avoid[] the separation of families").  For instance, if any member of a

---

[226] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).  Consistent with the discussion in Section II.C.1 of this preamble, encounters of individuals in family units and single adults have fallen more sharply than encounters of UCs, which has caused UCs' share of total encounters to increase, notwithstanding the overall drop in UC encounters in absolute numbers. The relative stability of UC flows compared to family unit flows is consistent with the fact that most policy changes in recent years (including the current rule) have not had a direct impact on UCs.

noncitizen's family—as described in 8 CFR 208.30(c)—with whom the noncitizen is traveling demonstrates exceptionally compelling circumstances for entering the United States during emergency border circumstances, then all of the members of that family unit traveling together will be excepted from the rule's limitation on asylum eligibility.  8 CFR 208.35(a)(2), 1208.35(a)(2); *see also* 89 FR at 48754.  The rule also contains an explicit family unity provision in the AMI process before USCIS and in removal proceedings before EOIR; this provision allows a principal asylum applicant to be excepted from the rule's limitation on asylum eligibility if the applicant can establish that the applicant meets the statutory requirements for statutory withholding of removal or CAT protection, among other requirements.  *See* 8 CFR 208.35(c), 1208.35(c); *see also* 89 FR at 48733 (explaining family unity provision requirements).

The Departments recognize commenters' concerns about the vulnerability of UCs.  The Departments encourage all those who seek to travel to the United States, including UCs, to take advantage of available lawful, safe, and orderly pathways and processes rather than rely on smugglers or criminal organizations to facilitate a potentially dangerous journey.  89 FR at 48723; 88 FR at 31346.  However, the Departments note that UCs are particularly vulnerable and entitled to special protections under the law.  *See* 88 FR at 31346 (citing INA 208(a)(2), 8 U.S.C. 1158(a)(2) (providing that safe-third-country bar does not apply to UCs); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (stating that an AO has initial jurisdiction over the asylum claims of UCs)); *see generally* 8 U.S.C. 1232.  Given that UCs have long had special rules and protections applicable to them in immigration proceedings, the Departments disagree with commenters that this rule's adoption of the exception for UCs at section 3(b)(iii) of the Proclamation would create any meaningful new incentive for noncitizens who may be a security risk to attempt to pose as UCs in order to circumvent the rule's provisions.  Further, immigration officers have training, knowledge, skills, and experience in identifying fraudulent behavior.  *See* 89 FR at 48744 (explaining that CBP immigration officials "have skills and expertise in interacting with

individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern").

Furthermore, with respect to commenters' concerns regarding the discretionary nature of the exceptions at sections 3(b)(vi) and 3(b)(vii) of the Proclamation based on the totality of the circumstances and operational considerations, the Departments reiterate that comments on the Proclamation itself are outside the scope of this rulemaking. And insofar as these comments relate to this rule, the Departments disagree that these exceptions will essentially swallow the rule, as commenters suggest, or that CBP immigration officers will be unable to apply these exceptions fairly or consistently. Section 3(b)(vi) of the Proclamation permits entry based on the totality of the circumstances, and then delineates examples such as "consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter." Thus, this "totality of the circumstances" exception provides numerous examples that would allow the CBP immigration officer to determine whether such circumstances were present such that a noncitizen would not be subject to the Proclamation's suspension and limitation on entry. The discretionary nature of the "operational considerations" exception provides flexibility for CBP immigration officers to better manage migratory flows during emergency border circumstances, which is a driving purpose of this rule. 89 FR at 48723, 48726–31 (explaining, in detail, the need for the rule). Moreover, CBP officers have experience considering various factors and factual scenarios when exercising their discretion as immigration officers, including determining appropriate processing pathways, and such experience is also relied upon in making these decisions.

Finally, as to commenters' concerns about whether noncitizens who were excepted from the Proclamation's suspension and limitation on entry under subsections 3(b)(vi) and (vii) of the Proclamation will nonetheless be subject to the rule's limitation on asylum eligibility in immigration court, those concerns are misplaced. By their terms, subsections 3(b)(vi) and (vii) apply to "any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting

through a CBP immigration officer," based on certain considerations.  Whether a noncitizen was

excepted from the Proclamation and permitted to enter the United States is a question of

historical fact, documented by CBP in the appropriate electronic processing system(s),[227] and

does not require a separate assessment by an AO or IJ.  *See* 89 FR at 48732 n.169.  Thus, any

noncitizen who is described in subsections 3(b)(vi) and (vii) of the Proclamation will not be

subject to the limitation on asylum eligibility contained in the rule.  *Id.*

i.  *Legal Concerns Related to CBP One and the Lack of Exceptions*

   *Comment:*  Commenters raised a number of concerns regarding the rule's exception to

the limitation on asylum eligibility for noncitizens who use the CBP One app to present at a POE

pursuant to a pre-scheduled time and place.  *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3

Proclamation sec. 3(b)(v)(D).

   Commenters expressed concern that use of CBP One is unlawful.  Some commenters

voiced concern that "barring" those who enter the United States along the SWB without a pre-

scheduled CBP One appointment would violate U.S. and international law and "effectively

eliminate[] asylum" for every noncitizen who crosses into the United States at the southern

border without an appointment.  Commenters further stated that, while the Departments seek to

distinguish the IFR from the vacated Proclamation Bar IFR by explaining that it is being

implemented during an emergency and some lawful pathways remain available to migrants, most

who cannot wait for a CBP One app appointment would be barred from asylum under the IFR.

Similarly, commenters stated that the INA requires DHS to provide every noncitizen who arrives

in the United States with the opportunity to establish a credible fear of persecution—not just

those with the resources to own a smartphone and the ability to schedule an appointment.  Other

commenters stated that the CBP One app codifies a form of electronic metering and essentially

---

[227] Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule,* Securing the Border attach. 5 (June 4, 2024) (Muster).

replaces a program that relied on metering to limit the number of noncitizens who could approach POEs, a practice that, the commenters argued, was held unlawful by the Federal courts.

One commenter expressed concern with the use of the CBP One app, stating that the app has been used to release record numbers of undocumented noncitizens into the United States. The commenter warned that the Biden Administration could continue to utilize and expand upon the CBP One app without any limits under the IFR. The commenter also raised concerns that the number of appointments available through the CBP One app can be expanded without limit, such that a large population of noncitizens could be excepted from the Proclamation's suspension and limitation on entry.

Several commenters expressed concern that the IFR, unlike the Circumvention of Lawful Pathways rule, does not provide an exception for those who are unable to access or use the CBP One application. Other commenters asserted that the IFR does not provide a justification for deviating from the Circumvention of Lawful Pathways rule's scheduling issues exception and expressed concern that while the Circumvention of Lawful Pathways rule's exception has not been properly applied, the lack of such an exception in the IFR would expose migrants who are unable to access or use the CBP One app to the risk of refoulement.

*Response:* The Departments believe the exception for noncitizens who present at a POE pursuant to a pre-scheduled time and place, such as through the CBP One app, is consistent with the INA and the purpose of the Proclamation and this rule.

As an initial matter, the Departments note that migrants do not apply for asylum with CBP at a POE. At POEs, CBP is responsible for the inspection and processing of all applicants for admission, including individuals who may intend to seek asylum in the United States. 8 CFR 235.1(a) (concerning all applicants for admission at POEs); *id.* 235.3(b)(4) (concerning individuals processed for expedited removal and claiming fear of persecution or torture). While the CBP One app is one key way that CBP is streamlining and increasing its capacity to process

undocumented noncitizens, the app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection.

The Departments disagree that the use of the CBP One app to manage the flow of migration and intake into POEs and to encourage the use of safe, orderly, and lawful pathways constitutes a form of "digital metering," unlawfully withholds or bars access to the asylum process, or conflicts with the agency's duties under 8 U.S.C. 1225(a)(3). Any noncitizen who is processed for expedited removal upon arrival at a POE and who indicates an intention to apply for asylum or a fear of return, whether or not the noncitizen uses the CBP One app, will be referred for a credible fear interview. Further, as noted in Sections II.B and III.A of this preamble, the United States implements its non-refoulement obligations under the 1967 Refugee Protocol through the provisions governing withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through section 208 of the INA, 8 U.S.C. 1158, which governs asylum. Noncitizens who are ineligible for asylum under the rule, such as those who enter the United States without pre-scheduling an appointment through the CBP One app, and are unable to establish that exceptionally compelling circumstances exist remain eligible to seek statutory withholding of removal and CAT protection consistent with these obligations.

The Departments also disagree with commenter concerns regarding unlimited expansion of CBP One or the use of CBP One to release individuals. The CBP One app is intended to allow for the orderly processing of noncitizens and, under the Proclamation and this rule, use of the app is especially critical during emergency border circumstances because it allows DHS to maximize the use of its limited resources. 89 FR at 48737; *see also* 88 FR at 31317–18 (explaining that the CBP One app "enables the POEs to manage the flows in a safe and efficient manner, consistent with [each POE's] footprint and operational capacity, which vary substantially across the SWB"). Thus, because the CBP One app allows each POE to manage the daily number of appointments that the POE has the capacity to handle, commenter concerns that the use of CBP One appointments will be vastly expanded beyond CBP's capacity to process

them are unfounded, especially during the emergency border circumstances that the Proclamation and this rule are designed to address. In addition, with regard to concerns regarding the number of noncitizens released following the use of the CBP One app to schedule an appointment, use of the CBP One app does not guarantee a particular processing disposition, and all such determinations are made on a case-by-case basis.[228]

Regarding commenters' concerns that the IFR does not provide an exception for those who present at a POE but are unable to access or use the CBP One app, here, and as noted in the IFR, the Departments choose not to include an exception to the rule's limitation on asylum eligibility for those who present at a POE but have an inability to access the CBP One app due to significant technical failure or other ongoing and serious obstacle. 89 FR at 48732 n.171. The IFR explained that the Departments made this decision in part because of the different purposes of this rule and the Circumvention of Lawful Pathways rule. This rule, unlike the Circumvention of Lawful Pathways rule, applies only during emergency border circumstances as described in the Proclamation and the rule, when encounters strain the border security and immigration systems' capacity. In contrast, the primary aim of the Circumvention of Lawful Pathways rule was to encourage the use of lawful, safe, and orderly pathways. Therefore, the Departments determined that the heightened need to address these emergency border circumstances necessitated limiting the scheduling issues exception in this rule.

Moreover, experience applying the Circumvention of Lawful Pathways rule in credible fear screenings indicates that the exception for presenting at a POE and being unable to access or use the CBP One app rarely applied.[229] The Circumvention of Lawful Pathways rule excepted, in addition to UCs, three categories of noncitizens: (1) individuals provided authorization to

---

[228] *See* Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule,* Securing the Border attach. 5–6 (June 4, 2024) (Muster); CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone* ("Upon arriving at a POE, CBP officers inspect and evaluate all individuals to determine the appropriate processing disposition.").

[229] OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening - CLP tab).

travel to the United States to seek parole, pursuant to a DHS-approved parole process;

(2) individuals who presented at a POE with a CBP One appointment or who presented at a POE

and demonstrated "it was not possible to access or use the DHS scheduling system due to

language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle";

and (3) individuals who sought asylum or other protection in a country through which the alien

traveled and received a final decision denying that application.  8 CFR 208.33(a)(2)(ii),

1208.33(a)(2)(ii).  Leaving aside UCs, as UCs are not subject to expedited removal, 8 U.S.C.

1232(a)(5)(D), noncitizens could establish at least one of these exceptions in only approximately

4.7 percent of total credible fear screenings conducted by USCIS under the Circumvention of

Lawful Pathways rule (i.e., including referrals from USBP and OFO).[230]  While DHS data do not

differentiate among the types of exceptions, available data show that the exception for presenting

at a POE and being unable to utilize the CBP One app applied in less than 5 percent of all

credible fear determinations made by USCIS when considering whether the presumption of

asylum ineligibility applied.[231]

      The data showing the limited application of the exception for presenting at a POE and

being unable to use CBP One reinforce the Departments' judgment not to adopt a similar

exception in the emergency border circumstances in which this rule applies.  Consistent with

AOs' obligation under 8 CFR 208.30(d) to elicit testimony on all potentially relevant

information, USCIS guidance instructs AOs to elicit testimony related to all exceptions to the

presumption of asylum ineligibility where they may apply and evaluate their applicability, which

for the exception under the Circumvention of Lawful Pathways rule (8 CFR 208.33(a)(2)(ii)(B))

would be any case where the presumption of asylum ineligibility applied and the noncitizen

presented at a POE.  At a time where emergency border circumstances are present that trigger a

suspension and limitation on entry and necessitate the limitation on asylum eligibility in the

---

[230] *Id.*

[231] *Id.*

current rule, the Departments do not believe it would be appropriate to expend the resources it would take to elicit testimony about possible ways a noncitizen was unable to access the CBP One app and analyze that information in every credible fear interview where the noncitizen presented at a POE without an appointment in order to apply an exception to the limitation on asylum eligibility similar to the one present at 8 CFR 208.33(a)(2)(ii)(B), particularly where recent experience shows that such an exception is rarely applicable in credible fear determinations.

In addition to these exceptions, the Circumvention of Lawful Pathways Rule also contains a "[r]ebuttal" ground for "exceptionally compelling circumstances." 8 CFR 208.33(a)(3), 1208.33(a)(3). The Departments determined that this rule should also contain an exception for exceptionally compelling circumstances to ensure that noncitizens with a time-sensitive imperative for entering the United States without authorization may avoid application of this rule's limitation on asylum eligibility. Notably, under the Circumvention of Lawful Pathways rule, across the set of all expedited removal cases that resulted in credible fear interviews (i.e., from encounters at and between POEs), USCIS found that an "exceptionally compelling circumstances" rebuttal ground applied in over 10 percent of those cases where the rule's presumption of asylum ineligibility was analyzed as part of the credible fear determination.[232] Under the present rule, the "exceptionally compelling circumstances" exception to the rule's limitation on asylum eligibility was found to apply in approximately 11 percent of all encounters with credible fear determinations issued by USCIS where the limitation on asylum eligibility was considered.[233] Under this rule, noncitizens may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. For those who are unable to meet such an exception, the Departments believe that, in the emergency border circumstances

---

[232] *See id.*

[233] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening - STB tab).

in which this rule applies, such noncitizens should wait for a CBP One appointment. *See* 89 FR at 48732 n.171.

For those individuals seeking a CBP One appointment, CBP continues to take steps to make the process of seeking appointments more equitable and accessible. For instance, individuals have the chance to request an appointment within a 12-hour period each day, with appointments allocated to the requesting group the following day.[234] In addition, noncitizens are not required to use the same mobile phone or device to request an appointment each day, as appointment requests are allocated based on the requesting registration. In other words, if a noncitizen has a registration, they can request an appointment each day from any mobile device. Individuals are not required to utilize a single device for each step of the process, and they may use a shared or borrowed device to request and schedule an appointment.

If a noncitizen receives an appointment, they are notified by an email notification, a push notification to the device that made the appointment, an in-app message, and a change to their registration status in the app.[235] The push notification that is sent to the device provides a notification to check the app, alerting a user to log into the app to review and confirm their appointment. This ensures that the notification is provided in multiple ways, such that those without continuous access to the same mobile device can still learn of their appointment status by logging into the app. If selected for an appointment, the individual then has 23 hours to complete the geolocation and liveness check and schedule the appointment.[236] Individuals may also request an automatic 24-hour extension to complete the process, if needed. Again, this can be done via any mobile device.

---

[234] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone*.

[235] *See* DHS, DHS/CBP/PIA-076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42*, at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf*.

[236] *See* DHS, DHS/CBP/PIA-076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42*, at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf*.

Individuals who do not have a smartphone or have other phone-related problems can seek assistance from trusted partners, if needed.  Individuals are also permitted to seek assistance from others to complete the registration, request, and appointment confirmation process.

## ii.  Wait Times for CBP One Appointments

*Comment:*  Commenters expressed concerns with long wait times for those using the CBP One app to schedule an appointment, with one organizational commenter stating that waiting times routinely reach half a year due to the "enforced scarcity of appointments."  Several commenters expressed concern that capping CBP One appointments at 1,450 per day is insufficient to address the number of arrivals at the border.  For example, a commenter stated that, while 1,450 CBP One appointments are assigned each day, the "average number of appointment requests made per month between January 2023 and February 2024 was just under 5 million."  A commenter stated that appointments are limited to less than 20 percent of the POEs at the SWB, while others noted that CBP One appointments are offered at only eight POEs along the almost 2,000 miles of the SWB.

Commenters further stated that the IFR would likely increase wait times by incentivizing more people to use the CBP One app—including Mexican nationals subject to the IFR—thereby exacerbating the significant backlog for securing an appointment.

Several commenters expressed additional concern that long wait times heighten the risk of danger for migrants in Mexico who intend to seek asylum in the United States.  Specifically, multiple commenters warned that long wait times place migrants at severe risk of rape, assault, torture, kidnapping, and death, while leaving Mexican nationals to wait in the same country from which they are fleeing, and that those waiting for a CBP One appointment are vulnerable to being targeted by "criminal actors and detained or mistreated by Mexican government officials."  Other commenters expressed concern about the hot weather, insufficient housing, and lack of access to essential resources.  Additionally, commenters remarked that violence, coercion, and apprehensions by Mexican authorities prevent migrants waiting in Mexico from attending their

pre-scheduled appointments.  Commenters further expressed that particularly vulnerable populations who are waiting in Mexico, including Black migrants and women, are particularly susceptible to discrimination, violence, and heightened barriers to report crimes and access support services.

A few commenters further addressed health concerns for noncitizens required to wait in Mexico for their CBP One appointment.  A commenter observed that the wait times for an appointment are "neither predictable nor reliable," which compounds stress and difficulties for noncitizens.  The commenter further stated that health problems among certain noncitizens make it more untenable for them to wait in Mexico.  The commenter wrote that living conditions in Mexico exacerbate preexisting conditions such as asthma, cancer, and mental health concerns related to trauma, and that migrants have limited access to adequate medical care and life-saving medicine in Mexico.  Likewise, another commenter observed that noncitizens living with HIV— both Mexican and non-Mexican—experience barriers to accessing treatment and medication while waiting in Mexico.  Another commenter expressed concern over documented outbreaks of chicken pox in informal migrant encampments in Mexico City due to the high number of asylum seekers waiting for an appointment.

A commenter remarked that noncitizens may be granted appointments at a POE far from where they are physically located, despite the app's purported use of geolocational technology, forcing individuals to risk travel within Mexico.  The commenter stated that Mexican authorities do not issue and renew temporary humanitarian visas to a majority of migrants, despite the fact that these visas are required to access bus and airline travel.  The commenter additionally wrote that Mexican authorities have set up checkpoints targeted at preventing individuals from accessing public transportation required to make it to their scheduled CBP One appointments.

*Response:*  Regarding concerns about long wait times to schedule a CBP One appointment, and the uncertainty this may cause, in large part due to high levels of migration in the region, the Departments note that CBP One is a tool that facilitates safe and orderly

processing of noncitizens at POEs, and has aided CBP's efforts to increase processing at POEs.[237]  CBP currently allocates a certain number of appointments per day to those registrations that have been pending for the longest period of time, based on the date on which a registration was created.  CBP also regularly monitors wait times to be able to address any issues.  While average wait times have generally increased since June 2023 due to demand for appointments, as of August 25, 2024, CBP has not seen evidence that average wait times have increased at a greater rate following the implementation of the Proclamation and IFR.  Indeed, CBP One represents a significant expansion of CBP's capacity to process noncitizens at SWB POEs: During the pre-pandemic period, CBP's OFO processed around 330 people per day.[238] From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed four-and-a-half times that number daily.[239]  Although demand for appointments currently outpaces supply, there are now more CBP One appointments available daily (1,450) than average daily encounters at and between POEs between FYs 2011 and 2018 (1,300).[240]

With regard to concerns about the number of available CBP One appointments, DHS acknowledges that there are more noncitizens seeking appointments than there are available appointments.  For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day.  The total appointment requests over multiple day periods include a significant number of repeat requests because individuals are encouraged to submit an appointment request each day until gaining an appointment, and thus monthly totals do not reflect an accurate count of unique individuals seeking appointments.  However, this high level

---

[237] *See, e.g.*, Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf*; 89 FR at 48737.

[238] *See* OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[239] *See id.*

[240] *See* OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000-2024 tab).

of demand reflects the high levels of migration throughout the region, which CBP has responded to by increasing capacity to process noncitizens at POEs.  CBP has increased the number of available appointments since January 2023 but notes that POEs can safely and securely process only a finite number of migrants,[241] and that the current number of appointments reflects that capacity.  The Departments disagree that there is "enforced scarcity" of appointments or that the number of appointments is set in an arbitrary manner.  The number of appointments is determined by a port's capability and capacity to process noncitizens.  CBP's ability to process undocumented noncitizens in a timely manner at land border POEs is dependent on CBP resources, including infrastructure and personnel.[242]

With regard to the number of POEs at which appointments are available and the locations of such ports, OFO must evaluate each POE's unique capabilities, both with respect to processing and staffing.  There are also important variances between POEs due to geography, infrastructure, and workload.  These considerations are evaluated continuously as OFO determines the number of appointments to schedule and at which ports to schedule them.  OFO has limited use of CBP One to certain POEs that have the space and infrastructure to process elevated numbers of inadmissible noncitizens and has assigned staff to those POEs to conduct this processing.  Adding additional POEs would require reallocation of that staffing, exchanging capacity in one location for another.  Additionally, OFO has sought to utilize POEs that are located in or near urban areas with sufficient resources for migrants who may be released from OFO custody.

The Departments acknowledge that there may be humanitarian and health concerns for noncitizens in Mexico, including but not limited to individuals seeking a CBP One appointment, particularly for those with preexisting or underlying health conditions.  The Departments also

---

[241] *See, e.g.*, Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Land Ports of Entry* 1–2 (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf*.

[242] *See, e.g.*, *id.*

acknowledge that the congregation of groups of individuals can lead to increased transmission of communicable diseases.  Similarly, the Departments acknowledge that some noncitizens seeking an appointment—including Mexican nationals—may be required to travel through Mexico to reach their appointment, and to wait in Mexico for their appointment, which may present safety concerns.  The Departments also recognize that such concerns may be exacerbated by uncertainty about how long a migrant may have to wait to be processed at a POE, which may make it harder to schedule medical care or travel within Mexico.

Such circumstances, however, have been a reality that existed for migrants seeking to present at POEs prior to the introduction of CBP One.  Indeed, before CBP One's introduction, migrants faced greater unpredictability given the high levels of migration in the region, which predate the introduction of CBP One,[243] and the fact that before CBP One's introduction, migrants did not have the ability to wait anywhere in the expanded geographic boundaries now available to migrants using CBP One.  In another respect, too, migrants would face worse conditions without this rule: As explained elsewhere in this preamble, the Departments assess that, when levels of encounters by USBP are elevated, such that DHS does not have the capacity to process most noncitizens through expedited removal and therefore must release a significant number of noncitizens pending section 240 removal proceedings, this dynamic serves to incentivize more migrants to travel through Mexico.  This dynamic both exacerbates dangerous conditions along that route and exposes more migrants to dangerous conditions along the way. While CBP has continued to take steps to increase processing at POEs in an effort to provide a safe and orderly mechanism to enter the United States, it continues to be operationally impossible for CBP to immediately process all noncitizens seeking to enter the United States.

---

[243] *See, e.g.*, Perla Trevizo, *Dozens of Families, Many from Guatemala, Arrive in Nogales Seeking US Asylum*, Ariz. Daily Star (Aug. 2, 2018), *https://tucson.com/news/local/dozens-of-families-many-from-guatemala-arrive-in-nogales-seeking/article_4dd45e2f-0b19-5b7b-880e-74a82e3515ea.html*; Ariel G. Ruiz Soto, *Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story*, Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

With regard to the location of scheduled appointments, the CBP One app does not arbitrarily designate the location for appointments.  The location is selected by the user, and the location can be changed by the user every time the user requests an appointment.  The Departments continue to believe that the use of CBP One to schedule appointments facilitates the safe and orderly entry of noncitizens at POEs, including migrants who are already waiting in Mexico to enter the United States.  In particular, the use of the app enables migrants to schedule their arrival at a pre-determined date and time, providing migrants with certainty about the date of their entry.  Migrants may then wait in whatever location they deem best before approaching the border for their appointment.  To this end, as of August 23, 2024, the CBP One app allows non-Mexican nationals to request and schedule an appointment from the southern Mexican states of Tabasco and Chiapas in addition to their existing ability to request and schedule appointments from Northern and Central Mexico.[244]  Mexican nationals may request and schedule an appointment from anywhere in Mexico.[245]  CBP continues to encourage migrants to make appointments at POEs close to where they may be geographically located in Mexico or seek to enter the United States.

With regard to claims regarding the actions of government authorities in Mexico, the Departments note that they do not control the actions or decisions of the Mexican government or Mexico's implementation of its own laws.

iii.  *Availability of and Access to CBP One Appointments and Concerns about Discrimination*

*Comment:*  Several commenters raised concerns about unequal access to POEs and asylum resulting from barriers to using the CBP One app, such as language, disability, resource, and other access issues that disparately impact and discriminate against migrants.  A commenter acknowledged that CBP One may allow for certain positive gains in receiving and processing migrants, and also expressed concern that the application is wielded to penalize those with

---

[244] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone*.

[245] *See id.*

possible protection needs who cannot access it or obtain an appointment.  One commenter called the CBP One app "inherently discriminatory," and another commenter articulated that the CBP One app has "pervasive" accessibility issues.  A commenter cited a 2024 Amnesty International report,[246] where that organization called on the United States to "stop the mandatory use of the CBP One application" due to concerns over language access, technological barriers, and privacy and surveillance.

In the same vein, numerous commenters raised concerns related to the accessibility of the app for those lacking the required technology.  Specifically, commenters expressed concern that scheduling an appointment via CBP One is not a viable option for those who lack access to reliable internet, electricity, or a smartphone.  Some commenters provided examples that migrants have reported that their phones have been stolen by Mexican authorities or cartels, or lost or damaged during their travels.  A commenter stated that in encampments with limited access to electricity, migrants are charged high prices for access to an outlet to charge their phones.  Another commenter expressed that the IFR places people who do not have access to technology in the prejudicial position of having to meet a higher standard of proof to receive a positive credible fear determination, in violation of U.S. asylum law.  A commenter remarked that in perpetuating the "division" between "classes of people seeking asylum"—"those who have a smartphone and access to the internet and are technologically literate" and "those who do not have these required items, skills or abilities"—the IFR fails to apply protections equally under U.S. and international law.

Many commenters also discussed limited language accessibility for the CBP One app, stating that the app is only available in Spanish, English, and Haitian Creole, and expressed that conditioning access to asylum on the use of a smartphone app that is only available in three languages denies equal access to asylum to those in need of protection who are unable to use the

---

[246] Amnesty Int'l, *CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States* (May 9, 2024), *https://www.amnesty.org/en/latest/news/2024/05/cbp-one-mobile-application-violates-the-rights-of-people-seeking-asylum-in-the-united-states/*.

app.  Commenters expressed concerns about the fact that different stages for securing a CBP One appointment are available in different sets of languages (e.g., Login.gov, the initial app registration page, and app form responses), as this results in noncitizens, even those who are literate in Spanish and Haitian Creole, requiring assistance with completing the CBP One app form.  The commenter further remarked that the system is particularly difficult for vulnerable populations to navigate as a result of challenges with finding adequate translation services, reasoning, for example, that it can take up to a week to find interpretation for Indigenous languages.

Several commenters additionally raised concerns about access to the app among those who are illiterate, have disabilities, or have limited language and digital literacy.  In particular, commenters expressed that the IFR assumes technological literacy in the use of smartphone apps, such as the ability to access an email account, check the account on an ongoing basis, upload a video, and enable Global Positioning System/geolocators with many people requiring assistance to undertake these steps.  A commenter provided an account of their experiences with individuals in Ciudad Juarez who struggle to navigate the app despite knowing how to read in Spanish and Haitian Creole, and the inability of legal service providers to provide logistical support to all the individuals with potential asylum claims who lack the digital literacy to navigate the mobile app.

Commenters further remarked on technological issues surrounding the app.  Commenters expressed concerns that CBP One remains inaccessible to many due to facial recognition technology errors, which commenters stated are frequent for migrants with darker skin tones.  Commenters stated that the app cannot read the faces of Black, Brown, Asian, and Indigenous people seeking asylum, and Haitians and Africans are particularly likely to experience "algorithm bias" while using the CBP One app which would prevent large classes of individuals from using the app to secure an appointment, and, therefore, from seeking asylum, perpetuating racism in the U.S. immigration system.

Commenters also noted additional technology concerns, such as issues with error messages, account access, and deactivated accounts. One commenter listed various reported issues with the CBP One app, such as difficulty uploading files, error messages only provided in English, saturated bandwidth resulting in delays, appointments being rejected if GPS is not activated, and phones unable to take video or photos of sufficient quality to be recognized by the app. Another commenter provided various anecdotal examples of individuals who were unable to access the CBP One app under the Circumvention of Lawful Pathways rule, and who the commenter said would similarly be harmed under the IFR, while another commenter added that complications with the app forced nongovernmental organizations to spend resources helping people use the app rather than assisting noncitizens with credible fear interviews, reviews of negative determinations, and representation in immigration court. A commenter also stated that "[t]here is a thriving black market for appointments available only to the wealthiest refugees."

Separately, while some commenters expressed support for the "expansion of mechanisms for [CBP One] appointments," commenters also stated that these expansions are insufficient to counteract noncitizens' unawareness of the CBP One application and the inability to obtain appointments.

Lastly, a commenter asserted that the use of CBP One results in family separation due to different appointment dates. Furthermore, a commenter expressed additional concern that families with a CBP One appointment are not always guaranteed the ability to cross the border, citing examples of families who were turned away despite arriving on time for a valid appointment.

*Response:* The Departments disagree that the CBP One app is a barrier to asylum. Rather, it is a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in a more orderly and efficient fashion. CBP One is also a free app, and noncitizens are not required to pay to register or schedule an appointment.

The Departments acknowledge that not all migrants may have access to a smartphone or be able to easily use the CBP One app, and that lack of or limited smartphone access or ability to use a smartphone (due to lack of digital literacy, disability, or other reasons) may limit a migrant's ability to use the CBP One app to schedule an appointment. However, individuals who do not have a smartphone or who have other phone-related issues can seek assistance, including sharing phones, or translation or technical assistance, from trusted partners, if needed. In addition, as noted above, individuals may utilize shared or borrowed devices to register for the CBP One app and to schedule an appointment. CBP conducts extensive engagement with non-governmental organizations ("NGOs") and stakeholders, and has received feedback and information about the challenges associated with the use of the CBP One app. Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals. CBP is aware that NGOs have discussed providing assistance with completing individuals' CBP One registrations and offering continued assistance with requesting appointments. CBP also notes that individuals seeking to create a CBP One registration can do so from anywhere. To create a registration, users are not required to enable location services, although they are required to enable location services in order to request and schedule an appointment.

With regard to internet access, the Departments acknowledge there can be connectivity gaps, electrical outages, and unreliable wireless internet access in northern Mexico. However, CBP made significant updates to the appointment scheduling process in 2023, including transitioning CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. Under this system, users must "ask for an appointment" each day, by selecting the relevant registration and submitting a request for that registration.[247] If a noncitizen receives an appointment that day, they are notified in multiple ways, and have up

---

[247] See CBP, CBP One™ Mobile Application, Frequently Asked Questions – English (last modified Sept. 19, 2024), https://www.cbp.gov/about/mobile-apps-directory/cbpone.

to 23 hours to confirm that appointment.[248]  If a noncitizen does not receive an appointment, they must "request an appointment" the following day, again by selecting the relevant registration and requesting that registration.  Individuals are not required to use the same mobile phone or device to request an appointment each day, and, as noted above, may use a shared or borrowed device to request and schedule the appointment.  In addition, in July 2024, CBP updated the appointment allocator to increase the percentage of appointments allocated to users who had been waiting for longer periods of time, based on the date on which their registration was created.

CBP also continually takes steps to provide access to the app for individuals in different languages.  The app was originally available in Spanish and English.  Haitian Creole was added in February 2023 in response to feedback from external stakeholders.  Additionally, after the user makes a language preference, error messages are available in the selected language (English, Spanish, or Haitian Creole).  While the app remains available in Spanish, English, and Haitian Creole, quick reference guides are now available in many languages (including Russian, French, Portuguese, Arabic, Dari, Pashto, Punjabi, and Chinese).  According to the UNHCR, of the top 5 nationalities of displaced individuals in Mexico, all are from Spanish-speaking countries and Haiti.[249]  Between May 11, 2023 (when the Title 42 public health Order terminated) and September 11, 2024, USBP data show that over 88 percent of noncitizens apprehended between POEs on the SWB were recorded as speaking Spanish or English.  The next most common languages were Mandarin, representing just over 2 percent of apprehensions, followed by Portuguese and French, which each represent less than 2 percent of noncitizens apprehended.[250]

---

[248] *See* CBP, CBP One™ Application Update Announcement – English (Mar. 1, 2024), https://www.cbp.gov/document/guidance/cbp-one-application-update-announcement-english.

[249] *See* United Nations High Commissioner for Refugees ("UNHCR"), *Country Operations: Mexico, Population by Origin,* https://reporting.unhcr.org/operational/operations/mexico# (last visited Sept. 19, 2024).  For purposes of this analysis, the Departments are excluding the nationalities grouped as "various," given a lack of information on what such category includes.

[250] Due to the way that CBP's OFO records and documents language services, data for languages used by those encountered at POEs are not readily available.  Although there is a high volume of displaced Haitian nationals in Mexico, CBP's experience is that, particularly in recent years, Haitian nationals have been much more likely to be encountered at POEs than from between POEs.  For instance, in FY 2023, more than 75,000 Haitian nationals were encountered at SWB POEs, compared with just over 1,000 between POEs.  *See* OHSS analysis of July 2024 Persist Dataset (Haitian Encounters tab).

Finally, a CBP analysis conducted in September 2024 showed that, of all of the CBP One appointment requests during the first week of September 2024, approximately 90 percent were made by individuals from Spanish-speaking countries, with the next highest percentage, 5 percent, made by Haitians, and the remainder by other nationalities. The fact that Haitian nationals represent a relatively large proportion of the displaced persons in Mexico generally, are more likely to be encountered at POEs, and use the CBP One app further supports the prioritization of Haitian Creole and Spanish translations in the app. In addition, based on NGO feedback, CBP will be adding a French translation to the app. CBP has also been made aware of concerns with regard to the accuracy of the app's Haitian Creole translation and is currently taking steps to improve its accuracy.

CBP acknowledges that individuals who do not speak Spanish, English, or Haitian Creole, including those who speak Portuguese or Mandarin, may have more difficulty accessing the app, but has determined that it is appropriate to prioritize translation services in the app to those languages spoken by the vast majority of users of the app and noncitizens in the region. And CBP believes that its efforts to make the app accessible in other ways, such as through the quick reference guides, are working. CBP has seen a significant number of individuals who do not speak Spanish, English, or Haitian Creole requesting appointments, suggesting that the quick reference guides, as well as other information about CBP One available on CBP's website,[251] are working to provide accessibility to the app even for those who do not speak one of those languages. With regard to concerns about different stages of the CBP One appointment process being in different languages, CBP does not exercise control over Login.gov, which is used to register for an appointment, as it is operated by the General Services Administration.[252] Login.gov is available in several languages, including English, Spanish, and French. And while

---

[251] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone*.

[252] *See* U.S. General Servs. Admin., *Login.gov*, *https://login.gov/* (last visited Aug. 10, 2024).

Login.gov is not available in Haitian Creole, CBP analysis showed that, as noted above, Haitian

nationals continue to be the second-highest population of noncitizens requesting CBP One

appointments, indicating that Login.gov's languages are not posing a substantial limitation for

those users. Moreover, the CBP One quick reference guides include a description of the

Login.gov steps in the process. The Departments also appreciate the concerns related to the

information required to access or use the CBP One app. The Departments note that users of the

app are not required to upload any documents in order to use the app. Users are required to

submit a photograph, and may, although are not required to, upload document information, such

as scanning their passport information. With regard to concerns raised by commenters relating

to facial recognition and access to the app by individuals with darker skin tones, CBP and the

third party responsible for liveness detection took steps in 2023 to improve the liveness

capability of the application and increase bandwidth. Since that time, CBP has data showing that

the app successfully matches liveness in 80-90 percent of attempts, with the difference in

performance across ethnicities on the order of tenths of a percent. If an individual initially is not

able to successfully match to their live photo, they are not prohibited from trying again, and they

may seek an extension to continue to try to complete liveness. Individuals who continue to fail

liveness are able to reach out to CBP either directly or, if appropriate, through an NGO or other

external entity. CBP notes that it does not collect data on race or skin complexion.

CBP engages frequently with stakeholders to determine further updates and changes in

the app that improve the users' experience and enhance access to its features. For example,

because of NGO feedback, height and weight were made optional fields and additional response

options were added such as "I don't have one" for a foreign address and "Unknown" for parental

information. CBP also acknowledges that reading comprehension and disability may present

challenges for some users among this user population. CBP has improved the app's text for

users with low literacy and will continue to make improvements to the app for this population.

The app has also undergone a compliance review pursuant to section 508 of the Rehabilitation

Act regarding its accessibility to people with disabilities, with a final certification expected by the end of November 2024.

Regarding concerns raised by NGOs regarding the resources expended to address questions from migrants about the app and its impacts, the Departments are not able to comment on how such entities determine the use of their own resources. With regard to concerns regarding a "black market" for appointments, CBP has advised noncitizens and the general public that appointments that purport to be "for sale" are fraudulent, and migrants should not pay for such appointments.[253]

With regard to the commenters' concerns related to whether noncitizens have sufficient awareness of the availability of the CBP One app and this rule, the Departments believe that they have provided sufficient notice to the public. The Departments note the use of, and benefits of, the CBP One app have been broadly publicized. Indeed, the CBP One app is widely used, as evidenced by the number of requests CBP receives each day for appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. Demand for CBP One appointments has outpaced supply, which has resulted in average wait times increasing since June 2023. CBP continues to regularly announce updates and improvements made to the app to the public. In particular, CBP regularly announces changes and updates to the app on its public website at *https://www.cbp.gov/about/mobile-apps-directory/cbpone*. This website also contains a number of detailed questions and answers regarding the use of the app. Additionally, DHS has published a Privacy Impact Analysis (PIA) for CBP One, and subsequent updates to the original CBP One PIA to address privacy risks in the deployment and use of the CBP One app.[254] Moreover, the Departments' publication of the

---

[253] *See* CBP, *CBP One™ Mobile Application, Frequently Asked Questions – English, CBP One™ Mobile Application, "What if someone asks me to pay for an appointment?"* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone*.

[254] *See* DHS, DHS/CBP/PIA-068, *Privacy Impact Assessment for CBP One™ Mobile Application* (2021 and subsequent updates), *https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf*; DHS, DHS/CBP/PIA-068(a), *Privacy Impact Assessment [Update] for CBP One™ Mobile*

Circumvention of Lawful Pathways rule, the IFR, and this rule have provided (and in the case of this rule, will provide) further notice to the public and to noncitizens of the pathways available to them and the potential consequences of not availing themselves of such pathways. The Departments believe that such efforts provide sufficient information for noncitizens seeking to travel to the United States.

With respect to comments suggesting that families are processed separately or have been turned away, the Departments note that all individuals—including members of families—are processed pursuant to existing CBP policies and practices. Family members who register together on CBP One using a single registration number to schedule an appointment for their whole family are given the same appointment date and time. So long as they arrive as a family for their appointment at that date and time, they will be processed at that appointment time.

*b. Regulatory Exception — Exceptionally Compelling Circumstances*

*Comment:* Commenters raised concerns regarding the preponderance of the evidence standard for establishing exceptionally compelling circumstances under the IFR. Commenters argued that applying a limitation on asylum eligibility during credible fear interviews, and then requiring noncitizens to demonstrate exceptionally compelling circumstances by a preponderance of the evidence in order to overcome the limitation on asylum eligibility, is inconsistent with the INA and congressional intent. Rather, commenters stated that Congress enacted a "significant possibility" standard for the credible fear interview in order to safeguard a noncitizen's opportunity to present potentially viable asylum claims in full proceedings and to prevent noncitizens from being returned to persecution or torture.

---

*Application* (2024), https://www.dhs.gov/sites/default/files/2024-07/24_0725_priv_pia-cbp-068%28a%29-cbpone-update.pdf; *see also* DHS, DHS/CBP/PIA-076, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (2023), https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf; DHS, DHS/CBP/PIA-076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42* (2023), https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.

Relatedly, commenters stated that noncitizens should not have to demonstrate exceptionally compelling circumstances unrelated to their asylum claim by a preponderance of the evidence in order to have their asylum claims adjudicated. Some commenters believed that the preponderance of the evidence standard was too onerous for noncitizens to meet during the credible fear interview, even if the noncitizen had experienced a situation or event prior to entry that should otherwise qualify as an exceptionally compelling circumstance.

Lastly, at least one commenter implied that AOs conducting credible fear interviews did not have adequate training and were not equipped to conduct the analyses required by the IFR, including applying the preponderance of the evidence standard to determine whether a noncitizen is subject to the limitation on asylum eligibility.

*Response:* Many of commenters' concerns are based on an incorrect premise. The Departments recognize that the "significant possibility" standard is established by statute, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and the Departments lack the authority to—and have not sought to—alter this statutory standard through rulemaking. By statute, to determine whether a noncitizen has a "credible fear," an AO must assess whether there is a "significant possibility . . . that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Thus, during credible fear proceedings, the overall standard of proof for establishing exceptionally compelling circumstances to overcome the limitation on asylum eligibility remains the "significant possibility" standard, which must be applied in conjunction with the standard of proof required for the ultimate determination (i.e., preponderance of the evidence that the exception applies). *See* 89 FR at 48739. Accordingly, at the credible fear interview, the AOs assess whether there is a "significant possibility" that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen satisfies the rule's exception. Likewise, during credible fear reviews, IJs will apply the "significant possibility" standard to determine whether a noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the

limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception.

To the extent commenters voiced general opposition to requiring a noncitizen to demonstrate exceptionally compelling circumstances by a preponderance of the evidence so as not to be subject to the rule's limitation on asylum eligibility, the Departments note that this standard is the general standard noncitizens must meet to determine that a ground of ineligibility does not apply in a merits adjudication. *See* 8 CFR 1240.8(d) ("If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply."). Additionally, this burden for establishing exceptionally compelling circumstances was codified by the Circumvention of Lawful Pathways rule, which has been in effect since May 11, 2023. 88 FR at 31450–51 (codified at 8 CFR 208.33(a)(3), 1208.33(a)(3)). The Departments believe that maintaining consistency in the preponderance of the evidence standard between these two related rules promotes consistent adjudications when adjudicators must determine whether a noncitizen has demonstrated exceptionally compelling circumstances. In fact, to promote such consistency, the rule provides that if a noncitizen demonstrates an exceptionally compelling circumstance for purposes of this rule, then the noncitizen has necessarily demonstrated an exceptionally compelling circumstance for purposes of the Circumvention of Lawful Pathways rule, and vice versa, further underscoring the importance of maintaining a consistent analytical framework between the two rules. *See* 89 FR at 48754–55 (explaining that the IFR's exception to the limitation on asylum eligibility mirrors the Circumvention of Lawful Pathways rule's rebuttal grounds to simplify administration of each while both rules are in effect).

Further, contrary to commenter concerns, the preponderance of the evidence standard is not onerous or unduly burdensome such that a noncitizen would be unable to demonstrate exceptionally compelling circumstances. To the extent that commenters expressed concern with

the preponderance of the evidence standard during credible fear proceedings, the Departments again clarify that the applicable standard during credible fear proceedings is the "significant possibility" standard, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and AOs will assess whether there is a significant possibility that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen meets the "exceptionally compelling circumstances" exception. Similar to the Circumvention of Lawful Pathways rule's rebuttal grounds, *see* 88 FR at 31380, the Departments believe that there should generally be sufficient evidence available at the time of the credible fear interview for an AO to evaluate whether there is a significant possibility that the noncitizen would be able to establish exceptionally compelling circumstances by a preponderance of the evidence. Notably, the credible fear screening process involves eliciting testimony from noncitizens seeking protection, and the rule does not require noncitizens to provide any specific form of evidence, such as written statements or other documentation. *See* 89 FR at 48746 & n.239.

Indeed, DHS data show that the standard is not unduly challenging to meet at the credible fear stage. Since the IFR went into effect through August 31, 2024, USCIS determined that the limitation on asylum eligibility did not apply in over 2,200 cases (approximately 11 percent of credible fear interviews completed under the IFR during that period) because the noncitizen was able to demonstrate exceptionally compelling circumstances under the credible fear screening standard.[255] The Departments believe that these data show that the exception is both meaningful and appropriately tailored to ensure that, during emergency border circumstances, only those with a time-sensitive imperative are able to avoid the rule's limitation on asylum eligibility.

Regarding the preponderance of the evidence standard during a full merits adjudication, the Departments similarly do not believe that it imposes an onerous or unduly burdensome

---

[255] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening - STB tab).

evidentiary standard. The INA explicitly provides that during full merits adjudication of an asylum claim "testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration" in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Thus, as the Departments have explained, the preponderance of the evidence standard may be met through credible testimony alone. *See* 88 FR at 31395. For example, if a noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom they were traveling faced an acute medical emergency, an imminent and extreme threat to life or safety, or satisfied the definition of a victim of a severe form of trafficking in persons, or faced other exceptionally compelling circumstances, then the noncitizen could present testimony of those facts and circumstances.

Lastly, to the extent commenters expressed skepticism about an AO or IJ's ability to properly apply the screening standard during a credible fear interview, the Departments note that both AOs and IJs receive extensive training in substantive law and procedure, *see* 88 FR at 31395 & nn.211–213, and the Departments are confident that AOs and IJs have the requisite knowledge, skills, and experience to properly apply the framework of this rule, as they have been doing for months.

*Comment:* Some commenters recommended that the Departments rescind the "exceptionally compelling circumstances" exception to the limitation on asylum eligibility, stating that the exception codifies "loopholes" that are easy for noncitizens to exploit and undermines the Departments' goal of discouraging irregular migration across the SWB.

*Response:* The Departments decline to rescind the "exceptionally compelling circumstances" exceptions at 8 CFR 208.35(a)(2)(i) and 1208.35(a)(2)(i). As the Departments explained in the IFR, maintaining an exception to the limitation on asylum eligibility for exceptionally compelling circumstances is intended to mitigate potential adverse impacts of the rule on certain particularly vulnerable individuals and family members as described in 8 CFR 208.30(c) with whom they are traveling, without undermining the Departments' stated policy

objectives of disincentivizing irregular migration during emergency border circumstances. 89 FR at 48754. The Departments believe the nature of the exceptionally compelling circumstances—such as facing an acute medical emergency, facing an imminent and extreme threat to life or safety, or meeting the definition of a victim of a severe form of trafficking in persons—appropriately balances the Departments' stated policy objectives and does not create a "loophole" as commenters suggest.

The Departments are also confident that AOs and IJs will appropriately assess a noncitizen's testimony and any evidence presented to determine whether a noncitizen has established that the rule's exception to the limitation on asylum eligibility applies. Indeed, DHS and EOIR personnel have the training and experience necessary to determine whether the exception applies, including several months of experience from implementing the IFR and other rules. For example, AOs were provided specific training for the implementation of the Circumvention of Lawful Pathways rule to elicit and analyze testimony related to whether a noncitizen can establish an exception or rebut the presumption of asylum ineligibility. *See* 88 FR at 31330. Additionally, before any AO can interview a noncitizen where the IFR's limitation on asylum eligibility applies, or any supervisory AO can review such a case, they must receive specific training on the IFR, including on applying the IFR's limitation on asylum eligibility and the "exceptionally compelling circumstances" exception.

*Comment:* Commenters stated that the enumerated per se exceptionally compelling circumstances in 8 CFR 208.35(a)(2) and 1208.35(a)(2) are, on the whole, too limited in number and narrow in scope, and are framed in a restrictive manner with a high burden of proof that commenters asserted many noncitizens will be unable to meet. According to commenters, because the exception is so difficult to establish, the vast majority of noncitizens who enter between POEs will be ineligible for asylum. Commenters also alleged that noncitizens may not have access to or be aware of what information or evidence is necessary to sufficiently demonstrate exceptionally compelling circumstances, particularly as they may not be aware of

the rule and its evidentiary requirements until they are placed in proceedings.  Similarly, commenters expressed concern about the evidentiary burden noncitizens would face in trying to establish that exceptionally compelling circumstances existed at the time of entry when their case may not be adjudicated until years after the date of entry due to existing backlogs, and when evidence and witnesses may be lost over time.  Commenters offered, as an example, the difficulty that noncitizens would face in demonstrating that they or a family member with whom they traveled experienced an acute medical emergency, in the absence of concurrently issued medical documents.

Commenters stated that it will be difficult for AOs to evaluate whether a noncitizen satisfies an exception at the credible fear stage because it is a fact-intensive inquiry and will require significant development of the record.  Commenters also stated that there is insufficient guidance about how, in practice, AOs are supposed to make a finding regarding exceptionally compelling circumstances.  Further, commenters expressed concern that AOs are not required to elicit potentially relevant facts about the rule's exceptions to ensure that noncitizens are not improperly subject to the IFR's limitation on asylum eligibility and recommended that the Departments adopt a screening framework in which AOs have a shared burden to elicit all information relevant to asylum eligibility, preferably in a non-adversarial manner.

*Response:*  The Departments believe that the rule's exception to the limitation on asylum eligibility for exceptionally compelling circumstances, including the enumerated per se circumstances, are appropriate in scope and detail, and as such, the Departments decline to modify those provisions.  Indeed, during emergency border circumstances, limiting the "exceptionally compelling circumstances" exception to those who are unable to wait for an appointment due to an acute medical emergency or an imminent and extreme threat to life or safety is important to deter irregular migration and provide for efficient border processing during

a period of high encounters.[256]  *See* 89 FR at 48732 n.171.  As discussed above in this section of the preamble, the data reflect that the "exceptionally compelling circumstances" exception is achieving this balance; USCIS determined that the exception had been met in approximately 11 percent of credible fear interviews completed between the IFR's effective date and August 31, 2024.[257]

The Departments stress, however, that exceptionally compelling circumstances are not limited to the enumerated examples.  Rather, similar to the rebuttal grounds adopted in the Circumvention of Lawful Pathways rule, the examples are a non-exhaustive list intended to preserve AO and IJ flexibility and permit consideration of all facts giving rise to potential exceptionally compelling circumstances.  89 FR at 48733; 88 FR at 31394.  Additionally, the Departments continue to prioritize family unity by extending these exceptions to qualifying family members with whom the noncitizen is traveling.  *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Regarding concerns that establishing exceptionally compelling circumstances is a fact-intensive inquiry that will require significant development of the record, and that noncitizens will not have access to information and evidence of exceptionally compelling circumstances at the time of screening, the Departments note that relevant evidence of such circumstances generally relates to the situation immediately prior to the noncitizen's entry into the United States, and focuses on relevant personal facts and circumstances within the noncitizen's knowledge. Accordingly, the Departments expect that any evidence necessary for a noncitizen to demonstrate that they have a significant possibility of ultimately showing exceptionally compelling circumstances should generally be readily available—whether from the noncitizen in

---

[256] Separately, noncitizens facing an urgent humanitarian situation may not be subject to the limitation at all if, under the Proclamation, a noncitizen is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of urgent humanitarian interests at the time of the entry or encounter.  *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); Section 3(b) of the Proclamation.

[257] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening - STB tab).

the form of credible testimony or other evidence or from government records relating to the noncitizen's circumstances at the time of entry—at the time of the credible fear screening. With respect to cases where the existence of exceptionally compelling circumstances at the time of entry may be evaluated later in time, the Departments similarly note that the rule does not impose any requirement for the type of evidence necessary to establish exceptionally compelling circumstances, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in a full merits hearing in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Regarding commenter concerns that noncitizens would have difficulty demonstrating that they faced an acute medical emergency at the time of entry without medical documents, the Departments expect that credible testimony about the medical emergency would generally be sufficient at the credible fear stage, and the rule does not require any specific type of evidence related to the acute medical emergency. *See* 89 FR at 48746 & n.239 (explaining that credible testimony is sufficient in a credible fear screening and that corroborating evidence is not required); *see also* 88 FR at 31392 (discussing the analogous acute medical emergency rebuttal ground under the Circumvention of Lawful Pathways rule).

Additionally, when conducting credible fear interviews, AOs have an obligation to elicit testimony relevant to a noncitizen's claim, which will necessarily include any information related to exceptionally compelling circumstances.[258] Moreover, during credible fear reviews before IJs, noncitizens have an opportunity to be heard and to be questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). During section 240 removal proceedings, IJs also must develop the record, which will, as relevant, necessarily include facts and testimony pertaining to exceptionally compelling circumstances. *See* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("[IJs] shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the

---

[258] *See, e.g.*, USCIS, *RAIO Directorate—Officer Training: Interviewing — Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.").

[noncitizen] and any witnesses."); 8 CFR 1003.10(b) (same); *see also Quintero v. Garland*, 998 F.3d 612, 626 (4th Cir. 2021).

Finally, the Departments disagree with the assertion that there is insufficient guidance regarding making a finding related to exceptionally compelling circumstances. The rule clearly sets forth both the standard for the "exceptionally compelling circumstances" exception and the process for evaluating the limitation on asylum eligibility during credible fear determinations. *See* 8 CFR 208.35(a), (b), 1208.35(a), (b). Additionally, AOs must receive training on application of the limitation on asylum eligibility and the "exceptionally compelling circumstances" exception before any AO can interview a noncitizen where the limitation on asylum eligibility applies, or any supervisory AO can review such a case. Further, the Departments have experience in applying the "exceptionally compelling circumstances" standard in the context of the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733 (explaining that the exception mirrors the rebuttal circumstances adopted in the Circumvention of Lawful Pathways rule and is intended to apply to the same circumstances); *see also* 88 FR at 31380, 31390–93 (explaining the standard for establishing and procedure for evaluating analogous rebuttal grounds under the Circumvention of Lawful Pathways rule). The Departments also now have several months of experience implementing the IFR, and implementation itself yields valuable information on continued operation of its provisions. *See supra* Section II.A.2.

*Comment:* Commenters raised concerns that the "exceptionally compelling circumstances" exception does not provide adequate protection for vulnerable groups. Specifically, commenters alleged that the exceptions are insufficient to protect vulnerable groups who face a disproportionate risk of harm in Mexico, including LGBTQI+ noncitizens, Black and Indigenous noncitizens, women, and children, among others. Commenters observed that some such noncitizens, and particularly those without access to legal representation, may not understand the intricacies of the IFR or the requirements to establish an exception. Further, commenters stated that the complicated exceptions will contribute to confusion among and

disparate treatment of such noncitizens, making them vulnerable to smugglers and undermining the Departments' goal of orderly processing at the SWB.

*Response:* For general discussion regarding concerns related to specific vulnerable populations, please see Section III.B.2.a.iii of this preamble.

With regard to the "exceptionally compelling circumstances" exception and vulnerable populations specifically, the Departments believe that the exception provides sufficient protection for such populations. The exception focuses on relevant personal facts and circumstances within the noncitizen's knowledge relating to potential harm they faced immediately preceding their entry into the United States. *See* 89 FR at 48747–48. To determine whether the exception applies, the AO questions the noncitizen regarding the circumstances of their entry into the United States, which does not require any particular legal knowledge by the noncitizen.

Further, the Departments disagree that the "exceptionally compelling circumstances" provision will make noncitizens more vulnerable to smugglers due to confusion about the rule. As the Departments explained in the IFR, 89 FR at 48733, the exception for exceptionally compelling circumstances was drafted to mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule, which the Departments believe will help reduce any confusion among noncitizens or adjudicators. Moreover, the Departments believe that, overall, this rule is a key measure to combat illegal smuggling activity by drastically reducing incentives for noncitizens without a lawful basis to remain in the United States to rely on smugglers for entry into the United States. *See* 89 FR at 48714–15 (explaining how the rule is necessary to combat illegal smuggling activity), *id.* at 48766. The "exceptionally compelling circumstances" exception is an important provision of this rule because it appropriately balances the essential need to use resources effectively during emergency border circumstances with consideration of whether a noncitizen or family member with whom they are traveling is specifically vulnerable to

immediate harm and has entered the United States during emergency border circumstances due to serious and urgent needs to do so. *See* 89 FR at 48754.

*Comment:* Commenters stated that the exception to the IFR was subjective, highly discretionary, and insufficient to ensure individuals were not refouled. Commenters also expressed concern that the enumerated per se exceptionally compelling circumstances require a subjective assessment of the degree and temporal nature of the needs and threats faced by noncitizens at the time of entry, which commenters allege is inconsistent with the right to seek asylum and the principle of non-refoulement.

*Response:* The Departments disagree that the "exceptionally compelling circumstances" exception is overly subjective or affords too much discretion to AOs and IJs, as the Departments are confident in AOs' and IJs' ability to fairly and accurately apply the exception. AOs and IJs have significant training and experience in eliciting testimony and applying legal standards in immigration proceedings. *See, e.g.*, 89 FR at 48747 (noting that AOs and IJs have the training and experience necessary to elicit information required to determine whether a case meets the necessary requirements); 8 CFR 1003.10(b) (requiring IJs to "seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations").

Further, to the extent a noncitizen has concerns with an AO's determination, all credible fear determinations undergo supervisory review to ensure consistency. 8 CFR 208.30(e)(8). Noncitizens may also request IJ review of negative credible fear determinations. 8 CFR 208.35(b)(2)(v). Moreover, if the limitation on asylum eligibility is applied to a noncitizen in section 240 removal proceedings, IJ determinations are subject to review by the BIA. 8 CFR 1003.1(b)(3).

With regard to concerns about potential refoulement, the Departments note that, even in those cases where a noncitizen is unable to establish exceptionally compelling circumstances and is subject to the limitation on asylum eligibility, the noncitizen remains eligible to pursue statutory withholding of removal and CAT protection, which implement the United States' non-

refoulement obligations.  *See* 8 CFR 208.35(b)(2); 8 CFR 1208.35(b)(2)(iii).  For additional

discussion regarding the United States' non-refoulement obligations, please see Sections

III.A.1.a and III.A.1.d of this preamble.

    *Comment:*  Commenters noted that the per se exceptionally compelling circumstances

mirror the rebuttal grounds established in the Circumvention of Lawful Pathways rule; some

commenters incorporated their previous objections to that rule, concerning the per se

exceptionally compelling circumstances, into comments submitted in response to this IFR.

    *Response:*  Commenters correctly assert that the per se exceptionally compelling

circumstances mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule.  *See* 89

FR at 48733.  To the extent that commenters stated that they were incorporating their previous

comments submitted in response to the Circumvention of Lawful Pathways NPRM, the

Departments responded to those comments as part of the Circumvention of Lawful Pathways

rulemaking, and commenters are encouraged to refer to that rule for the Departments' responses.

*See, e.g.*, 88 FR at 31390–95 (responding to commenter concerns related to the grounds for

rebutting the presumption of asylum ineligibility under the Circumvention of Lawful Pathways

rule).

    *Comment:*  Commenters alleged that the "imminent and extreme threat to life and safety"

exception is inadequate and illusory, claiming that CBP officers would, in practice, turn away

noncitizens who could otherwise establish such threats.  For example, commenters provided

anecdotal reports of women being turned away from POEs after CBP officers determined that

their accounts of being sexually assaulted and raped in Mexico did not fall within an exception.

    Commenters also stated that the exception incentivizes noncitizens to wait in Mexico

until they are subject to harm or violence before seeking protection.  Further, commenters were

concerned that the IFR included a per se exception for forward-looking threats, but not for being

a survivor of "recent and severe forms of violence."  Commenters stated that such survivors have

a significant need for protection to mitigate past harm and to prevent further harm.

Commenters also noted that, in responding to comments about the analogous rebuttal ground in the Circumvention of Lawful Pathways rule, the Departments explicitly stated that generalized threats of violence, membership in a particularly vulnerable group, and dangerous country conditions will not rise to the level of an "imminent and extreme threat to life and safety," which commenters believed was overly limiting.

Commenters further recommended broadening the per se exceptionally compelling circumstances, so that "acute medical emergencies" includes non-medical and non-life-threatening medical needs; and "imminent and extreme threats to life or safety" includes threats to life or safety that may not necessarily be "imminent" or "extreme." Commenters further stated that the grounds for rebutting the presumption of asylum ineligibility contained within the Circumvention of Lawful Pathways rule have been interpreted narrowly, resulting in noncitizens wrongfully being unable to rebut the presumption, not receiving a full adjudication of their claims, and ultimately being ordered removed. Commenters also urged the Departments to ensure that these per se exceptionally compelling circumstances encompass the medical risks and harms reported by asylum seekers while waiting in Mexico.

*Response:* The Departments decline to amend the list of per se exceptionally compelling circumstances established in the rule. The per se circumstances contained in the rule—acute medical emergencies, imminent and extreme threats to life or safety, or being a victim of severe trafficking in persons—are intended to capture noncitizens with a time-sensitive imperative for entering the United States to avoid immediate, serious harm. *See* 89 FR at 48732 n.171. Broadening these per se circumstances further would undermine the goal of this rule: to address the significant strain on the United States' immigration system during emergency border circumstances. *See* 89 FR at 48726–31 ("Need for These Measures").

Likewise, requiring a situation-specific analysis of potential harm to the noncitizen is necessary to limit the "exceptionally compelling circumstances" exception to only those noncitizens who truly require entry to the United States to avoid putting their life or well-being at

extreme risk.  Allowing, for example, concern about generalized violence to establish an imminent and extreme threat to life or safety would be purely speculative as to an individual noncitizen, and further undermine the objectives of the rule.  However, in requiring specific evidence of potential harm, the Departments note that more generalized evidence, such as membership in a particularly vulnerable group, "may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry."  88 FR at 31393.

Additionally, the Departments disagree that the parallel rebuttal grounds in the Circumvention of Lawful Pathways rule have been interpreted too narrowly, and therefore, that the per se exceptions should be expanded in this rule.  Departmental data show that, during the immediate post-pandemic period, over 10 percent of noncitizens subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility were able to rebut the presumption during USCIS credible fear interviews.[259]  This indicates that those rebuttal grounds were meaningfully available to noncitizens, and the Departments note that Departmental data show that the parallel exceptions in this rule are being similarly applied.  Since the IFR went into effect through August 31, 2024, USCIS determined that there was a significant possibility the noncitizen could demonstrate an "exceptionally compelling circumstances" exception to the limitation on asylum eligibility in over 2,200 cases—approximately 11 percent of credible fear interviews completed by USCIS that were subject to the IFR during that period.[260]

With regard to consideration of past harm, the Departments note that, to the extent a noncitizen suffered harm immediately preceding their entry into the United States, such harm can be relevant to whether the noncitizen faces further imminent and extreme harm or threats to their life or safety, and adjudicators could consider such immediate, past harm as relevant to making an "exceptionally compelling circumstances" determination.

---

[259] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening - CLP tab).

[260] *See* OHHS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening - STB tab).

The Departments also disagree with commenters' assertions that the imminent and extreme threat to life or safety exception incentivizes noncitizens to wait in another country until they are harmed to then seek an exception under the rule. To the extent that waiting in another country could increase the risk of potential harm, the Departments note that noncitizens need not have actually been harmed or show that the feared harm was certain to occur to demonstrate exceptionally compelling circumstances. Rather, the rule states that those who demonstrate that they or a member of their family as defined in 8 CFR 208.30(c) with whom they are traveling "[f]aced an imminent and extreme threat to life and safety, such as an imminent threat of rape, kidnapping, torture, or murder" shall have demonstrated exceptionally compelling circumstances. 8 CFR 208.35(a)(2)(i)(B), (ii), 1208.35(a)(2)(i)(B), (ii). Therefore, this exception is intended to balance the emergency border circumstances necessitating implementation of the rule's limitation on asylum eligibility with recognition that there may be noncitizens with a specific, time-sensitive safety imperative for entering the United States during times where DHS's resource capacity to process noncitizens at the border is overwhelmed.

Finally, more generally, the Departments also clarify that CBP officers do not apply this rule's "exceptionally compelling circumstances" exception during initial border encounters, although they do implement the Proclamation's suspension and limitation on entry. Rather, the exception—and this rule's limitation on asylum eligibility more broadly—is applied during credible fear screenings before USCIS, once a noncitizen has manifested a fear of return or expressed an intention to apply for asylum or other protection and is placed in the expedited removal process. *See* 8 CFR 208.35(b) ("Application in credible fear determinations.").

*Comment:* Commenters stated that the enumerated "exceptionally compelling circumstances" exception for victims of a severe form of trafficking in persons is inadequate and that this rule imposes an impossible evidentiary hurdle on trafficking survivors. For example, commenters said that not all victims of a severe form of trafficking have proof of such crimes and, during initial fear screenings, AOs do not ask specific questions about trafficking history.

Commenters also stated that the trafficking exception should be expanded to encompass both noncitizens who may be at risk of trafficking and noncitizens at risk of or who have experienced trafficking, regardless of the degree of severity of the trafficking.

*Response:*  The Departments disagree that the existing "exceptionally compelling circumstances" exception for trafficking victims should be further amended.  First, pursuant to section 3(b)(iv) of the Proclamation, noncitizens who are determined to be "a victim of a severe form of trafficking in persons" as defined in 22 U.S.C. 7102(16) are excepted from the Proclamation's suspension and limitation on entry and, therefore, are not subject to the IFR's limitation on asylum eligibility.  8 CFR 208.35(a)(1), 1208.35(a)(1) (providing that the limitation on asylum eligibility only applies to a noncitizen described in 8 CFR 1208.13(g) "and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024"); 89 FR at 48733 n.172.

Nonetheless, as explained by the Departments in the IFR, the Departments have retained the per se "exceptionally compelling circumstances" exception for human trafficking victims to avoid confusion and to ensure that the exceptions in this rule continue to mirror the rebuttal grounds adopted by the Departments in the Circumvention of Lawful Pathways rule.  89 FR at 48733 n.172.  Under the rule's exception for victims of human trafficking, both a noncitizen and any family members as defined in 8 CFR 208.30(c) with whom the noncitizen is traveling are excepted from the limitation on asylum eligibility if, at the time of entry, the noncitizen or family member satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201.  8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C); 89 FR at 48733.

The Departments disagree that this rule creates an insurmountable evidentiary burden for trafficking survivors.  While the Departments recognize that victims of trafficking often do not possess written or documentary evidence of their trafficking, the rule does not impose any requirements about the type of evidence a noncitizen must submit to establish exceptionally compelling circumstances.  Indeed, during the credible fear screening process, AOs or IJs elicit

testimony from noncitizens, and written statements or other documentation are not required.  *See* 89 FR at 48746 n.239.

Regarding concerns that noncitizens will not be asked specific questions about any history involving trafficking, the Departments note that those concerns are unfounded because interview guides specifically designed for credible fear interviews pursuant to the Circumvention of Lawful Pathways rule and the IFR instruct AOs to ask questions related to trafficking where they are relevant to the credible fear determination, including where either the Circumvention of Lawful Pathways rule's presumption of asylum ineligibility or the IFR's limitation on asylum eligibility applies.  In such cases, AOs are instructed to elicit testimony related to potential "exceptionally compelling circumstances" rebuttal grounds (in the case of the Circumvention of Lawful Pathways rule) or the "exceptionally compelling circumstances" exception (in the case of the IFR), including the exceptionally compelling circumstance of the noncitizen or an accompanying family member satisfying the definition of a victim of severe form of trafficking in persons pursuant to 8 CFR 208.33(a)(3)(i)(C) and 208.35(a)(2)(i)(C).  *See* 8 CFR 208.30(d). AOs receive extensive training in not only substantive law and procedure but in identifying and interviewing vulnerable noncitizens, including victims of trafficking.[261]  Further, for merits adjudications, AOs and IJs receive training[262] and have experience in evaluating credibility and evidence, even in the absence of other documentation, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in certain circumstances.  INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii).  The Departments are therefore confident in AOs'

---

[261] *See* USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Apr. 24, 2024)

[262] *See* USCIS, *RAIO Directorate—Officer Training: Decision Making* (Apr. 24, 2024); 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief IJ's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory authorities" and "[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties"); EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("[LERS] develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

and IJs' ability to elicit relevant information from victims of trafficking and appropriately evaluate whether the noncitizen established exceptionally compelling circumstances.

Finally, the Departments believe that, as drafted, both section 3(b)(iv) of the June 3 Proclamation and the rule itself, which provides that being a victim of a severe form of trafficking in persons is a per se exceptionally compelling circumstance, provide sufficient protections for victims of trafficking. The Departments decline to expand this exceptionally compelling circumstance to trafficking victims who do not rise to the level of being victims of "severe forms of trafficking in persons." This is a statutorily defined term[263] which includes "sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age" and "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." 22 U.S.C. 7102(11). The Departments find that this statutory definition sufficiently encompasses noncitizens who have experienced exceptionally compelling circumstances that should except them from the limitation on asylum eligibility. This definition has long been employed in the immigration context, *see, e.g.*, INA 101(a)(15)(T)(i)(I), 8 U.S.C. 1101(a)(15)(T)(i)(I) (T nonimmigrant status for victims of severe forms of trafficking in persons); INA 212(a)(2)(H), 8 U.S.C. 1182(a)(2)(H) (ground of inadmissibility for those who engage in severe forms of trafficking), with which AOs and IJs are familiar, and commenters have not offered a persuasive reason for deviating from this well-established definition. Exceptionally compelling circumstances are intended to be narrow and preserved only for those who would generally be subject to the limitation, but present with the most urgent and immediate need to enter without a CBP One appointment or between POEs during times when the border system is overwhelmed. That said, noncitizens who do not satisfy the existing exception for

---

[263] The provisions at 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) reference the definition of "victim of a severe form of trafficking in persons" in 8 CFR 214.201, and that regulatory provision references relevant statutory definitions, including definitions found at 22 U.S.C. 7102. *See* 8 CFR 214.201.

trafficking victims (or other exceptionally compelling circumstances enumerated in the rule) may still seek to establish exceptionally compelling circumstances for another reason, and officers will evaluate every case based on its individual facts and circumstances.

*Comment:*  Commenters asserted that the IFR did not provide sufficient clarity about the procedures for noncitizens to seek an exception to the IFR's limitation on asylum eligibility.

First, commenters stated that access to the IFR's exceptions requires physical access to U.S. immigration authorities at POEs but alleged that there are many factors that impede such physical access, including security agents on the Mexican side of the border restricting access to POEs.  Commenters asserted that such impediments to physically accessing U.S. immigration authorities undermine the IFR's exceptions and prevent noncitizens who may satisfy an exception from accessing protection.  Commenters also stated that it is unclear how the rule and Proclamation together impact access to POEs.  Accordingly, commenters requested that the Departments establish clear, transparent procedures to guarantee that noncitizens seeking to establish an exception from the limitation on asylum eligibility can physically access U.S. immigration officials.

*Response:*  The Departments believe that the IFR adequately explains the exception to the limitation on asylum eligibility for noncitizens who establish exceptionally compelling circumstances, including the process by which AOs and IJs will evaluate whether a noncitizen has satisfied the exception.  *See* 89 FR at 48732–33.  Regarding commenters' concerns related to noncitizens' ability to physically access U.S. immigration authorities, the Departments note that nothing in the IFR physically impedes a noncitizen from accessing U.S. immigration authorities and that insofar as these comments concern CBP's implementation of the Proclamation, they are outside the scope of this rulemaking, as are concerns about conduct by individuals outside of the United States who are not U.S. immigration authorities—for example, on the Mexican side of the border.  *Cf.* 89 FR at 48732 n.169 (explaining that "[w]hen it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens

when they enter or attempt to enter, must determine whether a noncitizen is subject to the

Proclamation under section 3(a), including whether the noncitizen is excluded from the

suspension and limitation on entry under section 3(b)").

     *Comment:* Commenters recommended that the Departments exclude noncitizens who

present at a POE from the IFR's limitation on asylum eligibility, and instead limit application of

any restrictions to those who cross irregularly, in order to guarantee access to border processing

for noncitizens who present at a POE.

     *Response:* The Departments decline to adopt an exception to the limitation on asylum

eligibility for all noncitizens who present at a POE. As the Departments explained in the IFR, in

the absence of congressional action, the changes made by this rule are intended to improve the

Departments' ability to deliver timely decisions and consequences to noncitizens who do not

have a legal basis to remain in the United States, and the Departments expect that the limitation

on asylum eligibility will encourage noncitizens to present at a POE pursuant to an appointment,

pursue another lawful pathway, or decline to journey to the United States at all. *See* 89 FR at

48715; *id.* at 48730–31. The Departments have determined that excepting all noncitizens who

present at a POE would undermine these objectives and undermine processes designed to

manage border inflows at POEs. *See, e.g.*, 88 FR at 31318 (noting that the "ability to schedule a

time and place to arrive at POEs and the availability of other orderly and lawful pathways" are

designed to, among other things, "protect against an unmanageable flow of migrants arriving at

the SWB").

     *Comment:* Commenters questioned why the IFR's exceptions do not fully align with the

exceptions available under the Circumvention of Lawful Pathways rule. In particular,

commenters stated that the IFR does not provide an exception for technological failure of the

CBP One app or for noncitizens who are unable to use the CBP One app due to illiteracy, a

language barrier, a disability, or an inability to afford a smartphone or data plan. Noting ongoing

technical and accessibility issues with the CBP One app, commenters urged the Departments to

adopt an exception to the limitation on asylum eligibility for all noncitizens—whether they present at a POE or cross between POEs—who: (1) are unable to use the CBP One app due to accessibility issues with the app itself; (2) are unable to use the CBP One app due to illiteracy, disabilities, not speaking a language in which the CBP One app is provided, lack of knowledge about the existence of the CBP One app, or a lack of resources or other difficulties; or (3) fail to secure appointments after multiple attempts.

Additionally, commenters noted that the IFR does not contain an exception for being denied asylum in a country through which the noncitizen transited. Commenters stated that the Departments failed to provide a justification or explanation for eliminating such exceptions under the IFR and alleged that it is arbitrary for the Departments to include such exceptions under the Circumvention of Lawful Pathways rule but not under the IFR.

Commenters also asserted that the inconsistencies between the exceptions available under the IFR and the Circumvention of Lawful Pathways rule will create confusion for all parties, as it is unclear which rule will apply when emergency border circumstances are in effect.

*Response:* The Departments decline to add any additional exceptions to the limitation on asylum eligibility and disagree with commenters' assertions that the Departments did not provide adequate justifications for why the rule does not contain exceptions for an inability to access or use the CBP One app or being denied asylum in a transit country.

The Departments explained in the IFR that they were not adopting these exceptions from the Circumvention of Lawful Pathways rule because, unlike that rule, this rule only applies during emergency border circumstances, when the number of encounters strains the capacity of immigration and border security systems. 89 FR at 48732 n.171. Because of this rule's focus on emergency border circumstances, the Departments have determined that the rule's exceptions should be limited to noncitizens "with a time-sensitive imperative" to enter the United States. *Id*. For example, the rule focuses its exception for exceptionally compelling circumstances on noncitizens who require immediate entry into the United States, due to medical emergencies or

imminent and extreme threats to life or safety, among other reasons.  *See* 8 CFR 208.35(a)(2)(i),

1208.35(a)(2)(i).  The Departments have explained above why they have not included in the IFR

and this rule the exception for difficulty using the CBP One app and refer readers to that

discussion.

Similarly, and as explained in the IFR, the Departments did not include and are not

adding an exception for noncitizens who received a final decision denying asylum in a country

through which they transited because this rule serves a different purpose than the Circumvention

of Lawful Pathways rule.  89 FR at 48732 n.171.  While the Circumvention of Lawful Pathways

rule sought to encourage noncitizens to seek protection in other countries, this rule is focused on

deterring irregular migration and speeding up the border process during emergency border

circumstances, when the immigration system is experiencing extreme and enduring strains.  *Id.*

Accordingly, the Departments believe that limiting exceptions to those noncitizens who have the

most immediate and urgent need to present at or cross the U.S. border is imperative.  *See id.*

Importantly, however, noncitizens who were denied protection in another country remain eligible

to apply for asylum if they "enter pursuant to an appointment, meet another exception to the

Proclamation, or establish exceptionally compelling circumstances" under this rule.  *Id.*

The Departments also disagree that omission of these exceptions will create confusion.

The Departments clarify that both this rule and the Circumvention of Lawful Pathways rule are

applied during credible fear screenings when emergency border circumstances are in effect.  If it

is determined that this rule does not apply, AOs and IJs will then consider the noncitizen's claim

through the now familiar Circumvention of Lawful Pathways rule, which has been in effect for

over a year.  Given the Departments' experience in implementing the Circumvention of Lawful

Pathways rule, the Departments are confident in adjudicators' ability to implement this rule,

which is similar in structure to the Circumvention of Lawful Pathways rule, and to apply this

rule's "exceptionally compelling circumstances" exception, which mirrors the rebuttal grounds

in the Circumvention of Lawful Pathways rule.  *See* 89 FR at 48739.  If the noncitizen

establishes exceptionally compelling circumstances under this rule pursuant to 8 CFR 208.35(a)(2)(i) or 8 CFR 1208.35(a)(2)(i), they will also have established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule.  8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii).  However, adjudication of the additional exceptions in Circumvention of Lawful Pathways are unlikely to be dispositive in cases where both this rule and the Circumvention of Lawful Pathways rule apply, because if the noncitizen does not meet the exception to this rule, this rule's limitation on asylum eligibility will apply.

*c.  Implementation by CBP Officers*

*Comment:*  A few commenters expressed concern that, unlike the Circumvention of Lawful Pathways rule, in which AOs and IJs solely adjudicate the application of its presumption of asylum ineligibility and exceptions, the application of the Proclamation and the IFR are first adjudicated by CBP officers at the limit line, resulting in at-risk individuals and survivors of violence being denied entry.  Relatedly, commenters stated that although the IFR allows CBP officials at POEs to assess whether a noncitizen qualifies for an exception, it is unclear what guidance or training has been provided to those officials to ensure fair determinations or whether there is a mechanism for noncitizens to be screened for application of the bar when they approach a POE.  A commenter noted that it is difficult to understand from the IFR how CBP will determine whether noncitizens are subject to the rule and how the rule and Proclamation would impact access to POEs and CBP conduct.  Another commenter similarly stated that it is unclear whether the Departments would equip CBP officers or noncitizens to navigate the changes under the Proclamation and IFR, including in circumstances where the applicable legal standards could change within short windows of time, depending on whether crossing thresholds are being met.

*Response:*  Comments relating to the implementation of the Proclamation itself are outside the scope of this rule, which applies a separate limitation on asylum eligibility. Additionally, to the extent that commenters expressed concern about CBP officials assessing

whether a noncitizen qualifies for a regulatory exception to the limitation on asylum eligibility,

commenters misunderstand the operation of the IFR.  CBP officials may determine whether an

exception to the June 3 Proclamation applies to a particular noncitizen, but do not apply the

rule's limitation on asylum eligibility and its exception.  Rather, it is AOs and IJs, during

credible fear screenings and reviews, who must determine "whether there is a significant

possibility that the noncitizen would be able to establish by a preponderance of the evidence that

they were not subject to the rule's limitation on asylum eligibility or that they will be able to

establish by a preponderance of the evidence exceptionally compelling circumstances."  89 FR at

48739; *see also* 8 CFR 208.35(b), 1208.35(b).  AOs and IJs—not CBP officials—will thus be

evaluating whether the limitation on asylum eligibility applies and whether a noncitizen has

established a regulatory exception.  *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a), (b).

### d.  Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR

*Comment:*  Commenters stated broad concerns with the credible fear review process in

general, including concerns over whether there are adequate opportunities to present

supplementary evidence and testimony, questions over whether IJ review is truly de novo,

concerns that IJs do not appropriately weigh evidence in the record, and concerns that the

outcome of credible fear reviews is dependent upon the IJ considering the case, rather than the

strength of the claim.

Commenters also objected to the IFR's provision that would require noncitizens to

affirmatively request IJ review of a negative credible fear determination.  Commenters stated that

this affirmative request requirement removes an important safeguard intended to minimize the

risk of refoulement, with particular harm to the most vulnerable noncitizens.  Commenters

explained that, given the frequency of IJs reversing negative credible fear findings, IJ review is a

necessary procedural protection for the integrity of the asylum screening process, especially

since the IFR's changes may lead to erroneous decisions by AOs.  Moreover, commenters stated

that requiring noncitizens to affirmatively request review is especially problematic when

combined with the other changes in the IFR, namely the limited opportunity to access counsel and the heightened standards of proof for pre-screening interviews. Commenters stated that there must be an opportunity for IJ review of negative fear determinations to be considered an effective remedy under international law.

Commenters also stated there are a multitude of reasons why a noncitizen may fail to request IJ review. For example, a noncitizen may fail to request IJ review due to mental health conditions, language barriers, trauma, or because they are not adequately informed of the procedure for requesting review. Similarly, one commenter stated that requiring noncitizens to affirmatively request review mirrors the Global Asylum Final Rule, 85 FR 80274, which the Departments later reversed in a subsequent rulemaking, *see* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) ("Asylum Processing IFR"), citing fairness concerns and noting that treating a failure to elect review as a request for review better accounts for the range of explanations for a noncitizen's failure to seek review.

Commenters supported the IFR's requirement that DHS inform noncitizens of the procedure to request review and recommended that such information be provided both verbally and in writing in a language that the noncitizen understands. However, commenters said that noncitizens may find the concept of an IJ review hearing confusing, and requiring noncitizens to request review may unfairly punish noncitizens for their confusion.

*Response:* To the extent that commenters raise concerns about the credible fear review process in general, such concerns are outside the scope of this rulemaking, which is focused only on the credible fear review process for noncitizens who are subject to this rule.

As to concerns about credible fear review under this rule, the Departments emphasize that, although the rule requires noncitizens to affirmatively request review of a negative credible fear determination, the statutory right to IJ review remains available. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g)(2). The

Departments will continue to seek to ensure noncitizens are aware of the right to IJ review and the consequences of failure to affirmatively request such review. *See, e.g.*, 88 FR at 11747. Specifically, if an AO enters a negative credible fear determination, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. 8 CFR 208.35(b)(1)(i), (2)(iii). Thus, contrary to commenters' concerns, this safeguard remains in place and the Departments believe that such notice sufficiently ensures that noncitizens who desire IJ review of negative credible fear determinations can elect it under this rule.

As explained in the analogous provision introduced in the Circumvention of Lawful Pathways rule, to ensure that the noncitizens referenced by commenters—including noncitizens with mental health conditions, those who have suffered trauma, or those who are unable to read or speak English—understand what review is available to them, DHS provides explanations to noncitizens "to make clear to noncitizens that the failure to affirmatively request review will be deemed a waiver of the right to seek such review." 88 FR at 11747. These explanations are provided by trained asylum office staff through an interpreter in a language understood by the noncitizen. As a result, the Departments believe it is reasonable to conclude that noncitizens who do not request IJ review after receiving sufficient notice, *see id.*, and the enhanced explanations described above, can be fairly processed as if they have declined to seek additional IJ review. *See* 88 FR at 11747.

Moreover, the Departments previously acknowledged in the Circumvention of Lawful Pathways rule that "the procedure for IJ review of negative credible fear determinations . . . differ[ed] from the credible fear review procedures implemented by the Asylum Processing IFR." 88 FR at 31423 (citing 88 FR at 11744). There, the Departments explained that "'the need for expedition under the current and anticipated exigent circumstances' weigh[ed] in favor of requiring noncitizens to affirmatively request IJ review of a negative credible fear determination." *Id.*

Following this reasoning, the Departments believe that this requirement that noncitizens affirmatively request IJ review of negative credible fear determinations continues to be necessary during times of emergency border circumstances, despite other measures to address the exceptionally high levels of irregular migration along the southern border, including the Circumvention of Lawful Pathways rule. *See* 89 FR at 48712–13 (listing measures). This rule has been adopted to address emergency border circumstances, times where the Departments' limited resources are under maximum strain to the point where border security and immigration systems are experiencing serious operative impacts and further fueling more lasting effects of a backlogged system. Accordingly, the Departments believe requiring noncitizens to affirmatively request IJ review of credible fear determinations will help ensure that such reviews take place only for those who desire such review. The alternatives suggested by commenters risk extending such review to those not actually interested in IJ review, thereby unnecessarily expending valuable adjudicatory capacity during a time when such resources are not available.

As to requests to provide information about review procedures verbally and in writing in a language that the noncitizen understands, noncitizens receive that information in writing (via a written English document), and noncitizens who do not speak English receive that information verbally through a real-time translation of the written document as well. This approach satisfies the Departments' statutory obligations, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), and in DHS's judgment, provides adequate notice of the ability to seek review. It is neither required nor feasible to, in addition, provide that information in written form in all languages that may be spoken.

*Comment:* Commenters stated that the same complexity concerns about the IFR raised by commenters in the credible fear context will apply to removal proceedings before IJs. For example, commenters stated that determinations as to the timing and applicability of emergency border circumstances, including determining whether emergency circumstances were in effect on the noncitizen's dates of entry, whether to apply this rule versus the Circumvention of Lawful

Pathways rule, and whether exceptionally compelling circumstances apply, would only lead to longer, more complex removal proceedings, and an inefficient focus on inquiries having no bearing on the merits of the protection claim in an already backlogged immigration court system. Commenters said that proceedings could be prolonged due to a potential rise in the numbers of motions to reopen or reconsider and appeals to the BIA or Federal courts challenging application of the rule, among other reasons.

Commenters stated that these determinations will be especially complex for noncitizens who enter without inspection ("EWI"). Commenters explained that it is unclear how the Departments will accurately determine whether this rule applies, especially when few people who EWI remember the exact date they crossed the border and, regardless, will likely not have evidence of the time of such crossing. Therefore, commenters stated that the rule will result in arbitrary IJ decisions, because IJs will not be able to determine whether the rule applies. As a result, commenters suggest creating a specific policy for noncitizens who EWI.

*Response:* The Departments disagree with commenters' concerns about the complexity in applying this rule in EOIR proceedings. To the contrary, given the IJ's role as the fact finder in removal proceedings, IJs are well-equipped to make fact-based determinations, such as dates of entry and whether emergency border circumstances were in effect on a specific date. *See, e.g.*, INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("Authority of immigration judge"). For example, regarding commenters' concerns about noncitizens who EWI, the Departments note that IJs routinely make similar entry timing determinations, such as determining application of the one-year filing deadline for asylum and continuous physical presence for cancellation of removal for certain nonpermanent residents. INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B) (one-year time limit); INA 240A(b)(1)(A), 8 U.S.C. 1229b(b)(1)(A) (cancellation of removal for certain nonpermanent residents). Moreover, IJs have been applying the Circumvention of Lawful Pathways rule since its effective date, which similarly requires determining a noncitizen's entry

date.  *See* 8 CFR 1208.33(a)(1)(i) (requiring determination as to whether a noncitizen entered the United States "[b]etween May 11, 2023, and May 11, 2025").

Additionally, one change made by this rule—requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters between POEs for 28 consecutive calendar days before the 14-day waiting period is triggered—will further reduce complexity concerns by reducing the probability that emergency border circumstances will be discontinued and then continued or reactivated soon thereafter.  This requirement not only better ensures that emergency border circumstances have abated, but also mitigates potential confusion in determining whether emergency border circumstances were in effect on a noncitizen's date of entry.  Contrary to commenters' concerns, this rule's provisions will not consistently "turn off" one day and "turn on" the next day.  Rather, when triggered, this rule will be in effect for a more sustained period of time, making it easier for noncitizens and adjudicators to determine the timing and applicability of emergency border circumstances.  Lastly of note, at all times since issuance of the June 3 Proclamation and publication of the IFR, DHS has maintained a publicly available record of the dates that a suspension and limitation on entry is in effect.[264]  This DHS-maintained record will be available into the future, and the Departments believe that it will serve as an essential aid for IJs in determining whether the provisions of the rule should be applied based on a noncitizen's date of entry.

*e.  Family Unity Provisions*

*Comment:*  Commenters expressed general support for the family unity provisions in the IFR, stating that family unity is a key principle in both international and U.S. immigration law.  However, commenters also raised concerns that the provisions were not sufficient, and that family unity would be better preserved by eliminating the rule's limitation on asylum eligibility altogether.  For example, commenters stated that the family unity provisions are overly limiting,

---

[264]  *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigration laws*.

as they only benefit noncitizens who are able to meet the higher burden of proof for statutory withholding of removal.

Commenters were also concerned that the family unity provisions would create unnecessary procedural hurdles for families. For example, commenters raised concerns that the family unity provisions only apply to qualifying family members who cannot independently establish other protection from removal. In doing so, commenters also questioned what forms of protection would qualify as "other protection from removal" sufficient to disqualify spouses or children from the family unity provisions.

Commenters stated that this requirement would result in ethical dilemmas where families would need to ensure that qualifying family members do not independently qualify for statutory withholding of removal so that the family members can receive derivative asylum relief under the family unity provisions. Commenters also claimed that this requirement would require family members to obtain separate counsel and sever proceedings, which will cause unnecessary financial hardship to the family and undue burdens to the Government. Rather, commenters recommended removing altogether the requirement that qualifying spouses or children not independently qualify for relief.

Commenters also raised procedural questions about how the family unity provisions function where a noncitizen is belatedly eligible for asylum under the family unity provisions, but after their spouse or child have undergone their own immigration adjudications.

*Response:* The Departments agree with commenters that keeping families unified and avoiding family separation is an important goal. Emergency border circumstances necessitated implementation of the IFR's limitation on asylum eligibility to better manage border operations and substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain in the United States. *See* 89 FR at 48715.

Nevertheless, recognizing the importance of family unity, the Departments included a number of provisions in the IFR to eliminate the risk of family separation. For example, the

"exceptionally compelling circumstances" exception applies to all qualifying family members of the noncitizen's traveling party if the noncitizen, or the noncitizen's qualifying family member with whom the noncitizen is traveling, meets the exception. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Similarly, the IFR made no changes to the family unity provision, which establishes an "exceptionally compelling circumstances" exception for noncitizens who can, among other requirements, establish eligibility for statutory withholding of removal or CAT protection and could have, but for either the IFR's limitation or Circumvention of Lawful Pathways presumption, established eligibility for asylum. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 88 FR at 11723–24 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to treat "the possibility of separating the family" as "an exceptionally compelling circumstance" when the provision's requirements are met). This provision allows qualifying noncitizens to pursue asylum, and its allowance for derivative beneficiaries, instead of statutory withholding of removal and CAT protection, with their comparatively fewer benefits. *See* INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Importantly, these provisions are not intended to serve as wholesale "family" exceptions to the IFR's limitation on asylum eligibility, which would significantly reduce the effectiveness of the limitation on asylum eligibility and incentivize families to engage in dangerous irregular migration to the United States. *See* 89 FR at 48757 (explaining that "[e]xcepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so"). Rather, the exceptionally compelling circumstances family unity exceptions help ensure that noncitizens who qualify for the rule's exception are not separated from their qualifying spouses or children while pursuing relief or protection in the United States, including, for example, through derivate asylee status if granted relief, or through removal of the family unit if denied.

With regard to commenter concerns about qualifying spouses or children obtaining their own independent relief or protection, which would in turn make the IFR's family unity provisions inapplicable, the Departments clarify that the IFR's family unity provisions are intended as limited exceptions solely to prevent potential family separation due to the IFR's limitation on asylum eligibility.  If qualifying spouses or children obtain independent relief or protection that allows them to remain in the United States, then they will have necessarily avoided the family separation concerns underlying the IFR's family unity provisions.  *See, e.g.*, 88 FR at 11724 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to avoid family separation where "at least one other family member would not qualify for asylum or other protection from removal on their own").  The Departments further note that asylum "or other protection" under this family unity provision refers to statutory withholding of removal and CAT protection.  *See, e.g.*, Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023) (noting that "asylum or other protection" refers to claims "relating to a fear of persecution or torture").

Additionally, to the extent that commenters raised concerns over qualifying spouses or children independently receiving statutory withholding of removal, with comparatively fewer benefits than asylum, the Departments note that statutory withholding of removal protects the qualifying spouse or child from removal to a country where they more likely than not would be persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion.  *See* INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); *INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999); *Stevic*, 467 U.S. at 429–30; *see also* 8 CFR 208.16, 1208.16.  Moreover, if noncitizen families wish to pursue asylum relief specifically, the IFR and the Circumvention of Lawful Pathways rule are designed to encourage noncitizens to make an appointment to present at the SWB or take advantage of other lawful migration pathways.  *See* 89 FR at 48730–31.

Relatedly, the Departments do not share commenters' concerns about potential ethical dilemmas faced by representatives related to pursuing independent relief for family members due to the family unity provisions. Representatives must be truthful to the court in presenting the record facts and will either be able to zealously advocate on behalf of all of their clients where the family members' interests present no conflict, or counsel can withdraw from such representation if they believe they cannot advocate for each client's interests equally. *See* 8 CFR 1003.102 (acknowledging that practitioners who appear before EOIR have a duty to zealously represent their clients "within the bounds of the law"); *see also* 8 CFR 1003.102(c) (setting forth that a practitioner may face disciplinary sanctions for "[k]nowingly or with reckless disregard" making a false statement of material fact or law).

Further, this rule does not impact EOIR's existing procedures for consolidating or severing cases, which has always involved parties making assessments and strategic decisions on how best to proceed with their cases. *See* Immigration Court Practice Manual ch 4.21 (setting forth procedures for combining and severing cases). Prior to this rule, family units have been able to seek asylum and related forms of protection in consolidated proceedings, and family units are always permitted to sever their proceedings if they so choose, including for strategic reasons based on their own assessment about the strength of their individual claims. *Id.* Thus, the Departments disagree that the rule will meaningfully impact noncitizens choosing to sever their cases from those of their families in the way that commenters claim, especially given the family unity provisions included in the IFR and maintained in this final rule.

Lastly, with regard to procedural timing concerns in applying the family unity provisions, the Departments clarify that the family unity provisions only apply to qualifying family members who are accompanying the principal applicant or who are eligible to follow to join that applicant. *See* 8 CFR 208.35(c), 1208.35(c). Therefore, principal applicants and accompanying family members who are traveling together will generally have their claims adjudicated together in removal proceedings. *See, e.g.*, Immigration Court Practice Manual ch. 4.21(a) (Oct. 25, 2023)

(explaining that immigration courts may consolidate cases together that involve immediate family members into a single adjudication).  As a result, there are unlikely to be significant timing gaps between determinations on any individual relief or protection claims within a family unit.

*Comment:*  Commenters supported the inclusion of a family unity provision in the AMI process, wherein DHS retains jurisdiction over an asylum application for further adjudication after a positive credible fear determination.  Commenters stated that it is logical and efficient for AOs to apply the same family unity provision as IJs when adjudicating the merits of an asylum application.  However, commenters also expressed concern that the family unity provision in the AMI process is discretionary for AOs, and urged the Departments to make the provision mandatory, similar to the family unity provision for IJs in the IFR.  Commenters also recommended amending the Circumvention of Lawful Pathways rule to allow DHS to apply the same family unity exception under that rule to avoid confusion that the disparity would allegedly cause for applicants, counsel, and AOs, particularly where the two rules are both in effect and overlapping.

*Response:* In the IFR, the Departments included a family unity provision in the AMI process before USCIS, but made it discretionary to provide USCIS with flexibility while implementing the new AMI process.  *See* 89 FR at 48733.  After further consideration, the Departments are retaining the discretionary nature of the family unity provision in the AMI process before USCIS.

USCIS maintains complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA.  8 CFR 208.30(f).  In exercising this discretion, USCIS does not foresee that it would be a prudent use of resources to place cases into the AMI process where, at the credible fear stage, the IFR's limitation on asylum eligibility applied and there was not a significant possibility the noncitizen could establish an exception to the limitation.  USCIS has a finite number of AOs, and it is more efficient at present to assign

work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the southern border.  *See* 89 FR at 48756.  Accordingly, it is unlikely that USCIS would adjudicate a case where the 8 CFR 208.35(c) family unity provision could apply in the foreseeable future.

With that understanding, were such a case ever to be placed into the AMI process, USCIS has the discretion to apply the 8 CFR 208.35(c) family unity provision, depending on the circumstances of the individual case.  Importantly, if USCIS exercises its discretion not to apply the family unity provision, the noncitizen will not be prejudiced because, if USCIS does not grant asylum in such a case, the asylum application will be reviewed de novo by an IJ, 8 CFR 1240.17(i), who is required to apply the family unity provision in removal proceedings pursuant to 8 CFR 1208.35(c).

Additionally, the discretionary nature of the family unity provision before USCIS in 8 CFR 208.35(c) is necessary in order for USCIS to comply with the AMI regulatory timeline laid out in 8 CFR 208.9.  This timeline requires USCIS to conduct the AMI interview no later than 45 days of the applicant being served with a positive credible fear determination, absent exigent circumstances, 8 CFR 208.9(a)(1), and prohibits extensions on the submission of additional evidence that would prevent the AMI decision from being issued within 60 days of service of the positive credible fear determination, 8 CFR 208.9(e)(2).  While the IFR allows for USCIS to extend both of those timelines up to 15 days in the event USCIS requires the noncitizen to submit a Form I-589, 8 CFR 208.35(b)(2)(ii), even with a 15-day extension, these are still accelerated time frames that would not accommodate applying the family unity provision in every AMI case where it could potentially apply before USCIS.

In some cases, USCIS may be able to apply the family unity provision without running afoul of the regulatory time frames, such as where the accompanying family members are also dependents on the AMI case, and the principal applicant is found eligible at the AMI for statutory withholding of removal with respect to their country of nationality based on the record

before USCIS.  In such a case, the AO could likely apply the family unity provision within the regulatory timelines, as there would likely be no need to request additional evidence verifying the qualifying family relationships.  Additionally, if the principal applicant was already found eligible for statutory withholding of removal with respect to their country of nationality based on the record before USCIS, it is likely that they also would be found eligible for asylum if the limitation on asylum eligibility is not applied.  In such a circumstance, USCIS could likely exercise discretion to apply the 8 CFR 208.35(c) family unity provision in a logical and efficient manner and complete the case within the regulatory time frame without issue.

In other cases, however, applying the family unity provision in an AMI case could prove excessively cumbersome within the regulatory time frame.  For example, if the qualifying family relationship relates to a family member outside of the United States for which additional proof is needed to establish the relationship, it may be impossible for an AO to extend the timeline to accommodate the production of such evidence and still meet the processing timeline for an AMI under 8 CFR 208.9(e)(2).  In a case where the AO finds the noncitizen is not eligible for asylum due to the IFR's limitation on asylum eligibility, and is not eligible for statutory withholding of removal, but would be eligible for withholding of removal under 8 CFR 208.16(c)(2) (withholding of removal under the CAT) based on the record before USCIS, requiring the AO to apply the 8 CFR 208.35(c) family unity provision would entail the AO conducting a cumbersome analysis, including revisiting the noncitizen's asylum eligibility, absent application of the IFR's limitation on eligibility, only to possibly still find the applicant ineligible for asylum on the merits and refer the case to the IJ, who would then review the asylum application de novo. *See* 8CFR 1240.17(i).

Indeed, if USCIS were required to apply the 8 CFR 208.35(c) family unity provision in all AMI cases, significant extra resources would likely have to be expended in any case where the provision might apply (including additional interview time, extending the evidentiary submission timeline, and additional time writing up the case) even where it would not result in a

grant of asylum. If asylum is not granted by USCIS, asylum eligibility would still be reviewed de novo by an IJ. *See* 8 CFR 1240.17(i). Keeping the provision discretionary, in contrast, allows USCIS to apply the provision where it can do so in a logical and efficient manner without thwarting the regulatory timelines for AMI processing.

While logic and efficiency support keeping the 8 CFR 208.35(c) family unity provision discretionary for AMI cases before USCIS, it is also logical for the 8 CFR 1208.35(c) family unity provision to apply in all removal proceedings (whether they originated as AMI cases or not) before EOIR. Removal proceedings before the IJ are potentially the last opportunity the noncitizen will have to be granted asylum. In contrast, the AMI process before USCIS cannot result in a denial of asylum, only a referral to the IJ for a de novo review of the asylum application. 8 CFR 208.14(c)(1), 1240.17(i). Additionally, while removal proceedings for AMI cases operate on a streamlined time frame, there is still substantially more time allotted for removal proceedings before EOIR than for the initial AMI adjudication before USCIS, 8 CFR 208.9(a)(1), (e)(2), *id.* at 1240.17(f), so there is more flexibility in the time frame for the IJ to apply the family unity provision at the final adjudication stage than there would be for an AO to apply the provision in the AMI process before USCIS.

Separately, the Departments note that any comments regarding family unity amendments to the separate Circumvention of Lawful Pathways rule are outside the scope of this rulemaking.

2. Manifestation of Fear Standard

*a.  Legality Concerns*

*Comment:*  Commenters expressed concerns that implementing a manifestation of fear requirement would ultimately lead to noncitizens with valid claims being removed without proper evaluation, which would violate U.S. international non-refoulement obligations and "circumvent U.S. asylum law." One advocacy group called the manifestation requirement a "deeply deficient" means of screening applicants for fear that will cause "credible fear pass rates to plummet and lead to refoulement." Another commenter described the change as "morally and

legally troubling," while a third commenter stated that it would create significant hurdles for noncitizens seeking statutory withholding of removal and CAT protection.

Commenters further asserted that the manifestation requirement violates specific international refugee laws or principles. Citing amicus briefs, the UNHCR handbook, and other UNHCR publications, one commenter stated that the United States has an "affirmative obligation" under international law "to elicit information that might reveal potential refugee status" and "conduct an individualized assessment to evaluate whether the individual is entitled to protection as a refugee," which the manifestation requirement violates. In that same vein, another commenter observed that international refugee organizations have "long emphasized that to fully carry out … obligations under the Refugee Convention" the parties should implement procedures that "affirmatively identify" possible applicants and provide guidance to them on how to apply for relief and protection, and the IFR's "reliance on manifestation of fear is inadequate to fulfill these basic requirements."

Commenters stated that the manifestation requirement violated proper implementation of the credible fear process outlined in the INA. One commenter characterized the IFR's manifestation requirement as an attempt to expand the reach of expedited removal by creating additional barriers to credible fear interviews, in violation of Federal law. Another commenter stated the manifestation requirement did not align with "Congressional intent" to "ensure that asylum was available to all those with legitimate claims." Other commenters echoed the sentiment that the manifestation requirement was implemented without regard for the risk of refoulement and purely as a means to efficiently remove noncitizens without a hearing.

Commenters also stated that eliminating the requirement that immigration officers affirmatively document and inquire about a noncitizen's fear of persecution during initial encounters at the border is a "sharp break from prior practice by the Departments" that would ultimately lead to higher numbers of noncitizens being refouled. One commenter described the change to using manifestation as "a dangerous reversal of a procedural safeguard" designed to

ensure legal compliance, expressing concern that other safeguards are already being removed. Other commenters recommended that the Departments end the manifestation of fear approach and reinstate the previous policy of using preliminary questions to identify whom to refer for credible fear screenings.

Some commenters opposed the manifestation requirement due to concerns that it violated DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), and pointed to what they purport was the Government's acknowledgment (*see* 89 FR at 48741 n.194) that an argument could be made that the IFR conflicts with the INA. Specifically, commenters argued that the INA requires DHS to provide information concerning credible fear interviews to noncitizens who may be eligible and eliminating use of the forms in lieu of a manifestation requirement was a violation of that statutory obligation. Commenters were specifically concerned that the alternatives outlined in the IFR—such as providing signs and videos in facilities—would not be "sufficient to put noncitizens on notice of how they may assert a claim for protection."

Commenters pointed to different parts of the IFR where they believe the Government explicitly acknowledged that the manifestation requirement will result in refoulement and stated that these purported acknowledgements are problematic. One commenter stated that the IFR was creating a standard that "knowingly accepts" a probability of violating non-refoulement and fails to satisfy the statutory requirement to provide information about credible fear interviews to noncitizens who may be eligible for such interviews. Another commenter highlighted part of the IFR that they said conceded that the manifestation requirement would result in the removal of noncitizens with valid claims. Similarly, commenters discussed the IFR's purported admission that asylum seekers who are asked affirmative questions about whether they have a fear of returning to their home country are seven times more likely to assert a claim.

*Response:* The Departments disagree that the manifestation standard violates any international obligations or that it is inconsistent with Federal law.

As to concerns related to international law, commenters did not specify any binding international law source that creates such obligations and instead cited publications and amicus briefs, which do not have the force of law and are not international treaties to which the United States is a party. As described in Section II.B of this preamble, the United States' non-refoulement obligations are implemented through domestic law, and neither the 1967 Protocol nor the CAT are self-executing. Regardless, as outlined in the IFR, 89 FR at 48740–41, the applicable international laws do not specifically prescribe the minimum screening requirements that must be implemented to determine whether a noncitizen should be referred for a credible fear interview.[265] Instead, it is up to each participating state "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure."[266] Thus, it is within the Departments' discretion to revisit the screening process the United States implements during emergency border circumstances.

Moreover, the United States continues to uphold its non-refoulement obligations during emergency border circumstances.[267] Under applicable international law, the United States has an obligation (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured. *See* Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176 (outlining standard under the Refugee Convention); *Pierre v. Gonzales*, 502 F.3d 109, 114 (2d Cir. 2007) (outlining standard under the CAT). During the emergency circumstances at the southern border, the manifestation standard temporarily affords immigration officers the ability to refrain from affirmatively asking

---

[265] *See* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967* (highlighting that the process for identifying refugees is not "specifically regulated").

[266] *Id.*

[267] The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), for mandatory withholding of removal. And the United States implements its obligations under Article 3 of the CAT through regulations. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note); *see also, e.g.*, 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

noncitizens about fear, and instead refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal.  89 FR at 48739–40.  This rule does not, in any way, prevent noncitizens from manifesting or expressing such fears; rather, the rule ensures that noncitizens who manifest or express such fears are properly screened consistent with United States' non-refoulement obligations.  *See* 8 CFR 235.15(b)(4).  As explained in the IFR and this rule, the Departments believe that this requirement represents the best way to remain consistent with U.S. international obligations while simultaneously addressing the emergency circumstances at the southern border.

The Departments also do not believe the manifestation standard violates the INA or any other Federal law.  As addressed in the IFR, 89 FR at 48739–40, DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO, so long as those procedures are consistent with the INA.[268]  In using this authority, the Departments are confident the manifestation standard is fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A).  That statutory section provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii).  As such— and contrary to commenters' assertions—the INA does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture, nor does it define what circumstances constitute the requisite indication of intent or

---

[268] *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

fear. To the contrary, the onus under the statute is on the noncitizen to indicate either of the circumstances warranting referral, which the IFR provides a noncitizen can do at any time during the process. *See* 89 FR at 48740.[269] Thus, as discussed in Section III.B.2 of this preamble, the rule's approach accords with section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[270]

Separately, regarding commenters' concerns about departing from the longstanding practice of providing individualized advisals and asking affirmative questions, the Departments disagree that there are insufficient procedural protections for individuals subject to the rule. As the IFR acknowledged, the practice of providing individualized advisals and asking affirmative questions was originally adopted to "ensure that bona fide asylum claimants [were] given every opportunity to assert their claim[s]." 89 FR at 48742 (quoting 62 FR at 10318–19). However, importantly, the legacy INS further explained that enacting these procedures was intended to "not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims." *Id.* (quoting 62 FR at 10318). While such procedures have remained in place in the expedited removal context since 1997, this fact alone does not indicate that they are required by the INA, and DHS maintains discretion to update the procedures in a manner consistent with the INA. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that an agency changing an established rule must show that there are good reasons for the new policy but need not necessarily "provide a more detailed justification than what would suffice for a new policy

---

[269] *Accord Indicate*, Merriam-Webster's Collegiate Dictionary 592 (10th ed. 1996) ("to point out or point to," "to be a sign, symptom, or index of," "to demonstrate or suggest the necessity or advisability of," or "to state or express briefly"); *Indicate*, New International Webster's Comprehensive Dictionary of the English Language 644 (1996) ("To be or give a sign of; betoken," "To point out; direct attention to," or "To express or make known, especially briefly or indirectly"); *Indicate*, The American Heritage Dictionary of the English Language 918–19 (3d ed. 1996) ("To show the way to or the direction of; point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the necessity, expedience, or advisability of," or "To state or express briefly"); *Indicate*, Webster's II New Riverside University Dictionary 622–23 (1994) ("To show or point out," "To serve as a sign, symptom, or token of : signify," "To suggest or demonstrate the need, expedience, or advisability of," or "To express briefly").

[270] *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *Knauff*, 338 U.S. at 543 ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigr. Advoc. Ctr.*, 507 F. Supp. at 18.

created on a blank slate"). And indeed, when emergency circumstances are present on the southern border, the procedures adopted in 1997 are unduly suggestive and, thus, unnecessarily burden the inspections process, which necessitates revisiting screening referral processes to more effectively and efficiently identify those noncitizens who may have a fear of return to their native country or country of removal or indicate an intention to seek fear-based relief or protection. Given the extraordinary circumstances facing the Departments during times of emergency border circumstances, DHS has determined it is reasonable to implement the manifestation standard.

The Departments similarly disagree that discontinuing use of the Form I-867A and Form I-867B during emergency border circumstances violates DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS "shall provide information concerning the asylum interview . . . to aliens who may be eligible." DHS continues to provide information concerning credible fear interviews to noncitizens in CBP custody subject to expedited removal who may be eligible to receive such an interview via signs and videos in multiple languages, satisfying DHS's statutory duty under the INA. This is precisely what footnote 194 of the IFR explains. Rather than any purported acknowledgement of conflict with the INA, that footnote was simply included to clarify the points above and illustrate that the IFR does, in fact, satisfy this statutory obligation. Moreover, as the IFR explains, 89 FR at 48741–42, noncitizens who manifest a fear of return (and, thus, who are in fact eligible for a credible fear interview) are given a more detailed written explanation of the credible fear interview process prior to being referred for the interview.[271] Additionally, noncitizens who manifest a fear in CBP custody are shown a video prior to their credible fear interview, which also explains the credible fear process in more detail.

The Departments also recognize commenters' concern regarding the IFR's explicit acknowledgment that the manifestation standard may result in some noncitizens with meritorious

---

[271] That explanation will be translated into certain common languages or will be read to the noncitizen if required. 89 FR at 48741 n.194.

claims not being referred to a credible fear interview. *See, e.g.*, 89 FR at 48743–44. The Departments included these statements to demonstrate their thorough consideration of all possible issues that might arise from the implementation of a manifestation standard at the southern border during emergency circumstances. In that vein, the Departments emphasize that the manifestation standard is a temporary solution to emergency border circumstances. In light of those circumstances, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek fear-based relief or protection. Unfortunately, any screening mechanism—even affirmative questioning—could result in some noncitizens with potentially meritorious claims not being referred for a credible fear interview. But given the emergency border circumstances facing the Departments and discussed in the June 3 Proclamation, the IFR, and this rule, the Departments believe the manifestation standard is appropriate and necessary.

### b. Concerns about the Efficiency and Complexity of the Manifestation Standard

*Comment:* Several commenters expressed doubts about the Departments' claims that the change to the manifestation approach would increase efficiency, while others observed that the change would make the system more complex and create further inefficiencies. Relatedly, multiple commenters questioned the stated purpose of efficiency for eliminating the credible fear questions by CBP officers, writing that it instead appears to be a desire to reduce referrals of noncitizens for fear interviews and described the assertion by DHS in the preamble that the questions are suggestive and do not result in grants of asylum as unfounded.

One commenter questioned whether the Departments are sacrificing legitimate claims in the name of speed. Commenters wrote that the three questions and explanation previously required by the Form I-867A and Form I-867B take only a few minutes to read and criticized the Departments for alleging efficiency gains of 20 to 30 minutes by eliminating critical questions that could prevent refoulement. The commenters further stated that investing in adequate training and enforcing compliance with the "standard" screening process would be more efficient

than providing additional guidance and requiring CBP officers to complete additional training. Another commenter described the scenario of CBP officers directing noncitizens to interpreters, who will refer to the informative signs and videos the IFR's preamble described in CBP waiting rooms, and questioned whether this process would be shorter.

*Response:* Regarding commenters' concerns regarding complexity and efficiencies, the Departments continue to believe that the manifestation standard outlined in the IFR meets the purposes for which it was implemented—to increase processing efficiency and avoid suggestive advisals and questioning, while still ensuring that noncitizens are able to seek protection in the United States.

As outlined in the preamble to the IFR, DHS determined that, in times of emergency border circumstances, it was appropriate to temporarily eliminate the use of affirmative advisals and questions on the Forms I-867A and I-867B, based on DHS's determinations that such advisals and questioning can be suggestive. *See* 89 FR at 48743–45. The Departments disagree with the assertion that this determination was "unfounded." It was based on CBP's experience that, when noncitizens are asked affirmative questions like those on the Form I-867B, noncitizens are more likely to respond in the affirmative. The affirmative questions thus can serve as a prompt for noncitizens in custody to respond in the affirmative, even if they do not actually have a fear of persecution or torture. As outlined in the IFR, the Departments' determination is also consistent with the behavioral science concept of "acquiescence," or the tendency of respondents to "consistently agree to questionnaire items, irrespective of item directionality." *See* 89 FR at 48743 n.220. Regarding concerns that such studies are less probative of noncitizens' experiences in CBP custody, DHS notes that it did not rely, and is not relying, on these studies as the sole basis for its determination that the advisals and affirmative questions are suggestive, nor is it asserting that these studies provide the only justification for the implementation of the manifestation standard in this rule. Rather, the implementation of the standard was, as noted above, based in part on CBP's experience in the years implementing the

expedited removal process that providing affirmative advisals and asking affirmative questions was suggestive. As noted in the IFR, these studies provide illustrative support for this learned experience. *See* 89 FR at 48743.

DHS continues to believe that the concept of acquiescence supports its determination, based on its decades of experience in the processing of noncitizens who enter the United States, that the affirmative advisals on the Form I-867A and the questions on the Form I-867B are suggestive. This determination is informed, in part, by information that agency personnel regularly receive about the activities of TCOs in the region, including information that TCOs guide or coach many noncitizens on what to say in order to remain in the United States. It is DHS's experience that, upon encounter and inspection, the questions on the Form I-867B can prompt noncitizens to follow this guidance, thus leading them to claim a fear even if they would not have done so on their own. While DHS acknowledges that noncitizens could similarly be prompted to manifest a fear under the approach of the IFR and this rule, DHS continues to believe that this approach will at minimum mitigate this problem by removing suggestive questions. Moreover, DHS continues to believe that it is likely that noncitizens with a fear of return or an intent to seek asylum will manifest a fear absent the affirmative advisals and questions on the Form I-867B. This is supported by the fact that DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[272]

DHS's determination that it was appropriate to eliminate the use of affirmative advisals and questions on the Form I-867B was also based in part on its assessment that such action would make the process more efficient. In particular, the Departments anticipated that the implementation of the manifestation standard would save approximately 20–30 minutes of processing time, contributing to increased efficiencies in processing and across the immigration process. *See* 89 FR at 48745. This assessment was based on the experience of CBP officers and

---

[272] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

agents with extensive experience reading and completing these forms, and DHS thus disagrees with commenters' contention that the completion of these forms only takes a few minutes. This is, in part, due to the fact that, when completing a sworn statement, such as the Form I-867A, officers and agents ask a number of questions of the noncitizen, each of which may need to be translated; the noncitizens' answers may need to be translated; and the officers and agents must record the answers to each question in the processing system. The noncitizen also must sign the sworn statement, which requires additional explanation that may require translation. This question-and-answer process is in addition to the potential need to provide translation services to noncitizens, if needed, when reading noncitizens the contents of the Form I-867A. While it is difficult to provide the exact time saved as a result of these changes in processes (because USBP systems do not automatically track processing time, standing alone), it is CBP's experience in the time since the Proclamation and IFR were implemented that the elimination of these questions and processes (including not reading the contents of the Form M-444) has, as anticipated, saved approximately 20–30 minutes per person, and led to more efficient and expedited processing overall.

With regard to concerns questioning the stated purpose behind the changes, the Departments disagree that the true purpose of the changes was to reduce the number of individuals referred for credible fear screenings. As explained in the IFR, the shift to a manifestation standard is intended to address suggestive questions and, in so doing, reduce the gap between high rates of referrals and screen-ins with historic ultimate grant rates as well as increase processing efficiency for DHS. *See* 89 FR at 48742–44 & n.220. As explained above in this section, there are multiple reasons why the referral rate observed under a direct questioning approach is very likely greater than the true rate of noncitizens who fear removal or intend to seek asylum—including coaching by TCOs and the possibility that the advisals and questions lead to an unduly high rate of false positives. *See id.* at 48743 & n.220. Seeking to address this problem is not the same as seeking to decrease the number of referrals for that purpose alone, as

commenters suggest.  Moreover, noncitizens who manifest or express a fear still have their claims adjudicated as required by the INA.

The Departments appreciate commenters' suggestion that, rather than implementing a manifestation standard, resources should be devoted to providing additional training to CBP officers and agents on the non-IFR process, but decline to eliminate or change the manifestation standard at this time.  As noted in the IFR and in this section, the Departments believe that, in the emergency border circumstances outlined in this rule, the manifestation standard is appropriate. In addition, CBP notes that its officers and agents have had experience implementing the statutory and regulatory requirements of expedited removal since they became effective and were implemented by legacy INS in 1997, including experience identifying indicators of fear.[273] Guidance authored at that time explained that inspectors were required to refer a noncitizen to an AO if that noncitizen indicated an intention to apply for asylum or a fear of harm or concern about returning home.[274]  The guidance stated that immigration inspectors should consider verbal as well as non-verbal cues given by the noncitizen; and it provided that, when determining whether to refer the noncitizen, "inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements."[275]  The guidance also highlighted that "[t]he inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution."[276]  CBP also notes that, like legacy INS, under the IFR procedures and consistent with agency policy,

---

[273] *See* Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[274] *See id.* at 3.

[275] *Id.*

[276] *Id.*

agents and officers are instructed to err on the side of caution and refer any questions to supervisory officers.[277]

The Departments also disagree with comments indicating that the manifestation standard creates complexities. They maintain that the manifestation standard, in fact, decreases the complexity of the process, given the more streamlined approach taken in the rule and disuse of the Form I-867A and the Form I-867B. In addition, as outlined in the preamble to the IFR and throughout this rule, the rule also allows DHS to effectively and efficiently remove inadmissible noncitizens who are subject to expedited removal orders while quickly identifying inadmissible noncitizens who require a credible fear screening by USCIS AOs. *See* 89 FR at 48742–43.

### c. Implementation Guidance and Accuracy of Manifestation to Identify Fear of Return

*Comment:* Several commenters described the manifestation approach presented by the IFR as an unclear method of assessing fear of return and critiqued the rule as confusing or lacking clear guidance on implementation. A commenter expressed concern that the criteria requiring referral for a credible fear interview are overly broad, including a "mere belief" that a noncitizen may have a fear of return. Similarly, another expressed concern that the IFR lacks guidance around what degree of manifestation is required, whether immigration officers will consistently implement the manifestation requirement, and whether noncitizens will be provided information "if and when the Departments begin to figure out what is sufficient under this test," while another commenter added that the existing U.S. asylum infrastructure is inadequate to administer the multiple layered and broad-ranging changes of the IFR, including the change to use manifestation.

---

[277] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance*; CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum of Fear Claims or Fear Manifestations* (July 18, 2024); Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. and & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal at 3 (Mar. 31, 1997).

Many commenters wrote that it is difficult and inappropriate for immigration officers to use manifestation of fear to assess fear of return. Commenters expressed concern that the IFR creates a confusing, non-transparent, and unfair situation for CBP officers to consider. A commenter described the manifestation standard as "deficient" in refugee protection and far from an equitable standard. The commenter wrote that requiring officers to simultaneously interrogate people at the border while also determining if their behaviors indicate fear is "nonsensical." Similarly, another commenter remarked that Border Patrol agents and CBP officers focus on border security and the identification and prevention of criminal activity at the border, often placing them in an adversarial role with noncitizens that would leave these workers ill-equipped to make careful and considered asylum determinations. The commenter also described the contrasting extensive trauma-informed training given to AOs to learn interviewing techniques designed for vulnerable populations, adding that research shows that many noncitizens who qualify for asylum relief have difficulty expressing their claims without the support of such trained techniques.

A commenter referenced a statement in the IFR noting that although the video explaining the importance of expressing a fear of return will not be played at small facilities, immigration officers at such facilities have resources to be able to "devote a great deal of attention to observing individuals" to see if they manifest fear or need a translator or reading assistance. *See* 89 FR at 48741 n.196. The commenter stated that this suggests that the opposite is true at the larger facilities, i.e., that officers at larger facilities will not have the time or wherewithal to scrutinize noncitizens for nonverbal signs of fear, and, in fact, expect the videos and signs to do a great deal of work for them.

Multiple commenters critiqued the IFR's directive for immigration officers to assess non-verbal shaking, crying, or fleeing behaviors as "unworkable." Commenters further expressed concern that the officers would not be able to discern whether newly arrived noncitizens were cold, hungry, tired, or exhibiting other unconscious behaviors as opposed to a fear of return.

Commenters described this directive in the IFR as "absurd and disingenuous," writing that it would be more effective and accurate for CBP officers to directly ask simple questions regarding fear than trying to be "mind readers."  Another commenter referenced studies and stated that nonverbal cues of fear would likely go unheard, reasoning that express manifestations of fear are being ignored.

Several commenters recommended requiring CBP officers to ask, in a language understood by the noncitizen, one question regarding whether they have a fear of return.

Many commenters cited research—including a 2022 study by the Center for Gender & Refugee Studies that interviewed 97 families expelled during a previous use of a manifestation approach while the Title 42 public health Order was in effect—that requiring manifestation lowers the rate of noncitizens receiving fear screenings.  Commenters stated that human rights monitors have documented that using the manifestation approach has resulted in "CBP failing to refer people who expressed a fear of return to the required fear screening interviews," and that the "shout" test under the Title 42 public health Order resulted in the erroneous return of many people, including women and children, to situations of danger.  Another commenter observed lower statistics of credible fear interviews granted to Haitian nationals when given the "shout test" at sea by the U.S. Coast Guard ("USCG") compared to the historical rate of credible fear interviews granted to migrants encountered by immigration officials at land borders, when the shout test was not used.  Lastly, commenters stated that the IFR is already leading to failures in properly referring noncitizens for fear interviews.

In addition, several commenters referenced research[278] and expressed strong concern that CBP officers have a pattern of ignoring signs of fear in migrants.  They critiqued the Departments' discussion and statistics of the likelihood of migrants responding affirmatively to asylum questions regardless of a valid fear of return, stating that the IFR's preamble does not cite

---

[278] *See, e.g.*, Ctr. for Gender & Refugee Studies, *"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions*, Jan. 30, 2024, *https://cgrs.uclawsf.edu/our-work/publications/"manifesting"-fear-border-lessons-title-42-expulsions*.

any statistics about noncitizens failing to present legitimate fear claims in their interview or account for greater numbers of people seeking fear interviews if they are told they are available. A commenter stated that the statistics cited by the Departments have been directly contradicted by other research findings.

Similarly, a couple of commenters cited research[279] that some families have been ignored or chastised for requesting asylum, voiced concern that CBP officers were hostile and mistreated noncitizens at the southern border, and further expressed concerns that under "the Shout Test" immigration officers have prevented migrants from speaking or verbally abused them.

*Response*:  The Departments disagree that the manifestation standard is an unclear, confusing, or inaccurate method of assessing fear of return and are confident that the manifestation process in the IFR—including the use of signage and a video to provide generalized notice of the right to seek asylum and protection and the way to raise such a claim— is sufficient to provide individuals with an opportunity to seek asylum and protection, while also maintaining the efficiency gains discussed above.  During the time that the manifestation process has been in place under the IFR, there have been higher rates of manifestation than when the standard was recorded and tracked for family units under the Title 42 public health Order, and DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[280]

The Departments acknowledge that immigration officers have historically provided advisals regarding the credible fear process and ascertained a noncitizen's fear through affirmative questioning, through use of the Form I-867A and Form I-867B, and that removing these questions is a significant change.  Thus, the Departments acknowledge that the manifestation process is, in the context of expedited removal, a new process both for officers and agents and for noncitizens.  However, the Departments disagree that USBP agents and CBP

---

[279] *See, e.g.*, *id.*

[280] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

officers are not equipped or trained to properly identify individuals who are vulnerable or who indicate or manifest fear. When implementing this process, agents and officers draw on their longstanding experience and practice observing and interacting with individuals, including observing any indications or behaviors of concern. Immigration officers have implemented the regulatory and statutory standards governing expedited removal since it was implemented in 1997, and, as noted above, they have had guidance regarding the treatment of noncitizens processed under these provisions since that time.

Additionally, CBP provided guidance to its frontline workforce implementing the IFR delineating how fear can be manifested by a noncitizen in many different ways, including verbally, non-verbally, or physically; CBP also provided examples and indicators. Such indicators include statements of fear; statements that the noncitizen was previously harmed in their home country or country of removal; evidence of physical injury consistent with abuse (e.g., bruises, scars); evidence of self-harm; or non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.

Furthermore, the recent guidance on IFR implementation provides that, if officers or agents are in doubt, or if ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then officers and agents should refer the matter to a supervisor.[281] And, as noted above, existing guidance and CBP practice is to err on the side of caution and on the side of referring an individual to USCIS.[282]

---

[281] *See id.*; *see also* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum or Fear Claims or Fear Manifestations* (July 18, 2024).

[282] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re:* Expedited Removal Policy (Aug. 11, 2004); Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

The Departments also disagree with the commenters' concerns that the manifestation of fear standard is difficult and inappropriate, confusing, or unfair for agents and officers to apply, or that agents and officers are ill-equipped to determine the nature of an individual's fear claim. Indeed, USBP agents and CBP officers, as immigration officers, are intimately familiar with the processing of individuals, including vulnerable populations or populations requiring additional care, safety, security, or medical assistance, and with recognizing the needs of such individuals. As a result of their experience and training, CBP immigration officers (both USBP agents and CBP officers) have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow-up steps with regards to any behaviors or indicators of concern. *See* 89 FR at 48744. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. *Id.* Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. *Id.* Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. *Id.* DHS believes that this experience, coupled with guidance, helps agents and officers effectively identify noncitizens with potential fear or asylum claims under a manifestation approach. *Id.*

The Departments acknowledge that interactions between agents and officers and noncitizens occur in the context of an immigration inspection and interview and in a custodial environment, but disagree with commenters' suggestion that the interview is "adversarial" in such a manner that noncitizens would be unlikely to manifest fear or officers would have difficulty recognizing manifestations of fear. Such immigration inspections and interviews are conducted for the sole purpose of determining an individual's admissibility under the

immigration laws of the United States and ensuring that they are processed accordingly.[283]  In addition, the Departments note that, when in use, the Form I-867A and Form I-867B are also completed in this same context.  During such an immigration inspection, officers and agents have face-to-face interactions with the noncitizen and thus have a chance to closely observe the individual who is being inspected, to identify those who may have a fear of return or indicate an intention to seek fear-based relief or protection.[284]  The Departments reiterate that agents and officers do not assess the merits of an individual's claim of fear.  The Departments acknowledge that fear can be manifested in many different ways, including verbally, non-verbally, or physically, and that when doubt or ambiguity exists, officers and agents should involve supervisors or managers to ensure appropriate decisions are made.  The Departments also reiterate that USBP agents and CBP officers do not determine whether a noncitizen is excepted from the rule's limitation on asylum eligibility.  Such decisions are made by a USCIS AO or, for those processed with an NTA, by an IJ.  *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a).  Agents and officers are responsible for identifying whether an individual has manifested or expressed a fear and, if so, referring them for further consideration by an AO.

Additionally, the Departments note that, under the manifestation standard, a noncitizen is not required to verbally express or state that they have a fear.  Contrary to commenters' concerns, the IFR does not impose a "shout test."  As outlined in the IFR, manifestations of fear may be verbal, non-verbal, or physical.  89 FR at 48739–45.  Thus, a migrant can manifest a fear through an unconscious behavior.  *Id.* at 48744.  The Departments acknowledge and appreciate that some noncitizens may have difficulty volunteering a fear of return to agents and officers during processing.  However, certain migrants may also have difficulty volunteering their fear in response to the previous questions on the Form I-867B, given that the questions are asked by immigration officers in the context of the immigration process.  Additionally, for noncitizens

---

[283] *See, e.g.*, INA 235(a)(3), 8 U.S.C. 1225(a)(3); 8 CFR 235.1; 8 CFR 235.3(a).

[284] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance.*

who may be hesitant to answer questions or to affirmatively express a fear, the manifestation standard and CBP officer and agent training and experience, as well as observations from the inspection itself, take into account physical and non-verbal manifestations, some of which may be unconscious by the noncitizen.

The Departments acknowledge a two-page document cited by commenters regarding the prior use of a manifestation standard under the Title 42 public health Order.[285]  The document asserts that from June through October 2022, advocates interviewed at least 97 families expelled to cities along the SWB, of whom over half reported that they had verbally expressed a fear of return and nearly three-quarters reported having non-verbally expressed a fear.  According to the document, multiple migrants sought to raise fear claims with "CBP officers" but such officers did not allow them to speak and ultimately expelled them to Mexico.  The Departments lack a basis to independently evaluate the advocates' methodology (which is largely undescribed) or the accuracy of migrants' claims as described in the document.  At the same time, the Departments note that most of the specific allegations in the document involve behavior—officers not allowing noncitizens to speak—that would be a violation of CBP policy under the Title 42 public health Order, under this rule,[286] and under the Form I-867A/B approach that applies when emergency border circumstances are not in place.[287]  For this reason, and due to the distinctions between processing under the IFR and during the implementation of the Title 42 public health Order described below, DHS does not regard this study as providing persuasive evidence that the manifestation approach of the IFR and this rule has not been and will not be effective.

---

[285] *See* Ctr. for Gender & Refugee Studies, *"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions* (Jan. 30, 2024), *https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-at-the-border-lessons-title-42-expulsions*.

[286] *See, e.g.*, CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance* (requiring officers and agents to refer any noncitizen who manifests a fear for a credible fear interview with USCIS).

[287] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. at 1 (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, Re: *Expedited Removal Policy* at 7–8 (Aug. 11, 2004).

The Departments disagree with commenters' implicit suggestion that the implementation of the IFR is substantially similar to the implementation of the manifestation standard used during the Title 42 public health Order, such that experience under Title 42, including in the study mentioned above, demonstrates that the manifestation standard is inherently unreliable. As an initial matter, the manifestation under the IFR occurs in the context of immigration processing under title 8, rather than in the context of processing and expulsion under Title 42. Immigration processing is, as a general matter, a more complex process than the processing that occurred under Title 42, with noncitizens generally interacting with immigration officers during processing for a longer period of time than occurred during processing for expulsion. For example, the processing of an individual for expulsion under Title 42 took, on average, less than 30 minutes, as compared to, under the current processes under the IFR, approximately 1.5 hours. Therefore, noncitizens have a longer period of time to interact with the processing agents or officers, and potentially manifest a fear. In addition, noncitizens processed under title 8 procedures under the IFR provisions are generally in CBP custody for longer than under Title 42, and can manifest a fear at any time in DHS custody.

Additionally, based on best practices and lessons learned during the implementation of the Title 42 public health Order, the Departments have implemented several operational advancements and information sharing developments. Under the IFR and this rule, noncitizens have access to signage explaining that they may manifest fear during their time in DHS custody. Noncitizens in large-capacity facilities can also view videos explaining the manifestation standard and the general process they are receiving. 89 FR at 48741–42. As noted above, during implementation of the public health Order under Title 42, the DHS process was more expedited. This resulted in a narrower window of opportunity for a noncitizen to manifest a fear in DHS custody. This difference can be seen through the higher number of noncitizens manifesting fear under the IFR. Since the implementation of the IFR, 27 percent of noncitizens encountered

between POEs at the SWB have manifested fear while in DHS custody.[288]  Between June 3, 2022, and May 11, 2023, when the use of the manifestation standard for noncitizens encountered and subject to the Title 42 public health Order was tracked, less than 7 percent of individuals in family units processed under the Title 42 public health Order nationwide were recorded as having manifested a fear in USBP custody and were, in general, excepted from the Title 42 public health Order.  As evidenced by the significantly higher manifestation rate under the IFR as compared to what had been recorded during implementation of the Title 42 public health Order, the two circumstances are not comparable.  Noncitizens encountered along the SWB under the IFR have manifested a fear and been referred to an AO for a credible fear interview on a much more frequent basis.  At the same time, as discussed in Section II.A.2 of this preamble, fear-claim rates remain well below the very high rates following the ending of the Title 42 public health Order and prior to the IFR.  During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not.  DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.  *See* 89 FR at 48744.

With regards to commenters' concerns that, particularly at large-capacity facilities, officers and agents may not be able to "scrutinize" noncitizens for nonverbal signs of manifestation of fear, the Departments disagree.  As acknowledged in the preamble to the IFR, CBP has placed signs in its facilities along the SWB advising noncitizens of their ability to express or manifest a fear, and has placed videos in its larger facilities.  89 FR at 48741–42.  DHS explained that, at smaller facilities, such videos are not played, but officers and agents have had sufficient resources to devote to observing individuals to determine if they manifested a fear.  *Id.* at 48741 n.196.  This statement was intended to explain why a video was not necessary at

---

[288] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

such facilities, but is not intended to convey any lack of attention to such claims at large-capacity facilities.  Indeed, as noted above, agents and officers interview and observe noncitizens during their immigration inspection and interviews, which occur one-on-one.  CBP operations at any CBP facilities with noncitizens in custody are staffed and operate 24 hours a day.  Every CBP officer and agent receives annual training on CBP National Standards on Transport, Escort, Detention, and Search (TEDS)—which provide standards for the custodial conditions in CBP facilities—that ensures every noncitizen in CBP custody is monitored for care and safety, including a provision requiring officers and agents to "physically check" areas where noncitizens are held "on a regular and frequent manner," providing noncitizens with an opportunity to raise any concerns or needs directly with CBP personnel conducting the checks.[289]  Noncitizens in custody at CBP facilities are generally under continuous and direct supervision by multiple personnel and may seek assistance or ask questions of any of those individuals supervising their holding areas at any time.  *See* 89 FR at 48744.  DHS is confident that, during this time, even in large-capacity facilities, agents and officers have sufficient experience and expertise to identify manifestations or expressions of fear.  Likewise, noncitizens in custody at ICE facilities may seek assistance or ask questions and are supervised such that officers, who have experience and expertise in these interactions, can identify manifestations or expressions of fear.  It is important to note that a noncitizen does not have a finite or limited number of opportunities to manifest fear, but rather may manifest fear at any point while in DHS custody.

Further, regarding comments that express concerns and reference reports concluding that the manifestation standard has resulted in failures to refer noncitizens for a required fear interview, and comments recommending that, given this, officers and agents should ask, at a minimum, a question about fear in the noncitizen's native language, the Departments are aware of these studies and their conclusions.  The Departments acknowledge that, under the

---

[289] CBP, *National Standards on Transport, Escort, Detention, and Search (TEDS) 4.6*, at 16 (Oct. 2015), *https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search*.

manifestation approach outlined in this rule, there may be some noncitizens who have a fear of persecution or a fear of return, but who are not referred for a credible fear interview. However, the Departments do not believe that such a possibility is unique to the manifestation standard, and, in any event, DHS has taken steps, including posting signs and videos and providing guidance to its personnel, to help mitigate this possibility. Having considered the reports commenters cite, as well as the mitigating steps DHS has taken and the lessons learned from DHS's experiences during processing under the Title 42 public health Order, the Departments continue to believe that the manifestation standard is appropriate in the circumstances outlined in the IFR and this rule. Moreover, as explained earlier in this response, the Departments' implementation of the IFR has resulted in a fear-claim rate substantially higher than the rate observed under the Title 42 public health Order, further suggesting that the circumstances from other operational contexts, including those studied in earlier research, may be inapposite.[290]DHS acknowledges that asking a single question about fear would be an alternative to the approach adopted in this IFR. However, DHS declines to implement such an option, as it would be subject to the same concerns that DHS outlined in the preamble to the IFR with regards to a short, individualized advisal. As noted in that preamble, DHS has determined that, during times of emergency border circumstances, a short, individualized advisal would be unlikely to convey information more effectively than signs and videos. *See* 89 FR at 48744. In particular, the Departments assessed that if an advisal could be developed that was short enough to avoid unduly lengthening processing times in the current emergency situation, such an advisal would be unlikely to convey information more effectively than the existing signs and videos, and such an advisal would still have the suggestiveness problems of the current system. The Departments

---

[290] As noted in the IFR, the manifestation standard is used by the USCG, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea. *See* 89 FR at 48744. Although the Departments believe these other uses support the view that a manifestation standard can be effective, having implemented the IFR's manifestation standard and observed the results of that standard, the Departments now believe that the difference between the operational contexts limits the usefulness of the direct comparison as suggested by some commenters.

assess that asking a single question—particularly in the context of the expedited removal process under the IFR where there are no individualized advisals provided—would likely present the suggestiveness problems of the current system.  DHS thus declines to implement this change.[291]

To the extent that there are allegations that an agent or officer ignored expressions or manifestations of fear by a noncitizen, such conduct is contrary to DHS policies and practices, and would be treated as such.  The Departments again note that, to the extent it exists, such employee misconduct would not be unique to the implementation of this rule.  Nor do such claims provide a persuasive reason to depart from the approach this rule adopts to address emergency border circumstances.  As already explained, DHS has provided guidance to CBP and ICE agents and officers on how to identify manifestations of fear; that guidance directs them to refer individuals who manifest fear for a credible fear screening, including instructing them to err on the side of referral.  89 FR at 48744.  If agents or officers disregard those instructions—which could occur with or without this rule—DHS has procedures in place for reporting misconduct.[292]

---

[291] As noted in the preamble to the IFR, the Departments acknowledge that there are some studies articulating that the Form I-867A and Form I-867B provide important protections.  As explained in the IFR, DHS disagrees with these studies to the extent that they conclude that individualized advisals and affirmative questions are not suggestive, based on DHS's longstanding experience with this process.  Indeed, such studies are now nearly two decades old and were done at a time when, as described above, the ER process was very different from what it is now.  Additionally, given that the studies do not account for the signs, videos, and other means of providing information under the IFR's approach, DHS does not believe they are particularly probative as a means of assessing the effectiveness of this approach.

[292] CBP takes allegations of employee misconduct very seriously, and allegations of serious misconduct are investigated by CBP's Office of Professional Responsibility (OPR).  CBP, *Office of Professional Responsibility*, *https://www.cbp.gov/about/leadership-organization/professional-responsibility* (last modified Mar. 29, 2024).  Allegations of misconduct by a CBP employee or contractor can be sent to CBP OPR's Intake Center via email: JointIntake@cbp.dhs.gov, or via phone: 1-877-2INTAKE (246-8253), Option 5.  Similarly, ICE's Office of Professional Responsibility ("OPR") takes employee misconduct very seriously and manages and investigates allegations of employee misconduct and oversees a variety of other integrity programs that protect the public trust and preserve the highest standards of integrity and accountability across the agency.  ICE, *Office of Professional* Responsibility, *https://www.ice.gov/about-ice/opr* (last updated May 15, 2024).  To promote integrity, mitigate risk, and uphold the agency's professional standards, the OPR-led Integrity Coordination Center receives and assesses information and refers any allegations of employee misconduct to appropriate offices for investigation, if necessary.  ICE, *Office of Professional Responsibility*, *https://www.ice.gov/about-ice/opr* (last updated May 15, 2024).  This process ensures that allegations of criminal or administrative misconduct against ICE personnel are properly assessed and thoroughly investigated.  ICE, *Office of Professional Responsibility*, *https://www.ice.gov/about-ice/opr* (last updated May 15, 2024).  Allegations of misconduct by an ICE employee or contractor can be sent to ICE OPR's Integrity Coordination Center via email: ICEOPRIntake@ice.dhs.gov, via phone: 1-833-4ICE-OPR (833-442-3677), or via the "File a Complaint" web link.  ICE, *Integrity Coordination Center - Intake Form*, *https://www.ice.gov/webform/opr-contact-form* (last updated Jan. 9, 2024).

Additionally, the DHS Office of Inspector General and the DHS Office for Civil Rights and Civil Liberties are also available for the public, including previously removed noncitizens, to provide feedback and make complaints

DHS relies on these procedures generally to ensure that personnel are following applicable law and guidance, and DHS assesses that these procedures are generally effective. If allegations of misconduct are found to be substantiated and misconduct is found, such findings may lead to, for instance, disciplinary action against involved personnel and referral for criminal charges if a determination is made that any laws were violated. In addition, regardless of whether any such findings are substantiated, DHS may impose additional training and policy measures consistent with the rule's provisions.

Concerns about misconduct by individual employees are further mitigated by the reality that, as explained above, noncitizens do not have just one chance to manifest fear while in CBP or ICE custody: Noncitizens will typically interact with multiple agents and officials, and they can manifest fear to any of them. Noncitizens will have these opportunities, moreover, after being exposed to signs and videos explaining that they can manifest fear. From June 5, 2024, through August 31, 2024, the median processing time from encounter through repatriation for a case with no fear claims was 6 days.[293]

Moreover, commenters have provided no evidence that there is a widespread problem of CBP officers and agents ignoring fear claims under the IFR. As described above, there are a number of mechanisms within the Department for such complaints and concerns to be raised, and CBP is not aware of any substantiated allegations of misconduct raised through these channels. And the data showing a manifestation rate of 27 percent under the IFR—though not alone proving a negative or showing that no fear claims are being missed—indicate that officers and agents are following their guidance and reporting manifestations of fear in a large number of cases. For all these reasons, DHS does not believe the commenters' arguments provide a reason to depart from the rule's approach.

---

involving DHS employees, including officers and agents, or programs; to submit allegations of civil rights and civil liberties violations; and to submit other types of grievances. *See, e.g.*, DHS, Off. of Inspector Gen., *Hotline*, *https://www.oig.dhs.gov/hotline* (last visited Sept. 21, 2024); UDHS, *Office for Rights and Civil Liberties*, *https://www.dhs.gov/office-civil-rights-and-civil-liberties* (last visited Sept. 21, 2024).

[293] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

*Comment:*  A few commenters reasoned that because the manifestation of fear approach does not require documentation, unlike affirmative questioning, the IFR removes appropriate accountability.  One commenter described the change to using manifestation as "a dangerous reversal of a procedural safeguard that has been implemented to ensure the United States' compliance with its international obligations," expressing concern that other safeguards are already being removed.  A commenter expressed concern that the Departments have eliminated the Form I-867A and Form I-867B without replacing them with any other documentation, which they wrote could make it impossible to have any record of missed viable claims for asylum or the total extent of any such errors.  Another commenter asserted that the previous system of requiring immigration officials to complete and sign two forms incentivized officials to be honest and critiqued the manifestation approach as leaving no paper trail.  Another commenter stated that the manifestation standard would worsen already problematic interactions between CBP officers and noncitizens.  The commenter referenced a report[294] finding that CBP officers had an "alarming" rate of irregularities and non-conforming practices when assessing fear of return, including failing to read the required script for the Form I-867A, failing to record answers correctly, and using questionable interpretation practices.  Another commenter discussed reports finding that many interviews conducted by CBP and ICE were marked by inaccuracies, mistranslations, and fabricated information, as well as research showing that in most situations when migrants stated that CBP agents did not ask about their fear of return, the immigration records showed instead that this question had been asked and answered.

*Response:*  The Departments disagree that the manifestation of fear standard removes accountability or eliminates official documentation of a fear claim.  As an initial matter, while CBP officers and agents are not required to provide noncitizens with an M-444 and do not complete a Form I-867A or Form I-867B when the IFR's provisions are in effect, fear claims are

---

[294] *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, at 19 (Aug. 2, 2016), *https://www.uscirf.gov/publications/barriers-protection-treatment-asylum-seekers-expedited-removal.*

documented in the relevant electronic systems.  Guidance issued to both USBP and the OFO

requires that, when a noncitizen subject to the Proclamation and the IFR is being processed for

expedited removal, and manifests a fear, that noncitizen is to be processed under a particular

disposition code in the electronic processing system.[295]  This code is unique to those who are

processed for expedited removal and who manifest a fear.  Additionally, while noncitizens

processed for expedited removal under the IFR procedures are not required to be provided the

Form M-444, they continue to be provided information about the credible fear process, through a

tear sheet called *Information about Credible Fear Interview* and by video, and they are provided

the opportunity to consult with an individual of their choosing.[296]  CBP facilities also have

signage and, in some cases, videos, providing notice to all noncitizens in custody that, if they

have a fear of return, they should inform an agent or officer.  89 FR at 48741.  This manifestation

may occur at any point during a noncitizen's time in CBP custody, and if such a claim is made, it

must be documented in the relevant electronic system at that time.

ICE maintains an electronic system to record case management actions for noncitizens,

including referrals to an AO and the disposition of a noncitizen's credible fear determination.[297]

If a noncitizen manifests or expresses a fear after their initial encounter with CBP, while in ICE

custody, ICE guidance requires officers to refer the case to USCIS for a credible fear interview,

---

[295] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4–5 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[296] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* 4–5 (June 4, 2024); 6.4.24 USBP Field Guidance ER IFR 1; Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 4 (June 4, 2024) (Muster).

[297] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (ICE officers are instructed "to document the Claim Credible Fear, Fear Referral package submitted, and all subsequent CF related actions in [the electronic system's] Actions and Decisions Tab"); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID)*, at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf*.

including having an opportunity to consult with an individual of their choosing prior to their credible fear interview.[298]

Per applicable guidance, ICE documents any manifestation or expression of fear on the Form G-166C, which also verifies that the noncitizen has been provided information on the credible fear interview process and the specific language in which it was provided.[299]  ICE guidance requires that all documentation, including the claim of credible fear and USCIS fear referral package, are captured in an electronic system of records.[300]

ICE and CBP utilize the same electronic database system for case management of noncitizens and have electronic access to these records.[301]  ICE tracks noncitizens transferred from CBP to ICE custody who have manifested fear through the same system.[302]  This system ensures that information relating to a noncitizen's case, including fear manifestation, is properly referred to USCIS.[303]

With regard to a commenter's concern that the absence of affirmative questioning will result in irregularities and non-conforming practices when assessing fear of return, the

---

[298] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule, Securing the Border,* at 4 (June 4, 2024) ("If ERO determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal, the officer will provide the noncitizen with the Information About Credible Fear Interview Sheet and refer the noncitizen to USCIS for a credible fear interview.").

[299] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024).

[300] *Id.*

[301] DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[302] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) ("The new processing dispositions [by CBP] can be tracked in the ICE [system's] Dashboard . . . by selecting these new processing dispositions . . . ."); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[303] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (for cases transferred to ICE from CBP after a noncitizen has manifested fear, "[t]he existing automated referral solution using the 'Refer Credible Fear to USCIS button' in [the electronic system] will be available for use … [and the automated] functionality will function as designed."); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

Departments disagree. The Departments acknowledge that, under the standard outlined in this rule, official documentation will indicate if a noncitizen expressed or manifested a fear, but will *not* contain an express similar record of a lack of such manifestation. DHS acknowledges that this is a change from non-IFR practices, in which a noncitizen's case file will reflect that the individual was provided with the Form I-867A advisals and will contain the noncitizen's response to the questions in the Form I-867B. DHS disagrees that the lack of such documentation under the manifestation of fear standard removes accountability from CBP officers and agents, incentivizes any falsification of records, or undermines the validity of the manifestation process. During immigration processing, CBP officers and agents ask a noncitizen a number of questions, including about their biographic information, nationality, and purpose of travel to the United States. The processing officer or agent records the noncitizen's answers to these questions in the electronic processing system.[304] In addition, as noted above, any individual who is processed for expedited removal and manifests or expresses a fear is processed using a unique code in the electronic system.[305] Officers and agents have an obligation, as law enforcement officers and Federal employees, to ensure that the record of a particular individual's case file is accurate and complete,[306] which includes any manifestations or expressions of fear. Thus, the lack of such a code indicates that the individual did not manifest a fear. However, to the extent that an officer or agent failed to accurately record a manifestation of fear, the lack of the unique code in the noncitizen's file itself would provide a record of that failure—just as an inaccurate "no" answer to a question on a Form I-867B would if a noncitizen actually answered

---

[304] *See* DHS, *Privacy Impact Assessment for the CBP Portal (E3) to ENFORCE/IDENT, DHS/CBP/PIA-012*, at 1, 3 (July 25, 2012), *https://www.dhs.gov/publication/cbp-portal-e3-enforceident* (discussing the type of information collected from noncitizens and how it is recorded in the electronic system).

[305] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[306] *See, e.g.*, 44 U.S.C. 3101 (providing that federal agencies "make and preserve records containing adequate and proper documentation of the [official activities] of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons affected by the agency's activities").

"yes" to the question.  To the extent that commenters are concerned about potential misconduct by officers and agents, CBP and ICE take allegations of misconduct very seriously and have mechanisms in place to investigate and respond to such allegations as discussed above.

*Comment:*  Multiple commenters expressed concern that the IFR and "shout test" approach avoids the provision of necessary interpretation by immigration officers and thwarts appropriate language access for migrants, often adding that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish.  Commenters further stated that the IFR might disproportionately impact speakers of Indigenous languages, who may be able to communicate regarding basic information in Spanish but may be unable to discuss the complicated matter of a fear-based claim in anything other than their native language.  Similarly, a commenter observed that noncitizens are held in facilities for only a limited time and that during that time language needs might be overlooked.  In the same vein, another commenter expressed concern that the IFR and the preamble are not clear regarding how noncitizens who speak languages other than English or Spanish are expected to manifest fear, when they may be able to communicate only basic identification in English or Spanish and Border Patrol agents are not incentivized to seek an interpreter in the noncitizen's language.

*Response:*  The Departments disagree with commenters expressing a belief that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish and that they are not incentivized to seek an interpreter.  As noted, noncitizens are not required to verbally express or state a fear.  A fear can also be manifested non-verbally or physically.  In addition, CBP has legal and policy obligations to provide language access services and translation and has long recognized the importance of effective and accurate communication between CBP personnel and the public.  Ensuring effective communication with all persons, including limited English proficiency ("LEP") persons, facilitates CBP's mission.

It is the policy of CBP to take reasonable steps to provide LEP persons with meaningful access, free of charge, to its operations, services, and other conducted activities and programs without unduly burdening the Agency's fundamental mission.[307]  This policy applies to all methods of communication—e.g., verbal (including telephone); correspondence (including emails); websites; newsletters; community engagement activities; and flyers, posters, pamphlets, and other documents explaining CBP programs.[308]  This policy also applies to interactions with the public, including law enforcement encounters (e.g., questioning, processing, etc.).[309]  As a result of and related to these policy obligations, CBP agents and officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language.  In addition, CBP facilities have ''I Speak'' signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[310]  Upon implementation of the IFR, signs were posted in areas of CBP facilities where individuals are most likely to see those signs, instructing individuals that, in addition to being able to inform the inspecting immigration officers of urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening.  89 FR at 48741.  Moreover, in CBP's large-capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns,

---

[307] *See, e.g.*, CBP Directive 2130-031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

[308] *See, e.g.*, CBP Directive 2130-031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

[309] *See, e.g.,* CBP Directive 2130-031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

[310] *See* CBP, *Language Access Plan* 7 (2016), https://www.dhs.gov/sites/default/files/ publications/final-cbp-language-access-plan.pdf; DHS, *I Speak . . . Language Identification Guide*, *https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 3, 2024); DHS*, I Speak . . . Indigenous Language Identification Poster*, *https://www.dhs.gov/sites/default/files/publications/Habla%20Poster_12-9-16.pdf* (last visited Sept. 3, 2024); *see also* DHS, *DHS Language Access Resources* (July 17, 2023), *https://www.dhs.gov/publication/dhs-language-access-materials*.

a need for food or water, or fear of return is shown on a loop in the processing areas and will also be available in commonly-spoken languages.  To the extent that noncitizens do not speak one of these languages, CBP provides language assistance services consistent with CBP's Language Access Plan.[311]  Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the signs and videos are presented will be read the contents of the signs and videos in a language they understand.

     *Comment:*  One commenter expressed concern that, as a result of the signs and videos in CBP facilities advising migrants of their ability to manifest or express a fear, noncitizens are "in essence … coached" by DHS with regard to manifesting fear.

     *Response:*  With regard to this concern that the existence of signs and videos amount to DHS "coaching" migrants with regards to manifesting or expressing a fear, the Departments are cognizant that, for some individuals, such messaging may result in migrants expressing or manifesting a fear when they otherwise would not.  However, as explained in the preamble to the IFR, DHS adopted the approach outlined in this rule—a manifestation standard, coupled with a general notice of the right to express or manifest a fear—in an effort to mitigate this potential, compared with the existing practice of asking affirmative questions.  *See* 89 FR at 48743–44.  DHS believes that the approach taken in this rule appropriately reflects and accounts for DHS operational needs while protecting noncitizens' ability to seek protection in the United States.

### d.  Trauma Impacting Manifestation and Vulnerable Populations

     *Comment:*  Many commenters expressed concern that noncitizens have endured significant trauma en route to the United States or are under stress after escaping harm and "might not be able to explicitly state their fears" and, thus, would fail the manifestation requirement.  One commenter pointed out that trauma does not always present with the physical cues identified in the IFR, such as "shaking, crying, or signs of physical injury."  The commenter

---

[311] *See* CBP, *Language Access Plan* (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf*; CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf*.

stated that the relevant USCIS Training Module "explains that survivors of severe trauma may appear emotionally detached"; the commenter wrote that removing an affirmative individualized explanation of the process makes it even harder for survivors to pursue protection for which they are entitled to apply. Other commenters similarly observed that people who have suffered trauma "often have great difficulty raising their fears of return in non-confidential group settings" and might be hesitant to disclose their fear to armed, uniformed officials. One commenter expressed concern that many migrants have fled violence at the hands of government officials and would have difficulty volunteering their fear of return to uniformed CBP agents who are not asking questions about their fear but about other aspects of their situation, while another commenter observed that "all people [seeking] asylum remain traumatized, and very few are able or prepared to tell their full story even if they understand the consequences of the [credible fear interview] process." Commenters also asserted that noncitizens may not understand the importance of their first encounter with a government official or may believe they will have an opportunity to raise their claim later in the process.

*Response:* The Departments acknowledge that many noncitizens arriving in CBP custody may have experienced trauma of some kind and that being taken into immigration custody may exacerbate some of this trauma. The Departments also acknowledge that it may be difficult for some noncitizens to articulate details of their fear claim to CBP officers and agents during processing, and may, in general, have negative reactions to law enforcement officials in uniform. On this point, however, the Departments note that, during CBP processing, the relevant factor determining whether a noncitizen is referred to USCIS is whether the noncitizen manifests a fear. They are not required to, nor expected to, articulate the full scope of their fear or the rationale behind it. Indeed, CBP agents and officers do not determine the validity of any fear claim. Additionally, to the extent that an individual may react negatively to a CBP officer or agent in uniform, such concerns are not limited to the process under the IFR and would ostensibly apply to any screening process implemented by the Departments. CBP has taken

steps over the past several years to integrate trauma-informed care for all persons in custody, with a particular focus on UCs.[312]  In particular, in CBP holding facilities, the agency has taken steps to ensure that processing procedures are informed by the potential for trauma experienced by individuals in custody, with a particular emphasis on providing a sense of safety and security, providing caregivers for children in custody and increased custodial oversight, increasing medical standards for individuals in CBP custody, providing regular orientation and assistance, and providing activities and recreation for children.[313]  In addition, CBP has taken steps specific to the credible fear process, for those going through the process in CBP custody, to protect the privacy of noncitizens during their interviews, where noncitizens may discuss traumatic situations.  These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview.  While DHS has taken steps to mitigate the impact of such trauma on the effectiveness of the screening process, including through its signage and videos, it is not possible to develop a screening process that completely eliminates the potential effects of past trauma.

Comment:  Many commenters expressed specific concerns that certain vulnerable populations of noncitizens would be at a particular disadvantage when seeking protection due to the manifestation requirement.  Some commenters highlighted survivors of sexual violence, political dissidents, and LGBTQI+ populations as particularly disadvantaged, in that they may not easily manifest fear in asylum settings due to their specific history of oppression.  For example, one commenter wrote that political dissidents may have a fear and mistrust of government officials and be unlikely to reveal their stories to immigration officials.  They also discussed the significant harm that they believe the manifestation requirement will have on members of the LGBTQI+ community who are fleeing persecution and thus are likely afraid to

---

[312] *See* Memorandum for Exec. Assistant Comm'rs, et al., from Chris Magnus, Comm'r, U.S. Customs and Border Protection, *Re:* Directive for U.S. Customs and Border Protection Approach to Trauma-Informed Care for Persons in Custody at 1 (Apr. 29, 2022).

[313] *Id.* at 2–4.

reveal intimate details of their lives in immigration facility spaces that lack privacy and confidentiality.

*Response:*  Regarding concerns that certain populations, including LGBTQI+ individuals, survivors of sexual violence, and political dissidents, may not be comfortable expressing the details of their fear claim to CBP officers and agents, the Departments reiterate that, at the time of CBP processing, agents and officers do not inquire about or ask questions about the nature of an individual's fear claim, nor do they evaluate the validity of that claim.  Thus, such migrants are not required to—and are not expected to—provide the details of any fear claim, or even the basis for their claim, during CBP processing.  In addition, the Departments note that concerns regarding the ability of these populations to articulate their fear claims are not limited to the process under the IFR, and would seemingly apply to any screening process implemented by the Departments, including the process utilizing the Form I-867A and Form I-867B.

### e.  A Manifestation of Fear Does Not Sufficiently Align with a Valid Claim for Asylum

*Comment:*  Several commenters critiqued the assertion in the IFR that a manifestation of fear aligns with a valid claim for asylum.  One commenter articulated that the Departments provided no rationale to think that the new manifestation of fear approach would only affect people with "frivolous claims" to asylum and wrote that this conclusion was contrary to common sense.  A commenter wrote that requests for relief or visibly detectable signs of fear are not proxies for a strong claim and that other factors, such as coaching by a smuggler, might determine whether or not a migrant manifests fear.

*Response:*  Contrary to the contention contained in the comments, the IFR did not state that the manifestation standard will only impact those with "frivolous" claims.  The Departments noted in the preamble to the IFR that they believed that the manifestation standard "is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return."  89 FR at 48744.  This decision was informed by the Department's experience that providing the affirmative advisals on the Form I-867A and asking the affirmative questions on

the Form I-867B is, in some cases, suggestive, and by the Departments' belief and experience that those with meritorious claims will make their fear or desire to request asylum known when given the opportunity to do so.  However, the Departments also acknowledge that any screening mechanism may result in some noncitizens with valid claims not being referred for a credible fear interview.  *Id.* at 48743–44.  Nonetheless, the Departments believe that the manifestation standard will allow DHS to identify claims that may be meritorious in an efficient and effective manner, and that this change remains appropriate and necessary in light of the emergency border circumstances in which this rule is implemented.  *Id.* at 48744.

*f.  Noncitizens May Not Understand Their Legal Right to Seek Asylum*

*Comment:*  Multiple commenters wrote that some noncitizens may not know that they legally can raise their fears of harm.  Other commenters wrote that many immigrants would be unable to meet the requirement to express their fear of return explicitly, due to lack of access to legal counsel or unfamiliarity with the legal requirements.  A commenter remarked that noncitizens may not understand that the experiences they suffered based on gender, racism, or homophobia or transphobia in their countries of origin might be grounds for asylum in the United States.

Some commenters described the signs and videos discussed in the IFR as insufficient for communicating the complex concepts of manifestation of fear and credible fear screenings.  A commenter criticized the content and design of the signs as insufficient to inform the reader that they forfeit their right to seek asylum if they do not manifest a fear of their return.  Another commenter noted that the videos would not necessarily even be played at smaller facilities.

Some commenters stated that signs or videos are an inadequate systematic approach to reaching a broad pool of noncitizens with valid asylum claims, particularly given the limited number of languages used.  One commenter criticized the "arbitrary" limitation on the number of languages used for the signs and videos and stated that the IFR at footnote 195 (89 FR at 48741 n.195) suggests the signs and videos in CBP facilities will be posted in English, Spanish,

Mandarin, and Hindi, but the ICE Implementation Guidance says only that the signs must be posted in English and Spanish without mentioning additional languages to be used on the signs themselves.[314]  The comment stated that limiting language access to these four languages will clearly leave many without any way to understand the procedure they must follow to have their claims heard.  The commenter stated that neither the Implementation Guidance nor the Rule explain how someone who cannot understand one of these four languages would know to seek out translations in the law library, as indicated in the rule, or if all facilities even have a law library.

*Response:*  The Departments disagree with the commenters' assertions that the signs and videos are not sufficient to notify noncitizens that they can manifest a fear.  CBP has posted signs in areas of its facilities where individuals are most likely to see those signs.  In addition, CBP has developed a video that is shown on a loop in the processing areas of its large-capacity facilities.  Commenters are correct that these videos are not shown in smaller facilities.  However, as outlined in the IFR, in such smaller facilities, the signs are posted, and officers and agents are generally able to devote significant attention to noncitizens in custody and identify either fear manifestations or language needs.  *See* 89 FR at 48741 n.196.  Contrary to commenters' assertion that the list of languages in which these signs and videos are provided is arbitrary, they are provided in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by most of the individuals in CBP custody who are subject to the rule.  And if a noncitizen does not speak one of these languages, CBP provides language assistance services in accordance with CBP's Language Access Plan.[315]

---

[314]  ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule,* Securing the Border, at 5 (June 4, 2024) ("These signs must be posted in English and Spanish.  ERO will have additional translations available in facility law libraries in the following languages. . . .").

[315]  *See* CBP, *Supplementary Language Access Plan: Fiscal Years 2020-2021,* at 6 (Feb. 7, 2020), *https://www.cbp.gov/about/language-access.*

These signs and videos have also been provided in short, concise language, rather than explaining the complex details of the credible fear process or the standards for addressing a claim for asylum or other protection.  This is based on DHS' experience that short, concise, and simple notifications are most effective for noncitizens in custody at CBP facilities, given the nature of CBP facilities and CBP operations.[316]  In particular, CBP's role in the credible fear screening process is to identify those who may be seeking protection in the United States, in order to ensure that such individuals are referred to a USCIS AO.  This role thus requires officers and agents to identify claims of fear, and, at this initial stage, err on the side of caution.[317]  In addition, noncitizens in CBP custody go through a number of steps and may move between various locations in a single facility while completing processing and awaiting transfer out of CBP custody.  Therefore, it is CBP's experience that short, simple signs, which can be noticed and read quickly, are more effective for communicating with noncitizens than signs with more complex language.  Such claims of fear are, under non-IFR procedures, identified in part through the questions on the Form I-867B.  Under this rule, such claims may be manifested or expressed to an officer or agent at the time of processing.  However, this rule does not change the role of either the noncitizen or CBP immigration officers in the process—a noncitizen may express or manifest a fear, and, once that fear is expressed, CBP refers the individual to an AO. Additionally, those noncitizens who are referred and who undergo their credible fear interviews in CBP custody are provided additional information about the credible fear process, through the *Information about Credible Fear* tear sheet and the USBP video explaining the credible fear process.

---

[316] *See* CBP, *Directive 2130-031: Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access*, at 1, 4–5 (Dec. 4, 2018), *https://www.cbp.gov/document/directives/2013-031-roles-and-responsibilities-us-customs-and-border-protection-offices?language=pt*.

[317] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance*, at 1 ("If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then CBP officers and agents should refer the matter to a supervisor.").

Additionally, for those transferred to ICE custody, commenters are correct that initial ICE guidance called for ICE to provide signage in English and Spanish,[318] but ICE subsequently directed the relevant facilities to post signage in the same four languages as CBP.  In addition, as noted by the commenter, ICE has translations available in facility law libraries in the following languages:  Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese.[319] Noncitizens in ICE detention facilities have access to law libraries for at least five hours per week.[320]  Furthermore, ICE has access to an ICE-wide 24/7 language services contract for interpretation and translation, and guidance and best practices materials for identifying LEP individuals and their primary language to secure the necessary interpretation and translation services for them.[321]  ICE detention standards provide that oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.[322]  Each detained noncitizen in an ICE detention facility is provided an ICE National Detainee Handbook,[323] which is currently available in 16 languages (English, Spanish, Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Pulaar, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and

---

[318] Memorandum for Enforcement and Removal Operations Exec. Assoc. Dir. Daniel A. Bible, from ICE Deputy Dir. and Senior Off. Performing the Duties of the Dir. Patrick J. Lechleitner, *Re:* Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*, and Interim Final Rule, *Securing the Border* at 5 (June 4, 2024).

[319] *Id.*

[320] ICE, *Attorney Information and Resources: Other Legal Resources Available to Noncitizens in ICE Custody* (Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources*.

[321] ICE, *Language Access Information and Resources* (May 7, 2024), *https://www.ice.gov/detain/language-access* (describing current language access policies); ICE, *ICE Language Access Plan, Supplemental Update Covering Fiscal Years 2019 and 2020*, at 3–5 (July 21, 2020), *https://www.ice.gov/doclib/about/offices/ero/pdf/iceLanguageAccessPlanSupplemental2020.pdf*; ICE, *Language Access Plan*, at 7, 10, 13 (June 14, 2015), *https://www.ice.gov/sites/default/files/documents/Document/2015/LanguageAccessPlan.pdf*.

[322] *See, e.g.*, ICE, *6.3 Law Libraries and Legal Material*, at 422 (revised Dec. 2016), *https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf*.

[323] ICE, *Detention Management, National Detainee Handbook* (Sept. 4, 2024), *https://www.ice.gov/detain/detention-management/national-detainee-handbook*.

Vietnamese).[324]  The Handbook describes the noncitizen's ability to ask for relief from removal, including by seeking asylum, and also provides information regarding the law library and additional resources available to noncitizens.[325]  All ICE detainees have the right to use the facility's law library to access approved legal materials.[326]

With regard to concerns that migrants may not know that their experience in their home country or on their journey to the United States may be grounds for asylum, the Departments note that this has always been the case, even under non-IFR credible fear processes.  In any event, the Departments note that the current signs and videos use general language to advise noncitizens that they should tell an officer if they "[f]ear persecution or torture if removed from the United States."  This open-ended language does not require a noncitizen to fully understand the legal nuances or complexities of their claim at the time it is manifested.  CBP therefore believes that the existing signs and videos are sufficient.

3. "Reasonable Probability" Screening Standard for Statutory Withholding of Removal and CAT Protection

Commenters largely opposed the heightened "reasonable probability" screening standard for statutory withholding of removal and CAT protection for noncitizens subject to this rule.  By contrast, one commenter supported the "reasonable probability" standard for this rulemaking and recommended more broadly applying it to all withholding of removal credible fear screenings.

*Comment:*  Commenters stated the "reasonable probability" standard was too high and would lead to refoulement.  Some commenters stated that the "reasonable probability" standard is inconsistent with the statutory "significant possibility" standard for asylum in credible fear

---

[324] *Id.*

[325] ICE, *National Detainee Handbook*, at 9, 16 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf* ("You have the right to ask for relief from removal based on various legal grounds if you believe you qualify.  These might include cancellation of removal, adjustment of status, asylum, withholding of removal, or relief under the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment.  For example, you have the right to ask for asylum to stay in the U.S. if you were (or are afraid that you will be) persecuted in your native country or a country where you last lived because of your race, religion, nationality, political opinion, or membership in a particular social group.").

[326] *Id.* at 16.

screenings, and that any attempt to change the "significant possibility" standard was ultra vires. Commenters also explained that the higher standard would cause credible fear passage rates to drop dramatically and result in the removal of noncitizens with valid asylum claims. Commenters stated that Congress intended, as evidenced by the plain language of the statute, for the threshold credible fear screening standards to be low so as not to exclude legitimate asylum seekers, and not to ensure the quick imposition of consequences for irregular entry as described in the IFR.

Similarly, commenters believed the "reasonable probability" standard was set too close to the ultimate burdens of proof for statutory withholding of removal and CAT protection and would require excessively specific evidence, particularly as the credible fear process is designed to move quickly. Rather, commenters suggested that only claims that were "manifestly unfounded" should be screened out at the credible fear stage and that, as much as possible, asylum, statutory withholding of removal, and CAT protection claims should be adjudicated in full removal proceedings before an IJ, as such claims are complex and require robust processes with more procedural safeguards. Commenters noted a number of issues that would make it difficult for noncitizens to provide the specific evidence required to establish a reasonable probability under this rule, including the inability to obtain counsel during the credible fear process; being interviewed shortly after arriving in the United States; difficulties sharing information due to trauma, exhaustion, or translation availability; additional stress placed on vulnerable populations; detention status; challenges surrounding placement into the non-detained Family Expedited Removal Management ("FERM") process, such as challenges involving children attending credible fear interviews and difficulty obtaining Indigenous language interpreters; and difficulties procuring documentary evidence, expert opinions, or witnesses.

*Response:* The Departments disagree with commenters that the rule's reasonable probability screening standard for statutory withholding of removal and CAT claims is too high and decline to make changes to the standard. The Departments believe the reasonable

probability screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

To start, and as discussed in Section III.A.1 of this preamble, the Departments note that the "reasonable probability" standard neither affects nor changes the "significant possibility" standard used to screen for asylum eligibility, which is set by statute and remains in effect for asylum claims in the credible fear process. *See* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (a credible fear of persecution "means that there is a significant possibility" that a noncitizen could establish eligibility for asylum). Commenter concerns about changes to the statutory "significant possibility" standard are therefore misplaced.

While Congress clearly expressed its intent that the "significant possibility" standard be used to screen asylum claims, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening procedures are to be employed with respect to statutory withholding of removal and CAT protection. The Departments therefore have some discretion to articulate the screening standard for such claims. And in the context of the emergency border circumstances described in the IFR and this rule, the Departments believe the "reasonable probability" screening standard better captures the population of noncitizens with potentially valid claims and is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection.

As explained in the IFR and the June 3 Proclamation, resource limitations, outdated laws, and significantly elevated encounter levels at the southern border have made it difficult for the Departments to quickly grant relief or protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. In light of the emergency border circumstances outlined in the June 3 Proclamation, the IFR, and this rule, the goal of this rule is to reduce irregular entries at the southern border and to quickly issue decisions and

impose consequences on those who cross our border irregularly and lack a legal basis to remain. *See* 89 FR at 48731.  The Departments believe that imposing a "reasonable probability" screening standard for statutory withholding of removal and CAT protection is needed to further this goal and is consistent with all statutory and regulatory requirements and the United States' international law obligations.

Specifically, the elevated "reasonable probability" screening standard will better allow the Departments to screen out claims that are unlikely to be meritorious, as the higher screening standard is more proportional to the ultimate burdens of proof for statutory withholding of removal and CAT protection, which are each higher than that for asylum.  *See, e.g.*, 89 FR at 48747 (noting that the higher screening standard will help better predict the likelihood of success on the ultimate application for relief or protection); *see also* Regulations Governing the Convention Against Torture, 64 FR at 8485 (applying a higher screening standard for statutory withholding of removal and CAT protection in the reasonable fear context "[b]ecause the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution)").  Identifying non-meritorious claims early in the process is an important deterrent to disincentivize noncitizens from making the perilous journey to the United States under the belief that they will be released and able to remain in the United States for a significant period, or indefinitely.  Instead, under this rule, those who do not establish eligibility for statutory withholding of removal or CAT protection under the "reasonable probability" standard will be swiftly removed rather than being released into the United States to potentially wait years for a hearing.  This will also allow the Departments to focus limited resources on processing of those who are most likely to be persecuted or tortured if removed, and to more quickly provide stability and benefits to noncitizens whose asylum claims are granted.  *See, e.g.*, INA 209, 8 U.S.C. 1159 ("Adjustment of status of refugees").

The Departments made a similar determination in the Circumvention of Lawful Pathways rule in implementing the "reasonable possibility" standard for statutory withholding of removal and CAT protection for noncitizens subject to that rule. *See* 88 FR at 31336 (noting that the heightened standard would help in "reducing the strain on the immigration courts by screening out and removing those with non-meritorious claims more quickly"). That determination has been subsequently validated, as the elevated standard for statutory withholding of removal and CAT protection in credible fear screenings under the Circumvention of Lawful Pathways rule resulted in an approximately 30 percent decrease in positive credible fear findings. *See* 89 FR at 48745–46 (providing Circumvention of Lawful Pathways data).

The Departments recognize that, as identified by commenters, noncitizens may face difficulties in their journeys to the United States and in presenting their claims during credible fear screenings. However, the statutory expedited removal process is predicated on the requirement that noncitizens must explain their fear during a credible fear screening. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B) (implementing credible fear "[a]sylum interviews," to include "material facts as stated by the applicant"). As part of this threshold screening, the "reasonable probability" standard is not intended to be an insurmountable hurdle; rather, it requires noncitizens to provide greater specificity in their testimony related to their claim than that which might be sufficient to meet the "reasonable possibility" or "significant possibility" screening standards. *See* 89 FR at 48746–48 (explaining that "the new standard requires a greater specificity of the claim in the noncitizen's testimony"). This greater specificity is intended to be straightforward for noncitizens to provide, as it entails answering standard credible fear screening questions, such as variations of the following questions: Why do you fear return to the country of removal? Who do you believe would harm you if you were removed from the United States? Have you been previously harmed in the country of removal? If so, why were you harmed? Having the noncitizen answer these types of questions with greater specificity is not intended to require legal expertise and instead seeks to have communicated

relevant personal facts and circumstances within the noncitizen's knowledge. Moreover, such evidence is generally provided through testimony at the credible fear screening stage, and credible testimony alone can satisfy the noncitizen's burden. *See, e.g.*, 89 FR at 48746.

Furthermore, to the extent that commenters expressed concerns about the compounding effects of trauma resulting in difficulty expressing fear, less time for consultation, and the need to meet a "reasonable probability" standard at the screening stage, the Departments note that AOs have significant training and experience in engaging in non-adversarial interview techniques, working with interpreters, cross-cultural communication, and eliciting information from trauma survivors and other vulnerable populations.[327] As discussed at greater length at section III.B.2.a.ii(2) of this preamble, while the length of the consultation period is outside the scope of this rulemaking, this rule ensures that noncitizens are provided with all of the rights due to them under the statutory expedited removal and credible fear processes, including the right to consult with a legal representative or other individual of their choosing prior to the credible fear interview and to have such an individual present during their credible fear interview, provided it will not unreasonably delay the process. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). AOs apply the same training and draw from the same breadth of experience in eliciting testimony and conducting non-adversarial interviews described above regardless of the screening standard that is being applied. Noncitizens are not expected to have legal knowledge or to be familiar with specific standards or elements related to a persecution or torture screening; rather, they are only expected to truthfully testify about their claim and testimony alone can be sufficient to support a positive fear determination.

---

[327] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

The Departments take seriously concerns raised by commenters related specifically to difficulties faced by families in the non-detained FERM process, including children attending credible fear interviews and challenges obtaining Indigenous language interpreters. Where issues arise in non-detained credible fear interviews in the FERM process, just as when issues arise in any interview, AOs and supervisory AOs tap into their extensive training and experience and follow existing procedures to address the issue.[328] USCIS has established procedures in place in order to obtain interpreters of rare languages for credible fear interviews and ensure appropriate steps are taken where an interpreter is not available, including issuing a discretionary NTA where warranted. And while there are inherent challenges in conducting non-detained interviews with families, including attending to children during an interview, these issues are not unique to the FERM process. They are issues dealt with during interviews where children may be present in various situations, including affirmative asylum interviews; and AOs, supervisory AOs, and asylum office staff handle these issues as they arise in various circumstances. Whether the credible fear interview is taking place in a detained setting or is taking place in a non-detained setting as part of the FERM process, AOs apply their extensive training related to non-adversarial interviewing, combined with their substantive legal training, to make a determination as to whether a noncitizen meets the given screening standard. Additionally, all credible fear determinations must be reviewed by a supervisory AO before they become final. 8 CFR 208.30(e)(8).

Moreover, as provided by statute and as the IFR makes clear, noncitizens have a right to request review by an IJ of the AO's credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b)(1); 89 FR at 48748. Where it is requested, the IJ conducts a de novo review of the negative credible fear determination, including the application of the rule's limitation on asylum eligibility and possible

---

[328] *See, e.g.*, USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024).

exceptions to that limitation.  8 CFR 1208.35(b).  Importantly, noncitizens will have additional

time to consult with other persons prior to this review.  8 CFR 235.15(b)(4) (requiring written

disclosure of a noncitizen's right to consult with other persons prior to an interview or any

review thereof).  During such review, noncitizens will have the opportunity to make statements

in support of their claims, and IJs may also consider other such facts as are known to the IJ.  *See*

8 CFR 1003.42(c)-(d); *see also* Immigration Court Practice Manual ch. 7.4(d)(4)(E),

*https://www.justice.gov/eoir/reference-materials/ic/chapter-7/4* (noting that "[e]ither the

noncitizen or DHS may introduce oral or written statements" during a credible fear review).  IJs

have significant training and experience in eliciting testimony from individuals who have

experienced trauma and developing the record accordingly.[329]  As further explained in the IFR,

AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory

withholding of removal, and CAT protection screening standards and in applying and reviewing

decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of

removal and CAT protection (for EOIR) merits standards.  As such, they are well-suited to be

able to identify in a screening whether the information the noncitizen has provided is sufficiently

specific to lead them to believe that the noncitizen may be able to establish eligibility at the

merits stage.  *See* 89 FR at 48747.  In sum, the Departments believe the procedural safeguards in

place that comport with all statutory requirements and the extensive training and experience of

AOs, supervisory AOs, and IJs in conducting screening interviews and making and reviewing

fear determinations will ensure that noncitizens in the credible fear process, including those

---

[329]  *See* 8 CFR 1003.0(b)(1)(vii) (authorizing the provision of comprehensive training and support to IJs); 8 CFR 1003.9(b)(2) (authorizing the Chief IJ to provide "appropriate training … on the conduct of their powers and duties"); *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline*; DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions.  LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

experiencing the effects of trauma and other vulnerable populations, will be screened for potential claims in a sensitive and fair manner at the applicable fear standard.

*Comment:*  Commenters stated that the rule's "reasonable probability" definition—which requires "substantially more than a 'reasonable possibility,' but somewhat less than more likely than not"—is vague and amorphous; overly subjective; and lacks interpretive guidance or similar usage in other comparative contexts.  Commenters stated that the definition would result in inconsistent application due to a lack of meaningful instruction for AOs and IJs, who would instead rely on their own discretion.

*Response:*  The Departments believe that the "reasonable probability" definition set forth in the IFR, which comparatively references the "reasonable possibility" and "more likely than not" legal standards, provides adequate guidance for AOs and IJs and noncitizens to understand the level of evidentiary proof needed to satisfy the threshold credible fear screening process.  Both "reasonable possibility" and "more likely than not" are longstanding legal standards familiar to AOs and IJs and representatives, so implementing a new "reasonable probability" standard that falls between those two existing standards provides a stable benchmark for determining whether the new standard has been satisfied.  *See, e.g.*, 8 CFR 208.13(b)(1)(iii)(B), 1208.13(b)(1)(iii)(B) ("reasonable possibility" standard); 8 CFR 208.16(b)(2), 1208.16(b)(2) ("more likely than not" standard).  AOs and IJs also receive training on the applicable legal screening standards.[330]

Moreover, as explained in the IFR, evaluating evidence under both the "reasonable probability" standard and the "reasonable possibility" standard remains the same, "save for the degree of specificity required."  89 FR at 48747; *see also id.* at 48746 (explaining the difference between the two standards "as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony").  Indeed, USCIS AOs and supervisory AOs have applied

---

[330] *See, e.g.*, USCIS, *RAIO Directorate—Officer Training: Evidence* 20–26 (Apr. 24, 2024); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

this new standard in a manner that is consistent with expectations, resulting in a somewhat, but not drastically, lower screen-in rate for USBP credible fear cases screened by USCIS under the IFR (51 percent for all fear screening cases subject to the rule, including 48 percent of those screened under the "reasonable probability" standard)[331] than USBP credible fear cases screened by USCIS under the Circumvention of Lawful Pathways rule (54 percent overall, including 51 percent of those screened under the :reasonable possibility" standard).[332]  In addition, during credible fear reviews overall, IJs have vacated negative credible fear determinations under the IFR at a much lower rate than under the Circumventing Legal Pathways rule.[333]

*Comment:*  Commenters stated that an additional "reasonable probability" screening standard in the credible fear process will lead to confusion amongst adjudicators.  Commenters explained that there are now three different legal standards in credible fear screenings—significant possibility, reasonable possibility, and reasonable probability—all of which could be applicable in some cases.  Moreover, commenters noted that the governing standards might change depending on whether emergency border circumstances are in effect under this rule.  Commenters were concerned that multiple standards would lead to AOs and IJs applying the wrong standard, or conflating the requirements of each standard, which could result in potential refoulement because there will be few mechanisms for accountability if a mistake occurs.

Commenters also stated that adding another screening standard is inefficient, as AOs and IJs will need to determine which standard applies to each aspect of a case.  Commenters also noted that this will require more resources from legal organizations to gather necessary evidence.

---

[331] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening - STB tab).  Data are limited to SWB encounters between POEs.  The total rate excludes cases referred for fear screening but determined by USCIS not to be subject to the IFR.

[332] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening - CLP tab).  The overall rate includes Mexican nationals (even though they are not technically covered by the rule) and excludes cases referred for fear screening but determined by USCIS not to be subject to the Circumvention of Lawful Pathways rule.  Data are limited to SWB encounters between POEs.

[333] *See* OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (IFR ERCF tab and Imm Post-Pandemic ERCF tab).  During the immediate post-pandemic period, OHSS estimates that IJs vacated 16 percent of negative fear credible fear interviews resulting from USBP ER cases, and 6 percent of all credible fear interviews; under the IFR the corresponding rates for USBP ER cases through July 31, 2024, were 9 percent and 4 percent.

*Response:*  The Departments disagree with commenters' claims that the "reasonable probability" screening standard for statutory withholding of removal and CAT protection will result in confusion or adjudication errors or would otherwise be inefficient.  AOs and IJs regularly work with various standards, and determine which standards apply, in the course of their adjudications, such as the "extraordinary circumstances" standard to determine whether an asylum applicant qualifies for an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), and the discretionary "compelling reasons" standard to determine whether an applicant who has suffered past persecution but lacks a well-founded fear of future persecution should be granted asylum in the exercise of discretion, *see* 8 CFR 208.13(b)(1)(iii)(A), 1208.13(b)(1)(iii)(A).  Indeed, deciding which legal standard applies is a critical aspect of the role of AOs and IJs.  *See* 8 CFR 1003.10(b).

Further, AOs and IJs have significant training and experience in eliciting testimony and applying evidentiary standards in immigration proceedings.  *See, e.g.*, 89 FR at 48747.  The Departments are similarly confident that AOs and IJs will efficiently apply the "reasonable probability" standard, which is similar to the "significant possibility" and "reasonable possibility" standards.  *See id.* at 48748 (explaining that the reasonable probability standard "is not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis" but is rather "a matter of degree").  Further, credible fear determinations are reviewed by a supervisory AO before they become final to ensure consistency and quality and are subject to de novo review by an IJ if a noncitizen requests such review.  *See* 8 CFR 208.30(e)(8), 1208.35(b); 89 FR at 48748.  Additionally, to avoid confusion, any changes regarding the applicability of emergency border circumstances are communicated to AOs, IJs, and the public, and have been made publicly available since the June 3 Proclamation and publication of the IFR.[334]

---

[334] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws*.

For comparison, under the Circumvention of Lawful Pathways rule, AOs and IJs have successfully applied the "significant possibility" screening standard to asylum claims and the "reasonable possibility" screening standard to statutory withholding of removal and CAT protection claims since its implementation. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). And for several months, AOs and IJs have successfully applied the "reasonable probability" standard in screenings under the IFR. Therefore, the Departments believe that AOs and IJs can continue to apply the "reasonable probability" standard implemented in this rule.

With regard to concerns from legal service organizations about gathering additional evidence under the "reasonable probability" standard, the Departments again reiterate that the relevant evidence largely remains the same, and simply requires more specificity. *See* 89 FR at 48746–47. Much of this specificity is likely to come through the noncitizen's testimony, which will require the noncitizen to describe why they, in particular, are likely to be harmed or threatened with harm. This testimony focuses on relevant personal facts and circumstances within the noncitizen's knowledge, which should not significantly increase the burden of production on the noncitizen or legal service providers.

*Comment:* Commenters raised concerns with the IFR's justifications for implementing the "reasonable probability" standard.

Commenters argued that the ultimate asylum grant rate should not be the sole justification for implementing the "reasonable probability" standard. Commenters noted that the disparity between positive credible fear determinations and ultimate asylum grant rates itself was not a reason to raise the credible fear screening standard. Commenters explained that the credible fear screening threshold was intended to be low to avoid refoulement and, therefore, the credible fear screening passage rate should necessarily be higher than the ultimate asylum grant rate.

Commenters also believed the IFR relied on misleading statistics in claiming that the screening standard should be raised because the credible fear screening passage rate was

significantly higher than the ultimate asylum grant rate in removal proceedings. Commenters explained that the ultimate asylum grant rate statistic in removal proceedings includes all disposition types—not just grants and denials—and also includes factors such as a lack of counsel, poor translation, and variable IJ grant rates, which does not necessarily mean that the asylum claim itself was insufficient. Moreover, commenters pointed to additional EOIR statistics, which they stated showed that the ultimate asylum grant rates were higher than portrayed in the IFR.

Commenters also stated that the Departments did not adequately explain why they imposed a higher screening standard in this rule while, in the previous Asylum Processing IFR (87 FR 18078), the Departments argued that the "significant possibility" standard was preferable for screening statutory withholding of removal and CAT protection claims. Separately, commenters argued that the "reasonable probability" standard would not meet the IFR's stated goals of deterring irregular migration, asserting that the Circumvention of Lawful Pathways rule's increased screening standard did not "significantly lower" the credible fear passage rate. Lastly, commenters stated that the Departments did not consider that deterrence-based policies, such as a heightened standard, only result in temporary reductions in border crossings.

*Response:* The Departments disagree with objections to the IFR's justifications supporting the "reasonable probability" standard.

First, the Departments disagree that the disparity between the credible fear screening passage rate and ultimate asylum grant rate is irrelevant or should not be relied upon. This disparity is a clear indication of how many positive credible fear determinations ultimately translate into grants of asylum relief. The Departments understand that the credible fear screening process is only a threshold determination and will, by design, result in asylum claims that meet the initial screening standard but fail during the ultimate merits adjudication. However, for purposes of the IFR, the Departments cited to this disparity to explain that such a wide disparity ultimately indicates a screening process that is excessively overinclusive, resulting

in a large number of non-meritorious asylum claims increasing adjudicatory backlogs. *See* 89

FR at 48746 (explaining that, under the Circumvention of Lawful Pathways rule, the "screen-in

rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB

expedited removal cases that existed prior to the rule" and that, under the IFR, the existence of

emergency border circumstances necessitates focusing limited resources on "processing those

who are most likely to be persecuted or tortured if removed").

   The Departments also disagree that any cited statistics in the IFR regarding asylum grant

rates in section 240 removal proceedings are misleading.  While commenters are correct that

section 240 removal proceedings may be completed without an ultimate adjudication on an

asylum application (such as through dismissal or termination of proceedings), EOIR data are

consistent that, for completed cases, only a small percentage of asylum claims referred from the

credible fear process are ultimately granted in section 240 removal proceedings, which was a

relevant concern underlying the IFR's justification for the heightened "reasonable probability"

standard.[335]  For example, in 2023, only 18 percent of referred asylum claims ultimately resulted

in an asylum grant at the completion of section 240 removal proceedings, even when excluding

cases that were administratively closed or did not have the asylum claim adjudicated.[336]

Moreover, the Departments note that the data also demonstrate that a large percentage of

completed cases without an ultimate asylum adjudication of grant or denial involve noncitizens

who never filed an asylum application once placed in section 240 removal proceedings.[337]

Additionally, to the extent that section 240 removal proceedings are terminated before an asylum

application is adjudicated, the termination does not necessarily have any bearing on the ultimate

strength or weakness of the asylum claim.

---

[335] *See, e.g.*, EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline*.

[336] *See id.*

[337] *See id.*

In response to commenters' concerns regarding the Departments' decision in the 2022 Asylum Processing IFR to maintain the "significant possibility" screening standard for statutory withholding of removal and CAT protection, the Departments note that they addressed these concerns in the Circumvention of Lawful Pathways rule.  *See* 88 FR at 31336.  In response to similar comments on that rule, the Departments explained that "the current and impending situation on the ground along the SWB warrants departing in some respects from the approach generally applied in credible fear screenings" and that the "Asylum Processing IFR was designed for non-exigent circumstances."  *Id.*  Similarly, as explained in the IFR and this rule, prior to implementation of the IFR, migration patterns and other factors resulting in emergency border circumstances had only intensified, thereby necessitating a further change to the relevant credible fear screening standard for statutory withholding of removal and CAT protection.  *See* 89 FR at 48724 ("While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration."); *see also supra* Section II.A.1 ("Basis for the IFR").

Lastly, the Departments disagree with commenters regarding the overall efficacy of this rule and of the "reasonable probability" standard in particular.  Contrary to commenters' claims, the Departments have seen a significant decrease in the credible fear screen-in rate since the Circumvention of Lawful Pathways rule's implementation of the "reasonable possibility" standard, and a further decrease since the IFR's implementation of the "reasonable probability" standard.  *See* 89 FR at 48745–46 (showing a 31 percent decrease in the screen-in rate under the Circumvention of Lawful Pathways rule); *see also* Section II.A.2 of this preamble (providing statistics on the IFR's efficacy to date).  The Departments also disagree that deterrence-based policies have only temporary or limited effects, but they do note that deterrence is only one part of an overall border and migration strategy that can help to better manage migratory flows.  *See* 89 FR at 48729–30 (explaining that DHS's migration strategy focuses on "enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy").

Overall, the Departments believe that the screening standard changes made in this rule will help better manage an overwhelmed immigration system, while also noting that, as explained in IFR, this rule is only a piece of broader efforts that will likely require further congressional action. *See* 89 FR at 48715 ("Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.").

*Comment:* Commenters noted that the "reasonable probability" standard could also apply in the context of the consideration of mandatory asylum bars as proposed in a separate DHS rulemaking, Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024) ("Mandatory Bars NPRM"). Commenters stated that the Departments should not apply the "reasonable probability" standard to noncitizens found to be barred from asylum due to a mandatory bar, noting the Mandatory Bars NPRM.

*Response:* The Departments agree with commenters that the "reasonable probability" standard may apply in the context of consideration of mandatory bars if DHS finalizes the DHS Mandatory Bars NPRM as proposed, as the Departments noted in the IFR. *See* 89 FR at 48739 n.186 (explaining that, if the DHS Mandatory Bars NPRM is finalized, the "reasonable probability" standard would still apply when a noncitizen is subject to this rule's limitation on asylum eligibility).

The Departments decline to amend the "reasonable probability" standard so that it would not apply to considerations of mandatory bars. First, as stated above in this section, the Departments have determined that a higher "reasonable probability" standard is needed in light of the emergency border circumstances. Accordingly, the Departments decline to make edits to reduce the standard's applicability. If DHS ultimately decides to consider the mandatory bars as part of fear screenings under the steady-state regulations and the Circumvention of Lawful Pathways rule, it would be appropriate for DHS to consider those bars under this rule as well,

also under a "reasonable probability" standard. *See* 8 CFR 208.35(b)(2)(i). This would be consistent with the overall purpose of the DHS Mandatory Bars NPRM. *See* 89 FR at 41351 (explaining that the proposed rule "is consistent with the Administration's demonstrated record of providing operators maximum flexibility and tools to apply consequences, including by more expeditiously removing those without a lawful basis to remain in the United States, while providing immigration relief or protection to those who merit it at the earliest point possible" and that the proposed rule would "allow DHS to quickly screen out certain non-meritorious protection claims and to swiftly remove those noncitizens who present a national security or public safety concern").

4. Other Comments on the Regulatory Provisions

*a. Application to Mexican Nationals*

     *Comment:* Commenters raised several concerns regarding the applicability of the IFR's limitation on asylum eligibility to Mexican nationals. Generally, commenters argued that Mexican asylum seekers should be exempt from the rule's limitation on asylum eligibility and should not be forced to wait in Mexico, the country where they fear persecution or torture, during emergency border circumstances. Commenters stated that requiring Mexican asylum seekers to wait in the country where they claim to face persecution is tantamount to refoulement in violation of international law and would further expose them to the threat of future harm. Similarly, commenters stated that Mexican nationals cannot be expected to apply for asylum in Mexico—the country where they are claiming harm—which commenters explained was a "common-sense principle" that the Departments abandoned in the IFR.

     Relatedly, commenters stated that the Departments' available pathways to pursue asylum, including the CBP One app, are too limited for Mexican nationals, who would be exposed to an increased risk of persecution if forced to wait in Mexico for the ability to pursue asylum. Commenters expressed further concerns about the rule's lack of exceptions, including that, if the IFR's exceptions are intended to "mirror" the Circumvention of Lawful Pathways rule, it is

"unfair and dangerous" for the IFR to apply to Mexican nationals, and that the IFR's

requirements would "trap" Mexican nationals in the country of alleged persecution in violation

of international law and non-refoulement obligations.

*Response:*  The Departments decline to change the rule's applicability to Mexican

nationals, as excepting Mexican nationals from the rule would undermine the rule's foundational

purpose to alleviate strain on border security and immigration systems while entry is suspended

and limited under the Proclamation.  *See* 89 FR at 48738–39.  The strains that resulted in

emergency border circumstances and necessitated implementation of the IFR were driven in part

by a recent sharp increase in Mexican nationals processed for expedited removal and referred for

credible fear interviews.  *Id.*  The Departments believe that these emergency border

circumstances weigh heavily in favor of applying the rule to Mexican nationals in order to better

process increased inflows of Mexican nationals and return border processing to more

manageable levels.

Moreover, the rule's applicability to Mexican nationals does not violate non-refoulement

obligations because the United States implements its non-refoulement obligations under Article

33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of

removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3).  All noncitizens,

including Mexican nationals, maintain the opportunity to make a threshold showing for statutory

withholding of removal and CAT protections during the credible fear screening process, as the

rule's limitation on asylum eligibility does not extend to those forms of protection.  *See* 8 CFR

208.35(b)(2), 1208.35(b)(2).

The Departments also disagree that Mexican nationals do not have sufficient paths for

seeking relief or protection in the United States.  First, Mexican nationals may avail themselves

of lawful, safe, and orderly pathways to the United States, such as making an appointment

through the CBP One app.  *See, e.g.*, 8 CFR 208.33(a)(2)(ii)(B); *see also* 89 FR at 48754

(explaining that CBP One appointments create an efficient and orderly process at POEs).  To the

extent a Mexican national cannot wait in Mexico for a CBP One appointment due to urgent safety concerns, the rule contains an exception for exceptionally compelling circumstances, including for imminent and extreme threats to life or safety. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). This exception maintains the rule's efficacy by ensuring that Mexican nationals with specific, urgent safety needs to enter the United States can do so, while otherwise allowing the rule to apply to those Mexican nationals who, for example, are able to safely wait in another part of Mexico for their appointment. Furthermore, as of August 23, 2024, the Departments note that Mexican nationals are able to request and schedule a CBP One appointment from anywhere within Mexico.[338] This new adjustment to the CBP One app will enable Mexican nationals facing imminent danger in a specific area of Mexico to internally relocate while waiting for their CBP One appointment.[339]

Second, this rule ensures that noncitizens are able to avoid refoulement through the availability of statutory withholding of removal, in addition to CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2). Third, the rule contains a number of provisions that may apply to Mexican nationals. For example, the limitation on asylum eligibility does not apply to groups that are excepted from the suspension and limitation on entry under section 3(b) of the Proclamation, including UCs. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). The rule also provides an exception for noncitizens who can establish the aforementioned exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Additionally, the rule includes a provision to ensure family unity and avoid potential family separation for certain noncitizens who can establish eligibility for statutory withholding of removal or CAT protection. *See* 8 CFR 208.35(c), 1208.35(c). Taken together, these provisions help ensure that, while some Mexican nationals may not be granted asylum after entering the United States during emergency border

---

[338] *See* CBP, *CBP One™ Mobile Application: Recent Updates* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone*.

[339] *See id.*

circumstances, sufficient options exist for Mexican nationals to pursue available protection and avoid immediate harm.

*Comment:*  Commenters stated that the rule's exceptions are inadequate for Mexican nationals.  Commenters stated that, for Mexican nationals, the facts underlying their asylum claim would be conflated with the rule's exception for an "imminent and extreme threat to life or safety."  According to commenters, in practice, this would result in Mexican nationals having to essentially present their full asylum claim to establish the exception.

*Response:*  If a Mexican national is unable to remain in Mexico while awaiting a CBP One appointment due to an imminent and extreme threat of harm, the rule provides an exception for exceptionally compelling circumstances, in order to provide a potential avenue for the Mexican national to avoid application of the rule's limitation on asylum eligibility.  *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).  The Departments disagree that this exception for noncitizens who demonstrate exceptionally compelling circumstances is inadequate for Mexican nationals.

The Departments clarify that the analysis to determine whether any noncitizen— including a Mexican national—has demonstrated exceptionally compelling circumstances based on an "imminent and extreme threat to life or safety" at the time of entry is separate from the ultimate determination regarding the merits of a noncitizen's asylum claim, even if, in certain circumstances, some of the same facts underlying a Mexican national's asylum claim may also be relevant to a determination on the rule's exception.  For purposes of the "imminent and extreme threat to life or safety" exception, noncitizens need only provide evidence focused on threats that the noncitizen faced at the time they crossed the SWB, such that the noncitizen could not wait for an opportunity to present at a POE.  *See, e.g.*, 88 FR at 11723 (explaining operation of similar ground for rebutting presumption of ineligibility for asylum under the Circumvention of Lawful Pathways rule).  In contrast, for the asylum claim itself, the noncitizen must demonstrate that they otherwise have a credible fear of persecution or torture during credible fear proceedings and, during a full merits adjudication, that they satisfy the eligibility requirements

for asylum. *See* 8 CFR 208.35(b)(1)(iii), 1208.35(b)(2)(ii) (directing AOs and IJs to proceed under 8 CFR 208.30 and 1208.30, respectively, in credible fear proceedings where a noncitizen has established the exception to the limitation on asylum eligibility based on exceptionally compelling circumstances); *see generally* 8 CFR 208.13, 1208.13 (describing asylum eligibility requirements).

Relatedly, the Departments also clarify that the "exceptionally compelling circumstances" exception is applied during the credible fear process, and not during any initial border encounter with CBP. *See* 8 CFR 208.35(b) ("Application in credible fear determinations.").

*Comment:* Commenters stated that the rule discriminates against Mexican nationals, both in intent and effect. Commenters stated that, by comparison, the rule is more restrictive than prior Departmental policies, including the Circumvention of Lawful Pathways rule and the now-defunct MPP, which specifically exempted Mexican nationals. Thus, commenters stated, this rule was issued to limit the entry of Mexican nationals and would result in more drastic consequences for Mexican nationals than those other rules and policies. Furthermore, commenters argued that, because the Circumvention of Lawful Pathways rule does not apply to Mexican nationals, there will be significant confusion in applying these rules together during the credible fear process.

*Response:* The Departments disagree with commenters' assertions that this rule discriminates against Mexican nationals. Commenters stated that the discriminatory intent and purpose is evidenced by the Circumvention of Lawful Pathways rule's comparative inapplicability to Mexican nationals. However, the Departments emphasize that this rule and the Circumvention of Lawful Pathways rule serve different objectives. For example, unlike with respect to this rule, traveling through a third country is a key requirement of the Circumvention of Lawful Pathways rule because requiring that noncitizens apply for protection in a third country is one means for providing protection in the United States where necessary while also

sharing the responsibility of providing necessary protections with the United States' regional partners.  *See* 8 CFR 208.33(a)(1)(iii); 1208.33(a)(1)(iii); 88 FR at 31316.  Thus, the Circumvention of Lawful Pathways rule generally does not apply to Mexican nationals residing in Mexico, who would not need to travel through another country to reach the United States.  To the contrary, this rule applies uniformly to all noncitizens who enter the United States at the southern border during emergency border circumstances and are not excepted under the June 3 Proclamation or able to establish exceptionally compelling circumstances, without consideration of the path of transit to the southern border.  *See* 8 CFR 208.13(g), 1208.13(g).

Additionally, since the implementation of the Circumvention of Lawful Pathways rule, emergency border circumstances dictate applying the rule broadly in order to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross the southern border irregularly and lack a legal basis to remain.  *See* 89 FR at 48731. As relevant here, the United States saw a sharp increase in the number of encounters of Mexican nationals at the SWB during the COVID-19 pandemic prior to implementation of the Circumvention of Lawful Pathways rule, which continued into the immediate post-pandemic period.[340]  During the same period, the United States saw a corresponding increase in credible fear referrals, which necessitates applying the rule to Mexican nationals.  *See id.* at 48738.

Moreover, the Departments do not believe that the rule's broad applicability will cause confusion, as the rule maintains a straightforward application to noncitizens who enter the United States at the southern border during periods of emergency border circumstances and are not excepted under the Proclamation or able to establish exceptionally compelling circumstances.

*Comment:*  Commenters stated that the rule's expediency justification for subjecting Mexican nationals to the limitation on asylum eligibility is insufficient.  Commenters argued that the statistics provided in the IFR cannot justify extending the limitation on asylum eligibility to

---

[340] *See* OHSS analysis of July 2024 Persist Dataset (USPB Encounters by Citizenship tab).

Mexican nationals, noting that statistics evincing recent increases in Mexican nationals making fear claims indicate increasingly dangerous conditions in Mexico and an increased need for protection. Another commenter claimed that applying the rule to Mexican nationals is contrary to the record before the agency because, according to the commenter's characterization of that record, encounters of Mexican nationals have actually declined significantly. Similarly, a commenter objected that the IFR subjects Mexican nationals fleeing persecution to extensive stays in Mexico if they wish to seek asylum in the United States, but fails to consider the impact on Mexican nationals or provide any rationale for that result.

*Response:* The Departments have considered the commenters' concerns and reaffirm the justifications for applying the IFR's limitation on asylum eligibility to Mexican nationals. The foundational basis of the June 3 Proclamation and the IFR is to address substantial migration levels at the southern border, including a "sharp increase" in SWB encounters of Mexican nationals. *See, e.g.*, 89 FR at 48726–27; *id.* at 48738. Addressing these migration levels, and their significant impact on border processing and the United States' immigration system more broadly, thereby necessitates applying the rule's limitation on asylum eligibility to all noncitizens, with limited exception, who enter the United States across the southern border during emergency border circumstances, including Mexican nationals.

The Departments believe the cited data fully support the rule's application to Mexican nationals. Departmental data show that excluding Mexican nationals would undermine the rule's deterrent effect, as Mexican nationals comprise the largest portion of recent (post-IFR) SWB encounters between POEs, at approximately 41 percent.[341] And, contrary to one commenter's claim, the data in the IFR did not show a decline in encounters of Mexican nationals. Rather, the Departments explained that, since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from northern

---

[341] *See id.*

Central American countries, and then to single adults and families from throughout the hemisphere (and beyond), many of whom are more likely to seek asylum and other forms of protection. *See* 89 FR at 48721. The Departments further explained that, as the demographics of border encounters have shifted in recent years to include a higher rate of Mexican nationals claiming fear, in addition to larger encounter numbers of other nationalities with high historical rates of asserting fear claims, the deterrent effect of apprehending noncitizens at the SWB has become more limited. *See id*. at 48731 n.167 (explaining that for noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for a determination, whereas from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024). Given this demonstrated increase in encounters of, and fear claims made by, Mexican nationals, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems during emergency border circumstances. Without broad application, the practical result would be that those with meritorious claims would wait years for their claims to be granted, while noncitizens who are ultimately denied protection potentially would spend years in the United States before being issued a final order of removal.

*Comment:* Commenters stated that not creating an exception for Mexican nationals is especially concerning for vulnerable Mexican nationals, including people fleeing gang and cartel violence or other severe forms of violence, women, members of the LGBTQI+ community, those escaping sexual and gender-based violence, children, families, Indigenous people, journalists, and activists, among others. Commenters explained that violence against these vulnerable populations is endemic in Mexico and has been recognized by the Departments, including through individual asylum adjudications. Therefore, the commenters stated that it is concerning

that the IFR does not except these vulnerable populations despite the clear need to prevent further harm and mitigate past harms suffered.

*Response:*  Regarding concerns about specific vulnerable populations of Mexican nationals, the Departments emphasize that agents and officers frequently encounter noncitizens who may be vulnerable and are trained on appropriate action.  *See* 89 FR at 48744–45.  Moreover, the rule contains an explicit exception for exceptionally compelling circumstances that is intended to limit potential adverse effects of the rule's limitation on asylum eligibility, including on uniquely vulnerable populations.  *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).  For example, a noncitizen may qualify for the exception if the noncitizen faces an imminent and extreme threat to the noncitizen's life or safety immediately prior to entry into the United States.  *See id.*

### b.  Adequacy of Statutory Withholding of Removal and CAT Protection

*Comment:*  Commenters stated that statutory withholding of removal and CAT protection are insufficient alternative forms of protection for noncitizens who would be ineligible for asylum under the rule, asserting that these forms of protection are more difficult to obtain and provide fewer benefits than asylum.

First, commenters explained that statutory withholding of removal and CAT protection require noncitizens to meet a higher burden of proof than asylum and that, ultimately, these higher burdens will result in more noncitizens being denied protection under the rule.

Second, commenters stated that, even if noncitizens were able to meet the higher burden of proof for statutory withholding of removal or CAT protection, the noncitizen would not be accorded the same benefits as asylees.  For example, commenters stated that recipients of statutory withholding of removal and CAT protection are subject to the continued risk of removal; cannot petition for derivative beneficiaries; are unable to apply for permanent residency or citizenship; are unable to travel abroad; and must apply annually for work authorization, which commenters claimed is subject to frequent adjudicatory delays.  As a result, commenters

argued that recipients of statutory withholding of removal and CAT protection are left in an uncertain status incongruent with the United States' obligations to protect refugees; that such status would lead to community instability in the United States, as it prevents noncitizens from investing in their communities and fully recovering from harm; and that such status would fail to ensure family unity—and even promote family separation—due to an inability to petition for derivative beneficiaries.

Further, commenters argued that the Departments cannot meet their non-refoulement obligations with statutory withholding of removal or CAT protections alone, stating that neither statutory withholding of removal nor CAT protections are equivalent to asylum because those protections do not convey rights guaranteed by the Refugee Protocol or meet the goals of the Refugee Convention. Those commenters said that the United States must comply with the Refugee Convention in its entirety, not only with Article 33. For example, commenters said that the United States is obligated to comply with Article 34 of the Refugee Convention and facilitate the integration and naturalization of refugees.

Lastly, commenters claimed that noncitizens who attempt to pursue statutory withholding of removal or CAT protection under the rule would increase confusion in their interactions with DHS, particularly due to the rule's interactions with other rulemakings.

*Response:* As an initial matter, the Departments reiterate that this rule fully complies with the United States' non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol), which the United States implements through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* Section III.A.1.d of this preamble. This rule's limitation on asylum eligibility does not affect a noncitizen's ultimate eligibility for statutory withholding of removal. *See* 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(i) (requiring an AO to assess a noncitizen's eligibility for statutory withholding of removal and CAT protection when applicable). Similarly, this rule's implementation of the "reasonable probability" screening standard is well within the Departments' broad discretion to

determine which screening standard should apply in implementing the United States' non-refoulement obligations. *See* 89 FR at 48740–41.

The rule is similarly compliant with Article 34 of the Refugee Convention, which is precatory and encourages the assimilation and naturalization of refugees. Importantly, although the rule limits asylum eligibility for noncitizens who enter the United States during emergency border circumstances, Article 34 "does not require the implementing authority actually to grant asylum to all those who are eligible." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987). Indeed, under U.S. law, asylum is a discretionary form of relief. *Id.*; *see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); 8 CFR 1208.14(a)–(b). Consistent with that authority, the Departments have determined that this rule's limitation on asylum eligibility is necessary to address the emergency border circumstances described in the IFR. *See* 89 FR at 48726–31. Further, the rule does not preclude the availability of asylum for those to whom the rule does not apply or who demonstrate that exceptionally compelling circumstances exist. For example, noncitizens may utilize the CBP One app to schedule an appointment to present themselves at a POE. *See* June 3 Proclamation Sec. 3(b)(v)(D) (excepting "noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States"); 89 FR at 48737 ("One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum."). Additionally, noncitizens may overcome the limitation on asylum eligibility if they, or a family member as described in 8 CFR 208.30(c) with whom they are traveling, are able to demonstrate exceptionally compelling circumstances by a preponderance of the evidence, such as if they face an acute medical emergency or an imminent and extreme threat to life or safety, among other circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Next, the Departments recognize that the burdens of proof for statutory withholding of removal and CAT protection are higher than that for asylum, as they require a demonstration that it is more likely than not that noncitizens will be persecuted or tortured in another country, while asylum requires that noncitizens demonstrate a lesser burden of proof: a well-founded fear of persecution. *See Cardoza-Fonseca*, 480 U.S. at 423. These higher burdens of proof for those to whom the limitation applies align with the overall purpose of the rule: to disincentivize irregular migration during periods of emergency border circumstances, so as to mitigate the risk that border enforcement operations and the larger immigration system become overwhelmed and unable to issue timely decisions or consequences. *See* 89 FR at 48718 (explaining that the rule is intended to "address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances"). These differences in burdens of proof also correspond with the distinct, but related, objectives of the Circumvention of Lawful Pathways rule: to encourage noncitizens to avail themselves of lawful, safe, and orderly pathways, where possible, as well as to discourage irregular migration, promote orderly processing at POEs, and ensure that protection is still available for those who satisfy the applicable standards for statutory withholding of removal or CAT protection. *See* 88 FR at 31428. Therefore, if a noncitizen is subject to the rule's limitation on asylum eligibility, being required to meet comparatively higher existing standards for statutory withholding of removal or CAT protection is intended to further disincentivize irregular migration when encounters are above a certain benchmark and to "substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain." 89 FR at 48715; *see also id*. at 48754.

Separately, and as explained in response to similar comments on the Circumvention of Lawful Pathways rule, the Departments also recognize the comparatively fewer benefits of statutory withholding of removal and CAT protection as compared to asylum, including: (1) no permanent right to remain in the United States; (2) the inability to adjust status to become a

lawful permanent resident and, relatedly, later naturalize as a U.S. citizen; (3) the inability to travel abroad; and (4) the need to affirmatively apply for, and annually renew, employment authorization documents. *See* 88 FR at 31428. However, the Departments again emphasize that the rule's limitation on asylum eligibility, along with the comparatively fewer benefits of statutory withholding of removal and CAT protection, align with the overall purposes of the June 3 Proclamation and this rule: to address historic levels of migration at the southern border and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718; *id.* at 48726–31.

Moreover, with regard to concerns about the inability of statutory withholding of removal or CAT protection recipients to petition for beneficiary derivatives,[342] this rule contains a family unity provision to help prevent family separation for noncitizens who can establish eligibility for statutory withholding of removal or CAT withholding. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, the family unity provision treats the following noncitizens as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those (1) who are found eligible for statutory withholding of removal or CAT withholding; (2) who would be eligible for asylum, but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) who have a qualifying spouse or child. *See id.*

Lastly, the Departments do not believe that the ability of a noncitizen to apply for statutory withholding of removal or CAT protection when subject to the rule's limitation on asylum eligibility will cause confusion. Noncitizens have long maintained the ability to pursue such protection, and DHS and EOIR personnel are well-trained in screening for, and

---

[342] The Departments note that, although there is no derivative protection under statutory withholding of removal or CAT protection, certain U.S.-based qualifying parents or legal guardians, including those granted withholding of removal, may petition for qualifying children and eligible family members to be considered for refugee status and possible resettlement in the United States. *See* USCIS, *Central American Minors (CAM) Program*, *https://www.uscis.gov/CAM* (last updated Mar. 7, 2024).

adjudicating, such forms of protection. *See* 89 FR at 48748 (explaining that "AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards").

### c. Requests for Reconsideration

*Comment:* Several commenters opposed eliminating noncitizens' ability to request reconsideration of a negative credible fear determination by USCIS. Commenters stated that the opportunity to request reconsideration of a negative credible fear determination after IJ concurrence is an important safeguard against non-refoulement. One commenter noted that in the Asylum Processing IFR, the Departments counted at least 569 negative credible fear determinations that were changed to positive credible fear determinations after a request for reconsideration between FY 2019 and 2021. Commenters stated that USCIS should continue the practice of allowing requests for reconsideration, as it may be the only opportunity for noncitizens to present additional evidence that was not presented during the credible fear interview or to correct procedural defects in the credible fear interview, alleging that the IJ review process generally does not provide meaningful review and routinely affirms erroneous negative credible fear determinations. A commenter also claimed that even with the regulatory language acknowledging that USCIS maintains the discretion to reconsider its own negative credible fear determinations following IJ concurrence, it is unclear under the rule when or how USCIS would exercise its *sua sponte* authority to reconsider a negative credible fear finding.

*Response:* The Departments disagree with comments urging USCIS to allow noncitizens to request reconsideration of negative credible fear determinations under the present rule. This rule does not eliminate the discretionary authority of USCIS to reconsider negative credible fear determinations concurred upon by an IJ, but instead only prohibits noncitizens from submitting a request to reconsider a negative credible fear determination in cases subject to the rule. 8 CFR

208.35(b)(2)(v)(B).  The Departments deem it appropriate to include this prohibition against requests for reconsideration in the rule to further its purpose of effectuating efficient yet fair credible fear case processing where emergency border circumstances are present.  As noted in prior rulemakings, allowing requests for reconsideration of negative credible fear determinations diverts limited USCIS resources away from initial screenings, and relatively few such requests ultimately result in a reversal of the determination.[343]

The Departments acknowledge that they previously provided information in the Asylum Processing IFR that USCIS counted at least 569 negative credible fear determinations that were reversed after a request for reconsideration was submitted between FY 2019 through FY 2021.  The Departments note, however, that that number was out of a total of at least 5,408 requests for reconsideration that were submitted during those years.  *See* 87 FR at 18132.  Under the present rule, where emergency border circumstances are present and a credible fear determination is made pursuant to the rule's limitation on asylum eligibility, the Departments assess that, in light of the safeguards in place, efficiency interests outweigh the interest in providing an opportunity to request reconsideration.

To the extent commenters argue that this provision of the rule implicates statutory or due process rights of noncitizens, the Departments note that noncitizens have no statutory right to request reconsideration of a negative credible fear determination.  The Supreme Court has held that the due process rights of noncitizens applying for admission at the border are limited to "only those rights regarding admission that Congress has provided by statute."  *Thuraissigiam*, 591 U.S. at 140.  In establishing the streamlined procedures governing credible fear screening, Congress explicitly mandated that review of any negative credible fear determination made by an AO be conducted by an IJ and provided no mechanism for noncitizens to request reconsideration of the IJ's determination.  INA 235(b)(1)(B)(iii)(III), 8 U.S.C.1225(b)(1)(B)(iii)(III).

---

[343] *See* Asylum Processing IFR, 87 FR at 18132; *see also* 88 FR at 31419.

With respect to commenters' concerns about fairness, the Departments note that all credible fear determinations, including determinations made under the processes set forth in this rule, will continue to be reviewed by a supervisory AO.  *See* 8 CFR 208.30(e)(8); *see also* 89 FR at 48748.  And the rule does not impact a noncitizen's right to request IJ review of a negative credible fear determination.  Where requested, the IJ will evaluate the case de novo, including making a de novo determination as to whether there is a significant possibility the noncitizen could demonstrate they are not subject to the rule's limitation on asylum eligibility or are eligible for the exception.  8 CFR 208.35(b)(2)(iii)– (v), 1208.35(b).  Accordingly, this rule ensures IJ review of the entirety of the negative credible fear determination, including application of the rule's limitation on asylum eligibility.  To the extent commenters raise general concerns about IJ review of negative credible fear determinations, those concerns are outside the scope of this rulemaking.

In response to the comment noting that it is unclear when USCIS would exercise its discretion to reconsider a negative credible fear determination *sua sponte*, the Departments note that the regulatory framework makes clear that USCIS possesses the inherent discretion to reconsider its own negative credible fear determination that has been concurred upon by an IJ, and that such discretion may be exercised on a case-by-case basis dependent on the facts and circumstances in an individual case.  *See, e.g.*, 8 CFR 1208.30(g)(2)(iv)(A) (2018) (noting that "[t]he Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge"); 208.35(b)(2)(v)(B).  As noted above, the Departments contend that the existing safeguards under the present rule comport with all statutory requirements and believe that these safeguards sufficiently address any concerns related to adequate review of negative credible fear determinations under the present rule.

*D.  Other Issues Relating to the Rule*

1.  Scope of the Rule and Implementation

*a.  Concerns That the Encounter Thresholds Are Too Low or Arbitrary*

*Comment:*  Some commenters expressed concern with the 2,500-encounter threshold that would trigger the limitation on asylum eligibility for certain individuals who enter during emergency border circumstances.  Some commenters characterized the threshold as "arbitrary." Another commenter claimed that encounter rates have historically never fallen below the 2,500-encounter threshold due to the urgent humanitarian need and expressed concern that, contrary to the realities of forced displacement, the IFR limiting entries to 2,500 encounters effectively serves as a policy to close the border and end access to asylum.

Several commenters remarked that the low threshold required for the limitation on asylum eligibility to be discontinued is unrealistic and would virtually guarantee the limitation would always be in place.  One commenter expressed concern that 1,500 daily encounters is well below historical averages.  Another commenter stated that in the past 6 FYs, monthly average border apprehensions consistently surpassed 1,500 individuals.  Similarly, another commenter stated that the "emergency border circumstances" would apply during 58 percent of all months this century.  Another commenter stated that the 1,500-encounter threshold is unreasonable given the number of encounters at the SWB in 2024, which, according to the commenter, has lately hovered between 170,000 to 190,000 per month, or around 6,000 people per day on average.

While referencing the thresholds, a commenter remarked that the preamble acknowledges that the Departments cannot swiftly change from one means of processing to another.  Citing high levels of border crossings since May 2023 (after the implementation of the Circumvention of Lawful Pathways rule), the commenter stated that the Departments' intent is to keep this rule in place indefinitely, punishing migrants in an attempt to deter them from seeking protection in the United States.  A commenter warned that "the mechanism for lifting the restrictions in the IFR is insufficient to meet the humanitarian needs at the U.S. border, jeopardizing the asylum system for many years to come."

*Response:*  The Departments disagree that the numerical thresholds are arbitrary or too low.  As explained in the IFR, the emergency border circumstances described in the June 3

Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48726–31. This is because, in such circumstances, DHS lacks the capacity to deliver timely consequences and must resort to large-scale releases of noncitizens pending section 240 removal proceedings. *Id.* at 48749. Such large-scale releases in the absence of this rule would lead to significant harms and incentivize human smuggling organizations to recruit more potential migrants based on the limitations on the Departments' ability to deliver timely decisions and consequences. *Id.* at 48749–50. The 1,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when the border security and immigration systems, as currently resourced, are no longer over capacity and the measures adopted in this rule are not necessary. *Id.* at 48750. And the 2,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when there has been a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States. *Id.* at 48752. Were the resourcing of border security and immigration systems to change, this change (if sufficiently substantial) could trigger reassessment of these thresholds, in order to ensure that they reflect the Departments' ability to deliver timely decisions and consequences.

In the IFR, the Departments demonstrated the reasonableness of the thresholds in two ways. First, the Departments explained that during the FY 2013 to FY 2019 pre-pandemic period, USBP total encounters (including all UCs) only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 noncitizens released each day,[344] while months in which daily encounters exceeded 2,500 resulted in

---

[344] Although the demographic composition of current encounters (e.g., a higher percentage of noncitizens encountered who assert fear claims) means that such a low release rate is likely unachievable in the near term, releases remain much lower when daily encounters are below the 2,500-encounter threshold. *See* 89 FR at 48731; *see also* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab, see cells L27 and M27).

approximately 1,300 noncitizens released each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.*

Second, the Departments demonstrated that at the 1,500-encounter level and assuming a similar level of voluntary returns and reinstatements to those seen during implementation of the Circumvention of Lawful Pathways rule, DHS would be able to refer for expedited removal more than 70 percent of the single adults and family unit individuals who are not quickly repatriated (through voluntary return or reinstatement), and would be able to repatriate a total of about 830 noncitizens (i.e., 56 percent of the 1,500 encounters counted towards the threshold). *Id.* at 48752 & nn.274, 276. By contrast, at above 2,500 encounters—the level at which the June 3 Proclamation and the IFR would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level; for instance, at that level DHS would be able to refer for expedited removal 43 percent of the single adults and family unit individuals who are not quickly repatriated, and would be able to repatriate a total of about 1,010 noncitizens (i.e., 40 percent of the 2,500 encounters counted towards the threshold). *Id.* at 48752 nn.277–278.

In this second analysis as presented in the IFR, consistent with the June 3 Proclamation, DHS excluded encounters of UCs from non-contiguous countries from the threshold counts. But as noted in the IFR, "the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals." *Id*. at 48753. Consistent with this reality, the September 27 Proclamation and this rule include, in both thresholds, consideration of encounters of all UCs, including those from non-contiguous countries. As discussed in Section II.C.1 of this preamble and later in this Section III.D.1, most UCs are from non-contiguous countries, and the processing of all UCs requires the use of significant CBP resources.

Including non-contiguous UCs in the 7-consecutive-calendar-day average calculation recognizes this impact. Depending on the levels of such UCs encountered at any given time, failing to include such UCs in the 1,500 and 2,500 encounter limits may result in an overestimate of resources available to the Departments to efficiently process noncitizens encountered at the SWB while delivering timely decisions and consequences to noncitizens who enter without a lawful basis to remain. This is because the number of UCs from non-contiguous countries encountered by USBP can fluctuate—something that models that assume stable demographics cannot fully account for. And if encounters of such UCs rise but are not included in the rule's thresholds, then those thresholds become much less useful predictors of overall capacity. Although encounters of UCs from non-contiguous countries have generally declined since the IFR took effect,[345] their proportion of USBP encounters has increased,[346] and the population of UCs from non-contiguous countries at the border has surged on several occasions in the past.[347]

As part of this final rule, DHS updated the second analysis discussed above to reflect more recent data and to demonstrate the impact on that analysis of counting all UCs—at current encounter levels—towards the encounter thresholds. The Office of Homeland Security Statistics ("OHSS") updated the IFR's methodology by (1) applying fear claim rates for the entirety of the immediate post-pandemic period (i.e., not ending in April 2024, as the prior analysis did), (2) assuming a demographic makeup (including with respect to UCs) similar to that observed between June 5, 2024, and July 30, 2024 for that entire period, and (3) including all UCs in the 1,500 and 2,500 encounter figures.[348]

---

[345] *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[346] *See id.*

[347] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[348] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). The figures presented in the IFR were based on fear claim rates, demographics, and average expedited removal capacity under the Circumvention of Lawful Pathways rule; these rates were pulled in early April 2024. *See* 89 FR at 48752 nn.274, 276. For instance, based on data pulled in early April 2024, the

Under these parameters, at 1,500 encounters between the POEs (including all UCs) and assuming USBP is able to process 900 cases for expedited removal per day (as was approximately the case during the immediate post-pandemic period between May 12, 2023 and June 4, 2024), DHS would be able to refer for expedited removal 77 percent of the noncitizen single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 880 noncitizens per day (i.e., under 60 percent of the 1,500 encounters counted towards the threshold).[349]

Similarly, at 2,500 encounters between the POEs (including all UCs) and assuming USBP can process 900 people for expedited removal per day, DHS would be able to refer for expedited removal 46 percent of the single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 1,040 noncitizens per day (i.e., over 40 percent of the 2,500 encounters counted towards the threshold).[350]

The Departments caution that this type of analysis depends on a range of assumptions regarding capacity, fear claim rates, screen-in rates, and geographic and demographic distribution of encounters, among other variables. A change in these variables—for instance, a spike in UC encounters—could place a strain on custody resources that would further reduce the Departments' overall capacity to deliver timely decisions and consequences, such as by processing noncitizens for expedited removal. The analysis does show, however, that the change to the thresholds to include counting of all UCs is incremental in nature and consistent with the rule's overall purpose.

---

figures in the IFR assumed that CBP could process approximately 900 USBP encounters for expedited removal per day and that 17 percent of encounters would result in rapid returns via voluntary return to Mexico, reinstatement of a removal order, or administrative removal. *Id.* Accounting for all of the immediate post-pandemic period (i.e., also, including April, May, and early June 2024), USBP averaged about 860 people processed for expedited removal per day during that time period. OHSS analysis of July 2024 Persist Dataset (Imm Pos Pandemic ERCF tab). CBP processed for expedited removal about 920 people on average during that time. *Id.* From June 5, 2024 through August 31, 2024, CBP processed over 1,100 people for expedited removal per day and about 16 percent of encounters resulted in such rapid returns. OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab, IFR ERCF tab, and CLP v pre-CLP Projection Tool tab).

[349] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[350] *Id.*

Finally, with respect to claims that either threshold effectively serves as a policy to "close the border" and end access to asylum, the Departments disagree.  The Departments also disagree with commenters' specific claims about historical encounter rates and numbers.  Commenters are incorrect that daily encounters rates have never fallen below 2,500.[351]  Commenters are also wrong that an average of 1,500 daily encounters is far below historical averages.  From FY 2013 through FY 2019, the 7-consecutive-calendar-day average of encounters was below 1,500 nearly 80 percent of the time, and above 2,500 approximately 5 percent of the time.[352]  And for over 70 percent of days during that time frame, the 7-consecutive-calendar-day average had been below 1,500 encounters for 28 consecutive days.[353]  Over a longer time period, from FY 2009 through FY 2020, there were a total of only four months (all during the spring 2019 family unit surge) that encounters averaged more than 2,500 per day.[354]  One commenter argued that in the past six fiscal years, monthly average apprehensions have consistently surpassed 1,500 noncitizens.  But this only shows that the past six fiscal years have generally been times of historically high migrations, and the Departments established the 1,500-encounter daily threshold not by selecting an arbitrary figure but by estimating capacity to deliver timely consequences at current resource levels.

Even since the IFR took effect, encounters have dropped to levels indicating that it is possible the 1,500-encounter threshold will be met in the future.  If, consistent with the June 3 Proclamation and IFR, one excludes UCs from non-contiguous countries, the 7-consecutive-

---

[351] Average daily encounters averaged 1,310 between FYs 2011 and 2018.  In FY 2009, average daily encounters were approximately 1,200.  *See* OHSS analysis of July 2024 Persist Dataset (Daily Encounters FY2000-2024 tab).

[352] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries.  If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the 7-consecutive-calendar-day average was below 1,500 nearly 85 percent of the time and above 2,500 only 4 percent of the time.  *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[353] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries.  If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the resulting figure is just below 80 percent.  *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[354] OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000-2024 tab).

calendar-day average has been below 2,000 encounters since June 27.[355]  And if, consistent with the September 27 Proclamation and this rule, one includes such UCs, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 29.[356]

#### b.  Concerns Regarding Exceptions from the Encounter Thresholds

*Comment:*  A commenter remarked that there are too many exceptions to the types of encounters that are counted daily.  The commenter stated that it is "hard to count up to 1,500" when there are so many exceptions.  The commenter used the exception for non-contiguous country UCs, who are not counted under the June 3 Proclamation, as an example.  The commenter stated that this exception encourages the trafficking of children and prevents reporting these as encounters.  The commenter also objected to the exception for noncitizens who are determined to be inadmissible at a SWB POE, which the commenter asserted significantly limits the number of encounters considered.

Another commenter expressed similar concerns regarding the exclusion of UCs from the 2,500-encounter threshold.  The commenter stated that the current UC policies, influenced by the Flores Settlement Agreement and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, are susceptible to exploitation.  The commenter further noted that during the current Administration, UC encounters have exponentially increased, with more than 480,000 UCs encountered at the southern border between POEs.  The commenter cautioned that without counting all UC encounters towards the 1,500-encounter threshold, existing policies may be further abused by criminal elements, leading to increased risks for UCs, such as human trafficking and other forms of exploitation.  The commenter remarked that in addition to excluding non-contiguous country UCs, the encounter thresholds in the IFR also exclude 1,650 encounters every day at POEs, plus 30,000 noncitizens processed every month through the CHNV parole processes.

---

[355] OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters Tab).

[356] *Id.*

*Response:*  Regarding UCs from non-contiguous countries, as discussed in Section II.C.1 of this preamble, the September 27 Proclamation amends the June 3 Proclamation to remove section 2(c), which provided that UCs from non-contiguous countries shall not be included in calculating the number of encounters, and this rule makes a parallel change.  As discussed in Section II.C.1 of this preamble, the Departments' experience implementing the IFR has shown that excluding encounters of UCs from non-contiguous countries results in an incomplete assessment of the Departments' resources and capabilities.  UCs, regardless of their country of origin or nationality, require considerable resources to process and safely hold in CBP facilities and the Departments have in the past experienced surges of encounters of such UCs.[357]  One of the primary purposes of this rule is to alleviate undue strain on the limited resources of border security and immigration systems, and through their experience with the IFR the Departments have recognized the need to consider the full operational burden that results from all UC encounters at the southern border.  The resource burden posed by UCs from non-contiguous countries, along with recent increases in the proportion of such UCs relative to types of encounters, support the Departments' determination that UCs from all countries, not just from contiguous countries, are relevant to the thresholds contained in the rule.

The Departments disagree that the encounter thresholds should include daily encounters at the SWB POEs or CHNV parolees.  The IFR applies only when encounters strain the border security and immigration systems' capacity.  To date, this strain has been caused primarily by increased encounters between POEs.  CBP can more efficiently process those at SWB POEs, particularly those who have used the CBP One app to make an appointment.  In the past several years, processing capacity at POEs has been significantly expanded, enabling CBP to manage processing of noncitizens in a safe and efficient manner.  However, despite the efforts to increase

---

[357] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

capacity within the limits of available resources and funding, processing between POEs continues to tax DHS resources and remains very resource intensive.

The CHNV processes do not adversely affect the Departments' resources at the southern border because noncitizens arriving under the CHNV processes travel by air to an interior POE.[358]  The Departments do not believe it necessary or appropriate to include noncitizens who use the CHNV processes as part of encounter calculations under this rule for that reason.

### c.  Other Concerns About the Encounter Thresholds

*Comment:*  A commenter wrote that it is reasonable to assume the threshold for suspending the rule will not be met in the foreseeable future, because even if the number of encounters dropped to the level where the 1,500-encounter threshold might be met, the Departments could issue a new IFR to keep the procedure in place.  A commenter stated that the IFR provides no end dates and the Departments do not provide an explanation as to why the IFR should be in place indefinitely.

*Response:*  The Departments disagree with the suggestion that they would perpetually take actions to lower the threshold for discontinuation solely to keep these emergency measures in place.  If the Departments intended to permanently have these measures in place, they could have made the IFR apply indefinitely without using encounter thresholds.  The two changes to the threshold made in this rule and the September 27 Proclamation are incremental in nature and consistent with the underlying purpose of the June 3 Proclamation.  The Secretary will monitor encounter levels and make relevant determinations consistent with the September 27 Proclamation.  Should further policy changes prove necessary—whether in response to comments submitted in response to this final rule's request or in another context—the Departments may take appropriate action to implement such changes.  Additionally, the rule does not contain specific end dates because its measures are designed to be responsive to patterns

---

[358] *See, e.g.*, Implementation of a Parole Process for Nicaraguans, 88 FR 1255, 1256, 1263 (Jan. 9, 2023); USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Aug. 29, 2024), *https://www.uscis.gov/CHNV*.

in daily encounters.  The IFR does not contain an overall expiration date because, due to the unpredictable nature of migration trends and for so long as Congress fails to increase the Departments' resources and modernize the current U.S. immigration system, such measures will be necessary when the Departments' operational capacity, as measured by daily encounter thresholds, is greatly overwhelmed.

*Comment:*  A commenter stated that it would be challenging for noncitizens to know when thresholds have been met.  The commenter stated that they had surveyed migrants in Mexico and over half of respondents in the first half of 2024 affirmed that they do not understand the requirements and processes for accessing U.S. territory, and that nearly half of respondents in certain areas confirmed that the main channel through which they receive information on policy changes is word of mouth, while around a third receive this information through social media.  The commenter said noncitizens would not be able to discern the application of the IFR without access to official information, particularly given that, according to the commenter, the United States Government does not currently publish statistics on encounters. The commenter wrote that even when some noncitizens might be aware of the dynamics of irregular movements, this awareness is likely to be limited to the specific region of the SWB where they are located and would very likely not cover the overall number of encounters.

The commenter stated that, given the swiftness with which the limitations established under the IFR can be invoked and applied, they are not likely to influence the ability of noncitizens in different parts of the transit route to adapt their decisions to increase their chances of receiving the protection that they need.  The commenter stated that those who are already at or around Mexico's northern border when the rule's provision apply cannot meaningfully consider any potential alternative pathways.  The commenter further stated that a significant proportion of people of concern present in Mexico could be ineligible for certain alternatives.  For example, 97.9 percent of respondents to the commenter's protection monitoring activities during the first semester of 2024 reported having entered Mexico irregularly, which could render them ineligible

for certain parole processes.  The commenter stated that as a result, persons of concern are unlikely to become aware of when the additional limitations on asylum eligibility would apply with sufficient lead time to be able to adapt their decisions.  This will thus undermine their ability to make decisions that increase their chances of receiving the protection that they need.

The commenter further stated that confusion around changing policies and practices governing access to U.S. territory has fueled the widespread belief that there are certain moments when the U.S. border is "open" and others when it is "closed," and that access to U.S. territory requires individuals to remain close to the border and attentive to any information suggesting that the border is "open."  The commenter stated that the IFR has already contributed to this dynamic, with migrants along the U.S.-Mexico border expressing their understanding that the new limitations effectively "close off" access to U.S. territory.  According to the commenter, this has led to desperation and fostered the likelihood that the population resorts to imprecise and misleading information provided by human traffickers or on social media.

*Response:*  DHS posts statistics on SWB encounters on CBP's website.[359]  The website includes data extracted from CBP systems and data sources regarding encounters with single adults, individuals in family units, and UCs.  Information about the status of the suspension and limitation on entry, and the related provisions in this rule, is available in English and Spanish at: *https://www.dhs.gov/immigrationlaws*.  In addition, regardless of whether the threshold for discontinuing or continuing or reactivating the suspension and limitation on entry under the Proclamation or the limitation on asylum eligibility under this rule has been met, migrants may, for instance, arrive in the United States at a SWB POE pursuant to a process the Secretary determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States.

---

[359] CBP, *Southwest Land Border Encounters* (last modified Sept. 16, 2024), *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters*.

For similar reasons, the Departments do not believe that it is necessary to adjust the rule to ensure that the potentially "abrupt" nature of its provisions allows sufficient time for those already in Mexico to adjust their behavior in order to access protection.  The IFR was not the first time that the Departments encouraged migrants to use lawful, safe, and orderly pathways to come to the United States.  The Circumvention of Lawful Pathways rule also incentivized the use of such pathways, *see generally* 8 CFR 208.33, 1208.33, and since their inception, the CHNV parole processes have included an ineligibility for those who crossed into Mexico irregularly, *see, e.g.*, Implementation of a Parole Process for Nicaraguans, 88 FR at 1263; Implementation of a Parole Process for Venezuelans, 87 FR 63507, 63515 (Oct. 19, 2022).  And the CBP One app remains available to noncitizens in Mexico.[360]  The rule also provides an exception for those who are able to demonstrate exceptionally compelling circumstances, *see* 8 CFR 208.35(a)(2)(i) and (ii), 1208.35(a)(2)(i) and (ii), and the rule's limitation on asylum eligibility does not apply those who are excepted under the Proclamation, *see* 8 CFR 208.35(a)(1), 1208.35(a)(1).  And the rule preserves access to statutory withholding of removal, as well as CAT protection.  *See* 8 CFR 208.35(b)(2), 1208.35(b).  Thus, migrants already in Mexico have the ability under the rule to access available protection.

The Departments acknowledge the potential that some migrants would perceive the possibility of abrupt changes in procedures at the southern border as a reason to remain close to the border and attentive to any information suggesting that the border is or soon will be "open." In the IFR, the Departments explained that "[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in

---

[360] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone*.  On August 23, 2024, CBP expanded the areas from which noncitizens can request appointments through the CBP One app.  With this expansion, Mexican nationals will be able to request an appointment from anywhere within Mexico.  Additionally, non-Mexican nationals will be able to request and schedule appointments from the Southern Mexico states of Tabasco and Chiapas, in addition to their existing ability to request and schedule an appointment from Northern and Central Mexico — enabling them to make appointments without having to travel all the way north to do so.  *See id.*

encounters is sustained." 89 FR at 48749 n.248. This rule makes an additional change that addresses this concern: The rule's provisions will not be discontinued unless there has been a 7 consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the 14-day waiting period after the Secretary makes a factual determination to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy.

*Comment:* A commenter wrote that while DHS has created a website that states whether the border is currently open or closed, it is unlikely that noncitizens in desperate conditions in Mexico would review the website before deciding to cross the border. Further, the commenter stated that, if the border were to reopen under the rule, it seems inevitable that smugglers would charge higher fees to move noncitizens across the border, and that if noncitizens understand the rule at all, they will flood the border when the suspension and limitation discontinues—leading again to its immediate closure. The commenter stated that the burden of tracking, identifying, and applying different standards over a matter of days is significantly more complex for USCIS personnel as they consider protection claims. The commenter expressed concern that the preamble to the IFR did not consider that this complexity would affect and complicate merits adjudications and lead to longer, more complex hearings in an already overwhelmed, backlogged system.

*Response:* As noted in Section II.A.2 of this preamble, encounters between POEs have dropped substantially since implementation of the IFR, suggesting that many migrants have not responded as the commenter predicted. But in any event, if a migrant were to disregard the existence of the rule and other restrictions on crossing between POEs, or if a migrant who is unaware of the existence of the rule were to cross between the POEs, the rule would allow the Departments to swiftly deliver decisions and consequences, while allowing noncitizens who are able to demonstrate the existence of exceptionally compelling circumstances to avoid application

of the rule's limitation on asylum eligibility and preserving access to statutory withholding of removal and CAT protection, as discussed in the preceding response.

With respect to the commenter's suggestion that noncitizens could respond to the discontinuation of the rule's provisions by "flood[ing] the border" and "leading again to its immediate closure," to the extent there is a prospect of such actions, this highlights the need for this rule, the overall effect of which will be to combat such actions by alleviating stresses on the border security and immigration systems at the southern border; it is not a reason to withdraw the rule. Moreover, the historical encounter data discussed in Section II.C of this preamble suggest that when regional migration decreases, encounter numbers often remain below 2,500 for very long periods. Those data militate against the commenter's view that encounters will inevitably rise quickly above 2,500.

Further, as discussed in Section II.C of this preamble, the September 27 Proclamation and this rule revise the timeline for the 1,500-encounter threshold to reduce the probability that an ephemeral drop in encounters would result in rapid shifts in applicable policy. With respect to the commenter's concern about complexity for Government personnel, the use of a 7-consecutive-calendar-day average, combined with the new requirement for the average to be below 1,500 encounters for each of 28 consecutive calendar days, also reduces the prospect of undue complexity. Although some section 240 removal proceedings and credible fear interviews may become more complex by virtue of this rule's provisions, many such proceedings may be avoided entirely. *See, e.g.*, 89 FR at 48767 ("[T]he Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.").

2. Other Comments on Issues Relating to the Rule

*Comment:* Commenters asked how USCIS' implementation of the IFR would be funded, remarking that the funds to execute the IFR as written have not been allocated.

*Response:*  USCIS applies the IFR's provisions as part of the credible fear determination or the full asylum adjudication.  It is not a discrete or separate adjudication that would require its own funding stream separate from that which is used for credible fear determinations or asylum adjudications.

*Comment:*  Commenters expressed concern about their ability to comment on the proposals in DHS's recent Mandatory Bars NPRM, the comment period for which ended four days after the IFR published.  For example, a commenter noted that, in the IFR, the Departments expressly asked for comment on the interaction between the two rules, including whether to explicitly apply the heightened "reasonable probability" standard to those who are subject to a mandatory bar but not subject to the Circumvention of Lawful Pathways rule, but the commenter asserted that they could not provide comment on those issues without knowing how and whether DHS plans to finalize the DHS Mandatory Bars NPRM.  Commenters also stated that DHS failed to analyze the interaction between the two rulemakings, which they stated will create additional hurdles for noncitizens seeking asylum and will lead to inconsistencies and potential challenges in processing.  Commenters expressed the need for a comprehensive examination of how the policies overlap to avoid uncertainty.

*Response:*  The Departments disagree that commenters did not have adequate opportunity to comment on the potential interaction between the DHS Mandatory Bars NPRM and the IFR.  Indeed, as the commenters note, the Departments requested comment in the IFR on whether to expand 8 CFR 208.35(b)(3) (directing asylum officers to apply a reasonable probability screening standard in protection screenings in the event that 8 CFR 208.35(a) is held to be invalid or unenforceable) to cover "those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to asylum eligibility if the [DHS Mandatory Bars NPRM] is finalized."  89 FR at 48756.  The DHS Mandatory Bars NPRM provides ample notice of the proposed mandatory bars policy, and the commenters do not explain with any specificity why they must review any final rule associated

with the DHS Mandatory Bars NPRM in order to provide relevant comments about its potential

impact on the IFR.

Moreover, the Departments have considered the interaction between the two rulemakings

and do not believe any corresponding changes to this rule are necessary.  While both rules

address DHS screening procedures, the DHS Mandatory Bars NPRM relates to a different issue

than the issues raised in this rulemaking.  The DHS Mandatory Bars NPRM proposes to allow

AOs to consider the applicability of certain statutory bars to asylum, statutory withholding of

removal, and withholding of removal under the CAT regulations during credible fear screenings,

but it does not propose changes to the substantive screening standards by which AOs make their

credible fear determinations.  *See generally* 89 FR at 41347–61.  On the other hand, the IFR

established a new "reasonable probability" standard for the statutory withholding and CAT

screening of noncitizens determined to be subject to the IFR's limitation on asylum eligibility.  8

CFR 208.35(b)(2)(i), 1208.35(b)(2)(iii).  Except for this changed screening standard, the AO and

IJ would otherwise follow the pre-existing standards at 8 CFR 208.30, 208.33, 1208.30, or

1208.33, as applicable.  *Id.*  Accordingly, as stated in the IFR, if DHS finalizes the DHS

Mandatory Bars NPRM as drafted, the "reasonable probability" standard would still apply to

determinations involving a noncitizen who is subject to this rule's limitation on asylum

eligibility.  89 FR at 48739 n.186.

*Comment:*  A commenter added that the Departments failed to explain how the IFR will

interact with the Circumvention of Lawful Pathways rule.

*Response*:  In the IFR, the Departments explained how the IFR will interact with another

recent rule, the Circumvention of Lawful Pathways rule.  89 FR at 48754.  The Departments

explained that they were adding to 8 CFR 208.13 and 1208.13 a paragraph (g), entitled "Entry

during emergency border circumstances," which "explain[s] when a noncitizen is potentially

subject to th[e] IFR's limitation on asylum eligibility and credible fear screening procedures and

how this limitation and its associated procedures interact with the Lawful Pathways condition

referenced in paragraph (f) of 8 CFR 208.13 and 1208.13." *Id.* These new paragraphs added to 8 CFR 208.13 and 1208.13 provide that, "[f]or an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35." 8 CFR 208.13(g), 1208.13(g).

In short, during emergency border circumstances, those who enter across the southern border are subject to this rule, "[n]otwithstanding" the Circumvention of Lawful Pathways rule or any other regulatory provision. *See* 8 CFR 208.35, 1208.35. A noncitizen who establishes exceptionally compelling circumstances under this rule has established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). And the credible fear process under this rule uses the same framework as the Circumvention of Lawful Pathways rule, except for the use of a "reasonable probability" screening standard. *See* 8 CFR 208.35(b)(1)(ii), (b)(2)(i), (c), 1208.35(b)(2)(i), (b)(2)(iii), (c). The Departments described the provisions of the regulatory text in detail in the IFR's preamble. 89 FR at 48754–48759; *id.* at 48762–66.

*Comment:* A commenter asserted that recent rulemakings have complicated the asylum system and that the Departments have not provided reliable information about those changes to affected noncitizens.

*Response:* The Departments acknowledge that recent rulemakings have modified the credible fear screening process to better enable the Departments to deliver timely decisions and consequences to noncitizens entering across the southern border who do not have a basis to remain in the United States. Specifically, in the past two and a half years, the Departments have issued the Asylum Processing IFR, the Circumvention of Lawful Pathways rule, and the IFR

discussed here.  DHS has also issued a proposed rule—the DHS Mandatory Bars NPRM.  Each rule has been accompanied by detailed preamble discussion and regulatory text.  In addition to the public-facing materials, although not required to by law, the Departments have executed robust communications plans to notify and inform the public about the consequences of irregular migration while noting the expansion of lawful pathways and the tools that can be used to access those lawful pathways.[361]  The public engagement plans have both domestic and international dimensions.[362]  Domestically, these plans have included engagement with NGOs, international organizations, legal services organizations, and others.[363]  Internationally, the Departments have also executed communications campaigns throughout the Western Hemisphere in coordination with interagency partners and partner governments to educate migrants and would-be migrants about lawful pathways and consequences for not using them.[364]  This includes media engagements with in-country reporters, graphics and explainer videos, and press releases highlighting removal flights as a direct consequence of coming to the United States irregularly.[365]

---

[361] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas*; USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

[362] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas*; USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (Apr. 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/*; DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[363] *See* U.S. Department of State, *Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas Opening Remarks at the Ministerial Conference on Migration and Protection Reception* (Apr. 19, 2022), *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-opening-remarks-at-the-ministerial-conference-on-migration-and-protection-reception/.*

[364] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas*; *see also* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

[365] *See* Ecuador Envivo, *La tragedia detrás de la migración irregular, una desgarradora realidad (The tragedy behind irregular migration, a heartbreaking reality)* (July 31, 2024), *https://ecuadorenvivo.com/blog/2024/07/31/la-*

The Departments understand concerns about changes to southern border processing. However, as discussed throughout the June 3 Proclamation, the IFR, and this rule, the circumstances at the southern border have changed, and U.S. policy has had to change with them to ensure the effective functioning of the immigration and border management systems. The Departments have consistently encouraged noncitizens seeking to enter the United States to pursue lawful, safe, and orderly pathways to do so, and they continue to provide that encouragement now.

*Comment:*  One commenter expressed concern that the Departments failed to analyze how the IFR interacts with the DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings (May 9, 2024).[366]

*Response:*  The Departments acknowledge that the IFR did not discuss DHS guidelines governing the use of classified or confidential information, but the IFR does not contain any provisions calling for or governing the use of classified information. Regardless, the rule and DHS's policy on the use of classified information in immigration proceedings are harmonious. The INA permits the use of classified information in certain immigration proceedings, and noncitizens have no right to examine classified national security information that DHS may consider or proffer in opposition to the noncitizen's admission to the United States or application for relief from removal. INA 235(c), 8 U.S.C. 1225(c); INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); 8 CFR 235.8(b)(3), 1240.33(c)(4). That was the case before DHS issued its updated policy and guidance on the use of classified information in immigration proceedings on May 9, 2024. The updated guidance does not alter those fundamental principles or the type of

---

*tragedia-humana-detras-de-la-migracion-expertos-analizan-crisis-de-migracion-irregular/*; *see also* ICE, *ICE conducts single adult, family unit removal flights Aug. 9* (Aug. 9, 2024), *https://www.ice.gov/news/releases/ice-conducts-single-adult-family-unit-removal-flights-aug-9-0*.

[366] DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings*.

information that may be used in the immigration proceedings governed by the IFR,[367] and so there was no need for the Departments to address the interaction between the IFR and the new classified information policy.

## E.  Statutory and Regulatory Requirements

1.  Administrative Procedure Act

*Comment:*  Commenters expressed concerns with the Departments' decision to issue an IFR instead of an NPRM, and the Departments' invocation of the "foreign affairs" and "good cause" exceptions.  Commenters stated that the Departments have not proved that either exception applies and, therefore, argued the IFR did not comply with the APA.

*Response:*  Under the APA, agencies must generally provide "notice of proposed rule making" in the *Federal Register* and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. 553(b) and (c).  The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances.  *Id*. 553(d).  However, consistent with the APA, the Departments did not employ these procedures before issuing the IFR because (1) the IFR involved a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3).  *See also* 89 FR at 48759–66 (explaining use of these APA exceptions).

---

[367] The previous policy and guidelines permitted the use of classified national security information in an individual's immigration proceedings only as a matter of last resort.  *See* DHS, *DHS Guidelines for the Use of Classified Information in Immigration Proceedings* (Oct. 4, 2004), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings-october*.  The new policy and guidelines now permit the use of classified national security information as the Department deems necessary to protect our national security and public safety interests, subject to procedures outlined in the new guidance.  *See* DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings*.  Neither the new or old policies and guidelines provide the individual who is subject to the immigration proceedings any entitlement to review classified national security information.  Such classified information would be reviewed either *ex parte* or *in camera*.

Because the Departments have now issued this final rule after soliciting comments, those concerns are moot—but regardless, the Departments address commenters' concerns below.

*a.  Foreign Affairs Exception*

*Comment:*  A commenter suggested that the Departments' invocation of the foreign affairs exception is inappropriate because this exception has been "selective[ly] appli[ed]," pointing to other rules concerning processing of noncitizens at the border (the Circumvention of Lawful Pathways rule and the DHS Mandatory Bars NPRM) for which the Departments did not invoke this exception.  Another commenter remarked that the foreign affairs exception cannot apply because the IFR is a "unilateral action" by the United States, seemingly without any formal agreements with Mexico or other affected countries, and the rule's effects might exacerbate undesirable international consequences.  A third commenter stated that the foreign affairs exception does not apply to rulemakings concerning the U.S. border, stating that these are matters of domestic policy.  Similarly, another commenter noted that Federal courts have previously informed agencies that these exceptions to the APA's notice-and-comment requirement "do not apply to regulations that alter domestic law around asylum eligibility."  A fifth commenter expressing opposition to the Departments' invocation of the foreign affairs exception remarked that the exception's interpretation is "overly broad."

*Response:*  The IFR is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1).  Courts have held that this exception applies when the rule in question is "clearly and directly involve[d]" in "a foreign affairs function."  *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up).  In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *See, e.g.*, *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) (quotation marks omitted).  This

rule satisfies both standards. Nevertheless, the Departments provided an opportunity for public comment after issuing the IFR and in this final rule are responding to those comments.

With respect to comments asserting this rule represents "unilateral action" by the United States, the United States' border management strategy, as further developed in this rule, is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.[368]  This strategy takes particular inspiration from the Los Angeles Declaration on Migration and Protection ("L.A. Declaration"), which was joined by world leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[369]

Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing.  This work includes efforts to expand access to and increase the number of lawful, safe, and orderly pathways, such as the Safe Mobility Initiative;[370] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols with the Government of Mexico along our shared border; and share information, technical assistance, and best practices.  *See* 89 FR at 48759–60 & nn.300–02. These also include the commitment by the United States and Mexico to strengthen their joint humanitarian plan on migration.  *See id*. at 48760 & n.310.  The United States and endorsing

---

[368] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador*; *see also* Kathia Martínez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7*.

[369] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries*, *https://losangelesdeclaration.com/endorsing-countries* (last visited Aug. 2, 2024).

[370] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sept. 21, 2024).

countries continue to progress and expand upon our shared commitments made under this framework.

Given the particular challenges facing the United States and its regional partners at this moment, the Departments appropriately assessed that it was critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that the IFR and the Proclamation—and the strong consequences they were intended to impose at the border—would send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.[371] *See* 89 FR at 48761.

In response to the comments that the Departments' invocation of the foreign affairs exception is overly broad and that because the IFR impacts asylum and issues at the southern border of the United States, it implicates only domestic policy and law and thus does not qualify for the foreign affairs exception, the Departments point out that the IFR stems from international cooperation and directly addresses international challenges. As one commenter noted, at least one court has determined that a rule imposing a limitation on asylum eligibility is not subject to the foreign affairs exception when that rule has only an indirect impact on foreign affairs. *See Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 56 (D.D.C. 2020). But recently Mexico and the United States have worked together on a joint humanitarian plan on migration intended "to address the humanitarian situation caused by unprecedented migration

---

[371] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

flows at our shared border and in the region."[372]  In a joint statement following a meeting between President Biden and President López-Obrador on April 28, 2024, the presidents "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights."[373] The IFR and this rule further this international mission by limiting heightened levels of migration.  This contrasts with the "indirect international effects," including potential "downstream effects in other countries or on international negotiations," that the court discussed in *Capital Area Immigrants' Rights Coalition*.  *Capital Area Immigrants' Rights Coalition*, 471 F. Supp. 3d at 55.  Given the IFR's direct and clear involvement in foreign affairs, the foreign affairs exception applies.

In addition to the IFR's clear and direct involvement in foreign affairs, the Departments believed that conducting a notice-and-comment process and providing a delayed effective date likely would have led to a surge to the southern border before the Departments could finalize the rule, as occurred in anticipation of the end of the Title 42 public health Order.[374]  Regional partner countries have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries.  *See* 88 FR at 31444.  For example, one foreign partner opined that the formation of caravans in the spring of 2022 were spurred by rumors of the United States Government terminating the Title 42 public health Order and then the officially announced plans to do so.  *Id.*  Such effects are precisely the

---

[372] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[373] The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador*.

[374] *See* 89 FR at 48761–62.  Note that the encounter projections included in the IFR excluded encounters of people who had registered with the CBP One app along with administrative encounters at POEs, but included non-CBP One enforcement encounters at POEs, which at the time averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day*; Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18-cv-06810-JST (N.D. Cal. June 16, 2023) (Dkt. 176-2).

kind of "definitely undesirable international consequences" that the Departments seek to avoid.

The Departments appropriately concluded that the emergency measures taken in the IFR would

help address this regional challenge, rather than exacerbate it as one commenter suggested, and

that any decrease in migration that results would help relieve the strain not just on the U.S.-

Mexico border, but also on countries throughout the hemisphere.[375]  The actions the United

States took in the IFR thus affected conditions beyond the southern border and demonstrated a

commitment to addressing irregular migration in the region, even as foreign partners have been

taking actions themselves that are aligned with a shared interest in reducing migration.[376]  Thus,

regardless of whether the foreign affairs exception has been invoked for other rulemakings

involving border issues, that exception is applicable here.  *See* 5 U.S.C. 553(a)(1).  The

Departments note, however, that the Circumvention of Lawful Pathways rule did invoke the

foreign affairs exception to the APA's delayed-effective-date requirement on similar grounds to

the IFR.  *See* 88 FR at 31444–45.

### b.  Good Cause Exception

*Comment:*  Commenters stated that the good cause exception did not apply to the IFR

because the Departments' claim that proceeding via NPRM would yield a surge in border

encounters was misguided, not supported by evidence, and an insufficient reason to invoke the

good cause exception.  Similarly, commenters stated that the IFR acknowledged that border

encounters were lower in 2024 than the year prior, belying the claim of a border emergency.

Commenters expressed concern that there is no indication of a new emergency sufficient for the

Departments to immediately change their rules without allowing the public an opportunity to

engage with or be warned about the coming changes.  Commenters further claimed that evidence

---

[375] *See* 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras in 2021, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).

[376] *See, e.g.*, The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

shows that migration rates rise independently of U.S. efforts to enact consequences, that any change in policy leads to a short-term decrease in encounters and, thus, that the IFR should not have been excepted from the APA. Commenters noted that the increase in encounters in December 2023 was not tied to any policy change. Commenters also criticized the Departments' discounting of the lack of a surge after the Circumvention of Lawful Pathways NPRM, stating that although at that time the Title 42 public health Order remained in effect, "it is disingenuous to compare the current IFR with the lifting of Title 42, which, as the agencies report, led to increased border entries." Commenters expressed opposition to the Departments' invocation of the good cause exception, remarking that the assumption that "not seeking safety in the United States protects the welfare of people who otherwise would undertake that dangerous journey is unsubstantiated and false."

Commenters compared the IFR to the Circumvention of Lawful Pathways NPRM, which according to the commenters did not invoke the good cause exception. Commenters wrote that the good cause exception should not have applied to the IFR because providing notice would have been both "practicable and in the public interest." Commenters stated that the Departments' good cause exception claim of an emergency is based on "long standing structural challenges," such as backlogged immigration case processing and limited resources.

*Response:* The Departments' decision to invoke the good cause exceptions to the APA's notice-and-comment and delayed-effective-date procedures at 5 U.S.C. 553(b)(B) and (d)(3) was reasonable and appropriate. Notwithstanding that the Departments had ample basis to forgo advance notice and comment, the Departments nevertheless provided an opportunity for public comment and in this final rule are responding to those comments.

An agency may forgo notice and comment when it is "impracticable, unnecessary, or contrary to the public interest." *Id.* 553(b)(B). Here, the notice-and-comment procedures were impracticable and contrary to the public interest because the delays associated with such procedures would have unduly postponed implementation of a policy that was urgently needed to

avert significant public harm. While courts have "narrowly construed" this exception, it can "excuse[] notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Am. Pub. Gas Ass'n v. U.S. DOE*, 72 F.4th 1324, 1339–40 (D.C. Cir. 2023) (internal citations omitted). An advance announcement of the IFR would have seriously undermined a key goal of the policy in disincentivizing substantial levels of irregular migration, *see, e.g.*, 89 FR at 48754, and instead would have incentivized noncitizens to irregularly enter the United States before the IFR took effect.

First, the "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations . . . or where delay could result in serious harm."[377] Findings of impracticability are "inevitably fact- or context-dependent,"[378] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures[379] and the agency's diligence in addressing the problem it seeks to address.[380]

The critical need to immediately implement more effective border management measures is described at length in the June 3 Proclamation, the IFR, and Section II.A of this preamble. Despite the strengthened consequences in place at the SWB and adjacent coastal borders,

---

[377] *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g.*, *id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[378] *Mid-Tex Elec. Co-op, Inc. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry v. Block*, 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry*, 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981).

[379] *See Util. Solid Waste Activities Grp.*, 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[380] *See, e.g.*, *Tri-Cty. Tel. Ass'n, Inc. v. FCC*, 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

including the Circumvention of Lawful Pathways rule and other measures (which led to the highest numbers of returns and removals in more than a decade, 89 FR at 48713), when the IFR was published, the U.S. Government continued to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[381]  While encounter levels in calendar year 2024 prior to issuance of the IFR had decreased from these record numbers, there was still a substantial and elevated level of migration.  Historically high percentages of migrants were claiming fear.  89 FR at 48713.

DHS was forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[382] Even then, it can take a substantial period to effectuate the removal of these individuals.[383]  This difficulty in predictably delivering timely decisions and consequences further compounded

---

[381] There were approximately 250,000 USBP encounters along the SWB in December 2023, higher than any previous month on record, *see* OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000-2024 tab).

[382] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID-19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated in February 2022 were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer.  OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR* Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/ strategic-plan/strategic-context/current-operating-enviroment* (last visited Aug. 2, 2024) ("EOIR [ ] suffered operational setbacks during the COVID-19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent.  While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt.").  While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (July 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,241 days); EOIR, *Median Completion Times for Detained Cases* (July 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl? inline* (median completion time of 46 days in the third quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (July 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months); *see also* 89 FR at 48749–54 (discussing the limits in the Departments' ability to quickly repatriate noncitizens when encounters are elevated, which results in the release of many of these noncitizens into the United States); Section III.D.1 of this preamble (describing how the rule's thresholds target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered).

[383] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay*, N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html* ("Most asylum claims are ultimately rejected.  But even when that happens, years down the road, applicants are highly unlikely to be [removed]. . . ."); OHSS analysis of July 2024 Persist Dataset (Removal Orders tab); *see also* 88 FR at 31326, 31381.

incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application.  89 FR at 48714.  The emergency border circumstances were not, however, due solely to longstanding structural challenges such as case backlogs in immigration court and the lack of government resources, as one commenter suggested; rather, the heightened level of encounters at the southern border occurred despite recent increases in the number of immigration court judges, immigration court cases completed, individuals processed through expedited removal, and expanded opportunities to use lawful, safe, and orderly processes.  *Id*. at 48712–13.  The Departments reasonably determined that the heightened levels of migration and forced displacement that resulted in the President's determination to apply the suspension and limitation on entry and the Departments' determination to adopt the IFR would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum or other protection—would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences.  *See id*. at 48763.  The Departments acted immediately to safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws.  *See id.*

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, when significant public harm would result from the notice-and-comment process.[384]  If, for example, advance notice of a coming price increase would

---

[384] *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . .

immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[385]  A number of cases follow this logic in the context of economic regulation.[386]

With respect to comments stating that migration rates can rise independently of policy changes, commenters are correct that there are increases in migration rates that do not appear to be a result of changes in U.S. policies, such as the increase in encounters in December 2023.  But that does not diminish the impact of even short-term surges after announcements of policy changes, which the Departments have experienced time and again, as detailed in the IFR.  *See* 89 FR at 48764–66.

The Departments reasonably assessed that announcing this rule in advance would have likely yielded a surge.  As explained in the IFR, the Departments were responding to emergency border circumstances, and advance announcement of the response—a significant change in border policy that increased the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly—would have significantly incentivized migrants to engage in actions likely to compound those very challenges.[387]  These incentives are exacerbated by smugglers, who routinely emphasize the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a

---

Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[385] *See, e.g.*, *Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[386] *See, e.g.*, *Chamber of Com. of U.S. v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[387] *See* Decl. of Robert E. Perez ¶¶ 4-15, *Innovation Law Lab*, No. 19-15716 (9th Cir. Mar. 3, 2020) (Dkt. 95-2) (noting that on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols, a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), and almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part).

change announced in U.S. policy.[388]  For the same reasons, "the [need] for immediate implementation" outweighed the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forgo it.[389]  The stark drop in encounters following implementation of the Proclamation and IFR, as discussed in Section II.A.2 of this preamble, is strong evidence that announcements of such changes in policy can have significant effects on migration patterns; by making the IFR immediately effective, the Departments avoided triggering a surge in migration that might otherwise have occurred during a notice-and-comment period or pending a delayed effective date.

The increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what DHS resources and operations are designed to handle.  Increasing encounters raised detention capacity concerns anew, and, at that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities.[390]  Given the nature of its facilities, increased numbers and custody duration increase the likelihood that USBP facilities will become quickly overcrowded.[391]  In response to the comment noting skepticism over the Departments' assumption that deterring irregular migration will protect migrants' welfare, the Departments disagree: crowding, particularly given how USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[392]  The Departments thus assessed that there would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for the IFR or delayed its effective date.

---

[388] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html*.

[389] *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[390] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas*, Case No. 3:22-cv-9962 (N.D. Fla. May 12, 2023) (Dkt. 13-1).

[391] *Id*. ¶¶ 6, 14, 17.

[392] *Id.* ¶ 17.

The Departments' determination in the IFR was also consistent with the United States' past practice. For example, and in response to the comment that the Departments did not invoke the good cause exception in promulgating the Circumvention of Lawful Pathways rule, the Departments provided notice and an opportunity to comment on that rule while the Title 42 public health Order remained in effect[393] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. Contrary to the comment asserting that it was disingenuous for the Departments to compare the potential surge of migrants between the end of Title 42 and the effective date of the Circumvention of Lawful Pathways rule with the potential surge associated with the delayed implementation of this rule, the Departments merely refer to the Title 42 surge to illustrate that a surge would be likely given the significance of the border policy change made by the IFR, not that the surge would have been of precisely the same degree. *See* 89 FR at 48761–62.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures, and witnessed a drastic reduction in irregular migration by Venezuelans.[394] Had the parole process been announced before a lengthy notice-and-comment period, thousands of Venezuelan nationals would have likely attempted to cross the United States and Mexican borders before the ineligibility criteria went into effect and before the United States could return Venezuelan nationals to Mexico. *See* 89 FR at 48766.

DHS similarly concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because

---

[393] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[394] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

"[p]re-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region."[395]  The "publication of the rule as a proposed rule . . . would [have] signal[ed] a significant change in policy while permitting continuation of the exception for Cuban nationals, [and] could [have led] to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[396]  A surge of this kind "would [have] threaten[ed] national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities" and "could also have [had] a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could [have] result[ed] in significant loss of human life."[397]

Given the emergency border circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for the IFR would have been contrary to the public interest because an advance announcement of the rule would have incentivized even more irregular migration by those seeking to enter the United States before the IFR took effect.

### c.  Length and Sufficiency of Comment Period

*Comment:*  Commenters remarked that the 30-day post-promulgation comment period was not long enough to allow for "meaningful[] comment" on the IFR, including from experts. Multiple commenters recommended that the Departments either rescind the IFR, reissue it with a longer comment period, or both, and suggested the new comment period be at least 60 days or 90 days.  A few commenters expressed concern with the IFR's publication four days before the end of the 30-day comment period for the DHS Mandatory Bars NPRM, stating that the Departments

---

[395] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[396] *Id*.

[397] *Id*.; *accord* U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

did not give the public an adequate opportunity to analyze or comment on them separately or in conjunction.

   *Response:*  As explained earlier in this Section III.E of this preamble, the Departments did not provide notice and an opportunity to comment or provide for a delayed effective date because the foreign affairs and good cause exceptions to those procedures applied.  *See* 5 U.S.C. 553(a)(1), (b)(B).  Thus, the IFR became effective on June 5, 2024, after the Proclamation was issued and the IFR was placed in public inspection.  *See* 89 FR at 48710.  The Departments invited the public to provide post-promulgation comments on the "rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by" July 8, 2024.  *Id*.  It bears noting that the APA does not impose any requirements governing the process for submitting public comments when an agency voluntarily chooses to receive them following the promulgation of a rule that is exempt from notice-and-comment procedures; much less does it establish any set number of days for which the Departments would have to leave such a comment period open.

   This post-promulgation comment period spanned 30 days from the date of publication (from June 7, 2024, through July 8, 2024) and 34 days from the date the IFR was filed for public inspection (the afternoon of June 4, 2024).  *See* 89 FR at 48710; *id.* at 48772.  The Departments believe this comment period was sufficient to allow for meaningful public input, as evidenced by the 1,067 public comments received, including numerous detailed comments from interested organizations.[398]

   Even where notice and comment is required, the APA does not require that the comment period be any particular length. *See* 5 U.S.C. 553(b), (c).  And although Executive Orders 12866 and 13563 generally recommend a comment period of at least 60 days, they do not impose any binding requirement that a 60-day period be utilized in every case.  In fact, courts have found 30

---

[398] Document Comments, Securing the Border, *https://www.regulations.gov/document/USCIS-2024-0006-0002/comment*.

days to be a reasonable comment period length, finding that such a period is generally "sufficient for interested persons to meaningfully review a proposed rule and provide informed comment," even when "substantial rule changes are proposed." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)); *see also Connecticut Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 534 (D.C. Cir. 1982) (noting that a 30-day comment period was not unreasonable despite complexity of proposed rule). Comment periods shorter than 30 days, often in the face of exigent circumstances, have also been deemed adequate. *See, e.g.*, *Omnipoint Corp.*, 78 F.3d at 629–30 (concluding 15 days for comments was sufficient); *NW Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1321 (8th Cir. 1981) (finding 7-day comment period sufficient).

Regarding commenters' concerns about the comment period in light of the DHS Mandatory Bars NPRM, the Departments first emphasize that the two rules regard separate aspects of DHS screening procedures, as discussed above in Section III.D.2 of this preamble. Nevertheless, the Departments explained the relationship between the two rules in the IFR by noting that, "[i]f DHS were to finalize that rule as drafted, [the IFR]'s 'reasonable probability' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility." 89 FR at 48739 n.186; *see id*. at 48756. In addition, because the DHS Mandatory Bars NPRM was published prior to the IFR, commenters were able to use that NPRM to inform their comments on the IFR. Accordingly, the Departments disagree that commenters were provided an inadequate opportunity to comment on the interaction of these two rules.

Here, the 30-day comment period allowed for significant, meaningful public participation. Commenters have provided numerous and detailed comments regarding the IFR, and the Departments appreciate their effort to provide thorough commentary for the Departments' consideration during the preparation of this final rule. The 30-day comment period also allowed the Departments to swiftly finalize a critical border measure needed to address the emergency border circumstances posed by the Departments' lack of resources for delivering

timely consequences to the heightened number of migrants attempting to enter the southern border without a viable legal basis for doing so. *See* 89 FR at 48749–54.

2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)

*Comments:* One commenter reasoned that the effects of removal on noncitizens should not be disregarded because the costs are not low. The commenter stated that the costs resulting from removal would "encourage refoulement for individuals attempting to reach safety." The commenter stated that correctly identifying meritorious claims of fear is an invaluable process that should not be categorized as costs in "additional time and resources." The commenter further stated that the Departments cannot simply dismiss the task of identifying meritorious claims or characterize their failure to do as purported cost savings, as the commenter alleges is done in the IFR.

*Response:* The commenter misrepresents the IFR's discussion of costs and impacts, *see* 89 FR at 48766–67, which acknowledged that a noncitizen who would have received asylum in the absence of the rule would incur costs from the denial of that benefit. The IFR also acknowledged that noncitizens may incur further costs upon removal. The Departments have described these potential costs qualitatively not as a means of dismissing the importance of such costs, but in order to assess the costs and benefits of the rule in accordance with certain executive orders addressing the regulatory process. *See id*.

Furthermore, the Departments disagree with the commenter's suggestion that the rule does not result in cost savings. The rule does not cause a reduction in overall resources dedicated to immigration processing and enforcement. Rather, it prevents those resources from being spread so thin. As the IFR's analysis explains, given ongoing strains on limited Federal Government immigration processing and enforcement resources, any reduction in new asylum claims would necessarily increase the availability of those resources and allow for more timely adjudications of existing claims. The benefits of the rule include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the

Departments' continued ability to safely, humanely, and effectively enforce and administer the nation's immigration laws; and a reduction in the role of exploitative TCOs and smugglers. *Id.* at 48767. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments. *Id.*

3. Alternatives

*a. Address Root Causes of Migration*

*Comment:* A few commenters specifically urged the United States Government to address "root causes" of migration. Many commenters blamed United States foreign policy generally for creating conditions in foreign countries that have caused irregular migration. For example, one commenter stated that the United States must amend its foreign policies "which contribute to poverty and injustice in the countries migrants are trying to escape." Another commenter called immigration "payback" for the United States's foreign policies. Some commenters specified foreign policies they would like to see changed, such as those regarding weapons sales, fossil fuels, the environment, humanitarian aid, and sanctions on foreign governments. Other commenters criticized the Government and corporations for contributing to destabilization in other countries leading to immigration. Commenters suggested that the Government should disrupt corporate greed causing destabilization in other countries.

*Response:* As a preliminary matter, these comments are outside the scope of this rulemaking. Regardless, the Departments disagree with the suggestion that addressing the root causes of migration obviates the necessity of the rule. Rather, the United States' ongoing efforts, along with those of partner nations, to address the root causes of migration and abate adverse effects from unprecedented levels of global irregular migration will not immediately resolve the urgent border security and immigration systems' situations. Efforts to address the root causes of irregular migration will take significant time to create impact, and in the meantime the more

targeted policies set forth in the IFR and this rule are necessary to alleviate the current acute stress on the border security and immigration systems.

The Departments nonetheless agree with commenters that addressing root causes is a necessary element of regional migration management. For example, the *U.S. Strategy for Addressing the Root Causes of Migration in Central America*, directed by the President in Executive Order 14010, 86 FR 8267 (Feb. 5, 2021), focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and it takes into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society.[399] The strategy includes addressing economic, governance, and security challenges through five pillars: (1) addressing economic insecurity and inequality; (2) combating corruption and strengthening democratic governance; (3) promoting human rights and labor rights; (4) countering and preventing violence; and (5) combating sexual and gender-based violence.[400] In March 2024, the White House announced that the Administration is on track to meet its commitment in the root causes strategy to provide $4 billion to the region over four years.[401]

The United States has also worked closely with its regional partners to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including taking measures to address the root causes of migration, expand access to lawful pathways, improve the U.S. asylum system, and address the pernicious role of smugglers. The IFR provided a detailed account of the United States' efforts throughout the region to implement such strategies. *See* 89 FR at 48759–62. For instance, the United States, along with 21 other countries in the Western Hemisphere, has endorsed the L.A. Declaration, which proposes a comprehensive approach to

---

[399] Nat'l Sec. Council, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* at 4 (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf*.

[400] The White House, *Fact Sheet: Update on the U.S. Strategy for Addressing the Root Causes of Migration in Central America* (Mar. 25, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/25/fact-sheet-update-on-the-u-s-strategy-for-addressing-the-root-causes-of-migration-in-central-america-3/*.

[401] *Id.*

managing migration throughout the Western Hemisphere. *See id.* at 48759. Under the L.A. Declaration's framework, the United States has been working closely with foreign partners to manage the unprecedented levels of migration that countries throughout the region have been experiencing, including efforts to expand access to and increase lawful pathways; conduct joint enforcement efforts; and share information, technical assistance, and best practices. *Id*. at 48759–60.

Additionally, the Government has developed and implemented a number of policy measures, including the Circumvention of Lawful Pathways rule and other measures, which are complemented by a range of actions taken by foreign partners in the region, such as campaigns by Colombia and Panama to counter smuggling networks in the Darién Gap. The Government believes that migration is a shared responsibility among all countries in the region, which is reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.

Consistent with these efforts, this rule will further incentivize noncitizens to avoid irregular migration and instead avail themselves of other lawful, safe, and orderly means for seeking protection in the United States or elsewhere. The Departments agree with commenters that recent surges in irregular migration have been caused by multiple factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose timely consequences at the border is limited by the lack of resources and tools available and by partner nations' operational constraints.

Although this rule does not purport to—and a single rule cannot—address all of the root causes and factors driving migration, the Departments assess that this rule has significantly increased their ability to deliver timely decisions and consequences at the southern border with currently available resources, combating perceptions and messaging to the contrary. Given the challenges facing the United States and its regional partners, this regulatory effort—and the strong consequences it imposes at the southern border—have sent and will continue to send an

important message throughout the region that the United States has put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In short, the Departments acknowledge that international migration trends are the product of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59. The United States Government is working to address these root causes of migration, including by cooperating closely with partner countries, and to abate adverse effects from unprecedented levels of irregular migration.

### b. Prioritize Funding and Other Resources

*Comment:* Many commenters urged the United States Government to prioritize funding, other resources, or alternative policies to make border processing and asylum adjudications more effective and efficient. Commenters suggested various priorities for funding, including hiring more personnel and staff, such as immigration officers, IJs, and court personnel; allocating more funding to already existing personnel and staff; allocating more funding and other resources to local governments and organizations that assist immigrants; increasing access to legal representation and mental health services; and devoting more resources to asylum processing and adjudications at POEs and the interior. Other commenters suggested more generally that the Government devote more resources to recent arrivals and the asylum system. A few commenters specified that the Government should provide additional funding for the Shelter and Services Program and the Case Management Pilot Program. One commenter suggested that the Government create a system to require asylum seekers to have their applications vetted in their home countries as a way to reduce costs and migration. Another commenter suggested sending noncitizen arrivals with family members in the United States to their families. One commenter stated that the Government should expand capacity at the border, while another commenter questioned DHS's ability to increase capacity at POEs.

*Response:*  The Departments acknowledge commenters' suggestions for increasing resources, both financial and otherwise, to account for the increased arrivals at the southern border, but those suggestions are outside the scope of this rulemaking, and they would require congressional action.  As discussed in the IFR, the circumstances that the Departments faced in June 2024 existed despite the Departments' efforts to address substantial levels of migration and were a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.  *See* 89 FR at 48712–15.  The Administration has repeatedly requested additional resources from Congress, only some of which have been provided.  *See id.* at 48728.  USCIS also implemented a new fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service.[402]  While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate, keeping pace with USCIS' protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.  89 FR at 48729.

Additional financial support would require additional congressional actions, including significant additional appropriations, which are outside the scope of this rulemaking.  The Departments agree with the commenters that additional resources would provide substantial benefits for managing the border and immigration systems but decline to wait to act pending receipt of additional funding from Congress.  DHS notes that despite this lack of additional funding it has taken steps to increase processing at SWB POEs, including through use of the CBP One app.[403]

---

[402] *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements*, 89 FR 6194, 6194 (Jan. 31, 2024); *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction*, 89 FR 20101 (Mar. 21, 2024) (making corrections).

[403] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

Additionally, the Departments note that they are leading ongoing Federal Government efforts to support NGOs, local and state governments, and other migrant support organizations as they work to respond to the unprecedented migration impacting communities across the United States.  As noted in the Circumvention of Lawful Pathways rule, FEMA spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the EFSP-H to assist migrants arriving at the SWB with shelter and transportation.  *See* 88 FR at 31327 (citing 88 FR at 11704–05).  In December 2022, $75 million was awarded through the program.[404]  In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS.  The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP-H, until the Shelter and Services Program is established.[405]  For FY 2023, there were $363.8 million in available funds to enable non-federal entities to provide humanitarian services to noncitizen migrants following their release from DHS.[406]  In FY 2024, that figure increased to nearly $650 million.[407]

The Departments do not agree with commenter's suggestions that alternative policies, including vetting migrants in their home countries and sending those who arrive the United States who have family members in the United States to those family members, should be pursued in place of this rule.  In addition to being far outside the scope of the rule, such policies would lack the demonstrably effective incentive structure of this rule.  The Departments nonetheless agree that the United States must consistently engage with partners throughout the

---

[404] *See* FEMA, Release No. HQ-22-232, *Emergency Food and Shelter Program National Board Allocates $75 Million for Humanitarian Assistance* (Dec. 23, 2022), *https://www.fema.gov/press-release/20230103/emergency-food-and-shelter-program-national-board-allocates-75-million.*

[405] Pub. L. No. 117–328, Division F, Title II, Security, Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support, 131 Stat. 4459, 4730 (2022).

[406] FEMA, Shelter and Services Program (June 14, 2024), *https://www.fema.gov/grants/shelter-services-program.*

[407] *Id.*

Western Hemisphere to address the hardships that cause people to leave their homes and come to our southern border. During the emergency border circumstances underlying the rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed and overall border security and immigration systems efficiencies. Swift removal of noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period.

*Comment:* Some commenters stated that the Government "should focus on educating the public about the complexities of immigration" and "provide information to the American people" regarding contributions of immigrants to society.

*Response:* The Departments maintain publicly accessible information regarding the border security and immigration systems and routinely publicize law enforcement action and efforts against human trafficking, smuggling, and TCOs that profit from irregular migration.[408] The Departments will continue to make such information publicly available through routine publication. To the extent commenters suggest that the Departments should inform the American public about the contributions migrants have made to the United States, the Departments respectfully note that such action is outside the scope of this rulemaking as it is unrelated to and would have no immediate effect on encounters at the southern border.

### c. Further Expand Refugee Processing or Other Lawful Pathways

*Comment:* Several commenters suggested increasing access to asylum and humanitarian protections. Commenters expressed concern that the United States' annual rates of refugee admissions have not kept pace with worldwide demand for refugee protections, driving migrants to seek alternative, and oftentimes irregular, migration routes. While many commenters focused on noncitizens arriving at the border, at least one commenter suggested expanding protections for

---

[408] *See* DHS, Securing the Border (last updated Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws*; DHS, Border Security (last updated Nov. 7, 2023), *https://www.dhs.gov/topics/border-security*.

"those who have long called the United States home."  Many commenters stated that the Government "should be creating accessible pathways to citizenship."  Many commenters emphasized the need for expanded lawful pathways and speeding up processing times.  One commenter requested that the Government "invest in expanding pathways to lawful status." Several commenters implored the Government to focus "on a solutions strategy."

*Response:*  The United States has made and will continue to make extensive efforts to expand refugee processing and lawful pathways generally.[409]  As explained in detail in the IFR, in recent years, the Government has overseen the largest expansion of lawful, safe, and orderly pathways and processes for noncitizens to come to the United States in decades.  89 FR at 48760. Such steps include promulgating the Circumvention of Lawful Pathways rule, refocusing a significant portion of DHS's southern border workforce to prioritize migration management above other border security missions, implementing the CHNV parole processes, implementing the Safe Mobility Initiative in several countries, expanding country-specific family reunification parole processes, expanding opportunities to enter the United States for seasonal employment, establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive at POEs through the CBP One app, increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024, completing approximately 89 percent more immigration court cases in FY 2023 compared to FY 2019, and increasing the IJ corps by 66 percent from FY 2019 to FY 2023.  89 FR at 48712–13.

Despite these and other efforts to expand lawful pathways and provide border security, and while DHS is processing noncitizens in record numbers and with record efficiency, the border security and immigration systems have not been able to keep pace with the number of

---

[409] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and* (citing continued efforts to expand lawful pathways and processes, including establishing country-specific parole processes for certain nationals, working with interagency partners and the private sector to increase access to H-2 nonimmigration visa programs, expanding capacity at POEs to increase CBP One app processing capabilities, and implementing new family reunification parole processes among other efforts).

noncitizens arriving at the southern border.  Simply put, the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross irregularly and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection, when noncitizens are arriving at such elevated volumes.

Further, existing levels of migration make clear that the efforts described above, on their own, are insufficient to change the incentives of migrants, reduce the risks associated with current levels of irregular migration and the current surges of migrants to the border, and protect migrants from human smugglers that profit from their vulnerability.  The Departments note that, while they continue to explore the possibility of providing additional lawful pathways, this rule does not create, expand, or otherwise constitute the basis for any lawful pathway.  The Departments further note that requests that the United States create a path to citizenship is outside the scope of this rulemaking.

### d.  Expand Asylum Merits Process

*Comment:*  One commenter stated that instead of finalizing the IFR, the Departments should consider expanding the use of the AMI process outlined in the Asylum Processing IFR. The commenter stated that the rule has the same stated purpose of increasing efficiency and fairness of asylum adjudications for those in expedited removal, but that DHS had reduced its use of the AMI process in the last quarter of 2022 and has not explained why finalizing the IFR is preferable.

*Response:*  The Departments do not view the present rulemaking and the Asylum Processing IFR as mutually exclusive.  Rather, the Departments view these rulemakings as complementary efforts.  The AMI process promulgated in the Asylum Processing IFR is predicated on a noncitizen receiving a positive credible fear determination and seeks to make the process following a positive credible fear determination more efficient and streamlined, while maintaining fairness; meanwhile, the present rulemaking establishes a limitation on asylum

eligibility and addresses the credible fear process itself.  While both rulemakings seek to increase efficiency and maintain fairness, they do so by focusing on separate parts of the process—one primarily prior to and during a credible fear determination (the present rulemaking) and one following service of a positive credible fear determination (the Asylum Processing IFR). Additionally, the Asylum Processing IFR was written with the express intent of being implemented in a discretionary manner.  As the Departments explained, the discretion of USCIS to place an individual with a positive credible fear determination into the AMI process under the rule or to issue an NTA for removal proceedings under section 240 of the INA was a necessary part of the rule in order for it to function, as the rule would have to be implemented in a reality in which USCIS did not have all of the resources necessary to place every case with a positive credible fear determination into the AMI process.  *See* 87 FR at 18185.  Accordingly, the Asylum Processing IFR provided USCIS complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA.  8 CFR 208.30(f).

As explained in the preamble to the IFR, there are simply not enough AOs available to conduct fear screenings to keep pace with current sustained high encounter rates.  *See* 89 FR at 48714.  USCIS has a finite number of AOs to conduct all of its casework, including fear screenings, and does not plan on placing cases into the AMI process in circumstances in which the noncitizen did not establish a significant possibility that they would ultimately be able to establish by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that they qualify for the exception; such an approach would not be a prudent use of resources given current operational realities.  *See* 89 FR at 48756.  The Departments nonetheless formulated the present rulemaking in a manner that preserves the ability of USCIS to exercise its discretion to place cases with positive credible fear determinations in the AMI process should USCIS have the resources available to do so in the future.  *See id.*; *see also* 8 CFR 208.35(b)(2)(ii).  The Departments will continue to implement the Asylum Processing IFR in a

manner consistent with the way the rule was envisioned to function, enrolling new cases in the process at the discretion of USCIS, in accordance with available resources.

*e.  Other Congressional Action*

*Comment:*  Many commenters stated that the Administration should work with Congress on comprehensive legislative reforms.  Commenters emphasized the need for meaningful legislative reform of the U.S. immigration system.  Several commenters demanded that Congress address "the issue of immigration."  Commenters pointed to a variety of reforms that they believed Congress should implement.  However, one commenter disagreed with any suggestion that the border crisis was the result of any failure of Congress and felt it was the Administration's consistent "abdication" of border security and immigration enforcement that has resulted in the sustained, high rate of encounters since 2021.

*Response:*  These are suggestions for Congress and are outside the scope of this rulemaking.  Nevertheless, the Departments acknowledge the commenters' expressed frustration with Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.  The Departments observe that this failure, combined with unprecedented levels of irregular migration along the southern border, makes up the causal background of the June 3 Proclamation and this rule, and they therefore disagree with one commenter's suggestion that the current border circumstances can be ascribed to the Administration's alleged "abdication" of border security, and in no part to any congressional inaction.  As explained in the June 3 Proclamation and the IFR, in the absence of congressional action to provide appropriate resources to DHS and EOIR and to reform the outdated statutory framework, the rule implements new policies to substantially improve the Departments' ability within that framework to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain.  *See* 89 FR at 48715. Although the Departments are adopting these measures to respond to the emergency situation at

the southern border, they are not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border.

*f.  Additional Suggested Measures or Revisions*

    *Comment:*  One commenter suggested that the Departments "engage in meaningful dialogue with legal experts and humanitarian groups to develop compassionate and effective approaches to migration."

    *Response:*  The Departments appreciate the commenter's suggestion and welcome the views of legal experts and humanitarian groups.  Indeed, the Departments have sought comment on their rules relating to border management—such as the Asylum Processing IFR, Circumvention of Lawful Pathways rule, DHS Mandatory Bars NPRM, and the IFR here—and have either considered and responded to those comments, or, in the case of the DHS Mandatory Bars NPRM, are in the process of doing so.  Additionally, such experts and organizations are able to petition the Departments for rulemaking, through which process they may present their proposals for consideration by the Departments.  The Departments appreciate the thoughtful comments and feedback they have received from the public, including legal experts and humanitarian groups, and hope that the public's interest in aiding the Departments in their efforts to manage the border continues.  Further, since the June 3 Proclamation and the IFR came into force, DHS has continually engaged advocacy, non-governmental, and international organization partners to seek their feedback and perspectives.

    *Comment:*  One commenter made several suggestions for additional, stricter measures instead of or in addition to this rule.  Such suggested measures included strictly limiting parole into the United States, reinstating MPP and requiring noncitizens to wait in Mexico pending removal proceedings, rescinding enforcement priorities and enforcing immigration law in the interior of the United States, expanding expedited removal, terminating policies the commenter viewed as hindering immigration enforcement, requiring AOs to apply all mandatory bars to asylum and statutory withholding of removal in credible fear screenings, raising the standard for

withholding of removal and deferral of removal to the "reasonable probability" standard for all credible fear proceedings, and terminating USCIS's policy of accepting requests for reconsideration after an IJ has concurred with an AO's negative credible fear determination. The commenter, addressing the instant rule, requested that the Departments eliminate "overbroad and easy to exploit loopholes," specifically stating that the Departments should "strike" the exception for those who establish exceptionally compelling circumstances. One commenter stated that the rule should also apply to the northern border.

*Response:* The Departments acknowledge the commenters' varying viewpoints and concerns but believe that even if some of the alternatives proposed by the commenters are suitable to pursue, they would not obviate the need for this rule. Proposals to broadly limit lawful pathways to enter the United States, such as parole processes, are outside the scope of this rulemaking, as are other comments advocating for immigration policy changes or reforms unrelated to the IFR.

The Departments nonetheless note that this rule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations. Even so, in the Departments' experience, the various parole processes work in tandem with other lawful pathways in a complementary manner to address surges in migration. Examples of the success of DHS's discretionary parole processes include the CHNV parole processes and family reunification parole processes resulting in use of lawful pathways for entry into the United States. Importantly, the parole processes themselves are lawful pathways for qualifying individuals seeking to come to the United States, and this rule does not discourage their use. The parole processes are lawful, safe, and orderly pathways that the Departments wish to encourage in light of the urgent circumstances.

The Departments disagree with commenters' suggestion to reinstate MPP for the reasons stated in the IFR and the Circumvention of Lawful Pathways rule. *See* 89 FR at 48752 n.271; 88 FR at 31370.

Regarding commenters' request for expansion of expedited removal, the Departments observe that, among the series of steps the Government has taken to strengthen consequences for irregular entry at the border, DHS has processed record numbers of individuals through expedited removal.  For example, in the months between May 12, 2023, and June 4, 2024, CBP processed more than 359,000 noncitizens encountered at and between POEs along the SWB for expedited removal[410]—almost twice as many as any prior full FY.[411]  Indeed, under the IFR, from June 5 through August 31, 2024:

- DHS removed or returned more than 119,000 individuals encountered at the SWB[412] to more than 140 countries, including by operating more than 400 international repatriation flights;[413]

- DHS has doubled the percentage of noncitizens encountered at the SWB who are removed or returned directly from CBP custody compared to the immediate post-pandemic period (32 percent compared to 16 percent);[414]

- DHS has more than tripled the percentage of noncitizens encountered by USBP at the SWB who are processed through expedited removal (up from 18 percent to 59 percent; expedited removal processing was already at record levels, as noted above);[415] and

- DHS has decreased the percentage of noncitizens encountered at the SWB who are released by USBP pending their section 240 removal proceedings by more than half (from 64 percent to 31 percent).[416]

---

[410] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[411] OHSS analysis of June 2024 Enforcement Lifecycle and July 2024 OHSS Persist Dataset.  Prior to FY 2024, the single-year FY record for Southwest Border cases processed for expedited removal was 202,000 in FY 2013 (Historic CFIs tab).

[412] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR details tab).

[413] OHSS analysis of data downloaded from UIP on September 3, 2024 (Flights and Removals tab).

[414] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[415] *Id.*

[416] *Id.*

However, as explained at length in the IFR, DHS's ability to apply expedited removal is subject to resource constraints. *See, e.g.*, 89 FR at 48752. At high levels of encounters, DHS simply lacks sufficient resources, such as AOs to conduct fear screenings and temporary processing facilities, to refer noncitizens for expedited removal processing. The mismatch in resources and encounters has created stress on the border security and immigration systems, forcing DHS to rely on processing pathways outside of expedited removal.

With respect to the suggestion that mandatory bars be considered at the screening stage under a reasonable possibility standard, DHS is considering that issue in a separate rulemaking. *See* Mandatory Bars NPRM.

The Departments decline to apply the "reasonable probability" standard to screen all statutory withholding of removal and CAT protection claims during all credible fear interviews at this time. Although the Departments acknowledge the commenters' concerns, the Departments emphasize that the primary focus of this rule is to substantially improve the Departments' ability, during periods of high encounters, to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. Application of a the "reasonable probability" standard under emergency border circumstances as defined in the rule satisfies these goals.

The suggestion to generally disallow USCIS from accepting requests for reconsideration of negative credible fear determinations exceeds the scope of this rulemaking, which regards the procedures applied during emergency border circumstances. The Departments note that during such circumstances, if it was determined at the credible fear interview that there is not a significant possibility a noncitizen could ultimately demonstrate by a preponderance of the evidence that they are not subject to the IFR's limitation on asylum eligibility or are eligible for the exception to the limitation, the noncitizen would not be permitted to submit requests for reconsideration with USCIS. *See* 8 CFR 208.35(b)(2)(v)(B). In such circumstances, USCIS may, in its sole discretion, reconsider a negative determination. *See id.*; *see also* 89 FR at 48756.

The Departments disagree with the concern one commenter raised about what it characterized as "loopholes." The exceptions to the limitation on eligibility for asylum are necessary to prevent undue hardship. The Departments have limited the means of avoiding the limitation on asylum eligibility to those identified in the June 3 Proclamation and to exceptionally compelling circumstances in an effort to maximize the rule's applicability.

With respect to a commenter's suggestion that the rule apply to the northern border, the Departments do not currently assess that application of the rule is necessary at the U.S.-Canada land border. Instead, the United States is implementing other measures to address irregular migration at that border, such as the Additional Protocol of 2022 to the Safe Third Country Agreement between the United States and Canada, which expands the Agreement to apply to noncitizens who claim asylum or other protection within 14 days of crossing the U.S.-Canada land border between POEs, including certain mutually designated bodies of water. *See* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023). Under the Safe Third Country Agreement, with limited exceptions, noncitizens who cross from Canada to the United States cannot pursue an asylum or other protection claim in the United States and are instead returned to Canada to pursue their claim.

*Comment:* A commenter suggested exempting persons who manifest a credible fear from penalties arising from expedited removal, including restrictions on subsequent admission to the United States, and conditioning the implementation of restrictions on eligibility for protection at the border "on the actual availability of an alternative pathway[]."

*Response:* The Departments acknowledge the commenters' suggestions but do not believe the alternatives proposed by the commenters are suitable to address operational concerns or meet the Departments' policy objectives.

With regard to comments recommending that all noncitizens who manifest a fear be exempted from facing "penalties" arising from expedited removal, including restrictions on

future admission to the United States, the Departments note that such a change would require a change to the INA, and thus is not within the Department's authority. *See* INA 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (providing that noncitizens removed pursuant to an order of expedited removal are inadmissible for a period of five or ten years following the date of such removal).

With regard to the commenter's suggestion to condition the limitation on asylum eligibility on whether each individual had a lawful, safe, and orderly pathway available to them, the Departments note that the current framework already effectively does so. Any noncitizen without documents sufficient for lawful admission to the United States may pre-schedule a time and place to present at a POE through the CBP One app.[417] Those who cannot wait for such an appointment may present at a POE and seek an exception to the Proclamation's suspension and limitation on entry or establish exceptionally compelling circumstances before an AO or IJ, both of which except them from the limitation on asylum eligibility. *See* 8 CFR 208.35(a), 1208.35(a). To the extent commenters think these mechanisms are insufficient, the Departments have considered those arguments but believe that the rule strikes an appropriate balance between managing emergency border circumstances and protecting noncitizens' access to asylum, as discussed in Section III.C.1.b of this preamble.

*F.  Out of Scope*

*Comment:* In addition to the comments discussed above, commenters also discussed a range of topics that are outside the scope of this rule. For example, some commenters shared a general concern relating to overpopulation; a recommendation that the United States accept a certain number of noncitizens each year to compensate for labor shortages; a suggestion that the Government provide legal counsel at no expense to noncitizens or otherwise fund court-appointed counsel; a suggestion to issue "general rules or guidelines in lieu of case by case assessments that would allow asylum officers to quickly approve certain cases"; a suggested

---

[417] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone*.

amendment to the DHS Mandatory Bars NPRM to require AOs to apply all mandatory bars to asylum and statutory withholding of removal at the credible fear stage; a recommendation to preclude USCIS from considering requests for reconsideration of negative credible fear or reasonable fear determinations that have been reviewed by an IJ; concern with and strong opposition to the United States' military support for Israel; a request for open borders; a request for the Government to focus its efforts on providing asylum seekers access to mental health services; requests related to custody and detention of noncitizens and asylum seekers, such as investing in "non-custodial processing centers"; concerns about family separation and reunification policies; a recommendation to provide "relief for undocumented caregivers by modernizing existing rules"; suggestions relating to work authorization for migrants and asylum seekers; sentiments that the Government should provide funding to support migrant communities with public services and respite; a recommendation that the Government grow "federal support for case management support"; claims that the President does not have authority under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), for the policies and objectives of the Proclamation; a claim that the President's use of his authority under section 212(f) of the INA, 8 U.S.C. 1182(f), to issue the Proclamation is a departure from how other presidents have used the authority in the past, relying on statements from the Ninth Circuit's decision in *Hawaii v. Trump*, 878 F.3d 662, 689 (9th Cir. 2017), *rev'd and remanded*, 585 U.S. 667 (2018); challenges to DHS's parole authority and use of parole; and a recommendation to give second chances to noncitizens involved in unlawful activities and to shut down operations such as the Western Hemisphere Institute for Security Cooperation because they further perpetuate drug-related violence.

*Response:*  These comments address matters beyond the scope of the rule and do not require further response.  To the extent that commenters' concerns raised in relation to actions taken under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f), 1185(a), apply also to the

legality of actions taken by the Departments, and not only to the President's June 3 Proclamation or DHS's implementation of it, those concerns are addressed in Section III.A.1 of this preamble.

## IV. Requests for Comments

*A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule with That of the Proclamation and This Rule*

The Departments request comment on whether to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country.  *See* 8 CFR 208.33(a)(1), 1208.33(a)(1).  The Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility applies to a noncitizen who "enters the United States from Mexico at the southwest land border or adjacent coastal borders."  *See* 8 CFR 208.33(a)(1), 1208.33(a)(1).  In addition, among other requirements, the rebuttable presumption only applies if the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the Refugee Convention or the Refugee Protocol.  *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii).

The Departments specifically welcome comment on two proposals: first, whether, in 8 CFR 208.33(a)(1) and 1208.33(a)(1), the Departments should remove the words "from Mexico at the southwest land border or adjacent coastal borders" and replace them with the words "across the southern border (as that term is described in section 4(d) of Presidential Proclamation 10773)."  Second, the Departments welcome comment on whether to add to the beginning of 8 CFR 208.33(a)(1)(iii) and 1208.33(a)(1)(iii) a clause that reads, "After the alien entered the United States by sea, or"—so that paragraph (a)(1)(iii) would state in full, "After the alien entered the United States by sea, or after the alien traveled through a country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol

relating to the Status of Refugees."  In a future final rule, the Departments may adopt the first proposal, the second proposal, or both.

Although this request for comment is similar to the Departments' request for comment in the Circumvention of Lawful Pathways rule, *see* 88 FR at 31440–44, the Departments are now seeking comments on the geographic scope in the broader context of this Securing the Border[418] rulemaking.  Given the intervening Securing the Border rulemaking, the comments that will be most useful are those that are informed by the full range of actions taken to address migration since the end of the Title 42 public health Order.  Accordingly, although the Departments intend to incorporate any comments received on the 2023 Circumvention of Lawful Pathways rule's request for comment into the docket for this request for comment, those who submitted comments in response to that request for comment are encouraged to update their comments in light of the intervening Securing the Border rulemaking and resubmit their comments here.

Unlike the Circumvention of Lawful Pathways rule, the Proclamation and the Securing the Border rule apply to certain noncitizens entering the United States across the "southern border," which includes "southern coastal borders."  89 FR at 48491; *see also* 8 CFR 208.13(g), 1208.13(g).  Section 4(b) of the Proclamation defines "southern coastal borders" to mean "all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico."  89 FR at 48491.  The term "southern border" adopted by the Proclamation and the Securing the Border rule is categorically broader than the term "adjacent coastal borders" adopted in the Circumvention of Lawful Pathways rule, which the Departments defined as "any coastal border at or near the U.S.-Mexico border."  88 FR at 31320.  In contrast to this definition, the term "southern coastal borders" encompasses certain specified coastlines that are not at or near the

---

[418] Although the Departments have not referred to the present rule as the "Securing the Border rule" throughout this preamble, the Departments do so in this request for comment to distinguish the present rule from the Circumvention of Lawful Pathways rule in an effort to avoid confusion.

U.S.-Mexico border, such as the maritime borders of Puerto Rico and the United States Virgin Islands. 89 FR at 48711 n.4.

The Departments believe it is best to align the geographic reach of the Circumvention of Lawful Pathways rule to that in the Proclamation, which was adopted by the Securing the Border rule, for three reasons: (1) to make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to crossing irregularly no matter where along the southern border they cross; (2) to deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) to ensure consistency in implementation. This modification to the geographic reach of the Circumvention of Lawful Pathways rule would encourage noncitizens to avoid dangerous maritime migration and further persuade them to utilize lawful, safe, and orderly pathways. As discussed in more detail below, maritime migration results in life-threatening risks for both migrants and DHS personnel.

When the Departments initially proposed the Circumvention of Lawful Pathways rule, the rule would have covered migrants who entered the United States from Mexico "at the southwest land border"—that is, "along the entirety of the U.S. land border with Mexico." 88 FR at 11704 n.1; *see also id*. at 11750, 11751. However, the Departments received comment from the public expressing concern that limiting the rebuttable presumption to only those who entered the United States from Mexico by land would incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making the hazardous attempt to reach the United States by sea. 88 FR at 31320. Concurring with this concern, the Departments modified the geographic reach of the rebuttable presumption to include "adjacent coastal borders" so that it applied to noncitizens who crossed into the United States from Mexico via

adjacent coastal borders. Further, this definition mirrored the geographic reach of the Centers for Disease Control and Prevention's ("CDC") Title 42 public health Order and, as implemented by CBP, the Amended CDC Order issued in May 2020. *Id*. Because CBP had been interpreting the term in this way for three years before the Circumvention of Lawful Pathways rule's finalization, the Departments believed this consistency with the Title 42 public health Order in geographic application would help prevent smugglers from exploiting what could be perceived as a loophole by persuading migrants to take the perilous journey of trying to reach the United States by sea upon the termination of the Order. *Id*.

The Departments now believe that further expanding the geographic scope of the Circumvention of Lawful Pathways rule beyond "adjacent coastal borders," and, with respect to those who arrive by sea, removing the restriction that the rule only applies to noncitizens who enter the United States from Mexico, could be supported by the same justification for the Securing the Border rule's inclusion of southern coastal borders: these changes would "help avoid any incentive for maritime migration to such locations" that are currently covered by the Securing the Border rule but not by the Circumvention of Lawful Pathways rule. 89 FR at 48711 n.4. For example, expanding the scope of the Circumvention of Lawful Pathways rule in this manner would mean that a noncitizen who enters the United States at a border via the Gulf of Mexico would be subject to the Circumvention of Lawful Pathways rule regardless of whether they transited through Mexico. Further, as an operational matter, this would ensure consistency in processing. Aligning the geographic scope of the Circumvention of Law Pathways rule with that of the Securing the Border rule would eliminate one operational switch that DHS personnel would have to make when the provisions of the Securing the Border rule discontinue in the absence of emergency border circumstances. This would allow DHS personnel to operate consistently with respect to noncitizens encountered utilizing maritime migration to cross the southern coastal borders, all of whom would be presumptively ineligible for asylum.

Maritime migration poses unique hazards to life and safety to both migrants and DHS personnel.[419]  Human smugglers and noncitizens migrating to the United States continue to use unseaworthy, overly crowded vessels, piloted by inexperienced mariners, without any safety equipment—including, but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons.[420]  The USCG regularly interdicts noncitizens employing maritime migration in the Gulf of Mexico and Atlantic Ocean in makeshift, overcrowded vessels.[421]  In FY 2022, over 12,500 noncitizens were interdicted by the USCG and in FY 2023, that figure was nearly 13,500.[422]  This is a dramatic increase from previous years. For example, between FY 2017 and FY 2020, annual maritime interdictions never exceeded 3,600.[423]  Between October 1, 2023 and April 30, 2024, the USCG carried out 35 maritime migration interdictions in the Mona Passage and waters near Puerto Rico, with nearly 1,200 noncitizens interdicted at sea from various countries such as the Dominican Republic, Haiti, and Venezuela.[424]  Between October 1, 2022 and August 5, 2023, the USCG interdicted over 6,900 migrants from Cuba alone.[425]  In August 2024, the USCG interdicted a disabled migrant vessel

---

[419] The Departments also reiterate the explanation of the dangers of maritime migration in the Circumvention of Lawful Pathways rule.  *See* 88 FR at 31441–42.

[420] *See* David C. Adams, James Wagner, *At Least 40 Migrants Die in Boat Fire Off Haitian Coast, U.N. says*, N.Y. Times (July 19, 2024), *https://nytimes.com/2024/07/19/world/americas/boat-fire-haiti-migrants.html*; Samantha Schmidt, Paulina Villegas, Hannah Dormido, *Dreams and Deadly Seas: Bahamas Human Smuggling by Boat*, The Wash. Post (July 27, 2023), *https://www.washingtonpost.com/nation/interactive/2023/bahamas-human-smuggling-by-boat/* ("The United States . . . Coast Guard cutters have been rescuing migrants from foundering or overcrowded boats every few days."); Adriana Gomez Licon, *Situation 'dire' as Coast Guard seeks 38 missing off Florida*, Associated Press (Jan. 26, 2022), *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019*; Gina Martinez, *Coast Guard rescues more than 180 people from overloaded sailboat in Florida Keys*, CBS News, CW44 Tampa (Nov. 22, 2022), *https://www.cbsnews.com/news/coast-guard-rescues-more-than-180-people-overloaded-sailboat-florida-keys/*.

[421] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate*; *see also* USCG, *Press Release: Coast Guard repatriates 119 migrants to Dominican Republic following 2 interdictions near Puerto Rico* (Apr. 29, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3758973/coast-guard-repatriates-119-migrants-to-dominican-republic-following-2-interdic/*.

[422] OHSS analysis of July 2024 Persist Dataset (Maritime Interdictions tab).

[423] *Id.*

[424] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate*.

[425] USCG, *Press Release: Coast Guard repatriates 27 people to Cuba* (Aug. 5, 2023),

and repatriated 182 migrants back to Haiti.[426]  In May 2024, the USCG located and intercepted a 30-foot makeshift vessel with over 60 migrants crammed into it traveling nearly 63 miles north of Punta Cana, Dominican Republic.[427]  During a second interdiction occurring on May 20, 2024, CBP's Air and Marine Operations interdicted a "grossly overloaded makeshift vessel" carrying 68 migrants located two miles from Puerto Rico's coastline.[428]

In FY 2023, the USCG recorded 112 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration.  IOM's Missing Migrants Project found that from 2014 to 2024, in the Americas, the maritime route from the Caribbean to the United States resulted in the second-highest number of dead and missing migrants, after the U.S.-Mexico border crossing.[429]  The intention behind the Circumvention of Lawful Pathways rule is to discourage individuals from resorting to irregular migration, including markedly more dangerous maritime migration, and to instead incentivize noncitizens to utilize lawful, safe, and orderly pathways and processes to come to the United States.  Expanding the geographic scope of the Circumvention of Lawful Pathways rule's rebuttable presumption would expand that incentive structure to cover the entire southern border, rather than just a portion of it.

The United States has taken significant steps to expand safe and orderly options for migrants, including migrants from the Caribbean region, to lawfully enter the United States.[430]

---

*https://www.news.uscg.mil/Press-Releases/Article/3484466/coast-guard-repatriates-27-people-to-cuba/.*

[426] USCG, *Press Release: Coast Guard repatriates 182 migrants to Haiti* (Aug. 21, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3878831/coast-guard-repatriates-182-migrants-to-haiti/.*

[427] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate/.*

[428] *Id.*

[429] IOM, *Missing Migrants Project: Migration Within the Americas*, *https://missingmigrants.iom.int/region/americas* (last visited Aug. 15, 2024).  IOM cautions that "[c]ollecting information about migrants who die or disappear on maritime routes while attempting to migrate by boat in the Caribbean is also very challenging.  The remote nature of maritime routes, the secrecy in which boats set out, and the lack of information on trajectories means that many shipwrecks carrying migrants are never identified.  It is rarely known exactly how many people were on board boats that ran into trouble at sea, making it difficult to verify how many people went missing, or to know any information about their identities."  *Id.*

[430] *See* DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

The United States has increased and will continue to increase refugee processing in the Western Hemisphere; country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit, including the Cuba and Haiti parole processes; and opportunities to lawfully enter the United States for the purpose of seasonal employment.[431]  In addition, the United States has resumed the Cuban Family Reunification Program and resumed and increased participation in the Haitian Family Reunification Program.[432]  The availability of these pathways serves as important background for the proposal to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country.  Such pathways for migrants from this region provide meaningful opportunities for these individuals to use a lawful, safe, and orderly pathway to enter the United States, even if they did not first travel through a third country where they could request such protection.  Accordingly, the Departments are considering and seeking comment on applying the Circumvention of Lawful Pathways rebuttable presumption to those who enter the United States via the southern coastal border, irrespective of whether they traveled through a third country, to discourage noncitizens from using dangerous maritime migration routes.

B.  *Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption*

Currently, the Circumvention of Lawful Pathways rule applies to a noncitizen who, *inter alia*, entered the United States from Mexico "between May 11, 2023 and May 11, 2025" and "[s]ubsequent to the end of implementation of the Title 42 public health Order."  8 CFR 208.33(a)(1)(i)–(ii), 1208.33(a)(1)(i)–(ii).  When issuing that rule, the Departments acknowledged that "aspects of the present situation at the border are likely to continue for some

---

[431] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024)*, https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and*.

[432] *See* DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10, 2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes*.

time and are unlikely to be significantly changed in a short period," but the Departments opted

for a two-year "entry period" to, *inter alia*, address the surge in migration that, in the absence of

the Circumvention of Lawful Pathways rule, was anticipated to follow the lifting of the Title 42

public health Order and to provide sufficient time to implement and assess the effects of the

policy contained in that rule. *See* 88 FR at 11727; 88 FR at 31421. The Departments are now

considering, and request comment on, whether to extend the entry period indefinitely so that the

rebuttable presumption will apply to noncitizens who entered the United States without

documents sufficient for lawful admission any time on or after May 11, 2023, and, if the

applicability is extended, other appropriate changes. *See* 8 CFR 208.33(a)(1)(i),

1208.33(a)(1)(i); *see also, e.g.*, *id.* 208.33(c), 1208.33(d) (providing the ongoing applicability of

the Circumvention of Lawful Pathways rebuttable presumption to any future asylum applications

filed by noncitizens who enter during the entry period regardless of when the application was

filed, except in the case of certain children who entered as part of a family unit if they later apply

for asylum as principal applicants).

In the Circumvention of Lawful Pathways NPRM, the Departments specifically

welcomed comment on whether the proposed two-year duration of the rule's applicability

"should be modified, including whether it should be shorter, longer, or of indefinite duration."

*See* 88 FR at 11708. In response to comments received on the NPRM, the Departments

maintained the proposed two-year period in the Circumvention of Lawful Pathways final rule

because that rule's focus was to respond to the anticipated surge in migration upon the

termination of the Title 42 public health Order. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); 88

FR at 31421–22. The Departments stated that a 24-month period would provide "sufficient time

to implement and assess the effects of the policy contained in this rule" and that "a 24-month

period is sufficiently long to impact the decision-making process for noncitizens who might

otherwise pursue irregular migration and make the dangerous journey to the United States, while

a shorter duration, or one based on specified conditions, would likely not have such an effect."

88 FR at 31421.  The Departments further stated that the United States would continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and implement other measures as appropriate, including continued efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants.  *Id.*

The Departments recognized, however, "that there is not a specific event or demarcation that would occur at the 24-month mark," and stated that they would "closely monitor conditions during this period in order to review and make a decision, consistent with the requirements of the APA, whether additional rulemaking is appropriate to modify, terminate, or extend the rebuttable presumption and the other provisions of th[e] rule."  *Id.*  The Departments explained that such review and decision would consider all relevant factors, such as resource limitations and the Departments' capacity to safely, humanely, and efficiently administer the immigration system; the availability of lawful pathways to seek protection in the United States and partner nations; and foreign policy considerations.  *Id.*  The Departments also expected to consider their experience under the Circumvention of Lawful Pathways rule at the 24-month mark, including the effects of the rebuttable presumption on those pursuing asylum claims.  *Id.*  In addition, the Departments expected to consider changes in policy views and imperatives, including foreign policy objectives, in making any decision regarding the future of the rule.  *Id.*  The Departments did not identify specific metrics for extending the rule *ex ante*, given the dynamic nature of the circumstances at the SWB and the multifaceted domestic and foreign policy challenges facing the Departments.  *Id.*

The Departments have considered these factors and propose and seek comment on an indefinite extension of the applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions.  The Departments also seek comment on whether other changes to the Circumvention of Lawful Pathways rule's provisions would be

appropriate if its applicability becomes indefinite. First, as detailed in the IFR, although the Circumvention of Lawful Pathways rule did not fully mitigate the very high levels of irregular migration during the immediate post-pandemic period, it yielded tangible results that ameliorated a situation that otherwise would have been more challenging. *See* 89 FR at 48723–31.[433] Extending the entry period for the Circumvention of Lawful Pathways rule would ensure that DHS can continue to deliver timely consequences, where appropriate, to more noncitizens encountered, even at levels of migration below the threshold at which the suspension and limitation on entry under this rule would be active. As the Departments explained in the IFR, "at 1,500 daily encounters between POEs . . . DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States." *Id*. at 48752. This estimate was expressly based on the Departments' demonstrated performance under the Circumvention of Lawful Pathways rule, *see id.*, and therefore accounted for the effects of that policy as well as the most recent data on capacity limitations, demographics, fear claim rates, and other variables. *See id.* Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption would mean that when encounters between POEs begin to exceed 1,500 encounters and the threshold for continuing or reactivating the measures in this rule is not yet met, the Departments' ability to deliver timely decisions and consequences would likely be impaired.[434]

---

[433] Between May 12, 2023, and June 4, 2024, CBP placed into expedited removal approximately 920 individuals encountered at and between POEs each day on average. OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab). While encounters at the SWB and in coastal sectors averaged over 5,000 per day for the period from May 12, 2023, to June 4, 2024, border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule. *Id.*; 89 FR at 48724 & n.99.

[434] Assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs) approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption. *Id.*

Second, the Departments continue to be subject to significant resource limitations, *see* 89 FR at 48728–31, such that—as explained earlier in this section—even at levels of encounters below the 2,500-encounter threshold contained in section 2(b) of the Proclamation, DHS would not be able to quickly remove the majority of those encountered who do not have a basis to remain.[435]  In such circumstances, DHS will need policy interventions like the Circumvention of Lawful Pathways rule to continue delivering timely consequences.  Although there were months during the FY 2013—FY 2019 period "in which daily encounters . . . between 1,500 and 2,500 resulted in an average of 210 individuals released each day," *see* 89 FR at 48753, such a low release rate would be unrealistic given today's demographic mix of encounters, even at 1,500 daily encounters, particularly in the absence of policy interventions such as the Circumvention of Lawful Pathways rule.  For instance, even under the Circumvention of Lawful Pathways rule, assuming that USBP processes 900 noncitizens per day for expedited removal at 1,500 daily encounters between POEs, and assuming a similar level of voluntary returns and reinstatements as observed during the immediate pre-pandemic period, DHS would be able to refer into expedited removal 77 percent of single adults and individuals in family units to expedited removal, and would likely release over 530 single adults and individuals in family units.[436]  This is due to current resource limits for expedited removal, current demographics, and fear-claim and screen-in rates under the Circumvention of Lawful Pathways rule.[437]  If one adjusts the calculation to use the fear-claim and comprehensive screen-in rates that existed during the pre-pandemic period, over 700 single adults and family members would be released.[438]  In short, unless the Departments extend the entry period of the Circumvention of Lawful Pathways rule,

---

[435] After the conditions for discontinuing the suspension and limitation on entry under section 2(a) of the Proclamation are met, the suspension and limitation on entry in this rule will continue or reactivate when the 2,500-encounter threshold in section 2(b) of the Proclamation is reached.  This numerical gap between discontinuation and continuation or reactivation is important for operational reasons, *see* 89 FR at 48753, but also potentially results in periods of relatively high encounter numbers that the Circumvention of Lawful Pathways rule is needed to manage.

[436] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[437] *Id.*

[438] *Id.*

DHS's ability to deliver timely consequences would be further degraded because releases pending section 240 removal proceeding would be significantly higher. If the demographics were to shift such that the Circumvention of Lawful Pathways rule was no longer necessary to manage steady-state levels of migration, the Departments could at that time revise policy as appropriate.

Third, even as the United States has continued to coordinate extensively with its regional partners to expand the availability of lawful, safe, and orderly pathways, the Departments have found that these efforts are strengthened by the imposition of appropriate measures to prepare for and respond to ongoing migration challenges as needed. A key component of the Departments' engagement with foreign counterparts has been their ability to demonstrate a willingness to impose, and as appropriate expand, meaningful policy and operational measures in direct response to the pressures caused by migratory flows. *See* 89 FR at 48759. The Departments believe that "leading by example" has been an important part of our overall regional engagement and helped encourage regional partners to continue to adopt new and creative policy and operational migration responses. *Id*. By extending the applicability of the Circumvention of Lawful Pathways rule, the Departments believe it would not only demonstrate to our regional partners that we are committed to disincentivizing irregular migration, but it would also encourage our international partners to maintain their mutual efforts to address the unprecedented migration of people in the Western Hemisphere.

Fourth, with respect to the effects of the rule in general and on those who migrate irregularly in particular, experience has proven that the ability to deliver swift consequences for those who do not use lawful, safe, and orderly pathways or processes for entering the United States is critical; the expiration of the Circumvention of Lawful Pathways rule would limit the Departments' abilities to deliver consequences where appropriate, likely changing the perception and decision-making calculus of would-be migrants and thus could be a pull-factor and serve to increase border encounters. Extending the entry period indefinitely would avoid creating the

impression among those contemplating crossing irregularly that no timely consequences will apply to them if they wait until the suspension and limitation on asylum eligibility provided for in the Securing the Border rule is lifted and then cross irregularly.

The indefinite applicability of the entry period would also ensure that the Circumvention of Lawful Pathways rule's incentive for migrants to utilize lawful, safe, and orderly pathways will continue should the enhanced measures in the Securing the Border rule not be in effect in the future. Although initially designed as a temporary measure, the Circumvention of Lawful Pathways rule is also a critical component of DHS's broader efforts to incentivize migrants to use the lawful, safe, and orderly pathways and processes that the United States Government has made available to them, thereby reducing irregular migration and allowing more efficient and timely processing at the southern border. *See* 88 FR at 31318. Since 2021, the Departments have steadily expanded such pathways, including by increasing refugee processing in the Western Hemisphere; providing country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit; and expanding the availability of the CBP One app to allow noncitizens to schedule appointments to present at a POE rather than risking their lives by crossing the border unlawfully.[439] To encourage noncitizens to continue to pursue such pathways, rather than putting their lives in the hands of dangerous smugglers and resorting to irregular migration that strains the border security and immigration system, the Departments are considering extending the Circumvention of Lawful Pathways rule indefinitely.

Fifth, there are a variety of factors outside of DHS's control that an indefinite extension could help mitigate. Political unrest abroad, natural disasters and climate change, perceptions about U.S. elections or changes in domestic policy, implications of elections in the region, large-scale economic fluctuations, and the migration management practices of regional partners (e.g.,

---

[439] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

their enforcement practices or visa policies)—all have the potential to serve as push or pull factors and dramatically impact encounters at the southern border. *See* 88 FR 31327. An indefinite extension would ensure consistency in U.S. border management practices and maintain a basic tool necessary to address potential migration surges.

Sixth, the Departments believe this approach would complement recent policy initiatives, including this Securing the Border rule, by allowing DHS to continue to deliver timely consequences to more noncitizens encountered who do not have a legal basis to remain, even at levels of migration below the threshold at which the suspension and limitation on entry would be continued or reactivated.

Finally, extending the applicability of the rebuttable presumption would guard against a circumstance where an adverse litigation outcome against any aspect of this rule or its limitation on asylum eligibility would leave the Departments without sufficient tools in place to address high volumes of migration. Litigation against the IFR remains ongoing,[440] as does litigation against the Circumvention of Lawful Pathways Rule.[441] Maintaining the rebuttable presumption as a fallback measure is a commonsense way to address the possibility of a judicial decision that temporarily or permanently impairs the Departments' ability to implement this rule.

In considering whether to extend the temporal applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions and, if so, how to implement such a change, the Departments expect to consider other changes to the rule's provisions warranted by an extension, and as necessary to achieve the goals of the rule. The Departments request comment regarding any such changes and particularly welcome comments addressing whether and how extending the Circumvention of Lawful Pathways rule's temporal applicability—especially an indefinite extension—would warrant:

---

[440] *See Las Americas Immigrant Advocacy Ctr. v. DHS*, No. 1:24-cv-1702-RC (D.D.C. filed June 12, 2024).

[441] *See East Bay Sanctuary Covenant v. Biden*, No. 18-cv-06810, 2023 WL 4729278 (N.D. Cal. July 25, 2023), vacatur stayed pending appeal *East Bay Sanctuary Covenant v. Biden*, No. 23-16032 (9th Cir. Aug. 3, 2023); *M.A. v. Mayorkas,* No. 23-cv-01843 (D.D.C. June 6, 2023); *Texas v. Mayorkas*, No. 23-cv-00024 (W.D. Tex. May 23, 2023); and *Indiana v. Mayorkas*, 23-cv-00106 (D.N.D. May 31, 2023).

- Amendments to the continuing applicability provisions at 8 CFR 208.33(c)(1) and 1208.33(d)(1) regarding future applicability of the rebuttable presumption of asylum ineligibility to those who enter and are subject to the Circumvention of Lawful Pathways rule's provisions;

- Amendments to the exception to continuing applicability at 8 CFR 208.33(c)(2) and 1208.33(d)(2) for certain asylum applications filed after May 11, 2025, by noncitizens who entered as children in a family unit and who later apply for asylum as principal applicants;

- Amendments to the grounds for necessarily rebutting the rebuttable presumption;

- Amendments to the exceptions to the rebuttable presumption; and

- The addition or amendment of any other specific regulatory provisions related to the Circumvention of Lawful Pathways rule in light of the proposal to extend the temporal application of the rebuttable presumption and related credible fear provisions.

## V. Regulatory Requirements

### A. Administrative Procedure Act

The Departments have forgone the Administrative Procedure Act's ("APA") delayed-effective-date procedure in implementing this rule because the Departments have found good cause to do so and because this rule relates to a foreign affairs function of the United States. *See* 5 U.S.C. 553(d)(3), (a)(1).[442]  This rule generally adopts the provisions of the IFR with a few technical amendments and changes to the calculation of thresholds to ensure those provisions can remain in force until there has been a sustained decrease in daily encounters.  None of the

---

[442] There is also good cause to forgo notice and comment on the rule's updates to the cross-reference to the definition of "victim of a severe form of trafficking in persons" in 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) from "§ 214.11" to "§ 214.201."  Notice and an opportunity to comment on that technical change to the cross-reference is unnecessary as it does not change the substance of the provision and merely updates a cross-reference that has been rendered imprecise by a subsequent rulemaking.  *See* 89 FR at 34931–32 (moving the definitions from 8 CFR 214.11 to the newly created 8 CFR 214.201).

amendments, crucially, implicate the justifications for the 30-day waiting period. The purpose of the waiting period is "to give affected parties time to adjust their behavior before the final rule takes effect." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir. 1992). Here, however, that purpose would not be served by delaying the effective date of the rule: The IFR has been in effect since June 5, and the limited changes adopted in this rule do not require anyone other than the Departments themselves to change their conduct or to take any particular steps in advance of the effective date. *See United States v. Gavrilovic*, 551 F.2d 1099, 1104 (8th Cir. 1977) (noting that the "legislative history of the APA" indicates that the waiting period "was not intended to unduly hamper agencies from making a rule effective immediately," but intended "to 'afford persons affected a reasonable time to prepare for the effective date of a rule . . . or to take other action which the issuance may prompt'" (citing S. Rep. No. 752, 79th Cong., 1st Sess. 15 (1946); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 25 (1946))). Instead, the changes made by this rule address the encounter thresholds that the Departments will use to determine the applicability of the rule's suspension and limitation on entry and better ensure that the measures devised to deal with emergency border circumstances will remain in place until there has been a sustained easing of those circumstances.

In finding good cause to bypass the 30-day waiting period, the Departments have taken care to "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable [amount of] time to prepare for the effective date of [the] rul[e]." *Gavrilovic*, 551 F.2d at 1105. Here, that balance tips considerably in favor of immediate implementation, where the limited changes introduced by this rule preserve the status quo and do not interfere with the operative provisions of the IFR. At most, the amendments in this rule are designed to buttress the IFR's effectiveness in dealing with the emergency border circumstances by better ensuring that its limitation on asylum eligibility and other measures will stay in place until there has been a sustained improvement in encounter patterns across the southern border. For instance, the September 27 Proclamation and

this rule provide that UCs from non-contiguous countries should be included in calculating the number of encounters to determine whether the suspension and limitation on entry remain in effect or are discontinued.  They additionally provide that the suspension and limitation on entry are not to be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days.  The changes to the threshold represent an incremental improvement upon the prior thresholds.  These changes fine-tune the statistical parameters for tracking daily encounters so as to immunize the emergency measures from transitory blips in the data, but do not disturb or add to requirements imposed by the IFR.

       Even in the narrow circumstances where the changes made in this final rule might have an effect on whether the rule's provisions apply, a waiting period would provide little benefit. The amendments do not impose new requirements or obligations on migrants contemplating a border crossing, nor on other entities that might claim an interest in the rulemaking, such as legal service organizations looking to help noncitizens navigate the immigration system (or, to the extent such interests should be considered, smugglers and TCOs angling to learn about legal developments ahead of time so as to exploit perceived gaps in the border processing regime). All of those parties have long been on notice of the substantive provisions of the June 3 Proclamation and the IFR, none of which this rule purports to invalidate.  The Proclamation and the IFR went into effect months ago and have since been the subject of regular public updates from DHS, as well as detailed coverage from the national news press.[443]

       To the extent the threshold adjustments might have any effect in the next 30 days—i.e., by preventing the IFR's emergency measures from being discontinued, when they otherwise

---

[443] *See* DHS, *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS-DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), *https://www.dhs.gov/news/2024/07/24/fact-sheet-president-bidens-presidential-proclamation-and-joint-dhs-doj-interim*; CBP, *Statistics Show Lowest Southwest Border Encounters in Nearly Four Years* (Aug. 16, 2024), *https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2024-monthly-update*; Miriam Jordan & J. David Goodman, *Amid Talk of Border Chaos, Crossings Have Sharply Declined*, N.Y. Times (July 20, 2024), *https://www.nytimes.com/2024/07/20/us/border-immigration-current-situation.html*; Rebecca Santana & Elliot Spagat, *Border arrests fall more than 40% after Biden's halt to asylum processing, Homeland Security says*, AP News (June 26, 2024), *https://apnews.com/article/border-arrests-biden-asylum-mexico-immigration-6e302f06f567b96d88cc1333aa6d10fe*.

would have turned off under the old parameters—this would only heighten the impetus for human smugglers and other criminals to inflate or distort the significance of the policy development to manufacture a sense of urgency among migrants and induce them to attempt to enter the country without delay.[444]  As the Departments explained in the IFR, individuals contemplating entry into the United States may respond to both real and perceived incentives that stem from changes to border management and immigration policies.  89 FR at 48764.  In such circumstances, it may be easier for smugglers to "prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy."  *Id*.

Immediate implementation is warranted not only in the absence of any benefit that advance notice would provide, but also to avoid the significant costs that would accrue to the Department if they had to toggle between applying and discontinuing the emergency border measures while waiting for this rule to go into effect.  That is especially true for the amendment expanding the timeline over which a decline in encounters must be observed before the agencies will lift the suspension and limitation on entry consistent with the June 3 Proclamation.  Prior to this rule, a one-day drop in the 7-consecutive-day average to a number below 1,500 encounters would have triggered the process by which the agencies must discontinue the emergency border measures—even if that drop turned out to be a mere one-off event amidst a longer pattern of daily encounters far exceeding 1,500.  The amendments contained in this rule guard against such situations where the agencies' ability to consistently apply the rule's important measures might

---

[444] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever.  But There's Still One Way into America*, Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html*; Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires*, AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message.  He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

be disrupted by short-lived and intermittent fluctuations in the longitudinal tracking data.[445]  That

rationale extends to the decision to bypass the 30-day waiting period for this rule.  Unless the

amendments are implemented immediately, the agencies could face a predicament where they

would have to abruptly suspend the emergency measures if the 7-consecutive-calendar-day-

average dipped below 1,500 for a single day, only to then reverse course and reimpose the same

measures as soon as encounters rose again to an average of 2,500 or more.  Such sudden shifts in

the implementation of the June 3 Proclamation and IFR would be operationally burdensome to

the agencies and would require the development and issuance of starkly differing instructions

and internal guidance based on whether the measures had been discontinued, continued, or

reactivated.  The possibility of such shifts is arguably an inevitable consequence of the decision

to limit the applicability of the rule's provisions to the existence of a temporary circumstance; at

the same time, the Departments have sought to temper the frequency and severity of such shifts

through two means: (1) in the IFR, providing for a gap between the 1,500-encounter threshold

and the 2,500-encounter threshold, *see* 89 FR at 48753; and (2) in this rule, making modest

changes to the provisions governing encounter calculations and discontinuation mechanics.

Finally, for similar reasons, immediate implementation is justified in light of the United

States' foreign policy priorities.  Because this rule involves a foreign affairs function of the

United States, it is exempt from the APA's delayed-effective-date requirement.  *See* 5 U.S.C.

553(a)(1); *see also* 89 FR at 48759–62.  It is conceivable that had a 30-day waiting period been

imposed, a very substantial one-day drop in the encounters average would have led to a

discontinuation of the emergency provisions of the Proclamation and IFR.  That in turn could

have had a direct and immediate impact on migratory flows through other countries in the region,

as those countries have articulated before.  *See* 89 FR at 48761.  Past experience has shown that

---

[445] For similar reasons, the June 3 Proclamation provides that the suspension and limitation on entry remain in place for 14 days after the agencies have determined there has been an average of less than 1,500 encounters.  This allows "the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained."  89 FR at 48749.

even a *perceived* policy development can touch off a surge in irregular migration throughout the region. One regional partner, for example, concluded that the formation of caravans in the spring of 2022 was attributable to rumors of the termination of the Title 42 public health Order, which were followed by an official announcement. *Id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid by forgoing a waiting period. *Rajah*, 544 F.3d at 437 (quotation marks omitted). Immediate implementation also allows the United States to demonstrate its continued and shared commitment to addressing irregular migration in the region, an objective that directly involves a foreign affairs function of the United States. *See* 89 FR at 48761–62.

In sum, the amendments introduced in this final rule do not fundamentally change the way in which the IFR addresses the emergency circumstances at the border and instead ensure that the system created in response to those circumstances remains in force until a decrease in encounters proves to be sustained. As a result, the purpose of the delayed-effective-date-requirement—providing affected parties time to adjust to changes in the status quo—would not be served by delaying effectiveness here, where the changes preserve the status quo. Moreover, even in the narrow circumstances in which this rule's changes to the thresholds would have an effect (by avoiding a discontinuation of the rule's emergency procedures due to a short-term change in encounter numbers), the Departments are unable to identify sufficient particular hardships to affected persons that would contravene fairness and potentially outweigh the Departments' considered assessment of the need for immediate implementation, including the need to avoid disruptive changes to the continuation of the rule's emergency provisions. There is good cause to forgo the 30-day waiting period for this rule and to instead implement it without delay.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Orders 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and 13563 ("Improving Regulation and Regulatory Review") direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Management and Budget has designated this rule a "significant regulatory action" as defined under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094. Accordingly, the Office of Management and Budget has reviewed this rule.

1. Effects Under a Without-IFR Baseline

The primary effect of the final rule, as compared to a without-IFR baseline,[446] is to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum eligibility under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a

---

[446] The benefits and costs of a regulation under Executive Order 12866 are generally measured against a no-action baseline: an analytically reasonable forecast of the way the world would look absent the regulatory action being assessed, including any expected changes to current conditions over time. *See* OMB Circular No. A-4 11 (Nov. 9, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf*. For purposes of this analysis, the Departments use the without-IFR baseline as the primary baseline, and a with-IFR baseline as a secondary baseline. The primary baseline also serves as the baseline for the significance determination under section 3(f)(1) of Executive Order 12866.

reasonable probability of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are denied or do not seek asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail not only the loss of asylum but also its attendant benefits, although such persons may be granted statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek asylum and protection. In these cases, there would likely be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs

would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration and to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The effects should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See, e.g.*, 89 FR 67459, 67486–88.

2. Effects Under a With-IFR Baseline

The only expected effects of this rule relative to a with-IFR baseline would involve the changes to the thresholds discussed above. As explained in Section II.C.1 of this preamble, the amendments marginally reduce the probability that the suspension and limitation on entry will be discontinued prematurely or remain discontinued during periods in which high levels of migration place significant strain on the Departments' resources and capabilities. The amendments do so by (1) requiring the 7-consecutive-calendar-day average below 1,500 encounters to persist for 28 consecutive calendar days before the 14-day waiting period is triggered, and by (2) including encounters of UCs from non-contiguous countries when calculating encounters for the purpose of the thresholds under sections 2(a) and 2(b) of the Proclamation.

It is challenging to predict with certainty the effects of the Departments' decision to adopt these changes. Although in some circumstances the Departments' decision could reduce the likelihood that the rule's limitation on asylum eligibility and changes to the credible fear process would be discontinued or remain discontinued, the Departments have not assigned a specific probability to such circumstances occurring. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59.

If the changes to the thresholds were to result in this rule's emergency provisions remaining activated for a longer period of time than they would have been under the IFR, those changes would amplify this rule's effects relative to a with-IFR baseline. In such a circumstance, the same analysis presented with respect to the without-IFR baseline above would apply here as well, but the marginal impacts of this final rule (compared to the with-IFR baseline) are expected to be smaller than the marginal impacts of the IFR (compared to the without-IFR baseline). For instance, the primary effects of this rule would still be felt by noncitizens outside of the United States. And for those who are present in the United States, the rule would still likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of persecution or torture would remain in the United States. The changes made in this rule may decrease the administrative burdens associated with discontinuing and continuing or reactivating the measures contained in the rule.

3. Discontinuation Analysis Under a Without-IFR Baseline

For purposes of this assessment, the Departments have also analyzed the potential effects of the 7-consecutive-calendar-day average of encounters falling below 1,500. If that average remains below 1,500 encounters for 28 consecutive calendar days, and the 2,500-encounter threshold is not reached during the 14-day waiting period, the rule's provisions will be

discontinued 14 days after the Secretary's determination and remain so until one day after the Secretary determines that the 7-consecutive-calendar-day average of encounters has reached 2,500.

The effects of discontinuation would depend on a wide range of factors that are difficult to predict and may involve factors arising from events occurring outside the United States, or entirely outside the Departments' control. Some such factors would include:

- Whether the Circumvention of Lawful Pathways rule would apply at the time of the discontinuation;[447]

- Whether metrics such as fear-claim rates and screen-in rates during the discontinuation period would resemble rates previously observed under the Circumvention of Lawful Pathways rule;[448]

- Whether, in the absence of a discontinuation, such rates would continue to resemble those observed from June 5, 2024, through August 31, 2024;

- Encounter levels and related demographics during the discontinuation period, which, in turn, are influenced by factors such as family and community networks, economic conditions, environmental and security-related push factors, responses to policy changes such as the discontinuation itself, and rapidly evolving criminal smuggling networks;

- Available processing resources;

- Tactical changes by smugglers and migrants;

---

[447] In Section IV.B of this preamble, the Departments seek comment on whether to extend the applicability of that rule to certain noncitizens who enter the United States after May 11, 2025.

[448] As noted in Section II.A.2 of this preamble, under this rule, from June 5, 2024, through August 31, 2024, 27 percent of those encounters between POEs at the SWB and processed for expedited removal claimed fear, compared to a 57 percent fear-claim rate under the Circumvention of Lawful Pathways rule and a 37 percent fear-claim rate during the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Similarly, with this rule's "reasonable probability" standard in place, the comprehensive screen-in rate for those USBP encounters manifesting fear has decreased to approximately 57 percent, compared to approximately 62 percent for those screened under the Circumvention of Lawful Pathway rule with its lower "reasonable possibility" standard in place, and 83 percent in the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

- Misinformation, disinformation, or malinformation generated by smugglers and circulating online among migrant communities; and

- Whether and how soon the 2,500-encounter threshold for continuing or reactivating the rule's provisions would be reached.

Assuming the Circumvention of Lawful Pathways rule remains in effect at the time of a discontinuation, in the immediate aftermath of a discontinuation, the Departments would begin the processing of noncitizens under the Circumvention of Lawful Pathways rule's provisions: the Departments would apply the rebuttable presumption of asylum ineligibility during covered credible fear screenings and section 240 removal proceedings and employ a "reasonable possibility of persecution or torture" standard to screen for potential eligibility for statutory withholding of removal and CAT protection for those noncitizens who are unable to establish a significant possibility that the rebuttable presumption does not apply or that they can rebut it. Although it is impossible to reliably address these uncertainties quantitatively, the Departments offer a number of observations about the potential outcomes of a discontinuation while the Circumvention of Lawful Pathways rule applies.

Although the Circumvention of Lawful Pathways rule meaningfully improved the Departments' capacity to deliver timely decisions and consequences and is a critical tool for the Departments to incentivize the use of lawful, safe, and orderly pathways, *see* Section IV of this preamble, it did not yield efficiency benefits comparable to those delivered by the IFR.[449]  Under the Circumvention of Lawful Pathways rule, the average processing time for USBP encounters, from encounter to removal, was 44 days—down from 75 days in the pre-pandemic period; under the IFR, the average processing time decreased more than 25 percent as compared to the time

---

[449] As discussed elsewhere in this preamble and in the Circumvention of Lawful Pathways rule, high encounter rates at the southern border, combined with inadequate resources and tools to keep pace, have limited DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities.  *See* 89 FR at 48714.  This mismatch between the resources made available by Congress and large numbers of encounters creates significant stress on the border and immigration systems that forces DHS to rely on slower processing pathways—limiting the Departments' ability to more quickly deliver consequences to individuals who do not have a legal basis to remain in the United States.

period under the Circumvention of Lawful Pathways rule, to 32 days.[450]  A comparison of the number of expedited removals processed per day is also instructive.  Under the Circumvention of Lawful Pathways rule, USBP referred, on average, about 860 people for expedited removal per day,[451] while under the IFR, USBP referrals for expedited removal increased approximately 28 percent, to an average of nearly 1,100 persons per day.[452]

In particular, the elimination of lengthy and suggestive advisals and the shift to a manifestation standard under the Securing the Border rule contributes to a substantially lower proportion of noncitizens encountered between POEs at the SWB being referred for credible fear interviews.  Fear-claim rates dropped from 57 percent under the Circumvention of Lawful Pathways rule to a 27 percent fear-claim rate under the IFR.[453]

The reduction in fear-claim rates allows USCIS to focus its resources more effectively and efficiently on those noncitizens who may have a fear of return to their native country or their country of removal or indicate an intention to seek fear-based relief or protection and enables DHS to more swiftly process and remove those who do not manifest a fear or express an intent to apply for asylum.[454]  Congress has not provided the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, including under the Circumvention of Lawful Pathways rule.  *See* 89 FR at 48732.  When the Departments' ability to timely process, detain, and remove, as appropriate, noncitizens who do not establish a legal basis to remain in the United States is limited, it exacerbates the risk of severe overcrowding in USBP facilities and POEs and creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be

---

[450] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[451] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[452] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[453] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[454] *Id.* (showing both reduced rates of fear claims/fear manifestation and reduced time from encounter to negative fear removals).

granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts.  *Id.*  This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants to make the dangerous journey to the southern border to invoke credible fear procedures and take their chances on being allowed to remain in the country for a lengthy period. *Id.*

The Securing the Border rule expressly guards against the resource strains posed by very high levels of encounters; the day after the Secretary makes a factual determination that there have been 2,500 daily encounters, the Departments will again implement the Securing the Border rule, thereby reestablishing stronger incentives against irregular migration.  But as discussed in Section II.C.1 of this preamble, the Departments may not be able to fully realize the benefits of the Securing the Border rule in the first few days of reactivation, because encounters made prior to reactivation must still be processed under the Circumvention of Lawful Pathways rule. Unnecessary discontinuations and reactivations also impose unnecessary costs on the Departments.  And frequent discontinuations—which the changes made in this rule seek to avoid—risk signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided entirely by simply waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing.

Finally, there are of course other differences between the two frameworks as well.  For instance, the Circumvention of Lawful Pathways rule affects the asylum eligibility of a smaller number of migrants, because that rule generally does not affect the asylum eligibility of Mexican nationals.  For such persons, the application of the Circumvention of Lawful Pathways rule instead of the Securing the Border rule could result in greater access to asylum and its attendant benefits, and even those determined to be subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility will be screened for statutory withholding of

removal and CAT protection at the "reasonable possibility" standard, rather than the "reasonable probability" standard applied during statutory withholding of removal and CAT protection screenings under the Securing the Border rule.

4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption

In Section IV of this preamble, the Departments also propose to extend and expand the applicability of the Circumvention of Lawful Pathways rebuttable presumption. First, in Section IV.A of this preamble, the Departments request comment on whether to expand the rebuttable presumption (which currently applies to noncitizens who "enter[] the United States from Mexico at the southwest land border or adjacent coastal borders" after traveling through certain third countries) such that the rebuttable presumption would also apply to noncitizens who enter across southern coastal borders by sea and irrespective of whether such noncitizens traveled through a third country before entry across the southern costal borders. This would expand the geographic reach of the rebuttable presumption. Second, in Section IV.B of this preamble, the Departments request comment on whether to indefinitely extend the entry period (currently scheduled to end on May 12, 2025) so that the rebuttable presumption will apply to noncitizens who enter the United States without documents sufficient for lawful admission any time on or after May 11, 2023. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i).

The potential effects of such an expansion and extension are described in Section IV of this preamble. The expansion would (1) make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to irregular migration no matter where along the southern border they cross; (2) deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of

Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) ensure consistency in implementation between the Circumvention of Lawful Pathways rule's rebuttable presumption and the provisions in the Securing the Border rule.

The proposed extension of the Circumvention of Lawful Pathways rule's entry period would better preserve the Departments' ability to deliver timely decisions and consequences. Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption after May 11, 2025 would mean that when the following three conditions are satisfied—1) the threshold for discontinuing the Securing the Border rule's provisions has been met, 2) encounters between POEs begin to exceed 1,500 encounters, and 3) the threshold for continuing or reactivating the measures in this rule is not yet met—without the ability to apply the Circumvention of Lawful Pathways rebuttable presumption, the Departments' ability to deliver timely decisions and consequences would likely be impaired.  For example, assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs), approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption.[455]  At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption.[456]  These differences are driven by differences in fear-claim and screen-in rates.[457]

---

[455] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[456] *Id.*

[457] *Id.*

The primary effect of the Departments' proposed expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption would be to reduce incentives for irregular migration and illegal smuggling activity during periods when the threshold for discontinuing the measures in the Securing the Border rule has been met or where that rule is otherwise not in effect due to an adverse litigation outcome against its asylum limitation or any aspect of that rule. The primary effects of such an expansion and extension would be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and subject to the rebuttable presumption, such an action would likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable possibility of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the rebuttable presumption if they meet certain exceptions, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable possibility of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of such an expansion or extension would include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the strain that further surges in irregular migration would impose on the Departments.

The direct costs of the expansion or extension would be borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rebuttable presumption but would otherwise have received asylum, such an outcome would

entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States—although such noncitizens may in the end be granted asylum despite the rebuttable presumption by operation of the family unity provision that applies in section 240 removal proceedings. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would.

The expansion and extension of the rebuttable presumption may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rebuttable presumption to the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rebuttable presumption would require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. However, such an expansion or extension may reduce perceived incentives for irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rebuttable presumption to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rebuttable presumption.

Other entities may also incur some indirect, downstream costs as a result of an expansion or extension. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of such an action, which would be the application of steady-state regulations that have not been the primary mode of the processing of noncitizens at the southern border since before the Title 42 public health Order. As compared to the baseline condition, an expansion and extension would be expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See* 89 FR at 67486–88.

## C.  Regulatory Flexibility Act

Under the Regulatory Flexibility Act ("RFA"), "[w]henever an agency is required by section 553 of [the APA], or any other law, to publish general notice of proposed rulemaking for any proposed rule, . . . the agency shall prepare and make available for public comment an initial regulatory flexibility analysis."  5 U.S.C. 603(a); *see also id.* 604(a) (final regulatory flexibility analysis).  Such analysis requires agencies to consider the direct impact of the proposed rule on "small entities."  *Id.* 603(a); *see also id.* 604(a) (final regulatory flexibility analysis).  This rule does not directly regulate small entities and is not expected to have a direct effect on small entities.  It does not mandate any actions or requirements for small entities.  Rather, this rule regulates individuals, and individuals are not defined as "small entities" by the RFA.  *See* 5 U.S.C. 601(6).  Based on the evidence presented in this analysis and throughout this preamble, the Departments certify that this final rule would not have a significant economic impact on a substantial number of small entities.  And for the same reason, the Departments certify that the Circumvention of Lawful Pathways rule, if extended or expanded, would not have a significant economic impact on a substantial number of small entities.

## D.  Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments.  Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector.  2 U.S.C. 1532(a).  The inflation-adjusted value of $100 million in 1995 is approximately $200 million in 2023 based on the Consumer Price Index for All Urban Consumers (CPI-U).[458]

---

[458] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI-U): U.S. city average, all items, by month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf* (last visited Sept. 21, 2024).

The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This rule does not contain a Federal mandate because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to the entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this proposed rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of UMRA, therefore, do not apply, and the Departments have not prepared a statement under UMRA.

*E. Congressional Review Act*

The Administrator of the Office of Information and Regulatory Affairs has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). When compared to the with-IFR baseline, the changes made in this final rule[459] have not resulted in, and are not likely to result in, an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or

---

Steps in calculation of inflation: (1) Calculate the average monthly CPI-U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI-U from current year CPI-U; (3) Divide the difference of the reference year CPI-U and current year CPI-U by the reference year CPI-U; (4) Multiply by 100 = [(Average monthly CPI-U for 2023 – Average monthly CPI-U for 1995) ÷ (Average monthly CPI-U for 1995)] × 100 = [(304.702 – 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

[459] The Administrator of the Office of Information and Regulatory Affairs has measured the effects of this final rule with a with-IFR baseline. *See* 5 U.S.C. 804(2); *compare* Section V.B of this preamble.

geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

*F. Executive Order 13132 (Federalism)*

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform.

*H. Family Assessment*

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the

norms of society.  If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

*I.  Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J.  National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.*, applies to these actions and, if so, what level of NEPA review is required.  42 U.S.C. 4336.  DHS's Directive 023-01, Revision 01 and Instruction Manual 023-01-001-01, Revision 01 ("Instruction Manual 023-01-001-01") establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement.  42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(c)(8), 1508.1(e).  DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023-01-001-01.  Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action;

and (3) no extraordinary circumstances exist that create the potential for a significant

environmental effect.

 The rule adopts as final the following three changes to the process for those seeking

asylum, statutory withholding of removal, or CAT protection during emergency border

circumstances:

- For those who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will continue to provide general notice regarding the processes for seeking asylum, statutory withholding of removal, and CAT protection, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to their country or the country of removal.

- During emergency border circumstances, those who enter the United States across the southern border and who are not described in paragraph 3(b) of the June 3 Proclamation will continue to be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201.

- The limitation on asylum eligibility will continue to be applied during credible fear interviews and reviews, and those who enter across the southern border during

emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation and do not establish exceptionally compelling circumstances under the credible fear screening standard will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

This rule also makes a small number of changes consistent with the overall purpose and structure of the IFR, as discussed in Section II.C of this preamble, and requests comment on the potential expansion and extension of the applicability of the Circumvention of Lawful Pathways rebuttable presumption.

Given the nature of the final rule with request for comment, DHS has determined that it is categorically excluded under its NEPA implementing procedures, as it satisfies all three relevant conditions.  First, the final rule with request for comment clearly fits within categorical exclusions A3(a) and A3(d) of DHS's Instruction Manual 023-01-001-01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively.  The IFR changed certain procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect.  This final rule makes only modest changes to the IFR and seeks comment on the expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption.  Second, this final rule with request for comment is a standalone rule and is not part of any larger action.[460]  Third, in accordance with its NEPA implementing procedures, DHS has determined no extraordinary circumstances exist that would cause a significant environmental impact.  Therefore, this final rule is categorically excluded, and no further NEPA analysis or documentation is required.  DOJ

---

[460] *See* Instruction Manual 023-01-001-01, at V-5.

is adopting the DHS determination that this final rule is categorically excluded under A3(a) and

A3(d) of DHS's Instruction Manual 023-01-001-01, Appendix A, because the final rule's

limitation on asylum eligibility and the "reasonable probability" standard will be applied by

EOIR in substantially the same manner as it will be applied by DHS and DOJ is not aware of any

extraordinary circumstances that would require the preparation of an environmental assessment

or environmental impact statement.  *See* 40 CFR 1506.3(d) (setting forth the ability of an agency

to adopt another agency's categorical exclusion determination).

*K.  Paperwork Reduction Act*

This rule does not adopt new, or revisions to existing, "collection[s] of information" as

that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat.

163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and

recordkeeping requirements.

8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and

recordkeeping requirements.

8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and

recordkeeping requirements.

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly,  the interim final rule amending 8 CFR parts 208 and 235, which was

published at 89 FR 48710 on June 7, 2024, is adopted as final with the following changes:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

2. Amend § 208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

**§ 208.13 Establishing asylum eligibility.**

\* \* \* \* \*

(g) *Entry during emergency border circumstances.*  For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.*  For purposes of paragraph (g) of this section and this chapter, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024.  The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

**§ 208.33 [Amended]**

3. Amend § 208.33 by removing the reference to "§ 214.11(a)" in paragraph (a)(3)(i)(C) and adding in its place "§ 214.201.

4. Amend § 208.35 by:

a. Removing the reference to "§ 214.11" in paragraph (a)(2)(i)(C) and adding in its place "§ 214.201";

b. Revising paragraph (b)(2)(i); and

c. Removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," and "Proclamation" wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),".

The revision reads as follows:

## § 208.35 Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

* * * * *

(b) * * *

(2) * * *

(i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

* * * * *

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

5. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731-32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (title VII, Pub. L. 110-229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108-458, 118 Stat. 3638, and Pub. L. 112-54, 125 Stat. 550).

## § 235.15 [Amended]

6. Amend § 235.15 by removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),".

**DEPARTMENT OF JUSTICE**

Accordingly, the interim final rule amending 8 CFR part 1208, which was published at 89 FR 48710, on June 7, 2024, is adopted as final with the following changes:

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

7. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

8. Amend § 1208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

**§ 1208.13 Establishing asylum eligibility.**

\* \* \* \* \*

(g) *Entry during emergency border circumstances.*  For a noncitizen who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 1208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.*  For purposes of paragraph (g) of this section and § 1208.35, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September

27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

## § 1208.33  [Amended]

9. Amend § 1208.33 by removing the reference to "8 CFR 214.11" in paragraph (a)(3)(i)(C) and adding in its place "8 CFR 214.201".

10. Amend § 1208.35 by:

a. Removing the reference to "§ 214.11(a)" in paragraph (a)(2)(i)(C) and adding in its place "§ 214.201";

b. Revising paragraph (b)(2)(iii);

c. Removing the words "An alien" and adding in their place the words "A noncitizen", wherever they appear;

d. Removing the words "the alien" and adding in their place the words "the noncitizen", wherever they appear;

e. Removing the words "the alien's" and adding in their place the words "the noncitizen's", wherever they appear;

f. Removing the words "an alien" and adding in their place the words "a noncitizen", wherever they appear;

g. Removing the words "The alien" and adding in their place the words "The noncitizen", wherever they appear; and

h. Removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," and "Proclamation" wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 1208.13(h).

The revision reads as follows:

## § 1208.35 Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

* * * * *

(b) * * *

(2) * * *

(iii) Where the immigration judge determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the noncitizen under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard.  For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

* * * * *

Alejandro N. Mayorkas,
Secretary,
U.S. Department of Homeland Security.

Dated: September 27, 2024.

Merrick B. Garland,
Attorney General,
U.S. Department of Justice.

[FR Doc. 2024-22602 Filed: 9/30/2024 1:00 pm; Publication Date:  10/7/2024]