## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| D.G. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| E.R. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| P.S. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| D.C. and her minor daughter, L.R. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | Case No. 24-cv-1702 |
| | ) | |
| A.E. and her minor son, E.D. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| T.R. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| S.G. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| J.C. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| J.R. | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |

Chicago, IL 60604                                )
                                                 )
L.B.                                             )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
J.G.                                             )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
E.M.                                             )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
R.R. and her minor children, A.L. and J.L.       )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
L.Q.                                             )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
S.O. and her minor children W.O. and G.F.        )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
J.N. and her minor children J.S. and K.C.        )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
E.C.                                             )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )
                                                 )
J.E.                                             )
c/o National Immigrant Justice Center            )
111 W. Jackson Blvd., Suite 800                  )
Chicago, IL 60604                                )

R.C.            )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800   )
Chicago, IL 60604       )
               )
M.F.            )
c/o National Immigrant Justice Center )
111 W. Jackson Blvd., Suite 800   )
Chicago, IL 60604       )
               )
LAS AMERICAS IMMIGRANT ADVOCACY )
CENTER          )
1500 East Yandell Drive      )
El Paso, TX 79902;       )
               )
REFUGEE AND IMMIGRANT CENTER FOR )
EDUCATION AND LEGAL SERVICES  )
P.O. Box 786100        )
San Antonio, TX 78278      )
               )
    *Plaintiffs*,      )
               )
     v.         )
               )
U.S. DEPARTMENT OF HOMELAND  )
SECURITY,         )
245 Murray Lane, SW      )
Washington, DC 20528;      )
               )
U.S. CITIZENSHIP AND IMMIGRATION )
SERVICES,         )
5900 Capital Gateway Drive    )
Camp Springs, MD 20746;     )
               )
U.S. CUSTOMS AND BORDER   )
PROTECTION,        )
1300 Pennsylvania Ave, NW    )
Washington, DC 20229;      )
               )
U.S. IMMIGRATION AND CUSTOMS  )
ENFORCEMENT,       )
500 12th Street, SW       )
Washington, DC 20536;      )
               )
U.S. DEPARTMENT OF JUSTICE,   )
950 Pennsylvania Avenue, NW    )

Washington, DC 20530;                                    )
                                                         )
EXECUTIVE OFFICE FOR IMMIGRATION                         )
REVIEW,                                                  )
5107 Leesburg Pike                                       )
Falls Church, VA 22041;                                  )
                                                         )
ALEJANDRO MAYORKAS, Secretary of the                     )
Department of Homeland Security, in his                  )
official capacity                                        )
245 Murray Lane, SW                                      )
Washington, DC 20528;                                    )
                                                         )
UR JADDOU, Director of U.S. Citizenship and              )
Immigration Services, in her official                    )
capacity,5900 Capital Gateway Drive Camp                 )
Springs, MD 20746;                                       )
                                                         )
TROY A. MILLER, Senior Official Performing               )
the Duties of Commissioner for U.S. Customs              )
and Border Protection, in his official capacity,         )
1300 Pennsylvania Ave, NW                                )
Washington, DC 20229;                                    )
                                                         )
PATRICK J. LECHLEITNER, Acting Director                  )
of Immigration and Customs Enforcement, in               )
his official capacity,                                   )
500 12th Street, SW                                      )
Washington, DC 20536;                                    )
                                                         )
MERRICK GARLAND, Attorney General of                     )
the United States, in his official capacity,             )
950 Pennsylvania Avenue, NW                              )
Washington, DC 20530;                                    )
                                                         )
MARY CHENG, Acting Director of the                       )
Executive Office for Immigration Review, in her          )
official capacity,                                       )
5107 Leesburg Pike                                       )
Falls Church, VA 22041;                                  )
                                                         )
          *Defendants*.                                  )
                                                         )
_____                 )

## SECOND AMENDED COMPLAINT

1.      The United States has long sheltered refugees seeking a haven from persecution. The 1980 Refugee Act enshrined that national commitment in law. While Congress has placed some limitations on the right to seek asylum over the years, it has never permitted the Executive Branch to categorically ban asylum based on where a noncitizen enters the country. To the contrary, Congress has expressly provided that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival*…), irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). That plain statutory text precludes the President and the Executive Branch from barring noncitizens from asylum based on their manner of entry into the United States.

2.      This case challenges a September 30, 2024, Final Rule ("Rule"),[1] 89 Fed. Reg. 81156, a corresponding June 4, 2024, Interim Final Rule ("IFR"),[2] 89 Fed. Reg. 48487, and accompanying Implementation Guidance ("Guidance"), *see* Dep't Homeland Security, Information Memorandum, *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule* (June 4, 2024) at Guidance AR1-5, that categorically exclude an entire group of asylum seekers from access to that protection because of where they entered the country, directly contrary to the statute's mandate. Under the Rule, which incorporates a September 27, 2024, Amended Presidential Proclamation ("Amended Proclamation"), 89 Fed. Reg. 80351, noncitizens arriving between ports of entry at the southern border are, with extremely limited exceptions, categorically ineligible for asylum unless a 7-consecutive-calendar-day

---

[1] The Final Rule was issued on September 30, 2024, and published on October 7, 2024. It took effect on October 1, 2024.

[2] The Interim Final Rule was issued on June 4, 2024, and published on June 7, 2024. It took effect on June 5, 2024.

average of daily "encounters" of inadmissible noncitizens between ports of entry is below a 1500-encounter threshold for 28 days. This policy further entrenches the identical categorical ban in place under the IFR.[3] The threshold has been exceeded continuously since July 2020.[4] The policy blatantly violates the plain language of Section 1158(a)(1).

3.    The Rule also finalizes unlawful regulations, previously imposed by the IFR, governing how arriving noncitizens are screened to determine whether they are eligible for two other more limited forms of protection against removal to persecution or torture (or "*refoulement*"): (1) withholding of removal under 8 U.S.C. § 1231(b)(3), and (2) protection under the Convention Against Torture. Prior to the IFR, an immigration officer interviewed each noncitizen encountered to ascertain whether the noncitizen had an intention to apply for asylum or a fear of persecution. If the person was ineligible for asylum, an asylum officer then determined whether the noncitizen had a credible fear, defined as a "significant possibility," of persecution or torture. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30 (e)(2)-(3). That screening threshold helped to mitigate the risk that noncitizens would be erroneously returned to persecution or torture in their home countries.

4.    The Rule, however, adopts a screening policy that will systematically lead to the *refoulement* of people seeking protection from persecution, torture, and death. First, under the Rule, a noncitizen can be quickly removed from the United States without any process whatsoever unless an immigration officer—usually a Border Patrol agent—determines that the person has

---

[3] The IFR incorporated a June 3, 2024, Presidential Proclamation ("Original Proclamation"). Under the Original Proclamation, the categorial ban on asylum was lifted after the number of encounters was, on average, below the threshold for 7 consecutive calendar days.

[4] *See* "The Futility of 'Shutting Down Asylum' by Executive Action at the U.S.-Mexico Border," WOLA (Jun. 4, 2024), https://www.wola.org/analysis/futility-of-shutting-down-asylum-by-executive-action-us-mexico-border/.

"manifested" a fear of return. Under this requirement, individuals must "manifest" a fear of persecution or torture, without being asked if they have a fear. In practice, noncitizens who have just crossed the border, and may be hungry, exhausted, ill, or traumatized after fleeing persecution in their home countries and danger in Mexico, are likely to be intimidated by armed, uniformed Border Patrol officers, and are thus unlikely to "manifest" their fear of return. Experience, including from the period when this same requirement was in effect under the IFR, shows that, when in the past a "manifestation of fear" standard or similar directives not to ask about fear of removal were imposed, asylum seekers' fear of return has gone unrecognized.

