**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LAS AMERICAS IMMIGRATION ADVOCACY CENTER, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | No. 1:24-cv-01702 |
| v. | ) ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) | |
| *Defendants.* | ) | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................... iii

INTRODUCTION ............................................................................................. 1

I.      PLAINTIFFS HAVE STANDING............................................................. 2

II.     THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY
        AND CAPRICIOUS.......................................................................... 3

        A.      The Asylum Bar Remains Contrary to Law......................................... 3

        B.      The Rule's Asylum Bar Is Arbitrary and Capricious............................ 3

                1.      The Rule fails to consider the harm facing migrants required to
                        wait in Mexico for an appointment at a port of entry. ............... 4

                2.      The Rule fails to consider the risk of harm it imposes on people
                        from Mexico................................................................. 9

                3.      Defendants unreasonably rely on the CBP One app.............. 10

III.    THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS MANIFEST
        FEAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. .............. 13

        A.      The Manifestation Standard Remains Contrary to Law. .................... 13

        B.      The Manifestation Standard Is Arbitrary and Capricious.................. 13

                1.      The Rule fails to adequately consider evidence showing that
                        many noncitizens who need protection nevertheless may not
                        "manifest" a fear of return................................................. 13

                2.      The Rule's assertion that Border Patrol officers can divine which
                        noncitizens need protection without asking is baseless and
                        implausible.................................................................. 15

                3.      The Rule failed to consider whether prior use of the manifestation
                        standard actually bears out the assertion that the standard is
                        reasonably designed........................................................ 16

                4.      The Rule's efficiency rationale cannot justify the manifestation
                        standard...................................................................... 19

IV.     THE RULE'S HEIGHTENED REASONABLE PROBABILITY STANDARD
        IS ARBITRARY AND CAPRICIOUS........................................................ 21

A.    Defendants Departed from Past Practice Without Adequate
      Explanation...................................................................................... 21

B.    Defendants' Decision to Require "Greater Specificity" and Detail at the
      Screening Stage Impermissibly Disregarded the Reasons That Many
      Asylum Seekers Are Unable to Do So................................................ 22

V.    THE GUIDANCE IS CONTRARY TO LAW AND ARBITRARY AND
      CAPRICIOUS.......................................................................................... 23

VI.   PLAINTIFFS ARE ENTITLED TO VACATUR AND OTHER RELIEF. ................... 25

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES[*]

CASES

American Federation of Government Employees, AFL-CIO v. Federal Labor
    Relations Authority, 25 F.4th 1 (D.C. Cir. 2022) ................................................. 16

American Freedom Defense Initiative v. WMTA, 901 F.3d 356 (D.C. Cir. 2018) ...................... 2

American Maritime Ass'n v. United States, 766 F.2d 545 (D.C. Cir. 1985) ............................... 2

American Wild Horse Preservation Campaign v. Perdue, 873 F.3d 914 (D.C. Cir.
    2017) ............................................................................................................ 16, 19, 20

Butte County v. Hogen, 613 F.3d 190 (D.C. Cir. 2010) .......................................................... 16

DHS v. Regents University of California, 591 U.S. 1 (2020) .................................................... 24

East Bay Sanctuary Covenant v. Garland, 994 F.3d 962 (9th Cir. 2020) ................................... 9

East Bay Sanctuary Covenant v. Biden, 683 F. Supp. 3d 1025 (N.D. Cal. 2023) ...................... 11

FCC v. Fox Television Stations, Inc., 556 U.S. 502 (2009) ..................................................... 22

INS v. Cardoza-Fonseca, 480 U.S. 421 (1987) ..................................................................... 13

Mozilla Corp. v. FCC, 940 F.3d 1 (D.C. Cir. 2019) ......................................................... 19, 20

Singh v. Whitaker, 914 F.3d 654 (9th Cir. 2019) ................................................................. 10

STATUTES

8 U.S.C. § 1158(a)(1) .......................................................................................................... 3

8 U.S.C. § 1225(b)(1)(B)(iv) ............................................................................................... 24

OTHER AUTHORITIES

8 C.F.R. § 208.13(g) ............................................................................................................ 4

8 C.F.R. § 208.35(a)(2)(i) ..................................................................................................... 4

8 C.F.R. § 208.35(a)(2)(i)(B) ................................................................................................ 6

87 Fed. Reg. 18078 (Mar. 29, 2022) .................................................................................... 21

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

89 Fed. Reg. 48487 (June 3, 2024) ............................................................................... 1

*89 Fed. Reg. 81156 (Oct. 7, 2024) ................................................. 1, 4-17, 19-24

Dep't Homeland Security, Information Memorandum, *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply* (June 4, 2024) ......................................................................................... 1

# INTRODUCTION

On September 30, 2024, Defendants U.S. Department of Homeland Security ("DHS") and U.S. Department of Justice ("DOJ") issued the Final Rule, Securing the Border (the "Rule"), 89 Fed. Reg. 81156 (Oct. 7, 2024), that superseded the Interim Final Rule ("IFR") bearing the same name, 89 Fed. Reg. 48487 (June 3, 2024), and that is at issue in this case. Because motions for summary judgment on the legality of the IFR and accompanying Credible Fear Scheduling Guidance ("Guidance")[1] were already fully briefed, the Court ordered the parties to file supplemental briefs "limited to addressing the impact of the issuance of the final rule, if any, on the parties' summary judgment motions," and stated that "the parties[] . . . shall not re-brief issues unaffected by the final rule." ECF No. 55. at 2.[2]

As relevant to Plaintiffs' claims, the Rule is identical to the IFR.[3]

The Rule suffers from the same fatal flaws as the IFR. Like the IFR, the Rule flagrantly violates the asylum statute by categorically denying asylum based on manner and place of entry whenever an arbitrary numeric cap is met. Like the IFR, the Rule is arbitrary and capricious in its attempts to justify this statutory violation by pointing to a narrow exception and the theoretical

---

[1] DHS Information Memorandum, *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply* (June 4, 2024), at Guidance AR1–5.

[2] "MSJ" refers to Plaintiffs' Motion for Summary Judgment, ECF No. 23; "Opp." refers to Defendants' Memorandum of Law in Opposition, ECF No. 45-1; "Reply" refers to Plaintiffs' Reply Brief, ECF No. 48; and "Def. Reply" refers to Defendants' Reply Brief, ECF No. 52.

