## DECLARATION OF JENNIFER BABAIE
## LAS AMERICAS IMMIGRANT ADVOCACY CENTER

I, Jennifer Babaie, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully.

2. I am an attorney licensed to practice law in California and focused on immigration practice. Since January 2023, I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas). Prior to joining Las Americas, I worked in various related positions. Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3. Las Americas is a nonprofit legal services organization based in El Paso, Texas. Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights. We provide immigration counseling and representation to immigrants seeking asylum and those detained by the U.S. government in and around West Texas, New Mexico, and Ciudad Juarez, Mexico, including by representing individuals facing expedited removal who are undergoing Credible Fear Interviews ("CFIs"). We also assist individuals who are awaiting a CBP One appointment in Mexico with preparing for CFIs. Our goal is to ensure that individuals have a fair opportunity to establish their eligibility for protection and are not wrongfully removed to persecution or torture.

4. I submit this declaration as a supplement to my earlier declaration in *Las Americas v. Department of Homeland Security*, which was executed on July 26, 2024.

1

5.       Las Americas has and will continue to experience substantive harm because of the rule issued by U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS") and Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ") entitled "Securing the Border" (the "Rule"); and contemporaneous memoranda issued by U.S. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") (collectively, the "Guidance").  Like the Interim Final Rule ("IFR"), the Rule and Guidance collectively impose new bars to asylum eligibility that threaten Las Americas' ability to execute its mission.  According to the Guidance, noncitizens arriving between ports of entry at the southwest border are categorically ineligible for asylum whenever a rolling seven-day average of the number of daily "encounters" of inadmissible noncitizens who entered between ports of entry exceeds a certain numerical threshold at any point in a 28-day window.  That threshold has been exceeded continuously since July 2020.  Moreover, the Guidance does nothing to institute or pave the way for increasing CBP One appointments, which is the sole means of accessing asylum in the United States during suspension periods.

6.       Even individuals who meet one of the narrow exceptions to this categorical ban may only apply for asylum if they present at a port of entry and obtain an appointment with CBP through a smartphone app called "CBP One." As discussed below, CBP One is a complex, error-prone, smartphone application, and it is difficult for noncitizens to use CBP One and to obtain an appointment. The app has numerous accessibility issues already known to the government thanks to feedback from advocates, including our organization, making it so that the suspension of asylum under the Rule leaves no pathway for asylum seekers who cannot obtain an appointment through no fault of their own.

7.      The Rule also imposes burdens on noncitizens who are eligible for withholding of removal or protection against removal under the Convention Against Torture ("CAT").  Prior to the IFR that preceded the Rule, an immigration officer was required to inform any individual encountered of their rights to seek protection in the United States and would conduct an interview to determine whether the noncitizen had a fear of persecution before initiating their removal. This added protection afforded individuals a means of accessing the asylum system and a chance at speaking with a licensed legal advocate—for example, through our programs for asylum seekers in expedited removal—who could explain the requirements for seeking asylum in the United States. Under the Rule, a noncitizen can be quickly removed from the United States unless an immigration officer determines that the person has affirmatively "manifested" a fear of return. Not only does this prevent an individual from receiving any information about their rights once they are on U.S. soil by keeping them away from venues where attorneys such as myself have access, but it keeps these individuals in the shadows and more vulnerable to victimization at the border by criminal groups and smugglers. Simply because the United States refuses to recognize a person's protection concerns doesn't negate the reality that they are in danger of being harmed, and advocates such as myself must now find new ways to gain access to these people so that we can study their situations and make meaningful attempts at advocating on their behalf and on behalf of others like them.

8.      For the few people that do manifest such fear, the Guidance permits them as little as 4 hours to consult an attorney before an immigration officer conducts a CFI—down from at least 24 hours before the Guidance, and a minimum of 48 hours just a year ago.  In that interview, a noncitizen must now establish that there is a "reasonable probability" they will be tortured or persecuted if they are removed from the United States.  This is a significantly more stringent

3

standard than the "significant possibility" and "reasonable possibility" standards previously applied in these interviews.

9. All of these aspects of the Rule and Guidance are significantly interfering with Las Americas' work and are requiring us to spend significant amounts of time in the attempt to counteract that harm.

