BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Assistant Director*

CHRISTINA P. GREER
PATRICK GLEN
DAVID KIM
KATHERINE J. SHINNERS
*Senior Litigation Counsel*

BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Las Americas Immigrant Advocacy Center, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. Department of Homeland Security, *et al.*, <br><br> Defendants. | Civil Action No. 1:24-cv-01702 |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................1

I.    Plaintiffs' Claims Remain Barred.........................................................................1

II.   The Rule's Asylum-Eligibility Limitation is Authorized by the INA and is Not
      Arbitrary or Capricious ........................................................................................4

III.  The Rule's Manifestation Standard is Not Arbitrary or Capricious ...................11

IV.   Defendants' Adoption of the "Reasonable Probability" Standard Was Reasonable and
      Reasonably Explained..........................................................................................18

V.    The Four-Hour Minimum Consultation Period is Consistent with the INA and Neither
      Arbitrary Nor Capricious .....................................................................................21

VI.   The Rule Satisfies the APA's Procedural Requirements.....................................22

VII.  Any Relief Must Be Sharply Limited ..................................................................23

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Ariz. All. for Retired Ams. v. Mayes,*
  117 F.4th 1165 (9th Cir. 2024) ............................................................... 2

*Ass'n of Am. Physicians & Surgeons v. Sebelius,*
  746 F.3d 468 (D.C. Cir. 2014) ............................................................... 23

*Barnhart v. Thomas,*
  540 U.S. 20 (2003).................................................................................. 10

*Biden v. Texas,*
  597 U.S. 785 (2022)................................................................................. 2

*California v. Texas,*
  593 U.S. 659 (2021)................................................................................. 2

*East Bay Sanctuary Covenant v. Biden,*
  2023 WL 11662094 (9th Cir. Aug. 3, 2023)............................................ 5

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024)................................................................................. 2

*Forest Guardians v. U.S. Forest Service,*
  329 F.3d 1089 (9th Cir. 2003) ............................................................... 12

*Hispanic Affairs Project v. Acosta,*
  901 F.3d 378, (D.C. Cir. 2018)............................................................... 12

*Kiyemba v. Obama,*
  555 F.3d 1022 (D.C. Cir. 2009) ............................................................. 24

*Little Sisters of the Poor v. Pennsylvania,*
  591 U.S. 657 (2020)................................................................................ 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983).................................................................................. 5

*Norton v. Sw. Utah Wilderness All.,*
  542 U.S. 55 (2004).................................................................................. 24

*Tenn. Conf. of the NAACP v. Lee,*
  105 F.4th 888 (6th Cir. 2024) ................................................................. 2

*Wildlife v. Zinke*,
   849 F.3d 1077 (D.C. Cir. 2017) ........................................................................................ 21

## Statutes

8 U.S.C. § 1158(b)(2)(C) ........................................................................................... 4, 5

8 U.S.C. § 1182(d)(5)(A) .............................................................................................. 24

8 U.S.C. § 1225 ............................................................................................... 20, 21, 24

8 U.S.C. § 1252(a)(2)(A) ............................................................................................... 2

8 U.S.C. § 1252(e)(3) ................................................................................... 2, 3, 22, 23, 24

8 U.S.C. § 1252(f) ...................................................................................................... 24

# INTRODUCTION

For the reasons set out in Defendants' motion and reply, and this supplemental brief, the Court should grant summary judgment to the government.

On September 30, 2024, the Department of Homeland Security (DHS) and the Department of Justice (DOJ), issued a final rule, *Securing the Border*, 89 Fed. Reg. 81,156 (Oct. 7, 2024) (the Rule), that finalizes the interim final rule (IFR) Plaintiffs initially challenged in this case. On November 1, 2024, Plaintiffs filed a second amended complaint challenging the final Rule and DHS guidance setting a four-hour minimum consultation period prior to a noncitizen's credible fear interview that largely tracks their earlier complaint. ECF No. 56. Defendants incorporate their earlier briefing seeking summary judgment on Plaintiffs' claims, *see* ECF No. 45, 45-1 (Defendants' Motion for Summary Judgment), ECF No. 52 (Defendants' Reply), and submit this supplemental brief to address the effect of the final Rule, and any new issues raised by Plaintiffs' second amended complaint and supplemental brief, *see* ECF No. 59.

# ARGUMENT

## I.    Plaintiffs' Claims Remain Barred.

As set out in Defendants' motion and reply, Plaintiffs' claims fail at the threshold. Defs' Mot. 13–24; Defs' Reply at 1–8. Despite their supplemental arguments, Pls' Suppl. Br. 2–3, the organizational Plaintiffs lack standing, the original individual Plaintiffs cannot challenge the final Rule, and the Court should dismiss the individual Plaintiffs as to the claims for which they have not established injury.

The organizational Plaintiffs lack standing. The organizational Plaintiffs continue to assert that the Rule and guidance harm their missions and that they have had to divert resources in response. *See generally* Babaie Decl.; Hidalgo Decl. However, as explained in Defendants' motion

and reply, Defs' Mot. 13–18; Defs' Reply at 1–2, Plaintiffs' theory of standing does not survive *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), and 8 U.S.C. § 1252(a)(2)(A) and (e)(3) bar the organizational Plaintiffs' claims challenging expedited removal policies. Like the organizational Plaintiffs, the organization in *All. for Hippocratic Med.* alleged an indirect "pocketbook" harm. *California v. Texas*, 593 U.S. 659, 669 (2021). They alleged that the FDA regulations had rendered their public-education efforts more costly by forcing them to devote extra time and expense to informing the public about the risks of the abortion drug at issue in the case. *See All. for Hippocratic Med.*, 602 U.S. at 393–95. Yet the Supreme Court held that these pocketbook injuries did not establish their standing to sue the FDA. *Id.* If the organizations' expenditures did not suffice in *All. for Hippocratic Med.*, then the organizational Plaintiffs' assertion of similar expenditures here also cannot suffice. *See Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1178 (9th Cir. 2024) (holding that under *All. for Hippocratic Med.*, plaintiff organization could not establish standing based on frustrated mission and diversion of resources); *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 904–05 (6th Cir. 2024) (applying *All. for Hippocratic Med.* to conclude that plaintiff organization did not have standing based on alleged indirect injuries). Because the organizational Plaintiffs cannot show an injury in fact, they lack standing and should be dismissed from this suit.

