**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, et al.,<br><br>                *Plaintiffs*,<br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,<br><br>                *Defendants*. | No. 1:24-cv-01702-RC |

**PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND SUPPLEMENTAL REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................1

I. PLAINTIFFS HAVE STANDING. ........................................................................................1

II. THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. ..................................................................................................2

    A. The Asylum Bar Remains Contrary to Law. ............................................................2

    B. The Rule's Asylum Bar Is Arbitrary and Capricious. ..............................................2

III. THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS MANIFEST FEAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS. ..................5

    A. The Manifestation Standard Remains Contrary to Law. .........................................5

    B. The Manifestation Standard Is Arbitrary and Capricious. .......................................6

IV. DEFENDANTS' ARGUMENTS REGARDING THE REASONABLE PROBABILITY STANDARD LACK MERIT. ..................................................................10

V. THIS COURT CAN ADDRESS PLAINTIFFS' NOTICE AND COMMENT CLAIMS. ..........................................................................................................................12

VI. JUSTIFICATIONS FOR DEFENDANTS' SCREENING GUIDANCE IN THE RULE CANNOT BE CONSIDERED. ................................................................................13

VII. PLAINTIFFS ARE ENTITLED TO VACATUR AND OTHER RELIEF. .......................13

CONCLUSION ..............................................................................................................................13

# TABLE OF AUTHORITIES[*]

**CASES**

*American Federation of Government Employees, AFL-CIO v. Federal Labor Relations Authority*, 25 F.4th 1 (D.C. Cir. 2022) ..................................................... 7

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ............................................................................................................ 9

*Butte County v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010) .................................................... 8

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979) .................................................... 12

*DHS v. Regents University of California*, 591 U.S. 1 (2020) ......................................... 10

*Di Pasquale v. Karnuth*, 158 F.2d 878 (2d Cir. 1947) ...................................................... 5

*East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *stay granted*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024) ............................................................ 2

*East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2020) ........................ 3

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) .................................... 1

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................... 1

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ............................................ 3

*Judulang v. Holder*, 565 U.S. 42 (2011) .......................................................................... 5

*O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019) ........................................................ 2

*Tozzi v. United States Department of Health & Human Services*, 271 F.3d 301 (D.C. Cir. 2001) ................................................................................................................ 2

**STATUTES**

8 U.S.C. § 1158(a)(1) ........................................................................................................ 2

**OTHER AUTHORITIES**

88 Fed. Reg. 31314 (May 16, 2023) ................................................................................. 4

89 Fed. Reg. 48710 (June 7, 2024) ................................................................................. 10

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

*89 Fed. Reg. 81156 (Oct. 7, 2024)......................................................................3, 7, 9, 10, 11, 13

Motion for Summary Judgment, *M.A. v. Mayorkas*, No. 1:23-cv-01843 (D.D.C. Sept. 28, 2023), Dkt. No. 37 ................................................................................................10

## INTRODUCTION

Defendants' Supplemental Brief confirms that the Rule shares the same fatal flaws as the IFR. Like the IFR, the Rule goes far beyond what Congress authorized. And like the IFR, the Rule rests on arbitrary reasoning that independently requires vacatur. The Court should grant summary judgment to Plaintiffs and vacate the Rule, the IFR, and the Guidance.

## I.     PLAINTIFFS HAVE STANDING.

Plaintiffs have established that they have standing to challenge the IFR and Rule, as well as the Guidance. *See* Reply 1-9; Supp. Br. 2-3.[1] Defendants' Supplemental Brief rehashes two flawed arguments they made in their original briefing. Neither should sway this Court.

First, Defendants argue that Organizational Plaintiffs lack standing. This argument rests on a mischaracterization of their injuries. Defendants contend that the IFR and Rule cause Organizational Plaintiffs only indirect "pocketbook" injuries. Supp. Opp. 1-2. Not so. The IFR and Rule "perceptibly impair [Organizational Plaintiffs'] ability to provide counseling and [legal] services [to asylum] [ ]seekers." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Organizational Plaintiffs are unable to engage in their "core business activit[y]"—providing legal representation to asylum seekers—because of the Rule and IFR. *See id.* This inability to provide core services is equivalent to the injury alleged by the plaintiffs in the seminal organizational standing case, *Havens Realty*, and establishes standing. 455 U.S. at 379.

