BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*
EREZ REUVENI
*Assistant Director*
CHRISTINA P. GREER
PATRICK GLEN
DAVID KIM
KATHERINE J. SHINNERS
*Senior Litigation Counsel*
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Las Americas Immigrant Advocacy Center, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. Department of Homeland Security, *et al.*,<br><br>Defendants. | Civil Action No. 1:24-cv-01702 |

**DEFENDANTS' SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT ........................................................................................................................1

I. Plaintiffs Lack Standing................................................................................................1

II. The Rule's Asylum-Eligibility Limitation Is Authorized by the INA and Is Not Arbitrary or Capricious .........................................................................................................2

III. The Manifestation Standard Is Not Arbitrary or Capricious or Contrary to Law................5

IV. Defendants' Adoption of the "Reasonable Probability" Standard Was Reasonable and Reasonably Explained........................................................................................................11

V. Plaintiffs Cannot Raise a Notice-and Comment Challenge to the Rule ............................13

VI. Any Relief Must Be Sharply Limited ...................................................................................14

CONCLUSION....................................................................................................................14

# TABLE OF AUTHORITIES

## Cases

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
934 F.3d 649 (D.C. Cir. 2019) ........ 5

*Barnhart v. Thomas*,
540 U.S. 20 (2003) ........ 5, 12

*Dep't of Comm. v. New York*,
588 U.S. 752 (2019) ........ 3, 4

*East Bay Sanctuary Covenant v. Biden*,
2023 WL 11662094 (9th Cir. Aug. 3, 2023) ........ 2

*FDA v. All. for Hippocratic,Med.*,
602 U.S. 367 (2024) ........ 1

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) ........ 2, 8

*Tozzi v. U.S. Dep't of Health & Hum. Servs.*,
271 F.3d 301 (D.C. Cir. 2001) ........ 2

## Statutes

6 U.S.C. § 202 ........ 6

8 U.S.C. § 1103(a)(1) ........ 6

8 U.S.C. § 1225(b) ........ 14

8 U.S.C. § 1252(f) ........ 14

## INTRODUCTION

The Court should grant summary judgment to Defendants for the reasons noted in Defendants' earlier briefs. Defendants submit this reply to briefly address Plaintiffs' arguments to the contrary in their most recent supplemental brief. *See* ECF No. 65. None of Plaintiffs' arguments in that brief has merit or prevents granting judgment to Defendants.

## ARGUMENT

### I. Plaintiffs Lack Standing.

Plaintiffs have not established standing. *See* Defs' Suppl. Br. 1–2 (citing prior pleadings).

First, despite previously asserting standing based on the IFR's purported impact on the organizational Plaintiffs' resources, *see* Pls' Reply 4–5, Plaintiffs disclaim any reliance on "pocketbook" injuries, claiming instead that their only theory for standing is that "[t]he IFR and Rule perceptibly impair Organizational Plaintiffs' ability to provide counseling and legal services to asylum seekers," Pls' Suppl. Reply 1 (cleaned up). But they do not explain how such claimed impairment differs from the standing theories found lacking in *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024). Furthermore, their claim that "Organizational Plaintiffs are unable to engage in their core business activity—providing legal representation to asylum seekers," Pls' Suppl. Br. 1, is unsupported by their own evidence. Nowhere do the organizational Plaintiffs state that they are unable to represent asylum seekers—indeed, their declarations state that they continue to do so. *See, e.g.*, Hidalgo Decl. ¶ 10 (between October 1 and November 14, RAICES "served 21 individuals adversely impacted by the Rule and Guidance"); Babaie Decl. ¶ 23 (Las Americas has served more than 1,100 people between January 1 and November 14).