5.      Second, even if a Border Patrol agent finds that a noncitizen adequately "manifests" a fear, the noncitizen still will not avoid removal unless an asylum officer determines that the noncitizen meets a new, more stringent screening standard: instead of satisfying the "significant possibility" standard, the noncitizen will need to show a "reasonable *probability*" of torture or persecution. As was borne out during the period the IFR was in effect, the practical impact of this policy is the return of many victims of torture and persecution to dangerous conditions.

6.      What is more, even if a noncitizen "manifests" a fear and gets screened for some form of protection, the corresponding Guidance drastically reduces the minimum time noncitizens have to find and consult with a lawyer before a credible fear interview. Previously, noncitizens had at least 24 hours, reduced from 48 hours just one year ago. Now, noncitizens may have as few as four hours, which will be spent in a border facility without meaningful access to family or counsel. In practice, this removes any chance of receiving a legal consultation, much less representation, for the overwhelming majority of noncitizens in Defendants' custody, greatly increasing the risk of *refoulement*.

7.      The Rule, IFR, and Guidance violate the Immigration and Nationality Act ("INA") and are contrary to law under the Administrative Procedure Act ("APA"). In addition, they are arbitrary and capricious in violation of the APA, and the IFR was promulgated in violation of the APA's procedural notice-and-comment requirements.

## JURISDICTION AND VENUE

8.      This case arises under the APA, 5 U.S.C. § 701 *et seq.*; the INA, 8 U.S.C. § 1101 *et seq.*; and regulations implementing the INA. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 8 U.S.C. § 1252(e)(3).

9.      Venue is proper under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, many Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also appropriate under 8 U.S.C. § 1252(e)(3)(A).

## PARTIES

10.     The Individual Plaintiffs are noncitizens who came to the United States to seek asylum, withholding of removal, and protection under the Convention Against Torture.[5] They were unlawfully issued expedited removal orders because of the IFR or the Rule. The Organizational Plaintiffs are organizations that serve asylum seekers.

### I.    Individual Plaintiffs

11.     Plaintiff D.G. is an asylum seeker from Colombia who fears persecution in that country by a criminal organization. Members of this criminal organization tried to stop D.G. from

---

[5] The Individual Plaintiffs added in this Second Amended Complaint are seeking leave to proceed under their initials in this case in a motion contemporaneously filed as to that issue, with declarations, filed under seal, setting forth the details. They are referred to in this Second Amended Complaint using their initials.

selling property and instead tried to claim it for themselves. When D.G. refused, the organization attempted to kill D.G. and her husband and held her son at gunpoint.  The family fled Colombia. While in Mexico, D.G.'s son evaded an attempted kidnapping. Fearing for their safety, the family fled to the United States. D.G. did not attempt to secure a CBP One appointment because she did not know about that option. After D.G. entered the United States and turned herself in to immigration officers on or about June 6, 2024, she was separated from her family. Unlike her husband, who was given a credible fear interview and released into the United States, and unlike her son, who was placed directly into full removal proceedings, D.G. was denied a credible fear interview based on the IFR. Despite her statements to immigration officers that she feared for her safety, they concluded that she did not affirmatively manifest a fear of harm. D.G. was deported to Colombia without her family.

12.    Plaintiff E.R. is an asylum seeker from Mexico who fears persecution in that country because of domestic violence and her sexual orientation. She had a relationship with a woman whose brother is a member of a criminal organization. The brother surveilled her and threatened to kill her. E.R. also fears her former partner, who cut her with a knife and beat her when she tried to leave the relationship. She fled to northern Mexico, where she was threatened with rape because of her sexual orientation. E.R. spent three months unsuccessfully attempting to obtain a CBP One appointment. E.R. then entered the United States at a port of entry without a CBP One appointment and turned herself in to immigration officers on or about June 8, 2024. E.R. attempted to tell immigration officers about her fear of returning to Mexico, but they disregarded her. E.R. was deemed ineligible for asylum based on the IFR. Even though she feared for her safety, she was denied a credible fear interview after an officer concluded that she did not affirmatively manifest a fear of harm. E.R. was deported to Mexico.

13. Plaintiff P.S. is an asylum seeker from Nicaragua who experienced frequent harassment and violence by the Sandinista regime. When P.S. denied the Sandinistas' request to join their movement, they called him a traitor and threatened to kill him. One day, when P.S. had the Nicaraguan flag hanging outside his home instead of the Sandinista flag, those threats evolved into physical violence. P.S. tried unsuccessfully to relocate to different parts of Nicaragua. When Nicaraguan officers aligned with the Sandinistas tried to recruit him yet again, P.S. fled to Mexico with his wife. He attempted for two weeks to get a CBP One appointment, but without success. P.S. and his wife entered the United States without a CBP One appointment and turned themselves in to immigration officers on or about June 11, 2024. He was then separated from his wife. P.S. tried multiple times to manifest his fear of harm by explaining to CBP officers that his life was in danger, including by presenting a letter expressing his fear of harm. Yet every attempt was either ignored or dismissed. P.S. was deemed ineligible for asylum based on the IFR. He was denied a credible fear interview after a CBP officer concluded that he did not affirmatively manifest a fear of harm. P.S. was deported to Mexico. By contrast, P.S.'s wife, who fled Nicaragua for the same reasons, is now in full removal proceedings where she will have an opportunity to seek protection.

14. Plaintiff D.C. is an asylum seeker from Mexico who fears persecution in that country, and Plaintiff L.R. is D.C.'s minor daughter. D.C. fled her hometown due to her former partner's involvement with a criminal organization. D.C.'s partner was incarcerated after their relationship began, but even from custody, he was violent. On one of her visits to see him in prison, D.C.'s partner raped her, leading her to become pregnant with L.R. When D.C. refused to smuggle contraband into the prison, her partner threatened her life and enlisted people not in custody to do the same. D.C. fled to the United States with L.R., but she did not use the CBP One app because she did not know about it. D.C. and her daughter entered the United States without authorization

and turned themselves in to immigration officers on or about June 8, 2024. They were detained for about eight days. At one point, a CBP officer told D.C. to sign a form so she could be released, without explaining or reading it to her. When the officer later stated that D.C. and her daughter would be "released" back to Mexico on the basis of her signature, she frantically told him that she feared for her life. The officer responded that asylum was "over" because of the number of people arriving at the border. D.C. was deemed ineligible for asylum based on the IFR. She was denied a credible fear interview after the officer concluded that she did not affirmatively manifest a fear of harm. D.C. and her daughter were deported to Mexico.

15. Plaintiff L.R. is the minor daughter of Plaintiff D.C. As a derivative on her mother's case, L.R. was subjected to the IFR. She was removed to Mexico.

16. Plaintiff A.E. is an indigenous woman from Mexico who fears persecution by a criminal organization, and Plaintiff E.D. is her minor son. This organization twice demanded that A.E. pay a substantial amount of money to them from the proceeds of a business that she ran. When A.E. first refused payment, members of the organization struck her in the face and mouth, requiring a hospital visit. When A.E. refused a second time, they threatened to burn down her house and business. The next morning, A.E. learned this same organization had killed her relatives. She therefore fled immediately to the border with her son. She did not attempt to relocate in Mexico because the criminal organization's widespread influence made doing so unsafe. A.E. did not apply for a CBP One appointment because she did not know she could. A.E. and her son entered the United States without authorization and turned themselves in to immigration officers on or about June 12, 2024. A.E. had a credible fear interview, but she did not have an opportunity to speak to an attorney beforehand, and she could not provide full answers during the interview because the officer asked primarily yes or no questions. She was deemed ineligible for asylum under the IFR.