[3] The only differences between the Rule and the IFR are that the numerical threshold determining when the Rule ceases to bar asylum access is more stringent, making it less likely that the Rule will ever cease to apply. The Rule bars access to asylum unless the 7-consecutive-calendar-day average of daily "encounters" of inadmissible noncitizens between ports of entry falls below a 1500-encounter-per-day threshold *for 28 consecutive calendar days*, rather than 7 days under the IFR. 89 Fed. Reg. at 81164–66. (As Plaintiffs have highlighted, the 1500-encounter threshold has been surpassed continuously since July 2020. *See* MSJ 8 & n.5.) And under the Rule, encounters of unaccompanied children from non-contiguous countries are now counted toward the numeric cap. 89 Fed. Reg. at 81166–67. These differences do not affect Plaintiffs' claims.

availability of CBP One app appointments to preserve asylum eligibility. Like the IFR, the Rule also imposes a "manifestation of fear" standard that violates the expedited removal and withholding-of-removal statutes and that is arbitrary and capricious. Defendants continue to disregard evidence that the manifestation standard results in fear claims being routinely ignored. And, like the IFR, the Rule imposes an arbitrary and capricious "reasonable probability" standard for evaluating whether a noncitizen has a credible fear of persecution. Finally, the Guidance issued under the IFR, which unlawfully shrinks the time to consult with counsel before a credible fear interview, applies under the Rule as well, and it remains unlawful. The Court should vacate the Rule, the IFR, and the Guidance.[4]

## I.    PLAINTIFFS HAVE STANDING.

Plaintiffs have standing to challenge the Rule, the IFR, and the Guidance.

All the Individual Plaintiffs can challenge the Rule. First, because the Rule and the IFR are identical with respect to Plaintiffs' legal claims, the claims of the Individual Plaintiffs who brought suit under the IFR "are equally applicable to the final rule and the interim rule." *Am. Mar. Ass'n v. United States*, 766 F.2d 545, 554 n.14 (D.C. Cir. 1985); *see also Am. Freedom Def. Initiative v. WMTA*, 901 F.3d 356, 361-63 (D.C. Cir. 2018).

Second, the Second Amended Complaint added additional Individual Plaintiffs who fled to the United States after the Rule was issued and thus clearly have standing to challenge it.[5] They and many other Plaintiffs were denied credible fear interviews ("CFIs") under the Rule's manifestation requirement. *See* S.O. Decl. ¶¶ 17-20; J.N. Decl. ¶¶ 10-14; E.C. Decl. ¶¶ 13-14; J.E.

---

[4] Plaintiffs who were injured by the IFR maintain their notice-and-comment challenge to the IFR, which is not impacted by the issuance of the Final Rule. *See* MSJ 38-44; Reply 31-36.

[5] Declarations of the Individual Plaintiffs added in the Second Amended Complaint are attached to ECF No. 57.

Decl. ¶¶ 13-14; R.C. Decl. ¶¶ 15-17; M.F. Decl. ¶¶ 15-19. Even those who were granted CFIs were barred from asylum under the Rule and then denied the chance to pursue other relief by the new heightened "reasonable probability" standard. *See* L.B. Decl. ¶¶ 17-18; J.G. Decl. ¶¶ 15-16; E.M. Decl. ¶¶ 15-16; R.R. Decl. ¶¶ 13-16; L.Q. Decl. ¶¶ 15-17.

Organizational Plaintiffs, through their supplemental declarations, demonstrate that they continue to be injured by the Rule just as they were by the IFR, *see* Hidalgo Supp. Decl. ¶¶ 10-11; Babaie Supp. Decl. ¶¶ 21-24; *see also* Reply 2-6, and these ongoing injuries continue to fall within the INA's zone of interests, Reply 7-9.

As previously explained, both Organizational Plaintiffs and several Individual Plaintiffs have standing to challenge the Guidance. *See* Reply 1-4, 2 n.4; *see also* R.R. Decl. ¶ 14 (R.R. was forced to have a CFI on behalf of herself and her children J.C. and J.R. fewer than 24 hours after being told of her right to consultation, and without an opportunity to consult with counsel).

## II.    THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A.    The Asylum Bar Remains Contrary to Law.

The asylum bar in the Rule is identical in operation to the bar in the IFR and violates the INA for the same reasons. As Plaintiffs have explained, MSJ 9-16; Reply 9-16, the bar, which renders asylum seekers ineligible for asylum unless they present at ports of entry with appointments scheduled through the CBP One smartphone app, violates the mandate in 8 U.S.C. § 1158(a)(1) that "*[a]ny* [noncitizen] who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .*), *irrespective of such [noncitizen's] status,* may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added).

### B.    The Rule's Asylum Bar Is Arbitrary and Capricious.

Even if the Rule's bar on applying for asylum between ports of entry did not violate the

plain text of the statute Congress enacted, the agency must still make a reasoned decision to bar asylum based on manner and place of entry. But the Rule, like the IFR, is arbitrary and capricious.

Under the Rule, noncitizens must make appointments at ports of entry using the CBP One app or they will be barred from asylum, unless they can establish certain narrowly defined "exceptionally compelling circumstances." *See* 8 C.F.R. § 208.13(g); 8 C.F.R. § 208.35(a)(2)(i). This supposed safety valve is illusory. The Rule exposes migrants to grave harm in Mexico while they wait for appointments and forces Mexican asylum seekers to remain in the very country they are trying to flee. Moreover, CBP One appointments are out of reach for many noncitizens because they face significant barriers to access and because appointments are simply unavailable. Defendants have failed to adequately address these problems in issuing the Rule, just as they failed to do in issuing the IFR. As a result, the Rule's asylum bar is arbitrary and capricious.

### 1. The Rule fails to consider the harm facing migrants required to wait in Mexico for an appointment at a port of entry.

People seeking asylum routinely must wait in Mexico for six months or longer for CBP One appointments. 89 Fed. Reg. at 81216-17; AR1 2883; *see also* S.O. Decl. ¶ 16 (S.O. tried and failed to secure a CBP One appointment for her and for her children W.O. and G.F. for several months before ultimately crossing the border without one due to fear for their safety).[6] During this wait, the Rule exposes them to a high risk of life-threatening exploitation and violence by criminal groups and government officials. For example, Human Rights First reported that over 2,500 people suffered kidnapping, rape, torture, extortion, and other violent harm while stranded in Mexico waiting to seek asylum between May 2023 and May 2024. AR1 6248-49, 6285-86. The

---

[6] "AR1" refers to Volume 1 of the administrative record for the Rule. "IFR AR" refers to the administrative record for the IFR. "Guidance AR" refers to the administrative record for the Guidance.