## Las Americas' Mission & Programs

10. Las Americas has served people in our community from over 80 countries since 1987. We are dedicated to serving the legal needs of low-income noncitizens and asylum seekers in West Texas, New Mexico, and Ciudad Juarez, Mexico. We assist individuals seeking legal entry to the United States by providing targeted legal information, advice, and translation and referral support, to help these individuals preserve eligibility for asylum. We also provide legal information presentations centered on clarifying the purpose and consequences of documents received upon crossing the border.

11. Our goal is to ensure that all asylum seekers have a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture. It is essential to our mission that all asylum seekers have a meaningful chance to fully develop and present their claims. To advance this mission, our goal is to serve asylum seekers with our limited resources.

12. We are one of the only organizations providing *pro bono* representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area. We receive a significant number of referrals and play a critical role in the community. Whenever we are suddenly forced to significantly limit or change our services, which has been necessary to respond to the Rule and Guidance, it has a palpable and adverse impact on our ability to serve these migrant communities.

13.  Las Americas' total budget in the fiscal year ending 2024 was about $1,799,000.[1] The grants we receive make up approximately 85% of our revenues, and some of them have requirements regarding the number of people we serve as well as limitations on the geography and types of services provided.  For example, one grant requires us to serve 650 people per year while another requires us to provide direct representation to 60 people and pro se support to an additional 120 people in ICE custody in New Mexico.  Low bono client fees and other individual contributions make up the remainder of our income sources, but all of our detention-related services, including CFI services, and our services in Mexico are provided at no cost to the individual.

14.  Las Americas' U.S. staff consists of 18 people, including attorneys, accredited representatives, and paralegals.  Two additional staff members work in Mexico.  We have several programmatic areas; those most relevant to the Rule and Guidance are detailed here.

15.  Las Americas' asylum work straddles the U.S.-Mexico border.  We assist individuals and families who have entered the United States, as well as people who are or have been stranded in Mexico due to U.S. policies, including the Rule and Guidance.

16.  Our Detained Program serves migrants in the El Paso Processing Center, Otero Service Center, and the Torrance and Cibola detention facilities, in New Mexico.  The heart of our Detained Program is helping individuals in expedited removal proceedings through the credible fear process and then seeking their release from detention.  Due to the overwhelming need for our CFI-related services, in April 2023 we added a legal fellow whose work focuses entirely on CFI services. Those services are now only able to continue as a result of daily collaboration between

---

[1] As of the time of filing this declaration, this number had not been finalized, and is therefore approximate.

Las Americas staff and students, and they must overcome constant logistical hurdles to remain a meaningful form of legal assistance. In 2023-2024, we have partnered with the CUNY School of Law to pilot a remote CFI preparation model that includes resources to support representation during CFIs and immigration judge (IJ) review hearings. Although we hope to continue this partnership, the challenges of finding students available to remain on call for major swaths of time throughout the week just in case we learn of a CFI being scheduled has proven difficult and requires flexibility and support on the part of CUNY's school administrators and professors. Moreover, the changes to the CFI process make it so complex that students will not be able to provide meaningful assistance without a lawyer present, which makes the program virtually impossible to implement.

17. We have also attempted to initiate a pilot remote CFI preparation model with a private law firm with the assistance of the International Refugee Assistance Project, but that project has been paused for multiple reasons. First, detention centers often take 24-48 hours to schedule calls, and many times our clients are either moved to another detention center or have received their CFI interview before the calls can be scheduled. Certain detention centers place even further restrictions on scheduling calls, with only certain days when women can be interviewed, for example. Second, even when we can speak to the client, there is not enough time to prepare them—we need a minimum of two hours, but that is just the bare minimum. Truly adequate preparation would require more than one interview over multiple days. Finally, some detention centers allow only one-on-one calls, which prevents an interpreter from joining the call.

18. For individuals who can clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings,

competency evaluations, and more.  Where resources allow, we provide these services as part of full representation in immigration court and before the Board of Immigration Appeals.  In other cases, we offer these services as *pro se* assistance.  For *pro se* individuals, we also provide assistance with document preparation and translation.