The Court should dismiss claims by individual Plaintiffs who lack injury or whose claims are untimely. Contrary to Plaintiffs' assertion, Pls' Suppl. Br. 2, the initial individual Plaintiffs who claimed injury from the IFR cannot also challenge the final Rule, regardless of how similar it may be to the IFR actually applied to them. *See Biden v. Texas*, 597 U.S. 785, 809–10 (2022) (concluding that a second statement of policy issued after plaintiffs challenged the first policy statement was a new and separate agency action despite coming to the same conclusion as the

first). Recognizing this issue, Plaintiffs have identified additional individual Plaintiffs. *Id.* at 2.

Although Defendants acknowledge that the new individual Plaintiffs have had aspects of the final Rule applied to them, these individual Plaintiffs' claims should be dismissed as to portions of the IFR, final Rule, and guidance to which they were not subjected, have not sufficiently alleged harm, or are outside the statutory deadline to challenge.[1]

First, none of the new individual Plaintiffs (L.B., J.G., E.M., R.R., A.L., J.L., L.Q., S.O., W.O., G.F., J.N., J.S., K.C., E.C., J.E., R.C., and M.F.) can challenge the IFR as all entered the United States after the final Rule became effective. *See* L.B. Decl. ¶ 16; J.G. Decl. ¶ 14; E.M. Decl. ¶ 14; R.R. Decl. ¶ 13; L.Q. Decl. ¶ 14; S.O. Decl. ¶ 16; J.N. Decl. ¶ 8; E.C. Decl. ¶ 9; J.E. Decl. ¶ 12; R.C. Decl. ¶ 15; M.F. Decl. ¶ 15. And none may challenge the four-hour consultation period because such claims would be outside the 60-day deadline for bringing challenges to expedited removal policies under 8 U.S.C. § 1252(e)(3)(B).

Second, L.B., J.G., E.M., R.R., A.L., J.L., and L.Q. were all referred for credible fear interviews and so were not harmed by the manifestation standard. *See* L.B. Decl. ¶ 17; J.G. Decl. ¶ 15; E.M. Decl. ¶ 15; R.R. Decl. ¶ 14; L.Q. Decl. ¶ 16.

Third, S.O., W.O., G.F., J.N., J.S., K.C., E.C., J.E., R.C., and M.F. cannot challenge the limitation on asylum eligibility or the "reasonable probability" standard governing screening of claims for statutory withholding of removal and protection under the regulations implementing the United Nations Convention Against Torture (CAT) because they were not identified as having

---

[1] Plaintiffs have claimed that there is at least one individual Plaintiff who has been injured by each aspect of the Rule and guidance and that this is sufficient to establish standing. Even assuming that at least one individual Plaintiff has asserted harm from each aspect of the Rule and guidance—that is, from the limitation on asylum eligibility, the manifestation standard, the reasonable probability standard, or the guidance—no Plaintiff has standing to challenge the IFR's issuance without notice and comment, and no Plaintiff has established redressability, *see* Defs' Reply at 8 n.1, 20-21.

expressed or manifested a fear of persecution or torture or an intent to apply for asylum and so were not subject to those provisions, both of which apply later in the process if a noncitizen expresses or manifests a fear or an intent to apply for asylum. *See* S.O. Decl. ¶ 20; J.N. Decl. ¶ 14; E.C. Decl. ¶ 13–14; J.E. Decl. ¶ 15; R.C. Decl. ¶ 17; M.F. Decl. ¶ 19.

Accordingly these Plaintiffs and their claims must be dismissed. Should the Court grant Plaintiffs any relief that relief must be narrowly tailored to address only Plaintiffs with actual, cognizable injuries.

## II.    The Rule's Asylum-Eligibility Limitation is Authorized by the INA and is Not Arbitrary or Capricious

### A. The Rule's asylum-eligibility limitation is authorized by the INA

The "text, structure, and history" of the INA make clear that the asylum-eligibility limitation embodied in the Rule "reflects a lawful exercise of the Executive's discretion to promulgate conditions on asylum eligibility." Defs' Mot. 24, 24-33; Defs' Reply at 4-7; *see* 8 U.S.C. § 1158(b)(2)(C); *see generally* 89 Fed. Reg. at 81,168-77 (addressing and rejecting comments that the Rule exceeds the authority of the Departments or otherwise conflicts with domestic or international law).

In their supplemental brief, Plaintiffs repeat their erroneous assertion that the Rule is impermissible because it renders noncitizens ineligible for asylum based on their manner of entry in violation of Section 1158(a)(1). Pls' Suppl. Br. 3. As the government has explained, however, the government is permitted to consider manner of entry, and in any event, the Rule does not limit who may apply for asylum and does not even necessarily limit *eligibility* for asylum based solely on whether a noncitizen entered at a port of entry (POE) or between POEs. Defs' Mot. 27-29; Defs' Reply at 5. As the final Rule reiterates, the "manner of entry is *never* dispositive," and "[t]he [asylum-eligibility] limitation is not a sweeping categorical bar that would preclude a grant of

asylum solely based on manner of entry." 89 Fed. Reg. at 81,170 (emphasis added). Rather, "the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established, or shown exceptionally compelling circumstances[.]" *Id.*; *see East Bay Sanctuary Covenant v. Biden*, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023) (staying district court's relief against an asylum-eligibility limitation despite similar arguments that the limitation violated Section 1158(a)(1)).