Second, Defendants ask this Court to dismiss Individual Plaintiffs from the claims for which they do not allege an injury. Supp. Opp. 2-4. This request flies in the face of a basic tenet

---

[1] "MSJ" refers to Plaintiffs' Motion for Summary Judgment, ECF No. 23; "Reply" refers to Plaintiffs' Reply Brief, ECF No. 48; "Supp. Br." refers to Plaintiffs' Supplemental Brief, ECF No. 59; and "Supp. Opp." refers to Defendants' Supplemental Brief, ECF No. 62.

1

of standing doctrine: if a court finds that one plaintiff has standing to bring a claim, it need not determine if other plaintiffs have standing. *See Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001). Defendants do not dispute that at least one plaintiff has standing for each claim alleged in the complaint. As such, no further analysis of standing is required.

## II. THE RULE'S ASYLUM BAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

### A. The Asylum Bar Remains Contrary to Law.

Plaintiffs have established that the asylum bar violates the Immigration and Nationality Act ("INA") by conditioning asylum eligibility on manner of entry, in violation of 8 U.S.C. § 1158(a)(1), and by deviating from the statutorily mandated "significant possibility" standard for assessing asylum eligibility at the credible fear stage. MSJ 9-16; Reply 9-16; *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 151 (D.D.C. 2019) (Moss, J.); *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1042 (N.D. Cal. 2023).[2] Defendants add only that the Rule reiterates their position that the asylum bar "*never*" operates to make manner of entry "dispositive." Supp. Opp. 4-5 (quoting 89 Fed. Reg. 81156, 81170 (Oct. 7, 2024)). But as Plaintiffs have explained, that is simply untrue. Reply 10-13.

### B. The Rule's Asylum Bar Is Arbitrary and Capricious.

Defendants fail to grapple with the Rule's devastating impact on asylum seekers forced to wait in Mexico, including Mexican asylum seekers, and the substantial flaws with the CBP One app.

**1.** Once again, Defendants have no response to the evidence that, by forcing asylum seekers to wait in Mexico for appointments, the Rule exposes many individuals to violence at the

---

[2] This decision is stayed pending appeal, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024).

hands of Mexican authorities, cartels, and criminal organizations. The dangerous conditions in Mexico for asylum seekers were well documented by the reports in the record and detailed by commenters. *See* Supp. Br. 4-5. Indeed, the D.C. Circuit recently acknowledged the violence and danger facing asylum seekers in Mexico. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733-34 (D.C. Cir. 2022); *see also E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 981 (9th Cir. 2020) (similar). The Rule, in contrast, brushes aside this evidence, instead simply instructing people to "wait for a CBP One appointment." 89 Fed. Reg. 81156, 81216 (Oct. 7, 2024).

Defendants argue that the Rule "seeks to mitigate" these dangers by "disincentivizing irregular migration" and "channeling migration" to ports of entry via CBP One appointments. Supp. Opp. 5-6. But that ignores the Rule's unquestionable effect of forcing people to wait in violent conditions, Supp. Br. 5-6, since it is undisputed that there are far fewer appointments than necessary, Supp. Opp. 10. Absent the Rule, those people would be able to enter the United States without either losing their asylum eligibility or risking violence by waiting in Mexico. Supp. Br. 6-8.

Defendants again point to the exceptionally compelling circumstances exception in the Rule as a safeguard. Supp. Opp. 6. But they have no answer for the evidence that asylum seekers who have endured kidnapping, assault, torture, and rape in Mexico are unprotected by this exception since, under the Rule, they are not necessarily facing "imminent" threats of further harm. Supp. Br. 6. Nor do Defendants respond to the problem that many asylum seekers have no opportunity to even assert that exception because they do not affirmatively "manifest" fear or are unable to present at ports without CBP One appointments. *See id.* 6-7 (citing examples); *see also infra* Part III.B. Defendants instead contend that applying the exception before credible fear interviews would be too generous and undercut the punitive rationale of the Rule. Supp. Opp. 7.