Second, although Plaintiffs are correct that in some circumstances when a court finds that one plaintiff has standing it does not need to determine whether other plaintiffs have standing

before the case can move forward, *see* Pls' Suppl. Br. 1–2; *Tozzi v. U.S. Dep't of Health & Hum. Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001), here, whether and the degree to which various Plaintiffs have standing will significantly affect the scope of relief in this case. Defendants continue to preserve their arguments against the individual Plaintiffs' standing to challenge the IFR, Rule, and Guidance, particularly as to aspects of the IFR, Rule, and Guidance for which they have not claimed injury. *See, e.g.*, Defs' Reply at 4; Defs' Suppl. Br. 3 n.1.

## II. The Rule's Asylum-Eligibility Limitation Is Authorized by the INA and Is Not Arbitrary or Capricious.

### A. The Rule's asylum-eligibility limitation is authorized by the INA.

Plaintiffs' argument on the statutory authority underlying the Rule adds little to their previous submission and fails for the reasons previously noted. *See* Defs' Mot. 27-29; Defs' Reply 5; Defs' Suppl. Br. 4-5. Plaintiffs also fail to grapple with the Ninth Circuit's decision to allow a similarly structured limitation to go into effect in *East Bay Sanctuary Covenant v. Biden*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023).[1]

### B. The Rule's asylum-eligibility limitation is not arbitrary or capricious.

The final Rule establishes that the Departments "examine[d] the relevant data and articulate[d] a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs' argument (Pls' Suppl. Reply 2-5) that the asylum-

[1] Plaintiffs do, however, raise an argument not raised in their initial supplemental brief, that the asylum-eligibility limitation "deviat[es] from the statutorily mandated 'significant possibility' standard" in credible fear proceedings. Pls' Suppl. Reply at 2. This argument is premised on fundamental misunderstandings regarding how the Rule functions in the context of credible fear proceedings, and the government has made clear that the "significant possibility" standard continues to apply in cases implicating the Rule and its asylum-eligibility limitation. Defs' Mot. 32-33.

eligibility limitation is nonetheless arbitrary and capricious represents nothing more than a request that the Court "substitute [its own] judgment for that of the agenc[ies]" based on the Plaintiffs' own weighing of the respective "risks and benefits" of the final Rule. *Dep't of Comm. v. New York*, 588 U.S. 752, 777 (2019).

*First*, Plaintiffs argue that the Departments failed to recognize the dangers asylum seekers may be subject to in northern Mexico. Pls' Suppl. Reply 2-4. The Departments repeatedly acknowledged these risks, but concluded that they were outweighed by benefits the Rule's limitation will have on the immigration system during the emergency periods covered by the Rule. Defs' Suppl. Br. 5-7. Moreover, as Defendants have explained, the Rule will channel migration to *safer* lawful pathways, including the CBP One app, which will mitigate the risks asylum seekers may face at the southern border. *Id.* The exceptionally compelling circumstances exception additionally provides an avenue for those most in need of protection. Plaintiffs would prefer that that exception be broader and encompass virtually anyone who fears some level of harm in Mexico, Pls' Suppl. Reply 3, but the Departments made the reasonable decision to limit exceptions to the asylum-eligibility limitation during the emergency border circumstances contemplated by the Rule. Additionally, there are a variety of ways in which a noncitizen can manifest a fear of return and thereby secure both a credible fear interview and an opportunity to assert an exception to the asylum-eligibility limitation. Defs' Suppl. Br. 7. The fact that any particular noncitizen may not manifest the requisite fear does not establish that the exception is too narrow or an inadequate "safeguard" in the context of this Rule.

*Second*, Plaintiffs fail to address the Departments' arguments for why it was imperative to include Mexican nationals within the ambit of this Rule, despite their exclusion from the Circumvention of Lawful Pathways Rule. *See* Pls' Suppl. Reply 4. Instead, they rely on a false

framing to assert that "Mexican asylum seekers have no option but to remain in" Mexico pending an appointment. *See id.* As the Departments noted, however, Mexican nationals may be eligible for a range of exceptions to both the Proclamation and the asylum-eligibility limitation, all of which provide colorable avenues to seeking asylum, while, regardless of the exceptions, Mexican nationals remain eligible to seek statutory withholding of removal and CAT protection. Defs' Suppl. Br. 8-9.