She was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld that decision in a hearing that lasted just a few minutes. A.E. and her son were deported to Mexico.

17.    Plaintiff E.D. is the son of A.E. and a minor. In addition to the persecution experienced by his mother, a criminal organization attempted to recruit him. In the credible fear interview, he did not mention this fact to the asylum officer and was not given the opportunity to speak to the immigration judge.

18.    Plaintiff T.R. is a Cuban of African descent who fears persecution due to her political opinion and because she was involved in a same-sex relationship. T.R. worked in a government-run facility, but she was fired and subjected to surveillance after she complained about issues arising at work. When she later raised similar concerns at another job in the same field, she was pressured into resigning. In addition, T.R. was kidnapped and raped twice because of her romantic relationship with a female. When she reported these rapes to the police, they did nothing. She fled to Mexico where she was robbed, including by people she believed were police officers, and witnessed the rape of a teenage girl who was traveling with her. When T.R. screamed for help, the men beat her. As a result, T.R. feared for her safety in Mexico. For several months, T.R. tried to make a CBP One appointment without success. T.R. entered the United States without authorization on or about June 16, 2024. At her credible fear interview, T.R. was deemed ineligible for asylum based on the IFR. T.R. wanted to explain that she had been raped, but the officer seemed to be laughing at her, so she felt too uncomfortable and embarrassed. She was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture. An immigration judge

upheld that decision. T.R. was deported to Mexico; she subsequently obtained an appointment using CBP One and has reentered the United States.

19.    Plaintiff S.G. is an asylum seeker from Colombia who fears persecution in that country by a criminal organization that murdered his father. After his father's killer was released from prison, the rest of S.G.'s immediate family fled to the United States. The criminal organization then began to target S.G. Members of the criminal organization murdered another of S.G.'s family members, thinking it was him, and later shot at S.G. He fled to Mexico but feared staying there because of the criminal organization's connections in Mexico. S.G. entered the United States without authorization. He did not know about the option to make a CBP One appointment. He turned himself in to immigration officials on or about June 6, 2024. He was unable to speak to a lawyer before his credible fear interview. At his credible fear interview, S.G. was deemed ineligible for asylum based on the IFR. He had trouble explaining his story because he was told to answer yes or no questions. S.G. was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld that decision. S.G. was deported to Colombia.

20.    Plaintiff J.C. is an asylum seeker from Mexico where he fears persecution and torture. J.C. was shot twice while playing soccer with his friends. Consequently, J.C. spent about two weeks in a coma and lost one of his eyes. J.C. does not know who attacked him and his friends but believes they were associated with organized crime. After he was released from the hospital, J.C. was subject to harassment, bullying, and targeting because of his visible impairment from the loss of his eye. One day, he was stopped by police, who accused him of selling drugs and beat him when he denied it. J.C. believes the police thought he was affiliated with organized crime because

of his eye injury. Afraid for his life, J.C. entered the United States without authorization and without a CBP One appointment on or about June 25, 2024. J.C. did not have the opportunity to consult with an attorney before his credible fear interview, which occurred less than 24 hours after he expressed his fear of being deported. At his credible fear interview, J.C. was deemed ineligible for asylum based on the IFR. He was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld the decision. J.C. was deported to Mexico.

21.     Plaintiff J.R. is an asylum seeker from Colombia. J.R. and her partner co-own a business. A criminal organization demanded that J.R.'s partner pay ten percent of the business's overall revenue to them as a fee for staying in business. After J.R.'s partner refused their demands, the group gave them one month to pay or be killed. J.R.'s partner kept certain details about the group from J.R. to protect her. J.R. did not contact the police because the group is well known, and the police are unable to provide protection. Before the one-month payment deadline was up, J.R. and her partner fled to Mexico. They did not know about the CBP One app, so they entered the United States without authorization and turned themselves in to immigration officers on Saturday, July 6, 2024. They were separated upon entry. J.R. had her credible fear interview on Sunday July 7, 2024, less than 24 hours after J.R. was processed by border officers. In her interview, J.R. was allowed to provide short answers and was limited mostly to answering yes or no questions. She was deemed ineligible for asylum based on the IFR. J.R. was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld the credible fear denial, but Defendants issued her a Notice to Appear and released her into the United States. She remains subject to the IFR and Rule in her ongoing removal proceedings.

22.    Plaintiffs L.B. and J.G. are an adult couple seeking asylum from Colombia. There, a criminal organization kidnapped them, raped L.B. and brutally assaulted J.G. at gunpoint, and threatened to kill them both. That led L.B. and J.G. to flee Colombia. They did not know about the CBP One app so they entered the United States without authorization on or around October 1, 2024, and waited for border patrol officers to pick them up. They failed their credible fear interviews and were deemed ineligible for asylum based on the Rule. L.B. and J.G. were removed to Colombia, where they fear for their lives.

23.    Plaintiff E.M. is a Mexican man who has been targeted by a drug cartel. After members of the cartel assaulted E.M., threatened him and his mother, and ransacked their home, E.M. and his mother fled to the United States. They entered the United States without authorization and turned themselves in to immigration officers on October 7, 2024, to seek asylum. E.M. failed his credible fear interview and was deemed ineligible for asylum based on the Rule. E.M. was removed to Mexico, where he again began receiving death threats and fears for his life. E.M.'s mother, however, was permitted to proceed with the process for seeking protection.

24.    Plaintiff R.R. is a Mexican woman who fled to the United States with her two young children, Plaintiffs A.L. and J.L., after members of a cartel forcibly took her home and threatened physical and sexual violence against R.R. and physical violence against her children. R.R. did not feel that it was safe to wait for a CBP One appointment, so on October 16, 2024, she and her children entered the United States on foot and waited for officials to find them. R.R. and her children were deemed ineligible for asylum based on the Rule. R.R. had her credible fear interview on October 16, 2024, less than 24 hours after R.R. was processed by border officials. They were deported to Mexico October 23, 2024, where R.R. fears that she and her children will be harmed or killed by the cartel.

25.     Plaintiffs A.L. and J.L. are Plaintiff R.R.'s minor children. As a derivative on their mother's case, A.L. and J.L. were subjected to the Rule and have been removed to Mexico.

26.     Plaintiff L.Q. is an indigenous Ecuadorian man who fled to the United States after a powerful and racist criminal organization targeted, extorted, threatened to kill, and severely beat him. On his path to the United States, L.Q. faced threats in Guatemala and was robbed at gunpoint in Mexico. L.Q. entered the United States on approximately October 4, 2024, and had his credible fear interview on October 13. L.Q failed his credible fear interview and was deemed ineligible for asylum based on the Rule. L.Q. is now in immigration detention in Laredo, Texas, and fears that if he is deported to Ecuador, the criminal organization will find and kill him.

27.     Plaintiff S.O. is a Venezuelan woman and political dissident who fled to the United States with her two minor children, Plaintiffs W.O. and G.F., after an armed group allied with the Maduro regime ransacked her home, threatened her, and physically attacked her and her family. To escape persecution, S.O., W.O., and G.F. traveled through numerous countries. In Mexico, they were kidnapped, extorted, and threatened by a cartel. Fearing the cartel, S.O. tried without success to get a CBP One appointment for five months. On or about October 18, 2024, S.O., W.O., and G.F. crossed the border into the United States. Despite telling multiple officers about her past persecution and fear of returning to Venezuela, S.O., W.O., and G.F., were denied a credible fear interview and deemed ineligible for asylum based on the Rule and removed to Mexico, where they live in fear.