Department of State Mexico 2023 Human Rights Report describes "numerous instances" of threats, kidnapping, extortion, and homicide of migrants, AR1 3207, and Department of State guidance instructs U.S. government employees not to travel to or to reconsider travel to the northern states of Mexico. Other record evidence similarly indicates high levels of assaults, kidnappings, and homicides of asylum seekers in Mexico. *See, e.g.,* AR1 6284-85 (citing Doctors Without Borders report that sexual violence against migrants in Mexican border cities of Reynosa and Matamoros increased 70% in late 2023, and that reports of sexual violence in northern Mexico in January 2024 exceeded those from any month of 2023); AR1 6762-64 (report summarizing dangers facing asylum seekers in Mexico); AR1 6851-62 (accounts of asylum seekers who have been kidnapped, tortured, raped, or who have experienced medical emergencies while forced to wait in Mexico since May 2023).

The Rule unreasonably disregards voluminous evidence of rampant violence against migrants in Mexico. Defendants generally disagree with comments and record evidence that returning people to Mexico is "necessarily unsafe," 89 Fed. Reg. at 81204, but that misses the point: even if *some* migrants can avoid harm while waiting in Mexico, *many cannot*. Indeed, Defendants ultimately "acknowledge" that waiting for CBP One appointments "*may* present safety concerns," which "*may* be exacerbated by uncertainty about how long a migrant may have to wait to be processed at a [port of entry]," 89 Fed. Reg. at 81218 (emphasis added), but claim that dangerous conditions "have been a reality that existed for migrants seeking to present at [ports of entry] prior to the introduction of CBP One," *id*. But citing the prior existence of dangerous conditions is not responsive to the reality of present conditions. This purported explanation also does not address the fact that these conditions stemmed from prior restrictions on asylum—such as the so-called "Migrant Protection Protocols" ("MPP") and the Title 42 bar on asylum—that

similarly trapped migrants in dangerous conditions in northern Mexico while awaiting the opportunity to access the U.S. asylum process. *See, e.g.*, AR1 6249-50; MSJ 17 (noting DHS's earlier acknowledgment that "'[s]ignificant evidence' demonstrates that [MPP] subjected [asylum seekers] to 'extreme violence[]'" (citation omitted)). The relevant question is whether the Rule's asylum bar results in these dangers as compared with the longstanding norm, codified in the statute, that migrants who enter between ports are eligible for asylum. The Rule never engages with that question. The preamble also mentions the theoretical availability of asylum protection in Mexico, 89 Fed. Reg. at 81204-05. That remote theoretical possibility has little bearing on the actual dangers noncitizens may face in Mexico (and no bearing at all on the many seeking asylum *from* Mexico).

The agencies repeatedly rely on the "exceptionally compelling circumstances" exception as an adequate safeguard, but this exception does little to protect noncitizens. Exceptionally compelling circumstances include an "imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," 8 C.F.R. § 208.35(a)(2)(i)(B), but do not include "generalized risks of violence," 89 Fed. Reg. at 81205. The agencies claim that this exception strikes a balance between managing migration at the border and protecting people at risk. *See, e.g.*, 89 Fed. Reg. at 81223, 81226. But this reasoning fails to account for the fact that many noncitizens who have faced severe harm during long waits in Mexico cannot satisfy the exception because such harm is not "imminent" at the moment they cross the border. For example, the agencies dismiss reports of women "being turned away from [ports of entry] after CBP officers determined that their accounts of being sexually assaulted and raped in Mexico did not fall within an exception," 89 Fed. Reg. at 81225, since they had *already been* raped.

6

Reliance on the "exceptionally compelling circumstances" exception to justify the bar to asylum is particularly hollow when that aspect of the Rule is considered in conjunction with the manifestation requirement, which means that many people will never even have an opportunity to invoke this exception. Indeed, as Defendants acknowledge, CBP officers do not apply the "exceptionally compelling circumstances" exception at all; instead, the exception is not assessed until the CFI. *See* 89 Fed. Reg. at 81226-28. Therefore, asylum seekers who may qualify for the exception will never get a chance to invoke it if they are deemed not to manifest fear or attempt to present at ports of entry without CBP One appointments. That was precisely the case for Plaintiff S.O. and her two children. They spent five months in Mexico trying unsuccessfully to get a CBP One appointment and faced substantial violence—including being kidnapped and threatened with rape by cartels—but they were returned to Mexico without a CFI after they were deemed not to "manifest" a fear despite repeated attempts to express their fear. S.O. Decl. ¶¶ 14-16. So, too, with Plaintiffs R.C. and M.F. These brothers faced violence at the hands of Mexican police and were injured in a train crash believed to have been caused by cartels. *See* R.C. Decl. ¶¶ 12-15; M.F. Decl. ¶¶ 12-15. They never got a chance to assert exceptionally compelling circumstances because they were deported to Mexico for purportedly failing to manifest a fear. *See* R.C. Decl. ¶¶ 15-17; M.F. Decl. ¶¶ 18-19.

Moreover, Defendants' claim that the Rule reduces the dangers asylum seekers face from cartels, *see, e.g.*, 89 Fed. Reg. at 81179, runs counter to the record. In reality, the Rule makes people more vulnerable to cartels by forcing them to seek CBP One appointments in dangerous areas of Mexico where they are easy prey for cartels and criminal organizations. *See, e.g.*, AR1 7485-86 ("the more difficult it is to apply for asylum, the more likely it is that people will turn to smugglers in desperation to guide them through the labyrinth of obstacles before them");

AR1 7815 (straightforward, safe pathways to seek asylum rather than erecting barriers would discourage people from using smugglers); AR1 7820-44 (deterrence policies enrich smugglers and kidnappers); AR1 7930-32 (Department of State 2023 Mexico Human Rights report describing increase in smuggling and human trafficking in some parts of Mexico, and widespread extortion, threats, and kidnapping by powerful human smuggling organizations); AR1 8074-75 (letter from members of Congress detailing concerns with CBP One, including that asylum seekers will increasingly rely on smugglers); AR1 8200 (restrictionist policies are "a boon to cartels and smugglers"). Defendants also assert that the argument that the "rule may increase asylum seekers' vulnerabilities to trafficking is speculative and ignores CBP immigration officers' training and experience in combating and preventing human trafficking." 89 Fed. Reg. at 81177. But this response is undercut by the Rule's acknowledgment that "[s]muggling networks are adaptable" and quickly respond to changes in U.S. immigration policies. *Id.* at 81184 (quotation omitted).