19.     In early 2019, Las Americas created the Las Americas Mexico Program (LAMX).  LAMX was created as a temporary measure to assist noncitizens who were subject to the MPP or "Remain in Mexico" Program and thus required to wait in Mexico for their asylum cases to be considered.  As U.S. immigration policy has changed, we have adapted LAMX's services and formalized LAMX as an incorporated entity in Mexico.  While Title 42 was in place and prevented asylum seekers from presenting at the ports to request asylum, we helped people seeking exemptions to that policy as well as parole.  Now, LAMX provides *pro se* asylum support and Know Your Rights presentations in shelters and other community spaces.  In these presentations, we teach people about the CFI process, advise them about what to expect in the expedited removal process, and field questions from people who are trying to understand how to navigate this process.

20.     In 2023, Las Americas served over 5,000 people.  We helped 3,381 people navigate the CBP One application in order to make an appointment to request asylum at a port of entry.  We also served nearly 303 individuals in Immigration and Customs Enforcement (ICE) custody.  This work occurred alongside our casework on behalf of people seeking immigration benefits from USCIS or the immigration courts.  Across programs, we opened over 688 new cases last year.  More than half of the clients that Las Americas serves are asylum seekers, and at present, we have

about 171 open cases in our Detained Program.[2] Additionally, we serve hundreds of people each month with Know Your Rights presentations in shelters, both in El Paso and in Mexico.

21.     Thus far in 2024, we have served more than 4,600 individuals. We have helped 1,100 individuals request with CBP One appointments, 93 individuals with CFI prep while in Immigrations and Custom Enforcement ("ICE") custody, and have served 288 total people in ICE custody. Across programs, we opened more than 700 new cases, with 231 opened in our detained program alone. We continue to serve hundreds of individuals in our weekly Know Your Rights presentations, which have been taking place three times a week since September.

22.     In addition to this work helping people prepare for the expedited removal process on the front end, we have also worked with many people who were deported or "voluntarily" returned to Mexico even though they are not Mexican nationals.  We are continuously working to develop systems to serve these individuals, as discussed in greater detail below.

23.     For several years now, Las Americas has been focused on helping people prepare for CFIs on both sides of the U.S.-Mexico border.   From May 12, 2023, to September 20, 2023, our cross-border program assisted more than 2,500 people in this manner, and we have assisted over 1,100 people thus far in 2024.

24.     As set forth in more detail below, however, because of the Rule and Guidance, that work is now immensely more complex and time consuming.  For example, our team in Mexico must now educate people on ways in which the Rule impedes access to asylum, explain the significance of the manifestation requirement for withholding and CAT protection, and prepare

---

[2] We collected information for the 2023 and 2024 calendar years on July 1, 2024.  Please note that due to the tight capacity of the organization and the general difficulty of allocating sufficient resources to administrative and technological support, all data reported should be taken as estimates reflecting current case data to the best of my knowledge.

them to manifest a fear when they encounter a Border Patrol officer. If a noncitizen obtains a CFI, the reduced pre-CFI consultation period (down from a minimum of two days in early 2023 to as little as 4 hours under the Rule) strains our ability to provide meaningful CFI-related services in a manner that will actually reach the individual prior to the scheduling of their appointment. This significantly limits the number of individuals we are able to prepare for a CFI, and, in turn, jeopardizes our ability to receive funding.

**The Rule Harms Las Americas' General Operations**

25. The Rule and Guidance challenged in this suit have caused and will continue to cause harm to Las Americas' mission. In particular, the Rule has forced us to divert limited resources away from individual representation in immigration court to continue to meet the most urgent needs of the community, which currently means aiding people attempting to navigate the manifestation of fear and CFI process.

26. In addition, because our mission is premised on ensuring access to asylum for people who are coming to the United States, the Rule fundamentally frustrates our organization's purpose by cutting off the right to seek asylum in the United States for huge numbers of people based on factors unrelated to a person's need for protection.

*The Rule's Reliance on CBP One*

27. As noted above, with certain exceptions that are almost never applicable, the Rule requires everyone—including people from Mexico—to make an appointment using CBP One to preserve the right to seek asylum at the border. The harms imposed by this requirement impair the operations of Las Americas before an asylum seeker ever reaches the United States.

28. First, the CBP One requirement has caused a dramatic diversion of resources in our Mexico office. While we have consistently provided Know Your Rights assistance in Mexico, that work has existed alongside direct legal representation. Now, many of those resources are diverted

to explaining the Rule, addressing the CBP One requirement, and helping people to understand the new procedural hurdles that they face, whether that be in managing to find a way to utilize the app successfully, or by explaining in detail the negative consequences of seeking asylum outside of a formal port of entry. In my experience, asylum seekers prefer to come to the United States through a port of entry; however, hard realities such as lack of timely access to an appointment, violence, kidnapping attempts, lack of safe housing or potable water, threats of deportation by Mexican officials, refusals by CBP to speak to anyone who appears at the port of entry without an appointment, and misinformation lead to individuals and families being forced to seek asylum between ports of entry.