### B. The Rule's asylum-eligibility limitation is not arbitrary or capricious

The Departments acted reasonably in promulgating the IFR, and the final Rule further establishes that they "examine[d] the relevant data and articulate[d] a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see* Defs' Mot. 44-48. The asylum-eligibility limitation represents a reasoned and balanced approach to addressing high encounter rates at the southern border, which had "outstripped the Departments' ability—based on available resources—to deliver timely decisions and consequences in significant numbers for those without a legal basis to remain in the United States." 89 Fed. Reg. at 81,158–59. Plaintiffs' arguments in their supplemental brief, *see* Pls' Suppl. Br. 3-13, which simply recast arguments already addressed by the government in the context of the IFR, *see* Defs' Mot. 48-51; Defs' Reply at 12-14, remain misguided and are contradicted by the record and the reasoned responses provided in the final Rule to identical concerns raised by commenters.

*First*, Plaintiffs argue that the Departments failed to consider the risks of harm to noncitizens waiting in Mexico for CBP One appointments. Pls' Suppl. Br. 4-9. Yet the Departments have consistently, throughout the rulemaking process, taken into account potential

harms to noncitizens in Mexico, *see* Defs' Mot. 48-49; Defs' Reply at 12-13, and acknowledged that noncitizens traveling to the border risk harm and violence during that journey and while waiting to enter the United States, *see* 89 Fed. Reg. at 81,218. The Rule seeks to mitigate that harm by disincentivizing irregular migration—where noncitizens are more likely to be harmed by bad actors—and channeling migration flows to lawful pathways and orderly methods of entry, including via prescheduled appointments to present at POEs using the CBP One app. *See id.* at 81,217-18; *see also id.* at 81,218 (noting that the possibilities for harm during significantly heightened border encounters would be exacerbated in the absence of this Rule).[2] Similarly, Plaintiffs contend that the Departments ignored evidence of harm to particularly vulnerable populations. *See* Pls' Suppl. Br. 8-9. As the Rule recognizes, however, the existence of the "exceptionally compelling circumstances" exception to the asylum-eligibility limitation was driven in part by a recognition of the unique vulnerabilities certain noncitizens may have. *See* 89 Fed. Reg. at 81,204; *see also id.* (the exception "will afford a means to seek asylum or protection when those risks manifest as specific threats to the individuals in question."). But beyond that recognition, the "rule and its exceptions apply equally to noncitizens who enter during the times when emergency border circumstances are present, regardless of nationality, race, ethnicity, or other demographic" traits. *Id*. As the "same reasons supporting the Rule generally apply" even to the "particularly vulnerable" individuals Plaintiffs posit, there is no reason to further differentiate between noncitizens subject to the Rule. *See* Defs' Mot. 49 n.8.

---

[2] Plaintiffs argue that there is no evidence that the Rule will reduce dangers associated with cartels and other smuggling operations, *see* Pls' Suppl. Br. 7-8, but the predictable result of channeling more migration to lawful pathways is just such a reduction, *see* 89 Fed. Reg. at 81,177 ("[T]he Departments believe the most helpful approach to prevent migrants from falling victim to smugglers and traffickers is to both discourage attempts to enter the United States irregularly and, ultimately, to increase availability of lawful pathways for migration.").

Additionally, Plaintiffs argue that the exception to the asylum-eligibility limitation will do little to help noncitizens at risk of violence in Mexico, especially where that exception applies only at the credible fear interview (CFI) stage and not during the initial encounter with CBP. *See* Pls' Suppl. Br. 6-7. Yet the exception was not meant to be broad, as such an exception would have undercut the rationale of the Rule. *See* 89 Fed. Reg. at 81,223, 81,225-26. Instead, the exception was meant only to encompass exceptionally compelling circumstances, such as those at imminent risk of significant harm, while others are required to await orderly processing through the CBP One app. *Id.* at 81,223. And although the exception only applies to those who manifest a fear and are referred for a credible fear interview, there are a variety of ways in which a noncitizen can indicate the requisite fear of harm, including affirmatively expressing an intent to apply for asylum or otherwise manifesting a fear of persecution or torture. *See id.* at 81,233-35.

*Second*, Plaintiffs renew their argument that the Departments failed to consider the harm to Mexican nationals in promulgating this Rule. *See* Pls' Suppl. Br. 9-10. Plaintiffs initially contend that the Departments failed to offer any justification for applying this Rule to Mexican nationals, *see id.* at 9, but that assertion is belied by the final Rule. There, the Departments noted that "[t]he strains that resulted in emergency border circumstances and necessitated implementation of the IFR were driven in part by a recent sharp increase in Mexican nationals processed for expedited removal and referred for credible fear interviews." 89 Fed. Reg. at 81,250. Given those increases, Mexican nationals must be included in the scope of the Rule in order for it to have the desired effect: "excepting Mexican nationals from the rule would undermine the rule's foundational purpose to alleviate strain on border security and immigration systems while entry is suspended and limited under the Proclamation." *Id.*

7

Plaintiffs also argue that, during periods where entry is suspended, Mexican nationals will have a difficult time obtaining any immigration relief, protection, or other benefits. Specifically, they argue that withholding of removal and protection under the CAT will be difficult to obtain, the exceptions to the asylum-eligibility limitation are strict and unlikely to be applicable, and it is impracticable to wait in safer geographical locations, even assuming the CBP One app can be accessed from anywhere within Mexico. *See* Pls' Suppl. Br. 9-10.

These arguments fail to establish that the Rule is unreasonable. Mexican nationals *do* retain the ability to seek withholding of removal and CAT protection. Although these forms of protection have higher burdens of proof than asylum, those higher burdens "align with the overall purpose of the rule: to disincentivize irregular migration during periods of emergency border circumstances, so as to mitigate the risk that border enforcement operations and the larger immigration system become overwhelmed and unable to issue timely decisions or consequences." 89 Fed. Reg. at 81,253. If a Mexican national has an urgent need to flee such that they cannot wait safely in Mexico, these forms of protection remain open to them. Likewise, regarding the exception to the asylum-eligibility limitation, "Mexican nationals with specific, urgent safety needs" may enter the United States without an appointment and retain eligibility to apply for asylum if such urgent needs constitute exceptionally compelling circumstances. In some cases, they may retain eligibility under the family unity provisions of the Rule. In addition, even during a suspension of entry, there are exceptions to the Proclamation itself, such as for those who enter with a CBP One appointment, those permitted to enter based on the totality of the circumstances, and for unaccompanied children. *See id.* at 81,251. Finally, the ability of Mexican nationals to schedule a CBP One appointment from anywhere in Mexico means that "Mexican nationals facing imminent danger in a specific area of Mexico [may] internally relocate while waiting for their CBP One appointment."