3

But that does not address the evidence that the Rule, as designed, forces asylum seekers to wait in Mexico where they are subject to "extreme violence." Supp. Br. 6 (quotation marks omitted).

**2.** Under the Rule, Mexican asylum seekers have no option but to remain in the very country where they fear persecution or torture. For this reason, Mexican nationals were specifically exempted from the agencies' 2023 asylum ban. *See* 88 Fed. Reg. 31314, 31415 (May 16, 2023). Defendants' responses do not engage with the harsh reality that the Rule imposes on Mexican asylum seekers. And their attempts to evade the issue fail even on their own terms. Making Mexican asylum seekers wait six months or longer in the country they seek to flee is not merely "less convenient," Supp. Opp. 9—it wrongly traps people where their lives and safety are at grave risk, Supp. Br. 9-10. Moreover, relocating internally within Mexico is not an option for asylum seekers who fear harm from state actors or cartels with extensive networks throughout the country. *See id.* And Defendants' argument that Mexicans may still be eligible for withholding of removal or CAT protection, Supp. Opp. 8, fails to address the problems with the manifestation requirement and the heightened "reasonable probability" screening standard, which make even those limited forms of protection out of reach for many bona fide asylum seekers, *see infra* Parts III.B. & 4.

**3.** The Rule also unreasonably relies on the CBP One app, while ignoring evidence of the problems with the app. Supp. Br. 10-13. Defendants' responses are unpersuasive.

First, Defendants assert that "the CBP One app is not a barrier to asylum access." Supp. Opp. 9. In reality, the record shows the app is offered in just four languages, is not available to many noncitizens, and remains plagued by accessibility issues including recurring failures of its facial recognition technology. Supp. Br. 11-12; *see also* MSJ 19-21; Reply 28-29.

Second, Defendants assert that DHS "has provided sufficient notice to the public" regarding the use of CBP One to schedule appointments, Supp. Opp. 10 (quoting 89 Fed. Reg. at

4

81221). But the evidence shows that, in fact, many asylum seekers—including several Individual Plaintiffs—are not aware of the CBP One app before crossing the border. Supp. Br. 12-13.

Third, Defendants discount the evidence that many people with CBP One appointments miss those appointments because of the extremely dangerous conditions at the border. *See* Supp. Opp. 10. According to one study, for example, over one third of people in the especially dangerous Mexican border state of Tamaulipas missed their CBP One appointments. Supp. Br. 12. Defendants' response is that "[v]irtually every . . . rule has imperfect applications in particular circumstances." Supp. Opp. 10 (quotation marks omitted). But that is no excuse for disregarding evidence of the Rule's systematic flaws.

For all these reasons, the CBP One appointment process amounts to a "lottery system" unrelated to people's need for protection. Supp. Br. 11-12 (quoting AR1 4407-08).[3] The Rule's reliance on the CBP One app therefore turns access to asylum into a "sport of chance," *Di Pasquale v. Karnuth*, 158 F.2d 878, 879 (2d Cir. 1947), "and that is what the APA's 'arbitrary and capricious' standard is designed to thwart," *Judulang v. Holder*, 565 U.S. 42, 59 (2011).

### III. THE RULE'S REQUIREMENT THAT ASYLUM SEEKERS MANIFEST FEAR IS CONTRARY TO LAW AND ARBITRARY AND CAPRICIOUS.

#### A. The Manifestation Standard Remains Contrary to Law.

As Plaintiffs have explained, MSJ 22-23; Reply 19-20; Supp. Br. 13, the Rule's "manifestation" standard, which is the same in the Rule and IFR, is contrary to law because it is inconsistent with the withholding of removal and expedited removal statutes and with CAT. Defendants offer no further argument rebutting this point. *See generally* Supp. Opp.

---

[3] "AR1" refers to Volume 1 of the administrative record for the Rule. "IFR AR" refers to the administrative record for the IFR.