*Finally*, use of the CBP One app is a reasonable means that a noncitizen may use to lawfully present themselves at a port of entry and thereby avoid application of the asylum-eligibility limitation. Defs' Suppl. Br. 9-11. Plaintiffs continue to argue the app is not available in all languages, Pls' Suppl. Reply 4, while failing to recognize that "the app is available in languages spoken by the top nationalities seeking entry across the southern border," has measures in place to address connectivity and other access issues, and continues to be upgraded to expand ease of access to users and other linguistic groups. *See* 89 Fed. Reg. at 81,219-20. Moreover, although some individuals may remain unaware of the CBP One app, *see* Pls' Suppl. Reply 4-5, the Departments have promoted its use via a website and press releases, among other mechanisms. Further, given that demand for appointments has continued to outpace availability, there appears to be broad awareness about the app. *See* Defs' Suppl. Br. 10. Finally, the Departments have not "discount[ed] evidence that" certain individuals have missed CBP One app appointments due to the actions of third parties, whether that be cartels or government actors. Pls' Suppl. Reply 5. Rather, the Departments recognized those risks, and provided an avenue to seek asylum without an appointment in the kind of exigent circumstances Plaintiffs claim occur via the exception to the asylum-eligibility limitation. *See* Defs' Suppl. Br. 10-11. Nonetheless, as already argued, the fact that some individuals may miss appointments because of the actions of third parties does not render

reliance on the CBP One app unreasonable; the Departments are not required to set up a system that operates perfectly in every conceivable circumstance, especially where circumstances on the Mexico side of the southern border are outside their control. *Cf. Barnhart v. Thomas*, 540 U.S. 20, 29 (2003) (rejecting argument that a rule must have perfect application in all circumstances); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 667-68 (D.C. Cir. 2019) ("As the Supreme Court repeatedly has held, the fact that petitioner can point to a hypothetical case in which the rule might lead to an arbitrary result does not render the rule facially invalid." (quotation marks omitted)).

**III. The Manifestation Standard Is Not Arbitrary or Capricious or Contrary to Law.**

In their supplemental reply, Plaintiffs argue that the manifestation standard "is contrary to law and arbitrary and capricious." Pls' Suppl. Reply 5. But they fail to refute the arguments already laid out by the government, which explain why the standard—like the Rule as a whole—comports with applicable law and was reasonably promulgated. *See* Defs' Suppl. Br.; Defs' Mot., ECF No. 45-1; Defs' Reply, ECF No. 52.

At the outset, Plaintiffs allege that the government has offered "no further argument rebutting" their claim that the manifestation standard is "contrary to law"—ignoring that they themselves give only sparse treatment to that claim, instead focusing their efforts on trying to show that the standard is "arbitrary and capricious." Pls' Suppl. Reply 5; *see* Pls' Suppl. Br. 13. But the government has already provided a clear and thorough rationale as to why the standard is consistent with the INA. *See* Defs' Mot. at 33–36; Defs' Reply at 7. As explained, the INA directs immigration officers to refer noncitizens for a credible fear interview only where they "indicate either an intention to apply for asylum ... or a fear of persecution"—without going so far as to impose a requirement on officers to affirmatively question noncitizens about any fear they might