28.     Plaintiffs W.O. and G.F. are Plaintiff S.O.'s minor children. As a derivative on their mother's case, W.O. and G.F. were subjected to the Rule and have been removed to Mexico.

29.     Plaintiff J.N. is a Mexican woman who fled to the United States with her partner, Plaintiff E.C., and their minor children, Plaintiffs J.S. and K.C., after a drug cartel threatened their

lives and fired bullets into their home because E.C. refused to work for the cartel. J.N., E.C., J.S., and K.C., entered the United States late in the evening on October 21, 2024. They were picked up by immigration officials and taken to a detention center in Arizona on October 22. Immigration officials instructed J.N and E.C. to sign deportation orders, but they refused because they sought protection. Without explanation, on October 23 officers woke up J.N., E.C., J.S., and K.C., loaded them into a truck with many other people, and removed them to Mexico. J.N., E.C., J.S., and K.C. were deemed ineligible for protection based on the Rule. They are currently in Mexico, where they fear the threat to their lives posed by the cartel.

30.    Plaintiffs J.S. and K.C. are Plaintiffs J.N. and E.C.'s minor children. As a derivative on their parents' case, J.S. and K.C. were subjected to the Rule and have been removed to Mexico.

31.    Plaintiff J.E. is a Mexican man who fled to the United States for protection from a drug cartel that kidnapped, relentlessly beat, and threatened to kill J.E. and his family after J.E. refused to work for the cartel. Unable to hide from the cartel, J.E. fled to the United States, entering on October 20, 2024 with his sister and his sister's minor child.  The cartel later killed members of J.E.'s family. J.E. immediately and repeatedly told officers he could not go back to Mexico because he feared for his life; he was ignored and told to shut up. J.E. was denied a credible fear interview and deemed ineligible for protection based on the Rule. On October 22, 2024, J.E. was placed on a bus and removed to Mexico, where he fears for his life. J.E.'s sister and niece, however, were permitted to seek protection.

32.    Plaintiff R.C. is a Venezuelan dissident who fled the country out of fear of being harmed or killed by the Maduro regime for participating in political organizing and opposition to the administration. R.C. and his brother, M.F., fled to Mexico in April 2024, where they were threatened with deportation, robbed, and physically assaulted by government officials. On or

around October 5, 2024, R.C. and M.F. crossed the U.S.-Mexico border. R.C. was separated from his brother, deemed ineligible for protection, and deported without a credible fear interview, even though he repeatedly told border agents that he was afraid and wanted to seek asylum in the United States.

33.    Plaintiff M.F., the brother of Plaintiff R.C., is a Venezuelan political dissident who fled the country out of fear of being harmed or killed by the Maduro regime for participating in political organizing and opposition to the administration. M.F. and R.C. fled to Mexico in April 2024, where they were threatened with deportation, robbed, and physically assaulted by government officials. On or around October 5, 2024, M.F. and R.C. crossed the U.S.-Mexico border. M.F. was separated from his brother, deemed ineligible for protection based on the Rule, and deported without a credible fear interview even though he repeatedly expressed fear to border agents. He was removed to Mexico, where he is currently homeless and fears for his safety.

**II.    Organizational Plaintiffs**

34.    Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers. An essential part of Las Americas' mission is to provide immigration counseling and legal services to asylum seekers subjected to expedited removal. This work includes assisting asylum seekers in preparing for credible fear interviews, representing them during those interviews, and representing them throughout the process of obtaining immigration judge review of negative credible fear determinations. Las Americas also counsels people in Mexico who are trying to seek asylum in the United States so that they are aware of the CBP One app and know what to expect in a credible fear interview.

35.    Las Americas' mission is significantly frustrated by the Rule, IFR, and Guidance.

Because the Rule, IFR, and Guidance reduce the number of people eligible for asylum, and significantly shorten the time that noncitizens referred for credible fear interviews have to find counsel, Las Americas is impeded in its ability to provide counseling and legal services to those seeking protection and subject to expedited removal. Las Americas is likewise harmed by Defendants' decision to issue the IFR without first providing notice and an opportunity to comment. In addition to providing legal services to noncitizens on both sides of the U.S.-Mexico border, Las Americas strives to advocate and educate the public about changes to immigration law, but that work was rendered impossible by Defendants' failure to provide advance notice regarding these illegal changes.

36.    Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas. RAICES' mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals, and is the largest immigration legal services provider in Texas. RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from DHS custody. A central piece of RAICES' work with detained people involves helping them prepare for the credible fear process.

37.    RAICES' mission is also frustrated by the Rule, IFR, and Guidance. The significant reduction in the number of people eligible for asylum, and of the time that noncitizens will have to find legal counsel prior to a credible fear interview, will reduce its ability to provide free and low-cost legal services to underserved immigrant communities. And the decision by Defendants to issue the IFR without first giving notice and an opportunity to comment prevented

RAICES from engaging in advocacy regarding these changes and likewise prevented RAICES from raising important factors that Defendants should have considered before moving forward with these illegal changes.

### III.    Defendants

38.    Defendant Department of Homeland Security ("DHS") is a cabinet-level department of the U.S. federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

39.    Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals seeking asylum or other protection and adjudicates affirmative applications for asylum.

40.    Defendant CBP is the sub-agency of DHS that is responsible for the apprehension, processing, and detention of individuals seeking asylum or other relief at or near the U.S. border.

41.    Defendant ICE is the sub-agency of DHS that is responsible for executing removal orders and overseeing immigration detention.

42.    Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

43.    Defendant Executive Office for Immigration Review ("EOIR") is the sub-agency of DOJ that, through its immigration judges and appellate immigration judges, both conducts limited review of negative credible fear determinations in expedited removal proceedings and adjudicates regular removal proceedings and appeals.

44.    Defendant Alejandro Mayorkas is the Secretary of Homeland Security. He is sued in his official capacity. Defendant Mayorkas directs each of the component agencies within the

DHS. In his official capacity, Defendant Mayorkas is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

45.    Defendant Ur Jaddou is the Director of USCIS. She is sued in her official capacity.

46.    Defendant Troy A. Miller is the Senior Official Performing the Duties of the Commissioner for CBP. He is sued in his official capacity.

47.    Defendant Patrick J. Lechleitner is the Acting Director of ICE. He is sued in his official capacity.

48.    Defendant Merrick Garland is the Attorney General of the United States. He is sued in his official capacity. Defendant Garland oversees each of the component agencies within the Department of Justice. In his official capacity, Defendant Garland is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

49.    Defendant Mary Cheng is the Acting Director of the Executive Office for Immigration Review ("EOIR"). She is sued in her official capacity.

## FACTS

### I.    Background

50.    The modern U.S. asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102. The Act reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and it "gives statutory meaning to our national commitment to human rights and humanitarian concerns." S. Rep. No. 96-256, 1st Sess. at 1 (1979), reprinted in 1980 U.S.C.C.A.N. 141. One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international refugee treaties and the bedrock principle of non-*refoulement*. *INS v. Cardoza-Fonsec*a, 480 U.S. 421, 436 (1987).

51.    Federal law provides three primary forms of protection for individuals fleeing

persecution and torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* Note to 8 U.S.C. § 1231; 8 C.F.R. § 1208.