Finally, the Rule again fails to grapple with the extensive record evidence of heightened danger for particularly vulnerable asylum seekers in Mexico, including women and children and people who are Black, Indigenous, LGBTQ+, or medically impaired. *See, e.g.*, AR1 6253-58, AR1 6289-93, AR1 6349-55. The agencies do not meaningfully respond to comments about the higher levels of risk for LGBTQ+ and female asylum seekers in Mexico, merely noting that "[t]o the extent" these populations face greater risk, 89 Fed. Reg. at 81205-06, they can try to claim the exceptionally compelling circumstances exception, and that "membership in a particularly vulnerable group, 'may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry,'" *id.* at 81225 (quoting 88 Fed. Reg. 31314, 31393 (May 16, 2023)). This response ignores that members of particularly vulnerable groups may face grievous harm and nonetheless fail to qualify for the exception, as in the myriad cases documented in the record and

corroborated by Individual Plaintiffs' own experiences. *See, e.g.*, 89 Fed. Reg. at 81225. For example, Plaintiff L.Q., an indigenous Quechua asylum seeker, was assaulted and robbed at gunpoint in Mexico, but failed to qualify for the exception. *See* L.Q. Decl. ¶¶ 12, 16-17.

In short, Defendants' response to the horrific violence suffered by people forced to wait for a CBP One appointment is to put their heads in the sand. They simply assert that "in the emergency border circumstances in which this rule applies, such noncitizens should wait for a CBP One appointment." 89 Fed. Reg. at 81216. That is not a reasoned response to the specific record evidence of very serious harm to migrants forced to wait for months in Mexico.

### 2. The Rule fails to consider the risk of harm it imposes on people from Mexico.

The Rule provides no justification for applying the asylum bar to Mexican asylum seekers, who are trapped in the very country where they face persecution. The agencies claim that applying the Rule to Mexican citizens is necessary "to alleviate strain on border security and immigration systems" 89 Fed. Reg. at 81250, and to promote deterrence, *id.* at 81252, but this is no basis for "wrongly return[ing] [asylum seekers] to [the] countr[y] from which they fled persecution." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 981 (9th Cir. 2020) (quotation marks omitted); *see also, e.g.*, AR1 6364-65 (examples of Mexican asylum seekers assaulted, tortured, and killed while waiting for CBP One appointments). Defendants claim that the United States' nonrefoulement obligations are met by the availability of withholding of removal and protection under the Convention against Torture ("CAT"), 89 Fed. Reg. at 81250-51, but those remedies are harder to obtain and less durable than asylum, MSJ 3 & n.1; and this reasoning ignores the fact that other aspects of the Rule curtail access to these lesser protections.

In response to comments and evidence about the dangers to Mexican asylum seekers, the agencies claim that Mexicans waiting for CBP One appointments "are able to safely wait in another

9

part of Mexico for their appointment," and that they can try to obtain an exception based on exceptionally compelling circumstances. 89 Fed. Reg. at 81251. But the notion that Mexican asylum seekers can simply wait in another part of the country ignores the reality that many are fleeing powerful actors with extensive networks, such as "brutal cartels that have national reach and exercise control over large parts of Mexico with the complicity of Mexican authorities." AR1 6364; *see also Singh v. Whitaker*, 914 F.3d 654, 659, 661 (9th Cir. 2019) (noting rule that it is presumptively unreasonable to expect such "internal relocation" for asylum seekers who have suffered past persecution or fear harm by state actors). The Rule likewise ignores that many Mexican asylum seekers will be unable to safely wait for months on end in their country of persecution, yet also will be unable to show an "imminent" threat of rape, kidnapping, or torture at the precise moment they cross the border. *See, e.g.*, AR1 6364 (Mexican LGBT asylum seeker murdered in Nogales while awaiting a CBP One appointment); AR1 6704-05 (Mexican asylum-seeking family ordered removed despite threats to their lives in southern Mexico).

### 3. Defendants unreasonably rely on the CBP One app.

The Rule asserts that people can use the CBP One app to avoid application of the asylum bar, but it provides no meaningful response to the serious flaws with CBP One raised by commenters and demonstrated by the record. *See* 89 Fed. Reg. at 81161, 81214-21.

*First*, significant and well-documented barriers prevent many asylum seekers from using CBP One, including technological impediments, language and literacy limitations, and misinformation. AR1 4407-08. Many asylum seekers do not have cell phones because they cannot afford them, or because criminal actors or government agents in Mexico have stolen them. Others have devices without sufficient memory space to support the app, cannot afford the data needed to use the app, or lack access to the internet. AR1 4595. Some asylum seekers have brands of cell phones, such as Huawei, that fail to load the app effectively, while for those who are able to load

it, frequent and mandatory updates are often required, limiting the user's ability to make daily attempts to seek an appointment. AR1 12884-85.

Even when applicants have a workable cell phone, CBP One remains available in just English, Spanish, and Haitian Creole—even though Defendants have had more than 18 months to expand access to people who speak other languages. *See E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1050 (N.D. Cal. 2023) (describing app's limited language availability). People attempting to use the app must first create an account through login.gov, which is only available in English, Spanish, French, and Chinese. AR1 3283 (copy of login.gov sign-in page). Once a login.gov account is created, the initial registration page for CBP One is only available in English, meaning that users must agree to a long page of terms and conditions about the privacy of their information in English before they can even access the portions of the app that are available in other languages. These limitations routinely prevent people who are not literate in the few available languages, including many Indigenous language speakers, from using CBP One.

Moreover, CBP One's mandatory facial recognition feature does not work ten to twenty percent of the time. This problem arises frequently for applicants with darker skin. 89 Fed. Reg. at 81219-20; *see also* AR1 12886 (an asylum seeker living with a child with a serious disability unable to make an appointment because the app was unable to recognize the child's face).

The agencies' only answer to these problems is the non-response that applicants can seek assistance from "trusted partners," 89 Fed. Reg. at 81219, and that the Rule applies "only during emergency border circumstances," *id.* at 81215—*i.e.*, circumstances that have existed every day since July 2020, *see* MSJ 7-8; 89 Fed. Reg. at 81167. They have no meaningful response to the evidence showing that the Rule "turns the legal right to asylum into a lottery system based on

chance" and that bona fide asylum seekers "may never be provided with safety and protection in the United States simply because they may never receive an appointment." AR1 4407-08.

*Second*, Defendants failed to consider that many people who do secure CBP One appointments often miss those appointments through no fault of their own. According to one researcher, only sixty-five percent of people in or near Nuevo Laredo with CBP One appointments actually make it to those appointments. AR1 4419. This often happens because appointment-holders are targeted by cartels acting in complicity with Mexican authorities. AR1 6249. More than forty percent of CBP One appointments are for the ports of entry in Reynosa, Matamoros, and Nuevo Laredo, Mexico—all in the exceptionally dangerous Mexican state of Tamaulipas. Cartels in that state—often operating with the knowledge or collusion of authorities and transportation providers—wait at bus stations and airports to kidnap people who have appointments. AR1 4419-20.