29. With the introduction of CBP One, moreover, we have received hundreds of requests for assistance with the app. Non-Mexican asylum seekers were required to use the CBP One app under the Circumvention of Lawful Pathways regulation beginning in May 2023, and the new Rule now requires all asylum seekers to use the app. Because of the Rule's CBP One requirement, our staff in Mexico primarily provide assistance with using the app, education as to the purpose of scheduling an appointment with the app, warnings on notario fraud and other bad actors charging money to register appointments on the app, and guidance as to consequences for entering without an appointment. While we have continued to flag highly vulnerable cases directly with CBP in an attempt to seek humanitarian protection for them without the need to wait for an appointment, our capacity to do so is limited by the amount of time we must spend helping those trying to understand the Rule's CBP One requirements.

30. We have also had to divert resources to overhaul the content of the legal presentations we provide to people preparing to enter the United States. Historically, we have focused our presentations on clarifying the purpose and consequences of documents received upon

crossing the border, educating people about what to expect during expedited removal, and preparing for the credible fear process. We have also historically acted as a referral partner whenever clients indicate a need for housing or other psycho-social support in Ciudad Juarez.

31. With the advent of the Rule, this work has become immensely more complex. On top of having to change our work to educate people about the substantive changes to asylum requirements imposed by the Rule (discussed below), we now spend a great deal of time providing direct assistance to people unable to navigate CBP One on their own.

32. Because the app is riddled with technical issues and difficult to use in general, our work in this arena is in incredibly high demand. As mentioned above, in the last four months, we have assisted more than 1,000 individuals in Mexico in understanding the Rule and the CBP One requirement.

33. Simply put, the Rule's requirement that people use the app to preserve asylum eligibility has forced Las Americas to spend resources helping people use the app rather than putting those resources toward its mission of assisting asylum seekers with CFIs, reviews of negative fear determinations, and representation in immigration court.

*The Rule's Changes to the Credible Fear System*

34. The changes brought by the Rule and Guidance have impaired and will continue to impair our work helping individuals who are seeking asylum and subject to the credible fear process.

35. To begin, noncitizens will not even be interviewed for credible fear unless they affirmatively manifest a fear of persecution—and even then, their explicit statements of fear are often ignored. As a result, we need to educate individuals in Mexico who intend to seek asylum in the United States about the manifestation standard. Based on our experience working with noncitizens seeking asylum, we know firsthand that manifesting a fear can be an extremely

difficult task. Noncitizens normally travel thousands of miles to reach the border, are tired and often starved, and have experienced significant trauma in their home country and on their journey north. In addition, they are often afraid when encountering CBP or other officials. By the time many actually reach a CBP official to express fear, they have already encountered and been turned back by Mexican officials operating on the Mexico side of the border and seeking to prevent them from ever reaching U.S. soil. Helping these individuals to prepare to manifest a fear immediately upon encountering a U.S. border official often requires helping them to process that fear and trauma, which is an extremely time-consuming process.

36. Moreover, even if a noncitizen manifests a fear, they are now required to reach an even higher threshold to establish a credible fear during the CFI. Prior to the implementation of a 2023 rule, which raised the standard for most applicants to a "reasonable possibility," applicants for withholding or CAT protection needed only to establish a "significant possibility" that they would be persecuted or tortured if removed from the United States. Under the Rule, they must now establish a "reasonable probability" of torture or persecution.

37. These changes make many fewer applicants eligible for asylum or other protection and in turn make our consultations more emotionally and substantively complex. Now, Las Americas must prepare people for a realistic chance that they will not be permitted to seek asylum, and that they face removal if they cannot overcome the higher standard.

38. These changes have injured our operations because our procedures for educating people on how to proceed through this system are more complicated and time-consuming. We must prepare people for multiple potential scenarios and outcomes. Since the Rule and Guidance took effect, the duration of our CFI screening consultations has significantly increased, and it has become difficult for us to conduct such screening conversations in fewer than two hours.