*Id.* Although this may be less convenient, the ability to safely relocate and schedule an appointment remains a possibility for those at risk of harm in specific areas of Mexico.

*Third*, Plaintiffs again contend that it is unreasonable for the Departments to point to the CBP One app as providing a means for noncitizens seeking asylum to enter the United States during periods of emergency border circumstances and avoid application of the asylum-eligibility limitation. They argue, for instance, that there are barriers that may prevent some noncitizens from using the app, including smart-phone access, connectivity issues, and language limitations. Pls' Suppl. Br. 10-12. Plaintiffs also argue that many noncitizens are unaware of the app or believe that it is limited to only certain nationalities. *Id.* at 12-13. Finally, Plaintiffs fault the very concept of appointments, where some noncitizens are unable to arrive at scheduled appointments because of the actions of the cartels or other third-parties in Mexico. *Id.* at 12.

All these concerns were considered by the Departments but, for rational reasons fully supported by available evidence, were determined to be insufficient to cause the Departments to abandon the Rule's reasonable approach to addressing emergency border circumstances. As the Departments noted, the CBP One app is not a barrier to asylum access, but rather "a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in a more orderly and efficient fashion." 89 Fed. Reg. at 81,219. Based on the feedback provided by nongovernmental stakeholders, the Departments determined that smartphone access is not a significant concern for most noncitizens. *Id.*; AR2 7423. While connectivity issues have presented periodic problems and may pose more significant problems in certain parts of Mexico, the registration and appointment process can be completed over time, bit by bit, and the app itself prioritizes appointments for those who have been waiting the longest, including because of connectivity issues. 89 Fed. Reg. at 81,220; AR1 1456-57. And the app is available in languages

spoken by the top nationalities seeking entry across the southern border. *See* 89 Fed. Reg. at 81,219-20; AR1 1456-61.

Further, contrary to Plaintiffs' assertions, the record reflects that noncitizens are aware of the app and its use to schedule appointments. DHS has "provided sufficient notice to the public" regarding both the existence of the app and the need to use it in scheduling appointments to present at POEs. 89 Fed. Reg. at 81,221; *see, e.g.*, AR1 425-46 (website providing detailed explanation and updates about CBP One); AR2 9346-50 (press release regarding changes to CBP One). The wide use of the app, "as evidenced by the number of requests CBP receives each day for appointments," belies the notion that noncitizens do not understand its importance. *Id.*; AR1 1457. As the final Rule notes, "[d]emand for CBP One appointments has outpaced supply," *id.*, indicating that awareness and use of the app is having the intended result of promoting regular, orderly means of entry over irregular border crossings.

Finally, the fact that *some* noncitizens may miss their appointments because of actions by third parties such as cartels or Mexican government officials is no reason to conclude that use of the app is generally insufficient to provide a means for noncitizens to avoid the asylum-eligibility limitation. This is especially so where a noncitizen may be eligible for asylum even if they do not arrive pursuant to a scheduled appointment due to, for example, an exigent safety concern. "Virtually *every* legal (or other) rule has imperfect applications in particular circumstances." *Barnhart v. Thomas*, 540 U.S. 20, 29 (2003). The final Rule makes clear that, although the CBP One app may not be absolutely perfect, it is a valuable tool that allows efficient processing of high numbers of noncitizens with minimal downsides. *See* 89 Fed. Reg. at 81,215-18. Especially in the context of the emergency border circumstances addressed by this Rule, it is reasonable for the

Departments to rely on that app to assist in addressing the emergency border circumstances as well as to provide means for noncitizens to avoid limitations on asylum eligibility.

### III.    The Rule's Manifestation Standard is Not Arbitrary or Capricious.

The Departments acted reasonably in promulgating the manifestation standard, whereby the "onus" is on a noncitizen facing expedited removal to manifest or express a fear of persecution or torture in order to be referred for a credible fear interview. 89 Fed. Reg. at 48,740. That standard is not arbitrary or capricious. On the contrary, as explained in Defendants' prior briefs on summary judgment, the Departments took care to lay out a clear rationale for the standard, explaining that this particular change to credible fear referrals was necessary "to address the emergency circumstances at the southern border discussed in the Proclamation ... in a manner consistent with [their] legal obligations." *Id.*; *see also* 89 Fed. Reg. at 81,235 ("emphasiz[ing] that the manifestation standard is a temporary solution to emergency border circumstances"). Those legal considerations include "the statutory procedures governing expedited removal," which mandate that the noncitizen must "indicate[]" a fear of persecution to receive an interview with an immigration officer, without imposing any requirement on the immigration officer to ask affirmative questions or provide individualized advisals. 89 Fed. Reg. at 81,234. Indeed, the manifestation standard maintains a measure of flexibility in the referral process, allowing immigration officers to rely on their considerable training and experience to assess whether a noncitizen has met that statutory threshold—not only through explicit statements, but also "non-verbal or physical cues" or even "unconscious behavior" exhibited by a noncitizen who otherwise might be unable to indicate a fear. 89 Fed. Reg at 48,744.