**B.     The Manifestation Standard Is Arbitrary and Capricious.**

1.      The Rule failed to adequately consider key evidence that many noncitizens in genuine need of protection will not affirmatively "manifest fear," and therefore will not even receive credible fear screenings. Supp. Br. 13-15. Defendants assert that, although they have jettisoned longstanding advisals accompanied by a structured interview process as the mechanism for migrants to express fear and request screenings, the display of signs and videos is sufficient to address any concerns. Supp. Opp. 13. But those materials are available in only four languages, Supp. Br. 15, and the video is not even shown in every facility, Supp. Opp. 13. Moreover, "many noncitizens do not see or understand the government's signs and videos." Reply 21 (citing Human Rights First Amicus Br. 13, ECF No. 27-1). Under the prior process, by contrast, officers had to individually notify noncitizens of their right to seek protection to ensure the issue was addressed. Additionally, the new materials do not convey the assurance of confidentiality that has long been recognized as essential. Supp. Br. 14-15; MSJ 25-26.

Defendants assert that it is mere "speculat[ion]" that forgoing the confidentiality of those advisals will result in people failing to express their fears. Supp. Opp. 14. Not so. The U.S. Commission on International Religious Freedom's congressionally mandated study concluded that noncitizens who received the advisals were *seven times* more likely to be referred for CFIs. Supp. Br. 14 (citing IFR AR 8192-93). And the record makes clear that asylum seekers were frequently unable to register their fear claims while the IFR was in place notwithstanding the signs and videos. *Id*. at 17-18. As commenters explained, signs and videos are "no substitute for a few simple questions asked in the person's language," particularly because noncitizens processed under the IFR reported "an intimidating and hostile environment in CBP and Border Patrol custody" where they felt unable to speak. AR1 6239; *see also* AR1 12817 (UNHCR comment explaining that the

6

Rule's approach of relying on "signs and videos . . . will lead to the refoulement of individuals entitled to refugee status"). Those questions were essential to providing noncitizens the specific opportunity to raise any fears before being removed. The Rule's disregard of the long-recognized need for advisals and questioning is arbitrary and capricious. Supp. Br. 14-15; MSJ 25-26.

    **2.**    Defendants also seek to defend the Rule's premise that DHS officers can reliably discern which noncitizens fear persecution or torture without even asking them. Supp. Opp. 14-16. That premise is baseless. Supp. Br. 15-16. That such officers interact with noncitizens on a regular basis, Supp. Opp. 15, does not mean that officers can discern which noncitizens need screenings based on nonverbal conduct like trembling and shaking. Such nonverbal cues have in theory always been a basis for a credible fear referral, but the Rule cites no evidence indicating that DHS officers have ever made CFI referrals on that basis. Supp. Br. 16. Moreover, nothing in the record suggests that such referrals could be consistent or reliable—as opposed to impermissibly arbitrary and subjective—especially in the rushed context of processing at the border, where noncitizens from different cultures and backgrounds may present different nonverbal cues. Supp. Br. 15-16; MSJ 26-28. Without a "factual basis" in the record, the Court need not accept Defendants' "conclusory and counterintuitive assertions" that DHS officers have the implausible ability to spot which noncitizens fear persecution or torture without asking them. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 10 (D.C. Cir. 2022).

    **3.**    Perhaps the most egregious defect in the Rule's rationale for the manifestation standard is its false premise that "commenters have provided *no evidence* that there is a widespread problem of CBP officers and agents ignoring fear claims under the IFR." 89 Fed. Reg. at 81240 (emphasis added). As already demonstrated in detail, commentators presented damning evidence of precisely such a widespread problem both when the manifestation standard was applied under

7

Title 42 and when it was applied under the IFR. Supp. Br. 17-18. Defendants argue that they were permitted to disregard this critical evidence because the agencies did not independently verify the commenters' reports. Supp. Opp. 16. But there is no rule that an agency need only consider evidence that it independently verifies. Such an approach would let agencies selectively ignore evidence presented in public comments that undermines their reasoning—precisely the conduct the APA prohibits. *See, e.g.*, *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("an agency cannot ignore evidence contradicting its position"). And the *only* evidence in the record on this critical issue shows a recurring problem of DHS officers silencing migrants and ignoring fear claims under the IFR.