possess or any intent to seek discretionary relief. 8 U.S.C. § 1225(b)(1)(A)(ii); *accord* 8 U.S.C. § 1225(b)(1)(A)(i). Instead, the onus remains squarely on the noncitizen to indicate any such fear or intention, with the Rule reasonably providing that a noncitizen can do so at any point in the expedited removal process, whether verbally, non-verbally, or physically. 89 Fed. Reg. at 48,740. The government has also addressed Plaintiffs' claim that the manifestation standard violates the statutory requirement that DHS "shall provide information concerning the asylum interview ... to aliens who may be eligible." *See* Defs' Mot. at 35–36; 8 U.S.C. § 1225(b)(1)(B)(iv). The Rule in no way prevents or discourages officers from providing that requisite information. On the contrary, it takes care to note that CBP will provide the information to any noncitizen subject to expedited removal; thus, notices are posted in CBP facilities instructing individuals to inform an immigration officer if they have either a fear of return or an intent to apply for asylum. *See* Defs' Mot. at 35–36 (citing 89 Fed. Reg. at 48,741). Nor is the Rule inconsistent with international law. At one point, Plaintiffs argued that "domestic statutes" should be interpreted to conform with what they describe as an "international law obligation to ask about fear." Pls' Reply at 19–20. But the UNHCR's guidance on which they rely is not binding authority that would trump the Departments' statutory authority to administer and enforce the immigration laws, or to take actions "necessary for carrying out" that authority. 8 U.S.C. § 1103(a)(1), (3); *see also* 6 U.S.C. § 202. Plaintiffs have not identified any international law that is binding on the United States and would require affirmative advisals and questions even where the statutes do not. *See* Defs' Reply at 7.

As for Plaintiffs' characterization of the manifestation standard as arbitrary and capricious, there is nothing in their supplemental reply that the government has not already addressed in its prior briefs. They amplify one particular statement in the Rule that "commenters have provided no evidence that there is a widespread problem of CBP officers and agents ignoring fear claims under

the IFR." Pls' Suppl. Reply 7–8 (citing 89 Fed. Reg. at 81,240). As the quoted language makes clear, the point was that there was no evidence of a "widespread" problem; the Rule acknowledged that some of the comments had urged that there had been problems in this regard, but did not treat those comments as evidence of a widespread problem, much less as a sufficient basis to abandon its proposal. That conclusion was reasonable. Among other things, the comments provided no basis for DHS to assess their accuracy or completeness, including the methodology used to gather and process any survey responses. *See* Defs' Suppl. Br. 16. And as DHS explained, it had not received substantiated allegations of such misconduct through the channels dedicated to reporting issues of that kind. 89 Fed. Reg. at 81,240. DHS also cited evidence that referrals for credible fear interviews were occurring in substantial numbers, which undermines any argument that manifestation of fear were being systematically ignored. *Id.* In particular, the Rule highlights data "showing a manifestation rate of 27 percent under the IFR"—data that would indicate "officers and agents are following their guidance and reporting manifestations of fear in a large number of cases," even if some fear claims might inadvertently be missed. *Id.* In short, some comments to the IFR did express "concern" about a possible pattern of fears being ignored, but the Rule addresses that concern head-on, reasonably concluding that there was no "basis to independently evaluate" the overbroad claims. 89 Fed. Reg. at 81,238.

Plaintiffs also contend that "the manifestation standard's design"—or what they describe as the lack of a "structured conversation"—makes it much more likely that individuals will not know to manifest fear and also much easier for officers to disregard expressions of fear." Pls' Suppl. Reply 8. But, as the Rule explains, during immigration inspections, CBP officers and agents benefit from "face-to-face interactions with the noncitizen and thus have a chance to closely observe the individual who is being inspected, to identify those who may have a fear of return or

indicate an intention to seek fear-based relief or protection." 89 Fed. Reg. at 81,238. Officers are aware and receive guidance that "fear can be manifested in many different ways, including verbally, non-verbally, or physically, and that when doubt or ambiguity exists, [they] should involve supervisors or mangers to ensure appropriate decisions are made." *Id.* Thus, what Plaintiffs characterize as a supposed lack of structure is in fact a deliberate procedural design that allows CBP officers and agents to use their skills and expertise in processing and interviewing individuals—including populations that might require particular care or assistance—so that they can "effectively identify noncitizens with potential fear or asylum claims under a manifestation approach." *Id.*; *see State Farm.*, 463 U.S. at 42 (agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances"). Plaintiffs also discredit the role played by CBP's Office of Professional Responsibility to investigate and address allegations of serious misconduct by a CBP employee or contractor, but the "record evidence" on which they lean is similar to the "research" cited by the commenters to the IFR—limited sets of interviews conducted by migrant services organizations, with hardly any accompanying analysis to show whether those "stories" might be representative of a larger, endemic problem; or reports containing such inflammatory, unfounded remarks as that U.S. Border Patrol has always "been steeped in institutional racism" and "has committed violent acts with near impunity" since its inception. AR1 10713–31; AR1 11008.