### A.    Three Forms of Protection for Individuals Fleeing Persecution and Torture

#### i.    Asylum

52.    "Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival …), irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Noncitizens are eligible for asylum if they can show a "well-founded fear of persecution" on account of one or more of five protected grounds and that their country is unable or unwilling to protect them from that harm. 8 U.S.C. § 1101(a)(42)(A).

53.    A "well-founded fear of persecution" has been construed to encompass even a ten percent chance that the applicant will be persecuted based on a protected characteristic.

54.    Section 1158 contains a handful of narrow bars to asylum eligibility. Entering the United States without inspection between ports of entry is not, and has never been, the basis for a bar on asylum. 8 U.S.C. § 1158(a)(2), (b)(2)(A). Although the Executive Branch may create additional eligibility restrictions on asylum, such restrictions must be "consistent with" the overall scheme of 8 U.S.C. § 1158. *Id.* § 1158(b)(2)(C).

55.    A person placed in regular removal proceedings under 8 U.S.C. § 1229a may submit an asylum application to the immigration judge to seek relief from removal. 8 C.F.R. § 208.2(b).

56.    A person who has been placed in "expedited removal"—a truncated removal process that may be applied to certain noncitizens who are arriving in the United States or who

have entered without inspection, 8 U.S.C. § 1225(b)(1)—may also raise an asylum claim through the credible fear screening process. If the person is found to have a credible fear of persecution, the noncitizen is then generally placed in regular removal proceedings under Section 240, where they can submit an asylum application.

<strong>ii.    Withholding of Removal and CAT Protection</strong>

57.    The withholding of removal statute prohibits the government from removing a noncitizen "to a country if . . . the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).

58.    Whereas asylum can be obtained based on a well-founded fear of persecution, the withholding of removal statute requires the applicant to show that persecution is more likely than not—a higher standard. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). The withholding statute bars removal to any country as to which this showing is made. It is possible to receive withholding of removal as to multiple countries.

59.    Regulations implementing the Convention Against Torture prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2).

60.    Withholding of removal and CAT protection are available to people who do not qualify for asylum. But the denial of asylum has major implications, notwithstanding the availability of these other forms of protection. In addition to the higher burden of proof these forms of protection impose, withholding of removal and CAT relief can be granted only after a person is ordered removed, and the grant of protection simply prevents the government from executing the removal order to the specific country or countries where the applicant has demonstrated a

19

likelihood of persecution or torture. By contrast, people granted asylum do not receive a removal order and may become lawful permanent residents, 8 U.S.C. § 1159(b), and eventually U.S. citizens, *id.* § 1427.

61.     In addition, the spouse and children of a person granted asylum may receive asylum as derivative family members, whether or not they accompanied the principal applicant to the United States. 8 U.S.C. § 1158(b)(3)(A). By contrast, withholding of removal and CAT protection do not permit derivative beneficiaries. Instead, spouses or children must be present in the United States, apply separately, and be granted withholding of removal or CAT protection independently, a process that can result in long-term family separation.

### iii.    The Expedited Removal System and Credible Fear Screening Interviews

62.     In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without immigration documents. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1). Expedited removal may be applied to certain noncitizens who arrive at the border without valid entry documents or who enter without inspection. 8 U.S.C. § 1225(b)(1)(A)(i). Absent further proceedings to assess any fear claims, people subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review." *Id.*

63.     But Congress's interest in "efficient removal" was balanced against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Thus, Congress took care to safeguard access to asylum by ensuring that noncitizens were screened to determine whether they had a "credible fear" of returning to their country of origin.

64.     The original agency regulations implementing the expedited removal statute in

1997 were designed to serve this interest, including by requiring immigration officers to advise noncitizens of their right to seek asylum and to ask if they feared removal. If so, they were referred for a credible fear interview. In the expedited removal process, noncitizens are entitled to "consult" with a person of their choosing "prior to the interview or any review thereof" as long as that review does not cause "unreasonable delay." 8 U.S.C. § 1225(b)(1)(B)(iv). The original regulations provided noncitizens a minimum of 48 hours to consult an attorney before a credible fear interview. 62 Fed. Reg. 10312, 10318-20 (Mar. 6, 1997).

65.    Because the credible fear interview is only a threshold screening device, a noncitizen needs to show only a "significant possibility" that the individual "could establish eligibility for asylum" in removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2)-(3).

66.    If the asylum officer finds a credible fear, the noncitizen is taken out of the expedited removal process. 8 U.S.C. § 1225(b)(1)(B)(v). The person's case, including claims for asylum and other forms of protection, is then generally considered in regular removal proceedings before an immigration judge under INA Section 240.

67.    In regular removal proceedings, noncitizens have the right to counsel, to present evidence, to cross-examine witnesses, and to appeal, if necessary, to the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C. §§ 1229, 1229a, 1252(a), (b); 8 C.F.R. §§ 1003.12-1003.47. They also have substantially more time to gather evidence, find and consult with counsel, develop arguments, and otherwise prepare.

68.    By contrast, if the asylum officer finds no credible fear, the noncitizen can request review of that decision by an immigration judge. If the immigration judge finds a credible fear, the noncitizen is then generally placed in regular Section 240 removal proceedings. 8

CFR § 1208.30(g)(2)(iv)(B). If, however, the immigration judge affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(i), (iii); *see* 8 U.S.C. § 1252(a)(2)(A), (e).

69.    In addition to screening for asylum, the credible fear interview has generally been used to screen claims for withholding of removal and CAT relief.

**B.    The Rule and IFR Model Previous Illegal Rules.**

70.    The Amended Proclamation, Original Proclamation, Rule, and IFR reprise previous efforts to restrict asylum eligibility based on manner of entry, which courts have held unlawful.

71.    In November 2018, DHS and DOJ attempted to bar asylum for any person who entered via the U.S.-Mexico border between ports of entry. As here, they issued this ban as an interim final rule concurrent with a presidential proclamation. These actions were challenged, and they were enjoined and later vacated as incompatible with 8 U.S.C. § 1158(a)(1) and procedurally improper. *See East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 844 (N.D. Cal. 2018) (finding an "irreconcilabl[e] conflict[]" with 8 U.S.C. § 1158(a)(1))*; O.A. v. Trump*, 404 F. Supp. 3d 109, 150 (D.D.C. 2019) (holding that the entry ban "is not compatible with the congressional mandate that all [noncitizens] present in the United States may apply for asylum, regardless of whether they entered the United States at a designated port of entry" (internal quotation marks omitted)). The government's appeals failed. *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) (refusing to stay the injunction); *Trump v. East Bay Sanctuary Covenant*, 139 S. Ct. 782 (2018) (same); *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 671, 675-77 (9th Cir. 2021) (upholding injunction on the merits).

72.    In May 2023, following a truncated comment period, DHS and DOJ issued a rule entitled "Circumvention of Lawful Pathways," 88 Fed. Reg. 31314 ("Lawful Pathways Rule").

The rule had numerous components, but as relevant here, it effectively barred asylum to non-Mexican adults and families who either entered outside of a port of entry or approached a port without an appointment made via a smartphone app called CBP One. *See* 8 C.F.R. § 208.33(a)(1), (a)(2)(i)-(ii). That rule included a narrow exception for "exceptionally compelling circumstances," defined to include an "acute medical emergency," an "imminent and extreme threat to life or safety," or being a "victim of a severe form of trafficking in persons," 8 C.F.R. § 208.33(a)(3)(i). It also included limited exceptions for people who were unable to use CBP One or who applied for and were denied asylum in a country through which they transited. DHS also introduced implementation guidance concurrent with the Lawful Pathways Rule that reduced the time people would have to consult with counsel or other representatives before credible fear interviews from 48 hours to 24 hours. *See* DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023).