*Third*, the record shows that many people do not know about CBP One or mistakenly believe it is only for certain nationalities. Indeed, many people do not even know about the asylum bar. *See* 89 Fed. Reg. at 81258 (survey found that over half of respondents in Mexico in the first half of 2024 did not understand the requirements and processes for accessing the asylum process); AR1 6247 (July 2024 report citing numerous examples of asylum seekers in dire need of protection who were unaware of CBP One and the asylum bar); *see also* J.N. Decl. ¶ 9 (describing ignorance of CBP One); E.C. Decl. ¶ 10 (same).[7] Defendants' only response—that they "believe that they have provided sufficient notice to the public" via a DHS website, 89 Fed. Reg. at 81221—is baseless. Defendants assert that notice has been sufficient because "the CBP One app is widely

---

[7] In addition to J.N. and E.C., other Individual Plaintiffs likewise had never heard of CBP One before they crossed the border. *See* D.G. Decl. ¶ 7; D.C. Decl. ¶ 11; A.E. Decl. ¶ 16; L.B. Decl. ¶ 16; J.G. Decl. ¶ 14; L.Q. Decl. ¶ 13.

used," *id.*, but that is no consolation to the many others barred by the Rule who had never heard of the app.

For the foregoing reasons, the agencies' reliance on the CBP One app is controverted by the record, and their purported rationalizations of the app's flaws are arbitrary and capricious.

## III.    THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS MANIFEST FEAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A.    The Manifestation Standard Remains Contrary to Law.

Under the Rule's "manifestation" standard, noncitizens—most of whom have traveled thousands of miles under harrowing conditions and do not speak English—must demonstrate a fear of return without being informed of their right to seek asylum or advised of the consequences if their fear goes unrecognized. The Rule's "manifestation" requirement is contrary to law for the same reasons as the IFR's identical requirement: it is inconsistent with the withholding-of-removal and expedited removal statutes and with CAT, as described in Plaintiffs' original briefing. *See* MSJ 22-23; Reply 19-24. The Rule likewise undermines the intention of withholding and CAT protections to bring U.S. law into conformity with nonrefoulement and international treaty obligations. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.25 (1987) (withholding is mandatory "in order to comply with" nonrefoulement obligations).

### B.    The Manifestation Standard Is Arbitrary and Capricious.

#### 1.    The Rule fails to adequately consider evidence showing that many noncitizens who need protection nevertheless may not "manifest" a fear of return.

The record makes clear that many asylum seekers will not raise their fears affirmatively without appropriate advisals and questioning, because of lack of awareness, the effects of trauma, and wariness of government officials, among other reasons. MSJ 24-26. The Rule purports to

address these concerns, which were raised by "[m]any commenters." 89 Fed. Reg. at 81243. But Defendants' explanations fail the test of reasoned decision-making.

*First*, the Rule asserts that asylum seekers can be expected to affirmatively raise their fears because they need not "articulate the full scope of their fear or the rationale behind it" to CBP officers. *Id.* But that sidesteps the problem and ignores the record, which shows that many asylum seekers will not raise their fears *at all* without proper instruction, assurances, and questions. *See* MSJ 24-26; AR1 6238, 10380, 10915, 13050.

*Second*, the Rule claims that "to the extent that an individual may react negatively to a CBP officer or agent in uniform, such concerns are not limited to the [manifestation standard] and would ostensibly apply to any screening process." 89 Fed. Reg. at 81243. But Defendants have long recognized the need for CBP officers to take simple but critical steps to *assuage* asylum seekers' reluctance by advising them, among other things, that they would "have the opportunity to speak *privately and confidentially* to another officer about your fear or concern." IFR AR8189 (emphasis added). The record illustrates the need for these advisals. A major 2005 study found that "[t]he odds of being referred for a [CFI] increased seven times when [this advisal] was read to [noncitizens] relative to when it was not." IFR AR8192-93. Another expert likewise explained that many asylum seekers "may need to receive the assurance of confidentiality *before* they will communicate with" immigration officials. IFR AR14510 (emphasis added). Like the IFR, the Rule fails to acknowledge that eliminating these advisals means that many people who need protection will not affirmatively "manifest" their fears.[8]

---

[8] The Rule separately claims that the impact of trauma on the manifestation standard is lessened because "CBP has taken steps . . . to protect the privacy of noncitizens during their [credible fear] interviews." 89 Fed. Reg. at 81243. Even if that were true—and the record indicates otherwise, *e.g.*, AR1 6634, 12889—it would be irrelevant to evaluating the manifestation standard, which is

*Third*, the Rule asserts that DHS's "signage and videos" will "mitigate the impact" "of past trauma." 89 Fed. Reg. at 81243. But those materials—provided in only English, Spanish, Hindi, and Mandarin—are not the equivalent of prior advisals. They do not contain the critical assurances that if noncitizens tell officers that they fear removal, they will have a private and confidential opportunity to explain their fears. AR1 504, 1381; AR1 Video File 214 at 00:57-01:11.[9]

The Rule therefore impermissibly ignores the reasons that individualized advisals and questioning had always been required, and the evidence clearly showing that many asylum seekers will not raise their fears affirmatively.

**2. The Rule's assertion that Border Patrol officers can divine which noncitizens need protection without asking is baseless and implausible.**

The Rule, like the IFR, repeatedly relies on the idea that "noncitizens are not required to verbally express or state a fear" and that "fear can also be manifested non-verbally or physically." 89 Fed. Reg. at 81242; *see also id.* at 81237-38. But the premise that DHS agents will reliably discern a fear absent advisals and questioning is implausible and controverted by the record. MSJ 26-28; Reply 22-23. The Rule does nothing to cure those deficiencies.

Just like the record for the IFR, the record for the Rule contains no training modules or other evidence lending credence to Defendants' extraordinary claims that CBP agents can reliably identify non-verbal manifestations of fear. Instead, the DHS guidance documents in the record that do address non-verbal manifestations of fear merely parrot the general descriptions in the IFR and Rule of behaviors such as "hysteria, trembling, shaking," and the like. *See, e.g.*, 89 Fed. Reg. at

---

applied *before* asylum seekers are referred for CFIs. What matters at the referral stage is whether asylum seekers are informed that the later interview will be private and confidential—and the manifestation standard eliminates those advisals.

[9] The other video in the record is directed at people who have already been referred for a CFI and therefore is not relevant to assessing the manifestation standard. *See* AR1 Video File 213.