39. Moreover, the fact that noncitizens are only guaranteed 4 hours to obtain and consult with a lawyer before a CFI means we need to have two workflows. For people in ICE custody, we have to increase the number of individuals conducting intake to attempt to provide noncitizens with services before their CFI interview. At the same time, to effectively serve clients knowing we will only have a short window to prep noncitizens for their CFI, we must try to assist them in Mexico, *before* they even enter the United States. This issue is discussed in detail below.

40. Because of these complexities, it is harder for us to serve as many people, which undermines our mission and complicates our ability to run a sustainable legal department. Additionally, with limited knowledge of how DHS is implementing the Rule, we are left with no means of adequately clarifying for asylum seekers what to expect when reaching the border and claiming fear of return.

41. In addition to making CFI preparation harder and more time-consuming, the Rule and Guidance have increased demand for Las Americas' representation for people who have failed their CFIs and need IJ review and requests for review by USCIS. But our capacity to provide this representation is diminished because we must spend so much of our time and resources providing pre-CFI support. Previously, the need to provide this post CFI-work was more modest because many clients received a positive result from the CFI.

***The Rule's Cascading Impact Beyond the Credible Fear Interview***

42. In response to the Rule's heightened burdens and convoluted processes that impede access to asylum at our southern border, it is fair to say that *all* of Las Americas' work has been forced to change.

43. Las Americas has already diverted, and will continue to be forced to divert, significant resources to understanding the new Rule and Guidance, and their impact on the communities we serve, training staff and volunteers, and advising our clients, prospective clients,

and immigration communities. In addition, we continue to spend resources developing educational materials, including internal training materials, external training, and *pro se* materials designed to help the impacted communities. We also need to reroute resources towards helping our non-legal partners on both sides of the border have a better understanding of access to asylum in the United States, so that they are able to appropriately direct individuals for referrals. I have spoken with several civil society partners on both sides of the border, and witnessed firsthand the frustration and confusion over how the U.S. is managing the ports of entries and sections of the wall in our sector.

44. For example, we have had to devote considerable resources to creating a system to educate individuals on the manifestation standard. We further had to create a system to contact individuals who are still waiting for a CFI to be scheduled. As part of that, we have had to divert staff from other programs to be available for CFI preparation because of the four-hour timeframe before an individual may be subject to a CFI interview.

45. Even with that increase in staff, we are unable to assist as many individuals as we had previously because CFI prep sessions take considerably more time. In these sessions, we have to help individuals understand whether they fall into one of the few narrow exceptions to the Rule's asylum bar for people who entered without CBP One appointments. And if they do not, we need to prepare them to meet the significantly higher "reasonable probability" screening standard for withholding and CAT. This is dramatically more time-consuming work than was required previously, which means we can serve fewer clients.

46. As a result of these changes, we have also been forced to significantly reduce the number of individuals we can assist in their efforts to obtain lasting protection or relief. For example, we now have fewer resources to represent people who have received negative credible

fear determinations and seek review of those findings. Previously we also provided our clients assistance in applying for work authorization, but we are now forced to choose between trying to help some people navigate the Rule over helping other people secure this more lasting benefit. We have also had to reduce the number of individuals we can represent who remain in immigration custody and who are in need of full representation. While resource limitations have always existed for Las Americas, the Rule has brought that strain to a new breaking point.

**The Guidance's Impact on the CFI Process**

47. The Guidance also impacts the implementation of the Rule and has made it significantly more difficult to further our mission and assist our clients.

48. As mentioned above, CFI consultations and representation are central to Las Americas' detained legal services. While we continue to provide this service, there is an entire population of people undergoing the CFI process in CBP custody that we can no longer feasibly help. That is because access to individuals in CBP custody is virtually impossible, particularly on the extremely expedited CFI-scheduling timeline imposed by the Guidance. We are not allowed to enter CBP facilities, nor do we have direct access to people detained there via telephone. Even if a family member contacts us about a loved one in CBP custody, we are unable to make arrangements to communicate with them.

49. The less than 4-hour timeline for trying to communicate with people in CBP custody exacerbates the communication problem. Because people detained in those facilities will have their CFIs so quickly, it is not possible for us to provide a CFI consultation before the interview actually occurs, forcing us to make the difficult decision to move forward with CFI legal services exclusively for individuals in ICE custody.