Plaintiffs give short shrift to these detailed explanations by the Departments. Instead, they simply surmise that "many asylum seekers will not raise their fears *at all* without proper

instruction, assurances, and questions." Pls' Suppl. Br. 14. But the mere fact that the expedited removal process devised by Congress is not entirely to their liking does not make that process arbitrary or capricious. As the Rule explains, immigration officers are not required "to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution." 89 Fed. Reg. at 81,234. On the contrary, the statute puts the onus on the noncitizen to indicate either an intention to apply for asylum or a fear of persecution. *Id.* The Rule, moreover, acknowledges the concern expressed by a few commenters that "some noncitizens with meritorious claims" might not be "referred to a credible fear interview." 89 Fed. Reg. at 81,234. But rather than eliding any further discussion of the possibility of such knock-on effects, the Rule responds by specifically noting that the manifestation standard is warranted as "a temporary solution to emergency border circumstances," and that "it is critical to have a system in place that *more effectively and efficiently* identifies those who may have a fear of return." *Id.* at 81,235 (emphasis added). Besides, since the implementation of the manifestation standard—specifically, while the IFR was in effect, leading up to the final Rule—27 percent of noncitizens encountered between ports of entry at the southwest border manifested fear while in DHS custody. 89 Fed. Reg. at 81,239. This represents a higher percentage of noncitizens manifesting fear than recorded in prior years, including during implementation of the public health order under Title 42, when that figure was lower than seven percent. *Id.*

Plaintiffs might complain the standard is not optimal in their view, but an "agency's actions need not be perfect," and courts "may only set aside decisions that have no basis in fact, and not those with which [they] disagree." *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1099 (9th Cir. 2003); *see also Hispanic Affairs Project v. Acosta*, 901 F.3d 378, (D.C. Cir. 2018) (the "mere fact" that an agency action is "less than perfect" "does not amount to arbitrary decision-

making"; so long as the agency "rationally connect[s] the facts to the choice made, it act[s] reasonably and its determination will be upheld" (cleaned up)). Ultimately, the manifestation standard was implemented with the intent of "enhanc[ing] the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances." 89 Fed. Reg. at 81,191. The Departments acknowledged the possibility of "some noncitizens with *potentially* meritorious claims not being referred for a credible fear interview," but they took that information into account before making the reasoned decision to adopt these emergency procedures in service of the critical policy goals underlying the Rule as a whole. *Id.* at 81,235 (emphasis added).

Not only that, as a practical matter, Plaintiffs' argument completely overlooks the fact that, under the Rule, signs and videos are widely deployed to ensure individuals subject to expedited removal do have notice of the statutory procedures available to them, including the opportunity to make a claim for asylum and pursue other forms of protection. 89 Fed. Reg. at 48,741 (explaining that signs directing individuals to "inform the inspecting immigration officer if they have a fear of return" will be posted "where individuals are most likely to see those signs" and "in the languages spoken by the most common nationalities encountered by CBP"); *id.* ("in CBP's large capacity facilities—where the vast majority of individuals ... undergo processing—a short video explaining the importance of raising" a fear of return "will be shown on a loop in the processing areas," likewise in the most commonly spoken languages). Plaintiffs might prefer different means of providing notice, but the Departments implemented its procedures based on their "experience"— drawn from an understanding of "the nature of CBP facilities and the utility of the existing signs"— that "short, concise, and simple notifications are effective." 89 Fed. Reg. at 48,472. And they found it was warranted to depart from the more involved process of, among other things, reading to each

individual *all* the information contained in the Form I-867A, given the "extraordinary circumstances" at the southern border. *Id*.

Plaintiffs also speculate that some individuals may not "affirmatively" manifest their fears unless they are assured of the "confidentiality" of any communications they might have with immigration officials about those fears. Pls' Suppl. Br. 14–15. But, again, the rule, including the manifestation standard, "appropriately reflects and accounts for DHS operational needs while protecting noncitizens' ability to seek protection in the United States." 89 Fed. Reg. at 81,243. Such trade-offs are reasonable to make even if they might not be optimized to the satisfaction of every potential stakeholder. In any case, the notices informing noncitizens that they should indicate a fear if they have one are "presented in a manner that is consistent with how CBP provides other important notifications to individuals," including critical information related to sensitive matters such as maintaining an awareness of "those who may commit suicide" and the agency's "zero tolerance regarding sexual assault." 89 Fed. Reg. at 48,471 n.199. These notices also clearly communicate to noncitizens that, "if they inform an immigration officer that they have a fear," an asylum officer will conduct a separate interview "to ask questions about their fear." *Id*. Nothing in the notices suggests that noncitizens who claim a fear will be denied confidentiality, and the Rule itself makes clear that "CBP has taken steps specific to the credible fear process, for those going through the process in CBP custody, to protect the privacy of noncitizens during their interviews," which "occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview." 89 Fed. Reg. at 81,243.

As for Plaintiffs' claim that immigration officers somehow lack the requisite training or expertise to "discern a fear absent advisals and questioning," Pls' Suppl. Br. 15, the Rule and the accompanying record show otherwise. The manifestation standard is premised on the extensive

experience of CBP officers, who, "as immigration officers, are intimately familiar with the processing of individuals, including vulnerable populations or populations requiring additional care, safety, security, or medical assistance, and with *recognizing* the needs of such individuals." 89 Fed. Reg. at 81,238 (emphasis added). The Rule sets out several examples where officers bring these "skills and expertise in interacting" with potentially vulnerable individuals to bear on determining whether to make a credible fear referral—observing, for instance, individuals in a purported family unit for "any concerns about the validity of the asserted familial relationship or the safety of any children in the group." *Id.* These officers have the advantage of being able to rely on "face-to-face interactions" with noncitizens "to closely observe" them and give heed to the fact that "fear can be manifested in many different ways, including verbally, non-verbally, or physically." *Id.* And should officers have any "doubt or ambiguity" even after having engaged so closely with a noncitizen, officers and agents are directed to "involve supervisors or managers to ensure appropriate decisions are made." *Id.*