Defendants also wrongly assert that this evidence "does not go to the reasonableness of the manifestation standard itself" because the Rule does not instruct officers to ignore fear claims. *See* Supp. Opp. 16-17. As Plaintiffs have explained, however, the manifestation standard's design makes it much more likely that individuals will not know to manifest fear and also much easier for officers to disregard expressions of fear, because "there is no structured conversation intended to ascertain whether a noncitizen fears return" and "no officer is individually responsible for assessing fear." Supp. Br. 16; *see also id.* at 19. Extensive evidence in the record—consistent with the sworn declarations of many Individual Plaintiffs—made clear to the agencies that this was a recurring problem under the IFR and during prior implementations of the manifestation requirement.[4] *Id.* at 17-19. Because the agencies "brushed aside" these "critical facts" showing the

---

[4] Contrary to Defendants' statement that the existence of a designated Office of Professional Responsibility is sufficient to address misconduct or misapplication of the manifestation requirement by CBP agents, Supp. Opp. 16-17, record evidence indicates there are longstanding problems of abuse and racial profiling by CBP agents. *See, e.g.*, AR1 10702-65, AR1 11005-31.

8

manifestation requirement's dismal track record, the requirement is arbitrary and capricious. *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).

    **4.** The Rule also failed to grapple with the consequences of removing large numbers of people to danger in the name of "efficiency." Supp. Br. 19-21. The manifestation standard caused huge decreases in CFI referral rates after the IFR was issued: the rate fell by more than half for all noncitizens and by more than two-thirds for Mexican nationals, who made up more than 40 percent of removals. Supp. Br. 19-21. Defendants attribute these massive drops to their view that "only a small percentage of asylum claims referred from the credible fear process are ultimately granted." Supp. Opp. 17 (quoting 89 Fed. Reg. at 81249). That assertion is unfounded, MSJ 29 n.17, and beside the point. The manifestation standard is not and cannot be justified as a means of assessing the *merits* of noncitizens' fear claims. It is instead a change to the procedure for identifying whether noncitizens fear removal *at all* and therefore should receive credible fear screenings. 89 Fed. Reg. at 81243 ("CBP agents and officers do not determine the validity of any fear claim."). The agencies' rationale for that change was that asking about fear "can serve as a prompt for noncitizens . . . to respond in the affirmative, even if they do not actually have a fear." *Id.* at 81235. But neither the Rule nor Defendants cite any record evidence that such a large decrease in CFI referrals could be attributed to that supposed prompting effect. Instead, the record shows that many people will not "manifest" a fear without being asked and that "DHS officers applying the manifestation standard under the IFR routinely ignored fear claims." Supp. Br. 20.

    As to the even more extreme drop in the referral rate for Mexican nationals, Defendants assert that the 8 percent CFI referral rate while the IFR was in effect "represents a return to the historical average" of 6 percent between 2014 and 2019, "after an aberrant, short-lived spike" to 33 percent in the year before the IFR was issued. Supp. Opp. 17. But that post hoc rationalization

appears nowhere in the Rule itself and so cannot excuse the agencies' failure to consider the manifestation standard's devastating impact on Mexican nationals. *See, e.g.*, *DHS v. Regents Univ. of Cal.*, 591 U.S. 1, 22-23 (2020). Indeed, as Defendants elsewhere acknowledge, Supp. Opp. 7, the IFR and Rule instead asserted that it was necessary to apply the Rule to Mexican nationals precisely because the agencies believed they would *continue* to express fear at high rates if they were asked. 89 Fed. Reg. at 81250, 81252 (Rule); 89 Fed. Reg. 48710, 48738 (June 7, 2024) (IFR). The agencies impermissibly ignored the glaring reality that the IFR achieved the agencies' "efficiency" goal of decimating the CFI referral rate only because migrants were unable to, or unaware of the need to, affirmatively manifest fear and because CBP officers were regularly ignoring expressions of fear, particularly by Mexican nationals. Supp. Br. 20-21. The Rule is therefore arbitrary and capricious.