The remainder of Plaintiffs' counterarguments also do not withstand scrutiny. They suggest that the notices alerting noncitizens of the opportunity to indicate a fear or intention to seek asylum should be provided in more than four languages, Pls' Suppl. Reply 6, but the Rule explicitly addresses that point, explaining that the notices "are provided in the languages spoken by the most common nationalities encountered by CBP and thus will be understood by most of the individuals

in CBP custody who are subject to the [R]ule." 89 Fed. Reg. at 81,244. Furthermore, "if a noncitizen does not speak one of these languages, CBP provides language assistance services in accordance with CBP's Language Access Plan." *Id.* The Departments likewise considered the finding in one 2005 study that noncitizens who receive affirmative advisals may be up to seven times more likely to assert a fear claim; to that, they provided a measured response that, while such procedures had "remained in place in the expedited removal context since 1997, this fact alone does not indicate that they are required by the INA, and DHS maintains discretion to update the procedures in a manner consistent with the INA." 89 Fed. Reg. at 81,234. The Departments determined that affirmative advisals and questions were "unduly suggestive" in light of the emergency circumstances present at the southern border, and reasonably exercised their discretion to revisit and update their "screening referral processes to more effectively and efficiently identify those noncitizens who may have a fear of return ... or indicate an intention to seek fear-based relief or protection." *Id.*

Plaintiffs also reject the "premise that DHS officers can reliably discern which noncitizens fear persecution or torture without even asking them," given what they claim is a complete lack of a "factual basis" in the record. Pls' Suppl. Reply 7. But, as the Rule details, "[d]uring the time that the manifestation process has been in place under the IFR, there have been higher rates of manifestation than when the standard was recorded and tracked for family units under the Title 42 public health order, and DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day." 89 Fed. Reg. at 81,237. And the Rule provides an overview of the training every CBP officer undergoes—including "annual training on CBP National Standards on Transport, Escort, Detention, and Search (TEDS)," which help ensure noncitizens have the "opportunity to raise any concerns or needs" in the course of their "regular and frequent"

interactions with CBP officers." 89 Fed. Reg. at 81,239. The Rule also takes care to note that "a noncitizen does not have a finite or limited number of opportunities to manifest fear, but rather may manifest fear at any point while in DHS custody," *id.*, and that "existing guidance and CBP practice is to err on the side of caution and on the side of referring an individual to USCIS, 89 Fed. Reg. at 81,237.

Finally, while Plaintiffs take issue with the government's reference to asylum grant rates, Pls' Suppl. Reply 9, those figures were invoked simply as a response to Plaintiffs' assertion that the "massive" drop in the referral rate—from 57 percent under the Circumvention of Lawful Pathways Rule to a still-considerable 27 percent under the IFR, 89 Fed. Reg. at 81,280—was somehow incontrovertible evidence of DHS officers "routinely ignor[ing] fear claims." Defs' Suppl. Br. 17 (citing Pls' Suppl Br. 19–21). While the "small percentage"[2] of asylum grants in completed section 240 removal proceedings does not establish that the decrease in referrals since the implementation of the Rule was a foregone conclusion or the only possible outcome, Defendants never made that claim. 89 Fed. Reg. at 81,249. Instead, the asylum grant rates were cited because they bolster the modest position taken by the government that the lower referral percentage under the Rule is not utterly "implausible"—as Plaintiffs would contend—but a reliable indicator that the emergency procedures are having their intended effect. *See* 89 Fed. Reg. at 81,160 (explaining that the "shift to a manifestation standard has, as intended, reduced the gap between high rates of referrals and screen-ins and historic ultimate grant rates as well as increased processing efficiency for DHS, and noncitizens who manifest or claim a fear, or who indicate an intention to apply for asylum, still have their claims adjudicated as required by the INA"). The