73.    A court vacated the Lawful Pathways Rule as, among other things, contrary to 8 U.S.C. § 1158(a)(1) and procedurally improper. *East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *stayed pending appeal*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024).

### C.    The Proclamations, Rule, Interim Final Rule, and Guidance

74.    On June 3, 2024, President Biden issued the Original Proclamation. 89 Fed. Reg. 48487. It announced that the entry of any noncitizen into the United States across the southern border was suspended "at 12:01 a.m. eastern daylight time on June 5, 2024," and that the suspension will continue if "the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more." *Id.* at 48491. Per the announcement, the suspension will be lifted "14 calendar days after the Secretary makes a factual

determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters" a day.[6] *Id.* at 48491.

75. According to the Original Proclamation, the need for executive action was the "direct result of the Congress's failure to update" the asylum system. *Id.* at 48488.

76. Based on the Original Proclamation, the Department of Homeland Security and Department of Justice jointly issued the IFR on June 4, 2024, effective the next day. 89 Fed. Reg. 48710. The IFR incorporated the Original Proclamation by reference and applied the label "emergency border circumstances" to time periods when the Original Proclamation purports to suspend entry across the southern border. *Id.* at 48711.

77. On September 27, 2024, the President issued the Amended Proclamation. The Amended Proclamation changed the Original Proclamation in two ways. 89 Fed. Reg. at 81164. First, it stated that the categorical ban on asylum would remain in place until the 7-day-average of encounters was below 1,500 for at least 28-consective-days. *Id.* And, when that threshold was met, the ban would not be lifted for an additional two weeks. *Id.* Second, it declared that unaccompanied children from non-contiguous countries would be used to calculate the number of "encounters" each day, making the 1,500-day threshold even harder to achieve. Previously, unaccompanied children from non-contiguous countries were not included in this count. *Id.*

78. The Rule and IFR cite 8 U.S.C. § 1158(b)(2)(C) as authority. That provision gives the Attorney General the power "by regulation [to] establish additional limitations and conditions,

---

[6] An "encounter" refers to a noncitizen who: (i) is physically apprehended by CBP immigration officers within 100 miles of the southwest border during the 14-day period immediately after entry between ports of entry; (ii) is physically apprehended by DHS personnel at the southern coastal border during the 14-day period immediately after entry between ports of entry; or (iii) is determined to be inadmissible at a port of entry. Noncitizens in the third category are excluded from the DHS Secretary's threshold calculation. 89 Fed. Reg. 48710, 48715 n.33.

consistent with [§ 1158], under which [a noncitizen] shall be ineligible for asylum." The Rule and IFR also rely on 8 U.S.C. § 1158(d)(5)(B), which gives the Attorney General the power to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter." These provisions, however, require new regulations to be "consistent with" existing statutes. *Id.* § 1158(b)(2)(C). By contrast, the Rule and IFR effectively eliminate asylum for virtually every noncitizen who crosses into the United States without first obtaining an appointment at a port of entry using the CBP One app, in violation of the statute.

79.    The CBP One app has been plagued with problems. For many noncitizens, making an appointment to present at a port of entry is impossible. Some lack access to up-to-date smartphones, Wi-Fi, a cellular data plan, or reliable electricity, all of which are necessary to use CBP One. Others do not understand the few languages used in the app, are illiterate, lack technological know-how, or have disabilities that prevent them from successfully navigating the app. And the U.S. government has artificially capped the number of appointment slots far below the number of noncitizens who need them, meaning that even those who are able to use the app are repeatedly denied appointments. As a result, countless asylum seekers have been forced to wait indefinitely under precarious conditions in Mexico in the hope of obtaining scarce appointments.

80.    The Departments imposed the requirement to use CBP One in the Lawful Pathways Rule, but that rule—unlike the Rule here—did not apply to citizens of Mexico. Under this Rule and IFR, Mexican citizens who wish to seek asylum in the United States are now expected to wait, *in the country where they fear persecution*, for some unknown amount of time to preserve their right to pursue this remedy.

81.    The Rule and IFR create a narrow exception to the asylum bar for individuals who

enter between ports of entry due to "exceptionally compelling circumstances." 89 Fed. Reg. 48710, 48718, 48733, 81164, 81168. These circumstances are extremely limited. Exceptionally compelling circumstances are defined to include situations where noncitizens can show they or a family member with whom they are traveling are experiencing acute medical emergencies, imminent and extreme threats to life or safety, or severe forms of trafficking in persons at the time of their entry into the United States. *Id.*

82.     Under the Rule and IFR, DHS will apply this asylum bar during credible fear interviews in expedited removal. In those interviews, the Rule places the burden on the asylum seeker to demonstrate an "exceptionally compelling circumstance[]" by a preponderance of the evidence. *Id.* This is inconsistent with the "significant possibility" standard that Congress established for credible fear interviews to safeguard a person's opportunity to fully present potentially viable asylum claims.

83.     The Rule and IFR also implement policy changes governing expedited removal that create significant hurdles to obtaining the other two forms of protection that theoretically are still available: withholding of removal and CAT relief.

84.     First, to seek such protection, noncitizens must "manifest[] a fear of return, express[] an intention to apply for asylum or protection, or express[] a fear of persecution or torture." *Id.* at 48718, 81168. Border Patrol agents and other immigration officers will no longer "provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear of return." *Id.* at 48740; *see also id.* at 81240.

85.     Evidence from prior experience shows that when the manifestation of fear standard is used, noncitizens' statements of fear are routinely ignored, even assuming noncitizens know that they must manifest a fear without being asked. The practical effect is that noncitizens with genuine

fear are removed without being referred for credible fear interviews. Noncitizens may not know that they need to "manifest" a fear of return in order to avoid removal; they may not manifest their fear in words or actions that immigration officers expect or require; they may speak a language that immigration officers cannot understand; they may be intimidated by a show of force from voicing such fear; and they may be hungry, thirsty, ill, or disoriented, and so be unable to demonstrate a manifestation of fear observable by an immigration officer. And even in situations where a person plainly attempts to manifest a fear, like Plaintiffs D.G. and P.S. did, sometimes the officers simply ignore them. That is exactly why regulations have long required individualized advisals and questioning, which the Rule and IFR eliminate.

86.    Even where noncitizens are able to manifest a fear and given a credible fear interview, they must now meet a heightened "reasonable probability of persecution" standard to pass screening for withholding of removal or CAT protection. *Id.* at 48718, 48746, 81279-80. The Rule defines "reasonable probability" as "substantially more than a reasonable possibility, but somewhat less than more likely than not." *Id.* at 46746 (citing 8 C.F.R. 208.35(b)(2)(i), 1208.35(b)(2)(ii)); 89 Fed. Reg. at 81285. The Rule and IFR state that this new standard "requires a greater specificity of the claim in the noncitizen's testimony" than previously necessary under the "reasonable possibility" standard imposed by the Lawful Pathways rule—a standard that was left undefined. *Id.* at 46746, 81247-48.

87.    The Guidance further constrains this process. Until last year, noncitizens were given a minimum of 48 hours to consult with a lawyer or other person of their choosing before their credible fear interview. This consultation is crucial to ensuring that noncitizens have a meaningful opportunity to present their claims. Noncitizens who are unfamiliar with the U.S. immigration system will be unprepared to properly explain the basis for their fear to an

immigration officer. Last year, DHS shortened that consultation period to a minimum of 24 hours. The Guidance now requires that noncitizens be given a minimum of only *four hours* to consult with a lawyer or other individual. The result will inevitably be a large increase in erroneous negative credible fear findings and a correspondingly large increase in the number of noncitizens illegally returned to persecution and torture.