81237; AR1 502; AR1 1421. At least in theory, however, such behaviors have *always* been a basis for credible fear referrals. *See, e.g.*, AR1 1425 (2014 guidance); *id.* at AR1 1450 (1997 guidance). And yet the Rule cites no evidence indicating that non-verbal conduct has ever been a meaningful basis for credible fear referrals—either under the IFR or previously. In the absence of any actual evidence supporting the dubious premise that Border Patrol agents can reliably identify who fears removal without asking, the manifestation requirement is arbitrary and capricious. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022) (a court is "not bound by the [agency]'s conclusory and counterintuitive assertions . . . especially when the record contains no factual basis"). Moreover, there are many reasons—*e.g.*, cultural norms, trauma responses—why a person might not visibly demonstrate fear and also refrain from speaking about a fear until being asked. *See* MSJ 27-28. The Rule has no response to that problem either.

### 3. The Rule failed to consider whether prior use of the manifestation standard actually bears out the assertion that the standard is reasonably designed.

Under the manifestation standard, no officer is individually responsible for assessing fear, and because there is no structured conversation intended to ascertain whether a noncitizen fears return, officers dismiss expressions of fear. Every time the manifestation standard was previously imposed—at sea and under Title 42—it prevented noncitizens from receiving CFIs and seeking protection, in large part because one consistent *feature* of the manifestation standard is that officers routinely ignore fear claims. MSJ 28-30; Reply 22-24. The record for the Rule demonstrates that this occurred again under the IFR. The Rule simply ignores that evidence. That is not reasoned decision-making. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies may not "brush[] aside critical facts"); *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("an agency cannot ignore evidence contradicting its position").

The Rule claims that "commenters have provided *no evidence* that there is a widespread

problem of CBP officers and agents ignoring fear claims under the IFR." 89 Fed. Reg. at 81240 (emphasis added). That is a glaring misstatement. When the standard was previously imposed at the border under Title 42, more than half of the nearly 100 families interviewed following their expulsion from the United States reported that officers had ignored their expressions of fear, AR1 4463, and DHS recorded just seven percent of noncitizens as having "manifested" fear, AR1 1492—the same as the extraordinarily low "manifestation" rates registered by the Coast Guard at sea, MSJ 30. The record shows that CBP officers again routinely ignored expressions of fear under the IFR. For example, the Florence Immigrant & Refugee Rights Project in Arizona reported that its staff "witnessed the same pattern of CBP officers engaging in abusive language and ignoring people's claims since the Rule went into effect on June 5" as occurred under Title 42. AR1 13254. Indeed, "*most* migrants" interviewed following their removal to Mexico said they had "voiced a fear of return to CBP agents but were ignored." AR1 13254-55 (emphasis added).

Similarly, Human Rights First interviewed migrants removed under the IFR who "were denied an opportunity to express their fear, describing an intimidating and hostile environment in CBP and Border Patrol custody in which they were not allowed to speak." AR1 6239. "Some individuals reported to Human Rights First that they expressly requested asylum, a hearing with an immigration judge, and relayed the facts of their asylum claims, including the past persecution they had suffered, as well as others who were visibly sobbing and begging to be heard, but were instead ignored, told 'there is no asylum' and 'the border is closed.'" *Id.*

Commenters also described numerous individual accounts illustrating this recurring problem. *See, e.g.*, AR1 6239 ("a seven-month-pregnant woman" from Mexico fleeing "harm and death threats by her partner . . . explicitly requested asylum to a DHS border officer" but the officer "replied, 'I don't speak good Spanish,' before summarily deporting her back to danger");

AR1 13149 (a woman who fled Mexico "with her seven year old daughter described crying while in CBP custody and saying that she feared return," but "[r]ather than referring her to a credible fear interview, a CBP officer told her to seek asylum in Mexico"—that is, in her home country); *id.* (a Mexican woman who had "fled death threats" reported that "when she told a CBP officer that she wanted to seek asylum, he responded [by saying] 'that's what everyone says' and [that] the new regulation made that impossible"); AR1 13255 (a woman "pleaded with agents not to deport her and showed agents the bruises she incurred at the hands of an angry persecutor who threatened her and her family" but was removed to Mexico without a CFI); *id.* (a woman "express[ed] a fear of return" and a CBP agent responded, "'It's not my problem if your country or your president treats you badly, I'm going to send you back to your country'"); *id.* (a woman "tried to explain her fear of return to a CBP agent" and "explained that she had a fear of return because her 16-year-old son had been beaten by an organized crime group," but "[t]he agent did not believe her, did not record her statement of fear, and told her it wasn't his problem"); *see also* AR1 9100-11375 (detailing countless examples of other malfeasance by Border Patrol agents).[10]

---

[10] These accounts are consistent with the experiences of Individual Plaintiffs subjected to the manifestation standard under the IFR. *See* D.G. Decl. ¶¶ 9-11 (D.G. "repeatedly tried to tell officers" at two different facilities about her fear but officers "either ignored or laughed at" her.); P.S. Decl. ¶¶ 12-15 (P.S. tried to express his fears, but officers told him "to sit down and shut up."); D.C. Decl. ¶¶ 13-14 (After D.C. told an officer "that she would be killed and that her daughter would be harmed" if they were removed, the officer told her that "asylum was 'over.'"). Individual Plaintiffs subject to the Rule have received the same treatment. *See* J.E. Decl. ¶¶ 13-14 (J.E. expressed fear "many times to at least three different officers" but "some ignored [her], and others told [her] to shut up"; when she later told a fourth officer, "he did not respond"); S.O. Decl. ¶¶ 16-20 (when S.O. told one officer she was "terrified of going back to Venezuela," the officer "ignored [her] and told her to go back to [her] spot"; another officer "told [her] that she didn't have an asylum case, so none of her [reasons for fearing removal] mattered"; a third told her "there was nothing he could do"; a fourth told her "that [her] 'drama' would not work"); *see also* R.C. Decl. ¶ 15 (an officer told R.C. "that [he] had to ask another officer about asylum" but no officer ever registered his multiple expressions of fear); M.F. Decl. ¶¶ 15-16 (M.F. told "officers that [he] was afraid to return to Venezuela," and they responded "that there was no asylum").

In the face of all of this, the Rule's response is that there is "no evidence" of a recurring problem. 89 Fed. Reg. at 81240. Because that disregards "critical facts," the manifestation standard is arbitrary and capricious. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 932.

In addition to denying the existence of a problem, the Rule claims that any "allegations that an agent or officer ignored expressions or manifestations of fear" do not relate to the design of the manifestation standard because such "employee misconduct . . . could occur with or without this rule." 89 Fed. Reg. at 81239-40. That ignores the flaws in the manifestation standard itself that inherently make it more likely that DHS officers will ignore fear claims.