50. While people in CBP custody may be able to make a limited number of outbound calls, the only numbers that they see are for organizations who have been able to set up special

hotlines with phone numbers designated solely for CBP custody. Because we do not have the staff capacity or resources to hire support to operate such a hotline, asylum seekers in CBP custody often do not have any way to contact us before their CFIs or even after the interview if the result was negative and they wish to challenge it.

51. As mentioned above, the government-created impediments to helping people in CBP custody before they have a CFI has forced us to move some of our CFI consultation work to Mexico. Even when we try to help people prepare for CFIs while in Mexico and even when we agree to represent them in their CFIs, we are often unable to do so because of the speed with which CFIs occur in CBP custody. Several Las Americas clients have been forced to forego having their attorney present during their CFI because the asylum office scheduled it without providing us any advance notice, even in cases where an attorney has entered an appearance.

52. In these circumstances, where there is a negative CFI determination because we were denied notice and thus precluded from representing the individuals during their fear interview, we are limited to assisting clients with the immigration judge ("IJ") review of a negative CFI determination. This assistance is also hindered by lack of information and notice. Staff who plan to attend IJ reviews must spend time and resources keeping track of whether a hearing has been scheduled, as well as preparing substantively for arguing exceptions and eligibility for asylum, withholding of removal, and protection under CAT.

**Overarching Harms from the Rule & Guidance**

53. The combined impact of the Rule and Guidance changes have fundamentally altered access to asylum at the U.S-Mexico border. As policy has shifted and immigration legal services work has become more difficult, Las Americas needs to hire more staff to try to meet the demands of our community. While we strive to increase *pro bono* representation and provide high quality legal representation, we are not government-funded and none of our grants are guaranteed

beyond two to three years. Moreover, it is difficult to secure funding for legal services, even in areas such as El Paso with clear needs and broad gaps in *pro bono* providers.

54. Additionally, many funders are interested in funding work that reaches the greatest number of people possible. Because the Rule has increased the workload for each case and prohibits us from taking as many cases, we risk losing out on grants that expect the reach of our work to maintain a growth trajectory in terms of the number of different people served. For example, we have one funding source that has a stated goal of decreasing the amount of time staff take to provide services. This Rule has the opposite effect on our work.

55. Additionally, our programs rely on volunteers. We already spend significant resources to coordinate, manage, and train volunteers. These changes injure our ability to rely on volunteers because the pace and complexity of the issues presented at the border continue to grow. The result is that many people on staff, myself included, have to devote resources to volunteer training and management, to the detriment of other work.

56. Further, as mentioned above, the need for Las Americas to focus on the front end of the expedited removal process detracts from our ability to provide ongoing legal representation in full removal proceedings in immigration court, appeals before the Board of Immigration Appeals, and on related benefits applications with USCIS. This change will result in more denied asylum applications without fully developed records, more appeals, and less capacity to do that work both for Las Americas and similar organizations.

57. In essence, the Rule and related border policies force Las Americas into full-time triage mode. We are now in a position of having to choose between preparing a larger number of noncitizens for the new screening processes, and providing full representation to people who are actually proceeding with their substantive claims.

58. Last, Las Americas' staff has experienced a mental and physical toll as a result of the Rule and Guidance, and the harm to Las Americas' mission. Living and working on the border, our staff are closely connected to the communities they serve. We witness firsthand the harmful effects of asylum bans and related enforcement-oriented policies. Attempting to lead a team that is already inundated with work through more tumult is having a serious, detrimental impact. Since the Rule and Guidance went into effect, I have observed many staff members foregoing their paid leave because of the volume of work. And because so much of our time is spent on the front end of the expedited removal process, staff are feeling less satisfied by the work because we do not have resources to provide longer-term services with the same frequency. The sense that people cannot devote their energy to the work that meaningfully advances Las Americas' mission is already leading to a sense of frustration and burnout. These harms will only persist as time goes on.

**Conclusion**

59. It is difficult for me to overstate the detrimental impact that this Rule and the Guidance have had, and will continue to have, on Las Americas' clients, staff, operations, and mission. These changes will do nothing to improve the functioning of our immigration system and will instead infringe on our clients' rights to seek asylum, strain our resources thus forcing us to cut back on our services, and impose insurmountable bureaucratic obstacles on people with legitimate asylum claims seeking refuge from persecution and torture.

_/s/ Jennifer Babaie_
Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center

Executed this 14th day of November 2024 in El Paso, Texas