Plaintiffs find fault with certain DHS guidance documents "merely parrot[ing]" the explication of the manifestation standard in the Rule, Pls' Suppl. Br. 15, but it is not arbitrary or capricious for the guidance to hew to the express provisions of the rulemaking that it implements. Indeed, the guidance takes care to uphold the observation in the Rule that "verbal, non-verbal, and physical indicators can be indicative of fear of persecution or torture," without going so far as to treat those indicators as an "exhaustive list." AR1 502. Thus, rather than impermissibly deviating from the examples provided in the Rule—*e.g.*, "hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence"—the guidance presents that illustrative list in a clear and easy-to-read format for officers to reference in any particular case. *Id.* As for Plaintiffs' assertion that "there are many reasons—

*e.g.*, cultural norms, trauma responses—why a person might not visibly demonstrate fear," Pls'
Suppl. Br. 16, that only *lends* support for the manifestation standard. The Rule explicitly accounts
for the presence of trauma in some individual cases and the possibility "that being taken into
immigration custody may exacerbate some of this trauma." 89 Fed. Reg. at 81,243. For that reason,
as the Rule notes, CBP "has taken steps to ensure that processing procedures are informed by the
potential for trauma experienced by individuals in custody, with a particular emphasis on providing
a sense of safety and security" for children. *Id.*; *see* AR1 1427–31 (detailing, *inter alia*, the
components of CBP's trauma-informed care, including trauma-informed awareness and training,
medical support, holding processes, and support activities).

Plaintiffs next rely on a number of unverified examples—including those from unrelated
contexts—to contend that officers "routinely ignore fear claims." Pls' Suppl. Br. 16–19 (stating
that, according to a survey done by one migrant services organization, "most migrants"
interviewed after their removal to Mexico claimed to have been ignored by CBP agents despite
voicing a fear of return). As the Rule correctly notes, however, the Departments "lack a basis to
independently evaluate" such anecdotal evidence or the methodology used by advocacy groups to
reach such sweeping conclusions as Plaintiffs' assertion that there is a "recurring problem" of
officers blatantly disregarding the manifestation standard. 89 Fed. Reg. at 81,238; Pls' Suppl. Br.
17–18. In addition to these evidentiary issues, Plaintiffs' allegation of disregard for the law among
immigration officers does not go to the reasonableness of the manifestation standard itself. All of
the individual cases cited by Plaintiffs of dismissive treatment of fear claims by CBP agents are
instances of conduct that would violate agency policy under the Rule—not to mention the
underlying expedited removal statute—which requires officers to refer any noncitizen who
indicates an intention to apply for asylum or a fear of persecution for a credible fear interview with

USCIS. *See* 89 Fed. Reg. at 81,238 n.286. As the Rule explains, "CBP takes allegations of employee misconduct very seriously," with a designated Office of Professional Responsibility to investigate any allegations of serious misconduct by a CBP employee or contractor. *Id.* at 81,240 n.292. Again, the question here is whether the manifestation standard is arbitrary and capricious, and to that the Rule gives plain assurance that detailed procedures are in place "to ensure that personnel are following applicable law and guidance," and that upon the agency's considered assessment these procedures have proven effective. *Id.* at 81,240.

Lastly, Plaintiffs cite a few select statistics showing a drop in the percentages of credible fear interview referrals to further their conjecture that fear claims are being "routinely ignored." Pls' Suppl. Br. 19–21. The lower referral percentages, however, are not at all implausible, as Plaintiffs suggest, given that, "for completed cases, only a small percentage of asylum claims referred from the credible fear process are ultimately granted in section 240 removal proceedings." 89 Fed. Reg. at 81,249. Indeed, the concerns that arise when noncitizens without meritorious claims still decide to pursue relief upon being prompted by affirmative advisals and questions factored into the justification for the Rule. *See id.* Beyond that, Plaintiffs take an unduly restrictive view of the relevant timeline for assessing the referral statistics. For instance, Plaintiffs suggest that the percentage of referrals should be closer to one-third of *all* Mexican nationals processed for expedited removal—as it was in the short, one-year period immediately after the pandemic. *See* Pls' Suppl. Br. 20–21. But in the pre-pandemic period (FY 2014 through FY 2019) only 6 percent of Mexican nationals in expedited removal claimed a fear of return. 89 Fed. Reg. at 48,738. In that sense, what Plaintiffs find to be an artificially low number of 8 percent under the IFR represents a return to the historical average, after an aberrant, short-lived spike in the longitudinal data. Thus, contrary to Plaintiffs' accusation that it "ignores" reality, the manifestation standard is

both reasonable and reasonably explained, as evidenced by the facts and the context meticulously laid out in the Rule.

## IV. Defendants' Adoption of the "Reasonable Probability" Standard Was Reasonable and Reasonably Explained.

As Defendants have already explained, *see* Defs' Mot. 36, 54–55; Defs' Reply at 15–16, their adoption of the "reasonable probability" standard to screen for potential statutory withholding of removal and CAT protection eligibility is reasonable and reasonably explained. In the Rule, Defendants address commenters' concerns about the heightened standard and provide additional explanation as to its advisability and reasonableness. *See* 89 Fed. Reg. at 81,161, 81,202–03, 81,245–50. Notably, despite Plaintiffs' concerns with the standard, approximately 48 percent of noncitizens who are found subject to the limitation on asylum eligibility and not excepted from it have been able to meet the "reasonable probability" standard. *Id.* at 81,202. This percentage "better aligns with the percentage of noncitizens who have historically been granted protection or relief,"[3] *id.* at 81,160–61, without being unduly burdensome, as a significant percentage of noncitizens "are still able to meet" the standard, *id.* at 81,202. Indeed, it is close to the 51 percent figure for those screened in under the lower "reasonable possibility" standard adopted by the 2023 rule, *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023). 89 Fed. Reg. at 81,160. The standard is thus far from insurmountable, nor is it a drastic departure from the prior standard applied during exigent circumstances.

---

[3] Historically only 18 percent of similarly situated noncitizens have been granted relief or protection. 89 Fed. Reg. at 81,160 n.22.