## IV. DEFENDANTS' ARGUMENTS REGARDING THE REASONABLE PROBABILITY STANDARD LACK MERIT.

Defendants' arguments concerning the "reasonable probability" standard confirm that they failed to consider both their own prior positions and other important aspects of the problem.

**1.** Defendants impermissibly failed to consider their prior factual findings that higher screening standards do not screen out non-meritorious claims while safeguarding against refoulement and that higher screening standards are inefficient. Supp. Br. 21 (quoting 87 Fed. Reg. 18,078, 18,092 (Mar. 29, 2022)). Defendants do not argue that they can ignore those findings. Rather, they again contend that the 2023 Rule addressed them. Supp. Opp. 18-20.[5]

---

[5] The screening standard in the 2023 Rule, which is lower than the standard at issue here, is itself being challenged as an arbitrary imposition of a heightened standard. Mot. for Summ. J. at 22-25, *M.A. v. Mayorkas*, No. 1:23-cv-01843 (D.D.C. Sept. 28, 2023), Dkt. No. 37.

That is unpersuasive. The quotations from the 2023 Rule on which Defendants rely do not address their previous findings regarding the ineffectiveness and inefficiency of higher standards. *See* Supp. Opp. 19. And Defendants' attempt to import a discussion from the 2023 Rule is itself arbitrary. As Defendants themselves admit, the Rule at issue here imposes an "elevated" screening standard that is different, more onerous, and demands a greater degree of specificity in an applicant's testimony than the one offered in the 2023 Rule. 89 Fed. Reg. at 81246. And this Rule, again unlike the 2023 Rule, imposes a completely novel standard. Thus, even if the 2023 Rule had considered and rejected Defendants' prior findings that heightened standards do not prevent refoulement and are inefficient—and it did not—Defendants' attempt to import that consideration here would be arbitrary.

2.  Defendants also do not, and cannot, show that they meaningfully considered the overwhelming evidence showing that trauma and other factors render many people unable to share specifics in the rushed, intimidating conditions of a screening interview at the border. Supp. Br. 22-23. Defendants' response points to their training of asylum officers, Supp. Opp. 20, but officer training cannot remedy internal psychological factors that prevent people from explaining the details of prior traumatic experiences to anyone at all. *See, e.g.*, AR1 11442-43, 11450, 11455-56, 11699, 11950-51, 12129-30, 12460, 12513, 12640-41 (scientific studies and discussions of such studies); *see also* AR1 7526, 8945-46, 13022-23. Nor does it ameliorate the factors that make it particularly difficult for people to meet a heightened evidentiary standard in the context of rushed credible fear interviews. *See, e.g.*, AR1 7526-28 (separation of families in detention, mistreatment of children, lack of access to counsel, and improper interpretation), *id.* at 8549-53 (conditions in which credible fear interviews are conducted), *id.* at 9421-22 (presence of children during parents' credible fear interviews), *id.* at 12898 (detention conditions, presence of government officials), *id.*

11

at 13051-52 (mistreatment, untreated health issues, detention conditions). And the fact that credible fear interviews are generally based solely on verbal testimony, Supp. Opp. 20, exacerbates rather than mitigates these challenges by preventing applicants from providing other types of evidence relevant to their protection claims.

Unable to show that they considered the relevant record evidence, Defendants point to the percentage of people who receive positive credible fear findings. Supp. Opp. 18. But that statistic does not address the substantial number of people with legitimate protection claims who fail their screenings and thus face refoulement to possible persecution or torture. Moreover, the fact that this Rule and the 2023 Rule have similarly low passage rates simply suggests that *both* heightened standards are insurmountable for many people.

## V. THIS COURT CAN ADDRESS PLAINTIFFS' NOTICE AND COMMENT CLAIMS.

Contrary to Defendants' contention, Supp. Opp. 22-23, Plaintiffs' notice-and-comment claims are not moot. The original Plaintiffs were harmed by the provisions of the IFR during the period from June 7 through October 1, 2024. *See* Reply 1-2 (citing declarations). Those harms would not have taken place absent Defendants' violation of the APA's notice-and-comment provisions. Defendants implicitly concede as much by arguing that the notice-and-comment claim is "out of the case" only if "the Court agrees with Defendants' argument that the individual Plaintiffs did not advance that claim." Supp. Opp. 23. As Plaintiffs have explained, that argument is incorrect. Reply 31 n.14. Accordingly, the issuance of the Rule cannot be said to "completely and irrevocably eradicate[] the effects of" the notice-and-comment violation, and Plaintiffs' challenge to that violation is not moot. *County of L.A. v. Davis*, 440 U.S. 625, 631 (1979).