[2] Only 18 percent in 2023, "even when excluding cases that were administratively closed or did not have the asylum claim adjudicated." 89 Fed. Reg. at 81,249.

same logic extends to the decreased referral rate for Mexican nationals—that lower percentage (8 percent) closely aligns with the percentage of Mexican nationals ultimately found to qualify for relief over a recent, five-year period (6 percent). AR1 1492; 89 Fed. Reg. at 48,738. The fact of that alignment is not a "post hoc rationalization" of the manifestation standard, but a reflection of the increased effectiveness of the referral process—which is meant to advance potentially meritorious asylum claims along in the application process. In sum, because Plaintiffs still have not provided a cogent explanation as to why the manifestation standard is unlawful, summary judgment should be granted for the government.

## IV. Defendants' Adoption of the "Reasonable Probability" Standard Was Reasonable and Reasonably Explained.

Plaintiffs' arguments supporting their claim that the adoption of the "reasonable probability" standard was insufficiently reasoned are misguided. *See* Pls' Suppl. Reply 10–11.

First, as argued previously, Defs' Suppl. Br. 19–20, Defendants changed course on whether to use heightened screening standards for statutory withholding and CAT in certain circumstances in the 2023 rule *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023), and the Rule challenged here was issued after that explained change in course. Plaintiffs provide no authority for their apparent view that relying on a prior change in course is arbitrary. Pls' Suppl. Reply 11. And to the extent they challenge the reasoning in the 2023 rule, a challenge to this separate rule is not the proper vehicle for doing so. Nevertheless, in the 2023 rule, Defendants indeed "considered and rejected" their "prior findings that heightened standards do not prevent refoulement and are inefficient," Pls' Suppl. Reply 11, and determined that in certain circumstances use of heightened screening standards is warranted. *See, e.g.*, *Circumvention of Lawful Pathways*, 88 Fed. Reg. 11,704, 11,745–47 (proposed Feb. 23, 2023). Specifically, regarding the efficiency finding, Defendants stated that the goal of efficiency of the credible fear

process must be weighed against "the need to create efficiencies in the system overall," which can be gained by "screening out more non-meritorious claims" so as not to add them to the immigration court backlog. *Id.* at 11,746. Such balancing of competing goals is reasonable. As for the concerns over refoulement, in the 2023 rule Defendants explained that the "reasonable possibility" standard that rule adopted has long been successfully used in reasonable fear screenings. *Id.* Although Plaintiffs object to what they characterize as the "low passage rates" under both the "reasonable possibility" standard adopted by the 2023 rule and the "reasonable probability" standard adopted by the Rule at issue here, those passage rates (51 percent and 48 percent, respectively), Defs' Suppl. Br. 18, show that the standard the Rule adopted is not insurmountable nor a stark departure from prior practice adopted by the 2023 rule.

Second, Plaintiffs are mistaken to suggest that Defendants failed to meaningfully consider evidence that trauma and other factors render noncitizens unable to share specifics during credible fear interviews. *See* Defs' Suppl. Br. 20–21; *see generally, e.g.*, 89 Fed. Reg. at 81,192–207, 81,245–50. The Rule explains that asylum officers are trained to engage in non-adversarial interviews to elicit relevant information from noncitizens and are specifically trained on various factors that could be implicated in these interviews, including interviewing survivors of torture or other severe trauma. Defs' Suppl. Br. 20. Plaintiffs do not grapple with the fact that the statute itself requires noncitizens to explain their fear during screenings. *Id.* at 21 (citing 89 Fed. Reg. at 81,246). Finally, Plaintiffs are incorrect that applicants are "prevent[ed] [ ] from providing other types of evidence relevant to their protection claims." Pls' Suppl. Br. 12. The Rule states that "Asylum seekers also may present evidence relevant to their claim during their interviews," 89 Fed. Reg. at 81,193 (citing 89 Fed. Reg. at 48,746 & n.239), and "Noncitizens can ... seek to

introduce new evidence before IJs" during negative credible fear reviews, *see* 89 Fed. Reg. at 81,198.