88.     All key aspects of the Rule and IFR—including the asylum bar, the manifestation of fear test, and the reasonable probability screening standard—are arbitrary and capricious. Defendants failed to consider critical factors, including the harm the Rule and IFR would cause asylum seekers in need of protection and the interaction of the Rule and IFR with other policies. They likewise ignored or contradicted significant evidence undermining the reasons for the Rule and IFR including, for example, evidence that the Rule and IFR will breach the government's *non-refoulement* obligations. Defendants departed from prior practice, including by raising the border screening standard to an unprecedented level, without adequate explanation. And they repeatedly relied on impermissible considerations contrary to Congress's policy choices. Defendants made these same errors in adopting the Guidance and unreasonably reducing the credible fear consultation period to just 4 hours. Accordingly, the Rule, IFR, and Guidance are arbitrary and capricious under the APA.

89.     What is more, the IFR's momentous regulatory changes and the accompanying Guidance were all issued without going through notice-and-comment procedures under the APA. Defendants claimed "good cause" to bypass the notice-and-comment procedures normally required for a rulemaking pursuant to 5 U.S.C. § 553(b)(B), and they likewise dispensed with the 30-day waiting period that is required even where a notice and comment period is provided, 5 U.S.C. § 553(d). Defendants also invoked the "foreign affairs" exception to those procedures. 5

U.S.C. § 553(a)(1). The record does not establish either the "good cause" or "foreign affairs" exception.

## II.    Harms to Plaintiffs

### A.    Harms to Individual Plaintiffs

90.    Absent relief, Plaintiffs have been and will continue to be severely and irreparably harmed by the Rule, IFR, and Guidance. First and foremost, the Individual Plaintiffs will be severely limited in their ability to access protection from persecution and torture. Plaintiffs have claims to asylum. Some claims, like those of P.S., T.R., R.C. and M.F., are based on anti-government political opinions. T.R. faces additional harm based on a past same-sex relationship, and Plaintiff E.R. similarly fears persecution based on her sexual orientation. Plaintiff L.Q. faced serious harm based in part on his indigenous identity. Plaintiffs S.G., J.E., E.M., S.O., and S.O.'s children face harm based on family relationships. And claims from many Plaintiffs turn on past opposition to gang or criminal activity that has caused them significant harm, including threats to their lives. Plaintiff D.C. experienced serious domestic violence from her partner, who is also involved with a criminal organization, and that harm presents ongoing danger to both her life and to that of her daughter, Plaintiff L.R. Yet, none of these Plaintiffs has had the opportunity to seek asylum because of the Rule and IFR.

91.    In addition to being barred from seeking asylum based on the Rule and IFR, all Plaintiffs but two, J.R. and L.Q., have already been removed from the United, and only one, T.R., has been able to subsequently obtain an appointment to return using CBP One. The remaining 24 individuals and are presently facing dangerous situations involving potential persecution or worse. Many of them, T.R., P.S., S.O., W.O., G.F., R.C. and M.F., are not from Mexico but have been removed to that country even though have experienced harm there already. Their own experience

is borne out by data. As DHS has acknowledged, nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers expelled from the United States to Mexico were documented in 2021 and 2022.

92.     Other Plaintiffs have been removed to their home countries, the very places they fled. The Plaintiffs who are from Mexico—E.R., D.C, L.R., A.E., E.D., J.C., E.M., R.R., A.L., J.L., J.N., E.C., J.S., K.C., and J.E.—have been harmed not only by being removed to the dangerous situations that they fled but also by the very premise of the Rule. That is because the Rule and IFR bar access to asylum to any person, absent exceptionally narrow circumstances, who failed to enter the United States at a port of entry with a CBP One appointment. Getting such an appointment can only be done from within circumscribed regions of Mexico. It can take months, and for some it is outright impossible. Yet, under the Rule, Mexican nationals are expected to wait for months in the very country where they fear persecution until they can get an appointment to enter the United States.

93.     Finally, some Plaintiffs, including J.C., J.R., and R.R. and her children, had less than 24 hours before their credible fear interviews. And for J.R., the entire duration of the minimal consultation window she did have occurred over a holiday weekend. As a result, J.C., J.R., and R.R., along with other Plaintiffs in this case, never had an opportunity to consult with any person, much less an attorney, before their interviews.

**B.     Harms to Organizational Plaintiffs**

94.     Under the IFR and Rule, Las Americas' clients must now "manifest" an intent to apply for asylum or a fear of return before receiving a credible fear interview. As a result, Las Americas must revamp its representation strategy and divert resources to preparing individuals who have a genuine fear to manifest such a fear before entering the United States, significantly

limiting the number of clients it can serve.

95.    The quick timeframe for removal under the Guidance also impedes Las Americas' mission. It now has just four hours, some of which are outside its business hours, to reach and confer with clients, which significantly reduces its ability to effectively represent them.

96.    The strain on Las Americas' ability to represent its clients is exacerbated by the heightened standard for establishing credible fear. Such preparation takes more time—not less—and will be difficult, and often impossible, to do effectively in the limited time the Proclamations, IFR, Rule, and Guidance give to consult with clients before credible fear interviews.

97.    The heightened standard also will result in more negative fear findings. This increase, in turn, means Las Americas will have to spend more time with each client challenging an asylum officer's negative fear findings before an immigration judge at the final stage of the expedited removal process. As a result, Las Americas will have to both reduce the number of clients it serves and will be unable to represent clients as effectively as in the past.

98.    Even for the clients who manage to both manifest a fear and also overcome the higher reasonable probability standard, the Proclamations, IFR, Rule, and Guidance will harm Las Americas' ability to engage in full representation of these individuals in removal proceedings. First, because people who were previously eligible for asylum are now limited to withholding of removal and CAT protection, which require a more stringent burden of proof than asylum, Las Americas will have to spend more time developing evidentiary records in those cases. Second, because withholding of removal and CAT protection do not allow family members to receive derivative benefits, Las Americas will have to engage in full representation

for each member of a family, which will substantially increase the number of overall applications it has to complete.

99.    The new policy also jeopardizes some of Las Americas' most critical funding streams. Many of Las Americas' existing grants require it to serve a certain number of clients each year. The need to spend additional resources on each client, reducing the number of clients served, risks placing Las Americas below the threshold required for these grants. A loss of funding will further hamper Las Americas' ability to fulfill its mission.

100.    The Proclamations, IFR, Rule, and Guidance similarly harm RAICES' work. These changes will require RAICES to revamp its representation strategy and to spend more time with each individual client. The heightened standard will also increase the number of clients for whom RAICES will need to challenge an asylum officer's negative credible fear finding before an immigration judge. This additional time spent will limit its client population and its ability to fulfill its mission.

101.    RAICES is also one of the very few organizations that provides counsel to individuals facing the credible fear process while detained in CBP custody. The changes in the Rule and IFR will make it harder for RAICES to provide those services, and the four-hour consultation window will make doing so all-but-impossible—rendering obsolete the system for that work that RAICES has spent the last year developing.

102.    In addition, RAICES will be harmed by the expedited timeline for removal. Less time to reach and prepare clients will result in less effective representation. As with Las Americas, this strain on effective representation is made worse by the Rule and IFR's heightened standard for establishing credible fear, which requires more time with clients to prepare them for interviews with asylum officers. The increased need and decreased time

frame hampers RAICES' ability to effectively serve its clients.