The Rule asserts that "[c]oncerns about misconduct by individual employees" are "mitigated" because noncitizens "will typically interact with multiple agents and officials, and they can manifest fear to any of them." 89 Fed. Reg. at 81240; *accord id.* at 81241. But far from being an advantage, that dynamic is a key defect. Because a noncitizen can (in theory) manifest fear to any *particular* officer, no *particular* officer is responsible for ensuring that the issue of fear is ever actually addressed. It is therefore unsurprising that the record reveals DHS officers telling noncitizens that their expressions of fear are "not my problem." *E.g.*, AR1 13255; *see also* R.C. Decl. ¶ 15 (when R.C. tried to express fear, he was told "that [he] had to ask another officer about asylum"). By contrast, under the prior system, a specific DHS officer had to sign their name to a form confirming that they had completed the required advisals and recorded the noncitizen's answers to the fear questions. AR1 10151-52. The manifestation standard arbitrarily and capriciously discards these decades-old safeguards. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 67 (D.C. Cir. 2019) (an agency is "required to grapple with the lapse in legal safeguards that its reversal of policy triggered").

### 4.  The Rule's efficiency rationale cannot justify the manifestation standard.

Because the "manifestation standard is structured to allow immigration officers to remain

willfully ignorant of noncitizens' reasons for flight," Reply 24, it "result[s] in a greater proportion of individuals with meritorious claims being expeditiously removed," MSJ 31. The Rule arbitrarily and capriciously fails to reckon with these consequences. *See Mozilla Corp.*, 940 F.3d at 67; *Am. Wild Horse Pres. Campaign*, 873 F.3d at 932.

In response to comments arguing that the manifestation standard will result in asylum seekers being returned to danger, the agencies state that "27 percent of those encountered between ports of entry" and subjected to the IFR "were referred for a credible fear interview." 89 Fed. Reg. at 81186; *see also id.* at 81240 ("the data showing a manifestation rate of 27 percent under the IFR . . . indicate that officers and agents are following their guidance and reporting manifestations of fear in a large number of cases"). But that rate is less than *half* of the fifty-seven percent of noncitizens who were referred for CFIs in what Defendants call the "immediate post-pandemic period" before the IFR was issued. *Id.* at 81159-60. The Rule cites no evidence that such a massive change could be attributable to CBP's baseless belief that asking about fear "can serve as a prompt for noncitizens . . . to respond in the affirmative, even if they do not actually have a fear." *See* 89 Fed. Reg. at 81235; *see also* MSJ 25-26 (addressing the IFR's reliance on inapposite social science articles about opinion questionnaires as support for this "prompting" theory). By contrast, the evidence cited above establishes a different and obvious explanation: DHS officers applying the manifestation standard under the IFR routinely ignored fear claims.

The Rule also impermissibly ignores the devastating impact of the manifestation standard on Mexican nationals, who "comprise[d] the largest portion"—"approximately 41 percent"—of people subjected to that standard under the IFR. 89 Fed. Reg. at 81252. One third of Mexican nationals were referred for CFIs during the "immediate post-pandemic [period]" before the IFR was issued. AR1 1492. But just eight percent were found to manifest fear under the IFR: less than

a third of the pre-IFR rate and virtually identical to the seven percent manifestation rate for all noncitizens under Title 42. *Id.* Mexican nationals are easy to remove if they are denied CFIs, and the manifestation standard is explicitly aimed at counteracting the "increase in . . . fear claims made by[] Mexican nationals" by permitting "faster processing of a significant number of Mexican noncitizens." 89 Fed. Reg. at 81252. The record shows this "faster processing" depends on the routine disregard of fear claims, but the Rule ignores this reality. That is arbitrary and capricious.

## IV.    THE RULE'S HEIGHTENED REASONABLE PROBABILITY STANDARD IS ARBITRARY AND CAPRICIOUS.

The Rule's heightened "reasonable probability" standard during screening interviews should be vacated as arbitrary and capricious because Defendants have still not meaningfully addressed their prior reasoning for declining to adopt a heightened standard, much less a brand-new standard that has never been used by asylum officers and that remains as ill-defined in the Rule as it was in the IFR. Nor do Defendants meaningfully address the inability of many people with viable protection claims to satisfy the standard in the context of a rushed border interview.

### A.    Defendants Departed from Past Practice Without Adequate Explanation.

Defendants previously found that heightened screening standards should *not* be adopted— but then impermissibly failed to address that finding in the IFR. *See* MSJ 31-33; Reply 24-26. In particular, Defendants did not address their own prior finding that "based on [their] experience implementing divergent screening standards," there was "no evidence" that applying a heightened standard "resulted in more successful screening out of non-meritorious claims while" safeguarding against refoulement. 87 Fed. Reg. 18078, 18092 (Mar. 29, 2022). Nor did Defendants address their own prior finding that "the delays associated with complicating and extending every credible fear interview likely outweigh any efficiencies gained." *Id.* The Rule does not remedy this deficiency. Given that "[a]n agency cannot simply disregard contrary or inconvenient factual determinations

that it made in the past," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009), Defendants' failure to address their prior factual conclusions is fatal.

Defendants nevertheless now claim that "emergency border circumstances" require a higher standard. 89 Fed. Reg. at 81250; *accord id.* at 81249 (quoting 88 Fed. Reg. at 31336). But that is a non-sequitur. If, as Defendants correctly stated in 2022, a higher standard is ineffective, it will be ineffective in exigent and non-exigent circumstances alike. And although Defendants note that a higher standard results in more denials at the credible-fear stage, *id.* at 81250, that fact has no bearing on Defendants' prior finding that a higher standard will fail to screen out *non-meritorious* claims while preventing refoulement of those with meritorious claims.

In any case, Defendants entirely fail to acknowledge their prior finding that the delays caused by a higher standard outweigh any efficiency gains. That failure, too, is impermissible. *See, e.g.*, *Fox*, 556 U.S. at 515 (agency must "display awareness that it is changing position" (emphasis omitted)). And although they discuss efficiency issues without reference to their prior finding, Defendants do not point to any new evidence that rationally supports a change in policy. For instance, they claim that they "successfully applied" the "reasonable possibility" standard under the 2023 ban, 89 Fed. Reg. at 81248-49, but they do not assert that the more complicated interviews that the higher standard entails have somehow been *more efficient*. Further, unlike the "reasonable possibility" standard, which at least had some track record of application in other contexts, the new "reasonable probability" standard had never been applied before at all. *See* Reply 25.

## B.   Defendants' Decision to Require "Greater Specificity" and Detail at the Screening Stage Impermissibly Disregarded the Reasons That Many Asylum Seekers Are Unable to Do So.

Plaintiffs also previously showed that Defendants failed to consider the record evidence that, because of trauma and the sensitive nature of the events giving rise to protection claims, many people are unable to share specifics in the rushed, fearful conditions of a screening interview at

the border. The full administrative record, as augmented by comments on the IFR, contains overwhelming evidence to the same effect. *See, e.g.*, AR1 7513-16, 7523-25, 12898-901, 13021-24, 13050-53, 13104-05 (comments); AR1 8544-53, 8945-46, 9421-22, 9545-46, 9583-85, 10380-97, 10535-36, 10549, 11122-23, 11376-12770 (attachments to comments).