In their supplemental brief, Plaintiffs again assert that the Defendants failed to "meaningfully address ... their own prior finding" in a 2022 rule[4] that there was no evidence that applying a heightened standard more successfully screened out non-meritorious claims while protecting against refoulement, and that the delays associated with applying a higher standard likely outweigh the efficiencies gained. Pls' Suppl. Br. 21. In identifying this 2022 rule as Defendants' "past practice" from which they departed "without adequate explanation," *id.*, Plaintiffs ignore that Defendants changed their practice in the later 2023 Circumvention of Lawful Pathways rule. 88 Fed. Reg. 31,314. In that rulemaking, Defendants explicitly addressed the 2022 rule's reasoning, including the reasoning as to whether heightened standards successfully screen out non-meritorious claims, and concluded that in the context of high encounter rates, "the interests balance differently and warrant a different approach from the one generally applied in credible fear screenings"—that is, the application of a heightened screening standard for certain withholding and CAT claims as opposed to the "significant possibility" standard the 2022 rule applied across the board. *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,742 (proposed Feb. 23, 2023); *see also id.* at 11,745–47 (explaining in detail Defendants' decision to depart from the 2022 rule). As Defendants explained in the Circumvention of Lawful Pathways final rule, the prior 2022 rule "was designed for non-exigent circumstances." 88 Fed. Reg. at 31,336. Like the Circumvention of Lawful Pathways rule, the Rule at issue here was promulgated to apply in exigent circumstances. *See* 89 Fed. Reg. at 48,711 (describing "emergency border circumstances"); 89 Fed. Reg. at 81,165–67 (discussing changes to the IFR's thresholds adopted by incorporating the September 30 Proclamation). Thus, contrary to Plaintiffs' arguments, the Rule

---

[4] *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*, 87 Fed. Reg. 18,078 (Mar. 29, 2022) ("Asylum Processing IFR").

does not represent a change in position as to the appropriateness of using a heightened standard for statutory withholding of removal and CAT protection screenings during exigent circumstances.

Plaintiffs also assert that the Rule does not "come to grips with the problem that this requirement sets a bar that many people with viable asylum claims cannot surmount for reasons unrelated to the strength of their claims." Pls' Suppl. Br. 23. Not so. As Plaintiffs note, in the Rule Defendants explain that asylum officers are trained to engage in non-adversarial interviews to elicit relevant information and that they are able to do so without the noncitizens having legal knowledge or being familiar with the standards or requirements. 89 Fed. Reg. at 81,247. The Rule cites asylum officer training modules that provide comprehensive guidance regarding non-adversarial interviewing, AR1 2797–843, eliciting testimony, AR1 2699–755, working with interpreters, AR1 2883–932, cross-cultural communication, AR1 2396–420, and interviewing survivors of severe torture and other severe trauma, AR2 2943–79. 89 Fed. Reg. at 81,247 n.327. As Defendants explain, given that the screening inquiry generally requires merely facts in the noncitizen's personal knowledge, the significant relevant training provided to asylum officers to draw out those facts, and the multiple levels of review provided, requiring some greater specificity to meet the requisite screening standard is reasonable. *Id.* at 81,247–48.

Finally, Plaintiffs challenge Defendants' determination that requiring noncitizens to provide specific information is reasonable because the statute requires noncitizens to explain their fear during the credible fear stage. Pls' Suppl. Br. 23. Specifically, Plaintiffs assert that "[n]othing in the statute remotely requires people seeking asylum to provide *specifics* about their claims at the credible fear stage." Pls' Suppl. Br. 23 (emphasis in original). This assertion misconstrues Defendants' explanation and the statute. The statute places the burden on noncitizens to establish a "credible fear of persecution," 8 U.S.C. § 1225(b)(1)(B)(iii)(II), which is defined as "a significant

possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum," *id.* § 1225(b)(1)(B)(v). Although the statute does not explicitly require a certain level of specificity, the statute is "predicated on the requirement that noncitizens must explain their fear during a credible fear screening." 89 Fed. Reg. at 81,246 (citing 8 U.S.C. § 1225(b)(1)(B)). There is no prohibition on eliciting specifics to establish a credible fear of persecution. Plaintiffs' suggestion otherwise is incorrect.

Plaintiffs' arguments boil down to a policy disagreement. But competing views about policy do not render an agency's action arbitrary and capricious. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017).

## V.    The Four-Hour Minimum Consultation Period is Consistent with the INA and Neither Arbitrary Nor Capricious.

To further effectuate the goals of the Rule, DHS issued guidance setting a four-hour minimum consultation period prior to the noncitizen's CFI during which the noncitizen may consult with an individual of his or her choosing. *See* Consultation AR 1-3. This guidance was issued outside of the rulemaking context, and thus the final Rule does not alter the government's arguments concerning the legality of that guidance or its reasonableness. *See* Defs' Mot. 36-39, 55-57; Defs' Reply at 7-8, 17-18.

Plaintiffs' arguments are, accordingly, inapposite. They argue, for instance, that the government may not offer post hoc rationales for adoption of the four-hour minimum period. *See* Pls' Suppl. Br. 23-24. Yet the government explicitly acknowledged in the final Rule, in response to commenters concerns regarding the shortened minimum consultation period, that such issues were "outside the scope of [the] rulemaking," since the Rule itself "does not alter procedures governing consultation or representation." 89 Fed. Reg. at 81,195. To the extent the consultation

period was addressed, the Departments simply explained why that guidance did not "undermine the Departments' decision to promulgate th[e] rule" and "adopt the changes made by the IFR and final Rule. *Id.* That being the case, Plaintiffs' further contention that even if considered on its merits, the government's reasoning in the final Rule lacks adequate justification, *see* Pls' Suppl. Br. 24-25, is misguided. The guidance is fully supported by the rationales proffered in the Administrative Record, *see* Consultation AR 1-3; Defs' Mot. 36-39, 55-57; Defs' Reply at 7-8, 17-18, and the reasoning in the final Rule is unnecessary to assess the legality or permissibility of the four-hour minimum consultation period.