## VI. JUSTIFICATIONS FOR DEFENDANTS' SCREENING GUIDANCE IN THE RULE CANNOT BE CONSIDERED.

Finally, as Defendants concede, Supp. Opp. 21-22, the Rule does not purport to implement Guidance limiting the consultation period to as little as four hours. Accordingly, the justifications for that Guidance offered in the Rule itself, *see* 89 Fed. Reg. at 81195-99, cannot be considered. Supp. Br. 23-25. And on the merits, the Guidance remains contrary to law and arbitrary and capricious for the reasons articulated in Plaintiffs' prior briefing. *See* MSJ 35-38; Reply 27-30; Supp. Br. 23-25.

## VII. PLAINTIFFS ARE ENTITLED TO VACATUR AND OTHER RELIEF.

The Court can and should order the relief that Plaintiffs request. MSJ 44-45; Reply 36-45; Supp. Br. 25. Defendants assert that Plaintiffs have identified no "authority to support" an order directing the government to return Individual Plaintiffs to the United States. But "numerous cases confirm that courts have authority to order the return of noncitizens unlawfully removed." Reply 45 (collecting cases). Defendants also wrongly assert that "Plaintiffs do not explain why equitable principles support . . . vacatur" of the Rule. Supp. Opp. 24. But as Plaintiffs have explained, "vacatur is the normal remedy," and the Rule's defects cannot be cured on remand. Reply 37-38 (quoting *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024)). As Plaintiffs have further explained, the equities weigh decisively against remand without vacatur in light of the devastating harm the Rule is inflicting on asylum seekers. *Id.* at 41-44; Supp. Br. 25.

### CONCLUSION

For the foregoing reasons, and those stated in Plaintiffs' previous briefing, the Court should grant summary judgment to Plaintiffs and vacate the Rule, the IFR, and the Guidance.

Dated: December 11, 2024

Respectfully submitted,

By: /s/ Lindsay Harrison

Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

Tamara Goodlette
(D.C. Bar. No. TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.org*

Lindsay Harrison (D.C. Bar #977407)
Mary E. Marshall (D.C. Bar #1739058)
Maura E. Smyles (D.C. Bar #90006775)*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*
*lharrison@jenner.com*
*mmarshall@jenner.com*
*msmyles@jenner.com*

Melissa Root*
Andrew L. Osborne*
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*
*aosborne@jenner.com*

*Attorneys for Organizational Plaintiffs*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street NW
Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

14

| | |
|---|---|
| Blaine Bookey* <br> Center for Gender & Refugee Studies <br> 200 McAllister Street <br> San Francisco, CA 94102 <br> T: 415-581-8825 <br> *bbookey@uclawsf.edu* | Edith Sangueza* <br> Center for Gender and Refugee Studies <br> 26 Broadway, 3rd Floor <br> New York, NY 10004 <br> T: 415-581-8835 <br> *sanguezaedith@uclawsf.edu* |
| Ashley Alcantara Harris* <br> David A. Donatti* <br> American Civil Liberties Foundation of Texas <br> P.O. Box 8306 <br> Houston, TX 77288 <br> T: 713-942-8146 <br> *aharris@aclutx.org* <br> *ddonatti@aclutx.org* <br><br> *Attorneys for Plaintiffs* | Robert Pauw* <br> Center for Gender and Refugee Studies <br> c/o Gibbs Houston Pauw <br> 1000 Second Avenue, Suite 1600 <br> Seattle, WA 98104 <br> T: 206-682-1080 <br> *rpauw@ghp-law.net* <br><br> *Attorneys for Plaintiffs* <br> *\*Admitted via certificate of pro bono representation or pro hac vice* |