**V. Plaintiffs Cannot Raise a Notice-and-Comment Challenge to the Rule.**

As Defendants explained in their supplemental brief, the final Rule was issued following notice and opportunity to comment, so there is no basis to raise a notice-and-comment challenge to the Rule. Defs' Suppl. Br. at 22. Defendants also reiterated that, for various reasons, the organizational Plaintiffs could not raise such a claim. *Id*. Plaintiffs do not dispute either point in their response. *See* Pls' Suppl. Reply at 12.

In their response, Plaintiffs dispute only that this claim is moot as to the original set of individual Plaintiffs challenging the IFR. *Id*. As Defendants previously noted, however, the individual Plaintiffs did not assert harm related to the Departments' decision to invoke notice-and-comment exceptions for the IFR in their complaint and appeared not to raise this claim. *See* Defs' Suppl. Br. at 22-23; Defs' Reply at 8 n.1. This was in sharp contrast to the organizations. *Compare* Complaint, ECF No. 14 at ¶ 91 (alleging that, "[f]or both organizations, the issuance of these changes via an [IFR] deprived them of an opportunity to comment on these changes before they took effect," as "neither organization had an opportunity to put relevant information in front of Defendants that might have informed their choices or prompted them to abandon these changes completely") *with id*. at ¶¶ 77-80 (setting out "Harms to Individual Plaintiffs" without mentioning notice and comment); *compare also* ECF No. 48 at 5-6 (asserting organizational Plaintiffs' standing to raise this claim) *with id*. at 1-2 (not raising this claim for individual Plaintiffs). Even if the Court disagrees and concludes that the original individual Plaintiffs raised this claim, the Court could provide relief at most only to those particular individuals, and should deny relief for the reasons previously noted. *See* Defs' Suppl. Br. 22-24.

## VI. Any Relief Must Be Sharply Limited.

For the reasons previously noted, the Court at most can grant vacatur of the individual removal orders of individual Plaintiffs who establish injury from the Rule or guidance and succeed on a challenge to the Rule or guidance. *See* Defs' Suppl. Br. at 23; Defs' Reply at 18-19. None has done so. Nor have Plaintiffs made any attempt to argue that any additional relief is proper or necessary to provide relief to the Plaintiffs in this case. *See* Defs' Suppl. Br. at 23-25. Plaintiffs argue that courts in other cases have ordered noncitizens returned to the United States, but they do not respond to Defendants' argument that they must point to some source of authority for such an affirmative injunctive remedy, nor do the cases they cite grapple with this problem with their requested relief. Pls' Suppl. Br. at 13. Plaintiffs also fail to respond to the arguments that no Plaintiff has established standing to seek prospective relief or vacatur of the rule and that 8 U.S.C. § 1252(f) bars remedies that interfere with the government's decisions on how to implement 8 U.S.C. § 1225(b). *See* Defs' Suppl. Br. at 24. Plaintiffs argue only that vacatur is the "normal remedy," Pls' Suppl. Br. at 13, but they do not and cannot argue that vacatur is required in all cases, and their argument that vacatur is warranted here based on the "harm the Rule is inflicting on asylum seekers," *id.*, does nothing to show how this relief is necessary to provide complete relief to the Plaintiffs in this case even if they could establish such harm.

## CONCLUSION

The Court should grant summary judgment to Defendants on all claims.

Dated: December 18, 2024

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Assistant Director*

CHRISTINA P. GREER
PATRICK GLEN
DAVID KIM
KATHERINE J. SHINNERS
*Senior Litigation Counsel*

By: /s/ *Brian C. Ward*
BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Brian C. Ward*
BRIAN C. WARD
Senior Litigation Counsel
United States Department of Justice