103.    The new policy also jeopardizes some of RAICES' critical funding streams. Much of the funding in certain RAICES' programs is tied to the number of clients it is able to serve. If RAICES must divert its resources to spend more time assisting fewer clients, that funding may be put in jeopardy. A loss of funding will further reduce RAICES' ability to fulfill its mission.

104.    For both organizations, the issuance of these changes via the IFR deprived them of an opportunity to comment on the changes before they took effect. As a result, neither organization had an opportunity to put relevant information in front of Defendants that might have informed their choices or prompted them to abandon these changes completely.

105.    For both organizations, these changes are likely to cause additional harm as staff become frustrated with their inability to provide meaningful assistance to impacted noncitizens because of the Rule and IFR's new limits and the Guidelines' imposition of an impossible timeline. This frustration is likely to lead to vicarious trauma, burnout, and an inability to sustain staffing to fulfill the organizations' respective missions.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Violation of Immigration and Nationality Act and Administrative Procedure Act –
Rule Eliminating Asylum Between Ports is Contrary to Law, 8 U.S.C. § 1158)**

106.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

107.    The INA provides, with certain exceptions not relevant here, that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including [a noncitizen] who is brought to the

United States after having been interdicted in international or United States waters), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

108.    The Administrative Procedure Act, 5 U.S.C. § 706, provides that courts "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.    The Rule and IFR are contrary to law, including 8 U.S.C. § 1158(a)(1). With limited exceptions, the Rule and IFR categorically bar noncitizens from asylum merely because they enter without inspection between ports or at ports but without a CBP One appointment.

## SECOND CLAIM FOR RELIEF

**(Violation of Immigration and Nationality Act and Administrative Procedure Act –
Rule is Contrary to Law, 8 U.S.C. § 1225(b))**

110.    The INA requires that any noncitizen subjected to expedited removal procedures who "indicates either an intention to apply for asylum . . . or a fear of persecution" must be referred for a credible fear screening interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii).

111.    In that screening interview, the asylum officer is to determine whether the noncitizen has a "credible fear of persecution." *Id.* § 1225(b)(1)(B)(ii), (iii). A credible fear of persecution is defined by statute as "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under [8 U.S.C.] section 1158." *Id.* § 1225(b)(1)(B)(v).

112.    The Rule and IFR improperly require asylum officers conducting credible fear interviews and immigration judges reviewing negative credible fear determinations to apply standards other than the "significant possibility" standard, including when applying the Rule and

IFR's exceptions at the credible fear stage. For example, the Rule and IFR require asylum officers conducting credible fear interviews and immigration judges reviewing negative credible fear determinations to determine whether a noncitizen has established an "exceptionally compelling circumstance" by preponderance of the evidence rather than under a "significant possibility" standard.

113.    The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" [or] "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

114.    The Rule and IFR are contrary to law, including 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(ii), (B)(iii), and (B)(v).

### THIRD CLAIM FOR RELIEF

**(Violation of Immigration and Nationality Act and Administrative Procedure Act –
Rule is Arbitrary and Capricious)**

115.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

117.    All key aspects of the Rule and IFR—including the asylum bar, the manifestation of fear test, and the reasonable probability screening standard—are arbitrary and capricious. Defendants failed to consider critical factors, including the harm the Rule and IFR would cause asylum seekers in need of protection and the interaction of the Rule and IFR with other policies. They likewise ignored or contradicted significant evidence undermining the reasons for the Rule

and IFR including, for example, evidence that the Rule and IFR will breach the government's *non-refoulement* obligations. Defendants departed from prior practice, including by raising the fear screening standard to an unprecedented level, without adequate explanation. And they repeatedly relied on impermissible considerations contrary to Congress's policy choices. Defendants made these same errors in adopting the Guidance and unreasonably reducing the credible fear consultation period to just four hours.

118.    Accordingly, the Rule and IFR are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

### FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act – Failure to Observe Required Procedures)

119.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

120.    The APA requires notice and opportunity for comment prior to the promulgation of regulations. 5 U.S.C. § 553(b), (c). The Attorney General and Secretary of Homeland Security failed to provide notice and an opportunity to comment on the Interim Final Rule and Guidance in a timely manner.

121.    The APA also requires that a regulation be published "no less than 30 days before its effective date." 5 U.S.C. § 553(d). The Attorney General and Secretary of Homeland Security failed to publish the IFR and Guidance 30 days before their effective date.

122.    The Attorney General and Secretary of Homeland Security have not articulated reasons sufficient to show good cause why these requirements are inapplicable, or why the foreign affairs exception is applicable.

## FIFTH CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act –
### Guidance is Contrary to Law and Arbitrary and Capricious)

123.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

124.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

125.    The INA provides that a noncitizen "who is eligible for [a credible fear] interview may consult with a person or persons of the [noncitizen's] choosing prior to the interview or any review thereof." 8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. § 208.30(d)(4).

126.    The statute and implementing regulations require meaningful access to a consultation and time to prepare for the credible fear interview. 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(2), (4).

127.    The Guidance makes meaningful access to a consultation and time to prepare for the credible fear interview effectively unavailable. It is therefore contrary to law. *See* 5 U.S.C. § 706(2)(A).

128.    The Guidance is also arbitrary and capricious because, in adopting a 4-hour consultation period, Defendants failed to articulate reasoned explanations for their decisions, which represent changes in agency policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decisions that run counter to the evidence before the agencies.

129.    Accordingly, the Guidance is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

    a.   Vacatur of the Rule, IFR, and Guidance;

    b.   Declaratory judgment finding the IFR and Guidance procedurally invalid and the Rule, IFR, and Guidance contrary to law and arbitrary and capricious;

    c.   An order vacating the removal orders issued to each of the Individual Plaintiffs;

    d.   For any Individual Plaintiffs who have been removed prior to the Court's Order, an order paroling those Individual Plaintiffs into the United States for the duration of their removal proceedings so that they may apply for asylum, withholding of removal, and/or CAT protection in the United States;

    e.   An order awarding Plaintiffs' costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

    f.   Such other and further relief as the Court deems equitable, just, and proper.

Dated: November 1, 2024

Respectfully submitted,


Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

*Attorneys for Plaintiffs*

By: /s/ Matthew E. Price
Matthew E. Price (D.C. Bar # 996158)
Lindsay Harrison (D.C. Bar #977407)
Mary E. Marshall (D.C. Bar #1739058)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*
*lharrison@jenner.com*
*mmarshall@jenner.com*

Melissa Root*
Andrew L. Osborne*
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*
*aosborne@jenner.com*

*Attorneys for Organzational Plaintiffs*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

*Attorneys for Plaintiffs*

Tamara Goodlette
(D.C. Bar. No. TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.org*

Blaine Bookey*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
*bbookey@uclawsf.edu*

Ashley Alcantara Harris*
David A. Donatti*
American Civil Liberties Foundation of Texas
P.O. Box 8306
Houston, TX 77288
T: 713-942-8146
*aharris@aclutx.org*
*ddonatti@aclutx.org*

*Attorneys for Plaintiffs*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street NW
Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

Edith Sangueza*
Center for Gender and Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
*sanguezaedith@uclawsf.edu*

Robert Pauw*
Center for Gender and Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
*rpauw@ghp-law.net*

*Attorneys for Plaintiffs*
*\*Admitted via certificate of pro bono*
*representation or pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify on November 1, 2024, I caused a copy of the foregoing to be transmitted

to all Defendants through the CM/ECF filing system.

/s/ Matthew E. Price
Matthew E. Price (D.C. Bar # 996158)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*