The Rule reiterates that the "reasonable probability" standard requires "greater specificity" than previous screening standards, 89 Fed. Reg. at 81248, but Defendants still fail to come to grips with the problem that this requirement sets a bar that many people with viable asylum claims cannot surmount for reasons unrelated to the strength of their claims. To be sure, Defendants acknowledge that "noncitizens may face difficulties." *Id.* at 81246. But they never provide any rational explanation as to how the difficulties might be overcome. Instead, Defendants point to factors—the training of asylum officers, the intent behind credible-fear questions, and the existence of IJ review, *id.* at 81247-48—that have no bearing on whether a higher substantive screening standard is justified, or instead will simply result in pretermitting meritorious claims.

Defendants also attempt to pass the buck to Congress, claiming that the statute is "predicated on the requirement that noncitizens must explain their fear during a [CFI]." 89 Fed. Reg. at 81246. That, too, misses the mark. As Plaintiffs have already shown, MSJ 5-6, Congress envisioned credible fear interviews as setting a very low standard that required nothing more than a bona fide fear claim. Nothing in the statute remotely requires people seeking asylum to provide *specifics* about their claims at the credible fear stage.

## V.    THE GUIDANCE IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

The Guidance continues to be contrary to law and arbitrary and capricious, and therefore, should be vacated. Nothing about the Rule changes that.

The Court should ignore Defendants' attempts to include in the Rule *post hoc*

rationalizations for the Guidance issued alongside the IFR, which reduced the consultation period before credible fear interviews to as little as four hours, from the previous minimum of 24 hours. As stated in the Rule, the agencies have never purported to implement that Guidance through rulemaking, 89 Fed. Reg. at 81161 n.33, 81195. Simply put, Defendants cannot use the Rule to supply new, post hoc justifications for the Guidance. *See DHS v. Regents Univ. of Cal.*, 591 U.S. 1, 22-23 (2020) (courts consider only "contemporaneous explanations for agency action," not later justifications raised either in court or "by agency officials").

Even if Defendants' improper efforts to justify the Guidance were permissible, the reasons offered in the Rule cannot save the Guidance from being both contrary to law and arbitrary and capricious. *See* MSJ 35-38; Reply 26-30. For example, the Rule claims that because the statute and regulations do not require a specific amount of time for consultation, a four-hour consultation period is permissible. 89 Fed. Reg. at 81161 n.33, 81196. But as Plaintiffs have shown, the reduced consultation period has the practical effect of eliminating the statutory right to "consult with a person or persons of the [noncitizen's] choosing," 8 U.S.C. § 1225(b)(1)(B)(iv). *See* MSJ 35-37; Reply 26-27. DHS's claim that the four-hour consultation period "continues to allow sufficient time for individuals to make multiple phone calls and have in-depth conversations" finds no support in the record or in common sense. 89 Fed. Reg. at 81196; *see* Reply 27-29. DHS has no response to the reality that people are not provided four hours *with a telephone*, much less the ability to make follow-up calls, whenever and to whomever they wish. Rather, they must be transported to the phones and an officer must assist in their use. These facts, coupled with the fact that a person's four hours can occur outside of attorney business hours, including before 9:00 a.m. or after 5:00 p.m., *see* 89 Fed. Reg. at 81197, and that there is no way for an attorney to call someone back, mean that many do not have *any* opportunity to confer with an attorney before a

credible fear interview. That was precisely the situation for Plaintiff R.R. and her children. She was presented with information about the credible fear process at about noon, was not permitted to access telephones that day, and had her CFI before 9:00 a.m. the following morning; she was not permitted to access telephones for consultation until *after* her interview had already occurred. R.R. Decl. ¶¶ 13-14. Thus, the Guidance does not protect the right to consult.

## VI.    PLAINTIFFS ARE ENTITLED TO VACATUR AND OTHER RELIEF.

For the same reasons Plaintiffs have already explained with respect to the IFR, vacatur is available, vacatur without remand is warranted, and the Court should grant Individual Plaintiffs' requested relief. MSJ 44-45; Reply 36-45. These arguments remain the same for the Rule. If anything, the record for the Rule further confirms that remanding without vacatur would have devastating consequences. Perhaps most egregiously, the unlawful manifestation standard is preventing noncitizens even from receiving CFIs at alarming rates. As explained above, the proportion of all noncitizens referred for CFIs fell by more than half under the IFR, from fifty-seven percent to just twenty-seven percent. *See* Part II.B.1, *supra*. The equivalent rate among Mexican noncitizens—who accounted for over forty percent of those processed under the IFR— fell by more than two thirds, from thirty-three percent to just eight percent. *See id.* The only explanation supported by the record for that massive decline is that many noncitizens are unable to affirmatively manifest fear at all and those who attempt to do so are routinely ignored. *See* Parts II.B.2-II.B.3, *supra*. This means that, since the IFR was issued, thousands of asylum seekers who would have received CFIs absent the Rule have been unlawfully removed to danger with no opportunity whatsoever to present their claims.

## CONCLUSION

For the foregoing reasons, and those stated in Plaintiffs' previous briefing, the Court should grant summary judgment to Plaintiffs and vacate the Rule, the IFR, and the Guidance.

Dated: November 15, 2024

Respectfully submitted,

Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

Tamara Goodlette
(D.C. Bar. No. TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.org*

By: /s/ Matthew E. Price____
Matthew E. Price (D.C. Bar # 996158)
Lindsay Harrison (D.C. Bar #977407)
Mary E. Marshall (D.C. Bar #1739058)
Maura E. Smyles (D.C. Bar #90006775)*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*
*lharrison@jenner.com*
*mmarshall@jenner.com*

Melissa Root*
Andrew L. Osborne*
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*
*aosborne@jenner.com*

*Attorneys for Organzational Plaintiffs*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street NW
Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

26

Blaine Bookey*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
*bbookey@uclawsf.edu*

Ashley Alcantara Harris*
David A. Donatti*
American Civil Liberties Foundation of Texas
P.O. Box 8306
Houston, TX 77288
T: 713-942-8146
*aharris@aclutx.org*
*ddonatti@aclutx.org*

*Attorneys for Plaintiffs*

Edith Sangueza*
Center for Gender and Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
*sanguezaedith@uclawsf.edu*

Robert Pauw*
Center for Gender and Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
*rpauw@ghp-law.net*

*Attorneys for Plaintiffs*
*\*Admitted via certificate of pro bono
representation or pro hac vice*

27