## VI.    The Rule Satisfies the APA's Procedural Requirements.

Plaintiffs' previous complaint and motion challenged the Departments' decision to issue the Rule initially as an IFR that took effect immediately without waiting to receive and respond to the comments the IFR solicited. *See* Defs' Mot. 40. As Defendants explained, the Departments were not required to complete a notice-and-comment process before issuing the Rule because multiple exceptions to the APA's notice-and-comment requirements applied. *Id.* at 40-44; Defs' Reply at 8-12. Moreover, the organizations could not pursue this claim because they lack standing and cannot bring claims under § 1252(e)(3). *See* Defs' Mot. 13-20

Plaintiffs' second amended complaint includes a notice-and-comment claim, but it is limited to arguing the Departments "have not articulated reasons sufficient to show good cause why" notice and comment "requirements are inapplicable, or why the foreign affairs exception is applicable" to the IFR. ECF No. 56 ¶ 122. This claim is moot because, rather than assert those exceptions, the final Rule addresses and responds to comments submitted in response to the solicitation in the IFR. *See* 89 Fed. Reg. at 81,168-81,272 ("Public Comments and Responses"). The final Rule moots any claim for prospective relief against the IFR based on lack of notice and

comment. To the extent the Court agrees with Defendants' previous argument that the individual Plaintiffs did not advance this claim, *see, e.g.*, Defs' Reply at 8 n.1, then the entire claim is now out of the case. *See Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 686 & n.14 (2020); *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472-73 (D.C. Cir. 2014) (final rule promulgated following notice and comment moots procedural challenge to IFR).

## VII.    Any Relief Must Be Sharply Limited

Plaintiffs again ask the Court to: (1) vacate the individual Plaintiffs' removal orders; (2) order the government to return them to the United States; and (3) vacate the Rule without remand. Pls' Suppl. Br. 25. In their supplemental brief, Plaintiffs assert that such relief is warranted because the number of credible fear interviews has declined following implementation of the manifestation standard. *Id*. But Plaintiffs' challenges to the manifestation standard fail for the reasons noted, *see supra* at 11-17, and even if they were entitled to relief on their claims, they still would not be entitled to the multiple forms of relief they seek here.

As previously noted, for purposes of this motion and in the circumstances of this § 1252(e)(3) challenge, the government does not dispute that if an individual Plaintiff could show he was injured by the Rule or guidance and succeeded on a challenge to the Rule or guidance, vacatur of his individual removal order may be a proper remedy. *See* Defs' Reply at 18-19. But that relief, which would redress the injuries that individual Plaintiffs allege, is the only relief sought that this Court may permissibly order. *Id*.

As to Plaintiffs' request for an injunction requiring the government to return them to the United States, Plaintiffs cannot identify any source of authority to support such an extraordinary affirmative injunctive remedy. *See* Defs' Reply at 19-20. It is Plaintiffs' burden to identify an affirmative source of authority permitting the Court to order this relief, including identifying "a

23

discrete agency action" the agency "is required to take." *Norton v. Sw. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Plaintiffs do not attempt to meet this burden, nor could they as Congress expressly committed decisions on whether to parole noncitizens into the United States to the Secretary's discretion. *See* 8 U.S.C. § 1182(d)(5)(A); *Kiyemba v. Obama*, 555 F.3d 1022, 1028 (D.C. Cir. 2009) (courts may not "compel[] the Executive to release [noncitizens] into the United States outside the framework of the immigration laws").

Plaintiffs' request for universal vacatur of the Rule fails because they do not have standing to request that relief and because universal vacatur is precluded by constitutional and equitable principles, as well as various features of the INA's judicial-review scheme. *See* Defs' Reply at 20-25. First, none of the individual Plaintiffs have established standing to seek prospective relief because none has established any non-speculative possibility that he will be injured in the future by the Rule or guidance. *Id*. at 20-21. Second, even if they had, § 1252(f) precludes universal vacatur in this context because it strips this Court's jurisdiction to enjoin or restrain the Departments' implementation of certain statutory provisions, including § 1225(b), and vacating the Rule or guidance would restrain the Departments chosen means of implementing § 1225(b). Defs' Reply at 20. Third, no individual Plaintiff can plausibly argue that universal, rather than plaintiff-specific, relief is necessary to redress their alleged injuries. Even assuming the APA authorizes vacatur of agency action—and Defendants preserve the argument that cases holding that are incorrect—Plaintiffs do not explain why equitable principles support universal vacatur here. *Id*. at 22-23. APA claims are subject to traditional equitable principles that generally restrict relief to the parties. *Id*. And the INA and § 1252(e) reinforce this principle by making clear that judicial review must be narrowly focused on individual noncitizens. *Id*. at 23-24.

If the Court believes some relief aside from vacatur of individual removal orders is

permitted and necessary, the Court should remand without vacatur to give the Departments an opportunity to address any issues the Court might identify with the Rule or guidance, while avoiding the disruptive consequences vacatur would cause. Defs' Reply at 25. If the Court disagrees, any vacatur must be narrow to give effect to the Rule's severability clause. *Id*.; *see also* Defs' Mot. 64-65.

## CONCLUSION

The Court should grant summary judgment to Defendants on all claims.

Dated: December 4, 2024            Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Assistant Director*

CHRISTINA P. GREER
PATRICK GLEN
DAVID KIM
KATHERINE J. SHINNERS
*Senior Litigation Counsel*

By: <u>/s/ Brian C. Ward</u>
    BRIAN C. WARD
    *Senior Litigation Counsel*
    U.S. Department of Justice, Civil Division
    Office of Immigration Litigation
    P.O. Box 868, Ben Franklin Station
    Washington, DC 20044
    Tel: (202) 616-9121
    Email: brian.c.ward@usdoj.gov

    *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2024, I electronically filed this brief with the Clerk of

the Court for the United States Court of for the District of Columbia by using the CM/ECF system.

Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF

system.

By: *<u>/s/ Brian C. Ward</u>*
     BRIAN C. WARD
     Senior Litigation Counsel
     United States Department of Justice