IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, et al., | ) ) ) |
| *Plaintiffs*, | ) ) No. 1:24-cv-01702 |
| v. | ) ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) |
| *Defendants.* | ) ) ) |

## SUPPLEMENTAL JOINT APPENDIX FILED PURSUANT TO LOCAL RULE 7(N)

## SUPPLEMENTAL JOINT APPENDIX INDEX

| Rulemaking Documents | |
|---|---|
| *Securing the Border*, 89 Fed. Reg. 81,156 (Oct. 7, 2024) (Final Rule), https://www.federalregister.gov/documents/2024/10/07/2024-22602/securing-the-border. | STB_AR1_000001–130 |
| *Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024) (IFR), https://www.federalregister.gov/documents/2024/06/07/2024-12435/securing-the-border. | STB_AR1_000131–193 |
| **Proclamations** | |
| Proclamation 10773, *Securing the Border* (June 3, 2024). | STB_AR1_000194–207 |
| Proclamation 10817, *Amending Proclamation 10773* (Sept. 27, 2024). | STB_AR1_000208–213 |
| **U.S. Government Sources** | |
| CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), https://www.cbp.gov/about/mobileapps-directory/cbpone | STB_AR1_000425–26 |
| CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance*. | STB_AR1_000502–03 |
| ICE, Securing the Border Facility Posting Four Languages (June 4, 2024). | STB_AR1_001381 |
| Memorandum for Daniel A. Bible, Exec. Assoc. Dir., Enforcement and Removal Operations, ICE, from Patrick J. Lechleitner, Deputy Dir. and Senior Official Performing the Duties of the Dir., ICE, Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule, Securing the Border (June 4, 2024). | STB_AR1_001418–22 |
| Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, Processing Expedited Removal Cases & attach. (Oct. 2, 2014). | STB_AR1_001423–26 |
| Memorandum for Exec. Assistant Comm'rs, et al., from Chris Magnus, Comm'r, U.S. Customs and Border Protection, *Directive for U.S. Customs and Border Protection Approach to Trauma-Informed Care for Persons in Custody* (Apr. 29, 2022). | STB_AR1_001427–31 |
| Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Office of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, Implementation of Expedited Removal (Mar. 31, 1997). | STB_AR1_001450–54 |
| Memorandum from Nathaniel Kaine, Chief of Staff, CBP, *CBP Operational Information – Securing the Border Final Rule* (Sept. 26, 2024). | STB_AR1_001456–69 |
| OHSS, Data for Securing the Border Final Rule (Sept. 3, 2024). | STB_AR1_001492-862 |

i

| | |
|---|---|
| USCIS, *RAIO Directorate—Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024). | STB_AR1_002396–420 |
| USCIS, *RAIO Directorate – Officer Training: Interviewing – Eliciting Testimony* (Apr. 24, 2024). | STB_AR1_002699–755 |
| USCIS, *RAIO Directorate – Officer Training: Interviewing – Introduction to the Non-Adversarial Interview* (Apr. 24, 2024). | STB_AR1_002797–843 |
| USCIS, *RAIO Directorate – Officer Training: Interviewing – Working With An Interpreter* (Apr. 24, 2024). | STB_AR1_002883–932 |
| U.S. Dep't of State, Bureau of Democracy, Human Rights, & Labor, Country Reports on Human Rights Practices: Mexico Human Rights Report (2023). | STB_AR1_003183, 3207 |
| U.S. General Servs. Admin., Login.gov, https://login.gov/ (last visited Aug. 10, 2024). | STB_AR1_003283–85 |
| **Non-U.S. Government Sources** | |
| Amnesty International, CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States (May 9, 2024), https://www.amnesty.org/en/latest/news/2024/05/cbp-one-mobile-applicationviolates-the-rights-of-people-seeking-asylum-in-the-united-states/. | STB_AR1_004406–12 |
| Ana Lucia Verduzco & Stephanie Brewer, Kidnapping of Migrants and Asylum Seekers at the Texas-Tamaulipas Border Reaches Intolerable Levels, Wash. Off. on Latin Am. (Apr. 4, 2024). | STB_AR1_004413, 4419–20 |
| Ctr. for Gender & Refugee Studies, "Manifesting" Fear at the Border: Lessons from Title 42 Expulsions, Jan.30, 2024, https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fearborder-lessons-title-42-expulsions. | STB_AR1_004462–63 |
| Human Rights Watch, US: Digital Metering System Exposes Migrants to Harm (May 1, 2024). | STB_AR1_004594–96 |
| **Public Submissions** | |
| Comment of Human Rights First and attachments, DHS Dkt. No. USCIS-2024-0006 (July 2, 2024) | STB_AR1_006227, 6238–39, 6247–50, 6253–58, 6278, 6284–86, 6289–93, 6321, 6349–55, 6364–65, 6593, 6634 |
| Comment of American Immigration Council (the Council) and the American Immigration Lawyers Association (AILA) and attachments, DHS Dkt. No. USCIS-2024-0006 (July 3, 2024) | STB_AR1_006704–05 |

| | |
|---|---|
| Comment of Center for Gender & Refugee Studies and attachments, DHS Dkt. No. USCIS-2024-0006 (July 3, 2024) | STB_AR1_006757-58, 6762–64, 6842, 6851–62, 7477, 7485–86, 7513–16, 7522–28 |
| Comment of National Immigrant Justice Center and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_007802, 7815, 7818, 7820–44, 7906, 7930–32, 8074–75, 8185, 8200, 8530, 8544–53, 8942, 8945–46 |
| Comment of Richard Caldarone and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_009353, 9421–22, 9545–46, 9572, 9583–85, 10151–52, 10371, 10380–97, 10531, 10535–36, 10549, 10702-65, 010713–731, 10896, 10915, 11005-31, 11113, 11122-23, 11439, 11442-43, 11449-50, 11452, 11455-56, 11673, 11699, 11946, 11950-51, 12116, 12129-30, 12456, 12460, 12508, 12513, 12631, 12640-41 |
| Comment of United Nations High Commissioner for Refugees (UNHCR) and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_012802, 12817 |
| Comment of Las Americas Immigrant Advocacy Center and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_012881, 12884-86, 12889, 12892, 12898-901 |
| Comment of Americans for Immigrant Justice and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013016, 13021-24 |
| Comment of Immigration Equality and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013028, 13050-53 |
| Comment of Human Rights Campaign and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013094, 13104-05 |
| Comment of Refugees International and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013148-50 |
| Comment of Florence Immigrant & Refugee Rights Project and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013247, 13254-55 |

| Other U.S. Government Sources | |
|---|---|
| DHS, USCIS, *RAIO Combined Training Program: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024) | STB_AR2_00002943 –79 |
| Memorandum from Tricia Kennedy, Program Manager, Off. of Field Operations, U.S. Customs & Border Prot., *CBP OneTM Application* (May 8, 2023). | STB_AR2_00007414 –24 |
| U.S. Dep't of Homeland Sec., Press Release, *CBP Makes Changes to CBP One App* (May 5, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-cbp-one-app?s=03. | STB_AR2_00009346 –50 |

**81156** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208 and 235**

[CIS No. 2778–24; Docket No: USCIS–2024–0006]

**RIN 1615–AC92**

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Part 1208**

[A.G. Order No. 6053–2024]

**RIN 1125–AB32**

### Securing the Border

**AGENCY:** U.S. Citizenship and Immigration Services (''USCIS''), Department of Homeland Security (''DHS''); Executive Office for Immigration Review (''EOIR''), Department of Justice (''DOJ'').

**ACTION:** Final rule; request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act (''INA'') suspending and limiting the entry of certain noncitizens into the United States during emergency border circumstances. DHS and DOJ (''the Departments'') issued a complementary interim final rule (''IFR'') shortly thereafter. This final rule responds to public comments received on the IFR, makes certain revisions to the regulatory text, and seeks comment on potential changes to the Circumvention of Lawful Pathways rule as well as changes that parallel modifications made by the subsequent Proclamation.

**DATES:**

*Effective date:* This rule is effective at 12:01 a.m. eastern daylight time on October 1, 2024.

*Comment period for solicited comments:* Comments on the extended and expanded applicability of the Circumvention of Lawful Pathways rebuttable presumption in Section IV of this preamble and changes that parallel modifications made by the subsequent Proclamation described in Section II.C.1 of this preamble must be submitted on or before November 6, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket:* To view comments on the IFR that preceded this rule, search for docket number USCIS–2024–0006 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

*Comment period for solicited additional comments:* You may submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov,* to DHS Docket Number USCIS–2024–0006. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage device, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, USCIS, DHS, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, DHS; telephone (202) 447–3459 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, DOJ, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
  A. Background and Purpose
  1. Basis for the IFR
  2. The Departments' Experience With the IFR
  B. Legal Authority
  C. Changes From the IFR to Final Rule
  1. Changes to the IFR's Thresholds
  2. Clarifying Changes to Regulatory Text
  3. Other Technical Changes
  D. Rule Provisions
  E. Severability
III. Public Comments and Responses
  A. Legal Authority and Background
  1. Legality Concerns
  a. General Comments on Domestic Law
  b. Statutory Conditions and Limitations on Asylum Eligibility
  c. Expedited Removal
  d. General Comments on International Law
  e. UNHCR Guidelines on International Protection
  f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children
  2. Justification and Statements on Need for the Rule
  a. Rule Is Unjustified, Unsubstantiated, or Arbitrary
  b. Lack of Resources Does Not Justify the Rule
  c. Rule Does Not Acknowledge Factors Contributing to Migration
  d. Other Comments Related to the Departments' Justification
  B. General Feedback on the IFR
  1. General Support
  2. General Opposition
  a. Negative Impacts on Noncitizens and Others
  i. Conflicts With Humanitarian Values
  ii. Procedural and Due Process Concerns
  (1) General Concerns
  (2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare
  (3) Noncitizens' Ability to Have Their Claims Heard
  (4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations
  (5) Fairness or Risks Associated With Process
  iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns
  iv. Impacts on Criminal Enforcement
  v. Negative Impacts on Other Affected Entities
  b. Negative or Minimal Impacts on Immigration System and Government Operations
  i. Undermines the Administration's Promises and Goals
  ii. Similarity to Actions of Past Administration
  iii. Would Be Ineffective or Not Achieve Its Intended Outcomes
  c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety
  d. Other General Opposition
  C. Provisions of the Rule
  1. Limitation on Asylum Eligibility
  a. Proclamation Exceptions—Section 3(b) of Proclamation
  i. Legal Concerns Related to CBP One and the Lack of Exceptions
  ii. Wait Times for CBP One Appointments
  iii. Availability of and Access to CBP One Appointments and Concerns about Discrimination
  b. Regulatory Exception—Exceptionally Compelling Circumstances
  c. Implementation by CBP Officers
  d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR
  e. Family Unity Provisions
  2. Manifestation of Fear Standard
  a. Legality Concerns
  b. Concerns About the Efficiency and Complexity of the Manifestation Standard
  c. Implementation Guidance and Accuracy of Manifestation To Identify Fear of Return
  d. Trauma Impacting Manifestation and Vulnerable Populations

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum
f. Noncitizens May Not Understand Their Legal Right to Seek Asylum
3. ''Reasonable Probability'' Screening Standard for Statutory Withholding of Removal and CAT Protection
4. Other Comments on the Regulatory Provisions
a. Application to Mexican Nationals
b. Adequacy of Statutory Withholding of Removal and CAT Protection
c. Requests for Reconsideration
D. Other Issues Relating to the Rule
1. Scope of the Rule and Implementation
a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary
b. Concerns Regarding Exceptions From the Encounter Thresholds
c. Other Concerns About the Encounter Thresholds
2. Other Comments on Issues Relating to the Rule
E. Statutory and Regulatory Requirements
1. Administrative Procedure Act
a. Foreign Affairs Exception
b. Good Cause Exception
c. Length and Sufficiency of Comment Period
2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)
3. Alternatives
a. Address Root Causes of Migration
b. Prioritize Funding and Other Resources
c. Further Expand Refugee Processing or Other Lawful Pathways
d. Expand Asylum Merits Process
e. Other Congressional Action
f. Additional Suggested Measures or Revisions
F. Out of Scope
IV. Requests for Comments
A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule
B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption
V. Regulatory Requirements
A. Administrative Procedure Act
B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
1. Effects Under a Without-IFR Baseline
2. Effects Under a With-IFR Baseline
3. Discontinuation Analysis Under a Without-IFR Baseline
4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Family Assessment
I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
J. National Environmental Policy Act
K. Paperwork Reduction Act

**List of Abbreviations**

AO   Asylum Officer
AMI   Asylum Merits Interview
APA   Administrative Procedure Act
BIA   Board of Immigration Appeals (DOJ, EOIR)
CAT   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP   U.S. Customs and Border Protection
CBP One app   CBP One mobile application
CDC   Centers for Disease Control and Prevention
CHNV   Cuba, Haiti, Nicaragua, and Venezuela
DHS   Department of Homeland Security
DOJ   Department of Justice
EOIR   Executive Office for Immigration Review
ERO   Enforcement and Removal Operations
FARRA   Foreign Affairs Reform and Restructuring Act of 1998
FERM   Family Expedited Removal Management
FY   Fiscal Year
HSA   Homeland Security Act of 2002
ICE   U.S. Immigration and Customs Enforcement
IFR   Interim Final Rule
IIRIRA   Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ   Immigration Judge
INA   or the Act Immigration and Nationality Act
LGBTQI+   Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex
MPP   Migrant Protection Protocols
NGO   Non-Governmental Organization
NEPA   National Environmental Policy Act of 1969
NTA   Notice to Appear
OFO   Office of Field Operations
OHSS   Office of Homeland Security Statistics
POE   Port of Entry
RFA   Regulatory Flexibility Act
SWB   Southwest Land Border
TCO   Transnational Criminal Organization
TVPA   Trafficking Victims Protection Act of 2000
UC   Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UDHR   Universal Declaration of Human Rights
UIP   U.S. Customs and Border Protection Unified Immigration Portal
UMRA   Unfunded Mandates Reform Act of 1995
UNHCR   United Nations High Commissioner for Refugees
USBP   U.S. Border Patrol
USCIS   U.S. Citizenship and Immigration Services
USCG   U.S. Coast Guard

# I. Public Participation

Interested persons are invited to submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble by submitting relevant written data, views, and arguments by the deadline stated above. To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than that pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

# II. Executive Summary

## A. Background and Purpose

### 1. Basis for the IFR

On June 3, 2024, the President signed Proclamation 10773 (''June 3 Proclamation'') [1] under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and

---

[1] As discussed in Section II.C.1 of this preamble, the President has since issued a proclamation amending portions of the June 3 Proclamation. That amending proclamation is referred to as the ''September 27 Proclamation'' in this preamble. Where the preamble refers to ''the Proclamation'' without specifying a date, it is referring to Proclamation 10773 as amended by the September 27 Proclamation.

STB_AR1_000002

suspending and limiting the entry of such noncitizens. 89 FR 48487, 48487–91 (June 7, 2024). The June 3 Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border of the United States, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492. The Departments subsequently promulgated an IFR, effective June 5, 2024, "designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances." [2] Securing the Border, 89 FR 48710, 48718 (June 7, 2024) ("the IFR").

The June 3 Proclamation and the IFR explain that, since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including at the southwest land border ("SWB"). 89 FR at 48487; *id.* at 48711 & n.3. In December 2023, migration levels at the SWB surged to the highest monthly total on record.[3] *Id.* at 48712 n.5. DHS assessed that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools made available by Congress and the Government of Mexico's operational constraints caused by a lack of funding at the end of the 2023 calendar year, which limited its ability to enforce its own immigration laws. *Id.* at 48725 & n.115.

These sustained high encounter rates outstripped the Departments' abilities—based on available resources—to deliver

timely decisions and consequences in significant numbers for those without a legal basis to remain in the United States. 89 FR at 48714. Due to its funding shortfall, DHS lacked adequate resources such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "softsides." *Id.* These factors limited DHS's ability to conduct credible fear interviews for individuals in U.S. Customs and Border Protection ("CBP") custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process. *Id.* The substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to impose timely consequences through expedited removal, the main consequence Congress has made available at the border under title 8 authorities. 89 FR at 48713–14. Consistent with past practice prior to the Title 42 public health Order, individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead generally released, after screening and vetting, pending removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an immigration judge ("IJ").

These higher encounter rates also place significant strain on the immigration courts. Recently, despite significant increases in the total number of IJs and case completions since Fiscal Year ("FY") 2021, newly initiated cases have far outpaced such completions.[4] Placing more noncitizens in section 240 removal proceedings before an IJ—rather than processing eligible noncitizens through the expedited removal process—only further contributes to the immigration court backlog, and those cases can take several years to conclude.[5] This strain is

also particularly acute in light of EOIR's current underfunding. Rather than increase funding to support IJ team hiring, EOIR's FY 2024 budget was $16 million less than in FY 2023 and was $94.3 million less than its inflation-adjusted funding requirements (referred to as "Current Services").[6]

The Departments reasoned that their capacity to predictably deliver timely decisions and consequences is jeopardized by emergency border circumstances, which, left unmitigated, further add to the incentives and motivations for migrants to make the dangerous journey to the SWB, regardless of their ultimate likelihood of success on an asylum or protection application, and that the current immigration and asylum systems had become a driver for irregular migration[7] throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations ("TCOs"). 89 FR at 48714. Despite the Departments' efforts to address these substantial levels of migration, strengthen the consequences in place at the border, and enhance the overall functioning of the immigration system, including through the

---

[2] The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed the Department of Homeland Security's ("DHS's") capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. *See* 89 FR at 48711 & n.2.

[3] There were nearly 302,000 U.S. Customs and Border Protection ("CBP") encounters at and between ports of entry ("POEs") along the southwest land border ("SWB") in December 2023, higher than any previous month on record. Office of Homeland Security Statistics ("OHSS") analysis of July 2024 OHSS Persist Dataset [Encounters Fiscal Year ("FY") 2000–2024]; 89 FR at 48714 n.21; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* (last updated Sept. 6, 2024), *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (SWB encounters from FY 2014 through December 2023). OHSS figures are generally rounded throughout this preamble.

[4] *See* Executive Office of Immigration Review ("EOIR"), *Adjudication Statistics: New Cases and Total Completions* (July 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline*; EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (July 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline.*

[5] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated during that time were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, EOIR's Strategic Context, Current Operating Environment, https://www.justice.gov/eoir/*

*strategic-plan/strategic-context/current-operating-environment* (last visited Sept. 20, 2024) ("EOIR . . . suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). Although EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving unaccompanied children ("UCs"). *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,254 days); EOIR, *Median Completion Times for Detained Cases* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 46 days in the second quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[6] *See* Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133; EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf.*

[7] As used in this preamble, "irregular migration" refers to the movement of people into another country unlawfully or without authorization. With respect to the United States' borders, the term "irregular" is used in this preamble to refer to physically entering between POEs or otherwise entering without documents sufficient for lawful admission, unless entering with advance authorization to travel or at a pre-scheduled time and place to present at a POE.

**STB_AR1_000003**

Circumvention of Lawful Pathways rule, 88 FR 31314 (May 16, 2023), these circumstances still existed as a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. 89 FR at 48711–13, 48715.

In the absence of congressional action, and consistent with the President's direction in the June 3 Proclamation to consider issuing regulations, the Departments adopted the provisions in the IFR, which were intended to address the emergency border circumstances and to substantially improve the Departments' ability to deliver timely decisions and consequences during such circumstances. *See* 89 FR at 48710. The IFR established a limitation on asylum eligibility that applies to certain individuals who enter irregularly across the southern border during emergency border circumstances and revised certain procedures applicable to the expedited removal process during such periods to reduce the time required to apply consequences to those individuals and remove noncitizens who do not have a legal basis to remain in the United States. *Id.* at 48715. The IFR was expected to achieve several benefits: reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; protect against overcrowding in border facilities; and reduce the ability of exploitative TCOs and smugglers to operate. *Id.* at 48745, 48767.

## 2. The Departments' Experience With the IFR

The IFR's limitation on asylum eligibility and revised procedures are working as intended, though as discussed below, the Departments have determined that modest adjustments to the threshold calculations are warranted. As explained in the paragraphs that follow, in the weeks since June 5, 2024, U.S. Border Patrol ("USBP") encounters between the ports of entry ("POEs") have dropped markedly. Although the Departments believe that this has occurred for a range of reasons, one important reason is that the rule itself has significantly shifted incentives at the southern border. As explained further below, and consistent with the explanation provided in the IFR, the rule has, at least in part, significantly improved DHS's ability to place into expedited removal a majority of single adults and individuals in family units encountered by USBP; to

avoid large-scale releases of such individuals into the United States pending section 240 removal proceedings; and to allow for swift resolution of such individuals' cases and, where appropriate, their removal. *See id.* At the same time, the Departments have continued to implement the largest expansion of lawful, safe, and orderly pathways and processes[8] for individuals to come to the United States and to uphold the United States' non-refoulement obligations under international law.

In the period between June 5, 2024, and August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and IFR have fallen 59 percent from the level of average daily encounters during the immediate post-pandemic period, *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023,[9] and before the IFR entered into effect on June 5, 2024.[10] This dramatic decrease in encounters has spanned multiple demographic categories. For instance, DHS has observed a drop in encounters of family units, a demographic category that presents particular operational challenges. During the immediate post-pandemic period, DHS experienced an average of about 2,000 daily encounters of individuals in family units.[11] Since the Departments issued the IFR, that daily average has dropped 70 percent to

about 600 individuals in family units encountered daily.[12] Other significant drops in encounter numbers occurred with single adults and unaccompanied children ("UCs").[13]

In contrast to processing before the IFR, DHS is now placing the majority of single adults and individuals in family units encountered by USBP at the SWB into expedited removal. Between June 5, 2024, and August 31, 2024, DHS placed 59 percent of these noncitizens into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order.[14] In the pre-pandemic period,[15] DHS placed 41 percent of such noncitizens into expedited removal proceedings.[16] The decrease in the number of encounters at the SWB directly enabled DHS's increased placement rate of noncitizens into expedited removal proceedings. Because encounter levels have decreased, DHS is able to use its operational resources to refer a higher percentage of noncitizens into expedited removal proceedings and deliver timely consequences in a greater proportion of cases.[17] The IFR is remedying the

---

[8] The terms "lawful pathways," "lawful, safe, and orderly pathways," "lawful pathways and processes," and "lawful, safe, and orderly pathways and processes," as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner, including to seek asylum and other forms of protection or other immigration benefits for which they may be eligible.

[9] While the rule's effective date was May 11, 2023, 88 FR at 31314, the rule only applies to noncitizens who enter the United States "[s]ubsequent to the end of implementation of the Title 42 public health Order[,]" 8 CFR 208.33(a)(1)(ii), which expired at 11:59 p.m. on May 11, 2023, *see* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Security Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.* Therefore, the Circumvention of Lawful Pathways rule began to apply on May 12, 2023.

[10] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on September 3, 2024 (Summary Statistics tab). There was an average of about 2,100 total encounters per day (including all demographic groups) between POEs at the SWB from June 5, 2024, to August 31, 2024, compared to around 5,100 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

[11] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[12] OHSS analysis data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[13] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[14] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[15] Throughout this preamble the "pre-pandemic period" refers to FY 2014 to FY 2019.

[16] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab). DHS reinstated removal orders for a larger share of single adults and individuals in family units during the pre-pandemic period (26 percent during the pre-pandemic period compared to 14 percent under the interim final rule ("IFR")), which is unsurprising given that the Departments are seeing fewer repeat encounters as a result of the higher proportion of non-Mexicans/non-northern Central Americans—with more limited migration histories—as a share of total encounters. *Id.;* 89 FR at 48721 n.49. Notably, the sum of reinstatements and expedited removals is still higher during the IFR (a combined 73 percent) than it was during the pre-pandemic period (67 percent). OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[17] The most effective way to deliver timely consequences to noncitizens who enter irregularly is through the expedited removal system, but DHS's capacity to use that system on a large scale is subject to resource constraints. One such constraint is space to hold noncitizens in DHS custody during the expedited removal process. Because noncitizens in expedited removal are subject to detention, including during the pendency of their credible fear proceedings, the use of expedited removal may lead to an increase in the time that an individual spends in CBP custody. This is particularly the case when the individual is receiving their credible fear interview while in CBP custody. When there are high numbers of individuals placed in expedited removal, the number of individuals who remain in CBP custody for a lengthier period can increase rapidly, leading to overcrowded conditions. In

Continued

negative effects of the previously sustained high encounter numbers described in the IFR and in this rule. *See, e.g.,* 89 FR at 48749 ("In order to maximize the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain in the United States. This includes, subject to available resources, referring the maximum number of eligible individuals into expedited removal to quickly adjudicate their claims.").

Relatedly, the IFR has also significantly reduced the percentage of noncitizens encountered between POEs at the SWB who are released into the United States pending completion of their section 240 removal proceedings. For instance, from June 5, 2024, through August 31, 2024, USBP placed 25 percent of noncitizens encountered at the SWB into section 240 removal proceedings.[18] This is down 41 percentage points from the immediate post-pandemic period, when USBP placed 66 percent of such noncitizens into section 240 removal proceedings, translating to a reduction of over 60 percent.[19] Similarly, between June 5, 2024, and August 31, 2024, 33 percent of all noncitizens encountered at the SWB were sent to Enforcement and Removal Operations ("ERO"); this figure is up from 19 percent during the immediate post-pandemic period.[20]

The IFR's change to how DHS immigration officers identify and refer noncitizens for credible fear interviews has resulted in a reduction of such referrals. Under the IFR, during emergency border circumstances, instead of asking specific questions about fear or providing lengthy advisals, DHS refers a noncitizen for such an interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to the noncitizen's country or the country of removal. From June 5, 2024, through August 31, 2024, 27 percent of noncitizens encountered between POEs at the SWB and processed for expedited removal indicated an intention to apply for asylum or a fear of persecution or torture, compared with a 37 percent fear-claim rate during the pre-pandemic period and 57 percent during the immediate post-pandemic period.[21] In the IFR, DHS explained that based on its extensive experience administering the expedited removal process, it concluded that the affirmative questions asked under steady state operations are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection. 89 FR at 48743.[22] The shift to a manifestation standard has, as intended, reduced the gap between high rates of referrals and screen-ins and historic ultimate grant rates as well as increased processing efficiency for DHS, and noncitizens who manifest or claim a fear, or who indicate an intention to apply for asylum, still have their claims adjudicated as required by the INA.

The shift to a "reasonable probability" standard for screening for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S 85,[23] has further reduced the difference between high screen-in rates and historically low ultimate grant rates of protection or relief. Overall, of those USBP has referred for credible fear interviews, the comprehensive screen-in rate has dropped to 57 percent, compared to 83 percent during the pre-pandemic period and 62 percent during the immediate post-pandemic period.[24] Of USBP encounters screened by USCIS under the rule's "reasonable probability" standard, the screen-in rate has decreased to approximately 48 percent[25] compared to 76 percent[26] under the "significant possibility" standard during the pre-pandemic period, and approximately 51 percent[27] for those screened under the Circumvention of Lawful Pathway rule's lower "reasonable possibility" standard.[28] The Departments believe the lower screen-in rate under the IFR better

---

[18] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[19] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[20] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

addition, given the nature of CBP facilities—which are designed for short-term temporary holding—CBP endeavors to move all individuals out of custody in an expeditious manner and to avoid overcrowding.

Thus, if high encounter levels result in a significant number of individuals in CBP custody, or if those individuals have been in custody for a significant period of time, CBP may lose optionality: having lost the capacity to place additional noncitizens into the expedited removal process, CBP generally must take steps to release some individuals from custody to ensure safe and sanitary conditions and appropriate time in custody. In cases when release is appropriate or warranted, CBP generally issues an individual a Notice to Appear ("NTA") before an immigration judge ("IJ") prior to their release from custody. Although in some circumstances transfer of such noncitizens to U.S. Immigration and Customs Enforcement ("ICE") for detention for the duration of the credible fear process is possible, the ability to do so is dependent on the availability of space in ICE's already significantly strained detention network. Therefore, when ICE detention space is unavailable, noncitizens must then be processed by CBP through non-expedited removal pathways.

[21] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[22] From FY 2014 through 2019, of total SWB encounters processed for expedited removal and then referred to section 240 proceedings, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n.219; OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results). During that same period, 37 percent of SWB encounters processed for expedited removal claimed fear, and 76 percent of those who claimed fear were screened in and referred to section 240 removal proceedings. OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[23] In this preamble, consistent with the IFR, the Departments generally refer to protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") as "CAT protection." *See, e.g.,* 89 FR at 48716.

[24] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Data for immediate post-pandemic and IFR periods are limited to SWB encounters between POEs. The comprehensive screen-in rate includes positive determinations issued by U.S. Citizenship and Immigration Services ("USCIS"), cases where an IJ vacated USCIS's negative determination, and cases administratively closed by USCIS in which a discretionary NTA was issued. For cases processed under either the Circumvention of Lawful Pathways rule or the IFR, the comprehensive screen-in rate encompasses cases where USCIS or an IJ determined that the noncitizen was found not subject to the Circumvention of Lawful Pathways rule's rebuttable presumption or the IFR's limitation on asylum eligibility under the significant possibility standard, in addition to cases screened-in under the "reasonable possibility" or "reasonable probability" standards, as applicable.

[25] OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab, Line 9 divided by Line 8). Data are limited to SWB encounters between POEs.

[26] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab). Data are limited to SWB encounters between POEs.

[27] OHSS analysis of July 2024 Persist Dataset (Fear Screening—CLP tab, Line 13 divided by Line 12). Data are limited to SWB encounters between POEs.

[28] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Although in the preamble to the IFR, DHS anticipated that the manifestation approach "will likely lead to a higher proportion of those referred having colorable claims for protection[,]" *see* 89 FR at 48743, USCIS screen-in rates have dropped slightly, as noted above, *see* OHSS analysis of June 2024 Enforcement Lifecycle dataset, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Historic ERCF Results, Fear Screening—STB, and Fear Screening—CLP tabs). There could be multiple reasons for this development, including the effects of the "manifestation" and "reasonable probability" provisions, which are difficult to disentangle.

STB_AR1_000005

aligns with the percentage of noncitizens who have historically been granted protection or relief. That is to say, noncitizens screened under the higher "reasonable probability" standard that receive positive findings are more likely to have meritorious claims in ultimate adjudications.

As a result of the IFR, DHS is able to more quickly remove a greater percentage of those who do not have a legal basis to remain in the United States. In the pre-pandemic period, the median processing time for a noncitizen encountered by USBP with a negative fear determination in expedited removal was 75 days from encounter to removal.[29] During the immediate post-pandemic period, this metric dropped to 44 days.[30] From June 5, 2024, through August 31, 2024, the metric dropped again to 32 days.[31] Similarly, the processing time from when a noncitizen is referred for a credible fear interview to when the noncitizen receives a fear determination is down 58 percent compared to the immediate post-pandemic period and down 71 percent compared to the pandemic period.[32] The Departments attribute the decreased processing time to key provisions of the IFR. For instance, the manifestation of fear provision has resulted in streamlined processing and a lower percentage of individuals indicating fear, thereby shortening the average processing time as those who do not indicate fear do not receive a screening by an AO or review by an IJ prior to removal. Then, for those who indicate fear, following a minimum consultation period that DHS reduced through separate guidance,[33] AOs, supervisory

AOs, and IJs have been applying the IFR's reasonable probability screening standard. In addition, between June 5, 2024, and August 31, 2024, 32 percent of all noncitizens encountered at the SWB were removed or returned to their home country or to Mexico directly from USBP custody.[34] This is double the rate of repatriations from USBP custody (16 percent) that occurred during the immediate post-pandemic period.[35] Overall, from June 5, 2024, through August 31, 2024, DHS has removed or returned 70 percent of single adults and individuals in family units encountered by USBP.[36] This contrasts with a 28-percent rate during the immediate post-pandemic period.[37] Viewed in terms of daily averages, under the IFR through August 31, 2024, there have been about 1,880 daily encounters of single adults and individuals in family units.[38] And DHS has averaged about 1,320 total daily repatriations and 580 releases from CBP custody pending immigration proceedings over that time frame.[39]

Faster repatriations free up DHS resources and capacity for processing new arrivals, allowing for further increases in the use of expedited removal and fewer releases pending completion of section 240 removal proceedings. These successes disrupt the "vicious cycle" the Departments sought to counteract in issuing the IFR. 89 FR at 48714; *see id.* at 48751 ("This reality contributes to the vicious cycle . . . in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are

encountered at the border will be allowed to remain and work in the United States for long periods of time.").

Meanwhile, noncitizens have continued to use lawful, safe, and orderly pathways and processes to seek entry to the United States. For example, the use of the CBP One mobile application ("CBP One app") to schedule an appointment at a SWB POE is an available tool that permits noncitizens to present themselves at the border in a lawful, safe, and orderly manner. From June 5, 2024, through August 31, 2024, approximately 123,500 noncitizens with CBP One appointments presented at SWB POEs and were accordingly processed outside of the procedures set forth in the IFR.[40] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); section 3(b)(v)(D) of the Proclamation. During the pre-pandemic period, approximately 300 encounters were processed at SWB POEs per day.[41] Since the launch of the CBP One app in January 2023, approximately 1,500 encounters have been processed at SWB POEs each day (with and without CBP One appointments).[42] And from the start of FY 2024 through August 31, 2024, that average increased to approximately 1,700 per day.[43] Other lawful pathways that continue to be available include expanded parole processes for specific populations and demographics such as nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), which allow certain individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;[44] the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other services, access to information and referrals for humanitarian and family parole processes, labor pathways, expedited refugee processing, and other lawful, safe, and orderly pathways for eligible

---

[29] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Summary Statistics tab).

[30] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[31] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[32] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[33] The Immigration and Nationality Act ("INA") requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to [duly prescribed] regulations." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); *see* INA 103(a), 8 U.S.C. 1103(a); 6 U.S.C. 557. Under those regulations, including during circumstances in which the measures in the IFR apply, consultation shall be at no expense to the Government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, . . . and shall not unreasonably delay the process." 8 CFR 235.3(b)(4)(ii), 235.15(a). The regulations do not require that the noncitizen be allowed a particular amount of time to consult with the person or persons of their choosing. *Id.* On June 4, 2024, to support implementation of the

Proclamation and IFR, as a matter of internal policy, USCIS reduced the minimum consultation period for noncitizens subject to the rule's provisions from at least 24 hours to at least 4 hours beginning at the time ICE or CBP provides the noncitizen with the opportunity to consult and continuing only during the hours of 7 a.m. and 7 p.m. local time. *See* Memorandum for Jennifer B. Higgins, Deputy Dir., USCIS, from Ted Kim, Assoc. Dir., Refugee, Asylum, and Int'l Operations Directorate, USCIS, *Re: Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply* (June 4, 2024).

[34] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[35] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[36] DHS encountered 165,000 single adults and individuals in family units between June 4, 2024, and August 31, 2024, and had repatriated 119,000 of them as of September 3, 2024. OHSS analysis of data downloaded from UIP on Sept. 3, 2024 (IFR Details tab).

[37] During that time period, there were 1.87 million such encounters with noncitizens other than UCs, of which 511,000 noncitizens were repatriated. OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab).

[38] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (IFR Details tab).

[39] *Id.*

[40] *Id.*

[41] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[42] *Id.* On June 30, 2023, CBP announced the expansion of available appointments for noncitizens through the CBP One mobile application ("CBP One app") to 1,450 per day, up from 1,250. Cumulatively, the expansion to 1,450 appointments represented a nearly 50 percent increase from May 12, 2023, when CBP processed 1,000 appointments per day. *See* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[43] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[44] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last reviewed/updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

individuals to the United States and other countries;[45] country-specific family reunification parole processes for certain nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras who have qualifying U.S. citizen relatives in the United States;[46] and temporary nonimmigrant worker visas, which provide employment opportunities for eligible individuals.[47]

Thus, the provisions of the IFR and other measures taken to assist in the IFR's implementation are effective tools in managing levels of irregular migration that, absent key policy interventions like this rule, severely strain the Departments' abilities to safely, effectively, and humanely enforce and administer U.S. immigration laws. The historically high level of encounters that DHS experienced in the months before the IFR's implementation has decreased markedly, and DHS's ability to expeditiously process noncitizens and deliver swift consequences to those who do not establish a legal basis to remain in the United States has therefore improved significantly.

### B. Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the CAT. The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.[48]

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to certain other officers. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA grants the Secretary the authority to establish regulations and take other actions that the Secretary deems "necessary for carrying out" the Secretary's authority under the immigration laws. INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521(a). In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the immigration laws. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings. These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521(a); INA 103(g)(1), 8 U.S.C. 1103(g)(1); 8 CFR 1240.1. With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai,* 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Secretary and the Secretary share some authorities. Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[ ]" "requirements and procedures" to govern asylum applications. *Id.* The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[49] The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2); *see also, e.g.,* INA 235(b)(1)(B)(iii)(III), (B)(iv), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (B)(iv), (C).

The INA and HSA grant DHS the authority to adjudicate asylum applications and to conduct credible fear interviews and to make credible fear determinations in expedited removal proceedings, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(1), (a)(3), 8 U.S.C. 1103(a)(1), (a)(3); INA 208(b)(1)(A), (d)(1), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (d)(1), (d)(5)(B); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b)(3) (providing for the transfer of adjudication of asylum and

---

[45] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Aug. 23, 2024).

[46] *See* USCIS, *Family Reunification Parole Processes* (last reviewed/updated Sept. 10, 2024), *https://www.uscis.gov/FRP.*

[47] *See* USCIS, *Temporary (Nonimmigrant) Workers* (last reviewed/updated July 24, 2024), *https://www.uscis.gov/working-in-the-united-states/temporary-nonimmigrant-workers.*

[48] The Homeland Security Act of 2002 ("HSA") further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General." 116 Stat. at 2274 (codified at 6 U.S.C. 522).

[49] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS); 6 U.S.C. 557 (providing that references to any officer from whom functions are transferred under the HSA are to be understood as referring to the Secretary of Homeland Security. Within DHS, AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted, all of which are subject to review by a supervisory AO. *See* 8 CFR 208.2(a), 208.9, 208.14(b), 208.30(b), (e)(6)(i), (e)(8). The INA grants IJs the authority to review AO negative credible fear determinations. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (''Refugee Protocol''), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention''). Article 33.1 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning (''refouling'') ''a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.'' Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

Because the Refugee Protocol is not self-executing,[50] Congress implemented these non-refoulement obligations through the INA, as amended by the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 (''Refugee Act''). *See* 8 U.S.C. 1253(h) (1952); *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (describing the history of the statutory withholding provision and the Refugee Act amendments). The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (''statutory withholding of removal''), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one

of the protected grounds listed in Article 33 of the Refugee Convention.[51] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT, which is likewise not self-executing.[52] The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA'') delegates to the Departments the authority to ''prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681 (codified at 8 U.S.C. 1231 note). Consistent with FARRA, DHS and DOJ have implemented in the Code of Federal Regulations the United States' obligations under Article 3 of the CAT. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), amended by 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, although the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures. This recognition that section 212(f) does not affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades.[53] That

longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may ''suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.'' INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—''grants the President broad discretion,'' it ''operate[s]'' only within its ''sphere.'' *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled ''Inadmissible aliens''), generally ''defines the universe of aliens who are admissible'' and ''sets the boundaries of admissibility into the United States.'' *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend ''entry,'' it ''enabl[es] the President to supplement the other grounds of inadmissibility in the INA,'' *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[54] First enacted in the Refugee Act, the asylum statute today provides that ''[a]ny alien who is physically present in the United States or who arrives in the United States[,]

proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws[,]'' including ''expedited-removal proceedings'' where they could ''raise any claims for protection[.]'' *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations were understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (updated Feb. 21, 2024). At the same time, nothing in the proclamations or the INA has precluded the Departments from considering as an adverse discretionary criterion that a noncitizen is described in a section 212(f) proclamation.

[54] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States. *Cf., e.g., Sale,* 509 U.S. at 164 n.13, 174–77, 187–88 (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have ''extraterritorial application'' to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) ''does not allow the President to expressly override particular provisions of the INA[,]'' while emphasizing the particular ''sphere[ ]'' in which it operates.

---

[50] *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.'' (citations omitted)).

[51] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to ''facilitate the assimilation and naturalization of refugees[,]'' which the Court found aligned with the discretionary provision in section 208 of the INA, 8 U.S.C. 1158).

[52] *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) (''This multilateral treaty is non-self-executing and thus does not itself create any rights enforceable in U.S. courts.'' (citation omitted)).

[53] In 1984, then-Assistant Attorney General for the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that ''[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)]

. . . irrespective of such alien's status, may apply for asylum.'' INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is ''physically present'' or has ''arrive[d] in the United States.'' [55] *Id.* As a result, the power under section 212(f) to suspend ''entry'' does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[56]

This rule, as discussed in the IFR and this preamble, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 8 U.S.C. 1103(a)(1), (a)(3), (g); INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

### C. Changes From the IFR to Final Rule

The Departments issued the IFR, effective June 5, 2024, adopting provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuated three key changes to eligibility for asylum and the expedited removal process for noncitizens who are encountered at the southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June 3 Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances, that is considered during credible fear screenings in addition to its application during adjudications on the merits; (2) rather than asking specific questions of every noncitizen encountered and processed for expedited removal, providing general notice regarding the process for seeking asylum, statutory withholding of removal, or CAT protection and referring a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because they could not establish a significant possibility that they are not subject to or are exempt from the limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and CAT protection under a ''reasonable probability'' standard.

Following careful consideration of public comments received and the Departments' experiences implementing the IFR's provisions since early June 2024, the Departments have made

modifications to the regulatory text adopted in the IFR, as described below. The rationale for the provisions adopted in the IFR and the reasoning provided in the IFR's preamble remain valid, except as distinguished in this regulatory preamble.

### 1. Changes to the IFR's Thresholds

On September 27, 2024, the President issued a proclamation amending the June 3 Proclamation. *See* Presidential Proclamation of September 27, 2024, *Amending Proclamation 10773* (''September 27 Proclamation''). Following the issuance of the IFR, the Departments have closely monitored its implementation and results across the southern border. The Departments recommended to the President adjustments to the Proclamation based on their experiences implementing the Proclamation and IFR. Following those recommendations, the President issued the September 27 Proclamation, which amended section 2 of the June 3 Proclamation in two ways. First, section 2(a) of the June 3 Proclamation provided that the suspension and limitation on entry would be discontinued at 12:01 a.m. eastern time on the date that is 14-calendar-days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters between POEs. As amended by the September 27 Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters between POEs for 28-consecutive-calendar-days before the 14-calendar-day waiting period is triggered.[57] Second, the September 27 Proclamation deleted section 2(c) of the June 3 Proclamation, which provided that UCs [58] from non-contiguous countries shall not be included in calculating the number of encounters for purposes of section 2(a) and 2(b) of the June 3 Proclamation.

The Departments are implementing changes in this final rule that parallel those made in the September 27 Proclamation. Specifically, the Departments are revising §§ 208.13(g) and 1208.13(g) to refer to ''the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section.'' Paragraph (h) of each section now defines ''Presidential Proclamation of June 3, 2024'' as referring to

---

[55] Section 212(f) of the INA, 8 U.S.C. 1182(f), contrasts with 42 U.S.C. 265, which authorizes the Centers for Disease Control and Prevention (''CDC'') to temporarily suspend ''the right to introduce . . . persons and property'' into the United States if such suspension ''is required in the interest of the public health.'' During the COVID–19 pandemic and to prevent the ''serious danger of the introduction of [the] disease into the United States,'' 42 U.S.C. 265, the CDC issued a public health Order invoking section 265 to expel certain noncitizens generally without title 8 protections, including asylum applications. As the final rule implementing section 265 explained, that provision originates in a ''broad public health statute'' that Congress intended to ''operate[ ] separately and independently of the immigration power'' and authorizes the CDC ''to temporarily suspend the effect of any law[ ] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.,'' *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes*, 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265's predecessor was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit ''the introduction of persons'' in order to broaden this provision and that this provision subsumed but was not limited to the authority to ''suspend immigration[.]'' Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha*, 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC Order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public-health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[56] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for ''any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe[,]'' the Attorney General could issue regulations governing entry during such an emergency to ''deny [certain noncitizens] a hearing . . . in special cases'' notwithstanding the ordinary exclusion hearing

provisions governing entry). This does not mean, however, that the President is prohibited from invoking section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

[57] As an illustration, for any given day, DHS will calculate the average number of encounters for that day and the prior 6 calendar days *i.e.*, the 7-consecutive-calendar-day average. If that average remains below 1,500 for 28 consecutive calendar days, the 14-day waiting period will begin.

[58] In this preamble, as in the Proclamation, the terms ''unaccompanied children'' or ''UCs'' have the same meaning as the term ''unaccompanied alien child[ren]'' under 6 U.S.C. 279(g)(2).

STB_AR1_000009

"Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024[ ]" for the purpose of §§ 208.13(g), 208.35, and 235.15 (in the case of § 208.13(h)) and §§ 1208.13(g) and 1208.35 (in the case of § 1208.13(h)). The Departments are also making conforming changes in §§ 208.35, 235.15, and 1208.35. To ensure that the rule can function even if the September 27 Proclamation were rendered inoperative by court order, and consistent with the September 27 Proclamation, the Departments have also included a severability clause in both §§ 208.13(h) and 1208.13(h).

The Departments believe that shifting to the 28-consecutive-calendar-day requirement for this rule, in parallel with the changes made in the September 27 Proclamation, is necessary to ensure that the rule's measures discontinue only once there has been a durable and sustained decrease in encounters at the southern border such that the emergency border circumstances have in fact abated. Premature and frequent discontinuations of the rule's measures, as discussed below, would increase the risk of sizeable and disruptive surges and could undermine the message the Departments intend the rule to send, which is to discourage noncitizens from utilizing irregular migration and the services of smugglers and TCOs to enter the United States. In the IFR, the Departments explained that at 1,500 daily encounters between POEs, "DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries." 89 FR at 48752. The Departments further explained that "[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained." 89 FR at 48749 n.248. The changes made here further both purposes.

Requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters for 28 consecutive calendar days instead of one calendar day will guard against a circumstance in which the threshold for discontinuation is met solely due to a short-term, erratic decrease (such as a short-term holiday downturn [59] or a decrease due to an extreme weather event) that does not signal a meaningful reduction in overall migration pressures. Such short-term decreases could force the provisions of the rule to trigger on and off more frequently, causing operational strain while also signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided by waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing. Moreover, if the Departments had opted for a substantially smaller number of consecutive days, there is a significant risk that the rule would deactivate due to a transient drop due to holidays, weather, or another cause, which can lead to several weeks of uncharacteristically low encounters. At the same time, a 28-day period is still a short enough period to ensure a timely response when an actual, sustained downturn occurs. The Departments have therefore decided that 28 days strikes an appropriate balance.

The Departments' experience since the IFR's implementation has informed their view that the limited changes made by this rule are necessary to provide greater assurance that a decrease is likely to be sustained and to guard against costly toggling of the rule when a brief decrease proves not to be sustained. For one thing, this experience highlights the risk that under an approach that looks only to a 7-consecutive-calendar-day average, the rule might discontinue even though a reduction is unlikely to be sustained. Comparing the week ending June 4, 2024, to the week ending August 31, 2024, the Departments observed (as expected) a significant decrease in encounters at the southern border, but Mexico's government reported a much smaller decrease in encounters within Mexico.[60] This trend suggests that even

though the IFR has affected incentives for migrants to try to cross the U.S. border, migrants continue to travel towards the U.S. border in large numbers, and that even if the 7-consecutive-calendar-day average dropped below 1,500 encounters, that drop likely would not be sustained given the large and growing population of migrants in Mexico who could relatively quickly reach the U.S. border. Moreover, if the IFR's provisions did deactivate, that large and growing population in Mexico would be a ready target for smugglers and TCOs, increasing the risk of a surge following a discontinuation that does not reflect a truly sustained decrease in migration flows.

Adding this rule's 28-consecutive-day requirement reduces those concerns by providing for greater stability. With that change, the rule's provisions will not be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the IFR's 14-day waiting period after the Secretary makes the factual determination necessary to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy. Although the Departments recognize that this change does not eliminate the risk of the rule discontinuing even when regional migration flows remain high, they assess that this rule's approach better balances this risk against this rule's purpose as an exceptional measure to address emergency border circumstances that should not apply when encounters have fallen for a sustained period. The Departments further discuss later in this subsection why the rule's approach appropriately balances those considerations.

The Departments' concern is also consistent with some of the public comments received on the IFR. For instance, one commenter remarked that some migrants had concluded that they should congregate near the border in preparation for the Proclamation and IFR's measures to discontinue. Other commenters expressed concern regarding potential misunderstandings about the threshold for discontinuation. Given the reality that a surge remains possible, the Departments seek to avoid a situation where the emergency

---

[59] Short-term decreases that are not associated with changes in the fundamental drivers of migration have been especially notable during the end-of-year holiday season. From FY 2013 through FY 2024, SWB encounters fell by an average of 42 percent in the two weeks between December 23 and January 5, only to be followed by an average

increase of 41 percent in the two weeks between January 5 and January 18. *See* OHSS analysis of July 2024 Persist Dataset (USBP Encounters—Holiday Dip tab). Although the January rebound was less dramatic in 2023 and 2024, this historic pattern suggests that if average encounters heading into the holidays are even as low as the mid-2000s—well above the intended threshold for discontinuation of emergency circumstances—a short-term decrease could push the 7-day average number of encounters below 1,500 even though the fundamental drivers of high levels of migration have not changed. A metric based on a 7-day average would trigger a discontinuation of emergency circumstances in this scenario, but the likely January rebound means a 28-day metric would not.

[60] *See* OHSS analysis of data downloaded from UIP on September 3, 2024, and data provided by the Government of Mexico as of August 31, 2024 (Mexican Enforcement tab) (showing that comparing the week ending June 4, 2024, to the week ending August 31, 2024, total Mexican

enforcement apprehensions dropped 19 percent, while total U.S. Border Patrol ("USBP") encounters dropped 48 percent).

STB_AR1_000010

measures in this rule are discontinued prematurely.

The Departments note that the existing 14-day waiting period before discontinuation once this threshold is reached will continue to help the Departments complete processing of noncitizens encountered during emergency border circumstances and to confirm that a sustained downward trend in encounters has been achieved. *See* 89 FR at 48749 n.248. At the same time, under the prior standard for discontinuation, a rapid shift between discontinuing and reactivating the rule's provisions would remain possible.[61] Such a shift would pose significant operational challenges.

Experience with the IFR suggests that rapidly switching between the rule's provisions discontinuing and reactivating would result in harmful operational burdens. For instance, upon implementation of the Proclamation and IFR, the Departments had to prioritize processing of individuals encountered prior to June 5. Therefore, USBP was unable to immediately maximize processing of the desired number of noncitizens through expedited removals.[62] USBP took 6 days to ramp up processing for expedited removal under the IFR, from about 60 encounters processed under the rule on June 5 to about 1,500 on June 10, which was the first day that a majority of encounters were processed for expedited removal under the rule.[63] Similarly, USBP released an average of about 930 post-June 4 encounters per day between June 5 and June 17, including 8 days of over 1,000 releases, before releases fell to an average of about 510 per day between June 18 and August 31, including an average of about 410 per day in August.[64] And although ICE repatriated approximately 38,500 single adults and members of family units from June 5 through July 31, 2024, only around

15,400 (40 percent) of them were encountered by USBP after June 4, 2024.[65] The rest were pre-June 5th USBP SWB encounters and pre- and post-June 5th Office of Field Operations ("OFO") encounters (39 percent) or non-SWB encounters and interior enforcement (21 percent).[66] USCIS did not complete its first credible fear interview under the IFR until June 9, 2024, and completed an average of about 20 interviews per day for the first two weeks after June 4, compared to an average of roughly 330 per day in the month of August.[67] EOIR did not conduct its first review of an adverse credible fear determination under the IFR until June 11, 2024, and averaged approximately 9 reviews per day in the first 3 weeks after June 4 compared to an average of about 90 per day in August.[68] The lag between the rule's activation and the Departments' ability to fully avail themselves of the rule's efficiencies means that when the provisions of the rule discontinue and then reactivate, the Departments' abilities to deliver timely decisions and consequences consistent with the rule's purpose may be unnecessarily impaired.

In addition, although the Departments continue to believe that the burden of shifting between applying this rule and the Circumvention of Lawful Pathways rule is warranted when there has been a sustained reduction in irregular migration, such a burden is much harder to justify in the context of a short-lived reduction in encounters followed by very high levels of encounters. For instance, USCIS required time to provide training, procedures, and guidance to the field before its staff could process credible fear referrals under the IFR. Additionally, EOIR required time to ensure IJs have sufficient docket capacity for any increase in credible fear reviews in response to any increased number of expedited removal cases. EOIR also required time to provide training to IJs who conduct credible fear reviews or who adjudicate cases involving individuals who enter the United States while the Proclamation and rule are in effect. To be sure, subsequent reactivation of the rule's measures will be easier given that the Departments' personnel will have become familiar with the rule's provisions. Nonetheless, reactivation will always require resources and

coordination within the workforce necessitating the need to ensure that discontinuations and reactivations do not occur with undue frequency.[69]

The Departments have also determined that it is appropriate and necessary to include UCs from non-contiguous countries in the encounter calculations relevant to discontinuing and continuing or reactivating the provisions of this rule, in parallel with the changes made in the September 27 Proclamation. Under the June 3 Proclamation and the IFR, the thresholds for such discontinuation and continuation or reactivation did not include encounters of such UCs. But as some commenters on the IFR correctly noted, excluding such encounters results in an unrealistic assessment of the Departments' resources and capabilities. All UCs (regardless of whether they came from a contiguous country or a non-contiguous country) require a greater proportion of resources to process and hold safely in CBP facilities and merit inclusion in the threshold calculations to accurately reflect this reality. For example, UCs in CBP custody generally must be referred to the Department of Health and Human Services' Office of Refugee Resettlement and transferred to its care within 72 hours after determining that the noncitizen is a UC, absent exceptional circumstances. 8 U.S.C. 1232(b)(3); *see also* 6 U.S.C. 279. Because of this, UCs are generally prioritized for processing in CBP facilities. The processing and treatment of UCs also include a number of other unique legal and policy requirements, such as conducting a thorough screening for trafficking and any claims of fear of return.[70] During their time in custody, UCs receive medical screenings and child-appropriate activities and humanitarian supplies. They also must generally be held separately from unrelated adults, impacting CBP's holding capacity. This means that DHS must expend resources to quickly process, refer, and transfer UCs to the Office of Refugee Resettlement's care. This time-consuming and resource-intensive process must always be followed for

---

[61] From FY 2013 through FY 2019, there were 2,014 days where the 7-consecutive-calendar-day average of USBP encounters (including encounters of UCs from non-contiguous countries) was below 1,500. OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab). Of those 2,014 days, 1,813 days (90 percent of the total) were also part of a period of time when the 7-consecutive-calendar-day average had remained below 1,500 for 28 consecutive days. *Id.* Thus, considering hypothetical lower-bound thresholds for the period FY 2013 through FY 2019, switching from the IFR's approach to this rule's approach would have reduced the number of below-threshold days by only 10 percent. *Id.* While it is too early in the post-IFR period to know the precise reduction in volatility it has brought about, requiring the 7-day average to remain below 1,500 encounters for 28 consecutive days may have a broadly similar effect.

[62] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[63] *Id.*

[64] *Id.*

[65] OHSS analysis of July 2024 Persist Dataset (IFR Ramp Up tab).

[66] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[67] *Id.*

[68] *Id.*

[69] The Departments acknowledge that they have not made a similar change to require 28 consecutive days of a 7-day average of encounters above 2,500 for the rule's provisions to be reactivated. The absence of a similar requirement prior to reactivation reflects the operational exigencies in a circumstance where there was a 7-consecutive-calendar-day average of more than 2,500 encounters. *See* 89 FR at 48749 n.248. The Departments have determined that those operational exigencies require the rule's provisions to be reactivated and outweigh the resources and coordination that reactivation requires.

[70] *See* 8 U.S.C. 1232(a)(2)(A)(ii).

UCs encountered at the southern border, regardless of whether emergency border circumstances are present.

In addition, UCs who are nationals or habitual residents of a contiguous country may, in certain circumstances, be permitted to withdraw their applications for admission and voluntarily return to their respective countries of nationality or habitual residence. *See* 8 U.S.C. 1232(a)(2). To determine whether such an outcome is permissible, such UCs are screened for indicators of trafficking or credible evidence that they are at risk of being trafficked upon return, whether they are able to make an independent decision to withdraw their applications, and whether they have any fear of return owing to a credible fear of persecution. *See* 8 U.S.C. 1232(a)(2)(A), (a)(4). However, as a matter of longstanding policy, CBP screens all UCs—even those from non-contiguous countries—in this manner.

Because one of the primary purposes of the rule is to alleviate undue strain on the limited resources of the border security and immigration systems, the Departments found that they must consider the operational burden that results from all UC encounters at the border. That is why UC encounters from all countries, not just from contiguous countries, should be considered by the Secretary when making a factual determination that average daily encounters at the southern border have exceeded or fallen below the requisite thresholds contained in the rule and the Proclamation.

Also informing the Departments' decision to reconsider the IFR's approach is that in recent months, encounters of UCs from non-contiguous countries have grown relative to other encounters. That growth, which adds operational burdens separate from those inherent in the processing of individuals for expedited removal, increases the distorting effects of excluding these UCs. Specifically, the Departments had observed from June 2023 through May 2024 that rates of encounters of UCs from non-contiguous countries had generally accounted for about 6.5 percent of total encounters of all non-contiguous nationalities, and comprised about 15 percent of encounters of nationals of El Salvador, Guatemala, and Honduras.[71] However, while encounters of UCs from non-contiguous countries have decreased in absolute terms since June 2024, such

encounters have not decreased in proportion with the decreases seen among single adults and individuals in family units. Rather, the UCs' share of total non-contiguous encounters has increased to 8.9 percent, including 24 percent of all encounters of nationals of El Salvador, Guatemala, and Honduras.[72] As a result, the share of total encounters attributable to UCs from non-contiguous countries increased from 4.6 percent from June 2023 to May 2024 to 6.4 percent from June 2024 to August 2024, and the share of all UCs increased from 6.2 percent to 9.4 percent.[73]

With the two changes just described, the rule will continue to serve the purposes that the IFR pursued from the start. First, the rule continues to target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered; Section III.D.1 of this preamble describes why the rule's thresholds continue to reflect those circumstances, accounting for the inclusion of UCs from non-contiguous countries.

Second, the rule will continue to deactivate when a decrease in encounters means that those emergency border circumstances no longer exist. Although the change to require that the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive days appropriately ensures that the rule does not deactivate prematurely, the rule will continue to deactivate where a decrease is likely to be genuinely sustained. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as natural disasters, economic changes, and political instability. However, the Departments believe, based on past experience, that the Departments may experience an average daily encounter rate below 1,500 for 28 consecutive days. In fact, from FY 2013 through FY 2019, the 7-consecutive-calendar-day USBP encounter average was below 1,500 encounters for 28 consecutive days 71 percent of the

time.[74] Even since the IFR was promulgated, encounters have dropped to levels indicating that the threshold in section 2(a) of the Proclamation will be met if migration dynamics change for a sustained period. If, consistent with the June 3 Proclamation, one excludes UCs from non-contiguous countries, the Departments have observed 40 separate days between June 5, 2024, and August 31, 2024, with encounters within 15 percent of 1,500 (*i.e.,* below 1,725).[75] And if, consistent with the September 27 Proclamation, one includes such UCs, the Departments have observed 15 such days.[76] These single-day figures suggest that the threshold for discontinuation, as revised, will be met if migration dynamics change for a sustained period.

### 2. Clarifying Changes to Regulatory Text

This final rule also makes clarifying changes to the regulatory text. In §§ 208.35(b)(2) and 1208.35(b)(2)(iii), the Departments removed from the definition of ''reasonable probability'' the clause: ''that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.'' The Departments believe that the remaining definition of ''reasonable probability''—''substantially more than a reasonable possibility, but somewhat less than more likely than not''— accurately defines the reasonable probability standard. The deleted clause describes what the AO or IJ is assessing for rather than what the standard means, so it need not be part of the standard's definition.

### 3. Other Technical Changes

The final rule also implements two technical changes. First, the rule replaces the term ''alien'' with ''noncitizen'' where it appears in 8 CFR 1208.35. *See* 8 CFR 1001.1(gg). Second, the rule amends 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) as well as the provisions of the Circumvention of Lawful Pathways rule at 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) to update the cross-references to the definition of ''victim of a severe form of trafficking in persons.'' Specifically, the rule replaces the cross-references to 8

---

[71] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[72] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab). While the monthly average single adult encounters fell 53 percent between June 2023–May 2024 and June 2024–August 2024, and the monthly average number of encounters of individuals in family units fell 69 percent, encounters of non-contiguous UCs fell just 42 percent and encounters of UCs overall fell just 37 percent. *Id.*

[73] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam status tab).

[74] *See* OHSS analysis of July 2024 OHSS Persist Dataset (Trigger Analysis tab). The Departments rely on data from FY 2013 through FY 2019 and not data from the pandemic period given the unique circumstances dictating migratory trends during the latter time.

[75] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters tab).

[76] *See id.*

STB_AR1_000012

CFR 214.11 with cross-references to 8 CFR 214.201. This change recognizes that on August 28, 2024, after the Departments published the IFR, DHS's rule Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status, 89 FR 34864 (Apr. 30, 2024),[77] became effective, which moved the definition of "victim of a severe form of trafficking in persons" from § 214.11 to § 214.201. *See id.* at 34931–32.

*D. Rule Provisions*

The rule contains the following key provisions:

• The rule applies to certain individuals who seek asylum, statutory withholding of removal, or CAT protection during emergency border circumstances giving rise to this rule and to the suspension and limitation on entry under the June 3 Proclamation, as amended by the September 27 Proclamation. *See* 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35.

• The rule establishes that those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Exceptionally compelling circumstances may also be established for noncitizens in section 240 removal proceedings or the asylum merits interview ("AMI") process under specified conditions to ensure family unity. *See* 8 CFR 208.35(c), 1208.35(c).

• The rule also establishes that, during emergency border circumstances, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the June 3 Proclamation, DHS will provide general notice regarding the process for seeking

asylum, statutory withholding of removal, and protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to their country or the country of removal. *See* 8 CFR 235.15.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet an exception. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The "reasonable probability" standard is defined to mean substantially more than a "reasonable possibility" but somewhat less than more likely than not. 8 CFR 208.35(b), 1208.35(b).

*E. Severability*

As stated in 8 CFR 208.13(h), 208.35(b)(3), 208.35(e), 235.15(g), 1208.13(h), 1208.35(b)(4), and 1208.35(e), the Departments intend for the provisions of the rule to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the other provisions will remain in effect as to any other person or circumstance.[78] *See* 89 FR at 48757–59. During emergency border circumstances, the Departments' abilities to refer and safely process noncitizens through expedited removal is overwhelmed and prevents the border security and immigration systems from delivering timely decisions and consequences to noncitizens arriving at the southern border. *See* 89 FR at 48714. Consequently, each provision of the rule

is designed to function sensibly without the others, and the Departments intend for them to be severable so that each can operate independently.

For example, the Departments intend for the "reasonable probability" screening standard to be used—even in the absence of a limitation on asylum eligibility, the manifestation of fear procedures, or the Proclamation—to screen for statutory withholding of removal and CAT protection claims if a noncitizen was otherwise unable to establish a credible fear of persecution for asylum purposes due to the Lawful Pathways rebuttable presumption. 8 CFR 208.35(b)(3), 1208.35(b)(4); *see* 8 CFR 208.35(b)(2), (e), 1208.35(b)(2), (e), 235.15(g); 89 FR at 48757. That approach ensures that, during emergency border circumstances, the Departments will continue to be able to benefit from the higher screening standard, even without the limitation on asylum eligibility this rule adopts.

To maintain operational flexibility, DHS similarly intends for manifestation of fear procedures under 8 CFR 235.15 to remain in effect, even without a limitation on asylum eligibility, the reasonable probability standard, or the Proclamation. *See* 8 CFR 235.15(g). As with the reasonable probability standard, allowing for the continued use of the manifestation of fear provisions absent the other portions of the rule or Proclamation ensures that such a tool remains available to the Departments during emergency border circumstances.

Finally, the Departments intend for the limitation on asylum eligibility to be severable from the manifestation of fear procedures, the reasonable probability standard, and the Proclamation because the limitation on asylum eligibility operates independently of those provisions and the Proclamation, and in the absence of those tools would likewise continue to be an important tool for addressing emergency border circumstances at the southern border. *See* 8 CFR 208.35(e), 1208.35(e).

**III. Public Comments and Responses**

The Departments received 1,067 comments on the IFR, the majority of which expressed opposition. A range of governmental and non-governmental entities, public officials, and private persons submitted comments. The Departments summarize and respond to the public comments below.

*A. Legal Authority and Background*

1. Legality Concerns

a. General Comments on Domestic Law

*Comment:* Commenters asserted that the rule violates domestic law and

---

[77] *See also* 89 FR 68081 (Aug. 23, 2024) (making corrections).

[78] Courts have uniformly held that the Administrative Procedure Act ("APA"), 5 U.S.C. 706(2), authorizes courts to sever and set aside "only the offending parts of the rule." *Carlson* v. *Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.*, 486 U.S. 281, 294 (1988).

emphasized that U.S. law allows noncitizens to apply for asylum regardless of where they entered the United States. Some commenters described a fundamental right to apply for asylum for anyone inside the United States and stated that analysis of an asylum application should focus on the applicant's reasonable fear of persecution rather than manner of entry, criticizing what a commenter characterized as a categorical exclusion of those "apprehended between ports of entry from asylum eligibility, barring narrow exceptions." Commenters asserted that entering the United States either through a POE or across the southern border between POEs and asking for asylum constitutes a "lawful pathway." Other commenters stated that the Departments should not and cannot categorically deny asylum for reasons unrelated to the merits of the claim itself. One commenter claimed that the rule effectively closes the border and asserted that closing the border is unconstitutional.

Although some commenters agreed that the rule is within the scope of the Departments' authority and is consistent with the INA, other commenters claimed that the rule would violate the Refugee Act of 1980 and the INA, specifically section 208 of the INA, 8 U.S.C. 1158. Commenters claimed that the rule conflicts with the plain language of these provisions, which permit a noncitizen "physically present in the United States" to apply for asylum. Refugee Act of 1980, 94 Stat. at 105; INA 208(a)(1), 8 U.S.C. 1158(a)(1). Commenters asserted that the INA does not require those seeking protection to apply before entering or at a POE or to schedule an appointment through a website or app in order to make an application, but instead allows applications from anywhere along the border. Commenters also stated that, although Congress gave the Attorney General and the Secretary authority to impose additional limitations on asylum eligibility, such limitations must be consistent with legislation and congressional intent. Along the same lines, a commenter stated that the IFR undermines the separation of powers between Congress and the Executive Branch because it is Congress, not the Executive Branch, that enacts laws, and the IFR rewrites the INA.

*Response:* The Departments disagree that this rule is inconsistent with U.S. law or congressional intent. The rule does not effectively close the border, require the Departments to turn away migrants at the southern border, or categorically deny all asylum applications filed by noncitizens who

enter the United States across the southern border. Nor does the rule prohibit any noncitizen from seeking protection solely because of the manner or location of their entry into the United States. Rather, the rule is a limitation on asylum eligibility, as authorized by sections 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), and the Departments' other discretionary authorities, *e.g.,* sections 103(a)(3), (g)(2), and 208(b)(1)(A) of the INA, 8 U.S.C. 1103(a)(3), (g)(2), and 1158(b)(1)(A). Given these authorities for the Departments to act, the Departments disagree that the IFR (or the final rule) violates the principle of separation of powers.

The rule's limitation on asylum eligibility does not prevent anyone from pursuing a claim for asylum, nor does it categorically foreclose eligibility for asylum. The Departments have authority to impose limitations on asylum eligibility. As explained above, the INA authorizes the Secretary and the Attorney General to establish, by regulation, "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]"). And section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), authorizes the Secretary or the Attorney General to grant asylum in their discretion. The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 235(b)(1)(B)(iii)(III), (B)(iv), (C), 241(a)(3), (d)(2)(B), 8 U.S.C. 1103(a)(3), (g)(2), 1225(b)(1)(B)(iii)(III), (B)(iv), (C), 1231(a)(3), (d)(2)(B); *see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A).

Consistent with these authorities, the Departments have promulgated other limitations or conditions on asylum eligibility, including some provisions that Congress later adopted and codified in the INA. *See* Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) (imposing firm resettlement bar); Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674,

30678, 30683 (July 27, 1990) (promulgating 8 CFR 208.14(c) (1990), which provided for mandatory regulatory bars to asylum for those convicted in the United States of a particularly serious crime or those who constitute a danger to the security of the United States while retaining a prior regulatory bar to asylum for noncitizens who were firmly resettled in a third country prior to arriving in the United States); Asylum Procedures, 65 FR 76121, 76134 (Dec. 6, 2000) (providing that an applicant does not have a well-founded fear of persecution if they could avoid persecution by internally relocating); *see also, e.g., Afriyie* v. *Holder,* 613 F.3d 924, 934–36 (9th Cir. 2010) (discussing internal relocation), *overruled on other grounds by Bringas-Rodriguez* v. *Sessions,* 850 F.3d 1051 (9th Cir. 2017) (en banc); *Yang* v. *INS,* 79 F.3d 932, 935–36 (9th Cir. 1996) (holding that the regulatory firm resettlement limitation was a permissible exercise of the Attorney General's authority under the asylum statute). Restraining the Departments' authority to promulgate additional limitations and conditions on the ability to establish eligibility for asylum consistent with section 208 of the INA, 8 U.S.C. 1158, would be contrary to Congress' intent that the Departments' only constraint be that additional limitations and conditions are consistent with section 208, 8 U.S.C. 1158, and "this chapter." INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B); *see also DHS* v. *Thuraissigiam,* 591 U.S. 103, 112 (2020) (recognizing that the "theme" of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") "was to protect the Executive's discretion from undue interference by the courts" (alteration and internal quotation marks omitted)); *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 (10th Cir. 2017) (reasoning that the "delegation of authority" in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)); *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 444–45 (1987); Circumvention of Lawful Pathways, 88 FR 11704, 11740 (Feb. 23, 2023).

The rule is within the scope of the Departments' authority and does not conflict with the statutory requirement that noncitizens "physically present in the United States" be permitted to apply for asylum because it adds a limitation on asylum eligibility as permitted under section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and

(d)(5)(B). The limitation is not a sweeping categorical bar that would preclude a grant of asylum solely based on manner of entry, which some courts have found to conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). *E.g., East Bay Sanctuary Covenant* v. *Biden (East Bay III),* 993 F.3d 640, 669–70 (9th Cir. 2021) (concluding that a prior regulation that enacted a bar on asylum eligibility for those who entered the United States between designated POEs was "effectively a categorical ban" on migrants based on their method of entering the United States, in conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)).

Under this rule—and contrary to commenter assertions—manner of entry alone is never dispositive. Rather, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Specifically, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established, or shown exceptionally compelling circumstances, when it is essential that noncitizens use such pathways to ensure the Government's ability to manage the border.

Limitations and conditions on asylum eligibility do not need to directly relate to whether a noncitizen satisfies the definition of a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A), but instead can embrace policy considerations that justify a finding of ineligibility. *See, e.g., Zheng* v. *Mukasey,* 509 F.3d 869, 871 (8th Cir. 2007) (noting that IIRIRA included several provisions, including the one-year bar, "intended to reduce delays and curb perceived abuses in removal proceedings"); *Ali* v. *Reno,* 237 F.3d 591, 594 (6th Cir. 2001) (recognizing that asylum law "was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives" (internal quotation marks and citation omitted));

*Matter of Negusie,* 28 I&N Dec. 120, 125 (A.G. 2020) (discussing the persecutor bar, and noting that Congress intended to make "certain forms of immigration relief," including asylum, "unavailable to persecutors"), *stayed by Matter of Negusie,* 28 I&N Dec. 399, 399 (A.G. 2021); *Singh* v. *Nelson,* 623 F. Supp. 545, 556 (S.D.N.Y. 1985) ("[A]ttempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories" of noncitizens who are not lawfully present.).

In sum, as with other conditions and limitations imposed by section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with meritorious asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that will overwhelm the Departments' ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. In seeking to enhance the overall functioning of the immigration system and to improve processing of asylum applications, the Departments are, in the exercise of their authority to promulgate limitations on asylum eligibility and in recognition of the limited resources provided by Congress, electing to implement a limitation on asylum eligibility that places greater weight on manner of entry. This limitation on asylum eligibility is expected to disincentivize irregular migration by those unlikely to establish exceptionally compelling circumstances during times when encounters exceed certain benchmarks and therefore challenge the Departments' ability to swiftly process single adults and individuals in family units encountered by USBP at the SWB through expedited removal. See Section II.A.2 of this preamble for further discussion of the Departments' experience with the IFR.

*Comment:* Commenters claim that the rule violates the principles of non-refoulement and nondiscrimination in the Refugee Act and other U.S. laws. Some commenters claimed the rule conflicts with congressional intent to create a uniform procedure for noncitizens applying for asylum regardless of manner of entry.

*Response:* The Departments disagree that the rule conflicts with U.S. law or congressional intent. The rule does not violate the principles of non-refoulement and nondiscrimination. And the rule does not conflict with what commenters describe as a congressional intent to create a uniform

procedure for noncitizens applying for asylum. *See Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 258 (3d Cir. 2017). The Departments may create additional substantive limitations and conditions on asylum eligibility—as Congress itself has done, and as Congress expressly authorized the Departments to do. INA 208(b)(2)(A), (b)(2)(C), 8 U.S.C. 1158(b)(2)(A), (b)(2)(C). Moreover, all noncitizens to whom the rule applies are subject to the same procedures for adjudicating their asylum claims as those who are not subject to the rule. The United States has implemented its non-refoulement obligations through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (which is referred to as statutory withholding of removal) and the regulations implementing U.S. obligations under Article 3 of the CAT at 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, and 1208.18. The INA's provision in section 208, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., Cardoza-Fonseca,* 480 U.S. at 441.

*Comment:* Commenters asserted that, under *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), manner of entry may not be the dispositive factor in deciding whether a noncitizen is eligible for asylum. Similarly, commenters argued that *Matter of Pula* is binding precedent and precludes consideration of manner of entry over all other factors. A commenter claimed that manner of entry can only be considered in determining whether a noncitizen merits asylum as a matter of discretion and not in determining whether the noncitizen is eligible for asylum.

*Response:* The rule is consistent with historical consideration of manner of entry as a relevant factor in considering whether to grant asylum as a matter of discretion. In *Matter of Pula,* the BIA identified—as relevant factors as to whether a noncitizen warrants the favorable exercise of discretion in granting asylum—the noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry"; whether they "passed through any other countries or arrived in the United States directly"; "whether orderly refugee procedures were in fact available to help" in any transit countries; and whether they "made any attempts to seek asylum before coming to the United States." 19 I&N Dec. at 473–74. The BIA explained that section 208(a) of the INA, 8 U.S.C. 1158(a), required the Attorney General to establish procedures for adjudicating

STB_AR1_000015

applications filed by any noncitizen, "irrespective of such alien's status," but the BIA did not preclude consideration of the manner of entry in assessing whether to grant asylum. *Id.* at 473. The BIA also stated that while the manner of entry could "be a serious adverse factor, . . . it should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Id.* at 473. The BIA cautioned against placing "too much emphasis on the circumvention of orderly refugee procedures" as "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id.* at 473–74.

While the Departments acknowledge that the rule places greater weight on manner of entry under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. Both how much weight to place on that factor and whether to do so in weighing asylum eligibility fall well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) (government can rely on rulemaking to "resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority" (quoting *Am. Hosp. Ass'n* v. *NLRB,* 499 U.S. 606, 612 (1991)); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993) (noting that INS need not "forswear use of reasonable presumptions and generic rules" even where the statute "requires some level of individualized determination" (citations and quotation marks omitted)).

Under this rule, manner of entry, standing alone, is never dispositive. Rather, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States has established when it is essential that noncitizens use such pathways to ensure the United States' ability to manage the border. And even during these situations, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was

a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

In line with *Matter of Pula,* then, the rule considers factors other than manner of entry. And, like *Matter of Pula,* this rule provides for consideration of manner of entry in assessing eligibility for some asylum seekers in "a way that the practical effect is" not "to deny relief in virtually all cases." 19 I&N Dec. at 473. Rather, the manner of entry reduces the availability of relief only in limited circumstances—during emergency border circumstances described in the Proclamation and this rule—and only for those unable to establish exceptionally compelling circumstances.

The Departments also recognize that the specific analysis discussed in *Matter of Pula* (considering manner of entry in the discretionary decision of whether to grant asylum) is distinct from how this rule considers manner of entry (as part of provisions governing asylum eligibility). *See* 19 I&N Dec. at 472. The Departments, in exercising their broad discretion to issue regulations adopting additional limitations on asylum eligibility, are not bound to consider manner of entry only as a factor contributing to whether a particular noncitizen warrants a favorable exercise of discretion. While *Matter of Pula* allows manner of entry to be one factor in the consideration of whether a noncitizen merits a grant of asylum as a matter of discretion, it does not purport to restrict the Departments from considering a noncitizen's manner of entry in assessing eligibility. *Id.* at 473–74.

Moreover, while *Matter of Pula* considered manner of entry for purposes of a discretionary grant whereas the rule considers manner of entry as a limitation on asylum eligibility, adjudicators are not precluded from considering the same facts when evaluating both eligibility and discretion. Indeed, it is possible for a single fact to be relevant to both determinations. *See Kankamalage* v. *INS,* 335 F.3d 858, 864 (9th Cir. 2003) (concluding that a conviction did not render a noncitizen ineligible for asylum, but stating that the Board was "not prohibited from taking into account Kankamalage's robbery conviction when it decides whether or not to grant asylum as a matter of discretion"); *Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (concluding that even a noncitizen who "qualifies as a 'refugee'" and whose criminal conviction did "not preclude her eligibility" for asylum could

nevertheless be "manifestly unfit for a *discretionary* grant of relief").

The Departments conclude that this rule does not conflict with *Matter of Pula,* which remains the applicable standard for discretionary determinations in the absence of a regulation that otherwise governs the discretionary determination. *See, e.g., Thamotar* v. *U.S. Att'y Gen.,* 1 F.4th 958, 970–71 (11th Cir. 2021) (observing that discretionary asylum determinations continue to be governed by *Matter of Pula*); *Hussam F.* v. *Sessions,* 897 F.3d 707, 714 (6th Cir. 2018) (stating that "circumvention [of proper immigration procedures] may be taken into account as a 'serious adverse factor'" (quoting *Matter of Pula,* 19 I&N Dec. at 473)); *see also Andriasian* v. *INS,* 180 F.3d 1033, 1043–44 (9th Cir. 1999) (finding that reliance on certain *Matter of Pula* factors was inappropriate once regulations controlling discretionary denials of asylum on the basis of a petitioner's stay or opportunity to stay in a third country had been promulgated). And the Departments view *Matter of Pula* as providing support for the proposition that it is lawful to consider manner of entry for asylum applicants.

b. Statutory Conditions and Limitations on Asylum Eligibility

*Comment:* Commenters stated that the rule would be inconsistent with or would otherwise render superfluous the statutory firm-resettlement bar and safe-third-country bar. *See* INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

*Response:* This rule is within the Departments' broad authority to create new limitations on asylum eligibility, and the Departments disagree that the rule conflicts with any of the exceptions to a noncitizen's ability to apply for asylum or limitations on a noncitizen's eligibility for a grant of asylum under section 208(a)(2) or (b)(2) of the INA, 8 U.S.C. 1158(a)(2) or (b)(2).

The INA's firm-resettlement provision precludes a noncitizen who "was firmly resettled in another country prior to arriving in the United States" from demonstrating eligibility for asylum. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *see also* 8 CFR 208.15, 1208.15 (2020).[79] The INA's safe-third-

---

[79] These regulations were amended by *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review,* 85 FR 80274 (Dec. 11, 2020), but the amendments were preliminarily enjoined. *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 969 (N.D. Cal. 2021). This order remains in effect.

Continued

country provision prohibits a noncitizen from applying for asylum if the noncitizen "may be removed, pursuant to a bilateral or multilateral agreement" to a safe third country in which the noncitizen would not be subject to persecution and "would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

The rule does not conflict with or otherwise render the firm-resettlement bar or safe-third-country bar superfluous; instead, this rule and the statutory bars apply independently.

First, this rule has a different scope. In contrast to those statutory bars, this limitation on asylum eligibility only applies to those who enter the United States during emergency border circumstances. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). Additionally, unlike those who are subject to the firm-resettlement or safe-third-country bars, those who are subject to this limitation on asylum eligibility are not categorically barred from applying for asylum or from being eligible for asylum, as application of the rule's limitation on asylum eligibility will be considered on a case-by-case basis, including to determine if exceptional circumstances apply to overcome this limitation.

The rule also serves a different purpose than those statutory bars. The INA's firm resettlement and safe-third-country provisions limit asylum eligibility and applications, respectively, for noncitizens who have available sustained protection in another country, and they help protect against forum shopping. *See Rosenberg* v. *Yee Chien Woo*, 402 U.S. 49, 55–56 (1971) (noting that the concept of firm resettlement is historically rooted in the notion of providing "a haven for the world's homeless people" while encouraging "other nations to do likewise"); *see also Maharaj* v. *Gonzales*, 450 F.3d 961, 988–89 (9th Cir. 2006) (en banc) (O'Scannlain, J., concurring in part and dissenting in part) (recognizing that the firm-resettlement provision protects against forum shopping, an issue "that our immigration laws have long sought to avoid"). The limitation on asylum eligibility adopted in this rule, by contrast, seeks to streamline the Departments' processing of noncitizens while upholding all screening and protection requirements, thereby conserving limited resources during the emergency border circumstances

and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment—is currently effective.

described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE. The rule is also designed to encourage noncitizens to use lawful, safe, and orderly pathways to the United States during emergency border circumstances or to wait until such circumstances have abated, to the extent possible. Thus, the limitation has a different object and purpose, and it is consistent with those statutory provisions.

Moreover, the INA permits the Attorney General and the Secretary to create new eligibility limitations and does not limit this authority from overlapping with existing statutory conditions. *See R–S–C,* 869 F.3d at 1187 (noting that Congress's delegation of authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), "means that Congress was prepared to accept administrative dilution" of the right to seek asylum); *cf. Hawaii,* 585 U.S. at 690–91 (recognizing that the existence of the Visa Waiver Program "did not implicitly foreclose the Executive from imposing tighter restrictions" in "similar" areas).

Indeed, section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), provide no subject-matter limit other than requiring any regulation be "consistent with" section 208 of the INA, 8 U.S.C. 1158, and the INA generally. *See R–S–C,* 869 F.3d at 1187 n.9. The limitation on asylum eligibility established by this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a whole, and the INA generally, and it is consistent with the firm-resettlement and safe-third-country bars in particular.

### c. Expedited Removal

*Comment:* Several commenters claimed that the rule conflicts with the expedited removal process created by Congress in IIRIRA. Commenters noted that the statutory framework provides for preliminary screening of noncitizens in credible fear interviews, where noncitizens may apply for asylum after demonstrating a "significant possibility" that the noncitizen could establish eligibility for asylum. In this regard, one commenter asserted that Congress had intended the "significant possibility" standard to be a "low screening standard," but that the IFR "would convert the preliminary screening into a full adjudication" of whether the IFR applied and would eliminate the "significant possibility" standard "entirely for all asylum seekers covered[,] . . . forc[ing] them to meet an

even higher 'reasonable probability' standard." Commenters asserted that the rule's requirement that noncitizens instead show a "reasonable probability" of persecution or torture is in conflict with this statutory framework. Commenters further asserted that the rule effectively creates a new legal framework by which to evaluate asylum claims in conflict with the statutory process. One commenter claimed that the rule unlawfully shuts down the U.S. asylum system.

*Response:* The Departments disagree that the rule conflicts with the expedited removal process created by Congress. The expedited removal process is applicable to certain noncitizens arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation required for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B). But Congress has not provided for such a screening for statutory withholding of removal or CAT protection. In the absence of a statutory process for screening for potential eligibility for statutory withholding of removal and CAT protection, the Departments have also used the credible fear screening process to identify potentially valid claims for such protection. *See generally* 8 CFR 208.30, 1003.42, 1208.30 (providing for screenings for potential eligibility for statutory withholding of removal and CAT protection alongside screening for potential asylum eligibility). If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to an AO to determine whether the noncitizen has a credible fear of persecution or torture in the

STB_AR1_000017

country of nationality or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 208.30(e)(2), 235.3(b)(4); *id.* 208.13(b)(1)–(2), 1208.13(b)(1)–(2) (defining the grounds for asylum eligibility); *id.* 208.16(b)–(c), 1208.16(b)–(c) (defining the grounds for statutory withholding of removal and CAT protection). A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v).

Just as the statute is silent on the availability of screening procedures for statutory withholding of removal and CAT protection, it is also silent on the standard applied during such screenings. By regulation, the Departments have applied the "significant possibility" standard to also screen for potential eligibility for statutory withholding of removal and CAT protection, *see* 8 CFR 208.30(e)(2)–(3), 1003.42(d): AOs must determine whether "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility . . . for withholding of removal under section 241(b)(3) of the Act," 8 CFR 208.30(e)(2), and whether the noncitizen "shows that there is a significant possibility that the alien is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17," 8 CFR 208.30(e)(3). If the AO determines that the noncitizen does not have a credible fear of persecution or torture in the proposed country of removal, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.16(b)–(c), 208.30(g), 208.33(b)(2)(v), 1208.16(b)–(c), 1208.30(g).

To the extent commenters allege that the Departments are not applying the "significant possibility" standard to screen for asylum eligibility—such as for application of the limitation on asylum eligibility—the commenters are mistaken. Under this rule, the AO or IJ determines whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet the exception

for exceptionally compelling circumstances. The "significant possibility" standard applies by statute, section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v), and the regulation does not in any way displace that standard, by its terms or otherwise. The Departments did not explicitly include this language in the regulation itself. This is because the provisions regarding credible fear screenings at 8 CFR 208.35(b) and 1208.35(b)(2) generally explain the order of operations—instructing the AO or IJ to consider the limitation first before considering the rest of the asylum claim. In other rules adopting conditions and limitations on asylum eligibility, the Departments have consistently used the regulatory text to explain the order of operations for consideration of the limitations during credible fear screenings without explicitly restating the applicable statutory standard,[80] while at the same time explaining that the "significant possibility" standard applies in the preamble.[81] Deviating from the Departments' practice here could wrongly imply that, in other regulations pertaining to the credible fear process, the default standard of proof for AO and IJ determinations is something other than the "significant

---

[80] For example, under the Circumvention of Lawful Pathways rule, "[t]he asylum officer shall first determine whether the alien is covered by the presumption . . . and, if so, whether the alien has rebutted the presumption[.]" 8 CFR 208.33(b)(1); *see also* 8 CFR 1208.33(b)(2) ("The immigration judge shall first determine whether the alien is covered by the presumption at 8 CFR 208.33(a)(1) and 1208.33(a)(1) and, if so, whether the alien has rebutted the presumption in accordance with 8 CFR 208.33(a)(3) and 1208.33(a)(3)."); *Asylum Eligibility and Procedural Modifications,* 84 FR 33829, 33843–45 (July 16, 2019) (interim final rule amending and adding provisions at 8 CFR 208.30(e)(5)(ii) through(iii), 1003.42(d)(2) and(3), and 1208.30(g)(1)(i) through (ii), providing the order of operations for applying two now-rescinded bars to asylum eligibility); 88 FR at 31319; *id.* at 31449 (adding amendatory instructions to remove regulatory provisions added to implement the bars to asylum eligibility adopted in two prior rules).

[81] *See, e.g.,* 89 FR at 48755 (explaining that, during the credible fear interview, "the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the [rule's] limitation on asylum eligibility"); *id.* at 48757–58 (discussing the application of the "significant possibility" standard under the rule during IJ review of a negative credible fear determination); 84 FR at 33837 ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear."); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55943 (Nov. 9, 2018) ("If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.").

possibility" standard. To avoid that unwanted implication, the Department declines to modify the text of §§ 208.35 and 1208.35 as well. The "reasonable probability" standard does not affect or change the "significant possibility" standard used to screen for asylum eligibility, which, as discussed above, is set by statute and remains in effect for asylum claims in the credible fear process. Accordingly, the Departments disagree with the claim that the use of the "reasonable probability" standard for the purposes of screening for potential eligibility for statutory withholding of removal and CAT protection would eliminate, or in any way affect, the "significant possibility" standard as it applies to screening for asylum eligibility.

The Departments also disagree that the rule's application of the "reasonable probability" standard to screen for potential eligibility for statutory withholding of removal or CAT protection is inconsistent with the "significant possibility" standard under the expedited removal statute. As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications." 88 FR at 11742. Section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening standards and procedures are to be employed in determining potential eligibility for statutory withholding of removal or CAT protection, and the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions. *See, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2). Accordingly, the Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and CAT protection. As further discussed in Section III.C.3 of this preamble, the Departments continue to believe that during the emergency border circumstances described in the IFR and this rule, the "reasonable probability" screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection and better captures the population of noncitizens with potentially valid claims for such protection. *See* 89 FR at 48745–47.

Thus, despite the claims of some commentators, the rule does not effectively shut down the U.S. asylum system or deviate from applicable statutory standards. Noncitizens still

STB_AR1_000018

may seek asylum and protection in the United States.

d. General Comments on International Law

*Comment:* Commenters generally asserted that the rule violates international law. A commenter wrote that seeking asylum is a human right guaranteed by international law and the rule unjustly denies people this right. In this regard, a commenter asserted that the use of emergency border circumstances as a justification for promulgating the rule is insufficient to justify violating international law and that the lack of a time frame or sunset provision denies access to migrants seeking asylum and places them at risk of refoulement. Commenters claimed that the rule imposes prohibited penalties on asylum seekers, bars refugees from a path to citizenship, and impermissibly discriminates based on manner of entry, race, and nationality. A commenter stated that regulations that deny access to asylum based on arbitrary factors that do not relate to a person's status as a refugee are inconsistent with the Refugee Convention and that the United States has an obligation under the Convention to provide a "fair and efficient refugee status determination procedure" to individuals in the U.S. asylum process.

Commenters were concerned that the rule violates the United States's non-refoulement obligations under the Refugee Convention (through the Refugee Protocol) and Article 3 of the CAT. For example, commenters predicted many noncitizens would not be able to satisfy the comparatively higher standards of proof for statutory withholding of removal and CAT protection claims and that, in turn, would lead to the refoulement of persons who, if not for the rule's limitation on asylum eligibility, would have been granted asylum. Several of these commenters also asserted that statutory withholding of removal and CAT protection are insufficient to satisfy the United States's non-refoulement obligations because they afford lesser protection than asylum. Commenters expressed apprehension that the rule would result in the turning away of migrants who seek refuge at the southern border.

Another commenter wrote that the rule is consistent with U.S. commitments under the Refugee Protocol and the CAT, reasoning that neither is self-executing and therefore the United States is bound only by its own law implementing these treaties. The commenter acknowledged that the United States implements its non-

refoulement obligations through the withholding of removal statute at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). Another commenter, however, asserted that the argument that asylum is discretionary under U.S. law and therefore the rule does not violate the Refugee Protocol is incorrect as a matter of international law, even if true under domestic law, because parties to the Refugee Convention must provide asylum and protection from refoulement to those who meet the definition of "refugee."

*Response:* This rule is consistent with the United States' international treaty obligations. Three primary documents govern the rights of refugees and corresponding obligations of states in international law: the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. 88 FR at 31384. Together, these documents provide a framework for states to provide protection to noncitizens fleeing persecution or torture and establish the principle of non-refoulement, which prohibits states from returning refugees to territories in specific circumstances. *Id.*

These treaties, however, do not prescribe or impose any particular minimum procedures for implementation of non-refoulement obligations. Although the United States is a party to the 1967 Refugee Protocol [82] and the CAT, these treaties are not directly enforceable in U.S. law. *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) (explaining that the CAT "is non-self-executing and thus does not itself create any rights enforceable in U.S. courts"). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations. The Refugee Convention's non-refoulement obligation is contained in Article 33.1, which prohibits contracting states from returning a refugee to a territory "where his life or freedom would be threatened" on account of an enumerated ground. 19 U.S.T. at 6276,

---

[82] *See Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 169 n.19 (1993) ("Although the United States is not a signatory to the [1951 Refugee] Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951." (citation omitted)).

189 U.N.T.S. at 176. The United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. The CAT's non-refoulement provision is in Article 3, which prohibits the return of a person to a country where there are "substantial grounds for believing" the person will be tortured. S. Treaty Doc. No. 100–20 at 20, 1465 U.N.T.S. 85, 114. The United States has implemented its obligations under Article 3 of the CAT through regulations. *See* FARRA, Public Law 105–277, sec. 2242(b), 112 Stat. 2681–761, 2681–822 (codified at 8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18. The rule does not change or limit ultimate eligibility for statutory withholding of removal or CAT protection. Instead, applicants subject to the rule's limitation on asylum eligibility will be screened for potential eligibility for statutory withholding of removal and CAT protection under a "reasonable probability" standard, which is lower than the ultimate statutory or regulatory standard of proof for those forms of protection.

The rule will limit asylum eligibility for some noncitizens. But, as the Supreme Court has explained, asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34[,]" which provides that contracting countries "shall as far as possible facilitate the assimilation and naturalization of refugees." *Cardoza-Fonseca,* 480 U.S. at 441 (quoting Refugee Convention art. 34, 19 U.S.T. at 6276, 189 U.N.T.S. at 176); *see also* United Nations High Commissioner for Refugees ("UNHCR"), *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 16 para. 25 (2019 ed.) ("[T]he granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol"). Article 34 "is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible." *Cardoza-Fonseca,* 480 U.S. at 441. Because the limitation on asylum eligibility does not affect ultimate eligibility for statutory withholding of removal or protection under the CAT regulations, the rule is consistent with U.S. non-refoulement obligations under the Refugee Protocol (incorporating,

among other things, Article 33 of the Refugee Convention) and the CAT. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that ''the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

The Departments agree that asylum is an important form of protection and acknowledge that the right to seek asylum has been recognized under the Universal Declaration of Human Rights (''UDHR''), art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). The UDHR is a nonbinding human rights resolution of the UN General Assembly, and thus it does not impose legal obligations on the United States. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004) (''[T]he [UDHR] does not of its own force impose obligations as a matter of international law.'').

Moreover, although the rule creates a limitation on eligibility for asylum, the rule does not bar those seeking asylum from taking part in procedures that protect them from refoulement. Under the rule, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. Even in those cases where the AO determines that the noncitizen has not established a significant possibility that they could ultimately demonstrate by a preponderance of the evidence that they are not subject to the limitation on asylum eligibility or are excepted from it, the noncitizen may still demonstrate credible fear by showing a reasonable probability of persecution or torture. Similarly, even if found ineligible for asylum by an IJ due to the application of the limitation on asylum eligibility, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

The rule is also consistent with the Refugee Convention and the corresponding obligations under international law, including the specific provisions cited by commenters. The rule does not violate the nondiscrimination requirement in Article 3 of the Refugee Convention. Article 3 prohibits discrimination on the basis of ''race, religion or country of origin.'' 19 U.S.T. at 6264, 189 U.N.T.S.

at 156. The rule does not discriminate on the basis of any of the protected characteristics described in Article 3. This rule is limited to the southern border because that is the U.S. border where emergency circumstances exist. The Departments acknowledge that this limitation will affect those noncitizens with easier access to the southern border and not those with easier access to other borders of the United States. However, the rule does not treat such noncitizens differently on that basis; the rule applies equally based on the actions of a noncitizen during emergency border circumstances. Specifically, the application of this rule is limited to those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances. For the same reason, the rule does not violate other antidiscrimination principles described in other international human rights treaties, including the International Convention on the Elimination of All Forms of Racial Discrimination, arts. 2–5, Dec. 21, 1965, T.I.A.S. No. 94–1120, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights, arts. 2–3, Dec. 16, 1966, T.I.A.S. No. 92–908, 999 U.N.T.S. 171.

Similarly, the rule is consistent with Article 31.1 of the Refugee Convention, which prohibits states from ''impos[ing] penalties'' on refugees based on ''illegal entry or presence'' if such refugees are ''coming directly from a territory where their life or freedom was threatened'' and ''present themselves without delay to the authorities and show good cause for their illegal entry or presence.'' 19 U.S.T. at 6275, 189 U.N.T.S. at 174. As the commentary to the Refugee Convention explains, the term ''penalties'' in Article 31.1 refers ''to administrative or judicial convictions on account of illegal entry or presence, not to expulsion.'' UNHCR, *The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary by Dr. Paul Weis* 219, *https://www.unhcr.org/us/media/refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul-weis; see Cazun,* 856 F.3d at 257 & n.16 (rejecting argument that the reinstatement bar on asylum was a ''penalty'' within the meaning of Article 31.1). The rule does not change any rules or policies relating to detention or convictions for unlawful entry or presence. The Departments acknowledge that the Ninth Circuit

concluded in *East Bay III,* 993 F.3d at 674, that the bar to asylum at issue in that case violated Article 31.1 of the Refugee Convention because it imposed a ''penalty.'' As described in the IFR, the rule here does not create a categorical bar to asylum, but instead a limitation on asylum eligibility, and *East Bay III* accordingly does not address the lawfulness of this rule. 89 FR at 48735. Moreover, the Ninth Circuit's conclusion was erroneous because the denial of discretionary relief is not a penalty within the meaning of Article 31.1. *Id.* at 48736.

*Comment:* One commenter asserted that the IFR conflicts with the United States Supreme Court's decisions in *Murray* v. *Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804), which generally states that ambiguous U.S. statutes should be interpreted to avoid conflicts with international law where possible, and *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 436–37 (1987), which explained that ''one of Congress' primary purposes'' when passing the Refugee Act of 1980 ''was to bring United States refugee law into conformance with the 1967 [Refugee Protocol].''

*Response:* The Departments disagree with the commenter that the IFR conflicts with *Charming Betsy* or *Cardoza-Fonseca.*[83] As explained above, the rule is consistent with the United States' obligations under international law, specifically the Refugee Convention, the Refugee Protocol, and the CAT. The rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection and is consistent with the United States' non-refoulement obligations. Moreover, the rule does not prohibit any person from seeking asylum or, more importantly for purposes of U.S. non-refoulement obligations, from seeking or obtaining statutory withholding of removal or CAT protection. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview. Even in cases in which the AO determines that the noncitizen is subject to the limitation on eligibility for asylum, the noncitizen may still receive a positive credible fear determination by

---

[83] For purposes of this response, the Departments assume *arguendo* that the *Charming Betsy* canon applies with respect to non-self-executing treaties. *See, e.g., Saleh* v. *Bush,* 848 F.3d 880, 891 n.9 (9th Cir. 2017) (noting that the question remains unsettled).

STB_AR1_000020

showing a reasonable probability of persecution or torture. Similarly, after applying for asylum before an IJ, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

e. UNHCR Guidelines on International Protection

*Comment:* Commenters stated that the rule violates UNHCR statements and guidelines and the right to seek asylum guaranteed by Article 14 of the UDHR. Commenters also claimed that the pre-screening procedures in expedited removal proceedings are contrary to UNHCR guidelines and that adjudicators must instead provide full and individualized assessments of each asylum case.

*Response:* The Departments agree that asylum is an important protection in international law and acknowledge that the right to seek asylum has been recognized under article 14 of the UDHR. However, the UDHR is a nonbinding human rights resolution of the UN General Assembly and does not impose legal obligations on the United States. *See Sosa,* 542 U.S. at 734–35 ("[T]he [UDHR] does not of its own force impose obligations as a matter of international law."). Moreover, UNHCR's interpretations of, or recommendations regarding, the Refugee Convention and Refugee Protocol are "not binding on the Attorney General, the BIA, or United States courts." *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status "itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Id.* at 427–28 (quoting *Cardoza-Fonseca,* 480 U.S. at 439 n.22). Such guidance "may be a useful interpretative aid," *id.* at 427, but it does not impose obligations on the United States.

*Comment:* Commenters stated that the rule violates the Refugee Convention because the exclusion grounds in Article 1(F) of the Refugee Convention are exhaustive, yet the rule creates an exclusion ground not found in Article 1(F). The commenters acknowledged that the rule's limitation on asylum eligibility contains an exception but asserted that the exception is insufficient to comply with the Refugee Convention. Along the same lines, a commenter asserted that such exclusionary grounds should only be considered after an assessment of whether the noncitizen is a "refugee"

and be balanced against the need for protection itself, as is the order of procedures in a full merits hearing.

*Response:* The Departments disagree with the commenters' characterization of the limitation on asylum eligibility in this rule as a ground of exclusion like those in Article 1(F) of the Refugee Convention. Article 1(F) of the Refugee Convention provides that the provisions of the Convention "shall not apply to any person with respect to whom there are serious reasons for considering that" they have: (1) "committed a crime against peace, a war crime, or a crime against humanity"; (2) "committed a serious non-political crime outside the country of refuge prior to [their] admission to that country as a refugee"; or (3) "been guilty of acts contrary to the purposes and principles of the United Nations." As explained above, the United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. This rule's limitation on asylum eligibility does not extend to statutory withholding of removal and therefore does not implicate the application of the Convention's exclusion grounds to the mandatory non-refoulement obligation of Article 33. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that "the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given *full effect* by the Attorney General's withholding-only rule" (emphasis added)). Nor does the rule restrict who qualifies as a refugee. *Cf.* INA 101(a)(42), 8 U.S.C. 1101(a)(42) (excluding those who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground from the "refugee" definition); UNHCR, *UNHCR Statement on Article 1F of the 1951 Convention* at 1 (July 2009), *https://www.unhcr.org/us/media/unhcr-statement-article-1f-1951-convention* (providing that the exclusion grounds "exclude a person from being a refugee where there are serious reasons for considering that she/he has committed certain heinous acts").

In any event, the exclusion clauses of Article 1(F) of the Refugee Convention do not limit the United States from adopting additional or different limitations on asylum eligibility. Congress has implemented Article 1(F) in establishing mandatory bars to eligibility for statutory withholding of

removal. *See* INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B). Congress adopted certain parallel bars to asylum eligibility, *see, e.g.,* INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), but also authorized the Departments to establish additional limitations on asylum eligibility, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As discussed earlier in this preamble, the asylum statute implements the precatory provision in Article 34 of the Convention, but neither the mandatory nor the precatory provisions of the Convention and Protocol are directly enforceable in U.S. law. *See Stevic,* 467 U.S. at 428 & n.22; *Al-Fara,* 404 F.3d at 743 ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation." (citations omitted)). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations, and the Protocol "serves only as a useful guide in determining congressional intent in enacting the Refugee Act." *Barapind* v. *Reno,* 225 F.3d 1100, 1107 (9th Cir. 2000) (citations omitted). Thus, the Refugee Protocol does not circumscribe the United States' prerogative to establish limitations on asylum eligibility that extend beyond the exclusion grounds described in Article 1(F).

f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children

*Comment:* A commenter stated that the rule conflicts with the United States' obligations under the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2237 U.N.T.S. 319 ("Trafficking Protocol"), and the Trafficking Victims Protection Act of 2000 ("TVPA"), 22 U.S.C. 7101 *et seq.,* because the rule will not prevent human trafficking and will instead drive trafficking networks further underground and make people more vulnerable to exploitation. The commenter stated that the reality of human movement and escape from harm will drive people to take other routes and reported that they had handled cases involving individuals who were mistreated after being forced to take on large debts to pay smuggling networks to seek safety in the United States. The commenter also claimed the rule will exacerbate violent crime, which increases asylum seekers' vulnerabilities to trafficking.

*Response:* The Departments disagree that the rule conflicts with U.S.

STB_AR1_000021

obligations under the Trafficking Protocol or the TVPA. At the outset, the Departments note that the Trafficking Protocol is separate from the Refugee Convention and Refugee Protocol; the Trafficking Protocol explicitly disclaims any impact upon those agreements or on the non-refoulement principle they contain. *See* Trafficking Protocol art. 14(1) (''Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including . . . , in particular, where applicable, the 1951 Convention and the 1967 Protocol relating to the Status of Refugees and the principle of non-refoulement as contained therein.'').

In addition, the rule is consistent with the Trafficking Protocol and TVPA. Nothing in the IFR or the rule is implicated by or conflicts with the provisions of the Trafficking Protocol, none of which relate to limitations on asylum eligibility. Moreover, the IFR and this rule remain in line with the purpose of the Trafficking Protocol in protecting and assisting the victims of human trafficking,[84] as they specify that any person who can demonstrate by a preponderance of the evidence that they are a ''victim of a severe form of trafficking in persons'' as defined in 8 CFR 214.201 will thereby show exceptionally compelling circumstances, and will therefore not be subject to the rule's limitation on asylum eligibility. Similarly, the IFR and this rule are entirely consistent with the TVPA, which provides immigration relief to certain victims of a severe form of trafficking in persons who assist law enforcement (or meet certain exceptions), Public Law 106–386, sec. 107(e), 114 Stat. 1464, 1477, but does not otherwise implicate immigration authorities under title 8.

Regarding the commenter's concerns about smuggling and trafficking, the Departments believe the most helpful approach to prevent migrants from falling victim to smugglers and traffickers is to both discourage attempts to enter the United States irregularly and, ultimately, to increase the availability of lawful pathways for migration.

This rule is expected to continue to reduce irregular migration, which benefits human smuggling and trafficking organizations. The rule is also expected to reduce human trafficking and smuggling by reducing overall flows of migrants, thereby allowing the Departments to better manage their limited resources while

delivering consequences more swiftly through expedited removal for those without a legal basis to remain. *Id.* at 48762, 48766–67.

Moreover, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. *Id.* at 48744. They are trained to identify potential trafficking victims or victims of crimes and to take appropriate follow up action. *Id.* The commenter's prediction that the rule may increase asylum seekers' vulnerabilities to trafficking is speculative and ignores CBP immigration officers' training and experience in combating and preventing human trafficking. Additionally, without this rule, incentives for irregular migration would likely increase, which would likely exacerbate the very vulnerabilities about which the commenter expressed concern, including by driving more migrants into the hands of human traffickers promising a pathway to the United States. *See id.* at 48714–15.

Regarding the commenter's concerns about the safety of noncitizens attempting to enter the United States, one cause of recent surges in irregular migration is smugglers and migrants' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. *Id.* at 48714. The Departments assess that the IFR has significantly increased the ability to deliver timely decisions and consequences, combating contrary messaging and perceptions. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. Additional discussion of the rule's incentive effects is found at Sections III.A.2 and III.B.2 of this preamble.

2. Justification and Statements on Need for the Rule

a. Rule Is Unjustified, Unsubstantiated, or Arbitrary

*Comment:* Several commenters argued that the Departments' reliance on the success of the Circumvention of Lawful Pathways rule to justify the IFR is erroneous because the evidence regarding the high levels of encounters at the border does not support implementing such ''extreme'' measures as those contained in the IFR. One commenter stated that the Departments cannot argue that the Circumvention of Lawful Pathways rule has been successful at alleviating the stress on the border and immigration systems while at the same time arguing that the measures in the IFR are needed to

address the surge in high levels of migration at the southern border. Another commenter argued that (1) the increase in encounters prior to the end of the Title 42 public health Order does not necessarily mean that encounters would have remained high after the Title 42 public health Order ended, and (2) it is implausible that the Circumvention of Lawful Pathways rule led to higher encounters prior to its implementation and lower encounters after its implementation, as most migrants did not know what the Circumvention of Lawful Pathways rule was before it was implemented. Thus, the commenter claimed, it is more likely that the end of the Title 42 public health Order was the reason for higher encounters prior to its end and lower encounters after its end. The commenter concluded that, as there is insufficient evidence to support the asserted success of the Circumvention of Lawful Pathways rule, a fundamental justification of the IFR, it is not justifiable to institute more stringent processes under the IFR.

Another commenter similarly took issue with the effectiveness of the Circumvention of Lawful Pathways rule, stating that it is well understood that the Title 42 public health Order drove border crossings to record highs, and the end of the Title 42 public health Order would therefore have led to a substantial decrease in border crossings without further policy changes. However, the commenter said the Departments claimed, without any evidence, that crossing levels under the Title 42 public health Order were somehow predictive of crossing levels after the Title 42 public health Order ended; the commenter said this assertion is contrary to the record.

*Response:* The Departments disagree with commenters' claim that there is not enough evidence demonstrating the Circumvention of Lawful Pathways rule's impact on encounters at the SWB. In the first month following the implementation of the Circumvention of Lawful Pathways rule, encounters between POEs along the SWB decreased by 69 percent compared to their peak just before the end of the Title 42 public health Order.[85] The Departments believe that overall encounters would not have decreased after the end of the Title 42 public health Order absent their implementation of policy changes, including the Circumvention of Lawful Pathways rule, to address the level of irregular migration. The Departments

---

[84] Trafficking Protocol art. 2.b, 2237 U.N.T.S. at 344.

[85] *See* Decl. of Blas Nuñez-Neto ¶ 13, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

agree with commenters that the Title 42 public health Order increased repeat crossing attempts, but as noted in the Circumvention of Lawful Pathways rule, repeat crossings were a contributing factor, but not the only reason, for the increase in overall encounters: for example, unique encounters with nationals of countries outside of Mexico and Northern Central America were also rising also increased in each of FYs 2022–2024, as compared with the pre-pandemic period.[86] In addition to the overall increase in encounters and unique encounters, several other factors caused the Departments to project a spike in average daily encounters in the run-up to the end of the Title 42 public health Order, including: (1) the prospect that DHS would no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order; (2) the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere; (3) the unprecedented recent growth in migration from countries of origin not previously typically encountered; (4) the already large number of migrants in proximity to the SWB; and (5) the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order. *See* 89 FR at 48723; *see also* 88 FR at 31316. Consistent with their projections, the Departments planned for, and briefly observed, a very significant spike in average daily encounters. *See* 89 FR at 48723. Had these levels of migration persisted without the incentives put in place by the Circumvention of Lawful Pathways rule, encounters may have exceeded even the very high levels of irregular migration that the Departments observed under that rule. *See id.* at 48723–24. The Departments believe the Circumvention of Lawful Pathways rule mitigated the overall impact on the border security and immigration systems that would have been caused by an expected surge following the end of processing under the Title 42 public health Order. This is evidenced by the sharp initial drop CBP saw in overall encounters at the SWB in the weeks following the expiration of the Title 42 public health Order and when the Circumvention of Lawful Pathways rule

went into effect.[87] Instead of seeing a surge of migrants arriving at the border following the end of the Title 42 public health Order, there was a precipitous drop that lasted through June 2023.[88] At about the same time DHS assessed, and public reporting confirmed, that DHS messaging about the Circumvention of Lawful Pathways rule and associated measures were effective in dissuading potential migrants from attempting to cross the U.S. border due to the disincentives created by that rule.[89]

The Departments recognize that while the Circumvention of Lawful Pathways rule is a valuable tool available to the Departments to reduce irregular migration, it is not, by itself, able to mitigate all the factors influencing migration trends. Despite the success of the Circumvention of Lawful Pathways rule and complementary measures, for much of the immediate post-pandemic period until issuance of the IFR, border encounters remained higher than the Departments' abilities to consistently deliver timely decisions and consequences.[90] Therefore, even if the

evidence supporting the Circumvention of Lawful Pathways rule's success was inconclusive (which the Departments do not believe), the Departments would have adopted the IFR in response to the high number of migrants subsequently arriving at the southern border, overwhelming the Departments' resources and preventing them from delivering timely decisions and consequences to those who lack a lawful basis to remain.

The rule is a tailored approach designed to substantially improve the Departments' abilities to process noncitizens more expeditiously and deliver timely decisions and consequences to most noncitizens who cross between POEs into the United States during emergency border circumstances. As discussed in Section II.A.2 of this preamble, the IFR is working as intended. DHS is placing into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB, the rule has reduced the percentage of noncitizens encountered at the SWB who are released, and DHS is more quickly removing a greater percentage of those without a legal basis to remain in the United States than during the immediate post-pandemic period, which in turn discourages additional crossings.[91] Since promulgating the IFR,

---

[86] Unique USBP SWB encounters of nationals of countries other than Mexico and Northern Central America were more than 30 times higher in each of FY 2022–FY 2024 (through May 2024) than in the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset (USBP Encounters by Citizenship tab).

[87] Average daily CBP SWB encounters fell 68 percent from their May 12, 2023, level in the first 11 days after the CLP rule went into effect and remained at similar low levels throughout May and June 2024. OHSS analysis of July 2024 OHSS Persist Dataset (Encounters FY2000–2024 tab).

[88] *Id.* In July 2023, total monthly CBP SWB encounters remained below 200,000. While total encounters increased from August 2023 through December 2023, the same increase occurred between August 2022 and December 2022 while the Title 42 public health Order was still in place, suggesting that these surges are more consistent with seasonal migration trends that changes in U.S. immigration policy cannot unilaterally mitigate. *Id.*

[89] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush,* Wash. Post (May 12, 2023), *https:// www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/;* see also Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted,* PBS (May 11, 2023), *https:// www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted;* Decl. of Blas Nuñez-Neto ¶ 22, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); *Testimony of Blas Nuñez-Neto Before U.S. House of Representatives Committee on Homeland Security Subcommittee on Border Security and Enforcement on "Examining DHS' Failure to Prepare for the Termination of Title 42"* (June 6, 2023), *https:// www.congress.gov/118/meeting/house/115908/ witnesses/HHRG-118-HM11-Wstate-Nuez-NetoB-20230606.pdf.*

[90] Total daily SWB encounters averaged about 5,700/day in April and May 2024 and USBP SWB encounters averaged about 4,100/day, compared to averages of 1,600 and 1,300/day, respectively, in the pre-Pandemic period (OHSS analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab). In late 2023, while the Title 42 public health Order was in place, total encounters at the SWB reached all-time highs. OHSS's analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab) shows that total SWB encounters reached over 242,000 in November 2023 and over 301,000 in December

2023. Total SWB encounters for the month of May 2023 were approximately 207,000. This was the month the Title 42 public health Order ended and when the Circumvention of Lawful Pathways rule went into effect. Total SWB encounters for the following month (June 2023) dropped precipitously to 145,000 encounters, but total SWB encounters climbed back to 233,000 in August 2023 and remained at highly elevated levels through December 2023.

[91] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP August 6, 2024, for encounters since May 1, 2024 (Summary Statistics tab). For encounters under the IFR through July 31, 2024, 34 percent of bookouts of single adults and individuals in family unit were releases, compared to 64 percent in the immediate post-pandemic period. Thirty percent of bookouts from CBP custody were repatriations, up from 16 percent during the immediate post-pandemic period. Overall, DHS repatriated an average of approximately 1,370 noncitizens encountered at the SWB per day during the first two months of enforcement under the IFR, up from approximately 1,360 in the immediate post-pandemic period. *Id.* This marginal increase understates the actual impact of the IFR, however, given the sharp drop in encounters: repatriations of noncitizens encountered at the SWB as a share of SWB encounters were equivalent to 26 percent in the immediate post-pandemic period compared to 62 percent under the IFR—a rate that is also slightly higher than the pandemic period (58 percent, only 5 percent of which were title 8 repatriations) and the pre-pandemic period (61 percent, at a time of much lower encounters and when Mexicans and Northern Central Americans accounted for over 90 percent of USBP encounters). *Id.* For public reporting suggesting that migrants are aware of the IFR and that it has discouraged attempts to cross

USBP has placed 59 percent of noncitizen single adults and individuals in family units encountered at the SWB into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order,[92] and 41 percent in the pre-pandemic period.[93]

While more noncitizens without a legal basis to remain in the United States were removed under the Circumvention of Lawful Pathways rule than in the pre-pandemic period, the Departments recognize that the volume of noncitizens arriving at the SWB remained beyond the Departments' capacity to timely process given the resources provided by Congress.[94] As explained in the IFR's preamble, once the Departments resumed widespread processing under their title 8 authorities, it became clear that, even with the Circumvention of Lawful Pathways rule's expanded measures to impose consequences along the SWB, substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to meaningfully address the historic levels of encounters at the southern border. *See* 89 FR at 48713.

The Departments did not and have not represented that the Circumvention of Lawful Pathways Rule would singlehandedly resolve migratory pressures in the region; the Departments

only represent that it would reduce the number of daily encounters at the SWB that, absent intervention, were predicted to materialize in a post-Title 42 public health Order surge. The pre-IFR status quo of the broken immigration and asylum systems had become a driver for irregular migration throughout the region and an increasingly lucrative source of income for dangerous TCOs. *See* 89 FR at 48714. Without adequate countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate. *See id.* All of these factors, taken together, pose significant threats to the safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit. *See id.* at 48715.

Moreover, the Departments do not expect the Circumvention of Lawful Pathways rule or this rule to solve every migration problem in the region. Its provisions cannot account for every factor impacting the unprecedented level of migration occurring in the Western Hemisphere, which is why the Departments have instituted complementary measures such as creating lawful, safe, and orderly pathways. Thus far, as discussed in Section II.A of this preamble, this rule has demonstrated that it helps meet its goal of allowing the Departments to deliver timely decisions and consequences during emergency border circumstances.

*Comment:* Several commenters argued that the rule's characterization of the situation at the border as an "emergency" is arbitrary. Commenters took issue with the rule's use of the daily encounter thresholds to identify the existence of emergency border circumstances. One commenter argued that the circumstances that give rise to "emergency border circumstances" and so trigger the provisions of the rule have been met for quite some time and are not a uniquely emergent circumstance but a reflection of an increase in migration globally. Another claimed that rather than starting with an assessment of need, looking at the number of asylum seekers and the capacities of other countries in the region, the Departments began with the current level and allocation of resources in the United States and "work[ed] backwards from there."

Commenters also argued that the rule is arbitrary because it invokes emergency authority while simultaneously asserting that border crossings are down. One commenter

argued that the existence of this emergency is undercut by an almost 50 percent drop in unauthorized border crossings since December 2023, a period during which the Departments' threshold has nonetheless been met. Citing to a statement in Section III.B.2 of the IFR's preamble, a commenter stated the Departments "concede" that the rule was based on a fear of a future emergency rather than a current one.

Finally, one commenter wrote that if a unilateral declaration of an emergency is all that is required for a Federal agency to violate statutes and court decisions, then the Executive Branch could call everything an "emergency." The commenter claimed that the IFR's limitation on asylum eligibility violates section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), and is indistinguishable from prior regulations that imposed limitations on asylum eligibility that some courts have held unlawful. The commenter also claimed that the rule violates section 235 of the INA, 8 U.S.C. 1225, because it conditions a noncitizen's access to a credible fear interview on the ability to obtain a CBP One appointment. The commenter argued that labeling the situation at the southern border an emergency does not allow the Departments to disregard these statutes and court decisions.

*Response:* The Departments disagree that the numerical encounter thresholds are arbitrary and do not reflect the existence of "emergency" circumstances at the southern border. As explained in the IFR, emergency border circumstances exist when "encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States." 89 FR at 48711. Thus, an emergency border circumstance is a function of high levels of encounters combined with resource constraints that substantially limit DHS's ability to place eligible noncitizens into expedited removal, the primary consequence-delivery mechanism Congress has made available to the Departments for managing border encounters under title 8. *Id.* at 48714. When southern border encounters exceed DHS's ability to process noncitizens for expedited removal, DHS generally must release those noncitizens pending section 240 removal proceedings, a process that can take several years to conclude. *Id.* The comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against the irregular migration of noncitizens without strong claims for asylum, and

into the United States irregularly, see Mariana Martínez Barbra & Caterina Morbiato, *US Border Policy Spurred Migrant Camps Hundreds of Miles Away in Mexico's Capital,* Associated Press, Sept. 1, 2024, *https://apnews.com/article/mexico-migrants-asylum-cbp-app-camps-22b49fabf6e4d7d25d2873d063755444fe.*

[92] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab).

[93] *Id.*

[94] OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab). Although sustained high encounter rates outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers in the immediate post-pandemic period, between May 12, 2023, and June 4, 2024, CBP placed into expedited removal an average of about 920 individuals encountered between POEs each day on average, and USCIS conducted more than 206,000 credible fear interviews, a record number. *Id.* Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 796,000 noncitizens who did not have a legal basis to remain in the United States, the vast majority of whom crossed the SWB. *Id.* USBP encounters at the SWB decreased by 16 percent compared to the previous 12 months, to an average of 5,100 per day for the period from May 12, 2023, to June 4, 2024, *id.,* and border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule and complementary measures. April 2023 OHSS Encounter Projection.

STB_AR1_000024

this disincentive is diminished when noncitizens are placed into section 240 removal proceedings, which may take several years to conclude.

Given the resources made available by Congress, the Departments determined that the daily encounter thresholds described in the June 3 Proclamation and this rule are a reasonable proxy for when such emergency border circumstances exist. *See* 89 FR at 48749–54. Specifically, when daily encounters average less than 1,500 for a sustained period, DHS anticipates that it ''would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries.'' *Id.* at 48752. In contrast, when daily encounters exceed 2,500, ''DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level.'' *Id.* For example, as noted in the IFR, during the FY 2013 to FY 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, an average of 210 individuals were released each day in months in which daily encounters were between 1,500 and 2,500, while approximately 1,300 individuals were released each day in months in which daily encounters exceeded 2,500, with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.* (footnote omitted). And as discussed below in Section III.D.1 of this preamble, the Departments' demonstrated capacity during the immediate post-pandemic period confirms that these thresholds reflect current operational capacity. If Congress provides significant additional resources, the Departments may then reevaluate whether the current thresholds still serve as a reasonable proxy for when such emergency border circumstances exist.

Relatedly, the Departments disagree with commenters' suggestion that it was arbitrary to rely on the United States' own processing capacity and challenges as a justification for the rule without any consideration of the capacities of other countries in the region to address heightened migration. The Departments acknowledge that since 2021, due to political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, which have severely strained the capacities of immigration systems in countries throughout the region. *See* 89 FR at 48722. The United States Government

has been working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[95] including by working closely with partner countries across the Western Hemisphere.[96] The Departments do not believe it would be appropriate to defer this rulemaking until foreign partners have developed enough capacity to absorb all irregular migrants, or to measure whether an emergency exists at the southern border by reference to whether such migrants have what commenters would view as sufficient opportunities to resettle elsewhere. Instead, the rule is part of the United States' efforts to act as a regional leader in responding to increased migratory flows. *See* Section III.E.1.a of this preamble. Moreover, the rule is structured to complement those regional efforts, as success in reducing push factors and in promoting alternatives to migration to the United States would contribute to decreasing encounter levels and alleviating emergency border circumstances. The rule permissibly responds to existing challenges at our southern border by providing effective safeguards that improve the Departments' ability to enforce the United States' immigration laws during periods of heightened migration by creating an incentive for noncitizens to use the lawful, safe, and orderly pathways that the Departments have put in place while simultaneously imposing swift consequences on those who do not have a legal basis to remain in the United States. *See* Section II.A.2 of this preamble. And this ability to impose consequences quickly, combined with a historic expansion of lawful pathways, is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. *See id.* at 48759–60.

The Departments further note that the United States Government is working with regional partners in a concerted and historic effort via the groundbreaking Los Angeles Declaration on Migration and Protection to address the shared challenge of irregular migration that has strained the resources

of countries throughout the region.[97] The United States has taken steps to address migratory flows throughout the region by encouraging foreign partners to increase their enforcement efforts, integrate migrants residing in their territories, expand lawful pathways and processes, and channel intending migrants into those pathways.[98] The United States is also working to address the root causes of migration, such as a lack of opportunity, poor government and corruption, crime, and violence in countries across the region and the world.[99] However, these measures will take time to have significant impacts and have not been in effect long enough to alleviate the stress that high encounters impose on the United States border security and immigration systems. *See id.* at 48727. In the face of these challenges to the United States' own border and immigration systems, however, the Departments believe that it is appropriate to act at the southern border while pursuing efforts to address the root causes of migration more broadly.

Second, the Departments disagree that, prior to implementation of the IFR, there had not been emergency circumstances at the southern border. During the immediate post-pandemic period, average daily encounters were at levels that significantly exceeded the Departments' capacity to impose consequences on most noncitizens who crossed irregularly at the southern border.[100] As the June 3 Proclamation explains, the border security and immigration systems are badly strained and have been for many years. 89 FR at 48490. DHS processing facilities frequently become overcrowded, forcing DHS to release into the United States noncitizens who could otherwise be

---

[95] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[96] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[97] *See* The White House, *Press Release: Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[98] *Id.*

[99] *See* Marcela X. Escobari, *FPC Briefing: Migration Policy and the Biden-Harris Administration's Root Cause Strategy* (June 22, 2023), *https://www.state.gov/briefings-foreign-press-centers/migration-policy-and-the-biden-harris-admins-root-causes-strategy; see also* The White House, *Fact Sheet: Strategy to Address the Root Causes of Migration in Central America* (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-strategy-to-address-the-root-causes-of-migration-in-central-america/.*

[100] OHSS analysis of July 2024 OHSS Persist Dataset (Summary Statistics tab) (reflecting that average daily encounters were over 5,100 per day during the immediate post-pandemic period). From May 12, 2023 through June 4, 2024, USBP referred a daily average of about 860 individuals encountered at the SWB into the expedited removal process. *See id.* (Imm Post-Pandemic ERCF tab).

**STB_AR1_000025**

processed for expedited removal, and place them into section 240 removal proceedings, the resolution of which can take years given the pre-existing backlog. By the end of the first half of FY 2024, despite EOIR being on pace to complete a record number of cases during FY 2024 and DHS maximizing expedited removal as much as resources allow, EOIR had received over 1 million initial receipts, some of which could have been processed for expedited removal had there been sufficient resources to do so, increasing the pending caseload before EOIR to over 3.1 million cases.[101] The Departments believe that releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal. 88 FR at 31326. Moreover, maximizing credible fear screening capacity pulls resources away from USCIS processing cases in the affirmative asylum backlog, which had reached over 1.25 million cases as of the third quarter of FY 2024.[102] This vicious cycle is exactly the circumstance to which the rule is responding.[103] The decrease in encounter levels after December 2023 was not an indication that emergency border circumstances had abated or the IFR was not warranted, because encounters remained well above the daily encounter thresholds that, as described above, the Departments determined reflect the existence of emergency

border circumstances.[104] *See* 89 FR at 48752. That DHS had anticipated an increase in migration absent the IFR was not a concession that the rule was unnecessary. Rather, that projection reflected the urgent need to take immediate action, without which encounters would have increased, and the emergency border circumstances that existed at the time that the IFR was issued would have continued to worsen. *See* 89 FR at 48726. Given that daily encounters persistently remain above 1,500—and could rise above 1,500 again, even if they decline for a time—the IFR is currently and will remain an important policy tool.

Finally, the Departments disagree with one commenter's suggestion that the Departments are characterizing the situation at the southern border as an emergency to avoid complying with their legal obligations under the INA and certain court decisions. The commenter is incorrect because the rule is fully compliant with relevant provisions of the INA and applicable judicial decisions. For the reasons discussed in Section III.A.1 of this preamble, the rule is fully consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). Moreover, for the reasons discussed in Section III.C.1.a.i. of this preamble, the Departments also disagree that the rule conditions noncitizens' access to the credible fear process on the ability to obtain CBP One appointments in violation of section 235 of the INA, 8 U.S.C. 1225. Finally, for the reasons discussed in the IFR, *see* 89 FR at 48735–39, and Section III.A of this preamble, the Departments disagree with commenters' comparison between this rule and prior regulatory actions imposing a limitation on asylum eligibility that some courts have ruled unlawful.

*Comment:* Several commenters argued that the Departments justified the rule using mischaracterizations of asylum grant rates resulting from positive credible fear determinations. Commenters took issue with the Departments' reference to a ''small proportion'' of noncitizens in the credible fear process who are likely to

be granted asylum, stating that the Departments artificially deflated the grant rate by including cases where there was no decision on the merits—such as cases where the asylum application was withdrawn or not adjudicated, or the case was administratively closed—in calculating the proportion of cases where asylum was granted. Commenters argued that '''the majority of people who establish a credible fear of persecution are granted asylum' when their asylum claim is adjudicated,'' quoting a statistic claiming that 55 percent of noncitizens whose cases were decided on the basis of their asylum claim after a positive credible fear determination were ultimately granted asylum in FY 2022 and 2023.

Commenters said that the EOIR denial rate in cases originating from a credible fear claim is an unreliable indicator of meritless asylum claims because a denial could result from factors that have nothing to do with the underlying merits of the case, including: noncitizens' lack of timely access to counsel, translation issues, noncitizens' lack of familiarity with the statutory 1-year bar to filling an asylum application after entering the United States, and the significant discretion provided to IJs by law.

One commenter took issue with the Departments' claim that an increase in positive credible fear determinations was evidence that meritorious asylum claims were still making it through the initial screening process, saying that those subject to the Circumvention of Lawful Pathways rule's presumption of ineligibility for asylum are three times more likely to receive negative credible fear determinations than individuals not subject to the presumption. The commenter said it has documented examples of individuals subjected to the Circumvention of Lawful Pathways rule in expedited removal who were wrongfully ordered removed or refouled, outcomes that the commenter stated will only become more frequent under the IFR. The commenter concluded that the available evidence makes clear that many, if not most, people subject to the IFR will have plausible, or even grantable, claims for humanitarian relief.

A commenter alleged that the Departments' focus on the gap between historical credible fear interview screen-in rates and asylum grant rates is ''willfully blind to reality.'' The commenter stated that the Departments ''simply ignore the fact that,'' even before the IFR, such screen-in rates had declined dramatically, and that historical asylum grant rates were for a

---

[101] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.* Initial receipts equal removal, deportation, exclusions, asylum-only, and withholding only cases.

[102] USCIS, *Asylum Division Monthly Statistics Report: Fiscal Year 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx.*

[103] 89 FR at 48489 (''Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.'').

[104] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Encounters FY2000–2024 tab). With the exception of the pandemic period (March 2020–May 2023), total SWB encounters for January 2024 and for FY 2024Q2 were the highest for the month of January and for Quarter 2 of the fiscal year since FY 2000, including over 4,000 average daily USBP encounters in January and nearly 5,000 in February (CBP SWB Encounter FY 2000–24 tab and Encounters FY2000–2024 tab). *See also* OHSS analysis of July 2024 OHSS Persist Dataset (USBP Encounters—Holiday Dip tab) (showing that encounters tend to dip immediately after each New Year before increasing again by the end of January).

population of people seeking asylum that, by the IFR's own admission, looked very different—and included many more single Mexican men seeking to work—than the current population of people seeking asylum. The commenter further objected that the Departments' focus on the gap between screen-in rates and merits rates ignores the fact that credible fear interviews are intended to be evaluated at a lower standard; according to the commenter, a screening interview is not, and cannot be, a merits adjudication.

*Response:* The Departments disagree that they have mischaracterized the data related to the percentage of EOIR asylum grants in cases originating from the credible fear process. The data consistently show that only a small percentage of cases referred for section 240 removal proceedings before EOIR after a credible fear determination ultimately result in a grant of asylum.[105]

In the IFR, the Departments noted that from FY 2014 through FY 2019, of the total SWB encounters with positive credible fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n. 219. The Departments included the underlying data in the IFR docket.[106] The Departments acknowledge that the denominator includes cases where there was no decision on the merits of the asylum claim, such as, for example, applications that were withdrawn or not adjudicated, or where the case was administratively closed, terminated, or dismissed.[107] The Departments disagree, however, that this approach is misleading. The cited statistic demonstrates that the number of noncitizens who are placed in section 240 removal proceedings after the expedited removal process greatly exceeds the number of noncitizens who are ultimately granted relief or protection. Even if one excludes cases involving termination, dismissal, or administrative closure as well as in absentia removal orders, DHS and EOIR data show that from 2014 through 2019, of the total SWB encounters referred to EOIR after being processed for expedited removal, only 33 percent of

EOIR case completions ultimately resulted in a grant of relief on the merits.[108] The rate increases slightly to 36 percent if the ''relief rate'' is defined as all EOIR findings of non-removability and grants of asylum, statutory withholding of removal, CAT protection, cancellation of removal, and adjustment of status, divided by the sum of those grants and removal orders not issued in absentia.[109] Whether one uses the 18 percent, 33 percent, or 36 percent figure, the data demonstrate that historically there is a significant disparity between positive credible fear findings and ultimate grants of relief in section 240 removal proceedings.[110]

The Departments disagree with the statistical approach presented by at least one commenter who claimed that the majority of people (55 percent in FY 2023 and 2024) who establish a credible fear are ultimately granted asylum when their asylum claim is adjudicated. The commenter seems to have arrived at this statistic by dividing the number of asylum grants by the total number of grants and denials from a chart provided on EOIR's website.[111] But the EOIR chart also demonstrates that a large percentage of completed cases resulting from a positive credible fear determination involve noncitizens who never filed asylum applications once placed in section 240 removal proceedings or who abandoned or withdrew their applications.[112] The Departments believe that it is inaccurate to exclude these cases in assessing the disparity between positive credible fear findings and ultimate relief because the noncitizens in these cases did not actually pursue an asylum claim during section 240 removal proceedings even though the opportunity to pursue such a claim was the sole reason they were placed in section 240 removal proceedings rather than being removed on an expedited removal order. Instead,

relying on the most recent version of the EOIR chart cited by the commenter, if one includes these cases, which are numerous, in the denominator (and excludes cases where the asylum application was not adjudicated or the case was administratively closed), the ultimate grant rates for cases reflect a much smaller percentage than commenter's representation of the ultimate asylum grant rate. As EOIR's adjudication statistics reflect, the asylum grant rates of cases completed by EOIR in FYs 2022 and 2023 that originated with a credible fear claim were just 23 percent and 18 percent, respectively.[113]

The Departments cited these data to demonstrate the general point that there is a significant disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings, which can take years to resolve. *See* 89 FR at 48743 n.219 (noting that from FY 2014 through FY 2019, of the total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief). That reality, as well as the length of time it can take before a removal takes place after a removal order is final, creates a strong incentive for some number of migrants without potentially meritorious claims to make the dangerous journey to the southern border to claim fear in order to take their chances on being allowed to remain in the United States for a lengthy period. And that risk is magnified by Congress's failure to provide the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during periods of high encounters. The rule's limitation on asylum eligibility is intended in part to reduce this incentive and encourage migrants with meritorious asylum claims to use the lawful, safe, and orderly pathways that the United States Government has provided. *See* 89 FR at 48732.

Regarding commenters' concerns that the data cited include noncitizens whose asylum applications may have been denied for reasons unrelated to the meritoriousness of their underlying claim—such as noncitizens' lack of access to counsel, translation issues, noncitizens' lack of knowledge about the one-year bar, and IJ discretion—the Departments disagree that these potential issues would undermine the Departments' reliance on DHS and EOIR

---

[105] *See, e.g.,* EOIR, Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline; see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results Tab)

[106] *See* OHSS Data Spreadsheet Data for Securing the Border IFR, tab 219 (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

[107] *See id.; see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[108] Relief on merits rate is defined as EOIR grants of asylum, conditional grants of asylum, or adjustment of status under statutory provisions divided by the sum of those grants of relief plus removal orders not issued in absentia. OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[109] *See id.*

[110] *See id.*

[111] *See* Human Rights First, Correcting the Record: The Reality of U.S. Asylum Process and Outcomes (Nov. 2023) *https://humanrightsfirst.org/wp-content/uploads/2023/11/US-Asylum-process-and-outcomes-Fact-Sheet_Nov-2023.pdf* (citing EOIR, *Adjudication Statistics: Asylum Decisions and Filing Rates in Cases Originating with a Credible Fear Claim* (Oct. 12, 2023), *https://www.justice.gov/eoir/page/file/1062976/download*).

[112] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline* (last visited Sept. 2, 2024).

[113] *See id.*

data to demonstrate the disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings. The factors cited by commenters exist in the absence of the rule and are not impacted by the rule. Furthermore, the Departments' procedures aimed at mitigating these concerns remain unchanged and are expected to continue mitigating those concerns. For example, all AOs are trained to elicit testimony and, even with this rule's changes to the credible fear screening process, the type of information sought to be elicited during a credible fear interview and IJ review is generally well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. *See* Section III.B.2.a.ii of this preamble. USCIS also has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures to address interpretation and rare language issues. *See* 8 CFR 208.30(d)(5). Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[114] Those long existing procedures remain in place under this rule. Nor have any of the procedural requirements for filing an asylum application changed, including the requirement that noncitizens must generally file their application within one year of their arrival in the United States, *see* section 208(a)(2)(B) of the INA, 8 U.S.C. 1158(a)(2)(B), and must show that they should be granted relief in the exercise of discretion. *See Delgado* v. *Mukasey*, 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum.").

The Departments agree that credible fear screenings are not meant to mirror ultimate merits adjudications and that, by design, these screenings will result in some noncitizens being screened in who ultimately are not granted asylum or protection. However, the number of noncitizens who are granted asylum or other protection following a screening necessarily reflects the effectiveness of those screenings; the gap between the screen-in rate and the rate of those granted asylum or other protection matters. With a screening standard that is more likely to identify meritorious claims, the Departments expect to see a

higher share of screened in noncitizens ultimately granted relief or protection. While a credible fear screening in the expedited removal process takes place shortly after entry into the United States, the ultimate adjudication of an asylum (or other protection) claim may be months or years later. The outcome of the screening compared with the outcome of the asylum application's ultimate adjudication on the merits is an important measure of the credible fear interview's effectiveness at ensuring that meritorious asylum claims proceed in the application process because only cases that could be viable should continue on in the process.

Finally, the Departments acknowledge that, as with all screening mechanisms, there is some risk under the rule that a meritorious case might not proceed to a credible fear screening or a merits adjudication. The Departments believe that during emergency border circumstances, the rule's provisions strike an appropriate balance, and that the rule's benefits outweigh any potential marginal increase in the likelihood that a meritorious case would be missed or would fail under the rule's procedures, as discussed in more detail in Section III.C.3 of this preamble. The Departments reiterate that nothing in this rule prevents a noncitizen from raising a fear claim. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. For the reasons discussed in Section III.C.2 of this preamble, DHS believes that the manifestation standard will continue to provide noncitizens with an adequate opportunity to seek relief and protection in the United States. Moreover, under the rule, those referred for a credible fear screening will continue to have an opportunity to have their claims assessed by an AO in a non-adversarial interview and will be able to seek IJ review of the AO's decision. Although many noncitizens may be subject to the limitation on asylum eligibility under this rule, during the credible fear interview and IJ review (if elected), they will still be screened for potential eligibility for statutory withholding of removal and CAT protection. In sum, as explained in the IFR, the Departments expect that these provisions will continue to produce accurate outcomes, although the Departments believe that the rule continues to be necessary and appropriate to address emergency

border circumstances even if this expectation turns out to be misplaced in close cases. 89 FR at 48750 n.250.

Indeed, as discussed in Section II.A.2 of this preamble, the Departments believe that the IFR is working to reduce the gap between high rates of referrals and screen-ins and the historically low percentage of those who are ultimately granted protection or relief, while still providing noncitizens with opportunities to raise and have their claims considered. The Departments believe that the difference between the positive credible fear rate during the pre-pandemic period and the rate under the IFR is attributable to the rule's limitation on asylum eligibility and the higher "reasonable probability" screening standard for statutory withholding of removal and CAT claims, which, as the Departments explained in the IFR, is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

*Comment:* At least one commenter argued that the IFR is arbitrary and capricious because the Departments impermissibly use the availability of pathways not related to asylum or humanitarian relief as justification for reducing asylum access. The commenter stated that the availability of lawful pathways is not a factor that Congress intended the agencies to consider as a basis for limiting asylum.

*Response:* The Departments disagree with the assertion that the rule impermissibly relies on the availability of lawful, safe, and orderly pathways to reduce access to asylum. As an initial matter, the Departments note that the primary purpose of the rule's temporary limitation on asylum eligibility is to reduce the daily number of entrants by discouraging irregular migration during periods when the border security and immigration systems are over capacity and unable to effectively process noncitizens through expedited removal. *See* 89 FR at 48731–32. Because section 3(b)(v)(D) of the Proclamation contains an exception for arrivals at the SWB under a process approved by the Secretary, and because this rule's limitation on asylum eligibility excepts those who are described in section 3(b) of the Proclamation, the limitation will also not apply to such arrivals. *See id.* at 48754. In this way, the Proclamation

---

[114] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

**STB_AR1_000028**

and the rule continue to maintain incentives for noncitizens seeking protection to use the safe, lawful, and orderly process that the United States has provided. *See id.* at 48730–31 (stating that "applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration pathways, or not undertake the dangerous journey north to begin with"); *see also id.* at 48754 (explaining that the rule "provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways"). Indeed, the use of such pathways and tools to access those pathways, like the CBP One app, is critical for promoting efficient border processing especially during emergency border circumstances. *See id.* at 48737 ("During emergency border circumstances [the] use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources." (citations omitted)); *see also* 88 FR at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). However, contrary to the commenter's claim, the rule does not impose a limitation on asylum eligibility based solely on the availability of such pathways. Rather, the rule's limitation applies to noncitizens who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. *See* 8 CFR 208.13(b), 208.35(a), 1208.13(g), 1208.35(a). And even during these situations, the rule provides an exception for noncitizens (including those who do not use the lawful, safe, and orderly pathways) who demonstrate exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2).

In any event, Congress did not preclude the Departments from considering a noncitizen's use of lawful pathways and processes as a factor when establishing conditions and limitations on asylum. As described in Section III.A.1.a of this preamble, in *Matter of Pula,* the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for discretionary asylum determinations, 19 I&N Dec. at 472–73, and this rule merely takes such circumvention into account to determine eligibility. And exactly how much weight to put on that factor and whether to do so in weighing asylum eligibility falls well within the broad discretion conferred by section

208 of the INA, 8 U.S.C. 1158, including section 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). For the reasons discussed in Section III.A.1 of this preamble and in the IFR, *see* 89 FR at 48733–38, this rule's limitation on asylum eligibility is consistent with the statute, a proper exercise of the Departments' authority, and distinguishable from the prior regulations that some courts have found invalid.

*Comment:* One commenter disagreed with the Departments' assertion that the IFR will undermine TCOs' ability to incentivize migrants to utilize irregular migration methods. The commenter argued that the IFR will instead have the opposite effect of forcing many migrants to use irregular routes, thus strengthening the organized smuggling operations and TCOs the agencies seek to combat. The commenter also argued that the IFR makes the "bizarre assertion that *new* measures punishing vulnerable people are necessary because" smuggling operations have ways to avoid existing asylum restrictions.

*Response:* The Departments disagree that the IFR will incentivize irregular migration and thereby strengthen organized smuggling operations and TCOs. The IFR has enhanced the disincentives to crossing irregularly, reducing the overall number of encounters between POEs. Through August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and the IFR have fallen 59 percent from the level of average daily encounters during the "immediate post-pandemic period," *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before the IFR entered into effect on June 5, 2024.[115] This rule addresses the reality of unprecedented migratory flows, the systemic costs these flows impose, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. The procedures in place before the publication of the IFR resulted in the release of a high proportion of migrants into the United States to await section 240 removal proceedings, creating a vicious cycle in which exploitative smuggling networks could effectively advertise that border crossers were likely to remain in the United States

upon arrival, encouraging higher encounter numbers, which in turn led to more releases. *See* 89 FR at 48714–15. This created a situation in which large numbers of migrants—regardless of their ultimate likelihood of success on an asylum or protection application—were subject to exploitation and risks to their lives by the networks that drove their movements north. *See id.* In contrast, the Departments believe that the reduction in migration resulting from this rule will, over time, weaken the TCOs that prey on migrants for profit by starving such TCOs of funding.

The IFR does not "punish[ ] vulnerable people," as the commenter alleges. The Departments explained that although heightened enforcement efforts by the United States and Mexico helped to mitigate very high levels of irregular migration, "[s]muggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes [in enforcement efforts] are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs." 89 FR at 48726. The Departments further stated that "[w]ithout the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States." *Id.*

The rule is consistent with concern for vulnerable people and the Departments' operational capacity to administer and enforce the immigration laws. As a means of preventing migrants from falling prey to smuggling and other criminal organizations, the Departments have discouraged attempts to enter the United States without inspection while increasing the availability of lawful pathways. The limitation on asylum eligibility contained in the rule undercuts claims made to migrants by TCOs and smugglers that simply arriving at the border will result in them being released into the United States. Additionally, the Departments believe that increasing the availability of lawful pathways for migration helps discourage attempts to enter the United States without inspection by providing individuals with options that do not involve putting their lives in the hands of smugglers. The Departments believe that this balanced approach—expanded lawful pathways to enter the United

---

[115] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab). There were, on average, 2,077 encounters per day (including all demographic groups) between POEs at the SWB from June 5 through August 31, 2024, compared to 5,119 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

STB_AR1_000029

States, coupled with conditions on asylum eligibility for those who fail to exercise those pathways and the swift imposition of immigration consequences when individuals do not establish a legal basis to remain in the United States—will continue to decrease attempts to irregularly enter the United States, and thereby reduce reliance on smugglers and human traffickers.

*Comment:* A commenter argued that the IFR fails to account for the effect of existing and contemporaneously promulgated policies, such as EOIR's "recent arrivals docket."

*Response:* The IFR is one of several tools that the Departments employ to encourage the use of safe, orderly, and lawful processes for accessing the border and to maintain a manageable operational capacity to adequately deliver timely decisions and consequences to noncitizens encountered at the southern border who do not establish a legal basis to remain. The Departments are not aware of any evidence that the recent arrivals docket or any other recent procedural changes in case processing could have, on their own, addressed the record high levels of migration that the Departments have contended with in recent years. Such changes offer important efficiency benefits but by themselves do not adequately address problems such as the large number of non-meritorious claims for asylum and related protection.

For example, as the Departments announced on May 16, 2024, the recent arrivals docket applies to certain noncitizen single adults.[116] For cases on the recent arrivals docket, IJs will generally aim to render a final decision within 180 days, which is substantially longer than the expedited removal process.[117] The recent arrivals docket

provides efficient case processing procedures for removal proceedings, which are, as a general matter, designed to be more comprehensive proceedings for the full adjudication of claims,[118] as compared with expedited removal, which is designed to quickly screen out those who cannot demonstrate a sufficient likelihood of ultimate success on the merits. Thus, the recent arrivals docket is not as efficient as either expedited removal proceedings generally or expedited removal proceedings undertaken pursuant to this rule. Accordingly, the recent arrivals docket is best considered as a complementary measure to this rule for those who are not subject to or cannot be processed under expedited removal despite the resource-saving measures laid out in this rule. Similarly, while the Departments are constantly making efforts to maximize the efficiency of their procedures, all such changes are inadequate, on their own, to accommodate the high volumes of encounters that make this rule necessary.

*Comment:* Citing 89 FR at 48724 nn.99–100 as an example, a commenter objected that the Departments' reliance on an undisclosed data analysis with unknown assumptions as a basis for projecting future trends is arbitrary.

*Response:* The Departments included in the rulemaking docket extensive data supporting the IFR, including an explanation of assumptions underlying certain projections.[119] As DHS explained in the IFR, the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. *See* 89 FR at 48727 n.127. The period leading up to the IFR

was characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *Id.* Nonetheless, the Departments included ample basis for their assessment that the IFR was needed and did not rely exclusively on internal projections as a basis for the rule. *See, e.g.,* 89 FR at 48726 (explaining that "between January and April, 2024, [UNCHR] tracked 139,000 irregular entries [through the Darién jungle], up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022," and that "[p]ast unprecedented migration surges [described in the IFR] bolster . . . the need for this rulemaking"). Further, the Departments note that they are including in the docket extensive data supporting this final rule, including data related to the impact of the IFR, the changes made in this final rule, and the request for comment discussed in Section IV of this preamble, as well as detailed explanations of certain projections.

### b. Lack of Resources Does Not Justify the Rule

*Comment:* Some commenters stated that the Departments' justification of the IFR based on the lack of resources and congressional funding needed to effectively and efficiently meet process demands for migrants and those in the U.S. asylum process is not a valid basis for the Departments' purportedly disregarding their legal obligations to migrants when managing asylum claims and upending the asylum system. A commenter similarly stated that resource constraints should have no relationship to the treatment of newly arriving migrants whose right to remain has not yet been assessed.

Another commenter said that the IFR is arbitrary and capricious because, while the agencies argue that the IFR is required because of a lack of funding, they provided no analysis to justify that conclusion. The commenter stated that the primary reason USCIS lacks enough AOs is that USCIS faces challenges with hiring and retention. The commenter stated that the agency underpays officers, forces them to work 60-hour weeks, and routinely requires them to apply new and illegal requirements in credible fear interviews, all while ignoring their primary duty of

---

[116] Press Release, *DHS, DHS and DOJ Announce "Recent Arrivals" Docket Process for More Efficient Immigration Hearings* (May 16, 2024), *https://www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration* ("Recent Arrivals Docket Announcement").

[117] Credible fear interviews generally take place close in time to when a noncitizen arrives in the United States. *See* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i) (providing that AOs "shall conduct interviews" of noncitizens who indicate either an intention to apply for asylum or a fear of persecution "at a port of entry or at such other place designated by the Attorney General"). If the noncitizen is not found to have a credible fear, the noncitizen may request review by an IJ, but such review must take place "in no case later than 7 days after the date" of the AO's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). DHS data show a median processing time from credible fear referral to result of 8 days in the pre-pandemic period; 17 days during the pandemic period; 12 days during the immediate post-

pandemic period; and 5 days during the IFR period. *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[118] Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: the rights to representation at no expense to the Government, to a reasonable opportunity to examine and present evidence, and to cross-examine witnesses, INA 240(b)(4)(A)–(B), 8 U.S.C. 1229a(b)(4)(A)–(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)-(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the Board of Immigration Appeals ("BIA"), 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of certain decisions in the appropriate U.S. Court of Appeals, *see generally* INA 242, 8 U.S.C. 1252. For these reasons, the completion goals for cases on the recent arrivals docket remain subject to case-specific circumstances and procedural protections, including allowing time for noncitizens to seek representation where needed. *See* Recent Arrivals Docket Announcement.

[119] *See* OHSS Data Spreadsheet, *Data for Securing the Border IFR* (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

conducting asylum adjudications. The commenter stated that CBP has the ability under current resources to greatly expand its capacity at POEs, but that CBP and DHS simply refuse to take that step. Another commenter similarly said that the IFR repeatedly invokes resource constraints as the reason to deny access to asylum, yet CBP is the nation's largest Federal law enforcement agency, and it has "seriously understated" its processing capacity in the past. A few commenters said that real solutions to alleviate conditions at the southern border include operational efficiency, better resource allocation, and increasing resources to meet demand and fairly process applications.

One commenter said the rule is motivated by the Departments' concern that too many people are seeking asylum, rather than whether individuals are eligible. Further, this commenter wrote that, without any monitoring of the consequences of removal, it is unclear if the IFR's supposed efficiency is in the best interests of the United States, which include a commitment to upholding human rights and providing humanitarian aid.

*Response:* With respect to the claim that the rule's reliance on resource and funding constraints and efficiency concerns are impermissible bases to disregard legal obligations to migrants seeking asylum and protection, the Departments first reiterate that the rule does not violate any legal obligations to migrants, as explained in Section III.A.1 of this preamble and in the IFR. *See* 89 FR at 48733–39. This rule is consistent with U.S. domestic law and with the United States's treaty obligations. The United States implements its non-refoulement obligations through statutory withholding of removal and CAT protection. Even when the threshold for emergency border circumstances has been reached, these forms of protection remain available. From June 5, 2024, through August 31, 2024, 27 percent of those encountered between ports of entry at the SWB and placed into expedited removal were referred for a credible fear interview, and over half of individuals referred for credible fear interviews under the IFR have ultimately been screened in.[120] Those who have not received such determinations have either been determined to have not manifested a fear of removal or have been determined to have not shown a significant possibility that they could ultimately demonstrate by a preponderance of the

evidence eligibility for asylum in light of the rule's limitation on asylum eligibility or a reasonable probability of persecution or torture.

In addition, the Departments disagree with commenters' assertion that it is impermissible to consider resource constraints and lack of funding as supporting the need for the IFR and this rule. Congress provided the Departments with broad discretionary authority under section 208 of the INA, 8 U.S.C. 1158, including expressly conferring discretion to impose limitations on asylum eligibility. INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B). Nothing in the INA explicitly or implicitly forecloses the Departments from considering the impact of resource constraints when exercising their discretionary authorities. For this reason, as explained in Section II.A.1 of this preamble and in the IFR, *see* 89 FR at 48731–49, the rule's changes to certain expedited removal procedures and the credible fear process are a lawful exercise of the Departments' authorities and are consistent with the INA.

Indeed, resources and funding cannot be separated from the safe, effective, and humane enforcement and administration of our immigration laws. The Departments can only function with the resources provided to them by Congress. While the Departments carefully utilize the resources that they are given, they are inadequate in the face of substantial and unprecedented global migration. As explained in the IFR, these constraints prevent the border and immigration systems from properly functioning to provide timely relief for those who warrant it and timely consequences for those without a legal basis to remain when encounters reach the thresholds identified in the rule. *See* 89 FR at 48730 (discussing the impact of resource limitations); *see also id.* at 48752 (explaining that "[g]iven current resources[ ] . . . there is a limit on how many people can be put through the process—and that limit directly informs the 1,500 threshold").

The rule is carefully tailored to address these challenges and is therefore a reasonable exercise of the Departments' discretionary authorities. By shifting to a manifestation standard for fear claims, and heightening the screening standard for withholding and CAT protection, DHS will be able to devote more of its limited resources to more effectively and quickly processing migrants, and the Departments will be able to focus on those claims that are more likely to have merit. *See id.* at 48744–45. The limitation on asylum

eligibility disincentivizes attempts at entry, thereby easing stress on DHS resources, while also providing an efficient way to address claims of fear raised by individuals who do not fall within the exception to the limitation. *See* 89 FR at 48731–33. At the same time, the rule does not foreclose asylum eligibility for noncitizens who are in circumstances that require immediate action: It includes an exception for exceptionally compelling circumstances, including for noncitizens (or members of their families with whom they are traveling) who experience an acute medical emergency, face an imminent and extreme threat to life or safety, or are a "victim of a severe form of trafficking in persons." *See* 89 FR at 48732–33. And those referred to the credible fear process will continue to be screened for potential eligibility for statutory withholding of removal and protection under the CAT. Thus, the rule allows the Departments to use their limited resources more effectively to administer and enforce the nation's immigration laws, while also reducing incentives for migrants to make the dangerous journey to the southern border in the hope that the overwhelmed and under-resourced immigration system will not be able to expeditiously process them for removal. In sum, the rule is needed to support the effective "operation of the immigration system" during emergency border circumstances. *Judulang* v. *Holder,* 565 U.S. 42, 55 (2011).

Contrary to commenters' claim, the IFR fully explains the funding shortfall facing the Departments and how it has severely hampered their abilities to effectively and efficiently process noncitizens at the southern border and deliver timely decisions and consequences to those without a legal basis to remain. *See* 89 FR at 48728–30. Under current appropriations, DHS will, at best, be able only to sustain most of its current operations and will not be able to expand capacity along the southern border or increase its ability to deliver consequences through referrals into expedited removal. *See id.* at 48729. Because of the funding shortfall, in the circumstances in which the measures enacted by this rule apply, DHS simply lacks sufficient personnel and facility resources to safely detain a majority of border crossers for the time needed to complete the expedited removal process, which forces DHS to release noncitizens pending prolonged processing pathways outside of expedited removal. *See id.* at 48752. This renders DHS unable to swiftly process migrants and impose

---

[120] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab and IFR ERCF tab).

STB_AR1_000031

consequences on those who fail to establish a legal basis to remain in the United States, which in turn leads to higher encounter rates. *See id.*

These resource constraints are not unique to front-line officials. In recent years, EOIR adjudicators have completed a record number of cases.[121] However, the drastic increase in the number of newly initiated cases—composed in large part of cases that could have been processed through expedited removal if DHS resources allowed, *id.* at 48751 (''Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[.]'')—has significantly outpaced even these record numbers of case completions, thus increasing the pending caseload before EOIR.[122]

Similarly, USCIS has experienced a dramatic increase in credible fear referrals. USCIS received an estimated 137,000 credible fear referrals resulting from SWB encounters in FY 2023, up from an average of about 52,000 from 2010 to 2019 and an average of about 5,700 from 2005 to 2009.[123] However, as the Departments explained in the IFR, USCIS does not have enough AOs to keep pace with the number of noncitizens who could be referred for credible fear interviews, much less keep pace with new affirmative asylum receipts or the existing affirmative backlog. 89 FR at 48730. The USCIS affirmative asylum application backlog has reached over 1.25 million cases.[124] Despite its growing affirmative asylum backlog, USCIS must continue to assign AOs to certain caseloads (some of which are included in the affirmative asylum backlog and some of which are not) that must be staffed to meet processing time frames established by statute, regulation, settlement agreement, court order, or litigation need, including: reasonable fear screenings; Operation Allies Welcome affirmative asylum cases; affirmative asylum cases subject to litigation; and Safe Third Country Agreement screenings. With a focus on

credible fear screenings and while having to address the required caseloads mentioned above, AOs are unavailable to fully support efforts to reduce the affirmative asylum backlog. If there is a surge in credible fear referrals, USCIS would be forced to detail and train additional staff from other parts of the agency, further affecting the overall immigration system.

USCIS has filled 850 out of 1,011 available AO positions as of August 15, 2024. USCIS is working diligently to avoid a gap between the number of AOs on board and the number of available positions, but some gap in these numbers persists, in part due to the time it takes to hire and receive security clearances for individuals to come on board as AOs. As of August 15, 2024, USCIS has a total of approximately 702 permanent AOs fully trained and certified to complete its workloads, including credible fear screening, reasonable fear screening, and affirmative asylum adjudication. Given that the ebb and flow of hiring and the number of credible fear referrals prior to the implementation of the IFR required far more officers to maintain pace, USCIS has trained staff members from across the agency to serve temporarily on detail as AOs and conduct credible fear interviews consistent with the statute. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). As of August 15, 2024, USCIS had a total of 807 credible fear trained AOs (702 permanent staff and 105 detailees, who are trained to conduct credible fear screenings only). Given the need to address the Departments' various required workloads mentioned above, 511 AOs are currently assigned to work exclusively on credible fear cases. With this number of available AOs and accounting for some fluctuation, USCIS can generally complete credible fear determinations for an average of 650 individuals daily Monday through Friday and an average of 200 individuals daily on Saturday and Sunday. Workload priorities related to border enforcement, statutory requirements, and litigation obligations, along with insufficient resourcing allocations from Congress, continue to affect USCIS's ability to staff at appropriate levels. Accordingly, these funding shortfalls, combined with high encounter levels at the southern border, necessitate this rule's limitation on asylum eligibility and its changes to the credible fear referral process and screening standard for statutory withholding of removal and CAT protection to ensure the Departments are able to deliver timely decisions and

consequences using the resources provided. *See* 89 FR at 48729–31.

DHS disagrees with the claim that USCIS's resource challenges are due to hiring and staff retention problems caused by working conditions and underpay, rather than Congress's failure to provide the agency with sufficient resources. Resource challenges at USCIS are not a novel issue. Nearly 96 percent of USCIS's funding is from filing fees, not from congressional appropriations. Fees for adjudication and naturalization services are set at a level to ''ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants.'' INA 286(m), 8 U.S.C. 1356(m). On April 1, 2024, DHS implemented a new fee schedule for USCIS-processed immigration benefits, which will generate approximately an additional $1 billion annually; the schedule includes a new asylum program surcharge for employment-based petitioners. 89 FR 6194, 6205, 6391 (Jan. 31, 2024). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[125] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[126] As DHS explained in proposing the new fee schedule, the new fee schedule was created based on historical data and the additional funding provided by the new fee schedule may not be sufficient to cover the increased costs of the asylum program, including credible fear processing, if encounters exceed historic rates. 88 FR 402, 432–38 (Jan. 4, 2023). Even with the very limited appropriations provided by Congress to USCIS, the President's budget requests demonstrate the need to supplement USCIS's ability to address credible fear screenings. The President's FY 2024 budget request to Congress sought funds necessary to complete up to 150,000

[121] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 19, 2024), *https:// www.justice.gov/eoir/media/1344796/dl?inline; see also* 89 FR at 48751 (noting that due to its resource constraints, ''the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[]'' (footnote omitted)).

[122] *Id.*

[123] *See* OHSS analysis of Asylum Pre-Screening Officer (''APSO'') Global and OHSS Persist Datasets current as of June 30, 2024 (Historic CFIs tab).

[124] USCIS, *Asylum Division Monthly Statistics Report. Fiscal Year 2024. June 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/ reports/asylumfiscalyear2024todatestats_ 240630.xlsx.*

[125] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https:// www.regulations.gov/document/USCIS-2021-0010- 8176.*

[126] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/ statements-releases/2024/03/11/fact-sheet-the- presidents-budget-secures-our-border-combats- fentanyl-trafficking-and-calls-on-congress-to-enact- critical-immigration-reform/.*

credible fear determinations.[127] A supplemental request in October 2023 sought congressional funding for 1,600 AOs.[128] Congress failed to provide resources to address credible fear screenings with respect to these appropriation requests. Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget[129] would impose a burden on other filers. *See* 89 FR at 48729. USCIS takes workforce retention seriously, but any concern about pay, hours, or workload does not obviate the systemic obstacles in running an underfunded program with limited resources.

With regard to the specific comments regarding CBP's ability and capacity to process noncitizens at POEs on the SWB, DHS disagrees that it has the resources to meaningfully expand that capacity under current conditions. CBP has finite resources available at POEs, all of which must be distributed both to processing of noncitizens and to implementing CBP's other priority missions, including facilitating lawful trade and travel and protecting national security interests.[130] That said, CBP has taken steps to increase the number of noncitizens processed at POEs, including through tools such as the CBP One app, which has helped CBP to maximize its limited resources as it permits noncitizens to pre-schedule appointments and mitigates long waiting times at POEs.[131] The

Departments welcome additional resources from Congress, but must respond to emergency border circumstances with the resources currently available.[132]

Finally, the Departments disagree that this rule is motivated by a concern that too many people are seeking asylum. The rule is intended to address the very high levels of irregular migration that the Departments have recently observed, without discouraging those with valid claims from applying for asylum or other protection. By managing flows more effectively, the rule will help ensure the continued effective, humane, and efficient processing of migrants who arrive at the southern border due to emergency border circumstances.

Moreover, the Departments disagree with the suggestion that the rule is not in the best interests of the United States. On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and suspending and limiting the entry of such noncitizens. 89 FR at 48490–91. The Departments determined that the IFR was necessary to respond to the emergency border circumstances discussed in the Proclamation. *Id.* at 48715. Exercising their authorities, including under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Secretary and the Attorney General determined that during emergency border circumstances, it is in the "best interests of the country . . . to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing of noncitizens who do not enter in violation of it." *Id.* at 48737 (alteration, citation, and internal quotation marks omitted). At this time, the Secretary and

people daily. *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[132] *See* Letter for the Hon. Patrick McHenry, Speaker Pro Tempore of the U.S. House of Representatives, from Shalanda D. Young, Dir., Off. of Mgmt. & Budget, *Re: Critical National Security Funding Needs for FY 2024* (Oct. 20, 2023), *https://www.whitehouse.gov/omb/briefing-room/2023/10/20/letter-regarding-critical-national-security-funding-needs-for-fy-2024/* ("This request includes resources for an additional 1,300 border patrol agents to work alongside the 20,200 agents already funded in the FY2024 Budget; 375 immigration judge teams to strengthen the immigration court system—the largest incremental request ever; [and] 1,600 asylum officers to speed up processing of asylum claims[.]").

the Attorney General continue to believe that this rule's limitation on asylum eligibility is in the best interests of the United States and that it should continue to apply, while encounter levels remain above the thresholds in the rule (*i.e.*, during emergency border circumstances), to noncitizens who enter across the southern border and who are not described in section 3(b) of the Proclamation, unless such noncitizens demonstrate that exceptionally compelling circumstances exist.

The Departments further disagree with the assertion of commenters that, without monitoring the consequences of removal, it is unclear if the IFR's improvement to systemic efficiency is in the best interests of the United States. The Departments believe that the present rulemaking strikes the appropriate balance between facilitating efficiency during times when emergency border circumstances are present and upholding the commitment of the United States to protecting human rights and honoring its non-refoulement obligations. Indeed, the credible fear screening process itself is designed to make a case-by-case determination related to the consequences of removal and whether those potential consequences warrant allowing a noncitizen to remain in the United States to pursue an asylum or related protection claim. While it is not feasible for the United States to monitor the exact consequences of removal in every individual case, AOs and IJs routinely use country conditions information, including Department of State Country Reports on Human Rights Practices, to inform their evaluation of potential consequences of removal as part of the credible fear determination, as part of their statutory obligation to consider "such other facts as are known" to them in the credible fear of persecution determination (INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)); likewise, they are required by regulation to consider "evidence of gross, flagrant or mass violations of human rights within the country of removal" and "any other relevant information regarding conditions in the country of removal" in any evaluation of protection under the CAT, 8 CFR 208.16(c)(3)(iii)–(iv).[133] The

[127] *See* DHS, *FY 2024 Budget-in-Brief* 74 (2024), *https://www.dhs.gov/publication/fy-2024-budget-brief* (last visited Sep. 3, 2024).

[128] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*.

[129] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/*.

[130] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, CBP, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/document/guidance/guidance-management-and-processing-undocumented-non-citizens-southwest-border-land*.

[131] *Id.* During the pre-pandemic period, CBP's Office of Field Operations ("OFO") processed around 330 people per day. From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed approximately four-and-a-half times that number of

[133] USCIS RAIO Directorate, *Officer Training: Credible Fear of Persecution and Torture Determinations* 19–20 (May 9, 2024) ("Additionally, pursuant to the statutory definition of 'credible fear of persecution,' the asylum officer must take account of 'such other facts as are known to the officer.' Such 'other facts' include relevant country conditions information. Similarly, country conditions information should be considered when evaluating a credible fear of torture. The Convention Against Torture and implementing

STB_AR1_000033

present rulemaking does not change the types of evidence AOs and IJs rely on, such as human rights monitoring reports relating to the potential consequences of removal to a particular country, in making credible fear determinations at the higher "reasonable probability" of persecution or torture standard.

### c. Rule Does Not Acknowledge Factors Contributing to Migration

*Comment:* Some commenters argued that the Departments failed to analyze to what extent migration patterns are shaped by U.S. immigration enforcement system incentive structures relative to other factors, such as the many reasons people are forced to flee their homes.

These commenters disagreed with what they characterized as the Departments' decision to impose further consequences on individuals seeking protection. Some commenters argued that many factors contribute to the number of border encounters, including dire conditions in migrants' countries of origin and their personal circumstances, and that while the IFR acknowledges that various push factors such as violence, persecution, poverty, human rights abuses, climate change, and others contribute to current migratory patterns, it does not fully engage with them and instead "assumes, without foundation, that the perceived incentives, responsive to U.S. enforcement measures, single-handedly shape migration patterns," despite ample United States Government and academic analyses that demonstrate that U.S. enforcement measures are only one of several factors informing patterns of migration.

Similarly, another commenter stated that, although the IFR asserts that insufficient enforcement leads to high encounter levels, it is more plausible that the world is experiencing high levels of displacement and international migration and that the United States is a desirable destination for migrants. The commenter added that such global pressures would be more productively met with policies that directly address the desire, ability, and opportunities for people to migrate, rather than imposing harsher enforcement.

*Response:* The Departments agree that many factors that are outside the U.S. Government's control influence migration patterns, including push factors. The Departments have never

asserted that U.S. enforcement measures singlehandedly shape migration patterns. Economic and political instability around the world is fueling the highest levels of migration since World War II, including in the Western Hemisphere. 88 FR at 11704. However, the effects of these factors and U.S. immigration enforcement are complementary to each other. They can both simultaneously and separately influence migrants' decisions regarding when, how, and where to migrate. The Departments believe that ensuring the timely enforcement of consequences for noncitizens who enter the United States irregularly without a legal basis to remain in the United States is a powerful tool for addressing the situation at the southern border, particularly when combined with the expanded availability of lawful pathways. This view is supported by the success of the IFR in reducing levels of irregular migration as further discussed in Section II.A.2 of this preamble. Timely enforcement of consequences is but one approach to respond to the specific issue of incentivizing the use of lawful, safe, and orderly pathways and disincentivizing migrants from utilizing dangerous, irregular migration routes along the southern border. This rule was designed to address encounters on our SWB, not to singlehandedly reshape migration patterns throughout the region.

### d. Other Comments Related to the Departments' Justification

*Comment:* Commenters suggested that high encounter levels are due to the Biden Administration's border security and immigration regulatory and policy efforts. One commenter disagreed with the Departments' assigning blame for the border crisis to Congress's failure to appropriate additional funding to the Departments, instead stating that it is the Administration's consistent "abdication of border security and immigration enforcement[]" that has resulted in the sustained high rate of encounters since 2021. The commenter said DHS must implement additional deterrence policies to discourage "illegal immigration" across the SWB.

*Response:* The Departments disagree that the Administration's regulatory and policy efforts have led to the emergency border circumstances. Rather, the Departments believe that the COVID–19 global pandemic upended travel throughout the world, forcing many noncitizens to delay their journeys to the United States. This was further exacerbated by the implementation of the Title 42 public health Order, which quickly expelled noncitizens who were

crossing the border back into Mexico without applying an immigration consequence. *See* 88 FR at 31335 (discussing lack of immigration consequences associated with expulsions under the Title 42 public health Order). These factors contributed greatly to the significant surge in migration immediately following the end of the COVID–19 pandemic period. Since 2021, the United States Government has taken a series of significant steps to strengthen consequences for irregular entry at the southern border in response to record levels of encounters there. The Circumvention of Lawful Pathways rule created disincentives for irregular border crossings and is a critical component of the Government's regional strategy. DHS also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful, safe, and orderly pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal.[134] In the immediate post-pandemic period, DHS maximized the use of expedited removal given its limited resources, placing an average of 900 individuals encountered between POEs at the SWB into the process each day between May 12, 2023, and June 4, 2024, and conducting an average of 490 credible fear interviews daily, both of which are record highs.[135] Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 794,000 noncitizens who did not have a legal basis to remain in the United States, the majority of whom crossed the SWB.[136] Average daily removals and returns during the immediate post-pandemic period exceeded daily rates for every FY since 2010.[137] The majority of all individuals encountered at the SWB from FY 2021 to FY 2023 were removed, returned, or expelled.[138]

Unfortunately, despite maximizing the usage of resources available to the Departments, these efforts have not been as effective as they could have been had Congress provided the tools and resources needed to address substantial

---

regulations require consideration of '[e]vidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and [o]ther relevant information regarding conditions in the country of removal.' " (quoting 8 CFR 208.16(c)(3)(iii)–(iv))).

[134] *See* Decl. of Blas Nuñez-Neto ¶ 20, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[135] OHSS analysis of June 2024 Enforcement Lifecycle data (Immediate Post-Pandemic ERCF tab); OHSS analysis of APSO Global and OHSS Persist Datasets (Historic CFIs tab).

[136] *Id.*

[137] OHSS 2022 Yearbook of Immigration Statistics (OHSS YB Table 39 tab) (listing past repatriations).

[138] OHSS analysis of June 2024 Enforcement Lifecycle data (Enforcement Lifecycle 6.2024 tab).

**STB_AR1_000034**

levels of migration impacting the southern border. Encounter levels increased toward the end of 2023,[139] and December 2023 saw the highest level of encounters between POEs in history,[140] as increasing numbers of people migrated through the Western Hemisphere. 89 FR at 48713. The Departments' inability, given a lack of sufficient resources, to deliver timely decisions and consequences through expedited removal for those without a legal basis to remain creates incentives for further irregular migration and creates further strain on the border security and immigration systems. *See id.* at 48713–14. The IFR was needed to respond to this emergency situation, and it is having its intended effect as discussed in Section II.A.2 of this preamble. However, only Congress can provide the resources and authorities that the Departments need to ensure durable solutions to heightened levels of global migration and the impact it has on the border security and immigration systems.

### B. General Feedback on the IFR

#### 1. General Support

*Comment:* Some commenters approved of the rule's limitation on asylum eligibility, reasoning that the U.S. asylum system is being "abused" and "exploit[ed]." A commenter stated that the Federal Government should stop permitting undocumented immigrants to stay in the country while their asylum claims are processed, as many exploit the system to remain for years, and that daily border crossings pose national security risks. That commenter also stated that the United States has housing and job shortages, so allowing immigrants to take housing and jobs is hurting America. Another commenter thanked the Departments for implementing this rule and asked that all enforcement mechanisms be deployed to uphold it.

*Response:* The Departments agree that maintaining border security is critical and that the rule will have benefits for the U.S. border security and immigration systems. Specifically, the United States Government has better ensured timely decisions and consequences for irregular entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States in decades. *See, e.g.,* 89 FR at 48712–13; *id.* at 48721–26

---

[139] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024, for July 2024 (Encounters FY 2000–2024 tab).
[140] *Id.*

(discussing the increase in migration at the SWB, consistent with global trends and regional United States Government efforts); 88 FR at 11716–18 (discussing United States Government measures to offer alternative pathways to address the root causes of migration, improve the asylum system, and address the pernicious role of smugglers). This approach has allowed DHS to process noncitizens arriving at the southern border for removal in record numbers and with record efficiency. 89 FR at 48713, 48727.

This rule has improved DHS's ability to place into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB and to swiftly issue decisions and impose consequences that have proven effective to disincentivize noncitizens who do not have a strong claim for asylum or other protection from entering the United States to pursue such claims. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. This rule is also designed to identify more effectively those with a fear of return, and, for noncitizens who have manifested or expressed a fear of return, to screen out and swiftly remove those whose claims have a low likelihood of succeeding on the merits. *See* 89 FR at 48743–46. As a result, the Departments believe that this rule will also improve the overall functioning and efficiency of the immigration system by reducing strains on EOIR and USCIS resources and allowing DHS to remove more noncitizens through expedited removal, rather than adding them to the backlogged immigration courts.

#### 2. General Opposition

##### a. Negative Impacts on Noncitizens and Others

###### i. Conflicts with Humanitarian Values

*Comment:* Several commenters expressed opposition to the IFR based on general humanitarian and moral concerns, with some commenters urging the Departments to reconsider or rescind the rule. Commenters addressed the general right to seek asylum and the United States' obligations to protect those seeking asylum. For example, commenters emphasized that people have the right to migrate and seek asylum, which commenters described as a human right. Commenters stated the Administration should provide rights to those in the U.S. asylum process. Commenters also stated that people have a right to work and live in a safe environment with their families so that they can enjoy a better life. Several commenters stated that the IFR denies

the right to seek asylum or that it harms those with the right to asylum. Commenters stated that the United States has a responsibility or moral obligation to welcome noncitizens who might make claims of asylum, that the United States should provide protection to those who seek it, and that turning them away is unconscionable. Some commenters suggested that the United States should welcome all people, regardless of their origin or when or how they arrive. Commenters stated that the United States has contributed to the conditions or push factors that promote migration and that it should share the responsibility for the geopolitical and climatic conditions it has created, especially since the response of the United States may shape how other countries react to humanitarian crises.

*Response:* The Departments agree that the United States has certain legal obligations to protect those present in the United States who fear persecution or torture in their home countries or countries of removal and recognize the importance of offering migrants the opportunity to seek protection from removal. *See* 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble, this rule does not run afoul of those obligations or otherwise undermine the commitment of the United States to adhering to international law principles concerning non-refoulement. *See also id.* at 48716–17, 48735–36. The Departments have instead exercised their authority to adopt a limitation on asylum eligibility and an exception to that limitation in certain circumstances. *See id.* at 48718. As discussed more fully in Section III.A.1 of this preamble, this framework comports with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), which permits limitations and conditions on asylum as long as they are consistent with the INA.

Any noncitizen who is physically present in the United States may apply for asylum, but there is no right for a noncitizen to enter the United States or to be processed in a particular manner. *See United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950) ("At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government."). No individual present in the United States will be denied the opportunity to seek asylum or protection under this rule.

In particular, this rule does not preclude noncitizens who cross the

STB_AR1_000035

southern border from seeking asylum. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Also, noncitizens in section 240 removal proceedings have the opportunity to present information asserting fear of or concern about potential removal. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4). Although many individuals may be ineligible for asylum under this rule, they may seek to establish that they are subject to the rule's exception for exceptionally compelling circumstances, and they may also still seek statutory withholding of removal and CAT protection in the United States.

The purpose of this rule is to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718. Consistent with that purpose, the rule limits eligibility for asylum during such circumstances and ensures that the process is not overwhelmed by those with nonviable claims in the expedited removal process who will add to an already-large backlog. Those referred to an IJ will become part of the backlog of pending immigration cases before EOIR, which at the end of the third quarter of FY 2024 was over 3.46 million cases.[141] Continuing to process non-viable claims will also exacerbate USCIS's asylum backlog, which, based on case filings through August 31, 2024, was over 1.3 million cases.[142]

*Comment:* Commenters wrote that the IFR contradicts U.S. values and history. Commenters stated that the United States is a nation of immigrants and is built on a history of welcoming migrants. Some commenters described the IFR's limitations on asylum as contrary to U.S. values and democracy and termed it "un-American." Commenters stated that the IFR does not treat noncitizens with dignity and respect. Many commenters emphasized the desire for any process to be "welcoming, transparent, humanitarian,

and fair;" one commenter specifically expressed concern for "the dignity, safety, and human rights of asylum seekers;" and another expressed concern for those people "seeking safety and the American dream." Another commenter emphasized that immigrants "are human beings and deserve to be treated as such." Many commenters generally desired policies that "welcome immigrants." Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. Commenters emphasized their own status as descendants of immigrants and expressed a desire for fairness in welcoming noncitizens at all borders. Commenters argued that the IFR undermines the historic commitment of the United States to protecting those who seek refuge. At least one commenter described the IFR as "authoritarian."

Commenters also addressed moral concerns related to the IFR or the immigration system overall. One commenter stated that immigrants are not "a problem;" rather it is "our immigration system that is the problem." Some described the IFR, or denying asylum, as "immoral," "inhumane," "cruel," "unjust" or "unfair," or "xenophobi[c]." Commenters asserted that the United States should have an accessible, diverse, safe, welcoming, dignified, fair, and balanced immigration system. Commenters stated that the United States should not make it harder for those fleeing danger to seek protections. Commenters stated that the United States should treat immigrants and refugees with respect, dignity, and compassion while defending human life. Commenters stated that Mexico and Latin America are neighbors of the United States and should be treated with goodwill. One commenter stated that asylum seekers from Mexico should be given the full rights of citizens. One commenter stated that there is no real border security or immigration crisis, but rather the concept has been created to distract Americans from certain political agendas, and that the "real crisis" is climate change.

*Response:* The United States is both a nation of immigrants and a nation of laws. The Departments are charged with administering and enforcing those laws and endeavor to do so humanely. The Departments agree that the historical openness of the United States to immigration has enriched our culture, expanded economic opportunities, and

enhanced our influence around the world. However, the Departments reject the contention that the IFR's limitation on asylum eligibility and other provisions are inconsistent with American values, fairness, and showing respect for immigrants.

The United States has a long tradition of accepting and welcoming refugees. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g., Stevic,* 467 U.S. at 409 ("For over 30 years the Attorney General has possessed statutory authority to withhold the deportation of an alien upon a finding that the alien would be subject to persecution in the country to which he would be deported."). Under this rule, the United States will continue to offer such protection. The rule is designed to implement the Proclamation's policies and objectives by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718. The rule enhances the Departments' ability to manage high levels of irregular migration to the United States during emergency border circumstances and allows the Departments to quickly deliver decisions and consequences to those who cross the southern border irregularly and are unable to establish a legal basis to remain, while upholding domestic and international protection obligations. *Id.* at 48731.

Without a policy in place to ensure lawful, safe, and orderly processing of migrants entering the United States, the number of migrants would exceed DHS's already limited resources and facilities. Over the past several years, the border security and immigration systems have experienced extreme strain, with a dramatic increase in the number of noncitizens attempting to cross the SWB between POEs. 89 FR at 48722. Despite the meaningful impact of the Circumvention of Lawful Pathways rule and related measures, encounter levels continued to exceed DHS's capacity to, as appropriate, effectively and safely process, detain, and remove noncitizens. *Id.* at 48727. As explained in the IFR, the Departments believed that, without meaningful policy change, encounters between POEs would continue to rise and surpass DHS's capacity and abilities based on available resources. *Id.* at 48726. The Departments disagree with the sentiment that the rule is unnecessary, as it responds to this urgent situation. The Departments reiterate that the goal

---

[141] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (July 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.* Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding-only cases.

[142] *See* OHSS analysis of USCIS Global data as of September 10, 2024.

STB_AR1_000036

of the rule is not to discourage migrants with valid claims from applying for asylum or other protection, but rather to discourage the unprecedented level of irregular migration while at the same time maintaining access to lawful, safe, and orderly pathways to enter the United States. The Departments have determined that the benefits to the overall functioning and efficiency of the immigration system at our southern border justify the rule; applying the rule is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws and to reduce the role of exploitative and dangerous smuggling and human trafficking networks.

The rule does not render noncitizens to whom it applies categorically ineligible for asylum, nor does it alter their ultimate eligibility for withholding or CAT protection. To ensure that particularly vulnerable migrants are not unduly burdened by the rule, the Departments have included an exception to the limitation on asylum eligibility that will allow some migrants to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And even those ineligible for asylum may continue to seek statutory withholding of removal and CAT protection. A noncitizen who seeks to maintain eligibility for asylum can also utilize one of several lawful, safe, and orderly pathways to the United States, including use of the CBP One app, or, for some noncitizens, refugee resettlement, parole processes, family reunification, and labor pathways. Indeed, as noted above, the CBP One app has permitted the United States Government to process nearly five times more individuals at land border POEs each day than it did on an average day in the six years preceding the pandemic—providing an important avenue for individuals who may wish to access protection in the United States to so in a safe and orderly manner.[143] The Safe Mobility Initiative, which includes Safe Mobility Offices in several countries in the Western Hemisphere, processes and educates migrants about the aforementioned pathways.[144] By reducing migration flows to a reasonable rate, the rule will reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the

Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and reduce the role of exploitative TCOs and smugglers. 89 FR at 48767. Finally, as explained in Section III.A.1 of this preamble, the rule is fully consistent with the Departments' authority and obligations under section 208 of the INA, 8 U.S.C. 1158.

ii. Procedural and Due Process Concerns

(1) General Concerns

*Comment:* A commenter stated that the IFR does not violate noncitizens' due process rights because asylum is a discretionary benefit to which noncitizens have no inherent due process interest; instead, they have only the procedural rights guaranteed by statute. Because the IFR preserves all procedural statutory protections, the commenter stated, the IFR complies with due process. The commenter further stated that regulatory bars to asylum do not alter the basic procedural protections, such as the opportunity to be heard, for noncitizens who make credible fear claims.

Other commenters urged the Departments to rescind the IFR entirely. Some commenters expressed general concern that the IFR would violate or undermine due process protections. One commenter said that U.S. immigration law is already confusing, citing research that it said showed that 55.9 percent of noncitizen respondents did not understand the requirements and processes for accessing United States territory. The commenter further stated that noncitizens arriving at the southern border will not be able to understand the procedures for seeking asylum or protection given the IFR's complexity.

Commenters discussed the importance of due process in the asylum system, as required by international human rights law, and said that the United States has a duty to ensure that noncitizens receive a fair trial and fully understand their rights. Similarly, one commenter stated that noncitizens who express the desire to seek asylum have a due process right to information about their rights and obligations, including deadlines and appeals, the interview process, and their right to legal representation. Such safeguards, the commenter wrote, would ensure that noncitizens receive the necessary guidance for pursuing their asylum claims.

Commenters wrote that fair and efficient asylum procedures are even more important for noncitizens with particular vulnerabilities, such as UCs. Commenters stated that the IFR would

hamper consistent application of the law and result in arbitrary application of the law, thus severely restricting access to asylum and humanitarian protections.

*Response:* The Departments disagree that the rule violates the Due Process Clause of the Fifth Amendment or impermissibly restricts access to asylum. Noncitizens who are encountered in close vicinity to and immediately after crossing the border and are placed in expedited removal proceedings, including those in the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute."[145] *Thuraissigiam,* 591 U.S. at 140; *see also Mendoza-Linares* v. *Garland,* 51 F.4th 1146, 1148 (9th Cir. 2022) (concluding that "an arriving immigrant caught at the border . . . 'has no constitutional rights regarding his application' for asylum" (quoting *Thuraissigiam,* 591 U.S. at 139)). As discussed above in Section III.A.1 of this preamble, the changes in this rule are consistent with the INA. They thus comply with the Due Process Clause with respect to noncitizens in expedited removal proceedings.[146]

Contrary to commenters' assertions, the rule ensures that noncitizens receive

---

[143] OHSS analysis of July 2024 OHSS Persist Dataset (OFO Encounters tab).

[144] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https:// www.state.gov/safe-mobility-initiative/* (last visited Sept. 24, 2024).

[145] Courts also have held that noncitizens do not have an underlying property or liberty interest in a grant of asylum to which the protections of the Due Process Clause attach. *See, e.g., Jin* v. *Mukasey,* 538 F.3d 143, 157 (2d Cir. 2008) (holding that "an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum"); *Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief, and asylum is a discretionary form of relief." (citation and internal quotation omitted)); *Mudric* v. *Att'y Gen.,* 469 F.3d 94, 99 (3d Cir. 2006) (holding that an 8-year delay in processing the petitioner's asylum application was not a constitutional violation because the petitioner "had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived"); *cf. Munoz* v. *Ashcroft,* 339 F.3d 950, 954 (9th Cir. 2003) ("Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause."). Notably, UCs are excepted from expedited removal and have other rights under the nation's immigration laws. *See generally* 8 U.S.C. 1232. Procedural concerns related to UCs are addressed later in this section.

[146] Although this rule's limitation on asylum eligibility also applies in section 240 removal proceedings, even if noncitizens in those proceedings had an interest protected by the Due Process Clause, the application of the limitation would not violate the Due Process Clause because, as noted below, noncitizens in such proceedings are entitled to all the procedural protections such proceedings normally entail. *See Pouhova* v. *Holder,* 726 F.3d 1007, 1011 (7th Cir. 2013) (citing section 240(b)(4) of the INA, 8 U.S.C. 1229a(b)(4), and explaining that "[a]ny proceeding that meets the requirements of the statute also satisfies constitutional due process").

a fair process. Indeed, although the rule changes some procedures, as discussed throughout this preamble, it leaves much of the process unaltered. Specific comments concerning the rule's manifestation of fear standard and related changes to the process for determining whether a noncitizen should be referred to an AO for a credible fear interview are addressed in Section III.C.2 of this preamble. The Departments address commenters' concerns about the rule's consistency with international obligations in Section III.A.1 of this preamble.

First, with respect to one commenter's claim that noncitizens do not understand the requirements for accessing United States territory because U.S. immigration law is confusing, the Departments are aware of no statutory requirement that notice regarding any of the INA's provisions be provided to individuals outside the United States, including those who may be subject to expedited removal provisions or this rule's limitation on asylum eligibility upon arrival. In addition, to the extent the commenter's objection is to the complexity of the INA, that concern is a matter for Congress to address.

Second, under the rule, DHS is continuing to provide noncitizens who are subject to expedited removal with notice of their ability to raise a claim of fear of persecution or torture. DHS is using signs and videos that are reasonably designed to ensure that noncitizens in its custody are aware of their right to request asylum or protection. As discussed further in Section III.C.2 of this preamble, these signs and videos are provided in languages that are common to the large majority of noncitizens encountered by CBP at the southern border. ICE likewise provides information in a number of languages to detainees being processed under the rule.[147] And the signs provide a simple instruction to noncitizens that, if they fear persecution or torture if they are removed from the United States, they should tell an immigration officer and an AO will conduct an interview and ask the noncitizens questions about

any fear they may have. Individuals who do not speak one of the languages are provided with language access services consistent with CBP's existing language assistance policies. These procedures are consistent with DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).

Moreover, to the extent that commenters have expressed due process concerns about the manifestation standard, the Departments reiterate that the expedited removal statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if the noncitizen has a fear of persecution or torture. *See* 89 FR at 48740. Instead, the statute provides that only those noncitizens who ''indicate[] either an intention to apply for asylum . . . or a fear of persecution,'' INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As discussed in detail in Section III.C.2 of this preamble, the statute does not place any affirmative obligation on the Government to question noncitizens about intent to seek relief or fear in their home countries, nor does it define what circumstances constitute the requisite indication of intent or fear; to the contrary, the onus under the statute is on the noncitizen to ''indicate[]'' either of the circumstances warranting referral. Because the Departments' procedures comply with the statute, they comport with due process. *See Thuraissigiam,* 591 U.S. at 139–140.

Third, noncitizens who manifest or express a fear and who are referred for a credible fear interview will receive additional information about the credible fear process that has the same types of procedural and substantive information as that provided in the Form M–444, which is used for those not subject to the rule's expedited removal procedures and during times when this rule's provisions do not apply. 89 FR at 48739–40. The new ''Information About Credible Fear Interview Sheet'' informs the noncitizen that the noncitizen may consult with another person, including a legal service provider, and is provided to the noncitizen along with an EOIR-maintained list of pro bono legal service providers. It gives the noncitizen information about the credible fear interview itself, including that an interpreter will be provided, if needed or requested. It explains that the noncitizen may request a male or female interpreter or AO and may speak to the AO separately from the noncitizen's

family. It highlights the importance of telling the AO about the noncitizen's fear of harm and that this may be the only opportunity to do so. The information sheet notifies the noncitizen of the right to have an IJ review a negative fear determination and gives details about the steps following a positive determination.

Individuals in the credible fear process maintain the right to consult with an attorney or other person or persons of their choosing before their interview, and such persons may be present for the interview itself. 8 CFR 235.15(b)(4)(i)(B). Asylum seekers also may present evidence relevant to their claim during their interviews. 89 FR at 48746 & n.239. Additionally, USCIS provides interpreter services at the agency's expense to noncitizens who cannot proceed effectively in English. 8 CFR 208.30(d)(5). And noncitizens may request review of a negative fear determination before an IJ. *Compare* 8 CFR 208.30(g)(1) (providing the standard process for requesting IJ review in credible fear proceedings), *with* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those subject to the rule and unable to show that the exception to the limitation on asylum eligibility applies). The rule requires noncitizens to respond affirmatively when asked whether the noncitizen would like to request such review, rather than providing review if the noncitizen does not respond, but IJ review remains available in all cases with a negative credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1). The rule is thus fully consistent with the Departments' legal authority and obligations.

In addition, the rule provides several procedural protections to ensure that asylum applicants receive a full and fair hearing before an IJ and that the limitation on asylum eligibility applies only to noncitizens properly within the scope of 8 CFR 208.35(a) and 1208.35(a). During the credible fear review, an IJ will evaluate de novo whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen meets the exception. 8 CFR 208.35(b)(2)(v), 1208.35(b). Even where an IJ determines that the noncitizen has not met that burden, if the noncitizen demonstrates a reasonable probability of persecution or torture in the country or countries of removal, the noncitizen will have an opportunity to apply for statutory withholding of removal,

---

[147] *See* Memorandum for Daniel A. Bible, Exec. Assoc. Dir., Enforcement and Removal Operations, ICE, from Patrick J. Lechleitner, Deputy Dir. and Senior Off. Performing the Duties of the Dir., ICE, *Re: Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border, *and Interim Final Rule,* Securing the Border 5 (June 4, 2024) (''These signs must be posted in English and Spanish. [Enforcement and Removal Operations ('ERO')] will have additional translations available in facility law libraries in the following languages . . . .''); ICE, *National Detainee Handbook* 7, 15, 25 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ ndHandbook/ ndEnglish.pdf.*

STB_AR1_000038

**81194**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

protection under the CAT regulations, or any other form of relief or protection for which the noncitizen is eligible in section 240 removal proceedings, including asylum. 8 CFR 1208.33(b)(2)(ii), 1208.35(b)(2)(iii). These standards help to ensure the outcome of the process delineated in the rule is not predetermined and that noncitizens potentially subject to the limitation on asylum eligibility receive sufficient opportunity for consideration and review of threshold eligibility determinations to satisfy any putative due process rights they may have. *See Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotation marks omitted)).

Nor does the rule violate any procedural due process rights noncitizens may have in section 240 removal proceedings. For those placed in section 240 removal proceedings, the rule's limitation on asylum eligibility will be litigated in those proceedings before an IJ with all the procedural rights that apply in such proceedings. *See Pouhova,* 726 F.3d at 1011; *see also Rehman* v. *Gonzales,* 441 F.3d 506, 508 (7th Cir. 2006) ("Any proceeding that meets [the requirements of section 240 of the INA, 8 U.S.C. 1229a, and the INA's implementing regulations,] satisfies the Constitution as well.").

Additionally, the Departments disagree with comments characterizing the IFR as resulting in unfair procedures that are especially harmful to those with particular vulnerabilities, such as UCs, individuals with mental health issues or intellectual capacity challenges, and victims of violence, torture, or other traumatic experiences. Nothing in the IFR changes the longstanding framework establishing that UCs are not subject to expedited removal. *See* 8 U.S.C. 1232(a)(5)(D). UCs are also specifically excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation and, accordingly, the IFR's limitation on asylum eligibility. 89 FR at 48447; 8 CFR 208.35(a)(1), 1208.35(a)(1). Moreover, the process outlined in the IFR does not prohibit USCIS from exercising its discretion to issue notices to appear ("NTAs") and place noncitizens, including those who are unable to testify or who speak a rare language, in section 240 removal proceedings, where they can request asylum. *See* 8 CFR 208.30(b); *see also Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523 (BIA 2011) (finding that the INA provides DHS with "discretion to put aliens in section 240 removal

proceedings even though they may also be subject to expedited removal"). Additionally, EOIR has established a specialized juvenile docket at each immigration court with an established caseload of children's cases; has issued guidance to its adjudicators regarding special considerations and procedures for cases involving children, including UCs; and has provided training to IJs on cases involving children, including UCs.[148]

Noncitizens in section 240 removal proceedings have a wide range of well-established statutory and regulatory rights, including the following: the right to representation at no expense to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)–(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA, 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of a final removal order in the appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252. Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[149] And safeguards are provided to those who are not competent to participate in their proceedings, *see Matter of Matter of M–A–M–,* 25 I&N Dec. 474, 481–82 (BIA 2011), which may include termination of the proceedings where "[f]undamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable," 8 CFR 1003.1(m)(1)(i)(B), 1003.18(d)(1)(i)(B).

The Departments also disagree with commenters' assertion that the IFR would lead to disparate or arbitrary application of the law. Asylum AOs and supervisory AOs have received the same training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use Global, a cloud-based case management system,[150] which includes interview guides, forms, and instructions—including specific interview guides, forms, and instructions to implement the IFR—to

ensure consistency in procedures and substantive guidelines. Moreover, the IFR does not change the fact that all credible fear determinations issued by USCIS are reviewed by a supervisory AO prior to being served on a noncitizen, 8 CFR 208.30(e)(8), another important safeguard to ensure quality and consistency within and between offices.

Additionally, IJs are career employees who are selected through a competitive process.[151] The Director of EOIR has authority to order "comprehensive, continuing training and support" directed at "promot[ing] the quality and consistency of adjudications." 8 CFR 1003.0(b)(1)(vii). And the Chief IJ has the authority to "[p]rovide for appropriate training of the immigration judges and other [Office of the Chief Immigration Judge] staff on the conduct of their powers and duties." 8 CFR 1003.9(b)(2). Regulations also require IJs to "resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations." 8 CFR 1003.10(b). To that end, all IJs receive ongoing training to facilitate the implementation of new policies and procedures, such as the IFR.[152] EOIR's Legal Education and Research Services Division also offers nationwide legal training for IJs and "regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations."[153]

(2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare

*Comment:* Commenters stated that access to counsel is a due process right. Commenters also discussed statutory and regulatory requirements that provide noncitizens eligible for a credible fear interview the right to consult with legal counsel and said that the recent change to a minimum 4-hour consultation period prior to a credible fear interview—which DHS made via guidance—would effectively deny noncitizens that right.

One commenter additionally stated that less than 3 percent of migrants in

---

[148] *See* EOIR, *Director's Memorandum 24–01, Children's Cases in Immigration Court* (Dec. 21, 2023), *https://www.justice.gov/d9/2023-12/dm-24-01_1.pdf.*

[149] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

[150] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division,* at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

[151] EOIR, *Make a Difference—Apply for an Immigration Judge Position* (last updated Sept. 17, 2024), *https://www.justice.gov/eoir/Adjudicators* (describing application process and core position requirements for IJ position).

[152] *See, e.g.,* EOIR, *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[153] EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division.*

STB_AR1_000039

expedited removal were able to obtain legal representation. Other commenters said that less than 1 percent were able to find representation in the credible fear process. A commenter stated that in 2023, 35 percent of represented individuals had their negative fear determinations vacated, compared to just 15 percent of unrepresented noncitizens. Commenters emphasized that any immigration solution should include procedures for asylum seekers to access legal representation.

Another commenter said that a 2010 study found that 54 percent of noncitizens with representation were granted asylum, compared to 11 percent of noncitizens without representation. Another commenter said that noncitizens with representation were twice as likely to receive a grant of asylum as their unrepresented counterparts. The commenter said that such data indicate that, as a result of the IFR and reduced access to counsel, applicants with meritorious claims who would have otherwise been referred to full hearings will be denied.

Commenters stated that many noncitizens do not understand the function and purpose of a credible fear interview without speaking with an attorney, particularly those who speak languages not included on orienting signs. Commenters explained that a majority of noncitizens do not have legal representation and thus may struggle to effectively present their cases, particularly if they do not speak English. Commenters also stated that, without legal counsel, many noncitizens will not understand the process nor the legal grounds for their asylum claims. Commenters stated that access to counsel significantly affects asylum outcomes and that less access to counsel is particularly troubling considering that noncitizens must now meet a new, higher standard for protection screenings. One commenter stated that the rule will worsen the issues that already exist in expedited removal proceedings, adding that children and adults are routinely denied access to legal advice if they get referred for fear screenings. Commenters who provide legal services also claimed that they have been excluded from credible fear interviews and subsequent credible fear review hearings before IJs.

Another commenter stated that the availability of legal information and representation at the outset of the asylum process increases efficiency, discourages frivolous claims, reduces the number of appeals and repeat claims, and shortens the time required to determine a claim.

Several commenters stated that noncitizens face significant barriers to obtaining legal representation during the credible fear process. A commenter stated that noncitizens in custody already face insurmountable hurdles to access legal counsel, such as knowing how to contact a lawyer, knowing where they are being detained, having access to a phone, and being given enough information to understand the credible fear process. Another commenter stated that having only 4 hours would make it impossible for providers to meet with clients before credible fear interviews, stating that legal representatives often face barriers to accessing clients within 48 hours, much less 4. The commenter discussed such barriers, stating that legal representatives frequently wait 24 to 48 hours for their interviews with their clients to be scheduled and may be barred from including translators or interpreters in those interviews. Some commenters stated that immigration advocates and attorneys face numerous issues in trying to provide legal consultations, such as being unable to physically access detention facilities or obtain the requisite signatures from their clients. Another commenter added that advocates lack access to private meeting rooms and experience long waits to meet with clients, malfunctioning technology, and unsafe or uncomfortable environments.

Several commenters stated that the rule would effectively eliminate access to legal representation because noncitizens would have only 4 hours to find and consult with a lawyer before an initial hearing. Commenters emphasized that they viewed a 4-hour window as troubling in light of the newly increased standards noncitizens must meet. Commenters stated that it takes more than 4 hours to adequately prepare a noncitizen for the credible fear process. Commenters stated that noncitizens will not have the time or resources to contest arguments and present evidence before the credible fear screenings. Commenters believed that the 4-hour window will lead to greater rates of refoulement. Commenters stated that the 4-hour window may fall on a weekend or after business hours, when legal service providers and aid organizations are closed. Commenters asserted that noncitizens will lose access to legal counsel because the United States does not provide free counsel for noncitizens, and 4 hours is not enough time for individuals to retain counsel. Commenters stated that the rule's restrictions are arbitrary and impermissible, not supported by evidence, and will lead to the denial of

otherwise meritorious asylum claims. Commenters stated that counsel would not be able to access their clients physically or telephonically in a 4-hour window.

Commenters stated that, by reducing noncitizens' ability to secure counsel and connect with communities, the IFR will prevent individuals from becoming aware of other protections from which they could potentially benefit.

*Response:* The rule does not deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause. The Supreme Court has held that the rights of individuals seeking asylum at the border are limited to "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam,* 591 U.S. at 140. The INA provides that a noncitizen "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General," provided that "[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). This statutory right to consult does not attach until a noncitizen becomes eligible for a credible fear interview, and it does not guarantee an absolute right to retain counsel. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). The regulations implementing expedited removal elaborate that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 CFR 235.3(b)(4)(ii).

Moreover, because this rule does not alter procedures governing consultation or representation, commenters' concerns regarding those issues—including that the minimum 4-hour consultation period violates section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), or is unreasonable—are outside the scope of this rulemaking. Procedures regarding consultation and representation are governed by other DHS regulations, guidance, and policies.

Nevertheless, insofar as commenters' concerns relate to the Departments' decision to adopt the changes made by the IFR and this rule, DHS's changes to the consultation period do not undermine the Departments' decision to promulgate this rule. Those changes aim to address the same emergency border circumstances as this rule—specifically, DHS determined that shortening the minimum consultation period would reduce the risk that DHS's processing capacity would become overwhelmed by increasing DHS's ability to impose

STB_AR1_000040

consequences swiftly, which in turn lowers incentives for additional irregular migration. DHS's 4-hour minimum consultation period, moreover, continues to allow sufficient time for individuals to make multiple phone calls and have in-depth conversations. DHS is not aware of any data supporting the assertion that this approach has decreased the effective availability of consultation. Finally, even if this approach had some adverse effect on noncitizens' ability to consult, the Departments would still find it necessary and appropriate to adopt this rule's changes, including the two changes to the portions of the removal process that follow consultation—the asylum limitation and the reasonable probability standard.

The Departments start by explaining how the consultation process works. Once a noncitizen is referred to USCIS for a credible fear interview pursuant to 8 CFR 235.15(b)(4), the rule ensures that the noncitizen receives information about that interview and the right to consult with a person or persons of the noncitizen's choosing. Specifically, all those referred for a credible fear interview receive a written ''Information About Credible Fear Interview Sheet'' describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of any negative fear determination an AO enters; and the consequences of a failure to establish a credible fear of persecution or torture. 8 CFR 235.15(b)(4)(i)(B). This written disclosure is available in English, Spanish, Haitian Creole, and Portuguese, and the noncitizen is also provided with a list of pro bono legal service providers. If the noncitizen does not speak one of these languages, then language access services are provided to orally communicate the written material in a language understood by the noncitizen.[154] As stated in the ''Information About Credible Fear

Interview Sheet,'' the minimum 4-hour consultation period begins at the time a noncitizen who has been referred to USCIS for a credible fear interview has access to a phone or another opportunity to consult with an individual of the noncitizen's choosing, and the minimum 4-hour period runs only between the hours of 7 a.m. and 7 p.m. This period is calculated in local time. Procedurally, a noncitizen is scheduled for a credible fear interview only after the minimum consultation period has elapsed, regardless of whether the noncitizen used the phone or consulted with anyone during that period.

The ''Information About Credible Fear Interview Sheet'' further explains that the noncitizen may have a consultant of the noncitizen's choice participate in the interview with USCIS by telephone, and an EOIR-maintained list of pro bono legal service providers who may be able to speak with the noncitizen is also provided. The information sheet instructs noncitizens to ask a DHS officer for assistance if they want to call someone. Individuals who manifest fear in CBP custody and go through the credible fear process in CBP custody are provided access to a phone in order to telephonically consult with any individual of their choosing, including legal counsel, and do not need to ask CBP employees to do so. After manifesting a fear, when a phone becomes available, such noncitizens are brought to the phone and given at least 4 hours in which to use it. If a noncitizen requests use of a phone after the end of the noncitizen's consultation period, but before the noncitizen's interview occurs, the noncitizen is afforded the opportunity to access a phone unless it is not operationally feasible to provide such access (such as because of a lack of available personnel to escort the noncitizen to the consultation area). The phone booths in which such consultations occur are private, closed, confidential booths and include an EOIR-maintained list of pro bono legal service providers.[155]

Those detained noncitizens who go through the credible fear process in ICE custody generally have direct access to phones (without having to interact with facility staff to request access, for instance) and have access to a free call platform that includes telephone numbers of legal service providers who are listed on the EOIR-maintained list of pro bono legal service providers, in accordance with ICE detention

standards.[156] Beyond telephone access, visits between a legal representative and a detained noncitizen are confidential and not subject to auditory supervision.[157] Private consultation rooms may be available for these meetings.[158] To facilitate improved access to legal resources and representation, ICE has also expanded its Virtual Attorney Visitation program, which facilitates confidential attorney-client conversations through virtual technology.[159]

Commenters' arguments concerning the minimum 4-hour consultation period, first, miss that Congress did not provide an unqualified right to consultation or representation during the credible fear process. Rather, noncitizens may consult ''according to regulations prescribed by'' the Secretary, and ''[such consultation . . . shall not unreasonably delay the process.'' *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). And those regulations specify that ''consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained.'' 8 CFR 235.3(b)(4)(ii). ''Read together, the text of these provisions provides noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained.'' *Las Americas Immigr. Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 25 (D.D.C. 2020); *cf.* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III) (providing that IJ review of an AO's negative credible fear determination ''shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination'').

DHS, moreover, moved to the 4-hour minimum consultation period for credible fear referrals for noncitizens

---

[154] *See, e.g.,* ICE, *2019 National Detention Standards for Non-Dedicated Facilities,* Foreword (2019), *https://www.ice.gov/detain/detention-management/2019* (''Generally, all written materials provided to detainees must be translated into Spanish and other frequently encountered languages. Oral interpretation or other language assistance must be provided to any detainee who speaks a language in which written material has not been translated or who is illiterate.''); ICE, *2011 Operations Manual ICE Performance-Based National Detention Standards,* Standard 2.13 (2011), *https://www.ice.gov/detain/detention-management/2011* (''Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.'').

[155] *See* USBP, *6.4.24 USBP Field Guidance,* at 4.

[156] ICE, *Attorney Information and Resources: Communicating with Your Client or Prospective Client* (last updated Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources.* Telephone access and use may be limited in the event of emergencies (for instance, escapes, escape attempts, disturbances, fires, power outages) or other events that disrupt orderly facility operations. If such disturbances occur, officers are responsible for ensuring that the minimum 4-hour consultation period is afforded.

[157] *Id.*

[158] *Id.*

[159] ICE, *Virtual Attorney Visitation Program* (last updated Aug. 16, 2024), *https://www.ice.gov/detain/detention-facilities/vav.*

STB_AR1_000041

covered by the IFR to address the emergency border circumstances described in the President's June 3 Proclamation based on a determination that operational imperatives necessitated this change in order to avoid unreasonable delays to the process in the context of these emergency border circumstances—exactly the type of determination that Congress authorized DHS to make. Under DHS's guidance that applies outside of the context of emergency border circumstances, noncitizens are not interviewed until at least 24 hours after the noncitizen's acknowledgement of receipt of the Form M–444,[160] unless the noncitizen, at the noncitizen's request, voluntarily waives the consultation period. Even if a noncitizen consults at the start of that 24-hour period, the noncitizen's credible fear interview is not conducted until after that period ends.

The 4-hour approach allows a swifter cadence of scheduling noncitizens for credible fear interviews. This minimum 4-hour consultation period thus enables credible fear screenings to take place in a more efficient manner and reduces the time noncitizens remain in custody; in turn, those improvements mitigate overcapacity issues in DHS facilities, free up detention space to allow for greater expedited-removal processing capacity over time, and help to avoid situations in which DHS must issue NTAs to individuals otherwise eligible for expedited removal and release them pending section 240 removal proceedings—in turn delaying the imposition of consequences for those without a legal basis to remain in the United States and creating incentives for additional arrivals at the border. Conversely, a longer minimum consultation period would delay credible fear screenings, increase the amount of time noncitizens remain in immigration detention, and contribute to a situation where DHS's capacity could quickly become overwhelmed, including potentially requiring the release of individuals into section 240 removal proceedings instead of processing such individuals under expedited removal due to resource constraints—thus delaying the imposition of consequences for those without a legal basis to remain and creating incentives for more irregular migration.

The Departments disagree with the conclusion drawn by certain

commenters that a shortened minimum consultation period effectively eliminates access to counsel or that the hours during which the consultation period runs make it practically impossible for noncitizens to reach attorneys or consultants. To the contrary, the minimum 4-hour period that DHS has adopted allows sufficient time for individuals to make multiple phone calls and have in-depth conversations prior to the credible fear interview. *Cf. Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. 3d at 12–14, 30.

The difference between DHS's 24-hour approach and its approach during these emergency border circumstances is also less significant in practice than certain commenters suggested. For example, the consultation period during emergency border circumstances begins to run only when the individual is provided access to a phone and comes access during at least that 4-hour period; the 24-hour period, by contrast, begins when a noncitizen acknowledges receipt of the Form M–444, and the noncitizen does not necessarily have access to a phone immediately at that point. For those who express a fear in CBP custody, under either approach, CBP generally takes a noncitizen to a phone booth once during the noncitizen's time in custody for consultation, and CBP generally will accommodate requests for additional phone access when operationally feasible. In addition, a significant share of the 24-hour period occurs overnight, when fewer people are likely be available to take calls. Under the 4-hour approach, by contrast, the clock runs only during daytime hours.

The 4-hour period is also a minimum, and noncitizens may receive greater time. For example, for noncitizens in CBP custody, if a noncitizen requests access to a phone booth after the consultation, but the interview has not yet occurred, the agent or officer would in the normal course facilitate another call, to the extent operationally feasible. For noncitizens in ICE custody, noncitizens are generally housed in areas with phones that they may use at any time. Hence, noncitizens have phone access even during times when the 4-hour consultation period is tolled, as well as in circumstances in which the noncitizen's credible-fear interview is delayed for a longer time than the 4-hour minimum. The result is that noncitizens in ICE custody will often have more than 4 hours of phone access. Requests to reschedule the credible fear interview may be accommodated for reasons that constitute extraordinary circumstances, such as serious illness of the noncitizen's consultant or serious

facility issues that prevented the noncitizen from contacting a consultant.

The Departments acknowledge that the period includes Saturdays, Sundays, holidays, and periods outside of traditional business hours (7 a.m. to 9 a.m. and 5 p.m. to 7 p.m.). And while the Departments recognize that it may be more difficult for detained noncitizens to connect with the person or persons with whom they wish to consult during these times, this concern again does not undermine the Departments' decision to adopt the changes in the IFR and this rule. DHS's 24-hour approach also includes Saturdays, Sundays, and holidays.[161] Although DHS's 4-hour approach uses a shorter window during those periods than its 24-hour approach, the Departments have already explained why that change makes less of a practical difference than some commenters suggest. Moreover, although DHS's approach during emergency border circumstances may sometimes result in some or all of the 4-hour period falling outside of traditional business hours, noncitizens may reach out to individuals in different time zones during these periods. For those who manifest fear in CBP custody, CBP provides noncitizens with a list of legal service providers operating in multiple time zones.[162] For those who manifest fear in ICE custody, ICE provides noncitizens with a list of legal providers who service the area in which the noncitizen is detained and ICE will, upon request, provide the noncitizen a list of providers in additional States identified by the noncitizen. In addition, DHS's 24-hour approach also does not guarantee that noncitizens would have access to phones during traditional business hours (for example, when the period falls over a weekend or holiday).[163] Excluding weekends, holidays, and periods outside of traditional business hours would thus mark a significant

---

[160] *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023).

[161] *See* DHS, *M–444 Information About Credible Fear Interview* (May 10, 2023) (noting that the interview will occur no earlier than 24 hours after receipt of the form without mention of any tolling or stoppage).

[162] *See, e.g., EOIR, List of Pro Bono Legal Service Providers (Noncitizens in U.S. Customs and Border Protection Custody)* (July 2024), *https:// www.justice.gov/eoir/page/file/1582586/dl.*

[163] The consultation period was not tolled for weekends, holidays, or periods outside of normal business hours under the 48-hour approach that predated the 24-hour approach. *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023) ("Under the current policy, credible fear interviews have generally taken place at least 48 hours after the time of the noncitizen's arrival at the detention facility, unless the noncitizen specifically requests to be interviewed more quickly.").

STB_AR1_000042

change in DHS's practice that could lead to unreasonable delays. And because CBP continues to encounter individuals and to take them into custody 24 hours a day and 7 days a week, that change would be inconsistent with the imperative to facilitate the prompt operation of the expedited removal process, especially during the emergency border circumstances when this rule applies.

In addition, when a noncitizen receives a negative credible fear determination, the noncitizen also has an additional opportunity to consult before review of that determination by an IJ (if requested). INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). Noncitizens can obtain counsel or consult with other individuals of their choosing and seek to introduce new evidence before IJs, allowing for additional consultation beyond the initial 4 hours. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42(c). That additional consultation opportunity further reinforces the Departments' view that the minimum 4-hour consultation period prior to the credible fear interview does not undermine their decision to adopt the changes made by the IFR and this rule.

In response to comments alleging that legal representatives have been excluded from credible fear interviews, the Departments again note that neither this rule nor the consultation period policy changes the procedures and regulations governing attorney participation during credible fear interviews. Under existing regulations, all noncitizens are afforded the opportunity to have a person or persons of their choosing present, including by phone, during their credible fear interview. 8 CFR 208.30(d)(4). In any case where USCIS has received a properly executed G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, prior to the credible fear interview, asylum office staff notify the attorney or accredited representative of the scheduled interview date and time, and the AO must call the attorney or representative before beginning the interview so the attorney or representative may be present. If the AO is unable to reach the attorney or accredited representative, the AO documents this in the interview notes and asks the noncitizen if the noncitizen would like to proceed without the attorney or accredited representative present. Guidance instructs that, where a properly executed Form G–28 is on file, asylum office staff will attempt to ensure that the attorney or accredited representative is present at the interview if the

noncitizen desires such a person's presence. Further, as long as it does not unreasonably delay the process, the asylum office has discretion to reschedule interviews on a case-by-case basis to ensure that an attorney or accredited representative may attend. At the beginning of the credible fear interview, if it has not already been established through a Form G–28, the AO asks the noncitizen if the noncitizen has an attorney or consultant and verifies whether the noncitizen received a list of free or low-cost legal service providers. If the noncitizen does not have an attorney or consultant present, the AO reminds the noncitizen that the noncitizen may have an attorney or consultant present during the interview and asks the noncitizen if the noncitizen wants to continue with the interview without an attorney or consultant present. In addition, as noted above, if a noncitizen requests to reschedule the interview for reasons that constitute extraordinary circumstances, such as illness of the noncitizen's consultant or technical issues that prevented the noncitizen from contacting a consultant, such requests may be accommodated. If there are individual instances where commenters believe legal representatives have been excluded from a credible fear interview contrary to the wishes of a noncitizen, commenters should lodge those complaints through the proper channels,[164] but the Departments emphasize that the present rule does not change the regulatory provisions that govern who may be present during the credible fear interview or impact how asylum office staff ensure those provisions are enforced.

As for the credible fear interview itself, as discussed more fully below in Section III.C.3 of this preamble, even with the heightened screening standard for those found not to have a significant possibility of demonstrating eligibility for asylum under this rule's limitation on asylum eligibility, the type of information sought to be elicited during a credible fear interview is well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. 89 FR at 48747–48. Indeed, even after implementation of the IFR, the experience of DHS has been that noncitizens who do not have an attorney or consultant present during

the credible fear interview are often able to successfully satisfy the "reasonable probability" screening standard.[165] Additionally, under the IFR and this rule, a noncitizen may request IJ review of an AO's negative credible fear determination, which provides an additional layer of protection, including for those noncitizens who are unable to consult with an attorney.

With respect to commenters' reliance on data that purport to show that few noncitizens are able to secure the assistance of counsel during the credible fear process and that those who do receive better outcomes, the Departments note that such data fail to take into account any screening that may occur by legal service providers to determine the perceived validity of the claim before agreeing to provide representation to a noncitizen. Even assuming some instances of improved results for those with counsel, due process "does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey* v. *Montrym,* 443 U.S. 1, 13 (1979). Moreover, as discussed in Section II.A.2 of this preamble, 51 percent of SWB encounters between POEs referred to the credible fear process under the rule— including many who did not have an attorney or consultant present during the credible fear interview—have received a positive result.[166]

With regard to commenter concerns about lack of privacy during credible fear interviews, DHS notes that these interviews are conducted "separate and apart from the general public." 8 CFR 208.30(d). The Departments are mindful of their duties under 8 CFR 208.6 and 1208.6 to prevent unauthorized disclosure of records pertaining to any credible fear determination, and AOs are required to explain these confidentiality requirements to noncitizens prior to credible fear interviews.[167] For those going through the consultation and credible fear process in CBP custody, noncitizens consulting with an attorney or other individual before a credible fear interview do so in a private phone booth. USCIS contract interpreters

---

[164] *See* USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint.*

[165] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[166] *See* OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[167] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 19–20 (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing— Working With An Interpreter* 14, 30 (Apr. 24, 2024).

conducting telephonic interpretation are bound by the confidentiality requirements protecting all credible fear determinations pursuant to 8 CFR 208.6 [168] and must pass all required DHS background checks applicable to contractors.[169] All AOs receive training on working with interpreters, which includes explaining confidentiality, assessing competency, and recognizing other factors that may affect the accuracy of interpretation.[170] AOs are trained to elicit all relevant testimony during credible fear interviews [171] and will not preemptively issue negative credible fear determinations due to phone connectivity issues. And all AOs receive training on interviewing survivors of torture and other severe trauma.[172]

The Departments therefore decline to amend in this rule existing practices with respect to credible fear proceedings based on commenters' concerns about noncitizens' ability to obtain and consult with counsel. Nothing in the rule alters noncitizens' existing ability to consult with persons of their choosing prior to the credible fear interview, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), or prior to IJ review of a negative credible fear determination, *see* 8 CFR 1003.42(c). The Departments believe that any minimal adverse impact on the ability to retain counsel resulting from the rule and changes in DHS's practices are outweighed by the significant benefits to efficiency that the rule and DHS's changed practices promote. In addition, the Departments do not believe that the limitation on asylum eligibility or the heightened ''reasonable probability'' standard applied to those who do not establish a credible fear of persecution for asylum purposes due to the

limitation require significant development prior to the credible fear interview. At the screening stage, the information pertinent to the limitation—including the existence of exceptionally compelling circumstances—and the reasons for the noncitizen's fear of persecution or torture are reasonably expected to be within the noncitizen's personal knowledge at the time of the credible fear interview. *See* 89 FR at 48747–48. And as explained in the IFR, AOs and IJs are trained on and have extensive experience eliciting such information from noncitizens. *Id.* at 48747–48 & nn.241–44. The Departments do not seek to diminish the importance of being able to consult with a person or persons of the noncitizen's choosing during the screening process as provided by statute, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), but the Departments also do not believe that the information required for the screening process under the IFR and this rule is such that the screening interviews must be significantly delayed to allow for greater consultation time. Doing so in the context of emergency border circumstances would ''unreasonably delay the process.'' INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).

As to commenters' arguments that ensuring legal representation increases efficiency, discourages frivolous claims, shortens the time required to determine a claim, and reduces the number of appeals and repeat claims, the Departments note that even assuming those claims are true, ensuring legal representation for all noncitizens would impose extraordinary burdens on DHS and would undermine the speed that Congress sought to achieve in the expedited removal system. Moreover, because Congress refrained from creating an unqualified right to legal representation, the approach adopted in this rule accords with the statute and is a reasonable exercise of the Departments' discretion. *See* INA 235(b)(1)(B)(iv) & 8 U.S.C. 1225(b)(1)(B)(iv) (providing the noncitizen only an opportunity to ''consult'' with a person prior to a credible fear interview).

### (3) Noncitizens' Ability To Have Their Claims Heard

*Comment:* Commenters stated that a quota system would deny vulnerable individuals and families the opportunity to have their claims fairly considered, in contravention of U.S. and international law. Similarly, a commenter stated that, by imposing a cap on daily asylum claims and automatically denying asylum to those

who exceed the limit, the IFR ''nullifies fundamental rights that the United States is obligated to uphold.'' The commenter wrote that this ''blanket denial'' would deviate from due process principles under U.S. and international law that mandate non-refoulement and the individualized assessment of asylum claims. Commenters also stated that the IFR strips away the humane aspects of the asylum system.

*Response:* The Departments do not believe that the rule affords noncitizens an insufficient opportunity to have their asylum or protection claims heard, and the rule's limitation on eligibility includes no automatic ''blanket denials'' based on quotas or caps. Instead, during the emergency border circumstances described in the Proclamation, in the IFR, and in this rule—which relate to encounter levels as described in Section III.D.1 of this preamble—the rule's provisions (which are consistent with U.S. domestic and international law, as discussed in Section III.A.1 of this preamble) impose a limitation on asylum eligibility (with an appropriate exception) and changes to the expedited removal and credible fear process aimed at providing the Departments a greater ability to deliver timely decisions and consequences to noncitizens encountered along the southern border. The rule does so while ensuring that those in expedited removal proceedings who fear removal continue to have their fear claims heard.

First, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Such referrals occur irrespective of how many noncitizens have presented at the border or sought protection on a given day.

Second, this rule does not change the longstanding procedural protections that are provided to noncitizens during these credible fear interviews. Credible fear interviews are conducted in a non-adversarial manner,[173] and all AOs are

---

[168] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With An Interpreter* 14, 30 (Apr. 24, 2024); *see also* USCIS, *Credible Fear Procedures Manual* sec. III.E.3.d (May 10, 2023), *https://www.uscis.gov/sites/default/files/document/guides/CredibleFearProceduresManual.pdf.*

[169] *See* DHS, *Fact Sheet: Contractor Fitness at DHS, https://www.dhs.gov/sites/default/files/publications/personnel_security_contractor_fitness_fact_sheet_new.pdf* (last visited Sept. 20, 2024).

[170] USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* 14, 17–22, 24, 30, 43–44 (Apr. 24, 2024).

[171] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) (''In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.''); *id.* at 12 (''It is your duty to fully and fairly develop the record by eliciting information from the interviewee, probing for additional information, and following up on the interviewee's statements.'').

[172] USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[173] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 13–15 (Apr. 24, 2024). As described in a previous rule, AOs have experience in ''country conditions and legal issues, as well as nonadversarial interviewing techniques,'' and they have ''ready access to country conditions experts.'' Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

**81200**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

trained in non-adversarial interview techniques to facilitate their duty to elicit relevant and useful information— in effect, to help the noncitizen meet their burden through testimony alone.[174] 8 CFR 208.1(b). AOs are also trained to consult country conditions information, which often provides context to a noncitizen's claim. *Id.* In evaluating whether a noncitizen has shown a credible fear, AOs are instructed by statute to take into account the credibility of the statements made by the noncitizen and such other facts as are known to the AO. INA 235(b)(1)(B)(ii)–(iii), 8 U.S.C. 1158(b)(1)(B)(ii)–(iii). Just as a noncitizen's testimony alone without corroboration may be sufficient to establish the noncitizen meets the definition of a refugee where it is credible, persuasive, and refers to specific facts, INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii), a noncitizen's testimony alone, in the credible fear context, may meet the burden to demonstrate a credible fear of persecution or torture.[175] Accordingly, insofar as it is part of a credible fear determination, credible testimony and evidence available to the AO alone may be sufficient to demonstrate a significant possibility that the noncitizen could show that the noncitizen is eligible for the "exceptionally compelling circumstances" exception to this rule's limitation on asylum eligibility. The procedures outlined above do not depend on how many noncitizens have presented at the border or have sought protection on a given day.

Third, all negative credible fear determinations are reviewed by a supervisory AO prior to becoming final, *see* 8 CFR 208.30(e)(8), and, consistent with the sole statutorily provided mechanism for review of negative credible fear determinations, *see* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), noncitizens may request review of a negative credible fear determination before an IJ, *see* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those described in the Proclamation and unable to show that the rule's exception to the limitation on asylum eligibility applies).

Unlike the process that applies to negative credible fear determinations under 8 CFR 208.30(g)(1)(i), during which a noncitizen's refusal or failure to request or decline IJ review is treated as a request for IJ review, noncitizens under the present rule must indicate whether they desire IJ review when asked, *see* 8 CFR 208.35(b)(2)(iv). When serving the negative credible fear determination, USCIS staff read the contents of the Form I–869SBIFR, Record of Negative Credible Fear and Reasonable Probability Finding and Request for Review by Immigration Judge for Noncitizens Subject to the Limitation on Asylum Eligibility Pursuant to 8 CFR 208.35(a), to the noncitizen in a language the noncitizen understands, using an interpreter if needed.[176] The Form I–869SBIFR includes a statement that the noncitizen may request that an IJ review the negative determination and that, if the noncitizen does not request IJ review, the noncitizen will not receive review by an IJ and may be removed from the United States immediately. The noncitizen then must check one of two boxes on the I–869SBIFR indicating either that the noncitizen requests IJ review or does not request IJ review. The noncitizen will be referred to an IJ for review of a negative determination only where the noncitizen requests such review. 8 CFR 208.35(b)(2)(iv)–(v). Under the IFR and this rule, IJ review remains available in all cases with a negative credible fear determination, and such review includes an opportunity for the noncitizen to be heard and questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1) and (2). Additionally, while it is not equivalent to another level of review, USCIS retains the sole discretion to reconsider its own negative credible fear determination following IJ concurrence. 8 CFR 208.35(b)(2)(v)(B). Thus, the rule maintains review of any negative credible fear determination by a supervisory AO prior to service and, following service of a negative credible fear determination, the opportunity to have an IJ review the finding de novo. *See* 8 CFR 1208.35(b)(1).

As discussed above in this section of the preamble, the Departments believe these processes are adequate in light of the high levels of training received by adjudicators and the high volume of cases before the Departments.

**(4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations**

*Comment:* Several commenters expressed concern with the conduct of AOs during credible fear interviews and suggested that AOs are ill-equipped to conduct the analysis the rule requires, including applying the "exceptionally compelling circumstances" exception to the limitation and screening fear claims at a higher evidentiary standard. Some commenters stated that they are aware of instances where AOs have failed to comply with established guidelines during credible fear interviews and that translation issues, such as Indigenous language speakers being interviewed in Spanish, exist in some cases. One commenter recounted examples of noncitizens who, the commenter believes, were wrongly issued negative credible fear determinations; the commenter said that noncitizens' statements were incorrectly translated by interpreters and that noncitizens were not adequately asked about their experiences or were interrupted by AOs during screenings. Other commenters discussed alleged violations of the credible fear interview procedures experienced by noncitizens, such as alleged failures to address language barriers, that prevent noncitizens from adequately telling their stories, resulting in refoulement.

An organizational commenter discussed its experience with clients who it contends were wrongfully deported and returned to violence, stating that the rule will only increase the frequency with which USCIS errs in conducting credible fear screenings and IJs err in reviewing credible fear determinations. Commenters emphasized that hearings take place shortly after noncitizens have endured lengthy and traumatic journeys to reach the United States and asserted that they take place while noncitizens are in detention facilities with deplorable conditions. Commenters stated that the harm caused by the IFR will be exacerbated by expedited removal policies such as conducting credible fear interviews while noncitizens are in CBP custody. A commenter stated that courts have questioned the reliability of credible fear interviews because of the expedited and stressful nature of the process.

*Response:* The Departments take any allegations of misconduct by AOs or other government officials seriously, and there are existing channels available to report any such alleged

---

[174] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11–12 (Apr. 24, 2024).

[175] *See* USCIS, *RAIO Directorate—Officer Training: Credible Fear of Persecution and Torture Determinations* 19 (May 9, 2024); *see also Kiakombua* v. *Wolf,* 498 F. Supp. 3d 1, 46–47 (D.D.C. 2020) (asylum officer ("AO") cannot require an applicant to provide corroborating evidence at the credible fear stage where the applicant's testimony is otherwise found credible).

[176] Following issuance of this rule, the form will be designated I–869SB instead of I–869SBIFR.

STB_AR1_000045

misconduct.[177] To the extent that commenters suggested that examples where they believe AOs failed to follow existing guidance related to credible fear screenings or failed to conduct a fair credible fear interview are representative of AOs generally and are grounds for reasoning that AOs are ill-equipped to perform credible fear screenings under the current rule, the Departments disagree with these assertions and find them unpersuasive. Instances where commenters believe AOs failed to conduct credible fear interviews fairly should be reported through the proper channels and will be addressed on a case-by-case basis, but these anecdotal complaints do not dissuade the Departments from concluding that AOs are capable of performing their duties under this rule. These complaints about AO conduct in specific credible fear interviews do not undermine the statutorily prescribed role of AOs to conduct credible fear interviews and make credible fear determinations, and the Departments are confident, for the reasons explained above, that AOs have the necessary training and expertise to fulfill that role.

As discussed in Section III.A.1.c of this preamble, the rule operates within the expedited removal and credible fear screening process established by section 235 of the INA, 8 U.S.C. 1225, and comports with all statutory requirements. Under the credible fear statutory framework, AOs conduct credible fear screening interviews. INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i). By definition, AOs are individuals who have had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of asylum applications under section 208 of the INA, 8 U.S.C. 1158. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). They are supervised by officers who meet the same training requirements and have had substantial experience adjudicating asylum applications. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). AOs conducting credible fear interviews do so in a non-adversarial manner, beginning with ensuring the noncitizen understands the purpose of the interview, that the noncitizen has a right to have a legal representative or other person of the noncitizen's choosing present during the interview, and that the noncitizen understands the

interpreter, where applicable. 8 CFR 208.30(d). USCIS has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures in place that all AOs must follow to address instances where rare language interpreters may not be available, including issuing a discretionary NTA in certain circumstances. After the noncitizen has received an NTA, the noncitizen's language barrier can be addressed in proceedings before an IJ. At the beginning of a credible fear interview, AOs explain to noncitizens the confidentiality provisions governing credible fear interviews pursuant to 8 CFR 208.6, including that the AO and interpreter will keep the noncitizen's information and testimony confidential. The AO verifies that the noncitizen is comfortable proceeding with the interpreter and the AO of the given gender. AOs also ask noncitizens if there are any issues that could affect their ability to testify, such as a language barrier or health issue, and deal with any such issue according to established procedures. All credible fear determinations, including those in which the IFR limitation on asylum eligibility applies, are reviewed by supervisory AOs before becoming final and being served on the noncitizen, and this will remain true under the final rule. 8 CFR 208.30(e)(8). Supervisory review includes ensuring that AOs follow all applicable procedures and guidelines related to language access and other issues that could impede the noncitizen's ability to effectively communicate during a credible fear interview.

As already explained, AOs are specifically trained on eliciting testimony, working with interpreters, engaging in cross-cultural communication, detecting possible victims of trafficking, and interviewing vulnerable populations, including survivors of torture and other severe trauma. In addition to receiving specialized training on interviewing and eliciting testimony, AOs are trained on and well-versed in applying substantive asylum law in both full asylum adjudications and in screening determinations. As explained in the IFR, AOs and supervisory AOs have the training and experience necessary to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage. 89 FR at 48748. AOs frequently assess physical and psychological harm

when adjudicating asylum applications and are trained to do so in a sensitive manner.[178] AOs may also evaluate harm resulting from the unavailability of necessary medical care or specific medications when assessing ''other serious harm'' under 8 CFR 208.13(b)(1)(iii)(B) in full asylum adjudications.[179] When conducting a credible fear interview where the IFR's limitation on asylum eligibility applies, AOs' questioning will necessarily include information related to whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception, regardless of whether the noncitizen affirmatively raises the issue. Since May 11, 2023, when the Circumvention of Lawful Pathways rule went into effect, AOs and supervisory AOs have evaluated the exceptionally compelling circumstances grounds for rebutting the presumption of asylum ineligibility under that rule, including the enumerated examples of an acute medical emergency, imminent and extreme threat to life or safety, and satisfying the definition of a victim of a severe form of trafficking in persons. 8 CFR 208.33(a)(3). The enumerated examples mirror the enumerated examples of exceptionally compelling circumstances that except noncitizens from the limitation on asylum eligibility under the IFR and this rule, see 8 CFR 208.35(a)(2), so not only have AOs and supervisory AOs been implementing this approach since the IFR was implemented, but they also already had considerable experience in eliciting testimony related to the ''exceptionally compelling circumstances'' exception and determining whether that exception applied in the context of the Circumvention of Lawful Pathways rule. Likewise, IJs have extensive experience and training in applying such concepts to individual cases under the Circumvention of Lawful Pathways rule and the IFR.[180] Accordingly, the

---

[177] See USCIS, Report USCIS Employee Misconduct (last reviewed/updated Mar. 15, 2024), https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also DHS, Make a Civil Rights Complaint (last updated Aug. 20, 2024), https://www.dhs.gov/file-civil-rights-complaint.

[178] For example, AOs adjudicate cases involving forms of persecution like female genital mutilation, forced abortion, and forced sterilization. See Matter of Kasinga, 21 I&N Dec. 357 (BIA 1996); INA 101(a)(42)(B), 8 U.S.C. 1101(a)(42)(B); see also USCIS, RAIO Directorate—Officer Training: Gender-Related Claims 23–27 (Apr. 24, 2024).

[179] See USCIS, RAIO Directorate—Officer Training: Definition of Persecution and Eligibility Based on Past Persecution 56–57 (Apr. 24, 2024).

[180] See 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to ''[p]rovide for comprehensive, continuing training and support'' for IJs); 8 CFR 1003.9(b)(1)–(2) (Chief IJ's authority to issue ''procedural instructions regarding the implementation of new statutory or regulatory
Continued

Departments believe that IJs and AOs will continue to fairly and competently examine the facts and circumstances of each individual's case to determine whether the individual has established a significant possibility that the individual would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the individual satisfies the rule's exception.

The Departments consider the commenters' concerns about the quality of determinations unfounded. USCIS AOs and supervisory AOs have received the same thorough training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use the Global case management system,[181] which includes updated interview guides, forms, and instructions for processing cases under the IFR to ensure consistency in procedures and substantive guidelines. All credible fear determinations, as noted above, are subject to review by a supervisory AO, 8 CFR 208.30(e)(8), and IJ (if requested), INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), and determinations made in section 240 removal proceedings are subject to administrative appeal and judicial review.

Regarding concerns about noncitizens going through the credible fear process while in CBP custody, the Departments disagree with the contention that such a process causes or exacerbates harm. Noncitizens who are going through the credible fear process in CBP custody are given at least 4 hours between 7 a.m. and 7 p.m. to telephonically consult with an individual of their choosing, including legal counsel, before their credible fear interview. Additionally, the noncitizens are afforded privacy for these consultations, which occur in a private phone booth. These phones and phone booths are also used to conduct the credible fear interview.

Additionally, to the extent that commenters have generalized concerns about conditions in CBP custody, such comments are outside the scope of this rule. DHS notes, however, that it is committed to providing safe, sanitary, and humane conditions to all individuals in custody, and that it is committed to transferring individuals out of CBP custody in an expeditious manner. The Departments further note that one anticipated effect of this rule is to reduce the risk of overcrowding in DHS detention facilities. *See* 89 FR at 48742 (noting that ''[h]igh [encounter] numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded . . . [which] creates health and safety concerns for noncitizens and Government personnel'').

(5) Fairness or Risks Associated With Process

*Comment:* Commenters stated that the rule would undermine the commitment of the United States to providing refuge for those fleeing persecution and violence and exacerbate the humanitarian crisis at the southern border. Other commenters stated that the rule would increase refoulement and that the Departments did not adequately consider this consequence. Commenters asserted that the rule could cause arbitrary denials of asylum, thus placing noncitizens back into harm's way and resulting in life-threatening outcomes. A commenter asserted that the IFR ignores the realities of initial fear screenings (including that individuals have often experienced a long and difficult journey, undergo screenings within days of arrival, and may face barriers to accessing counsel and language services) and establishes an even higher screening standard that may prevent noncitizens from factually presenting claims before an AO. A commenter stated that a decline in positive credible fear determinations under the Circumvention of Lawful Pathways rule is a result of an orchestrated effort to reduce the screen-in rate by erecting barriers to eligibility and attorney consultation and eroding due process protections, not the result of the appropriate screening out of claims that would in fact be non-meritorious, as suggested by the Departments in the IFR.

Some commenters discussed the existing difficulties that noncitizens in CBP custody have in obtaining what they need, such as a pen and paper to write down essential information, access to counsel, and access to private phone services. Some commenters

stated that they have witnessed failures by USCIS and EOIR to notify attorneys of their clients' interviews and immigration court reviews.

*Response:* The present rule complies with all statutory and regulatory requirements related to access to counsel, including the right of a noncitizen to access counsel at no cost to the Government, the right to consult with a person of the noncitizen's choosing prior to the credible fear interview, and the right to have a person of the noncitizen's choosing (including a legal representative) present during the interview, provided it will not cause unreasonable delay. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). Moreover, in addition to protecting the procedural safeguards guaranteed by statute, the rule also ensures the United States honors its non-refoulement obligations under international law by screening for statutory withholding and protection under regulations implementing the CAT, even where a noncitizen is subject to the rule's limitation on asylum eligibility and cannot establish that the rule's exception applies under the significant possibility standard. 8 CFR 208.35(b)(2). Contrary to commenters' assertions that noncitizens may be prevented from presenting factual claims to an AO where they are subject to the IFR's limitation on asylum eligibility, AOs elicit testimony, and noncitizens have the opportunity to present testimony and other evidence relevant to a potential persecution or torture claim, even where the limitation applies and no exception is established during the credible fear interview; this allows the AO to effectively screen the noncitizen for a reasonable probability of persecution or torture. 8 CFR 208.35(b)(2)(i). Indeed, the experience of USCIS with the IFR since its implementation illustrates that noncitizens are still able to meet the higher reasonable probability standard in approximately 48 percent of cases where the IFR's limitation on asylum eligibility applies and no exception is established during the credible fear interview.[182]

Further, while a commenter suggested that the drop in the overall screen-in rate under the Circumvention of Lawful Pathways rule resulted from barriers to eligibility or to counsel and the erosion of due process rights, as opposed to screening out more potentially non-meritorious cases under the higher ''reasonable possibility'' standard in the

---

[181] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division*, at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

authorities'' and ''[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties''); EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

[182] OHSS analysis of data pulled from CBP UIP on September 3, 2024 (Fear Screening—STB tab).

IFR, *see* 89 FR at 48746, a more granular examination of the various screen-in rates undermines the commenter's assertion. In fact, SWB encounter credible fear screen-in rates for screenings conducted by USCIS under the significant possibility standard remain consistent or increase when comparing (1) interviews that took place in the pre-pandemic period (76 percent positive); (2) interviews that took place under the Circumvention of Lawful Pathways rule where the presumption of asylum ineligibility applied but an exception was established (79 percent positive) or the presumption was rebutted (86 percent positive); and (3) interviews that took place under the IFR where the IFR's limitation on asylum eligibility applied but the IFR's exception was applicable (81 percent positive).[183] If anything, then, the screen-in rate at the significant possibility standard is higher under the Circumvention of Lawful Pathways rule and under the IFR, notwithstanding commenters' claims that factors such as difficulty in accessing counsel necessarily reduce screen-in rates. Rather, USCIS screen-in rates for USBP encounters effectively drop only when AOs apply the higher substantive standards, dropping (1) to approximately 51 percent for cases screened at the reasonable possibility standard where the Circumvention of Lawful Pathways presumption of asylum eligibility applies and no exception or rebuttal is established; and (2) to approximately 48 percent for cases screened at the reasonable probability standard where the IFR's limitation on asylum eligibility applies and no exception is established.[184] Accordingly, the analysis provided by the Departments in the IFR concluding that the drop in screen-in rates under the higher "reasonable possibility" standard relates to the merits of the potential claim, *see* 89 FR at 48746, remains supported and is only further bolstered by the experience of the Departments in implementing the IFR.

The IFR acknowledges that the rule's manifestation of fear and reasonable probability standards may increase the risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or may not receive a positive credible fear

determination. 89 FR at 48767. It also explains that there may be costs to noncitizens that result from their removal—indeed, such costs are likely. *Id.* Thus, the Departments did consider these risks, and they have continued to consider these risks in finalizing this rule.

The Departments weighed the fact that, despite the protections preserved by the rule, the available exception, and the training and expertise of DHS personnel, the changes to the credible fear process adopted may result in the denial of asylum where such an asylum claim otherwise may have been granted. *Id.* at 48750 n.250. As with all screening mechanisms, there is some risk that a case that might otherwise lead to a grant of asylum might not proceed to a merits adjudication, *id.*, but as discussed in Sections III.C.2.c and III.B.2.a.ii of this preamble, DHS personnel have significant experience and training in recognizing and interviewing noncitizens with protection claims, which the Departments believe will minimize the frequency of such cases. Regardless, in light of the emergency border circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate, necessary, and legally permissible. *Id.* And given the emergency border circumstances facing the Departments and the gap between high rates of referrals and screen-ins during the immediate post-pandemic period and historic ultimate grant rates, as described in Section II.A.2 of this preamble, the Departments believe the rule's provisions are appropriate and justified even if certain close cases result in imperfect outcomes. *Id.* As with other conditions and limitations imposed under section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with valid asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that would overwhelm DHS's ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. The Departments have determined that these important policies outweigh whatever marginal impact on meritorious claims the rule might have.

DHS serves noncitizens with all the necessary documents related to their credible fear determination, 8 CFR 208.30(f)–(g), which for noncitizens in detention may be served through a telephone call by USCIS, during which

information on the noncitizen's determination is relayed in a language that the noncitizen understands, while CBP or ICE personnel physically provide the documents to a noncitizen. While any person may consult with a noncitizen in the credible fear process, DHS provides copies of documents only to legal representatives who have completed a fully executed Form G–28.[185] Although commenters expressed concern about the burden of obtaining consent and a signature from a detained noncitizen, the Departments must balance the sensitive nature of credible fear interviews and the importance of confidentiality pursuant to the nondisclosure provisions in 8 CFR 208.6.

With regard to the comment about noncitizens in CBP custody having difficulties obtaining items such as pen and paper, or having access to counsel or to private phone booths, the Departments disagree with the commenters' characterizations. Noncitizens who are going through the credible fear process in CBP custody are provided with pen and paper, and they are afforded a period of time to consult with an individual of their choosing, which occurs in a private phone booth, as discussed in this section.[186] These phones and phone booths are also used to conduct the credible fear interview.

### iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns

*Comment:* Many commenters expressed concern that the rule would disproportionately harm vulnerable groups, including Black individuals, Indigenous individuals, and People of Color ("BIPOC"), those who are HIV positive, and people with disabilities. For example, a commenter remarked that the Departments did not analyze the effect the rule has on particularly vulnerable populations such as Black migrants. A commenter voiced concern about the impact the rule could have on predominantly BIPOC communities, remarking that the rule perpetuates harmful political rhetoric about these communities and the border that can lead to long-term detrimental effects and violence. While sharing specific examples of the way the IFR has impacted members of BIPOC communities, another commenter raised

---

[183] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Summary Statistics tab; Fear Screening—CLP tab; Fear Screening—STB tab).

[184] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Fear Screening—CLP tab and Fear Screening—STB tab).

[185] DHS, *Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative* 1, 4 (Sep. 17, 2018), *https:// www.uscis.gov/sites/default/files/document/forms/ g-28instr.pdf.*

[186] To the extent that commenters have concerns regarding compliance with this policy, DHS notes that such complaints about noncompliance can be addressed under the process described in Section III.C.2.c of this preamble.

concern for the discrimination these populations may face under the rule while seeking asylum and waiting for an appointment. A commenter stated that the rule would prevent fair and equal access to lifesaving protections and lead to the unnecessary deaths of individuals who are denied entry and returned to dangerous and unsafe countries. Therefore, the commenter urged, the rule should be rescinded in its entirety.

*Response:* The Departments are committed to the equal treatment of all persons, and this rule does not distinguish between individuals based on race, nationality, ethnicity, or any other protected characteristic. The Departments also acknowledge that certain populations, including members of BIPOC communities, may have unique vulnerabilities or face unique issues in their country of origin or countries of transit, and agree that the United States has certain legal obligations to protect noncitizens present in the United States who fear harm in their home countries. But as explained more fully in Section III.A.1 of this preamble, the rule ensures that noncitizens may continue to seek asylum or other protection in the United States. The Departments note that the rule and its exception apply equally to noncitizens who enter during the times when emergency border circumstances are present, regardless of nationality, race, ethnicity, or other demographics of concern identified by the commenters. Further, as explained in this section, adjudicators receive training to help them identify members of vulnerable communities and account for the harms such individuals may face. And, to the extent that members of certain communities may face greater risks because of their membership in those communities, the Departments believe that the "exceptionally compelling circumstances" exception will afford a means to seek asylum or protection when those risks manifest as specific threats to the individuals in question.

*Comment:* Several commenters expressed concern regarding the separation of families and the treatment of trafficking victims. A commenter generally supported allowing united families to escape persecution and cross the border together. Other commenters raised concern that the IFR and associated policy changes routinely separate families and often complicate or prevent family reunification. Another commenter wrote that the rule is likely to impose negative impacts on family wellbeing and result in family separations, as the commenter reasoned the changes in policy would incentivize an increase in the arrival of UCs because

families are unable to seek or receive protection by crossing the border together. One commenter also expressed concern that the rule puts children at risk to migrate alone. Another commenter elaborated that family unity and reunification is fundamental to our Nation's immigration policies and the foundational principles of a Catholic social teaching. The commenter voiced concern that the effects of this rule would be similar to the effects of the Migrant Protection Protocols ("MPP") and the Title 42 public health Order, which, the commenter stated, "led families to 'self-separate' at the border" because either the adults decided the conditions in Mexico were too dangerous to wait with them or the adults were injured or had disappeared. The commenter urged the Departments to rescind the rule entirely, arguing that the policy changes undermine families' ability to seek humanitarian protection.

Additionally, a commenter stated that the rule's exemption for survivors of trafficking is inadequate. The commenter wrote that survivors could be returned to trafficking situations when the new heightened credible fear standard fails to trigger safeguards codified in the TVPA.

*Response:* The Departments have designed the rule with a goal of keeping families together. As described in Section III.C.1.e of this preamble, the Departments have adopted family unity provisions that apply during both AMIs and section 240 removal proceedings. *See* 8 CFR 208.35(c), 1208.35(c). Additionally, if one member of a family unit traveling together is excepted from the limitation on asylum eligibility based on exceptionally compelling circumstances, then the entire family unit is excepted. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Accordingly, commenters are incorrect that the rule disallows families from obtaining relief or protection together.

Additionally, the Departments believe that the safeguards in place for victims of human trafficking are sufficient. A noncitizen who is a victim of a severe form of trafficking in persons as defined in 8 CFR 214.201 is excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and is also separately excepted from the provisions of this rule. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1) (excepting from the limitation on asylum eligibility noncitizens described in section 3(b) of the Proclamation); 8 CFR 235.15(a) (excepting from the manifestation provision noncitizens described in section 3(b) of the Proclamation). Noncitizens who meet that definition

are also excepted from the limitation on asylum eligibility as having established exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C). In practice, these two provisions provide two significant safeguards and work alongside section 3(b) of the Proclamation and 8 CFR 235.15(a) to ensure that noncitizens are not subject to the suspension and limitation on entry or any of the rule's provisions if they meet the definition of a victim of a severe form of trafficking.

*Comment:* A commenter raised concern for non-Mexicans under the rule being removed and left stranded in Mexico without migration documents or resources. The commenter explained that undocumented individuals removed to Mexico are vulnerable to arrest, detention, and potential deportation by Mexican immigration authorities. The commenter stated that this process has been a dangerous and unsafe practice that results in human rights violations and that government officials in Mexico have confirmed this practice will continue and potentially expand under the rule.

*Response:* This rule does not change the statutory and regulatory process for designating the country to which a noncitizen may be removed. To the extent that a greater number of noncitizens may be removed through the operation of this rule—some of whom may be removed to Mexico rather than their home countries, consistent with country of removal designation authorities—the Departments note that noncitizens may assert claims of fear of harm in Mexico and that the rule explicitly provides that noncitizens are screened for fear of harm in their "designated country or countries of removal." 8 CFR 208.35(b)(2)(ii); *see also* 8 CFR 208.35(b)(2)(iii).

The Departments acknowledge that noncitizens other than Mexicans who are removed to Mexico may be subject to Mexican immigration law. However, the Departments disagree that being returned to Mexico is necessarily unsafe, whether because of actions by the Government of Mexico or otherwise. Over the last several years, the Government of Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders. For instance, Mexico's Federal Public Defender's office provides legal counseling and support to asylum seekers and migrants who file claims with Mexico's Commission for Refugee Assistance, and the office has expanded its specialized staff and increased its visits to migration stations. 88 FR at

31411. Further, not only is Mexico a party to the 1951 Convention [187] relating to the Status of Refugees and its 1967 Refugee Protocol,[188] but also Mexico's Constitution includes a right to seek and receive asylum from political persecution. *See* Mex. Const. art. 11. In fact, the available grounds to qualify for asylum are broader in Mexico than in the United States. *See* 88 FR at 31411 (explaining that Mexico has joined the Cartagena Declaration on Refugees, which expands the definition of ''refugee,'' ''thus providing some who may apply for protection, such as asylum, with more grounds on which to make their claim than they would have in the United States''). And applicants who do not qualify for asylum in Mexico are automatically considered for complementary protection if they possess a fear of harm in their country of origin, or if there is reason to believe that they will be subjected to torture or to cruel, inhuman, or degrading treatment, but do not meet the ''refugee'' definition; those granted complimentary protection are able to regularize their status.[189]

*Comment:* Multiple commenters expressed concerns for the health and safety of women and noncitizens from Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex (''LGBTQI+'') communities. For example, one commenter voiced concern for the asserted lack of equal opportunity and the Departments' asserted lack of analysis of the effect of the rule on particularly vulnerable populations, such as LGBTQI+ migrants. Another commenter wrote that the rule erroneously separates the imminent threat the noncitizen suffer at the border from their future threat of persecution upon return, especially for those noncitizens fleeing from Mexico who identify as LGBTQI+. The commenter wrote that violence towards members of the LGBTQI+ community can happen randomly and unexpectedly, and hence that noncitizens would be unable to predict or articulate the violent risks

they may face when seeking refuge in the United States. In addition, the commenter voiced concern for the disproportionate impacts of the rule on LGBTQI+ community members from Mexico and the ''Northen Triangle'' countries of Guatemala, Honduras, and El Salvador because, the commenter asserted, these countries have long and documented histories of severe violence against the LGBTQI+ population. Citing research, the commenter wrote that 4,385 claims of fear were related to LGBTQI+ status and 98.4 percent of the interviews resulted in positive determinations for fear of persecution. In conclusion, the commenter urged that it is imperative for the United States to remain a haven for all people fleeing danger and violence, especially LGBTQI+ migrants and therefore requested that the IFR be immediately rescinded. This commenter further expressed concern that the IFR was contrary to President Biden's February 2021 memorandum on advancing the human rights of LBGTQI+ persons around the world, which included an explicit instruction to the Departments of State and Homeland Security to ''enhance their ongoing efforts to ensure that LGBTQI+ refugees and asylum seekers have equal access to protection and assistance, particularly in countries of first asylum.''

Citing experts on gender-based violence in Mexico, a commenter stated that violence against asylum seekers who are women or members of LGBTQI+ communities is endemic in many parts of the country. While sharing specific examples involving both LGBTQI+ community members and women, a commenter raised concern about the violence these populations may face under the rule while seeking asylum. For example, the commenter shared that migrant girls, adolescents, and women have either witnessed or been victims of exploitation, sexual violence, kidnapping, and human trafficking both in transit and while waiting in Mexico. The commenter also remarked that the rule adds new barriers that further endanger LGBTQI+ individuals, such as lack of access to safe housing, employment, and medical care.

Another commenter asserted that the rule arbitrarily and unlawfully prevents women, children, families, and LGBTQI+ community members from seeking safety in the form of asylum based on border encounter numbers that are unrelated to the individuals' need for protection. The commenter wrote that the result would be to severely harm the health and safety of those who would otherwise merit protection.

*Response:* The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries and recognize the importance of offering noncitizens the opportunity to seek protection from removal from the United States based on a likelihood of future persecution or torture. 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble and in the IFR, this rule complies with all such obligations and does not deny anyone the ability to apply for asylum or other protection in the United States. *See id.* at 48716–17, 48735–36.

The rule does not prevent noncitizens with valid claims from seeking asylum or other protection. To the extent that, as commenters asserted, women and members of the LGBTQI+ community do in fact face a greater risk of violence, those individuals would necessarily have a greater ability to establish that exceptionally compelling circumstances exist that would except them from the rule's limitation on asylum eligibility. To be clear, generalized risks of violence would not be sufficient to establish such circumstances, but insofar as such generalized risks manifest as specific threats to women and members of the LGBTQI+ community, the rule affords an avenue for those individuals to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And the rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection. A noncitizen who seeks to apply for asylum can also schedule arrival at a POE under a process approved by the Secretary, including by using the CBP One app, and avoid application of the rule. 8 CFR 208.35(a)(1), 1208.35(a)(1); Proclamation sec. 3(b)(v); 89 FR at 48737.

This rule does not preclude noncitizens who cross the southern border from seeking asylum or protection. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). AOs receive mandatory, specific training on screening and adjudicating gender-related claims.[190] This training includes information about violence against women (including domestic

---

[187] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Convention Relating to the Status of Refugees, https://treaties. un.org/doc/Publication/MTDSG/Volume%20I/ Chapter%20V-V-2.en.pdf* (last visited Sept. 24, 2024).

[188] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Protocol Relating to the Status of Refugees, https://treaties.un.org/ doc/Publication/MTDSG/Volume%20I/ Chapter%20V-V-5.en.pdf* (last visited Sept. 24, 2024).

[189] 88 FR at 11721 & n.144 (citing Government of Mexico, *Ley sobre Refugiados, Protección Complementaria y Asilo Político* (Jan. 27, 2011), *https://www.gob.mx/cms/uploads/attachment/file/ 211049/08_Ley_sobre_Refugiados__Protecci_n_ Complementaria_y_Asilo_Pol_tico.pdf*).

[190] USCIS, *RAIO Directorate—Officer Training: Gender-Related Claims* (Apr. 24, 2024).

violence), and guidance on interview considerations specific to gender-based claims.[191] AOs also receive training on screening and adjudicating claims relating to LGBTQI+ noncitizens.[192] This training includes information about types of harm that may be directed at LGBTQI+ individuals, as well as guidance on interview considerations specific to LGBTQI+ claims.[193] AOs are trained to recognize the sensitive nature of these claims and to pursue appropriate lines of inquiry.[194] AOs also receive training on country of origin information specific to LGBTQI+ issues, while recognizing that LGBTQI+ country-of-origin information may sometimes be difficult to find.[195]

Additionally, the Departments recognize the sensitive nature of credible fear interviews, especially for vulnerable populations, including LGBTQI+ noncitizens. For example, for those going through the credible fear process in CBP custody, CBP has taken steps to protect the privacy of noncitizens during their interviews. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. Additionally, ICE provides similar reasonable access to legal counsel for those who are detained in ICE custody during the credible fear process.[196]

*Comment:* Commenters stated that many immigrants today are Punjabi-speaking Sikhs seeking protection due to the worsening human rights conditions under India's current administration. The commenters stated that these immigrants may face hardships such as language barriers and difficulty accessing employment opportunities and resources upon arrival. Commenters stated that the rule would exacerbate language-barrier issues. Specifically, a commenter stated that the requirement to express a fear of persecution explicitly and proactively in order to be referred for a credible fear screening, and the limited time to seek legal advice from a language-accessible attorney, would prevent many Sikh noncitizens from understanding their legal rights or the need to express their credible fear. The commenters wrote

that it is critical for the Sikh community and many other populations fleeing persecution to have the opportunity to seek asylum and requested clarification on how the Government intends to address the concerns of religious minorities who would be impacted by the rule.

*Response:* The Departments disagree that the rule will exacerbate language-barrier issues. For those who are going through the credible fear process in CBP custody, CBP provides language assistance services for those who do not speak English, consistent with CBP's Language Access Plan.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. *See* 89 FR at 48741. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages, including Punjabi.[198] With respect to the signs and videos in CBP facilities that provide general information about the ability to express a fear, individuals who are unable to read those signs or communicate effectively in one of the languages in which the sign and video are presented are read the contents of the sign and video in a language they understand. *See* 89 FR at 48741.

The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries, including those who are fleeing for religious reasons, and recognize the importance of offering noncitizens the opportunity to seek protection from removal. But as explained more fully in Section III.A.1 of the preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States and meets all such legal obligations. *See also id.* at 48716–17, 48735–36. Further, although commenters asserted generally

that religious minorities would be harmed by the IFR and DHS's policy changes, the commenters provided no specific reason to believe that the IFR and policy changes would disproportionately impact any particular religious groups other than the Punjabi-speaking Sikhs discussed above.

*Comment:* Commenters discussed the rule's impact on noncitizens with fewer financial resources and means. For example, a commenter wrote that the rule would further disadvantage those noncitizens with fewer financial resources because they are less likely to pursue alternative routes to safety. A few commenters expressed concern for noncitizens with physical and mental health disabilities. And a commenter remarked that individuals with cognitive issues, disabilities, and language barriers are less likely to effectively articulate fears to border officials.

*Response:* The Departments agree that the United States has certain legal obligations to protect from removal those who fear specific types of harm upon removal and recognize the importance of offering noncitizens the opportunity to seek protection from removal, including noncitizens with fewer financial resources, noncitizens with physical and mental health disabilities, and noncitizens with cognitive issues, disabilities, and language barriers. But as explained more fully in Section III.A.1 of this preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States. *See also id.* at 48716–17, 48735–36. Further, there is no fee to download or use the CBP One app to schedule an appointment and thereby avoid the IFR's limitation on asylum eligibility,[199] and DHS has designed the CBP One app to be accessible to people with disabilities. Additionally, the Departments note that, depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the "exceptionally compelling circumstances" standard, or, as discussed previously, may exercise their discretion to issue an NTA to place such noncitizens into section 240 removal proceedings as appropriate, where additional procedural safeguards are available to noncitizens. For

---

[191] *E.g., id.* at 15–20, 42.

[192] USCIS, *RAIO Directorate—Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Apr. 24, 2024).

[193] *E.g., id.* at 18–19, 27–34.

[194] *Id.* at 28–30, 37–38, 49.

[195] *Id.* at 43–44, 50.

[196] ICE, *Access to Due Process: Fiscal Year 2023 Report to Congress* 2–3 (Feb. 20,2024), *https://www.dhs.gov/sites/default/files/2024-04/2024_0220_ice_access_to_due_process.pdf.*

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (Feb. 7, 2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 24, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https://www.dhs.gov/sites/default/files/publications/Habla%20Poster_12-9-16.pdf* (last visited Sept. 24, 2024); *see also* DHS, *DHS Language Access Resources* (last updated July 17, 2023), *https://www.dhs.gov/publication/dhs-language-access-materials.*

[199] *See* CBP, *CBP One*™ *Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone* (explaining in response to frequently asked questions that "the CBP One™ mobile application is FREE and available to everyone who has access to a mobile device").

example, during section 240 removal proceedings, IJs may more fully consider whether a noncitizen demonstrates indicia of mental incompetency and, if so, what procedural safeguards are appropriate. *See Matter of M–A–M–*, 25 I&N Dec. at 481–83. Additionally, CBP officers may determine that such noncitizens are excepted from the suspension and limitation on entry (and thus that the provisions of this rule do not apply) under Section 3(b)(vi) or (vii) of the Proclamation.

iv. Impacts on Criminal Enforcement

*Comment:* Commenters stated that they are concerned that noncitizens would face criminal charges if they attempted to return to the United States following removal under the rule. One commenter stated that an increased number of expedited removal orders would inevitably lead more noncitizens to attempt to reenter the United States after their removal, potentially subjecting them to felony charges and two years of imprisonment, and that noncitizens should not be deemed criminals and incarcerated for seeking asylum in the United States. Another commenter stated that charging noncitizens criminally would decrease their access to humanitarian relief and increase the risk that criminal organizations would target those noncitizens.

*Response:* The Departments are committed to the fair, evenhanded enforcement of the law as Congress has enacted it. The Departments agree that, in appropriate cases, noncitizens who have been removed pursuant to an expedited removal order may be subject to criminal charges if they attempt to unlawfully reenter the United States. *See* INA 276(a), 8 U.S.C. 1326(a). Because the rule will allow the Departments to predictably and swiftly impose consequences on noncitizens who enter the United States without a legal basis to remain, the Departments believe noncitizens will be disincentivized from attempting to enter without a legal basis to remain or to reenter after being removed. Nevertheless, for the relatively few who choose nevertheless to reenter unlawfully, congressionally enacted criminal penalties remain an important tool to enforce the law.[200]

v. Negative Impacts on Other Affected Entities

*Comment:* Commenters stated that the rule would impose more burdens on nonprofit organizations, legal-service providers, and communities near the border. One commenter believed that the increase in negative fear determinations would cause legal-service providers to dedicate significant resources to preparing clients for and representing them in hearings before IJs and potential requests for reconsideration to USCIS. The commenter also alleged that the Departments have failed to consider reliance interests such as those of legal-service providers that prepare informational material, employ internal protocols, and deliver client services predicated on access to asylum and on access to clients in custody; the commenter stated that their organization would need to understand the changes effected by the rule, train staff and pro bono volunteers on those changes, and rewrite published legal information in multiple languages. Another commenter stated that its presentations would become longer and more complex to explain the effect of the rule's limitation on asylum eligibility, the exceptionally compelling circumstances needed to overcome it, and the new, heightened "reasonable probability" standard in credible fear interviews. The commenter asserted that the rule would also affect its staff's ability to provide services to callers of its hotline and its clients' ability to understand the legal issues involved.

*Response:* The Departments decline to modify the rule in response to the commenters' concerns. The concerns raised are not unique to immigration. Any change to any law or policy regulating the public requires providers who practice in the relevant area to adapt—they must learn the new law and advise clients accordingly. To facilitate the transition to the new provisions, since the Proclamation and IFR came into force, DHS personnel have regularly made themselves available to answer questions about these policies and the Departments' implementation activities, made information about these policies public on the Departments' websites,[201] and proactively engaged a variety of stakeholder groups to promote understanding of the rule. The Departments believe that any purported costs that nonprofit organizations and legal-service providers assert they will bear in adapting to the changes effected by the rule are outweighed by the interest in reducing the current levels of encounters and allowing the Departments to invest more of their limited resources into predictably and swiftly delivering consequences to noncitizens who cross the border without a lawful basis to remain in the United States. *See* 89 FR at 48714. Although returning to the status quo before the IFR may eliminate some of the asserted burdens to which the commenters object, that status quo would perpetuate the vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to those encountered at the southern border who lack a lawful basis to remain in the United States, ultimately incentivizing more noncitizens to attempt to cross the border. *See id.* Conversely, a decrease in encounters at the southern border could be expected to allow organizations like the commenters to allocate more resources to each of their individual clients, allowing them to serve their clients more effectively.

The Departments also disagree that the rule will burden communities near the border. To the contrary, the rule will free resources to allow DHS to more effectively patrol the border and interdict smugglers and TCOs.[202] Moreover, the rule enables the delivery of predictable, swift consequences to noncitizens who cross the border without a legal basis to remain in the United States. That will disincentivize such noncitizens from attempting to cross the border, depriving smugglers and TCOs of opportunities to perpetuate their illegal operations. *See* 89 FR at 48730. In these ways, this rule is expected to reduce smuggler and TCO activity in border communities, ultimately reducing the harms that those activities bring to those communities. Additionally, the same incentives are expected to ultimately lower the number of noncitizens present in border communities, further reducing the burdens on those communities.

---

[200] Even so, although convictions for certain "particularly serious crimes" may render noncitizens ineligible for asylum or withholding of removal, unlawful reentry alone is not necessarily a particularly serious crime. *See* INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii); INA 241(b)(3)(B)(ii), 8 U.S.C. 1231(b)(3)(B)(ii); *Matter of N–A–M–*, 24 I&N Dec. 336, 342 (BIA 2007) ("Where,

as in the instant case, a conviction is not for an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction.").

[201] *See, e.g.,* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[202] *See* 89 FR at 48729–30.

STB_AR1_000052

b. Negative or Minimal Impacts on Immigration System and Government Operations

i. Undermines the Administration's Promises and Goals

*Comment:* Some commenters urged the Administration to keep its promises, stating that "[w]e are all immigrant[s]." Specifically, one commenter stated that the Administration "has not upheld its promise to safeguard the legal right to asylum and protect individuals from persecution, violations of due process, and family separation." Other commenters asserted that the Administration issued the Proclamation for political reasons, including using it as a political tool and for reelection purposes, while another commenter stated that the rule will not be effective in achieving the Administration's perceived political messaging or in "sway[ing]" right-wing individuals. And a third commenter argued that the Democratic Party supported discriminatory ideas like those found in the rule despite claiming to disagree with such policies.

Along the same lines, commenters stated that the rule is inconsistent with the Administration's goal of creating a just immigration system and goes against the Administration's promise to not deny asylum for noncitizens fleeing persecution and violence. One commenter claimed that the Administration had "previously pledged to restore the United States' 'moral standing in the world and our historic role as a haven for refugees and asylum seekers, and those fleeing violence and persecution,'" but that the rule "is misaligned with the values promised by this administration, including promises to end Trump-era restrictions on asylum seekers." Other commenters asserted that the Departments sought to curtail the rights of noncitizens arriving at the border by shutting them out of the asylum process based "solely" on how they arrived in the United States, even though the Administration had previously called on agencies to review expedited removal procedures to make them fairer. Another commenter expressed concern regarding what they alleged was a shift in the Administration's "rhetoric" and support for "fear-based restrictions" on asylum, instead of proposing measures to overhaul and ameliorate the asylum process, which they said was "sadly a very different stance" from the Administration's position a few years ago. A few commenters urged the Administration to expand the asylum system and to not close the southern border.

*Response:* The Departments agree that the United States has a long tradition of accepting and welcoming refugees and note that in the past few years, the United States Government has taken steps to significantly expand refugee admissions worldwide,[203] including for refugees from Latin America and the Caribbean. *See* 89 FR at 48712; 88 FR at 31333, 31341. However, without a policy in place to ensure lawful, safe, and orderly processing of noncitizens entering the United States during emergency border circumstances, the number of noncitizens in such circumstances would exceed DHS's already limited resources and facilities. *See* 89 FR at 48711–15. As explained in the IFR and under this rule, noncitizens seeking protection in the United States will still be able to do so, either before USCIS or in removal proceedings before EOIR, subject to the rule's provisions.

The Departments have determined that the changes effected by the IFR and the rule during emergency border circumstances will allow for better management of the limited resources Congress has provided to the Departments. Specifically, noncitizens intending to seek asylum are encouraged to do so using lawful pathways and processes, which facilitate the orderly processing of claims. In addition, the changes in the IFR and this rule permit the Departments to swiftly screen noncitizens not likely to establish eligibility for relief or protection, as well as to efficiently identify and process valid claims. The combined effect of the changes has reduced the percentage of noncitizens placed in section 240 removal proceedings,[204] where cases may take years to resolve.[205] In addition to reducing the impact on EOIR operations, reducing the number of noncitizens in removal proceedings reduces ancillary benefit requests to USCIS, *see* 8 CFR 208.7 (employment authorization for pending asylum applicants), and alleviates the burden on ICE of removing non-detained noncitizens who receive final orders of removal at the conclusion of section 240 removal proceedings but who do not comply with their orders, *see, e.g.,* 8 CFR 241.4(f)(7) (in considering whether to recommend further detention or

release of a noncitizen, an adjudicator must consider "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal").

The Departments reiterate that a noncitizen may avoid application of the limitation on asylum eligibility if the noncitizen establishes by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). The Departments recognize that some noncitizens who would otherwise be granted asylum may not be eligible due to this rule. However, because such noncitizens remain able to seek statutory withholding of removal and CAT protection, the Departments believe that this rule strikes the appropriate balance between the need to protect those who wish to seek protection in the United States and the need to use resources effectively during emergency border circumstances.

Moreover, the Departments have determined that responding to emergency border circumstances is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws, as well as to reduce the role of exploitative and dangerous smuggling and human trafficking networks. *See* 89 FR at 48714, 48723, 48726, 48767. One cause of recent surges in irregular migration is smugglers' and noncitizens' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. Indeed, this rule follows congressional inaction limiting DHS's capacity to impose such consequences despite the Departments' repeated attempts to obtain the legislative framework and resources required to address unprecedented levels of irregular migration. In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[206] 89 FR at 48729.

---

[203] U.S. Dep't of State, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024,* at 6 (2023), *https://www.state.gov/wp-content/uploads/2023/11/FY-2024-USRAP-Report-to-Congress_FINAL-Accessible-11.02.2023.pdf.*

[204] OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[205] *See* OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab).

[206] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

STB_AR1_000053

Critically, the proposal included more than $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities.[207] *Id.* However, Congress failed to move forward with this bipartisan legislative proposal.[208] *Id.* It also failed to pass the emergency supplemental funding requests that the Administration submitted. *Id.* Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. *Id.*

In light of congressional inaction, this rule is designed to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances with the resources and tools Congress did make available. As discussed in Section II.A.2 of this preamble, the Departments assess that this rule significantly increases their ability to deliver timely decisions and consequences. Accordingly, the Departments reject commenters' claim that the Departments' basis for promulgating the rule is political. Rather, the Departments believe that the rule will continue to reduce irregular migration by allowing the Departments to better manage their limited resources while delivering consequences more swiftly through expedited removal for those without a legal basis to remain in the United States.

### ii. Similarity to Actions of Past Administration

*Comment:* Some commenters stated that the rule was akin to the asylum-related rulemaking and policies of the prior Administration, which, the commenters said, denied noncitizens their "legal right to request asylum in the United States" and were "struck down" by Federal courts. Specifically, one commenter stated that the prior Administration "provided [a] similar rationale" for its policies: "to alleviate the mass illegal immigration crises along the Southern border by discouraging the submission of fraudulent or otherwise meritless asylum claims." And another commenter asserted that the rule was

similar to the prior Administration's interim final rule entitled Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR"), in that it is "again barring people crossing between ports from accessing asylum protections for no legitimate reason beyond false optics of border 'control' that unlawfully penalize and seek to deter those who need access to protection." A number of commenters criticized the rule as an insufficient break from prior immigration policies that the commenters described as "inhumane," "cruel[]," and "punishing." Some commenters claimed that the Administration was "walking back promises to protect fair asylum processes" since revoking Title 42. And another commenter stated that the Administration's echoing of "reactionary measures" of the prior Administration "during a looming election season" was a "cynical approach" that would foster "division and xenophobia," fail to address the root causes of immigration issues, and "alienat[e] an electorate that values fairness and justice for immigrants."

*Response:* The Departments disagree that the rule is indistinguishable from or too similar to the asylum-related rulemakings and policies commenters cited. The Proclamation Bar IFR, for instance, imposed a categorical eligibility bar for noncitizens crossing the southern border outside a POE. *See* 83 FR at 55935; *cf. East Bay III,* 993 F.3d at 669–70. By contrast, this rule does not operate as a categorical bar on asylum eligibility based on manner of entry. Instead, the rule provides a limitation on asylum eligibility for certain noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Importantly, then, noncitizens may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). Such circumstances necessarily exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety;

or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Noncitizens may also be excepted from the limitation if, during section 240 removal proceedings or the asylum merits process, they meet the family unity exception. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, under the family unity provision, the following noncitizens may be treated as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those who (1) are found eligible for statutory withholding of removal or CAT withholding; (2) would be eligible for asylum but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) have a qualifying spouse or child. *See id.* The Departments believe that the distinctions between this rule and the Proclamation Bar IFR are of legal significance, and those distinctions are discussed at length in the IFR. *See* 89 FR at 48735–36.

In addition, the rule is designed to implement policies distinct from those motivating the Proclamation Bar IFR. This rule seeks to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718, 48726–31. The rule is intended to better manage already strained resources, thereby protecting against overcrowding in border facilities and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. *See* 89 FR at 48767. In that vein, the Proclamation Bar IFR differed in important respects from this rule. *See* 89 FR at 48734–36, 48738 (explaining that this rule does not treat the manner of entry as dispositive in determining asylum eligibility, contains an exception that accounts for varied circumstances, and is narrowly tailored to address the emergency border circumstances described in the Proclamation and this rule and thus does not allow for implementation of future proclamations or orders).

Moreover, this rule is a response to emergency border circumstances that did not exist when the Proclamation Bar IFR was promulgated. 89 FR at 48726–28. Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution,

[207] Deirdre Walsh & Claudia Grisales, *Negotiators Release $118 Billion Border Bill as GOP Leaders Call It Dead in the House,* NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/ senate-border-deal-reached.*

[208] Stephen Groves, Rebecca Santana & Mary Clane Jalonick, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance,* AP News (May 23, 2024), *https:// apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

poverty, human rights abuses, the impacts of climate change, and other factors. *Id.* at 48726. The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[209] including by working closely with partner countries across the Western Hemisphere.[210] *Id.* at 48727. But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. *Id.*

iii. Would Be Ineffective or Not Achieve Its Intended Outcomes

*Comment:* Commenters expressed opposition to the rule, claiming that the rule would decrease, not increase, the efficiency of USCIS management of asylum cases and could lead to further backlogs and inefficiencies for AOs and immigration courts, complicating the asylum process. One commenter believed that the rule would "exacerbate efficiency issues by requiring operational changes to compensate for elimination of the preliminary screening to notify noncitizens of the expedited removal process and the need to affirmatively express their fear of persecution or torture." Some commenters asserted that the Departments have created an "unworkable, convoluted, and unfair" system at the border, which CBP officers and AOs will not be prepared to adapt to. Commenters claimed that the rule would create additional administrative burdens by requiring officers, applicants, stakeholders, and judges to apply multiple tests in one proceeding. Further, commenters stated that having to track, identify, and apply different standards would be more complex for all those involved.

Other commenters stated that the rule would exacerbate conditions at the southern border and would increase the number of migrants who enter between POEs, further straining resources and escalating the current humanitarian crisis. A commenter stated that the rule may cause migrants to be turned away if they walked up to a POE, and thus, it would "inadvertently encourage desperate individuals to resort to dangerous methods to reach safety." One commenter voiced concern that the rule would have an adverse effect on the asylum process because the rule would cause a foundational shift in the U.S. asylum system, causing access to asylum to be the exception rather than the norm. Another commenter claimed that decades of deterrence policies have "proven that punitive policies do not reduce irregular migration—they only increase chaos, confusion, and human suffering." (Emphasis omitted.)

Other commenters claimed that the rule would be ineffective at achieving its intended goals for managing the border. One commenter stated that people were coming to the United States because they had no choice, so securing the border would not solve the problem. Similarly, a commenter stated that the rule would be like playing "whack-a-mole, except with real live people, most of whom would not undertake such a dangerous, difficult journey to the border if they felt they could stay where they were." Furthermore, a commenter stated that, without additional resources, the Government will have no way of fully implementing its own policy. Commenters cited an article stating that "it is hard to say with confidence whether this regulation will work as the administration intends."[211] One commenter stated that the Proclamation did not address the actual needs of asylum seekers, nor did it address the problem that has led the U.S. immigration system to be "broken." This commenter described a "broken legal system that takes years to process cases, leading individuals to live in limbo and without important legal rights." Along the same lines, another commenter stated that turning away noncitizens is evidence of a faulty immigration system and, thus, there are better solutions than turning away those asking for help.

Other commenters asserted that the rule had not substantiated its aim of incentivizing a sustained drop in the number of encounters at the southern border. While citing a study, one commenter stated that any change in border policy triggers a short-term drop in encounters, regardless of the intent of the policy change. The commenter also stated that the rule has not provided an adequate explanation for the assumption that it would achieve its objective of reducing the number of encounters at the border. And while referencing another study, another commenter elaborated that policies that limit access to POEs increase irregular crossings by noncitizens who cannot wait in Mexico, which they stated was also confirmed by DHS's Office of Inspector General. Conversely, another commenter remarked that, while there has been a temporary drop in encounters immediately after the issuance of the IFR, the IFR would be ineffective in deterring migrants in the long term because of the rule's exceptions and loopholes. Lastly, another commenter expressed concern that "[a]s written, the [IFR] simply continues the status quo by encouraging mass illegal immigration and abuse of our asylum system."

*Response:* The Departments disagree that the rule decreases the efficiency of management of asylum claims. The Departments recognize that the rule may require additional time for AOs and IJs during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and noncitizens' fear claims. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the IFR has resulted in significantly reduced irregular migration and has allowed the Departments to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. *See* Section II.A.2 of this preamble. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be accompanied by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule. And as discussed in Section III.C.3 of this preamble, AOs and IJs are specifically trained to apply multiple tests in the same proceedings; any claim that these trained and skilled professionals would be burdened by multiple tests is unfounded. Moreover, any burdens imposed by the rule on

---

[209] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[210] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[211] Am. Immigr. Council, *Analysis of the President's 212(f) Proclamation & Interim Final Rule Restricting Asylum* 2 (2024), *https://www.americanimmigrationcouncil.org/research/american-immigration-council-analysis-presidents-212f-proclamation-and-interim-final-rule.*

STB_AR1_000055

CBP officers and agents have been accompanied by a substantial reduction in other resource burdens due to a substantial reduction in encounters at the southern border caused by this rule.

The Departments agree with commenters that the immigration system is badly in need of additional resources and efficiencies. This rule is not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade. However, the Departments disagree that these fundamental challenges mean this rule will be ineffective in achieving its aims. Given the absence of reforms by Congress, the Departments are working within the legal framework and with the resources provided by Congress to ensure the functioning of the border security and immigration systems during emergency border circumstances. After the implementation of the Proclamation and IFR, the Departments saw a significant decrease in encounters along the southern border, which has allowed the Departments to more efficiently process noncitizens through expedited removal, delivering timely decisions and consequences and discouraging irregular migration. In other words, commenters are incorrect that the rule would lead to an increase in encounters between POEs and decreased efficiencies in the process.

Notably, in addition to the decrease in encounters, operations at POEs have remained largely steady over this time. For example, vehicle wait times at POEs on the SWB have not shown changes from typical monthly fluctuations. The numbers of vehicle occupants and pedestrians entering the United States with lawful status have remained aligned with normal entry data. In particular, between August 2023 and May 2024—the last month before implementation of the IFR—the average wait time across all SWB POEs (passenger vehicle, pedestrian, and truck cargo) was 32 minutes for vehicles, 15 minutes for cargo trucks, and 9 minutes for pedestrians. From June 2024 through July 2024, the average wait times were 34 minutes for vehicle traffic, 9 minutes for truck cargo, and 7 minutes for pedestrians.

With respect to the suggestion that the rule would inadvertently encourage desperate individuals to resort to dangerous methods to reach safety (such as crossing between POEs), the Departments note that the rule creates no such incentive; experience shows that the IFR has improved DHS's capacity to swiftly deliver consequences to those who cross between POEs and

do not have a lawful basis to remain, including through the use of expedited removal. *See* Section II.A.2 of this preamble. Notably, the comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against irregular migration of noncitizens who cross between POEs without viable claims for asylum. In addition, the rule, by adopting the exceptions contained in section 3(b) of the Proclamation, complements and incentivizes the use of lawful, safe, and orderly pathways and processes for individuals to come to the United States.

With respect to the claim that this rule will yield at most a short-term reduction in encounters as noncitizens decide that they cannot wait in Mexico, the Departments note that thus far, encounters have not increased to the levels that were seen in the years leading up to the IFR. *See* Section II.A.2 of this preamble. Moreover, in the Departments' experience, migrants are sensitive to the incentives created by national policy,[212] and the Departments see an imperative to act in the face of the challenging problem of very high levels of irregular migration. Even if the rule's effects did not last indefinitely, moreover, that would not be a reason to depart from the rule's approach now— when its approach is having its intended effect.

The Departments do assess that ensuring that the reduction in border encounters is sustained will require not just the rule itself but work on the confluence of factors that also contribute to high levels of irregular migration. And in parallel with this rule, the Administration is working to address those factors.[213] For instance, the United States Government is working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[214] including through working

closely with partner countries across the Western Hemisphere.[215] 89 FR at 48727; *see* Section II.A.2 of this preamble. Additionally, increased access to lawful, safe, and orderly pathways will continue to complement one of the rule's goals of discouraging irregular migration where appropriate.[216] While these and other parallel measures are necessary complements to the rule, they cannot substitute for the rule: These efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. 89 FR at 48727.

c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety

*Comment:* Commenters expressed general concern that the IFR would negatively impact the U.S. workforce and economy, stating that the United States needs immigrants to bolster the workforce and address labor shortages, that the United States was built on the labor of immigrants, and that reliance on immigrant labor continues today. They argued that restricting immigration into the United States exacerbates population shortages, and that closing borders to immigrants negatively impacts the food supply chain because a significant portion of agricultural workers and food processing employees are immigrants. One commenter specified that migrants are currently needed because "the reproductive birthrate here has declined" and "replacement" of economic contributors is "essential to avoid complete replacement by 'artificial intelligence.'"

*Response:* The Departments do not dispute the importance and contributions of immigrants to the economy. As noted in Section V.B. of this preamble (in which the Departments describe the estimated

---

[212] *See, e.g.,* Miriam Jordan, One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay, N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.*

[213] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and;* U.S. Agency for Int'l Dev., *U.S. Strategy to Address the Roots Causes of Migration in Central America—FY 2022 USAID Results, https://www.usaid.gov/central-america-and-mexico-regional-program/fy-2022-root-causes-strategy-results* (last visited Sept. 15, 2024).

[214] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-*

*strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[215] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declaration-migration-and-protection-in-guatemala.*

[216] *See, e.g.,* Ezra Klein, *The Real 'Border Czar' Defends the Biden-Harris Record,* N.Y. Times (Sept. 13, 2024), *https://www.nytimes.com/2024/09/13/opinion/ezra-klein-podcast-alejandro-mayorkas.html* (interview response of Secretary of Homeland Security Alejandro Mayorkas explaining that one "leg[] of the stool" for decreasing encounters is presenting migrants with "alternative means of accessing humanitarian relief in the United States," including "the lawful pathways that we have built").

STB_AR1_000056

effects of the rule pursuant to Executive Order 12866), the expected effect of this rule is primarily to reduce incentives for irregular migration and illegal smuggling activity. This rule does not inhibit or prevent regular migration into the United States. In particular, the Departments have been clear that the IFR does not apply to any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States or presents at a POE pursuant to a pre-scheduled time and place. 89 FR at 48715; *see also* 8 CFR 208.35(a), 1208.35(a) (excepting from the limitation on asylum eligibility noncitizens who are excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation). Additionally, this rule does not change or place any restrictions on those who may be eligible for employment authorization within the United States. The Departments recognize that there may be an impact on some people who attempt to enter the United States irregularly and who are removed after their entry, but the Departments find that the limitation on asylum eligibility is, on balance, an appropriate response to surges in irregular migration during emergency border circumstances. For those whom this rule renders ineligible for asylum but who ultimately receive statutory withholding of removal or CAT protection, another effect would be the increased frequency with which those subject to this rule who are present in the United States are required to renew their employment authorization and a reduced ability for their family to immigrate to the United States.

Additionally, as noted in the IFR, 89 FR at 48712 & nn.10–13, over the past several years the United States Government has implemented a historic expansion of lawful pathways and processes to come to the United States, including:

• The CHNV parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;

• The Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other things, information and referrals to humanitarian or family reunification parole processes, labor pathways, and expedited refugee processing for eligible individuals; [217]

• The expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 up to 50,000 in FY 2024; and

• Expanding access to labor pathways.

More specifically, recognizing the significant contributions noncitizens make to the U.S. economy, the United States Government significantly expanded access to labor pathways to maintain strong economic growth and meet labor demand in the United States. Our efforts to expand access to labor pathways have yielded results. In FY 2023, the United States issued 442,000 H–2A and H–2B nonimmigrant worker visas globally.[218] Similarly, in FY 2023, the United States issued 265,777 H–1B specialty occupation visas,[219] the highest number of visas issued or otherwise utilized in decades.[220] Furthermore, the United States also issued more than 192,000 employment-based immigrant visas in 2023—far above the pre-pandemic number—and ensured that no employment-based visas went unused for the second year running.[221]

The Departments believe that these new or expanded lawful pathways, and particularly employment-based pathways, are effective ways to address labor shortages and encourage lawful migration. The Departments also believe that, by reducing migrants' incentives to use human smugglers and traffickers to enter the United States, this rule will reduce the likelihood that newly arrived migrants will be subjected to labor

trafficking. The Departments further reiterate that noncitizens who avail themselves of any of the lawful, safe, and orderly pathways recognized in this rule will not be subject to the limitation on asylum eligibility or the other provisions of the rule.

*Comment:* Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. While citing a 2024 article, a commenter stated that the IFR would subject noncitizens who cross the border irregularly to expedited removal and further criminalization through criminal prosecution, costing taxpayers over $7 billion to incarcerate migrants charged or convicted with unauthorized entry or reentry crimes.

*Response:* The Departments emphasize that neither the IFR nor this rule requires DHS to refer noncitizens it encounters at the border for prosecution for unauthorized entry or other immigration-related offenses. It is incorrect to cite expedited removal as the vehicle leading to mass incarceration and criminal prosecution of migrants. To the contrary, expedited removal is a process that allows DHS officials to quickly remove certain noncitizens encountered at the border. While it is true that noncitizens will spend some time in custody pending completion of the expedited removal process (and for a credible fear determination where referred), such custody is not for purposes of criminal prosecution. Although the Departments recognize commenters' concerns regarding the amount of taxpayer funds used to incarcerate migrants who are charged and convicted with unauthorized entry or reentry crimes, that is not at issue here. And in any event, as discussed in Section V.B of this preamble, the Departments expect that the rule will result in significantly reduced irregular migration. Accordingly, the Departments expect AOs and IJs to conduct a smaller number of credible fear cases than AOs and IJs would otherwise be required to handle in the absence of this rule, with the possibility of attendant savings of Government resources.

### d. Other General Opposition

*Comment:* Several comments urged the Departments not to close the SWB.

*Response:* The rule does not close the SWB. It adds a limitation on asylum eligibility and alters the process for those individuals described in section 3(a) of the Proclamation who are not described in section 3(b) of the

---

[217] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sep. 20, 2024);

The White House, *Fact Sheet: Biden-Harris Administration on World Refugee Day Celebrates a Rebuilt U.S. Refugee Admissions Program* (June 20, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/20/fact-sheet-biden-harris-administration-on-world-refugee-day-celebrates-a-rebuilt-u-s-refugee-admissions-program/.*

[218] U.S. Dep't of State, *Worldwide Visa Operations: Update, https://travel.state.gov/content/travel/en/News/visas-news/worldwide-visa-operations-update.html* (last updated Jan. 2, 2024).

[219] U.S. Dep't of State, *Nonimmigrant Visa Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics.html* (last visited Aug. 27, 2024) (see the "FY2019–2023 Detail Table (PDF)" under "Nonimmigrant Visas by Individual Class of Admission (e.g. A1, A2, etc.)").

[220] *Id.* (see the "FY1997–2023 NIV Detail Table (Excel spreadsheet)" under "Nonimmigrant Visa Issuances by Visa Class and by Nationality" showing issuance totals of H–1B specialty occupation visas).

[221] USCIS, *Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade* (Feb. 9, 2024), *https://www.uscis.gov/EOY2023.*

Proclamation, but it does not ''close'' the border.

Additionally, the rule does not impose any changes to asylum eligibility or processing of noncitizens who use lawful, safe, and orderly pathways to seek entry to the United States. Noncitizens who use the CBP One app to pre-schedule an appointment at a SWB POE to present themselves at the border in a safe, orderly, and lawful manner are excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and so are excepted from the limitation on asylum eligibility and changes to expedited removal processing. This exception is significant. From June 5, 2024, through August 31, 2024, 123,600 noncitizens with CBP One appointments presented at POEs and were accordingly processed outside of the IFR's provisions and will be excepted from the limitation on asylum eligibility if they choose to apply for asylum.[222] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D). During the pre-pandemic period, approximately 330 encounters were processed at SWB POEs per day.[223] Since January 2023 through August 2024, approximately 1,500 encounters have been processed at SWB POEs per day.[224] And since the start of FY 2024 through August 2024, that average has increased to approximately 1,700 per day.[225]

### C. Provisions of the Rule

1. Limitation on Asylum Eligibility

a. Proclamation Exceptions—Section 3(b) of Proclamation

*Comment:* Commenters raised a number of concerns regarding the exceptions to the Proclamation's suspension and limitation on entry, including the exceptions for UCs; those permitted to enter based on the totality of the circumstances; and those permitted to enter based on operational considerations.

As an initial matter, a majority of commenters supported the Proclamation's exclusion of UCs from the suspension and limitation on entry or from provisions of the rule. However, some commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry, without also providing an exception for family units,

would lead families traveling together to choose to ''self-separate'' at the border and send the children across unaccompanied because conditions in Mexico are too dangerous for children to wait with their parents until the family can cross together. Similarly, commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry would encourage the trafficking and exploitation of children. Commenters stated that the rule, without an additional family-unit exception, would therefore result in the separation of families.

Another commenter opposed the Proclamation's exception for UCs. This commenter stated that noncitizens, including those who pose security risks, would attempt to pose as UCs to evade the Proclamation's suspension and limitation on entry.

Additionally, some commenters opposed the exceptions in sections 3(b)(vi) and 3(b)(vii) of the June 3 Proclamation, which provide that the suspension and limitation on entry will not apply to a noncitizen if a CBP immigration officer determines that the noncitizen is permitted to enter either based on the totality of the circumstances or based on operational considerations. Commenters expressed concern that these exceptions are vague and subjective and should not be left to the discretion of CBP immigration officers.

Specifically, commenters asserted that the Proclamation does not provide any standards or make clear how CBP officers will determine when someone is excepted based on the totality of the circumstances or operational considerations. Commenters also stated that CBP immigration officers may not be properly equipped to apply the Proclamation's exceptions, which would result in arbitrary decision-making and removals in violation of non-refoulement principles.

Other commenters stated that the Proclamation's exceptions were overly broad and would authorize CBP immigration officers to use them as a ''loophole'' to permit large populations of noncitizens to enter the country based on the ''totality of the circumstances'' or due to ''operational considerations.'' These commenters stated that, as a result, overbroad use of these exceptions will result in fewer noncitizens being removed and will not change the status quo of large numbers of noncitizens crossing the border.

Lastly, commenters expressed concern that noncitizens excepted under section 3(b)(vi) or 3(b)(vii) of the June 3 Proclamation based on the totality of the circumstances or for

operational considerations and who are subsequently placed into immigration court proceedings will be unable to demonstrate that they are not subject to the rule's provisions in immigration court.

*Response:* Any comments opposing provisions of the Proclamation, as opposed to the parallel provisions of the rule, are outside of the scope of this rule. President Biden issued the Proclamation by the authority vested in the President by the INA. *See* INA 212(f), 8 U.S.C. 1182(f); INA 215(a), 8 U.S.C. 1185(a); 89 FR 48487. Under section 3(d) of the Proclamation, the President directed the Secretary and Attorney General to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions to such asylum eligibility limitations and conditions that they determine are warranted. The Departments lack authority to amend the exceptions to the Proclamation's suspension and limitation on entry, as set forth in section 3(b) of the Proclamation, and any proposal to do so would be outside the scope of this rule. At the same time, the Departments may depart from the Proclamation's section 3(b) exceptions in determining which exceptions to this rule's limitation on asylum eligibility are warranted to the extent they are adopted in this rule, and the Departments have responded to comments suggesting such exceptions below.

To the extent that commenters suggest excepting family units from the rule's limitation on asylum eligibility, the Departments reiterate that excepting all family units could incentivize families to bring their children on the often-perilous journey to the United States. *See* 89 FR at 48757. Such a broad exception would also be at odds with the Proclamation and rule's goals in addressing emergency border circumstances. *See id.* at 48726–31 (''Need for These Measures'').

Further, the Departments do not believe that the rule will meaningfully incentivize the ''self-separation'' of families. Because UCs are already excluded from expedited removal by statute, *see* 8 U.S.C. 1232(a)(5)(D), the Departments do not expect based on their experience implementing border enforcement and asylum that excepting UCs, but not family units, from the limitation on asylum eligibility would lead to increased incentives to ''self-separate.'' Rather, in the time since the

---

[222] OHSS analysis data downloaded from UIP on September 3, 2024 (IFR Details tab).

[223] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[224] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[225] *Id.*

**STB_AR1_000058**

IFR took effect, average daily encounters of UCs at the SWB have actually decreased by 37 percent.[226]

Moreover, on balance, the Departments believe that the important interests of protecting the statutorily recognized vulnerabilities of UCs, while maintaining the fundamental goals of the rule in addressing emergency border circumstances, outweigh any consequences of claimed incentives for noncitizens to "self-separate" at the border. Notably, the Departments emphasized the importance of maintaining family unity in the IFR and crafted a number of exceptions to the limitation to preserve family unity and avoid family self-separations. *See* 8 CFR 208.35(a)(2), 208.35(c), 1208.35(a)(2), 1208.35(c); *see also* 89 FR at 48733 (explaining that the rule contains exceptions that "avoid[] the separation of families"). For instance, if any member of a noncitizen's family—as described in 8 CFR 208.30(c)—with whom the noncitizen is traveling demonstrates exceptionally compelling circumstances for entering the United States during emergency border circumstances, then all of the members of that family unit traveling together will be excepted from the rule's limitation on asylum eligibility. 8 CFR 208.35(a)(2), 1208.35(a)(2); *see also* 89 FR at 48754. The rule also contains an explicit family unity provision in the AMI process before USCIS and in removal proceedings before EOIR; this provision allows a principal asylum applicant to be excepted from the rule's limitation on asylum eligibility if the applicant can establish that the applicant meets the statutory requirements for statutory withholding of removal or CAT protection, among other requirements. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 89 FR at 48733 (explaining family unity provision requirements).

The Departments recognize commenters' concerns about the vulnerability of UCs. The Departments encourage all those who seek to travel to the United States, including UCs, to take advantage of available lawful, safe, and orderly pathways and processes rather than rely on smugglers or criminal organizations to facilitate a potentially dangerous journey. 89 FR at 48723; 88 FR at 31346. However, the Departments note that UCs are particularly vulnerable and entitled to special protections under the law. *See* 88 FR at 31346 (citing INA 208(a)(2), 8 U.S.C. 1158(a)(2) (providing that safe-third-country bar does not apply to UCs); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (stating that an AO has initial jurisdiction over the asylum claims of UCs)); *see generally* 8 U.S.C. 1232. Given that UCs have long had special rules and protections applicable to them in immigration proceedings, the Departments disagree with commenters that this rule's adoption of the exception for UCs at section 3(b)(iii) of the Proclamation would create any meaningful new incentive for noncitizens who may be a security risk to attempt to pose as UCs in order to circumvent the rule's provisions. Further, immigration officers have training, knowledge, skills, and experience in identifying fraudulent behavior. *See* 89 FR at 48744 (explaining that CBP immigration officials "have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow ups steps with regards to any behaviors or indicators of concern").

Furthermore, with respect to commenters' concerns regarding the discretionary nature of the exceptions at sections 3(b)(vi) and 3(b)(vii) of the Proclamation based on the totality of the circumstances and operational considerations, the Departments reiterate that comments on the Proclamation itself are outside the scope of this rulemaking. And insofar as these comments relate to this rule, the Departments disagree that these exceptions will essentially swallow the rule, as commenters suggest, or that CBP immigration officers will be unable to apply these exceptions fairly or consistently. Section 3(b)(vi) of the Proclamation permits entry based on the totality of the circumstances, and then delineates examples such as "consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter." Thus, this "totality of the circumstances" exception provides numerous examples that would allow the CBP immigration officer to determine whether such circumstances were present such that a noncitizen would not be subject to the Proclamation's suspension and limitation on entry. The discretionary nature of the "operational considerations" exception provides flexibility for CBP immigration officers to better manage migratory flows during emergency border circumstances, which is a driving purpose of this rule. 89 FR at 48723, 48726–31 (explaining, in detail, the need for the rule). Moreover, CBP officers have experience considering various factors and factual scenarios when exercising their discretion as immigration officers, including determining appropriate processing pathways, and such experience is also relied upon in making these decisions.

Finally, as to commenters' concerns about whether noncitizens who were excepted from the Proclamation's suspension and limitation on entry under subsections 3(b)(vi) and (vii) of the Proclamation would nonetheless be subject to the rule's limitation on asylum eligibility in immigration court, those concerns are misplaced. By their terms, subsections 3(b)(vi) and (vii) apply to "any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer," based on certain considerations. Whether a noncitizen was excepted from the Proclamation and permitted to enter the United States is a question of historical fact, documented by CBP in the appropriate electronic processing system(s),[227] and does not require a separate assessment by an AO or IJ. *See* 89 FR at 48732 n.169. Thus, any noncitizen who is described in subsections 3(b)(vi) and (vii) of the Proclamation will not be subject to the limitation on asylum eligibility contained in the rule. *Id.*

i. Legal Concerns Related to CBP One and the Lack of Exceptions

*Comment:* Commenters raised a number of concerns regarding the rule's exception to the limitation on asylum eligibility for noncitizens who use the CBP One app to present at a POE pursuant to a pre-scheduled time and place. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D).

Commenters expressed concern that use of CBP One is unlawful. Some commenters voiced concern that "barring" those who enter the United States along the SWB without a pre-

---

[226] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Consistent with the discussion in Section II.C.1 of this preamble, encounters of individuals in family units and single adults have fallen more sharply than encounters of UCs, which has caused UCs' share of total encounters to increase, notwithstanding the overall drop in UC encounters in absolute numbers. The relative stability of UC flows compared to family unit flows is consistent with the fact that most policy changes in recent years (including the current rule) have not had a direct impact on UCs.

[227] Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule,* Securing the Border attach. 5 (June 4, 2024) (Muster).

STB_AR1_000059

scheduled CBP One appointment would violate U.S. and international law and "effectively eliminate[] asylum" for every noncitizen who crosses into the United States at the southern border without an appointment. Commenters further stated that, while the Departments seek to distinguish the IFR from the vacated Proclamation Bar IFR by explaining that it is being implemented during an emergency and some lawful pathways remain available to migrants, most who cannot wait for a CBP One app appointment would be barred from asylum under the IFR. Similarly, commenters stated that the INA requires DHS to provide every noncitizen who arrives in the United States with the opportunity to establish a credible fear of persecution—not just those with the resources to own a smartphone and the ability to schedule an appointment. Other commenters stated that the CBP One app codifies a form of electronic metering and essentially replaces a program that relied on metering to limit the number of noncitizens who could approach POEs, a practice that, the commenters argued, was held unlawful by the Federal courts.

One commenter expressed concern with the use of CBP One app, stating that the app has been used to release record numbers of undocumented noncitizens into the United States. The commenter warned that the Biden Administration could continue to utilize and expand upon the CBP One app without any limits under the IFR. The commenter also raised concerns that the number of appointments available through the CBP One app can be expanded without limit, such that a large population of noncitizens could be excepted from the Proclamation's suspension and limitation on entry.

Several commenters expressed concern that the IFR, unlike the Circumvention of Lawful Pathways rule, does not provide an exception for those who are unable to access or use the CBP One application. Other commenters asserted that the IFR does not provide a justification for deviating from the Circumvention of Lawful Pathways rule's scheduling issues exception and expressed concern that while the Circumvention of Lawful Pathways rule's exception has not been properly applied, the lack of such an exception in the IFR would expose migrants who are unable to access or use the CBP One app to the risk of refoulement.

*Response:* The Departments believe the exception for noncitizens who present at a POE pursuant to a pre-scheduled time and place, such as through the CBP One app, is consistent with the INA and the purpose of the Proclamation and this rule.

As an initial matter, the Departments note that migrants do not apply for asylum with CBP at a POE. At POEs, CBP is responsible for the inspection and processing of all applicants for admission, including individuals who may intend to seek asylum in the United States. 8 CFR 235.1(a) (concerning all applicants for admission at POEs); *id.* 235.3(b)(4) (concerning individuals processed for expedited removal and claiming fear of persecution or torture). While the CBP One app is one key way that CBP is streamlining and increasing its capacity to process undocumented noncitizens, the app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection.

The Departments disagree that the use of the CBP One app to manage the flow of migration and intake into POEs and to encourage the use of safe, orderly, and lawful pathways constitutes a form of "digital metering," unlawfully withholds or bars access to the asylum process, or conflicts with the agency's duties under 8 U.S.C. 1225(a)(3). Any noncitizen who is processed for expedited removal upon arrival at a POE and who indicates an intention to apply for asylum or a fear of return, whether or not the noncitizen uses the CBP One app, will be referred for a credible fear interview. Further, as noted in Sections II.B and III.A of this preamble, the United States implements its non-refoulement obligations under the 1967 Refugee Protocol through the provisions governing withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through section 208 of the INA, 8 U.S.C. 1158, which governs asylum. Noncitizens who are ineligible for asylum under the rule, such as those who enter the United States without pre-scheduling an appointment through the CBP One app, and are unable to establish that exceptionally compelling circumstances exist remain eligible to seek statutory withholding of removal and CAT protection consistent with these obligations.

The Departments also disagree with commenter concerns regarding unlimited expansion of CBP One or the use of CBP One to release individuals. The CBP One app is intended to allow for the orderly processing of noncitizens and, under the Proclamation and this rule, use of the app is especially critical during emergency border circumstances because it allows DHS to maximize the use of its limited resources. 89 FR at 48737; *see also* 88 FR at 31317–18 (explaining that the CBP One app

"enables the POEs to manage the flows in a safe and efficient manner, consistent with [each POE's] footprint and operational capacity, which vary substantially across the SWB"). Thus, because the CBP One app allows each POE to manage the daily number of appointments that the POE has the capacity to handle, commenter concerns that the use of CBP One appointments will be vastly expanded beyond CBP's capacity to process them are unfounded, especially during the emergency border circumstances that the Proclamation and this rule are designed to address. In addition, with regard to concerns regarding the number of noncitizens released following the use of the CBP One app to schedule an appointment, use of the CBP One app does not guarantee a particular processing disposition, and all such determinations are made on a case-by-case basis.[228]

Regarding commenters' concerns that the IFR does not provide an exception for those who present at a POE but are unable to access or use the CBP One app, here, and as noted in the IFR, the Departments choose not to include an exception to the rule's limitation on asylum eligibility for those who present at a POE but have an inability to access the CBP One app due to significant technical failure or other ongoing and serious obstacle. 89 FR at 48732 n.171. The IFR explained that the Departments made this decision in part because of the different purposes of this rule and the Circumvention of Lawful Pathways rule. This rule, unlike the Circumvention of Lawful Pathways rule, applies only during emergency border circumstances as described in the Proclamation and the rule, when encounters strain the border security and immigration systems' capacity. In contrast, the primary aim of the Circumvention of Lawful Pathways rule was to encourage the use of lawful, safe, and orderly pathways. Therefore, the Departments determined that the heightened need to address these emergency border circumstances necessitated limiting the scheduling issues exception in this rule.

Moreover, experience applying the Circumvention of Lawful Pathways rule in credible fear screenings indicates that

---

[228] *See* Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule,* Securing the Border attach. 5–6 (June 4, 2024) (Muster); CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone* ("Upon arriving at a POE, CBP officers inspect and evaluate all individuals to determine the appropriate processing disposition.").

the exception for presenting at a POE and being unable to access or use the CBP One app rarely applied.[229] The Circumvention of Lawful Pathways rule excepted, in addition to UCs, three categories of noncitizens: (1) individuals provided authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) individuals who presented at a POE with a CBP One appointment or who presented at a POE and demonstrated "it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle"; and (3) individuals who sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Leaving aside UCs, as UCs are not subject to expedited removal, 8 U.S.C. 1232(a)(5)(D), noncitizens could establish at least one of these three exceptions in only approximately 4.7 percent of total credible fear screenings conducted by USCIS under the Circumvention of Lawful Pathways rule (*i.e.*, including referrals from USBP and OFO).[230] While DHS data do not differentiate among the types of exceptions, available data show that the exception for presenting at a POE and being unable to utilize the CBP One app applied in less than 5 percent of all credible fear determinations made by USCIS when considering whether the presumption of asylum ineligibility applied.[231]

The data showing the limited application of the exception for presenting at a POE and being unable to use CBP One reinforce the Departments' judgment not to adopt a similar exception in the emergency border circumstances in which this rule applies. Consistent with AOs' obligation under 8 CFR 208.30(d) to elicit testimony on all potentially relevant information, USCIS guidance instructs AOs to elicit testimony related to all exceptions to the presumption of asylum ineligibility where they may apply and evaluate their applicability, which for the exception under the Circumvention of Lawful Pathways rule (8 CFR 208.33(a)(2)(ii)(B)) would be any case where the presumption of asylum ineligibility applied and the noncitizen presented at a POE. At a time where emergency border circumstances are present that trigger a suspension and limitation on entry and necessitate the

limitation on asylum eligibility in the current rule, the Departments do not believe it would be appropriate to expend the resources it would take to elicit testimony about possible ways a noncitizen was unable to access the CBP One app and analyze that information in every credible fear interview where the noncitizen presented at a POE without an appointment in order to apply an exception to the limitation on asylum eligibility similar to the one present at 8 CFR 208.33(a)(2)(ii)(B), particularly where recent experience shows that such an exception is rarely applicable in credible fear determinations.

In addition to these exceptions, the Circumvention of Lawful Pathways Rule also contains a "[r]ebuttal" ground for "exceptionally compelling circumstances." 8 CFR 208.33(a)(3), 1208.33(a)(3). The Departments determined that this rule should also contain an exception for exceptionally compelling circumstances to ensure that noncitizens with a time-sensitive imperative for entering the United States without authorization may avoid application of this rule's limitation on asylum eligibility. Notably, under the Circumvention of Lawful Pathways rule, across the set of all expedited removal cases that resulted in credible fear interviews (*i.e.*, from encounters at and between POEs), USCIS found that an "exceptionally compelling circumstances" rebuttal ground applied in over 10 percent of those cases where the rule's presumption of asylum ineligibility was analyzed as part of the credible fear determination.[232] Under the present rule, the "exceptionally compelling circumstances" exception to the rule's limitation on asylum eligibility was found to apply in approximately 11 percent of all encounters with credible fear determinations issued by USCIS where the limitation on asylum eligibility was considered.[233] Under this rule, noncitizens may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. For those who are unable to meet such an exception, the Departments believe that, in the emergency border circumstances in which this rule applies, such noncitizens should wait for a CBP One appointment. *See* 89 FR at 48732 n.171.

For those individuals seeking a CBP One appointment, CBP continues to take steps to make the process of seeking appointments more equitable and accessible. For instance, individuals have the chance to request an

appointment within a 12-hour period each day, with appointments allocated to the requesting group the following day.[234] In addition, noncitizens are not required to use the same mobile phone or device to request an appointment each day, as appointment requests are allocated based on the requesting registration. In other words, if a noncitizen has a registration, they can request an appointment each day from any mobile device. Individuals are not required to utilize a single device for each step of the process, and they may use a shared or borrowed device to request and schedule an appointment.

If a noncitizen receives an appointment, they are notified by an email notification, a push notification to the device that made the appointment, an in-app message, and a change to their registration status in the app.[235] The push notification that is sent to the device provides a notification to check the app, alerting a user to log into the app to review and confirm their appointment. This ensures that the notification is provided in multiple ways, such that those without continuous access to the same mobile device can still learn of their appointment status by logging into the app. If selected for an appointment, the individual then has 23 hours to complete the geolocation and liveness check and schedule the appointment.[236] Individuals may also request an automatic 24-hour extension to complete the process, if needed. Again, this can be done via any mobile device.

Individuals who do not have a smartphone or have other phone-related problems can seek assistance from trusted partners, if needed. Individuals are also permitted to seek assistance from others to complete the registration, request, and appointment confirmation process.

## ii. Wait Times for CBP One Appointments

*Comment:* Commenters expressed concerns with long wait times for those using the CBP One app to schedule an

---

[229] OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).

[230] *Id.*

[231] *Id.*

[232] *See id.*

[233] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—STB tab).

[234] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[235] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

[236] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

STB_AR1_000061

appointment, with one organizational commenter stating that waiting times routinely reach half a year due to the "enforced scarcity of appointments." Several commenters expressed concern that capping CBP One appointments at 1,450 per day is insufficient to address the number of arrivals at the border. For example, a commenter stated that, while 1,450 CBP One appointments are assigned each day, the "average number of appointment requests made per month between January 2023 and February 2024 was just under 5 million." A commenter stated that appointments are limited to less than 20 percent of the POEs at the SWB, while others noted that CBP One appointments are offered at only eight POEs along the almost 2,000 miles of the SWB.

Commenters further stated that the IFR would likely increase wait times by incentivizing more people to use the CBP One app—including Mexican nationals subject to the IFR—thereby exacerbating the significant backlog for securing an appointment.

Several commenters expressed additional concern that long wait times heighten the risk of danger for migrants in Mexico who intend to seek asylum in the United States. Specifically, multiple commenters warned that long wait times place migrants at severe risk of rape, assault, torture, kidnapping, and death, while leaving Mexican nationals to wait in the same country from which they are fleeing, and that those waiting for a CBP One appointment are vulnerable to being targeted by "criminal actors and detained or mistreated by Mexican government officials." Other commenters expressed concern about the hot weather, insufficient housing, and lack of access to essential resources. Additionally, commenters remarked that violence, coercion, and apprehensions by Mexican authorities prevent migrants waiting in Mexico from attending their pre-scheduled appointments. Commenters further expressed that particularly vulnerable populations who are waiting in Mexico, including Black migrants and women, are particularly susceptible to discrimination, violence, and heightened barriers to report crimes and access support services.

A few commenters further addressed health concerns for noncitizens required to wait in Mexico for their CBP One appointment. A commenter observed that the wait times for an appointment are "neither predictable nor reliable," which compounds stress and difficulties for noncitizens. The commenter further stated that health problems among certain noncitizens make it more untenable for them to wait in Mexico. The commenter wrote that living conditions in Mexico exacerbate preexisting conditions such as asthma, cancer, and mental health concerns related to trauma, and that migrants have limited access to adequate medical care and life-saving medicine in Mexico. Likewise, another commenter observed that noncitizens living with HIV—both Mexican and non-Mexican—experience barriers to accessing treatment and medication while waiting in Mexico. Another commenter expressed concern over documented outbreaks of chicken pox in informal migrant encampments in Mexico City due to the high number of asylum seekers waiting for an appointment.

A commenter remarked that noncitizens may be granted appointments at a POE far from where they are physically located, despite the app's purported use of geolocation technology, forcing individuals to risk travel within Mexico. The commenter stated that Mexican authorities do not issue and renew temporary humanitarian visas to a majority of migrants, despite the fact that these visas are required to access bus and airline travel. The commenter additionally wrote that Mexican authorities have set up checkpoints targeted at preventing individuals from accessing public transportation required to make it to their scheduled CBP One appointments.

*Response:* Regarding concerns about long wait times to schedule a CBP One appointment, and the uncertainty this may cause, in large part due to high levels of migration in the region, the Departments note that CBP One is a tool that facilitates safe and orderly processing of noncitizens at POEs, and has aided CBP's efforts to increase processing at POEs.[237] CBP currently allocates a certain number of appointments per day to those registrations that have been pending for the longest period of time, based on the date on which a registration was created. CBP also regularly monitors wait times to be able to address any issues. While average wait times have generally increased since June 2023 due to demand for appointments, as of August 25, 2024, CBP has not seen evidence that average wait times have increased at a greater rate following the implementation of the Proclamation and IFR. Indeed, CBP One represents a significant expansion of CBP's capacity to process noncitizens at SWB POEs: During the pre-pandemic period, CBP's OFO processed around 330 people per day.[238] From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed four-and-a-half times that number daily.[239] Although demand for appointments currently outpaces supply, there are now more CBP One appointments available daily (1,450) than average daily encounters at and between POEs between FYs 2011 and 2018 (1,300).[240]

With regard to concerns about the number of available CBP One appointments, DHS acknowledges that there are more noncitizens seeking appointments than there are available appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. The total appointment requests over multiple day periods include a significant number of repeat requests because individuals are encouraged to submit an appointment request each day until gaining an appointment, and thus monthly totals do not reflect an accurate count of unique individuals seeking appointments. However, this high level of demand reflects the high levels of migration throughout the region, which CBP has responded to by increasing capacity to process noncitizens at POEs. CBP has increased the number of available appointments since January 2023 but notes that POEs can safely and securely process only a finite number of migrants,[241] and that the current number of appointments reflects that capacity. The Departments disagree that there is "enforced scarcity" of appointments or that the number of appointments is set in an arbitrary manner. The number of appointments is determined by a port's capability and capacity to process noncitizens. CBP's ability to process undocumented noncitizens in a timely manner at land border POEs is dependent on CBP

[237] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf;* 89 FR at 48737.

[238] *See* OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[239] *See id.*

[240] *See* OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[241] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* 1–2 (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

resources, including infrastructure and personnel.[242]

With regard to the number of POEs at which appointments are available and the locations of such ports, OFO must evaluate each POE's unique capabilities, both with respect to processing and staffing. There are also important variances between POEs due to geography, infrastructure, and workload. These considerations are evaluated continuously as OFO determines the number of appointments to schedule and at which ports to schedule them. OFO has limited use of CBP One to certain POEs that have the space and infrastructure to process elevated numbers of inadmissible noncitizens and has assigned staff to those POEs to conduct this processing. Adding additional POEs would require reallocation of that staffing, exchanging capacity in one location for another. Additionally, OFO has sought to utilize POEs that are located in or near urban areas with sufficient resources for migrants who may be released from OFO custody.

The Departments acknowledge that there may be humanitarian and health concerns for noncitizens in Mexico, including but not limited to individuals seeking a CBP One appointment, particularly for those with preexisting or underlying health conditions. The Departments also acknowledge that the congregation of groups of individuals can lead to increased transmission of communicable diseases. Similarly, the Departments acknowledge that some noncitizens seeking an appointment— including Mexican nationals—may be required to travel through Mexico to reach their appointment, and to wait in Mexico for their appointment, which may present safety concerns. The Departments also recognize that such concerns may be exacerbated by uncertainty about how long a migrant may have to wait to be processed at a POE, which may make it harder to schedule medical care or travel within Mexico.

Such circumstances, however, have been a reality that existed for migrants seeking to present at POEs prior to the introduction of CBP One. Indeed, before CBP One's introduction, migrants faced greater unpredictability given the high levels of migration in the region, which predate the introduction of CBP One,[243]

and the fact that before CBP One's introduction, migrants did not have the ability to wait anywhere in the expanded geographic boundaries now available to migrants using CBP One. In another context, too, migrants would face worse conditions without this rule: As explained elsewhere in this preamble, the Departments assess that, when levels of encounters by USBP are elevated, such that DHS does not have the capacity to process most noncitizens through expedited removal and therefore must release a significant number of noncitizens pending section 240 removal proceedings, this dynamic serves to incentivize more migrants to travel through Mexico. This dynamic both exacerbates dangerous conditions along that route and exposes more migrants to dangerous conditions along the way. While CBP has continued to take steps to increase processing at POEs in an effort to provide a safe and orderly mechanism to enter the United States, it continues to be operationally impossible for CBP to immediately process all noncitizens seeking to enter the United States.

With regard to the location of scheduled appointments, the CBP One app does not arbitrarily designate the location for appointments. The location is selected by the user, and the location can be changed by the user every time the user requests an appointment. The Departments continue to believe that the use of CBP One to schedule appointments facilitates the safe and orderly entry of noncitizens at POEs, including migrants who are already waiting in Mexico to enter the United States. In particular, the use of the app enables migrants to schedule their arrival at a pre-determined date and time, providing migrants with certainty about the date of their entry. Migrants may then wait in whatever location they deem best before approaching the border for their appointment. To this end, as of August 23, 2024, the CBP One app allows non-Mexican nationals to request and schedule an appointment from the southern Mexican states of Tabasco and Chiapas in addition to their existing ability to request and schedule appointments from Northern and Central Mexico.[244] Mexican nationals may request and schedule an appointment from anywhere in Mexico.[245] CBP continues to encourage

migrants to make appointments at POEs close to where they may be geographically located in Mexico or seek to enter the United States.

With regard to claims regarding the actions of government authorities in Mexico, the Departments note that they do not control the actions or decisions of the Mexican government or Mexico's implementation of its own laws.

### iii. Availability of and Access to CBP One Appointments and Concerns About Discrimination

*Comment:* Several commenters raised concerns about unequal access to POEs and asylum resulting from barriers to using the CBP One app, such as language, disability, resource, and other access issues that disparately impact and discriminate against migrants. A commenter acknowledged that CBP One may allow for certain positive gains in receiving and processing migrants, and also expressed concern that the application is wielded to penalize those with possible protection needs who cannot access it or obtain an appointment. One commenter called the CBP One app "inherently discriminatory," and another commenter articulated that the CBP One app has "pervasive" accessibility issues. A commenter cited a 2024 Amnesty International report,[246] where that organization called on the United States to "stop the mandatory use of the CBP One application" due to concerns over language access, technological barriers, and privacy and surveillance.

In the same vein, numerous commenters raised concerns related to the accessibility of the app for those lacking the required technology. Specifically, commenters expressed concern that scheduling an appointment via CBP One is not a viable option for those who lack access to reliable internet, electricity, or a smartphone. Some commenters provided examples that migrants have reported that their phones have been stolen by Mexican authorities or cartels, or lost or damaged during their travels. A commenter stated that in encampments with limited access to electricity, migrants are charged high prices for access to an outlet to charge their phones. Another commenter expressed that the IFR places people who do not have access to technology in the prejudicial position of having to meet a higher standard of proof to receive a positive credible fear

[242] *See, e.g., id.*

[243] *See, e.g.,* Perla Trevizo, *Dozens of Families, Many from Guatemala, Arrive in Nogales Seeking US Asylum,* Ariz. Daily Star (Aug. 2, 2018), *https://tucson.com/news/local/dozens-of-families-many-from-guatemala-arrive-in-nogales-seeking/article_4dd45e2f-0b19-5b7b-880e-74a82e3515ea.html;* Ariel G. Ruiz Soto, *Record-Breaking Migrant*

*Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[244] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[245] *See id.*

[246] Amnesty Int'l, *CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States* (May 9, 2024), *https://www.amnesty.org/en/latest/news/2024/05/cbp-one-mobile-application-violates-the-rights-of-people-seeking-asylum-in-the-united-states/.*

**STB_AR1_000063**

determination, in violation of U.S. asylum law. A commenter remarked that in perpetuating the ''division'' between ''classes of people seeking asylum''—''those who have a smartphone and access to the internet and are technologically literate'' and ''those who do not have these required items, skills or abilities''—the IFR fails to apply protections equally under U.S. and international law.

Many commenters also discussed limited language accessibility for the CBP One app, stating that the app is only available in Spanish, English, and Haitian Creole, and expressed that conditioning access to asylum on the use of a smartphone app that is only available in three languages denies equal access to asylum to those in need of protection who are unable to use the app. Commenters expressed concerns about the fact that different stages for securing a CBP One appointment are available in different sets of languages (*e.g.*, *Login.gov*, the initial app registration page, and app form responses), as this results in noncitizens, even those who are literate in Spanish and Haitian Creole, requiring assistance with completing the CBP One app form. The commenter further remarked that the system is particularly difficult for vulnerable populations to navigate as a result of challenges with finding adequate translation services, reasoning, for example, that it can take up to a week to find interpretation for Indigenous languages.

Several commenters additionally raised concerns about access to the app among those who are illiterate, have disabilities, or have limited language and digital literacy. In particular, commenters expressed that the IFR assumes technological literacy in the use of smartphone apps, such as the ability to access an email account, check the account on an ongoing basis, upload a video, and enable Global Positioning System/geolocators with many people requiring assistance to undertake these steps. A commenter provided an account of their experiences with individuals in Ciudad Juarez who struggle to navigate the app despite knowing how to read in Spanish and Haitian Creole, and the inability of legal service providers to provide logistical support to all the individuals with potential asylum claims who lack the digital literacy to navigate the mobile app.

Commenters further remarked on technological issues surrounding the app. Commenters expressed concerns that CBP One remains inaccessible to many due to facial recognition technology errors, which commenters stated are frequent for migrants with darker skin tones. Commenters stated that the app cannot read the faces of Black, Brown, Asian, and Indigenous people seeking asylum, and Haitians and Africans are particularly likely to experience ''algorithm bias'' while using the CBP One app which would prevent large classes of individuals from using the app to secure an appointment, and, therefore, from seeking asylum, perpetuating racism in the U.S. immigration system.

Commenters also noted additional technology concerns, such as issues with error messages, account access, and deactivated accounts. One commenter listed various reported issues with the CBP One app, such as difficulty uploading files, error messages only provided in English, saturated bandwidth resulting in delays, appointments being rejected if GPS is not activated, and phones unable to take video or photos of sufficient quality to be recognized by the app. Another commenter provided various anecdotal examples of individuals who were unable to access the CBP One app under the Circumvention of Lawful Pathways rule, and who the commenter said would similarly be harmed under the IFR, while another commenter added that complications with the app forced nongovernmental organizations to spend resources helping people use the app rather than assisting noncitizens with credible fear interviews, reviews of negative determinations, and representation in immigration court. A commenter also stated that ''[t]here is a thriving black market for appointments available only to the wealthiest refugees.''

Separately, while some commenters expressed support for the ''expansion of mechanisms for [CBP One] appointments,'' commenters also stated that these expansions are insufficient to counteract noncitizens' unawareness of the CBP One application and the inability to obtain appointments.

Lastly, a commenter asserted that the use of CBP One results in family separation due to different appointment dates. Furthermore, a commenter expressed additional concern that families with a CBP One appointment are not always guaranteed the ability to cross the border, citing examples of families who were turned away despite arriving on time for a valid appointment.

*Response:* The Departments disagree that the CBP One app is a barrier to asylum. Rather, it is a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in a more orderly and efficient fashion. CBP One is a free app, and noncitizens are not required to pay to register or schedule an appointment.

The Departments acknowledge that not all migrants may have access to a smartphone or be able to easily use the CBP One app, and that lack of or limited smartphone access or ability to use a smartphone (due to lack of digital literacy, disability, or other reasons) may limit a migrant's ability to use the CBP One app to schedule an appointment. However, individuals who do not have a smartphone or who have other phone-related issues can seek assistance, including sharing phones, or translation or technical assistance, from trusted partners, if needed. In addition, as noted above, individuals may utilize shared or borrowed devices to register for the CBP One app and to schedule an appointment. CBP conducts extensive engagement with non-governmental organizations (''NGOs'') and stakeholders, and has received feedback and information about the challenges associated with the use of the CBP One app. Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals. CBP is aware that NGOs have discussed providing assistance with completing individuals' CBP One registrations and offering continued assistance with requesting appointments. CBP also notes that individuals seeking to create a CBP One registration can do so from anywhere. To create a registration, users are not required to enable location services, although they are required to enable location services in order to request and schedule an appointment.

With regard to internet access, the Departments acknowledge there can be connectivity gaps, electrical outages, and unreliable wireless internet access in northern Mexico. However, CBP made significant updates to the appointment scheduling process in 2023, including transitioning CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. Under this system, users must ''ask for an appointment'' each day, by selecting the relevant registration and submitting a request for that registration.[247] If a noncitizen receives an appointment that day, they are notified in multiple ways, and have up to 23 hours to confirm that appointment.[248] If a noncitizen does not receive an appointment, they must ''request an appointment'' the following day, again by selecting the relevant registration and requesting that registration. Individuals are not required to use the same mobile phone or device to request an appointment each day, and, as noted above, may use a shared or borrowed device to request and schedule the appointment. In addition, in July 2024, CBP updated the appointment allocator to increase the percentage of appointments allocated to users who had been waiting for longer periods of time, based on the date on which their registration was created.

CBP also continually takes steps to provide access to the app for individuals in different languages. The app was originally available in Spanish and English. Haitian Creole was added in February 2023 in response to feedback from stakeholders. Additionally, after the user makes a language preference, error messages are available in the selected language (English, Spanish, or Haitian Creole). While the app remains available in Spanish, English, and Haitian Creole, quick reference guides are now available in many languages (including Russian, French, Portuguese, Arabic, Dari, Pashto, Punjabi, and Chinese). According to the UNHCR, of the top 5 nationalities of displaced individuals in Mexico, all are from Spanish-speaking countries and Haiti.[249] Between May 11,

2023 (when the Title 42 public health Order terminated) and September 11, 2024, USBP data show that over 88 percent of noncitizens apprehended between POEs on the SWB were recorded as speaking Spanish or English. The next most common languages were Mandarin, representing just over 2 percent of apprehensions, followed by Portuguese and French, which each represent less than 2 percent of noncitizens apprehended.[250] Finally, a CBP analysis conducted in September 2024 showed that, of all of the CBP One appointment requests during the first week of September 2024, approximately 90 percent were made by individuals from Spanish-speaking countries, with the next highest percentage, 5 percent, made by Haitians, and the remainder by other nationalities. The fact that Haitian nationals represent a relatively large proportion of the displaced persons in Mexico generally, are more likely to be encountered at POEs, and use the CBP One app further supports the prioritization of Haitian Creole and Spanish translations in the app. In addition, based on NGO feedback, CBP will be adding a French translation to the app. CBP has also been made aware of concerns with regard to the accuracy of the app's Haitian Creole translation and is currently taking steps to improve its accuracy.

CBP acknowledges that individuals who do not speak Spanish, English, or Haitian Creole, including those who speak Portuguese or Mandarin, may have more difficulty accessing the app, but has determined that it is appropriate to prioritize translation services in the app to those languages spoken by the vast majority of users of the app and noncitizens in the region. And CBP believes that its efforts to make the app accessible in other ways, such as through the quick reference guides, are working. CBP has seen a significant number of individuals who do not speak Spanish, English, or Haitian Creole requesting appointments, suggesting that the quick reference guides, as well as other information about CBP One

available on CBP's website,[251] are working to provide accessibility to the app even for those who do not speak one of those languages. With regard to concerns about different stages of the CBP One appointment process being in different languages, CBP does not exercise control over Login.gov, which is used to register for an appointment, as it is operated by the General Services Administration.[252] Login.gov is available in several languages, including English, Spanish, and French. And while Login.gov is not available in Haitian Creole, CBP analysis showed that, as noted above, Haitian nationals continue to be the second-highest population of noncitizens requesting CBP One appointments, indicating that Login.gov's languages are not posing a substantial limitation for those users. Moreover, the CBP One quick reference guides include a description of the Login.gov steps in the process. The Departments also appreciate the concerns related to the information required to access or use the CBP One app. The Departments note that users of the app are not required to upload any documents in order to use the app. Users are required to submit a photograph, and may, although are not required to, upload document information, such as scanning their passport information. With regard to concerns raised by commenters relating to facial recognition and access to the app by individuals with darker skin tones, CBP and the third party responsible for liveness detection took steps in 2023 to improve the liveness capability of the application and increase bandwidth. Since that time, CBP has data showing that the app successfully matches liveness in 80–90 percent of attempts, with the difference in performance across ethnicities on the order of tenths of a percent. If an individual initially is not able to successfully match to their live photo, they are not prohibited from trying again, and they may seek an extension to continue to try to complete liveness. Individuals who continue to fail liveness are able to reach out to CBP either directly or, if appropriate, through an NGO or other external entity. CBP notes that it does not collect data on race or skin complexion.

CBP engages frequently with stakeholders to determine further updates and changes in the app that improve the users' experience and

---

[247] *See* CBP, CBP One™ Mobile Application, Frequently Asked Questions—English (last modified Sept. 19, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[248] *See* CBP, CBP One™ Application Update Announcement—English (Mar. 1, 2024), *https://www.cbp.gov/document/guidance/cbp-one-application-update-announcement-english.*

[249] *See* United Nations High Commissioner for Refugees (''UNHCR''), *Country Operations: Mexico, Population by Origin, https://reporting.unhcr.org/operational/operations/mexico#* (last visited Sept. 19, 2024). For purposes of this analysis, the Departments are excluding the nationalities

grouped as ''various,'' given a lack of information on what such category includes.

[250] Due to the way that CBP's OFO records and documents language services, data for languages used by those encountered at POEs are not readily available. Although there is a high volume of displaced Haitian nationals in Mexico, CBP's experience is that, particularly in recent years, Haitian nationals have been much more likely to be encountered at POEs than between POEs. For instance, in FY 2023, more than 75,000 Haitian nationals were encountered at SWB POEs, compared with just over 1,000 between POEs. *See* OHSS analysis of July 2024 Persist Dataset (Haitian Encounters tab).

[251] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[252] *See* U.S. General Servs. Admin., *Login.gov, https://login.gov/* (last visited Aug. 10, 2024).

**STB_AR1_000065**

enhance access to its features. For example, because of NGO feedback, height and weight were made optional fields and additional response options were added such as "I don't have one" for a foreign address and "Unknown" for parental information. CBP also acknowledges that reading comprehension and disability may present challenges for some users among this user population. CBP has improved the app's text for users with low literacy and will continue to make improvements to the app for this population. The app has also undergone a compliance review pursuant to section 508 of the Rehabilitation Act regarding its accessibility to people with disabilities, with a final certification expected by the end of November 2024.

Regarding concerns raised by NGOs regarding the resources expended to address questions from migrants about the app and its impacts, the Departments are not able to comment on how such entities determine the use of their own resources. With regard to concerns regarding a "black market" for appointments, CBP has advised noncitizens and the general public that appointments that purport to be "for sale" are fraudulent, and migrants should not pay for such appointments.[253]

With regard to the commenters' concerns related to whether noncitizens have sufficient awareness of the availability of the CBP One app and this rule, the Departments believe that they have provided sufficient notice to the public. The Departments note the use of, and benefits of, the CBP One app have been broadly publicized. Indeed, the CBP One app is widely used, as evidenced by the number of requests CBP receives each day for appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. Demand for CBP One appointments has outpaced supply, which has resulted in average wait times increasing since June 2023. CBP continues to regularly announce updates and improvements made to the app to the public. In particular, CBP regularly announces changes and updates to the app on its public website at *https://www.cbp.gov/about/mobile-apps-directory/cbpone*. This website also contains a number of detailed questions and answers regarding the use of the app. Additionally, DHS has

published a Privacy Impact Analysis (PIA) for CBP One, and subsequent updates to the original CBP One PIA to address privacy risks in the deployment and use of the CBP One app.[254] Moreover, the Departments' publication of the Circumvention of Lawful Pathways rule, the IFR, and this rule have provided (and in the case of this rule, will provide) further notice to the public and to noncitizens of the pathways available to them and the potential consequences of not availing themselves of such pathways. The Departments believe that such efforts provide sufficient information for noncitizens seeking to travel to the United States.

With respect to comments suggesting that families are processed separately or have been turned away, the Departments note that all individuals—including members of families—are processed pursuant to existing CBP policies and practices. Family members who register together on CBP One using a single registration number to schedule an appointment for their whole family are given the same appointment date and time. So long as they arrive as a family for their appointment at that date and time, they will be processed at that appointment time.

b. Regulatory Exception—Exceptionally Compelling Circumstances

*Comment:* Commenters raised concerns regarding the preponderance of the evidence standard for establishing exceptionally compelling circumstances under the IFR. Commenters argued that applying a limitation on asylum eligibility during credible fear interviews, and then requiring noncitizens to demonstrate exceptionally compelling circumstances by a preponderance of the evidence in order to overcome the limitation on asylum eligibility, is inconsistent with

the INA and congressional intent. Rather, commenters stated that Congress enacted a "significant possibility" standard for the credible fear interview in order to safeguard a noncitizen's opportunity to present potentially viable asylum claims in full proceedings and to prevent noncitizens from being returned to persecution or torture.

Relatedly, commenters stated that noncitizens should not have to demonstrate exceptionally compelling circumstances unrelated to their asylum claim by a preponderance of the evidence in order to have their asylum claims adjudicated. Some commenters believed that the preponderance of the evidence standard was too onerous for noncitizens to meet during the credible fear interview, even if the noncitizen had experienced a situation or event prior to entry that should otherwise qualify as an exceptionally compelling circumstance.

Lastly, at least one commenter implied that AOs conducting credible fear interviews did not have adequate training and were not equipped to conduct the analyses required by the IFR, including applying the preponderance of the evidence standard to determine whether a noncitizen is subject to the limitation on asylum eligibility.

*Response:* Many of commenters' concerns are based on an incorrect premise. The Departments recognize that the "significant possibility" standard is established by statute, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and the Departments lack the authority to—and have not sought to—alter this statutory standard through rulemaking. By statute, to determine whether a noncitizen has a "credible fear," an AO must assess whether there is a "significant possibility . . . that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Thus, during credible fear proceedings, the overall standard of proof for establishing exceptionally compelling circumstances to overcome the limitation on asylum eligibility remains the "significant possibility" standard, which must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that the exception applies). *See* 89 FR at 48739. Accordingly, at the credible fear interview, the AOs assess whether there is a "significant possibility" that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen satisfies the rule's exception.

---

[253] *See* CBP, *CBP One™ Mobile Application, Frequently Asked Questions—English, CBP One™ Mobile Application, "What if someone asks me to pay for an appointment?"* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[254] *See* DHS, DHS/CBP/PIA–068, *Privacy Impact Assessment for CBP One™ Mobile Application* (2021 and subsequent updates), *https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf;* DHS, DHS/CBP/PIA–068(a), *Privacy Impact Assessment [Update] for CBP One™ Mobile Application* (2024), *https://www.dhs.gov/sites/default/files/2024-07/24_0725_priv_pia-cbp-068%28a%29-cbpone-update.pdf; see also* DHS, DHS/CBP/PIA–076, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf;* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42* (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

Likewise, during credible fear reviews, IJs will apply the "significant possibility" standard to determine whether a noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception.

To the extent commenters voiced general opposition to requiring a noncitizen to demonstrate exceptionally compelling circumstances by a preponderance of the evidence so as not to be subject to the rule's limitation on asylum eligibility, the Departments note that this standard is the general standard noncitizens must meet to determine that a ground of ineligibility does not apply in a merits adjudication. *See* 8 CFR 1240.8(d) ("If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply."). Additionally, this burden for establishing exceptionally compelling circumstances was codified by the Circumvention of Lawful Pathways rule, which has been in effect since May 11, 2023. 88 FR at 31450–51 (codified at 8 CFR 208.33(a)(3), 1208.33(a)(3)). The Departments believe that maintaining consistency in the preponderance of the evidence standard between these two related rules promotes consistent adjudications when adjudicators must determine whether a noncitizen has demonstrated exceptionally compelling circumstances. In fact, to promote such consistency, the rule provides that if a noncitizen demonstrates an exceptionally compelling circumstance for purposes of this rule, then the noncitizen has necessarily demonstrated an exceptionally compelling circumstance for purposes of the Circumvention of Lawful Pathways rule, and vice versa, further underscoring the importance of maintaining a consistent analytical framework between the two rules. *See* 89 FR at 48754–55 (explaining that the IFR's exception to the limitation on asylum eligibility mirrors the Circumvention of Lawful Pathways rule's rebuttal grounds to simplify administration of each while both rules are in effect).

Further, contrary to commenter concerns, the preponderance of the evidence standard is not onerous or unduly burdensome such that a noncitizen would be unable to demonstrate exceptionally compelling circumstances. To the extent that commenters expressed concern with the preponderance of the evidence standard

during credible fear proceedings, the Departments again clarify that the applicable standard during credible fear proceedings is the "significant possibility" standard, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and AOs will assess whether there is a significant possibility that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen meets the "exceptionally compelling circumstances" exception. Similar to the Circumvention of Lawful Pathways rule's rebuttal grounds, *see* 88 FR at 31380, the Departments believe that there should generally be sufficient evidence available at the time of the credible fear interview for an AO to evaluate whether there is a significant possibility that the noncitizen would be able to establish exceptionally compelling circumstances by a preponderance of the evidence. Notably, the credible fear screening process involves eliciting testimony from noncitizens seeking protection, and the rule does not require noncitizens to provide any specific form of evidence, such as written statements or other documentation. *See* 89 FR at 48746 & n.239.

Indeed, DHS data show that the standard is not unduly challenging to meet at the credible fear stage. Since the IFR went into effect through August 31, 2024, USCIS determined that the limitation on asylum eligibility did not apply in over 2,200 cases (approximately 11 percent of credible fear interviews completed under the IFR during that period) because the noncitizen was able to demonstrate exceptionally compelling circumstances under the credible fear screening standard.[255] The Departments believe that these data show that the exception is both meaningful and appropriately tailored to ensure that, during emergency border circumstances, only those with a time-sensitive imperative are able to avoid the rule's limitation on asylum eligibility.

Regarding the preponderance of the evidence standard during a full merits adjudication, the Departments similarly do not believe that it imposes an onerous or unduly burdensome evidentiary standard. The INA explicitly provides that during full merits adjudication of an asylum claim "testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration" in

certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Thus, as the Departments have explained, the preponderance of the evidence standard may be met through credible testimony alone. *See* 88 FR at 31395. For example, if a noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom they were traveling faced an acute medical emergency, an imminent and extreme threat to life or safety, or satisfied the definition of a victim of a severe form of trafficking in persons, or faced other exceptionally compelling circumstances, then the noncitizen could present testimony of those facts and circumstances.

Lastly, to the extent commenters expressed skepticism about an AO or IJ's ability to properly apply the screening standard during a credible fear interview, the Departments note that both AOs and IJs receive extensive training in substantive law and procedure, *see* 88 FR at 31395 & nn.211–213, and the Departments are confident that AOs and IJs have the requisite knowledge, skills, and experience to properly apply the framework of this rule, as they have been doing for months.

*Comment:* Some commenters recommended that the Departments rescind the "exceptionally compelling circumstances" exception to the limitation on asylum eligibility, stating that the exception codifies "loopholes" that are easy for noncitizens to exploit and undermines the Departments' goal of discouraging irregular migration across the SWB.

*Response:* The Departments decline to rescind the "exceptionally compelling circumstances" exceptions at 8 CFR 208.35(a)(2)(i) and 1208.35(a)(2)(i). As the Departments explained in the IFR, maintaining an exception to the limitation on asylum eligibility for exceptionally compelling circumstances is intended to mitigate potential adverse impacts of the rule on certain particularly vulnerable individuals and family members as described in 8 CFR 208.30(c) with whom they are traveling, without undermining the Departments' stated policy objectives of disincentivizing irregular migration during emergency border circumstances. 89 FR at 48754. The Departments believe the nature of the exceptionally compelling circumstances—such as facing an acute medical emergency, facing an imminent and extreme threat to life or safety, or meeting the definition of a victim of a severe form of trafficking in persons—appropriately balances the Departments' stated policy

---

[255] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

objectives and does not create a "loophole" as commenters suggest.

The Departments are also confident that AOs and IJs will appropriately assess a noncitizen's testimony and any evidence presented to determine whether a noncitizen has established that the rule's exception to the limitation on asylum eligibility applies. Indeed, DHS and EOIR personnel have the training and experience necessary to determine whether the exception applies, including several months of experience from implementing the IFR and other rules. For example, AOs were provided specific training for the implementation of the Circumvention of Lawful Pathways rule to elicit and analyze testimony related to whether a noncitizen can establish an exception or rebut the presumption of asylum ineligibility. *See* 88 FR at 33330. Additionally, before any AO can interview a noncitizen where the IFR's limitation on asylum eligibility applies, or any supervisory AO can review such a case, they must receive specific training on the IFR, including on applying the IFR's limitation on asylum eligibility and the "exceptionally compelling circumstances" exception.

*Comment:* Commenters stated that the enumerated per se exceptionally compelling circumstances in 8 CFR 208.35(a)(2) and 1208.35(a)(2) are, on the whole, too limited in number and narrow in scope, and are framed in a restrictive manner with a high burden of proof that commenters asserted many noncitizens will be unable to meet. According to commenters, because the exception is so difficult to establish, the vast majority of noncitizens who enter between POEs will be ineligible for asylum. Commenters also alleged that noncitizens may not have access to or be aware of what information or evidence is necessary to sufficiently demonstrate exceptionally compelling circumstances, particularly as they may not be aware of the rule and its evidentiary requirements until they are placed in proceedings. Similarly, commenters expressed concern about the evidentiary burden noncitizens would face in trying to establish that exceptionally compelling circumstances existed at the time of entry when their case may not be adjudicated until years after the date of entry due to existing backlogs, and when evidence and witnesses may be lost over time. Commenters offered, as an example, the difficulty that noncitizens would face in demonstrating that they or a family member with whom they traveled experienced an acute medical emergency, in the absence of concurrently issued medical documents.

Commenters stated that it will be difficult for AOs to evaluate whether a noncitizen satisfies an exception at the credible fear stage because it is a fact-intensive inquiry and will require significant development of the record. Commenters also stated that there is insufficient guidance about how, in practice, AOs are supposed to make a finding regarding exceptionally compelling circumstances. Further, commenters expressed concern that AOs are not required to elicit potentially relevant facts about the rule's exceptions to ensure that noncitizens are not improperly subject to the IFR's limitation on asylum eligibility and recommended that the Departments adopt a screening framework in which AOs have a shared burden to elicit all information relevant to asylum eligibility, preferably in a non-adversarial manner.

*Response:* The Departments believe that the rule's exception to the limitation on asylum eligibility for exceptionally compelling circumstances, including the enumerated per se circumstances, are appropriate in scope and detail, and as such, the Departments decline to modify those provisions. Indeed, during emergency border circumstances, limiting the "exceptionally compelling circumstances" exception to those who are unable to wait for an appointment due to an acute medical emergency or an imminent and extreme threat to life or safety is important to deter irregular migration and provide for efficient border processing during a period of high encounters.[256] *See* 89 FR at 48732 n.171. As discussed above in this section of the preamble, the data reflect that the "exceptionally compelling circumstances" exception is achieving this balance; USCIS determined that the exception had been met in approximately 11 percent of credible fear interviews completed between the IFR's effective date and August 31, 2024.[257]

The Departments stress, however, that exceptionally compelling circumstances are not limited to the enumerated examples. Rather, similar to the rebuttal grounds adopted in the Circumvention

of Lawful Pathways rule, the examples are a non-exhaustive list intended to preserve AO and IJ flexibility and permit consideration of all facts giving rise to potential exceptionally compelling circumstances. 89 FR at 48733; 88 FR at 31394. Additionally, the Departments continue to prioritize family unity by extending these exceptions to qualifying family members with whom the noncitizen is traveling. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Regarding concerns that establishing exceptionally compelling circumstances is a fact-intensive inquiry that will require significant development of the record, and that noncitizens will not have access to information and evidence of exceptionally compelling circumstances at the time of screening, the Departments note that relevant evidence of such circumstances generally relates to the situation immediately prior to the noncitizen's entry into the United States, and focuses on relevant personal facts and circumstances within the noncitizen's knowledge. Accordingly, the Departments expect that any evidence necessary for a noncitizen to demonstrate that they have a significant possibility of ultimately showing exceptionally compelling circumstances should generally be readily available—whether from the noncitizen in the form of credible testimony or other evidence or from government records relating to the noncitizen's circumstances at the time of entry—at the time of the credible fear screening. With respect to cases where the existence of exceptionally compelling circumstances at the time of entry may be evaluated later in time, the Departments similarly note that the rule does not impose any requirement for the type of evidence necessary to establish exceptionally compelling circumstances, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in a full merits hearing in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Regarding commenter concerns that noncitizens would have difficulty demonstrating that they faced an acute medical emergency at the time of entry without medical documents, the Departments expect that credible testimony about the medical emergency would generally be sufficient at the credible fear stage, and the rule does not require any specific type of evidence related to the acute medical emergency. *See* 89 FR at 48746 & n.239 (explaining that credible testimony is sufficient in a credible fear screening and that

---

[256] Separately, noncitizens facing an urgent humanitarian situation may not be subject to the limitation at all if, under the Proclamation, a noncitizen is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of urgent humanitarian interests at the time of the entry or encounter. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); Section 3(b) of the Proclamation.

[257] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

STB_AR1_000068

corroborating evidence is not required); *see also* 88 FR at 31392 (discussing the analogous acute medical emergency rebuttal ground under the Circumvention of Lawful Pathways rule).

Additionally, when conducting credible fear interviews, AOs have an obligation to elicit testimony relevant to a noncitizen's claim, which will necessarily include any information related to exceptionally compelling circumstances.[258] Moreover, during credible fear reviews before IJs, noncitizens have an opportunity to be heard and to be questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). During section 240 removal proceedings, IJs also must develop the record, which will, as relevant, necessarily include facts and testimony pertaining to exceptionally compelling circumstances. *See* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("[IJs] shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses."); 8 CFR 1003.10(b) (same); *see also Quintero* v. *Garland*, 998 F.3d 612, 626 (4th Cir. 2021).

Finally, the Departments disagree with the assertion that there is insufficient guidance regarding making a finding related to exceptionally compelling circumstances. The rule clearly sets forth both the standard for the "exceptionally compelling circumstances" exception and the process for evaluating the limitation on asylum eligibility during credible fear determinations. *See* 8 CFR 208.35(a), (b), 1208.35(a), (b). Additionally, AOs must receive training on application of the limitation on asylum eligibility and the "exceptionally compelling circumstances" exception before any AO can interview a noncitizen where the limitation on asylum eligibility applies, or any supervisory AO can review such a case. Further, the Departments have experience in applying the "exceptionally compelling circumstances" standard in the context of the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733 (explaining that the exception mirrors the rebuttal circumstances adopted in the Circumvention of Lawful Pathways rule and is intended to apply to the same circumstances); *see also* 88 FR at 31380, 31390–93 (explaining the standard for establishing and procedure for evaluating analogous rebuttal

grounds under the Circumvention of Lawful Pathways rule). The Departments also now have several months of experience implementing the IFR, and implementation itself yields valuable information on continued operation of its provisions. *See supra* Section II.A.2.

*Comment:* Commenters raised concerns that the "exceptionally compelling circumstances" exception does not provide adequate protection for vulnerable groups. Specifically, commenters alleged that the exceptions are insufficient to protect vulnerable groups who face a disproportionate risk of harm in Mexico, including LGBTQI+ noncitizens, Black and Indigenous noncitizens, women, and children, among others. Commenters observed that some such noncitizens, and particularly those without access to legal representation, may not understand the intricacies of the IFR or the requirements to establish an exception. Further, commenters stated that the complicated exceptions will contribute to confusion among and disparate treatment of such noncitizens, making them vulnerable to smugglers and undermining the Departments' goal of orderly processing at the SWB.

*Response:* For general discussion regarding concerns related to specific vulnerable populations, please see Section III.B.2.a.iii of this preamble.

With regard to the "exceptionally compelling circumstances" exception and vulnerable populations specifically, the Departments believe that the exception provides sufficient protection for such populations. The exception focuses on relevant personal facts and circumstances within the noncitizen's knowledge relating to potential harm they faced immediately preceding their entry into the United States. *See* 89 FR at 48747–48. To determine whether the exception applies, the AO questions the noncitizen regarding the circumstances of their entry into the United States, which does not require any particular legal knowledge by the noncitizen.

Further, the Departments disagree that the "exceptionally compelling circumstances" provision will make noncitizens more vulnerable to smugglers due to confusion about the rule. As the Departments explained in the IFR, 89 FR at 48733, the exception for exceptionally compelling circumstances was drafted to mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule, which the Departments believe will help reduce any confusion among noncitizens or adjudicators. Moreover, the Departments believe that, overall, this rule is a key measure to combat illegal

smuggling activity by drastically reducing incentives for noncitizens without a lawful basis to remain in the United States to rely on smugglers for entry into the United States. *See* 89 FR at 48714–15 (explaining how the rule is necessary to combat illegal smuggling activity), *id.* at 48766. The "exceptionally compelling circumstances" exception is an important provision of this rule because it appropriately balances the essential need to use resources effectively during emergency border circumstances with consideration of whether a noncitizen or family member with whom they are traveling is specifically vulnerable to immediate harm and has entered the United States during emergency border circumstances due to serious and urgent needs to do so. *See* 89 FR at 48754.

*Comment:* Commenters stated that the exception to the IFR was subjective, highly discretionary, and insufficient to ensure individuals were not refouled. Commenters also expressed concern that the enumerated per se exceptionally compelling circumstances require a subjective assessment of the degree and temporal nature of the needs and threats faced by noncitizens at the time of entry, which commenters allege is inconsistent with the right to seek asylum and the principle of non-refoulement.

*Response:* The Departments disagree that the "exceptionally compelling circumstances" exception is overly subjective or affords too much discretion to AOs and IJs, as the Departments are confident in AOs' and IJs' ability to fairly and accurately apply the exception. AOs and IJs have significant training and experience in eliciting testimony and applying legal standards in immigration proceedings. *See, e.g.,* 89 FR at 48747 (noting that AOs and IJs have the training and experience necessary to elicit information required to determine whether a case meets the necessary requirements); 8 CFR 1003.10(b) (requiring IJs to "seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations").

Further, to the extent a noncitizen has concerns with an AO's determination, all credible fear determinations undergo supervisory review to ensure consistency. 8 CFR 208.30(e)(8). Noncitizens may also request IJ review of negative credible fear determinations. 8 CFR 208.35(b)(2)(v). Moreover, if the limitation on asylum eligibility is applied to a noncitizen in section 240 removal proceedings, IJ determinations are subject to review by the BIA. 8 CFR 1003.1(b)(3).

---

[258] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.").

STB_AR1_000069

With regard to concerns about potential refoulement, the Departments note that, even in those cases where a noncitizen is unable to establish exceptionally compelling circumstances and is subject to the limitation on asylum eligibility, the noncitizen remains eligible to pursue statutory withholding of removal and CAT protection, which implement the United States' non-refoulement obligations. *See* 8 CFR 208.35(b)(2); 8 CFR 1208.35(b)(2)(iii). For additional discussion regarding the United States' non-refoulement obligations, please see Sections III.A.1.a and III.A.1.d of this preamble.

*Comment:* Commenters noted that the per se exceptionally compelling circumstances mirror the rebuttal grounds established in the Circumvention of Lawful Pathways rule; some commenters incorporated their previous objections to that rule, concerning the per se exceptionally compelling circumstances, into comments submitted in response to this IFR.

*Response:* Commenters correctly assert that the per se exceptionally compelling circumstances mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733. To the extent that commenters stated that they were incorporating their previous comments submitted in response to the Circumvention of Lawful Pathways NPRM, the Departments responded to those comments as part of the Circumvention of Lawful Pathways rulemaking, and commenters are encouraged to refer to that rule for the Departments' responses. *See, e.g.,* 88 FR at 31390–95 (responding to commenter concerns related to the grounds for rebutting the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule).

*Comment:* Commenters alleged that the ''imminent and extreme threat to life and safety'' exception is inadequate and illusory, claiming that CBP officers would, in practice, turn away noncitizens who could otherwise establish such threats. For example, commenters provided anecdotal reports of women being turned away from POEs after CBP officers determined that their accounts of being sexually assaulted and raped in Mexico did not fall within an exception.

Commenters also stated that the exception incentivizes noncitizens to wait in Mexico until they are subject to harm or violence before seeking protection. Further, commenters were concerned that the IFR included a per se exception for forward-looking threats, but not for being a survivor of ''recent and severe forms of violence.'' Commenters stated that such survivors have a significant need for protection to mitigate past harm and to prevent further harm.

Commenters also noted that, in responding to comments about the analogous rebuttal ground in the Circumvention of Lawful Pathways rule, the Departments explicitly stated that generalized threats of violence, membership in a particularly vulnerable group, and dangerous country conditions will not rise to the level of an ''imminent and extreme threat to life and safety,'' which commenters believed was overly limiting.

Commenters further recommended broadening the per se exceptionally compelling circumstances, so that ''acute medical emergencies'' includes non-medical and non-life-threatening medical needs; and ''imminent and extreme threats to life or safety'' includes threats to life or safety that may not necessarily be ''imminent'' or ''extreme.'' Commenters further stated that the grounds for rebutting the presumption of asylum ineligibility contained within the Circumvention of Lawful Pathways rule have been interpreted narrowly, resulting in noncitizens wrongfully being unable to rebut the presumption, not receiving a full adjudication of their claims, and ultimately being ordered removed. Commenters also urged the Departments to ensure that these per se exceptionally compelling circumstances encompass the medical risks and harms reported by asylum seekers while waiting in Mexico.

*Response:* The Departments decline to amend the list of per se exceptionally compelling circumstances established in the rule. The per se circumstances contained in the rule—acute medical emergencies, imminent and extreme threats to life or safety, or being a victim of severe trafficking in persons—are intended to capture noncitizens with a time-sensitive imperative for entering the United States to avoid immediate, serious harm. *See* 89 FR at 48732 n.171. Broadening these per se circumstances further would undermine the goal of this rule: to address the significant strain on the United States' immigration system during emergency border circumstances. *See* 89 FR at 48726–31 (''Need for These Measures'').

Likewise, requiring a situation-specific analysis of potential harm to the noncitizen is necessary to limit the ''exceptionally compelling circumstances'' exception to only those noncitizens who truly require entry to the United States to avoid putting their life or well-being at extreme risk. Allowing, for example, concern about generalized violence to establish an imminent and extreme threat to life or safety would be purely speculative as to an individual noncitizen, and further undermine the objectives of the rule. However, in requiring specific evidence of potential harm, the Departments note that more generalized evidence, such as membership in a particularly vulnerable group, ''may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry.'' 88 FR at 31393.

Additionally, the Departments disagree that the parallel rebuttal grounds in the Circumvention of Lawful Pathways rule have been interpreted too narrowly, and therefore, that the per se exceptions should be expanded in this rule. Departmental data show that, during the immediate post-pandemic period, over 10 percent of noncitizens subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility were able to rebut the presumption during USCIS credible fear interviews.[259] This indicates that those rebuttal grounds were meaningfully available to noncitizens, and the Departments note that Departmental data show that the parallel exceptions in this rule are being similarly applied. Since the IFR went into effect through August 31, 2024, USCIS determined that there was a significant possibility the noncitizen could demonstrate an ''exceptionally compelling circumstances'' exception to the limitation on asylum eligibility in over 2,200 cases—approximately 11 percent of credible fear interviews completed by USCIS that were subject to the IFR during that period.[260]

With regard to consideration of past harm, the Departments note that, to the extent a noncitizen suffered harm immediately preceding their entry into the United States, such harm can be relevant to whether the noncitizen faces further imminent and extreme harm or threats to their life or safety, and adjudicators could consider such immediate, past harm as relevant to making an ''exceptionally compelling circumstances'' determination.

The Departments also disagree with commenters' assertions that the imminent and extreme threat to life or safety exception incentivizes noncitizens to wait in another country until they are harmed to then seek an

---

[259] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).

[260] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

STB_AR1_000070

exception under the rule. To the extent that waiting in another country could increase the risk of potential harm, the Departments note that noncitizens need not have actually been harmed or show that the feared harm was certain to occur to demonstrate exceptionally compelling circumstances. Rather, the rule states that those who demonstrate that they or a member of their family as defined in 8 CFR 208.30(c) with whom they are traveling "[f]aced an imminent and extreme threat to life and safety, such as an imminent threat of rape, kidnapping, torture, or murder" shall have demonstrated exceptionally compelling circumstances. 8 CFR 208.35(a)(2)(i)(B), (ii), 1208.35(a)(2)(i)(B), (ii). Therefore, this exception is intended to balance the emergency border circumstances necessitating implementation of the rule's limitation on asylum eligibility with recognition that there may be noncitizens with a specific, time-sensitive safety imperative for entering the United States during times where DHS's resource capacity to process noncitizens at the border is overwhelmed.

Finally, more generally, the Departments also clarify that CBP officers do not apply this rule's "exceptionally compelling circumstances" exception during initial border encounters, although they do implement the Proclamation's suspension and limitation on entry. Rather, the exception—and this rule's limitation on asylum eligibility more broadly—is applied during credible fear screenings before USCIS, once a noncitizen has manifested a fear of return or expressed an intention to apply for asylum or other protection and is placed in the expedited removal process. *See* 8 CFR 208.35(b) ("Application in credible fear determinations.").

*Comment:* Commenters stated that the enumerated "exceptionally compelling circumstances" exception for victims of a severe form of trafficking in persons is inadequate and that this rule imposes an impossible evidentiary hurdle on trafficking survivors. For example, commenters said that not all victims of a severe form of trafficking have proof of such crimes and, during initial fear screenings, AOs do not ask specific questions about trafficking history. Commenters also stated that the trafficking exception should be expanded to encompass both noncitizens who may be at risk of trafficking and noncitizens at risk of or who have experienced trafficking, regardless of the degree of severity of the trafficking.

*Response:* The Departments disagree that the existing "exceptionally compelling circumstances" exception for trafficking victims should be further amended. First, pursuant to section 3(b)(iv) of the Proclamation, noncitizens who are determined to be "a victim of a severe form of trafficking in persons" as defined in 22 U.S.C. 7102(16) are excepted from the Proclamation's suspension and limitation on entry and, therefore, are not subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(a)(1), 1208.35(a)(1) (providing that the limitation on asylum eligibility only applies to a noncitizen described in 8 CFR 1208.13(g) "and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024"); 89 FR at 48733 n.172.

Nonetheless, as explained by the Departments in the IFR, the Departments have retained the per se "exceptionally compelling circumstances" exception for human trafficking victims to avoid confusion and to ensure that the exceptions in this rule continue to mirror the rebuttal grounds adopted by the Departments in the Circumvention of Lawful Pathways rule. 89 FR at 48733 n.172. Under the rule's exception for victims of human trafficking, both a noncitizen and any family members as defined in 8 CFR 208.30(c) with whom the noncitizen is traveling are excepted from the limitation on asylum eligibility if, at the time of entry, the noncitizen or family member satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C); 89 FR at 48733.

The Departments disagree that this rule creates an insurmountable evidentiary burden for trafficking survivors. While the Departments recognize that victims of trafficking often do not possess written or documentary evidence of their trafficking, the rule does not impose any requirements about the type of evidence a noncitizen must submit to establish exceptionally compelling circumstances. Indeed, during the credible fear screening process, AOs or IJs elicit testimony from noncitizens, and written statements or other documentation are not required. *See* 89 FR at 48746 n.239.

Regarding concerns that noncitizens will not be asked specific questions about any history involving trafficking, the Departments note that those concerns are unfounded because interview guides specifically designed for credible fear interviews pursuant to the Circumvention of Lawful Pathways rule and the IFR instruct AOs to ask

questions related to trafficking where they are relevant to the credible fear determination, including where either the Circumvention of Lawful Pathways rule's presumption of asylum ineligibility or the IFR's limitation on asylum eligibility applies. In such cases, AOs are instructed to elicit testimony related to potential "exceptionally compelling circumstances" rebuttal grounds (in the case of the Circumvention of Lawful Pathways rule) or the "exceptionally compelling circumstances" exception (in the case of the IFR), including the exceptionally compelling circumstance of the noncitizen or an accompanying family member satisfying the definition of a victim of severe form of trafficking in persons pursuant to 8 CFR 208.33(a)(3)(i)(C) and 208.35(a)(2)(i)(C). *See* 8 CFR 208.30(d). AOs receive extensive training in not only substantive law and procedure but in identifying and interviewing vulnerable noncitizens, including victims of trafficking.[261] Further, for merits adjudications, AOs and IJs receive training[262] and have experience in evaluating credibility and evidence, even in the absence of other documentation, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). The Departments are therefore confident in AOs' and IJs' ability to elicit relevant information from victims of trafficking and appropriately evaluate whether the noncitizen established exceptionally compelling circumstances.

Finally, the Departments believe that, as drafted, both section 3(b)(iv) of the June 3 Proclamation and the rule itself, which provides that being a victim of a

---

[261] *See* USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Apr. 24, 2024)

[262] *See* USCIS, *RAIO Directorate—Officer Training: Decision Making* (Apr. 24, 2024); 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief IJ's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory authorities" and "[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties"); EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("[LERS] develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

severe form of trafficking in persons is a per se exceptionally compelling circumstance, provide sufficient protections for victims of trafficking. The Departments decline to expand this exceptionally compelling circumstance to trafficking victims who do not rise to the level of being victims of ''severe forms of trafficking in persons.'' This is a statutorily defined term [263] which includes ''sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age'' and ''the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.'' 22 U.S.C. 7102(11). The Departments find that this statutory definition sufficiently encompasses noncitizens who have experienced exceptionally compelling circumstances that should except them from the limitation on asylum eligibility. This definition has long been employed in the immigration context, *see, e.g.,* INA 101(a)(15)(T)(i)(I), 8 U.S.C. 1101(a)(15)(T)(i)(I) (T nonimmigrant status for victims of severe forms of trafficking in persons); INA 212(a)(2)(H), 8 U.S.C. 1182(a)(2)(H) (ground of inadmissibility for those who engage in severe forms of trafficking), with which AOs and IJs are familiar, and commenters have not offered a persuasive reason for deviating from this well-established definition. Exceptionally compelling circumstances are intended to be narrow and preserved only for those who would generally be subject to the limitation, but present with the most urgent and immediate need to enter without a CBP One appointment or between POEs during times when the border system is overwhelmed. That said, noncitizens who do not satisfy the existing exception for trafficking victims (or other exceptionally compelling circumstances enumerated in the rule) may still seek to establish exceptionally compelling circumstances for another reason, and officers will evaluate every case based on its individual facts and circumstances.

*Comment:* Commenters asserted that the IFR did not provide sufficient clarity about the procedures for noncitizens to

seek an exception to the IFR's limitation on asylum eligibility.

First, commenters stated that access to the IFR's exceptions requires physical access to U.S. immigration authorities at POEs but alleged that there are many factors that impede such physical access, including security agents on the Mexican side of the border restricting access to POEs. Commenters asserted that such impediments to physically accessing U.S. immigration authorities undermine the IFR's exceptions and prevent noncitizens who may satisfy an exception from accessing protection. Commenters also stated that it is unclear how the rule and Proclamation together impact access to POEs. Accordingly, commenters requested that the Departments establish clear, transparent procedures to guarantee that noncitizens seeking to establish an exception from the limitation on asylum eligibility can physically access U.S. immigration officials.

*Response:* The Departments believe that the IFR adequately explains the exception to the limitation on asylum eligibility for noncitizens who establish exceptionally compelling circumstances, including the process by which AOs and IJs will evaluate whether a noncitizen has satisfied the exception. *See* 89 FR at 48732–33. Regarding commenters' concerns related to noncitizens' ability to physically access U.S. immigration authorities, the Departments note that nothing in the IFR physically impedes a noncitizen from accessing U.S. immigration authorities and that insofar as these comments concern CBP's implementation of the Proclamation, they are outside the scope of this rulemaking, as are concerns about conduct by individuals outside of the United States who are not U.S. immigration authorities—for example, on the Mexican side of the border. *Cf.* 89 FR at 48732 n.169 (explaining that ''[w]hen it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b)'').

*Comment:* Commenters recommended that the Departments exclude noncitizens who present at a POE from the IFR's limitation on asylum eligibility, and instead limit application of any restrictions to those who cross irregularly, in order to guarantee access to border processing for noncitizens who present at a POE.

*Response:* The Departments decline to adopt an exception to the limitation on asylum eligibility for all noncitizens who present at a POE. As the Departments explained in the IFR, in the absence of congressional action, the changes made by this rule are intended to improve the Departments' ability to deliver timely decisions and consequences to noncitizens who do not have a legal basis to remain in the United States, and the Departments expect that the limitation on asylum eligibility will encourage noncitizens to present at a POE pursuant to an appointment, pursue another lawful pathway, or decline to journey to the United States at all. *See* 89 FR at 48715; *id.* at 48730–31. The Departments have determined that excepting all noncitizens who present at a POE would undermine these objectives and undermine processes designed to manage border inflows at POEs. *See, e.g.,* 88 FR at 31318 (noting that the ''ability to schedule a time and place to arrive at POEs and the availability of other orderly and lawful pathways'' are designed to, among other things, ''protect against an unmanageable flow of migrants arriving at the SWB'').

*Comment:* Commenters questioned why the IFR's exceptions do not fully align with the exceptions available under the Circumvention of Lawful Pathways rule. In particular, commenters stated that the IFR does not provide an exception for technological failure of the CBP One app or for noncitizens who are unable to use the CBP One app due to illiteracy, a language barrier, a disability, or an inability to afford a smartphone or data plan. Noting ongoing technical and accessibility issues with the CBP One app, commenters urged the Departments to adopt an exception to the limitation on asylum eligibility for all noncitizens—whether they present at a POE or cross between POEs—who: (1) are unable to use the CBP One app due to accessibility issues with the app itself; (2) are unable to use the CBP One app due to illiteracy, disabilities, not speaking a language in which the CBP One app is provided, lack of knowledge about the existence of the CBP One app, or a lack of resources or other difficulties; or (3) fail to secure appointments after multiple attempts.

Additionally, commenters noted that the IFR does not contain an exception for being denied asylum in a country through which the noncitizen transited. Commenters stated that the Departments failed to provide a justification or explanation for eliminating such exceptions under the IFR and alleged that it is arbitrary for the Departments

---

[263] The provisions at 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) reference the definition of ''victim of a severe form of trafficking in persons'' in 8 CFR 214.201, and that regulatory provision references relevant statutory definitions, including definitions found at 22 U.S.C. 7102. *See* 8 CFR 214.201.

STB_AR1_000072

to include such exceptions under the Circumvention of Lawful Pathways rule but not under the IFR.

Commenters also asserted that the inconsistencies between the exceptions available under the IFR and the Circumvention of Lawful Pathways rule will create confusion for all parties, as it is unclear which rule will apply when emergency border circumstances are in effect.

*Response:* The Departments decline to add any additional exceptions to the limitation on asylum eligibility and disagree with commenters' assertions that the Departments did not provide adequate justifications for why the rule does not contain exceptions for an inability to access or use the CBP One app or being denied asylum in a transit country.

The Departments explained in the IFR that they were not adopting these exceptions from the Circumvention of Lawful Pathways rule because, unlike that rule, this rule only applies during emergency border circumstances, when the number of encounters strains the capacity of immigration and border security systems. 89 FR at 48732 n.171. Because of this rule's focus on emergency border circumstances, the Departments have determined that the rule's exceptions should be limited to noncitizens "with a time-sensitive imperative" to enter the United States. *Id.* For example, the rule focuses its exception for exceptionally compelling circumstances on noncitizens who require immediate entry into the United States, due to medical emergencies or imminent and extreme threats to life or safety, among other reasons. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments have explained above why they have not included in the IFR and this rule the exception for difficulty using the CBP One app and refer readers to that discussion.

Similarly, and as explained in the IFR, the Departments did not include and are not adding an exception for noncitizens who received a final decision denying asylum in a country through which they transited because this rule serves a different purpose than the Circumvention of Lawful Pathways rule. 89 FR at 48732 n.171. While the Circumvention of Lawful Pathways rule sought to encourage noncitizens to seek protection in other countries, this rule is focused on deterring irregular migration and speeding up the border process during emergency border circumstances, when the immigration system is experiencing extreme and enduring strains. *Id.* Accordingly, the Departments believe that limiting exceptions to those noncitizens who

have the most immediate and urgent need to present at or cross the U.S. border is imperative. *See id.* Importantly, however, noncitizens who were denied protection in another country remain eligible to apply for asylum if they "enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances" under this rule. *Id.*

The Departments also disagree that omission of these exceptions will create confusion. The Departments clarify that both this rule and the Circumvention of Lawful Pathways rule are applied during credible fear screenings when emergency border circumstances are in effect. If it is determined that this rule does not apply, AOs and IJs will then consider the noncitizen's claim through the now familiar Circumvention of Lawful Pathways rule, which has been in effect for over a year. Given the Departments' experience in implementing the Circumvention of Lawful Pathways rule, the Departments are confident in adjudicators' ability to implement this rule, which is similar in structure to the Circumvention of Lawful Pathways rule, and to apply this rule's "exceptionally compelling circumstances" exception, which mirrors the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48739. If the noncitizen establishes exceptionally compelling circumstances under this rule pursuant to 8 CFR 208.35(a)(2)(i) or 8 CFR 1208.35(a)(2)(i), they will also have established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). However, adjudication of the additional exceptions in Circumvention of Lawful Pathways are unlikely to be dispositive in cases where both this rule and the Circumvention of Lawful Pathways rule apply, because if the noncitizen does not meet the exception to this rule, this rule's limitation on asylum eligibility will apply.

### c. Implementation by CBP Officers

*Comment:* A few commenters expressed concern that, unlike the Circumvention of Lawful Pathways rule, in which AOs and IJs solely adjudicate the application of its presumption of asylum ineligibility and exceptions, the application of the Proclamation and the IFR are first adjudicated by CBP officers at the limit line, resulting in at-risk individuals and survivors of violence being denied entry. Relatedly, commenters stated that although the IFR allows CBP officials at POEs to assess whether a noncitizen qualifies for an

exception, it is unclear what guidance or training has been provided to those officials to ensure fair determinations or whether there is a mechanism for noncitizens to be screened for application of the bar when they approach a POE. A commenter noted that it is difficult to understand from the IFR how CBP will determine whether noncitizens are subject to the rule and how the rule and Proclamation would impact access to POEs and CBP conduct. Another commenter similarly stated that it is unclear whether the Departments would equip CBP officers or noncitizens to navigate the changes under the Proclamation and IFR, including in circumstances where the applicable legal standards could change within short windows of time, depending on whether crossing thresholds are being met.

*Response:* Comments relating to the implementation of the Proclamation itself are outside the scope of this rule, which applies a separate limitation on asylum eligibility. Additionally, to the extent that commenters expressed concern about CBP officials assessing whether a noncitizen qualifies for a regulatory exception to the limitation on asylum eligibility, commenters misunderstand the operation of the IFR. CBP officials may determine whether an exception to the June 3 Proclamation applies to a particular noncitizen, but do not apply the rule's limitation on asylum eligibility and its exception. Rather, it is AOs and IJs, during credible fear screenings and reviews, who must determine "whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances." 89 FR at 48739; *see also* 8 CFR 208.35(b), 1208.35(b). AOs and IJs—not CBP officials—will thus be evaluating whether the limitation on asylum eligibility applies and whether a noncitizen has established a regulatory exception. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a), (b).

### d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR

*Comment:* Commenters stated broad concerns with the credible fear review process in general, including concerns over whether there are adequate opportunities to present supplementary evidence and testimony, questions over whether IJ review is truly de novo, concerns that IJs do not appropriately

weigh evidence in the record, and concerns that the outcome of credible fear reviews is dependent upon the IJ considering the case, rather than the strength of the claim.

Commenters also objected to the IFR's provision that would require noncitizens to affirmatively request IJ review of a negative credible fear determination. Commenters stated that this affirmative request requirement removes an important safeguard intended to minimize the risk of refoulement, with particular harm to the most vulnerable noncitizens. Commenters explained that, given the frequency of IJs reversing negative credible fear findings, IJ review is a necessary procedural protection for the integrity of the asylum screening process, especially since the IFR's changes may lead to erroneous decisions by AOs. Moreover, commenters stated that requiring noncitizens to affirmatively request review is especially problematic when combined with the other changes in the IFR, namely the limited opportunity to access counsel and the heightened standards of proof for pre-screening interviews. Commenters stated that there must be an opportunity for IJ review of negative fear determinations to be considered an effective remedy under international law.

Commenters also stated there are a multitude of reasons why a noncitizen may fail to request IJ review. For example, a noncitizen may fail to request IJ review due to mental health conditions, language barriers, trauma, or because they are not adequately informed of the procedure for requesting review. Similarly, one commenter stated that requiring noncitizens to affirmatively request review mirrors the Global Asylum Final Rule, 85 FR 80274, which the Departments later reversed in a subsequent rulemaking, *see* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) (''Asylum Processing IFR''), citing fairness concerns and noting that treating a failure to elect review as a request for review better accounts for the range of explanations for a noncitizen's failure to seek review.

Commenters supported the IFR's requirement that DHS inform noncitizens of the procedure to request review and recommended that such information be provided both verbally and in writing in a language that the noncitizen understands. However, commenters said that noncitizens may find the concept of an IJ review hearing

confusing, and requiring noncitizens to request review may unfairly punish noncitizens for their confusion.

*Response:* To the extent that commenters raise concerns about the credible fear review process in general, such concerns are outside the scope of this rulemaking, which is focused only on the credible fear review process for noncitizens who are subject to this rule.

As to concerns about credible fear review under this rule, the Departments emphasize that, although the rule requires noncitizens to affirmatively request review of a negative credible fear determination, the statutory right to IJ review remains available. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g)(2). The Departments will continue to seek to ensure noncitizens are aware of the right to IJ review and the consequences of failure to affirmatively request such review. *See, e.g.,* 88 FR at 11747. Specifically, if an AO enters a negative credible fear determination, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. 8 CFR 208.35(b)(1)(i), (2)(iii). Thus, contrary to commenters' concerns, this safeguard remains in place and the Departments believe that such notice sufficiently ensures that noncitizens who desire IJ review of negative credible fear determinations can elect it under this rule.

As explained in the analogous provision introduced in the Circumvention of Lawful Pathways rule, to ensure that the noncitizens referenced by commenters—including noncitizens with mental health conditions, those who have suffered trauma, or those who are unable to read or speak English—understand what review is available to them, DHS provides explanations to noncitizens ''to make clear to noncitizens that the failure to affirmatively request review will be deemed a waiver of the right to seek such review.'' 88 FR at 11747. These explanations are provided by trained asylum office staff through an interpreter in a language understood by the noncitizen. As a result, the Departments believe it is reasonable to conclude that noncitizens who do not request IJ review after receiving sufficient notice, see *id.,* and the enhanced explanations described above, can be fairly processed as if they have declined to seek additional IJ review. See 88 FR at 11747.

Moreover, the Departments previously acknowledged in the Circumvention of Lawful Pathways rule that ''the

procedure for IJ review of negative credible fear determinations . . . differ[ed] from the credible fear review procedures implemented by the Asylum Processing IFR.'' 88 FR at 31423 (citing 88 FR at 11744). There, the Departments explained that ''''the need for expedition under the current and anticipated exigent circumstances' weigh[ed] in favor of requiring noncitizens to affirmatively request IJ review of a negative credible fear determination.'' *Id.*

Following this reasoning, the Departments believe that this requirement that noncitizens affirmatively request IJ review of negative credible fear determinations continues to be necessary during times of emergency border circumstances, despite other measures to address the exceptionally high levels of irregular migration along the southern border, including the Circumvention of Lawful Pathways rule. *See* 89 FR at 48712–13 (listing measures). This rule has been adopted to address emergency border circumstances, times where the Departments' limited resources are under maximum strain to the point where border security and immigration systems are experiencing serious operative impacts and further fueling more lasting effects of a backlogged system. Accordingly, the Departments believe requiring noncitizens to affirmatively request IJ review of credible fear determinations will help ensure that such reviews take place only for those who desire such review. The alternatives suggested by commenters risk extending such review to those not actually interested in IJ review, thereby unnecessarily expending valuable adjudicatory capacity during a time when such resources are not available.

As to requests to provide information about review procedures verbally and in writing in a language that the noncitizen understands, noncitizens receive that information in writing (via a written English document), and noncitizens who do not speak English receive that information verbally through a real-time translation of the written document as well. This approach satisfies the Departments' statutory obligations, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), and in DHS's judgment, provides adequate notice of the ability to seek review. It is neither required nor feasible to, in addition, provide that information in written form in all languages that may be spoken.

*Comment:* Commenters stated that the same complexity concerns about the IFR raised by commenters in the credible fear context will apply to removal proceedings before IJs. For example,

commenters stated that determinations as to the timing and applicability of emergency border circumstances, including determining whether emergency circumstances were in effect on the noncitizen's dates of entry, whether to apply this rule versus the Circumvention of Lawful Pathways rule, and whether exceptionally compelling circumstances apply, would only lead to longer, more complex removal proceedings, and an inefficient focus on inquiries having no bearing on the merits of the protection claim in an already backlogged immigration court system. Commenters said that proceedings could be prolonged due to a potential rise in the numbers of motions to reopen or reconsider and appeals to the BIA or Federal courts challenging application of the rule, among other reasons.

Commenters stated that these determinations will be especially complex for noncitizens who enter without inspection ("EWI"). Commenters explained that it is unclear how the Departments will accurately determine whether this rule applies, especially when few people who EWI remember the exact date they crossed the border and, regardless, will likely not have evidence of the time of such crossing. Therefore, commenters stated that the rule will result in arbitrary IJ decisions, because IJs will not be able to determine whether the rule applies. As a result, commenters suggest creating a specific policy for noncitizens who EWI.

*Response:* The Departments disagree with commenters' concerns about the complexity in applying this rule in EOIR proceedings. To the contrary, given the IJ's role as the fact finder in removal proceedings, IJs are well-equipped to make fact-based determinations, such as dates of entry and whether emergency border circumstances were in effect on a specific date. *See, e.g.,* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("Authority of immigration judge"). For example, regarding commenters' concerns about noncitizens who EWI, the Departments note that IJs routinely make similar entry timing determinations, such as determining application of the one-year filing deadline for asylum and continuous physical presence for cancellation of removal for certain nonpermanent residents. INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B) (one-year time limit); INA 240A(b)(1)(A), 8 U.S.C. 1229b(b)(1)(A) (cancellation of removal for certain nonpermanent residents). Moreover, IJs have been applying the Circumvention of Lawful Pathways rule since its effective date, which similarly requires determining a

noncitizen's entry date. *See* 8 CFR 1208.33(a)(1)(i) (requiring determination as to whether a noncitizen entered the United States "[b]etween May 11, 2023, and May 11, 2025").

Additionally, one change made by this rule—requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters between POEs for 28 consecutive calendar days before the 14-day waiting period is triggered—will further reduce complexity concerns by reducing the probability that emergency border circumstances will be discontinued and then continued or reactivated soon thereafter. This requirement not only better ensures that emergency border circumstances have abated, but also mitigates potential confusion in determining whether emergency border circumstances were in effect on a noncitizen's date of entry. Contrary to commenters' concerns, this rule's provisions will not consistently "turn off" one day and "turn on" the next day. Rather, when triggered, this rule will be in effect for a more sustained period of time, making it easier for noncitizens and adjudicators to determine the timing and applicability of emergency border circumstances. Lastly of note, at all times since issuance of the June 3 Proclamation and publication of the IFR, DHS has maintained a publicly available record of the dates that a suspension and limitation on entry is in effect.[264] This DHS-maintained record will be available into the future, and the Departments believe that it will serve as an essential aid for IJs in determining whether the provisions of the rule should be applied based on a noncitizen's date of entry.

e. Family Unity Provisions

*Comment:* Commenters expressed general support for the family unity provisions in the IFR, stating that family unity is a key principle in both international and U.S. immigration law. However, commenters also raised concerns that the provisions were not sufficient, and that family unity would be better preserved by eliminating the rule's limitation on asylum eligibility altogether. For example, commenters stated that the family unity provisions are overly limiting, as they only benefit noncitizens who are able to meet the higher burden of proof for statutory withholding of removal.

Commenters were also concerned that the family unity provisions would create unnecessary procedural hurdles

for families. For example, commenters raised concerns that the family unity provisions only apply to qualifying family members who cannot independently establish other protection from removal. In doing so, commenters also questioned what forms of protection would qualify as "other protection from removal" sufficient to disqualify spouses or children from the family unity provisions.

Commenters stated that this requirement would result in ethical dilemmas where families would need to ensure that qualifying family members do not independently qualify for statutory withholding of removal so that the family members can receive derivative asylum relief under the family unity provisions. Commenters also claimed that this requirement would require family members to obtain separate counsel and sever proceedings, which will cause unnecessary financial hardship to the family and undue burdens to the Government. Rather, commenters recommended removing altogether the requirement that qualifying spouses or children not independently qualify for relief.

Commenters also raised procedural questions about how the family unity provisions function where a noncitizen is belatedly eligible for asylum under the family unity provisions, but after their spouse or child have undergone their own immigration adjudications.

*Response:* The Departments agree with commenters that keeping families unified and avoiding family separation is an important goal. Emergency border circumstances necessitated implementation of the IFR's limitation on asylum eligibility to better manage border operations and substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain in the United States. *See* 89 FR at 48715.

Nevertheless, recognizing the importance of family unity, the Departments included a number of provisions in the IFR to eliminate the risk of family separation. For example, the "exceptionally compelling circumstances" exception applies to all qualifying family members of the noncitizen's traveling party if the noncitizen, or the noncitizen's qualifying family member with whom the noncitizen is traveling, meets the exception. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Similarly, the IFR made no changes to the family unity provision, which establishes an "exceptionally compelling circumstances" exception for noncitizens who can, among other

---

[264] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigration laws.*

**STB_AR1_000075**

requirements, establish eligibility for statutory withholding of removal or CAT protection and could have, but for either the IFR's limitation or Circumvention of Lawful Pathways presumption, established eligibility for asylum. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 88 FR at 11723–24 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to treat "the possibility of separating the family" as "an exceptionally compelling circumstance" when the provision's requirements are met). This provision allows qualifying noncitizens to pursue asylum, and its allowance for derivative beneficiaries, instead of statutory withholding of removal and CAT protection, with their comparatively fewer benefits. *See* INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Importantly, these provisions are not intended to serve as wholesale "family" exceptions to the IFR's limitation on asylum eligibility, which would significantly reduce the effectiveness of the limitation on asylum eligibility and incentivize families to engage in dangerous irregular migration to the United States. *See* 89 FR at 48757 (explaining that "[e]xcepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so"). Rather, the exceptionally compelling circumstances family unity exceptions help ensure that noncitizens who qualify for the rule's exception are not separated from their qualifying spouses or children while pursuing relief or protection in the United States, including, for example, through derivate asylee status if granted relief, or through removal of the family unit if denied.

With regard to commenter concerns about qualifying spouses or children obtaining their own independent relief or protection, which would in turn make the IFR's family unity provisions inapplicable, the Departments clarify that the IFR's family unity provisions are intended as limited exceptions solely to prevent potential family separation due to the IFR's limitation on asylum eligibility. If qualifying spouses or children obtain independent relief or protection that allows them to remain in the United States, then they will have necessarily avoided the family separation concerns underlying the IFR's family unity provisions. *See, e.g.,* 88 FR at 11724 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to avoid family separation where "at least one other family member would not qualify for asylum or

other protection from removal on their own"). The Departments further note that asylum "or other protection" under this family unity provision refers to statutory withholding of removal and CAT protection. *See, e.g.,* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023) (noting that "asylum or other protection" refers to claims "relating to a fear of persecution or torture").

Additionally, to the extent that commenters raised concerns over qualifying spouses or children independently receiving statutory withholding of removal, with comparatively fewer benefits than asylum, the Departments note that statutory withholding of removal protects the qualifying spouse or child from removal to a country where they more likely than not would be persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion. *See* INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 419 (1999); *Stevic,* 467 U.S. at 429–30; *see also* 8 CFR 208.16, 1208.16. Moreover, if noncitizen families wish to pursue asylum relief specifically, the IFR and the Circumvention of Lawful Pathways rule are designed to encourage noncitizens to make an appointment to present at the SWB or take advantage of other lawful migration pathways. *See* 89 FR at 48730–31.

Relatedly, the Departments do not share commenters' concerns about potential ethical dilemmas faced by representatives related to pursuing independent relief for family members due to the family unity provisions. Representatives must be truthful to the court in presenting the record facts and will either be able to zealously advocate on behalf of all of their clients where the family members' interests present no conflict, or counsel can withdraw from such representation if they believe they cannot advocate for each client's interests equally. *See* 8 CFR 1003.102 (acknowledging that practitioners who appear before EOIR have a duty to zealously represent their clients "within the bounds of the law"); *see also* 8 CFR 1003.102(c) (setting forth that a practitioner may face disciplinary sanctions for "[k]nowingly or with reckless disregard" making a false statement of material fact or law).

Further, this rule does not impact EOIR's existing procedures for consolidating or severing cases, which

has always involved parties making assessments and strategic decisions on how best to proceed with their cases. *See* Immigration Court Practice Manual ch 4.21 (setting forth procedures for combining and severing cases). Prior to this rule, family units have been able to seek asylum and related forms of protection in consolidated proceedings, and family units are always permitted to sever their proceedings if they so choose, including for strategic reasons based on their own assessment about the strength of their individual claims. *Id.* Thus, the Departments disagree that the rule will meaningfully impact noncitizens choosing to sever their cases from those of their families in the way that commenters claim, especially given the family unity provisions included in the IFR and maintained in this final rule.

Lastly, with regard to procedural timing concerns in applying the family unity provisions, the Departments clarify that the family unity provisions only apply to qualifying family members who are accompanying the principal applicant or who are eligible to follow to join that applicant. *See* 8 CFR 208.35(c), 1208.35(c). Therefore, principal applicants and accompanying family members who are traveling together will generally have their claims adjudicated together in removal proceedings. *See, e.g.,* Immigration Court Practice Manual ch. 4.21(a) (Oct. 25, 2023) (explaining that immigration courts may consolidate cases together that involve immediate family members into a single adjudication). As a result, there are unlikely to be significant timing gaps between determinations on any individual relief or protection claims within a family unit.

*Comment:* Commenters supported the inclusion of a family unity provision in the AMI process, wherein DHS retains jurisdiction over an asylum application for further adjudication after a positive credible fear determination. Commenters stated that it is logical and efficient for AOs to apply the same family unity provision as IJs when adjudicating the merits of an asylum application. However, commenters also expressed concern that the family unity provision in the AMI process is discretionary for AOs, and urged the Departments to make the provision mandatory, similar to the family unity provision for IJs in the IFR. Commenters also recommended amending the Circumvention of Lawful Pathways rule to allow DHS to apply the same family unity exception under that rule to avoid confusion that the disparity would allegedly cause for applicants, counsel,

and AOs, particularly where the two rules are both in effect and overlapping.

*Response:* In the IFR, the Departments included a family unity provision in the AMI process before USCIS, but made it discretionary to provide USCIS with flexibility while implementing the new AMI process. *See* 89 FR at 48733. After further consideration, the Departments are retaining the discretionary nature of the family unity provision in the AMI process before USCIS.

USCIS maintains complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f). In exercising this discretion, USCIS does not foresee that it would be a prudent use of resources to place cases into the AMI process where, at the credible fear stage, the IFR's limitation on asylum eligibility applied and there was not a significant possibility the noncitizen could establish an exception to the limitation. USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the southern border. *See* 89 FR at 48756. Accordingly, it is unlikely that USCIS would adjudicate a case where the 8 CFR 208.35(c) family unity provision could apply in the foreseeable future.

With that understanding, were such a case ever to be placed into the AMI process, USCIS has the discretion to apply the 8 CFR 208.35(c) family unity provision, depending on the circumstances of the individual case. Importantly, if USCIS exercises its discretion not to apply the family unity provision, the noncitizen will not be prejudiced because, if USCIS does not grant asylum in such a case, the asylum application will be reviewed de novo by an IJ, 8 CFR 1240.17(i), who is required to apply the family unity provision in removal proceedings pursuant to 8 CFR 1208.35(c).

Additionally, the discretionary nature of the family unity provision before USCIS in 8 CFR 208.35(c) is necessary in order for USCIS to comply with the AMI regulatory timeline laid out in 8 CFR 208.9. This timeline requires USCIS to conduct the AMI interview no later than 45 days of the applicant being served with a positive credible fear determination, absent exigent circumstances, 8 CFR 208.9(a)(1), and prohibits extensions on the submission of additional evidence that would prevent the AMI decision from being issued within 60 days of service of the positive credible fear determination, 8 CFR 208.9(e)(2). While the IFR allows for USCIS to extend both of those timelines up to 15 days in the event

USCIS requires the noncitizen to submit a Form I–589, 8 CFR 208.35(b)(2)(ii), even with a 15-day extension, these are still accelerated time frames that would not accommodate applying the family unity provision in every AMI case where it could potentially apply before USCIS.

In some cases, USCIS may be able to apply the family unity provision without running afoul of the regulatory time frames, such as where the accompanying family members are also dependents on the AMI case, and the principal applicant is found eligible at the AMI for statutory withholding of removal with respect to their country of nationality based on the record before USCIS. In such a case, the AO could likely apply the family unity provision within the regulatory timelines, as there would likely be no need to request additional evidence verifying the qualifying family relationships. Additionally, if the principal applicant was already found eligible for statutory withholding of removal with respect to their country of nationality based on the record before USCIS, it is likely that they also would be found eligible for asylum if the limitation on asylum eligibility is not applied. In such a circumstance, USCIS could likely exercise discretion to apply the 8 CFR 208.35(c) family unity provision in a logical and efficient manner and complete the case within the regulatory time frame without issue.

In other cases, however, applying the family unity provision in an AMI case could prove excessively cumbersome within the regulatory time frame. For example, if the qualifying family relationship relates to a family member outside of the United States for which additional proof is needed to establish the relationship, it may be impossible for an AO to extend the timeline to accommodate the production of such evidence and still meet the processing timeline for an AMI under 8 CFR 208.9(e)(2). In a case where the AO finds the noncitizen is not eligible for asylum due to the IFR's limitation on asylum eligibility, and is not eligible for statutory withholding of removal, but would be eligible for withholding of removal under 8 CFR 208.16(c)(2) (withholding of removal under the CAT) based on the record before USCIS, requiring the AO to apply the 8 CFR 208.35(c) family unity provision would entail the AO conducting a cumbersome analysis, including revisiting the noncitizen's asylum eligibility, absent application of the IFR's limitation on eligibility, only to possibly still find the applicant ineligible for asylum on the merits and refer the case to the IJ, who

would then review the asylum application de novo. *See* 8 CFR 1240.17(i).

Indeed, if USCIS were required to apply the 8 CFR 208.35(c) family unity provision in all AMI cases, significant extra resources would likely have to be expended in any case where the provision might apply (including additional interview time, extending the evidentiary submission timeline, and additional time writing up the case) even where it would not result in a grant of asylum. If asylum is not granted by USCIS, asylum eligibility would still be reviewed de novo by an IJ. *See* 8 CFR 1240.17(i). Keeping the provision discretionary, in contrast, allows USCIS to apply the provision where it can do so in a logical and efficient manner without thwarting the regulatory timelines for AMI processing.

While logic and efficiency support keeping the 8 CFR 208.35(c) family unity provision discretionary for AMI cases before USCIS, it is also logical for the 8 CFR 1208.35(c) family unity provision to apply in all removal proceedings (whether they originated as AMI cases or not) before EOIR. Removal proceedings before the IJ are potentially the last opportunity the noncitizen will have to be granted asylum. In contrast, the AMI process before USCIS cannot result in a denial of asylum, only a referral to the IJ for a de novo review of the asylum application. 8 CFR 208.14(c)(1), 1240.17(i). Additionally, while removal proceedings for AMI cases operate on a streamlined time frame, there is still substantially more time allotted for removal proceedings before EOIR than for the initial AMI adjudication before USCIS, 8 CFR 208.9(a)(1), (e)(2), *id.* at 1240.17(f), so there is more flexibility in the time frame for the IJ to apply the family unity provision at the final adjudication stage than there would be for an AO to apply the provision in the AMI process before USCIS.

Separately, the Departments note that any comments regarding family unity amendments to the separate Circumvention of Lawful Pathways rule are outside the scope of this rulemaking.

### 2. Manifestation of Fear Standard

#### a. Legality Concerns

*Comment:* Commenters expressed concerns that implementing a manifestation of fear requirement would ultimately lead to noncitizens with valid claims being removed without proper evaluation, which would violate U.S. international non-refoulement obligations and "circumvent U.S. asylum law." One advocacy group

STB_AR1_000077

called the manifestation requirement a "deeply deficient" means of screening applicants for fear that will cause "credible fear pass rates to plummet and lead to refoulement." Another commenter described the change as "morally and legally troubling," while a third commenter stated that it would create significant hurdles for noncitizens seeking statutory withholding of removal and CAT protection.

Commenters further asserted that the manifestation requirement violates specific international refugee laws or principles. Citing amicus briefs, the UNHCR handbook, and other UNHCR publications, one commenter stated that the United States has an "affirmative obligation" under international law "to elicit information that might reveal potential refugee status" and "conduct an individualized assessment to evaluate whether the individual is entitled to protection as a refugee," which the manifestation requirement violates. In that same vein, another commenter observed that international refugee organizations have "long emphasized that to fully carry out . . . obligations under the Refugee Convention" the parties should implement procedures that "affirmatively identify" possible applicants and provide guidance to them on how to apply for relief and protection, and the IFR's "reliance on manifestation of fear is inadequate to fulfill these basic requirements."

Commenters stated that the manifestation requirement violated proper implementation of the credible fear process outlined in the INA. One commenter characterized the IFR's manifestation requirement as an attempt to expand the reach of expedited removal by creating additional barriers to credible fear interviews, in violation of Federal law. Another commenter stated the manifestation requirement did not align with "Congressional intent" to "ensure that asylum was available to all those with legitimate claims." Other commenters echoed the sentiment that the manifestation requirement was implemented without regard for the risk of refoulement and purely as a means to efficiently remove noncitizens without a hearing.

Commenters also stated that eliminating the requirement that immigration officers affirmatively document and inquire about a noncitizen's fear of persecution during initial encounters at the border is a "sharp break from prior practice by the Departments" that would ultimately lead to higher numbers of noncitizens being refouled. One commenter

described the change to using manifestation as "a dangerous reversal of a procedural safeguard" designed to ensure legal compliance, expressing concern that other safeguards are already being removed. Other commenters recommended that the Departments end the manifestation of fear approach and reinstate the previous policy of using preliminary questions to identify whom to refer for credible fear screenings.

Some commenters opposed the manifestation requirement due to concerns that it violated DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), and pointed to what they purport was the Government's acknowledgment (*see* 89 FR at 48741 n.194) that an argument could be made that the IFR conflicts with the INA. Specifically, commenters argued that the INA requires DHS to provide information concerning credible fear interviews to noncitizens who may be eligible and eliminating use of the forms in lieu of a manifestation requirement was a violation of that statutory obligation. Commenters were specifically concerned that the alternatives outlined in the IFR—such as providing signs and videos in facilities—would not be "sufficient to put noncitizens on notice of how they may assert a claim for protection."

Commenters pointed to different parts of the IFR where they believe the Government explicitly acknowledged that the manifestation requirement will result in refoulement and stated that these purported acknowledgements are problematic. One commenter stated that the IFR was creating a standard that "knowingly accepts" a probability of violating non-refoulement and fails to satisfy the statutory requirement to provide information about credible fear interviews to noncitizens who may be eligible for such interviews. Another commenter highlighted part of the IFR that they said conceded that the manifestation requirement would result in the removal of noncitizens with valid claims. Similarly, commenters discussed the IFR's purported admission that asylum seekers who are asked affirmative questions about whether they have a fear of returning to their home country are seven times more likely to assert a claim.

*Response:* The Departments disagree that the manifestation standard violates any international obligations or that it is inconsistent with Federal law.

As to concerns related to international law, commenters did not specify any binding international law source that creates such obligations and instead

cited publications and amicus briefs, which do not have the force of law and are not international treaties to which the United States is a party. As described in Section II.B of this preamble, the United States' non-refoulement obligations are implemented through domestic law, and neither the 1967 Protocol nor the CAT are self-executing. Regardless, as outlined in the IFR, 89 FR at 48740–41, the applicable international laws do not specifically prescribe the minimum screening requirements that must be implemented to determine whether a noncitizen should be referred for a credible fear interview.[265] Instead, it is up to each participating state "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure."[266] Thus, it is within the Departments' discretion to revisit the screening process the United States implements during emergency border circumstances.

Moreover, the United States continues to uphold its non-refoulement obligations during emergency border circumstances.[267] Under applicable international law, the United States has an obligation (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured. *See* Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176 (outlining standard under the Refugee Convention); *Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007) (outlining standard under the CAT). During the emergency circumstances at the southern border, the manifestation standard temporarily affords immigration officers the ability to refrain from affirmatively asking noncitizens about fear, and instead refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a

---

[265] *See* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/ handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967* (highlighting that the process for identifying refugees is not "specifically regulated").

[266] *Id.*

[267] The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), for mandatory withholding of removal. And the United States implements its obligations under Article 3 of the CAT through regulations. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

STB_AR1_000078

fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. 89 FR at 48739–40. This rule does not, in any way, prevent noncitizens from manifesting or expressing such fears; rather, the rule ensures that noncitizens who manifest or express such fears are properly screened consistent with United States' non-refoulement obligations. *See* 8 CFR 235.15(b)(4). As explained in the IFR and this rule, the Departments believe that this requirement represents the best way to remain consistent with U.S. international obligations while simultaneously addressing the emergency circumstances at the southern border.

The Departments also do not believe the manifestation standard violates the INA or any other Federal law. As addressed in the IFR, 89 FR at 48739–40, DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO, so long as those procedures are consistent with the INA.[268] In using this authority, the Departments are confident the manifestation standard is fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). That statutory section provides that only those noncitizens who "indicate[ ] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As such—and contrary to commenters' assertions—the INA does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture, nor does it define what circumstances constitute the requisite indication of intent or fear. To the contrary, the onus under the statute is on the noncitizen to indicate either of the circumstances warranting referral, which the IFR provides a noncitizen can do at any time during the process. *See* 89 FR at

48740.[269] Thus, as discussed in Section III.B.2 of this preamble, the rule's approach accords with section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[270]

Separately, regarding commenters' concerns about departing from the longstanding practice of providing individualized advisals and asking affirmative questions, the Departments disagree that there are insufficient procedural protections for individuals subject to the rule. As the IFR acknowledged, the practice of providing individualized advisals and asking affirmative questions was originally adopted to "ensure that bona fide asylum claimants [were] given every opportunity to assert their claim[s]." 89 FR at 48742 (quoting 62 FR at 10318–19). However, importantly, the legacy INS further explained that enacting these procedures was intended to "not unnecessarily burden[ ] the inspections process or encourag[e] spurious asylum claims." *Id.* (quoting 62 FR at 10318). While such procedures have remained in place in the expedited removal context since 1997, this fact alone does not indicate that they are required by the INA, and DHS maintains discretion to update the procedures in a manner consistent with the INA. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (holding that an agency changing an established rule must show that there are good reasons for the new policy but need not necessarily "provide a more detailed justification

than what would suffice for a new policy created on a blank slate"). And indeed, when emergency circumstances are present on the southern border, the procedures adopted in 1997 are unduly suggestive and, thus, unnecessarily burden the inspections process, which necessitates revisiting screening referral processes to more effectively and efficiently identify those noncitizens who may have a fear of return to their native country or country of removal or indicate an intention to seek fear-based relief or protection. Given the extraordinary circumstances facing the Departments during times of emergency border circumstances, DHS has determined it is reasonable to implement the manifestation standard.

The Departments similarly disagree that discontinuing use of the Form I–867A and Form I–867B during emergency border circumstances violates DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS "shall provide information concerning the asylum interview . . . to aliens who may be eligible." DHS continues to provide information concerning credible fear interviews to noncitizens in CBP custody subject to expedited removal who may be eligible to receive such an interview via signs and videos in multiple languages, satisfying DHS's statutory duty under the INA. This is precisely what footnote 194 of the IFR explains. Rather than any purported acknowledgement of conflict with the INA, that footnote was simply included to clarify the points above and illustrate that the IFR does, in fact, satisfy this statutory obligation. Moreover, as the IFR explains, 89 FR at 48741–42, noncitizens who manifest a fear of return (and, thus, who are in fact eligible for a credible fear interview) are given a more detailed written explanation of the credible fear interview process prior to being referred for the interview.[271] Additionally, noncitizens who manifest a fear in CBP custody are shown a video prior to their credible fear interview, which also explains the credible fear process in more detail.

The Departments also recognize commenters' concern regarding the IFR's explicit acknowledgment that the manifestation standard may result in some noncitizens with meritorious claims not being referred to a credible fear interview. *See, e.g.,* 89 FR at 48743–44. The Departments included these statements to demonstrate their

---

[268] *See* INA 103(a)(1), (3), & INA 103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

[269] *Accord Indicate,* Merriam-Webster's Collegiate Dictionary 592 (10th ed. 1996) ("to point out or point to," "to be a sign, symptom, or index of," "to demonstrate or suggest the necessity or advisability of," or "to state or express briefly"); *Indicate,* New International Webster's Comprehensive Dictionary of the English Language 644 (1996) ("To be or give a sign of; betoken," "To point out; direct attention to," or "To express or make known, especially briefly or indirectly"); *Indicate,* The American Heritage Dictionary of the English Language 918–19 (3d ed. 1996) ("To show the way to or the direction of; point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the necessity, expedience, or advisability of," or "To state or express briefly"); *Indicate,* Webster's II New Riverside University Dictionary 622–23 (1994) ("To show or point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the need, expedience, or advisability of," or "To express briefly").

[270] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *Knauff,* 338 U.S. at 543 ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. at 18.

[271] That explanation will be translated into certain common languages or will be read to the noncitizen if required. 89 FR at 48741 n.194.

thorough consideration of all possible issues that might arise from the implementation of a manifestation standard at the southern border during emergency circumstances. In that vein, the Departments emphasize that the manifestation standard is a temporary solution to emergency border circumstances. In light of those circumstances, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek fear-based relief or protection. Unfortunately, any screening mechanism—even affirmative questioning—could result in some noncitizens with potentially meritorious claims not being referred for a credible fear interview. But given the emergency border circumstances facing the Departments and discussed in the June 3 Proclamation, the IFR, and this rule, the Departments believe the manifestation standard is appropriate and necessary.

b. Concerns About the Efficiency and Complexity of the Manifestation Standard

*Comment:* Several commenters expressed doubts about the Departments' claims that the change to the manifestation approach would increase efficiency, while others observed that the change would make the system more complex and create further inefficiencies. Relatedly, multiple commenters questioned the stated purpose of efficiency for eliminating the credible fear questions by CBP officers, writing that it instead appears to be a desire to reduce referrals of noncitizens for fear interviews and described the assertion by DHS in the preamble that the questions are suggestive and do not result in grants of asylum as unfounded.

One commenter questioned whether the Departments are sacrificing legitimate claims in the name of speed. Commenters wrote that the three questions and explanation previously required by the Form I–867A and Form I–867B take only a few minutes to read and criticized the Departments for alleging efficiency gains of 20 to 30 minutes by eliminating critical questions that could prevent refoulement. The commenters further stated that investing in adequate training and enforcing compliance with the "standard" screening process would be more efficient than providing additional guidance and requiring CBP officers to complete additional training. Another commenter described the scenario of CBP officers directing noncitizens to interpreters, who will

refer to the informative signs and videos the IFR's preamble described in CBP waiting rooms, and questioned whether this process would be shorter.

*Response:* Regarding commenters' concerns regarding complexity and efficiencies, the Departments continue to believe that the manifestation standard outlined in the IFR meets the purposes for which it was implemented—to increase processing efficiency and avoid suggestive advisals and questioning, while still ensuring that noncitizens are able to seek protection in the United States.

As outlined in the preamble to the IFR, DHS determined that, in times of emergency border circumstances, it was appropriate to temporarily eliminate the use of affirmative advisals and questions on the Forms I–867A and I–867B, based on DHS's determinations that such advisals and questioning can be suggestive. *See* 89 FR at 48743–45. The Departments disagree with the assertion that this determination was "unfounded." It was based on CBP's experience that, when noncitizens are asked affirmative questions like those on the Form I–867B, noncitizens are more likely to respond in the affirmative. The affirmative questions thus can serve as a prompt for noncitizens in custody to respond in the affirmative, even if they do not actually have a fear of persecution or torture. As outlined in the IFR, the Departments' determination is also consistent with the behavioral science concept of "acquiescence," or the tendency of respondents to "consistently agree to questionnaire items, irrespective of item directionality." *See* 89 FR at 48743 n.220. Regarding concerns that such studies are less probative of noncitizens' experiences in CBP custody, DHS notes that it did not rely, and is not relying, on these studies as the sole basis for its determination that the advisals and affirmative questions are suggestive, nor is it asserting that these studies provide the only justification for the implementation of the manifestation standard in this rule. Rather, the implementation of the standard was, as noted above, based in part on CBP's experience in the years implementing the expedited removal process that providing affirmative advisals and asking affirmative questions was suggestive. As noted in the IFR, these studies provide illustrative support for this learned experience. *See* 89 FR at 48743.

DHS continues to believe that the concept of acquiescence supports its determination, based on its decades of experience in the processing of noncitizens who enter the United States,

that the affirmative advisals on the Form I–867A and the questions on the Form I–867B are suggestive. This determination is informed, in part, by information that agency personnel regularly receive about the activities of TCOs in the region, including information that TCOs guide or coach many noncitizens on what to say in order to remain in the United States. It is DHS's experience that, upon encounter and inspection, the questions on the Form I–867B can prompt noncitizens to follow this guidance, thus leading them to claim a fear even if they would not have done so on their own. While DHS acknowledges that noncitizens could similarly be prompted to manifest a fear under the approach of the IFR and this rule, DHS continues to believe that this approach will at minimum mitigate this problem by removing suggestive questions. Moreover, DHS continues to believe that it is likely that noncitizens with a fear of return or an intent to seek asylum will manifest a fear absent the affirmative advisals and questions on the Form I–867B. This is supported by the fact that DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[272]

DHS's determination that it was appropriate to eliminate the use of affirmative advisals and questions on the Form I–867B was also based in part on its assessment that such action would make the process more efficient. In particular, the Departments anticipated that the implementation of the manifestation standard would save approximately 20–30 minutes of processing time, contributing to increased efficiencies in processing and across the immigration process. *See* 89 FR at 48745. This assessment was based on the experience of CBP officers and agents with extensive experience reading and completing these forms, and DHS thus disagrees with commenters' contention that the completion of these forms only takes a few minutes. This is, in part, due to the fact that, when completing a sworn statement, such as the Form I–867A, officers and agents ask a number of questions of the noncitizen, each of which may need to be translated; the noncitizens' answers may need to be translated; and the officers and agents must record the answers to each question in the processing system. The noncitizen also must sign the sworn statement, which requires additional explanation that may require

---

[272] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

STB_AR1_000080

translation. This question-and-answer process is in addition to the potential need to provide translation services to noncitizens, if needed, when reading noncitizens the contents of the Form I–867A. While it is difficult to provide the exact time saved as a result of these changes in processes (because USBP systems do not automatically track processing time, standing alone), it is CBP's experience in the time since the Proclamation and IFR were implemented that the elimination of these questions and processes (including not reading the contents of the Form M–444) has, as anticipated, saved approximately 20–30 minutes per person, and led to more efficient and expedited processing overall.

With regard to concerns questioning the stated purpose behind the changes, the Departments disagree that the true purpose of the changes was to reduce the number of individuals referred for credible fear screenings. As explained in the IFR, the shift to a manifestation standard is intended to address suggestive questions and, in so doing, reduce the gap between high rates of referrals and screen-ins with historic ultimate grant rates as well as increase processing efficiency for DHS. *See* 89 FR at 48742–44 & n.220. As explained above in this section, there are multiple reasons why the referral rate observed under a direct questioning approach is very likely greater than the true rate of noncitizens who fear removal or intend to seek asylum—including coaching by TCOs and the possibility that the advisals and questions lead to an unduly high rate of false positives. *See id.* at 48743 & n.220. Seeking to address this problem is not the same as seeking to decrease the number of referrals for that purpose alone, as commenters suggest. Moreover, noncitizens who manifest or express a fear still have their claims adjudicated as required by the INA.

The Departments appreciate commenters' suggestion that, rather than implementing a manifestation standard, resources should be devoted to providing additional training to CBP officers and agents on the non-IFR process, but decline to eliminate or change the manifestation standard at this time. As noted in the IFR and in this section, the Departments believe that, in the emergency border circumstances outlined in this rule, the manifestation standard is appropriate. In addition, CBP notes that its officers and agents have had experience implementing the statutory and regulatory requirements of expedited removal since they became effective and were implemented by legacy INS in

1997, including experience identifying indicators of fear.[273] Guidance authored at that time explained that inspectors were required to refer a noncitizen to an AO if that noncitizen indicated an intention to apply for asylum or a fear of harm or concern about returning home.[274] The guidance stated that immigration inspectors should consider verbal as well as non-verbal cues given by the noncitizen; and it provided that, when determining whether to refer the noncitizen, "inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements."[275] The guidance also highlighted that "[t]he inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution."[276] CBP also notes that, like legacy INS, under the IFR procedures and consistent with agency policy, agents and officers are instructed to err on the side of caution and refer any questions to supervisory officers.[277]

The Departments also disagree with comments indicating that the manifestation standard creates complexities. They maintain that the manifestation standard, in fact, decreases the complexity of the process, given the more streamlined approach taken in the rule and disuse of the Form I–867A and the Form I–867B. In addition, as outlined in the preamble to the IFR and throughout this rule, the rule also allows DHS to effectively and efficiently remove inadmissible noncitizens who are subject to expedited removal orders while quickly identifying inadmissible noncitizens who require a credible fear screening by USCIS AOs. *See* 89 FR at 48742–43.

---

[273] *See* Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[274] *See id.* at 3.

[275] *Id.*

[276] *Id.*

[277] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance;* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum of Fear Claims or Fear Manifestations* (July 18, 2024); Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. and & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal at 3 (Mar. 31, 1997).

## c. Implementation Guidance and Accuracy of Manifestation to Identify Fear of Return

*Comment:* Several commenters described the manifestation approach presented by the IFR as an unclear method of assessing fear of return and critiqued the rule as confusing or lacking clear guidance on implementation. A commenter expressed concern that the criteria requiring referral for a credible fear interview are overly broad, including a "mere belief" that a noncitizen may have a fear of return. Similarly, another expressed concern that the IFR lacks guidance around what degree of manifestation is required, whether immigration officers will consistently implement the manifestation requirement, and whether noncitizens will be provided information "if and when the Departments begin to figure out what is sufficient under this test," while another commenter added that the existing U.S. asylum infrastructure is inadequate to administer the multiple layered and broad-ranging changes of the IFR, including the change to use manifestation.

Many commenters wrote that it is difficult and inappropriate for immigration officers to use manifestation of fear to assess fear of return. Commenters expressed concern that the IFR creates a confusing, non-transparent, and unfair situation for CBP officers to consider. A commenter described the manifestation standard as "deficient" in refugee protection and far from an equitable standard. The commenter wrote that requiring officers to simultaneously interrogate people at the border while also determining if their behaviors indicate fear is "nonsensical." Similarly, another commenter remarked that Border Patrol agents and CBP officers focus on border security and the identification and prevention of criminal activity at the border, often placing them in an adversarial role with noncitizens that would leave these workers ill-equipped to make careful and considered asylum determinations. The commenter also described the contrasting extensive trauma-informed training given to AOs to learn interviewing techniques designed for vulnerable populations, adding that research shows that many noncitizens who qualify for asylum relief have difficulty expressing their claims without the support of such trained techniques.

A commenter referenced a statement in the IFR noting that although the video explaining the importance of expressing a fear of return will not be

**STB_AR1_000081**

played at small facilities, immigration officers at such facilities have resources to be able to "devote a great deal of attention to observing individuals" to see if they manifest fear or need a translator or reading assistance. *See* 89 FR at 48741 n.196. The commenter stated that this suggests that the opposite is true at the larger facilities, *i.e.,* that officers at larger facilities will not have the time or wherewithal to scrutinize noncitizens for nonverbal signs of fear, and, in fact, expect the videos and signs to do a great deal of work for them.

Multiple commenters critiqued the IFR's directive for immigration officers to assess non-verbal shaking, crying, or fleeing behaviors as "unworkable." Commenters further expressed concern that the officers would not be able to discern whether newly arrived noncitizens were cold, hungry, tired, or exhibiting other unconscious behaviors as opposed to a fear of return. Commenters described this directive in the IFR as "absurd and disingenuous," writing that it would be more effective and accurate for CBP officers to directly ask simple questions regarding fear than trying to be "mind readers." Another commenter referenced studies and stated that nonverbal cues of fear would likely go unheard, reasoning that express manifestations of fear are being ignored.

Several commenters recommended requiring CBP officers to ask, in a language understood by the noncitizen, one question regarding whether they have a fear of return.

Many commenters cited research—including a 2022 study by the Center for Gender & Refugee Studies that interviewed 97 families expelled during a previous use of a manifestation approach while the Title 42 public health Order was in effect—that requiring manifestation lowers the rate of noncitizens receiving fear screenings. Commenters stated that human rights monitors have documented that using the manifestation approach has resulted in "CBP failing to refer people who expressed a fear of return to the required fear screening interviews," and that the "shout" test under the Title 42 public health Order resulted in the erroneous return of many people, including women and children, to situations of danger. Another commenter observed lower statistics of credible fear interviews granted to Haitian nationals when given the "shout test" at sea by the U.S. Coast Guard ("USCG") compared to the historical rate of credible fear interviews granted to migrants encountered by immigration officials at land borders, when the shout

test was not used. Lastly, commenters stated that the IFR is already leading to failures in properly referring noncitizens for fear interviews.

In addition, several commenters referenced research [278] and expressed strong concern that CBP officers have a pattern of ignoring signs of fear in migrants. They critiqued the Departments' discussion and statistics of the likelihood of migrants responding affirmatively to asylum questions regardless of a valid fear of return, stating that the IFR's preamble does not cite any statistics about noncitizens failing to present legitimate fear claims in their interview or account for greater numbers of people seeking fear interviews if they are told they are available. A commenter stated that the statistics cited by the Departments have been directly contradicted by other research findings.

Similarly, a couple of commenters cited research [279] that some families have been ignored or chastised for requesting asylum, voiced concern that CBP officers were hostile and mistreated noncitizens at the southern border, and further expressed concerns that under "the Shout Test" immigration officers have prevented migrants from speaking or verbally abused them.

*Response:* The Departments disagree that the manifestation standard is an unclear, confusing, or inaccurate method of assessing fear of return and are confident that the manifestation process in the IFR—including the use of signage and a video to provide generalized notice of the right to seek asylum and protection and the way to raise such a claim—is sufficient to provide individuals with an opportunity to seek asylum and protection, while also maintaining the efficiency gains discussed above. During the time that the manifestation process has been in place under the IFR, there have been higher rates of manifestation than when the standard was recorded and tracked for family units under the Title 42 public health Order, and DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[280]

The Departments acknowledge that immigration officers have historically provided advisals regarding the credible fear process and ascertained a

noncitizen's fear through affirmative questioning, through use of the Form I–867A and Form I–867B, and that removing these questions is a significant change. Thus, the Departments acknowledge that the manifestation process is, in the context of expedited removal, a new process both for officers and agents and for noncitizens. However, the Departments disagree that USBP agents and CBP officers are not equipped or trained to properly identify individuals who are vulnerable or who indicate or manifest fear. When implementing this process, agents and officers draw on their longstanding experience and practice observing and interacting with individuals, including observing any indications or behaviors of concern. Immigration officers have implemented the regulatory and statutory standards governing expedited removal since it was implemented in 1997, and, as noted above, they have had guidance regarding the treatment of noncitizens processed under these provisions since that time.

Additionally, CBP provided guidance to its frontline workforce implementing the IFR delineating how fear can be manifested by a noncitizen in many different ways, including verbally, non-verbally, or physically; CBP also provided examples and indicators. Such indicators include statements of fear; statements that the noncitizen was previously harmed in their home country or country of removal; evidence of physical injury consistent with abuse (*e.g.,* bruises, scars); evidence of self-harm; or non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.

Furthermore, the recent guidance on IFR implementation provides that, if officers or agents are in doubt, or if ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then officers and agents should refer the matter to a supervisor.[281] And, as noted above, existing guidance and CBP practice is to err on the side of caution and on the side of referring an individual to USCIS.[282]

[278] *See, e.g.,* Ctr. for Gender & Refugee Studies, "*Manifesting*" *Fear at the Border: Lessons from Title 42 Expulsions,* Jan. 30, 2024, *https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[279] *See, e.g., id.*

[280] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[281] *See id.; see also* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum or Fear Claims or Fear Manifestations* (July 18, 2024).

[282] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP,
Continued

The Departments also disagree with the commenters' concerns that the manifestation of fear standard is difficult and inappropriate, confusing, or unfair for agents and officers to apply, or that agents and officers are ill-equipped to determine the nature of an individual's fear claim. Indeed, USBP agents and CBP officers, as immigration officers, are intimately familiar with the processing of individuals, including vulnerable populations or populations requiring additional care, safety, security, or medical assistance, and with recognizing the needs of such individuals. As a result of their experience and training, CBP immigration officers (both USBP agents and CBP officers) have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow-up steps with regards to any behaviors or indicators of concern. *See* 89 FR at 48744. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. *Id.* Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. *Id.* Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. *Id.* DHS believes that this experience, coupled with guidance, helps agents and officers effectively identify noncitizens with potential fear or asylum claims under a manifestation approach. *Id.*

The Departments acknowledge that interactions between agents and noncitizens occur in the context of an immigration inspection and interview and in a custodial environment, but disagree with commenters' suggestion that the interview is "adversarial" in such a manner that noncitizens would be unlikely to manifest fear or officers would have difficulty recognizing manifestations of fear. Such immigration inspections and interviews are conducted for the sole purpose of

determining an individual's admissibility under the immigration laws of the United States and ensuring that they are processed accordingly.[283] In addition, the Departments note that, when in use, the Form I–867A and Form I–867B are also completed in this same context. During such an immigration inspection, officers and agents have face-to-face interactions with the noncitizen and thus have a chance to closely observe the individual who is being inspected, to identify those who may have a fear of return or indicate an intention to seek fear-based relief or protection.[284] The Departments reiterate that agents and officers do not assess the merits of an individual's claim of fear. The Departments acknowledge that fear can be manifested in many different ways, including verbally, non-verbally, or physically, and that when doubt or ambiguity exists, officers and agents should involve supervisors or managers to ensure appropriate decisions are made. The Departments also reiterate that USBP agents and CBP officers do not determine whether a noncitizen is excepted from the rule's limitation on asylum eligibility. Such decisions are made by a USCIS AO or, for those processed with an NTA, by an IJ. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a). Agents and officers are responsible for identifying whether an individual has manifested or expressed a fear and, if so, referring them for further consideration by an AO.

Additionally, the Departments note that, under the manifestation standard, a noncitizen is not required to verbally express or state that they have a fear. Contrary to commenters' concerns, the IFR does not impose a "shout test." As outlined in the IFR, manifestations of fear may be verbal, non-verbal, or physical. 89 FR at 48739–45. Thus, a migrant can manifest a fear through an unconscious behavior. *Id.* at 48744. The Departments acknowledge and appreciate that some noncitizens may have difficulty volunteering a fear of return to agents and officers during processing. However, certain migrants may also have difficulty volunteering their fear in response to the previous questions on the Form I–867B, given that the questions are asked by immigration officers in the context of the immigration process. Additionally, for noncitizens who may be hesitant to answer questions or to affirmatively express a fear, the manifestation

standard and CBP officer and agent training and experience, as well as observations from the inspection itself, take into account physical and non-verbal manifestations, some of which may be unconscious by the noncitizen.

The Departments acknowledge a two-page document cited by commenters regarding the prior use of a manifestation standard under the Title 42 public health Order.[285] The document asserts that from June through October 2022, advocates interviewed at least 97 families expelled to cities along the SWB, of whom over half reported that they had verbally expressed a fear of return and nearly three-quarters reported having non-verbally expressed a fear. According to the document, multiple migrants sought to raise fear claims with "CBP officers" but such officers did not allow them to speak and ultimately expelled them to Mexico. The Departments lack a basis to independently evaluate the advocates' methodology (which is largely undescribed) or the accuracy of migrants' claims as described in the document. At the same time, the Departments note that most of the specific allegations in the document involve behavior—officers not allowing noncitizens to speak—that would be a violation of CBP policy under the Title 42 public health Order, under this rule,[286] and under the Form I–867A/B approach that applies when emergency border circumstances are not in place.[287] For this reason, and due to the distinctions between processing under the IFR and during the implementation of the Title 42 public health Order described below, DHS does not regard this study as providing persuasive evidence that the manifestation approach of the IFR and this rule has not been and will not be effective.

The Departments disagree with commenters' implicit suggestion that the implementation of the IFR is substantially similar to the

*Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re:* Expedited Removal Policy (Aug. 11, 2004); Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[283] *See, e.g.,* INA 235(a)(3), 8 U.S.C. 1225(a)(3); 8 CFR 235.1; 8 CFR 235.3(a).

[284] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance.*

[285] *See* Ctr. for Gender & Refugee Studies, "Manifesting" Fear at the Border: Lessons from Title 42 Expulsions (Jan. 30, 2024), *https://cgrs. uclawsf.edu/our-work/publications/ %E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[286] *See, e.g.,* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance* (requiring officers and agents to refer any noncitizen who manifests a fear for a credible fear interview with USCIS).

[287] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. at 1 (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re: Expedited Removal Policy* at 7–8 (Aug. 11, 2004).

implementation of the manifestation standard used during the Title 42 public health Order, such that experience under Title 42, including in the study mentioned above, demonstrates that the manifestation standard is inherently unreliable. As an initial matter, the manifestation under the IFR occurs in the context of immigration processing under title 8, rather than in the context of processing and expulsion under Title 42. Immigration processing is, as a general matter, a more complex process than the processing that occurred under Title 42, with noncitizens generally interacting with immigration officers during processing for a longer period of time than occurred during processing for expulsion. For example, the processing of an individual for expulsion under Title 42 took, on average, less than 30 minutes, as compared to, under the current processes under the IFR, approximately 1.5 hours. Therefore, noncitizens have a longer period of time to interact with the processing agents or officers, and potentially manifest a fear. In addition, noncitizens processed under title 8 procedures under the IFR provisions are generally in CBP custody for longer than under Title 42, and can manifest a fear at any time in DHS custody.

Additionally, based on best practices and lessons learned during the implementation of the Title 42 public health Order, the Departments have implemented several operational advancements and information sharing developments. Under the IFR and this rule, noncitizens have access to signage explaining that they may manifest fear during their time in DHS custody. Noncitizens in large-capacity facilities can also view videos explaining the manifestation standard and the general process they are receiving. 89 FR at 48741–42. As noted above, during implementation of the public health Order under Title 42, the DHS process was more expedited. This resulted in a narrower window of opportunity for a noncitizen to manifest a fear in DHS custody. This difference can be seen through the higher number of noncitizens manifesting fear under the IFR. Since the implementation of the IFR, 27 percent of noncitizens encountered between POEs at the SWB have manifested fear while in DHS custody.[288] Between June 3, 2022, and May 11, 2023, when the use of the manifestation standard for noncitizens encountered and subject to the Title 42 public health Order was tracked, less than 7 percent of individuals in family

units processed under the Title 42 public health Order nationwide were recorded as having manifested a fear in USBP custody and were, in general, excepted from the Title 42 public health Order. As evidenced by the significantly higher manifestation rate under the IFR as compared to what had been recorded during implementation of the Title 42 public health Order, the two circumstances are not comparable. Noncitizens encountered along the SWB under the IFR have manifested a fear and been referred to an AO for a credible fear interview on a much more frequent basis. At the same time, as discussed in Section II.A.2 of this preamble, fear-claim rates remain well below the very high rates following the ending of the Title 42 public health Order and prior to the IFR. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances. *See* 89 FR at 48744.

With regards to commenters' concerns that, particularly at large-capacity facilities, officers and agents may not be able to "scrutinize" noncitizens for nonverbal signs of manifestation of fear, the Departments disagree. As acknowledged in the preamble to the IFR, CBP has placed signs in its facilities along the SWB advising noncitizens of their ability to express or manifest a fear, and has placed videos in its larger facilities. 89 FR at 48741– 42. DHS explained that, at smaller facilities, such videos are not played, but officers and agents have had sufficient resources to devote to observing individuals to determine if they manifested a fear. *Id.* at 48741 n.196. This statement was intended to explain why a video was not necessary at such facilities, but is not intended to convey any lack of attention to such claims at large-capacity facilities. Indeed, as noted above, agents and officers interview and observe noncitizens during their immigration inspection and interviews, which occur one-on-one. CBP operations at any CBP facilities with noncitizens in custody are staffed and operate 24 hours a day. Every CBP officer and agent receives annual training on CBP National Standards on Transport, Escort, Detention, and Search (TEDS)—which provide standards for the custodial conditions in CBP facilities—that ensures every noncitizen in CBP

custody is monitored for care and safety, including a provision requiring officers and agents to "physically check" areas where noncitizens are held "on a regular and frequent manner," providing noncitizens with an opportunity to raise any concerns or needs directly with CBP personnel conducting the checks.[289] Noncitizens in custody at CBP facilities are generally under continuous and direct supervision by multiple personnel and may seek assistance or ask questions of any of those individuals supervising their holding areas at any time. *See* 89 FR at 48744. DHS is confident that, during this time, even in large-capacity facilities, agents and officers have sufficient experience and expertise to identify manifestations or expressions of fear. Likewise, noncitizens in custody at ICE facilities may seek assistance or ask questions and are supervised such that officers, who have experience and expertise in these interactions, can identify manifestations or expressions of fear. It is important to note that a noncitizen does not have a finite or limited number of opportunities to manifest fear, but rather may manifest fear at any point while in DHS custody.

Further, regarding comments that express concerns and reference reports concluding that the manifestation standard has resulted in failures to refer noncitizens for a required fear interview, and comments recommending that, given this, officers and agents should ask, at a minimum, a question about fear in the noncitizen's native language, the Departments are aware of these studies and their conclusions. The Departments acknowledge that, under the manifestation approach outlined in this rule, there may be some noncitizens who have a fear of persecution or a fear of return, but who are not referred for a credible fear interview. However, the Departments do not believe that such a possibility is unique to the manifestation standard, and, in any event, DHS has taken steps, including posting signs and videos and providing guidance to its personnel, to help mitigate this possibility. Having considered the reports commenters cite, as well as the mitigating steps DHS has taken and the lessons learned from DHS's experiences during processing under the Title 42 public health Order, the Departments continue to believe that the manifestation standard is

---

[288] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[289] CBP, *National Standards on Transport, Escort, Detention, and Search (TEDS) 4.6,* at 16 (Oct. 2015), *https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search.*

**STB_AR1_000084**

appropriate in the circumstances outlined in the IFR and this rule. Moreover, as explained earlier in this response, the Departments' implementation of the IFR has resulted in a fear-claim rate substantially higher than the rate observed under the Title 42 public health Order, further suggesting that the circumstances from other operational contexts, including those studied in earlier research, may be inapposite.[290] DHS acknowledges that asking a single question about fear would be an alternative to the approach adopted in this IFR. However, DHS declines to implement such an option, as it would be subject to the same concerns that DHS outlined in the preamble to the IFR with regards to a short, individualized advisal. As noted in that preamble, DHS has determined that, during times of emergency border circumstances, a short, individualized advisal would be unlikely to convey information more effectively than signs and videos. *See* 89 FR at 48744. In particular, the Departments assessed that if an advisal could be developed that was short enough to avoid unduly lengthening processing times in the current emergency situation, such an advisal would be unlikely to convey information more effectively than the existing signs and videos, and such an advisal would still have the suggestiveness problems of the current system. The Departments assess that asking a single question—particularly in the context of the expedited removal process under the IFR where there are no individualized advisals provided—would likely present the suggestiveness problems of the current system. DHS thus declines to implement this change.[291]

To the extent that there are allegations that an agent or officer ignored expressions or manifestations of fear by a noncitizen, such conduct is contrary to DHS policies and practices, and would be treated as such. The Departments again note that, to the extent it exists, such employee misconduct would not be unique to the implementation of this rule. Nor do such claims provide a persuasive reason to depart from the approach this rule adopts to address emergency border circumstances. As already explained, DHS has provided guidance to CBP and ICE agents and officers on how to identify manifestations of fear; that guidance directs them to refer individuals who manifest fear for a credible fear screening, including instructing them to err on the side of referral. 89 FR at 48744. If agents or officers disregard those instructions—which could occur with or without this rule—DHS has procedures in place for reporting misconduct.[292] DHS relies on

these procedures generally to ensure that personnel are following applicable law and guidance, and DHS assesses that these procedures are generally effective. If allegations of misconduct are found to be substantiated and misconduct is found, such findings may lead to, for instance, disciplinary action against involved personnel and referral for criminal charges if a determination is made that any laws were violated. In addition, regardless of whether any such findings are substantiated, DHS may impose additional training and policy measures consistent with the rule's provisions.

Concerns about misconduct by individual employees are further mitigated by the reality that, as explained above, noncitizens do not have just one chance to manifest fear while in CBP or ICE custody: Noncitizens will typically interact with multiple agents and officials, and they can manifest fear to any of them. Noncitizens will have these opportunities, moreover, after being exposed to signs and videos explaining that they can manifest fear. From June 5, 2024, through August 31, 2024, the median processing time from encounter through repatriation for a case with no fear claims was 6 days.[293]

Moreover, commenters have provided no evidence that there is a widespread problem of CBP officers and agents ignoring fear claims under the IFR. As described above, there are a number of mechanisms within the Department for such complaints and concerns to be raised, and CBP is not aware of any substantiated allegations of misconduct raised through these channels. And the data showing a manifestation rate of 27 percent under the IFR—though not alone proving a negative or showing that no fear claims are being missed—indicate that officers and agents are following their guidance and reporting manifestations of fear in a large number of cases. For all these reasons, DHS does not believe the commenters' arguments provide a reason to depart from the rule's approach.

*Comment:* A few commenters reasoned that because the manifestation of fear approach does not require documentation, unlike affirmative questioning, the IFR removes appropriate accountability. One commenter described the change to using manifestation as "a dangerous reversal of a procedural safeguard that

---

[290] As noted in the IFR, the manifestation standard is used by the USCG, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea. *See* 89 FR at 48744. Although the Departments believe these other uses support the view that a manifestation standard can be effective, having implemented the IFR's manifestation standard and observed the results of that standard, the Departments now believe that the difference between the operational contexts limits the usefulness of the direct comparison as suggested by some commenters.

[291] As noted in the preamble to the IFR, the Departments acknowledge that there are some studies articulating that the Form I–867A and Form I–867B provide important protections. As explained in the IFR, DHS disagrees with these studies to the extent that they conclude that individualized advisals and affirmative questions are not suggestive, based on DHS's longstanding experience with this process. Indeed, such studies are now nearly two decades old and were done at a time when, as described above, the ER process was very different from what it is now. Additionally, given that the studies do not account for the signs, videos, and other means of providing information under the IFR's approach, DHS does not believe they are

particularly probative as a means of assessing the effectiveness of this approach.

[292] CBP takes allegations of employee misconduct very seriously, and allegations of serious misconduct are investigated by CBP's Office of Professional Responsibility (OPR). CBP, *Office of Professional Responsibility, https://www.cbp.gov/about/leadership-organization/professional-responsibility* (last modified Mar. 29, 2024). Allegations of misconduct by a CBP employee or contractor can be sent to CBP OPR's Intake Center via email: *JointIntake@cbp.dhs.gov,* or via phone: 1–877–2INTAKE (246–8253), Option 5. Similarly, ICE's Office of Professional Responsibility ("OPR") takes employee misconduct very seriously and manages and investigates allegations of employee misconduct and oversees a variety of other integrity programs that protect the public trust and preserve the highest standards of integrity and accountability across the agency. ICE, *Office of Professional* Responsibility, *https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). To promote integrity, mitigate risk, and uphold the agency's professional standards, the OPR-led Integrity Coordination Center receives and assesses information and refers any allegations of employee misconduct to appropriate offices for investigation, if necessary. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). This process ensures that allegations of criminal or administrative misconduct against ICE personnel are properly assessed and thoroughly investigated. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). Allegations of misconduct by an ICE employee or contractor can be sent to ICE OPR's Integrity Coordination Center via email: *ICEOPRIntake@ice.dhs.gov,* via phone: 1–833–4ICE–OPR (833–442–3677), or via the "File a Complaint" web link. ICE, *Integrity Coordination Center—Intake Form, https://www.ice.gov/webform/opr-contact-form* (last updated Jan. 9, 2024).

Additionally, the DHS Office of Inspector General and the DHS Office for Civil Rights and Civil Liberties are also available for the public, including previously removed noncitizens, to provide feedback and make complaints involving DHS employees, including officers and agents, or programs; to submit allegations of civil rights and civil liberties violations; and to submit other types of grievances. *See, e.g.,* DHS, Off. of Inspector Gen.,

*Hotline, https://www.oig.dhs.gov/hotline* (last visited Sept. 21, 2024); UDHS, *Office for Rights and Civil Liberties, https://www.dhs.gov/office-civil-rights-and-civil-liberties* (last visited Sept. 21, 2024).

[293] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

STB_AR1_000085

has been implemented to ensure the United States' compliance with its international obligations,'' expressing concern that other safeguards are already being removed. A commenter expressed concern that the Departments have eliminated the Form I–867A and Form I–867B without replacing them with any other documentation, which they wrote could make it impossible to have any record of missed viable claims for asylum or the total extent of any such errors. Another commenter asserted that the previous system of requiring immigration officials to complete and sign two forms incentivized officials to be honest and critiqued the manifestation approach as leaving no paper trail. Another commenter stated that the manifestation standard would worsen already problematic interactions between CBP officers and noncitizens. The commenter referenced a report [294] finding that CBP officers had an ''alarming'' rate of irregularities and non-conforming practices when assessing fear of return, including failing to read the required script for the Form I–867A, failing to record answers correctly, and using questionable interpretation practices. Another commenter discussed reports finding that many interviews conducted by CBP and ICE were marked by inaccuracies, mistranslations, and fabricated information, as well as research showing that in most situations when migrants stated that CBP agents did not ask about their fear of return, the immigration records showed instead that this question had been asked and answered.

*Response:* The Departments disagree that the manifestation of fear standard removes accountability or eliminates official documentation of a fear claim. As an initial matter, while CBP officers and agents are not required to provide noncitizens with an M–444 and do not complete a Form I–867A or Form I–867B when the IFR's provisions are in effect, fear claims are documented in the relevant electronic systems. Guidance issued to both USBP and the OFO requires that, when a noncitizen subject to the Proclamation and the IFR is being processed for expedited removal, and manifests a fear, that noncitizen is to be processed under a particular disposition code in the electronic processing

system.[295] This code is unique to those who are processed for expedited removal and who manifest a fear. Additionally, while noncitizens processed for expedited removal under the IFR procedures are not required to be provided the Form M–444, they continue to be provided information about the credible fear process, through a tear sheet called *Information about Credible Fear Interview* and by video, and they are provided the opportunity to consult with an individual of their choosing.[296] CBP facilities also have signage and, in some cases, videos, providing notice to all noncitizens in custody that, if they have a fear of return, they should inform an agent or officer. 89 FR at 48741. This manifestation may occur at any point during a noncitizen's time in CBP custody, and if such a claim is made, it must be documented in the relevant electronic system at that time.

ICE maintains an electronic system to record case management actions for noncitizens, including referrals to an AO and the disposition of a noncitizen's credible fear determination.[297] If a noncitizen manifests or expresses a fear after their initial encounter with CBP, while in ICE custody, ICE guidance requires officers to refer the case to USCIS for a credible fear interview, including having an opportunity to

consult with an individual of their choosing prior to their credible fear interview.[298]

Per applicable guidance, ICE documents any manifestation or expression of fear on the Form G–166C, which also verifies that the noncitizen has been provided information on the credible fear interview process and the specific language in which it was provided.[299] ICE guidance requires that all documentation, including the claim of credible fear and USCIS fear referral package, are captured in an electronic system of records.[300]

ICE and CBP utilize the same electronic database system for case management of noncitizens and have electronic access to these records.[301] ICE tracks noncitizens transferred from CBP to ICE custody who have manifested fear through the same system.[302] This system ensures that information relating to a noncitizen's case, including fear manifestation, is properly referred to USCIS.[303]

[294] *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal,* at 19 (Aug. 2, 2016), *https://www.uscirf.gov/publications/barriers-protection-treatment-asylum-seekers-expedited-removal.*

[295] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4–5 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[296] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* 4–5 (June 4, 2024); 6.4.24 USBP Field Guidance ER IFR 1; Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 4 (June 4, 2024) (Muster).

[297] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (ICE officers are instructed ''to document the Claim Credible Fear, Fear Referral package submitted, and all subsequent CF related actions in [the electronic system's] Actions and Decisions Tab''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[298] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border, *and Interim Final Rule,* Securing the Border, at 4 (June 4, 2024) (''If ERO determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal, the officer will provide the noncitizen with the Information About Credible Fear Interview Sheet and refer the noncitizen to USCIS for a credible fear interview.'').

[299] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024).

[300] *Id.*

[301] DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[302] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (''The new processing dispositions [by CBP] can be tracked in the ICE [system's] Dashboard . . . by selecting these new processing dispositions . . . .''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[303] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (for cases transferred to ICE from CBP after a noncitizen has manifested fear, ''[t]he existing automated referral solution using the 'Refer Credible Fear to USCIS button' in [the electronic system] will be available for use . . . [and the automated] functionality will function as designed.''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4

Continued

With regard to a commenter's concern that the absence of affirmative questioning will result in irregularities and non-conforming practices when assessing fear of return, the Departments disagree. The Departments acknowledge that, under the standard outlined in this rule, official documentation will indicate if a noncitizen expressed or manifested a fear, but will *not* contain an express similar record of a lack of such manifestation. DHS acknowledges that this is a change from non-IFR practices, in which a noncitizen's case file will reflect that the individual was provided with the Form I–867A advisals and will contain the noncitizen's response to the questions in the Form I–867B. DHS disagrees that the lack of such documentation under the manifestation of fear standard removes accountability from CBP officers and agents, incentivizes any falsification of records, or undermines the validity of the manifestation process. During immigration processing, CBP officers and agents ask a noncitizen a number of questions, including about their biographic information, nationality, and purpose of travel to the United States. The processing officer or agent records the noncitizen's answers to these questions in the electronic processing system.[304] In addition, as noted above, any individual who is processed for expedited removal and manifests or expresses a fear is processed using a unique code in the electronic system.[305] Officers and agents have an obligation, as law enforcement officers and Federal employees, to ensure that the record of a particular individual's case file is accurate and complete,[306] which

includes any manifestations or expressions of fear. Thus, the lack of such a code indicates that the individual did not manifest a fear. However, to the extent that an officer or agent failed to accurately record a manifestation of fear, the lack of the unique code in the noncitizen's file itself would provide a record of that failure—just as an inaccurate "no" answer to a question on a Form I–867B would if a noncitizen actually answered "yes" to the question. To the extent that commenters are concerned about potential misconduct by officers and agents, CBP and ICE take allegations of misconduct very seriously and have mechanisms in place to investigate and respond to such allegations as discussed above.

*Comment:* Multiple commenters expressed concern that the IFR and "shout test" approach avoids the provision of necessary interpretation by immigration officers and thwarts appropriate language access for migrants, often adding that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish. Commenters further stated that the IFR might disproportionately impact speakers of Indigenous languages, who may be able to communicate regarding basic information in Spanish but may be unable to discuss the complicated matter of a fear-based claim in anything other than their native language. Similarly, a commenter observed that noncitizens are held in facilities for only a limited time and that during that time language needs might be overlooked. In the same vein, another commenter expressed concern that the IFR and the preamble are not clear regarding how noncitizens who speak languages other than English or Spanish are expected to manifest fear, when they may be able to communicate only basic identification in English or Spanish and Border Patrol agents are not incentivized to seek an interpreter in the noncitizen's language.

*Response:* The Departments disagree with commenters expressing a belief that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish and that they are not incentivized to seek an interpreter. As noted, noncitizens are not required to verbally express or state a fear. A fear can also be manifested non-verbally or physically. In addition, CBP has legal and policy obligations to provide language access services and translation and has long recognized the importance of effective and accurate communication between CBP personnel and the public. Ensuring effective communication with

all persons, including limited English proficiency ("LEP") persons, facilitates CBP's mission.

It is the policy of CBP to take reasonable steps to provide LEP persons with meaningful access, free of charge, to its operations, services, and other conducted activities and programs without unduly burdening the Agency's fundamental mission.[307] This policy applies to all methods of communication—*e.g.,* verbal (including telephone); correspondence (including emails); websites; newsletters; community engagement activities; and flyers, posters, pamphlets, and other documents explaining CBP programs.[308] This policy also applies to interactions with the public, including law enforcement encounters (*e.g.,* questioning, processing, etc.).[309] As a result of and related to these policy obligations, CBP agents and officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[310] Upon implementation of the IFR, signs were posted in areas of CBP facilities where individuals are most likely to see those signs, instructing individuals that, in addition to being able to inform the inspecting immigration officers of

---

(Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[304] *See* DHS, *Privacy Impact Assessment for the CBP Portal (E3) to ENFORCE/IDENT, DHS/CBP/PIA–012,* at 1, 3 (July 25, 2012), *https://www.dhs.gov/publication/cbp-portal-e3-enforcedent* (discussing the type of information collected from noncitizens and how it is recorded in the electronic system).

[305] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[306] *See, e.g.,* 44 U.S.C. 3101 (providing that federal agencies "make and preserve records containing adequate and proper documentation of the [official activities] of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons affected by the agency's activities").

[307] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[308] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[309] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[310] *See* CBP, *Language Access Plan 7* (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 3, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https://www.dhs.gov/sites/default/files/publications/Habla%20Poster_12-9-16.pdf* (last visited Sept. 3, 2024); *see also* DHS, *DHS Language Access Resources* (July 17, 2023), *https://www.dhs.gov/publication/dhs-language-access-materials.*

urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. 89 FR at 48741. Moreover, in CBP's large-capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return is shown on a loop in the processing areas and will also be available in commonly-spoken languages. To the extent that noncitizens do not speak one of these languages, CBP provides language assistance services consistent with CBP's Language Access Plan.[311] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the signs and videos are presented will be read the contents of the signs and videos in a language they understand.

*Comment:* One commenter expressed concern that, as a result of the signs and videos in CBP facilities advising migrants of their ability to manifest or express a fear, noncitizens are "in essence . . . coached" by DHS with regard to manifesting fear.

*Response:* With regard to this concern that the existence of signs and videos amount to DHS "coaching" migrants with regards to manifesting or expressing a fear, the Departments are cognizant that, for some individuals, such messaging may result in migrants expressing or manifesting a fear when they otherwise would not. However, as explained in the preamble to the IFR, DHS adopted the approach outlined in this rule—a manifestation standard, coupled with a general notice of the right to express or manifest a fear—in an effort to mitigate this potential, compared with the existing practice of asking affirmative questions. *See* 89 FR at 48743–44. DHS believes that the approach taken in this rule appropriately reflects and accounts for DHS operational needs while protecting noncitizens' ability to seek protection in the United States.

d. Trauma Impacting Manifestation and Vulnerable Populations

*Comment:* Many commenters expressed concern that noncitizens have endured significant trauma en route to

the United States or are under stress after escaping harm and "might not be able to explicitly state their fears" and, thus, would fail the manifestation requirement. One commenter pointed out that trauma does not always present with the physical cues identified in the IFR, such as "shaking, crying, or signs of physical injury." The commenter stated that the relevant USCIS Training Module "explains that survivors of severe trauma may appear emotionally detached"; the commenter wrote that removing an affirmative individualized explanation of the process makes it even harder for survivors to pursue protection for which they are entitled to apply. Other commenters similarly observed that people who have suffered trauma "often have great difficulty raising their fears of return in non-confidential group settings" and might be hesitant to disclose their fear to armed, uniformed officials. One commenter expressed concern that many migrants have fled violence at the hands of government officials and would have difficulty volunteering their fear of return to uniformed CBP agents who are not asking questions about their fear but about other aspects of their situation, while another commenter observed that "all people [seeking] asylum remain traumatized, and very few are able or prepared to tell their full story even if they understand the consequences of the [credible fear interview] process." Commenters also asserted that noncitizens may not understand the importance of their first encounter with a government official or may believe they will have an opportunity to raise their claim later in the process.

*Response:* The Departments acknowledge that many noncitizens arriving in CBP custody may have experienced trauma of some kind and that being taken into immigration custody may exacerbate some of this trauma. The Departments also acknowledge that it may be difficult for some noncitizens to articulate details of their fear claim to CBP officers and agents during processing, and may, in general, have negative reactions to law enforcement officials in uniform. On this point, however, the Departments note that, during CBP processing, the relevant factor determining whether a noncitizen is referred to USCIS is whether the noncitizen manifests a fear. They are not required to, nor expected to, articulate the full scope of their fear or the rationale behind it. Indeed, CBP agents and officers do not determine the validity of any fear claim. Additionally, to the extent that an individual may

react negatively to a CBP officer or agent in uniform, such concerns are not limited to the process under the IFR and would ostensibly apply to any screening process implemented by the Departments. CBP has taken steps over the past several years to integrate trauma-informed care for all persons in custody, with a particular focus on UCs.[312] In particular, in CBP holding facilities, the agency has taken steps to ensure that processing procedures are informed by the potential for trauma experienced by individuals in custody, with a particular emphasis on providing a sense of safety and security, providing caregivers for children in custody and increased custodial oversight, increasing medical standards for individuals in CBP custody, providing regular orientation and assistance, and providing activities and recreation for children.[313] In addition, CBP has taken steps specific to the credible fear process, for those going through the process in CBP custody, to protect the privacy of noncitizens during their interviews, where noncitizens may discuss traumatic situations. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. While DHS has taken steps to mitigate the impact of such trauma on the effectiveness of the screening process, including through its signage and videos, it is not possible to develop a screening process that completely eliminates the potential effects of past trauma.

*Comment:* Many commenters expressed specific concerns that certain vulnerable populations of noncitizens would be at a particular disadvantage when seeking protection due to the manifestation requirement. Some commenters highlighted survivors of sexual violence, political dissidents, and LGBTQI+ populations as particularly disadvantaged, in that they may not easily manifest fear in asylum settings due to their specific history of oppression. For example, one commenter wrote that political dissidents may have a fear and mistrust of government officials and be unlikely to reveal their stories to immigration officials. They also discussed the significant harm that they believe the manifestation requirement will have on members of the LGBTQI+ community who are fleeing persecution and thus are

---

[311] *See* CBP, *Language Access Plan* (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[312] *See* Memorandum for Exec. Assistant Comm'rs, et al., from Chris Magnus, Comm'r, U.S. Customs and Border Protection, *Re:* Directive for U.S. Customs and Border Protection Approach to Trauma-Informed Care for Persons in Custody at 1 (Apr. 29, 2022).

[313] *Id.* at 2–4.

likely afraid to reveal intimate details of their lives in immigration facility spaces that lack privacy and confidentiality.

*Response:* Regarding concerns that certain populations, including LGBTQI+ individuals, survivors of sexual violence, and political dissidents, may not be comfortable expressing the details of their fear claim to CBP officers and agents, the Departments reiterate that, at the time of CBP processing, agents and officers do not inquire about or ask questions about the nature of an individual's fear claim, nor do they evaluate the validity of that claim. Thus, such migrants are not required to—and are not expected to—provide the details of any fear claim, or even the basis for their claim, during CBP processing. In addition, the Departments note that concerns regarding the ability of these populations to articulate their fear claims are not limited to the process under the IFR, and would seemingly apply to any screening process implemented by the Departments, including the process utilizing the Form I–867A and Form I–867B.

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum

*Comment:* Several commenters critiqued the assertion in the IFR that a manifestation of fear aligns with a valid claim for asylum. One commenter articulated that the Departments provided no rationale to think that the new manifestation of fear approach would only affect people with "frivolous claims" to asylum and wrote that this conclusion was contrary to common sense. A commenter wrote that requests for relief or visibly detectable signs of fear are not proxies for a strong claim and that other factors, such as coaching by a smuggler, might determine whether or not a migrant manifests fear.

*Response:* Contrary to the contention contained in the comments, the IFR did not state that the manifestation standard will only impact those with "frivolous" claims. The Departments noted in the preamble to the IFR that they believed that the manifestation standard "is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return." 89 FR at 48744. This decision was informed by the Department's experience that providing the affirmative advisals on the Form I–867A and asking the affirmative questions on the Form I–867B is, in some cases, suggestive, and by the Departments' belief and experience that those with meritorious claims will make their fear or desire to request asylum known when

given the opportunity to do so. However, the Departments also acknowledge that any screening mechanism may result in some noncitizens with valid claims not being referred for a credible fear interview. *Id.* at 48743–44. Nonetheless, the Departments believe that the manifestation standard will allow DHS to identify claims that may be meritorious in an efficient and effective manner, and that this change remains appropriate and necessary in light of the emergency border circumstances in which this rule is implemented. *Id.* at 48744.

f. Noncitizens May Not Understand Their Legal Right To Seek Asylum

*Comment:* Multiple commenters wrote that some noncitizens may not know that they legally can raise their fears of harm. Other commenters wrote that many immigrants would be unable to meet the requirement to express their fear of return explicitly, due to lack of access to legal counsel or unfamiliarity with the legal requirements. A commenter remarked that noncitizens may not understand that the experiences they suffered based on gender, racism, or homophobia or transphobia in their countries of origin might be grounds for asylum in the United States.

Some commenters described the signs and videos discussed in the IFR as insufficient for communicating the complex concepts of manifestation of fear and credible fear screenings. A commenter criticized the content and design of the signs as insufficient to inform the reader that they forfeit their right to seek asylum if they do not manifest a fear of their return. Another commenter noted that the videos would not necessarily even be played at smaller facilities.

Some commenters stated that signs or videos are an inadequate systematic approach to reaching a broad pool of noncitizens with valid asylum claims, particularly given the limited number of languages used. One commenter criticized the "arbitrary" limitation on the number of languages used for the signs and videos and stated that the IFR at footnote 195 (89 FR at 48741 n.195) suggests the signs and videos in CBP facilities will be posted in English, Spanish, Mandarin, and Hindi, but the ICE Implementation Guidance says only that the signs must be posted in English and Spanish without mentioning additional languages to be used on the signs themselves.[314] The comment

stated that limiting language access to these four languages will clearly leave many without any way to understand the procedure they must follow to have their claims heard. The commenter stated that neither the Implementation Guidance nor the Rule explain how someone who cannot understand one of these four languages would know to seek out translations in the law library, as indicated in the rule, or if all facilities even have a law library.

*Response:* The Departments disagree with the commenters' assertions that the signs and videos are not sufficient to notify noncitizens that they can manifest a fear. CBP has posted signs in areas of its facilities where individuals are most likely to see those signs. In addition, CBP has developed a video that is shown on a loop in the processing areas of its large-capacity facilities. Commenters are correct that these videos are not shown in smaller facilities. However, as outlined in the IFR, in such smaller facilities, the signs are posted, and officers and agents are generally able to devote significant attention to noncitizens in custody and identify either fear manifestations or language needs. *See* 89 FR at 48741 n.196. Contrary to commenters' assertion that the list of languages in which these signs and videos are provided is arbitrary, they are provided in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by most of the individuals in CBP custody who are subject to the rule. And if a noncitizen does not speak one of these languages, CBP provides language assistance services in accordance with CBP's Language Access Plan.[315]

These signs and videos have also been provided in short, concise language, rather than explaining the complex details of the credible fear process or the standards for addressing a claim for asylum or other protection. This is based on DHS' experience that short, concise, and simple notifications are most effective for noncitizens in custody at CBP facilities, given the nature of CBP facilities and CBP operations.[316] In

---

[314] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3,*

*2024, Securing the Border, and Interim Final Rule,* Securing the Border, at 5 (June 4, 2024) ("These signs must be posted in English and Spanish. ERO will have additional translations available in facility law libraries in the following languages. . . .").

[315] *See* CBP, *Supplementary Language Access Plan: Fiscal Years 2020–2021,* at 6 (Feb. 7, 2020), *https://www.cbp.gov/about/language-access.*

[316] *See* CBP, *Directive 2130–031: Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access,* at 1, 4–5 (Dec. 4, 2018), *https://www.cbp.gov/document/directives/2013-031-roles-and-responsibilities-us-customs-and-border-protection-offices?language=pt.*

STB_AR1_000089

particular, CBP's role in the credible fear screening process is to identify those who may be seeking protection in the United States, in order to ensure that such individuals are referred to a USCIS AO. This role thus requires officers and agents to identify claims of fear, and, at this initial stage, err on the side of caution.[317] In addition, noncitizens in CBP custody go through a number of steps and may move between various locations in a single facility while completing processing and awaiting transfer out of CBP custody. Therefore, it is CBP's experience that short, simple signs, which can be noticed and read quickly, are more effective for communicating with noncitizens than signs with more complex language. Such claims of fear are, under non-IFR procedures, identified in part through the questions on the Form I–867B. Under this rule, such claims may be manifested or expressed to an officer or agent at the time of processing. However, this rule does not change the role of either the noncitizen or CBP immigration officers in the process—a noncitizen may express or manifest a fear, and, once that fear is expressed, CBP refers the individual to an AO. Additionally, those noncitizens who are referred and who undergo their credible fear interviews in CBP custody are provided additional information about the credible fear process, through the *Information about Credible Fear* tear sheet and the USBP video explaining the credible fear process.

Additionally, for those transferred to ICE custody, commenters are correct that initial ICE guidance called for ICE to provide signage in English and Spanish,[318] but ICE subsequently directed the relevant facilities to post signage in the same four languages as CBP. In addition, as noted by the commenter, ICE has translations available in facility law libraries in the following languages: Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese.[319]

Noncitizens in ICE detention facilities have access to law libraries for at least five hours per week.[320] Furthermore, ICE has access to an ICE-wide 24/7 language services contract for interpretation and translation, and guidance and best practices materials for identifying LEP individuals and their primary language to secure the necessary interpretation and translation services for them.[321] ICE detention standards provide that oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.[322] Each detained noncitizen in an ICE detention facility is provided an ICE National Detainee Handbook,[323] which is currently available in 16 languages (English, Spanish, Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Pulaar, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese).[324] The Handbook describes the noncitizen's ability to ask for relief from removal, including by seeking asylum, and also provides information regarding the law library and additional resources available to noncitizens.[325] All ICE detainees have the right to use the facility's law library to access approved legal materials.[326]

With regard to concerns that migrants may not know that their experience in their home country or on their journey to the United States may be grounds for asylum, the Departments note that this has always been the case, even under non-IFR credible fear processes. In any event, the Departments note that the current signs and videos use general language to advise noncitizens that they should tell an officer if they ''[f]ear persecution or torture if removed from the United States.'' This open-ended language does not require a noncitizen to fully understand the legal nuances or complexities of their claim at the time it is manifested. CBP therefore believes that the existing signs and videos are sufficient.

### 3. ''Reasonable Probability'' Screening Standard for Statutory Withholding of Removal and CAT Protection

Commenters largely opposed the heightened ''reasonable probability'' screening standard for statutory withholding of removal and CAT protection for noncitizens subject to this rule. By contrast, one commenter supported the ''reasonable probability'' standard for this rulemaking and recommended more broadly applying it to all withholding of removal credible fear screenings.

*Comment:* Commenters stated the ''reasonable probability'' standard was too high and would lead to refoulement. Some commenters stated that the ''reasonable probability'' standard is inconsistent with the statutory ''significant possibility'' standard for asylum in credible fear screenings, and that any attempt to change the ''significant possibility'' standard was ultra vires. Commenters also explained that the higher standard would cause credible fear passage rates to drop dramatically and result in the removal of noncitizens with valid asylum claims. Commenters stated that Congress intended, as evidenced by the plain language of the statute, for the threshold credible fear screening standards to be low so as not to exclude legitimate asylum seekers, and not to ensure the quick imposition of consequences for irregular entry as described in the IFR.

Similarly, commenters believed the ''reasonable probability'' standard was set too close to the ultimate burdens of proof for statutory withholding of removal and CAT protection and would require excessively specific evidence, particularly as the credible fear process is designed to move quickly. Rather, commenters suggested that only claims that were ''manifestly unfounded'' should be screened out at the credible fear stage and that, as much as possible,

---

[317] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance,* at 1 (''If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then CBP officers and agents should refer the matter to a supervisor.'').

[318] Memorandum for Enforcement and Removal Operations Exec. Assoc. Dir. Daniel A. Bible, from ICE Deputy Dir. and Senior Off. Performing the Duties of the Dir. Patrick J. Lechleitner, *Re: Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border,* and Interim Final Rule, *Securing the Border* at 5 (June 4, 2024).

[319] *Id.*

[320] ICE, *Attorney Information and Resources: Other Legal Resources Available to Noncitizens in ICE Custody* (Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources.*

[321] ICE, *Language Access Information and Resources* (May 7, 2024), *https://www.ice.gov/detain/language-access* (describing current language access policies); ICE, *ICE Language Access Plan, Supplemental Update Covering Fiscal Years 2019 and 2020,* at 3–5 (July 21, 2020), *https://www.ice.gov/doclib/about/offices/ero/pdf/iceLanguageAccessPlanSupplemental2020.pdf;* ICE, *Language Access Plan,* at 7, 10, 13 (June 14, 2015), *https://www.ice.gov/sites/default/files/documents/Document/2015/LanguageAccessPlan.pdf.*

[322] *See, e.g.,* ICE, *6.3 Law Libraries and Legal Material,* at 422 (revised Dec. 2016), *https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf.*

[323] ICE, *Detention Management, National Detainee Handbook* (Sept. 4, 2024), *https://www.ice.gov/detain/detention-management/national-detainee-handbook.*

[324] *Id.*

[325] ICE, *National Detainee Handbook,* at 9, 16 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf* (''You have the right to ask for relief from removal based on various legal grounds if you believe you qualify. These might include cancellation of removal, adjustment of status, asylum, withholding of removal, or relief under the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. For example, you have the right to ask for asylum to stay in the U.S. if you were (or are afraid that you will be) persecuted in your native country or a country where you last lived because of your race, religion, nationality, political opinion, or membership in a particular social group.'').

[326] *Id.* at 16.

STB_AR1_000090

asylum, statutory withholding of removal, and CAT protection claims should be adjudicated in full removal proceedings before an IJ, as such claims are complex and require robust processes with more procedural safeguards. Commenters noted a number of issues that would make it difficult for noncitizens to provide the specific evidence required to establish a reasonable probability under this rule, including the inability to obtain counsel during the credible fear process; being interviewed shortly after arriving in the United States; difficulties sharing information due to trauma, exhaustion, or translation availability; additional stress placed on vulnerable populations; detention status; challenges surrounding placement into the non-detained Family Expedited Removal Management (''FERM'') process, such as challenges involving children attending credible fear interviews and difficulty obtaining Indigenous language interpreters; and difficulties procuring documentary evidence, expert opinions, or witnesses.

*Response:* The Departments disagree with commenters that the rule's reasonable probability screening standard for statutory withholding of removal and CAT claims is too high and decline to make changes to the standard. The Departments believe the reasonable probability screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

To start, and as discussed in Section III.A.1 of this preamble, the Departments note that the ''reasonable probability'' standard neither affects nor changes the ''significant possibility'' standard used to screen for asylum eligibility, which is set by statute and remains in effect for asylum claims in the credible fear process. *See* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (a credible fear of persecution ''means that there is a significant possibility'' that a noncitizen could establish eligibility for asylum). Commenter concerns about changes to the statutory ''significant possibility'' standard are therefore misplaced.

While Congress clearly expressed its intent that the ''significant possibility'' standard be used to screen asylum claims, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening

procedures are to be employed with respect to statutory withholding of removal and CAT protection. The Departments therefore have some discretion to articulate the screening standard for such claims. And in the context of the emergency border circumstances described in the IFR and this rule, the Departments believe the ''reasonable probability'' screening standard better captures the population of noncitizens with potentially valid claims and is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection.

As explained in the IFR and the June 3 Proclamation, resource limitations, outdated laws, and significantly elevated encounter levels at the southern border have made it difficult for the Departments to quickly grant relief or protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. In light of the emergency border circumstances outlined in the June 3 Proclamation, the IFR, and this rule, the goal of this rule is to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross our border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. The Departments believe that imposing a ''reasonable probability'' screening standard for statutory withholding of removal and CAT protection is needed to further this goal and is consistent with all statutory and regulatory requirements and the United States' international law obligations.

Specifically, the elevated ''reasonable probability'' screening standard will better allow the Departments to screen out claims that are unlikely to be meritorious, as the higher screening standard is more proportional to the ultimate burdens of proof for statutory withholding of removal and CAT protection, which are each higher than that for asylum. *See, e.g.,* 89 FR at 48747 (noting that the higher screening standard will help better predict the likelihood of success on the ultimate application for relief or protection); *see also* Regulations Governing the Convention Against Torture, 64 FR at 8485 (applying a higher screening standard for statutory withholding of removal and CAT protection in the reasonable fear context ''[b]ecause the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution)''). Identifying non-meritorious claims early

in the process is an important deterrent to disincentivize noncitizens from making the perilous journey to the United States under the belief that they will be released and able to remain in the United States for a significant period, or indefinitely. Instead, under this rule, those who do not establish eligibility for statutory withholding of removal or CAT protection under the ''reasonable probability'' standard will be swiftly removed rather than being released into the United States to potentially wait years for a hearing. This will also allow the Departments to focus limited resources on processing of those who are most likely to be persecuted or tortured if removed, and to more quickly provide stability and benefits to noncitizens whose asylum claims are granted. *See, e.g.,* INA 209, 8 U.S.C. 1159 (''Adjustment of status of refugees'').

The Departments made a similar determination in the Circumvention of Lawful Pathways rule in implementing the ''reasonable possibility'' standard for statutory withholding of removal and CAT protection for noncitizens subject to that rule. *See* 88 FR at 31336 (noting that the heightened standard would help in ''reducing the strain on the immigration courts by screening out and removing those with non-meritorious claims more quickly''). That determination has been subsequently validated, as the elevated standard for statutory withholding of removal and CAT protection in credible fear screenings under the Circumvention of Lawful Pathways rule resulted in an approximately 30 percent decrease in positive credible fear findings. *See* 89 FR at 48745–46 (providing Circumvention of Lawful Pathways data).

The Departments recognize that, as identified by commenters, noncitizens may face difficulties in their journeys to the United States and in presenting their claims during credible fear screenings. However, the statutory expedited removal process is predicated on the requirement that noncitizens must explain their fear during a credible fear screening. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B) (implementing credible fear ''[a]sylum interviews,'' to include ''material facts as stated by the applicant''). As part of this threshold screening, the ''reasonable probability'' standard is not intended to be an insurmountable hurdle; rather, it requires noncitizens to provide greater specificity in their testimony related to their claim than that which might be sufficient to meet the ''reasonable possibility'' or ''significant possibility'' screening standards. *See* 89 FR at

48746–48 (explaining that ''the new standard requires a greater specificity of the claim in the noncitizen's testimony''). This greater specificity is intended to be straightforward for noncitizens to provide, as it entails answering standard credible fear screening questions, such as variations of the following questions: Why do you fear return to the country of removal? Who do you believe would harm you if you were removed from the United States? Have you been previously harmed in the country of removal? If so, why were you harmed? Having the noncitizen answer these types of questions with greater specificity is not intended to require legal expertise and instead seeks to have communicated relevant personal facts and circumstances within the noncitizen's knowledge. Moreover, such evidence is generally provided through testimony at the credible fear screening stage, and credible testimony alone can satisfy the noncitizen's burden. *See, e.g.,* 89 FR at 48746.

Furthermore, to the extent that commenters expressed concerns about the compounding effects of trauma resulting in difficulty expressing fear, less time for consultation, and the need to meet a ''reasonable probability'' standard at the screening stage, the Departments note that AOs have significant training and experience in engaging in non-adversarial interview techniques, working with interpreters, cross-cultural communication, and eliciting information from trauma survivors and other vulnerable populations.[327] As discussed at greater length at section III.B.2.a.ii(2) of this preamble, while the length of the consultation period is outside the scope of this rulemaking, this rule ensures that noncitizens are provided with all of the rights due to them under the statutory expedited removal and credible fear processes, including the right to consult with a legal representative or other individual of their choosing prior to the credible fear interview and to have such an individual present during their credible fear interview, provided it will not unreasonably delay the process. *See* INA 235(b)(1)(B)(iv), 8 U.S.C.

1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). AOs apply the same training and draw from the same breadth of experience in eliciting testimony and conducting non-adversarial interviews described above regardless of the screening standard that is being applied. Noncitizens are not expected to have legal knowledge or to be familiar with specific standards or elements related to a persecution or torture screening; rather, they are only expected to truthfully testify about their claim and testimony alone can be sufficient to support a positive fear determination.

The Departments take seriously concerns raised by commenters related specifically to difficulties faced by families in the non-detained FERM process, including children attending credible fear interviews and challenges obtaining Indigenous language interpreters. Where issues arise in non-detained credible fear interviews in the FERM process, just as when issues arise in any interview, AOs and supervisory AOs tap into their extensive training and experience and follow existing procedures to address the issue.[328] USCIS has established procedures in place in order to obtain interpreters of rare languages for credible fear interviews and ensure appropriate steps are taken where an interpreter is not available, including issuing a discretionary NTA where warranted. And while there are inherent challenges in conducting non-detained interviews with families, including attending to children during an interview, these issues are not unique to the FERM process. They are issues dealt with during interviews where children may be present in various situations, including affirmative asylum interviews; and AOs, supervisory AOs, and asylum office staff handle these issues as they arise in various circumstances. Whether the credible fear interview is taking place in a detained setting or is taking place in a non-detained setting as part of the FERM process, AOs apply their extensive training related to non-adversarial interviewing, combined with their substantive legal training, to make a determination as to whether a noncitizen meets the given screening standard. Additionally, all credible fear determinations must be reviewed by a supervisory AO before they become final. 8 CFR 208.30(e)(8).

Moreover, as provided by statute and as the IFR makes clear, noncitizens have a right to request review by an IJ of the AO's credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b)(1); 89 FR at 48748. Where it is requested, the IJ conducts a de novo review of the negative credible fear determination, including the application of the rule's limitation on asylum eligibility and possible exceptions to that limitation. 8 CFR 1208.35(b). Importantly, noncitizens will have additional time to consult with other persons prior to this review. 8 CFR 235.15(b)(4) (requiring written disclosure of a noncitizen's right to consult with other persons prior to an interview or any review thereof). During such review, noncitizens will have the opportunity to make statements in support of their claims, and IJs may also consider other such facts as are known to the IJ. *See* 8 CFR 1003.42(c)–(d); *see also* Immigration Court Practice Manual ch. 7.4(d)(4)(E), *https://www.justice.gov/ eoir/reference-materials/ic/chapter-7/4* (noting that ''[e]ither the noncitizen or DHS may introduce oral or written statements'' during a credible fear review). IJs have significant training and experience in eliciting testimony from individuals who have experienced trauma and developing the record accordingly.[329] As further explained in the IFR, AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards. As such, they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the

---

[327] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing— Eliciting Testimony* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing— Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[328] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024).

[329] *See* 8 CFR 1003.0(b)(1)(vii) (authorizing the provision of comprehensive training and support to IJs); 8 CFR 1003.9(b)(2) (authorizing the Chief IJ to provide ''appropriate training . . . on the conduct of their powers and duties''); *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/ eoir/page/file/1513996/dl?inline;* DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

STB_AR1_000092

merits stage. *See* 89 FR at 48747. In sum, the Departments believe the procedural safeguards in place that comport with all statutory requirements and the extensive training and experience of AOs, supervisory AOs, and IJs in conducting screening interviews and making and reviewing fear determinations will ensure that noncitizens in the credible fear process, including those experiencing the effects of trauma and other vulnerable populations, will be screened for potential claims in a sensitive and fair manner at the applicable fear standard.

*Comment:* Commenters stated that the rule's "reasonable probability" definition—which requires "substantially more than a 'reasonable possibility,' but somewhat less than more likely than not"—is vague and amorphous; overly subjective; and lacks interpretive guidance or similar usage in other comparative contexts. Commenters stated that the definition would result in inconsistent application due to a lack of meaningful instruction for AOs and IJs, who would instead rely on their own discretion.

*Response:* The Departments believe that the "reasonable probability" definition set forth in the IFR, which comparatively references the "reasonable possibility" and "more likely than not" legal standards, provides adequate guidance for AOs and IJs and noncitizens to understand the level of evidentiary proof needed to satisfy the threshold credible fear screening process. Both "reasonable possibility" and "more likely than not" are longstanding legal standards familiar to AOs and IJs and representatives, so implementing a new "reasonable probability" standard that falls between those two existing standards provides a stable benchmark for determining whether the new standard has been satisfied. *See, e.g.,* 8 CFR 208.13(b)(1)(iii)(B), 1208.13(b)(1)(iii)(B) ("reasonable possibility" standard); 8 CFR 208.16(b)(2), 1208.16(b)(2) ("more likely than not" standard). AOs and IJs also receive training on the applicable legal screening standards.[330]

Moreover, as explained in the IFR, evaluating evidence under both the "reasonable probability" standard and the "reasonable possibility" standard remains the same, "save for the degree of specificity required." 89 FR at 48747; *see also id.* at 48746 (explaining the difference between the two standards "as being that the new standard requires

a greater specificity of the claim in the noncitizen's testimony"). Indeed, USCIS AOs and supervisory AOs have applied this new standard in a manner that is consistent with expectations, resulting in a somewhat, but not drastically, lower screen-in rate for USBP credible fear cases screened by USCIS under the IFR (51 percent for all fear screening cases subject to the rule, including 48 percent of those screened under the "reasonable probability" standard)[331] than USBP credible fear cases screened by USCIS under the Circumvention of Lawful Pathways rule (54 percent overall, including 51 percent of those screened under the: reasonable possibility" standard).[332] In addition, during credible fear reviews overall, IJs have vacated negative credible fear determinations under the IFR at a much lower rate than under the Circumventing Legal Pathways rule.[333]

*Comment:* Commenters stated that an additional "reasonable probability" screening standard in the credible fear process will lead to confusion amongst adjudicators. Commenters explained that there are now three different legal standards in credible fear screenings—significant possibility, reasonable possibility, and reasonable probability—all of which could be applicable in some cases. Moreover, commenters noted that the governing standards might change depending on whether emergency border circumstances are in effect under this rule. Commenters were concerned that multiple standards would lead to AOs and IJs applying the wrong standard, or conflating the requirements of each standard, which could result in potential refoulement because there will be few mechanisms for accountability if a mistake occurs.

Commenters also stated that adding another screening standard is inefficient, as AOs and IJs will need to

determine which standard applies to each aspect of a case. Commenters also noted that this will require more resources from legal organizations to gather necessary evidence.

*Response:* The Departments disagree with commenters' claims that the "reasonable probability" screening standard for statutory withholding of removal and CAT protection will result in confusion or adjudication errors or would otherwise be inefficient. AOs and IJs regularly work with various standards, and determine which standards apply, in the course of their adjudications, such as the "extraordinary circumstances" standard to determine whether an asylum applicant qualifies for an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), and the discretionary "compelling reasons" standard to determine whether an applicant who has suffered past persecution but lacks a well-founded fear of future persecution should be granted asylum in the exercise of discretion, *see* 8 CFR 208.13(b)(1)(iii)(A), 1208.13(b)(1)(iii)(A). Indeed, deciding which legal standard applies is a critical aspect of the role of AOs and IJs. *See* 8 CFR 1003.10(b).

Further, AOs and IJs have significant training and experience in eliciting testimony and applying evidentiary standards in immigration proceedings. *See, e.g.,* 89 FR at 48747. The Departments are similarly confident that AOs and IJs will efficiently apply the "reasonable probability" standard, which is similar to the "significant possibility" and "reasonable possibility" standards. *See id.* at 48748 (explaining that the reasonable probability standard "is not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis" but is rather "a matter of degree"). Further, credible fear determinations are reviewed by a supervisory AO before they become final to ensure consistency and quality and are subject to de novo review by an IJ if a noncitizen requests such review. *See* 8 CFR 208.30(e)(8), 1208.35(b); 89 FR at 48748. Additionally, to avoid confusion, any changes regarding the applicability of emergency border circumstances are communicated to AOs, IJs, and the public, and have been made publicly available since the June 3 Proclamation and publication of the IFR.[334]

For comparison, under the Circumvention of Lawful Pathways rule,

---

[330] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Evidence* 20–26 (Apr. 24, 2024); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[331] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab). Data are limited to SWB encounters between POEs. The total rate excludes cases referred for fear screening but determined by USCIS not to be subject to the IFR.

[332] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab). The overall rate includes Mexican nationals (even though they are not technically covered by the rule) and excludes cases referred for fear screening but determined by USCIS not to be subject to the Circumvention of Lawful Pathways rule. Data are limited to SWB encounters between POEs.

[333] *See* OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (IFR ERCF tab and Imm Post-Pandemic ERCF tab). During the immediate post-pandemic period, OHSS estimates that IJs vacated 16 percent of negative fear credible fear interviews resulting from USBP ER cases, and 6 percent of all credible fear interviews; under the IFR the corresponding rates for USBP ER cases through July 31, 2024, were 9 percent and 4 percent.

[334] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws.*

STB_AR1_000093

AOs and IJs have successfully applied the "significant possibility" screening standard to asylum claims and the "reasonable possibility" screening standard to statutory withholding of removal and CAT protection claims since its implementation. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). And for several months, AOs and IJs have successfully applied the "reasonable probability" standard in screenings under the IFR. Therefore, the Departments believe that AOs and IJs can continue to apply the "reasonable probability" standard implemented in this rule.

With regard to concerns from legal service organizations about gathering additional evidence under the "reasonable probability" standard, the Departments again reiterate that the relevant evidence largely remains the same, and simply requires more specificity. *See* 89 FR at 48746–47. Much of this specificity is likely to come through the noncitizen's testimony, which will require the noncitizen to describe why they, in particular, are likely to be harmed or threatened with harm. This testimony focuses on relevant personal facts and circumstances within the noncitizen's knowledge, which should not significantly increase the burden of production on the noncitizen or legal service providers.

*Comment:* Commenters raised concerns with the IFR's justifications for implementing the "reasonable probability" standard.

Commenters argued that the ultimate asylum grant rate should not be the sole justification for implementing the "reasonable probability" standard. Commenters noted that the disparity between positive credible fear determinations and ultimate asylum grant rates itself was not a reason to raise the credible fear screening standard. Commenters explained that the credible fear screening threshold was intended to be low to avoid refoulement and, therefore, the credible fear screening passage rate should necessarily be higher than the ultimate asylum grant rate.

Commenters also believed the IFR relied on misleading statistics in claiming that the screening standard should be raised because the credible fear screening passage rate was significantly higher than the ultimate asylum grant rate in removal proceedings. Commenters explained that the ultimate asylum grant rate statistic in removal proceedings includes all disposition types—not just grants and denials—and also includes factors such as a lack of counsel, poor translation, and variable IJ grant rates, which does not necessarily mean that the asylum claim itself was insufficient. Moreover, commenters pointed to additional EOIR statistics, which they stated showed that the ultimate asylum grant rates were higher than portrayed in the IFR.

Commenters also stated that the Departments did not adequately explain why they imposed a higher screening standard in this rule while, in the previous Asylum Processing IFR (87 FR 18078), the Departments argued that the "significant possibility" standard was preferable for screening statutory withholding of removal and CAT protection claims. Separately, commenters argued that the "reasonable probability" standard would not meet the IFR's stated goals of deterring irregular migration, asserting that the Circumvention of Lawful Pathways rule's increased screening standard did not "significantly lower" the credible fear passage rate. Lastly, commenters stated that the Departments did not consider that deterrence-based policies, such as a heightened standard, only result in temporary reductions in border crossings.

*Response:* The Departments disagree with objections to the IFR's justifications supporting the "reasonable probability" standard.

First, the Departments disagree that the disparity between the credible fear screening passage rate and ultimate asylum grant rate is irrelevant or should not be relied upon. This disparity is a clear indication of how many positive credible fear determinations ultimately translate into grants of asylum relief. The Departments understand that the credible fear screening process is only a threshold determination and will, by design, result in asylum claims that meet the initial screening standard but fail during the ultimate merits adjudication. However, for purposes of the IFR, the Departments cited to this disparity to explain that such a wide disparity ultimately indicates a screening process that is excessively overinclusive, resulting in a large number of non-meritorious asylum claims increasing adjudicatory backlogs. *See* 89 FR at 48746 (explaining that, under the Circumvention of Lawful Pathways rule, the "screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule" and that, under the IFR, the existence of emergency border circumstances necessitates focusing limited resources on "processing those

who are most likely to be persecuted or tortured if removed").

The Departments also disagree that any cited statistics in the IFR regarding asylum grant rates in section 240 removal proceedings are misleading. While commenters are correct that section 240 removal proceedings may be completed without an ultimate adjudication on an asylum application (such as through dismissal or termination of proceedings), EOIR data are consistent that, for completed cases, only a small percentage of asylum claims referred from the credible fear process are ultimately granted in section 240 removal proceedings, which was a relevant concern underlying the IFR's justification for the heightened "reasonable probability" standard.[335] For example, in 2023, only 18 percent of referred asylum claims ultimately resulted in an asylum grant at the completion of section 240 removal proceedings, even when excluding cases that were administratively closed or did not have the asylum claim adjudicated.[336] Moreover, the Departments note that the data also demonstrate that a large percentage of completed cases without an ultimate asylum adjudication of grant or denial involve noncitizens who have never filed an asylum application once placed in section 240 removal proceedings.[337] Additionally, to the extent that section 240 removal proceedings are terminated before an asylum application is adjudicated, the termination does not necessarily have any bearing on the ultimate strength or weakness of the asylum claim.

In response to commenters' concerns regarding the Departments' decision in the 2022 Asylum Processing IFR to maintain the "significant possibility" screening standard for statutory withholding of removal and CAT protection, the Departments note that they addressed these concerns in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31336. In response to similar comments on that rule, the Departments explained that "the current and impending situation on the ground along the SWB warrants departing in some respects from the approach generally applied in credible fear screenings" and that the "Asylum Processing IFR was designed for non-exigent circumstances." *Id.* Similarly, as explained in the IFR and this rule, prior to implementation of the IFR, migration

---

[335] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline.*
[336] *See id.*
[337] *See id.*

patterns and other factors resulting in emergency border circumstances had only intensified, thereby necessitating a further change to the relevant credible fear screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48724 ("While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration."); *see also supra* Section II.A.1 ("Basis for the IFR").

Lastly, the Departments disagree with commenters regarding the overall efficacy of this rule and of the "reasonable probability" standard in particular. Contrary to commenters' claims, the Departments have seen a significant decrease in the credible fear screen-in rate since the Circumvention of Lawful Pathways rule's implementation of the "reasonable possibility" standard, and a further decrease since the IFR's implementation of the "reasonable probability" standard. *See* 89 FR at 48745–46 (showing a 31 percent decrease in the screen-in rate under the Circumvention of Lawful Pathways rule); *see also* Section II.A.2 of this preamble (providing statistics on the IFR's efficacy to date). The Departments also disagree that deterrence-based policies have only temporary or limited effects, but they do note that deterrence is only one part of an overall border and migration strategy that can help to better manage migratory flows. *See* 89 FR at 48729–30 (explaining that DHS's migration strategy focuses on "enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy").

Overall, the Departments believe that the screening standard changes made in this rule will help better manage an overwhelmed immigration system, while also noting that, as explained in IFR, this rule is only a piece of broader efforts that will likely require further congressional action. *See* 89 FR at 48715 ("Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.").

*Comment:* Commenters noted that the "reasonable probability" standard could also apply in the context of the consideration of mandatory asylum bars as proposed in a separate DHS rulemaking, Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024) ("Mandatory Bars NPRM"). Commenters stated that the Departments should not apply the "reasonable probability" standard to noncitizens found to be barred from asylum due to a mandatory bar, noting the Mandatory Bars NPRM.

*Response:* The Departments agree with commenters that the "reasonable probability" standard may apply in the context of consideration of mandatory bars if DHS finalizes the DHS Mandatory Bars NPRM as proposed, as the Departments noted in the IFR. *See* 89 FR at 48739 n.186 (explaining that, if the DHS Mandatory Bars NPRM is finalized, the "reasonable probability" standard would still apply when a noncitizen is subject to this rule's limitation on asylum eligibility).

The Departments decline to amend the "reasonable probability" standard so that it would not apply to considerations of mandatory bars. First, as stated above in this section, the Departments have determined that a higher "reasonable probability" standard is needed in light of the emergency border circumstances. Accordingly, the Departments decline to make edits to reduce the standard's applicability. If DHS ultimately decides to consider the mandatory bars as part of fear screenings under the steady-state regulations and the Circumvention of Lawful Pathways rule, it would be appropriate for DHS to consider those bars under this rule as well, also under a "reasonable probability" standard. *See* 8 CFR 208.35(b)(2)(i). This would be consistent with the overall purpose of the DHS Mandatory Bars NPRM. *See* 89 FR at 41351 (explaining that the proposed rule "is consistent with the Administration's demonstrated record of providing operators maximum flexibility and tools to apply consequences, including by more expeditiously removing those without a lawful basis to remain in the United States, while providing immigration relief or protection to those who merit it at the earliest point possible" and that the proposed rule would "allow DHS to quickly screen out certain non-meritorious protection claims and to swiftly remove those noncitizens who present a national security or public safety concern").

### 4. Other Comments on the Regulatory Provisions

#### a. Application to Mexican Nationals

*Comment:* Commenters raised several concerns regarding the applicability of the IFR's limitation on asylum eligibility to Mexican nationals. Generally, commenters argued that Mexican asylum seekers should be exempt from the rule's limitation on asylum eligibility and should not be forced to wait in Mexico, the country where they fear persecution or torture, during emergency border circumstances. Commenters stated that requiring Mexican asylum seekers to wait in the country where they claim to face persecution is tantamount to refoulement in violation of international law and would further expose them to the threat of future harm. Similarly, commenters stated that Mexican nationals cannot be expected to apply for asylum in Mexico—the country where they are claiming harm—which commenters explained was a "common-sense principle" that the Departments abandoned in the IFR.

Relatedly, commenters stated that the Departments' available pathways to pursue asylum, including the CBP One app, are too limited for Mexican nationals, who would be exposed to an increased risk of persecution if forced to wait in Mexico for the ability to pursue asylum. Commenters expressed further concerns about the rule's lack of exceptions, including that, if the IFR's exceptions are intended to "mirror" the Circumvention of Lawful Pathways rule, it is "unfair and dangerous" for the IFR to apply to Mexican nationals, and that the IFR's requirements would "trap" Mexican nationals in the country of alleged persecution in violation of international law and non-refoulement obligations.

*Response:* The Departments decline to change the rule's applicability to Mexican nationals, as excepting Mexican nationals from the rule would undermine the rule's foundational purpose to alleviate strain on border security and immigration systems while entry is suspended and limited under the Proclamation. *See* 89 FR at 48738–39. The strains that resulted in emergency border circumstances and necessitated implementation of the IFR were driven in part by a recent sharp increase in Mexican nationals processed for expedited removal and referred for credible fear interviews. *Id.* The Departments believe that these emergency border circumstances weigh heavily in favor of applying the rule to Mexican nationals in order to better process increased inflows of Mexican nationals and return border processing to more manageable levels.

Moreover, the rule's applicability to Mexican nationals does not violate non-refoulement obligations because the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory

withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). All noncitizens, including Mexican nationals, maintain the opportunity to make a threshold showing for statutory withholding of removal and CAT protections during the credible fear screening process, as the rule's limitation on asylum eligibility does not extend to those forms of protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2).

The Departments also disagree that Mexican nationals do not have sufficient paths for seeking relief or protection in the United States. First, Mexican nationals may avail themselves of lawful, safe, and orderly pathways to the United States, such as making an appointment through the CBP One app. *See, e.g.,* 8 CFR 208.33(a)(2)(ii)(B); *see also* 89 FR at 48754 (explaining that CBP One appointments create an efficient and orderly process at POEs). To the extent a Mexican national cannot wait in Mexico for a CBP One appointment due to urgent safety concerns, the rule contains an exception for exceptionally compelling circumstances, including for imminent and extreme threats to life or safety. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). This exception maintains the rule's efficacy by ensuring that Mexican nationals with specific, urgent safety needs to enter the United States can do so, while otherwise allowing the rule to apply to those Mexican nationals who, for example, are able to safely wait in another part of Mexico for their appointment. Furthermore, as of August 23, 2024, the Departments note that Mexican nationals are able to request and schedule a CBP One appointment from anywhere within Mexico.[338] This new adjustment to the CBP One app will enable Mexican nationals facing imminent danger in a specific area of Mexico to internally relocate while waiting for their CBP One appointment.[339]

Second, this rule ensures that noncitizens are able to avoid refoulement through the availability of statutory withholding of removal, in addition to CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2). Third, the rule contains a number of provisions that may apply to Mexican nationals. For example, the limitation on asylum eligibility does not apply to groups that are excepted from the suspension and limitation on entry under section 3(b) of

the Proclamation, including UCs. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). The rule also provides an exception for noncitizens who can establish the aforementioned exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Additionally, the rule includes a provision to ensure family unity and avoid potential family separation for certain noncitizens who can establish eligibility for statutory withholding of removal or CAT protection. *See* 8 CFR 208.35(c), 1208.35(c). Taken together, these provisions help ensure that, while some Mexican nationals may not be granted asylum after entering the United States during emergency border circumstances, sufficient options exist for Mexican nationals to pursue available protection and avoid immediate harm.

*Comment:* Commenters stated that the rule's exceptions are inadequate for Mexican nationals. Commenters stated that, for Mexican nationals, the facts underlying their asylum claim would be conflated with the rule's exception for an ''imminent and extreme threat to life or safety.'' According to commenters, in practice, this would result in Mexican nationals having to essentially present their full asylum claim to establish the exception.

*Response:* If a Mexican national is unable to remain in Mexico while awaiting a CBP One appointment due to an imminent and extreme threat of harm, the rule provides an exception for exceptionally compelling circumstances, in order to provide a potential avenue for the Mexican national to avoid application of the rule's limitation on asylum eligibility. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments disagree that this exception for noncitizens who demonstrate exceptionally compelling circumstances is inadequate for Mexican nationals.

The Departments clarify that the analysis to determine whether any noncitizen—including a Mexican national—has demonstrated exceptionally compelling circumstances based on an ''imminent and extreme threat to life or safety'' at the time of entry is separate from the ultimate determination regarding the merits of a noncitizen's asylum claim, even if, in certain circumstances, some of the same facts underlying a Mexican national's asylum claim may also be relevant to a determination on the rule's exception. For purposes of the ''imminent and extreme threat to life or safety'' exception, noncitizens need only provide evidence focused on threats that the noncitizen faced at the time they

crossed the SWB, such that the noncitizen could not wait for an opportunity to present at a POE. *See, e.g.,* 88 FR at 11723 (explaining operation of similar ground for rebutting presumption of ineligibility for asylum under the Circumvention of Lawful Pathways rule). In contrast, for the asylum claim itself, the noncitizen must demonstrate that they otherwise have a credible fear of persecution or torture during credible fear proceedings and, during a full merits adjudication, that they satisfy the eligibility requirements for asylum. *See* 8 CFR 208.35(b)(1)(iii), 1208.35(b)(2)(ii) (directing AOs and IJs to proceed under 8 CFR 208.30 and 1208.30, respectively, in credible fear proceedings where a noncitizen has established the exception to the limitation on asylum eligibility based on exceptionally compelling circumstances); *see generally* 8 CFR 208.13, 1208.13 (describing asylum eligibility requirements).

Relatedly, the Departments also clarify that the ''exceptionally compelling circumstances'' exception is applied during the credible fear process, and not during any initial border encounter with CBP. *See* 8 CFR 208.35(b) (''Application in credible fear determinations.'').

*Comment:* Commenters stated that the rule discriminates against Mexican nationals, both in intent and effect. Commenters stated that, by comparison, the rule is more restrictive than prior Departmental policies, including the Circumvention of Lawful Pathways rule and the now-defunct MPP, which specifically exempted Mexican nationals. Thus, commenters stated, this rule was issued to limit the entry of Mexican nationals and would result in more drastic consequences for Mexican nationals than those other rules and policies. Furthermore, commenters argued that, because the Circumvention of Lawful Pathways rule does not apply to Mexican nationals, there will be significant confusion in applying these rules together during the credible fear process.

*Response:* The Departments disagree with commenters' assertions that this rule discriminates against Mexican nationals. Commenters stated that the discriminatory intent and purpose is evidenced by the Circumvention of Lawful Pathways rule's comparative inapplicability to Mexican nationals. However, the Departments emphasize that this rule and the Circumvention of Lawful Pathways rule serve different objectives. For example, unlike with respect to this rule, traveling through a third country is a key requirement of the Circumvention of Lawful Pathways rule

---

[338] *See* CBP, *CBP One™ Mobile Application: Recent Updates* (last modified Sept. 23, 2024), https://www.cbp.gov/about/mobile-apps-directory/cbpone.

[339] *See id.*

STB_AR1_000096

because requiring that noncitizens apply for protection in a third country is one means for providing protection in the United States where necessary while also sharing the responsibility of providing necessary protections with the United States' regional partners. *See* 8 CFR 208.33(a)(1)(iii); 1208.33(a)(1)(iii); 88 FR at 31316. Thus, the Circumvention of Lawful Pathways rule generally does not apply to Mexican nationals residing in Mexico, who would not need to travel through another country to reach the United States. To the contrary, this rule applies uniformly to all noncitizens who enter the United States at the southern border during emergency border circumstances and are not excepted under the June 3 Proclamation or able to establish exceptionally compelling circumstances, without consideration of the path of transit to the southern border. *See* 8 CFR 208.13(g), 1208.13(g).

Additionally, since the implementation of the Circumvention of Lawful Pathways rule, emergency border circumstances dictate applying the rule broadly in order to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross the southern border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. As relevant here, the United States saw a sharp increase in the number of encounters of Mexican nationals at the SWB during the COVID–19 pandemic prior to implementation of the Circumvention of Lawful Pathways rule, which continued into the immediate post-pandemic period.[340] During the same period, the United States saw a corresponding increase in credible fear referrals, which necessitates applying the rule to Mexican nationals. *See id.* at 48738.

Moreover, the Departments do not believe that the rule's broad applicability will cause confusion, as the rule maintains a straightforward application to noncitizens who enter the United States at the southern border during periods of emergency border circumstances and are not excepted under the Proclamation or able to establish exceptionally compelling circumstances.

*Comment:* Commenters stated that the rule's expediency justification for subjecting Mexican nationals to the limitation on asylum eligibility is insufficient. Commenters argued that the statistics provided in the IFR cannot justify extending the limitation on asylum eligibility to Mexican nationals,

noting that statistics evincing recent increases in Mexican nationals making fear claims indicate increasingly dangerous conditions in Mexico and an increased need for protection. Another commenter claimed that applying the rule to Mexican nationals is contrary to the record before the agency because, according to the commenter's characterization of that record, encounters of Mexican nationals have actually declined significantly. Similarly, a commenter objected that the IFR subjects Mexican nationals fleeing persecution to extensive stays in Mexico if they wish to seek asylum in the United States, but fails to consider the impact on Mexican nationals or provide any rationale for that result.

*Response:* The Departments have considered the commenters' concerns and reaffirm the justifications for applying the IFR's limitation on asylum eligibility to Mexican nationals. The foundational basis of the June 3 Proclamation and the IFR is to address substantial migration levels at the southern border, including a "sharp increase" in SWB encounters of Mexican nationals. *See, e.g.,* 89 FR at 48726–27; *id.* at 48738. Addressing these migration levels, and their significant impact on border processing and the United States' immigration system more broadly, thereby necessitates applying the rule's limitation on asylum eligibility to all noncitizens, with limited exception, who enter the United States across the southern border during emergency border circumstances, including Mexican nationals.

The Departments believe the cited data fully support the rule's application to Mexican nationals. Departmental data show that excluding Mexican nationals would undermine the rule's deterrent effect, as Mexican nationals comprise the largest portion of recent (post-IFR) SWB encounters between POEs, at approximately 41 percent.[341] And, contrary to one commenter's claim, the data in the IFR did not show a decline in encounters of Mexican nationals. Rather, the Departments explained that, since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from northern Central American countries, and then to single adults and families from throughout the hemisphere (and beyond), many of whom are more likely to seek asylum and other forms of protection. *See* 89 FR at 48721. The Departments further explained that, as the demographics of border encounters

have shifted in recent years to include a higher rate of Mexican nationals claiming fear, in addition to larger encounter numbers of other nationalities with high historical rates of asserting fear claims, the deterrent effect of apprehending noncitizens at the SWB has become more limited. *See id.* at 48731 n.167 (explaining that for noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for a determination, whereas from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024). Given this demonstrated increase in encounters of, and fear claims made by, Mexican nationals, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems during emergency border circumstances. Without broad application, the practical result would be that those with meritorious claims would wait years for their claims to be granted, while noncitizens who are ultimately denied protection potentially would spend years in the United States before being issued a final order of removal.

*Comment:* Commenters stated that not creating an exception for Mexican nationals is especially concerning for vulnerable Mexican nationals, including people fleeing gang and cartel violence or other severe forms of violence, women, members of the LGBTQI+ community, those escaping sexual and gender-based violence, children, families, Indigenous people, journalists, and activists, among others. Commenters explained that violence against these vulnerable populations is endemic in Mexico and has been recognized by the Departments, including through individual asylum adjudications. Therefore, the commenters stated that it is concerning that the IFR does not except these vulnerable populations despite the clear need to prevent further harm and mitigate past harms suffered.

*Response:* Regarding concerns about specific vulnerable populations of Mexican nationals, the Departments emphasize that agents and officers frequently encounter noncitizens who may be vulnerable and are trained on appropriate action. *See* 89 FR at 48744–

---

[340] *See* OHSS analysis of July 2024 Persist Dataset (USPB Encounters by Citizenship tab).

[341] *See id.*

45. Moreover, the rule contains an explicit exception for exceptionally compelling circumstances that is intended to limit potential adverse effects of the rule's limitation on asylum eligibility, including on uniquely vulnerable populations. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may qualify for the exception if the noncitizen faces an imminent and extreme threat to the noncitizen's life or safety immediately prior to entry into the United States. *See id.*

b. Adequacy of Statutory Withholding of Removal and CAT Protection

*Comment:* Commenters stated that statutory withholding of removal and CAT protection are insufficient alternative forms of protection for noncitizens who would be ineligible for asylum under the rule, asserting that these forms of protection are more difficult to obtain and provide fewer benefits than asylum.

First, commenters explained that statutory withholding of removal and CAT protection require noncitizens to meet a higher burden of proof than asylum and that, ultimately, these higher burdens will result in more noncitizens being denied protection under the rule.

Second, commenters stated that, even if noncitizens were able to meet the higher burden of proof for statutory withholding of removal or CAT protection, the noncitizen would not be accorded the same benefits as asylees. For example, commenters stated that recipients of statutory withholding of removal and CAT protection are subject to the continued risk of removal; cannot petition for derivative beneficiaries; are unable to apply for permanent residency or citizenship; are unable to travel abroad; and must apply annually for work authorization, which commenters claimed is subject to frequent adjudicatory delays. As a result, commenters argued that recipients of statutory withholding of removal and CAT protection are left in an uncertain status incongruent with the United States' obligations to protect refugees; that such status would lead to community instability in the United States, as it prevents noncitizens from investing in their communities and fully recovering from harm; and that such status would fail to ensure family unity—and even promote family separation—due to an inability to petition for derivative beneficiaries.

Further, commenters argued that the Departments cannot meet their non-refoulement obligations with statutory withholding of removal or CAT

protections alone, stating that neither statutory withholding of removal nor CAT protections are equivalent to asylum because those protections do not convey rights guaranteed by the Refugee Protocol or meet the goals of the Refugee Convention. Those commenters said that the United States must comply with the Refugee Convention in its entirety, not only with Article 33. For example, commenters said that the United States is obligated to comply with Article 34 of the Refugee Convention and facilitate the integration and naturalization of refugees.

Lastly, commenters claimed that noncitizens who attempt to pursue statutory withholding of removal or CAT protection under the rule would increase confusion in their interactions with DHS, particularly due to the rule's interactions with other rulemakings.

*Response:* As an initial matter, the Departments reiterate that this rule fully complies with the United States' non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol), which the United States implements through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* Section III.A.1.d of this preamble. This rule's limitation on asylum eligibility does not affect a noncitizen's ultimate eligibility for statutory withholding of removal. *See* 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(i) (requiring an AO to assess a noncitizen's eligibility for statutory withholding of removal and CAT protection when applicable). Similarly, this rule's implementation of the "reasonable probability" screening standard is well within the Departments' broad discretion to determine which screening standard should apply in implementing the United States' non-refoulement obligations. *See* 89 FR at 48740–41.

The rule is similarly compliant with Article 34 of the Refugee Convention, which is precatory and encourages the assimilation and naturalization of refugees. Importantly, although the rule limits asylum eligibility for noncitizens who enter the United States during emergency border circumstances, Article 34 "does not require the implementing authority actually to grant asylum to all those who are eligible." *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987). Indeed, under U.S. law, asylum is a discretionary form of relief. *Id.; see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); 8 CFR 1208.14(a)–(b). Consistent with that authority, the Departments have determined that this rule's limitation on asylum eligibility is necessary to address the emergency border circumstances described in the

IFR. *See* 89 FR at 48726–31. Further, the rule does not preclude the availability of asylum for those to whom the rule does not apply or who demonstrate that exceptionally compelling circumstances exist. For example, noncitizens may utilize the CBP One app to schedule an appointment to present themselves at a POE. *See* June 3 Proclamation Sec. 3(b)(v)(D) (excepting "noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States"); 89 FR at 48737 ("One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum."). Additionally, noncitizens may overcome the limitation on asylum eligibility if they, or a family member as described in 8 CFR 208.30(c) with whom they are traveling, are able to demonstrate exceptionally compelling circumstances by a preponderance of the evidence, such as if they face an acute medical emergency or an imminent and extreme threat to life or safety, among other circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Next, the Departments recognize that the burdens of proof for statutory withholding of removal and CAT protection are higher than that for asylum, as they require a demonstration that it is more likely than not that noncitizens will be persecuted or tortured in another country, while asylum requires that noncitizens demonstrate a lesser burden of proof: a well-founded fear of persecution. *See Cardoza-Fonseca,* 480 U.S. at 423. These higher burdens of proof for those to whom the limitation applies align with the overall purpose of the rule: to disincentivize irregular migration during periods of emergency border circumstances, so as to mitigate the risk that border enforcement operations and the larger immigration system become overwhelmed and unable to issue timely decisions or consequences. *See* 89 FR at 48718 (explaining that the rule is intended to "address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances"). These differences in burdens of proof also correspond with the distinct, but related, objectives of the Circumvention of Lawful Pathways

rule: to encourage noncitizens to avail themselves of lawful, safe, and orderly pathways, where possible, as well as to discourage irregular migration, promote orderly processing at POEs, and ensure that protection is still available for those who satisfy the applicable standards for statutory withholding of removal or CAT protection. *See* 88 FR at 31428. Therefore, if a noncitizen is subject to the rule's limitation on asylum eligibility, being required to meet comparatively higher existing standards for statutory withholding of removal or CAT protection is intended to further disincentivize irregular migration when encounters are above a certain benchmark and to ''substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain.'' 89 FR at 48715; *see also id.* at 48754.

Separately, and as explained in response to similar comments on the Circumvention of Lawful Pathways rule, the Departments also recognize the comparatively fewer benefits of statutory withholding of removal and CAT protection as compared to asylum, including: (1) no permanent right to remain in the United States; (2) the inability to adjust status to become a lawful permanent resident and, relatedly, later naturalize as a U.S. citizen; (3) the inability to travel abroad; and (4) the need to affirmatively apply for, and annually renew, employment authorization documents. *See* 88 FR at 31428. However, the Departments again emphasize that the rule's limitation on asylum eligibility, along with the comparatively fewer benefits of statutory withholding of removal and CAT protection, align with the overall purposes of the June 3 Proclamation and this rule: to address historic levels of migration at the southern border and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718; *id.* at 48726–31.

Moreover, with regard to concerns about the inability of statutory withholding of removal or CAT protection recipients to petition for beneficiary derivatives,[342] this rule contains a family unity provision to help prevent family separation for

noncitizens who can establish eligibility for statutory withholding of removal or CAT withholding. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, the family unity provision treats the following noncitizens as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those (1) who are found eligible for statutory withholding of removal or CAT withholding; (2) who would be eligible for asylum, but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) who have a qualifying spouse or child. *See id.*

Lastly, the Departments do not believe that the ability of a noncitizen to apply for statutory withholding of removal or CAT protection when subject to the rule's limitation on asylum eligibility will cause confusion. Noncitizens have long maintained the ability to pursue such protection, and DHS and EOIR personnel are well-trained in screening for, and adjudicating, such forms of protection. *See* 89 FR at 48748 (explaining that ''AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards'').

### c. Requests for Reconsideration

*Comment:* Several commenters opposed eliminating noncitizens' ability to request reconsideration of a negative credible fear determination by USCIS. Commenters stated that the opportunity to request reconsideration of a negative credible fear determination after IJ concurrence is an important safeguard against non-refoulement. One commenter noted that in the Asylum Processing IFR, the Departments counted at least 569 negative credible fear determinations that were changed to positive credible fear determinations after a request for reconsideration between FY 2019 and 2021. Commenters stated that USCIS should continue the practice of allowing requests for reconsideration, as it may be the only opportunity for noncitizens to present additional evidence that was not presented during the credible fear interview or to correct procedural defects in the credible fear interview, alleging that the IJ review process generally does not provide meaningful review and routinely affirms erroneous

negative credible fear determinations. A commenter also claimed that even with the regulatory language acknowledging that USCIS maintains the discretion to reconsider its own negative credible fear determinations following IJ concurrence, it is unclear under the rule when or how USCIS would exercise its *sua sponte* authority to reconsider a negative credible fear finding.

*Response:* The Departments disagree with comments urging USCIS to allow noncitizens to request reconsideration of negative credible fear determinations under the present rule. This rule does not eliminate the discretionary authority of USCIS to reconsider negative credible fear determinations concurred upon by an IJ, but instead only prohibits noncitizens from submitting a request to reconsider a negative credible fear determination in cases subject to the rule. 8 CFR 208.35(b)(2)(v)(B). The Departments deem it appropriate to include this prohibition against requests for reconsideration in the rule to further its purpose of effectuating efficient yet fair credible fear case processing where emergency border circumstances are present. As noted in prior rulemakings, allowing requests for reconsideration of negative credible fear determinations diverts limited USCIS resources away from initial screenings, and relatively few such requests ultimately result in a reversal of the determination.[343]

The Departments acknowledge that they previously provided information in the Asylum Processing IFR that USCIS counted at least 569 negative credible fear determinations that were reversed after a request for reconsideration was submitted between FY 2019 through FY 2021. The Departments note, however, that that number was out of a total of at least 5,408 requests for reconsideration that were submitted during those years. *See* 87 FR at 18132. Under the present rule, where emergency border circumstances are present and a credible fear determination is made pursuant to the rule's limitation on asylum eligibility, the Departments assess that, in light of the safeguards in place, efficiency interests outweigh the interest in providing an opportunity to request reconsideration.

To the extent commenters argue that this provision of the rule implicates statutory or due process rights of noncitizens, the Departments note that noncitizens have no statutory right to request reconsideration of a negative credible fear determination. The Supreme Court has held that the due process rights of noncitizens applying

---

[342] The Departments note that, although there is no derivative protection under statutory withholding of removal or CAT protection, certain U.S.-based qualifying parents or legal guardians, including those granted withholding of removal, may petition for qualifying children and eligible family members to be considered for refugee status and possible resettlement in the United States. *See* USCIS, *Central American Minors (CAM) Program,* *https://www.uscis.gov/CAM* (last updated Mar. 7, 2024).

[343] *See* Asylum Processing IFR, 87 FR at 18132; *see also* 88 FR at 31419.

**STB_AR1_000099**

for admission at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 591 U.S. at 140. In establishing the streamlined procedures governing credible fear screening, Congress explicitly mandated that review of any negative credible fear determination made by an AO be conducted by an IJ and provided no mechanism for noncitizens to request reconsideration of the IJ's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

With respect to commenters' concerns about fairness, the Departments note that all credible fear determinations, including determinations made under the processes set forth in this rule, will continue to be reviewed by a supervisory AO. *See* 8 CFR 208.30(e)(8); *see also* 89 FR at 48748. And the rule does not impact a noncitizen's right to request IJ review of a negative credible fear determination. Where requested, the IJ will evaluate the case de novo, including making a de novo determination as to whether there is a significant possibility the noncitizen could demonstrate they are not subject to the rule's limitation on asylum eligibility or are eligible for the exception. 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b). Accordingly, this rule ensures IJ review of the entirety of the negative credible fear determination, including application of the rule's limitation on asylum eligibility. To the extent commenters raise general concerns about IJ review of negative credible fear determinations, those concerns are outside the scope of this rulemaking.

In response to the comment noting that it is unclear when USCIS would exercise its discretion to reconsider a negative credible fear determination *sua sponte,* the Departments note that the regulatory framework makes clear that USCIS possesses the inherent discretion to reconsider its own negative credible fear determination that has been concurred upon by an IJ, and that such discretion may be exercised on a case-by-case basis dependent on the facts and circumstances in an individual case. *See, e.g.,* 8 CFR 1208.30(g)(2)(iv)(A) (2018) (noting that ''[t]he Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge''); 208.35(b)(2)(v)(B). As noted above, the Departments contend that the existing safeguards under the present rule comport with all statutory requirements and believe that these safeguards sufficiently address any concerns related to adequate review of negative credible fear determinations under the present rule.

*D. Other Issues Relating to the Rule*

1. Scope of the Rule and Implementation

a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary

*Comment:* Some commenters expressed concern with the 2,500-encounter threshold that would trigger the limitation on asylum eligibility for certain individuals who enter during emergency border circumstances. Some commenters characterized the threshold as ''arbitrary.'' Another commenter claimed that encounter rates have historically never fallen below the 2,500-encounter threshold due to the urgent humanitarian need and expressed concern that, contrary to the realities of forced displacement, the IFR limiting entries to 2,500 encounters effectively serves as a policy to close the border and end access to asylum.

Several commenters remarked that the low threshold required for the limitation on asylum eligibility to be discontinued is unrealistic and would virtually guarantee the limitation would always be in place. One commenter expressed concern that 1,500 daily encounters is well below historical averages. Another commenter stated that in the past 6 FYs, monthly average border apprehensions consistently surpassed 1,500 individuals. Similarly, another commenter stated that the ''emergency border circumstances'' would apply during 58 percent of all months this century. Another commenter stated that the 1,500-encounter threshold is unreasonable given the number of encounters at the SWB in 2024, which, according to the commenter, has lately hovered between 170,000 to 190,000 per month, or around 6,000 people per day on average.

While referencing the thresholds, a commenter remarked that the preamble acknowledges that the Departments cannot swiftly change from one means of processing to another. Citing high levels of border crossings since May 2023 (after the implementation of the Circumvention of Lawful Pathways rule), the commenter stated that the Departments' intent is to keep this rule in place indefinitely, punishing migrants in an attempt to deter them from seeking protection in the United States. A commenter warned that ''the mechanism for lifting the restrictions in the IFR is insufficient to meet the humanitarian needs at the U.S. border, jeopardizing the asylum system for many years to come.''

*Response:* The Departments disagree that the numerical thresholds are arbitrary or too low. As explained in the IFR, the emergency border circumstances described in the June 3 Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48726–31. This is because, in such circumstances, DHS lacks the capacity to deliver timely consequences and must resort to large-scale releases of noncitizens pending section 240 removal proceedings. *Id.* at 48749. Such large-scale releases in the absence of this rule would lead to significant harms and incentivize human smuggling organizations to recruit more potential migrants based on the limitations on the Departments' ability to deliver timely decisions and consequences. *Id.* at 48749–50. The 1,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when the border security and immigration systems, as currently resourced, are no longer over capacity and the measures adopted in this rule are not necessary. *Id.* at 48750. And the 2,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when there has been a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States. *Id.* at 48752. Were the resourcing of border security and immigration systems to change, this change (if sufficiently substantial) could trigger reassessment of these thresholds, in order to ensure that they reflect the Departments' ability to deliver timely decisions and consequences.

In the IFR, the Departments demonstrated the reasonableness of the thresholds in two ways. First, the Departments explained that during the FY 2013 to FY 2019 pre-pandemic period, USBP total encounters (including all UCs) only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 noncitizens released each day,[344] while months in which daily

[344] Although the demographic composition of current encounters (*e.g.,* a higher percentage of noncitizens encountered who assert fear claims) means that such a low release rate is likely unachievable in the near term, releases remain much lower when daily encounters are below the 2,500-encounter threshold. *See* 89 FR at 48731; *see also* OHSS analysis of July 2024 Persist Dataset and
Continued

STB_AR1_000100

encounters exceeded 2,500 resulted in approximately 1,300 noncitizens released each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.*

Second, the Departments demonstrated that at the 1,500-encounter level and assuming a similar level of voluntary returns and reinstatements to those seen during implementation of the Circumvention of Lawful Pathways rule, DHS would be able to refer for expedited removal more than 70 percent of the single adults and family unit individuals who are not quickly repatriated (through voluntary return or reinstatement), and would be able to repatriate a total of about 830 noncitizens (*i.e.,* 56 percent of the 1,500 encounters counted towards the threshold). *Id.* at 48752 & nn.274, 276. By contrast, at above 2,500 encounters—the level at which the June 3 Proclamation and the IFR would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level; for instance, at that level DHS would be able to refer for expedited removal 43 percent of the single adults and family unit individuals who are not quickly repatriated, and would be able to repatriate a total of about 1,010 noncitizens (*i.e.,* 40 percent of the 2,500 encounters counted towards the threshold). *Id.* at 48752–278.

In this second analysis as presented in the IFR, consistent with the June 3 Proclamation, DHS excluded encounters of UCs from non-contiguous countries from the threshold counts. But as noted in the IFR, "the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals." *Id.* at 48753. Consistent with this reality, the September 27 Proclamation and this rule include, in both thresholds, consideration of encounters of all UCs, including those from non-contiguous countries. As discussed in Section II.C.1 of this preamble and later in this Section III.D.1, most UCs are from non-contiguous countries, and the processing of all UCs requires the use of significant CBP resources.

Including non-contiguous UCs in the 7-consecutive-calendar-day average calculation recognizes this impact. Depending on the levels of such UCs encountered at any given time, failing to include such UCs in the 1,500 and 2,500 encounter limits may result in an overestimate of resources available to the Departments to efficiently process noncitizens encountered at the SWB while delivering timely decisions and consequences to noncitizens who enter without a lawful basis to remain. This is because the number of UCs from non-contiguous countries encountered by USBP can fluctuate—something that models that assume stable demographics cannot fully account for. And if encounters of such UCs rise but are not included in the rule's thresholds, then those thresholds become much less useful predictors of overall capacity. Although encounters of UCs from non-contiguous countries have generally declined since the IFR took effect,[345] their proportion of USBP encounters has increased,[346] and the population of UCs from non-contiguous countries at the border has surged on several occasions in the past.[347]

As part of this final rule, DHS updated the second analysis discussed above to reflect more recent data and to demonstrate the impact on that analysis of counting all UCs—at current encounter levels—towards the encounter thresholds. The Office of Homeland Security Statistics ("OHSS") updated the IFR's methodology by (1) applying fear claim rates for the entirety of the immediate post-pandemic period (*i.e.,* not ending in April 2024, as the prior analysis did), (2) assuming a demographic makeup (including with respect to UCs) similar to that observed between June 5, 2024, and July 30, 2024 for that entire period, and (3) including all UCs in the 1,500 and 2,500 encounter figures.[348]

Under these parameters, at 1,500 encounters between the POEs (including all UCs) and assuming USBP is able to process 900 cases for expedited removal per day (as was approximately the case during the immediate post-pandemic period between May 12, 2023 and June 4, 2024), DHS would be able to refer for expedited removal 77 percent of the noncitizen single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 880 noncitizens per day (*i.e.,* under 60 percent of the 1,500 encounters counted towards the threshold).[349]

Similarly, at 2,500 encounters between the POEs (including all UCs) and assuming USBP can process 900 people for expedited removal per day, DHS would be able to refer for expedited removal 46 percent of the single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 1,040 noncitizens per day (*i.e.,* over 40 percent of the 2,500 encounters counted towards the threshold).[350]

The Departments caution that this type of analysis depends on a range of assumptions regarding capacity, fear claim rates, screen-in rates, and geographic and demographic distribution of encounters, among other variables. A change in these variables—for instance, a spike in UC encounters—could place a strain on custody resources that would further reduce the Departments' overall capacity to deliver timely decisions and consequences, such as by processing noncitizens for expedited removal. The analysis does show, however, that the change to the thresholds to include counting of all UCs is incremental in nature and consistent with the rule's overall purpose.

Finally, with respect to claims that either threshold effectively serves as a policy to "close the border" and end access to asylum, the Departments

---

[345] *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[346] *See id.*

[347] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https:// www.dhs.gov/ohss/topics/immigration/ enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[348] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). The figures presented in the IFR were based on fear claim rates, demographics, and average expedited removal capacity under the Circumvention of Lawful Pathways rule; these rates were pulled in early April 2024. *See* 89 FR at 48752 nn.274, 276. For instance, based on data pulled in early April 2024, the figures in the IFR assumed that CBP could process approximately 900 USBP encounters for expedited removal per day and that 17 percent of encounters would result in rapid returns via

voluntary return to Mexico, reinstatement of a removal order, or administrative removal. *Id.* Accounting for all of the immediate post-pandemic period (*i.e.,* also, including April, May, and early June 2024), USBP averaged about 860 people processed for expedited removal per day during that time period. OHSS analysis of July 2024 Persist Dataset (Imm Pos Pandemic ERCF tab). CBP processed for expedited removal about 920 people on average during that time. *Id.* From June 5, 2024 through August 31, 2024, CBP processed over 1,100 people for expedited removal per day and about 16 percent of encounters resulted in such rapid returns. OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab, IFR ERCF tab, and CLP v pre-CLP Projection Tool tab).

[349] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[350] *Id.*

---

data downloaded from UIP on September 3, 2024 (Summary Statistics tab, see cells L27 and M27).

STB_AR1_000101

disagree. The Departments also disagree with commenters' specific claims about historical encounter rates and numbers. Commenters are incorrect that daily encounters rates have never fallen below 2,500.[351] Commenters are also wrong that an average of 1,500 daily encounters is far below historical averages. From FY 2013 through FY 2019, the 7-consecutive-calendar-day average of encounters was below 1,500 nearly 80 percent of the time, and above 2,500 approximately 5 percent of the time.[352] And for over 70 percent of days during that time frame, the 7-consecutive-calendar-day average had been below 1,500 encounters for 28 consecutive days.[353] Over a longer time period, from FY 2009 through FY 2020, there were a total of only four months (all during the spring 2019 family unit surge) that encounters averaged more than 2,500 per day.[354] One commenter argued that in the past six fiscal years, monthly average apprehensions have consistently surpassed 1,500 noncitizens. But this only shows that the past six fiscal years have generally been times of historically high migrations, and the Departments established the 1,500-encounter daily threshold not by selecting an arbitrary figure but by estimating capacity to deliver timely consequences at current resource levels.

Even since the IFR took effect, encounters have dropped to levels indicating that it is possible the 1,500-encounter threshold will be met in the future. If, consistent with the June 3 Proclamation and IFR, one excludes UCs from non-contiguous countries, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 27.[355] And if, consistent with the September 27 Proclamation and this rule, one includes such UCs, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 29.[356]

b. Concerns Regarding Exceptions From the Encounter Thresholds

*Comment:* A commenter remarked that there are too many exceptions to the types of encounters that are counted daily. The commenter stated that it is "hard to count up to 1,500" when there are so many exceptions. The commenter used the exception for non-contiguous country UCs, who are not counted under the June 3 Proclamation, as an example. The commenter stated that this exception encourages the trafficking of children and prevents reporting these as encounters. The commenter also objected to the exception for noncitizens who are determined to be inadmissible at a SWB POE, which the commenter asserted significantly limits the number of encounters considered.

Another commenter expressed similar concerns regarding the exclusion of UCs from the 2,500-encounter threshold. The commenter stated that the current UC policies, influenced by the Flores Settlement Agreement and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, are susceptible to exploitation. The commenter further noted that during the current Administration, UC encounters have exponentially increased, with more than 480,000 UCs encountered at the southern border between POEs. The commenter cautioned that without counting all UC encounters towards the 1,500-encounter threshold, existing policies may be further abused by criminal elements, leading to increased risks for UCs, such as human trafficking and other forms of exploitation. The commenter maintained that in addition to excluding non-contiguous country UCs, the encounter thresholds in the IFR also exclude 1,650 encounters every day at POEs, plus 30,000 noncitizens processed every month through the CHNV parole processes.

*Response:* Regarding UCs from non-contiguous countries, as discussed in Section II.C.1 of this preamble, the September 27 Proclamation amends the June 3 Proclamation to remove section 2(c), which provided that UCs from non-contiguous countries shall not be included in calculating the number of encounters, and this rule makes a parallel change. As discussed in Section II.C.1 of this preamble, the Departments' experience implementing the IFR has shown that excluding encounters of UCs from non-contiguous countries results in an incomplete assessment of the

Departments' resources and capabilities. UCs, regardless of their country of origin or nationality, require considerable resources to process and safely hold in CBP facilities and the Departments have in the past experienced surges of encounters of such UCs.[357] One of the primary purposes of this rule is to alleviate undue strain on the limited resources of border security and immigration systems, and through their experience with the IFR the Departments have recognized the need to consider the full operational burden that results from all UC encounters at the southern border. The resource burden posed by UCs from non-contiguous countries, along with recent increases in the proportion of such UCs relative to types of encounters, support the Departments' determination that UCs from all countries, not just from contiguous countries, are relevant to the thresholds contained in the rule.

The Departments disagree that the encounter thresholds should include daily encounters at the SWB POEs or CHNV parolees. The IFR applies only when encounters strain the border security and immigration systems' capacity. To date, this strain has been caused primarily by increased encounters between POEs. CBP can more efficiently process those at SWB POEs, particularly those who have used the CBP One app to make an appointment. In the past several years, processing capacity at POEs has been significantly expanded, enabling CBP to manage processing of noncitizens in a safe and efficient manner. However, despite the efforts to increase capacity within the limits of available resources and funding, processing between POEs continues to tax DHS resources and remains very resource intensive.

The CHNV processes do not adversely affect the Departments' resources at the southern border because noncitizens arriving under the CHNV processes travel by air to an interior POE.[358] The Departments do not believe it necessary or appropriate to include noncitizens who use the CHNV processes as part of encounter calculations under this rule for that reason.

---

[351] Average daily encounters averaged 1,310 between FYs 2011 and 2018. In FY 2009, average daily encounters were approximately 1,200. *See* OHSS analysis of July 2024 Persist Dataset (Daily Encounters FY2000–2024 tab).

[352] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the 7-consecutive-calendar-day average was below 1,500 nearly 85 percent of the time and above 2,500 only 4 percent of the time. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[353] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the resulting figure is just below 80 percent. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[354] OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[355] OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters Tab).

[356] *Id.*

[357] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[358] *See, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR 1255, 1256, 1263 (Jan. 9, 2023); USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

STB_AR1_000102

c. Other Concerns About the Encounter Thresholds

*Comment:* A commenter wrote that it is reasonable to assume the threshold for suspending the rule will not be met in the foreseeable future, because even if the number of encounters dropped to the level where the 1,500-encounter threshold might be met, the Departments could issue a new IFR to keep the procedure in place. A commenter stated that the IFR provides no end dates and the Departments do not provide an explanation as to why the IFR should be in place indefinitely.

*Response:* The Departments disagree with the suggestion that they would perpetually take actions to lower the threshold for discontinuation solely to keep these emergency measures in place. If the Departments intended to permanently have these measures in place, they could have made the IFR apply indefinitely without using encounter thresholds. The two changes to the threshold made in this rule and the September 27 Proclamation are incremental in nature and consistent with the underlying purpose of the June 3 Proclamation. The Secretary will monitor encounter levels and make relevant determinations consistent with the September 27 Proclamation. Should further policy changes prove necessary—whether in response to comments submitted in response to this final rule's request or in another context—the Departments may take appropriate action to implement such changes. Additionally, the rule does not contain specific end dates because its measures are designed to be responsive to patterns in daily encounters. The IFR does not contain an overall expiration date because, due to the unpredictable nature of migration trends and for so long as Congress fails to increase the Departments' resources and modernize the current U.S. immigration system, such measures will be necessary when the Departments' operational capacity, as measured by daily encounter thresholds, is greatly overwhelmed.

*Comment:* A commenter stated that it would be challenging for noncitizens to know when thresholds have been met. The commenter stated that they had surveyed migrants in Mexico and over half of respondents in the first half of 2024 affirmed that they do not understand the requirements and processes for accessing U.S. territory, and that nearly half of respondents in certain areas confirmed that the main channel through which they receive information on policy changes is word of mouth, while around a third receive this information through social media.

The commenter said noncitizens would not be able to discern the application of the IFR without access to official information, particularly given that, according to the commenter, the United States Government does not currently publish statistics on encounters. The commenter wrote that even when some noncitizens might be aware of the dynamics of irregular movements, this awareness is likely to be limited to the specific region of the SWB where they are located and would very likely not cover the overall number of encounters.

The commenter stated that, given the swiftness with which the limitations established under the IFR can be invoked and applied, they are not likely to influence the ability of noncitizens in different parts of the transit route to adapt their decisions to increase their chances of receiving the protection that they need. The commenter stated that those who are already at or around Mexico's northern border when the rule's provision apply cannot meaningfully consider any potential alternative pathways. The commenter further stated that a significant proportion of people of concern present in Mexico could be ineligible for certain alternatives. For example, 97.9 percent of respondents to the commenter's protection monitoring activities during the first semester of 2024 reported having entered Mexico irregularly, which could render them ineligible for certain parole processes. The commenter stated that as a result, persons of concern are unlikely to become aware of when the additional limitations on asylum eligibility would apply with sufficient lead time to be able to adapt their decisions. This will thus undermine their ability to make decisions that increase their chances of receiving the protection that they need.

The commenter further stated that confusion around changing policies and practices governing access to U.S. territory has fueled the widespread belief that there are certain moments when the U.S. border is "open" and others when it is "closed," and that access to U.S. territory requires individuals to remain close to the border and attentive to any information suggesting that the border is "open." The commenter stated that the IFR has already contributed to this dynamic, with migrants along the U.S.-Mexico border expressing their understanding that the new limitations effectively "close off" access to U.S. territory. According to the commenter, this has led to desperation and fostered the likelihood that the population resorts to imprecise and misleading information

provided by human traffickers or on social media.

*Response:* DHS posts statistics on SWB encounters on CBP's website.[359] The website includes data extracted from CBP systems and data sources regarding encounters with single adults, individuals in family units, and UCs. Information about the status of the suspension and limitation on entry, and the related provisions in this rule, is available in English and Spanish at: *https://www.dhs.gov/immigrationlaws.* In addition, regardless of whether the threshold for discontinuing or continuing or reactivating the suspension and limitation on entry under the Proclamation or the limitation on asylum eligibility under this rule has been met, migrants may, for instance, arrive in the United States at a SWB POE pursuant to a process the Secretary determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States.

For similar reasons, the Departments do not believe that it is necessary to adjust the rule to ensure that the potentially "abrupt" nature of its provisions allows sufficient time for those already in Mexico to adjust their behavior in order to access protection. The IFR was not the first time that the Departments encouraged migrants to use lawful, safe, and orderly pathways to come to the United States. The Circumvention of Lawful Pathways rule also incentivized the use of such pathways, *see generally* 8 CFR 208.33, 1208.33, and since their inception, the CHNV parole processes have included an ineligibility for those who crossed into Mexico irregularly, *see, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR at 1263; Implementation of a Parole Process for Venezuelans, 87 FR 63507, 63515 (Oct. 19, 2022). And the CBP One app remains available to noncitizens in Mexico.[360] The rule also provides an exception for those who are able to demonstrate exceptionally compelling circumstances, *see* 8 CFR 208.35(a)(2)(i)

[359] CBP, *Southwest Land Border Encounters* (last modified Sept. 16, 2024), *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.*

[360] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.* On August 23, 2024, CBP expanded the areas from which noncitizens can request appointments through the CBP One app. With this expansion, Mexican nationals will be able to request an appointment from anywhere within Mexico. Additionally, non-Mexican nationals will be able to request and schedule appointments from the Southern Mexico states of Tabasco and Chiapas, in addition to their existing ability to request and schedule an appointment from Northern and Central Mexico—enabling them to make appointments without having to travel all the way north to do so. *See id.*

and (ii), 1208.35(a)(2)(i) and (ii), and the rule's limitation on asylum eligibility does not apply those who are excepted under the Proclamation, *see* 8 CFR 208.35(a)(1), 1208.35(a)(1). And the rule preserves access to statutory withholding of removal, as well as CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b). Thus, migrants already in Mexico have the ability under the rule to access available protection.

The Departments acknowledge the potential that some migrants would perceive the possibility of abrupt changes in procedures at the southern border as a reason to remain close to the border and attentive to any information suggesting that the border is or soon will be "open." In the IFR, the Departments explained that "[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained." 89 FR at 48749 n.248. This rule makes an additional change that addresses this concern: The rule's provisions will not be discontinued unless there has been a 7 consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the 14-day waiting period after the Secretary makes a factual determination to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy.

*Comment:* A commenter wrote that while DHS has created a website that states whether the border is currently open or closed, it is unlikely that noncitizens in desperate conditions in Mexico would review the website before deciding to cross the border. Further, the commenter stated that, if the border were to reopen under the rule, it seems inevitable that smugglers would charge higher fees to move noncitizens across the border, and that if noncitizens understand the rule at all, they will flood the border when the suspension and limitation discontinues—leading again to its immediate closure. The commenter stated that the burden of tracking, identifying, and applying different standards over a matter of days is significantly more complex for USCIS personnel as they consider protection claims. The commenter expressed concern that the preamble to the IFR did not consider that this complexity would affect and complicate merits adjudications and lead to longer, more complex hearings in an already overwhelmed, backlogged system.

*Response:* As noted in Section II.A.2 of this preamble, encounters between POEs have dropped substantially since implementation of the IFR, suggesting that many migrants have not responded as the commenter predicted. But in any event, if a migrant were to disregard the existence of the rule and other restrictions on crossing between POEs, or if a migrant who is unaware of the existence of the rule were to cross between the POEs, the rule would allow the Departments to swiftly deliver decisions and consequences, while allowing noncitizens who are able to demonstrate the existence of exceptionally compelling circumstances to avoid application of the rule's limitation on asylum eligibility and preserving access to statutory withholding of removal and CAT protection, as discussed in the preceding response.

With respect to the commenter's suggestion that noncitizens could respond to the discontinuation of the rule's provisions by "flood[ing] the border" and "leading again to its immediate closure," to the extent there is a prospect of such actions, this highlights the need for this rule, the overall effect of which will be to combat such actions by alleviating stresses on the border security and immigration systems at the southern border; it is not a reason to withdraw the rule. Moreover, the historical encounter data discussed in Section II.C of this preamble suggest that when regional migration decreases, encounter numbers often remain below 2,500 for very long periods. Those data militate against the commenter's view that encounters will inevitably rise quickly above 2,500.

Further, as discussed in Section II.C of this preamble, the September 27 Proclamation and this rule revise the timeline for the 1,500-encounter threshold to reduce the probability that an ephemeral drop in encounters would result in rapid shifts in applicable policy. With respect to the commenter's concern about complexity for Government personnel, the use of a 7-consecutive-calendar-day average, combined with the new requirement for the average to be below 1,500 encounters for each of 28 consecutive calendar days, also reduces the prospect of undue complexity. Although some section 240 removal proceedings and credible fear interviews may become more complex by virtue of this rule's provisions, many such proceedings may be avoided entirely. *See, e.g.,* 89 FR at 48767 ("[T]he Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.").

**2. Other Comments on Issues Relating to the Rule**

*Comment:* Commenters asked how USCIS' implementation of the IFR would be funded, remarking that the funds to execute the IFR as written have not been allocated.

*Response:* USCIS applies the IFR's provisions as part of the credible fear determination or the full asylum adjudication. It is not a discrete or separate adjudication that would require its own funding stream separate from that which is used for credible fear determinations or asylum adjudications.

*Comment:* Commenters expressed concern about their ability to comment on the proposals in DHS's recent Mandatory Bars NPRM, the comment period for which ended four days after the IFR published. For example, a commenter noted that, in the IFR, the Departments expressly asked for comment on the interaction between the two rules, including whether to explicitly apply the heightened "reasonable probability" standard to those who are subject to a mandatory bar but not subject to the Circumvention of Lawful Pathways rule, but the commenter asserted that they could not provide comment on those issues without knowing how and whether DHS plans to finalize the DHS Mandatory Bars NPRM. Commenters also stated that DHS failed to analyze the interaction between the two rulemakings, which they stated will create additional hurdles for noncitizens seeking asylum and will lead to inconsistencies and potential challenges in processing. Commenters expressed the need for a comprehensive examination of how the policies overlap to avoid uncertainty.

*Response:* The Departments disagree that commenters did not have adequate opportunity to comment on the potential interaction between the DHS Mandatory Bars NPRM and the IFR. Indeed, as the commenters note, the Departments requested comment in the IFR on whether to expand 8 CFR 208.35(b)(3) (directing asylum officers to apply a reasonable probability screening standard in protection screenings in the event that 8 CFR 208.35(a) is held to be invalid or unenforceable) to cover "those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to

asylum eligibility if the [DHS Mandatory Bars NPRM] is finalized.'' 89 FR at 48756. The DHS Mandatory Bars NPRM provides ample notice of the proposed mandatory bars policy, and the commenters do not explain with any specificity why they must review any final rule associated with the DHS Mandatory Bars NPRM in order to provide relevant comments about its potential impact on the IFR.

Moreover, the Departments have considered the interaction between the two rulemakings and do not believe any corresponding changes to this rule are necessary. While both rules address DHS screening procedures, the DHS Mandatory Bars NPRM relates to a different issue than the issues raised in this rulemaking. The DHS Mandatory Bars NPRM proposes to allow AOs to consider the applicability of certain statutory bars to asylum, statutory withholding of removal, and withholding of removal under the CAT regulations during credible fear screenings, but it does not propose changes to the substantive screening standards by which AOs make their credible fear determinations. *See generally* 89 FR at 41347–61. On the other hand, the IFR established a new ''reasonable probability'' standard for the statutory withholding and CAT screening of noncitizens determined to be subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(iii). Except for this changed screening standard, the AO and IJ would otherwise follow the pre-existing standards at 8 CFR 208.30, 208.33, 1208.30, or 1208.33, as applicable. *Id.* Accordingly, as stated in the IFR, if DHS finalizes the DHS Mandatory Bars NPRM as drafted, the ''reasonable probability'' standard would still apply to determinations involving a noncitizen who is subject to this rule's limitation on asylum eligibility. 89 FR at 48739 n.186.

*Comment:* A commenter added that the Departments failed to explain how the IFR will interact with the Circumvention of Lawful Pathways rule.

*Response:* In the IFR, the Departments explained how the IFR will interact with another recent rule, the Circumvention of Lawful Pathways rule. 89 FR at 48754. The Departments explained that they were adding to 8 CFR 208.13 and 1208.13 a paragraph (g), entitled ''Entry during emergency border circumstances,'' which ''explain[s] when a noncitizen is potentially subject to th[e] IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful

Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13.'' *Id.* These new paragraphs added to 8 CFR 208.13 and 1208.13 provide that, ''[f]or an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.'' 8 CFR 208.13(g), 1208.13(g).

In short, during emergency border circumstances, those who enter across the southern border are subject to this rule, ''[n]otwithstanding'' the Circumvention of Lawful Pathways rule or any other regulatory provision. *See* 8 CFR 208.35, 1208.35. A noncitizen who establishes exceptionally compelling circumstances under this rule has established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). And the credible fear process under this rule uses the same framework as the Circumvention of Lawful Pathways rule, except for the use of a ''reasonable probability'' screening standard. *See* 8 CFR 208.35(b)(1)(ii), (b)(2)(i), (c), 1208.35(b)(2)(i), (b)(2)(iii), (c). The Departments described the provisions of the regulatory text in detail in the IFR's preamble. 89 FR at 48754–48759; *id.* at 48762–66.

*Comment:* A commenter asserted that recent rulemakings have complicated the asylum system and that the Departments have not provided reliable information about those changes to affected noncitizens.

*Response:* The Departments acknowledge that recent rulemakings have modified the credible fear screening process to better enable the Departments to deliver timely decisions and consequences to noncitizens entering across the southern border who do not have a basis to remain in the United States. Specifically, in the past two and a half years, the Departments have issued the Asylum Processing IFR, the Circumvention of Lawful Pathways rule, and the IFR discussed here. DHS has also issued a proposed rule—the DHS Mandatory Bars NPRM. Each rule has been accompanied by detailed preamble discussion and regulatory text. In addition to the public-facing

materials, although not required to by law, the Departments have executed robust communications plans to notify and inform the public about the consequences of irregular migration while noting the expansion of lawful pathways and the tools that can be used to access those lawful pathways.[361] The public engagement plans have both domestic and international dimensions.[362] Domestically, these plans have included engagement with NGOs, international organizations, legal services organizations, and others.[363] Internationally, the Departments have also executed communications campaigns throughout the Western Hemisphere in coordination with interagency partners and partner governments to educate migrants and would-be migrants about lawful pathways and consequences for not using them.[364] This includes media engagements with in-country reporters, graphics and explainer videos, and press releases highlighting removal flights as a direct consequence of

---

[361] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

[362] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (Apr. 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/;* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[363] *See* U.S. Department of State, *Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas Opening Remarks at the Ministerial Conference on Migration and Protection Reception* (Apr. 19, 2022), *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-opening-remarks-at-the-ministerial-conference-on-migration-and-protection-reception/.*

[364] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas; see also* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

coming to the United States irregularly.[365]

The Departments understand concerns about changes to southern border processing. However, as discussed throughout the June 3 Proclamation, the IFR, and this rule, the circumstances at the southern border have changed, and U.S. policy has had to change with them to ensure the effective functioning of the immigration and border management systems. The Departments have consistently encouraged noncitizens seeking to enter the United States to pursue lawful, safe, and orderly pathways to do so, and they continue to provide that encouragement now.

*Comment:* One commenter expressed concern that the Departments failed to analyze how the IFR interacts with the DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings (May 9, 2024).[366]

*Response:* The Departments acknowledge that the IFR did not discuss DHS guidelines governing the use of classified or confidential information, but the IFR does not contain any provisions calling for or governing the use of classified information. Regardless, the rule and DHS's policy on the use of classified information in immigration proceedings are harmonious. The INA permits the use of classified information in certain immigration proceedings, and noncitizens have no right to examine classified national security information that DHS may consider or proffer in opposition to the noncitizen's admission to the United States or application for relief from removal. INA 235(c), 8 U.S.C. 1225(c); INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); 8 CFR 235.8(b)(3), 1240.33(c)(4). That was the case before DHS issued its updated policy and guidance on the use of classified information in immigration proceedings on May 9, 2024. The updated guidance does not alter those fundamental principles or the type of information that may be used in the immigration proceedings governed by

the IFR,[367] and so there was no need for the Departments to address the interaction between the IFR and the new classified information policy.

*E. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* Commenters expressed concerns with the Departments' decision to issue an IFR instead of an NPRM, and the Departments' invocation of the "foreign affairs" and "good cause" exceptions. Commenters stated that the Departments have not proved that either exception applies and, therefore, argued the IFR did not comply with the APA.

*Response:* Under the APA, agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). However, consistent with the APA, the Departments did not employ these procedures before issuing the IFR because (1) the IFR involved a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3). *See also* 89 FR at 48759–66 (explaining use of these APA exceptions). Because the Departments have now issued this final rule after soliciting comments, those concerns are moot—but regardless, the Departments address commenters' concerns below.

a. Foreign Affairs Exception

*Comment:* A commenter suggested that the Departments' invocation of the foreign affairs exception is inappropriate because this exception has been "selective[ly] appli[ed]," pointing to other rules concerning processing of noncitizens at the border (the Circumvention of Lawful Pathways rule and the DHS Mandatory Bars NPRM) for which the Departments did not invoke this exception. Another commenter remarked that the foreign affairs exception cannot apply because the IFR is a "unilateral action" by the United States, seemingly without any formal agreements with Mexico or other affected countries, and the rule's effects might exacerbate undesirable international consequences. A third commenter stated that the foreign affairs exception does not apply to rulemakings concerning the U.S. border, stating that these are matters of domestic policy. Similarly, another commenter noted that Federal courts have previously informed agencies that these exceptions to the APA's notice-and-comment requirement "do not apply to regulations that alter domestic law around asylum eligibility." A fifth commenter expressing opposition to the Departments' invocation of the foreign affairs exception remarked that the exception's interpretation is "overly broad."

*Response:* The IFR is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question is "clearly and directly involve[d]" in "a foreign affairs function." *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up). In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008) (quotation marks omitted). This rule satisfies both standards. Nevertheless, the Departments provided an opportunity for public comment after issuing the IFR and in this final rule are responding to those comments.

With respect to comments asserting this rule represents "unilateral action" by the United States, the United States' border management strategy, as further developed in this rule, is predicated on the belief that migration is a shared responsibility among all countries in the

---

[365] *See* Ecuador Envivo, *La tragedia detrás de la migración irregular, una desgarradora realidad (The tragedy behind irregular migration, a heartbreaking reality)* (July 31, 2024), *https://ecuadorenvivo.com/blog/2024/07/31/la-tragedia-humana-detras-de-la-migracion-expertos-analizan-crisis-de-migracion-irregular/; see also* ICE, *ICE conducts single adult, family unit removal flights Aug. 9* (Aug. 9, 2024), *https://www.ice.gov/news/releases/ice-conducts-single-adult-family-unit-removal-flights-aug-9-0.*

[366] DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.*

[367] The previous policy and guidelines permitted the use of classified national security information in an individual's immigration proceedings only as a matter of last resort. *See* DHS, *DHS Guidelines for the Use of Classified Information in Immigration Proceedings* (Oct. 4, 2004), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings-october.* The new policy and guidelines now permit the use of classified national security information as the Department deems necessary to protect our national security and public safety interests, subject to procedures outlined in the new guidance. *See* DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.* Neither the new or old policies and guidelines provide the individual who is subject to the immigration proceedings any entitlement to review classified national security information. Such classified information would be reviewed either *ex parte* or *in camera.*

STB_AR1_000106

region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.[368] This strategy takes particular inspiration from the Los Angeles Declaration on Migration and Protection ("L.A. Declaration"), which was joined by world leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[369]

Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing. This work includes efforts to expand access to and increase the number of lawful, safe, and orderly pathways, such as the Safe Mobility Initiative;[370] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols with the Government of Mexico along our shared border; and share information, technical assistance, and best practices. See 89 FR at 48759–60 & nn.300–02. These also include the commitment by the United States and Mexico to strengthen their joint humanitarian plan on migration. See id. at 48760 & n.310. The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.

Given the particular challenges facing the United States and its regional partners at this moment, the Departments appropriately assessed that it was critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that the IFR and the Proclamation—and the strong consequences they were intended to impose at the border—would send an important message to the region that the

United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.[371] See 89 FR at 48761.

In response to the comments that the Departments' invocation of the foreign affairs exception is overly broad and that because the IFR impacts asylum and issues at the southern border of the United States, it implicates only domestic policy and law and thus does not qualify for the foreign affairs exception, the Departments point out that the IFR stems from international cooperation and directly addresses international challenges. As one commenter noted, at least one court has determined that a rule imposing a limitation on asylum eligibility is not subject to the foreign affairs exception when that rule has only an indirect impact on foreign affairs. See Capital Area Immigrants' Rights Coalition v. Trump, 471 F. Supp. 3d 25, 56 (D.D.C. 2020). But recently Mexico and the United States have worked together on a joint humanitarian plan on migration intended "to address the humanitarian situation caused by unprecedented migration flows at our shared border and in the region."[372] In a joint statement following a meeting between President Biden and President López-Obrador on April 28, 2024, the presidents "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce

irregular border crossings while protecting human rights."[373] The IFR and this rule further this international mission by limiting heightened levels of migration. This contrasts with the "indirect international effects," including potential "downstream effects in other countries or on international negotiations," that the court discussed in Capital Area Immigrants' Rights Coalition. Capital Area Immigrants' Rights Coalition, 471 F. Supp. 3d at 55. Given the IFR's direct and clear involvement in foreign affairs, the foreign affairs exception applies.

In addition to the IFR's clear and direct involvement in foreign affairs, the Departments believed that conducting a notice-and-comment process and providing a delayed effective date likely would have led to a surge to the southern border before the Departments could finalize the rule, as occurred in anticipation of the end of the Title 42 public health Order.[374] Regional partner countries have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. See 88 FR at 31444. For example, one foreign partner opined that the formation of caravans in the spring of 2022 were spurred by rumors of the United States Government terminating the Title 42 public health Order and then the officially announced plans to do so. Id. Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid. The Departments appropriately concluded that the emergency measures taken in the IFR would help address this regional challenge, rather than exacerbate it as one commenter suggested, and that any decrease in migration that results would help relieve the strain not just on the U.S.-Mexico border, but also on

---

[368] See The White House, Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador (Apr. 29, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador; see also Kathia Martínez, US, Panama, and Colombia aim to stop Darien Gap migration, AP News (Apr. 11, 2023), https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7.

[369] See Los Angeles Declaration on Migration and Protection, Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries (last visited Aug. 2, 2024).

[370] See U.S. Dep't of State, Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/ (last visited Sept. 21, 2024).

[371] See Muzaffar Chishti et al., At the Breaking Point: Rethinking the U.S. Immigration Court System, Migration Pol'y Inst., at 11 (2023), https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, The U.S. Asylum System in Crisis: Charting a Way Forward, Migration Pol'y Inst., at 9 (2018), https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[372] The White House, Mexico and United States Strengthen Joint Humanitarian Plan on Migration (May 2, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.

[373] The White House, Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador (Apr. 29, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador.

[374] See 89 FR at 48761–62. Note that the encounter projections included in the IFR excluded encounters of people who had registered with the CBP One app along with administrative encounters at POEs, but included non-CBP One enforcement encounters at POEs, which at the time averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset; see also CBP, CBP One™ Appointments Increased to 1,450 Per Day (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day; Decl. of Blas Nuñez-Neto ¶ 9, E. Bay Sanctuary Covenant v. Biden, No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

countries throughout the hemisphere.[375] The actions the United States took in the IFR thus affected conditions beyond the southern border and demonstrated a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration.[376] Thus, regardless of whether the foreign affairs exception has been invoked for other rulemakings involving border issues, that exception is applicable here. *See* 5 U.S.C. 553(a)(1). The Departments note, however, that the Circumvention of Lawful Pathways rule did invoke the foreign affairs exception to the APA's delayed-effective-date requirement on similar grounds to the IFR. *See* 88 FR at 31444–45.

b. Good Cause Exception

*Comment:* Commenters stated that the good cause exception did not apply to the IFR because the Departments' claim that proceeding via NPRM would yield a surge in border encounters was misguided, not supported by evidence, and an insufficient reason to invoke the good cause exception. Similarly, commenters stated that the IFR acknowledged that border encounters were lower in 2024 than the year prior, belying the claim of a border emergency. Commenters expressed concern that there is no indication of a new emergency sufficient for the Departments to immediately change their rules without allowing the public an opportunity to engage with or be warned about the coming changes. Commenters further claimed that evidence shows that migration rates rise independently of U.S. efforts to enact consequences, that any change in policy leads to a short-term decrease in encounters and, thus, that the IFR should not have been excepted from the APA. Commenters noted that the increase in encounters in December 2023 was not tied to any policy change. Commenters also criticized the Departments' discounting of the lack of a surge after the Circumvention of Lawful Pathways NPRM, stating that although at that time the Title 42 public health Order remained in effect, "it is disingenuous to compare the current IFR with the lifting of Title 42, which,

as the agencies report, led to increased border entries." Commenters expressed opposition to the Departments' invocation of the good cause exception, remarking that the assumption that "not seeking safety in the United States protects the welfare of people who otherwise would undertake that dangerous journey is unsubstantiated and false."

Commenters compared the IFR to the Circumvention of Lawful Pathways NPRM, which according to the commenters did not invoke the good cause exception. Commenters wrote that the good cause exception should not have applied to the IFR because providing notice would have been both "practicable and in the public interest." Commenters stated that the Departments' good cause exception claim of an emergency is based on "long standing structural challenges," such as backlogged immigration case processing and limited resources.

*Response:* The Departments' decision to invoke the good cause exceptions to the APA's notice-and-comment and delayed-effective-date procedures at 5 U.S.C. 553(b)(B) and (d)(3) was reasonable and appropriate. Notwithstanding that the Departments had ample basis to forgo advance notice and comment, the Departments nevertheless provided an opportunity for public comment and in this final rule are responding to these comments.

An agency may forgo notice and comment when it is "impracticable, unnecessary, or contrary to the public interest." *Id.* 553(b)(B). Here, the notice-and-comment procedures were impracticable and contrary to the public interest because the delays associated with such procedures would have unduly postponed implementation of a policy that was urgently needed to avert significant public harm. While courts have "narrowly construed" this exception, it can "excuse[ ] notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Am. Pub. Gas Ass'n* v. *U.S. DOE,* 72 F.4th 1324, 1339–40 (D.C. Cir. 2023) (internal citations omitted). An advance announcement of the IFR would have seriously undermined a key goal of the policy in disincentivizing substantial levels of irregular migration, *see, e.g.,* 89 FR at 48754, and instead would have incentivized noncitizens to irregularly enter the United States before the IFR took effect.

First, the "impracticable" prong of the good cause exception "excuses notice

and comment in emergency situations . . . or where delay could result in serious harm." [377] Findings of impracticability are "inevitably fact- or context-dependent," [378] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures [379] and the agency's diligence in addressing the problem it seeks to address.[380]

The critical need to immediately implement more effective border management measures is described at length in the June 3 Proclamation, the IFR, and Section II.A of this preamble. Despite the strengthened consequences in place at the SWB and adjacent coastal borders, including the Circumvention of Lawful Pathways rule and other measures (which led to the highest numbers of returns and removals in more than a decade, 89 FR at 48713), when the IFR was published, the U.S. Government continued to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[381] While encounter

---

[375] *See* 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras in 2021, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).

[376] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[377] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[378] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[379] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[380] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("'[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .'").

[381] There were approximately 250,000 USBP encounters along the SWB in December 2023, higher than any previous month on record, *see*
Continued

levels in calendar year 2024 prior to issuance of the IFR had decreased from these record numbers, there was still a substantial and elevated level of migration. Historically high percentages of migrants were claiming fear. 89 FR at 48713.

DHS was forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[382] Even then, it can take a substantial period to effectuate the removal of these individuals.[383] This difficulty in predictably delivering timely decisions

OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[382] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated in February 2022 were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, Current Operating Environment, https:// www.justice.gov/eoir/strategic-plan/strategic- context/current-operating-environment* (last visited Aug. 2, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (July 19, 2024), *https://www.justice.gov/eoir/media/1344951/ dl?inline* (median completion time of 1,241 days); EOIR, *Median Completion Times for Detained Cases* (July 19, 2024), *https://www.justice.gov/eoir/media/ 1344866/dl?inline* (median completion time of 46 days in the third quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS- Detained Cases Completed within Six Months* (July 19, 2024), *https://www.justice.gov/eoir/media/ 1344886/dl?inline* (reporting seven percent of detained cases not completed within six months); *see also* 89 FR at 48749–54 (discussing the limits in the Departments' ability to quickly repatriate noncitizens when encounters are elevated, which results in the release of many of these noncitizens into the United States); Section III.D.1 of this preamble (describing how the rule's thresholds target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered).

[383] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https:// www.nytimes.com/2024/01/31/us/us-immigration- asylum-border.html* ("Most asylum claims are ultimately rejected. But even when that happens, years down the road, applicants are highly unlikely to be [removed]. . . ."); OHSS analysis of 2024 Persist Dataset (Removal Orders tab); *see also* 88 FR at 31326, 31381.

and consequences further compounded incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application. 89 FR at 48714. The emergency border circumstances were not, however, due solely to longstanding structural challenges such as case backlogs in immigration court and the lack of government resources, as one commenter suggested; rather, the heightened level of encounters at the southern border occurred despite recent increases in the number of immigration court judges, immigration court cases completed, individuals processed through expedited removal, and expanded opportunities to use lawful, safe, and orderly processes. *Id.* at 48712–13. The Departments reasonably determined that the heightened levels of migration and forced displacement that resulted in the President's determination to apply the suspension and limitation on entry and the Departments' determination to adopt the IFR would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum or other protection— would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. *See id.* at 48763. The Departments acted immediately to safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. *See id.*

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, when significant public harm would result from the notice-and-comment process.[384] If, for

[384] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was

example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[385] A number of cases follow this logic in the context of economic regulation.[386]

With respect to comments stating that migration rates can rise independently of policy changes, commenters are correct that there are increases in migration rates that do not appear to be a result of changes in U.S. policies, such as the increase in encounters in December 2023. But that does not diminish the impact of even short-term surges after announcements of policy changes, which the Departments have experienced time and again, as detailed in the IFR. *See* 89 FR at 48764–66.

The Departments reasonably assessed that announcing this rule in advance would have likely yielded a surge. As explained in the IFR, the Departments were responding to emergency border circumstances, and advance announcement of the response—a significant change in border policy that increased the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly— would have significantly incentivized migrants to engage in actions likely to compound those very challenges.[387]

'impracticable, unnecessary, or contrary to the public interest' within the meaning of §553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and contract 'actual transactions'—or avoid them—before the freeze deadline.").

[385] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[386] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[387] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2) (noting that on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols, a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), and almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting

These incentives are exacerbated by smugglers, who routinely emphasize the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy.[388] For the same reasons, "the [need] for immediate implementation" outweighed the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forgo it.[389] The stark drop in encounters following implementation of the Proclamation and IFR, as discussed in Section II.A.2 of this preamble, is strong evidence that announcements of such changes in policy can have significant effects on migration patterns; by making the IFR immediately effective, the Departments avoided triggering a surge in migration that might otherwise have occurred during a notice-and-comment period or pending a delayed effective date.

The increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what DHS resources and operations are designed to handle. Increasing encounters raised detention capacity concerns anew, and, at that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities.[390] Given the nature of its facilities, increased numbers and custody duration increase the likelihood that USBP facilities will become quickly overcrowded.[391] In response to the comment noting skepticism over the Departments' assumption that deterring irregular migration will protect migrants' welfare, the Departments disagree: crowding, particularly given how USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[392] The Departments thus assessed that there

would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for the IFR or delayed its effective date.

The Departments' determination in the IFR was also consistent with the United States' past practice. For example, and in response to the comment that the Departments did not invoke the good cause exception in promulgating the Circumvention of Lawful Pathways rule, the Departments provided notice and an opportunity to comment on that rule while the Title 42 public health Order remained in effect[393] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. See 88 FR at 31445–47. Contrary to the comment asserting that it was disingenuous for the Departments to compare the potential surge of migrants between the end of Title 42 and the effective date of the Circumvention of Lawful Pathways rule with the potential surge associated with the delayed implementation of this rule, the Departments merely refer to the Title 42 surge to illustrate that a surge would be likely given the significance of the border policy change made by the IFR, not that the surge would have been of precisely the same degree. See 89 FR at 48761–62.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures, and witnessed a drastic reduction in irregular migration by Venezuelans.[394] Had the parole process been announced before a lengthy notice-and-comment period, thousands of Venezuelan nationals would have likely attempted to cross the United States and Mexican borders before the ineligibility criteria went into effect and before the United States could return Venezuelan nationals to Mexico. See 89 FR at 48766.

DHS similarly concluded in January 2017 that it was imperative to give immediate effect to a rule designating

Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region." [395] The "publication of the rule as a proposed rule . . . would [have] signal[ed] a significant change in policy while permitting continuation of the exception for Cuban nationals, [and] could [have] led] to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." [396] A surge of this kind "would [have] threaten[ed] national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities" and "could also have [had] a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could [have] result[ed] in significant loss of human life." [397]

Given the emergency border circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for the IFR would have been contrary to the public interest because an advance announcement of the rule would have incentivized even more irregular migration by those seeking to enter the United States before the IFR took effect.

c. Length and Sufficiency of Comment Period

*Comment:* Commenters remarked that the 30-day post-promulgation comment period was not long enough to allow for "meaningful[ ] comment" on the IFR, including from experts. Multiple commenters recommended that the Departments either rescind the IFR, reissue it with a longer comment period, or both, and suggested the new comment period be at least 60 days or 90 days. A few commenters expressed concern with the IFR's publication four days before the end of the 30-day comment period for the DHS Mandatory Bars NPRM, stating that the Departments did not give the public an adequate opportunity to analyze or comment on them separately or in conjunction.

---

to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part).

[388] See Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html.*

[389] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[390] See Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[391] *Id.* ¶¶ 6, 14, 17.

[392] *Id.* ¶ 17.

[393] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[394] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

[395] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[396] *Id.*

[397] *Id.*; accord U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

STB_AR1_000110

*Response:* As explained earlier in this Section III.E of this preamble, the Departments did not provide notice and an opportunity to comment or provide for a delayed effective date because the foreign affairs and good cause exceptions to those procedures applied. *See* 5 U.S.C. 553(a)(1), (b)(B). Thus, the IFR became effective on June 5, 2024, after the Proclamation was issued and the IFR was placed in public inspection. *See* 89 FR at 48710. The Departments invited the public to provide post-promulgation comments on the "rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by" July 8, 2024. *Id.* It bears noting that the APA does not impose any requirements governing the process for submitting public comments when an agency voluntarily chooses to receive them following the promulgation of a rule that is exempt from notice-and-comment procedures; much less does it establish any set number of days for which the Departments would have to leave such a comment period open.

This post-promulgation comment period spanned 30 days from the date of publication (from June 7, 2024, through July 8, 2024) and 34 days from the date the IFR was filed for public inspection (the afternoon of June 4, 2024). *See* 89 FR at 48710; *id.* at 48772. The Departments believe this comment period was sufficient to allow for meaningful public input, as evidenced by the 1,067 public comments received, including numerous detailed comments from interested organizations.[398]

Even where notice and comment is required, the APA does not require that the comment period be any particular length. *See* 5 U.S.C. 553(b), (c). And although Executive Orders 12866 and 13563 generally recommend a comment period of at least 60 days, they do not impose any binding requirement that a 60-day period be utilized in every case. In fact, courts have found 30 days to be a reasonable comment period length, finding that such a period is generally "sufficient for interested persons to meaningfully review a proposed rule and provide informed comment," even when "substantial rule changes are proposed." *Nat'l Lifeline Ass'n* v. *FCC,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)); *see also Connecticut Light & Power Co.* v. *Nuclear Regul. Comm'n,* 673 F.2d 525, 534 (D.C. Cir. 1982) (noting that a 30-day comment period was not

unreasonable despite complexity of proposed rule). Comment periods shorter than 30 days, often in the face of exigent circumstances, have also been deemed adequate. *See, e.g., Omnipoint Corp.,* 78 F.3d at 629–30 (concluding 15 days for comments was sufficient); *NW Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (finding 7-day comment period sufficient).

Regarding commenters' concerns about the comment period in light of the DHS Mandatory Bars NPRM, the Departments first emphasize that the two rules regard separate aspects of DHS screening procedures, as discussed above in Section III.D.2 of this preamble. Nevertheless, the Departments explained the relationship between the two rules in the IFR by noting that, "[i]f DHS were to finalize that rule as drafted, [the IFR]'s 'reasonable probability' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility." 89 FR at 48739 n.186; *see id.* at 48756. In addition, because the DHS Mandatory Bars NPRM was published prior to the IFR, commenters were able to use that NPRM to inform their comments on the IFR. Accordingly, the Departments disagree that commenters were provided an inadequate opportunity to comment on the interaction of these two rules.

Here, the 30-day comment period allowed for significant, meaningful public participation. Commenters have provided numerous and detailed comments regarding the IFR, and the Departments appreciate their effort to provide thorough commentary for the Departments' consideration during the preparation of this final rule. The 30-day comment period also allowed the Departments to swiftly finalize a critical border measure needed to address the emergency border circumstances posed by the Departments' lack of resources for delivering timely consequences to the heightened number of migrants attempting to enter the southern border without a viable legal basis for doing so. *See* 89 FR at 48749–54.

### 2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)

*Comments:* One commenter reasoned that the effects of removal on noncitizens should not be disregarded because the costs are not low. The commenter stated that the costs resulting from removal would "encourage refoulement for individuals attempting to reach safety." The commenter stated that correctly identifying meritorious claims of fear is an invaluable process that should not be categorized as costs in "additional time

and resources." The commenter further stated that the Departments cannot simply dismiss the task of identifying meritorious claims or characterize their failure to do as purported cost savings, as the commenter alleges is done in the IFR.

*Response:* The commenter misrepresents the IFR's discussion of costs and impacts, *see* 89 FR at 48766–67, which acknowledged that a noncitizen who would have received asylum in the absence of the rule would incur costs from the denial of that benefit. The IFR also acknowledged that noncitizens may incur further costs upon removal. The Departments have described these potential costs qualitatively not as a means of dismissing the importance of such costs, but in order to assess the costs and benefits of the rule in accordance with certain executive orders addressing the regulatory process. *See id.*

Furthermore, the Departments disagree with the commenter's suggestion that the rule does not result in cost savings. The rule does not cause a reduction in overall resources dedicated to immigration processing and enforcement. Rather, it prevents those resources from being spread so thin. As the IFR's analysis explains, given ongoing strains on limited Federal Government immigration processing and enforcement resources, any reduction in new asylum claims would necessarily increase the availability of those resources and allow for more timely adjudications of existing claims. The benefits of the rule include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the nation's immigration laws; and a reduction in the role of exploitative TCOs and smugglers. *Id.* at 48767. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments. *Id.*

### 3. Alternatives

#### a. Address Root Causes of Migration

*Comment:* A few commenters specifically urged the United States Government to address "root causes" of migration. Many commenters blamed United States foreign policy generally for creating conditions in foreign countries that have caused irregular migration. For example, one commenter stated that the United States must

amend its foreign policies ''which contribute to poverty and injustice in the countries migrants are trying to escape.'' Another commenter called immigration ''payback'' for the United States's foreign policies. Some commenters specified foreign policies they would like to see changed, such as those regarding weapons sales, fossil fuels, the environment, humanitarian aid, and sanctions on foreign governments. Other commenters criticized the Government and corporations for contributing to destabilization in other countries leading to immigration. Commenters suggested that the Government should disrupt corporate greed causing destabilization in other countries.

*Response:* As a preliminary matter, these comments are outside the scope of this rulemaking. Regardless, the Departments disagree with the suggestion that addressing the root causes of migration obviates the necessity of the rule. Rather, the United States' ongoing efforts, along with those of partner nations, to address the root causes of migration and abate adverse effects from unprecedented levels of global irregular migration will not immediately resolve the urgent border security and immigration systems' situations. Efforts to address the root causes of irregular migration will take significant time to create impact, and in the meantime the more targeted policies set forth in the IFR and this rule are necessary to alleviate the current acute stress on the border security and immigration systems.

The Departments nonetheless agree with commenters that addressing root causes is a necessary element of regional migration management. For example, the *U.S. Strategy for Addressing the Root Causes of Migration in Central America,* directed by the President in Executive Order 14010, 86 FR 8267 (Feb. 5, 2021), focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and it takes into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society.[399] The strategy includes addressing economic, governance, and security challenges through five pillars: (1) addressing economic insecurity and inequality; (2) combating corruption and strengthening democratic governance; (3) promoting human rights and labor rights; (4) countering and preventing violence; and

(5) combating sexual and gender-based violence.[400] In March 2024, the White House announced that the Administration is on track to meet its commitment in the root causes strategy to provide $4 billion to the region over four years.[401]

The United States has also worked closely with its regional partners to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including taking measures to address the root causes of migration, expand access to lawful pathways, improve the U.S. asylum system, and address the pernicious role of smugglers. The IFR provided a detailed account of the United States' efforts throughout the region to implement such strategies. *See* 89 FR at 48759–62. For instance, the United States, along with 21 other countries in the Western Hemisphere, has endorsed the L.A. Declaration, which proposes a comprehensive approach to managing migration throughout the Western Hemisphere. *See id.* at 48759. Under the L.A. Declaration's framework, the United States has been working closely with foreign partners to manage the unprecedented levels of migration that countries throughout the region have been experiencing, including efforts to expand access to and increase lawful pathways; conduct joint enforcement efforts; and share information, technical assistance, and best practices. *Id.* at 48759–60.

Additionally, the Government has developed and implemented a number of policy measures, including the Circumvention of Lawful Pathways rule and other measures, which are complemented by a range of actions taken by foreign partners in the region, such as campaigns by Colombia and Panama to counter smuggling networks in the Darién Gap. The Government believes that migration is a shared responsibility among all countries in the region, which is reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.

Consistent with these efforts, this rule will further incentivize noncitizens to avoid irregular migration and instead avail themselves of other lawful, safe, and orderly means for seeking

protection in the United States or elsewhere. The Departments agree with commenters that recent surges in irregular migration have been caused by multiple factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose timely consequences at the border is limited by the lack of resources and tools available and by partner nations' operational constraints.

Although this rule does not purport to—and a single rule cannot—address all of the root causes and factors driving migration, the Departments assess that this rule has significantly increased their ability to deliver timely decisions and consequences at the southern border with currently available resources, combating perceptions and messaging to the contrary. Given the challenges facing the United States and its regional partners, this regulatory effort—and the strong consequences it imposes at the southern border—have sent and will continue to send an important message throughout the region that the United States has put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In short, the Departments acknowledge that international migration trends are the product of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59. The United States Government is working to address these root causes of migration, including by cooperating closely with partner countries, and to abate adverse effects from unprecedented levels of irregular migration.

b. Prioritize Funding and Other Resources

*Comment:* Many commenters urged the United States Government to prioritize funding, other resources, or alternative policies to make border processing and asylum adjudications more effective and efficient. Commenters suggested various priorities for funding, including hiring more personnel and staff, such as immigration officers, IJs, and court personnel; allocating more funding to already existing personnel and staff; allocating more funding and other resources to local governments and organizations that assist immigrants; increasing access to legal representation and mental health services; and devoting more resources to asylum processing and adjudications at POEs and the interior.

---

[399] Nat'l Sec. Council, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* at 4 (July 2021), *https://www.whitehouse.gov/wp-content/uploads/2021/07/Root-Causes-Strategy.pdf.*

[400] The White House, *Fact Sheet: Update on the U.S. Strategy for Addressing the Root Causes of Migration in Central America* (Mar. 25, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/25/fact-sheet-update-on-the-u-s-strategy-for-addressing-the-root-causes-of-migration-in-central-america-3/.*

[401] *Id.*

Other commenters suggested more generally that the Government devote more resources to recent arrivals and the asylum system. A few commenters specified that the Government should provide additional funding for the Shelter and Services Program and the Case Management Pilot Program. One commenter suggested that the Government create a system to require asylum seekers to have their applications vetted in their home countries as a way to reduce costs and migration. Another commenter suggested sending noncitizen arrivals with family members in the United States to their families. One commenter stated that the Government should expand capacity at the border, while another commenter questioned DHS's ability to increase capacity at POEs.

*Response:* The Departments acknowledge commenters' suggestions for increasing resources, both financial and otherwise, to account for the increased arrivals at the southern border, but those suggestions are outside the scope of this rulemaking, and they would require congressional action. As discussed in the IFR, the circumstances that the Departments faced in June 2024 existed despite the Departments' efforts to address substantial levels of migration and were a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. *See* 89 FR at 48712–15. The Administration has repeatedly requested additional resources from Congress, only some of which have been provided. *See id.* at 48728. USCIS also implemented a new fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service.[402] While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate, keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget. 89 FR at 48729.

Additional financial support would require additional congressional actions, including significant additional appropriations, which are outside the scope of this rulemaking. The Departments agree with the commenters that additional resources would provide substantial benefits for managing the border and immigration systems but decline to wait to act pending receipt of additional funding from Congress. DHS notes that despite this lack of additional funding it has taken steps to increase processing at SWB POEs, including through use of the CBP One app.[403]

Additionally, the Departments note that they are leading ongoing Federal Government efforts to support NGOs, local and state governments, and other migrant support organizations as they work to respond to the unprecedented migration impacting communities across the United States. As noted in the Circumvention of Lawful Pathways rule, FEMA spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the EFSP–H to assist migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 31327 (citing 88 FR at 11704–05). In December 2022, $75 million was awarded through the program.[404] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[405] For FY 2023, there were $363.8 million in available funds to enable non-federal entities to provide humanitarian services to noncitizen migrants following their release from DHS.[406] In FY 2024, that figure increased to nearly $650 million.[407]

The Departments do not agree with commenter's suggestions that alternative policies, including vetting migrants in their home countries and sending those who arrive the United States who have family members in the United States to those family members, should be pursued in place of this rule. In addition to being far outside the scope of the rule, such policies would lack the demonstrably effective incentive structure of this rule. The Departments nonetheless agree that the United States must consistently engage with partners throughout the Western Hemisphere to address the hardships that cause people to leave their homes and come to our southern border. During the emergency border circumstances underlying the rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed and overall border security and immigration systems efficiencies. Swift removal of noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period.

*Comment:* Some commenters stated that the Government "should focus on educating the public about the complexities of immigration" and "provide information to the American people" regarding contributions of immigrants to society.

*Response:* The Departments maintain publicly accessible information regarding the border security and immigration systems and routinely publicize law enforcement action and efforts against human trafficking, smuggling, and TCOs that profit from irregular migration.[408] The Departments will continue to make such information publicly available through routine publication. To the extent commenters suggest that the Departments should inform the American public about the contributions migrants have made to the United States, the Departments respectfully note that such action is outside the scope of this rulemaking as it is unrelated to and would have no immediate effect on encounters at the southern border.

c. Further Expand Refugee Processing or Other Lawful Pathways

*Comment:* Several commenters suggested increasing access to asylum and humanitarian protections. Commenters expressed concern that the United States' annual rates of refugee admissions have not kept pace with

---

[402] *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 89 FR 6194, 6194 (Jan. 31, 2024); *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction,* 89 FR 20101 (Mar. 21, 2024) (making corrections).

[403] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[404] *See* FEMA, Release No. HQ–22–232, *Emergency Food and Shelter Program National Board Allocates $75 Million for Humanitarian Assistance* (Dec. 23, 2022), *https://www.fema.gov/press-release/20230103/emergency-food-and-shelter-program-national-board-allocates-75-million.*

[405] Public Law 117–328, Division F, Title II, Security, Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support, 131 Stat. 4459, 4730 (2022).

[406] FEMA, Shelter and Services Program (June 14, 2024), *https://www.fema.gov/grants/shelter-services-program.*

[407] *Id.*

[408] *See* DHS, Securing the Border (last updated Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws;* DHS, Border Security (last updated Nov. 7, 2023), *https://www.dhs.gov/topics/border-security.*

worldwide demand for refugee protections, driving migrants to seek alternative, and oftentimes irregular, migration routes. While many commenters focused on noncitizens arriving at the border, at least one commenter suggested expanding protections for "those who have long called the United States home." Many commenters stated that the Government "should be creating accessible pathways to citizenship." Many commenters emphasized the need for expanded lawful pathways and speeding up processing times. One commenter requested that the Government "invest in expanding pathways to lawful status." Several commenters implored the Government to focus "on a solutions strategy."

*Response:* The United States has made and will continue to make extensive efforts to expand refugee processing and lawful pathways generally.[409] As explained in detail in the IFR, in recent years, the Government has overseen the largest expansion of lawful, safe, and orderly pathways and processes for noncitizens to come to the United States in decades. 89 FR at 48760. Such steps include promulgating the Circumvention of Lawful Pathways rule, refocusing a significant portion of DHS's southern border workforce to prioritize migration management above other border security missions, implementing the CHNV parole processes, implementing the Safe Mobility Initiative in several countries, expanding country-specific family reunification parole processes, expanding opportunities to enter the United States for seasonal employment, establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive at POEs through the CBP One app, increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024, completing approximately 89 percent more immigration court cases in FY 2023 compared to FY 2019, and increasing the IJ corps by 66 percent from FY 2019 to FY 2023. 89 FR at 48712–13.

---

[409] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and* (citing continued efforts to expand lawful pathways and processes, including establishing country-specific parole processes for certain nationals, working with interagency partners and the private sector to increase access to H–2 nonimmigration visa programs, expanding capacity at POEs to increase CBP One app processing capabilities, and implementing new family reunification parole processes among other efforts).

Despite these and other efforts to expand lawful pathways and provide border security, and while DHS is processing noncitizens in record numbers and with record efficiency, the border security and immigration systems have not been able to keep pace with the number of noncitizens arriving at the southern border. Simply put, the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross irregularly and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection, when noncitizens are arriving at such elevated volumes.

Further, existing levels of migration make clear that the efforts described above, on their own, are insufficient to change the incentives of migrants, reduce the risks associated with current levels of irregular migration and the current surges of migrants to the border, and protect migrants from human smugglers that profit from their vulnerability. The Departments note that, while they continue to explore the possibility of providing additional lawful pathways, this rule does not create, expand, or otherwise constitute the basis for any lawful pathway. The Departments further note that requests that the United States create a path to citizenship is outside the scope of this rulemaking.

d. Expand Asylum Merits Process

*Comment:* One commenter stated that instead of finalizing the IFR, the Departments should consider expanding the use of the AMI process outlined in the Asylum Processing IFR. The commenter stated that the rule has the same stated purpose of increasing efficiency and fairness of asylum adjudications for those in expedited removal, but that DHS had reduced its use of the AMI process in the last quarter of 2022 and has not explained why finalizing the IFR is preferable.

*Response:* The Departments do not view the present rulemaking and the Asylum Processing IFR as mutually exclusive. Rather, the Departments view these rulemakings as complementary efforts. The AMI process promulgated in the Asylum Processing IFR is predicated on a noncitizen receiving a positive credible fear determination and seeks to make the process following a positive credible fear determination more efficient and streamlined, while maintaining fairness; meanwhile, the present rulemaking establishes a limitation on asylum eligibility and addresses the credible fear process

itself. While both rulemakings seek to increase efficiency and maintain fairness, they do so by focusing on separate parts of the process—one primarily prior to and during a credible fear determination (the present rulemaking) and one following service of a positive credible fear determination (the Asylum Processing IFR). Additionally, the Asylum Processing IFR was written with the express intent of being implemented in a discretionary manner. As the Departments explained, the discretion of USCIS to place an individual with a positive credible fear determination into the AMI process under the rule or to issue an NTA for removal proceedings under section 240 of the INA was a necessary part of the rule in order for it to function, as the rule would have to be implemented in a reality in which USCIS did not have all of the resources necessary to place every case with a positive credible fear determination into the AMI process. *See* 87 FR at 18185. Accordingly, the Asylum Processing IFR provided USCIS complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f).

As explained in the preamble to the IFR, there are simply not enough AOs available to conduct fear screenings to keep pace with current sustained high encounter rates. *See* 89 FR at 48714. USCIS has a finite number of AOs to conduct all of its casework, including fear screenings, and does not plan on placing cases into the AMI process in circumstances in which the noncitizen did not establish a significant possibility that they would ultimately be able to establish by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that they qualify for the exception; such an approach would not be a prudent use of resources given current operational realities. *See* 89 FR at 48756. The Departments nonetheless formulated the present rulemaking in a manner that preserves the ability of USCIS to exercise its discretion to place cases with positive credible fear determinations in the AMI process should USCIS have the resources available to do so in the future. *See id.; see also* 8 CFR 208.35(b)(2)(ii). The Departments will continue to implement the Asylum Processing IFR in a manner consistent with the way the rule was envisioned to function, enrolling new cases in the process at the discretion of USCIS, in accordance with available resources.

**STB_AR1_000114**

e. Other Congressional Action

*Comment:* Many commenters stated that the Administration should work with Congress on comprehensive legislative reforms. Commenters emphasized the need for meaningful legislative reform of the U.S. immigration system. Several commenters demanded that Congress address ''the issue of immigration.'' Commenters pointed to a variety of reforms that they believed Congress should implement. However, one commenter disagreed with any suggestion that the border crisis was the result of any failure of Congress and felt it was the Administration's consistent ''abdication'' of border security and immigration enforcement that has resulted in the sustained, high rate of encounters since 2021.

*Response:* These are suggestions for Congress and are outside the scope of this rulemaking. Nevertheless, the Departments acknowledge the commenters' expressed frustration with Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. The Departments observe that this failure, combined with unprecedented levels of irregular migration along the southern border, makes up the causal background of the June 3 Proclamation and this rule, and they therefore disagree with one commenter's suggestion that the current border circumstances can be ascribed to the Administration's alleged ''abdication'' of border security, and in no part to any congressional inaction. As explained in the June 3 Proclamation and the IFR, in the absence of congressional action to provide appropriate resources to DHS and EOIR and to reform the outdated statutory framework, the rule implements new policies to substantially improve the Departments' ability within that framework to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. *See* 89 FR at 48715. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border.

f. Additional Suggested Measures or Revisions

*Comment:* One commenter suggested that the Departments ''engage in meaningful dialogue with legal experts and humanitarian groups to develop compassionate and effective approaches to migration.''

*Response:* The Departments appreciate the commenter's suggestion and welcome the views of legal experts and humanitarian groups. Indeed, the Departments have sought comment on their rules relating to border management—such as the Asylum Processing IFR, Circumvention of Lawful Pathways rule, DHS Mandatory Bars NPRM, and the IFR here—and have either considered and responded to those comments, or, in the case of the DHS Mandatory Bars NPRM, are in the process of doing so. Additionally, such experts and organizations are able to petition the Departments for rulemaking, through which process they may present their proposals for consideration by the Departments. The Departments appreciate the thoughtful comments and feedback they have received from the public, including legal experts and humanitarian groups, and hope that the public's interest in aiding the Departments in their efforts to manage the border continues. Further, since the June 3 Proclamation and the IFR came into force, DHS has continually engaged advocacy, non-governmental, and international organization partners to seek their feedback and perspectives.

*Comment:* One commenter made several suggestions for additional, stricter measures instead of or in addition to this rule. Such suggested measures included strictly limiting parole into the United States, reinstating MPP and requiring noncitizens to wait in Mexico pending removal proceedings, rescinding enforcement priorities and enforcing immigration law in the interior of the United States, expanding expedited removal, terminating policies the commenter viewed as hindering immigration enforcement, requiring AOs to apply all mandatory bars to asylum and statutory withholding of removal in credible fear screenings, raising the standard for withholding of removal and deferral of removal to the ''reasonable probability'' standard for all credible fear proceedings, and terminating USCIS's policy of accepting requests for reconsideration after an IJ has concurred with an AO's negative credible fear determination. The commenter, addressing the instant rule, requested that the Departments eliminate ''overbroad and easy to exploit loopholes,'' specifically stating that the Departments should ''strike'' the exception for those who establish exceptionally compelling circumstances. One commenter stated that the rule should also apply to the northern border.

*Response:* The Departments acknowledge the commenters' varying viewpoints and concerns but believe that even if some of the alternatives proposed by the commenters are suitable to pursue, they would not obviate the need for this rule. Proposals to broadly limit lawful pathways to enter the United States, such as parole processes, are outside the scope of this rulemaking, as are other comments advocating for immigration policy changes or reforms unrelated to the IFR.

The Departments nonetheless note that this rule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations. Even so, in the Departments' experience, the various parole processes work in tandem with other lawful pathways in a complementary manner to address surges in migration. Examples of the success of DHS's discretionary parole processes include the CHNV parole processes and family reunification parole processes resulting in use of lawful pathways for entry into the United States. Importantly, the parole processes themselves are lawful pathways for qualifying individuals seeking to come to the United States, and this rule does not discourage their use. The parole processes are lawful, safe, and orderly pathways that the Departments wish to encourage in light of the urgent circumstances.

The Departments disagree with commenters' suggestion to reinstate MPP for the reasons stated in the IFR and the Circumvention of Lawful Pathways rule. *See* 89 FR at 48752 n.271; 88 FR at 31370.

Regarding commenters' request for expansion of expedited removal, the Departments observe that, among the series of steps the Government has taken to strengthen consequences for irregular entry at the border, DHS has processed record numbers of individuals through expedited removal. For example, in the months between May 12, 2023, and June 4, 2024, CBP processed more than 359,000 noncitizens encountered at and between POEs along the SWB for expedited removal [410]—almost twice as many as any prior full FY.[411] Indeed, under the IFR, from June 5 through August 31, 2024:

---

[410] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[411] OHSS analysis of June 2024 Enforcement Lifecycle and July 2024 OHSS Persist Dataset. Prior to FY 2024, the single-year FY record for Southwest Border cases processed for expedited removal was 202,000 in FY 2013 (Historic CFIs tab).

• DHS removed or returned more than 119,000 individuals encountered at the SWB [412] to more than 140 countries, including by operating more than 400 international repatriation flights; [413]

• DHS has doubled the percentage of noncitizens encountered at the SWB who are removed or returned directly from CBP custody compared to the immediate post-pandemic period (32 percent compared to 16 percent); [414]

• DHS has more than tripled the percentage of noncitizens encountered by USBP at the SWB who are processed through expedited removal (up from 18 percent to 59 percent; expedited removal processing was already at record levels, as noted above); [415] and

• DHS has decreased the percentage of noncitizens encountered at the SWB who are released by USBP pending their section 240 removal proceedings by more than half (from 64 percent to 31 percent).[416]

However, as explained at length in the IFR, DHS's ability to apply expedited removal is subject to resource constraints. *See, e.g.,* 89 FR at 48752. At high levels of encounters, DHS simply lacks sufficient resources, such as AOs to conduct fear screenings and temporary processing facilities, to refer noncitizens for expedited removal processing. The mismatch in resources and encounters has created stress on the border security and immigration systems, forcing DHS to rely on processing pathways outside of expedited removal.

With respect to the suggestion that mandatory bars be considered at the screening stage under a reasonable possibility standard, DHS is considering that issue in a separate rulemaking. *See* Mandatory Bars NPRM.

The Departments decline to apply the "reasonable probability" standard to screen all statutory withholding of removal and CAT protection claims during all credible fear interviews at this time. Although the Departments acknowledge the commenters' concerns, the Departments emphasize that the primary focus of this rule is to substantially improve the Departments' ability, during periods of high encounters, to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. Application of the a "reasonable

probability" standard under emergency border circumstances as defined in the rule satisfies these goals.

The suggestion to generally disallow USCIS from accepting requests for reconsideration of negative credible fear determinations exceeds the scope of this rulemaking, which regards the procedures applied during emergency border circumstances. The Departments note that during such circumstances, if it was determined at the credible fear interview that there is not a significant possibility a noncitizen could ultimately demonstrate by a preponderance of the evidence that they are not subject to the IFR's limitation on asylum eligibility or are eligible for the exception to the limitation, the noncitizen would not be permitted to submit requests for reconsideration with USCIS. *See* 8 CFR 208.35(b)(2)(v)(B). In such circumstances, USCIS may, in its sole discretion, reconsider a negative determination. *See id.; see also* 89 FR at 48756.

The Departments disagree with the concern one commenter raised about what it characterized as "loopholes." The exceptions to the limitation on eligibility for asylum are necessary to prevent undue hardship. The Departments have limited the means of avoiding the limitation on asylum eligibility to those identified in the June 3 Proclamation and to exceptionally compelling circumstances in an effort to maximize the rule's applicability.

With respect to a commenter's suggestion that the rule apply to the northern border, the Departments do not currently assess that application of the rule is necessary at the U.S.-Canada land border. Instead, the United States is implementing other measures to address irregular migration at that border, such as the Additional Protocol of 2022 to the Safe Third Country Agreement between the United States and Canada, which expands the Agreement to apply to noncitizens who claim asylum or other protection within 14 days of crossing the U.S.-Canada land border between POEs, including certain mutually designated bodies of water. *See* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023). Under the Safe Third Country Agreement, with limited exceptions, noncitizens who cross from Canada to the United States cannot pursue an asylum or other protection claim in the United States and are instead returned to Canada to pursue their claim.

*Comment:* A commenter suggested exempting persons who manifest a credible fear from penalties arising from expedited removal, including restrictions on subsequent admission to the United States, and conditioning the implementation of restrictions on eligibility for protection at the border "on the actual availability of an alternative pathway[ ]."

*Response:* The Departments acknowledge the commenters' suggestions but do not believe the alternatives proposed by the commenters are suitable to address operational concerns or meet the Departments' policy objectives.

With regard to comments recommending that all noncitizens who manifest a fear be exempted from facing "penalties" arising from expedited removal, including restrictions on future admission to the United States, the Departments note that such a change would require a change to the INA, and thus is not within the Department's authority. *See* INA 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (providing that noncitizens removed pursuant to an order of expedited removal are inadmissible for a period of five or ten years following the date of such removal).

With regard to the commenter's suggestion to condition the limitation on asylum eligibility on whether each individual had a lawful, safe, and orderly pathway available to them, the Departments note that the current framework already effectively does so. Any noncitizen without documents sufficient for lawful admission to the United States may pre-schedule a time and place to present at a POE through the CBP One app.[417] Those who cannot wait for such an appointment may present at a POE and seek an exception to the Proclamation's suspension and limitation on entry or establish exceptionally compelling circumstances before an AO or IJ, both of which except them from the limitation on asylum eligibility. *See* 8 CFR 208.35(a), 1208.35(a). To the extent commenters think these mechanisms are insufficient, the Departments have considered those arguments but believe that the rule strikes an appropriate balance between managing emergency border circumstances and protecting noncitizens' access to asylum, as discussed in Section III.C.1.b of this preamble.

---

[412] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR details tab).

[413] OHSS analysis of data downloaded from UIP on September 3, 2024 (Flights and Removals tab).

[414] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[415] *Id.*

[416] *Id.*

[417] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

STB_AR1_000116

## F. Out of Scope

*Comment:* In addition to the comments discussed above, commenters also discussed a range of topics that are outside the scope of this rule. For example, some commenters shared a general concern relating to overpopulation; a recommendation that the United States accept a certain number of noncitizens each year to compensate for labor shortages; a suggestion that the Government provide legal counsel at no expense to noncitizens or otherwise fund court-appointed counsel; a suggestion to issue "general rules or guidelines in lieu of case by case assessments that would allow asylum officers to quickly approve certain cases"; a suggested amendment to the DHS Mandatory Bars NPRM to require AOs to apply all mandatory bars to asylum and statutory withholding of removal at the credible fear stage; a recommendation to preclude USCIS from considering requests for reconsideration of negative credible fear or reasonable fear determinations that have been reviewed by an IJ; concern with and strong opposition to the United States' military support for Israel; a request for open borders; a request for the Government to focus its efforts on providing asylum seekers access to mental health services; requests related to custody and detention of noncitizens and asylum seekers, such as investing in "non-custodial processing centers"; concerns about family separation and reunification policies; a recommendation to provide "relief for undocumented caregivers by modernizing existing rules"; suggestions relating to work authorization for migrants and asylum seekers; sentiments that the Government should provide funding to support migrant communities with public services and respite; a recommendation that the Government grow "federal support for case management support"; claims that the President does not have authority under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), for the policies and objectives of the Proclamation; a claim that the President's use of his authority under section 212(f) of the INA, 8 U.S.C. 1182(f), to issue the Proclamation is a departure from how other presidents have used the authority in the past, relying on statements from the Ninth Circuit's decision in *Hawaii* v. *Trump,* 878 F.3d 662, 689 (9th Cir. 2017), *rev'd and remanded,* 585 U.S. 667 (2018); challenges to DHS's parole authority and use of parole; and a recommendation to give second chances

to noncitizens involved in unlawful activities and to shut down operations such as the Western Hemisphere Institute for Security Cooperation because they further perpetuate drug-related violence.

*Response:* These comments address matters beyond the scope of the rule and do not require further response. To the extent that commenters' concerns raised in relation to actions taken under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f), 1185(a), apply also to the legality of actions taken by the Departments, and not only to the President's June 3 Proclamation or DHS's implementation of it, those concerns are addressed in Section III.A.1 of this preamble.

## IV. Requests for Comments

### A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule

The Departments request comment on whether to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). The Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility applies to a noncitizen who "enters the United States from Mexico at the southwest land border or adjacent coastal borders." *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). In addition, among other requirements, the rebuttable presumption only applies if the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the Refugee Convention or the Refugee Protocol. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii).

The Departments specifically welcome comment on two proposals: first, whether, in 8 CFR 208.33(a)(1) and 1208.33(a)(1), the Departments should remove the words "from Mexico at the southwest land border or adjacent coastal borders" and replace them with the words "across the southern border (as that term is described in section 4(d) of Presidential Proclamation 10773)." Second, the Departments welcome comment on whether to add to the beginning of 8 CFR 208.33(a)(1)(iii) and 1208.33(a)(1)(iii) a clause that reads, "After the alien entered the United States by sea, or"—so that paragraph (a)(1)(iii) would state in full, "After the alien entered the United States by sea, or after the alien traveled through a

country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees." In a future final rule, the Departments may adopt the first proposal, the second proposal, or both.

Although this request for comment is similar to the Departments' request for comment in the Circumvention of Lawful Pathways rule, *see* 88 FR at 31440–44, the Departments are now seeking comments on the geographic scope in the broader context of this Securing the Border [418] rulemaking. Given the intervening Securing the Border rulemaking, the comments that will be most useful are those that are informed by the full range of actions taken to address migration since the end of the Title 42 public health Order. Accordingly, although the Departments intend to incorporate any comments received on the 2023 Circumvention of Lawful Pathways rule's request for comment into the docket for this request for comment, those who submitted comments in response to that request for comment are encouraged to update their comments in light of the intervening Securing the Border rulemaking and resubmit their comments here.

Unlike the Circumvention of Lawful Pathways rule, the Proclamation and the Securing the Border rule apply to certain noncitizens entering the United States across the "southern border," which includes "southern coastal borders." 89 FR at 48491; *see also* 8 CFR 208.13(g), 1208.13(g). Section 4(b) of the Proclamation defines "southern coastal borders" to mean "all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico." 89 FR at 48491. The term "southern border" adopted by the Proclamation and the Securing the Border rule is categorically broader than the term "adjacent coastal borders" adopted in the Circumvention of Lawful Pathways rule, which the Departments defined as "any coastal border at or near the U.S.-Mexico border." 88 FR at 31320. In contrast to this definition, the term "southern coastal borders" encompasses certain specified coastlines that are not at or

---

[418] Although the Departments have not referred to the present rule as the "Securing the Border rule" throughout this preamble, the Departments do so in this request for comment to distinguish the present rule from the Circumvention of Lawful Pathways rule in an effort to avoid confusion.

near the U.S.-Mexico border, such as the maritime borders of Puerto Rico and the United States Virgin Islands. 89 FR at 48711 n.4.

The Departments believe it is best to align the geographic reach of the Circumvention of Lawful Pathways rule to that in the Proclamation, which was adopted by the Securing the Border rule, for three reasons: (1) to make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to crossing irregularly no matter where along the southern border they cross; (2) to deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) to ensure consistency in implementation. This modification to the geographic reach of the Circumvention of Lawful Pathways rule would encourage noncitizens to avoid dangerous maritime migration and further persuade them to utilize lawful, safe, and orderly pathways. As discussed in more detail below, maritime migration results in life-threatening risks for both migrants and DHS personnel.

When the Departments initially proposed the Circumvention of Lawful Pathways rule, the rule would have covered migrants who entered the United States from Mexico "at the southwest land border"—that is, "along the entirety of the U.S. land border with Mexico." 88 FR at 11704 n.1; *see also id.* at 11750, 11751. However, the Departments received comment from the public expressing concern that limiting the rebuttable presumption to only those who entered the United States from Mexico by land would incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making the hazardous attempt to reach the United States by sea. 88 FR at 31320. Concurring with this concern, the Departments modified the geographic reach of the rebuttable presumption to include "adjacent coastal borders" so that it applied to noncitizens who crossed into the United States from Mexico via adjacent coastal borders. Further, this definition mirrored the geographic reach of the Centers for Disease Control and Prevention's ("CDC") Title 42 public

health Order and, as implemented by CBP, the Amended CDC Order issued in May 2020. *Id.* Because CBP had been interpreting the term in this way for three years before the Circumvention of Lawful Pathways rule's finalization, the Departments believed this consistency with the Title 42 public health Order in geographic application would help prevent smugglers from exploiting what could be perceived as a loophole by persuading migrants to take the perilous journey of trying to reach the United States by sea upon the termination of the Order. *Id.*

The Departments now believe that further expanding the geographic scope of the Circumvention of Lawful Pathways rule beyond "adjacent coastal borders," and, with respect to those who arrive by sea, removing the restriction that the rule only applies to noncitizens who enter the United States from Mexico, could be supported by the same justification for the Securing the Border rule's inclusion of southern coastal borders: these changes would "help avoid any incentive for maritime migration to such locations" that are currently covered by the Securing the Border rule but not by the Circumvention of Lawful Pathways rule. 89 FR at 48711 n.4. For example, expanding the scope of the Circumvention of Lawful Pathways rule in this manner would mean that a noncitizen who enters the United States at a border via the Gulf of Mexico would be subject to the Circumvention of Lawful Pathways rule regardless of whether they transited through Mexico. Further, as an operational matter, this would ensure consistency in processing. Aligning the geographic scope of the Circumvention of Law Pathways rule with that of the Securing the Border rule would eliminate one operational switch that DHS personnel would have to make when the provisions of the Securing the Border rule discontinue in the absence of emergency border circumstances. This would allow DHS personnel to operate consistently with respect to noncitizens encountered utilizing maritime migration to cross the southern coastal borders, all of whom would be presumptively ineligible for asylum.

Maritime migration poses unique hazards to life and safety to both migrants and DHS personnel.[419] Human smugglers and noncitizens migrating to the United States continue to use unseaworthy, overly crowded vessels,

piloted by inexperienced mariners, without any safety equipment—including, but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons.[420] The USCG regularly interdicts noncitizens employing maritime migration in the Gulf of Mexico and Atlantic Ocean in makeshift, overcrowded vessels.[421] In FY 2022, over 12,500 noncitizens were interdicted by the USCG and in FY 2023, that figure was nearly 13,500.[422] This is a dramatic increase from previous years. For example, between FY 2017 and FY 2020, annual maritime interdictions never exceeded 3,600.[423] Between October 1, 2023 and April 30, 2024, the USCG carried out 35 maritime migration interdictions in the Mona Passage and waters near Puerto Rico, with nearly 1,200 noncitizens interdicted at sea from various countries such as the Dominican Republic, Haiti, and Venezuela.[424] Between October 1, 2022 and August 5, 2023, the USCG interdicted over 6,900 migrants from Cuba alone.[425] In August 2024, the

---

[419] The Departments also reiterate the explanation of the dangers of maritime migration in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31441–42.

[420] *See* David C. Adams, James Wagner, *At Least 40 Migrants Die in Boat Fire off Haitian Coast, U.N. says,* N.Y. Times (July 19, 2024), *https://nytimes.com/2024/07/19/world/americas/boat-fire-haiti-migrants.html;* Samantha Schmidt, Paulina Villegas, Hannah Dormido, *Dreams and Deadly Seas: Bahamas Human Smuggling by Boat,* The Wash. Post (July 27, 2023), *https://www.washingtonpost.com/nation/interactive/2023/bahamas-human-smuggling-by-boat/* ("The United States . . . Coast Guard cutters have been rescuing migrants from foundering or overcrowded boats every few days."); Adriana Gomez Licon, *Situation 'dire' as Coast Guard seeks 38 missing off Florida,* Associated Press (Jan. 26, 2022), *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe06430474dc3a3019;* Gina Martinez, *Coast Guard rescues more than 180 people from overloaded sailboat in Florida Keys,* CBS News, CW44 Tampa (Nov. 22, 2022), *https://www.cbsnews.com/news/coast-guard-rescues-more-than-180-people-overloaded-sailboat-florida-keys/.*

[421] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate; see also* USCG, *Press Release: Coast Guard repatriates 119 migrants to Dominican Republic following 2 interdictions near Puerto Rico* (Apr. 29, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3758973/coast-guard-repatriates-119-migrants-to-dominican-republic-following-2-interdic/.*

[422] OHSS analysis of July 2024 Persist Dataset (Maritime Interdictions tab).

[423] *Id.*

[424] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate.*

[425] USCG, *Press Release: Coast Guard repatriates 27 people to Cuba* (Aug. 5, 2023), *https://www.news.uscg.mil/Press-Releases/Article/*

Continued

USCG interdicted a disabled migrant vessel and repatriated 182 migrants back to Haiti.[426] In May 2024, the USCG located and intercepted a 30-foot makeshift vessel with over 60 migrants crammed into it traveling nearly 63 miles north of Punta Cana, Dominican Republic.[427] During a second interdiction occurring on May 20, 2024, CBP's Air and Marine Operations interdicted a "grossly overloaded makeshift vessel" carrying 68 migrants located two miles from Puerto Rico's coastline.[428]

In FY 2023, the USCG recorded 112 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. IOM's Missing Migrants Project found that from 2014 to 2024, in the Americas, the maritime route from the Caribbean to the United States resulted in the second-highest number of dead and missing migrants, after the U.S.-Mexico border crossing.[429] The intention behind the Circumvention of Lawful Pathways rule is to discourage individuals from resorting to irregular migration, including markedly more dangerous maritime migration, and to instead incentivize noncitizens to utilize lawful, safe, and orderly pathways and processes to come to the United States. Expanding the geographic scope of the Circumvention of Lawful Pathways rule's rebuttable presumption would expand that incentive structure to cover the entire southern border, rather than just a portion of it.

The United States has taken significant steps to expand safe and orderly options for migrants, including migrants from the Caribbean region, to lawfully enter the United States.[430] The United States has increased and will continue to increase refugee processing in the Western Hemisphere; country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit, including the Cuba and Haiti parole processes; and opportunities to lawfully enter the United States for the purpose of seasonal employment.[431] In addition, the United States has resumed the Cuban Family Reunification Program and resumed and increased participation in the Haitian Family Reunification Program.[432] The availability of these pathways serves as important background for the proposal to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. Such pathways for migrants from this region provide meaningful opportunities for these individuals to use a lawful, safe, and orderly pathway to enter the United States, even if they did not first travel through a third country where they could request such protection. Accordingly, the Departments are considering and seeking comment on applying the Circumvention of Lawful Pathways rebuttable presumption to those who enter the United States via the southern coastal border, irrespective of whether they traveled through a third country, to discourage noncitizens from using dangerous maritime migration routes.

*B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption*

Currently, the Circumvention of Lawful Pathways rule applies to a noncitizen who, *inter alia*, entered the United States from Mexico "between May 11, 2023 and May 11, 2025" and "[s]ubsequent to the end of implementation of the Title 42 public health Order." 8 CFR 208.33(a)(1)(i)–(ii),

1208.33(a)(1)(i)–(ii). When issuing that rule, the Departments acknowledged that "aspects of the present situation at the border are likely to continue for some time and are unlikely to be significantly changed in a short period," but the Departments opted for a two-year "entry period" to, *inter alia*, address the surge in migration that, in the absence of the Circumvention of Lawful Pathways rule, was anticipated to follow the lifting of the Title 42 public health Order and to provide sufficient time to implement and assess the effects of the policy contained in that rule. *See* 88 FR at 11727; 88 FR at 31421. The Departments are now considering, and request comment on, whether to extend the entry period indefinitely so that the rebuttable presumption will apply to noncitizens who entered the United States without documents sufficient for lawful admission any time on or after May 11, 2023, and, if the applicability is extended, other appropriate changes. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); *see also, e.g., id.* 208.33(c), 1208.33(d) (providing the ongoing applicability of the Circumvention of Lawful Pathways rebuttable presumption to any future asylum applications filed by noncitizens who enter during the entry period regardless of when the application was filed, except in the case of certain children who entered as part of a family unit if they later apply for asylum as principal applicants).

In the Circumvention of Lawful Pathways NPRM, the Departments specifically welcomed comment on whether the proposed two-year duration of the rule's applicability "should be modified, including whether it should be shorter, longer, or of indefinite duration." *See* 88 FR at 11708. In response to comments received on the NPRM, the Departments maintained the proposed two-year period in the Circumvention of Lawful Pathways final rule because that rule's focus was to respond to the anticipated surge in migration upon the termination of the Title 42 public health Order. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); 88 FR at 31421–22. The Departments stated that a 24-month period would provide "sufficient time to implement and assess the effects of the policy contained in this rule" and that "a 24-month period is sufficiently long to impact the decision-making process for noncitizens who might otherwise pursue irregular migration and make the dangerous journey to the United States, while a shorter duration, or one based on specified conditions, would likely not

3484466/coast-guard-repatriates-27-people-to-cuba/.

[426] USCG, *Press Release: Coast Guard repatriates 182 migrants to Haiti* (Aug. 21, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3878831/coast-guard-repatriates-182-migrants-to-haiti/.*

[427] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate/.*

[428] *Id.*

[429] IOM, *Missing Migrants Project: Migration Within the Americas, https://missingmigrants.iom.int/region/americas* (last visited Aug. 15, 2024). IOM cautions that "[c]ollecting information about migrants who die or disappear on maritime routes while attempting to migrate by boat in the Caribbean is also very challenging. The remote nature of maritime routes, the secrecy in which boats set out, and the lack of information on trajectories means that many shipwrecks carrying migrants are never identified. It is rarely known exactly how many people were on board boats that ran into trouble at sea, making it difficult to verify how many people went missing, or to know any information about their identities." *Id.*

[430] *See* DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[431] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

[432] *See* DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10, 2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

have such an effect.'' 88 FR at 31421. The Departments further stated that the United States would continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and implement other measures as appropriate, including continued efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. *Id.*

The Departments recognized, however, ''that there is not a specific event or demarcation that would occur at the 24-month mark,'' and stated that they would ''closely monitor conditions during this period in order to review and make a decision, consistent with the requirements of the APA, whether additional rulemaking is appropriate to modify, terminate, or extend the rebuttable presumption and the other provisions of th[e] rule.'' *Id.* The Departments explained that such review and decision would consider all relevant factors, such as resource limitations and the Departments' capacity to safely, humanely, and efficiently administer the immigration system; the availability of lawful pathways to seek protection in the United States and partner nations; and foreign policy considerations. *Id.* The Departments also expected to consider their experience under the Circumvention of Lawful Pathways rule at the 24-month mark, including the effects of the rebuttable presumption on those pursuing asylum claims. *Id.* In addition, the Departments expected to consider changes in policy views and imperatives, including foreign policy objectives, in making any decision regarding the future of the rule. *Id.* The Departments did not identify specific metrics for extending the rule *ex ante*, given the dynamic nature of the circumstances at the SWB and the multifaceted domestic and foreign policy challenges facing the Departments. *Id.*

The Departments have considered these factors and propose and seek comment on an indefinite extension of the applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions. The Departments also seek comment on whether other changes to the Circumvention of Lawful Pathways rule's provisions would be appropriate if its applicability becomes indefinite. First, as detailed in the IFR, although the Circumvention of Lawful Pathways rule did not fully mitigate the very high levels of irregular migration during the

immediate post-pandemic period, it yielded tangible results that ameliorated a situation that otherwise would have been more challenging. *See* 89 FR at 48723–31.[433] Extending the entry period for the Circumvention of Lawful Pathways rule would ensure that DHS can continue to deliver timely consequences, where appropriate, to more noncitizens encountered, even at levels of migration below the threshold at which the suspension and limitation on entry under this rule would be active. As the Departments explained in the IFR, ''at 1,500 daily encounters between POEs . . . DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.'' *Id.* at 48752. This estimate was expressly based on the Departments' demonstrated performance under the Circumvention of Lawful Pathways rule, *see id.,* and therefore accounted for the effects of that policy as well as the most recent data on capacity limitations, demographics, fear claim rates, and other variables. *See id.* Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption would mean that when encounters between POEs begin to exceed 1,500 encounters and the threshold for continuing or reactivating the measures in this rule is not yet met, the Departments' ability to deliver timely decisions and consequences would likely be impaired.[434]

Second, the Departments continue to be subject to significant resource

limitations, *see* 89 FR at 48728–31, such that—as explained earlier in this section—even at levels of encounters below the 2,500-encounter threshold contained in section 2(b) of the Proclamation, DHS would not be able to quickly remove the majority of those encountered who do not have a basis to remain.[435] In such circumstances, DHS will need policy interventions like the Circumvention of Lawful Pathways rule to continue delivering timely consequences. Although there were months during the FY 2013–FY 2019 period ''in which daily encounters . . . between 1,500 and 2,500 resulted in an average of 210 individuals released each day,'' *see* 89 FR at 48753, such a low release rate would be unrealistic given today's demographic mix of encounters, even at 1,500 daily encounters, particularly in the absence of policy interventions such as the Circumvention of Lawful Pathways rule. For instance, even under the Circumvention of Lawful Pathways rule, assuming that USBP processes 900 noncitizens per day for expedited removal at 1,500 daily encounters between POEs, and assuming a similar level of voluntary returns and reinstatements as observed during the immediate pre-pandemic period, DHS would be able to refer into expedited removal 77 percent of single adults and individuals in family units to expedited removal, and would likely release over 530 single adults and individuals in family units.[436] This is due to current resource limits for expedited removal, current demographics, and fear-claim and screen-in rates under the Circumvention of Lawful Pathways rule.[437] If one adjusts the calculation to use the fear-claim and comprehensive screen-in rates that existed during the pre-pandemic period, over 700 single adults and family members would be released.[438] In short, unless the Departments extend the entry period of the Circumvention of Lawful Pathways rule, DHS's ability to deliver timely consequences would be further degraded because releases pending

---

[433] Between May 12, 2023, and June 4, 2024, CBP placed into expedited removal approximately 920 individuals encountered at and between POEs each day on average. OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab). While encounters at the SWB and in coastal sectors averaged over 5,000 per day for the period from May 12, 2023, to June 4, 2024, border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule. *Id.;* 89 FR at 48724 & n.99.

[434] Assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs) approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption. *Id.*

[435] After the conditions for discontinuing the suspension and limitation on entry under section 2(a) of the Proclamation are met, the suspension and limitation on entry in this rule will continue or reactivate when the 2,500-encounter threshold in section 2(b) of the Proclamation is reached. This numerical gap between discontinuation and continuation or reactivation is important for operational reasons, *see* 89 FR at 48753, but also potentially results in periods of relatively high encounter numbers that the Circumvention of Lawful Pathways rule is needed to manage.

[436] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[437] *Id.*

[438] *Id.*

**STB_AR1_000120**

section 240 removal proceeding would be significantly higher. If the demographics were to shift such that the Circumvention of Lawful Pathways rule was no longer necessary to manage steady-state levels of migration, the Departments could at that time revise policy as appropriate.

Third, even as the United States has continued to coordinate extensively with its regional partners to expand the availability of lawful, safe, and orderly pathways, the Departments have found that these efforts are strengthened by the imposition of appropriate measures to prepare for and respond to ongoing migration challenges as needed. A key component of the Departments' engagement with foreign counterparts has been their ability to demonstrate a willingness to impose, and as appropriate expand, meaningful policy and operational measures in direct response to the pressures caused by migratory flows. *See* 89 FR at 48759. The Departments believe that ''leading by example'' has been an important part of our overall regional engagement and helped encourage regional partners to continue to adopt new and creative policy and operational migration responses. *Id.* By extending the applicability of the Circumvention of Lawful Pathways rule, the Departments believe it would not only demonstrate to our regional partners that we are committed to disincentivizing irregular migration, but it would also encourage our international partners to maintain their mutual efforts to address the unprecedented migration of people in the Western Hemisphere.

Fourth, with respect to the effects of the rule in general and on those who migrate irregularly in particular, experience has proven that the ability to deliver swift consequences for those who do not use lawful, safe, and orderly pathways or processes for entering the United States is critical; the expiration of the Circumvention of Lawful Pathways rule would limit the Departments' abilities to deliver consequences where appropriate, likely changing the perception and decision-making calculus of would-be migrants and thus could be a pull-factor and serve to increase border encounters. Extending the entry period indefinitely would avoid creating the impression among those contemplating crossing irregularly that no timely consequences will apply to them if they wait until the suspension and limitation on asylum eligibility provided for in the Securing the Border rule is lifted and then cross irregularly.

The indefinite applicability of the entry period would also ensure that the Circumvention of Lawful Pathways rule's incentive for migrants to utilize lawful, safe, and orderly pathways will continue should the enhanced measures in the Securing the Border rule not be in effect in the future. Although initially designed as a temporary measure, the Circumvention of Lawful Pathways rule is also a critical component of DHS's broader efforts to incentivize migrants to use the lawful, safe, and orderly pathways and processes that the United States Government has made available to them, thereby reducing irregular migration and allowing more efficient and timely processing at the southern border. *See* 88 FR at 31318. Since 2021, the Departments have steadily expanded such pathways, including by increasing refugee processing in the Western Hemisphere; providing country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit; and expanding the availability of the CBP One app to allow noncitizens to schedule appointments to present at a POE rather than risking their lives by crossing the border unlawfully.[439] To encourage noncitizens to continue to pursue such pathways, rather than putting their lives in the hands of dangerous smugglers and resorting to irregular migration that strains the border security and immigration system, the Departments are considering extending the Circumvention of Lawful Pathways rule indefinitely.

Fifth, there are a variety of factors outside of DHS's control that an indefinite extension could help mitigate. Political unrest abroad, natural disasters and climate change, perceptions about U.S. elections or changes in domestic policy, implications of elections in the region, large-scale economic fluctuations, and the migration management practices of regional partners (*e.g.,* their enforcement practices or visa policies)—all have the potential to serve as push or pull factors and dramatically impact encounters at the southern border. *See* 88 FR 31327. An indefinite extension would ensure consistency in U.S. border management practices and maintain a basic tool necessary to address potential migration surges.

Sixth, the Departments believe this approach would complement recent policy initiatives, including this Securing the Border rule, by allowing

DHS to continue to deliver timely consequences to more noncitizens encountered who do not have a legal basis to remain, even at levels of migration below the threshold at which the suspension and limitation on entry would be continued or reactivated.

Finally, extending the applicability of the rebuttable presumption would guard against a circumstance where an adverse litigation outcome against any aspect of this rule or its limitation on asylum eligibility would leave the Departments without sufficient tools in place to address high volumes of migration. Litigation against the IFR remains ongoing,[440] as does litigation against the Circumvention of Lawful Pathways Rule.[441] Maintaining the rebuttable presumption as a fallback measure is a commonsense way to address the possibility of a judicial decision that temporarily or permanently impairs the Departments' ability to implement this rule.

In considering whether to extend the temporal applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions and, if so, how to implement such a change, the Departments expect to consider other changes to the rule's provisions warranted by an extension, and as necessary to achieve the goals of the rule. The Departments request comment regarding any such changes and particularly welcome comments addressing whether and how extending the Circumvention of Lawful Pathways rule's temporal applicability—especially an indefinite extension—would warrant:

• Amendments to the continuing applicability provisions at 8 CFR 208.33(c)(1) and 1208.33(d)(1) regarding future applicability of the rebuttable presumption of asylum ineligibility to those who enter and are subject to the Circumvention of Lawful Pathways rule's provisions;

• Amendments to the exception to continuing applicability at 8 CFR 208.33(c)(2) and 1208.33(d)(2) for certain asylum applications filed after May 11, 2025, by noncitizens who entered as children in a family unit and who later apply for asylum as principal applicants;

---

[439] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

[440] *See Las Americas Immigrant Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC (D.D.C. filed June 12, 2024).

[441] *See East Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–06810, 2023 WL 4729278 (N.D. Cal. July 25, 2023), vacatur stayed pending appeal *East Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023); *M.A.* v. *Mayorkas,* No. 23–cv–01843 (D.D.C. June 6, 2023); *Texas* v. *Mayorkas,* No. 23–cv–00024 (W.D. Tex. May 23, 2023); and *Indiana* v. *Mayorkas,* 23–cv–00106 (D.N.D. May 31, 2023).

**STB_AR1_000121**

• Amendments to the grounds for necessarily rebutting the rebuttable presumption;
• Amendments to the exceptions to the rebuttable presumption; and
• The addition or amendment of any other specific regulatory provisions related to the Circumvention of Lawful Pathways rule in light of the proposal to extend the temporal application of the rebuttable presumption and related credible fear provisions.

## V. Regulatory Requirements

### A. Administrative Procedure Act

The Departments have forgone the Administrative Procedure Act's ("APA") delayed-effective-date procedure in implementing this rule because the Departments have found good cause to do so and because this rule relates to a foreign affairs function of the United States. *See* 5 U.S.C. 553(d)(3), (a)(1).[442] This rule generally adopts the provisions of the IFR with a few technical amendments and changes to the calculation of thresholds to ensure those provisions can remain in force until there has been a sustained decrease in daily encounters. None of the amendments, crucially, implicate the justifications for the 30-day waiting period. The purpose of the waiting period is "to give affected parties time to adjust their behavior before the final rule takes effect." *Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992). Here, however, that purpose would not be served by delaying the effective date of the rule: The IFR has been in effect since June 5, and the limited changes adopted in this rule do not require anyone other than the Departments themselves to change their conduct or to take any particular steps in advance of the effective date. *See United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (noting that the "legislative history of the APA" indicates that the waiting period "was not intended to unduly hamper agencies from making a rule effective immediately," but intended "to afford persons affected a reasonable time to prepare for the effective date of a rule . . . or to take other action which the issuance may prompt' " (citing S. Rep.

No. 752, 79th Cong., 1st Sess. 15 (1946); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 25 (1946))). Instead, the changes made by this rule address the encounter thresholds that the Departments will use to determine the applicability of the rule's suspension and limitation on entry and better ensure that the measures devised to deal with emergency border circumstances will remain in place until there has been a sustained easing of those circumstances.

In finding good cause to bypass the 30-day waiting period, the Departments have taken care to "balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable [amount of] time to prepare for the effective date of [the] rul[e]." *Gavrilovic,* 551 F.2d at 1105. Here, that balance tips considerably in favor of immediate implementation, where the limited changes introduced by this rule preserve the status quo and do not interfere with the operative provisions of the IFR. At most, the amendments in this rule are designed to buttress the IFR's effectiveness in dealing with the emergency border circumstances by better ensuring that its limitation on asylum eligibility and other measures will stay in place until there has been a sustained improvement in encounter patterns across the southern border. For instance, the September 27 Proclamation and this rule provide that UCs from non-contiguous countries should be included in calculating the number of encounters to determine whether the suspension and limitation on entry remain in effect or are discontinued. They additionally provide that the suspension and limitation on entry are not to be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The changes to the threshold represent an incremental improvement upon the prior thresholds. These changes fine-tune the statistical parameters for tracking daily encounters so as to immunize the emergency measures from transitory blips in the data, but do not disturb or add to requirements imposed by the IFR.

Even in the narrow circumstances where the changes made in this final rule might have an effect on whether the rule's provisions apply, a waiting period would provide little benefit. The amendments do not impose new requirements or obligations on migrants contemplating a border crossing, nor on other entities that might claim an interest in the rulemaking, such as legal service organizations looking to help

noncitizens navigate the immigration system (or, to the extent such interests should be considered, smugglers and TCOs angling to learn about legal developments ahead of time so as to exploit perceived gaps in the border processing regime). All of those parties have long been on notice of the substantive provisions of the June 3 Proclamation and the IFR, none of which this rule purports to invalidate. The Proclamation and the IFR went into effect months ago and have since been the subject of regular public updates from DHS, as well as detailed coverage from the national news press.[443]

To the extent the threshold adjustments might have any effect in the next 30 days—*i.e.,* by preventing the IFR's emergency measures from being discontinued, when they otherwise would have turned off under the old parameters—this would only heighten the impetus for human smugglers and other criminals to inflate or distort the significance of this policy development to manufacture a sense of urgency among migrants and induce them to attempt to enter the country without delay.[444] As the Departments explained in the IFR, individuals contemplating entry into the United States may respond to both real and perceived incentives that stem from changes to border management and immigration

---

[442] There is also good cause to forgo notice and comment on the rule's updates to the cross-reference to the definition of "victim of a severe form of trafficking in persons" in 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) from "§ 214.11" to "§ 214.201." Notice and an opportunity to comment on that technical change to the cross-reference is unnecessary as it does not change the substance of the provision and merely updates a cross-reference that has been rendered imprecise by a subsequent rulemaking. *See* 89 FR at 34931–32 (moving the definitions from 8 CFR 214.11 to the newly created 8 CFR 214.201).

[443] *See* DHS, *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS–DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), *https:// www.dhs.gov/news/2024/07/24/fact-sheet-president-bidens-presidential-proclamation-and-joint-dhs-doj-interim;* CBP, *Statistics Show Lowest Southwest Border Encounters in Nearly Four Years* (Aug. 16, 2024), *https://www.cbp.gov/newsroom/ national-media-release/cbp-releases-july-2024-monthly-update;* Miriam Jordan & J. David Goodman, *Amid Talk of Border Chaos, Crossings Have Sharply Declined,* N.Y. Times (July 20, 2024), *https://www.nytimes.com/2024/07/20/us/border-immigration-current-situation.html;* Rebecca Santana & Elliot Spagat, *Border arrests fall more than 40% after Biden's halt to asylum processing, Homeland Security says,* AP News (June 26, 2024), *https://apnews.com/article/border-arrests-biden-asylum-mexico-immigration-6e302f06f567b96d88 cc1333aa6d10fe.*

[444] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/ national-security/theres-still-one-way-into-america/ 2018/10/24/db68842-aafb-11e8-8f4b-aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257 c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

STB_AR1_000122

policies. 89 FR at 48764. In such circumstances, it may be easier for smugglers to "prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy." *Id.*

Immediate implementation is warranted not only in the absence of any benefit that advance notice would provide, but also to avoid the significant costs that would accrue to the Department if they had to toggle between applying and discontinuing the emergency border measures while waiting for this rule to go into effect. That is especially true for the amendment expanding the timeline over which a decline in encounters must be observed before the agencies will lift the suspension and limitation on entry consistent with the June 3 Proclamation. Prior to this rule, a one-day drop in the 7-consecutive-day average to a number below 1,500 encounters would have triggered the process by which the agencies must discontinue the emergency border measures—even if that drop turned out to be a mere one-off event amidst a longer pattern of daily encounters far exceeding 1,500. The amendments contained in this rule guard against such situations where the agencies' ability to consistently apply the rule's important measures might be disrupted by short-lived and intermittent fluctuations in the longitudinal tracking data.[445] That rationale extends to the decision to bypass the 30-day waiting period for this rule. Unless the amendments are implemented immediately, the agencies could face a predicament where they would have to abruptly suspend the emergency measures if the 7-consecutive-calendar-day-average dipped below 1,500 for a single day, only to then reverse course and reimpose the same measures as soon as encounters rose again to an average of 2,500 or more. Such sudden shifts in the

implementation of the June 3 Proclamation and IFR would be operationally burdensome to the agencies and would require the development and issuance of starkly differing instructions and internal guidance based on whether the measures had been discontinued, continued, or reactivated. The possibility of such shifts is arguably an inevitable consequence of the decision to limit the applicability of the rule's provisions to the existence of a temporary circumstance; at the same time, the Departments have sought to temper the frequency and severity of such shifts through two means: (1) in the IFR, providing for a gap between the 1,500-encounter threshold and the 2,500-encounter threshold, *see* 89 FR at 48753; and (2) in this rule, making modest changes to the provisions governing encounter calculations and discontinuation mechanics.

Finally, for similar reasons, immediate implementation is justified in light of the United States' foreign policy priorities. Because this rule involves a foreign affairs function of the United States, it is exempt from the APA's delayed-effective-date requirement. *See* 5 U.S.C. 553(a)(1); *see also* 89 FR at 48759–62. It is conceivable that had a 30-day waiting period been imposed, a very substantial one-day drop in the encounters average would have led to a discontinuation of the emergency provisions of the Proclamation and IFR. That in turn could have had a direct and immediate impact on migratory flows through other countries in the region, as those countries have articulated before. *See* 89 FR at 48761. Past experience has shown that even a *perceived* policy development can touch off a surge in irregular migration throughout the region. One regional partner, for example, concluded that the formation of caravans in the spring of 2022 was attributable to rumors of the termination of the Title 42 public health Order, which were followed by an official announcement. *Id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid by forgoing a waiting period. *Rajah,* 544 F.3d at 437 (quotation marks omitted). Immediate implementation also allows the United States to demonstrate its continued and shared commitment to addressing

irregular migration in the region, an objective that directly involves a foreign affairs function of the United States. *See* 89 FR at 48761–62.

In sum, the amendments introduced in this final rule do not fundamentally change the way in which the IFR addresses the emergency circumstances at the border and instead ensure that the system created in response to those circumstances remains in force until a decrease in encounters proves to be sustained. As a result, the purpose of the delayed-effective-date-requirement—providing affected parties time to adjust to changes in the status quo—would not be served by delaying effectiveness here, where the changes preserve the status quo. Moreover, even in the narrow circumstances in which this rule's changes to the thresholds would have an effect (by avoiding a discontinuation of the rule's emergency procedures due to a short-term change in encounter numbers), the Departments are unable to identify sufficient particular hardships to affected persons that would contravene fairness and potentially outweigh the Departments' considered assessment of the need for immediate implementation, including the need to avoid disruptive changes to the continuation of the rule's emergency provisions. There is good cause to forgo the 30-day waiting period for this rule and to instead implement it without delay.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Orders 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and 13563 ("Improving Regulation and Regulatory Review") direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

---

[445] For similar reasons, the June 3 Proclamation provides that the suspension and limitation on entry remain in place for 14 days after the agencies have determined there has been an average of less than 1,500 encounters. This allows "the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained." 89 FR at 48749.

The Office of Management and Budget has designated this rule a ''significant regulatory action'' as defined under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094. Accordingly, the Office of Management and Budget has reviewed this rule.

1. Effects Under a Without-IFR Baseline

The primary effect of the final rule, as compared to a without-IFR baseline,[446] is to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum eligibility under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable probability of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular

---

[446] The benefits and costs of a regulation under Executive Order 12866 are generally measured against a no-action baseline: an analytically reasonable forecast of the way the world would look absent the regulatory action being assessed, including any expected changes to current conditions over time. *See* OMB Circular No. A–4 11 (Nov. 9, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf*. For purposes of this analysis, the Departments use the without-IFR baseline as the primary baseline, and a with-IFR baseline as a secondary baseline. The primary baseline also serves as the baseline for the significance determination under section 3(f)(1) of Executive Order 12866.

migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are denied or do not seek asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail not only the loss of asylum but also its attendant benefits, although such persons may be granted statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek asylum and protection. In these cases, there would likely be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration and to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The effects should be considered relative to the baseline condition that would exist in the

absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See, e.g.,* 89 FR 67459, 67486–88.

2. Effects Under a With-IFR Baseline

The only expected effects of this rule relative to a with-IFR baseline would involve the changes to the thresholds discussed above. As explained in Section II.C.1 of this preamble, the amendments marginally reduce the probability that the suspension and limitation on entry will be discontinued prematurely or remain discontinued during periods in which high levels of migration place significant strain on the Departments' resources and capabilities. The amendments do so by (1) requiring the 7-consecutive-calendar-day average below 1,500 encounters to persist for 28 consecutive calendar days before the 14-day waiting period is triggered, and by (2) including encounters of UCs from non-contiguous countries when calculating encounters for the purpose of the thresholds under sections 2(a) and 2(b) of the Proclamation.

It is challenging to predict with certainty the effects of the Departments' decision to adopt these changes. Although in some circumstances the Departments' decision could reduce the likelihood that the rule's limitation on asylum eligibility and changes to the credible fear process would be discontinued or remain discontinued, the Departments have not assigned a specific probability to such circumstances occurring. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59.

If the changes to the thresholds were to result in this rule's emergency provisions remaining activated for a longer period of time than they would have been under the IFR, those changes would amplify this rule's effects relative to a with-IFR baseline. In such a circumstance, the same analysis presented with respect to the without-IFR baseline above would apply here as well, but the marginal impacts of this final rule (compared to the with-IFR baseline) are expected to be smaller than the marginal impacts of the IFR (compared to the without-IFR baseline). For instance, the primary effects of this

rule would still be felt by noncitizens outside of the United States. And for those who are present in the United States, the rule would still likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of persecution or torture would remain in the United States. The changes made in this rule may decrease the administrative burdens associated with discontinuing and continuing or reactivating the measures contained in the rule.

### 3. Discontinuation Analysis Under a Without-IFR Baseline

For purposes of this assessment, the Departments have also analyzed the potential effects of the 7-consecutive-calendar-day average of encounters falling below 1,500. If that average remains below 1,500 encounters for 28 consecutive calendar days, and the 2,500-encounter threshold is not reached during the 14-day waiting period, the rule's provisions will be discontinued 14 days after the Secretary's determination and remain so until one day after the Secretary determines that the 7-consecutive-calendar-day average of encounters has reached 2,500.

The effects of discontinuation would depend on a wide range of factors that are difficult to predict and may involve factors arising from events occurring outside the United States, or entirely outside the Departments' control. Some such factors would include:
• Whether the Circumvention of Lawful Pathways rule would apply at the time of the discontinuation;[447]
• Whether metrics such as fear-claim rates and screen-in rates during the discontinuation period would resemble rates previously observed under the Circumvention of Lawful Pathways rule;[448]

• Whether, in the absence of a discontinuation, such rates would continue to resemble those observed from June 5, 2024, through August 31, 2024;
• Encounter levels and related demographics during the discontinuation period, which, in turn, are influenced by factors such as family and community networks, economic conditions, environmental and security-related push factors, responses to policy changes such as the discontinuation itself, and rapidly evolving criminal smuggling networks;
• Available processing resources;
• Tactical changes by smugglers and migrants;
• Misinformation, disinformation, or malinformation generated by smugglers and circulating online among migrant communities; and
• Whether and how soon the 2,500-encounter threshold for continuing or reactivating the rule's provisions would be reached.

Assuming the Circumvention of Lawful Pathways rule remains in effect at the time of a discontinuation, in the immediate aftermath of a discontinuation, the Departments would begin the processing of noncitizens under the Circumvention of Lawful Pathways rule's provisions: the Departments would apply the rebuttable presumption of asylum ineligibility during covered credible fear screenings and section 240 removal proceedings and employ a ''reasonable possibility of persecution or torture'' standard to screen for potential eligibility for statutory withholding of removal and CAT protection for those noncitizens who are unable to establish a significant possibility that the rebuttable presumption does not apply or that they can rebut it. Although it is impossible to reliably address these uncertainties quantitatively, the Departments offer a number of observations about the potential outcomes of a discontinuation while the Circumvention of Lawful Pathways rule applies.

Although the Circumvention of Lawful Pathways rule meaningfully improved the Departments' capacity to deliver timely decisions and consequences and is a critical tool for the Departments to incentivize the use of lawful, safe, and orderly pathways, *see* Section IV of this preamble, it did not yield efficiency benefits comparable to those delivered by the IFR.[449] Under

the Circumvention of Lawful Pathways rule, the average processing time for USBP encounters, from encounter to removal, was 44 days—down from 75 days in the pre-pandemic period; under the IFR, the average processing time decreased more than 25 percent as compared to the time period under the Circumvention of Lawful Pathways rule, to 32 days.[450] A comparison of the number of expedited removals processed per day is also instructive. Under the Circumvention of Lawful Pathways rule, USBP referred, on average, about 860 people for expedited removal per day,[451] while under the IFR, USBP referrals for expedited removal increased approximately 28 percent, to an average of nearly 1,100 persons per day.[452]

In particular, the elimination of lengthy and suggestive advisals and the shift to a manifestation standard under the Securing the Border rule contributes to a substantially lower proportion of noncitizens encountered between POEs at the SWB being referred for credible fear interviews. Fear-claim rates dropped from 57 percent under the Circumvention of Lawful Pathways rule to a 27 percent fear-claim rate under the IFR.[453]

The reduction in fear-claim rates allows USCIS to focus its resources more effectively and efficiently on those noncitizens who may have a fear of return to their native country or their country of removal or indicate an intention to seek fear-based relief or protection and enables DHS to more swiftly process and remove those who do not manifest a fear or express an intent to apply for asylum.[454] Congress has not provided the resources necessary to timely and effectively process and interview all those who

---

[447] In Section IV.B of this preamble, the Departments seek comment on whether to extend the applicability of that rule to certain noncitizens who enter the United States after May 11, 2025.

[448] As noted in Section II.A.2 of this preamble, under this rule, from June 5, 2024, through August 31, 2024, 27 percent of those encounters between POEs at the SWB and processed for expedited removal claimed fear, compared to a 57 percent fear-claim rate under the Circumvention of Lawful Pathways rule and a 37 percent fear-claim rate during the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Similarly, with this rule's ''reasonable probability'' standard in place, the comprehensive screen-in rate for those USBP encounters manifesting fear has decreased to approximately 57 percent, compared to approximately 62 percent for those screened under the Circumvention of Lawful Pathway rule with its lower ''reasonable possibility'' standard in place, and 83 percent in the pre-pandemic period.

OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[449] As discussed elsewhere in this preamble and in the Circumvention of Lawful Pathways rule, high

encounter rates at the southern border, combined with inadequate resources and tools to keep pace, have limited DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities. *See* 89 FR at 48714. This mismatch between the resources made available by Congress and large numbers of encounters creates significant stress on the border and immigration systems that forces DHS to rely on slower processing pathways—limiting the Departments' ability to more quickly deliver consequences to individuals who do not have a legal basis to remain in the United States.

[450] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[451] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[452] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[453] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[454] *Id.* (showing both reduced rates of fear claims/ fear manifestation and reduced time from encounter to negative fear removals).

STB_AR1_000125

invoke credible fear procedures through the expedited removal process at the southern border, including under the Circumvention of Lawful Pathways rule. *See* 89 FR at 48732. When the Departments' ability to timely process, detain, and remove, as appropriate, noncitizens who do not establish a legal basis to remain in the United States is limited, it exacerbates the risk of severe overcrowding in USBP facilities and POEs and creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. *Id.* This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants to make the dangerous journey to the southern border to invoke credible fear procedures and take their chances on being allowed to remain in the country for a lengthy period. *Id.*

The Securing the Border rule expressly guards against the resource strains posed by very high levels of encounters; the day after the Secretary makes a factual determination that there have been 2,500 daily encounters, the Departments will again implement the Securing the Border rule, thereby reestablishing stronger incentives against irregular migration. But as discussed in Section II.C.1 of this preamble, the Departments may not be able to fully realize the benefits of the Securing the Border rule in the first few days of reactivation, because encounters made prior to reactivation must still be processed under the Circumvention of Lawful Pathways rule. Unnecessary discontinuations and reactivations also impose unnecessary costs on the Departments. And frequent discontinuations—which the changes made in this rule seek to avoid—risk signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided entirely by simply waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing.

Finally, there are of course other differences between the two frameworks as well. For instance, the Circumvention of Lawful Pathways rule affects the asylum eligibility of a smaller number of migrants, because that rule generally does not affect the asylum eligibility of Mexican nationals. For short persons, the application of the Circumvention of Lawful Pathways rule instead of the Securing the Border rule could result in

greater access to asylum and its attendant benefits, and even those determined to be subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility will be screened for statutory withholding of removal and CAT protection at the "reasonable possibility" standard, rather than the "reasonable probability" standard applied during statutory withholding of removal and CAT protection screenings under the Securing the Border rule.

4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption

In Section IV of this preamble, the Departments also propose to extend and expand the applicability of the Circumvention of Lawful Pathways rebuttable presumption. First, in Section IV.A of this preamble, the Departments request comment on whether to expand the rebuttable presumption (which currently applies to noncitizens who "enter[ ] the United States from Mexico at the southwest land border or adjacent coastal borders" after traveling through certain third countries) such that the rebuttable presumption would also apply to noncitizens who enter across southern coastal borders by sea and irrespective of whether such noncitizens traveled through a third country before entry across the southern coastal borders. This would expand the geographic reach of the rebuttable presumption. Second, in Section IV.B of this preamble, the Departments request comment on whether to indefinitely extend the entry period (currently scheduled to end on May 12, 2025) so that the rebuttable presumption will apply to noncitizens who enter the United States without documents sufficient for lawful admission any time on or after May 11, 2023. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i).

The potential effects of such an expansion and extension are described in Section IV of this preamble. The expansion would (1) make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to irregular migration no matter where along the southern border they cross; (2) deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of

Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) ensure consistency in implementation between the Circumvention of Lawful Pathways rule's rebuttable presumption and the provisions in the Securing the Border rule.

The proposed extension of the Circumvention of Lawful Pathways rule's entry period would better preserve the Departments' ability to deliver timely decisions and consequences. Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption after May 11, 2025 would mean that when the following three conditions are satisfied—(1) the threshold for discontinuing the Securing the Border rule's provisions has been met, (2) encounters between POEs begin to exceed 1,500 encounters, and (3) the threshold for continuing or reactivating the measures in this rule is not yet met—without the ability to apply the Circumvention of Lawful Pathways rebuttable presumption, the Departments' ability to deliver timely decisions and consequences would likely be impaired. For example, assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs), approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption.[455] At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption.[456] These differences are driven by differences in fear-claim and screen-in rates.[457]

The primary effect of the Departments' proposed expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption would be to reduce incentives for irregular migration and illegal smuggling activity during periods when the threshold for discontinuing

---

[455] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[456] *Id.*

[457] *Id.*

the measures in the Securing the Border rule has been met or where that rule is otherwise not in effect due to an adverse litigation outcome against its asylum limitation or any aspect of that rule. The primary effects of such an expansion and extension would be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and subject to the rebuttable presumption, such an action would likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable possibility of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the rebuttable presumption if they meet certain exceptions, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable possibility of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of such an expansion or extension would include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the strain that further surges in irregular migration would impose on the Departments.

The direct costs of the expansion or extension would be borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rebuttable presumption but would otherwise have received asylum, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States—although such noncitizens may in the end be granted asylum despite the rebuttable presumption by operation of the family

unity provision that applies in section 240 removal proceedings. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would.

The expansion and extension of the rebuttable presumption may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rebuttable presumption to the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rebuttable presumption would require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. However, such an expansion or extension may reduce perceived incentives for irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rebuttable presumption to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rebuttable presumption.

Other entities may also incur some indirect, downstream costs as a result of an expansion or extension. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of such an action, which would be the application of steady-state regulations that have not been the primary mode of the processing of noncitizens at the southern border since before the Title 42 public health Order. As compared to the baseline condition, an expansion and extension would be expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See* 89 FR at 67486–88.

## C. Regulatory Flexibility Act

Under the Regulatory Flexibility Act ("RFA"), "[w]henever an agency is required by section 553 of [the APA], or any other law, to publish general notice of proposed rulemaking for any proposed rule, . . . the agency shall prepare and make available for public comment an initial regulatory flexibility analysis." 5 U.S.C. 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). Such analysis requires agencies to consider the direct impact of the proposed rule on "small entities." *Id.* 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). This rule does not directly regulate small entities and is not expected to have a direct effect on small entities. It does not

mandate any actions or requirements for small entities. Rather, this rule regulates individuals, and individuals are not defined as "small entities" by the RFA. *See* 5 U.S.C. 601(6). Based on the evidence presented in this analysis and throughout this preamble, the Departments certify that this final rule would not have a significant economic impact on a substantial number of small entities. And for the same reason, the Departments certify that the Circumvention of Lawful Pathways rule, if extended or expanded, would not have a significant economic impact on a substantial number of small entities.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The inflation-adjusted value of $100 million in 1995 is approximately $200 million in 2023 based on the Consumer Price Index for All Urban Consumers (CPI–U).[458]

The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon the private sector (except as a condition

---

[458] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf* (last visited Sept. 21, 2024). Steps in calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023 − Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702 − 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent ≈ 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This rule does not constitute a Federal mandate because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to the entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this proposed rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of UMRA, therefore, do not apply, and the Departments have not prepared a statement under UMRA.

*E. Congressional Review Act*

The Administrator of the Office of Information and Regulatory Affairs has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). When compared to the with-IFR baseline, the changes made in this final rule [459] have not resulted in, and are not likely to result in, an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

*F. Executive Order 13132 (Federalism)*

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

---

[459] The Administrator of the Office of Information and Regulatory Affairs has measured the effects of this final rule with a with-IFR baseline. *See* 5 U.S.C. 804(2); *compare* Section V.B of this preamble.

*G. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform.

*H. Family Assessment*

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.,* applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 and Instruction Manual

023–01–001–01, Revision 01 ("Instruction Manual 023–01–001–01") establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(c)(8), 1508.1(e). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01–001–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

The rule adopts as final the following three changes to the process for those seeking asylum, statutory withholding of removal, or CAT protection during emergency border circumstances:

• For those who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will continue to provide general notice regarding the processes for seeking asylum, statutory withholding of removal, and CAT protection, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to their country or the country of removal.

• During emergency border circumstances, those who enter the United States across the southern border and who are not described in paragraph 3(b) of the June 3 Proclamation will continue to be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of

their family as described in 8 CFR 208.30(c) when they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201.

• The limitation on asylum eligibility will continue to be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation and do not establish exceptionally compelling circumstances under the credible fear screening standard will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

This rule also makes a small number of changes consistent with the overall purpose and structure of the IFR, as discussed in Section II.C of this preamble, and requests comment on the potential expansion and extension of the applicability of the Circumvention of Lawful Pathways rebuttable presumption.

Given the nature of the final rule with request for comment, DHS has determined that it is categorically excluded under its NEPA implementing procedures, as it satisfies all three relevant conditions. First, the final rule with request for comment clearly fits within categorical exclusions A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively. The IFR changed certain procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. This final rule makes only modest changes to the IFR and seeks comment on the expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption. Second, this final rule with request for comment is a standalone rule and is not part of any larger action.[460] Third, in accordance

with its NEPA implementing procedures, DHS has determined no extraordinary circumstances exist that would cause a significant environmental impact. Therefore, this final rule is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this final rule is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, because the final rule's limitation on asylum eligibility and the "reasonable probability" standard will be applied by EOIR in substantially the same manner as it will be applied by DHS and DOJ is not aware of any extraordinary circumstances that would require the preparation of an environmental assessment or environmental impact statement. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

### K. Paperwork Reduction Act

This rule does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

### List of Subjects

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Department of Homeland Security

Accordingly, the interim final rule amending 8 CFR parts 208 and 235, which was published at 89 FR 48710 on June 7, 2024, is adopted as final with the following changes:

### PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 208.13    Establishing asylum eligibility.

\*    \*    \*    \*    \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and this chapter, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

### § 208.33    [Amended]

■ 3. Amend § 208.33 by removing the reference to "§ 214.11(a)" in paragraph (a)(3)(i)(C) and adding in its place "§ 214.201.

■ 4. Amend § 208.35 by:
■ a. Removing the reference to "§ 214.11" in paragraph (a)(2)(i)(C) and adding in its place "§ 214.201";
■ b. Revising paragraph (b)(2)(i); and
■ c. Removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," and "Proclamation" wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),".

The revision reads as follows:

### § 208.35    Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

\*    \*    \*    \*    \*

(b) \*    \*    \*
(2) \*    \*    \*

---

[460] *See* Instruction Manual 023–01–001–01, at V–5.

STB_AR1_000129

(i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

\* \* \* \* \*

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 5. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

### § 235.15  [Amended]

■ 6. Amend § 235.15 by removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),".

### Department of Justice

Accordingly, the interim final rule amending 8 CFR part 1208, which was published at 89 FR 48710, on June 7, 2024, is adopted as final with the following changes:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 7. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 8. Amend § 1208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 1208.13  Establishing asylum eligibility.

\* \* \* \* \*

(g) *Entry during emergency border circumstances.* For a noncitizen who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 1208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and § 1208.35, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

### § 1208.33  [Amended]

■ 9. Amend § 1208.33 by removing the reference to "8 CFR 214.11" in paragraph (a)(3)(i)(C) and adding in its place "8 CFR 214.201".

■ 10. Amend § 1208.35 by:
■ a. Removing the reference to "§ 214.11(a)" in paragraph (a)(2)(i)(C) and adding in its place "§ 214.201";
■ b. Revising paragraph (b)(2)(iii);
■ c. Removing the words "An alien" and adding in their place the words "A noncitizen", wherever they appear;

■ d. Removing the words "the alien" and adding in their place the words "the noncitizen", wherever they appear;
■ e. Removing the words "the alien's" and adding in their place the words "the noncitizen's", wherever they appear;
■ f. Removing the words "an alien" and adding in their place the words "a noncitizen", wherever they appear;
■ g. Removing the words "The alien" and adding in their place the words "The noncitizen", wherever they appear; and
■ h. Removing the words "Presidential Proclamation of June 3, 2024, Securing the Border," and "Proclamation" wherever they appear and adding, in their place, the words "Presidential Proclamation of June 3, 2024, as defined in 8 CFR 1208.13(h).

The revision reads as follows:

### § 1208.35  Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

\* \* \* \* \*

(b) \* \* \*

(2) \* \* \*

(iii) Where the immigration judge determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the noncitizen under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

\* \* \* \* \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

Dated: September 27, 2024.

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2024–22602 Filed 9–30–24; 1:00 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208 and 235**

[USCIS Docket No. USCIS–2024–0006]

RIN 1615–AC92

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

[A.G. Order No. 5943–2024]

RIN 1125–AB32

**Securing the Border**

**AGENCY:** U.S. Citizenship and Immigration Services (''USCIS''), Department of Homeland Security (''DHS''); Executive Office for Immigration Review (''EOIR''), Department of Justice (''DOJ'').

**ACTION:** Interim final rule (''IFR'') with request for comments.

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act (''INA''), finding that the entry into the United States of certain noncitizens during emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those noncitizens. The Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. The Departments are now issuing this IFR.

**DATES:**
*Effective date:* This IFR is effective at 12:01 a.m. eastern daylight time on June 5, 2024.

*Submission of public comments:* Comments must be submitted on or before July 8, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on this IFR, identified by USCIS Docket No. USCIS–2024–0006, through the Federal eRulemaking Portal: *https:// www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and

may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**
*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For the Executive Office for Immigration Review:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Public Participation
II. Executive Summary
  A. Background and Purpose
  B. Legal Authority
  C. Summary of Provisions of the IFR
III. Discussion of the IFR
  A. Current Framework
  1. Asylum, Statutory Withholding of Removal, and CAT Protection
  2. Expedited Removal and Screenings in the Credible Fear Process
  3. Lawful Pathways Condition on Asylum Eligibility
  B. Justification
  1. Global Migration at Record Levels
  2. Need for These Measures
  3. Description of the Rule and Explanation of Regulatory Changes
  C. Section-by-Section Description of Amendments
  1. 8 CFR 208.13 and 1208.13
  2. 8 CFR 208.35
  3. 8 CFR 1208.35
  4. 8 CFR 235.15
IV. Statutory and Regulatory Requirements
  A. Administrative Procedure Act
  1. Foreign Affairs
  2. Good Cause
  B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act of 1995
  E. Congressional Review Act
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Family Assessment
  I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
  J. National Environmental Policy Act
  K. Paperwork Reduction Act

**List of Abbreviations**

AO    Asylum Officer
APA    Administrative Procedure Act
BIA    Board of Immigration Appeals (DOJ, EOIR)
CAT    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP    U.S. Customs and Border Protection
CBP    One app CBP One mobile application
CDC    Centers for Disease Control and Prevention
CHNV    Cuba, Haiti, Nicaragua, and Venezuela
DHS    Department of Homeland Security
DOD    Department of Defense
DOJ    Department of Justice
EOIR    Executive Office for Immigration Review
FARRA    Foreign Affairs Reform and Restructuring Act of 1998
FRP    Family Reunification Parole
FY    Fiscal Year
HSA    Homeland Security Act of 2002
ICE    U.S. Immigration and Customs Enforcement
IFR    Interim Final Rule
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ    Immigration Judge
INA    or the Act Immigration and Nationality Act
INS    Immigration and Naturalization Service
MPP    Migrant Protection Protocols
NGO    Non-Governmental Organization
NEPA    National Environmental Policy Act
NTA    Notice to Appear
OHSS    Office of Homeland Security Statistics
OIS    Office of Immigration Statistics
OMB    Office of Management and Budget
POE    Port of Entry
RFA    Regulatory Flexibility Act
SWB    Southwest Land Border
TCO    Transnational Criminal Organization
UC    Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UIP    U.S. Customs and Border Protection Unified Immigration Portal
UMRA    Unfunded Mandates Reform Act of 1995
UNHCR    United Nations High Commissioner for Refugees
USBP    U.S. Border Patrol
USCIS    U.S. Citizenship and Immigration Services

**I. Public Participation**

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by the deadline stated above. The Departments also invite comments

STB_AR1_000131

that relate to the economic, environmental, and federalism effects that might result from this IFR. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the IFR, explain the reason for any recommended change, and include data, information, or authority that supports such recommended change. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States are unduly strained at this time, the entry into the United States of certain categories of noncitizens [1] is detrimental to the interests of the United States, and

suspending and limiting the entry of such noncitizens. The Proclamation explicitly excepts from its terms certain persons who are not subject to the suspension and limitation. This rule is necessary to respond to the emergency border circumstances discussed in the Proclamation.

The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. As the preamble elsewhere explains, the periods during which the Proclamation is intended to be in effect, when encounters exceed certain thresholds, identify such situations. Hence, the Departments in this preamble use the term "emergency border circumstances" to refer more specifically to the period of time after the date that the Proclamation's suspension and limitation on entry would commence (as described in section 1 of the Proclamation) until the discontinuation date referenced in section 2(a) of the Proclamation or the date the President revokes the Proclamation (whichever comes first), as well as any subsequent period during which the Proclamation's suspension and limitation on entry would apply as described in section 2(b) of the Proclamation.[2] As the Proclamation and this preamble explain, these circumstances exist despite the Departments' efforts to address substantial levels of migration, and such circumstances are a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere,[3] including record levels at

the southwest land border ("SWB").[4] In

250,000 Colombians, 210,000 Haitians, and 210,000 Salvadorans, among others. By comparison, prior to 2018 there were never more than 1 million displaced persons in the hemisphere, and prior to 2007 there were never more than 300,000. Nearly 1 in every 100 people in the Western Hemisphere was displaced in 2022, compared to less than 1 in 1,000 displaced in the region each year prior to 2018. *See* UNHCR, *Refugee Data Finder, unhcr.org/refugee-statistics/download/?url=PhV1Xc* (last visited May 27, 2024); *see also* UNHCR, *Global Trends: Forced Displacement in 2022,* at 2, 8, 9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases); UNHCR, *Venezuela Situation, https://www.unhcr.org/emergencies/venezuela-situation* (last updated Aug. 2023).

[4] United States Government sources refer to the U.S. border with Mexico by various terms, including "SWB" and "the southern border." In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. As defined in section 4(d) of the Proclamation, the term "southern border" includes both the southwest land border ("SWB") and the southern coastal borders. As defined in section 4(c) of the Proclamation, the term "southwest land border" means the entirety of the United States land border with Mexico. And as defined in section 4(b) of the Proclamation, the term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the SWB, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico. The Departments believe that the factual circumstances described herein support applying this IFR to both the SWB and the southern coastal borders, although they recognize that occasionally different variations of this terminology may be used. The Departments further note there are sound reasons for the Proclamation and rule to include maritime borders of the United States Virgin Islands and Puerto Rico; this aspect of the Proclamation and rule help avoid any incentive for maritime migration to such locations. The dangers of such migration, and the operational challenges associated with responding to such maritime migration, are well documented. *See Securing America's Maritime Border: Challenges and Solutions for U.S. National Security: Hearing Before the Subcomm. on Transp. & Mar. Sec. of the H. Comm. on Homeland Sec.,* 108th Cong. 10–11 (prepared statement of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, U.S. Coast Guard) (describing an increasingly challenging operational environment and noting that most "Cuban and Haitian migrants use transit routes into Florida, either directly or via the Bahamas. Alternatively, Dominican and some Haitian migrants use shorter transit routes across the Mona Passage to Puerto Rico and the U.S. Virgin Islands. Common conveyances used in this region range from fishing vessels, coastal freighters, sail freighters, go-fast type vessels, and 'rusticas.'"); PBS, *More Than 100 Migrants Stranded Near Puerto Rico Await Help During Human Smuggling Operation* (Oct. 18, 2022), *https://www.pbs.org/newshour/world/more-than-100-migrants-stranded-near-puerto-rico-await-help-during-human-smuggling-operation* ("Mona Island is located in the treacherous waters between Dominican Republic and Puerto Rico and has long been a dropping off point for human smugglers promising to ferry Haitian and Dominican migrants to the U.S. territory aboard rickety boats. Dozens of them have died in recent months in an attempt to flee their countries amid a spike in poverty and

Continued

---

[1] For purposes of this preamble, the Departments use the term "noncitizen" to be synonymous with the term "alien" as it is used in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr,* 590 U.S. 222, 226 n.2 (2020).

[2] The Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility.

[3] According to OHSS analysis of the United Nations High Commissioner for Refugees ("UNHCR") data from 1969 to 2022, there were more than 8.5 million displaced persons in the Western Hemisphere in 2022, including approximately 6.6 million Venezuelans, 300,000 Nicaraguans, 260,000 Hondurans, 250,000 Cubans,

response to record levels of encounters at the SWB,[5] the United States

Government has taken a series of significant steps to strengthen consequences for unlawful or unauthorized entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States for protection in decades.[6] These steps include:

• Promulgating and implementing the rule titled Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) ("Circumvention of Lawful Pathways rule");

• Deploying more than 500 additional DHS personnel at a time to the SWB to support U.S. Customs and Border Protection ("CBP") operations and refocusing a significant portion of DHS's SWB workforce to prioritize migration management above other border security missions;[7]

• Deploying over 1,000 additional Department of Defense ("DOD") personnel on top of the 2,500 steady state presence to the SWB in May 2023 to further enhance border security;[8]

• Processing record numbers of individuals through expedited removal;[9]

• Implementing a historic expansion of lawful pathways and processes to come to the United States, including: the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide access to expedited refugee processing for eligible individuals; and the expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;[10]

• Expanding opportunities to enter the United States for seasonal employment;[11]

• Establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive in a safe, orderly, and lawful manner at ports of entry ("POEs") through the CBP One mobile application ("CBP One app");[12]

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year ("FY") 2021 to up to 50,000 in FY 2024;[13]

---

violence."); United States Coast Guard, *Coast Guard Repatriates 38 Migrants to Dominican Republic Following 2 Interdictions Near Puerto Rico* (Apr. 25, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3755880/coast-guard-repatriates-38-migrants-to-dominican-republic-following-2-interdict/*; United States Coast Guard, *Coast Guard Repatriates 101 Migrants to Dominican Republic Following 3 Interdictions Near Puerto Rico* (Apr. 9, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3734747/coast-guard-repatriates-101-migrants-to-dominican-republic-following-3-interdic/*; United States Coast Guard, *Federal, Local Interagency Responders Search for Possible Survivors of Capsized Migrant Vessel in Camuy, Puerto Rico* (Feb. 1, 2024), *https://www.uscg.mil/Press-Releases/Article/3663106/coast-guard-federal-local-interagency-responders-search-for-possible-survivors/*; United States Coast Guard, *Coast Guard Repatriates 28 Migrants to Dominican Republic, Following Interdiction of Unlawful Migration Voyage in the Mona Passage* (Jan. 31, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3661517/coast-guard-repatriates-28-migrants-to-dominican-republic-following-interdictio/*. There were 35,100 encounters of Dominicans between POEs at the SWB in Fiscal Year ("FY") 2023 and 14,100 in the first six months of FY 2024 (on pace for 28,200), up from an average of 400 such encounters per year in FY 2014 through FY 2019—roughly a 90-fold increase. Office of Homeland Security Statistics ("OHSS") analysis of March 2024 OHSS Persist Dataset.

[5] At the SWB, U.S. Customs and Border Protection ("CBP") completed approximately 1.7 million encounters at and between POEs in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.68 million in FY 2000. *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and Title 42 expulsions from 1925 to 2022), *and id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022), *with* OHSS, *2012 Yearbook of Immigration Statistics* 96 tbl. 35 (July 2013), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2012.pdf* (apprehensions from FY 2003 to FY 2012), *and* OHSS, *2002 Yearbook of Immigration Statistics* 184 tbl. 40 (Oct. 2003), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2002.pdf* (apprehensions from FY 1996 to FY 2002). In December 2023, CBP also completed a single-month record of approximately 302,000 encounters at and between POEs, almost one and a half times as many as the highest monthly number recorded prior to 2021 (approximately 209,000 in March 2000) based on records available in the OHSS Persist Dataset from FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individuals during the period in which noncitizens were expelled pursuant to the Centers for Disease Control and Prevention's ("CDC's") Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See* OHSS analysis of March 2024 OHSS Persist Dataset.

DHS data in this IFR are current through March 31, 2024, the most recent month for which DHS has data that have gone through its full validation process. DHS primarily relies on two separate datasets for most of the data in this IFR. Most DHS data are pulled from OHSS's official statistical system of record data, known as the OHSS Persist Dataset, which is typically released by OHSS on a 90-day delay. Other data in this IFR are pulled from OHSS's Enforcement Lifecycle dataset, which combines 23 separate DHS and DOJ datasets to report on the end-to-end immigration enforcement process. Due to this greater complexity, Lifecycle data generally become available for reporting 90 to 120 days after the end of each quarter.

CBP also publishes preliminary data pulled from its operational systems more quickly as part of its regular Monthly Operational Updates. The data in these updates reflect operational realities but change over time as transactional records in the systems of record are cleaned and validated; they are best viewed as initial estimates rather than as final historical records. CBP released an operational update on May 15, 2024, that includes the Component's official reporting for encounters through the end of April. Based on these data, SWB encounters between POEs fell slightly by six percent between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this IFR. Excluding March through April 2020, which was an unusual case because of the onset of the COVID–19 pandemic, the average month-over-month change between March and April for 2013 through 2024 is a 2.3 percent increase, with 4 out of those 11 years experiencing decreases in April and 7 years experiencing increases.

[6] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[7] DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), *https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border.*

[8] *Id.*; *see also* DOD, *Austin Approves Homeland Security Request for Troops at Border* (May 2,

2023), *https://www.defense.gov/News/News-Stories/Article/3382272/austin-approves-homeland-security-request-for-troops-at-border/.*

[9] In the months between May 12, 2023, and March 31, 2024, CBP processed roughly 316,000 noncitizens encountered at and between SWB POEs for expedited removal, more than in any prior full fiscal year. OHSS analysis of data pulled from CBP Unified Immigration Portal ("UIP") on April 2, 2024.

[10] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.*

[11] DHS, *DHS to Supplement H–2B Cap with Nearly 65,000 Additional Visas for FY 2024, Department of Homeland Security* (Nov. 3, 2023), *https://www.dhs.gov/news/2023/11/03/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2024.*

[12] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), *https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration*; CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[13] U.S. State Dep't, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024* (Nov. 3, 2023), *https://www.state.gov/report-to-congress-on-proposed-refugee-admissions-for-fiscal-year-2024/.*

• Completing approximately 89 percent more immigration court cases in FY 2023 as compared to FY 2019;[14] and

• Increasing the immigration judge ("IJ") corps by 66 percent from FY 2019 to FY 2023, including maximizing the congressionally authorized number in FY 2023 for a total corps of 734.[15]

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency[16]—the border security and immigration systems have not been able to keep pace with the number of individuals arriving at the southern border.[17] Simply put, the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection when individuals are arriving at such elevated, historic volumes.[18]

This became even more clear in the months following the lifting of the Title 42 public health Order.[19] As the Departments resumed widespread processing under title 8 authorities, the insufficiency of both the available statutorily authorized tools and the resources provided to implement them came into stark focus. Despite the expanded ability to impose consequences at the SWB through the Circumvention of Lawful Pathways rule and complementary measures, which led to the highest numbers of returns and removals in more than a decade,[20] encounter levels have remained elevated well above historical levels, with December 2023 logging the highest monthly total on record.[21] While encounter levels in calendar year 2024 have decreased from these record numbers, there is still a substantial and elevated level of migration, and historically high percentages of migrants are claiming fear and are challenging to remove, as discussed in more detail in Section III.B.1 of this preamble.[22] This

[14] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1–2 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf.*

[15] *See* EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* 1 (Jan. 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline* (showing 734 total IJs on board in FY 2023); Executive Office for Immigration Review ("EOIR") Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 27, 2024) ("The agency's streamlining efforts also enabled EOIR, by the close of FY 2023, to fill all 734 appropriated IJ positions, thus creating the largest judge corps in the agency's history.").

[16] *See supra* note 9. Since May 12, 2023, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative credible fear determinations, the median time from encounter to removal, over the same time frames, decreased 85 percent from 73 days to 11 days. Pre-May 12, 2023, data from OHSS Lifecycle Dataset as of December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

DHS removed or returned over 662,000 noncitizens between May 12, 2023, and March 31, 2024, or an average of over 61,300 per month (excluding crew members detained on board their vessels and other administrative returns); this represents the highest average monthly count of removals and returns since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[17] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office of Management and Budget ("OMB") (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[18] *Id.; see also* Ariel G. Ruiz-Soto et al., Migration Pol'y Inst., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape* 20 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Across the border, interviewed agents expressed frustration with low staffing levels and resource allocations compared to the challenge of managing the border."). DHS acknowledges that the enacted FY 2024 DHS budget does appropriate funding sufficient to pay for approximately 2,000 additional Border Patrol agents, bringing the total level indicated by Congress up to 22,000 agents, compared with 19,855 agents for FY 2023. 170 Cong Rec. H1809–10 (daily ed. Mar. 22, 2024) (Explanatory Statement Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024) ("The agreement includes . . . [funding] to hire 22,000 Border Patrol Agents."); 168 Cong Rec. S8557 (daily ed. Dec. 20, 2022) (Explanatory Statement Regarding H.R. 2617, Consolidated Appropriations Act, 2023) ("The agreement provides funding for 19,855 Border Patrol agents."). However, the FY 2024 appropriations do not fully fund CBP's existing operational and staffing requirements. Additionally, CBP estimates that it will likely be unable to implement a hiring surge to meaningfully grow its overall staffing levels towards the staffing levels funded by the FY 2024 budget before the end of the current fiscal year. The hiring process requires time and resources to bring additional agents on board. For example, it generally takes more than six months for an applicant to complete the hiring process and report to the U.S. Border Patrol ("USBP") Academy to receive necessary training. *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("However, DHS's border security and immigration enforcement efforts along the Southwest border desperately require the additional funds requested by the Administration and included in the Senate's bipartisan border security legislation, which would provide DHS with approximately $19 billion to fund additional personnel, facilities, repatriation capabilities, and other enforcement resources.").

[19] *See* Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19"). Although the CDC indicated its intention to lift the order on May 23, 2022, ongoing litigation prevented the order from being lifted until it ultimately expired on May 11, 2023. *See* 88 FR at 31319.

[20] In the ten and a half months between May 12, 2023, and March 31, 2024, DHS completed over 662,000 removals and enforcement returns, more than in any full fiscal year since FY 2011, and the highest monthly average of enforcement repatriations since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[21] There were nearly 302,000 CBP encounters at and between POEs along the SWB in December 2023, higher than any previous month on record. OHSS analysis of March 2024 OHSS Persist Dataset and historic CBP data for encounters prior to FY 2000; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[22] After peaking at nearly 302,000 in December 2023, encounters at and between POEs along the SWB fell to approximately 176,000 in January 2024, 190,000 in February 2024, and 189,000 in March 2024. At an average of 185,000 for the first three months of 2024, monthly encounters levels were almost 4 times higher than the pre-pandemic (FY 2014 through 2019) average of 48,000 encounters at and between POEs per month and—with the exceptions of FY 2022 and FY 2023—represented the highest second quarter count of encounters in any year since FY 2001. March 2024 OHSS Persist Dataset; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and title 42 expulsions from 1925 to 2022); *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-*

Continued

substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limits DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities.

The sustained, high encounter rates the Departments have experienced over the past year have outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers. Due to its funding shortfall, DHS simply lacks sufficient resources, such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides," which limits DHS's ability to conduct credible fear interviews for individuals in CBP custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process.[23] This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting the Departments' ability to deliver timely consequences to individuals who do not have a legal basis to remain in the United States.[24] Individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead released pending removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). After an IJ, a process that can take several years to conclude.[25] These immigration court proceedings can be less resource intensive for processing upon initial encounter, because individuals can be released from custody fairly quickly, but are also far less likely to result in swift decisions and swift consequences, and generally require more IJ and ICE attorney time to resolve. *Compare* INA 235(b)(1), 8 U.S.C. 1225(b)(1), *with* INA 240, 8 U.S.C. 1229a. Notably, in FY 2023, when the immigration courts had a historic high number of case completions, the number of new cases far outnumbered those completions and led to a larger backlog—likely extending the length of time it will take individuals encountered and referred into section 240 removal proceedings to finish their immigration court process.[26]

Said another way, at the current levels of encounters and with current resources, the Departments cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain. This inability to predictably deliver timely decisions and consequences further compounds incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application.[27] Smugglers and transnational criminal organizations ("TCOs") have exploited this mismatch, further fueling migration by actively advertising to migrants that they are likely to be able to remain in the United States.[28]

The Departments' ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States. This, in turn, forces DHS to release individuals into the backlogged immigration court system; for the many cases in that system initiated just prior to or during the COVID–19 pandemic, the process can take several years to result in a final decision or consequence,[29] which then incentivizes more people to make the dangerous journey north to take their chances at the SWB.[30] The status quo of the broken immigration and asylum system has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous TCOs.[31] Without countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.[32] All of these factors, taken together, pose significant threats to the

*monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[23] "Because ICE has very limited detention capacity and appropriated bedspace has remained relatively static, the agency must carefully prioritize whom it detains. Similar to FY 2022, during FY 2023, Enforcement and Removal Operations' limited detention capacity was primarily used to house two populations: noncitizens CBP arrested at the Southwest Border and noncitizens with criminal histories [Enforcement and Removal Operations] arrested in the interior." Fiscal Year 2023 ICE Annual Report 18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf*. In FY 2024, ICE was appropriated $5,082,218,000.00 "for enforcement, detention and removal operations." Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, 1812 (daily ed. Mar. 22, 2024).

[24] *See* CBP, *Custody and Transfer Statistics, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (last updated Apr. 12, 2024) (table showing that, under current constraints, the number of individuals processed for expedited removal makes up only a fraction of total processing dispositions, including section 240 proceedings).

[25] EOIR decisions completed in December 2023 were, on average, initiated in December 2020, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 50 percent of EOIR cases initiated during that time were still pending as of December 2023, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of February 12, 2024; EOIR Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 26, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,346 days); EOIR, *Median Completion Times for Detained Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 47 days in the first quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[26] EOIR completed more than 520,000 cases in FY 2023 (a record number), but also had almost 1.2 million case receipts, resulting in a net increase of nearly 700,000 cases in its backlog. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2020/01/31/1_pending_new_receipts_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*. OHSS estimates that 1.1 million of the nearly 1.2 million case receipts (95 percent) resulted from SWB encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[27] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html*.

[28] *See* Parker Asmann & Steven Dudley, *How US Policy Foments Organized Crime on US-Mexico Border,* Insight Crime (June 28, 2023), *https://insightcrime.org/investigations/how-us-policy-foments-organized-crime-us-mexico-border/*.

[29] *See supra* note 25.

[30] *See, e.g.,* Jordan, *supra* note 27.

[31] *See* Asmann & Dudley, *supra* note 28.

[32] *See* Jordan, *supra* note 27.

safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit.

In the absence of congressional action to appropriately resource DHS and EOIR and to reform the outdated statutory framework, the Proclamation and the changes made by this rule are intended to substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. By suspending and limiting entries until 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE, and by imposing a limitation on asylum eligibility and making other policy changes, the Proclamation and IFR will realign incentives at the southern border.[33] The Proclamation and IFR will do this by improving DHS's ability to place into expedited removal the majority of noncitizens who are amenable to such processing; to avoid large-scale releases of such individuals pending section 240 removal proceedings; and to allow for swift resolution of their cases and, where appropriate, removal.

The Proclamation imposes a suspension and limitation on entry upon certain classes of noncitizens who are encountered while the suspension and limitation is in effect. The Proclamation provides that the suspension and limitation on entry applies beginning at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the

Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. Unaccompanied children ("UCs")[34] from non-contiguous countries are not included in calculating the number of encounters. If at any time after such a factual determination the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, the suspension and limitation on entry will apply at 12:01 a.m. eastern time on the next calendar day (or will continue to apply, if the 14-calendar-day period has yet to elapse) until 14 days after the Secretary makes another factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters or the President revokes the Proclamation, at which time its application will be discontinued once again.

The Proclamation does not apply to the following persons:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 217 of the INA, 8 U.S.C. 1187; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for

the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

The President authorized the Secretary of Homeland Security and the Attorney General to issue any instructions, orders, or regulations as may be necessary to implement the Proclamation, including the determination of the exceptions in section 3(b), and directed them to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

Consistent with the President's direction, the Departments have determined that this IFR is necessary to address the situation at the southern border. This IFR aligns the Departments' border operations and applicable authorities with the Proclamation's policy and objectives. Specifically, this IFR establishes a limitation on asylum eligibility that applies to certain individuals who enter during emergency border circumstances and revises certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration[35] and remove noncitizens who do not have a legal basis to remain in the United States. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.

---

[33] Under the Proclamation, the term "encounter" refers to a noncitizen who (i) is physically apprehended by CBP immigration officers within 100 miles of the United States SWB during the 14-day period immediately after entry between POEs; (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between POEs; or (iii) is determined to be inadmissible at a SWB POE. But the 1,500 and 2,500 encounter thresholds in the Proclamation and this rule exclude the third category of encounters—individuals determined to be inadmissible at a SWB POE. When describing historical data in this preamble, the Departments have generally sought to distinguish between encounters between POEs (also referred to as "USBP encounters") and encounters at and between the POEs (also referred to as "total CBP encounters" or "encounters," depending on the context).

[34] In this rulemaking, as in the Proclamation, the term "unaccompanied children" or "UCs" has the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

[35] In this preamble, "irregular migration" refers to the movement of people into another country without authorization.

STB_AR1_000136

## B. Legal Authority

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[36] The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521; INA 103(g)(1), 8 U.S.C. 1103(g)(1). With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions*, 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai*, 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities.[37] Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[]" "requirements and procedures" to govern asylum applications. *Id.* The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the

Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[38] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(3), 8 U.S.C. 1103(a)(3); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. *See* DHS, No. 0150.1, Delegation to the Bureau of Citizenship and Immigration Services (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning ("refouler") "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra*, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

---

[36] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, 114; *see also* 8 U.S.C. 1231 note (United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture); 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18.

[37] The HSA further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General." Public Law 107–296, 116 Stat. 2135, 2274 (codified at 6 U.S.C. 522).

[38] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

Congress implemented these obligations through the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("Refugee Act"), creating the precursor to what is now known as statutory withholding of removal. The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[39] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (codified at 8 U.S.C. 1231 note). DHS and DOJ have implemented the obligations of the United States under Article 3 of the CAT in the Code of Federal Regulations, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), *amended by* 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, while the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, eligibility for asylum, or asylum procedures. That has been the Executive Branch's consistent position for four decades.[40] That longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only in its "sphere[ ]." *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[41] The asylum statute,

[40] In 1984, then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws," including "expedited-removal proceedings" where they could "raise any claims for protection." *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations was understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. *See* Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (Feb. 21, 2024). At the same time, nothing in the proclamations or the INA have precluded the Departments from considering as an adverse *discretionary* criterion that a noncitizen is described in a section 212(f) proclamation.

[41] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States.

first enacted in the Refugee Act of 1980, today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States," *id.,* as those terms are properly understood, and exists regardless of whether a noncitizen is inadmissible.[42] As a result, the power under section 212(f) to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[43]

*Cf., e.g., Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have "extraterritorial application" to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) "does not allow the President to expressly override particular provisions of the INA," while emphasizing the particular "sphere[ ]" in which it operates).

[42] Section 212(f) contrasts with 42 U.S.C. 265, which authorizes the CDC to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health." During the COVID–19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued an order invoking section 265 to expel certain noncitizens without allowing asylum applications. As the final rule implementing section 265 explained, the provision is part of a "broad public health statute" that "operates separately and independently of the immigration power" and authorizes the CDC "to temporarily suspend the effect of any law . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265 was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration." Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[43] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also

Continued

[39] *See INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees," which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

This rule, as discussed elsewhere, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1103(a)(1), (a)(3), (g), 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

*C. Summary of Provisions of the IFR*

This IFR adds provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuate three key changes to the process for those seeking asylum, statutory withholding of removal, or protection under the CAT during emergency border circumstances giving rise to the suspension and limitation on entry under the Presidential Proclamation of June 3, 2024, Securing the Border (''Presidential Proclamation of June 3''):

• During emergency border circumstances, persons who enter across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11.

• During emergency border circumstances, rather than asking

<hr>

invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy*, 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for ''any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe,'' the Attorney General could issue regulations governing entry during such an emergency to ''deny [certain noncitizens] a hearing . . . in special cases'' notwithstanding the ordinary exclusion hearing provisions governing entry). This does not mean, however, that the President could not invoke section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, or protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The ''reasonable probability'' standard is defined to mean substantially more than a ''reasonable possibility'' but somewhat less than more likely than not.

As discussed throughout this IFR, these changes are designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances.

## III. Discussion of the IFR

*A. Current Framework*

1. Asylum, Statutory Withholding of Removal, and CAT Protection

Asylum is a discretionary benefit that can be granted by the Secretary or the Attorney General if a noncitizen establishes, among other things, that they have experienced past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INA 208(b)(1)–(2), 8 U.S.C. 1158(b)(1)–(2)

(providing that, unless subject to a mandatory bar, the Secretary or Attorney General ''may'' grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining ''refugee''). As long as they retain their asylee status, noncitizens who are granted asylum (1) cannot be removed or returned to their country of nationality or, if they have no nationality, their last habitual residence, (2) receive employment authorization incident to their status, (3) may be permitted to travel outside of the United States and return with prior consent, and (4) may seek derivative benefits for their spouses or children. INA 208(c)(1), 8 U.S.C. 1158(c)(1); *see Johnson* v. *Guzman Chavez*, 594 U.S. 523, 536 (2021) (''[A] grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year[.]'' (emphasis omitted) (internal quotation marks and citation omitted)); 8 CFR 274a.12(a)(5) (employment authorization incident to asylum status); 8 CFR 223.1(b) (allowing for return to the United States after travel with a requisite travel document for a ''person who holds . . . asylum status pursuant to section 208 of the Act''); *see also* 6 U.S.C. 271(b)(3) (transferring asylum functions to DHS); 6 U.S.C. 557 (providing that references to any other officer shall be deemed to refer to the ''Secretary'' with respect to any transferred function); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Asylum applications are generally classified as ''affirmative'' or ''defensive'' applications, depending on the agency with which they are filed. If a noncitizen is physically present in the United States, not detained, and not in section 240 removal proceedings, the noncitizen may file an asylum application with USCIS. These applications are ''affirmative'' filings. Generally, if the noncitizen is in section 240 removal proceedings before an IJ, the noncitizen may apply for asylum before the IJ as a defense to removal.[44] These applications are ''defensive'' filings.

Noncitizens are eligible for asylum if they have been persecuted or have a well-founded fear of future persecution in their country of nationality or, if they have no nationality, their last habitual residence, on account of one of five protected grounds and are not subject to a bar to eligibility. *See generally* INA 208, 8 U.S.C. 1158; INA 101(a)(42), 8 U.S.C. 1101(a)(42). To be granted

<hr>

[44] The only exception is that USCIS has initial jurisdiction over asylum applications filed by a UC even where the applicant is in section 240 removal proceedings. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C).

STB_AR1_000139

asylum, eligible noncitizens must also establish that they merit asylum in the exercise of discretion. *Id.* Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, may qualify for other forms of protection. An application for asylum submitted by a noncitizen in section 240 removal proceedings is also considered an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b), 1208.13(c)(1). An IJ also may consider a noncitizen's eligibility for statutory withholding of removal and CAT protection under regulations issued pursuant to the implementing legislation regarding the obligations of the United States under Article 3 of the CAT. FARRA sec. 2242(b) (codified at 8 U.S.C. 1231 note); 8 CFR 1208.3(b), 1208.13(c)(1); *see also* 8 CFR 1208.16(c), 1208.17.

Statutory withholding of removal and CAT protection preclude removing a noncitizen to any country where the noncitizen would "more likely than not" face persecution or torture, meaning that the noncitizen's life or freedom would be threatened because of a protected ground or that the noncitizen would be tortured. 8 CFR 1208.16(b)(2), (c)(2). Thus, if a noncitizen establishes that it is more likely than not that their life or freedom would be threatened because of a protected ground, but is denied asylum for some other reason, the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16. Likewise, a noncitizen who establishes that they more likely than not will face torture in their country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a).

In contrast to the more generous benefits available by attaining asylum, statutory withholding of removal and CAT protection do not: (1) prohibit the Government from removing the noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status; or (3) afford the same ancillary benefits, such as derivative protection for family members. *See, e.g., Guzman Chavez,* 594 U.S. at 536 ("distinguish[ing] withholding-only relief from asylum" on the ground that withholding does not preclude the Government from removing the noncitizen to a third country and does

not provide the noncitizen any permanent right to remain in the United States); *Matter of A–K–,* 24 I&N Dec. 275, 279 (BIA 2007) (stating that "the Act does not permit derivative withholding of removal under any circumstances"); INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (statutory provision allowing asylum status to be granted to accompanying or following-to-join spouse or children of a noncitizen granted asylum; no equivalent statutory or regulatory provision for individuals granted withholding or deferral of removal).

2. Expedited Removal and Screenings in the Credible Fear Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process. The process is applicable to certain noncitizens present or arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation requirements for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. The Departments have used the same screening process to identify potentially valid claims for statutory withholding of removal and CAT protection. If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to a USCIS AO to determine whether the noncitizen has a credible fear of persecution or torture in the country of citizenship or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4). A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the

alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). If the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 208.33(b)(2)(v), 1208.30(g).

If the AO (or an IJ reviewing the AO's decision) determines that a noncitizen has a credible fear of persecution or torture, USCIS can refer the noncitizen to an immigration court for adjudication of the noncitizen's claims in section 240 removal proceedings, 8 CFR 208.30(f), 8 CFR 1208.30(g)(2)(iv)(B), and the noncitizen may subsequently file a defensive asylum application with the court during those proceedings, *see* 8 CFR 1240.1(a)(1)(ii). Alternatively, USCIS can retain jurisdiction over the application for asylum for further consideration in an asylum merits interview. *See* 8 CFR 208.30(f). During an asylum merits interview, a positive credible fear determination is treated as the asylum application, and strict timelines thereafter govern the applicant's case before both USCIS and EOIR. *See* 8 CFR 208.2(a)(1)(ii), 208.3(a)(2), 208.4(b)(2), 208.9(a)(1), (e)(1)–(2), (g)(2), (i), 1240.17. The AO may grant asylum, subject to review within USCIS, where the noncitizen is eligible and warrants a grant as a matter of discretion. 8 CFR 208.14(b). If the noncitizen is not eligible or does not warrant a grant of asylum as a matter of discretion, the AO refers the application to EOIR. 8 CFR 208.14(c)(1). Where USCIS does not grant asylum, the AO's decision will also include a determination on eligibility for statutory withholding of removal and CAT protection based on the record before USCIS. 8 CFR 208.16(a), (c)(4).

For cases referred to EOIR following an asylum merits interview, the written record of the positive credible fear determination serves as the asylum application, 8 CFR 1240.17(e), and the record the AO developed during the asylum merits interview, as supplemented by the parties, serves as the record before the IJ, 8 CFR 1240.17(c), (f)(2)(i)(A)(1), (f)(2)(ii)(B). The IJ reviews applications for asylum de novo and also reviews applications for statutory withholding of removal and CAT protection de novo where USCIS found the noncitizen ineligible for such protection. 8 CFR 1240.17(i)(1). However, where USCIS found the noncitizen eligible for statutory withholding of removal or CAT

protection, IJs must give effect to USCIS's eligibility determination unless DHS demonstrates, through evidence or other testimony that specifically pertains to the noncitizen and was not in the record of proceedings for the asylum merits interview, that the noncitizen is not eligible for such protection. 8 CFR 1240.17(i)(2). With a limited exception, DHS may not appeal the grant of any protection for which the AO determined the noncitizen eligible. *Id.*

3. Lawful Pathways Condition on Asylum Eligibility

On March 20, 2020, the Director of the Centers for Disease Control and Prevention ("CDC") issued an order under 42 U.S.C. 265 and 268 suspending the introduction of certain noncitizens from foreign countries or places where the existence of a communicable disease creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of such introduction is necessary to protect the public health.[45] The CDC's Title 42 public health Order was extended multiple times.[46] While the Title 42 public health Order was in effect, noncitizens who did not have proper travel documents were generally not processed into the United States; they were instead expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in title 8 of the United States Code, which includes the INA. Circumvention of Lawful Pathways, 88 FR 11704, 11705 (Feb. 23, 2023) ("Circumvention of Lawful Pathways NPRM"). In early 2023, the President announced that the Administration expected to end the public health emergency on May 11, 2023, which would cause the then-operative Title 42 public health Order to end. *See id.* at 11708.

As the Departments stated in the Circumvention of Lawful Pathways rule, absent further action, the end of the Title 42 public health Order was expected to cause encounters with noncitizens seeking to enter the United States at the SWB to rise to or remain at all-time highs—as high as 11,000 migrants daily. 88 FR at 31331, 31315. And many of these individuals would be entitled to remain in the United States pending resolution of their asylum and protection claims. *See* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii) (not allowing for removal of those found to have a credible fear pending further consideration of the asylum claim); *see also* 88 FR at 31363 (noting that "most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future"). The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 public health Order was expected to result in many more migrants crossing the border and asserting claims of fear or seeking protection, which would in turn exceed the border security and immigration systems' capacity to process migrants in a safe, expeditious, and orderly way. *See* 88 FR at 31363. To address this expected increase in the number of migrants at the SWB and adjacent coastal borders seeking to enter the United States without authorization, the Departments promulgated the Circumvention of Lawful Pathways rule. *See* 88 FR 31314.

The Circumvention of Lawful Pathways rule, which became effective on its public inspection date, May 11, 2023, *id.*, and applies to those who enter during a two-year period, imposes a rebuttable presumption of asylum ineligibility on certain noncitizens who fail to pursue safe, orderly, and lawful processes for entry into the United States or seek protection in another qualifying country through which they traveled. 8 CFR 208.33(a), 1208.33(a). The rebuttable presumption applies to noncitizens who enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission where the entry is: (1) between May 11, 2023, and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in 42 U.S.C. 265 and 268 and the implementing regulation at 42 CFR 71.40; and (3) after the noncitizen traveled through a country other than their country of citizenship, nationality, or, if stateless,

last habitual residence, that is a party to the Refugee Convention or Refugee Protocol. 8 CFR 208.33(a)(1), 1208.33(a)(1).

The presumption does not apply to UCs or to noncitizens who availed themselves of or were traveling with a family member who availed themselves of certain safe, orderly, and lawful pathways—specifically those who (1) received appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE pursuant to a pre-scheduled time and place or presented at a POE without a pre-scheduled time and place but who can demonstrate by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. 8 CFR 208.33(a)(2), 1208.33(a)(2). Noncitizens may also overcome the presumption by demonstrating by a preponderance of the evidence that "exceptionally compelling circumstances exist." 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Such circumstances necessarily exist where, at the time of entry, the noncitizen or a family member with whom the noncitizen is traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) was a victim of a severe form of trafficking in persons under 8 CFR 214.11(a). 8 CFR 208.33(a)(3)(i)(A)–(C), (ii), 1208.33(a)(3)(i)(A)–(C), (ii). A noncitizen presumed ineligible for asylum under the rule may still apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is more likely than not that they will be persecuted because of a protected ground or tortured.

The condition on asylum eligibility in the Circumvention of Lawful Pathways rule ("Lawful Pathways condition") applies to asylum applications before USCIS and EOIR. 8 CFR 208.13(f), 1208.13(f). It also applies during credible fear screenings. 8 CFR 208.33(b), 1208.33(b). Noncitizens subject to expedited removal who indicate a fear of persecution or an intention to apply for asylum are currently first screened to assess whether the rebuttable presumption applies and, if so, whether the noncitizen is able to rebut the presumption. 8 CFR 208.33(b). If the AO

---

[45] CDC, Order Under Sections 362 & 365 of the Public Health Services Act (42 U.S.C. 265, 268): Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists (Mar. 20, 2020), *https://www.cdc.gov/quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf.*

[46] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

STB_AR1_000141

determines that the rebuttable presumption does not apply or the noncitizen has rebutted the presumption, the general procedures governing the credible fear process then apply. *See* 8 CFR 208.33(b)(1)(ii). On the other hand, if the AO determines that the noncitizen is covered by the rebuttable presumption and no rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 CFR 208.33(b)(1)(i), (b)(2). The Circumvention of Lawful Pathways rule currently provides that, if a noncitizen has established a reasonable possibility of persecution or torture, then DHS will issue a notice to appear ("NTA") to commence section 240 removal proceedings and may not refer the case to the asylum merits interview process. 8 CFR 208.33(b)(2)(ii).

Where a noncitizen requests review by an IJ, the IJ reviews the negative credible fear finding de novo. *See* 8 CFR 1208.33(b). If the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT protection, the IJ issues a positive credible fear finding and the case proceeds under existing procedures. *See* 8 CFR 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the noncitizen is covered by the rebuttable presumption and it has not been rebutted, but the noncitizen has established a reasonable possibility of persecution or torture, the IJ issues a positive credible fear finding and DHS will issue an NTA to commence section 240 removal proceedings. 8 CFR 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See* 8 CFR 208.33(b)(2)(v)(C), 1208.33(b)(2)(iii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that USCIS reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C).

A noncitizen who has not established during expedited removal proceedings a significant possibility of eligibility for asylum because of the Lawful Pathways condition may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or CAT protection, or any other form of relief or protection for which the noncitizen is eligible. *See* 8 CFR 1208.33(b)(4). Where a principal asylum applicant in section 240 removal proceedings is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption, and where either an accompanying spouse or child does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. 8 CFR 1208.33(c).

*B. Justification*

1. Global Migration at Record Levels

Border encounters in the 1980s, 1990s, and 2000s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[47] Beginning in the 2010s, a growing share of migrants were from northern Central America[48] and, since the late 2010s, from countries throughout the Americas.[49] Since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from the northern Central American countries, and now to single adults and families from throughout the hemisphere (and beyond). Those encountered also have been more likely to seek asylum and other forms of relief or protection, straining the Departments' capacity to process individuals through expedited removal.[50]

In the early 2010s, U.S. Border Patrol ("USBP") encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2018. *See* 88 FR at 11708. This followed decades during which annual USBP encounters routinely numbered in the millions; however, the overall share of those who were processed for expedited removal and claimed a fear never exceeded 2 percent until 2011. *Id.* at 11708, 11716. Despite these historically low encounter numbers, the Departments faced significant challenges in 2014 due to an unprecedented surge in migration by UCs and in 2016 due to a surge in family units at the border—demographics that present unique challenges due to their vulnerability.[51]

From FY 2017 to FY 2019, however, encounters between the POEs along the SWB more than doubled, to more than 850,000, and—following a significant drop during the beginning of the COVID–19 pandemic—continued to increase in FY 2021 and FY 2022.[52] In FY 2021, USBP encounters between POEs along the SWB reached a level not seen since the early 2000s—over 1.6 million.[53] In FY 2022, encounters at the

---

[47] *See* 88 FR at 11708. According to OHSS Persist data and historic Office of Immigration Statistics ("OIS") Yearbooks of Immigration Statistics, Mexican nationals accounted for 87 to over 99 percent of apprehensions between POEs of persons entering without inspection between 1981 and 2010. *See* March 2024 OHSS Persist Dataset; *see, e.g.,* INS, *1981 Statistical Yearbook of the Immigration and Naturalization Service* 119 tbl. 53 (1981); INS, *1999 Statistical Yearbook of the Immigration and Naturalization Service* 208–11 tbl. 56 (Mar. 2002), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1999.pdf*. For more information about Mexican migrants' demographics and economic motivations during some of that time period, see Jorge Durand et al., *The New Era of Mexican Migration to the United States,* 86 J. Am. Hist. 518, 527–28, 530–31, 535–36 (1999).

[48] Northern Central America refers to El Salvador, Guatemala, and Honduras. 88 FR at 11708 n.35.

[49] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries

accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

[50] For noncitizens encountered at the SWB from FY 2014 to FY 2019 who were placed in expedited removal proceedings, roughly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination compared to roughly 57 percent of people from northern Central America and 90 percent of all other nationalities. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023; *see also* 88 FR at 11709 n.37.

[51] Decl. of Blas Nuñez-Neto ¶ 6, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[52] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[53] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

STB_AR1_000142

SWB reached a new high-water mark, with total USBP encounters exceeding 2.2 million.[54] FY 2023 saw a slight drop, but USBP encounters remained high—over 2.0 million.[55] By early 2023, while the Title 42 public health Order was in place, total encounters at the SWB—referring to the number of times U.S. officials encountered noncitizens attempting to cross the SWB without authorization to do so either between or at POEs—had reached all-time highs.[56] This dramatic increase in encounters has coincided with a substantial and—setting aside the period of time when the Title 42 public health Order was in effect—persistent increase in the number of noncitizens making fear claims in recent years. *See* 88 FR at 11716.[57] In 2019—prior to the implementation of the Title 42 public health Order—44 percent of noncitizens encountered at the SWB placed in expedited removal proceedings claimed fear, resulting in 98,000 credible fear screenings. *Id.* The number of fear claims returned to these historically high levels after the Title 42 public health Order ended. From May 2023 through March 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 169,000 fear claims out of 315,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE).[58] These high numbers of both encounters and fear claims combine to further compound the significant stress on the immigration system.

Much of this growth in encounters was driven by nationalities that DHS had never before encountered in large numbers at the border—including nationals of countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela, as well as migrants from Eastern Hemisphere countries.[59] Because of this, DHS has had to undertake a focused diplomatic effort, working closely with the Department of State, to enter into commitments with countries to facilitate the return of their nationals. However, despite this concerted effort, it remains difficult for DHS to repatriate citizens of some of these countries who do not establish a legal basis to remain in the United States, including those from the Eastern Hemisphere—substantially limiting DHS's ability to impose consequences on those nationals.[60]

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014 to December 2020.[61] Encounters of Mexican nationals have fallen to 29 percent of total SWB encounters during this time frame—an enormous change from historical trends that has sweeping ramifications for the border and immigration system, which are detailed below.[62]

The increase in migration at the SWB is consistent with global and regional trends. Over the past three years, migration around the world has reached levels not seen since World War II.[63] The Western Hemisphere is no exception and has been facing historic levels of migration that have severely strained the immigration systems of countries throughout the region.[64] There is a growing consensus within the region that this shared challenge cannot be solved without collective action—a consensus reflected by the 22 countries that have supported the Los Angeles Declaration on Migration and Protection, which proposes a comprehensive approach to managing migration throughout the region.[65]

---

[54] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[55] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[56] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024). During the initial seven months of FY 2023, while the Title 42 public health Order was still in effect, total CBP encounters surged to an all-time high of 1.4 million—an 11 percent increase over the same period in FY 2022 and nearly double the encounters recorded in FY 2021 for the same time period.

[57] The percentage of noncitizens encountered at and between SWB POEs processed for expedited removal who made fear claims steadily rose from 16 percent in FY 2013 to 44 percent in FY 2019, experienced a temporary dip in FY 2020 at the start of the Title 42 public health Order, and then resumed an upward trajectory, reaching a peak of 59 percent in FY 2023, marking the highest level of fear claims as a share of the SWB expedited removal population ever recorded. *See* OHSS Enforcement Lifecycle as of December 31, 2023; March 2024 OHSS Persist Dataset. Data on the exact number of noncitizens encountered at the SWB processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that about 84 percent of all fear claims made in prior years were made by noncitizens encountered at and between SWB POEs. Even if 100 percent of fear claims made before FY 2013 were made by noncitizens encountered at the SWB, the level of fear claims as a share of SWB encounters at and between POEs processed for expedited removal in 2023 would be the highest ever.

[58] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[59] Nationals from all countries other than Mexico and the northern Central American countries accounted for less than 5 percent of total CBP SWB encounters each year between FY 1981 and FY 2010, an average of 5 percent of SWB encounters from FY 2010 to FY 2013, and 10 percent of total SWB encounters from FY 2014 to FY 2019. The increase in encounters from these new countries of origin has accelerated since the start of FY 2021, as non-Mexican, non-northern Central American countries accounted for 42 percent of encounters from the start of FY 2021 through the second quarter of FY 2024, including 51 percent of FY 2024 encounters through March 2024. OHSS analysis of historic OIS *Yearbooks of Immigration Statistics* and March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (''SW Border Encounters by Citizenship'').

[60] *See* 88 FR at 11708–11.

[61] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (''CBP SW Border Encounters by Agency and Selected Citizenship'').

The application of title 42 authorities at the SWB also altered migratory patterns, in part by incentivizing individuals who were expelled—without being issued a removal order, which, unlike a title 42 expulsion, carries immigration consequences—to try to re-enter, often multiple times. *See* 88 FR at 11709. The majority of repeat encounters were of Mexican and northern Central American nationals, who were much more likely than others to be expelled to the Mexican side of the U.S.-Mexico border—between FY 2020 and FY 2023, 72 percent of Mexican and 50 percent of northern Central American encounters at and between SWB POEs resulted in title 42 expulsion, contrasting sharply with 8 percent of non-Mexican and non-northern Central American encounters experiencing similar outcomes. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (''CBP SW Border Encounters Book-Outs by Selected Citizenship'').

Even accounting for increased repeat encounters, unique encounters at and between SWB POEs also hit all-time highs in each year from FY 2021 to FY 2023. Nationals of countries other than Mexico and the northern Central America countries account for an even larger share of the growth in unique encounters, comprising 51 percent of unique encounters from January 2021 to March 2024, up from 9 percent in FY 2014 to December 2020. March 2024 OHSS Persist Dataset.

[62] March 2024 OHSS Persist Dataset.

[63] Decl. of Blas Nuñez-Neto ¶ 2, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[64] *See* 88 FR at 11710–11.

[65] *See* The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*.

STB_AR1_000143

As it prepared for the return to title 8 processing of all noncitizens, DHS led a comprehensive, all-of-government planning and preparation effort that lasted more than 18 months.[66] This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.[67] This effort also included the development and implementation of policy measures, including the joint DHS and DOJ Circumvention of Lawful Pathways rule and complementary measures, which were critically important components of DHS preparations to manage the anticipated significant influx of migrants associated with the end of the Title 42 public health Order's application at the border.[68] And the United States Government's efforts were complemented by a range of measures taken by foreign partners in the region, such as Mexico's independent decision to continue to accept the return of certain non-Mexican migrants after May 11, 2023,[69] and campaigns by Colombia and Panama to attack smuggling networks operating in the Darién Gap.[70]

The Circumvention of Lawful Pathways rule has strengthened the consequences in place for those who cross the border irregularly and is a critical component of the Government's regional strategy. DHS has also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal and limit noncitizens absconding;[71] changing the consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen's acknowledgement of receipt of information explaining the credible fear process;[72] returning current third-country nationals to Mexico, consistent

with established processes under the INA;[73] permitting certain non-Mexican citizens to withdraw their application for admission and voluntarily return to Mexico;[74] and increasing USCIS's capacity to train and prepare additional staff temporarily detailed as AOs to conduct credible fear interviews.[75] These measures, combined with existing processes and resources and work with regional and international partners to disrupt irregular migration and smuggling networks, seek to form a comprehensive framework for managing migratory flows to the border—one that seeks to disincentivize noncitizens from putting their lives in the hands of callous smugglers by crossing the SWB between POEs and to incentivize noncitizens to use lawful, safe, and orderly pathways and processes instead.

Without the Circumvention of Lawful Pathways rule and complementary measures, DHS assesses that irregular migration at the border would be substantially higher today. DHS saw evidence of very high levels of irregular migration in the days leading up to the end of the Title 42 public health Order on May 11, 2023.[76] A historic surge in migration culminated with what were then the highest recorded encounter levels in U.S. history over the days immediately preceding May 11, which placed a significant strain on DHS's operational capacity at the border.[77] Encounters between POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the Title 42 public health Order (from May 8 to May 11).[78] The

sharp increase in encounters between POEs during the 30 days preceding May 11 represented the largest month-over-month increase in almost two decades—since January 2004.[79]

As a consequence of the elevated flows USBP experienced in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges.[80] From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000 noncitizens, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.[81] During this same time frame, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, Rio Grande Valley, and Yuma) at more than 50 percent over their holding capacity and one sector (Tucson) at more than two-and-a-half times over its holding capacity.[82]

This record number of encounters between POEs severely strained DHS operations and resources, as well as the resources of other Federal Government agencies, local communities, and non-governmental organizations ("NGOs").[83] CBP redirected limited resources from other mission needs—in particular, legitimate travel and trade operations, the volume of which by that time had surpassed pre-pandemic levels—to focus on processing apprehended noncitizens.[84] Overcrowding in CBP facilities increased the potential for health and safety risks to noncitizens, Government personnel, and contract support staff. Such risks were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody who must be processed.[85] To manage these conditions, USBP sectors redirected personnel from the field to perform tasks for noncitizens in custody, including processing, transporting, and escorting noncitizens.[86] This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.[87]

The surge in encounters between POEs immediately preceding the end of the Title 42 public health Order also led

[66] Decl. of Blas Nuñez-Neto ¶ 8, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[67] *Id.*

[68] *Id.*

[69] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[70] Decl. of Blas Nuñez-Neto ¶ 40, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[71] *Id.* ¶ 5.

[72] *Id.*

[73] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (noting the United States and Mexico's commitment to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration, and noting that Mexico will continue to accept back migrants on humanitarian grounds).

[74] Decl. of Blas Nuñez-Neto ¶ 5, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[75] *Id.*

[76] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[77] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[78] *Id.*

[79] *Id.*

[80] *Id.* ¶ 10.

[81] *Id.*

[82] *Id.*

[83] *Id.* ¶ 11.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

to significant challenges for local border communities.[88] For example, in the days leading up to May 11, 2023, local community resources in El Paso, Texas, were quickly overwhelmed as the number of noncitizens arriving in the United States surpassed the city's capacity.[89] In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency, as more than 1,000 noncitizens were sleeping on the sidewalks and left without shelter.[90] Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[91] The surge in encounters also placed strain on interior cities. In May 2023, for instance, New York's Governor declared a State Disaster Emergency.[92]

Since their implementation in May 2023, the Circumvention of Lawful Pathways rule and complementary measures have helped DHS to better manage migratory flows. Between May 12, 2023, and March 31, 2024, CBP placed into expedited removal more than 970 individuals encountered at and between POEs each day on average, and USCIS conducted a record number of credible fear interviews (more than 152,000) resulting from such cases. This is more interviews from SWB encounters at and between POEs during the span of ten and a half months than in any full fiscal year prior to 2023, and more than twice as many as the annual average from FY 2010 to FY 2019.[93] On average, since May 12, 2023, USCIS has completed approximately 3,300 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.[94] In addition, in FY 2023, IJs conducted over 38,000 credible fear and reasonable fear reviews, the highest figure on record since at least 2000.[95]

These efforts have significantly reduced the median time to process credible fear cases. Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations, the median time from encounter to removal, in the same time frames, decreased by 85 percent from 73 days to 11 days.[96]

The increase in referrals into expedited removal proceedings, combined with the streamlining of the process, has had tangible results. From May 12, 2023, to March 31, 2024, DHS removed more than 662,000 individuals—more removals than in any full fiscal year since 2013 and an indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences when individuals do not establish a legal basis to remain in the United States.[97] Over the first six months immediately following May 12, 2023, DHS saw a significant decrease in border encounters between POEs. After peaking at 9,700 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between POEs decreased by 45 percent to an average of 5,200 per day for the period from May 12, 2023, to November 30, 2023.[98] While this months-long trend included variability over shorter periods, border encounters between POEs remained below the levels projected to occur in the absence of the

Circumvention of Lawful Pathways rule and complementary measures.[99]

While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration.

After months of relatively lower encounter levels between POEs following the changes put in place after May 11, 2023, encounter levels increased through the fall of 2023,[100] and December 2023 saw the highest levels of encounters between POEs in history, including a surge in which border encounters between POEs exceeded 10,000 for three consecutive days and averaged more than 8,000 a day for the month.[101] That surge in migration was focused increasingly on western areas of the border—California and Arizona—that had not been the focal point of migration over the prior two years, and in areas that are geographically remote and challenging to respond to. For instance, the Tucson sector's average full-year encounter total for the pre-pandemic period (FY 2014 to FY 2019) was approximately 62,000; by contrast, in November and December of 2023, the sector recorded approximately 64,000 and 80,000 encounters, respectively.[102] And while the number of encounters between POEs since December 2023 has decreased, consistent with seasonal migration flows and as a result of increased enforcement, they still remain at historically high levels—USBP encounters from January 2024 to March 2024 are just 5 percent below the levels

---

[88] *Id.* ¶ 12.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *See* N.Y. Exec. Order No. 28, Declaring a Disaster Emergency in the State of New York (May 9, 2023), *https://www.governor.ny.gov/executive-order/no-28-declaring-disaster-emergency-state-new-york; see also* Mayor of Chicago Emergency Exec. Order No. 2023–2 (May 9, 2023).

[93] Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[94] Completed cases are those with credible fear interviews that have been adjudicated or that have been closed. Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[95] EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Apr. 27, 2023), *https://www.justice.gov/eoir/media/1344816/dl?inline.*

[96] Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023; post-May 12 estimates are based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. Encounter-to-removal cases include noncitizens removed after being placed in expedited removal proceedings, claiming fear, and receiving a negative fear determination or an administrative closure that is not referred to EOIR. Comparisons to the pandemic period are not relevant because many noncitizens who normally would have been referred for expedited removal processing were instead expelled under title 42 authority.

[97] OHSS analysis of data downloaded from UIP on April 2, 2024; *see* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[98] Pre-May 12, 2023, data from March 2024 OHSS Persist Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on December 12, 2023.

[99] Decl. of Blas Nuñez-Neto ¶ 4, *E. Bay Sanctuary Covenant v. Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) (noting that in the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Title 42 public health Order).

[100] *See* CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited May 27, 2024) (providing monthly figures for 2021 to 2024).

[101] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf;* ·Priscilla Alvarez, *Authorities Encountering Record Number of Migrants at the Border Each Day Amid Unprecedented Surge,* CNN (Dec. 22, 2023), *https://www.cnn.com/2023/12/22/politics/border-surge-record-amounts/index.html.*

[102] *See* March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

STB_AR1_000145

reached during the same months in 2023,[103] while some USBP sectors, such as Tucson and San Diego, have seen increases of 83 percent and 62 percent, respectively, from the second quarter of FY 2023, and Tucson is on pace for an all-time high number of annual encounters.[104]

Since the lifting of the Title 42 public health Order, then, it has become increasingly clear that DHS's ability to process individuals encountered at the SWB under applicable title 8 authorities—including, critically, to deliver timely consequences to a meaningful proportion of those who do not establish a legal basis to remain in the United States—is significantly limited by the lack of resources and tools available to the Departments. In response to the record high levels of encounters between POEs in December 2023, DHS had to take extraordinary steps to shift personnel and resources to the affected sectors: CBP curtailed or suspended operations at a number of POEs, and, just before December 25, 2023, CBP reassigned 246 officers to support USBP operations. As part of these extraordinary measures: vehicular traffic through the Eagle Pass, Texas, POE was suspended on November 27, 2023; the POE in Lukeville, Arizona, was closed on December 4, 2023; rail operations at POEs in El Paso and Eagle Pass, Texas, were suspended on December 18, 2023;[105] the Morley Gate POE in Nogales, Arizona, which was closed due to construction and slated to be reopened in November 2023, delayed its reopening;[106] and operations at Pedestrian West, part of the San Ysidro POE in San Diego, California, were suspended on December 9, 2023.[107] On

January 4, 2024, once the volume of migrants had diminished and CBP officers were able to return to normal duties, port operations in these locations resumed.[108]

The decision to close POEs was not one taken lightly. The United States Government fully understands the impacts of such closures on local communities on both sides of the border, both socially and economically.[109] Closing international POEs is a measure of last resort, and one that DHS was compelled to take in order to reassign its resources to support frontline agents in a challenging moment.

In addition to concerted efforts to strengthen and maximize consequences, including through new regulations, the United States Government has engaged intensively with the Government of Mexico to identify coordinated measures both countries could take, as partners, to address irregular migration. During the period before and after the December surge, the United States Government and the Government of Mexico held numerous talks at the highest levels of government to address migration. For example, President Biden and President of Mexico Andrés Manuel López Obrador spoke on December 21, 2023, and February 3, 2024.[110] During their conversation on December 21, the presidents agreed that additional enforcement actions were urgently needed so that the POEs that were temporarily closed could reopen.[111] In

subsequent high-level meetings, both countries committed to expanding efforts to increase enforcement measures to deter irregular migration, expanding safe and lawful pathways, and strengthening cooperation.[112] The Government of Mexico expressed its concern about the economic impact of the POE closures and committed to increasing enforcement on key transit routes north.[113] On January 22, 2024, after a series of follow-on meetings between United States and Mexican Cabinet members in Washington, DC, Mexico's Foreign Secretary enumerated a series of steps that the United States and Mexico committed to taking to continue to address migration, including combating human smuggling and trafficking organizations.[114]

DHS assesses that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available and the Government of Mexico's operational constraints at the end of its fiscal year, which limited its ability to enforce its own immigration laws.[115] The

---

[103] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[104] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[105] *See* CBP, *Statement from CBP on Operations in Eagle Pass, Texas and Lukeville, Arizona* (Nov. 27, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-eagle-pass-texas-and-lukeville-arizona*.

[106] *See* CBP, *Statement on Operational Changes and Resumption of Rail Operations in Eagle Pass and El Paso* (Dec. 22, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operational-changes-and-resumption-rail-operations*.

[107] *See* CBP, *Statement from CBP on Operations in San Diego, California* (Dec. 7, 2023), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-san-diego-california*.

[108] *See* CBP, *Statement from CBP on Resumption of Operations in Arizona, California, and Texas* (Jan. 2, 2024), *https://www.cbp.gov/newsroom/national-media-release/statement-cbp-resumption-field-operations-arizona-california-and/*.

[109] *See, e.g.,* Russel Contreras, *U.S.-Mexico Border Closures Could Cost Billions,* Axios (Dec. 22, 2023), *https://www.axios.com/2023/12/22/us-mexico-border-closures-could-cost-billions* (discussing evidence of the "devastating consequences" that follow from partial border closings); *cf.* Bryan Roberts et al., *The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry: Report to U.S. Customs and Border Protection* 5 (Apr. 2013), *https://cbre.info/wp-content/uploads/2014/07/U.S.C.-Create-CBP-Final-Report.pdf* (discussing the benefits of adding staffing to land border POEs).

[110] *See* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/;* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Feb. 3, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/03/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-3/*.

[111] The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-*

bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/.

[112] The White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/*.

[113] *Id.; see also, e.g.,* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis; US, Mexico Agree to Strengthen Efforts to Curb Record Migration,* Reuters (Dec. 28, 2023), *https://www.reuters.com/world/us-mexico-keep-border-crossings-open-lopez-obrador-says-2023-12-28/*.

[114] *See, e.g.,* Valentine Hilaire & Cassandra Garrison, *Mexico, US Pitch Measures to Ease Pressure on Border, Plan Guatemala Talks,* Reuters (Jan. 22, 2024), *https://www.reuters.com/world/americas/mexico-us-guatemala-officials-meet-migration-talks-2024-01-22/;* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Mexico's Foreign Affairs Secretary as saying that "we have done much more law enforcement to bring down the pressure in the border in the north").

[115] *See* María Verza, *Mexico Halts Deportations and Migrant Transfers Citing Lack of Funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc; Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents,* NPR (Dec. 10, 2023), *https://www.npr.org/2023/12/10/1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents;*

Continued

Departments cannot address all of these factors in one rule, but assess that this rule will significantly increase the ability to deliver timely decisions and timely consequences at the border within current resources, combating perceptions and messaging to the contrary.

Encounters between POEs in January 2024 were substantially lower than December 2023 encounters, consistent with historic seasonal trends, and encounters in January 2022 and January 2023.[116] In February and March 2024, encounter levels increased from the levels in January but remained significantly lower than in December 2023.[117] Overall, from January 1 to March 31, 2024, encounters between POEs were 5 percent lower than during the same months in 2023 and 22 percent lower than those in 2022.[118] However, despite the overall decrease in encounters since December 2023, specific areas of the border—in particular USBP's San Diego and Tucson Sectors—have experienced localized increases in encounters that have, at times, strained DHS's holding capacity, adversely impacted local operations, and limited DHS's ability to swiftly impose consequences on individuals who do not establish a legal basis to remain in the United States. During the last week of April 2024, USBP's San Diego Sector encountered an average of more than 1,400 migrants each day, including many migrants from countries outside the Western Hemisphere who are more difficult to process.[119] The USBP Tucson Sector is experiencing similar, unprecedented migratory flows and consequent challenges. This high concentration of encounters, including comparatively large numbers of migrants who are hard to remove, in a focused geographic area places particular strain on the immigration enforcement system. This is particularly true in areas of the border—such as San Diego—where infrastructure-related capacity constraints limit DHS's ability to swiftly

impose consequences at the border. These factors resulted in USBP's main processing facility in San Diego reaching over 200 percent capacity in April 2024, despite a recent expansion of this facility.

Since January 2024, the United States and Mexico have continued to hold regular, high-level conversations, as partners, to continue to deepen their collaboration, identify emerging trends, and coordinate additional steps by both countries to address changing flows. These meetings have informed operational deployments by both governments, including the coordinated response to the shift in migratory flows to the San Diego and Tucson sectors. This extensive ongoing collaboration was reflected by another bilateral engagement between President Biden and President López-Obrador on April 28, 2024, after which the presidents released a joint statement in which they ''ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights.''[120]

Since then, the United States and the Government of Mexico have worked together, cooperatively, to increase enforcement.[121] But these efforts—while significant—are likely to be less effective over time. Smuggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the

funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs.

### 2. Need for These Measures

DHS projects that, absent the policy changes being promulgated here, irregular migration will once again increase, and that any disruption in Mexican enforcement will only exacerbate that trend. Without the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States.

Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution, poverty, human rights abuses, the impacts of climate change, and other factors. The case of migration through the Darién jungle between Colombia and Panama is illustrative. For example, between January and April, 2024, the United Nations High Commissioner for Refugees (''UNHCR'') tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022.[122] The number of migrants crossing the Darién will only further increase the pressure on Mexico at its southern border and on the United States at the SWB.

Past unprecedented migration surges bolster the Departments' views and the need for this rulemaking. As described in detail in Section III.B.1 of this preamble, migration trends have been steadily increasing in scope and complexity, featuring increasingly varied nationalities and demographic groups. This has been true even as DHS has experienced sustained levels of historically high encounter levels. Over the past two years, an increasing proportion of total CBP encounters at the SWB has been composed of families and UCs, and DHS has seen record flows of migrants from countries outside of northern Central America.[123] These

Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends*, Washington Office of Latin America (Dec. 15, 2023), *https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/*; Jordan, *supra* note 27.

[116] OHSS analysis of March 2024 OHSS Persist Dataset.

[117] OHSS analysis of March 2024 OHSS Persist Dataset.

[118] OHSS analysis of March 2024 OHSS Persist Dataset.

[119] *See* Elliot Spagat, *The Latest Hot Spot for Illegal Border Crossings is San Diego. But Routes Change Quickly*, AP News (May 17, 2024), *https://apnews.com/article/san-diego-border-asylum-biden-mexico-da1e7b7c81e4e58912deff6d36dbdb9e*.

[120] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador*.

[121] *See* Valerie Gonzalez & Elliot Spagat, *The US Sees a Drop in Illegal Border Crossings After Mexico Increases Enforcement*, AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a*; Luke Barr, *US Customs And Border Protection Reopening 4 Ports of Entry After Migrant Surge Subsides*, ABC News (Jan. 2, 2024), *https://abcnews.go.com/US/us-customs-border-protection-reopening-4-ports-entry/story?id=106062555*; Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration*, AP News (Apr. 30, 2024), *https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b*; Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down*, NBC News (May 15, 2024), *https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821*.

[122] The UNHCR tracked 20,000 irregular entries in the Darién gap in 2022. OHSS analysis of downloaded from UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring—January–December 2023*, *https://data.unhcr.org/en/documents/details/105569* (last visited May 31, 2024); *Darien Panama: Mixed Movements Protection Monitoring—April 2024*, *https://data.unhcr.org/en/documents/details/108399* (last visited May 31, 2024).

[123] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables*, *https://www.dhs.gov/*

international migration trends are the result of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks.[124] The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[125] including through working closely with partner countries across the Western Hemisphere.[126] But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation.

The Departments' views and the need for this rulemaking are further supported by projections developed from ongoing work by DHS's Office of Homeland Security Statistics ("OHSS"), which leads an interagency working group that produces encounter projections used for operational planning, policy development, and short-term budget planning. OHSS uses a mixed-method approach that combines a statistical predictive model with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed-methods approach blends multiple types of models through an ensemble approach of model averaging.[127] The

model includes encounter data disaggregated by country and demographic characteristics, data on apprehensions of third-country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, which can include "low" planning models that are based on the lower bound of the 95 percent forecast interval, "moderate" planning models that are based on the upper bound of the 68 percent forecast interval, and "high" planning models based on the upper bound of the 95 percent forecast interval. These planning models account for changes in effectiveness of current enforcement and lawful migration processes.[128]

Because of the significant time and operational cost it takes to redeploy resources, DHS is generally conservative in its enforcement planning. 88 FR at 31328. As a result, it focuses on its higher planning models as it projects future resource deployments to avoid using more optimistic scenarios that could leave enforcement efforts badly under-resourced. *Id.* The current internal projections, based on this robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the three months from July to September, 2024, in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[129] The Departments believe the policies in this rule are

justified in light of high levels of migration that have ultimately proved persistent even in the face of new policies that have resulted in processing migrants with record efficiency, as evidenced by the migration patterns witnessed in December 2023. Current sustained, high encounter rates exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered.[130] This is generally true when considering total encounters across the entire SWB, and even more the case when specific sectors along the border are targeted by smuggling organizations with focused localized surges in encounters—as has been happening since the late fall in Tucson, Arizona, which accounted for 35 percent of SWB encounters between POEs in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022.[131]

Despite the fact that the average of 4,400 daily encounters between POEs in the second quarter of FY 2024 is below the highs experienced in the days immediately preceding the end of the Title 42 public health Order and in December 2023,[132] daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.[133]

---

*ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SWB Encounters by Agency and Family Status" and "SWB Encounters by Citizenship and Family Status").

[124] *See* 88 FR at 31327–28 & n.59.

[125] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[126] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[127] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.,* Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art,* 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has "stood the test of time . . . that combining forecasts improves the [forecast] accuracy"); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change,* 7 Nat. Hum. Behaviour 484 (2023), *https://doi.org/10.1038/s41562-022-01517-1* (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and

multidisciplinary team members). DHS notes that the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *See* 88 FR at 31316 n.14.

[128] OHSS Southwest Border Encounter Projection, April 2024.

[129] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[130] *See, e.g.,* Decl. of Blas Nuñez-Neto ¶ 8, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[131] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables—October 2023, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[132] March 2024 OHSS Persist Dataset. As noted *supra* note 5, preliminary April data show SWB encounters between POEs fell slightly, by 6 percent, between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this rule.

[133] The Tucson Sector accounted for 35 percent of USBP encounters in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022. OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *Southwest Land Border Encounters (By Component), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component* (last modified May 15, 2024). Border encounters typically fall around the New Year and often times lower than other months in January. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/*

Continued

When capacity is strained like this in specific locations along the border, it becomes even more difficult for the Departments to deliver timely decisions and timely consequences. At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates,[134] a scenario that would likely continue to incentivize an increasing number of migrants to journey to the United States and further increase the likelihood of sustained high encounter rates.

Even in times with sustained lower encounter volumes, such as between 2011 and 2017, the Departments experienced challenging situations, including the first surge in UCs in 2014, that severely strained the United States Government's capacity.[135] Surges in encounters at the southern border—both at and between POEs—are now occurring more frequently and at higher magnitudes, and featuring more diverse demographics and nationalities than ever before.[136] These surges affect more

CBP sectors along the border, disrupt operations more quickly, and affect readiness in other critical areas as DHS diverts resources, including front-line agents, from other urgent tasks and geographic areas.[137] These actions, in turn, impact other critical mission sets, including processing lawful trade and travel at POEs.[138]

DHS continues to lack the necessary funding and resources to deliver timely consequences to the majority of noncitizens encountered given the increased level of encounters it is experiencing at the SWB.[139] On August 10, 2023, the Administration submitted to Congress a request for $2.2 billion in supplemental funding for border operations, including $1.4 billion for CBP and $714 million for ICE for border management and enforcement and an additional $416 million for counter-fentanyl efforts.[140]

On October 20, 2023, the Administration submitted to Congress a second request for supplemental funding for DHS, which would provide funding to enhance enforcement and processing, procure and operationalize needed technologies, and hire additional personnel.[141] This funding

would further support critical border enforcement efforts, including:

• An additional 1,300 Border Patrol Agents to work alongside the 20,200 agents proposed in the President's FY 2024 budget request, as well as 300 Border Patrol Processing Coordinators and support staff;[142]

• An additional 1,600 AOs and associated support staff to process migrant claims, which would provide USCIS with the critical resources needed to expand its current credible fear interview capacity to support timely processing of those placed in expedited removal;[143] and

• An expansion of detention beds and ICE removal flight funding to sustain the current significantly increased use of expedited removal, provide necessary surge capacity, and allow DHS to process more expeditiously noncitizens who cross the SWB unlawfully and swiftly remove those without a legal basis to remain in the United States.[144]

On January 31, 2024, DHS published a new USCIS fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 FR 6194, 6194 (Jan. 31, 2024); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction, 89 FR 20101 (Mar. 21, 2024) (making corrections). Because there is

*enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("Nationwide CBP Encounters by Encounter Type and Region"). Thus, while CBP's apprehension of 402,000 noncitizens between POEs in the second quarter of FY 2024 is slightly lower than the 424,000 observed in FY 2023 and 518,000 in FY 2022, it is almost four times as high as the pre-pandemic second-quarter average for FY 2014 through FY 2019, and with the exceptions of FY 2022 and FY 2023 the highest second-quarter count recorded since FY 2001. Even with the downturn between January and March, 2024, the high volume of encounters and challenging demographic mix still meant that most noncitizens processed by USBP were released from custody into the United States (including noncitizens enrolled in an ICE Alternatives to Detention program and those paroled by the Office of Field Operations). OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Agency").

[134] Since May 12, 2023, 60 percent of non-Mexican noncitizen SWB encounters (at and between POEs) processed for expedited removal who have made fear claims have been referred to EOIR for immigration proceedings. OHSS analysis of data downloaded from UIP on April 2, 2024. But based on historic (pre-pandemic) data, only 18 percent of non-Mexican noncitizens processed for expedited removal that are referred to EOIR result in an individual being granted relief or protection from removal once the case is completed. OHSS Enforcement Lifecycle December 31, 2023.

[135] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status").

[136] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/*

*ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status" and "CBP SW Border Encounters by Agency and Selected Citizenship"); *The Unaccompanied Children Crisis: Does the Administration Have a Plan to Stop the Border Surge and Adequately Monitor the Children?: Hearing Before the S. Comm. On the Judiciary,* 114th Cong. (2016) (statement of Ronald Vitiello, Acting Chief of USBP), *https://www.judiciary.senate.gov/imo/media/doc/02-23-16%20Vitiello%20Testimony.pdf;* Memorandum on the Response to the Influx of Unaccompanied Alien Children Across the Southwest Border, 1 Pub. Papers of Pres. Barack Obama 635, 635 (June 2, 2014).

[137] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2).

[138] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2); Decl. of Blas Nuñez-Neto ¶ 32, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[139] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[140] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3, attach. at 45–50 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf;*

[141] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical*

*National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[142] *See* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[143] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[144] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.*

no fee required to file an asylum application or for protection screenings, 8 CFR 106.2(a)(28), and because Congress has not provided other funds to pay for the operating expenses of the Asylum Division,[145] fees generated from other immigration applications and petitions must be used to pay for these expenses. *See* INA 286(m), 8 U.S.C. 1356(m). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[146] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[147] Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget[148] would impose a burden on other filers.

In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[149] Critically, the proposal included nearly $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities,[150] including resources for:

• Over 1,500 new CBP personnel, including Border Patrol Agents and CBP Officers;

• Over 4,300 new AOs, as well as USCIS staff to facilitate timely and fair decisions;

• 100 additional IJ teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

• Shelter and critical services for newcomers in U.S. cities and States; and

• 1,200 new ICE personnel for functions including enforcement and removals.[151]

However, Congress failed to move forward with this bipartisan legislative proposal.[152] It also failed to pass the emergency supplemental funding requests that the Administration submitted. Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. For example, the bill does not provide the resources necessary for DHS to refer the majority of noncitizens encountered by USBP who are amenable to expedited removal into such processing, resulting in large-scale releases pending section 240 removal proceedings based on current encounter numbers. Such releases, in turn, have significant impacts on communities and contribute to further migration by incentivizing potential migrants to travel to the United States with the belief that, even if initially detained, they will ultimately be released to live and work in the United States for long periods of time. Absent the Proclamation and this rule, these harmful results are especially likely given the circumstances described in the Proclamation.

The FY 2024 appropriations provided some additional funding for DHS above its request, including for additional Border Patrol Agents and a higher level of ICE detention beds than was previously appropriated.[153] Although

this increase is helpful, there are a number of ways in which the FY 2024 budget falls well short of what DHS needs to respond to the current elevated levels of migration. For example, the FY 2024 appropriations failed to fund the salary increase set across the Federal Government by the Office of Management and Budget ("OMB"), effectively reducing salary funding for the entirety of the appropriations-funded DHS workforce.[154] This reduction will limit the availability of overtime to respond to surges in irregular migration and may require difficult operational decisions during the closing months of the fiscal year, which is historically a busier period for such migration. The appropriations also did not provide sufficient funding to maintain the temporary processing facilities needed to hold migrants in custody. Further, the funds for hiring additional personnel were restricted to the current fiscal year rather than being provided as multi-year funds as requested; given the length of the hiring process, DHS will not be able to realize the increases in personnel envisioned by the legislation before the funding expires.

All of these factors, taken together, mean that under the current appropriations law, DHS will, at best, be able only to sustain most of its current operations, resulting in an operating capacity that already experiences strain during times of high migration levels; this will, in turn, reduce DHS's ability to maximize the delivery of timely consequences for those without a lawful basis to remain. Additionally, DHS will not be able to expand capacity along the border or increase its ability to deliver consequences through referrals into expedited removal. Instead, DHS may actually need to reduce capacity in some key areas, including by closing critical temporary processing facilities and pulling USBP agents away from the frontline to undertake processing and tasks related to custody. Thus, while DHS has made significant progress toward a migration strategy focused on enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy, a lack of needed resources and tools hampers DHS's current ability to manage the unprecedented flow of hemispheric migration, and the

---

[145] *See* DHS, *U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2025 Congressional Justification* CIS—IEFA—22 (Mar. 8, 2024), *https://www.dhs.gov/sites/default/files/2024-03/2024_0308_us_citizenship_and_immigration_services.pdf* (showing AOs are funded by Immigration Examinations Fee Account); *id.* at CIS—O&S—30 (showing that appropriated funds from the Refugee, Asylum, and International Operations Directorate of USCIS support Refugee Officers).

[146] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum 53* (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[147] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

[148] *Id.*

[149] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[150] Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call*

it dead in the House, NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[151] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[152] Associated Press, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance* (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

[153] *See* House of Representatives, *Explanatory Statement: Division C, Department of Homeland Security Appropriations Act, 2024,* at 14, 25 (Mar.

18, 2024), *https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf.*

[154] *See id.* at 14, 22 (explaining that for CBP, "[t]he agreement includes $346,498,000 below the request, including the following: $182,772,000 for the 2024 pay raise," and for ICE, "[t]he agreement provides $9,501,542,000 for Operations and Support, including a decrease below the request of $74,153,000 for the 2024 pay raise").

STB_AR1_000150

situation will only worsen with expected seasonal and other increases.

Immigration-related resource challenges are not unique to front-line border officials. The immigration removal continuum—from apprehension, processing, and inspection to protection interviews and removal—is hampered by a lack of sufficient funding, resources, and tools at every stage.[155] EOIR is underfunded, without sufficient resources to address the backlog of over 2.78 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024.[156] This under-resourcing has contributed to the growth of this backlog; in FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[157] The FY 2024 budget creates even greater strains on EOIR. EOIR received $844 million this fiscal year,[158] a cut of $16 million from FY 2023.[159] EOIR's budget was also cut $94.3 million from its inflation-adjusted funding requirements (referred to as "Current Services").[160] As a result of the significant budgetary gap, EOIR will necessarily be required to reduce the Federal and contract labor force that has been supporting its immigration courts nationwide and cut spending to technological initiatives. Specifically, EOIR has identified a need to cut 200 of its authorized Federal positions and is identifying areas in which it can make cuts to contracts, including those supporting the Office of Information Technology, with the least amount of impact on operations.

Similarly, the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing.[161] USCIS does not have enough AOs to keep pace with the number of individuals who could be referred for credible fear interviews at the border, much less keep pace with new affirmative asylum receipts or even marginally reduce the affirmative asylum backlog. In sum, the border security and immigration systems are badly strained and not functioning to provide timely relief or protection for those who warrant it or timely consequences for those without a legal basis to remain, including those without viable asylum or protection claims.

The TCOs operating in the region, and the migrants they prey upon who intend to make the dangerous journey north, have taken notice of this situation. They understand that when the capacity of DHS to quickly process individuals at the border is strained, DHS is limited in its ability to deliver timely consequences. Because of these resource limitations, individuals are more likely than not to be released to pursue a years-long immigration court process during which, beginning 180 days after applying for asylum, they may be authorized to work.[162] These smuggling organizations have built a multi-billion-dollar industry, featuring online marketing campaigns to spread misinformation and sophisticated logistics networks designed to quickly funnel migrants to the parts of the border where DHS capacity is lower.[163]

While the emergency measures instituted by the Proclamation are in effect, the Departments will put in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time noncitizens spend in DHS facilities. The specific measures introduced by this rule are designed to further streamline DHS processes at the border so that DHS can more quickly deliver meaningful consequences to more individuals who cross unlawfully or without authorization within the resource and operational constraints that have limited DHS capacity to date.

Under this rule, while emergency border circumstances persist, the way noncitizens are processed, their eligibility for asylum, and the way in which their eligibility for protection is assessed, will change in three ways. First, during emergency border circumstances, those who enter the United States across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. As discussed in Section III.B.3.a of this preamble, the Departments expect that applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration

---

[155] See DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("DHS reiterates previously submitted funding requests that are critical to secure the border, build immigration enforcement capacity, combat fentanyl and address domestic needs like natural disaster response, which Congress has failed to act on. Among them, the October funding request, which includes $8.7 billion for border, immigration, and counter fentanyl requirements and $9.2 billion for FEMA's Disaster Relief Fund and Nonprofit Security Grant Program. Notably, the Administration's border supplemental request includes funding to build capacity in the areas of border security, immigration enforcement, and countering fentanyl. DHS strongly supports the additional $19 billion in funding proposals included in the Senate's bipartisan border legislation that would, among other things, enable DHS to hire more CBP agents and officers, ICE enforcement and investigative personnel, and USCIS asylum officers and provide new tools to bolster the Department's efforts to secure and manage the border."); *see also* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf*; The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/*; DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request*.

[156] See EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/workload-and-adjudication-statistics*.

[157] See EOIR, *Adjudication Statistics: New Cases and Total Completions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/05/08/2_new_cases_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*.

[158] Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133 ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000").

[159] Consolidated Appropriations Act, 2023, Public Law 117–328, 136 Stat. 4459, 4522 (2022) ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $860,000,000"); EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (showing FY 2023 enacted budget providing EOIR $860 million).

[160] EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (providing the Current Services Adjustment as an increase of $78.3 million, bringing the inflation-adjusted amount to $938.3 million).

[161] OHSS analysis of USCIS Global Affirmative Data as of April 25, 2024 (noting that "[d]ata is limited to filings between FY2000 and March 31, 2024").

[162] See 8 CFR 208.7, 274a.12(c)(8). Sixty-seven percent of individuals encountered by CBP at and between POEs at the SWB between May 2023 and March 2024 were released, including 66 percent of such individuals in the second quarter of FY 2024. These individuals include noncitizens enrolled in an ICE Alternatives to Detention program. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Out Outcomes by Agency").

[163] *See, e.g.,* Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says,* CNN (July 27, 2022), *https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html*; Bernd Debussmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border,* BBC (July 8, 2023), *https://www.bbc.com/news/world-us-canada-65848683*.

STB_AR1_000151

pathways, or not undertake the dangerous journey north to begin with.

Second, this rule will reduce the time it takes to process individuals placed in expedited removal at the border by changing the way CBP immigration officers identify and refer noncitizens for credible fear interviews. Under current title 8 procedures, noncitizens encountered at the border and processed for expedited removal are provided lengthy advisals regarding the credible fear and asylum process and are asked questions to ascertain whether they may potentially have a fear of persecution or torture.[164] During emergency border circumstances, DHS will move to a "manifestation of fear" process at the border, detailed below in Section III.B.3.b of this preamble, that will involve general (rather than individual) advisals and require individuals who have a fear of persecution or torture to manifest that fear, verbally, non-verbally, or physically, in order for DHS personnel to refer them for a credible fear interview.

Third, the limitation on asylum eligibility will be considered during credible fear interviews and reviews, and those who are subject to the limitation and are unable to establish a significant possibility of showing exceptionally compelling circumstances will be screened for eligibility for statutory withholding of removal and CAT protection under a heightened "reasonable probability of persecution or torture" standard—a higher standard than the "reasonable possibility" standard under the Circumvention of Lawful Pathways rule.

As the Departments described more fully in the Circumvention of Lawful Pathways rule, the current asylum system—in which a high number of migrants are initially determined to be eligible to pursue their claims, even though most ultimately are not granted asylum or protection at the merits stage—has contributed to the growing backlog of cases awaiting review by IJs.[165] The practical result is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[166] As the demographics of border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the

time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[167]

The provisions in this rule are intended to be emergency measures that impact the expedited removal process and eligibility for relief or protection only for those who enter the United States across the southern border during emergency border circumstances. Unfortunately, the significant efforts the Departments have made to address such circumstances to date have not been as effective as they could have been had

[167] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. In contrast, as discussed in Section III.B.3.a.iv of this preamble, from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024. OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019, nearly 57 percent of people from northern Central America (*i.e.*, El Salvador, Guatemala, and Honduras), and close to 90 percent of all other nationalities made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. Of note, according to OHSS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at and between SWB POEs. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from countries other than Mexico and northern Central America now account for the largest numbers of such encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

Congress provided the personnel, infrastructure, technology, and broader reforms that the Departments have requested. Communities all over the United States are being adversely impacted as a result. The goal of these measures is to quickly reduce unlawful and unauthorized entries at the border and to quickly impose decisions and consequences on those who cross our border unlawfully and lack a legal basis to remain.

### 3. Description of the Rule and Explanation of Regulatory Changes

This rule amends the Departments' regulations to further the purpose of the Presidential Proclamation of June 3, 2024, which suspends and limits entry along the southern border to address the emergency border circumstances outlined in that Proclamation. The rule does so by amending 8 CFR 208.13 and 1208.13 and adding regulatory provisions at 8 CFR 208.35, 235.15, and 1208.35 that (1) limit asylum eligibility for those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances; (2) alter the process for advising noncitizens of their rights to seek asylum and for identifying which noncitizens to refer to an AO for credible fear screening during emergency border circumstances; and (3) alter the standard for screening for statutory withholding of removal and CAT protection while such circumstances exist.[168] Below is an explanation of the limitation and each change to the expedited removal and fear screening process. The specific content of each provision and amendment is set forth in detail in Section III.C of this preamble.

#### a. Limitation on Asylum Eligibility

As discussed above in Sections III.B.1 and 2 of this preamble, irregular migration is continuing to strain the Departments' ability to timely process, detain, and remove, as appropriate, and

[164] 8 CFR 235.3(b)(2).

[165] 88 FR at 31315.

[166] *See supra* note 25.

[168] The Departments understand that the President has directed the agencies to promptly consider issuing "any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border." Such actions may include other measures that are not addressed in this rule, and the Departments have considered and are continuing to consider such other actions. The Departments believe that the changes made in this rule are the most appropriate means to begin addressing the concerns identified in the Proclamation, and the Departments will assess the effectiveness of this rule as they continue to consider other actions to respond to the President's direction.

thus to swiftly deliver timely decisions and timely consequences to noncitizens at the southern border. This challenge is exacerbated by the sheer number of migrants who invoke credible fear procedures at a POE or when they are encountered between POEs without following the lawful, safe, and orderly processes that DHS has made available. The Departments have implemented the Circumvention of Lawful Pathways rule and complementary measures, but Congress has not provided the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during times in which the country's border faces an emergency of the magnitude described in the Proclamation. The record numbers of migrants invoking the credible fear procedures at the southern border exacerbate the risk of severe overcrowding in USBP facilities and POEs, and it creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants without potentially meritorious claims for asylum to make the dangerous journey to the southern border to invoke credible fear procedures at the southern border and take their chances on being allowed to remain in the country for a lengthy period.

For these reasons, pursuant to section 208(b)(1)(A), (b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B), the Departments are adopting a limitation on asylum eligibility for noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Section 3(b) of the Proclamation lists classes of individuals to whom the Proclamation's suspension and limitation on entry and this limitation on asylum eligibility does not apply; those classes are discussed in Section II.A of this preamble. The exceptionally compelling circumstances exception to this rule's limitation on asylum eligibility is discussed below in Sections III.B.3.a and III.C.2 of this preamble.

The limitation on asylum eligibility is needed to address the emergency border circumstances outlined in the Proclamation and this rule and responds to the President's direction to the Secretary of Homeland Security and the Attorney General to promptly consider issuing such instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted. Under the circumstances described in the Proclamation, the Departments assess that the limitation on asylum is necessary to help streamline the Departments' processing of noncitizens, thereby conserving limited resources during the emergency border circumstances described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE.[169]

The Departments have further made the determination to apply the limitation on asylum eligibility to those who enter the United States across the southern border during emergency border circumstances irrespective of whether the noncitizen is encountered during such emergency border circumstances. This will permit a consistent application of the rule to all those who enter across the southern border during such circumstances and

are subject to this limitation on asylum eligibility, including those who evade detection at the southern border and are later placed in section 240 removal proceedings, as well as those who affirmatively apply for asylum. The Departments have considered applying the rule's asylum limitation only to those who enter and are encountered at the southern border during emergency border circumstances. The Departments believe, however, that the rule's asylum limitation should avoid creating an incentive for noncitizens to take risky measures to evade detection, which would further strain resources dedicated to apprehension at the border.[170]

Additionally, the approach adopted in this rule is consistent with the Circumvention of Lawful Pathways rule, which, with narrow exceptions, applies to all those who enter during the two-year period currently specified in that rule, regardless of whether they are apprehended at or near the border during the 14-day period immediately after entry or within 100 miles of the border. *See* 8 CFR 208.33(c), 1208.33(d). Moreover, the Departments note that the provisions of §§ 208.35(b) and 235.15 would be applicable only to those who have entered the United States during the emergency border circumstances described in the Proclamation and this rule and are processed for expedited removal. Thus, those provisions would not apply to those who have long since entered the United States. Accordingly, the Departments have determined that it is reasonable to apply this rule's limitation on asylum eligibility consistent with the Circumvention of Lawful Pathways rule, without regard to the date of encounter or commencement of proceedings.

Even if a noncitizen entered the United States across the southern border during emergency border circumstances and is not described in section 3(b) of the Proclamation, they may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist.[171] Such circumstances necessarily

---

[169] When it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b). *See* 8 CFR 208.35(a), 1208.35(a). The Departments anticipate that, when determining whether the limitation on asylum eligibility applies, AOs and IJs will rarely have grounds to reach a different result from the CBP immigration officers. *See* 8 CFR 208.35(b), 1208.35(b). In part, the Proclamation's application turns on straightforward questions of status—*e.g.,* whether someone was a noncitizen, Proclamation sec. 3(a)(i); was a noncitizen national, *id.* sec. 3(b)(i); was a lawful permanent resident, *id.* sec. 3(b)(ii); was a UC, *id.* sec. 3(b)(iii); or had a valid visa or other lawful permission to seek entry or admission into the United States or presented at a POE pursuant to a pre-scheduled time and place, *id.* sec. 3(b)(v). The Proclamation's application also turns on questions of historical fact, including whether the suspension and limitation on entry was in place at the relevant time, *id.* sec. 3(a), and whether someone was ''permitted to enter by . . . a CBP immigration officer'' based on two sets of specified considerations ''at the time of the entry or encounter that warranted permitting the noncitizen to enter,'' *id.* Sec. 3(b)(vi)–(vii). These two exceptions allow CBP immigration officers to permit the entry of noncitizens who present at the encounter with—for example—medical issues requiring immediate attention. *See id.* sec. 3(b)(vi).

[170] The Departments note that adjudicators already make determinations regarding the noncitizen's date of arrival when determining whether the noncitizen is barred from filing an asylum application (unless meeting an exception) within one year of arrival. *See* INA 208(a)(2)(B) and (D), 8 U.S.C. 1158(a)(2)(B) and (D).

[171] The Departments decline to adopt an exception mirroring the exception from the Circumvention of Lawful Pathways rule for those who present at a POE without a pre-scheduled time and place but show that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See*

exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11.[172] 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Acute medical emergencies would include, but would not be limited to, situations in which someone faces a life-threatening medical emergency or faces acute and grave medical needs that cannot be

8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This rule, unlike the Circumvention of Lawful Pathways rule, applies only in the emergency circumstances described in the Proclamation and the rule, where encounters strain the border security and immigration systems' capacity. And although the Circumvention of Lawful Pathways rule was also aimed at reducing irregular migration, it was focused on encouraging the use of lawful pathways, rather than the number of daily entrants. In these emergency border circumstances, this rule's exception for "exceptionally compelling circumstances" captures individuals with a time-sensitive imperative; such individuals may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. And in these emergency border circumstances, the Departments have determined that individuals who do not qualify for this exception should wait for a CBP One appointment. Moreover, under the Circumvention of Lawful Pathways rule, this exception requires additional questioning of any noncitizen who entered at a POE and is subject to the rule—time that, in the aggregate, could diminish the Departments' ability to deploy resources to address the emergency circumstances that support application of this rule.

In addition, the Departments did not include an exception for a noncitizen who sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. See 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). This rule serves a different purpose than 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C); specifically, this rule is aimed at deterring irregular migration and speeding up the border process during a period of high encounters, rather than encouraging noncitizens to seek protection in other countries. During the emergency border circumstances described in the Proclamation and this rule, narrowing the exceptions to those who are unable to wait for an appointment is key. Those who sought and were denied protection in another country will still be eligible for asylum if they enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances, such as that at the time of entry they faced an acute medical emergency or an imminent and extreme threat to life or safety.

[172] The Departments note that noncitizens who are a "victim of a severe form of trafficking in persons" are already excepted from the Proclamation's suspension and limitation on entry as provided in section 3(b) of the Proclamation and are therefore also not subject to the rule's limitation on asylum eligibility. Nonetheless, the Departments have opted to retain "victims of severe form of trafficking in persons" as an exceptional circumstance to avoid any confusion and to ensure that the exceptions in this rule mirror the rebuttal circumstances the Departments adopted in the Circumvention of Lawful Pathways rule.

adequately addressed outside of the United States. Examples of imminent and extreme threats would include imminent threats of rape, kidnapping, torture, or murder that the noncitizen faced at the time the noncitizen crossed the southern border, such that they cannot wait for an appointment at a pre-scheduled time and place or until this IFR's limitation on asylum eligibility is not in effect for an opportunity to present at a POE without putting their life or well-being at extreme risk; it would not include generalized threats of violence.

The "exceptionally compelling circumstances" exception mirrors the rebuttal circumstance the Departments adopted in the Circumvention of Lawful Pathways rule. See 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). That exception is adopted here for the reasons articulated for adopting it in the Circumvention of Lawful Pathways NPRM and rule and the exception is intended to apply to the same circumstances identified in that NPRM and rule. See, e.g., 88 FR at 11723; 88 FR at 31318, 31338, 31348, 31351, 31380, 31390, 31391–93.

Like the Circumvention of Lawful Pathways rule, this rule recognizes an additional exception that avoids the separation of families. See 8 CFR 208.35(c), 1208.35(c). Those noncitizens who are subject to the limitation on asylum eligibility and who do not establish exceptionally compelling circumstances under 8 CFR 208.35(a)(2)(i) or 1208.35(a)(2)(i) would be able to continue to apply for statutory withholding of removal and protection under the CAT, forms of protection to which the limitation does not apply if placed in section 240 removal proceedings. Unlike asylum, spouses and minor children are not eligible for derivative grants of statutory withholding of removal or CAT protection. Compare INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) ("[a] spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien"), with INA 241(b)(3), 8 U.S.C. 1231(b)(3) (not providing for derivative statutory withholding of removal), and 8 CFR 1208.16(c) (not providing for derivative CAT protection); see also Sumolang v. Holder, 723 F.3d 1080, 1083 (9th Cir. 2013) (recognizing that the asylum statute allows for derivative beneficiaries of the principal applicant for asylum, but that the withholding of removal statute makes no such allowance). Again, mirroring EOIR's

family unity provision in the Circumvention of Lawful Pathways rule, see 8 CFR 1208.33(c), where a principal asylum applicant is eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the limitation on eligibility established in this rule, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the noncitizen shall be excepted from the limitation on eligibility by the IJ if placed in section 240 removal proceedings. 8 CFR 1208.35(c). The Departments have determined that the possibility of separating the family should be avoided. See E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 2, 2021) ("It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.").

In the Circumvention of Lawful Pathways rule, the Departments included a family unity provision in EOIR's regulations but not DHS's. The Departments did so because they decided at that time that those who an AO concludes are subject to the Lawful Pathways presumption and who are not able to establish an exception or rebut the presumption during a credible fear screening may not be placed into the asylum merits interview process and may instead only be issued an NTA and placed into section 240 removal proceedings. See 88 FR at 11725–26; 88 FR at 31336–37. For purposes of this rule, the Departments have allowed for an asylum merits interview process at the discretion of USCIS that includes USCIS discretion to apply a parallel family unity provision. See 8 CFR 208.35(c). This provision is discretionary to allow USCIS flexibility as it implements the new process. The Departments request comment on whether to adopt a non-discretionary family unity provision for the asylum merits interview process in a final rule.

i. Authority To Impose Additional Limitations on Asylum Eligibility

The Secretary and the Attorney General have authority to adopt this additional limitation on asylum eligibility. Both have long exercised discretion, now expressly authorized by Congress, to create new rules governing the granting of asylum. When section

**STB_AR1_000154**

208 of the INA was first enacted as part of the Refugee Act of 1980, it simply provided that the Attorney General "shall establish a procedure" for a noncitizen "to apply for asylum," and that the noncitizen "may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. 1158(a) (1982). In 1980, the Attorney General, in the exercise of that broad statutory discretion, established several mandatory bars to the granting of asylum. *See* 8 CFR 208.8(f)(1) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the noncitizen as a danger to the security of the United States. *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly-serious-crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc).

In that 1990 rule, the Attorney General also codified another limitation that was first discussed in *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989). 55 FR at 30678. Specifically, although the statute defines a "refugee" and thus allows asylum for a noncitizen based on a showing of past "persecution or a well-founded fear of persecution," INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A), by regulation, a showing of past persecution only gives rise to a presumption of a well-founded fear of future persecution, which can be rebutted by showing that circumstances have changed such that the noncitizen no longer has a well-founded fear of future persecution or that the noncitizen can relocate to avoid persecution and under all the circumstances it is reasonable to expect the noncitizen to do so.[173] 8 CFR 208.13(b)(1), 1208.13(b)(1). Where the presumption is rebutted, the adjudicator, "in the

exercise of his or her discretion, shall deny the asylum application." [174] 8 CFR 208.13(b)(1)(i), 1208.13(b)(1)(i). In 1990, Congress added a mandatory statutory bar for those with aggravated felony convictions. Immigration Act of 1990, Public Law 101–649, sec. 515, 104 Stat. 4978, 5053.

With the passage of IIRIRA, Congress added three categorical statutory bars to the ability to apply for asylum for (1) noncitizens who can be removed, pursuant to a bilateral or multilateral agreement, to a third country where they would not be persecuted on account of a specified ground; (2) noncitizens who failed to apply for asylum within one year of arriving in the United States; and (3) noncitizens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604, 110 Stat. 3009, 3009–690 to –691. Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars that had been set forth in the Attorney General's asylum regulations. These bars cover (1) noncitizens who "ordered, incited, assisted, or otherwise participated" in the persecution of others; (2) noncitizens who, having been convicted of a "particularly serious crime," constitute a danger to the United States; (3) noncitizens for whom there are serious reasons to believe committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) noncitizens for whom there are reasonable grounds to regard as a "danger to the security of the United States"; (5) noncitizens who are removable under a set of specified grounds relating to terrorist activity; and (6) noncitizens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* at 3009–691 (codified at INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A)). Congress further added that aggravated felonies, defined in section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* at 3009–692 (codified at INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i)).

In IIRIRA, Congress also made clear that the Executive Branch may continue to exercise its broad discretion in determining whether to grant asylum by creating additional limitations and

conditions on the granting of asylum. The INA provides that the Attorney General and Secretary "may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 6 U.S.C. 552(d); INA 103(a)(1), 8 U.S.C. 1103(a)(1). In addition, while section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), establishes certain procedures for consideration of asylum applications, Congress specified that the Attorney General and Secretary "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum" so long as those conditions or limitations are "not inconsistent with this chapter," INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). In sum, the current statutory framework retains the broad discretion of the Attorney General (and, after the HSA, also the Secretary) to adopt additional limitations on the granting of asylum and procedures for implementing those limitations.

Previous Attorneys General and Secretaries have since invoked their authorities under section 208 of the INA, 8 U.S.C. 1158, to establish eligibility bars beyond those required by the statute itself. *See, e.g.,* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000) (requiring consideration of the applicant's ability to relocate safely in his or her home country in assessing asylum eligibility); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) ("Proclamation Bar IFR") (limit on eligibility for applicants subject to certain presidential proclamations; [175] Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) ("TCT Bar final rule") (limit on eligibility for certain noncitizens who failed to apply for protection while in a third country through which they transited en route to the United States); [176] Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) (limits on eligibility for noncitizens convicted of certain criminal offenses); [177] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

---

[173] As noted below, the internal relocation provision was added in 2000 by Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000).

[174] There is a narrow exception to this mandatory discretionary ground for denial, called "humanitarian asylum," where the noncitizen establishes "compelling reasons for being unwilling or unable to return to the [noncitizen's] country arising out of the severity of . . . past persecution" or "that there is a reasonable possibility that [the non-citizen] may suffer other serious harm upon removal to [the noncitizen's] country." 8 CFR 208.13(b)(1)(iii), 1208.13(b)(1)(iii).

[175] *See O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating Proclamation Bar IFR).

[176] *See E. Bay Sanctuary Covenant* v. *Barr,* 519 F. Supp. 3d 663 (N.D. Cal. 2021) (preliminarily enjoining the TCT Bar final rule).

[177] *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020) (granting temporary restraining order against operation of the rule and ordering defendants to show cause why the rule should not be preliminarily enjoined).

Removal Proceedings; Asylum Procedures, 62 FR 10312, 10342 (Mar. 6, 1997) (IFR codifying mandatory bars and adding provision allowing for discretionary denials of asylum where "the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution"); *see also Yang,* 79 F.3d at 936–39 (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). Consistent with this historical practice, the Secretary and Attorney General exercised this authority when adopting the Lawful Pathways presumption of asylum ineligibility. *See* Circumvention of Lawful Pathways rule, 88 FR 31314.[178]

#### ii. Litigation Over the Proclamation Bar IFR

This rule places a limitation on asylum eligibility for those noncitizens who are described in the Proclamation subject to certain exceptions. The Departments acknowledge prior judicial decisions addressing a different limit on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), relating to suspensions and limitations on entry by presidential proclamation under section 212(f) of the INA, 8 U.S.C. 1182(f). In *East Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640 (9th Cir. 2021) ("*East Bay III*"), the Ninth Circuit affirmed a preliminary injunction against the Proclamation Bar IFR, which categorically rendered certain noncitizens ineligible for asylum if they entered the United States in violation of a presidential proclamation or other presidential order suspending or limiting the entry of noncitizens along the southern border. The relevant presidential proclamation in that case suspended entry of all migrants along the southern border except those who entered at a POE. *See id.* at 659. The court held that the Proclamation Bar IFR was inconsistent with section 208(a) of the INA, 8 U.S.C. 1158(a), which provides that any migrant "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or

United States waters), irrespective of such alien's status, may apply for asylum." *Id.* at 670.[179]

The Departments regard this rule as substantially different than the rule the Ninth Circuit deemed invalid in *East Bay III.* The Proclamation and limitation on asylum eligibility at issue here differ significantly from the prior categorical bar on "manner of entry" because they do not treat the manner of entry as dispositive in determining eligibility. Rather, the limitation at issue here turns on whether—during emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established during these emergency situations when it is essential that noncitizens use such pathways to ensure the United States Government's ability to manage the border. And even during these situations, AOs and IJs have the ability to except noncitizens from the rule's asylum limitation where the noncitizens establish that an exceptionally compelling circumstance exists. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may be excepted from the limitation on asylum eligibility if they experienced an acute medical emergency at the time of entry regardless of where that entry occurred. Other exceptionally compelling circumstances include, but are not limited to, if the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an imminent and extreme threat to their life or safety or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. 8 CFR 208.35(a)(2)(i)(B)–(C), 1208.33(a)(2)(i)(B)–(C). Indeed, the rule's exceptionally compelling circumstances exception is identical to the grounds that would rebut the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule, which has been allowed to continue in effect despite litigation challenging its validity. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023) (staying order vacating Circumvention of Lawful Pathways rule pending appeal). Furthermore, this rule does not implicate the same concerns as the prior

categorical bar based on "manner of entry" because it applies only to individuals who enter during emergency border circumstances and would not treat solely the manner of entry as dispositive in determining eligibility even during such circumstances, given that the rule applies both at and between POEs and in light of the exceptions available under section 3(b) of the Proclamation and for exceptionally compelling circumstances under 8 CFR 208.35(a)(2) and 1208.35(a)(2).

Moreover, the Departments disagree with important aspects of the reasoning that the district court and Ninth Circuit relied upon in *East Bay III.* The Departments argued in *East Bay III* that section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), by its plain terms requires only that a noncitizen be permitted to "apply" for asylum, regardless of their manner of entry. It does not require that a noncitizen be eligible to be granted asylum, regardless of their manner of entry. Indeed, the BIA has long taken account of a noncitizen's manner of entry in determining whether to grant asylum. *See Matter of Pula,* 19 I&N Dec. 467, 473 (BIA 1987) (holding that "manner of entry . . . is a proper and relevant discretionary factor to consider in adjudicating asylum applications"). The court in *East Bay III* rejected this argument, stating that "[e]xplicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity," 993 F.3d at 670 (emphasis omitted), but the statute draws a clear distinction between the two. Section 208(a) of the INA, 8 U.S.C. 1158(a), governs who may "apply for asylum" and includes several categorical bars, such as the bar for applications for noncitizens present in the country for more than one year. INA 208(a)(1), (2)(B), 8 U.S.C. 1158(a)(1), (2)(B); *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). Section 208(b) of the INA, 8 U.S.C. 1158(b), in turn, governs who is eligible to be granted asylum. Specifically, section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), provides that the Attorney General or the Secretary "may grant asylum to an alien who has applied," INA 208(b)(2), 8 U.S.C. 1158(b)(2), then specifies six categories of noncitizens to whom "[p]aragraph (1)" (*i.e.,* the discretionary authority to grant asylum to an applicant) "shall not apply." Any noncitizen falling within one of those categories may apply for asylum under section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), but is categorically ineligible

---

[178] The Circumvention of Lawful Pathways rule was vacated by *East Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). But the Ninth Circuit has stayed that vacatur pending appeal, *see E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023), and thus the rule and its presumption remain in effect. On February 21, 2024, the Ninth Circuit placed the case in abeyance pending settlement discussions. *E. Bay Sanctuary Covenant* v. *Biden,* 93 F.4th 1130 (9th Cir. 2024).

[179] The court also held that the Proclamation Bar IFR likely did not properly fall under the good cause or foreign affairs exceptions to notice-and-comment rulemaking under 5 U.S.C. 553(a)(1) and (b)(B). *See East Bay III,* 993 F.3d at 676–77.

to receive it under section 208(b) of the INA, 8 U.S.C. 1158(b).

The broad preemptive sweep that the Ninth Circuit attributed to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), also fails to account for the discretionary nature of asylum. No noncitizen ever has a right to be granted asylum. The ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [and the Secretary's] discretion." *INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 420 (1999). The *East Bay III* court did not dispute that manner of entry is a permissible consideration in determining whether to exercise that discretion to grant asylum in individual cases. 99 F.3d at 671; *see also Matter of Pula*, 19 I&N Dec. at 473; *Fook Hong Mak* v. *INS*, 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) (upholding the INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

The *East Bay III* court also suggested that a regulation categorically barring asylum based on manner of entry is inconsistent with the United States' commitments under the Refugee Protocol, in which the United States adhered to specified provisions of the Refugee Convention. *See* 993 F.3d at 972–75. Even accepting *East Bay III*'s reasoning on this point, that reasoning is limited to a categorical eligibility bar premised on manner of entry; this IFR does not implicate the same concerns as the prior categorical bar on "manner of entry" for the reasons stated above. In any event, the *East Bay III* court's conclusion was incorrect. The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through the provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3)(A), for mandatory withholding of removal. This rule specifically preserves the availability of that protection from removal. The INA's provision in section 208 of the INA, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 440–41 (1987). The *East Bay III* court also misread Article 31(1) of the Refugee Convention, which pertains only to "penalties" imposed "on account of . . . illegal entry or presence" on refugees who, among other criteria, are "coming directly from a territory where" they face persecution. *See, e.g.,*

*Singh* v. *Nelson*, 623 F. Supp. 545, 560–61 & n.14 (S.D.N.Y. 1985) (quoting the Refugee Convention). And a bar to the granting of the discretionary relief of asylum is not a penalty under Article 31(1), especially given that the noncitizen remains eligible to apply for statutory withholding of removal, which implements U.S. non-refoulement obligations under the Refugee Protocol. *See Mejia* v. *Sessions*, 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.*, 856 F.3d 249, 257 n.16 (3d Cir. 2017).

### iii. Litigation Over Other Limitations

The Departments also acknowledge other prior precedent concerning the scope of the Departments' statutory rulemaking authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Specifically, when reviewing the TCT Bar final rule, the Ninth Circuit in *East Bay Sanctuary Covenant* v. *Garland*, 994 F.3d 962 (9th Cir. 2020) ("*East Bay I*"), held that a new condition on asylum eligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), must "further[ ] the purpose" of another provision in section 208 to be "consistent with" it. 994 F.3d at 977, 977–80. The Departments disagree. A requirement that additional asylum limitations can only "further[ ] the purpose" of the existing exceptions by either targeting threats to the nation or promoting the purposes the Ninth Circuit identified in the safe-third-country or firm-resettlement bars, *id.* at 977, is irreconcilable with the statute's meaning and conflicts with its history. Not only has Congress adopted asylum bars that do not further the purpose the Ninth Circuit identified—*e.g.,* the one-year filing deadline and the bar on successive applications—it has granted to the Departments the broad discretion to add more such bars. The Ninth Circuit's approach is also inconsistent with *Trump* v. *Hawaii*, 585 U.S. 667, 690–91 (2018) (INA's express provisions governing entry "did not implicitly foreclose the Executive from imposing tighter restrictions," even if restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on"). The statutory asylum bars likewise do not foreclose imposing further conditions, even if those conditions address subjects similar to those already in the asylum statute. *See, e.g.,* INA 241(a)(5), 8 U.S.C. 1231(a)(5) (barring from asylum those whose orders of removal have been reinstated regardless whether they have asylum claims stemming from events that occurred after the original order of removal); *see R–S–C* v. *Sessions*, 869 F.3d 1176, 1184 (10th Cir. 2017) (reconciling the reinstatement provision's bar on asylum

with section 208's allowing noncitizens to apply for asylum regardless of manner of entry).

Regardless, this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a limitation on asylum eligibility.[180] The President has determined that, under certain emergency border circumstances, entries must be suspended and limited because in such circumstances the border security and immigration systems lack capacity to deliver timely decisions and timely consequences, which threatens to incentivize further migration. And in light of such circumstances and their pernicious effects, the Departments have determined that special procedures must be used to quickly process the influx of noncitizens, including those seeking asylum. Those determinations do not conflict with the text or structure of section 208 of the INA, 8 U.S.C. 1158, and are consistent with (and an appropriate exercise of the Departments' authority under) that provision. Nothing more is required for the rule to constitute a valid exercise of authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C).

Moreover, this rule's propriety is reinforced by the statutory bars on asylum Congress has enacted. Just as Congress has chosen to promote systemic efficiency by prohibiting asylum applications filed more than one year after entry and by generally prohibiting noncitizens from pursuing successive asylum applications, INA 208(a)(2)(B)–(C), 8 U.S.C. 1158(a)(2)(B)–(C), this rule furthers systemic efficiency by limiting asylum in certain situations where the strains on the immigration system are at their peak. Congress did

---

[180] The Departments' interpretation of the phrase "consistent with" is supported by judicial interpretation of the term in other contexts. The D.C. Circuit, for example, has cautioned against construing "consistent with" too narrowly in a Clean Air Act case. *Envtl. Def. Fund, Inc.* v. *EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam), *amended by* 92 F.3d 1209 (D.C. Cir. 1996). The court emphasized that this "flexible statutory language" does not require "exact correspondence . . . but only congruity or compatibility" and underscored that the phrase's ambiguity warranted deference to the agency's policy. *Id.* Other courts have adopted the same understanding of "consistent with." *See, e.g., Jimenez-Rodriguez* v. *Garland*, 996 F.3d 190, 198 (4th Cir. 2021) ("The phrase 'consistent with' does not require 'exact correspondence . . . but only congruity or compatibility.'" (quoting *Nuclear Energy Inst., Inc.* v. *EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004))); *Nat'l Wildlife Fed'n* v. *Sec'y of U.S. Dep't of Transp.*, 960 F.3d 872, 878 (6th Cir. 2020) ("'[T]he phrase 'consistent with' cannot bear the weight that the Federation places on it. Response plans are 'consistent' with the contingency plans if they 'show no noteworthy opposing, conflicting, inharmonious, or contradictory qualities'—in other words, if the documents put together are 'not self-contradictory. Consistency does *not* mean exact, point-by-point correspondence." (cleaned up)).

not foreclose the Departments from likewise taking systemic considerations into account when exercising their discretion to add conditions or limitations on eligibility. Indeed, the ultimate consideration when determining whether someone warrants a grant of relief as a matter of discretion is whether granting relief ''appears in the best interests of th[e] country,'' *Matter of Marin,* 16 I&N Dec. 581, 584 (BIA 1978), a point Congress was aware of when it amended the INA in 1996, *see id.* (best interests standard preceded 1996 amendments by nearly two decades). The Departments find that the rule's limitation on asylum eligibility furthers the efficiency aims of the asylum statute and is in the best interests of the United States because it allows the Departments to deliver timely decisions and timely consequences in order to address the emergency border circumstances discussed in the Proclamation and this rule.

Consistent with the best-interest standard, the BIA has long held a noncitizen's ''circumvention of orderly refugee procedures'' to be relevant to whether a favorable exercise of discretion is warranted. *Matter of Pula,* 19 I&N Dec. at 473. And the BIA has specifically considered as relevant factors the noncitizen's ''manner of entry or attempted entry.'' *Id.* Although the rule places greater weight on these factors under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. And exactly how much weight to place on those factors, and whether to do so in weighing asylum eligibility, falls well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 244 (2001); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993); *Yang,* 79 F.3d at 936–37.

The Departments acknowledge that *Matter of Pula* did not consider a noncitizen's arrival at a POE to weigh against a discretionary grant of asylum. *See* 19 I&N Dec. at 473. But *Matter of Pula* also did not involve circumstances in which the country's border faced an emergency of a magnitude comparable to the emergency border circumstances described by the Proclamation and this rule, where even arrivals at POEs significantly contribute to the Departments' inability to process migrants and deliver timely decisions and timely consequences to those without a lawful basis to remain. Given the emergency border circumstances described by the Proclamation and the

President's direction in section 3(d) of the Proclamation to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the situation at the southern border; and given the strain on operations and resources that high volumes of new arrivals create, such that consequences cannot be appropriately delivered; the Departments believe that the rule's limitation on asylum eligibility should apply to noncitizens who enter the United States across the southern border, including at a POE during the emergency border circumstances described in the Proclamation and this rule, unless an exception applies.

In *Matter of Pula,* the BIA explained that a noncitizen's ''circumvention of orderly refugee procedures,'' including their ''manner of entry or attempted entry,'' is a relevant factor for asylum, 19 I&N Dec. at 473–74, and this rule merely takes such circumvention into account. Because the Proclamation contains an exception for arrivals at a pre-scheduled time and place under a process approved by the Secretary, this rule's limitation on asylum will also not apply to such arrivals. One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Indeed, without CBP One, noncitizens could have longer wait times for processing at the POE depending on daily operational constraints and circumstances. *See* 88 FR at 31342. During emergency border circumstances, use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources. *See, e.g., id.* at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). The CBP One app and other lawful pathways that the United States Government has made available to those seeking to enter the United States, including to seek asylum or protection, are intended to allow for orderly processing. Therefore, those who ''circumvent orderly refugee procedures,'' consistent with *Matter of Pula,* 19 I&N Dec. at 474, during emergency border circumstances without meeting one of the recognized exceptions will be ineligible for asylum.[181]

iv. This Limitation on Asylum Eligibility

For the reasons discussed above, the *East Bay* cases dealt with different limitations on asylum and involved different factual circumstances, and hence are distinguishable from this rule.[182] Moreover, the Departments respectfully disagree with some of the substantive holdings of the Ninth Circuit and the district court as described above. The Secretary and the Attorney General permissibly may determine that, during emergency border circumstances, it is in the ''best interests of th[e] country,'' *Matter of Marin,* 16 I&N Dec. at 584, to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing noncitizens who do not enter in violation of it. Nothing in section 208 of the INA, 8 U.S.C. 1158, forecloses that view, and securing the best interests of the country is a reasonable policy goal under section 208 and thus ''consistent with'' it. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see Yang,* 79 F.3d at 939 (observing that ''it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208''); *see also id.* at 935 (''We must reject the argument that [the] regulation [establishing a categorical discretionary bar to asylum eligibility] exceeds the authority of the Attorney General if we find that the regulation has a 'reasonable foundation . . .' that is, if it rationally pursues a purpose that it is lawful for the

---

[181] As the BIA further explained with respect to the asylum statute as it existed at the time, ''[a] careful reading of the language of [section 208(a)(1)]

reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien.' '' *Matter of Pula,* 19 I&N Dec. at 473. ''The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from *any* alien present in the United States or at a land or port of entry, irrespective of such alien's status.' '' *Id.* (collecting cases). Congress accordingly made clear that noncitizens like stowaways, who, at the time the Refugee Act was passed, could not avail themselves of our immigration laws, would be eligible at least to apply for asylum ''irrespective of [their] status.'' *Id.* ''Thus, while section 208(a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion.'' *Id.*

[182] The Departments have considered the July 25, 2023 district court decision vacating the Circumvention of Lawful Pathways rule. *See E. Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). That decision applied the holdings of the other *East Bay* decisions generally, and the Departments do not see a need to address it separately except to note that as of publication the court's vacatur remains stayed pending appeal in the Ninth Circuit, and thus the rule is in effect. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023).

[immigration agencies] to seek.' '' (quoting *Reno,* 507 U.S. at 309)).

Beyond the clear statutory text, settled principles of administrative law dictate that the Departments may adopt generally applicable eligibility requirements. Those principles establish that it is permissible for agencies to establish general rules or guidelines in lieu of case-by-case assessments, so long as those rules or guidelines are not inconsistent with the statute, and that principle is especially salient here as asylum is inherently discretionary in nature. *See Lopez,* 531 U.S. at 243–44 (rejecting the argument that the Bureau of Prisons was required to make "case-by-case assessments" of eligibility for sentence reductions and explaining that an agency "is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking' " (quoting *Heckler* v. *Campbell,* 461 U.S.458, 467 (1983))); *Reno,* 507 U.S. at 313–14 (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules" (quotation marks omitted)); *Fook Hong Mak,* 435 F.2d at 730 (upholding INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration" and observing that there is no legal principle forbidding an agency that is "vested with discretionary power" from determining that it will not use that power "in favor of a particular class on a case-by-case basis"); *see also Singh,* 623 F. Supp. at 556 ("attempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories of illegal aliens"); *Matter of Salim,* 18 I&N Dec. 311, 315–16 (BIA 1982) (before *Pula,* explaining that a certain form of entry can be considered an "extremely adverse factor which can only be overcome with the most unusual showing of countervailing equities"); *cf. Peulic* v. *Garland,* 22 F.4th 340, 346–48 (1st Cir. 2022) (rejecting challenge to *Matter of Jean,* 23 I&N Dec. 373 (A.G. 2002), which established strong presumption against a favorable exercise of discretion for certain categories of applicants for asylee and refugee adjustment of status under section 209(c) of the INA, 8 U.S.C. 1159(c) (citing cases)); *Cisneros* v. *Lynch,* 834 F.3d 857, 863–64 (7th Cir. 2016) (rejecting challenge to 8 CFR 1212.7(d), which established strong presumption against a favorable exercise of discretion

for waivers under section 212(h) of the INA, 8 U.S.C. 1182(h), for certain classes of noncitizens, even if a few could meet the heightened discretionary standard (citing cases)).

The Departments recognize that in the Circumvention of Lawful Pathways rule they declined to adopt on a permanent basis the Proclamation Bar IFR because it conflicted with the tailored approach in that rule and because barring all noncitizens who enter between POEs along the SWB was not the proper approach under the circumstances the Departments then faced. *See* 88 FR at 31432. The Departments continue to believe that the approach taken in the Proclamation Bar IFR conflicts with the tailored approach of the Circumvention of Lawful Pathways rule as well as the tailored approach in this rule, which borrows heavily from the Circumvention of Lawful Pathways rule. The Proclamation Bar IFR contained no exceptions and was open-ended, allowing for implementation of any future proclamations or orders regardless of their terms. *See* 83 FR at 55952. In contrast, like the Circumvention of Lawful Pathways rule, this rule is narrowly tailored to address the emergency border circumstances described in the Proclamation and the rule and includes exceptions to account for circumstances in which waiting for an end to the suspension and limitation on entry and the limitation on asylum eligibility is not possible. And by relating the rule to a specific proclamation and the circumstances described therein, the Departments have been able to tailor its provisions to the terms of the Proclamation and the circumstances under which it is applied.

Finally, the Departments acknowledge that, unlike the Circumvention of Lawful Pathways rule, neither the Proclamation nor this rule excepts Mexican nationals. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii) (providing that the Lawful Pathways rebuttable presumption of asylum ineligibility applies only to those who enter the United States along the SWB after transiting through a third country). Traveling through a third country is a key part of the Circumvention of Lawful Pathways rule because one lawful pathway for obtaining protection is applying for protection in a third country. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments recognize that some Mexican nationals seek asylum and protection in the United States. Indeed, since 2021, DHS has seen a sharp increase in total SWB encounters of Mexican nationals, from a pre-pandemic (FY 2014 through FY

2019) average of approximately 239,000 to more than 717,000 in FY 2023.[183] Of note, this increase in encounters has been accompanied by a sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal. The percentage of Mexican nationals processed for expedited removal who claimed a fear of return averaged 6 percent in the pre-pandemic period (FY 2014 through FY 2019), and never exceeded 7 percent for any fiscal year.[184] But 29 percent of all Mexican nationals processed for expedited removal at the SWB from May 12, 2023, to March 31, 2024, made fear claims, including 39 percent in February 2024.[185] Because of this sharp increase from the historical average, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems while entry is suspended and limited under the Proclamation. At the same time, the Departments continue to believe that, if encounters decrease to levels under which the systems do not experience the substantial strains they currently experience while the Circumvention of Lawful Pathways rule remains in effect, the application of that rule only to those noncitizens who travel through a third country en route to the United States appropriately accounts for the goals of encouraging migrants to seek protection in other countries or to use safe, orderly, and lawful pathways to enter the United States, ensuring the border security and immigration systems can efficiently process noncitizens, and affording asylum and other protection to those seeking it who establish their eligibility.

Under this rule, Mexican nationals will still be eligible for asylum in some circumstances—they may present at a POE pursuant to a pre-scheduled appointment, or, if they are unable to wait in Mexico while scheduling an appointment, they may be able to establish an exception to the Proclamation or exceptionally compelling circumstances under the rule. Even if they are not able to do so, the rule does not preclude eligibility for

---

[183] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

[184] OHSS Enforcement Lifecycle December 31, 2023.

[185] OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

**STB_AR1_000159**

statutory withholding of removal and CAT protection, and they will be able to seek such protection. In the absence of an exception, however, Mexican nationals should be ineligible for asylum under the rule because, during the emergency border circumstances described in the Proclamation and this rule, it is important to deter irregular entry by all noncitizens regardless of country of origin. And the above data make clear that additional incentives are necessary to encourage Mexican nationals to pursue the available lawful, safe, and orderly pathways, rather than entering the country unlawfully.

*v. Application During Credible Fear Screenings and Reviews*

The limitation on asylum eligibility adopted here applies during merits adjudications, *see* 8 CFR 208.13(g), 1208.13(g), but will most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Noncitizens in expedited removal are subject to removal ''without further hearing or review'' unless they indicate an intention to apply for asylum or fear of persecution. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Noncitizens in expedited removal who indicate an intention to apply for asylum or fear of persecution are referred to an AO for an interview to determine if they have a credible fear of persecution and should accordingly remain in proceedings for further consideration of the application. INA 235(b)(1)(A)(ii), (b)(1)(B)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(ii), (b)(1)(B)(i), (ii). In addition, AOs consider whether a noncitizen in expedited removal may be eligible for statutory withholding of removal or for CAT protection. *See* 8 CFR 208.30(e)(2), (3).

This rule instructs AOs and IJs to apply the limitation it adopts during credible fear screenings and reviews. 8 CFR 208.35(b), 1208.35(b). Under the rule, when screening for asylum eligibility, the AO and IJ must determine whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances. For the reasons noted in the Circumvention of Lawful Pathways rule, the Departments expect that noncitizens rarely would be found excepted from the limitation on asylum for credible fear purposes and subsequently be found not to be excepted at the merits stage. *See* 88 FR at 31380–81.

The Departments recognize that in the recent past they changed course regarding whether to apply bars and conditions and limitations on asylum eligibility during credible fear screenings by rescinding provisions that would have applied the mandatory asylum bars during credible fear screenings. *See* 87 FR at 18135. In the Circumvention of Lawful Pathways NPRM, the Departments explained their reasoning for nevertheless applying that condition on asylum eligibility during credible fear screenings, stating that the rebuttable presumption would be less difficult to apply than other bars, limitations, or conditions because the facts regarding the presumption's applicability, exceptions, and rebuttal circumstances would generally be straightforward to apply. 88 FR at 11744–45. Indeed, the Departments have applied the presumption effectively in credible fear screenings for the time in which the Circumvention of Lawful Pathways rule has been in effect.[186]

The limitation adopted here is in many ways parallel to the Lawful Pathways rebuttable presumption—specifically, it borrows from the Circumvention of Lawful Pathways rule's rebuttal circumstances—although it is more straightforward because it does not include the Lawful Pathways rebuttable presumption's exceptions for those who applied and were denied asylum or other protection in a third country and those who were unable to schedule an appointment through the CBP One app for certain reasons. *See* 8 CFR 208.33(a)(2)(ii)(B)–(C), 1208.33(a)(2)(ii)(B)–(C). Given the Departments' experience with implementing the Circumvention of Lawful Pathways rule, the Departments are confident that the limitation and exceptions established here will be just as straightforward to apply as the similar provisions are for the Circumvention of Lawful Pathways rule.

*b. Manifestation of Fear*

This rule also alters certain aspects of the expedited removal process for individuals who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. When an immigration officer inspects a noncitizen at a POE or between POEs and determines that the noncitizen is inadmissible and will be subject to expedited removal, current regulations require the immigration officer to take certain steps before ordering the noncitizen removed from the United States. *See* 8 CFR 235.3(b). This process takes approximately two hours per individual in USBP custody. In particular, the immigration officer conducts an inspection, including taking biometrics; running background checks; collecting biographic information, citizenship, and place and manner of entry; and advising the noncitizen of the charges against them. 8 CFR 235.3(b)(2)(i). The noncitizen has an opportunity to provide a response. *Id.* The officer must also read (or have read through an interpreter, if appropriate) the information contained in the Form I–867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which advises the noncitizen of their ability to seek protection in the United States. *Id.* The examining immigration officer must also read the noncitizen the questions on the Form I–867B, Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which asks, among other things, whether the noncitizen has any fear of return or would be harmed if returned. *Id.* After the noncitizen has provided answers to the questions on Form I–867B, the immigration officer records the answers, and the noncitizen then reads the statement (or has the statement read to them) and signs the statement. *Id.* On average, USBP agents spend about 20 to 30 minutes of the inspection period completing both the Form I–867A and the Form I–867B. Finally, a noncitizen who indicates a fear of return or an intention to seek asylum is served with and acknowledges receipt of a Form M–444, which includes more detailed information about the credible fear process. 8 CFR 235.3(b)(4)(i).

Instead of this current process, DHS is adding a new provision at 8 CFR 235.15(b)(4) to modify the process for determining whether a noncitizen who enters across the southern border and is

---

[186] In the post-May 12, 2023, period, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews has decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations or administrative closures that are not referred to EOIR, the median time from encounter to removal, in the same time frames, decreased 85 percent from 73 days to 11 days. Pre-pandemic medians based on OHSS analysis of OHSS Enforcement Lifecycle December 31, 2023; post-May 12 estimates based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. The Departments note that DHS recently published a notice of proposed rulemaking proposing that certain mandatory bars be considered at the screening stage under a reasonable possibility standard. Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024). If DHS were to finalize that rule as drafted, this rule's ''reasonable probability'' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.

not described in section 3(b) of the Proclamation during the emergency circumstances giving rise to the Proclamation's suspension and limitation on entry should be referred to an AO for a credible fear interview. These procedures apply during emergency border circumstances. *See* 8 CFR 235.15(a). Under the new rule, immigration officers will conduct an immigration inspection and, where the noncitizen will be subject to expedited removal, will advise the noncitizen of the removal charges against them and provide an opportunity to respond, consistent with existing practice and regulations outlined above. 8 CFR 235.3(b)(2)(i). However, the immigration officer will not complete either the Form I–867A or Form I–867B or a sworn statement. Moreover, the officer will not be required to provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear. *See* 8 CFR 235.15(b)(4). Under the rule, the immigration officer will instead refer the noncitizen to an AO for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. *See id.* This manifestation can occur at any time in the process and can be expressed verbally, non-verbally, or physically.[187] In such situations, the immigration officer will not proceed further with the removal and will comply with the existing regulations, policies, and procedures, including as outlined in 8 CFR 235.3(b)(4), regarding processing and referring noncitizens for credible fear interviews. At the time that a noncitizen is referred for a credible fear interview, they will receive additional information about the credible fear process that has the same substantive information as in the current process, but without the requirement that such information be provided on a particular form.

DHS is making these changes to address the emergency circumstances at the southern border discussed in the

Proclamation and the rule in a manner consistent with its legal obligations. DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO so long as those procedures are consistent with the INA. *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

DHS believes that the above-described changes are fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). Section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A), does not specify the relevant aspects of the procedures that immigration officers must follow to determine whether a noncitizen who is subject to expedited removal can be ordered removed or whether the noncitizen must be referred to an AO for a credible fear interview. Instead, the statute provides that the immigration officer may order removed any noncitizen who, subject to certain exceptions, is arriving in the United States, or who is within a class of noncitizens subject to expedited removal as designated by the Secretary, and who is inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or 1182(a)(7). The statute further provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). But the statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture. Moreover, Congress has not provided a particular definition of the phrase "indicates . . . an intention." The statute's text thus gives DHS discretion to employ the procedures it reasonably concludes are appropriate to implement

section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[188]

Interpreting the statute in this manner is also consistent with the United States' international law obligations. As described in Section II.B of this preamble, the United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra*, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.[189] Neither the Refugee Convention nor the Protocol prescribes minimum screening procedures that must be implemented.[190] Rather, each state party has the authority "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure," as long as such procedures are consistent with the purposes of the Convention.[191] The United States has also ratified the CAT, which includes a non-refoulement provision at Article 3 that prohibits the return of a person from the United States to a country where there are "substantial grounds for believing" the person would be tortured. *See Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007); *see id.* at 115 (" '[T]he United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in

---

[187] By these terms, DHS intends to include a wide range of human communication and behavior, such that "non-verbally" could include things like noises or sounds without any words, while physical manifestations could include behaviors, with or without sound, such as shaking, crying, or signs of abuse. *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm.* A noncitizen could thus manifest a fear of returning to a previous location without using actual words to state that they are specifically afraid of return to their home country or country of removal.

[188] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 543 (1950) (" '[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigrant Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 18 (D.D.C. 2020).

[189] *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[190] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967.*

[191] *Id.*

STB_AR1_000161

Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " (quoting the Senate resolution of ratification)). The CAT similarly does not prescribe screening requirements. As such, the United States has broad discretion in what procedures are appropriate to implement, through domestic law, to satisfy its non-refoulement obligations.[192]

The United States implements its obligations under the Refugee Protocol and the CAT through the INA and related rulemaking, and it provides specified procedures—including in the expedited removal process, as described above—for seeking asylum or other protection in the United States. The process outlined in this rule temporarily affords immigration officers the ability to refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. The Departments have concluded that the manifestation standard is consistent with their obligations (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured.[193]

In addition to changing to a "manifestation" standard, CBP is implementing operational changes to generally inform noncitizens subject to expedited removal that, if they have a fear of return, they should inform an immigration officer, and they will be referred to an AO for consideration of their fear claim. DHS believes that these operational changes and notice provisions, as implemented, are consistent with the notice provision in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).[194] Moreover, CBP will provide immigration officers with information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically.

Upon implementation of this rule, signs will be posted in areas of CBP facilities where individuals are most likely to see these signs. The signs will provide clear direction to individuals that, in addition to being able to inform the inspecting immigration officers of urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. These signs will be in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by those described in the Proclamation and likely subject to the provisions of this rule.[195]

Moreover, in CBP's large capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return will be shown on a loop in the processing areas and will also be available in those languages most commonly spoken by those noncitizens encountered by CBP who may be described in the Proclamation and likely subject to the provisions of this rule.[196]

The video will also explain to noncitizens that, if they inform an immigration officer that they have a fear, an AO will conduct an interview to ask questions about their fear. Consistent with CBP's Language Access Plan, CBP provides language assistance services for those who may not speak one of those languages.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[198] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the sign and video will be presented will be read the contents of the sign and video in a language they understand.[199]

---

[192] Although neither the Refugee Convention nor the Refugee Protocol nor the CAT includes specific screening requirements, the United States is bound not to return noncitizens from the United States to countries where they would be tortured, or, with limited exceptions, to countries where they would be persecuted on account of a protected ground. As discussed in detail above in Section III.A.1 of this preamble, the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), not through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. And the United States implements its obligations under the CAT through regulations. *See* FARRA, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

[193] 136 Cong. Rec. 36198 (1990) (recording the Senate's advice and consent to the ratification of the CAT, subject to certain reservations, understandings, and declarations, including that the phrase in Article 3 of the CAT, " 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' " is understood to mean " 'if it is more likely than not that he would be tortured' "); *see also Pierre,* 502 F.3d at 115.

[194] DHS acknowledges that an argument could be made that the requirement in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS "shall provide information concerning the asylum interview . . . to aliens who may be eligible," is not limited only to noncitizens who are eligible for a credible fear interview, but instead applies to noncitizens who are suspected of qualifying for expedited removal and "may" be eligible for an interview. In all events, DHS is providing information to noncitizens who are being processed for expedited removal about their right to seek asylum and protection in the United States. As explained below, DHS is posting signs on display for all noncitizens in CBP custody and including information in a video that will be on display for the vast majority of noncitizens in CBP custody, informing them that if they have a fear of return, they should inform an immigration officer and, if they do, an AO will conduct an interview and ask the noncitizens questions about any fear they may have. Noncitizens who indicate a fear of return will be given a more detailed written explanation of the credible fear interview process prior to being referred for the interview. That explanation will be translated into certain common languages or will be read to the noncitizen if required.

[195] Currently, these languages are English, Spanish, Mandarin, and Hindi.

[196] These large capacity facilities currently hold the vast majority of individuals in CBP custody. Although the videos will not be shown at smaller facilities, including small POEs and Border Patrol stations, these facilities house very few noncitizens who are subject to the asylum limitation. These small facilities will still post the relevant signs in the processing areas. And at these small facilities, resources are such that immigration officers will be able to devote a great deal of attention to observing individuals, including for any manifestations of fear or any indication that an individual requires assistance from a translator or reading assistance to understand the information provided at the facility, including the information provided on the signs. Immigration officers at these facilities are trained to provide such assistance as needed and will continue to do so under this rule.

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (Oct. 30, 2023), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf; see also* DHS, *DHS Language Access Resources, https://www.dhs.gov/publication/dhs-language-access-materials* (last updated July 17, 2023); DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last updated Mar. 10, 2021).

[199] These videos and signs will be presented in a manner that is consistent with how CBP provides other important notifications to individuals in its facilities. CBP utilizes posters for other critical information, such as ensuring that individuals are on the lookout for those who may commit suicide, advising all children in custody of the amenities available to them (*e.g.,* food, water, medical care, blankets, and hygiene products), communicating its zero tolerance regarding sexual assault, and conveying critical information about oversight entities such as the Office of the Inspector General. CBP also has a video targeted towards UCs explaining the process that they will go through. These signs and videos are similarly posted in the

Continued

DHS's experience, based on the nature of CBP facilities and the utility of the existing signs, is that short, concise, and simple notifications are effective. This is because CBP holds individuals only for as long as it takes to complete inspection and processing, including conducting any basic medical screenings and making arrangements for transfer out of CBP custody. Particularly for those who are apprehended by USBP between POEs, noncitizens will go through a number of steps during their time in a CBP facility, including completion of processing paperwork, fingerprinting, and being interviewed by an inspecting immigration officer. In many USBP facilities, these steps occur at the same time as the facility provides showers and hygiene products, medical evaluations, and food and water. Given that noncitizens may move through other areas of the facility and do not remain in custody for a long period of time, DHS regularly places important signs in both the processing areas and the detention areas of its facilities, which are the locations where noncitizens spend time while being inspected or while in CBP custody; DHS is confident that noncitizens see these existing signs and that the new signs added as part of this rule are also likely to be seen. DHS has determined that more complicated videos and signs are less effective for conveying important information.

DHS acknowledges that these procedures represent a departure from the justification that the former Immigration and Naturalization Service (''INS'') provided, in 1997, when it adopted the current procedures in 8 CFR 235.3(b)(2)(i). At the time, INS explained that adopting these procedures would ''ensure that bona fide asylum claimants are given every opportunity to assert their claim[s],'' and that it was including the requirement that immigration officers must provide advisals about the credible fear process and ask questions about fear as ''safeguards'' to ''protect potential asylum claimants.'' *See* 62 FR at 10318–19. INS further explained that these procedures would ''not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims.'' *Id.* at 10318. While such procedures have remained in place since 1997, this fact alone is not an indication that they are required by the statute, and DHS maintains discretion to update the procedures in a manner consistent with the statute. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S.

502, 515 (2009) (holding that an agency changing an established rule need not justify the change with a more detailed justification than that supporting the original so long as it can show ''good reasons'' for the new policy). Given the extraordinary circumstances currently facing the Departments, DHS has determined it is reasonable to change the procedures here.

When the existing regulations were adopted in 1997, the situation at the border was different. In 1998 (the first full year that statistics concerning the expedited removal process were available), approximately 80,000 noncitizens were processed for expedited removal.[200] In that same year, AOs conducted fewer than 3,000 credible fear interviews [201] and IJ reviews numbered around 100.[202] Additionally, at that time, expedited removal was applied only to ''arriving aliens,'' noncitizens processed at a POE, not noncitizens encountered between POEs.[203] Expedited removal was not extended to certain noncitizens encountered after entering between POEs until 2004. *See* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (extending expedited removal to noncitizens encountered within 100 air miles of the border and within 14 days of entry). At that time, USBP apprehended approximately 1.1 million noncitizens between POEs annually.[204] The numbers have changed significantly since that time. In FY 2023, USBP apprehended more than 2 million noncitizens between POEs along the SWB.[205] In February 2024, USBP processed more than 33,000 individuals for expedited removal,[206] and USBP

processed more than 28,000 in March 2024.[207] Since May 2023, USCIS has completed about 3,300 credible fear interviews per week of individuals encountered at and between SWB POEs,[208] and in FY 2023, IJs reviewed over 34,000 credible fear decisions.[209] These high levels of encounters and credible fear referrals impose a significant burden on the expedited removal process and have strained DHS and EOIR resources, substantially impairing the Departments' ability to deliver timely decisions and timely consequences. At a processing time of approximately 2 hours per person, USBP agents spent approximately 56,000 hours—the equivalent of approximately 2,333 calendar days— processing the approximately 28,000 expedited removal cases in March 2024 under the current process. High numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded.[210] This type of crowding in USBP facilities creates health and safety concerns for noncitizens and Government personnel.[211]

Additionally, compared to 1997, today's high levels of migration impose a severe strain on the credible fear process. AOs and IJs must devote substantial resources to credible fear interviews and reviews.[212] Despite the strengthened consequences in place at the SWB through the Circumvention of Lawful Pathways rule and the complementary measures that have led to record returns and removals, encounter levels and credible fear referrals are exceeding the capacity of

---

[200] *See* INS, *1998 Statistical Yearbook of the Immigration and Naturalization Service* 203 (Nov. 1998), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1998.pdf*.

[201] *See id.* at 91.

[202] EOIR, *Statistical Yearbook 2000*, at D1 (Jan. 2001), *https://www.justice.gov/sites/default/files/eoir/legacy/2001/05/09/SYB2000Final.pdf* (reporting that EOIR received 90 credible fear reviews in FY 1998).

[203] *See* 62 FR at 10318–19; *compare* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (applying expedited removal to noncitizens arriving at ports of entry), *with* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii) (permitting the application to designated noncitizens).

[204] CBP, *United States Border Patrol Nationwide Encounters Fiscal Year 1925–2020*, *https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/U.S.%20Border%20Patrol%20Total%20Apprehensions%20%28FY%201925%20-%20FY%202020%29%20%28508%29.pdf* (last accessed May 27, 2024).

[205] CBP, *Southwest Land Border Encounters*, *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[206] OHSS analysis of data downloaded from UIP on April 2, 2024.

[207] OHSS analysis of data downloaded from UIP on April 2, 2024.

[208] OHSS analysis of data downloaded from UIP on April 2, 2024.

[209] *See* EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/10/26/7_credible_fear_review_and_reasonable_fear_review_decisions.pdf*.

[210] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas*, Case No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[211] *Id.*

[212] USCIS closed or adjudicated an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009. OHSS analysis of March 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (reflecting ever increasing numbers of credible fear interview screenings at the ''SW Border Credible Fear Screenings Referred to USCIS by citizenship'' tab); *see also* 88 FR at 31314, 31326, 31381.

---

areas of CBP facilities where DHS is confident they are likely to be seen by noncitizens being processed.

STB_AR1_000163

the expedited removal process.[213] Therefore, DHS has determined that a different approach is needed here. The manifestation standard in the new rule is designed to reasonably help meet these challenges during emergency border circumstances. It is intended to help immigration officers process noncitizens more expeditiously, while still affording opportunities for those seeking protection to do so.

DHS acknowledges that, by implementing a manifestation standard in the circumstances outlined in this rule, it is temporarily eliminating the requirement to provide individualized advisals and ask affirmative questions via Forms I–867A and B. DHS has determined that, in light of the circumstances giving rise to the Proclamation and this rule, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek asylum. DHS is making the decision to use the manifestation standard consistent with the statute, as described above, and for the reasons detailed below. At bottom, based on DHS's long experience inspecting and interviewing individuals, DHS has determined that a manifestation approach is the most appropriate way to address emergency border circumstances while still sufficiently affording the ability to seek protection. Specifically, DHS makes this determination based on its significant experience relating to the inspection of individuals seeking entry and admission into the United States. DHS immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day. In FY 2019, prior to COVID–19, for example, the approximately 28,000 officers of CBP's Office of Field Operations [214] processed more than 1.1 million people at POEs every day.[215] USBP's 20,000 agents [216] encountered more than 2 million people on the SWB in FY 2023.[217]

In addition, DHS, including through its predecessor agencies, has been implementing the expedited removal provisions since 1997. It therefore has nearly 30 years of experience completing the Form I–867A advisals and asking the questions on Form I–867B.[218] Based on this experience, it is DHS's determination that, when individuals are asked affirmative questions, such as those on Form I–867B, individuals are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum. Moreover, based on this experience, DHS concludes that providing noncitizens with specific advisals on fear claims— particularly given the emergency context of this rule and because few if any other advisals are provided—would be suggestive and prompt many individuals to respond in the affirmative even if they do not have any actual fear or intention to seek asylum. For this reason, as well, DHS has made the determination, based on its experience and expertise inspecting noncitizens, to temporarily adjust its approach to individualized advisals and questions about fear.

As part of this approach, DHS is temporarily forgoing asking the fear questions on Form I–867B with respect to noncitizens who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. DHS anticipates that this approach will likely lead to a higher proportion of those referred having colorable claims for protection. Based on the expertise of DHS in administering Form I–867B, it has determined that affirmative questions are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.[219] DHS believes that those noncitizens who indicate a fear of return on their own, in the absence of suggestive questions, are more likely to be urgently seeking protection. Indeed, it is DHS's experience and assessment that asking questions is likely to lead individuals to answer yes, even if they do not actually have a fear of persecution or torture.[220] DHS acknowledges that there are mixed opinions on this point and that this may not be the case for all individuals, such that questioning may be helpful in order for some individuals to feel comfortable articulating a fear.[221] DHS recognizes

[213] See Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden*, No. 18 cv 6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶¶ 10–12, *Florida* v. *Mayorkas*, No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1); Decl. of Enrique M. Lucero ¶ 7, *Innovation Law Lab* v. *Wolf*, No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3).

[214] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices,* https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices (last updated Jan. 30, 2024).

[215] See CBP, *On a Typical Day in 2019, CBP . . . ,* https://www.cbp.gov/newsroom/stats/typical-day-fy2019 (last modified May 11, 2022).

[216] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices,* https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices (last updated Apr. 19, 2024).

[217] See CBP, *Southwest Land Border Encounters,* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified May 15, 2024).

[218] See 62 FR at 10312, 10318–19.

[219] From 2014 through 2019, of total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. OHSS Enforcement Lifecycle December 31, 2023.

[220] This is also reflected in the behavioral science concept of "acquiescence," in which individuals tend to "consistently agree to questionnaire items, irrespective of item directionality." Shane Costello & John Roodenburg, *Acquiescence Response Bias—Yeasaying and Higher Education,* 32 Australian Ed. & Dev. Pysch. 105, 105 (2015). Studies have shown that this bias is higher amongst those with lower education levels and from countries that score higher on scales of corruption or collectivism. *See, e.g.,* Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, *Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences,* 107 Personality & Individual Differences 190 (2017); Seth J. Hill & Margaret E. Roberts, *Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions,* 31 Pol. Analysis 575 (2023).

[221] DHS acknowledges that some studies of the expedited removal process concluded that the Form I–867A information and the Form I–867B questions are important protections, and that failure to read the advisals led to lower referrals for credible fear interviews. *See, e.g.,* Allen Keller et al., *Study on Asylum Seekers in Expedited Removal as Authorized by Section 605 of the International Religious Freedom Act of 1998: Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States* 16–18 (2005), https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf ("USCIRF Report") (finding that noncitizens who are read the information in Form I–867A are seven times more likely to be referred for a credible fear interview and "the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked"); *see also* U.S. Gov't Accountability Off., *Opportunities Exist to Improve the Expedited Removal Process,* No. GAO/GGD–00–176 (Sept. 2000). DHS acknowledges that one study concluded that there was "little evidence" that the advisals and fear questions prompted noncitizens to make fear claims, but rather most of the noncitizens whose cases were studied "spontaneously expressed fear of returning to their home country." *See* USCIRF Report at 21. The same study noted that three quarters of those had been read the advisals on Form I–867A. *See id.* Given the small sample size (n=73) and the report's uncertain conclusion, this report does not alleviate CBP's long held "concerns that [noncitizens] may be 'prompted' to express fears to officers by the I–867B fear questions." *Id.* As in 2005, at the time of the report, DHS continues to have such concerns, and DHS further believes that the individualized advisals on Form I–867A raise similar "prompting" concerns. And, even to the extent that the study concluded otherwise, DHS notes that, under the manifestation standard outlined in the rule, noncitizens continue to have the ability to affirmatively manifest a fear. Thus, considering the current situation at the border that gives rise to the Proclamation and this rule and the need to allocate limited resources to those urgently seeking protection, DHS believes that, notwithstanding the study's finding, the approach taken in this rule provides an appropriate standard for the emergency border circumstances at issue. As noted, CBP will be providing signs and videos advising, in a general matter, that individuals may express a fear of return. Accordingly, DHS has fully considered and weighed the contrary evidence and has concluded that the rule adopts the appropriate approach to help meet the challenge when emergency border circumstances are present.

that the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview. However, in light of the emergency border circumstances facing the Departments and addressed by the Proclamation and this rule, DHS believes the standard is appropriate and necessary. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.

Additionally, DHS is eliminating the requirement that officers and agents read the individualized advisals on Form I–867A. DHS plans to replace these advisals with a generalized notice—for all individuals in CBP facilities—of the ability to raise a claim of fear of persecution or torture. DHS is making this change based on its experience suggesting that, like with the Form I–867B advisals, individualized Form I–867A advisals would be suggestive and would likely lead many individuals to claim a fear of return when they otherwise would not, particularly given the emergency context of this rule and because there are few if any other advisals provided. Based on its experience, DHS determines that these advisals on their own is also suggestive.[222] Thus, in the context of inspecting individuals who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal, DHS has determined not to require the provision of such suggestive advisals. DHS acknowledges that, like with the Form I–867B questions, there are studies that show that such advisals make it more likely that a noncitizen will indicate a fear of return.[223] However, based on DHS's

experience, the nature of the emergency border circumstances facing the Departments, and the statutory requirements, DHS has determined that the approach taken here—eliminating the requirement to provide individualized advisals but providing signage and videos—is appropriate.[224]

Indeed, DHS notes that the manifestation standard has been used in other urgent and challenging situations to identify noncitizens with fear claims. This standard has long been used by the United States Coast Guard, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea.[225] This standard was also adopted by the United States Government to screen family units during the pendency of the Title 42 public health Order, when the Government was similarly dealing with urgent, exigent circumstances—the global pandemic—while still allowing noncitizens an opportunity to seek protection.[226]

DHS believes that the manifestation standard is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return. Manifestations may be verbal, non-verbal, or physical.[227] A manifestation of fear may present with non-verbal or physical cues, through behaviors such as shaking, crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse.[228] An individual who may

not be comfortable answering a question about whether they have a fear of return may nevertheless manifest that fear through an unconscious behavior, which can be observed by the inspecting immigration officer, and the individual may then be referred for a fear screening. DHS acknowledges that, in some cases, these behaviors may reflect circumstances other than a fear of return—for instance, a noncitizen who has just arrived at the border may be physically tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear. In such cases, DHS immigration officers will use their expertise and training to determine whether the noncitizen is manifesting a fear. If there is any doubt, however, immigration officers will be instructed to err on the side of caution and refer the noncitizen to an AO for a credible fear interview.

Moreover, DHS will provide immigration officers with information on how to apply the standard, which will build on their existing training and experience. Indeed, as noted above, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. As a result of their experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. Agents and officers are also trained on identifying potential trafficking victims or victims of crimes and are trained on appropriate follow up action. Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. Agents and officers will also receive information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically. DHS believes that this experience, coupled with guidance, will help agents and officers effectively

---

[222] This determination is based, in part, on CBP's experience that the language in specific, individualized advisals often serves as a prompt for noncitizens to express a fear while in CBP custody. This is, in part, because CBP understands that TCOs coach noncitizens and advise them to listen for certain words in the language of particular advisals as a prompt to express a fear. While it is possible that TCOs will provide noncitizens information about how to manifest fear, even in the absence of affirmative advisals, CBP believes that, at least at the outset of the process, individuals without such a fear or intent to seek asylum are less likely to remember the information a TCO provided in the absence of individualized advisals. Additionally, CBP believes that individuals who do have a fear of return or intend to seek asylum will generally make such a claim even in the absence of such advisals.

[223] See, e.g., USCIRF Report at 16–18.

[224] DHS considered whether to provide a short, individualized advisal to inform noncitizens of their ability to seek asylum, in addition to these signs and videos. But DHS determined that such a short, individualized advisal would be unlikely to convey information more effectively than the signs and videos that CBP already intends to use as a general notification, and that even a short advisal would take undue time to administer. Moreover, CBP assesses that the signs and videos providing general notification of the ability to seek asylum are less suggestive than short, individualized advisals would be.

[225] U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm* (notifying the public that U.S. Coast Guard personnel were provided updated training ''on identifying manifestations of fear by interdicted migrants'').

[226] See Huisha-Huisha v. Mayorkas, 27 F.4th 718, 732–33 (D.C. Cir. 2022); CBP, Office of Field Operations, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022); USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022).

[227] See U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm* (noting implementation of training that ''demonstrates different ways a migrant might express a verbal or non-verbal manifestation of fear'').

[228] Id.

STB_AR1_000165

identify noncitizens with potential fear or asylum claims under a manifestation approach. Therefore, DHS believes that this rule remains consistent with the need to "safeguard[]" the rights of asylum seekers. *See* 62 FR at 10319. Because an immigration officer's observation of whether a noncitizen manifests a fear—rather than a noncitizen's answers to affirmative questions regarding asylum—will lead to a referral to an AO for a fear screening, this standard may result in a greater proportion of those referred to an AO being individuals with meritorious claims.

Additionally, the manifestation standard in the rule will enable DHS to streamline the process, allowing it to process noncitizens in a more expeditious manner during the emergency border circumstances identified in the Proclamation and this rule. In particular, DHS anticipates that omitting the requirement to complete Form I–867A and I–867B will save about 20 to 30 minutes per noncitizen, providing DHS with—based on the number of cases in March 2024— approximately 14,000 extra personnel hours per month.[229] This increased efficiency is critical for processing noncitizens in an expeditious way, and thus will better ensure that, given the immense challenges of irregular migration at the southern border, DHS's limited resources are used most effectively while still affording opportunities for noncitizens to seek asylum or protection. Indeed, this is particularly critical in the emergency border circumstances described in the Proclamation and the rule. As discussed above, given the number of noncitizens and the time it takes to process them during periods of heightened encounters, expediting the process is critical for avoiding overcrowding and ensuring safe conditions for those in custody.[230]

For all of these reasons, DHS believes that the "manifestation of fear" standard, as explained in the rule, will enable immigration officers to effectively identify noncitizens who require credible fear interviews while streamlining the process. During the emergency circumstances described in the Proclamation and the rule, it is important for immigration officers to expeditiously process and swiftly apply consequences to noncitizens while still affording access to protection. Here, the Departments are currently facing such emergency circumstances, as explained above in Sections III.B.1 and 2 of this preamble. DHS believes that the approach taken in the rule is the most appropriate one in light of the situation at the southern border, as explained in this rule and as discussed in the Proclamation, balancing the need to protect those who may wish to seek protection in the United States against an urgent need to use DHS resources effectively.

c. Raising the Standard for Protection Screening

Under this rule, if the AO determines that, in light of the limitation on asylum eligibility under 8 CFR 208.35(a), there is not a significant possibility that the noncitizen could establish eligibility for asylum, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim. *See* 8 CFR 208.35(b)(1)(i). The AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b)(2) of the INA, 8 U.S.C. 1231(b)(2).[231] *See* 8 CFR 208.35(b)(2)(i). Likewise, when reviewing a negative credible fear determination, where the IJ concludes that there is not a significant possibility that the noncitizen could establish eligibility for asylum in light of the limitation on asylum eligibility, the IJ will assess whether the noncitizen has established a reasonable probability of persecution because of a protected ground or torture. *See* 8 CFR 1208.35(b)(2)(ii).

The Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and protection under the CAT. As the Departments observed previously, "Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications." 88 FR at 11742. In addition, "the legislative history regarding the credible fear screening process references only asylum." *Id.* at 11743. By contrast, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening procedures are to be employed, while the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions, *see, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2).

Moreover, in past rules applying a "reasonable possibility" screening standard to claims for statutory withholding of removal or CAT protection, the Departments have noted that such a screening standard is used "in other contexts where noncitizens would also be ineligible for asylum." 88 FR at 11743 (citing 8 CFR 208.31(c), (e)); *see also, e.g.,* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264, 36270 (June 15, 2020) (referencing "the established framework for considering whether to grant statutory withholding of removal or CAT protection in the reasonable fear context"). Under the Circumvention of Lawful Pathways rule, "[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum." 88 FR at 11742. For those noncitizens, the Departments implemented a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and protection under the CAT. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). The Departments similarly believe that those who enter across the southern border during the emergency border circumstances identified in the Proclamation and this rule and who are not described in section 3(b) of the Proclamation, do not establish an enumerated exception, and are unable to establish a significant possibility of eligibility for asylum should be screened for protection under a higher screening standard.

The Departments' experience with the Circumvention of Lawful Pathways rule has validated the Departments' choice to use an elevated screening standard to narrowly focus limited resources on those who are likely to be persecuted or tortured and to remove those who are unlikely to establish eligibility for statutory withholding of removal or CAT protection. Under that rule, which

---

[229] At a time savings of 30 minutes per noncitizen, multiplied by 28,466 noncitizens processed for expedited removal in March 2024, *see* OHSS analysis of data downloaded from UIP on April 2, 2024, DHS would save approximately 14,000 hours per month.

[230] *See* Decl. of Matthew J. Hudak ¶¶ 7, 17–22, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[231] As noted above, DHS is also concurrently soliciting comment on the Application of Certain Mandatory Bars Notice of Proposed Rulemaking, which proposes that certain mandatory bars be considered at the screening stage under a reasonable possibility standard.

STB_AR1_000166

uses a "reasonable possibility of persecution or torture" screening standard for statutory withholding of removal and CAT protection claims, the Departments have processed record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies.[232] Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases—this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.[233] Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear of persecution or torture under the "reasonable possibility" standard,[234] compared to an 83 percent credible fear screen-in rate in the pre-pandemic period of 2014 to 2019.[235] From 2014 through 2019, of SWB expedited removal cases with positive fear determinations, less than 25 percent of EOIR case completions ultimately resulted in a grant of protection or relief.[236]

Screening under the "reasonable possibility" standard has allowed the Departments to screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage. Although fewer noncitizens are screened in under the "reasonable possibility" standard applied in the context of the Circumvention of Lawful Pathways rule, that screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule.[237] Under the emergency border circumstances described in the Proclamation and this rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed, and overall border security and immigration systems efficiencies outweigh any challenges related to training on a new screening standard and a possible marginal increase in interview length resulting from the application of a new standard in screening interviews. Likewise, the benefits of this rule, which is consistent with all statutory and regulatory requirements and the United States' international law obligations, outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard. Swiftly removing noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period. See, e.g., 88 FR at 31324 (discussing the success of the CHNV parole processes as being in part due to imposing consequences for failing to use a lawful pathway, namely swift removal); 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).[238]

To allow for swift removals in the case of those noncitizens who the Departments are confident are unlikely to meet their ultimate burden to establish eligibility for statutory withholding of removal or protection under the CAT, the Departments have decided to raise the screening standard to "reasonable probability of persecution or torture" during the emergency border circumstances described in the Proclamation and this rule. The Departments define this "reasonable probability" standard as "substantially more than a reasonable possibility, but somewhat less than more likely than not." 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(ii). Under this standard, a noncitizen would be screened in if they provide credible testimony [239] and set forth a credible claim with sufficient specificity for an AO or IJ to be persuaded that there is a reasonable probability that the noncitizen would be persecuted or tortured so as to qualify for statutory withholding of removal or CAT protection in an ultimate merits adjudication.

The Departments view the difference between the "reasonable possibility" standard and the new "reasonable probability" standard as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony before the AO or the IJ. In particular, although claims based on general fears of return may at times be found to meet the "reasonable possibility" standard where evidence in the record of country conditions

[232] Decl. of Blas Nuñez-Neto ¶ 7, M.A. v. Mayorkas, No. 1:23–cv–01843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1). The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (i.e., positive and negative fear determinations). See id. ¶ 7 n.2.

[233] Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[234] OHSS analysis of data downloaded from UIP on April 2, 2024. At this time, data on EOIR's grant rate under the Circumvention of Lawful Pathways rule is not available because only a small number of cases processed under that rule have been completed. From May 12 through November 30, 2023 (the most recent date for which fully linked records are available), a total of 61,000 SWB expedited removal cases have been referred to EOIR for section 240 removal proceedings, including 1,400 with case completions (2.2 percent). In addition, cases that are already completed are a biased sample of all future completions because in years since FY 2014, the median processing time for cases resulting in relief or other protection from removal has been, on average, about six times longer than the median processing time for cases resulting in removal orders, so reporting on the small data set of already completed cases would yield a relief rate that is artificially low. OHSS analysis of OHSS Enforcement Lifecycle Dataset December 31, 2023 and OHSS analysis of EOIR data as of January 31, 2024.

[235] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[236] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[237] DHS OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[238] See also, e.g., Muzaffar Chishti et al., At the Breaking Point: Rethinking the U.S. Immigration Court System, Migration Pol'y Inst., at 11 (2023), https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border

enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, The U.S. Asylum System in Crisis: Charting a Way Forward, Migration Pol'y Inst., at 9 (2018), https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[239] Credible testimony alone is sufficient in a credible fear screening, and AOs are trained to ask questions to elicit testimony to assist the noncitizen in meeting their burden with testimony alone. Although testimony alone could certainly meet the burden, it is not required that the burden be met solely through testimony. And even though corroborating evidence is not required, AOs will consider any additional evidence the noncitizen presents. Additionally, AOs are trained to conduct interviews of individuals with persecution or non-persecution-related injuries, traumas, or conditions that may impact their ability to provide testimony for themselves.

indicates instances of persecution or torture within the country, such claims are less likely to be sufficient under the "reasonable probability" standard when the noncitizen cannot provide greater detail in their statements and information as to the basis for their individual claim.

The Departments frequently see such general claims of fear that lack specificity at both the screening and merits stage. However, generalized fear of persecution is ultimately not sufficient to establish a claim. *See Sharma* v. *Garland,* 9 F.4th 1052, 1060 (9th Cir. 2023) ("[A]dverse country conditions are not sufficient evidence of past persecution, for the obvious reason that '[t]o establish past persecution, an applicant must show that he as individually targeted on account of a protected ground rather than simply the victim of generalized violence.'" (quoting *Hussain* v. *Rosen,* 985 F.3d 634, 646 (9th Cir. 2012)); *Prasad* v. *INS,* 101 F.3d 614, 617 (9th Cir. 1996) (stating that to establish past persecution, "[i]t is not sufficient to show [the applicant] was merely subject to the general dangers attending a civil war or domestic unrest"); *Al Fara* v. *Gonzales,* 404 F.3d 733, 740 (3d Cir. 2005) ("[G]enerally harsh conditions shared by many other persons do not amount to persecution. . . . [H]arm resulting from country-wide civil strife is not persecution on account of an enumerated statutory factor." (quotation marks omitted)); *see also Debab* v. *INS,* 163 F.3d 21, 27 (1st Cir. 1998) (citing cases).

Moreover, to establish ultimate eligibility for CAT protection, the noncitizen must demonstrate an individualized risk of torture—not a general possibility of it. *See Escobar-Hernandez* v. *Barr,* 940 F.3d 1358, 1362 (10th Cir. 2019) ("[P]ervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there."); *Bernard* v. *Sessions,* 881 F.3d 1042, 1047 (7th Cir. 2018) ("Evidence of generalized violence is not enough; the IJ must conclude that there is a substantial risk that the petitioner will be targeted specifically."); *Lorzano-Zuniga* v. *Lynch,* 832 F.3d 822, 830–31 (7th Cir. 2016) ("[G]eneralized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country."); *Alvizures-Gomes* v. *Lynch,* 830 F.3d 49, 55 (1st Cir. 2016) (country reports demonstrating overall corruption and ineffectiveness of Guatemalan authorities "do not relieve

[the applicant] of the obligation to point to specific evidence indicating that he, personally, faces a risk of torture because of these alleged shortcomings"); *Delgado-Ortiz* v. *Holder,* 600 F.3d 1148, 1152 (9th Cir. 2010) ("Petitioners' generalized evidence of violence and crime in Mexico is not particular to Petitioners and is insufficient to meet th[e] standard [for eligibility for CAT protection].").

Under the "reasonable possibility" standard, a noncitizen presenting a claim based on general civil strife is sometimes found to pass the screening stage even where they provide only general testimony about their fear of harm. For example, a noncitizen may meet the "reasonable possibility" standard where he expresses a fear of being killed by the government upon his return to his native country, United States Government reports indicate the country may engage in human rights abuses, and the noncitizen has been involved in anti-government political activism for years, even absent specific information as to an individualized threat against the noncitizen or any other individuals who have been threatened or harmed. But to meet the "reasonable probability" standard, the noncitizen would either need to explain with some specificity why he thinks he, in particular, is likely to be harmed, or the record would have to reflect some specific information regarding the treatment of anti-government political activists similarly situated to the applicant. Such claims are assessed on a case-by-case basis. As an example, however, were the noncitizen to credibly state that he knew, and to provide details about, people who are similarly situated to him who have been killed, harmed, or credibly threatened, that testimony may be sufficient to meet the "reasonable probability" standard because it provides more specificity as to why the noncitizen believes he would be harmed. The Departments believe that the "reasonable probability" standard, by requiring additional specificity, will better identify claims that are likely to be meritorious in a full adjudication while screening out those whose claims are not likely to prevail.[240]

The Departments are confident that AOs and IJs can apply this heightened standard effectively to identify those who are likely to have viable claims on the merits while mitigating the possibility that those with a viable claim would be screened out. The level of specificity and certainty that the "reasonable probability" standard requires remains lower than that the ultimate merits standard, and AOs and IJs have the training and experience necessary to elicit the information required to determine whether a case is sufficiently specific to meet the "reasonable probability" standard.[241] This is particularly the case because, in implementing such training, USCIS expects to adapt existing training, including on the ultimate merits standard, to prepare AOs on the "reasonable probability" screening standard, since the way evidence is evaluated remains the same, save for the degree of specificity required. AOs especially have significant training in non-adversarial interview techniques and are required to elicit testimony from the noncitizen—in effect, to help the noncitizen meet their burden through testimony alone.[242] If upon such questioning a noncitizen is unable to provide specific facts that lead the AO or IJ to believe that the noncitizen would be able to meet their burden with more opportunity to prepare, such claims are unlikely to prevail at the merits stage.

Moreover, this heightened screening standard targets information—specificity based on the noncitizen's own knowledge—that should generally be available at the screening stage. A noncitizen at the screening stage generally would have information regarding their fear of harm, such as whom they are afraid of and why, and an AO will elicit information regarding the claim that either is sufficiently specific to satisfy the heightened screening standard or is not. Credible

---

[240] Although the Departments believe the standard will better identify claims that are likely to be meritorious, for now the Departments do not seek to apply the "reasonable probability" standard outside the context of this rule—that is, to those who do not establish a significant possibility of eligibility for asylum because of the limitation on asylum eligibility or, if the limitation is rendered inoperative by court order, to those who are ineligible for asylum under the *Circumvention of Lawful Pathways* rule, *see* 8 CFR 208.35(b)(2)(i) and (3), 1208.35(b)(2)(iii) and (4)—because in this rule

the Departments are addressing emergency border circumstances rather than to regulating to change the status quo. The Departments may consider such changes in future rulemaking.

[241] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[242] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

STB_AR1_000168

testimony alone can satisfy the noncitizen's burden and is sometimes the only available evidence of persecution or torture. *See, e.g., Matter of Mogharrabi,* 19 I&N Dec. 439, 443 (BIA 1987). In most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony. Instances of past harm or those that inform a future fear of return that caused a noncitizen to seek protection generally occur before entry and would not be expected to develop after the fact of entry or after the screening stage. Hence, the Departments believe that this standard will screen out claims that are likely to fail at the merits stage and poses only a minimal risk of screening out claims that could ultimately succeed. For example, if a noncitizen does not know who harmed or would harm them or why, in the Departments' experience, AOs and IJs will often be able to determine—depending on the facts of the case—that it is unlikely that the noncitizen will be able to provide answers to those critical questions at the merits stage.

In addition, AOs and IJs also receive training in, and have substantial experience weighing, country conditions, which will further help them assess whether and under what circumstances the lack of specificity in a noncitizen's testimony indicates that they have little prospect of meeting their ultimate burden.[243] For example, it may

be the case that where a noncitizen expresses only generalized fear of harm based on their ethnicity, but country conditions confirm serious, ongoing harm in the form of widespread, systematic persecutory acts by government institutions targeting individuals who are similarly situated to the noncitizen, adjudicators will rely on that information to deem the "reasonable probability" standard satisfied.

AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards, so they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage.[244] Moreover, all credible fear determinations must be concurred upon by a supervisory AO before they become final to ensure quality and consistency and will be subject to de novo IJ review if requested by the noncitizen. *See* 8 CFR 235.3(b)(7), 235.15(b)(2)(i)(B), 1208.35(b).

Although AOs, supervisory AOs, and IJs will have to be trained on applying the new "reasonable probability of persecution or torture" standard, the standard as explained above is not a

significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis. Rather, it is a matter of degree—to meet the "reasonable probability of persecution or torture" standard, the noncitizen must present more specificity than is required to meet the "reasonable possibility of persecution or torture" standard, but not so much as to establish ultimate eligibility for protection. Indeed, to meet the ultimate standard, noncitizens may still be required to provide more evidence—whether testimonial or documentary.

The Departments do not believe that applying the "reasonable probability of persecution or torture" standard will increase the time required for credible fear interviews by any great margin. AOs generally ask similar questions to elicit information from noncitizens during screening interviews regardless of the standard they will apply to the information elicited. The difference will be whether the information provided as a result of those questions reaches the required level of specificity. That said, there may be cases where an AO believes that the noncitizen may be able to meet the "reasonable probability of persecution or torture" standard after answering a few additional questions. But even if there is a marginal increase in the length of some interviews, the Departments believe that the interest in swift removal of those unlikely to establish eligibility for protection during emergency border circumstances outweighs the risk of some interviews taking longer.[245] This is because a higher standard will be more likely to create a deterrent: Those less likely to establish eligibility for statutory withholding of removal or CAT protection will be swiftly removed rather than being released and waiting years for a hearing, or in some cases, absconding and remaining in the United States unlawfully. And this deterrent effect could lead to lower encounter levels as noncitizens and smugglers realize that the process is functioning

---

[243] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); 86 FR at 46918. IJs "receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078, 18170 (Mar. 29, 2022); *see also* EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.* Moreover, IJs are required to maintain professional competence in the law, U.S. Dep't of Justice, Ethics and Professionalism Guide for Immigration Judges § IV (Jan. 26, 2011), *https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf,* which necessarily includes the elements required to establish eligibility for relief or entitlement to protection from removal, *id.* Consistent with their role in adjudicating asylum and related protection applications, IJs have long been able to take administrative notice of commonly known facts, including country conditions evidence. *See* 8 CFR 208.12 (1997) (stating that the adjudicator may rely on information from a variety of sources ranging from the Department of State to credible international organizations or academic institutions); 8 CFR 208.1(a) (1997) (stating this part shall apply to all applicants for asylum whether before an AO or an IJ). Federal Government country

conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information to which IJs often look. *See, e.g., Sowe* v. *Mukasey,* 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (quotation marks omitted)); *Xiao Ji Chen* v. *U.S. Dep't of Justice,* 471 F.3d 315, 341 (2d Cir. 2006) (Department of State country reports are "usually the best available source of information on country conditions" (quotation marks omitted)).

[244] *See* USCIS, *RAIO Directorate—Officer Training: Note Taking* (Feb. 12, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing— Survivors of Torture and Other Severe Trauma* (Nov. 2, 2023); USCIS, *RAIO Directorate—Officer Training: Children's Claims* (Dec. 20, 2020); USCIS, *RAIO Directorate—Officer Training: Interviewing— Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Working With an Interpreter* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[245] In Section III.B.3.b of this preamble, the Departments conclude that there is a need to streamline immigration officers' processing of noncitizens through expedited removal while the Proclamation's suspension and limitation on entry is in effect. That reasoning is not inconsistent with the reasoning here. Because AOs interview only a subset of noncitizens processed through expedited removal, the Departments believe at most a portion of those noncitizens' credible fear interviews may be longer, and, as noted, any marginal increase in the time it takes to conduct some interviews is outweighed by improving deterrence and avoiding erroneous screen-ins, which result in noncitizens being added to the backlog of immigration cases and being released into and remaining in the United States for a significant period of time.

STB_AR1_000169

more effectively.[246] Screening out those unlikely to establish eligibility for protection has the added benefit of saving United States Government resources overall because fewer noncitizens who are unlikely to establish eligibility for protection will be placed into section 240 removal proceedings before EOIR, which as of the end of December 2023 had a backlog of more than 2.7 million cases.[247]

In developing this rule, the Departments considered the possibility that the application of different screening standards to "the same or a closely related set of facts" might result in inefficiencies. *See* 87 FR at 18091; *see also* 88 FR at 11746. The Departments note, however, that under this rule, that is unlikely to be the case. The facts relevant to whether a noncitizen is subject to the rule's limitation on asylum eligibility will only rarely be relevant to the inquiry into whether the noncitizen has a fear of persecution or torture. For example, whether the noncitizen faced an acute medical emergency that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(A) or 1208.35(a)(2)(i)(A) will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal and so only the "reasonable probability" standard will be applied to the facts relevant to their persecution or torture claim. And where a noncitizen meets such an exception, they will continue to be eligible to pursue asylum in addition to any claim of persecution or torture,

and those claims will all be considered only under the "significant possibility" standard. Similarly, whether a noncitizen faced an imminent and extreme threat to life and safety that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(B) or 1208.35(a)(2)(i)(B) will involve an evaluation of the discrete set of circumstances at the time of the noncitizen's arrival at the border, and will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal. The question of an imminent threat relates to the situation immediately prior to the noncitizen's entry into the United States, rather than necessarily any fear of persecution or torture. Thus, the Departments do not believe there will generally be a need to apply multiple standards to the same set of facts.

**d. The Scope of This Rule**

The Departments have decided to tie the application of this IFR, including the limitation on asylum eligibility, to emergency border circumstances. The suspension and limitation on entry applies beginning at 12:01 a.m. eastern time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. If encounters increase again (including during the 14-calendar-day period), the suspension and limitation will apply again (or continue to apply, as applicable) after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of more than 2,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. These thresholds are consistent with those set forth in sections 2(a) and (b) of the Proclamation.[248] In order to maximize

the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims. However, as described below, DHS has been limited in its ability to do so as a result of capacity and resource constraints. The number of people who can be processed for expedited removal is dependent on the Departments' resources and can be impacted by several factors, including limited detention beds and holding capacity;[249] the presence or absence of sufficient AOs to conduct credible fear interviews for all those who claim a fear or indicate an intent to apply for asylum; the availability of IJs to review negative fear findings; and the ability to repatriate individuals ordered removed in a timely manner—an option that is not always available because, among other things, it relies on independent decisions made by foreign governments.

Sustained high encounter rates threaten to overwhelm the Departments' ability to effectively process, detain, and remove the migrants encountered, as appropriate, in a timely manner. *See* 88 FR at 31316. The President has determined that the suspension and limitation on entry is necessary to manage encounter levels. The Departments have determined that emergency border circumstances described in the Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard because, in such circumstances, DHS lacks the capacity to deliver timely consequences, and absent this rule, must resort to large-scale releases of noncitizens pending section 240 removal proceedings, which leads to significant harms and threatens to incentivize further migration by individuals who recognize the

---

[246] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.").

[247] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[248] The 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained. The absence of a similar waiting period prior to a reactivation reflects the operational exigencies in a circumstance in which there has been a 7-consecutive-calendar-day average of more than 2,500 encounters and is necessary to avoid a surge to the border in advance of a reactivation. As the Departments have explained, the preliminary data pulled from DHS's operational systems have not undergone a full validation process. *See supra* note 5. But a rapid policy and operational response to emergency border circumstances requires relying on this more recent data when making factual determinations consistent with sections 2(a) and

2(b) of the Proclamation. Hence, the data used to make these factual determinations may differ somewhat from the more definitive numbers that ultimately emerge from DHS's full validation process.

[249] *See, e.g.,* Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, H1812 (daily ed. Mar. 22, 2024).

STB_AR1_000170

limitations on the ability to deliver timely consequences.[250]

DHS simply lacks sufficient resources to detain and conduct credible fear interviews for the number of noncitizens arriving each day who claim a fear of return when processed through expedited removal. This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting DHS's ability to swiftly deliver consequences on individuals who do not have a legal basis to remain in the United States.[251] The Departments have determined that the 1,500-encounter threshold is a reasonable proxy for when the border security and immigration system is no longer over capacity and the measures adopted in this rule are not necessary to deal with such circumstances.

At the outset, it is important to put the threshold in context. From FY 2000 through FY 2008, USBP encounters between POEs averaged approximately 3,000 per day, routinely including monthly averages over 3,500 for a few months most springs.[252] The vast majority (94 percent) of individuals encountered by USBP during this period were Mexican nationals, and very few of those who were processed for expedited removal claimed a fear of return or an intent to seek asylum during that process—fewer than one percent of all CBP SWB encounters.[253] As a result, DHS and its predecessor agency were able to swiftly remove or voluntarily return the vast majority of those

encountered at the SWB using comparatively few resources. *See* 88 FR at 11708, 11716.

From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period—May 2019 when USBP encounters peaked at 4,300 during that year's surge.[254] Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs even above 2,500 per day.[255] In fact, for the 15 years prior to March 2021, DHS did not experience a single month with more than 5,000 total average daily encounters.[256] However, during that time, the demographics of these encounters changed significantly, with nationals from the northern Central American countries steadily increasing as a proportion of encounters, becoming a majority of individuals encountered between POEs for the first time in history in 2017—a trend that continued until 2020. Starting in 2014, families and UCs increased as a proportion of USBP encounters as well, reaching a high of 65 percent of encounters in 2019.[257] Finally, and as described in

greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever, accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low.[258]

The change in the nationalities and demographics being encountered at the border has coincided with a dramatic increase in the number of individuals who claim fear when they are processed at the border. Between 2005 and 2015, the proportion of noncitizens encountered by CBP and processed for expedited removal who claimed fear ranged from 5 percent at the low end to 26 percent at the high end.[259] Driven by the changing demographics at the border, both the percentage of those processed for expedited removal as well as the percentage of those processed for expedited removal who claimed a fear of return or an intent to seek asylum generally increased during this time frame.[260] This, in turn, has resulted in a steep increase in the number of credible fear interviews that USCIS is required to conduct.[261]

In 2023, a record 59 percent of encounters at and between POEs on the SWB that were processed for expedited removal resulted in fear claims. From 2016 to 2023, the percentage of SWB encounters processed for expedited removal who claimed a fear dipped below 41 percent just once, in FY 2020, the first year of the COVID–19

---

[250] See Section III.B.2 of this preamble. The Departments acknowledge that, despite the protections preserved by the rule and the available exceptions, the provisions adopted by this rule will result in the denial of some asylum claims that otherwise may have been granted and, as with all screening mechanisms, there is some risk that a case that might otherwise warrant protection might not proceed to a merits adjudication. However, in light of the emergency circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate and necessary. And given the Departments' experience with asylum and protection screenings and adjudications, the Departments believe the rule's provisions will produce accurate outcomes, although the Departments believe the rule continues to be justified even if that expectation turns out to be misplaced in close cases.

[251] See CBP, *Custody and Transfer Statistics* (May 15, 2024), *https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (detailing the number of individuals processed for expedited removal compared to another processing disposition, including section 240 proceedings).

[252] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 3,000 per day from FY 2004 to FY 2008; data on encounters at POEs are not available prior to FY 2004.

[253] OHSS analysis of March 2024 OHSS Persist Dataset.

[254] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) averaged approximately 1,500 per day during this period. For most of this period (from FY 2009 through FY 2018), the share of encounters processed for expedited removal and the share of those processed through expedited removal making fear claims generally increased, so that during FY 2018, 41 percent of SWB encounters were processed for expedited removal and 45 percent of those processed for expedited removal made fear claims, yielding an all-time high of 18 percent of all encounters making fear claims. OHSS analysis of March 2024 OHSS Persist Dataset. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that the vast majority (84 percent) of all fear claims made in prior years were made by SWB encounters. Even if 100 percent of fear claims made before FY 2013 were made by SWB encounters, FY 2018 would represent the all-time highest percentage of all encounters making fear claims.

[255] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

[256] OHSS analysis of March 2024 OHSS Persist Dataset.

[257] OHSS analysis of March 2024 OHSS Persist Dataset. Northern Central Americans accounted for 54 percent of encounters between POEs in 2017. Northern Central Americans' proportion of encounters between POEs continued to increase until it reached 71 percent of USBP encounters in 2019 but dropped at the onset of the pandemic, in 2020, to less than 26 percent. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/*

*immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

[258] OHSS analysis of OIS Yearbook of Immigration Statistics 1980–1999 and OHSS analysis of March 2024 OHSS Persist Dataset. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship"). Nationality breakouts of border encounters are not available prior to 1980, but Mexicans accounted for 97 percent of encounters for all of 1980 through 1999 and never accounted for less than 96 percent in any fiscal year during that period.

[259] OHSS analysis of March 2024 OHSS Persist Dataset.

[260] The percentage of those processed via expedited removal fell again in 2019 due to resource constraints. OHSS analysis of March 2024 OHSS Persist Dataset.

[261] The share of noncitizens encountered by CBP at and between POEs who were processed through expedited removal increased from 6 percent in FY 2005 to between 39 and 47 percent each year from FY 2012 to FY 2018, but then dropped in FY 2019 because DHS was unable to scale up expedited removal processing in proportion to the substantial increase in USBP encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

STB_AR1_000171

pandemic.[262] The global COVID–19 pandemic briefly interrupted this trend, which has continued after the lifting of the Title 42 public health Order in May 2023. Between May 12, 2023, and the end of March 2024, DHS processed a record number of individuals through expedited removal as it sought to maximize the consequences at the border, and 54 percent of noncitizens processed for expedited removal indicated a fear of persecution or intent to seek asylum.[263] As part of DHS's comprehensive effort to impose strengthened consequences at the border after the lifting of the Title 42 public health Order, USCIS reassigned a significant number of AOs to conduct credible fear interviews, which resulted in USCIS completing a record number of such interviews. In fact, USCIS conducted more interviews from SWB encounters during the span of ten and a half months after the lifting of the Title 42 public health Order than in any full fiscal year prior to 2023, and twice as many as the annual average from FY 2010 to FY 2019.[264]

As DHS transitioned from the enforcement of the Title 42 public health Order at the border to full use of its title 8 authorities after May 11, 2023, DHS's capacity constraints—and the impact of those constraints on DHS's ability to impose consequences on noncitizens who cross unlawfully or without authorization—have come increasingly into focus. Given these real resource constraints, DHS has had to make hard choices about whom it can prioritize for detention or refer into expedited removal.[265] As a result of a lack of sufficient holding spaces, detention beds, and AOs, DHS has only been able to refer certain noncitizens into expedited removal—which, as detailed above, is the most efficient tool available under title 8 authorities to impose swift consequences for irregular migration. This means that DHS cannot impose consequences swiftly or predictably on most people encountered at the border, feeding the narrative pushed by smugglers that irregular

migrants will be able to stay in the United States.[266]

The expedited removal process requires the outlay of significant Government resources. When a noncitizen in expedited removal indicates an intention to seek asylum or a fear of persecution, rather than being swiftly removed, they are referred to an AO for a credible fear interview and may seek review of any negative screening by an IJ—all of which takes time and Government resources. As described in further detail above, DHS has made significant process enhancements to reduce the overall time it takes for individuals to proceed through this process. However, the availability of sufficient numbers of AOs to conduct credible fear interviews is critical to DHS's ability to quickly adjudicate fear claims and deliver consequences to those who do not have a credible fear of persecution or torture.

As described above, Congress has failed to provide the additional resources requested for USCIS that would have increased the number of AOs that are available to conduct credible fear interviews for SWB cases. This reality, combined with increases in encounters at the border, and increases in the proportion of noncitizens processed for expedited removal who claim fear of return, means that DHS cannot impose consequences swiftly or predictably on most people whom DHS encounters. Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings,[267] undercutting the effectiveness of the previous measures that have been implemented. This reality contributes to the vicious cycle described above in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.

As a result of the changes to the nationalities and demographics being encountered at the border, and the associated increase in the rate of claiming fear by individuals encountered, the amount of resources required to deliver consequences quickly through referrals into expedited removal for the vast majority of individuals who claimed a fear in 2000 (when DHS's predecessor agency averaged 3,000 to 7,000 daily

encounters between POEs) or in 2010 (when DHS averaged 1,000 to 2,000 daily encounters between POEs) was far lower than the amount of resources required to manage the same number of encounters today.[268]

Of course, as noted above, DHS has been experiencing much higher encounter levels,[269] and simply does not have the resources it would need to place into expedited removal the majority of those encountered by USBP who are amenable to such processing. Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.[270] When DHS does not

---

[262] OHSS analysis of March 2024 OHSS Persist Dataset.

[263] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[264] OHSS analysis of data downloaded from CBP UIP on April 2, 2024. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is only available since FY 2013; for the years prior to FY 2013 there was no full fiscal year in which the total number of USCIS fear claims was equal to the number of fear claims completed for SWB encounters processed for expedited removal between May 12, 2023, and March 31, 2024.

[265] ICE, *Fiscal Year 2023 ICE Annual Report* 17–18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf.*

[266] March 2024 OHSS Persist Dataset.

[267] OHSS analysis of March 2024 OHSS Persist Dataset.

[268] March 2024 OHSS Persist Dataset. The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010. OHSS Persist Database March 31, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

[269] Even as compared to the 2,000 to 7,000 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher. In FY 2023, there were 3,300 to 7,300 such daily encounters, and from October 2023 through March 2024, the corresponding numbers are 4,000 to 8,300. March 2024 OHSS Persist Dataset.

[270] *See* OHSS analysis of data downloaded from UIP on April 2, 2024. CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000. *See* OHSS analysis of March 2024 OHSS Persist Dataset. In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

Continued

STB_AR1_000172

have the capacity to process individuals through expedited removal or detain noncitizens to await their proceedings, releasing individuals into the interior of the United States is generally the only option that is left.[271] The need to release individuals at the border has increased over time and peaked during surges.

By contrast, when encounters (excluding UCs from non-contiguous countries and noncitizens determined to be inadmissible at a SWB POE) are below 1,500 per day, DHS will be able to refer more individuals it encounters into expedited removal and deliver a swift consequence to the majority of individuals it encounters who do not establish a legal basis to remain in the United States—in the form of a return or removal. Given limited congressional appropriations and agency funding levels, DHS has a finite capacity to deliver such consequences at the border, which is reflected in the number of individuals that can be processed through expedited removal on any given day. As detailed above, DHS over the past year has significantly streamlined the expedited removal process and has set records in terms of individuals placed in expedited removal by CBP at the SWB and credible fear interviews conducted by AOs. Given current resources, however, and in the absence of congressional action, there is a limit

on how many people can be put through the process—and that limit directly informs the 1,500 threshold.

From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.[272] During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b).[273] This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.[274] As discussed previously, of those individuals encountered by USBP and placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found not to have a credible fear and are ordered removed.[275] This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.[276]

Simply put, at 1,500 daily encounters, DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries. DHS would also be able to minimize releases of those who are amenable to expedited removal or transfer them to ICE custody pending immigration proceedings. By contrast, above 2,500 encounters—the level at which the Proclamation and the rule would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level. At the 2,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements described above, DHS would be able to place just 43 percent of the individuals who are not quickly repatriated into expedited removal—significantly less than the 70 percent under the 1,500-encounter threshold.[277] This would, in turn, lead to a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States, with DHS only able to quickly remove or return substantially less than half of the individuals it encounters.[278] Moreover, the percentage of people who can be referred to expedited removal and ultimately be quickly removed if they do not establish a legal basis to remain decreases rapidly as encounters increase beyond 2,500 given the baseline constraints outlined above.

This difficulty in imposing swift consequences on individuals without a legal basis to remain in the United States during periods of elevated

CBP held an average of 21,863 noncitizens in custody each day during December 2023, averaging 104 percent of CBP's daily custody capacity (21,042) roughly each day for the entire month. OHSS analysis of data downloaded from UIP on February 14, 2024.

EOIR had a backlog of over 2.7 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline*; *see also* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape*, Migration Pol'y Inst., at 1 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); UNHCR, *Global Trends: Forced Displacement in 2022*, at 2, 8–9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases).

[271] Consistent with the Departments' conclusion in the Circumvention of Lawful Pathways rule, the Departments believe the emergency border circumstances described in the Proclamation and this rule cannot be addressed by relying on the programmatic use of its contiguous territory return authority at section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), due to resource constraints and foreign affairs considerations. *See* 88 FR at 31370; 88 FR at 11731.

[272] OHSS analysis of data downloaded from UIP on April 2, 2024.

[273] Based on comprehensive CBP processing dispositions for single adults, family units, and UCs from contiguous countries encountered May 12, 2023 to March 31, 2024; data downloaded from UIP on April 2, 2024.

[274] At 1,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 1,250 encounters would not be subject to rapid repatriation, including 1,240 who would potentially be amenable to expedited removal. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 72 percent of people not subject to rapid repatriation and 73 percent of potentially amenable single adults and family units into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024. Applying the rule even more broadly based on a lower threshold would also raise countervailing considerations, *see supra* note 250, and so the Departments have struck the balance reflected in the rule.

[275] OHSS analysis of data downloaded from UIP on April 2, 2024.

[276] At 1,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 250 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be

repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 830 repatriations (sums do not add due to rounding), or 56 percent of encounters.

[277] At 2,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 2,080 encounters would not be subject to rapid repatriation. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 43 percent of people not subject to rapid repatriation into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024.

[278] At 2,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 420 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 1,010 repatriations (sums do not add due to rounding), or 40 percent of encounters.

STB_AR1_000173

encounters is borne out by both recent experience, which is detailed in Sections III.B.1 and 2 of this preamble, and by historical data. DHS historical data also clearly show the dichotomy between the outcomes for individuals processed at the border at the 1,500- and 2,500-encounter levels. DHS data show that releases from CBP custody as a share of encounters have generally been highest during periods of sustained high-encounter levels, and lowest when encounters have been at 1,500 or below. For example, from FY 2013 through FY 2019, months with average daily USBP encounters of fewer than 1,500 per day resulted in a minimal level of releases due to capacity constraints at the border.[279] During the 2013 to 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. During that 7-year stretch, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 individuals released each day, while months in which daily encounters exceeded 2,500 resulted in approximately 1,300 releases each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings.[280]

It is important to note, however, the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals. During the 2013 to 2019 time frame—which forms the basis for the analysis in the preceding paragraph—the vast majority of encounters at the border were from Mexico, El Salvador, Guatemala, and Honduras—countries that are comparatively easy to return people to.[281] Today, a much higher proportion of SWB encounters are from other countries that are comparatively much more difficult to return people to, including record numbers from the Eastern Hemisphere.[282] At the same time, the proportion of encounters

involving family units and UCs, although still high, is lower today than it was during periods of high numbers of encounters and releases in FY 2019.[283] Although shifting demographics affect the Departments' capacity to deliver timely decisions and timely consequences at varying levels of encounters, it remains clear that with the challenging demographics being encountered today, DHS would have the ability to deliver a timely consequence to the majority of people it processes at the border when encounters are below 1,500—supporting the decision to suspend the application of the rule when DHS reaches that level of encounters over a 7-day average. Likewise, as discussed above, the Departments have concluded that it is reasonable to apply the rule when encounter levels rise above a 7-day average of 2,500 due to the sharp decrease in their ability to swiftly impose meaningful consequences at the border once encounters exceed that level.

Lastly, it is important to note that using a single threshold—for example, 1,500 encounters—to activate or deactivate the measures in this rule would pose significant challenges and not be operationally viable. Having a single threshold would likely lead to scenarios where the rule would be regularly activated and deactivated as the 7-day average rose above and below 1,500, which would have significant operational impacts for CBP, ICE, and USCIS, and be confusing for government personnel, migrants, and other key stakeholders. For example, the Departments will need to notify and provide guidance to their personnel to apply the provisions of this rule in connection with each activation and deactivation. These actions represent a burden on staff time and resources that would have negative operational impacts if activation or deactivation happened regularly. CBP and ICE will also face scenarios in which they would have many people in their custody some of whom would be subject to and others of whom would not be subject to the provisions of this rule, and CBP and ICE will need to keep track of which individuals needed to be processed under which procedures—something that could become extraordinarily complex and unwieldy if the rule were to be activated and deactivated regularly. Legal service providers and migrants would similarly face a great

deal of confusion about when the provisions of this rule were in effect based upon a single threshold of 1,500 encounters to activate or deactivate the measures in this rule. The burden of tracking, identifying, and applying different standards that change back and forth over a matter of days is significantly more complex for USCIS personnel as they consider protection claims.

For all of these reasons, it is important to ensure that there is a clear division between the levels at which the rule is deactivated and when it is activated. And to ensure that stakeholders are aware of when the rule is deactivated and activated, DHS will notify the public about Secretarial determinations of the encounter levels described in sections 2(a) and 2(b) of the Proclamation. As noted above, the 2,500-encounter level is a good proxy for when DHS's ability to quickly impose consequences at the border for individuals who do not establish a legal basis to remain is becoming so degraded that it is likely to further incentivize additional unlawful crossings. It also has the benefit of increasing the time that would elapse between deactivations and activations, allowing DHS to ensure that its personnel are not having to constantly switch back and forth between different procedures.[284]

The exclusion of those determined to be inadmissible at a SWB POE from the 1,500- and 2,500-encounter thresholds is also reasonable in light of recent policy decisions, processing experience, and operational needs. Since May 12, 2023, SWB daily POE encounters have averaged 1,650—largely because DHS has been incentivizing individuals to present at POEs in a safe, orderly manner.[285] This number has stayed relatively constant compared to the number of encounters between POEs, which have varied widely, from a low of 2,554 on May 21, 2023, to a high of 10,822 on December 18, 2023.[286] The predictability in the number of POE encounters, paired with the processing efficiencies gained by the widespread use of the CBP One app, improves CBP's

---

[279] For FY 2013 to FY 2019, in months with fewer than 1,500 encounters between POEs, USBP released an average of 11 encounters per day. OHSS analysis of March 2024 OHSS Persist Dataset.

[280] OHSS analysis of March 2024 OHSS Persist Dataset.

[281] OHSS analysis of March 2024 OHSS Persist Dataset.

[282] OHSS analysis of March 2024 OHSS Persist Dataset.

[283] UCs and family units accounted for 65 percent of USBP encounters in FY 2019, compared to 45 percent in FY 2024 through March. OHSS analysis of March 2024 OHSS Persist Dataset.

[284] The Departments recognize that, due to the rule's approach, at a given encounter level between 1,500 and 2,500 encounters per day—such as 2,000 encounters a day—whether the rule applies will be path dependent. If encounters have been above 2,500, the rule will apply. If encounters have been below 1,500, the rule will not apply. This is a necessary consequence of providing the clear division that the Departments have deemed necessary, and the Departments assess that adopting this approach best balances the relevant considerations.

[285] OHSS analysis of March 2024 OHSS Persist Dataset.

[286] OHSS analysis of March 2024 OHSS Persist Dataset.

ability to manage encounters at POEs. The vast majority of noncitizens who present at a SWB POE have done so after having registered with the CBP One app.[287] Because such individuals have registered with the CBP One app, CBP can process these individuals more efficiently and in a more orderly way than individuals encountered between POEs.[288] This is a critical element of our strategy to encourage the use of safe, orderly, and lawful pathways, as described above, to incentivize noncitizens to seek out lawful pathways instead of attempting to cross into the United States irregularly. CBP officers will determine the most appropriate processing disposition on a case-by-case basis, although DHS expects to generally issue such individuals an NTA for removal proceedings under section 240 of the INA.

In short, DHS has assessed that the emergency border circumstances that are described by the Proclamation and this rule—and that the President has concluded warrant the step of suspending and limiting entry—reasonably capture the capacity of the border security and immigration systems to deliver consequences in a timely manner to individuals who cross unlawfully or without authorization. Thus, the Departments have determined to tie the application of the rule's provisions to the date that the Proclamation takes effect, and to include a mechanism to temporarily halt the application of the rule's provisions when encounters between POEs reach 1,500 and to restart the application of its provisions if they once again rise above 2,500. Because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation, the Departments intend for the Secretary of Homeland Security to continue to make the factual determinations regarding the 1,500 and 2,500 thresholds described in this rule and in sections 2(a) and 2(b) of the Proclamation, even if the Proclamation is enjoined, in order to provide continuity during emergency border circumstances. Lastly, the Proclamation may be revoked by the President upon a determination that it is no longer needed.[289]

## C. Section-by-Section Description of Amendments

### 1. 8 CFR 208.13 and 1208.13

DHS and DOJ are adding a paragraph (g) to the end of 8 CFR 208.13 and 1208.13, respectively, *Establishing asylum eligibility,* to explain when a noncitizen is potentially subject to this IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13. Paragraph (g) refers the reader to the new regulatory provisions at 8 CFR 208.35 and 1208.35 that establish the limitation on eligibility for asylum where a noncitizen entered the United States across the southern border during emergency border circumstances.

### 2. 8 CFR 208.35

DHS is adding to 8 CFR part 208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DHS is adding a new § 208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and screening procedures related to the application of such limitation in expedited removal proceedings and the conduct of credible fear screenings during the emergency border circumstances. This provision applies notwithstanding any contrary provision of part 208.

Section 208.35 consists of the following provisions:

Paragraph (a) sets forth the limitation on asylum eligibility. Under the rule, a noncitizen is ineligible for asylum if the noncitizen is described in § 208.13(g) and not described in section 3(b) of the Proclamation. This approach is consistent with the general policy of the Proclamation and rule and provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways, such as for those who arrive in the United States at a southwest land border POE pursuant to a process approved by the Secretary of Homeland Security.[290]

Paragraph (a)(2) contains provisions regarding an exception to the limitation on asylum eligibility that aligns with the means for rebutting the presumption of asylum ineligibility in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). The exception applies if the noncitizen, or the noncitizen's family member as described in § 208.30(c) with whom the noncitizen is traveling, demonstrates by a preponderance of the evidence exceptionally compelling circumstances, including that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in § 208.30(c) with whom the noncitizen is traveling:

• Faced an acute medical emergency;
• Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or
• Satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

Paragraph (a)(2)(ii) makes clear that where a noncitizen establishes one of the above, they shall necessarily have established exceptionally compelling circumstances. This exception for exceptionally compelling circumstances limits the potential adverse effects of the limitation on asylum eligibility on certain particularly vulnerable populations, and family members with whom they are traveling, without undermining the key policy imperative to disincentivize irregular migration during a time when encounters are above certain benchmarks.[291] Paragraph (a)(2)(iii) deems those who have established exceptionally compelling circumstances for purposes of this asylum limitation or who are described in the provisions of the Proclamation as being excepted from its suspension and limitation on entry as having established exceptionally compelling circumstances for purposes of the Lawful Pathways condition. This provision is intended to simplify administration of this asylum limitation while it and the Circumvention of

---

[287] OHSS analysis of March 2024 OHSS Persist Dataset.

[288] *See, e.g.,* 88 FR at 11719.

[289] The Departments have not sought to apply the rule even after any revocation of the Proclamation by the President, because the Departments expect that any such revocation would only follow consultation with the Departments regarding the policy and operational implications of such an

action. Moreover, a decision by the President would reflect important changed circumstances, and the Departments would want to take into account those changed circumstances in assessing the appropriate policy as to the issues covered by this rule.

[290] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures To Humanely*

*Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[291] *See, e.g.,* 88 FR at 31325 ("These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.").

Lawful Pathways rule are both operative.

Paragraph (b) prescribes procedures for considering the limitation on asylum eligibility during the credible fear screening process and for applying the "reasonable probability" standard in the event the Proclamation or the limitation on asylum eligibility are rendered inoperable by court order. Under paragraph (b)(1), the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the limitation on asylum eligibility in paragraph (a). The paragraph sets forth three possible procedural scenarios depending on the AO's findings. First, where the AO determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a)—including that there is not a significant possibility, *see* INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii),[292] that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception to the limitation under paragraph (a)(2), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim and continue to consider the noncitizen for potential eligibility for statutory withholding of removal and CAT protection under the procedures in paragraph (b)(2), as described below. *See* 8 CFR 208.35(b)(1)(i). Second, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 208.13(g), the AO will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 208.33(b). *See id.* 208.35(b)(1)(ii). This provides that those noncitizens who are not subject to the Proclamation because they did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 208.33(b)(1)(ii), if the noncitizen is not subject to that condition, they will be screened for a significant possibility of

eligibility for statutory withholding of removal or CAT protection consistent with § 208.30.[293] Third, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the AO will conduct the screening consistent with 8 CFR 208.30. *See id.* 208.35(b)(1)(iii).

If the AO determines that the noncitizen is subject to paragraph (a) and cannot establish a significant possibility that they will be able to establish exceptionally compelling circumstances by a preponderance of the evidence per paragraph (a)(2), the AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b) of the INA, 8 U.S.C. 1231(b). *See* 8 CFR 208.35(b)(2)(i). As noted above, for purposes of this section, reasonable probability means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the noncitizen would be persecuted because of his or her race, religion, nationality, membership in a particular social group, or political opinion, or tortured, with respect to the designated country or countries of removal. *See id.*

If the noncitizen establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, DHS will issue a positive credible fear determination and follow the procedures in § 208.30(f). *See id.* 208.35(b)(2)(ii). Under § 208.30(f), USCIS may issue an NTA for removal proceedings under section 240 of the INA, or, in its discretion, retain the application for an asylum merits interview pursuant to § 208.2(a)(1)(ii). Under the regulations governing the asylum merits interview process, where USCIS exercises its discretion to retain jurisdiction over an application for asylum of a noncitizen found to have a credible fear of persecution or torture

pursuant to § 208.30(f), the written record of the positive credible fear determination is treated as the asylum application. 8 CFR 208.3(a)(2). Under this IFR, however, noncitizens who are subject to the limitation on asylum eligibility under 8 CFR 208.35(a), and fail to show a significant possibility of being able to establish an exception by a preponderance of the evidence at the credible fear interview, will receive a negative credible fear determination with respect to their application for asylum, pursuant to § 208.35(b)(1)(i), but could go on to receive a positive credible fear determination with respect to a potential claim for statutory withholding of removal or protection under the CAT at the reasonable probability of persecution or torture standard. *See id.* 208.35(b)(2).

In the event that USCIS were to exercise its discretion to place such a case into the asylum merits interview process, the credible fear record in that case would have found the applicant unable to establish eligibility for asylum under § 208.35(a) and the positive determination would be based only on a potential statutory withholding of removal or protection under the CAT claim. USCIS may thus need supplementary information to constitute an application for asylum, as the asylum claim may not have been fully explored in the credible fear record given that the AO determined the applicant would have been ineligible for asylum based on the rule's limitation on asylum eligibility. Therefore, § 208.35(b)(2)(ii) allows USCIS to require a noncitizen who received a negative credible fear determination with respect to their application for asylum pursuant to § 208.35(b)(1)(i), but whose application is nonetheless retained by USCIS for asylum merits interview proceedings, to submit an asylum application to USCIS within 30 days of service of the positive credible fear determination, to ensure that there is a record of their potential asylum claim to serve as a substantive asylum application. For purposes of the filing and receipt date, the date of service of the positive credible fear determination will continue to serve as the date of filing pursuant to § 208.3(a)(2); however, if USCIS requires the submission of an asylum application, the timelines laid out in § 208.9(a)(1) and § 208.9(e)(2) may be delayed up to 15 days, considering the need to allow extra time for the submission of an asylum application to USCIS following service of the positive credible fear determination. *See id.* 208.35(b)(2)(ii). Under this IFR, if the applicant does not submit the

---

[292] In the *Circumvention of Lawful Pathways* rule, the Departments described how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard. *See* 88 FR at 31380. That discussion in the *Circumvention of Lawful Pathways* rule also applies to AOs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, AOs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

[293] In such cases, consistent with the *Circumvention of Lawful Pathways* rule, DHS would also have discretion to refer the noncitizen to EOIR for section 240 removal proceedings. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520 (BIA 2011); *see also* 88 FR at 31348.

application within the time period required, USCIS will refer the noncitizen to section 240 removal proceedings before an IJ. USCIS does not foresee that it would be a prudent use of resources to place such cases into the asylum merits interview process, considering that USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the border. Nevertheless, the IFR preserves the flexibility for USCIS to exercise its discretion to potentially place such cases into the asylum merits interview process (albeit with the potential addition of a supplementary application for asylum) should available resources and circumstances ever be such that it would be prudent to place such cases into the asylum merits interview process.

If the noncitizen fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. *See id.* 208.35(b)(2)(iii). If the noncitizen indicates on the Record of Negative Fear that they request IJ review of the adverse finding, *see id.* 208.35(b)(2)(iv), the AO will serve the noncitizen with a Notice of Referral to Immigration Judge, *see id.* 208.35(b)(2)(v). *See* 88 FR at 11747; 88 FR at 31423. The record of determination, including copies of the Notice of Referral to Immigration Judge, the AO's notes, the summary of the material facts, and other materials upon which the AO based their determination regarding the applicability of the condition on asylum eligibility (which, in cases where the limitation on asylum eligibility created by this IFR applies, includes materials showing the relevant known entry date), will be provided to the IJ with the negative determination. *See* 8 CFR 208.35(b)(2)(v). The IJ would then review the case consistent with § 1208.35, described below.

If, following IJ review, the IJ makes a positive credible fear determination under § 1208.35(b)(2)(iii) or § 1208.35(b)(4), the case will proceed under § 1208.30(g)(2)(iv)(B). *See id.* 208.35(b)(2)(v)(A). The IJ may vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with 8 CFR 1208.2(a)(1)(ii). *See id.* 1208.30(g)(2)(iv)(B). Alternatively, DHS may commence section 240 removal proceedings, during which time the noncitizen may file an application for asylum, statutory withholding of removal, and CAT protection in accordance with § 1208.4(b)(3)(i). *See id.* 1208.30(g)(2)(iv)(B).

If the IJ makes a negative credible fear determination, however, the case will be returned to DHS for removal of the noncitizen. *See id.* 208.35(b)(2)(v)(B). Consistent with the purpose of the expedited removal process and this IFR, there would be no appeal from the IJ's decision and DHS would not accept requests for reconsideration. *See id.* USCIS may, however, in its sole discretion, reconsider a negative determination. *See id.;* 88 FR at 11747; 88 FR at 31418–19.

Paragraph (b)(3) applies in the event that the limitation on asylum eligibility in paragraph (a) is rendered inoperative by court order. In such circumstance, those who enter during emergency border circumstances and who are found not to have a significant possibility of eligibility for asylum because of the Lawful Pathways condition will be screened for eligibility for statutory withholding of removal and CAT protection under the "reasonable probability" screening standard. This will ensure continued applicability of that standard during emergency border circumstances, even absent the rule's limitation on asylum eligibility. The Departments acknowledge that under this approach, not all who would have been subject to the higher screening standard if the limitation remained in force would be subject to it in the event of an injunction—*i.e.*, those who do not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence; those excepted from the Lawful Pathways condition under the exceptions at 8 CFR 208.33(a)(2)(ii)(A) and (C); those excepted from the Lawful Pathways condition because they present at a POE without a pre-scheduled time and place and demonstrate that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; and those who enter across the maritime borders covered by the Proclamation that are not covered by the Lawful Pathways condition. The Departments have adopted a somewhat narrower scope for the standard to avoid a circumstance where AOs and IJs would be required to analyze both the applicability of the Lawful Pathways condition and then also whether the noncitizen would otherwise be subject to the rule's limitation—which could complicate and increase the time required to conduct credible fear screenings. The Departments believe the approach adopted strikes the right balance between the interest in applying the screening standard to those to whom it would otherwise apply and administrability in the event the limitation on asylum eligibility is rendered inoperative by court order. The Departments request comment on whether to expressly expand this provision to also apply to those who are found not to have a significant possibility of eligibility for asylum due to a mandatory bar to asylum eligibility if the rule Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024), is finalized.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the DOJ family unity provision in the Circumvention of Lawful Pathways rule. *See* 8 CFR 1208.33(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity posture where the other requirements are met. The expressly permissive, discretionary nature of this provision, which owes in part to the considerations described earlier in this section with respect to asylum merits interviews, distinguishes it from the parallel DOJ provision in the Circumvention of Lawful Pathways rule and the parallel DOJ provision described in the next section of this preamble.

Paragraph (d) mirrors 8 CFR 208.33(c) and 1208.33(d) and specifies the ongoing applicability of the limitation on asylum eligibility by providing that it shall apply to "any asylum application" that is filed by a covered noncitizen "regardless of when the application is filed and adjudicated." *Id.* 208.35(d)(1). The Departments have excepted from this ongoing application of the limitation on asylum eligibility certain noncitizens who enter the United States during emergency border circumstances while under the age of 18 and who later seek asylum as principal applicants so long as the asylum application is filed after the period of time described in § 208.13(g) during which the noncitizen entered. *See id.* 208.35(d)(2). Commenters on the Circumvention of Lawful Pathways rule raised concerns about the impact of that rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents. 88 FR at 31320. The Departments decided to adopt a provision excepting

such children from that rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognized that children who enter with their families are generally traveling due to their parents' decision-making. 88 FR at 31320. The Departments believe that these considerations are also relevant to this rule and have decided to adopt a similar approach as that adopted in the Circumvention of Lawful Pathways rule.

The Departments considered whether to except family units, or children who are part of family units, from the limitation on asylum eligibility entirely. The Departments decline to adopt such an approach. Excepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so. And excepting only the child could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening, as they would not be subject to the limitation but their parents could be. Although accompanied children remain subject to the limitation on asylum eligibility generally, the Departments have determined that the limitation should not apply to them in any application for asylum they file after the relevant period, but only if they apply as a principal (as opposed to a derivative) applicant.

The Departments also considered applying a specific calendar date to this provision, similar to the approach taken by the Departments in the Circumvention of Lawful Pathways rule.[294] The Departments determined that such a provision would be challenging to implement because the Departments have not identified a date certain upon which emergency border circumstances are expected to discontinue. The Departments believe that the key purpose of an asylum application waiting period—protecting against any perceived incentive for family units to migrate irregularly—is adequately served by a requirement that the applicable period of emergency border circumstances is no longer in place at the time of application. For that same reason, the Departments do not believe it is necessary to make this exception unavailable during any period of emergency border circumstances; instead, this exception will be available

after the end of the emergency border circumstance during which the applicant entered. Because noncitizens will not know in advance when the emergency border circumstance will end, and when another emergency border circumstance might occur, the approach adopted in the rule addresses noncitizens' incentives without restricting this exception more than is necessary.

The Departments believe this approach balances the interest in ensuring the limitation has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the limitation, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to children who filed as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the end of the circumstances leading to the suspension and limitation on entry, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the limitation entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exception, in light of the urgent need to gain efficiencies in the expedited removal process and dissuade entry during the circumstances described in the Proclamation and this rule.

Finally, DHS is including a severability clause in this provision. *See* 8 CFR 208.35(e). If any provision of this section, § 235.15, or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DHS intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. Indeed, in this rule, the Departments have sought to avoid describing ''emergency border circumstances'' as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility. This

approach is consistent with the nature of the rule as an emergency measure and reflects DHS's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, even in the absence of the limitation on asylum eligibility, as expressly set forth in paragraph (b)(3), the Department intends that the ''reasonable probability'' standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. Similarly, even in the absence of the new provision at 8 CFR 235.15 discussed below, the changes made in § 208.35 are expected to prove helpful in the emergency circumstances described by the Proclamation and the rule. *See id.* 208.35(e).

### 3. 8 CFR 1208.35

Like DHS's addition to 8 CFR part 208, DOJ is adding to 8 CFR part 1208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DOJ is adding a new § 1208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and procedures related to IJ review of credible fear determinations in expedited removal proceedings during emergency border circumstances. This provision applies notwithstanding any contrary provision in EOIR's regulations. Section 1208.35 consists of the following provisions:

Paragraph (a) mirrors new § 208.35(a), discussed above.

Paragraph (b) provides procedures for credible fear determinations. Under these procedures, when a noncitizen has requested IJ review of an AO's negative credible fear determination, the IJ will evaluate the case de novo, taking into account the credibility of the statements made by the noncitizen in support of the noncitizen's claim and such other facts as are known to the IJ. *See* 8 CFR 1208.35(b)(1). The paragraph sets forth three possible procedural scenarios depending on the IJ's determinations. First, where the IJ determines that the

---

[294] Under that rule, the Lawful Pathways condition does not apply to certain asylum applications filed after May 11, 2025—two years after that rule's initial issuance. 8 CFR 208.33(c)(2), 1208.33(d)(2); 88 FR at 31449.

noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 1208.13(g), the IJ will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 1208.33(b). *See id.* 1208.35(b)(2)(i).[295] This provides that those noncitizens who did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 1208.33(b)(2)(i), if the noncitizen is not subject to that condition they will be screened for a significant possibility of eligibility for statutory withholding of removal or CAT protection consistent with § 208.30. Second, where the IJ determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the IJ will follow the procedures in 8 CFR 1208.30. *See id.* 1208.35(b)(2)(ii). Third, where the IJ determines that the IFR's limitation on asylum eligibility applies—including that there is not a significant possibility that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception under paragraph (a)(2) of the limitation, the IJ will apply the Circumvention of Lawful Pathways rule's procedures set forth in § 1208.33(b)(2)(ii), except that the IJ will apply a "reasonable probability" standard to parallel the standard adopted by DHS. *See id.* 1208.35(b)(2)(iii).

Paragraph (b)(4), mirrors new § 208.35(b)(3), discussed above.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the family unity provision in the Circumvention of Lawful Pathways rule. *See id.* 1208.33(c), 1208.35(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the

IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met.

Paragraph (d) mirrors new § 208.35(d), discussed above.

Paragraph (e) contains a severability provision that serves a similar purpose to the provision in § 208.35(e) described above. If any provision of this section or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DOJ intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. This approach is consistent with the nature of the rule as an emergency measure and reflects DOJ's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, as set forth explicitly in paragraph (b)(4), even in the absence of the limitation on asylum eligibility, the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. *See id.* 1208.35(e).

### 4. 8 CFR 235.15

DHS is adding to 8 CFR part 235, *Inspection of Persons Applying for Admission,* a new § 235.15, *Inadmissible aliens and expedited removal during emergency border circumstances.* New 8 CFR 235.15 will further streamline aspects of the expedited removal process by effectively replacing paragraphs (b)(2)(i) and (b)(4)(i) of 8 CFR 235.3 for those individuals described in § 235.3(b)(1)(i) or (ii) and who are described in § 208.13(g) but not described in section 3(b) of the Proclamation. *See* 8 CFR 235.15. The changes would not affect implementation of 8 CFR 235.3(b)(4)(ii)

or any other portion of 8 CFR 235.3. *See id.* The changes are as follows.

First, under 8 CFR 235.3(b)(2)(i), the record of proceeding includes a sworn statement using Form I–867AB, *Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act.* Under the existing regulations, the examining immigration officer reads (or has read) to the noncitizen all information contained on Form I–867A. Following questioning and recording of the noncitizen's statement regarding identity, alienage, and inadmissibility, the examining immigration officer records the noncitizen's response to the questions contained on Form I–867B, and has the noncitizen read (or has read to the noncitizen) the statement, and the noncitizen signs and initials each page of the statement and each correction, if any.

DHS is adding a new 8 CFR 235.15(b)(2)(i) to apply to certain noncitizens instead of this current process during emergency border circumstances. Under this procedure, Forms I–867A and I–867B will no longer be mandated in such circumstances. Instead, the immigration officer shall advise the individual of the charges against them on the Form I–860 and give him or her an opportunity to respond to those charges. *See* 8 CFR 235.15(b)(2)(i)(B). This provision does not require that the response be done through a sworn statement. *See id.* Consistent with current regulations, however, the inspecting officer must obtain supervisory concurrence of an expedited removal order in accordance with § 235.3(b)(7). *Id.* Moreover, consistent with current regulations, the examining immigration official shall serve the noncitizen with Form I–860, and the noncitizen shall be required to sign the form acknowledging receipt. *Id.* The new 8 CFR 235.15(b)(2)(i) no longer mandates that the signature occur on the reverse, but preserves the requirement that the noncitizen be required to sign, allowing greater flexibility for location of signature blocks on the document. *See id.* 235.3(b)(2)(i). The new provision maintains the requirement that interpretative assistance shall be used if necessary to communicate with the noncitizen. *Id.* 235.3(b)(2)(i)(B). The new 8 CFR 235.15(b)(2)(i) also allows for greater flexibility regarding how DHS records the information that supports the finding that the noncitizen is inadmissible and subject to expedited removal. This operational flexibility is consistent with the President's determination that emergency border circumstances are present such that the suspension and limitation on entry is warranted.

---

[295] As explained above regarding AOs, the discussion in the Circumvention of Lawful Pathways rule regarding how AOs would apply the limitation on asylum eligibility at issue here consistent with the statutory "significant possibility" standard, *see* 88 FR at 31380, is equally applicable to IJs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, IJs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

Second, under 8 CFR 235.3(b)(4), if a noncitizen subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer does not proceed further with removal of the noncitizen until the noncitizen has been referred for an interview by an AO in accordance with 8 CFR 208.30.

Instead of this current process, DHS is adding a new 8 CFR 235.3(b)(4), applicable to those who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. Under this provision the immigration officer would refer the noncitizen to an AO if the noncitizen manifests a fear of return or affirmatively expresses an intention to apply for asylum, or affirmatively expresses a fear of persecution or torture, or a fear of return to his or her country or the country of removal.

Third, under 8 CFR 235.3(b)(4)(i), the referring officer provides the noncitizen with a written disclosure on Form M–444, *Information About Credible Fear Interview,* describing (1) the purpose of the referral and description of the credible fear interview process; (2) the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; (3) the right to request a review by an IJ of the AO's credible fear determination; and (4) the consequences of failure to establish a credible fear of persecution or torture. New 8 CFR 235.15(b)(4) will simply require that an immigration officer provide "a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of the AO's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture." 8 CFR 235.15(b)(4)(i)(B). Thus, while maintaining the substance of the information that must be provided to the noncitizen, the regulation removes the requirement that it be on a particular form, allowing for greater flexibility in how the information is distributed.

Finally, DHS is including a severability clause in this provision. *See id.* 235.15(g). DHS believes that each of these changes can function sensibly without the others, given that each change is independently seeking to provide greater flexibility during a time when the suspension and limitation on entry is in effect, while still protecting the important ability of individuals to seek protection from removal. DHS further believes that even if a court order enjoins or vacates the Proclamation or provisions other than § 235.15 of this rule, the provisions in § 235.15 can continue to apply to those described in § 208.13(g) and not described in section 3(b) of the Proclamation, even if they cannot be subject to those provisions by operation of such court order.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). Consistent with the APA, the Departments have not invoked these procedures because (1) this rule involves a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments have found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3), for the reasons explained below. At the same time, the Departments seek and welcome post-promulgation comments on this IFR.

#### 1. Foreign Affairs

This rule is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question "is clearly and directly involved in a foreign affairs function." [296] In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d

Cir. 2008) (quotation marks omitted).[297] This rule satisfies both standards.

The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere. This strategy includes the Los Angeles Declaration on Migration and Protection, which was joined by leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[298] Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing, including on efforts to: expand access to, and increase, lawful pathways, such as the Safe Mobility Office initiative;[299] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols[300] with the Government of Mexico along

[296] *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up); *see Mast Indus., Inc.* v. *Regan,* 596 F. Supp. 1567, 1582 (Ct. Int'l Trade 1984); *see also Am. Ass'n of Exps. & Imps.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that the exception applies where a rule is "linked intimately with the Government's overall political agenda concerning relations with another country").

[297] *See, e.g., Rajah,* 544 F.3d at 437 ("There are at least three definitely undesirable international consequences that would follow from notice and comment rulemaking. First, sensitive foreign intelligence might be revealed in the course of explaining why some of a particular nation's citizens are regarded as a threat. Second, relations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security. Third, the process would be slow and cumbersome, diminishing our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists."); *see also Yassini* v. *Crosland,* 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("For the [foreign affairs] exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."). *But see E.B.,* 583 F. Supp. 3d at 64–66 (rejecting the "provoke definitely undesirable international consequences" standard).

[298] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries* (last visited May 27, 2024).

[299] *See* U.S. Dep't of State, *Safe Mobility Initiative, https://www.state.gov/refugee-admissions/safe-mobility-initiative* (last visited May 27, 2024).

[300] *See* CBP, *Readout: U.S.-Mexico meeting on joint actions to further enhance border security* (Sept. 24, 2023), *https://www.cbp.gov/newsroom/national-media-release/readout-us-mexico-meeting-joint-actions-further-enhance-border* (noting that CBP encouraged mirrored patrols); U.S. Dep't of State, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue—Fact Sheet* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/* (noting that "CBP and INM regularly coordinate enforcement efforts at the border through mirrored patrols," which suggests that those patrols were occurring).

**STB_AR1_000180**

our shared border; [301] and share information, technical assistance, and best practices.[302] The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.[303]

This international coordination has yielded important results. A number of foreign partners, including Mexico, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public health Order.[304] These governments recognized that the United States was taking measures to strengthen border enforcement, specifically through application of the Circumvention of Lawful Pathways rule along with other complementary measures, and committed to taking their own actions to address irregular migratory flows in the region.[305] Additionally, immediately prior to the transition from DHS processing under the Title 42 public health Order to processing under title 8 authorities, the Government of Mexico announced that it had independently decided to accept the return into Mexico of nationals from CHNV countries under title 8 processes.[306] However, in the

intervening months, Mexico and other partners' resources have been significantly strained by sustained high encounter levels, and at different times enforcement by our partners has been disrupted, leading to surges at our own border.[307]

In public messaging, the Government of Mexico linked its decision to accept return into Mexico of CHNV nationals to the success of the CHNV parole processes framework under the Title 42 public health Order,[308] which combined expansion of lawful pathways and processes for nationals of these countries with a meaningful consequence framework, and which reduced irregular border crossings.[309] Sustaining and, as appropriate, ramping

up efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. This has been a key component of our diplomacy, as regional partner countries have regularly encouraged DHS to take steps to address migratory flows, including by channeling intending migrants into expanded lawful pathways and processes. For example, following the development of the parole process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which imposed consequences for irregular migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States.[310] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region and at the U.S.-Mexico border slowed. *See* 88 FR at 31317 ("DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.").

The United States has continued to build on this historic expansion of lawful pathways and processes, which include the humanitarian parole processes for CHNV nationals; [311] efforts to expand labor pathways and dedicate a set number of visas to nationals of countries in the hemisphere; [312] the implementation of new Family Reunification Parole ("FRP") processes for certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras; and the modernization of FRP processes for certain nationals of Cuba and Haiti.[313]

[301] *See* DHS, *Trilateral Statement* (Apr. 11, 2023), *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement*.

[302] *See, e.g., Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* Exec. Order 14010, 86 FR 8267, 8270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/*; The White House, *Fact Sheet: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-level-security-dialogue/*; U.S. Dep't of State, *Fact Sheet: Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/*.

[303] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024),

[304] Kathia Martínez, *US, Panama and Colombia Aim to Stop Darien Gap Migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7*; Camila Montoya-Galvez, *Mexico Will Increase Efforts To Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say,* CBS News (May 10, 2023), *https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/*.

[305] 88 FR at 31444.

[306] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*;

[307] *See* Charles G. Ripley III, *Crisis Prompts Record Emigration from Nicaragua, Surpassing Cold War Era,* Migration Pol'y Inst. (Mar. 7, 2023), *https://www.migrationpolicy.org/article/record-emigration-nicaragua-crisis*; James Fredrick, *Mexico Feels Pressure of Relentless Migration from South America,* N.Y. Times (Sept. 21, 2023) ("Similar scenes are playing out across the country as Mexico's immigration system strains under a tide of people desperately trying to go north. The relentless surge has led to a hodgepodge response in Mexico ranging from shutting down railways heading north to the busing of people to areas with fewer migrants."); Megan Janetsky & Javier Córdoba, *Central America scrambles as the international community fails to find solution to record migration,* AP News (Oct. 28, 2023), *https://apnews.com/article/costa-rica-migration-darien-gap-biden-420e2d1219d403d7feec6463a6e9cdae* (noting the resources pull migration flows place on certain Central American countries); María Verza, *Mexico halts deportations and migrant transfers citing lack of funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc* (observing that the "head of Mexico's immigration agency . . . ordered the suspension of migrant deportations and transfers due to a lack of funds"); Valerie Gonzalez & Elliot Spagat, *The US sees a drop in illegal border crossings after Mexico increases enforcement,* AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a* (noting the disruption in enforcement that resulted from Mexico's lack of funding and quoting Andrew Selee, President of the Migration Policy Institute, as saying that "[t]he U.S. is able to lean on Mexico for a short-term enforcement effect at the border, but the long-term effects are not always clear").

[308] *See* Gobierno de México, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published* (characterizing the effort of the Government of Mexico as a successful joint initiative and expressing the Government's commitment to continue to accept migrants back into Mexico on humanitarian grounds).

[309] *See id.* (describing a significant reduction in irregular migration following the implementation of CHNV parole processes, which pair an expansion of lawful pathways with consequences for irregular migration).

[310] *See* 88 FR at 31444; The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/*.

[311] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023), *https://www.uscis.gov/CHNV*.

[312] *See* DHS & U.S. Dep't of Labor, *Temporary Rule—Exercise of Time-Limited Authority To Increase the Numerical Limitation for FY 2024 for the H-2B Temporary Nonagricultural Worker Program and Portability Flexibility for H-2B Workers Seeking To Change Employers,* 88 FR 80394 (Nov. 17, 2023).

[313] DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10,

Concurrently, the Governments of Colombia and Panama have made significant efforts to combat smuggling networks operating on both sides of the Darién Gap.[314] The Government of Mexico has likewise increased enforcement along its southern border and the transit routes north.[315] These enforcement campaigns have been implemented at substantial cost for those governments and, as with United States Government actions, reflect our shared regional responsibility to manage migration.[316]

Given the particular challenges facing the United States and its regional partners at this moment, the Departments assess that it is critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that this regulatory effort and the Presidential Proclamation—and the strong consequences they will impose at the border—will send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In addition to this IFR's clear and direct involvement in foreign affairs, the Departments believe that conducting a notice-and-comment process and providing a delayed effective date on this rule likely would lead to a surge to the border before the Departments could finalize the rule, which would adversely impact the United States' foreign policy priorities. Prior to the end of the Title 42 public health Order, regional partners expressed great concern about the misperception that the end of the Order would mean an open U.S. border and result in a surge of irregular migration flowing through their countries as migrants sought to enter the United States. *See* 88 FR at 31444. One foreign partner, for example, expressed the strong concern that the formation of caravans during the spring of 2022 was spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order. *See id.* This view is consistent with the views of other regional partner countries that have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid.

The surge about which many foreign leaders were concerned happened sooner than expected. In the weeks leading up to the lifting of the Title 42 public health Order, hemispheric migration spiked. Entries into the Darién jungle by migrants staged in Colombia began increasing in the months leading up to May 12, 2023, from a little more than 24,600 in January 2023, to more than 40,000 in April 2023 immediately before the Order lifted.[317] And as described more fully above, total CBP encounters at the SWB increased to then-record levels in the days immediately preceding May 12, 2023, a situation that was fueled by noncitizens seeking to enter the United States before new policies were put into effect, as well as by smuggling organizations that disseminated misinformation.[318] The scale of regional migration in those weeks strained the immigration processes of all the affected countries, including those of the United States.

As noted above, the United States saw a similar scale of migration at the end of 2023. The surge in December 2023 led the United States Government and the Government of Mexico to hold a series of engagements at the highest levels—including between the countries' Presidents and Cabinet Members—to address the shared challenge of migration confronting both countries.[319] These conversations included commitments by both governments to continue to expand efforts to coordinate enforcement actions on both sides of the border.[320] January, February, and March are typically slower months, but since these engagements, and the joint operational actions that resulted, there has been a decrease in USBP encounters at the border, as discussed in Section III.B.1 of this preamble.

The record-breaking hemispheric migration throughout the region has deeply affected governments from South America all the way to the U.S.-Mexico border. Panama has been encountering record numbers of migrants transiting one of the most dangerous smuggling corridors on the planet, the Darién Jungle.[321] Colombia, Peru, and Ecuador have hosted around 3 million,[322] over 1.5 million,[323] and more than 475,000 Venezuelans,[324] respectively, while Costa Rica has recently hosted hundreds of thousands of Nicaraguans.[325] Mexico has received record-breaking numbers of

---

2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

[314] *See* Kathia Martinez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Juan Zamorano & Christopher Sherman, *Explainer: Panama launches operation against smugglers in Darien Gap,* AP News (June 3, 2023), *https://apnews.com/article/panama-colombia-darien-gap-migrants-d0ec93c4d4ddc91f34e31c704b4cf8ae.*

[315] *See, e.g.,* Associated Press, *U.S. Border Arrests Decline Amid Increased Enforcement in Mexico,* NPR (Apr. 13, 2024), *https://www.npr.org/2024/04/13/1244590766/mexico-border-arrests-fall-march* ("Mexico detained migrants 240,000 times in the first two months of the year, more than triple from the same period of 2023, sending many deeper south into the country to discourage them from coming to the United States. While Mexico hasn't released figures for March, U.S. officials have said Mexican enforcement is largely responsible for recent declines.").

[316] *See, e.g.,* The White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[317] *See* Servicio Nacional de Migración Panamá, *Estadísticas, Tránsito Irregular por Darién 2023, https://www.migracion.gob.pa/inicio/estadisticas.*

[318] *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* (noting that "[m]any migrants were acutely aware of looming policy changes as they searched Thursday for an opportunity to turn themselves over to U.S. immigration authorities before the 11:59 EDT deadline . . . [and] [e]ven as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message . . . [and] offering to take migrants to the United States and telling them the border was open starting Thursday").

[319] *See supra* Section III.B.1 of this preamble.

[320] *See, e.g.,* White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/;* Amna Nawaz, *Mexico's foreign secretary discusses what her country is doing to ease border crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Foreign Secretary Bárcena as describing "much more law enforcement to bring down the pressure in the border" by Mexico in the preceding weeks).

[321] *See* Nick Paton Walsh et al., *On one of the world's most dangerous migrant routes, a cartel makes millions off the American dream,* CNN (Apr. 17, 2023), *https://www.cnn.com/2023/04/15/americas/darien-gap-migrants-colombia-panama-whole-story-cmd-intl/index.html;* Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us;* Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023.*

[322] *See* UNHCR, *Colombia Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/colombia.*

[323] *See* UNHCR, *Peru Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/peru.*

[324] *See* UNHCR, *Ecuador Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/ecuador.*

[325] *See* UNHCR, *Costa Rica Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/costa-rica.*

STB_AR1_000182

asylum applications in addition to the enforcement efforts it is undertaking.[326]

As described more fully above, DHS's internal projections suggest that SWB encounters may once again reach extremely elevated levels in the weeks to come, averaging in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[327] Regional migration trends support these projections. For example, between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[328] Moreover, as noted above, the Government of Mexico has been receiving record-breaking numbers of asylum applications—reflecting the large number of migrants currently in Mexico.

The weeks leading up to May 12, 2023, demonstrated that when migrants anticipate major changes in border policy, there is the potential to ignite a rush to the border to arrive before the changes take effect.[329] Any delay between announcement of this rule and its implementation through notice and comment would almost certainly trigger a surge in migration that would undermine the principal goal of this entire effort: to reduce migratory flows to our border, and throughout the region.

The Departments believe that the emergency measures being taken here are needed to help address this regional challenge, and that any decrease in migration that results will help relieve the strain not just on the U.S.-Mexico border but on countries throughout the hemisphere. The actions the United States is taking in this regulation demonstrate a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration. The IFR changes key procedures to significantly streamline and strengthen the consequences delivered for unlawful or unauthorized entry at the southern border. The actions the Departments are taking are directly responsive to the shared challenge the United States and its regional partners are confronting and, equally important, it is critical to implement these actions without a lengthy period of advance notice before the actions go into effect.

## 2. Good Cause

The Departments have also found good cause to forego the APA's notice-and-comment and delayed-effective-date procedures. *See* 5 U.S.C. 553(b)(B), (d)(3). Such procedures are impracticable because the delays associated with such procedures would unduly postpone implementation of a policy that is urgently needed to avert significant public harm. Such procedures are likewise contrary to the public interest because an advance announcement of this rule would seriously undermine a key goal of the policy: It would incentivize even more irregular migration by those seeking to enter the United States before the rule would take effect.

First, the "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations . . . or where delay could result in serious harm." [330] Findings of impracticability are "inevitably fact- or context-dependent," [331] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures [332] and the agency's diligence in addressing the problem it seeks to address.[333]

The critical need to immediately implement more effective border management measures is described at length in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble. Despite the strengthened consequences in place at the SWB, including the Circumvention of Lawful Pathways rule and other measures, the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[334] DHS's ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's negative credible fear determination, which requires additional time and resources.

---

[326] See UNHCR, *Operational Update: Mexico* (Dec. 2023), *https://reporting.unhcr.org/mexico-operational-update-6421;* UNHCR, *Fact Sheet, Mexico* (Nov. 2023), *https://data.unhcr.org/en/documents/download/105202* ("From January to October 2023, Mexico received over 127,796 asylum applications, the highest ever number of asylum claims received in this time frame."); Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay,* Reuters (Feb. 13, 2023), *https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/* ("Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance.").

[327] OHSS Southwest Border Encounter Projection, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[328] *See supra* note 122.

[329] Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[330] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[331] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[332] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[333] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[334] According to March 2024 OHSS Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000, USBP completed 250,000 encounters along the SWB in December 2023, higher than any previous month on record. *See also* OHSS, *2022 Yearbook of Immigration Statistics,* tbls. 33 & 35, *https://www.dhs.gov/ohss/topics/immigration/yearbook.*

**STB_AR1_000183**

Without adequate resources and tools to keep pace, the Departments cannot deliver timely decisions and timely consequences to all noncitizens encountered at the SWB who do not establish a lawful basis to remain. Instead, DHS is forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[335] Even then, it can take weeks, months, or years to execute a removal order depending upon the facts of the individual case.[336]

Quite simply, these historic levels of encounters and fear claims, combined with limited resources and tools to manage them, create a vicious cycle: The expectation of a lengthy stay in the United States and the inability to impose consequences for irregular migration close in time to entry inspires more people to make the dangerous journey north to take their chances at the border.[337] The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.[338] At the end of the first quarter of FY 2024, there were over 2.7 million cases pending in the immigration courts.[339] During FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[340]

Absent changes promulgated in this rule, recent encounter trends both in the region and at our southern border indicate a risk of further exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered, and exacerbating perceived incentives to migrate now. As noted above, DHS's current internal projections suggest that total encounters will average in the range of 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are

expected to be encountered at POEs after making appointments though the CBP One app.[341] Even at the low end of such projections, such a volume of encounters would likely result in thousands of migrants per day being referred to section 240 removal proceedings; their cases would further exacerbate the immigration court backlog and perceived incentives to migrate irregularly, and would take many years to complete. Such harms would be mitigated by the additional measures put in place by this rule. If implementation of the rule is delayed, by contrast, the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking. Thus, it is impracticable to delay the measures in this rule for even a few months to allow for notice and an opportunity to comment and a delayed effective date. In the interim, the heightened levels of migration and forced displacement that have resulted in the President's determination to apply the suspension and limitation on entry and the Departments adopting the provisions in this rule would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants[342]—only a small proportion of whom are likely to be granted asylum or other protection— would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. The Departments must immediately safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. This rule does just that.

Furthermore, current trends in migration, including through the Darién jungle between Colombia and Panama, indicate that a significant increase in encounters may be imminent. Between

January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[343] And the Departments believe that most of those migrants are on their way to seek entry into the United States.[344] Based on historical trends, the Departments expect that many of these migrants may already be proximate to the SWB, giving the Departments insufficient time to seek public comment and delay the effective date of this rule without immediate and substantial harm to U.S. interests. Indeed, as of May 2024, CBP estimates that there are more than 40,000 non-Mexican migrants in northern Mexico, proximate to the SWB, in addition to more than 100,000 such migrants in central and southern Mexico. These

[335] *See supra* note 25.

[336] OHSS analysis of March 2024 OHSS Persist Dataset.

[337] *See, e.g.,* Jordan, *supra* note 27.

[338] OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024. Almost all of this backlog is the result of cases filed since FY 2015. From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed. In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed. OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

[339] *See* EOIR, *Caseload: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[340] *See id.;* EOIR, *New Cases and Total Completions-Historical, https://www.justice.gov/eoir/media/1344801/dl?inline* (Jan. 18, 2024).

[341] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day* (last modified July 14, 2023).

[342] Decl. of Matthew J. Hudak, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[343] *See supra* note 122.

[344] *See* Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.,* NPR, (Apr. 22, 2024), *https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration* ("[Analysts] keep a close eye on the Darién Gap in Panama and the borders between Central American countries, two key points to gauge the number of people venturing up north. 'In most countries (outward) migration has increased . . . particularly in Venezuela, and that's not really reflected yet in the U.S. numbers,' said [one analyst]. . . . Despite Mexico's cracking down on migrants, [the analyst] said people are still making their way up north, even if they need to pause for months at different points during their journey. 'There must be a huge number of people from Venezuela bottled up in Mexico right now,' he said."); Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us* ("The surge across the Darién Gap is reflected in an influx at the southern U.S. border, where U.S. border authorities reported that they apprehended close to 2.5 million people during fiscal year 2023, a record high, while northern cities such as New York are also struggling to manage the arrivals."); Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023/* ("Laurent Duvillier, UNICEF's spokesperson for Latin America and the Caribbean based in Panama, tells TIME that many—driven to leave their homes by poverty, crime, or discrimination—aim to seek asylum in the U.S. or Canada, though they may never get there. This analysis is supported by refugee protection organization HIAS, with a spokesperson telling TIME that, by the group's estimations, between 90 to 95% of those crossing the Darién Gap aim to reach the U.S."); Ariel G. Ruiz Soto, *Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border* ("Record flows of extracontinental migrants through the Darién Gap jungle that connects Colombia to Panama foreshadow increases in migration through Central America and Mexico. The 28,000 Venezuelan migrants who trekked through the deadly jungle in August were mostly en route to the United States; with more than 34,000 Venezuelans recorded at the Darién Gap in September, it is very likely that many of them will be reaching the U.S.-Mexico border soon.").

numbers show that a very large number of migrants would likely have the ability and the incentive to travel to the U.S. border, and the Departments assess that announcing this rule in advance would likely yield the type of surges described in connection with prior changes in significant border policies affecting the availability of asylum for large numbers of migrants. For these reasons, consistent with the President's judgment, and given the emergency circumstances facing the Departments, the Departments assess that it would be impracticable to delay the policies set forth in this rule to allow time to complete notice-and-comment rulemaking or delay the rule's effective date.

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[345] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[346] A number of cases follow this logic in the context of economic regulation.[347] The same logic

applies here, where the Departments are responding to exceedingly serious challenges at the border, and advance announcement of this response—which will increase the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly— would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. For the same reasons, "the [need] for immediate implementation" outweighs the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forego it.[348] The Departments' experience has been that in some circumstances when official public announcements have been made regarding significant upcoming changes in immigration laws and procedures that would impact how individuals are processed at the border, such as changes that restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States—including, most recently, in the days preceding the lifting of the Title 42 public health Order in May 2023.[349] This is not only because, generally, would-be migrants respond to real and perceived incentives created by border management and immigration policies, such that many choose to seek entry under a border processing regime they think is preferable, prior to the implementation of a new system, including increasing the speed of their transit north in an effort to arrive before the implementation of any such measure. Additionally, smugglers routinely prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy, as highlighted by the many examples described below.[350]

The acuteness of such concerns is borne out by the facts. An influx of migrants occurred in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[351] Leading up to the Order's expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[352] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. 88 FR at 31315. In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effects.[353]

Similarly, on February 28, 2020, the Ninth Circuit lifted a stay of a

[345] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[346] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[347] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can

be expected to precipitate activity by affected parties that would harm the public welfare.").

[348] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[349] *See supra* Sections III.B.1 and III.B.2 of this preamble.

[350] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/*

*national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* ("Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.").

The Departments recognize that there has been reporting on the possibility of the policies set forth in the Proclamation and this IFR since February with no apparent month-over-month increase in encounters. *See, e.g.,* Myah Ward, *Biden considering major new executive actions for migrant crisis,* Politico (Feb. 21, 2024), *https://www.politico.com/news/2024/02/21/biden-considering-major-new-executive-actions-for-southern-border-00142524.* But such reporting about vague, possible plans differs significantly from officially proposed policy changes with timelines provided for implementation, such as those mentioned below.

[351] *See Huisha-Huisha* v. *Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *stay granted, Arizona* v. *Mayorkas,* __ S. Ct. __, 2022 WL 17750015 (U.S. Dec. 19, 2022); DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), *https://www.dhs.gov/news/2022/12/13/statement-secretary-mayorkas-planning-end-title-42.*

[352] *See, e.g.,* Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why,* L.A. Times (Dec. 23, 2022), *https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion.*

[353] OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

STB_AR1_000185

nationwide injunction of the Migrant Protection Protocols ("MPP"), a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[354] Almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.[355] Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.[356] Absent immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.[357] And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so they were diverted away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.[358]

This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that those arriving before the Order ended and the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States.[359] This surge culminated with

what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border.[360] Encounters between POEs (which excludes arrival of inadmissible individuals scheduled through the CBP One app, who appear at POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11).[361] The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.[362]

Meanwhile, the current backlogs and inefficiencies in our border security and immigration systems render DHS unable to effect removals and apply consequences at a sufficient scale to deter migration by those whose claims may not ultimately succeed.[363] This, too, serves as an incentive for migrants to take a chance. And sudden influxes, which result in part from smugglers' deliberate actions, overload scarce United States Government resources dedicated to border security that, as reflected above, are already stretched extremely thin.[364] This rule is specifically designed to allow the United States Government to deliver consequences more swiftly, and with a reduced resource burden, during such an influx.

In a more manageable steady-state environment, when encounters surge in specific sectors, DHS manages its detention capacity using the other tools at its disposal, such as lateral decompression flights and similar efforts.[365] But the increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what

DHS resources and operations are designed to handle. They raised detention capacity concerns anew. At that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities. Given the nature of its facilities, increased numbers and times in custody increase the likelihood that USBP facilities will become quickly overcrowded.[366] Crowding, particularly given the way that USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[367]

The Departments assess that there would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for this rule or delayed its effective date. As demonstrated by the Departments' experience with the end of the Title 42 public health Order and MPP, significant shifts in U.S. border policies lead to an increase in migrants coming to the SWB that risks overwhelming the Departments' resources and operations. This rule is likewise a significant shift in U.S. border policy that affects the vast majority of noncitizens arriving at the southern border who do not have documents sufficient for lawful admission—a shift that may be viewed as similar to the end of the Title 42 public health Order and MPP. In addition, unlike the Lawful Pathways rebuttable presumption, the limitation on asylum eligibility in this rule would affect Mexican migrants, which may provide an additional perceived incentive for such migrants—who constitute a large and geographically proximate potential population[368]—to rush to the border during a notice-and-comment period. Finally, such a surge in migration would come at a time when our border security and immigration systems' resources are already stretched thin and severely backlogged.[369]

---

[354] See *Innovation Law Lab* v. *Wolf,* 951 F.3d 1073, 1077, 1095 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab* v. *Mayorkas,* 5 F.4th 1099 (9th Cir. 2021).

[355] See Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[356] *Id.* ¶¶ 4, 8.

[357] *Id.* ¶ 14.

[358] *Id.* ¶ 15.

[359] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2). Conversely, as noted above, smugglers also messaged that the border would be open starting on May 12. *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9.* This conflicting messaging underscores smuggling organizations' tendency to deceptively message on changes in border policy to lure vulnerable migrants to pay for their services.

[360] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–6810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[361] *Id.*

[362] *Id.*

[363] See EOIR, *Adjudication Statistics: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[364] Decl. of Enrique Lucero ¶¶ 6–8, *Innovation Law Lab* v. *Wolf,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3); Decl. of Robert E. Perez ¶ 15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[365] See 88 FR at 11715.

[366] Decl. of Matthew J. Hudak ¶¶ 6, 14, 17, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[367] *Id.* ¶ 17.

[368] U.S. Census Bureau, *Mexico, https://www.census.gov/popclock/world/mx* (last visited May 27, 2024).

[369] *See, e.g.,* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape,* Migration Pol'y Inst., at 1 (rev. Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals."); The White House, *Fact Sheet: Whirlpool*
Continued

Therefore, the Departments believe that a gap between when this rule is made public and when it becomes effective would create the same incentive for migrants to come to the United States before the rule takes effect.

The Departments' determination here is consistent with past practice. For example, in the Circumvention of Lawful Pathways rule, the Departments undertook a notice-and-comment rulemaking while the Title 42 public health Order remained in effect,[370] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. The Departments noted that such a gap "would likely result in a significant further increase in irregular migration," and that such an increase, "exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions." *Id.* at 31445.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures,[371] and witnessed a drastic reduction in irregular migration by Venezuelans.[372] The process by which eligible Venezuelans could receive advance travel authorization to present at a POE was accompanied by a policy that those who entered the United States outside this process or who entered Mexico illegally after the

---

*House Calls on Congress To Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office and Management Budget (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[370] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[371] *See* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[372] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

---

date of announcement would be ineligible for parole under this process, and was conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. *See* 87 FR at 63508. Thus, had the parole process been announced prior to a lengthy notice-and-comment period, it likely would have resulted in thousands of Venezuelan nationals attempting to cross the United States and Mexican borders before the ineligibility criteria went into effect, and before the United States was able to return Venezuelan nationals to Mexico in large numbers.

DHS also concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[373] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[374] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities," "could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could result in significant loss of human life."[375]

Given the urgent circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for this rule would be contrary to the public interest because an advance announcement of the rule would incentivize even more irregular migration by those seeking to enter the United States before the IFR would take effect.

---

[373] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[374] *Id.*

[375] *Id.; accord* U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

---

## B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)

Executive Order 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and Executive Order 13563 ("Improving Regulation and Regulatory Review"), directs agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs ("OIRA") of OMB reviewed this IFR as a significant regulatory action under Executive Order 12866, as amended by Executive Order 14094. The estimated effects of the rule are described and summarized qualitatively below. Consistent with OMB Circular A–4, the Departments assessed the impacts of this rule against a baseline. The baseline used for this analysis is the "no action" baseline, or what the world would be like absent the rule. For purposes of this analysis, the Departments assumed that the no-action baseline involved continued application of the Circumvention of Lawful Pathways rule.

The expected effect of this rule, as discussed above, is primarily to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish

STB_AR1_000187

a reasonable probability of persecution or torture would still be able to seek statutory withholding or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for work authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection. In these cases, there may be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. The Departments welcome comments on the effects described above to inform analysis in a final rule.

## C. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare and make available to the public a final regulatory flexibility analysis that describes the effect of a rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions) when the agency was required "to publish a general notice of proposed rulemaking" prior to issuing the final rule. *See* 5 U.S.C. 604(a). Because this IFR is being issued without a prior proposal, on the grounds set forth above, a regulatory flexibility analysis is not required under the RFA.

## D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 ("UMRA") is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 658(6), 1502(1). A "Federal intergovernmental mandate," in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term "Federal private sector mandate" refers to a provision that would impose an enforceable duty upon

the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This IFR is not subject to the UMRA because the Departments did not publish a proposed rule prior to this action. In addition, this rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to an entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of Title II of the UMRA, therefore, do not apply, and the Departments have not prepared a statement under the UMRA.

## E. Congressional Review Act

OMB has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

## F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

## G. Executive Order 12988 (Civil Justice Reform)

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

## H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the

stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

## I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

## J. National Environmental Policy Act

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.,* applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 [376] and Instruction Manual 023–01–001–01, Revision 01 ("Instruction Manual 023–01") [377] establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ")

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[378]

The IFR effectuates the following three changes to the process for those seeking asylum, withholding of removal, or protection under the CAT during emergency border circumstances:

• For those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will provide general notice regarding the processes for seeking asylum, withholding of removal, and protection under the CAT, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

• During emergency border circumstances, persons who enter the United States across the southern border and who are not described in paragraph 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and

extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the Proclamation and do not establish exceptionally compelling circumstances will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

Given the nature of the IFR, it is categorically excluded from DHS's NEPA implementing procedures, as it satisfies all three relevant conditions. First, the Departments have determined that the IFR fits clearly within categorical exclusions A3(a) and (d) of DHS's Instruction Manual 023–01, Appendix A, for the promulgation of rules of a "strictly administrative or procedural nature" and rules that "interpret or amend an existing regulation without changing its environmental effect," respectively. The IFR changes certain administrative procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. Second, this IFR is a standalone rule and is not part of any larger action. Third, the Departments are not aware of any extraordinary circumstances that would cause a significant environmental impact. Therefore, this IFR is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this IFR is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01, Appendix A, because the IFR's asylum limitation and the reasonable probability standard will be applied by EOIR in substantially the same manner as it will be applied by DHS. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

## K. Paperwork Reduction Act

This IFR does not adopt new, or revisions to existing, "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163,

---

[376] DHS, *Implementation of the National Environmental Policy Act, Directive 023–01, Revision 01* (Oct. 31, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Directive%20023-01%20Rev%2001_508compliantversion.pdf.*

[377] DHS, *Implementation of the National Environmental Policy Act (NEPA), Instruction Manual 023–01–001–01, Revision 01* (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*

[378] Instruction Manual 023–01 at V.B(2)(a) through (c).

STB_AR1_000189

44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

## List of Subjects

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR parts 208 and 235 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. In § 208.13, add paragraph (g) to read as follows:

### § 208.13  Establishing asylum eligibility.

\* \* \* \* \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

■ 3. Add subpart D, consisting of § 208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 208.35  Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, 208.30, and 208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in § 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 208.33(a)(3).

(b) *Application in credible fear determinations.* (1) *Initial determination.* The asylum officer shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the asylum officer determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, then the asylum officer shall enter a negative credible fear determination with respect to the alien's asylum claim and continue

to consider the alien's claim under paragraph (b)(2) of this section.

(ii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 208.13(g), the asylum officer shall follow the procedures in § 208.33(b).

(iii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Protection eligibility screening.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(ii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, the Department will issue a positive credible fear determination and follow the procedures in § 208.30(f). For any case in which USCIS retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in an interview pursuant to § 208.9, USCIS may require aliens who received a negative credible fear determination with respect to their asylum claim under paragraph (b)(1)(i) of this section to submit a Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form, to USCIS within 30 days from the date of service of the positive credible fear determination. The date of service of the positive credible fear determination remains the date of filing and receipt of the asylum application under § 208.3(a)(2); however, for any case in which USCIS requires the alien to submit a Form I–589, it may extend the

STB_AR1_000190

timelines in § 208.9(a)(1) and (e)(2) by up to 15 days. If USCIS requires the alien to submit a Form I–589 and the alien fails to do so within the applicable timeline, USCIS shall issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Immigration judges will evaluate the case as provided in 8 CFR 1208.35(b). The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) and (B) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.35(b)(2)(iii) or (b)(4), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a negative credible fear determination, the case shall be returned to the Department for removal of the alien. No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(3) *Procedures in the absence of the limitation on asylum eligibility.* If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 208.13(g), the asylum officer shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 208.33(b)(2).

(c) *Family unity in the asylum merits process.* In cases where the Department

retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii), where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 208.16(c)(2) and would be granted asylum but for the limitation on asylum in paragraph (a)(1) of this section or § 208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the asylum officer may deem the principal applicant to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any provision of this section, § 235.15, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 235.15 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 4. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806 and notes, 1807, and 1808 (Title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

■ 5. Add § 235.15 to read as follows:

### § 235.15 Inadmissible aliens and expedited removal during emergency border circumstances.

(a) *Applicability.* Notwithstanding §§ 235.3(b)(2)(i) and 235.3(b)(4)(i) (but not § 235.3(b)(4)(ii)), the provisions of this section apply to any alien described in § 235.3(b)(1)(i) through (ii) if the alien is described in § 208.13(g) and is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border.

(b) *Expedited removal.* (1) [Reserved]

(2) *Determination of inadmissibility*—(i) *Record of proceeding.* (A) A noncitizen who is arriving in the United States, or other alien as designated pursuant to § 235.3(b)(1)(ii), who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter) shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien.

(B) The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges. After obtaining supervisory concurrence in accordance with § 235.3(b)(7), the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) [Reserved]

(iii) [Reserved]

(3) [Reserved]

(4) *Claim of asylum or fear of persecution or torture.* (i) If an alien subject to the expedited removal

STB_AR1_000191

provisions manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with part 208 of this chapter.

(A) The inspecting immigration officer shall document whether the alien has manifested or affirmatively expressed such intention, fear, or concern.

(B) The referring officer shall provide the alien with a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an immigration judge of the asylum officer's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture.

(ii) [Reserved]

(c)–(f) [Reserved]

(g) *Severability.* The Department intends that in the event that any provision of paragraphs (a), (b)(2)(i), and (b)(4) of this section, § 208.35, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 208.35 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 7. In § 1208.13, add paragraph (g) to read as follows:

**§ 1208.13    Establishing asylum eligibility.**

\*    \*    \*    \*    \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier) refer to the provisions on asylum eligibility described in § 1208.35.

■ 8. Add subpart D, consisting of § 1208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

**§ 1208.35    Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.**

Notwithstanding any contrary section of this chapter, including §§ 1003.42, 1208.2, 1208.13, 1208.30, and 1208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 1208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in 8 CFR 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this title.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June

3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 1208.33(a)(3).

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.35(b), and the alien has requested immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 1208.13(g), the immigration judge shall follow the procedures in § 1208.33(b).

(ii) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the immigration judge shall follow the procedures in § 1208.30.

(iii) Where the immigration judge determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the alien under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.35(b)(2)(v)(A) and (B).

(4) If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or

unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 1208.13(g), the immigration judge shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 1208.33(b)(2)(ii).

(c) *Family unity and removal proceedings.* In removal proceedings under section 240 of the Act, where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the limitation on asylum eligibility in paragraph (a)(1) of this section or § 1208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the

Act, the alien shall be deemed to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 1208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 1208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 1208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any

provision of this section or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2024–12435 Filed 6–4–24; 4:15 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

SECURING THE BORDER

- - - - - - -

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

There are more people around the world who are displaced from their homes today than at any point in time since World War II.  Many factors have contributed to this problem.  Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere.  Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America.  The global COVID-19 pandemic upended societies around the globe.  Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border.  In 2019, encounters nearly doubled from their 2018 level to almost 1 million.  In 2020, the global COVID-19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

2

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully.  Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact.  On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency.  Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000

3

credible fear interviews, both of which are record highs.  As a
result, from May 12, 2023, to May 1, 2024, my Administration
removed or returned more than 720,000 noncitizens who did not
have a lawful basis to remain in the United States, the vast
majority of whom crossed the southwest land border.  Total
removals and returns in the 12 months following May 12, 2023,
exceeded removals and returns in every full Fiscal Year since
2010.  The majority of all individuals encountered at the
southwest land border from Fiscal Year 2021 to Fiscal Year 2023
were removed, returned, or expelled.

Despite these efforts, and after months of reduced
encounter levels following the changes put in place after May
12, 2023, encounter levels increased toward the end of 2023, and
December 2023 saw the highest level of encounters between ports
of entry in history, as increasing numbers of people migrated
through the Western Hemisphere.  The challenges presented by
this surge in migration, which would have been even worse had
the Lawful Pathways rule and other measures not been in place,
were compounded by the fact that the surge was focused
increasingly on western areas of the border in California and
Arizona that are geographically remote, challenging to address,
and without sufficient pre-existing infrastructure or resources
to respond to the surge.  From January to March 2024, encounters
decreased from and have remained below levels experienced in
November and December 2023, including as a result of increased
enforcement by the United States and partner countries.
However, the factors that are driving the unprecedented movement
of people in our hemisphere remain, and there is still a
substantial and elevated level of migration that continues to
pose significant operational challenges.

The current situation is also the direct result of the
Congress's failure to update an immigration and asylum system

STB_ARC_000096

4

that is simply broken -- and not equipped to meet current needs.
While my Administration has vigorously enforced the law within
the constraints imposed by the existing system, the statutory
framework put in place by the Congress is outdated.  For the
vast majority of people in immigration proceedings, the current
laws make it impossible to quickly grant protection to those who
require it and to quickly remove those who do not establish a
legal basis to remain in the United States.  This reality is
compounded by the fact that the Congress has chronically
underfunded our border security and immigration system and has
failed to provide the resources or reforms it needs to be able
to deliver timely consequences to most individuals who cross
unlawfully and cannot establish a legal basis to remain in the
United States.

Despite the strengthened consequences in place at our
border through the Lawful Pathways rule and the related measures
that have led to record returns and removals, encounter levels
are exceeding our capacity to deliver those consequences in a
timely manner due to the outdated laws and limited resources we
have available.

My Administration has repeatedly asked the Congress to
update the outdated and inadequate immigration statutes, to
create a legal framework that is functional and addresses
current realities, and to provide additional resources so that
we can more effectively deliver consequences at the border.  In
August 2023, I requested more than $4 billion in additional
funding for border security and related migration issues,
including more than $2 billion for urgent DHS border management
requirements.  The Congress failed to act.  In October 2023, I
requested $13.6 billion for border enforcement and migration
management.  This request included more than $5 billion for DHS
to manage conditions on the southern border, as well as funding

SFB_AR_000097

5

for critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

(a)  over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

(b)  over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

(c)  100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

(d)  shelter and critical services for newcomers in our cities and States; and

(e)  1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations. While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade.

6

However, the Congress failed to move forward with this
bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public
Law 118-47) increased funding for DHS over Fiscal Year 2023, but
it did not address the needs identified in various related
supplemental requests, nor did it equip the Federal Government
with the new authorities from the bipartisan legislative
proposal. In May 2024, when the Senate again considered the
bipartisan legislative proposal, the Senate failed to advance
the measure.

Our broken immigration system is directly contributing to
the historic migration we are seeing throughout the Western
Hemisphere, exacerbated by poor economic conditions, natural
disasters, and general insecurity, and this fact, combined with
inadequate resources to keep pace, has once again severely
strained our capacity at the border. The result is a vicious
cycle in which our United States Border Patrol facilities
constantly risk overcrowding, our detention system has regularly
been at capacity, and our asylum system remains backlogged and
cannot deliver timely decisions, all of which spurs more people
to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms
and adequate funding, despite repeated requests that they do so,
is a core cause of this problem. Under current law, whenever a
noncitizen in expedited removal indicates an intention to apply
for asylum or a fear of persecution, they are referred for an
interview with an asylum officer and cannot be removed through
expedited removal if there is a significant possibility that
they could establish eligibility for asylum. This screening
standard is a requirement imposed by the Congress, but it has
not functioned well in predicting ultimate success in asylum
proceedings. From 2014 to 2019, 83 percent of individuals

STB_AR_000098

7

referred for an interview with an asylum officer passed the
screening stage, meaning that they were not removed pursuant to
expedited removal, but less than 25 percent of cases ultimately
resulted in a grant of asylum or other protection, often after
waiting years to reach a final decision.  By imposing a
rebuttable presumption of asylum ineligibility on those who
cross the border unlawfully, the Lawful Pathways rule has made a
meaningful impact in reducing this disparity.  The screen-in
rate from May 12, 2023, to March 31, 2024, dropped to 52 percent
for individuals who are subject to the rebuttable presumption of
asylum ineligibility.  However, the Lawful Pathways rule alone
is inadequate during times of record encounter levels and cannot
change the underlying statutory limitations.

     Data confirm that the system has been badly strained for
many years and is not functioning to provide timely relief for
those who warrant it or timely consequences for those without
viable protection claims.  Due to an outdated and inefficient
system and insufficient resources that do not allow for prompt
adjudication of claims, too many people have had to be processed
by the Border Patrol and released with a notice to appear in
removal proceedings before an immigration judge since May 2023.
The U.S. Citizenship and Immigration Service affirmative asylum
backlog is now over 1 million cases and growing, with over
300,000 applications filed prior to 2021 still pending.  At the
end of Fiscal Year 2023, there were over 2.4 million cases
pending in the immigration courts.  Pending cases more than
doubled from the end of Fiscal Year 2016 to the end of Fiscal
Year 2020 and doubled again between that time and the end of
Fiscal Year 2023.  Between Fiscal Year 2006 and the end of
Fiscal Year 2023, in tandem with historic increases in filings
to initiate immigration court proceedings, the immigration
courts' pending caseload increased from approximately 170,000 to

8

approximately 2.46 million.  During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system -- the result of outdated laws and inadequate resources -- has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment.  This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process.  This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

9

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

Section 1. Suspension and Limitation on Entry. The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

10

Sec. 2.  Applicability of Suspension and Limitation on
Entry.  (a)  The Secretary of Homeland Security shall monitor
the number of daily encounters and, subject to subsection (b) of
this section, the suspension and limitation on entry pursuant to
section 1 of this proclamation shall be discontinued at 12:01
a.m. eastern time on the date that is 14 calendar days after the
Secretary makes a factual determination that there has been a 7-
consecutive-calendar-day average of less than 1,500 encounters,
not including encounters described in subsection 4(a)(iii) of
this proclamation.

(b)  Notwithstanding a factual determination made under
subsection (a) of this section, the suspension and limitation on
entry pursuant to section 1 of this proclamation shall apply at
12:01 a.m. eastern time on the calendar day immediately after
the Secretary has made a factual determination that there has
been a 7-consecutive-calendar-day average of 2,500 encounters or
more, not including encounters described in subsection 4(a)(iii)
of this proclamation, until such suspension and limitation on
entry is discontinued pursuant to subsection (a) of this
section.

(c)  For purposes of subsection (a) and subsection (b) of
this section, unaccompanied children (as defined in section
279(g)(2) of title 6, United States Code) from non-contiguous
countries shall not be included in calculating the number of
encounters.

Sec. 3.  Scope and Implementation of Suspension and
Limitation on Entry.  (a)  The suspension and limitation on
entry pursuant to section 1 of this proclamation shall apply
across the southern border to noncitizens, other than those
described in subsection (b) of this section, during such times
that the suspension and limitation on entry is in effect.

11

(b)   The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

(i)    any noncitizen national of the United States;

(ii)   any lawful permanent resident of the United States;

(iii)  any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv)   any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v)    any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A)  members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B)  noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C)  noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

(D)  noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe

SFB_ARC_000204

12

and orderly entry of noncitizens into the United States;

(vi)   any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii)   any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c)   An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d)   The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e)   Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the

13

United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

Sec. 4. Definitions. (a) The term "encounter" refers to a noncitizen who:

> (i) is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

> (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

> (iii) is determined to be inadmissible at a southwest land border port of entry.

(b) The term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c) The term "southwest land border" means the entirety of the United States land border with Mexico.

(d) The term "southern border" means the southwest land border and the southern coastal borders.

Sec. 5. Severability. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

14

Sec. 6. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

AMENDING PROCLAMATION 10773

- - - - - - -

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

On June 3, 2024, I signed Proclamation 10773 (Securing the Border).  That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted.  Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results.  Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect.  July and August 2024 were the lowest 2 months of encounters between ports

2

of entry since September 2020. While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments. Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the border circumstances in which Proclamation 10773 and the IFR are designed to apply. The Departments are currently considering regulatory action to address this issue as it relates to the measures described in

3

the IFR.  With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border.  This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity.  Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR.  I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters.  Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

4

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

Section 1. Amendment to Section 2(a) of Proclamation 10773. Section 2(a) of Proclamation 10773 is amended to read as follows:

"The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation."

Sec. 2. Revocation of Section 2(c) of Proclamation 10773. Section 2(c) of Proclamation 10773 is revoked.

Sec. 3. Severability. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States.

5

Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 4. Effectiveness. The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final rule promulgated by the Secretary of Homeland Security and the Attorney General that amends the IFR entitled Securing the Border, 89 Fed. Reg. 48,710 (June 7, 2024), consistent with the amendments described in sections 1 and 2 of this proclamation. If, due to court order, the final rule described in the prior sentence cannot be enforced insofar as it makes changes consistent with the amendment described in section 1 of this proclamation, then the amendment described in section 1 of this proclamation will no longer be in effect and section 2(a) of Proclamation 10773 shall continue to apply by its terms. If, due to court order, the final rule described in the first sentence of this section cannot be enforced insofar as it makes changes consistent with the amendment described in section 2 of this proclamation, then the amendment described in section 2 of this proclamation will no longer be in effect and section 2(c) of Proclamation 10773 shall continue to apply by its terms.

Sec. 5. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

6

(b)  This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-seventh day of September, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-ninth.



U.S. Customs and Border Protection

# CBP One™ Mobile Application

> ### ⓘ Recent Updates
>
> As of Monday, September 23, 2024, migrants with a CBP One™ appointment in Brownsville/Matamoros will be processed at the B&M Bridge. Migrants with confirmed CBP One™ appointments should present themselves on the South Side of the B&M Bridge. No appointments will be processed at the Gateway Bridge until further notice. There are no other changes to CBP operations in the Brownsville area.
>
> A partir del lunes 23 de septiembre de 2024, los migrantes con una cita de CBP One™ en Brownsville/Matamoros serán procesados en el puente B&M. Los migrantes con citas confirmadas de CBP One™ deben presentarse en el lado sur del puente B&M. No se procesarán citas en el puente Gateway hasta nuevo aviso. No hay otros cambios en las operaciones de la CBP en el área de Brownsville.
>
> On August 23, 2024, CBP updated the process for individuals to request and schedule appointments at one of the eight southwest land ports of entry that currently process individuals using the CBP One™ mobile application. The location from where individuals can request an appointment will be expanded. Currently, individuals can request an appointment from Northern and Central Mexico. Migrants who cross Mexico's southern border can now wait in Southern Mexico to secure an appointment before traveling to the north.
>
> As of Friday, August 23, 2024, non-Mexican migrants are able to request and schedule appointments from the Southern Mexico states of Tabasco and Chiapas, in addition to their existing ability to request and schedule an appointment from Northern and Central Mexico — enabling them to make appointments without having to travel all the way north to do so.

STB_AR1_000425



*Areas of Mexico where migrants of all nationalities can now request a CBP One™ appointment.*

Mexican nationals are able to request an appointment from anywhere within Mexico.



STB_AR1_000426

**Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance**

Upon suspension of and limitation on entry during emergency border circumstances under the Presidential Proclamation, *Securing the Border*, pursuant to the Interim Final Rule, *Securing the Border,* 8 C.F.R. § 235.15, a noncitizen who enters across the southern border, who is not described in the exceptions to the Proclamation, and who is placed in expedited removal will be referred for a credible fear interview only if the noncitizen manifests a fear of return or expresses an intention to apply for asylum or related protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal. Such a noncitizen in expedited removal must manifest fear or express a fear or intention to apply for asylum or related protection. This fear is not prompted by CBP questioning regarding whether the noncitizen has a fear of persecution or torture. A noncitizen can manifest fear or an intention to apply for asylum or related protection *at any time in custody.*

A fear can be manifested in many different ways, including verbally, non-verbally, or physically. In determining whether a noncitizen manifests fear, the following verbal, non-verbal, and physical indicators can be indicative of fear of persecution or torture, though this is not an exhaustive list:

- Statements of fear
    - For example, statements of fear may include, but are not limited to, the following;
        - I am afraid to go to [country]
        - I don't want to go to [country] because I [or my family] will be harmed
        - [Individual or group] will hurt me [or my family]
        - I am afraid of [country's government or governing group]
- Statements that the noncitizen was previously harmed in their home country or country of removal
- Statements that, if traveling in a family unit or family group, the noncitizen's family member was previously harmed in home country or proposed country of removal
- Evidence of physical injury consistent with abuse (e.g., bruises, scars, etc.)
- Evidence of self-harm
- Non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence

If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then CBP officers and agents should refer the matter to a supervisor. Note that a noncitizen can only express or manifest fear for themselves or members of their family unit, not on behalf of noncitizens outside their family unit. For instance, a single adult traveling in a large group of unrelated individuals may only express or manifest fear on their own behalf. They may not express or manifest a fear for the entire group of individuals.

STB_AR1_000502

If a member of a family unit manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country of removal, CBP officers and agents will process the rest of the family unit with the family member who expressed or manifested fear or expressed an intention to apply for asylum or related protection.

If CBP determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country of removal, the agent/officer will refer the noncitizen to USCIS for further screening.

## IF YOU:

- Are hungry or thirsty,
- Need medical care,
- Fear persecution or torture if removed from the United States,
- Have been a victim of abuse,
- Have been a victim of a sexual assault,
- Have witnessed a crime,

**Tell an Officer. Your claim will be heard.**

**You may be referred to a medical professional, an asylum officer or other law enforcement professional.**

## SI USTED

- Tiene hambre o sed,
- Necesita atención medica,
- Teme persecución o tortura si se lo expulsa de los Estados Unidos,
- Ha sido víctima de abuso,
- Ha sido víctima de asalto sexual,
- Ha sido testigo de un crimen,

**Avisar a un agente de la Patrulla Fronteriza Dígaselo a un oficial. Su reclamo será escuchado. Usted podría ser referida a un profesional médico, o un oficial de asilo u otro funcionario del gobierno.**

## 如果你

- 饿了或渴了 / 餓了或渴了
- 需要医疗护理 / 需要醫療護理
- 担心如果被驱逐出美国会受到迫害或酷刑 / 擔心如果被驅逐出美國會受到迫害或酷刑迫害或者遭受酷刑
- 曾经被是虐待的受害者 / 曾是被虐待的受害者
- 曾经是被性侵犯的受害者 / 曾是被性侵害的受害者
- 曾目睹过犯罪行为 / 曾目睹過犯罪行為

告诉一位官员。您的申诉将会被听取 / 告訴一名官員。您的申訴將會被聽取 / 您可能会被转介给医疗专业人员、庇护官员或其他执法专业人员。/ 您可能會被轉介給醫療專業人員、庇護官員或其他執法專業人員

## यदि आप

- क्या आप भूखे या प्यासे हैं
- चिकित्सा देखभाल की आवश्यकता है
- संयुक्त राज्य अमेरिका से हटाए जाने पर उत्पीड़न या यातना का डर
- दुर्व्यवहार के शिकार हो
- यौन उत्पीड़न के शिकार हो
- किसी अपराध के गवाह हो

किसी अधिकारी को बताइए। आपकी बात सुनी जाएगी।

आपको किसी चिकित्सा पेशेवर, शरण अधिकारी या अन्य कानून प्रवर्तन पेशेवर के पास भेजा जा सकता है।

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536


**U.S. Immigration
and Customs
Enforcement**

June 4, 2024

MEMORANDUM FOR:    Daniel A. Bible
                    Executive Associate Director
                    Enforcement and Removal Operations

FROM:    Patrick J. Lechleitner    PATRICK J    Digitally signed by
          Deputy Director and       LECHLEITNER   PATRICK J LECHLEITNER
          Senior Official Performing the Duties of the Director   Date: 2024.06.04 12:09:06
                                                                   -04'00'

SUBJECT:    Implementation Guidance for Noncitizens Described in
            Presidential Proclamation of June 3, 2024, *Securing the Border*,
            and Interim Final Rule, *Securing the Border*

The President issued Presidential Proclamation of June 3, 2024, *Securing the Border*.
Subsequently, the Secretary issued a memorandum directing relevant components to take all
appropriate actions to implement the Proclamation. In addition, the Secretary and the Attorney
General issued an Interim Final Rule (IFR), *Securing the Border*, establishing certain limitations
on asylum eligibility and revising certain standards and procedures associated with the expedited
removal process. These documents go into effect at 12:01 a.m. Eastern Daylight Time on June 5,
2024.

The IFR makes key changes to asylum processing that will be in place whenever encounters are
at levels that impede DHS' ability to apply timely decisions and consequences to the majority of
noncitizens encountered at the southern border, as described in the Proclamation. These changes
include: deeming certain noncitizens who enter across the southern border during circumstances
of high encounters at the border to be ineligible for asylum, with limited exceptions; applying a
manifestation of fear requirement for those processed for expedited removal to be referred to
USCIS for a credible fear interview; and creating a new, higher screening standard when
screening for statutory withholding of removal and protection under Article 3 of the Convention
Against Torture.

The IFR is intended to significantly increase the consequences in place for noncitizens who cross
irregularly—including those who cross unlawfully between ports-of-entry (POEs)— and to
maximize our ability to remove noncitizens who do not establish a legal basis to remain in the
United States as quickly as possible. The ultimate goal of these measures is to decrease
encounter rates at the southern border.

**STB_AR1_001418**

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,
*Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 2 of 5

The Proclamation's suspension and limitation on entry and the IFR both rely on factual findings about average daily encounters, and after June 5, 2024, will turn on or off depending on encounter numbers. The measures in the Proclamation and the rule apply until 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters between POEs. The measures continue or reactivate on the calendar day after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more between POEs.

During a period where the Presidential Proclamation's suspension and limitation on entry applies, the entry of noncitizens across the southern border is suspended and limited, unless an exception applies. For purposes of the Presidential Proclamation, "southern border" refers to:

- The southwest land border, defined as the entirety of the U.S. land border with Mexico; and
- The southern coastal border, defined as all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida, and all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California, as well as the coasts of the U.S. Virgin Islands and Puerto Rico.

The Presidential Proclamation does not apply to U.S. citizens. Moreover, it is not applicable to any of the following:

- U.S. noncitizen nationals;
- Lawful permanent residents (LPRs);
- Unaccompanied children (UCs);
- Noncitizens who are determined to be victims of severe forms of trafficking;
- Noncitizens who have sufficient documents to seek entry or admission into the United States, including visa holders, members of the armed forces, visa waiver program travelers, or those holding advance parole documents;
- Individuals arriving at a POE with a CBP One appointment, which the Secretary has determined is a safe and orderly process to arrive at a POE;
- Noncitizens who a U.S. Customs and Border Protection (CBP) officer permits to enter, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests that warrant permitting the noncitizen to enter; and
- Noncitizens who a CBP officer permits to enter due to operational considerations that warrant permitting the noncitizen to enter.

In general, noncitizens encountered by CBP between POEs on the southern border are subject to the Presidential Proclamation, though it is not applicable to excepted categories of noncitizens such as LPRs, UCs, and other excepted categories of noncitizens.

Additionally, the IFR implements a limitation on asylum eligibility for any noncitizen, with limited exceptions, who enters the United States across the southern border during a period in which the suspension and limitation on entry applies, as described in the Presidential

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,
*Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 3 of 5

Proclamation, and makes a number of changes to the credible fear process as applied to such individuals.

Specifically, CBP will not question a noncitizen described in the Presidential Proclamation and processed for expedited removal regarding his or her fear of return, but will refer the impacted noncitizen for a credible fear interview before U.S. Citizenship and Immigration Services (USCIS) only if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

Those who enter the United States across the southern border while the suspension and limitation described in the Presidential Proclamation is in effect will be ineligible for asylum unless they demonstrate to USCIS or EOIR that certain exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family with whom they are traveling:

      (1) faced an acute medical emergency;
      (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or
      (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 C.F.R. § 214.11.

ERO officers will not determine whether noncitizens are subject to an exception to the limitation on asylum eligibility, however, officers will assist partner agencies, such as USCIS, in their assessment of whether the rule applies or if a noncitizen is subject to an exception, by documenting any information affirmatively stated by the noncitizen that may be relevant to the consideration of the above factors.

ERO officers will continue to follow all other applicable legal obligations and DHS and ICE policies and procedures, including complying with the *Orantes* Injunction,[1] the *Flores* Settlement Agreement,[2] and the *Ms. L. v. ICE* Settlement Agreement.[3]

### Guidance on Noncitizens Manifesting Fear

Upon suspension of and limitation on entry during certain periods of high encounters under the Presidential Proclamation of June 3, 2024, *Securing the Border*, pursuant to the *Securing the Border* IFR, 8 C.F.R. § 235.15, a noncitizen who enters across the southern border, who is not described in the exceptions to the Presidential Proclamation and who is placed in expedited removal will be referred for a credible fear interview only if the noncitizen manifests a fear of return or expresses an intention to apply for asylum or related protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of

---

[1] *Orantes-Hernandez v. Gonzales*, No. 82-01107 (C.D. Cal. Nov. 26, 2007) (Modified, Consolidated Injunction).

[2] *Flores v. Reno*, No. 85-4544 (C.D. Cal. Jan. 17, 1997) (Stipulated Settlement Agreement).

[3] *Ms. L. v. ICE*, No. 18-428 (S.D. Cal. Dec. 11, 2023) (Settlement Agreement).

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,
*Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 4 of 5

removal. Such a noncitizen in expedited removal must manifest fear, or express a fear or intention to apply for asylum or related protection. This fear is not prompted by CBP or ICE questioning regarding whether the noncitizen has a fear of persecution or torture. A noncitizen can manifest fear or an intention to apply for asylum or related protection *at any time in custody*.

There may be cases in which a noncitizen manifests a fear of return after the expedited removal order is issued and the noncitizen is transferred to ERO custody. ICE has long recognized that a fear or intention to apply for asylum or related protection can be manifested in many different ways. Indeed, a fear may be manifested verbally, non-verbally, or physically. In determining whether a noncitizen manifests fear, the following verbal, non-verbal, and physical indicators can be indicative of fear of persecution or torture, though this is not an exhaustive list:

- Statements of fear
  - For example, statements may include, but are not limited to, the following;
    - I am afraid to go to [country]
    - I don't want to go to [ country] because I [or my family traveling with me or my family in my home country] will be harmed
    - Individual or group] will hurt me [or my family]
    - I am afraid of [country's government or governing group]
- Statements that the noncitizen was previously harmed in their home country or country of removal
- Statements that, if traveling in a family unit or family group, the noncitizen's family member was previously harmed in home country or proposed country of removal
- Evidence of physical injury consistent with abuse (e.g., bruises, scars)
- Evidence of self-harm
- Non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.

If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or protection, then ERO officers should refer the matter to a supervisor.

If ERO determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal, the officer will provide the noncitizen with the Information About Credible Fear Interview Sheet and refer the noncitizen to USCIS for a credible fear interview. Noncitizens who have been referred to USCIS for a credible fear interview shall be afforded a consultation period of a minimum of 4 hours that must occur between 7 a.m. and 7 p.m. local time prior to a credible fear interview. The 4 hour consultation period begins when ICE provides the individual with an opportunity to consult, i.e., when the noncitizen is provided access to a phone. The ERO officer makes no qualitative determination of any claim of fear.

STB_AR1_001421

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 5 of 5

## Signage and Video Guidelines for Noncitizens Described in the Presidential Proclamation

ERO must take the following measures in ICE facilities in which noncitizens subject to the Presidential Proclamation and/or the IFR are housed to ensure that noncitizens who may wish to seek asylum or other protection in the United States are aware of their ability to claim a fear of return or an intention to seek asylum or related protection.

- Post signs in the following areas in detention facilities:
    - Intake/In-processing areas, including hold rooms
    - Medical Units
    - Housing units – including special/restricted housing units
    - Dining Areas
    - Law Libraries

The language on these signs will be provided by ICE headquarters and read:

> If you
> Are hungry or thirsty,
> Need medical care,
> Fear persecution or torture if removed from the United States,
> Have been a victim of abuse,
> Have been a victim of a sexual assault,
> Have witnessed a crime,
> Tell an Officer. Your claim will be heard.
> You may be referred to a medical professional, an asylum officer, or other law enforcement professional.

These signs must be posted in English and Spanish. ERO will have additional translations available in facility law libraries in the following languages: Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese.

Moreover, in any location where it is possible to show to noncitizens a video, the video provided explaining to noncitizens that they should raise these concerns should be played on a loop. It may be played in conjunction with other videos but should be shown no fewer than once every two hours from 7:00 a.m. until 7:00 p.m. on a daily basis.

Specifically, the videos must be played in in-processing areas.

## Disclaimer

This guidance does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person.

1300 Pennsylvania Avenue NW
Washington, DC 20229



**U.S. Customs and Border Protection**

MEMORANDUM FOR:    Directors, Field Operations
Director, Preclearance Operations
Office of Field Operations

FROM:    Acting Executive Director
Admissibility and Passenger Programs

SUBJECT:    Processing Expedited Removal Cases

U.S. Customs and Border Protection (CBP) is continually scrutinized for its processing of inadmissible aliens under Section 235(b)(1) of the Immigration and Nationality Act (INA), commonly referred to as Expedited Removal (ER). As stated on March 31, 1997 by the Deputy Commissioner of the Immigration and Naturalization Service in implementing ER:

The expedited removal provisions present a tremendous challenge and responsibility…Every officer must adhere strictly to required procedures to ensure that the rights of aliens are protected, particularly those who express a fear of persecution, at the same time ensuring that aliens who clearly seek to violate the immigration laws are quickly removed from the United States in a professional, fair, and objective manner…."

This memorandum and muster is to serve as a reminder to CBP officers, supervisors, and managers processing, reviewing, and approving ER cases. This reminder includes the following items:

1. Use of the correct forms and charges for ER.
2. Asking the four "fear" questions on the I-867B.
3. Referring aliens who express a fear of return, whether verbally in response to a question or by non-verbal cues, for a Credible Fear interview.
4. Use of interpreters in any cases where the alien cannot communicate in the English Language.

The incorrect and incomplete processing of ER cases reflects upon the professionalism of CBP officers, supervisors and managers; and creates a perception to the public of the lack of sensitivity of CBP officers.

Please ensure that this memorandum and muster are disseminated to all ports of entry within your jurisdiction. Should you have any questions or require additional information, please contact ▮▮▮▮▮ Director, Enforcement Programs Division (EPD) ▮▮▮▮▮

Attachment

For Official Use Only
Law Enforcement Sensitive

**STB_AR1_001423**

## **Muster**

| | |
|---|---|
| **Week of**: | Immediate |
| **Topic**: | Processing Expedited Removal Cases |
| **References**: | Section 235(b)(1) of the INA; 8 CFR 235.3(b) |
| **Headquarters POC**: | ███████████████ |
| **Office**: | Admissibility and Passenger Programs |

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), amended Section 235(b) of the Immigration and Nationality Act (INA) to authorize the Attorney General (now the Secretary of the Department of Homeland Security (DHS)) to remove, without a hearing before an immigration judge, aliens arriving in the United States who are inadmissible under Section 212(a)(6)(C) or 212(a)(7) of the INA.

Under this expedited removal provision, aliens who indicate an intention to apply for asylum or who assert a fear of persecution or torture are referred to an asylum officer for a credible fear interview.

When processing cases under Section 235(b) of the INA, it is mandatory to process the case using the required forms and to document the case correctly.  The correct forms specific to ER cases include:
1. I-867A – Sworn Statement
2. I-867B – Jurat for the Sworn Statement
3. I-860 – Order of Expedited Removal
4. I-296 – Removal Order and Verification of Departure
5. M-444 – Information Regarding a Credible Fear Interview (if the alien expresses a fear of return)

**Fear of persecution or torture** – if the alien indicates in any manner or at any time during the inspection process, that he or she has a fear of persecution, that he or she has a fear of return to where they came, or that he or she has suffered or may suffer torture; you are **required** to refer the alien to an asylum officer for a credible fear determination.
- The four questions on the Form I-867B are designed to help in determining whether the alien has such fear.
- The sworn statement (both I-867A and I-867B (Jurat)) must be taken in a language the alien understands.
  - If the alien does not understand a language the officer is speaking, an interpreter must be obtained.
- Ask the questions as they appear on the Form I-867B at the end of the sworn statement, even if the officer asked the questions or similar questions earlier in the sworn statement.
  - Some aliens will respond to the question "Why did you leave your home country or country of last residence?" by saying either that they were looking for work in the United States or could not find work in their home county.
    - Such responses normally should not trigger a referral.

For Official Use Only
Law Enforcement Sensitive

Weekly Muster
Processing Expedited Removal Cases
Page 2

- However, if the alien also answers "yes" to either of the subsequent protection-related questions, even if no additional information is offered, the alien must be referred to an asylum officer for a credible fear interview.
  - o If the alien mentions any discrimination, harassment, or threats that made it difficult to find work or work in the alien's chosen profession, or mentions discrimination, harassment, or threats as to the reason he or she quit a job or was fired, the alien must be referred to an asylum officer.
- Any comments of concern made by the alien must be recorded in the sworn statement, including any indications made by the alien **prior to the secondary interview.**
- Any alien who exhibits any non-verbal cues – such as crying, hysteria, trembling, unusual behavior, incoherent or difficult speech patterns, or even silence – that may alert the officer/supervisors to possible fear of harm must be referred.
  - o If an officer/supervisor notices signs of physical trauma, such as cuts or bruises that might indicate a beating, the officer/supervisor must consult with a supervisory asylum officer before removing the alien or alien must be referred. All non-verbal cues must be noted in detail in the I-213 or a memo to file.
- CBPOs/Supervisors must recognize that simply coming to the Port of Entry could mean that they are asserting a fear claim.
  - o It is CBP's responsibility to clearly determine what the purpose is for that arrival and take the appropriate action.
  - o CBPOs/Supervisors must recognize that language barriers may present a problem and services of a translator may be required.
- Do not ask detailed questions about the nature of the alien's fear of persecution or torture; leave that for the asylum officer.
  - o In determining whether to refer the alien, CBPOs/Supervisors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements.
- The CBPO/Supervisor should err on the side of caution, apply the criteria generously, and refer to the asylum officer any questionable cases, including cases that might raise a question about whether the alien faces persecution or torture.
  - o **Do not** make any evaluation as to the merits of such fear; that is the responsibility of the asylum officer.
- Considerations that **should not** affect the officer/supervisor's decision to refer an alien for a credible fear interview include:  credibility, identity of the persecutor, size of the group at risk or country of origin.
- Officers/supervisors **should not** make a determination on whether the harm feared is on account of the alien's race, religion, nationality, membership in a particular social group or political opinion. Asylum law and particularly the definition of a "social group" are evolving.
- Cases involving domestic violence, spousal abuse, and sexual abuse of children, female genital mutilation, coercive family planning practices, organized crime, and whistleblowers on government corruption, homosexuality, AIDS, and other unresolved legal areas should be referred.
- When an individual or group expresses fear, it is against CBP and DHS policy to:
  - o Improperly encourage the alien(s) to withdraw their application for admission

Weekly Muster
Processing Expedited Removal Cases
Page 3

- o Fail to refer such the alien(s) for an interview by an Asylum Officer for a credible fear determination
  - o Incorrectly remove or send back (deny admission/referral) the alien(s) to a country where he/she/they may be persecuted and/or back to the country in which they came from, i.e., Mexico.
  - o Detain the alien(s) improperly or in inappropriate conditions
- CBP officers, supervisors, and managers should not provide an estimate of the time that the alien will be in detention prior to the credible fear interview.
  - o Under 8 CFR 235.3(b)(4)(ii), aliens referred for credible fear interviews are subject to mandatory detention unless:
    - There is a medical emergency for the alien; or,
    - There is a legitimate law enforcement objective.
  - o CBP must refer to ICE/ERO to detain all aliens referred for credible fear interviews.

If the alien answers affirmatively to one of the protection-related questions or requests asylum, and later changes the answer or asks to be sent home, the officer/supervisor must consult with the local USCIS Asylum office that has jurisdiction over the port of entry, to obtain guidance and fully document the results in the I-213. If the CBPO/Supervisor is unable to consult with a Supervisory Asylum Officer, they must refer the case.

Aliens who indicate an intention to apply for asylum or a fear of persecution or torture may not be ordered removed until an asylum officer has interviewed the alien to determine whether the alien has a credible fear of persecution or torture and warrants a full asylum hearing before an immigration judge.

It is CBP's responsibility to protect an alien(s)'s identity and not reveal or announce to any other foreign national or foreign government official that the alien(s) have sought refuge in the United States by requesting asylum or asserting a claim of fear of persecution or torture in returning to their country of origin.

For Official Use Only
Law Enforcement Sensitive



1300 Pennsylvania Avenue. NW
Washington, DC 20229

**U.S. Customs and
Border Protection**

*Commissioner*

APR 2 9 2022

MEMORANDUM FOR:    See Distribution

FROM:              Chris Magnus
                   Commissioner

SUBJECT:           Directive for U.S. Customs and Border Protection Approach to
                   Trauma-Informed Care for Persons in Custody

U.S. Customs and Border Protection (CBP) places the highest priority on the health and well-being of CBP personnel and persons in CBP custody. To that end, CBP has taken extensive steps to significantly enhance, in scope and scale, its medical support capabilities along the Southwest border. CBP has established a world-class, frontline medical support system for persons in custody, in coordination with local health systems, state/local/non-governmental agency officials, Department of Homeland Security (DHS) Headquarters (HQ), U.S. Immigration and Customs Enforcement, and U.S. Department of Health and Human Services. This medical support system is responsive to potentially vulnerable populations, such as children, and includes appropriate trauma-informed behavioral health considerations.

**Trauma-Informed Care Assessment**

Considering the increasing numbers of and time in custody for unaccompanied children, CBP undertook a detailed assessment of its trauma-informed care efforts, in coordination with the DHS Chief Medical Officer (CMO) and the Flores Settlement Medical Monitor. This assessment included: multiple consultations with internal and external subject matter experts (stakeholders); multiple site visits and interviews over recent years by the CBP CMO; multiple site visits and interviews over the past year by the Flores Medical Monitor; and site visits and structured interviews by the DHS CMO. The assessment identified areas for improvement in trauma-informed awareness/training, medical support, and holding processes. The conclusions of this assessment are below.

**CBP's Approach to Trauma-Informed Care in Custody**

CBP recognizes that many persons in CBP custody, especially children, may have experienced trauma prior to or as a result of their journey. Many more are subject to significant trauma, trafficking, violence, and abuse during their journey. Unaccompanied children are particularly at risk for trauma as a result of their journey and lack of immediate parent or family support, which could potentially be heightened while in custody.

**STB_AR1_001427**

A trauma-informed care approach, with an emphasis on unaccompanied children, is essential for CBP personnel. Key trauma-informed holding processes include: ensuring sense of safety/security; providing a reassuring adult presence (caregivers); providing regular reassurance; and providing activities for distraction. The core of a trauma-informed approach is recognition and awareness of potential trauma and potential adverse effects for persons in CBP custody. Key components of the CBP trauma-informed care approach are: awareness and training; trauma-informed medical support; and trauma-informed holding processes.

CBP trauma-informed care efforts for persons in custody are led by the CBP CMO with support from CBP Office of the Chief Medical Officer professional staff, in coordination with CBP offices and operational components and the DHS CMO. These efforts are supported by CBP Behavioral Health Advisors and CBP contract medical personnel and informed by other expert stakeholders as appropriate.

CBP will integrate trauma-informed care considerations into its medical support system and its processing/holding operations through five key components.

### I.  Trauma-Informed Awareness and Training
- CBP will ensure that its medical support processes are informed by the potential for trauma in persons in custody.
- CBP will ensure that its processing/holding operations are informed by the potential for trauma in persons in custody.
- CBP worked with behavioral health professionals to develop trauma-informed training for CBP medical support personnel. This will continue to be provided as part of medical support personnel onboarding.
- CBP is working with behavioral health professionals to develop trauma-informed training for CBP caregivers and CBP operational personnel who interact with persons in custody.

### II.  Trauma-Informed Medical Support
- CBP medical support processes are informed by the potential for trauma in persons in custody.
- CBP medical support processes emphasize early recognition of significant trauma-related behavioral health concerns with a focus on psychological triage, psychological first aid, and appropriate referral.
- CBP conducts structured health intake interviews on persons in custody, to include urgent behavioral health concerns.
- CBP conducts more detailed medical assessments, to include additional behavioral health considerations, on children and any person with an identified medical or behavioral health concern.
- CBP medical personnel receive trauma-informed care training to ensure trauma awareness in the conduct of these medical assessments.
- CBP medical personnel are trained, licensed, and credentialed to identify, address, and refer child welfare concerns for persons in custody.
- CBP medical personnel conduct psychological triage for potential trauma-related or other behavioral health concerns as appropriate for persons in custody.

STB_AR1_001428

- CBP medical personnel conduct psychological first aid for potential trauma-related or other behavioral health concerns as appropriate for persons in custody.
- CBP medical personnel coordinate appropriate referrals to local health systems for further evaluation, diagnosis, treatment, and management of behavioral health concerns.
- CBP medical personnel conduct appropriate follow-up care as directed.
- CBP medical personnel coordinate with CBP operational personnel to prioritize persons with trauma-related or other behavioral health concerns for transfer to the appropriate next level of the immigration continuum for disposition.
- CBP's Behavioral Health Advisors provide expert support, guidance, coordination, and consultation to the above processes for persons in custody.

### /II.  *Trauma-Informed Holding Processes*

- CBP, in coordination with operational components, will ensure that CBP holding processes are informed by the potential for trauma in persons in custody. These efforts will focus on four aims: provide a sense of safety/security; provide a reassuring adult presence (caregivers); provide regular orientation/reassurance; and provide activities for distraction/diversion.

    a) *Safe and Sanitary Conditions.* CBP ensures that all persons in custody are held in safe and sanitary conditions consistent with Transport, Escort, Detention and Search and other relevant guidance.

    b) *Limit Separations and Time in Custody.* CBP, to the greatest extent possible, makes every effort to limit family group separations and time in CBP custody.

    c) *Access to Medical/Behavioral Health Care.* CBP ensures that persons in custody have access to trauma-informed medical and behavioral health care. (See Section II above.)

    d) *Child-Friendly Environment.* CBP will, to the extent operationally feasible, promote a 'child-friendly' environment in facilities that regularly hold children.
    - Employment of caregivers (See 111.e, below.)
    - Trauma-informed support activities (See 111.f, below.)
    - Limiting chain-link fencing
    - Positive signage
    - Child-friendly decorations

    e) *CBP Caregivers.* CBP contracted caregivers are a critical component of CBP trauma-informed care efforts. They provide a reassuring adult presence and direct support to unaccompanied children, and they support and supervise trauma-informed support activities.
    - CBP is increasing contract caregiver availability on-site at locations expected to hold unaccompanied children to provide face-to-face engagement, interaction, and support. CBP is assessing the optimal ratio of caregivers to children.
    - CBP caregivers are properly vetted and qualified to provide the same type of support as day care providers.
    - CBP caregivers will receive training on trauma-informed recognition of medical and behavioral distress.
    - CBP caregivers will notify CBP operational and/or medical personnel of children in custody with potential medical or behavioral health concerns.

- CBP caregivers will provide support and supervision to trauma-informed support activities. (See III.f, below.)
  f) *Trauma-informed Support Activities.* CBP, in coordination with operational components, will provide an array of trauma-informed support activities focused on unaccompanied children at facilities expected to hold unaccompanied children. Recognizing the potential for trauma in their home communities and on their journey, and that time in custody can be destabilizing and disorienting, CBP will provide support activities, with assistance from CBP caregivers, to foster reassurance, resilience, orientation, recreation, and distraction for unaccompanied children.
    - *Access to Phone Calls to Family.* CBP will continue to ensure that unaccompanied children in custody are aware of and receive access to at least one phone call to a family member per day, subject to operational limitations.
    - *Daily Reassurance and Orientation Messaging.* CBP will ensure that unaccompanied children in custody receive at least one daily message (in person or video) providing reassurance of their safety and orienting them to date, time, location, and general process/disposition/expectations.
    - *Physical Recreation.* CBP will ensure that unaccompanied children receive daily physical activity/recreation, subject to operational limitations.
    - *Recreational Activities.* CBP will ensure that unaccompanied children receive daily recreational activity time (e.g., drawing, reading, puzzles, games), subject to operational limitations.

IV. *Monitoring and Oversight*
- The CBP CMO, the CBP Behavioral Health Officer, and CBP Behavioral Health Advisors regularly review and advise CBP trauma-informed care efforts, in collaboration with other internal and external stakeholders as appropriate.
- The CBP Juvenile Coordinator, in coordination with the CBP CMO, will monitor compliance of CBP trauma-informed care efforts.
- CBP will continue to review and assess trauma-informed care efforts with the DHS CMO and other internal/external stakeholders.

Regarding the timeline for implementation, CBP will identify additional priority facilities for institution of enhanced trauma-informed practices over the next 90 days. CBP CMO will work with the U.S. Border Patrol to institute enhanced trauma-informed practices outlined above at initial high priority facilities for unaccompanied children (Donna Soft-Side Facilities and El Paso Central Processing Center) over the next 90 days. Further, CBP CMO and CBP Juvenile Coordinator will assess progress toward enhanced trauma-informed practices. In addition, CBP CMO and CBP Juvenile Coordinator will review progress assessment with the DHS CMO.

As identified in this memorandum, CBP has established a path forward to addressing the findings of the joint assessment conducted in coordination with the DHS CMO and the Flores Settlement Medical Monitor regarding CBP's trauma-informed care efforts. These trauma informed care efforts are an essential part of CBP's commitment to ensuring the safety and

security of individuals, particularly vulnerable populations such as unaccompanied children, in our custody.

Distribution:  Executive Assistant Commissioners
Chief, Office of U.S. Border Patrol
Chief Counsel
Executive Director, Privacy and Diversity Office
Director, Office of the Executive Secretariat
Director, State and Local Liaison
Chief of Staff
Deputy Chief of Staff
Deputy Chief of Staff (Policy)

# Memorandum



| Subject: | Date: |
|---|---|
| Implementation of Expedited Removal | (S) March 31, 1997 |

**To:**  Management Team
       Regional Directors
    Regional Administrators
    District Directors (incl. foreign)
    Officers-in-Charge (incl. foreign)
    Chief Patrol Agents
    Asylum Office Directors
    Service Center Directors
    Port Directors
    ODTF Glynco
    ODTF Artesia

**From:**  Office of the Deputy Commissioner

The expedited removal provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) become effective April 1, 1997.  These provisions provide immigration officers the exclusive authority to order removed from the United States, without further hearing or review, arriving aliens who attempt entry by fraud or who arrive without proper documents. A proposed rule was published on January 3, and interim implementing regulations were published in the Federal Register on March 6,  to be effective April 1.

From February 27 - March 5, the Training Division conducted a train-the-trainer session at Jekyll Island, Georgia, to train almost 300 Immigration and Naturalization Service (INS) trainers in many of the provisions of IIRIRA, including expedited removal.  All Service officers are to have received this training by April 1.

In addition to the interim regulations, the Service has completed a draft of the Inspector's Field Manual (IFM), the first in a series of officer field manuals that will eventually replace the Service Operations Instructions.  Each of these field manuals will eventually be carried on INSERTS, the INS Easy Research and Transmittal System.  Several advance chapters of the IFM particularly affected by IIRIRA are being distributed to field offices for use in implementing these new provisions.  Chapter 17.15 of the IFM contains the expedited removal provisions.

The expedited removal provisions present a tremendous challenge and responsibility to INS officers, and will be the subject of close scrutiny by Congress, the Department of Justice,  advocacy groups, and others.  Every officer must adhere strictly to required procedures to ensure that the rights of aliens are protected, particularly those who express a fear of persecution, at the same time ensuring that

STB_AR1_001450

aliens who clearly seek to violate the immigration laws are quickly removed from the United States in a professional, fair, and objective manner.

Although the general expedited removal procedures are contained in Chapter 17.15 of the IFM and the IIRIRA training materials, following are additional instructions relating to implementation of these provisions.

1.     Arriving aliens who are inadmissible under section 212(a)(6)(C) or (7) are subject to expedited removal under section 235(b)(1) of the new Act.  If 212(a)(6)(C) and 212(a)(7) are the only charges lodged, the alien must be processed under expedited removal and may not be referred for an immigration hearing under section 240.  If additional charges are lodged, the alien may be referred for a section 240 hearing, but this should only occur in extraordinary circumstances. Generally speaking, if an alien is inadmissible under 212(a)(6)(C) or (7), additional charges should not be brought and the alien should be placed in expedited removal.  Aliens charged with grounds other than 212(a)(6)(C) or (7) should be referred for a hearing under section 240.

2.     Any immigration officer issuing an expedited removal order and any designated supervisory officer concurring on an expedited removal order must have completed Phase I of the official 96 Act Training Program prepared by the Training Division.

3.     All expedited removal orders require supervisory approval before service upon the alien. By regulation, this approval authority is not to be delegated below the level of a second line supervisor.  Each district may determine at what level this review authority should be delegated. All districts must report the names and titles of designated approving officials through channels to the Headquarters Office of Field Operations no later than April 1.

4.     When an unaccompanied minor or mentally incompetent alien appears to be subject to expedited removal, and the case cannot be resolved under existing guidelines by granting a waiver, deferring the inspection, or by other discretionary means, an expedited removal order may be issued, but the order must by reviewed by the district director or the deputy district director, or person officially acting in that capacity, before the alien is removed from the United States.

5.     The Service retains the discretion to permit withdrawal of application for admission in lieu of issuing an expedited removal order.  Provisions for withdrawal are now contained in both statute and regulation, with specific guidance in the IFM and should be followed by all officers with authority to permit withdrawals.  As an example, in cases where a lack of proper documents is the result of inadvertent error, misinformation, or where no fraud was intended (e.g. an expired nonimmigrant visa), Service officers may consider, on a case-by-case basis and at the discretion of the Service, any appropriate waivers, withdrawal of application for admission, or deferred inspection to resolve the ground of inadmissibility rather than issuing an expedited removal order.

6.     Numerous Service forms have been revised or newly created to conform with IIRIRA.  The revised forms are listed in 8 CFR 299.1 and 299.5 of the interim regulations.  A separate IIRIRA wire details the list of forms and how to obtain them.  Districts may request these forms from the Service Forms Centers.  In addition, the forms are being incorporated in electronic format into numerous automated forms-generation systems.

STB_AR1_001451

7.    When recording answers to the closing questions on Form I-867B, Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, if the alien indicates an intention to apply for asylum or a fear of harm or concern about returning home, the inspector should ask enough follow-up questions to ascertain the general nature of the fear or concern.  If the alien indicates an intention to apply for asylum or a fear of persecution, the alien should be referred to an asylum officer.  Inspectors should consider verbal as well as non-verbal cues given by the alien.  If an alien asserts a fear or concern which is clearly unrelated to an intention to seek asylum or a fear of persecution, then the case should not be referred to an asylum officer.  In determining whether to refer the alien, inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements.  The inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution.   Immigration officers processing aliens for expedited removal may contact the asylum office point(s) of contact when necessary to obtain guidance on questionable cases involving an expression of fear or a potential asylum claim.

8.    It is the responsibility of the referring officer to provide the alien being referred for a credible fear interview with both a Form M-444, Information about Credible Fear Interview, and a list of free legal services, as provided in 8 CFR parts 3 and 292.

9.    Credible fear interviews will normally take place at Service or contract detention facilities.  Each port-of-entry and detention facility will be provided with a point or points of contact at the asylum office having responsibility for that geographical area.  It is the responsibility of the detention or deportation officer to notify the appropriate Asylum office point of contact when an alien subject to the expedited removal process requires a credible fear interview, and is being detained in Service custody pending this interview.  That officer should also provide any additional information or requirements of the alien, such as whether the alien requires an interpreter or other special requests or considerations.  When aliens are detained in non-Service facilities or at remote locations, the referring officer must notify the appropriate Asylum Office. If the alien is subsequently transferred to another detention site, the detention or deportation officer must ensure that the appropriate Asylum Office has been notified.

10.    Normally the credible fear interview will not take place sooner than 48 hours after the alien arrives at the detention facility.  If the alien requests that the interview be conducted  sooner, the referring officer, or any other officer to whom the alien makes the request, should immediately convey that information to the appropriate Asylum office.

11.    Aliens placed into expedited removal proceedings must be detained until removed from the United States.  Parole may be authorized only for medical emergencies or for a legitimate law enforcement objective.  Once an alien has established a credible fear of persecution or is otherwise referred (as provided by regulation) for a full removal proceeding under section 240, release of the alien may be considered under normal parole criteria.

12.    If there is insufficient detention space to detain an alien in expedited removal who is arriving at a land port-of-entry and who claims a fear of persecution, that alien may be required to wait in

Canada or Mexico pending a final determination of his or her claim. This option should be taken only as a last resort and should only be used for aliens who claim a fear of persecution that is unrelated to Canada or Mexico. Aliens who make false claims to U.S. citizenship, or false or unverified claims to lawful permanent resident, asylee, or refugee status, and aliens who claim a fear of persecution that is related to Canada or Mexico must be detained. Aliens arriving at a land border port-of-entry who do not claim lawful status in the United States or a fear of persecution should normally be processed immediately and either returned to Canada or Mexico or detained until removed. These aliens should not be required to wait in Canada or Mexico pending issuance of an expedited removal order.

13.     Every case in which an expedited removal order is issued must be entered into the Deportable Alien Control System (DACS). Entry of data for those aliens detained by the Service will be handled by the Detention and Deportation section responsible for the detention facility. Entry of data for aliens not requiring detention who are removed directly from the port-of-entry is the responsibility of the Inspections section. A separate memorandum issued by the Office of Field Operations on March 18 details the procedures for entry of data into DACS for expedited removal cases. Cases initiated at the ports-of-entry and referred for removal proceedings under section 240 will continue to be entered into DACS by Detention and Deportation.

14.     The expedited removal process will be the subject of extensive inquiry and will require appropriate tracking of specific case data. A separate memorandum regarding tracking of expedited removal cases at ports-of-entry explains how this data collection will be accomplished.

15.     Unless an "A" number already exists for an alien placed into expedited removal, an "A" number must be assigned to every expedited removal case at the port-of-entry in order to ensure proper tracking of the case from the onset.

16.     New codes are being considered for entry of expedited removal cases into the Central Index System (CIS). Field offices will be notified once these codes are finalized. Entry of cases into CIS should be accomplished as quickly as possible in accordance with district policy. To ensure prompt data entry, "A" files for expedited removal cases should be separated from other files and flagged as expedited removal cases.

17.     New codes are also being created to designate expedited removal cases in the National Automated Immigration Lookout System (NAILS) and the Interagency Border Inspection System (IBIS). The new IBIS disposition codes have recently been posted in the IBIS Daily News. Field offices will be notified as new codes are finalized.

18.     The Inspections Workload Report, Form G-22.1 is being revised to include data relating to expedited removal cases, and is expected to be available October 1.

19.     The expedited removal provisions are not applicable in preclearance or preinspection operations. If the Service wishes to proceed with expedited removal of an alien inspected during an en route inspection of a vessel, action on the case will be deferred until the vessel has arrived in the United States. The alien may then be processed as an expedited removal case.

20.   Port directors are responsible for ensuring that all U.S. Customs officers who are cross-designated to perform immigration inspections are adequately trained in the expedited removal provisions. Customs officers shall not issue expedited orders of removal, even in ports where there is only a Customs officer on duty. Such cases must be referred to an INS officer if a decision is made to pursue expedited removal.

Questions regarding this memorandum may be addressed to Linda Loveless, Office of Inspections, at (202) 616-7489; Patrice Ward, Office of Inspections, at (202) 514-0964; Charlie Fillinger, Office of Asylum, at (202) 305-2666; Kelly Ryan, Office of General Counsel, at (202) 514-3211, and Ken Elwood, Office of Field Operations, at (202) 307-1983.


Chris Sale
Deputy Commissioner

September 26, 2024

MEMORANDUM FOR THE FILE

FROM:                       Nathaniel Kaine    **NATHANIEL**  Digitally signed by
                                   Chief of Staff      **C KAINE**  NATHANIEL C KAINE
                                   Date: 2024.09.26 21:22:44 -04'00'

U.S. Customs and Border Protection (CBP)

SUBJECT:              CBP Operational Information – *Securing the Border* Final Rule

This memorandum provides information about CBP operations at the southwest border, including information about the CBP One™ (CBP One) application, the processing of noncitizens at the border, the nature of CBP facilities, and the CBP process for reporting and addressing misconduct. This information was confirmed and considered in the course of developing the Final Rule *Securing the Border*.

## I.     CBP One

This memo provides certain data and information about CBP One and the ability of noncitizens to use the app to schedule an appointment to present themselves at a land POE. This memo provides certain data and information about CBP One and that capability, focusing on updates and changes to the app that have been made since May 2023.

### A.  Technological Updates and Changes to CBP One Since May 2023

CBP regularly makes updates to the app to address and resolve technical issues, to make the app more accessible, and to address security concerns. These steps have included implementing several new measures to combat the misuse of the app by users attempting to submit fraudulent duplicate registrations; updates to the appointment allocation process to render it more equitable; and steps to increase the security of the app.

These measures include, for example:
- Enhanced the appointment allocation process with capabilities to better detect and remove duplicate and fraudulent registrations.
- Implemented a cap of appointment offers of 20 percent to Mexican citizens (August 2023).
- Expanded the number of days in advance CBP offers appointments from 14 to 21 days.
- Implemented several additional security features to combat bots, automation, scripting and spoofing. For example, CBP implemented the CAPTCHA feature, a type of challenge–response test used in computing to determine whether the user is human to deter bot attacks and spam.

- Enhanced security features to include geo-spoofing measures and liveness checks for group registrations to schedule an appointment.
- Updated the app to eliminate a technical bug causing log in errors (known as 403 errors) reported by NGOs.
- Adjusted the appointment allocator to increase the number of appointments allocated to those users waiting the longest based on the create date of their registration (July 2024).

## B. Wait Times, Appointment Scheduling, and Allocation of Appointments

Based on data pulled by the Office of Field Operations (OFO), I understand that, between June 1, 2023, through February 2, 2024, there was an average of approximately 7.8 million appointments requested per month. Data that I reviewed on August 21, 2024 showed that, in July 2024, CBP received an average of 282,824 CBP One appointment requests each day. The total number of appointment requests over a multiple day period does not necessarily indicate the number of individual *people* requesting an appointment. This is because this number includes a significant number of repeat requests, as individuals are encouraged to submit an appointment request each day until gaining an appointment. Therefore, monthly totals do not reflect an accurate count of individuals seeking appointments.

There are currently 1,450 appointments allocated daily at eight POEs on the SWB. The number of appointments at a particular port is determined by the port's capability and capacity to process noncitizens using the app to schedule an appointment. When determining the locations of ports at which appointments are available, and the number of such appointments at each port, OFO evaluates a port's individual capacity and capabilities, which are continually assessed and evaluated. The ports vary with respect to geography, workload, resources, staffing, and infrastructure. The eight POEs at which appointments are processed are those that are large enough and have sufficient capacity and resources to process large groups of noncitizens. Moreover, OFO has assigned staff to these ports to conduct processing. They are also, as a general matter, located in or near urban areas with sufficient resources for noncitizens who may be released from OFO custody. Additionally, the selected POEs also have established relationships with NGOs who can provide direct support for recently released noncitizens. To add or expand to additional POEs would require OFO to reallocate staff to those additional POEs, which would essentially result in exchanging capacity in one POE for another.

The average wait time for appointments has increased since June 1, 2023, from an average of 40 days on June 1, 2023, to an average of 118 days on July 31, 2024. This increase was expected given the high demand for appointments and as the use of CBP One becomes more prevalent. There are multiple factors that go into calculating wait times as enhancements to the process and the opt-in pool changes daily. CBP monitors the app and wait times to ensure it is able to address any issues. As of August 25, 2024, there has not been any indication that wait times have increased at a greater rate since the *Securing the Border* Interim Final Rule (IFR) went into effect on June 5, 2024.

STB_AR1_001457

To request an appointment, noncitizens must "opt in" each day, by selecting the relevant registration that contains all of their family members or co-travelers and requesting an appointment on behalf of that registration. Noncitizens have a 12-hour window per day, between 12 pm ET to 11:59 pm ET, to request an appointment. Individuals are not required to use the same mobile phone or device to request an appointment each day, and therefore, may use a shared or borrowed device to request and schedule the appointment. Individuals who do not have a smartphone, or who have phone issues, may seek assistance from trusted partners. Individuals may create a registration from anywhere and are not required to enable location services to do so. Individuals are required to turn on location services in order to request and schedule an appointment. If an individual receives an appointment, they are notified by an email notification; a push notification to the device that made the appointment, which notifies them to log onto the app; an in-app message; and a change to their registration status in the app, ensuring that they receive notice in multiple ways. Once selected for an appointment, they have a period of 23 hours to log into the application and confirm the appointment. They also have an opportunity to request an additional 24-hour extension to confirm, if needed. The appointment can be confirmed using any mobile device, as long as there is access to the app itself. When allocating appointments, CBP allocates a certain percentage of appointments to those registrations which have been pending for the longest period of time. This is done based on the date on which the registration was created.

Family members or co-travelers who register together will always receive an appointment on the same day and time. If such family members or co-travelers arrive at that date and time, they will be processed at that same date and time. The location of the appointment is selected by the user, and they can change the requested location each time they request an appointment. To combat misuse of CBP One, on March 4, 2024, CBP limited the number of individuals who can register together, addressing a trend developed by users to create registrations with an excess of 70 individuals to increase their chances of obtaining an appointment through the random allocator. These individuals were unrelated families and unaccompanied adults, and therefore the information in the CBP One application regarding foreign and U.S. addresses and contact information was inaccurate. If an NGO or family contacts CBP with specific information on a family or group of co-travelers in excess of 10 individuals who are unable to register together, CBP can accommodate those registrations on a case-by-case basis.

CBP has been exploring a process to formalize NGO/International Organization coordination for vulnerable individuals who may need a CBP One appointment on an expedited timeline. CBP is partnering with DHS to establish this process to define, identify, refer and issue a limited number of CBP One appointments in specific cases. CBP and DHS are working to launch the program in the coming months.

Individuals who seek to use the app are not required to upload any documentation to create a registration or to schedule an appointment. They may, but are not required to, upload document information such as scanning their passport information.

### C.  CBP Engagement with Stakeholders

To assist in the collection of the customer experience requirements, there are various ways in which CBP actively seeks feedback on issues or concerns, and communicates directly with undocumented noncitizens using the application and the NGOs who support them. First, the CBP One email inbox is the primary mechanism by which users can send an inquiry or concern about any capability within the CBP One app. Since CBP One has many capabilities and functionalities, and is available to a diverse audience, the inbox initially responds to the author by asking them to select the appropriate topic pertaining to their specific issue. Emails related to the scheduling capability are addressed by one of three teams: CBP Customer Service, Office of Information Technology, or the CBP One team within OFO. Emails are responded to in the language in which the email was sent. Second, CBP holds recurrent meetings with NGOs to share updates and provide a forum for NGOs to express their concerns. Finally, CBP designated personnel both at local POEs and within CBP Headquarters who manage CBP One issues receive direct email communications from the NGOs through established channels.

Within the next 90 days, CBP will transition the CBP One inbox to the CBP Information Center, which is a dedicated external relations team that has an established method to track and respond to inquiries for CBP. After this transition, CBP will be better positioned to provide more timely responses and specific statistics on the number and type of queries CBP receives related to CBP One.

### D.  Feedback and Studies on Racial Bias

When the app was initially implemented, CBP received feedback that it was having issues recognizing individuals of color. Most of the feedback received from users and NGOs during in-person, phone, email, and formal briefings were challenges related to the registration process. Neither CBP nor CBP One collects data on race or skin complexion, and CBP does not provide the third-party software provider any personally identifiable information. However, CBP and its third-party liveness vendor, iProov, determined that there were issues related to the bandwidth for liveness detection, and made requisite app updates. Following the app updates and increased bandwidth, iProov data provided to CBP shows the app is successfully verifying liveness in around 80 to 90 percent of attempts. If someone consistently fails liveness, they should request an automatic extension to confirm their appointment. This will give them up to an additional 24 hours to attempt to pass liveness at a different time of day or in different light to ensure they cannot overcome the issue themselves.  If there continues to be an issue, they can reach out to the CBP One inbox or through NGOs who provide case information for CBP to investigate.

Additionally, CBP requested the results of previous analytics conducted on racial bias in iProov's genuine presence software. IProov advised they conducted their own equality analysis and provided a summary statement of their findings, stating that "Across our global platform, differences in performance between ethnicities are of the order of tenths of a percent. These

long-term averages are smaller than the variations we see month-to month for each ethnicity, and so it's unlikely they would be noticeable to users." Based on communications with iProov, CBP's understanding of the term "performance" is the "successful identification of genuine presence."

### E.  Language and Disability Access

CBP One was originally available in English and Spanish, with Haitian Creole added on February 1, 2023, based on stakeholder feedback that language access was a significant concern for the large Haitian population attempting to use this functionality. The terms and conditions were translated in all three languages on April 6, 2023. All drop-down menus are translated, as well as error codes, in the selected language (English, Spanish, or Haitian Creole).

An analysis of all CBP One appointment requests during the first week of September 2024 showed that 90.5 percent of requests were from nationalities where Spanish is the primary language, 5.3 percent of requests were from Haitians, and the remainder were from other nationalities. Based on NGO feedback, CBP will be implementing French next. There are no current plans to translate the app in Russian as there does not appear to be a demand by users. CBP has to balance the resource requirements for additional translations against other development requirements for the application and has not identified additional translations as critical to merit prioritization above other development work essential to the application's function at this time.

Spanish and Haitian Creole have always accounted for the languages spoken by the top 5 nationalities seeking appointments in the app, as well as the languages spoken by the top 5 nationalities of displaced individuals in Mexico and throughout Central and South America. Data I was provided on September 16, 2024, shows that, between May 11, 2023 (when the Title 42 public health Order terminated) through September 11, 2024, approximately 88 percent of noncitizens apprehended between POEs on the SWB were recorded as speaking Spanish or English. The next most common languages were recorded as Mandarin, representing just over 2 percent of encounters, followed by Portuguese, and French, which respectively represent less than 2 percent of encounters. All other languages were recorded as accounting for less than 1 percent of encounters. It is my understanding that, due to the way that OFO collects and maintains data on languages and encounters, that similar information regarding noncitizens who arrive at POEs is not available.

In addition, the CBP One advance information quick reference guides are currently available in Spanish, Haitian Creole, Russian, Portuguese, French, Arabic, Dari, Pashto, Punjabi, Simplified Chinese, and Traditional Chinese. CBP has seen a significant number of individuals who do not speak Spanish or Haitian Creole opting in and requesting an appointment, suggesting that the quick reference guides and other information published by CBP increase the accessibility of the app even to individuals who do not speak one of those languages. Additionally, individuals who do not speak one of the languages in which the app is available may seek assistance, as needed, from NGOs or other external entities.

CBP has received reports of inaccuracies with Haitian Creole translations and is currently working to improve the accuracy of those translations. CBP also understands digital literacy and reading comprehension are challenges for some among this user population. While CBP ensured the language in the app was appropriate for low-literacy users, some users have required the assistance of family, friends, and NGOs to complete the process. CBP will continue to make improvements to address these literacy issues. For example, CBP has taken steps, based on NGO feedback, to make certain data fields, including height and weight, optional for users. CBP also took steps, based on this feedback, to add additional response options such as "I don't have one" for a foreign address and "Unknown" for parental information.

To access CBP One, an individual must first create an account on Login.gov, which is run by the U.S. General Services Administration. I am aware that Login.gov provides the ability to create an account in several languages, including English, Spanish, and French. It is my understanding that, while the service's terms and conditions are initially presented in English, users are then able to choose a language to proceed, and the rest of the process occurs in that language.

CBP One was evaluated for a compliance review under section 508 of the Rehabilitation Act regarding its accessibility to people with disabilities in April 2023. CBP expects a final certification by the end of November 2024. In the meantime, CBP is aware of multiple free iOS and Android assistive technologies that can be used to access the app, if needed. For example, users can utilize free translate applications or other applications targeted to convert text to sound, provide magnification or translate into various languages. There are also videos online in various languages that provide step-by-step instruction. CBP is in the process of developing step-by step video instructions in Spanish and Haitian Creole.

In an effort to improve the ability for the user population to understand the instructions in the application, CBP utilized an online tool at www.hemingwayapp.com to evaluate all the language in the app to ensure it was at a 3rd grade comprehension level or lower. However, this continues to need improvement and the team will make further adjustments by users or NGOs.

CBP is committed to taking steps to ensure that the app is accessible to those noncitizens seeking to utilize it, and continues to take steps to do so.

## II.    CBP Processing at the Southwest Border

### A.  CBP Facilities and TEDS Training

Noncitizens taken into CBP custody are held at one of CBP's holding facilities, which, if they are holding noncitizens in custody, are staffed twenty-four hours a day, seven days a week, 365 days a year, as CBP encounters and takes people into custody at all times, every day of the year. Every CBP officer and agent receives training on CBP's *Transport, Escort, Detention, and Search* (TEDS) Policy, which provides custodial standards for CBP facilities, including requirements related to the provision of humanitarian amenities and conditions, and the monitoring of conditions in custody. In most facilities along the SWB, noncitizens in custody are

subject to continuous observation and supervision by a number of CBP personnel at the facility. In some smaller facilities, such supervision may not be continuous, but welfare checks are conducted on a regular and recurring basis.

## B. Processing of Family Units and Unaccompanied Children

During processing of noncitizens, CBP must determine the appropriate processing pathway for each individual taken into custody. This determination is made on a case-by-case basis, taking into account a number of factors, including an individual's age; nationality; and whether the individual is a member of a family unit, single adult, or unaccompanied child (UC). CBP agents and officers also conduct records checks on individuals during this time and take steps to identify any indicia that an individual may present a public safety or national security risk, as well as indicia of fraud or other unlawful activity. All of the information collected during processing is recorded in CBP's electronic processing systems. The collection of this information occurs during face-to-face interactions and interviews with the noncitizen, where CBP personnel have a chance to observe the noncitizen and their behavior.

The processing of family units and unaccompanied children generally takes longer than the processing of an individual who is a single adult. This is because, for families, each individual member of the family must be processed individually, and the familial relationships documented in the appropriate manner. Families and children are also, in general, prioritized for expedient processing. In addition, there are specific requirements applicable to the processing and holding of minors, including ensuring that minors receive appropriate notice of their rights and are, consistent with the *Flores* Agreement, processed for release from custody "as expeditiously as possible." DHS currently does not have the ability to detain families with children for longer than is permitted in CBP's short term holding facilities. Thus, if a family unit cannot be quickly processed for expedited removal while in CBP custody and removed directly by CBP, the family is generally released with a Notice to Appear in immigration court or placed into Expedited Removal through the Family Expedited Removal Management process and paroled.

The processing of unaccompanied children, as defined in 6 U.S.C. § 279(g)(2), is particularly resource-intensive, due to the unique vulnerabilities of this population. The processing of UCs is governed by the requirements of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457 (TVPRA). Under this statute, all UCs who are not nationals or residents of contiguous countries (e.g., Mexico and Canada), as well as UCs from contiguous countries who are not able to withdraw their application for admission, must be transferred to the custody of the Department of Health and Human Services, where they are cared for until they can be released to a sponsor within the United States. This transfer must occur within 72 hours of determining that a child is a UC, absent exceptional circumstances. Therefore, in order to meet this timeline, CBP must first determine whether a particular individual is, in fact, an unaccompanied noncitizen child. This is determined based on information obtained during the inspection and processing of an individual, including information provided by the individual and observations of the processing officer or agent.

STB_AR1_001462

Officers and agents have experience making these determinations, and are experienced at identifying, for instance, individuals who may be fraudulently presenting as unaccompanied children. CBP generally prioritizes UCs for processing in order to ensure they can be transferred within the appropriate time frame. Additionally, CBP screens all UCs to determine whether there are any indicators of trafficking or the child has a fear of returning to their home country, using the CBP Form 93. The TVPRA requires that this screening be conducted for UCs from contiguous countries, to determine whether they may be permitted to withdraw their application for admission to the United States. However, as a matter of longstanding policy, CBP screens all UCs for such concerns. This screening process, which is critical to protecting UCs from trafficking, consistent with the goals of the TVPRA, can take anywhere from approximately 15 minutes to over an hour. During processing, UCs are also provided with a Form I-770 explaining their legal rights, and a list of free or low-cost legal service providers. From the time of apprehension, it can take an overall average of 15 to 24 hours to complete processing and request and confirm placement with HHS.

CBP endeavors to hold UCs in our custody for as short a period of time as possible before they are transferred to HHS custody. During the time that UCs are in CBP custody, they receive medical screening and appropriate medical care, as well as appropriate humanitarian amenities/supplies. In addition, during the time that UCs spend in custody, they are subject to several requirements that are unique to and protect their particular vulnerability – including that they are held separately from unrelated adults for their safety, are provided with a video message that informs them of their rights and what to expect during the process, and are, as appropriate and operationally feasible, provided with child-appropriate activities and recreation. Ensuring that conditions are appropriate for such children require CBP resources and has an impact on the operations of CBP holding facilities. For example, female UCs must be held separately from adult males. Therefore, if a facility has even one female UC in custody, the holding room or pod in which that child is held may not also be used to hold any adult male. This may, depending on the numbers and demographics in custody, have an impact on the number and distribution of individuals who can be safely held in that facility.

Therefore, UCs who are not able to return to their country of origin, and who remain in CBP custody pending their transfer to HHS, take more CBP resources during their time in custody than required to process UCs from contiguous countries who withdraw their application for admission and voluntarily return home. Although the number of UCs from non-contiguous countries (and thus subject to the above provisions) fluctuates, most UCs encountered by CBP in FY 2024 are from non-contiguous countries. In particular, based on data I reviewed on August 8, 2024, U.S. Border Patrol (USBP) had apprehended approximately 89,200 UCs for FY 2024 to date, with approximately 63,000 being from non-contiguous countries and thus transferred to HHS custody in accordance with the provisions discussed above. In addition, the proportion of total USBP encounters who are UCs from non-contiguous countries has recently increased. In May 2024, non-contiguous UCs made up 4 percent of USBP encounters, while they made up 7 percent in July 2024.

### C. Expedited Removal and Notices to Appear

CBP endeavors to process the maximum number of amenable noncitizens for expedited removal, in order to apply effective and timely consequences to noncitizens who enter illegally or without authorization. However, because noncitizens in expedited removal are subject to mandatory detention, including during the pendency of their credible fear proceedings, its use may lead to an increase in the time that an individual spends in CBP custody. This is particularly the case when the individual is receiving a credible fear interview while in CBP custody. Thus, when there are high numbers of individuals encountered at the border, the number of individuals who remain in CBP custody for a lengthier period of time can increase rapidly, leading to overcrowded conditions. Given the nature of CBP facilities – which are designed for short-term temporary holding – CBP endeavors to move all individuals out of custody in an expeditious manner and to avoid overcrowding. In some circumstances, individuals going through the credible fear process may be transferred to ICE custody for detention during the duration of their credible fear proceedings. However, the ability to transfer such noncitizens is dependent on ICE's already-strained capacity. Accordingly, if there are a significant number of individuals in custody, and/or if those individuals have been in custody for a significant period of time, CBP generally, and as a matter of historical past practice since prior to the use of the Title 42 public health Order, must take steps to release some individuals to ensure safe and sanitary conditions and appropriate times in custody. In such cases when release is appropriate or warranted, CBP generally issues an individual a Notice to Appear before an immigration judge prior to their release from custody, following appropriate screening and vetting. In some cases, therefore, a noncitizen who would be otherwise amenable to expedited removal is released with a Notice to Appear.

The capacity to process individuals for expedited removal depends in significant part on a number of factors, including, but not limited to, the geographic distribution of encounters and the demographics of individuals encountered. As noted above, the processing of family units and UCs is particularly resource intensive. Thus, a spike or surge in the number of families and, in particular, UCs, has a significant impact on CBP's processing capacity and resources. In addition, if there are a large number of noncitizens encountered in a particular geographic area, resources may need to be diverted from other areas to address the processing constraints in the area of the surge. Such use of resources reduces CBP's capacity to process individuals into expedited removal.

### D. CBP Processing under the Interim Final Rule, *Securing the Border*

On June 5, 2024, the President issued a Proclamation, *Securing the Border*, and DHS and DOJ issued an IFR, *Securing the Border*. At the time that these processes were implemented, there was a delay in CBP's ability to immediately maximize processing noncitizens that it encountered after June 5th for expedited removal, due to the need to prioritize the processing of those who were encountered prior to June 5th.

In accordance with the Proclamation, the entry of any noncitizen across the southern border is suspended and limited, unless the noncitizen falls within one of several delineated exceptions to the Proclamation. One such exception is for a noncitizen who a CBP Officer permits to enter the United States, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interest, or based on operational considerations. The administration of these exceptions, while new and novel in and of themselves, require consideration of factors that officers regularly consider and take into account during other discretionary decisions made during immigration processing. For example, officers have experience assessing the totality of the situation when determining the appropriate processing pathway for a noncitizen or in determining whether parole is appropriate. Officers can call upon this experience and expertise when making decisions regarding exceptions from the Proclamation.

For those noncitizens who are described in the Proclamation and are processed for expedited removal, CBP refers such noncitizens for a credible fear interview if the noncitizen manifests a fear or otherwise indicates a fear of persecution or torture or an intention to seek asylum. Unlike under the procedures outside of the Proclamation and IFR, CBP officers and agents do not provide noncitizens with advisals on the Form I-867A or ask the affirmative questions on the Form I-867B. Noncitizens in custody may manifest or express a fear at any time, and are not limited to a single or definite number of opportunities. Claims of fear are documented in the relevant electronic processing system. While CBP officers and agents do not assess the validity of an individual's claim of fear, they do refer anyone who manifests or indicates such a fear or intent to USCIS for a credible fear interview. While this manifestation standard is, in the context of expedited removal, a new process, agents and officers have longstanding experience and practice in identifying potential claims of fear as part of the expedited removal process, and, in accordance with existing CBP policy and practice. CBP policy requires that any noncitizen who manifests or indicates a fear or intent to apply for asylum be referred to USCIS for a credible fear interview. Any failure by any agent or officer to comply with this policy would be referred for appropriate remedial action, including disciplinary action as appropriate.

The current manifestation of fear process under the *Securing the Border* IFR was implemented, in part, based on the conclusions of senior leaders within CBP that the provision of advisals and asking of affirmative questions on the Form I-867A and Form I-867B was suggestive. In particular, it was the conclusion of members of CBP senior leadership, that, when noncitizens are asked affirmative questions and are provided individualized advisals, noncitizens are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum. This is, in part, because the advisals and questions can serve to prompt a noncitizen to answer in the affirmative. This conclusion remains the same at this time, and is true regardless of the number of questions asked or the nature of the individualized advisals. Indeed, it is the conclusion of CBP senior leaders that a single question regarding a claim of fear would be suggestive, particularly in the context of emergency border circumstances as outlined in the IFR.

As part of this processing, CBP developed a sign and a video that advise noncitizens in custody that they should notify an agent or officer if they have any medical concern; a need for food, water, or other amenities; or if they have a fear of persecution or torture if removed from the United States. The video and signs also inform noncitizens that, if they express a fear of return, they will be referred to a USCIS asylum officer, who will assess their claim. The signs are posted in a number of areas at both POEs and USBP facilities, in locations where CBP is confident that they are likely to be seen by noncitizens in custody, including in circumstances where there may be overcrowding. The video will be played in the processing areas of CBP's large capacity facilities, at which the vast majority of noncitizens are processed for expedited removal. These signs and the video are provided in languages that are common to the majority of noncitizens encountered by CBP at the southwest border who may be subject to the *Securing the Border* rule and are written in plain and simple language. Currently, the poster and video are available in Spanish, Mandarin, and Hindi, as well as in English. Individuals who do not speak one of the languages are provided with language access services consistent with CBP's existing language assistance policies, which includes having the poster read to them in a language they understand. Officers and agents are trained to provide such language assistance services and continue to provide them to individuals processed under the Proclamation and Rule.

In August 2024, OFO became aware that the signs referenced above were erroneously not posted at the Hidalgo and Brownsville POE. On September 5, 2024, OFO HQ issued a memo and muster to all Field Offices on the southwest border reiterating that the signs need to be posted in all facilities in areas where noncitizens are likely to see them.

In addition, noncitizens who manifest a fear are provided with an information sheet, "Information about Credible Fear Interview Sheet," which explains the credible fear process. This information sheet is currently available in English, Spanish, Haitian Creole, and Portuguese. They also receive an Executive Office for Immigration Review (EOIR)-maintained list of pro bono legal service providers. If they are unable to speak or understand one of those languages, language access services are provided, including having the form read to them in a language they understand. These noncitizens are also shown an approximately 5-minute video explaining the credible fear process in more detail and what to expect during the process. This video is available in English, Spanish, and Haitian Creole.

Those noncitizens who manifest a fear and undergo their credible fear interview during their time in CBP custody are provided with a 4-hour window of time to consult with an individual of their choosing prior to their credible fear interview. Noncitizens are provided the opportunity to access information they may need from their personal property, including contact information, prior to this consultation. This consultation occurs by phone, and takes place in a private, confidential, closed booth, to protect privacy. Additionally, during the time that a noncitizen is able to consult, they have access to paper and a pen. This consultation occurs in the same phone booths that are used for credible fear interviews, all of which contain the EOIR-maintained list of pro bono legal service providers. If a noncitizen is held in CBP custody pending a credible rear interview, they will automatically receive use of a phone at the beginning of their consultation period. If a noncitizen requests use of a phone after the end of their consultation period, but before their

interview occurs, they will be afforded the opportunity to access a phone unless it is not operationally feasible to provide such access (such as a lack of available personnel to escort them to the consultation area). This practice of automatically providing access to a phone and of facilitating access to a phone even after the end of the consultation period, as operationally feasible, is consistent with CBP's practices during the time when noncitizens had 24 hours to consult.

It is CBP's experience that the 4-hour consultation period enables credible fear interviews to occur in a more efficient manner and reduces the time that noncitizens spend in CBP custody. This more efficient processing mitigates concerns about overcrowding in CBP facilities, enables the processing of more individuals for expedited removal, and helps to avoid situations – as described above – in which DHS must issue Notices to Appear for individuals otherwise eligible for expedited removal and release them from custody (which serves to delay the imposition of consequences for noncitizens without a legal basis to remain the United States, and serves to create incentives for additional noncitizens to come to the United States). In contrast, a longer consultation period would delay credible fear interviews and increase the amount of time that a noncitizen remains in custody, contributing to overcrowding in CBP facilities and potentially requiring the release of increased numbers of noncitizens with a Notice to Appear.

Since the implementation of the Proclamation and the IFR, CBP and DHS have consistently assessed the process and whether it is having its intended effect. For example, on July 22, 2024, I requested feedback from DHS operational components about their implementation of the Proclamation and the IFR, specifically asking about areas of success and areas of improvement. In response to that email, USBP reported that the Proclamation and IFR generally had several positive impacts, including, as anticipated, improved, overall processing efficiencies as a result of streamlined processing procedures. In particular, it was anticipated that the manifestation procedures under the Proclamation and IFR would save approximately 20-30 minutes per person. This was based, in large part, on USBP's experience that reading and completing a sworn statement, such as I-867A, may involve a number of questions, the answers to which all need to be documented, and then a signature is required. All of these steps must also be translated, if needed, which adds additional time to the process. While it is difficult to provide the exact time saved as a result of the changes to these processes under the Proclamation and IFR (because USBP systems do not automatically track processing time, standing alone), USBP has confirmed that it is their experience that eliminating these questions and processes has, as anticipated, saved approximately 20-30 minutes per person. USBP also acknowledged that the Proclamation and IFR had effectively deterred illegal entry. Areas identified for recommended improvement included operational considerations such as improving and expanding repatriation flight options, increasing ICE detention capacity, and efforts to further increase the number of credible fear interviews that could be conducted daily.

While individuals encountered by USBP and processed into expedited removal under the IFR may be removed directly from USBP custody, individuals encountered by OFO are not removed directly from OFO custody but instead first transferred to ERO for removal.

STB_AR1_001467

### III. Processing Noncitizens for Expulsion under Title 42 and Manifestation of Fear

In March 2020, the Centers for Disease Control and Prevention (CDC) issued an order under Title 42 of the U.S. Code suspending the introduction of certain noncitizens from foreign countries in an effort to protect public health. This Order was amended and extended multiple times and remained in effect through May 11, 2023. While this order was in effect, noncitizens without proper travel documents were generally expelled directly to Mexico or their home countries. They were not processed under the immigration provisions in Title 8. In general, processing for expulsion under Title 42 was a more streamlined, quicker process, with less interaction between the noncitizen and the inspecting/processing immigration officer. In particular, it is my understanding from the USBP that processing a noncitizen for expulsion took, on average, less than 30 minutes. Noncitizens who could be expelled to Mexico generally remained in custody for only the short period of time required to arrange for their repatriation back to Mexico. During the pendency of the Title 42 order, Mexico accepted the expulsion of a larger population of non-Mexicans than it does today for non-Mexicans ordered removed from the United States under Title 8. Thus, some non-Mexicans who could have been expelled to Mexico under Title 42 must, when processed for removal under Title 8, remain in custody pending a flight to their home country. This means that these noncitizens remain in custody for longer than they would have when processed under the Title 42 public health Order.

Noncitizens being processed for expulsion under Title 42 who affirmatively claimed a fear of torture in the country of expulsion were referred to USCIS for a protection screening or excepted from Title 42 for Title 8 processing. However, CBP did not systematically record or track such screenings or exceptions. In May 2022, following and in compliance with a March 2022, decision by the U.S. Court of Appeals for the District of Columbia Circuit, in *Huisha Huisha v. Mayorkas,* finding that the Government may only expel family units to places where they are not likely to be persecuted or tortured, USBP and OFO issued guidance that clarified previous guidance implementing the CDC Order to ensure consistency with the opinion. The guidance provided that, if a family unit manifested a fear of returning or being sent to the country to which they would be expelled, they should be either referred to USCIS for a screening interview or excepted from Title 42. The guidance provided certain factors that may indicate that a family unit may have manifested such a fear. USBP also began generally recording referrals for a screening or exceptions from the Order. I have reviewed data regarding noncitizens who were recorded as having manifested fear in USBP custody between June 3, 2022 and May 11, 2023, and were, in general, excepted from Title 42 and processed under Title 8 in accordance with the implementation guidance for this process. This data shows that, during that time, recorded manifestations represented 6.6 percent of all family unit individuals processed under Title 42, and who were, in general, excepted from Title 42 and processed under Title 8 after manifesting fear.

### IV. Investigations of Allegations of Misconduct or Policy Violations

If there are allegations that CBP has violated policy or there are allegations of misconduct, CBP may receive the inquiry in many ways. In some cases, CBP receives a request for information

from DHS' Office of Civil Rights and Civil Liberties (CRCL). An allegation of misconduct may come through the Joint Intake Center. CBP's Office of Professional Responsibility (OPR), in coordination with the DHS Office of Inspector General, reviews allegations of CBP employee misconduct. Any allegations of misconduct related to a CBP employee that are referred to CBP's OPR are investigated thoroughly, and appropriate actions are taken if the allegation is substantiated. These outcomes may include a referral for disciplinary action against involved personnel; or a referral of criminal charges if a determination is made that any laws were broken. In addition, investigations by CBP OPR, DHS CRCL, and DHS OIG all may result in recommendations of various remedial measures, including the imposition of additional training and policy measures to correct systemic issues, as appropriate. The agency believes that this robust process is sufficient to address any allegations or issues related to manifestation claims.

As of September 11, 2024, I am not aware of any substantiated allegations of misconduct related to ignoring any claims or manifestations of fear under the IFR process.

Average Daily **USBP** Encounters and Processing Rates and DHS Repatriations by Time Period and Selected Citizenship

| | Mexico | | | | OTM | | | | Total | | | | % change from pre-pandemic | % change from pandemic | % change from immediate post-pandemic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-Pandemic Period | Pandemic Period | Immediate post-pandemic | IFR Period | Pre-Pandemic Period | Pandemic Period | Immediate post-pandemic | IFR Period | Pre-Pandemic Period | Pandemic Period | Immediate post-pandemic | IFR Period | | | |
| Total Southern Border encounters | 482 | 1,669 | 1,466 | 863 | 793 | 3,071 | 3,661 | 1,224 | 1,275 | 4,741 | 5,127 | 2,088 | 64% | -56% | -59% |
| Coastal Sectors | 2 | 1 | 1 | 2 | 8 | 13 | 7 | 9 | 10 | 13 | 8 | 10 | -1% | -25% | 31% |
| Southwest Border | 479 | 1,669 | 1,465 | 862 | 786 | 3,059 | 3,654 | 1,215 | 1,265 | 4,728 | 5,119 | 2,077 | 64% | -56% | -59% |
| SA | 438 | 1,529 | 834 | 546 | 290 | 1,758 | 1,936 | 712 | 728 | 3,287 | 2,770 | 1,259 | 73% | -62% | -55% |
| FM | 10 | 75 | 551 | 251 | 374 | 1,026 | 1,478 | 365 | 384 | 1,101 | 2,029 | 617 | 61% | -44% | -70% |
| UC | 31 | 65 | 80 | 64 | 122 | 275 | 240 | 138 | 153 | 340 | 320 | 202 | 32% | -41% | -37% |
| **T8 Dispositions (FM and SA only; Title 8 only)** | | | | | | | | | | | | | | | |
| VR | 6% | 15% | 40% | 4% | 0% | 0% | 1% | 0% | 2% | 1% | 12% | 2% | 0% | 100% | -83% |
| Reinstatement | 43% | 30% | 9% | 24% | 15% | 1% | 3% | 6% | 26% | 3% | 4% | 14% | -46% | 367% | 250% |
| ER | 47% | 24% | 12% | 62% | 38% | 12% | 20% | 56% | 41% | 13% | 18% | 59% | 44% | 354% | 228% |
| NTA | 3% | 18% | 39% | 8% | 47% | 47% | 76% | 37% | 29% | 45% | 66% | 25% | -14% | -44% | -62% |
| Other | 2% | 13% | 0% | 1% | 1% | 40% | 0% | 1% | 1% | 38% | 0% | 1% | 0% | -97% | |
| **ER Processing** | | | | | | | | | | | | | | | |
| % claiming fear | 1% | 4% | 33% | 8% | 61% | 66% | 63% | 43% | 37% | 59% | 57% | 27% | -27% | -54% | -53% |
| USCIS screen-in rate | 41% | 45% | 42% | 42% | 76% | 61% | 49% | 53% | 76% | 61% | 54% | 51% | -33% | -16% | -6% |
| Comprehensive screen-in rate | 45% | 55% | 51% | 47% | 83% | 73% | 64% | 58% | 83% | 73% | 62% | 57% | -31% | -22% | -8% |
| **ERCF Processing timelines (Median days)** | | | | | | | | | | | | | | | |
| Encounter to Referral | 14 | 11 | 4 | 2 | 13 | 11 | 6 | 12 | 13 | 11 | 5 | 10 | -23% | -9% | 100% |
| Referral to Result | 8 | 19 | 12 | 3 | 8 | 17 | 12 | 6 | 8 | 17 | 12 | 5 | -38% | -71% | -58% |
| Encounter to Removal: no fear | 1 | 1 | 1 | 2 | 11 | 10 | 7 | 8 | 1 | 1 | 5 | 6 | 500% | 500% | 20% |
| Enounter to Removal: negative fear | 53 | 65 | 25 | 10 | 75 | 74 | 46 | 37 | 75 | 74 | 44 | 32 | -57% | -50% | -27% |
| **CBP Bookouts (include T42)** | | | | | | | | | | | | | | | |
| Repatriation | 89% | 97% | 53% | 68% | 3% | 36% | 2% | 4% | 37% | 58% | 16% | 32% | -15% | -45% | 94% |
| Release | 1% | 1% | 37% | 12% | 17% | 46% | 75% | 46% | 10% | 30% | 64% | 31% | 200% | 4% | -52% |
| TOT ERO | 9% | 3% | 11% | 13% | 80% | 17% | 23% | 47% | 52% | 12% | 19% | 33% | -36% | 176% | 71% |
| Other | 1% | 0% | 0% | 6% | 0% | 0% | 0% | 3% | 1% | 0% | 0% | 3% | 585% | 2172% | |
| **DHS Repatriations (excludes admin returns; includes T42)** | 730 | 1,816 | 1,032 | 901 | 438 | 1,251 | 1,009 | 980 | 1,168 | 3,067 | 2,041 | 1,881 | 61% | -39% | -8% |
| Total Title 8 Repatriations | 730 | 262 | 1,032 | 901 | 438 | 226 | 1,009 | 980 | 1,168 | 488 | 2,041 | 1,881 | 61% | 285% | -8% |
| Total Title 42 | 0 | 1,554 | 0 | 0 | 0 | 1,026 | 0 | 0 | 0 | 2,579 | 0 | 0 | -100% | | |
| **DHS SWB repatriations** | 556 | 1,721 | 924 | 882 | 223 | 1,051 | 431 | 470 | 780 | 2,772 | 1,355 | 1,352 | 73% | -51% | 0% |
| SWB Title 8 Repatriations | 556 | 169 | 924 | 882 | 223 | 66 | 431 | 470 | 780 | 235 | 1,355 | 1,352 | 73% | 475% | 0% |
| SWB Title 42 Repatriations | 0 | 1,552 | 0 | 0 | 0 | 985 | 0 | 0 | 0 | 2,537 | 0 | 0 | -100% | | |
| OTMs to Mexico | 0 | 0 | 0 | 0 | 3 | 554 | 37 | 50 | 3 | 554 | 37 | 50 | 1567% | -91% | 35% |
| OTMs to home countries | 0 | 0 | 0 | 0 | 220 | 63 | 394 | 421 | 220 | 63 | 394 | 421 | 91% | 568% | 7% |
| OTMs T42 delayed expulsion - unknown country | 0 | 0 | 0 | 0 | 0 | 434 | 0 | 0 | 0 | 434 | 0 | 0 | | | |

| | Pre-Pandemic | CLP Period | STB Period |
|---|---|---|---|
| % of encounters placed in ER | 41% | 18% | 59% |
| % claiming/manifesting fear | 37% | 57% | 27% |
| USCIS screen-in rate | 76% | 54% | 51% |
| Comprehensive screen-in rate | 83% | 62% | 57% |

| ERCF Processing timelines | Pre-Pandemic | CLP Period | STB Period |
|---|---|---|---|
| Encounter to Referral | 13 | 5 | 10 |
| Referral to Result | 8 | 12 | 5 |
| Encounter to Removal: no fear | 1 | 5 | 6 |
| Encounter to Removal: negative f | 75 | 44 | 32 |

Notes: Average daily encounters data are for all USBP encounters in SW border and adjacent coastal sectors; dispositions, ER Processing timelines, CBP bookouts, and SWB repatriations data are limited to SWB USBP encounters of single adults and family units. DHS repatriations include nationwide repatriations, excluding administrative returns. SWB Repatriations refers to repatriations resulting from SWB encounters. Pandemic period dispositions data are limited to Title 8 encounters but bookouts data and repatriations include Title 42 expulsions within the count of repatriations. Pre-pandemic period refers to FY 2014 - FY 2019; Pandemic period refers to March 20, 2020 to May 11, 2023; immediate post-pandemic period refers to May 12, 2023 - June 4, 2024; IFR Period refers to June 5 - August 31, 2024.

Source: All data for pre-pandemic period, pandemic period, and immediate post-pandemic period are based on OHSS analysis of July 2024 OHSS Persist dataset except for ER Processing data (rows 16-24), which are from OHSS analysis of OHSS Enforcement Lifecycle dataset as of June 30, 2024. All data for IFR period are OHSS analysis of data downloaded from UIP on Sept. 3, 2024.

CBP SWB Encounters FY 2000 - FY 2024

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | FY Total | Q2 averages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 87,819 | 74,362 | 66,256 | 175,383 | 200,619 | 209,311 | 170,621 | 155,961 | 103,856 | 111,963 | 113,448 | 96,822 | ####### | 195,104 |
| 2001 | 81,995 | 67,217 | 54,828 | 124,586 | 150,616 | 169,904 | 142,040 | 123,054 | 89,034 | 83,853 | 84,837 | 59,448 | ####### | 148,369 |
| 2002 | 37,746 | 32,694 | 31,531 | 79,647 | 95,645 | 126,906 | 121,908 | 97,571 | 78,730 | 76,719 | 82,860 | 68,384 | 930,341 | 100,733 |
| 2003 | 61,913 | 47,919 | 37,930 | 87,002 | 97,016 | 98,625 | 75,564 | 88,845 | 75,634 | 79,396 | 84,651 | 72,239 | 906,734 | 94,214 |
| 2004 | 69,246 | 62,452 | 48,280 | 98,764 | 116,398 | 162,530 | 142,491 | 125,502 | 101,178 | 98,989 | 99,986 | 85,877 | ####### | 125,897 |
| 2005 | 81,687 | 70,617 | 54,028 | 101,552 | 121,177 | 150,892 | 148,688 | 125,226 | 99,490 | 105,093 | 107,620 | 103,177 | ####### | 124,540 |
| 2006 | 91,935 | 78,817 | 60,375 | 110,987 | 132,780 | 169,077 | 133,964 | 113,311 | 76,274 | 67,636 | 67,631 | 65,571 | ####### | 137,615 |
| 2007 | 68,083 | 58,199 | 47,537 | 79,794 | 86,435 | 122,450 | 112,773 | 97,196 | 79,997 | 75,766 | 69,142 | 57,556 | 954,928 | 96,226 |
| 2008 | 58,616 | 48,693 | 38,556 | 66,471 | 80,724 | 97,774 | 99,518 | 77,048 | 60,492 | 56,806 | 56,142 | 51,713 | 792,553 | 81,656 |
| 2009 | 49,217 | 38,450 | 31,206 | 50,737 | 55,132 | 74,323 | 65,129 | 57,593 | 52,600 | 50,986 | 51,048 | 42,666 | 619,123 | 60,064 |
| 2010 | 47,290 | 39,064 | 31,352 | 40,741 | 48,753 | 69,152 | 62,351 | 54,018 | 39,308 | 32,363 | 33,717 | 29,310 | 527,419 | 52,882 |
| 2011 | 32,451 | 28,516 | 25,728 | 29,737 | 34,408 | 48,920 | 42,739 | 37,543 | 32,909 | 29,520 | 30,216 | 28,386 | 401,073 | 37,688 |
| 2012 | 31,344 | 28,617 | 24,380 | 30,798 | 37,009 | 48,538 | 46,680 | 43,020 | 36,808 | 32,833 | 33,699 | 32,399 | 426,125 | 38,782 |
| 2013 | 34,847 | 33,159 | 29,077 | 32,485 | 40,636 | 54,010 | 54,771 | 50,500 | 40,790 | 40,006 | 41,125 | 38,206 | 489,612 | 42,377 |
| 2014 | 41,835 | 38,692 | 36,707 | 35,200 | 42,473 | 57,548 | 59,383 | 69,033 | 66,572 | 48,833 | 39,766 | 34,006 | 570,048 | 45,074 |
| 2015 | 35,903 | 33,024 | 34,231 | 30,179 | 32,554 | 39,162 | 38,299 | 40,684 | 38,620 | 38,610 | 42,419 | 41,171 | 444,856 | 33,965 |
| 2016 | 45,245 | 45,387 | 48,393 | 33,396 | 38,068 | 45,779 | 48,271 | 54,987 | 45,168 | 46,658 | 51,569 | 56,070 | 558,991 | 39,081 |
| 2017 | 66,707 | 63,366 | 58,416 | 42,458 | 23,555 | 16,592 | 15,768 | 19,940 | 21,657 | 25,014 | 30,569 | 31,157 | 415,199 | 27,535 |
| 2018 | 34,842 | 39,031 | 40,476 | 35,865 | 36,690 | 50,213 | 51,019 | 51,790 | 43,096 | 40,005 | 46,551 | 50,366 | 519,944 | 40,923 |
| 2019 | 60,775 | 62,463 | 60,789 | 58,313 | 76,543 | 103,730 | 109,413 | 144,113 | 104,310 | 81,748 | 62,608 | 52,424 | 977,229 | 79,529 |
| 2020 | 45,139 | 42,642 | 40,563 | 36,583 | 36,686 | 34,457 | 17,106 | 23,237 | 33,029 | 40,949 | 50,007 | 57,668 | 458,066 | 35,909 |
| 2021 | 71,943 | 72,113 | 73,994 | 78,414 | 101,098 | 173,277 | 178,795 | 180,597 | 189,034 | 213,593 | 209,840 | 192,001 | ####### | 117,596 |
| 2022 | 164,837 | 174,845 | 179,253 | 154,874 | 166,010 | 222,574 | 235,785 | 241,136 | 207,834 | 200,162 | 204,087 | 227,547 | ####### | 181,153 |
| 2023 | 231,529 | 235,173 | 252,315 | 157,358 | 156,630 | 193,249 | 211,992 | 206,690 | 144,556 | 183,479 | 232,963 | 269,735 | ####### | 169,079 |
| 2024 | 240,932 | 242,400 | 301,980 | 176,196 | 189,912 | 189,360 | 179,740 | 170,718 | 130,416 | 104,116 | 100,497 | | | 185,156 |

Note: August 2024 figure is a preliminary estimate based on opertational data.

Source: July 2024 OHSS Persist and data downloaded from UIP Sept. 6, 2024.

STB_AR1_001493

| | USBP | | | Percent of total by column | | |
|---|---|---|---|---|---|---|
| | Mexico | OTM | Total | Mexico | OTM | Total |
| Total encounters | 143,177 | 241,091 | 384,268 | | | |
| UCs | 8,177 | 15,079 | 23,256 | 6% | 6% | 6% |
| VR | 3,598 | 1 | 3,599 | 3% | 0% | 1% |
| Other UC dispositions | 4,579 | 15,078 | 19,657 | 3% | 6% | 5% |
| SA + FM Encounters | 135,000 | 226,012 | 361,012 | 94% | 94% | 94% |
| VR/withdraw | 40,736 | 973 | 41,709 | 28% | 0% | 11% |
| Reinstatements | 13,786 | 6,406 | 20,192 | 10% | 3% | 5% |
| Admin Removals | 63 | 160 | 223 | 0% | 0% | 0% |
| | | | | 0% | 0% | 0% |
| Potentially Amenable to ER | | | | | | |
| ER | 30,591 | 56,935 | 87,526 | 21% | 24% | 23% |
| All Other | 49,824 | 161,538 | 211,362 | 35% | 67% | 55% |
| Total potentially amenable | 80,415 | 218,473 | 298,888 | 56% | 91% | 78% |
| Percent of potentially amenable | | | | | | |

Notes: Based on USBP encounters at the southwest land border **Mar 1, 2024 - May 31, 2024**. Dispositions are initial dispositions.
Source: OHSS analysis of June 2024 OHSS Persist

1351.35

| Encounter | 1,531 |
|---|---|

**CLP Fear Rates**

| | Mex | OTM | Total | |
|---|---|---|---|---|
| Withdraw | | | 1% | |
| No Fear | | | 46% | |
| Comprehensive Negative fear | 50% | 45% | 46% | 25% |
| Comprehensive Positive fear | 50% | 55% | 54% | |

**Pre CLP Fear Rates**

| | | | | |
|---|---|---|---|---|
| Withdraw | | | 0% | |
| No Fear | | | 31% | |
| Comprehensive Negative fear | 46% | 29% | 30% | 21% |
| Comprehensive Positive fear | 54% | 71% | 70% | |

**STB Fear Rates**

| | | | | |
|---|---|---|---|---|
| Withdraw | | | 0% | |

Rapid non ER - Repatriations

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| UC VR | 3% | 0% | 1% |
| SA+FM VR/withdraw | 28% | 0% | 11% |
| Reinstatements | 10% | 3% | 5% |
| Admin Removals | 0% | 0% | 0% |
| **Total Rapid repatriations** | 41% | 3% | 17% |

Not amenable to ER -total

| | | | |
|---|---|---|---|
| Rapid Repatriations | 41% | 3% | 17% |
| Other Ucs | 3% | 6% | 10% |
| Total | 44% | 9% | 27% |

**ER Outcomes**

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Withdraw | | | 0% |
| No Fear | | | 73% |
| Comprehensive Negative fear | 56% | 44% | 45% |
| Comprehensive Positive fear | 44% | 56% | 55% |
| **Total ER removals/returns** | | | 85% |

27%

Source: DHS OHSS Enforcement Lifecycle Dataset as of April 30, 2024.
Notes: Fear claim screen-in rates for March-April 2024, re-weighted to reflect encounter demographics f

Current Population

| | USBP | | |
|---|---|---|---|
| | Mexico | OTM | Total |
| Total | 143,177 | 241,090 | 384,267 |
| UC | 8,177 | 15,078 | 23,255 |
| FM+SA | 135,000 | 226,012 | 361,012 |

STB_AR1_001494

| | | | |
|---|---|---|---|
| No Fear | | | 73% |
| Comprehensive Negative fear | 56% | 44% | 45% |
| Comprehensive Positive fear | 44% | 56% | 55% |

12%

Source: OHSS analysis of July 2024 Persist, Enforcement Lifecycle dataset as of June 30, 2024, and data downloaded from UIP Sept. 3, 2024.

STB_AR1_001495

Outcomes

| | Mexico | OTM | Total | % of FM+SA | % total encounters | | |
|---|---|---|---|---|---|---|---|
| Total Encounters | 570 | 960 | 1,531 | | 100% | | |
| Non Section 2c Encounters | | | 31 | | | | |
| Section 2c Encounters | | | 1,500 | | | | |
| UC Encounters | 33 | 60 | 91 | | 6% | Includes non-con | 0.98 |
| SA + FM Encounters | 538 | 900 | 1,409 | | 1% | Excludes non-con | 0.92 |
| | | | | | | | |
| Rapid Non-ER Repatriations | | | | | | | |
| Contiguous UC VR | 14 | 0 | 14 | | 92% | | |
| SA+FM VR/withdraw | 162 | 4 | 163 | 12% | 11% | | |
| SA+FM Reinstatements | 55 | 26 | 79 | 6% | 5% | | |
| SA+FM Admin Removals | 0 | 1 | 1 | 0% | 0% | | |
| **Total Non-ER Repatriations** | **232** | **30** | **257** | | | | |
| | | | | | | | |
| Population not quickly removed | 339 | 930 | 1,274 | | | 78% | share of people not quickly repatriated processed for ER |
| Amenable to ER | 320 | 870 | 1,167 | 83% | 76% | 86% | share of amenable population processed for ER |
| **Processed for ER** | **247** | **671** | **1,000** | 71% | 65% | | |
| ER Withdrawal | - | - | - | 0% | 0% | | |
| No Fear Removal | - | - | 726 | 51% | 47% | 73% | share of ER population quickly removed - No fear |
| Negative Fear Removal | 138 | 295 | 124 | 9% | 8% | 12% | share of ER population removed vis a RO |
| **Total ER removals** | **138** | **295** | **849** | | | | |
| | | | | | | | |
| Positive Fear NTA | 109 | 376 | 151 | 11% | 10% | | |
| Over-Capacity Releases | 73 | 199 | 167 | 12% | 11% | | |
| **SA+FM Removals** | **356** | **325** | **1,092** | **77%** | **71%** | | |
| **SA+FM Releases** | **182** | **575** | **318** | **23%** | **21%** | | |
| Total Removals | 370 | 325 | 1,106 | | 72.2% | | |
| Total Releases | 200 | 635 | 394 | | 25.8% | | |

| Encounters | | SA + FM encounters | Amenable to ER | Dispositions (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | | excl Capacity Release |
|---|---|---|---|---|---|---|---|---|---|---|
| Section 2c | Total | | | NTA | ER | Other | ER% amenable | % ER | % NTA | |
| 1500 | 1,531 | 1,409 | 1,167 | 167 | 1,000 | 243 | 83% | 71% | 12% | 167 |
| | | | | | | | | | | 77% |

STB_AR1_001496

STB_AR1_001497

| Detailed Outcomes  (FMs/SAs) udes UCs and non-Section 2c encounters | | | | Outcomes - Section 2c | | | Outcomes - Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Positive Fear Release | Repatriati ons | % released | % repatriated | % released | % repatriat ed | UCs | % released | % repatriat ed | UCs | Non-Section 2c |
| 151 | 1,092 | 23% | 77% | 21% | 73% | 6% | 21% | 71% | 6% | 2% |

share of repatriated encounters

STB_AR1_001498

**Assume 900 cases processed for ER/day**

**CLP fear rates**

| Encounters | | SA + FM Encounters | Amenable to ER | Dispositions (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | | Detailed Outcomes (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | Outcomes - Section 2c | | | Outcomes - Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 2c | Total | | | NTA | ER | Other | ER% amenable | ER% FM+SA | NTA% FM+SA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released | % repatriated | UCs |
| 1500 | 1,531 | 1,409 | 1,168 | 268 | 900 | 241 | 77% | 64% | 19% | 268 | 264 | 882 | 38% | 63% | 35% | 59% | 6% | 35% | 58% | 6% |
| 2500 | 2,551 | 2,349 | 1,947 | 1,047 | 900 | 401 | 46% | 38% | 45% | 1,047 | 264 | 1,043 | 56% | 44% | 52% | 42% | 6% | 51% | 41% | 6% |
| 3500 | 3,571 | 3,288 | 2,726 | 1,826 | 900 | 562 | 33% | 27% | 56% | 1,826 | 264 | 1,204 | 64% | 37% | 60% | 34% | 6% | 59% | 34% | 6% |
| 4500 | 4,592 | 4,228 | 3,505 | 2,605 | 900 | 723 | 26% | 21% | 62% | 2,605 | 264 | 1,364 | 68% | 32% | 64% | 30% | 6% | 62% | 30% | 6% |
| 5500 | 5,612 | 5,167 | 4,284 | 3,384 | 900 | 883 | 21% | 17% | 65% | 3,384 | 264 | 1,525 | 71% | 30% | 66% | 28% | 6% | 65% | 27% | 6% |

**Pre-CLP fear rates**

| Encounters | | SA + FM Encounters | Amenable to ER | Dispositions (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | | Detailed Outcomes (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | Outcomes - Section 2c | | | Outcomes - Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 2c | Total | | | NTA | ER | Other | ER% amenable | % ER | % NTA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released | % repatriated | UCs |
| 1500 | 1,531 | 1,409 | 1,168 | 268 | 900 | 241 | 77% | 64% | 19% | 268 | 438 | 703 | 50% | 50% | 47% | 47% | 6% | 46% | 46% | 6% |
| 2500 | 2,551 | 2,349 | 1,947 | 1,047 | 900 | 401 | 46% | 38% | 45% | 1,047 | 438 | 864 | 63% | 37% | 59% | 35% | 6% | 58% | 34% | 6% |
| 3500 | 3,571 | 3,288 | 2,726 | 1,826 | 900 | 562 | 33% | 27% | 56% | 1,826 | 438 | 1,024 | 69% | 31% | 65% | 29% | 6% | 63% | 29% | 6% |
| 4500 | 4,592 | 4,228 | 3,505 | 2,605 | 900 | 723 | 26% | 21% | 62% | 2,605 | 438 | 1,185 | 72% | 28% | 68% | 26% | 6% | 66% | 26% | 6% |
| 5500 | 5,612 | 5,167 | 4,284 | 3,384 | 900 | 883 | 21% | 17% | 65% | 3,384 | 438 | 1,345 | 74% | 26% | 69% | 24% | 6% | 68% | 24% | 6% |

**STB rates**

| Encounters | | SA + FM Encounters | Amenable to ER | Dispositions (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | | Detailed Outcomes (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | Outcomes - Section 2c | | | Outcomes - Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 2c | Total | | | NTA | ER | Other | ER% amenable | % ER | % NTA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released | % repatriated | UCs |
| 1500 | 1,531 | 1,409 | 1,167 | 266.7 | 900 | 242.5 | 83% | 64% | 19% | 266.7206461 | 135.8775 | 1,007 | 29% | 71% | 27% | 67% | 6% | 26% | 66% | 6% |
| 2500 | 2,551 | 2,349 | 1,945 | 1,045 | 900 | 404.2 | 83% | 38% | 44% | 1,045 | 135.8775 | 1,168 | 50% | 50% | 47% | 47% | 6% | 46% | 46% | 6% |
| 3500 | 3,571 | 3,288 | 2,722 | 1,822 | 900 | 565.8 | 83% | 27% | 56% | 1,822 | 135.8775 | 1,330 | 60% | 40% | 56% | 38% | 6% | 55% | 37% | 6% |
| 4500 | 4,592 | 4,228 | 3,500 | 2,600 | 900 | 727.5 | 83% | 21% | 62% | 2,600 | 135.8775 | 1,492 | 65% | 35% | 61% | 33% | 6% | 60% | 32% | 6% |
| 5500 | 5,612 | 5,167 | 4,278 | 3,378 | 900 | 889.2 | 83% | 17% | 65% | 3,378 | 135.8775 | 1,653 | 68% | 32% | 64% | 30% | 6% | 63% | 29% | 6% |

Source: OHSS analysis of July 2024 Persist, Enforcement Lifecycle dataset as of June 30, 2024, and data downloaded from UIP Sept. 3, 2024.

STB_AR1_001499

Assume 1,000 cases processed for ER/day

### CLP fear rates

| Non-Section 2c | Section 2c | Total | SA + FM Encounters | Amenable to ER | NTA | ER | Other | ER% amenable | ER% FM+SA | NTA% FM+SA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released | % repatriated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2% | 1500 | 1,531 | 1,409 | 1,168 | 168 | 1,000 | 241 | 86% | 71% | 12% | 168 | 293 | 954 | 33% | 67% | 31% | 64% | 6% | 30% | 62% |
| 2% | 2500 | 2,551 | 2,349 | 1,947 | 947 | 1,000 | 401 | 51% | 43% | 40% | 947 | 293 | 1,114 | 53% | 47% | 50% | 45% | 6% | 49% | 44% |
| 2% | 3500 | 3,571 | 3,288 | 2,726 | 1,726 | 1,000 | 562 | 37% | 30% | 52% | 1,726 | 293 | 1,275 | 61% | 39% | 58% | 36% | 6% | 57% | 36% |
| 2% | 4500 | 4,592 | 4,228 | 3,505 | 2,505 | 1,000 | 723 | 29% | 24% | 59% | 2,505 | 293 | 1,435 | 66% | 34% | 62% | 32% | 6% | 61% | 31% |
| 2% | 5500 | 5,612 | 5,167 | 4,284 | 3,284 | 1,000 | 883 | 23% | 19% | 64% | 3,284 | 293 | 1,596 | 69% | 31% | 65% | 29% | 6% | 64% | 28% |

### Pre-CLP fear rates

| Non-Section 2c | Section 2c | Total | SA + FM Encounters | Amenable to ER | NTA | ER | Other | ER% amenable | ER% FM+SA | NTA% FM+SA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released | % repatriated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2% | 1500 | 1,531 | 1,409 | 1,168 | 168 | 1,000 | 241 | 86% | 71% | 12% | 168 | 486 | 755 | 46% | 54% | 44% | 50% | 6% | 43% | 49% |
| 2% | 2500 | 2,551 | 2,349 | 1,947 | 947 | 1,000 | 401 | 51% | 43% | 40% | 947 | 486 | 915 | 61% | 39% | 57% | 37% | 6% | 56% | 36% |
| 2% | 3500 | 3,571 | 3,288 | 2,726 | 1,726 | 1,000 | 562 | 37% | 30% | 52% | 1,726 | 486 | 1,076 | 67% | 33% | 63% | 31% | 6% | 62% | 30% |
| 2% | 4500 | 4,592 | 4,228 | 3,505 | 2,505 | 1,000 | 723 | 29% | 24% | 59% | 2,505 | 486 | 1,236 | 71% | 29% | 66% | 27% | 6% | 65% | 27% |
| 2% | 5500 | 5,612 | 5,167 | 4,284 | 3,284 | 1,000 | 883 | 23% | 19% | 64% | 3,284 | 486 | 1,397 | 73% | 27% | 69% | 25% | 6% | 67% | 25% |

### STB rates

| Non-Section 2c | Section 2c | Total | SA + FM Encounters | Amenable to ER | NTA | ER | Other | ER% amenable | ER% FM+SA | NTA% FM+SA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released | % repatriated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2% | 1500 | 1,531 | 1,409 | 1,167 | 166.7206 | 1,000 | 242.5026 | 83% | 71% | 12% | 166.7206 | 150.975 | 1,092 | 23% | 77% | 21% | 73% | 6% | 21% | 71% |
| 2% | 2500 | 2,551 | 2,349 | 1,945 | 944.5344 | 1,000 | 404.171 | 83% | 43% | 40% | 944.5344 | 150.975 | 1,253 | 47% | 53% | 44% | 50% | 6% | 43% | 49% |
| 2% | 3500 | 3,571 | 3,288 | 2,722 | 1,722 | 1,000 | 565.8395 | 83% | 30% | 52% | 1,722 | 150.975 | 1,415 | 57% | 43% | 54% | 40% | 6% | 52% | 40% |
| 2% | 4500 | 4,592 | 4,228 | 3,500 | 2,500 | 1,000 | 727.5079 | 83% | 24% | 59% | 2,500 | 150.975 | 1,577 | 63% | 37% | 59% | 35% | 6% | 58% | 34% |
| 2% | 5500 | 5,612 | 5,167 | 4,278 | 3,278 | 1,000 | 889.1763 | 83% | 19% | 63% | 3,278 | 150.975 | 1,738 | 66% | 34% | 62% | 32% | 6% | 61% | 31% |

STB_AR1_001500

**Assume 1,100 cases processed for ER/day**

**CLP fear rates**

| Rates - Total | | Encounters | | SA + FM Encounters | Amenable to ER | Dispositions (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | | Detailed Outcomes (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | Outcomes - Section 2c | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UCs | Non-Section 2c | Section 2c | Total | | | NTA | ER | Other | ER% amenable | ER% FM+SA | NTA% FM+SA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released |
| 6% | 2% | 1500 | 1,531 | 1,409 | 1,167 | 67 | 1,100 | 243 | 94% | 78% | 5% | 67 | 322 | 1,027 | 27% | 73% | 26% | 68% | 6% | 25% |
| 6% | 2% | 2500 | 2,551 | 2,349 | 1,945 | 845 | 1,100 | 404 | 57% | 47% | 36% | 845 | 322 | 1,188 | 50% | 50% | 47% | 48% | 6% | 46% |
| 6% | 2% | 3500 | 3,571 | 3,288 | 2,722 | 1,622 | 1,100 | 566 | 40% | 33% | 49% | 1,622 | 322 | 1,350 | 59% | 41% | 56% | 39% | 6% | 54% |
| 6% | 2% | 4500 | 4,592 | 4,228 | 3,500 | 2,400 | 1,100 | 728 | 31% | 26% | 57% | 2,400 | 322 | 1,512 | 64% | 36% | 60% | 34% | 6% | 59% |
| 6% | 2% | 5500 | 5,612 | 5,167 | 4,278 | 3,178 | 1,100 | 889 | 26% | 21% | 62% | 3,178 | 322 | 1,673 | 68% | 32% | 64% | 30% | 6% | 62% |

**Pre-CLP fear rates**

| Rates - Total | | Encounters | | SA + FM Encounters | Amenable to ER | Dispositions (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | | Detailed Outcomes (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | Outcomes - Section 2c | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UCs | Non-Section 2c | Section 2c | Total | | | NTA | ER | Other | ER% amenable | ER% FM+SA | NTA% FM+SA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released |
| 6% | 2% | 1500 | 1,531 | 1,409 | 1,167 | 67 | 1,100 | 243 | 94% | 78% | 5% | 67 | 535 | 808 | 43% | 57% | 40% | 54% | 6% | 39% |
| 6% | 2% | 2500 | 2,551 | 2,349 | 1,945 | 845 | 1,100 | 404 | 57% | 47% | 36% | 845 | 535 | 969 | 59% | 41% | 55% | 39% | 6% | 54% |
| 6% | 2% | 3500 | 3,571 | 3,288 | 2,722 | 1,622 | 1,100 | 566 | 40% | 33% | 49% | 1,622 | 535 | 1,131 | 66% | 34% | 62% | 32% | 6% | 60% |
| 6% | 2% | 4500 | 4,592 | 4,228 | 3,500 | 2,400 | 1,100 | 728 | 31% | 26% | 57% | 2,400 | 535 | 1,293 | 69% | 31% | 65% | 29% | 6% | 64% |
| 6% | 2% | 5500 | 5,612 | 5,167 | 4,278 | 3,178 | 1,100 | 889 | 26% | 21% | 62% | 3,178 | 535 | 1,454 | 72% | 28% | 68% | 26% | 6% | 66% |

**STB rates**

| Rates - Total | | Encounters | | SA + FM Encounters | Amenable to ER | Dispositions (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | | Detailed Outcomes (FMs/SAs) excludes UCs and non-Section 2c encounters | | | | | Outcomes - Section 2c | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UCs | Non-Section 2c | Section 2c | Total | | | NTA | ER | Other | ER% amenable | ER% FM+SA | NTA% FM+SA | Capacity Release | Positive Fear Release | Repatriations | % released | % repatriated | % released | % repatriated | UCs | % released |
| 6% | 2% | 1500 | 1,531 | 1,409 | 1,167 | 67 | 1,100 | 243 | 83% | 78% | 5% | 67 | 166 | 1,176 | 17% | 83% | 16% | 78% | 6% | 15% |
| 6% | 2% | 2500 | 2,551 | 2,349 | 1,945 | 845 | 1,100 | 404 | 83% | 47% | 36% | 845 | 166 | 1,338 | 43% | 57% | 40% | 54% | 6% | 40% |
| 6% | 2% | 3500 | 3,571 | 3,288 | 2,722 | 1,622 | 1,100 | 566 | 83% | 33% | 49% | 1,622 | 166 | 1,500 | 54% | 46% | 51% | 43% | 6% | 50% |
| 6% | 2% | 4500 | 4,592 | 4,228 | 3,500 | 2,400 | 1,100 | 728 | 83% | 26% | 57% | 2,400 | 166 | 1,661 | 61% | 39% | 57% | 37% | 6% | 56% |
| 6% | 2% | 5500 | 5,612 | 5,167 | 4,278 | 3,178 | 1,100 | 889 | 83% | 21% | 62% | 3,178 | 166 | 1,823 | 65% | 35% | 61% | 33% | 6% | 60% |

| Outcomes - Total | | |
|---|---|---|
| % repatriated | UCs | Non-Section 2c |
| 67% | 6% | 2% |
| 47% | 6% | 2% |
| 38% | 6% | 2% |
| 33% | 6% | 2% |
| 30% | 6% | 2% |

| Outcomes - Total | | |
|---|---|---|
| % repatriated | UCs | Non-Section 2c |
| 53% | 6% | 2% |
| 38% | 6% | 2% |
| 32% | 6% | 2% |
| 28% | 6% | 2% |
| 26% | 6% | 2% |

| Outcomes - Total | | |
|---|---|---|
| % repatriated | UCs | Non-Section 2c |
| 77% | 6% | 2% |
| 52% | 6% | 2% |
| 42% | 6% | 2% |
| 36% | 6% | 2% |
| 32% | 6% | 2% |

STB_AR1_001502

| Date | CBP monthly encounters | USBP monthly encounters | USBP monthly releases | CBP daily encounters | USBP daily encounters | USBP daily releases | | Date | CBP daily Encounters | 7-day average |
|---|---|---|---|---|---|---|---|---|---|---|
| Oct-99 | 87819 | 87819 | | 2833 | 2833 | | | 5/1/2023 | 7914 | 7960 |
| Nov-99 | 74362 | 74362 | | 2479 | 2479 | | | 5/2/2023 | 7765 | 7948 |
| Dec-99 | 66256 | 66256 | | 2137 | 2137 | | | 5/3/2023 | 8627 | 7914 |
| Jan-00 | 175383 | 175383 | | 5658 | 5658 | | | 5/4/2023 | 8484 | 7929 |
| Feb-00 | 200619 | 200619 | | 6918 | 6918 | | | 5/5/2023 | 9185 | 8135 |
| Mar-00 | 209311 | 209311 | | 6752 | 6752 | | | 5/6/2023 | 8986 | 8329 |
| Apr-00 | 170621 | 170621 | | 5687 | 5687 | | | 5/7/2023 | 8777 | 8534 |
| May-00 | 155961 | 155961 | | 5031 | 5031 | | | 5/8/2023 | 10219 | 8863 |
| Jun-00 | 103856 | 103856 | | 3462 | 3462 | | | 5/9/2023 | 10802 | 9297 |
| Jul-00 | 111963 | 111963 | | 3612 | 3612 | | | 5/10/2023 | 10377 | 9547 |
| Aug-00 | 113448 | 113448 | | 3660 | 3660 | | | 5/11/2023 | 9836 | 9740 |
| Sep-00 | 96822 | 96822 | | 3227 | 3227 | | | 5/12/2023 | 6223 | 9317 |
| Oct-00 | 81995 | 81995 | | 2645 | 2645 | | | 5/13/2023 | 4339 | 8653 |
| Nov-00 | 67217 | 67217 | | 2241 | 2241 | | | 5/14/2023 | 4199 | 7999 |
| Dec-00 | 54828 | 54828 | | 1769 | 1769 | | | 5/15/2023 | 3737 | 7073 |
| Jan-01 | 124586 | 124586 | | 4019 | 4019 | | | 5/16/2023 | 3704 | 6059 |
| Feb-01 | 150616 | 150616 | | 5379 | 5379 | | | 5/17/2023 | 2837 | 4982 |
| Mar-01 | 169904 | 169904 | | 5481 | 5481 | | | 5/18/2023 | 3233 | 4039 |
| Apr-01 | 142040 | 142040 | | 4735 | 4735 | | | 5/19/2023 | 2961 | 3573 |
| May-01 | 123054 | 123054 | | 3969 | 3969 | | | 5/20/2023 | 3196 | 3410 |
| Jun-01 | 89034 | 89034 | | 2968 | 2968 | | | 5/21/2023 | 2554 | 3175 |
| Jul-01 | 83853 | 83853 | | 2705 | 2705 | | | 5/22/2023 | 2648 | 3019 |
| Aug-01 | 84837 | 84837 | | 2737 | 2737 | | | 5/23/2023 | 3503 | 2990 |
| Sep-01 | 59448 | 59448 | | 1982 | 1982 | | | 5/24/2023 | 3609 | 3101 |
| Oct-01 | 37746 | 37746 | | 1218 | 1218 | | | 5/25/2023 | 3498 | 3138 |
| Nov-01 | 32694 | 32694 | | 1090 | 1090 | | | 5/26/2023 | 3452 | 3209 |
| Dec-01 | 31531 | 31531 | | 1017 | 1017 | | | 5/27/2023 | 3305 | 3224 |
| Jan-02 | 79647 | 79647 | | 2569 | 2569 | | | 5/28/2023 | 3359 | 3339 |
| Feb-02 | 95645 | 95645 | | 3416 | 3416 | | | 5/29/2023 | 3312 | 3434 |
| Mar-02 | 126906 | 126906 | | 4094 | 4094 | | | 5/30/2023 | 3563 | 3443 |
| Apr-02 | 121908 | 121908 | | 4064 | 4064 | | | 5/31/2023 | 3179 | 3381 |
| May-02 | 97571 | 97571 | | 3147 | 3147 | | | 6/1/2023 | 3134 | 3329 |
| Jun-02 | 78730 | 78730 | | 2624 | 2624 | | | 6/2/2023 | 2951 | 3258 |
| Jul-02 | 76719 | 76719 | | 2475 | 2475 | | | 6/3/2023 | 3079 | 3225 |
| Aug-02 | 82860 | 82860 | | 2673 | 2673 | | | 6/4/2023 | 2886 | 3158 |
| Sep-02 | 68384 | 68384 | | 2279 | 2279 | | | 6/5/2023 | 2942 | 3105 |
| Oct-02 | 61913 | 61913 | | 1997 | 1997 | | | 6/6/2023 | 3394 | 3081 |
| Nov-02 | 47919 | 47919 | | 1597 | 1597 | | | 6/7/2023 | 3050 | 3062 |
| Dec-02 | 37930 | 37930 | | 1224 | 1224 | | | 6/8/2023 | 3585 | 3127 |
| Jan-03 | 87002 | 87002 | | 2807 | 2807 | | | 6/9/2023 | 3272 | 3173 |
| Feb-03 | 97016 | 97016 | | 3465 | 3465 | | | 6/10/2023 | 3022 | 3164 |
| Mar-03 | 98625 | 98625 | | 3181 | 3181 | | | 6/11/2023 | 2650 | 3131 |
| Apr-03 | 75564 | 75564 | | 2519 | 2519 | | | 6/12/2023 | 3086 | 3151 |
| May-03 | 88845 | 88845 | | 2866 | 2866 | | | 6/13/2023 | 3381 | 3149 |

| Change from 5/12/2023: | |
|---|---|
| 5/23/2023 | -68% |
| 5/31/2023 | -64% |
| 6/30/2023 | -63% |
| 7/31/2023 | -45% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Jun-03 | 75634 | 75634 | 2521 | 2521 | 6/14/2023 | 3500 | 3214 |
| Jul-03 | 79396 | 79396 | 2561 | 2561 | 6/15/2023 | 3594 | 3215 |
| Aug-03 | 84651 | 84651 | 2731 | 2731 | 6/16/2023 | 3159 | 3199 |
| Sep-03 | 72239 | 72239 | 2408 | 2408 | 6/17/2023 | 3152 | 3217 |
| Oct-03 | 69246 | 65388 | 2234 | 2109 | 6/18/2023 | 3598 | 3353 |
| Nov-03 | 62452 | 57942 | 2082 | 1931 | 6/19/2023 | 3187 | 3367 |
| Dec-03 | 48280 | 43663 | 1557 | 1408 | 6/20/2023 | 3573 | 3395 |
| Jan-04 | 98764 | 92751 | 3186 | 2992 | 6/21/2023 | 3950 | 3459 |
| Feb-04 | 116398 | 110824 | 4014 | 3822 | 6/22/2023 | 3820 | 3491 |
| Mar-04 | 162530 | 155089 | 5243 | 5003 | 6/23/2023 | 3428 | 3530 |
| Apr-04 | 142491 | 135632 | 4750 | 4521 | 6/24/2023 | 3487 | 3578 |
| May-04 | 125502 | 118811 | 4048 | 3833 | 6/25/2023 | 3279 | 3532 |
| Jun-04 | 101178 | 94607 | 3373 | 3154 | 6/26/2023 | 3703 | 3606 |
| Jul-04 | 98989 | 92152 | 3193 | 2973 | 6/27/2023 | 3230 | 3557 |
| Aug-04 | 99986 | 93299 | 3225 | 3010 | 6/28/2023 | 3730 | 3525 |
| Sep-04 | 85877 | 80089 | 2863 | 2670 | 6/29/2023 | 3469 | 3475 |
| Oct-04 | 81687 | 75908 | 2635 | 2449 | 6/30/2023 | 3291 | 3456 |
| Nov-04 | 70617 | 65110 | 2354 | 2170 | 7/1/2023 | 3362 | 3438 |
| Dec-04 | 54028 | 48410 | 1743 | 1562 | 7/2/2023 | 3326 | 3444 |
| Jan-05 | 101552 | 93029 | 3276 | 3001 | 7/3/2023 | 3325 | 3390 |
| Feb-05 | 121177 | 113776 | 4328 | 4063 | 7/4/2023 | 3553 | 3437 |
| Mar-05 | 150892 | 143044 | 4867 | 4614 | 7/5/2023 | 3785 | 3444 |
| Apr-05 | 148688 | 140074 | 4956 | 4669 | 7/6/2023 | 3195 | 3405 |
| May-05 | 125226 | 115817 | 4040 | 3736 | 7/7/2023 | 3559 | 3444 |
| Jun-05 | 99490 | 90796 | 3316 | 3027 | 7/8/2023 | 3973 | 3531 |
| Jul-05 | 105093 | 94964 | 3390 | 3063 | 7/9/2023 | 3432 | 3546 |
| Aug-05 | 107620 | 96745 | 3472 | 3121 | 7/10/2023 | 3443 | 3563 |
| Sep-05 | 103177 | 93718 | 3439 | 3124 | 7/11/2023 | 4194 | 3654 |
| Oct-05 | 91935 | 83561 | 2966 | 2696 | 7/12/2023 | 4606 | 3772 |
| Nov-05 | 78817 | 70954 | 2627 | 2365 | 7/13/2023 | 3786 | 3856 |
| Dec-05 | 60375 | 52663 | 1948 | 1699 | 7/14/2023 | 4339 | 3968 |
| Jan-06 | 110987 | 101262 | 3580 | 3267 | 7/15/2023 | 4198 | 4000 |
| Feb-06 | 132780 | 125030 | 4742 | 4465 | 7/16/2023 | 3792 | 4051 |
| Mar-06 | 169077 | 160696 | 5454 | 5184 | 7/17/2023 | 4539 | 4208 |
| Apr-06 | 133964 | 126554 | 4465 | 4218 | 7/18/2023 | 4461 | 4246 |
| May-06 | 113311 | 105443 | 3655 | 3401 | 7/19/2023 | 4482 | 4228 |
| Jun-06 | 76274 | 68365 | 2542 | 2279 | 7/20/2023 | 5094 | 4415 |
| Jul-06 | 67636 | 59633 | 2182 | 1924 | 7/21/2023 | 4450 | 4431 |
| Aug-06 | 67631 | 59733 | 2182 | 1927 | 7/22/2023 | 4098 | 4417 |
| Sep-06 | 65571 | 58082 | 2186 | 1936 | 7/23/2023 | 5000 | 4589 |
| Oct-06 | 68083 | 60726 | 2196 | 1959 | 7/24/2023 | 5094 | 4668 |
| Nov-06 | 58199 | 51592 | 1940 | 1720 | 7/25/2023 | 5234 | 4779 |
| Dec-06 | 47537 | 40527 | 1533 | 1307 | 7/26/2023 | 5220 | 4884 |
| Jan-07 | 79794 | 72000 | 2574 | 2323 | 7/27/2023 | 5372 | 4924 |
| Feb-07 | 86435 | 79273 | 3087 | 2831 | 7/28/2023 | 4900 | 4988 |
| Mar-07 | 122450 | 114136 | 3950 | 3682 | 7/29/2023 | 5688 | 5215 |

STB_AR1_001504

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Apr-07 | 112773 | 104465 | | 3759 | 3482 | 7/30/2023 | 4540 | 5150 |
| May-07 | 97196 | 88510 | | 3135 | 2855 | 7/31/2023 | 4704 | 5094 |
| Jun-07 | 79997 | 71336 | | 2667 | 2378 | | | |
| Jul-07 | 75766 | 66793 | | 2444 | 2155 | | | |
| Aug-07 | 69142 | 59801 | | 2230 | 1929 | | | |
| Sep-07 | 57556 | 49577 | | 1919 | 1653 | | | |
| Oct-07 | 58616 | 51355 | | 1891 | 1657 | | | |
| Nov-07 | 48693 | 42208 | | 1623 | 1407 | | | |
| Dec-07 | 38556 | 31824 | | 1244 | 1027 | | | |
| Jan-08 | 66471 | 59034 | | 2144 | 1904 | | | |
| Feb-08 | 80724 | 73483 | | 2784 | 2534 | | | |
| Mar-08 | 97774 | 89769 | | 3154 | 2896 | | | |
| Apr-08 | 99518 | 91552 | | 3317 | 3052 | | | |
| May-08 | 77048 | 69240 | | 2485 | 2234 | | | |
| Jun-08 | 60492 | 53850 | | 2016 | 1795 | | | |
| Jul-08 | 56806 | 49468 | | 1832 | 1596 | | | |
| Aug-08 | 56142 | 48544 | | 1811 | 1566 | | | |
| Sep-08 | 51713 | 44722 | | 1724 | 1491 | | | |
| Oct-08 | 49217 | 42937 | | 1588 | 1385 | | | |
| Nov-08 | 38450 | 32782 | | 1282 | 1093 | | | |
| Dec-08 | 31206 | 25946 | | 1007 | 837 | | | |
| Jan-09 | 50737 | 44503 | | 1637 | 1436 | | | |
| Feb-09 | 55132 | 49211 | | 1969 | 1758 | | | |
| Mar-09 | 74323 | 67342 | | 2398 | 2172 | | | |
| Apr-09 | 65129 | 58493 | | 2171 | 1950 | | | |
| May-09 | 57593 | 50883 | | 1858 | 1641 | | | |
| Jun-09 | 52600 | 46044 | | 1753 | 1535 | | | |
| Jul-09 | 50986 | 43841 | | 1645 | 1414 | | | |
| Aug-09 | 51084 | 43519 | | 1648 | 1404 | | | |
| Sep-09 | 42666 | 35350 | | 1422 | 1178 | | | |
| Oct-09 | 47290 | 40890 | | 1525 | 1319 | | | |
| Nov-09 | 39064 | 32815 | | 1302 | 1094 | | | |
| Dec-09 | 31352 | 25034 | | 1011 | 808 | | | |
| Jan-10 | 40741 | 34784 | | 1314 | 1122 | | | |
| Feb-10 | 48753 | 42790 | | 1741 | 1528 | | | |
| Mar-10 | 69152 | 61361 | | 2231 | 1979 | | | |
| Apr-10 | 62351 | 55237 | | 2078 | 1841 | | | |
| May-10 | 54018 | 47045 | | 1743 | 1518 | | | |
| Jun-10 | 39308 | 32955 | | 1310 | 1099 | | | |
| Jul-10 | 32363 | 25609 | | 1044 | 826 | | | |
| Aug-10 | 33717 | 26415 | | 1088 | 852 | | | |
| Sep-10 | 29310 | 22796 | | 977 | 760 | | | |
| Oct-10 | 32451 | 26165 | | 1047 | 844 | | | |
| Nov-10 | 28516 | 22405 | | 951 | 747 | | | |
| Dec-10 | 25728 | 19429 | | 830 | 627 | | | |
| Jan-11 | 29737 | 23926 | | 959 | 772 | | | |
| Feb-11 | 34408 | 28786 | | 1229 | 1028 | AVG Daily: FY2011-FY2018 | | |

Source: OHSS analysis of July 2024 OHSS Persist.

STB_AR1_001505

| | | | | | | |
|---|---|---|---|---|---|---|
| Mar-11 | 48920 | 42014 | | 1578 | 1355 | 1,309 |
| Apr-11 | 42739 | 36251 | | 1425 | 1208 | |
| May-11 | 37543 | 31236 | | 1211 | 1008 | |
| Jun-11 | 32909 | 27166 | | 1097 | 906 | |
| Jul-11 | 29520 | 23170 | | 952 | 747 | |
| Aug-11 | 30216 | 24166 | | 975 | 780 | |
| Sep-11 | 28386 | 22863 | | 946 | 762 | |
| Oct-11 | 31344 | 25612 | | 1011 | 826 | |
| Nov-11 | 28617 | 23368 | | 954 | 779 | |
| Dec-11 | 24380 | 18983 | | 786 | 612 | |
| Jan-12 | 30798 | 25714 | | 993 | 829 | |
| Feb-12 | 37009 | 31579 | | 1276 | 1089 | |
| Mar-12 | 48538 | 42218 | | 1566 | 1362 | |
| Apr-12 | 46680 | 40628 | | 1556 | 1354 | |
| May-12 | 43020 | 36966 | | 1388 | 1192 | |
| Jun-12 | 36808 | 30669 | | 1227 | 1022 | |
| Jul-12 | 32833 | 26978 | | 1059 | 870 | |
| Aug-12 | 33699 | 27567 | | 1087 | 889 | |
| Sep-12 | 32399 | 26591 | | 1080 | 886 | |
| Oct-12 | 34847 | 28929 | | 1124 | 933 | |
| Nov-12 | 33159 | 27636 | | 1105 | 921 | |
| Dec-12 | 29077 | 23243 | | 938 | 750 | |
| Jan-13 | 32485 | 26921 | | 1048 | 868 | |
| Feb-13 | 40636 | 35042 | | 1451 | 1252 | |
| Mar-13 | 54010 | 47293 | | 1742 | 1526 | |
| Apr-13 | 54771 | 48212 | | 1826 | 1607 | |
| May-13 | 50500 | 43856 | | 1629 | 1415 | |
| Jun-13 | 40790 | 34436 | | 1360 | 1148 | |
| Jul-13 | 40006 | 33230 | | 1291 | 1072 | |
| Aug-13 | 41125 | 33797 | | 1327 | 1090 | |
| Sep-13 | 38206 | 31802 | | 1274 | 1060 | |
| Oct-13 | 41835 | 35312 | 180 | 1350 | 1139 | 5.8 | 1% |
| Nov-13 | 38692 | 31896 | 133 | 1290 | 1063 | 4.4 | 0% |
| Dec-13 | 36707 | 29528 | 195 | 1184 | 953 | 6.3 | 1% |
| Jan-14 | 35200 | 28668 | 169 | 1135 | 925 | 5.5 | 1% |
| Feb-14 | 42473 | 36403 | 192 | 1517 | 1300 | 6.9 | 1% |
| Mar-14 | 57548 | 49596 | 447 | 1856 | 1600 | 14.4 | 1% |
| Apr-14 | 59383 | 51502 | 317 | 1979 | 1717 | 10.6 | 1% |
| May-14 | 69033 | 60683 | 1455 | 2227 | 1958 | 46.9 | 2% |
| Jun-14 | 66572 | 57861 | 2153 | 2219 | 1929 | 71.8 | 4% |
| Jul-14 | 48833 | 40708 | 820 | 1575 | 1313 | 26.5 | 2% |
| Aug-14 | 39766 | 31388 | 288 | 1283 | 1013 | 9.3 | 1% |
| Sep-14 | 34006 | 25825 | 175 | 1134 | 861 | 5.8 | 1% |
| Oct-14 | 35903 | 26450 | 127 | 1158 | 853 | 4.1 | 0% |
| Nov-14 | 33024 | 24641 | 126 | 1101 | 821 | 4.2 | 1% |
| Dec-14 | 34231 | 25019 | 138 | 1104 | 807 | 4.5 | 1% |
| Jan-15 | 30179 | 21514 | 204 | 974 | 694 | 6.6 | 1% |

STB_AR1_001506

| | | | | | | |
|---|---|---|---|---|---|---|
| Feb-15 | 32554 | 24376 | 224 | 1163 | 871 | 8.0 | 1% |
| Mar-15 | 39162 | 29791 | 224 | 1263 | 961 | 7.2 | 1% |
| Apr-15 | 38299 | 29750 | 270 | 1277 | 992 | 9.0 | 1% |
| May-15 | 40684 | 31576 | 222 | 1312 | 1019 | 7.2 | 1% |
| Jun-15 | 38620 | 29303 | 233 | 1287 | 977 | 7.8 | 1% |
| Jul-15 | 38610 | 28388 | 348 | 1245 | 916 | 11.2 | 1% |
| Aug-15 | 42419 | 30239 | 313 | 1368 | 975 | 10.1 | 1% |
| Sep-15 | 41171 | 30286 | 248 | 1372 | 1010 | 8.3 | 1% |
| Oct-15 | 45245 | 32724 | 242 | 1460 | 1056 | 7.8 | 1% |
| Nov-15 | 45387 | 32838 | 212 | 1513 | 1095 | 7.1 | 1% |
| Dec-15 | 48393 | 37014 | 336 | 1561 | 1194 | 10.8 | 1% |
| Jan-16 | 33396 | 23758 | 215 | 1077 | 766 | 6.9 | 1% |
| Feb-16 | 38068 | 26072 | 220 | 1313 | 899 | 7.6 | 1% |
| Mar-16 | 45779 | 33316 | 246 | 1477 | 1075 | 7.9 | 1% |
| Apr-16 | 48271 | 38089 | 260 | 1609 | 1270 | 8.7 | 1% |
| May-16 | 54987 | 40337 | 353 | 1774 | 1301 | 11.4 | 1% |
| Jun-16 | 45168 | 34450 | 309 | 1506 | 1148 | 10.3 | 1% |
| Jul-16 | 46658 | 33723 | 472 | 1505 | 1088 | 15.2 | 1% |
| Aug-16 | 51569 | 37048 | 382 | 1664 | 1195 | 12.3 | 1% |
| Sep-16 | 56070 | 39501 | 567 | 1869 | 1317 | 18.9 | 1% |
| Oct-16 | 66707 | 46184 | 389 | 2152 | 1490 | 12.5 | 1% |
| Nov-16 | 63366 | 47211 | 338 | 2112 | 1574 | 11.3 | 1% |
| Dec-16 | 58416 | 43251 | 320 | 1884 | 1395 | 10.3 | 1% |
| Jan-17 | 42458 | 31576 | 240 | 1370 | 1019 | 7.7 | 1% |
| Feb-17 | 23555 | 18754 | 75 | 841 | 670 | 2.7 | 0% |
| Mar-17 | 16592 | 12195 | 39 | 535 | 393 | 1.3 | 0% |
| Apr-17 | 15768 | 11127 | 44 | 526 | 371 | 1.5 | 0% |
| May-17 | 19940 | 14519 | 69 | 643 | 468 | 2.2 | 0% |
| Jun-17 | 21657 | 16087 | 46 | 722 | 536 | 1.5 | 0% |
| Jul-17 | 25014 | 18187 | 41 | 807 | 587 | 1.3 | 0% |
| Aug-17 | 30569 | 22288 | 62 | 986 | 719 | 2.0 | 0% |
| Sep-17 | 31157 | 22537 | 45 | 1039 | 751 | 1.5 | 0% |
| Oct-17 | 34842 | 25488 | 49 | 1124 | 822 | 1.6 | 0% |
| Nov-17 | 39031 | 29085 | 46 | 1301 | 970 | 1.5 | 0% |
| Dec-17 | 40476 | 28995 | 58 | 1306 | 935 | 1.9 | 0% |
| Jan-18 | 35865 | 25975 | 36 | 1157 | 838 | 1.2 | 0% |
| Feb-18 | 36690 | 26666 | 57 | 1310 | 952 | 2.0 | 0% |
| Mar-18 | 50213 | 37390 | 71 | 1620 | 1206 | 2.3 | 0% |
| Apr-18 | 51019 | 38243 | 81 | 1701 | 1275 | 2.7 | 0% |
| May-18 | 51790 | 40339 | 123 | 1671 | 1301 | 4.0 | 0% |
| Jun-18 | 43096 | 34089 | 130 | 1437 | 1136 | 4.3 | 0% |
| Jul-18 | 40005 | 31299 | 115 | 1290 | 1010 | 3.7 | 0% |
| Aug-18 | 46551 | 37524 | 117 | 1502 | 1210 | 3.8 | 0% |
| Sep-18 | 50366 | 41486 | 150 | 1679 | 1383 | 5.0 | 0% |
| Oct-18 | 60775 | 51005 | 4839 | 1960 | 1645 | 156.1 | 9% |
| Nov-18 | 62463 | 51857 | 5868 | 2082 | 1729 | 195.6 | 11% |
| Dec-18 | 60789 | 50751 | 6022 | 1961 | 1637 | 194.3 | 12% |

STB_AR1_001507

| | | | | | | |
|---|---|---|---|---|---|---|
| Jan-19 | 58313 | 47979 | 3774 | 1881 | 1548 | 121.7 | 8% |
| Feb-19 | 76543 | 66883 | 7142 | 2734 | 2389 | 255.1 | 11% |
| Mar-19 | 103730 | 92833 | 21758 | 3346 | 2995 | 701.9 | 23% |
| Apr-19 | 109413 | 99273 | 31438 | 3647 | 3309 | 1047.9 | 32% |
| May-19 | 144113 | 132856 | 61304 | 4649 | 4286 | 1977.5 | 46% |
| Jun-19 | 104310 | 94902 | 42852 | 3477 | 3163 | 1428.4 | 45% |
| Jul-19 | 81748 | 71978 | 31022 | 2637 | 2322 | 1000.7 | 43% |
| Aug-19 | 62608 | 50684 | 13352 | 2020 | 1635 | 430.7 | 26% |
| Sep-19 | 52424 | 40507 | 6750 | 1747 | 1350 | 225.0 | 17% |
| Oct-19 | 45139 | 35402 | 1252 | 1456 | 1142 | 40.4 | 4% |
| Nov-19 | 42642 | 33524 | 1231 | 1421 | 1117 | 41.0 | 4% |
| Dec-19 | 40563 | 32853 | 1049 | 1308 | 1060 | 33.8 | 3% |
| Jan-20 | 36583 | 29205 | 917 | 1180 | 942 | 29.6 | 3% |
| Feb-20 | 36686 | 30077 | 706 | 1265 | 1037 | 24.3 | 2% |
| Mar-20 | 34457 | 30389 | 492 | 1112 | 980 | 15.9 | 2% |
| Apr-20 | 17106 | 16182 | 56 | 570 | 539 | 1.9 | 0% |
| May-20 | 23237 | 21593 | 66 | 750 | 697 | 2.1 | 0% |
| Jun-20 | 33029 | 30816 | 73 | 1101 | 1027 | 2.4 | 0% |
| Jul-20 | 40949 | 38556 | 106 | 1321 | 1244 | 3.4 | 0% |
| Aug-20 | 50007 | 47276 | 118 | 1613 | 1525 | 3.8 | 0% |
| Sep-20 | 57684 | 54778 | 264 | 1923 | 1826 | 8.8 | 0% |
| Oct-20 | 71927 | 69032 | 223 | 2320 | 2227 | 7.2 | 0% |
| Nov-20 | 72113 | 69169 | 195 | 2404 | 2306 | 6.5 | 0% |
| Dec-20 | 73994 | 71141 | 265 | 2387 | 2295 | 8.5 | 0% |
| Jan-21 | 78414 | 75316 | 1545 | 2529 | 2430 | 49.8 | 2% |
| Feb-21 | 101098 | 97643 | 8881 | 3611 | 3487 | 317.2 | 9% |
| Mar-21 | 173277 | 169216 | 26624 | 5590 | 5459 | 858.8 | 16% |
| Apr-21 | 178795 | 173699 | 26451 | 5960 | 5790 | 881.7 | 15% |
| May-21 | 180597 | 172654 | 27347 | 5826 | 5569 | 882.2 | 16% |
| Jun-21 | 189034 | 178649 | 36238 | 6301 | 5955 | 1207.9 | 20% |
| Jul-21 | 213593 | 200658 | 62397 | 6890 | 6473 | 2012.8 | 31% |
| Aug-21 | 209840 | 196514 | 59045 | 6769 | 6339 | 1904.7 | 30% |
| Sep-21 | 192001 | 185515 | 44258 | 6400 | 6184 | 1475.3 | 24% |
| Oct-21 | 164837 | 159113 | 27942 | 5317 | 5133 | 901.4 | 18% |
| Nov-21 | 174845 | 167015 | 40445 | 5828 | 5567 | 1348.2 | 24% |
| Dec-21 | 179253 | 170602 | 51780 | 5782 | 5503 | 1670.3 | 30% |
| Jan-22 | 154874 | 147877 | 43646 | 4996 | 4770 | 1407.9 | 30% |
| Feb-22 | 166010 | 159170 | 35879 | 5929 | 5685 | 1281.4 | 23% |
| Mar-22 | 222574 | 211181 | 56129 | 7180 | 6812 | 1810.6 | 27% |
| Apr-22 | 235785 | 203504 | 61534 | 7860 | 6783 | 2051.1 | 30% |
| May-22 | 241136 | 224370 | 72755 | 7779 | 7238 | 2346.9 | 32% |
| Jun-22 | 207834 | 192399 | 59705 | 6928 | 6413 | 1990.2 | 31% |
| Jul-22 | 200162 | 181834 | 65614 | 6457 | 5866 | 2116.6 | 36% |
| Aug-22 | 204087 | 181774 | 64868 | 6583 | 5864 | 2092.5 | 36% |
| Sep-22 | 227547 | 207597 | 105007 | 7585 | 6920 | 3500.2 | 51% |
| Oct-22 | 231529 | 205134 | 89823 | 7469 | 6617 | 2897.5 | 44% |
| Nov-22 | 235173 | 207680 | 107280 | 7839 | 6923 | 3576.0 | 52% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Dec-22 | 252315 | 222018 | 140370 | 8139 | 7162 | 4528.1 | 63% |
| Jan-23 | 157358 | 129513 | 23098 | 5076 | 4178 | 745.1 | 18% |
| Feb-23 | 156630 | 130521 | 14797 | 5594 | 4661 | 528.5 | 11% |
| Mar-23 | 193249 | 163672 | 25917 | 6234 | 5280 | 836.0 | 16% |
| Apr-23 | 211992 | 183921 | 65690 | 7066 | 6131 | 2189.7 | 36% |
| May-23 | 206690 | 171382 | 77850 | 6667 | 5528 | 2511.3 | 45% |
| Jun-23 | 144556 | 99538 | 36551 | 4819 | 3318 | 1218.4 | 37% |
| Jul-23 | 183479 | 132642 | 70462 | 5919 | 4279 | 2273.0 | 53% |
| Aug-23 | 232963 | 181054 | 101651 | 7515 | 5840 | 3279.1 | 56% |
| Sep-23 | 269735 | 218763 | 155961 | 8991 | 7292 | 5198.7 | 71% |
| Oct-23 | 240932 | 188754 | 122684 | 7772 | 6089 | 3957.5 | 65% |
| Nov-23 | 242400 | 191107 | 131257 | 8080 | 6370 | 4375.2 | 69% |
| Dec-23 | 301980 | 249740 | 191806 | 9741 | 8056 | 6187.3 | 77% |
| Jan-24 | 176196 | 124216 | 70425 | 5684 | 4007 | 2271.8 | 57% |
| Feb-24 | 189912 | 140640 | 76950 | 6549 | 4850 | 2653.4 | 55% |
| Mar-24 | 189360 | 137475 | 78542 | 6108 | 4435 | 2533.6 | 57% |
| Apr-24 | 179740 | 128893 | 68216 | 5991 | 4296 | 2273.9 | 53% |
| May-24 | 170718 | 117905 | 62206 | 5507 | 3803 | 2006.6 | 53% |
| Jun-24 | 130416 | 83533 | 27810 | 4347 | 2784 | 927.0 | 33% |
| Jul-24 | 104116 | 56408 | 12148 | 3359 | 1820 | 391.9 | 22% |

| AVG Daily: | CBP | USBP |
|---|---|---|
| April-May 2024 | 5,749 | 4,050 |
| Pre-Pandemic | 1,591 | 1,265 |

Source: OHSS analysis of July 2024 OHSS Persist.

STB_AR1_001509

**Table 33.**
**NONCITIZEN APPREHENSIONS: FISCAL YEARS 1925 TO 2022**

| Year | Number | Year | Number |
|------|--------|------|--------|
| 1925 | 22,199 | 1981 | 975,780 |
| 1926 | 12,735 | 1982 | 970,246 |
| 1927 | 16,393 | 1983 | 1,251,357 |
| 1928 | 23,566 | 1984 | 1,246,981 |
| 1929 | 32,711 | 1985 | 1,348,749 |
| 1930 | 20,880 | 1986 | 1,767,400 |
| 1931 | 22,276 | 1987 | 1,190,488 |
| 1932 | 22,735 | 1988 | 1,008,145 |
| 1933 | 20,949 | 1989 | 954,243 |
| 1934 | 10,319 | 1990 | 1,169,939 |
| 1935 | 11,016 | 1991 | 1,197,875 |
| 1936 | 11,728 | 1992 | 1,258,481 |
| 1937 | 13,054 | 1993 | 1,327,261 |
| 1938 | 12,851 | 1994 | 1,094,719 |
| 1939 | 12,037 | 1995 | 1,394,554 |
| 1940 | 10,492 | 1996 | 1,649,986 |
| 1941 | 11,294 | 1997 | 1,536,520 |
| 1942 | 11,784 | 1998 | 1,679,439 |
| 1943 | 11,175 | 1999 | 1,714,035 |
| 1944 | 31,174 | 2000 | 1,814,729 |
| 1945 | 69,164 | 2001 | 1,387,486 |
| 1946 | 99,591 | 2002 | 1,062,270 |
| 1947 | 193,657 | 2003 | 1,046,422 |
| 1948 | 192,779 | 2004 | 1,264,232 |
| 1949 | 288,253 | 2005 | 1,291,065 |
| 1950 | 468,339 | 2006 [3] | 1,206,408 |
| 1951 | 509,040 | 2007 | 960,673 |
| 1952 [1] | 543,535 | 2008 [4] | 1,043,759 |
| 1953 | 885,587 | 2009 | 889,212 |
| 1954 | 1,089,583 | 2010 | 796,587 |
| 1955 | 254,096 | 2011 | 678,606 |
| 1956 | 87,696 | 2012 [5] | 795,735 |
| 1957 | 59,918 | 2013 | 786,223 |
| 1958 | 53,474 | 2014 | 805,334 |
| 1959 | 45,336 | 2015 | 596,560 |
| 1960 | 70,684 | 2016 [6] | 683,782 |
| 1961 | 88,823 | 2017 | 607,677 |
| 1962 | 92,758 | 2018 | 739,486 |
| 1963 | 88,712 | 2019 | 1,175,841 |
| 1964 | 86,597 | 2020 [7] | 609,265 |
| 1965 | 110,371 | 2021 | 1,865,379 |



| Month | Day Count |
|-------|-----------|
| 1 | 31 |
| 2 | 28 |
| 3 | 31 |
| 4 | 30 |
| 5 | 31 |
| 6 | 30 |
| 7 | 31 |
| 8 | 31 |
| 9 | 30 |
| 10 | 31 |
| 11 | 30 |
| 12 | 31 |

| | | | |
|---|---|---|---|
| 1966 | 138,520 | 2022 | 2,584,220 |
| 1967 | 161,608 | | |
| 1968 | 212,057 | | |
| 1969 | 283,557 | | |
| 1970 | 345,353 | | |
| 1971 | 420,126 | | |
| 1972 | 505,949 | | |
| 1973 | 655,968 | | |
| 1974 | 788,145 | | |
| 1975 | 766,600 | | |
| 1976 [2] | 1,097,739 | | |
| 1977 | 1,042,215 | | |
| 1978 | 1,057,977 | | |
| 1979 | 1,076,418 | | |
| 1980 | 910,361 | | |

[1] Prior to 1952, data are limited to U.S. Customs and Border Protection (CBP) U.S. Border Patrol (USBP) apprehensions; beginning in 1952, data also include Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) administrative arrests.

[2] Includes the 15 months from July 1, 1975 to September 30, 1976 because the end date of fiscal years was changed from June 30 to September 30.

[3] Beginning in 2006, data also include arrests of fugitive and nonfugitive aliens under the National Fugitive Operations Program of ICE Enforcement and Removal Operations (ERO).

[4] Beginning in 2008, data also include all administrative arrests conducted by ICE ERO.

[5] Beginning in 2012, data also include enforcement encounters by CBP Office of Field Operations (OFO), reflecting attempted unlawful entries into the United States.

[6] Prior to 2016 reporting methodology limits data to one ERO administrative arrest for a single person on a single day; beginning in 2016 the reporting methodology was revised to align with ICE ERO reporting, which may include multiple arrests on a single day.

[7] Beginning in 2020, data include CBP encounters resulting in expulsions on public health grounds under U.S. Code Title 42 in response to the COVID-19 pandemic.

Source: FY 2022 Yearbook of Immigration Statistics

STB_AR1_001511

## Final or Most Current Outcomes, Total SW Border Encounters by Family Status

| MOST RECENT OUTCOMES | TOTAL | | | | | | | | | | | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q3 | | |
| Total Encounters[1] | 544,667 | 403,473 | 505,086 | 385,192 | 497,699 | 957,155 | 448,731 | 1,725,239 | 2,339,010 | 2,188,596 | 1,430,739 | 67,040 | 39,834 |
| Repatriations | 380,209 | 291,540 | 304,719 | 221,790 | 265,762 | 324,647 | 368,543 | 1,137,095 | 1,195,205 | 850,779 | 340,250 | 7,472 | 6,271 |
| Title 42 Expulsion | 0 | 0 | 0 | 0 | 0 | 0 | 204,463 | 1,061,969 | 1,077,309 | 562,990 | 0 | 0 | 0 |
| Removals | 308,497 | 249,559 | 263,608 | 185,149 | 229,145 | 256,656 | 128,621 | 35,391 | 63,126 | 122,630 | 181,118 | 3,914 | 3,275 |
| Expedited | 178,444 | 141,948 | 145,214 | 101,544 | 127,729 | 141,611 | 70,414 | 16,214 | 35,083 | 80,217 | 131,140 | 2,242 | 1,768 |
| Reinstatement | 118,633 | 98,392 | 108,521 | 76,243 | 92,676 | 99,168 | 54,174 | 14,816 | 20,505 | 35,371 | 46,909 | 612 | 690 |
| Administrative removals | 1,174 | 982 | 842 | 696 | 718 | 1,110 | 550 | 317 | 376 | 334 | 348 | 45 | 7 |
| Other removals[2] | 10,246 | 8,237 | 9,031 | 6,666 | 8,022 | 14,767 | 3,483 | 4,044 | 7,162 | 6,708 | 2,721 | 1,015 | 810 |
| Returns | 62,128 | 35,233 | 33,173 | 31,189 | 29,079 | 33,582 | 17,764 | 26,037 | 38,775 | 149,258 | 150,760 | 2,118 | 2,356 |
| Re-encounters[3] | 9,584 | 6,748 | 7,938 | 5,452 | 7,538 | 34,409 | 17,695 | 13,698 | 15,995 | 15,901 | 8,372 | 1,440 | 640 |
| No confirmed departure | 164,458 | 111,933 | 200,367 | 163,402 | 231,937 | 632,508 | 80,188 | 588,144 | 1,143,805 | 1,337,817 | 1,090,489 | 59,568 | 33,563 |
| Being processed | 41,261 | 28,120 | 56,112 | 49,429 | 81,780 | 282,850 | 41,518 | 376,971 | 813,279 | 1,083,354 | 1,042,856 | 19,212 | 9,453 |
| Being processed by DHS | 18,712 | 8,646 | 17,513 | 17,820 | 31,006 | 132,572 | 19,612 | 198,750 | 457,172 | 416,133 | 157,268 | 10,199 | 2,245 |
| In EOIR proceedings[4] | 2,720 | 2,306 | 8,593 | 10,838 | 23,238 | 94,034 | 11,220 | 113,399 | 238,862 | 538,151 | 825,657 | 1,560 | 930 |
| EOIR case completed - additional DOJ action[5] | 19,829 | 17,168 | 30,006 | 20,771 | 27,536 | 56,244 | 10,686 | 64,822 | 117,245 | 129,070 | 59,931 | 7,453 | 6,278 |
| Final order/voluntary departure | 47,277 | 30,843 | 53,109 | 42,586 | 65,145 | 164,320 | 12,552 | 76,073 | 89,391 | 69,689 | 25,018 | 21,159 | 12,557 |
| Unexecuted removal orders | 45,346 | 29,354 | 51,085 | 41,483 | 63,743 | 162,082 | 12,460 | 74,606 | 88,317 | 69,013 | 24,779 | 20,315 | 11,813 |
| In absentia | 34,629 | 20,799 | 34,864 | 30,805 | 49,999 | 132,657 | 10,047 | 60,159 | 72,729 | 59,247 | 15,565 | 15,207 | 8,083 |
| Not in absentia | 10,717 | 8,555 | 16,221 | 10,678 | 13,744 | 29,425 | 2,413 | 14,447 | 15,588 | 9,766 | 9,214 | 5,108 | 3,730 |
| Unexecuted voluntary departures | 1,931 | 1,489 | 2,024 | 1,103 | 1,402 | 2,238 | 92 | 1,467 | 1,074 | 676 | 239 | 844 | 744 |
| Relief | 29,701 | 23,620 | 40,990 | 30,208 | 34,044 | 57,956 | 10,117 | 59,393 | 112,690 | 89,708 | 1,027 | 9,164 | 5,758 |
| SIJ or affirmative asylum | 8,976 | 6,594 | 17,168 | 14,309 | 16,783 | 32,618 | 4,804 | 27,827 | 19,710 | 7,328 | 339 | 3,265 | 1,675 |
| LPR status granted by DHS | 3,799 | 2,414 | 3,028 | 2,092 | 1,946 | 3,647 | 532 | 1,828 | 47,645 | 53,127 | 96 | 566 | 159 |
| EOIR relief[6] | 14,327 | 13,234 | 18,867 | 12,039 | 14,490 | 18,080 | 2,883 | 12,564 | 15,578 | 5,910 | 424 | 4,635 | 3,675 |
| Relief on merits[7] | 13,544 | 12,613 | 17,935 | 11,498 | 13,900 | 17,423 | 2,777 | 12,373 | 15,312 | 5,731 | 355 | 4,379 | 3,487 |
| Relief not on Merits[8] | 783 | 621 | 932 | 541 | 590 | 657 | 106 | 191 | 266 | 179 | 69 | 256 | 188 |
| Other[9] | 2,599 | 1,378 | 1,927 | 1,768 | 825 | 3,251 | 1,898 | 17,174 | 29,757 | 23,343 | 168 | 698 | 249 |
| EOIR Termination | 45,825 | 28,984 | 49,670 | 40,814 | 50,679 | 127,541 | 15,897 | 75,072 | 125,222 | 92,406 | 21,356 | 9,952 | 5,784 |
| MPP | 0 | 0 | 0 | 0 | 0 | 8,522 | 2,512 | 528 | 954 | 0 | 0 | 0 | |
| Non-MPP | 45,825 | 28,984 | 49,670 | 40,814 | 50,679 | 119,019 | 13,385 | 74,544 | 124,268 | 92,406 | 21,356 | 9,952 | 5,784 |
| No Subsequent Event[10] | 394 | 366 | 486 | 365 | 289 | 201 | 104 | 635 | 3,223 | 2,660 | 232 | 81 | 11 |

*FM data limited to USBP for FY 2013-FY2015; later years include both USBP and OFO.

[1] Excludes Accompanied Minors (AM), OFO inadmissibles paroled with a CBP One confirmation number, and OFO administrative cases including, crewmembers, parolees, and withdrawals without prejudice. Total exclusions made up 7.3 percent of total enco

[2] Other removals include removals executed pursuant to an INA §240 proceeding.

[3] Includes noncitizens encountered more than once by CBP without a known intervening removal or return. OIS assumes the noncitizen departed of their own accord during the intervening period.

[4] Includes noncitizens in proceedings whose cases have been closed and are not on an active docket.

[5] Includes noncitizens subject to a final order or other EOIR case completion who are subject to a motion to reopen or reconsider or who appeal their case to the Board of Immigration Appeals.

[6] This category includes noncitizens granted asylum and other forms of relief from removal. This category also includes withholding of removal and protection under the Convention Against Torture even though they are not technically forms of relief.

STB_AR1_001512

[7] Completion codes for conditional grants of asylum, grants of asylum, adjustment of status under various statutory provisions, asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, and c

[8] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[9] Includes noncitizens granted cancelation of removal, DHS prosecutorial discretion, T visas, S visas, U visas, Temporary Protected Status, and EOIR conditional grants, as well as people found to be U.S. citizens or lawfully present noncitizens not subject to re

[10] Initial enforcement action cannot be linked to a subsequent enforcement outcome; may result from data errors, missing identifier data, and/or because the noncitizen awaits further processing.

Notes: Results based on OHSS Enforcement Lifecycle methodology as of July 11, 2024. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens enco

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle. Results based on source data as of June 30, 2024.

## Final or Most Current Outcomes, Total SW Border Encounters by Family Status

| MOST RECENT OUTCOMES | TOTAL | | | | | | | | | | | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q3 | | |
| Total Encounters[1] | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Repatriations | 70% | 72% | 60% | 58% | 53% | 34% | 82% | 66% | 51% | 39% | 24% | 11% | 16% |
| Title 42 Expulsion as a Percent of Repatriations | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 55% | 93% | 90% | 66% | 0.0% | 0.0% | 0.0% |
| Removals as a Percent of Repatriations | 81% | 86% | 87% | 83% | 86% | 79% | 35% | 3.1% | 5.3% | 14% | 53% | 52% | 52% |
| Expedited as a Percent of Removals | 58% | 57% | 55% | 55% | 56% | 55% | 55% | 46% | 56% | 65% | 72% | 57% | 54% |
| Reinstatement as a Percent of Removals | 38% | 39% | 41% | 41% | 40% | 39% | 42% | 42% | 32% | 29% | 26% | 16% | 21% |
| Administrative removals as a Percent of Removals | 0.4% | 0.4% | 0.3% | 0.4% | 0.3% | 0.4% | 0.4% | 0.9% | 0.6% | 0.3% | 0.2% | 1.1% | 0.2% |
| Other removals[2] as a Percent of Total Removals | 3.3% | 3.3% | 3.4% | 3.6% | 3.5% | 5.8% | 2.7% | 11% | 11% | 5.5% | 1.5% | 26% | 25% |
| Returns as a Percent of Repatriations | 16% | 12% | 11% | 14% | 11% | 10% | 4.8% | 2.3% | 3.2% | 18% | 44% | 28% | 38% |
| Re-encounters[3] as a Percent of Repatriations | 2.5% | 2.3% | 2.6% | 2.5% | 2.8% | 11% | 4.8% | 1.2% | 1.3% | 1.9% | 2.5% | 19% | 10% |
| No confirmed departure | 30% | 28% | 40% | 42% | 47% | 66% | 18% | 34% | 49% | 61% | 76% | 89% | 84% |
| Being processed as a Percent of NCD | 25% | 25% | 28% | 30% | 35% | 45% | 52% | 64% | 71% | 81% | 96% | 32% | 28% |
| Being processed by DHS | 45% | 31% | 31% | 36% | 38% | 47% | 47% | 53% | 56% | 38% | 15% | 53% | 24% |
| In EOIR proceedings[4] | 6.6% | 8.2% | 15% | 22% | 28% | 33% | 27% | 30% | 29% | 50% | 79% | 8.1% | 9.8% |
| EOIR case completed - additional DOJ action[5] | 48% | 61% | 53% | 42% | 34% | 20% | 26% | 17% | 14% | 12% | 5.7% | 39% | 66% |
| Final order/voluntary departure (FO/VD) as a Percent of NCD | 29% | 28% | 27% | 26% | 28% | 26% | 16% | 13% | 7.8% | 5.2% | 2.3% | 36% | 37% |
| Unexecuted removal orders as a Percent of FO/VD | 96% | 95% | 96% | 97% | 98% | 99% | 99% | 98% | 99% | 99% | 99% | 96% | 94% |
| In absentia | 76% | 71% | 68% | 74% | 78% | 82% | 81% | 81% | 82% | 86% | 63% | 75% | 68% |
| Not in absentia | 24% | 29% | 32% | 26% | 22% | 18% | 19% | 19% | 18% | 14% | 37% | 25% | 32% |
| Unexecuted voluntary departures as a Percent of FO/VD | 4.1% | 4.8% | 3.8% | 2.6% | 2.2% | 1.4% | 0.7% | 1.9% | 1.2% | 1.0% | 1.0% | 4.0% | 5.9% |
| Relief as a Percent of NCD | 18% | 21% | 20% | 18% | 15% | 9.1% | 13% | 10% | 9.9% | 6.7% | 0.1% | 15% | 17% |
| SIJ or affirmative asylum as a Percent of Relief | 30% | 28% | 42% | 47% | 49% | 57% | 47% | 47% | 17% | 8.2% | 33% | 36% | 29% |
| LPR status granted by DHS as a Percent of Relief | 13% | 10% | 7.4% | 6.9% | 5.7% | 6.3% | 5.3% | 3.1% | 42% | 59% | 9.3% | 6.2% | 2.8% |
| EOIR relief[6] as a Percent of Relief | 48% | 56% | 46% | 40% | 43% | 31% | 28% | 21% | 14% | 6.6% | 41% | 51% | 64% |
| Merits as Percent of EOIR relief | 95% | 95% | 95% | 96% | 96% | 96% | 96% | 98% | 98% | 97% | 84% | 94% | |
| Not on Merits as Percent of EOIR relief | 5% | 5% | 5% | 4% | 4% | 4% | 4% | 2% | 2% | 3% | 16% | 6% | |
| Other[9] as a Percent of Relief | 8.8% | 5.8% | 4.7% | 5.9% | 2.4% | 5.6% | 19% | 29% | 26% | 26% | 16% | 7.6% | 4.3% |
| EOIR Termination as a Percent of NCD | 28% | 26% | 25% | 25% | 22% | 20% | 20% | 13% | 11% | 6.9% | 2.0% | 17% | 17% |
| MPP EOIR as a Percent of EOIR Termination | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 6.7% | 16% | 0.7% | 0.8% | 0.0% | 0.0% | 0.0% | 0.0% |
| Non MPP EOIR as a Percent of EOIR Termination | 100% | 100% | 100% | 100% | 100% | 93% | 84% | 99% | 99% | 100% | 100% | 100% | 100% |
| No Subsequent Event[10] as a Percent of NCD | 0.2% | 0.3% | 0.2% | 0.2% | 0.1% | 0.0% | 0.1% | 0.0% | 0.1% | 0.3% | 0.2% | 0.0% | 0.0% |

STB_AR1_001513

STB_AR1_001514

| FM | | | | | | | | | SA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q3 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| **99,931** | **101,768** | **157,686** | **523,365** | **69,493** | **478,565** | **544,182** | **684,655** | **535,430** | **341,481** | **251,501** | **303,361** | **232,404** | **281,802** | **354,632** | **346,915** | **1,099,822** | **1,642,277** |
| 10,919 | 9,582 | 12,097 | 36,320 | 29,346 | 136,167 | 129,424 | 99,782 | 51,373 | 305,928 | 228,106 | 260,766 | 199,367 | 239,610 | 274,435 | 321,212 | 973,997 | 1,039,687 |
| 0 | 0 | 0 | 0 | 10,050 | 126,847 | 116,063 | 66,304 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 183,229 | 930,254 | 960,820 |
| 5,513 | 4,260 | 5,688 | 12,341 | 11,805 | 2,389 | 7,177 | 18,682 | 37,435 | 278,919 | 220,189 | 246,004 | 179,235 | 221,594 | 243,133 | 116,614 | 32,526 | 55,626 |
| 2,771 | 2,046 | 2,417 | 4,284 | 10,543 | 413 | 5,404 | 16,596 | 34,614 | 155,320 | 118,223 | 133,845 | 99,242 | 125,029 | 137,206 | 59,830 | 15,775 | 29,668 |
| 1,037 | 794 | 856 | 3,051 | 717 | 343 | 412 | 1,155 | 2,351 | 117,844 | 97,545 | 107,367 | 75,400 | 91,775 | 96,075 | 53,442 | 14,468 | 20,083 |
| 10 | 6 | 9 | 69 | 28 | 5 | 1 | 4 | 0 | 1,092 | 926 | 790 | 668 | 696 | 1,027 | 515 | 304 | 372 |
| 1,695 | 1,414 | 2,406 | 4,937 | 517 | 1,628 | 1,360 | 927 | 470 | 4,663 | 3,495 | 4,002 | 3,925 | 4,094 | 8,825 | 2,827 | 1,979 | 5,503 |
| 3,189 | 3,458 | 3,172 | 3,651 | 1,772 | 658 | 1,575 | 12,491 | 13,097 | 22,417 | 5,152 | 11,335 | 17,533 | 14,923 | 19,036 | 9,933 | 5,235 | 12,649 |
| 2,217 | 1,864 | 3,237 | 20,328 | 5,719 | 6,273 | 4,609 | 2,305 | 841 | 4,592 | 2,765 | 3,427 | 2,599 | 3,093 | 12,266 | 11,436 | 5,982 | 10,592 |
| 89,012 | 92,186 | 145,589 | 487,045 | 40,147 | 342,398 | 414,758 | 584,873 | 484,057 | 35,553 | 23,395 | 42,595 | 33,037 | 42,192 | 80,197 | 25,703 | 125,825 | 602,590 |
| 29,364 | 30,628 | 54,968 | 228,954 | 22,530 | 221,961 | 293,376 | 481,850 | 463,722 | 11,298 | 7,960 | 13,210 | 9,988 | 13,706 | 28,177 | 13,223 | 81,837 | 426,642 |
| 8,817 | 10,838 | 22,009 | 111,331 | 10,251 | 105,100 | 154,389 | 132,476 | 31,166 | 4,497 | 2,581 | 3,536 | 2,619 | 3,257 | 7,359 | 6,242 | 43,406 | 234,585 |
| 5,413 | 8,124 | 19,081 | 83,420 | 7,948 | 81,996 | 103,188 | 308,353 | 413,184 | 331 | 167 | 727 | 714 | 910 | 3,351 | 2,127 | 13,511 | 114,019 |
| 15,134 | 11,666 | 13,878 | 34,203 | 4,331 | 34,865 | 35,799 | 41,021 | 19,372 | 6,470 | 5,212 | 8,947 | 6,655 | 9,539 | 17,467 | 4,854 | 24,920 | 78,038 |
| 28,412 | 27,987 | 48,143 | 140,863 | 5,793 | 50,511 | 30,407 | 32,721 | 7,893 | 9,226 | 4,905 | 9,531 | 6,534 | 7,287 | 13,670 | 4,880 | 11,615 | 48,439 |
| 27,171 | 27,271 | 47,105 | 138,883 | 5,746 | 49,219 | 29,801 | 32,353 | 7,779 | 8,807 | 4,652 | 9,179 | 6,298 | 7,095 | 13,536 | 4,854 | 11,509 | 48,031 |
| 17,244 | 20,065 | 37,151 | 114,239 | 5,070 | 39,719 | 23,989 | 28,142 | 7,027 | 6,293 | 2,923 | 5,768 | 3,810 | 4,261 | 9,707 | 3,302 | 7,764 | 39,090 |
| 9,927 | 7,206 | 9,954 | 24,644 | 676 | 9,500 | 5,812 | 4,211 | 752 | 2,514 | 1,729 | 3,411 | 2,488 | 2,834 | 3,829 | 1,552 | 3,745 | 8,941 |
| 1,241 | 716 | 1,038 | 1,980 | 47 | 1,292 | 606 | 368 | 114 | 419 | 253 | 352 | 236 | 192 | 134 | 26 | 106 | 408 |
| 12,473 | 10,775 | 12,437 | 26,129 | 2,926 | 23,490 | 37,406 | 28,865 | 108 | 6,390 | 5,168 | 10,080 | 8,149 | 9,651 | 13,383 | 2,996 | 13,682 | 60,032 |
| 4,780 | 4,918 | 5,692 | 14,642 | 599 | 5,169 | 2,547 | 707 | 27 | 84 | 86 | 329 | 255 | 327 | 692 | 170 | 920 | 2,440 |
| 352 | 387 | 527 | 913 | 181 | 200 | 13,941 | 14,549 | 16 | 763 | 482 | 1,012 | 860 | 1,078 | 2,484 | 309 | 1,549 | 33,666 |
| 6,999 | 4,895 | 5,896 | 8,491 | 693 | 9,119 | 8,273 | 2,618 | 35 | 4,877 | 4,136 | 7,563 | 6,028 | 7,891 | 9,295 | 2,135 | 3,316 | 7,254 |
| 6,573 | 4,696 | 5,570 | 8,184 | 674 | 8,995 | 8,167 | 2,596 | 34 | 4,569 | 3,939 | 7,219 | 5,721 | 7,637 | 8,951 | 2,049 | 3,250 | 7,099 |
| 426 | 199 | 326 | 307 | 19 | 124 | 106 | 22 | 1 | 308 | 197 | 344 | 307 | 254 | 344 | 86 | 66 | 155 |
| 342 | 575 | 322 | 2,083 | 1,453 | 9,002 | 12,645 | 10,991 | 30 | 666 | 464 | 1,176 | 1,006 | 355 | 912 | 382 | 7,897 | 16,672 |
| 18,664 | 22,731 | 29,974 | 90,968 | 8,872 | 45,981 | 52,520 | 40,769 | 12,295 | 8,375 | 5,090 | 9,446 | 8,075 | 11,330 | 24,899 | 4,529 | 18,516 | 65,304 |
| 0 | 0 | 0 | 6,262 | 1,138 | 142 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,260 | 1,372 | 386 | 954 |
| 18,664 | 22,731 | 29,974 | 84,706 | 7,734 | 45,839 | 52,520 | 40,769 | 12,295 | 8,375 | 5,090 | 9,446 | 8,075 | 11,330 | 22,639 | 3,157 | 18,130 | 64,350 |
| 99 | 65 | 67 | 131 | 26 | 455 | 1,049 | 668 | 39 | 264 | 272 | 328 | 291 | 218 | 68 | 75 | 175 | 2,173 |

ounters between FY2013 and FY2024 Q3.

STB_AR1_001515

ancellation of removal.

noval.

ountered on multiple occasions appear in the table multiple times.  Accompanied Minors (AM), OFO inadmissibles paroled with a CBP One confirmation number, and OFO with dispositions of Crewmember, Parole, or Withdrawal are excluded.

| | FM | | | | | | | | | SA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q3 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 11% | 9.4% | 7.7% | 6.9% | 42% | 28% | 24% | 15% | 9.6% | 90% | 91% | 86% | 86% | 85% | 77% | 93% | 89% | 63% |
| 0.0% | 0.0% | 0.0% | 0.0% | 34% | 93% | 90% | 66% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 57% | 96% | 92% |
| 50% | 44% | 47% | 34% | 40% | 1.8% | 5.5% | 19% | 73% | 91% | 97% | 94% | 90% | 92% | 89% | 36% | 3.3% | 5.4% |
| 50% | 48% | 42% | 35% | 89% | 17% | 75% | 89% | 92% | 56% | 54% | 54% | 55% | 56% | 56% | 51% | 48% | 53% |
| 19% | 19% | 15% | 25% | 6.1% | 14% | 5.7% | 6.2% | 6.3% | 42% | 44% | 44% | 42% | 41% | 40% | 46% | 44% | 36% |
| 0.2% | 0.1% | 0.2% | 0.6% | 0.2% | 0.2% | 0.0% | 0.0% | 0.0% | 0.4% | 0.4% | 0.3% | 0.4% | 0.3% | 0.4% | 0.4% | 0.9% | 0.7% |
| 31% | 33% | 42% | 40% | 4.4% | 68% | 19% | 5.0% | 1.3% | 1.7% | 1.6% | 1.6% | 2.2% | 1.8% | 3.6% | 2.4% | 6.1% | 9.9% |
| 29% | 36% | 26% | 10% | 6.0% | 0.5% | 1.2% | 13% | 25% | 7.3% | 2.3% | 4.3% | 8.8% | 6.2% | 6.9% | 3.1% | 0.5% | 1.2% |
| 20% | 19% | 27% | 56% | 19% | 4.6% | 3.6% | 2.3% | 1.6% | 1.5% | 1.2% | 1.3% | 1.3% | 1.3% | 4.5% | 3.6% | 0.6% | 1.0% |
| 89% | 91% | 92% | 93% | 58% | 72% | 76% | 85% | 90% | 10% | 9.3% | 14% | 14% | 15% | 23% | 7.4% | 11% | 37% |
| 33% | 33% | 38% | 47% | 56% | 65% | 71% | 82% | 96% | 32% | 34% | 31% | 30% | 32% | 35% | 51% | 65% | 71% |
| 30% | 35% | 40% | 49% | 45% | 47% | 53% | 27% | 6.7% | 40% | 32% | 27% | 26% | 24% | 26% | 47% | 53% | 55% |
| 18% | 27% | 35% | 36% | 35% | 37% | 35% | 64% | 89% | 2.9% | 2.1% | 5.5% | 7.1% | 6.6% | 12% | 16% | 17% | 27% |
| 52% | 38% | 25% | 15% | 19% | 16% | 12% | 8.5% | 4.2% | 57% | 65% | 68% | 67% | 70% | 62% | 37% | 30% | 18% |
| 32% | 30% | 33% | 29% | 14% | 15% | 7.3% | 5.6% | 1.6% | 26% | 21% | 22% | 20% | 17% | 17% | 19% | 9.2% | 8.0% |
| 96% | 97% | 98% | 99% | 99% | 97% | 98% | 99% | 99% | 95% | 95% | 96% | 96% | 97% | 99% | 99% | 99% | 99% |
| 63% | 74% | 79% | 82% | 88% | 81% | 80% | 87% | 90% | 71% | 63% | 63% | 60% | 60% | 72% | 68% | 67% | 81% |
| 37% | 26% | 21% | 18% | 12% | 19% | 20% | 13% | 9.7% | 29% | 37% | 37% | 40% | 40% | 28% | 32% | 33% | 19% |
| 4.4% | 2.6% | 2.2% | 1.4% | 0.8% | 2.6% | 2.0% | 1.1% | 1.4% | 4.5% | 5.2% | 3.7% | 3.6% | 2.6% | 1.0% | 0.5% | 0.9% | 0.8% |
| 14% | 12% | 8.5% | 5.4% | 7.3% | 6.9% | 9.0% | 4.9% | 0.0% | 18% | 22% | 24% | 25% | 23% | 17% | 12% | 11% | 10.0% |
| 38% | 46% | 46% | 56% | 20% | 22% | 6.8% | 2.4% | 25% | 1.3% | 1.7% | 3.3% | 3.1% | 3.4% | 5.2% | 5.7% | 6.7% | 4.1% |
| 2.8% | 3.6% | 4.2% | 3.5% | 6.2% | 0.9% | 37% | 50% | 15% | 12% | 9.3% | 10% | 11% | 11% | 19% | 10% | 11% | 56% |
| 56% | 45% | 47% | 32% | 24% | 39% | 22% | 9.1% | 32% | 76% | 80% | 75% | 74% | 82% | 69% | 71% | 24% | 12% |
| 94% | 96% | 94% | 96% | 97% | 99% | 99% | 99% | 97% | 94% | 95% | 95% | 95% | 97% | 96% | 96% | 98% | 98% |
| 6% | 4% | 6% | 4% | 3% | 1% | 1% | 1% | 3% | 6% | 5% | 5% | 5% | 3% | 4% | 4% | 2% | 2% |
| 2.7% | 5.3% | 2.6% | 8.0% | 50% | 38% | 34% | 38% | 28% | 10% | 9.0% | 12% | 12% | 3.7% | 6.8% | 13% | 58% | 28% |
| 21% | 25% | 21% | 19% | 22% | 13% | 13% | 7.0% | 2.5% | 24% | 22% | 22% | 24% | 27% | 31% | 18% | 15% | 11% |
| 0.0% | 0.0% | 0.0% | 6.9% | 13% | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 9.1% | 30% | 2.1% | 1.5% |
| 100% | 100% | 100% | 93% | 87% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 91% | 70% | 98% | 99% |
| 0.1% | 0.1% | 0.0% | 0.0% | 0.1% | 0.1% | 0.3% | 0.1% | 0.0% | 0.7% | 1.2% | 0.8% | 0.9% | 0.5% | 0.1% | 0.3% | 0.1% | 0.4% |

STB_AR1_001516

STB_AR1_001517

| | | | | | | UC - Contiguous Countries | | | | | | | | | | UC - Non Contiguou | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2023** | **2024Q3** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024Q3** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| **1,366,307** | **804,961** | **17,106** | **12,724** | **12,849** | **9,915** | **11,568** | **11,760** | **15,085** | **25,063** | **27,455** | **27,994** | **26,201** | **55,570** | **31,294** | **53,326** | **38,486** | **46,353** | **67,239** |
| 731,172 | 278,648 | 16,307 | 11,547 | 11,867 | 9,161 | 10,337 | 10,461 | 14,292 | 23,218 | 24,028 | 18,805 | 9,849 | 5,285 | 2,784 | 3,863 | 2,806 | 3,541 | 3,354 |
| 496,499 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8,080 | 3,445 | 5 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 103,819 | 143,633 | 358 | 592 | 310 | 218 | 163 | 141 | 61 | 25 | 26 | 30 | 19 | 3,503 | 1,768 | 2,117 | 1,330 | 1,617 | 1,000 |
| 63,592 | 96,501 | 71 | 53 | 66 | 58 | 56 | 45 | 26 | 4 | 5 | 16 | 11 | 189 | 128 | 50 | 146 | 215 | 71 |
| 34,210 | 44,555 | 66 | 64 | 63 | 43 | 36 | 38 | 14 | 4 | 6 | 3 | 2 | 13 | 4 | 4 | 5 | 2 | 3 |
| 330 | 348 | 7 | 13 | 9 | 14 | 1 | 5 | 2 | 1 | 1 | 0 | 0 | 23 | 16 | 26 | 8 | 12 | 9 |
| 5,687 | 2,229 | 214 | 462 | 172 | 103 | 70 | 53 | 19 | 16 | 14 | 11 | 6 | 3,278 | 1,620 | 2,037 | 1,171 | 1,388 | 917 |
| 117,560 | 127,582 | 15,681 | 10,738 | 11,363 | 8,793 | 9,926 | 9,838 | 5,891 | 19,535 | 23,809 | 18,656 | 9,772 | 470 | 288 | 638 | 696 | 970 | 1,030 |
| 13,294 | 7,433 | 268 | 217 | 194 | 150 | 248 | 482 | 260 | 213 | 188 | 113 | 58 | 1,312 | 728 | 1,108 | 780 | 954 | 1,324 |
| 635,135 | 526,313 | 799 | 1,177 | 982 | 754 | 1,231 | 1,299 | 793 | 1,845 | 3,427 | 9,189 | 16,352 | 50,285 | 28,510 | 49,463 | 35,680 | 42,812 | 63,885 |
| 495,751 | 499,669 | 129 | 176 | 193 | 153 | 365 | 527 | 346 | 1,002 | 2,418 | 8,397 | 16,255 | 5,528 | 3,156 | 8,088 | 8,069 | 12,707 | 25,155 |
| 205,442 | 59,189 | 99 | 91 | 98 | 85 | 169 | 287 | 226 | 613 | 1,669 | 6,211 | 13,594 | 1,564 | 1,016 | 3,244 | 4,004 | 5,563 | 13,574 |
| 204,605 | 400,423 | 4 | 14 | 28 | 27 | 84 | 148 | 56 | 274 | 639 | 2,019 | 2,578 | 356 | 462 | 1,649 | 1,845 | 3,160 | 7,108 |
| 85,704 | 40,057 | 26 | 71 | 67 | 41 | 112 | 92 | 64 | 115 | 110 | 167 | 83 | 3,608 | 1,678 | 3,195 | 2,220 | 3,984 | 4,473 |
| 33,254 | 16,934 | 105 | 147 | 152 | 112 | 180 | 151 | 87 | 177 | 219 | 169 | 32 | 12,631 | 7,062 | 10,724 | 7,521 | 9,505 | 9,619 |
| 32,967 | 16,819 | 95 | 138 | 146 | 108 | 171 | 146 | 85 | 175 | 213 | 167 | 29 | 12,039 | 6,816 | 10,415 | 7,376 | 9,343 | 9,500 |
| 27,614 | 8,372 | 83 | 104 | 103 | 92 | 144 | 128 | 74 | 156 | 192 | 159 | 20 | 10,118 | 5,915 | 9,090 | 6,500 | 8,418 | 8,568 |
| 5,353 | 8,447 | 12 | 34 | 43 | 16 | 27 | 18 | 11 | 19 | 21 | 8 | 9 | 1,921 | 901 | 1,325 | 876 | 925 | 932 |
| 287 | 115 | 10 | 9 | 6 | 4 | 9 | 5 | 2 | 2 | 6 | 2 | 3 | 592 | 246 | 309 | 145 | 162 | 119 |
| 55,689 | 772 | 277 | 362 | 261 | 229 | 319 | 308 | 221 | 433 | 459 | 255 | 12 | 9,216 | 6,664 | 14,379 | 10,771 | 11,612 | 17,766 |
| 1,852 | 170 | 55 | 146 | 125 | 136 | 240 | 262 | 203 | 401 | 446 | 245 | 11 | 5,196 | 4,204 | 10,822 | 8,876 | 10,506 | 17,015 |
| 38,541 | 78 | 151 | 129 | 76 | 58 | 46 | 27 | 5 | 15 | 8 | 5 | 1 | 1,158 | 689 | 1,058 | 732 | 292 | 222 |
| 3,282 | 389 | 19 | 46 | 40 | 25 | 22 | 8 | 2 | 4 | 1 | 0 | 0 | 2,182 | 1,506 | 2,285 | 1,006 | 677 | 284 |
| 3,125 | 321 | 19 | 44 | 38 | 23 | 22 | 8 | 2 | 4 | 1 | 0 | 0 | 2,112 | 1,461 | 2,234 | 976 | 667 | 279 |
| 157 | 68 | 0 | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 | 45 | 51 | 30 | 10 | 5 |
| 12,014 | 135 | 52 | 41 | 20 | 10 | 11 | 11 | 11 | 13 | 4 | 5 | 0 | 680 | 265 | 214 | 157 | 137 | 245 |
| 48,451 | 8,747 | 287 | 490 | 374 | 257 | 364 | 312 | 139 | 230 | 330 | 368 | 52 | 22,910 | 11,628 | 16,271 | 9,319 | 8,988 | 11,344 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 48,451 | 8,747 | 287 | 490 | 374 | 257 | 364 | 312 | 139 | 230 | 330 | 368 | 52 | 22,910 | 11,628 | 16,271 | 9,319 | 8,988 | 11,344 |
| 1,990 | 191 | 1 | 2 | 2 | 3 | 3 | 1 | 0 | 3 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 |

STB_AR1_001518

| | | | | | | UC - Contiguous Countries | | | | | | | | | | UC - Non Contiguou | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | 2024Q3 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q3 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 54% | 35% | 95% | 91% | 92% | 92% | 89% | 89% | 95% | 93% | 88% | 67% | 38% | 9.5% | 8.9% | 7.2% | 7.3% | 7.6% | 5.0% |
| 68% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 57% | 15% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 14% | 52% | 2.2% | 5.1% | 2.6% | 2.4% | 1.6% | 1.3% | 0.4% | 0.1% | 0.1% | 0.2% | 0.2% | 66% | 64% | 55% | 47% | 46% | 30% |
| 61% | 67% | 20% | 9.0% | 21% | 27% | 34% | 32% | 43% | 16% | 19% | 53% | 58% | 5.4% | 7.2% | 2.4% | 11% | 13% | 7.1% |
| 33% | 31% | 18% | 11% | 20% | 20% | 22% | 27% | 23% | 16% | 23% | 10% | 11% | 0.4% | 0.2% | 0.2% | 0.4% | 0.1% | 0.3% |
| 0.3% | 0.2% | 2.0% | 2.2% | 2.9% | 6.4% | 0.6% | 3.5% | 3.3% | 4.0% | 3.8% | 0.0% | 0.0% | 0.7% | 0.9% | 1.2% | 0.6% | 0.7% | 0.9% |
| 5.5% | 1.6% | 60% | 78% | 55% | 47% | 43% | 38% | 31% | 64% | 54% | 37% | 32% | 94% | 92% | 96% | 88% | 86% | 92% |
| 16% | 46% | 96% | 93% | 96% | 96% | 96% | 94% | 41% | 84% | 99% | 99% | 99% | 8.9% | 10% | 17% | 25% | 27% | 31% |
| 1.8% | 2.7% | 1.6% | 1.9% | 1.6% | 1.6% | 2.4% | 4.6% | 1.8% | 0.9% | 0.8% | 0.6% | 0.6% | 25% | 26% | 29% | 28% | 27% | 39% |
| 46% | 65% | 4.7% | 9.3% | 7.6% | 7.6% | 11% | 11% | 5.3% | 7.4% | 12% | 33% | 62% | 90% | 91% | 93% | 93% | 92% | 95% |
| 78% | 95% | 16% | 15% | 20% | 20% | 30% | 41% | 44% | 54% | 71% | 91% | 99% | 11% | 11% | 16% | 23% | 30% | 39% |
| 41% | 12% | 77% | 52% | 51% | 56% | 46% | 54% | 65% | 61% | 69% | 74% | 84% | 28% | 32% | 40% | 50% | 44% | 54% |
| 41% | 80% | 3.1% | 8.0% | 15% | 18% | 23% | 28% | 16% | 27% | 26% | 24% | 16% | 6.4% | 15% | 20% | 23% | 25% | 28% |
| 17% | 8.0% | 20% | 40% | 35% | 27% | 31% | 17% | 18% | 11% | 4.5% | 2.0% | 0.5% | 65% | 53% | 40% | 28% | 31% | 18% |
| 5.2% | 3.2% | 13% | 12% | 15% | 15% | 15% | 12% | 11% | 9.6% | 6.4% | 1.8% | 0.2% | 25% | 25% | 22% | 21% | 22% | 15% |
| 99% | 99% | 90% | 94% | 96% | 96% | 95% | 97% | 98% | 99% | 97% | 99% | 91% | 95% | 97% | 97% | 97% | 98% | 99% |
| 84% | 50% | 87% | 75% | 71% | 85% | 84% | 88% | 87% | 89% | 90% | 95% | 69% | 84% | 87% | 87% | 88% | 90% | 90% |
| 16% | 50% | 13% | 25% | 29% | 15% | 16% | 12% | 13% | 11% | 9.9% | 4.8% | 31% | 16% | 13% | 13% | 12% | 9.9% | 9.8% |
| 0.9% | 0.7% | 9.5% | 6.1% | 3.9% | 3.6% | 5.0% | 3.3% | 2.3% | 1.1% | 2.7% | 1.2% | 9.4% | 4.7% | 3.5% | 2.9% | 1.9% | 1.7% | 1.2% |
| 8.8% | 0.1% | 35% | 31% | 27% | 30% | 26% | 24% | 28% | 23% | 13% | 2.8% | 0.1% | 18% | 23% | 29% | 30% | 27% | 28% |
| 3.3% | 22% | 20% | 40% | 48% | 59% | 75% | 85% | 92% | 93% | 97% | 96% | 92% | 56% | 63% | 75% | 82% | 90% | 96% |
| 69% | 10% | 55% | 36% | 29% | 25% | 14% | 8.8% | 2.3% | 3.5% | 1.7% | 2.0% | 8.3% | 13% | 10% | 7.4% | 6.8% | 2.5% | 1.2% |
| 5.9% | 50% | 6.9% | 13% | 15% | 11% | 6.9% | 2.6% | 0.9% | 0.9% | 0.2% | 0.0% | 0.0% | 24% | 23% | 16% | 9.3% | 5.8% | 1.6% |
| 95% | 83% | 100% | 96% | 95% | 92% | 100% | 100% | 100% | 100% | 100% | #DIV/0! | #DIV/0! | 97% | 97% | 98% | 97% | 99% | 98% |
| 5% | 17% | 0% | 4% | 5% | 8% | 0% | 0% | 0% | 0% | 0% | #DIV/0! | #DIV/0! | 3% | 3% | 2% | 3% | 1% | 2% |
| 22% | 17% | 19% | 11% | 7.7% | 4.4% | 3.4% | 3.6% | 5.0% | 3.0% | 0.9% | 2.0% | 0.0% | 7.4% | 4.0% | 1.5% | 1.5% | 1.2% | 1.4% |
| 7.6% | 1.7% | 36% | 42% | 38% | 34% | 30% | 24% | 18% | 12% | 9.6% | 4.0% | 0.3% | 46% | 41% | 33% | 26% | 21% | 18% |
| 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 0.3% | 0.0% | 0.1% | 0.2% | 0.2% | 0.4% | 0.2% | 0.1% | 0.0% | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |

STB_AR1_001519

STB_AR1_001520

| ...s Countries | | | | | Unk | | | | | | | | | | | | |
| 2020 | 2021 | 2022 | 2023 | 2024Q1 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q1 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **17,160** | **121,548** | **124,399** | **109,228** | **63,817** | **63,470** | **68,120** | **35,619** | **2,619** | **290** | **159** | **78** | **241** | **697** | **412** | **330** | 544,667 | 0 |
| 3,637 | 3,572 | 1,623 | 791 | 181 | 45,217 | 42,832 | 17,304 | 874 | 177 | 77 | 56 | 141 | 443 | 229 | 199 | 380,209 | 0 |
| 3,072 | 1,294 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 | 129 | 419 | 177 | 0 | 0 | 0 |
| 131 | 448 | 296 | 92 | 19 | 21,803 | 23,735 | 9,664 | 106 | 83 | 41 | 10 | 3 | 1 | 7 | 12 | 308,497 | 0 |
| 14 | 20 | 5 | 9 | 3 | 20,622 | 21,776 | 8,482 | 52 | 12 | 5 | 1 | 2 | 1 | 4 | 11 | 178,444 | 0 |
| 0 | 1 | 4 | 1 | 0 | 98 | 89 | 50 | 1 | 7 | 1 | 1 | 0 | 0 | 2 | 1 | 118,633 | 0 |
| 5 | 7 | 2 | 0 | 0 | 7 | 20 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,174 | 0 |
| 112 | 420 | 285 | 82 | 16 | 1,076 | 1,850 | 1,125 | 53 | 64 | 35 | 8 | 1 | 0 | 1 | 0 | 10,246 | 0 |
| 156 | 602 | 720 | 508 | 127 | 21,442 | 16,699 | 6,648 | 709 | 88 | 27 | 12 | 7 | 22 | 43 | 182 | 62,128 | 0 |
| 278 | 1,228 | 605 | 187 | 35 | 1,972 | 2,398 | 759 | 59 | 6 | 9 | 2 | 2 | 1 | 2 | 5 | 9,584 | 0 |
| 13,523 | 117,976 | 122,776 | 108,437 | 63,636 | 18,253 | 25,288 | 18,315 | 1,745 | 113 | 82 | 22 | 100 | 254 | 183 | 131 | 164,458 | 0 |
| 5,411 | 72,121 | 90,687 | 97,223 | 63,086 | 5,094 | 7,375 | 5,257 | 591 | 34 | 37 | 8 | 50 | 156 | 133 | 124 | 41,261 | 0 |
| 2,888 | 49,600 | 66,448 | 71,929 | 53,312 | 2,353 | 2,713 | 1,818 | 274 | 8 | 21 | 5 | 31 | 81 | 75 | 7 | 18,712 | 0 |
| 1,088 | 17,607 | 20,949 | 23,120 | 9,360 | 469 | 733 | 776 | 128 | 3 | 7 | 1 | 11 | 67 | 54 | 112 | 2,720 | 0 |
| 1,435 | 4,914 | 3,290 | 2,174 | 414 | 2,272 | 3,929 | 2,663 | 189 | 23 | 9 | 2 | 8 | 8 | 4 | 5 | 19,829 | 0 |
| 1,787 | 13,758 | 10,306 | 3,538 | 158 | 4,156 | 6,172 | 4,290 | 432 | 30 | 17 | 5 | 12 | 20 | 7 | 1 | 47,277 | 0 |
| 1,770 | 13,691 | 10,252 | 3,519 | 151 | 4,090 | 5,935 | 4,174 | 430 | 29 | 17 | 5 | 12 | 20 | 7 | 1 | 45,346 | 0 |
| 1,597 | 12,510 | 9,438 | 3,325 | 145 | 2,928 | 3,774 | 2,659 | 338 | 25 | 15 | 4 | 10 | 20 | 7 | 1 | 34,629 | 0 |
| 173 | 1,181 | 814 | 194 | 6 | 1,162 | 2,161 | 1,515 | 92 | 4 | 2 | 1 | 2 | 0 | 0 | 0 | 10,717 | 0 |
| 17 | 67 | 54 | 19 | 7 | 66 | 237 | 116 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1,931 | 0 |
| 3,970 | 21,772 | 14,770 | 4,874 | 134 | 4,654 | 5,668 | 3,797 | 284 | 25 | 10 | 4 | 16 | 23 | 25 | 1 | 29,701 | 0 |
| 3,830 | 21,329 | 14,276 | 4,524 | 131 | 376 | 483 | 1,112 | 124 | 18 | 7 | 2 | 8 | 1 | 0 | 0 | 8,976 | 0 |
| 36 | 64 | 21 | 7 | 0 | 1,161 | 955 | 530 | 55 | 3 | 1 | 1 | 0 | 9 | 25 | 1 | 3,799 | 0 |
| 53 | 122 | 50 | 10 | 0 | 2,614 | 3,871 | 1,980 | 85 | 4 | 2 | 0 | 3 | 0 | 0 | 0 | 14,327 | 0 |
| 52 | 121 | 45 | 10 | 0 | 2,465 | 3,682 | 1,871 | 82 | 4 | 1 | 0 | 3 | 0 | 0 | 0 | 13,544 | 0 |
| 1 | 1 | 5 | 0 | 0 | 149 | 189 | 109 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 783 | 0 |
| 51 | 257 | 423 | 333 | 3 | 503 | 359 | 175 | 20 | 0 | 0 | 1 | 5 | 13 | 0 | 0 | 2,599 | 0 |
| 2,352 | 10,323 | 7,013 | 2,801 | 257 | 4,301 | 5,992 | 4,915 | 432 | 23 | 18 | 5 | 22 | 55 | 17 | 5 | 45,825 | 0 |
| 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,350 | 10,323 | 7,013 | 2,801 | 257 | 4,301 | 5,992 | 4,915 | 432 | 23 | 18 | 5 | 22 | 55 | 17 | 5 | 45,825 | 0 |
| 3 | 2 | 0 | 1 | 1 | 48 | 81 | 56 | 6 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 394 | 0 |

STB_AR1_001521

| s Countries | | | | | Unk | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020 | 2021 | 2022 | 2023 | 2024Q3 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024Q3 |
| **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |
| 21% | 2.9% | 1.3% | 0.7% | 0.3% | 71% | 63% | 49% | 33% | 61% | 48% | 72% | 59% | 64% | 56% | 60% |
| 84% | 36% | 0.1% | 0.5% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 57% | 91% | 95% | 77% | 0.0% |
| 3.6% | 13% | 18% | 12% | 10% | 48% | 55% | 56% | 12% | 47% | 53% | 18% | 2.1% | 0.2% | 3.1% | 6.0% |
| 11% | 4.5% | 1.7% | 9.8% | 16% | 95% | 92% | 88% | 49% | 14% | 12% | 10% | 67% | 100% | 57% | 92% |
| 0.0% | 0.2% | 1.4% | 1.1% | 0.0% | 0.4% | 0.4% | 0.5% | 0.9% | 8.4% | 2.4% | 10% | 0.0% | 0.0% | 29% | 8.3% |
| 3.8% | 1.6% | 0.7% | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 85% | 94% | 96% | 89% | 84% | 4.9% | 7.8% | 12% | 50% | 77% | 85% | 80% | 33% | 0.0% | 14% | 0.0% |
| 4.3% | 17% | 44% | 64% | 70% | 47% | 39% | 38% | 81% | 50% | 35% | 21% | 5.0% | 5.0% | 19% | 91% |
| 7.6% | 34% | 37% | 24% | 19% | 4.4% | 5.6% | 5.7% | 6.8% | 3.4% | 12% | 3.6% | 1.4% | 0.2% | 0.9% | 2.5% |
| 79% | 97% | 99% | 99% | 100% | 29% | 37% | 51% | 67% | 39% | 52% | 28% | 41% | 36% | 44% | 40% |
| 40% | 61% | 74% | 90% | 99% | 28% | 29% | 29% | 34% | 30% | 45% | 36% | 50% | 61% | 73% | 95% |
| 53% | 69% | 73% | 74% | 85% | 46% | 37% | 35% | 46% | 24% | 57% | 63% | 62% | 52% | 56% | 5.6% |
| 20% | 24% | 23% | 24% | 15% | 9.2% | 9.9% | 15% | 22% | 8.8% | 19% | 13% | 22% | 43% | 41% | 90% |
| 27% | 6.8% | 3.6% | 2.2% | 0.7% | 45% | 53% | 51% | 32% | 68% | 24% | 25% | 16% | 5.1% | 3.0% | 4.0% |
| 13% | 12% | 8.4% | 3.3% | 0.2% | 23% | 24% | 23% | 25% | 27% | 21% | 23% | 12% | 7.9% | 3.8% | 0.8% |
| 99% | 100% | 99% | 99% | 96% | 98% | 96% | 97% | 100% | 97% | 100% | 100% | 100% | 100% | 100% | 100% |
| 90% | 91% | 92% | 94% | 96% | 72% | 64% | 64% | 79% | 86% | 88% | 80% | 83% | 100% | 100% | 100% |
| 9.8% | 8.6% | 7.9% | 5.5% | 4.0% | 28% | 36% | 36% | 21% | 14% | 12% | 20% | 17% | 0.0% | 0.0% | 0.0% |
| 1.0% | 0.5% | 0.5% | 0.5% | 4.4% | 1.6% | 3.8% | 2.7% | 0.5% | 3.3% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 29% | 18% | 12% | 4.5% | 0.2% | 25% | 22% | 21% | 16% | 22% | 12% | 18% | 16% | 9.1% | 14% | 0.8% |
| 96% | 98% | 97% | 93% | 98% | 8.1% | 8.5% | 29% | 44% | 72% | 70% | 50% | 50% | 4.3% | 0.0% | 0.0% |
| 0.9% | 0.3% | 0.1% | 0.1% | 0.0% | 25% | 17% | 14% | 19% | 12% | 10% | 25% | 0.0% | 39% | 100% | 100% |
| 1.3% | 0.6% | 0.3% | 0.2% | 0.0% | 56% | 68% | 52% | 30% | 16% | 20% | 0.0% | 19% | 0.0% | 0.0% | 0.0% |
| 98% | 99% | 90% | 100% | #DIV/0! | 94% | 95% | 94% | 96% | 100% | 50% | #DIV/0! | 100% | #DIV/0! | #DIV/0! | #DIV/0! |
| 2% | 1% | 10% | 0% | #DIV/0! | 6% | 5% | 6% | 4% | 0% | 50% | #DIV/0! | 0% | #DIV/0! | #DIV/0! | #DIV/0! |
| 1.3% | 1.2% | 2.9% | 6.8% | 2.2% | 11% | 6.3% | 4.6% | 7.0% | 0.0% | 0.0% | 25% | 31% | 57% | 0.0% | 0.0% |
| 17% | 8.8% | 5.7% | 2.6% | 0.4% | 24% | 24% | 27% | 25% | 20% | 22% | 23% | 22% | 22% | 9.3% | 3.8% |
| 0.1% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.3% | 0.3% | 0.3% | 0.3% | 0.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.5% | 0.0% |

STB_AR1_001522

STB_AR1_001523

| Fear Screening of OFO and USBP Encounters by Circumventing Legal Pathways Rules | Immediate Post-Pandemic Period May 12, 2023 - June 4, 2024 | | |
|---|---|---|---|
| **Subject to Circumvention of Lawful Pathways Rule*** | USBP | OFO | CBP |
| **Established Exception1** | **1,519** | **5,852** | **7,371** |
| Positive Fear | 1,202 | 4,602 | 5,804 |
| Negative Fear | 292 | 1,173 | 1,465 |
| Administrative Closure | 25 | 77 | 102 |
| **Presumption Rebutted2** | **15,403** | **667** | **16,070** |
| Positive Fear | 13,264 | 507 | 13,771 |
| Negative Fear | 1,973 | 144 | 2,117 |
| Administrative Closure | 166 | 16 | 182 |
| **Subject to Presumption of Ineligibility for Asylum (Reasonable Possibility)3** | **130,348** | **2,577** | **132,925** |
| Positive Fear | 67,085 | 1,760 | 68,845 |
| Negative Fear | 61,559 | 767 | 62,326 |
| Administrative Closure | 1,704 | 50 | 1,754 |
| **Sub-total Subject to CLP4*** | **147,270** | **9,096** | **156,366** |
| Positive Fear | 81,551 | 6,869 | 88,420 |
| Negative Fear | 63,824 | 2,084 | 65,908 |
| Administrative Closure | 1,895 | 143 | 2,038 |
| **Not Subject to Circumvention of Lawful Pathways5 (Mexican)*** | **21,964** | **3,906** | **25,870** |
| Positive Fear | 9,146 | 1,476 | 10,622 |
| Negative Fear | 9,796 | 1,423 | 11,219 |
| Administrative Closure | 3,022 | 1,007 | 4,029 |
| **Not Subject to Circumvention of Lawful Pathways5 (OTMs)** | **22,189** | **1,990** | **24,179** |
| Positive Fear | 1,107 | 236 | 1,343 |
| Negative Fear | 900 | 101 | 1,001 |
| Administrative Closure | 20,182 | 1,653 | 21,835 |
| **Total** | **191,423** | **14,992** | **206,415** |
| Positive Fear | 91,804 | 8,581 | 100,385 |
| Negative Fear | 74,520 | 3,608 | 78,128 |

| Administrative Closure | 25,099 | 2,803 | 27,902 |
|---|---|---|---|

* Note: Table reports 1,008 Mexican nationals who have CLP codes in Asylum Pre-Screening Officer (APSO) Dataset within "Not subject to CLP (Mexicans)" category instead of Subject to CLP category.

[1]CLP - Established Exception, individuals encountered at the southwest border.

[2]CLP - Presumption Rebutted, individuals encountered at the southwest border.

[3]CLP - Presumption of Ineligibility Applies, individuals encountered at the southwest border.

[4] Exclude a 1,085 cases processed by USCIS as CLP but did not have an ER disposition.

[5] Not Subject to CLP.

Notes: Results based on OIS Enforcement Lifecycle methodology as of July 11, 2024. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times. Table is limited to Single Adults and Family Units.

Source: DHS Office of Immigration Statistics Enforcement Lifecycle. Results based on source data as of June 30, 2024.

STB_AR1_001525

**Screen-in Rate for Those subject to Rule**

| USBP | OFO | CBP |
|---|---|---|
| 54% | 64% | 54% |

Note: Includes Mexican nationals but excludes OTMs determined by USCIS to not be subject to CLP rule.

**Screen-in rate for those who established exception**

| USBP | OFO | CBP |
|---|---|---|
| 79% | 79% | 79% |

**Screen-in rate for those who rebutted presumption**

| USBP | OFO | CBP |
|---|---|---|
| 86% | 76% | 86% |

**Screen-in rate under the Reasonable possibility standard**

| USBP | OFO | CBP |
|---|---|---|
| 51% | 68% | 52% |

**Percent CFIs subject to the CLP rule that met the 'exceptionally compelling circumstances' threshhold to rebut presumption**

| USBP | OFO | CBP |
|---|---|---|
| 10.5% | 7.3% | 10.3% |

STB_AR1_001526

206,415

STB_AR1_001527

STB_AR1_001528

STB_AR1_001529

| Fear Screening by Emergency Border Circumstances Proclamation Categories, June 5 - Aug. 31, 2024 | USBP | OFO | CBP |
|---|---|---|---|
| **Exception by USCIS (Credible Fear)[1]** | **2,229** | **40** | **2,269** |
| Positive Fear | 1,813 | 24 | 1,837 |
| Negative Fear | 398 | 14 | 412 |
| Administrative Closure | 18 | 2 | 20 |
| **Ineligible for Asylum (Reasonable Probability)[2]** | **17,697** | **198** | **17,895** |
| Positive Fear | 8,444 | 92 | 8,536 |
| Negative Fear | 9,081 | 102 | 9,183 |
| Administrative Closure | 172 | 4 | 176 |
| **Subtotal Subject to the IFR** | **19,926** | **238** | **20,164** |
| Positive Fear | 10,257 | 116 | 10,373 |
| Negative Fear | 9,479 | 116 | 9,595 |
| Administrative Closure | 190 | 6 | 196 |
| **Not Subject to the IFR** | **3,522** | **84** | **3,606** |
| Positive Fear | 169 | 14 | 183 |
| Negative Fear | 111 | 13 | 124 |
| Administrative Closure | 3,242 | 57 | 3,299 |
| **Total** | **23,448** | **322** | **23,770** |
| Positive Fear | 10,426 | 130 | 10,556 |
| Negative Fear | 9,590 | 129 | 9,719 |
| Administrative Closure | 3,432 | 63 | 3,495 |

N/A not applicable.

[1]SB IFR established exception, individuals encountered at the southwest border.

[2]SB IFR applies, individuals encountered at the southwest border.

Notes: Population includes fear screenings resulting from apprehensions beginning on June 5, 2024, where an apprehension date is not present, data are limited to a USCIS creation date beginning on June 5, 2024. Excluded encounters include port of entry encounters of non-citizens who have registered with the CBP One app. Data are current through August 31, 2024.

Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on September 3, 2024.

**Screen-in rate for those who established excepti...**

| USBP | OFO |
|---|---|
| 81% | 60% |

**Screen-in rate under the Reasonable probability...**

| USBP | OFO |
|---|---|
| 48% | 46% |

**Screen-in Rate for those subject to Rule**

| USBP | OFO |
|---|---|
| 51% | 49% |

**Percent CFIs subject to the IFR that have met the...**

| USBP | OFO |
|---|---|
| 11.2% | 17% |

**Percent CFIs subject to the IFR that have screene...**

| USBP | OFO |
|---|---|
| 89% | 83% |

STB_AR1_001530

on

| CBP |
|-----|
| 81% |

**standard**

| CBP |
|-----|
| 48% |

| CBP |
|-----|
| 51% |

**'exceptionally compelling circumstances' exception.**

| CBP |
|-----|
| 11.3% |

**d under reasonable probability standard**

| CBP |
|-----|
| 89% |

STB_AR1_001531

Fear Screening of Expedited Removal Cases Under the IFR by Attorney/Consultant Attendance and CFI Results

| | Attorney Present | Consultant pres | Representative Present | | No Representative | | Total |
|---|---|---|---|---|---|---|---|
| **Exception by USCIS (Credible Fear)**[1] | **51** | **9** | **60** | | **2,169** | | **2,229** |
| Positive Fear | 45 | 8 | **53** | 88% | 1,760 | 81% | 1,813 |
| Negative Fear | 6 | 1 | **7** | | 391 | | 398 |
| Administrative Closure | 0 | 0 | **-** | | 18 | | 18 |
| **Ineligible for Asylum (Reasonable Probability)**[2] | **340** | **57** | **397** | | **17,300** | | **17,697** |
| Positive Fear | 237 | 29 | **266** | 67% | 8,178 | 47% | 8,444 |
| Negative Fear | 100 | 27 | **127** | | 8,954 | | 9,081 |
| Administrative Closure | 3 | 1 | **4** | | 168 | | 172 |
| **Total** | **391** | **66** | **457** | | **19,469** | | **19,926** |
| Positive Fear | 282 | 37 | **319** | 70% | 9,938 | 51% | 10,257 |
| Negative Fear | 106 | 28 | **134** | | 9,345 | | 9,479 |
| Administrative Closure | 3 | 1 | **4** | | 186 | | 190 |

0.514755

Note: data on attorney/consultant attendance are limited to whether or not an attorney or consultant were present during the actual CFI; data are not available on whether noncitizens consulted with legal counsel prior to their CFI. Data on attorney/consul
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on September 3, 2024 and data pulled from Global on September 11, 2024

Fear Screening of Expedited Removal Cases by Time Period, Detention Location, and Attorney/Consultant Attendance

| | Attorney Present | Consultant present | Representative Present | | No Representative | | Total |
|---|---|---|---|---|---|---|---|
| **CLP (May 12, 2023 - June 4, 2024)** | **2,269** | **558** | **2,827** | 1.40% | 203,588 | 99% | **206,415** |
| **Detained** | 1,576 | 398 | 1,974 | 1.20% | 167,900 | 99% | **169,874** |
| CBP | 65 | 81 | **146** | 0.30% | 52,917 | 100% | 53,063 |
| ICE | 1,511 | 316 | **1,827** | 1.60% | 110,146 | 98% | 111,973 |
| Unknown detention Facility | - | 1 | **1** | 0.00% | 4,837 | 100% | 4,838 |
| **Non-Detained** | 693 | 160 | **853** | 2.30% | 35,689 | 98% | 36,542 |
| **IFR (June 5 - Aug. 31, 2024)** | **431** | **69** | **500** | 2.10% | 23,270 | 98% | **23,770** |
| **Detained** | 414 | 63 | **477** | 2.20% | 20,856 | 98% | **21,333** |
| CBP | 25 | 11 | **36** | 0.50% | 6,561 | 99% | 6,597 |
| ICE | 389 | 52 | **441** | 3.10% | 14,003 | 97% | 14,445 |
| Unknown detention Facility | - | - | **-** | **-** | 292 | 100% | 292 |
| **Non-Detained** | 17 | 6 | **23** | 0.90% | 2,414 | 99% | 2,437 |

Note: data on attorney/consultant attendance are limited to whether or not an attorney or consultant were present during the actual CFI; data are not available on whether noncitizens consulted with legal counsel prior to their CFI. Data on attorney/consul
Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on September 3, 2024 and data pulled from Global on September 11, 2024

STB_AR1_001532

ltant attendance are not reflective of whether a Form G-28 was on file. Table excludes CFIs for which USCIS determined the non-citizen was not subject to the IFR.

ltant attendance are not reflective of whether a Form G-28 was on file.

STB_AR1_001533

ICE Air Charter Flights

| Mission Date | Ice Air Mission Number | Mission Country List | Passengers - Adults | Passengers - FM Members | Passengers - Minor | Total Passengers |
|---|---|---|---|---|---|---|
| 8/30/2024 | 24-002138 | Honduras | 123 | 0 | 1 | 124 |
| 8/30/2024 | 24-002143 | El Salvador | 128 | 5 | 0 | 133 |
| 8/30/2024 | 24-002313 | Brazil | 126 | 4 | 0 | 130 |
| 8/30/2024 | 24-002401 | Honduras | 117 | 15 | 0 | 132 |
| 8/30/2024 | 24-002408 | Guatemala | 123 | 0 | 0 | 123 |
| 8/29/2024 | 24-002075 | Jamaica | 43 | 0 | 0 | 43 |
| 8/29/2024 | 24-002396 | Colombia | 122 | 0 | 0 | 122 |
| 8/29/2024 | 24-002400 | Ecuador | 98 | 21 | 0 | 119 |
| 8/29/2024 | 24-002404 | Guatemala | 132 | 0 | 0 | 132 |
| 8/29/2024 | 24-002411 | Guatemala | 86 | 47 | 0 | 133 |
| 8/28/2024 | 24-002131 | Guatemala | 118 | 0 | 0 | 118 |
| 8/28/2024 | 24-002397 | Guatemala | 103 | 23 | 0 | 126 |
| 8/28/2024 | 24-002398 | El Salvador | 97 | 26 | 0 | 123 |
| 8/28/2024 | 24-002399 | Honduras | 88 | 42 | 0 | 130 |
| 8/27/2024 | 24-002053 | Liberia\, Cameroon | 8 | 0 | 0 | 8 |
| 8/27/2024 | 24-002068 | Ecuador | 130 | 0 | 0 | 130 |
| 8/27/2024 | 24-002389 | Mexico | 89 | 43 | 0 | 132 |
| 8/27/2024 | 24-002391 | Mexico | 132 | 0 | 0 | 132 |
| 8/27/2024 | 24-002392 | Mexico | 113 | 11 | 0 | 124 |
| 8/27/2024 | 24-002413 | Cuba | 47 | 1 | 0 | 48 |
| 8/26/2024 | 24-002130 | Guatemala | 124 | 0 | 1 | 125 |
| 8/26/2024 | 24-002136 | Honduras | 106 | 0 | 0 | 106 |
| 8/26/2024 | 24-002386 | Honduras | 68 | 44 | 0 | 112 |
| 8/25/2024 | 24-002383 | Colombia | 127 | 0 | 0 | 127 |
| 8/23/2024 | 24-002139 | Honduras | 116 | 0 | 1 | 117 |
| 8/23/2024 | 24-002144 | El Salvador | 98 | 36 | 0 | 134 |
| 8/23/2024 | 24-002291 | Guatemala | 111 | 6 | 0 | 117 |
| 8/23/2024 | 24-002292 | Colombia | 135 | 0 | 0 | 135 |
| 8/23/2024 | 24-002293 | Guatemala | 130 | 0 | 0 | 130 |
| 8/23/2024 | 24-002295 | Honduras | 56 | 23 | 0 | 79 |
| 8/23/2024 | 24-002384 | Guatemala | 128 | 0 | 0 | 128 |
| 8/22/2024 | 24-002070 | Peru | 69 | 3 | 0 | 72 |
| 8/22/2024 | 24-002072 | Nicaragua | 207 | 2 | 0 | 209 |
| 8/22/2024 | 24-002286 | Colombia | 98 | 1 | 0 | 99 |
| 8/22/2024 | 24-002287 | Ecuador | 95 | 32 | 0 | 127 |
| 8/22/2024 | 24-002288 | Mexico | 135 | 0 | 0 | 135 |
| 8/22/2024 | 24-002289 | Guatemala | 131 | 0 | 0 | 131 |
| 8/21/2024 | 24-002129 | Guatemala | 134 | 0 | 0 | 134 |
| 8/21/2024 | 24-002267 | Honduras | 115 | 4 | 0 | 119 |
| 8/21/2024 | 24-002283 | El Salvador | 95 | 32 | 0 | 127 |
| 8/21/2024 | 24-002284 | Guatemala | 103 | 16 | 0 | 119 |
| 8/20/2024 | 24-001988 | Romania\, Uzbekistan\, Tajikistan\, Georgia\, Albania | 135 | 0 | 0 | 135 |
| 8/20/2024 | 24-002064 | Dominican Republic | 135 | 0 | 0 | 135 |

| Total MVM Flights |
|---|
| Total ICE Air Charter Flights |
| **Total Flights** |

Source: OHSS Analysis of ICE Air and JFMTCU Flight Data.

| | | | | | | |
|---|---|---|---|---|---|---|
| 8/20/2024 | 24-002067 | Ecuador | 124 | 0 | 0 | 124 |
| 8/20/2024 | 24-002278 | Mexico | 130 | 5 | 0 | 135 |
| 8/20/2024 | 24-002279 | Honduras | 97 | 33 | 0 | 130 |
| 8/20/2024 | 24-002282 | Mexico | 115 | 0 | 0 | 115 |
| 8/19/2024 | 24-002062 | Colombia | 120 | 0 | 0 | 120 |
| 8/19/2024 | 24-002128 | Guatemala | 131 | 0 | 0 | 131 |
| 8/19/2024 | 24-002135 | Honduras | 127 | 0 | 0 | 127 |
| 8/19/2024 | 24-002382 | Honduras | 131 | 4 | 0 | 135 |
| 8/18/2024 | 24-002254 | Colombia | 77 | 0 | 0 | 77 |
| 8/16/2024 | 24-002076 | Brazil | 121 | 11 | 0 | 132 |
| 8/16/2024 | 24-002142 | El Salvador | 134 | 0 | 0 | 134 |
| 8/16/2024 | 24-002259 | Guatemala | 73 | 13 | 0 | 86 |
| 8/16/2024 | 24-002263 | Guatemala | 45 | 82 | 0 | 127 |
| 8/16/2024 | 24-002266 | Guatemala | 130 | 0 | 0 | 130 |
| 8/15/2024 | 24-002137 | Honduras | 133 | 0 | 0 | 133 |
| 8/15/2024 | 24-002253 | Colombia | 115 | 0 | 0 | 115 |
| 8/15/2024 | 24-002255 | Ecuador | 38 | 30 | 0 | 68 |
| 8/15/2024 | 24-002264 | Mexico | 135 | 0 | 0 | 135 |
| 8/14/2024 | 24-002127 | Guatemala | 132 | 2 | 0 | 134 |
| 8/14/2024 | 24-002252 | Colombia | 83 | 0 | 0 | 83 |
| 8/14/2024 | 24-002256 | Honduras | 67 | 25 | 0 | 92 |
| 8/14/2024 | 24-002257 | El Salvador | 77 | 48 | 0 | 125 |
| 8/14/2024 | 24-002258 | Guatemala | 105 | 13 | 1 | 119 |
| 8/14/2024 | 24-002265 | Guatemala | 128 | 0 | 0 | 128 |
| 8/13/2024 | 24-002066 | Ecuador | 130 | 0 | 0 | 130 |
| 8/13/2024 | 24-002251 | Mexico | 95 | 40 | 0 | 135 |
| 8/13/2024 | 24-002261 | Mexico | 118 | 0 | 0 | 118 |
| 8/12/2024 | 24-002061 | Colombia | 132 | 0 | 0 | 132 |
| 8/12/2024 | 24-002126 | Guatemala | 128 | 0 | 0 | 128 |
| 8/12/2024 | 24-002134 | Honduras | 129 | 0 | 0 | 129 |
| 8/12/2024 | 24-002247 | Ecuador | 100 | 0 | 0 | 100 |
| 8/12/2024 | 24-002248 | Honduras | 84 | 49 | 0 | 133 |
| 8/11/2024 | 24-002223 | Colombia | 77 | 0 | 0 | 77 |
| 8/11/2024 | 24-002241 | Ecuador | 115 | 0 | 0 | 115 |
| 8/9/2024 | 24-002141 | El Salvador | 123 | 9 | 0 | 132 |
| 8/9/2024 | 24-002216 | Honduras | 118 | 14 | 0 | 132 |
| 8/9/2024 | 24-002224 | Guatemala | 81 | 9 | 0 | 90 |
| 8/9/2024 | 24-002237 | Guatemala | 72 | 48 | 0 | 120 |
| 8/9/2024 | 24-002238 | Guatemala | 130 | 0 | 0 | 130 |
| 8/8/2024 | 24-002069 | Peru | 94 | 15 | 0 | 109 |
| 8/8/2024 | 24-002071 | Nicaragua | 204 | 0 | 0 | 204 |
| 8/8/2024 | 24-002133 | Honduras | 124 | 0 | 0 | 124 |
| 8/8/2024 | 24-002219 | Guatemala | 81 | 37 | 0 | 118 |
| 8/8/2024 | 24-002221 | Ecuador | 80 | 11 | 0 | 91 |
| 8/8/2024 | 24-002222 | Colombia | 111 | 0 | 0 | 111 |

STB_AR1_001535

| Date | Number | Country | A | B | C | D |
|---|---|---|---|---|---|---|
| 8/8/2024 | 24-002226 | Mexico | 135 | 0 | 0 | 135 |
| 8/8/2024 | 24-002236 | Guatemala | 130 | 0 | 0 | 130 |
| 8/7/2024 | 24-001815 | Mauritania\, Senegal\, Ivory Coast\, Dem Rep of the Congo | 8 | 0 | 0 | 8 |
| 8/7/2024 | 24-002125 | Guatemala | 130 | 0 | 0 | 130 |
| 8/7/2024 | 24-002215 | Honduras | 59 | 32 | 0 | 91 |
| 8/7/2024 | 24-002218 | El Salvador | 68 | 19 | 0 | 87 |
| 8/7/2024 | 24-002220 | Ecuador | 110 | 8 | 0 | 118 |
| 8/7/2024 | 24-002233 | Guatemala | 78 | 56 | 0 | 134 |
| 8/7/2024 | 24-002234 | Guatemala | 126 | 0 | 0 | 126 |
| 8/6/2024 | 24-002055 | Dominican Republic | 84 | 0 | 0 | 84 |
| 8/6/2024 | 24-002065 | Ecuador | 128 | 0 | 0 | 128 |
| 8/6/2024 | 24-002209 | Colombia | 134 | 0 | 0 | 134 |
| 8/6/2024 | 24-002217 | Mexico | 111 | 21 | 0 | 132 |
| 8/6/2024 | 24-002231 | Mexico | 126 | 0 | 0 | 126 |
| 8/5/2024 | 24-002060 | Colombia | 132 | 0 | 0 | 132 |
| 8/5/2024 | 24-002124 | Guatemala | 131 | 3 | 0 | 134 |
| 8/5/2024 | 24-002214 | Honduras | 107 | 27 | 0 | 134 |
| 8/5/2024 | 24-002240 | Honduras | 71 | 0 | 0 | 71 |
| 8/4/2024 | 24-002192 | Colombia | 132 | 0 | 0 | 132 |
| 8/2/2024 | 24-002186 | Guatemala | 76 | 16 | 0 | 92 |
| 8/2/2024 | 24-002191 | Honduras | 115 | 11 | 0 | 126 |
| 8/2/2024 | 24-002195 | Guatemala | 88 | 38 | 0 | 126 |
| 8/2/2024 | 24-002204 | Honduras | 112 | 0 | 0 | 112 |
| 8/2/2024 | 24-002207 | Honduras | 135 | 0 | 0 | 135 |
| 8/1/2024 | 24-002132 | Honduras | 128 | 0 | 0 | 128 |
| 8/1/2024 | 24-002189 | Ecuador | 105 | 8 | 0 | 113 |
| 8/1/2024 | 24-002190 | Colombia | 132 | 0 | 0 | 132 |
| 8/1/2024 | 24-002194 | Mexico | 134 | 0 | 0 | 134 |
| 8/1/2024 | 24-002200 | Guatemala | 128 | 0 | 0 | 128 |
| 7/31/2024 | 24-001848 | Guatemala | 139 | 1 | 0 | 140 |
| 7/31/2024 | 24-002140 | El Salvador | 126 | 2 | 0 | 128 |
| 7/31/2024 | 24-002185 | Guatemala | 74 | 27 | 0 | 101 |
| 7/31/2024 | 24-002187 | El Salvador | 61 | 45 | 0 | 106 |
| 7/31/2024 | 24-002188 | Honduras | 85 | 39 | 0 | 124 |
| 7/31/2024 | 24-002201 | Guatemala | 73 | 33 | 0 | 106 |
| 7/31/2024 | 24-002202 | Guatemala | 116 | 0 | 0 | 116 |
| 7/30/2024 | 24-001828 | Ecuador | 115 | 3 | 1 | 119 |
| 7/30/2024 | 24-002176 | Mexico | 119 | 0 | 0 | 119 |
| 7/30/2024 | 24-002183 | Mexico | 128 | 0 | 0 | 128 |
| 7/30/2024 | 24-002184 | Colombia | 130 | 0 | 0 | 130 |
| 7/30/2024 | 24-002199 | Guatemala | 132 | 0 | 0 | 132 |
| 7/30/2024 | 24-002210 | Guatemala | 142 | 0 | 1 | 143 |
| 7/29/2024 | 24-001823 | Colombia | 101 | 0 | 0 | 101 |
| 7/29/2024 | 24-001855 | Honduras | 128 | 1 | 0 | 129 |
| 7/29/2024 | 24-002019 | India | 8 | 0 | 0 | 8 |

STB_AR1_001536

| Date | Case | Country | | | | |
|---|---|---|---|---|---|---|
| 7/29/2024 | 24-002175 | Ecuador | 88 | 9 | 0 | 97 |
| 7/29/2024 | 24-002182 | Guatemala | 131 | 0 | 0 | 131 |
| 7/29/2024 | 24-002208 | Guatemala | 103 | 27 | 0 | 130 |
| 7/28/2024 | 24-002156 | Colombia | 116 | 0 | 0 | 116 |
| 7/26/2024 | 24-001837 | Brazil | 110 | 3 | 0 | 113 |
| 7/26/2024 | 24-001862 | El Salvador | 127 | 3 | 0 | 130 |
| 7/26/2024 | 24-002054 | Honduras | 131 | 0 | 0 | 131 |
| 7/26/2024 | 24-002150 | Guatemala | 123 | 8 | 1 | 132 |
| 7/26/2024 | 24-002154 | Honduras | 119 | 0 | 0 | 119 |
| 7/26/2024 | 24-002172 | Honduras | 121 | 0 | 0 | 121 |
| 7/25/2024 | 24-001834 | Haiti | 61 | 0 | 0 | 61 |
| 7/25/2024 | 24-001835 | Nicaragua | 206 | 4 | 0 | 210 |
| 7/25/2024 | 24-001836 | Jamaica | 39 | 0 | 0 | 39 |
| 7/25/2024 | 24-001846 | Guatemala | 130 | 0 | 0 | 130 |
| 7/25/2024 | 24-002153 | Honduras | 127 | 6 | 0 | 133 |
| 7/25/2024 | 24-002155 | Ecuador | 115 | 41 | 0 | 156 |
| 7/25/2024 | 24-002159 | Mexico | 133 | 0 | 0 | 133 |
| 7/25/2024 | 24-002171 | Guatemala | 130 | 0 | 0 | 130 |
| 7/24/2024 | 24-002057 | Colombia | 134 | 1 | 0 | 135 |
| 7/24/2024 | 24-002149 | Guatemala | 75 | 21 | 0 | 96 |
| 7/24/2024 | 24-002151 | El Salvador | 60 | 68 | 0 | 128 |
| 7/24/2024 | 24-002152 | Honduras | 70 | 48 | 0 | 118 |
| 7/24/2024 | 24-002168 | Guatemala | 86 | 26 | 0 | 112 |
| 7/24/2024 | 24-002173 | Ecuador | 130 | 0 | 0 | 130 |
| 7/23/2024 | 24-001827 | Ecuador | 120 | 6 | 0 | 126 |
| 7/23/2024 | 24-001831 | Peru | 79 | 5 | 0 | 84 |
| 7/23/2024 | 24-002147 | Guatemala | 98 | 33 | 0 | 131 |
| 7/23/2024 | 24-002148 | Colombia | 126 | 0 | 0 | 126 |
| 7/23/2024 | 24-002166 | Mexico | 106 | 0 | 0 | 106 |
| 7/23/2024 | 24-002167 | Mexico | 110 | 24 | 0 | 134 |
| 7/22/2024 | 24-001822 | Colombia | 128 | 0 | 0 | 128 |
| 7/22/2024 | 24-001840 | Guatemala | 134 | 1 | 0 | 135 |
| 7/22/2024 | 24-001854 | Honduras | 126 | 0 | 0 | 126 |
| 7/22/2024 | 24-002158 | Guatemala | 132 | 0 | 0 | 132 |
| 7/21/2024 | 24-002036 | Colombia | 109 | 0 | 0 | 109 |
| 7/19/2024 | 24-001858 | Honduras | 133 | 0 | 0 | 133 |
| 7/19/2024 | 24-001861 | El Salvador | 120 | 0 | 0 | 120 |
| 7/19/2024 | 24-002033 | Ecuador | 132 | 2 | 0 | 134 |
| 7/19/2024 | 24-002035 | Guatemala | 96 | 25 | 0 | 121 |
| 7/19/2024 | 24-002040 | Guatemala | 115 | 15 | 0 | 130 |
| 7/19/2024 | 24-002051 | Honduras | 126 | 2 | 0 | 128 |
| 7/19/2024 | 24-002056 | El Salvador | 117 | 0 | 0 | 117 |
| 7/18/2024 | 24-001833 | Cuba | 53 | 1 | 0 | 54 |
| 7/18/2024 | 24-002028 | Colombia | 127 | 0 | 0 | 127 |
| 7/18/2024 | 24-002032 | Ecuador | 93 | 25 | 0 | 118 |

STB_AR1_001537

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/18/2024 | 24-002034 | Honduras | 27 | 96 | 0 | 123 |
| 7/18/2024 | 24-002039 | Mexico | 141 | 0 | 0 | 141 |
| 7/18/2024 | 24-002078 | Guatemala | 132 | 0 | 0 | 132 |
| 7/17/2024 | 24-001845 | Guatemala | 131 | 0 | 0 | 131 |
| 7/17/2024 | 24-002029 | Guatemala | 98 | 31 | 0 | 129 |
| 7/17/2024 | 24-002030 | El Salvador | 94 | 41 | 0 | 135 |
| 7/17/2024 | 24-002031 | Honduras | 90 | 17 | 0 | 107 |
| 7/17/2024 | 24-002038 | Honduras | 105 | 0 | 0 | 105 |
| 7/17/2024 | 24-002046 | Guatemala | 114 | 18 | 0 | 132 |
| 7/17/2024 | 24-002047 | Guatemala | 131 | 0 | 0 | 131 |
| 7/16/2024 | 24-001826 | Ecuador | 123 | 0 | 0 | 123 |
| 7/16/2024 | 24-001832 | Dominican Republic | 80 | 0 | 0 | 80 |
| 7/16/2024 | 24-002026 | Mexico | 105 | 7 | 0 | 112 |
| 7/16/2024 | 24-002027 | Colombia | 131 | 0 | 0 | 131 |
| 7/16/2024 | 24-002044 | Mexico | 118 | 0 | 0 | 118 |
| 7/15/2024 | 24-001821 | Colombia | 131 | 0 | 0 | 131 |
| 7/15/2024 | 24-001844 | Guatemala | 129 | 2 | 0 | 131 |
| 7/15/2024 | 24-001853 | Honduras | 124 | 11 | 0 | 135 |
| 7/15/2024 | 24-002037 | Guatemala | 131 | 0 | 0 | 131 |
| 7/14/2024 | 24-001995 | Colombia | 119 | 0 | 0 | 119 |
| 7/12/2024 | 24-001860 | El Salvador | 121 | 4 | 0 | 125 |
| 7/12/2024 | 24-001991 | Guatemala | 108 | 21 | 0 | 129 |
| 7/12/2024 | 24-002005 | Guatemala | 131 | 0 | 0 | 131 |
| 7/12/2024 | 24-002015 | Honduras | 122 | 10 | 0 | 132 |
| 7/12/2024 | 24-002023 | Ecuador | 118 | 0 | 0 | 118 |
| 7/11/2024 | 24-001784 | Nicaragua | 208 | 2 | 0 | 210 |
| 7/11/2024 | 24-001830 | Peru | 110 | 0 | 0 | 110 |
| 7/11/2024 | 24-001857 | Honduras | 120 | 3 | 0 | 123 |
| 7/11/2024 | 24-001993 | Ecuador | 128 | 22 | 0 | 150 |
| 7/11/2024 | 24-001996 | Colombia | 131 | 0 | 0 | 131 |
| 7/11/2024 | 24-002001 | Mexico | 59 | 9 | 0 | 68 |
| 7/11/2024 | 24-002004 | Mexico | 135 | 0 | 0 | 135 |
| 7/11/2024 | 24-002022 | Guatemala | 128 | 0 | 0 | 128 |
| 7/10/2024 | 24-001843 | Guatemala | 129 | 0 | 0 | 129 |
| 7/10/2024 | 24-001980 | Ecuador | 75 | 2 | 0 | 77 |
| 7/10/2024 | 24-001990 | Guatemala | 87 | 19 | 0 | 106 |
| 7/10/2024 | 24-001998 | El Salvador | 92 | 19 | 0 | 111 |
| 7/10/2024 | 24-001999 | Honduras | 41 | 42 | 0 | 83 |
| 7/10/2024 | 24-002011 | Guatemala | 105 | 25 | 0 | 130 |
| 7/9/2024 | 24-001825 | Ecuador | 117 | 6 | 0 | 123 |
| 7/9/2024 | 24-001985 | Dominican Republic | 121 | 0 | 0 | 121 |
| 7/9/2024 | 24-001989 | Mexico | 58 | 17 | 0 | 75 |
| 7/9/2024 | 24-001994 | Colombia | 104 | 0 | 0 | 104 |
| 7/9/2024 | 24-002009 | Mexico | 96 | 0 | 0 | 96 |
| 7/9/2024 | 24-002010 | Guatemala | 131 | 0 | 0 | 131 |

STB_AR1_001538

| | | | | | | |
|---|---|---|---|---|---|---|
| 7/8/2024 | 24-001820 | Colombia | 128 | 0 | 0 | 128 |
| 7/8/2024 | 24-001842 | Guatemala | 125 | 0 | 0 | 125 |
| 7/8/2024 | 24-001852 | Honduras | 106 | 0 | 0 | 106 |
| 7/8/2024 | 24-002003 | Guatemala | 90 | 11 | 0 | 101 |
| 7/8/2024 | 24-002020 | Honduras | 111 | 0 | 0 | 111 |
| 7/6/2024 | 24-001986 | Ecuador | 74 | 0 | 0 | 74 |
| 7/5/2024 | 24-001859 | El Salvador | 134 | 0 | 0 | 134 |
| 7/5/2024 | 24-001958 | Ecuador | 97 | 27 | 0 | 124 |
| 7/5/2024 | 24-001963 | Honduras | 101 | 17 | 0 | 118 |
| 7/5/2024 | 24-001966 | Guatemala | 106 | 22 | 0 | 128 |
| 7/5/2024 | 24-001968 | Guatemala | 125 | 0 | 1 | 126 |
| 7/5/2024 | 24-001984 | Guatemala | 69 | 69 | 0 | 138 |
| 7/5/2024 | 24-001987 | El Salvador | 106 | 4 | 0 | 110 |
| 7/4/2024 | 24-001957 | Ecuador | 103 | 8 | 0 | 111 |
| 7/4/2024 | 24-001961 | Colombia | 118 | 0 | 0 | 118 |
| 7/4/2024 | 24-001965 | Guatemala | 109 | 23 | 0 | 132 |
| 7/4/2024 | 24-001975 | Guatemala | 132 | 0 | 0 | 132 |
| 7/4/2024 | 24-001981 | Guatemala | 127 | 0 | 0 | 127 |
| 7/4/2024 | 24-001983 | Ecuador | 129 | 0 | 0 | 129 |
| 7/4/2024 | 24-002017 | Honduras | 66 | 26 | 0 | 92 |
| 7/3/2024 | 24-001841 | Guatemala | 133 | 0 | 1 | 134 |
| 7/3/2024 | 24-001931 | Guatemala | 130 | 0 | 0 | 130 |
| 7/3/2024 | 24-001947 | Mexico | 118 | 7 | 0 | 125 |
| 7/3/2024 | 24-001948 | Mexico | 135 | 0 | 0 | 135 |
| 7/3/2024 | 24-001964 | El Salvador | 82 | 38 | 0 | 120 |
| 7/3/2024 | 24-001973 | Guatemala | 125 | 0 | 0 | 125 |
| 7/3/2024 | 24-001982 | Guatemala | 119 | 7 | 0 | 126 |
| 7/2/2024 | 24-001824 | Ecuador | 120 | 8 | 0 | 128 |
| 7/2/2024 | 24-001829 | Peru | 124 | 8 | 0 | 132 |
| 7/2/2024 | 24-001946 | Mexico | 117 | 0 | 0 | 117 |
| 7/2/2024 | 24-001949 | Mexico | 91 | 7 | 0 | 98 |
| 7/2/2024 | 24-001959 | Colombia | 133 | 0 | 0 | 133 |
| 7/1/2024 | 24-001819 | Colombia | 102 | 0 | 0 | 102 |
| 7/1/2024 | 24-001851 | Honduras | 119 | 0 | 0 | 119 |
| 7/1/2024 | 24-001956 | Ecuador | 84 | 28 | 0 | 112 |
| 7/1/2024 | 24-001962 | Honduras | 113 | 13 | 0 | 126 |
| 6/29/2024 | 24-001740 | China\, Peoples Republic of | 116 | 0 | 0 | 116 |
| 6/29/2024 | 24-001937 | Guatemala | 111 | 24 | 0 | 135 |
| 6/28/2024 | 24-001559 | Brazil | 102 | 4 | 0 | 106 |
| 6/28/2024 | 24-001602 | El Salvador | 101 | 34 | 0 | 135 |
| 6/28/2024 | 24-001914 | Guatemala | 135 | 0 | 0 | 135 |
| 6/28/2024 | 24-001926 | Honduras | 69 | 18 | 0 | 87 |
| 6/28/2024 | 24-001929 | Guatemala | 120 | 0 | 0 | 120 |
| 6/28/2024 | 24-001930 | Guatemala | 132 | 0 | 0 | 132 |
| 6/28/2024 | 24-001941 | Guatemala | 121 | 6 | 0 | 127 |
| 6/27/2024 | 24-001555 | Nicaragua | 205 | 5 | 0 | 210 |

STB_AR1_001539

| Date | Number | Country | | | | |
|---|---|---|---|---|---|---|
| 6/27/2024 | 24-001558 | Jamaica | 44 | 0 | 0 | 44 |
| 6/27/2024 | 24-001610 | Honduras | 119 | 0 | 0 | 119 |
| 6/27/2024 | 24-001920 | Mexico | 65 | 15 | 0 | 80 |
| 6/27/2024 | 24-001923 | Colombia | 116 | 0 | 0 | 116 |
| 6/27/2024 | 24-001925 | Ecuador | 97 | 14 | 0 | 111 |
| 6/26/2024 | 24-001618 | Guatemala | 129 | 0 | 0 | 129 |
| 6/26/2024 | 24-001921 | El Salvador | 97 | 33 | 0 | 130 |
| 6/26/2024 | 24-001924 | Honduras | 75 | 10 | 0 | 85 |
| 6/26/2024 | 24-001928 | Guatemala | 131 | 0 | 0 | 131 |
| 6/26/2024 | 24-001942 | Honduras | 122 | 0 | 0 | 122 |
| 6/26/2024 | 24-001950 | Ecuador | 135 | 0 | 0 | 135 |
| 6/25/2024 | 24-001838 | Ecuador | 111 | 4 | 0 | 115 |
| 6/25/2024 | 24-001918 | Mexico | 79 | 7 | 0 | 86 |
| 6/25/2024 | 24-001919 | Mexico | 99 | 0 | 0 | 99 |
| 6/25/2024 | 24-001922 | Colombia | 122 | 0 | 0 | 122 |
| 6/25/2024 | 24-001932 | Guatemala | 131 | 0 | 0 | 131 |
| 6/24/2024 | 24-001545 | Colombia | 132 | 0 | 0 | 132 |
| 6/24/2024 | 24-001606 | Honduras | 127 | 0 | 0 | 127 |
| 6/24/2024 | 24-001614 | Guatemala | 128 | 0 | 2 | 130 |
| 6/24/2024 | 24-001818 | Peru | 139 | 5 | 0 | 144 |
| 6/24/2024 | 24-001913 | Guatemala | 135 | 0 | 0 | 135 |
| 6/24/2024 | 24-001915 | Guatemala | 90 | 14 | 0 | 104 |
| 6/24/2024 | 24-001916 | Guatemala | 133 | 0 | 0 | 133 |
| 6/24/2024 | 24-001943 | Ecuador | 118 | 0 | 0 | 118 |
| 6/21/2024 | 24-001601 | El Salvador | 124 | 6 | 0 | 130 |
| 6/21/2024 | 24-001609 | Honduras | 131 | 0 | 0 | 131 |
| 6/21/2024 | 24-001780 | Mexico | 135 | 0 | 0 | 135 |
| 6/21/2024 | 24-001788 | Honduras | 91 | 40 | 0 | 131 |
| 6/21/2024 | 24-001801 | Guatemala | 136 | 0 | 0 | 136 |
| 6/21/2024 | 24-001802 | Ecuador | 94 | 5 | 0 | 99 |
| 6/21/2024 | 24-001806 | Guatemala | 129 | 2 | 0 | 131 |
| 6/21/2024 | 24-001813 | Guatemala | 74 | 58 | 0 | 132 |
| 6/20/2024 | 24-001557 | Cuba | 56 | 0 | 0 | 56 |
| 6/20/2024 | 24-001707 | Peru | 121 | 13 | 0 | 134 |
| 6/20/2024 | 24-001794 | Mexico | 86 | 6 | 0 | 92 |
| 6/20/2024 | 24-001799 | Honduras | 126 | 4 | 0 | 130 |
| 6/20/2024 | 24-001800 | Colombia | 133 | 0 | 0 | 133 |
| 6/20/2024 | 24-001911 | Honduras | 123 | 0 | 0 | 123 |
| 6/19/2024 | 24-001551 | Ecuador | 129 | 0 | 0 | 129 |
| 6/19/2024 | 24-001617 | Guatemala | 140 | 0 | 0 | 140 |
| 6/19/2024 | 24-001656 | Guinea\, Mauritania\, Senegal | 8 | 0 | 0 | 8 |
| 6/19/2024 | 24-001787 | Honduras | 127 | 0 | 0 | 127 |
| 6/19/2024 | 24-001796 | Colombia | 88 | 0 | 0 | 88 |
| 6/19/2024 | 24-001797 | El Salvador | 87 | 11 | 0 | 98 |
| 6/19/2024 | 24-001798 | Guatemala | 128 | 3 | 0 | 131 |
| 6/19/2024 | 24-001811 | Guatemala | 107 | 0 | 0 | 107 |
| 6/18/2024 | 24-001541 | Dominican Republic | 123 | 0 | 0 | 123 |

STB_AR1_001540

| Date | Case No. | Country | | | | |
|---|---|---|---|---|---|---|
| 6/18/2024 | 24-001550 | Ecuador | 134 | 0 | 0 | 134 |
| 6/18/2024 | 24-001781 | Mexico | 122 | 0 | 0 | 122 |
| 6/18/2024 | 24-001793 | Mexico | 94 | 22 | 0 | 116 |
| 6/18/2024 | 24-001795 | Guatemala | 118 | 11 | 0 | 129 |
| 6/18/2024 | 24-001810 | Guatemala | 114 | 0 | 0 | 114 |
| 6/17/2024 | 24-001544 | Colombia | 101 | 0 | 0 | 101 |
| 6/17/2024 | 24-001605 | Honduras | 122 | 0 | 0 | 122 |
| 6/17/2024 | 24-001613 | Guatemala | 121 | 0 | 0 | 121 |
| 6/17/2024 | 24-001791 | Guatemala | 130 | 11 | 0 | 141 |
| 6/17/2024 | 24-001792 | Honduras | 112 | 22 | 0 | 134 |
| 6/14/2024 | 24-001600 | El Salvador | 78 | 57 | 0 | 135 |
| 6/14/2024 | 24-001755 | Guatemala | 129 | 0 | 0 | 129 |
| 6/14/2024 | 24-001760 | Honduras | 52 | 75 | 0 | 127 |
| 6/14/2024 | 24-001778 | Guatemala | 74 | 60 | 0 | 134 |
| 6/13/2024 | 24-001553 | Peru | 122 | 12 | 0 | 134 |
| 6/13/2024 | 24-001554 | Nicaragua | 178 | 2 | 0 | 180 |
| 6/13/2024 | 24-001608 | Honduras | 111 | 19 | 0 | 130 |
| 6/13/2024 | 24-001757 | Colombia | 131 | 0 | 0 | 131 |
| 6/13/2024 | 24-001762 | Ecuador | 124 | 8 | 0 | 132 |
| 6/13/2024 | 24-001767 | Mexico | 135 | 0 | 0 | 135 |
| 6/13/2024 | 24-001770 | Guatemala | 131 | 0 | 2 | 133 |
| 6/13/2024 | 24-001773 | Mexico | 70 | 28 | 0 | 98 |
| 6/13/2024 | 24-001786 | Guatemala | 108 | 0 | 0 | 108 |
| 6/12/2024 | 24-001483 | Gabon\, Angola\, Zimbabwe\, Tanzania | 8 | 0 | 0 | 8 |
| 6/12/2024 | 24-001616 | Guatemala | 133 | 0 | 0 | 133 |
| 6/12/2024 | 24-001747 | Honduras | 125 | 0 | 0 | 125 |
| 6/12/2024 | 24-001754 | Guatemala | 111 | 15 | 1 | 127 |
| 6/12/2024 | 24-001756 | Colombia | 112 | 0 | 0 | 112 |
| 6/12/2024 | 24-001761 | El Salvador | 64 | 60 | 0 | 124 |
| 6/12/2024 | 24-001775 | Honduras | 102 | 23 | 0 | 125 |
| 6/11/2024 | 24-001549 | Ecuador | 112 | 14 | 0 | 126 |
| 6/11/2024 | 24-001749 | Guatemala | 128 | 2 | 0 | 130 |
| 6/11/2024 | 24-001753 | Guatemala | 118 | 16 | 0 | 134 |
| 6/11/2024 | 24-001758 | Mexico | 112 | 6 | 0 | 118 |
| 6/11/2024 | 24-001772 | Mexico | 128 | 0 | 0 | 128 |
| 6/11/2024 | 24-001774 | Guatemala | 130 | 0 | 0 | 130 |
| 6/10/2024 | 24-001543 | Colombia | 107 | 0 | 0 | 107 |
| 6/10/2024 | 24-001604 | Honduras | 134 | 1 | 0 | 135 |
| 6/10/2024 | 24-001612 | Guatemala | 127 | 0 | 1 | 128 |
| 6/10/2024 | 24-001752 | Guatemala | 106 | 24 | 0 | 130 |
| 6/10/2024 | 24-001759 | Honduras | 118 | 11 | 0 | 129 |
| 6/7/2024 | 24-001599 | El Salvador | 87 | 48 | 0 | 135 |
| 6/7/2024 | 24-001615 | Guatemala | 130 | 3 | 0 | 133 |
| 6/7/2024 | 24-001715 | Honduras | 42 | 91 | 0 | 133 |
| 6/7/2024 | 24-001719 | Guatemala | 54 | 77 | 0 | 131 |
| 6/7/2024 | 24-001729 | Guatemala | 100 | 0 | 0 | 100 |
| 6/7/2024 | 24-001736 | Guatemala | 117 | 0 | 0 | 117 |

STB_AR1_001541

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/6/2024 | 24-001552 | Peru | 126 | 9 | 0 | 135 |
| 6/6/2024 | 24-001721 | Ecuador | 96 | 19 | 0 | 115 |
| 6/6/2024 | 24-001722 | Honduras | 132 | 0 | 0 | 132 |
| 6/6/2024 | 24-001726 | Mexico | 135 | 0 | 0 | 135 |
| 6/6/2024 | 24-001734 | Mexico | 58 | 59 | 0 | 117 |
| 6/5/2024 | 24-001482 | Romania\, Uzbekistan\, Georgia\, Albania | 126 | 0 | 0 | 126 |
| 6/5/2024 | 24-001607 | Honduras | 127 | 0 | 0 | 127 |
| 6/5/2024 | 24-001714 | Honduras | 110 | 6 | 0 | 116 |
| 6/5/2024 | 24-001718 | El Salvador | 77 | 53 | 0 | 130 |
| 6/5/2024 | 24-001738 | Ecuador | 132 | 0 | 0 | 132 |
| 6/5/2024 | 24-001739 | Colombia | 103 | 0 | 0 | 103 |
| 6/4/2024 | 24-001516 | Dominican Republic | 120 | 0 | 0 | 120 |
| 6/4/2024 | 24-001548 | Ecuador | 122 | 5 | 0 | 127 |
| 6/4/2024 | 24-001716 | Mexico | 123 | 0 | 0 | 123 |
| 6/4/2024 | 24-001717 | Guatemala | 127 | 0 | 0 | 127 |
| 6/4/2024 | 24-001733 | Guatemala | 131 | 0 | 0 | 131 |
| 6/4/2024 | 24-001743 | Guatemala | 130 | 0 | 0 | 130 |
| 6/3/2024 | 24-001542 | Colombia | 128 | 0 | 0 | 128 |
| 6/3/2024 | 24-001603 | Honduras | 85 | 0 | 0 | 85 |
| 6/3/2024 | 24-001713 | Honduras | 96 | 24 | 0 | 120 |
| 5/31/2024 | 24-001350 | Brazil | 92 | 2 | 0 | 94 |
| 5/31/2024 | 24-001410 | Honduras | 116 | 0 | 0 | 116 |
| 5/31/2024 | 24-001669 | Ecuador | 120 | 8 | 0 | 128 |
| 5/31/2024 | 24-001683 | Honduras | 70 | 53 | 0 | 123 |
| 5/31/2024 | 24-001684 | Guatemala | 112 | 12 | 1 | 125 |
| 5/30/2024 | 24-001335 | Nicaragua | 185 | 0 | 0 | 185 |
| 5/30/2024 | 24-001349 | Jamaica | 39 | 0 | 0 | 39 |
| 5/30/2024 | 24-001415 | El Salvador | 88 | 10 | 0 | 98 |
| 5/30/2024 | 24-001680 | Ecuador | 66 | 2 | 0 | 68 |
| 5/30/2024 | 24-001681 | Guatemala | 82 | 4 | 0 | 86 |
| 5/30/2024 | 24-001682 | Colombia | 97 | 0 | 0 | 97 |
| 5/30/2024 | 24-001688 | Guatemala | 80 | 0 | 0 | 80 |
| 5/30/2024 | 24-001689 | Mexico | 135 | 0 | 0 | 135 |
| 5/30/2024 | 24-001699 | Mexico | 122 | 0 | 0 | 122 |
| 5/30/2024 | 24-001700 | Honduras | 49 | 57 | 0 | 106 |
| 5/29/2024 | 24-001406 | Guatemala | 134 | 0 | 0 | 134 |
| 5/29/2024 | 24-001672 | El Salvador | 62 | 61 | 0 | 123 |
| 5/29/2024 | 24-001677 | Guatemala | 125 | 0 | 1 | 126 |
| 5/29/2024 | 24-001678 | El Salvador | 97 | 25 | 0 | 122 |
| 5/29/2024 | 24-001679 | Ecuador | 115 | 0 | 0 | 115 |
| 5/29/2024 | 24-001687 | Guatemala | 132 | 0 | 0 | 132 |
| 5/29/2024 | 24-001697 | Guatemala | 132 | 0 | 0 | 132 |
| 5/29/2024 | 24-001698 | Honduras | 105 | 6 | 0 | 111 |
| 5/28/2024 | 24-001342 | Colombia | 115 | 0 | 0 | 115 |
| 5/28/2024 | 24-001347 | Ecuador | 113 | 0 | 0 | 113 |
| 5/28/2024 | 24-001675 | Mexico | 120 | 0 | 0 | 120 |
| 5/28/2024 | 24-001676 | Guatemala | 89 | 4 | 0 | 93 |

| Date | Number | Country | | | | |
|---|---|---|---|---|---|---|
| 5/28/2024 | 24-001695 | Mexico | 131 | 0 | 0 | 131 |
| 5/28/2024 | 24-001696 | Guatemala | 131 | 0 | 0 | 131 |
| 5/27/2024 | 24-001398 | Guatemala | 123 | 0 | 0 | 123 |
| 5/27/2024 | 24-001402 | Honduras | 135 | 0 | 0 | 135 |
| 5/27/2024 | 24-001673 | Honduras | 123 | 0 | 0 | 123 |
| 5/27/2024 | 24-001674 | Guatemala | 83 | 39 | 0 | 122 |
| 5/27/2024 | 24-001694 | Honduras | 126 | 0 | 0 | 126 |
| 5/24/2024 | 24-001414 | El Salvador | 111 | 23 | 1 | 135 |
| 5/24/2024 | 24-001628 | Honduras | 105 | 28 | 0 | 133 |
| 5/24/2024 | 24-001636 | Guatemala | 132 | 2 | 0 | 134 |
| 5/24/2024 | 24-001647 | Guatemala | 100 | 0 | 0 | 100 |
| 5/24/2024 | 24-001668 | Colombia | 123 | 0 | 0 | 123 |
| 5/24/2024 | 24-001704 | Guatemala | 123 | 9 | 0 | 132 |
| 5/23/2024 | 24-001338 | Peru | 130 | 0 | 0 | 130 |
| 5/23/2024 | 24-001348 | Cuba | 45 | 0 | 0 | 45 |
| 5/23/2024 | 24-001409 | Honduras | 130 | 4 | 0 | 134 |
| 5/23/2024 | 24-001629 | Colombia | 109 | 0 | 0 | 109 |
| 5/23/2024 | 24-001634 | Ecuador | 97 | 15 | 0 | 112 |
| 5/23/2024 | 24-001635 | Guatemala | 123 | 0 | 0 | 123 |
| 5/23/2024 | 24-001639 | Mexico | 134 | 0 | 0 | 134 |
| 5/23/2024 | 24-001640 | Guatemala | 123 | 0 | 0 | 123 |
| 5/23/2024 | 24-001648 | Mexico | 118 | 0 | 0 | 118 |
| 5/22/2024 | 24-001405 | Guatemala | 114 | 0 | 0 | 114 |
| 5/22/2024 | 24-001631 | El Salvador | 93 | 41 | 0 | 134 |
| 5/22/2024 | 24-001646 | Guatemala | 130 | 0 | 0 | 130 |
| 5/22/2024 | 24-001653 | Ecuador | 130 | 0 | 0 | 130 |
| 5/22/2024 | 24-001659 | Honduras | 132 | 0 | 0 | 132 |
| 5/21/2024 | 24-001346 | Ecuador | 130 | 0 | 0 | 130 |
| 5/21/2024 | 24-001630 | Mexico | 131 | 0 | 0 | 131 |
| 5/21/2024 | 24-001632 | Guatemala | 99 | 9 | 0 | 108 |
| 5/21/2024 | 24-001644 | Mexico | 118 | 0 | 0 | 118 |
| 5/21/2024 | 24-001645 | Guatemala | 131 | 0 | 0 | 131 |
| 5/20/2024 | 24-001341 | Colombia | 129 | 0 | 0 | 129 |
| 5/20/2024 | 24-001397 | Guatemala | 128 | 0 | 0 | 128 |
| 5/20/2024 | 24-001401 | Honduras | 121 | 0 | 0 | 121 |
| 5/20/2024 | 24-001627 | Honduras | 103 | 19 | 0 | 122 |
| 5/20/2024 | 24-001633 | Ecuador | 110 | 0 | 0 | 110 |
| 5/20/2024 | 24-001651 | Guatemala | 129 | 0 | 0 | 129 |
| 5/17/2024 | 24-001413 | El Salvador | 127 | 0 | 0 | 127 |
| 5/17/2024 | 24-001531 | Ecuador | 110 | 19 | 0 | 129 |
| 5/17/2024 | 24-001533 | Guatemala | 104 | 18 | 0 | 122 |
| 5/17/2024 | 24-001540 | Honduras | 94 | 38 | 0 | 132 |
| 5/17/2024 | 24-001623 | Guatemala | 133 | 0 | 0 | 133 |
| 5/17/2024 | 24-001650 | Honduras | 130 | 0 | 0 | 130 |
| 5/17/2024 | 24-001658 | Honduras | 118 | 0 | 0 | 118 |
| 5/17/2024 | 24-001661 | Peru | 126 | 6 | 0 | 132 |
| 5/16/2024 | 24-001322 | Congo\, Burundi\, Kenya | 8 | 0 | 0 | 8 |

STB_AR1_001543

| Date | Case | Country | | | |
|---|---|---|---|---|---|
| 5/16/2024 | 24-001334 | Nicaragua | 210 | 0 | 0 | 210 |
| 5/16/2024 | 24-001352 | Haiti | 81 | 1 | 0 | 82 |
| 5/16/2024 | 24-001523 | Mexico | 125 | 0 | 0 | 125 |
| 5/16/2024 | 24-001529 | Colombia | 126 | 0 | 0 | 126 |
| 5/16/2024 | 24-001530 | Ecuador | 100 | 16 | 0 | 116 |
| 5/16/2024 | 24-001532 | Guatemala | 118 | 4 | 0 | 122 |
| 5/16/2024 | 24-001535 | Mexico | 135 | 0 | 0 | 135 |
| 5/16/2024 | 24-001536 | Guatemala | 128 | 0 | 0 | 128 |
| 5/16/2024 | 24-001657 | Honduras | 97 | 2 | 0 | 99 |
| 5/15/2024 | 24-001404 | Guatemala | 118 | 4 | 0 | 122 |
| 5/15/2024 | 24-001527 | El Salvador | 104 | 12 | 0 | 116 |
| 5/15/2024 | 24-001528 | Guatemala | 131 | 0 | 0 | 131 |
| 5/15/2024 | 24-001620 | El Salvador | 51 | 29 | 0 | 80 |
| 5/14/2024 | 24-001343 | Dominican Republic | 118 | 0 | 0 | 118 |
| 5/14/2024 | 24-001345 | Ecuador | 120 | 8 | 0 | 128 |
| 5/14/2024 | 24-001521 | Mexico | 133 | 0 | 0 | 133 |
| 5/14/2024 | 24-001522 | Mexico | 121 | 0 | 0 | 121 |
| 5/14/2024 | 24-001524 | Guatemala | 69 | 12 | 0 | 81 |
| 5/14/2024 | 24-001525 | Guatemala | 131 | 0 | 0 | 131 |
| 5/13/2024 | 24-001340 | Colombia | 125 | 0 | 0 | 125 |
| 5/13/2024 | 24-001396 | Guatemala | 126 | 0 | 0 | 126 |
| 5/13/2024 | 24-001400 | Honduras | 132 | 0 | 0 | 132 |
| 5/13/2024 | 24-001621 | Guatemala | 118 | 0 | 1 | 119 |
| 5/10/2024 | 24-001403 | Guatemala | 119 | 0 | 0 | 119 |
| 5/10/2024 | 24-001485 | Colombia | 133 | 0 | 0 | 133 |
| 5/10/2024 | 24-001487 | Honduras | 100 | 14 | 0 | 114 |
| 5/10/2024 | 24-001488 | Ecuador | 123 | 3 | 0 | 126 |
| 5/10/2024 | 24-001496 | Guatemala | 134 | 0 | 0 | 134 |
| 5/10/2024 | 24-001501 | Guatemala | 130 | 0 | 0 | 130 |
| 5/9/2024 | 24-001395 | Guatemala | 129 | 0 | 1 | 130 |
| 5/9/2024 | 24-001408 | Honduras | 128 | 0 | 3 | 131 |
| 5/9/2024 | 24-001412 | El Salvador | 114 | 18 | 0 | 132 |
| 5/9/2024 | 24-001489 | Colombia | 114 | 0 | 0 | 114 |
| 5/9/2024 | 24-001490 | Ecuador | 109 | 7 | 0 | 116 |
| 5/9/2024 | 24-001491 | Guatemala | 82 | 0 | 0 | 82 |
| 5/9/2024 | 24-001495 | Mexico | 134 | 0 | 0 | 134 |
| 5/9/2024 | 24-001497 | Guatemala | 130 | 0 | 0 | 130 |
| 5/9/2024 | 24-001507 | Mexico | 116 | 0 | 0 | 116 |
| 5/9/2024 | 24-001513 | Mexico | 129 | 0 | 0 | 129 |
| 5/8/2024 | 24-001486 | Honduras | 105 | 7 | 0 | 112 |
| 5/8/2024 | 24-001492 | El Salvador | 100 | 34 | 0 | 134 |
| 5/8/2024 | 24-001512 | Ecuador | 110 | 4 | 0 | 114 |
| 5/7/2024 | 24-001323 | Dominican Republic | 114 | 0 | 0 | 114 |
| 5/7/2024 | 24-001344 | Ecuador | 109 | 11 | 0 | 120 |
| 5/7/2024 | 24-001504 | Mexico | 121 | 0 | 0 | 121 |
| 5/6/2024 | 24-001339 | Colombia | 128 | 0 | 0 | 128 |
| 5/6/2024 | 24-001399 | Honduras | 133 | 0 | 0 | 133 |

STB_AR1_001544

| | | | | | | |
|---|---|---|---|---|---|---|
| 5/3/2024 | 24-001411 | El Salvador | 103 | 31 | 0 | 134 |
| 5/3/2024 | 24-001434 | Guatemala | 121 | 0 | 1 | 122 |
| 5/3/2024 | 24-001451 | Honduras | 34 | 67 | 0 | 101 |
| 5/3/2024 | 24-001454 | Guatemala | 94 | 0 | 2 | 96 |
| 5/3/2024 | 24-001459 | Guatemala | 129 | 0 | 0 | 129 |
| 5/3/2024 | 24-001471 | Honduras | 56 | 76 | 0 | 132 |
| 5/2/2024 | 24-001333 | Nicaragua | 133 | 0 | 0 | 133 |
| 5/2/2024 | 24-001336 | Peru | 116 | 19 | 0 | 135 |
| 5/2/2024 | 24-001407 | Honduras | 133 | 0 | 0 | 133 |
| 5/2/2024 | 24-001455 | Ecuador | 76 | 9 | 0 | 85 |
| 5/2/2024 | 24-001456 | El Salvador | 101 | 29 | 0 | 130 |
| 5/2/2024 | 24-001457 | Colombia | 123 | 0 | 0 | 123 |
| 5/2/2024 | 24-001460 | Guatemala | 130 | 0 | 0 | 130 |
| 5/2/2024 | 24-001461 | Mexico | 127 | 0 | 0 | 127 |
| 5/2/2024 | 24-001465 | Mexico | 119 | 0 | 0 | 119 |
| 5/2/2024 | 24-001470 | Guatemala | 104 | 0 | 0 | 104 |
| 5/1/2024 | 24-001473 | Ecuador | 85 | 0 | 0 | 85 |
| 5/1/2024 | 24-001479 | Colombia | 118 | 0 | 0 | 118 |
| 4/30/2024 | 24-001240 | Ecuador | 116 | 6 | 0 | 122 |
| 4/30/2024 | 24-001464 | Mexico | 117 | 0 | 0 | 117 |
| 4/30/2024 | 24-001468 | Guatemala | 133 | 0 | 0 | 133 |
| 4/30/2024 | 24-001477 | Honduras | 95 | 14 | 0 | 109 |
| 4/29/2024 | 24-001188 | Guatemala | 131 | 0 | 0 | 131 |
| 4/29/2024 | 24-001450 | Honduras | 95 | 36 | 0 | 131 |
| 4/29/2024 | 24-001452 | Honduras | 134 | 0 | 0 | 134 |
| 4/29/2024 | 24-001458 | Guatemala | 134 | 0 | 0 | 134 |
| 4/26/2024 | 24-001183 | El Salvador | 96 | 39 | 0 | 135 |
| 4/26/2024 | 24-001189 | Brazil | 84 | 11 | 0 | 95 |
| 4/26/2024 | 24-001420 | Honduras | 122 | 6 | 0 | 128 |
| 4/26/2024 | 24-001423 | Guatemala | 38 | 18 | 0 | 56 |
| 4/26/2024 | 24-001433 | Guatemala | 127 | 0 | 1 | 128 |
| 4/26/2024 | 24-001445 | Honduras | 0 | 129 | 0 | 129 |
| 4/25/2024 | 24-001135 | Jamaica | 23 | 0 | 0 | 23 |
| 4/25/2024 | 24-001136 | Cuba | 47 | 0 | 0 | 47 |
| 4/25/2024 | 24-001205 | Honduras | 131 | 0 | 0 | 131 |
| 4/25/2024 | 24-001425 | Ecuador | 129 | 0 | 0 | 129 |
| 4/25/2024 | 24-001426 | Mexico | 135 | 0 | 0 | 135 |
| 4/25/2024 | 24-001428 | Guatemala | 130 | 0 | 0 | 130 |
| 4/25/2024 | 24-001431 | Mexico | 121 | 0 | 0 | 121 |
| 4/25/2024 | 24-001438 | Colombia | 133 | 0 | 0 | 133 |
| 4/24/2024 | 24-001210 | Guatemala | 120 | 0 | 0 | 120 |
| 4/24/2024 | 24-001422 | Guatemala | 127 | 0 | 2 | 129 |
| 4/24/2024 | 24-001424 | El Salvador | 80 | 48 | 0 | 128 |
| 4/24/2024 | 24-001441 | Honduras | 123 | 0 | 0 | 123 |
| 4/24/2024 | 24-001446 | Guatemala | 131 | 0 | 0 | 131 |
| 4/23/2024 | 24-001129 | Ecuador | 91 | 6 | 0 | 97 |
| 4/23/2024 | 24-001430 | Mexico | 123 | 0 | 0 | 123 |

STB_AR1_001545

| 4/23/2024 | 24-001435 | Guatemala | 107 | 0 | 0 | 107 |
|---|---|---|---|---|---|---|
| 4/22/2024 | 24-001123 | Colombia | 131 | 2 | 0 | 133 |
| 4/22/2024 | 24-001187 | Guatemala | 125 | 0 | 0 | 125 |
| 4/22/2024 | 24-001204 | Honduras | 132 | 0 | 0 | 132 |
| 4/22/2024 | 24-001419 | Honduras | 104 | 25 | 0 | 129 |
| 4/22/2024 | 24-001421 | Guatemala | 88 | 43 | 0 | 131 |
| 4/19/2024 | 24-001182 | El Salvador | 95 | 21 | 0 | 116 |
| 4/19/2024 | 24-001305 | Ecuador | 127 | 2 | 0 | 129 |
| 4/19/2024 | 24-001311 | Honduras | 64 | 71 | 0 | 135 |
| 4/19/2024 | 24-001320 | Guatemala | 87 | 2 | 0 | 89 |
| 4/18/2024 | 24-001131 | Nicaragua | 202 | 5 | 0 | 207 |
| 4/18/2024 | 24-001133 | Peru | 110 | 18 | 0 | 128 |
| 4/18/2024 | 24-001134 | Haiti | 52 | 0 | 0 | 52 |
| 4/18/2024 | 24-001203 | Honduras | 130 | 0 | 0 | 130 |
| 4/18/2024 | 24-001314 | Mexico | 135 | 0 | 0 | 135 |
| 4/18/2024 | 24-001315 | Guatemala | 124 | 0 | 0 | 124 |
| 4/18/2024 | 24-001318 | Mexico | 123 | 0 | 0 | 123 |
| 4/18/2024 | 24-001324 | Ecuador | 130 | 5 | 0 | 135 |
| 4/17/2024 | 24-001209 | Guatemala | 118 | 2 | 0 | 120 |
| 4/17/2024 | 24-001292 | Guatemala | 127 | 0 | 0 | 127 |
| 4/17/2024 | 24-001310 | Honduras | 132 | 0 | 0 | 132 |
| 4/17/2024 | 24-001312 | El Salvador | 88 | 46 | 0 | 134 |
| 4/17/2024 | 24-001313 | Colombia | 124 | 0 | 0 | 124 |
| 4/16/2024 | 24-001125 | Dominican Republic | 114 | 1 | 0 | 115 |
| 4/16/2024 | 24-001128 | Ecuador | 122 | 7 | 0 | 129 |
| 4/16/2024 | 24-001197 | Honduras | 126 | 2 | 0 | 128 |
| 4/16/2024 | 24-001308 | Guatemala | 115 | 12 | 0 | 127 |
| 4/16/2024 | 24-001317 | Mexico | 127 | 0 | 0 | 127 |
| 4/15/2024 | 24-001186 | Guatemala | 129 | 1 | 0 | 130 |
| 4/15/2024 | 24-001328 | Guatemala | 117 | 0 | 0 | 117 |
| 4/12/2024 | 24-001181 | El Salvador | 115 | 0 | 0 | 115 |
| 4/12/2024 | 24-001284 | Colombia | 113 | 0 | 0 | 113 |
| 4/12/2024 | 24-001285 | Honduras | 125 | 8 | 0 | 133 |
| 4/12/2024 | 24-001287 | Guatemala | 130 | 0 | 0 | 130 |
| 4/12/2024 | 24-001299 | Ecuador | 130 | 4 | 0 | 134 |
| 4/12/2024 | 24-001303 | Honduras | 119 | 12 | 0 | 131 |
| 4/11/2024 | 24-001132 | Peru | 130 | 3 | 0 | 133 |
| 4/11/2024 | 24-001202 | Honduras | 64 | 71 | 0 | 135 |
| 4/11/2024 | 24-001281 | Guatemala | 88 | 0 | 0 | 88 |
| 4/11/2024 | 24-001286 | Mexico | 135 | 0 | 0 | 135 |
| 4/11/2024 | 24-001288 | Guatemala | 111 | 1 | 0 | 112 |
| 4/11/2024 | 24-001294 | Mexico | 123 | 0 | 0 | 123 |
| 4/11/2024 | 24-001304 | Colombia | 107 | 1 | 0 | 108 |
| 4/10/2024 | 24-001127 | Ecuador | 107 | 18 | 0 | 125 |
| 4/10/2024 | 24-001208 | Guatemala | 135 | 0 | 1 | 136 |
| 4/10/2024 | 24-001279 | El Salvador | 9 | 80 | 0 | 89 |
| 4/10/2024 | 24-001280 | El Salvador | 65 | 0 | 0 | 65 |

STB_AR1_001546

| Date | Case | Country | | | | |
|---|---|---|---|---|---|---|
| 4/10/2024 | 24-001283 | Colombia | 103 | 0 | 0 | 103 |
| 4/9/2024 | 24-001293 | Mexico | 129 | 0 | 0 | 129 |
| 4/9/2024 | 24-001298 | Ecuador | 91 | 3 | 0 | 94 |
| 4/8/2024 | 24-001185 | Guatemala | 135 | 0 | 0 | 135 |
| 4/8/2024 | 24-001275 | Honduras | 119 | 16 | 0 | 135 |
| 4/8/2024 | 24-001277 | Honduras | 134 | 0 | 0 | 134 |
| 4/8/2024 | 24-001290 | Guatemala | 126 | 0 | 0 | 126 |
| 4/5/2024 | 24-001180 | El Salvador | 92 | 46 | 0 | 138 |
| 4/5/2024 | 24-001201 | Honduras | 131 | 0 | 0 | 131 |
| 4/5/2024 | 24-001254 | Guatemala | 126 | 0 | 0 | 126 |
| 4/5/2024 | 24-001258 | Colombia | 110 | 0 | 0 | 110 |
| 4/5/2024 | 24-001260 | Honduras | 113 | 20 | 0 | 133 |
| 4/5/2024 | 24-001264 | Guatemala | 129 | 0 | 0 | 129 |
| 4/5/2024 | 24-001271 | Guatemala | 74 | 6 | 0 | 80 |
| 4/4/2024 | 24-000953 | Peru | 119 | 13 | 0 | 132 |
| 4/4/2024 | 24-001051 | Ecuador | 92 | 0 | 0 | 92 |
| 4/4/2024 | 24-001130 | Nicaragua | 122 | 3 | 0 | 125 |
| 4/4/2024 | 24-001242 | Honduras | 83 | 49 | 0 | 132 |
| 4/4/2024 | 24-001261 | Guatemala | 128 | 2 | 0 | 130 |
| 4/4/2024 | 24-001265 | Mexico | 141 | 0 | 0 | 141 |
| 4/4/2024 | 24-001269 | Mexico | 131 | 0 | 0 | 131 |
| 4/3/2024 | 24-001200 | El Salvador | 117 | 11 | 0 | 128 |
| 4/3/2024 | 24-001207 | Guatemala | 87 | 6 | 0 | 93 |
| 4/3/2024 | 24-001259 | El Salvador | 115 | 14 | 0 | 129 |
| 4/3/2024 | 24-001263 | Guatemala | 125 | 0 | 0 | 125 |
| 4/3/2024 | 24-001270 | Guatemala | 83 | 0 | 0 | 83 |
| 4/2/2024 | 24-001080 | Sierra Leone\, Togo\, Ivory Coast | 6 | 0 | 0 | 6 |
| 4/2/2024 | 24-001124 | Dominican Republic | 117 | 0 | 0 | 117 |
| 4/2/2024 | 24-001126 | Ecuador | 121 | 3 | 0 | 124 |
| 4/2/2024 | 24-001253 | Guatemala | 115 | 0 | 0 | 115 |
| 4/2/2024 | 24-001255 | Guatemala | 92 | 20 | 0 | 112 |
| 4/2/2024 | 24-001257 | Colombia | 124 | 0 | 0 | 124 |
| 4/2/2024 | 24-001268 | Mexico | 114 | 0 | 0 | 114 |
| 4/2/2024 | 24-001273 | Guatemala | 128 | 0 | 0 | 128 |
| 4/1/2024 | 24-001120 | Colombia | 132 | 0 | 0 | 132 |
| 4/1/2024 | 24-001184 | Guatemala | 104 | 0 | 0 | 104 |
| 4/1/2024 | 24-001199 | Honduras | 132 | 0 | 1 | 133 |
| 4/1/2024 | 24-001251 | Guatemala | 103 | 15 | 0 | 118 |
| 4/1/2024 | 24-001262 | Guatemala | 132 | 0 | 0 | 132 |
| 3/29/2024 | 24-001211 | China\, Peoples Republic of | 8 | 0 | 0 | 8 |
| 3/28/2024 | 24-000949 | Ecuador | 123 | 6 | 0 | 129 |
| 3/28/2024 | 24-000954 | Cuba | 55 | 6 | 0 | 61 |
| 3/28/2024 | 24-000956 | Jamaica | 25 | 0 | 0 | 25 |
| 3/27/2024 | 24-000945 | Colombia | 122 | 0 | 0 | 122 |
| 3/26/2024 | 24-001018 | Egypt | 7 | 0 | 0 | 7 |
| 3/26/2024 | 24-001235 | Mexico | 120 | 0 | 0 | 120 |
| 3/26/2024 | 24-001236 | Mexico | 122 | 0 | 0 | 122 |

| 3/26/2024 | 24-001237 | Mexico | 135 | 0 | 0 | 135 |
|---|---|---|---|---|---|---|
| 3/26/2024 | 24-001245 | Colombia | 115 | 0 | 0 | 115 |
| 3/25/2024 | 24-001011 | Guatemala | 129 | 0 | 0 | 129 |
| 3/25/2024 | 24-001016 | Honduras | 132 | 0 | 0 | 132 |
| 3/25/2024 | 24-001017 | Honduras | 119 | 8 | 0 | 127 |
| 3/25/2024 | 24-001196 | Guatemala | 126 | 0 | 2 | 128 |
| 3/25/2024 | 24-001229 | Guatemala | 130 | 0 | 0 | 130 |
| 3/22/2024 | 24-000955 | Brazil | 74 | 0 | 0 | 74 |
| 3/22/2024 | 24-001006 | Guatemala | 107 | 0 | 0 | 107 |
| 3/22/2024 | 24-001015 | El Salvador | 106 | 17 | 0 | 123 |
| 3/22/2024 | 24-001195 | Guatemala | 123 | 0 | 0 | 123 |
| 3/22/2024 | 24-001218 | Colombia | 102 | 0 | 0 | 102 |
| 3/22/2024 | 24-001220 | Guatemala | 132 | 0 | 0 | 132 |
| 3/22/2024 | 24-001226 | Honduras | 110 | 0 | 0 | 110 |
| 3/21/2024 | 24-000951 | Nicaragua | 100 | 0 | 0 | 100 |
| 3/21/2024 | 24-001005 | Honduras | 109 | 1 | 0 | 110 |
| 3/21/2024 | 24-001099 | Mexico | 135 | 0 | 0 | 135 |
| 3/21/2024 | 24-001217 | Guatemala | 116 | 0 | 0 | 116 |
| 3/21/2024 | 24-001225 | Mexico | 123 | 0 | 0 | 123 |
| 3/21/2024 | 24-001231 | Ecuador | 134 | 0 | 0 | 134 |
| 3/20/2024 | 24-001193 | Guatemala | 88 | 2 | 0 | 90 |
| 3/20/2024 | 24-001194 | Guatemala | 136 | 0 | 0 | 136 |
| 3/20/2024 | 24-001212 | Guatemala | 108 | 0 | 0 | 108 |
| 3/20/2024 | 24-001215 | El Salvador | 108 | 17 | 0 | 125 |
| 3/20/2024 | 24-001216 | Honduras | 78 | 47 | 0 | 125 |
| 3/20/2024 | 24-001234 | Honduras | 94 | 30 | 0 | 124 |
| 3/19/2024 | 24-000729 | Colombia | 101 | 0 | 0 | 101 |
| 3/19/2024 | 24-000914 | Dominican Republic | 116 | 0 | 0 | 116 |
| 3/19/2024 | 24-000948 | Ecuador | 121 | 8 | 0 | 129 |
| 3/19/2024 | 24-001192 | Guatemala | 94 | 0 | 0 | 94 |
| 3/19/2024 | 24-001224 | Mexico | 123 | 0 | 0 | 123 |
| 3/19/2024 | 24-001239 | Guatemala | 123 | 0 | 0 | 123 |
| 3/18/2024 | 24-000944 | Colombia | 125 | 0 | 0 | 125 |
| 3/18/2024 | 24-001004 | Honduras | 115 | 0 | 0 | 115 |
| 3/18/2024 | 24-001010 | Guatemala | 126 | 0 | 1 | 127 |
| 3/18/2024 | 24-001191 | Guatemala | 119 | 0 | 0 | 119 |
| 3/15/2024 | 24-001003 | Honduras | 116 | 3 | 0 | 119 |
| 3/15/2024 | 24-001014 | El Salvador | 128 | 1 | 0 | 129 |
| 3/15/2024 | 24-001088 | Honduras | 124 | 11 | 0 | 135 |
| 3/15/2024 | 24-001097 | Colombia | 112 | 0 | 0 | 112 |
| 3/15/2024 | 24-001101 | Guatemala | 128 | 0 | 0 | 128 |
| 3/15/2024 | 24-001106 | Guatemala | 116 | 0 | 0 | 116 |
| 3/15/2024 | 24-001198 | Guatemala | 90 | 0 | 0 | 90 |
| 3/15/2024 | 24-001213 | Honduras | 131 | 0 | 0 | 131 |
| 3/15/2024 | 24-001230 | El Salvador | 43 | 76 | 0 | 119 |
| 3/14/2024 | 24-000952 | Peru | 129 | 6 | 0 | 135 |
| 3/14/2024 | 24-001089 | Guatemala | 125 | 10 | 0 | 135 |

STB_AR1_001548

| Date | Case | Country | | | | |
|---|---|---|---|---|---|---|
| 3/14/2024 | 24-001091 | Guatemala | 107 | 2 | 0 | 109 |
| 3/14/2024 | 24-001096 | Colombia | 117 | 0 | 0 | 117 |
| 3/14/2024 | 24-001100 | Mexico | 135 | 0 | 0 | 135 |
| 3/14/2024 | 24-001105 | Mexico | 128 | 0 | 0 | 128 |
| 3/14/2024 | 24-001117 | Ecuador | 115 | 6 | 0 | 121 |
| 3/13/2024 | 24-001002 | Honduras | 123 | 0 | 0 | 123 |
| 3/13/2024 | 24-001085 | Guatemala | 95 | 9 | 0 | 104 |
| 3/13/2024 | 24-001087 | Honduras | 92 | 15 | 0 | 107 |
| 3/13/2024 | 24-001093 | Guatemala | 123 | 0 | 0 | 123 |
| 3/13/2024 | 24-001094 | El Salvador | 82 | 0 | 0 | 82 |
| 3/13/2024 | 24-001113 | Guatemala | 132 | 0 | 0 | 132 |
| 3/13/2024 | 24-001137 | Guatemala | 131 | 0 | 0 | 131 |
| 3/12/2024 | 24-000947 | Ecuador | 130 | 2 | 0 | 132 |
| 3/12/2024 | 24-001090 | Guatemala | 106 | 0 | 0 | 106 |
| 3/12/2024 | 24-001095 | Colombia | 127 | 0 | 0 | 127 |
| 3/12/2024 | 24-001104 | Mexico | 131 | 0 | 0 | 131 |
| 3/12/2024 | 24-001111 | Guatemala | 129 | 0 | 0 | 129 |
| 3/12/2024 | 24-001112 | Guatemala | 120 | 0 | 0 | 120 |
| 3/11/2024 | 24-000943 | Colombia | 126 | 0 | 0 | 126 |
| 3/11/2024 | 24-001001 | Honduras | 111 | 0 | 0 | 111 |
| 3/11/2024 | 24-001009 | Guatemala | 123 | 0 | 0 | 123 |
| 3/11/2024 | 24-001092 | Guatemala | 117 | 0 | 0 | 117 |
| 3/11/2024 | 24-001109 | Guatemala | 88 | 40 | 0 | 128 |
| 3/11/2024 | 24-001110 | Guatemala | 118 | 0 | 0 | 118 |
| 3/8/2024 | 24-001007 | Honduras | 129 | 0 | 0 | 129 |
| 3/8/2024 | 24-001013 | El Salvador | 111 | 21 | 0 | 132 |
| 3/8/2024 | 24-001054 | Colombia | 135 | 0 | 0 | 135 |
| 3/8/2024 | 24-001058 | Honduras | 122 | 6 | 0 | 128 |
| 3/8/2024 | 24-001063 | Guatemala | 134 | 0 | 0 | 134 |
| 3/8/2024 | 24-001069 | Guatemala | 114 | 0 | 0 | 114 |
| 3/8/2024 | 24-001070 | Guatemala | 131 | 0 | 0 | 131 |
| 3/8/2024 | 24-001079 | Guatemala | 134 | 2 | 0 | 136 |
| 3/7/2024 | 24-000950 | Nicaragua | 73 | 3 | 0 | 76 |
| 3/7/2024 | 24-001053 | Colombia | 131 | 0 | 0 | 131 |
| 3/7/2024 | 24-001057 | Guatemala | 129 | 2 | 0 | 131 |
| 3/7/2024 | 24-001064 | Guatemala | 132 | 0 | 0 | 132 |
| 3/7/2024 | 24-001067 | Mexico | 132 | 0 | 0 | 132 |
| 3/7/2024 | 24-001073 | Guatemala | 123 | 0 | 0 | 123 |
| 3/6/2024 | 24-001000 | Honduras | 129 | 0 | 0 | 129 |
| 3/6/2024 | 24-001059 | Honduras | 100 | 23 | 1 | 124 |
| 3/6/2024 | 24-001060 | El Salvador | 127 | 4 | 0 | 131 |
| 3/6/2024 | 24-001062 | Guatemala | 127 | 0 | 0 | 127 |
| 3/6/2024 | 24-001068 | Guatemala | 117 | 0 | 1 | 118 |
| 3/5/2024 | 24-000913 | Dominican Republic | 124 | 0 | 0 | 124 |
| 3/5/2024 | 24-000946 | Ecuador | 121 | 2 | 0 | 123 |
| 3/5/2024 | 24-001055 | Guatemala | 124 | 3 | 0 | 127 |
| 3/5/2024 | 24-001056 | Guatemala | 75 | 33 | 0 | 108 |

STB_AR1_001549

| Date | Case | Country | A | B | C | Total |
|---|---|---|---|---|---|---|
| 3/5/2024 | 24-001061 | Mexico | 135 | 0 | 0 | 135 |
| 3/5/2024 | 24-001066 | Mexico | 114 | 0 | 0 | 114 |
| 3/5/2024 | 24-001076 | Honduras | 104 | 22 | 0 | 126 |
| 3/4/2024 | 24-000942 | Colombia | 79 | 0 | 0 | 79 |
| 3/4/2024 | 24-000999 | Honduras | 106 | 0 | 0 | 106 |
| 3/4/2024 | 24-001008 | Guatemala | 129 | 6 | 0 | 135 |
| 3/2/2024 | 24-000821 | Romania\, Uzbekistan\, Georgia\, Albania | 124 | 0 | 0 | 124 |
| 3/1/2024 | 24-000998 | Honduras | 131 | 0 | 0 | 131 |
| 3/1/2024 | 24-001012 | El Salvador | 108 | 27 | 0 | 135 |
| 3/1/2024 | 24-001022 | Honduras | 125 | 4 | 0 | 129 |
| 3/1/2024 | 24-001027 | Guatemala | 135 | 0 | 0 | 135 |
| 3/1/2024 | 24-001038 | Guatemala | 114 | 0 | 0 | 114 |
| 3/1/2024 | 24-001046 | Honduras | 132 | 0 | 0 | 132 |
| 3/1/2024 | 24-001047 | Guatemala | 122 | 0 | 0 | 122 |
| 3/1/2024 | 24-001075 | El Salvador | 117 | 11 | 0 | 128 |
| 2/29/2024 | 24-000711 | Peru | 117 | 16 | 0 | 133 |
| 2/29/2024 | 24-000726 | Jamaica | 38 | 0 | 0 | 38 |
| 2/29/2024 | 24-001024 | Guatemala | 128 | 5 | 0 | 133 |
| 2/29/2024 | 24-001026 | Guatemala | 132 | 0 | 0 | 132 |
| 2/29/2024 | 24-001030 | Colombia | 135 | 0 | 0 | 135 |
| 2/29/2024 | 24-001035 | Mexico | 115 | 0 | 0 | 115 |
| 2/29/2024 | 24-001036 | Mexico | 130 | 0 | 0 | 130 |
| 2/29/2024 | 24-001042 | Guatemala | 128 | 0 | 0 | 128 |
| 2/28/2024 | 24-000721 | Ecuador | 110 | 25 | 0 | 135 |
| 2/28/2024 | 24-000749 | Honduras | 122 | 0 | 1 | 123 |
| 2/28/2024 | 24-001021 | Honduras | 124 | 4 | 0 | 128 |
| 2/28/2024 | 24-001029 | Colombia | 123 | 0 | 0 | 123 |
| 2/28/2024 | 24-001039 | Guatemala | 124 | 0 | 1 | 125 |
| 2/28/2024 | 24-001040 | Guatemala | 96 | 0 | 0 | 96 |
| 2/27/2024 | 24-000715 | Colombia | 112 | 0 | 0 | 112 |
| 2/27/2024 | 24-001023 | Guatemala | 113 | 9 | 0 | 122 |
| 2/27/2024 | 24-001025 | Guatemala | 113 | 0 | 0 | 113 |
| 2/27/2024 | 24-001034 | Mexico | 120 | 0 | 0 | 120 |
| 2/27/2024 | 24-001037 | Guatemala | 113 | 0 | 0 | 113 |
| 2/26/2024 | 24-000748 | Honduras | 50 | 0 | 0 | 50 |
| 2/26/2024 | 24-000795 | South Korea | 8 | 0 | 0 | 8 |
| 2/26/2024 | 24-000910 | Guatemala | 126 | 0 | 0 | 126 |
| 2/23/2024 | 24-000725 | Brazil | 80 | 0 | 0 | 80 |
| 2/23/2024 | 24-000747 | Honduras | 109 | 5 | 0 | 114 |
| 2/23/2024 | 24-000753 | El Salvador | 100 | 28 | 0 | 128 |
| 2/23/2024 | 24-000922 | Guatemala | 117 | 12 | 0 | 129 |
| 2/23/2024 | 24-000932 | Guatemala | 128 | 1 | 1 | 130 |
| 2/23/2024 | 24-000936 | Guatemala | 128 | 0 | 0 | 128 |
| 2/22/2024 | 24-000723 | Nicaragua | 106 | 0 | 0 | 106 |
| 2/22/2024 | 24-000724 | Cuba | 51 | 0 | 0 | 51 |
| 2/22/2024 | 24-000736 | Guatemala | 119 | 0 | 0 | 119 |
| 2/22/2024 | 24-000919 | Guatemala | 124 | 4 | 0 | 128 |

STB_AR1_001550

| Date | Case | Country | | | | |
|---|---|---|---|---|---|---|
| 2/22/2024 | 24-000926 | Honduras | 112 | 0 | 2 | 114 |
| 2/22/2024 | 24-000928 | Colombia | 121 | 1 | 0 | 122 |
| 2/22/2024 | 24-000934 | Mexico | 130 | 0 | 0 | 130 |
| 2/22/2024 | 24-000939 | Guatemala | 131 | 0 | 0 | 131 |
| 2/22/2024 | 24-000941 | Mexico | 131 | 0 | 0 | 131 |
| 2/21/2024 | 24-000746 | Honduras | 106 | 0 | 0 | 106 |
| 2/21/2024 | 24-000820 | Ecuador | 107 | 5 | 0 | 112 |
| 2/21/2024 | 24-000921 | Guatemala | 129 | 6 | 0 | 135 |
| 2/21/2024 | 24-000924 | Honduras | 124 | 8 | 0 | 132 |
| 2/21/2024 | 24-000927 | El Salvador | 92 | 9 | 1 | 102 |
| 2/21/2024 | 24-000935 | Guatemala | 120 | 0 | 0 | 120 |
| 2/21/2024 | 24-000938 | Guatemala | 127 | 0 | 0 | 127 |
| 2/20/2024 | 24-000714 | Colombia | 107 | 0 | 0 | 107 |
| 2/20/2024 | 24-000717 | Dominican Republic | 115 | 0 | 0 | 115 |
| 2/20/2024 | 24-000794 | Nepal | 8 | 0 | 0 | 8 |
| 2/20/2024 | 24-000920 | Guatemala | 132 | 2 | 0 | 134 |
| 2/20/2024 | 24-000933 | Mexico | 128 | 0 | 0 | 128 |
| 2/20/2024 | 24-000937 | Guatemala | 127 | 0 | 0 | 127 |
| 2/19/2024 | 24-000745 | Honduras | 121 | 0 | 0 | 121 |
| 2/19/2024 | 24-000880 | Guatemala | 133 | 0 | 0 | 133 |
| 2/19/2024 | 24-000917 | Guatemala | 93 | 0 | 0 | 93 |
| 2/16/2024 | 24-000744 | Honduras | 132 | 0 | 0 | 132 |
| 2/16/2024 | 24-000752 | El Salvador | 85 | 33 | 0 | 118 |
| 2/16/2024 | 24-000888 | Guatemala | 125 | 6 | 0 | 131 |
| 2/16/2024 | 24-000891 | Honduras | 122 | 9 | 0 | 131 |
| 2/16/2024 | 24-000894 | Guatemala | 131 | 0 | 0 | 131 |
| 2/16/2024 | 24-000904 | Guatemala | 128 | 0 | 0 | 128 |
| 2/16/2024 | 24-000915 | Honduras | 116 | 0 | 0 | 116 |
| 2/15/2024 | 24-000710 | Peru | 122 | 13 | 0 | 135 |
| 2/15/2024 | 24-000735 | Guatemala | 133 | 0 | 0 | 133 |
| 2/15/2024 | 24-000887 | Guatemala | 129 | 2 | 0 | 131 |
| 2/15/2024 | 24-000893 | Guatemala | 133 | 0 | 0 | 133 |
| 2/15/2024 | 24-000899 | Mexico | 129 | 0 | 0 | 129 |
| 2/14/2024 | 24-000720 | Ecuador | 89 | 8 | 0 | 97 |
| 2/14/2024 | 24-000743 | Honduras | 111 | 0 | 0 | 111 |
| 2/14/2024 | 24-000890 | El Salvador | 81 | 11 | 0 | 92 |
| 2/14/2024 | 24-000892 | Honduras | 110 | 8 | 0 | 118 |
| 2/14/2024 | 24-000900 | Guatemala | 134 | 0 | 0 | 134 |
| 2/14/2024 | 24-000901 | Guatemala | 126 | 0 | 0 | 126 |
| 2/13/2024 | 24-000523 | Nigeria\, Chad | 8 | 0 | 0 | 8 |
| 2/13/2024 | 24-000713 | Colombia | 113 | 0 | 0 | 113 |
| 2/13/2024 | 24-000882 | Dominican Republic | 122 | 0 | 0 | 122 |
| 2/13/2024 | 24-000886 | Guatemala | 106 | 6 | 0 | 112 |
| 2/13/2024 | 24-000889 | Guatemala | 134 | 0 | 0 | 134 |
| 2/13/2024 | 24-000898 | Mexico | 127 | 0 | 0 | 127 |
| 2/12/2024 | 24-000742 | Honduras | 113 | 0 | 0 | 113 |
| 2/12/2024 | 24-000872 | Guatemala | 134 | 0 | 0 | 134 |

STB_AR1_001551

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/12/2024 | 24-000885 | Guatemala | 123 | 0 | 0 | 123 |
| 2/12/2024 | 24-000905 | Guatemala | 129 | 0 | 0 | 129 |
| 2/9/2024 | 24-000741 | Honduras | 108 | 0 | 0 | 108 |
| 2/9/2024 | 24-000751 | El Salvador | 101 | 34 | 0 | 135 |
| 2/9/2024 | 24-000857 | Guatemala | 81 | 30 | 1 | 112 |
| 2/9/2024 | 24-000862 | Honduras | 123 | 4 | 0 | 127 |
| 2/9/2024 | 24-000864 | Guatemala | 132 | 0 | 0 | 132 |
| 2/9/2024 | 24-000875 | Guatemala | 131 | 0 | 0 | 131 |
| 2/8/2024 | 24-000722 | Nicaragua | 93 | 0 | 0 | 93 |
| 2/8/2024 | 24-000734 | Guatemala | 133 | 1 | 0 | 134 |
| 2/8/2024 | 24-000856 | Guatemala | 114 | 9 | 0 | 123 |
| 2/8/2024 | 24-000861 | Guatemala | 131 | 0 | 0 | 131 |
| 2/8/2024 | 24-000878 | Mexico | 130 | 0 | 0 | 130 |
| 2/8/2024 | 24-000881 | Honduras | 128 | 0 | 0 | 128 |
| 2/7/2024 | 24-000719 | Ecuador | 108 | 13 | 0 | 121 |
| 2/7/2024 | 24-000739 | Honduras | 104 | 0 | 0 | 104 |
| 2/7/2024 | 24-000859 | El Salvador | 79 | 48 | 0 | 127 |
| 2/7/2024 | 24-000860 | Guatemala | 134 | 1 | 0 | 135 |
| 2/7/2024 | 24-000876 | Honduras | 78 | 56 | 0 | 134 |
| 2/7/2024 | 24-000877 | El Salvador | 38 | 70 | 0 | 108 |
| 2/6/2024 | 24-000660 | Bangladesh | 7 | 1 | 0 | 8 |
| 2/6/2024 | 24-000712 | Colombia | 129 | 0 | 0 | 129 |
| 2/6/2024 | 24-000855 | Guatemala | 106 | 4 | 0 | 110 |
| 2/6/2024 | 24-000858 | Honduras | 76 | 56 | 0 | 132 |
| 2/6/2024 | 24-000863 | Guatemala | 125 | 0 | 0 | 125 |
| 2/6/2024 | 24-000873 | Mexico | 132 | 0 | 0 | 132 |
| 2/5/2024 | 24-000733 | Guatemala | 132 | 0 | 0 | 132 |
| 2/2/2024 | 24-000737 | Honduras | 132 | 0 | 0 | 132 |
| 2/2/2024 | 24-000831 | Guatemala | 129 | 0 | 0 | 129 |
| 2/2/2024 | 24-000833 | Guatemala | 126 | 0 | 0 | 126 |
| 2/2/2024 | 24-000871 | El Salvador | 101 | 18 | 0 | 119 |
| 2/1/2024 | 24-000621 | Guatemala | 124 | 0 | 0 | 124 |
| 2/1/2024 | 24-000709 | Peru | 127 | 8 | 0 | 135 |
| 2/1/2024 | 24-000750 | El Salvador | 84 | 44 | 0 | 128 |
| 2/1/2024 | 24-000827 | Honduras | 60 | 40 | 0 | 100 |
| 2/1/2024 | 24-000830 | Guatemala | 126 | 0 | 0 | 126 |
| 2/1/2024 | 24-000845 | Guatemala | 110 | 16 | 0 | 126 |
| 1/31/2024 | 24-000662 | Mauritania\, Senegal\, Egypt | 135 | 0 | 0 | 135 |
| 1/31/2024 | 24-000689 | Honduras | 123 | 0 | 0 | 123 |
| 1/31/2024 | 24-000718 | Ecuador | 115 | 20 | 0 | 135 |
| 1/31/2024 | 24-000826 | Honduras | 134 | 0 | 0 | 134 |
| 1/31/2024 | 24-000829 | Guatemala | 117 | 16 | 1 | 134 |
| 1/31/2024 | 24-000836 | Guatemala | 122 | 2 | 0 | 124 |
| 1/30/2024 | 24-000544 | Colombia | 132 | 1 | 0 | 133 |
| 1/30/2024 | 24-000825 | Honduras | 38 | 86 | 0 | 124 |
| 1/30/2024 | 24-000828 | Guatemala | 60 | 17 | 0 | 77 |
| 1/30/2024 | 24-000839 | Mexico | 120 | 0 | 0 | 120 |

STB_AR1_001552

| Date | Case | Country | | | |
|---|---|---|---|---|---|
| 1/30/2024 | 24-000849 | El Salvador | 95 | 2 | 0 | 97 |
| 1/29/2024 | 24-000604 | Honduras | 116 | 0 | 0 | 116 |
| 1/29/2024 | 24-000619 | Guatemala | 125 | 0 | 1 | 126 |
| 1/29/2024 | 24-000824 | Honduras | 77 | 52 | 0 | 129 |
| 1/29/2024 | 24-000841 | Ecuador | 130 | 0 | 0 | 130 |
| 1/29/2024 | 24-000844 | Honduras | 104 | 26 | 0 | 130 |
| 1/29/2024 | 24-000846 | Guatemala | 101 | 0 | 0 | 101 |
| 1/29/2024 | 24-000847 | Guatemala | 132 | 0 | 0 | 132 |
| 1/27/2024 | 24-000843 | Guatemala | 109 | 24 | 0 | 133 |
| 1/26/2024 | 24-000549 | Ecuador | 132 | 2 | 0 | 134 |
| 1/26/2024 | 24-000556 | Brazil | 95 | 7 | 0 | 102 |
| 1/26/2024 | 24-000608 | Honduras | 131 | 0 | 0 | 131 |
| 1/26/2024 | 24-000801 | Honduras | 93 | 36 | 0 | 129 |
| 1/26/2024 | 24-000802 | Honduras | 65 | 58 | 0 | 123 |
| 1/26/2024 | 24-000809 | Guatemala | 77 | 24 | 0 | 101 |
| 1/26/2024 | 24-000814 | Guatemala | 37 | 17 | 0 | 54 |
| 1/26/2024 | 24-000815 | Guatemala | 123 | 0 | 1 | 124 |
| 1/25/2024 | 24-000550 | Nicaragua | 135 | 0 | 0 | 135 |
| 1/25/2024 | 24-000551 | Jamaica | 29 | 0 | 0 | 29 |
| 1/25/2024 | 24-000555 | Cuba | 37 | 0 | 0 | 37 |
| 1/25/2024 | 24-000797 | Guatemala | 39 | 95 | 0 | 134 |
| 1/25/2024 | 24-000803 | Honduras | 9 | 107 | 0 | 116 |
| 1/25/2024 | 24-000816 | Guatemala | 116 | 0 | 0 | 116 |
| 1/25/2024 | 24-000842 | El Salvador | 28 | 102 | 0 | 130 |
| 1/24/2024 | 24-000692 | Venezuela | 132 | 0 | 0 | 132 |
| 1/24/2024 | 24-000804 | Honduras | 28 | 99 | 0 | 127 |
| 1/24/2024 | 24-000805 | El Salvador | 34 | 100 | 0 | 134 |
| 1/23/2024 | 24-000543 | Colombia | 135 | 0 | 0 | 135 |
| 1/23/2024 | 24-000553 | Dominican Republic | 65 | 0 | 0 | 65 |
| 1/23/2024 | 24-000798 | Guatemala | 26 | 108 | 0 | 134 |
| 1/23/2024 | 24-000810 | Honduras | 77 | 57 | 0 | 134 |
| 1/23/2024 | 24-000811 | Guatemala | 89 | 41 | 0 | 130 |
| 1/22/2024 | 24-000603 | Honduras | 110 | 5 | 0 | 115 |
| 1/22/2024 | 24-000618 | Guatemala | 135 | 0 | 0 | 135 |
| 1/22/2024 | 24-000792 | Colombia | 135 | 0 | 0 | 135 |
| 1/22/2024 | 24-000799 | Guatemala | 96 | 38 | 0 | 134 |
| 1/19/2024 | 24-000607 | Honduras | 125 | 0 | 0 | 125 |
| 1/19/2024 | 24-000610 | El Salvador | 118 | 9 | 0 | 127 |
| 1/19/2024 | 24-000695 | Honduras | 48 | 66 | 0 | 114 |
| 1/19/2024 | 24-000700 | Guatemala | 105 | 26 | 0 | 131 |
| 1/19/2024 | 24-000706 | Guatemala | 132 | 0 | 0 | 132 |
| 1/19/2024 | 24-000708 | Guatemala | 59 | 55 | 0 | 114 |
| 1/19/2024 | 24-000791 | Guatemala | 95 | 30 | 0 | 125 |
| 1/18/2024 | 24-000390 | Peru | 127 | 5 | 0 | 132 |
| 1/18/2024 | 24-000554 | Haiti | 52 | 0 | 0 | 52 |
| 1/18/2024 | 24-000617 | Guatemala | 109 | 4 | 0 | 113 |
| 1/18/2024 | 24-000698 | Guatemala | 130 | 5 | 0 | 135 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1/18/2024 | 24-000699 | Guatemala | 122 | 10 | 0 | 132 |
| 1/18/2024 | 24-000705 | Guatemala | 127 | 0 | 0 | 127 |
| 1/18/2024 | 24-000707 | Honduras | 61 | 52 | 0 | 113 |
| 1/18/2024 | 24-000740 | Ecuador | 109 | 0 | 0 | 109 |
| 1/17/2024 | 24-000602 | Honduras | 121 | 0 | 0 | 121 |
| 1/17/2024 | 24-000687 | Venezuela | 125 | 0 | 0 | 125 |
| 1/17/2024 | 24-000694 | Honduras | 13 | 98 | 0 | 111 |
| 1/17/2024 | 24-000697 | El Salvador | 61 | 59 | 0 | 120 |
| 1/16/2024 | 24-000696 | Honduras | 84 | 32 | 0 | 116 |
| 1/12/2024 | 24-000606 | Honduras | 124 | 0 | 0 | 124 |
| 1/12/2024 | 24-000609 | El Salvador | 131 | 2 | 0 | 133 |
| 1/12/2024 | 24-000672 | Guatemala | 133 | 0 | 0 | 133 |
| 1/12/2024 | 24-000675 | Honduras | 129 | 0 | 0 | 129 |
| 1/12/2024 | 24-000679 | Guatemala | 131 | 0 | 1 | 132 |
| 1/12/2024 | 24-000685 | Guatemala | 130 | 0 | 0 | 130 |
| 1/11/2024 | 24-000392 | Nicaragua | 97 | 0 | 0 | 97 |
| 1/11/2024 | 24-000542 | Colombia | 118 | 0 | 0 | 118 |
| 1/11/2024 | 24-000670 | Guatemala | 119 | 0 | 0 | 119 |
| 1/11/2024 | 24-000673 | Guatemala | 135 | 0 | 0 | 135 |
| 1/11/2024 | 24-000686 | Guatemala | 134 | 0 | 0 | 134 |
| 1/11/2024 | 24-000690 | Guatemala | 118 | 0 | 0 | 118 |
| 1/10/2024 | 24-000498 | Romania\, India | 86 | 2 | 0 | 88 |
| 1/10/2024 | 24-000641 | Venezuela | 130 | 0 | 0 | 130 |
| 1/10/2024 | 24-000669 | Guatemala | 133 | 0 | 0 | 133 |
| 1/10/2024 | 24-000674 | Honduras | 127 | 0 | 0 | 127 |
| 1/10/2024 | 24-000676 | El Salvador | 84 | 50 | 0 | 134 |
| 1/10/2024 | 24-000677 | Honduras | 102 | 0 | 0 | 102 |
| 1/10/2024 | 24-000684 | Guatemala | 134 | 0 | 0 | 134 |
| 1/9/2024 | 24-000540 | Colombia | 133 | 0 | 0 | 133 |
| 1/9/2024 | 24-000552 | Dominican Republic | 117 | 0 | 0 | 117 |
| 1/9/2024 | 24-000671 | Guatemala | 134 | 0 | 0 | 134 |
| 1/9/2024 | 24-000678 | Guatemala | 118 | 0 | 0 | 118 |
| 1/8/2024 | 24-000601 | Honduras | 126 | 0 | 0 | 126 |
| 1/8/2024 | 24-000616 | Guatemala | 134 | 0 | 0 | 134 |
| 1/8/2024 | 24-000691 | Guatemala | 134 | 0 | 0 | 134 |
| 1/5/2024 | 24-000405 | El Salvador | 121 | 4 | 0 | 125 |
| 1/5/2024 | 24-000613 | Honduras | 111 | 0 | 0 | 111 |
| 1/5/2024 | 24-000644 | Honduras | 16 | 119 | 0 | 135 |
| 1/5/2024 | 24-000647 | Guatemala | 134 | 0 | 0 | 134 |
| 1/5/2024 | 24-000652 | Honduras | 0 | 131 | 0 | 131 |
| 1/5/2024 | 24-000654 | Guatemala | 133 | 0 | 0 | 133 |
| 1/5/2024 | 24-000655 | Guatemala | 134 | 0 | 0 | 134 |
| 1/4/2024 | 24-000389 | Peru | 117 | 2 | 0 | 119 |
| 1/4/2024 | 24-000643 | Honduras | 98 | 32 | 0 | 130 |
| 1/4/2024 | 24-000645 | Guatemala | 129 | 0 | 0 | 129 |
| 1/4/2024 | 24-000646 | Guatemala | 114 | 0 | 0 | 114 |
| 1/4/2024 | 24-000653 | Guatemala | 118 | 0 | 0 | 118 |

STB_AR1_001554

| Date | Number | Country | | | | |
|---|---|---|---|---|---|---|
| 1/4/2024 | 24-000664 | Colombia | 117 | 0 | 0 | 117 |
| 1/3/2024 | 24-000413 | Guatemala | 109 | 0 | 0 | 109 |
| 1/3/2024 | 24-000545 | Ecuador | 127 | 7 | 1 | 135 |
| 1/3/2024 | 24-000605 | Honduras | 130 | 0 | 0 | 130 |
| 1/3/2024 | 24-000615 | Venezuela | 132 | 0 | 0 | 132 |
| 1/3/2024 | 24-000642 | Honduras | 130 | 0 | 0 | 130 |
| 1/3/2024 | 24-000648 | El Salvador | 28 | 38 | 0 | 66 |
| 12/29/2023 | 24-000614 | Honduras | 118 | 0 | 0 | 118 |
| 12/29/2023 | 24-000629 | Honduras | 38 | 86 | 0 | 124 |
| 12/29/2023 | 24-000633 | Guatemala | 123 | 0 | 0 | 123 |
| 12/29/2023 | 24-000635 | Guatemala | 35 | 90 | 0 | 125 |
| 12/29/2023 | 24-000640 | Guatemala | 128 | 0 | 0 | 128 |
| 12/28/2023 | 24-000391 | Nicaragua | 38 | 0 | 0 | 38 |
| 12/28/2023 | 24-000395 | Haiti | 26 | 0 | 0 | 26 |
| 12/28/2023 | 24-000630 | Honduras | 81 | 29 | 0 | 110 |
| 12/28/2023 | 24-000632 | Guatemala | 131 | 0 | 0 | 131 |
| 12/28/2023 | 24-000634 | Guatemala | 109 | 23 | 0 | 132 |
| 12/28/2023 | 24-000639 | Cuba | 31 | 0 | 0 | 31 |
| 12/28/2023 | 24-000659 | Guatemala | 128 | 0 | 0 | 128 |
| 12/27/2023 | 24-000409 | Honduras | 108 | 0 | 0 | 108 |
| 12/27/2023 | 24-000524 | Venezuela | 116 | 0 | 0 | 116 |
| 12/27/2023 | 24-000628 | Honduras | 92 | 40 | 0 | 132 |
| 12/27/2023 | 24-000631 | Guatemala | 132 | 0 | 0 | 132 |
| 12/22/2023 | 24-000404 | El Salvador | 131 | 0 | 0 | 131 |
| 12/22/2023 | 24-000408 | Honduras | 115 | 1 | 0 | 116 |
| 12/22/2023 | 24-000531 | Honduras | 85 | 48 | 1 | 134 |
| 12/22/2023 | 24-000622 | Guatemala | 80 | 50 | 0 | 130 |
| 12/22/2023 | 24-000623 | Guatemala | 124 | 0 | 0 | 124 |
| 12/22/2023 | 24-000624 | Honduras | 66 | 56 | 0 | 122 |
| 12/21/2023 | 24-000172 | Peru | 126 | 6 | 0 | 132 |
| 12/21/2023 | 24-000394 | Jamaica | 25 | 0 | 0 | 25 |
| 12/21/2023 | 24-000412 | Guatemala | 134 | 0 | 0 | 134 |
| 12/21/2023 | 24-000529 | Guatemala | 132 | 0 | 0 | 132 |
| 12/20/2023 | 24-000388 | Ecuador | 127 | 4 | 0 | 131 |
| 12/20/2023 | 24-000402 | Guatemala | 129 | 1 | 0 | 130 |
| 12/20/2023 | 24-000497 | Venezuela | 131 | 0 | 0 | 131 |
| 12/20/2023 | 24-000530 | Honduras | 124 | 0 | 0 | 124 |
| 12/20/2023 | 24-000532 | El Salvador | 67 | 59 | 0 | 126 |
| 12/20/2023 | 24-000535 | Guatemala | 128 | 0 | 0 | 128 |
| 12/20/2023 | 24-000612 | Honduras | 134 | 0 | 0 | 134 |
| 12/19/2023 | 24-000336 | Uzbekistan | 116 | 0 | 0 | 116 |
| 12/19/2023 | 24-000365 | Dominican Republic | 76 | 0 | 0 | 76 |
| 12/19/2023 | 24-000385 | Colombia | 106 | 0 | 0 | 106 |
| 12/19/2023 | 24-000528 | Guatemala | 134 | 0 | 0 | 134 |
| 12/19/2023 | 24-000534 | Guatemala | 130 | 0 | 0 | 130 |
| 12/18/2023 | 24-000400 | Honduras | 130 | 0 | 0 | 130 |
| 12/18/2023 | 24-000527 | Guatemala | 132 | 0 | 0 | 132 |

STB_AR1_001555

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/15/2023 | 24-000142 | Brazil | 52 | 1 | 0 | 53 |
| 12/15/2023 | 24-000310 | El Salvador | 135 | 0 | 0 | 135 |
| 12/15/2023 | 24-000503 | Honduras | 95 | 37 | 0 | 132 |
| 12/14/2023 | 24-000175 | Nicaragua | 51 | 0 | 0 | 51 |
| 12/14/2023 | 24-000407 | Honduras | 125 | 2 | 0 | 127 |
| 12/13/2023 | 24-000335 | Senegal\, Mauritania\, Guinea\, Angola | 130 | 0 | 0 | 130 |
| 12/13/2023 | 24-000387 | Ecuador | 110 | 11 | 0 | 121 |
| 12/13/2023 | 24-000401 | Guatemala | 72 | 0 | 0 | 72 |
| 12/13/2023 | 24-000501 | Guatemala | 133 | 0 | 0 | 133 |
| 12/13/2023 | 24-000502 | Honduras | 132 | 0 | 0 | 132 |
| 12/13/2023 | 24-000504 | El Salvador | 126 | 0 | 0 | 126 |
| 12/13/2023 | 24-000510 | Guatemala | 130 | 0 | 0 | 130 |
| 12/13/2023 | 24-000511 | Honduras | 118 | 0 | 0 | 118 |
| 12/13/2023 | 24-000520 | Venezuela | 135 | 0 | 0 | 135 |
| 12/12/2023 | 24-000384 | Colombia | 111 | 0 | 0 | 111 |
| 12/12/2023 | 24-000500 | Guatemala | 127 | 0 | 0 | 127 |
| 12/12/2023 | 24-000509 | Guatemala | 121 | 0 | 0 | 121 |
| 12/11/2023 | 24-000399 | Honduras | 120 | 0 | 0 | 120 |
| 12/11/2023 | 24-000411 | Guatemala | 84 | 0 | 0 | 84 |
| 12/11/2023 | 24-000493 | Cape Verde | 1 | 0 | 0 | 1 |
| 12/11/2023 | 24-000499 | Guatemala | 129 | 0 | 0 | 129 |
| 12/11/2023 | 24-000518 | Guatemala | 57 | 61 | 0 | 118 |
| 12/8/2023 | 24-000311 | El Salvador | 80 | 55 | 0 | 135 |
| 12/8/2023 | 24-000482 | Honduras | 122 | 0 | 0 | 122 |
| 12/8/2023 | 24-000515 | Honduras | 115 | 0 | 0 | 115 |
| 12/7/2023 | 24-000171 | Peru | 122 | 13 | 0 | 135 |
| 12/7/2023 | 24-000406 | Honduras | 68 | 42 | 0 | 110 |
| 12/7/2023 | 24-000410 | Guatemala | 125 | 0 | 1 | 126 |
| 12/7/2023 | 24-000474 | Colombia | 128 | 0 | 0 | 128 |
| 12/7/2023 | 24-000479 | Guatemala | 59 | 0 | 0 | 59 |
| 12/7/2023 | 24-000495 | Guatemala | 95 | 0 | 0 | 95 |
| 12/6/2023 | 24-000167 | Guatemala | 98 | 0 | 0 | 98 |
| 12/6/2023 | 24-000386 | Ecuador | 77 | 16 | 0 | 93 |
| 12/6/2023 | 24-000477 | Venezuela | 134 | 0 | 0 | 134 |
| 12/6/2023 | 24-000480 | El Salvador | 56 | 73 | 0 | 129 |
| 12/6/2023 | 24-000481 | Honduras | 133 | 0 | 0 | 133 |
| 12/6/2023 | 24-000488 | Guatemala | 121 | 0 | 0 | 121 |
| 12/5/2023 | 24-000364 | Dominican Republic | 93 | 0 | 0 | 93 |
| 12/5/2023 | 24-000383 | Colombia | 135 | 0 | 0 | 135 |
| 12/5/2023 | 24-000478 | Guatemala | 131 | 0 | 0 | 131 |
| 12/5/2023 | 24-000487 | Guatemala | 121 | 0 | 2 | 123 |
| 12/5/2023 | 24-000494 | Guatemala | 0 | 110 | 0 | 110 |
| 12/4/2023 | 24-000334 | South Korea | 8 | 0 | 0 | 8 |
| 12/4/2023 | 24-000398 | Honduras | 87 | 0 | 0 | 87 |
| 12/1/2023 | 24-000456 | Venezuela | 131 | 0 | 0 | 131 |
| 12/1/2023 | 24-000463 | Honduras | 115 | 1 | 1 | 117 |
| 11/30/2023 | 24-000176 | Haiti | 14 | 0 | 0 | 14 |

| 11/30/2023 | 24-000177 | Cuba | 37 | 0 | 0 | 37 |
|---|---|---|---|---|---|---|
| 11/30/2023 | 24-000178 | Jamaica | 31 | 1 | 0 | 32 |
| 11/30/2023 | 24-000245 | Guatemala | 105 | 0 | 0 | 105 |
| 11/30/2023 | 24-000461 | Guatemala | 94 | 0 | 0 | 94 |
| 11/29/2023 | 24-000166 | Ecuador | 90 | 22 | 1 | 113 |
| 11/29/2023 | 24-000235 | Guatemala | 131 | 0 | 0 | 131 |
| 11/29/2023 | 24-000314 | Liberia\, Cape Verde | 7 | 0 | 0 | 7 |
| 11/29/2023 | 24-000457 | Honduras | 127 | 0 | 0 | 127 |
| 11/29/2023 | 24-000459 | Guatemala | 131 | 0 | 1 | 132 |
| 11/29/2023 | 24-000462 | El Salvador | 49 | 83 | 0 | 132 |
| 11/29/2023 | 24-000469 | Honduras | 72 | 52 | 0 | 124 |
| 11/28/2023 | 24-000460 | Guatemala | 67 | 64 | 0 | 131 |
| 11/27/2023 | 24-000182 | Guatemala | 108 | 0 | 0 | 108 |
| 11/27/2023 | 24-000230 | Honduras | 108 | 0 | 0 | 108 |
| 11/27/2023 | 24-000452 | Venezuela | 131 | 0 | 0 | 131 |
| 11/27/2023 | 24-000458 | Guatemala | 117 | 0 | 0 | 117 |
| 11/24/2023 | 24-000239 | Honduras | 130 | 0 | 0 | 130 |
| 11/24/2023 | 24-000244 | Guatemala | 99 | 1 | 0 | 100 |
| 11/24/2023 | 24-000284 | El Salvador | 74 | 56 | 0 | 130 |
| 11/22/2023 | 24-000165 | Ecuador | 105 | 4 | 0 | 109 |
| 11/22/2023 | 24-000368 | Honduras | 65 | 67 | 0 | 132 |
| 11/22/2023 | 24-000371 | Colombia | 107 | 0 | 0 | 107 |
| 11/22/2023 | 24-000373 | El Salvador | 28 | 103 | 0 | 131 |
| 11/22/2023 | 24-000379 | Honduras | 128 | 0 | 0 | 128 |
| 11/22/2023 | 24-000381 | Guatemala | 109 | 0 | 0 | 109 |
| 11/22/2023 | 24-000453 | Venezuela | 131 | 1 | 0 | 132 |
| 11/21/2023 | 24-000183 | Dominican Republic | 90 | 0 | 0 | 90 |
| 11/21/2023 | 24-000370 | Guatemala | 63 | 58 | 0 | 121 |
| 11/20/2023 | 24-000229 | Honduras | 113 | 0 | 0 | 113 |
| 11/20/2023 | 24-000366 | Guatemala | 131 | 0 | 0 | 131 |
| 11/20/2023 | 24-000372 | Guatemala | 126 | 0 | 0 | 126 |
| 11/17/2023 | 24-000141 | Brazil | 65 | 0 | 0 | 65 |
| 11/17/2023 | 24-000248 | El Salvador | 56 | 69 | 0 | 125 |
| 11/17/2023 | 24-000360 | Honduras | 122 | 0 | 1 | 123 |
| 11/16/2023 | 24-000164 | Ecuador | 128 | 5 | 0 | 133 |
| 11/16/2023 | 24-000170 | Peru | 92 | 2 | 0 | 94 |
| 11/16/2023 | 24-000174 | Nicaragua | 47 | 1 | 0 | 48 |
| 11/16/2023 | 24-000238 | Honduras | 115 | 0 | 0 | 115 |
| 11/16/2023 | 24-000243 | Guatemala | 75 | 1 | 0 | 76 |
| 11/16/2023 | 24-000363 | Venezuela | 132 | 0 | 0 | 132 |
| 11/15/2023 | 24-000161 | India | 8 | 0 | 0 | 8 |
| 11/15/2023 | 24-000233 | Guatemala | 66 | 1 | 0 | 67 |
| 11/15/2023 | 24-000339 | Guatemala | 83 | 46 | 0 | 129 |
| 11/15/2023 | 24-000340 | Colombia | 76 | 0 | 0 | 76 |
| 11/15/2023 | 24-000341 | El Salvador | 24 | 107 | 0 | 131 |
| 11/15/2023 | 24-000343 | Guatemala | 126 | 0 | 0 | 126 |
| 11/15/2023 | 24-000359 | Honduras | 114 | 0 | 0 | 114 |

STB_AR1_001557

| Date | Number | Country | | | | |
|---|---|---|---|---|---|---|
| 11/14/2023 | 24-000180 | Colombia | 66 | 1 | 0 | 67 |
| 11/13/2023 | 24-000342 | Guatemala | 119 | 0 | 0 | 119 |
| 11/10/2023 | 24-000247 | El Salvador | 113 | 22 | 0 | 135 |
| 11/10/2023 | 24-000331 | Guatemala | 24 | 0 | 0 | 24 |
| 11/10/2023 | 24-000332 | Honduras | 110 | 0 | 0 | 110 |
| 11/10/2023 | 24-000358 | Guatemala | 113 | 0 | 0 | 113 |
| 11/9/2023 | 24-000163 | Ecuador | 119 | 15 | 0 | 134 |
| 11/9/2023 | 24-000169 | Peru | 69 | 7 | 0 | 76 |
| 11/9/2023 | 24-000237 | Honduras | 83 | 0 | 0 | 83 |
| 11/9/2023 | 24-000242 | Guatemala | 91 | 0 | 0 | 91 |
| 11/9/2023 | 24-000319 | Guatemala | 67 | 65 | 0 | 132 |
| 11/8/2023 | 24-000232 | Guatemala | 99 | 0 | 0 | 99 |
| 11/8/2023 | 24-000321 | Honduras | 69 | 58 | 0 | 127 |
| 11/8/2023 | 24-000322 | El Salvador | 59 | 72 | 0 | 131 |
| 11/8/2023 | 24-000338 | Guatemala | 117 | 0 | 0 | 117 |
| 11/7/2023 | 24-000145 | Dominican Republic | 106 | 0 | 0 | 106 |
| 11/7/2023 | 24-000328 | Guatemala | 129 | 0 | 0 | 129 |
| 11/6/2023 | 24-000179 | Colombia | 95 | 0 | 0 | 95 |
| 11/6/2023 | 24-000226 | Honduras | 125 | 1 | 0 | 126 |
| 11/6/2023 | 24-000320 | Honduras | 133 | 0 | 0 | 133 |
| 11/6/2023 | 24-000333 | Guatemala | 124 | 0 | 0 | 124 |
| 11/3/2023 | 24-000246 | El Salvador | 72 | 60 | 0 | 132 |
| 11/3/2023 | 24-000290 | Guatemala | 60 | 74 | 0 | 134 |
| 11/3/2023 | 24-000291 | Guatemala | 93 | 0 | 0 | 93 |
| 11/3/2023 | 24-000303 | Honduras | 125 | 0 | 0 | 125 |
| 11/2/2023 | 24-000028 | Senegal\, Mauritania\, Ghana | 172 | 0 | 0 | 172 |
| 11/2/2023 | 24-000168 | Peru | 73 | 0 | 0 | 73 |
| 11/2/2023 | 24-000173 | Nicaragua | 104 | 0 | 0 | 104 |
| 11/2/2023 | 24-000231 | Guatemala | 117 | 0 | 0 | 117 |
| 11/2/2023 | 24-000236 | Honduras | 124 | 1 | 1 | 126 |
| 11/2/2023 | 24-000241 | Guatemala | 84 | 0 | 0 | 84 |
| 11/1/2023 | 24-000278 | Colombia | 64 | 0 | 0 | 64 |
| 11/1/2023 | 24-000289 | Honduras | 78 | 56 | 0 | 134 |
| 11/1/2023 | 24-000295 | El Salvador | 22 | 100 | 0 | 122 |
| 11/1/2023 | 24-000309 | Honduras | 0 | 129 | 0 | 129 |
| 10/31/2023 | 24-000276 | Ecuador | 105 | 0 | 0 | 105 |
| 10/30/2023 | 24-000070 | Honduras | 79 | 0 | 0 | 79 |
| 10/30/2023 | 24-000275 | Venezuela | 124 | 0 | 0 | 124 |
| 10/30/2023 | 24-000285 | Guatemala | 133 | 0 | 0 | 133 |
| 10/30/2023 | 24-000294 | Honduras | 123 | 0 | 0 | 123 |
| 10/27/2023 | 24-000016 | Ecuador | 119 | 2 | 0 | 121 |
| 10/27/2023 | 24-000081 | El Salvador | 103 | 21 | 0 | 124 |
| 10/27/2023 | 24-000260 | Guatemala | 109 | 4 | 0 | 113 |
| 10/27/2023 | 24-000270 | Honduras | 78 | 25 | 0 | 103 |
| 10/27/2023 | 24-000272 | Guatemala | 72 | 0 | 0 | 72 |
| 10/26/2023 | 24-000012 | Colombia | 92 | 0 | 0 | 92 |
| 10/26/2023 | 24-000017 | Haiti | 36 | 0 | 0 | 36 |

STB_AR1_001558

| | | | | | | |
|---|---|---|---|---|---|---|
| 10/26/2023 | 24-000020 | Cuba | 27 | 0 | 0 | 27 |
| 10/26/2023 | 24-000021 | Jamaica | 26 | 0 | 0 | 26 |
| 10/26/2023 | 24-000022 | Peru | 86 | 2 | 0 | 88 |
| 10/26/2023 | 24-000077 | Guatemala | 85 | 10 | 0 | 95 |
| 10/26/2023 | 24-000085 | Honduras | 120 | 9 | 0 | 129 |
| 10/25/2023 | 24-000027 | Angola | 8 | 0 | 0 | 8 |
| 10/25/2023 | 24-000073 | Guatemala | 117 | 0 | 0 | 117 |
| 10/25/2023 | 24-000259 | Guatemala | 76 | 1 | 0 | 77 |
| 10/25/2023 | 24-000262 | El Salvador | 43 | 88 | 0 | 131 |
| 10/24/2023 | 24-000281 | Colombia | 118 | 1 | 0 | 119 |
| 10/23/2023 | 24-000069 | Honduras | 125 | 1 | 0 | 126 |
| 10/23/2023 | 24-000261 | Honduras | 80 | 2 | 0 | 82 |
| 10/23/2023 | 24-000280 | Venezuela | 111 | 0 | 0 | 111 |
| 10/20/2023 | 24-000080 | El Salvador | 96 | 7 | 0 | 103 |
| 10/20/2023 | 24-000160 | Honduras | 88 | 10 | 0 | 98 |
| 10/20/2023 | 24-000277 | Peru | 116 | 8 | 0 | 124 |
| 10/19/2023 | 24-000015 | Ecuador | 129 | 3 | 0 | 132 |
| 10/19/2023 | 24-000025 | Nicaragua | 75 | 1 | 1 | 77 |
| 10/19/2023 | 24-000026 | Brazil | 112 | 1 | 0 | 113 |
| 10/19/2023 | 24-000076 | Guatemala | 82 | 17 | 0 | 99 |
| 10/19/2023 | 24-000084 | Honduras | 103 | 6 | 0 | 109 |
| 10/19/2023 | 24-000159 | Guatemala | 46 | 20 | 1 | 67 |
| 10/18/2023 | 24-000072 | Guatemala | 114 | 0 | 3 | 117 |
| 10/18/2023 | 24-000156 | Guatemala | 43 | 86 | 0 | 129 |
| 10/18/2023 | 24-000157 | El Salvador | 72 | 54 | 0 | 126 |
| 10/18/2023 | 24-000252 | Venezuela | 127 | 0 | 0 | 127 |
| 10/17/2023 | 24-000007 | Dominican Republic | 100 | 0 | 0 | 100 |
| 10/17/2023 | 24-000251 | Colombia | 91 | 1 | 0 | 92 |
| 10/16/2023 | 24-000002 | Uzbekistan\, Georgia | 8 | 0 | 0 | 8 |
| 10/16/2023 | 24-000068 | Honduras | 121 | 2 | 0 | 123 |
| 10/16/2023 | 24-000155 | Guatemala | 33 | 31 | 0 | 64 |
| 10/16/2023 | 24-000158 | Honduras | 67 | 14 | 0 | 81 |
| 10/14/2023 | 24-000140 | Guatemala | 0 | 118 | 0 | 118 |
| 10/13/2023 | 24-000079 | El Salvador | 54 | 0 | 0 | 54 |
| 10/13/2023 | 24-000114 | Honduras | 96 | 9 | 0 | 105 |
| 10/13/2023 | 24-000122 | Guatemala | 67 | 62 | 0 | 129 |
| 10/13/2023 | 24-000123 | Honduras | 45 | 86 | 0 | 131 |
| 10/13/2023 | 24-000131 | Guatemala | 103 | 18 | 0 | 121 |
| 10/12/2023 | 24-000014 | Ecuador | 124 | 5 | 0 | 129 |
| 10/12/2023 | 24-000019 | Peru | 122 | 4 | 0 | 126 |
| 10/12/2023 | 24-000075 | Guatemala | 102 | 18 | 0 | 120 |
| 10/12/2023 | 24-000083 | Honduras | 92 | 31 | 0 | 123 |
| 10/12/2023 | 24-000139 | Guatemala | 102 | 30 | 0 | 132 |
| 10/11/2023 | 24-000004 | Dem Rep of the Congo\, Angola | 8 | 0 | 0 | 8 |
| 10/11/2023 | 24-000071 | Guatemala | 102 | 0 | 0 | 102 |
| 10/11/2023 | 24-000116 | Ecuador | 125 | 0 | 0 | 125 |
| 10/11/2023 | 24-000121 | Guatemala | 35 | 89 | 0 | 124 |

STB_AR1_001559

| 10/11/2023 | 24-000125 | El Salvador | 77 | 45 | 0 | 122 |
|---|---|---|---|---|---|---|
| 10/11/2023 | 24-000130 | Honduras | 79 | 45 | 0 | 124 |
| 10/10/2023 | 24-000097 | Honduras | 47 | 83 | 0 | 130 |
| 10/9/2023 | 24-000001 | South Korea | 8 | 0 | 0 | 8 |
| 10/9/2023 | 24-000009 | Colombia | 81 | 1 | 0 | 82 |
| 10/9/2023 | 24-000067 | Honduras | 132 | 0 | 0 | 132 |
| 10/9/2023 | 24-000082 | Honduras | 123 | 0 | 0 | 123 |
| 10/9/2023 | 24-000124 | Guatemala | 42 | 79 | 0 | 121 |
| 10/9/2023 | 24-000136 | Honduras | 66 | 65 | 0 | 131 |
| 10/6/2023 | 24-000078 | El Salvador | 78 | 0 | 0 | 78 |
| 10/6/2023 | 24-000102 | Guatemala | 46 | 83 | 1 | 130 |
| 10/6/2023 | 24-000111 | Guatemala | 98 | 34 | 0 | 132 |
| 10/6/2023 | 24-000137 | Guatemala | 106 | 9 | 0 | 115 |
| 10/6/2023 | 24-000138 | Nicaragua | 91 | 1 | 0 | 92 |
| 10/5/2023 | 24-000013 | Ecuador | 116 | 9 | 0 | 125 |
| 10/5/2023 | 24-000018 | Peru | 128 | 0 | 0 | 128 |
| 10/4/2023 | 24-000066 | Guatemala | 121 | 1 | 0 | 122 |
| 10/4/2023 | 24-000101 | Guatemala | 36 | 84 | 0 | 120 |
| 10/4/2023 | 24-000103 | El Salvador | 74 | 51 | 0 | 125 |
| 10/3/2023 | 24-000006 | Dominican Republic | 117 | 0 | 0 | 117 |
| 10/3/2023 | 24-000099 | Honduras | 47 | 60 | 0 | 107 |
| 10/2/2023 | 24-000008 | Colombia | 113 | 0 | 0 | 113 |
| 10/2/2023 | 24-000065 | Honduras | 97 | 0 | 0 | 97 |
| 10/2/2023 | 24-000098 | Honduras | 43 | 79 | 0 | 122 |
| 10/2/2023 | 24-000100 | Guatemala | 63 | 72 | 0 | 135 |

Source: OHSS analysis of ICE Air data downloaded from UIP Sept. 6, 2024.

STB_AR1_001560

MVM Flights

| | | | | | |
|---|---|---|---|---|---|
| 24 | | | | | |
| 380 | | | | | |
| **404** | | | | | |
| Removals | | | | | |

| Date of Flight | BP Sector Origin | Destination City | Family Units | Full Count of Family Members | Country of FAMU Citizenship |
|---|---|---|---|---|---|
| 8/30/2024 | EPT/LRT | Guatemala City, Guatemala | 43 | 103 | Guatemala |
| 8/29/2024 | EPT/LRT | San Pedro Sula, Honduras | 52 | 123 | Honduras |
| 8/23/2024 | EPT/LRT | Guatemala City, Guatemala | 44 | 103 | Guatemala |
| 8/22/2024 | EPT/LRT | San Pedro Sula, Honduras | 49 | 109 | Honduras |
| 8/16/2024 | EPT/LRT | Guatemala City, Guatemala | 52 | 127 | Guatemala |
| 8/15/2024 | EPT/LRT | San Pedro Sula, Honduras | 44 | 100 | Honduras |
| 8/9/2024 | EPT/LRT | Guatemala City, Guatemala | 46 | 122 | Guatemala |
| 8/8/2024 | EPT/LRT | San Pedro Sula, Honduras | 58 | 134 | Honduras |
| 8/2/2024 | EPT/LRT | San Pedro Sula, Honduras | 50 | 117 | Honduras |
| 8/1/2024 | EPT/LRT | Guatemala City, Guatemala | 42 | 107 | Guatemala |
| 7/26/2024 | EPT/LRT | San Pedro Sula, Honduras | 45 | 102 | Honduras |
| 7/25/2024 | EPT/LRT | Guatemala City, Guatemala | 39 | 90 | Guatemala |
| 7/5/2024 | EPT/LRT | San Pedro Sula, Honduras | 52 | 135 | Honduras |
| 7/3/2024 | EPT/LRT | Guatemala City, Guatemala | 44 | 104 | Guatemala |
| 6/28/2024 | EPT/LRT | San Pedro Sula, Honduras | 57 | 135 | Honduras |
| 6/27/2024 | EPT/LRT | Guatemala City, Guatemala | 60 | 140 | Guatemala |
| 6/25/2024 | RGV | San Pedro Sula, Honduras | 18 | 46 | Honduras |
| 6/24/2024 | EPT/LRT | San Pedro Sula, Honduras | 45 | 119 | Honduras |
| 6/20/2024 | RGV | Guatemala City, Guatemala | 21 | 48 | Guatemala |
| 6/19/2024 | EPT/LRT | Guatemala City, Guatemala | 52 | 123 | Guatemala |
| 6/18/2024 | RGV | San Pedro Sula, Honduras | 43 | 107 | Honduras |
| 6/13/2024 | RGV | Guatemala City, Guatemala | 45 | 100 | Guatemala |
| 6/11/2024 | RGV | San Pedro Sula, Honduras | 55 | 135 | Honduras |
| 6/4/2024 | RGV | San Pedro Sula, Honduras | 51 | 122 | Honduras |
| 5/31/2024 | RGV | Guatemala City, Guatemala | 44 | 115 | Guatemala |
| 5/28/2024 | RGV | San Pedro Sula, Honduras | 26 | 63 | Honduras |
| 5/23/2024 | RGV | Guatemala City, Guatemala | 30 | 70 | Guatemala |
| 5/21/2024 | RGV | San Pedro Sula, Honduras | 44 | 103 | Honduras |
| 5/14/2024 | RGV | San Pedro Sula, Honduras | 58 | 135 | Honduras |
| 5/9/2024 | RGV | Guatemala City, Guatemala | 21 | 58 | Guatemala |
| 5/7/2024 | RGV | San Pedro Sula, Honduras | 57 | 131 | Honduras |
| 5/2/2024 | RGV | Guatemala City, Guatemala | 51 | 126 | Guatemala |
| 4/30/2024 | RGV | San Pedro Sula, Honduras | 56 | 135 | Honduras |
| 4/25/2024 | RGV | Guatemala City, Guatemala | 41 | 103 | Guatemala |
| 4/23/2024 | RGV | San Pedro Sula, Honduras | 52 | 135 | Honduras |
| 4/18/2024 | RGV | Guatemala City, Guatemala | 46 | 102 | Guatemala |
| 4/17/2024 | RGV | San Pedro Sula, Honduras | 54 | 135 | Honduras |
| 4/11/2024 | RGV | Guatemala City, Guatemala | 28 | 70 | Guatemala |
| 4/9/2024 | RGV | San Pedro Sula, Honduras | 38 | 82 | Honduras |
| 4/4/2024 | RGV | Guatemala City, Guatemala | 34 | 85 | Guatemala |
| 4/2/2024 | RGV | San Pedro Sula, Honduras | 58 | 135 | Honduras |
| 3/26/2024 | RGV | San Pedro Sula, Honduras | 46 | 111 | Honduras |

| 3/22/2024 | RGV | San Pedro Sula, Honduras | 54 | 128 | Honduras |
|---|---|---|---|---|---|
| 3/21/2024 | RGV | Guatemala City, Guatemala | 11 | 35 | Guatemala |
| 3/19/2024 | RGV | Guatemala City, Guatemala | 31 | 85 | Guatemala |
| 3/15/2024 | RGV | San Pedro Sula, Honduras | 32 | 78 | Honduras |
| 3/14/2024 | RGV | Guatemala City, Guatemala | 21 | 47 | Guatemala |
| 3/12/2024 | RGV | Guatemala City, Guatemala | 30 | 77 | Guatemala |
| 3/11/2024 | RGV | San Pedro Sula, Honduras | 40 | 99 | Honduras |
| 3/7/2024 | RGV | Guatemala City, Guatemala | 46 | 112 | Guatemala |
| 3/6/2024 | RGV | Guatemala City, Guatemala | 51 | 127 | Guatemala |
| 3/6/2024 | RGV | San Salvador, El Salvador | 29 | 67 | El Salvador |
| 3/1/2024 | RGV | San Pedro Sula, Honduras | 56 | 134 | Honduras |
| 2/29/2024 | RGV | Guatemala City, Guatemala | 37 | 94 | Guatemala |
| 2/28/2024 | RGV | San Salvador, El Salvador | 34 | 82 | El Salvador |
| 2/27/2024 | RGV | San Pedro Sula, Honduras | 31 | 69 | Honduras |
| 2/26/2024 | RGV | Guatemala City, Guatemala | 28 | 70 | Guatemala |
| 2/23/2024 | RGV | San Pedro Sula, Honduras | 33 | 84 | Honduras |
| 2/22/2024 | RGV | Guatemala City, Guatemala | 18 | 47 | Guatemala |
| 2/21/2024 | RGV | San Salvador, El Salvador | 38 | 91 | El Salvador |
| 2/20/2024 | RGV | San Pedro Sula, Honduras | 36 | 92 | Honduras |
| 2/19/2024 | RGV | Guatemala City, Guatemala | 34 | 76 | Guatemala |
| 2/16/2024 | RGV | San Pedro Sula, Honduras | 41 | 100 | Honduras |
| 2/15/2024 | RGV | Guatemala City, Guatemala | 39 | 94 | Guatemala |
| 2/14/2024 | RGV | San Salvador, El Salvador | 35 | 88 | El Salvador |
| 2/13/2024 | RGV | San Pedro Sula, Honduras | 40 | 91 | Honduras |
| 2/12/2024 | RGV | Guatemala City, Guatemala | 36 | 92 | Guatemala |
| 2/9/2024 | RGV | San Pedro Sula, Honduras | 58 | 127 | Honduras |
| 2/8/2024 | RGV | Guatemala City, Guatemala | 50 | 132 | Guatemala |
| 2/2/2024 | RGV | San Pedro Sula, Honduras | 41 | 98 | Honduras |
| 2/2/2024 | RGV | Guatemala City, Guatemala | 32 | 70 | Guatemala |
| 1/29/2024 | RGV | Guatemala City, Guatemala | 39 | 85 | Guatemala |
| 1/12/2024 | RGV | Guatemala City, Guatemala | 40 | 91 | Guatemala |
| 1/12/2024 | RGV | San Pedro Sula, Honduras | 21 | 49 | Honduras |
| 1/10/2024 | RGV | San Pedro Sula, Honduras | 36 | 98 | Honduras |
| 1/10/2024 | EPT | Guatemala City, Guatemala | 36 | 90 | Guatemala |
| 1/9/2024 | RGV | San Pedro Sula, Honduras | 41 | 109 | Honduras |
| 1/9/2024 | RGV | Guatemala City, Guatemala | 30 | 83 | Guatemala |
| 1/8/2024 | RGV | San Pedro Sula, Honduras | 34 | 93 | Honduras |
| 1/8/2024 | RGV | Guatemala City, Guatemala | 52 | 125 | Guatemala |
| 1/5/2024 | RGV | San Pedro Sula, Honduras | 46 | 134 | Honduras |
| 1/5/2024 | RGV | Guatemala City, Guatemala | 54 | 135 | Guatemala |
| 1/4/2024 | RGV | San Pedro Sula, Honduras | 40 | 98 | Honduras |
| 1/4/2024 | RGV | Guatemala City, Guatemala | 48 | 132 | Guatemala |
| 1/3/2024 | EPT | Guatemala City, Guatemala | 35 | 89 | Guatemala |
| 1/3/2024 | RGV | Guatemala City, Guatemala | 56 | 135 | Guatemala |
| 1/2/2024 | RGV | San Pedro Sula, Honduras | 43 | 128 | Honduras |

STB_AR1_001562

| 12/29/2023 | RGV | San Pedro Sula, Honduras | 42 | 134 | Honduras |
|---|---|---|---|---|---|
| 12/29/2023 | RGV | San Pedro Sula, Honduras | 43 | 117 | Honduras |
| 12/28/2023 | RGV | Guatemala City, Guatemala | 41 | 129 | Guatemala |
| 12/27/2023 | HRL | San Pedro Sula, Honduras | 50 | 135 | Honduras |
| 12/27/2023 | EPT | Guatemala City, Guatemala | 41 | 107 | Guatemala |
| 12/27/2023 | HRL | San Pedro Sula, Honduras | 46 | 135 | Honduras |
| 12/27/2023 | RGV | Guatemala City, Guatemala | 47 | 135 | Guatemala |
| 12/27/2023 | HRL | San Pedro Sula, Honduras | 52 | 135 | Honduras |
| 12/22/2023 | RGV | San Pedro Sula, Honduras | 47 | 134 | Honduras |
| 12/22/2023 | RGV | Guatemala City, Guatemala | 52 | 129 | Guatemala |
| 12/21/2023 | RGV | Guatemala City, Guatemala | 55 | 135 | Guatemala |
| 12/20/2023 | RGV | San Pedro Sula, Honduras | 54 | 132 | Honduras |
| 12/20/2023 | EPT | Guatemala City, Guatemala | 53 | 134 | Guatemala |
| 12/20/2023 | RGV | Guatemala City, Guatemala | 54 | 135 | Guatemala |
| 12/20/2023 | RGV | San Salvador, El Salvador | 55 | 135 | El Salvador |
| 12/19/2023 | RGV | San Pedro Sula, Honduras | 54 | 135 | Honduras |
| 12/19/2023 | RGV | Guatemala City, Guatemala | 52 | 135 | Guatemala |
| 12/18/2023 | RGV | San Pedro Sula, Honduras | 50 | 124 | Honduras |
| 12/16/2023 | RGV | Guatemala City, Guatemala | 55 | 135 | Guatemala |
| 12/15/2023 | RGV | San Pedro Sula, Honduras | 41 | 115 | Honduras |
| 12/15/2023 | RGV | San Pedro Sula, Honduras | 41 | 97 | Honduras |
| 12/15/2023 | RGV | San Pedro Sula, Honduras | 34 | 98 | Honduras |
| 12/13/2023 | RGV | San Pedro Sula, Honduras | 51 | 135 | Honduras |
| 12/13/2023 | EPT | Guatemala City, Guatemala | 48 | 117 | Guatemala |
| 12/13/2023 | RGV | Guatemala City, Guatemala | 52 | 132 | Guatemala |
| 12/13/2023 | RGV | San Salvador, El Salvador | 56 | 135 | El Salvador |
| 12/12/2023 | RGV | San Pedro Sula, Honduras | 48 | 123 | Honduras |
| 12/12/2023 | EPT | Guatemala City, Guatemala | 50 | 120 | Guatemala |
| 12/12/2023 | RGV | Guatemala City, Guatemala | 50 | 124 | Guatemala |
| 12/8/2023 | RGV | San Pedro Sula, Honduras | 43 | 109 | Honduras |
| 12/7/2023 | EPT | Guatemala City, Guatemala | 55 | 123 | Guatemala |
| 12/7/2023 | RGV | Guatemala City, Guatemala | 43 | 106 | Guatemala |
| 12/6/2023 | EPT | Guatemala City, Guatemala | 58 | 126 | Guatemala |
| 12/6/2023 | RGV | San Pedro Sula, Honduras | 54 | 91 | Honduras |
| 12/6/2023 | RGV | Guatemala City, Guatemala | 53 | 133 | Guatemala |
| 12/6/2023 | RGV | San Salvador, El Salvador | 59 | 135 | El Salvador |
| 12/5/2023 | RGV | San Pedro Sula, Honduras | 55 | 134 | Honduras |
| 12/5/2023 | RGV | Guatemala City, Guatemala | 53 | 127 | Guatemala |
| 12/4/2023 | RGV | San Pedro Sula, Honduras | 56 | 133 | Honduras |
| 12/1/2023 | RGV | San Pedro Sula, Honduras | 28 | 75 | Honduras |
| 12/1/2023 | RGV | San Pedro Sula, Honduras | 28 | 71 | Honduras |
| 11/30/2023 | RGV | Guatemala City, Guatemala | 33 | 79 | Guatemala |
| 11/30/2023 | ELP | Guatemala City, Guatemala | 58 | 135 | Guatemala |
| 11/30/2023 | RGV | Guatemala City, Guatemala | 45 | 103 | Guatemala |
| 11/29/2023 | RGV | San Pedro Sula, Honduras | 47 | 116 | Honduras |

STB_AR1_001563

| Date | Code | Origin | | Number | Country |
|---|---|---|---|---|---|
| 11/29/2023 | RGV | Guatemala City, Guatemala | 54 | 130 | Guatemala |
| 11/29/2023 | RGV | San Salvador, El Salvador | 53 | 134 | El Salvador |
| 11/28/2023 | RGV | San Pedro Sula, Honduras | 49 | 120 | Honduras |
| 11/28/2023 | RGV | Guatemala City, Guatemala | 52 | 135 | Guatemala |
| 11/27/2023 | RGV | San Pedro Sula, Honduras | 49 | 127 | Honduras |
| 11/27/2023 | RGV | Guatemala City, Guatemala | 56 | 131 | Guatemala |
| 11/25/2023 | RGV | Guatemala City, Guatemala | 56 | 135 | Guatemala |
| 11/24/2023 | RGV | San Pedro Sula, Honduras | 39 | 93 | Honduras |
| 11/24/2023 | RGV | Guatemala, City Guatemala | 56 | 133 | Guatemala |
| 11/24/2023 | LRD | San Pedro Sula, Honduras | 48 | 112 | Honduras |
| 11/24/2023 | EPT | Guatemala, City Guatemala | 57 | 134 | Guatemala |
| 11/22/2023 | ELP | Guatemala, City Guatemala | 58 | 135 | Guatemala |
| 11/22/2023 | RGV | San Salvador, El Salvador | 59 | 135 | El Salvador |
| 11/22/2023 | RGV | San Pedro Sula, Honduras | 56 | 134 | Honduras |
| 11/21/2023 | RGV | Guatemala, City Guatemala | 56 | 131 | Guatemala |
| 11/20/2023 | RGV | San Pedro Sula, Honduras | 54 | 134 | Honduras |
| 11/20/2023 | RGV | Guatemala, City Guatemala | 53 | 133 | Guatemala |
| 11/18/2023 | RGV | Guatemala, City Guatemala | 59 | 133 | Guatemala |
| 11/17/2023 | RGV | San Pedro Sula, Honduras | 34 | 84 | Honduras |
| 11/17/2023 | EPT | Guatemala, City Guatemala | 57 | 133 | Guatemala |
| 11/17/2023 | HRL | San Pedro Sula, Honduras | 36 | 84 | Honduras |
| 11/17/2023 | RGV | Guatemala, City Guatemala | 54 | 135 | Guatemala |
| 11/16/2023 | RGV | Guatemala, City Guatemala | 58 | 135 | Guatemala |
| 11/15/2023 | ELP | Guatemala, City Guatemala | 59 | 135 | Guatemala |
| 11/15/2023 | RGV | San Pedro Sula, Honduras | 55 | 134 | Honduras |
| 11/15/2023 | RGV | San Salvador, El Salvador | 52 | 135 | El Salvador |
| 11/14/2023 | RGV | San Pedro Sula, Honduras | 57 | 134 | Honduras |
| 11/14/2023 | RGV | Guatemala, City Guatemala | 57 | 129 | Guatemala |
| 11/13/2023 | RGV | San Pedro Sula, Honduras | 50 | 128 | Honduras |
| 11/13/2023 | RGV | Guatemala City, Guatemala | 55 | 135 | Guatemala |
| 11/10/2023 | RGV | San Pedro Sula, Honduras | 56 | 135 | Honduras |
| 11/10/2023 | RGV | San Pedro Sula, Honduras | 49 | 135 | Honduras |
| 11/10/2023 | LRD | San Pedro Sula, Honduras | 58 | 142 | Honduras |
| 11/10/2023 | RGV | Guatemala City, Guatemala | 60 | 134 | Guatemala |
| 11/10/2023 | RGV | Guatemala, City Guatemala | 51 | 123 | Guatemala |
| 11/9/2023 | RGV | Guatemala City, Guatemala | 56 | 132 | Guatemala |
| 11/8/2023 | RGV | San Pedro Sula, Honduras | 54 | 135 | Honduras |
| 11/8/2023 | RGV | Guatemala City, Guatemala | 61 | 134 | Guatemala |
| 11/8/2023 | RGV | San Salvador, El Salvador | 57 | 131 | El Salvador |
| 11/7/2023 | RGV | San Pedro Sula, Honduras | 57 | 135 | Honduras |
| 11/7/2023 | RGV | Guatemala City, Guatemala | 54 | 132 | Guatemala |
| 11/6/2023 | RGV | Guatemala City, Guatemala | 51 | 125 | Guatemala |
| 11/6/2023 | RGV | San Pedro Sula, Honduras | 55 | 134 | Honduras |
| 11/3/2023 | EPT | Guatemala City, Guatemala | 51 | 128 | Guatemala |
| 11/3/2023 | RGV | San Pedro Sula, Honduras | 50 | 126 | Honduras |

STB_AR1_001564

| 11/3/2023 | RGV | San Pedro Sula, Honduras | 55 | | 134 | Honduras |
|---|---|---|---|---|---|---|
| 11/3/2023 | RGV | Guatemala City, Guatemala | 53 | | 135 | Guatemala |
| 11/3/2023 | RGV | San Pedro Sula, Honduras | 54 | | 129 | Honduras |
| 11/2/2023 | RGV | Guatemala City, Guatemala | 54 | | 133 | Guatemala |
| 11/1/2023 | RGV | San Pedro Sula, Honduras | 58 | | 134 | Honduras |
| 11/1/2023 | RGV | San Salvador, El Salvador | 56 | | 135 | El Salvador |
| 10/31/2023 | RGV | San Pedro, Sula Honduras | 47 | | 113 | Honduras |
| 10/31/2023 | RGV | Guatemala, City Guatemala | 43 | | 110 | Guatemala |
| 10/30/2023 | RGV | San Pedro, Sula Honduras | 53 | | 129 | Honduras |
| 10/28/2023 | RGV | Guatemala, City Guatemala | 49 | | 119 | Guatemala |
| 10/27/2023 | EPT | Guatemala, City Guatemala | 40 | | 104 | Guatemala |
| 10/27/2023 | RGV | San Pedro, Sula Honduras | 55 | | 129 | Honduras |
| 10/27/2023 | RGV | San Pedro, Sula Honduras | 55 | | 125 | Honduras |
| 10/27/2023 | LRT | San Pedro, Sula Honduras | 32 | | 80 | Honduras |
| 10/26/2023 | RGV | Guatemala, City Guatemala | 33 | | 85 | Guatemala |
| 10/26/2023 | RGV | Guatemala, City Guatemala | 17 | | 43 | Guatemala |
| 10/25/2023 | EPT | Guatemala, City Guatemala | 43 | | 101 | Guatemala |
| 10/25/2023 | RGV | San Pedro, Sula Honduras | 54 | | 124 | Honduras |
| 10/25/2023 | RGV | Guatemala, City Guatemala | 32 | | 75 | Guatemala |
| 10/25/2023 | RGV | San Salvador, El Salvador | 53 | | 129 | El Salvador |
| 10/24/2023 | RGV | San Pedro, Sula Honduras | 39 | | 97 | Honduras |
| 10/24/2023 | RGV | Guatemala, City Guatemala | 47 | | 123 | Guatemala |
| 10/23/2023 | RGV | San Pedro, Sula Honduras | 39 | | 99 | Honduras |
| 10/23/2023 | RGV | Guatemala, City Guatemala | 42 | | 100 | Guatemala |
| 10/20/2023 | RGV | San Pedro, Sula Honduras | 51 | | 123 | Honduras |
| 10/20/2023 | RGV | San Pedro, Sula Honduras | 28 | | 64 | Honduras |
| 10/19/2023 | EPT | Guatemala, City Guatemala | 42 | | 94 | Guatemala |
| 10/19/2023 | LRT | Guatemala, City Guatemala | 24 | | 53 | Guatemala |
| 10/19/2023 | RGV | Guatemala, City Guatemala | 30 | | 77 | Guatemala |
| 10/18/2023 | RGV | Guatemala, City Guatemala | 55 | | 126 | Guatemala |
| 10/18/2023 | RGV | San Pedro, Sula Honduras | 55 | | 130 | Honduras |
| 10/18/2023 | RGV | San Salvador, El Salvador | 55 | | 128 | El Salvador |
| 10/17/2023 | RGV | San Pedro, Sula Honduras | 54 | | 133 | Honduras |
| 10/16/2023 | RGV | Guatemala, City Guatemala | 50 | | 118 | Guatemala |
| 10/13/2023 | RGV | Guatemala, City Guatemala | 55 | | 127 | Guatemala |
| 10/12/2023 | RGV | Guatemala, City Guatemala | 49 | | 122 | Guatemala |
| 10/11/2023 | RGV | Guatemala, City Guatemala | 56 | | 132 | Guatemala |
| 10/11/2023 | RGV | San Pedro, Sula Honduras | 54 | | 135 | Honduras |
| 10/10/2023 | RGV | Guatemala, City Guatemala | 54 | | 122 | Guatemala |
| 10/9/2023 | RGV | Guatemala, City Guatemala | 55 | | 131 | Guatemala |
| 10/6/2023 | RGV | Guatemala, City Guatemala | 50 | | 124 | Guatemala |
| 10/5/2023 | RGV | Guatemala, City Guatemala | 52 | | 134 | Guatemala |
| 10/3/2023 | RGV | Guatemala, City Guatemala | 54 | | 130 | Guatemala |
| 9/29/2023 | RGV | San Pedro Sula, Honduras | 52 | | 127 | Honduras |
| 9/29/2023 | RGV | Guatemala City, Guatemala | 50 | | 120 | Guatemala |

STB_AR1_001565

| 9/28/2023 | RGV | Guatemala City, Guatemala | 55 | 135 | Guatemala |
| 9/27/2023 | RGV | San Pedro Sula, Honduras | 54 | 124 | Honduras |
| 9/26/2023 | RGV | Guatemala City, Guatemala | 47 | 117 | Guatemala |
| 9/22/2023 | RGV | San Pedro Sula, Honduras | 58 | 135 | Honduras |
| 9/22/2023 | RGV | Guatemala City, Guatemala | 55 | 129 | Guatemala |
| 9/21/2023 | RGV | Guatemala City, Guatemala | 53 | 135 | Guatemala |
| 9/20/2023 | RGV | San Pedro Sula, Honduras | 52 | 124 | Honduras |
| 9/19/2023 | RGV | Guatemala City, Guatemala | 51 | 131 | Guatemala |
| 9/14/2023 | RGV | San Pedro Sula, Honduras | 55 | 134 | Honduras |
| 9/14/2023 | RGV | Guatemala City, Guatemala | 57 | 129 | Guatemala |
| 9/13/2023 | RGV | San Pedro Sula, Honduras | 47 | 114 | Honduras |
| 9/13/2023 | RGV | Guatemala City, Guatemala | 52 | 134 | Guatemala |
| 9/12/2023 | RGV | Guatemala City, Guatemala | 54 | 130 | Guatemala |
| 9/8/2023 | RGV | San Pedro Sula, Honduras | 53 | 124 | Honduras |
| 9/8/2023 | RGV | Guatemala City, Guatemala | 56 | 133 | Guatemala |
| 9/7/2023 | RGV | Guatemala City, Guatemala | 55 | 130 | Guatemala |
| 9/6/2023 | RGV | San Pedro Sula, Honduras | 58 | 133 | Honduras |
| 9/6/2023 | YUM | Guatemala City, Guatemala | 36 | 83 | Guatemala |
| 9/6/2023 | RGV | Guatemala City, Guatemala | 47 | 120 | Guatemala |
| 9/5/2023 | RGV | Guatemala City, Guatemala | 55 | 127 | Guatemala |
| 9/4/2023 | RGV | San Pedro Sula, Honduras | 33 | 77 | Honduras |
| 9/1/2023 | RGV | San Pedro Sula, Honduras | 58 | 134 | Honduras |
| 9/1/2023 | RGV | Guatemala City, Guatemala | 50 | 121 | Guatemala |

Source: OHSS analysis of ICE Air data downloaded from UIP Sept. 6, 2024.

STB_AR1_001566

STB_AR1_001567

STB_AR1_001568

STB_AR1_001569

STB_AR1_001570

STB_AR1_001571

STB_AR1_001572

STB_AR1_001573

STB_AR1_001574

STB_AR1_001575

STB_AR1_001576

STB_AR1_001577

STB_AR1_001578

STB_AR1_001579

STB_AR1_001580

STB_AR1_001581

STB_AR1_001582

STB_AR1_001583

STB_AR1_001584

STB_AR1_001585

STB_AR1_001586

STB_AR1_001587

total repatriations 6/5/24 - 8/31/24 for SA + FM encountered at SWB during that period

| Citizenship | Total | | Removal/Return Destination | Count |
|---|---|---|---|---|
| Mexico | 77,836 | | Mexico | 82,378 |
| Guatemala | 12,159 | | Guatemala | 10,607 |
| Honduras | 7,484 | | Honduras | 7,387 |
| Colombia | 4,951 | | Colombia | 4,921 |
| Ecuador | 4,673 | | Ecuador | 4,652 |
| El Salvador | 3,292 | | El Salvador | 3,263 |
| Nicaragua | 2,200 | | Nicaragua | 1,214 |
| Venezuela | 1,484 | | Peru | 1,007 |
| Peru | 1,020 | | Dominican Republic | 573 |
| Dominican Republic | 574 | | Canada | 505 |
| Brazil | 492 | | Brazil | 483 |
| India | 370 | | Uzbekistan | 167 |
| Cuba | 301 | | China | 161 |
| China | 203 | | Cuba | 157 |
| Uzbekistan | 168 | | Romania | 146 |
| Romania | 162 | | Jamaica | 118 |
| Jamaica | 122 | | India | 99 |
| Haiti | 110 | | Bolivia | 97 |
| Spain | 104 | | Russia | 75 |
| Bolivia | 99 | | Costa Rica | 73 |
| Russia | 93 | | Chile | 70 |
| Chile | 83 | | Mauritania | 63 |
| Costa Rica | 73 | | Haiti | 61 |
| Mauritania | 64 | | Georgia | 55 |
| Georgia | 57 | | Panama | 40 |
| Canada | 52 | | Spain | 38 |
| Turkey | 50 | | Turkey | 37 |
| United Kingdom | 48 | | Senegal | 36 |
| Bangladesh | 45 | | Belize | 33 |
| Italy | 38 | | Jordan | 33 |
| Senegal | 35 | | United Kingdom | 32 |
| Jordan | 34 | | Tajikistan | 28 |
| Panama | 33 | | Micronesia, Federated States | 26 |
| South Korea | 32 | | Nigeria | 26 |
| Belize | 32 | | Italy | 23 |
| Tajikistan | 29 | | Bahamas, the | 23 |
| Argentina | 28 | | Kyrgyzstan | 21 |
| Ireland | 25 | | Philippines | 21 |
| Micronesia, Federated States | 25 | | Argentina | 20 |
| Nigeria | 25 | | Ireland | 20 |
| France | 24 | | Marshall Islands | 17 |
| Philippines | 24 | | Venezuela | 17 |

STB_AR1_001588

| Country | Count | | Country | Count |
|---|---|---|---|---|
| Bahamas, The | 23 | | Egypt | 15 |
| Pakistan | 20 | | Morocco | 15 |
| Kyrgyzstan | 19 | | Pakistan | 15 |
| Congo, Democratic Republic | 17 | | Paraguay | 15 |
| Marshall Islands | 17 | | Poland | 15 |
| Portugal | 16 | | Portugal | 15 |
| Guinea | 16 | | Guinea | 13 |
| Morocco | 16 | | South Korea | 13 |
| Vietnam | 16 | | Guyana | 12 |
| Afghanistan | 15 | | Iraq | 12 |
| Egypt | 15 | | Kenya | 12 |
| Unknown | 14 | | Liberia | 11 |
| Germany | 14 | | Trinidad and Tobago | 11 |
| Kenya | 14 | | Bangladesh | 10 |
| Paraguay | 14 | | Congo, Democratic Republic | 10 |
| Guyana | 13 | | Angola | 9 |
| Poland | 13 | | France | 9 |
| Iraq | 12 | | Vietnam | 9 |
| Liberia | 11 | | Ghana | 8 |
| Angola | 11 | | Armenia | 7 |
| Trinidad and Tobago | 11 | | Cambodia | 7 |
| Ukraine | 11 | | Chad | 7 |
| Nepal | 10 | | Lebanon | 7 |
| Taiwan | 9 | | Mauritius | 7 |
| Netherlands | 9 | | Nepal | 7 |
| Ghana | 9 | | Netherlands | 7 |
| Israel | 8 | | Taiwan | 7 |
| Chad | 8 | | Ukraine | 7 |
| Sri Lanka | 8 | | Cocos Islands | 6 |
| Australia | 7 | | Ethiopia | 6 |
| Hungary | 7 | | Gabon | 6 |
| Armenia | 7 | | Guadeloupe | 6 |
| Ethiopia | 7 | | Hungary | 6 |
| Lebanon | 7 | | Kazakhstan | 6 |
| Somalia | 7 | | Qatar | 6 |
| Cambodia | 6 | | Thailand | 6 |
| Thailand | 6 | | Albania | 5 |
| Syria | 5 | | Benin | 5 |
| Albania | 5 | | Burkina Faso | 5 |
| Benin | 5 | | Cameroon | 5 |
| Burkina Faso | 5 | | Indonesia | 5 |
| Cameroon | 5 | | Israel | 5 |
| Indonesia | 5 | | South Africa | 5 |
| Iran | 5 | | Uruguay | 5 |
| South Africa | 5 | | Afghanistan | 4 |

STB_AR1_001589

| | |
|---|---|
| Uruguay | 5 |
| Austria | 4 |
| Belgium | 4 |
| Greece | 4 |
| Sweden | 4 |
| Algeria | 4 |
| Cape Verde | 4 |
| Gabon | 4 |
| Kazakhstan | 4 |
| Moldova | 4 |
| KOSOVO | 4 |
| Saudi Arabia | 3 |
| Antigua-Barbuda | 3 |
| Korea | 3 |
| Latvia | 3 |
| Niger | 3 |
| Uganda | 3 |
| Zimbabwe | 3 |
| Switzerland | 2 |
| Japan | 2 |
| Mongolia | 2 |
| Norway | 2 |
| Azerbaijan | 2 |
| Belarus | 2 |
| Czech Republic | 2 |
| Estonia | 2 |
| Lithuania | 2 |
| Palau | 2 |
| Samoa | 2 |
| St. Lucia | 2 |
| Suriname | 2 |
| Tanzania | 2 |
| Togo | 2 |
| Ivory Coast | 2 |
| North Macedonia | 2 |
| Bosnia-Herzegovina | 1 |
| Botswana | 1 |
| Burundi | 1 |
| Central African Republic | 1 |
| Congo, Republic | 1 |
| Dominica | 1 |
| Finland | 1 |
| Guadeloupe | 1 |
| Malaysia | 1 |
| Mali | 1 |

| | |
|---|---|
| Australia | 4 |
| Belgium | 4 |
| Cape Verde | 4 |
| Congo | 4 |
| Dominica | 4 |
| Germany | 4 |
| Japan | 4 |
| Latvia | 4 |
| Moldova | 4 |
| Somalia | 4 |
| Sri Lanka | 4 |
| Algeria | 3 |
| Antigua-Barbuda | 3 |
| Austria | 3 |
| Botswana | 3 |
| East Timor | 3 |
| Greece | 3 |
| Iran | 3 |
| Saba | 3 |
| Sweden | 3 |
| Syria | 3 |
| Tanzania | 3 |
| Uganda | 3 |
| Zimbabwe | 3 |
| Belarus | 2 |
| Czech Republic | 2 |
| Kosovo | 2 |
| Lithuania | 2 |
| Niger | 2 |
| Palau | 2 |
| Samoa | 2 |
| Saudi Arabia | 2 |
| St. Lucia | 2 |
| Suriname | 2 |
| Togo | 2 |
| Azerbaijan | 1 |
| Bosnia-Herzegovina | 1 |
| Burundi | 1 |
| Central African Republic | 1 |
| Christmas Island | 1 |
| Curacao | 1 |
| Estonia | 1 |
| Holy See | 1 |
| Iceland | 1 |
| Ivory Coast | 1 |

STB_AR1_001590

| | |
|---|---|
| New Zealand | 1 |
| St. Kitts-Nevis | 1 |
| Tonga | 1 |
| Tunisia | 1 |
| Montenegro | 1 |
| Serbia | 1 |
| Slovakia | 1 |
| Total | 119,353 |

| | |
|---|---|
| Macau | 1 |
| Malaysia | 1 |
| Mali | 1 |
| Mongolia | 1 |
| New Zealand | 1 |
| North Macedonia | 1 |
| Norway | 1 |
| Oman | 1 |
| Serbia | 1 |
| Slovakia | 1 |
| St. Kitts-Nevis | 1 |
| Sudan | 1 |
| Tonga | 1 |
| Other/Unknown | 18 |
| **Grand Total** | **119,353** |

Source: OHSS analysis of CBP data downloaded from UIP Sept. 3, 2024 and  ICE Air data downloaded from UIP Sept. 6, 2024.

STB_AR1_001591

CBP SWB Encounters of Haitian Nationals by Component, FY 2013 - FY 2024 YTD (July 31)

| FY | OFO | USBP | Total |
|---|---|---|---|
| 2013 | 930 | - | 930 |
| 2014 | 490 | - | 490 |
| 2015 | 340 | - | 340 |
| 2016 | 6,420 | - | 6,430 |
| 2017 | 9,210 | 60 | 9,260 |
| 2018 | 300 | 10 | 310 |
| 2019 | 1,020 | 2,050 | 3,070 |
| 2020 | 140 | 4,400 | 4,540 |
| 2021 | 1,720 | 45,530 | 47,260 |
| 2022 | 24,910 | 29,000 | 53,910 |
| 2023 | 75,020 | 1,110 | 76,130 |
| 2024 | 77,780 | 1,890 | 79,670 |

Note: Data are rounded to the nearest tens place to protect privacy.
Source: OHSS July 2024 Persist.

STB_AR1_001592

**Final or Most Current Outcomes, Total SW Border Encounters by Fear Claims: Fiscal Years 2013 - 2024 YTD (April 2024)**

| MOST CURRENT OUTCOMES | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total 10/1/2019-3/19/2020 | 3/20/2020-9/30/2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total encounters[1] | 436,363 | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 200,942 | 215,543 | 1,578,628 | 2,187,156 |
| T42 encounters | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 193,311 | 1,057,230 | 1,077,302 |
| T8 encounters | 436,363 | 471,989 | 359,453 | 438,908 | 336,791 | 439,776 | 878,156 | 200,942 | 22,232 | 521,398 | 1,109,854 |
| Placed in ER (CBP ER dispositions) | 229,838 | 228,049 | 180,592 | 227,911 | 160,305 | 214,667 | 223,200 | 86,382 | 5,337 | 84,687 | 119,665 |
| No fear claim[2] | 190,978 | 173,876 | 130,792 | 130,354 | 89,010 | 114,463 | 121,633 | 63,563 | 2,644 | 14,421 | 36,367 |
| No Fear Claim - confirmed removal or return | 183,475 | 166,016 | 129,815 | 127,887 | 86,647 | 110,074 | 118,752 | 61,162 | 2,561 | 10,980 | 28,322 |
| Reprocessed[3] | 2,795 | 5,285 | 3,209 | 4,366 | 2,264 | 4,464 | 3,426 | 1,476 | 162 | 18,608 | 26,469 |
| APSO fear claims[4] | 36,065 | 48,888 | 46,591 | 93,191 | 69,031 | 95,740 | 98,141 | 21,343 | 2,531 | 51,658 | 56,829 |
| APSO fear claims with ER removal orders[5] | 4,115 | 11,168 | 9,629 | 12,791 | 10,149 | 13,284 | 20,011 | 10,692 | 543 | 12,177 | 19,214 |
| Negative Fear not Appealed to EOIR | 258 | 1,848 | 1,275 | 1,789 | 1,428 | 2,366 | 3,372 | 2,576 | 47 | 437 | 1,050 |
| Negative Fear appealed to EOIR and Affirmed | 2,161 | 6,009 | 5,025 | 5,629 | 4,447 | 5,460 | 10,421 | 6,180 | 391 | 9,289 | 12,017 |
| Admin Closure not Resulting in 240 Proceedings | 1,696 | 3,311 | 3,329 | 5,373 | 4,274 | 5,458 | 6,218 | 1,936 | 105 | 2,451 | 6,147 |
| ER Removal orders with Confirmed Departures | 3,645 | 9,755 | 8,482 | 11,244 | 9,289 | 11,604 | 18,408 | 8,384 | 391 | 6,294 | 8,688 |
| Referred to EOIR[6] | 31,950 | 37,720 | 36,962 | 80,400 | 58,882 | 82,456 | 78,130 | 10,651 | 1,988 | 39,481 | 37,615 |
| Positive Fear | 30,868 | 35,048 | 33,968 | 73,871 | 53,664 | 74,436 | 70,876 | 6,984 | 1,480 | 33,723 | 28,388 |
| Negative Fear Vacated by EOIR | 228 | 1,275 | 1,233 | 1,999 | 1,451 | 1,272 | 3,862 | 2,713 | 445 | 3,527 | 4,792 |
| Admin Closure Resulting in 240 Proceedings | 854 | 1,397 | 1,761 | 4,530 | 3,767 | 6,748 | 3,392 | 954 | 63 | 2,231 | 4,435 |
| EOIR Results | | | | | | | | | | | |
| EOIR case started | 31,690 | 37,369 | 36,678 | 78,901 | 57,289 | 78,050 | 72,525 | 10,150 | 1,861 | 34,346 | 31,663 |
| EOIR case not started | 260 | 351 | 284 | 1,499 | 1,593 | 4,406 | 5,605 | 501 | 127 | 5,135 | 5,952 |
| Still in EOIR proceedings[7] | 5,126 | 6,197 | 6,120 | 14,002 | 12,305 | 18,992 | 21,363 | 4,439 | 873 | 21,054 | 22,052 |
| Active Pending | 3,304 | 4,572 | 4,900 | 11,645 | 10,624 | 17,520 | 20,376 | 4,295 | 839 | 20,533 | 21,844 |
| Inactive Pending only | 1,822 | 1,625 | 1,220 | 2,357 | 1,681 | 1,472 | 987 | 144 | 34 | 521 | 208 |
| EOIR case completion[8] | 26,564 | 31,172 | 30,558 | 64,899 | 44,984 | 59,058 | 51,162 | 5,711 | 988 | 13,292 | 9,611 |
| Relief[9] | 6,956 | 6,688 | 6,750 | 11,546 | 7,318 | 9,470 | 7,897 | 1,422 | 246 | 1,865 | 1,243 |
| Relief on merits[10] | 3,766 | 5,256 | 6,175 | 10,421 | 6,630 | 8,802 | 7,360 | 1,299 | 233 | 1,729 | 1,122 |
| Relief not on merits[11] | 3,190 | 1,432 | 575 | 1,125 | 688 | 668 | 537 | 123 | 13 | 136 | 121 |
| Removal Order + VD[12] | 14,637 | 17,702 | 16,972 | 36,489 | 23,415 | 29,558 | 22,996 | 2,096 | 248 | 5,460 | 6,513 |
| Absentia | 7,753 | 7,339 | 5,645 | 13,440 | 9,649 | 14,461 | 7,448 | 620 | 78 | 3,569 | 4,379 |
| Confirmed departure | 1,076 | 898 | 594 | 1,147 | 782 | 797 | 430 | 44 | 9 | 116 | 168 |
| No confirmed departure | 6,677 | 6,441 | 5,051 | 12,293 | 8,867 | 13,664 | 7,018 | 576 | 69 | 3,453 | 4,211 |
| Not absentia | 6,884 | 10,363 | 11,327 | 23,049 | 13,766 | 15,097 | 15,548 | 1,476 | 170 | 1,891 | 2,134 |
| Confirmed departure | 3,460 | 5,074 | 4,759 | 6,776 | 5,710 | 6,903 | 10,673 | 705 | 59 | 395 | 872 |
| No confirmed departure | 3,424 | 5,289 | 6,568 | 16,273 | 8,056 | 8,194 | 4,875 | 771 | 111 | 1,496 | 1,262 |
| Termination/Dismissal/closure/other[13] | 4,971 | 6,782 | 6,836 | 16,864 | 14,251 | 20,030 | 20,269 | 2,193 | 494 | 5,967 | 1,855 |
| Percent claiming fear | 16% | 21% | 26% | 41% | 43% | 45% | 44% | 25% | 47% | 61% | 47% |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Percent of negative fear appealed to EOIR | 90% | 80% | 83% | 81% | 81% | 74% | 81% | 78% | 95% | 97% | 94% |
| Percent of negative fear appeals vacated | 9% | 14% | 16% | 21% | 20% | 14% | 22% | 24% | 50% | 27% | 27% |
| USCIS Screen-in rate14 | 92% | 79% | 82% | 89% | 88% | 89% | 80% | 38% | 63% | 72% | 61% |
| USCIS Admin Close rate | 7% | 10% | 11% | 11% | 12% | 13% | 10% | 14% | 7% | 9% | 19% |
| Comprehensive screen-in rate15 | 89% | 77% | 79% | 86% | 85% | 86% | 80% | 50% | 79% | 76% | 66% |
| Total Percent of ER referred to 240 | 14% | 17% | 20% | 35% | 37% | 38% | 35% | 12% | 37% | 47% | 31% |
| ER removal orders as share of processed for ER | 85% | 81% | 78% | 63% | 62% | 60% | 63% | 86% | 60% | 31% | 46% |
| Percent ER removal orders executed | 96% | 95% | 98% | 97% | 97% | 95% | 97% | 94% | 93% | 65% | 67% |
| EOIR comprehensive relief rate | 26% | 21% | 22% | 18% | 16% | 16% | 15% | 25% | 25% | 14% | 13% |
| EOIR relief on merits rate | 35% | 34% | 35% | 31% | 33% | 37% | 32% | 47% | 58% | 48% | 34% |
| All forms of relief as share of relief + non absentia removals | | | | | | | | | | | |
| **Median Processing Times (days)** | | | | | | | | | | | |
| Encounter to Removal (no fear cases) | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Encounter to CF Referral | 23 | 19 | 17 | 10 | 8 | 9 | 15 | 7 | 6 | 14 | 12 |
| CF Referral to CIS Determination | 8 | 7 | 7 | 7 | 7 | 8 | 12 | 10 | 10 | 21 | 20 |
| Negative Determination to EOIR CFR Decision | 19 | 15 | 15 | 13 | 14 | 15 | 16 | 12 | 10 | 13 | 10 |
| Comprehensive Negative Determination to Removal | 25 | 25 | 21 | 21 | 20 | 21 | 27 | 14 | 29 | 42 | 33 |
| Encounter to Removal (Negative Determinations only) | 80 | 70 | 63 | 72 | 68 | 64 | 91 | 47 | 69 | 102 | 75 |

[1] Includes SW Border encounters by USBP and OFO. Excludes Unaccompanied Children (UC), Accompanied Minors (AM), OFO administrative encounters, and parolees released into the United States with Notice to Appear and a CBP One confirmation number, none of

[2] No fear claim in CBP custody and no associated record of a fear claim in USCIS Asylum Pre-Screening Officer (APSO) data.

[3] Fear claim in CBP custody and no associated record of a fear claim in USCIS APSO data. Includes cases reprocessed by ICE into other dispositions.

[4] Individuals placed in ER and found to have a Credible Fear (CF) case in USCIS APSO system.

[5] Negative CF interviews not appealed to Executive Office for Immigration Review (EOIR), negative CF interviews affirmed by EOIR, and case closures not referred to EOIR. Cases result in final ER removal orders.

[6] USCIS positive fear determinations, negative fear determinations vacated by EOIR, and case closures referred to EOIR.

[7] Cases with no EOIR completion code or completion codes indicating change of venue, transfer, fear vacated, zero bond, BIA appeal, decision rescinded, administrative closure, or other administrative completions.

[8] Cases with the EOIR completion codes indicating an IJ decision or other completion codes indicating termination and dismissal.

[9] Completion codes for conditional grants of asylum, grants of asylum, adjustment of status under various statutory provisions,  asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-remov

[10] Includes completion  codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[11] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.

[12] Completion codes for removal order, grant of voluntary departure, withdrawal of far claim, abandonment, and denial.

[13] Completion codes for termination, dismissal, administrative closure, failure to prosecute, and other administrative completions.

[14] USCIS screen-in rate includes positive fear cases as a share of positive fear + negative fear.

[15] Comprehensive screen-in-rate includes negative fear cases vacated by EOIR and admin closures issued NTAs.

Notes: Results based on OHSS Enforcement Lifecycle methodology as of June 30, 2024. Add data are reported by year of encounter based on most current available outcome data.

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle data as of June 30, 2024.

STB_AR1_001594

| 10/1/2022-5/11/2023 | 5/12/2023-9/30/2023 | 10/1/2023-6/4/2024 | 6/5/2024-6/30/2024 | 2014-2019 | FY 2014 - March 2020 | FY 2013 - June 2024 |
|---|---|---|---|---|---|---|
| 1,370,994 | 680,380 | 1,274,596 | 66,124 | 2,925,073 | 3,126,015 | 10,869,675 |
| 562,980 | 0 | 0 | 0 | 0 | 0 | 2,890,823 |
| 808,014 | 680,380 | 1,274,596 | 66,124 | 2,925,073 | 3,126,015 | 7,978,852 |
| 85,645 | 121,546 | 238,258 | 2,966 | 1,234,724 | 1,321,106 | 2,206,082 |
| 20,642 | 40,634 | 106,754 | 1,521 | 760,128 | 823,691 | 1,236,131 |
| 17,800 | 36,570 | 100,137 | 1,345 | 739,191 | 800,353 | 1,180,198 |
| 7,475 | 1,722 | 4,279 | 575 | 23,014 | 24,490 | 86,000 |
| 57,528 | 79,190 | 127,225 | 870 | 451,582 | 472,925 | 883,951 |
| 14,061 | 27,406 | 48,809 | 446 | 77,032 | 87,724 | 214,049 |
| 1,696 | 6,064 | 12,288 | 13 | 12,078 | 14,654 | 36,494 |
| 10,276 | 17,714 | 29,381 | 41 | 36,991 | 43,171 | 124,400 |
| 2,089 | 3,628 | 7,140 | 392 | 27,963 | 29,899 | 53,155 |
| 10,798 | 22,469 | 29,924 | 5 | 68,782 | 77,166 | 159,375 |
| 43,467 | 51,784 | 78,416 | 424 | 374,550 | 385,201 | 669,902 |
| 39,018 | 42,277 | 58,108 | 95 | 341,863 | 348,847 | 582,709 |
| 2,295 | 4,331 | 8,350 | 4 | 11,092 | 13,805 | 37,773 |
| 2,154 | 5,176 | 11,958 | 325 | 21,595 | 22,549 | 49,420 |
| | | | | 0 | 0 | 0 |
| 38,129 | 49,702 | 76,194 | 380 | 360,812 | 370,962 | 634,547 |
| 5,338 | 2,082 | 2,222 | 44 | 13,738 | 14,239 | 35,355 |
| 29,452 | 40,514 | 71,298 | 380 | 78,979 | 83,418 | 273,787 |
| 29,324 | 40,454 | 71,256 | 380 | 69,637 | 73,932 | 261,486 |
| 128 | 60 | 42 | 0 | 9,342 | 9,486 | 12,301 |
| 8,677 | 9,188 | 4,896 | 0% | 281,833 | 287,544 | 360,760 |
| 542 | 353 | 188 | 0 | 49,669 | 51,091 | 62,484 |
| 429 | 219 | 116 | 0 | 44,644 | 45,943 | 53,557 |
| 113 | 134 | 72 | 0 | 5,025 | 5,148 | 8,927 |
| 5,830 | 4,528 | 2,645 | 0 | 147,132 | 149,228 | 189,089 |
| 3,886 | 2,514 | 957 | 0 | 57,982 | 58,602 | 81,738 |
| 95 | 46 | 23 | 0 | 4,648 | 4,692 | 6,225 |
| 3,791 | 2,468 | 934 | 0 | 53,334 | 53,910 | 75,513 |
| 1,944 | 2,014 | 1,688 | 0% | 89,150 | 90,626 | 107,351 |
| 1,189 | 1,202 | 889 | 0 | 39,895 | 40,600 | 48,666 |
| 755 | 812 | 799 | 0 | 49,255 | 50,026 | 58,685 |
| 2,305 | 4,307 | 2,063 | 0 | 85,032 | 87,225 | 109,187 |
| | | | | | | |
| 67% | 65% | 53% | 29% | 37% | 36% | 40% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 88% | 78% | 75% | 78% | | | |
| 16% | 15% | 17% | 7% | | | |
| 73% | 60% | 54% | 62% | 76% | 74% | 66% |
| 7% | 11% | 15% | 82% | | | |
| 76% | 65% | 62% | 49% | **83%** | 81% | 76% |
| 51% | 43% | 33% | 14% | | | |
| 41% | 56% | 65% | 66% | | | |
| 82% | 87% | 84% | 69% | | | |
| 6% | 4% | 4% | | 18% | 18% | 17% |
| 18% | 10% | 6% | | 33% | 34% | 33% |
| | | | | 36% | 36% | 37% 2014-2019 Total Relief Rate |
| | | | | | | 0.36791 |
| 1 | 5 | 5 | 1 | | | |
| 8 | 6 | 5 | 4 | | | |
| 13 | 10 | 14 | 8 | | | |
| 6 | 4 | 4 | 4 | | | |
| 34 | 23 | 18 | 1 | | | |
| 61 | 48 | 41 | 20 | | | |

whom are amenable to expedited removal.

%

vability, and cancellation of removal.

STB_AR1_001596

**Nationwide**
**Credible Fear Claims: 2000-2023**

| Year | Encounter | SWB CBP Encounters | SWB USBP Encounters | SWB T8 encounters | SWB USBP Process for ER | Total APSO Global Credible Fear Claims[1] | Lifecycle Data SWB Credible Fear Claims[2] | Estimated Southwest Border Credible Fear Claims[3] | Percent ER Fear Claims | Percent Encounters fear claims | Daily SWB Credible fear claims |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 1,590,196 | 1,566,325 | | 1,566,325 | | 10,284 | - | NA | | | NA |
| 2001 | 1,255,843 | 1,231,359 | | 1,231,359 | | 13,241 | - | NA | | | NA |
| 2002 | 953,629 | 930,293 | | 930,293 | | 10,204 | - | NA | | | NA |
| 2003 | 931,844 | 906,694 | | 906,694 | | 6,480 | - | NA | | | NA |
| 2004 | 1,330,801 | 1,211,633 | | | | 8,230 | - | NA | | | NA |
| 2005 | 1,440,160 | 1,269,176 | 1,171,391 | 1,269,176 | 36,576 | 9,696 | | 8,190 | 84% | 1% | 22 |
| 2006 | 1,296,708 | 1,168,340 | 1,071,976 | 1,168,340 | 58,398 | 5,660 | - | 4,781 | 84% | 0% | 13 |
| 2007 | 1,078,811 | 954,907 | 858,736 | 954,907 | 59,475 | 5,770 | - | 4,873 | 84% | 1% | 13 |
| 2008 | 946,642 | 792,535 | 705,049 | 792,535 | 77,031 | 5,753 | - | 4,859 | 84% | 1% | 13 |
| 2009 | 779,816 | 619,010 | 540,851 | 619,010 | 73,110 | 6,617 | - | 5,589 | 84% | 1% | 15 |
| 2010 | 692,904 | 527,372 | 447,731 | 527,372 | 80,774 | 11,030 | - | 9,316 | 84% | 2% | 26 |
| 2011 | 553,597 | 401,073 | 327,577 | 401,073 | 93,967 | 14,405 | - | 12,167 | 84% | 3% | 33 |
| 2012 | 560,572 | 426,125 | 356,873 | 426,125 | 148,909 | 18,629 | | 15,735 | 84% | 4% | 43 |
| 2013 | 626,412 | 489,612 | 414,397 | 489,612 | 202,109 | 43,231 | 36,076 | | 83.4% | 7% | 99 |
| 2014 | 711,667 | 570,048 | 479,370 | 570,048 | 198,021 | 59,186 | 48,927 | | 82.7% | 9% | 134 |
| 2015 | 591,831 | 444,856 | 331,333 | 444,856 | 147,607 | 55,411 | 46,610 | | 84.1% | 10% | 128 |
| 2016 | 690,433 | 558,991 | 408,870 | 558,991 | 185,726 | 102,973 | 93,212 | | 90.5% | 17% | 255 |
| 2017 | 526,807 | 415,199 | 303,916 | 415,199 | 123,778 | 88,448 | 69,042 | | 78.1% | 17% | 189 |
| 2018 | 626,035 | 519,944 | 396,579 | 519,944 | 170,469 | 109,896 | 95,775 | | 87.2% | 18% | 262 |
| 2019 | 1,084,644 | 977,229 | 851,508 | 977,229 | 184,948 | 118,387 | 98,157 | | 82.9% | 10% | 269 |
| 2020 | 561,718 | 458,066 | 400,635 | 253,292 | 75,976 | 39,524 | 23,886 | | 60.4% | 5% | 65 |
| 2021 | 1,828,981 | 1,734,069 | 1,659,222 | 671,159 | 82,183 | 64,244 | 51,664 | | 80.4% | 3% | 142 |
| 2022 | 2,617,845 | 2,378,945 | 2,206,437 | 1,299,438 | 110,858 | 75,264 | 56,831 | | 75.5% | 2% | 156 |
| 2023 | 2,752,822 | 2,475,668 | 2,045,837 | 1,911,288 | 190,721 | 160,868 | 136,724 | | 85.0% | 6% | 375 |
| 2024 | 2,427,598 | 1,821,649 | 1,362,256 | 1,821,649 | 224,155 | 160,636 | 128,101 | | 80.8% | | 351 |
| 2013-2019[4] | | | | | | 577,532 | 487,799 | | 84% | | |

| | |
|---|---|
| 2023 SWB ERCF | 136,724 |
| 2010-2019 SWB ERCF | 52,502 |
| 2005-2009 SWB ERCF | 5,658 |

[1] Prior to 2000, Asylum Pre-Screening Officer (APSO) asylum data is unavailable while EOIR defensive asylum data is unreliable. APSO Global data is not limited to Southwest Border.

[2] OHSS analysis of June 2024 Lifecycle data.

[3] Estimated Southwest Border Credible Fear Claims based on the proportion of Lifecycle Data [Southwest Border] Credible Fear Claims to APSO Global Credible Fear Claims

Sources: OHSS analysis of APSO Global data as of June 30, 2024 and OHSS Persist Data current as of June 30, 2024.

STB_AR1_001597

Encounter Processing Details: June 5, 2024 - August 31, 2024

| Reportable field | Total | Mexico | NCA* | CHNV* | CDEP* | Other* | SA** | FM** | UC** | FM+SA | Daily averages | Daily FM+SA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBP One encounters[1] | 123,552 | | | | | | | | | | 1,404 | - | |
| Other OFO encounters[1] | 13,722 | | | | | | | | | | 156 | - | 123,600 |
| USBP Encounters[2] | 183,712 | 75,980 | 43,379 | 4,977 | 29,017 | 30,359 | 111,608 | 54,316 | 17,788 | 165,924 | 2,088 | 1,886 | |
| Section 2c encounters | 168,673 | 74,255 | 32,044 | 4,520 | 28,005 | 29,849 | 108,825 | 54,240 | 5,608 | 163,065 | 1,917 | 1,853 | |
| *SWB USBP Encounters - Single Adults and Family Unit Individuals Only* | | | | | | | | | | | | | |
| SWB USBP Encounters | 165,040 | 70,209 | 32,559 | 4,401 | 27,966 | 29,905 | 110,775 | 54,265 | | 165,040 | 1,875 | 1,880 | |
| VR | 3,513 | 3,134 | 6 | 373 | 0 | 0 | 2,646 | 867 | | 3,513 | 40 | 0.021286 | |
| Reinstatement | 22,518 | 16,949 | 4,886 | 158 | 427 | 98 | 21,362 | 1,156 | | 22,518 | 256 | 0.13644 | |
| Placed in ER - total | 96,752 | 43,829 | 21,292 | 2,653 | 16,786 | 12,192 | 70,474 | 26,278 | | 96,752 | 1,099 | | |
| Placed in ER - not subject to IFR | 3,522 | 675 | 784 | 38 | 932 | 1,093 | 2,141 | 1,381 | | 3,522 | 40 | | |
| Placed in ER - subject to IFR | 93,230 | 43,154 | 20,508 | 2,615 | 15,854 | 11,099 | 68,333 | 24,897 | | 93,230 | 1,059 | | 27% |
| Fear Mainfested - total | 26,559 | 3,544 | 5,161 | 494 | 10,610 | 6,750 | 19,759 | 6,800 | | 26,559 | 302 | | 51% |
| Fear Manifested - not subject to IFR | 3,522 | 675 | 784 | 38 | 932 | 1,093 | 2,141 | 1,381 | | 3,522 | | | |
| Fear Manifested - subject to IFR | 23,037 | 2,869 | 4,377 | 456 | 9,678 | 5,657 | 17,618 | 5,419 | | 23,037 | 262 | | |
| USCIS CFI results | 19,926 | 2,520 | 3,894 | 423 | 8,673 | 4,416 | 15,512 | 4,414 | | 19,926 | 226 | | 57% |
| USCIS positive | 10,257 | 1,064 | 1,465 | 215 | 4,686 | 2,827 | 8,151 | 2,106 | | 10,257 | 117 | | |
| USCIS negative | 9,479 | 1,396 | 2,373 | 203 | 3,935 | 1,572 | 7,272 | 2,207 | | 9,479 | 108 | | |
| USCIS admin closed | 190 | 60 | 56 | 5 | 52 | 17 | 89 | 101 | | 190 | 2 | | |
| Comprehensive fear results | 19,926 | 2,520 | 3,894 | 423 | 8,673 | 4,416 | 15,512 | 4,414 | | 19,926 | 226 | | |
| Referred to EOIR | 11,279 | 1,181 | 1,616 | 251 | 5,139 | 3,092 | 9,022 | 2,257 | | 11,279 | 128 | | |
| Removal Order | 8,647 | 1,339 | 2,278 | 172 | 3,534 | 1,324 | 6,490 | 2,157 | | 8,647 | 98 | | |
| NTA (excludes positive fear release NTA) | 41,254 | 5,894 | 6,160 | 1,086 | 10,647 | 17,467 | 15,394 | 25,860 | | 41,254 | 469 | | |
| Other | 1,003 | 403 | 215 | 131 | 106 | 148 | 899 | 104 | | 1,003 | 11 | | |
| ERCF Processing timelines | | | | | | | | | | | | | |
| Encounter to Referral | 10 | 2 | 7 | 11 | 11 | 16 | 13 | 2 | | | | | |
| Referral to Result | 5 | 3 | 4 | 5 | 6 | 8 | 6 | 3 | | | | | |
| Encounter to Removal: no fear | 6 | 2 | 8 | 3 | 14 | 38 | 7 | 5 | | | | | |
| Encounter to Removal: negative fear | 32 | 10 | 31 | 18 | 38 | 50 | 39 | 13 | | | | | |
| CBP Book-outs[3] | 161,658 | 69,019 | 31,409 | 4,352 | 27,436 | 29,442 | 108,286 | 53,372 | | 161,658 | 1,837 | | |
| Repatriation | 51,058 | 47,110 | 1,592 | 2,335 | 21 | 0 | 36,145 | 14,913 | | 51,058 | 580 | | |
| Release[5] | 50,871 | 8,487 | 9,133 | 1,357 | 13,693 | 18,201 | 17,547 | 33,324 | | 50,871 | 578 | | 580 |
| TOT ERO | 52,623 | 9,048 | 18,259 | 589 | 13,577 | 11,150 | 48,093 | 4,530 | | 52,623 | 598 | | |
| TOT Other | 6,856 | 4,245 | 2,351 | 62 | 125 | 73 | 6,279 | 577 | | 6,856 | 78 | | |
| Other | 250 | 129 | 74 | 9 | 20 | 18 | 222 | 28 | | 250 | 3 | | |
| Total Enforcement Repatriations[5] | 165,524 | 79,287 | 23,146 | 4,525 | 12,102 | 46,464 | 132,305 | 30,233 | 2,619 | 162,538 | 1,847 | | |
| Repatriations resulting from SWB Encounters | 119,016 | 77,626 | 22,869 | 4,082 | 10,613 | 3,826 | 96,585 | 19,689 | 2,571 | 116,274 | 1,321 | 70% | 1,320 |
| Mexicans | 77,626 | 77,626 | 0 | 0 | 0 | 0 | 59,190 | 15,709 | 2,571 | 74,899 | 851 | | |
| OTMs | 41,390 | 0 | 22,869 | 4,082 | 10,613 | 3,826 | 37,395 | 3,980 | 0 | 41,375 | 470 | | |
| OTMs to Mexico | 4,364 | 0 | 1,647 | 2,404 | 43 | 270 | 3,238 | 1,111 | 0 | 4,349 | 49 | | |
| OTMs to home countries | 37,026 | 0 | 21,222 | 1,678 | 10,570 | 3,556 | 34,157 | 2,869 | 0 | 37,026 | 421 | | |

71%

* NCA includes nationals of Guatemala, Honduras, and El Salvador; CHNV includes nationals of Cuba, Haiti, Nicaragua, and Venezuela; CDEP includes nationals of Colombia, Dominican

** Single Adult (SA), Familiy Unit Inividuals (FM), Unaccompanied Children (UC).

[1] Southwest land border encounters; total includes Accompanied Minors (AM).

[2] Southwest land border plus New Orleans, Miami, and Ramey sectors.

[3] Bookout outcomes are reported by encounter date (not bookout date).

[4] Releases from CBP custody.  Includes enrollments in ATD.

[5] Nationwide DHS enforcement repatriations; excludes administrative returns. ERO repatriations are by departed date; CBP repatriations are by CBP encounter date.

Source: OHSS analysis of data pulled from CBP Unified Immigration Portal on September 3, 2024.

STB_AR1_001599

2%
14%
59%

1%

70%

STB_AR1_001600

**IFR Period: June 5, 2024 - August 31, 2024**

| USBP Expedited Removal Processing: Southwest Border | SWB - CBP total | SWB - CBP excluding non-IFR cases | SWB - USBP total | SWB - USBP excluding non-IFR cases |
|---|---|---|---|---|
| **SW Border Encounters** | **177,893** | **174,287** | **165,040** | **161,518** |
| **Processed for ER** | **100,199** | **96,593** | **96,752** | **93,230** |
| % Encounters processed for ER | 56% | 55% | 59% | 58% |
| Percent claiming fear | 27% | 24% | 27% | 25% |
| USCIS Screen-in Rate | 48% | 51% | 48% | 51% |
| Percent of negative fear appealed to EOIR | 61% | 61% | 61% | 61% |
| Percent of negative fear appeals vacated | 17% | 16% | 17% | 16% |
| Comprehensive screen-in rate | 62% | 57% | 62% | 57% |
| Total Percent of ER referred to 240 | 17% | 14% | 17% | 14% |
| ER removal orders as share of processed for ER | 83% | 84% | 82% | 84% |
| ER referrals pending | 3% | 3% | 3% | 3% |
| Percent of ER removal orders executed | 76% | 75% | 75% | 75% |
| Reprocessed with other dispositions | 1,437 | 1,206 | 1,423 | 1,193 |
| **Total ER Processed** | **100,199** | **96,593** | **96,752** | **93,230** |
| Credible fear referrals | 26,916 | 23,310 | 26,559 | 23,037 |
| CFIs conducted | 23,215 | 21,399 | 22,885 | 21,145 |
| **CFI results** | **21,980** | **20,164** | **21,666** | **19,926** |
| Positive fear finding | 10,556 | 10,373 | 10,426 | 10,257 |
| Negative fear finding | 9,717 | 9,595 | 9,588 | 9,479 |
| Appealed to IJ | 5,923 | 5,851 | 5,837 | 5,773 |
| Pending or blank order | 824 | 820 | 818 | 814 |
| Affirmed | 4,120 | 4,068 | 4,053 | 4,008 |
| Vacated | 979 | 963 | 966 | 951 |
| Not appealed to IJ | 3,794 | 3,744 | 3,751 | 3,706 |
| Admin closed | 1,707 | 196 | 1,652 | 190 |
| Admin closed with NTA | 229 | 72 | 228 | 71 |
| Admin closed without CFI | 1,788 | 0 | 1,780 | 0 |
| **Repatriations** | **61,579** | **61,206** | **58,691** | **58,340** |
| No fear claim ER removals | 57,369 | 57,369 | 54,559 | 54,559 |

STB_AR1_001601

| | | | | |
|---|---|---|---|---|
| Negative fear; no IJ review | 1,838 | 1,812 | 1,809 | 1,787 |
| Negative fear; IJ affirmed | 1,682 | 1,661 | 1,653 | 1,634 |
| ER withdrawn VRs | 7 | 3 | 7 | 3 |
| Other | 683 | 361 | 663 | 357 |
| **Total ER Processed in CBP Custody** | **64,915** | **63,297** | **61,906** | **60,290** |
| Credible fear referrals | 9,040 | 7,422 | 9,025 | 7,409 |
| CFIs conducted | 7,338 | 6,832 | 7,323 | 6,819 |
| **CFI results** | **6,800** | **6,294** | **6,786** | **6,282** |
| Positive fear finding | 3,133 | 3,105 | 3,126 | 3,098 |
| Negative fear finding | 3,070 | 3,048 | 3,066 | 3,044 |
| Appealed to IJ | 1,291 | 1,282 | 1,291 | 1,282 |
| Pending or blank order | 320 | 319 | 320 | 319 |
| Affirmed | 640 | 637 | 640 | 637 |
| Vacated | 331 | 326 | 331 | 326 |
| Not appealed to IJ | 1,779 | 1,766 | 1,775 | 1,762 |
| Admin closed | 597 | 141 | 594 | 140 |
| Admin closed with NTA | 224 | 71 | 223 | 70 |
| Admin closed without CFI | 1,110 | 0 | 1,110 | 0 |
| **Repatriations** | **48,638** | **48,492** | **45,844** | **45,700** |
| No fear claim ER removals | 47,080 | 47,080 | 44,293 | 44,293 |
| Negative fear; no IJ review | 915 | 906 | 911 | 902 |
| Negative fear; IJ affirmed | 344 | 341 | 344 | 341 |
| ER withdrawn VRs | 7 | 3 | 7 | 3 |
| Other | 292 | 162 | 289 | 161 |
| **Total ER Processed in ICE Custody** | **35,284** | **33,296** | **34,846** | **32,940** |
| Credible fear referrals | 17,876 | 15,888 | 17,534 | 15,628 |
| CFIs conducted | 15,877 | 14,567 | 15,562 | 14,326 |
| **CFI results** | **15,180** | **13,870** | **14,880** | **13,644** |
| Positive fear finding | 7,423 | 7,268 | 7,300 | 7,159 |
| Negative fear finding | 6,647 | 6,547 | 6,522 | 6,435 |
| Appealed to IJ | 4,632 | 4,569 | 4,546 | 4,491 |
| Pending or blank order | 504 | 501 | 498 | 495 |

STB_AR1_001602

| | | | | |
|---|--:|--:|--:|--:|
| Affirmed | 3,480 | 3,431 | 3,413 | 3,371 |
| Vacated | 648 | 637 | 635 | 625 |
| Not appealed to IJ | 2,015 | 1,978 | 1,976 | 1,944 |
| Admin closed | 1,110 | 55 | 1,058 | 50 |
| Admin closed with NTA | 5 | 1 | 5 | 1 |
| Admin closed without CFI | 678 | 0 | 670 | 0 |
| **Repatriations** | **12,941** | **12,714** | **12,847** | **12,640** |
| No fear claim ER removals | 10,289 | 10,289 | 10,266 | 10,266 |
| Negative fear; no IJ review | 923 | 906 | 898 | 885 |
| Negative fear; IJ affirmed | 1,338 | 1,320 | 1,309 | 1,293 |
| ER withdrawn VRs | 0 | 0 | 0 | 0 |
| Other | 391 | 199 | 374 | 196 |

Notes: All counts are based on month of encounter. Population is limited to single adults and family unit individuals encountered at the southwest land border, excluding OFO encounters of people with CBP One
Source: Office of Homeland Security Statistics analysis of UIP ER Daily Report Data Dashboard as of September 3, 2024.

STB_AR1_001603

| CBP daily avg | USBP daily avg | USBP Subject to Rule |
|---|---|---|
| 2,022 | 1,875 | |
| 1,139 | 1,099 | |

| | | |
|---|---|---|
| 306 | 302 | 262 |

| | |
|---|---|
| Vacaturs as share of negative fear: | 9% |
| Vacaturs as share of total CFIs: | 4% |

STB_AR1_001604

STB_AR1_001605

e appointments. Table includes encounters between June 4 and August 31, 2024.

STB_AR1_001606

| | 5/12/23 - 6/4/24 | | 6/5/24 - 7/31/24 | | |
|---|---|---|---|---|---|
| | UC | FM + SA | UC | FM + SA | |
| ICE repatriations during reporting period | 2,260 | 260,109 | 346 | 38,493 | |
| Subset that were encountered by OFO at SWB during the reporting period | 20 | 4,264 | 0 | 105 | 0% |
| Subset that were encountered by USBP at SWB during the reporting period | 178 | 173,323 | 6 | 15,369 | 40% |
| Subset that were encountered by OFO at SWB prior to the reporting period | 120 | 1,635 | 16 | 742 | 2% |
| Subset that were encountered by USBP at SWB prior to the reporting period | 1,926 | 24,403 | 321 | 14,163 | 37% |
| Non-SWB encounters and interior enforcement (arrests) | 16 | 56,484 | 3 | 8,114 | 21% |

| | 5/12/23 - 6/4/24 | | 6/5/24 - 7/31/24 | |
|---|---|---|---|---|
| | UC | FM + SA | UC | FM + SA |
| Total DHS repatriations during reporting period* | 17,089 | 778,930 | 1,829 | 84,840 |
| Subset that were encountered by OFO at SWB during the reporting period | 358 | 32,769 | 44 | 5,186 |
| Subset that were encountered by USBP at SWB during the reporting period | 14,410 | 453,653 | 1,408 | 26,089 |
| Subset that were encountered by OFO at SWB prior to the reporting period | 120 | 1,635 | 16 | 742 |
| Subset that were encountered by USBP at SWB prior to the reporting period | 1,923 | 23,905 | 321 | 14,026 |

*Exclude administrative returns and accompanied minors

Source: OHSS Persist as of July 31st, 2024.

| Date | USBP Encounters | Processed for ER* | CBP Releases |
|---|---|---|---|
| 6/5/2024 | 3,746 | 58 | 55 |
| 6/6/2024 | 3,519 | 416 | 457 |
| 6/7/2024 | 2,917 | 666 | 596 |
| 6/8/2024 | 3,376 | 738 | 1,046 |
| 6/9/2024 | 2,992 | 1,002 | 839 |
| 6/10/2024 | 2,839 | 1,487 | 1,343 |
| 6/11/2024 | 3,040 | 1,497 | 1,010 |
| 6/12/2024 | 2,788 | 1,366 | 1,324 |
| 6/13/2024 | 2,713 | 1,650 | 1,325 |
| 6/14/2024 | 2,794 | 1,245 | 1,061 |
| 6/15/2024 | 2,623 | 1,153 | 1,104 |
| 6/16/2024 | 2,208 | 751 | 934 |
| 6/17/2024 | 1,881 | 951 | 1,008 |
| 6/18/2024 | 2,373 | 1,342 | 651 |
| 6/19/2024 | 2,138 | 1,457 | 970 |
| 6/20/2024 | 2,401 | 1,108 | 669 |
| 6/21/2024 | 1,917 | 1267 | 817 |
| 6/22/2024 | 2,065 | 921 | 737 |
| 6/23/2024 | 1,778 | 952 | 916 |
| 6/24/2024 | 1,933 | 1099 | 831 |
| 6/25/2024 | 1,822 | 1139 | 812 |
| 6/26/2024 | 1,790 | 1177 | 546 |
| 6/27/2024 | 1,662 | 1208 | 794 |
| 6/28/2024 | 1,801 | 1220 | 487 |
| 6/29/2024 | 1,593 | 756 | 610 |
| 6/30/2024 | 1,822 | 595 | 557 |
| 7/1/2024 | 1,697 | 809 | 619 |
| 7/2/2024 | 1,763 | 865 | 509 |
| 7/3/2024 | 1,718 | 1193 | 656 |
| 7/4/2024 | 1,894 | 920 | 590 |
| 7/5/2024 | 1,600 | 1441 | 673 |
| 7/6/2024 | 1,752 | 668 | 649 |
| 7/7/2024 | 1,601 | 678 | 639 |
| 7/8/2024 | 1,647 | 671 | 510 |
| 7/9/2024 | 1,798 | 925 | 673 |
| 7/10/2024 | 1,781 | 1000 | 527 |
| 7/11/2024 | 1,528 | 1156 | 488 |
| 7/12/2024 | 1,575 | 1175 | 503 |
| 7/13/2024 | 1,690 | 621 | 529 |
| 7/14/2024 | 1,640 | 621 | 398 |
| 7/15/2024 | 1,558 | 832 | 394 |
| 7/16/2024 | 1,671 | 824 | 351 |

| | | | |
|---|---|---|---|
| 7/17/2024 | 1,554 | 998 | 463 |
| 7/18/2024 | 1,775 | 1188 | 392 |
| 7/19/2024 | 1,497 | 1089 | 337 |
| 7/20/2024 | 1,476 | 684 | 629 |
| 7/21/2024 | 1,690 | 587 | 568 |
| 7/22/2024 | 1,323 | 1023 | 545 |
| 7/23/2024 | 1,651 | 1325 | 536 |
| 7/24/2024 | 1,639 | 1301 | 444 |
| 7/25/2024 | 1,432 | 1223 | 704 |
| 7/26/2024 | 1,611 | 983 | 480 |
| 7/27/2024 | 1,691 | 649 | 256 |
| 7/28/2024 | 1,703 | 614 | 451 |
| 7/29/2024 | 1,488 | 1087 | 492 |
| 7/30/2024 | 1,767 | 786 | 557 |
| 7/31/2024 | 1,599 | 1022 | 355 |
| 8/1/2024 | 1,533 | 1301 | 441 |
| 8/2/2024 | 1,626 | 1106 | 376 |
| 8/3/2024 | 1,530 | 872 | 521 |
| 8/4/2024 | 1,349 | 666 | 387 |
| 8/5/2024 | 1,561 | 865 | 527 |
| 8/6/2024 | 1,694 | 906 | 448 |
| 8/7/2024 | 1,893 | 1,001 | 472 |
| 8/8/2024 | 1,521 | 1271 | 456 |
| 8/9/2024 | 1,638 | 997 | 370 |
| 8/10/2024 | 1,783 | 644 | 276 |
| 8/11/2024 | 1,589 | 731 | 344 |
| 8/12/2024 | 1,467 | 980 | 498 |
| 8/13/2024 | 1,524 | 968 | 361 |
| 8/14/2024 | 1,649 | 1,055 | 284 |
| 8/15/2024 | 1,668 | 1201 | 352 |
| 8/16/2024 | 1,597 | 1196 | 356 |
| 8/17/2024 | 1,851 | 721 | 300 |
| 8/18/2024 | 1,406 | 662 | 497 |
| 8/19/2024 | 1,792 | 721 | 579 |
| 8/20/2024 | 1,734 | 987 | 478 |
| 8/21/2024 | 1,617 | 1323 | 402 |
| 8/22/2024 | 1,607 | 1192 | 419 |
| 8/23/2024 | 1,649 | 1,212 | 367 |
| 8/24/2024 | 1,697 | 702 | 325 |
| 8/25/2024 | 1,667 | 809 | 325 |
| 8/26/2024 | 1,751 | 1,121 | 353 |
| 8/27/2024 | 1,689 | 1,241 | 355 |
| 8/28/2024 | 1,925 | 997 | 440 |
| 8/29/2024 | 2,025 | 1,139 | 503 |
| 8/30/2024 | 1,673 | 1,212 | 437 |

STB_AR1_001608

| 8/31/2024 | 1,995 | 863 | 483 |
| Grand Total | **165,040** | **86,841** | **50,148** |

Note: Data are limited to post-June 4th USBP SWB encounters. STB ER processing
Source: OHSS analysis of Asylum Pre-Screening Officer (APSO) data pulled from U

STB_AR1_001609

| APSO CFI Completions - Not Subject to IFR | APSO CFI Completions - Subject to IFR | EOIR CFI Reviews | Repatriations of Post June 4 USBP Encounters | STB ER as share of encounters | STB CFIs as share of processes for ER | Repats as share of encounters |
|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 244 | 2% | 0% | 7% |
| 0 | 0 | 0 | 703 | 12% | 0% | 20% |
| 0 | 0 | 0 | 772 | 23% | 0% | 26% |
| 0 | 0 | 0 | 873 | 22% | 0% | 26% |
| 2 | 4 | 0 | 1,006 | 33% | 0% | 34% |
| 1 | 5 | 0 | 1,410 | 52% | 0% | 50% |
| 2 | 29 | 1 | 1,099 | 49% | 2% | 36% |
| 1 | 23 | 4 | 1,035 | 49% | 2% | 37% |
| 4 | 42 | 3 | 1,246 | 61% | 3% | 46% |
| 13 | 47 | 8 | 834 | 45% | 4% | 30% |
| 12 | 34 | 2 | 891 | 44% | 3% | 34% |
| 13 | 43 | 3 | 532 | 34% | 6% | 24% |
| 9 | 39 | 6 | 722 | 51% | 4% | 38% |
| 11 | 66 | 7 | 1,164 | 57% | 5% | 49% |
| 5 | 89 | 22 | 1,155 | 68% | 6% | 54% |
| 20 | 73 | 22 | 977 | 46% | 7% | 41% |
| 33 | 100 | 31 | 905 | 66% | 8% | 47% |
| 8 | 93 | 8 | 634 | 45% | 10% | 31% |
| 12 | 80 | 11 | 620 | 54% | 8% | 35% |
| 31 | 104 | 26 | 1143 | 57% | 9% | 59% |
| 29 | 88 | 32 | 978 | 63% | 8% | 54% |
| 23 | 132 | 42 | 960 | 66% | 11% | 54% |
| 27 | 96 | 15 | 850 | 73% | 8% | 51% |
| 12 | 80 | 25 | 973 | 68% | 7% | 54% |
| 6 | 95 | 10 | 627 | 47% | 13% | 39% |
| 9 | 45 | 7 | 422 | 33% | 8% | 23% |
| 35 | 116 | 18 | 747 | 48% | 14% | 44% |
| 32 | 112 | 33 | 791 | 49% | 13% | 45% |
| 21 | 138 | 48 | 1023 | 69% | 12% | 60% |
| 11 | 89 | 13 | 1020 | 49% | 10% | 54% |
| 17 | 128 | 40 | 1063 | 90% | 9% | 66% |
| 7 | 140 | 19 | 486 | 38% | 21% | 28% |
| 10 | 108 | 17 | 434 | 42% | 16% | 27% |
| 16 | 92 | 27 | 692 | 41% | 14% | 42% |
| 36 | 161 | 38 | 798 | 51% | 17% | 44% |
| 20 | 169 | 36 | 794 | 56% | 17% | 45% |
| 30 | 174 | 31 | 1002 | 76% | 15% | 66% |
| 38 | 239 | 35 | 836 | 75% | 20% | 53% |
| 14 | 160 | 33 | 271 | 37% | 26% | 16% |
| 4 | 144 | 17 | 386 | 38% | 23% | 24% |
| 32 | 258 | 68 | 671 | 53% | 31% | 43% |
| 73 | 268 | 100 | 787 | 49% | 33% | 47% |

STB_AR1_001610

| | | | | | | |
|---|---|---|---|---|---|---|
| 45 | 323 | 78 | 914 | 64% | 32% | 59% |
| 64 | 218 | 32 | 776 | 67% | 18% | 44% |
| 24 | 207 | 52 | 973 | 73% | 19% | 65% |
| 12 | 219 | 34 | 429 | 46% | 32% | 29% |
| 4 | 221 | 33 | 416 | 35% | 38% | 25% |
| 29 | 266 | 58 | 816 | 77% | 26% | 62% |
| 53 | 324 | 89 | 968 | 80% | 24% | 59% |
| 65 | 324 | 76 | 1099 | 79% | 25% | 67% |
| 39 | 323 | 96 | 862 | 85% | 26% | 60% |
| 22 | 352 | 130 | 780 | 61% | 36% | 48% |
| 8 | 187 | 25 | 501 | 38% | 29% | 30% |
| 12 | 187 | 38 | 501 | 36% | 30% | 29% |
| 40 | 294 | 86 | 974 | 73% | 27% | 65% |
| 43 | 309 | 92 | 989 | 44% | 39% | 56% |
| 38 | 352 | 86 | 1049 | 64% | 34% | 66% |
| 44 | 362 | 101 | 970 | 85% | 28% | 63% |
| 25 | 326 | 99 | 841 | 68% | 29% | 52% |
| 8 | 206 | 29 | 462 | 57% | 24% | 30% |
| 13 | 163 | 2 | 496 | 49% | 24% | 37% |
| 54 | 285 | 106 | 678 | 55% | 33% | 43% |
| 35 | 369 | 118 | 1032 | 53% | 41% | 61% |
| 30 | 351 | 120 | 992 | 53% | 35% | 52% |
| 52 | 424 | 145 | 935 | 84% | 33% | 61% |
| 37 | 371 | 128 | 904 | 61% | 37% | 55% |
| 9 | 264 | 51 | 514 | 36% | 41% | 29% |
| 12 | 168 | 27 | 660 | 46% | 23% | 42% |
| 38 | 294 | 80 | 843 | 67% | 30% | 57% |
| 41 | 378 | 138 | 916 | 64% | 39% | 60% |
| 40 | 443 | 165 | 1066 | 64% | 42% | 65% |
| 30 | 394 | 117 | 782 | 72% | 33% | 47% |
| 39 | 397 | 127 | 1035 | 75% | 33% | 65% |
| 21 | 220 | 50 | 537 | 39% | 31% | 29% |
| 15 | 183 | 23 | 480 | 47% | 28% | 34% |
| 51 | 335 | 116 | 624 | 40% | 46% | 35% |
| 48 | 353 | 120 | 1121 | 57% | 36% | 65% |
| 39 | 368 | 140 | 868 | 82% | 28% | 54% |
| 151 | 324 | 112 | 904 | 74% | 27% | 56% |
| 83 | 349 | 130 | 1270 | 73% | 29% | 77% |
| 22 | 209 | 54 | 462 | 41% | 30% | 27% |
| 11 | 210 | 0 | 657 | 49% | 26% | 39% |
| 52 | 362 | 120 | 897 | 64% | 32% | 51% |
| 77 | 373 | 70 | 968 | 73% | 30% | 57% |
| 67 | 523 | 168 | 839 | 52% | 52% | 44% |
| 118 | 493 | 129 | 762 | 56% | 43% | 38% |
| 49 | 452 | 83 | 850 | 72% | 37% | 51% |

STB_AR1_001611

| | | | | | | |
|---|---|---|---|---|---|---|
| 19 | 316 | 22 | 522 | 43% | 37% | 26% |
| **2,507** | **18,274** | **4,753** | **71,510** | 53% | 21% | 43% |

, USCIS CFIs, and EOIR reviews are limited to ER cases processed under the IFR
IP Sept. 3, 2024.

STB_AR1_001612

Encounter Processing Details: May 12, 2023 - June 4, 2024

| Reportable field | Total | Mexico | NCA* | CHNV* | CDEP* | Other* | SA** | FM** | UC** | FM+SA | Daily average | Daily avg (FM+SA) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CBP One encounters[1] | 551,254 | | | | | | | | | | 1,413 | |
| Other OFO encounters[1] | 92,177 | | | | | | | | | | 236 | |
| USBP Encounters[2] | 1,999,360 | 571,755 | 526,613 | 286,512 | 348,878 | 265,602 | 1,083,098 | 791,546 | 124,716 | 1,874,644 | 5,127 | 4,807 |
| *Section 2c encounters* | *1,894,760* | *565,151* | *445,448* | *280,436* | *341,873* | *261,852* | *1,072,972* | *790,875* | *30,913* | *1,863,847* | *4,858* | *4,779* |
| *SWB USBP Encounters - Single Adults and Family Unit Individuals Only* | | | | | | | | | | | | |
| USBP Dispositions | 1,871,693 | 540,314 | 447,439 | 280,619 | 341,507 | 261,814 | 1,080,274 | 791,479 | | 1,871,693 | 4,799 | 4,799 |
| VR | 226,662 | 216,450 | 6,586 | 3,467 | 150 | 9 | 206,103 | 20,559 | | 226,662 | 581 | |
| Reinstatement | 81,215 | 46,817 | 26,936 | 3,515 | 3,003 | 944 | 72,748 | 8,467 | | 81,215 | 208 | |
| Placed in ER - total | 333,560 | 66,385 | 127,295 | 50,781 | 69,785 | 19,314 | 252,835 | 80,725 | | 333,560 | 855 | |
| Placed in ER - OTM USCIS determined not to be subject to CLP rule | 22,189 | 0 | 7,635 | 3,865 | 6,325 | 4,364 | 19,769 | 2,420 | | 22,189 | 57 | |
| Placed in ER - Subject to CLP or Mexican national | 311,371 | 66,385 | 119,660 | 46,916 | 63,460 | 14,950 | 233,066 | 78,305 | | 311,371 | 798 | |
| No Fear claim | 136,774 | 43,781 | 80,860 | 7,042 | 4,670 | 421 | 92,341 | 44,433 | | 136,774 | 351 | |
| Fear claim (Total) | 191,423 | 21,964 | 45,114 | 43,033 | 63,057 | 18,255 | 156,037 | 35,386 | | 191,423 | 491 | Daily Credi |
| Fear claim outcomes of CLP and Mexican nationals | 169,234 | | | | | | | | | | | |
| USCIS positive | 90,697 | 9,146 | 16,255 | 22,354 | 32,903 | 10,039 | 70,466 | 20,231 | | 90,697 | 233 | |
| USCIS negative | 73,620 | 9,796 | 20,631 | 16,096 | 23,391 | 3,706 | 61,942 | 11,678 | | 73,620 | 189 | |
| USCIS admin closed | 4,917 | 3,022 | 593 | 718 | 438 | 146 | 3,860 | 1,057 | | 4,917 | 13 | |
| Comprehensive fear results | 169,234 | 21,964 | 37,479 | 39,168 | 56,732 | 13,891 | 136,268 | 32,966 | | 169,234 | 434 | |
| Referred to EOIR | 105,342 | 11,236 | 18,854 | 26,880 | 37,301 | 11,071 | 81,483 | 23,859 | | 105,342 | 270 | |
| Removal Order | 63,892 | 10,728 | 18,625 | 12,288 | 19,431 | 2,820 | 54,785 | 9,107 | | 63,892 | 164 | |
| ERCF EOIR case completions | 10,255 | 486 | 2,236 | 2,735 | 3,247 | 1,551 | 9,379 | 876 | | 10,255 | 26 | |
| Removal Order | 4,683 | 260 | 1,185 | 1,118 | 1,563 | 557 | 4,168 | 515 | | 4,683 | 12 | |
| Relief | 203 | 3 | 26 | 34 | 23 | 117 | 196 | 7 | | 203 | 1 | |
| Other | 5,369 | 223 | 1,025 | 1,583 | 1,661 | 877 | 5,015 | 354 | | 5,369 | 14 | |
| NTA (excludes positive fear release NTA) | 1,226,610 | 209,265 | 285,474 | 222,392 | 268,137 | 241,342 | 545,458 | 681,152 | | 1,226,610 | 3,145 | |
| Other | 3,646 | 1,397 | 1,148 | 464 | 432 | 205 | 3,070 | 576 | | 3,646 | 9 | |
| ERCF Processing timelines of CLP and Mexican nationals | | | | | | | | | | | | |
| Encounter to Referral | 5 | 4 | 5 | 6 | 4 | 8 | 6 | 3 | | | | |
| Referral to Result | 11 | 12 | 14 | 7 | 10 | 14 | 7 | 17 | | | | |
| Encounter to Removal: no fear | 5 | 1 | 7 | 39 | 17 | 47 | 5 | 5 | | | | |
| Encounter to Removal: negative fear | 44 | 24 | 42 | 82 | 43 | 96 | 44 | 45 | | | | |
| CBP Book-outs[3] | | | | | | | | | | | | |
| Repatriation | 308,442 | 283,976 | 6,739 | 17,542 | 185 | 0 | 284,708 | 23,734 | | 308,442 | 791 | |
| Release[4] | 1,200,250 | 197,930 | 278,298 | 230,393 | 271,473 | 222,156 | 539,750 | 660,500 | | 1,200,250 | 3,078 | 64% |
| TOT ERO | 361,785 | 57,696 | 162,195 | 32,588 | 69,730 | 39,576 | 254,113 | 107,072 | | 361,785 | 928 | |
| Other | 1,217 | 712 | 207 | 96 | 119 | 83 | 1,044 | 173 | | 1,217 | 3 | |
| Total Enforcement Repatriations[5] | 796,065 | 402,165 | 135,515 | 14,585 | 39,783 | 204,017 | 656,062 | 121,663 | 17,061 | 777,725 | 2,041 | |
| Repatriations resulting from SWB Encounters | 528,238 | 359,940 | 120,856 | 11,459 | 28,670 | 7,313 | 432,229 | 78,786 | 16,783 | 511,015 | 1,354 | 28% |
| Mexicans | 359,940 | 359,940 | 0 | 0 | 0 | 0 | 316,074 | 28,728 | 14,723 | 344,802 | 923 | |
| OTMs | 168,298 | 0 | 120,856 | 11,459 | 28,670 | 7,313 | 116,155 | 50,058 | 2,060 | 166,213 | 432 | |
| OTMs to Mexico | 14,443 | 0 | 7,422 | 5,724 | 310 | 987 | 13,916 | 488 | 14 | 14,404 | 37 | |

STB_AR1_001613

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| OTMs to home countries | 153,855<br>28% | 0 | 113,434 | 5,735 | 28,360 | 6,326 | 102,239 | 49,570 | 2,046 | 151,809 | 395 |

\* NCA contains nationals of Guatemala, Honduras, and El Salvador; CHNV contains nationals of Cuba, Haiti, Nicaragua, and Venezuela; CDEP contains nationals of Colombia, Dominican Republic,

\*\* Single Adult (SA), Familiy Unit Inividuals (FM), Unaccompanied Children (UC).

[1] Southwest land border encounters; total includes Accompanied Minors (AM).

[2] Southwest land border plus New Orleans, Miami, and Ramey sectors.

[3] Bookout outcomes are reported by encounter date (not bookout date).

[4] Releases from CBP custody.  Includes enrollments in ATD.

[5] Nationwide DHS enforcement repatriations; excludes administrative returns. ERO repatriations are by departed date; CBP repatriations are by CBP encounter date.

Source: ER Processing details and timelines based on OHSS analysis of Enforcement Lifecycle dataset as of June 30, 2024; all other data based on OHSS analysis of July 2024 OHSS Persist.

/

STB_AR1_001614

| USBP Encounters | |
|---|---|
| May 2022-April 2023 (from Encounters FY tab) | 6,104 |
| Immediate post-pandemic daily average | 5,127 |
| Difference (Immediate minus Pre-pandemic) | -0.1601733 |

57%

54%

ble fear claims          62%

STB_AR1_001615

**Immediate Post-Pandemic**
**May 12 2023 - June 4 2024**

| USBP Expedited Removal Processing: Southwest Border | CBP | USBP Total | USBP Subject to CLP[1] | USBP Mexico |
|---|---|---|---|---|
| **SW Border Encounters** | **1,954,976** | **1,871,693** | **1,309,190** | **540,314** |
| **Processed for ER** | **359,804** | **333,560** | **244,986** | **66,385** |
| % Encounters processed for ER | 18% | 18% | 19% | 12% |
| **Reprocessed with other dispositions** | 6,001 | 5,363 | 4,723 | 640 |
| No fear claim | 147,388 | 136,774 | 92,993 | 43,781 |
| No Fear Claim - confirmed removal or return | 136,707 | 126,166 | 82,413 | 43,753 |
| CFIs | 206,415 | 191,423 | 147,270 | 21,964 |
| Percent claiming fear | 57% | 57% | 60% | 33% |
| USCIS screen-in rate | 49% | 48% | 55% | 42% |
| Percent of negative fear appealed to EOIR | 77% | 77% | 81% | 50% |
| Percent of negative fear appeals vacated | 21% | 21% | 22% | 18% |
| Comprehensive screen-in rate | 63% | 62% | 64% | 51% |
| Total Percent of ER referred to 240 | 36% | 36% | 38% | 17% |
| Removal orders as share of CFIs | 37% | 38% | 36% | 49% |
| Percent of excuted removal orders | 25% | 27% | 27% | 27% |
| CFIs | 206,415 | 191,423 | 147,270 | 21,964 |
| Positive fear finding | 100,385 | 91,804 | 81,551 | 9,146 |
| Negative fear finding | 78,128 | 74,520 | 63,824 | 9,796 |
| Appealed to IJ | 59,776 | 57,084 | 51,405 | 4,934 |
| Affirmed | 47,095 | 44,945 | 40,280 | 4,049 |
| Vacated | 12,681 | 12,139 | 11,125 | 885 |
| Not appealed to IJ | 18,352 | 17,436 | 12,419 | 4,862 |
| Admin closed | 27,902 | 25,099 | 1,895 | 3,022 |
| Admin Closure Resulting in 240 Proceedings | 17,134 | 15,285 | 1,430 | 1,205 |
| Admin Closure not Resulting in 240 Proceedings | 10,768 | 9,814 | 465 | 1,817 |

| | | | | |
|---|---|---|---|---|
| ER Removal orders with Confirmed Departures | 52,393 | 49,286 | 39,202 | 5,534 |
| **Repatriations** | **189,100** | **175,452** | **121,615** | **49,287** |
| No Fear Claim ER removals | 136,707 | 126,166 | 82,413 | 43,753 |
| Fear Claim ER removals | 52,393 | 49,286 | 39,202 | 5,534 |

1 Exclude approximately 22,000 OTM credible fear cases that were not subject to CLP due to data entry error or discretionary NTA.

Notes: Results based on OIS Enforcement Lifecycle methodology as of July 11, 2024. Encounters include USBP apprehensions and OFO inadmissibility determinations on the Southwest Border by year of encounter. Table is event-based, so noncitizens encountered on multiple occasions appear in the table multiple times. Table is limited to Single Adults and Family Units.

Source: DHS Office of Homeland Security Statistics Enforcement Lifecycle data as of June 30, 2024.

Daily average

| USBP subject to CLP + Mexico | CBP | USBP |
|---|---|---|
| **1,849,504** | 5,013 | 4,799 |
| **311,371** | **923** | **855** |
| 31% | 900 | 900 |
| 5,363 | | |
| 136,774 | | |
| 126,166 | | |
| 169,234 | 206,400 | 191,400 |
| 54% | | |
| 54% | | |
| 77% | | |
| 21% | | |
| 62% | | |
| 34% | | |
| 38% | | |
| 26% | | |
| 169,234 | | |
| 90,697 | | |
| 73,620 | | |
| 56,339 | | |
| 44,329 | | |
| 12,010 | | |
| 17,281 | | |
| 4,917 | | |
| 2,635 | | |
| 2,282 | | |

| | |
|---|---|
| Vacaturs as share of negative fear | 16% |
| Vacaturs as share of negative fear Appealed | 21% |
| Vacaturs as share of CFIs | 6% |

STB_AR1_001618

| |
|---|
| 44,736 |
| **170,902** |
| 126,166 |
| 44,736 |

0%

0
0

STB_AR1_001619

STB_AR1_001620

STB_AR1_001621

USCG Maritime Migrant Interdictions, FY 2014 - July 2024

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cuba | 2,090 | 2,736 | 5,221 | 1,465 | 259 | 381 | 43 | 827 | 5,740 | 6,925 | 640 |
| Haiti | 968 | 561 | 380 | 419 | 609 | 824 | 398 | 1,205 | 4,025 | 3,954 | 541 |
| Dominican Republic | 269 | 257 | 570 | 519 | 492 | 920 | 1,201 | 744 | 1,804 | 1,965 | 1,146 |
| Mexico | 33 | 11 | 3 | 50 | 123 | 160 | 343 | 612 | 676 | 464 | 443 |
| Other | 31 | 49 | 160 | 59 | 179 | 144 | 94 | 120 | 276 | 156 | 74 |
| Total | **3,391** | **3,614** | **6,334** | **2,512** | **1,662** | **2,429** | **2,079** | **3,508** | **12,521** | **13,464** | **2,844** |

OHSS analysis of USCG interdictions and apprehensions data through July 31, 2024.

USBP Coastal Sector Encounters, FY 2014 - July 2024

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Cuba | 956 | 1,040 | 1,845 | 547 | 107 | 144 | 83 |
| Mexico | 742 | 668 | 1,040 | 1,027 | 950 | 977 | 628 |
| Haiti | 1,014 | 370 | 160 | 77 | 75 | 64 | 116 |
| Dominican Republic | 166 | 164 | 314 | 210 | 284 | 556 | 319 |
| Other | 1,064 | 916 | 1,304 | 1,727 | 1,831 | 1,844 | 1,084 |
| Total | **3,942** | **3,158** | **4,663** | **3,588** | **3,247** | **3,585** | **2,230** |

Source: OHSS Persist July 2024.

STB_AR1_001622

| 2021 | 2022 | 2023 | 2024 YTD |
|---:|---:|---:|---:|
| 239 | 2,675 | 4,716 | 318 |
| 269 | 259 | 416 | 352 |
| 601 | 1,840 | 965 | 390 |
| 366 | 515 | 842 | 486 |
| 570 | 689 | 894 | 937 |
| **2,045** | **5,978** | **7,833** | **2,483** |

STB_AR1_001623

| Cases completed July 2024 | Completed cases | Mean filed date | Median filed date |
|---|---|---|---|
| Total Completed | **105,000** | **2/6/2022** | **2/9/2023** |

| Case outcomes by filing date | February, 2022 | February, 2023 |
|---|---|---|
| Total Filed | **62,838** | **78,668** |
|   Relief on merits[1] | 1,877 | 1,081 |
|   Other relief[2] | 180 | 123 |
|   Removal Order[3] | 14,279 | 13,793 |
|   Voluntary Departure | 373 | 406 |
|   Failure to Prosecute | 86 | 54 |
|   Terminate/Dismiss[4] | 8,253 | 5,721 |
|   Pending Cases | 37,790 | 57,490 |
|     Pending (Active) | 36,353 | 56,879 |
|     Pending (Inactive) | 1,437 | 611 |
| Pending cases as a percentage of total filed cases | **60%** | **73%** |

[1] Includes completion codes for conditional grants of asylum, grants of asylum, and adjustment of status under various statutory provisions.

[2] Includes completion codes for asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of removal.

[3] Includes completion codes for removal order, withdrawal, abandonment, denial, and DHS negative fear decision affirmed.

[4] Includes completion codes for termination, dismissal, and other administrative completions.

Source: OHSS analysis of EOIR data as of July 31, 2024.

**EOIR Completions and Median Processing time by Year of EOIR initial receipt: Fiscal Years 2010 - 2024 YTD**

| MOST CURRENT OUTCOMES | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Case Receipts[1]** | 248,076 | 238,961 | 213,809 | 197,383 | 231,184 | 193,822 | 229,662 | 296,806 | 318,119 | 549,071 | 371,916 | 245,331 | 708,424 | ####### |
| **Pending[2]** | 11,186 | 14,377 | 17,394 | 21,639 | 27,457 | 24,661 | 32,104 | 52,730 | 73,251 | 145,474 | 148,194 | 120,057 | 442,889 | 980,423 |
| **Median Days pending** | 5,215 | 4,851 | 4,492 | 4,116 | 3,751 | 3,414 | 3,025 | 2,676 | 2,274 | 1,890 | 1,632 | 1,134 | 827 | 424 |
| **Completed[3]** | 236,423 | 224,114 | 196,056 | 175,393 | 203,483 | 169,117 | 197,541 | 243,984 | 244,324 | 398,944 | 222,061 | 124,583 | 264,119 | 225,922 |
| **Median Days to completion** | 138 | 153 | 280 | 550 | 684 | 596 | 783 | 840 | 637 | 641 | 979 | 620 | 441 | 239 |

[1] Includes removal, deportation, exclusion, asylum-only, and withholding only cases.

[2] Includes administratively closed cases.

3 Includes completion codes for removal order, withdrawal, abandonment, denial, asylum withholding, statutory withholding of removal, deferral of removal under CAT, withholding of removal under CAT, findings of non-removability, cancellation of remo

Source: OHSS analysis of EOIR data as of July 31, 2024.

STB_AR1_001624

| 2024 |
| --- |
| ####### |
| 1,485,286 |
| 149 |
| 89,240 |
| 91 |

val, termination, dismissal, and other administrative completions.

STB_AR1_001625

| long_date | Mexican Apprehensions | CBP Encounters |
|---|---|---|
| 1/1/2023 | 2,546 | 2,755 |
| 1/2/2023 | 2,469 | 3,076 |
| 1/3/2023 | 2,910 | 3,923 |
| 1/4/2023 | 2,759 | 3,442 |
| 1/5/2023 | 3,293 | 3,648 |
| 1/6/2023 | 3,613 | 3,623 |
| 1/7/2023 | 3,137 | 3,818 |
| 1/8/2023 | 2,947 | 3,452 |
| 1/9/2023 | 3,280 | 3,592 |
| 1/10/2023 | 3,108 | 4,104 |
| 1/11/2023 | 3,466 | 4,340 |
| 1/12/2023 | 2,909 | 4,322 |
| 1/13/2023 | 3,392 | 4,277 |
| 1/14/2023 | 2,928 | 4,522 |
| 1/15/2023 | 2,820 | 3,844 |
| 1/16/2023 | 2,872 | 3,904 |
| 1/17/2023 | 3,277 | 4,456 |
| 1/18/2023 | 3,209 | 4,716 |
| 1/19/2023 | 3,581 | 4,388 |
| 1/20/2023 | 3,415 | 4,681 |
| 1/21/2023 | 3,138 | 4,496 |
| 1/22/2023 | 3,071 | 4,160 |
| 1/23/2023 | 2,916 | 4,588 |
| 1/24/2023 | 2,825 | 4,329 |
| 1/25/2023 | 3,115 | 4,825 |
| 1/26/2023 | 3,312 | 4,823 |
| 1/27/2023 | 3,204 | 5,014 |
| 1/28/2023 | 3,320 | 4,835 |
| 1/29/2023 | 3,102 | 4,180 |
| 1/30/2023 | 3,284 | 4,491 |
| 1/31/2023 | 3,185 | 4,864 |
| 2/1/2023 | 3,414 | 4,685 |
| 2/2/2023 | 3,725 | 4,732 |
| 2/3/2023 | 3,668 | 4,718 |
| 2/4/2023 | 3,501 | 4,241 |
| 2/5/2023 | | 4,068 |
| 2/6/2023 | 3,737 | 4,569 |
| 2/7/2023 | 3,400 | 5,132 |
| 2/8/2023 | 3,456 | 5,068 |
| 2/9/2023 | 3,829 | 5,173 |
| 2/10/2023 | 3,800 | 4,626 |
| 2/11/2023 | 3,545 | 4,286 |
| 2/12/2023 | 3,664 | 4,047 |
| 2/13/2023 | 3,350 | 4,691 |
| 2/14/2023 | 3,267 | 4,742 |

|  | Mexican encounters | CBP encounters |
|---|---|---|
| Week ending 6/4/24 | 8,772 | 3,941 |
| Week ending 8/31/24 | 7,092 | 2,031 |
| Percent change | -19% | -48% |



| U.S. encounters | | | | | |
|---|---|---|---|---|---|
|  |  | Mex Encou | Total USBF | OTM | Mex | Mex Encou |
| Week endi | 4-Jun | 8,772 | 3,941 | 2,475 | 1,466 | |
| Week endi | 11-Jun | 8,883 | 3,444 | 2,063 | 1,381 | 1% |
| Week endi | 18-Jun | 8,749 | 2,722 | 1,678 | 1,044 | -2% |
| Week endi | 25-Jun | 8,620 | 2,213 | 1,358 | 856 | -1% |
| Week endi | 2-Jul | 8,465 | 1,923 | 1,154 | 770 | -2% |
| Week endi | 9-Jul | 8,404 | 1,891 | 1,207 | 684 | -1% |
| Week endi | 16-Jul | 8,255 | 1,804 | 1,156 | 649 | -2% |
| Week endi | 23-Jul | 8,140 | 1,753 | 1,014 | 740 | -1% |
| Week endi | 30-Jul | 8,204 | 1,805 | 1,035 | 770 | 1% |
| Week endi | 6-Aug | 7,956 | 1,802 | 1,028 | 774 | -3% |
| Week endi | 13-Aug | 7,612 | 1,835 | 1,061 | 774 | -4% |
| Week endi | 20-Aug | 7,370 | 1,841 | 1,075 | 766 | -3% |
| Week endi | 27-Aug | 7,294 | 1,804 | 1,029 | 775 | -1% |
| Week endi | 31-Aug | 7,092 | 2,031 | 1,105 | 926 | -3% |
| Total |  |  |  |  |  | -19% |

STB_AR1_001626

| | | |
|---|---|---|
| 2/15/2023 | 3,651 | 4,634 |
| 2/16/2023 | 3,425 | 4,722 |
| 2/17/2023 | 3,451 | 4,751 |
| 2/18/2023 | 3,492 | 4,527 |
| 2/19/2023 | 3,539 | 4,364 |
| 2/20/2023 | 3,144 | 4,438 |
| 2/21/2023 | 3,162 | 4,746 |
| 2/22/2023 | 3,444 | 4,512 |
| 2/23/2023 | 3,567 | 5,037 |
| 2/24/2023 | 3,935 | 5,033 |
| 2/25/2023 | 3,503 | 4,797 |
| 2/26/2023 | 3,408 | 4,271 |
| 2/27/2023 | 3,291 | 4,351 |
| 2/28/2023 | 3,394 | 5,538 |
| 3/1/2023 | 3,377 | 5,460 |
| 3/2/2023 | 3,547 | 5,134 |
| 3/3/2023 | 3,440 | 5,438 |
| 3/4/2023 | 3,332 | 5,332 |
| 3/5/2023 | 3,247 | 5,010 |
| 3/6/2023 | 3,835 | 4,904 |
| 3/7/2023 | 3,708 | 6,104 |
| 3/8/2023 | 3,220 | 5,354 |
| 3/9/2023 | 3,458 | 5,392 |
| 3/10/2023 | 3,451 | 5,392 |
| 3/11/2023 | 3,122 | 5,082 |
| 3/12/2023 | 3,272 | 4,573 |
| 3/13/2023 | 3,337 | 4,722 |
| 3/14/2023 | 3,464 | 5,472 |
| 3/15/2023 | 4,115 | 5,198 |
| 3/16/2023 | 3,438 | 5,557 |
| 3/17/2023 | 3,642 | 4,821 |
| 3/18/2023 | 3,378 | 4,949 |
| 3/19/2023 | 3,158 | 4,171 |
| 3/20/2023 | 3,352 | 5,146 |
| 3/21/2023 | 3,350 | 5,509 |
| 3/22/2023 | 3,436 | 4,981 |
| 3/23/2023 | 3,881 | 5,480 |
| 3/24/2023 | 3,396 | 5,148 |
| 3/25/2023 | 3,735 | 5,289 |
| 3/26/2023 | 3,591 | 5,185 |
| 3/27/2023 | 3,874 | 5,396 |
| 3/28/2023 | 3,851 | 5,926 |
| 3/29/2023 | 4,132 | 6,219 |
| 3/30/2023 | 3,813 | 6,237 |
| 3/31/2023 | 3,591 | 5,073 |
| 4/1/2023 | 3,888 | 4,743 |
| 4/2/2023 | 3,538 | 4,439 |

STB_AR1_001627

| | | |
|---|---|---|
| 4/3/2023 | 3,157 | 5,213 |
| 4/4/2023 | 3,886 | 5,350 |
| 4/5/2023 | 3,685 | 5,288 |
| 4/6/2023 | 3,539 | 5,755 |
| 4/7/2023 | 3,696 | 4,801 |
| 4/8/2023 | 3,417 | 4,727 |
| 4/9/2023 | 2,905 | 3,495 |
| 4/10/2023 | 3,141 | 4,466 |
| 4/11/2023 | 3,632 | 5,706 |
| 4/12/2023 | 3,747 | 5,747 |
| 4/13/2023 | 4,352 | 6,335 |
| 4/14/2023 | 3,806 | 6,431 |
| 4/15/2023 | 3,796 | 5,255 |
| 4/16/2023 | 3,849 | 5,148 |
| 4/17/2023 | 3,770 | 5,804 |
| 4/18/2023 | 4,359 | 6,223 |
| 4/19/2023 | 3,970 | 6,582 |
| 4/20/2023 | 4,519 | 6,981 |
| 4/21/2023 | 4,206 | 6,169 |
| 4/22/2023 | 4,109 | 6,699 |
| 4/23/2023 | 3,703 | 7,110 |
| 4/24/2023 | 3,952 | 7,638 |
| 4/25/2023 | 4,178 | 7,846 |
| 4/26/2023 | 4,064 | 8,862 |
| 4/27/2023 | 4,219 | 8,387 |
| 4/28/2023 | 3,720 | 7,731 |
| 4/29/2023 | 4,023 | 7,627 |
| 4/30/2023 | 3,558 | 7,344 |
| 5/1/2023 | 3,562 | 7,914 |
| 5/2/2023 | 4,203 | 7,766 |
| 5/3/2023 | 4,210 | 8,627 |
| 5/4/2023 | 4,084 | 8,484 |
| 5/5/2023 | 4,021 | 9,185 |
| 5/6/2023 | 3,985 | 8,986 |
| 5/7/2023 | 4,114 | 8,777 |
| 5/8/2023 | 4,349 | 10,218 |
| 5/9/2023 | 4,729 | 10,801 |
| 5/10/2023 | 5,289 | 10,371 |
| 5/11/2023 | 5,499 | 9,836 |
| 5/12/2023 | 5,425 | 6,223 |
| 5/13/2023 | 5,117 | 4,338 |
| 5/14/2023 | 3,387 | 4,199 |
| 5/15/2023 | 5,383 | 3,737 |
| 5/16/2023 | 6,065 | 3,703 |
| 5/17/2023 | 5,975 | 2,837 |
| 5/18/2023 | | 3,232 |
| 5/19/2023 | 5,949 | 2,961 |

STB_AR1_001628

| | | |
|---|---|---|
| 5/20/2023 | 5,932 | 3,196 |
| 5/21/2023 | 5,859 | 2,554 |
| 5/22/2023 | 6,117 | 2,648 |
| 5/23/2023 | 6,370 | 3,503 |
| 5/24/2023 | 6,246 | 3,608 |
| 5/25/2023 | 6,302 | 3,496 |
| 5/26/2023 | 6,452 | 3,452 |
| 5/27/2023 | 6,182 | 3,305 |
| 5/28/2023 | 6,130 | 3,359 |
| 5/29/2023 | 5,970 | 3,311 |
| 5/30/2023 | 6,023 | 3,563 |
| 5/31/2023 | 6,147 | 3,179 |
| 6/1/2023 | 6,265 | 3,134 |
| 6/2/2023 | 6,162 | 2,951 |
| 6/3/2023 | 6,327 | 3,079 |
| 6/4/2023 | 6,123 | 2,886 |
| 6/5/2023 | 5,955 | 2,941 |
| 6/6/2023 | 6,167 | 3,394 |
| 6/7/2023 | 6,421 | 3,050 |
| 6/8/2023 | 6,392 | 3,582 |
| 6/9/2023 | 6,714 | 3,272 |
| 6/10/2023 | 6,476 | 3,022 |
| 6/11/2023 | 6,418 | 2,650 |
| 6/12/2023 | 6,500 | 3,085 |
| 6/13/2023 | 6,603 | 3,381 |
| 6/14/2023 | 6,405 | 3,500 |
| 6/15/2023 | | 3,594 |
| 6/16/2023 | 6,617 | 3,157 |
| 6/17/2023 | 6,718 | 3,152 |
| 6/18/2023 | 6,563 | 3,594 |
| 6/19/2023 | 6,429 | 3,184 |
| 6/20/2023 | 6,479 | 3,571 |
| 6/21/2023 | 6,816 | 3,949 |
| 6/22/2023 | 7,354 | 3,814 |
| 6/23/2023 | 6,987 | 3,428 |
| 6/24/2023 | 6,805 | 3,486 |
| 6/25/2023 | 7,272 | 3,275 |
| 6/26/2023 | 6,913 | 3,699 |
| 6/27/2023 | 7,480 | 3,227 |
| 6/28/2023 | 6,929 | 3,726 |
| 6/29/2023 | 6,979 | 3,467 |
| 6/30/2023 | 6,792 | 3,289 |
| 7/1/2023 | 6,187 | 3,362 |
| 7/2/2023 | 6,212 | 3,323 |
| 7/3/2023 | 6,452 | 3,324 |
| 7/4/2023 | 6,629 | 3,548 |
| 7/5/2023 | 6,433 | 3,776 |

STB_AR1_001629

| | | |
|---|---|---|
| 7/6/2023 | 6,789 | 3,194 |
| 7/7/2023 | 6,626 | 3,557 |
| 7/8/2023 | 6,578 | 3,971 |
| 7/9/2023 | 6,782 | 3,431 |
| 7/10/2023 | 6,791 | 3,442 |
| 7/11/2023 | 7,342 | 4,191 |
| 7/12/2023 | 6,795 | 4,600 |
| 7/13/2023 | 7,354 | 3,784 |
| 7/14/2023 | 7,135 | 4,333 |
| 7/15/2023 | 7,333 | 4,198 |
| 7/16/2023 | 7,088 | 3,789 |
| 7/17/2023 | 7,095 | 4,538 |
| 7/18/2023 | 7,092 | 4,458 |
| 7/19/2023 | 7,329 | 4,480 |
| 7/20/2023 | 7,768 | 5,090 |
| 7/21/2023 | 7,268 | 4,447 |
| 7/22/2023 | 7,172 | 4,095 |
| 7/23/2023 | 7,006 | 4,998 |
| 7/24/2023 | 7,481 | 5,093 |
| 7/25/2023 | 7,362 | 5,232 |
| 7/26/2023 | 7,580 | 5,219 |
| 7/27/2023 | 7,677 | 5,368 |
| 7/28/2023 | 7,516 | 4,895 |
| 7/29/2023 | 7,413 | 5,682 |
| 7/30/2023 | 7,392 | 4,534 |
| 7/31/2023 | 7,332 | 4,702 |
| 8/1/2023 | 7,491 | 5,792 |
| 8/2/2023 | 7,825 | 5,908 |
| 8/3/2023 | 7,633 | 5,507 |
| 8/4/2023 | 8,264 | 5,702 |
| 8/5/2023 | 7,784 | 5,458 |
| 8/6/2023 | 7,796 | 5,559 |
| 8/7/2023 | 8,012 | 5,611 |
| 8/8/2023 | 8,730 | 6,031 |
| 8/9/2023 | 8,552 | 6,296 |
| 8/10/2023 | 8,318 | 6,103 |
| 8/11/2023 | 8,494 | 5,114 |
| 8/12/2023 | 8,213 | 5,114 |
| 8/13/2023 | 8,642 | 5,202 |
| 8/14/2023 | 8,334 | 5,403 |
| 8/15/2023 | 9,072 | 5,588 |
| 8/16/2023 | 8,924 | 5,662 |
| 8/17/2023 | 8,610 | 5,105 |
| 8/18/2023 | 9,223 | 5,683 |
| 8/19/2023 | 8,892 | 4,821 |
| 8/20/2023 | 8,525 | 5,795 |
| 8/21/2023 | 8,867 | 6,093 |

STB_AR1_001630

| | | |
|---|---|---|
| 8/22/2023 | 8,902 | 5,667 |
| 8/23/2023 | 8,782 | 6,914 |
| 8/24/2023 | 8,972 | 6,304 |
| 8/25/2023 | 8,957 | 6,505 |
| 8/26/2023 | 8,794 | 5,451 |
| 8/27/2023 | 8,523 | 6,807 |
| 8/28/2023 | 8,895 | 6,034 |
| 8/29/2023 | 9,379 | 7,258 |
| 8/30/2023 | 8,794 | 6,701 |
| 8/31/2023 | 8,845 | 5,869 |
| 9/1/2023 | 8,919 | 6,793 |
| 9/2/2023 | 9,450 | 5,864 |
| 9/3/2023 | 8,890 | 6,454 |
| 9/4/2023 | 8,926 | 5,856 |
| 9/5/2023 | 8,939 | 6,037 |
| 9/6/2023 | 9,209 | 6,487 |
| 9/7/2023 | 8,893 | 6,557 |
| 9/8/2023 | 9,227 | 7,246 |
| 9/9/2023 | 8,873 | 5,586 |
| 9/10/2023 | 9,132 | 7,001 |
| 9/11/2023 | 9,093 | 7,789 |
| 9/12/2023 | 9,341 | 7,738 |
| 9/13/2023 | 9,664 | 7,339 |
| 9/14/2023 | 9,322 | 6,149 |
| 9/15/2023 | 9,291 | 6,989 |
| 9/16/2023 | 9,052 | 6,208 |
| 9/17/2023 | 8,997 | 7,507 |
| 9/18/2023 | 8,653 | 8,084 |
| 9/19/2023 | 9,469 | 7,707 |
| 9/20/2023 | 9,522 | 9,105 |
| 9/21/2023 | 9,553 | 8,358 |
| 9/22/2023 | 9,917 | 7,972 |
| 9/23/2023 | 9,657 | 7,580 |
| 9/24/2023 | 10,237 | 9,088 |
| 9/25/2023 | 9,975 | 7,248 |
| 9/26/2023 | 9,784 | 9,415 |
| 9/27/2023 | 9,354 | 7,498 |
| 9/28/2023 | 6,803 | 8,938 |
| 9/29/2023 | 7,845 | 6,529 |
| 9/30/2023 | 6,686 | 7,657 |
| 10/1/2023 | 6,205 | 6,638 |
| 10/2/2023 | 5,949 | 7,740 |
| 10/3/2023 | 6,868 | 8,413 |
| 10/4/2023 | 7,024 | 8,276 |
| 10/5/2023 | 7,468 | 6,741 |
| 10/6/2023 | 7,837 | 6,804 |
| 10/7/2023 | | 7,526 |

STB_AR1_001631

| | | |
|---|---|---|
| 10/8/2023 | 5,660 | 6,568 |
| 10/9/2023 | 6,258 | 6,066 |
| 10/10/2023 | 6,501 | 5,229 |
| 10/11/2023 | 5,258 | 6,877 |
| 10/12/2023 | 4,707 | 7,229 |
| 10/13/2023 | 6,016 | 5,079 |
| 10/14/2023 | 5,097 | 5,187 |
| 10/15/2023 | 7,692 | 4,547 |
| 10/16/2023 | 7,198 | 4,663 |
| 10/17/2023 | 8,416 | 4,727 |
| 10/18/2023 | 9,313 | 4,953 |
| 10/19/2023 | 9,811 | 5,169 |
| 10/20/2023 | 9,508 | 5,080 |
| 10/21/2023 | 8,698 | 4,325 |
| 10/22/2023 | 9,028 | 5,371 |
| 10/23/2023 | 10,054 | 5,529 |
| 10/24/2023 | 9,592 | 5,829 |
| 10/25/2023 | 9,728 | 6,285 |
| 10/26/2023 | 9,417 | 7,403 |
| 10/27/2023 | 10,063 | 5,739 |
| 10/28/2023 | 9,284 | 7,072 |
| 10/29/2023 | 9,370 | 6,401 |
| 10/30/2023 | | 5,897 |
| 10/31/2023 | 11,023 | 5,408 |
| 11/1/2023 | 10,196 | 6,233 |
| 11/2/2023 | 10,025 | 5,175 |
| 11/3/2023 | 9,977 | 5,388 |
| 11/4/2023 | 10,790 | 6,164 |
| 11/5/2023 | 10,422 | 6,011 |
| 11/6/2023 | 10,424 | 6,950 |
| 11/7/2023 | 9,766 | 5,358 |
| 11/8/2023 | 10,232 | 5,404 |
| 11/9/2023 | 8,736 | 5,062 |
| 11/10/2023 | 10,079 | 5,387 |
| 11/11/2023 | 10,221 | 5,682 |
| 11/12/2023 | 10,342 | 6,652 |
| 11/13/2023 | 10,305 | 5,892 |
| 11/14/2023 | 10,561 | 6,296 |
| 11/15/2023 | 10,299 | 7,099 |
| 11/16/2023 | 10,461 | 6,443 |
| 11/17/2023 | 9,292 | 6,455 |
| 11/18/2023 | 9,587 | 5,895 |
| 11/19/2023 | 8,679 | 6,754 |
| 11/20/2023 | 9,242 | 6,834 |
| 11/21/2023 | 8,791 | 6,593 |
| 11/22/2023 | 9,375 | 6,522 |
| 11/23/2023 | 8,995 | 6,491 |

STB_AR1_001632

| | | |
|---|---|---|
| 11/24/2023 | 9,117 | 6,429 |
| 11/25/2023 | 8,832 | 7,191 |
| 11/26/2023 | 8,535 | 6,992 |
| 11/27/2023 | 8,767 | 7,574 |
| 11/28/2023 | 9,233 | 7,528 |
| 11/29/2023 | 8,811 | 7,734 |
| 11/30/2023 | 9,016 | 6,920 |
| 12/1/2023 | 8,977 | 7,225 |
| 12/2/2023 | 8,426 | 7,591 |
| 12/3/2023 | 8,289 | 8,421 |
| 12/4/2023 | 8,817 | 8,575 |
| 12/5/2023 | 8,463 | 10,325 |
| 12/6/2023 | 9,152 | 8,248 |
| 12/7/2023 | 9,152 | 7,206 |
| 12/8/2023 | 8,638 | 5,865 |
| 12/9/2023 | 8,652 | 6,207 |
| 12/10/2023 | 8,726 | 7,946 |
| 12/11/2023 | 8,928 | 7,458 |
| 12/12/2023 | 9,038 | 8,318 |
| 12/13/2023 | 9,055 | 9,026 |
| 12/14/2023 | 8,865 | 8,619 |
| 12/15/2023 | 8,458 | 9,372 |
| 12/16/2023 | 7,898 | 8,647 |
| 12/17/2023 | 8,430 | 8,342 |
| 12/18/2023 | 8,766 | 10,823 |
| 12/19/2023 | 9,251 | 10,511 |
| 12/20/2023 | 8,626 | 10,561 |
| 12/21/2023 | 9,188 | 8,990 |
| 12/22/2023 | 8,940 | 8,655 |
| 12/23/2023 | 9,111 | 7,622 |
| 12/24/2023 | 9,271 | 6,761 |
| 12/25/2023 | 9,429 | 5,913 |
| 12/26/2023 | 10,180 | 5,936 |
| 12/27/2023 | 9,429 | 7,703 |
| 12/28/2023 | 9,431 | 8,293 |
| 12/29/2023 | 9,147 | 7,654 |
| 12/30/2023 | 9,406 | 7,030 |
| 12/31/2023 | 8,906 | 5,900 |
| 1/1/2024 | 8,178 | 2,605 |
| 1/2/2024 | 8,605 | 3,939 |
| 1/3/2024 | 9,343 | 4,007 |
| 1/4/2024 | 8,936 | 2,789 |
| 1/5/2024 | 9,488 | 3,053 |
| 1/6/2024 | 8,882 | 3,646 |
| 1/7/2024 | 8,675 | 2,731 |
| 1/8/2024 | 8,567 | 2,765 |
| 1/9/2024 | 9,065 | 3,304 |

STB_AR1_001633

| Date | | |
|---|---|---|
| 1/10/2024 | 8,509 | 2,911 |
| 1/11/2024 | 8,722 | 3,748 |
| 1/12/2024 | 8,537 | 4,100 |
| 1/13/2024 | 8,865 | 4,159 |
| 1/14/2024 | 8,854 | 4,091 |
| 1/15/2024 | | 3,942 |
| 1/16/2024 | 8,591 | 4,330 |
| 1/17/2024 | 9,193 | 4,229 |
| 1/18/2024 | 9,271 | 5,039 |
| 1/19/2024 | 9,314 | 5,025 |
| 1/20/2024 | 8,742 | 4,937 |
| 1/21/2024 | 8,768 | 3,596 |
| 1/22/2024 | 9,004 | 4,109 |
| 1/23/2024 | 9,247 | 4,097 |
| 1/24/2024 | 9,259 | 4,247 |
| 1/25/2024 | 9,576 | 4,883 |
| 1/26/2024 | 9,401 | 4,711 |
| 1/27/2024 | 8,624 | 4,394 |
| 1/28/2024 | 8,625 | 4,334 |
| 1/29/2024 | 8,550 | 4,708 |
| 1/30/2024 | 9,172 | 4,547 |
| 1/31/2024 | 8,833 | 5,242 |
| 2/1/2024 | 8,879 | 5,098 |
| 2/2/2024 | 9,088 | 4,748 |
| 2/3/2024 | 9,314 | 4,884 |
| 2/4/2024 | 8,717 | 4,875 |
| 2/5/2024 | 8,684 | 4,852 |
| 2/6/2024 | 9,114 | 5,297 |
| 2/7/2024 | 9,493 | 4,240 |
| 2/8/2024 | 9,595 | 4,983 |
| 2/9/2024 | 10,065 | 4,931 |
| 2/10/2024 | 9,195 | 5,197 |
| 2/11/2024 | 9,807 | 4,483 |
| 2/12/2024 | 9,874 | 4,506 |
| 2/13/2024 | 9,905 | 4,271 |
| 2/14/2024 | 9,629 | 4,273 |
| 2/15/2024 | 9,191 | 5,086 |
| 2/16/2024 | 9,677 | 4,628 |
| 2/17/2024 | 9,213 | 5,157 |
| 2/18/2024 | 9,590 | 5,002 |
| 2/19/2024 | 9,322 | 5,080 |
| 2/20/2024 | 9,444 | 4,763 |
| 2/21/2024 | 9,287 | 4,397 |
| 2/22/2024 | 9,373 | 4,313 |
| 2/23/2024 | 9,213 | 5,278 |
| 2/24/2024 | 9,073 | 5,952 |
| 2/25/2024 | 9,143 | 4,901 |

STB_AR1_001634

| | | |
|---|---|---|
| 2/26/2024 | 9,034 | 5,087 |
| 2/27/2024 | 9,139 | 4,951 |
| 2/28/2024 | 9,609 | 4,881 |
| 2/29/2024 | 9,569 | 4,527 |
| 3/1/2024 | 9,257 | 5,447 |
| 3/2/2024 | 9,121 | 5,368 |
| 3/3/2024 | 9,657 | 5,394 |
| 3/4/2024 | 9,357 | 5,531 |
| 3/5/2024 | 9,497 | 5,476 |
| 3/6/2024 | 9,114 | 5,633 |
| 3/7/2024 | 9,499 | 5,128 |
| 3/8/2024 | 9,388 | 5,070 |
| 3/9/2024 | 8,989 | 4,772 |
| 3/10/2024 | 9,051 | 4,610 |
| 3/11/2024 | 9,197 | 4,309 |
| 3/12/2024 | 9,026 | 4,665 |
| 3/13/2024 | 8,901 | 4,386 |
| 3/14/2024 | 9,395 | 4,267 |
| 3/15/2024 | 9,189 | 4,300 |
| 3/16/2024 | 8,964 | 3,886 |
| 3/17/2024 | 9,315 | 3,541 |
| 3/18/2024 | 9,456 | 4,354 |
| 3/19/2024 | 9,007 | 3,759 |
| 3/20/2024 | 9,355 | 3,623 |
| 3/21/2024 | 9,350 | 3,998 |
| 3/22/2024 | 8,996 | 3,461 |
| 3/23/2024 | 9,006 | 3,779 |
| 3/24/2024 | 8,822 | 3,665 |
| 3/25/2024 | 8,787 | 4,126 |
| 3/26/2024 | 9,538 | 4,502 |
| 3/27/2024 | 9,443 | 4,300 |
| 3/28/2024 | 9,716 | 4,457 |
| 3/29/2024 | 9,620 | 3,990 |
| 3/30/2024 | 9,063 | 3,859 |
| 3/31/2024 | 8,847 | 3,820 |
| 4/1/2024 | 8,865 | 3,197 |
| 4/2/2024 | 9,058 | 3,672 |
| 4/3/2024 | 9,174 | 4,086 |
| 4/4/2024 | 9,094 | 3,898 |
| 4/5/2024 | 9,339 | 4,007 |
| 4/6/2024 | 9,407 | 4,141 |
| 4/7/2024 | 9,184 | 3,201 |
| 4/8/2024 | 8,836 | 3,368 |
| 4/9/2024 | 9,408 | 3,799 |
| 4/10/2024 | 9,393 | 4,336 |
| 4/11/2024 | 9,363 | 3,820 |
| 4/12/2024 | 9,653 | 4,525 |

STB_AR1_001635

| Date | | | OTM | Mex | | |
|---|---|---|---|---|---|---|
| 4/13/2024 | 9,222 | 4,259 | | | 9,294 | April 7-13 |
| 4/14/2024 | 9,566 | 4,196 | | | | |
| 4/15/2024 | 9,546 | 4,372 | | | | |
| 4/16/2024 | 9,388 | 4,919 | | | | |
| 4/17/2024 | 9,783 | 5,017 | | | | |
| 4/18/2024 | 9,894 | 4,609 | | | | |
| 4/19/2024 | 10,004 | 5,552 | | | | |
| 4/20/2024 | 9,428 | 4,684 | | | 9,658 | April 14-20 |
| 4/21/2024 | 9,804 | 4,656 | | | | |
| 4/22/2024 | 9,248 | 4,737 | | | | |
| 4/23/2024 | 9,284 | 4,462 | | | | |
| 4/24/2024 | 9,650 | 5,300 | | | | |
| 4/25/2024 | 9,481 | 4,528 | | | | |
| 4/26/2024 | 9,305 | 4,694 | | | | |
| 4/27/2024 | 9,109 | 4,814 | | | 9,412 | April 21-27 |
| 4/28/2024 | 8,985 | 4,009 | | | | |
| 4/29/2024 | 9,093 | 3,940 | | | | |
| 4/30/2024 | 9,167 | 4,097 | | | | |
| 5/1/2024 | 8,968 | 4,244 | | | | |
| 5/2/2024 | 9,736 | 4,001 | | | | |
| 5/3/2024 | 9,646 | 3,819 | | | | |
| 5/4/2024 | 9,471 | 3,885 | | | 9,295 | April 28-May 4 |
| 5/5/2024 | 9,322 | 4,166 | | | | |
| 5/6/2024 | 9,152 | 3,552 | | | | |
| 5/7/2024 | 9,074 | 4,582 | | | | |
| 5/8/2024 | 9,256 | 3,806 | | | | |
| 5/9/2024 | 9,165 | 3,856 | | | | |
| 5/10/2024 | 9,074 | 3,858 | | | | |
| 5/11/2024 | 8,910 | 3,686 | | | 9,136 | May 5-11 |
| 5/12/2024 | 8,834 | 3,716 | | | | |
| 5/13/2024 | 8,823 | 3,469 | | | | |
| 5/14/2024 | 8,871 | 3,829 | | | | |
| 5/15/2024 | 9,055 | 3,685 | | | | |
| 5/16/2024 | 8,872 | 3,947 | | | | |
| 5/17/2024 | 9,145 | 3,739 | | | | |
| 5/18/2024 | 9,122 | 3,515 | | | 8,960 | May 12-18 |
| 5/19/2024 | 8,852 | 3,349 | | | | |
| 5/20/2024 | 8,875 | 3,000 | | | | |
| 5/21/2024 | 8,955 | 3,707 | | | | |
| 5/22/2024 | 8,967 | 3,682 | | | | |
| 5/23/2024 | 8,759 | 4,153 | | | | |
| 5/24/2024 | 9,073 | 3,743 | | | | |
| 5/25/2024 | 8,788 | 3,758 | | | 8,896 | May 19-25 |
| 5/26/2024 | 8,830 | 3,430 | 1,996 | 1,434 | | |
| 5/27/2024 | 8,774 | 3,971 | 2,511 | 1,460 | | |
| 5/28/2024 | 8,763 | 3,443 | 2,084 | 1,359 | | |

STB_AR1_001636

| Date | | | | | |
|---|---|---|---|---|---|
| 5/29/2024 | 8,738 | 4,062 | 2,393 | 1,669 | |
| 5/30/2024 | 8,695 | 3,978 | 2,265 | 1,713 | |
| 5/31/2024 | 8,816 | 4,276 | 2,606 | 1,670 | |
| 6/1/2024 | 8,449 | 3,763 | 2,379 | 1,384 | 8,724 | May 26-June 1 |
| 6/2/2024 | 9,048 | 3,661 | 2,550 | 1,111 | |
| 6/3/2024 | 8,877 | 3,517 | 2,339 | 1,178 | |
| 6/4/2024 | 8,782 | 4,331 | 2,795 | 1,536 | |
| 6/5/2024 | 8,908 | 4,004 | 2,439 | 1,565 | |
| 6/6/2024 | 9,141 | 3,792 | 2,350 | 1,442 | |
| 6/7/2024 | 8,942 | 3,115 | 1,617 | 1,498 | |
| 6/8/2024 | 9,012 | 3,626 | 2,246 | 1,380 | 8,959 | June 2-8 |
| 6/9/2024 | 8,652 | 3,189 | 1,869 | 1,320 | |
| 6/10/2024 | 8,800 | 3,082 | 1,987 | 1,095 | |
| 6/11/2024 | 8,729 | 3,297 | 1,931 | 1,366 | |
| 6/12/2024 | 8,824 | 3,000 | 1,904 | 1,096 | |
| 6/13/2024 | 8,763 | 2,957 | 1,748 | 1,209 | |
| 6/14/2024 | 8,916 | 3,049 | 1,861 | 1,188 | |
| 6/15/2024 | 8,736 | 2,844 | 1,723 | 1,121 | 8,774 | June 9-15 |
| 6/16/2024 | 8,637 | 2,470 | 1,626 | 844 | |
| 6/17/2024 | 8,604 | 2,117 | 1,335 | 782 | |
| 6/18/2024 | 8,762 | 2,620 | 1,550 | 1,070 | |
| 6/19/2024 | 8,681 | 2,434 | 1,461 | 974 | |
| 6/20/2024 | 8,778 | 2,602 | 1,613 | 989 | |
| 6/21/2024 | 8,643 | 2,099 | 1,209 | 890 | |
| 6/22/2024 | 8,411 | 2,262 | 1,506 | 756 | 8,645 | June 16-22 |
| 6/23/2024 | 8,563 | 1,929 | 1,071 | 858 | |
| 6/24/2024 | 8,582 | 2,101 | 1,377 | 724 | |
| 6/25/2024 | 8,680 | 2,065 | 1,267 | 798 | |
| 6/26/2024 | 8,575 | 1,979 | 1,154 | 825 | |
| 6/27/2024 | 8,713 | 1,878 | 1,093 | 785 | |
| 6/28/2024 | 8,684 | 1,999 | 1,246 | 753 | |
| 6/29/2024 | 8,392 | 1,765 | 1,061 | 704 | 8,598 | June 23-29 |
| 6/30/2024 | 8,220 | 1,988 | 1,263 | 725 | |
| 7/1/2024 | 8,307 | 1,879 | 1,135 | 744 | |
| 7/2/2024 | 8,367 | 1,974 | 1,123 | 851 | |
| 7/3/2024 | 8,624 | 1,908 | 1,228 | 680 | |
| 7/4/2024 | 8,511 | 2,098 | 1,277 | 821 | |
| 7/5/2024 | 8,407 | 1,786 | 1,048 | 738 | |
| 7/6/2024 | 8,310 | 1,924 | 1,321 | 603 | 8,392 | June 30-July 6 |
| 7/7/2024 | 8,303 | 1,733 | 1,074 | 659 | |
| 7/8/2024 | 8,343 | 1,817 | 1,272 | 545 | |
| 7/9/2024 | 8,329 | 1,972 | 1,231 | 741 | |
| 7/10/2024 | 8,488 | 1,970 | 1,309 | 661 | |
| 7/11/2024 | 8,447 | 1,658 | 1,026 | 633 | |
| 7/12/2024 | 8,240 | 1,776 | 1,208 | 568 | |
| 7/13/2024 | 8,247 | 1,870 | 1,188 | 682 | 8,342 | July 7-13 |



10000

| Date | | | | | |
|---|---|---|---|---|---|
| 7/14/2024 | 8,044 | 1,795 | 1,146 | 649 | |
| 7/15/2024 | 8,137 | 1,703 | 1,121 | 582 | |
| 7/16/2024 | 8,179 | 1,858 | 1,092 | 766 | |
| 7/17/2024 | 8,232 | 1,743 | 1,002 | 741 | |
| 7/18/2024 | 8,276 | 2,016 | 1,205 | 811 | |
| 7/19/2024 | 8,092 | 1,690 | 1,016 | 674 | |
| 7/20/2024 | 8,151 | 1,659 | 1,025 | 635 | 8,159 — July 14-20 |
| 7/21/2024 | 8,081 | 1,850 | 1,015 | 835 | |
| 7/22/2024 | 8,025 | 1,489 | 795 | 694 | |
| 7/23/2024 | 8,125 | 1,827 | 1,037 | 790 | |
| 7/24/2024 | 8,456 | 1,828 | 1,113 | 715 | |
| 7/25/2024 | 8,320 | 1,594 | 860 | 734 | |
| 7/26/2024 | 8,254 | 1,777 | 914 | 863 | |
| 7/27/2024 | 8,145 | 1,923 | 1,204 | 719 | 8,201 — July 21-27 |
| 7/28/2024 | 8,113 | 1,905 | 1,181 | 724 | |
| 7/29/2024 | 8,007 | 1,647 | 883 | 766 | |
| 7/30/2024 | 8,136 | 1,960 | 1,089 | 869 | |
| 7/31/2024 | 8,127 | 1,810 | 1,064 | 746 | |
| 8/1/2024 | 7,940 | 1,826 | 1,093 | 733 | |
| 8/2/2024 | 8,047 | 1,817 | 1,012 | 805 | |
| 8/3/2024 | 8,054 | 1,664 | 884 | 780 | 8,061 — July 28-August 3 |
| 8/4/2024 | 7,725 | 1,469 | 732 | 737 | |
| 8/5/2024 | 7,937 | 1,798 | 1,105 | 693 | |
| 8/6/2024 | 7,864 | 1,917 | 1,022 | 895 | |
| 8/7/2024 | 7,911 | 2,109 | 1,186 | 923 | |
| 8/8/2024 | 7,809 | 1,705 | 877 | 828 | |
| 8/9/2024 | 7,936 | 1,847 | 1,057 | 790 | |
| 8/10/2024 | 7,528 | 1,955 | 1,046 | 909 | 7,816 — August 4-August 10 |
| 8/11/2024 | 7,657 | 1,735 | 927 | 808 | |
| 8/12/2024 | 7,150 | 1,642 | 906 | 736 | |
| 8/13/2024 | 7,294 | 1,751 | 815 | 936 | |
| 8/14/2024 | 7,725 | 1,838 | 938 | 900 | |
| 8/15/2024 | 7,288 | 1,872 | 968 | 904 | |
| 8/16/2024 | 7,556 | 1,805 | 896 | 909 | |
| 8/17/2024 | 7,222 | 2,080 | 1,148 | 932 | 7,413 — August 11-August 17 |
| 8/18/2024 | 7,111 | 1,558 | 775 | 783 | |
| 8/19/2024 | 7,298 | 2,010 | 1,259 | 751 | |
| 8/20/2024 | 7,391 | 1,964 | 1,018 | 946 | |
| 8/21/2024 | 7,395 | 1,812 | 846 | 966 | |
| 8/22/2024 | 7,314 | 1,885 | 965 | 920 | |
| 8/23/2024 | 7,316 | 1,872 | 1,010 | 862 | |
| 8/24/2024 | 7,426 | 1,953 | 1,032 | 921 | 7,322 — August 18-August 24 |
| 8/25/2024 | 7,105 | 1,842 | 907 | 935 | |
| 8/26/2024 | 7,255 | 1,943 | 1,040 | 903 | |
| 8/27/2024 | 7,245 | 1,900 | 997 | 903 | |
| 8/28/2024 | 7,292 | 2,171 | 1,232 | 939 | |
| 8/29/2024 | 6,929 | 2,232 | 1,383 | 849 | |





STB_AR1_001638

| 8/30/2024 | 7,007 | 1,887 | 986 | 901 | | |
| 8/31/2024 | 6,812 | 2,242 | 1,189 | 1,053 | 7,092 | August 25-August 31 |

Source: Office of Homeland Security Statistics analysis of Mexico's immigration Data provided to DHS by the Government of Mexico as of August 31, 2024 and data downloaded from UIP Sept. 3, 2024.

STB_AR1_001639



| | Total USBP | OTM | Mex |
|---|---|---|---|
| | -13% | -17% | -6% |
| | -21% | -19% | -24% | -2% |
| | -19% | -19% | -18% |
| | -13% | -15% | -10% |
| | -2% | 5% | -11% |
| | -5% | -4% | -5% |
| | -3% | -12% | 14% |
| | 3% | 2% | 4% |
| | 0% | -1% | 1% |
| | 2% | 3% | 0% |
| | 0% | 1% | -1% |
| | -2% | -4% | 1% |
| | 13% | 7% | 20% |
| | -48% | -55% | -37% |

STB_AR1_001640

STB_AR1_001641

STB_AR1_001642

STB_AR1_001643

STB_AR1_001644

STB_AR1_001645

STB_AR1_001646

STB_AR1_001647

STB_AR1_001648

STB_AR1_001649

STB_AR1_001650



STB_AR1_001651



STB_AR1_001652

| Sum of mex_app | Column Labels | | |
|---|---|---|---|
| Row Labels | 2022 | 2023 | 2024 |
| **Jan** | **31247** | **96403** | **267396** |
| 1 | 328 | 2546 | 8178 |
| 2 | 386 | 2469 | 8605 |
| 3 | 503 | 2910 | 9343 |
| 4 | 641 | 2759 | 8936 |
| 5 | 685 | 3293 | 9488 |
| 6 | 792 | 3613 | 8882 |
| 7 | 743 | 3137 | 8675 |
| 8 | 656 | 2947 | 8567 |
| 9 | 662 | 3280 | 9065 |
| 10 | 757 | 3108 | 8509 |
| 11 | 836 | 3466 | 8722 |
| 12 | 1075 | 2909 | 8537 |
| 13 | 965 | 3392 | 8865 |
| 14 | 1191 | 2928 | 8854 |
| 15 | 1032 | 2820 | |
| 16 | 1210 | 2872 | 8591 |
| 17 | 1001 | 3277 | 9193 |
| 18 | 1425 | 3209 | 9271 |
| 19 | 1462 | 3581 | 9314 |
| 20 | 1477 | 3415 | 8742 |
| 21 | 1489 | 3138 | 8768 |
| 22 | 1444 | 3071 | 9004 |
| 23 | 1095 | 2916 | 9247 |
| 24 | 1023 | 2825 | 9259 |
| 25 | 1199 | 3115 | 9576 |
| 26 | 1403 | 3312 | 9401 |
| 27 | 1525 | 3204 | 8624 |
| 28 | 975 | 3320 | 8625 |
| 29 | 992 | 3102 | 8550 |
| 30 | 922 | 3284 | 9172 |
| 31 | 1353 | 3185 | 8833 |
| **Feb** | **32634** | **94762** | **271236** |
| 1 | 1037 | 3414 | 8879 |
| 2 | 1225 | 3725 | 9088 |
| 3 | 1103 | 3668 | 9314 |
| 4 | 1116 | 3501 | 8717 |
| 5 | 1444 | | 8684 |
| 6 | 1030 | 3737 | 9114 |
| 7 | 981 | 3400 | 9493 |
| 8 | 887 | 3456 | 9595 |
| 9 | 1150 | 3829 | 10065 |
| 10 | 1550 | 3800 | 9195 |
| 11 | 1298 | 3545 | 9807 |
| 12 | 1148 | 3664 | 9874 |



Mexico Daily Encounters, Jan 1 - Sep 30
FY 2022 - 2024

STB_AR1_001653

|     |       |        |        |
|-----|-------|--------|--------|
| 13  | 947   | 3350   | 9905   |
| 14  | 968   | 3267   | 9629   |
| 15  | 1206  | 3651   | 9191   |
| 16  | 1266  | 3425   | 9677   |
| 17  | 1445  | 3451   | 9213   |
| 18  | 1400  | 3492   | 9590   |
| 19  | 1126  | 3539   | 9322   |
| 20  | 1146  | 3144   | 9444   |
| 21  | 1095  | 3162   | 9287   |
| 22  | 1124  | 3444   | 9373   |
| 23  | 1265  | 3567   | 9213   |
| 24  | 1400  | 3935   | 9073   |
| 25  | 1270  | 3503   | 9143   |
| 26  | 921   | 3408   | 9034   |
| 27  | 1157  | 3291   | 9139   |
| 28  | 929   | 3394   | 9609   |
| 29  |       |        | 9569   |
| **Mar** | **35452** | **109543** | **285923** |
| 1   | 1040  | 3377   | 9257   |
| 2   | 1368  | 3547   | 9121   |
| 3   | 1177  | 3440   | 9657   |
| 4   | 1135  | 3332   | 9357   |
| 5   | 945   | 3247   | 9497   |
| 6   | 1057  | 3835   | 9114   |
| 7   | 1029  | 3708   | 9499   |
| 8   | 1305  | 3220   | 9388   |
| 9   | 1200  | 3458   | 8989   |
| 10  | 1233  | 3451   | 9051   |
| 11  | 1250  | 3122   | 9197   |
| 12  | 970   | 3272   | 9026   |
| 13  | 1021  | 3337   | 8901   |
| 14  | 812   | 3464   | 9395   |
| 15  | 1161  | 4115   | 9189   |
| 16  | 1256  | 3438   | 8964   |
| 17  | 1069  | 3642   | 9315   |
| 18  | 994   | 3378   | 9456   |
| 19  | 1062  | 3158   | 9007   |
| 20  | 995   | 3352   | 9355   |
| 21  | 848   | 3350   | 9350   |
| 22  | 1124  | 3436   | 8996   |
| 23  | 1146  | 3881   | 9006   |
| 24  | 1478  | 3396   | 8822   |
| 25  | 1221  | 3735   | 8787   |
| 26  | 1081  | 3591   | 9538   |
| 27  | 1240  | 3874   | 9443   |
| 28  | 976   | 3851   | 9716   |
| 29  | 1485  | 4132   | 9620   |

STB_AR1_001654

| | | | |
|---|---|---|---|
| 30 | 1466 | 3813 | 9063 |
| 31 | 1308 | 3591 | 8847 |
| **Apr** | **38677** | **114384** | **280731** |
| 1 | 1155 | 3888 | 8865 |
| 2 | 939 | 3538 | 9058 |
| 3 | 997 | 3157 | 9174 |
| 4 | 1059 | 3886 | 9094 |
| 5 | 1366 | 3685 | 9339 |
| 6 | 1198 | 3539 | 9407 |
| 7 | 1779 | 3696 | 9184 |
| 8 | 1507 | 3417 | 8836 |
| 9 | 1053 | 2905 | 9408 |
| 10 | 971 | 3141 | 9393 |
| 11 | 1286 | 3632 | 9363 |
| 12 | 1187 | 3747 | 9653 |
| 13 | 1452 | 4352 | 9222 |
| 14 | 1391 | 3806 | 9566 |
| 15 | 1136 | 3796 | 9546 |
| 16 | 898 | 3849 | 9388 |
| 17 | 1372 | 3770 | 9783 |
| 18 | 761 | 4359 | 9894 |
| 19 | 979 | 3970 | 10004 |
| 20 | 1058 | 4519 | 9428 |
| 21 | 1297 | 4206 | 9804 |
| 22 | 1060 | 4109 | 9248 |
| 23 | 1898 | 3703 | 9284 |
| 24 | 1433 | 3952 | 9650 |
| 25 | 1031 | 4178 | 9481 |
| 26 | 1147 | 4064 | 9305 |
| 27 | 2666 | 4219 | 9109 |
| 28 | 1740 | 3720 | 8985 |
| 29 | 1598 | 4023 | 9093 |
| 30 | 1263 | 3558 | 9167 |
| **May** | **43821** | **159076** | **279381** |
| 1 | 1472 | 3562 | 8968 |
| 2 | 1241 | 4203 | 9736 |
| 3 | 1497 | 4210 | 9646 |
| 4 | 1830 | 4084 | 9471 |
| 5 | 1415 | 4021 | 9322 |
| 6 | 1608 | 3985 | 9152 |
| 7 | 1907 | 4114 | 9074 |
| 8 | 1175 | 4349 | 9256 |
| 9 | 1159 | 4729 | 9165 |
| 10 | 1285 | 5289 | 9074 |
| 11 | 1232 | 5499 | 8910 |
| 12 | 1617 | 5425 | 8834 |
| 13 | 1520 | 5117 | 8823 |

STB_AR1_001655

| | | | |
|---|---|---|---|
| 14 | 1440 | 3387 | 8871 |
| 15 | 1311 | 5383 | 9055 |
| 16 | 1488 | 6065 | 8872 |
| 17 | 1501 | 5975 | 9145 |
| 18 | 1801 | | 9122 |
| 19 | 1600 | 5949 | 8852 |
| 20 | 1624 | 5932 | 8875 |
| 21 | 1368 | 5859 | 8955 |
| 22 | 1363 | 6117 | 8967 |
| 23 | 1084 | 6370 | 8759 |
| 24 | 1252 | 6246 | 9073 |
| 25 | 1364 | 6302 | 8788 |
| 26 | 1495 | 6452 | 8830 |
| 27 | 1221 | 6182 | 8774 |
| 28 | 1549 | 6130 | 8763 |
| 29 | 1268 | 5970 | 8738 |
| 30 | 1027 | 6023 | 8695 |
| 31 | 1107 | 6147 | 8816 |
| **Jun** | **43925** | **192061** | **261504** |
| 1 | 1417 | 6265 | 8449 |
| 2 | 1439 | 6162 | 9048 |
| 3 | 1514 | 6327 | 8877 |
| 4 | 1485 | 6123 | 8782 |
| 5 | 1422 | 5955 | 8908 |
| 6 | 1102 | 6167 | 9141 |
| 7 | 1669 | 6421 | 8942 |
| 8 | 1244 | 6392 | 9012 |
| 9 | 1532 | 6714 | 8652 |
| 10 | 1496 | 6476 | 8800 |
| 11 | 1357 | 6418 | 8729 |
| 12 | 1606 | 6500 | 8824 |
| 13 | 1470 | 6603 | 8763 |
| 14 | 1618 | 6405 | 8916 |
| 15 | 1644 | | 8736 |
| 16 | 1754 | 6617 | 8637 |
| 17 | 1435 | 6718 | 8604 |
| 18 | 1426 | 6563 | 8762 |
| 19 | 1435 | 6429 | 8681 |
| 20 | 1081 | 6479 | 8778 |
| 21 | 1500 | 6816 | 8643 |
| 22 | 1424 | 7354 | 8411 |
| 23 | 1725 | 6987 | 8563 |
| 24 | 1622 | 6805 | 8582 |
| 25 | 1208 | 7272 | 8680 |
| 26 | 1275 | 6913 | 8575 |
| 27 | 1323 | 7480 | 8713 |
| 28 | 1361 | 6929 | 8684 |

STB_AR1_001656

|     |      |        |        |
|-----|------|--------|--------|
| 29  | 1456 | 6979   | 8392   |
| 30  | 1885 | 6792   | 8220   |
| **Jul** | **51357** | **219009** | **255823** |
| 1   | 1626 | 6187   | 8307   |
| 2   | 1551 | 6212   | 8367   |
| 3   | 1533 | 6452   | 8624   |
| 4   | 1628 | 6629   | 8511   |
| 5   | 1607 | 6433   | 8407   |
| 6   | 1594 | 6789   | 8310   |
| 7   | 1804 | 6626   | 8303   |
| 8   | 1627 | 6578   | 8343   |
| 9   | 1487 | 6782   | 8329   |
| 10  | 1486 | 6791   | 8488   |
| 11  | 1669 | 7342   | 8447   |
| 12  | 1743 | 6795   | 8240   |
| 13  | 1647 | 7354   | 8247   |
| 14  | 1911 | 7135   | 8044   |
| 15  | 1356 | 7333   | 8137   |
| 16  | 1649 | 7088   | 8179   |
| 17  | 1509 | 7095   | 8232   |
| 18  | 1670 | 7092   | 8276   |
| 19  | 1498 | 7329   | 8092   |
| 20  | 1803 | 7768   | 8151   |
| 21  | 1576 | 7268   | 8081   |
| 22  | 1793 | 7172   | 8025   |
| 23  | 1624 | 7006   | 8125   |
| 24  | 1965 | 7481   | 8456   |
| 25  | 1472 | 7362   | 8320   |
| 26  | 1656 | 7580   | 8254   |
| 27  | 1942 | 7677   | 8145   |
| 28  | 1915 | 7516   | 8113   |
| 29  | 2019 | 7413   | 8007   |
| 30  | 1384 | 7392   | 8136   |
| 31  | 1613 | 7332   | 8127   |
| **Aug** | **66306** | **265044** | **159838** |
| 1   | 1509 | 7491   | 7940   |
| 2   | 1791 | 7825   | 8047   |
| 3   | 2245 | 7633   | 8054   |
| 4   | 2587 | 8264   | 7725   |
| 5   | 2129 | 7784   | 7937   |
| 6   | 2010 | 7796   | 7864   |
| 7   | 1903 | 8012   | 7911   |
| 8   | 1839 | 8730   | 7809   |
| 9   | 1883 | 8552   | 7936   |
| 10  | 1970 | 8318   | 7528   |
| 11  | 2282 | 8494   | 7657   |
| 12  | 1985 | 8213   | 7150   |

STB_AR1_001657

| | | | |
|---|---|---|---|
| 13 | 2698 | 8642 | 7294 |
| 14 | 1614 | 8334 | 7725 |
| 15 | 1799 | 9072 | 7288 |
| 16 | 2226 | 8924 | 7556 |
| 17 | 2177 | 8610 | 7222 |
| 18 | 2418 | 9223 | 7111 |
| 19 | 2307 | 8892 | 7298 |
| 20 | 2038 | 8525 | 7391 |
| 21 | 2015 | 8867 | 7395 |
| 22 | 2003 | 8902 | 7314 |
| 23 | 2759 | 8782 | 7316 |
| 24 | 2982 | 8972 | 7426 |
| 25 | 2625 | 8957 | 7105 |
| 26 | 2216 | 8794 | 7255 |
| 27 | 2161 | 8523 | 7245 |
| 28 | 2012 | 8895 | 7292 |
| 29 | 2051 | 9379 | 6929 |
| 30 | 2019 | 8794 | 7007 |
| 31 | 2053 | 8845 | 6812 |
| **Grand Total** | **343419** | **1250282** | **2061832** |

Source: Office of Homeland Security Statistics analysis of Mexico's immigration Data provided to DHS by the Government of Mexico as of August 31, 2024.

STB_AR1_001658





'21 25 29

STB_AR1_001659

**Table 39.**
**NONCITIZEN REMOVALS, RETURNS, AND EXPULSIONS: FISCAL YEARS 1892 TO 2022**

| Year | Removals[1] | Administrative Returns[2] | Enforcement Returns[2] | Expulsions[3] | Total Title 8 Repatriations | Title 8 Enforcement Repatriations |
|------|------------|--------------------------|------------------------|---------------|------------------------------|-----------------------------------|
| 1892 | 2,801 | NA | NA | X | 2,801 | 2,801 |
| 1893 | 1,630 | NA | NA | X | 1,630 | 1,630 |
| 1894 | 1,806 | NA | NA | X | 1,806 | 1,806 |
| 1895 | 2,596 | NA | NA | X | 2,596 | 2,596 |
| 1896 | 3,037 | NA | NA | X | 3,037 | 3,037 |
| 1897 | 1,880 | NA | NA | X | 1,880 | 1,880 |
| 1898 | 3,229 | NA | NA | X | 3,229 | 3,229 |
| 1899 | 4,052 | NA | NA | X | 4,052 | 4,052 |
| 1900 | 4,602 | NA | NA | X | 4,602 | 4,602 |
| 1901 | 3,879 | NA | NA | X | 3,879 | 3,879 |
| 1902 | 5,439 | NA | NA | X | 5,439 | 5,439 |
| 1903 | 9,316 | NA | NA | X | 9,316 | 9,316 |
| 1904 | 8,773 | NA | NA | X | 8,773 | 8,773 |
| 1905 | 12,724 | NA | NA | X | 12,724 | 12,724 |
| 1906 | 13,108 | NA | NA | X | 13,108 | 13,108 |
| 1907 | 14,059 | NA | NA | X | 14,059 | 14,059 |
| 1908 | 12,971 | NA | NA | X | 12,971 | 12,971 |
| 1909 | 12,535 | NA | NA | X | 12,535 | 12,535 |
| 1910 | 26,965 | NA | NA | X | 26,965 | 26,965 |
| 1911 | 25,137 | NA | NA | X | 25,137 | 25,137 |
| 1912 | 18,513 | NA | NA | X | 18,513 | 18,513 |
| 1913 | 23,399 | NA | NA | X | 23,399 | 23,399 |
| 1914 | 37,651 | NA | NA | X | 37,651 | 37,651 |
| 1915 | 26,675 | NA | NA | X | 26,675 | 26,675 |
| 1916 | 21,648 | NA | NA | X | 21,648 | 21,648 |
| 1917 | 17,881 | NA | NA | X | 17,881 | 17,881 |
| 1918 | 8,866 | NA | NA | X | 8,866 | 8,866 |
| 1919 | 11,694 | NA | NA | X | 11,694 | 11,694 |
| 1920 | 14,557 | NA | NA | X | 14,557 | 14,557 |
| 1921 | 18,296 | NA | NA | X | 18,296 | 18,296 |
| 1922 | 18,076 | NA | NA | X | 18,076 | 18,076 |
| 1923 | 24,280 | NA | NA | X | 24,280 | 24,280 |
| 1924 | 36,693 | NA | NA | X | 36,693 | 36,693 |
| 1925 | 34,885 | NA | NA | X | 34,885 | 34,885 |
| 1926 | 31,454 | NA | NA | X | 31,454 | 31,454 |
| 1927 | 31,417 | NA | 15,012 | X | 46,429 | 46,429 |
| 1928 | 30,464 | NA | 19,946 | X | 50,410 | 50,410 |
| 1929 | 31,035 | NA | 25,888 | X | 56,923 | 56,923 |
| 1930 | 24,864 | NA | 11,387 | X | 36,251 | 36,251 |
| 1931 | 27,886 | NA | 11,719 | X | 39,605 | 39,605 |
| 1932 | 26,490 | NA | 10,775 | X | 37,265 | 37,265 |
| 1933 | 25,392 | NA | 10,347 | X | 35,739 | 35,739 |
| 1934 | 14,263 | NA | 8,010 | X | 22,273 | 22,273 |
| 1935 | 13,877 | NA | 7,978 | X | 21,855 | 21,855 |
| 1936 | 16,195 | NA | 8,251 | X | 24,446 | 24,446 |
| 1937 | 16,905 | NA | 8,788 | X | 25,693 | 25,693 |
| 1938 | 17,341 | NA | 9,278 | X | 26,619 | 26,619 |
| 1939 | 14,700 | NA | 9,590 | X | 24,290 | 24,290 |
| 1940 | 12,254 | NA | 8,594 | X | 20,848 | 20,848 |

| | | | | | |
|---|---|---|---|---|---|
| 1941 | 7,336 | NA | 6,531 | X | 13,867 | 13,867 |
| 1942 | 5,542 | NA | 6,904 | X | 12,446 | 12,446 |
| 1943 | 5,702 | NA | 11,947 | X | 17,649 | 17,649 |
| 1944 | 8,821 | NA | 32,270 | X | 41,091 | 41,091 |
| 1945 | 13,611 | NA | 69,490 | X | 83,101 | 83,101 |
| 1946 | 17,317 | NA | 101,945 | X | 119,262 | 119,262 |
| 1947 | 23,434 | NA | 195,880 | X | 219,314 | 219,314 |
| 1948 | 25,276 | NA | 197,184 | X | 222,460 | 222,460 |
| 1949 | 23,874 | NA | 276,297 | X | 300,171 | 300,171 |
| 1950 | 10,199 | NA | 572,477 | X | 582,676 | 582,676 |
| 1951 | 17,328 | NA | 673,169 | X | 690,497 | 690,497 |
| 1952 | 23,125 | NA | 703,778 | X | 726,903 | 726,903 |
| 1953 | 23,482 | NA | 885,391 | X | 908,873 | 908,873 |
| 1954 | 30,264 | NA | 1,074,277 | X | 1,104,541 | 1,104,541 |
| 1955 | 17,695 | NA | 232,769 | X | 250,464 | 250,464 |
| 1956 | 9,006 | NA | 80,891 | X | 89,897 | 89,897 |
| 1957 | 5,989 | NA | 63,379 | X | 69,368 | 69,368 |
| 1958 | 7,875 | NA | 60,600 | X | 68,475 | 68,475 |
| 1959 | 8,468 | NA | 56,610 | X | 65,078 | 65,078 |
| 1960 | 7,240 | NA | 52,796 | X | 60,036 | 60,036 |
| 1961 | 8,181 | NA | 52,383 | X | 60,564 | 60,564 |
| 1962 | 8,025 | NA | 54,164 | X | 62,189 | 62,189 |
| 1963 | 7,763 | NA | 69,392 | X | 77,155 | 77,155 |
| 1964 | 9,167 | NA | 73,042 | X | 82,209 | 82,209 |
| 1965 | 10,572 | NA | 95,263 | X | 105,835 | 105,835 |
| 1966 | 9,680 | NA | 123,683 | X | 133,363 | 133,363 |
| 1967 | 9,728 | NA | 142,343 | X | 152,071 | 152,071 |
| 1968 | 9,590 | NA | 179,952 | X | 189,542 | 189,542 |
| 1969 | 11,030 | NA | 240,958 | X | 251,988 | 251,988 |
| 1970 | 17,469 | NA | 303,348 | X | 320,817 | 320,817 |
| 1971 | 18,294 | NA | 370,074 | X | 388,368 | 388,368 |
| 1972 | 16,883 | NA | 450,927 | X | 467,810 | 467,810 |
| 1973 | 17,346 | NA | 568,005 | X | 585,351 | 585,351 |
| 1974 | 19,413 | NA | 718,740 | X | 738,153 | 738,153 |
| 1975 | 24,432 | NA | 655,814 | X | 680,246 | 680,246 |
| 1976 [4] | 38,471 | NA | 955,374 | X | 993,845 | 993,845 |
| 1977 | 31,263 | NA | 867,015 | X | 898,278 | 898,278 |
| 1978 | 29,277 | NA | 975,515 | X | 1,004,792 | 1,004,792 |
| 1979 | 26,825 | NA | 966,137 | X | 992,962 | 992,962 |
| 1980 | 18,013 | NA | 719,211 | X | 737,224 | 737,224 |
| 1981 | 17,379 | NA | 823,875 | X | 841,254 | 841,254 |
| 1982 | 15,216 | NA | 812,572 | X | 827,788 | 827,788 |
| 1983 | 19,211 | NA | 931,600 | X | 950,811 | 950,811 |
| 1984 | 18,696 | NA | 909,833 | X | 928,529 | 928,529 |
| 1985 | 23,105 | NA | 1,041,296 | X | 1,064,401 | 1,064,401 |
| 1986 | 24,592 | NA | 1,586,320 | X | 1,610,912 | 1,610,912 |
| 1987 | 24,336 | NA | 1,091,203 | X | 1,115,539 | 1,115,539 |
| 1988 | 25,829 | NA | 911,790 | X | 937,619 | 937,619 |
| 1989 | 34,427 | NA | 830,890 | X | 865,317 | 865,317 |
| 1990 | 30,039 | NA | 1,022,533 | X | 1,052,572 | 1,052,572 |
| 1991 | 33,189 | NA | 1,061,105 | X | 1,094,294 | 1,094,294 |
| 1992 | 43,671 | NA | 1,105,829 | X | 1,149,500 | 1,149,500 |
| 1993 | 42,542 | NA | 1,243,410 | X | 1,285,952 | 1,285,952 |

| Year | | | | | | |
|---|---|---|---|---|---|---|
| 1994 | 45,674 | NA | 1,029,107 | X | 1,074,781 | 1,074,781 |
| 1995 | 50,924 | NA | 1,313,764 | X | 1,364,688 | 1,364,688 |
| 1996 | 69,680 | NA | 1,573,428 | X | 1,643,108 | 1,643,108 |
| 1997 | 114,432 | NA | 1,440,684 | X | 1,555,116 | 1,555,116 |
| 1998 | 174,813 | NA | 1,570,127 | X | 1,744,940 | 1,744,940 |
| 1999 | 183,114 | NA | 1,574,863 | X | 1,757,977 | 1,757,977 |
| 2000 | 188,467 | NA | 1,675,876 | X | 1,864,343 | 1,864,343 |
| 2001 | 189,026 | NA | 1,349,371 | X | 1,538,397 | 1,538,397 |
| 2002 | 165,168 | NA | 1,012,116 | X | 1,177,284 | 1,177,284 |
| 2003 | 211,098 | NA | 945,294 | X | 1,156,392 | 1,156,392 |
| 2004 | 240,665 | NA | 1,166,576 | X | 1,407,241 | 1,407,241 |
| 2005 | 246,431 | NA | 1,096,920 | X | 1,343,351 | 1,343,351 |
| 2006 | 280,974 | NA | 1,043,381 | X | 1,324,355 | 1,324,355 |
| 2007 | 319,382 | NA | 891,390 | X | 1,210,772 | 1,210,772 |
| 2008 | 359,795 | NA | 811,263 | X | 1,171,058 | 1,171,058 |
| 2009 | 379,739 | 59,409 | 523,153 | X | 962,301 | 902,892 |
| 2010 | 382,449 | 61,895 | 409,898 | X | 854,242 | 792,347 |
| 2011 | 390,413 | 60,896 | 261,149 | X | 712,458 | 651,562 |
| 2012 | 415,579 | 47,361 | 183,744 | X | 646,684 | 599,323 |
| 2013 | 432,334 | 44,707 | 134,265 | X | 611,306 | 566,599 |
| 2014 | 405,193 | 45,666 | 118,170 | X | 569,029 | 523,363 |
| 2015 | 324,428 | 43,237 | 86,399 | X | 454,064 | 410,827 |
| 2016 [5] | 332,331 | 30,341 | 76,137 | X | 438,809 | 408,468 |
| 2017 | 284,365 | 15,072 | 85,380 | X | 384,817 | 369,745 |
| 2018 | 327,608 | 72,756 | 87,202 | X | 487,566 | 414,810 |
| 2019 | 347,090 | 89,719 | 81,401 | X | 518,210 | 428,491 |
| 2020 | 237,364 | 113,857 | 53,595 | 206,770 | 404,816 | 290,959 |
| 2021 | 85,783 | 128,339 | 49,664 | 1,071,074 | 263,786 | 135,447 |
| 2022 | 108,733 | 180,266 | 81,121 | 1,103,966 | 370,120 | 189,854 |

X Not applicable.

NA Not available.

[1] Removals are the compulsory and confirmed movement of an inadmissible or deportable noncitizen out of the United States based on an order of removal. A noncitizen who is removed has administrative or criminal consequences placed on subsequent reentry owing to the fact of the removal.

[2] Returns are the confirmed movement of an inadmissible or deportable noncitizen out of the United States not based on an order of removal. Administrative returns include crew members from 2005 to 2017, and both crew members and administrative withdrawals since 2018. The enforcement returns are all return

[3] U.S. Border Patrol (USBP) and OFO data for 2020, 2021, and 2022 include encounters resulting in expulsions on public health grounds under U.S. Code Title 42 in response to the COVID-19 pandemic.

[4] Includes the 15 months from July 1, 1975 to September 30, 1976 because the end date of fiscal years was changed from June 30 to September 30.

[5] The counting methodology for administrative arrests by ICE Enforcement and Removal Operations (ERO) was revised to align with ICE ERO reporting for 2016; for earlier years only one administrative arrest could be counted for the same person on the same day.

Source: OHSS 2022 Yearbook of Immigration Statistics.

STB_AR1_001662

STB_AR1_001663

STB_AR1_001664

s with the exception of crew members and administrative withdrawals. All returns are reported as enforcement returns from 1927 to 2008.

STB_AR1_001665

SWB OFO Encounters

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 5,918 | 5,523 | 5,834 | 5,564 | 5,594 | 6,717 | 6,559 | 6,644 | 6,354 | 6,776 | 7,328 | 6,404 | 75,215 |
| 2014 | 6,523 | 6,796 | 7,179 | 6,532 | 6,070 | 7,952 | 7,881 | 8,350 | 8,711 | 8,125 | 8,378 | 8,181 | 90,678 |
| 2015 | 9,453 | 8,383 | 9,212 | 8,665 | 8,178 | 9,371 | 8,549 | 9,108 | 9,317 | 10,222 | 12,180 | 10,885 | 113,523 |
| 2016 | 12,521 | 12,549 | 11,379 | 9,638 | 11,996 | 12,463 | 10,182 | 14,650 | 10,718 | 12,935 | 14,521 | 16,569 | 150,121 |
| 2017 | 20,523 | 16,155 | 15,165 | 10,882 | 4,801 | 4,397 | 4,641 | 5,421 | 5,570 | 6,827 | 8,281 | 8,620 | 111,283 |
| 2018 | 9,354 | 9,946 | 11,481 | 9,890 | 10,024 | 12,823 | 12,776 | 11,451 | 9,007 | 8,706 | 9,027 | 8,880 | 123,365 |
| 2019 | 9,770 | 10,606 | 10,038 | 10,334 | 9,660 | 10,897 | 10,140 | 11,257 | 9,408 | 9,770 | 11,924 | 11,917 | 125,721 |
| 2020 | 9,737 | 9,118 | 7,710 | 7,378 | 6,609 | 4,068 | 924 | 1,644 | 2,213 | 2,393 | 2,731 | 2,906 | 57,431 |
| 2021 | 2,895 | 2,944 | 2,853 | 3,098 | 3,455 | 4,061 | 5,096 | 7,943 | 10,385 | 12,935 | 13,326 | 6,486 | 75,477 |
| 2022 | 5,724 | 7,830 | 8,651 | 6,997 | 6,840 | 11,393 | 32,281 | 16,766 | 15,435 | 18,328 | 22,313 | 19,950 | 172,508 |
| 2023 | 26,395 | 27,493 | 30,297 | 27,845 | 26,109 | 29,577 | 28,071 | 35,308 | 45,018 | 50,837 | 51,909 | 50,972 | 429,831 |
| 2024 | 52,178 | 51,293 | 52,240 | 51,980 | 49,272 | 51,885 | 50,847 | 52,813 | 46,883 | 47,708 | 49,536 | | 556,635 |
| **Grand Total** | **170,991** | **168,636** | **172,039** | **158,804** | **148,608** | **165,604** | **177,947** | **181,356** | **179,019** | **147,854** | **161,918** | **151,770** | **1,984,546** |

Note: August 2024 figure is a preliminary estimate based on opertational data.

Source: July 2024 OHSS Persist and data downloaded from UIP Sept. 3, 2024.

Pre-Pandemic period
Since Jan 2023
FY24 YTD

Since Jan 2023
FY24 YTD

SWB OFO Encounters excluding CBP One

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 5,918 | 5,523 | 5,834 | 5,564 | 5,594 | 6,717 | 6,559 | 6,644 | 6,354 | 6,776 | 7,328 | 6,404 | 75,215 |
| 2014 | 6,523 | 6,796 | 7,179 | 6,532 | 6,070 | 7,952 | 7,881 | 8,350 | 8,711 | 8,125 | 8,378 | 8,181 | 90,678 |
| 2015 | 9,453 | 8,383 | 9,212 | 8,665 | 8,178 | 9,371 | 8,549 | 9,108 | 9,317 | 10,222 | 12,180 | 10,885 | 113,523 |
| 2016 | 12,521 | 12,549 | 11,379 | 9,638 | 11,996 | 12,463 | 10,182 | 14,650 | 10,718 | 12,935 | 14,521 | 16,569 | 150,121 |
| 2017 | 20,523 | 16,155 | 15,165 | 10,882 | 4,801 | 4,397 | 4,641 | 5,421 | 5,570 | 6,827 | 8,281 | 8,620 | 111,283 |
| 2018 | 9,354 | 9,946 | 11,481 | 9,890 | 10,024 | 12,823 | 12,776 | 11,451 | 9,007 | 8,706 | 9,027 | 8,880 | 123,365 |
| 2019 | 9,770 | 10,606 | 10,038 | 10,334 | 9,660 | 10,897 | 10,140 | 11,257 | 9,408 | 9,770 | 11,924 | 11,917 | 125,721 |
| 2020 | 9,737 | 9,118 | 7,710 | 7,378 | 6,609 | 4,068 | 924 | 1,644 | 2,213 | 2,393 | 2,731 | 2,906 | 57,431 |
| 2021 | 2,895 | 2,944 | 2,853 | 3,098 | 3,455 | 4,061 | 5,096 | 7,943 | 10,385 | 12,935 | 13,326 | 6,486 | 75,477 |
| 2022 | 5,724 | 7,830 | 8,651 | 6,997 | 6,840 | 11,393 | 32,281 | 16,766 | 15,435 | 18,328 | 22,313 | 19,950 | 172,508 |
| 2023 | 23,714 | 23,567 | 26,889 | 17,566 | 5,664 | 6,734 | 5,814 | 6,828 | 6,860 | 6,145 | 6,602 | 7,373 | 143,756 |
| 2024 | 7,473 | 7,570 | 6,549 | 7,054 | 7,105 | 7,668 | 7,920 | 8,286 | 5,076 | 4,893 | 4,804 | | 74,398 |
| **Grand Total** | **123,605** | **120,987** | **122,940** | **103,598** | **85,996** | **98,544** | **112,763** | **108,348** | **99,054** | **108,055** | **121,415** | **108,171** | **1,313,476** |

Note: August 2024 figure is a preliminary estimate based on opertational data.

Source: July 2024 OHSS Persist and data downloaded from UIP Sept. 3, 2024.

Pre-Pandemic period
Since Jan 2023
FY24 YTD

| | | |
|---|---|---|
| 326 | 330 | |
| 1,482 | 1,500 | 50 |
| 1,657 | 1,700 | 250 |

| | |
|---|---|
| 4.5 | 4.5 |
| 5.1 | 5.2 |

| | |
|---|---|
| 326 | 300 |
| 249 | 200 |
| 221 | 200 |

STB_AR1_001667

Data are limited to fillings between FY2000 and August 31, 2024
By Filling Date
FIL_FY

Data are limited to completions between FY2000 and Completions 31, 2024
By Completion Date
COMP_FY

| Frequency | Admin Close - NACARA Grant | Admin Close/Dismissal | Asylum Terminated | Deny/Referral | Grant | Pending | Total | | Frequency | Admin Clo: | Admin Clo: | Asylum Te | Deny/Refe | Grant | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 173 | 4,204 | 154 | 19,898 | 17,083 | 17 | 41,529 | | 2000 | 7,433 | 12,483 | 53 | 21,233 | 16,445 | 57,647 | |
| 2001 | 77 | 7,389 | 173 | 30,666 | 21,877 | 23 | 60,205 | | 2001 | 13,507 | 7,154 | 47 | 26,595 | 20,110 | 67,413 | |
| 2002 | 36 | 6,427 | 152 | 33,880 | 18,390 | 49 | 58,934 | | 2002 | 16,087 | 13,499 | 29 | 33,241 | 18,805 | 81,661 | |
| 2003 | 34 | 5,719 | 75 | 25,431 | 11,015 | 32 | 42,306 | | 2003 | 20,280 | 27,483 | 50 | 27,539 | 11,332 | 86,684 | |
| 2004 | 40 | 3,472 | 45 | 15,472 | 8,784 | 21 | 27,834 | | 2004 | 22,695 | 52,268 | 75 | 21,144 | 10,025 | 106,207 | |
| 2005 | 48 | 2,173 | 41 | 14,274 | 7,675 | 33 | 24,244 | | 2005 | 11,657 | 59,516 | 185 | 19,829 | 9,385 | 100,572 | |
| 2006 | 12 | 2,259 | 19 | 12,987 | 7,919 | 28 | 23,224 | | 2006 | 21,171 | 20,839 | 128 | 20,741 | 9,809 | 72,688 | |
| 2007 | 17 | 3,989 | 14 | 13,914 | 7,120 | 28 | 25,082 | | 2007 | 7,668 | 13,856 | 70 | 26,042 | 10,112 | 57,748 | |
| 2008 | 15 | 2,946 | 15 | 14,344 | 7,410 | 26 | 24,756 | | 2008 | 4,436 | 8,817 | 91 | 21,070 | 9,665 | 44,079 | |
| 2009 | 10 | 1,765 | 19 | 14,518 | 7,696 | 22 | 24,030 | | 2009 | 1,386 | 3,893 | 142 | 16,925 | 9,507 | 31,853 | |
| 2010 | 8 | 2,828 | 14 | 16,086 | 9,186 | 43 | 28,165 | | 2010 | 434 | 2,892 | 91 | 16,301 | 8,980 | 28,698 | |
| 2011 | 10 | 4,013 | 49 | 19,171 | 11,389 | 57 | 34,689 | | 2011 | 337 | 3,759 | 85 | 17,943 | 10,423 | 32,547 | |
| 2012 | 9 | 5,641 | 104 | 20,747 | 14,885 | 114 | 41,500 | | 2012 | 253 | 4,571 | 54 | 18,517 | 12,649 | 36,044 | |
| 2013 | 14 | 7,976 | 20 | 18,633 | 17,122 | 472 | 44,237 AVG 2015- 156,198 | | 2013 | 89 | 4,024 | 28 | 12,812 | 10,605 | 27,558 AVG 2015- 47,169 | |
| 2014 | 7 | 10,546 | 8 | 25,478 | 17,070 | 3,969 | 57,078 | | 2014 | 188 | 5,199 | 30 | 12,256 | 10,197 | 27,870 | |
| 2015 | 4 | 15,141 | 7 | 34,086 | 16,549 | 17,933 | 83,720 | | 2015 | 175 | 5,106 | 20 | 17,168 | 13,833 | 36,302 | |
| 2016 | 12 | 18,047 | 1 | 29,428 | 12,177 | 56,792 | 116,457 | | 2016 | 141 | 5,953 | 35 | 13,524 | 9,083 | 28,736 | |
| 2017 | 7 | 19,573 | 3 | 28,810 | 11,022 | 82,448 | 141,863 | | 2017 | 144 | 8,523 | 147 | 24,970 | 12,396 | 46,180 | |
| 2018 | 8 | 11,511 | 3 | 34,694 | 15,318 | 46,553 | 108,087 | | 2018 | 124 | 13,698 | 47 | 44,334 | 16,607 | 74,810 | |
| 2019 | 8 | 8,886 | 3 | 29,653 | 13,940 | 47,555 | 100,045 | | 2019 | 50 | 12,229 | 28 | 42,520 | 17,048 | 71,875 | |
| 2020 | 3 | 9,271 | 0 | 12,626 | 5,769 | 69,603 | 97,272 | | 2020 | 61 | 15,401 | 33 | 27,632 | 9,888 | 53,015 | |
| 2021 | 3 | 5,310 | 0 | 10,302 | 3,217 | 45,784 | 64,616 | | 2021 | 70 | 13,999 | 17 | 17,265 | 5,881 | 37,232 | |
| 2022 | 2 | 28,563 | 0 | 7,795 | 11,855 | 195,594 | 243,809 | | 2022 | 49 | 13,406 | 9 | 16,704 | 8,181 | 38,349 | |
| 2023 | 0 | 61,708 | 0 | 734 | 10,292 | 387,044 | 459,778 cases filed 216,046 | | 2023 | 22 | 32,294 | 4 | 5,716 | 11,735 | 49,771 cases filed 78,382 | |
| 2024 (as of 8/31) | 0 | 30,695 | 0 | 399 | 1734 | 357,852 | 390,680 | | 2024 | 11 | 100,774 | 7 | 5,311 | 18,441 | 124,544 | |
| Total | 557 | 280,052 | 919 | 484,026 | 286,494 | 1,312,092 | 2,364,140 | | Total | 128,468 | 461,636 | 1,505 | 527,332 | 301,142 | 1,420,083 | |

Source: OHHS analysis of USCIS Global data as of September 10, 2024

STB_AR1_001668

DHS Removals of People with EOIR Removal Orders by Removal Date and Days between Removal Order and Removal Date

| Fiscal Year | Total | | | Not in Absentia | | | In Absentia | | |
|---|---|---|---|---|---|---|---|---|---|
| | N Obs | Mean | Median | N Obs | Mean | Median | N Obs | Mean | Median |
| 2010 | 78,469 | 71 | 17 | 74,335 | 64 | 15 | 4,134 | 200 | 156 |
| 2011 | 80,452 | 119 | 19 | 74,622 | 103 | 16 | 5,830 | 317 | 251 |
| 2012 | 68,569 | 207 | 28 | 63,808 | 189 | 23 | 4,761 | 445 | 348 |
| 2013 | 55,728 | 348 | 60 | 51,063 | 326 | 47 | 4,665 | 588 | 482 |
| 2014 | 54,875 | 413 | 55 | 50,817 | 389 | 43 | 4,058 | 714 | 568 |
| 2015 | 46,982 | 485 | 64 | 43,710 | 462 | 49 | 3,272 | 794 | 576 |
| 2016 | 48,890 | 556 | 69 | 45,199 | 533 | 50 | 3,691 | 839 | 596 |
| 2017 | 61,425 | 547 | 45 | 56,391 | 505 | 36 | 5,034 | 1,025 | 823 |
| 2018 | 67,425 | 623 | 50 | 60,960 | 567 | 37 | 6,465 | 1,149 | 943 |
| 2019 | 75,987 | 663 | 56 | 68,245 | 603 | 42 | 7,742 | 1,194 | 910 |
| 2020 | 64,385 | 708 | 79 | 56,656 | 657 | 55 | 7,729 | 1,081 | 661 |
| 2021 | 25,816 | 907 | 189 | 22,905 | 832 | 93 | 2,911 | 1,498 | 1,136 |
| 2022 | 30,018 | 947 | 70 | 27,284 | 867 | 56 | 2,734 | 1,739 | 1,399 |
| 2023 | 60,192 | 837 | 48 | 53,850 | 761 | 40 | 6,342 | 1,481 | 1,270 |
| 2024 | 75,269 | 771 | 43 | 67,089 | 690 | 35 | 8,180 | 1,438 | 850 |

Note: Includes EOIR 862 removal order (e.g., INA 240 proceedings) and 863 removal orders (e.g., credible fear reviews resulting in affirmations of USCIS negative fear findings).
Source: July 2024 Persist.

STB_AR1_001669

STB Proclamation Section 2c Encounters: June 5 - August 31, 2024

| Row Label | Section 2c as defined in June 4 Proc | Updated encounter threshhold from Sept. 26 Proc | 7-day Moving Avg: Including Non-Contiguous UCs | 7-day Moving Avg: Excluding Non-Contiguous UCs | Difference |
|---|---|---|---|---|---|
| 30-May | 3,793 | 3,957 | | | |
| 31-May | 4,053 | 4,255 | | | |
| 1-Jun | 3,619 | 3,742 | | | |
| 2-Jun | 3,483 | 3,637 | | | |
| 3-Jun | 3,366 | 3,471 | | | |
| 4-Jun | 4,036 | 4,295 | | | |
| 5-Jun | 3,801 | 3,966 | 3,736 | 3,903 | (167) |
| 6-Jun | 3,603 | 3,775 | 3,709 | 3,877 | (169) |
| 7-Jun | 2,948 | 3,080 | 3,551 | 3,709 | (159) |
| 8-Jun | 3,422 | 3,598 | 3,523 | 3,689 | (166) |
| 9-Jun | 3,051 | 3,167 | 3,461 | 3,622 | (161) |
| 10-Jun | 2,909 | 3,092 | 3,396 | 3,568 | (172) |
| 11-Jun | 3,085 | 3,270 | 3,260 | 3,421 | (161) |
| 12-Jun | 2,824 | 2,972 | 3,120 | 3,279 | (159) |
| 13-Jun | 2,771 | 2,936 | 3,001 | 3,159 | (158) |
| 14-Jun | 2,906 | 3,081 | 2,995 | 3,159 | (164) |
| 15-Jun | 2,658 | 2,808 | 2,886 | 3,047 | (160) |
| 16-Jun | 2,261 | 2,461 | 2,773 | 2,946 | (172) |
| 17-Jun | 1,930 | 2,088 | 2,634 | 2,802 | (169) |
| 18-Jun | 2,441 | 2,598 | 2,542 | 2,706 | (165) |
| 19-Jun | 2,185 | 2,413 | 2,450 | 2,626 | (176) |
| 20-Jun | 2,437 | 2,580 | 2,403 | 2,576 | (173) |
| 21-Jun | 1,955 | 2,080 | 2,267 | 2,433 | (166) |
| 22-Jun | 2,087 | 2,230 | 2,185 | 2,350 | (165) |
| 23-Jun | 1,797 | 1,900 | 2,119 | 2,270 | (151) |
| 24-Jun | 1,954 | 2,077 | 2,122 | 2,268 | (146) |
| 25-Jun | 1,875 | 2,041 | 2,041 | 2,189 | (147) |
| 26-Jun | 1,926 | 2,068 | 2,004 | 2,139 | (135) |
| 27-Jun | 1,669 | 1,832 | 1,895 | 2,033 | (138) |
| 28-Jun | 1,844 | 1,997 | 1,879 | 2,021 | (142) |
| 29-Jun | 1,627 | 1,749 | 1,813 | 1,952 | (139) |
| 30-Jun | 1,871 | 1,987 | 1,824 | 1,964 | (141) |
| 1-Jul | 1,741 | 1,861 | 1,793 | 1,934 | (140) |
| 2-Jul | 1,800 | 1,940 | 1,783 | 1,919 | (137) |
| 3-Jul | 1,729 | 1,881 | 1,754 | 1,892 | (138) |
| 4-Jul | 1,913 | 2,069 | 1,789 | 1,926 | (137) |
| 5-Jul | 1,654 | 1,772 | 1,762 | 1,894 | (132) |
| 6-Jul | 1,786 | 1,908 | 1,785 | 1,917 | (132) |
| 7-Jul | 1,618 | 1,714 | 1,749 | 1,878 | (129) |
| 8-Jul | 1,666 | 1,803 | 1,738 | 1,870 | (132) |
| 9-Jul | 1,834 | 1,946 | 1,743 | 1,870 | (128) |
| 10-Jul | 1,779 | 1,923 | 1,750 | 1,876 | (126) |
| 11-Jul | 1,555 | 1,637 | 1,699 | 1,815 | (116) |
| 12-Jul | 1,599 | 1,761 | 1,691 | 1,813 | (122) |
| 13-Jul | 1,709 | 1,847 | 1,680 | 1,804 | (124) |
| 14-Jul | 1,659 | 1,774 | 1,686 | 1,813 | (127) |
| 15-Jul | 1,571 | 1,673 | 1,672 | 1,794 | (122) |
| 16-Jul | 1,685 | 1,823 | 1,651 | 1,777 | (126) |
| 17-Jul | 1,575 | 1,703 | 1,622 | 1,745 | (124) |
| 18-Jul | 1,790 | 1,966 | 1,655 | 1,792 | (137) |
| 19-Jul | 1,524 | 1,665 | 1,645 | 1,779 | (134) |
| 20-Jul | 1,500 | 1,640 | 1,615 | 1,749 | (134) |
| 21-Jul | 1,731 | 1,819 | 1,625 | 1,756 | (130) |
| 22-Jul | 1,367 | 1,469 | 1,596 | 1,726 | (130) |
| 23-Jul | 1,678 | 1,798 | 1,595 | 1,723 | (128) |
| 24-Jul | 1,662 | 1,799 | 1,607 | 1,737 | (129) |
| 25-Jul | 1,472 | 1,566 | 1,545 | 1,658 | (113) |
| 26-Jul | 1,662 | 1,748 | 1,568 | 1,676 | (108) |
| 27-Jul | 1,698 | 1,896 | 1,610 | 1,728 | (118) |
| 28-Jul | 1,733 | 1,884 | 1,610 | 1,737 | (127) |
| 29-Jul | 1,515 | 1,624 | 1,631 | 1,759 | (128) |
| 30-Jul | 1,836 | 1,951 | 1,654 | 1,781 | (127) |
| 31-Jul | 1,638 | 1,780 | 1,651 | 1,778 | (128) |
| 1-Aug | 1,578 | 1,804 | 1,666 | 1,812 | (147) |
| 2-Aug | 1,686 | 1,796 | 1,669 | 1,819 | (150) |
| 3-Aug | 1,556 | 1,646 | 1,649 | 1,784 | (135) |
| 4-Aug | 1,388 | 1,449 | 1,614 | 1,738 | (124) |

Average Difference    (141)

Days < 172
Including r
40

| | | | | |
|---|---|---|---|---|
| 5-Aug | 1,595 | 1,763 | 1,611 | 1,741 | (130) |
| 6-Aug | 1,741 | 1,899 | 1,597 | 1,734 | (136) |
| 7-Aug | 1,942 | 2,078 | 1,641 | 1,776 | (136) |
| 8-Aug | 1,561 | 1,677 | 1,638 | 1,758 | (120) |
| 9-Aug | 1,672 | 1,818 | 1,636 | 1,761 | (125) |
| 10-Aug | 1,827 | 1,939 | 1,675 | 1,803 | (128) |
| 11-Aug | 1,645 | 1,737 | 1,712 | 1,844 | (133) |
| 12-Aug | 1,510 | 1,621 | 1,700 | 1,824 | (124) |
| 13-Aug | 1,565 | 1,715 | 1,675 | 1,798 | (123) |
| 14-Aug | 1,695 | 1,801 | 1,639 | 1,758 | (119) |
| 15-Aug | 1,728 | 1,849 | 1,663 | 1,783 | (120) |
| 16-Aug | 1,638 | 1,769 | 1,658 | 1,776 | (118) |
| 17-Aug | 1,912 | 2,053 | 1,670 | 1,792 | (122) |
| 18-Aug | 1,438 | 1,527 | 1,641 | 1,762 | (121) |
| 19-Aug | 1,819 | 1,989 | 1,685 | 1,815 | (130) |
| 20-Aug | 1,801 | 1,930 | 1,719 | 1,845 | (127) |
| 21-Aug | 1,664 | 1,802 | 1,714 | 1,846 | (131) |
| 22-Aug | 1,665 | 1,847 | 1,705 | 1,845 | (140) |
| 23-Aug | 1,711 | 1,852 | 1,716 | 1,857 | (141) |
| 24-Aug | 1,769 | 1,928 | 1,695 | 1,839 | (144) |
| 25-Aug | 1,701 | 1,816 | 1,733 | 1,881 | (148) |
| 26-Aug | 1,785 | 1,902 | 1,728 | 1,868 | (140) |
| 27-Aug | 1,724 | 1,867 | 1,717 | 1,859 | (142) |
| 28-Aug | 1,987 | 2,155 | 1,763 | 1,910 | (146) |
| 29-Aug | 2,054 | 2,199 | 1,819 | 1,960 | (141) |
| 30-Aug | 1,726 | 1,865 | 1,821 | 1,962 | (141) |
| 31-Aug | 2,074 | 2,217 | 1,864 | 2,003 | (139) |

Note: Section 2(c) Encounters include USBP encounters of Single Adults (SAs) and Family
Unit Individuals (FMs) during the 14-day period immediately after their entry between ports
of entry, and Unaccompanied Children (UC) from contiguous countries at the southwest
land border and southern coastal sectors. Non-Section 2(c) Encounters include USBP
encounters of Unaccompanied Children (UC) from non-contiguous countries and USBP
encounters that occur more than 14 days after entry between ports of entry at the southern
border, and OFO encounters. Data are pulled from a live system and subject to change as
records mature.
Source: OHSS ananlysis of data downloaded from UIP Sept. 3, 2024.

STB_AR1_001671

:5
Excluding
15

STB_AR1_001672

Total SWB encounters

| Row Label | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | Pre-Pandemic Months |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 34,847 | 33,159 | 29,077 | 32,485 | 40,636 | 54,010 | 54,771 | 50,500 | 40,790 | 40,006 | 41,125 | 38,206 | 489,612 | |
| 2014 | 41,835 | 38,692 | 36,707 | 35,200 | 42,473 | 57,548 | 59,383 | 69,033 | 66,572 | 48,833 | 39,766 | 34,006 | 570,048 | |
| 2015 | 35,903 | 33,024 | 34,231 | 30,179 | 32,554 | 39,162 | 38,299 | 40,684 | 38,620 | 38,610 | 42,419 | 41,171 | 444,856 | |
| 2016 | 45,245 | 45,387 | 48,393 | 33,396 | 38,068 | 45,779 | 48,271 | 54,987 | 45,168 | 46,658 | 51,569 | 56,070 | 558,991 | |
| 2017 | 66,707 | 63,366 | 58,416 | 42,458 | 23,555 | 16,592 | 15,768 | 19,940 | 21,657 | 25,014 | 30,569 | 31,157 | 415,199 | |
| 2018 | 34,842 | 39,031 | 40,476 | 35,865 | 36,690 | 50,213 | 51,019 | 51,790 | 43,096 | 40,005 | 46,551 | 50,366 | 519,944 | |
| 2019 | 60,775 | 62,463 | 60,789 | 58,313 | 76,543 | 103,730 | 109,413 | 144,113 | 104,310 | 81,748 | 62,608 | 52,424 | 977,229 | |
| 2020 | 45,139 | 42,642 | 40,563 | 36,583 | 36,686 | 34,457 | 17,106 | 23,237 | 33,029 | 40,949 | 50,007 | 57,684 | 458,082 | |
| 2021 | 71,927 | 72,113 | 73,994 | 78,414 | 101,098 | 173,277 | 178,795 | 180,597 | 189,034 | 213,593 | 209,840 | 192,001 | 1,734,683 | |
| 2022 | 164,837 | 174,845 | 179,253 | 154,874 | 166,010 | 222,574 | 235,785 | 241,136 | 207,834 | 200,162 | 204,087 | 227,547 | 2,378,944 | |
| 2023 | 231,529 | 235,173 | 252,315 | 157,358 | 156,630 | 193,249 | 211,992 | 206,690 | 144,556 | 183,479 | 232,963 | 269,735 | 2,475,669 | |
| 2024 | 240,932 | 242,400 | 301,980 | 176,196 | 189,912 | 189,360 | 179,740 | 170,718 | 130,416 | 104,116 | 107,637 | | 2,033,407 | First 3 Months |

Note: August 2024 figure is a preliminary estimate based on opertational data.
Source: July 2024 OHSS Persist and data downloaded from UIP Sept. 3, 2024.

STB_AR1_001673

48,420.38
42,377.00
45,073.67
33,965.00
39,081.00
27,535.00
40,922.67
79,528.67
35,908.67
117,596.33
181,152.67
169,079.00
185,156.00

STB_AR1_001674

USBP SWB 1,500 and 2,500 Encounters triggers: Oct 1, 2012 – Sep 30, 2019

| Metric | Including Non-Contiguous UCs | Excluding Non-Contiguous UCs |
|---|---|---|
| Low Triggers | 13 | 11 |
| Extended Low Triggers | 5 | 4 |
| High Triggers | 5 | 4 |
| % of days 7-day MA less than 1,500 | 79% | 84% |
| % of days 7-day MA less than 1,500 for 28 consecutive days | 71% | 78% |
| % of days 7-day MA greater than 2,500 | 5% | 4% |

USBP SWB Encounters Including Non-Contiguous

| Number of Days in Time Period | Days 7-day MA less than 1,500 | Days 7-day MA less than 1,500 for 28 consecutive days |
|---|---|---|
| 2556 | 2014 | 1813 |

Notes: Low trigger: When the 7-day moving average (MA) crosses below 1,500 encounters. Extended low triggers: When the 7-day MA remains below 1,500 encounters for at least 28 consecutive days. High triggers: When the 7-day MA crosses above 2,500 encounters. Data are limited to USBP SWB land encounters.
Source: OHSS analysis of July 2024 OHSS Persist.

STB_AR1_001675

UCs: Oct 1, 2012 – Sep 30, 2019

| Days 7-day MA less than 1,500 & for 28 consecutive days greated than 1500 | Percent Days 7-day MA less than 1,500 & for 28 consecutive days greated than 1501 |
|---|---|
| 201 | 8% |

STB_AR1_001676

| Day | FY | Encounters (Includes non-contiguous UCs ) | 7dayMA | New IFR Turned Off | 7dayMA<1500 | New IFR Trigger dates | Encounters (Excludes non-contiguous UCs) | 7dayMA | Old IFR Turned Off | 28dayconsec_7dayMA<1500 | Old IFR Trigger Dates | New IFR Turned Off but Old IFR Turned On |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/1/2012 | 2013 | 935 | | 0 | 0 | 0 | 898 | | 0 | 0 | 0 | 0 |
| 10/2/2012 | 2013 | 1,034 | | 0 | 0 | 0 | 1,000 | | 0 | 0 | 0 | 0 |
| 10/3/2012 | 2013 | 912 | | 0 | 0 | 0 | 898 | | 0 | 0 | 0 | 0 |
| 10/4/2012 | 2013 | 982 | | 0 | 0 | 0 | 952 | | 0 | 0 | 0 | 0 |
| 10/5/2012 | 2013 | 839 | | 0 | 0 | 0 | 802 | | 0 | 0 | 0 | 0 |
| 10/6/2012 | 2013 | 787 | | 0 | 0 | 0 | 754 | | 0 | 0 | 0 | 0 |
| 10/7/2012 | 2013 | 779 | 895 | 0 | 1 | 0 | 741 | 864 | 1 | 0 | 1 | 0 |
| 10/8/2012 | 2013 | 887 | 889 | 0 | 1 | 0 | 860 | 858 | 1 | 0 | 0 | 0 |
| 10/9/2012 | 2013 | 1,003 | 884 | 0 | 1 | 0 | 969 | 854 | 1 | 0 | 0 | 0 |
| 10/10/2012 | 2013 | 984 | 894 | 0 | 1 | 0 | 962 | 863 | 1 | 0 | 0 | 0 |
| 10/11/2012 | 2013 | 950 | 890 | 0 | 1 | 0 | 913 | 857 | 1 | 0 | 0 | 0 |
| 10/12/2012 | 2013 | 889 | 897 | 0 | 1 | 0 | 863 | 866 | 1 | 0 | 0 | 0 |
| 10/13/2012 | 2013 | 925 | 917 | 0 | 1 | 0 | 887 | 885 | 1 | 0 | 0 | 0 |
| 10/14/2012 | 2013 | 1,102 | 963 | 0 | 1 | 0 | 1,048 | 929 | 1 | 0 | 0 | 0 |
| 10/15/2012 | 2013 | 945 | 971 | 0 | 1 | 0 | 912 | 936 | 1 | 0 | 0 | 0 |
| 10/16/2012 | 2013 | 1,055 | 979 | 0 | 1 | 0 | 1,012 | 942 | 1 | 0 | 0 | 0 |
| 10/17/2012 | 2013 | 962 | 975 | 0 | 1 | 0 | 919 | 936 | 1 | 0 | 0 | 0 |
| 10/18/2012 | 2013 | 961 | 977 | 0 | 1 | 0 | 924 | 938 | 1 | 0 | 0 | 0 |
| 10/19/2012 | 2013 | 913 | 980 | 0 | 1 | 0 | 894 | 942 | 1 | 0 | 0 | 0 |
| 10/20/2012 | 2013 | 952 | 984 | 0 | 1 | 0 | 922 | 947 | 1 | 0 | 0 | 0 |
| 10/21/2012 | 2013 | 837 | 946 | 0 | 1 | 0 | 797 | 911 | 1 | 0 | 0 | 0 |
| 10/22/2012 | 2013 | 995 | 954 | 0 | 1 | 0 | 961 | 918 | 1 | 0 | 0 | 0 |
| 10/23/2012 | 2013 | 972 | 942 | 0 | 1 | 0 | 945 | 909 | 1 | 0 | 0 | 0 |
| 10/24/2012 | 2013 | 1,006 | 948 | 0 | 1 | 0 | 964 | 915 | 1 | 0 | 0 | 0 |
| 10/25/2012 | 2013 | 974 | 950 | 0 | 1 | 0 | 940 | 918 | 1 | 0 | 0 | 0 |
| 10/26/2012 | 2013 | 827 | 938 | 0 | 1 | 0 | 798 | 904 | 1 | 0 | 0 | 0 |
| 10/27/2012 | 2013 | 928 | 934 | 0 | 1 | 0 | 898 | 900 | 1 | 0 | 0 | 0 |
| 10/28/2012 | 2013 | 792 | 928 | 0 | 1 | 0 | 755 | 894 | 1 | 0 | 0 | 0 |
| 10/29/2012 | 2013 | 990 | 927 | 0 | 1 | 0 | 952 | 893 | 1 | 0 | 0 | 0 |
| 10/30/2012 | 2013 | 866 | 912 | 0 | 1 | 0 | 838 | 878 | 1 | 0 | 0 | 0 |
| 10/31/2012 | 2013 | 946 | 903 | 0 | 1 | 0 | 916 | 871 | 1 | 0 | 0 | 0 |
| 11/1/2012 | 2013 | 980 | 904 | 0 | 1 | 0 | 947 | 872 | 1 | 0 | 0 | 0 |
| 11/2/2012 | 2013 | 749 | 893 | 0 | 1 | 0 | 725 | 862 | 1 | 0 | 0 | 0 |
| 11/3/2012 | 2013 | 873 | 885 | 1 | 1 | 1 | 839 | 853 | 1 | 1 | 0 | 0 |
| 11/4/2012 | 2013 | 887 | 899 | 1 | 1 | 0 | 835 | 865 | 1 | 1 | 0 | 0 |
| 11/6/2012 | 2013 | 861 | 870 | 1 | 1 | 0 | 832 | 834 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/7/2012 | 2013 | 911 | 865 | 1 | 1 | 0 | 881 | 829 | 1 | 1 | 0 | 0 |
| 11/8/2012 | 2013 | 834 | 844 | 1 | 1 | 0 | 799 | 808 | 1 | 1 | 0 | 0 |
| 11/9/2012 | 2013 | 969 | 875 | 1 | 1 | 0 | 912 | 835 | 1 | 1 | 0 | 0 |
| 11/10/2012 | 2013 | 920 | 882 | 1 | 1 | 0 | 867 | 839 | 1 | 1 | 0 | 0 |
| 11/11/2012 | 2013 | 953 | 891 | 1 | 1 | 0 | 918 | 851 | 1 | 1 | 0 | 0 |
| 11/12/2012 | 2013 | 940 | 913 | 1 | 1 | 0 | 899 | 873 | 1 | 1 | 0 | 0 |
| 11/13/2012 | 2013 | 859 | 912 | 1 | 1 | 0 | 812 | 870 | 1 | 1 | 0 | 0 |
| 11/14/2012 | 2013 | 756 | 890 | 1 | 1 | 0 | 729 | 848 | 1 | 1 | 0 | 0 |
| 11/15/2012 | 2013 | 976 | 910 | 1 | 1 | 0 | 931 | 867 | 1 | 1 | 0 | 0 |
| 11/16/2012 | 2013 | 1,036 | 920 | 1 | 1 | 0 | 997 | 879 | 1 | 1 | 0 | 0 |
| 11/17/2012 | 2013 | 884 | 915 | 1 | 1 | 0 | 847 | 876 | 1 | 1 | 0 | 0 |
| 11/18/2012 | 2013 | 854 | 901 | 1 | 1 | 0 | 819 | 862 | 1 | 1 | 0 | 0 |
| 11/19/2012 | 2013 | 1,067 | 919 | 1 | 1 | 0 | 1,020 | 879 | 1 | 1 | 0 | 0 |
| 11/20/2012 | 2013 | 871 | 921 | 1 | 1 | 0 | 834 | 882 | 1 | 1 | 0 | 0 |
| 11/21/2012 | 2013 | 805 | 928 | 1 | 1 | 0 | 767 | 888 | 1 | 1 | 0 | 0 |
| 11/22/2012 | 2013 | 809 | 904 | 1 | 1 | 0 | 773 | 865 | 1 | 1 | 0 | 0 |
| 11/23/2012 | 2013 | 785 | 868 | 1 | 1 | 0 | 772 | 833 | 1 | 1 | 0 | 0 |
| 11/24/2012 | 2013 | 1,019 | 887 | 1 | 1 | 0 | 955 | 849 | 1 | 1 | 0 | 0 |
| 11/25/2012 | 2013 | 1,050 | 915 | 1 | 1 | 0 | 1,004 | 875 | 1 | 1 | 0 | 0 |
| 11/26/2012 | 2013 | 1,119 | 923 | 1 | 1 | 0 | 1,056 | 880 | 1 | 1 | 0 | 0 |
| 11/27/2012 | 2013 | 916 | 929 | 1 | 1 | 0 | 890 | 888 | 1 | 1 | 0 | 0 |
| 11/28/2012 | 2013 | 1,143 | 977 | 1 | 1 | 0 | 1,111 | 937 | 1 | 1 | 0 | 0 |
| 11/29/2012 | 2013 | 1,031 | 1,009 | 1 | 1 | 0 | 997 | 969 | 1 | 1 | 0 | 0 |
| 11/30/2012 | 2013 | 988 | 1,038 | 1 | 1 | 0 | 956 | 996 | 1 | 1 | 0 | 0 |
| 12/1/2012 | 2013 | 816 | 1,009 | 1 | 1 | 0 | 784 | 971 | 1 | 1 | 0 | 0 |
| 12/2/2012 | 2013 | 689 | 957 | 1 | 1 | 0 | 664 | 923 | 1 | 1 | 0 | 0 |
| 12/3/2012 | 2013 | 824 | 915 | 1 | 1 | 0 | 795 | 885 | 1 | 1 | 0 | 0 |
| 12/4/2012 | 2013 | 944 | 919 | 1 | 1 | 0 | 906 | 888 | 1 | 1 | 0 | 0 |
| 12/5/2012 | 2013 | 985 | 897 | 1 | 1 | 0 | 950 | 865 | 1 | 1 | 0 | 0 |
| 12/6/2012 | 2013 | 959 | 886 | 1 | 1 | 0 | 915 | 853 | 1 | 1 | 0 | 0 |
| 12/7/2012 | 2013 | 765 | 855 | 1 | 1 | 0 | 734 | 821 | 1 | 1 | 0 | 0 |
| 12/8/2012 | 2013 | 758 | 846 | 1 | 1 | 0 | 713 | 811 | 1 | 1 | 0 | 0 |
| 12/9/2012 | 2013 | 891 | 875 | 1 | 1 | 0 | 832 | 835 | 1 | 1 | 0 | 0 |
| 12/10/2012 | 2013 | 703 | 858 | 1 | 1 | 0 | 672 | 817 | 1 | 1 | 0 | 0 |
| 12/11/2012 | 2013 | 828 | 841 | 1 | 1 | 0 | 779 | 799 | 1 | 1 | 0 | 0 |
| 12/12/2012 | 2013 | 710 | 802 | 1 | 1 | 0 | 676 | 760 | 1 | 1 | 0 | 0 |
| 12/13/2012 | 2013 | 938 | 799 | 1 | 1 | 0 | 902 | 758 | 1 | 1 | 0 | 0 |
| 12/14/2012 | 2013 | 756 | 798 | 1 | 1 | 0 | 691 | 752 | 1 | 1 | 0 | 0 |
| 12/15/2012 | 2013 | 554 | 769 | 1 | 1 | 0 | 511 | 723 | 1 | 1 | 0 | 0 |
| 12/16/2012 | 2013 | 764 | 750 | 1 | 1 | 0 | 726 | 708 | 1 | 1 | 0 | 0 |
| 12/17/2012 | 2013 | 920 | 781 | 1 | 1 | 0 | 853 | 734 | 1 | 1 | 0 | 0 |
| 12/18/2012 | 2013 | 960 | 800 | 1 | 1 | 0 | 908 | 752 | 1 | 1 | 0 | 0 |
| 12/19/2012 | 2013 | 858 | 821 | 1 | 1 | 0 | 793 | 769 | 1 | 1 | 0 | 0 |
| 12/20/2012 | 2013 | 743 | 794 | 1 | 1 | 0 | 711 | 742 | 1 | 1 | 0 | 0 |
| 12/21/2012 | 2013 | 662 | 780 | 1 | 1 | 0 | 634 | 734 | 1 | 1 | 0 | 0 |
| 12/22/2012 | 2013 | 707 | 802 | 1 | 1 | 0 | 670 | 756 | 1 | 1 | 0 | 0 |
| 12/23/2012 | 2013 | 673 | 789 | 1 | 1 | 0 | 641 | 744 | 1 | 1 | 0 | 0 |

STB_AR1_001678

| 12/24/2012 | 2013 | 623 | 747 | 1 | 1 | 0 | 586 | 706 | 1 | 1 | 0 | 0 |
| 12/25/2012 | 2013 | 441 | 672 | 1 | 1 | 0 | 435 | 639 | 1 | 1 | 0 | 0 |
| 12/26/2012 | 2013 | 520 | 624 | 1 | 1 | 0 | 495 | 596 | 1 | 1 | 0 | 0 |
| 12/27/2012 | 2013 | 543 | 596 | 1 | 1 | 0 | 523 | 569 | 1 | 1 | 0 | 0 |
| 12/28/2012 | 2013 | 711 | 603 | 1 | 1 | 0 | 681 | 576 | 1 | 1 | 0 | 0 |
| 12/29/2012 | 2013 | 771 | 612 | 1 | 1 | 0 | 736 | 585 | 1 | 1 | 0 | 0 |
| 12/30/2012 | 2013 | 645 | 608 | 1 | 1 | 0 | 616 | 582 | 1 | 1 | 0 | 0 |
| 12/31/2012 | 2013 | 582 | 602 | 1 | 1 | 0 | 564 | 579 | 1 | 1 | 0 | 0 |
| 1/1/2013 | 2013 | 437 | 601 | 1 | 1 | 0 | 426 | 577 | 1 | 1 | 0 | 0 |
| 1/2/2013 | 2013 | 427 | 588 | 1 | 1 | 0 | 414 | 566 | 1 | 1 | 0 | 0 |
| 1/3/2013 | 2013 | 629 | 600 | 1 | 1 | 0 | 604 | 577 | 1 | 1 | 0 | 0 |
| 1/4/2013 | 2013 | 580 | 582 | 1 | 1 | 0 | 565 | 561 | 1 | 1 | 0 | 0 |
| 1/5/2013 | 2013 | 624 | 561 | 1 | 1 | 0 | 601 | 541 | 1 | 1 | 0 | 0 |
| 1/6/2013 | 2013 | 668 | 564 | 1 | 1 | 0 | 637 | 544 | 1 | 1 | 0 | 0 |
| 1/7/2013 | 2013 | 638 | 572 | 1 | 1 | 0 | 624 | 553 | 1 | 1 | 0 | 0 |
| 1/8/2013 | 2013 | 637 | 600 | 1 | 1 | 0 | 615 | 580 | 1 | 1 | 0 | 0 |
| 1/9/2013 | 2013 | 702 | 640 | 1 | 1 | 0 | 685 | 619 | 1 | 1 | 0 | 0 |
| 1/10/2013 | 2013 | 870 | 674 | 1 | 1 | 0 | 842 | 653 | 1 | 1 | 0 | 0 |
| 1/11/2013 | 2013 | 665 | 686 | 1 | 1 | 0 | 646 | 664 | 1 | 1 | 0 | 0 |
| 1/12/2013 | 2013 | 691 | 696 | 1 | 1 | 0 | 672 | 674 | 1 | 1 | 0 | 0 |
| 1/13/2013 | 2013 | 757 | 709 | 1 | 1 | 0 | 732 | 688 | 1 | 1 | 0 | 0 |
| 1/14/2013 | 2013 | 831 | 736 | 1 | 1 | 0 | 801 | 713 | 1 | 1 | 0 | 0 |
| 1/15/2013 | 2013 | 904 | 774 | 1 | 1 | 0 | 878 | 751 | 1 | 1 | 0 | 0 |
| 1/16/2013 | 2013 | 831 | 793 | 1 | 1 | 0 | 812 | 769 | 1 | 1 | 0 | 0 |
| 1/17/2013 | 2013 | 975 | 808 | 1 | 1 | 0 | 947 | 784 | 1 | 1 | 0 | 0 |
| 1/18/2013 | 2013 | 945 | 848 | 1 | 1 | 0 | 917 | 823 | 1 | 1 | 0 | 0 |
| 1/19/2013 | 2013 | 975 | 888 | 1 | 1 | 0 | 935 | 860 | 1 | 1 | 0 | 0 |
| 1/20/2013 | 2013 | 1,096 | 937 | 1 | 1 | 0 | 1,040 | 904 | 1 | 1 | 0 | 0 |
| 1/21/2013 | 2013 | 982 | 958 | 1 | 1 | 0 | 950 | 926 | 1 | 1 | 0 | 0 |
| 1/22/2013 | 2013 | 968 | 967 | 1 | 1 | 0 | 928 | 933 | 1 | 1 | 0 | 0 |
| 1/23/2013 | 2013 | 1,129 | 1,010 | 1 | 1 | 0 | 1,097 | 973 | 1 | 1 | 0 | 0 |
| 1/24/2013 | 2013 | 1,163 | 1,037 | 1 | 1 | 0 | 1,110 | 997 | 1 | 1 | 0 | 0 |
| 1/25/2013 | 2013 | 1,144 | 1,065 | 1 | 1 | 0 | 1,108 | 1,024 | 1 | 1 | 0 | 0 |
| 1/26/2013 | 2013 | 1,136 | 1,088 | 1 | 1 | 0 | 1,098 | 1,047 | 1 | 1 | 0 | 0 |
| 1/27/2013 | 2013 | 1,066 | 1,084 | 1 | 1 | 0 | 1,038 | 1,047 | 1 | 1 | 0 | 0 |
| 1/28/2013 | 2013 | 1,083 | 1,098 | 1 | 1 | 0 | 1,037 | 1,059 | 1 | 1 | 0 | 0 |
| 1/29/2013 | 2013 | 1,002 | 1,103 | 1 | 1 | 0 | 964 | 1,065 | 1 | 1 | 0 | 0 |
| 1/30/2013 | 2013 | 1,043 | 1,091 | 1 | 1 | 0 | 994 | 1,050 | 1 | 1 | 0 | 0 |
| 1/31/2013 | 2013 | 1,323 | 1,114 | 1 | 1 | 0 | 1,261 | 1,071 | 1 | 1 | 0 | 0 |
| 2/1/2013 | 2013 | 914 | 1,081 | 1 | 1 | 0 | 880 | 1,039 | 1 | 1 | 0 | 0 |
| 2/2/2013 | 2013 | 1,283 | 1,102 | 1 | 1 | 0 | 1,218 | 1,056 | 1 | 1 | 0 | 0 |
| 2/3/2013 | 2013 | 1,138 | 1,112 | 1 | 1 | 0 | 1,083 | 1,062 | 1 | 1 | 0 | 0 |
| 2/4/2013 | 2013 | 1,257 | 1,137 | 1 | 1 | 0 | 1,210 | 1,087 | 1 | 1 | 0 | 0 |
| 2/5/2013 | 2013 | 1,067 | 1,146 | 1 | 1 | 0 | 1,038 | 1,098 | 1 | 1 | 0 | 0 |
| 2/6/2013 | 2013 | 1,133 | 1,159 | 1 | 1 | 0 | 1,098 | 1,113 | 1 | 1 | 0 | 0 |
| 2/7/2013 | 2013 | 1,450 | 1,177 | 1 | 1 | 0 | 1,387 | 1,131 | 1 | 1 | 0 | 0 |
| 2/8/2013 | 2013 | 1,264 | 1,227 | 1 | 1 | 0 | 1,200 | 1,176 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/9/2013 | 2013 | 1,118 | 1,204 | 1 | 1 | 0 | 1,063 | 1,154 | 1 | 1 | 0 | 0 |
| 2/10/2013 | 2013 | 1,245 | 1,219 | 1 | 1 | 0 | 1,173 | 1,167 | 1 | 1 | 0 | 0 |
| 2/11/2013 | 2013 | 1,236 | 1,216 | 1 | 1 | 0 | 1,166 | 1,161 | 1 | 1 | 0 | 0 |
| 2/12/2013 | 2013 | 1,012 | 1,208 | 1 | 1 | 0 | 981 | 1,153 | 1 | 1 | 0 | 0 |
| 2/13/2013 | 2013 | 1,062 | 1,198 | 1 | 1 | 0 | 1,032 | 1,143 | 1 | 1 | 0 | 0 |
| 2/14/2013 | 2013 | 1,159 | 1,157 | 1 | 1 | 0 | 1,120 | 1,105 | 1 | 1 | 0 | 0 |
| 2/15/2013 | 2013 | 922 | 1,108 | 1 | 1 | 0 | 888 | 1,060 | 1 | 1 | 0 | 0 |
| 2/16/2013 | 2013 | 966 | 1,086 | 1 | 1 | 0 | 924 | 1,041 | 1 | 1 | 0 | 0 |
| 2/17/2013 | 2013 | 1,337 | 1,099 | 1 | 1 | 0 | 1,267 | 1,054 | 1 | 1 | 0 | 0 |
| 2/18/2013 | 2013 | 1,377 | 1,119 | 1 | 1 | 0 | 1,331 | 1,078 | 1 | 1 | 0 | 0 |
| 2/19/2013 | 2013 | 1,471 | 1,185 | 1 | 1 | 0 | 1,416 | 1,140 | 1 | 1 | 0 | 0 |
| 2/20/2013 | 2013 | 1,320 | 1,222 | 1 | 1 | 0 | 1,272 | 1,174 | 1 | 1 | 0 | 0 |
| 2/21/2013 | 2013 | 1,336 | 1,247 | 1 | 1 | 0 | 1,289 | 1,198 | 1 | 1 | 0 | 0 |
| 2/22/2013 | 2013 | 1,256 | 1,295 | 1 | 1 | 0 | 1,212 | 1,244 | 1 | 1 | 0 | 0 |
| 2/23/2013 | 2013 | 1,514 | 1,373 | 1 | 1 | 0 | 1,439 | 1,318 | 1 | 1 | 0 | 0 |
| 2/24/2013 | 2013 | 1,315 | 1,370 | 1 | 1 | 0 | 1,260 | 1,317 | 1 | 1 | 0 | 0 |
| 2/25/2013 | 2013 | 1,383 | 1,371 | 1 | 1 | 0 | 1,324 | 1,316 | 1 | 1 | 0 | 0 |
| 2/26/2013 | 2013 | 1,495 | 1,374 | 1 | 1 | 0 | 1,454 | 1,321 | 1 | 1 | 0 | 0 |
| 2/27/2013 | 2013 | 1,440 | 1,391 | 1 | 1 | 0 | 1,368 | 1,335 | 1 | 1 | 0 | 0 |
| 2/28/2013 | 2013 | 1,572 | 1,425 | 1 | 1 | 0 | 1,519 | 1,368 | 1 | 1 | 0 | 0 |
| 3/1/2013 | 2013 | 1,418 | 1,448 | 1 | 1 | 0 | 1,359 | 1,389 | 1 | 1 | 0 | 0 |
| 3/2/2013 | 2013 | 1,473 | 1,442 | 1 | 1 | 0 | 1,379 | 1,380 | 1 | 1 | 0 | 0 |
| 3/3/2013 | 2013 | 1,573 | 1,479 | 1 | 1 | 0 | 1,517 | 1,417 | 1 | 1 | 0 | 0 |
| 3/4/2013 | 2013 | 1,555 | 1,504 | 0 | 0 | 0 | 1,495 | 1,442 | 1 | 1 | 0 | 0 |
| 3/5/2013 | 2013 | 1,477 | 1,501 | 0 | 0 | 0 | 1,385 | 1,432 | 1 | 1 | 0 | 0 |
| 3/6/2013 | 2013 | 1,641 | 1,530 | 0 | 0 | 0 | 1,577 | 1,462 | 1 | 1 | 0 | 0 |
| 3/7/2013 | 2013 | 1,387 | 1,503 | 0 | 0 | 0 | 1,327 | 1,434 | 1 | 1 | 0 | 0 |
| 3/8/2013 | 2013 | 1,240 | 1,478 | 0 | 1 | 0 | 1,187 | 1,410 | 1 | 1 | 0 | 0 |
| 3/9/2013 | 2013 | 1,185 | 1,437 | 0 | 1 | 0 | 1,141 | 1,376 | 1 | 1 | 0 | 0 |
| 3/10/2013 | 2013 | 1,461 | 1,421 | 0 | 1 | 0 | 1,403 | 1,359 | 1 | 1 | 0 | 0 |
| 3/11/2013 | 2013 | 1,419 | 1,401 | 0 | 1 | 0 | 1,353 | 1,339 | 1 | 1 | 0 | 0 |
| 3/12/2013 | 2013 | 1,398 | 1,390 | 0 | 1 | 0 | 1,351 | 1,334 | 1 | 1 | 0 | 0 |
| 3/13/2013 | 2013 | 1,749 | 1,406 | 0 | 1 | 0 | 1,688 | 1,350 | 1 | 1 | 0 | 0 |
| 3/14/2013 | 2013 | 1,436 | 1,413 | 0 | 1 | 0 | 1,376 | 1,357 | 1 | 1 | 0 | 0 |
| 3/15/2013 | 2013 | 1,454 | 1,443 | 0 | 1 | 0 | 1,389 | 1,386 | 1 | 1 | 0 | 0 |
| 3/16/2013 | 2013 | 1,412 | 1,476 | 0 | 1 | 0 | 1,356 | 1,417 | 1 | 1 | 0 | 0 |
| 3/17/2013 | 2013 | 1,377 | 1,464 | 0 | 1 | 0 | 1,319 | 1,405 | 1 | 1 | 0 | 0 |
| 3/18/2013 | 2013 | 1,558 | 1,483 | 0 | 1 | 0 | 1,488 | 1,424 | 1 | 1 | 0 | 0 |
| 3/19/2013 | 2013 | 1,824 | 1,544 | 0 | 0 | 0 | 1,727 | 1,478 | 1 | 1 | 0 | 0 |
| 3/20/2013 | 2013 | 1,681 | 1,535 | 0 | 0 | 0 | 1,603 | 1,465 | 1 | 1 | 0 | 0 |
| 3/21/2013 | 2013 | 1,678 | 1,569 | 0 | 0 | 0 | 1,601 | 1,498 | 1 | 1 | 0 | 0 |
| 3/22/2013 | 2013 | 1,556 | 1,584 | 0 | 0 | 0 | 1,483 | 1,511 | 0 | 0 | 0 | 0 |
| 3/23/2013 | 2013 | 1,540 | 1,602 | 0 | 0 | 0 | 1,438 | 1,523 | 0 | 0 | 0 | 0 |
| 3/24/2013 | 2013 | 1,609 | 1,635 | 0 | 0 | 0 | 1,541 | 1,554 | 0 | 0 | 0 | 0 |
| 3/25/2013 | 2013 | 1,844 | 1,676 | 0 | 0 | 0 | 1,743 | 1,591 | 0 | 0 | 0 | 0 |
| 3/26/2013 | 2013 | 1,786 | 1,671 | 0 | 0 | 0 | 1,707 | 1,588 | 0 | 0 | 0 | 0 |
| 3/27/2013 | 2013 | 1,672 | 1,669 | 0 | 0 | 0 | 1,578 | 1,584 | 0 | 0 | 0 | 0 |

STB_AR1_001680

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/28/2013 | 2013 | 1,742 | 1,678 | 0 | 0 | 0 | 1,671 | 1,594 | 0 | 0 | 0 | 0 |
| 3/29/2013 | 2013 | 1,363 | 1,651 | 0 | 0 | 0 | 1,297 | 1,568 | 0 | 0 | 0 | 0 |
| 3/30/2013 | 2013 | 1,566 | 1,655 | 0 | 0 | 0 | 1,468 | 1,572 | 0 | 0 | 0 | 0 |
| 3/31/2013 | 2013 | 1,219 | 1,599 | 0 | 0 | 0 | 1,145 | 1,516 | 0 | 0 | 0 | 0 |
| 4/1/2013 | 2013 | 1,548 | 1,557 | 0 | 0 | 0 | 1,441 | 1,472 | 1 | 0 | 1 | 0 |
| 4/2/2013 | 2013 | 1,550 | 1,523 | 0 | 0 | 0 | 1,471 | 1,439 | 1 | 0 | 0 | 0 |
| 4/3/2013 | 2013 | 1,493 | 1,497 | 0 | 1 | 0 | 1,409 | 1,415 | 1 | 0 | 0 | 0 |
| 4/4/2013 | 2013 | 1,544 | 1,469 | 0 | 1 | 0 | 1,491 | 1,389 | 1 | 0 | 0 | 0 |
| 4/5/2013 | 2013 | 1,576 | 1,499 | 0 | 1 | 0 | 1,499 | 1,418 | 1 | 0 | 0 | 0 |
| 4/6/2013 | 2013 | 1,636 | 1,509 | 0 | 0 | 0 | 1,560 | 1,431 | 1 | 0 | 0 | 0 |
| 4/7/2013 | 2013 | 1,566 | 1,559 | 0 | 0 | 0 | 1,479 | 1,479 | 1 | 0 | 0 | 0 |
| 4/8/2013 | 2013 | 1,690 | 1,579 | 0 | 0 | 0 | 1,620 | 1,504 | 0 | 0 | 0 | 0 |
| 4/9/2013 | 2013 | 1,833 | 1,620 | 0 | 0 | 0 | 1,778 | 1,548 | 0 | 0 | 0 | 0 |
| 4/10/2013 | 2013 | 1,418 | 1,609 | 0 | 0 | 0 | 1,378 | 1,544 | 0 | 0 | 0 | 0 |
| 4/11/2013 | 2013 | 1,412 | 1,590 | 0 | 0 | 0 | 1,355 | 1,524 | 0 | 0 | 0 | 0 |
| 4/12/2013 | 2013 | 1,461 | 1,574 | 0 | 0 | 0 | 1,408 | 1,511 | 0 | 0 | 0 | 0 |
| 4/13/2013 | 2013 | 1,585 | 1,566 | 0 | 0 | 0 | 1,496 | 1,502 | 0 | 0 | 0 | 0 |
| 4/14/2013 | 2013 | 1,689 | 1,584 | 0 | 0 | 0 | 1,592 | 1,518 | 0 | 0 | 0 | 0 |
| 4/15/2013 | 2013 | 1,493 | 1,556 | 0 | 0 | 0 | 1,426 | 1,490 | 1 | 0 | 1 | 0 |
| 4/16/2013 | 2013 | 1,543 | 1,514 | 0 | 0 | 0 | 1,468 | 1,446 | 1 | 0 | 0 | 0 |
| 4/17/2013 | 2013 | 1,553 | 1,534 | 0 | 0 | 0 | 1,483 | 1,461 | 1 | 0 | 0 | 0 |
| 4/18/2013 | 2013 | 1,781 | 1,586 | 0 | 0 | 0 | 1,675 | 1,507 | 0 | 0 | 0 | 0 |
| 4/19/2013 | 2013 | 1,636 | 1,611 | 0 | 0 | 0 | 1,548 | 1,527 | 0 | 0 | 0 | 0 |
| 4/20/2013 | 2013 | 1,533 | 1,604 | 0 | 0 | 0 | 1,448 | 1,520 | 0 | 0 | 0 | 0 |
| 4/21/2013 | 2013 | 1,501 | 1,577 | 0 | 0 | 0 | 1,430 | 1,497 | 1 | 0 | 1 | 0 |
| 4/22/2013 | 2013 | 1,928 | 1,639 | 0 | 0 | 0 | 1,816 | 1,553 | 0 | 0 | 0 | 0 |
| 4/23/2013 | 2013 | 1,725 | 1,665 | 0 | 0 | 0 | 1,630 | 1,576 | 0 | 0 | 0 | 0 |
| 4/24/2013 | 2013 | 1,345 | 1,636 | 0 | 0 | 0 | 1,287 | 1,548 | 0 | 0 | 0 | 0 |
| 4/25/2013 | 2013 | 1,549 | 1,602 | 0 | 0 | 0 | 1,487 | 1,521 | 0 | 0 | 0 | 0 |
| 4/26/2013 | 2013 | 1,590 | 1,596 | 0 | 0 | 0 | 1,523 | 1,517 | 0 | 0 | 0 | 0 |
| 4/27/2013 | 2013 | 1,610 | 1,607 | 0 | 0 | 0 | 1,530 | 1,529 | 0 | 0 | 0 | 0 |
| 4/28/2013 | 2013 | 1,750 | 1,642 | 0 | 0 | 0 | 1,665 | 1,563 | 0 | 0 | 0 | 0 |
| 4/29/2013 | 2013 | 1,976 | 1,649 | 0 | 0 | 0 | 1,857 | 1,568 | 0 | 0 | 0 | 0 |
| 4/30/2013 | 2013 | 1,698 | 1,645 | 0 | 0 | 0 | 1,602 | 1,564 | 0 | 0 | 0 | 0 |
| 5/1/2013 | 2013 | 1,445 | 1,660 | 0 | 0 | 0 | 1,356 | 1,574 | 0 | 0 | 0 | 0 |
| 5/2/2013 | 2013 | 1,586 | 1,665 | 0 | 0 | 0 | 1,498 | 1,576 | 0 | 0 | 0 | 0 |
| 5/3/2013 | 2013 | 1,268 | 1,619 | 0 | 0 | 0 | 1,214 | 1,532 | 0 | 0 | 0 | 0 |
| 5/4/2013 | 2013 | 1,363 | 1,584 | 0 | 0 | 0 | 1,278 | 1,496 | 1 | 0 | 1 | 0 |
| 5/5/2013 | 2013 | 1,591 | 1,561 | 0 | 0 | 0 | 1,511 | 1,474 | 1 | 0 | 0 | 0 |
| 5/6/2013 | 2013 | 1,711 | 1,523 | 0 | 0 | 0 | 1,621 | 1,440 | 1 | 0 | 0 | 0 |
| 5/7/2013 | 2013 | 1,540 | 1,501 | 0 | 0 | 0 | 1,473 | 1,422 | 1 | 0 | 0 | 0 |
| 5/8/2013 | 2013 | 1,666 | 1,532 | 0 | 0 | 0 | 1,564 | 1,451 | 1 | 0 | 0 | 0 |
| 5/9/2013 | 2013 | 1,738 | 1,554 | 0 | 0 | 0 | 1,644 | 1,472 | 1 | 0 | 0 | 0 |
| 5/10/2013 | 2013 | 1,399 | 1,573 | 0 | 0 | 0 | 1,340 | 1,490 | 1 | 0 | 0 | 0 |
| 5/11/2013 | 2013 | 1,301 | 1,564 | 0 | 0 | 0 | 1,218 | 1,482 | 1 | 0 | 0 | 0 |
| 5/12/2013 | 2013 | 1,224 | 1,511 | 0 | 0 | 0 | 1,164 | 1,432 | 1 | 0 | 0 | 0 |
| 5/13/2013 | 2013 | 1,639 | 1,501 | 0 | 0 | 0 | 1,544 | 1,421 | 1 | 0 | 0 | 0 |

STB_AR1_001681

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/14/2013 | 2013 | 1,557 | 1,503 | 0 | 0 | 0 | 1,455 | 1,418 | 1 | 0 | 0 | 0 |
| 5/15/2013 | 2013 | 1,340 | 1,457 | 0 | 1 | 0 | 1,280 | 1,378 | 1 | 0 | 0 | 0 |
| 5/16/2013 | 2013 | 1,379 | 1,406 | 0 | 1 | 0 | 1,293 | 1,328 | 1 | 0 | 0 | 0 |
| 5/17/2013 | 2013 | 1,355 | 1,399 | 0 | 1 | 0 | 1,293 | 1,321 | 1 | 0 | 0 | 0 |
| 5/18/2013 | 2013 | 1,351 | 1,406 | 0 | 1 | 0 | 1,291 | 1,331 | 1 | 0 | 0 | 0 |
| 5/19/2013 | 2013 | 1,365 | 1,427 | 0 | 1 | 0 | 1,277 | 1,348 | 1 | 0 | 0 | 0 |
| 5/20/2013 | 2013 | 1,286 | 1,376 | 0 | 1 | 0 | 1,198 | 1,298 | 1 | 0 | 0 | 0 |
| 5/21/2013 | 2013 | 1,373 | 1,350 | 0 | 1 | 0 | 1,310 | 1,277 | 1 | 0 | 0 | 0 |
| 5/22/2013 | 2013 | 1,401 | 1,359 | 0 | 1 | 0 | 1,303 | 1,281 | 1 | 0 | 0 | 0 |
| 5/23/2013 | 2013 | 1,383 | 1,359 | 0 | 1 | 0 | 1,320 | 1,285 | 1 | 0 | 0 | 0 |
| 5/24/2013 | 2013 | 1,100 | 1,323 | 0 | 1 | 0 | 1,046 | 1,249 | 1 | 0 | 0 | 0 |
| 5/25/2013 | 2013 | 1,324 | 1,319 | 0 | 1 | 0 | 1,229 | 1,240 | 1 | 0 | 0 | 0 |
| 5/26/2013 | 2013 | 1,223 | 1,299 | 0 | 1 | 0 | 1,157 | 1,223 | 1 | 0 | 0 | 0 |
| 5/27/2013 | 2013 | 1,440 | 1,321 | 0 | 1 | 0 | 1,351 | 1,245 | 1 | 0 | 0 | 0 |
| 5/28/2013 | 2013 | 1,393 | 1,323 | 0 | 1 | 0 | 1,312 | 1,245 | 1 | 0 | 0 | 0 |
| 5/29/2013 | 2013 | 1,428 | 1,327 | 0 | 1 | 0 | 1,350 | 1,252 | 1 | 0 | 0 | 0 |
| 5/30/2013 | 2013 | 1,364 | 1,325 | 0 | 1 | 0 | 1,297 | 1,249 | 1 | 0 | 0 | 0 |
| 5/31/2013 | 2013 | 1,323 | 1,356 | 0 | 1 | 0 | 1,254 | 1,279 | 1 | 1 | 0 | 0 |
| 6/1/2013 | 2013 | 1,159 | 1,333 | 0 | 1 | 0 | 1,064 | 1,255 | 1 | 1 | 0 | 0 |
| 6/2/2013 | 2013 | 1,157 | 1,323 | 0 | 1 | 0 | 1,087 | 1,245 | 1 | 1 | 0 | 0 |
| 6/3/2013 | 2013 | 1,418 | 1,320 | 0 | 1 | 0 | 1,344 | 1,244 | 1 | 1 | 0 | 0 |
| 6/4/2013 | 2013 | 1,340 | 1,313 | 0 | 1 | 0 | 1,280 | 1,239 | 1 | 1 | 0 | 0 |
| 6/5/2013 | 2013 | 1,170 | 1,276 | 0 | 1 | 0 | 1,117 | 1,206 | 1 | 1 | 0 | 0 |
| 6/6/2013 | 2013 | 1,155 | 1,246 | 0 | 1 | 0 | 1,101 | 1,178 | 1 | 1 | 0 | 0 |
| 6/7/2013 | 2013 | 1,250 | 1,236 | 0 | 1 | 0 | 1,172 | 1,166 | 1 | 1 | 0 | 0 |
| 6/8/2013 | 2013 | 1,263 | 1,250 | 0 | 1 | 0 | 1,187 | 1,184 | 1 | 1 | 0 | 0 |
| 6/9/2013 | 2013 | 1,113 | 1,244 | 0 | 1 | 0 | 1,026 | 1,175 | 1 | 1 | 0 | 0 |
| 6/10/2013 | 2013 | 1,248 | 1,220 | 0 | 1 | 0 | 1,173 | 1,151 | 1 | 1 | 0 | 0 |
| 6/11/2013 | 2013 | 1,211 | 1,201 | 1 | 1 | 1 | 1,147 | 1,132 | 1 | 1 | 0 | 0 |
| 6/12/2013 | 2013 | 1,159 | 1,200 | 1 | 1 | 0 | 1,088 | 1,128 | 1 | 1 | 0 | 0 |
| 6/13/2013 | 2013 | 1,216 | 1,209 | 1 | 1 | 0 | 1,157 | 1,136 | 1 | 1 | 0 | 0 |
| 6/14/2013 | 2013 | 1,041 | 1,179 | 1 | 1 | 0 | 983 | 1,109 | 1 | 1 | 0 | 0 |
| 6/15/2013 | 2013 | 990 | 1,140 | 1 | 1 | 0 | 911 | 1,069 | 1 | 1 | 0 | 0 |
| 6/16/2013 | 2013 | 1,032 | 1,128 | 1 | 1 | 0 | 952 | 1,059 | 1 | 1 | 0 | 0 |
| 6/17/2013 | 2013 | 1,007 | 1,094 | 1 | 1 | 0 | 936 | 1,025 | 1 | 1 | 0 | 0 |
| 6/18/2013 | 2013 | 1,131 | 1,082 | 1 | 1 | 0 | 1,081 | 1,015 | 1 | 1 | 0 | 0 |
| 6/19/2013 | 2013 | 1,141 | 1,080 | 1 | 1 | 0 | 1,069 | 1,013 | 1 | 1 | 0 | 0 |
| 6/20/2013 | 2013 | 1,147 | 1,070 | 1 | 1 | 0 | 1,083 | 1,002 | 1 | 1 | 0 | 0 |
| 6/21/2013 | 2013 | 1,171 | 1,088 | 1 | 1 | 0 | 1,097 | 1,018 | 1 | 1 | 0 | 0 |
| 6/22/2013 | 2013 | 1,137 | 1,109 | 1 | 1 | 0 | 1,043 | 1,037 | 1 | 1 | 0 | 0 |
| 6/23/2013 | 2013 | 1,051 | 1,112 | 1 | 1 | 0 | 978 | 1,041 | 1 | 1 | 0 | 0 |
| 6/24/2013 | 2013 | 1,043 | 1,117 | 1 | 1 | 0 | 976 | 1,047 | 1 | 1 | 0 | 0 |
| 6/25/2013 | 2013 | 1,145 | 1,119 | 1 | 1 | 0 | 1,084 | 1,047 | 1 | 1 | 0 | 0 |
| 6/26/2013 | 2013 | 1,247 | 1,134 | 1 | 1 | 0 | 1,157 | 1,060 | 1 | 1 | 0 | 0 |
| 6/27/2013 | 2013 | 1,228 | 1,146 | 1 | 1 | 0 | 1,154 | 1,070 | 1 | 1 | 0 | 0 |
| 6/28/2013 | 2013 | 982 | 1,119 | 1 | 1 | 0 | 921 | 1,045 | 1 | 1 | 0 | 0 |
| 6/29/2013 | 2013 | 1,000 | 1,099 | 1 | 1 | 0 | 946 | 1,031 | 1 | 1 | 0 | 0 |

STB_AR1_001682

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/30/2013 | 2013 | 1,084 | 1,104 | 1 | 1 | 0 | 1,010 | 1,035 | 1 | 1 | 0 | 0 |
| 7/1/2013 | 2013 | 1,114 | 1,114 | 1 | 1 | 0 | 1,017 | 1,041 | 1 | 1 | 0 | 0 |
| 7/2/2013 | 2013 | 1,012 | 1,095 | 1 | 1 | 0 | 930 | 1,019 | 1 | 1 | 0 | 0 |
| 7/3/2013 | 2013 | 1,117 | 1,077 | 1 | 1 | 0 | 1,049 | 1,004 | 1 | 1 | 0 | 0 |
| 7/4/2013 | 2013 | 993 | 1,043 | 1 | 1 | 0 | 944 | 974 | 1 | 1 | 0 | 0 |
| 7/5/2013 | 2013 | 1,132 | 1,065 | 1 | 1 | 0 | 1,068 | 995 | 1 | 1 | 0 | 0 |
| 7/6/2013 | 2013 | 1,157 | 1,087 | 1 | 1 | 0 | 1,085 | 1,015 | 1 | 1 | 0 | 0 |
| 7/7/2013 | 2013 | 1,089 | 1,088 | 1 | 1 | 0 | 998 | 1,013 | 1 | 1 | 0 | 0 |
| 7/8/2013 | 2013 | 1,158 | 1,094 | 1 | 1 | 0 | 1,091 | 1,024 | 1 | 1 | 0 | 0 |
| 7/9/2013 | 2013 | 1,305 | 1,136 | 1 | 1 | 0 | 1,222 | 1,065 | 1 | 1 | 0 | 0 |
| 7/10/2013 | 2013 | 983 | 1,117 | 1 | 1 | 0 | 924 | 1,047 | 1 | 1 | 0 | 0 |
| 7/11/2013 | 2013 | 962 | 1,112 | 1 | 1 | 0 | 888 | 1,039 | 1 | 1 | 0 | 0 |
| 7/12/2013 | 2013 | 1,106 | 1,109 | 1 | 1 | 0 | 1,044 | 1,036 | 1 | 1 | 0 | 0 |
| 7/13/2013 | 2013 | 991 | 1,085 | 1 | 1 | 0 | 928 | 1,014 | 1 | 1 | 0 | 0 |
| 7/14/2013 | 2013 | 1,012 | 1,074 | 1 | 1 | 0 | 935 | 1,005 | 1 | 1 | 0 | 0 |
| 7/15/2013 | 2013 | 1,074 | 1,062 | 1 | 1 | 0 | 985 | 989 | 1 | 1 | 0 | 0 |
| 7/16/2013 | 2013 | 904 | 1,005 | 1 | 1 | 0 | 853 | 937 | 1 | 1 | 0 | 0 |
| 7/17/2013 | 2013 | 1,110 | 1,023 | 1 | 1 | 0 | 1,033 | 952 | 1 | 1 | 0 | 0 |
| 7/18/2013 | 2013 | 1,037 | 1,033 | 1 | 1 | 0 | 973 | 964 | 1 | 1 | 0 | 0 |
| 7/19/2013 | 2013 | 981 | 1,016 | 1 | 1 | 0 | 907 | 945 | 1 | 1 | 0 | 0 |
| 7/20/2013 | 2013 | 1,041 | 1,023 | 1 | 1 | 0 | 971 | 951 | 1 | 1 | 0 | 0 |
| 7/21/2013 | 2013 | 1,129 | 1,039 | 1 | 1 | 0 | 1,051 | 968 | 1 | 1 | 0 | 0 |
| 7/22/2013 | 2013 | 1,134 | 1,048 | 1 | 1 | 0 | 1,066 | 979 | 1 | 1 | 0 | 0 |
| 7/23/2013 | 2013 | 1,083 | 1,074 | 1 | 1 | 0 | 1,026 | 1,004 | 1 | 1 | 0 | 0 |
| 7/24/2013 | 2013 | 1,091 | 1,071 | 1 | 1 | 0 | 1,035 | 1,004 | 1 | 1 | 0 | 0 |
| 7/25/2013 | 2013 | 1,138 | 1,085 | 1 | 1 | 0 | 1,072 | 1,018 | 1 | 1 | 0 | 0 |
| 7/26/2013 | 2013 | 954 | 1,081 | 1 | 1 | 0 | 895 | 1,017 | 1 | 1 | 0 | 0 |
| 7/27/2013 | 2013 | 1,184 | 1,102 | 1 | 1 | 0 | 1,084 | 1,033 | 1 | 1 | 0 | 0 |
| 7/28/2013 | 2013 | 951 | 1,076 | 1 | 1 | 0 | 881 | 1,008 | 1 | 1 | 0 | 0 |
| 7/29/2013 | 2013 | 1,110 | 1,073 | 1 | 1 | 0 | 1,038 | 1,004 | 1 | 1 | 0 | 0 |
| 7/30/2013 | 2013 | 1,098 | 1,075 | 1 | 1 | 0 | 1,016 | 1,003 | 1 | 1 | 0 | 0 |
| 7/31/2013 | 2013 | 1,080 | 1,074 | 1 | 1 | 0 | 1,007 | 999 | 1 | 1 | 0 | 0 |
| 8/1/2013 | 2013 | 1,121 | 1,071 | 1 | 1 | 0 | 1,041 | 995 | 1 | 1 | 0 | 0 |
| 8/2/2013 | 2013 | 1,003 | 1,078 | 1 | 1 | 0 | 949 | 1,002 | 1 | 1 | 0 | 0 |
| 8/3/2013 | 2013 | 1,112 | 1,068 | 1 | 1 | 0 | 1,057 | 998 | 1 | 1 | 0 | 0 |
| 8/4/2013 | 2013 | 974 | 1,071 | 1 | 1 | 0 | 896 | 1,001 | 1 | 1 | 0 | 0 |
| 8/5/2013 | 2013 | 1,103 | 1,070 | 1 | 1 | 0 | 1,031 | 1,000 | 1 | 1 | 0 | 0 |
| 8/6/2013 | 2013 | 1,110 | 1,072 | 1 | 1 | 0 | 1,032 | 1,002 | 1 | 1 | 0 | 0 |
| 8/7/2013 | 2013 | 1,134 | 1,080 | 1 | 1 | 0 | 1,073 | 1,011 | 1 | 1 | 0 | 0 |
| 8/8/2013 | 2013 | 1,053 | 1,070 | 1 | 1 | 0 | 986 | 1,003 | 1 | 1 | 0 | 0 |
| 8/9/2013 | 2013 | 1,053 | 1,077 | 1 | 1 | 0 | 976 | 1,007 | 1 | 1 | 0 | 0 |
| 8/10/2013 | 2013 | 1,118 | 1,078 | 1 | 1 | 0 | 1,046 | 1,006 | 1 | 1 | 0 | 0 |
| 8/11/2013 | 2013 | 964 | 1,076 | 1 | 1 | 0 | 917 | 1,009 | 1 | 1 | 0 | 0 |
| 8/12/2013 | 2013 | 1,131 | 1,080 | 1 | 1 | 0 | 1,050 | 1,011 | 1 | 1 | 0 | 0 |
| 8/13/2013 | 2013 | 1,179 | 1,090 | 1 | 1 | 0 | 1,101 | 1,021 | 1 | 1 | 0 | 0 |
| 8/14/2013 | 2013 | 1,226 | 1,103 | 1 | 1 | 0 | 1,151 | 1,032 | 1 | 1 | 0 | 0 |
| 8/15/2013 | 2013 | 1,043 | 1,102 | 1 | 1 | 0 | 983 | 1,032 | 1 | 1 | 0 | 0 |

STB_AR1_001683

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/16/2013 | 2013 | 926 | 1,084 | 1 | 1 | 0 | 864 | 1,016 | 1 | 1 | 0 | 0 |
| 8/17/2013 | 2013 | 949 | 1,060 | 1 | 1 | 0 | 873 | 991 | 1 | 1 | 0 | 0 |
| 8/18/2013 | 2013 | 927 | 1,054 | 1 | 1 | 0 | 856 | 983 | 1 | 1 | 0 | 0 |
| 8/19/2013 | 2013 | 1,008 | 1,037 | 1 | 1 | 0 | 950 | 968 | 1 | 1 | 0 | 0 |
| 8/20/2013 | 2013 | 1,033 | 1,016 | 1 | 1 | 0 | 972 | 950 | 1 | 1 | 0 | 0 |
| 8/21/2013 | 2013 | 1,005 | 984 | 1 | 1 | 0 | 940 | 920 | 1 | 1 | 0 | 0 |
| 8/22/2013 | 2013 | 1,120 | 995 | 1 | 1 | 0 | 1,055 | 930 | 1 | 1 | 0 | 0 |
| 8/23/2013 | 2013 | 1,114 | 1,022 | 1 | 1 | 0 | 1,047 | 956 | 1 | 1 | 0 | 0 |
| 8/24/2013 | 2013 | 1,125 | 1,047 | 1 | 1 | 0 | 1,045 | 981 | 1 | 1 | 0 | 0 |
| 8/25/2013 | 2013 | 1,177 | 1,083 | 1 | 1 | 0 | 1,103 | 1,016 | 1 | 1 | 0 | 0 |
| 8/26/2013 | 2013 | 1,271 | 1,121 | 1 | 1 | 0 | 1,198 | 1,051 | 1 | 1 | 0 | 0 |
| 8/27/2013 | 2013 | 1,243 | 1,151 | 1 | 1 | 0 | 1,134 | 1,075 | 1 | 1 | 0 | 0 |
| 8/28/2013 | 2013 | 1,096 | 1,164 | 1 | 1 | 0 | 1,018 | 1,086 | 1 | 1 | 0 | 0 |
| 8/29/2013 | 2013 | 1,325 | 1,193 | 1 | 1 | 0 | 1,220 | 1,109 | 1 | 1 | 0 | 0 |
| 8/30/2013 | 2013 | 1,085 | 1,189 | 1 | 1 | 0 | 979 | 1,100 | 1 | 1 | 0 | 0 |
| 8/31/2013 | 2013 | 1,069 | 1,181 | 1 | 1 | 0 | 962 | 1,088 | 1 | 1 | 0 | 0 |
| 9/1/2013 | 2013 | 946 | 1,148 | 1 | 1 | 0 | 844 | 1,051 | 1 | 1 | 0 | 0 |
| 9/2/2013 | 2013 | 1,195 | 1,137 | 1 | 1 | 0 | 1,119 | 1,039 | 1 | 1 | 0 | 0 |
| 9/3/2013 | 2013 | 1,118 | 1,119 | 1 | 1 | 0 | 1,029 | 1,024 | 1 | 1 | 0 | 0 |
| 9/4/2013 | 2013 | 1,006 | 1,106 | 1 | 1 | 0 | 942 | 1,014 | 1 | 1 | 0 | 0 |
| 9/5/2013 | 2013 | 1,177 | 1,085 | 1 | 1 | 0 | 1,133 | 1,001 | 1 | 1 | 0 | 0 |
| 9/6/2013 | 2013 | 964 | 1,068 | 1 | 1 | 0 | 922 | 993 | 1 | 1 | 0 | 0 |
| 9/7/2013 | 2013 | 1,163 | 1,081 | 1 | 1 | 0 | 1,071 | 1,009 | 1 | 1 | 0 | 0 |
| 9/8/2013 | 2013 | 1,058 | 1,097 | 1 | 1 | 0 | 982 | 1,028 | 1 | 1 | 0 | 0 |
| 9/9/2013 | 2013 | 1,402 | 1,127 | 1 | 1 | 0 | 1,304 | 1,055 | 1 | 1 | 0 | 0 |
| 9/10/2013 | 2013 | 1,043 | 1,116 | 1 | 1 | 0 | 973 | 1,047 | 1 | 1 | 0 | 0 |
| 9/11/2013 | 2013 | 1,174 | 1,140 | 1 | 1 | 0 | 1,094 | 1,068 | 1 | 1 | 0 | 0 |
| 9/12/2013 | 2013 | 1,266 | 1,153 | 1 | 1 | 0 | 1,182 | 1,075 | 1 | 1 | 0 | 0 |
| 9/13/2013 | 2013 | 1,025 | 1,162 | 1 | 1 | 0 | 954 | 1,080 | 1 | 1 | 0 | 0 |
| 9/14/2013 | 2013 | 1,007 | 1,139 | 1 | 1 | 0 | 953 | 1,063 | 1 | 1 | 0 | 0 |
| 9/15/2013 | 2013 | 918 | 1,119 | 1 | 1 | 0 | 845 | 1,044 | 1 | 1 | 0 | 0 |
| 9/16/2013 | 2013 | 898 | 1,047 | 1 | 1 | 0 | 827 | 975 | 1 | 1 | 0 | 0 |
| 9/17/2013 | 2013 | 1,181 | 1,067 | 1 | 1 | 0 | 1,115 | 996 | 1 | 1 | 0 | 0 |
| 9/18/2013 | 2013 | 1,036 | 1,047 | 1 | 1 | 0 | 962 | 977 | 1 | 1 | 0 | 0 |
| 9/19/2013 | 2013 | 1,021 | 1,012 | 1 | 1 | 0 | 941 | 942 | 1 | 1 | 0 | 0 |
| 9/20/2013 | 2013 | 955 | 1,002 | 1 | 1 | 0 | 907 | 936 | 1 | 1 | 0 | 0 |
| 9/21/2013 | 2013 | 1,070 | 1,011 | 1 | 1 | 0 | 986 | 940 | 1 | 1 | 0 | 0 |
| 9/22/2013 | 2013 | 894 | 1,008 | 1 | 1 | 0 | 821 | 937 | 1 | 1 | 0 | 0 |
| 9/23/2013 | 2013 | 1,198 | 1,051 | 1 | 1 | 0 | 1,119 | 979 | 1 | 1 | 0 | 0 |
| 9/24/2013 | 2013 | 1,049 | 1,032 | 1 | 1 | 0 | 965 | 957 | 1 | 1 | 0 | 0 |
| 9/25/2013 | 2013 | 982 | 1,024 | 1 | 1 | 0 | 919 | 951 | 1 | 1 | 0 | 0 |
| 9/26/2013 | 2013 | 1,026 | 1,025 | 1 | 1 | 0 | 930 | 950 | 1 | 1 | 0 | 0 |
| 9/27/2013 | 2013 | 1,146 | 1,052 | 1 | 1 | 0 | 1,054 | 971 | 1 | 1 | 0 | 0 |
| 9/28/2013 | 2013 | 932 | 1,032 | 1 | 1 | 0 | 860 | 953 | 1 | 1 | 0 | 0 |
| 9/29/2013 | 2013 | 993 | 1,047 | 1 | 1 | 0 | 922 | 967 | 1 | 1 | 0 | 0 |
| 9/30/2013 | 2013 | 959 | 1,012 | 1 | 1 | 0 | 903 | 936 | 1 | 1 | 0 | 0 |
| 10/1/2013 | 2014 | 1,135 | 1,025 | 1 | 1 | 0 | 1,031 | 946 | 1 | 1 | 0 | 0 |

STB_AR1_001684

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/2/2013 | 2014 | 1,087 | 1,040 | 1 | 1 | 0 | 1,033 | 962 | 1 | 1 | 0 | 0 |
| 10/3/2013 | 2014 | 1,082 | 1,048 | 1 | 1 | 0 | 1,024 | 975 | 1 | 1 | 0 | 0 |
| 10/4/2013 | 2014 | 1,067 | 1,036 | 1 | 1 | 0 | 1,005 | 968 | 1 | 1 | 0 | 0 |
| 10/5/2013 | 2014 | 1,156 | 1,068 | 1 | 1 | 0 | 1,065 | 998 | 1 | 1 | 0 | 0 |
| 10/6/2013 | 2014 | 1,251 | 1,105 | 1 | 1 | 0 | 1,143 | 1,029 | 1 | 1 | 0 | 0 |
| 10/7/2013 | 2014 | 1,194 | 1,139 | 1 | 1 | 0 | 1,099 | 1,057 | 1 | 1 | 0 | 0 |
| 10/8/2013 | 2014 | 1,137 | 1,139 | 1 | 1 | 0 | 1,072 | 1,063 | 1 | 1 | 0 | 0 |
| 10/9/2013 | 2014 | 1,032 | 1,131 | 1 | 1 | 0 | 964 | 1,053 | 1 | 1 | 0 | 0 |
| 10/10/2013 | 2014 | 1,222 | 1,151 | 1 | 1 | 0 | 1,150 | 1,071 | 1 | 1 | 0 | 0 |
| 10/11/2013 | 2014 | 1,309 | 1,186 | 1 | 1 | 0 | 1,214 | 1,101 | 1 | 1 | 0 | 0 |
| 10/12/2013 | 2014 | 1,243 | 1,198 | 1 | 1 | 0 | 1,103 | 1,106 | 1 | 1 | 0 | 0 |
| 10/13/2013 | 2014 | 1,031 | 1,167 | 1 | 1 | 0 | 957 | 1,080 | 1 | 1 | 0 | 0 |
| 10/14/2013 | 2014 | 1,091 | 1,152 | 1 | 1 | 0 | 997 | 1,065 | 1 | 1 | 0 | 0 |
| 10/15/2013 | 2014 | 980 | 1,130 | 1 | 1 | 0 | 915 | 1,043 | 1 | 1 | 0 | 0 |
| 10/16/2013 | 2014 | 1,166 | 1,149 | 1 | 1 | 0 | 1,085 | 1,060 | 1 | 1 | 0 | 0 |
| 10/17/2013 | 2014 | 1,123 | 1,135 | 1 | 1 | 0 | 1,027 | 1,043 | 1 | 1 | 0 | 0 |
| 10/18/2013 | 2014 | 1,154 | 1,113 | 1 | 1 | 0 | 1,091 | 1,025 | 1 | 1 | 0 | 0 |
| 10/19/2013 | 2014 | 1,089 | 1,091 | 1 | 1 | 0 | 988 | 1,009 | 1 | 1 | 0 | 0 |
| 10/20/2013 | 2014 | 1,109 | 1,102 | 1 | 1 | 0 | 1,035 | 1,020 | 1 | 1 | 0 | 0 |
| 10/21/2013 | 2014 | 1,240 | 1,123 | 1 | 1 | 0 | 1,164 | 1,044 | 1 | 1 | 0 | 0 |
| 10/22/2013 | 2014 | 1,236 | 1,160 | 1 | 1 | 0 | 1,173 | 1,080 | 1 | 1 | 0 | 0 |
| 10/23/2013 | 2014 | 901 | 1,122 | 1 | 1 | 0 | 844 | 1,046 | 1 | 1 | 0 | 0 |
| 10/24/2013 | 2014 | 1,013 | 1,106 | 1 | 1 | 0 | 939 | 1,033 | 1 | 1 | 0 | 0 |
| 10/25/2013 | 2014 | 1,175 | 1,109 | 1 | 1 | 0 | 1,083 | 1,032 | 1 | 1 | 0 | 0 |
| 10/26/2013 | 2014 | 1,111 | 1,112 | 1 | 1 | 0 | 1,000 | 1,034 | 1 | 1 | 0 | 0 |
| 10/27/2013 | 2014 | 1,373 | 1,150 | 1 | 1 | 0 | 1,245 | 1,064 | 1 | 1 | 0 | 0 |
| 10/28/2013 | 2014 | 1,119 | 1,133 | 1 | 1 | 0 | 1,035 | 1,046 | 1 | 1 | 0 | 0 |
| 10/29/2013 | 2014 | 1,228 | 1,131 | 1 | 1 | 0 | 1,126 | 1,039 | 1 | 1 | 0 | 0 |
| 10/30/2013 | 2014 | 1,137 | 1,165 | 1 | 1 | 0 | 1,044 | 1,067 | 1 | 1 | 0 | 0 |
| 10/31/2013 | 2014 | 1,121 | 1,181 | 1 | 1 | 0 | 1,028 | 1,080 | 1 | 1 | 0 | 0 |
| 11/1/2013 | 2014 | 871 | 1,137 | 1 | 1 | 0 | 804 | 1,040 | 1 | 1 | 0 | 0 |
| 11/2/2013 | 2014 | 1,129 | 1,140 | 1 | 1 | 0 | 1,011 | 1,042 | 1 | 1 | 0 | 0 |
| 11/3/2013 | 2014 | 1,214 | 1,117 | 1 | 1 | 0 | 1,101 | 1,021 | 1 | 1 | 0 | 0 |
| 11/4/2013 | 2014 | 1,119 | 1,117 | 1 | 1 | 0 | 1,021 | 1,019 | 1 | 1 | 0 | 0 |
| 11/5/2013 | 2014 | 1,096 | 1,098 | 1 | 1 | 0 | 1,010 | 1,003 | 1 | 1 | 0 | 0 |
| 11/6/2013 | 2014 | 948 | 1,071 | 1 | 1 | 0 | 877 | 979 | 1 | 1 | 0 | 0 |
| 11/7/2013 | 2014 | 1,050 | 1,061 | 1 | 1 | 0 | 968 | 970 | 1 | 1 | 0 | 0 |
| 11/8/2013 | 2014 | 1,060 | 1,088 | 1 | 1 | 0 | 983 | 996 | 1 | 1 | 0 | 0 |
| 11/9/2013 | 2014 | 966 | 1,065 | 1 | 1 | 0 | 874 | 976 | 1 | 1 | 0 | 0 |
| 11/10/2013 | 2014 | 1,148 | 1,055 | 1 | 1 | 0 | 1,023 | 965 | 1 | 1 | 0 | 0 |
| 11/11/2013 | 2014 | 1,113 | 1,054 | 1 | 1 | 0 | 1,017 | 965 | 1 | 1 | 0 | 0 |
| 11/12/2013 | 2014 | 971 | 1,037 | 1 | 1 | 0 | 884 | 947 | 1 | 1 | 0 | 0 |
| 11/13/2013 | 2014 | 977 | 1,041 | 1 | 1 | 0 | 899 | 950 | 1 | 1 | 0 | 0 |
| 11/14/2013 | 2014 | 1,192 | 1,061 | 1 | 1 | 0 | 1,106 | 969 | 1 | 1 | 0 | 0 |
| 11/15/2013 | 2014 | 1,034 | 1,057 | 1 | 1 | 0 | 930 | 962 | 1 | 1 | 0 | 0 |
| 11/16/2013 | 2014 | 1,087 | 1,075 | 1 | 1 | 0 | 986 | 978 | 1 | 1 | 0 | 0 |
| 11/17/2013 | 2014 | 1,055 | 1,061 | 1 | 1 | 0 | 940 | 966 | 1 | 1 | 0 | 0 |

STB_AR1_001685

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/18/2013 | 2014 | 1,109 | 1,061 | 1 | 1 | 0 | 1,021 | 967 | 1 | 1 | 0 | 0 |
| 11/19/2013 | 2014 | 1,152 | 1,087 | 1 | 1 | 0 | 1,057 | 991 | 1 | 1 | 0 | 0 |
| 11/20/2013 | 2014 | 1,305 | 1,133 | 1 | 1 | 0 | 1,140 | 1,026 | 1 | 1 | 0 | 0 |
| 11/21/2013 | 2014 | 1,121 | 1,123 | 1 | 1 | 0 | 1,020 | 1,013 | 1 | 1 | 0 | 0 |
| 11/22/2013 | 2014 | 953 | 1,112 | 1 | 1 | 0 | 898 | 1,009 | 1 | 1 | 0 | 0 |
| 11/23/2013 | 2014 | 998 | 1,099 | 1 | 1 | 0 | 865 | 992 | 1 | 1 | 0 | 0 |
| 11/24/2013 | 2014 | 989 | 1,090 | 1 | 1 | 0 | 872 | 982 | 1 | 1 | 0 | 0 |
| 11/25/2013 | 2014 | 1,097 | 1,088 | 1 | 1 | 0 | 1,002 | 979 | 1 | 1 | 0 | 0 |
| 11/26/2013 | 2014 | 1,198 | 1,094 | 1 | 1 | 0 | 1,067 | 981 | 1 | 1 | 0 | 0 |
| 11/27/2013 | 2014 | 968 | 1,046 | 1 | 1 | 0 | 850 | 939 | 1 | 1 | 0 | 0 |
| 11/28/2013 | 2014 | 848 | 1,007 | 1 | 1 | 0 | 762 | 902 | 1 | 1 | 0 | 0 |
| 11/29/2013 | 2014 | 982 | 1,011 | 1 | 1 | 0 | 888 | 901 | 1 | 1 | 0 | 0 |
| 11/30/2013 | 2014 | 1,146 | 1,033 | 1 | 1 | 0 | 1,037 | 925 | 1 | 1 | 0 | 0 |
| 12/1/2013 | 2014 | 1,164 | 1,058 | 1 | 1 | 0 | 1,007 | 945 | 1 | 1 | 0 | 0 |
| 12/2/2013 | 2014 | 1,111 | 1,060 | 1 | 1 | 0 | 1,013 | 946 | 1 | 1 | 0 | 0 |
| 12/3/2013 | 2014 | 1,138 | 1,051 | 1 | 1 | 0 | 1,007 | 938 | 1 | 1 | 0 | 0 |
| 12/4/2013 | 2014 | 1,248 | 1,091 | 1 | 1 | 0 | 1,119 | 976 | 1 | 1 | 0 | 0 |
| 12/5/2013 | 2014 | 1,072 | 1,123 | 1 | 1 | 0 | 958 | 1,004 | 1 | 1 | 0 | 0 |
| 12/6/2013 | 2014 | 979 | 1,123 | 1 | 1 | 0 | 847 | 998 | 1 | 1 | 0 | 0 |
| 12/7/2013 | 2014 | 1,051 | 1,109 | 1 | 1 | 0 | 939 | 984 | 1 | 1 | 0 | 0 |
| 12/8/2013 | 2014 | 990 | 1,084 | 1 | 1 | 0 | 873 | 965 | 1 | 1 | 0 | 0 |
| 12/9/2013 | 2014 | 911 | 1,056 | 1 | 1 | 0 | 831 | 939 | 1 | 1 | 0 | 0 |
| 12/10/2013 | 2014 | 1,242 | 1,070 | 1 | 1 | 0 | 1,098 | 952 | 1 | 1 | 0 | 0 |
| 12/11/2013 | 2014 | 1,133 | 1,054 | 1 | 1 | 0 | 999 | 935 | 1 | 1 | 0 | 0 |
| 12/12/2013 | 2014 | 1,084 | 1,056 | 1 | 1 | 0 | 966 | 936 | 1 | 1 | 0 | 0 |
| 12/13/2013 | 2014 | 1,113 | 1,075 | 1 | 1 | 0 | 962 | 953 | 1 | 1 | 0 | 0 |
| 12/14/2013 | 2014 | 1,033 | 1,072 | 1 | 1 | 0 | 912 | 949 | 1 | 1 | 0 | 0 |
| 12/15/2013 | 2014 | 1,125 | 1,092 | 1 | 1 | 0 | 961 | 961 | 1 | 1 | 0 | 0 |
| 12/16/2013 | 2014 | 931 | 1,094 | 1 | 1 | 0 | 827 | 961 | 1 | 1 | 0 | 0 |
| 12/17/2013 | 2014 | 1,285 | 1,101 | 1 | 1 | 0 | 1,149 | 968 | 1 | 1 | 0 | 0 |
| 12/18/2013 | 2014 | 1,188 | 1,108 | 1 | 1 | 0 | 1,052 | 976 | 1 | 1 | 0 | 0 |
| 12/19/2013 | 2014 | 1,245 | 1,131 | 1 | 1 | 0 | 1,115 | 997 | 1 | 1 | 0 | 0 |
| 12/20/2013 | 2014 | 905 | 1,102 | 1 | 1 | 0 | 815 | 976 | 1 | 1 | 0 | 0 |
| 12/21/2013 | 2014 | 1,031 | 1,101 | 1 | 1 | 0 | 910 | 976 | 1 | 1 | 0 | 0 |
| 12/22/2013 | 2014 | 833 | 1,060 | 1 | 1 | 0 | 739 | 944 | 1 | 1 | 0 | 0 |
| 12/23/2013 | 2014 | 745 | 1,033 | 1 | 1 | 0 | 662 | 920 | 1 | 1 | 0 | 0 |
| 12/24/2013 | 2014 | 580 | 932 | 1 | 1 | 0 | 525 | 831 | 1 | 1 | 0 | 0 |
| 12/25/2013 | 2014 | 417 | 822 | 1 | 1 | 0 | 377 | 735 | 1 | 1 | 0 | 0 |
| 12/26/2013 | 2014 | 643 | 736 | 1 | 1 | 0 | 574 | 657 | 1 | 1 | 0 | 0 |
| 12/27/2013 | 2014 | 670 | 703 | 1 | 1 | 0 | 605 | 627 | 1 | 1 | 0 | 0 |
| 12/28/2013 | 2014 | 828 | 674 | 1 | 1 | 0 | 715 | 600 | 1 | 1 | 0 | 0 |
| 12/29/2013 | 2014 | 758 | 663 | 1 | 1 | 0 | 706 | 595 | 1 | 1 | 0 | 0 |
| 12/30/2013 | 2014 | 578 | 639 | 1 | 1 | 0 | 545 | 578 | 1 | 1 | 0 | 0 |
| 12/31/2013 | 2014 | 497 | 627 | 1 | 1 | 0 | 450 | 567 | 1 | 1 | 0 | 0 |
| 1/1/2014 | 2014 | 411 | 626 | 1 | 1 | 0 | 381 | 568 | 1 | 1 | 0 | 0 |
| 1/2/2014 | 2014 | 640 | 626 | 1 | 1 | 0 | 592 | 571 | 1 | 1 | 0 | 0 |
| 1/3/2014 | 2014 | 608 | 617 | 1 | 1 | 0 | 567 | 565 | 1 | 1 | 0 | 0 |

STB_AR1_001686

| Date | Year | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/4/2014 | 2014 | 701 | 599 | 1 | 1 | 0 | 637 | 554 | 1 | 1 | 0 | 0 |
| 1/5/2014 | 2014 | 722 | 594 | 1 | 1 | 0 | 675 | 550 | 1 | 1 | 0 | 0 |
| 1/6/2014 | 2014 | 705 | 612 | 1 | 1 | 0 | 669 | 567 | 1 | 1 | 0 | 0 |
| 1/7/2014 | 2014 | 578 | 624 | 1 | 1 | 0 | 540 | 580 | 1 | 1 | 0 | 0 |
| 1/8/2014 | 2014 | 693 | 664 | 1 | 1 | 0 | 663 | 620 | 1 | 1 | 0 | 0 |
| 1/9/2014 | 2014 | 822 | 690 | 1 | 1 | 0 | 765 | 645 | 1 | 1 | 0 | 0 |
| 1/10/2014 | 2014 | 781 | 715 | 1 | 1 | 0 | 735 | 669 | 1 | 1 | 0 | 0 |
| 1/11/2014 | 2014 | 746 | 721 | 1 | 1 | 0 | 691 | 677 | 1 | 1 | 0 | 0 |
| 1/12/2014 | 2014 | 926 | 750 | 1 | 1 | 0 | 844 | 701 | 1 | 1 | 0 | 0 |
| 1/13/2014 | 2014 | 941 | 784 | 1 | 1 | 0 | 882 | 731 | 1 | 1 | 0 | 0 |
| 1/14/2014 | 2014 | 962 | 839 | 1 | 1 | 0 | 842 | 775 | 1 | 1 | 0 | 0 |
| 1/15/2014 | 2014 | 908 | 869 | 1 | 1 | 0 | 819 | 797 | 1 | 1 | 0 | 0 |
| 1/16/2014 | 2014 | 993 | 894 | 1 | 1 | 0 | 886 | 814 | 1 | 1 | 0 | 0 |
| 1/17/2014 | 2014 | 936 | 916 | 1 | 1 | 0 | 859 | 832 | 1 | 1 | 0 | 0 |
| 1/18/2014 | 2014 | 1,132 | 971 | 1 | 1 | 0 | 1,001 | 876 | 1 | 1 | 0 | 0 |
| 1/19/2014 | 2014 | 975 | 978 | 1 | 1 | 0 | 875 | 881 | 1 | 1 | 0 | 0 |
| 1/20/2014 | 2014 | 979 | 984 | 1 | 1 | 0 | 880 | 880 | 1 | 1 | 0 | 0 |
| 1/21/2014 | 2014 | 1,012 | 991 | 1 | 1 | 0 | 901 | 889 | 1 | 1 | 0 | 0 |
| 1/22/2014 | 2014 | 1,116 | 1,020 | 1 | 1 | 0 | 1,007 | 916 | 1 | 1 | 0 | 0 |
| 1/23/2014 | 2014 | 1,119 | 1,038 | 1 | 1 | 0 | 1,039 | 937 | 1 | 1 | 0 | 0 |
| 1/24/2014 | 2014 | 1,046 | 1,054 | 1 | 1 | 0 | 962 | 952 | 1 | 1 | 0 | 0 |
| 1/25/2014 | 2014 | 1,136 | 1,055 | 1 | 1 | 0 | 1,023 | 955 | 1 | 1 | 0 | 0 |
| 1/26/2014 | 2014 | 1,160 | 1,081 | 1 | 1 | 0 | 1,060 | 982 | 1 | 1 | 0 | 0 |
| 1/27/2014 | 2014 | 1,207 | 1,114 | 1 | 1 | 0 | 1,084 | 1,011 | 1 | 1 | 0 | 0 |
| 1/28/2014 | 2014 | 1,124 | 1,130 | 1 | 1 | 0 | 1,022 | 1,028 | 1 | 1 | 0 | 0 |
| 1/29/2014 | 2014 | 1,224 | 1,145 | 1 | 1 | 0 | 1,108 | 1,043 | 1 | 1 | 0 | 0 |
| 1/30/2014 | 2014 | 1,223 | 1,160 | 1 | 1 | 0 | 1,135 | 1,056 | 1 | 1 | 0 | 0 |
| 1/31/2014 | 2014 | 1,142 | 1,174 | 1 | 1 | 0 | 1,026 | 1,065 | 1 | 1 | 0 | 0 |
| 2/1/2014 | 2014 | 1,127 | 1,172 | 1 | 1 | 0 | 1,009 | 1,063 | 1 | 1 | 0 | 0 |
| 2/2/2014 | 2014 | 1,088 | 1,162 | 1 | 1 | 0 | 972 | 1,051 | 1 | 1 | 0 | 0 |
| 2/3/2014 | 2014 | 1,089 | 1,145 | 1 | 1 | 0 | 995 | 1,038 | 1 | 1 | 0 | 0 |
| 2/4/2014 | 2014 | 1,194 | 1,155 | 1 | 1 | 0 | 1,078 | 1,046 | 1 | 1 | 0 | 0 |
| 2/5/2014 | 2014 | 1,150 | 1,145 | 1 | 1 | 0 | 1,064 | 1,040 | 1 | 1 | 0 | 0 |
| 2/6/2014 | 2014 | 1,244 | 1,148 | 1 | 1 | 0 | 1,138 | 1,040 | 1 | 1 | 0 | 0 |
| 2/7/2014 | 2014 | 1,119 | 1,144 | 1 | 1 | 0 | 1,007 | 1,038 | 1 | 1 | 0 | 0 |
| 2/8/2014 | 2014 | 1,032 | 1,131 | 1 | 1 | 0 | 923 | 1,025 | 1 | 1 | 0 | 0 |
| 2/9/2014 | 2014 | 1,262 | 1,156 | 1 | 1 | 0 | 1,139 | 1,049 | 1 | 1 | 0 | 0 |
| 2/10/2014 | 2014 | 1,364 | 1,195 | 1 | 1 | 0 | 1,228 | 1,082 | 1 | 1 | 0 | 0 |
| 2/11/2014 | 2014 | 1,223 | 1,199 | 1 | 1 | 0 | 1,116 | 1,088 | 1 | 1 | 0 | 0 |
| 2/12/2014 | 2014 | 1,190 | 1,205 | 1 | 1 | 0 | 1,079 | 1,090 | 1 | 1 | 0 | 0 |
| 2/13/2014 | 2014 | 1,204 | 1,199 | 1 | 1 | 0 | 1,100 | 1,085 | 1 | 1 | 0 | 0 |
| 2/14/2014 | 2014 | 1,385 | 1,237 | 1 | 1 | 0 | 1,243 | 1,118 | 1 | 1 | 0 | 0 |
| 2/15/2014 | 2014 | 1,400 | 1,290 | 1 | 1 | 0 | 1,255 | 1,166 | 1 | 1 | 0 | 0 |
| 2/16/2014 | 2014 | 1,373 | 1,306 | 1 | 1 | 0 | 1,269 | 1,184 | 1 | 1 | 0 | 0 |
| 2/17/2014 | 2014 | 1,253 | 1,290 | 1 | 1 | 0 | 1,130 | 1,170 | 1 | 1 | 0 | 0 |
| 2/18/2014 | 2014 | 1,405 | 1,316 | 1 | 1 | 0 | 1,290 | 1,195 | 1 | 1 | 0 | 0 |
| 2/19/2014 | 2014 | 1,250 | 1,324 | 1 | 1 | 0 | 1,135 | 1,203 | 1 | 1 | 0 | 0 |

STB_AR1_001687

| 2/20/2014 | 2014 | 1,295 | 1,337 | 1 | 1 | 0 | 1,159 | 1,212 | 1 | 1 | 0 | 0 |
| 2/21/2014 | 2014 | 1,421 | 1,342 | 1 | 1 | 0 | 1,282 | 1,217 | 1 | 1 | 0 | 0 |
| 2/22/2014 | 2014 | 1,323 | 1,331 | 1 | 1 | 0 | 1,150 | 1,202 | 1 | 1 | 0 | 0 |
| 2/23/2014 | 2014 | 1,438 | 1,341 | 1 | 1 | 0 | 1,311 | 1,208 | 1 | 1 | 0 | 0 |
| 2/24/2014 | 2014 | 1,299 | 1,347 | 1 | 1 | 0 | 1,176 | 1,215 | 1 | 1 | 0 | 0 |
| 2/25/2014 | 2014 | 1,438 | 1,352 | 1 | 1 | 0 | 1,269 | 1,212 | 1 | 1 | 0 | 0 |
| 2/26/2014 | 2014 | 1,736 | 1,421 | 1 | 1 | 0 | 1,553 | 1,271 | 1 | 1 | 0 | 0 |
| 2/27/2014 | 2014 | 1,551 | 1,458 | 1 | 1 | 0 | 1,411 | 1,307 | 1 | 1 | 0 | 0 |
| 2/28/2014 | 2014 | 1,550 | 1,476 | 1 | 1 | 0 | 1,435 | 1,329 | 1 | 1 | 0 | 0 |
| 3/1/2014 | 2014 | 1,662 | 1,525 | 0 | 0 | 0 | 1,503 | 1,380 | 1 | 1 | 0 | 0 |
| 3/2/2014 | 2014 | 1,367 | 1,515 | 0 | 0 | 0 | 1,216 | 1,366 | 1 | 1 | 0 | 0 |
| 3/3/2014 | 2014 | 1,325 | 1,518 | 0 | 0 | 0 | 1,198 | 1,369 | 1 | 1 | 0 | 0 |
| 3/4/2014 | 2014 | 1,351 | 1,506 | 0 | 0 | 0 | 1,210 | 1,361 | 1 | 1 | 0 | 0 |
| 3/5/2014 | 2014 | 1,319 | 1,446 | 0 | 1 | 0 | 1,200 | 1,310 | 1 | 1 | 0 | 0 |
| 3/6/2014 | 2014 | 1,679 | 1,465 | 0 | 1 | 0 | 1,498 | 1,323 | 1 | 1 | 0 | 0 |
| 3/7/2014 | 2014 | 1,434 | 1,448 | 0 | 1 | 0 | 1,309 | 1,305 | 1 | 1 | 0 | 0 |
| 3/8/2014 | 2014 | 1,369 | 1,406 | 0 | 1 | 0 | 1,224 | 1,265 | 1 | 1 | 0 | 0 |
| 3/9/2014 | 2014 | 1,316 | 1,399 | 0 | 1 | 0 | 1,156 | 1,256 | 1 | 1 | 0 | 0 |
| 3/10/2014 | 2014 | 1,347 | 1,402 | 0 | 1 | 0 | 1,221 | 1,260 | 1 | 1 | 0 | 0 |
| 3/11/2014 | 2014 | 1,436 | 1,414 | 0 | 1 | 0 | 1,252 | 1,266 | 1 | 1 | 0 | 0 |
| 3/12/2014 | 2014 | 1,488 | 1,438 | 0 | 1 | 0 | 1,361 | 1,289 | 1 | 1 | 0 | 0 |
| 3/13/2014 | 2014 | 1,703 | 1,442 | 0 | 1 | 0 | 1,514 | 1,291 | 1 | 1 | 0 | 0 |
| 3/14/2014 | 2014 | 1,558 | 1,460 | 0 | 1 | 0 | 1,387 | 1,302 | 1 | 1 | 0 | 0 |
| 3/15/2014 | 2014 | 1,519 | 1,481 | 0 | 1 | 0 | 1,355 | 1,321 | 1 | 1 | 0 | 0 |
| 3/16/2014 | 2014 | 1,409 | 1,494 | 0 | 0 | 0 | 1,243 | 1,333 | 1 | 1 | 0 | 0 |
| 3/17/2014 | 2014 | 1,820 | 1,562 | 0 | 0 | 0 | 1,608 | 1,389 | 1 | 1 | 0 | 0 |
| 3/18/2014 | 2014 | 1,708 | 1,601 | 0 | 0 | 0 | 1,531 | 1,428 | 1 | 1 | 0 | 0 |
| 3/19/2014 | 2014 | 1,815 | 1,647 | 0 | 0 | 0 | 1,613 | 1,464 | 1 | 1 | 0 | 0 |
| 3/20/2014 | 2014 | 1,780 | 1,658 | 0 | 0 | 0 | 1,600 | 1,477 | 1 | 1 | 0 | 0 |
| 3/21/2014 | 2014 | 1,829 | 1,697 | 0 | 0 | 0 | 1,600 | 1,507 | 0 | 0 | 0 | 0 |
| 3/22/2014 | 2014 | 1,757 | 1,731 | 0 | 0 | 0 | 1,552 | 1,535 | 0 | 0 | 0 | 0 |
| 3/23/2014 | 2014 | 1,494 | 1,743 | 0 | 0 | 0 | 1,308 | 1,545 | 0 | 0 | 0 | 0 |
| 3/24/2014 | 2014 | 1,693 | 1,725 | 0 | 0 | 0 | 1,542 | 1,535 | 0 | 0 | 0 | 0 |
| 3/25/2014 | 2014 | 1,823 | 1,742 | 0 | 0 | 0 | 1,600 | 1,545 | 0 | 0 | 0 | 0 |
| 3/26/2014 | 2014 | 1,841 | 1,745 | 0 | 0 | 0 | 1,633 | 1,548 | 0 | 0 | 0 | 0 |
| 3/27/2014 | 2014 | 1,767 | 1,743 | 0 | 0 | 0 | 1,547 | 1,540 | 0 | 0 | 0 | 0 |
| 3/28/2014 | 2014 | 1,750 | 1,732 | 0 | 0 | 0 | 1,564 | 1,535 | 0 | 0 | 0 | 0 |
| 3/29/2014 | 2014 | 1,667 | 1,719 | 0 | 0 | 0 | 1,488 | 1,526 | 0 | 0 | 0 | 0 |
| 3/30/2014 | 2014 | 1,655 | 1,742 | 0 | 0 | 0 | 1,476 | 1,550 | 0 | 0 | 0 | 0 |
| 3/31/2014 | 2014 | 1,915 | 1,774 | 0 | 0 | 0 | 1,728 | 1,577 | 0 | 0 | 0 | 0 |
| 4/1/2014 | 2014 | 1,682 | 1,754 | 0 | 0 | 0 | 1,507 | 1,563 | 0 | 0 | 0 | 0 |
| 4/2/2014 | 2014 | 1,987 | 1,775 | 0 | 0 | 0 | 1,763 | 1,582 | 0 | 0 | 0 | 0 |
| 4/3/2014 | 2014 | 1,837 | 1,785 | 0 | 0 | 0 | 1,637 | 1,595 | 0 | 0 | 0 | 0 |
| 4/4/2014 | 2014 | 1,644 | 1,770 | 0 | 0 | 0 | 1,468 | 1,581 | 0 | 0 | 0 | 0 |
| 4/5/2014 | 2014 | 1,815 | 1,791 | 0 | 0 | 0 | 1,595 | 1,596 | 0 | 0 | 0 | 0 |
| 4/6/2014 | 2014 | 1,501 | 1,769 | 0 | 0 | 0 | 1,312 | 1,573 | 0 | 0 | 0 | 0 |
| 4/7/2014 | 2014 | 1,987 | 1,779 | 0 | 0 | 0 | 1,757 | 1,577 | 0 | 0 | 0 | 0 |

STB_AR1_001688

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/8/2014 | 2014 | 1,957 | 1,818 | 0 | 0 | 0 | 1,752 | 1,612 | 0 | 0 | 0 | 0 |
| 4/9/2014 | 2014 | 1,889 | 1,804 | 0 | 0 | 0 | 1,675 | 1,599 | 0 | 0 | 0 | 0 |
| 4/10/2014 | 2014 | 1,821 | 1,802 | 0 | 0 | 0 | 1,648 | 1,601 | 0 | 0 | 0 | 0 |
| 4/11/2014 | 2014 | 1,454 | 1,775 | 0 | 0 | 0 | 1,278 | 1,574 | 0 | 0 | 0 | 0 |
| 4/12/2014 | 2014 | 1,831 | 1,777 | 0 | 0 | 0 | 1,543 | 1,566 | 0 | 0 | 0 | 0 |
| 4/13/2014 | 2014 | 1,806 | 1,821 | 0 | 0 | 0 | 1,645 | 1,614 | 0 | 0 | 0 | 0 |
| 4/14/2014 | 2014 | 1,578 | 1,762 | 0 | 0 | 0 | 1,440 | 1,569 | 0 | 0 | 0 | 0 |
| 4/15/2014 | 2014 | 1,988 | 1,767 | 0 | 0 | 0 | 1,801 | 1,576 | 0 | 0 | 0 | 0 |
| 4/16/2014 | 2014 | 1,950 | 1,775 | 0 | 0 | 0 | 1,727 | 1,583 | 0 | 0 | 0 | 0 |
| 4/17/2014 | 2014 | 1,851 | 1,780 | 0 | 0 | 0 | 1,641 | 1,582 | 0 | 0 | 0 | 0 |
| 4/18/2014 | 2014 | 1,402 | 1,772 | 0 | 0 | 0 | 1,235 | 1,576 | 0 | 0 | 0 | 0 |
| 4/19/2014 | 2014 | 1,633 | 1,744 | 0 | 0 | 0 | 1,403 | 1,556 | 0 | 0 | 0 | 0 |
| 4/20/2014 | 2014 | 1,034 | 1,634 | 0 | 0 | 0 | 948 | 1,456 | 1 | 0 | 1 | 0 |
| 4/21/2014 | 2014 | 1,228 | 1,584 | 0 | 0 | 0 | 1,104 | 1,408 | 1 | 0 | 0 | 0 |
| 4/22/2014 | 2014 | 1,766 | 1,552 | 0 | 0 | 0 | 1,515 | 1,368 | 1 | 0 | 0 | 0 |
| 4/23/2014 | 2014 | 1,795 | 1,530 | 0 | 0 | 0 | 1,606 | 1,350 | 1 | 0 | 0 | 0 |
| 4/24/2014 | 2014 | 1,668 | 1,504 | 0 | 0 | 0 | 1,486 | 1,328 | 1 | 0 | 0 | 0 |
| 4/25/2014 | 2014 | 1,492 | 1,517 | 0 | 0 | 0 | 1,332 | 1,342 | 1 | 0 | 0 | 0 |
| 4/26/2014 | 2014 | 1,533 | 1,502 | 0 | 0 | 0 | 1,336 | 1,332 | 1 | 0 | 0 | 0 |
| 4/27/2014 | 2014 | 1,718 | 1,600 | 0 | 0 | 0 | 1,490 | 1,410 | 1 | 0 | 0 | 0 |
| 4/28/2014 | 2014 | 1,983 | 1,708 | 0 | 0 | 0 | 1,727 | 1,499 | 1 | 0 | 0 | 0 |
| 4/29/2014 | 2014 | 1,789 | 1,711 | 0 | 0 | 0 | 1,539 | 1,502 | 0 | 0 | 0 | 0 |
| 4/30/2014 | 2014 | 1,883 | 1,724 | 0 | 0 | 0 | 1,644 | 1,508 | 0 | 0 | 0 | 0 |
| 5/1/2014 | 2014 | 2,262 | 1,809 | 0 | 0 | 0 | 1,954 | 1,575 | 0 | 0 | 0 | 0 |
| 5/2/2014 | 2014 | 1,856 | 1,861 | 0 | 0 | 0 | 1,520 | 1,601 | 0 | 0 | 0 | 0 |
| 5/3/2014 | 2014 | 1,937 | 1,918 | 0 | 0 | 0 | 1,631 | 1,644 | 0 | 0 | 0 | 0 |
| 5/4/2014 | 2014 | 1,622 | 1,905 | 0 | 0 | 0 | 1,378 | 1,628 | 0 | 0 | 0 | 0 |
| 5/5/2014 | 2014 | 2,013 | 1,909 | 0 | 0 | 0 | 1,766 | 1,633 | 0 | 0 | 0 | 0 |
| 5/6/2014 | 2014 | 1,947 | 1,931 | 0 | 0 | 0 | 1,658 | 1,650 | 0 | 0 | 0 | 0 |
| 5/7/2014 | 2014 | 2,097 | 1,962 | 0 | 0 | 0 | 1,850 | 1,680 | 0 | 0 | 0 | 0 |
| 5/8/2014 | 2014 | 2,012 | 1,926 | 0 | 0 | 0 | 1,723 | 1,647 | 0 | 0 | 0 | 0 |
| 5/9/2014 | 2014 | 1,897 | 1,932 | 0 | 0 | 0 | 1,652 | 1,665 | 0 | 0 | 0 | 0 |
| 5/10/2014 | 2014 | 1,759 | 1,907 | 0 | 0 | 0 | 1,440 | 1,638 | 0 | 0 | 0 | 0 |
| 5/11/2014 | 2014 | 1,520 | 1,892 | 0 | 0 | 0 | 1,321 | 1,630 | 0 | 0 | 0 | 0 |
| 5/12/2014 | 2014 | 1,835 | 1,867 | 0 | 0 | 0 | 1,588 | 1,605 | 0 | 0 | 0 | 0 |
| 5/13/2014 | 2014 | 1,912 | 1,862 | 0 | 0 | 0 | 1,641 | 1,602 | 0 | 0 | 0 | 0 |
| 5/14/2014 | 2014 | 1,844 | 1,826 | 0 | 0 | 0 | 1,583 | 1,564 | 0 | 0 | 0 | 0 |
| 5/15/2014 | 2014 | 2,012 | 1,826 | 0 | 0 | 0 | 1,696 | 1,560 | 0 | 0 | 0 | 0 |
| 5/16/2014 | 2014 | 1,648 | 1,790 | 0 | 0 | 0 | 1,445 | 1,531 | 0 | 0 | 0 | 0 |
| 5/17/2014 | 2014 | 1,700 | 1,782 | 0 | 0 | 0 | 1,490 | 1,538 | 0 | 0 | 0 | 0 |
| 5/18/2014 | 2014 | 1,684 | 1,805 | 0 | 0 | 0 | 1,426 | 1,553 | 0 | 0 | 0 | 0 |
| 5/19/2014 | 2014 | 2,261 | 1,866 | 0 | 0 | 0 | 1,994 | 1,611 | 0 | 0 | 0 | 0 |
| 5/20/2014 | 2014 | 2,199 | 1,907 | 0 | 0 | 0 | 1,878 | 1,645 | 0 | 0 | 0 | 0 |
| 5/21/2014 | 2014 | 2,142 | 1,949 | 0 | 0 | 0 | 1,867 | 1,685 | 0 | 0 | 0 | 0 |
| 5/22/2014 | 2014 | 2,081 | 1,959 | 0 | 0 | 0 | 1,725 | 1,689 | 0 | 0 | 0 | 0 |
| 5/23/2014 | 2014 | 2,080 | 2,021 | 0 | 0 | 0 | 1,712 | 1,727 | 0 | 0 | 0 | 0 |
| 5/24/2014 | 2014 | 2,230 | 2,097 | 0 | 0 | 0 | 1,788 | 1,770 | 0 | 0 | 0 | 0 |

STB_AR1_001689

| 5/25/2014 | 2014 | 1,671 | 2,095 | 0 | 0 | 0 | 1,369 | 1,762 | 0 | 0 | 0 | 0 |
| 5/26/2014 | 2014 | 2,086 | 2,070 | 0 | 0 | 0 | 1,777 | 1,731 | 0 | 0 | 0 | 0 |
| 5/27/2014 | 2014 | 2,123 | 2,059 | 0 | 0 | 0 | 1,795 | 1,719 | 0 | 0 | 0 | 0 |
| 5/28/2014 | 2014 | 2,170 | 2,063 | 0 | 0 | 0 | 1,795 | 1,709 | 0 | 0 | 0 | 0 |
| 5/29/2014 | 2014 | 2,176 | 2,077 | 0 | 0 | 0 | 1,820 | 1,722 | 0 | 0 | 0 | 0 |
| 5/30/2014 | 2014 | 2,095 | 2,079 | 0 | 0 | 0 | 1,732 | 1,725 | 0 | 0 | 0 | 0 |
| 5/31/2014 | 2014 | 1,812 | 2,019 | 0 | 0 | 0 | 1,529 | 1,688 | 0 | 0 | 0 | 0 |
| 6/1/2014 | 2014 | 1,520 | 1,997 | 0 | 0 | 0 | 1,282 | 1,676 | 0 | 0 | 0 | 0 |
| 6/2/2014 | 2014 | 1,879 | 1,968 | 0 | 0 | 0 | 1,593 | 1,649 | 0 | 0 | 0 | 0 |
| 6/3/2014 | 2014 | 1,991 | 1,949 | 0 | 0 | 0 | 1,726 | 1,640 | 0 | 0 | 0 | 0 |
| 6/4/2014 | 2014 | 2,057 | 1,933 | 0 | 0 | 0 | 1,766 | 1,635 | 0 | 0 | 0 | 0 |
| 6/5/2014 | 2014 | 1,865 | 1,888 | 0 | 0 | 0 | 1,546 | 1,596 | 0 | 0 | 0 | 0 |
| 6/6/2014 | 2014 | 1,999 | 1,875 | 0 | 0 | 0 | 1,661 | 1,586 | 0 | 0 | 0 | 0 |
| 6/7/2014 | 2014 | 1,713 | 1,861 | 0 | 0 | 0 | 1,419 | 1,570 | 0 | 0 | 0 | 0 |
| 6/8/2014 | 2014 | 1,668 | 1,882 | 0 | 0 | 0 | 1,418 | 1,590 | 0 | 0 | 0 | 0 |
| 6/9/2014 | 2014 | 1,617 | 1,844 | 0 | 0 | 0 | 1,421 | 1,565 | 0 | 0 | 0 | 0 |
| 6/10/2014 | 2014 | 2,396 | 1,902 | 0 | 0 | 0 | 1,892 | 1,589 | 0 | 0 | 0 | 0 |
| 6/11/2014 | 2014 | 2,053 | 1,902 | 0 | 0 | 0 | 1,745 | 1,586 | 0 | 0 | 0 | 0 |
| 6/12/2014 | 2014 | 2,022 | 1,924 | 0 | 0 | 0 | 1,693 | 1,607 | 0 | 0 | 0 | 0 |
| 6/13/2014 | 2014 | 2,211 | 1,954 | 0 | 0 | 0 | 1,884 | 1,639 | 0 | 0 | 0 | 0 |
| 6/14/2014 | 2014 | 2,138 | 2,015 | 0 | 0 | 0 | 1,724 | 1,682 | 0 | 0 | 0 | 0 |
| 6/15/2014 | 2014 | 1,740 | 2,025 | 0 | 0 | 0 | 1,368 | 1,675 | 0 | 0 | 0 | 0 |
| 6/16/2014 | 2014 | 2,077 | 2,091 | 0 | 0 | 0 | 1,719 | 1,718 | 0 | 0 | 0 | 0 |
| 6/17/2014 | 2014 | 1,902 | 2,020 | 0 | 0 | 0 | 1,563 | 1,671 | 0 | 0 | 0 | 0 |
| 6/18/2014 | 2014 | 2,091 | 2,026 | 0 | 0 | 0 | 1,759 | 1,673 | 0 | 0 | 0 | 0 |
| 6/19/2014 | 2014 | 2,145 | 2,043 | 0 | 0 | 0 | 1,775 | 1,685 | 0 | 0 | 0 | 0 |
| 6/20/2014 | 2014 | 1,973 | 2,009 | 0 | 0 | 0 | 1,663 | 1,653 | 0 | 0 | 0 | 0 |
| 6/21/2014 | 2014 | 1,831 | 1,966 | 0 | 0 | 0 | 1,515 | 1,623 | 0 | 0 | 0 | 0 |
| 6/22/2014 | 2014 | 1,521 | 1,934 | 0 | 0 | 0 | 1,280 | 1,611 | 0 | 0 | 0 | 0 |
| 6/23/2014 | 2014 | 1,896 | 1,908 | 0 | 0 | 0 | 1,563 | 1,588 | 0 | 0 | 0 | 0 |
| 6/24/2014 | 2014 | 2,122 | 1,940 | 0 | 0 | 0 | 1,800 | 1,622 | 0 | 0 | 0 | 0 |
| 6/25/2014 | 2014 | 2,303 | 1,970 | 0 | 0 | 0 | 1,932 | 1,647 | 0 | 0 | 0 | 0 |
| 6/26/2014 | 2014 | 1,977 | 1,946 | 0 | 0 | 0 | 1,612 | 1,624 | 0 | 0 | 0 | 0 |
| 6/27/2014 | 2014 | 1,959 | 1,944 | 0 | 0 | 0 | 1,648 | 1,621 | 0 | 0 | 0 | 0 |
| 6/28/2014 | 2014 | 1,882 | 1,951 | 0 | 0 | 0 | 1,508 | 1,620 | 0 | 0 | 0 | 0 |
| 6/29/2014 | 2014 | 1,479 | 1,945 | 0 | 0 | 0 | 1,246 | 1,616 | 0 | 0 | 0 | 0 |
| 6/30/2014 | 2014 | 1,834 | 1,937 | 0 | 0 | 0 | 1,578 | 1,618 | 0 | 0 | 0 | 0 |
| 7/1/2014 | 2014 | 1,714 | 1,878 | 0 | 0 | 0 | 1,495 | 1,574 | 0 | 0 | 0 | 0 |
| 7/2/2014 | 2014 | 1,872 | 1,817 | 0 | 0 | 0 | 1,596 | 1,526 | 0 | 0 | 0 | 0 |
| 7/3/2014 | 2014 | 1,391 | 1,733 | 0 | 0 | 0 | 1,191 | 1,466 | 1 | 0 | 1 | 0 |
| 7/4/2014 | 2014 | 1,548 | 1,674 | 0 | 0 | 0 | 1,369 | 1,426 | 1 | 0 | 0 | 0 |
| 7/5/2014 | 2014 | 1,627 | 1,638 | 0 | 0 | 0 | 1,432 | 1,415 | 1 | 0 | 0 | 0 |
| 7/6/2014 | 2014 | 1,349 | 1,619 | 0 | 0 | 0 | 1,168 | 1,404 | 1 | 0 | 0 | 0 |
| 7/7/2014 | 2014 | 1,546 | 1,578 | 0 | 0 | 0 | 1,336 | 1,370 | 1 | 0 | 0 | 0 |
| 7/8/2014 | 2014 | 1,557 | 1,556 | 0 | 0 | 0 | 1,339 | 1,347 | 1 | 0 | 0 | 0 |
| 7/9/2014 | 2014 | 1,434 | 1,493 | 0 | 1 | 0 | 1,262 | 1,300 | 1 | 0 | 0 | 0 |
| 7/10/2014 | 2014 | 1,354 | 1,488 | 0 | 1 | 0 | 1,220 | 1,304 | 1 | 0 | 0 | 0 |

STB_AR1_001690

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/11/2014 | 2014 | 1,232 | 1,443 | 0 | 1 | 0 | 1,104 | 1,266 | 1 | 0 | 0 | 0 |
| 7/12/2014 | 2014 | 1,234 | 1,387 | 0 | 1 | 0 | 1,114 | 1,220 | 1 | 0 | 0 | 0 |
| 7/13/2014 | 2014 | 1,163 | 1,360 | 0 | 1 | 0 | 1,045 | 1,203 | 1 | 0 | 0 | 0 |
| 7/14/2014 | 2014 | 1,253 | 1,318 | 0 | 1 | 0 | 1,102 | 1,169 | 1 | 0 | 0 | 0 |
| 7/15/2014 | 2014 | 1,364 | 1,291 | 0 | 1 | 0 | 1,212 | 1,151 | 1 | 0 | 0 | 0 |
| 7/16/2014 | 2014 | 1,307 | 1,272 | 0 | 1 | 0 | 1,200 | 1,142 | 1 | 0 | 0 | 0 |
| 7/17/2014 | 2014 | 1,070 | 1,232 | 0 | 1 | 0 | 959 | 1,105 | 1 | 0 | 0 | 0 |
| 7/18/2014 | 2014 | 1,039 | 1,204 | 0 | 1 | 0 | 941 | 1,082 | 1 | 0 | 0 | 0 |
| 7/19/2014 | 2014 | 1,116 | 1,187 | 0 | 1 | 0 | 990 | 1,064 | 1 | 0 | 0 | 0 |
| 7/20/2014 | 2014 | 879 | 1,147 | 0 | 1 | 0 | 787 | 1,027 | 1 | 0 | 0 | 0 |
| 7/21/2014 | 2014 | 1,227 | 1,143 | 0 | 1 | 0 | 1,085 | 1,025 | 1 | 0 | 0 | 0 |
| 7/22/2014 | 2014 | 1,400 | 1,148 | 0 | 1 | 0 | 1,254 | 1,031 | 1 | 0 | 0 | 0 |
| 7/23/2014 | 2014 | 1,546 | 1,182 | 0 | 1 | 0 | 1,411 | 1,061 | 1 | 0 | 0 | 0 |
| 7/24/2014 | 2014 | 1,239 | 1,207 | 0 | 1 | 0 | 1,109 | 1,082 | 1 | 0 | 0 | 0 |
| 7/25/2014 | 2014 | 1,080 | 1,212 | 0 | 1 | 0 | 995 | 1,090 | 1 | 0 | 0 | 0 |
| 7/26/2014 | 2014 | 1,146 | 1,217 | 0 | 1 | 0 | 1,040 | 1,097 | 1 | 0 | 0 | 0 |
| 7/27/2014 | 2014 | 883 | 1,217 | 0 | 1 | 0 | 808 | 1,100 | 1 | 0 | 0 | 0 |
| 7/28/2014 | 2014 | 1,332 | 1,232 | 0 | 1 | 0 | 1,211 | 1,118 | 1 | 0 | 0 | 0 |
| 7/29/2014 | 2014 | 1,251 | 1,211 | 0 | 1 | 0 | 1,129 | 1,100 | 1 | 0 | 0 | 0 |
| 7/30/2014 | 2014 | 1,315 | 1,178 | 0 | 1 | 0 | 1,221 | 1,073 | 1 | 1 | 0 | 0 |
| 7/31/2014 | 2014 | 1,240 | 1,178 | 0 | 1 | 0 | 1,142 | 1,078 | 1 | 1 | 0 | 0 |
| 8/1/2014 | 2014 | 1,111 | 1,183 | 0 | 1 | 0 | 1,033 | 1,083 | 1 | 1 | 0 | 0 |
| 8/2/2014 | 2014 | 1,028 | 1,166 | 0 | 1 | 0 | 959 | 1,072 | 1 | 1 | 0 | 0 |
| 8/3/2014 | 2014 | 1,129 | 1,201 | 0 | 1 | 0 | 1,011 | 1,101 | 1 | 1 | 0 | 0 |
| 8/4/2014 | 2014 | 1,276 | 1,193 | 0 | 1 | 0 | 1,157 | 1,093 | 1 | 1 | 0 | 0 |
| 8/5/2014 | 2014 | 1,072 | 1,167 | 1 | 1 | 1 | 1,006 | 1,076 | 1 | 1 | 0 | 0 |
| 8/6/2014 | 2014 | 1,253 | 1,158 | 1 | 1 | 0 | 1,152 | 1,066 | 1 | 1 | 0 | 0 |
| 8/7/2014 | 2014 | 1,173 | 1,149 | 1 | 1 | 0 | 1,104 | 1,060 | 1 | 1 | 0 | 0 |
| 8/8/2014 | 2014 | 1,068 | 1,143 | 1 | 1 | 0 | 987 | 1,054 | 1 | 1 | 0 | 0 |
| 8/9/2014 | 2014 | 936 | 1,130 | 1 | 1 | 0 | 877 | 1,042 | 1 | 1 | 0 | 0 |
| 8/10/2014 | 2014 | 951 | 1,104 | 1 | 1 | 0 | 900 | 1,026 | 1 | 1 | 0 | 0 |
| 8/11/2014 | 2014 | 1,156 | 1,087 | 1 | 1 | 0 | 1,073 | 1,014 | 1 | 1 | 0 | 0 |
| 8/12/2014 | 2014 | 1,004 | 1,077 | 1 | 1 | 0 | 952 | 1,006 | 1 | 1 | 0 | 0 |
| 8/13/2014 | 2014 | 1,188 | 1,068 | 1 | 1 | 0 | 1,098 | 999 | 1 | 1 | 0 | 0 |
| 8/14/2014 | 2014 | 1,113 | 1,059 | 1 | 1 | 0 | 1,049 | 991 | 1 | 1 | 0 | 0 |
| 8/15/2014 | 2014 | 1,008 | 1,051 | 1 | 1 | 0 | 934 | 983 | 1 | 1 | 0 | 0 |
| 8/16/2014 | 2014 | 911 | 1,047 | 1 | 1 | 0 | 851 | 980 | 1 | 1 | 0 | 0 |
| 8/17/2014 | 2014 | 834 | 1,031 | 1 | 1 | 0 | 780 | 962 | 1 | 1 | 0 | 0 |
| 8/18/2014 | 2014 | 1,000 | 1,008 | 1 | 1 | 0 | 936 | 943 | 1 | 1 | 0 | 0 |
| 8/19/2014 | 2014 | 1,161 | 1,031 | 1 | 1 | 0 | 1,083 | 962 | 1 | 1 | 0 | 0 |
| 8/20/2014 | 2014 | 952 | 997 | 1 | 1 | 0 | 902 | 934 | 1 | 1 | 0 | 0 |
| 8/21/2014 | 2014 | 985 | 979 | 1 | 1 | 0 | 912 | 914 | 1 | 1 | 0 | 0 |
| 8/22/2014 | 2014 | 790 | 948 | 1 | 1 | 0 | 739 | 886 | 1 | 1 | 0 | 0 |
| 8/23/2014 | 2014 | 851 | 939 | 1 | 1 | 0 | 782 | 876 | 1 | 1 | 0 | 0 |
| 8/24/2014 | 2014 | 792 | 933 | 1 | 1 | 0 | 750 | 872 | 1 | 1 | 0 | 0 |
| 8/25/2014 | 2014 | 990 | 932 | 1 | 1 | 0 | 932 | 871 | 1 | 1 | 0 | 0 |
| 8/26/2014 | 2014 | 1,132 | 927 | 1 | 1 | 0 | 1,053 | 867 | 1 | 1 | 0 | 0 |

STB_AR1_001691

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/27/2014 | 2014 | 911 | 922 | 1 | 1 | 0 | 851 | 860 | 1 | 1 | 0 | 0 |
| 8/28/2014 | 2014 | 970 | 919 | 1 | 1 | 0 | 923 | 861 | 1 | 1 | 0 | 0 |
| 8/29/2014 | 2014 | 884 | 933 | 1 | 1 | 0 | 835 | 875 | 1 | 1 | 0 | 0 |
| 8/30/2014 | 2014 | 908 | 941 | 1 | 1 | 0 | 858 | 886 | 1 | 1 | 0 | 0 |
| 8/31/2014 | 2014 | 851 | 949 | 1 | 1 | 0 | 800 | 893 | 1 | 1 | 0 | 0 |
| 9/1/2014 | 2014 | 929 | 941 | 1 | 1 | 0 | 880 | 886 | 1 | 1 | 0 | 0 |
| 9/2/2014 | 2014 | 1,085 | 934 | 1 | 1 | 0 | 1,025 | 882 | 1 | 1 | 0 | 0 |
| 9/3/2014 | 2014 | 892 | 931 | 1 | 1 | 0 | 840 | 880 | 1 | 1 | 0 | 0 |
| 9/4/2014 | 2014 | 932 | 926 | 1 | 1 | 0 | 881 | 874 | 1 | 1 | 0 | 0 |
| 9/5/2014 | 2014 | 931 | 933 | 1 | 1 | 0 | 880 | 881 | 1 | 1 | 0 | 0 |
| 9/6/2014 | 2014 | 901 | 932 | 1 | 1 | 0 | 848 | 879 | 1 | 1 | 0 | 0 |
| 9/7/2014 | 2014 | 936 | 944 | 1 | 1 | 0 | 895 | 893 | 1 | 1 | 0 | 0 |
| 9/8/2014 | 2014 | 911 | 941 | 1 | 1 | 0 | 856 | 889 | 1 | 1 | 0 | 0 |
| 9/9/2014 | 2014 | 989 | 927 | 1 | 1 | 0 | 916 | 874 | 1 | 1 | 0 | 0 |
| 9/10/2014 | 2014 | 888 | 927 | 1 | 1 | 0 | 836 | 873 | 1 | 1 | 0 | 0 |
| 9/11/2014 | 2014 | 806 | 909 | 1 | 1 | 0 | 772 | 858 | 1 | 1 | 0 | 0 |
| 9/12/2014 | 2014 | 874 | 901 | 1 | 1 | 0 | 833 | 851 | 1 | 1 | 0 | 0 |
| 9/13/2014 | 2014 | 762 | 881 | 1 | 1 | 0 | 704 | 830 | 1 | 1 | 0 | 0 |
| 9/14/2014 | 2014 | 674 | 843 | 1 | 1 | 0 | 626 | 792 | 1 | 1 | 0 | 0 |
| 9/15/2014 | 2014 | 790 | 826 | 1 | 1 | 0 | 750 | 777 | 1 | 1 | 0 | 0 |
| 9/16/2014 | 2014 | 822 | 802 | 1 | 1 | 0 | 783 | 758 | 1 | 1 | 0 | 0 |
| 9/17/2014 | 2014 | 875 | 800 | 1 | 1 | 0 | 814 | 755 | 1 | 1 | 0 | 0 |
| 9/18/2014 | 2014 | 975 | 825 | 1 | 1 | 0 | 920 | 776 | 1 | 1 | 0 | 0 |
| 9/19/2014 | 2014 | 830 | 818 | 1 | 1 | 0 | 790 | 770 | 1 | 1 | 0 | 0 |
| 9/20/2014 | 2014 | 775 | 820 | 1 | 1 | 0 | 731 | 773 | 1 | 1 | 0 | 0 |
| 9/21/2014 | 2014 | 645 | 816 | 1 | 1 | 0 | 611 | 771 | 1 | 1 | 0 | 0 |
| 9/22/2014 | 2014 | 838 | 823 | 1 | 1 | 0 | 789 | 777 | 1 | 1 | 0 | 0 |
| 9/23/2014 | 2014 | 921 | 837 | 1 | 1 | 0 | 853 | 787 | 1 | 1 | 0 | 0 |
| 9/24/2014 | 2014 | 822 | 829 | 1 | 1 | 0 | 786 | 783 | 1 | 1 | 0 | 0 |
| 9/25/2014 | 2014 | 878 | 816 | 1 | 1 | 0 | 820 | 769 | 1 | 1 | 0 | 0 |
| 9/26/2014 | 2014 | 779 | 808 | 1 | 1 | 0 | 745 | 762 | 1 | 1 | 0 | 0 |
| 9/27/2014 | 2014 | 766 | 807 | 1 | 1 | 0 | 712 | 759 | 1 | 1 | 0 | 0 |
| 9/28/2014 | 2014 | 781 | 826 | 1 | 1 | 0 | 744 | 778 | 1 | 1 | 0 | 0 |
| 9/29/2014 | 2014 | 904 | 836 | 1 | 1 | 0 | 858 | 788 | 1 | 1 | 0 | 0 |
| 9/30/2014 | 2014 | 914 | 835 | 1 | 1 | 0 | 852 | 788 | 1 | 1 | 0 | 0 |
| 10/1/2014 | 2015 | 901 | 846 | 1 | 1 | 0 | 850 | 797 | 1 | 1 | 0 | 0 |
| 10/2/2014 | 2015 | 861 | 844 | 1 | 1 | 0 | 815 | 797 | 1 | 1 | 0 | 0 |
| 10/3/2014 | 2015 | 833 | 851 | 1 | 1 | 0 | 793 | 803 | 1 | 1 | 0 | 0 |
| 10/4/2014 | 2015 | 703 | 842 | 1 | 1 | 0 | 656 | 795 | 1 | 1 | 0 | 0 |
| 10/5/2014 | 2015 | 732 | 835 | 1 | 1 | 0 | 696 | 789 | 1 | 1 | 0 | 0 |
| 10/6/2014 | 2015 | 805 | 821 | 1 | 1 | 0 | 753 | 774 | 1 | 1 | 0 | 0 |
| 10/7/2014 | 2015 | 929 | 823 | 1 | 1 | 0 | 879 | 777 | 1 | 1 | 0 | 0 |
| 10/8/2014 | 2015 | 948 | 830 | 1 | 1 | 0 | 901 | 785 | 1 | 1 | 0 | 0 |
| 10/9/2014 | 2015 | 903 | 836 | 1 | 1 | 0 | 853 | 790 | 1 | 1 | 0 | 0 |
| 10/10/2014 | 2015 | 874 | 842 | 1 | 1 | 0 | 829 | 795 | 1 | 1 | 0 | 0 |
| 10/11/2014 | 2015 | 1,015 | 887 | 1 | 1 | 0 | 944 | 836 | 1 | 1 | 0 | 0 |
| 10/12/2014 | 2015 | 755 | 890 | 1 | 1 | 0 | 722 | 840 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/13/2014 | 2015 | 847 | 896 | 1 | 1 | 0 | 801 | 847 | 1 | 1 | 0 | 0 |
| 10/14/2014 | 2015 | 725 | 867 | 1 | 1 | 0 | 684 | 819 | 1 | 1 | 0 | 0 |
| 10/15/2014 | 2015 | 915 | 862 | 1 | 1 | 0 | 839 | 810 | 1 | 1 | 0 | 0 |
| 10/16/2014 | 2015 | 918 | 864 | 1 | 1 | 0 | 842 | 809 | 1 | 1 | 0 | 0 |
| 10/17/2014 | 2015 | 977 | 879 | 1 | 1 | 0 | 921 | 822 | 1 | 1 | 0 | 0 |
| 10/18/2014 | 2015 | 872 | 858 | 1 | 1 | 0 | 832 | 806 | 1 | 1 | 0 | 0 |
| 10/19/2014 | 2015 | 770 | 861 | 1 | 1 | 0 | 721 | 806 | 1 | 1 | 0 | 0 |
| 10/20/2014 | 2015 | 840 | 860 | 1 | 1 | 0 | 790 | 804 | 1 | 1 | 0 | 0 |
| 10/21/2014 | 2015 | 1,000 | 899 | 1 | 1 | 0 | 952 | 842 | 1 | 1 | 0 | 0 |
| 10/22/2014 | 2015 | 1,008 | 912 | 1 | 1 | 0 | 945 | 858 | 1 | 1 | 0 | 0 |
| 10/23/2014 | 2015 | 893 | 909 | 1 | 1 | 0 | 839 | 857 | 1 | 1 | 0 | 0 |
| 10/24/2014 | 2015 | 787 | 881 | 1 | 1 | 0 | 748 | 832 | 1 | 1 | 0 | 0 |
| 10/25/2014 | 2015 | 671 | 853 | 1 | 1 | 0 | 631 | 804 | 1 | 1 | 0 | 0 |
| 10/26/2014 | 2015 | 794 | 856 | 1 | 1 | 0 | 745 | 807 | 1 | 1 | 0 | 0 |
| 10/27/2014 | 2015 | 749 | 843 | 1 | 1 | 0 | 702 | 795 | 1 | 1 | 0 | 0 |
| 10/28/2014 | 2015 | 973 | 839 | 1 | 1 | 0 | 914 | 789 | 1 | 1 | 0 | 0 |
| 10/29/2014 | 2015 | 917 | 826 | 1 | 1 | 0 | 877 | 779 | 1 | 1 | 0 | 0 |
| 10/30/2014 | 2015 | 819 | 816 | 1 | 1 | 0 | 770 | 770 | 1 | 1 | 0 | 0 |
| 10/31/2014 | 2015 | 716 | 806 | 1 | 1 | 0 | 677 | 759 | 1 | 1 | 0 | 0 |
| 11/1/2014 | 2015 | 713 | 812 | 1 | 1 | 0 | 670 | 765 | 1 | 1 | 0 | 0 |
| 11/2/2014 | 2015 | 815 | 815 | 1 | 1 | 0 | 772 | 769 | 1 | 1 | 0 | 0 |
| 11/3/2014 | 2015 | 752 | 815 | 1 | 1 | 0 | 711 | 770 | 1 | 1 | 0 | 0 |
| 11/4/2014 | 2015 | 774 | 787 | 1 | 1 | 0 | 726 | 743 | 1 | 1 | 0 | 0 |
| 11/5/2014 | 2015 | 752 | 763 | 1 | 1 | 0 | 701 | 718 | 1 | 1 | 0 | 0 |
| 11/6/2014 | 2015 | 612 | 733 | 1 | 1 | 0 | 586 | 692 | 1 | 1 | 0 | 0 |
| 11/7/2014 | 2015 | 822 | 749 | 1 | 1 | 0 | 760 | 704 | 1 | 1 | 0 | 0 |
| 11/8/2014 | 2015 | 888 | 774 | 1 | 1 | 0 | 828 | 726 | 1 | 1 | 0 | 0 |
| 11/9/2014 | 2015 | 823 | 775 | 1 | 1 | 0 | 775 | 727 | 1 | 1 | 0 | 0 |
| 11/10/2014 | 2015 | 931 | 800 | 1 | 1 | 0 | 869 | 749 | 1 | 1 | 0 | 0 |
| 11/11/2014 | 2015 | 915 | 820 | 1 | 1 | 0 | 843 | 766 | 1 | 1 | 0 | 0 |
| 11/12/2014 | 2015 | 847 | 834 | 1 | 1 | 0 | 792 | 779 | 1 | 1 | 0 | 0 |
| 11/13/2014 | 2015 | 854 | 869 | 1 | 1 | 0 | 789 | 808 | 1 | 1 | 0 | 0 |
| 11/14/2014 | 2015 | 907 | 881 | 1 | 1 | 0 | 842 | 820 | 1 | 1 | 0 | 0 |
| 11/15/2014 | 2015 | 811 | 870 | 1 | 1 | 0 | 750 | 809 | 1 | 1 | 0 | 0 |
| 11/16/2014 | 2015 | 701 | 852 | 1 | 1 | 0 | 647 | 790 | 1 | 1 | 0 | 0 |
| 11/17/2014 | 2015 | 643 | 811 | 1 | 1 | 0 | 615 | 754 | 1 | 1 | 0 | 0 |
| 11/18/2014 | 2015 | 922 | 812 | 1 | 1 | 0 | 860 | 756 | 1 | 1 | 0 | 0 |
| 11/19/2014 | 2015 | 1,034 | 839 | 1 | 1 | 0 | 967 | 781 | 1 | 1 | 0 | 0 |
| 11/20/2014 | 2015 | 934 | 850 | 1 | 1 | 0 | 878 | 794 | 1 | 1 | 0 | 0 |
| 11/21/2014 | 2015 | 816 | 837 | 1 | 1 | 0 | 779 | 785 | 1 | 1 | 0 | 0 |
| 11/22/2014 | 2015 | 803 | 836 | 1 | 1 | 0 | 737 | 783 | 1 | 1 | 0 | 0 |
| 11/23/2014 | 2015 | 734 | 841 | 1 | 1 | 0 | 686 | 789 | 1 | 1 | 0 | 0 |
| 11/24/2014 | 2015 | 931 | 882 | 1 | 1 | 0 | 867 | 825 | 1 | 1 | 0 | 0 |
| 11/25/2014 | 2015 | 922 | 882 | 1 | 1 | 0 | 822 | 819 | 1 | 1 | 0 | 0 |
| 11/26/2014 | 2015 | 859 | 857 | 1 | 1 | 0 | 792 | 794 | 1 | 1 | 0 | 0 |
| 11/27/2014 | 2015 | 783 | 835 | 1 | 1 | 0 | 707 | 770 | 1 | 1 | 0 | 0 |
| 11/28/2014 | 2015 | 855 | 841 | 1 | 1 | 0 | 814 | 775 | 1 | 1 | 0 | 0 |

STB_AR1_001693

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/29/2014 | 2015 | 760 | 835 | 1 | 1 | 0 | 711 | 771 | 1 | 1 | 0 | 0 |
| 11/30/2014 | 2015 | 728 | 834 | 1 | 1 | 0 | 661 | 768 | 1 | 1 | 0 | 0 |
| 12/1/2014 | 2015 | 845 | 822 | 1 | 1 | 0 | 756 | 752 | 1 | 1 | 0 | 0 |
| 12/2/2014 | 2015 | 1,029 | 837 | 1 | 1 | 0 | 961 | 772 | 1 | 1 | 0 | 0 |
| 12/3/2014 | 2015 | 1,105 | 872 | 1 | 1 | 0 | 1,036 | 807 | 1 | 1 | 0 | 0 |
| 12/4/2014 | 2015 | 792 | 873 | 1 | 1 | 0 | 749 | 813 | 1 | 1 | 0 | 0 |
| 12/5/2014 | 2015 | 916 | 882 | 1 | 1 | 0 | 873 | 821 | 1 | 1 | 0 | 0 |
| 12/6/2014 | 2015 | 672 | 870 | 1 | 1 | 0 | 633 | 810 | 1 | 1 | 0 | 0 |
| 12/7/2014 | 2015 | 687 | 864 | 1 | 1 | 0 | 632 | 806 | 1 | 1 | 0 | 0 |
| 12/8/2014 | 2015 | 891 | 870 | 1 | 1 | 0 | 833 | 817 | 1 | 1 | 0 | 0 |
| 12/9/2014 | 2015 | 1,013 | 868 | 1 | 1 | 0 | 947 | 815 | 1 | 1 | 0 | 0 |
| 12/10/2014 | 2015 | 1,042 | 859 | 1 | 1 | 0 | 948 | 802 | 1 | 1 | 0 | 0 |
| 12/11/2014 | 2015 | 948 | 881 | 1 | 1 | 0 | 864 | 819 | 1 | 1 | 0 | 0 |
| 12/12/2014 | 2015 | 817 | 867 | 1 | 1 | 0 | 743 | 800 | 1 | 1 | 0 | 0 |
| 12/13/2014 | 2015 | 879 | 897 | 1 | 1 | 0 | 789 | 822 | 1 | 1 | 0 | 0 |
| 12/14/2014 | 2015 | 760 | 907 | 1 | 1 | 0 | 683 | 830 | 1 | 1 | 0 | 0 |
| 12/15/2014 | 2015 | 953 | 916 | 1 | 1 | 0 | 872 | 835 | 1 | 1 | 0 | 0 |
| 12/16/2014 | 2015 | 882 | 897 | 1 | 1 | 0 | 812 | 816 | 1 | 1 | 0 | 0 |
| 12/17/2014 | 2015 | 1,006 | 892 | 1 | 1 | 0 | 931 | 813 | 1 | 1 | 0 | 0 |
| 12/18/2014 | 2015 | 920 | 888 | 1 | 1 | 0 | 872 | 815 | 1 | 1 | 0 | 0 |
| 12/19/2014 | 2015 | 876 | 897 | 1 | 1 | 0 | 815 | 825 | 1 | 1 | 0 | 0 |
| 12/20/2014 | 2015 | 867 | 895 | 1 | 1 | 0 | 762 | 821 | 1 | 1 | 0 | 0 |
| 12/21/2014 | 2015 | 690 | 885 | 1 | 1 | 0 | 635 | 814 | 1 | 1 | 0 | 0 |
| 12/22/2014 | 2015 | 785 | 861 | 1 | 1 | 0 | 712 | 791 | 1 | 1 | 0 | 0 |
| 12/23/2014 | 2015 | 790 | 848 | 1 | 1 | 0 | 701 | 775 | 1 | 1 | 0 | 0 |
| 12/24/2014 | 2015 | 656 | 798 | 1 | 1 | 0 | 594 | 727 | 1 | 1 | 0 | 0 |
| 12/25/2014 | 2015 | 371 | 719 | 1 | 1 | 0 | 348 | 652 | 1 | 1 | 0 | 0 |
| 12/26/2014 | 2015 | 651 | 687 | 1 | 1 | 0 | 596 | 621 | 1 | 1 | 0 | 0 |
| 12/27/2014 | 2015 | 642 | 655 | 1 | 1 | 0 | 576 | 595 | 1 | 1 | 0 | 0 |
| 12/28/2014 | 2015 | 680 | 654 | 1 | 1 | 0 | 636 | 595 | 1 | 1 | 0 | 0 |
| 12/29/2014 | 2015 | 631 | 632 | 1 | 1 | 0 | 586 | 577 | 1 | 1 | 0 | 0 |
| 12/30/2014 | 2015 | 723 | 622 | 1 | 1 | 0 | 661 | 571 | 1 | 1 | 0 | 0 |
| 12/31/2014 | 2015 | 500 | 600 | 1 | 1 | 0 | 468 | 553 | 1 | 1 | 0 | 0 |
| 1/1/2015 | 2015 | 282 | 587 | 1 | 1 | 0 | 269 | 542 | 1 | 1 | 0 | 0 |
| 1/2/2015 | 2015 | 421 | 554 | 1 | 1 | 0 | 405 | 514 | 1 | 1 | 0 | 0 |
| 1/3/2015 | 2015 | 466 | 529 | 1 | 1 | 0 | 442 | 495 | 1 | 1 | 0 | 0 |
| 1/4/2015 | 2015 | 515 | 505 | 1 | 1 | 0 | 484 | 474 | 1 | 1 | 0 | 0 |
| 1/5/2015 | 2015 | 602 | 501 | 1 | 1 | 0 | 551 | 469 | 1 | 1 | 0 | 0 |
| 1/6/2015 | 2015 | 676 | 495 | 1 | 1 | 0 | 636 | 465 | 1 | 1 | 0 | 0 |
| 1/7/2015 | 2015 | 659 | 517 | 1 | 1 | 0 | 634 | 489 | 1 | 1 | 0 | 0 |
| 1/8/2015 | 2015 | 594 | 562 | 1 | 1 | 0 | 561 | 530 | 1 | 1 | 0 | 0 |
| 1/9/2015 | 2015 | 616 | 590 | 1 | 1 | 0 | 600 | 558 | 1 | 1 | 0 | 0 |
| 1/10/2015 | 2015 | 496 | 594 | 1 | 1 | 0 | 466 | 562 | 1 | 1 | 0 | 0 |
| 1/11/2015 | 2015 | 574 | 602 | 1 | 1 | 0 | 533 | 569 | 1 | 1 | 0 | 0 |
| 1/12/2015 | 2015 | 680 | 614 | 1 | 1 | 0 | 646 | 582 | 1 | 1 | 0 | 0 |
| 1/13/2015 | 2015 | 769 | 627 | 1 | 1 | 0 | 704 | 592 | 1 | 1 | 0 | 0 |
| 1/14/2015 | 2015 | 698 | 632 | 1 | 1 | 0 | 657 | 595 | 1 | 1 | 0 | 0 |

STB_AR1_001694

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/15/2015 | 2015 | 799 | 662 | 1 | 1 | 0 | 739 | 621 | 1 | 1 | 0 | 0 |
| 1/16/2015 | 2015 | 740 | 679 | 1 | 1 | 0 | 708 | 636 | 1 | 1 | 0 | 0 |
| 1/17/2015 | 2015 | 701 | 709 | 1 | 1 | 0 | 653 | 663 | 1 | 1 | 0 | 0 |
| 1/18/2015 | 2015 | 737 | 732 | 1 | 1 | 0 | 690 | 685 | 1 | 1 | 0 | 0 |
| 1/19/2015 | 2015 | 798 | 749 | 1 | 1 | 0 | 744 | 699 | 1 | 1 | 0 | 0 |
| 1/20/2015 | 2015 | 925 | 771 | 1 | 1 | 0 | 863 | 722 | 1 | 1 | 0 | 0 |
| 1/21/2015 | 2015 | 699 | 771 | 1 | 1 | 0 | 662 | 723 | 1 | 1 | 0 | 0 |
| 1/22/2015 | 2015 | 780 | 769 | 1 | 1 | 0 | 751 | 724 | 1 | 1 | 0 | 0 |
| 1/23/2015 | 2015 | 721 | 766 | 1 | 1 | 0 | 683 | 721 | 1 | 1 | 0 | 0 |
| 1/24/2015 | 2015 | 825 | 784 | 1 | 1 | 0 | 773 | 738 | 1 | 1 | 0 | 0 |
| 1/25/2015 | 2015 | 697 | 778 | 1 | 1 | 0 | 664 | 734 | 1 | 1 | 0 | 0 |
| 1/26/2015 | 2015 | 759 | 772 | 1 | 1 | 0 | 709 | 729 | 1 | 1 | 0 | 0 |
| 1/27/2015 | 2015 | 928 | 773 | 1 | 1 | 0 | 878 | 731 | 1 | 1 | 0 | 0 |
| 1/28/2015 | 2015 | 913 | 803 | 1 | 1 | 0 | 851 | 758 | 1 | 1 | 0 | 0 |
| 1/29/2015 | 2015 | 843 | 812 | 1 | 1 | 0 | 795 | 765 | 1 | 1 | 0 | 0 |
| 1/30/2015 | 2015 | 880 | 835 | 1 | 1 | 0 | 824 | 785 | 1 | 1 | 0 | 0 |
| 1/31/2015 | 2015 | 721 | 820 | 1 | 1 | 0 | 675 | 771 | 1 | 1 | 0 | 0 |
| 2/1/2015 | 2015 | 708 | 822 | 1 | 1 | 0 | 652 | 769 | 1 | 1 | 0 | 0 |
| 2/2/2015 | 2015 | 678 | 810 | 1 | 1 | 0 | 645 | 760 | 1 | 1 | 0 | 0 |
| 2/3/2015 | 2015 | 795 | 791 | 1 | 1 | 0 | 756 | 743 | 1 | 1 | 0 | 0 |
| 2/4/2015 | 2015 | 836 | 780 | 1 | 1 | 0 | 811 | 737 | 1 | 1 | 0 | 0 |
| 2/5/2015 | 2015 | 894 | 787 | 1 | 1 | 0 | 835 | 743 | 1 | 1 | 0 | 0 |
| 2/6/2015 | 2015 | 839 | 782 | 1 | 1 | 0 | 797 | 739 | 1 | 1 | 0 | 0 |
| 2/7/2015 | 2015 | 879 | 804 | 1 | 1 | 0 | 832 | 761 | 1 | 1 | 0 | 0 |
| 2/8/2015 | 2015 | 872 | 828 | 1 | 1 | 0 | 811 | 784 | 1 | 1 | 0 | 0 |
| 2/9/2015 | 2015 | 984 | 871 | 1 | 1 | 0 | 930 | 825 | 1 | 1 | 0 | 0 |
| 2/10/2015 | 2015 | 833 | 877 | 1 | 1 | 0 | 771 | 827 | 1 | 1 | 0 | 0 |
| 2/11/2015 | 2015 | 922 | 889 | 1 | 1 | 0 | 872 | 835 | 1 | 1 | 0 | 0 |
| 2/12/2015 | 2015 | 882 | 887 | 1 | 1 | 0 | 844 | 837 | 1 | 1 | 0 | 0 |
| 2/13/2015 | 2015 | 767 | 877 | 1 | 1 | 0 | 720 | 826 | 1 | 1 | 0 | 0 |
| 2/14/2015 | 2015 | 958 | 888 | 1 | 1 | 0 | 874 | 832 | 1 | 1 | 0 | 0 |
| 2/15/2015 | 2015 | 805 | 879 | 1 | 1 | 0 | 765 | 825 | 1 | 1 | 0 | 0 |
| 2/16/2015 | 2015 | 938 | 872 | 1 | 1 | 0 | 877 | 818 | 1 | 1 | 0 | 0 |
| 2/17/2015 | 2015 | 918 | 884 | 1 | 1 | 0 | 872 | 832 | 1 | 1 | 0 | 0 |
| 2/18/2015 | 2015 | 1,041 | 901 | 1 | 1 | 0 | 990 | 849 | 1 | 1 | 0 | 0 |
| 2/19/2015 | 2015 | 955 | 912 | 1 | 1 | 0 | 890 | 855 | 1 | 1 | 0 | 0 |
| 2/20/2015 | 2015 | 787 | 915 | 1 | 1 | 0 | 735 | 858 | 1 | 1 | 0 | 0 |
| 2/21/2015 | 2015 | 705 | 878 | 1 | 1 | 0 | 661 | 827 | 1 | 1 | 0 | 0 |
| 2/22/2015 | 2015 | 853 | 885 | 1 | 1 | 0 | 797 | 832 | 1 | 1 | 0 | 0 |
| 2/23/2015 | 2015 | 856 | 874 | 1 | 1 | 0 | 785 | 819 | 1 | 1 | 0 | 0 |
| 2/24/2015 | 2015 | 908 | 872 | 1 | 1 | 0 | 845 | 815 | 1 | 1 | 0 | 0 |
| 2/25/2015 | 2015 | 1,138 | 886 | 1 | 1 | 0 | 1,047 | 823 | 1 | 1 | 0 | 0 |
| 2/26/2015 | 2015 | 939 | 884 | 1 | 1 | 0 | 866 | 819 | 1 | 1 | 0 | 0 |
| 2/27/2015 | 2015 | 908 | 901 | 1 | 1 | 0 | 848 | 836 | 1 | 1 | 0 | 0 |
| 2/28/2015 | 2015 | 778 | 911 | 1 | 1 | 0 | 729 | 845 | 1 | 1 | 0 | 0 |
| 3/1/2015 | 2015 | 822 | 907 | 1 | 1 | 0 | 749 | 838 | 1 | 1 | 0 | 0 |
| 3/2/2015 | 2015 | 850 | 906 | 1 | 1 | 0 | 805 | 841 | 1 | 1 | 0 | 0 |

STB_AR1_001695

| 3/3/2015 | 2015 | 1,009 | 921 | 1 | 1 | 0 | 957 | 857 | 1 | 1 | 0 | 0 |
| 3/4/2015 | 2015 | 1,062 | 910 | 1 | 1 | 0 | 991 | 849 | 1 | 1 | 0 | 0 |
| 3/5/2015 | 2015 | 1,011 | 920 | 1 | 1 | 0 | 937 | 859 | 1 | 1 | 0 | 0 |
| 3/6/2015 | 2015 | 1,008 | 934 | 1 | 1 | 0 | 959 | 875 | 1 | 1 | 0 | 0 |
| 3/7/2015 | 2015 | 980 | 963 | 1 | 1 | 0 | 908 | 901 | 1 | 1 | 0 | 0 |
| 3/8/2015 | 2015 | 867 | 970 | 1 | 1 | 0 | 812 | 910 | 1 | 1 | 0 | 0 |
| 3/9/2015 | 2015 | 900 | 977 | 1 | 1 | 0 | 849 | 916 | 1 | 1 | 0 | 0 |
| 3/10/2015 | 2015 | 943 | 967 | 1 | 1 | 0 | 894 | 907 | 1 | 1 | 0 | 0 |
| 3/11/2015 | 2015 | 1,130 | 977 | 1 | 1 | 0 | 1,063 | 917 | 1 | 1 | 0 | 0 |
| 3/12/2015 | 2015 | 1,015 | 978 | 1 | 1 | 0 | 949 | 919 | 1 | 1 | 0 | 0 |
| 3/13/2015 | 2015 | 860 | 956 | 1 | 1 | 0 | 815 | 899 | 1 | 1 | 0 | 0 |
| 3/14/2015 | 2015 | 814 | 933 | 1 | 1 | 0 | 763 | 878 | 1 | 1 | 0 | 0 |
| 3/15/2015 | 2015 | 927 | 941 | 1 | 1 | 0 | 879 | 887 | 1 | 1 | 0 | 0 |
| 3/16/2015 | 2015 | 1,026 | 959 | 1 | 1 | 0 | 954 | 902 | 1 | 1 | 0 | 0 |
| 3/17/2015 | 2015 | 932 | 958 | 1 | 1 | 0 | 855 | 897 | 1 | 1 | 0 | 0 |
| 3/18/2015 | 2015 | 942 | 931 | 1 | 1 | 0 | 899 | 873 | 1 | 1 | 0 | 0 |
| 3/19/2015 | 2015 | 979 | 926 | 1 | 1 | 0 | 925 | 870 | 1 | 1 | 0 | 0 |
| 3/20/2015 | 2015 | 900 | 931 | 1 | 1 | 0 | 816 | 870 | 1 | 1 | 0 | 0 |
| 3/21/2015 | 2015 | 871 | 940 | 1 | 1 | 0 | 782 | 873 | 1 | 1 | 0 | 0 |
| 3/22/2015 | 2015 | 817 | 924 | 1 | 1 | 0 | 763 | 856 | 1 | 1 | 0 | 0 |
| 3/23/2015 | 2015 | 1,099 | 934 | 1 | 1 | 0 | 1,021 | 866 | 1 | 1 | 0 | 0 |
| 3/24/2015 | 2015 | 994 | 943 | 1 | 1 | 0 | 935 | 877 | 1 | 1 | 0 | 0 |
| 3/25/2015 | 2015 | 1,027 | 955 | 1 | 1 | 0 | 966 | 887 | 1 | 1 | 0 | 0 |
| 3/26/2015 | 2015 | 879 | 941 | 1 | 1 | 0 | 799 | 869 | 1 | 1 | 0 | 0 |
| 3/27/2015 | 2015 | 949 | 948 | 1 | 1 | 0 | 840 | 872 | 1 | 1 | 0 | 0 |
| 3/28/2015 | 2015 | 964 | 961 | 1 | 1 | 0 | 882 | 887 | 1 | 1 | 0 | 0 |
| 3/29/2015 | 2015 | 871 | 969 | 1 | 1 | 0 | 791 | 891 | 1 | 1 | 0 | 0 |
| 3/30/2015 | 2015 | 1,260 | 992 | 1 | 1 | 0 | 1,180 | 913 | 1 | 1 | 0 | 0 |
| 3/31/2015 | 2015 | 1,083 | 1,005 | 1 | 1 | 0 | 997 | 922 | 1 | 1 | 0 | 0 |
| 4/1/2015 | 2015 | 1,214 | 1,031 | 1 | 1 | 0 | 1,131 | 946 | 1 | 1 | 0 | 0 |
| 4/2/2015 | 2015 | 1,043 | 1,055 | 1 | 1 | 0 | 988 | 973 | 1 | 1 | 0 | 0 |
| 4/3/2015 | 2015 | 858 | 1,042 | 1 | 1 | 0 | 788 | 965 | 1 | 1 | 0 | 0 |
| 4/4/2015 | 2015 | 767 | 1,014 | 1 | 1 | 0 | 712 | 941 | 1 | 1 | 0 | 0 |
| 4/5/2015 | 2015 | 789 | 1,002 | 1 | 1 | 0 | 731 | 932 | 1 | 1 | 0 | 0 |
| 4/6/2015 | 2015 | 867 | 946 | 1 | 1 | 0 | 800 | 878 | 1 | 1 | 0 | 0 |
| 4/7/2015 | 2015 | 1,029 | 938 | 1 | 1 | 0 | 939 | 870 | 1 | 1 | 0 | 0 |
| 4/8/2015 | 2015 | 858 | 887 | 1 | 1 | 0 | 808 | 824 | 1 | 1 | 0 | 0 |
| 4/9/2015 | 2015 | 1,091 | 894 | 1 | 1 | 0 | 1,026 | 829 | 1 | 1 | 0 | 0 |
| 4/10/2015 | 2015 | 950 | 907 | 1 | 1 | 0 | 884 | 843 | 1 | 1 | 0 | 0 |
| 4/11/2015 | 2015 | 1,013 | 942 | 1 | 1 | 0 | 930 | 874 | 1 | 1 | 0 | 0 |
| 4/12/2015 | 2015 | 895 | 958 | 1 | 1 | 0 | 840 | 890 | 1 | 1 | 0 | 0 |
| 4/13/2015 | 2015 | 900 | 962 | 1 | 1 | 0 | 854 | 897 | 1 | 1 | 0 | 0 |
| 4/14/2015 | 2015 | 1,042 | 964 | 1 | 1 | 0 | 957 | 900 | 1 | 1 | 0 | 0 |
| 4/15/2015 | 2015 | 1,164 | 1,008 | 1 | 1 | 0 | 1,100 | 942 | 1 | 1 | 0 | 0 |
| 4/16/2015 | 2015 | 1,044 | 1,001 | 1 | 1 | 0 | 930 | 928 | 1 | 1 | 0 | 0 |
| 4/17/2015 | 2015 | 825 | 983 | 1 | 1 | 0 | 758 | 910 | 1 | 1 | 0 | 0 |
| 4/18/2015 | 2015 | 850 | 960 | 1 | 1 | 0 | 760 | 886 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/19/2015 | 2015 | 915 | 963 | 1 | 1 | 0 | 827 | 884 | 1 | 1 | 0 | 0 |
| 4/20/2015 | 2015 | 1,021 | 980 | 1 | 1 | 0 | 939 | 896 | 1 | 1 | 0 | 0 |
| 4/21/2015 | 2015 | 1,166 | 998 | 1 | 1 | 0 | 1,103 | 917 | 1 | 1 | 0 | 0 |
| 4/22/2015 | 2015 | 968 | 970 | 1 | 1 | 0 | 885 | 886 | 1 | 1 | 0 | 0 |
| 4/23/2015 | 2015 | 1,210 | 994 | 1 | 1 | 0 | 1,113 | 912 | 1 | 1 | 0 | 0 |
| 4/24/2015 | 2015 | 974 | 1,015 | 1 | 1 | 0 | 893 | 931 | 1 | 1 | 0 | 0 |
| 4/25/2015 | 2015 | 1,015 | 1,038 | 1 | 1 | 0 | 919 | 954 | 1 | 1 | 0 | 0 |
| 4/26/2015 | 2015 | 936 | 1,041 | 1 | 1 | 0 | 865 | 960 | 1 | 1 | 0 | 0 |
| 4/27/2015 | 2015 | 1,140 | 1,058 | 1 | 1 | 0 | 1,031 | 973 | 1 | 1 | 0 | 0 |
| 4/28/2015 | 2015 | 1,064 | 1,044 | 1 | 1 | 0 | 947 | 950 | 1 | 1 | 0 | 0 |
| 4/29/2015 | 2015 | 1,038 | 1,054 | 1 | 1 | 0 | 946 | 959 | 1 | 1 | 0 | 0 |
| 4/30/2015 | 2015 | 1,104 | 1,039 | 1 | 1 | 0 | 1,016 | 945 | 1 | 1 | 0 | 0 |
| 5/1/2015 | 2015 | 979 | 1,039 | 1 | 1 | 0 | 888 | 945 | 1 | 1 | 0 | 0 |
| 5/2/2015 | 2015 | 790 | 1,007 | 1 | 1 | 0 | 719 | 916 | 1 | 1 | 0 | 0 |
| 5/3/2015 | 2015 | 891 | 1,001 | 1 | 1 | 0 | 796 | 906 | 1 | 1 | 0 | 0 |
| 5/4/2015 | 2015 | 1,104 | 996 | 1 | 1 | 0 | 1,023 | 905 | 1 | 1 | 0 | 0 |
| 5/5/2015 | 2015 | 1,205 | 1,016 | 1 | 1 | 0 | 1,117 | 929 | 1 | 1 | 0 | 0 |
| 5/6/2015 | 2015 | 1,209 | 1,040 | 1 | 1 | 0 | 1,092 | 950 | 1 | 1 | 0 | 0 |
| 5/7/2015 | 2015 | 1,192 | 1,053 | 1 | 1 | 0 | 1,113 | 964 | 1 | 1 | 0 | 0 |
| 5/8/2015 | 2015 | 1,093 | 1,069 | 1 | 1 | 0 | 991 | 979 | 1 | 1 | 0 | 0 |
| 5/9/2015 | 2015 | 839 | 1,076 | 1 | 1 | 0 | 783 | 988 | 1 | 1 | 0 | 0 |
| 5/10/2015 | 2015 | 789 | 1,062 | 1 | 1 | 0 | 728 | 978 | 1 | 1 | 0 | 0 |
| 5/11/2015 | 2015 | 949 | 1,039 | 1 | 1 | 0 | 873 | 957 | 1 | 1 | 0 | 0 |
| 5/12/2015 | 2015 | 1,194 | 1,038 | 1 | 1 | 0 | 1,079 | 951 | 1 | 1 | 0 | 0 |
| 5/13/2015 | 2015 | 1,228 | 1,041 | 1 | 1 | 0 | 1,079 | 949 | 1 | 1 | 0 | 0 |
| 5/14/2015 | 2015 | 1,012 | 1,015 | 1 | 1 | 0 | 918 | 922 | 1 | 1 | 0 | 0 |
| 5/15/2015 | 2015 | 1,054 | 1,009 | 1 | 1 | 0 | 960 | 917 | 1 | 1 | 0 | 0 |
| 5/16/2015 | 2015 | 1,036 | 1,037 | 1 | 1 | 0 | 949 | 941 | 1 | 1 | 0 | 0 |
| 5/17/2015 | 2015 | 893 | 1,052 | 1 | 1 | 0 | 788 | 949 | 1 | 1 | 0 | 0 |
| 5/18/2015 | 2015 | 1,061 | 1,068 | 1 | 1 | 0 | 976 | 964 | 1 | 1 | 0 | 0 |
| 5/19/2015 | 2015 | 1,118 | 1,057 | 1 | 1 | 0 | 1,008 | 954 | 1 | 1 | 0 | 0 |
| 5/20/2015 | 2015 | 1,095 | 1,038 | 1 | 1 | 0 | 1,001 | 943 | 1 | 1 | 0 | 0 |
| 5/21/2015 | 2015 | 1,044 | 1,043 | 1 | 1 | 0 | 972 | 951 | 1 | 1 | 0 | 0 |
| 5/22/2015 | 2015 | 1,009 | 1,037 | 1 | 1 | 0 | 895 | 941 | 1 | 1 | 0 | 0 |
| 5/23/2015 | 2015 | 875 | 1,014 | 1 | 1 | 0 | 798 | 920 | 1 | 1 | 0 | 0 |
| 5/24/2015 | 2015 | 727 | 990 | 1 | 1 | 0 | 658 | 901 | 1 | 1 | 0 | 0 |
| 5/25/2015 | 2015 | 1,047 | 988 | 1 | 1 | 0 | 955 | 898 | 1 | 1 | 0 | 0 |
| 5/26/2015 | 2015 | 1,219 | 1,002 | 1 | 1 | 0 | 1,104 | 912 | 1 | 1 | 0 | 0 |
| 5/27/2015 | 2015 | 1,097 | 1,003 | 1 | 1 | 0 | 977 | 908 | 1 | 1 | 0 | 0 |
| 5/28/2015 | 2015 | 1,164 | 1,020 | 1 | 1 | 0 | 1,016 | 915 | 1 | 1 | 0 | 0 |
| 5/29/2015 | 2015 | 974 | 1,015 | 1 | 1 | 0 | 856 | 909 | 1 | 1 | 0 | 0 |
| 5/30/2015 | 2015 | 941 | 1,024 | 1 | 1 | 0 | 830 | 914 | 1 | 1 | 0 | 0 |
| 5/31/2015 | 2015 | 748 | 1,027 | 1 | 1 | 0 | 656 | 913 | 1 | 1 | 0 | 0 |
| 6/1/2015 | 2015 | 1,039 | 1,026 | 1 | 1 | 0 | 925 | 909 | 1 | 1 | 0 | 0 |
| 6/2/2015 | 2015 | 1,040 | 1,000 | 1 | 1 | 0 | 959 | 888 | 1 | 1 | 0 | 0 |
| 6/3/2015 | 2015 | 1,110 | 1,002 | 1 | 1 | 0 | 975 | 888 | 1 | 1 | 0 | 0 |
| 6/4/2015 | 2015 | 1,004 | 979 | 1 | 1 | 0 | 925 | 875 | 1 | 1 | 0 | 0 |

STB_AR1_001697

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/5/2015 | 2015 | 943 | 975 | 1 | 1 | 0 | 869 | 877 | 1 | 1 | 0 | 0 |
| 6/6/2015 | 2015 | 797 | 954 | 1 | 1 | 0 | 708 | 860 | 1 | 1 | 0 | 0 |
| 6/7/2015 | 2015 | 673 | 944 | 1 | 1 | 0 | 625 | 855 | 1 | 1 | 0 | 0 |
| 6/8/2015 | 2015 | 1,175 | 963 | 1 | 1 | 0 | 1,045 | 872 | 1 | 1 | 0 | 0 |
| 6/9/2015 | 2015 | 1,190 | 985 | 1 | 1 | 0 | 1,094 | 892 | 1 | 1 | 0 | 0 |
| 6/10/2015 | 2015 | 1,196 | 997 | 1 | 1 | 0 | 1,058 | 903 | 1 | 1 | 0 | 0 |
| 6/11/2015 | 2015 | 1,075 | 1,007 | 1 | 1 | 0 | 975 | 911 | 1 | 1 | 0 | 0 |
| 6/12/2015 | 2015 | 959 | 1,009 | 1 | 1 | 0 | 882 | 912 | 1 | 1 | 0 | 0 |
| 6/13/2015 | 2015 | 1,012 | 1,040 | 1 | 1 | 0 | 925 | 943 | 1 | 1 | 0 | 0 |
| 6/14/2015 | 2015 | 851 | 1,065 | 1 | 1 | 0 | 770 | 964 | 1 | 1 | 0 | 0 |
| 6/15/2015 | 2015 | 976 | 1,037 | 1 | 1 | 0 | 885 | 941 | 1 | 1 | 0 | 0 |
| 6/16/2015 | 2015 | 1,103 | 1,025 | 1 | 1 | 0 | 927 | 917 | 1 | 1 | 0 | 0 |
| 6/17/2015 | 2015 | 1,142 | 1,017 | 1 | 1 | 0 | 1,016 | 911 | 1 | 1 | 0 | 0 |
| 6/18/2015 | 2015 | 980 | 1,003 | 1 | 1 | 0 | 873 | 897 | 1 | 1 | 0 | 0 |
| 6/19/2015 | 2015 | 1,153 | 1,031 | 1 | 1 | 0 | 1,046 | 920 | 1 | 1 | 0 | 0 |
| 6/20/2015 | 2015 | 840 | 1,006 | 1 | 1 | 0 | 742 | 894 | 1 | 1 | 0 | 0 |
| 6/21/2015 | 2015 | 801 | 999 | 1 | 1 | 0 | 706 | 885 | 1 | 1 | 0 | 0 |
| 6/22/2015 | 2015 | 883 | 986 | 1 | 1 | 0 | 763 | 868 | 1 | 1 | 0 | 0 |
| 6/23/2015 | 2015 | 983 | 969 | 1 | 1 | 0 | 891 | 862 | 1 | 1 | 0 | 0 |
| 6/24/2015 | 2015 | 988 | 947 | 1 | 1 | 0 | 889 | 844 | 1 | 1 | 0 | 0 |
| 6/25/2015 | 2015 | 990 | 948 | 1 | 1 | 0 | 890 | 847 | 1 | 1 | 0 | 0 |
| 6/26/2015 | 2015 | 967 | 922 | 1 | 1 | 0 | 875 | 822 | 1 | 1 | 0 | 0 |
| 6/27/2015 | 2015 | 860 | 925 | 1 | 1 | 0 | 743 | 822 | 1 | 1 | 0 | 0 |
| 6/28/2015 | 2015 | 756 | 918 | 1 | 1 | 0 | 669 | 817 | 1 | 1 | 0 | 0 |
| 6/29/2015 | 2015 | 897 | 920 | 1 | 1 | 0 | 813 | 824 | 1 | 1 | 0 | 0 |
| 6/30/2015 | 2015 | 920 | 911 | 1 | 1 | 0 | 827 | 815 | 1 | 1 | 0 | 0 |
| 7/1/2015 | 2015 | 859 | 893 | 1 | 1 | 0 | 776 | 799 | 1 | 1 | 0 | 0 |
| 7/2/2015 | 2015 | 918 | 882 | 1 | 1 | 0 | 814 | 788 | 1 | 1 | 0 | 0 |
| 7/3/2015 | 2015 | 1,047 | 894 | 1 | 1 | 0 | 945 | 798 | 1 | 1 | 0 | 0 |
| 7/4/2015 | 2015 | 973 | 910 | 1 | 1 | 0 | 854 | 814 | 1 | 1 | 0 | 0 |
| 7/5/2015 | 2015 | 788 | 915 | 1 | 1 | 0 | 719 | 821 | 1 | 1 | 0 | 0 |
| 7/6/2015 | 2015 | 935 | 920 | 1 | 1 | 0 | 815 | 821 | 1 | 1 | 0 | 0 |
| 7/7/2015 | 2015 | 1,061 | 940 | 1 | 1 | 0 | 922 | 835 | 1 | 1 | 0 | 0 |
| 7/8/2015 | 2015 | 1,005 | 961 | 1 | 1 | 0 | 869 | 848 | 1 | 1 | 0 | 0 |
| 7/9/2015 | 2015 | 869 | 954 | 1 | 1 | 0 | 791 | 845 | 1 | 1 | 0 | 0 |
| 7/10/2015 | 2015 | 856 | 927 | 1 | 1 | 0 | 770 | 820 | 1 | 1 | 0 | 0 |
| 7/11/2015 | 2015 | 772 | 898 | 1 | 1 | 0 | 670 | 794 | 1 | 1 | 0 | 0 |
| 7/12/2015 | 2015 | 692 | 884 | 1 | 1 | 0 | 632 | 781 | 1 | 1 | 0 | 0 |
| 7/13/2015 | 2015 | 848 | 872 | 1 | 1 | 0 | 754 | 773 | 1 | 1 | 0 | 0 |
| 7/14/2015 | 2015 | 924 | 852 | 1 | 1 | 0 | 848 | 762 | 1 | 1 | 0 | 0 |
| 7/15/2015 | 2015 | 761 | 817 | 1 | 1 | 0 | 674 | 734 | 1 | 1 | 0 | 0 |
| 7/16/2015 | 2015 | 837 | 813 | 1 | 1 | 0 | 778 | 732 | 1 | 1 | 0 | 0 |
| 7/17/2015 | 2015 | 1,172 | 858 | 1 | 1 | 0 | 962 | 760 | 1 | 1 | 0 | 0 |
| 7/18/2015 | 2015 | 911 | 878 | 1 | 1 | 0 | 784 | 776 | 1 | 1 | 0 | 0 |
| 7/19/2015 | 2015 | 838 | 899 | 1 | 1 | 0 | 736 | 791 | 1 | 1 | 0 | 0 |
| 7/20/2015 | 2015 | 837 | 897 | 1 | 1 | 0 | 756 | 791 | 1 | 1 | 0 | 0 |
| 7/21/2015 | 2015 | 903 | 894 | 1 | 1 | 0 | 806 | 785 | 1 | 1 | 0 | 0 |

STB_AR1_001698

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/22/2015 | 2015 | 745 | 892 | 1 | 1 | 0 | 682 | 786 | 1 | 1 | 0 | 0 |
| 7/23/2015 | 2015 | 959 | 909 | 1 | 1 | 0 | 836 | 795 | 1 | 1 | 0 | 0 |
| 7/24/2015 | 2015 | 1,148 | 906 | 1 | 1 | 0 | 952 | 793 | 1 | 1 | 0 | 0 |
| 7/25/2015 | 2015 | 1,053 | 926 | 1 | 1 | 0 | 926 | 813 | 1 | 1 | 0 | 0 |
| 7/26/2015 | 2015 | 925 | 939 | 1 | 1 | 0 | 812 | 824 | 1 | 1 | 0 | 0 |
| 7/27/2015 | 2015 | 841 | 939 | 1 | 1 | 0 | 769 | 826 | 1 | 1 | 0 | 0 |
| 7/28/2015 | 2015 | 782 | 922 | 1 | 1 | 0 | 728 | 815 | 1 | 1 | 0 | 0 |
| 7/29/2015 | 2015 | 840 | 935 | 1 | 1 | 0 | 743 | 824 | 1 | 1 | 0 | 0 |
| 7/30/2015 | 2015 | 1,165 | 965 | 1 | 1 | 0 | 968 | 843 | 1 | 1 | 0 | 0 |
| 7/31/2015 | 2015 | 1,124 | 961 | 1 | 1 | 0 | 966 | 845 | 1 | 1 | 0 | 0 |
| 8/1/2015 | 2015 | 901 | 940 | 1 | 1 | 0 | 767 | 822 | 1 | 1 | 0 | 0 |
| 8/2/2015 | 2015 | 876 | 933 | 1 | 1 | 0 | 763 | 815 | 1 | 1 | 0 | 0 |
| 8/3/2015 | 2015 | 818 | 929 | 1 | 1 | 0 | 753 | 813 | 1 | 1 | 0 | 0 |
| 8/4/2015 | 2015 | 961 | 955 | 1 | 1 | 0 | 871 | 833 | 1 | 1 | 0 | 0 |
| 8/5/2015 | 2015 | 919 | 966 | 1 | 1 | 0 | 825 | 845 | 1 | 1 | 0 | 0 |
| 8/6/2015 | 2015 | 1,072 | 953 | 1 | 1 | 0 | 913 | 837 | 1 | 1 | 0 | 0 |
| 8/7/2015 | 2015 | 993 | 934 | 1 | 1 | 0 | 858 | 821 | 1 | 1 | 0 | 0 |
| 8/8/2015 | 2015 | 966 | 944 | 1 | 1 | 0 | 837 | 831 | 1 | 1 | 0 | 0 |
| 8/9/2015 | 2015 | 804 | 933 | 1 | 1 | 0 | 713 | 824 | 1 | 1 | 0 | 0 |
| 8/10/2015 | 2015 | 865 | 940 | 1 | 1 | 0 | 797 | 831 | 1 | 1 | 0 | 0 |
| 8/11/2015 | 2015 | 797 | 917 | 1 | 1 | 0 | 734 | 811 | 1 | 1 | 0 | 0 |
| 8/12/2015 | 2015 | 1,020 | 931 | 1 | 1 | 0 | 916 | 824 | 1 | 1 | 0 | 0 |
| 8/13/2015 | 2015 | 1,155 | 943 | 1 | 1 | 0 | 958 | 830 | 1 | 1 | 0 | 0 |
| 8/14/2015 | 2015 | 1,121 | 961 | 1 | 1 | 0 | 988 | 849 | 1 | 1 | 0 | 0 |
| 8/15/2015 | 2015 | 1,030 | 970 | 1 | 1 | 0 | 904 | 859 | 1 | 1 | 0 | 0 |
| 8/16/2015 | 2015 | 968 | 994 | 1 | 1 | 0 | 842 | 877 | 1 | 1 | 0 | 0 |
| 8/17/2015 | 2015 | 910 | 1,000 | 1 | 1 | 0 | 824 | 881 | 1 | 1 | 0 | 0 |
| 8/18/2015 | 2015 | 929 | 1,019 | 1 | 1 | 0 | 802 | 891 | 1 | 1 | 0 | 0 |
| 8/19/2015 | 2015 | 892 | 1,001 | 1 | 1 | 0 | 819 | 877 | 1 | 1 | 0 | 0 |
| 8/20/2015 | 2015 | 1,076 | 989 | 1 | 1 | 0 | 932 | 873 | 1 | 1 | 0 | 0 |
| 8/21/2015 | 2015 | 1,127 | 990 | 1 | 1 | 0 | 977 | 871 | 1 | 1 | 0 | 0 |
| 8/22/2015 | 2015 | 1,056 | 994 | 1 | 1 | 0 | 917 | 873 | 1 | 1 | 0 | 0 |
| 8/23/2015 | 2015 | 968 | 994 | 1 | 1 | 0 | 850 | 874 | 1 | 1 | 0 | 0 |
| 8/24/2015 | 2015 | 799 | 978 | 1 | 1 | 0 | 721 | 860 | 1 | 1 | 0 | 0 |
| 8/25/2015 | 2015 | 895 | 973 | 1 | 1 | 0 | 787 | 858 | 1 | 1 | 0 | 0 |
| 8/26/2015 | 2015 | 1,028 | 993 | 1 | 1 | 0 | 916 | 871 | 1 | 1 | 0 | 0 |
| 8/27/2015 | 2015 | 1,211 | 1,012 | 1 | 1 | 0 | 1,006 | 882 | 1 | 1 | 0 | 0 |
| 8/28/2015 | 2015 | 1,087 | 1,006 | 1 | 1 | 0 | 927 | 875 | 1 | 1 | 0 | 0 |
| 8/29/2015 | 2015 | 1,018 | 1,001 | 1 | 1 | 0 | 908 | 874 | 1 | 1 | 0 | 0 |
| 8/30/2015 | 2015 | 928 | 995 | 1 | 1 | 0 | 778 | 863 | 1 | 1 | 0 | 0 |
| 8/31/2015 | 2015 | 1,049 | 1,031 | 1 | 1 | 0 | 972 | 899 | 1 | 1 | 0 | 0 |
| 9/1/2015 | 2015 | 934 | 1,036 | 1 | 1 | 0 | 814 | 903 | 1 | 1 | 0 | 0 |
| 9/2/2015 | 2015 | 999 | 1,032 | 1 | 1 | 0 | 910 | 902 | 1 | 1 | 0 | 0 |
| 9/3/2015 | 2015 | 1,184 | 1,028 | 1 | 1 | 0 | 1,003 | 902 | 1 | 1 | 0 | 0 |
| 9/4/2015 | 2015 | 945 | 1,008 | 1 | 1 | 0 | 819 | 886 | 1 | 1 | 0 | 0 |
| 9/5/2015 | 2015 | 1,142 | 1,026 | 1 | 1 | 0 | 989 | 898 | 1 | 1 | 0 | 0 |
| 9/6/2015 | 2015 | 963 | 1,031 | 1 | 1 | 0 | 833 | 906 | 1 | 1 | 0 | 0 |

STB_AR1_001699

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/7/2015 | 2015 | 839 | 1,001 | 1 | 1 | 0 | 761 | 876 | 1 | 1 | 0 | 0 |
| 9/8/2015 | 2015 | 925 | 1,000 | 1 | 1 | 0 | 833 | 878 | 1 | 1 | 0 | 0 |
| 9/9/2015 | 2015 | 1,061 | 1,008 | 1 | 1 | 0 | 939 | 882 | 1 | 1 | 0 | 0 |
| 9/10/2015 | 2015 | 1,088 | 995 | 1 | 1 | 0 | 945 | 874 | 1 | 1 | 0 | 0 |
| 9/11/2015 | 2015 | 1,031 | 1,007 | 1 | 1 | 0 | 921 | 889 | 1 | 1 | 0 | 0 |
| 9/12/2015 | 2015 | 929 | 977 | 1 | 1 | 0 | 820 | 865 | 1 | 1 | 0 | 0 |
| 9/13/2015 | 2015 | 1,016 | 984 | 1 | 1 | 0 | 859 | 868 | 1 | 1 | 0 | 0 |
| 9/14/2015 | 2015 | 881 | 990 | 1 | 1 | 0 | 794 | 873 | 1 | 1 | 0 | 0 |
| 9/15/2015 | 2015 | 993 | 1,000 | 1 | 1 | 0 | 891 | 881 | 1 | 1 | 0 | 0 |
| 9/16/2015 | 2015 | 1,005 | 992 | 1 | 1 | 0 | 886 | 874 | 1 | 1 | 0 | 0 |
| 9/17/2015 | 2015 | 1,120 | 996 | 1 | 1 | 0 | 946 | 874 | 1 | 1 | 0 | 0 |
| 9/18/2015 | 2015 | 1,093 | 1,005 | 1 | 1 | 0 | 978 | 882 | 1 | 1 | 0 | 0 |
| 9/19/2015 | 2015 | 1,041 | 1,021 | 1 | 1 | 0 | 924 | 897 | 1 | 1 | 0 | 0 |
| 9/20/2015 | 2015 | 890 | 1,003 | 1 | 1 | 0 | 777 | 885 | 1 | 1 | 0 | 0 |
| 9/21/2015 | 2015 | 742 | 983 | 1 | 1 | 0 | 678 | 869 | 1 | 1 | 0 | 0 |
| 9/22/2015 | 2015 | 1,120 | 1,002 | 1 | 1 | 0 | 991 | 883 | 1 | 1 | 0 | 0 |
| 9/23/2015 | 2015 | 943 | 993 | 1 | 1 | 0 | 825 | 874 | 1 | 1 | 0 | 0 |
| 9/24/2015 | 2015 | 1,297 | 1,018 | 1 | 1 | 0 | 1,155 | 904 | 1 | 1 | 0 | 0 |
| 9/25/2015 | 2015 | 1,119 | 1,022 | 1 | 1 | 0 | 993 | 906 | 1 | 1 | 0 | 0 |
| 9/26/2015 | 2015 | 964 | 1,011 | 1 | 1 | 0 | 858 | 897 | 1 | 1 | 0 | 0 |
| 9/27/2015 | 2015 | 1,047 | 1,033 | 1 | 1 | 0 | 887 | 912 | 1 | 1 | 0 | 0 |
| 9/28/2015 | 2015 | 1,005 | 1,071 | 1 | 1 | 0 | 909 | 945 | 1 | 1 | 0 | 0 |
| 9/29/2015 | 2015 | 907 | 1,040 | 1 | 1 | 0 | 811 | 920 | 1 | 1 | 0 | 0 |
| 9/30/2015 | 2015 | 1,063 | 1,057 | 1 | 1 | 0 | 946 | 937 | 1 | 1 | 0 | 0 |
| 10/1/2015 | 2016 | 1,237 | 1,049 | 1 | 1 | 0 | 1,086 | 927 | 1 | 1 | 0 | 0 |
| 10/2/2015 | 2016 | 1,109 | 1,047 | 1 | 1 | 0 | 1,004 | 929 | 1 | 1 | 0 | 0 |
| 10/3/2015 | 2016 | 1,147 | 1,074 | 1 | 1 | 0 | 983 | 947 | 1 | 1 | 0 | 0 |
| 10/4/2015 | 2016 | 1,010 | 1,068 | 1 | 1 | 0 | 889 | 947 | 1 | 1 | 0 | 0 |
| 10/5/2015 | 2016 | 1,016 | 1,070 | 1 | 1 | 0 | 932 | 950 | 1 | 1 | 0 | 0 |
| 10/6/2015 | 2016 | 911 | 1,070 | 1 | 1 | 0 | 801 | 949 | 1 | 1 | 0 | 0 |
| 10/7/2015 | 2016 | 1,116 | 1,078 | 1 | 1 | 0 | 954 | 950 | 1 | 1 | 0 | 0 |
| 10/8/2015 | 2016 | 1,056 | 1,052 | 1 | 1 | 0 | 919 | 926 | 1 | 1 | 0 | 0 |
| 10/9/2015 | 2016 | 886 | 1,020 | 1 | 1 | 0 | 795 | 896 | 1 | 1 | 0 | 0 |
| 10/10/2015 | 2016 | 1,188 | 1,026 | 1 | 1 | 0 | 1,038 | 904 | 1 | 1 | 0 | 0 |
| 10/11/2015 | 2016 | 1,008 | 1,026 | 1 | 1 | 0 | 852 | 899 | 1 | 1 | 0 | 0 |
| 10/12/2015 | 2016 | 1,062 | 1,032 | 1 | 1 | 0 | 952 | 902 | 1 | 1 | 0 | 0 |
| 10/13/2015 | 2016 | 873 | 1,027 | 1 | 1 | 0 | 771 | 897 | 1 | 1 | 0 | 0 |
| 10/14/2015 | 2016 | 826 | 986 | 1 | 1 | 0 | 735 | 866 | 1 | 1 | 0 | 0 |
| 10/15/2015 | 2016 | 1,191 | 1,005 | 1 | 1 | 0 | 1,008 | 879 | 1 | 1 | 0 | 0 |
| 10/16/2015 | 2016 | 1,080 | 1,033 | 1 | 1 | 0 | 954 | 901 | 1 | 1 | 0 | 0 |
| 10/17/2015 | 2016 | 1,038 | 1,011 | 1 | 1 | 0 | 909 | 883 | 1 | 1 | 0 | 0 |
| 10/18/2015 | 2016 | 1,060 | 1,019 | 1 | 1 | 0 | 939 | 895 | 1 | 1 | 0 | 0 |
| 10/19/2015 | 2016 | 1,056 | 1,018 | 1 | 1 | 0 | 955 | 896 | 1 | 1 | 0 | 0 |
| 10/20/2015 | 2016 | 1,187 | 1,063 | 1 | 1 | 0 | 1,053 | 936 | 1 | 1 | 0 | 0 |
| 10/21/2015 | 2016 | 1,048 | 1,094 | 1 | 1 | 0 | 917 | 962 | 1 | 1 | 0 | 0 |
| 10/22/2015 | 2016 | 1,040 | 1,073 | 1 | 1 | 0 | 931 | 951 | 1 | 1 | 0 | 0 |
| 10/23/2015 | 2016 | 1,059 | 1,070 | 1 | 1 | 0 | 919 | 946 | 1 | 1 | 0 | 0 |

STB_AR1_001700

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/24/2015 | 2016 | 1,014 | 1,066 | 1 | 1 | 0 | 888 | 943 | 1 | 1 | 0 | 0 |
| 10/25/2015 | 2016 | 1,076 | 1,069 | 1 | 1 | 0 | 957 | 946 | 1 | 1 | 0 | 0 |
| 10/26/2015 | 2016 | 1,180 | 1,086 | 1 | 1 | 0 | 1,047 | 959 | 1 | 1 | 0 | 0 |
| 10/27/2015 | 2016 | 1,107 | 1,075 | 1 | 1 | 0 | 969 | 947 | 1 | 1 | 0 | 0 |
| 10/28/2015 | 2016 | 965 | 1,063 | 1 | 1 | 0 | 847 | 937 | 1 | 1 | 0 | 0 |
| 10/29/2015 | 2016 | 1,106 | 1,072 | 1 | 1 | 0 | 968 | 942 | 1 | 1 | 0 | 0 |
| 10/30/2015 | 2016 | 1,004 | 1,065 | 1 | 1 | 0 | 894 | 939 | 1 | 1 | 0 | 0 |
| 10/31/2015 | 2016 | 1,068 | 1,072 | 1 | 1 | 0 | 904 | 941 | 1 | 1 | 0 | 0 |
| 11/1/2015 | 2016 | 1,027 | 1,065 | 1 | 1 | 0 | 852 | 926 | 1 | 1 | 0 | 0 |
| 11/2/2015 | 2016 | 859 | 1,019 | 1 | 1 | 0 | 768 | 886 | 1 | 1 | 0 | 0 |
| 11/3/2015 | 2016 | 1,092 | 1,017 | 1 | 1 | 0 | 929 | 880 | 1 | 1 | 0 | 0 |
| 11/4/2015 | 2016 | 1,090 | 1,035 | 1 | 1 | 0 | 948 | 895 | 1 | 1 | 0 | 0 |
| 11/5/2015 | 2016 | 1,086 | 1,032 | 1 | 1 | 0 | 927 | 889 | 1 | 1 | 0 | 0 |
| 11/6/2015 | 2016 | 996 | 1,031 | 1 | 1 | 0 | 859 | 884 | 1 | 1 | 0 | 0 |
| 11/7/2015 | 2016 | 908 | 1,008 | 1 | 1 | 0 | 785 | 867 | 1 | 1 | 0 | 0 |
| 11/8/2015 | 2016 | 959 | 999 | 1 | 1 | 0 | 838 | 865 | 1 | 1 | 0 | 0 |
| 11/9/2015 | 2016 | 968 | 1,014 | 1 | 1 | 0 | 866 | 879 | 1 | 1 | 0 | 0 |
| 11/10/2015 | 2016 | 1,190 | 1,028 | 1 | 1 | 0 | 1,042 | 895 | 1 | 1 | 0 | 0 |
| 11/11/2015 | 2016 | 906 | 1,002 | 1 | 1 | 0 | 807 | 875 | 1 | 1 | 0 | 0 |
| 11/12/2015 | 2016 | 963 | 984 | 1 | 1 | 0 | 823 | 860 | 1 | 1 | 0 | 0 |
| 11/13/2015 | 2016 | 1,303 | 1,028 | 1 | 1 | 0 | 1,145 | 901 | 1 | 1 | 0 | 0 |
| 11/14/2015 | 2016 | 1,202 | 1,070 | 1 | 1 | 0 | 1,061 | 940 | 1 | 1 | 0 | 0 |
| 11/15/2015 | 2016 | 1,186 | 1,103 | 1 | 1 | 0 | 992 | 962 | 1 | 1 | 0 | 0 |
| 11/16/2015 | 2016 | 975 | 1,104 | 1 | 1 | 0 | 857 | 961 | 1 | 1 | 0 | 0 |
| 11/17/2015 | 2016 | 1,048 | 1,083 | 1 | 1 | 0 | 890 | 939 | 1 | 1 | 0 | 0 |
| 11/18/2015 | 2016 | 1,112 | 1,113 | 1 | 1 | 0 | 1,000 | 967 | 1 | 1 | 0 | 0 |
| 11/19/2015 | 2016 | 1,317 | 1,163 | 1 | 1 | 0 | 1,109 | 1,008 | 1 | 1 | 0 | 0 |
| 11/20/2015 | 2016 | 1,062 | 1,129 | 1 | 1 | 0 | 940 | 978 | 1 | 1 | 0 | 0 |
| 11/21/2015 | 2016 | 1,222 | 1,132 | 1 | 1 | 0 | 984 | 967 | 1 | 1 | 0 | 0 |
| 11/22/2015 | 2016 | 1,048 | 1,112 | 1 | 1 | 0 | 885 | 952 | 1 | 1 | 0 | 0 |
| 11/23/2015 | 2016 | 1,065 | 1,125 | 1 | 1 | 0 | 919 | 961 | 1 | 1 | 0 | 0 |
| 11/24/2015 | 2016 | 1,139 | 1,138 | 1 | 1 | 0 | 971 | 973 | 1 | 1 | 0 | 0 |
| 11/25/2015 | 2016 | 1,182 | 1,148 | 1 | 1 | 0 | 1,022 | 976 | 1 | 1 | 0 | 0 |
| 11/26/2015 | 2016 | 1,256 | 1,139 | 1 | 1 | 0 | 1,041 | 966 | 1 | 1 | 0 | 0 |
| 11/27/2015 | 2016 | 1,126 | 1,148 | 1 | 1 | 0 | 965 | 970 | 1 | 1 | 0 | 0 |
| 11/28/2015 | 2016 | 1,293 | 1,158 | 1 | 1 | 0 | 1,051 | 979 | 1 | 1 | 0 | 0 |
| 11/29/2015 | 2016 | 1,182 | 1,178 | 1 | 1 | 0 | 972 | 992 | 1 | 1 | 0 | 0 |
| 11/30/2015 | 2016 | 1,076 | 1,179 | 1 | 1 | 0 | 960 | 997 | 1 | 1 | 0 | 0 |
| 12/1/2015 | 2016 | 1,203 | 1,188 | 1 | 1 | 0 | 1,052 | 1,009 | 1 | 1 | 0 | 0 |
| 12/2/2015 | 2016 | 1,378 | 1,216 | 1 | 1 | 0 | 1,174 | 1,031 | 1 | 1 | 0 | 0 |
| 12/3/2015 | 2016 | 1,671 | 1,276 | 1 | 1 | 0 | 1,358 | 1,076 | 1 | 1 | 0 | 0 |
| 12/4/2015 | 2016 | 1,223 | 1,289 | 1 | 1 | 0 | 1,037 | 1,086 | 1 | 1 | 0 | 0 |
| 12/5/2015 | 2016 | 1,270 | 1,286 | 1 | 1 | 0 | 1,099 | 1,093 | 1 | 1 | 0 | 0 |
| 12/6/2015 | 2016 | 1,190 | 1,287 | 1 | 1 | 0 | 988 | 1,095 | 1 | 1 | 0 | 0 |
| 12/7/2015 | 2016 | 1,226 | 1,309 | 1 | 1 | 0 | 1,063 | 1,110 | 1 | 1 | 0 | 0 |
| 12/8/2015 | 2016 | 1,370 | 1,333 | 1 | 1 | 0 | 1,126 | 1,121 | 1 | 1 | 0 | 0 |
| 12/9/2015 | 2016 | 977 | 1,275 | 1 | 1 | 0 | 842 | 1,073 | 1 | 1 | 0 | 0 |

STB_AR1_001701

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/10/2015 | 2016 | 1,302 | 1,223 | 1 | 1 | 0 | 1,079 | 1,033 | 1 | 1 | 0 | 0 |
| 12/11/2015 | 2016 | 1,261 | 1,228 | 1 | 1 | 0 | 1,082 | 1,040 | 1 | 1 | 0 | 0 |
| 12/12/2015 | 2016 | 1,057 | 1,198 | 1 | 1 | 0 | 854 | 1,005 | 1 | 1 | 0 | 0 |
| 12/13/2015 | 2016 | 1,298 | 1,213 | 1 | 1 | 0 | 1,056 | 1,015 | 1 | 1 | 0 | 0 |
| 12/14/2015 | 2016 | 1,240 | 1,215 | 1 | 1 | 0 | 1,083 | 1,017 | 1 | 1 | 0 | 0 |
| 12/15/2015 | 2016 | 1,432 | 1,224 | 1 | 1 | 0 | 1,186 | 1,026 | 1 | 1 | 0 | 0 |
| 12/16/2015 | 2016 | 1,280 | 1,267 | 1 | 1 | 0 | 1,058 | 1,057 | 1 | 1 | 0 | 0 |
| 12/17/2015 | 2016 | 1,481 | 1,293 | 1 | 1 | 0 | 1,230 | 1,078 | 1 | 1 | 0 | 0 |
| 12/18/2015 | 2016 | 1,383 | 1,310 | 1 | 1 | 0 | 1,132 | 1,086 | 1 | 1 | 0 | 0 |
| 12/19/2015 | 2016 | 1,141 | 1,322 | 1 | 1 | 0 | 973 | 1,103 | 1 | 1 | 0 | 0 |
| 12/20/2015 | 2016 | 1,282 | 1,320 | 1 | 1 | 0 | 1,046 | 1,101 | 1 | 1 | 0 | 0 |
| 12/21/2015 | 2016 | 1,212 | 1,316 | 1 | 1 | 0 | 1,026 | 1,093 | 1 | 1 | 0 | 0 |
| 12/22/2015 | 2016 | 1,265 | 1,292 | 1 | 1 | 0 | 1,089 | 1,079 | 1 | 1 | 0 | 0 |
| 12/23/2015 | 2016 | 1,244 | 1,287 | 1 | 1 | 0 | 1,022 | 1,074 | 1 | 1 | 0 | 0 |
| 12/24/2015 | 2016 | 1,210 | 1,248 | 1 | 1 | 0 | 973 | 1,037 | 1 | 1 | 0 | 0 |
| 12/25/2015 | 2016 | 650 | 1,143 | 1 | 1 | 0 | 548 | 954 | 1 | 1 | 0 | 0 |
| 12/26/2015 | 2016 | 970 | 1,119 | 1 | 1 | 0 | 779 | 926 | 1 | 1 | 0 | 0 |
| 12/27/2015 | 2016 | 984 | 1,076 | 1 | 1 | 0 | 848 | 898 | 1 | 1 | 0 | 0 |
| 12/28/2015 | 2016 | 931 | 1,036 | 1 | 1 | 0 | 834 | 870 | 1 | 1 | 0 | 0 |
| 12/29/2015 | 2016 | 1,178 | 1,024 | 1 | 1 | 0 | 1,057 | 866 | 1 | 1 | 0 | 0 |
| 12/30/2015 | 2016 | 837 | 966 | 1 | 1 | 0 | 744 | 826 | 1 | 1 | 0 | 0 |
| 12/31/2015 | 2016 | 868 | 917 | 1 | 1 | 0 | 737 | 792 | 1 | 1 | 0 | 0 |
| 1/1/2016 | 2016 | 521 | 898 | 1 | 1 | 0 | 430 | 776 | 1 | 1 | 0 | 0 |
| 1/2/2016 | 2016 | 565 | 841 | 1 | 1 | 0 | 502 | 736 | 1 | 1 | 0 | 0 |
| 1/3/2016 | 2016 | 744 | 806 | 1 | 1 | 0 | 676 | 711 | 1 | 1 | 0 | 0 |
| 1/4/2016 | 2016 | 651 | 766 | 1 | 1 | 0 | 596 | 677 | 1 | 1 | 0 | 0 |
| 1/5/2016 | 2016 | 710 | 699 | 1 | 1 | 0 | 670 | 622 | 1 | 1 | 0 | 0 |
| 1/6/2016 | 2016 | 578 | 662 | 1 | 1 | 0 | 541 | 593 | 1 | 1 | 0 | 0 |
| 1/7/2016 | 2016 | 811 | 654 | 1 | 1 | 0 | 733 | 593 | 1 | 1 | 0 | 0 |
| 1/8/2016 | 2016 | 615 | 668 | 1 | 1 | 0 | 569 | 612 | 1 | 1 | 0 | 0 |
| 1/9/2016 | 2016 | 668 | 682 | 1 | 1 | 0 | 603 | 627 | 1 | 1 | 0 | 0 |
| 1/10/2016 | 2016 | 702 | 676 | 1 | 1 | 0 | 636 | 621 | 1 | 1 | 0 | 0 |
| 1/11/2016 | 2016 | 582 | 667 | 1 | 1 | 0 | 535 | 612 | 1 | 1 | 0 | 0 |
| 1/12/2016 | 2016 | 657 | 659 | 1 | 1 | 0 | 597 | 602 | 1 | 1 | 0 | 0 |
| 1/13/2016 | 2016 | 678 | 673 | 1 | 1 | 0 | 632 | 615 | 1 | 1 | 0 | 0 |
| 1/14/2016 | 2016 | 831 | 676 | 1 | 1 | 0 | 753 | 618 | 1 | 1 | 0 | 0 |
| 1/15/2016 | 2016 | 760 | 697 | 1 | 1 | 0 | 691 | 635 | 1 | 1 | 0 | 0 |
| 1/16/2016 | 2016 | 769 | 711 | 1 | 1 | 0 | 694 | 648 | 1 | 1 | 0 | 0 |
| 1/17/2016 | 2016 | 790 | 724 | 1 | 1 | 0 | 703 | 658 | 1 | 1 | 0 | 0 |
| 1/18/2016 | 2016 | 799 | 755 | 1 | 1 | 0 | 738 | 687 | 1 | 1 | 0 | 0 |
| 1/19/2016 | 2016 | 813 | 777 | 1 | 1 | 0 | 734 | 706 | 1 | 1 | 0 | 0 |
| 1/20/2016 | 2016 | 816 | 797 | 1 | 1 | 0 | 754 | 724 | 1 | 1 | 0 | 0 |
| 1/21/2016 | 2016 | 932 | 811 | 1 | 1 | 0 | 801 | 731 | 1 | 1 | 0 | 0 |
| 1/22/2016 | 2016 | 887 | 829 | 1 | 1 | 0 | 791 | 745 | 1 | 1 | 0 | 0 |
| 1/23/2016 | 2016 | 918 | 851 | 1 | 1 | 0 | 828 | 764 | 1 | 1 | 0 | 0 |
| 1/24/2016 | 2016 | 741 | 844 | 1 | 1 | 0 | 669 | 759 | 1 | 1 | 0 | 0 |
| 1/25/2016 | 2016 | 1,018 | 875 | 1 | 1 | 0 | 946 | 789 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/26/2016 | 2016 | 742 | 865 | 1 | 1 | 0 | 674 | 780 | 1 | 1 | 0 | 0 |
| 1/27/2016 | 2016 | 928 | 881 | 1 | 1 | 0 | 854 | 795 | 1 | 1 | 0 | 0 |
| 1/28/2016 | 2016 | 941 | 882 | 1 | 1 | 0 | 821 | 798 | 1 | 1 | 0 | 0 |
| 1/29/2016 | 2016 | 960 | 893 | 1 | 1 | 0 | 896 | 813 | 1 | 1 | 0 | 0 |
| 1/30/2016 | 2016 | 846 | 882 | 1 | 1 | 0 | 758 | 803 | 1 | 1 | 0 | 0 |
| 1/31/2016 | 2016 | 785 | 889 | 1 | 1 | 0 | 690 | 806 | 1 | 1 | 0 | 0 |
| 2/1/2016 | 2016 | 800 | 857 | 1 | 1 | 0 | 758 | 779 | 1 | 1 | 0 | 0 |
| 2/2/2016 | 2016 | 813 | 868 | 1 | 1 | 0 | 719 | 785 | 1 | 1 | 0 | 0 |
| 2/3/2016 | 2016 | 819 | 852 | 1 | 1 | 0 | 734 | 768 | 1 | 1 | 0 | 0 |
| 2/4/2016 | 2016 | 933 | 851 | 1 | 1 | 0 | 845 | 771 | 1 | 1 | 0 | 0 |
| 2/5/2016 | 2016 | 856 | 836 | 1 | 1 | 0 | 798 | 757 | 1 | 1 | 0 | 0 |
| 2/6/2016 | 2016 | 833 | 834 | 1 | 1 | 0 | 752 | 757 | 1 | 1 | 0 | 0 |
| 2/7/2016 | 2016 | 821 | 839 | 1 | 1 | 0 | 739 | 764 | 1 | 1 | 0 | 0 |
| 2/8/2016 | 2016 | 789 | 838 | 1 | 1 | 0 | 740 | 761 | 1 | 1 | 0 | 0 |
| 2/9/2016 | 2016 | 906 | 851 | 1 | 1 | 0 | 837 | 778 | 1 | 1 | 0 | 0 |
| 2/10/2016 | 2016 | 859 | 857 | 1 | 1 | 0 | 795 | 787 | 1 | 1 | 0 | 0 |
| 2/11/2016 | 2016 | 896 | 851 | 1 | 1 | 0 | 816 | 782 | 1 | 1 | 0 | 0 |
| 2/12/2016 | 2016 | 849 | 850 | 1 | 1 | 0 | 779 | 780 | 1 | 1 | 0 | 0 |
| 2/13/2016 | 2016 | 816 | 848 | 1 | 1 | 0 | 747 | 779 | 1 | 1 | 0 | 0 |
| 2/14/2016 | 2016 | 732 | 835 | 1 | 1 | 0 | 696 | 773 | 1 | 1 | 0 | 0 |
| 2/15/2016 | 2016 | 774 | 833 | 1 | 1 | 0 | 730 | 771 | 1 | 1 | 0 | 0 |
| 2/16/2016 | 2016 | 790 | 817 | 1 | 1 | 0 | 728 | 756 | 1 | 1 | 0 | 0 |
| 2/17/2016 | 2016 | 805 | 809 | 1 | 1 | 0 | 738 | 748 | 1 | 1 | 0 | 0 |
| 2/18/2016 | 2016 | 1,011 | 825 | 1 | 1 | 0 | 891 | 758 | 1 | 1 | 0 | 0 |
| 2/19/2016 | 2016 | 887 | 831 | 1 | 1 | 0 | 827 | 765 | 1 | 1 | 0 | 0 |
| 2/20/2016 | 2016 | 884 | 840 | 1 | 1 | 0 | 800 | 773 | 1 | 1 | 0 | 0 |
| 2/21/2016 | 2016 | 943 | 871 | 1 | 1 | 0 | 873 | 798 | 1 | 1 | 0 | 0 |
| 2/22/2016 | 2016 | 1,017 | 905 | 1 | 1 | 0 | 919 | 825 | 1 | 1 | 0 | 0 |
| 2/23/2016 | 2016 | 934 | 926 | 1 | 1 | 0 | 850 | 843 | 1 | 1 | 0 | 0 |
| 2/24/2016 | 2016 | 1,140 | 974 | 1 | 1 | 0 | 1,050 | 887 | 1 | 1 | 0 | 0 |
| 2/25/2016 | 2016 | 1,014 | 974 | 1 | 1 | 0 | 913 | 890 | 1 | 1 | 0 | 0 |
| 2/26/2016 | 2016 | 1,040 | 996 | 1 | 1 | 0 | 941 | 907 | 1 | 1 | 0 | 0 |
| 2/27/2016 | 2016 | 983 | 1,010 | 1 | 1 | 0 | 909 | 922 | 1 | 1 | 0 | 0 |
| 2/28/2016 | 2016 | 1,144 | 1,039 | 1 | 1 | 0 | 1,072 | 951 | 1 | 1 | 0 | 0 |
| 2/29/2016 | 2016 | 984 | 1,034 | 1 | 1 | 0 | 912 | 950 | 1 | 1 | 0 | 0 |
| 3/1/2016 | 2016 | 1,083 | 1,055 | 1 | 1 | 0 | 1,001 | 971 | 1 | 1 | 0 | 0 |
| 3/2/2016 | 2016 | 1,158 | 1,058 | 1 | 1 | 0 | 1,069 | 974 | 1 | 1 | 0 | 0 |
| 3/3/2016 | 2016 | 1,097 | 1,070 | 1 | 1 | 0 | 1,006 | 987 | 1 | 1 | 0 | 0 |
| 3/4/2016 | 2016 | 1,111 | 1,080 | 1 | 1 | 0 | 1,043 | 1,002 | 1 | 1 | 0 | 0 |
| 3/5/2016 | 2016 | 948 | 1,075 | 1 | 1 | 0 | 862 | 995 | 1 | 1 | 0 | 0 |
| 3/6/2016 | 2016 | 848 | 1,033 | 1 | 1 | 0 | 797 | 956 | 1 | 1 | 0 | 0 |
| 3/7/2016 | 2016 | 1,045 | 1,041 | 1 | 1 | 0 | 929 | 958 | 1 | 1 | 0 | 0 |
| 3/8/2016 | 2016 | 1,068 | 1,039 | 1 | 1 | 0 | 964 | 953 | 1 | 1 | 0 | 0 |
| 3/9/2016 | 2016 | 1,054 | 1,024 | 1 | 1 | 0 | 953 | 936 | 1 | 1 | 0 | 0 |
| 3/10/2016 | 2016 | 1,013 | 1,012 | 1 | 1 | 0 | 922 | 924 | 1 | 1 | 0 | 0 |
| 3/11/2016 | 2016 | 1,141 | 1,017 | 1 | 1 | 0 | 1,040 | 924 | 1 | 1 | 0 | 0 |
| 3/12/2016 | 2016 | 1,024 | 1,028 | 1 | 1 | 0 | 939 | 935 | 1 | 1 | 0 | 0 |

STB_AR1_001703

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/13/2016 | 2016 | 848 | 1,028 | 1 | 1 | 0 | 777 | 932 | 1 | 1 | 0 | 0 |
| 3/14/2016 | 2016 | 831 | 997 | 1 | 1 | 0 | 750 | 906 | 1 | 1 | 0 | 0 |
| 3/15/2016 | 2016 | 1,107 | 1,003 | 1 | 1 | 0 | 993 | 911 | 1 | 1 | 0 | 0 |
| 3/16/2016 | 2016 | 1,270 | 1,033 | 1 | 1 | 0 | 1,133 | 936 | 1 | 1 | 0 | 0 |
| 3/17/2016 | 2016 | 1,052 | 1,039 | 1 | 1 | 0 | 959 | 942 | 1 | 1 | 0 | 0 |
| 3/18/2016 | 2016 | 941 | 1,010 | 1 | 1 | 0 | 845 | 914 | 1 | 1 | 0 | 0 |
| 3/19/2016 | 2016 | 912 | 994 | 1 | 1 | 0 | 816 | 896 | 1 | 1 | 0 | 0 |
| 3/20/2016 | 2016 | 1,057 | 1,024 | 1 | 1 | 0 | 957 | 922 | 1 | 1 | 0 | 0 |
| 3/21/2016 | 2016 | 1,375 | 1,102 | 1 | 1 | 0 | 1,240 | 992 | 1 | 1 | 0 | 0 |
| 3/22/2016 | 2016 | 1,107 | 1,102 | 1 | 1 | 0 | 1,004 | 993 | 1 | 1 | 0 | 0 |
| 3/23/2016 | 2016 | 1,222 | 1,095 | 1 | 1 | 0 | 1,084 | 986 | 1 | 1 | 0 | 0 |
| 3/24/2016 | 2016 | 1,296 | 1,130 | 1 | 1 | 0 | 1,173 | 1,017 | 1 | 1 | 0 | 0 |
| 3/25/2016 | 2016 | 1,199 | 1,167 | 1 | 1 | 0 | 1,069 | 1,049 | 1 | 1 | 0 | 0 |
| 3/26/2016 | 2016 | 1,014 | 1,181 | 1 | 1 | 0 | 906 | 1,062 | 1 | 1 | 0 | 0 |
| 3/27/2016 | 2016 | 880 | 1,156 | 1 | 1 | 0 | 805 | 1,040 | 1 | 1 | 0 | 0 |
| 3/28/2016 | 2016 | 1,031 | 1,107 | 1 | 1 | 0 | 943 | 998 | 1 | 1 | 0 | 0 |
| 3/29/2016 | 2016 | 1,118 | 1,109 | 1 | 1 | 0 | 1,024 | 1,001 | 1 | 1 | 0 | 0 |
| 3/30/2016 | 2016 | 1,183 | 1,103 | 1 | 1 | 0 | 1,075 | 999 | 1 | 1 | 0 | 0 |
| 3/31/2016 | 2016 | 1,283 | 1,101 | 1 | 1 | 0 | 1,194 | 1,002 | 1 | 1 | 0 | 0 |
| 4/1/2016 | 2016 | 1,201 | 1,101 | 1 | 1 | 0 | 1,094 | 1,006 | 1 | 1 | 0 | 0 |
| 4/2/2016 | 2016 | 919 | 1,088 | 1 | 1 | 0 | 840 | 996 | 1 | 1 | 0 | 0 |
| 4/3/2016 | 2016 | 1,026 | 1,109 | 1 | 1 | 0 | 941 | 1,016 | 1 | 1 | 0 | 0 |
| 4/4/2016 | 2016 | 1,037 | 1,110 | 1 | 1 | 0 | 944 | 1,016 | 1 | 1 | 0 | 0 |
| 4/5/2016 | 2016 | 1,468 | 1,160 | 1 | 1 | 0 | 1,338 | 1,061 | 1 | 1 | 0 | 0 |
| 4/6/2016 | 2016 | 1,195 | 1,161 | 1 | 1 | 0 | 1,071 | 1,060 | 1 | 1 | 0 | 0 |
| 4/7/2016 | 2016 | 1,142 | 1,141 | 1 | 1 | 0 | 1,065 | 1,042 | 1 | 1 | 0 | 0 |
| 4/8/2016 | 2016 | 1,086 | 1,125 | 1 | 1 | 0 | 969 | 1,024 | 1 | 1 | 0 | 0 |
| 4/9/2016 | 2016 | 1,258 | 1,173 | 1 | 1 | 0 | 1,120 | 1,064 | 1 | 1 | 0 | 0 |
| 4/10/2016 | 2016 | 1,090 | 1,182 | 1 | 1 | 0 | 953 | 1,066 | 1 | 1 | 0 | 0 |
| 4/11/2016 | 2016 | 1,316 | 1,222 | 1 | 1 | 0 | 1,173 | 1,098 | 1 | 1 | 0 | 0 |
| 4/12/2016 | 2016 | 1,472 | 1,223 | 1 | 1 | 0 | 1,264 | 1,088 | 1 | 1 | 0 | 0 |
| 4/13/2016 | 2016 | 1,419 | 1,255 | 1 | 1 | 0 | 1,280 | 1,118 | 1 | 1 | 0 | 0 |
| 4/14/2016 | 2016 | 1,365 | 1,287 | 1 | 1 | 0 | 1,238 | 1,142 | 1 | 1 | 0 | 0 |
| 4/15/2016 | 2016 | 1,271 | 1,313 | 1 | 1 | 0 | 1,138 | 1,167 | 1 | 1 | 0 | 0 |
| 4/16/2016 | 2016 | 1,144 | 1,297 | 1 | 1 | 0 | 1,013 | 1,151 | 1 | 1 | 0 | 0 |
| 4/17/2016 | 2016 | 1,050 | 1,291 | 1 | 1 | 0 | 923 | 1,147 | 1 | 1 | 0 | 0 |
| 4/18/2016 | 2016 | 1,293 | 1,288 | 1 | 1 | 0 | 1,188 | 1,149 | 1 | 1 | 0 | 0 |
| 4/19/2016 | 2016 | 1,447 | 1,284 | 1 | 1 | 0 | 1,296 | 1,154 | 1 | 1 | 0 | 0 |
| 4/20/2016 | 2016 | 1,501 | 1,296 | 1 | 1 | 0 | 1,337 | 1,162 | 1 | 1 | 0 | 0 |
| 4/21/2016 | 2016 | 1,318 | 1,289 | 1 | 1 | 0 | 1,177 | 1,153 | 1 | 1 | 0 | 0 |
| 4/22/2016 | 2016 | 1,217 | 1,281 | 1 | 1 | 0 | 1,064 | 1,143 | 1 | 1 | 0 | 0 |
| 4/23/2016 | 2016 | 1,377 | 1,315 | 1 | 1 | 0 | 1,198 | 1,169 | 1 | 1 | 0 | 0 |
| 4/24/2016 | 2016 | 1,168 | 1,332 | 1 | 1 | 0 | 1,050 | 1,187 | 1 | 1 | 0 | 0 |
| 4/25/2016 | 2016 | 1,481 | 1,358 | 1 | 1 | 0 | 1,340 | 1,209 | 1 | 1 | 0 | 0 |
| 4/26/2016 | 2016 | 1,496 | 1,365 | 1 | 1 | 0 | 1,358 | 1,218 | 1 | 1 | 0 | 0 |
| 4/27/2016 | 2016 | 1,268 | 1,332 | 1 | 1 | 0 | 1,103 | 1,184 | 1 | 1 | 0 | 0 |
| 4/28/2016 | 2016 | 1,392 | 1,343 | 1 | 1 | 0 | 1,258 | 1,196 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/29/2016 | 2016 | 1,460 | 1,377 | 1 | 1 | 0 | 1,315 | 1,232 | 1 | 1 | 0 | 0 |
| 4/30/2016 | 2016 | 1,212 | 1,354 | 1 | 1 | 0 | 1,054 | 1,211 | 1 | 1 | 0 | 0 |
| 5/1/2016 | 2016 | 1,128 | 1,348 | 1 | 1 | 0 | 958 | 1,198 | 1 | 1 | 0 | 0 |
| 5/2/2016 | 2016 | 1,303 | 1,323 | 1 | 1 | 0 | 1,175 | 1,174 | 1 | 1 | 0 | 0 |
| 5/3/2016 | 2016 | 1,484 | 1,321 | 1 | 1 | 0 | 1,317 | 1,169 | 1 | 1 | 0 | 0 |
| 5/4/2016 | 2016 | 1,525 | 1,358 | 1 | 1 | 0 | 1,372 | 1,207 | 1 | 1 | 0 | 0 |
| 5/5/2016 | 2016 | 1,488 | 1,371 | 1 | 1 | 0 | 1,357 | 1,221 | 1 | 1 | 0 | 0 |
| 5/6/2016 | 2016 | 1,411 | 1,364 | 1 | 1 | 0 | 1,244 | 1,211 | 1 | 1 | 0 | 0 |
| 5/7/2016 | 2016 | 1,215 | 1,365 | 1 | 1 | 0 | 1,076 | 1,214 | 1 | 1 | 0 | 0 |
| 5/8/2016 | 2016 | 1,310 | 1,391 | 1 | 1 | 0 | 1,190 | 1,247 | 1 | 1 | 0 | 0 |
| 5/9/2016 | 2016 | 1,214 | 1,378 | 1 | 1 | 0 | 1,087 | 1,235 | 1 | 1 | 0 | 0 |
| 5/10/2016 | 2016 | 1,300 | 1,352 | 1 | 1 | 0 | 1,165 | 1,213 | 1 | 1 | 0 | 0 |
| 5/11/2016 | 2016 | 1,313 | 1,322 | 1 | 1 | 0 | 1,156 | 1,182 | 1 | 1 | 0 | 0 |
| 5/12/2016 | 2016 | 1,499 | 1,323 | 1 | 1 | 0 | 1,326 | 1,178 | 1 | 1 | 0 | 0 |
| 5/13/2016 | 2016 | 1,270 | 1,303 | 1 | 1 | 0 | 1,126 | 1,161 | 1 | 1 | 0 | 0 |
| 5/14/2016 | 2016 | 1,061 | 1,281 | 1 | 1 | 0 | 963 | 1,145 | 1 | 1 | 0 | 0 |
| 5/15/2016 | 2016 | 1,175 | 1,262 | 1 | 1 | 0 | 1,034 | 1,122 | 1 | 1 | 0 | 0 |
| 5/16/2016 | 2016 | 1,208 | 1,261 | 1 | 1 | 0 | 1,105 | 1,125 | 1 | 1 | 0 | 0 |
| 5/17/2016 | 2016 | 1,247 | 1,253 | 1 | 1 | 0 | 1,104 | 1,116 | 1 | 1 | 0 | 0 |
| 5/18/2016 | 2016 | 1,273 | 1,248 | 1 | 1 | 0 | 1,126 | 1,112 | 1 | 1 | 0 | 0 |
| 5/19/2016 | 2016 | 1,316 | 1,221 | 1 | 1 | 0 | 1,155 | 1,088 | 1 | 1 | 0 | 0 |
| 5/20/2016 | 2016 | 1,016 | 1,185 | 1 | 1 | 0 | 935 | 1,060 | 1 | 1 | 0 | 0 |
| 5/21/2016 | 2016 | 1,463 | 1,243 | 1 | 1 | 0 | 1,269 | 1,104 | 1 | 1 | 0 | 0 |
| 5/22/2016 | 2016 | 1,209 | 1,247 | 1 | 1 | 0 | 1,064 | 1,108 | 1 | 1 | 0 | 0 |
| 5/23/2016 | 2016 | 1,385 | 1,273 | 1 | 1 | 0 | 1,222 | 1,125 | 1 | 1 | 0 | 0 |
| 5/24/2016 | 2016 | 1,621 | 1,326 | 1 | 1 | 0 | 1,426 | 1,171 | 1 | 1 | 0 | 0 |
| 5/25/2016 | 2016 | 1,481 | 1,356 | 1 | 1 | 0 | 1,287 | 1,194 | 1 | 1 | 0 | 0 |
| 5/26/2016 | 2016 | 1,305 | 1,354 | 1 | 1 | 0 | 1,175 | 1,197 | 1 | 1 | 0 | 0 |
| 5/27/2016 | 2016 | 1,218 | 1,383 | 1 | 1 | 0 | 1,058 | 1,214 | 1 | 1 | 0 | 0 |
| 5/28/2016 | 2016 | 1,097 | 1,331 | 1 | 1 | 0 | 975 | 1,172 | 1 | 1 | 0 | 0 |
| 5/29/2016 | 2016 | 1,151 | 1,323 | 1 | 1 | 0 | 990 | 1,162 | 1 | 1 | 0 | 0 |
| 5/30/2016 | 2016 | 1,390 | 1,323 | 1 | 1 | 0 | 1,244 | 1,165 | 1 | 1 | 0 | 0 |
| 5/31/2016 | 2016 | 1,261 | 1,272 | 1 | 1 | 0 | 1,123 | 1,122 | 1 | 1 | 0 | 0 |
| 6/1/2016 | 2016 | 991 | 1,202 | 1 | 1 | 0 | 877 | 1,063 | 1 | 1 | 0 | 0 |
| 6/2/2016 | 2016 | 1,241 | 1,193 | 1 | 1 | 0 | 1,086 | 1,050 | 1 | 1 | 0 | 0 |
| 6/3/2016 | 2016 | 1,223 | 1,193 | 1 | 1 | 0 | 1,118 | 1,059 | 1 | 1 | 0 | 0 |
| 6/4/2016 | 2016 | 1,079 | 1,191 | 1 | 1 | 0 | 941 | 1,054 | 1 | 1 | 0 | 0 |
| 6/5/2016 | 2016 | 1,113 | 1,185 | 1 | 1 | 0 | 1,011 | 1,057 | 1 | 1 | 0 | 0 |
| 6/6/2016 | 2016 | 1,348 | 1,179 | 1 | 1 | 0 | 1,207 | 1,052 | 1 | 1 | 0 | 0 |
| 6/7/2016 | 2016 | 1,355 | 1,193 | 1 | 1 | 0 | 1,208 | 1,064 | 1 | 1 | 0 | 0 |
| 6/8/2016 | 2016 | 1,173 | 1,219 | 1 | 1 | 0 | 1,048 | 1,088 | 1 | 1 | 0 | 0 |
| 6/9/2016 | 2016 | 1,297 | 1,227 | 1 | 1 | 0 | 1,178 | 1,102 | 1 | 1 | 0 | 0 |
| 6/10/2016 | 2016 | 1,144 | 1,216 | 1 | 1 | 0 | 1,009 | 1,086 | 1 | 1 | 0 | 0 |
| 6/11/2016 | 2016 | 1,186 | 1,231 | 1 | 1 | 0 | 1,049 | 1,101 | 1 | 1 | 0 | 0 |
| 6/12/2016 | 2016 | 1,027 | 1,219 | 1 | 1 | 0 | 910 | 1,087 | 1 | 1 | 0 | 0 |
| 6/13/2016 | 2016 | 1,285 | 1,210 | 1 | 1 | 0 | 1,163 | 1,081 | 1 | 1 | 0 | 0 |
| 6/14/2016 | 2016 | 1,153 | 1,181 | 1 | 1 | 0 | 1,017 | 1,053 | 1 | 1 | 0 | 0 |

STB_AR1_001705

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/15/2016 | 2016 | 1,301 | 1,199 | 1 | 1 | 0 | 1,165 | 1,070 | 1 | 1 | 0 | 0 |
| 6/16/2016 | 2016 | 1,188 | 1,183 | 1 | 1 | 0 | 1,023 | 1,048 | 1 | 1 | 0 | 0 |
| 6/17/2016 | 2016 | 1,274 | 1,202 | 1 | 1 | 0 | 1,141 | 1,067 | 1 | 1 | 0 | 0 |
| 6/18/2016 | 2016 | 1,190 | 1,203 | 1 | 1 | 0 | 1,063 | 1,069 | 1 | 1 | 0 | 0 |
| 6/19/2016 | 2016 | 900 | 1,184 | 1 | 1 | 0 | 806 | 1,054 | 1 | 1 | 0 | 0 |
| 6/20/2016 | 2016 | 900 | 1,129 | 1 | 1 | 0 | 807 | 1,003 | 1 | 1 | 0 | 0 |
| 6/21/2016 | 2016 | 1,129 | 1,126 | 1 | 1 | 0 | 1,009 | 1,002 | 1 | 1 | 0 | 0 |
| 6/22/2016 | 2016 | 1,340 | 1,132 | 1 | 1 | 0 | 1,180 | 1,004 | 1 | 1 | 0 | 0 |
| 6/23/2016 | 2016 | 1,216 | 1,136 | 1 | 1 | 0 | 1,091 | 1,014 | 1 | 1 | 0 | 0 |
| 6/24/2016 | 2016 | 1,109 | 1,112 | 1 | 1 | 0 | 1,016 | 996 | 1 | 1 | 0 | 0 |
| 6/25/2016 | 2016 | 1,026 | 1,089 | 1 | 1 | 0 | 885 | 971 | 1 | 1 | 0 | 0 |
| 6/26/2016 | 2016 | 730 | 1,064 | 1 | 1 | 0 | 659 | 950 | 1 | 1 | 0 | 0 |
| 6/27/2016 | 2016 | 1,121 | 1,096 | 1 | 1 | 0 | 922 | 966 | 1 | 1 | 0 | 0 |
| 6/28/2016 | 2016 | 1,047 | 1,084 | 1 | 1 | 0 | 936 | 956 | 1 | 1 | 0 | 0 |
| 6/29/2016 | 2016 | 1,391 | 1,091 | 1 | 1 | 0 | 1,228 | 962 | 1 | 1 | 0 | 0 |
| 6/30/2016 | 2016 | 973 | 1,057 | 1 | 1 | 0 | 874 | 931 | 1 | 1 | 0 | 0 |
| 7/1/2016 | 2016 | 1,009 | 1,042 | 1 | 1 | 0 | 931 | 919 | 1 | 1 | 0 | 0 |
| 7/2/2016 | 2016 | 1,156 | 1,061 | 1 | 1 | 0 | 1,022 | 939 | 1 | 1 | 0 | 0 |
| 7/3/2016 | 2016 | 793 | 1,070 | 1 | 1 | 0 | 693 | 944 | 1 | 1 | 0 | 0 |
| 7/4/2016 | 2016 | 1,162 | 1,076 | 1 | 1 | 0 | 999 | 955 | 1 | 1 | 0 | 0 |
| 7/5/2016 | 2016 | 1,218 | 1,100 | 1 | 1 | 0 | 1,053 | 971 | 1 | 1 | 0 | 0 |
| 7/6/2016 | 2016 | 1,171 | 1,069 | 1 | 1 | 0 | 1,060 | 947 | 1 | 1 | 0 | 0 |
| 7/7/2016 | 2016 | 1,042 | 1,079 | 1 | 1 | 0 | 919 | 954 | 1 | 1 | 0 | 0 |
| 7/8/2016 | 2016 | 1,048 | 1,084 | 1 | 1 | 0 | 941 | 955 | 1 | 1 | 0 | 0 |
| 7/9/2016 | 2016 | 912 | 1,049 | 1 | 1 | 0 | 823 | 927 | 1 | 1 | 0 | 0 |
| 7/10/2016 | 2016 | 805 | 1,051 | 1 | 1 | 0 | 689 | 926 | 1 | 1 | 0 | 0 |
| 7/11/2016 | 2016 | 1,319 | 1,074 | 1 | 1 | 0 | 1,098 | 940 | 1 | 1 | 0 | 0 |
| 7/12/2016 | 2016 | 1,280 | 1,082 | 1 | 1 | 0 | 1,106 | 948 | 1 | 1 | 0 | 0 |
| 7/13/2016 | 2016 | 1,261 | 1,095 | 1 | 1 | 0 | 1,119 | 956 | 1 | 1 | 0 | 0 |
| 7/14/2016 | 2016 | 1,140 | 1,109 | 1 | 1 | 0 | 996 | 967 | 1 | 1 | 0 | 0 |
| 7/15/2016 | 2016 | 1,180 | 1,128 | 1 | 1 | 0 | 1,029 | 980 | 1 | 1 | 0 | 0 |
| 7/16/2016 | 2016 | 866 | 1,122 | 1 | 1 | 0 | 717 | 965 | 1 | 1 | 0 | 0 |
| 7/17/2016 | 2016 | 822 | 1,124 | 1 | 1 | 0 | 727 | 970 | 1 | 1 | 0 | 0 |
| 7/18/2016 | 2016 | 1,239 | 1,113 | 1 | 1 | 0 | 1,074 | 967 | 1 | 1 | 0 | 0 |
| 7/19/2016 | 2016 | 1,261 | 1,110 | 1 | 1 | 0 | 1,102 | 966 | 1 | 1 | 0 | 0 |
| 7/20/2016 | 2016 | 1,089 | 1,085 | 1 | 1 | 0 | 970 | 945 | 1 | 1 | 0 | 0 |
| 7/21/2016 | 2016 | 1,351 | 1,115 | 1 | 1 | 0 | 1,202 | 974 | 1 | 1 | 0 | 0 |
| 7/22/2016 | 2016 | 1,068 | 1,099 | 1 | 1 | 0 | 953 | 964 | 1 | 1 | 0 | 0 |
| 7/23/2016 | 2016 | 937 | 1,110 | 1 | 1 | 0 | 831 | 980 | 1 | 1 | 0 | 0 |
| 7/24/2016 | 2016 | 843 | 1,113 | 1 | 1 | 0 | 740 | 982 | 1 | 1 | 0 | 0 |
| 7/25/2016 | 2016 | 1,115 | 1,095 | 1 | 1 | 0 | 973 | 967 | 1 | 1 | 0 | 0 |
| 7/26/2016 | 2016 | 1,401 | 1,115 | 1 | 1 | 0 | 1,187 | 979 | 1 | 1 | 0 | 0 |
| 7/27/2016 | 2016 | 1,182 | 1,128 | 1 | 1 | 0 | 1,058 | 992 | 1 | 1 | 0 | 0 |
| 7/28/2016 | 2016 | 1,199 | 1,106 | 1 | 1 | 0 | 1,019 | 966 | 1 | 1 | 0 | 0 |
| 7/29/2016 | 2016 | 1,161 | 1,120 | 1 | 1 | 0 | 1,019 | 975 | 1 | 1 | 0 | 0 |
| 7/30/2016 | 2016 | 821 | 1,103 | 1 | 1 | 0 | 754 | 964 | 1 | 1 | 0 | 0 |
| 7/31/2016 | 2016 | 872 | 1,107 | 1 | 1 | 0 | 770 | 969 | 1 | 1 | 0 | 0 |

STB_AR1_001706

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/1/2016 | 2016 | 1,231 | 1,124 | 1 | 1 | 0 | 1,056 | 980 | 1 | 1 | 0 | 0 |
| 8/2/2016 | 2016 | 1,144 | 1,087 | 1 | 1 | 0 | 998 | 953 | 1 | 1 | 0 | 0 |
| 8/3/2016 | 2016 | 1,162 | 1,084 | 1 | 1 | 0 | 987 | 943 | 1 | 1 | 0 | 0 |
| 8/4/2016 | 2016 | 1,161 | 1,079 | 1 | 1 | 0 | 990 | 939 | 1 | 1 | 0 | 0 |
| 8/5/2016 | 2016 | 1,088 | 1,068 | 1 | 1 | 0 | 953 | 930 | 1 | 1 | 0 | 0 |
| 8/6/2016 | 2016 | 952 | 1,087 | 1 | 1 | 0 | 843 | 942 | 1 | 1 | 0 | 0 |
| 8/7/2016 | 2016 | 845 | 1,083 | 1 | 1 | 0 | 743 | 939 | 1 | 1 | 0 | 0 |
| 8/8/2016 | 2016 | 1,261 | 1,088 | 1 | 1 | 0 | 1,083 | 942 | 1 | 1 | 0 | 0 |
| 8/9/2016 | 2016 | 1,384 | 1,122 | 1 | 1 | 0 | 1,224 | 975 | 1 | 1 | 0 | 0 |
| 8/10/2016 | 2016 | 1,214 | 1,129 | 1 | 1 | 0 | 1,092 | 990 | 1 | 1 | 0 | 0 |
| 8/11/2016 | 2016 | 1,266 | 1,144 | 1 | 1 | 0 | 1,075 | 1,002 | 1 | 1 | 0 | 0 |
| 8/12/2016 | 2016 | 1,234 | 1,165 | 1 | 1 | 0 | 1,079 | 1,020 | 1 | 1 | 0 | 0 |
| 8/13/2016 | 2016 | 1,182 | 1,198 | 1 | 1 | 0 | 1,054 | 1,050 | 1 | 1 | 0 | 0 |
| 8/14/2016 | 2016 | 821 | 1,195 | 1 | 1 | 0 | 731 | 1,048 | 1 | 1 | 0 | 0 |
| 8/15/2016 | 2016 | 1,215 | 1,188 | 1 | 1 | 0 | 1,060 | 1,045 | 1 | 1 | 0 | 0 |
| 8/16/2016 | 2016 | 1,594 | 1,218 | 1 | 1 | 0 | 1,347 | 1,063 | 1 | 1 | 0 | 0 |
| 8/17/2016 | 2016 | 1,599 | 1,273 | 1 | 1 | 0 | 1,393 | 1,106 | 1 | 1 | 0 | 0 |
| 8/18/2016 | 2016 | 1,143 | 1,255 | 1 | 1 | 0 | 995 | 1,094 | 1 | 1 | 0 | 0 |
| 8/19/2016 | 2016 | 1,239 | 1,256 | 1 | 1 | 0 | 1,081 | 1,094 | 1 | 1 | 0 | 0 |
| 8/20/2016 | 2016 | 1,037 | 1,235 | 1 | 1 | 0 | 942 | 1,078 | 1 | 1 | 0 | 0 |
| 8/21/2016 | 2016 | 844 | 1,239 | 1 | 1 | 0 | 760 | 1,083 | 1 | 1 | 0 | 0 |
| 8/22/2016 | 2016 | 1,189 | 1,235 | 1 | 1 | 0 | 984 | 1,072 | 1 | 1 | 0 | 0 |
| 8/23/2016 | 2016 | 1,241 | 1,185 | 1 | 1 | 0 | 1,133 | 1,041 | 1 | 1 | 0 | 0 |
| 8/24/2016 | 2016 | 1,434 | 1,161 | 1 | 1 | 0 | 1,186 | 1,012 | 1 | 1 | 0 | 0 |
| 8/25/2016 | 2016 | 1,220 | 1,172 | 1 | 1 | 0 | 1,063 | 1,021 | 1 | 1 | 0 | 0 |
| 8/26/2016 | 2016 | 1,079 | 1,149 | 1 | 1 | 0 | 967 | 1,005 | 1 | 1 | 0 | 0 |
| 8/27/2016 | 2016 | 1,112 | 1,160 | 1 | 1 | 0 | 977 | 1,010 | 1 | 1 | 0 | 0 |
| 8/28/2016 | 2016 | 946 | 1,174 | 1 | 1 | 0 | 833 | 1,020 | 1 | 1 | 0 | 0 |
| 8/29/2016 | 2016 | 1,575 | 1,230 | 1 | 1 | 0 | 1,287 | 1,064 | 1 | 1 | 0 | 0 |
| 8/30/2016 | 2016 | 1,295 | 1,237 | 1 | 1 | 0 | 1,168 | 1,069 | 1 | 1 | 0 | 0 |
| 8/31/2016 | 2016 | 1,341 | 1,224 | 1 | 1 | 0 | 1,198 | 1,070 | 1 | 1 | 0 | 0 |
| 9/1/2016 | 2016 | 1,230 | 1,225 | 1 | 1 | 0 | 1,093 | 1,075 | 1 | 1 | 0 | 0 |
| 9/2/2016 | 2016 | 1,261 | 1,251 | 1 | 1 | 0 | 1,108 | 1,095 | 1 | 1 | 0 | 0 |
| 9/3/2016 | 2016 | 945 | 1,228 | 1 | 1 | 0 | 867 | 1,079 | 1 | 1 | 0 | 0 |
| 9/4/2016 | 2016 | 854 | 1,214 | 1 | 1 | 0 | 770 | 1,070 | 1 | 1 | 0 | 0 |
| 9/5/2016 | 2016 | 1,558 | 1,212 | 1 | 1 | 0 | 1,333 | 1,077 | 1 | 1 | 0 | 0 |
| 9/6/2016 | 2016 | 1,506 | 1,242 | 1 | 1 | 0 | 1,299 | 1,095 | 1 | 1 | 0 | 0 |
| 9/7/2016 | 2016 | 1,251 | 1,229 | 1 | 1 | 0 | 1,076 | 1,078 | 1 | 1 | 0 | 0 |
| 9/8/2016 | 2016 | 1,213 | 1,227 | 1 | 1 | 0 | 1,087 | 1,077 | 1 | 1 | 0 | 0 |
| 9/9/2016 | 2016 | 1,300 | 1,232 | 1 | 1 | 0 | 1,114 | 1,078 | 1 | 1 | 0 | 0 |
| 9/10/2016 | 2016 | 1,235 | 1,274 | 1 | 1 | 0 | 1,110 | 1,113 | 1 | 1 | 0 | 0 |
| 9/11/2016 | 2016 | 966 | 1,290 | 1 | 1 | 0 | 886 | 1,129 | 1 | 1 | 0 | 0 |
| 9/12/2016 | 2016 | 1,411 | 1,269 | 1 | 1 | 0 | 1,222 | 1,113 | 1 | 1 | 0 | 0 |
| 9/13/2016 | 2016 | 1,560 | 1,277 | 1 | 1 | 0 | 1,382 | 1,125 | 1 | 1 | 0 | 0 |
| 9/14/2016 | 2016 | 1,478 | 1,309 | 1 | 1 | 0 | 1,282 | 1,155 | 1 | 1 | 0 | 0 |
| 9/15/2016 | 2016 | 1,301 | 1,322 | 1 | 1 | 0 | 1,149 | 1,164 | 1 | 1 | 0 | 0 |
| 9/16/2016 | 2016 | 1,680 | 1,376 | 1 | 1 | 0 | 1,474 | 1,215 | 1 | 1 | 0 | 0 |

STB_AR1_001707

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/17/2016 | 2016 | 1,203 | 1,371 | 1 | 1 | 0 | 1,065 | 1,209 | 1 | 1 | 0 | 0 |
| 9/18/2016 | 2016 | 978 | 1,373 | 1 | 1 | 0 | 901 | 1,211 | 1 | 1 | 0 | 0 |
| 9/19/2016 | 2016 | 1,464 | 1,381 | 1 | 1 | 0 | 1,247 | 1,214 | 1 | 1 | 0 | 0 |
| 9/20/2016 | 2016 | 1,453 | 1,365 | 1 | 1 | 0 | 1,313 | 1,204 | 1 | 1 | 0 | 0 |
| 9/21/2016 | 2016 | 1,523 | 1,372 | 1 | 1 | 0 | 1,355 | 1,215 | 1 | 1 | 0 | 0 |
| 9/22/2016 | 2016 | 1,468 | 1,396 | 1 | 1 | 0 | 1,319 | 1,239 | 1 | 1 | 0 | 0 |
| 9/23/2016 | 2016 | 1,310 | 1,343 | 1 | 1 | 0 | 1,157 | 1,194 | 1 | 1 | 0 | 0 |
| 9/24/2016 | 2016 | 1,095 | 1,327 | 1 | 1 | 0 | 1,005 | 1,185 | 1 | 1 | 0 | 0 |
| 9/25/2016 | 2016 | 891 | 1,315 | 1 | 1 | 0 | 799 | 1,171 | 1 | 1 | 0 | 0 |
| 9/26/2016 | 2016 | 1,440 | 1,311 | 1 | 1 | 0 | 1,248 | 1,171 | 1 | 1 | 0 | 0 |
| 9/27/2016 | 2016 | 1,603 | 1,333 | 1 | 1 | 0 | 1,426 | 1,187 | 1 | 1 | 0 | 0 |
| 9/28/2016 | 2016 | 1,541 | 1,335 | 1 | 1 | 0 | 1,344 | 1,185 | 1 | 1 | 0 | 0 |
| 9/29/2016 | 2016 | 1,581 | 1,352 | 1 | 1 | 0 | 1,377 | 1,194 | 1 | 1 | 0 | 0 |
| 9/30/2016 | 2016 | 1,202 | 1,336 | 1 | 1 | 0 | 1,066 | 1,181 | 1 | 1 | 0 | 0 |
| 10/1/2016 | 2017 | 1,195 | 1,350 | 1 | 1 | 0 | 1,055 | 1,188 | 1 | 1 | 0 | 0 |
| 10/2/2016 | 2017 | 989 | 1,364 | 1 | 1 | 0 | 914 | 1,204 | 1 | 1 | 0 | 0 |
| 10/3/2016 | 2017 | 1,490 | 1,372 | 1 | 1 | 0 | 1,250 | 1,205 | 1 | 1 | 0 | 0 |
| 10/4/2016 | 2017 | 1,647 | 1,378 | 1 | 1 | 0 | 1,431 | 1,205 | 1 | 1 | 0 | 0 |
| 10/5/2016 | 2017 | 1,402 | 1,358 | 1 | 1 | 0 | 1,263 | 1,194 | 1 | 1 | 0 | 0 |
| 10/6/2016 | 2017 | 1,548 | 1,353 | 1 | 1 | 0 | 1,385 | 1,195 | 1 | 1 | 0 | 0 |
| 10/7/2016 | 2017 | 1,593 | 1,409 | 1 | 1 | 0 | 1,394 | 1,242 | 1 | 1 | 0 | 0 |
| 10/8/2016 | 2017 | 1,332 | 1,429 | 1 | 1 | 0 | 1,199 | 1,262 | 1 | 1 | 0 | 0 |
| 10/9/2016 | 2017 | 1,087 | 1,443 | 1 | 1 | 0 | 946 | 1,267 | 1 | 1 | 0 | 0 |
| 10/10/2016 | 2017 | 1,484 | 1,442 | 1 | 1 | 0 | 1,265 | 1,269 | 1 | 1 | 0 | 0 |
| 10/11/2016 | 2017 | 1,784 | 1,461 | 1 | 1 | 0 | 1,530 | 1,283 | 1 | 1 | 0 | 0 |
| 10/12/2016 | 2017 | 1,566 | 1,485 | 1 | 1 | 0 | 1,417 | 1,305 | 1 | 1 | 0 | 0 |
| 10/13/2016 | 2017 | 1,348 | 1,456 | 1 | 1 | 0 | 1,218 | 1,281 | 1 | 1 | 0 | 0 |
| 10/14/2016 | 2017 | 1,292 | 1,413 | 1 | 1 | 0 | 1,136 | 1,244 | 1 | 1 | 0 | 0 |
| 10/15/2016 | 2017 | 1,389 | 1,421 | 1 | 1 | 0 | 1,254 | 1,252 | 1 | 1 | 0 | 0 |
| 10/16/2016 | 2017 | 1,208 | 1,439 | 1 | 1 | 0 | 1,072 | 1,270 | 1 | 1 | 0 | 0 |
| 10/17/2016 | 2017 | 1,903 | 1,499 | 1 | 1 | 0 | 1,651 | 1,325 | 1 | 1 | 0 | 0 |
| 10/18/2016 | 2017 | 1,770 | 1,497 | 1 | 1 | 0 | 1,541 | 1,327 | 1 | 1 | 0 | 0 |
| 10/19/2016 | 2017 | 1,642 | 1,507 | 0 | 0 | 0 | 1,465 | 1,334 | 1 | 1 | 0 | 0 |
| 10/20/2016 | 2017 | 1,428 | 1,519 | 0 | 0 | 0 | 1,274 | 1,342 | 1 | 1 | 0 | 0 |
| 10/21/2016 | 2017 | 1,578 | 1,560 | 0 | 0 | 0 | 1,392 | 1,378 | 1 | 1 | 0 | 0 |
| 10/22/2016 | 2017 | 1,388 | 1,560 | 0 | 0 | 0 | 1,226 | 1,374 | 1 | 1 | 0 | 0 |
| 10/23/2016 | 2017 | 1,306 | 1,574 | 0 | 0 | 0 | 1,128 | 1,382 | 1 | 1 | 0 | 0 |
| 10/24/2016 | 2017 | 1,858 | 1,567 | 0 | 0 | 0 | 1,621 | 1,378 | 1 | 1 | 0 | 0 |
| 10/25/2016 | 2017 | 1,984 | 1,598 | 0 | 0 | 0 | 1,741 | 1,407 | 1 | 1 | 0 | 0 |
| 10/26/2016 | 2017 | 1,758 | 1,614 | 0 | 0 | 0 | 1,566 | 1,421 | 1 | 1 | 0 | 0 |
| 10/27/2016 | 2017 | 1,716 | 1,655 | 0 | 0 | 0 | 1,491 | 1,452 | 1 | 1 | 0 | 0 |
| 10/28/2016 | 2017 | 1,416 | 1,632 | 0 | 0 | 0 | 1,257 | 1,433 | 1 | 1 | 0 | 0 |
| 10/29/2016 | 2017 | 1,471 | 1,644 | 0 | 0 | 0 | 1,252 | 1,437 | 1 | 1 | 0 | 0 |
| 10/30/2016 | 2017 | 1,214 | 1,631 | 0 | 0 | 0 | 1,099 | 1,432 | 1 | 1 | 0 | 0 |
| 10/31/2016 | 2017 | 1,398 | 1,565 | 0 | 0 | 0 | 1,254 | 1,380 | 1 | 1 | 0 | 0 |
| 11/1/2016 | 2017 | 1,642 | 1,516 | 0 | 0 | 0 | 1,410 | 1,333 | 1 | 1 | 0 | 0 |
| 11/2/2016 | 2017 | 1,636 | 1,499 | 0 | 1 | 0 | 1,444 | 1,315 | 1 | 1 | 0 | 0 |

STB_AR1_001708

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/3/2016 | 2017 | 1,453 | 1,461 | 0 | 1 | 0 | 1,279 | 1,285 | 1 | 1 | 0 | 0 |
| 11/4/2016 | 2017 | 1,532 | 1,478 | 0 | 1 | 0 | 1,353 | 1,299 | 1 | 1 | 0 | 0 |
| 11/5/2016 | 2017 | 1,355 | 1,461 | 0 | 1 | 0 | 1,197 | 1,291 | 1 | 1 | 0 | 0 |
| 11/6/2016 | 2017 | 1,513 | 1,504 | 0 | 0 | 0 | 1,333 | 1,324 | 1 | 1 | 0 | 0 |
| 11/7/2016 | 2017 | 1,572 | 1,529 | 0 | 0 | 0 | 1,331 | 1,335 | 1 | 1 | 0 | 0 |
| 11/8/2016 | 2017 | 1,803 | 1,552 | 0 | 0 | 0 | 1,533 | 1,353 | 1 | 1 | 0 | 0 |
| 11/9/2016 | 2017 | 1,493 | 1,532 | 0 | 0 | 0 | 1,308 | 1,333 | 1 | 1 | 0 | 0 |
| 11/10/2016 | 2017 | 1,786 | 1,579 | 0 | 0 | 0 | 1,582 | 1,377 | 1 | 1 | 0 | 0 |
| 11/11/2016 | 2017 | 1,573 | 1,585 | 0 | 0 | 0 | 1,375 | 1,380 | 1 | 1 | 0 | 0 |
| 11/12/2016 | 2017 | 1,535 | 1,611 | 0 | 0 | 0 | 1,363 | 1,404 | 1 | 1 | 0 | 0 |
| 11/13/2016 | 2017 | 1,193 | 1,565 | 0 | 0 | 0 | 1,050 | 1,363 | 1 | 1 | 0 | 0 |
| 11/14/2016 | 2017 | 1,600 | 1,569 | 0 | 0 | 0 | 1,426 | 1,377 | 1 | 1 | 0 | 0 |
| 11/15/2016 | 2017 | 1,779 | 1,566 | 0 | 0 | 0 | 1,505 | 1,373 | 1 | 1 | 0 | 0 |
| 11/16/2016 | 2017 | 1,902 | 1,624 | 0 | 0 | 0 | 1,626 | 1,418 | 1 | 1 | 0 | 0 |
| 11/17/2016 | 2017 | 1,704 | 1,612 | 0 | 0 | 0 | 1,494 | 1,406 | 1 | 1 | 0 | 0 |
| 11/18/2016 | 2017 | 1,576 | 1,613 | 0 | 0 | 0 | 1,336 | 1,400 | 1 | 1 | 0 | 0 |
| 11/19/2016 | 2017 | 1,417 | 1,596 | 0 | 0 | 0 | 1,255 | 1,385 | 1 | 1 | 0 | 0 |
| 11/20/2016 | 2017 | 1,224 | 1,600 | 0 | 0 | 0 | 1,053 | 1,385 | 1 | 1 | 0 | 0 |
| 11/21/2016 | 2017 | 1,611 | 1,602 | 0 | 0 | 0 | 1,343 | 1,373 | 1 | 1 | 0 | 0 |
| 11/22/2016 | 2017 | 1,718 | 1,593 | 0 | 0 | 0 | 1,471 | 1,368 | 1 | 1 | 0 | 0 |
| 11/23/2016 | 2017 | 1,783 | 1,576 | 0 | 0 | 0 | 1,547 | 1,357 | 1 | 1 | 0 | 0 |
| 11/24/2016 | 2017 | 1,382 | 1,530 | 0 | 0 | 0 | 1,191 | 1,314 | 1 | 1 | 0 | 0 |
| 11/25/2016 | 2017 | 1,458 | 1,513 | 0 | 0 | 0 | 1,259 | 1,303 | 1 | 1 | 0 | 0 |
| 11/26/2016 | 2017 | 1,602 | 1,540 | 0 | 0 | 0 | 1,345 | 1,316 | 1 | 1 | 0 | 0 |
| 11/27/2016 | 2017 | 1,382 | 1,562 | 0 | 0 | 0 | 1,190 | 1,335 | 1 | 1 | 0 | 0 |
| 11/28/2016 | 2017 | 1,521 | 1,549 | 0 | 0 | 0 | 1,311 | 1,331 | 1 | 1 | 0 | 0 |
| 11/29/2016 | 2017 | 1,693 | 1,546 | 0 | 0 | 0 | 1,415 | 1,323 | 1 | 1 | 0 | 0 |
| 11/30/2016 | 2017 | 1,773 | 1,544 | 0 | 0 | 0 | 1,515 | 1,318 | 1 | 1 | 0 | 0 |
| 12/1/2016 | 2017 | 1,608 | 1,577 | 0 | 0 | 0 | 1,373 | 1,344 | 1 | 1 | 0 | 0 |
| 12/2/2016 | 2017 | 1,666 | 1,606 | 0 | 0 | 0 | 1,418 | 1,367 | 1 | 1 | 0 | 0 |
| 12/3/2016 | 2017 | 1,401 | 1,578 | 0 | 0 | 0 | 1,166 | 1,341 | 1 | 1 | 0 | 0 |
| 12/4/2016 | 2017 | 1,213 | 1,554 | 0 | 0 | 0 | 1,040 | 1,320 | 1 | 1 | 0 | 0 |
| 12/5/2016 | 2017 | 1,394 | 1,535 | 0 | 0 | 0 | 1,180 | 1,301 | 1 | 1 | 0 | 0 |
| 12/6/2016 | 2017 | 1,749 | 1,543 | 0 | 0 | 0 | 1,446 | 1,305 | 1 | 1 | 0 | 0 |
| 12/7/2016 | 2017 | 1,689 | 1,531 | 0 | 0 | 0 | 1,449 | 1,296 | 1 | 1 | 0 | 0 |
| 12/8/2016 | 2017 | 1,630 | 1,535 | 0 | 0 | 0 | 1,362 | 1,294 | 1 | 1 | 0 | 0 |
| 12/9/2016 | 2017 | 1,296 | 1,482 | 0 | 1 | 0 | 1,088 | 1,247 | 1 | 1 | 0 | 0 |
| 12/10/2016 | 2017 | 1,351 | 1,475 | 0 | 1 | 0 | 1,120 | 1,241 | 1 | 1 | 0 | 0 |
| 12/11/2016 | 2017 | 1,093 | 1,457 | 0 | 1 | 0 | 933 | 1,225 | 1 | 1 | 0 | 0 |
| 12/12/2016 | 2017 | 1,356 | 1,452 | 0 | 1 | 0 | 1,181 | 1,226 | 1 | 1 | 0 | 0 |
| 12/13/2016 | 2017 | 1,674 | 1,441 | 0 | 1 | 0 | 1,411 | 1,221 | 1 | 1 | 0 | 0 |
| 12/14/2016 | 2017 | 1,567 | 1,424 | 0 | 1 | 0 | 1,373 | 1,210 | 1 | 1 | 0 | 0 |
| 12/15/2016 | 2017 | 1,489 | 1,404 | 0 | 1 | 0 | 1,268 | 1,196 | 1 | 1 | 0 | 0 |
| 12/16/2016 | 2017 | 1,658 | 1,455 | 0 | 1 | 0 | 1,382 | 1,238 | 1 | 1 | 0 | 0 |
| 12/17/2016 | 2017 | 1,615 | 1,493 | 0 | 1 | 0 | 1,338 | 1,269 | 1 | 1 | 0 | 0 |
| 12/18/2016 | 2017 | 1,341 | 1,529 | 0 | 0 | 0 | 1,123 | 1,297 | 1 | 1 | 0 | 0 |
| 12/19/2016 | 2017 | 1,660 | 1,572 | 0 | 0 | 0 | 1,411 | 1,329 | 1 | 1 | 0 | 0 |

STB_AR1_001709

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/20/2016 | 2017 | 1,779 | 1,587 | 0 | 0 | 0 | 1,512 | 1,344 | 1 | 1 | 0 | 0 |
| 12/21/2016 | 2017 | 1,570 | 1,587 | 0 | 0 | 0 | 1,326 | 1,337 | 1 | 1 | 0 | 0 |
| 12/22/2016 | 2017 | 1,697 | 1,617 | 0 | 0 | 0 | 1,413 | 1,358 | 1 | 1 | 0 | 0 |
| 12/23/2016 | 2017 | 1,370 | 1,576 | 0 | 0 | 0 | 1,164 | 1,327 | 1 | 1 | 0 | 0 |
| 12/24/2016 | 2017 | 1,022 | 1,491 | 0 | 1 | 0 | 852 | 1,257 | 1 | 1 | 0 | 0 |
| 12/25/2016 | 2017 | 620 | 1,388 | 0 | 1 | 0 | 544 | 1,175 | 1 | 1 | 0 | 0 |
| 12/26/2016 | 2017 | 979 | 1,291 | 0 | 1 | 0 | 854 | 1,095 | 1 | 1 | 0 | 0 |
| 12/27/2016 | 2017 | 1,252 | 1,216 | 0 | 1 | 0 | 1,108 | 1,037 | 1 | 1 | 0 | 0 |
| 12/28/2016 | 2017 | 1,279 | 1,174 | 0 | 1 | 0 | 1,129 | 1,009 | 1 | 1 | 0 | 0 |
| 12/29/2016 | 2017 | 1,233 | 1,108 | 0 | 1 | 0 | 1,105 | 965 | 1 | 1 | 0 | 0 |
| 12/30/2016 | 2017 | 1,074 | 1,066 | 0 | 1 | 0 | 938 | 933 | 1 | 1 | 0 | 0 |
| 12/31/2016 | 2017 | 926 | 1,052 | 0 | 1 | 0 | 832 | 930 | 1 | 1 | 0 | 0 |
| 1/1/2017 | 2017 | 413 | 1,022 | 0 | 1 | 0 | 368 | 905 | 1 | 1 | 0 | 0 |
| 1/2/2017 | 2017 | 599 | 968 | 0 | 1 | 0 | 548 | 861 | 1 | 1 | 0 | 0 |
| 1/3/2017 | 2017 | 904 | 918 | 0 | 1 | 0 | 819 | 820 | 1 | 1 | 0 | 0 |
| 1/4/2017 | 2017 | 771 | 846 | 0 | 1 | 0 | 711 | 760 | 1 | 1 | 0 | 0 |
| 1/5/2017 | 2017 | 905 | 799 | 0 | 1 | 0 | 844 | 723 | 1 | 1 | 0 | 0 |
| 1/6/2017 | 2017 | 799 | 760 | 0 | 1 | 0 | 710 | 690 | 1 | 1 | 0 | 0 |
| 1/7/2017 | 2017 | 694 | 726 | 0 | 1 | 0 | 643 | 663 | 1 | 1 | 0 | 0 |
| 1/8/2017 | 2017 | 674 | 764 | 0 | 1 | 0 | 607 | 697 | 1 | 1 | 0 | 0 |
| 1/9/2017 | 2017 | 780 | 790 | 0 | 1 | 0 | 702 | 719 | 1 | 1 | 0 | 0 |
| 1/10/2017 | 2017 | 1,009 | 805 | 0 | 1 | 0 | 895 | 730 | 1 | 1 | 0 | 0 |
| 1/11/2017 | 2017 | 1,100 | 852 | 0 | 1 | 0 | 959 | 766 | 1 | 1 | 0 | 0 |
| 1/12/2017 | 2017 | 989 | 864 | 0 | 1 | 0 | 886 | 772 | 1 | 1 | 0 | 0 |
| 1/13/2017 | 2017 | 1,146 | 913 | 0 | 1 | 0 | 989 | 812 | 1 | 1 | 0 | 0 |
| 1/14/2017 | 2017 | 1,426 | 1,018 | 0 | 1 | 0 | 1,205 | 892 | 1 | 1 | 0 | 0 |
| 1/15/2017 | 2017 | 1,137 | 1,084 | 0 | 1 | 0 | 962 | 943 | 1 | 1 | 0 | 0 |
| 1/16/2017 | 2017 | 1,249 | 1,151 | 0 | 1 | 0 | 1,073 | 996 | 1 | 1 | 0 | 0 |
| 1/17/2017 | 2017 | 1,451 | 1,214 | 0 | 1 | 0 | 1,241 | 1,045 | 1 | 1 | 0 | 0 |
| 1/18/2017 | 2017 | 1,383 | 1,254 | 0 | 1 | 0 | 1,212 | 1,081 | 1 | 1 | 0 | 0 |
| 1/19/2017 | 2017 | 1,430 | 1,317 | 0 | 1 | 0 | 1,276 | 1,137 | 1 | 1 | 0 | 0 |
| 1/20/2017 | 2017 | 1,533 | 1,373 | 1 | 1 | 1 | 1,363 | 1,190 | 1 | 1 | 0 | 0 |
| 1/21/2017 | 2017 | 1,155 | 1,334 | 1 | 1 | 0 | 996 | 1,160 | 1 | 1 | 0 | 0 |
| 1/22/2017 | 2017 | 848 | 1,293 | 1 | 1 | 0 | 748 | 1,130 | 1 | 1 | 0 | 0 |
| 1/23/2017 | 2017 | 1,115 | 1,274 | 1 | 1 | 0 | 989 | 1,118 | 1 | 1 | 0 | 0 |
| 1/24/2017 | 2017 | 1,212 | 1,239 | 1 | 1 | 0 | 1,084 | 1,095 | 1 | 1 | 0 | 0 |
| 1/25/2017 | 2017 | 1,148 | 1,206 | 1 | 1 | 0 | 1,004 | 1,066 | 1 | 1 | 0 | 0 |
| 1/26/2017 | 2017 | 1,126 | 1,162 | 1 | 1 | 0 | 993 | 1,025 | 1 | 1 | 0 | 0 |
| 1/27/2017 | 2017 | 899 | 1,072 | 1 | 1 | 0 | 806 | 946 | 1 | 1 | 0 | 0 |
| 1/28/2017 | 2017 | 874 | 1,032 | 1 | 1 | 0 | 781 | 915 | 1 | 1 | 0 | 0 |
| 1/29/2017 | 2017 | 826 | 1,029 | 1 | 1 | 0 | 742 | 914 | 1 | 1 | 0 | 0 |
| 1/30/2017 | 2017 | 1,042 | 1,018 | 1 | 1 | 0 | 937 | 907 | 1 | 1 | 0 | 0 |
| 1/31/2017 | 2017 | 939 | 979 | 1 | 1 | 0 | 841 | 872 | 1 | 1 | 0 | 0 |
| 2/1/2017 | 2017 | 846 | 936 | 1 | 1 | 0 | 785 | 841 | 1 | 1 | 0 | 0 |
| 2/2/2017 | 2017 | 882 | 901 | 1 | 1 | 0 | 808 | 814 | 1 | 1 | 0 | 0 |
| 2/3/2017 | 2017 | 809 | 888 | 1 | 1 | 0 | 737 | 804 | 1 | 1 | 0 | 0 |
| 2/4/2017 | 2017 | 904 | 893 | 1 | 1 | 0 | 817 | 810 | 1 | 1 | 0 | 0 |

| 2/5/2017 | 2017 | 580 | 857 | 1 | 1 | 0 | 533 | 780 | 1 | 1 | 0 | 0 |
| 2/6/2017 | 2017 | 804 | 823 | 1 | 1 | 0 | 737 | 751 | 1 | 1 | 0 | 0 |
| 2/7/2017 | 2017 | 990 | 831 | 1 | 1 | 0 | 904 | 760 | 1 | 1 | 0 | 0 |
| 2/8/2017 | 2017 | 922 | 842 | 1 | 1 | 0 | 850 | 769 | 1 | 1 | 0 | 0 |
| 2/9/2017 | 2017 | 833 | 835 | 1 | 1 | 0 | 772 | 764 | 1 | 1 | 0 | 0 |
| 2/10/2017 | 2017 | 731 | 823 | 1 | 1 | 0 | 684 | 757 | 1 | 1 | 0 | 0 |
| 2/11/2017 | 2017 | 705 | 795 | 1 | 1 | 0 | 660 | 734 | 1 | 1 | 0 | 0 |
| 2/12/2017 | 2017 | 599 | 798 | 1 | 1 | 0 | 576 | 740 | 1 | 1 | 0 | 0 |
| 2/13/2017 | 2017 | 745 | 789 | 1 | 1 | 0 | 698 | 735 | 1 | 1 | 0 | 0 |
| 2/14/2017 | 2017 | 639 | 739 | 1 | 1 | 0 | 588 | 690 | 1 | 1 | 0 | 0 |
| 2/15/2017 | 2017 | 780 | 719 | 1 | 1 | 0 | 723 | 672 | 1 | 1 | 0 | 0 |
| 2/16/2017 | 2017 | 711 | 701 | 1 | 1 | 0 | 671 | 657 | 1 | 1 | 0 | 0 |
| 2/17/2017 | 2017 | 517 | 671 | 1 | 1 | 0 | 494 | 630 | 1 | 1 | 0 | 0 |
| 2/18/2017 | 2017 | 612 | 658 | 1 | 1 | 0 | 573 | 618 | 1 | 1 | 0 | 0 |
| 2/19/2017 | 2017 | 593 | 657 | 1 | 1 | 0 | 562 | 616 | 1 | 1 | 0 | 0 |
| 2/20/2017 | 2017 | 437 | 613 | 1 | 1 | 0 | 414 | 575 | 1 | 1 | 0 | 0 |
| 2/21/2017 | 2017 | 518 | 595 | 1 | 1 | 0 | 487 | 561 | 1 | 1 | 0 | 0 |
| 2/22/2017 | 2017 | 560 | 564 | 1 | 1 | 0 | 525 | 532 | 1 | 1 | 0 | 0 |
| 2/23/2017 | 2017 | 490 | 532 | 1 | 1 | 0 | 467 | 503 | 1 | 1 | 0 | 0 |
| 2/24/2017 | 2017 | 500 | 530 | 1 | 1 | 0 | 469 | 500 | 1 | 1 | 0 | 0 |
| 2/25/2017 | 2017 | 545 | 520 | 1 | 1 | 0 | 503 | 490 | 1 | 1 | 0 | 0 |
| 2/26/2017 | 2017 | 485 | 505 | 1 | 1 | 0 | 457 | 475 | 1 | 1 | 0 | 0 |
| 2/27/2017 | 2017 | 537 | 519 | 1 | 1 | 0 | 512 | 489 | 1 | 1 | 0 | 0 |
| 2/28/2017 | 2017 | 480 | 514 | 1 | 1 | 0 | 450 | 483 | 1 | 1 | 0 | 0 |
| 3/1/2017 | 2017 | 447 | 498 | 1 | 1 | 0 | 421 | 468 | 1 | 1 | 0 | 0 |
| 3/2/2017 | 2017 | 371 | 481 | 1 | 1 | 0 | 345 | 451 | 1 | 1 | 0 | 0 |
| 3/3/2017 | 2017 | 400 | 466 | 1 | 1 | 0 | 373 | 437 | 1 | 1 | 0 | 0 |
| 3/4/2017 | 2017 | 450 | 453 | 1 | 1 | 0 | 422 | 426 | 1 | 1 | 0 | 0 |
| 3/5/2017 | 2017 | 373 | 437 | 1 | 1 | 0 | 352 | 411 | 1 | 1 | 0 | 0 |
| 3/6/2017 | 2017 | 481 | 429 | 1 | 1 | 0 | 457 | 403 | 1 | 1 | 0 | 0 |
| 3/7/2017 | 2017 | 471 | 428 | 1 | 1 | 0 | 437 | 401 | 1 | 1 | 0 | 0 |
| 3/8/2017 | 2017 | 462 | 430 | 1 | 1 | 0 | 435 | 403 | 1 | 1 | 0 | 0 |
| 3/9/2017 | 2017 | 395 | 433 | 1 | 1 | 0 | 380 | 408 | 1 | 1 | 0 | 0 |
| 3/10/2017 | 2017 | 379 | 430 | 1 | 1 | 0 | 364 | 407 | 1 | 1 | 0 | 0 |
| 3/11/2017 | 2017 | 441 | 429 | 1 | 1 | 0 | 428 | 408 | 1 | 1 | 0 | 0 |
| 3/12/2017 | 2017 | 356 | 426 | 1 | 1 | 0 | 342 | 406 | 1 | 1 | 0 | 0 |
| 3/13/2017 | 2017 | 450 | 422 | 1 | 1 | 0 | 425 | 402 | 1 | 1 | 0 | 0 |
| 3/14/2017 | 2017 | 378 | 409 | 1 | 1 | 0 | 361 | 391 | 1 | 1 | 0 | 0 |
| 3/15/2017 | 2017 | 442 | 406 | 1 | 1 | 0 | 424 | 389 | 1 | 1 | 0 | 0 |
| 3/16/2017 | 2017 | 438 | 412 | 1 | 1 | 0 | 422 | 395 | 1 | 1 | 0 | 0 |
| 3/17/2017 | 2017 | 329 | 405 | 1 | 1 | 0 | 312 | 388 | 1 | 1 | 0 | 0 |
| 3/18/2017 | 2017 | 353 | 392 | 1 | 1 | 0 | 338 | 375 | 1 | 1 | 0 | 0 |
| 3/19/2017 | 2017 | 372 | 395 | 1 | 1 | 0 | 359 | 377 | 1 | 1 | 0 | 0 |
| 3/20/2017 | 2017 | 342 | 379 | 1 | 1 | 0 | 334 | 364 | 1 | 1 | 0 | 0 |
| 3/21/2017 | 2017 | 361 | 377 | 1 | 1 | 0 | 349 | 363 | 1 | 1 | 0 | 0 |
| 3/22/2017 | 2017 | 376 | 367 | 1 | 1 | 0 | 361 | 354 | 1 | 1 | 0 | 0 |
| 3/23/2017 | 2017 | 399 | 362 | 1 | 1 | 0 | 388 | 349 | 1 | 1 | 0 | 0 |

STB_AR1_001711

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/24/2017 | 2017 | 303 | 358 | 1 | 1 | 0 | 288 | 345 | 1 | 1 | 0 | 0 |
| 3/25/2017 | 2017 | 435 | 370 | 1 | 1 | 0 | 417 | 357 | 1 | 1 | 0 | 0 |
| 3/26/2017 | 2017 | 351 | 367 | 1 | 1 | 0 | 334 | 353 | 1 | 1 | 0 | 0 |
| 3/27/2017 | 2017 | 403 | 375 | 1 | 1 | 0 | 383 | 360 | 1 | 1 | 0 | 0 |
| 3/28/2017 | 2017 | 362 | 376 | 1 | 1 | 0 | 342 | 359 | 1 | 1 | 0 | 0 |
| 3/29/2017 | 2017 | 390 | 378 | 1 | 1 | 0 | 380 | 362 | 1 | 1 | 0 | 0 |
| 3/30/2017 | 2017 | 390 | 376 | 1 | 1 | 0 | 371 | 359 | 1 | 1 | 0 | 0 |
| 3/31/2017 | 2017 | 295 | 375 | 1 | 1 | 0 | 281 | 358 | 1 | 1 | 0 | 0 |
| 4/1/2017 | 2017 | 337 | 361 | 1 | 1 | 0 | 324 | 345 | 1 | 1 | 0 | 0 |
| 4/2/2017 | 2017 | 328 | 358 | 1 | 1 | 0 | 312 | 342 | 1 | 1 | 0 | 0 |
| 4/3/2017 | 2017 | 386 | 355 | 1 | 1 | 0 | 375 | 341 | 1 | 1 | 0 | 0 |
| 4/4/2017 | 2017 | 418 | 363 | 1 | 1 | 0 | 395 | 348 | 1 | 1 | 0 | 0 |
| 4/5/2017 | 2017 | 300 | 351 | 1 | 1 | 0 | 287 | 335 | 1 | 1 | 0 | 0 |
| 4/6/2017 | 2017 | 432 | 357 | 1 | 1 | 0 | 422 | 342 | 1 | 1 | 0 | 0 |
| 4/7/2017 | 2017 | 398 | 371 | 1 | 1 | 0 | 387 | 357 | 1 | 1 | 0 | 0 |
| 4/8/2017 | 2017 | 399 | 380 | 1 | 1 | 0 | 388 | 367 | 1 | 1 | 0 | 0 |
| 4/9/2017 | 2017 | 265 | 371 | 1 | 1 | 0 | 248 | 357 | 1 | 1 | 0 | 0 |
| 4/10/2017 | 2017 | 372 | 369 | 1 | 1 | 0 | 363 | 356 | 1 | 1 | 0 | 0 |
| 4/11/2017 | 2017 | 454 | 374 | 1 | 1 | 0 | 430 | 361 | 1 | 1 | 0 | 0 |
| 4/12/2017 | 2017 | 401 | 389 | 1 | 1 | 0 | 389 | 375 | 1 | 1 | 0 | 0 |
| 4/13/2017 | 2017 | 387 | 382 | 1 | 1 | 0 | 364 | 367 | 1 | 1 | 0 | 0 |
| 4/14/2017 | 2017 | 411 | 384 | 1 | 1 | 0 | 395 | 368 | 1 | 1 | 0 | 0 |
| 4/15/2017 | 2017 | 261 | 364 | 1 | 1 | 0 | 252 | 349 | 1 | 1 | 0 | 0 |
| 4/16/2017 | 2017 | 222 | 358 | 1 | 1 | 0 | 213 | 344 | 1 | 1 | 0 | 0 |
| 4/17/2017 | 2017 | 286 | 346 | 1 | 1 | 0 | 279 | 332 | 1 | 1 | 0 | 0 |
| 4/18/2017 | 2017 | 415 | 340 | 1 | 1 | 0 | 392 | 326 | 1 | 1 | 0 | 0 |
| 4/19/2017 | 2017 | 373 | 336 | 1 | 1 | 0 | 358 | 322 | 1 | 1 | 0 | 0 |
| 4/20/2017 | 2017 | 399 | 338 | 1 | 1 | 0 | 380 | 324 | 1 | 1 | 0 | 0 |
| 4/21/2017 | 2017 | 426 | 340 | 1 | 1 | 0 | 418 | 327 | 1 | 1 | 0 | 0 |
| 4/22/2017 | 2017 | 270 | 342 | 1 | 1 | 0 | 262 | 329 | 1 | 1 | 0 | 0 |
| 4/23/2017 | 2017 | 288 | 351 | 1 | 1 | 0 | 277 | 338 | 1 | 1 | 0 | 0 |
| 4/24/2017 | 2017 | 419 | 370 | 1 | 1 | 0 | 400 | 355 | 1 | 1 | 0 | 0 |
| 4/25/2017 | 2017 | 455 | 376 | 1 | 1 | 0 | 434 | 361 | 1 | 1 | 0 | 0 |
| 4/26/2017 | 2017 | 393 | 379 | 1 | 1 | 0 | 370 | 363 | 1 | 1 | 0 | 0 |
| 4/27/2017 | 2017 | 451 | 386 | 1 | 1 | 0 | 415 | 368 | 1 | 1 | 0 | 0 |
| 4/28/2017 | 2017 | 405 | 383 | 1 | 1 | 0 | 384 | 363 | 1 | 1 | 0 | 0 |
| 4/29/2017 | 2017 | 363 | 396 | 1 | 1 | 0 | 339 | 374 | 1 | 1 | 0 | 0 |
| 4/30/2017 | 2017 | 413 | 414 | 1 | 1 | 0 | 381 | 389 | 1 | 1 | 0 | 0 |
| 5/1/2017 | 2017 | 374 | 408 | 1 | 1 | 0 | 352 | 382 | 1 | 1 | 0 | 0 |
| 5/2/2017 | 2017 | 434 | 405 | 1 | 1 | 0 | 406 | 378 | 1 | 1 | 0 | 0 |
| 5/3/2017 | 2017 | 425 | 409 | 1 | 1 | 0 | 407 | 383 | 1 | 1 | 0 | 0 |
| 5/4/2017 | 2017 | 331 | 392 | 1 | 1 | 0 | 317 | 369 | 1 | 1 | 0 | 0 |
| 5/5/2017 | 2017 | 486 | 404 | 1 | 1 | 0 | 442 | 378 | 1 | 1 | 0 | 0 |
| 5/6/2017 | 2017 | 401 | 409 | 1 | 1 | 0 | 371 | 382 | 1 | 1 | 0 | 0 |
| 5/7/2017 | 2017 | 432 | 412 | 1 | 1 | 0 | 413 | 387 | 1 | 1 | 0 | 0 |
| 5/8/2017 | 2017 | 401 | 416 | 1 | 1 | 0 | 383 | 391 | 1 | 1 | 0 | 0 |
| 5/9/2017 | 2017 | 543 | 431 | 1 | 1 | 0 | 521 | 408 | 1 | 1 | 0 | 0 |

STB_AR1_001712

| 5/10/2017 | 2017 | 562 | 451 | 1 | 1 | 0 | 528 | 425 | 1 | 1 | 0 | 0 |
| 5/11/2017 | 2017 | 475 | 471 | 1 | 1 | 0 | 457 | 445 | 1 | 1 | 0 | 0 |
| 5/12/2017 | 2017 | 483 | 471 | 1 | 1 | 0 | 455 | 447 | 1 | 1 | 0 | 0 |
| 5/13/2017 | 2017 | 481 | 482 | 1 | 1 | 0 | 460 | 460 | 1 | 1 | 0 | 0 |
| 5/14/2017 | 2017 | 389 | 476 | 1 | 1 | 0 | 364 | 453 | 1 | 1 | 0 | 0 |
| 5/15/2017 | 2017 | 429 | 480 | 1 | 1 | 0 | 402 | 455 | 1 | 1 | 0 | 0 |
| 5/16/2017 | 2017 | 518 | 477 | 1 | 1 | 0 | 487 | 450 | 1 | 1 | 0 | 0 |
| 5/17/2017 | 2017 | 565 | 477 | 1 | 1 | 0 | 539 | 452 | 1 | 1 | 0 | 0 |
| 5/18/2017 | 2017 | 423 | 470 | 1 | 1 | 0 | 409 | 445 | 1 | 1 | 0 | 0 |
| 5/19/2017 | 2017 | 473 | 468 | 1 | 1 | 0 | 451 | 445 | 1 | 1 | 0 | 0 |
| 5/20/2017 | 2017 | 431 | 461 | 1 | 1 | 0 | 408 | 437 | 1 | 1 | 0 | 0 |
| 5/21/2017 | 2017 | 384 | 460 | 1 | 1 | 0 | 357 | 436 | 1 | 1 | 0 | 0 |
| 5/22/2017 | 2017 | 374 | 453 | 1 | 1 | 0 | 348 | 428 | 1 | 1 | 0 | 0 |
| 5/23/2017 | 2017 | 601 | 464 | 1 | 1 | 0 | 567 | 440 | 1 | 1 | 0 | 0 |
| 5/24/2017 | 2017 | 564 | 464 | 1 | 1 | 0 | 523 | 438 | 1 | 1 | 0 | 0 |
| 5/25/2017 | 2017 | 491 | 474 | 1 | 1 | 0 | 468 | 446 | 1 | 1 | 0 | 0 |
| 5/26/2017 | 2017 | 493 | 477 | 1 | 1 | 0 | 449 | 446 | 1 | 1 | 0 | 0 |
| 5/27/2017 | 2017 | 487 | 485 | 1 | 1 | 0 | 448 | 451 | 1 | 1 | 0 | 0 |
| 5/28/2017 | 2017 | 394 | 486 | 1 | 1 | 0 | 360 | 452 | 1 | 1 | 0 | 0 |
| 5/29/2017 | 2017 | 573 | 515 | 1 | 1 | 0 | 530 | 478 | 1 | 1 | 0 | 0 |
| 5/30/2017 | 2017 | 568 | 510 | 1 | 1 | 0 | 532 | 473 | 1 | 1 | 0 | 0 |
| 5/31/2017 | 2017 | 534 | 506 | 1 | 1 | 0 | 498 | 469 | 1 | 1 | 0 | 0 |
| 6/1/2017 | 2017 | 517 | 509 | 1 | 1 | 0 | 487 | 472 | 1 | 1 | 0 | 0 |
| 6/2/2017 | 2017 | 463 | 505 | 1 | 1 | 0 | 441 | 471 | 1 | 1 | 0 | 0 |
| 6/3/2017 | 2017 | 482 | 504 | 1 | 1 | 0 | 439 | 470 | 1 | 1 | 0 | 0 |
| 6/4/2017 | 2017 | 468 | 515 | 1 | 1 | 0 | 443 | 481 | 1 | 1 | 0 | 0 |
| 6/5/2017 | 2017 | 459 | 499 | 1 | 1 | 0 | 410 | 464 | 1 | 1 | 0 | 0 |
| 6/6/2017 | 2017 | 620 | 506 | 1 | 1 | 0 | 573 | 470 | 1 | 1 | 0 | 0 |
| 6/7/2017 | 2017 | 548 | 508 | 1 | 1 | 0 | 515 | 473 | 1 | 1 | 0 | 0 |
| 6/8/2017 | 2017 | 569 | 516 | 1 | 1 | 0 | 527 | 478 | 1 | 1 | 0 | 0 |
| 6/9/2017 | 2017 | 481 | 518 | 1 | 1 | 0 | 441 | 478 | 1 | 1 | 0 | 0 |
| 6/10/2017 | 2017 | 505 | 521 | 1 | 1 | 0 | 465 | 482 | 1 | 1 | 0 | 0 |
| 6/11/2017 | 2017 | 445 | 518 | 1 | 1 | 0 | 401 | 476 | 1 | 1 | 0 | 0 |
| 6/12/2017 | 2017 | 498 | 524 | 1 | 1 | 0 | 465 | 484 | 1 | 1 | 0 | 0 |
| 6/13/2017 | 2017 | 617 | 523 | 1 | 1 | 0 | 577 | 484 | 1 | 1 | 0 | 0 |
| 6/14/2017 | 2017 | 578 | 528 | 1 | 1 | 0 | 534 | 487 | 1 | 1 | 0 | 0 |
| 6/15/2017 | 2017 | 507 | 519 | 1 | 1 | 0 | 481 | 481 | 1 | 1 | 0 | 0 |
| 6/16/2017 | 2017 | 536 | 527 | 1 | 1 | 0 | 498 | 489 | 1 | 1 | 0 | 0 |
| 6/17/2017 | 2017 | 503 | 526 | 1 | 1 | 0 | 462 | 488 | 1 | 1 | 0 | 0 |
| 6/18/2017 | 2017 | 415 | 522 | 1 | 1 | 0 | 368 | 484 | 1 | 1 | 0 | 0 |
| 6/19/2017 | 2017 | 474 | 519 | 1 | 1 | 0 | 435 | 479 | 1 | 1 | 0 | 0 |
| 6/20/2017 | 2017 | 640 | 522 | 1 | 1 | 0 | 599 | 482 | 1 | 1 | 0 | 0 |
| 6/21/2017 | 2017 | 582 | 522 | 1 | 1 | 0 | 535 | 483 | 1 | 1 | 0 | 0 |
| 6/22/2017 | 2017 | 586 | 534 | 1 | 1 | 0 | 541 | 491 | 1 | 1 | 0 | 0 |
| 6/23/2017 | 2017 | 621 | 546 | 1 | 1 | 0 | 578 | 503 | 1 | 1 | 0 | 0 |
| 6/24/2017 | 2017 | 579 | 557 | 1 | 1 | 0 | 531 | 512 | 1 | 1 | 0 | 0 |
| 6/25/2017 | 2017 | 451 | 562 | 1 | 1 | 0 | 416 | 519 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/26/2017 | 2017 | 659 | 588 | 1 | 1 | 0 | 590 | 541 | 1 | 1 | 0 | 0 |
| 6/27/2017 | 2017 | 517 | 571 | 1 | 1 | 0 | 470 | 523 | 1 | 1 | 0 | 0 |
| 6/28/2017 | 2017 | 636 | 578 | 1 | 1 | 0 | 581 | 530 | 1 | 1 | 0 | 0 |
| 6/29/2017 | 2017 | 516 | 568 | 1 | 1 | 0 | 450 | 517 | 1 | 1 | 0 | 0 |
| 6/30/2017 | 2017 | 615 | 568 | 1 | 1 | 0 | 547 | 512 | 1 | 1 | 0 | 0 |
| 7/1/2017 | 2017 | 523 | 560 | 1 | 1 | 0 | 475 | 504 | 1 | 1 | 0 | 0 |
| 7/2/2017 | 2017 | 440 | 558 | 1 | 1 | 0 | 398 | 502 | 1 | 1 | 0 | 0 |
| 7/3/2017 | 2017 | 446 | 528 | 1 | 1 | 0 | 407 | 475 | 1 | 1 | 0 | 0 |
| 7/4/2017 | 2017 | 596 | 539 | 1 | 1 | 0 | 547 | 486 | 1 | 1 | 0 | 0 |
| 7/5/2017 | 2017 | 567 | 529 | 1 | 1 | 0 | 520 | 478 | 1 | 1 | 0 | 0 |
| 7/6/2017 | 2017 | 660 | 550 | 1 | 1 | 0 | 596 | 499 | 1 | 1 | 0 | 0 |
| 7/7/2017 | 2017 | 568 | 543 | 1 | 1 | 0 | 512 | 494 | 1 | 1 | 0 | 0 |
| 7/8/2017 | 2017 | 540 | 545 | 1 | 1 | 0 | 455 | 491 | 1 | 1 | 0 | 0 |
| 7/9/2017 | 2017 | 538 | 559 | 1 | 1 | 0 | 485 | 503 | 1 | 1 | 0 | 0 |
| 7/10/2017 | 2017 | 607 | 582 | 1 | 1 | 0 | 543 | 523 | 1 | 1 | 0 | 0 |
| 7/11/2017 | 2017 | 657 | 591 | 1 | 1 | 0 | 586 | 528 | 1 | 1 | 0 | 0 |
| 7/12/2017 | 2017 | 496 | 581 | 1 | 1 | 0 | 449 | 518 | 1 | 1 | 0 | 0 |
| 7/13/2017 | 2017 | 720 | 589 | 1 | 1 | 0 | 653 | 526 | 1 | 1 | 0 | 0 |
| 7/14/2017 | 2017 | 585 | 592 | 1 | 1 | 0 | 531 | 529 | 1 | 1 | 0 | 0 |
| 7/15/2017 | 2017 | 567 | 596 | 1 | 1 | 0 | 498 | 535 | 1 | 1 | 0 | 0 |
| 7/16/2017 | 2017 | 498 | 590 | 1 | 1 | 0 | 442 | 529 | 1 | 1 | 0 | 0 |
| 7/17/2017 | 2017 | 659 | 597 | 1 | 1 | 0 | 590 | 536 | 1 | 1 | 0 | 0 |
| 7/18/2017 | 2017 | 723 | 607 | 1 | 1 | 0 | 640 | 543 | 1 | 1 | 0 | 0 |
| 7/19/2017 | 2017 | 615 | 624 | 1 | 1 | 0 | 563 | 560 | 1 | 1 | 0 | 0 |
| 7/20/2017 | 2017 | 696 | 620 | 1 | 1 | 0 | 644 | 558 | 1 | 1 | 0 | 0 |
| 7/21/2017 | 2017 | 521 | 611 | 1 | 1 | 0 | 477 | 551 | 1 | 1 | 0 | 0 |
| 7/22/2017 | 2017 | 618 | 619 | 1 | 1 | 0 | 552 | 558 | 1 | 1 | 0 | 0 |
| 7/23/2017 | 2017 | 556 | 627 | 1 | 1 | 0 | 493 | 566 | 1 | 1 | 0 | 0 |
| 7/24/2017 | 2017 | 732 | 637 | 1 | 1 | 0 | 649 | 574 | 1 | 1 | 0 | 0 |
| 7/25/2017 | 2017 | 677 | 631 | 1 | 1 | 0 | 605 | 569 | 1 | 1 | 0 | 0 |
| 7/26/2017 | 2017 | 626 | 632 | 1 | 1 | 0 | 573 | 570 | 1 | 1 | 0 | 0 |
| 7/27/2017 | 2017 | 533 | 609 | 1 | 1 | 0 | 492 | 549 | 1 | 1 | 0 | 0 |
| 7/28/2017 | 2017 | 524 | 609 | 1 | 1 | 0 | 479 | 549 | 1 | 1 | 0 | 0 |
| 7/29/2017 | 2017 | 488 | 591 | 1 | 1 | 0 | 429 | 531 | 1 | 1 | 0 | 0 |
| 7/30/2017 | 2017 | 572 | 593 | 1 | 1 | 0 | 524 | 536 | 1 | 1 | 0 | 0 |
| 7/31/2017 | 2017 | 639 | 580 | 1 | 1 | 0 | 560 | 523 | 1 | 1 | 0 | 0 |
| 8/1/2017 | 2017 | 703 | 584 | 1 | 1 | 0 | 614 | 524 | 1 | 1 | 0 | 0 |
| 8/2/2017 | 2017 | 691 | 593 | 1 | 1 | 0 | 628 | 532 | 1 | 1 | 0 | 0 |
| 8/3/2017 | 2017 | 579 | 599 | 1 | 1 | 0 | 523 | 537 | 1 | 1 | 0 | 0 |
| 8/4/2017 | 2017 | 604 | 611 | 1 | 1 | 0 | 546 | 546 | 1 | 1 | 0 | 0 |
| 8/5/2017 | 2017 | 524 | 616 | 1 | 1 | 0 | 462 | 551 | 1 | 1 | 0 | 0 |
| 8/6/2017 | 2017 | 464 | 601 | 1 | 1 | 0 | 409 | 535 | 1 | 1 | 0 | 0 |
| 8/7/2017 | 2017 | 649 | 602 | 1 | 1 | 0 | 575 | 537 | 1 | 1 | 0 | 0 |
| 8/8/2017 | 2017 | 893 | 629 | 1 | 1 | 0 | 788 | 562 | 1 | 1 | 0 | 0 |
| 8/9/2017 | 2017 | 751 | 638 | 1 | 1 | 0 | 694 | 571 | 1 | 1 | 0 | 0 |
| 8/10/2017 | 2017 | 697 | 655 | 1 | 1 | 0 | 658 | 590 | 1 | 1 | 0 | 0 |
| 8/11/2017 | 2017 | 611 | 656 | 1 | 1 | 0 | 565 | 593 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/12/2017 | 2017 | 803 | 695 | 1 | 1 | 0 | 733 | 632 | 1 | 1 | 0 | 0 |
| 8/13/2017 | 2017 | 759 | 738 | 1 | 1 | 0 | 667 | 669 | 1 | 1 | 0 | 0 |
| 8/14/2017 | 2017 | 805 | 760 | 1 | 1 | 0 | 723 | 690 | 1 | 1 | 0 | 0 |
| 8/15/2017 | 2017 | 787 | 745 | 1 | 1 | 0 | 700 | 677 | 1 | 1 | 0 | 0 |
| 8/16/2017 | 2017 | 746 | 744 | 1 | 1 | 0 | 679 | 675 | 1 | 1 | 0 | 0 |
| 8/17/2017 | 2017 | 668 | 740 | 1 | 1 | 0 | 627 | 671 | 1 | 1 | 0 | 0 |
| 8/18/2017 | 2017 | 756 | 761 | 1 | 1 | 0 | 667 | 685 | 1 | 1 | 0 | 0 |
| 8/19/2017 | 2017 | 766 | 755 | 1 | 1 | 0 | 680 | 678 | 1 | 1 | 0 | 0 |
| 8/20/2017 | 2017 | 636 | 738 | 1 | 1 | 0 | 581 | 665 | 1 | 1 | 0 | 0 |
| 8/21/2017 | 2017 | 728 | 727 | 1 | 1 | 0 | 658 | 656 | 1 | 1 | 0 | 0 |
| 8/22/2017 | 2017 | 939 | 748 | 1 | 1 | 0 | 856 | 678 | 1 | 1 | 0 | 0 |
| 8/23/2017 | 2017 | 702 | 742 | 1 | 1 | 0 | 648 | 674 | 1 | 1 | 0 | 0 |
| 8/24/2017 | 2017 | 797 | 761 | 1 | 1 | 0 | 735 | 689 | 1 | 1 | 0 | 0 |
| 8/25/2017 | 2017 | 653 | 746 | 1 | 1 | 0 | 600 | 680 | 1 | 1 | 0 | 0 |
| 8/26/2017 | 2017 | 819 | 753 | 1 | 1 | 0 | 733 | 687 | 1 | 1 | 0 | 0 |
| 8/27/2017 | 2017 | 666 | 758 | 1 | 1 | 0 | 578 | 687 | 1 | 1 | 0 | 0 |
| 8/28/2017 | 2017 | 765 | 763 | 1 | 1 | 0 | 683 | 690 | 1 | 1 | 0 | 0 |
| 8/29/2017 | 2017 | 854 | 751 | 1 | 1 | 0 | 768 | 678 | 1 | 1 | 0 | 0 |
| 8/30/2017 | 2017 | 774 | 761 | 1 | 1 | 0 | 695 | 685 | 1 | 1 | 0 | 0 |
| 8/31/2017 | 2017 | 699 | 747 | 1 | 1 | 0 | 651 | 673 | 1 | 1 | 0 | 0 |
| 9/1/2017 | 2017 | 653 | 747 | 1 | 1 | 0 | 589 | 671 | 1 | 1 | 0 | 0 |
| 9/2/2017 | 2017 | 865 | 754 | 1 | 1 | 0 | 782 | 678 | 1 | 1 | 0 | 0 |
| 9/3/2017 | 2017 | 711 | 760 | 1 | 1 | 0 | 639 | 687 | 1 | 1 | 0 | 0 |
| 9/4/2017 | 2017 | 717 | 753 | 1 | 1 | 0 | 651 | 682 | 1 | 1 | 0 | 0 |
| 9/5/2017 | 2017 | 877 | 757 | 1 | 1 | 0 | 766 | 682 | 1 | 1 | 0 | 0 |
| 9/6/2017 | 2017 | 829 | 764 | 1 | 1 | 0 | 746 | 689 | 1 | 1 | 0 | 0 |
| 9/7/2017 | 2017 | 704 | 765 | 1 | 1 | 0 | 649 | 689 | 1 | 1 | 0 | 0 |
| 9/8/2017 | 2017 | 731 | 776 | 1 | 1 | 0 | 674 | 701 | 1 | 1 | 0 | 0 |
| 9/9/2017 | 2017 | 715 | 755 | 1 | 1 | 0 | 630 | 679 | 1 | 1 | 0 | 0 |
| 9/10/2017 | 2017 | 666 | 748 | 1 | 1 | 0 | 600 | 674 | 1 | 1 | 0 | 0 |
| 9/11/2017 | 2017 | 935 | 780 | 1 | 1 | 0 | 821 | 698 | 1 | 1 | 0 | 0 |
| 9/12/2017 | 2017 | 795 | 768 | 1 | 1 | 0 | 692 | 687 | 1 | 1 | 0 | 0 |
| 9/13/2017 | 2017 | 758 | 758 | 1 | 1 | 0 | 692 | 680 | 1 | 1 | 0 | 0 |
| 9/14/2017 | 2017 | 833 | 776 | 1 | 1 | 0 | 767 | 697 | 1 | 1 | 0 | 0 |
| 9/15/2017 | 2017 | 673 | 768 | 1 | 1 | 0 | 631 | 690 | 1 | 1 | 0 | 0 |
| 9/16/2017 | 2017 | 646 | 758 | 1 | 1 | 0 | 595 | 685 | 1 | 1 | 0 | 0 |
| 9/17/2017 | 2017 | 583 | 746 | 1 | 1 | 0 | 552 | 679 | 1 | 1 | 0 | 0 |
| 9/18/2017 | 2017 | 853 | 734 | 1 | 1 | 0 | 757 | 669 | 1 | 1 | 0 | 0 |
| 9/19/2017 | 2017 | 848 | 742 | 1 | 1 | 0 | 755 | 678 | 1 | 1 | 0 | 0 |
| 9/20/2017 | 2017 | 792 | 747 | 1 | 1 | 0 | 711 | 681 | 1 | 1 | 0 | 0 |
| 9/21/2017 | 2017 | 726 | 732 | 1 | 1 | 0 | 671 | 667 | 1 | 1 | 0 | 0 |
| 9/22/2017 | 2017 | 666 | 731 | 1 | 1 | 0 | 635 | 668 | 1 | 1 | 0 | 0 |
| 9/23/2017 | 2017 | 648 | 731 | 1 | 1 | 0 | 591 | 667 | 1 | 1 | 0 | 0 |
| 9/24/2017 | 2017 | 547 | 726 | 1 | 1 | 0 | 506 | 661 | 1 | 1 | 0 | 0 |
| 9/25/2017 | 2017 | 800 | 718 | 1 | 1 | 0 | 730 | 657 | 1 | 1 | 0 | 0 |
| 9/26/2017 | 2017 | 866 | 721 | 1 | 1 | 0 | 778 | 660 | 1 | 1 | 0 | 0 |
| 9/27/2017 | 2017 | 840 | 728 | 1 | 1 | 0 | 762 | 668 | 1 | 1 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/28/2017 | 2017 | 828 | 742 | 1 | 1 | 0 | 751 | 679 | 1 | 1 | 0 | 0 |
| 9/29/2017 | 2017 | 732 | 752 | 1 | 1 | 0 | 654 | 682 | 1 | 1 | 0 | 0 |
| 9/30/2017 | 2017 | 700 | 759 | 1 | 1 | 0 | 625 | 687 | 1 | 1 | 0 | 0 |
| 10/1/2017 | 2018 | 560 | 761 | 1 | 1 | 0 | 510 | 687 | 1 | 1 | 0 | 0 |
| 10/2/2017 | 2018 | 714 | 749 | 1 | 1 | 0 | 651 | 676 | 1 | 1 | 0 | 0 |
| 10/3/2017 | 2018 | 771 | 735 | 1 | 1 | 0 | 685 | 663 | 1 | 1 | 0 | 0 |
| 10/4/2017 | 2018 | 898 | 743 | 1 | 1 | 0 | 824 | 671 | 1 | 1 | 0 | 0 |
| 10/5/2017 | 2018 | 785 | 737 | 1 | 1 | 0 | 727 | 668 | 1 | 1 | 0 | 0 |
| 10/6/2017 | 2018 | 750 | 740 | 1 | 1 | 0 | 708 | 676 | 1 | 1 | 0 | 0 |
| 10/7/2017 | 2018 | 789 | 752 | 1 | 1 | 0 | 726 | 690 | 1 | 1 | 0 | 0 |
| 10/8/2017 | 2018 | 654 | 766 | 1 | 1 | 0 | 604 | 704 | 1 | 1 | 0 | 0 |
| 10/9/2017 | 2018 | 685 | 762 | 1 | 1 | 0 | 631 | 701 | 1 | 1 | 0 | 0 |
| 10/10/2017 | 2018 | 888 | 778 | 1 | 1 | 0 | 813 | 719 | 1 | 1 | 0 | 0 |
| 10/11/2017 | 2018 | 964 | 788 | 1 | 1 | 0 | 869 | 725 | 1 | 1 | 0 | 0 |
| 10/12/2017 | 2018 | 851 | 797 | 1 | 1 | 0 | 807 | 737 | 1 | 1 | 0 | 0 |
| 10/13/2017 | 2018 | 819 | 807 | 1 | 1 | 0 | 743 | 742 | 1 | 1 | 0 | 0 |
| 10/14/2017 | 2018 | 851 | 816 | 1 | 1 | 0 | 778 | 749 | 1 | 1 | 0 | 0 |
| 10/15/2017 | 2018 | 683 | 820 | 1 | 1 | 0 | 606 | 750 | 1 | 1 | 0 | 0 |
| 10/16/2017 | 2018 | 827 | 840 | 1 | 1 | 0 | 773 | 770 | 1 | 1 | 0 | 0 |
| 10/17/2017 | 2018 | 956 | 850 | 1 | 1 | 0 | 847 | 775 | 1 | 1 | 0 | 0 |
| 10/18/2017 | 2018 | 778 | 824 | 1 | 1 | 0 | 708 | 752 | 1 | 1 | 0 | 0 |
| 10/19/2017 | 2018 | 902 | 831 | 1 | 1 | 0 | 829 | 755 | 1 | 1 | 0 | 0 |
| 10/20/2017 | 2018 | 857 | 836 | 1 | 1 | 0 | 795 | 762 | 1 | 1 | 0 | 0 |
| 10/21/2017 | 2018 | 798 | 829 | 1 | 1 | 0 | 721 | 754 | 1 | 1 | 0 | 0 |
| 10/22/2017 | 2018 | 712 | 833 | 1 | 1 | 0 | 639 | 759 | 1 | 1 | 0 | 0 |
| 10/23/2017 | 2018 | 940 | 849 | 1 | 1 | 0 | 853 | 770 | 1 | 1 | 0 | 0 |
| 10/24/2017 | 2018 | 940 | 847 | 1 | 1 | 0 | 850 | 771 | 1 | 1 | 0 | 0 |
| 10/25/2017 | 2018 | 944 | 870 | 1 | 1 | 0 | 871 | 794 | 1 | 1 | 0 | 0 |
| 10/26/2017 | 2018 | 964 | 879 | 1 | 1 | 0 | 854 | 798 | 1 | 1 | 0 | 0 |
| 10/27/2017 | 2018 | 841 | 877 | 1 | 1 | 0 | 760 | 793 | 1 | 1 | 0 | 0 |
| 10/28/2017 | 2018 | 848 | 884 | 1 | 1 | 0 | 769 | 799 | 1 | 1 | 0 | 0 |
| 10/29/2017 | 2018 | 693 | 881 | 1 | 1 | 0 | 606 | 795 | 1 | 1 | 0 | 0 |
| 10/30/2017 | 2018 | 912 | 877 | 1 | 1 | 0 | 839 | 793 | 1 | 1 | 0 | 0 |
| 10/31/2017 | 2018 | 914 | 874 | 1 | 1 | 0 | 836 | 791 | 1 | 1 | 0 | 0 |
| 11/1/2017 | 2018 | 952 | 875 | 1 | 1 | 0 | 858 | 789 | 1 | 1 | 0 | 0 |
| 11/2/2017 | 2018 | 907 | 867 | 1 | 1 | 0 | 815 | 783 | 1 | 1 | 0 | 0 |
| 11/3/2017 | 2018 | 1,026 | 893 | 1 | 1 | 0 | 952 | 811 | 1 | 1 | 0 | 0 |
| 11/4/2017 | 2018 | 832 | 891 | 1 | 1 | 0 | 735 | 806 | 1 | 1 | 0 | 0 |
| 11/5/2017 | 2018 | 707 | 893 | 1 | 1 | 0 | 630 | 809 | 1 | 1 | 0 | 0 |
| 11/6/2017 | 2018 | 863 | 886 | 1 | 1 | 0 | 770 | 799 | 1 | 1 | 0 | 0 |
| 11/7/2017 | 2018 | 993 | 897 | 1 | 1 | 0 | 926 | 812 | 1 | 1 | 0 | 0 |
| 11/8/2017 | 2018 | 989 | 902 | 1 | 1 | 0 | 898 | 818 | 1 | 1 | 0 | 0 |
| 11/9/2017 | 2018 | 806 | 888 | 1 | 1 | 0 | 709 | 803 | 1 | 1 | 0 | 0 |
| 11/10/2017 | 2018 | 1,055 | 892 | 1 | 1 | 0 | 930 | 800 | 1 | 1 | 0 | 0 |
| 11/11/2017 | 2018 | 838 | 893 | 1 | 1 | 0 | 739 | 800 | 1 | 1 | 0 | 0 |
| 11/12/2017 | 2018 | 692 | 891 | 1 | 1 | 0 | 631 | 800 | 1 | 1 | 0 | 0 |
| 11/13/2017 | 2018 | 928 | 900 | 1 | 1 | 0 | 831 | 809 | 1 | 1 | 0 | 0 |

STB_AR1_001716

| 11/14/2017 | 2018 | 1,187 | 928 | 1 | 1 | 0 | 1,053 | 827 | 1 | 1 | 0 | 0 |
| 11/15/2017 | 2018 | 989 | 928 | 1 | 1 | 0 | 881 | 825 | 1 | 1 | 0 | 0 |
| 11/16/2017 | 2018 | 1,014 | 958 | 1 | 1 | 0 | 870 | 848 | 1 | 1 | 0 | 0 |
| 11/17/2017 | 2018 | 873 | 932 | 1 | 1 | 0 | 783 | 827 | 1 | 1 | 0 | 0 |
| 11/18/2017 | 2018 | 1,020 | 958 | 1 | 1 | 0 | 916 | 852 | 1 | 1 | 0 | 0 |
| 11/19/2017 | 2018 | 973 | 998 | 1 | 1 | 0 | 863 | 885 | 1 | 1 | 0 | 0 |
| 11/20/2017 | 2018 | 1,088 | 1,021 | 1 | 1 | 0 | 961 | 904 | 1 | 1 | 0 | 0 |
| 11/21/2017 | 2018 | 916 | 982 | 1 | 1 | 0 | 825 | 871 | 1 | 1 | 0 | 0 |
| 11/22/2017 | 2018 | 993 | 982 | 1 | 1 | 0 | 886 | 872 | 1 | 1 | 0 | 0 |
| 11/23/2017 | 2018 | 1,043 | 987 | 1 | 1 | 0 | 930 | 881 | 1 | 1 | 0 | 0 |
| 11/24/2017 | 2018 | 1,155 | 1,027 | 1 | 1 | 0 | 1,023 | 915 | 1 | 1 | 0 | 0 |
| 11/25/2017 | 2018 | 1,075 | 1,035 | 1 | 1 | 0 | 959 | 921 | 1 | 1 | 0 | 0 |
| 11/26/2017 | 2018 | 870 | 1,020 | 1 | 1 | 0 | 785 | 910 | 1 | 1 | 0 | 0 |
| 11/27/2017 | 2018 | 985 | 1,005 | 1 | 1 | 0 | 867 | 896 | 1 | 1 | 0 | 0 |
| 11/28/2017 | 2018 | 1,131 | 1,036 | 1 | 1 | 0 | 1,005 | 922 | 1 | 1 | 0 | 0 |
| 11/29/2017 | 2018 | 1,116 | 1,054 | 1 | 1 | 0 | 985 | 936 | 1 | 1 | 0 | 0 |
| 11/30/2017 | 2018 | 1,069 | 1,057 | 1 | 1 | 0 | 956 | 940 | 1 | 1 | 0 | 0 |
| 12/1/2017 | 2018 | 1,117 | 1,052 | 1 | 1 | 0 | 999 | 937 | 1 | 1 | 0 | 0 |
| 12/2/2017 | 2018 | 915 | 1,029 | 1 | 1 | 0 | 826 | 918 | 1 | 1 | 0 | 0 |
| 12/3/2017 | 2018 | 901 | 1,033 | 1 | 1 | 0 | 803 | 920 | 1 | 1 | 0 | 0 |
| 12/4/2017 | 2018 | 910 | 1,023 | 1 | 1 | 0 | 828 | 915 | 1 | 1 | 0 | 0 |
| 12/5/2017 | 2018 | 1,135 | 1,023 | 1 | 1 | 0 | 991 | 913 | 1 | 1 | 0 | 0 |
| 12/6/2017 | 2018 | 916 | 995 | 1 | 1 | 0 | 804 | 887 | 1 | 1 | 0 | 0 |
| 12/7/2017 | 2018 | 1,014 | 987 | 1 | 1 | 0 | 892 | 878 | 1 | 1 | 0 | 0 |
| 12/8/2017 | 2018 | 1,016 | 972 | 1 | 1 | 0 | 863 | 858 | 1 | 1 | 0 | 0 |
| 12/9/2017 | 2018 | 1,011 | 986 | 1 | 1 | 0 | 873 | 865 | 1 | 1 | 0 | 0 |
| 12/10/2017 | 2018 | 865 | 981 | 1 | 1 | 0 | 737 | 855 | 1 | 1 | 0 | 0 |
| 12/11/2017 | 2018 | 952 | 987 | 1 | 1 | 0 | 841 | 857 | 1 | 1 | 0 | 0 |
| 12/12/2017 | 2018 | 1,105 | 983 | 1 | 1 | 0 | 983 | 856 | 1 | 1 | 0 | 0 |
| 12/13/2017 | 2018 | 1,247 | 1,030 | 1 | 1 | 0 | 1,076 | 895 | 1 | 1 | 0 | 0 |
| 12/14/2017 | 2018 | 1,163 | 1,051 | 1 | 1 | 0 | 1,013 | 912 | 1 | 1 | 0 | 0 |
| 12/15/2017 | 2018 | 1,049 | 1,056 | 1 | 1 | 0 | 945 | 924 | 1 | 1 | 0 | 0 |
| 12/16/2017 | 2018 | 993 | 1,053 | 1 | 1 | 0 | 848 | 920 | 1 | 1 | 0 | 0 |
| 12/17/2017 | 2018 | 951 | 1,066 | 1 | 1 | 0 | 852 | 937 | 1 | 1 | 0 | 0 |
| 12/18/2017 | 2018 | 1,086 | 1,085 | 1 | 1 | 0 | 968 | 955 | 1 | 1 | 0 | 0 |
| 12/19/2017 | 2018 | 975 | 1,066 | 1 | 1 | 0 | 856 | 937 | 1 | 1 | 0 | 0 |
| 12/20/2017 | 2018 | 1,052 | 1,038 | 1 | 1 | 0 | 897 | 911 | 1 | 1 | 0 | 0 |
| 12/21/2017 | 2018 | 937 | 1,006 | 1 | 1 | 0 | 833 | 886 | 1 | 1 | 0 | 0 |
| 12/22/2017 | 2018 | 1,007 | 1,000 | 1 | 1 | 0 | 896 | 879 | 1 | 1 | 0 | 0 |
| 12/23/2017 | 2018 | 1,017 | 1,004 | 1 | 1 | 0 | 896 | 885 | 1 | 1 | 0 | 0 |
| 12/24/2017 | 2018 | 839 | 988 | 1 | 1 | 0 | 715 | 866 | 1 | 1 | 0 | 0 |
| 12/25/2017 | 2018 | 496 | 903 | 1 | 1 | 0 | 441 | 791 | 1 | 1 | 0 | 0 |
| 12/26/2017 | 2018 | 642 | 856 | 1 | 1 | 0 | 591 | 753 | 1 | 1 | 0 | 0 |
| 12/27/2017 | 2018 | 876 | 831 | 1 | 1 | 0 | 788 | 737 | 1 | 1 | 0 | 0 |
| 12/28/2017 | 2018 | 740 | 802 | 1 | 1 | 0 | 669 | 714 | 1 | 1 | 0 | 0 |
| 12/29/2017 | 2018 | 669 | 754 | 1 | 1 | 0 | 609 | 673 | 1 | 1 | 0 | 0 |
| 12/30/2017 | 2018 | 776 | 720 | 1 | 1 | 0 | 703 | 645 | 1 | 1 | 0 | 0 |

STB_AR1_001717

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/31/2017 | 2018 | 623 | 689 | 1 | 1 | 0 | 577 | 625 | 1 | 1 | 0 | 0 |
| 1/1/2018 | 2018 | 302 | 661 | 1 | 1 | 0 | 294 | 604 | 1 | 1 | 0 | 0 |
| 1/2/2018 | 2018 | 389 | 625 | 1 | 1 | 0 | 366 | 572 | 1 | 1 | 0 | 0 |
| 1/3/2018 | 2018 | 636 | 591 | 1 | 1 | 0 | 588 | 544 | 1 | 1 | 0 | 0 |
| 1/4/2018 | 2018 | 569 | 566 | 1 | 1 | 0 | 545 | 526 | 1 | 1 | 0 | 0 |
| 1/5/2018 | 2018 | 645 | 563 | 1 | 1 | 0 | 617 | 527 | 1 | 1 | 0 | 0 |
| 1/6/2018 | 2018 | 622 | 541 | 1 | 1 | 0 | 588 | 511 | 1 | 1 | 0 | 0 |
| 1/7/2018 | 2018 | 457 | 517 | 1 | 1 | 0 | 438 | 491 | 1 | 1 | 0 | 0 |
| 1/8/2018 | 2018 | 717 | 576 | 1 | 1 | 0 | 631 | 539 | 1 | 1 | 0 | 0 |
| 1/9/2018 | 2018 | 633 | 611 | 1 | 1 | 0 | 596 | 572 | 1 | 1 | 0 | 0 |
| 1/10/2018 | 2018 | 742 | 626 | 1 | 1 | 0 | 684 | 586 | 1 | 1 | 0 | 0 |
| 1/11/2018 | 2018 | 807 | 660 | 1 | 1 | 0 | 726 | 611 | 1 | 1 | 0 | 0 |
| 1/12/2018 | 2018 | 1,166 | 735 | 1 | 1 | 0 | 1,010 | 668 | 1 | 1 | 0 | 0 |
| 1/13/2018 | 2018 | 870 | 770 | 1 | 1 | 0 | 784 | 696 | 1 | 1 | 0 | 0 |
| 1/14/2018 | 2018 | 768 | 815 | 1 | 1 | 0 | 698 | 733 | 1 | 1 | 0 | 0 |
| 1/15/2018 | 2018 | 973 | 851 | 1 | 1 | 0 | 867 | 766 | 1 | 1 | 0 | 0 |
| 1/16/2018 | 2018 | 743 | 867 | 1 | 1 | 0 | 640 | 773 | 1 | 1 | 0 | 0 |
| 1/17/2018 | 2018 | 942 | 896 | 1 | 1 | 0 | 833 | 794 | 1 | 1 | 0 | 0 |
| 1/18/2018 | 2018 | 1,099 | 937 | 1 | 1 | 0 | 970 | 829 | 1 | 1 | 0 | 0 |
| 1/19/2018 | 2018 | 1,022 | 917 | 1 | 1 | 0 | 939 | 819 | 1 | 1 | 0 | 0 |
| 1/20/2018 | 2018 | 1,014 | 937 | 1 | 1 | 0 | 915 | 837 | 1 | 1 | 0 | 0 |
| 1/21/2018 | 2018 | 850 | 949 | 1 | 1 | 0 | 765 | 847 | 1 | 1 | 0 | 0 |
| 1/22/2018 | 2018 | 951 | 946 | 1 | 1 | 0 | 856 | 845 | 1 | 1 | 0 | 0 |
| 1/23/2018 | 2018 | 1,071 | 993 | 1 | 1 | 0 | 962 | 891 | 1 | 1 | 0 | 0 |
| 1/24/2018 | 2018 | 970 | 997 | 1 | 1 | 0 | 901 | 901 | 1 | 1 | 0 | 0 |
| 1/25/2018 | 2018 | 1,122 | 1,000 | 1 | 1 | 0 | 1,024 | 909 | 1 | 1 | 0 | 0 |
| 1/26/2018 | 2018 | 992 | 996 | 1 | 1 | 0 | 896 | 903 | 1 | 1 | 0 | 0 |
| 1/27/2018 | 2018 | 1,049 | 1,001 | 1 | 1 | 0 | 947 | 907 | 1 | 1 | 0 | 0 |
| 1/28/2018 | 2018 | 872 | 1,004 | 1 | 1 | 0 | 779 | 909 | 1 | 1 | 0 | 0 |
| 1/29/2018 | 2018 | 1,023 | 1,014 | 1 | 1 | 0 | 939 | 921 | 1 | 1 | 0 | 0 |
| 1/30/2018 | 2018 | 1,012 | 1,006 | 1 | 1 | 0 | 940 | 918 | 1 | 1 | 0 | 0 |
| 1/31/2018 | 2018 | 947 | 1,002 | 1 | 1 | 0 | 879 | 915 | 1 | 1 | 0 | 0 |
| 2/1/2018 | 2018 | 943 | 977 | 1 | 1 | 0 | 874 | 893 | 1 | 1 | 0 | 0 |
| 2/2/2018 | 2018 | 994 | 977 | 1 | 1 | 0 | 890 | 893 | 1 | 1 | 0 | 0 |
| 2/3/2018 | 2018 | 1,089 | 983 | 1 | 1 | 0 | 964 | 895 | 1 | 1 | 0 | 0 |
| 2/4/2018 | 2018 | 797 | 972 | 1 | 1 | 0 | 730 | 888 | 1 | 1 | 0 | 0 |
| 2/5/2018 | 2018 | 1,051 | 976 | 1 | 1 | 0 | 943 | 889 | 1 | 1 | 0 | 0 |
| 2/6/2018 | 2018 | 971 | 970 | 1 | 1 | 0 | 904 | 883 | 1 | 1 | 0 | 0 |
| 2/7/2018 | 2018 | 1,005 | 979 | 1 | 1 | 0 | 934 | 891 | 1 | 1 | 0 | 0 |
| 2/8/2018 | 2018 | 782 | 956 | 1 | 1 | 0 | 707 | 867 | 1 | 1 | 0 | 0 |
| 2/9/2018 | 2018 | 814 | 930 | 1 | 1 | 0 | 758 | 849 | 1 | 1 | 0 | 0 |
| 2/10/2018 | 2018 | 884 | 901 | 1 | 1 | 0 | 798 | 825 | 1 | 1 | 0 | 0 |
| 2/11/2018 | 2018 | 814 | 903 | 1 | 1 | 0 | 753 | 828 | 1 | 1 | 0 | 0 |
| 2/12/2018 | 2018 | 920 | 884 | 1 | 1 | 0 | 850 | 815 | 1 | 1 | 0 | 0 |
| 2/13/2018 | 2018 | 989 | 887 | 1 | 1 | 0 | 893 | 813 | 1 | 1 | 0 | 0 |
| 2/14/2018 | 2018 | 1,007 | 887 | 1 | 1 | 0 | 926 | 812 | 1 | 1 | 0 | 0 |
| 2/15/2018 | 2018 | 799 | 890 | 1 | 1 | 0 | 729 | 815 | 1 | 1 | 0 | 0 |

STB_AR1_001718

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/16/2018 | 2018 | 838 | 893 | 1 | 1 | 0 | 788 | 820 | 1 | 1 | 0 | 0 |
| 2/17/2018 | 2018 | 839 | 887 | 1 | 1 | 0 | 787 | 818 | 1 | 1 | 0 | 0 |
| 2/18/2018 | 2018 | 733 | 875 | 1 | 1 | 0 | 673 | 807 | 1 | 1 | 0 | 0 |
| 2/19/2018 | 2018 | 1,056 | 894 | 1 | 1 | 0 | 956 | 822 | 1 | 1 | 0 | 0 |
| 2/20/2018 | 2018 | 1,050 | 903 | 1 | 1 | 0 | 954 | 830 | 1 | 1 | 0 | 0 |
| 2/21/2018 | 2018 | 1,020 | 905 | 1 | 1 | 0 | 925 | 830 | 1 | 1 | 0 | 0 |
| 2/22/2018 | 2018 | 1,177 | 959 | 1 | 1 | 0 | 1,052 | 876 | 1 | 1 | 0 | 0 |
| 2/23/2018 | 2018 | 973 | 978 | 1 | 1 | 0 | 895 | 892 | 1 | 1 | 0 | 0 |
| 2/24/2018 | 2018 | 797 | 972 | 1 | 1 | 0 | 747 | 886 | 1 | 1 | 0 | 0 |
| 2/25/2018 | 2018 | 859 | 990 | 1 | 1 | 0 | 789 | 903 | 1 | 1 | 0 | 0 |
| 2/26/2018 | 2018 | 1,178 | 1,008 | 1 | 1 | 0 | 1,088 | 921 | 1 | 1 | 0 | 0 |
| 2/27/2018 | 2018 | 1,224 | 1,033 | 1 | 1 | 0 | 1,119 | 945 | 1 | 1 | 0 | 0 |
| 2/28/2018 | 2018 | 1,063 | 1,039 | 1 | 1 | 0 | 989 | 954 | 1 | 1 | 0 | 0 |
| 3/1/2018 | 2018 | 1,185 | 1,040 | 1 | 1 | 0 | 1,107 | 962 | 1 | 1 | 0 | 0 |
| 3/2/2018 | 2018 | 1,294 | 1,086 | 1 | 1 | 0 | 1,212 | 1,007 | 1 | 1 | 0 | 0 |
| 3/3/2018 | 2018 | 1,057 | 1,123 | 1 | 1 | 0 | 990 | 1,042 | 1 | 1 | 0 | 0 |
| 3/4/2018 | 2018 | 1,023 | 1,146 | 1 | 1 | 0 | 952 | 1,065 | 1 | 1 | 0 | 0 |
| 3/5/2018 | 2018 | 1,069 | 1,131 | 1 | 1 | 0 | 988 | 1,051 | 1 | 1 | 0 | 0 |
| 3/6/2018 | 2018 | 1,130 | 1,117 | 1 | 1 | 0 | 1,015 | 1,036 | 1 | 1 | 0 | 0 |
| 3/7/2018 | 2018 | 1,272 | 1,147 | 1 | 1 | 0 | 1,182 | 1,064 | 1 | 1 | 0 | 0 |
| 3/8/2018 | 2018 | 1,209 | 1,151 | 1 | 1 | 0 | 1,124 | 1,066 | 1 | 1 | 0 | 0 |
| 3/9/2018 | 2018 | 1,103 | 1,123 | 1 | 1 | 0 | 1,023 | 1,039 | 1 | 1 | 0 | 0 |
| 3/10/2018 | 2018 | 1,268 | 1,153 | 1 | 1 | 0 | 1,151 | 1,062 | 1 | 1 | 0 | 0 |
| 3/11/2018 | 2018 | 1,161 | 1,173 | 1 | 1 | 0 | 1,026 | 1,073 | 1 | 1 | 0 | 0 |
| 3/12/2018 | 2018 | 1,298 | 1,206 | 1 | 1 | 0 | 1,202 | 1,103 | 1 | 1 | 0 | 0 |
| 3/13/2018 | 2018 | 1,275 | 1,227 | 1 | 1 | 0 | 1,178 | 1,127 | 1 | 1 | 0 | 0 |
| 3/14/2018 | 2018 | 1,250 | 1,223 | 1 | 1 | 0 | 1,153 | 1,122 | 1 | 1 | 0 | 0 |
| 3/15/2018 | 2018 | 1,170 | 1,218 | 1 | 1 | 0 | 1,094 | 1,118 | 1 | 1 | 0 | 0 |
| 3/16/2018 | 2018 | 1,055 | 1,211 | 1 | 1 | 0 | 956 | 1,109 | 1 | 1 | 0 | 0 |
| 3/17/2018 | 2018 | 983 | 1,170 | 1 | 1 | 0 | 906 | 1,074 | 1 | 1 | 0 | 0 |
| 3/18/2018 | 2018 | 1,015 | 1,149 | 1 | 1 | 0 | 933 | 1,060 | 1 | 1 | 0 | 0 |
| 3/19/2018 | 2018 | 1,292 | 1,149 | 1 | 1 | 0 | 1,186 | 1,058 | 1 | 1 | 0 | 0 |
| 3/20/2018 | 2018 | 1,431 | 1,171 | 1 | 1 | 0 | 1,331 | 1,080 | 1 | 1 | 0 | 0 |
| 3/21/2018 | 2018 | 1,401 | 1,192 | 1 | 1 | 0 | 1,292 | 1,100 | 1 | 1 | 0 | 0 |
| 3/22/2018 | 2018 | 1,159 | 1,191 | 1 | 1 | 0 | 1,080 | 1,098 | 1 | 1 | 0 | 0 |
| 3/23/2018 | 2018 | 1,063 | 1,192 | 1 | 1 | 0 | 981 | 1,101 | 1 | 1 | 0 | 0 |
| 3/24/2018 | 2018 | 1,215 | 1,225 | 1 | 1 | 0 | 1,120 | 1,132 | 1 | 1 | 0 | 0 |
| 3/25/2018 | 2018 | 1,046 | 1,230 | 1 | 1 | 0 | 926 | 1,131 | 1 | 1 | 0 | 0 |
| 3/26/2018 | 2018 | 1,526 | 1,263 | 1 | 1 | 0 | 1,380 | 1,159 | 1 | 1 | 0 | 0 |
| 3/27/2018 | 2018 | 1,549 | 1,280 | 1 | 1 | 0 | 1,396 | 1,168 | 1 | 1 | 0 | 0 |
| 3/28/2018 | 2018 | 1,313 | 1,267 | 1 | 1 | 0 | 1,185 | 1,153 | 1 | 1 | 0 | 0 |
| 3/29/2018 | 2018 | 1,366 | 1,297 | 1 | 1 | 0 | 1,227 | 1,174 | 1 | 1 | 0 | 0 |
| 3/30/2018 | 2018 | 1,292 | 1,330 | 1 | 1 | 0 | 1,188 | 1,203 | 1 | 1 | 0 | 0 |
| 3/31/2018 | 2018 | 920 | 1,287 | 1 | 1 | 0 | 829 | 1,162 | 1 | 1 | 0 | 0 |
| 4/1/2018 | 2018 | 794 | 1,251 | 1 | 1 | 0 | 741 | 1,135 | 1 | 1 | 0 | 0 |
| 4/2/2018 | 2018 | 832 | 1,152 | 1 | 1 | 0 | 765 | 1,047 | 1 | 1 | 0 | 0 |
| 4/3/2018 | 2018 | 1,329 | 1,121 | 1 | 1 | 0 | 1,223 | 1,023 | 1 | 1 | 0 | 0 |

STB_AR1_001719

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/4/2018 | 2018 | 1,041 | 1,082 | 1 | 1 | 0 | 947 | 989 | 1 | 1 | 0 | 0 |
| 4/5/2018 | 2018 | 1,140 | 1,050 | 1 | 1 | 0 | 1,075 | 967 | 1 | 1 | 0 | 0 |
| 4/6/2018 | 2018 | 1,256 | 1,045 | 1 | 1 | 0 | 1,165 | 964 | 1 | 1 | 0 | 0 |
| 4/7/2018 | 2018 | 1,299 | 1,099 | 1 | 1 | 0 | 1,192 | 1,015 | 1 | 1 | 0 | 0 |
| 4/8/2018 | 2018 | 1,064 | 1,137 | 1 | 1 | 0 | 974 | 1,049 | 1 | 1 | 0 | 0 |
| 4/9/2018 | 2018 | 1,218 | 1,192 | 1 | 1 | 0 | 1,133 | 1,101 | 1 | 1 | 0 | 0 |
| 4/10/2018 | 2018 | 1,352 | 1,196 | 1 | 1 | 0 | 1,243 | 1,104 | 1 | 1 | 0 | 0 |
| 4/11/2018 | 2018 | 1,379 | 1,244 | 1 | 1 | 0 | 1,267 | 1,150 | 1 | 1 | 0 | 0 |
| 4/12/2018 | 2018 | 1,460 | 1,290 | 1 | 1 | 0 | 1,334 | 1,187 | 1 | 1 | 0 | 0 |
| 4/13/2018 | 2018 | 1,121 | 1,270 | 1 | 1 | 0 | 1,025 | 1,167 | 1 | 1 | 0 | 0 |
| 4/14/2018 | 2018 | 1,376 | 1,281 | 1 | 1 | 0 | 1,230 | 1,172 | 1 | 1 | 0 | 0 |
| 4/15/2018 | 2018 | 1,167 | 1,296 | 1 | 1 | 0 | 1,056 | 1,184 | 1 | 1 | 0 | 0 |
| 4/16/2018 | 2018 | 1,206 | 1,294 | 1 | 1 | 0 | 1,113 | 1,181 | 1 | 1 | 0 | 0 |
| 4/17/2018 | 2018 | 1,597 | 1,329 | 1 | 1 | 0 | 1,437 | 1,209 | 1 | 1 | 0 | 0 |
| 4/18/2018 | 2018 | 1,615 | 1,363 | 1 | 1 | 0 | 1,452 | 1,235 | 1 | 1 | 0 | 0 |
| 4/19/2018 | 2018 | 1,610 | 1,385 | 1 | 1 | 0 | 1,467 | 1,254 | 1 | 1 | 0 | 0 |
| 4/20/2018 | 2018 | 1,311 | 1,412 | 1 | 1 | 0 | 1,196 | 1,279 | 1 | 1 | 0 | 0 |
| 4/21/2018 | 2018 | 1,373 | 1,411 | 1 | 1 | 0 | 1,247 | 1,281 | 1 | 1 | 0 | 0 |
| 4/22/2018 | 2018 | 1,032 | 1,392 | 1 | 1 | 0 | 942 | 1,265 | 1 | 1 | 0 | 0 |
| 4/23/2018 | 2018 | 1,245 | 1,398 | 1 | 1 | 0 | 1,142 | 1,269 | 1 | 1 | 0 | 0 |
| 4/24/2018 | 2018 | 1,529 | 1,388 | 1 | 1 | 0 | 1,383 | 1,261 | 1 | 1 | 0 | 0 |
| 4/25/2018 | 2018 | 1,317 | 1,345 | 1 | 1 | 0 | 1,199 | 1,225 | 1 | 1 | 0 | 0 |
| 4/26/2018 | 2018 | 1,442 | 1,321 | 1 | 1 | 0 | 1,328 | 1,205 | 1 | 1 | 0 | 0 |
| 4/27/2018 | 2018 | 1,323 | 1,323 | 1 | 1 | 0 | 1,205 | 1,207 | 1 | 1 | 0 | 0 |
| 4/28/2018 | 2018 | 1,245 | 1,305 | 1 | 1 | 0 | 1,150 | 1,193 | 1 | 1 | 0 | 0 |
| 4/29/2018 | 2018 | 1,064 | 1,309 | 1 | 1 | 0 | 956 | 1,195 | 1 | 1 | 0 | 0 |
| 4/30/2018 | 2018 | 1,506 | 1,347 | 1 | 1 | 0 | 1,326 | 1,221 | 1 | 1 | 0 | 0 |
| 5/1/2018 | 2018 | 1,357 | 1,322 | 1 | 1 | 0 | 1,239 | 1,200 | 1 | 1 | 0 | 0 |
| 5/2/2018 | 2018 | 1,336 | 1,325 | 1 | 1 | 0 | 1,182 | 1,198 | 1 | 1 | 0 | 0 |
| 5/3/2018 | 2018 | 1,304 | 1,305 | 1 | 1 | 0 | 1,203 | 1,180 | 1 | 1 | 0 | 0 |
| 5/4/2018 | 2018 | 1,093 | 1,272 | 1 | 1 | 0 | 1,005 | 1,152 | 1 | 1 | 0 | 0 |
| 5/5/2018 | 2018 | 1,338 | 1,285 | 1 | 1 | 0 | 1,191 | 1,157 | 1 | 1 | 0 | 0 |
| 5/6/2018 | 2018 | 1,081 | 1,288 | 1 | 1 | 0 | 963 | 1,158 | 1 | 1 | 0 | 0 |
| 5/7/2018 | 2018 | 1,290 | 1,257 | 1 | 1 | 0 | 1,152 | 1,134 | 1 | 1 | 0 | 0 |
| 5/8/2018 | 2018 | 1,543 | 1,284 | 1 | 1 | 0 | 1,316 | 1,145 | 1 | 1 | 0 | 0 |
| 5/9/2018 | 2018 | 1,503 | 1,307 | 1 | 1 | 0 | 1,309 | 1,163 | 1 | 1 | 0 | 0 |
| 5/10/2018 | 2018 | 1,269 | 1,302 | 1 | 1 | 0 | 1,101 | 1,148 | 1 | 1 | 0 | 0 |
| 5/11/2018 | 2018 | 1,120 | 1,306 | 1 | 1 | 0 | 970 | 1,143 | 1 | 1 | 0 | 0 |
| 5/12/2018 | 2018 | 1,184 | 1,284 | 1 | 1 | 0 | 1,004 | 1,116 | 1 | 1 | 0 | 0 |
| 5/13/2018 | 2018 | 1,207 | 1,302 | 1 | 1 | 0 | 1,076 | 1,133 | 1 | 1 | 0 | 0 |
| 5/14/2018 | 2018 | 1,354 | 1,311 | 1 | 1 | 0 | 1,150 | 1,132 | 1 | 1 | 0 | 0 |
| 5/15/2018 | 2018 | 1,190 | 1,261 | 1 | 1 | 0 | 1,050 | 1,094 | 1 | 1 | 0 | 0 |
| 5/16/2018 | 2018 | 1,271 | 1,228 | 1 | 1 | 0 | 1,105 | 1,065 | 1 | 1 | 0 | 0 |
| 5/17/2018 | 2018 | 1,388 | 1,245 | 1 | 1 | 0 | 1,173 | 1,075 | 1 | 1 | 0 | 0 |
| 5/18/2018 | 2018 | 1,563 | 1,308 | 1 | 1 | 0 | 1,261 | 1,117 | 1 | 1 | 0 | 0 |
| 5/19/2018 | 2018 | 1,122 | 1,299 | 1 | 1 | 0 | 927 | 1,106 | 1 | 1 | 0 | 0 |
| 5/20/2018 | 2018 | 940 | 1,261 | 1 | 1 | 0 | 799 | 1,066 | 1 | 1 | 0 | 0 |

STB_AR1_001720

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/21/2018 | 2018 | 1,287 | 1,252 | 1 | 1 | 0 | 1,067 | 1,055 | 1 | 1 | 0 | 0 |
| 5/22/2018 | 2018 | 1,328 | 1,271 | 1 | 1 | 0 | 1,129 | 1,066 | 1 | 1 | 0 | 0 |
| 5/23/2018 | 2018 | 1,573 | 1,314 | 1 | 1 | 0 | 1,310 | 1,095 | 1 | 1 | 0 | 0 |
| 5/24/2018 | 2018 | 1,383 | 1,314 | 1 | 1 | 0 | 1,187 | 1,097 | 1 | 1 | 0 | 0 |
| 5/25/2018 | 2018 | 1,560 | 1,313 | 1 | 1 | 0 | 1,305 | 1,103 | 1 | 1 | 0 | 0 |
| 5/26/2018 | 2018 | 1,360 | 1,347 | 1 | 1 | 0 | 1,120 | 1,131 | 1 | 1 | 0 | 0 |
| 5/27/2018 | 2018 | 1,102 | 1,370 | 1 | 1 | 0 | 959 | 1,154 | 1 | 1 | 0 | 0 |
| 5/28/2018 | 2018 | 1,193 | 1,357 | 1 | 1 | 0 | 1,059 | 1,153 | 1 | 1 | 0 | 0 |
| 5/29/2018 | 2018 | 1,386 | 1,365 | 1 | 1 | 0 | 1,161 | 1,157 | 1 | 1 | 0 | 0 |
| 5/30/2018 | 2018 | 1,335 | 1,331 | 1 | 1 | 0 | 1,116 | 1,130 | 1 | 1 | 0 | 0 |
| 5/31/2018 | 2018 | 1,379 | 1,331 | 1 | 1 | 0 | 1,220 | 1,134 | 1 | 1 | 0 | 0 |
| 6/1/2018 | 2018 | 1,290 | 1,292 | 1 | 1 | 0 | 1,073 | 1,101 | 1 | 1 | 0 | 0 |
| 6/2/2018 | 2018 | 1,293 | 1,283 | 1 | 1 | 0 | 1,091 | 1,097 | 1 | 1 | 0 | 0 |
| 6/3/2018 | 2018 | 1,115 | 1,284 | 1 | 1 | 0 | 993 | 1,102 | 1 | 1 | 0 | 0 |
| 6/4/2018 | 2018 | 1,162 | 1,280 | 1 | 1 | 0 | 1,008 | 1,095 | 1 | 1 | 0 | 0 |
| 6/5/2018 | 2018 | 1,468 | 1,292 | 1 | 1 | 0 | 1,258 | 1,108 | 1 | 1 | 0 | 0 |
| 6/6/2018 | 2018 | 1,175 | 1,269 | 1 | 1 | 0 | 1,038 | 1,097 | 1 | 1 | 0 | 0 |
| 6/7/2018 | 2018 | 1,204 | 1,244 | 1 | 1 | 0 | 1,056 | 1,074 | 1 | 1 | 0 | 0 |
| 6/8/2018 | 2018 | 1,220 | 1,234 | 1 | 1 | 0 | 1,042 | 1,069 | 1 | 1 | 0 | 0 |
| 6/9/2018 | 2018 | 955 | 1,186 | 1 | 1 | 0 | 827 | 1,032 | 1 | 1 | 0 | 0 |
| 6/10/2018 | 2018 | 1,061 | 1,178 | 1 | 1 | 0 | 922 | 1,022 | 1 | 1 | 0 | 0 |
| 6/11/2018 | 2018 | 1,372 | 1,208 | 1 | 1 | 0 | 1,171 | 1,045 | 1 | 1 | 0 | 0 |
| 6/12/2018 | 2018 | 1,438 | 1,204 | 1 | 1 | 0 | 1,206 | 1,037 | 1 | 1 | 0 | 0 |
| 6/13/2018 | 2018 | 1,351 | 1,229 | 1 | 1 | 0 | 1,162 | 1,055 | 1 | 1 | 0 | 0 |
| 6/14/2018 | 2018 | 1,220 | 1,231 | 1 | 1 | 0 | 1,061 | 1,056 | 1 | 1 | 0 | 0 |
| 6/15/2018 | 2018 | 1,218 | 1,231 | 1 | 1 | 0 | 1,027 | 1,054 | 1 | 1 | 0 | 0 |
| 6/16/2018 | 2018 | 1,010 | 1,239 | 1 | 1 | 0 | 864 | 1,059 | 1 | 1 | 0 | 0 |
| 6/17/2018 | 2018 | 851 | 1,209 | 1 | 1 | 0 | 704 | 1,028 | 1 | 1 | 0 | 0 |
| 6/18/2018 | 2018 | 1,034 | 1,160 | 1 | 1 | 0 | 907 | 990 | 1 | 1 | 0 | 0 |
| 6/19/2018 | 2018 | 1,330 | 1,145 | 1 | 1 | 0 | 1,172 | 985 | 1 | 1 | 0 | 0 |
| 6/20/2018 | 2018 | 1,119 | 1,112 | 1 | 1 | 0 | 1,008 | 963 | 1 | 1 | 0 | 0 |
| 6/21/2018 | 2018 | 977 | 1,077 | 1 | 1 | 0 | 879 | 937 | 1 | 1 | 0 | 0 |
| 6/22/2018 | 2018 | 912 | 1,033 | 1 | 1 | 0 | 796 | 904 | 1 | 1 | 0 | 0 |
| 6/23/2018 | 2018 | 748 | 996 | 1 | 1 | 0 | 648 | 873 | 1 | 1 | 0 | 0 |
| 6/24/2018 | 2018 | 884 | 1,001 | 1 | 1 | 0 | 800 | 887 | 1 | 1 | 0 | 0 |
| 6/25/2018 | 2018 | 1,051 | 1,003 | 1 | 1 | 0 | 924 | 890 | 1 | 1 | 0 | 0 |
| 6/26/2018 | 2018 | 1,036 | 961 | 1 | 1 | 0 | 932 | 855 | 1 | 1 | 0 | 0 |
| 6/27/2018 | 2018 | 1,299 | 987 | 1 | 1 | 0 | 1,168 | 878 | 1 | 1 | 0 | 0 |
| 6/28/2018 | 2018 | 1,376 | 1,044 | 1 | 1 | 0 | 1,226 | 928 | 1 | 1 | 0 | 0 |
| 6/29/2018 | 2018 | 1,039 | 1,062 | 1 | 1 | 0 | 955 | 950 | 1 | 1 | 0 | 0 |
| 6/30/2018 | 2018 | 881 | 1,081 | 1 | 1 | 0 | 777 | 969 | 1 | 1 | 0 | 0 |
| 7/1/2018 | 2018 | 885 | 1,081 | 1 | 1 | 0 | 772 | 965 | 1 | 1 | 0 | 0 |
| 7/2/2018 | 2018 | 745 | 1,037 | 1 | 1 | 0 | 674 | 929 | 1 | 1 | 0 | 0 |
| 7/3/2018 | 2018 | 1,003 | 1,033 | 1 | 1 | 0 | 896 | 924 | 1 | 1 | 0 | 0 |
| 7/4/2018 | 2018 | 1,140 | 1,010 | 1 | 1 | 0 | 1,016 | 902 | 1 | 1 | 0 | 0 |
| 7/5/2018 | 2018 | 1,088 | 969 | 1 | 1 | 0 | 1,002 | 870 | 1 | 1 | 0 | 0 |
| 7/6/2018 | 2018 | 975 | 960 | 1 | 1 | 0 | 880 | 860 | 1 | 1 | 0 | 0 |

STB_AR1_001721

| 7/7/2018 | 2018 | 870 | 958 | 1 | 1 | 0 | 767 | 858 | 1 | 1 | 0 | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/8/2018 | 2018 | 879 | 957 | 1 | 1 | 0 | 802 | 862 | 1 | 1 | 0 | 0 |
| 7/9/2018 | 2018 | 996 | 993 | 1 | 1 | 0 | 886 | 893 | 1 | 1 | 0 | 0 |
| 7/10/2018 | 2018 | 1,188 | 1,019 | 1 | 1 | 0 | 1,084 | 920 | 1 | 1 | 0 | 0 |
| 7/11/2018 | 2018 | 1,201 | 1,028 | 1 | 1 | 0 | 1,067 | 927 | 1 | 1 | 0 | 0 |
| 7/12/2018 | 2018 | 1,071 | 1,026 | 1 | 1 | 0 | 964 | 921 | 1 | 1 | 0 | 0 |
| 7/13/2018 | 2018 | 978 | 1,026 | 1 | 1 | 0 | 867 | 920 | 1 | 1 | 0 | 0 |
| 7/14/2018 | 2018 | 950 | 1,038 | 1 | 1 | 0 | 853 | 932 | 1 | 1 | 0 | 0 |
| 7/15/2018 | 2018 | 870 | 1,036 | 1 | 1 | 0 | 775 | 928 | 1 | 1 | 0 | 0 |
| 7/16/2018 | 2018 | 1,010 | 1,038 | 1 | 1 | 0 | 893 | 929 | 1 | 1 | 0 | 0 |
| 7/17/2018 | 2018 | 1,246 | 1,047 | 1 | 1 | 0 | 1,118 | 934 | 1 | 1 | 0 | 0 |
| 7/18/2018 | 2018 | 1,047 | 1,025 | 1 | 1 | 0 | 935 | 915 | 1 | 1 | 0 | 0 |
| 7/19/2018 | 2018 | 958 | 1,008 | 1 | 1 | 0 | 866 | 901 | 1 | 1 | 0 | 0 |
| 7/20/2018 | 2018 | 951 | 1,005 | 1 | 1 | 0 | 839 | 897 | 1 | 1 | 0 | 0 |
| 7/21/2018 | 2018 | 869 | 993 | 1 | 1 | 0 | 773 | 886 | 1 | 1 | 0 | 0 |
| 7/22/2018 | 2018 | 907 | 998 | 1 | 1 | 0 | 804 | 890 | 1 | 1 | 0 | 0 |
| 7/23/2018 | 2018 | 1,055 | 1,005 | 1 | 1 | 0 | 964 | 900 | 1 | 1 | 0 | 0 |
| 7/24/2018 | 2018 | 1,163 | 993 | 1 | 1 | 0 | 1,043 | 889 | 1 | 1 | 0 | 0 |
| 7/25/2018 | 2018 | 1,090 | 999 | 1 | 1 | 0 | 993 | 897 | 1 | 1 | 0 | 0 |
| 7/26/2018 | 2018 | 1,145 | 1,026 | 1 | 1 | 0 | 1,020 | 919 | 1 | 1 | 0 | 0 |
| 7/27/2018 | 2018 | 1,024 | 1,036 | 1 | 1 | 0 | 918 | 931 | 1 | 1 | 0 | 0 |
| 7/28/2018 | 2018 | 992 | 1,054 | 1 | 1 | 0 | 884 | 947 | 1 | 1 | 0 | 0 |
| 7/29/2018 | 2018 | 829 | 1,043 | 1 | 1 | 0 | 747 | 938 | 1 | 1 | 0 | 0 |
| 7/30/2018 | 2018 | 992 | 1,034 | 1 | 1 | 0 | 895 | 929 | 1 | 1 | 0 | 0 |
| 7/31/2018 | 2018 | 1,182 | 1,036 | 1 | 1 | 0 | 1,073 | 933 | 1 | 1 | 0 | 0 |
| 8/1/2018 | 2018 | 1,164 | 1,047 | 1 | 1 | 0 | 1,057 | 942 | 1 | 1 | 0 | 0 |
| 8/2/2018 | 2018 | 1,117 | 1,043 | 1 | 1 | 0 | 1,018 | 942 | 1 | 1 | 0 | 0 |
| 8/3/2018 | 2018 | 1,185 | 1,066 | 1 | 1 | 0 | 1,066 | 963 | 1 | 1 | 0 | 0 |
| 8/4/2018 | 2018 | 1,147 | 1,088 | 1 | 1 | 0 | 1,033 | 984 | 1 | 1 | 0 | 0 |
| 8/5/2018 | 2018 | 913 | 1,100 | 1 | 1 | 0 | 823 | 995 | 1 | 1 | 0 | 0 |
| 8/6/2018 | 2018 | 1,022 | 1,104 | 1 | 1 | 0 | 921 | 999 | 1 | 1 | 0 | 0 |
| 8/7/2018 | 2018 | 1,261 | 1,116 | 1 | 1 | 0 | 1,145 | 1,009 | 1 | 1 | 0 | 0 |
| 8/8/2018 | 2018 | 1,030 | 1,096 | 1 | 1 | 0 | 944 | 993 | 1 | 1 | 0 | 0 |
| 8/9/2018 | 2018 | 1,192 | 1,107 | 1 | 1 | 0 | 1,069 | 1,000 | 1 | 1 | 0 | 0 |
| 8/10/2018 | 2018 | 1,274 | 1,120 | 1 | 1 | 0 | 1,186 | 1,017 | 1 | 1 | 0 | 0 |
| 8/11/2018 | 2018 | 1,192 | 1,126 | 1 | 1 | 0 | 1,036 | 1,018 | 1 | 1 | 0 | 0 |
| 8/12/2018 | 2018 | 974 | 1,135 | 1 | 1 | 0 | 880 | 1,026 | 1 | 1 | 0 | 0 |
| 8/13/2018 | 2018 | 1,188 | 1,159 | 1 | 1 | 0 | 1,074 | 1,048 | 1 | 1 | 0 | 0 |
| 8/14/2018 | 2018 | 1,435 | 1,184 | 1 | 1 | 0 | 1,320 | 1,073 | 1 | 1 | 0 | 0 |
| 8/15/2018 | 2018 | 1,144 | 1,200 | 1 | 1 | 0 | 1,044 | 1,087 | 1 | 1 | 0 | 0 |
| 8/16/2018 | 2018 | 1,135 | 1,192 | 1 | 1 | 0 | 1,038 | 1,083 | 1 | 1 | 0 | 0 |
| 8/17/2018 | 2018 | 1,226 | 1,185 | 1 | 1 | 0 | 1,143 | 1,076 | 1 | 1 | 0 | 0 |
| 8/18/2018 | 2018 | 981 | 1,155 | 1 | 1 | 0 | 883 | 1,055 | 1 | 1 | 0 | 0 |
| 8/19/2018 | 2018 | 892 | 1,143 | 1 | 1 | 0 | 816 | 1,045 | 1 | 1 | 0 | 0 |
| 8/20/2018 | 2018 | 1,309 | 1,160 | 1 | 1 | 0 | 1,196 | 1,063 | 1 | 1 | 0 | 0 |
| 8/21/2018 | 2018 | 1,466 | 1,165 | 1 | 1 | 0 | 1,329 | 1,064 | 1 | 1 | 0 | 0 |
| 8/22/2018 | 2018 | 1,169 | 1,168 | 1 | 1 | 0 | 1,087 | 1,070 | 1 | 1 | 0 | 0 |

STB_AR1_001722

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/23/2018 | 2018 | 1,369 | 1,202 | 1 | 1 | 0 | 1,243 | 1,100 | 1 | 1 | 0 | 0 |
| 8/24/2018 | 2018 | 1,324 | 1,216 | 1 | 1 | 0 | 1,193 | 1,107 | 1 | 1 | 0 | 0 |
| 8/25/2018 | 2018 | 1,391 | 1,274 | 1 | 1 | 0 | 1,254 | 1,160 | 1 | 1 | 0 | 0 |
| 8/26/2018 | 2018 | 1,211 | 1,320 | 1 | 1 | 0 | 1,068 | 1,196 | 1 | 1 | 0 | 0 |
| 8/27/2018 | 2018 | 1,419 | 1,336 | 1 | 1 | 0 | 1,297 | 1,210 | 1 | 1 | 0 | 0 |
| 8/28/2018 | 2018 | 1,398 | 1,326 | 1 | 1 | 0 | 1,273 | 1,202 | 1 | 1 | 0 | 0 |
| 8/29/2018 | 2018 | 1,573 | 1,384 | 1 | 1 | 0 | 1,427 | 1,251 | 1 | 1 | 0 | 0 |
| 8/30/2018 | 2018 | 1,285 | 1,372 | 1 | 1 | 0 | 1,164 | 1,239 | 1 | 1 | 0 | 0 |
| 8/31/2018 | 2018 | 1,138 | 1,345 | 1 | 1 | 0 | 1,043 | 1,218 | 1 | 1 | 0 | 0 |
| 9/1/2018 | 2018 | 1,411 | 1,348 | 1 | 1 | 0 | 1,294 | 1,224 | 1 | 1 | 0 | 0 |
| 9/2/2018 | 2018 | 1,060 | 1,326 | 1 | 1 | 0 | 949 | 1,207 | 1 | 1 | 0 | 0 |
| 9/3/2018 | 2018 | 1,262 | 1,304 | 1 | 1 | 0 | 1,184 | 1,191 | 1 | 1 | 0 | 0 |
| 9/4/2018 | 2018 | 1,224 | 1,279 | 1 | 1 | 0 | 1,113 | 1,168 | 1 | 1 | 0 | 0 |
| 9/5/2018 | 2018 | 1,532 | 1,273 | 1 | 1 | 0 | 1,384 | 1,162 | 1 | 1 | 0 | 0 |
| 9/6/2018 | 2018 | 1,380 | 1,287 | 1 | 1 | 0 | 1,268 | 1,176 | 1 | 1 | 0 | 0 |
| 9/7/2018 | 2018 | 1,124 | 1,285 | 1 | 1 | 0 | 1,031 | 1,175 | 1 | 1 | 0 | 0 |
| 9/8/2018 | 2018 | 1,286 | 1,267 | 1 | 1 | 0 | 1,179 | 1,158 | 1 | 1 | 0 | 0 |
| 9/9/2018 | 2018 | 1,203 | 1,287 | 1 | 1 | 0 | 1,106 | 1,181 | 1 | 1 | 0 | 0 |
| 9/10/2018 | 2018 | 1,315 | 1,295 | 1 | 1 | 0 | 1,204 | 1,184 | 1 | 1 | 0 | 0 |
| 9/11/2018 | 2018 | 1,534 | 1,339 | 1 | 1 | 0 | 1,383 | 1,222 | 1 | 1 | 0 | 0 |
| 9/12/2018 | 2018 | 1,555 | 1,342 | 1 | 1 | 0 | 1,445 | 1,231 | 1 | 1 | 0 | 0 |
| 9/13/2018 | 2018 | 1,286 | 1,329 | 1 | 1 | 0 | 1,171 | 1,217 | 1 | 1 | 0 | 0 |
| 9/14/2018 | 2018 | 1,322 | 1,357 | 1 | 1 | 0 | 1,207 | 1,242 | 1 | 1 | 0 | 0 |
| 9/15/2018 | 2018 | 1,035 | 1,321 | 1 | 1 | 0 | 956 | 1,210 | 1 | 1 | 0 | 0 |
| 9/16/2018 | 2018 | 1,184 | 1,319 | 1 | 1 | 0 | 1,067 | 1,205 | 1 | 1 | 0 | 0 |
| 9/17/2018 | 2018 | 1,293 | 1,316 | 1 | 1 | 0 | 1,184 | 1,202 | 1 | 1 | 0 | 0 |
| 9/18/2018 | 2018 | 1,610 | 1,326 | 1 | 1 | 0 | 1,481 | 1,216 | 1 | 1 | 0 | 0 |
| 9/19/2018 | 2018 | 1,610 | 1,334 | 1 | 1 | 0 | 1,469 | 1,219 | 1 | 1 | 0 | 0 |
| 9/20/2018 | 2018 | 1,450 | 1,358 | 1 | 1 | 0 | 1,332 | 1,242 | 1 | 1 | 0 | 0 |
| 9/21/2018 | 2018 | 1,480 | 1,380 | 1 | 1 | 0 | 1,334 | 1,260 | 1 | 1 | 0 | 0 |
| 9/22/2018 | 2018 | 989 | 1,374 | 1 | 1 | 0 | 920 | 1,255 | 1 | 1 | 0 | 0 |
| 9/23/2018 | 2018 | 1,224 | 1,379 | 1 | 1 | 0 | 1,150 | 1,267 | 1 | 1 | 0 | 0 |
| 9/24/2018 | 2018 | 1,497 | 1,409 | 1 | 1 | 0 | 1,391 | 1,297 | 1 | 1 | 0 | 0 |
| 9/25/2018 | 2018 | 1,873 | 1,446 | 1 | 1 | 0 | 1,722 | 1,331 | 1 | 1 | 0 | 0 |
| 9/26/2018 | 2018 | 1,943 | 1,494 | 1 | 1 | 0 | 1,736 | 1,369 | 1 | 1 | 0 | 0 |
| 9/27/2018 | 2018 | 1,489 | 1,499 | 1 | 1 | 0 | 1,360 | 1,373 | 1 | 1 | 0 | 0 |
| 9/28/2018 | 2018 | 1,739 | 1,536 | 0 | 0 | 0 | 1,578 | 1,408 | 1 | 1 | 0 | 0 |
| 9/29/2018 | 2018 | 1,434 | 1,600 | 0 | 0 | 0 | 1,300 | 1,462 | 1 | 1 | 0 | 0 |
| 9/30/2018 | 2018 | 1,142 | 1,588 | 0 | 0 | 0 | 1,064 | 1,450 | 1 | 1 | 0 | 0 |
| 10/1/2018 | 2019 | 1,553 | 1,596 | 0 | 0 | 0 | 1,438 | 1,457 | 1 | 1 | 0 | 0 |
| 10/2/2018 | 2019 | 1,841 | 1,592 | 0 | 0 | 0 | 1,677 | 1,450 | 1 | 1 | 0 | 0 |
| 10/3/2018 | 2019 | 1,671 | 1,553 | 0 | 0 | 0 | 1,564 | 1,426 | 1 | 1 | 0 | 0 |
| 10/4/2018 | 2019 | 1,459 | 1,548 | 0 | 0 | 0 | 1,369 | 1,427 | 1 | 1 | 0 | 0 |
| 10/5/2018 | 2019 | 1,642 | 1,535 | 0 | 0 | 0 | 1,551 | 1,423 | 1 | 1 | 0 | 0 |
| 10/6/2018 | 2019 | 1,435 | 1,535 | 0 | 0 | 0 | 1,303 | 1,424 | 1 | 1 | 0 | 0 |
| 10/7/2018 | 2019 | 1,232 | 1,548 | 0 | 0 | 0 | 1,134 | 1,434 | 1 | 1 | 0 | 0 |
| 10/8/2018 | 2019 | 1,507 | 1,541 | 0 | 0 | 0 | 1,403 | 1,429 | 1 | 1 | 0 | 0 |

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/9/2018 | 2019 | 1,718 | 1,523 | 0 | 0 | 0 | 1,569 | 1,413 | 1 | 1 | 0 | 0 |
| 10/10/2018 | 2019 | 1,756 | 1,536 | 0 | 0 | 0 | 1,605 | 1,419 | 1 | 1 | 0 | 0 |
| 10/11/2018 | 2019 | 1,381 | 1,524 | 0 | 0 | 0 | 1,274 | 1,406 | 1 | 1 | 0 | 0 |
| 10/12/2018 | 2019 | 1,392 | 1,489 | 0 | 1 | 0 | 1,275 | 1,366 | 1 | 1 | 0 | 0 |
| 10/13/2018 | 2019 | 1,445 | 1,490 | 0 | 1 | 0 | 1,330 | 1,370 | 1 | 1 | 0 | 0 |
| 10/14/2018 | 2019 | 1,454 | 1,522 | 0 | 0 | 0 | 1,340 | 1,399 | 1 | 1 | 0 | 0 |
| 10/15/2018 | 2019 | 1,415 | 1,509 | 0 | 0 | 0 | 1,275 | 1,381 | 1 | 1 | 0 | 0 |
| 10/16/2018 | 2019 | 1,680 | 1,503 | 0 | 0 | 0 | 1,556 | 1,379 | 1 | 1 | 0 | 0 |
| 10/17/2018 | 2019 | 1,945 | 1,530 | 0 | 0 | 0 | 1,785 | 1,405 | 1 | 1 | 0 | 0 |
| 10/18/2018 | 2019 | 1,882 | 1,602 | 0 | 0 | 0 | 1,745 | 1,472 | 1 | 1 | 0 | 0 |
| 10/19/2018 | 2019 | 1,437 | 1,608 | 0 | 0 | 0 | 1,339 | 1,481 | 1 | 1 | 0 | 0 |
| 10/20/2018 | 2019 | 1,753 | 1,652 | 0 | 0 | 0 | 1,593 | 1,519 | 0 | 0 | 0 | 0 |
| 10/21/2018 | 2019 | 1,561 | 1,668 | 0 | 0 | 0 | 1,459 | 1,536 | 0 | 0 | 0 | 0 |
| 10/22/2018 | 2019 | 1,845 | 1,729 | 0 | 0 | 0 | 1,707 | 1,598 | 0 | 0 | 0 | 0 |
| 10/23/2018 | 2019 | 1,733 | 1,737 | 0 | 0 | 0 | 1,586 | 1,602 | 0 | 0 | 0 | 0 |
| 10/24/2018 | 2019 | 1,823 | 1,719 | 0 | 0 | 0 | 1,663 | 1,585 | 0 | 0 | 0 | 0 |
| 10/25/2018 | 2019 | 2,050 | 1,743 | 0 | 0 | 0 | 1,872 | 1,603 | 0 | 0 | 0 | 0 |
| 10/26/2018 | 2019 | 1,568 | 1,762 | 0 | 0 | 0 | 1,442 | 1,617 | 0 | 0 | 0 | 0 |
| 10/27/2018 | 2019 | 1,948 | 1,790 | 0 | 0 | 0 | 1,764 | 1,642 | 0 | 0 | 0 | 0 |
| 10/28/2018 | 2019 | 1,373 | 1,763 | 0 | 0 | 0 | 1,275 | 1,616 | 0 | 0 | 0 | 0 |
| 10/29/2018 | 2019 | 1,654 | 1,736 | 0 | 0 | 0 | 1,512 | 1,588 | 0 | 0 | 0 | 0 |
| 10/30/2018 | 2019 | 2,012 | 1,775 | 0 | 0 | 0 | 1,832 | 1,623 | 0 | 0 | 0 | 0 |
| 10/31/2018 | 2019 | 1,840 | 1,778 | 0 | 0 | 0 | 1,672 | 1,624 | 0 | 0 | 0 | 0 |
| 11/1/2018 | 2019 | 1,789 | 1,741 | 0 | 0 | 0 | 1,636 | 1,590 | 0 | 0 | 0 | 0 |
| 11/2/2018 | 2019 | 1,882 | 1,785 | 0 | 0 | 0 | 1,720 | 1,630 | 0 | 0 | 0 | 0 |
| 11/3/2018 | 2019 | 1,922 | 1,782 | 0 | 0 | 0 | 1,734 | 1,626 | 0 | 0 | 0 | 0 |
| 11/4/2018 | 2019 | 1,727 | 1,832 | 0 | 0 | 0 | 1,580 | 1,669 | 0 | 0 | 0 | 0 |
| 11/5/2018 | 2019 | 1,462 | 1,805 | 0 | 0 | 0 | 1,347 | 1,646 | 0 | 0 | 0 | 0 |
| 11/6/2018 | 2019 | 1,841 | 1,780 | 0 | 0 | 0 | 1,668 | 1,622 | 0 | 0 | 0 | 0 |
| 11/7/2018 | 2019 | 1,965 | 1,798 | 0 | 0 | 0 | 1,780 | 1,638 | 0 | 0 | 0 | 0 |
| 11/8/2018 | 2019 | 1,602 | 1,772 | 0 | 0 | 0 | 1,479 | 1,615 | 0 | 0 | 0 | 0 |
| 11/9/2018 | 2019 | 1,670 | 1,741 | 0 | 0 | 0 | 1,519 | 1,587 | 0 | 0 | 0 | 0 |
| 11/10/2018 | 2019 | 1,621 | 1,698 | 0 | 0 | 0 | 1,484 | 1,551 | 0 | 0 | 0 | 0 |
| 11/11/2018 | 2019 | 1,226 | 1,627 | 0 | 0 | 0 | 1,140 | 1,488 | 1 | 0 | 1 | 0 |
| 11/12/2018 | 2019 | 1,500 | 1,632 | 0 | 0 | 0 | 1,336 | 1,487 | 1 | 0 | 0 | 0 |
| 11/13/2018 | 2019 | 2,124 | 1,673 | 0 | 0 | 0 | 1,911 | 1,521 | 0 | 0 | 0 | 0 |
| 11/14/2018 | 2019 | 1,900 | 1,663 | 0 | 0 | 0 | 1,718 | 1,512 | 0 | 0 | 0 | 0 |
| 11/15/2018 | 2019 | 1,701 | 1,677 | 0 | 0 | 0 | 1,554 | 1,523 | 0 | 0 | 0 | 0 |
| 11/16/2018 | 2019 | 2,122 | 1,742 | 0 | 0 | 0 | 1,923 | 1,581 | 0 | 0 | 0 | 0 |
| 11/17/2018 | 2019 | 2,110 | 1,812 | 0 | 0 | 0 | 1,915 | 1,642 | 0 | 0 | 0 | 0 |
| 11/18/2018 | 2019 | 1,468 | 1,846 | 0 | 0 | 0 | 1,341 | 1,671 | 0 | 0 | 0 | 0 |
| 11/19/2018 | 2019 | 1,538 | 1,852 | 0 | 0 | 0 | 1,407 | 1,681 | 0 | 0 | 0 | 0 |
| 11/20/2018 | 2019 | 1,947 | 1,827 | 0 | 0 | 0 | 1,781 | 1,663 | 0 | 0 | 0 | 0 |
| 11/21/2018 | 2019 | 1,331 | 1,745 | 0 | 0 | 0 | 1,222 | 1,592 | 0 | 0 | 0 | 0 |
| 11/22/2018 | 2019 | 1,681 | 1,742 | 0 | 0 | 0 | 1,559 | 1,593 | 0 | 0 | 0 | 0 |
| 11/23/2018 | 2019 | 1,628 | 1,672 | 0 | 0 | 0 | 1,510 | 1,534 | 0 | 0 | 0 | 0 |
| 11/24/2018 | 2019 | 1,590 | 1,598 | 0 | 0 | 0 | 1,436 | 1,465 | 1 | 0 | 1 | 0 |

STB_AR1_001724

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/25/2018 | 2019 | 1,468 | 1,598 | 0 | 0 | 0 | 1,350 | 1,466 | 1 | 0 | 0 | 0 |
| 11/26/2018 | 2019 | 1,451 | 1,585 | 0 | 0 | 0 | 1,347 | 1,458 | 1 | 0 | 0 | 0 |
| 11/27/2018 | 2019 | 1,975 | 1,589 | 0 | 0 | 0 | 1,830 | 1,465 | 1 | 0 | 0 | 0 |
| 11/28/2018 | 2019 | 1,644 | 1,634 | 0 | 0 | 0 | 1,523 | 1,508 | 0 | 0 | 0 | 0 |
| 11/29/2018 | 2019 | 1,961 | 1,674 | 0 | 0 | 0 | 1,785 | 1,540 | 0 | 0 | 0 | 0 |
| 11/30/2018 | 2019 | 2,011 | 1,729 | 0 | 0 | 0 | 1,817 | 1,584 | 0 | 0 | 0 | 0 |
| 12/1/2018 | 2019 | 1,477 | 1,712 | 0 | 0 | 0 | 1,347 | 1,571 | 0 | 0 | 0 | 0 |
| 12/2/2018 | 2019 | 1,559 | 1,725 | 0 | 0 | 0 | 1,434 | 1,583 | 0 | 0 | 0 | 0 |
| 12/3/2018 | 2019 | 2,701 | 1,904 | 0 | 0 | 0 | 2,423 | 1,737 | 0 | 0 | 0 | 0 |
| 12/4/2018 | 2019 | 1,828 | 1,883 | 0 | 0 | 0 | 1,677 | 1,715 | 0 | 0 | 0 | 0 |
| 12/5/2018 | 2019 | 1,610 | 1,878 | 0 | 0 | 0 | 1,497 | 1,711 | 0 | 0 | 0 | 0 |
| 12/6/2018 | 2019 | 1,889 | 1,868 | 0 | 0 | 0 | 1,740 | 1,705 | 0 | 0 | 0 | 0 |
| 12/7/2018 | 2019 | 1,606 | 1,810 | 0 | 0 | 0 | 1,465 | 1,655 | 0 | 0 | 0 | 0 |
| 12/8/2018 | 2019 | 1,552 | 1,821 | 0 | 0 | 0 | 1,425 | 1,666 | 0 | 0 | 0 | 0 |
| 12/9/2018 | 2019 | 1,897 | 1,869 | 0 | 0 | 0 | 1,737 | 1,709 | 0 | 0 | 0 | 0 |
| 12/10/2018 | 2019 | 1,776 | 1,737 | 0 | 0 | 0 | 1,577 | 1,588 | 0 | 0 | 0 | 0 |
| 12/11/2018 | 2019 | 1,984 | 1,759 | 0 | 0 | 0 | 1,821 | 1,609 | 0 | 0 | 0 | 0 |
| 12/12/2018 | 2019 | 2,244 | 1,850 | 0 | 0 | 0 | 2,044 | 1,687 | 0 | 0 | 0 | 0 |
| 12/13/2018 | 2019 | 1,801 | 1,837 | 0 | 0 | 0 | 1,670 | 1,677 | 0 | 0 | 0 | 0 |
| 12/14/2018 | 2019 | 1,455 | 1,816 | 0 | 0 | 0 | 1,341 | 1,659 | 0 | 0 | 0 | 0 |
| 12/15/2018 | 2019 | 1,682 | 1,834 | 0 | 0 | 0 | 1,547 | 1,677 | 0 | 0 | 0 | 0 |
| 12/16/2018 | 2019 | 2,158 | 1,871 | 0 | 0 | 0 | 1,974 | 1,711 | 0 | 0 | 0 | 0 |
| 12/17/2018 | 2019 | 2,175 | 1,928 | 0 | 0 | 0 | 2,004 | 1,772 | 0 | 0 | 0 | 0 |
| 12/18/2018 | 2019 | 1,877 | 1,913 | 0 | 0 | 0 | 1,703 | 1,755 | 0 | 0 | 0 | 0 |
| 12/19/2018 | 2019 | 2,186 | 1,905 | 0 | 0 | 0 | 1,988 | 1,747 | 0 | 0 | 0 | 0 |
| 12/20/2018 | 2019 | 1,635 | 1,881 | 0 | 0 | 0 | 1,497 | 1,722 | 0 | 0 | 0 | 0 |
| 12/21/2018 | 2019 | 1,673 | 1,912 | 0 | 0 | 0 | 1,534 | 1,750 | 0 | 0 | 0 | 0 |
| 12/22/2018 | 2019 | 1,503 | 1,887 | 0 | 0 | 0 | 1,375 | 1,725 | 0 | 0 | 0 | 0 |
| 12/23/2018 | 2019 | 1,683 | 1,819 | 0 | 0 | 0 | 1,537 | 1,663 | 0 | 0 | 0 | 0 |
| 12/24/2018 | 2019 | 1,499 | 1,722 | 0 | 0 | 0 | 1,376 | 1,573 | 0 | 0 | 0 | 0 |
| 12/25/2018 | 2019 | 1,018 | 1,600 | 0 | 0 | 0 | 945 | 1,465 | 1 | 0 | 1 | 0 |
| 12/26/2018 | 2019 | 1,293 | 1,472 | 0 | 1 | 0 | 1,214 | 1,354 | 1 | 0 | 0 | 0 |
| 12/27/2018 | 2019 | 1,215 | 1,412 | 0 | 1 | 0 | 1,130 | 1,302 | 1 | 0 | 0 | 0 |
| 12/28/2018 | 2019 | 1,057 | 1,324 | 0 | 1 | 0 | 997 | 1,225 | 1 | 0 | 0 | 0 |
| 12/29/2018 | 2019 | 1,161 | 1,275 | 0 | 1 | 0 | 1,094 | 1,185 | 1 | 0 | 0 | 0 |
| 12/30/2018 | 2019 | 782 | 1,146 | 0 | 1 | 0 | 742 | 1,071 | 1 | 0 | 0 | 0 |
| 12/31/2018 | 2019 | 775 | 1,043 | 0 | 1 | 0 | 735 | 980 | 1 | 0 | 0 | 0 |
| 1/1/2019 | 2019 | 529 | 973 | 0 | 1 | 0 | 504 | 917 | 1 | 0 | 0 | 0 |
| 1/2/2019 | 2019 | 789 | 901 | 0 | 1 | 0 | 740 | 849 | 1 | 0 | 0 | 0 |
| 1/3/2019 | 2019 | 807 | 843 | 0 | 1 | 0 | 761 | 796 | 1 | 0 | 0 | 0 |
| 1/4/2019 | 2019 | 653 | 785 | 0 | 1 | 0 | 620 | 742 | 1 | 0 | 0 | 0 |
| 1/5/2019 | 2019 | 599 | 705 | 0 | 1 | 0 | 572 | 668 | 1 | 0 | 0 | 0 |
| 1/6/2019 | 2019 | 631 | 683 | 0 | 1 | 0 | 594 | 647 | 1 | 0 | 0 | 0 |
| 1/7/2019 | 2019 | 676 | 669 | 0 | 1 | 0 | 645 | 634 | 1 | 0 | 0 | 0 |
| 1/8/2019 | 2019 | 1,224 | 768 | 0 | 1 | 0 | 1,133 | 724 | 1 | 0 | 0 | 0 |
| 1/9/2019 | 2019 | 1,009 | 800 | 0 | 1 | 0 | 945 | 753 | 1 | 0 | 0 | 0 |
| 1/10/2019 | 2019 | 939 | 819 | 0 | 1 | 0 | 877 | 769 | 1 | 0 | 0 | 0 |

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/11/2019 | 2019 | 1,839 | 988 | 0 | 1 | 0 | 1,653 | 917 | 1 | 0 | 0 | 0 |
| 1/12/2019 | 2019 | 1,363 | 1,097 | 0 | 1 | 0 | 1,229 | 1,011 | 1 | 0 | 0 | 0 |
| 1/13/2019 | 2019 | 1,627 | 1,240 | 0 | 1 | 0 | 1,484 | 1,138 | 1 | 0 | 0 | 0 |
| 1/14/2019 | 2019 | 2,041 | 1,435 | 0 | 1 | 0 | 1,854 | 1,311 | 1 | 0 | 0 | 0 |
| 1/15/2019 | 2019 | 1,626 | 1,492 | 0 | 1 | 0 | 1,479 | 1,360 | 1 | 0 | 0 | 0 |
| 1/16/2019 | 2019 | 1,906 | 1,620 | 0 | 0 | 0 | 1,703 | 1,468 | 1 | 0 | 0 | 0 |
| 1/17/2019 | 2019 | 2,468 | 1,839 | 0 | 0 | 0 | 2,209 | 1,659 | 0 | 0 | 0 | 0 |
| 1/18/2019 | 2019 | 1,805 | 1,834 | 0 | 0 | 0 | 1,610 | 1,653 | 0 | 0 | 0 | 0 |
| 1/19/2019 | 2019 | 2,059 | 1,933 | 0 | 0 | 0 | 1,836 | 1,739 | 0 | 0 | 0 | 0 |
| 1/20/2019 | 2019 | 1,527 | 1,919 | 0 | 0 | 0 | 1,377 | 1,724 | 0 | 0 | 0 | 0 |
| 1/21/2019 | 2019 | 1,763 | 1,879 | 0 | 0 | 0 | 1,610 | 1,689 | 0 | 0 | 0 | 0 |
| 1/22/2019 | 2019 | 1,723 | 1,893 | 0 | 0 | 0 | 1,545 | 1,699 | 0 | 0 | 0 | 0 |
| 1/23/2019 | 2019 | 1,625 | 1,853 | 0 | 0 | 0 | 1,485 | 1,667 | 0 | 0 | 0 | 0 |
| 1/24/2019 | 2019 | 2,415 | 1,845 | 0 | 0 | 0 | 2,200 | 1,666 | 0 | 0 | 0 | 0 |
| 1/25/2019 | 2019 | 2,076 | 1,884 | 0 | 0 | 0 | 1,918 | 1,710 | 0 | 0 | 0 | 0 |
| 1/26/2019 | 2019 | 1,732 | 1,837 | 0 | 0 | 0 | 1,591 | 1,675 | 0 | 0 | 0 | 0 |
| 1/27/2019 | 2019 | 1,864 | 1,885 | 0 | 0 | 0 | 1,709 | 1,723 | 0 | 0 | 0 | 0 |
| 1/28/2019 | 2019 | 2,125 | 1,937 | 0 | 0 | 0 | 1,931 | 1,768 | 0 | 0 | 0 | 0 |
| 1/29/2019 | 2019 | 2,528 | 2,052 | 0 | 0 | 0 | 2,266 | 1,871 | 0 | 0 | 0 | 0 |
| 1/30/2019 | 2019 | 1,907 | 2,092 | 0 | 0 | 0 | 1,713 | 1,904 | 0 | 0 | 0 | 0 |
| 1/31/2019 | 2019 | 2,104 | 2,048 | 0 | 0 | 0 | 1,873 | 1,857 | 0 | 0 | 0 | 0 |
| 2/1/2019 | 2019 | 2,110 | 2,053 | 0 | 0 | 0 | 1,901 | 1,855 | 0 | 0 | 0 | 0 |
| 2/2/2019 | 2019 | 1,732 | 2,053 | 0 | 0 | 0 | 1,611 | 1,858 | 0 | 0 | 0 | 0 |
| 2/3/2019 | 2019 | 1,897 | 2,058 | 0 | 0 | 0 | 1,740 | 1,862 | 0 | 0 | 0 | 0 |
| 2/4/2019 | 2019 | 2,443 | 2,103 | 0 | 0 | 0 | 2,161 | 1,895 | 0 | 0 | 0 | 0 |
| 2/5/2019 | 2019 | 2,079 | 2,039 | 0 | 0 | 0 | 1,910 | 1,844 | 0 | 0 | 0 | 0 |
| 2/6/2019 | 2019 | 2,086 | 2,064 | 0 | 0 | 0 | 1,937 | 1,876 | 0 | 0 | 0 | 0 |
| 2/7/2019 | 2019 | 2,057 | 2,058 | 0 | 0 | 0 | 1,886 | 1,878 | 0 | 0 | 0 | 0 |
| 2/8/2019 | 2019 | 2,147 | 2,063 | 0 | 0 | 0 | 1,946 | 1,884 | 0 | 0 | 0 | 0 |
| 2/9/2019 | 2019 | 2,275 | 2,141 | 0 | 0 | 0 | 2,065 | 1,949 | 0 | 0 | 0 | 0 |
| 2/10/2019 | 2019 | 1,965 | 2,150 | 0 | 0 | 0 | 1,802 | 1,958 | 0 | 0 | 0 | 0 |
| 2/11/2019 | 2019 | 3,237 | 2,264 | 0 | 0 | 0 | 2,887 | 2,062 | 0 | 0 | 0 | 0 |
| 2/12/2019 | 2019 | 2,536 | 2,329 | 0 | 0 | 0 | 2,275 | 2,114 | 0 | 0 | 0 | 0 |
| 2/13/2019 | 2019 | 2,492 | 2,387 | 0 | 0 | 0 | 2,280 | 2,163 | 0 | 0 | 0 | 0 |
| 2/14/2019 | 2019 | 2,294 | 2,421 | 0 | 0 | 0 | 2,113 | 2,195 | 0 | 0 | 0 | 0 |
| 2/15/2019 | 2019 | 2,520 | 2,474 | 0 | 0 | 0 | 2,303 | 2,246 | 0 | 0 | 0 | 0 |
| 2/16/2019 | 2019 | 2,460 | 2,501 | 0 | 0 | 0 | 2,242 | 2,272 | 0 | 0 | 0 | 0 |
| 2/17/2019 | 2019 | 2,157 | 2,528 | 0 | 0 | 0 | 1,970 | 2,296 | 0 | 0 | 0 | 0 |
| 2/18/2019 | 2019 | 2,251 | 2,387 | 0 | 0 | 0 | 2,051 | 2,176 | 0 | 0 | 0 | 0 |
| 2/19/2019 | 2019 | 2,924 | 2,443 | 0 | 0 | 0 | 2,656 | 2,231 | 0 | 0 | 0 | 0 |
| 2/20/2019 | 2019 | 2,680 | 2,469 | 0 | 0 | 0 | 2,454 | 2,256 | 0 | 0 | 0 | 0 |
| 2/21/2019 | 2019 | 2,574 | 2,509 | 0 | 0 | 0 | 2,339 | 2,288 | 0 | 0 | 0 | 0 |
| 2/22/2019 | 2019 | 2,166 | 2,459 | 0 | 0 | 0 | 2,001 | 2,245 | 0 | 0 | 0 | 0 |
| 2/23/2019 | 2019 | 2,309 | 2,437 | 0 | 0 | 0 | 2,102 | 2,225 | 0 | 0 | 0 | 0 |
| 2/24/2019 | 2019 | 2,325 | 2,461 | 0 | 0 | 0 | 2,098 | 2,243 | 0 | 0 | 0 | 0 |
| 2/25/2019 | 2019 | 2,916 | 2,556 | 0 | 0 | 0 | 2,694 | 2,335 | 0 | 0 | 0 | 0 |
| 2/26/2019 | 2019 | 3,341 | 2,616 | 0 | 0 | 0 | 3,069 | 2,394 | 0 | 0 | 0 | 0 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/27/2019 | 2019 | 2,465 | 2,585 | 0 | 0 | 0 | 2,245 | 2,364 | 0 | 0 | 0 | 0 |
| 2/28/2019 | 2019 | 2,445 | 2,567 | 0 | 0 | 0 | 2,234 | 2,349 | 0 | 0 | 0 | 0 |
| 3/1/2019 | 2019 | 2,700 | 2,643 | 0 | 0 | 0 | 2,464 | 2,415 | 0 | 0 | 0 | 0 |
| 3/2/2019 | 2019 | 2,645 | 2,691 | 0 | 0 | 0 | 2,424 | 2,461 | 0 | 0 | 0 | 0 |
| 3/3/2019 | 2019 | 2,104 | 2,659 | 0 | 0 | 0 | 1,938 | 2,438 | 0 | 0 | 0 | 0 |
| 3/4/2019 | 2019 | 2,511 | 2,602 | 0 | 0 | 0 | 2,327 | 2,386 | 0 | 0 | 0 | 0 |
| 3/5/2019 | 2019 | 2,476 | 2,478 | 0 | 0 | 0 | 2,264 | 2,271 | 0 | 0 | 0 | 0 |
| 3/6/2019 | 2019 | 3,236 | 2,588 | 0 | 0 | 0 | 2,987 | 2,377 | 0 | 0 | 0 | 0 |
| 3/7/2019 | 2019 | 2,804 | 2,639 | 0 | 0 | 0 | 2,618 | 2,432 | 0 | 0 | 0 | 0 |
| 3/8/2019 | 2019 | 2,659 | 2,634 | 0 | 0 | 0 | 2,473 | 2,433 | 0 | 0 | 0 | 0 |
| 3/9/2019 | 2019 | 2,881 | 2,667 | 0 | 0 | 0 | 2,604 | 2,459 | 0 | 0 | 0 | 0 |
| 3/10/2019 | 2019 | 2,580 | 2,735 | 0 | 0 | 0 | 2,371 | 2,521 | 0 | 0 | 0 | 0 |
| 3/11/2019 | 2019 | 3,235 | 2,839 | 0 | 0 | 0 | 2,956 | 2,610 | 0 | 0 | 0 | 0 |
| 3/12/2019 | 2019 | 3,457 | 2,979 | 0 | 0 | 0 | 3,151 | 2,737 | 0 | 0 | 0 | 0 |
| 3/13/2019 | 2019 | 2,524 | 2,877 | 0 | 0 | 0 | 2,340 | 2,645 | 0 | 0 | 0 | 0 |
| 3/14/2019 | 2019 | 2,988 | 2,903 | 0 | 0 | 0 | 2,742 | 2,662 | 0 | 0 | 0 | 0 |
| 3/15/2019 | 2019 | 2,535 | 2,886 | 0 | 0 | 0 | 2,292 | 2,637 | 0 | 0 | 0 | 0 |
| 3/16/2019 | 2019 | 3,171 | 2,927 | 0 | 0 | 0 | 2,949 | 2,686 | 0 | 0 | 0 | 0 |
| 3/17/2019 | 2019 | 2,808 | 2,960 | 0 | 0 | 0 | 2,568 | 2,714 | 0 | 0 | 0 | 0 |
| 3/18/2019 | 2019 | 3,009 | 2,927 | 0 | 0 | 0 | 2,764 | 2,687 | 0 | 0 | 0 | 0 |
| 3/19/2019 | 2019 | 3,611 | 2,949 | 0 | 0 | 0 | 3,277 | 2,705 | 0 | 0 | 0 | 0 |
| 3/20/2019 | 2019 | 3,069 | 3,027 | 0 | 0 | 0 | 2,794 | 2,769 | 0 | 0 | 0 | 0 |
| 3/21/2019 | 2019 | 2,868 | 3,010 | 0 | 0 | 0 | 2,645 | 2,756 | 0 | 0 | 0 | 0 |
| 3/22/2019 | 2019 | 3,017 | 3,079 | 0 | 0 | 0 | 2,775 | 2,825 | 0 | 0 | 0 | 0 |
| 3/23/2019 | 2019 | 3,301 | 3,098 | 0 | 0 | 0 | 3,006 | 2,833 | 0 | 0 | 0 | 0 |
| 3/24/2019 | 2019 | 3,144 | 3,146 | 0 | 0 | 0 | 2,824 | 2,869 | 0 | 0 | 0 | 0 |
| 3/25/2019 | 2019 | 3,745 | 3,251 | 0 | 0 | 0 | 3,395 | 2,959 | 0 | 0 | 0 | 0 |
| 3/26/2019 | 2019 | 3,755 | 3,271 | 0 | 0 | 0 | 3,391 | 2,976 | 0 | 0 | 0 | 0 |
| 3/27/2019 | 2019 | 3,547 | 3,340 | 0 | 0 | 0 | 3,242 | 3,040 | 0 | 0 | 0 | 0 |
| 3/28/2019 | 2019 | 3,238 | 3,392 | 0 | 0 | 0 | 2,949 | 3,083 | 0 | 0 | 0 | 0 |
| 3/29/2019 | 2019 | 2,876 | 3,372 | 0 | 0 | 0 | 2,661 | 3,067 | 0 | 0 | 0 | 0 |
| 3/30/2019 | 2019 | 2,810 | 3,302 | 0 | 0 | 0 | 2,541 | 3,000 | 0 | 0 | 0 | 0 |
| 3/31/2019 | 2019 | 3,529 | 3,357 | 0 | 0 | 0 | 3,256 | 3,062 | 0 | 0 | 0 | 0 |
| 4/1/2019 | 2019 | 3,608 | 3,338 | 0 | 0 | 0 | 3,316 | 3,051 | 0 | 0 | 0 | 0 |
| 4/2/2019 | 2019 | 3,310 | 3,274 | 0 | 0 | 0 | 3,054 | 3,003 | 0 | 0 | 0 | 0 |
| 4/3/2019 | 2019 | 2,622 | 3,142 | 0 | 0 | 0 | 2,387 | 2,881 | 0 | 0 | 0 | 0 |
| 4/4/2019 | 2019 | 3,008 | 3,109 | 0 | 0 | 0 | 2,789 | 2,858 | 0 | 0 | 0 | 0 |
| 4/5/2019 | 2019 | 3,403 | 3,184 | 0 | 0 | 0 | 3,155 | 2,928 | 0 | 0 | 0 | 0 |
| 4/6/2019 | 2019 | 2,757 | 3,177 | 0 | 0 | 0 | 2,509 | 2,924 | 0 | 0 | 0 | 0 |
| 4/7/2019 | 2019 | 2,023 | 2,962 | 0 | 0 | 0 | 1,845 | 2,722 | 0 | 0 | 0 | 0 |
| 4/8/2019 | 2019 | 3,491 | 2,945 | 0 | 0 | 0 | 3,212 | 2,707 | 0 | 0 | 0 | 0 |
| 4/9/2019 | 2019 | 4,121 | 3,061 | 0 | 0 | 0 | 3,756 | 2,808 | 0 | 0 | 0 | 0 |
| 4/10/2019 | 2019 | 3,462 | 3,181 | 0 | 0 | 0 | 3,216 | 2,926 | 0 | 0 | 0 | 0 |
| 4/11/2019 | 2019 | 3,647 | 3,272 | 0 | 0 | 0 | 3,370 | 3,009 | 0 | 0 | 0 | 0 |
| 4/12/2019 | 2019 | 3,502 | 3,286 | 0 | 0 | 0 | 3,216 | 3,018 | 0 | 0 | 0 | 0 |
| 4/13/2019 | 2019 | 3,247 | 3,356 | 0 | 0 | 0 | 2,991 | 3,087 | 0 | 0 | 0 | 0 |
| 4/14/2019 | 2019 | 2,699 | 3,453 | 0 | 0 | 0 | 2,469 | 3,176 | 0 | 0 | 0 | 0 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/15/2019 | 2019 | 3,409 | 3,441 | 0 | 0 | 0 | 3,130 | 3,164 | 0 | 0 | 0 | 0 |
| 4/16/2019 | 2019 | 4,707 | 3,525 | 0 | 0 | 0 | 4,310 | 3,243 | 0 | 0 | 0 | 0 |
| 4/17/2019 | 2019 | 4,480 | 3,670 | 0 | 0 | 0 | 4,073 | 3,366 | 0 | 0 | 0 | 0 |
| 4/18/2019 | 2019 | 3,863 | 3,701 | 0 | 0 | 0 | 3,556 | 3,392 | 0 | 0 | 0 | 0 |
| 4/19/2019 | 2019 | 2,910 | 3,616 | 0 | 0 | 0 | 2,687 | 3,317 | 0 | 0 | 0 | 0 |
| 4/20/2019 | 2019 | 2,495 | 3,509 | 0 | 0 | 0 | 2,288 | 3,216 | 0 | 0 | 0 | 0 |
| 4/21/2019 | 2019 | 2,876 | 3,534 | 0 | 0 | 0 | 2,635 | 3,240 | 0 | 0 | 0 | 0 |
| 4/22/2019 | 2019 | 2,667 | 3,428 | 0 | 0 | 0 | 2,454 | 3,143 | 0 | 0 | 0 | 0 |
| 4/23/2019 | 2019 | 3,178 | 3,210 | 0 | 0 | 0 | 2,955 | 2,950 | 0 | 0 | 0 | 0 |
| 4/24/2019 | 2019 | 2,974 | 2,995 | 0 | 0 | 0 | 2,750 | 2,761 | 0 | 0 | 0 | 0 |
| 4/25/2019 | 2019 | 3,014 | 2,873 | 0 | 0 | 0 | 2,840 | 2,658 | 0 | 0 | 0 | 0 |
| 4/26/2019 | 2019 | 3,246 | 2,921 | 0 | 0 | 0 | 3,006 | 2,704 | 0 | 0 | 0 | 0 |
| 4/27/2019 | 2019 | 2,916 | 2,982 | 0 | 0 | 0 | 2,680 | 2,760 | 0 | 0 | 0 | 0 |
| 4/28/2019 | 2019 | 3,552 | 3,078 | 0 | 0 | 0 | 3,243 | 2,847 | 0 | 0 | 0 | 0 |
| 4/29/2019 | 2019 | 3,236 | 3,159 | 0 | 0 | 0 | 2,970 | 2,921 | 0 | 0 | 0 | 0 |
| 4/30/2019 | 2019 | 4,850 | 3,398 | 0 | 0 | 0 | 4,500 | 3,141 | 0 | 0 | 0 | 0 |
| 5/1/2019 | 2019 | 4,178 | 3,570 | 0 | 0 | 0 | 3,835 | 3,296 | 0 | 0 | 0 | 0 |
| 5/2/2019 | 2019 | 3,924 | 3,700 | 0 | 0 | 0 | 3,643 | 3,411 | 0 | 0 | 0 | 0 |
| 5/3/2019 | 2019 | 3,571 | 3,747 | 0 | 0 | 0 | 3,295 | 3,452 | 0 | 0 | 0 | 0 |
| 5/4/2019 | 2019 | 5,236 | 4,078 | 0 | 0 | 0 | 4,756 | 3,749 | 0 | 0 | 0 | 0 |
| 5/5/2019 | 2019 | 3,910 | 4,129 | 0 | 0 | 0 | 3,569 | 3,795 | 0 | 0 | 0 | 0 |
| 5/6/2019 | 2019 | 4,481 | 4,307 | 0 | 0 | 0 | 4,125 | 3,960 | 0 | 0 | 0 | 0 |
| 5/7/2019 | 2019 | 4,680 | 4,283 | 0 | 0 | 0 | 4,273 | 3,928 | 0 | 0 | 0 | 0 |
| 5/8/2019 | 2019 | 4,840 | 4,377 | 0 | 0 | 0 | 4,466 | 4,018 | 0 | 0 | 0 | 0 |
| 5/9/2019 | 2019 | 5,102 | 4,546 | 0 | 0 | 0 | 4,697 | 4,169 | 0 | 0 | 0 | 0 |
| 5/10/2019 | 2019 | 5,283 | 4,790 | 0 | 0 | 0 | 4,803 | 4,384 | 0 | 0 | 0 | 0 |
| 5/11/2019 | 2019 | 4,357 | 4,665 | 0 | 0 | 0 | 3,981 | 4,273 | 0 | 0 | 0 | 0 |
| 5/12/2019 | 2019 | 3,851 | 4,656 | 0 | 0 | 0 | 3,558 | 4,272 | 0 | 0 | 0 | 0 |
| 5/13/2019 | 2019 | 4,308 | 4,632 | 0 | 0 | 0 | 3,977 | 4,251 | 0 | 0 | 0 | 0 |
| 5/14/2019 | 2019 | 4,296 | 4,577 | 0 | 0 | 0 | 3,940 | 4,203 | 0 | 0 | 0 | 0 |
| 5/15/2019 | 2019 | 3,989 | 4,455 | 0 | 0 | 0 | 3,729 | 4,098 | 0 | 0 | 0 | 0 |
| 5/16/2019 | 2019 | 3,824 | 4,273 | 0 | 0 | 0 | 3,529 | 3,931 | 0 | 0 | 0 | 0 |
| 5/17/2019 | 2019 | 4,471 | 4,157 | 0 | 0 | 0 | 4,107 | 3,832 | 0 | 0 | 0 | 0 |
| 5/18/2019 | 2019 | 3,802 | 4,077 | 0 | 0 | 0 | 3,497 | 3,762 | 0 | 0 | 0 | 0 |
| 5/19/2019 | 2019 | 3,877 | 4,081 | 0 | 0 | 0 | 3,583 | 3,766 | 0 | 0 | 0 | 0 |
| 5/20/2019 | 2019 | 4,282 | 4,077 | 0 | 0 | 0 | 3,960 | 3,764 | 0 | 0 | 0 | 0 |
| 5/21/2019 | 2019 | 3,695 | 3,991 | 0 | 0 | 0 | 3,420 | 3,689 | 0 | 0 | 0 | 0 |
| 5/22/2019 | 2019 | 3,252 | 3,886 | 0 | 0 | 0 | 3,060 | 3,594 | 0 | 0 | 0 | 0 |
| 5/23/2019 | 2019 | 5,056 | 4,062 | 0 | 0 | 0 | 4,615 | 3,749 | 0 | 0 | 0 | 0 |
| 5/24/2019 | 2019 | 3,508 | 3,925 | 0 | 0 | 0 | 3,253 | 3,627 | 0 | 0 | 0 | 0 |
| 5/25/2019 | 2019 | 4,119 | 3,970 | 0 | 0 | 0 | 3,781 | 3,667 | 0 | 0 | 0 | 0 |
| 5/26/2019 | 2019 | 3,282 | 3,885 | 0 | 0 | 0 | 3,030 | 3,588 | 0 | 0 | 0 | 0 |
| 5/27/2019 | 2019 | 4,679 | 3,942 | 0 | 0 | 0 | 4,284 | 3,635 | 0 | 0 | 0 | 0 |
| 5/28/2019 | 2019 | 4,639 | 4,076 | 0 | 0 | 0 | 4,312 | 3,762 | 0 | 0 | 0 | 0 |
| 5/29/2019 | 2019 | 5,462 | 4,392 | 0 | 0 | 0 | 5,047 | 4,046 | 0 | 0 | 0 | 0 |
| 5/30/2019 | 2019 | 5,049 | 4,391 | 0 | 0 | 0 | 4,720 | 4,061 | 0 | 0 | 0 | 0 |
| 5/31/2019 | 2019 | 3,853 | 4,440 | 0 | 0 | 0 | 3,556 | 4,104 | 0 | 0 | 0 | 0 |

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/1/2019 | 2019 | 4,404 | 4,481 | 0 | 0 | 0 | 4,138 | 4,155 | 0 | 0 | 0 | 0 |
| 6/2/2019 | 2019 | 4,624 | 4,673 | 0 | 0 | 0 | 4,244 | 4,329 | 0 | 0 | 0 | 0 |
| 6/3/2019 | 2019 | 3,947 | 4,568 | 0 | 0 | 0 | 3,647 | 4,238 | 0 | 0 | 0 | 0 |
| 6/4/2019 | 2019 | 3,953 | 4,470 | 0 | 0 | 0 | 3,654 | 4,144 | 0 | 0 | 0 | 0 |
| 6/5/2019 | 2019 | 3,740 | 4,224 | 0 | 0 | 0 | 3,484 | 3,920 | 0 | 0 | 0 | 0 |
| 6/6/2019 | 2019 | 3,369 | 3,984 | 0 | 0 | 0 | 3,143 | 3,695 | 0 | 0 | 0 | 0 |
| 6/7/2019 | 2019 | 3,167 | 3,886 | 0 | 0 | 0 | 2,958 | 3,610 | 0 | 0 | 0 | 0 |
| 6/8/2019 | 2019 | 3,510 | 3,759 | 0 | 0 | 0 | 3,217 | 3,478 | 0 | 0 | 0 | 0 |
| 6/9/2019 | 2019 | 3,810 | 3,642 | 0 | 0 | 0 | 3,512 | 3,374 | 0 | 0 | 0 | 0 |
| 6/10/2019 | 2019 | 3,503 | 3,579 | 0 | 0 | 0 | 3,253 | 3,317 | 0 | 0 | 0 | 0 |
| 6/11/2019 | 2019 | 3,431 | 3,504 | 0 | 0 | 0 | 3,220 | 3,255 | 0 | 0 | 0 | 0 |
| 6/12/2019 | 2019 | 3,528 | 3,474 | 0 | 0 | 0 | 3,283 | 3,227 | 0 | 0 | 0 | 0 |
| 6/13/2019 | 2019 | 3,714 | 3,523 | 0 | 0 | 0 | 3,464 | 3,272 | 0 | 0 | 0 | 0 |
| 6/14/2019 | 2019 | 3,380 | 3,554 | 0 | 0 | 0 | 3,141 | 3,299 | 0 | 0 | 0 | 0 |
| 6/15/2019 | 2019 | 3,286 | 3,522 | 0 | 0 | 0 | 3,028 | 3,272 | 0 | 0 | 0 | 0 |
| 6/16/2019 | 2019 | 2,078 | 3,274 | 0 | 0 | 0 | 1,940 | 3,047 | 0 | 0 | 0 | 0 |
| 6/17/2019 | 2019 | 2,530 | 3,135 | 0 | 0 | 0 | 2,370 | 2,921 | 0 | 0 | 0 | 0 |
| 6/18/2019 | 2019 | 3,255 | 3,110 | 0 | 0 | 0 | 3,071 | 2,900 | 0 | 0 | 0 | 0 |
| 6/19/2019 | 2019 | 2,677 | 2,989 | 0 | 0 | 0 | 2,509 | 2,789 | 0 | 0 | 0 | 0 |
| 6/20/2019 | 2019 | 2,740 | 2,849 | 0 | 0 | 0 | 2,586 | 2,664 | 0 | 0 | 0 | 0 |
| 6/21/2019 | 2019 | 2,536 | 2,729 | 0 | 0 | 0 | 2,365 | 2,553 | 0 | 0 | 0 | 0 |
| 6/22/2019 | 2019 | 2,280 | 2,585 | 0 | 0 | 0 | 2,120 | 2,423 | 0 | 0 | 0 | 0 |
| 6/23/2019 | 2019 | 2,506 | 2,646 | 0 | 0 | 0 | 2,309 | 2,476 | 0 | 0 | 0 | 0 |
| 6/24/2019 | 2019 | 3,178 | 2,739 | 0 | 0 | 0 | 2,956 | 2,559 | 0 | 0 | 0 | 0 |
| 6/25/2019 | 2019 | 2,862 | 2,683 | 0 | 0 | 0 | 2,713 | 2,508 | 0 | 0 | 0 | 0 |
| 6/26/2019 | 2019 | 3,056 | 2,737 | 0 | 0 | 0 | 2,860 | 2,558 | 0 | 0 | 0 | 0 |
| 6/27/2019 | 2019 | 2,166 | 2,655 | 0 | 0 | 0 | 2,029 | 2,479 | 0 | 0 | 0 | 0 |
| 6/28/2019 | 2019 | 2,318 | 2,624 | 0 | 0 | 0 | 2,159 | 2,449 | 0 | 0 | 0 | 0 |
| 6/29/2019 | 2019 | 2,882 | 2,710 | 0 | 0 | 0 | 2,706 | 2,533 | 0 | 0 | 0 | 0 |
| 6/30/2019 | 2019 | 2,472 | 2,705 | 0 | 0 | 0 | 2,281 | 2,529 | 0 | 0 | 0 | 0 |
| 7/1/2019 | 2019 | 2,463 | 2,603 | 0 | 0 | 0 | 2,322 | 2,439 | 0 | 0 | 0 | 0 |
| 7/2/2019 | 2019 | 2,613 | 2,567 | 0 | 0 | 0 | 2,417 | 2,396 | 0 | 0 | 0 | 0 |
| 7/3/2019 | 2019 | 2,959 | 2,553 | 0 | 0 | 0 | 2,775 | 2,384 | 0 | 0 | 0 | 0 |
| 7/4/2019 | 2019 | 2,807 | 2,645 | 0 | 0 | 0 | 2,611 | 2,467 | 0 | 0 | 0 | 0 |
| 7/5/2019 | 2019 | 2,826 | 2,717 | 0 | 0 | 0 | 2,642 | 2,536 | 0 | 0 | 0 | 0 |
| 7/6/2019 | 2019 | 2,223 | 2,623 | 0 | 0 | 0 | 2,089 | 2,448 | 0 | 0 | 0 | 0 |
| 7/7/2019 | 2019 | 1,475 | 2,481 | 0 | 0 | 0 | 1,371 | 2,318 | 0 | 0 | 0 | 0 |
| 7/8/2019 | 2019 | 2,019 | 2,417 | 0 | 0 | 0 | 1,925 | 2,261 | 0 | 0 | 0 | 0 |
| 7/9/2019 | 2019 | 2,251 | 2,366 | 0 | 0 | 0 | 2,093 | 2,215 | 0 | 0 | 0 | 0 |
| 7/10/2019 | 2019 | 2,539 | 2,306 | 0 | 0 | 0 | 2,356 | 2,155 | 0 | 0 | 0 | 0 |
| 7/11/2019 | 2019 | 2,775 | 2,301 | 0 | 0 | 0 | 2,565 | 2,149 | 0 | 0 | 0 | 0 |
| 7/12/2019 | 2019 | 3,329 | 2,373 | 0 | 0 | 0 | 3,105 | 2,215 | 0 | 0 | 0 | 0 |
| 7/13/2019 | 2019 | 2,337 | 2,389 | 0 | 0 | 0 | 2,186 | 2,229 | 0 | 0 | 0 | 0 |
| 7/14/2019 | 2019 | 1,833 | 2,440 | 0 | 0 | 0 | 1,714 | 2,278 | 0 | 0 | 0 | 0 |
| 7/15/2019 | 2019 | 2,412 | 2,497 | 0 | 0 | 0 | 2,252 | 2,324 | 0 | 0 | 0 | 0 |
| 7/16/2019 | 2019 | 2,325 | 2,507 | 0 | 0 | 0 | 2,192 | 2,339 | 0 | 0 | 0 | 0 |
| 7/17/2019 | 2019 | 2,917 | 2,561 | 0 | 0 | 0 | 2,702 | 2,388 | 0 | 0 | 0 | 0 |

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/18/2019 | 2019 | 2,077 | 2,461 | 0 | 0 | 0 | 1,947 | 2,300 | 0 | 0 | 0 | 0 |
| 7/19/2019 | 2019 | 2,422 | 2,332 | 0 | 0 | 0 | 2,262 | 2,179 | 0 | 0 | 0 | 0 |
| 7/20/2019 | 2019 | 2,021 | 2,287 | 0 | 0 | 0 | 1,881 | 2,136 | 0 | 0 | 0 | 0 |
| 7/21/2019 | 2019 | 2,212 | 2,341 | 0 | 0 | 0 | 2,046 | 2,183 | 0 | 0 | 0 | 0 |
| 7/22/2019 | 2019 | 1,500 | 2,211 | 0 | 0 | 0 | 1,397 | 2,061 | 0 | 0 | 0 | 0 |
| 7/23/2019 | 2019 | 2,187 | 2,191 | 0 | 0 | 0 | 2,037 | 2,039 | 0 | 0 | 0 | 0 |
| 7/24/2019 | 2019 | 2,470 | 2,127 | 0 | 0 | 0 | 2,289 | 1,980 | 0 | 0 | 0 | 0 |
| 7/25/2019 | 2019 | 1,971 | 2,112 | 0 | 0 | 0 | 1,830 | 1,963 | 0 | 0 | 0 | 0 |
| 7/26/2019 | 2019 | 2,298 | 2,094 | 0 | 0 | 0 | 2,166 | 1,949 | 0 | 0 | 0 | 0 |
| 7/27/2019 | 2019 | 2,770 | 2,201 | 0 | 0 | 0 | 2,587 | 2,050 | 0 | 0 | 0 | 0 |
| 7/28/2019 | 2019 | 1,884 | 2,154 | 0 | 0 | 0 | 1,763 | 2,010 | 0 | 0 | 0 | 0 |
| 7/29/2019 | 2019 | 2,160 | 2,249 | 0 | 0 | 0 | 2,017 | 2,098 | 0 | 0 | 0 | 0 |
| 7/30/2019 | 2019 | 2,028 | 2,226 | 0 | 0 | 0 | 1,911 | 2,080 | 0 | 0 | 0 | 0 |
| 7/31/2019 | 2019 | 1,875 | 2,141 | 0 | 0 | 0 | 1,768 | 2,006 | 0 | 0 | 0 | 0 |
| 8/1/2019 | 2019 | 1,920 | 2,134 | 0 | 0 | 0 | 1,797 | 2,001 | 0 | 0 | 0 | 0 |
| 8/2/2019 | 2019 | 2,085 | 2,103 | 0 | 0 | 0 | 1,974 | 1,974 | 0 | 0 | 0 | 0 |
| 8/3/2019 | 2019 | 1,854 | 1,972 | 0 | 0 | 0 | 1,743 | 1,853 | 0 | 0 | 0 | 0 |
| 8/4/2019 | 2019 | 1,322 | 1,892 | 0 | 0 | 0 | 1,268 | 1,783 | 0 | 0 | 0 | 0 |
| 8/5/2019 | 2019 | 1,692 | 1,825 | 0 | 0 | 0 | 1,597 | 1,723 | 0 | 0 | 0 | 0 |
| 8/6/2019 | 2019 | 1,980 | 1,818 | 0 | 0 | 0 | 1,873 | 1,717 | 0 | 0 | 0 | 0 |
| 8/7/2019 | 2019 | 2,407 | 1,894 | 0 | 0 | 0 | 2,222 | 1,782 | 0 | 0 | 0 | 0 |
| 8/8/2019 | 2019 | 1,913 | 1,893 | 0 | 0 | 0 | 1,837 | 1,788 | 0 | 0 | 0 | 0 |
| 8/9/2019 | 2019 | 1,800 | 1,853 | 0 | 0 | 0 | 1,698 | 1,748 | 0 | 0 | 0 | 0 |
| 8/10/2019 | 2019 | 1,878 | 1,856 | 0 | 0 | 0 | 1,758 | 1,750 | 0 | 0 | 0 | 0 |
| 8/11/2019 | 2019 | 1,294 | 1,852 | 0 | 0 | 0 | 1,230 | 1,745 | 0 | 0 | 0 | 0 |
| 8/12/2019 | 2019 | 1,569 | 1,834 | 0 | 0 | 0 | 1,476 | 1,728 | 0 | 0 | 0 | 0 |
| 8/13/2019 | 2019 | 1,720 | 1,797 | 0 | 0 | 0 | 1,602 | 1,689 | 0 | 0 | 0 | 0 |
| 8/14/2019 | 2019 | 2,008 | 1,740 | 0 | 0 | 0 | 1,882 | 1,640 | 0 | 0 | 0 | 0 |
| 8/15/2019 | 2019 | 1,695 | 1,709 | 0 | 0 | 0 | 1,615 | 1,609 | 0 | 0 | 0 | 0 |
| 8/16/2019 | 2019 | 1,595 | 1,680 | 0 | 0 | 0 | 1,502 | 1,581 | 0 | 0 | 0 | 0 |
| 8/17/2019 | 2019 | 1,383 | 1,609 | 0 | 0 | 0 | 1,288 | 1,514 | 0 | 0 | 0 | 0 |
| 8/18/2019 | 2019 | 1,497 | 1,638 | 0 | 0 | 0 | 1,388 | 1,536 | 0 | 0 | 0 | 0 |
| 8/19/2019 | 2019 | 1,261 | 1,594 | 0 | 0 | 0 | 1,201 | 1,497 | 1 | 0 | 1 | 0 |
| 8/20/2019 | 2019 | 1,128 | 1,510 | 0 | 0 | 0 | 1,085 | 1,423 | 1 | 0 | 0 | 0 |
| 8/21/2019 | 2019 | 1,995 | 1,508 | 0 | 0 | 0 | 1,890 | 1,424 | 1 | 0 | 0 | 0 |
| 8/22/2019 | 2019 | 1,706 | 1,509 | 0 | 0 | 0 | 1,617 | 1,424 | 1 | 0 | 0 | 0 |
| 8/23/2019 | 2019 | 1,390 | 1,480 | 0 | 1 | 0 | 1,321 | 1,399 | 1 | 0 | 0 | 0 |
| 8/24/2019 | 2019 | 1,457 | 1,491 | 0 | 1 | 0 | 1,367 | 1,410 | 1 | 0 | 0 | 0 |
| 8/25/2019 | 2019 | 1,369 | 1,472 | 0 | 1 | 0 | 1,295 | 1,397 | 1 | 0 | 0 | 0 |
| 8/26/2019 | 2019 | 1,343 | 1,484 | 0 | 1 | 0 | 1,287 | 1,409 | 1 | 0 | 0 | 0 |
| 8/27/2019 | 2019 | 1,425 | 1,526 | 0 | 0 | 0 | 1,354 | 1,447 | 1 | 0 | 0 | 0 |
| 8/28/2019 | 2019 | 1,558 | 1,464 | 0 | 1 | 0 | 1,488 | 1,390 | 1 | 0 | 0 | 0 |
| 8/29/2019 | 2019 | 1,559 | 1,443 | 0 | 1 | 0 | 1,469 | 1,369 | 1 | 0 | 0 | 0 |
| 8/30/2019 | 2019 | 1,478 | 1,456 | 0 | 1 | 0 | 1,411 | 1,382 | 1 | 0 | 0 | 0 |
| 8/31/2019 | 2019 | 1,403 | 1,448 | 0 | 1 | 0 | 1,335 | 1,377 | 1 | 0 | 0 | 0 |
| 9/1/2019 | 2019 | 1,490 | 1,465 | 0 | 1 | 0 | 1,411 | 1,394 | 1 | 0 | 0 | 0 |
| 9/2/2019 | 2019 | 1,191 | 1,443 | 0 | 1 | 0 | 1,110 | 1,368 | 1 | 0 | 0 | 0 |

STB_AR1_001730

| Date | Year | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/3/2019 | 2019 | 1,547 | 1,461 | 0 | 1 | 0 | 1,443 | 1,381 | 1 | 0 | 0 | 0 |
| 9/4/2019 | 2019 | 1,252 | 1,417 | 0 | 1 | 0 | 1,181 | 1,337 | 1 | 0 | 0 | 0 |
| 9/5/2019 | 2019 | 1,178 | 1,363 | 0 | 1 | 0 | 1,124 | 1,288 | 1 | 0 | 0 | 0 |
| 9/6/2019 | 2019 | 1,268 | 1,333 | 0 | 1 | 0 | 1,214 | 1,260 | 1 | 0 | 0 | 0 |
| 9/7/2019 | 2019 | 1,344 | 1,324 | 0 | 1 | 0 | 1,250 | 1,248 | 1 | 0 | 0 | 0 |
| 9/8/2019 | 2019 | 1,236 | 1,288 | 0 | 1 | 0 | 1,165 | 1,212 | 1 | 0 | 0 | 0 |
| 9/9/2019 | 2019 | 1,439 | 1,323 | 0 | 1 | 0 | 1,353 | 1,247 | 1 | 0 | 0 | 0 |
| 9/10/2019 | 2019 | 1,506 | 1,318 | 0 | 1 | 0 | 1,425 | 1,245 | 1 | 0 | 0 | 0 |
| 9/11/2019 | 2019 | 1,586 | 1,365 | 0 | 1 | 0 | 1,507 | 1,291 | 1 | 0 | 0 | 0 |
| 9/12/2019 | 2019 | 1,302 | 1,383 | 0 | 1 | 0 | 1,242 | 1,308 | 1 | 0 | 0 | 0 |
| 9/13/2019 | 2019 | 1,411 | 1,403 | 0 | 1 | 0 | 1,322 | 1,323 | 1 | 0 | 0 | 0 |
| 9/14/2019 | 2019 | 1,302 | 1,397 | 0 | 1 | 0 | 1,227 | 1,320 | 1 | 0 | 0 | 0 |
| 9/15/2019 | 2019 | 1,254 | 1,400 | 0 | 1 | 0 | 1,191 | 1,324 | 1 | 1 | 0 | 0 |
| 9/16/2019 | 2019 | 1,172 | 1,362 | 0 | 1 | 0 | 1,132 | 1,292 | 1 | 1 | 0 | 0 |
| 9/17/2019 | 2019 | 1,542 | 1,367 | 0 | 1 | 0 | 1,461 | 1,297 | 1 | 1 | 0 | 0 |
| 9/18/2019 | 2019 | 1,627 | 1,373 | 0 | 1 | 0 | 1,528 | 1,300 | 1 | 1 | 0 | 0 |
| 9/19/2019 | 2019 | 1,174 | 1,355 | 0 | 1 | 0 | 1,114 | 1,282 | 1 | 1 | 0 | 0 |
| 9/20/2019 | 2019 | 1,370 | 1,349 | 0 | 1 | 0 | 1,303 | 1,279 | 1 | 1 | 0 | 0 |
| 9/21/2019 | 2019 | 1,230 | 1,338 | 0 | 1 | 0 | 1,169 | 1,271 | 1 | 1 | 0 | 0 |
| 9/22/2019 | 2019 | 1,368 | 1,355 | 0 | 1 | 0 | 1,293 | 1,286 | 1 | 1 | 0 | 0 |
| 9/23/2019 | 2019 | 1,287 | 1,371 | 0 | 1 | 0 | 1,188 | 1,294 | 1 | 1 | 0 | 0 |
| 9/24/2019 | 2019 | 1,150 | 1,315 | 1 | 1 | 1 | 1,095 | 1,241 | 1 | 1 | 0 | 0 |
| 9/25/2019 | 2019 | 1,497 | 1,297 | 1 | 1 | 0 | 1,416 | 1,225 | 1 | 1 | 0 | 0 |
| 9/26/2019 | 2019 | 1,604 | 1,358 | 1 | 1 | 0 | 1,520 | 1,283 | 1 | 1 | 0 | 0 |
| 9/27/2019 | 2019 | 1,373 | 1,358 | 1 | 1 | 0 | 1,306 | 1,284 | 1 | 1 | 0 | 0 |
| 9/28/2019 | 2019 | 1,240 | 1,360 | 1 | 1 | 0 | 1,180 | 1,285 | 1 | 1 | 0 | 0 |
| 9/29/2019 | 2019 | 1,309 | 1,351 | 1 | 1 | 0 | 1,241 | 1,278 | 1 | 1 | 0 | 0 |
| 9/30/2019 | 2019 | 1,258 | 1,347 | 1 | 1 | 0 | 1,178 | 1,277 | 1 | 1 | 0 | 0 |
| **Total** | | | | **1812** | **2013** | **5** | | | **2148** | **1991** | **11** | **0** |

Source: OHSS analysis of July 2024 Persist.

STB_AR1_001731



STB_AR1_001732

| Old IFR Turned Off but New IFR Turned On |
| --- |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001734

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001735

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001736

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |

STB_AR1_001737

| |
|---|
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001738

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001739

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001740

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001741

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001742

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001743

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001744

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001745

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |

STB_AR1_001746

| |
|---|
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001747

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001748

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001749

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001750

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001751

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001752

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001753

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001754

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001755

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001756

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001757

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001758

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001759

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001760

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001761

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001762

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001763

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |

STB_AR1_001764

| |
|---|
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |

STB_AR1_001765

| |
|---|
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001766

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001767

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001768

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001769

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001770

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001771

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001772

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001773

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001774

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001775

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001776

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001777

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001778

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |

STB_AR1_001779

| |
|---|
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |

STB_AR1_001780

| |
|---|
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |

STB_AR1_001781

| |
|---|
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001782

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001783

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001784

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |

STB_AR1_001785

| |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |

STB_AR1_001786

| |
|---|
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 1 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| **336** |

0.073057

STB_AR1_001787



Chart Title

STB_AR1_001788

USBP SWB Encounters

Sum of col Column Labels

| | 10 | 11 | 12 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 Grand Total | | May-June | June-Aug. | May - Aug. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 28,929 | 27,636 | 23,243 | 26,921 | 35,042 | 47,293 | 48,212 | 43,856 | 34,436 | 33,230 | 33,797 | 31,802 | 414,397 | | -21% | -2% | -23% |
| 2014 | 35,312 | 31,896 | 29,528 | 28,668 | 36,403 | 49,596 | 51,502 | 60,683 | 57,861 | 40,708 | 31,388 | 25,825 | 479,370 | | -5% | -46% | -48% |
| 2015 | 26,450 | 24,641 | 25,019 | 21,514 | 24,376 | 29,791 | 29,750 | 31,576 | 29,303 | 28,388 | 30,239 | 30,286 | 331,333 | | -7% | 3% | -4% |
| 2016 | 32,724 | 32,838 | 37,014 | 23,758 | 26,072 | 33,316 | 38,089 | 40,337 | 34,450 | 33,723 | 37,048 | 39,501 | 408,870 | | -15% | 8% | -8% |
| 2017 | 46,184 | 47,211 | 43,251 | 31,576 | 18,754 | 12,195 | 11,127 | 14,519 | 16,087 | 18,187 | 22,288 | 22,537 | 303,916 | | 11% | 39% | 54% |
| 2018 | 25,488 | 29,085 | 28,995 | 25,975 | 26,666 | 37,390 | 38,243 | 40,339 | 34,089 | 31,299 | 37,524 | 41,486 | 396,579 | | -15% | 10% | -7% |
| 2019 | 51,005 | 51,857 | 50,751 | 47,979 | 66,883 | 92,833 | 99,273 | 132,856 | 94,902 | 71,978 | 50,684 | 40,507 | 851,508 | | -29% | -47% | -62% |
| 2020 | 35,402 | 33,524 | 32,853 | 29,205 | 30,077 | 30,389 | 16,182 | 21,593 | 30,816 | 38,556 | 47,276 | 54,778 | 400,651 | | 43% | 53% | 119% |
| 2021 | 69,032 | 69,169 | 71,141 | 75,316 | 97,643 | 169,216 | 173,699 | 172,654 | 178,649 | 200,658 | 196,514 | 185,515 | 1,659,206 | | 3% | 10% | 14% |
| 2022 | 159,113 | 167,015 | 170,602 | 147,877 | 159,170 | 211,181 | 203,504 | 224,370 | 192,399 | 181,834 | 181,774 | 207,597 | 2,206,436 | | -14% | -6% | -19% |
| 2023 | 205,134 | 207,680 | 222,018 | 129,513 | 130,521 | 163,672 | 183,921 | 171,382 | 99,538 | 132,642 | 181,054 | 218,763 | 2,045,838 | | -42% | 82% | 6% |
| 2024 | 188,754 | 191,107 | 249,740 | 124,216 | 140,640 | 137,475 | 128,893 | 117,905 | 83,533 | 56,408 | 58,101 | | 1,476,772 | | -29% | -30% | -51% |

Note: August 2024 figure is a preliminary estimate based on opertational data.

Source: July 2024 OHSS Persist and data downloaded from UIP Sept. 3, 2024.     -10%  -5%  -13%

STB_AR1_001789

STB_AR1_001790

USBP SWB Encounters by family status

| | FM | SA | Contiguou | Non-contig | NCA UC | Total UC | Unknown | Mexico | Total Non- | NCA | Total | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct-12 | 693 | 25655 | 1298 | 1035 | 993 | 2333 | 248 | 20,396 | 8,533 | 7,940 | 28,929 | 593 |
| Nov-12 | 649 | 24345 | 1227 | 1165 | 1126 | 2392 | 250 | 18,917 | 8,719 | 8,044 | 27,636 | 675 |
| Dec-12 | 657 | 20162 | 1071 | 1147 | 1103 | 2218 | 206 | 15,512 | 7,731 | 7,121 | 23,243 | 610 |
| Jan-13 | 686 | 23712 | 1317 | 943 | 902 | 2260 | 263 | 19,971 | 6,950 | 6,246 | 26,921 | 704 |
| Feb-13 | 794 | 31029 | 1555 | 1430 | 1382 | 2985 | 234 | 24,194 | 10,848 | 10,089 | 35,042 | 759 |
| Mar-13 | 1124 | 41718 | 1919 | 2201 | 2135 | 4120 | 331 | 31,965 | 15,328 | 14,224 | 47,293 | 1,104 |
| Apr-13 | 1171 | 42491 | 1846 | 2360 | 2265 | 4206 | 344 | 31,387 | 16,825 | 15,561 | 48,212 | 1,264 |
| May-13 | 1147 | 38450 | 1570 | 2415 | 2322 | 3985 | 274 | 26,862 | 16,994 | 15,667 | 43,856 | 1,327 |
| Jun-13 | 1107 | 29759 | 1272 | 2112 | 2041 | 3384 | 186 | 20,486 | 13,950 | 12,810 | 34,436 | 1,140 |
| Jul-13 | 1441 | 27926 | 1393 | 2214 | 2138 | 3607 | 256 | 18,723 | 14,507 | 13,393 | 33,230 | 1,114 |
| Aug-13 | 1702 | 28130 | 1425 | 2292 | 2222 | 3717 | 248 | 19,088 | 14,709 | 13,683 | 33,797 | 1,026 |
| Sep-13 | 1763 | 26266 | 1326 | 2224 | 2154 | 3550 | 223 | 17,908 | 13,894 | 12,770 | 31,802 | 1,124 |
| Oct-13 | 2218 | 28693 | 1548 | 2633 | 2526 | 4181 | 220 | 20,334 | 14,978 | 13,696 | 35,312 | 1,282 |
| Nov-13 | 2622 | 24724 | 1361 | 2983 | 2904 | 4344 | 206 | 17,505 | 14,391 | 13,138 | 31,896 | 1,253 |
| Dec-13 | 3152 | 21852 | 1057 | 3270 | 3163 | 4327 | 197 | 14,543 | 14,985 | 13,784 | 29,528 | 1,201 |
| Jan-14 | 2185 | 22634 | 1208 | 2498 | 2441 | 3706 | 143 | 16,555 | 12,113 | 11,219 | 28,668 | 894 |
| Feb-14 | 3169 | 28226 | 1358 | 3487 | 3397 | 4845 | 163 | 19,508 | 16,895 | 15,681 | 36,403 | 1,214 |
| Mar-14 | 5632 | 36579 | 1817 | 5359 | 5262 | 7176 | 209 | 25,095 | 24,501 | 23,108 | 49,596 | 1,393 |
| Apr-14 | 6369 | 37202 | 1752 | 5948 | 5822 | 7700 | 231 | 24,720 | 26,782 | 25,347 | 51,502 | 1,435 |
| May-14 | 12671 | 37151 | 1438 | 9140 | 8951 | 10578 | 283 | 22,605 | 38,078 | 36,396 | 60,683 | 1,682 |
| Jun-14 | 16293 | 30776 | 1057 | 9563 | 9410 | 10620 | 172 | 17,617 | 40,244 | 38,788 | 57,861 | 1,456 |
| Jul-14 | 7339 | 27718 | 1058 | 4441 | 4354 | 5499 | 152 | 16,386 | 24,322 | 23,170 | 40,708 | 1,152 |
| Aug-14 | 3186 | 24878 | 1028 | 2109 | 2043 | 3137 | 187 | 16,351 | 15,037 | 14,006 | 31,388 | 1,031 |
| Sep-14 | 2204 | 21049 | 951 | 1475 | 1431 | 2426 | 146 | 15,551 | 10,274 | 9,527 | 25,825 | 747 |
| Oct-14 | 2162 | 21766 | 990 | 1529 | 1474 | 2519 | 3 | 16,297 | 10,153 | 9,250 | 26,450 | 903 |
| Nov-14 | 2415 | 19615 | 926 | 1684 | 1633 | 2610 | 1 | 14,563 | 10,209 | 9,145 | 24,641 | 933 |
| Dec-14 | 2891 | 19267 | 862 | 1996 | 1959 | 2858 | 3 | 13,759 | 11,260 | 10,303 | 25,019 | 957 |
| Jan-15 | 1622 | 17772 | 854 | 1264 | 1215 | 2118 | 2 | 13,923 | 7,591 | 6,854 | 21,514 | 737 |
| Feb-15 | 2041 | 19948 | 866 | 1519 | 1475 | 2385 | 2 | 15,806 | 8,570 | 7,721 | 24,376 | 849 |
| Mar-15 | 2782 | 23880 | 1068 | 2056 | 2019 | 3124 | 5 | 19,225 | 10,566 | 9,734 | 29,791 | 832 |
| Apr-15 | 3087 | 23389 | 943 | 2330 | 2301 | 3273 | 1 | 17,505 | 12,245 | 11,267 | 29,750 | 978 |
| May-15 | 3861 | 23770 | 965 | 2978 | 2938 | 3943 | 2 | 16,891 | 14,685 | 13,448 | 31,576 | 1,237 |
| Jun-15 | 4042 | 21427 | 819 | 3014 | 2948 | 3833 | 1 | 14,859 | 14,444 | 13,413 | 29,303 | 1,031 |
| Jul-15 | 4502 | 19703 | 851 | 3331 | 3287 | 4182 | 1 | 13,597 | 14,791 | 13,767 | 28,388 | 1,024 |
| Aug-15 | 5156 | 20441 | 974 | 3664 | 3610 | 4638 | 4 | 14,583 | 15,656 | 14,551 | 30,239 | 1,105 |
| Sep-15 | 5273 | 20527 | 893 | 3592 | 3527 | 4485 | 1 | 15,009 | 15,277 | 14,075 | 30,286 | 1,202 |
| Oct-15 | 6025 | 21745 | 987 | 3955 | 3895 | 4942 | 12 | 15,923 | 16,801 | 15,574 | 32,724 | 1,227 |
| Nov-15 | 6471 | 20758 | 974 | 4630 | 4556 | 5604 | 5 | 14,413 | 18,425 | 17,149 | 32,838 | 1,276 |
| Dec-15 | 8973 | 21267 | 916 | 5841 | 5755 | 6757 | 17 | 13,596 | 23,418 | 21,955 | 37,014 | 1,463 |
| Jan-16 | 3143 | 17513 | 846 | 2243 | 2176 | 3089 | 13 | 13,157 | 10,601 | 9,178 | 23,758 | 1,423 |
| Feb-16 | 3050 | 19926 | 928 | 2164 | 2118 | 3092 | 4 | 15,400 | 10,672 | 9,193 | 26,072 | 1,479 |
| Mar-16 | 4451 | 24648 | 1163 | 3044 | 2972 | 4207 | 10 | 19,462 | 13,854 | 12,237 | 33,316 | 1,617 |
| Apr-16 | 5620 | 27293 | 1175 | 3987 | 3893 | 5162 | 14 | 20,149 | 17,940 | 16,041 | 38,089 | 1,899 |
| May-16 | 6783 | 27951 | 1058 | 4536 | 4422 | 5594 | 9 | 19,008 | 21,329 | 19,439 | 40,337 | 1,890 |
| Jun-16 | 6627 | 23062 | 927 | 3823 | 3755 | 4750 | 11 | 15,654 | 18,796 | 17,104 | 34,450 | 1,692 |

Average monthly encounters

| | FM | SA | Contiguous UC |
|---|---|---|---|
| Pre-Pandemic | 11,681 | 22,112 | 945 |
| Pandemic-Era | 33,363 | 99,931 | 1,986 |
| Immediate Post-Pandemic | 64,176 | 85,156 | 2,484 |
| IFR | 19,816 | 39,964 | 1,974 |
| Immediate Post-Pandemic Change from Pandemic | 92% | -15% | 25% |
| IFR change from immediate post-pandemic | -69% | -53% | -21% |

STB_AR1_001791

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jul-16 | 7569 | 21121 | 877 | 4149 | 4092 | 5026 | 7 | 13,427 | 20,296 | 18,838 | 33,723 | 1,458 |
| Aug-16 | 9352 | 21919 | 1001 | 4766 | 4714 | 5767 | 10 | 14,476 | 22,572 | 21,036 | 37,048 | 1,536 |
| Sep-16 | 9609 | 24190 | 1071 | 4628 | 4545 | 5699 | 3 | 16,095 | 23,406 | 21,657 | 39,501 | 1,749 |
| Oct-16 | 13115 | 26348 | 1207 | 5497 | 5400 | 6704 | 17 | 18,123 | 28,061 | 26,392 | 46,184 | 1,669 |
| Nov-16 | 15588 | 24268 | 974 | 6372 | 6315 | 7346 | 9 | 15,307 | 31,904 | 30,374 | 47,211 | 1,530 |
| Dec-16 | 16139 | 19916 | 775 | 6412 | 6317 | 7187 | 9 | 11,257 | 31,994 | 30,205 | 43,251 | 1,789 |
| Jan-17 | 9300 | 17865 | 763 | 3642 | 3536 | 4405 | 6 | 11,422 | 20,154 | 18,417 | 31,576 | 1,737 |
| Feb-17 | 3123 | 13718 | 612 | 1298 | 1231 | 1910 | 3 | 9,122 | 9,632 | 8,578 | 18,754 | 1,054 |
| Mar-17 | 1126 | 10026 | 471 | 570 | 543 | 1041 | 2 | 7,422 | 4,773 | 4,068 | 12,195 | 705 |
| Apr-17 | 1118 | 9009 | 503 | 494 | 468 | 997 | 3 | 7,440 | 3,687 | 3,243 | 11,127 | 444 |
| May-17 | 1580 | 11462 | 606 | 867 | 849 | 1473 | 4 | 8,950 | 5,569 | 5,030 | 14,519 | 539 |
| Jun-17 | 2322 | 11813 | 662 | 1287 | 1247 | 1949 | 3 | 8,897 | 7,190 | 6,520 | 16,087 | 670 |
| Jul-17 | 3388 | 12318 | 655 | 1820 | 1757 | 2475 | 6 | 8,838 | 9,349 | 8,608 | 18,187 | 741 |
| Aug-17 | 4631 | 14668 | 823 | 2164 | 2080 | 2987 | 2 | 10,373 | 11,915 | 10,900 | 22,288 | 1,015 |
| Sep-17 | 4190 | 15385 | 826 | 2135 | 2011 | 2961 | 1 | 10,787 | 11,750 | 10,556 | 22,537 | 1,194 |
| Oct-17 | 4836 | 17488 | 897 | 2256 | 2147 | 3153 | 11 | 12,053 | 13,435 | 12,245 | 25,488 | 1,190 |
| Nov-17 | 7016 | 18081 | 859 | 3113 | 2956 | 3972 | 16 | 11,722 | 17,363 | 15,804 | 29,085 | 1,559 |
| Dec-17 | 8120 | 16800 | 679 | 3382 | 3270 | 4061 | 14 | 10,256 | 18,739 | 17,389 | 28,995 | 1,350 |
| Jan-18 | 5653 | 17107 | 844 | 2358 | 2304 | 3202 | 13 | 12,223 | 13,752 | 12,817 | 25,975 | 935 |
| Feb-18 | 5475 | 18062 | 860 | 2251 | 2214 | 3111 | 18 | 13,115 | 13,551 | 12,771 | 26,666 | 780 |
| Mar-18 | 8875 | 24358 | 1063 | 3077 | 2988 | 4140 | 17 | 17,669 | 19,721 | 18,398 | 37,390 | 1,323 |
| Apr-18 | 9646 | 24297 | 954 | 3330 | 3216 | 4284 | 16 | 16,370 | 21,873 | 20,395 | 38,243 | 1,478 |
| May-18 | 9485 | 24468 | 837 | 5530 | 5344 | 6367 | 19 | 13,534 | 26,805 | 24,588 | 40,339 | 2,217 |
| Jun-18 | 9434 | 19559 | 686 | 4394 | 4198 | 5080 | 16 | 10,807 | 23,282 | 21,249 | 34,089 | 2,033 |
| Jul-18 | 9252 | 18119 | 682 | 3229 | 2975 | 3911 | 17 | 9,939 | 21,360 | 18,785 | 31,299 | 2,575 |
| Aug-18 | 12760 | 20360 | 939 | 3454 | 3266 | 4393 | 11 | 12,149 | 25,375 | 22,869 | 37,524 | 2,506 |
| Sep-18 | 16657 | 20464 | 836 | 3524 | 3309 | 4360 | 5 | 12,420 | 29,066 | 26,294 | 41,486 | 2,772 |
| Oct-18 | 23116 | 22904 | 868 | 4096 | 3965 | 4964 | 21 | 13,868 | 37,137 | 34,380 | 51,005 | 2,757 |
| Nov-18 | 25164 | 21431 | 752 | 4505 | 4400 | 5257 | 5 | 11,149 | 40,708 | 37,498 | 51,857 | 3,210 |
| Dec-18 | 27507 | 18484 | 592 | 4161 | 4039 | 4753 | 7 | 8,706 | 42,045 | 38,944 | 50,751 | 3,101 |
| Jan-19 | 24188 | 18678 | 791 | 4314 | 4205 | 5105 | 8 | 11,109 | 36,870 | 34,014 | 47,979 | 2,856 |
| Feb-19 | 36528 | 23533 | 906 | 5911 | 5743 | 6817 | 5 | 12,878 | 54,005 | 50,444 | 66,883 | 3,561 |
| Mar-19 | 53202 | 30667 | 1111 | 7845 | 7621 | 8956 | 8 | 16,749 | 76,084 | 70,843 | 92,833 | 5,241 |
| Apr-19 | 58711 | 31671 | 969 | 7911 | 7650 | 8880 | 11 | 16,481 | 82,792 | 75,094 | 99,273 | 7,698 |
| May-19 | 84482 | 36879 | 1020 | 10455 | 10006 | 11475 | 20 | 17,531 | 115,325 | 103,247 | 132,856 | 12,078 |
| Jun-19 | 57358 | 30166 | 829 | 6543 | 6206 | 7372 | 6 | 15,703 | 79,199 | 66,682 | 94,902 | 12,517 |
| Jul-19 | 42541 | 23875 | 794 | 4760 | 4461 | 5554 | 8 | 12,683 | 59,295 | 48,844 | 71,978 | 10,451 |
| Aug-19 | 25049 | 21912 | 908 | 2814 | 2579 | 3722 | 1 | 13,642 | 37,042 | 29,881 | 50,684 | 7,161 |
| Sep-19 | 15824 | 21517 | 947 | 2218 | 1873 | 3165 | 1 | 15,959 | 24,548 | 17,903 | 40,507 | 6,645 |
| Oct-19 | 9721 | 22835 | 941 | 1900 | 1755 | 2841 | 5 | 16,910 | 18,492 | 13,717 | 35,402 | 4,775 |
| Nov-19 | 9006 | 21204 | 1015 | 2293 | 2129 | 3308 | 6 | 15,810 | 17,714 | 12,677 | 33,524 | 5,037 |
| Dec-19 | 8595 | 21030 | 1081 | 2142 | 1962 | 3223 | 5 | 14,565 | 18,288 | 12,437 | 32,853 | 5,851 |
| Jan-20 | 5161 | 21362 | 1065 | 1615 | 1487 | 2680 | 2 | 16,118 | 13,087 | 8,271 | 29,205 | 4,816 |
| Feb-20 | 4610 | 22396 | 1133 | 1937 | 1798 | 3070 | 1 | 16,726 | 13,351 | 8,992 | 30,077 | 4,359 |
| Mar-20 | 3455 | 23957 | 1106 | 1868 | 1738 | 2974 | 3 | 18,082 | 12,307 | 8,877 | 30,389 | 3,430 |
| Apr-20 | 716 | 14753 | 507 | 205 | 176 | 712 | 1 | 11,151 | 5,031 | 3,757 | 16,182 | 1,274 |
| May-20 | 979 | 19646 | 835 | 131 | 113 | 966 | 2 | 17,488 | 4,105 | 2,870 | 21,593 | 1,235 |

| Jun-20 | 1578 | 27636 | 1261 | 341 | 320 | 1602 | | 25,485 | 5,331 | 3,627 | 30,816 | 1,704 |
| Jul-20 | 1992 | 34136 | 1615 | 812 | 769 | 2427 | 1 | 29,948 | 8,608 | 6,160 | 38,556 | 2,448 |
| Aug-20 | 2609 | 41666 | 1824 | 1175 | 1112 | 2999 | 2 | 34,404 | 12,872 | 9,551 | 47,276 | 3,321 |
| Sep-20 | 3808 | 47214 | 1976 | 1779 | 1674 | 3755 | 1 | 36,431 | 18,347 | 12,882 | 54,778 | 5,465 |
| Oct-20 | 4634 | 59708 | 2365 | 2322 | 2171 | 4687 | 3 | 44,137 | 24,895 | 19,540 | 69,032 | 5,355 |
| Nov-20 | 4172 | 60521 | 1936 | 2539 | 2346 | 4475 | 1 | 41,541 | 27,628 | 22,032 | 69,169 | 5,596 |
| Dec-20 | 4248 | 62039 | 1661 | 3191 | 2950 | 4852 | 2 | 36,900 | 34,241 | 26,572 | 71,141 | 7,669 |
| Jan-21 | 7066 | 62560 | 1775 | 3913 | 3593 | 5688 | 2 | 38,122 | 37,194 | 27,777 | 75,316 | 9,417 |
| Feb-21 | 19289 | 69086 | 1772 | 7491 | 7204 | 9263 | 5 | 41,344 | 56,299 | 44,693 | 97,643 | 11,606 |
| Mar-21 | 53411 | 97078 | 2278 | 16438 | 15854 | 18716 | 11 | 59,347 | 109,869 | 85,333 | 169,216 | 24,536 |
| Apr-21 | 48297 | 108488 | 2266 | 14634 | 13873 | 16900 | 14 | 62,170 | 111,529 | 78,363 | 173,699 | 33,166 |
| May-21 | 40816 | 117951 | 2365 | 11513 | 10692 | 13878 | 9 | 66,237 | 106,417 | 66,521 | 172,654 | 39,896 |
| Jun-21 | 50106 | 113510 | 2070 | 12952 | 12190 | 15022 | 11 | 59,469 | 119,180 | 73,098 | 178,649 | 46,082 |
| Jul-21 | 76571 | 105401 | 1843 | 16838 | 15709 | 18681 | 5 | 52,995 | 147,663 | 90,425 | 200,658 | 57,238 |
| Aug-21 | 79895 | 98116 | 1801 | 16691 | 15669 | 18492 | 11 | 49,609 | 146,905 | 87,722 | 196,514 | 59,183 |
| Sep-21 | 62577 | 108744 | 1997 | 12183 | 11524 | 14180 | 14 | 56,166 | 129,349 | 61,818 | 185,515 | 67,531 |
| Oct-21 | 41554 | 104922 | 2307 | 10318 | 9862 | 12625 | 12 | 62,898 | 96,215 | 50,839 | 159,113 | 45,376 |
| Nov-21 | 43279 | 109969 | 2039 | 11706 | 11084 | 13745 | 22 | 59,153 | 107,862 | 49,882 | 167,015 | 57,980 |
| Dec-21 | 49436 | 109437 | 1783 | 9921 | 9196 | 11704 | 25 | 46,902 | 123,700 | 47,521 | 170,602 | 76,179 |
| Jan-22 | 30417 | 108818 | 2053 | 6554 | 5941 | 8607 | 35 | 55,697 | 92,180 | 31,174 | 147,877 | 61,006 |
| Feb-22 | 25165 | 122220 | 2498 | 9281 | 8728 | 11779 | 6 | 67,185 | 91,985 | 32,867 | 159,170 | 53,218 |
| Mar-22 | 34052 | 163224 | 2847 | 11045 | 10325 | 13892 | 13 | 82,797 | 128,384 | 45,204 | 211,181 | 83,180 |
| Apr-22 | 37082 | 154554 | 2552 | 9305 | 8588 | 11857 | 11 | 76,851 | 126,653 | 41,453 | 203,504 | 85,200 |
| May-22 | 51166 | 158777 | 2288 | 12132 | 11170 | 14420 | 7 | 70,606 | 153,764 | 47,446 | 224,370 | 106,318 |
| Jun-22 | 44070 | 133387 | 1924 | 13005 | 12245 | 14929 | 13 | 60,574 | 131,825 | 55,655 | 192,399 | 76,170 |
| Jul-22 | 42851 | 125969 | 1693 | 11310 | 10398 | 13003 | 11 | 48,347 | 133,487 | 45,473 | 181,834 | 88,014 |
| Aug-22 | 39305 | 131457 | 1951 | 9042 | 8138 | 10993 | 19 | 52,398 | 129,376 | 34,358 | 181,774 | 95,018 |
| Sep-22 | 44579 | 151465 | 2015 | 9524 | 8346 | 11539 | 14 | 55,372 | 152,225 | 32,830 | 207,597 | 119,395 |
| Oct-22 | 46745 | 146722 | 2185 | 9469 | 8139 | 11654 | 13 | 56,847 | 148,287 | 30,278 | 205,134 | 118,009 |
| Nov-22 | 49827 | 145037 | 1880 | 10900 | 9280 | 12780 | 36 | 49,016 | 158,664 | 28,963 | 207,680 | 129,701 |
| Dec-22 | 60843 | 149301 | 1582 | 10247 | 8282 | 11829 | 45 | 36,768 | 185,250 | 28,732 | 222,018 | 156,518 |
| Jan-23 | 25829 | 94637 | 2192 | 6842 | 5934 | 9034 | 13 | 52,468 | 77,045 | 23,864 | 129,513 | 53,181 |
| Feb-23 | 25643 | 94455 | 2413 | 8005 | 7396 | 10418 | 5 | 59,482 | 71,039 | 28,616 | 130,521 | 42,423 |
| Mar-23 | 33269 | 118546 | 2795 | 9057 | 8225 | 11852 | 5 | 72,043 | 91,629 | 31,772 | 163,672 | 59,857 |
| Apr-23 | 46554 | 126302 | 2330 | 8732 | 7542 | 11062 | 3 | 59,668 | 124,253 | 30,812 | 183,921 | 93,441 |
| May-23 | 45026 | 116910 | 1848 | 7594 | 6496 | 9442 | 4 | 43,612 | 127,770 | 36,535 | 171,382 | 91,235 |
| Jun-23 | 31271 | 61535 | 1566 | 5166 | 4424 | 6732 | | 33,958 | 65,580 | 22,247 | 99,538 | 43,333 |
| Jul-23 | 60165 | 62440 | 1991 | 8044 | 7230 | 10035 | 2 | 36,003 | 96,639 | 47,642 | 132,642 | 48,997 |
| Aug-23 | 93111 | 74408 | 2189 | 11338 | 10108 | 13527 | 8 | 39,508 | 141,546 | 74,010 | 181,054 | 67,536 |
| Sep-23 | 103027 | 102574 | 2159 | 10995 | 9326 | 13154 | 8 | 39,773 | 178,990 | 63,802 | 218,763 | 115,188 |
| Oct-23 | 84411 | 93638 | 2411 | 8286 | 6810 | 10697 | 8 | 48,998 | 139,756 | 47,403 | 188,754 | 92,353 |
| Nov-23 | 82676 | 96479 | 2875 | 9064 | 7449 | 11939 | 13 | 50,981 | 140,126 | 48,811 | 191,107 | 91,315 |
| Dec-23 | 101708 | 135559 | 3095 | 9361 | 7165 | 12456 | 17 | 56,239 | 193,501 | 59,504 | 249,740 | 133,997 |
| Jan-24 | 39807 | 76923 | 2426 | 5057 | 4147 | 7483 | 3 | 46,271 | 77,945 | 29,554 | 124,216 | 48,391 |
| Feb-24 | 45972 | 85303 | 2917 | 6439 | 5435 | 9356 | 9 | 49,918 | 90,722 | 35,489 | 140,640 | 55,233 |
| Mar-24 | 45988 | 83546 | 3038 | 4888 | 3892 | 7926 | 15 | 52,154 | 85,321 | 25,226 | 137,475 | 60,095 |
| Apr-24 | 40160 | 81088 | 2570 | 5062 | 4034 | 7632 | 13 | 45,899 | 82,994 | 22,901 | 128,893 | 60,093 |

STB_AR1_001793

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| May-24 | 41821 | 68377 | 2569 | 5127 | 4334 | 7696 | 11 | 45,127 | 72,778 | 25,030 | 117,905 | 47,748 |
| Jun-24 | 27817 | 49045 | 2020 | 4645 | 3988 | 6665 | 6 | 31,966 | 51,567 | 20,055 | 83,533 | 31,512 |
| Jul-24 | 16082 | 34699 | 1659 | 3966 | 3442 | 5625 | 2 | 22,231 | 34,177 | 13,435 | 56,408 | 20,742 |
| Aug-24 | 15550 | 36148 | 2244 | 4159 | 3646 | 6403 | 0 | 26850 | 58,101 | 12964 | 84,951 | 45,137 |

Note: August 2024 figure is a preliminary estimate based on opertational data.
Source: July 2024 OHSS Persist and data downloaded from UIP Sept. 3, 2024.

STB_AR1_001794

| Non-contig UC | NCA UC | Total UC | Share of Total Encounters | | | | Share of encounters by citizenship | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Contiguous UC | Non-contig UC | NCA UC | Total UC | Contiguou | Non-contig | NCA UC | Total UC |
| 3,717 | 3,607 | 4,662 | 2% | 10% | 9% | 12% | 6% | 16% | 17% | 12% |
| 8,420 | 7,750 | 10,406 | 1% | 6% | 5% | 7% | 4% | 9% | 20% | 7% |
| 7,402 | 6,196 | 9,886 | 1.6% | 4.6% | 3.9% | 6.2% | 5.5% | 6.5% | 14.8% | 6.2% |
| 4,257 | 3,692 | 6,231 | 3.0% | 6.4% | 5.6% | 9.4% | 7.3% | 8.9% | 23.8% | 8.3% |
| -12% | -20% | -5% | | | | | | | | |
| -42% | -40% | -37% | | | | | | | | |

STB_AR1_001795

Total  USBP SWB Encounters by selected Citizenships, FY 2013- July 2024

| | Mexico | NCA | Other |
|---|---|---|---|
| Oct-12 | 20,396 | 7,940 | 593 |
| Nov-12 | 18,917 | 8,044 | 675 |
| Dec-12 | 15,512 | 7,121 | 610 |
| Jan-13 | 19,971 | 6,246 | 704 |
| Feb-13 | 24,194 | 10,089 | 759 |
| Mar-13 | 31,965 | 14,224 | 1,104 |
| Apr-13 | 31,387 | 15,561 | 1,264 |
| May-13 | 26,862 | 15,667 | 1,327 |
| Jun-13 | 20,486 | 12,810 | 1,140 |
| Jul-13 | 18,723 | 13,393 | 1,114 |
| Aug-13 | 19,088 | 13,683 | 1,026 |
| Sep-13 | 17,908 | 12,770 | 1,124 |
| Oct-13 | 20,334 | 13,696 | 1,282 |
| Nov-13 | 17,505 | 13,138 | 1,253 |
| Dec-13 | 14,543 | 13,784 | 1,201 |
| Jan-14 | 16,555 | 11,219 | 894 |
| Feb-14 | 19,508 | 15,681 | 1,214 |
| Mar-14 | 25,095 | 23,108 | 1,393 |
| Apr-14 | 24,720 | 25,347 | 1,435 |
| May-14 | 22,605 | 36,396 | 1,682 |
| Jun-14 | 17,617 | 38,788 | 1,456 |
| Jul-14 | 16,386 | 23,170 | 1,152 |
| Aug-14 | 16,351 | 14,006 | 1,031 |
| Sep-14 | 15,551 | 9,527 | 747 |
| Oct-14 | 16,297 | 9,250 | 903 |
| Nov-14 | 14,563 | 9,145 | 933 |
| Dec-14 | 13,759 | 10,303 | 957 |
| Jan-15 | 13,923 | 6,854 | 737 |
| Feb-15 | 15,806 | 7,721 | 849 |
| Mar-15 | 19,225 | 9,734 | 832 |
| Apr-15 | 17,505 | 11,267 | 978 |
| May-15 | 16,891 | 13,448 | 1,237 |
| Jun-15 | 14,859 | 13,413 | 1,031 |
| Jul-15 | 13,597 | 13,767 | 1,024 |
| Aug-15 | 14,583 | 14,551 | 1,105 |
| Sep-15 | 15,009 | 14,075 | 1,202 |
| Oct-15 | 15,923 | 15,574 | 1,227 |
| Nov-15 | 14,413 | 17,149 | 1,276 |
| Dec-15 | 13,596 | 21,955 | 1,463 |
| Jan-16 | 13,157 | 9,178 | 1,423 |
| Feb-16 | 15,400 | 9,193 | 1,479 |
| Mar-16 | 19,462 | 12,237 | 1,617 |
| Apr-16 | 20,149 | 16,041 | 1,899 |
| May-16 | 19,008 | 19,439 | 1,890 |
| Jun-16 | 15,654 | 17,104 | 1,692 |

**Average monthly encounters**

| | Mexico | NCA | Other |
|---|---|---|---|
| Pre-Pandemic | 14,586 | 21,737 | 2,171 |
| Pandemic-Era | 51,027 | 39,091 | 53,592 |
| Immediate Post-Pandemic | 44,270 | 36,156 | 79,237 |
| IFR | 27,016 | 15,485 | 23,514 |
| Immediate Post-Pandemic Change from previous | -13% | -8% | 48% |
| IFR change from previous | -39% | -57% | -70% |
| | | | |
| Pre-Pandemic | 38% | 56% | 6% |
| Pandemic-Era | 36% | 27% | 37% |
| Immediate Post-Pandemic | 28% | 23% | 50% |
| IFR | 41% | 23% | 36% |

**Change from 2014-2019**

| | Mexico | NCA | Other |
|---|---|---|---|
| FY 2021 | 42% | 56% | -135% |
| FY 2022 | 30% | 67% | -506% |
| FY 2023 | 40% | 69% | -629% |
| FY 2024 to | 64% | 86% | -332% |

**USBP SWB Encounters**

| | Immediate post-pandemic | | IFR | | Total Post-Pandemic | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| Mexico | 531,242 | 29% | 81,047 | 39% | 612,289 | 29% |
| Guatemala | 226,603 | 14% | 23,841 | 12% | 250,444 | 14% |
| Venezuela | 166,766 | 12% | 3,185 | 2% | 169,951 | 11% |
| Honduras | 158,465 | 10% | 15,357 | 8% | 173,822 | 10% |
| Ecuador | 137,797 | 7% | 12,542 | 7% | 150,339 | 7% |
| Colombia | 129,400 | 7% | 14,900 | 8% | 144,300 | 7% |
| El Salvador | 48,806 | 3% | 7,256 | 4% | 56,062 | 3% |
| China, Peo| | 29,544 | 2% | 5,488 | 3% | 35,032 | 2% |
| Peru | 59,429 | 2% | 1,139 | 1% | 60,568 | 2% |
| India | 27,994 | 2% | 3,667 | 3% | 31,661 | 2% |
| Nicaragua | 108,395 | 2% | 1,623 | 1% | 110,018 | 2% |
| Dominican | 33,168 | 1% | 2,529 | 2% | 35,697 | 1% |
| Guinea | 8,118 | 1% | 40 | 0% | 8,158 | 1% |
| Cuba | 113,567 | 1% | 484 | 0% | 114,051 | 1% |
| Haiti | 527 | 0% | 140 | 0% | 667 | 0% |
| Russia | 5,789 | 0% | 92 | 0% | 5,881 | 0% |
| Ukraine | 68 | 0% | 3 | 0% | 71 | 0% |
| Other | 130,280 | 8% | 24,709 | 11% | 154,989 | 8% |
| Total | 1,915,958 | | 198,042 | | 2,114,000 | |

Source: July 2024 OHSS Persist and data downloaded from UIP 9/5/24 for august 2024 encounters.

| | | | |
|---|---|---|---|
| Jul-16 | 13,427 | 18,838 | 1,458 |
| Aug-16 | 14,476 | 21,036 | 1,536 |
| Sep-16 | 16,095 | 21,657 | 1,749 |
| Oct-16 | 18,123 | 26,392 | 1,669 |
| Nov-16 | 15,307 | 30,374 | 1,530 |
| Dec-16 | 11,257 | 30,205 | 1,789 |
| Jan-17 | 11,422 | 18,417 | 1,737 |
| Feb-17 | 9,122 | 8,578 | 1,054 |
| Mar-17 | 7,422 | 4,068 | 705 |
| Apr-17 | 7,440 | 3,243 | 444 |
| May-17 | 8,950 | 5,030 | 539 |
| Jun-17 | 8,897 | 6,520 | 670 |
| Jul-17 | 8,838 | 8,608 | 741 |
| Aug-17 | 10,373 | 10,900 | 1,015 |
| Sep-17 | 10,787 | 10,556 | 1,194 |
| Oct-17 | 12,053 | 12,245 | 1,190 |
| Nov-17 | 11,722 | 15,804 | 1,559 |
| Dec-17 | 10,256 | 17,389 | 1,350 |
| Jan-18 | 12,223 | 12,817 | 935 |
| Feb-18 | 13,115 | 12,771 | 780 |
| Mar-18 | 17,669 | 18,398 | 1,323 |
| Apr-18 | 16,370 | 20,395 | 1,478 |
| May-18 | 13,534 | 24,588 | 2,217 |
| Jun-18 | 10,807 | 21,249 | 2,033 |
| Jul-18 | 9,939 | 18,785 | 2,575 |
| Aug-18 | 12,149 | 22,869 | 2,506 |
| Sep-18 | 12,420 | 26,294 | 2,772 |
| Oct-18 | 13,868 | 34,380 | 2,757 |
| Nov-18 | 11,149 | 37,498 | 3,210 |
| Dec-18 | 8,706 | 38,944 | 3,101 |
| Jan-19 | 11,109 | 34,014 | 2,856 |
| Feb-19 | 12,878 | 50,444 | 3,561 |
| Mar-19 | 16,749 | 70,843 | 5,241 |
| Apr-19 | 16,481 | 75,094 | 7,698 |
| May-19 | 17,531 | 103,247 | 12,078 |
| Jun-19 | 15,703 | 66,682 | 12,517 |
| Jul-19 | 12,683 | 48,844 | 10,451 |
| Aug-19 | 13,642 | 29,881 | 7,161 |
| Sep-19 | 15,959 | 17,903 | 6,645 |
| Oct-19 | 16,910 | 13,717 | 4,775 |
| Nov-19 | 15,810 | 12,677 | 5,037 |
| Dec-19 | 14,565 | 12,437 | 5,851 |
| Jan-20 | 16,118 | 8,271 | 4,816 |
| Feb-20 | 16,726 | 8,992 | 4,359 |
| Mar-20 | 18,082 | 8,877 | 3,430 |
| Apr-20 | 11,151 | 3,757 | 1,274 |
| May-20 | 17,488 | 2,870 | 1,235 |

STB_AR1_001797

| | | | |
|---|---|---|---|
| Jun-20 | 25,485 | 3,627 | 1,704 |
| Jul-20 | 29,948 | 6,160 | 2,448 |
| Aug-20 | 34,404 | 9,551 | 3,321 |
| Sep-20 | 36,431 | 12,882 | 5,465 |
| Oct-20 | 44,137 | 19,540 | 5,355 |
| Nov-20 | 41,541 | 22,032 | 5,596 |
| Dec-20 | 36,900 | 26,572 | 7,669 |
| Jan-21 | 38,122 | 27,777 | 9,417 |
| Feb-21 | 41,344 | 44,693 | 11,606 |
| Mar-21 | 59,347 | 85,333 | 24,536 |
| Apr-21 | 62,170 | 78,363 | 33,166 |
| May-21 | 66,237 | 66,521 | 39,896 |
| Jun-21 | 59,469 | 73,098 | 46,082 |
| Jul-21 | 52,995 | 90,425 | 57,238 |
| Aug-21 | 49,609 | 87,722 | 59,183 |
| Sep-21 | 56,166 | 61,818 | 67,531 |
| Oct-21 | 62,898 | 50,839 | 45,376 |
| Nov-21 | 59,153 | 49,882 | 57,980 |
| Dec-21 | 46,902 | 47,521 | 76,179 |
| Jan-22 | 55,697 | 31,174 | 61,006 |
| Feb-22 | 67,185 | 38,767 | 53,218 |
| Mar-22 | 82,797 | 45,204 | 83,180 |
| Apr-22 | 76,851 | 41,453 | 85,200 |
| May-22 | 70,606 | 47,446 | 106,318 |
| Jun-22 | 60,574 | 55,655 | 76,170 |
| Jul-22 | 48,347 | 45,473 | 88,014 |
| Aug-22 | 52,398 | 34,358 | 95,018 |
| Sep-22 | 55,372 | 32,830 | 119,395 |
| Oct-22 | 56,847 | 30,278 | 118,009 |
| Nov-22 | 49,016 | 28,963 | 129,701 |
| Dec-22 | 36,768 | 28,732 | 156,518 |
| Jan-23 | 52,468 | 23,864 | 53,181 |
| Feb-23 | 59,482 | 28,616 | 42,423 |
| Mar-23 | 72,043 | 31,772 | 59,857 |
| Apr-23 | 59,668 | 30,812 | 93,441 |
| May-23 | 43,612 | 36,535 | 91,235 |
| Jun-23 | 33,958 | 22,247 | 43,333 |
| Jul-23 | 36,003 | 47,642 | 48,997 |
| Aug-23 | 39,508 | 74,010 | 67,536 |
| Sep-23 | 39,773 | 63,802 | 115,188 |
| Oct-23 | 56,847 | 30,278 | 118,009 |
| Nov-23 | 49,016 | 28,963 | 129,701 |
| Dec-23 | 36,768 | 28,732 | 156,518 |
| Jan-24 | 46,271 | 29,554 | 48,391 |
| Feb-24 | 49,918 | 35,489 | 55,233 |
| Mar-24 | 52,154 | 25,226 | 60,095 |
| Apr-24 | 45,899 | 22,901 | 60,093 |

STB_AR1_001798

| | | | |
|---|---|---|---|
| May-24 | 45,127 | 25,030 | 47,748 |
| Jun-24 | 31,966 | 20,055 | 31,512 |
| Jul-24 | 22,231 | 13,435 | 20,742 |
| Aug-24 | 26,850 | 12,964 | 18,287 |

Note: August 2024 figure is a preliminary estimate based on opertational data.
Source: July 2024 OHSS Persist and data downloaded from UIP Sept. 3, 2024.

STB_AR1_001799



**81%**

| Day | FY | Encounters (Includes non-contiguous UCs ) | 7dayMA |
|---|---|---|---|
| 10/1/2012 | 2013 | 935 | |
| 10/2/2012 | 2013 | 1,034 | |
| 10/3/2012 | 2013 | 912 | |
| 10/4/2012 | 2013 | 982 | |
| 10/5/2012 | 2013 | 839 | |
| 10/6/2012 | 2013 | 787 | |
| 10/7/2012 | 2013 | 779 | 895 |
| 10/8/2012 | 2013 | 887 | 889 |
| 10/9/2012 | 2013 | 1,003 | 884 |
| 10/10/2012 | 2013 | 984 | 894 |
| 10/11/2012 | 2013 | 950 | 890 |
| 10/12/2012 | 2013 | 889 | 897 |
| 10/13/2012 | 2013 | 925 | 917 |
| 10/14/2012 | 2013 | 1,102 | 963 |
| 10/15/2012 | 2013 | 945 | 971 |
| 10/16/2012 | 2013 | 1,055 | 979 |
| 10/17/2012 | 2013 | 962 | 975 |
| 10/18/2012 | 2013 | 961 | 977 |
| 10/19/2012 | 2013 | 913 | 980 |
| 10/20/2012 | 2013 | 952 | 984 |
| 10/21/2012 | 2013 | 837 | 946 |
| 10/22/2012 | 2013 | 995 | 954 |
| 10/23/2012 | 2013 | 972 | 942 |
| 10/24/2012 | 2013 | 1,006 | 948 |
| 10/25/2012 | 2013 | 974 | 950 |
| 10/26/2012 | 2013 | 827 | 938 |
| 10/27/2012 | 2013 | 928 | 934 |
| 10/28/2012 | 2013 | 792 | 928 |
| 10/29/2012 | 2013 | 990 | 927 |
| 10/30/2012 | 2013 | 866 | 912 |
| 10/31/2012 | 2013 | 946 | 903 |
| 11/1/2012 | 2013 | 980 | 904 |
| 11/2/2012 | 2013 | 749 | 893 |
| 11/3/2012 | 2013 | 873 | 885 |
| 11/4/2012 | 2013 | 887 | 899 |
| 11/5/2012 | 2013 | 791 | 870 |
| 11/6/2012 | 2013 | 861 | 870 |
| 11/7/2012 | 2013 | 911 | 865 |
| 11/8/2012 | 2013 | 834 | 844 |
| 11/9/2012 | 2013 | 969 | 875 |

| 2013-2019 | 2020-2022 | 2023-2024 |
|---|---|---|
| -42% | -36% | -52% |
| 49% | 47% | 7% |

| 2013-2022 | 2020-2024 |
|---|---|
| -40% | -42% |
| 48% | 31% |

| 2013-2024 | |
|---|---|
| -42% | |
| 41% | |

2586.207
1500
-0.42

| | Daily USBP Encounters | 7-day moving Avg - Daily USBP Encounters | | |
|---|---|---|---|---|
| 1 | 944 | | | 1 |
| 2 | 1257 | | | 2 |
| 3 | 1065 | | | 3 |
| 4 | 1608 | | | 4 |
| 5 | 1154 | | | 5 |
| 6 | 963 | | | 6 |
| 7 | 1098 | 1,156 | | 7 |
| 8 | 1068 | 1,173 | | 8 |
| 9 | 1129 | 1,155 | | 9 |
| 10 | 1277 | 1,185 | | 10 |
| 11 | 1442 | 1,162 | | 11 |
| 12 | 1251 | 1,175 | | 12 |
| 13 | 1164 | 1,204 | | 13 |
| 14 | 995 | 1,189 | | 14 |
| 15 | 1231 | 1,213 | | 15 |
| 16 | 997 | 1,194 | Dec --2020 | 16 |
| 17 | 1211 | 1,184 | | 17 |
| 18 | 1274 | 1,160 | | 18 |
| 19 | 1210 | 1,155 | | 19 |
| 20 | 1103 | 1,146 | | 20 |
| 21 | 1217 | 1,178 | | 21 |
| 22 | 843 | 1,122 | | 22 |
| 23 | 1128 | 1,141 | | 23 |
| 24 | 776 | 1,079 | | 24 |
| 25 | 564 | 977 | | 25 |
| 26 | 751 | 912 | | 26 |
| 27 | 793 | 867 | | 27 |
| 28 | 881 | 819 | | 28 |
| 29 | 758 | 807 | | 29 |
| 30 | 893 | 774 | | 30 |
| 31 | 808 | 778 | | 31 |
| 1 | 505 | 770 | | 1 |
| 2 | 598 | 748 | | 2 |
| 3 | 690 | 733 | | 3 |
| 4 | 625 | 697 | | 4 |
| 5 | 653 | 682 | | 5 |
| 6 | 831 | 673 | -0.40228 | 6 |
| 7 | 686 | 655 | | 7 |
| 8 | 819 | 700 | | 8 |
| 9 | 850 | 736 | | 9 |

Dec --2019

STB_AR1_001801

| Date | Year | Value 1 | Value 2 |
|---|---|---|---|
| 11/10/2012 | 2013 | 920 | 882 |
| 11/11/2012 | 2013 | 953 | 891 |
| 11/12/2012 | 2013 | 940 | 913 |
| 11/13/2012 | 2013 | 859 | 912 |
| 11/14/2012 | 2013 | 756 | 890 |
| 11/15/2012 | 2013 | 976 | 910 |
| 11/16/2012 | 2013 | 1,036 | 920 |
| 11/17/2012 | 2013 | 884 | 915 |
| 11/18/2012 | 2013 | 854 | 901 |
| 11/19/2012 | 2013 | 1,067 | 919 |
| 11/20/2012 | 2013 | 871 | 921 |
| 11/21/2012 | 2013 | 805 | 928 |
| 11/22/2012 | 2013 | 809 | 904 |
| 11/23/2012 | 2013 | 785 | 868 |
| 11/24/2012 | 2013 | 1,019 | 887 |
| 11/25/2012 | 2013 | 1,050 | 915 |
| 11/26/2012 | 2013 | 1,119 | 923 |
| 11/27/2012 | 2013 | 916 | 929 |
| 11/28/2012 | 2013 | 1,143 | 977 |
| 11/29/2012 | 2013 | 1,031 | 1,009 |
| 11/30/2012 | 2013 | 988 | 1,038 |
| 12/1/2012 | 2013 | 816 | 1,009 |
| 12/2/2012 | 2013 | 689 | 957 |
| 12/3/2012 | 2013 | 824 | 915 |
| 12/4/2012 | 2013 | 944 | 919 |
| 12/5/2012 | 2013 | 985 | 897 |
| 12/6/2012 | 2013 | 959 | 886 |
| 12/7/2012 | 2013 | 765 | 855 |
| 12/8/2012 | 2013 | 758 | 846 |
| 12/9/2012 | 2013 | 891 | 875 |
| 12/10/2012 | 2013 | 703 | 858 |
| 12/11/2012 | 2013 | 828 | 841 |
| 12/12/2012 | 2013 | 710 | 802 |
| 12/13/2012 | 2013 | 938 | 799 |
| 12/14/2012 | 2013 | 756 | 798 |
| 12/15/2012 | 2013 | 554 | 769 |
| 12/16/2012 | 2013 | 764 | 750 |
| 12/17/2012 | 2013 | 920 | 781 |
| 12/18/2012 | 2013 | 960 | 800 |
| 12/19/2012 | 2013 | 858 | 821 |
| 12/20/2012 | 2013 | 743 | 794 |
| 12/21/2012 | 2013 | 662 | 780 |
| 12/22/2012 | 2013 | 707 | 802 |
| 12/23/2012 | 2013 | 673 | 789 |
| 12/24/2012 | 2013 | 623 | 747 |
| 12/25/2012 | 2013 | 441 | 672 |
| 12/26/2012 | 2013 | 520 | 624 |

| | Jan --2020 | | | | Jan --2021 | |
|---|---|---|---|---|---|---|
| 10 | 808 | 753 | | | 10 |
| 11 | 804 | 779 | | | 11 |
| 12 | 715 | 788 | | | 12 |
| 13 | 1028 | 816 | | | 13 |
| 14 | 981 | 858 | | | 14 |
| 15 | 1114 | 900 | | | 15 |
| 16 | 1116 | 938 | | | 16 |
| 17 | 1118 | 982 | | | 17 |
| 18 | 954 | 1,004 | | | 18 |
| 19 | 849 | 1,023 | 0.472141 | | 19 |
| 20 | 1117 | 1,036 | | | 20 |
| 21 | 1305 | 1,082 | | | 21 |
| 22 | 1128 | 1,084 | | | 22 |
| 23 | 1141 | 1,087 | | | 23 |
| 24 | 1029 | 1,075 | | | 24 |
| 25 | 1075 | 1,092 | | | 25 |
| 26 | 1107 | 1,129 | | | 26 |
| 27 | 1042 | 1,118 | | | 27 |
| 28 | 1172 | 1,099 | | | 28 |
| 29 | 1160 | 1,104 | | | 29 |
| 30 | 1061 | 1,092 | | | 30 |
| 31 | 1124 | 1,106 | | | 31 |

STB_AR1_001802

| | | | | |
|---|---|---|---|---|
| 12/27/2012 | 2013 | 543 | 596 | |
| 12/28/2012 | 2013 | 711 | 603 | |
| 12/29/2012 | 2013 | 771 | 612 | |
| 12/30/2012 | 2013 | 645 | 608 | |
| 12/31/2012 | 2013 | 582 | 602 | |
| 1/1/2013 | 2013 | 437 | 601 | |
| 1/2/2013 | 2013 | 427 | 588 | |
| 1/3/2013 | 2013 | 629 | 600 | |
| 1/4/2013 | 2013 | 580 | 582 | |
| 1/5/2013 | 2013 | 624 | 561 | -0.28897 |
| 1/6/2013 | 2013 | 668 | 564 | |
| 1/7/2013 | 2013 | 638 | 572 | |
| 1/8/2013 | 2013 | 637 | 600 | |
| 1/9/2013 | 2013 | 702 | 640 | |
| 1/10/2013 | 2013 | 870 | 674 | |
| 1/11/2013 | 2013 | 665 | 686 | |
| 1/12/2013 | 2013 | 691 | 696 | |
| 1/13/2013 | 2013 | 757 | 709 | |
| 1/14/2013 | 2013 | 831 | 736 | |
| 1/15/2013 | 2013 | 904 | 774 | |
| 1/16/2013 | 2013 | 831 | 793 | |
| 1/17/2013 | 2013 | 975 | 808 | |
| 1/18/2013 | 2013 | 945 | 848 | 0.511586 |
| 1/19/2013 | 2013 | 975 | 888 | |
| 1/20/2013 | 2013 | 1,096 | 937 | |
| 1/21/2013 | 2013 | 982 | 958 | |
| 1/22/2013 | 2013 | 968 | 967 | |
| 1/23/2013 | 2013 | 1,129 | 1,010 | |
| 1/24/2013 | 2013 | 1,163 | 1,037 | |
| 1/25/2013 | 2013 | 1,144 | 1,065 | |
| 1/26/2013 | 2013 | 1,136 | 1,088 | |
| 1/27/2013 | 2013 | 1,066 | 1,084 | |
| 1/28/2013 | 2013 | 1,083 | 1,098 | |
| 1/29/2013 | 2013 | 1,002 | 1,103 | |
| 1/30/2013 | 2013 | 1,043 | 1,091 | |
| 1/31/2013 | 2013 | 1,323 | 1,114 | |
| 2/1/2013 | 2013 | 914 | 1,081 | |
| 2/2/2013 | 2013 | 1,283 | 1,102 | |
| 2/3/2013 | 2013 | 1,138 | 1,112 | |
| 2/4/2013 | 2013 | 1,257 | 1,137 | |
| 2/5/2013 | 2013 | 1,067 | 1,146 | |
| 2/6/2013 | 2013 | 1,133 | 1,159 | |
| 2/7/2013 | 2013 | 1,450 | 1,177 | |
| 2/8/2013 | 2013 | 1,264 | 1,227 | |
| 2/9/2013 | 2013 | 1,118 | 1,204 | |
| 2/10/2013 | 2013 | 1,245 | 1,219 | |
| 2/11/2013 | 2013 | 1,236 | 1,216 | |

STB_AR1_001803

| | | | |
|---|---|---|---|
| 2/12/2013 | 2013 | 1,012 | 1,208 |
| 2/13/2013 | 2013 | 1,062 | 1,198 |
| 2/14/2013 | 2013 | 1,159 | 1,157 |
| 2/15/2013 | 2013 | 922 | 1,108 |
| 2/16/2013 | 2013 | 966 | 1,086 |
| 2/17/2013 | 2013 | 1,337 | 1,099 |
| 2/18/2013 | 2013 | 1,377 | 1,119 |
| 2/19/2013 | 2013 | 1,471 | 1,185 |
| 2/20/2013 | 2013 | 1,320 | 1,222 |
| 2/21/2013 | 2013 | 1,336 | 1,247 |
| 2/22/2013 | 2013 | 1,256 | 1,295 |
| 2/23/2013 | 2013 | 1,514 | 1,373 |
| 2/24/2013 | 2013 | 1,315 | 1,370 |
| 2/25/2013 | 2013 | 1,383 | 1,371 |
| 2/26/2013 | 2013 | 1,495 | 1,374 |
| 2/27/2013 | 2013 | 1,440 | 1,391 |
| 2/28/2013 | 2013 | 1,572 | 1,425 |
| 3/1/2013 | 2013 | 1,418 | 1,448 |
| 3/2/2013 | 2013 | 1,473 | 1,442 |
| 3/3/2013 | 2013 | 1,573 | 1,479 |
| 3/4/2013 | 2013 | 1,555 | 1,504 |
| 3/5/2013 | 2013 | 1,477 | 1,501 |
| 3/6/2013 | 2013 | 1,641 | 1,530 |
| 3/7/2013 | 2013 | 1,387 | 1,503 |
| 3/8/2013 | 2013 | 1,240 | 1,478 |
| 3/9/2013 | 2013 | 1,185 | 1,437 |
| 3/10/2013 | 2013 | 1,461 | 1,421 |
| 3/11/2013 | 2013 | 1,419 | 1,401 |
| 3/12/2013 | 2013 | 1,398 | 1,390 |
| 3/13/2013 | 2013 | 1,749 | 1,406 |
| 3/14/2013 | 2013 | 1,436 | 1,413 |
| 3/15/2013 | 2013 | 1,454 | 1,443 |
| 3/16/2013 | 2013 | 1,412 | 1,476 |
| 3/17/2013 | 2013 | 1,377 | 1,464 |
| 3/18/2013 | 2013 | 1,558 | 1,483 |
| 3/19/2013 | 2013 | 1,824 | 1,544 |
| 3/20/2013 | 2013 | 1,681 | 1,535 |
| 3/21/2013 | 2013 | 1,678 | 1,569 |
| 3/22/2013 | 2013 | 1,556 | 1,584 |
| 3/23/2013 | 2013 | 1,540 | 1,602 |
| 3/24/2013 | 2013 | 1,609 | 1,635 |
| 3/25/2013 | 2013 | 1,844 | 1,676 |
| 3/26/2013 | 2013 | 1,786 | 1,671 |
| 3/27/2013 | 2013 | 1,672 | 1,669 |
| 3/28/2013 | 2013 | 1,742 | 1,678 |
| 3/29/2013 | 2013 | 1,363 | 1,651 |
| 3/30/2013 | 2013 | 1,566 | 1,655 |

STB_AR1_001804

| | | | |
|---|---|---|---|
| 3/31/2013 | 2013 | 1,219 | 1,599 |
| 4/1/2013 | 2013 | 1,548 | 1,557 |
| 4/2/2013 | 2013 | 1,550 | 1,523 |
| 4/3/2013 | 2013 | 1,493 | 1,497 |
| 4/4/2013 | 2013 | 1,544 | 1,469 |
| 4/5/2013 | 2013 | 1,576 | 1,499 |
| 4/6/2013 | 2013 | 1,636 | 1,509 |
| 4/7/2013 | 2013 | 1,566 | 1,559 |
| 4/8/2013 | 2013 | 1,690 | 1,579 |
| 4/9/2013 | 2013 | 1,833 | 1,620 |
| 4/10/2013 | 2013 | 1,418 | 1,609 |
| 4/11/2013 | 2013 | 1,412 | 1,590 |
| 4/12/2013 | 2013 | 1,461 | 1,574 |
| 4/13/2013 | 2013 | 1,585 | 1,566 |
| 4/14/2013 | 2013 | 1,689 | 1,584 |
| 4/15/2013 | 2013 | 1,493 | 1,556 |
| 4/16/2013 | 2013 | 1,543 | 1,514 |
| 4/17/2013 | 2013 | 1,553 | 1,534 |
| 4/18/2013 | 2013 | 1,781 | 1,586 |
| 4/19/2013 | 2013 | 1,636 | 1,611 |
| 4/20/2013 | 2013 | 1,533 | 1,604 |
| 4/21/2013 | 2013 | 1,501 | 1,577 |
| 4/22/2013 | 2013 | 1,928 | 1,639 |
| 4/23/2013 | 2013 | 1,725 | 1,665 |
| 4/24/2013 | 2013 | 1,345 | 1,636 |
| 4/25/2013 | 2013 | 1,549 | 1,602 |
| 4/26/2013 | 2013 | 1,590 | 1,596 |
| 4/27/2013 | 2013 | 1,610 | 1,607 |
| 4/28/2013 | 2013 | 1,750 | 1,642 |
| 4/29/2013 | 2013 | 1,976 | 1,649 |
| 4/30/2013 | 2013 | 1,698 | 1,645 |
| 5/1/2013 | 2013 | 1,445 | 1,660 |
| 5/2/2013 | 2013 | 1,586 | 1,665 |
| 5/3/2013 | 2013 | 1,268 | 1,619 |
| 5/4/2013 | 2013 | 1,363 | 1,584 |
| 5/5/2013 | 2013 | 1,591 | 1,561 |
| 5/6/2013 | 2013 | 1,711 | 1,523 |
| 5/7/2013 | 2013 | 1,540 | 1,501 |
| 5/8/2013 | 2013 | 1,666 | 1,532 |
| 5/9/2013 | 2013 | 1,738 | 1,554 |
| 5/10/2013 | 2013 | 1,399 | 1,573 |
| 5/11/2013 | 2013 | 1,301 | 1,564 |
| 5/12/2013 | 2013 | 1,224 | 1,511 |
| 5/13/2013 | 2013 | 1,639 | 1,501 |
| 5/14/2013 | 2013 | 1,557 | 1,503 |
| 5/15/2013 | 2013 | 1,340 | 1,457 |
| 5/16/2013 | 2013 | 1,379 | 1,406 |

STB_AR1_001805

| | | | |
|---|---|---|---|
| 5/17/2013 | 2013 | 1,355 | 1,399 |
| 5/18/2013 | 2013 | 1,351 | 1,406 |
| 5/19/2013 | 2013 | 1,365 | 1,427 |
| 5/20/2013 | 2013 | 1,286 | 1,376 |
| 5/21/2013 | 2013 | 1,373 | 1,350 |
| 5/22/2013 | 2013 | 1,401 | 1,359 |
| 5/23/2013 | 2013 | 1,383 | 1,359 |
| 5/24/2013 | 2013 | 1,100 | 1,323 |
| 5/25/2013 | 2013 | 1,324 | 1,319 |
| 5/26/2013 | 2013 | 1,223 | 1,299 |
| 5/27/2013 | 2013 | 1,440 | 1,321 |
| 5/28/2013 | 2013 | 1,393 | 1,323 |
| 5/29/2013 | 2013 | 1,428 | 1,327 |
| 5/30/2013 | 2013 | 1,364 | 1,325 |
| 5/31/2013 | 2013 | 1,323 | 1,356 |
| 6/1/2013 | 2013 | 1,159 | 1,333 |
| 6/2/2013 | 2013 | 1,157 | 1,323 |
| 6/3/2013 | 2013 | 1,418 | 1,320 |
| 6/4/2013 | 2013 | 1,340 | 1,313 |
| 6/5/2013 | 2013 | 1,170 | 1,276 |
| 6/6/2013 | 2013 | 1,155 | 1,246 |
| 6/7/2013 | 2013 | 1,250 | 1,236 |
| 6/8/2013 | 2013 | 1,263 | 1,250 |
| 6/9/2013 | 2013 | 1,113 | 1,244 |
| 6/10/2013 | 2013 | 1,248 | 1,220 |
| 6/11/2013 | 2013 | 1,211 | 1,201 |
| 6/12/2013 | 2013 | 1,159 | 1,200 |
| 6/13/2013 | 2013 | 1,216 | 1,209 |
| 6/14/2013 | 2013 | 1,041 | 1,179 |
| 6/15/2013 | 2013 | 990 | 1,140 |
| 6/16/2013 | 2013 | 1,032 | 1,128 |
| 6/17/2013 | 2013 | 1,007 | 1,094 |
| 6/18/2013 | 2013 | 1,131 | 1,082 |
| 6/19/2013 | 2013 | 1,141 | 1,080 |
| 6/20/2013 | 2013 | 1,147 | 1,070 |
| 6/21/2013 | 2013 | 1,171 | 1,088 |
| 6/22/2013 | 2013 | 1,137 | 1,109 |
| 6/23/2013 | 2013 | 1,051 | 1,112 |
| 6/24/2013 | 2013 | 1,043 | 1,117 |
| 6/25/2013 | 2013 | 1,145 | 1,119 |
| 6/26/2013 | 2013 | 1,247 | 1,134 |
| 6/27/2013 | 2013 | 1,228 | 1,146 |
| 6/28/2013 | 2013 | 982 | 1,119 |
| 6/29/2013 | 2013 | 1,000 | 1,099 |
| 6/30/2013 | 2013 | 1,084 | 1,104 |
| 7/1/2013 | 2013 | 1,114 | 1,114 |
| 7/2/2013 | 2013 | 1,012 | 1,095 |

STB_AR1_001806

| | | | |
|---|---|---|---|
| 7/3/2013 | 2013 | 1,117 | 1,077 |
| 7/4/2013 | 2013 | 993 | 1,043 |
| 7/5/2013 | 2013 | 1,132 | 1,065 |
| 7/6/2013 | 2013 | 1,157 | 1,087 |
| 7/7/2013 | 2013 | 1,089 | 1,088 |
| 7/8/2013 | 2013 | 1,158 | 1,094 |
| 7/9/2013 | 2013 | 1,305 | 1,136 |
| 7/10/2013 | 2013 | 983 | 1,117 |
| 7/11/2013 | 2013 | 962 | 1,112 |
| 7/12/2013 | 2013 | 1,106 | 1,109 |
| 7/13/2013 | 2013 | 991 | 1,085 |
| 7/14/2013 | 2013 | 1,012 | 1,074 |
| 7/15/2013 | 2013 | 1,074 | 1,062 |
| 7/16/2013 | 2013 | 904 | 1,005 |
| 7/17/2013 | 2013 | 1,110 | 1,023 |
| 7/18/2013 | 2013 | 1,037 | 1,033 |
| 7/19/2013 | 2013 | 981 | 1,016 |
| 7/20/2013 | 2013 | 1,041 | 1,023 |
| 7/21/2013 | 2013 | 1,129 | 1,039 |
| 7/22/2013 | 2013 | 1,134 | 1,048 |
| 7/23/2013 | 2013 | 1,083 | 1,074 |
| 7/24/2013 | 2013 | 1,091 | 1,071 |
| 7/25/2013 | 2013 | 1,138 | 1,085 |
| 7/26/2013 | 2013 | 954 | 1,081 |
| 7/27/2013 | 2013 | 1,184 | 1,102 |
| 7/28/2013 | 2013 | 951 | 1,076 |
| 7/29/2013 | 2013 | 1,110 | 1,073 |
| 7/30/2013 | 2013 | 1,098 | 1,075 |
| 7/31/2013 | 2013 | 1,080 | 1,074 |
| 8/1/2013 | 2013 | 1,121 | 1,071 |
| 8/2/2013 | 2013 | 1,003 | 1,078 |
| 8/3/2013 | 2013 | 1,112 | 1,068 |
| 8/4/2013 | 2013 | 974 | 1,071 |
| 8/5/2013 | 2013 | 1,103 | 1,070 |
| 8/6/2013 | 2013 | 1,110 | 1,072 |
| 8/7/2013 | 2013 | 1,134 | 1,080 |
| 8/8/2013 | 2013 | 1,053 | 1,070 |
| 8/9/2013 | 2013 | 1,053 | 1,077 |
| 8/10/2013 | 2013 | 1,118 | 1,078 |
| 8/11/2013 | 2013 | 964 | 1,076 |
| 8/12/2013 | 2013 | 1,131 | 1,080 |
| 8/13/2013 | 2013 | 1,179 | 1,090 |
| 8/14/2013 | 2013 | 1,226 | 1,103 |
| 8/15/2013 | 2013 | 1,043 | 1,102 |
| 8/16/2013 | 2013 | 926 | 1,084 |
| 8/17/2013 | 2013 | 949 | 1,060 |
| 8/18/2013 | 2013 | 927 | 1,054 |

STB_AR1_001807

| | | | |
|---|---|---|---|
| 8/19/2013 | 2013 | 1,008 | 1,037 |
| 8/20/2013 | 2013 | 1,033 | 1,016 |
| 8/21/2013 | 2013 | 1,005 | 984 |
| 8/22/2013 | 2013 | 1,120 | 995 |
| 8/23/2013 | 2013 | 1,114 | 1,022 |
| 8/24/2013 | 2013 | 1,125 | 1,047 |
| 8/25/2013 | 2013 | 1,177 | 1,083 |
| 8/26/2013 | 2013 | 1,271 | 1,121 |
| 8/27/2013 | 2013 | 1,243 | 1,151 |
| 8/28/2013 | 2013 | 1,096 | 1,164 |
| 8/29/2013 | 2013 | 1,325 | 1,193 |
| 8/30/2013 | 2013 | 1,085 | 1,189 |
| 8/31/2013 | 2013 | 1,069 | 1,181 |
| 9/1/2013 | 2013 | 946 | 1,148 |
| 9/2/2013 | 2013 | 1,195 | 1,137 |
| 9/3/2013 | 2013 | 1,118 | 1,119 |
| 9/4/2013 | 2013 | 1,006 | 1,106 |
| 9/5/2013 | 2013 | 1,177 | 1,085 |
| 9/6/2013 | 2013 | 964 | 1,068 |
| 9/7/2013 | 2013 | 1,163 | 1,081 |
| 9/8/2013 | 2013 | 1,058 | 1,097 |
| 9/9/2013 | 2013 | 1,402 | 1,127 |
| 9/10/2013 | 2013 | 1,043 | 1,116 |
| 9/11/2013 | 2013 | 1,174 | 1,140 |
| 9/12/2013 | 2013 | 1,266 | 1,153 |
| 9/13/2013 | 2013 | 1,025 | 1,162 |
| 9/14/2013 | 2013 | 1,007 | 1,139 |
| 9/15/2013 | 2013 | 918 | 1,119 |
| 9/16/2013 | 2013 | 898 | 1,047 |
| 9/17/2013 | 2013 | 1,181 | 1,067 |
| 9/18/2013 | 2013 | 1,036 | 1,047 |
| 9/19/2013 | 2013 | 1,021 | 1,012 |
| 9/20/2013 | 2013 | 955 | 1,002 |
| 9/21/2013 | 2013 | 1,070 | 1,011 |
| 9/22/2013 | 2013 | 894 | 1,008 |
| 9/23/2013 | 2013 | 1,198 | 1,051 |
| 9/24/2013 | 2013 | 1,049 | 1,032 |
| 9/25/2013 | 2013 | 982 | 1,024 |
| 9/26/2013 | 2013 | 1,026 | 1,025 |
| 9/27/2013 | 2013 | 1,146 | 1,052 |
| 9/28/2013 | 2013 | 932 | 1,032 |
| 9/29/2013 | 2013 | 993 | 1,047 |
| 9/30/2013 | 2013 | 959 | 1,012 |
| 10/1/2013 | 2014 | 1,135 | 1,025 |
| 10/2/2013 | 2014 | 1,087 | 1,040 |
| 10/3/2013 | 2014 | 1,082 | 1,048 |
| 10/4/2013 | 2014 | 1,067 | 1,036 |

STB_AR1_001808

| | | | |
|---|---|---|---|
| 10/5/2013 | 2014 | 1,156 | 1,068 |
| 10/6/2013 | 2014 | 1,251 | 1,105 |
| 10/7/2013 | 2014 | 1,194 | 1,139 |
| 10/8/2013 | 2014 | 1,137 | 1,139 |
| 10/9/2013 | 2014 | 1,032 | 1,131 |
| 10/10/2013 | 2014 | 1,222 | 1,151 |
| 10/11/2013 | 2014 | 1,309 | 1,186 |
| 10/12/2013 | 2014 | 1,243 | 1,198 |
| 10/13/2013 | 2014 | 1,031 | 1,167 |
| 10/14/2013 | 2014 | 1,091 | 1,152 |
| 10/15/2013 | 2014 | 980 | 1,130 |
| 10/16/2013 | 2014 | 1,166 | 1,149 |
| 10/17/2013 | 2014 | 1,123 | 1,135 |
| 10/18/2013 | 2014 | 1,154 | 1,113 |
| 10/19/2013 | 2014 | 1,089 | 1,091 |
| 10/20/2013 | 2014 | 1,109 | 1,102 |
| 10/21/2013 | 2014 | 1,240 | 1,123 |
| 10/22/2013 | 2014 | 1,236 | 1,160 |
| 10/23/2013 | 2014 | 901 | 1,122 |
| 10/24/2013 | 2014 | 1,013 | 1,106 |
| 10/25/2013 | 2014 | 1,175 | 1,109 |
| 10/26/2013 | 2014 | 1,111 | 1,112 |
| 10/27/2013 | 2014 | 1,373 | 1,150 |
| 10/28/2013 | 2014 | 1,119 | 1,133 |
| 10/29/2013 | 2014 | 1,228 | 1,131 |
| 10/30/2013 | 2014 | 1,137 | 1,165 |
| 10/31/2013 | 2014 | 1,121 | 1,181 |
| 11/1/2013 | 2014 | 871 | 1,137 |
| 11/2/2013 | 2014 | 1,129 | 1,140 |
| 11/3/2013 | 2014 | 1,214 | 1,117 |
| 11/4/2013 | 2014 | 1,119 | 1,117 |
| 11/5/2013 | 2014 | 1,096 | 1,098 |
| 11/6/2013 | 2014 | 948 | 1,071 |
| 11/7/2013 | 2014 | 1,050 | 1,061 |
| 11/8/2013 | 2014 | 1,060 | 1,088 |
| 11/9/2013 | 2014 | 966 | 1,065 |
| 11/10/2013 | 2014 | 1,148 | 1,055 |
| 11/11/2013 | 2014 | 1,113 | 1,054 |
| 11/12/2013 | 2014 | 971 | 1,037 |
| 11/13/2013 | 2014 | 977 | 1,041 |
| 11/14/2013 | 2014 | 1,192 | 1,061 |
| 11/15/2013 | 2014 | 1,034 | 1,057 |
| 11/16/2013 | 2014 | 1,087 | 1,075 |
| 11/17/2013 | 2014 | 1,055 | 1,061 |
| 11/18/2013 | 2014 | 1,109 | 1,061 |
| 11/19/2013 | 2014 | 1,152 | 1,087 |
| 11/20/2013 | 2014 | 1,305 | 1,133 |

STB_AR1_001809

| | | | | |
|---|---|---|---|---|
| 11/21/2013 | 2014 | 1,121 | 1,123 | |
| 11/22/2013 | 2014 | 953 | 1,112 | |
| 11/23/2013 | 2014 | 998 | 1,099 | |
| 11/24/2013 | 2014 | 989 | 1,090 | |
| 11/25/2013 | 2014 | 1,097 | 1,088 | |
| 11/26/2013 | 2014 | 1,198 | 1,094 | |
| 11/27/2013 | 2014 | 968 | 1,046 | |
| 11/28/2013 | 2014 | 848 | 1,007 | |
| 11/29/2013 | 2014 | 982 | 1,011 | |
| 11/30/2013 | 2014 | 1,146 | 1,033 | |
| 12/1/2013 | 2014 | 1,164 | 1,058 | |
| 12/2/2013 | 2014 | 1,111 | 1,060 | |
| 12/3/2013 | 2014 | 1,138 | 1,051 | |
| 12/4/2013 | 2014 | 1,248 | 1,091 | |
| 12/5/2013 | 2014 | 1,072 | 1,123 | |
| 12/6/2013 | 2014 | 979 | 1,123 | |
| 12/7/2013 | 2014 | 1,051 | 1,109 | |
| 12/8/2013 | 2014 | 990 | 1,084 | |
| 12/9/2013 | 2014 | 911 | 1,056 | |
| 12/10/2013 | 2014 | 1,242 | 1,070 | |
| 12/11/2013 | 2014 | 1,133 | 1,054 | |
| 12/12/2013 | 2014 | 1,084 | 1,056 | |
| 12/13/2013 | 2014 | 1,113 | 1,075 | |
| 12/14/2013 | 2014 | 1,033 | 1,072 | |
| 12/15/2013 | 2014 | 1,125 | 1,092 | |
| 12/16/2013 | 2014 | 931 | 1,094 | |
| 12/17/2013 | 2014 | 1,285 | 1,101 | |
| 12/18/2013 | 2014 | 1,188 | 1,108 | |
| 12/19/2013 | 2014 | 1,245 | 1,131 | |
| 12/20/2013 | 2014 | 905 | 1,102 | |
| 12/21/2013 | 2014 | 1,031 | 1,101 | |
| 12/22/2013 | 2014 | 833 | 1,060 | |
| 12/23/2013 | 2014 | 745 | 1,033 | |
| 12/24/2013 | 2014 | 580 | 932 | |
| 12/25/2013 | 2014 | 417 | 822 | |
| 12/26/2013 | 2014 | 643 | 736 | |
| 12/27/2013 | 2014 | 670 | 703 | |
| 12/28/2013 | 2014 | 828 | 674 | |
| 12/29/2013 | 2014 | 758 | 663 | |
| 12/30/2013 | 2014 | 578 | 639 | |
| 12/31/2013 | 2014 | 497 | 627 | |
| 1/1/2014 | 2014 | 411 | 626 | |
| 1/2/2014 | 2014 | 640 | 626 | |
| 1/3/2014 | 2014 | 608 | 617 | |
| 1/4/2014 | 2014 | 701 | 599 | |
| 1/5/2014 | 2014 | 722 | 594 | -0.42498 |
| 1/6/2014 | 2014 | 705 | 612 | |

STB_AR1_001810

| Date | Year | Value 1 | Value 2 | Extra |
|---|---|---|---|---|
| 1/7/2014 | 2014 | 578 | 624 | |
| 1/8/2014 | 2014 | 693 | 664 | |
| 1/9/2014 | 2014 | 822 | 690 | |
| 1/10/2014 | 2014 | 781 | 715 | |
| 1/11/2014 | 2014 | 746 | 721 | |
| 1/12/2014 | 2014 | 926 | 750 | |
| 1/13/2014 | 2014 | 941 | 784 | |
| 1/14/2014 | 2014 | 962 | 839 | |
| 1/15/2014 | 2014 | 908 | 869 | |
| 1/16/2014 | 2014 | 993 | 894 | |
| 1/17/2014 | 2014 | 936 | 916 | |
| 1/18/2014 | 2014 | 1,132 | 971 | 0.63468 |
| 1/19/2014 | 2014 | 975 | 978 | |
| 1/20/2014 | 2014 | 979 | 984 | |
| 1/21/2014 | 2014 | 1,012 | 991 | |
| 1/22/2014 | 2014 | 1,116 | 1,020 | |
| 1/23/2014 | 2014 | 1,119 | 1,038 | |
| 1/24/2014 | 2014 | 1,046 | 1,054 | |
| 1/25/2014 | 2014 | 1,136 | 1,055 | |
| 1/26/2014 | 2014 | 1,160 | 1,081 | |
| 1/27/2014 | 2014 | 1,207 | 1,114 | |
| 1/28/2014 | 2014 | 1,124 | 1,130 | |
| 1/29/2014 | 2014 | 1,224 | 1,145 | |
| 1/30/2014 | 2014 | 1,223 | 1,160 | |
| 1/31/2014 | 2014 | 1,142 | 1,174 | |
| 2/1/2014 | 2014 | 1,127 | 1,172 | |
| 2/2/2014 | 2014 | 1,088 | 1,162 | |
| 2/3/2014 | 2014 | 1,089 | 1,145 | |
| 2/4/2014 | 2014 | 1,194 | 1,155 | |
| 2/5/2014 | 2014 | 1,150 | 1,145 | |
| 2/6/2014 | 2014 | 1,244 | 1,148 | |
| 2/7/2014 | 2014 | 1,119 | 1,144 | |
| 2/8/2014 | 2014 | 1,032 | 1,131 | |
| 2/9/2014 | 2014 | 1,262 | 1,156 | |
| 2/10/2014 | 2014 | 1,364 | 1,195 | |
| 2/11/2014 | 2014 | 1,223 | 1,199 | |
| 2/12/2014 | 2014 | 1,190 | 1,205 | |
| 2/13/2014 | 2014 | 1,204 | 1,199 | |
| 2/14/2014 | 2014 | 1,385 | 1,237 | |
| 2/15/2014 | 2014 | 1,400 | 1,290 | |
| 2/16/2014 | 2014 | 1,373 | 1,306 | |
| 2/17/2014 | 2014 | 1,253 | 1,290 | |
| 2/18/2014 | 2014 | 1,405 | 1,316 | |
| 2/19/2014 | 2014 | 1,250 | 1,324 | |
| 2/20/2014 | 2014 | 1,295 | 1,337 | |
| 2/21/2014 | 2014 | 1,421 | 1,342 | |
| 2/22/2014 | 2014 | 1,323 | 1,331 | |

STB_AR1_001811

| 2/23/2014 | 2014 | 1,438 | 1,341 |
|-----------|------|-------|-------|
| 2/24/2014 | 2014 | 1,299 | 1,347 |
| 2/25/2014 | 2014 | 1,438 | 1,352 |
| 2/26/2014 | 2014 | 1,736 | 1,421 |
| 2/27/2014 | 2014 | 1,551 | 1,458 |
| 2/28/2014 | 2014 | 1,550 | 1,476 |
| 3/1/2014 | 2014 | 1,662 | 1,525 |
| 3/2/2014 | 2014 | 1,367 | 1,515 |
| 3/3/2014 | 2014 | 1,325 | 1,518 |
| 3/4/2014 | 2014 | 1,351 | 1,506 |
| 3/5/2014 | 2014 | 1,319 | 1,446 |
| 3/6/2014 | 2014 | 1,679 | 1,465 |
| 3/7/2014 | 2014 | 1,434 | 1,448 |
| 3/8/2014 | 2014 | 1,369 | 1,406 |
| 3/9/2014 | 2014 | 1,316 | 1,399 |
| 3/10/2014 | 2014 | 1,347 | 1,402 |
| 3/11/2014 | 2014 | 1,436 | 1,414 |
| 3/12/2014 | 2014 | 1,488 | 1,438 |
| 3/13/2014 | 2014 | 1,703 | 1,442 |
| 3/14/2014 | 2014 | 1,558 | 1,460 |
| 3/15/2014 | 2014 | 1,519 | 1,481 |
| 3/16/2014 | 2014 | 1,409 | 1,494 |
| 3/17/2014 | 2014 | 1,820 | 1,562 |
| 3/18/2014 | 2014 | 1,708 | 1,601 |
| 3/19/2014 | 2014 | 1,815 | 1,647 |
| 3/20/2014 | 2014 | 1,780 | 1,658 |
| 3/21/2014 | 2014 | 1,829 | 1,697 |
| 3/22/2014 | 2014 | 1,757 | 1,731 |
| 3/23/2014 | 2014 | 1,494 | 1,743 |
| 3/24/2014 | 2014 | 1,693 | 1,725 |
| 3/25/2014 | 2014 | 1,823 | 1,742 |
| 3/26/2014 | 2014 | 1,841 | 1,745 |
| 3/27/2014 | 2014 | 1,767 | 1,743 |
| 3/28/2014 | 2014 | 1,750 | 1,732 |
| 3/29/2014 | 2014 | 1,667 | 1,719 |
| 3/30/2014 | 2014 | 1,655 | 1,742 |
| 3/31/2014 | 2014 | 1,915 | 1,774 |
| 4/1/2014 | 2014 | 1,682 | 1,754 |
| 4/2/2014 | 2014 | 1,987 | 1,775 |
| 4/3/2014 | 2014 | 1,837 | 1,785 |
| 4/4/2014 | 2014 | 1,644 | 1,770 |
| 4/5/2014 | 2014 | 1,815 | 1,791 |
| 4/6/2014 | 2014 | 1,501 | 1,769 |
| 4/7/2014 | 2014 | 1,987 | 1,779 |
| 4/8/2014 | 2014 | 1,957 | 1,818 |
| 4/9/2014 | 2014 | 1,889 | 1,804 |
| 4/10/2014 | 2014 | 1,821 | 1,802 |

STB_AR1_001812

| | | | |
|---|---|---|---|
| 4/11/2014 | 2014 | 1,454 | 1,775 |
| 4/12/2014 | 2014 | 1,831 | 1,777 |
| 4/13/2014 | 2014 | 1,806 | 1,821 |
| 4/14/2014 | 2014 | 1,578 | 1,762 |
| 4/15/2014 | 2014 | 1,988 | 1,767 |
| 4/16/2014 | 2014 | 1,950 | 1,775 |
| 4/17/2014 | 2014 | 1,851 | 1,780 |
| 4/18/2014 | 2014 | 1,402 | 1,772 |
| 4/19/2014 | 2014 | 1,633 | 1,744 |
| 4/20/2014 | 2014 | 1,034 | 1,634 |
| 4/21/2014 | 2014 | 1,228 | 1,584 |
| 4/22/2014 | 2014 | 1,766 | 1,552 |
| 4/23/2014 | 2014 | 1,795 | 1,530 |
| 4/24/2014 | 2014 | 1,668 | 1,504 |
| 4/25/2014 | 2014 | 1,492 | 1,517 |
| 4/26/2014 | 2014 | 1,533 | 1,502 |
| 4/27/2014 | 2014 | 1,718 | 1,600 |
| 4/28/2014 | 2014 | 1,983 | 1,708 |
| 4/29/2014 | 2014 | 1,789 | 1,711 |
| 4/30/2014 | 2014 | 1,883 | 1,724 |
| 5/1/2014 | 2014 | 2,262 | 1,809 |
| 5/2/2014 | 2014 | 1,856 | 1,861 |
| 5/3/2014 | 2014 | 1,937 | 1,918 |
| 5/4/2014 | 2014 | 1,622 | 1,905 |
| 5/5/2014 | 2014 | 2,013 | 1,909 |
| 5/6/2014 | 2014 | 1,947 | 1,931 |
| 5/7/2014 | 2014 | 2,097 | 1,962 |
| 5/8/2014 | 2014 | 2,012 | 1,926 |
| 5/9/2014 | 2014 | 1,897 | 1,932 |
| 5/10/2014 | 2014 | 1,759 | 1,907 |
| 5/11/2014 | 2014 | 1,520 | 1,892 |
| 5/12/2014 | 2014 | 1,835 | 1,867 |
| 5/13/2014 | 2014 | 1,912 | 1,862 |
| 5/14/2014 | 2014 | 1,844 | 1,826 |
| 5/15/2014 | 2014 | 2,012 | 1,826 |
| 5/16/2014 | 2014 | 1,648 | 1,790 |
| 5/17/2014 | 2014 | 1,700 | 1,782 |
| 5/18/2014 | 2014 | 1,684 | 1,805 |
| 5/19/2014 | 2014 | 2,261 | 1,866 |
| 5/20/2014 | 2014 | 2,199 | 1,907 |
| 5/21/2014 | 2014 | 2,142 | 1,949 |
| 5/22/2014 | 2014 | 2,081 | 1,959 |
| 5/23/2014 | 2014 | 2,080 | 2,021 |
| 5/24/2014 | 2014 | 2,230 | 2,097 |
| 5/25/2014 | 2014 | 1,671 | 2,095 |
| 5/26/2014 | 2014 | 2,086 | 2,070 |
| 5/27/2014 | 2014 | 2,123 | 2,059 |

STB_AR1_001813

| | | | |
|---|---|---|---|
| 5/28/2014 | 2014 | 2,170 | 2,063 |
| 5/29/2014 | 2014 | 2,176 | 2,077 |
| 5/30/2014 | 2014 | 2,095 | 2,079 |
| 5/31/2014 | 2014 | 1,812 | 2,019 |
| 6/1/2014 | 2014 | 1,520 | 1,997 |
| 6/2/2014 | 2014 | 1,879 | 1,968 |
| 6/3/2014 | 2014 | 1,991 | 1,949 |
| 6/4/2014 | 2014 | 2,057 | 1,933 |
| 6/5/2014 | 2014 | 1,865 | 1,888 |
| 6/6/2014 | 2014 | 1,999 | 1,875 |
| 6/7/2014 | 2014 | 1,713 | 1,861 |
| 6/8/2014 | 2014 | 1,668 | 1,882 |
| 6/9/2014 | 2014 | 1,617 | 1,844 |
| 6/10/2014 | 2014 | 2,396 | 1,902 |
| 6/11/2014 | 2014 | 2,053 | 1,902 |
| 6/12/2014 | 2014 | 2,022 | 1,924 |
| 6/13/2014 | 2014 | 2,211 | 1,954 |
| 6/14/2014 | 2014 | 2,138 | 2,015 |
| 6/15/2014 | 2014 | 1,740 | 2,025 |
| 6/16/2014 | 2014 | 2,077 | 2,091 |
| 6/17/2014 | 2014 | 1,902 | 2,020 |
| 6/18/2014 | 2014 | 2,091 | 2,026 |
| 6/19/2014 | 2014 | 2,145 | 2,043 |
| 6/20/2014 | 2014 | 1,973 | 2,009 |
| 6/21/2014 | 2014 | 1,831 | 1,966 |
| 6/22/2014 | 2014 | 1,521 | 1,934 |
| 6/23/2014 | 2014 | 1,896 | 1,908 |
| 6/24/2014 | 2014 | 2,122 | 1,940 |
| 6/25/2014 | 2014 | 2,303 | 1,970 |
| 6/26/2014 | 2014 | 1,977 | 1,946 |
| 6/27/2014 | 2014 | 1,959 | 1,944 |
| 6/28/2014 | 2014 | 1,882 | 1,951 |
| 6/29/2014 | 2014 | 1,479 | 1,945 |
| 6/30/2014 | 2014 | 1,834 | 1,937 |
| 7/1/2014 | 2014 | 1,714 | 1,878 |
| 7/2/2014 | 2014 | 1,872 | 1,817 |
| 7/3/2014 | 2014 | 1,391 | 1,733 |
| 7/4/2014 | 2014 | 1,548 | 1,674 |
| 7/5/2014 | 2014 | 1,627 | 1,638 |
| 7/6/2014 | 2014 | 1,349 | 1,619 |
| 7/7/2014 | 2014 | 1,546 | 1,578 |
| 7/8/2014 | 2014 | 1,557 | 1,556 |
| 7/9/2014 | 2014 | 1,434 | 1,493 |
| 7/10/2014 | 2014 | 1,354 | 1,488 |
| 7/11/2014 | 2014 | 1,232 | 1,443 |
| 7/12/2014 | 2014 | 1,234 | 1,387 |
| 7/13/2014 | 2014 | 1,163 | 1,360 |

STB_AR1_001814

| | | | |
|---|---|---|---|
| 7/14/2014 | 2014 | 1,253 | 1,318 |
| 7/15/2014 | 2014 | 1,364 | 1,291 |
| 7/16/2014 | 2014 | 1,307 | 1,272 |
| 7/17/2014 | 2014 | 1,070 | 1,232 |
| 7/18/2014 | 2014 | 1,039 | 1,204 |
| 7/19/2014 | 2014 | 1,116 | 1,187 |
| 7/20/2014 | 2014 | 879 | 1,147 |
| 7/21/2014 | 2014 | 1,227 | 1,143 |
| 7/22/2014 | 2014 | 1,400 | 1,148 |
| 7/23/2014 | 2014 | 1,546 | 1,182 |
| 7/24/2014 | 2014 | 1,239 | 1,207 |
| 7/25/2014 | 2014 | 1,080 | 1,212 |
| 7/26/2014 | 2014 | 1,146 | 1,217 |
| 7/27/2014 | 2014 | 883 | 1,217 |
| 7/28/2014 | 2014 | 1,332 | 1,232 |
| 7/29/2014 | 2014 | 1,251 | 1,211 |
| 7/30/2014 | 2014 | 1,315 | 1,178 |
| 7/31/2014 | 2014 | 1,240 | 1,178 |
| 8/1/2014 | 2014 | 1,111 | 1,183 |
| 8/2/2014 | 2014 | 1,028 | 1,166 |
| 8/3/2014 | 2014 | 1,129 | 1,201 |
| 8/4/2014 | 2014 | 1,276 | 1,193 |
| 8/5/2014 | 2014 | 1,072 | 1,167 |
| 8/6/2014 | 2014 | 1,253 | 1,158 |
| 8/7/2014 | 2014 | 1,173 | 1,149 |
| 8/8/2014 | 2014 | 1,068 | 1,143 |
| 8/9/2014 | 2014 | 936 | 1,130 |
| 8/10/2014 | 2014 | 951 | 1,104 |
| 8/11/2014 | 2014 | 1,156 | 1,087 |
| 8/12/2014 | 2014 | 1,004 | 1,077 |
| 8/13/2014 | 2014 | 1,188 | 1,068 |
| 8/14/2014 | 2014 | 1,113 | 1,059 |
| 8/15/2014 | 2014 | 1,008 | 1,051 |
| 8/16/2014 | 2014 | 911 | 1,047 |
| 8/17/2014 | 2014 | 834 | 1,031 |
| 8/18/2014 | 2014 | 1,000 | 1,008 |
| 8/19/2014 | 2014 | 1,161 | 1,031 |
| 8/20/2014 | 2014 | 952 | 997 |
| 8/21/2014 | 2014 | 985 | 979 |
| 8/22/2014 | 2014 | 790 | 948 |
| 8/23/2014 | 2014 | 851 | 939 |
| 8/24/2014 | 2014 | 792 | 933 |
| 8/25/2014 | 2014 | 990 | 932 |
| 8/26/2014 | 2014 | 1,132 | 927 |
| 8/27/2014 | 2014 | 911 | 922 |
| 8/28/2014 | 2014 | 970 | 919 |
| 8/29/2014 | 2014 | 884 | 933 |

STB_AR1_001815

| | | | |
|---|---|---|---|
| 8/30/2014 | 2014 | 908 | 941 |
| 8/31/2014 | 2014 | 851 | 949 |
| 9/1/2014 | 2014 | 929 | 941 |
| 9/2/2014 | 2014 | 1,085 | 934 |
| 9/3/2014 | 2014 | 892 | 931 |
| 9/4/2014 | 2014 | 932 | 926 |
| 9/5/2014 | 2014 | 931 | 933 |
| 9/6/2014 | 2014 | 901 | 932 |
| 9/7/2014 | 2014 | 936 | 944 |
| 9/8/2014 | 2014 | 911 | 941 |
| 9/9/2014 | 2014 | 989 | 927 |
| 9/10/2014 | 2014 | 888 | 927 |
| 9/11/2014 | 2014 | 806 | 909 |
| 9/12/2014 | 2014 | 874 | 901 |
| 9/13/2014 | 2014 | 762 | 881 |
| 9/14/2014 | 2014 | 674 | 843 |
| 9/15/2014 | 2014 | 790 | 826 |
| 9/16/2014 | 2014 | 822 | 802 |
| 9/17/2014 | 2014 | 875 | 800 |
| 9/18/2014 | 2014 | 975 | 825 |
| 9/19/2014 | 2014 | 830 | 818 |
| 9/20/2014 | 2014 | 775 | 820 |
| 9/21/2014 | 2014 | 645 | 816 |
| 9/22/2014 | 2014 | 838 | 823 |
| 9/23/2014 | 2014 | 921 | 837 |
| 9/24/2014 | 2014 | 822 | 829 |
| 9/25/2014 | 2014 | 878 | 816 |
| 9/26/2014 | 2014 | 779 | 808 |
| 9/27/2014 | 2014 | 766 | 807 |
| 9/28/2014 | 2014 | 781 | 826 |
| 9/29/2014 | 2014 | 904 | 836 |
| 9/30/2014 | 2014 | 914 | 835 |
| 10/1/2014 | 2015 | 901 | 846 |
| 10/2/2014 | 2015 | 861 | 844 |
| 10/3/2014 | 2015 | 833 | 851 |
| 10/4/2014 | 2015 | 703 | 842 |
| 10/5/2014 | 2015 | 732 | 835 |
| 10/6/2014 | 2015 | 805 | 821 |
| 10/7/2014 | 2015 | 929 | 823 |
| 10/8/2014 | 2015 | 948 | 830 |
| 10/9/2014 | 2015 | 903 | 836 |
| 10/10/2014 | 2015 | 874 | 842 |
| 10/11/2014 | 2015 | 1,015 | 887 |
| 10/12/2014 | 2015 | 755 | 890 |
| 10/13/2014 | 2015 | 847 | 896 |
| 10/14/2014 | 2015 | 725 | 867 |
| 10/15/2014 | 2015 | 915 | 862 |

STB_AR1_001816

| | | | |
|---|---|---|---|
| 10/16/2014 | 2015 | 918 | 864 |
| 10/17/2014 | 2015 | 977 | 879 |
| 10/18/2014 | 2015 | 872 | 858 |
| 10/19/2014 | 2015 | 770 | 861 |
| 10/20/2014 | 2015 | 840 | 860 |
| 10/21/2014 | 2015 | 1,000 | 899 |
| 10/22/2014 | 2015 | 1,008 | 912 |
| 10/23/2014 | 2015 | 893 | 909 |
| 10/24/2014 | 2015 | 787 | 881 |
| 10/25/2014 | 2015 | 671 | 853 |
| 10/26/2014 | 2015 | 794 | 856 |
| 10/27/2014 | 2015 | 749 | 843 |
| 10/28/2014 | 2015 | 973 | 839 |
| 10/29/2014 | 2015 | 917 | 826 |
| 10/30/2014 | 2015 | 819 | 816 |
| 10/31/2014 | 2015 | 716 | 806 |
| 11/1/2014 | 2015 | 713 | 812 |
| 11/2/2014 | 2015 | 815 | 815 |
| 11/3/2014 | 2015 | 752 | 815 |
| 11/4/2014 | 2015 | 774 | 787 |
| 11/5/2014 | 2015 | 752 | 763 |
| 11/6/2014 | 2015 | 612 | 733 |
| 11/7/2014 | 2015 | 822 | 749 |
| 11/8/2014 | 2015 | 888 | 774 |
| 11/9/2014 | 2015 | 823 | 775 |
| 11/10/2014 | 2015 | 931 | 800 |
| 11/11/2014 | 2015 | 915 | 820 |
| 11/12/2014 | 2015 | 847 | 834 |
| 11/13/2014 | 2015 | 854 | 869 |
| 11/14/2014 | 2015 | 907 | 881 |
| 11/15/2014 | 2015 | 811 | 870 |
| 11/16/2014 | 2015 | 701 | 852 |
| 11/17/2014 | 2015 | 643 | 811 |
| 11/18/2014 | 2015 | 922 | 812 |
| 11/19/2014 | 2015 | 1,034 | 839 |
| 11/20/2014 | 2015 | 934 | 850 |
| 11/21/2014 | 2015 | 816 | 837 |
| 11/22/2014 | 2015 | 803 | 836 |
| 11/23/2014 | 2015 | 734 | 841 |
| 11/24/2014 | 2015 | 931 | 882 |
| 11/25/2014 | 2015 | 922 | 882 |
| 11/26/2014 | 2015 | 859 | 857 |
| 11/27/2014 | 2015 | 783 | 835 |
| 11/28/2014 | 2015 | 855 | 841 |
| 11/29/2014 | 2015 | 760 | 835 |
| 11/30/2014 | 2015 | 728 | 834 |
| 12/1/2014 | 2015 | 845 | 822 |

STB_AR1_001817

| | | | | |
|---|---|---|---|---|
| 12/2/2014 | 2015 | 1,029 | 837 | |
| 12/3/2014 | 2015 | 1,105 | 872 | |
| 12/4/2014 | 2015 | 792 | 873 | |
| 12/5/2014 | 2015 | 916 | 882 | |
| 12/6/2014 | 2015 | 672 | 870 | |
| 12/7/2014 | 2015 | 687 | 864 | |
| 12/8/2014 | 2015 | 891 | 870 | |
| 12/9/2014 | 2015 | 1,013 | 868 | |
| 12/10/2014 | 2015 | 1,042 | 859 | |
| 12/11/2014 | 2015 | 948 | 881 | |
| 12/12/2014 | 2015 | 817 | 867 | |
| 12/13/2014 | 2015 | 879 | 897 | |
| 12/14/2014 | 2015 | 760 | 907 | |
| 12/15/2014 | 2015 | 953 | 916 | |
| 12/16/2014 | 2015 | 882 | 897 | |
| 12/17/2014 | 2015 | 1,006 | 892 | |
| 12/18/2014 | 2015 | 920 | 888 | |
| 12/19/2014 | 2015 | 876 | 897 | |
| 12/20/2014 | 2015 | 867 | 895 | |
| 12/21/2014 | 2015 | 690 | 885 | |
| 12/22/2014 | 2015 | 785 | 861 | |
| 12/23/2014 | 2015 | 790 | 848 | |
| 12/24/2014 | 2015 | 656 | 798 | |
| 12/25/2014 | 2015 | 371 | 719 | |
| 12/26/2014 | 2015 | 651 | 687 | |
| 12/27/2014 | 2015 | 642 | 655 | |
| 12/28/2014 | 2015 | 680 | 654 | |
| 12/29/2014 | 2015 | 631 | 632 | |
| 12/30/2014 | 2015 | 723 | 622 | |
| 12/31/2014 | 2015 | 500 | 600 | |
| 1/1/2015 | 2015 | 282 | 587 | |
| 1/2/2015 | 2015 | 421 | 554 | |
| 1/3/2015 | 2015 | 466 | 529 | |
| 1/4/2015 | 2015 | 515 | 505 | |
| 1/5/2015 | 2015 | 602 | 501 | -0.4092 |
| 1/6/2015 | 2015 | 676 | 495 | |
| 1/7/2015 | 2015 | 659 | 517 | |
| 1/8/2015 | 2015 | 594 | 562 | |
| 1/9/2015 | 2015 | 616 | 590 | |
| 1/10/2015 | 2015 | 496 | 594 | |
| 1/11/2015 | 2015 | 574 | 602 | |
| 1/12/2015 | 2015 | 680 | 614 | |
| 1/13/2015 | 2015 | 769 | 627 | |
| 1/14/2015 | 2015 | 698 | 632 | |
| 1/15/2015 | 2015 | 799 | 662 | |
| 1/16/2015 | 2015 | 740 | 679 | |
| 1/17/2015 | 2015 | 701 | 709 | |

STB_AR1_001818

| Date | Year | Value 1 | Value 2 | |
|------|------|---------|---------|------|
| 1/18/2015 | 2015 | 737 | 732 | 0.461078 |
| 1/19/2015 | 2015 | 798 | 749 | |
| 1/20/2015 | 2015 | 925 | 771 | |
| 1/21/2015 | 2015 | 699 | 771 | |
| 1/22/2015 | 2015 | 780 | 769 | |
| 1/23/2015 | 2015 | 721 | 766 | |
| 1/24/2015 | 2015 | 825 | 784 | |
| 1/25/2015 | 2015 | 697 | 778 | |
| 1/26/2015 | 2015 | 759 | 772 | |
| 1/27/2015 | 2015 | 928 | 773 | |
| 1/28/2015 | 2015 | 913 | 803 | |
| 1/29/2015 | 2015 | 843 | 812 | |
| 1/30/2015 | 2015 | 880 | 835 | |
| 1/31/2015 | 2015 | 721 | 820 | |
| 2/1/2015 | 2015 | 708 | 822 | |
| 2/2/2015 | 2015 | 678 | 810 | |
| 2/3/2015 | 2015 | 795 | 791 | |
| 2/4/2015 | 2015 | 836 | 780 | |
| 2/5/2015 | 2015 | 894 | 787 | |
| 2/6/2015 | 2015 | 839 | 782 | |
| 2/7/2015 | 2015 | 879 | 804 | |
| 2/8/2015 | 2015 | 872 | 828 | |
| 2/9/2015 | 2015 | 984 | 871 | |
| 2/10/2015 | 2015 | 833 | 877 | |
| 2/11/2015 | 2015 | 922 | 889 | |
| 2/12/2015 | 2015 | 882 | 887 | |
| 2/13/2015 | 2015 | 767 | 877 | |
| 2/14/2015 | 2015 | 958 | 888 | |
| 2/15/2015 | 2015 | 805 | 879 | |
| 2/16/2015 | 2015 | 938 | 872 | |
| 2/17/2015 | 2015 | 918 | 884 | |
| 2/18/2015 | 2015 | 1,041 | 901 | |
| 2/19/2015 | 2015 | 955 | 912 | |
| 2/20/2015 | 2015 | 787 | 915 | |
| 2/21/2015 | 2015 | 705 | 878 | |
| 2/22/2015 | 2015 | 853 | 885 | |
| 2/23/2015 | 2015 | 856 | 874 | |
| 2/24/2015 | 2015 | 908 | 872 | |
| 2/25/2015 | 2015 | 1,138 | 886 | |
| 2/26/2015 | 2015 | 939 | 884 | |
| 2/27/2015 | 2015 | 908 | 901 | |
| 2/28/2015 | 2015 | 778 | 911 | |
| 3/1/2015 | 2015 | 822 | 907 | |
| 3/2/2015 | 2015 | 850 | 906 | |
| 3/3/2015 | 2015 | 1,009 | 921 | |
| 3/4/2015 | 2015 | 1,062 | 910 | |
| 3/5/2015 | 2015 | 1,011 | 920 | |

STB_AR1_001819

| 3/6/2015 | 2015 | 1,008 | 934 |
|---|---|---|---|
| 3/7/2015 | 2015 | 980 | 963 |
| 3/8/2015 | 2015 | 867 | 970 |
| 3/9/2015 | 2015 | 900 | 977 |
| 3/10/2015 | 2015 | 943 | 967 |
| 3/11/2015 | 2015 | 1,130 | 977 |
| 3/12/2015 | 2015 | 1,015 | 978 |
| 3/13/2015 | 2015 | 860 | 956 |
| 3/14/2015 | 2015 | 814 | 933 |
| 3/15/2015 | 2015 | 927 | 941 |
| 3/16/2015 | 2015 | 1,026 | 959 |
| 3/17/2015 | 2015 | 932 | 958 |
| 3/18/2015 | 2015 | 942 | 931 |
| 3/19/2015 | 2015 | 979 | 926 |
| 3/20/2015 | 2015 | 900 | 931 |
| 3/21/2015 | 2015 | 871 | 940 |
| 3/22/2015 | 2015 | 817 | 924 |
| 3/23/2015 | 2015 | 1,099 | 934 |
| 3/24/2015 | 2015 | 994 | 943 |
| 3/25/2015 | 2015 | 1,027 | 955 |
| 3/26/2015 | 2015 | 879 | 941 |
| 3/27/2015 | 2015 | 949 | 948 |
| 3/28/2015 | 2015 | 964 | 961 |
| 3/29/2015 | 2015 | 871 | 969 |
| 3/30/2015 | 2015 | 1,260 | 992 |
| 3/31/2015 | 2015 | 1,083 | 1,005 |
| 4/1/2015 | 2015 | 1,214 | 1,031 |
| 4/2/2015 | 2015 | 1,043 | 1,055 |
| 4/3/2015 | 2015 | 858 | 1,042 |
| 4/4/2015 | 2015 | 767 | 1,014 |
| 4/5/2015 | 2015 | 789 | 1,002 |
| 4/6/2015 | 2015 | 867 | 946 |
| 4/7/2015 | 2015 | 1,029 | 938 |
| 4/8/2015 | 2015 | 858 | 887 |
| 4/9/2015 | 2015 | 1,091 | 894 |
| 4/10/2015 | 2015 | 950 | 907 |
| 4/11/2015 | 2015 | 1,013 | 942 |
| 4/12/2015 | 2015 | 895 | 958 |
| 4/13/2015 | 2015 | 900 | 962 |
| 4/14/2015 | 2015 | 1,042 | 964 |
| 4/15/2015 | 2015 | 1,164 | 1,008 |
| 4/16/2015 | 2015 | 1,044 | 1,001 |
| 4/17/2015 | 2015 | 825 | 983 |
| 4/18/2015 | 2015 | 850 | 960 |
| 4/19/2015 | 2015 | 915 | 963 |
| 4/20/2015 | 2015 | 1,021 | 980 |
| 4/21/2015 | 2015 | 1,166 | 998 |

STB_AR1_001820

| | | | |
|---|---|---|---|
| 4/22/2015 | 2015 | 968 | 970 |
| 4/23/2015 | 2015 | 1,210 | 994 |
| 4/24/2015 | 2015 | 974 | 1,015 |
| 4/25/2015 | 2015 | 1,015 | 1,038 |
| 4/26/2015 | 2015 | 936 | 1,041 |
| 4/27/2015 | 2015 | 1,140 | 1,058 |
| 4/28/2015 | 2015 | 1,064 | 1,044 |
| 4/29/2015 | 2015 | 1,038 | 1,054 |
| 4/30/2015 | 2015 | 1,104 | 1,039 |
| 5/1/2015 | 2015 | 979 | 1,039 |
| 5/2/2015 | 2015 | 790 | 1,007 |
| 5/3/2015 | 2015 | 891 | 1,001 |
| 5/4/2015 | 2015 | 1,104 | 996 |
| 5/5/2015 | 2015 | 1,205 | 1,016 |
| 5/6/2015 | 2015 | 1,209 | 1,040 |
| 5/7/2015 | 2015 | 1,192 | 1,053 |
| 5/8/2015 | 2015 | 1,093 | 1,069 |
| 5/9/2015 | 2015 | 839 | 1,076 |
| 5/10/2015 | 2015 | 789 | 1,062 |
| 5/11/2015 | 2015 | 949 | 1,039 |
| 5/12/2015 | 2015 | 1,194 | 1,038 |
| 5/13/2015 | 2015 | 1,228 | 1,041 |
| 5/14/2015 | 2015 | 1,012 | 1,015 |
| 5/15/2015 | 2015 | 1,054 | 1,009 |
| 5/16/2015 | 2015 | 1,036 | 1,037 |
| 5/17/2015 | 2015 | 893 | 1,052 |
| 5/18/2015 | 2015 | 1,061 | 1,068 |
| 5/19/2015 | 2015 | 1,118 | 1,057 |
| 5/20/2015 | 2015 | 1,095 | 1,038 |
| 5/21/2015 | 2015 | 1,044 | 1,043 |
| 5/22/2015 | 2015 | 1,009 | 1,037 |
| 5/23/2015 | 2015 | 875 | 1,014 |
| 5/24/2015 | 2015 | 727 | 990 |
| 5/25/2015 | 2015 | 1,047 | 988 |
| 5/26/2015 | 2015 | 1,219 | 1,002 |
| 5/27/2015 | 2015 | 1,097 | 1,003 |
| 5/28/2015 | 2015 | 1,164 | 1,020 |
| 5/29/2015 | 2015 | 974 | 1,015 |
| 5/30/2015 | 2015 | 941 | 1,024 |
| 5/31/2015 | 2015 | 748 | 1,027 |
| 6/1/2015 | 2015 | 1,039 | 1,026 |
| 6/2/2015 | 2015 | 1,040 | 1,000 |
| 6/3/2015 | 2015 | 1,110 | 1,002 |
| 6/4/2015 | 2015 | 1,004 | 979 |
| 6/5/2015 | 2015 | 943 | 975 |
| 6/6/2015 | 2015 | 797 | 954 |
| 6/7/2015 | 2015 | 673 | 944 |

STB_AR1_001821

| | | | |
|---|---|---|---|
| 6/8/2015 | 2015 | 1,175 | 963 |
| 6/9/2015 | 2015 | 1,190 | 985 |
| 6/10/2015 | 2015 | 1,196 | 997 |
| 6/11/2015 | 2015 | 1,075 | 1,007 |
| 6/12/2015 | 2015 | 959 | 1,009 |
| 6/13/2015 | 2015 | 1,012 | 1,040 |
| 6/14/2015 | 2015 | 851 | 1,065 |
| 6/15/2015 | 2015 | 976 | 1,037 |
| 6/16/2015 | 2015 | 1,103 | 1,025 |
| 6/17/2015 | 2015 | 1,142 | 1,017 |
| 6/18/2015 | 2015 | 980 | 1,003 |
| 6/19/2015 | 2015 | 1,153 | 1,031 |
| 6/20/2015 | 2015 | 840 | 1,006 |
| 6/21/2015 | 2015 | 801 | 999 |
| 6/22/2015 | 2015 | 883 | 986 |
| 6/23/2015 | 2015 | 983 | 969 |
| 6/24/2015 | 2015 | 988 | 947 |
| 6/25/2015 | 2015 | 990 | 948 |
| 6/26/2015 | 2015 | 967 | 922 |
| 6/27/2015 | 2015 | 860 | 925 |
| 6/28/2015 | 2015 | 756 | 918 |
| 6/29/2015 | 2015 | 897 | 920 |
| 6/30/2015 | 2015 | 920 | 911 |
| 7/1/2015 | 2015 | 859 | 893 |
| 7/2/2015 | 2015 | 918 | 882 |
| 7/3/2015 | 2015 | 1,047 | 894 |
| 7/4/2015 | 2015 | 973 | 910 |
| 7/5/2015 | 2015 | 788 | 915 |
| 7/6/2015 | 2015 | 935 | 920 |
| 7/7/2015 | 2015 | 1,061 | 940 |
| 7/8/2015 | 2015 | 1,005 | 961 |
| 7/9/2015 | 2015 | 869 | 954 |
| 7/10/2015 | 2015 | 856 | 927 |
| 7/11/2015 | 2015 | 772 | 898 |
| 7/12/2015 | 2015 | 692 | 884 |
| 7/13/2015 | 2015 | 848 | 872 |
| 7/14/2015 | 2015 | 924 | 852 |
| 7/15/2015 | 2015 | 761 | 817 |
| 7/16/2015 | 2015 | 837 | 813 |
| 7/17/2015 | 2015 | 1,172 | 858 |
| 7/18/2015 | 2015 | 911 | 878 |
| 7/19/2015 | 2015 | 838 | 899 |
| 7/20/2015 | 2015 | 837 | 897 |
| 7/21/2015 | 2015 | 903 | 894 |
| 7/22/2015 | 2015 | 745 | 892 |
| 7/23/2015 | 2015 | 959 | 909 |
| 7/24/2015 | 2015 | 1,148 | 906 |

STB_AR1_001822

| | | | |
|---|---|---|---|
| 7/25/2015 | 2015 | 1,053 | 926 |
| 7/26/2015 | 2015 | 925 | 939 |
| 7/27/2015 | 2015 | 841 | 939 |
| 7/28/2015 | 2015 | 782 | 922 |
| 7/29/2015 | 2015 | 840 | 935 |
| 7/30/2015 | 2015 | 1,165 | 965 |
| 7/31/2015 | 2015 | 1,124 | 961 |
| 8/1/2015 | 2015 | 901 | 940 |
| 8/2/2015 | 2015 | 876 | 933 |
| 8/3/2015 | 2015 | 818 | 929 |
| 8/4/2015 | 2015 | 961 | 955 |
| 8/5/2015 | 2015 | 919 | 966 |
| 8/6/2015 | 2015 | 1,072 | 953 |
| 8/7/2015 | 2015 | 993 | 934 |
| 8/8/2015 | 2015 | 966 | 944 |
| 8/9/2015 | 2015 | 804 | 933 |
| 8/10/2015 | 2015 | 865 | 940 |
| 8/11/2015 | 2015 | 797 | 917 |
| 8/12/2015 | 2015 | 1,020 | 931 |
| 8/13/2015 | 2015 | 1,155 | 943 |
| 8/14/2015 | 2015 | 1,121 | 961 |
| 8/15/2015 | 2015 | 1,030 | 970 |
| 8/16/2015 | 2015 | 968 | 994 |
| 8/17/2015 | 2015 | 910 | 1,000 |
| 8/18/2015 | 2015 | 929 | 1,019 |
| 8/19/2015 | 2015 | 892 | 1,001 |
| 8/20/2015 | 2015 | 1,076 | 989 |
| 8/21/2015 | 2015 | 1,127 | 990 |
| 8/22/2015 | 2015 | 1,056 | 994 |
| 8/23/2015 | 2015 | 968 | 994 |
| 8/24/2015 | 2015 | 799 | 978 |
| 8/25/2015 | 2015 | 895 | 973 |
| 8/26/2015 | 2015 | 1,028 | 993 |
| 8/27/2015 | 2015 | 1,211 | 1,012 |
| 8/28/2015 | 2015 | 1,087 | 1,006 |
| 8/29/2015 | 2015 | 1,018 | 1,001 |
| 8/30/2015 | 2015 | 928 | 995 |
| 8/31/2015 | 2015 | 1,049 | 1,031 |
| 9/1/2015 | 2015 | 934 | 1,036 |
| 9/2/2015 | 2015 | 999 | 1,032 |
| 9/3/2015 | 2015 | 1,184 | 1,028 |
| 9/4/2015 | 2015 | 945 | 1,008 |
| 9/5/2015 | 2015 | 1,142 | 1,026 |
| 9/6/2015 | 2015 | 963 | 1,031 |
| 9/7/2015 | 2015 | 839 | 1,001 |
| 9/8/2015 | 2015 | 925 | 1,000 |
| 9/9/2015 | 2015 | 1,061 | 1,008 |

STB_AR1_001823

| 9/10/2015 | 2015 | 1,088 | 995 |
|-----------|------|-------|-----|
| 9/11/2015 | 2015 | 1,031 | 1,007 |
| 9/12/2015 | 2015 | 929 | 977 |
| 9/13/2015 | 2015 | 1,016 | 984 |
| 9/14/2015 | 2015 | 881 | 990 |
| 9/15/2015 | 2015 | 993 | 1,000 |
| 9/16/2015 | 2015 | 1,005 | 992 |
| 9/17/2015 | 2015 | 1,120 | 996 |
| 9/18/2015 | 2015 | 1,093 | 1,005 |
| 9/19/2015 | 2015 | 1,041 | 1,021 |
| 9/20/2015 | 2015 | 890 | 1,003 |
| 9/21/2015 | 2015 | 742 | 983 |
| 9/22/2015 | 2015 | 1,120 | 1,002 |
| 9/23/2015 | 2015 | 943 | 993 |
| 9/24/2015 | 2015 | 1,297 | 1,018 |
| 9/25/2015 | 2015 | 1,119 | 1,022 |
| 9/26/2015 | 2015 | 964 | 1,011 |
| 9/27/2015 | 2015 | 1,047 | 1,033 |
| 9/28/2015 | 2015 | 1,005 | 1,071 |
| 9/29/2015 | 2015 | 907 | 1,040 |
| 9/30/2015 | 2015 | 1,063 | 1,057 |
| 10/1/2015 | 2016 | 1,237 | 1,049 |
| 10/2/2015 | 2016 | 1,109 | 1,047 |
| 10/3/2015 | 2016 | 1,147 | 1,074 |
| 10/4/2015 | 2016 | 1,010 | 1,068 |
| 10/5/2015 | 2016 | 1,016 | 1,070 |
| 10/6/2015 | 2016 | 911 | 1,070 |
| 10/7/2015 | 2016 | 1,116 | 1,078 |
| 10/8/2015 | 2016 | 1,056 | 1,052 |
| 10/9/2015 | 2016 | 886 | 1,020 |
| 10/10/2015 | 2016 | 1,188 | 1,026 |
| 10/11/2015 | 2016 | 1,008 | 1,026 |
| 10/12/2015 | 2016 | 1,062 | 1,032 |
| 10/13/2015 | 2016 | 873 | 1,027 |
| 10/14/2015 | 2016 | 826 | 986 |
| 10/15/2015 | 2016 | 1,191 | 1,005 |
| 10/16/2015 | 2016 | 1,080 | 1,033 |
| 10/17/2015 | 2016 | 1,038 | 1,011 |
| 10/18/2015 | 2016 | 1,060 | 1,019 |
| 10/19/2015 | 2016 | 1,056 | 1,018 |
| 10/20/2015 | 2016 | 1,187 | 1,063 |
| 10/21/2015 | 2016 | 1,048 | 1,094 |
| 10/22/2015 | 2016 | 1,040 | 1,073 |
| 10/23/2015 | 2016 | 1,059 | 1,070 |
| 10/24/2015 | 2016 | 1,014 | 1,066 |
| 10/25/2015 | 2016 | 1,076 | 1,069 |
| 10/26/2015 | 2016 | 1,180 | 1,086 |

STB_AR1_001824

| | | | |
|---|---|---|---|
| 10/27/2015 | 2016 | 1,107 | 1,075 |
| 10/28/2015 | 2016 | 965 | 1,063 |
| 10/29/2015 | 2016 | 1,106 | 1,072 |
| 10/30/2015 | 2016 | 1,004 | 1,065 |
| 10/31/2015 | 2016 | 1,068 | 1,072 |
| 11/1/2015 | 2016 | 1,027 | 1,065 |
| 11/2/2015 | 2016 | 859 | 1,019 |
| 11/3/2015 | 2016 | 1,092 | 1,017 |
| 11/4/2015 | 2016 | 1,090 | 1,035 |
| 11/5/2015 | 2016 | 1,086 | 1,032 |
| 11/6/2015 | 2016 | 996 | 1,031 |
| 11/7/2015 | 2016 | 908 | 1,008 |
| 11/8/2015 | 2016 | 959 | 999 |
| 11/9/2015 | 2016 | 968 | 1,014 |
| 11/10/2015 | 2016 | 1,190 | 1,028 |
| 11/11/2015 | 2016 | 906 | 1,002 |
| 11/12/2015 | 2016 | 963 | 984 |
| 11/13/2015 | 2016 | 1,303 | 1,028 |
| 11/14/2015 | 2016 | 1,202 | 1,070 |
| 11/15/2015 | 2016 | 1,186 | 1,103 |
| 11/16/2015 | 2016 | 975 | 1,104 |
| 11/17/2015 | 2016 | 1,048 | 1,083 |
| 11/18/2015 | 2016 | 1,112 | 1,113 |
| 11/19/2015 | 2016 | 1,317 | 1,163 |
| 11/20/2015 | 2016 | 1,062 | 1,129 |
| 11/21/2015 | 2016 | 1,222 | 1,132 |
| 11/22/2015 | 2016 | 1,048 | 1,112 |
| 11/23/2015 | 2016 | 1,065 | 1,125 |
| 11/24/2015 | 2016 | 1,139 | 1,138 |
| 11/25/2015 | 2016 | 1,182 | 1,148 |
| 11/26/2015 | 2016 | 1,256 | 1,139 |
| 11/27/2015 | 2016 | 1,126 | 1,148 |
| 11/28/2015 | 2016 | 1,293 | 1,158 |
| 11/29/2015 | 2016 | 1,182 | 1,178 |
| 11/30/2015 | 2016 | 1,076 | 1,179 |
| 12/1/2015 | 2016 | 1,203 | 1,188 |
| 12/2/2015 | 2016 | 1,378 | 1,216 |
| 12/3/2015 | 2016 | 1,671 | 1,276 |
| 12/4/2015 | 2016 | 1,223 | 1,289 |
| 12/5/2015 | 2016 | 1,270 | 1,286 |
| 12/6/2015 | 2016 | 1,190 | 1,287 |
| 12/7/2015 | 2016 | 1,226 | 1,309 |
| 12/8/2015 | 2016 | 1,370 | 1,333 |
| 12/9/2015 | 2016 | 977 | 1,275 |
| 12/10/2015 | 2016 | 1,302 | 1,223 |
| 12/11/2015 | 2016 | 1,261 | 1,228 |
| 12/12/2015 | 2016 | 1,057 | 1,198 |

STB_AR1_001825

| Date | Year | Value 1 | Value 2 | Extra |
|---|---|---|---|---|
| 12/13/2015 | 2016 | 1,298 | 1,213 | |
| 12/14/2015 | 2016 | 1,240 | 1,215 | |
| 12/15/2015 | 2016 | 1,432 | 1,224 | |
| 12/16/2015 | 2016 | 1,280 | 1,267 | |
| 12/17/2015 | 2016 | 1,481 | 1,293 | |
| 12/18/2015 | 2016 | 1,383 | 1,310 | |
| 12/19/2015 | 2016 | 1,141 | 1,322 | |
| 12/20/2015 | 2016 | 1,282 | 1,320 | |
| 12/21/2015 | 2016 | 1,212 | 1,316 | |
| 12/22/2015 | 2016 | 1,265 | 1,292 | |
| 12/23/2015 | 2016 | 1,244 | 1,287 | |
| 12/24/2015 | 2016 | 1,210 | 1,248 | |
| 12/25/2015 | 2016 | 650 | 1,143 | |
| 12/26/2015 | 2016 | 970 | 1,119 | |
| 12/27/2015 | 2016 | 984 | 1,076 | |
| 12/28/2015 | 2016 | 931 | 1,036 | |
| 12/29/2015 | 2016 | 1,178 | 1,024 | |
| 12/30/2015 | 2016 | 837 | 966 | |
| 12/31/2015 | 2016 | 868 | 917 | |
| 1/1/2016 | 2016 | 521 | 898 | |
| 1/2/2016 | 2016 | 565 | 841 | |
| 1/3/2016 | 2016 | 744 | 806 | |
| 1/4/2016 | 2016 | 651 | 766 | |
| 1/5/2016 | 2016 | 710 | 699 | -0.45688 |
| 1/6/2016 | 2016 | 578 | 662 | |
| 1/7/2016 | 2016 | 811 | 654 | |
| 1/8/2016 | 2016 | 615 | 668 | |
| 1/9/2016 | 2016 | 668 | 682 | |
| 1/10/2016 | 2016 | 702 | 676 | |
| 1/11/2016 | 2016 | 582 | 667 | |
| 1/12/2016 | 2016 | 657 | 659 | |
| 1/13/2016 | 2016 | 678 | 673 | |
| 1/14/2016 | 2016 | 831 | 676 | |
| 1/15/2016 | 2016 | 760 | 697 | |
| 1/16/2016 | 2016 | 769 | 711 | |
| 1/17/2016 | 2016 | 790 | 724 | |
| 1/18/2016 | 2016 | 799 | 755 | 0.080114 |
| 1/19/2016 | 2016 | 813 | 777 | |
| 1/20/2016 | 2016 | 816 | 797 | |
| 1/21/2016 | 2016 | 932 | 811 | |
| 1/22/2016 | 2016 | 887 | 829 | |
| 1/23/2016 | 2016 | 918 | 851 | |
| 1/24/2016 | 2016 | 741 | 844 | |
| 1/25/2016 | 2016 | 1,018 | 875 | |
| 1/26/2016 | 2016 | 742 | 865 | |
| 1/27/2016 | 2016 | 928 | 881 | |
| 1/28/2016 | 2016 | 941 | 882 | |

STB_AR1_001826

| | | | |
|---|---|---|---|
| 1/29/2016 | 2016 | 960 | 893 |
| 1/30/2016 | 2016 | 846 | 882 |
| 1/31/2016 | 2016 | 785 | 889 |
| 2/1/2016 | 2016 | 800 | 857 |
| 2/2/2016 | 2016 | 813 | 868 |
| 2/3/2016 | 2016 | 819 | 852 |
| 2/4/2016 | 2016 | 933 | 851 |
| 2/5/2016 | 2016 | 856 | 836 |
| 2/6/2016 | 2016 | 833 | 834 |
| 2/7/2016 | 2016 | 821 | 839 |
| 2/8/2016 | 2016 | 789 | 838 |
| 2/9/2016 | 2016 | 906 | 851 |
| 2/10/2016 | 2016 | 859 | 857 |
| 2/11/2016 | 2016 | 896 | 851 |
| 2/12/2016 | 2016 | 849 | 850 |
| 2/13/2016 | 2016 | 816 | 848 |
| 2/14/2016 | 2016 | 732 | 835 |
| 2/15/2016 | 2016 | 774 | 833 |
| 2/16/2016 | 2016 | 790 | 817 |
| 2/17/2016 | 2016 | 805 | 809 |
| 2/18/2016 | 2016 | 1,011 | 825 |
| 2/19/2016 | 2016 | 887 | 831 |
| 2/20/2016 | 2016 | 884 | 840 |
| 2/21/2016 | 2016 | 943 | 871 |
| 2/22/2016 | 2016 | 1,017 | 905 |
| 2/23/2016 | 2016 | 934 | 926 |
| 2/24/2016 | 2016 | 1,140 | 974 |
| 2/25/2016 | 2016 | 1,014 | 974 |
| 2/26/2016 | 2016 | 1,040 | 996 |
| 2/27/2016 | 2016 | 983 | 1,010 |
| 2/28/2016 | 2016 | 1,144 | 1,039 |
| 2/29/2016 | 2016 | 984 | 1,034 |
| 3/1/2016 | 2016 | 1,083 | 1,055 |
| 3/2/2016 | 2016 | 1,158 | 1,058 |
| 3/3/2016 | 2016 | 1,097 | 1,070 |
| 3/4/2016 | 2016 | 1,111 | 1,080 |
| 3/5/2016 | 2016 | 948 | 1,075 |
| 3/6/2016 | 2016 | 848 | 1,033 |
| 3/7/2016 | 2016 | 1,045 | 1,041 |
| 3/8/2016 | 2016 | 1,068 | 1,039 |
| 3/9/2016 | 2016 | 1,054 | 1,024 |
| 3/10/2016 | 2016 | 1,013 | 1,012 |
| 3/11/2016 | 2016 | 1,141 | 1,017 |
| 3/12/2016 | 2016 | 1,024 | 1,028 |
| 3/13/2016 | 2016 | 848 | 1,028 |
| 3/14/2016 | 2016 | 831 | 997 |
| 3/15/2016 | 2016 | 1,107 | 1,003 |

STB_AR1_001827

| | | | |
|---|---|---|---|
| 3/16/2016 | 2016 | 1,270 | 1,033 |
| 3/17/2016 | 2016 | 1,052 | 1,039 |
| 3/18/2016 | 2016 | 941 | 1,010 |
| 3/19/2016 | 2016 | 912 | 994 |
| 3/20/2016 | 2016 | 1,057 | 1,024 |
| 3/21/2016 | 2016 | 1,375 | 1,102 |
| 3/22/2016 | 2016 | 1,107 | 1,102 |
| 3/23/2016 | 2016 | 1,222 | 1,095 |
| 3/24/2016 | 2016 | 1,296 | 1,130 |
| 3/25/2016 | 2016 | 1,199 | 1,167 |
| 3/26/2016 | 2016 | 1,014 | 1,181 |
| 3/27/2016 | 2016 | 880 | 1,156 |
| 3/28/2016 | 2016 | 1,031 | 1,107 |
| 3/29/2016 | 2016 | 1,118 | 1,109 |
| 3/30/2016 | 2016 | 1,183 | 1,103 |
| 3/31/2016 | 2016 | 1,283 | 1,101 |
| 4/1/2016 | 2016 | 1,201 | 1,101 |
| 4/2/2016 | 2016 | 919 | 1,088 |
| 4/3/2016 | 2016 | 1,026 | 1,109 |
| 4/4/2016 | 2016 | 1,037 | 1,110 |
| 4/5/2016 | 2016 | 1,468 | 1,160 |
| 4/6/2016 | 2016 | 1,195 | 1,161 |
| 4/7/2016 | 2016 | 1,142 | 1,141 |
| 4/8/2016 | 2016 | 1,086 | 1,125 |
| 4/9/2016 | 2016 | 1,258 | 1,173 |
| 4/10/2016 | 2016 | 1,090 | 1,182 |
| 4/11/2016 | 2016 | 1,316 | 1,222 |
| 4/12/2016 | 2016 | 1,472 | 1,223 |
| 4/13/2016 | 2016 | 1,419 | 1,255 |
| 4/14/2016 | 2016 | 1,365 | 1,287 |
| 4/15/2016 | 2016 | 1,271 | 1,313 |
| 4/16/2016 | 2016 | 1,144 | 1,297 |
| 4/17/2016 | 2016 | 1,050 | 1,291 |
| 4/18/2016 | 2016 | 1,293 | 1,288 |
| 4/19/2016 | 2016 | 1,447 | 1,284 |
| 4/20/2016 | 2016 | 1,501 | 1,296 |
| 4/21/2016 | 2016 | 1,318 | 1,289 |
| 4/22/2016 | 2016 | 1,217 | 1,281 |
| 4/23/2016 | 2016 | 1,377 | 1,315 |
| 4/24/2016 | 2016 | 1,168 | 1,332 |
| 4/25/2016 | 2016 | 1,481 | 1,358 |
| 4/26/2016 | 2016 | 1,496 | 1,365 |
| 4/27/2016 | 2016 | 1,268 | 1,332 |
| 4/28/2016 | 2016 | 1,392 | 1,343 |
| 4/29/2016 | 2016 | 1,460 | 1,377 |
| 4/30/2016 | 2016 | 1,212 | 1,354 |
| 5/1/2016 | 2016 | 1,128 | 1,348 |

STB_AR1_001828

| | | | |
|---|---|---|---|
| 5/2/2016 | 2016 | 1,303 | 1,323 |
| 5/3/2016 | 2016 | 1,484 | 1,321 |
| 5/4/2016 | 2016 | 1,525 | 1,358 |
| 5/5/2016 | 2016 | 1,488 | 1,371 |
| 5/6/2016 | 2016 | 1,411 | 1,364 |
| 5/7/2016 | 2016 | 1,215 | 1,365 |
| 5/8/2016 | 2016 | 1,310 | 1,391 |
| 5/9/2016 | 2016 | 1,214 | 1,378 |
| 5/10/2016 | 2016 | 1,300 | 1,352 |
| 5/11/2016 | 2016 | 1,313 | 1,322 |
| 5/12/2016 | 2016 | 1,499 | 1,323 |
| 5/13/2016 | 2016 | 1,270 | 1,303 |
| 5/14/2016 | 2016 | 1,061 | 1,281 |
| 5/15/2016 | 2016 | 1,175 | 1,262 |
| 5/16/2016 | 2016 | 1,208 | 1,261 |
| 5/17/2016 | 2016 | 1,247 | 1,253 |
| 5/18/2016 | 2016 | 1,273 | 1,248 |
| 5/19/2016 | 2016 | 1,316 | 1,221 |
| 5/20/2016 | 2016 | 1,016 | 1,185 |
| 5/21/2016 | 2016 | 1,463 | 1,243 |
| 5/22/2016 | 2016 | 1,209 | 1,247 |
| 5/23/2016 | 2016 | 1,385 | 1,273 |
| 5/24/2016 | 2016 | 1,621 | 1,326 |
| 5/25/2016 | 2016 | 1,481 | 1,356 |
| 5/26/2016 | 2016 | 1,305 | 1,354 |
| 5/27/2016 | 2016 | 1,218 | 1,383 |
| 5/28/2016 | 2016 | 1,097 | 1,331 |
| 5/29/2016 | 2016 | 1,151 | 1,323 |
| 5/30/2016 | 2016 | 1,390 | 1,323 |
| 5/31/2016 | 2016 | 1,261 | 1,272 |
| 6/1/2016 | 2016 | 991 | 1,202 |
| 6/2/2016 | 2016 | 1,241 | 1,193 |
| 6/3/2016 | 2016 | 1,223 | 1,193 |
| 6/4/2016 | 2016 | 1,079 | 1,191 |
| 6/5/2016 | 2016 | 1,113 | 1,185 |
| 6/6/2016 | 2016 | 1,348 | 1,179 |
| 6/7/2016 | 2016 | 1,355 | 1,193 |
| 6/8/2016 | 2016 | 1,173 | 1,219 |
| 6/9/2016 | 2016 | 1,297 | 1,227 |
| 6/10/2016 | 2016 | 1,144 | 1,216 |
| 6/11/2016 | 2016 | 1,186 | 1,231 |
| 6/12/2016 | 2016 | 1,027 | 1,219 |
| 6/13/2016 | 2016 | 1,285 | 1,210 |
| 6/14/2016 | 2016 | 1,153 | 1,181 |
| 6/15/2016 | 2016 | 1,301 | 1,199 |
| 6/16/2016 | 2016 | 1,188 | 1,183 |
| 6/17/2016 | 2016 | 1,274 | 1,202 |

STB_AR1_001829

| | | | |
|---|---|---|---|
| 6/18/2016 | 2016 | 1,190 | 1,203 |
| 6/19/2016 | 2016 | 900 | 1,184 |
| 6/20/2016 | 2016 | 900 | 1,129 |
| 6/21/2016 | 2016 | 1,129 | 1,126 |
| 6/22/2016 | 2016 | 1,340 | 1,132 |
| 6/23/2016 | 2016 | 1,216 | 1,136 |
| 6/24/2016 | 2016 | 1,109 | 1,112 |
| 6/25/2016 | 2016 | 1,026 | 1,089 |
| 6/26/2016 | 2016 | 730 | 1,064 |
| 6/27/2016 | 2016 | 1,121 | 1,096 |
| 6/28/2016 | 2016 | 1,047 | 1,084 |
| 6/29/2016 | 2016 | 1,391 | 1,091 |
| 6/30/2016 | 2016 | 973 | 1,057 |
| 7/1/2016 | 2016 | 1,009 | 1,042 |
| 7/2/2016 | 2016 | 1,156 | 1,061 |
| 7/3/2016 | 2016 | 793 | 1,070 |
| 7/4/2016 | 2016 | 1,162 | 1,076 |
| 7/5/2016 | 2016 | 1,218 | 1,100 |
| 7/6/2016 | 2016 | 1,171 | 1,069 |
| 7/7/2016 | 2016 | 1,042 | 1,079 |
| 7/8/2016 | 2016 | 1,048 | 1,084 |
| 7/9/2016 | 2016 | 912 | 1,049 |
| 7/10/2016 | 2016 | 805 | 1,051 |
| 7/11/2016 | 2016 | 1,319 | 1,074 |
| 7/12/2016 | 2016 | 1,280 | 1,082 |
| 7/13/2016 | 2016 | 1,261 | 1,095 |
| 7/14/2016 | 2016 | 1,140 | 1,109 |
| 7/15/2016 | 2016 | 1,180 | 1,128 |
| 7/16/2016 | 2016 | 866 | 1,122 |
| 7/17/2016 | 2016 | 822 | 1,124 |
| 7/18/2016 | 2016 | 1,239 | 1,113 |
| 7/19/2016 | 2016 | 1,261 | 1,110 |
| 7/20/2016 | 2016 | 1,089 | 1,085 |
| 7/21/2016 | 2016 | 1,351 | 1,115 |
| 7/22/2016 | 2016 | 1,068 | 1,099 |
| 7/23/2016 | 2016 | 937 | 1,110 |
| 7/24/2016 | 2016 | 843 | 1,113 |
| 7/25/2016 | 2016 | 1,115 | 1,095 |
| 7/26/2016 | 2016 | 1,401 | 1,115 |
| 7/27/2016 | 2016 | 1,182 | 1,128 |
| 7/28/2016 | 2016 | 1,199 | 1,106 |
| 7/29/2016 | 2016 | 1,161 | 1,120 |
| 7/30/2016 | 2016 | 821 | 1,103 |
| 7/31/2016 | 2016 | 872 | 1,107 |
| 8/1/2016 | 2016 | 1,231 | 1,124 |
| 8/2/2016 | 2016 | 1,144 | 1,087 |
| 8/3/2016 | 2016 | 1,162 | 1,084 |

STB_AR1_001830

| | | | |
|---|---|---|---|
| 8/4/2016 | 2016 | 1,161 | 1,079 |
| 8/5/2016 | 2016 | 1,088 | 1,068 |
| 8/6/2016 | 2016 | 952 | 1,087 |
| 8/7/2016 | 2016 | 845 | 1,083 |
| 8/8/2016 | 2016 | 1,261 | 1,088 |
| 8/9/2016 | 2016 | 1,384 | 1,122 |
| 8/10/2016 | 2016 | 1,214 | 1,129 |
| 8/11/2016 | 2016 | 1,266 | 1,144 |
| 8/12/2016 | 2016 | 1,234 | 1,165 |
| 8/13/2016 | 2016 | 1,182 | 1,198 |
| 8/14/2016 | 2016 | 821 | 1,195 |
| 8/15/2016 | 2016 | 1,215 | 1,188 |
| 8/16/2016 | 2016 | 1,594 | 1,218 |
| 8/17/2016 | 2016 | 1,599 | 1,273 |
| 8/18/2016 | 2016 | 1,143 | 1,255 |
| 8/19/2016 | 2016 | 1,239 | 1,256 |
| 8/20/2016 | 2016 | 1,037 | 1,235 |
| 8/21/2016 | 2016 | 844 | 1,239 |
| 8/22/2016 | 2016 | 1,189 | 1,235 |
| 8/23/2016 | 2016 | 1,241 | 1,185 |
| 8/24/2016 | 2016 | 1,434 | 1,161 |
| 8/25/2016 | 2016 | 1,220 | 1,172 |
| 8/26/2016 | 2016 | 1,079 | 1,149 |
| 8/27/2016 | 2016 | 1,112 | 1,160 |
| 8/28/2016 | 2016 | 946 | 1,174 |
| 8/29/2016 | 2016 | 1,575 | 1,230 |
| 8/30/2016 | 2016 | 1,295 | 1,237 |
| 8/31/2016 | 2016 | 1,341 | 1,224 |
| 9/1/2016 | 2016 | 1,230 | 1,225 |
| 9/2/2016 | 2016 | 1,261 | 1,251 |
| 9/3/2016 | 2016 | 945 | 1,228 |
| 9/4/2016 | 2016 | 854 | 1,214 |
| 9/5/2016 | 2016 | 1,558 | 1,212 |
| 9/6/2016 | 2016 | 1,506 | 1,242 |
| 9/7/2016 | 2016 | 1,251 | 1,229 |
| 9/8/2016 | 2016 | 1,213 | 1,227 |
| 9/9/2016 | 2016 | 1,300 | 1,232 |
| 9/10/2016 | 2016 | 1,235 | 1,274 |
| 9/11/2016 | 2016 | 966 | 1,290 |
| 9/12/2016 | 2016 | 1,411 | 1,269 |
| 9/13/2016 | 2016 | 1,560 | 1,277 |
| 9/14/2016 | 2016 | 1,478 | 1,309 |
| 9/15/2016 | 2016 | 1,301 | 1,322 |
| 9/16/2016 | 2016 | 1,680 | 1,376 |
| 9/17/2016 | 2016 | 1,203 | 1,371 |
| 9/18/2016 | 2016 | 978 | 1,373 |
| 9/19/2016 | 2016 | 1,464 | 1,381 |

STB_AR1_001831

| | | | |
|---|---|---|---|
| 9/20/2016 | 2016 | 1,453 | 1,365 |
| 9/21/2016 | 2016 | 1,523 | 1,372 |
| 9/22/2016 | 2016 | 1,468 | 1,396 |
| 9/23/2016 | 2016 | 1,310 | 1,343 |
| 9/24/2016 | 2016 | 1,095 | 1,327 |
| 9/25/2016 | 2016 | 891 | 1,315 |
| 9/26/2016 | 2016 | 1,440 | 1,311 |
| 9/27/2016 | 2016 | 1,603 | 1,333 |
| 9/28/2016 | 2016 | 1,541 | 1,335 |
| 9/29/2016 | 2016 | 1,581 | 1,352 |
| 9/30/2016 | 2016 | 1,202 | 1,336 |
| 10/1/2016 | 2017 | 1,195 | 1,350 |
| 10/2/2016 | 2017 | 989 | 1,364 |
| 10/3/2016 | 2017 | 1,490 | 1,372 |
| 10/4/2016 | 2017 | 1,647 | 1,378 |
| 10/5/2016 | 2017 | 1,402 | 1,358 |
| 10/6/2016 | 2017 | 1,548 | 1,353 |
| 10/7/2016 | 2017 | 1,593 | 1,409 |
| 10/8/2016 | 2017 | 1,332 | 1,429 |
| 10/9/2016 | 2017 | 1,087 | 1,443 |
| 10/10/2016 | 2017 | 1,484 | 1,442 |
| 10/11/2016 | 2017 | 1,784 | 1,461 |
| 10/12/2016 | 2017 | 1,566 | 1,485 |
| 10/13/2016 | 2017 | 1,348 | 1,456 |
| 10/14/2016 | 2017 | 1,292 | 1,413 |
| 10/15/2016 | 2017 | 1,389 | 1,421 |
| 10/16/2016 | 2017 | 1,208 | 1,439 |
| 10/17/2016 | 2017 | 1,903 | 1,499 |
| 10/18/2016 | 2017 | 1,770 | 1,497 |
| 10/19/2016 | 2017 | 1,642 | 1,507 |
| 10/20/2016 | 2017 | 1,428 | 1,519 |
| 10/21/2016 | 2017 | 1,578 | 1,560 |
| 10/22/2016 | 2017 | 1,388 | 1,560 |
| 10/23/2016 | 2017 | 1,306 | 1,574 |
| 10/24/2016 | 2017 | 1,858 | 1,567 |
| 10/25/2016 | 2017 | 1,984 | 1,598 |
| 10/26/2016 | 2017 | 1,758 | 1,614 |
| 10/27/2016 | 2017 | 1,716 | 1,655 |
| 10/28/2016 | 2017 | 1,416 | 1,632 |
| 10/29/2016 | 2017 | 1,471 | 1,644 |
| 10/30/2016 | 2017 | 1,214 | 1,631 |
| 10/31/2016 | 2017 | 1,398 | 1,565 |
| 11/1/2016 | 2017 | 1,642 | 1,516 |
| 11/2/2016 | 2017 | 1,636 | 1,499 |
| 11/3/2016 | 2017 | 1,453 | 1,461 |
| 11/4/2016 | 2017 | 1,532 | 1,478 |
| 11/5/2016 | 2017 | 1,355 | 1,461 |

STB_AR1_001832

| | | | |
|---|---|---|---|
| 11/6/2016 | 2017 | 1,513 | 1,504 |
| 11/7/2016 | 2017 | 1,572 | 1,529 |
| 11/8/2016 | 2017 | 1,803 | 1,552 |
| 11/9/2016 | 2017 | 1,493 | 1,532 |
| 11/10/2016 | 2017 | 1,786 | 1,579 |
| 11/11/2016 | 2017 | 1,573 | 1,585 |
| 11/12/2016 | 2017 | 1,535 | 1,611 |
| 11/13/2016 | 2017 | 1,193 | 1,565 |
| 11/14/2016 | 2017 | 1,600 | 1,569 |
| 11/15/2016 | 2017 | 1,779 | 1,566 |
| 11/16/2016 | 2017 | 1,902 | 1,624 |
| 11/17/2016 | 2017 | 1,704 | 1,612 |
| 11/18/2016 | 2017 | 1,576 | 1,613 |
| 11/19/2016 | 2017 | 1,417 | 1,596 |
| 11/20/2016 | 2017 | 1,224 | 1,600 |
| 11/21/2016 | 2017 | 1,611 | 1,602 |
| 11/22/2016 | 2017 | 1,718 | 1,593 |
| 11/23/2016 | 2017 | 1,783 | 1,576 |
| 11/24/2016 | 2017 | 1,382 | 1,530 |
| 11/25/2016 | 2017 | 1,458 | 1,513 |
| 11/26/2016 | 2017 | 1,602 | 1,540 |
| 11/27/2016 | 2017 | 1,382 | 1,562 |
| 11/28/2016 | 2017 | 1,521 | 1,549 |
| 11/29/2016 | 2017 | 1,693 | 1,546 |
| 11/30/2016 | 2017 | 1,773 | 1,544 |
| 12/1/2016 | 2017 | 1,608 | 1,577 |
| 12/2/2016 | 2017 | 1,666 | 1,606 |
| 12/3/2016 | 2017 | 1,401 | 1,578 |
| 12/4/2016 | 2017 | 1,213 | 1,554 |
| 12/5/2016 | 2017 | 1,394 | 1,535 |
| 12/6/2016 | 2017 | 1,749 | 1,543 |
| 12/7/2016 | 2017 | 1,689 | 1,531 |
| 12/8/2016 | 2017 | 1,630 | 1,535 |
| 12/9/2016 | 2017 | 1,296 | 1,482 |
| 12/10/2016 | 2017 | 1,351 | 1,475 |
| 12/11/2016 | 2017 | 1,093 | 1,457 |
| 12/12/2016 | 2017 | 1,356 | 1,452 |
| 12/13/2016 | 2017 | 1,674 | 1,441 |
| 12/14/2016 | 2017 | 1,567 | 1,424 |
| 12/15/2016 | 2017 | 1,489 | 1,404 |
| 12/16/2016 | 2017 | 1,658 | 1,455 |
| 12/17/2016 | 2017 | 1,615 | 1,493 |
| 12/18/2016 | 2017 | 1,341 | 1,529 |
| 12/19/2016 | 2017 | 1,660 | 1,572 |
| 12/20/2016 | 2017 | 1,779 | 1,587 |
| 12/21/2016 | 2017 | 1,570 | 1,587 |
| 12/22/2016 | 2017 | 1,697 | 1,617 |

STB_AR1_001833

| | | | | | |
|---|---|---|---|---|---|
| 12/23/2016 | 2017 | 1,370 | 1,576 | | |
| 12/24/2016 | 2017 | 1,022 | 1,491 | | |
| 12/25/2016 | 2017 | 620 | 1,388 | | |
| 12/26/2016 | 2017 | 979 | 1,291 | | |
| 12/27/2016 | 2017 | 1,252 | 1,216 | | |
| 12/28/2016 | 2017 | 1,279 | 1,174 | | |
| 12/29/2016 | 2017 | 1,233 | 1,108 | | |
| 12/30/2016 | 2017 | 1,074 | 1,066 | | |
| 12/31/2016 | 2017 | 926 | 1,052 | | |
| 1/1/2017 | 2017 | 413 | 1,022 | | |
| 1/2/2017 | 2017 | 599 | 968 | | |
| 1/3/2017 | 2017 | 904 | 918 | | |
| 1/4/2017 | 2017 | 771 | 846 | | |
| 1/5/2017 | 2017 | 905 | 799 | -0.49302 | |
| 1/6/2017 | 2017 | 799 | 760 | | |
| 1/7/2017 | 2017 | 694 | 726 | | |
| 1/8/2017 | 2017 | 674 | 764 | | |
| 1/9/2017 | 2017 | 780 | 790 | | |
| 1/10/2017 | 2017 | 1,009 | 805 | | |
| 1/11/2017 | 2017 | 1,100 | 852 | | |
| 1/12/2017 | 2017 | 989 | 864 | | |
| 1/13/2017 | 2017 | 1,146 | 913 | | |
| 1/14/2017 | 2017 | 1,426 | 1,018 | | |
| 1/15/2017 | 2017 | 1,137 | 1,084 | | |
| 1/16/2017 | 2017 | 1,249 | 1,151 | | |
| 1/17/2017 | 2017 | 1,451 | 1,214 | | |
| 1/18/2017 | 2017 | 1,383 | 1,254 | 0.569462 | |
| 1/19/2017 | 2017 | 1,430 | 1,317 | | |
| 1/20/2017 | 2017 | 1,533 | 1,373 | | |
| 1/21/2017 | 2017 | 1,155 | 1,334 | | |
| 1/22/2017 | 2017 | 848 | 1,293 | | |
| 1/23/2017 | 2017 | 1,115 | 1,274 | | |
| 1/24/2017 | 2017 | 1,212 | 1,239 | | |
| 1/25/2017 | 2017 | 1,148 | 1,206 | | |
| 1/26/2017 | 2017 | 1,126 | 1,162 | | |
| 1/27/2017 | 2017 | 899 | 1,072 | | |
| 1/28/2017 | 2017 | 874 | 1,032 | | |
| 1/29/2017 | 2017 | 826 | 1,029 | | |
| 1/30/2017 | 2017 | 1,042 | 1,018 | | |
| 1/31/2017 | 2017 | 939 | 979 | | |
| 2/1/2017 | 2017 | 846 | 936 | | |
| 2/2/2017 | 2017 | 882 | 901 | | |
| 2/3/2017 | 2017 | 809 | 888 | | |
| 2/4/2017 | 2017 | 904 | 893 | | |
| 2/5/2017 | 2017 | 580 | 857 | | |
| 2/6/2017 | 2017 | 804 | 823 | | |
| 2/7/2017 | 2017 | 990 | 831 | | |

STB_AR1_001834

| | | | |
|---|---|---|---|
| 2/8/2017 | 2017 | 922 | 842 |
| 2/9/2017 | 2017 | 833 | 835 |
| 2/10/2017 | 2017 | 731 | 823 |
| 2/11/2017 | 2017 | 705 | 795 |
| 2/12/2017 | 2017 | 599 | 798 |
| 2/13/2017 | 2017 | 745 | 789 |
| 2/14/2017 | 2017 | 639 | 739 |
| 2/15/2017 | 2017 | 780 | 719 |
| 2/16/2017 | 2017 | 711 | 701 |
| 2/17/2017 | 2017 | 517 | 671 |
| 2/18/2017 | 2017 | 612 | 658 |
| 2/19/2017 | 2017 | 593 | 657 |
| 2/20/2017 | 2017 | 437 | 613 |
| 2/21/2017 | 2017 | 518 | 595 |
| 2/22/2017 | 2017 | 560 | 564 |
| 2/23/2017 | 2017 | 490 | 532 |
| 2/24/2017 | 2017 | 500 | 530 |
| 2/25/2017 | 2017 | 545 | 520 |
| 2/26/2017 | 2017 | 485 | 505 |
| 2/27/2017 | 2017 | 537 | 519 |
| 2/28/2017 | 2017 | 480 | 514 |
| 3/1/2017 | 2017 | 447 | 498 |
| 3/2/2017 | 2017 | 371 | 481 |
| 3/3/2017 | 2017 | 400 | 466 |
| 3/4/2017 | 2017 | 450 | 453 |
| 3/5/2017 | 2017 | 373 | 437 |
| 3/6/2017 | 2017 | 481 | 429 |
| 3/7/2017 | 2017 | 471 | 428 |
| 3/8/2017 | 2017 | 462 | 430 |
| 3/9/2017 | 2017 | 395 | 433 |
| 3/10/2017 | 2017 | 379 | 430 |
| 3/11/2017 | 2017 | 441 | 429 |
| 3/12/2017 | 2017 | 356 | 426 |
| 3/13/2017 | 2017 | 450 | 422 |
| 3/14/2017 | 2017 | 378 | 409 |
| 3/15/2017 | 2017 | 442 | 406 |
| 3/16/2017 | 2017 | 438 | 412 |
| 3/17/2017 | 2017 | 329 | 405 |
| 3/18/2017 | 2017 | 353 | 392 |
| 3/19/2017 | 2017 | 372 | 395 |
| 3/20/2017 | 2017 | 342 | 379 |
| 3/21/2017 | 2017 | 361 | 377 |
| 3/22/2017 | 2017 | 376 | 367 |
| 3/23/2017 | 2017 | 399 | 362 |
| 3/24/2017 | 2017 | 303 | 358 |
| 3/25/2017 | 2017 | 435 | 370 |
| 3/26/2017 | 2017 | 351 | 367 |

STB_AR1_001835

| 3/27/2017 | 2017 | 403 | 375 |
|-----------|------|-----|-----|
| 3/28/2017 | 2017 | 362 | 376 |
| 3/29/2017 | 2017 | 390 | 378 |
| 3/30/2017 | 2017 | 390 | 376 |
| 3/31/2017 | 2017 | 295 | 375 |
| 4/1/2017 | 2017 | 337 | 361 |
| 4/2/2017 | 2017 | 328 | 358 |
| 4/3/2017 | 2017 | 386 | 355 |
| 4/4/2017 | 2017 | 418 | 363 |
| 4/5/2017 | 2017 | 300 | 351 |
| 4/6/2017 | 2017 | 432 | 357 |
| 4/7/2017 | 2017 | 398 | 371 |
| 4/8/2017 | 2017 | 399 | 380 |
| 4/9/2017 | 2017 | 265 | 371 |
| 4/10/2017 | 2017 | 372 | 369 |
| 4/11/2017 | 2017 | 454 | 374 |
| 4/12/2017 | 2017 | 401 | 389 |
| 4/13/2017 | 2017 | 387 | 382 |
| 4/14/2017 | 2017 | 411 | 384 |
| 4/15/2017 | 2017 | 261 | 364 |
| 4/16/2017 | 2017 | 222 | 358 |
| 4/17/2017 | 2017 | 286 | 346 |
| 4/18/2017 | 2017 | 415 | 340 |
| 4/19/2017 | 2017 | 373 | 336 |
| 4/20/2017 | 2017 | 399 | 338 |
| 4/21/2017 | 2017 | 426 | 340 |
| 4/22/2017 | 2017 | 270 | 342 |
| 4/23/2017 | 2017 | 288 | 351 |
| 4/24/2017 | 2017 | 419 | 370 |
| 4/25/2017 | 2017 | 455 | 376 |
| 4/26/2017 | 2017 | 393 | 379 |
| 4/27/2017 | 2017 | 451 | 386 |
| 4/28/2017 | 2017 | 405 | 383 |
| 4/29/2017 | 2017 | 363 | 396 |
| 4/30/2017 | 2017 | 413 | 414 |
| 5/1/2017 | 2017 | 374 | 408 |
| 5/2/2017 | 2017 | 434 | 405 |
| 5/3/2017 | 2017 | 425 | 409 |
| 5/4/2017 | 2017 | 331 | 392 |
| 5/5/2017 | 2017 | 486 | 404 |
| 5/6/2017 | 2017 | 401 | 409 |
| 5/7/2017 | 2017 | 432 | 412 |
| 5/8/2017 | 2017 | 401 | 416 |
| 5/9/2017 | 2017 | 543 | 431 |
| 5/10/2017 | 2017 | 562 | 451 |
| 5/11/2017 | 2017 | 475 | 471 |
| 5/12/2017 | 2017 | 483 | 471 |

STB_AR1_001836

| | | | |
|---|---|---|---|
| 5/13/2017 | 2017 | 481 | 482 |
| 5/14/2017 | 2017 | 389 | 476 |
| 5/15/2017 | 2017 | 429 | 480 |
| 5/16/2017 | 2017 | 518 | 477 |
| 5/17/2017 | 2017 | 565 | 477 |
| 5/18/2017 | 2017 | 423 | 470 |
| 5/19/2017 | 2017 | 473 | 468 |
| 5/20/2017 | 2017 | 431 | 461 |
| 5/21/2017 | 2017 | 384 | 460 |
| 5/22/2017 | 2017 | 374 | 453 |
| 5/23/2017 | 2017 | 601 | 464 |
| 5/24/2017 | 2017 | 564 | 464 |
| 5/25/2017 | 2017 | 491 | 474 |
| 5/26/2017 | 2017 | 493 | 477 |
| 5/27/2017 | 2017 | 487 | 485 |
| 5/28/2017 | 2017 | 394 | 486 |
| 5/29/2017 | 2017 | 573 | 515 |
| 5/30/2017 | 2017 | 568 | 510 |
| 5/31/2017 | 2017 | 534 | 506 |
| 6/1/2017 | 2017 | 517 | 509 |
| 6/2/2017 | 2017 | 463 | 505 |
| 6/3/2017 | 2017 | 482 | 504 |
| 6/4/2017 | 2017 | 468 | 515 |
| 6/5/2017 | 2017 | 459 | 499 |
| 6/6/2017 | 2017 | 620 | 506 |
| 6/7/2017 | 2017 | 548 | 508 |
| 6/8/2017 | 2017 | 569 | 516 |
| 6/9/2017 | 2017 | 481 | 518 |
| 6/10/2017 | 2017 | 505 | 521 |
| 6/11/2017 | 2017 | 445 | 518 |
| 6/12/2017 | 2017 | 498 | 524 |
| 6/13/2017 | 2017 | 617 | 523 |
| 6/14/2017 | 2017 | 578 | 528 |
| 6/15/2017 | 2017 | 507 | 519 |
| 6/16/2017 | 2017 | 536 | 527 |
| 6/17/2017 | 2017 | 503 | 526 |
| 6/18/2017 | 2017 | 415 | 522 |
| 6/19/2017 | 2017 | 474 | 519 |
| 6/20/2017 | 2017 | 640 | 522 |
| 6/21/2017 | 2017 | 582 | 522 |
| 6/22/2017 | 2017 | 586 | 534 |
| 6/23/2017 | 2017 | 621 | 546 |
| 6/24/2017 | 2017 | 579 | 557 |
| 6/25/2017 | 2017 | 451 | 562 |
| 6/26/2017 | 2017 | 659 | 588 |
| 6/27/2017 | 2017 | 517 | 571 |
| 6/28/2017 | 2017 | 636 | 578 |

STB_AR1_001837

| | | | |
|---|---|---|---|
| 6/29/2017 | 2017 | 516 | 568 |
| 6/30/2017 | 2017 | 615 | 568 |
| 7/1/2017 | 2017 | 523 | 560 |
| 7/2/2017 | 2017 | 440 | 558 |
| 7/3/2017 | 2017 | 446 | 528 |
| 7/4/2017 | 2017 | 596 | 539 |
| 7/5/2017 | 2017 | 567 | 529 |
| 7/6/2017 | 2017 | 660 | 550 |
| 7/7/2017 | 2017 | 568 | 543 |
| 7/8/2017 | 2017 | 540 | 545 |
| 7/9/2017 | 2017 | 538 | 559 |
| 7/10/2017 | 2017 | 607 | 582 |
| 7/11/2017 | 2017 | 657 | 591 |
| 7/12/2017 | 2017 | 496 | 581 |
| 7/13/2017 | 2017 | 720 | 589 |
| 7/14/2017 | 2017 | 585 | 592 |
| 7/15/2017 | 2017 | 567 | 596 |
| 7/16/2017 | 2017 | 498 | 590 |
| 7/17/2017 | 2017 | 659 | 597 |
| 7/18/2017 | 2017 | 723 | 607 |
| 7/19/2017 | 2017 | 615 | 624 |
| 7/20/2017 | 2017 | 696 | 620 |
| 7/21/2017 | 2017 | 521 | 611 |
| 7/22/2017 | 2017 | 618 | 619 |
| 7/23/2017 | 2017 | 556 | 627 |
| 7/24/2017 | 2017 | 732 | 637 |
| 7/25/2017 | 2017 | 677 | 631 |
| 7/26/2017 | 2017 | 626 | 632 |
| 7/27/2017 | 2017 | 533 | 609 |
| 7/28/2017 | 2017 | 524 | 609 |
| 7/29/2017 | 2017 | 488 | 591 |
| 7/30/2017 | 2017 | 572 | 593 |
| 7/31/2017 | 2017 | 639 | 580 |
| 8/1/2017 | 2017 | 703 | 584 |
| 8/2/2017 | 2017 | 691 | 593 |
| 8/3/2017 | 2017 | 579 | 599 |
| 8/4/2017 | 2017 | 604 | 611 |
| 8/5/2017 | 2017 | 524 | 616 |
| 8/6/2017 | 2017 | 464 | 601 |
| 8/7/2017 | 2017 | 649 | 602 |
| 8/8/2017 | 2017 | 893 | 629 |
| 8/9/2017 | 2017 | 751 | 638 |
| 8/10/2017 | 2017 | 697 | 655 |
| 8/11/2017 | 2017 | 611 | 656 |
| 8/12/2017 | 2017 | 803 | 695 |
| 8/13/2017 | 2017 | 759 | 738 |
| 8/14/2017 | 2017 | 805 | 760 |

STB_AR1_001838

| | | | |
|---|---|---|---|
| 8/15/2017 | 2017 | 787 | 745 |
| 8/16/2017 | 2017 | 746 | 744 |
| 8/17/2017 | 2017 | 668 | 740 |
| 8/18/2017 | 2017 | 756 | 761 |
| 8/19/2017 | 2017 | 766 | 755 |
| 8/20/2017 | 2017 | 636 | 738 |
| 8/21/2017 | 2017 | 728 | 727 |
| 8/22/2017 | 2017 | 939 | 748 |
| 8/23/2017 | 2017 | 702 | 742 |
| 8/24/2017 | 2017 | 797 | 761 |
| 8/25/2017 | 2017 | 653 | 746 |
| 8/26/2017 | 2017 | 819 | 753 |
| 8/27/2017 | 2017 | 666 | 758 |
| 8/28/2017 | 2017 | 765 | 763 |
| 8/29/2017 | 2017 | 854 | 751 |
| 8/30/2017 | 2017 | 774 | 761 |
| 8/31/2017 | 2017 | 699 | 747 |
| 9/1/2017 | 2017 | 653 | 747 |
| 9/2/2017 | 2017 | 865 | 754 |
| 9/3/2017 | 2017 | 711 | 760 |
| 9/4/2017 | 2017 | 717 | 753 |
| 9/5/2017 | 2017 | 877 | 757 |
| 9/6/2017 | 2017 | 829 | 764 |
| 9/7/2017 | 2017 | 704 | 765 |
| 9/8/2017 | 2017 | 731 | 776 |
| 9/9/2017 | 2017 | 715 | 755 |
| 9/10/2017 | 2017 | 666 | 748 |
| 9/11/2017 | 2017 | 935 | 780 |
| 9/12/2017 | 2017 | 795 | 768 |
| 9/13/2017 | 2017 | 758 | 758 |
| 9/14/2017 | 2017 | 833 | 776 |
| 9/15/2017 | 2017 | 673 | 768 |
| 9/16/2017 | 2017 | 646 | 758 |
| 9/17/2017 | 2017 | 583 | 746 |
| 9/18/2017 | 2017 | 853 | 734 |
| 9/19/2017 | 2017 | 848 | 742 |
| 9/20/2017 | 2017 | 792 | 747 |
| 9/21/2017 | 2017 | 726 | 732 |
| 9/22/2017 | 2017 | 666 | 731 |
| 9/23/2017 | 2017 | 648 | 731 |
| 9/24/2017 | 2017 | 547 | 726 |
| 9/25/2017 | 2017 | 800 | 718 |
| 9/26/2017 | 2017 | 866 | 721 |
| 9/27/2017 | 2017 | 840 | 728 |
| 9/28/2017 | 2017 | 828 | 742 |
| 9/29/2017 | 2017 | 732 | 752 |
| 9/30/2017 | 2017 | 700 | 759 |

STB_AR1_001839

| | | | |
|---|---|---|---|
| 10/1/2017 | 2018 | 560 | 761 |
| 10/2/2017 | 2018 | 714 | 749 |
| 10/3/2017 | 2018 | 771 | 735 |
| 10/4/2017 | 2018 | 898 | 743 |
| 10/5/2017 | 2018 | 785 | 737 |
| 10/6/2017 | 2018 | 750 | 740 |
| 10/7/2017 | 2018 | 789 | 752 |
| 10/8/2017 | 2018 | 654 | 766 |
| 10/9/2017 | 2018 | 685 | 762 |
| 10/10/2017 | 2018 | 888 | 778 |
| 10/11/2017 | 2018 | 964 | 788 |
| 10/12/2017 | 2018 | 851 | 797 |
| 10/13/2017 | 2018 | 819 | 807 |
| 10/14/2017 | 2018 | 851 | 816 |
| 10/15/2017 | 2018 | 683 | 820 |
| 10/16/2017 | 2018 | 827 | 840 |
| 10/17/2017 | 2018 | 956 | 850 |
| 10/18/2017 | 2018 | 778 | 824 |
| 10/19/2017 | 2018 | 902 | 831 |
| 10/20/2017 | 2018 | 857 | 836 |
| 10/21/2017 | 2018 | 798 | 829 |
| 10/22/2017 | 2018 | 712 | 833 |
| 10/23/2017 | 2018 | 940 | 849 |
| 10/24/2017 | 2018 | 940 | 847 |
| 10/25/2017 | 2018 | 944 | 870 |
| 10/26/2017 | 2018 | 964 | 879 |
| 10/27/2017 | 2018 | 841 | 877 |
| 10/28/2017 | 2018 | 848 | 884 |
| 10/29/2017 | 2018 | 693 | 881 |
| 10/30/2017 | 2018 | 912 | 877 |
| 10/31/2017 | 2018 | 914 | 874 |
| 11/1/2017 | 2018 | 952 | 875 |
| 11/2/2017 | 2018 | 907 | 867 |
| 11/3/2017 | 2018 | 1,026 | 893 |
| 11/4/2017 | 2018 | 832 | 891 |
| 11/5/2017 | 2018 | 707 | 893 |
| 11/6/2017 | 2018 | 863 | 886 |
| 11/7/2017 | 2018 | 993 | 897 |
| 11/8/2017 | 2018 | 989 | 902 |
| 11/9/2017 | 2018 | 806 | 888 |
| 11/10/2017 | 2018 | 1,055 | 892 |
| 11/11/2017 | 2018 | 838 | 893 |
| 11/12/2017 | 2018 | 692 | 891 |
| 11/13/2017 | 2018 | 928 | 900 |
| 11/14/2017 | 2018 | 1,187 | 928 |
| 11/15/2017 | 2018 | 989 | 928 |
| 11/16/2017 | 2018 | 1,014 | 958 |

STB_AR1_001840

| | | | |
|---|---|---|---|
| 11/17/2017 | 2018 | 873 | 932 |
| 11/18/2017 | 2018 | 1,020 | 958 |
| 11/19/2017 | 2018 | 973 | 998 |
| 11/20/2017 | 2018 | 1,088 | 1,021 |
| 11/21/2017 | 2018 | 916 | 982 |
| 11/22/2017 | 2018 | 993 | 982 |
| 11/23/2017 | 2018 | 1,043 | 987 |
| 11/24/2017 | 2018 | 1,155 | 1,027 |
| 11/25/2017 | 2018 | 1,075 | 1,035 |
| 11/26/2017 | 2018 | 870 | 1,020 |
| 11/27/2017 | 2018 | 985 | 1,005 |
| 11/28/2017 | 2018 | 1,131 | 1,036 |
| 11/29/2017 | 2018 | 1,116 | 1,054 |
| 11/30/2017 | 2018 | 1,069 | 1,057 |
| 12/1/2017 | 2018 | 1,117 | 1,052 |
| 12/2/2017 | 2018 | 915 | 1,029 |
| 12/3/2017 | 2018 | 901 | 1,033 |
| 12/4/2017 | 2018 | 910 | 1,023 |
| 12/5/2017 | 2018 | 1,135 | 1,023 |
| 12/6/2017 | 2018 | 916 | 995 |
| 12/7/2017 | 2018 | 1,014 | 987 |
| 12/8/2017 | 2018 | 1,016 | 972 |
| 12/9/2017 | 2018 | 1,011 | 986 |
| 12/10/2017 | 2018 | 865 | 981 |
| 12/11/2017 | 2018 | 952 | 987 |
| 12/12/2017 | 2018 | 1,105 | 983 |
| 12/13/2017 | 2018 | 1,247 | 1,030 |
| 12/14/2017 | 2018 | 1,163 | 1,051 |
| 12/15/2017 | 2018 | 1,049 | 1,056 |
| 12/16/2017 | 2018 | 993 | 1,053 |
| 12/17/2017 | 2018 | 951 | 1,066 |
| 12/18/2017 | 2018 | 1,086 | 1,085 |
| 12/19/2017 | 2018 | 975 | 1,066 |
| 12/20/2017 | 2018 | 1,052 | 1,038 |
| 12/21/2017 | 2018 | 937 | 1,006 |
| 12/22/2017 | 2018 | 1,007 | 1,000 |
| 12/23/2017 | 2018 | 1,017 | 1,004 |
| 12/24/2017 | 2018 | 839 | 988 |
| 12/25/2017 | 2018 | 496 | 903 |
| 12/26/2017 | 2018 | 642 | 856 |
| 12/27/2017 | 2018 | 876 | 831 |
| 12/28/2017 | 2018 | 740 | 802 |
| 12/29/2017 | 2018 | 669 | 754 |
| 12/30/2017 | 2018 | 776 | 720 |
| 12/31/2017 | 2018 | 623 | 689 |
| 1/1/2018 | 2018 | 302 | 661 |
| 1/2/2018 | 2018 | 389 | 625 |

STB_AR1_001841

| | | | | |
|---|---|---|---|---|
| 1/3/2018 | 2018 | 636 | 591 | |
| 1/4/2018 | 2018 | 569 | 566 | |
| 1/5/2018 | 2018 | 645 | 563 | -0.43924 |
| 1/6/2018 | 2018 | 622 | 541 | |
| 1/7/2018 | 2018 | 457 | 517 | |
| 1/8/2018 | 2018 | 717 | 576 | |
| 1/9/2018 | 2018 | 633 | 611 | |
| 1/10/2018 | 2018 | 742 | 626 | |
| 1/11/2018 | 2018 | 807 | 660 | |
| 1/12/2018 | 2018 | 1,166 | 735 | |
| 1/13/2018 | 2018 | 870 | 770 | |
| 1/14/2018 | 2018 | 768 | 815 | |
| 1/15/2018 | 2018 | 973 | 851 | |
| 1/16/2018 | 2018 | 743 | 867 | |
| 1/17/2018 | 2018 | 942 | 896 | |
| 1/18/2018 | 2018 | 1,099 | 937 | 0.664298 |
| 1/19/2018 | 2018 | 1,022 | 917 | |
| 1/20/2018 | 2018 | 1,014 | 937 | |
| 1/21/2018 | 2018 | 850 | 949 | |
| 1/22/2018 | 2018 | 951 | 946 | |
| 1/23/2018 | 2018 | 1,071 | 993 | |
| 1/24/2018 | 2018 | 970 | 997 | |
| 1/25/2018 | 2018 | 1,122 | 1,000 | |
| 1/26/2018 | 2018 | 992 | 996 | |
| 1/27/2018 | 2018 | 1,049 | 1,001 | |
| 1/28/2018 | 2018 | 872 | 1,004 | |
| 1/29/2018 | 2018 | 1,023 | 1,014 | |
| 1/30/2018 | 2018 | 1,012 | 1,006 | |
| 1/31/2018 | 2018 | 947 | 1,002 | |
| 2/1/2018 | 2018 | 943 | 977 | |
| 2/2/2018 | 2018 | 994 | 977 | |
| 2/3/2018 | 2018 | 1,089 | 983 | |
| 2/4/2018 | 2018 | 797 | 972 | |
| 2/5/2018 | 2018 | 1,051 | 976 | |
| 2/6/2018 | 2018 | 971 | 970 | |
| 2/7/2018 | 2018 | 1,005 | 979 | |
| 2/8/2018 | 2018 | 782 | 956 | |
| 2/9/2018 | 2018 | 814 | 930 | |
| 2/10/2018 | 2018 | 884 | 901 | |
| 2/11/2018 | 2018 | 814 | 903 | |
| 2/12/2018 | 2018 | 920 | 884 | |
| 2/13/2018 | 2018 | 989 | 887 | |
| 2/14/2018 | 2018 | 1,007 | 887 | |
| 2/15/2018 | 2018 | 799 | 890 | |
| 2/16/2018 | 2018 | 838 | 893 | |
| 2/17/2018 | 2018 | 839 | 887 | |
| 2/18/2018 | 2018 | 733 | 875 | |

STB_AR1_001842

| 2/19/2018 | 2018 | 1,056 | 894 |
| 2/20/2018 | 2018 | 1,050 | 903 |
| 2/21/2018 | 2018 | 1,020 | 905 |
| 2/22/2018 | 2018 | 1,177 | 959 |
| 2/23/2018 | 2018 | 973 | 978 |
| 2/24/2018 | 2018 | 797 | 972 |
| 2/25/2018 | 2018 | 859 | 990 |
| 2/26/2018 | 2018 | 1,178 | 1,008 |
| 2/27/2018 | 2018 | 1,224 | 1,033 |
| 2/28/2018 | 2018 | 1,063 | 1,039 |
| 3/1/2018 | 2018 | 1,185 | 1,040 |
| 3/2/2018 | 2018 | 1,294 | 1,086 |
| 3/3/2018 | 2018 | 1,057 | 1,123 |
| 3/4/2018 | 2018 | 1,023 | 1,146 |
| 3/5/2018 | 2018 | 1,069 | 1,131 |
| 3/6/2018 | 2018 | 1,130 | 1,117 |
| 3/7/2018 | 2018 | 1,272 | 1,147 |
| 3/8/2018 | 2018 | 1,209 | 1,151 |
| 3/9/2018 | 2018 | 1,103 | 1,123 |
| 3/10/2018 | 2018 | 1,268 | 1,153 |
| 3/11/2018 | 2018 | 1,161 | 1,173 |
| 3/12/2018 | 2018 | 1,298 | 1,206 |
| 3/13/2018 | 2018 | 1,275 | 1,227 |
| 3/14/2018 | 2018 | 1,250 | 1,223 |
| 3/15/2018 | 2018 | 1,170 | 1,218 |
| 3/16/2018 | 2018 | 1,055 | 1,211 |
| 3/17/2018 | 2018 | 983 | 1,170 |
| 3/18/2018 | 2018 | 1,015 | 1,149 |
| 3/19/2018 | 2018 | 1,292 | 1,149 |
| 3/20/2018 | 2018 | 1,431 | 1,171 |
| 3/21/2018 | 2018 | 1,401 | 1,192 |
| 3/22/2018 | 2018 | 1,159 | 1,191 |
| 3/23/2018 | 2018 | 1,063 | 1,192 |
| 3/24/2018 | 2018 | 1,215 | 1,225 |
| 3/25/2018 | 2018 | 1,046 | 1,230 |
| 3/26/2018 | 2018 | 1,526 | 1,263 |
| 3/27/2018 | 2018 | 1,549 | 1,280 |
| 3/28/2018 | 2018 | 1,313 | 1,267 |
| 3/29/2018 | 2018 | 1,366 | 1,297 |
| 3/30/2018 | 2018 | 1,292 | 1,330 |
| 3/31/2018 | 2018 | 920 | 1,287 |
| 4/1/2018 | 2018 | 794 | 1,251 |
| 4/2/2018 | 2018 | 832 | 1,152 |
| 4/3/2018 | 2018 | 1,329 | 1,121 |
| 4/4/2018 | 2018 | 1,041 | 1,082 |
| 4/5/2018 | 2018 | 1,140 | 1,050 |
| 4/6/2018 | 2018 | 1,256 | 1,045 |

STB_AR1_001843

| 4/7/2018 | 2018 | 1,299 | 1,099 |
| 4/8/2018 | 2018 | 1,064 | 1,137 |
| 4/9/2018 | 2018 | 1,218 | 1,192 |
| 4/10/2018 | 2018 | 1,352 | 1,196 |
| 4/11/2018 | 2018 | 1,379 | 1,244 |
| 4/12/2018 | 2018 | 1,460 | 1,290 |
| 4/13/2018 | 2018 | 1,121 | 1,270 |
| 4/14/2018 | 2018 | 1,376 | 1,281 |
| 4/15/2018 | 2018 | 1,167 | 1,296 |
| 4/16/2018 | 2018 | 1,206 | 1,294 |
| 4/17/2018 | 2018 | 1,597 | 1,329 |
| 4/18/2018 | 2018 | 1,615 | 1,363 |
| 4/19/2018 | 2018 | 1,610 | 1,385 |
| 4/20/2018 | 2018 | 1,311 | 1,412 |
| 4/21/2018 | 2018 | 1,373 | 1,411 |
| 4/22/2018 | 2018 | 1,032 | 1,392 |
| 4/23/2018 | 2018 | 1,245 | 1,398 |
| 4/24/2018 | 2018 | 1,529 | 1,388 |
| 4/25/2018 | 2018 | 1,317 | 1,345 |
| 4/26/2018 | 2018 | 1,442 | 1,321 |
| 4/27/2018 | 2018 | 1,323 | 1,323 |
| 4/28/2018 | 2018 | 1,245 | 1,305 |
| 4/29/2018 | 2018 | 1,064 | 1,309 |
| 4/30/2018 | 2018 | 1,506 | 1,347 |
| 5/1/2018 | 2018 | 1,357 | 1,322 |
| 5/2/2018 | 2018 | 1,336 | 1,325 |
| 5/3/2018 | 2018 | 1,304 | 1,305 |
| 5/4/2018 | 2018 | 1,093 | 1,272 |
| 5/5/2018 | 2018 | 1,338 | 1,285 |
| 5/6/2018 | 2018 | 1,081 | 1,288 |
| 5/7/2018 | 2018 | 1,290 | 1,257 |
| 5/8/2018 | 2018 | 1,543 | 1,284 |
| 5/9/2018 | 2018 | 1,503 | 1,307 |
| 5/10/2018 | 2018 | 1,269 | 1,302 |
| 5/11/2018 | 2018 | 1,120 | 1,306 |
| 5/12/2018 | 2018 | 1,184 | 1,284 |
| 5/13/2018 | 2018 | 1,207 | 1,302 |
| 5/14/2018 | 2018 | 1,354 | 1,311 |
| 5/15/2018 | 2018 | 1,190 | 1,261 |
| 5/16/2018 | 2018 | 1,271 | 1,228 |
| 5/17/2018 | 2018 | 1,388 | 1,245 |
| 5/18/2018 | 2018 | 1,563 | 1,308 |
| 5/19/2018 | 2018 | 1,122 | 1,299 |
| 5/20/2018 | 2018 | 940 | 1,261 |
| 5/21/2018 | 2018 | 1,287 | 1,252 |
| 5/22/2018 | 2018 | 1,328 | 1,271 |
| 5/23/2018 | 2018 | 1,573 | 1,314 |

STB_AR1_001844

| 5/24/2018 | 2018 | 1,383 | 1,314 |
| 5/25/2018 | 2018 | 1,560 | 1,313 |
| 5/26/2018 | 2018 | 1,360 | 1,347 |
| 5/27/2018 | 2018 | 1,102 | 1,370 |
| 5/28/2018 | 2018 | 1,193 | 1,357 |
| 5/29/2018 | 2018 | 1,386 | 1,365 |
| 5/30/2018 | 2018 | 1,335 | 1,331 |
| 5/31/2018 | 2018 | 1,379 | 1,331 |
| 6/1/2018 | 2018 | 1,290 | 1,292 |
| 6/2/2018 | 2018 | 1,293 | 1,283 |
| 6/3/2018 | 2018 | 1,115 | 1,284 |
| 6/4/2018 | 2018 | 1,162 | 1,280 |
| 6/5/2018 | 2018 | 1,468 | 1,292 |
| 6/6/2018 | 2018 | 1,175 | 1,269 |
| 6/7/2018 | 2018 | 1,204 | 1,244 |
| 6/8/2018 | 2018 | 1,220 | 1,234 |
| 6/9/2018 | 2018 | 955 | 1,186 |
| 6/10/2018 | 2018 | 1,061 | 1,178 |
| 6/11/2018 | 2018 | 1,372 | 1,208 |
| 6/12/2018 | 2018 | 1,438 | 1,204 |
| 6/13/2018 | 2018 | 1,351 | 1,229 |
| 6/14/2018 | 2018 | 1,220 | 1,231 |
| 6/15/2018 | 2018 | 1,218 | 1,231 |
| 6/16/2018 | 2018 | 1,010 | 1,239 |
| 6/17/2018 | 2018 | 851 | 1,209 |
| 6/18/2018 | 2018 | 1,034 | 1,160 |
| 6/19/2018 | 2018 | 1,330 | 1,145 |
| 6/20/2018 | 2018 | 1,119 | 1,112 |
| 6/21/2018 | 2018 | 977 | 1,077 |
| 6/22/2018 | 2018 | 912 | 1,033 |
| 6/23/2018 | 2018 | 748 | 996 |
| 6/24/2018 | 2018 | 884 | 1,001 |
| 6/25/2018 | 2018 | 1,051 | 1,003 |
| 6/26/2018 | 2018 | 1,036 | 961 |
| 6/27/2018 | 2018 | 1,299 | 987 |
| 6/28/2018 | 2018 | 1,376 | 1,044 |
| 6/29/2018 | 2018 | 1,039 | 1,062 |
| 6/30/2018 | 2018 | 881 | 1,081 |
| 7/1/2018 | 2018 | 885 | 1,081 |
| 7/2/2018 | 2018 | 745 | 1,037 |
| 7/3/2018 | 2018 | 1,003 | 1,033 |
| 7/4/2018 | 2018 | 1,140 | 1,010 |
| 7/5/2018 | 2018 | 1,088 | 969 |
| 7/6/2018 | 2018 | 975 | 960 |
| 7/7/2018 | 2018 | 870 | 958 |
| 7/8/2018 | 2018 | 879 | 957 |
| 7/9/2018 | 2018 | 996 | 993 |

STB_AR1_001845

| | | | |
|---|---|---|---|
| 7/10/2018 | 2018 | 1,188 | 1,019 |
| 7/11/2018 | 2018 | 1,201 | 1,028 |
| 7/12/2018 | 2018 | 1,071 | 1,026 |
| 7/13/2018 | 2018 | 978 | 1,026 |
| 7/14/2018 | 2018 | 950 | 1,038 |
| 7/15/2018 | 2018 | 870 | 1,036 |
| 7/16/2018 | 2018 | 1,010 | 1,038 |
| 7/17/2018 | 2018 | 1,246 | 1,047 |
| 7/18/2018 | 2018 | 1,047 | 1,025 |
| 7/19/2018 | 2018 | 958 | 1,008 |
| 7/20/2018 | 2018 | 951 | 1,005 |
| 7/21/2018 | 2018 | 869 | 993 |
| 7/22/2018 | 2018 | 907 | 998 |
| 7/23/2018 | 2018 | 1,055 | 1,005 |
| 7/24/2018 | 2018 | 1,163 | 993 |
| 7/25/2018 | 2018 | 1,090 | 999 |
| 7/26/2018 | 2018 | 1,145 | 1,026 |
| 7/27/2018 | 2018 | 1,024 | 1,036 |
| 7/28/2018 | 2018 | 992 | 1,054 |
| 7/29/2018 | 2018 | 829 | 1,043 |
| 7/30/2018 | 2018 | 992 | 1,034 |
| 7/31/2018 | 2018 | 1,182 | 1,036 |
| 8/1/2018 | 2018 | 1,164 | 1,047 |
| 8/2/2018 | 2018 | 1,117 | 1,043 |
| 8/3/2018 | 2018 | 1,185 | 1,066 |
| 8/4/2018 | 2018 | 1,147 | 1,088 |
| 8/5/2018 | 2018 | 913 | 1,100 |
| 8/6/2018 | 2018 | 1,022 | 1,104 |
| 8/7/2018 | 2018 | 1,261 | 1,116 |
| 8/8/2018 | 2018 | 1,030 | 1,096 |
| 8/9/2018 | 2018 | 1,192 | 1,107 |
| 8/10/2018 | 2018 | 1,274 | 1,120 |
| 8/11/2018 | 2018 | 1,192 | 1,126 |
| 8/12/2018 | 2018 | 974 | 1,135 |
| 8/13/2018 | 2018 | 1,188 | 1,159 |
| 8/14/2018 | 2018 | 1,435 | 1,184 |
| 8/15/2018 | 2018 | 1,144 | 1,200 |
| 8/16/2018 | 2018 | 1,135 | 1,192 |
| 8/17/2018 | 2018 | 1,226 | 1,185 |
| 8/18/2018 | 2018 | 981 | 1,155 |
| 8/19/2018 | 2018 | 892 | 1,143 |
| 8/20/2018 | 2018 | 1,309 | 1,160 |
| 8/21/2018 | 2018 | 1,466 | 1,165 |
| 8/22/2018 | 2018 | 1,169 | 1,168 |
| 8/23/2018 | 2018 | 1,369 | 1,202 |
| 8/24/2018 | 2018 | 1,324 | 1,216 |
| 8/25/2018 | 2018 | 1,391 | 1,274 |

STB_AR1_001846

| | | | |
|---|---|---|---|
| 8/26/2018 | 2018 | 1,211 | 1,320 |
| 8/27/2018 | 2018 | 1,419 | 1,336 |
| 8/28/2018 | 2018 | 1,398 | 1,326 |
| 8/29/2018 | 2018 | 1,573 | 1,384 |
| 8/30/2018 | 2018 | 1,285 | 1,372 |
| 8/31/2018 | 2018 | 1,138 | 1,345 |
| 9/1/2018 | 2018 | 1,411 | 1,348 |
| 9/2/2018 | 2018 | 1,060 | 1,326 |
| 9/3/2018 | 2018 | 1,262 | 1,304 |
| 9/4/2018 | 2018 | 1,224 | 1,279 |
| 9/5/2018 | 2018 | 1,532 | 1,273 |
| 9/6/2018 | 2018 | 1,380 | 1,287 |
| 9/7/2018 | 2018 | 1,124 | 1,285 |
| 9/8/2018 | 2018 | 1,286 | 1,267 |
| 9/9/2018 | 2018 | 1,203 | 1,287 |
| 9/10/2018 | 2018 | 1,315 | 1,295 |
| 9/11/2018 | 2018 | 1,534 | 1,339 |
| 9/12/2018 | 2018 | 1,555 | 1,342 |
| 9/13/2018 | 2018 | 1,286 | 1,329 |
| 9/14/2018 | 2018 | 1,322 | 1,357 |
| 9/15/2018 | 2018 | 1,035 | 1,321 |
| 9/16/2018 | 2018 | 1,184 | 1,319 |
| 9/17/2018 | 2018 | 1,293 | 1,316 |
| 9/18/2018 | 2018 | 1,610 | 1,326 |
| 9/19/2018 | 2018 | 1,610 | 1,334 |
| 9/20/2018 | 2018 | 1,450 | 1,358 |
| 9/21/2018 | 2018 | 1,480 | 1,380 |
| 9/22/2018 | 2018 | 989 | 1,374 |
| 9/23/2018 | 2018 | 1,224 | 1,379 |
| 9/24/2018 | 2018 | 1,497 | 1,409 |
| 9/25/2018 | 2018 | 1,873 | 1,446 |
| 9/26/2018 | 2018 | 1,943 | 1,494 |
| 9/27/2018 | 2018 | 1,489 | 1,499 |
| 9/28/2018 | 2018 | 1,739 | 1,536 |
| 9/29/2018 | 2018 | 1,434 | 1,600 |
| 9/30/2018 | 2018 | 1,142 | 1,588 |
| 10/1/2018 | 2019 | 1,553 | 1,596 |
| 10/2/2018 | 2019 | 1,841 | 1,592 |
| 10/3/2018 | 2019 | 1,671 | 1,553 |
| 10/4/2018 | 2019 | 1,459 | 1,548 |
| 10/5/2018 | 2019 | 1,642 | 1,535 |
| 10/6/2018 | 2019 | 1,435 | 1,535 |
| 10/7/2018 | 2019 | 1,232 | 1,548 |
| 10/8/2018 | 2019 | 1,507 | 1,541 |
| 10/9/2018 | 2019 | 1,718 | 1,523 |
| 10/10/2018 | 2019 | 1,756 | 1,536 |
| 10/11/2018 | 2019 | 1,381 | 1,524 |

STB_AR1_001847

| | | | |
|---|---|---|---|
| 10/12/2018 | 2019 | 1,392 | 1,489 |
| 10/13/2018 | 2019 | 1,445 | 1,490 |
| 10/14/2018 | 2019 | 1,454 | 1,522 |
| 10/15/2018 | 2019 | 1,415 | 1,509 |
| 10/16/2018 | 2019 | 1,680 | 1,503 |
| 10/17/2018 | 2019 | 1,945 | 1,530 |
| 10/18/2018 | 2019 | 1,882 | 1,602 |
| 10/19/2018 | 2019 | 1,437 | 1,608 |
| 10/20/2018 | 2019 | 1,753 | 1,652 |
| 10/21/2018 | 2019 | 1,561 | 1,668 |
| 10/22/2018 | 2019 | 1,845 | 1,729 |
| 10/23/2018 | 2019 | 1,733 | 1,737 |
| 10/24/2018 | 2019 | 1,823 | 1,719 |
| 10/25/2018 | 2019 | 2,050 | 1,743 |
| 10/26/2018 | 2019 | 1,568 | 1,762 |
| 10/27/2018 | 2019 | 1,948 | 1,790 |
| 10/28/2018 | 2019 | 1,373 | 1,763 |
| 10/29/2018 | 2019 | 1,654 | 1,736 |
| 10/30/2018 | 2019 | 2,012 | 1,775 |
| 10/31/2018 | 2019 | 1,840 | 1,778 |
| 11/1/2018 | 2019 | 1,789 | 1,741 |
| 11/2/2018 | 2019 | 1,882 | 1,785 |
| 11/3/2018 | 2019 | 1,922 | 1,782 |
| 11/4/2018 | 2019 | 1,727 | 1,832 |
| 11/5/2018 | 2019 | 1,462 | 1,805 |
| 11/6/2018 | 2019 | 1,841 | 1,780 |
| 11/7/2018 | 2019 | 1,965 | 1,798 |
| 11/8/2018 | 2019 | 1,602 | 1,772 |
| 11/9/2018 | 2019 | 1,670 | 1,741 |
| 11/10/2018 | 2019 | 1,621 | 1,698 |
| 11/11/2018 | 2019 | 1,226 | 1,627 |
| 11/12/2018 | 2019 | 1,500 | 1,632 |
| 11/13/2018 | 2019 | 2,124 | 1,673 |
| 11/14/2018 | 2019 | 1,900 | 1,663 |
| 11/15/2018 | 2019 | 1,701 | 1,677 |
| 11/16/2018 | 2019 | 2,122 | 1,742 |
| 11/17/2018 | 2019 | 2,110 | 1,812 |
| 11/18/2018 | 2019 | 1,468 | 1,846 |
| 11/19/2018 | 2019 | 1,538 | 1,852 |
| 11/20/2018 | 2019 | 1,947 | 1,827 |
| 11/21/2018 | 2019 | 1,331 | 1,745 |
| 11/22/2018 | 2019 | 1,681 | 1,742 |
| 11/23/2018 | 2019 | 1,628 | 1,672 |
| 11/24/2018 | 2019 | 1,590 | 1,598 |
| 11/25/2018 | 2019 | 1,468 | 1,598 |
| 11/26/2018 | 2019 | 1,451 | 1,585 |
| 11/27/2018 | 2019 | 1,975 | 1,589 |

STB_AR1_001848

| | | | | |
|---|---|---|---|---|
| 11/28/2018 | 2019 | 1,644 | 1,634 | |
| 11/29/2018 | 2019 | 1,961 | 1,674 | |
| 11/30/2018 | 2019 | 2,011 | 1,729 | |
| 12/1/2018 | 2019 | 1,477 | 1,712 | |
| 12/2/2018 | 2019 | 1,559 | 1,725 | |
| 12/3/2018 | 2019 | 2,701 | 1,904 | |
| 12/4/2018 | 2019 | 1,828 | 1,883 | |
| 12/5/2018 | 2019 | 1,610 | 1,878 | |
| 12/6/2018 | 2019 | 1,889 | 1,868 | |
| 12/7/2018 | 2019 | 1,606 | 1,810 | |
| 12/8/2018 | 2019 | 1,552 | 1,821 | |
| 12/9/2018 | 2019 | 1,897 | 1,869 | |
| 12/10/2018 | 2019 | 1,776 | 1,737 | |
| 12/11/2018 | 2019 | 1,984 | 1,759 | |
| 12/12/2018 | 2019 | 2,244 | 1,850 | |
| 12/13/2018 | 2019 | 1,801 | 1,837 | |
| 12/14/2018 | 2019 | 1,455 | 1,816 | |
| 12/15/2018 | 2019 | 1,682 | 1,834 | |
| 12/16/2018 | 2019 | 2,158 | 1,871 | |
| 12/17/2018 | 2019 | 2,175 | 1,928 | |
| 12/18/2018 | 2019 | 1,877 | 1,913 | |
| 12/19/2018 | 2019 | 2,186 | 1,905 | |
| 12/20/2018 | 2019 | 1,635 | 1,881 | |
| 12/21/2018 | 2019 | 1,673 | 1,912 | |
| 12/22/2018 | 2019 | 1,503 | 1,887 | |
| 12/23/2018 | 2019 | 1,683 | 1,819 | |
| 12/24/2018 | 2019 | 1,499 | 1,722 | |
| 12/25/2018 | 2019 | 1,018 | 1,600 | |
| 12/26/2018 | 2019 | 1,293 | 1,472 | |
| 12/27/2018 | 2019 | 1,215 | 1,412 | |
| 12/28/2018 | 2019 | 1,057 | 1,324 | |
| 12/29/2018 | 2019 | 1,161 | 1,275 | |
| 12/30/2018 | 2019 | 782 | 1,146 | |
| 12/31/2018 | 2019 | 775 | 1,043 | |
| 1/1/2019 | 2019 | 529 | 973 | |
| 1/2/2019 | 2019 | 789 | 901 | |
| 1/3/2019 | 2019 | 807 | 843 | |
| 1/4/2019 | 2019 | 653 | 785 | |
| 1/5/2019 | 2019 | 599 | 705 | -0.61242 |
| 1/6/2019 | 2019 | 631 | 683 | |
| 1/7/2019 | 2019 | 676 | 669 | |
| 1/8/2019 | 2019 | 1,224 | 768 | |
| 1/9/2019 | 2019 | 1,009 | 800 | |
| 1/10/2019 | 2019 | 939 | 819 | |
| 1/11/2019 | 2019 | 1,839 | 988 | |
| 1/12/2019 | 2019 | 1,363 | 1,097 | |
| 1/13/2019 | 2019 | 1,627 | 1,240 | |

STB_AR1_001849

| | | | |
|---|---|---|---|
| 1/14/2019 | 2019 | 2,041 | 1,435 |
| 1/15/2019 | 2019 | 1,626 | 1,492 |
| 1/16/2019 | 2019 | 1,906 | 1,620 |
| 1/17/2019 | 2019 | 2,468 | 1,839 |
| 1/18/2019 | 2019 | 1,805 | 1,834 |
| 1/19/2019 | 2019 | 2,059 | 1,933 |
| 1/20/2019 | 2019 | 1,527 | 1,919 |
| 1/21/2019 | 2019 | 1,763 | 1,879 |
| 1/22/2019 | 2019 | 1,723 | 1,893 |
| 1/23/2019 | 2019 | 1,625 | 1,853 |
| 1/24/2019 | 2019 | 2,415 | 1,845 |
| 1/25/2019 | 2019 | 2,076 | 1,884 |
| 1/26/2019 | 2019 | 1,732 | 1,837 |
| 1/27/2019 | 2019 | 1,864 | 1,885 |
| 1/28/2019 | 2019 | 2,125 | 1,937 |
| 1/29/2019 | 2019 | 2,528 | 2,052 |
| 1/30/2019 | 2019 | 1,907 | 2,092 |
| 1/31/2019 | 2019 | 2,104 | 2,048 |
| 2/1/2019 | 2019 | 2,110 | 2,053 |
| 2/2/2019 | 2019 | 1,732 | 2,053 |
| 2/3/2019 | 2019 | 1,897 | 2,058 |
| 2/4/2019 | 2019 | 2,443 | 2,103 |
| 2/5/2019 | 2019 | 2,079 | 2,039 |
| 2/6/2019 | 2019 | 2,086 | 2,064 |
| 2/7/2019 | 2019 | 2,057 | 2,058 |
| 2/8/2019 | 2019 | 2,147 | 2,063 |
| 2/9/2019 | 2019 | 2,275 | 2,141 |
| 2/10/2019 | 2019 | 1,965 | 2,150 |
| 2/11/2019 | 2019 | 3,237 | 2,264 |
| 2/12/2019 | 2019 | 2,536 | 2,329 |
| 2/13/2019 | 2019 | 2,492 | 2,387 |
| 2/14/2019 | 2019 | 2,294 | 2,421 |
| 2/15/2019 | 2019 | 2,520 | 2,474 |
| 2/16/2019 | 2019 | 2,460 | 2,501 |
| 2/17/2019 | 2019 | 2,157 | 2,528 |
| 2/18/2019 | 2019 | 2,251 | 2,387 |
| 2/19/2019 | 2019 | 2,924 | 2,443 |
| 2/20/2019 | 2019 | 2,680 | 2,469 |
| 2/21/2019 | 2019 | 2,574 | 2,509 |
| 2/22/2019 | 2019 | 2,166 | 2,459 |
| 2/23/2019 | 2019 | 2,309 | 2,437 |
| 2/24/2019 | 2019 | 2,325 | 2,461 |
| 2/25/2019 | 2019 | 2,916 | 2,556 |
| 2/26/2019 | 2019 | 3,341 | 2,616 |
| 2/27/2019 | 2019 | 2,465 | 2,585 |
| 2/28/2019 | 2019 | 2,445 | 2,567 |
| 3/1/2019 | 2019 | 2,700 | 2,643 |

1.601418

STB_AR1_001850

| | | | |
|---|---|---|---|
| 3/2/2019 | 2019 | 2,645 | 2,691 |
| 3/3/2019 | 2019 | 2,104 | 2,659 |
| 3/4/2019 | 2019 | 2,511 | 2,602 |
| 3/5/2019 | 2019 | 2,476 | 2,478 |
| 3/6/2019 | 2019 | 3,236 | 2,588 |
| 3/7/2019 | 2019 | 2,804 | 2,639 |
| 3/8/2019 | 2019 | 2,659 | 2,634 |
| 3/9/2019 | 2019 | 2,881 | 2,667 |
| 3/10/2019 | 2019 | 2,580 | 2,735 |
| 3/11/2019 | 2019 | 3,235 | 2,839 |
| 3/12/2019 | 2019 | 3,457 | 2,979 |
| 3/13/2019 | 2019 | 2,524 | 2,877 |
| 3/14/2019 | 2019 | 2,988 | 2,903 |
| 3/15/2019 | 2019 | 2,535 | 2,886 |
| 3/16/2019 | 2019 | 3,171 | 2,927 |
| 3/17/2019 | 2019 | 2,808 | 2,960 |
| 3/18/2019 | 2019 | 3,009 | 2,927 |
| 3/19/2019 | 2019 | 3,611 | 2,949 |
| 3/20/2019 | 2019 | 3,069 | 3,027 |
| 3/21/2019 | 2019 | 2,868 | 3,010 |
| 3/22/2019 | 2019 | 3,017 | 3,079 |
| 3/23/2019 | 2019 | 3,301 | 3,098 |
| 3/24/2019 | 2019 | 3,144 | 3,146 |
| 3/25/2019 | 2019 | 3,745 | 3,251 |
| 3/26/2019 | 2019 | 3,755 | 3,271 |
| 3/27/2019 | 2019 | 3,547 | 3,340 |
| 3/28/2019 | 2019 | 3,238 | 3,392 |
| 3/29/2019 | 2019 | 2,876 | 3,372 |
| 3/30/2019 | 2019 | 2,810 | 3,302 |
| 3/31/2019 | 2019 | 3,529 | 3,357 |
| 4/1/2019 | 2019 | 3,608 | 3,338 |
| 4/2/2019 | 2019 | 3,310 | 3,274 |
| 4/3/2019 | 2019 | 2,622 | 3,142 |
| 4/4/2019 | 2019 | 3,008 | 3,109 |
| 4/5/2019 | 2019 | 3,403 | 3,184 |
| 4/6/2019 | 2019 | 2,757 | 3,177 |
| 4/7/2019 | 2019 | 2,023 | 2,962 |
| 4/8/2019 | 2019 | 3,491 | 2,945 |
| 4/9/2019 | 2019 | 4,121 | 3,061 |
| 4/10/2019 | 2019 | 3,462 | 3,181 |
| 4/11/2019 | 2019 | 3,647 | 3,272 |
| 4/12/2019 | 2019 | 3,502 | 3,286 |
| 4/13/2019 | 2019 | 3,247 | 3,356 |
| 4/14/2019 | 2019 | 2,699 | 3,453 |
| 4/15/2019 | 2019 | 3,409 | 3,441 |
| 4/16/2019 | 2019 | 4,707 | 3,525 |
| 4/17/2019 | 2019 | 4,480 | 3,670 |

STB_AR1_001851

| 4/18/2019 | 2019 | 3,863 | 3,701 |
|-----------|------|-------|-------|
| 4/19/2019 | 2019 | 2,910 | 3,616 |
| 4/20/2019 | 2019 | 2,495 | 3,509 |
| 4/21/2019 | 2019 | 2,876 | 3,534 |
| 4/22/2019 | 2019 | 2,667 | 3,428 |
| 4/23/2019 | 2019 | 3,178 | 3,210 |
| 4/24/2019 | 2019 | 2,974 | 2,995 |
| 4/25/2019 | 2019 | 3,014 | 2,873 |
| 4/26/2019 | 2019 | 3,246 | 2,921 |
| 4/27/2019 | 2019 | 2,916 | 2,982 |
| 4/28/2019 | 2019 | 3,552 | 3,078 |
| 4/29/2019 | 2019 | 3,236 | 3,159 |
| 4/30/2019 | 2019 | 4,850 | 3,398 |
| 5/1/2019 | 2019 | 4,178 | 3,570 |
| 5/2/2019 | 2019 | 3,924 | 3,700 |
| 5/3/2019 | 2019 | 3,571 | 3,747 |
| 5/4/2019 | 2019 | 5,236 | 4,078 |
| 5/5/2019 | 2019 | 3,910 | 4,129 |
| 5/6/2019 | 2019 | 4,481 | 4,307 |
| 5/7/2019 | 2019 | 4,680 | 4,283 |
| 5/8/2019 | 2019 | 4,840 | 4,377 |
| 5/9/2019 | 2019 | 5,102 | 4,546 |
| 5/10/2019 | 2019 | 5,283 | 4,790 |
| 5/11/2019 | 2019 | 4,357 | 4,665 |
| 5/12/2019 | 2019 | 3,851 | 4,656 |
| 5/13/2019 | 2019 | 4,308 | 4,632 |
| 5/14/2019 | 2019 | 4,296 | 4,577 |
| 5/15/2019 | 2019 | 3,989 | 4,455 |
| 5/16/2019 | 2019 | 3,824 | 4,273 |
| 5/17/2019 | 2019 | 4,471 | 4,157 |
| 5/18/2019 | 2019 | 3,802 | 4,077 |
| 5/19/2019 | 2019 | 3,877 | 4,081 |
| 5/20/2019 | 2019 | 4,282 | 4,077 |
| 5/21/2019 | 2019 | 3,695 | 3,991 |
| 5/22/2019 | 2019 | 3,252 | 3,886 |
| 5/23/2019 | 2019 | 5,056 | 4,062 |
| 5/24/2019 | 2019 | 3,508 | 3,925 |
| 5/25/2019 | 2019 | 4,119 | 3,970 |
| 5/26/2019 | 2019 | 3,282 | 3,885 |
| 5/27/2019 | 2019 | 4,679 | 3,942 |
| 5/28/2019 | 2019 | 4,639 | 4,076 |
| 5/29/2019 | 2019 | 5,462 | 4,392 |
| 5/30/2019 | 2019 | 5,049 | 4,391 |
| 5/31/2019 | 2019 | 3,853 | 4,440 |
| 6/1/2019 | 2019 | 4,404 | 4,481 |
| 6/2/2019 | 2019 | 4,624 | 4,673 |
| 6/3/2019 | 2019 | 3,947 | 4,568 |

STB_AR1_001852

| | | | |
|---|---|---|---|
| 6/4/2019 | 2019 | 3,953 | 4,470 |
| 6/5/2019 | 2019 | 3,740 | 4,224 |
| 6/6/2019 | 2019 | 3,369 | 3,984 |
| 6/7/2019 | 2019 | 3,167 | 3,886 |
| 6/8/2019 | 2019 | 3,510 | 3,759 |
| 6/9/2019 | 2019 | 3,810 | 3,642 |
| 6/10/2019 | 2019 | 3,503 | 3,579 |
| 6/11/2019 | 2019 | 3,431 | 3,504 |
| 6/12/2019 | 2019 | 3,528 | 3,474 |
| 6/13/2019 | 2019 | 3,714 | 3,523 |
| 6/14/2019 | 2019 | 3,380 | 3,554 |
| 6/15/2019 | 2019 | 3,286 | 3,522 |
| 6/16/2019 | 2019 | 2,078 | 3,274 |
| 6/17/2019 | 2019 | 2,530 | 3,135 |
| 6/18/2019 | 2019 | 3,255 | 3,110 |
| 6/19/2019 | 2019 | 2,677 | 2,989 |
| 6/20/2019 | 2019 | 2,740 | 2,849 |
| 6/21/2019 | 2019 | 2,536 | 2,729 |
| 6/22/2019 | 2019 | 2,280 | 2,585 |
| 6/23/2019 | 2019 | 2,506 | 2,646 |
| 6/24/2019 | 2019 | 3,178 | 2,739 |
| 6/25/2019 | 2019 | 2,862 | 2,683 |
| 6/26/2019 | 2019 | 3,056 | 2,737 |
| 6/27/2019 | 2019 | 2,166 | 2,655 |
| 6/28/2019 | 2019 | 2,318 | 2,624 |
| 6/29/2019 | 2019 | 2,882 | 2,710 |
| 6/30/2019 | 2019 | 2,472 | 2,705 |
| 7/1/2019 | 2019 | 2,463 | 2,603 |
| 7/2/2019 | 2019 | 2,613 | 2,567 |
| 7/3/2019 | 2019 | 2,959 | 2,553 |
| 7/4/2019 | 2019 | 2,807 | 2,645 |
| 7/5/2019 | 2019 | 2,826 | 2,717 |
| 7/6/2019 | 2019 | 2,223 | 2,623 |
| 7/7/2019 | 2019 | 1,475 | 2,481 |
| 7/8/2019 | 2019 | 2,019 | 2,417 |
| 7/9/2019 | 2019 | 2,251 | 2,366 |
| 7/10/2019 | 2019 | 2,539 | 2,306 |
| 7/11/2019 | 2019 | 2,775 | 2,301 |
| 7/12/2019 | 2019 | 3,329 | 2,373 |
| 7/13/2019 | 2019 | 2,337 | 2,389 |
| 7/14/2019 | 2019 | 1,833 | 2,440 |
| 7/15/2019 | 2019 | 2,412 | 2,497 |
| 7/16/2019 | 2019 | 2,325 | 2,507 |
| 7/17/2019 | 2019 | 2,917 | 2,561 |
| 7/18/2019 | 2019 | 2,077 | 2,461 |
| 7/19/2019 | 2019 | 2,422 | 2,332 |
| 7/20/2019 | 2019 | 2,021 | 2,287 |

| | | | |
|---|---|---|---|
| 7/21/2019 | 2019 | 2,212 | 2,341 |
| 7/22/2019 | 2019 | 1,500 | 2,211 |
| 7/23/2019 | 2019 | 2,187 | 2,191 |
| 7/24/2019 | 2019 | 2,470 | 2,127 |
| 7/25/2019 | 2019 | 1,971 | 2,112 |
| 7/26/2019 | 2019 | 2,298 | 2,094 |
| 7/27/2019 | 2019 | 2,770 | 2,201 |
| 7/28/2019 | 2019 | 1,884 | 2,154 |
| 7/29/2019 | 2019 | 2,160 | 2,249 |
| 7/30/2019 | 2019 | 2,028 | 2,226 |
| 7/31/2019 | 2019 | 1,875 | 2,141 |
| 8/1/2019 | 2019 | 1,920 | 2,134 |
| 8/2/2019 | 2019 | 2,085 | 2,103 |
| 8/3/2019 | 2019 | 1,854 | 1,972 |
| 8/4/2019 | 2019 | 1,322 | 1,892 |
| 8/5/2019 | 2019 | 1,692 | 1,825 |
| 8/6/2019 | 2019 | 1,980 | 1,818 |
| 8/7/2019 | 2019 | 2,407 | 1,894 |
| 8/8/2019 | 2019 | 1,913 | 1,893 |
| 8/9/2019 | 2019 | 1,800 | 1,853 |
| 8/10/2019 | 2019 | 1,878 | 1,856 |
| 8/11/2019 | 2019 | 1,294 | 1,852 |
| 8/12/2019 | 2019 | 1,569 | 1,834 |
| 8/13/2019 | 2019 | 1,720 | 1,797 |
| 8/14/2019 | 2019 | 2,008 | 1,740 |
| 8/15/2019 | 2019 | 1,695 | 1,709 |
| 8/16/2019 | 2019 | 1,595 | 1,680 |
| 8/17/2019 | 2019 | 1,383 | 1,609 |
| 8/18/2019 | 2019 | 1,497 | 1,638 |
| 8/19/2019 | 2019 | 1,261 | 1,594 |
| 8/20/2019 | 2019 | 1,128 | 1,510 |
| 8/21/2019 | 2019 | 1,995 | 1,508 |
| 8/22/2019 | 2019 | 1,706 | 1,509 |
| 8/23/2019 | 2019 | 1,390 | 1,480 |
| 8/24/2019 | 2019 | 1,457 | 1,491 |
| 8/25/2019 | 2019 | 1,369 | 1,472 |
| 8/26/2019 | 2019 | 1,343 | 1,484 |
| 8/27/2019 | 2019 | 1,425 | 1,526 |
| 8/28/2019 | 2019 | 1,558 | 1,464 |
| 8/29/2019 | 2019 | 1,559 | 1,443 |
| 8/30/2019 | 2019 | 1,478 | 1,456 |
| 8/31/2019 | 2019 | 1,403 | 1,448 |
| 9/1/2019 | 2019 | 1,490 | 1,465 |
| 9/2/2019 | 2019 | 1,191 | 1,443 |
| 9/3/2019 | 2019 | 1,547 | 1,461 |
| 9/4/2019 | 2019 | 1,252 | 1,417 |
| 9/5/2019 | 2019 | 1,178 | 1,363 |

STB_AR1_001854

| | | | |
|---|---|---|---|
| 9/6/2019 | 2019 | 1,268 | 1,333 |
| 9/7/2019 | 2019 | 1,344 | 1,324 |
| 9/8/2019 | 2019 | 1,236 | 1,288 |
| 9/9/2019 | 2019 | 1,439 | 1,323 |
| 9/10/2019 | 2019 | 1,506 | 1,318 |
| 9/11/2019 | 2019 | 1,586 | 1,365 |
| 9/12/2019 | 2019 | 1,302 | 1,383 |
| 9/13/2019 | 2019 | 1,411 | 1,403 |
| 9/14/2019 | 2019 | 1,302 | 1,397 |
| 9/15/2019 | 2019 | 1,254 | 1,400 |
| 9/16/2019 | 2019 | 1,172 | 1,362 |
| 9/17/2019 | 2019 | 1,542 | 1,367 |
| 9/18/2019 | 2019 | 1,627 | 1,373 |
| 9/19/2019 | 2019 | 1,174 | 1,355 |
| 9/20/2019 | 2019 | 1,370 | 1,349 |
| 9/21/2019 | 2019 | 1,230 | 1,338 |
| 9/22/2019 | 2019 | 1,368 | 1,355 |
| 9/23/2019 | 2019 | 1,287 | 1,371 |
| 9/24/2019 | 2019 | 1,150 | 1,315 |
| 9/25/2019 | 2019 | 1,497 | 1,297 |
| 9/26/2019 | 2019 | 1,604 | 1,358 |
| 9/27/2019 | 2019 | 1,373 | 1,358 |
| 9/28/2019 | 2019 | 1,240 | 1,360 |
| 9/29/2019 | 2019 | 1,309 | 1,351 |
| 9/30/2019 | 2019 | 1,258 | 1,347 |

Source: July 2024 OHSS Persist.

STB_AR1_001855

| Day | Daily USBP Encounters | 7-day moving Avg - Daily USBP Encounters | Day | Daily USBP Encounters | 7-day moving Avg - Daily USBP Encounters | Day | Daily USBP Encounters | 7-day moving Avg - Daily USBP Encounters | Day | Daily USBP Encounters | 7-day moving Avg - Daily USBP Encounters |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 2542 |  | 1 | 6525 |  | 1 | 7536 |  | 1 | 7225 |  |
|  | 2700 |  | 2 | 6934 |  | 2 | 8737 |  | 2 | 7591 |  |
|  | 2404 |  | 3 | 6221 |  | 3 | 7119 |  | 3 | 8420 |  |
|  | 2597 |  | 4 | 6734 |  | 4 | 7102 |  | 4 | 8575 |  |
|  | 2466 |  | 5 | 6725 |  | 5 | 7451 |  | 5 | 10324 |  |
|  | 2204 |  | 6 | 5823 |  | 6 | 7421 |  | 6 | 8248 |  |
|  | 2449 |  | 7 | 5872 | 6,405 | 7 | 8419 | 7,684 | 7 | 7206 | 8,227 |
|  | 2706 | 2,504 | 8 | 6224 | 6,362 | 8 | 8387 | 7,805 | 8 | 5865 | 8,033 |
|  | 2747 | 2,510 | 9 | 6109 | 6,244 | 9 | 8507 | 7,772 | 9 | 6207 | 7,835 |
|  | 2563 | 2,533 | 10 | 5614 | 6,157 | 10 | 8187 | 7,925 | 10 | 7945 | 7,767 |
|  | 2394 | 2,504 | 11 | 5202 | 5,938 | 11 | 7914 | 8,041 | 11 | 7458 | 7,608 |
|  | 2248 | 2,473 | 12 | 4896 | 5,677 | 12 | 7822 | 8,094 | 12 | 8318 | 7,321 |
|  | 2071 | 2,454 | 13 | 5597 | 5,645 | 13 | 8083 | 8,188 | 13 | 9026 | 7,432 |
|  | 2410 | 2,448 | 14 | 6905 | 5,792 | 14 | 8289 | 8,170 | 14 | 8619 | 7,634 |
|  | 2440 | 2,410 | 15 | 6166 | 5,784 | 15 | 8149 | 8,136 | 15 | 9373 | 8,135 |
|  | 2692 | 2,403  Dec --2021 | 16 | 6038 | 5,774  Dec --2022 | 16 | 6862 | 7,901  Dec --2023 | 16 | 8647 | 8,484 |
|  | 2517 | 2,396 | 17 | 5709 | 5,788 | 17 | 6943 | 7,723 | 17 | 8342 | 8,540 |
|  | 2461 | 2,406 | 18 | 5025 | 5,762 | 18 | 6908 | 7,579 | 18 | 10822 | 9,021 |
|  | 2015 | 2,372 | 19 | 5443 | 5,840 | 19 | 7308 | 7,506 | 19 | 10510 | 9,334 |
|  | 2000 | 2,362 | 20 | 5053 | 5,763 | 20 | 8579 | 7,577 | 20 | 10562 | 9,554 |
|  | 2633 | 2,394 | 21 | 5966 | 5,629 | 21 | 8463 | 7,602 | 21 | 8990 | 9,607 |
|  | 2674 | 2,427 | 22 | 5392 | 5,518 | 22 | 8100 | 7,595 | 22 | 8655 | 9,504 |
|  | 2103 | 2,343 | 23 | 5662 | 5,464 | 23 | 7302 | 7,658 | 23 | 7622 | 9,358 |
|  | 1894 | 2,254 | 24 | 5233 | 5,396 | 24 | 6246 | 7,558 | 24 | 6761 | 9,132 |
|  | 1162 | 2,069 | 25 | 3104 | 5,122 | 25 | 3532 | 7,076 | 25 | 5913 | 8,430 |
|  | 1386 | 1,979 | 26 | 3815 | 4,889 | 26 | 5022 | 6,749 | 26 | 5936 | 7,777 |
|  | 1928 | 1,969 | 27 | 4047 | 4,746 | 27 | 6090 | 6,394 | 27 | 7703 | 7,369 |
|  | 2306 | 1,922 | 28 | 4728 | 4,569 | 28 | 5917 | 6,030 | 28 | 8293 | 7,269 |
|  | 2425 | 1,886 | 29 | 4727 | 4,474 | 29 | 5512 | 5,660 | 29 | 7654 | 7,126 |
|  | 2218 | 1,903 | 30 | 4644 | 4,328 | 30 | 4736 | 5,294 | 30 | 7029 | 7,041 |
|  | 1786 | 1,887 | 31 | 4469 | 4,219 | 31 | 5375 | 5,169 | 31 | 5900 | 6,918 |
|  | 995 | 1,863 | 1 | 2567 | 4,142 | 1 | 2757 | 5,058 | 1 | 2605 | 6,446 |
|  | 1204 | 1,837 | 2 | 2978 | 4,023 | 2 | 3077 | 4,781 | 2 | 3939 | 6,160 |
|  | 1425 | 1,766 | 3 | 3245 | 3,908 | 3 | 3925 | 4,471 | 3 | 4007 | 5,632 |
|  | 1684 | 1,677 | 4 | 3255 | 3,698 | 4 | 3442 | 4,118 | 4 | 2789 | 4,846 |
|  | 1990 | 1,615 | 5 | 3593 | 3,536 | 5 | 3648 | 3,851 | 5 | 3054 | 4,189 |
|  | 2385 | 1,638  -0.31071 | 6 | 3985 | 3,442  -0.35286 | 6 | 3623 | 3,692  -0.49713 | 6 | 3646 | 3,706  -0.55236 |
|  | 2117 | 1,686 | 7 | 3782 | 3,344 | 7 | 3818 | 3,470 | 7 | 2731 | 3,253 |
|  | 1904 | 1,816 | 8 | 3586 | 3,489 | 8 | 3452 | 3,569 | 8 | 2765 | 3,276 |
|  | 1988 | 1,928 | 9 | 3365 | 3,544 | 9 | 3592 | 3,643 | 9 | 3304 | 3,185 |

STB_AR1_001856

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1670 | 1,963 | | 10 | 3749 | 3,616 | | 10 | 4104 | 3,668 | | 10 | 2911 | 3,029 |
| 1988 | 2,006 | | 11 | 4032 | 3,727 | | 11 | 4340 | 3,797 | | 11 | 3748 | 3,166 |
| 2438 | 2,070 | | 12 | 4446 | 3,849 | | 12 | 4327 | 3,894 | | 12 | 4099 | 3,315 |
| 2216 | 2,046 | | 13 | 4857 | 3,974 | | 13 | 4277 | 3,987 | | 13 | 4158 | 3,388 |
| 2401 | 2,086 | | 14 | 4417 | 4,065 | | 14 | 4522 | 4,088 | | 14 | 4090 | 3,582 |
| 2571 | 2,182 | | 15 | 4962 | 4,261 | | 15 | 3844 | 4,144 | | 15 | 3942 | 3,750 |
| 2221 | 2,215 | Jan --2022 | 16 | 5170 | 4,519 | Jan --2023 | 16 | 3904 | 4,188 | Jan --2024 | 16 | 4330 | 3,897 |
| 2316 | 2,307 | | 17 | 5680 | 4,795 | | 17 | 4458 | 4,239 | | 17 | 4230 | 4,085 |
| 2438 | 2,372 | | 18 | 6851 | 5,198 | | 18 | 4716 | 4,293 | | 18 | 5039 | 4,270 |
| 2744 | 2,415 0.468731 | | 19 | 6183 | 5,446 0.470023 | | 19 | 4393 | 4,302 0.114775 | | 19 | 5025 | 4,402 0.019336 |
| 2813 | 2,501 | | 20 | 6009 | 5,610 | | 20 | 4681 | 4,360 | | 20 | 4935 | 4,513 |
| 2762 | 2,552 | | 21 | 5689 | 5,792 | | 21 | 4496 | 4,356 | | 21 | 3596 | 4,442 |
| 3038 | 2,619 | | 22 | 5864 | 5,921 | | 22 | 4160 | 4,401 | | 22 | 4109 | 4,466 |
| 2743 | 2,693 | | 23 | 5171 | 5,921 | | 23 | 4587 | 4,499 | | 23 | 4097 | 4,433 |
| 2907 | 2,778 | | 24 | 5895 | 5,952 | | 24 | 4330 | 4,480 | | 24 | 4247 | 4,435 |
| 2972 | 2,854 | | 25 | 5813 | 5,803 | | 25 | 4826 | 4,496 | | 25 | 4883 | 4,413 |
| 3201 | 2,919 | | 26 | 5460 | 5,700 | | 26 | 4829 | 4,558 | | 26 | 4711 | 4,368 |
| 3188 | 2,973 | | 27 | 6154 | 5,721 | | 27 | 5014 | 4,606 | | 27 | 4394 | 4,291 |
| 3170 | 3,031 | | 28 | 5726 | 5,726 | | 28 | 4835 | 4,654 | | 28 | 4334 | 4,396 |
| 3349 | 3,076 | | 29 | 5569 | 5,684 | | 29 | 4182 | 4,658 | | 29 | 4708 | 4,482 |
| 3222 | 3,144 | | 30 | 4712 | 5,618 | | 30 | 4490 | 4,644 | | 30 | 4547 | 4,546 |
| 3256 | 3,194 | | 31 | 5112 | 5,507 | | 31 | 4864 | 4,720 | | 31 | 5243 | 4,689 |

STB_AR1_001857

Unique USBP SWB Encounters by selected Citizenships, FY 2013- July 2024

| | Mexico | NCA | Other |
|---|---|---|---|
| Oct-12 | 13,834 | 6,846 | 574 |
| Nov-12 | 12,601 | 6,891 | 647 |
| Dec-12 | 10,233 | 6,128 | 581 |
| Jan-13 | 13,784 | 5,349 | 681 |
| Feb-13 | 17,149 | 8,766 | 723 |
| Mar-13 | 22,482 | 12,745 | 1,060 |
| Apr-13 | 21,575 | 14,049 | 1,235 |
| May-13 | 17,751 | 14,164 | 1,290 |
| Jun-13 | 13,201 | 11,483 | 1,110 |
| Jul-13 | 12,343 | 11,851 | 1,089 |
| Aug-13 | 12,419 | 11,936 | 1,003 |
| Sep-13 | 11,733 | 11,216 | 1,099 |
| Oct-13 | 13,019 | 11,936 | 1,252 |
| Nov-13 | 11,144 | 11,547 | 1,224 |
| Dec-13 | 9,084 | 12,209 | 1,168 |
| Jan-14 | 10,897 | 9,778 | 868 |
| Feb-14 | 13,374 | 13,866 | 1,190 |
| Mar-14 | 17,369 | 20,924 | 1,373 |
| Apr-14 | 16,430 | 23,103 | 1,414 |
| May-14 | 15,100 | 33,803 | 1,655 |
| Jun-14 | 11,438 | 36,379 | 1,431 |
| Jul-14 | 10,508 | 21,016 | 1,121 |
| Aug-14 | 10,988 | 12,329 | 1,010 |
| Sep-14 | 10,434 | 8,347 | 732 |
| Oct-14 | 11,059 | 8,018 | 885 |
| Nov-14 | 9,665 | 7,929 | 916 |
| Dec-14 | 9,079 | 8,898 | 936 |
| Jan-15 | 9,413 | 5,858 | 721 |
| Feb-15 | 11,010 | 6,667 | 825 |
| Mar-15 | 13,528 | 8,606 | 817 |
| Apr-15 | 12,361 | 10,158 | 957 |
| May-15 | 11,644 | 12,317 | 1,213 |
| Jun-15 | 10,060 | 12,356 | 1,011 |
| Jul-15 | 9,448 | 12,768 | 1,002 |
| Aug-15 | 10,242 | 13,626 | 1,084 |
| Sep-15 | 10,472 | 13,272 | 1,183 |
| Oct-15 | 11,241 | 14,599 | 1,204 |
| Nov-15 | 10,013 | 16,161 | 1,260 |
| Dec-15 | 9,222 | 20,816 | 1,440 |
| Jan-16 | 9,136 | 8,557 | 1,395 |
| Feb-16 | 11,119 | 8,530 | 1,459 |
| Mar-16 | 13,949 | 11,381 | 1,587 |
| Apr-16 | 14,240 | 15,064 | 1,873 |
| May-16 | 13,028 | 18,172 | 1,863 |
| Jun-16 | 10,467 | 16,118 | 1,674 |

Average monthly encounters

| | | Mexico | NCA | Other |
|---|---|---|---|---|
| Pre-Pandemic | | 10,066 | 20,484 | 2,168 |
| Pandemic-Era | | 24,797 | 28,107 | 53,085 |
| Immediate Post-Pandemic | | 35,083 | 39,934 | 69,548 |
| IFR | | 20,863 | 15,639 | 25,800 |
| Immediate Post-Pandemic Change from previous | | 41% | 42% | 31% |
| IFR change from previous | | -41% | -61% | -63% |



Unique Encounters, FY

| | | | |
|---|---|---|---|
| Jul-16 | 9,197 | 17,696 | 1,437 |
| Aug-16 | 9,861 | 19,848 | 1,517 |
| Sep-16 | 10,925 | 20,423 | 1,723 |
| Oct-16 | 12,306 | 24,982 | 1,639 |
| Nov-16 | 10,186 | 28,921 | 1,512 |
| Dec-16 | 7,243 | 28,862 | 1,766 |
| Jan-17 | 7,792 | 17,377 | 1,714 |
| Feb-17 | 6,181 | 7,679 | 1,035 |
| Mar-17 | 5,341 | 3,616 | 688 |
| Apr-17 | 5,392 | 2,901 | 435 |
| May-17 | 6,533 | 4,560 | 522 |
| Jun-17 | 6,418 | 6,045 | 657 |
| Jul-17 | 6,402 | 8,037 | 732 |
| Aug-17 | 7,462 | 10,274 | 1,002 |
| Sep-17 | 7,772 | 9,968 | 1,181 |
| Oct-17 | 8,719 | 11,474 | 1,179 |
| Nov-17 | 8,469 | 15,015 | 1,549 |
| Dec-17 | 7,252 | 16,552 | 1,343 |
| Jan-18 | 8,765 | 12,147 | 921 |
| Feb-18 | 9,459 | 12,041 | 766 |
| Mar-18 | 12,736 | 17,480 | 1,314 |
| Apr-18 | 11,360 | 19,353 | 1,450 |
| May-18 | 9,393 | 23,475 | 2,199 |
| Jun-18 | 7,681 | 20,214 | 2,010 |
| Jul-18 | 7,026 | 17,730 | 2,561 |
| Aug-18 | 8,765 | 21,587 | 2,489 |
| Sep-18 | 8,926 | 25,176 | 2,751 |
| Oct-18 | 9,910 | 33,111 | 2,725 |
| Nov-18 | 7,898 | 36,237 | 3,181 |
| Dec-18 | 6,120 | 37,898 | 3,085 |
| Jan-19 | 8,164 | 32,883 | 2,837 |
| Feb-19 | 9,336 | 48,851 | 3,516 |
| Mar-19 | 12,183 | 68,977 | 5,199 |
| Apr-19 | 11,721 | 73,083 | 7,654 |
| May-19 | 12,214 | 100,430 | 12,023 |
| Jun-19 | 10,941 | 64,353 | 12,412 |
| Jul-19 | 8,908 | 46,874 | 10,195 |
| Aug-19 | 9,589 | 27,686 | 6,717 |
| Sep-19 | 11,285 | 15,936 | 6,011 |
| Oct-19 | 11,773 | 11,917 | 3,973 |
| Nov-19 | 10,878 | 10,981 | 4,355 |
| Dec-19 | 10,207 | 10,594 | 5,019 |
| Jan-20 | 11,358 | 6,720 | 3,885 |
| Feb-20 | 11,916 | 7,481 | 3,539 |
| Mar-20 | 12,195 | 7,403 | 2,744 |
| Apr-20 | 5,407 | 2,362 | 668 |
| May-20 | 8,821 | 1,566 | 577 |

STB_AR1_001859

| | | | |
|---|---|---|---|
| Jun-20 | 13,370 | 1,987 | 986 |
| Jul-20 | 15,240 | 3,773 | 1,278 |
| Aug-20 | 16,853 | 6,078 | 1,631 |
| Sep-20 | 18,302 | 8,252 | 3,149 |
| Oct-20 | 21,492 | 12,108 | 3,095 |
| Nov-20 | 19,606 | 12,526 | 3,073 |
| Dec-20 | 16,414 | 14,066 | 4,013 |
| Jan-21 | 18,477 | 14,670 | 6,155 |
| Feb-21 | 19,219 | 29,149 | 8,146 |
| Mar-21 | 28,333 | 64,251 | 20,343 |
| Apr-21 | 29,647 | 54,519 | 29,000 |
| May-21 | 30,094 | 41,356 | 33,664 |
| Jun-21 | 25,870 | 49,890 | 39,687 |
| Jul-21 | 22,738 | 70,049 | 51,395 |
| Aug-21 | 22,608 | 71,113 | 52,310 |
| Sep-21 | 25,783 | 46,959 | 62,953 |
| Oct-21 | 29,897 | 37,226 | 44,046 |
| Nov-21 | 27,626 | 37,214 | 56,907 |
| Dec-21 | 20,477 | 32,507 | 74,866 |
| Jan-22 | 26,506 | 19,597 | 60,162 |
| Feb-22 | 30,661 | 26,304 | 52,497 |
| Mar-22 | 38,208 | 30,643 | 81,621 |
| Apr-22 | 35,429 | 27,135 | 83,734 |
| May-22 | 32,968 | 33,748 | 100,256 |
| Jun-22 | 28,023 | 40,143 | 74,238 |
| Jul-22 | 22,850 | 32,058 | 86,323 |
| Aug-22 | 25,256 | 23,016 | 93,609 |
| Sep-22 | 27,441 | 22,661 | 118,137 |
| Oct-22 | 28,250 | 21,950 | 115,810 |
| Nov-22 | 25,216 | 22,110 | 127,163 |
| Dec-22 | 18,402 | 21,536 | 153,341 |
| Jan-23 | 27,549 | 16,239 | 51,490 |
| Feb-23 | 30,200 | 20,541 | 40,914 |
| Mar-23 | 36,535 | 22,857 | 57,781 |
| Apr-23 | 29,611 | 22,530 | 87,075 |
| May-23 | 23,520 | 27,620 | 82,706 |
| Jun-23 | 20,437 | 20,252 | 41,799 |
| Jul-23 | 23,723 | 45,147 | 47,322 |
| Aug-23 | 26,335 | 71,176 | 65,711 |
| Sep-23 | 29,049 | 61,438 | 111,644 |
| Oct-23 | 38,277 | 45,643 | 90,517 |
| Nov-23 | 41,265 | 47,112 | 89,499 |
| Dec-23 | 48,146 | 57,600 | 130,443 |
| Jan-24 | 37,579 | 28,427 | 47,591 |
| Feb-24 | 39,018 | 34,121 | 54,633 |
| Mar-24 | 40,547 | 24,107 | 59,458 |
| Apr-24 | 34,406 | 21,754 | 59,386 |

STB_AR1_001860

| | | | |
|---|---|---|---|
| May-24 | 37,021 | 23,779 | 47,229 |
| Jun-24 | 25,630 | 18,900 | 31,140 |
| Jul-24 | 16,096 | 12,377 | 20,459 |

Note: Unique encounters exclude encounters of individuals previously encountered in the prior 365 days.

Source: July 2024 OHSS Persist.

STB_AR1_001861



2013 - July 2024

STB_AR1_001862



## *RAIO DIRECTORATE*

# CROSS-CULTURAL COMMUNICATION AND OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN INTERVIEW

### TRAINING MODULE

*This Page Left Blank Intentionally*

**RAIO Directorate**

---

# CROSS-CULTURAL COMMUNICATION AND OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN INTERVIEW

## Training Module

---

## MODULE DESCRIPTION

Through interactive communication exercises, this module describes how cultural differences may create barriers to effective communication and provides techniques for recognizing and overcoming those barriers.

## ENABLING PERFORMANCE OBJECTIVES

1. Explain factors that may impede communication at an interview.

2. Recognize issues that may arise in interviewing individuals from different cultures.

3. Describe techniques for effective communication across cultural barriers.

## RECOMMENDED READING

   None

## ADDITIONAL RESOURCES

1. Kalin, Walter. "Troubled Communication: Inter-cultural Misunderstanding in the Asylum Hearing," International Migration Review, guest editor: Dennis Gallagher (Summer, 1986), p. 230-239.

2. Lawyers Committee for Human Rights. Guidelines for Immigration Lawyers Working with Interpreters: Extending Legal Assistance Across Language Barriers (New York, NY: June 1995), 5 p.

3. Rubin, Joan and Thompson, Irene. How to be a More Successful Language Learner: Toward Learner Autonomy (Boston, Massachusetts: Heinle & Heinle Publishers, 1994), p. 37-41.

---

**CRITICAL TASKS**

| Task Description |
|---|
| Knowledge of principles of cross-cultural communication (e.g., obstacles, sensitivity, techniques for communication |
| Knowledge of principles and practices of cross-cultural professionalism |
| Skill in tailoring communications to diverse audiences (e.g., cross-cultural, management) |
| Skill in responding to cultural behavior in an appropriate way (e.g., respectful, accepting of cultural differences) |

**SCHEDULE OF REVISIONS**

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|---|---|---|---|
| 12/12/2012 | Entire Lesson Plan | Lesson Plan published | RAIO Training |
| 05/10/2013 | Throughout document | Corrected minor typos, formatting, cites identified by OCC-TKMD. | LGollub, RAIO Training |
| 11/23/2015 | Throughout document | Corrected broken links and minor typos | RAIO Training |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
| 4/24/2024 | Pages 1- 4 | Rebranding edits to remove specific training program mention and to update lesson plan objectives and linked KSAs. | RAIO Training |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# Table of Contents

1  INTRODUCTION ........................................................................................................... 7

2  COMMUNICATING ACROSS A SECOND LANGUAGE ........................................... 7

2.1  Overview ..................................................................................................................... 7

2.2  Communication ........................................................................................................... 8

2.3  Verbal Communication - Linguistic ........................................................................... 9

    2.3.1  The Danger of Mistranslation ............................................................................ 9
    2.3.2  The Development of Language ........................................................................... 9

2.4  Verbal Communication - Paralinguistic ................................................................... 10

2.5  Non-Verbal Communication ..................................................................................... 12

3  INTER-CULTURAL COMMUNICATION ............................................................... 12

3.1  Overview ................................................................................................................... 12

3.2  No Two People Are Alike ......................................................................................... 12

3.3  Inter-Cultural Miscommunication ............................................................................ 13

4  STRESS AND PERSONAL AGENDAS ..................................................................... 15

4.1  Stress ......................................................................................................................... 15

4.2  Agendas ..................................................................................................................... 17

4.3  How Stress and Personal Agendas Can Negatively Affect the Interview Process ... 18

4.4  Ways to Minimize the Negative Effects of Stress and Personal Agendas ............... 18

5  OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN INTERVIEW ...... 19

5.1  Additional Factors .................................................................................................... 19

6  CONCLUSION ............................................................................................................. 20

7  SUMMARY .................................................................................................................. 20

PRACTICAL EXERCISES ................................................................................................. 22

OTHER MATERIALS ........................................................................................................ 23

SUPPLEMENT A – REFUGEE AFFAIRS DIVISION .................................................... 24

Recommended Reading ...................................................................................................... 24

Additional Resources ................................................................................ 24

Supplements ................................................................... **Error! Bookmark not defined.**

**SUPPLEMENT B – ASYLUM DIVISION** .................................................................. **25**

Recommended Reading ...................................................... **Error! Bookmark not defined.**

Additional Resources ........................................................ **Error! Bookmark not defined.**

Supplements ................................................................... **Error! Bookmark not defined.**

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.

# 1    INTRODUCTION

This lesson explains how communicating through a second language, cultural factors, stress, and "personal agendas" can affect the interview process. The lesson also includes ways that you, the interviewing officer, can minimize the negative effects that these factors can have at an interview.

# 2    COMMUNICATING ACROSS A SECOND LANGUAGE[1]

## 2.1    Overview

English is not the first language of most of the interviewees you will encounter. Although some interviews are conducted entirely in English, at most interviews there is an interpreter who interprets what the interviewee says into English and what you say into a language the interviewee can understand. Not only does this increase the time spent conducting the interview, but it also creates a situation in which miscommunication can occur.

Interpreting from one language to another is not simply a word-for-word interpretation. The language structure and vocabulary of a culture evolve as an expression of what is

---

[1] This section of the lesson plan is based in part on a presentation entitled, "Dimensions of Language and Culture," by Susan Raufer (currently the Director at the Newark Asylum Office) as part of studies in World Issues at the Experiment in International Living (World Learning), Brattleboro, VT and used with the author's permission.

necessary and important in that culture; therefore, language and culture are closely intertwined. Although there are literal translations between languages for many words, there are many other words in some languages that do not have lexical equivalents in other languages and which need to be translated by multiple words or phrases. (For example, Alaska natives have many different words for "snow." A translation into English using only the word "snow" would not capture the exact meaning of what had been said.) In addition, communication does not involve merely the spoken word; tone of voice, "body language," and other factors contribute to the message that is conveyed.

You need to be aware of the potential for miscommunication when a second language is used, and to attempt to keep the possibility of miscommunication at a minimum.

## 2.2    Communication

Communication can be broken down into two components, verbal and non-verbal.

### *Verbal*

- Linguistic
  - ➢ vocabulary
  - ➢ grammar
- Paralinguistic
  - ➢ manipulation of speech: e.g., volume of speech, rate of speech, pitch/tone, stress
  - ➢ extra-speech sounds: e.g., groans, sighs, laughter, crying, whistling, and other sounds such as "huh" and "uh"

### *Non-verbal*

- Movements that substitute for language, i.e. body language
  - ➢ facial expressions (smiles, frowns, etc.)
  - ➢ eye contact
  - ➢ body movement
  - ➢ posture
  - ➢ physical distance
  - ➢ use of environment (tapping fingers on tabletop, drawing, etc.)
  - ➢ touching
  - ➢ use of silence; timing

### *Written language*

For purposes of this training, we will not discuss written language; whenever non-verbal communication is discussed below, it refers only to body language.

## 2.3    Verbal Communication - Linguistic

### 2.3.1    The Danger of Mistranslation

"The enormous danger of failing to communicate in the modern world is dramatically illustrated by the circumstances surrounding the bombing of Hiroshima. There is evidence that the first atom bomb might never have been dropped if a Japanese translator had not erred in the translation of one word. The word *mokusatsu*, used by the Japanese cabinet in their reply to the Potsdam surrender ultimatum was rendered 'ignore' rather than correctly, 'withholding comment pending decision.' Thinking the Japanese had rejected the ultimatum, the Allies went ahead with the nuclear bombardment."[2]

### 2.3.2    The Development of Language

People develop and build for themselves a language to meet their specific needs. This language acts as a grid through which the individual perceives the world. This also constrains the ways in which the individual categorizes and conceptualizes different phenomena. Examples of ways in which different languages have evolved include the following.

*Tense*

Although English has several past tenses, it does not have the same specific past tenses that some other languages may have. For example, Sukima, a Tanzanian language, has the following past tenses which English does not have.

- Immediate past - Used when something happened less than 2 hours ago.

- Proximate past - Used when something happened this morning.

- Intermediate past - Used when something happened two days ago.

- Remote past - Used when something happened any time more than two days ago.

Some languages may have past and future tenses, but these tenses may not always be used in everyday speech. Instead, a "time" word may be used with a present tense verb. (e.g., Khmer [Cambodian]-speakers often do not use the marker for past or future tenses when conversing, but rather use the present tense along with a time-marking word such as "last year," "tomorrow," "in a while," "next week," etc., to denote the past or future. This is sometimes done in English also: "I'm leaving tomorrow.")

---

[2] Frank M. Grittner, Teaching Foreign Languages, Harper and Row, NY, 1977, p. 33, citing to Lincoln Kinnear Barnett, The Treasure of Our Tongue, New York, Knopf, 1964, p. 292.

### Person

- English - I, you (singular and plural)

- French - one form of "I", two forms of "you"

- Thai - several forms of "I" and "you", the use of which depends on the sex of the speaker, his or her relation to the other person, and the situation; in addition, there are forms of "I" and "you" which are used only by the king and royal family

### Gender

- English - no gender (one form of "the")

- Spanish - masculine and feminine (the = el, la)

- French - masculine and feminine (the = le, la)

### Use of terms [3]

- In Moré, spoken in Burkina Faso, cold, hunger, or thirst "has" a person. ("Cold has me.")

- In the Ama-Zulu culture, women are not allowed to mention the names of certain of their husband's relatives. Instead, they must use a substitute, often a descriptive term. For example, a woman cannot refer to her husband's brother by name but rather might call him "younger father" or "small father," or "the father of ____ (naming one of his children)."

- Even the words that form the names cannot be used. For example, Chief Buthelezi's father's name was "Mathole Mnyama" which means "calf" (Mathole) and "dark" or "black" (Mnyama). Not only is the chief's wife not able to refer to her father-in-law by his name, but she also cannot use the words for "calf," "black," or "dark," or even "nyama" which means "meat." If she wants to refer to a black dress, for example, she must use another term such as "color like night."

Differences between languages such as those noted above can create problems when the exchange of information must be done through an interpreter.

## 2.4    Verbal Communication - Paralinguistic

**Manipulation of Speech**

---

[3] For additional information on the use of terminology between different versions of languages, see RAIO Training module, *Interviewing – Working with an Interpreter*.

The way people manipulate their speech may convey a message. Consider the implications if an interviewee's manipulation of speech regarding the following issues is misinterpreted at an interview.

### Pitch (tone)

Pitch is not very important in English; it usually remains constant during speech. In other languages such as Chinese, Lao, Vietnamese, Thai, words may be determined by the pitch. For example in Mandarin, the word "ma" has different meanings, depending on the tone used.

- ma (high tone, level) = mother
- ma (high tone, rising) = jute
- ma (low tone, rising) = horse
- ma (low tone, falling) = scold

In Thai, depending on the tone used, "kow" can have several meanings, including "rice," "white," and "I."

### Stress

Stress is more important in English than pitch and usually affects sentences rather than individual words. Consider the meaning of the following sentence with the stress falling on different words: "The military put my brother in jail."

Stress in some languages affects individual words. For example, placing the stress on different parts of the following Spanish word alters the meaning of the word.

- te'rmino - terminal
- term'ino - I finish
- termino' - he finished

### Volume of speech

Volume of speech can indicate anger, surprise, distress, etc. The situation, setting, and culture often dictate the appropriate volume.

### Rate of speech

When someone speaks quickly it may indicate nervousness, or it may be that the person's normal speech is fast. Likewise, there may be various reasons why someone might speak slowly.

### Extra-speech sounds

When and how extra-speech sounds such as groans, laughter, etc., are used is usually culturally determined. For example, when it is appropriate to laugh or cry is often determined by one's culture. This has implications for interviews as interviewees may laugh or cry at what may appear to you to be inappropriate moments.

## 2.5    Non-Verbal Communication

Non-verbal communication is very often culturally determined. The individuals within a culture usually know the meanings of the non-verbal signals in their own culture. The same signals, however, can have very different meanings in other cultures.

The next section of this lesson discusses non-verbal communication across cultures. Please also refer to the background reading for information on this topic.

# 3    INTER-CULTURAL COMMUNICATION

## 3.1    Overview

In addition to bringing other languages to the interview, interviewees bring their cultural backgrounds.[4] You also bring you own cultural background to the interview and view things through your own cultural perspective.

The individuals you interview will be from many different cultural backgrounds. Most will be from a cultural background that is different from your own. Although there are many similarities between cultures, there are also many differences, and these differences can affect the interview process.

It is impossible to understand the cultural norms of all the people you will encounter. Anthropologists and others spend many years immersed in other cultures and still are not able to learn all the nuances of the culture. You can, however, become sensitive to some of the potential problems that you may encounter and which are related to cultural differences, and learn techniques that you can use when interviewing persons from other cultures.

## 3.2    No Two People Are Alike

Even two people within the same culture will not react exactly the same in similar situations. One's ways of interacting with people and coping with situations are developed by prior experiences, family background, age and sex, culture, etc. No two people are alike – not even people who are from the same family and who share a common culture.

---

[4] Each person at the interview - interpreter, legal representative, etc. - brings his or her cultural background to the interview.

We bring to every situation our "personal baggage" of how we expect others to act and think.[5] We sometimes misinterpret the words and actions of others because we unconsciously expect that the meanings behind their words and actions are the same as our own meanings if we were in a similar situation. Misunderstandings arise, feelings are hurt, and problems are encountered due to such misinterpretations. Even when we make a conscious effort to be sensitive to other cultures, we may still miscommunicate because of the difficulty in picking up on the cultural cues of others.

In the RAIO context, the consequences of misinterpretation at an interview can be grave.

## 3.3    Inter-Cultural Miscommunication

### Perceptions of other cultures

Most people have had little or no training in inter-cultural interactions. Therefore, in an encounter with someone from a culture other than our own, we rely on our assumptions about how other persons from our own culture act, as well as on our perceptions of how individuals from the other culture act.

These perceptions are formed by what we have heard or learned in school, through the media, and through other vicarious experiences, as well as any actual contact with persons from the other culture. We may have developed ideas about persons from certain cultures that have little basis in actual fact.

In addition, we have fewer points of common reference with someone from a different culture than we have with someone from our own culture and we may find it difficult to understand someone with whom there are only a few or no common points of reference.

Our "personal baggage" is sometimes magnified when dealing with persons from other cultures because we often know very little about their cultures, and may have misconceptions about them.

Both interviewers and interviewees (as well as others at an interview) bring with them to the interview culturally based perceptions of the world.

### Cultural perceptions at an interview

Interviewees also have preconceived ideas of immigration officers.

Culture dictates certain behavior. You need to keep constantly in mind that you cannot assume that an interviewee's actions and words have the same meanings as they have in your culture.

---

[5] For additional information on "Personal baggage," see RAIO Training module, *Interviewing – Introduction to the Non-Adversarial Interview*.

### *Examples*

- Certain body language may differ from culture to culture. Many hand gestures used in one culture to beckon people, to point to people or objects, to indicate agreement, to wave, etc., can have different meanings in other cultures, some of which are very insulting. Ways of non-verbally indicating "yes" and "no" also vary from culture to culture. What may be a gesture to indicate affirmation may indicate a negative response in another culture.

- The physical distance between two people who are engaged in conversation differs from culture to culture. In some cultures, a foot of space is sufficient between two people; in other cultures, much more space is needed for the people involved to feel comfortable.

- The amount of physical contact also varies from culture to culture. For example, in some cultures, individuals of the same sex who are not romantically involved hold hands when walking or talking. In other cultures, this is rarely done.

- Sitting so that the sole of your shoe faces someone is considered very rude in some cultures, whereas in other cultures, this is not an issue.

- Time is measured differently and holds different importance in various cultures. Time in some cultures may be measured in terms of planting seasons rather than months, weeks, and days as it is in other cultures. Being on time for all functions is highly valued in some cultures while in others, it is expected that people will arrive after the announced starting time for events, especially social functions such as parties.

- Women's roles vary greatly from one culture to another. In some cultures, very few women hold positions of authority, power, and respect in the workforce; in other cultures, women have a more active role in this area. In certain cultures, many women have little contact with men other than male family members and defer to men; in other cultures, women interact openly and freely with men.

- People's reactions to grief differ widely from individual to individual as well as from culture to culture.[6] Some people may have difficulty speaking about the death of a loved one without crying while other people may be able to discuss events surrounding the death of a loved one without exhibiting any outward signs of emotion.

- "Saving face" rules many of the actions of people from some cultures; people may do the utmost possible to avoid losing face or putting someone else in a situation

---

[6] A particular reaction to grief may also indicate that the applicant is suffering from Post-Traumatic Stress Disorder or other trauma-related condition.  For additional information, see RAIO Training module, *Interviewing Survivors of Torture*.

where that person would lose face. In other cultures, being "forthright" in interactions often takes precedence over saving face.

> ➢ For example, if an individual is asked to give directions to a location but does not know how to get to the location, he or she may point the questioner in a particular direction in order to avoid not being able to give assistance.

- Gift-giving is a way of assuring that things get done in some cultures; gifts are expected and are given to thank people for performing a service or act, or in anticipation of a particular service or act. In other cultures, such practices may be viewed as inappropriate or may be seen as a form of bribery. In addition, in some cultures, if you admire a possession of someone, you may receive it as a gift; not accepting it may offend the giver.

- Eye contact varies from culture to culture. What may be considered a normal length of time for eye contact in one culture, may, in another culture, be termed "staring" and considered rude, causing the other person to feel uncomfortable.

- In some cultures, the left hand is only used for bathroom functions, and so giving or receiving anything with the left hand is considered extremely rude.

**Application of knowledge of cultural differences**

There are many such examples, and it would be impossible to list or understand all of them. The point is not to try and learn about every situation and cultural nuance, but to recognize that our expectations about how people react and what they say are often culture-bound. It is not uncommon for individuals to make judgments based on preconceived ideas of cultures. You must try as much as possible to recognize and put aside any preconceived ideas about how people act and the meanings of their actions in order to avoid making decisions based on cultural misperceptions.

# 4    STRESS AND PERSONAL AGENDAS

## 4.1    Stress

People deal with stressful situations in ways that vary in degree of intensity. For example, a job interview, taking a test, becoming a parent, and the death of a loved one are all stressful situations. An interview before a U.S. government official involving a possible benefit, can be a stressful situation for all of the individuals involved. Each person responds to stress differently and has developed personal mechanisms for handling stress, and you and the interviewees bring this to the interview. For example:

*Interviewee*

- Future depends on the interview

- Is nervous about an interview with a government official

- Is dealing with an unfamiliar environment

- Is worried about communicating through an interpreter (concerned that information may not be communicated correctly)

- May be apprehensive about retelling painful or humiliating experiences (See RAIO Training module, *Interviewing – Interviewing Survivors of Torture or Other Severe Trauma.*)

- May be concerned about forgetting important information or becoming confused

- May be suffering from Post-Traumatic Stress Disorder or other trauma-related condition, in which case his or her stress level may be heightened

### *Officer*

- Concerned you may not get all of the necessary information (especially if you are new to the position)

- Concerned about time pressure—the next interviewee may have arrived

### *Interpreter*

- Has heavy responsibility to interpret accurately

- May not speak English or the interviewee's language well

- May be under time pressure to interpret for another interviewee or to leave quickly in order to be on time for work

- May also have experienced trauma; the interviewee's story may trigger symptoms in the interpreter relating to his or her own trauma

### *Representative (trusted adult in the context of children's interviews), etc.*

- Concerned that the interviewee will have difficulty answering questions due to the stress of the interview or because the interviewee may be suffering from Post-Traumatic Stress Disorder, etc.

- Afraid of surprises: interviewee tells you something that the legal representative has not yet heard

- May have another appointment – anxious to complete interview

- Concerned you will not elicit all pertinent information

**How people react to stress**

Each person brings to the interview his or her individual ways of reacting to and dealing with stress. This can interfere with the interview process. Some of the ways people react to stress include:

- Change in voice and speech patterns

- Forgetfulness

- Need to feel in control

- Deference to authority

- Defensiveness

In stressful situations, individuals may easily remember the least important things and forget what is most important. This addition to the dynamic of the interview can result in miscommunication and misunderstanding.

## 4.2    Agendas

In addition to the interview being stressful for all concerned, each person has a personal "agenda" which, whether an appropriate or inappropriate agenda, may impede open communication. Agendas may be conscious or unconscious.

### *Applicant*

- To the get story out; not to forget anything; to avoid discussing particularly painful or humiliating experiences

- To convince the interviewer to grant the requested benefit

- In the case of fraud, to present a convincing claim which is untrue—not to get caught in a lie

### *Officer*

- To finish the interview in an established amount of time

- Not to overlook any procedural points

- Not to miss any important facts

- To focus on the important issues and not spend time on non-relevant topics

- Not to let previous interviews have an impact on your approach to the current interview

- In cases where you suspect a lack of credibility or fraud, to remain neutral in tone, demeanor, and attitude

### *Interpreter*

- To interpret correctly

- To understand all of the interviewer's words without having to ask for clarification and appearing not to know English well

- To help the applicant present a good claim

- To please the person who hired him or her

- To project a professional image

- To avoid losing face

### *Representative*

- To present the applicant in a favorable light

- To make sure the applicant doesn't forget to relate any important information

- To notice if any points are missed by the interviewer

- To be allowed to make comments on behalf of the applicant

- To distance himself or herself from fraud if he or she discovers fraud during the interview; to help cover-up the fraud if he or she is involved in the fraud

## 4.3    How Stress and Personal Agendas Can Negatively Affect the Interview Process

Agendas may help both you and the interviewee get out all of the important information. There are often situations, however, in which stress and agendas can have an adverse impact on an interview.

The individuals at the interview are often overwhelmed by dealing with the stressful environment of the interview and may be too intently focused on pursuing their personal agendas. This can result in the following:

- Material facts of testimony missing

- Inaccuracy in interpretation or the appearance of inaccuracy

- Appearance of incredibility on the part of the interviewee, such as nervous demeanor and inconsistent testimony or appearance of inconsistent testimony

- Attention not entirely focused on questions and/or responses and therefore what is said is not accurately heard and understood

- "Pushiness" to get points across

- Impatience; non-adversarial nature of the interview is jeopardized

## 4.4    Ways to Minimize the Negative Effects of Stress and Personal Agendas

You are in control of the interview; the interviewee has little control over how stressful the interview is. Therefore, you need to be aware of your actions during the interview and

adapt your behavior to fit the situation in order to minimize as much as possible the negative effects of stress and personal agendas. To this end, you can:

1. Attempt to put the interviewee and others at ease at the beginning of the interview.

2. Assure the interviewee that he or she will be given a full opportunity to present his or her claim.

3. Explain the process of the interview and the roles of each person so that everyone will know what to expect.

4. Focus on the interviewee and listen to what he or she is saying.

5. Have patience when the interviewee does not answer a question. Keep in mind the variety of factors that may have prevented the interviewee from hearing or understanding the questions. Remember that although the interview process may become routine for you, it is not routine for the interviewee and others who may be present. You may need to give the interviewee a few seconds of silence to organize his or her thoughts.[7]

6. Recognize your own agendas, such as the need to get all the information within a certain amount of time, but do not let that interfere with your ability to listen to the interviewee. Consciously set aside inappropriate agendas.

7. Use your time wisely during the interview so you do not feel rushed near the end of your time: structure and pace the interview, and avoid discussing information that is irrelevant to the interview at hand.

# 5    OTHER FACTORS THAT MAY IMPEDE COMMUNICATION AT AN INTERVIEW

## 5.1    Additional Factors

There are a number of other factors that may impede communication at an interview:

- The interviewee may be suffering from Post-Traumatic Stress Disorder or other trauma-related condition that may impair his or her ability to follow your questioning, to answer questions, and to relate his or her story in a credible manner.[8]

- The interviewee may be experiencing physical discomfort or impaired cognitive ability due to torture or other abuse he or she experienced (or may have a physical condition unrelated to such abuse but which may cause physical pain or discomfort).

---

[7] For additional information on the use of silence during the interview, see RAIO Training modules, *Interviewing – Eliciting Testimony* and *Interviewing Survivors of Torture*.

[8] For additional information, see RAIO Training module, *Interviewing Survivors of Torture*.

- The environment of the interview may not put the interviewee at ease during the interview. For example:

  ➤ The interviewee may not feel comfortable disclosing information to you because he or she is of the same or different sex as you

  ➤ The interpreter may be someone to whom the interviewee feels uncomfortable telling parts of his or her story

  ➤ You or the physical environment may remind the interviewee of the place where he or she was abused in his or her country at the hands of a government official

- Something about the interviewee or his or her story may trigger a response in you that may distract you momentarily from your task of conducting a non-adversarial interview.

## 6    CONCLUSION

You cannot possibly be aware of all of the factors that impede communication at a particular interview; each interview is unique, and each interviewee is unique. What you can do, however, is to be aware that a number of factors may impede communication, and when communication appears to be impaired, you should attempt to discern what the problem may be and attempt to alleviate it.

## 7    SUMMARY

### Communicating Across a Second Language

Although some interviews are conducted entirely in English, there is usually an interpreter who interprets what the interviewee says into English and what you, the interviewing officer, say into a language the applicant can understand. Interpreting from one language to another is not simply a word-for-word interpretation between two languages.

Although there are literal translations between languages for many words, there are many other words in some languages that do not have lexical equivalents in other languages and that need to be translated by using more than one word. In addition, communication does not involve merely the spoken word; tone of voice, "body language" and other factors contribute to the message that is conveyed. You need to be aware of the potential for miscommunication when a second language is used, and to attempt to keep the possibility of miscommunication at a minimum.

### Inter-Cultural Communication

Culture plays an especially important role in the communication at an immigration interview. There are many differences between cultures regarding body language, physical closeness, views of time, women's roles, reactions to grief, etc.

Because of the many differences between individuals, it is often difficult to determine how someone will react in a given situation. We often misinterpret the meanings of the words and actions of others because we assign our own meanings to their words and actions, and our meanings may not be the same as theirs. You need to keep in mind the effects of culture in evaluating an interviewee's behavior.

**Stress and Personal Agendas**

Interviews with a U.S. government official are stressful situations, and the individuals at an interview bring with them the methods they have devised for dealing with stress, any personal agendas they may have, their cultural backgrounds, and their "personal baggage." In addition, an interviewee may be affected by trauma experienced in his or her country or during the flight from the country. All of these factors influence the behavior of the individuals at an interview, and may impede communication.

You must attempt to reduce the stress of the others at the interview and recognize the existence of possible agendas in order to assist the flow of communication. You also need to recognize your own ways of dealing with stress and personal agendas and minimize any negative effect your own stress and agendas may have on the interview process.

## PRACTICAL EXERCISES

There are several practical exercises that will be conducted during this class. The materials for the exercises will be distributed during class.

---

### Practical Exercise # 1

- **Title**:

- **Student Materials**:

---

# OTHER MATERIALS

There are no Other Materials for this module.

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

There is no International and Refugee Adjudications Supplement for this module.

### RECOMMENDED READING

None

### ADDITIONAL RESOURCES

None

### SUPPLEMENTS

| |
|---|
| **International and Refugee Adjudications Supplement** |

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

There is no Asylum Adjudications Supplement for this module.

## RECOMMENDED READING

None

## ADDITIONAL RESOURCES

None

## SUPPLEMENTS

**Asylum Adjudications Supplement**



## *RAIO DIRECTORATE*

# INTERVIEWING –
# ELICITING TESTIMONY

## TRAINING MODULE

*This Page Left Blank Intentionally*

**RAIO Directorate**

<div style="border:1px solid;">

# ELICITING TESTIMONY

## Training Module

</div>

## MODULE DESCRIPTION

This training module instructs students on how to elicit information from an interviewee in a non-adversarial manner: how to probe appropriately to elicit necessary information, the types of questions to ask, and questioning techniques to use.

## ENABLING PERFORMANCE OBJECTIVES

1.  Define the officer's duty to elicit testimony.

2.  Identify types of questions used in interviews.

3.  Distinguish between effectiveness of different types of questions based on the information being eliciting.

4.  Recongize when to ask follow-up questions to obtain additional information for the adjudication.

5.  List the guidelines for eliciting testimony.

## RECOMMENDED READING

None

## ADDITIONAL RESOURCES

1.  Amina Memon, Christian A. Meissner and Joanne Fraser, "The Cognitive Interview: A Meta-Analytic Review and Study Space Analysis of the Past 25 Years," *Psychology, Public Policy and the Law* 16, no. 4, 2010, pp. 340-372. Available at http://works.bepress.com/cgi/viewcontent.cgi?article=1057&context=christian_meissner.

2.  Ronald P. Fisher & R. Edward Geiselman, "The Cognitive Interview method of conducting police interviews: Eliciting extensive information and promoting Therapeutic Jurisprudence,"

*International Journal of Law and Psychiatry 33*, 2010, pp.321-328. Available at
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1696130.

## CRITICAL TASKS

| Task Description |
|---|
| Knowledge of policies and procedures for processing claims for individuals with disabilities |
| Knowledge of strategies and techniques for conducting non-adversarial interviews (e.g., question style, organization, active listening) |
| Skill in identifying the most appropriate interview technique (e.g., yes/no, open-ended) |
| Skill in organizing and sequencing interview questions to elicit information |
| Skill in framing interview questions and requests for information |
| Skill in asking appropriate follow-up interview questions |
| Skill in communicating with others in a direct manner |
| Skill in active listening |
| Skill in recognizing and reacting to non-verbal cues |
| Skill in building rapport with others |
| Plan the approach and strategy for the interview. |
| Prepare materials for case-related interview (e.g., questions, forms, stamps). |
| Conduct interview to gather information pertaining to an applicant's eligibility for benefits. |
| Ask follow-up questions to develop the record, investigate particular issues, and verify case information. |

## SCHEDULE OF REVISIONS

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|---|---|---|---|
| 09/12/2012 | Entire Lesson Plan | Lesson Plan published | RAIO Training |
| 11/25/2015 | Throughout document | Corrected links and minor typos | RAIO Training |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
| 4/24/2024 | Pages 1- 4 | Rebranding edits to remove specific training program mention and to update lesson plan objectives and linked KSAs. | RAIO Training |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## TABLE OF CONTENTS

**1    INTRODUCTION** ........................................................................................................**8**

**2    GOALS IN ELICITING TESTIMONY** ....................................................................**9**

2.1    Give the Interviewee the Opportunity to Be Heard .........................................9

2.2    Address Credibility Concerns ..........................................................................10

2.3    Determine Whether the Interviewee Is Subject to Any Bars or Grounds of Inadmissibility    11

**3    OFFICER'S DUTY TO ELICIT TESTIMONY** .....................................................**11**

3.1    Eliciting Testimony = Fully Exploring Issues ................................................11

3.2    Going Beyond the Information in the Application ...........................................12

3.3    The Interviewee May Not Know What Is Important to Disclose .....................12

3.4    Vague or Non-Responsive Answers .................................................................12

**4    TYPES OF QUESTIONS USED IN INTERVIEWS** .............................................**12**

4.1    Open-Ended Questions .....................................................................................13

4.2    Closed-Ended Questions ..................................................................................15

4.3    Multiple Choice Questions ..............................................................................16

4.4    Leading Questions ...........................................................................................17

**5    PROBING / FOLLOWING UP** ..............................................................................**18**

5.1    Elicit Additional Facts Bearing On Eligibility ...............................................19

5.2    Clarify Terms or Phrases .................................................................................20

5.3    Clarify Statements ...........................................................................................20

5.4    Connect Statements Made at Different Points in the Interview .......................21

5.5    Resolve Possible Inconsistencies ....................................................................21

5.6    Address Vague or Non-Responsive Testimony ................................................22

5.7    Ask Questions in Relation to Country of Origin Information ..........................23

**6    GUIDELINES FOR ELICITING TESTIMONY** ...................................................**23**

6.1    Prepare for the Interview .................................................................................24

6.2    Establish Rapport ................................................................................................24

6.3    Be an Active Listener .........................................................................................24

6.3.1  Listen Carefully ..................................................................................................24
6.3.2  Maintain Appropriate Eye Contact ....................................................................24
6.3.3  Show Interest ......................................................................................................25
6.3.4  Use the Interviewee's Words and Terms ............................................................25

6.4    Be Patient and Flexible ......................................................................................25

6.5    Have All Interactions Interpreted to the Interviewee ........................................26

6.6    Keep Questions Simple .......................................................................................26

6.7    Use Language That is Easy for the Interviewee to Understand ..........................27

6.8    Repeat or Rephrase Questions ...........................................................................28

6.9    Repeat or Summarize the Interviewee's Testimony ...........................................29

6.10   Ask the Interviewee to Repeat Your Question Back to You ...............................29

6.11   Place the Events in Time or Sequence ...............................................................29

6.12   Consider the Cultural Background of the Interviewee .......................................31

6.13   Be Aware of the Use of Pronouns and Other Ambiguous Terms.......................31

6.14   Do Not Use Compound Questions .....................................................................31

6.15   Do Not Use Loaded Questions ..........................................................................32

6.16   Keep the Interview Focused ...............................................................................33

6.16.1 Focus on Relevant Details ..................................................................................33
6.16.2 Thoroughly Address Each Issue Before Moving On ..........................................33
6.16.3 Help the Interviewee Understand What Is Relevant ...........................................33
6.16.4 Keep the Interviewee on Point ...........................................................................34

6.17   Use Time Efficiently ...........................................................................................35

6.18   Consider Past Trauma .........................................................................................36

6.19   Pay Attention to Transitions ...............................................................................36

6.20   Ask Questions about Events in Relation to Known Country of Origin Information........36

6.21   Avoid Making Assumptions ...............................................................................37

6.22   Resolve Inconsistencies .....................................................................................37

6.23   Develop a Library of Interviewing Best Practices .............................................38

**7    CONCLUSION** ...................................................................................................**38**

**8    SUMMARY** .......................................................................................................**39**

8.1    Officer's Duty to Elicit Testimony ................................................................39

8.2    Types of Questions Used in Interviews .......................................................39

8.3    Probing / Following Up ...............................................................................40

8.4    Guidelines for Eliciting Testimony.............................................................40

**PRACTICAL EXERCISES** .........................................................................................**42**

**OTHER MATERIALS** ...............................................................................................**43**

**SUPPLEMENT A – REFUGEE AFFAIRS DIVISION** ...................................................**44**

Recommended Reading ...........................................................................................44

Additional Resources ..............................................................................................44

**SUPPLEMENT B – ASYLUM DIVISION** ..................................................................**54**

Recommended Reading ...........................................................................................54

Additional Resources ..............................................................................................54

Supplements ............................................................................................................54

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

---

Officers in the RAIO Directorate conduct interviews primarily to: determine eligibility for immigration benefits or requests; corroborate information provided by applicants, petitioners, and beneficiaries; and/or establish whether a person understands the consequences of his or her actions.

The modules of the RAIO Directorate – Officer Training Program and the adjudication-specific training courses constitute primary field guidance for all officers who conduct interviews for the RAIO Directorate. The USCIS Adjudicator's Field Manual (AFM) also provides guidance for officers when conducting interviews, particularly for officers serving in RAIO's international offices. There may be some instances where the guidance in the AFM conflicts with guidance provided by the RAIO Directorate. If this is the case, follow the RAIO guidance. Further guidance regarding interviews for specific applications will be discussed during adjudication-specific trainings.

In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.

# 1    INTRODUCTION

This module is part of a series of interviewing modules that discuss various topics, including the basic principles and components of conducting a non-adversarial interview, the proper procedures for taking notes, and considerations when conducting an interview through an interpreter. This module describes how to elicit information in a non-adversarial manner through the use of various question types and questioning techniques. Please refer to the other interviewing modules for additional guidance on conducting RAIO interviews.

- Interviewing – Introduction to the Non-Adversarial Interview

- Interviewing – Note-Taking

- Interviewing – Working with an Interpreter

- Interviewing – Interviewing Survivors of Torture

As an officer in the Refugee, Asylum, and International Operations (RAIO) Directorate, you will conduct different types of interviews. The Code of Federal Regulations, 8 C.F.R. § 208.9(b), requires that Asylum Officers conduct interviews in a non-adversarial manner. Although this regulation applies specifically to asylum adjudications, as a matter of policy, RAIO directs that all officers in the RAIO Directorate must conduct all interviews in a non-adversarial manner.

Conducting an interview may appear to be straightforward – you ask questions and the interviewee answers them. Conducting a truly effective interview, however, takes a great deal of skill. You must be aware at all times of the direction in which the interview is proceeding, and, when necessary, change the direction by adjusting your questioning techniques so that you can elicit material information from the interviewee.

It is your responsibility to control the exchange of information during an interview. You must encourage the interviewee to speak freely, ensure that you and the interviewee understand each other, keep the interviewee focused on relevant issues, and make certain that you gather all of the information that you need in the timeframe allotted. Although you can control only your own actions, the manner in which you conduct the interview and interact with the interviewee will affect how he or she reacts and will affect his or her ability to provide the information you need.

## 2    GOALS IN ELICITING TESTIMONY

The main goal in conducting almost all of the interviews conducted by the RAIO Directorate is to elicit testimony from the interviewee to determine eligibility for a benefit, or for some other purpose as noted above. Depending on the type of interview, you will use information you have learned from several sources to guide the interview. These sources may include an application and supporting documents, information from U.S. Government databases, and country of origin information.

### 2.1    Give the Interviewee the Opportunity to Be Heard

Give the interviewee an opportunity to provide in his or her own words information bearing on eligibility for a benefit. Also, give the interviewee an opportunity to provide additional information that is not already in the record so that you will have a complete understanding of the events that form the basis for the application or request.

## 2.2    Address Credibility Concerns

Address any concerns you may have regarding the interviewee's credibility or information that is lacking in the record, and give the interviewee an opportunity to address concerns regarding implausible testimony, lack of detail, and/or internal and external inconsistencies.[1] There may be inconsistencies:

- within the application and supporting documentation

    ***Example***

    The applicant claimed on the application that his date of birth is December 10, 1947; the marriage certificate which he submitted with his application indicated that his date of birth is April 18, 1947.

    (Note that you must make changes to the application if necessary. See RAIO Training module, *Interviewing – Introduction to the Non-Adversarial Interview*.)

- between the application (including supporting documentation) and the applicant's oral testimony

    ***Example***

    During the interview, the applicant stated that he was never arrested but the application states that he was detained by the authorities for attending a political rally.

- between the applicant's claim and country of origin information

    ***Example***

    The applicant stated she joined a political party in 1988, but the pre-interview country of origin research conducted by the officer indicates that the party did not come into existence until 1990.

- within the applicant's testimony

    ***Example***

    At the beginning of the interview, the applicant claimed that he worked until he left his country; later in the interview, the applicant claimed that he was in hiding for three months prior to leaving his country.

---

[1] For additional information on assessing credibility, see RAIO Training module, *Credibility.*

**2.3    Determine Whether the Interviewee Is Subject to Any Bars or Grounds of Inadmissibility**

Determine whether the interviewee participated in any activities that would result in:

- a mandatory bar

- being found inadmissible to the United States

- a discretionary denial/referral

**3    OFFICER'S DUTY TO ELICIT TESTIMONY**

When someone applies for an immigration benefit, it is his or her burden to establish eligibility. For some benefits, such as the I-601 *Application for Waiver of Ground of Inadmissibility*, applicants establish eligibility exclusively through documentary evidence. For other benefits, such as asylum or refugee status, credible testimony alone may be enough to satisfy that burden. In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.

During your pre-interview preparation, you will have gathered evidence such as information about the interviewee from the application, case file, and U.S. Government databases, and in the case of refugee or asylum interviews, you will also have gathered information from country of origin resources. The interview is your opportunity to further develop the record by gathering testimonial evidence. The quality of that testimonial evidence depends on your ability to elicit information from the interviewee. [International and Refugee Adjudications  Supplement – Officer's Duty to Elicit Testimony; International and Refugee Adjudications Supplement – Family Based Petitions; International and Refugee Adjudications Supplement – Intercountry Adoption Forms; International and Refugee Adjudications Supplement – Naturalization Forms; International and Refugee Adjudications Supplement – Travel Documents; Asylum Adjudications Supplement – Officer's Duty to Elicit Testimony]

**3.1    Eliciting Testimony = Fully Exploring Issues**

Eliciting testimony means more than asking routine questions and receiving responses. In the refugee and asylum context, you have the affirmative duty to "elicit all relevant and useful information bearing on the applicant's eligibility" for the form of relief sought.[2] This is applicable in other adjudication contexts as well. "Eliciting" testimony means fully exploring an issue by asking follow-up questions to expand upon and clarify the interviewee's responses before moving on to another topic. An answer to one question may lead to additional questioning that is necessary to have a complete picture of the events that occurred.

---

[2] 8 C.F.R. § 208.9(b); UNHCR Handbook, paras. 196 and 205(b)(i)

If you move on to another line of inquiry without allowing the interviewee the opportunity to provide relevant information, important information may remain undisclosed.

## 3.2    Going Beyond the Information in the Application

Applications, petitions, and other requests for action generally contain biographic and historical information about the applicant/beneficiary that can assist you in making your determinations. Although you must verify all of the information contained in the application, petition, or request, do not merely ask the interviewee the same questions that are listed on the form. An application, petition, or request only outlines the minimum information required to establish eligibility. You must expand upon the information that the interviewee has already provided by asking follow-up questions. The interviewee's responses will enable you to develop a complete picture of the interviewee's request and whether the interviewee is eligible for the benefit he or she seeks.

## 3.3    The Interviewee May Not Know What Is Important to Disclose

As the interviewing officer, you should not limit the inquiry to what the interviewee may believe is important. The interviewee is not likely to be familiar with U.S. immigration laws and regulations and what is necessary to establish eligibility for a benefit. In addition, he or she will not be familiar with the interview process. You, however, are the authority on relevant law, what is necessary to establish eligibility, and the interview process. Therefore, you must help the interviewee understand the process so that he or she can focus on and provide the information necessary for you to make a determination.

### *Example*

A refugee or asylum applicant believes that the authorities wish to harm him because of his religious beliefs. During the interview, however, the officer elicits information that indicates that the authorities also wish to harm the applicant because of his ethnic background, or because his religious activities are viewed as a form of political opinion which could lead to an additional ground of eligibility for status.

## 3.4    Vague or Non-Responsive Answers

For a number of reasons, an interviewee may give a vague or non-responsive answer to a question you ask. If this happens, you should not simply move forward to another line of inquiry; instead, you must ask follow-up questions to expand upon and clarify the interviewee's statements. It is your duty to fully and fairly develop the record by eliciting information from the interviewee, probing for additional information, and following up on the interviewee's statements.

## 4    TYPES OF QUESTIONS USED IN INTERVIEWS

There are many different ways you can ask questions during an interview. The types of questions you use will vary within each interview as well as from interview to interview. Some types of questions may be more effective than others, depending on characteristics of the applicant such as age, education, and effects of trauma, as well as the kind of information you are eliciting from the interviewee. Additionally, there are some types of questions that you should avoid in the RAIO context. You must be familiar with various types of questions, be aware of the effectiveness of the specific questioning techniques and when to use them, and be able to change the types of questions you use to fit the circumstances of each interview.

Educators and linguists have categorized questions in a number of different ways. For the purpose of RAIO interviews, we use the question types described below, some of which may overlap in certain ways. These question types are categorized according to how they are used in the RAIO context.

### *Most frequently used question types*

- Open-ended questions

- Closed-ended questions

### *Question types to use with caution in limited circumstances*

- Multiple choice questions

- Leading questions

### *Question types to avoid in non-adversarial interviews (discussed below at 6.14 and 6.15)*

- Compound questions

- Loaded questions

## 4.1     Open-Ended Questions

As the term suggests, an open-ended question is framed to give the interviewee an opportunity to provide a full answer in his or her own words. It may also provide the interviewee the opportunity to expand on a statement made earlier in the interview. Open-ended questions generally begin with interrogative words such as "what," "why," and "how," and elicit descriptive/factual information, such as a factual account of a situation or event, or an opinion rather than a simple "yes" or "no" response.

### *Examples*

- "What happened then?"

- "Why do you think [the persecutor] wanted to harm you?"

- "Why did you go into hiding?"

- "Why did the authorities arrest you?"

- "Is there anything else you would like to add? Is there anything that you feel is important for me to know that we did not discuss?"

- "How did the child become an orphan?"

- "How did you meet your spouse?"

- "Why do you want to give up your permanent residency?"

- "Describe what your spouse/child does for work in the United States."

*Effect*

The use of open-ended questions can assist you in obtaining information and putting the interviewee at ease. Asking open-ended questions demonstrates to the interviewee your willingness to listen to his or her responses, and such questions usually yield more information than most other types of questions. Allowing a complete response may expand on the information originally included in the application or in a statement by the interviewee, and requires you to listen carefully in order to identify all key issues. In such circumstances, the interviewee may raise other important points that you will need to pursue with additional lines of questioning.

Because open-ended questions can elicit a lengthy response, such questions may lead the interviewee to give information that you do not need. Unless carefully worded, some open-ended questions can be overly broad or even confusing and the interviewee may not know how to reply if, in his or her mind, there could be many possible responses. Therefore, you must pay attention to how you craft open-ended questions so it will be clear to the interviewee what you are asking and so that you elicit information in a controlled way.

*Examples*

- "What is the last thing that happened that made you decide to leave home?"

- "How did you decide to marry your wife?"

Research on interview techniques has shown that carefully framed open-ended questions can provide more accurate information with more detail than other types of questions. The research further indicates that if the interviewer uses open-ended questions and

encourages the interviewee with occasional prompting questions, the most detail is elicited and the information provided is most accurate.[3]

*Examples*

- "Tell me more about …"

- "You mentioned a weapon earlier while you were telling me about being kidnapped. Tell me more about that weapon."

## 4.2    Closed-Ended Questions

Unlike open-ended questions, closed-ended questions normally elicit the simple answer "yes" or "no" or a very brief statement or limited information. These questions allow you to obtain specific information in a short amount of time when a lengthy response is not needed.

Closed-ended questions that elicit a "yes" or "no" response usually begin with "did," "does," "do," "is," "are," "was," "were," "has," or "have."

*Examples*

- "Did the military know you were involved with the rebels?"

- "Did you go to the police for help?"

- "Have you ever been arrested?"

- "Were you in contact with either of the birth parents prior to filing the petition?"

- "Does anyone else over the age of 18 reside in your household?

Closed-ended questions that elicit limited information generally result in a brief reply and do not encourage the applicant to explain the circumstances surrounding the information in the reply.

*Examples*

- "What is the name of your political party?"

- "How many members are there in your local union?"

---

[3] Amina Memon, et al., "The Cognitive Interview: A Meta-Analytic Review and Study Space Analysis of the Past 25 Years," *Psychology, Public Policy and the Law* 16, no. 4, 2010, pp. 340-372; Ronald P. Fisher and R. Edward Geiselman, "The Cognitive Interview method of conducting police interviews: Eliciting extensive information and promoting Therapeutic Jurisprudence," *International Journal of Law and Psychiatry* 33, 2010, pp. 321–328.

- "When did you become aware that you were in danger?"

- "When did you last see the child's birth father?"

*Effect*

Closed-ended questions are helpful when your primary purpose is to confirm information already provided. When you are reviewing information on the application with the interviewee, specific closed-ended questions can be appropriate. Closed-ended questions can also be used to probe into answers elicited by open-ended questions. Sometimes, an interviewee may not provide certain information unless it is specifically requested. In such circumstances you should alternate between open- and closed-ended questions as appropriate.

Keep in mind that closed-ended questions limit the information you can elicit. Because it allows the interviewee to reply only briefly, and does not encourage him or her to explain the circumstances surrounding the information in the reply, you will often need to ask additional questions to clarify the facts and gain a full perspective. For example, the question: "How many members are there in your local union?" may fail to elicit the fact that there were 38 original members, but 6 were arrested during a military raid and now there are 32 members remaining.

## 4.3   Multiple Choice Questions

A multiple choice question requires the interviewee to choose between two or more options. There are two kinds of multiple choice questions: "limited options" and "open options."

A "limited options" multiple choice question gives the interviewee a few options from which he or she can chose as a response.

*Example*

"When you left your village, did you tell anyone you were going or did you leave without telling anyone?"

*Effect*

A "limited options" multiple choice question can help point the interviewee in a particular direction by limiting his or her response options. As the name suggests, however, this type of question may limit an interviewee's response by suggesting to the interviewee that only one of the options presented is the appropriate response. By limiting the possible responses in this way, the interviewer may miss information that the interviewee would otherwise have offered. In the example above, the interviewee has only two options – to indicate that he or she did or did not tell anyone about leaving. It does not elicit an alternative answer such as, "I told one of the soldiers that I could no longer live under their tyranny, but I did not actually tell him that I was leaving."

Therefore, when using "limited options" questions, you should understand their limitations and word them carefully.

An "open options" multiple choice question can help focus the interviewee on the information you are seeking by opening up a number of possible responses or by indicating to the interviewee the type of answer you are trying to elicit.

*Example*

>    Q: Then what happened?
>
>    A: The policeman hit me.
>
>    Q: How did the policeman hit you?
>
>    A: I don't understand.
>
>    Q: Did the policeman hit you with an open hand, a closed fist, his foot, or with an object?
>
>    A: He hit me with the butt of his gun.

*Effect*

An "open options" multiple choice question can be useful in focusing an interviewee and can help move along the interview, particularly if the interviewee is having difficulty forming a response. Although there is less potential for limiting an interviewee's response than when using "limited options" questions, you should still word "open options" questions carefully so as not to suggest an answer to the interviewee.

## 4.4    Leading Questions

A leading question is a question that is phrased in a way that suggests or elicits a particular answer. If you ask a question in a way that suggests the answer, the interviewee may give you the answer he or she thinks you want to hear, not the facts as they occurred.

On the other hand, in limited circumstances, a leading question can be useful when it is used to confirm something that the interviewee has already stated. Leading questions can focus the interviewee's answer in a particular direction, and may be helpful when you are trying to guide the interviewee to the appropriate point in his or her story in order to develop his or her testimony.

*Example (appropriate leading question)*

>    "Do you still live at 123 Main Street in Hoboken?"

*Effect*

Leading questions can speed up the interview process in an appropriate manner, particularly when confirming biographical information or when you want to make sure you understand what the interviewee has said. Gathering information using the question above is faster than asking, "Where do you live?" Using the leading version of this question, however, would be inappropriate if you have questions or doubts about the interviewee's address.

*Example (inappropriate leading question)*

> "Since Christians were harmed in Iraq, do you think you'll be harmed because you're Christian?"

*Effect*

Leading questions such as the one above may persuade the interviewee to give a specific answer, even though it may not be the answer the interviewee wants to give. You must remember that your task is to elicit information from the interviewee, not provide it for him or her.

*Example (inappropriate leading question)*

> "They didn't really harm you, did they?"

*Effect*

This question, if asked during an asylum or refugee interview, suggests that you have decided, before the interview is concluded, that the interviewee did not experience past persecution. Instead, an open-ended question such as, "What happened before you left your country?" would elicit a response without suggesting an answer.

During an interview, you are in a position of authority and power. Most interviewees are unfamiliar with the interview process, and want you to see them in a favorable light. If you ask a question in a way that suggests the answer, the interviewee may give you the answer he or she thinks you want to hear, not the facts as they occurred.

In general, leading questions during non-adversarial interviews should be avoided, because interviewees are more likely to fully disclose information if they are asked open-ended questions that elicit a full range of possible answers.


## 5    PROBING / FOLLOWING UP

Probing or following up is **crucial** during an interview. If responses are not followed up with further questioning, you may discover after the interview that you do not have all the information needed to make an appropriate decision on credibility and the applicant's eligibility for the benefit sought.

It may be necessary to probe or follow up with whoever is present at the interview, including the principal interviewee, a family member, the attorney or legal representative (if one is present), or any others present.

The response to one question you ask may lead to additional questions that elicit more information about a particular topic or event. Probing for details and clarification is often done by beginning with open-ended questions, then following up on particular issues raised in the interviewee's responses by asking additional open-ended questions, closed-ended questions, or other types of questions.

Probing and following up should become second nature to you as an interviewing skill. This requires that you remain alert and intellectually engaged during the interview process. When probing for details, you should always maintain a neutral tone and give the interviewee an opportunity to respond with more detail or to clarify his or her statements. Let the interviewee know that you are attempting to understand fully what he or she is trying to convey.

You will ask follow-up questions to obtain additional information and further develop the record. This often involves probing to thoroughly understand the circumstances surrounding an event and its relevance to the purpose of the interview. You should base your follow-up questions on what the interviewee has already told you. For example, if the interviewee says she was threatened, ask questions to determine what the threat consisted of, when the threat occurred, who made the threat, and how it was made.

It is important to keep in mind the nature of the particular event as it may dictate the type of questions to ask and the extent to which probing is appropriate. For example, in a refugee case where the applicant has been sexually abused, you may decide to follow up on specific details related to the circumstances surrounding abuse (e.g., the time of the attack(s), the location, the number of people involved), but asking for details about the abuse itself is not necessary. Such questions could further traumatize the applicant and would not affect a determination on eligibility.[4]

You will need to ask follow-up questions in a number of circumstances. Consider the following:

## 5.1    Elicit Additional Facts Bearing On Eligibility

It is your role to make decisions and legal determinations based on facts. The additional information you obtain through follow-up questions helps you develop the factual record, which, in turn, helps you determine eligibility. A refugee or asylum applicant who fears persecution must establish, through direct or circumstantial evidence, the motive of the person he or she fears. The applicant may not know, or may not be able to articulate the motive of his or her persecutor and generally will not be able to make legal conclusions.

---

[4] For additional information, see RAIO Training module, *Interviewing Survivors of Torture and Other Severe Trauma.*

For example, an interviewee whose claim involves domestic violence may not be able to explain clearly why he or she was abused. Questions such as "What were you doing or saying at the time of the attack?" or "What did [your attacker] say to you when he or she was hitting you?" may help to clarify the motive of the persecutor. Asking follow-up questions will assist you in determining the facts necessary to make these legal decisions.

## 5.2    Clarify Terms or Phrases

You will often need to clarify the meaning of a term or phrase the interviewee uses by asking follow-up questions.

### *Examples*

- If an interviewee uses a term such as "tortured," "mistreated," or "detained," that has a number of interpretations, you must determine exactly what the interviewee means.

- If the interviewee says that he or she was "hit," it may be appropriate to ask the following:

    - ➢ "How did your attacker hit you?"

    - ➢ "What did the attacker hit you with?"

    - ➢ "Where on your body did the attacker hit you?"

    - ➢ "Please describe what happened."

    - ➢ If an interviewee claims that the child she or he wants to adopt was "abandoned," you may need to ask:

    - ➢ "What were the circumstances that led to the birth mother giving up the child?"

    - ➢ "Where did the birth mother leave the child?"

    - ➢ "With whom did the birth mother leave the child?"

## 5.3    Clarify Statements

Sometimes you will need to clarify statements that appear to be illogical or that may have several meanings.

### *Examples*

- When asked how many children the interviewee had, she states that she is the mother of five children; however, she may also have several step-children that she

is not including because she did not give birth to them, or she may be including children who are deceased.

- An interviewee may state that he came into the United States without inspection at Los Angeles. He may mean that he crossed the border at San Ysidro, but the only city he knows is Los Angeles; or he may have been a stowaway who arrived at the port in Los Angeles; or he may have arrived at the airport with false documents.

Ambiguous statements such as these must be clarified.

## 5.4    Connect Statements Made at Different Points in the Interview

You may need to connect statements the interviewee made at one point in the interview with statements he or she made at another point in the interview, asking follow-up questions about the relationship between the two statements.

### *Example*

An interviewee states at the beginning of the interview that she has two brothers in the military. Later she states that guerrillas targeted her house when they raided her village but that she does not know why they targeted her house. It would be appropriate to probe further to determine whether there is any connection between her brothers' membership in the military and the guerrillas' attack on her house.

Appropriate follow-up questions include:

- Did the guerrillas say anything during the attack?

- Did they attack other houses?

- Why do you think they targeted certain houses, in addition to your house?

- How were the households that were not attacked different from the households that were attacked?

In asking such follow-up questions, you should avoid leading questions, such as:

- Did the guerrillas attack your house because your brothers were in the military?

## 5.5    Resolve Possible Inconsistencies

There may be inconsistencies within the interviewee's verbal testimony or between the interviewee's testimony and documents he or she submitted, including the application, or

there may be other inconsistencies.[5] Prior to the interview, you must review carefully all documents submitted by the interviewee, being alert for any possible inconsistencies in the information within the documents, which may raise lines of questioning that you must pursue. During the interview, you should compare the information the interviewee provides with those documents and you should be alert to possible conflicting statements within the interviewee's testimony.

### *Examples*

- At the beginning of the interview, an interviewee states that he entered the country of first flight in June 1995 after escaping from prison. Later in the interview, the interviewee submits an arrest document from his country of origin that is dated July 1, 1995. You must determine the reason for the discrepancy in dates. It is possible that the interviewee actually traveled to the country of first flight in July and made a mistake when giving the date, that the interpreter misinterpreted[6] the dates, or that the arrest document is false.

- On the application the interviewee gives January 12, 2010 as his date of marriage. During the interview he says he was married in December 2009. Upon further questioning, he explains that the marriage contract between the two families was signed and recorded with the government in December, but they held the party for the families and community on January 12.

- Applicant stated at the beginning of the interview that she had four children, listed their names, and stated that three were in the Central African Republic and one was in Uganda. Later in the interview, she stated that all of her close relatives had fled Uganda. You would need to ask probing questions to clarify these conflicting statements.

### 5.6    Address Vague or Non-Responsive Testimony

You must always follow up on vague or non-responsive answers. If the interviewee's answer is vague, does not directly answer the question, or does not answer the question at all, this may indicate that you, the interpreter, or the interviewee has not communicated clearly. On the other hand, it may indicate that the interviewee is not being forthright or is fabricating a claim.[7]

### *Examples*

- The interviewee testifies to having attended high school at a boarding school in Tehran for five years. You ask the interviewee the school address, but the

---

[5] For additional information, see RAIO Training modules, *Credibility* and *Evidence*.

[6] For the definition of "interpret" and "translate," see Other Materials.

[7] For additional information, see RAIO Training module, *Credibility*.

interviewee says he does not know the address. You then follow up by asking, "You testified to attending and residing at this school for five years. Is there a reason you do not know the address?" (Note: In some locations, such as rural villages, there may not be street addresses. See RAIO Training module, *Cross-Cultural Communication*.)

- When you ask the interviewee questions, he does not answer completely; rather, he gives vague responses and his wife answers for him, sometimes correcting or contradicting what he has said. When you advise that you want only the husband to respond to the questions you ask him, you find out that there is an issue with the language of interpretation: the interpreter only speaks Mandarin. The husband's first language is Cantonese, however, and he does not speak Mandarin well. Because his wife speaks both Mandarin and Cantonese, she has been responding for her husband.

- The interviewee testifies to having served as an active member of an opposition political party for the past ten years. When you ask the interviewee the name of the political party, he responds with an acronym, OLF. When you ask what the letters stand for in the full name of the party, he cannot answer. You then follow up by asking, "You testified to having been an active member of this political party for the past ten years. It seems that someone who is an active member of a political party for ten years would know the full name of their party. Can you explain why you do not know the full name of the party?"

When following up on vague or non-responsive answers you must be particularly careful about your tone of voice, being sure to refrain from using a hostile or confrontational tone.

## 5.7    Ask Questions in Relation to Country of Origin Information

For protection-related interviews, a thorough knowledge of country of origin information is essential in order to ask appropriate follow-up questions. Officers who are well-versed in country of origin information will be better able to ask relevant follow-up questions and will be less likely to miss important facts.

## 6    GUIDELINES FOR ELICITING TESTIMONY

You will have to draw on a range of question types and interviewing techniques to elicit all necessary information in an impartial manner within time constraints, while remaining in control of the interview. This section includes a number of techniques to keep in mind when interviewing.[8]

---

[8] For additional information on interview best practices, see RAIO Training module, *Interviewing – Introduction to the Non-Adversarial Interview.*

## 6.1     Prepare for the Interview

Before beginning an interview, review the application, the supporting documents, security check information, as well as country of origin information if necessary. This review can provide a basis for determining initial lines of questioning as well as specific questions to ask during the interview. It may be helpful to create a timeline in your notes to refer to during the interview, particularly if the interviewee discusses multiple and/or overlapping events. Additionally, adjudicative aids from your Division may be referenced to help prepare for your interview. [Asylum Adjudications Supplement – Sample Checklists] You should go into the interview with a mental or written outline of the issues raised in the application that you need to develop during the interview.

While thorough pre-interview preparation allows you to identify questions to ask during the interview, it should not prevent you from exploring additional issues that arise during the interview.

## 6.2     Establish Rapport

Research has shown that a good relationship between the interviewer and interviewee is key to getting sufficient and accurate information during an interview.[9] During your introduction, while you explain the purpose of the interview, the roles of those present, and while you verify biographical sections of the application, make every effort to establish rapport with the interviewee and others present. You can continue to build on this rapport as you enter the substantive phases of the interview.

## 6.3     Be an Active Listener

In addition to assisting you in gathering the information you need, being an active listener can help build rapport with the interviewee.

## 6.3.1     Listen Carefully

It is imperative that you pay attention and listen to what the interviewee is saying so that you do not miss important information or relevant lines of questioning. If you are mentally preparing your next question or focusing on taking notes as the interviewee is testifying, you may miss key elements in the interviewee's answer that would affect your choice of question or questioning technique.

## 6.3.2     Maintain Appropriate Eye Contact

Make non-confrontational eye contact with the interviewee. Look at the interviewee rather than the interpreter when asking questions. Keep in mind, however, that eye

---

[9] Amina Memon, et al., "The Cognitive Interview: A Meta-Analytic Review and Study Space Analysis of the Past 25 Years," *Psychology, Public Policy and the Law* 16, no. 4, 2010, pp. 340-372; Ronald P. Fisher and R. Edward Geiselman, "The Cognitive Interview method of conducting police interviews: Eliciting extensive information and promoting Therapeutic Jurisprudence," *International Journal of Law and Psychiatry* 33, 2010, pp. 321–328.

contact may have different meanings in different cultures, and with different types of interviewees. When interviewing survivors of torture or severe trauma, for example, eye contact may appear confrontational. Always be mindful of cultural cues, and adapt your eye contact to the situation.[10]

### 6.3.3    Show Interest

Engage the interviewee by showing interest in what he or she is saying. Convey your interest to the interviewee through appropriate posture and facial expressions. During the interview, you should avoid slouching, fidgeting, looking at people passing by the office, or reading the application when the interviewee is speaking. Keep your facial expressions open and neutral.

Encourage the interviewee to continue speaking when appropriate. General leads or prompts, such as "go on" or "and then?" let the interviewee know you are listening and that you are following what he or she says, allowing him or her to elaborate. This type of encouragement also indicates that you are engaged in the interview even while taking notes.

### 6.3.4    Use the Interviewee's Words and Terms

Repeating what the interviewee said can encourage him or her to continue a narrative or explanation. Further, it can help the interviewee refocus if he or she becomes confused or goes off on a tangent.

Using the interviewee's words also can help build rapport by showing the interviewee that you are focusing on their statement.

#### *Example*

> "You said the soldiers 'came in the tea shop while [your] husband and parents were out in the fields.' When they came in, what did they say to you?"

### 6.4    Be Patient and Flexible

As noted above, you must not show impatience or discouragement when encountering a confused, non-responsive, or evasive interviewee. The interview can be a stressful situation for the interviewee and others at the interview. Cultural and language barriers may be substantial. Information can be easily misunderstood, especially when an interpreter is involved. You must be patient and prepared to repeat or rephrase questions or to ask the interviewee to repeat his or her answers.

---

[10] For additional information, see RAIO Training modules, *Cross-Cultural Communication* and *Interviewing - Interviewing Survivors of Torture and Other Severe Trauma*.

It is inappropriate to show frustration by your tone of voice or by making statements such as "Just answer the question!" Even saying, "Could you please …?" depending on the tone, may still convey frustration. Also be aware of your body language and other non-verbal cues as they may reflect emotions such as impatience, more clearly than your words.

Sometimes, a few seconds of silence can give the interviewee an opportunity to collect his or her thoughts and determine how to answer a particularly difficult question. You may feel a need to fill in the silence by asking additional questions. However, waiting a reasonable time for the applicant to respond is likely to result in better responses. If the interviewee is clearly formulating an answer, give him or her the time to do so. Silence can seem to last longer in our minds. As you gain more experience, silence will become a useful tool.

Keep in mind that interviews unfold in unpredictable ways and at various speeds. You must be flexible so that you can pursue lines of questioning that may come up. Allow enough time for the lines of questioning to develop fully, adapting your questioning to fit the situation.

## 6.5    Have All Interactions Interpreted to the Interviewee

There may be times when you need to discuss certain issues with the attorney or representative, interpreter (if one is present), or someone else at the interview. During interviews in which an interpreter is present, the interpreter is the conduit through which information is relayed to and from the interviewee. Conversations with the interpreter or any other person present that are not interpreted isolate the interviewee and create distance between you and the interviewee, thereby thwarting the ultimate goal of eliciting sufficient relevant testimony to determine eligibility. Ensure that what is discussed is interpreted so the interviewee is aware of all that transpires during the interview and to avoid confusion and foster a sense of inclusion on the part of the interviewee.[11]

## 6.6    Keep Questions Simple

Use questions that are clear, short, and simple:

- "Who are you afraid of?"

- "What do you think would happen to you if you returned?"

- "Why?"

Avoid using double negatives in your questions, as it can confuse the interviewee and interpreter.

---

[11] For additional information on eliciting testimony through an interpreter, see RAIO Training module, *Interviewing – Working with an Interpreter*.

*Example (of a <u>poorly-worded</u> question)*

"Isn't it true that you didn't leave your town until you found out that you were unemployed and unable to locate a job?"

Be mindful of the various types of questions and the effect they have and use various questioning techniques purposefully to fully elicit from the interviewee the relevant information bearing on their eligibility for the benefit sought.

When working with an interpreter, if you need to ask a long question or a question for which you need to give an explanation before the interviewee responds, break up your question or statements into shorter phrases that can be easily interpreted.

*Example*

1. Mr. Abdul, I need to change the subject now. (Pause for interpreter)

2. I want to begin discussing your military history. (Interpret)

3. I will be asking you about each part of your military service, (Interpret)

4. what your duties were, (Interpret)

5. and where you were stationed. (Interpret)

6. Are you ready? (Interpret)

7. When did you first join the military? (Interpret)

## 6.7    Use Language That is Easy for the Interviewee to Understand[12]

The interviewees you encounter will have varied levels of English language ability, education, knowledge of the U.S. immigration process, and knowledge of colloquial English terms. Words such as *adjudicate*, *well-founded fear*, and *inadmissibility* may not be clear to the interviewee or interpreter. Therefore, you must use words and terms that will not be misunderstood by the interviewee and others present at the interview.

Furthermore, on October 13, 2011, the U.S. Government implemented the *<u>Plain Writing Act of 2010</u>*. This law requires, in part, that federal agencies draft and issue documents in language that the public can understand. Although this law concerns written communication, the principles outlined in it are relevant to verbal communication with the public, including your interviews.

---

[12] For additional information on using language that is easy to understand, see RAIO Training module, *Interviewing – Working with an Interpreter*.

## 6.8    Repeat or Rephrase Questions

At times it may become necessary to repeat a question due to a non-responsive or unclear answer from the interviewee. When the interviewee appears confused by an initial question, the wording of that question may be the source of the problem. Think of a way to restate the question or to approach the subject in a different way rather than asking the same question again. Rephrasing may help the interviewee better understand what you are asking.

*Example*

>       Q: "Were you ever arrested?"

>       A: (silence, long pause)

>       Q: "Have you ever had any problems with the police?"

>               or

>       Q: "Have you ever been stopped or detained by any authorities?"

When you don't understand what the interviewee has said, say so. Just as it is important for an interviewee to explain when he or she has not understood a question, it is also critical for you to let the interviewee know when you don't understand something he or she has said. Of course, this should be done in a polite manner. This will give the interviewee an opportunity to clarify what he or she has said.

Keep in mind that the interviewee wants you to understand his or her testimony. Rarely will asking an interviewee to repeat or rephrase an answer due to your confusion be problematic.

*Example*

>       Q: "Why did you join the student group?"

>       A: "We met at school."

>       Q: "The group met at school?"

>       A: "Yes"

>       Q: "And what was the reason you joined the group?"

*Example*

Q: "Did you ever have any problems with the Guatemalan army (interpreted as *ejercito*)?

A: "No."

Q: "Did you ever have any problems with soldiers (interpreted as *soldados*)?

A: "Yes. They came to our village and took my husband and the other men. Then they came back to me and…"

## 6.9    Repeat or Summarize the Interviewee's Testimony

Repeating what the interviewee said can ensure that you do not misunderstand or miss any information.

When you summarize what you heard, the interviewee is given an opportunity to point out any misunderstandings or information that was missed. Summarizing parts of the testimony also brings together the important points of the discussion and gives each participant at the interview an organized picture of what was said. When summarizing, omit irrelevant issues and organize the pertinent information presented.

### *Example*

"What I heard you say was . . . Is that correct?"

## 6.10    Ask the Interviewee to Repeat Your Question Back to You

If an interviewee's response does not answer your question, a technique you can use is to ask the interviewee or interpreter to repeat your question back to you so you can be certain it was understood. This technique should be used sparingly. While it serves to ensure accurate understanding, it does cause a delay, and if done many times in one interview, it can lead to confusion.

### *Example*

"Your answer makes me think you did not understand what I am asking. Can you repeat my question so that I am sure we are discussing the same topic?"

## 6.11    Place the Events in Time or Sequence

Putting events in proper sequence can help you and the interviewee discuss the events and helps you assess the impact of the events on the claim. Knowing when and the sequence in which events occurred can affect the determination of eligibility as well as the assessment of the interviewee's credibility. You should ask questions that facilitate understanding the order in which the events took place.

### *Examples*

- "When did the arrest happen?"

- "Was this before or after the birth of your oldest child?"

- "What led up to the attack?"

Recollection of exact dates or a sequence of events can be difficult, particularly if the event was traumatic.[13] It is often easier to recall events in relation to one another than to recall events in isolation. If the interviewee has difficulty responding to: "What month did you desert the army?" you could try rephrasing the question to: "Had the airstrikes begun when you deserted?"

It is important to keep in mind that perceptions of time vary from culture to culture. A question asking for a specific time or date may not be understood by an interviewee whose culture places little value on specific hours and dates. In addition, some interviewees may want to explain what they feel to be the most important events first rather than relate a story in chronological order.

Ask for the time of an event by asking the time relative to other events, such as in what season the event occurred, or if the event took place before or after a holiday, rainy or dry season, birth of a child, death, planting or harvesting, etc. In addition, asking the question several different ways may help you elicit all of the necessary information.[14]

### *Examples*

- "You told me you were stationed north of Kirkuk in 1977 or 1978 but you can't recall which months. Do you remember if the weather was cold or hot?"

- "Was your son old enough to attend school when your husband left home?"

However, in situations where you suspect fraud, it may be useful to elicit testimony out of order to determine whether the interviewee's testimony is internally consistent. This does not mean that it is appropriate to try to trick the applicant. Asking questions out of sequence is an appropriate method of verifying credibility only if the applicant has demonstrated ability during previous portions of the interview to appropriately handle such questioning. It may be inappropriate to draw a negative credibility inference when the interviewee has previously demonstrated, for example, that she is from a culture where time references are not significant.[15] It is important to remember to always remain professional and impartial, even when suspecting fraud.

---

[13] For additional information, see RAIO Training module, *Interviewing – Interviewing Survivors of Torture and Other Severe Trauma*.

[14] For additional information on culturally-based perceptions of time, see RAIO modules, *Credibility* and *Cross-Cultural Communication*.

[15] For additional information, see RAIO Training module, *Evidence Assessment*.

## 6.12    Consider the Cultural Background of the Interviewee

Be mindful of the fact that even among people who share a common language, words, expressions, and gestures can have different meanings in different cultures or countries, and perceptions can vary from culture to culture. Even within one country or culture, an interviewee from a remote, indigenous population likely would not describe his or her experiences using the same words, with the same meanings, as an interviewee from a city. Furthermore, interpreters using the precise dialect of the interviewee or sharing the interviewee's cultural background will not always be available. [16]

## 6.13    Be Aware of the Use of Pronouns and Other Ambiguous Terms

"What did they do then?" may seem clear to you, but the interviewee or interpreter may be unclear about the use of ambiguous terms such as "they" and "then." Which "they" is being referred to: the traffickers, the interviewee's family, members of the opposition party, or the children? Moreover, "then" is an imprecise time marker and may be misunderstood. It is important to be specific when asking questions.

*Example*

> "After the police tore down your banner, what happened next?"

Relationship terms such as "your sister," titles such as "the police inspector," or actual names of persons should be substituted for pronouns such as "he" or "they" to avoid confusion. Similarly, it is important to clarify with the interviewee what he or she means by the terms "he" or "they."

*Examples*

- "You said 'they' hit you. When you say 'they,' who do you mean?"

- "When you say the birth parents relinquished the child to "them," are you referring to the prospective adoptive parents or are you referring to the orphanage?"

- "When you say "they" were all witnesses at your wedding, do you mean your family, your husband's family, or someone else?"

## 6.14    Do Not Use Compound Questions

Compound questions are several questions asked together. In everyday conversation, individuals who speak the same language and know each other may use compound questions without miscommunication. They reframe questions and statements in mid-thought, combine related ideas, or ask multiple questions without pausing. At an immigration interview, however, a second language and an interpreter are often involved,

---

[16] For additional information, see RAIO Training module, *Cross-Cultural Communication*.

as well as different cultures. These are all "filters" through which the exchange of information occurs. Asking compound questions at an immigration interview can lead to critical misunderstandings. Officers asking compound questions do so unwittingly, as they do with normal conversation. You should make every effort to avoid asking compound questions.

**Examples** *(to be avoided)*

- "What were your experiences in jail, such as how long you were detained, the conditions of the jail, and what happened to you while you were there?"

- "How were you threatened and why, if you were so fearful for your life after receiving the threats, did you wait six months to leave the country?"

- "Can you tell me the name and current location of your spouse, what she does for work there, and what she's told you about the city in which she currently lives?"

- "Do you know what prompted your father to leave China and why is he not identified as your parent on the household registry you submitted?"

The use of compound questions can result in several unfavorable outcomes including the following:

- Questions are not interpreted completely.

- Confusion and misunderstandings occur because the answer to one question may be interpreted as the answer to a different question.

- The interviewee and the interpreter can easily become confused and not know what to answer.

- The interviewee's confusion could cause you to determine that the interviewee is not credible.

Ask each part of a compound question, or a series of questions, separately to minimize confusion or the appearance of inconsistencies. Writing your interview notes in a question and answer format can help you avoid asking compound questions.

Clear and concise questions are more likely than compound questions to withstand the filters of interpreters and cultural differences and will cause less confusion for all parties during the interview process. Compound questions may compromise an interview and must be avoided.

## 6.15   Do Not Use Loaded Questions

A loaded question conveys a bias or a personal judgment, usually negative, of the interviewing officer, or it presupposes information or facts that have not yet been established.

*Examples (to be avoided)*

- "Why didn't you stay and protect your family instead of leaving them to fend for themselves?"

- "Why in the world did you do that?"

- "If you really weren't complicit with the regime, why did you return?"

Loaded questions put people on the defensive and impede the open flow of communication. An interviewee who feels defensive may be reluctant to openly relate his or her experiences. Asking questions that reveal your personal biases undermines your control of the interview. For all of these reasons, loaded questions must not be used during interviews.

## 6.16    Keep the Interview Focused

Keeping the interview focused is important so that you can gather all of the relevant information necessary to make a decision within time constraints.

### 6.16.1   Focus on Relevant Details

When you begin an interview, you should have a plan of what information you need to elicit. Of course, your plan may change as the interview progresses, but having a plan will help you to focus on the relevant information you need to elicit.

### 6.16.2   Thoroughly Address Each Issue Before Moving On

As issues come up during the interview and you recognize additional lines of questioning that you want to pursue, you may be tempted to move to another topic without fully exploring the first topic. As noted in RAIO Training module, *Interviewing – Introduction to the Non-Adversarial Interview*, it is a good practice to keep a notepad or some other method of quickly recording questions or lines of questioning that come to mind that you want to ask later so you do not forget to ask, and you can remain on point on one topic until you have all the information you need before moving on.

### 6.16.3   Help the Interviewee Understand What Is Relevant

An interviewee's perception of what information is important may differ from yours. The interviewee may not feel it is necessary to include certain details and may omit information that can assist you in determining whether the interviewee is eligible for a benefit. He or she is already familiar with the information and may not realize that you need to know additional details surrounding particular events. An interviewee also may

jump from one thought to another. In such cases, you may need to focus the interviewee on a single topic or point. The interviewee may be confused by your attempt to focus on something that he or she feels is not important. It is your responsibility to help the interviewee focus his or her testimony on information that is relevant to the purpose of your interview.

*Examples*

- "In order to help reach a decision in your case, it is important that we discuss what happened when you went to the Prosecutor's Office on March 15, 2008."

- "I understand that the home invasion was a trauma

- tic event for your family. However, to make the right decision, I need to get a few more details about the call you received afterwards. What specifically did the caller say?"

- An interviewee at an I-730 refugee follow-to-join interview may think that his previous military history is irrelevant since the purpose of the interview is to confirm the family relationship. The information is important, however, because it could show that the interviewee assisted or engaged in the persecution of others, in which case the interviewee would not meet the legal definition of a refugee.

### 6.16.4  Keep the Interviewee on Point

To conduct efficient interviews, focus your questioning on topics that are relevant to the purpose of the interview. If the interviewee keeps returning to topics you consider irrelevant or that you believe already were covered, you should explore the topic enough to determine its relevance. If it is relevant, you should either explore the issue or explain to the applicant that you will return to the subject later. However, if you determine it is irrelevant, acknowledge the interviewee's concern and explain what information you actually need.

*Example*

Q: Right now, I am asking about an incident in your village outside of Mosul. You continue to tell me about what happened to your father in Diyala. How does your father's situation relate to the incident in the village?

A: Because my father was a deacon at St. Paul's church, the Iraqi Islamic State sent a message to the church to tell all of us in our home village that we are not wanted in Iraq unless we convert. Most of the members of St. Paul's are people who migrated to Diyala from our village and many come back here for safety because Diyala is so dangerous.

Q: I see. Tell me about the message to the church. Then we will come back to what happened in the village.

Some interviewees may try to explain in detail information about their country or relate a complete history of their family. In such cases, provide assurance to the interviewee that you are aware of the situation in the particular country and would like the interviewee to focus on details that relate specifically to the application or request. You can also assure the interviewee that you will be eliciting all the information that you need.

### *Examples*

- "Sir, I understand your explanation of the 'South Azeri movement' in Iran and how important it is to you. I also have country condition background information about it. Right now, though, I would like you to talk about what actions the Iranian government took when you participated in the meeting with other 'South Azeris' two years ago."

- "I see that your grandfather was very influential in your life. However, right now I would like you to tell me when you became politically active yourself."

- "Information about your arrest is important. Before we discuss that, however, I would like to learn more about how you became involved in your political party."

Although trying to refocus an interviewee may sometimes be difficult, you must remain professional and non-adversarial at all times, while keeping control of the interview.

## 6.17    Use Time Efficiently

Time is limited in all interviews. Managing your time can also help you keep the interview focused. You must efficiently use the time available by asking questions that will elicit the information you need. Ideally, the interviewee should be doing most of the talking and you should be actively listening and noting the interviewee's responses. When the interviewee raises topics that are not material to the purpose of the interview, politely redirect the interview.

### *Examples*

- "I'm sorry, I know you are trying to answer the question, but I'd like you to tell me what the soldier said to you."

- "That's interesting, but what I'm asking is..."

Keep in mind, however, that if the interviewee digresses or does not answer the questions posed, this may be an indication that the interviewee is not being truthful. In such situations, you may need to take time to ask additional questions to further assess credibility.

Your time management during the interview will evolve as you gain experience and familiarity with the types of interviews you conduct. Keep the interview focused on eligibility.

## 6.18    Consider Past Trauma

Interviewees who are survivors of torture or other severe trauma may have difficulty responding to questioning during an interview. The trauma he or she experienced may distract the interviewee to such an extent that it may be difficult for the interviewee to testify about certain incidents or experiences. You need to take this into consideration when interviewing.[17]

### *Examples*

- "I understand that you have difficulty remembering what happened while you were imprisoned, but please tell me what you do remember."

- "I understand that you'd prefer not to talk about what happened, but it is very important to your case. Everything you tell me is completely confidential. Did the police hurt you after they arrested you?"

## 6.19    Pay Attention to Transitions

Be aware of how you shift from one topic to another and what effect these shifts have on the interviewee's testimony. In most cases, the transition should be smooth and clear. Remember that the interviewee probably does not know the law and the important issues to the same extent as you. A smooth transition will aid efforts to elicit information.

### *Example*

Changing focus from a discussion of what happened at the hospital after the interviewee was beaten to what happens to similarly situated people may confuse the interviewee. A statement such as, "We have talked about the events at the hospital; now I want to ask you some questions about what happens to other people who have been attacked" can help the interviewee make the transition to the new topic of future harm.

## 6.20    Ask Questions about Events in Relation to Known Country of Origin Information

Being well-versed in country of origin information allows you to ask relevant follow-up questions for a variety of adjudications. The more you know about the interviewee's country of origin, the less likely you will be to miss important facts. Awareness of country of origin information also assists you in conducting the interview with cultural sensitivity, may assist you in putting the interviewee at ease during the interview, and may assist you in determining credibility.[18]

---

[17] For additional information, see RAIO Training module, *Interviewing Survivors of Torture and Other Severe Trauma*.

[18] For additional information, see RAIO Training module, *Researching and Using Country of Origin Information*.

### 6.21    Avoid Making Assumptions

Avoid jumping to conclusions by making assumptions without knowing all of the facts.

*Examples*

- The interviewee states that he was a member of an opposition political party and that he was arrested at a party rally at which he was the main speaker. You might assume that the interviewee was arrested because he voiced his political opinion at the rally. It may be possible, however, that the interviewee was arrested because his party did not apply for the necessary permission to hold the rally or that he and others in the rally became violent and attacked the houses of opposing party members who lived nearby.

- In an interview for an I-407, Abandonment of Lawful Permanent Resident Status, an LPR states that she has been outside the United States for more than one year. You should not assume that she has abandoned her status. Instead, elicit testimony regarding the circumstances and reason for her departure from the U.S. including whether she has applied for and been granted a reentry permit.

Assumptions about what an interviewee may know, such as "all Christians know the Bible," may keep you from probing more deeply into an interviewee's eligibility, or may lead you to determine incorrectly that the interviewee is not credible.

### 6.22    Resolve Inconsistencies

You must let the interviewee know if you have noticed a material inconsistency or if you are trying to better understand his or her testimony. Always remain impartial and give the interviewee an opportunity to respond with more detail or clarify his or her statements. When following up on inconsistencies or vague, non-responsive, or contradictory answers, you must be particularly careful about your tone of voice. Be sure to refrain from using a hostile or confrontational tone. Always remain professional, impartial, and in control of the interview.

*Example*

"When you were explaining your situation to UNHCR, you said the Mai Mai entered your house, took your parents outside, then killed your father and raped your mother. Now you said something different, that the Mai Mai took your father and brother away and you have not seen them since. Can you help me understand the difference in what you said happened to your father?"

(Note: If an interpreter is involved, this example would most likely be interpreted to the interviewee in three chunks of information, conforming to the principle noted above under, "Keep Questions Simple," to keep your questioning clear, short, and simple.)

**6.23    Develop a Library of Interviewing Best Practices**

As you gain more experience, you will develop your own interview style and you will recognize best practices that work for you. Talking with other officers can also help increase your repertoire of interviewing skills.[19]

# 7    CONCLUSION

You have the affirmative duty "to elicit all relevant and useful information bearing on the applicant's eligibility."[20] 8 C.F.R. § 208.9(b) requires that Asylum Officers conduct interviews in a non-adversarial manner. Although this regulation applies only to Asylum Officers, it is RAIO policy for officers in the RAIO Directorate to conduct all interviews in a non-adversarial manner.

The goal of RAIO interviews is for the interviewee to confirm, correct, or elaborate on information that is in the application and supporting documentation so that you can make a determination on eligibility for the benefit he or she seeks. The interview allows you to address inconsistencies and other credibility concerns and gives the interviewee an opportunity to address those issues. The interview also allows you to determine whether the interviewee participated in any activities that would result in a mandatory bar or a ground of inadmissibility, or establish a basis for a discretionary denial or referral.

You may apply a wide range of interviewing techniques to achieve these goals, many of which are discussed in this module. Officers who remain flexible and alert will generally elicit the most useful and relevant information. When implementing the techniques for eliciting testimony, remember: engage the interviewee; put the interviewee at ease by using a non-adversarial tone; maintain control of the interview; and always be professional.

The key to a successful interview is to:

- Prepare

- Establish rapport

- Review relevant documentation

- Use appropriate questioning techniques

- Listen actively

- Ask probing questions

- Follow up thoroughly

---

[19] For additional suggestions and best practices for developing interviewing skills, see RAIO Training module, *Interviewing – Introduction to the Non-adversarial Interview*.

[20] 8 C.F.R. § 208.9(b).

- Clarify inconsistencies

# 8    SUMMARY

## 8.1    Officer's Duty to Elicit Testimony

While the burden is on the applicant to establish eligibility for a benefit, equally important is your obligation as the interviewing officer to elicit all pertinent information. The interview is your opportunity to further develop the record by gathering testimonial evidence. The quality of that testimonial evidence depends on your ability to elicit information from the interviewee.

## 8.2    Types of Questions Used in Interviews

There are many ways you can ask questions during an interview. The types of questions you use will vary within each interview as well as from interview to interview. Some types of questions may be more effective than others, depending on the kind of information you are eliciting from the interviewee.

### Open-Ended Questions

An open-ended question helps put the interviewee at ease and is framed to give the interviewee the opportunity to provide a full answer in his or her own words. It often begins with "why" or "how." An open-ended question gives some control to the interviewee and may lead to a lengthy response; therefore, you must take care to always keep the interviewee focused on what is relevant to the proceedings.

### Closed-Ended Questions

Closed-ended questions elicit a brief specific statement or a yes or no answer. Closed-ended questions help you maintain control as the interviewing Officer. These questions can be helpful when you are trying to confirm information that was already provided and when eliciting specific information. In combination with open-ended questions, closed-ended questions assist you in directing the flow of the interview and obtaining certain specific facts.

### Multiple Choice Questions

A multiple-choice question can be either "limited options" or "open options."

A "limited options" question gives the interviewee a choice of a few possible responses. An "open options" question provides suggestions about the type of information you need, rather than providing specific responses from which to choose.

### Leading Questions

A leading question is a question that is phrased in a way that suggests a particular answer is expected. Leading questions must be worded and used carefully and judiciously, taking care not to "create" the interviewee's testimony.

## 8.3    Probing / Following Up

No reply or issue should be left in doubt when you finish the interview. Remain alert throughout the interview and be prepared once you have asked a question and received a response to follow up on the information you received until you have obtained the information necessary to make a proper determination. Asking follow-up questions and probing for information during an interview is *crucial*. You will need to ask follow-up questions throughout the interview and, in particular, in order to:

- Elicit additional facts bearing on eligibility

- Clarify terms or phrases

- Clarify statements

- Connect statements the interviewee made at different points in the interview

- Resolve possible inconsistencies

- Address vague or non-responsive testimony

- Ask questions in relation to country of origin information

## 8.4    Guidelines for Eliciting Testimony

- Prepare for the interview.

- Establish rapport.

- Be an active listener.

- Be patient and flexible.

- Have all interactions interpreted to the interviewee.

- Keep questions simple.

- Use language that is easy to for the interviewee to understand.

- Repeat or rephrase questions.

- Repeat or summarize the interviewee's testimony.

- Ask the interviewee to repeat your questions back to you.

- Place the events in time or sequence.

- Consider the cultural background of the interviewee.

- Be aware of the use of pronouns and other ambiguous terms.

- Do not use compound or loaded questions.

- Keep the interview focused.

- Use time efficiently.

- Consider past trauma.

- Pay attention to transitions.

- Ask questions about events in relation to known country of origin information.

- Avoid making assumptions.

- Resolve inconsistencies.

- Develop a library of interviewing best practices.

# PRACTICAL EXERCISES

## OTHER MATERIALS

"Interpret" vs. "Translate"

Very often the terms "interpret" and "translate" are used interchangeably; however, for the purpose of this module it is important to understand the distinction between these two processes. The main difference between interpret and translate is the medium: "interpret" involves oral communication; "translate" involves written text.

Interpreting is essentially the art of orally conveying information from one language to another. The interpreter listens to a speaker in one language, grasps the content of what is being said, and then restates in another language what was said, using wording that is as close as possible to the original statement while still maintaining the meaning of what was said.

In this module, the terms "interpretation," "interpret," and "interpreter" refer to oral communication. Interpreters utilized in the RAIO Directorate usually provide only interpretation; on occasion, however, they may be asked to translate written documents from another language into English and vice versa.

For additional information, see RAIO Training module, *Interviewing – Working with an Interpreter.*

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

> 1. RAIO Training Module-International and Refugee Adjudications Supplements
>
> 2. Sample Checklists (under development)

### ADDITIONAL RESOURCES

> None

### SUPPLEMENTS

---

**International and Refugee Adjudications Supplement – Officer's Duty to Elicit Information**

The basic information the officer needs to elicit during the interview must answer the following questions:

1. Who is the applicant?

2. How and when did the applicant leave his or her country of nationality or last habitual residence?

3. Why did the applicant leave his or her country? Did he or she ever return?

4. Is the applicant afraid to return, and if so, why? (Focus not only on the experiences of the applicant but also on the experiences of others who are similarly situated.)

5. Is the applicant subject to any grounds that would make him or her ineligible for refugee status or admission to the United States?

---

**International and Refugee Adjudications Supplement – Family Based Petitions**

**Form I-730, (Visa 92/Visa 93) Refugee/Asylee Relative Petition**

Purpose: To verify the family relationship between the interviewee and the Petitioner in the U.S.

People Interviewed: The beneficiary residing overseas.

Basic information the officer should elicit:

Who is the interviewee?

How is the interviewee related to the Petitioner?

For following spouse – elicit information on marriage dates and associated history, compare with I-589 or I-590.

Does the interviewee know why the Petitioner left their country?

*CAUTION reminder: 8 CFR 208.6 confidentiality continues to apply, per regulation (for asylum) and per policy (for refugee) in the following-to-join interview.*
Question example: Do you know the date your relative (spouse, parent etc.) departed country X? To your knowledge, did your relative depart with a visa? Do you know the purpose of your relative's departure from country X? Officer should document any discrepancies.

Is the interviewee subject to any grounds that would make them inadmissible or bar them from following-to-join status or admission to the United States as a refugee or derivative asylee?

**Form I-130, Petition for Alien Relative**

Please note: I-130s are typically a paper-based adjudication; however interviews may be conducted by USCIS when the bona fides of the relationship are in question.

Purpose: To verify the family relationship between the interviewee and the Petitioner.

People Interviewed: The beneficiary and occasionally the petitioner residing overseas

Basic information you should elicit:

> Who is the interviewee?

> How is the interviewee related to the Petitioner?

> Have the interviewee and Petitioner submitted sufficient evidence to establish the claimed relationship?

>> If relevant (with beneficiary and Petitioner attending interview together), you may interview the relatives separately to assess credibility and *bona fides*.

> Verify marital and divorce history.

> Verify birth/parental information.

> Can the interviewees provide sufficient biographical details about one another?

>> Example question: Tell me about your spouse's family – how many siblings does he/she have? What is the name of the oldest/youngest sibling? What are the names of your spouse's parents? Are both parents alive? Where do they live?

> Do the interviewees provide consistent and detailed information regarding their courtship?

>> Example question: When and where did you first meet? Tell me what happened? Where were you living at the time? (if relevant) What is the name of the person who introduced you to each other?

> Do the interviewees provide consistent and detailed information regarding their living arrangements?

>> Example question: (if relevant) Describe the home/apartment? Suggest interviewee draw a quick floor plan. (if relevant) Does couple sleep in same bed – who sleeps on what side?

> Is the beneficiary-interviewee subject to any grounds that would make them inadmissible for admission to the United States as a conditional or legal permanent resident?

## International and Refugee Adjudications Supplement – Intercountry Adoption Forms

The following are forms that you may or may not interview to process an adoption case. There is no requirement that an interview be conducted on any of the following forms associated with an intercountry adoption. Local guidance and case specific facts dictate whether these forms are verified through a face to face interview with the prospective adoptive parents or through a paper adjudication. For the purpose of intercountry adoptions, an interview may be conducted individually or by a combination of the following individuals: Department of State Official, USCIS Officer, Consular Officer, and/or FSN.

### Form I-600A, Application for Advance Processing of Orphan Petition

Purpose: To determine eligibility/suitability of prospective adoptive parents (PAPs) to adopt.

People Interviewed: Prospective adoptive parents (PAPs)

Basic information the you must elicit:

Verification of the PAPs identities, marital status and countries of citizenship.

Verification of the required home study requirements.

What is the name and contact information of the organization or individual assisting the PAPs in locating or identifying a child?

Do the PAPs plan to travel abroad to locate or adopt a child? When do they intend to depart and to where will they travel?

Will the child come to the U.S. for adoption after compliance with the pre-adoption requirements, if any, of the State of proposed residence?

Will the child be adopted abroad after having been personally seen and observed by the PAPs?

Where do the PAPs intend to file their Form I-600 petition after being matched with a child?

How many children do the PAPs intend to adopt?

Have the PAPs submitted a valid and complete home study conducted by an adoption agency or individual certified to conduct home studies?

Have the PAPs paid the correct fees associated with the application?

Do the PAPs have current fingerprint clearances?

1.

**Form I-600, Petition to Classify Orphan as an Immediate Relative**

Purpose: To establish eligibility of the child as an orphan already adopted or coming to the U.S. for adoption.

People Interviewed: Prospective adoptive parents; see also other parties in Form I-604 section below.

Basic information you should elicit:

Verification of the PAPs identities, marital status and countries of citizenship.

Verification of the child beneficiary's identity, gender, DOB and POB.

How did the beneficiary become an orphan?

If the child has only one parent, what happened to the other parent, is the remaining parent capable of providing for the child and has the remaining parent in writing irrevocably released the child for emigration and adoption?

Has the child been adopted abroad by the PAPs or do the PAPs intend to adopt the child in the U.S.?

Have pre-adoption requirements, if any, of the child's proposed State of residence been met if required for Form I-600 processing? If not, will they be met later? (Pre-adoption requirements only apply: 1) when the child is coming to the U.S. for adoption, 2) if the unmarried PAP or both married PAPs did not personally see the child prior to or during the adoption proceeding, and 3) if the adoption abroad was not full and final.)

Does the child have any special needs, physical, emotional or otherwise?

Who has legal custody of the child?

Name of attorney abroad, if applicable.

What is the name and contact information of the organization or individual assisting the PAPs in this case?

What is address where the child will reside in the U.S.?

What is the present address of the child?

Any additional information available to locate the child?

Location of the U.S. Embassy or consulate where the application for visa will be made.

Have the PAPs submitted a valid and complete home study conducted by an adoption agency or individual certified to conduct home studies? Or evidence of a valid Form I-600A approval?

Have the PAPs paid the correct fees associated with the petition, if any?

Do the PAPs have current fingerprint clearances?

Have there been any significant changes in the PAP household since the Form I-600A was approved (or since the last home study submitted to USCIS)?

Are there any new children or adult household members residing in the PAPs home since the Form I-600A was approved (or since the last home study submitted to USCIS)?

Have the PAPs moved or changed residences since the Form I-600A was approved (or since the last home study submitted to USCIS)?1.


**Form I-604, Determination on Child for Adoption**

Purpose: To determine if the child is eligible to be classified as an orphan, and verify the documentary evidence submitted with the Form I-600, *Petition to Classify Orphan as an Immediate Relative*.

People Interviewed: Orphanage, hospital, police, government officials, birth parents, or anyone with knowledge of the child's origins.

Basic information you must elicit (as appropriate):

How was the child presented to the orphanage?

Where are the birth parents?

Did the birth parents relinquish the child voluntarily?

Identification of individual/entity with legal custody of the child.

Testimony to verify that the child meets the regulatory definitions of an orphan (i.e. abandonment, desertion, disappearance, loss, separation, or relinquishment by qualifying sole or surviving parent).

Evidence of child-buying.

**International and Refugee Adjudications Supplement – Naturalization Forms**

**Form N-400, Application for Naturalization (for active-duty military and their family members)**

Purpose: To ensure that a lawful permanent resident meets the qualifications for citizenship.

People Interviewed: Lawful permanent residents: Active duty member of the military, spouse of an active duty member of the military, or child of an active duty member of the military.

Basic information you should elicit:

Verification of the identity of the interviewee.

Does the interviewee have their green card with them?

Verify all information on N-400 and N-445 is accurate.

Does the interviewee have a criminal history?

Has the interviewee met the good moral character requirements?

Evaluate the interviewee's ability to read, write and speak English.

Evaluate the interviewee's knowledge of civics.

Verify the interviewee's loyalty to the United States.

**Form I-407, Abandonment of Lawful Permanent Resident Status**

Purpose: To ensure that the interviewee is freely relinquishing permanent resident status and understands the consequences of abandonment.

People Interviewed: Lawful permanent residents wishing to relinquish status.

Basic information the you should elicit:

Verify the identity of the interviewee.

Has the interviewee brought their green card for relinquishment? If not, where is it?

What was the interviewee's date and place of last departure from the United States?

What is the interviewee's intended or actual residence abroad?

Is the interviewee voluntarily, willingly, and affirmatively abandoning permanent residency?

Why does the interviewee want to abandon permanent residency?

Does the interviewee reserve the right to appear before an immigration judge to determine admissibility at a later date?

Does the interviewee waive their right to a hearing before an immigration judge at a later date?

Does the interviewee fully understand the consequences of abandoning lawful permanent residence?

**International and Refugee Adjudications Supplement – Travel Documents**

**Boarding Letters**

Purpose: To ensure that a lawful permanent resident meets the criteria for the issuance of a boarding letter.

People Interviewed: Lawful permanent residents whose LPR cards have been lost, stolen, destroyed, or are in possession of an expired LPR card.

Basic information you should elicit:

> Verification of the identity of the interviewee.

> What are the circumstances prompting the request for a boarding letter?

> Where did the interviewee travel to? What was the purpose of interviewee's travel outside the United States?

> How long has the interviewee been outside of the United States? If relevant, ask for documentary corroboration.

> If relevant, has the interviewee abandoned their residence in the United States? If relevant, can the interviewee present corroborating documentary evidence of continued U.S. residence?

> Has the interviewee made previous requests for a boarding letter? When? Where? And under what circumstances?

> Determine if interviewee has corroborating documentary evidence substantiating the request for boarding letter. If not, why not?

>> Includes, but not limited to, police statement/letter (for stolen LPR card). Statement from medical professional if medically related (for applicant or immediate family member).

> Does the interviewee continue to be admissible to the United States?

> What arrangements has the interviewee made, if any, for return travel to the United States? If relevant, ask for documentary corroboration.


**Form I-131, Application for Travel Document**

Refugee Travel Document (RTD):

People Interviewed: persons classified as refugees or asylees, or refugees or asylees who obtained LPR status and whose travel documents have been lost, stolen, destroyed, or are in possession of expired travel documents.

Basic information the you should elicit:

> Verify the identity of the interviewee.

What are the circumstances prompting the request for a RTD?

Has the interviewee made previous requests for a RTD? When? Where? And under what circumstances?

Where did the interviewee travel to? What was the purpose of the interviewee's travel outside the United States?

How long has the interviewee been outside of the United States? If relevant, ask for documentary corroboration.

Did the interviewee return to the country of feared persecution? If so, why and for how long?

Does the interviewee have any legal immigration status in any other country besides the United States?

If relevant, has the interviewee abandoned their residence in the United States? If relevant, can the interviewee present corroborating documentary evidence of continued U.S. residence?

If relevant, determine if interviewee has corroborating documentary evidence supporting the request for RTD. If not, why not?
Includes, but not limited to, police statement/letter (for stolen documents).

Statement from medical professional if medically related (for applicant or immediate family member).

Does the interviewee continue to be admissible to the United States? Or, if asylee, has the interviewee become subject to any bars for asylum?

What arrangements has the interviewee made, if any, for return travel to the United States? If relevant, ask for documentary corroboration.

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

1. RAIO Training Module—Asylum Adjudications Supplements

2. Interviewing Adjudicative Aid (see below)

### ADDITIONAL RESOURCES

None

### SUPPLEMENTS

---

**Asylum Adjudications Supplement – Officer's Duty to Elicit Information**

During an asylum interview, the officer must elicit testimony in order to answer the following questions:

- Who is the applicant?

- Who are the family members included in the application?

- How and when did the applicant enter the United States?

- Why did the applicant leave his or her country?

- Did the applicant suffer past persecution? (Focusing on past harm and/or threats, if any.)

- Does the applicant fear future persecution?

- What are the motives of the past or potential future persecutor in harming the applicant?

---

- Is the applicant afraid to return, and if so, why? (Focusing not only on the experiences of the applicant, but also on the experiences of others similarly situated, and any other serious harm.)

- Who does the applicant fear? (Who is the persecutor?)

- Is the persecutor a governmental actor or a person or entity that the government is unable or unwilling to control?

- Is the feared persecution country-wide?

- Did the applicant participate in any activity that would make him or her ineligible for asylum or warrant a discretionary denial/referral?

**Asylum Adjudications Supplement – Interviewing Adjudicative Aids**

This adjudicative aid is not intended to be fully exhaustive of all avenues of exploration and all issues that may arise during an interview. The purpose of this aid is to serve as a reminder of key elements in preparing for and conducting an asylum interview.

**PRE-INTERVIEW preparation/review of file**

_____ note who is included/family relationships/ages

_____ is file complete?

necessary forms (I-589, fingerprints, photos)

dependents' A-files included

_____ G-28 on file? signed by applicant and representative?

_____ any indication file is not in jurisdiction?

_____ note claimed entry date, status of applicant, and filing date

_____ review claim

_____ review relevant documents

_____ quick country of origin information review

_____ general timeline of key events


_____ check for any special status (e.g., *ABC*, *Mendez*)

_____ computer systems check

_____ does file review raise the possibility there may be another A-file associated

with the applicant?

## CONDUCTING THE INTERVIEW

- **<u>Introduction</u>**
  _____ purpose of interview
  _____ confidentiality
  _____ process (including roles of those present)
  _____ interpreter
  interpreter's form, role
  _____ representative
  G-28,
  waiver if representative is not present
  role
  _____dependents
  verify (and dismiss during interview if appropriate)

- **<u>Oath</u>**
  _____ applicant
  _____ interpreter, and interpreter monitor if being used
  _____ witnesses


- **<u>Verify basic biographic and entry information (check I-589 and documents)</u>**
  _____ address, biographical information (use "post-it" on front
  of file as reminder to update RAPS if necessary)
  _____ date, place, manner of entry
  _____ documents
  verify and note if from original
  compare for consistency
  (copy at end of interview if necessary)
  _____ determine who prepared I-589 and if applicant is aware of contents of
  application
  _____ annotate changes on the I-589

- **<u>Testimony</u>**
  _____ other countries lived in and status there

_____ reason for claim (cover all possible grounds)
_____ identify persecutor and issues of state protection
_____ mandatory bars, other reasons for ineligibility, inadmissibility or discretionary
    denial
_____ go to Q&A format if there is derogatory information
_____ compare with I-589, documents, and country of origin information
_____ probe credibility
_____ question applicant about reason for any discrepancies/inconsistencies
_____ question applicant about any circumstances surrounding any delay in filing

- **Closing statement/questions**
    _____ applicant
    _____ representative

- **Conclusion**
    _____ sign/date I-589
    explain any corrections to applicant
    _____ copy documents and certify if from original or copy
    _____ advise applicant how s/he will be informed of decision (pick-up, mail)

- **Immediate POST-INTERVIEW tasks**

    _____ Update Global



### *RAIO DIRECTORATE*

# INTERVIEWING – INTRODUCTION TO THE NON-ADVERSARIAL INTERVIEW

## TRAINING MODULE

*This Page Left Blank Intentionally*

**RAIO Directorate**

> # INTERVIEWING – INTRODUCTION TO THE NON-ADVERSARIAL INTERVIEW
> ## Training Module

## MODULE DESCRIPTION

This module describes the main components of an interview for all RAIO adjudications.

## ENABLING PERFORMANCE OBJECTIVES

1. Describe the purpose of the interview for RAIO adjudications.

2. Explain the responsibilities and roles of all parties involved in the interview.

3. Identify the components of an interview for RAIO adjudications.

4. Recognize best practices to maintain control and elicit all nessary information at the interview.

## RECOMMENDED READING

None

## ADDITIONAL RESOURCES

1. Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, HQCOU 120/12.8 (Jun. 21, 2001).

2. Fisher, Ronald P. and Geiselman, R. Edward. "The Cognitive Interview method of conducting police interviews: Eliciting extensive information and promoting

Therapeutic Jurisprudence," *International Journal of Law and Psychiatry 33*, 2010, pp. 321–328.

3.  Memorandum from Joseph E. Langlois, Director, Asylum Division, to Asylum Office Directors and Deputy Directors, *Fact Sheet on Confidentiality*, HQASM 120/12.8 (Jun. 15, 2005).

4. Memon, Amina; Meissner, Christian A.; and Fraser, Joanne. "The Cognitive Interview: A Meta-Analytic Review and Study Space Analysis of the Past 25 Years," *Psychology, Public Policy and the Law 16, no. 4*, 2010, pp. 340–372.

**CRITICAL TASKS**

| Task Description |
| --- |
| Knowledge of policies, procedures, and guidelines for conducting non-adversarial interviews (e.g., confidentiality, conditions) |
| Knowledge of the roles and responsibilities of parties involved in the interview process |
| Knowledge of strategies and techniques for conducting non-adversarial interviews (e.g., question style, organization, active listening) |
| Knowledge of procedures and guidelines for administering oaths |
| Knowledge of strategies, techniques, and tools for time management |
| Skill in maintaining control of interviews |
| Skill in conducting non-adversarial interviews |
| Skill in communicating difficult or contentious information with concerned parties (e.g., attorney, applicant, supervisor) |
| Skill in interacting with others in a professional manner (e.g., respectful, courteous) |
| Skill in time management (e.g., multi-tasking) |
| Skill in maintaining professional demeanor in stressful situations (e.g., potentially dangerous encounters, emergency situations, threats to personal safety) |
| Skill in managing situations involving conflict |
| Review information pertaining to applicant representation (e.g., Notice of Entry or Appearance as Attorney or Representative [G-28]) |
| Liaise with attorneys and other applicant representatives to exchange case and applicant information |
| Verify the identity of the interviewee and any persons present during the interview. |
| Administer oaths to those providing testimony and interpretation. |
| Explain the purpose and process of the interview. |
| Inform all participants of their roles and responsibilities during the interview. |
| Describe the roles and responsibilities to all participants (e.g., adjudicator, interpreter, applicant) during the interview. |
| Explain confidentiality to any persons present during the interview. |
| Verify the identity of dependents and other relatives of an applicant |
| Review the accuracy of all information listed in the application with the applicant. |
| Interact with interviewee in a respectful and non-adversarial manner. |

## SCHEDULE OF REVISIONS

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|---|---|---|---|
| 06/06/2013 | Throughout document | Corrected minor typos, formatting, cites identified by OCC-TKMD. | MMorales, RAIO Training |
| 10/01/2013 | Throughout document | Corrected bad links due to move of RDOT Curriculum Library | LG, RAIO Training |
| 1/10/2015 | Throughout document | Fixed links | RAIO Training |
| 11/25/2015 | Throughout document | Corrected links | RAIO Training |
| 3/24/2017 | Throughout document | Updated link to I-590 SOP in RAD supplement; made minor revisions suggested by divisions; updated table of contents. | RAIO Training |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
| 4/24/2024 | Pages 1- 5 | Rebranding edits to remove specific training program mention and to update lesson plan objectives and linked KSAs. | RAIO Training |
|  |  |  |  |
|  |  |  |  |

# Table of Contents

1  INTRODUCTION ................................................................................... 8

2  AUTHORITY ......................................................................................... 9

3  PURPOSE OF THE INTERVIEW ........................................................ 10

3.1 Elicit Information .................................................................................... 10

3.2 Provide Information ................................................................................ 11

4  IMPORTANCE OF THE INTERVIEW ............................................... 11

5  THE PARTICIPANTS AND THEIR ROLES ...................................... 12

5.1 The Officer ............................................................................................. 12

5.2 The Interviewee ..................................................................................... 12

5.3 The Interpreter ....................................................................................... 13

5.4 The Representative .................................................................................. 13

5.5 Other Participants ................................................................................... 14

6  THE NON-ADVERSARIAL NATURE OF THE INTERVIEW ......... 14

7  THE COMPONENTS OF AN INTERVIEW ....................................... 15

7.1 Pre-Interview Preparation ...................................................................... 15

7.2 Introduction to the Interview ................................................................. 16

7.3 Oath 23

7.4 Verification of Basic Biographic Information ........................................ 23

7.5 Testimony ............................................................................................... 25

7.6 Closing Statement/Comment/Questions by Interviewee and/or Representative ................... 26

8  OUTSIDE FACTORS THAT CAN AFFECT THE INTERVIEW ....... 27

8.1 Stress ...................................................................................................... 27

8.2 Time Constraints .................................................................................... 28

8.3 Your Personal Experiences .................................................................... 28

9  INTERVIEWING BEST PRACTICES ................................................ 28

STB_AR1_002802

9.1    Be Organized ....................................................................................................29

9.2    Interview, Don't Interrogate .............................................................................30

9.3    Maintain Control of the Interview ....................................................................33

9.4    Practices to Avoid .............................................................................................34

**10    CONCLUSION ..................................................................................................34**

**11    SUMMARY .......................................................................................................35**

11.1  Authority ...........................................................................................................35

11.2  The Purpose of the Interview ...........................................................................35

        11.2.1 To Gather Information ...........................................................................35
        11.2.2 To Provide Information ..........................................................................36

11.3  Importance of the Interview .............................................................................36

11.4  The Participants and Their Roles .....................................................................36

11.5  The Components of an Interview ......................................................................37

11.6  Interviewing Tips..............................................................................................37

**PRACTICAL EXERCISES ......................................................................................39**

**OTHER MATERIALS ..............................................................................................40**

**SUPPLEMENT A – REFUGEE AFFAIRS DIVISION ..........................................41**

Recommended Reading ..............................................................................................41

Additional Resources .................................................................................................41

Supplements ...............................................................................................................41

**SUPPLEMENT B – ASYLUM DIVISION ............................................................44**

Recommended Reading ..............................................................................................44

Additional Resources .................................................................................................44

Supplements ...............................................................................................................44

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

Officers in the RAIO Directorate conduct interviews primarily to determine eligibility for immigration benefits or requests; to corroborate information provided by applicants, petitioners, and beneficiaries; and/or to establish whether a person understands the consequences of his or her actions.

The modules of the RAIO Directorate – Officer Training Program and the division-specific training courses constitute primary field guidance for all officers who conduct interviews for the RAIO Directorate. The USCIS Adjudicator's Field Manual (AFM) also provides guidance for officers when conducting interviews, particularly for officers serving in RAIO's international offices. There may be some instances where the guidance in the AFM conflicts with guidance provided by the RAIO Directorate. If this is the case, you should follow the RAIO guidance. Further guidance regarding interviews for specific applications will be discussed during division-specific trainings.

In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.

# 1   INTRODUCTION

This is the first in a series of interviewing modules that discuss various topics including how to elicit testimony, the proper procedures for taking notes, and considerations when conducting an interview through an interpreter. This module outlines the basic principles and components of conducting a non-adversarial interview. Please refer to the other interviewing modules for additional guidance on conducting RAIO interviews.

- Interviewing – Eliciting Testimony

- Interviewing – Note-Taking

- Interviewing – Working with an Interpreter

- Interviewing – Interviewing Survivors of Torture

The following is a non-exhaustive list of immigration benefits, petitions, protection determinations, and other immigration-related requests you may encounter as an officer in the RAIO directorate:

- G-646 Sworn Statement of Refugee Applying for Admission into the United States

- I-130 Petition for Alien Relative

- I-131 Application for Travel Document

- I-407 Abandonment of Permanent Resident Status

- I-589 Application for Asylum and Withholding of Removal

- I-590 Registration for Classification as Refugee

- I-600 Petition to Classify Orphan as Immediate Relative

- I-604 Determination on Child for Adoption

- I-730 Refugee/Asylee Relative Petition

- I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (NACARA)

- N-400 Application for Naturalization (Military Naturalizations)

- Boarding letters

- Credible fear determination

- Reasonable fear determination

## 2    AUTHORITY

The following provides the authority on interviewing for all officers who conduct interviews for the RAIO Directorate.

- 8 C.F.R. § 103.2(b)(9) gives the authority to USCIS to require that an applicant, petitioner, sponsor, beneficiary, or other individual appear for an interview.

- 8 C.F.R. § 208.9(b) requires that Asylum Officers conduct interviews in a non-adversarial manner. Although this regulation applies only to Asylum Officers, as a matter of policy, officers in the RAIO Directorate must conduct all interviews in a non-adversarial manner.

- 8 C.F.R. § 207.2(b) requires that each applicant 14 years and older appear in person before an Immigration Officer for an inquiry under oath to determine his or her eligibility for admission as a refugee.

- INA § 287(b) gives the authority to USCIS officers to administer oaths and to take and consider evidence concerning the privilege of any person to enter, reenter, pass through, or reside in the United States.

## 3    PURPOSE OF THE INTERVIEW

The main purpose of the interview is to elicit and provide information related to eligibility for an immigration benefit or for some other official purpose. The interview also provides an opportunity for the interviewee to ask questions that he or she may have and to present relevant information [Asylum Adjudicaitons Supplement – Purpose of the Interview].

### 3.1    Elicit Information

The main reasons that you will elicit information during an interview are to:

- Verify the identity of those present at the interview.

- Determine whether to proceed with the interview (which may depend on jurisdiction, the availability of an interpreter, the presence of an attorney of record, or other factors).

- Determine eligibility for a benefit being sought (if the interview relates to an application for a benefit).

- Determine whether the interviewee is subject to any bars or grounds of inadmissibility.

- Evaluate the credibility of the interviewee.

- Identify whether fraud may be involved.

Eliciting testimony involves more than simply asking questions and receiving responses. You will likely need to actively draw out information from the interviewee that has a bearing on the purpose of the interview, such as an interviewee's eligibility for a benefit.[1]

## 3.2    Provide Information

In addition to obtaining information during the interview, you also provide information to the interviewee and to others who may be present, such as derivative family members, interpreters, and in some circumstances, witnesses or the interviewee's representative. The information you provide includes:

- The purpose of the interview and the interview process

- The roles and responsibilities of all persons involved in the interview

- What the interviewee can expect to happen after the interview

If the interviewee has questions, you will also provide information in response to those questions.

## 4    IMPORTANCE OF THE INTERVIEW

The importance of the interview cannot be overstated.

- The interview is an important part of your adjudication or determination and is one of the main tools you use to gather the information necessary to make a correct decision.

- The interview may be the only opportunity for you to elicit and clarify information upon which to base a decision.

- The decision you make, based on the information you gather at the interview, may have serious consequences.

    ➢ Your decision may affect whether the interviewee is reunited with close family members.

    ➢ In the protection context, an interviewee wrongly found ineligible for the benefit sought may eventually be returned to the country from which he or she fled and may thereby face persecution or even death.

    ➢ Your decision regarding the grant of an immigration benefit could have implications for U.S. national security.

---

[1] For additional information, see RAIO Training module, *Eliciting Testimony*.

- Interviewees may shape their opinion of the U.S. Government based on their interactions with you. While you may not remember every person you interview, this interview may be a pivotal point in an interviewee's life, and he or she will likely remember you and his or her impression of you and the U.S. Government for years to come.

Because of the importance of the interview, you must conduct yourself in a professional manner at all times, treating the interviewee with respect and courtesy. You must constantly strive to conduct organized, focused, and well-planned interviews.


## 5    THE PARTICIPANTS AND THEIR ROLES

A number of individuals may be present at an interview, each with a different role. The roles of the possible participants, outlined below, are discussed throughout this module.


### 5.1    The Officer

You are a representative of the U.S. Government and as such, you must project a competent, professional, and courteous image, and uphold the integrity of the U.S. immigration system. With this in mind, you are to conduct non-adversarial interviews in the manner described throughout this module.

Officers within RAIO include:

- International and Refugee Affairs Division (IRAD): Adjudications Officers, Overseas Adjudications Officers, Overseas Adjudications Specialists, and Supervisory Adjudications Officers (including Field Office Directors, District Directors, Deputy District Directors, and Branch Chiefs), Refugee Officers, Supervisory Refugee Officers, Fraud Detection and National Security (FDNS) Officers, and officers from other USCIS components who are detailed to IRAD to conduct refugee interviews. (Note: guidance in this module also applies to non-officers, such as Office of Chief Counsel [OCC] attorneys, who are detailed to IRAD to conduct refugee interviews)

- Asylum Division: Asylum Officers (including Senior Asylum Officers and Training Officers), Supervisory Asylum Officers (including Asylum Office Directors, Deputy Directors), and FDNS Officers

In most cases, when conducting interviews, you are both the fact-finder and the decision-maker. You control the direction, pace, and tone of the interview and have a duty to elicit all relevant testimony.


### 5.2    The Interviewee

The interviewee may be the principal applicant, a derivative family member, or witness in the case. The interviewee's role is to provide testimony and, when appropriate, other evidence.[2]

## 5.3    The Interpreter

The interpreter's role is to accurately interpret between the language of the interviewee and the language of the officer (English). The interpreter is not a witness and should not offer testimony, nor should the interpreter attempt to clarify the officer's or interviewee's statements or questions.[3]

## 5.4    The Representative

An applicant or petitioner may be represented by an attorney in the United States, an attorney outside the United States (in matters occurring outside the geographical confines of the United States), or an accredited representative of a recognized organization.[4] In addition, whenever an examination is required, the person involved has the right to be represented by an attorney or representative.[5] This does not provide any applicant for admission the right to representation, in either primary or secondary inspection or in an interview regarding a request for classification as a refugee, unless the applicant is the focus of a criminal investigation and has been taken into custody.[6]

The representative must file a properly completed Form _G-28 Notice of Entry of Appearance as Attorney or Accredited Representative_ or Form _G-28I Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States_, which must be signed by the applicant or petitioner.

Because of the non-adversarial nature of the process, described below, the role of the representative during the interview is minimal. You control the interview and will ask most of the questions. You may allow the representative to comment or ask questions during the course of the interview to clarify specific points. After your last question, you should give the attorney an opportunity to offer a closing statement. You have the discretion to limit the length of the closing statement, or in rare circumstances, require that a statement be submitted in writing instead.[7]

---

[2] 8 C.F.R. § 208.9(b).

[3] For additional information, see RAIO Training module, _Interviewing — Working with an Interpreter_.

[4] 8 C.F.R. § 103.2(a)(3).

[5] 8 C.F.R. § 292.5(b).

[6] Memorandum from Grover Joseph Rees III, INS Office of the General Counsel, to Jan C. Ting, Office of International Affairs, _Representation of an Applicant for Admission to the United States as a Refugee During an Eligibility Hearing_ (Nov. 9, 1992).

[7] 8 C.F.R. § 208.9(d).

## 5.5    Other Participants

In some interviews the applicant has another person present. In the case of children, this may be a "trusted adult" who participates in order to help the child feel at ease.[8] In interviews of children or individuals with disabilities who may be unable to state their claim, a "trusted individual" may assist by testifying about the applicant's circumstances.


## 6    THE NON-ADVERSARIAL NATURE OF THE INTERVIEW

It is well established that a non-adversarial approach in which the interviewer builds rapport is the most effective interview style for eliciting credible information.[9]

A non-adversarial proceeding is one in which the parties are not opposing each other. It differs from an adversarial proceeding, such as civil and criminal court proceedings, in which parties oppose each other by advocating their mutually exclusive positions before a neutral arbiter until one side prevails and the other side loses. A removal proceeding before an immigration judge is generally an adversarial proceeding because the Immigration and Customs Enforcement (ICE) attorney represents DHS in removal proceedings.[10]

In conducting an interview for an immigration benefit as well as other RAIO interviews, you are usually the only person who questions the interviewee. With a request for a benefit, the primary intent of USCIS is to determine whether the principal interviewee qualifies for a benefit. It is not the role of the interviewer to oppose the principal interviewee's request or application. Because the process is non-adversarial, it is inappropriate for you to interrogate or argue with any interviewee. You are a neutral decision-maker, not an advocate for either side. In this role you must effectively elicit information from the interviewee in a non-adversarial manner, to determine whether he or she qualifies for the benefit.

Additionally, RAIO interprets the term "non-adversarial interview" to encompass not only the manner of questioning as described above, but also the tone and atmosphere in which you must conduct interviews. It is your job to maintain a neutral and professional demeanor even when confronted with interpretation problems, a difficult or challenging interviewee or representative, or an interviewee whom you suspect is being evasive or

---

[8] Memorandum from Jeff Weiss, INS Office of International Affairs, to Asylum Officers, Immigration Officers, and Headquarters Coordinators (Asylum and Refugees), *Guidelines for Children's Asylum Claims*, 120/11.6 (Dec. 10, 1998); for additional information, see RAIO Training module, *Children's Claims*.

[9] Amina Memon, et al., "The Cognitive Interview: A Meta-Analytic Review and Study Space Analysis of the Past 25 Years," *Psychology, Public Policy and the Law 16*, no. 4, 2010, pp. 340–372; Ronald P. Fisher and R. Edward Geiselman, "The Cognitive Interview method of conducting police interviews: Eliciting extensive information and promoting Therapeutic Jurisprudence," *International Journal of Law and Psychiatry 33*, 2010, pp. 321–328.

[10] USCIS, Adjudicator's Field Manual (AFM), Appendix 15-2 *Non-Adversarial Interview Techniques*.

untruthful. Your personal feelings about the participants in the interview should not affect the quality of your interview or your decision.

The non-adversarial nature of the interview allows the applicant to present a claim in an unrestricted manner, within the inherent constraints of an interview before a government official. An interview before a government official may be intimidating to an applicant for various reasons, including, but not limited to, the following:

1. Prior negative experiences with authority figures

2. Trauma from sudden flight from the country of origin, or other causes

3. Perceived or real differences between the applicant's culture and the culture of the government official conducting the interview

4. Fear of sharing information of a highly personal or sensitive nature

# 7    THE COMPONENTS OF AN INTERVIEW

Although you will develop your own interview style, the following components are required components of every officer's interviews:

- Pre-Interview Preparation
- Introduction
- Oath
- Verification of Basic Biographical Information
- Testimony
- Closing Statement/Comment/Questions by Interviewee and/or Representative
- Conclusion

## 7.1    Pre-Interview Preparation

Preparing for the interview helps you identify the issues to focus on and to formulate meaningful questions to ask during the interview to gather the facts needed to support your decision. Before each interview you must analyze the case and assess the evidence in the record by reviewing the file, performing security checks, and, in many instances, reviewing relevant country of origin information.

As you review the file, you should read the application and any accompanying statements and supporting documents. You should also cross-check names and aliases of the principal interviewees and dependents against other documents in the file and available databases.  In addition, you must be alert to indications that you will need to follow special procedural guidance or modify your questioning techniques; for example, when

interviewing children, possible trafficking victims, or individuals who may pose a threat to national security [Asylum Adjudications Supplement – Pre-Interview Preparation].

This preparation helps you to establish the chronology of events of a case, determine lines of questioning, and, where relevant, identify gaps, inconsistencies, or potential bars you will need to address during the interview[11] [International and Refugee Adjudications Supplement – Pre-Interview Preparation].

As noted below in *Interviewing Tips*, an outline or checklist of the main points you want to address in the interview may be helpful. You may create such a checklist yourself for each case or use common checklists created by each division. Before a refugee or asylum interview, you could write a chronology of events leading to the interviewee's departure from his or her country and refer to it during the interview. If using an outline, checklist, or chronology, be sure that it does not distract you from asking necessary follow-up questions during the interview or from actively listening to and evaluating the interviewee's responses or questions.

It is essential that the interviewee appreciate the importance and seriousness of the proceedings. Therefore, the setting in which the interview takes place must be orderly and official in appearance.[12]

> Before beginning an interview, you should take particular care to remove from the interview area all files and documentation relating to other interviewees. This ensures confidentiality and prevents documents from being placed in the wrong file.

## 7.2 Introduction to the Interview

The introduction to the interview includes greeting the parties and explaining what will happen during the interview. You will develop your own style for handling the introduction. Your manner during the introduction sets the tone for the interview. The introduction is your best opportunity to establish rapport[13] with the interviewee. Your introduction should help put the interviewee at ease, thus facilitating the flow of information and allowing you to elicit the information that you need throughout the interview. Whatever approach you choose, you must conduct the entire interview in a non-adversarial manner.

---

[11] *See also* European Asylum Curriculum (EAC) #6 – Interview Techniques, Sub-module 1: Conducting the Interview, Unit 1.1 Preparation of the Case, "Case preparation."

[12] USCIS, Adjudicator's Field Manual (AFM), Chapter 15.2 *Interview Environment*.

[13] For additional information on establishing rapport, see RAIO Training module, *Interviewing - Eliciting Testimony*.

**Greet the Parties**

You should greet the interviewee and any other participants present at the interview and establish the identities of all parties. You should introduce yourself and any other participants who may not know each other. Before escorting the interviewee to your interview space, verify the identity of the interviewee and any dependents, as well as that of the interpreter when appropriate. In situations where the interviewee is escorted by another person to your interview space, do this as soon as the interviewee arrives.

**Determine Who Will Be Present During the Interview**

You have the discretion to decide who will be present at the interview.

- Dependents

Dependents may remain with the principal interviewee during the interview at your discretion. In certain types of cases, dependents must be interviewed individually. In these situations, you should interview the dependents separately, apart from the principal interviewee and other dependents. When it is not required that dependents be interviewed separately or offer testimony, you should defer to the principal interviewee's preference as to whether their dependents remain present during the interview. However, in protection interviews it is generally better to interview the principal applicant without dependents present, as noted below.

In interviews where the principal applicant is unable to testify due to disability or incapacity, it is permissible for a third party to testify on his or her behalf.[14]

- Sensitive Topics

As noted above, you should defer to the interviewee's preference when determining whether dependents will remain in the interview. However, after the interview has begun, an interviewee may be reluctant to request that dependents leave the room. You should therefore be alert for signs that an interviewee may be uncomfortable discussing certain issues with others present. In some cases (e.g., involving domestic violence or sexual abuse), you may ask to speak with the interviewee alone first to determine whether the interviewee would prefer to be interviewed without the dependents present.

In protection interviews it is best to make it your practice to interview the principal applicant without dependents present. Even if topics under discussion do not appear to be sensitive, it is usually troubling for children to see their parent display her or his vulnerabilities and an inability to protect them. Furthermore, many men feel reluctant to express personal fears in front of their families, and if their dependents remain in the interview, you may not adequately elicit all of the applicant's concerns.

---

[14] For additional information on specific procedures, refer to Division procedure manuals.

Some interviewees may request that a relative or friend be present at the interview for moral support. You may allow such individuals to remain. In particular, children may have a "trusted adult" present during the interview. However, you must also explain to any accompanying individual that he or she is not the interviewee's representative, and that he or she must not become involved in the interview process. You should also watch for any red flags which may suggest problems or irregularities with the relationship between the "trusted adult" and the child, and should consult your supervisor if you suspect any wrongdoing on the part of the "trusted adult" or other accompanying adult. *See also* "Trafficking or Other Forms of Coercion," below.

- Validity of Family Relationships

In some interviews, you will have to determine whether the relationship between the primary applicant and a relative listed on the application form is genuine.

*Example*

> In the adjudication of a Form I-590, Registration for Classification as Refugee, where the primary applicant has listed seven minor dependent children, you may interview some of the children separately to ensure that they are in fact part of the same family unit. If you believe that some or all of the relationships are not as claimed on the I-590, it is best to interview each child separately, so that blame for a denial does not fall on one or two children, who may be harmed as a result.

- Trafficking or Other Forms of Coercion

You may become concerned that the interviewee is in a vulnerable situation in relation to another party present at the interview. These are sensitive situations, and you must proceed with caution. While you may attempt to interview an interviewee apart from a suspected trafficker who may represent himself or herself as a party to the interview (such as a guardian, companion, or interpreter), you must also ensure that you are not violating the interviewee's right to representation or exposing the interviewee to possible reprisal from the trafficker. In such situations you should seek supervisory guidance before separating an interviewee from another party to the interview.[15]

- National Security Risks

If you discover during your interview preparation or during the interview that the interviewee may have provided support to a terrorist group or may have been involved in a terrorist activity or in another act that could negatively impact public safety or national security, contact your supervisor.[16]

---

[15] For additional information, see RAIO Training module, *Detecting Possible Victims of Trafficking.*

[16] For additional information, see the specific procedures for your division and RAIO Training module, *National Security: Terrorism Related Inadmissibility Grounds.*

### Explain the Purpose of the Interview

You must explain that the purpose of the interview is to:

- Give the interviewee an opportunity to explain why he or she submitted the application or requested the benefit.

- Allow the interviewee to present evidence of eligibility.

- Allow you to gather necessary information from the interviewee and any witnesses.

- Provide information to the interviewee concerning the application process.

### Explain Confidentiality

All asylum and refugee interviews are confidential.[17] Asylum confidentiality standards are formalized in the regulations. In the asylum context, absent the applicant's consent, you are generally prohibited from disclosing information contained in or pertaining to any asylum application to individuals other than the applicant. This includes acknowledging the existence of an asylum application. This restriction on disclosure does not apply to releasing information to the applicant's representative. The regulation also has exceptions on the prohibition on disclosure for certain U.S. Government officials and certain U.S. courts with a need to know the information.[18] Confidentiality provisions for asylum applicants contained in 8 C.F.R. § 208.6 also apply to the beneficiaries of I-730 petitions, whether they are following-to-join asylees or refugees. They also generally govern the disclosure of information related to credible fear and reasonable fear determinations, as well as to applications for withholding or deferral of removal under Article 3 of the Convention Against Torture, which are encompassed within the asylum application.[19]

As a matter of policy, adjudications in the refugee context follow the same confidentiality guidelines as asylum, with one limited exception:

- When a credibility issue arises based on conflicting testimony by family members who are part of the same case or a cross-referenced case, information provided by one

---

[17] Immigration and Nationality Act (INA) § 245A(c)(5); Memorandum from Barbara L. Strack, Chief, Refugee Affairs Division and Joanna Ruppel, Chief, International Operations Division, USCIS, to Refugee Affairs Division, *Information Consent Form for Use in Refugee Interviews,* 120/6 (Jun. 17, 2009).

[18] The Secretary may disclose asylum related information  Only your supervisor or upper management may decide whether an exception on the prohibition on disclosure exists. For additional information, refer to the *Identity and Security Check Procedures Manual* (ISCPM).

[19] *See Asylum Confidentiality Memos*: Memorandum from Joseph E. Langlois, Director, Asylum Division, to Asylum Office Directors and Deputy Directors, *Fact Sheet on Confidentiality*, HQASM 120/12.8 (Jun. 15, 2005); and Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, HQCOU 120/12.8 (Jun. 21, 2001).

---

family member should be shared with another family member to give the applicant(s) an opportunity to explain the discrepancies.

You are required to safeguard information and may not disclose it unless one of the exceptions to the disclosure restrictions applies. You must know if any prohibitions on disclosure exist for the benefit being adjudicated, and inform interviewees of the applicable confidentiality provisions.

Interviewees may be hesitant to disclose information if they believe it is not confidential because:

- Descriptions of past events may be highly personal.

- Interviewees may fear harm to themselves or others as a result of disclosing certain information.

- Interviewees may fear for the lives and safety of family members and friends.

Remember that many interviewees are from countries where the government does not value or protect the privacy of its citizens. Therefore, it may be difficult for some interviewees to understand the term "confidentiality." In the overseas refugee context, officers are provided specific language to assist the applicant in understanding confidentiality and what it means to waive confidentiality or otherwise disclose information under certain circumstances.[20]

**Explain Other Aspects of the Interview Process**

You can help alleviate some of the interviewee's nervousness by explaining the process of the interview so that the interviewee will know what to expect. The interviewee should be informed that:

- It is important that you and the interviewee understand each other.

- The interviewee must answer your questions truthfully and to the best of his or her knowledge.

- The interviewee must tell you if he or she does not know the answer to a question, rather than guess at or supply an answer he or she thinks you want to hear.

- It is crucial that the interviewee understand each question and if he or she does not understand a question, he or she must let you know so that you may clarify it. (Due to

---

[20] See Memorandum from Barbara L. Strack, Chief, Refugee Affairs Division and Joanna Ruppel, Chief, International Operations Division, USCIS, to Refugee Affairs Division, *Information Consent Form for Use in Refugee Interviews*, 120/6 (Jun. 17, 2009).

cultural barriers or fear of authority figures, many interviewees will not ask for clarification when they do not understand your question.)

- He or she should not ask the interpreter for help or clarification, because the interpreter's role is only to interpret what each party says.

- You will take notes during the interview to remember what was said during the interview.

- The interviewee may ask questions at any time during the interview.

- All the information in the notes is also confidential and will not be shared with unauthorized individuals.

- You will allow the interviewee time at the end of the interview to make any additional statements, including information that you did not ask about that he or she thinks is important and would like to add.

- You will carefully consider the information the interviewee provides to determine eligibility for the benefit.

- At the end of the interview, you will tell the interviewee how he or she will be notified of the decision on the case.

**Advise the Interpreter**

The interpreter's role is to interpret as accurately as possible what the officer and interviewee say during the interview. You must advise the interpreter that he or she is a conduit of communication and must not add nor detract from your statements or the interviewee's statements. Officers in the RAIO Directorate should follow their division-specific guidance when advising interpreters about confidentiality requirements and their oath to interpret truthfully and accurately.[21] [International and Refugee Adjudications Supplement – Interpreters for Refugee Interviews]

**If a Representative Is Present at the Interview**

If a representative is present, you must:

- Review form G-28 *Notice of Entry of Appearance as Attorney or Accredited Representative* or form G-28I *Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States* to verify that it has been properly executed;[22] or

---

[21] For additional information, see RAIO Training module, *Interviewing – Working with an Interpreter*.

[22] 8 C.F.R. § 292.4.

- If the representative and/or the interviewee have not signed the form, ask them to do so at the interview; or

- If no form is in the file, ask the representative to submit one before beginning the interview.

You also must verify that the representative at the interview is the same person who signed the G-28 or G-28I. If the representative present is not the representative listed on the G-28, follow the guidance below.

- If the representative appearing at the interview is from the same office as the representative who submitted the G-28, he or she must sign the form and correct any information on it, as appropriate.

- If the representative appearing at the interview is not from the same office as the representative who submitted the G-28, he or she must submit a new G-28.

You must clarify with the interviewee whether the new representative is representing him or her for purposes of the interview only or is replacing the original representative, in which case you should annotate the original G-28 to reflect the change in representation.

If the representative has submitted a G-28 or G-28I but is not present, you must inform the interviewee that he or she has a right to have a representative present at the interview. If the interviewee wishes to proceed without the representative, the interviewee must sign a waiver form before the interview can be conducted. If the interviewee does not wish to proceed without the representative, you must reschedule the interview.

### *Cooperative Relationship Between the Representative and the Officer*

You and the representative are not adversaries. Therefore, some actions that may be appropriate for attorneys in an adversarial setting may not be appropriate in the non-adversarial interview, where you and the representative share a cooperative role in developing and clarifying the merits of the interviewee's claim.

In certain instances it may be appropriate for the representative to comment during the course of the interview to clarify issues. Such comments may be helpful and should not be discouraged. However, you must retain control of the interview. If the representative repeatedly interrupts or otherwise disrupts the interview, ask the representative to refrain from interrupting and explain that he or she will have an opportunity at the end of the interview to ask questions and make comments.

If you encounter a representative who is unaware of the non-adversarial nature of the interview, you may need to advise the attorney of his or her role in this proceeding. In doing so, you must always conduct yourself professionally.

You must inform the representative that he or she will be allowed to make a closing statement, comment on the evidence presented, and ask the interviewee additional questions. You have the discretion, however, to limit the length of the statement or request that it be submitted in writing, in lieu of an oral statement at the end of the interview.[23]  You also have the discretion to have the attorney suggest questions for you to ask rather than allowing the attorney to question the interviewee directly.

## 7.3    Oath

Interviewees and witnesses must be placed under oath before testifying. You must place all interviewees under oath before asking any questions related to the claim or application. You, the interviewee, and the interpreter should stand during the administration of the oath unless physically unable to do so.

The oath should be administered in a way that impresses upon the interviewee the importance of the occasion and the testimony he or she is about to give. A suggested explanation of the oath follows:

> "I am now going to place you under oath. This means that I am going to ask you to vow or promise to tell the truth. Once you are placed under oath, I will expect that what you tell me will be the truth to the best of your knowledge."

The Refugee Affairs Division has developed specific language for the oath [International and Refugee Adjudications Supplement – Oaths].

The fact that the interview is being conducted under oath or affirmation should be recorded in the interview notes. If a verbatim question-and-answer statement is taken, the exact wording of the oath or affirmation should be included in the statement [Asylum Adjudications Supplement – Oath].

If an interpreter is present, you must administer a separate oath to the interpreter.

## 7.4    Verification of Basic Biographic Information

You must verify with the interviewee all of the biographical information on the application form. Techniques for gathering this information are elaborated in RAIO Training module, *Interviewing – Eliciting Testimony*.

**Review the Form**

You must verify and, if necessary, update or correct information on the form. Someone other than the interviewee may have completed the form, or information about the interviewee may have changed since the form was filed. As a result, some of the information on the form may not be correct [Refugee and International Adjudications

---

[23] 8 C.F.R. §208.9(d).

Supplement – Review the Application Form]. Please keep in mind that the interviewee may not be aware of all of the information that has been submitted on his or her behalf. Any corrections must be made in red ink and numbered. At the end of the interview, the interviewee must provide a signature to confirm all changes made to the form.

You must be certain that the form contains the interviewee's full and correct name, plus any aliases (for refugee interviews, see Standard Operating Procedure for Form I-590). Aliases are any other names the interviewee has used, including maiden names, nicknames, hyphenated names, abbreviated names, baptismal names, and alternate order of first and last names. You must also note any variation in birth date that the interviewee has used. Different calendars and cultural practices can lead to confusion about dates of birth. You must confirm all dates in addition to places of birth, address, and entry information, and you must confirm that all other biographical information on the form is current and correct.

You must also compare information on the form with other documentation in the file and documents presented by the interviewee at the interview, such as birth certificates, marriage and divorce certificates, death certificates, school records, baptismal certificates, and passports. If the interviewee has dependents, verify that the biographical information for each is also correct.

**Review Documents**

The interviewee may submit documents with his or her application or petition and may bring additional documents to the interview.

Although interviewees are not always required to submit identity documents, you must ask the interviewee and dependents if they have such documents. Examples include identity documents from the interviewee's country, the United Nations High Commissioner for Refugees (UNHCR), the United States, or other governmental sources.

If the interviewee does not have identity documents, and he or she is from a population that ordinarily possesses identity documents, you should ask the interviewee to explain why he or she does not have these documents.

If the interviewee submits an original document with copies of the document, you should retain the copies for the file, write or stamp on the copies "original seen and returned," and sign and date each copy below this statement.[24]

Similarly, if the interviewee presents an original document for which there are copies in the file, you should write or stamp on the file copies that the "original was seen and returned" and sign and date the file copies. If the interviewee has only photocopies of a document, you should write on the copies retained for the file "from photocopy," and

---

[24] For additional information, see RAIO Training modules, *Evidence* and *Fraud.*

sign and date each one. You should also inquire as to why the applicant does not possess the original document.

Guidance on how to proceed if you encounter a document that appears to be fraudulent is provided in RAIO Training module, *Fraud*.

**Correct the Form**

Any corrections to the form must be made in red ink on the record copy of the form, crossing out the original information so that it is still legible. This includes corrections to a personal statement attached to the Form I-589 in asylum processing and the Resettlement Support Center (RSC) case history attached to the Form I-590 in overseas refugee processing.

At the beginning of the interview, you should ask the interviewee and the interviewee's representative, if any, if they would like to make any corrections on the personal statement or RSC Case History.

The corrections must be numbered so that they can be explained to the interviewee before he or she signs the form at the end of the interview to verify that the application form is accurate. If the interviewee does not alert you to any corrections before the interview begins, and his or her testimony is inconsistent with information on the form, you must address material credibility concerns with the interviewee. However, it is important to remember that the applicant may not have prepared this form and may not be fully aware of its contents.[25]

## 7.5    Testimony

Because this is a non-adversarial proceeding and you are the fact-finder in the case, you are responsible for eliciting all relevant information from the interviewee.[26] Although you must cover all of the information requested in the application form, you should not simply ask the interviewee the same questions as those on the form. Instead, you should use a variety of techniques that provide the interviewee an opportunity to speak in his or her own words.[27]

**Allow Applicant to Clarify Inconsistencies**

If any of the information in the form conflicts with the interviewee's interview testimony, or if you notice inconsistencies within the interviewee's interview testimony, you must give him or her an opportunity to explain the discrepancies. You must correct the application form when necessary, advising the interviewee of the corrections.

---

[25] For additional information, see RAIO Training modules, *Credibility* and *Evidence*.

[26] 8 C.F.R. § 208.9(b); UNHCR Handbook, para. 196.

[27] For additional information on methods and issues related to eliciting testimony, see RAIO Training module *Interviewing – Eliciting Testimony*.

You must pursue all relevant lines of questioning, until you are certain that you have sufficient pertinent information to make a determination on the interviewee's claim. You must also allow the interviewee to ask questions as appropriate and to submit additional documents at the interview in support of his or her claim.

You must learn to distinguish between the likelihood that the interviewee is confused and the possibility that his or her non-responsiveness is an attempt to receive a benefit by fraud. If the interviewee does not appear to understand your question, you should ascertain whether there is a problem with the interpretation or with your phrasing of the question. However, if the interviewee appears to understand your question and is being evasive or non-responsive, or presents inconsistent or implausible testimony, you must confront the interviewee and give him or her an opportunity to explain. Proper confrontation of an interviewee is not hostile or challenging. By confronting an interviewee, you merely make the interviewee aware of your concerns, and provide the opportunity to address them.[28]

## 7.6    Closing Statement/Comment/Questions by Interviewee and/or Representative

As noted above, at the end of the interview, you should allow the interviewee and, if present, the representative, to make final comments or ask questions after you have finished asking your questions.

**Signatures on Form**

You and the interviewee must sign the record copy of the form. You must note the corrections made to the form, explain them to the interviewee, and inform the interviewee that, by signing the application, he or she is affirming that all the information in the form is true and correct as of the date of the interview.

**Requests to Submit Additional Documents**

In certain cases, you may request that the interviewee submit additional documentation as evidence in support of his or her claim.[29]

**Explanation of the Next Steps in the Process**

In most cases, you will not inform the interviewee of the decision at the end of the interview. Instead, you will advise the interviewee as to how he or she will receive the decision. These procedures vary, depending on the form type and interview location.

**Exit Procedures**

---

[28] For additional information, see RAIO Training modules, *Credibility* and *Evidence.*

[29] For additional information, see RAIO Training module, *Evidence.*

At every interview location, you must follow local exit procedures at the conclusion of the interview. Before beginning your first interview, you should be familiar with the local procedures. For example, in most locations a waiting area is set apart from the interview spaces and other offices. You may be required to escort the interviewee back to the waiting area rather than allow the interviewee to find his or her own way back unescorted. In other locations it may be standard procedure to allow the interpreter, when present, to escort the interviewee back to the waiting area.

# 8    OUTSIDE FACTORS THAT CAN AFFECT THE INTERVIEW

Multiple factors may interfere with your ability to conduct the interview or may affect the interviewee's ability to testify.

## 8.1    Stress

An immigration interview, no matter what type, can be a stressful situation for all of the individuals involved. People respond to stress in different ways and develop personal mechanisms for handling stress. These factors can affect both you and the interviewee during an interview.

You, as the interviewing officer, may have days when you are distracted by personal issues or other professional issues. You must recognize your own distractions and minimize their effect on the interview.

The interviewee may find the interview stressful for a number of reasons. He or she may be:

- Anxious because his or her future may depend on the outcome

- Anxious about the unknown (not knowing what will happen during the interview)

- Concerned that he or she will not be able to answer the questions asked

- Fearful of dealing with a government official or being in an unfamiliar environment

- Concerned about communicating through an interpreter

- Worried about forgetting important information

- Concerned that his or her application or request may be denied

- Apprehensive about retelling painful or humiliating experiences

- Suffering from a physical ailment such as dementia, or a trauma-related condition such as Post-Traumatic Stress Disorder (PTSD)[30]

All of these factors have the potential to increase the interviewee's level of stress or otherwise impede the smooth flow of the interview.

The interpreter, representative, witness, or other participants in the interview may have their own concerns, such as their ability to interpret correctly, or to represent or testify on behalf of the interviewee in such a way as to assist the interviewee most effectively. In some cases, those accompanying the interviewee may have an ulterior motive to commit fraud on behalf of the interviewee.

You are responsible for monitoring your stress level as well as identifying and mitigating the stressors that may affect all other participants at the interview.

## 8.2    Time Constraints

As the interviewing officer, you are obligated to collect as much relevant information as possible within the time period allocated by your division or local office to conduct an interview.  The tasks and time involved in completing a particular interview may increase when:

- A complicated story takes additional time to fully elicit

- A potential bar or ground of inadmissibility needs to be explored

- Several dependents on the case require interview and processing, and/or

- A dependent must be added or deleted

To accomplish all of the required tasks successfully, you must work expeditiously within predetermined time constraints. Always be mindful of the need to gather enough information to make a legally sufficient adjudication.

## 8.3    Your Personal Experiences

During the interview, you should not allow your personal life experiences and biases to influence you either in favor of or against the interviewee. You should never approach the interview with a preconceived notion of the outcome.

## 9    INTERVIEWING BEST PRACTICES

---

[30] For additional information, see RAIO Training module, *Interviewing Survivors of Torture and Other Severe Trauma*.

The following tips may help you to maintain control and elicit all necessary information at the interview.[31]

## 9.1    Be Organized

As you prepare for the interview, create an organized environment that will help you capture all of the information you need. You and the interviewee must remember a significant amount of information; the fewer distractions, the easier it will be.

Your desk should be clean and free of clutter, including papers from other files, with only those items that are necessary for processing the case visible to the applicant. Have all supplies and necessary papers (notepad, checklists/outlines) within easy access during the interview. This will remove unnecessary distractions and allow you and the interviewee to concentrate on the interview. It is also helpful to have a box of tissues nearby in case the interviewee becomes emotional during the interview.

**Use an Outline or Checklist**

Before you begin conducting interviews, ask your supervisor if he or she recommends an outline or checklist that other officers have used. Another option is to prepare your own outline or checklist based on Standard Operating Procedures (SOP) for different form types. For example, for protection interviews, your outline or checklist might include background, past harm, possession of a protected characteristic, awareness, capability, inclination, military service, firm resettlement, and whether mandatory bars or grounds of inadmissibility apply. Using an outline or checklist may prevent omissions of important lines of questioning. Even experienced officers sometimes forget to ask certain questions. You should review the outline or checklist before the interview and look at it again before ending the interview to ensure that everything has been covered.

> Outlines or checklists are merely the starting point for the information you must elicit during the interview. They should not be used as a substitute for all necessary lines of questioning and follow-up questions during your adjudication. Do not let an outline or checklist distract you from asking necessary follow-up questions during the interview or from actively listening to and evaluating the interviewee's responses or questions.

**Develop Time Management Skills**

Before adjudicating a new form type, you should learn about the adjudication, both from procedures manuals and from experienced colleagues who are able to adjudicate the same form efficiently. You can learn methods that streamline the process without negatively

---

[31] For additional information, *see* RAIO Training Modules, *Cross-cultural Communication* and *Interviewing – Working with an Interpreter*.

affecting the quality of the adjudication. Your colleagues can help you to develop interviewing skills that will allow you to quickly and efficiently gather all relevant information needed for a legally sufficient adjudication.

**Record Questions as They Arise as a Reminder to Ask Them Later in Interview**

During the interview, jot down questions that arise but are not appropriate to ask at that moment, as a reminder to ask those questions when it is appropriate. This allows you to focus on what the interviewee is saying, rather than on the question you plan to ask later. Use a notepad or piece of paper at the side of the desk, or create a place on your computer document to jot down any specific questions or lines of questioning that come to mind that you want to ask later. Refer to these notes later in the interview to be reminded of the additional questions that you need to ask.[32]

**Have a Map or Atlas at Hand**

The interviewee may be able to identify important locations on a map, such as where he or she lived, moved, or traveled. Keep in mind, however, that some interviewees may never have seen a map and may not know how to read one. In addition, some interviewees may never have traveled beyond their villages or towns. Their view of "distance" may be confined to the distance between their home and their field or the market. Furthermore, such interviewees may not measure distance in terms of miles or linear measurements, but rather according to another form of measurement, such as the length of time it takes to arrive at a destination, or landmarks along the way.

## 9.2    Interview, Don't Interrogate

Your questioning must be done in a professional, non-threatening, and non-accusatory manner.

**Treat the Interviewee with Respect**

As an officer in the RAIO Directorate, you should treat the interviewee with respect regardless of his or her eligibility for the benefit being sought. Similarly, you must treat the interviewee with respect even if he or she is not forthcoming with information during the interview, or does not seem to understand the process. You cannot know all of the factors that motivated the interviewee to apply for the benefit he or she is seeking, or what events have transpired in the interviewee's life before this moment. For these reasons, you should treat every interviewee with respect and consideration.

You must not show impatience or incredulity, even though you may have heard similar stories from many interviewees or you find the interviewee's testimony implausible.

---

[32] For additional information, see RAIO Training module, *Interviewing - Note Taking*.

Even the most self-possessed officer may feel annoyed if it appears that an interviewee is not being truthful during an interview, but you must refrain from expressing emotions such as annoyance either verbally or non-verbally.

**Maintain a Neutral Tone throughout the Interview**

It is important that you always maintain a neutral tone, even when frustrated. You occasionally may be frustrated with interviewees who are long-winded, discuss issues irrelevant to the claim, are confused by your questions, or appear to be fabricating a claim.

**Be Non-Judgmental and Non-Moralistic**

Some information you gather during an interview may shed a negative light on the interviewee. How an interviewee reacts to or handles a particular situation may differ from how you think the situation should have been handled. The interviewee may have left family members behind in difficult or dangerous circumstances, or the interviewee may belong to an organization for which you have little respect.

Although you may feel offended by some interviewees' actions, you must put personal feelings aside and avoid passing moral judgments on interviewees in order to make neutral, legally sound decisions.

**Create a Comfortable Atmosphere**

Create an atmosphere in which the interviewee can freely express his or her claim. You should attempt to put the interviewee at ease at the beginning of the interview and continue to do so throughout the interview. Physical discomfort may also impede communication. If the interviewee has been testifying for an extended period of time, it may be appropriate to suggest that you take a break to use the restroom or get a drink of water.

**Treat Each Interviewee as an Individual**

Although many claims may be similar, each claim must be evaluated on its own merits, and each interviewee must be treated as an individual. You must approach each interviewee without any predisposition to grant or deny the benefit sought.

**Be Mindful of Potential Biases**

Everyone develops individual preferences, biases, and prejudices based on personal life experiences. This influences how you view others and how you perceive circumstances, either negatively or positively. You must make continual efforts to become aware of instances in which this can influence your approach to interviews, either positively or negatively, such that it becomes "personal baggage."

The following types of biases encountered in other interview settings, such as job applicant interviews, may also apply in a RAIO interview setting.

- **Halo effect:** The interviewee's strength in one area causes you to view the other areas positively without fully considering or exploring them.

- **First impression:** The interviewee is judged before having a fair chance to respond to your questions.

- **Stereotype:** Because you perceive the interviewee as fitting into a certain category, you believe that he or she is not qualified for the benefit.

- **Similarity:** Your decision on eligibility is muddied after confusing the interviewee's personal similarity to yourself with his or her qualifications for the benefit.

- **Contrast:** Your judgment in the interviewee's case is based on how well others answered questions in previous interviews.

- **Excessive harshness:** You focus unfairly only on the negative factors in the interviewee's case, disregarding all strengths in his or her claim.

Being aware will allow you to recognize how your biases may interfere with the interview process. You must make an effort to prevent "personal baggage" from negatively affecting your ability to interview in a non-adversarial and neutral manner.

**Have Patience**

Remember that although the interview process may become routine for you, it is not routine for the interviewee and may not be routine for others present. You should take time to explain the process and allow time for the interviewee to gather his or her thoughts.

**Ensure That All Parties to the Interview Remain Non-Adversarial**

If, during the course of the interview, the interviewee or any other party to the interview becomes agitated, shouts, or otherwise loses composure, you must re-establish order. Calmly and in a moderate tone of voice remind the parties that this is a non-adversarial interview, and that this applies to all parties. If this does not defuse the situation, you should not continue the interview until the problem can be resolved. You may need to ask a colleague or supervisor to intercede. Under no circumstances should you respond in kind to anger or frustration from the interviewee, representative, interpreter, or other participant at the interview, as this will only exacerbate the problem.

**Do Not Intimidate, Harass, or Embarrass the Interviewee**

Your tone of voice and facial expressions must remain neutral throughout the interview process. You must not argue against the interviewee's statements, raise your voice, use rapid-fire questioning, roll your eyes, or use a hostile, deprecating, or incredulous tone with any interviewee.

You may be tempted to do all of these with some interviewees if you notice serious credibility problems during an interview. If the interviewee does not appear to understand your question, you should ascertain whether there is a problem with the interpretation or with the way in which you articulated the question. However, if the interviewee appears to understand your question and is evasive or non-responsive, or presents inconsistent or implausible testimony, you must probe the interviewee's credibility by confronting him or her with the specific credibility problem and by giving him or her an opportunity to explain.

Confronting an interviewee does not require you to challenge or become hostile toward the interviewee. Rather, confronting an interviewee merely makes him or her aware of your specific concerns and gives the interviewee the opportunity to address the concerns.[33]

The non-adversarial nature of the interview allows the interviewee to present a claim in as unrestricted a manner as possible, within the inherent constraints of an interview before a government official. An interview with a government official may be intimidating to an interviewee. Interviewees may feel vulnerable and threatened during an interview with you, as a representative of the U.S. Government, because of:

- Negative experiences with authority figures

- Differences between the interviewee's culture and yours

- Fear of exposing highly personal or sensitive information

- Trauma due to a variety of reasons, including sudden flight from the country of persecution

- Fear of an agent or trafficker who smuggled the interviewee, if the interviewee was trafficked

## 9.3    Maintain Control of the Interview

During the entire interview, you must not only remain alert to information from the interviewee, but must also be aware of more general factors affecting the flow of communication.

**Promote Effective Exchange of Information**

To the extent that it is possible, try to eliminate factors that limit or prevent an effective exchange of information during the interview. If the interviewee appears to be uncomfortable disclosing part of the claim in front of family members, you may ask family members to wait in the waiting room. If the interpreter is having difficulty

---

[33] For additional information, see RAIO Training module, *Evaluating Evidence.*

interpreting a question, think of a different way to ask the question or obtain the information. Always be on the lookout for anything you can do that can facilitate the flow of information.

**Keep the Interview Focused**

In order to conduct efficient interviews, you should limit questions to topics that are relevant to the purpose of the interview.

## 9.4    Practices to Avoid

- Do not over-empathize with the interviewee.

- Do not ask questions that are not relevant to the adjudication in question.

- Do not eat, drink, answer the phone, or engage in other personal behavior during the interview.

## 10    CONCLUSION

You play multiple roles in the adjudication process. As both the fact finder and neutral decision-maker, you must elicit testimony from the applicant, maintain a neutral tone throughout the process, and create an atmosphere in which the interviewee can freely express his or her claim. The interview is your opportunity to probe into all material elements of the interviewee's claim to determine eligibility for the benefit sought. You must develop strong interviewing skills that allow you to elicit expeditiously and efficiently all necessary testimony to make a decision.

Although you will develop your own style over time, for each interview you must:

- Thoroughly prepare, including file review, country of origin research, security checks, and electronic data base searches, before inviting the interviewee into your office

- Greet the parties and establish rapport

- Explain the interview process

- Place parties under oath, as necessary

- Verify identity, address, contact, and all biographical information on the forms

- Correct errors or update information that may have changed since the form was completed

- Elicit testimony regarding the claim and ask all relevant follow-up questions

- Confront the interviewee with material credibility issues and allow him or her an opportunity to explain

- Allow the interviewee and representative to make final comments and ask questions to provide information not already covered during interview

- Sign the application form and obtain all necessary signatures

- Advise the interviewee of the decision notification process

## 11    SUMMARY

### 11.1    Authority

The following authorizes USCIS officers to conduct interviews:

- 8 C.F.R. § 103.2(b)(9) gives the authority to USCIS to require that an applicant, petitioner, sponsor, beneficiary, or other individual appear for an interview.

- 8 C.F.R. § 208.9(b) requires that Asylum Officers conduct interviews in a non-adversarial manner. Although this regulation applies only to Asylum Officers, as a matter of policy, officers in the RAIO Directorate must conduct interviews in a non-adversarial manner.

- 8 C.F.R. § 207.2(b) gives the authority to USCIS to require that each applicant 14 years and older appear in person before an Immigration Officer for an inquiry under oath to determine his or her eligibility for admission as a refugee.

- INA § 287(b) gives the authority to USCIS officers to administer oaths and to take and consider evidence concerning the privilege of any person to enter, reenter, pass through or reside in the United States.

### 11.2    The Purpose of the Interview

#### 11.2.1    To Gather Information

At an interview you elicit information to:

- Verify the identity of those present at the interview

- Determine whether to proceed with the interview, based on factors such as jurisdiction and availability of accurate interpretation

- Evaluate credibility and determine eligibility for the benefit being sought

- Determine whether the interviewee is subject to any bars or grounds of inadmissibility

## 11.2.2  To Provide Information

At an interview you provide information to the interviewee about:

- The purpose of the interview and the interview process

- The roles and responsibilities of all persons involved in the interview

- What the interviewee can expect to happen during and after the interview

## 11.3  Importance of the Interview

- The interview, as the basis for your determination, may be the only opportunity for you to obtain accurate and complete information from the interviewee.

- The interview may be the only opportunity for you to elicit and clarify information upon which to base a decision.

- The decision you make, based on the information you gather at the interview, may have serious consequences.

- Interviewees may shape their opinion of the U.S. Government based on their interactions with you.

## 11.4  The Participants and Their Roles

### *The Officer*

You are a representative of the U.S. Government and must project a competent, professional, and courteous image, and uphold the integrity of the U.S. immigration system.

### *The Interviewee*

The interviewee may be a principal applicant, a derivative family member, or a witness in the case.

### *The Interpreter*

The interpreter's role is to accurately interpret between the language of the interviewee and English.

### *The Representative*

An applicant or petitioner may be represented by an attorney in the United States, an attorney outside the United States (in matters occurring outside the geographical confines of the United States), or an accredited representative of a recognized organization.

*Other Parties*

Other parties may be present at the interview, depending on the circumstances. For example, some children or applicants with disabilities may need the assistance of a relative or guardian to present their claim.

## 11.5 The Components of an Interview

- Pre-Interview Preparation

- Introduction

- Oath

- Verification of Basic Biographical Information

- Testimony

- Closing Statement/Comments/Questions by Interviewee and/or Representative

- Conclusion

## 11.6 Interviewing Tips

- Be organized
  - ➢ Use an outline or checklist to ensure that all necessary information is covered.
  - ➢ Develop time-management skills.
  - ➢ Record questions as they arise as a reminder to ask them later in interview.
  - ➢ Have a map or atlas at hand.
- Interview, don't interrogate
  - ➢ Treat the interviewee with respect.
  - ➢ Maintain a neutral tone throughout the interview.
  - ➢ Be non-judgmental and non-moralistic.
  - ➢ Create a comfortable atmosphere.
  - ➢ Treat each interviewee as an individual.
  - ➢ Be mindful of potential biases.
  - ➢ Have patience.

- ➤ Ensure that all parties to the interview remain non-adversarial.

- ➤ Do not intimidate, harass, or embarrass the interviewee.

- Maintain control of the interview

  - ➤ Promote effective exchange of information.

  - ➤ Keep the interview focused.

  - ➤ Treat the applicant with respect.

  - ➤ Maintain a neutral tone throughout the interview.

  - ➤ Be non-judgmental and non-moralistic.

  - ➤ Create an atmosphere in which the interviewee can freely express his or her claim.

  - ➤ Treat each interviewee as an individual.

  - ➤ Be mindful of potential biases.

  - ➤ Have patience.

- Practices to avoid

  - ➤ Do not over-empathize with the interviewee.

  - ➤ Do not ask questions that are not relevant to the adjudication in question.

  - ➤ Do not eat, drink, answer the phone, or engage in other personal behavior during the interview.

# PRACTICAL EXERCISES

There are no Practical Exercises for this module.

# OTHER MATERIALS

There are no Other Materials for this module.

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

    None

### ADDITIONAL RESOURCES

    None

### SUPPLEMENTS

> **International and Refugee Adjudications Supplement – Interpreters for Refugee Interviews**
>
> The Resettlement Support Centers (RSCs) provide interpreters for most USCIS Refugee Interviews and I-730 interviews. The RSC seeks to recruit dispassionate interpreters who have no interest in U.S. resettlement. The RSC provides an orientation for the interpreters used at USCIS interviews, including the requirement to interpret accurately and completely and maintain the confidential nature of the interview. The RSC makes every effort not to use interpreters from the same refugee camp population or urban refugee population as the population being interviewed; however, this may not be possible at times in particular locations or in certain circumstances. For example, an interpreter may be used from the refugee camp population or urban refugee population if the interview site is very remote and there are no interpreters available in the local population, or if the interviewee's language is not spoken widely outside the interviewee's ethnic group.  For these same reasons, it may not be possible to find an interpreter in the local population who is not interested in resettlement to the United States, and at some interview locations, the interpreters themselves may be applicants to the United States Refugee Admissions Program (USRAP).
>
> **Interpreter's Oath**
>
> The interpreter must be placed under oath ("Do you solemnly swear or affirm that you will interpret all statements made during the interview completely and truthfully and that you will keep all information confidential?") If the same

Case 1:24-cv-01702-RC     Document 69     Filed 01/10/25     Page 751 of 1203

**Supplement A**
**International and Refugee Adjudications**     Interviewing – Introduction to the Non-Adversarial Interview

interpreter is used for more than one interview, the interpreter needs to be placed under oath only prior to the first interview. The interviewee should be told during the introduction or at the time of his or her oath that the interpreter has already taken an oath to interpret completely and keep all information confidential.

The interpreter should generally stand and raise his or her right hand when taking the oath. However, some interpreters may have objections to using the term "swear" or object to raising their right hands. The officer should adapt the oath to accommodate such objections, ensuring that the interpreter understands that he or she is promising, under the law, to interpret completely and truthfully and to keep the information in the interview confidential (e.g., using "affirm" rather than "solemnly swear" in the following: "Do you affirm that you will interpret all statements made during the interview completely and truthfully and that you will keep all information confidential?"). USCIS Refugee Affairs Division, Standard Operating Procedures: Introduction, Section 8 "Administer the Oath," 19 August 2009.

---

### International and Refugee Adjudications Supplement – Oaths

The International and Refugee Affairs Division has instituted several requirements for administering the oath to an applicant, including standard language. Applicants must stand and raise their right hand for the administration of the oath. An exception may be made if the applicant is elderly or incapacitated. The officer administering the oath should also stand and raise his or her right hand. As some applicants may have religious objections to using the term "swear" or "so help me God," the required oath for applicants is:

> "Do you solemnly swear or affirm that the statements you are about to make will be the truth, the whole truth, and nothing but the truth?"

Some applicants may have objections to using the term "swear" or object to raising their right hands. The officer should adapt the oath to accommodate such objections, ensuring that the applicant understands that he or she is promising, under the law, to tell the truth. USCIS Refugee Affairs Division, Standard Operating Procedures: Introduction, Section 8 "Administer the Oath," 19 August 2009.

**International and Refugee Adjudications  Supplement – Review the Application Form**

See *Pilot Standard Operating Procedure for Form I-590: Registration for Classification as a Refugee* (October 30, 2015).

**International and Refguee Adjudications Supplement - Pre-Interview Preparation**

The following are examples of tools used in the interview process:

- Revised NCTC Check Requirements for Visas 92/93

- Naturalization NQP5 Checklists

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

1.  Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, HQCOU 120/12.8 (Jun. 21, 2001).

2.  Memorandum from Joseph E. Langlois, Director, Asylum Division, to Asylum Office Directors and Deputy Directors, *Fact Sheet on Confidentiality*, HQASM 120/12.8 (Jun. 15, 2005).

### ADDITIONAL RESOURCES

None

### SUPPLEMENTS

> **Asylum Adjudications Supplement – Purpose of the Interview**
>
> In this lesson, students will learn about the purpose, components, and non-adversarial nature of the asylum interview, as well as the roles of the representative and the applicant. The lesson will also cover eliciting the basic biographical information on the I-589, such as date and place of birth and information pertaining to entry into the United States.
>
> **Definition**
>
> At asylum interviews (unlike defensive proceedings before an immigration judge, the Board of Immigration Appeals, or the Federal courts) there is no government official present arguing in opposition to the asylum applicant. Neither the Asylum Officer nor the representative cross-examines the applicant and witnesses (if any), as in defensive proceedings. The officer is not an advocate for either side; rather, the officer is a neutral decision-maker.

**Asylum Adjudications Supplement - Pre-Interview Preparation**

- **Review file and DHS computer systems to:**
  - ➢ Determine who is included in the application
  - ➢ Determine which version of the I-589 the applicant submitted
  - ➢ Ascertain whether the file is complete

If the file is missing any documents, such as photographs or photocopies of documents, the officer should request that the applicant provide the missing documents.

The officer should also determine whether there is a "Notice of Entry of Appearance as Attorney or Representative" (Form G-28) in the file and whether it is properly completed.

If there is no G-28 in the file, but if it appears that the applicant is represented, the officer should ask the representative and applicant to complete a G-28 during the interview.

  - ➢ Determine whether there is any indication that the application is not within the jurisdiction of the Asylum Office.
  - ➢ Determine when the applicant claims to have entered the United States and when he or she filed the asylum application.

The officer should be prepared to inquire into whether the applicant's I-589 was filed in timely fashion, i.e., within one year of the last arrival into the United States, and whether an exception to that filing requirement may apply.

  - ➢ Become familiar with the applicant's background and claim.

The officer must read the information on the I-589 and review any supporting documents.

An applicant may have submitted extensive background information on country of origin information. It is not necessary to review all of the information prior to the interview, as this can be very time-consuming. However, the Asylum Officer must look through the information and read any information that specifically pertains to the applicant or his or her claim.

  - ➢ Identify issues to cover during the interview.

A review of the file allows the officer to identify lines of questioning and specific questions to ask during the interview.

> ➢ Determine whether the applicant may be in any "special status" (e.g., ABC, Mendez).

The procedures for handling certain cases, such as cases involving ABC class members, are different from other cases. Officers must be aware at the outset of the interview whether the case is governed by special procedures, in order to follow correct procedures.

- **Review country of origin information**

If the officer is unfamiliar with country of origin information relevant to the applicant's claim, the officer should quickly look up basic conditions in that country, referring to the electronic database Refworld, annual Department of State human rights reports, or information in the office library. A review of country of origin information can assist the Asylum Officer to focus on relevant elements of a claim and disregard that which is irrelevant.

- **Review procedures, if necessary**

The officer may find it necessary to review specific procedures prior to interviewing some applicants (e.g., ABC cases, sensitive cases), if he or she is unfamiliar with the particular procedures involved in interviewing these applicants.

---

**Asylum Adjudications Supplement – Oath**

Applicants and any witnesses must be placed under oath prior to giving testimony. Some applicants may have religious objections to using the term "swear." Other applicants may object to the phrase "so help me God." The officer must adapt the oath to accommodate the applicant, ensuring that the applicant understands that he or she is promising, under the law, to tell the truth.

The applicant must also sign a statement acknowledging that he or she swears or affirms to tell the truth and understands the penalties for misrepresentation. The applicant should not be made to sign the form without a brief explanation of the significance of the oath and the acknowledgement of the penalties for misrepresentation.

The interpreter must sign a statement (interpreter's oath), which puts the interpreter under oath. At the officer's discretion, he or she may administer the oath to the interpreter in addition to having him or her sign the interpreter's oath.

The interpreter monitor must also be placed under oath. The oath given to the interpreter monitor should be translated for the applicant by the applicant's interpreter.

- **<u>Oaths if you suspect a national security risk</u>**

If you have identified an individual who may be a national security risk, you must use Q&A format and take his or her testimony as a sworn statement [see RAIO Training module, *Interviewing – Note Taking;* AOBTC Lesson Plan, *Mandatory Bars to Asylum and Discretion*].



### _RAIO DIRECTORATE_

# INTERVIEWING – WORKING WITH AN INTERPRETER

## TRAINING MODULE

*This Page Left Blank Intentionally*

*This Page Left Blank Intentionally*

**RAIO Directorate**

| |
|---|
| **INTERVIEWING – WORKING WITH AN INTERPRETER**<br>Training Module |

## MODULE DESCRIPTION

This module describes the role and responsibilities of an interpreter, and how to communicate effectively through the use of an interpreter.

## ENABLING PERFORMANCE OBJECTIVES

1. Explain the role and responsibilities of the interpreter in the interview.

2. Summarize strategies for effective communication through an interpreter.

3. Identify signs of misinterpretation during the interview.

4. Describe techniques for corrective action when encountering misinterpretation problems.

## RECOMMENDED READING

None

## ADDITIONAL RESOURCES

Collopy, Dree K, "Lost In Translation: Why Professional Interpreters are Critical to the Fairness of Asylum Interviews," *Immigration Law Today* 27, no. 3, May/June 2008, pp.12-22, http://www.ailadownloads.org/ilt/2008/May-June08ILTFullText.pdf, accessed 25 November 2015.

## CRITICAL TASKS

| Task Description |
|---|
| Knowledge of policies, procedures, and guidelines for working with an interpreter |
| Skill in interviewing through an interpreter |
| Identify if the use of an interpreter is necessary for an interview. |
| Work with an interpreter according to established procedures. |
| Verify that the applicant and interpreter understand each other. |
| Identify interpreter abuse or incompetence. |
| |
| |
| |
| |

## SCHEDULE OF REVISIONS

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
|---|---|---|---|
| 12/12/2012 | Entire Lesson Plan | Lesson Plan published | RAIO Training |
| 11/25/2015 | Throughout document | Corrected links and minor typos | RAIO Training |
| 4/11/2017 | RAD Supplement | Issued new supplement | RAD |
| 9/17/2018 | Throughout document | Fixed formatting | RAIO Training |
| 8/22/2019 | ASM Supplement | Issued new supplement incorporating updated guidance on use of contract interpreters | ASM |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
| 4/24/2024 | Pages 1- 5 | Rebranding edits to remove specific training program mention and to update lesson plan objectives and linked KSAs. | RAIO Training |
| | | | |
| | | | |

## Table of Contents

1  INTRODUCTION .................................................................................................. 9

2  IDENTIFYING THE NEED FOR AN INTERPRETER ............................................. 11

2.1  Language Ability of the Interviewee .......................................................... 11

2.2  Interpreters Utilized for RAIO Interviews ................................................. 11

2.3  Conducting an Interview if you are Fluent in the Interviewee's Language ........................ 12

2.4  Verifying the Identity of the Interpreter .................................................. 12

3  ROLE OF THE INTERPRETER .......................................................................... 13

3.1  Interpreter's Role is Crucial ..................................................................... 13

3.2  Advising the Interpreter of His or Her Role ............................................. 13

3.3  Interpreter's Oath ..................................................................................... 16

4  COMPETENCY OF THE INTERPRETER ............................................................ 17

4.1  General ...................................................................................................... 17

4.2  Indicators of Misinterpretation during the Interview ............................... 17

4.3  Determining the Interpreter's Competency .............................................. 18

4.4  What to Do Once You Have Stopped the Interview Due to the Interpreter's Incompetence or if Another Interpreter is Not Available ...................... 18

5  FACTORS THAT MAY AFFECT THE ACCURACY OF INTERPRETATION AT THE INTERVIEW
     19

5.1  Interpreters at the Interview are Often Not Professionally Trained ...................... 19

5.2  The Interpreter and the Interviewee May Not Have Met Prior to the Interview .................. 19

5.3  The Interpreter May Not be Sufficiently Competent in English ........................... 19

5.4  The Interpreter May Encounter the Inherent Difficulties of Interpreting from One Language to Another ...................... 20

5.5  The Interviewee and Interpreter May be Communicating through a Second Language ....... 20

5.6  The Interviewee and Interpreter May Speak Different Versions of the Same Language ...... 21

5.7  Cultural Factors Can Influence Interpretation ........................................ 21

5.8  The Interpreter's Personal Opinions or Biases Can Influence Interpretation ..................... 22

6  WAYS TO FACILITATE INTERPRETATION THROUGH AN INTERPRETER ............ 22

6.1   Address the Interviewee Directly and Maintain Eye Contact ...........................................23

6.2   Explain the Interpreter's Role to the Interviewee................................................................24

6.3   Make Sure the Interpreter's Physical Placement during the Interview is Appropriate .........24

6.4   Have all Conversations between You and the Interpreter Interpreted to the Interviewee.....24

6.5   Be Conscious of Your Speech Patterns ..............................................................................25

6.6   Choose Words Carefully and Avoid Idioms ......................................................................25

6.7   Avoid the Use of Certain Pronouns Whenever Possible ....................................................25

6.8   Speak Clearly, and, When Necessary, Speak Slowly..........................................................26

6.9   Keep Questions Clear and Simple, Asking Specific Questions One at a Time ...................26

6.10  Break Down What is Said at the Interview into Reasonable Amounts of Information .........26

6.11  Repeat the Question/Statement Slowly or Rephrase it if the Interpreter does not Appear to Understand.................................................................................................................27

6.12  Provide Pen and Paper to the Interpreter if Necessary .......................................................27

6.13  Resolve all Communication Problems as Quickly as Possible ...........................................27

6.14  Remind the Interpreter of His or Her Role When Necessary ..............................................27

6.15  Be Certain that all Parties Remain in the "Communication Loop".......................................28

**7    CONCLUSION** ......................................................................................................................**28**

**8    SUMMARY** .............................................................................................................................**28**

8.1   Identifying the Need for an Interpreter...............................................................................28

8.1.1 The Language Ability of the Interviewee ............................................................................28
8.1.2 Interpreters Utilized for RAIO Interviews..........................................................................29
8.1.3 Conducting an Interview if You are Fluent in the Interviewee's Language.........................29
8.1.4 Verifying the Identity of the Interpreter..............................................................................29

8.2   Role of the Interpreter and Interpreter Ground Rules .........................................................30

8.2.1 Interpreter's Oath ...............................................................................................................30

8.3   Competency of the Interpreter ...........................................................................................31

8.3.1 Signs of Misinterpretation during the Interview .................................................................31

8.4   Factors that May Affect the Accuracy of Interpretation at the Interview .............................31

8.5   Ways to Facilitate Interpretation through an Interpreter .....................................................32

**PRACTICAL EXERCISES** .............................................................................................................**34**

**OTHER MATERIALS** ...................................................................................................................**35**

## SUPPLEMENT A – REFUGEE AFFAIRS DIVISION ....................................................................38

Recommended Reading ................................................................................................38

Additional Resources ..................................................................................................38

Supplements ................................................................................................................38

## SUPPLEMENT B – ASYLUM DIVISION ....................................................................................42

Recommended Reading ................................................................................................42

Additional Resources ..................................................................................................42

Supplements ................................................................................................................42

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

You may also encounter references to the legacy Refugee Affairs Division (RAD) and the legacy International Operations Division (IO). RAD has been renamed the International and Refugee Affairs Division (IRAD) and has assumed much of the workload of IO, which is no longer operating as a separate RAIO division.

---

Officers in the RAIO Directorate conduct interviews primarily to determine eligibility for immigration benefits or requests; to corroborate information provided by applicants, petitioners, and beneficiaries; and/or to establish whether a person understands the consequences of his or her actions.

The modules of the RAIO Directorate – Officer Training Program and the adjudication-specific training courses constitute primary field guidance for all officers who conduct interviews for the RAIO Directorate. The USCIS Adjudicator's Field Manual (AFM) also provides guidance for officers when conducting interviews, particularly for officers serving in RAIO's international offices. There may be some instances where the guidance in the AFM conflicts with guidance provided by the RAIO Directorate. If this is the case, you should follow the RAIO guidance. Further guidance regarding interviews for specific applications will be discussed during adjudication-specific trainings.

In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.

---

# 1    INTRODUCTION

This module is part of a series of interviewing modules that discuss various topics including the basic principles and components of conducting a non-adversarial interview, how to elicit information through various question types and techniques, and the proper procedures for taking notes. This module provides information on procedures governing the use of interpreters, the role of interpreters in the RAIO context, factors that may affect the integrity of interpretation, and how to facilitate communication through an interpreter. The ability to communicate with an interviewee through an interpreter is one of the many

skills you must develop as an officer. Please refer to the other interviewing modules for additional guidance on conducting RAIO interviews.

- Interviewing – Introduction to the Non-Adversarial Interview

- Interviewing – Note-Taking

- Interviewing – Eliciting Testimony

- Interviewing – Interviewing Survivors of Torture

As an officer in the RAIO Directorate, you will conduct different types of non-adversarial interviews in the course of your duties.

Although some interviewees you encounter will speak English well enough to proceed with the interview in English, many interviewees will need the assistance of an interpreter in order to communicate during the interview. Accurate interpretation is crucial in these interviews.

The main goal in conducting an interview is to elicit testimony from the interviewee so that you are able to determine eligibility for the benefit sought, or for some other purpose as noted above. The interpreters you encounter may be professionally trained interpreters, but in many cases, they will be friends or family members who have not had formal training to be an interpreter and may not have interpreted previously. Regardless of the interpreter's level of experience and/or training, it is your responsibility to ensure that everyone present understands the procedures for facilitating interpretation during the interview and that the interpretation contributes to the primary goal of effectively eliciting relevant information during the interview.[1]

> Very often the terms "interpret" and "translate" are used interchangeably; however, for the purpose of this module it is important to understand the distinction between these two processes. The main difference between interpret and translate is the medium: "interpret" involves oral communication; "translate" involves written text.
>
> Interpreting is essentially the art of orally conveying information from one language to another. The interpreter listens to a speaker in one language, grasps the content of what is being said, and then restates in another language what was said, using wording that is as close as possible to the original statement while still maintaining the meaning of what was said.

---

[1] For additional information on the interview process, see RAIO Training module, *Interviewing: Introduction to the Non-Adversarial Interview.*

In this module, the terms "interpretation," "interpret," and "interpreter" refer to oral communication. Interpreters utilized in the RAIO Directorate usually provide only interpretation; on occasion, however, they may be asked to translate written documents from another language into English and vice versa.

## 2    IDENTIFYING THE NEED FOR AN INTERPRETER

### 2.1    Language Ability of the Interviewee

The individuals you interview will have varying degrees of English language proficiency. When the interviewee cannot speak English well enough to fully understand you or to express himself or herself, you will need to conduct the interview utilizing an interpreter. The interpreter must be proficient in both English and the interviewee's native language, or another language in which the interviewee is fluent. [Asylum Adjudications Supplement – 1]

Some interviewees can speak English well enough to be interviewed in English without utilizing an interpreter. Nonetheless, many will need an interpreter during the interview to fully comprehend the information conveyed and questions asked and to provide testimony. Even an interviewee who is competent in English may feel more comfortable being interviewed in his or her native language. There may be times when it appears that the interviewee speaks English and should proceed with the interview in English; however, in almost all cases, it is in the applicant's best interest to conduct the interview in the language he or she can most fully express himself or herself.

### 2.2    Interpreters Utilized for RAIO Interviews

The U.S. Government provides interpreters for some but not all RAIO interviews where the interviewees are not proficient in English. These interpreters are professional interpreters or USCIS staff members who are fluent in the interviewee's language. At USCIS offices overseas, USCIS employees, including Locally Engaged Staff (LES), serve as interpreters due to local security protocols or the unavailability of competent interpreters. Each division has specific procedures providing guidance on who can serve as an interpreter. [International and Refugee Adjudications Supplement – 1, Asylum Adjudications Supplement – 2,].

For certain USCIS interviews conducted overseas, Resettlement Support Centers (RSC's), under contract with the Department of State (DOS), and on occasion the United Nations High Commissioner for Refugees (UNHCR), provide interpreters. [International and Refugee Adjudications Supplement – 1].

USCIS does not provide interpreters for non-English speaking interviewees at affirmative asylum interviews. Accordingly, interviewees are required to bring their own interpreter to the interview. In addition, during affirmative asylum interviews, the Asylum Division

utilizes professional interpreter monitors (via telephone). Their function is generally not to interpret, but to monitor the quality of the interpretation provided by the interviewee's interpreter to ensure that the interpretation is accurate, complete, adequate, and neutral.[2] But see Asylum Adjudications Supplement – 9 for guidance on using contract interpreters after stopping the interview due to incompetence or misconduct on the part of the interviewee's interpreter. The Asylum Division does provide professional interpreters (via telephone) during credible fear and reasonable fear interviews.

## 2.3    Conducting an Interview if you are Fluent in the Interviewee's Language

Ideally, the services of a disinterested person should be employed as an interpreter.[3] However, in some circumstances, if you are fluent in a language that the interviewee speaks, you may conduct the interview in that language without utilizing an interpreter. If you conduct an interview in the interviewee's language without an interpreter, you do not have to be sworn in but you should note in the record the language in which you conducted the interview.

If there are others present at the interview who do not speak the interviewee's language (e.g., an attorney or family member), it is important that the other parties understand everything that occurs while they are present in the interview. Even though you may speak the interviewee's language, using an interpreter may be the best way to assure that all present understand what takes place during the interview. RAIO has different procedures for when an officer can conduct an interview in a language other than English depending on the type of adjudication you are performing. For asylum adjudications, this can only be done if your language ability has been certified by the Department of State. Refer to the adjudication-specific procedures contained in the supplements for guidance. [International and Refugee Adjudications Supplement – 2, Asylum Adjudications Supplement – 3].

## 2.4    Verifying the Identity of the Interpreter

At the onset of most interviews, you will request identification from the interpreter. RAIO has specific procedures regarding verifying the identity of the interpreter and the documentation that is needed for each type of adjudication. Because the interpreters used for refugee interviews are usually hired by the UNHCR or the RSCs, officers interviewing refugee cases are not required to check the identity documents of the interpreters. Officers conducting asylum adjudications and other international adjudications should make a copy of the identification document(s) provided by the interpreter to retain as part of the record. [International and Refugee Adjudications Supplement – 3, Asylum Adjudications Supplement – 4].

---

[2] For additional information on Asylum Division procedures governing the use of interpreter monitors, see Affirmative Asylum Procedures Manual Section II.J.4(b) and Memorandum from Joseph E. Langlois, Chief, USCIS Asylum Division, to Asylum Office Directors, et al., *Award of Interpreter Services Contracts and Guidance on Use of Interpreter Services*, (HQRAIO 140/12) (23 May 2011).

[3] USCIS Adjudicator's Field Manual, Section 15.7 "Use of Interpreters" (Rev. March 5, 2010).

# 3    ROLE OF THE INTERPRETER

## 3.1    Interpreter's Role is Crucial

In an interview requiring an interpreter, the role of the interpreter is crucial. Misinterpretations can impede your ability to elicit accurate information and therefore can lead to incorrect determinations of eligibility or dissemination of incorrect information. Interpretation during the interview should be a collaborative effort between you and the interpreter to ensure that the interpretation is accurate.

Due to the inherent complexities of interpretation and communicating in a second language, the interpreter may not be able to restate information word for word.[4] The interpreter is, in many ways, a "filter" through which information is passed. It is your responsibility to ensure that the interpreter understands and performs his or her role, which is to interpret as close as possible the meaning of the words and concepts being communicated.

If, at any point during the interview, there are indications that the interpreter is not able to interpret effectively, you should work with the interpreter to evaluate whether he or she is capable of continuing and take appropriate action as described below.

## 3.2    Advising the Interpreter of His or Her Role

It is important to explain the roles of all parties present, including the interpreter, at the beginning of the interview to mitigate any confusion and to manage expectations. When the interpreter, interviewee, and attorney or witness(es), if applicable, understand their role in the interview process, there is a higher likelihood that the interview will go smoothly. By explaining clearly what you expect of the interpreter, you will be better able to maintain control of the interview and identify and address any problems that may arise with the interpretation.

Some interpreters may have a great deal of experience interpreting or may have interpreted at RAIO interviews previously. Such interpreters may be aware of the general mechanics of the process and the interpreter's role. Individual interviewing styles vary from officer to officer, however, and interpreters should not assume that one interview will be conducted in the same manner as a previous interview. Therefore, you should still always explain to both inexperienced and experienced interpreters the rules for interpreting.

As you explain to the interpreter his or her role and the accompanying "ground rules" for interpreting, you should have the interpreter interpret to the interviewee your explanation. This will help the interviewee understand how the interpretation should take place as well as address the goal of keeping the interviewee informed at all times of what is transpiring

---

[4] For additional information, see RAIO Training module, *Cross-Cultural Communication*.

during the interview. The following chart outlines the ground rules for interpreting during any interview conducted by RAIO staff.

| INTERPRETER GROUND RULES |
|---|
| **The Interpreter <u>Should</u> Do the Following:** |

| 1 | ***Keep all information discussed by all parties at a USCIS interview confidential*** [International and Refugee Adjudications Supplement – 4, Asylum Adjudications Supplement – 5]. |
|---|---|
| 2 | ***Interpret verbatim (word for word) as much as possible***<br><br>• Use your (the officer's) and the interviewee's choice of words, rather than using the interpreter's choice of words, while maintaining the meaning of what was said.<br><br>• Advise you if certain terminology cannot be interpreted verbatim and therefore needs a lengthy interpretation in order to accurately convey the meaning of what was said.<br><br>• Use the same person that you and the interviewee use. For example:<br><br>    **You**:  What did you do next?<br><br>    **Interpreter** (to interviewee):<br><br>        (proper):        What did you do next?<br><br>        (not proper):   He asked what you did next.<br><br>    **Interviewee**:  I went to the U.S. Embassy to request a visa.<br><br>    **Interpreter** (to you):<br><br>        (proper):        I went to the U.S. Embassy to request a visa.<br><br>        (not proper):   He went to the U.S. Embassy to request a visa. |

| | | • Another way of thinking about this is that the interpreter is, in effect, an echo, interpreting everything that she or he hears, not selectively interpreting what he or she chooses to interpret. |
|---|---|---|
| | 3 | *Interpret the interviewee's responses to your questions even if the responses do not appear to answer the questions* |
| | 4 | *Inform you if he or she does not understand what you have said* |
| | 5 | *Inform you if he or she does not understand something the interviewee has said and that he or she needs to ask the interviewee for clarification* |
| | 6 | *Advise you or the interviewee if the length of a question or response would pose difficulties for him or her to interpret*<br><br>You and/or the interviewee can then break the statement/question into shorter chunks of information for the interpreter to convey. |
| | 7 | *Interpret all conversations that take place between you and him or her during the interview so that the interviewee is aware at all times of what is transpiring during the interview* |
| | 8 | *Advise you if the interviewee expresses any confusion about your question or statement* |

| **The Interpreter Should <u>NOT</u> do the following:** | |
|---|---|
| 1 | *Engage in private conversations with the interviewee during the interview* |
| 2 | *Attempt to explain the meaning of anything that is said during the interview, including your questions and statements, even if the interviewee appears confused.* |

|   | It is the interpreter's role to simply interpret the questions asked and the responses provided.[5] He or she should inform you if the interviewee appears confused at any time during the interview. This will then allow you to clarify any confusion with follow up questions. |
|---|---|
| 3 | ***Condense or elaborate upon what you say or what the interviewee says*** |
| 4 | ***Attempt to answer for the interviewee or explain the meaning of what the interviewee says*** |
| 5 | ***Begin the interview ahead of you;*** it is you, not the interpreter who begins, directs, and concludes the interview.<br><br>When interpreters interpret for multiple interviews, they become familiar with the interview procedures and so may proceed without the officer directing them. As the interviewing officer, you must maintain control of the interview and ensure that the interpreter does not proceed without your direction. |
| 6 | ***Allow any personal biases and opinions to affect the interpretation during an interview*** |

Explain to the interpreter that these ground rules are necessary because the interview is important to the interviewee and the officer and that these rules enable the interviewee and officer to communicate fully and avoid any misunderstanding. The interpreter may be more likely to follow instructions if he or she understands the rationale for them.

## 3.3    Interpreter's Oath

As stated in the <u>Adjudicator's Field Manual</u> Chapter 15.7, interpreters interpreting before a USCIS officer must be placed under oath. "He or she should be placed under oath to interpret and translate all questions and answers accurately and literally."[6]

All USCIS officers must, at a minimum, comply with the *AFM* 15.7 requirements as stated above. Each division within RAIO has developed guidance with regard to the specific wording of the interpreter's oath and the context in which it is used. Officers in

---

[5] For additional information on follow-up questions to clarify confusion by the interviewee, see RAIO Training module, *Interviewing – Eliciting Testimony*.

[6] USCIS Adjudicator's Field Manual, <u>Section 15.7 "Use of Interpreters"</u> (Rev. March 5, 2010).

the RAIO Directorate should follow any additional adjudication-specific guidance when administering the oath and, where applicable, signing an Interpreter's Oath form prior to the interview. [International and Refugee Adjudications Supplement – 5, Asylum Adjudications Supplement- 6]. If the interpreter used is an employee of USCIS or DHS, he or she need not be sworn in. He or she should, however, be identified for the record.[7]

As stated above, the Asylum Division utilizes telephonic interpreter monitors for affirmative asylum, reasonable fear, and credible fear interviews. When adjudicating asylum cases, officers are required to administer an oath to the interpreter monitor at the beginning of the interview. [Asylum Adjudications Supplement – 7].

## 4    COMPETENCY OF THE INTERPRETER

### 4.1    General

In order to achieve the goals of the interview, you and the interviewee must be able to understand each other. When an interpreter is involved, the interpreter's ability to effectively interpret is crucial to the success of the interview. The interpreter must be proficient in both English and the interviewee's native language (or another language in which the interviewee and interpreter are fluent). During the interview, there may be indicators leading you to determine that the interpreter is not competent and you should stop the interview. It is best if you make this determination as early as possible during the interview for a variety of reasons including time constraints and/or the limited availability of other interpreters. [Asylum Adjudication Supplement – 9].

### 4.2    Indicators of Misinterpretation during the Interview

There are a number of indicators that can signal that there may be miscommunication between the individuals at the interview and/or that the interpreter is having difficulty interpreting. These indicators include:

- The response to a question you ask does not answer the question, or the response only partially answers the question.

- Words you recognize without interpretation (e.g., proper names, English words) are not interpreted.

- The interpreter uses more words to interpret a question or response than appears to have been required.

- The interpreter uses very few words to interpret a lengthy question or response by either the interviewee or officer.

---

[7] USCIS Adjudicator's Field Manual, Section 15.7 "Use of Interpreters" (Rev. March 5, 2010).

- There is back and forth dialogue between the interpreter and interviewee, without explanation from the interpreter.

- The interviewee indicates non-verbally that he or she is confused or doesn't understand, such as not responding or looking surprised or confused. Keep in mind, however, that non-verbal expressions can be culturally bound, so what may indicate confusion in one culture may indicate something different in another culture.[8]

You need to be alert continually for any signs of miscommunication during the interview and to clarify with the interpreter immediately if problems arise. As the interviewing officer, you are responsible to look for signs of inaccurate, incomplete, inadequate, or biased interpretation by the interpreter, and to address these problems if they occur. When using a telephonic interpreter, you will not be able to *see* signs of miscommunication and must remain alert and listen carefully for verbal indicators of miscommunication.

## 4.3    Determining the Interpreter's Competency

The indicators listed in the section above should alert you to potential problems with the interpretation during the interview. [Asylum Adjudications Supplement – 8]. You may need to stop the interview due to an interpreter's lack of competency. The decision to stop the interview is left to your discretion; however, before stopping the interview you should first make every reasonable effort to resolve any interpretation problems or issues. Once you make a determination that the interpreter is not competent, you should consult with your supervisor, if necessary, and then stop the interview. Generally, you should determine that an interpreter is not competent if you encounter the following:

- The interpreter is not sufficiently competent in English and/or the interviewee's language, and is not able to accurately interpret during the interview; and/or

- You have good reason to believe that the interpreter is providing answers to the interviewee, altering or embellishing answers, or changing the questions you ask, and when working with the interpreter, you are not able to resolve these issues.

## 4.4    What to Do Once You Have Stopped the Interview Due to the Interpreter's Incompetence or if Another Interpreter is Not Available

Each division has specific procedures you must follow once you have determined that an interpreter is not competent or that the interviewee is unable to continue in English and an alternate interpreter is unavailable. [International and Refugee Adjudications Supplement – 7, Asylum Adjudications Supplement – 9]. This includes guidance on stopping the interview, rescheduling the interview, providing written notice if applicable, stopping the "clock" (in the Asylum context), etc.

---

[8] For additional information, see RAIO Training module, *Cross-Cultural Communication* (under development; please refer to IRAD and ASM lesson plans on this topic).

# 5 FACTORS THAT MAY AFFECT THE ACCURACY OF INTERPRETATION AT THE INTERVIEW

There are a number of reasons why the quality and accuracy of interpretation at an interview may be impaired. These reasons are outlined below. It is important that you are aware of these factors and their impact on the interpretation during the interview in order to mitigate, as much as possible, any negative impact on the communication between you and the interviewee.

## 5.1 Interpreters at the Interview are Often Not Professionally Trained

The interpreter may or may not have had professional training as an interpreter or experience interpreting or translating. Even if an interpreter has prior experience interpreting or translating, he or she may not fully understand the role of an interpreter and how to best interpret during an interview in the RAIO context.

## 5.2 The Interpreter and the Interviewee May Not Have Met Prior to the Interview

In some cases, the interviewee and interpreter may be meeting for the first time at the interview. Therefore, the interviewee and interpreter may be unfamiliar with one another's accent, pronunciation, mannerisms, etc. Generally, the less familiar an interpreter is with the interviewee, the more challenging it is for the interpreter to interpret. There may be several ways of interpreting a particular word or phrase, some of which may be more appropriate to a particular situation. (Think of a thesaurus, which lists numerous synonyms for one word.) When interpreting, the interpreter chooses his or her words in a "split second." Once the interpreter has chosen the words to use, it may be difficult later for him or her to change or correct the choice of words. If an interpreter is familiar with the interviewee as well as the interviewee's country and culture, the interpreter will be more capable to make these split second determinations to interpret particular words or phrases. Conversely, the less time an interpreter has spent with an interviewee, the more challenging it will be for the interpreter to accurately make these decisions.

On the other hand, an interpreter who knows the interviewee and his or her culture and background may think he or she knows in advance what the interviewee is going to say, and may not listen as intently as an interpreter who does not know the interviewee.

## 5.3 The Interpreter May Not be Sufficiently Competent in English

The interpreter's English language proficiency may vary in quality from excellent to poor. For example, a Spanish speaker, for whom English is not his or her native language, may mistakenly interpret the Spanish word, "*embarazada,*" (*pregnant* in Spanish) as "embarrassed." Even if an interpreter is competent in English, English is not the native language of the interpreter in most cases. Therefore, the interpreter may not completely understand certain subtleties of the English language. Furthermore, some terms that may be used in an interview, such as "threatened," "torture," "organization,"

etc., may not be among the words in a non-native English speaker's English vocabulary. In addition, an interpreter may not be familiar with or understand the various accents of officers, which may create an additional layer of difficulty for the interpreter.

### 5.4    The Interpreter May Encounter the Inherent Difficulties of Interpreting from One Language to Another

It is not always possible to interpret verbatim (word for word) from one language to another and retain the meaning of what is being said. The structure and syntax of one language can vary considerably from another language. Consider the simple sentence, "I am thirsty." In the French language, one would say, "*J'ai soif,*" which means, "I have thirst." In the Mòoré language, spoken in Burkina Faso, one would say "*Ko yuud n tar mam,*" which means, "Thirst has me."

Word order can be essential to the meaning of a phrase or sentence; changing the word sequence can change the meaning. For example, in Spanish, when the word order of "*un amigo viejo*" which means "a friend who is old," changes to "*un viejo amigo*" the meaning becomes "a longtime friend."

When colloquial expressions, sayings, and idioms are interpreted verbatim, the meaning of what was said can be altered or may not make sense. Consider the Spanish, "*me costó un ojo de la cara,*" which is interpreted word for word into English as, "it cost me an eye from the face," rather than the familiar English equivalent, "it cost me an arm and a leg."

Rather than interpret word for word, an interpreter must interpret meaning for meaning to accurately convey what is being said. This involves knowledge of the subtleties of the interviewee's language and English. Because interpreters vary in their knowledge of the subtleties of languages used and in their ability to interpret meaning for meaning, you should always be vigilant for signs of misinterpretation.

### 5.5    The Interviewee and Interpreter May be Communicating through a Second Language

It is important to determine the native languages of both the interviewee and the interpreter, and the language they will be using to communicate during the interview and how proficient both are in that language. The interviewee and interpreter may be communicating through a language that is a second language for one or both of them. For example, the native language of many I-730 beneficiaries from the People's Republic of China is Fuzhou and their second language is Mandarin, which they may not speak as well as Fuzhou. Often, the interpreter for such cases is proficient in Mandarin but does not speak Fuzhou. Because the interviewee may have only a rudimentary understanding of Mandarin, it may be challenging to elicit information from him or her.

Therefore, it is important to determine at the beginning of the interview the native languages of the interviewee and interpreter. You can do this by asking the interviewee

and interpreter what their native language is or by asking "What language do you understand best?" or "What language do you speak at home?"

## 5.6    The Interviewee and Interpreter May Speak Different Versions of the Same Language

Although an interviewee and interpreter may speak the same language, they may have learned different versions of that language and/or speak with different accents. This may be the case if they are from different socio-economic groups, from different parts of the same country, or from different countries that speak the same language. Even within the English language there are inconsistencies in terminology among different regions in the U.S. or different English-speaking countries, as the following example illustrates.

| **British English** | **American English** |
|---|---|
| Lift | Elevator |
| Flat | Apartment |
| Chemist | Pharmacist |
| Boot | Trunk |
| Football | Soccer |
| Jumper | Sweater |

Such minor inconsistencies in terminology, as well as variations in usage between different versions of a language, can lead to subtle differences in interpretation, which can impact the outcome of an interview. Consider the possible effect at an interview of the following:

- The word "*ahorita*" in the Dominican Republic means "in a little while;" in Mexico it means "right now."

- A Spanish language interpreter who is not from Guatemala may not understand the term for "civil patrol" expressed by a Guatemalan interviewee and may interpret it as "military."

## 5.7    Cultural Factors Can Influence Interpretation[9]

Interviewees and interpreters are usually from a culture that is different from the culture of the officer who is conducting the interview. Therefore, the exchange of information through an interpreter is not only being interpreted from one language to another, but also from one culture to another. If the interviewee and the interpreter are also from different cultural backgrounds, there is an additional cultural layer through which the information must pass.

---

[9] For additional information, see RAIO Training module, *Cross-Cultural Communication* .

For example, it may be taboo for an interpreter to openly discuss rape in his or her culture. During the interview, if the applicant discusses a rape that he or she experienced, the interpreter may feel uncomfortable and may therefore substitute the word "harm" for "rape."

## 5.8    The Interpreter's Personal Opinions or Biases Can Influence Interpretation

Interpreters are rarely neutral. In some circumstances, they may have a certain disposition toward you or the interviewee. They may also bring biases, preconceived ideas, or personal opinions to the interview. Examples of this are listed below.
The interpreter may:

- Try to impress you with his or her knowledge of English or country conditions, and may add editorial comments about the interviewee's country

- Want to distance him or herself from the interviewee if he or she feels that the interviewee is of a lower socio-economic group or if he or she believes the interviewee may be fabricating a claim

- Want to put his or her country and culture in a favorable light so may not interpret the abuse the interviewee suffered at the hands of the authorities as graphically as the interviewee's depiction

- Want to help the interviewee so may not interpret some information accurately because he or she may think that it could have negative consequences for the interviewee

- Want you to know that he or she is acquainted with the interviewee and that the interviewee is a "good person"

Whatever the reason, the interviewee's testimony may be distorted by the interpreter. Often, the interpreter is not consciously aware of his or her personal opinions or biases and how these can affect the interview.

You must remain vigilant to the possible presence of these factors and take appropriate steps to control the interview when necessary. This applies to all interviews, even asylum interviews where an interpreter monitor is present and the effects these factors may have on communication during the interview may be lessened by the presence of the interpreter monitor.

## 6    WAYS TO FACILITATE INTERPRETATION THROUGH AN INTERPRETER

There are certain inherent difficulties in interpreting from one language to another and in working with an interpreter. Everyone has a particular way of speaking in which he or she incorporates accent, speech patterns, rates of speech, and other personal behavior.

Some ways of speaking can be easy for an interpreter to understand while others may pose problems. There is also a cultural filter through which information is exchanged.[10] In addition, as explained earlier in this module, there are a variety of other factors that may adversely impact the interpretation of information exchanged during the interview.

The following are the steps in the communication process during an interview when working through an interpreter.[11]

- You ask a clearly-worded question.

- The interpreter correctly understands the question.

- The interpreter correctly interprets the question.

- The interviewee correctly understands the interpreted question.

- The interviewee answers the question.

- The interpreter correctly understands the answer.

- The interpreter correctly interprets the answer.

- You understand the interpreted answer.

- You correctly record the answer.

Miscommunication during any of these steps can lead to incorrect information being relayed, with the potential for affecting the outcome of the interview. It is your responsibility as an officer within RAIO to develop interviewing skills that can facilitate accurate interpretation. Incorporating the techniques listed in this module and other RAIO training modules can assist you in developing these skills.

## 6.1    Address the Interviewee Directly and Maintain Eye Contact

Face the interviewee when speaking and direct questions and comments to him or her. Stay focused throughout the interview on the interviewee, not the interpreter, and make eye contact with the interviewee. Keep in mind, however, that some interviewees may not maintain eye contact with you due to cultural norms.[12] Do not tell the interpreter to ask the interviewee something or refer to the interviewee in the third person.

---

[10] For additional information, see RAIO Training module, *Cross-Cultural Communication*.

[11] European Asylum Curriculum, Submodule 1, *Introduction*. Unit 1.2: *Challenges and Definitions*, "The difficulty of obtaining evidence."

[12] For additional information, see RAIO Training module, *Cross-Cultural Communication*.

### Example

Proper: What did you do next? (looking at the interviewee)

Not proper: Ask her what she did next. (looking at the interpreter)

## 6.2   Explain the Interpreter's Role to the Interviewee

As noted above, the interview is an exchange of information between you and the interviewee, with the interpreter acting only as a conduit through which information is passed. You should explain this to the interviewee at the beginning of the interview when you explain the role of the interpreter. Tell the interviewee that although you do not speak the interviewee's language, you will still communicate with him or her during the interview, utilizing an interpreter. You should also explain to the interviewee that the interpreter has no influence upon the outcome of the case and that anything discussed during the interview will remain confidential. With a few exceptions, neither you nor the interpreter may disclose any aspect of the interview to anyone else.[13]

## 6.3   Make Sure the Interpreter's Physical Placement during the Interview is Appropriate

The presence of an interpreter at an interview can sometimes create a "distance" between you and the interviewee. It is your job to ensure that the interviewee understands that the interview is in effect an exchange of information between you and him or her. The physical placement of the interpreter during the interview can reduce this distance. The interpreter is a secondary participant, and should not sit between you and the interviewee. He or she may sit beside the interviewee or next to you. If you decide to have the interpreter sit next to you during the interview, maintain proper security measures by ensuring that the interpreter cannot view the computer screen (if you are using a computer), or any documents or handwritten notes.[14]

## 6.4   Have all Conversations between You and the Interpreter Interpreted to the Interviewee

If it is necessary to discuss an issue with the interpreter (e.g., the manner of interpretation), you should explain to the interviewee what you are discussing with the interpreter. That is, you should have the interpreter interpret for the interviewee what you said to the interpreter, and the interpreter's response, if any. This procedure should also be followed when necessary to discuss something with the representative, or anyone else present at the interview. This will avoid confusion about what the interpreter should interpret and will reinforce to the interpreter that the interviewee must be aware of all that

---

[13] For additional information on confidentiality provisions, see *Interpreter Ground Rules* above.

[14] For additional information on precautionary measures to take when taking notes during an interview, see RAIO Training module, *Interviewing – Note-Taking.*

transpires during the interview. Additionally, this keeps the interviewee informed at all times of what is occurring during the interview.

### 6.5     Be Conscious of Your Speech Patterns

Be aware of your particular speech patterns and consider how they may impact the interpretation during the interview. Ask yourself, "Do I speak quickly? Do I speak softly? Do I change thoughts in mid-sentence? Do I mumble? Do I frequently use idiomatic expressions?" Pay attention to the circumstances under which your speech patterns change (e.g. when confused, irritated, tired) and how they change. Once you have identified any speech patterns that may impede effective interpretation, you can work to avoid these patterns during the interview.

### 6.6     Choose Words Carefully and Avoid Idioms

You should be conscious of the language you use. Carefully choose words that have clear meanings and are easily understood. Certain idiomatic expressions used in English may be familiar only to native speakers of the language or to someone who has lived in the U.S for some time. For example, if you asked a refugee applicant, "Did you keep tabs on your family after you fled your village?" he or she may not understand what you mean, as "keeping tabs on" is an idiom that most likely would only be familiar to an English speaker in the U.S.

### 6.7     Avoid the Use of Certain Pronouns Whenever Possible

When speaking to the interviewee through an interpreter, avoid to the extent possible using certain pronouns. Questions such as "What did he do?" or "What did they do?" may seem clear to you, but the interpreter or interviewee may be using a different referent for "he" and "they." It is better to use words that denote relationships rather than certain pronouns (e.g., "What did your brother do?") or to refer to specific individuals by name or position (e.g., "What did the policeman do then?").[15]

Even though interpreters are advised to interpret using the same person as the officer and the interviewee (see the section above, *Advising the Interpreter of His or Her Role*), interpreters occasionally interpret the interviewee's statements into the third person referring to the interviewee – as well as anyone to whom the interviewee refers — as "he" or "she." If you and the interpreter use pronouns frequently during the interview, it can become confusing to the interviewee, as he or she may not understand who is being discussed.

Similarly, when terms such as "he" or "they" are used by the interviewee, clarify to whom the interviewee is referring. Simply ask, "When you said 'she,' who did you mean?"

---

[15] For additional information, see RAIO Training module, *Interviewing – Eliciting Testimony*.

*Example*

> Interviewee: He reported him, but he escaped before they caught him.

> You: When you say 'He reported him,' who do you mean?

## 6.8    Speak Clearly, and, When Necessary, Speak Slowly

You may find that, especially at the beginning of an interview, you need to adjust your rate of speech and enunciate more clearly than usual until the interpreter is somewhat familiar with the particular characteristics of your speech and accent. When speaking to an interviewee, you should not combine two words together in spoken American English, such as the following, as they may not be easily understood by the interpreter.

**Examples:**

| Avoid: | Say: |
|---|---|
| gonna | going to |
| wanna | want to |
| goin' | going |
| whaddaya | what do you |
| whad'ja | what did you |
| 'n' | and |

Think of the difficulty that non-native English speakers may have when trying to interpret the words listed above if they run together. Therefore, be conscious of your speech patterns and enunciate each word clearly.

## 6.9    Keep Questions Clear and Simple, Asking Specific Questions One at a Time

Avoid asking the interviewee several questions at once, such as: "Please tell me why you are abandoning your permanent resident status at this time and if you understand what the consequences of abandonment are." Ask one question at a time and allow the interviewee to completely respond before asking the next question.

## 6.10    Break Down What is Said at the Interview into Reasonable Amounts of Information

As noted in the section above, *Role of the Interpreter*, break down what you say into reasonable amounts of information to facilitate accurate interpretation. If the interviewee is giving lengthy responses, you can stop him or her at what appear to be natural pauses so the interviewee can give shorter statements that the interpreter can interpret more easily. Assure the interviewee that he or she will be allowed an opportunity to finish, and

then make sure you honor this assurance.[16] You should work with the interpreter to find the comfortable rhythm for him or her to interpret.

## 6.11 Repeat the Question/Statement Slowly or Rephrase it if the Interpreter does not Appear to Understand

Repeat the question/statement if the interpreter or interviewee does not appear to understand. Rephrase the question if, after repeating the question, the interpreter or interviewee still does not understand.

## 6.12 Provide Pen and Paper to the Interpreter if Necessary

Some interpreters are more effective in interpreting if they have a pen and paper they can use to jot down key terms said by the interviewee or the officer. Providing pen and paper to the interpreter may also be useful if you want a person's name, location, or other information spelled out for you during the interview. You should collect all interpreter notes after the interview and follow your division's procedures regarding proper placement and handling of interpreter notes.

## 6.13 Resolve all Communication Problems as Quickly as Possible

Periodically, particularly at the beginning of an interview, you should ask the interpreter if he or she has any difficulty understanding you, if you are speaking too quickly, or if you are saying too much at one time. An interpreter may state that he or she understands you when in fact this is not the case. Due to embarrassment, pride, loss of face, etc., the interpreter may be reluctant to admit that he or she cannot understand what you are saying. Therefore, as noted above, you must watch for signs that the interpreter may be having difficulty understanding and interpreting, and you must try to resolve any problems immediately.

If it appears that there is a problem in communication, speak to the interpreter and the interviewee immediately about what you perceive to be a problem. Ask the interviewee if he or she understands the interpreter and ask the interpreter if he or she understands both you and the interviewee.

To ascertain whether the interpreter has understood a question you asked the interviewee, ask the interpreter to repeat the question back to you in English. You can also ask the interpreter to repeat back to you in English what he or she said to the interviewee.

## 6.14 Remind the Interpreter of His or Her Role When Necessary

At times, the interpreter may forget his or her role during the interview. He or she may begin to condense what the interviewee says, engage in a lengthy discussion with the

---

[16] For additional information, see RAIO Training module, *Interviewing – Introduction to the Non-Adversarial Interview*.

interviewee when something is not clear, provide a lengthy explanation to contextualize an answer to help you understand the answer, etc. At such times, you need to tactfully remind the interpreter of his or her role and responsibilities, as noted above under *Advising the Interpreter of His or Her Role*.

## 6.15   Be Certain that all Parties Remain in the "Communication Loop"

When an interpreter is present, the interview involves an exchange of information among three people: in general, the interviewing officer asks questions, the interviewee provides responses, and the interpreter relays information between the officer and the interviewee. On occasion, the legal representative or other parties present at the interview may also participate in the process.

It is critical that throughout the interview, all parties present understand everything that is communicated – everyone needs to remain in the "communication loop." There may be times when you are tempted to stop using the interpreter, particularly if you have some fluency in the interviewee's language, or if the interviewee understands some English. You should avoid communicating in this way with the interviewee or any other person at the interview, however, without using the interpreter. All parties involved must understand all that transpires during the interview in order to perform their respective duties in the interview process.

## 7   CONCLUSION

Your responsibility is to ensure that everyone at the interview understands one another. Although you will encounter some interviewees who speak English well enough to proceed with the interview in English, most interviewees will need the assistance of an interpreter. Accurate interpretation is essential in any interview in which an interpreter is utilized. As the interviewing officer, you are responsible for ensuring that all participants at the interview, including the interpreter, understand their role in the interview process, and that the interpreter is utilized properly throughout the interview. You are also responsible for ensuring that all interactions during the interview are interpreted correctly to everyone present. To do so, pay attention to your speech patterns and modify them as appropriate, and watch for any factors impeding communication and take corrective action so miscommunication does not continue to occur. Your objective is to elicit the information you need from the interviewee in the most efficient manner while maintaining control of the interview in a manner that is conducive to communication.

## 8   SUMMARY

## 8.1   Identifying the Need for an Interpreter

### 8.1.1   The Language Ability of the Interviewee

- The individuals you interview will have a varying degree of English language proficiency.

- Whether you use an interpreter or not, it is always in the interviewee's best interest to conduct the interview in the language in which the interviewee can most fully express himself or herself.

- An interviewee should not be required to participate in an interview in a language other than the interviewee's primary language.

### 8.1.2   Interpreters Utilized for RAIO Interviews

- USCIS provides interpreters for some, but not all RAIO interviews.

- For refugee interviews, the interpreters are provided by the RSC, and sometimes by UNHCR.

- For affirmative asylum interviews, interviewees are required to provide their own interpreter; the quality of the interpretation is telephonically monitored by a professional interpreter.

- For credible fear and reasonable fear interviews, the Asylum Division utilizes professional interpreters via telephone.

- At USCIS offices overseas, USCIS employees, including Locally Engaged Staff (LES), may serve as interpreters when required.

- Please refer to adjudication-specific procedures and requirements regarding who can serve as an interpreter.

### 8.1.3   Conducting an Interview if You are Fluent in the Interviewee's Language

- If you are fluent in a language that the interviewee speaks, you may, in certain circumstances, conduct the interview in that language without utilizing an interpreter.

- Refer to your division's procedures for specific guidance on when you may conduct an interview in a language other than English.

### 8.1.4   Verifying the Identity of the Interpreter

- If you are required to verify the identity of the interpreter, this should be done at the beginning of the interview. You should:

  ➢ Request identification from all parties at the interview, including the interpreter.

  ➢ Make a copy of the identification collected from all parties at the interview to retain as a part of the record.

## 8.2     Role of the Interpreter and Interpreter Ground Rules

- At the beginning of the interview, explain the role of the interpreter and the role of each person who is present.

- During the interview, the interpreter should:

  - Keep all information discussed at the interview confidential—please see your division procedures for specific guidance.

  - Interpret verbatim (word for word) as much as possible.

  - Interpret the interviewee's responses to your questions even if the responses do not appear to answer your questions.

  - Inform you if he or she does not understand what you have said.

  - Inform you if he or she does not understand something the interviewee has said and needs to ask the interviewee for clarification.

  - Advise you or the interviewee if the length of a question or response makes it difficult for him or her to interpret.

  - Interpret all conversations that take place between you and him or her during the interview.

  - Advise you if the interviewee expresses any confusion about your question or statement

- During the interview, the interpreter should **_not_**:

  - Engage in private conversations with the interviewee.

  - Explain anything to the interviewee if the interviewee is confused or does not understand.

  - Condense or elaborate upon what you or the interviewee says.

  - Attempt to answer for the interviewee or explain what the interviewee says.

  - Begin the interview ahead of you.

  - Allow any interpersonal biases and opinions to affect the interpretations during an interview.

### 8.2.1   Interpreter's Oath

- The Adjudicator's Field Manual Section 15.7 requires that interpreters in a USCIS interview must be placed under oath.

- Please refer to your division's procedures for placing an interpreter under oath.

## 8.3    Competency of the Interpreter

- If you think the interpreter is not competent, it is best to make this determination as early as possible during the interview.

### 8.3.1    Signs of Misinterpretation during the Interview

- You must be continually alert throughout the interview for signs of miscommunication, which include, but are not limited to:

  - Interviewee's response does not answer the question, or only partially answers a question

  - Words that you recognize without interpretation (ex. proper names or English words) are not interpreted

  - Interpreter uses many more words to interpret a question or response than appear to have been required

  - Interpreter uses very few words to interpret a lengthy question or response

  - Back-and-forth dialog between the interpreter and interviewee occurs without explanation from the interpreter

  - Interviewee indicates non-verbally that he or she is confused or doesn't understand

- You should also determine the interpreter is incompetent if you encounter any these circumstances:

  - The interpreter is not sufficiently competent in English and/or the interviewee's language and is not able to accurately interpret during the interview

  - You have good reason to believe that the interpreter is providing answers to the interviewee, altering or embellishing answers, or changing the questions you ask, and in working with the interpreter, you are not able to resolve these issues

- If you determine that the interpreter is not competent, stop the interview and follow division-specific procedures or guidance.

## 8.4    Factors that May Affect the Accuracy of Interpretation at the Interview

- Many factors may affect the accuracy of interpretation during an interview, including:

➢ Interpreters may not be professionally trained

➢ The interpreter and the interviewee may not have met prior to the interview

➢ The interpreter may not be sufficiently competent in English

➢ The difficulties inherent in interpreting from one language to another

➢ The interviewee or the interpreter may be communicating through a second language rather than a native language

➢ The interviewee and the interpreter may speak different versions of the same language

➢ There may be cultural factors present that influence the interpretation

➢ The interpreter's personal opinions or biases may influence the interpretation

## 8.5    Ways to Facilitate Interpretation through an Interpreter

• There are a number of ways in which you can facilitate the interpretation during an interview, such as:

➢ Address the interviewee directly and maintain eye contact

➢ Explain the interpreter's role to the interviewee

➢ Make sure the interpreter's physical placement during the interview is appropriate

➢ Have all conversations between you and the interpreter interpreted for the interviewee

➢ Be conscious of your speech patterns

➢ Choose your words carefully and avoid the use of idioms

➢ Avoid the use of pronouns whenever possible

➢ Speak clearly, and when necessary, speak slowly

➢ Keep your questions clear and simple, and ask questions one at a time

➢ Break down what you say during the interview into reasonable amounts of information

➢ Repeat the question/statement slowly or rephrase it if the interpreter does not appear to understand

➢ Resolve all communication problems as quickly as possible

➢ Remind the interpreter of his or her role when necessary

➢ Be certain that all parties remain in the "communication loop"

## PRACTICAL EXERCISES

There are no student materials for Practical Exercises 1 – 10.

Please note that there are a number of potential practical exercises, but not all will be used. Your instructor has discretion to choose the practical exercises that will suit the needs of the class.

---

### Practical Exercise # 11

- **Title**: *Foo Chow, Not Mandarin*

- **Student Materials:**

  *He v. Ashcroft*, 328 F.3d 593 (9th Cir. 2003)

---

## OTHER MATERIALS

### Other Materials – 1

**Adjudicator's Field Manual**

**15.7 Use of Interpreters**

Following are guidelines for interviews requiring the use of interpreters:

- If the person being questioned exhibits difficulty in speaking and understanding English, arrangements should be made for use of an interpreter even though the person may be willing to proceed without an interpreter. Any doubt should be resolved in favor of the use of an interpreter.

- Ideally, the services of a disinterested person should be employed as an interpreter. However, in the exercise of judgment, a witness, friend, or relative of the subject may be utilized as an interpreter, depending upon the issues involved and the possibility of adverse action against the subject.

- If the interpreter used is an employee of USCIS or DHS, he or she need not be sworn. He or she should, however, be identified for the record.

- If the interpreter is not a USCIS or DHS employee, he or she should be identified and questioned as to his ability to speak and translate into English the language of the person being questioned, and vice versa. Also, he or she should be placed under oath to interpret and translate all questions and answers accurately and literally.

The interpreter's oath should be administered as follows:

> "Do you solemnly swear (or affirm) that in connection with this proceedings you will truthfully, literally, and fully translate the questions asked by me into the _____ language and that you will truthfully, literally, and fully translate answers to such questions into the English language?"

If a verbatim record is made, the oath should be shown in the record.

- The subject's attorney or representative should not be utilized as an interpreter in his client's behalf although under some circumstances an

exception to this may be made if the interests of the Government will not be prejudiced.

- The record should show that the interpreter and the person being questioned have conversed in the latter's language and that they understand each other. This is especially important when questioning persons whose native language has many dialects, such as Chinese. The record should also indicate what language and dialect is being used in the questioning.

- The subject should be informed at the beginning of the questioning that he should advise the adjudicator if he fails to understand the interpreter.

- It is desirable in taking a verbatim record in a complex case to check from time to time to ensure that the interpreter and the person being questioned understand each other. Such checks should be noted in the record.

- In using an interpreter it is imperative that the adjudicator instruct the interpreter in his or her duties.

- It is essential that the interpreter be strictly limited to furnishing verbatim interpretations. For example, if the subject answers, "I don't understand the question", the answer is to be given by the interpreter. Under no circumstances is the interpreter to attempt an explanation of his own. The interpreter must understand that he or she acts only as a voice, nothing else. Constant guard is needed to overcome the natural impulse of an interpreter to attempt to explain or clear up questions asked. The adjudicator will lose control of the situation and be unaware of what is transpiring unless he or she insists that the interpreter repeat verbatim the answer the subject makes. If any explanation is required, it is the function of the adjudicator and not of the interpreter to rephrase or change the question. In this manner the adjudicator knows exactly what is being adduced and is not being given a summary by the interpreter of what the witness says. The interpreter should never be permitted to say, "He says". He or she is to repeat by translation into the appropriate language the exact question or answer as it was expressed initially.

- The adjudicator should not permit conversations or explanations, and should not accept a reply such as "He says, 'No'" after a lengthy conversation between the interpreter and the subject.

The interviewer must remain alert to the possibility that shades of meaning may be missed.

USCIS Adjudicator's Field Manual, Section 15.7 "Use of Interpreters" (Rev. March 5, 2010).

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

1. USCIS Refugee Affairs Division, *Standard Operating Procedure: Working with an Interpreter*, October 2017.

2. USCIS Refugee Affairs Division, Section III of *Standard Operating Procedure: Introduction*, July 2017.

3. Memorandum from Barbara L. Strack, Chief, USCIS Refugee Affairs Division, and Joanna Ruppel, Chief, USCIS International Operations Division, to Refugee Affairs Division, Overseas Staff, *Information Consent Form For Use in Refugee Interviews*, (120/6), June 17, 2009.

### ADDITIONAL RESOURCES

None

### SUPPLEMENTS

---

**International and Refugee Adjudications Supplement – 1**

**2.2 Interpreters Utilized for RAIO Interviews**

IRAD field guidance regarding the use of an interpreter during I-730 interviews indicates:

> Subject to local field office policy, the beneficiary may be required to bring his or her own interpreter. In posts that will not allow anyone other than the beneficiary into the interviewing facility, interpreters may be provided by the OPE or other Embassy-endorsed organization. As noted, USCIS LES staff may serve as interpreters when required.

Overseas Processing of Asylee and Refugee Derivatives: Form I-730 Beneficiaries ("Visas 92/93"), Version 1.0, September 30, 2010.

---

---

**International and Refugee Adjudications Supplement – 2**

**2.3 Conducting an Interview if You are Fluent in the Interviewee's Language**

Currently, IRAD has no written policy governing its overseas officers interviewing in a language other than English. Officers should refer to local office procedures.

---

**International and Refugee Adjudications Supplement – 3**

**2.4 Verifying the Identity of the Interpreter**

Refer to local office procedures.

---

**International and Refugee Adjudications Supplement – 4**

**3.2 Advising the Interpreter of His or Her Role**

**Interpreter Ground Rules # 1:** *Keep all information discussed by all parties at a USCIS interview confidential*

International and Refugee Affairs Division procedures provide the following guidance on privacy and confidentiality requirements for overseas case processing:

> Confidentiality issues mandated in 8 CFR § 208.6 apply to the beneficiaries of I-730 petitions, whether they are following-to-join asylees or refugees. (*See* Appendix L, *Asylum Confidentiality Memos*: Joseph E. Langlois, *Fact Sheet on Confidentiality*, Memorandum to Asylum Office Directors and Deputy Directors, June 15, 2005, plus attachments; and Cooper, Bo., INS Office of the General Counsel, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information,* Memorandum to Jeffrey Weiss, Director, Office of International Affairs, June 21, 2001).

> Asylum information is protected from disclosure to a third party, including a beneficiary of an approved Form I-730. The confidentiality

regulations governing asylum applications are equally applied to refugee applications as a matter of policy. While information contained within the petitioner's asylum or refugee case records may provide the interviewer with pertinent questions, *the interviewing officer must exercise caution in revealing protected information contained in the petitioner's refugee or asylee case record.* (*See* Section III.B, *Confidentiality Issues*, for further guidance).

Each officer conducting Visas 92/93 interviews must, to the maximum extent possible given office limitations, provide suitable interviewing space that allows for privacy.

Overseas Processing of Asylee and Refugee Derivatives: Form I-730 (V92/93)-Section I(H): Privacy/Confidentiality, Version 1.0, September 30, 2010.

---

**International and Refugee Adjudications Supplement – 5**

**3.3 Interpreter's Oath**

International and Refugee Affairs Division field guidance regarding interpreter oaths for overseas case processing indicates:

**ii. Interpreter**

The officer must also place the interpreter under oath, including LES or OPE staff serving as interpreters. They are similarly bound to the confidentiality provisions associated with Visas 92/93 cases. Before proceeding with the interview, the officer should ensure that the interpreter answers affirmatively the following questions:

- Are you here today at the request of [beneficiary being interviewed]?

- Do you speak and understand both English and the [language spoken by the beneficiary] fluently and know from talking with [the beneficiary] that you understand each other?

- Do you solemnly swear/affirm to truthfully, literally and fully interpret the questions asked by me and the answers given by [the beneficiary]?

- Do you understand that you must translate every word as precisely as possible and not summarize, paraphrase, reduce, expand, or change the content of [beneficiary's name]'s testimony to me?

- Do you understand that DHS may choose to collect, retain, and verify the identity information you have provided?

- Do you understand that you must keep all information discussed during this interview confidential?

Overseas Processing of Asylee and Refugee Derivatives: Form I-730 (V92/93), Section III(C)(3)(c)(ii): "Interpreter," Version 1.0, September 30, 2010.

**International and Refugee Adjudications Supplement – 7**

**4.4. What to Do Once You Have Stopped the Interview Due to the Interpreter's Incompetency or if the Interpreter is Not Available**

Refer to local office procedures.

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

1. USCIS Refugee, Asylum, and International Operations Directorate, Asylum Division, *Affirmative Asylum Procedures Manual* (AAPM), Section II.J.

2. Memorandum from Joseph E. Langlois, Chief, USCIS Asylum Division, to Asylum Office Directors, et al., *Award of Interpreter Services Contracts and Guidance on Use of Interpreter Services* (HQRAIO 140/12) (23 May 2011).

3. Memorandum from John Lafferty, Chief, USCIS Asylum Division, to All Asylum Division Staff, *Updated Procedures on Working with Interpreters in Affirmative Asylum Interviews* (HQRAIO 120/12a) (14 June 2019).

### ADDITIONAL RESOURCES

None

### SUPPLEMENTS

> #### Asylum Adjudications Supplement – 1
>
> #### 2.1 Language Ability of the Interviewee
>
> **8 CFR § 208.9(g):**
>
> An applicant unable to proceed with the interview in English must provide, at no expense to the Service, a competent interpreter fluent in both English and the applicant's native language or any other language in which the applicant is fluent. The interpreter must be at least 18 years of age. Neither the applicant's attorney or representative of record, a witness testifying on the applicant's behalf, nor a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence, may serve as the applicant's interpreter. Failure without good cause to comply with this paragraph may be considered a failure to appear for the interview for purposes of § 208.10.

**Asylum Adjudications Supplement – 2**

**2.2 Interpreter Used for Asylum Interviews**

An interpreter in the Asylum Division must meet the following qualifications:

- Must be fluent in both English and a language in which the applicant is fluent;

- Must be 18 years of age;

- Must not be the applicant's attorney or representative, or a witness testifying on behalf of the applicant (an employee of the attorney, such as a paralegal, may serve as the interpreter);

- Must not be a representative or employee of the applicant's country of nationality, or if stateless, country of last habitual residence; and

- Must not be an individual with a pending asylum application.

There are no other regular requirements regarding who can serve as an interpreter. The immigration status of the interpreter is not a bar nor is the interpreter's relationship to the applicant (the interpreter may be a family member), as long as the interpreter meets the requirements listed above.

Please note that there are fewer requirements for interpreters in ABC/NACARA interviews.

For ABC/NACARA case interpreters, the interpreter:

- May be under age 18 and

- May be a country representative or employee.

For additional information, see *American Baptist Churches (ABC) Settlement Agreement* and the Asylum Division Lesson Plan, *Suspension of Deportation and Special Rule Cancellation of Removal under NACARA*.

**Asylum Adjudications Supplement – 3**

**2.3 Conducting an Interview if You are Fluent in the Interviewee's Language**

*Conducting an Interview in a Language Other than English*

Each asylum office has a local policy on whether an officer may conduct an asylum interview in a language other than English in accordance with the below guidance. If the local policy allows an officer to conduct interviews in a language other than English, the officer must be certified by the Department of State (DOS).

An applicant who is not fluent in English is required to bring an interpreter with him/her to the asylum interview. Depending upon local policy and with the asylum applicant's approval, an officer who has been certified by the Department of State can either conduct the interview in the applicant's language, if the applicant agrees, or use the services of the interpreter. The officer must make a clear notation in the interview notes that the interview was conducted in a language other than English and indicate the language used by the officer. If the officer conducts an interview in the applicant's language, it is preferable that a competent interpreter be present during the interview to monitor the level of understanding between the officer and applicant.

Because 8 CFR § 208.9(g) requires an applicant who is not competent in English to bring an interpreter to an asylum interview, as a general rule, asylum applicants are required to bring interpreters regardless of whether there are asylum office personnel available to conduct interviews in languages other than English. Nevertheless, the asylum office Director maintains the discretion to allow qualified asylum office personnel to conduct or assist in the conducting of an interview in the applicant's preferred language, with the applicant's consent, if there are extraordinary circumstances for doing so, such as (but not limited to) the disqualification of an interpreter through no fault of the applicant combined with the applicant's having traveled a very long distance for the interview, etc.

See *Affirmative Asylum Procedures Manual*, Section II.J.11, "Conducting an Interview in a Language Other than English."

---

### Asylum Adjudications Supplement – 4

#### 2.4 Verifying the Identity of the Interpreter

**8 CFR § 208.9(c):**

The officer shall have authority to administer oaths, verify the identity of the applicant (including through the use of electronic means), verify the identity of any interpreter, present and receive evidence, and question the applicant and any witnesses.

**Affirmative Asylum Procedures Manual, Section II.J.4.a.iii:**

Like asylum applicants, interpreters are not required to present identity documents in order to interpret for an asylum applicant. Regulations give an officer the authority to verify the identity of the interpreter, which is best accomplished through the review of identity documents. However, an officer may not terminate or reschedule an interview if the interpreter is lacking identity documents, or presents identity documents that the officer does not wish to accept. Local asylum office policy dictates whether an officer should photocopy any identity documents of an interpreter, or whether the officer should indicate on the *Record of Applicant and Interpreter Oaths* the type of identity documents, if any, the interpreter provided. Officers must base an individual's ability to interpret on interpretation skills and not on questions of identity.

There may be instances where an officer believes that the issue of an individual's identity is material to his/her ability to interpret. The officer must consult with his or her supervisor in these circumstances. Only the Asylum Office Director or his/her designee has the authority to dismiss/bar an individual from interpreting in an office.

See *Affirmative Asylum Procedures Manual*, Section II.J.4.a.iii, "Identity."

---

## Asylum Adjudications Supplement – 5

### 3.2 Advising the Interpreter of His or Her Role

**Interpreter Ground Rules # 1:** *Keep all information discussed by all parties at a USCIS interview confidential*

Officers must inform applicants of the confidential nature of the interview. Regulations prohibit disclosure of information pertaining to an alien's application for asylum, without the written consent of the applicant. Some information may be given to some other government officials; however, they are required to keep this information confidential. Even the fact that an applicant has applied for asylum is confidential.

See 8 C.F.R. § 208.6 and Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, INS Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, (HQCOU 120/12.8) (21 June 2001).

**Confidentiality Requirements**

When information contained in or pertaining to an asylum application is disclosed to a DOS employee, the USCIS or DHS officer must inform the DOS employee of the confidentiality requirements of 8 C.F.R. § 208.6. Confidentiality requirements

for asylum applications and the Department of State are discussed in more detail in Memorandum from Bo Cooper, INS Office of the General Counsel, to Jeffrey Weiss, Director, INS Office of International Affairs, *Confidentiality of Asylum Applications and Overseas Verification of Documents and Application Information*, (HQCOU 120/12.8) (21 June 2001), and in Memorandum from Joseph E. Langlois, Director, Asylum Division, to Asylum Office Directors and Deputy Directors, *Fact Sheet on Confidentiality*, (HQASM 120/12.8) (15 June 2005), including the attached fact sheet, *Federal Regulations Protecting the Confidentiality of Asylum Applicants*. See also 8 C.F.R. § 208.6(b).

Officers should be familiar with exceptions to the confidentiality procedures as provided by regulation (information on asylum applicants can be disclosed to other federal entities and state and local governments when there is an action arising out of the asylum adjudication (8 C.F.R. § 208.6(c)) and explained in Asylum Division policy.

### Asylum Adjudications Supplement – 6

### 3.3. Interpreter's Oath

The interpreter must fill out an Interpreter's Oath form (sworn statement) at the beginning of the interview. The officer must explain the meaning of this document to the interpreter and have the interpreter explain the meaning of the document to the applicant.

By signing the interpreter's oath form, the interpreter swears to "truthfully, literally, and fully interpret the questions asked by the officer and the answers given by the applicant." Should a concern arise that an interpreter is not fulfilling that oath, the officer should follow procedures set out in the *Affirmative Asylum Procedures Manual*, Section II.J.a.vi, "Inability to Perform, or Abuse of, the Interpreter's Role."

See also *Affirmative Asylum Procedures Manual* for a copy of the Interpreter's Oath.

**Asylum Adjudications Supplement – 7**

**3.3. Interpreter Monitor's Oath**

At the beginning of the interview, the officer explains to the applicant, through the applicant's interpreter, that a contract interpreter will be monitoring the interview to ensure the accuracy of interpretation by the applicant's interpreter. The officer should also remind the contract interpreter, in the presence of the applicant, of the confidentiality requirements of the interview and should inform the applicant that the interpreter has pledged to keep any and all information the applicant provides during the interview confidential. See *Affirmative Asylum Procedures Manual*, Section II.J.4.b.iv, "Role of the Contract Interpreter when Acting As Monitor."

The officer will administer an oath to the interpreter monitor in which he or she will swear or affirm:

- to immediately report to the officer any errors in interpretation;

- to notify the officer if he or she is unable to monitor in a neutral manner due to bias against the applicant because of race, religion, nationality, membership in a particular social group, or political opinion; and

- that he or she understands the matters discussed during the interview are confidential.

The officer's notes must reflect that the oath was administered to the interpreter monitor.

Should concerns arise that the interpreter monitor is not fulfilling the oath, the officer should follow the procedures set out in the *Affirmative Asylum Procedures Manual,* as well as any local asylum office procedures that may apply. *Affirmative Asylum Procedures Manual*, Section II.J.4.b.iv, "Role of the Contract Interpreter when Acting As Monitor," and *Affirmative Asylum Procedures Manual*, Section II.J.4.b.v.(a), "Introduction and Orientation."

For further information on procedural requirements pertaining to the use of interpreter monitors in Asylum interviews, including the oath requirement, refer to *Affirmative Asylum Procedures Manual*, Section II.J.4.b.v.(a), "Introduction and Orientation" and any additional local asylum office procedures that may apply.

**Asylum Adjudications Supplement – 8**

## 4.3 Determining the Interpreter's Competency

If the interpreter monitor frequently corrects the interpretation provided by the applicant's interpreter, this *may* be an indication that the primary interpreter is not competent to interpret at the interview or is abusing his or her role. However, the officer must verify that the interpreter monitor understands that his or her monitoring role is not to call attention to minor mistranslations that do not affect the applicant's meaning, but to alert the officer if the primary interpreter fails to provide adequate, accurate, and neutral interpretation. "If the interpreter monitor frequently interjects, the officer must determine whether frequent interjections occur because the applicant's interpreter has abused his or her role, or whether the contract interpreter misunderstands his or her role as a monitor, and take appropriate action." See *Affirmative Asylum Procedures Manual*, Section II.J.4.b.iv, "Role of the Contract Interpreter when Acting as Monitor."

Despite the use of an interpreter monitor, the officer retains the duty of determining the primary interpreter's competency. The officer may rely on information given by the interpreter monitor to arrive at a decision regarding the primary interpreter's competency; however, this duty cannot be delegated to the interpreter monitor.

See also Memorandum from Joseph E. **Langlois, Chief, Asylum Division, to** Asylum Office Directors, et al., *Award of Interpreter Services Contracts and Guidance on Use of Interpreter Services*, (HQRAIO 140/12) (24 February 2010).

## Asylum Adjudications Supplement – 9

### 4.4. What to Do Once You Have Stopped the Interview Due to the Interpreter's Incompetence, Misconduct, or if a Contract Interpreter is Not Available

Problems with Applicant's Interpreter

An officer may believe that a particular interpreter is unable to perform the role of interpreter or is abusing his or her role as an interpreter because the interpreter has engaged in misrepresentation, is incompetent, or has engaged in other improper conduct. See *Affirmative Asylum Procedures Manual*, Section II.J.4.a.vi, "Inability to Perform, or Abuse of, the Interpreter's Role."

If any of the scenarios in Section II.J.4.a.vi applies, and it is appropriate to do so, the officer or supervisory asylum office personnel may inform the interpreter of the problem and ask the interpreter to correct the behavior. If the behavior continues or the applicant brings a prohibited interpreter, the appropriate asylum office personnel will take action based on the scenario.

In cases related to misrepresentation, fraud, other improper conduct on the part of the applicant's interpreter or a prohibited interpreter (unless the interpreter is the applicant's attorney or accredited representative), office personnel will dismiss the applicant's interpreter from the interview and immediately attempt to secure a contract interpreter to provide direct interpretation.

In the case of incompetence on the part of the applicant's interpreter, office personnel will immediately attempt to secure a contract interpreter to provide direct interpretation. If a contract interpreter provides direct interpretation for the interview, the applicant's interpreter may remain in the interview room, and may, in the discretion of the officer, help facilitate communication as needed.

If there is no contract interpreter available to provide direct interpretation or the applicant declines the use of a contract interpreter, asylum office personnel will:

- Terminate or cancel the interview with supervisor approval;

- Explain to all parties (the applicant, interpreter, and representative) the reason for the termination or cancellation of the interview;

- Explain to all parties that the applicant will be rescheduled only once and that the applicant must reappear with a different interpreter who is competent, not prohibited from interpreting, and who has not previously been found to have abused his or her role as an interpreter;

- Complete a Rescheduling of Asylum Interview – Interpretation Problems (Appendix 7) form, providing the original to the applicant and maintaining a copy in the file. Attach copies of any identity documents submitted by the interpreter to the file copy of the letter;

- Explain to all parties that a copy of the letter will be submitted to asylum office management, which may result in the interpreter being barred from the office; and

- Reschedule the interview in Global, indicating the rescheduling is caused by the applicant.

### APPLICANTS WITHOUT INTERPRETERS

Stopping the Interview

If the applicant has not provided an interpreter and the officer determines that the applicant does not understand the questions and/or cannot express the claim, the officer must stop the interview. There may be times when the applicant wishes to proceed in English even though his or her English is not proficient enough. Due to

the potential for misunderstandings, however, the officer must terminate the interview if he or she determines there are difficulties in communication.

Rescheduling the Interview

At the officer's discretion and in consultation with a supervisor, the officer may reschedule the interview so that the applicant can return with an interpreter. See *Affirmative Asylum Procedures Manual*, Section II.J.4.a.vi, "Inability to Perform, or Abuse of, the Interpreter's Role."

An applicant's failure without good cause to provide a competent interpreter may result in ineligibility for employment authorization. Therefore, all applicants should be given a second chance to provide a competent interpreter if he or she has failed to bring an interpreter, or if the interview is terminated due to problems with an applicant's interpreter and inability to secure a contract interpreter. However, the interview can only be rescheduled once and the applicant must bring a different, competent interpreter to the rescheduled interview. In order to discourage solicitation at Asylum Offices, applicants should not be permitted to return to the waiting room to seek alternate interpreters. See 8 C.F.R. §§ 208.7(a)(4), 208.9(g), 208.10.

Written Notice

If an applicant does not provide an interpreter, the Asylum Office must give the applicant written notice explaining the consequences of failing to bring a competent interpreter. This must be given to all non-*Mendez* and non-*ABC* asylum applicants who appear without a competent interpreter. (There are certain provisions regarding interpreters for *Mendez* and *ABC* applicants that do not apply with other asylum applicants.)

Similarly, if an affirmative asylum interview is rescheduled due to interpreter problems, the officer must complete the form, *Rescheduling of Asylum Interview – Interpretation Problems. Affirmative Asylum Procedures Manual*. Note: There is a special notice for *ABC* applicants.

The "CLOCK"

For purposes of work authorization, if the asylum application was filed on or after January 4, 1995, the 150-day processing "clock" will be tolled (stopped) between the dates of the first scheduled interview and the rescheduled interview.

# Mexico 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Mexico during the year.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious government corruption; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, child, early, and forced marriage, femicide, and other forms of such violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant or systematic restrictions on workers' freedom of association, including crimes of violence and intimidation against workers.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
STB_AR1_003183

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
https:www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:**  There were numerous instances of armed groups limiting the movements of migrants, including by threats and acts of kidnapping, extortion, and homicide.  Criminal groups dominated migrant smuggling operations and often kidnapped, threatened, and extorted migrants to pay a fee for facilitating northbound travel.  On August 17, international organizations in Ciudad Juárez reported an increase in extortion and kidnappings by smugglers.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, and other persons of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
STB_AR1_003207



[Skip to main content](#)

An official website of the United States government

Here's how you know

| Here's how you know |



Language

[Sign in with Login.gov](#)



| Menu |

| ✕ | [Sign in with Login.gov](#)

- [What is Login.gov?](#)
- [Who uses Login.gov?](#)
- [Create an account](#)
- [Help center](#)

[Contact us](#)

Search                                          | Search |

🌐 Language

- [English](#)
- [Español](#)
- [Français](#)
- [中文 (简体)](#)

# The public's one account for government.

Use one account and password for secure, private access to participating government agencies.

# Login.gov is for you

## Individuals

Use one account for secure, private access to participating government agencies.

[Learn about Login.gov](#)

## Agency partners

STB_AR1_003283

Protect your users' information with the highest standards of digital security and user experience. Login.gov handles software development, security operations, and customer support so you don't have to.

[Become a partner](#)

## Agency developers

Developer resources, real-time support and modern tools to help you implement and deploy your application with Login.gov

[See developer guide](#)
Your one account for government

[Learn how to create an account](#)

 **LOGIN.GOV**

## For agencies

- [Become a partner](#)
- [Developer guide](#)

## Learn

- [About us](#)
- [Accessibility statement](#)
- [Join us](#)
- [Privacy & security](#)

## Support

- [Contact us](#)
- [Help center](#)

[Login.gov system status](#)



Login.gov

An official website of the [General Services Administration](#)

- [About GSA](#)
- [Accessibility support](#)
- [FOIA requests](#)
- [No FEAR Act data](#)
- [Office of the Inspector General](#)
- [Performance reports](#)
- [Privacy policy](#)

Looking for U.S. government information and services?

STB_AR1_003284

Visit USA.gov

STB_AR1_003285

Which language would you like to use this site in?          CLOSE

ENGLISH          ESPAÑOL          FRANÇAIS          العربية



Photo © Gary Coronado / Los Angeles Times via Getty Images

May 9, 2024

## CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States

The mandatory use of the CBP One mobile application as the sole means of seeking asylum in the United States is a clear violation of international human rights and refugee law, said Amnesty International in a new report published today.

STB_AR1_004406

The report, _USA: CBP One – A blessing or a trap?_, documents the human rights concerns associated with the mobile app and sheds light on the implications of the Circumvention of Lawful Pathways Final Rule, more commonly known as the Asylum Ban, introduced by the Biden Administration on 11 May 2023.

The Asylum Ban imposes severe restrictions on asylum seekers entering the United States from Mexico at the southern border, denying human rights and violating international law. Amnesty International considers that the Final Rule violates the right to seek asylum, as well as the principles of _non-refoulement_ and non-penalization. Under this rule, individuals are required to use the CBP One application to schedule appointments at ports of entry in order to be considered eligible for asylum, adding layers of complexity and obstacles to an already challenging process.

"The use of the CBP One application conditions entry and access to asylum on appearing at a port of entry with a prior appointment, which is not feasible for some people," said Ana Piquer, Americas director at Amnesty International. "While technological innovations could potentially provide for safe transit and more orderly border processes, programmes like CBP One cannot condition and limit the manner to seek international protection in the United States."

## "

# The use of the CBP One application conditions entry and access to asylum on appearing at a port of entry with a prior appointment, which is not feasible for some people.

**Ana Piquer, Americas Director at Amnesty International**

Amnesty International's report documents the significant hurdles faced by asylum seekers in using the CBP One application, including technological barriers, language and literacy limitations, misinformation and the arbitrary nature of appointment allocation. The CBP One application, available only in English,

STB_AR1_004407

10/15/24, 2:14 PM                  CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States - Amnesty International

Case 1:24-cv-01702-RC   Document 69   Filed 01/10/25   Page 814 of 1203

Spanish, and Haitian Creole, operates on a system where daily appointments are mainly distributed at random, leading to inconsistent experiences among asylum seekers, leaving them in uncertainty and at risk.

"The CBP One application turns the legal right to asylum into a lottery system based on chance." said Paul O'Brien, Executive Director of Amnesty International USA. "Asylum seekers may never be provided with safety and protection in the United States simply because they may never receive an appointment."  Moreover, the application's mandatory use of facial recognition and GPS tracking raises serious concerns about privacy, surveillance, and potential discrimination, further complicating the asylum-seeking process. An analysis of the CBP One application by Amnesty International's Security Lab found that device information and identifiers are sent to Google's Firebase service, functionality that is not disclosed to users.

## "

# The CBP One application turns the legal right to asylum into a lottery system based on chance.

### Paul O'Brien, Executive Director of Amnesty International USA

The report also outlines the dire situation faced by those seeking asylum waiting in Mexico for CBP One appointments. According to the findings, Mexico has become increasingly dangerous for people seeking asylum who are often extorted, kidnapped and experience discrimination and sexual and gender-based violence by both state and non-state actors.

In one testimony to Amnesty International, a Venezuelan woman seeking asylum in the United States described the harsh conditions of waiting in Mexico until her appointment:

"We were kidnapped for three days and then released. We were blindfolded and they beat us several times. We were taken off the buses several times and were forced to pay. We were sold tickets at double the price. So many things happened

STB_ART_004408

10/15/24, 2:14 PM
Case 1:24-cv-01702-RC Document 69 Filed 01/10/25 Page 815 of 1203
CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States - Amnesty International

to us that make you want to cry. If we don't get the appointment quickly, we'll throw ourselves into the river."

## We were kidnapped for three days and then released. We were blindfolded and they beat us several times.

**Venezuelan woman seeking asylum in the United States**

In another testimony to Amnesty International, a Mexican woman seeking asylum waited months for her appointment to arrive:

"I've been trying to get the appointment for three months. I thought that the appointments were going in order. It's maddening. I'm distraught with the situation. Someone tried to kill me. I don't want to leave my Mexico, but I can't stay."

## It's maddening. I'm distraught with the situation. Someone tried to kill me.

**Mexican woman seeking asylum in the United States**

"The situation faced by asylum seekers in Mexico is severe, with many experiencing violence and discrimination on a daily basis," said Edith Olivares Ferreto, Executive Director of Amnesty International Mexico. "Forced to wait in limbo for undetermined amounts of time, people seeking safety are left vulnerable to further harm and violations of their rights."

STB_AR1_004409

Case 1:24-cv-01702-RC    Document 60    Filed 01/10/25    Page 816 of 1203

# Forced to wait in limbo for undetermined amounts of time, people seeking safety are left vulnerable to further harm and violations of their rights.

**Edith Olivares Ferreto, Executive Director of Amnesty International Mexico.**

With increasing wait times and uncertainty about appointment allocation, many asylum seekers are forced to make perilous decisions to cross into the United States without appointments, putting their lives at risk and potentially being ineligible for asylum because of the Asylum Ban.

"The United States has a moral and legal obligation to protect all people who seek safety in our country," said Amy Fischer, Director for Refugee and Migrant Rights at Amnesty International USA. "The Biden administration cannot continue down this path and must live up to our country's promise as a welcoming nation for all."

## "

# The United States has a moral and legal obligation to protect all people who seek safety in our country.

**Amy Fischer, Director for Refugee and Migrant Rights at Amnesty International USA**

Amnesty International calls on the United States to immediately cease implementation of its Asylum Ban and stop the mandatory use of the CBP One application, both of which are violations of international human rights law and refugee law. The United States must ensure access to fair and individualized asylum procedures without discrimination based on migration status.

Amnesty International urges the Mexican government to protect the rights of asylum seekers in transit, including ensuring access to US ports of entry and implementing measures to address violence and discrimination against asylum seekers within its borders.

STB_AR1_004410

CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States - Amnesty International

For more information or to request an interview, please contact:

- Amnesty International Americas Regional Office, <u>press@amnesty.org</u>
- Amnesty International USA, <u>media@aiusa.org</u>

---

NEWS       AMERICAS       CENTRAL AMERICA AND THE CARIBBEAN       HAITI       MEXICO       NORTH AMERICA

UNITED STATES OF AMERICA       PRESS RELEASE       ASYLUM       MIGRANTS       REFUGEES

---

# Related Content

**COUNTRY**
## Haiti

NEWS

**President Luis Abinader's second mandate must prioritize respect for human rights and put an end to racist migration policies**

STB_AR1_004411

Case 1:24-cv-01702-RC   Document 60   Filed 01/10/25   Page 818 of 1203

NEWS

## Denials of racism do not exempt the Dominican government from its human rights responsibilities

NEWS

## Kenya: High Court to decide jurisdiction status in landmark Meta case

NEWS

## Global: Abortion rights defenders facing violence and stigmatization share powerful stories as part of Amnesty's new podcast

STB_AR1_004412

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 819 of 1203



ABOUT US     PROGRAMS     ANALYSIS     THEMES     NEWS     GET INVOLVED     **DONATE**



📖 **4 APR 2024 | PUBLICATION**

*Photo: Sergio Borbolla*

# Kidnapping of Migrants and Asylum Seekers at the Texas-Tamaulipas Border Reaches Intolerable Levels

by **Ana Lucia Verduzco** and **Stephanie Brewer**

*Content warning: This feature discusses sensitive topics including sexual violence and other forms of abuse.*

"Kidnappings were always known, but they were not as normal as they are now," a religious worker told us about the migrant population they work with. "They're dragging people out of their tents at night, they're taking entire families," added the director of a humanitarian group. "Every woman we work with has been raped,"

**SHARE**     **TWEET**

**SIGN UP TO GET THE LATEST ON ANALYSIS & POLICY**



STB_AR1_004413

8/18/24, 3:34 PM    Kidnapping of Migrants and Asylum Seekers at the Texas-Tamaulipas Border Reaches Intolerable Levels - WOLA

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 820 of 1203



ABOUT US    PROGRAMS    ANALYSIS    THEMES    NEWS    GET INVOLVED    **DONATE**

Asylum seekers can either:

1. Secure an appointment at a port of entry using the CBP One smartphone app, with all the accompanying technological hurdles. This requires being in Mexico City or farther north, where they will wait for up to six months for an appointment at the border.

2. Approach a port of entry to ask for asylum as one of a few daily "walkups", if they are able to get past Mexican immigration authorities

3. Attempt to cross between ports of entry, which in the case of Tamaulipas requires getting across the river and organized crime's paid permission, and turn themselves in to Border Patrol, a method that is a misdemeanor under U.S. law and may limit their ability to seek asylum. Despite the risks, many view this as their only choice, especially when fleeing imminent threats.

Asylum seekers with CBP One appointments in Tamaulipas face obvious dangers of kidnapping and violence if waiting near the border. For this reason, many choose to wait further south in Mexico, in cities such as Mexico City, the southernmost city where the app works, where the risks are fewer, traveling to the border region a day or two before their appointments. We were told this strategy frequently fails, however, because organized crime—often operating with the knowledge or collusion of authorities and transportation drivers—is waiting at bus stations and airports in Tamaulipas for those with appointments.

People often miss their appointments with U.S authorities due to being kidnapped in Mexico; it is unlikely a coincidence that the "no-show" rate in Nuevo Laredo is especially high: a migration researcher informed us that roughly 65% make their appointments. Those who miss appointments are out of luck: barring exceptional intervention by authorities, CBP One forces the asylum seeker to restart the entire, months-long process of requesting an appointment. This ends up being another incentive to cross the river and surrender to Border Patrol instead.

**U.S. OFFICIALS KNOW THIS IS HAPPENING—BUT NOTHING CHANGES**

Organized crime is known to adapt its business strategies according to changes in U.S. migration policies: the rule is that border restrictions lead to violence and profitability for criminal groups, since the migrant smuggling and kidnapping industries become more lucrative. This was more than apparent in the high levels of attacks on migrants under the U.S' Title 42 and "Remain in Mexico"

STB_AR1_004419

8/18/24, 3:34 PM        Kidnapping of Migrants and Asylum Seekers at the Texas-Tamaulipas Border Reaches Intolerable Levels - WOLA

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 821 of 1203



ABOUT US    PROGRAMS    ANALYSIS    THEMES    NEWS    GET INVOLVED    DONATE

of extortion without kidnapping using brutal violence and intimidation tactics.

The dangers of travel through Tamaulipas are no secret. Yet the state's ports of entry concentrate 43 percent of the daily appointments that CBP offers border-wide (630 out of 1,450). Since Laredo is the border's busiest port, and McAllen and Brownsville are commercially important, CBP concentrates more personnel and infrastructure in these areas. CBP's reluctance to move assets elsewhere to respond to asylum needs helps perpetuate the crisis.

Tamaulipas is also consistently the highest or second-highest Mexican border state where Mexican migrants from the U.S. interior are sent when deported by Immigration and Customs Enforcement (ICE). In January 2024, the agency deported over 3,600 people into the state—over 100 per day, a concerning practice WOLA has been denouncing for over a decade. ICE often deports Mexican citizens into Tamaulipas because it is the closest segment of the border to the eastern United States, where the agency is constantly arresting migrants.

CBP officers and management know that Tamaulipas is notorious for kidnapping, rape, and brutal assaults of migrants, and that kidnappers are often brazenly waiting within a few hundred yards of the border bridges. Yet service providers have not seen the agency adjust its policies or practices to avoid these harms.

## Conclusion: "No one deserves this"

*Quote from a migration researcher.*

The targeting of migrants in Mexico's northern cities is not a new phenomenon. Human rights organizations including WOLA have been seeking to address it for many years , starting well before policies like "Remain in Mexico" existed. In Tamaulipas, the brutality and frequency of abuse are especially intolerable and growing fast, which demands action from both the U.S. and Mexican governments.

Current U.S.-Mexico border policies that severely limit access to ports of entry, force asylum seekers to wait many months in Mexico, and expel migrants into high-danger border cities like those surveyed here don't just overlook the systematic victimization of migrants by organized crime: they facilitate it. If restricting the right to seek asylum is already intolerable when thousands of families and individuals are fleeing for their lives, it is even more unacceptable in

STB_AR1_004420



**Center for Gender & Refugee Studies**

## "Manifesting" Fear At the Border: Lessons from Title 42 Expulsions

*January 30, 2024*

### Title 42 Expulsion Policy and Legal Challenge

In March 2020, under the pretext of the COVID-19 pandemic, the Trump administration began expelling people seeking asylum at the U.S. southern border pursuant to a policy known as Title 42. The U.S. government carried out the expulsions without screening individuals for fear of persecution or torture, in violation of its obligations under international and domestic law. Before the policy ended in May 2023, over two million expulsions were completed, putting many refugees directly in harm's way.

Advocates brought litigation successfully challenging the policy. But the Biden administration was permitted to continue effectuating expulsions with no screening whatsoever while the litigation wound its way through the appellate process. However, in March 2022, the U.S. Court of Appeals for the D.C. Circuit upheld a lower court ruling prohibiting the government from expelling families to places where they risked harm. Although the court concluded the administration had the authority to expel, it had to do so in compliance with the U.S. obligation of *non-refoulement*, which prohibits the return of refugees to countries where they face persecution or torture.

### Implementation of the Manifestation of Fear Guidance

While Title 42 was in place, the U.S. government could have required that border officers ask individuals apprehended near the border whether they had a fear of persecution or torture in Mexico or any other country of expulsion. If so, they would have been required to refer the individuals for a more complete interview with a trained Asylum Officer. This has in fact been the mandatory process at the border since 1996. Instead, the government adopted a "manifestation of fear" process. Also known as the "shout test," it requires an individual to affirmatively raise their fear of return to receive any sort of screening for protection. The "shout test" was first designed by the United States to repel Haitians intercepted at sea in the 1980s and has operated as intended ever since, to keep refugees out and deny them safe haven.

To comply with the March 2022 order in the Title 42 litigation, U.S. Customs and Border Protection (CBP) issued guidance in May 2022 on the processing of individuals "manifesting a fear" of expulsion. Pursuant to that guidance, as with the "shout test" applied to migrants at sea, border officers were to "consider all available information within the scope of their operations." A manifestation of fear could be either "verbal," such as statements of fear or recounting of previous harms, or "non-verbal," such as "panic attacks" or "an unusual level of silence."

**Subjecting Refugees to the "Shout Test" Flouts U.S. Obligations**

Following issuance of the guidance, the Center for Gender & Refugee Studies (CGRS) and other immigrant rights organizations based at the border monitored implementation of the injunction. From June-October 2022, advocates interviewed at least 97 families expelled to cities along the U.S.-Mexico border, including Ciudad Juárez, Reynosa, and Tijuana, Mexico. Of those interviewed, over half (51 families) reported that they had verbally expressed a fear of return, and nearly three-quarters (73 families) reported having non-verbally expressed a fear. Yet CBP did not refer a single family for a fear screening as required under the guidance. Instead, families disclosed that CBP officers verbally abused them, telling them to "shut up," declaring they had "no right" to an interview, or completely ignoring their attempts to communicate.

The cases below illustrate CBP's failure to follow its own guidance and the inadequacy of a "manifestation of fear" requirement to protect against *refoulement*. Each family feared return, but none received a screening to determine the viability of their protection claims.

- A Salvadoran mother with her seven-year-old child feared return because her brother-in-law, a gang member, had attempted to kill her. When she tried to express her fear, CBP did not allow her to speak before expelling her on June 8, 2022.

- A Honduran mother traveling with her 10-year-old child feared return because she had witnessed gang members killing her neighbor and received threats as a result. She was too afraid to speak because of how CBP officers treated her and other asylum seekers. She was expelled on June 11, 2022.

- A Salvadoran mother fled her home with her seven-year-old daughter after her husband threatened to kill her. As he had followed her when she escaped, she feared he would find her in Mexico. CBP did not allow her to speak before expelling her on June 11, 2022.

- A Honduran father fled with his nine-year-old child after his brother was killed, fearing the same fate. CBP officers did not allow him to speak before expelling him on June 11, 2022.

- A Honduran mother and her four-year-old child were kidnapped and held for 22 days in Mexico, before finally escaping and attempting to seek asylum in the United States. CBP did not permit her to speak before expelling her back to Mexico on August 9, 2022.

- An Indigenous Guatemalan woman traveling with her three-year-old child could not explain her fear. She did not speak Spanish well, and CBP did not provide an interpreter or permit her to speak. She was expelled on September 20, 2022.

These harrowing stories represent just the tip of the iceberg. Experience shows that relying on a "shout test" results in refugees being returned to danger. Any legislative proposal to revive this approach will make a mockery of our international commitments and must be rejected.

STB_AR1_004463



**MAY 1, 2024**

# US: Digital Metering System Exposes Migrants to Harm

### Asylum Turnbacks Violate Rights and Enrich Criminal Groups
Published in

(Mexico City) – The administrations of US
President Joe Biden and Mexican President
Andrés Manuel López Obrador are forcing
thousands of people seeking asylum in the
US to wait for months in Mexico, exposing
them to danger, Human Rights Watch said in
a report released today.



A man seeking asylum in the US uses his phone to access
the US Customs and Border Protection CBP One
application to request an appointment at a land port of entry
to the US, outside a shelter in Ciudad Juarez, Mexico,
January 12, 2023.

© 2023 REUTERS/Jose Luis Gonzalez

The 68-page report, "We Couldn't Wait:
Digital Metering at the US-Mexico Border,"
details how the Biden and López Obrador
administrations have made a difficult-to-use
US government mobile application, CBP
One, all but mandatory for people seeking
asylum in the United States. The result is de
facto "metering," a practice formalized early
in the Trump administration that limits the number of asylum seekers processed at ports of entry each day,
turning others back to Mexico.

"The Biden and López Obrador administrations are knowingly exposing migrants to persecution at the hands
of cartels that systematically target migrants for kidnapping, extortion, and sexual assault," said Ari Sawyer,
US border researcher at Human Rights Watch. "The US and Mexican governments should stop forcing
migrants to wait in Mexico and should stop collaborating on rights-abusive immigration policies."

The report is based on interviews with 128 asylum seekers who were able to share information on the
experiences of a total of 263 people, including family members and friends with whom they were traveling, as
well as interviews with 13 shelter workers, eight migrant service providers, Mexican government officials,
and human rights workers. Research was conducted in August and September 2023 in Mexico City, Saltillo,

STB_AR1_004594

and Piedras Negras, Coahuila; Monterrey, Nuevo Leon; Nuevo Laredo, Tamaulipas; and Eagle Pass, Texas. Because US Customs and Border Protection (CBP) does not provide enough appointments through the app to meet the demand from asylum seekers each day, tens of thousands of people seeking asylum have been compelled to wait in Mexico, often for several months, since the Biden administration introduced a new asylum rule in May 2023.

CBP's nearly exclusive use of the CBP One app to process asylum seekers creates additional barriers to access for those seeking asylum, particularly for certain groups. Many asylum seekers do not have cellphones because they cannot afford them or because criminal actors or government agents in Mexico have stolen their phones. When asylum seekers do have phones, their devices often do not have memory space to support the app, they cannot pay for the data they need to use the app, or they do not have access to Wi-Fi.

In addition, nearly all the asylum seekers Human Rights Watch spoke to described having trouble using or accessing CBP One. For some, the app was particularly difficult to use due to identity factors such as their race, digital literacy, ability to read or write, language, age, LGBT status, or disability.

The Biden asylum rule relies on policies nearly identical to two Trump-era policies—the entry and transit bans —held by federal courts to be illegal. It stipulates that asylum seekers must use CBP One in most cases to access the US asylum system. Asylum seekers who show up at the border without an appointment, who cannot prove they applied for and were denied asylum in another country along their route of transit or certain difficult-to-prove extenuating circumstances, face "enhanced expedited removal" to Mexico or their country of origin without adequate due process.

US and Mexican officials and private security guards hired by the Mexican government stand guard at international bridges and screen asylum seekers for CBP One appointments, turning back those who do not have one. Asylum seekers who face danger if they wait in Mexico often cross over more remote and dangerous areas at the border, where their lives are at risk or where they find their passage blocked by river currents, razor wire, or other barriers.

In just one example in September, Human Rights Watch witnessed a Haitian family attempt for three hours to turn themselves in to US immigration officials near Eagle Pass, Texas, but were impeded by Texas Department of Public Safety boats, river currents, razor wire, and other barriers.

Those who are forced to wait in Mexico also face forced relocation to southern Mexico by Mexican officials; a lack of access to basic services like health care, potable water, and shelter; violence at the hands of criminal groups as well as Mexican immigration authorities, National Guard soldiers, and police; and the possibility of summary deportation.

STB_AR1_004595

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 826 of 1203

Cartels and corrupt government officials <u>profit from policies</u> that strand non-Mexican migrants in Mexico for long periods of time. <u>Thanks to these policies</u>, cartels have expanded their business model to include the extortion of the US-based family or friends of kidnapped migrants, Human Rights Watch found. Cartels routinely search kidnapped migrants' phones for US numbers and demand ransom payments in US dollars. Cartels in Nuevo Laredo extort asylum seekers who have CBP One appointments, threatening to prevent them from getting to their appointments if they don't pay.

"An app-based appointment system suggests the illusion of order and impartiality, but in reality CBP One puts people in danger and means more profit and power for criminal cartels," Sawyer said. "The United States and Mexico can and should do better."

# Related Content

<u>"We Couldn't Wait"</u> <u>Texas Constructing Massive Anti-Migrant Military Base</u>
Region / Country

- <u>United States</u>
- <u>Immigrants' Rights and Border Policy</u>

Topic

- <u>Refugees and Migrants</u>
- <u>Migrants</u>

---

**Source URL:** *https://www.hrw.org/news/2024/05/01/us-digital-metering-system-exposes-migrants-harm*

STB_AR1_004596



July 2, 2024

**Human Rights First Comment on the Departments of Justice and Homeland Security's Interim Final Rule, *Securing the Border*, DHS Docket No. USCIS-2024-0006**

Human Rights First submits the following comment in response to the Departments of Justice and Homeland Security's ("the Departments") Interim Final Rule, *Securing the Border* ("Interim Final Rule"), incorporating and providing for the implementation of President Biden's proclamation of the same name ("the Proclamation").[1] Human Rights First requests the Departments publish a notice in the Federal Register withdrawing the Interim Final Rule.

The Interim Final Rule represents an aggressive expansion of the Departments' Circumvention of Lawful Pathways ("CLP Rule") manner of entry bar, with fewer exceptions, higher standards, and a laser focus on keeping the Credible Fear screen-in rate lower (and more politically palatable).[2] As reported by asylum seekers to Human Rights First, U.S. officers have said, "There is no asylum" and that "the border is now closed."

It is nearly identical to a Trump administration interim final rule already found to be unlawful by the federal courts, despite the Departments' strenuous exhortations to the contrary. Formally and functionally, the Interim Final Rule is more restrictive than the Trump administration ban because it eliminates the long-required credible fear referral safeguards, invents a higher standard for screening for withholding of removal and protection under the Convention Against Torture ("CAT") eligibility, and effectively limits access to asylum to those who can access and secure a CBP One appointment and survive in Mexico long enough to present themselves at a port of entry at the appointed time. The Interim Final Rule denies equal access to asylum and is inconsistent with federal law and the United States' treaty obligations.

This politically motivated rulemaking from the Departments betrays the United States' commitments to refugees and the commitments made by the Biden-Harris administration. The Departments must withdraw it, and instead, as Human Rights First has detailed in its recommendation reports, strengthen and improve the asylum system.[3]

---

[1] 89 Fed. Reg. 48,710; Exec. Order No. 10773 of June 3, 2024, 89 Fed. Reg. 48,487 (June 7, 2024).
[2] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 11, 2023).
[3] Human Rights First, "Upholding and Upgrading Asylum," 17-22 (Oct. 2023), https://humanrightsfirst.org/library/upholding-and-upgrading-asylum.

interviews. Research confirms that when questions are not asked, people who express fear are not referred for credible fear screenings.[62]

Most recently, CBP employed only the Shout Test — rather than the referral questions — for members of family units subject to expulsion under Title 42 in connection with a court order preventing their return to persecution or torture.[63] Recent research by the Center for Gender and Refugee Studies showed the use of the Shout Test or "manifestation" approach resulted in CBP failing to refer people who expressed a fear of return to the fear screening interviews they are due under law.[64] Of 97 families interviewed by advocates and expelled during 2022, DHS failed to refer for a screening any of the 73 families that verbally or non-verbally expressed fear.[65] Instead, CBP officers, "verbally abused them, telling them to 'shut up,' declaring they had 'no right' to an interview, or completely ignoring their attempts to communicate."[66]

Eliminating these crucial referral questions will endanger vulnerable and at-risk asylum seekers including rape survivors, people who do not speak English or Spanish, LGBTQI+ asylum seekers, political dissidents, and victims of trauma or torture. For example, if an asylum seeker from China, Russia, Syria, Sudan, or the Democratic Republic of Congo, expresses in their language that they fear return, a CBP officer would likely not understand that expression of fear. Many asylum seekers speak only Indigenous languages, so their expressions of fear will go unrecognized. The expectation that people must somehow start "shaking, crying," or "fleeing" (while in CBP custody) in order to be identified as an asylum seeker who should be referred for a screening interview is absurd and disingenuous.[67] The Interim Final Rule treats CBP officers as though they are mind readers.  The Supplementary Information Section asserts that officers will observe for "unconscious behavior" and "will use their expertise and training to determine whether the noncitizen is manifesting a fear" or instead shaking or engaging in other behavior because they are cold, hungry or tired.[68]  Certainly asking three simple questions would be more effective, accurate, and efficient than expecting CBP officers to spend time trying to ascertain what only a mind reader could discern: whether various obvious or unconscious behaviors or statements in a language the officer does not understand constitute manifestations of fear of harm, persecution, and torture.

Moreover, people who have suffered torture, rape, and trauma often have great difficulty raising their fears of return in non-confidential group settings. LGBTQI+ refugees who do not speak English, do not know they can raise, or are hesitant to raise fears of harm that relate to their sexual orientation, gender identity or other persecution would not be properly identified and referred for fear screenings. In addition, as CBP regularly tells people in its custody that they are

---

[62] *See* U.S. Comm'n on Int'l Religious Freedom, Barrier to Protection: Report Highlights 1-2 (2016), https://www.uscirf.gov/sites/default/files/Report%20Highlights.%20CBPs%20Record%20Identifying%20Asylum%20Seekers.pdf.
[63] Mem. from Exec. Dir., Office of Field Operations, Customs and Border Protection, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022), https://www.aila.org/library/cbp-issues-guidance-on-processing-of-noncitizens.
[64] Ctr. for Refugee and Gender Studies, "Manifesting" Fear At the Border: Lessons from Title 42 Expulsions (Jan. 30, 2024), https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.
[65] *Id.* at 2.
[66] *Id.*
[67] Interim Final Rule at 48,744.
[68] *Id.*

being deported, some do not even know that they can raise their fears of harm. A sign or video is entirely inadequate to ensure proper identification of asylum seekers and is no substitute for a few simple questions asked in the person's language.

Indeed, failure to refer under the newly imposed Shout Test is already underway.[69] Human Rights First interviewed Mexican families and adults who were summarily removed to Mexico during the first two weeks of the IFR's implementation and were denied an opportunity to express their fear, describing an intimidating and hostile environment in CBP and Border Patrol custody in which they were not allowed to speak. Some individuals reported to Human Rights First that they expressly requested asylum, a hearing with an immigration judge, and relayed the facts of their asylum claims, including the past persecution they had suffered, as well as others who were visibly sobbing and begging to be heard, but were instead ignored, told "there is no asylum" and "the border is closed." Other families recounted to Human Rights First that not only were they not asked whether they had a fear of return or what motivated their arrival, but they were not allowed to speak.

These Mexican families and adults were denied their statutory right to be referred for a credible fear screening or asylum hearing, and were deported back to potential persecution. Among them were three separate female survivors of gender-based violence, including a Mexican woman who was so violently harmed by her husband that she suffered a miscarriage, and a seven-month-pregnant woman escaping harm and death threats by her partner who explicitly requested asylum to a DHS border officer who replied, "I don't speak good Spanish," before summarily deporting her back to danger.

The Interim Final Rule's elimination of the simple fear questions and advisal is cloaked in the language of efficiency, with the Departments noting that it takes "20 to 30 minutes" to fill out Forms I-867A and I-867B that contain not only the three simple questions crucial to help identify asylum seekers but also some initial explanatory language.[70] The three simple questions and the explanation take only a few minutes to read. Indeed, reading the question as to whether a person has a fear of return takes only seconds. Avoiding the provision of necessary interpretation, which thwarts language access, is entirely improper.

The true purpose of the elimination of these essential questions appears to be a desire to reduce referrals of asylum seekers for Credible Fear Interviews — a goal of the Interim Final Rule that is confirmed repeatedly throughout the preamble. The Departments baselessly claim that the questions are "suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection."[71] This assertion is belied by the fact that these questions have been included in the expedited removal process since its very inception. Over the years, the United States Commission on International Religious Freedom ("USCIRF") and other researchers have confirmed that these questions are critical to ensuring

---

[69] Emily Bregel, *Migrants Report Overnight Deportations, Family Separations,* Arizona Daily Star (June 22, 2024), https://tucson.com/news/local/subscriber/arizona-sonora-us-mexico-border-asylum-deportation-rule-violations-alleged/article_d2ef785c-2e62-11ef-ab2d-e772ff84e1d6.html; Emily Bregel, *Border Agents Ignoring Fear Claims, Migrants Say, In Violation of Biden Border Exception*, Arizona Daily Star (June 16, 2024), https://tucson.com/news/local/border/us-mexico-border-arizona-biden-order-asylum-seekers/article_461bd3a4-29b1-11ef-b884-5f9fc26ba81b.html.
[70] Interim Final Rule at 48,739.
[71] Interim Final Rule at 48,743.

themselves to the Interim Final Rule's asylum eligibility ban and heightened standard for lesser forms of protection.[97] The following examples documented by Human Rights First of asylum seekers unable to use the CBP One app under the CLP Rule illustrate people in need of protection that the Interim Final Rule will similarly harm:[98]

- A Black Senegalese gay asylum seeker who speaks Wolof and Fulani is at risk under the CLP Rule asylum ban. The man's boyfriend was killed in Senegal, and he fled a stoning, beatings, and death threats because of his sexuality. Once in Mexico, he sought protection after crossing into the United States between ports of entry and was unaware of the asylum ban's consequences for entering without an appointment. He only speaks Wolof and Fulani, languages the CBP One appointment system is not available in and was unable to access the app. He is now in ICE detention and risks return to persecution under the CLP Rule.

- Three Hazara men, a persecuted ethnic and religious minority, fled Afghanistan after the fall of Kabul to the Taliban. Lacking any safe pathways to protection they crossed irregularly into the United States and immediately turned themselves in to seek asylum. They speak Dari and were unfamiliar with the CBP One app, which is not available in their language. Under the CLP Rule asylum ban, they now risk potential return to the Taliban and their certain deaths in Afghanistan. Even if they are subsequently found eligible for withholding of removal, they will be denied a path to permanent residence, citizenship, and stability.

- A Turkish transgender male asylum seeker who does not speak a CBP One language reported to Human Rights First that he was unable to use the app to schedule an appointment at a port of entry due to the language barrier, as he speaks Turkish. He crossed between ports of entry in California and will now risk being barred from asylum under the CLP Rule despite his potential eligibility for asylum.

- A Black Mauritanian human rights advocate who was unaware of, and does not speak CBP One languages, is at risk under the CLP Rule asylum ban. Imprisoned for his anticorruption work in Mauritania, the human rights advocate fears arrest, torture, and death if returned to Mauritania. He was unaware of the CBP One app or of the asylum ban's consequences when seeking protection at the U.S. southwest border. As an Arabic and French speaker, he would not have been able to use the CBP One scheduling system. While in Mexico, he was robbed and beaten by gangs and extorted by Mexican police which motivated his crossing to the U.S. to seek protection. He now risks being barred from asylum and returned to persecution under the ban.

- An Indian Sikh family fleeing persecution on religious grounds crossed between ports of entry into southern California. The family are Hindi speakers and were unaware of the CBP One app.

- A Black Senegalese man who speaks only Wolof is at risk under the CLP Rule. He fled torture and sexual assault in Senegal due to his imputed LGBTQI+ status. The man has limited literacy and only speaks Wolof. While on a bus in Mexico, armed men pulled him and other Black migrants off the bus and robbed them at gunpoint. Shortly after,

---

[97] Trapped, Preyed Upon, and Punished at 14-16.
[98] *Id.* at 15-16.

Mexican immigration officers detained them and held them for four days before releasing them near the U.S. border and informing them they had ten days to leave the country. He entered the United States between ports of entry to seek asylum, was sent into ICE detention, and is at risk of return to persecution under the CLP Rule asylum ban.

While the Interim Final Rule should be rescinded in full for all the reasons we outline in this comment, to the extent the rule continues in force, it must include an exception for all asylum seekers, whether they present at ports of entry or cross irregularly, who do not speak a language in which the CBP One app is provided, are unable to use the application due to illiteracy, disabilities, lack of resources or other difficulties, fail to secure appointments after multiple attempts, or did not know about the application's existence.

C.      The Interim Final Rule's Secretary approved process requirement subjects asylum seekers to kidnapping, torture, and rape in Mexico.

The CLP Rule's CBP One appointment requirement already strands asylum seekers in Mexico while they wait to secure an appointment or wait until the day and time of their appointment — and those wait times will grow longer under the Interim Final Rule. CBP One appointments are only available at eight ports of entry across the entire southwest border, concentrating people seeking asylum at these locations. In Reynosa, Matamoros, and Nuevo Laredo, Mexican border cities where the Department of Homeland Security ("DHS") issues over 40% of its CBP One appointments, kidnappings, torture, and sexual assault by cartels of people seeking asylum, including those waiting for or with CBP One appointments, have risen since the ban took effect.[99]

These areas were already designated by the Department of State as "Do Not Travel" locations due to life-threatening risks — designations that are akin to those issued for war zones. In Nuevo Laredo, the Strauss Center for International Security and Law has reported that conditions are so dangerous that migrant shelters continue to be closed due to "members of organized crime threatening and perpetrating violence against shelter staff and migrants."[100] Reports of sexual violence against migrants in Reynosa and Matamoros increased 70% during the last months of 2023 according to Doctors Without Borders, in addition to the already sharply escalating instances of kidnappings in Reynosa following the implementation of the ban. In January 2024, Doctors Without Borders teams in northern Mexico reported more cases of sexual violence than in any month of the previous year.[101]

Humanitarian aid workers in these areas have informed Human Rights First researchers that the frequency and brutality of the kidnappings has only gotten worse. Aid workers recounted that men and women have suffered from horrific torture and sexual violence, including women gang raped and sexually assaulted in the presence of children. Migrant survivors of kidnapping in Tamaulipas also report extreme physical violence such as acid burns, fractures, beatings with a slab of wood, and even mentioned having witnessed homicides, as told to Doctors Without Borders. After suffering these horrors, children and their families remain terrified and trapped in danger. Aid workers reported to Human Rights First that they have observed that increased

---

[99] *Id.* at 7.
[100] Straus Ctr. for Int'l Sec. and Law, Asylum Processing at the U.S.-Mexico Border: February 2024, at 7 (Feb. 2024), https://www.strausscenter.org/wp-content/uploads/Feb_2024_AsylumProcessing.pdf.
[101] Trapped, Preyed Upon, and Punished  at 7.

numbers of asylum seekers have missed their CBP One appointments because of these escalating abuses.[102]

Those who secure CBP One appointments are often specifically targeted by cartels, with Mexican authorities complicit or actively engaged in the abuse against migrants. They will be at even greater risk due to the Interim Final Rule's additional bar on port of entry access for people who do not have CBP One appointments and the even longer wait times the Interim Final Rule will spur. Human Rights First has tracked reports of over 2,500 migrant survivors of kidnapping, rape, torture, extortion, and other violent harm while stranded in Mexico as they wait to seek U.S. asylum in the year since the CLP Rule asylum ban took effect.[103] For Mexican nationals, this danger is compounded by being trapped in their own country of feared persecution under the Interim Final Rule. Given the under-reporting of kidnappings and other crimes in Mexico and substantial increase in kidnappings in parts of the northern Mexico border reported by aid workers and Mexican authorities, this figure certainly represents the tip of the iceberg.

Human Rights First has documented the horrific abuses inflicted on migrants and asylum seekers when they are blocked, turned away, or left to wait in Mexico, including over 13,000 survivors of murder, kidnapping, rape, and other violent attacks against asylum seekers blocked in or expelled to Mexico under the Title 42 policy[104] during the first two years of the Biden administration and similar reports of targeted harm against asylum seekers forced to wait in Mexico under the "Remain in Mexico" Migrant Protection Protocols.[105]

In its prior reports on the CLP Rule asylum ban, Human Rights First documented numerous examples of adults, children, and families who survived these harms while stranded in Mexico as they attempted to secure a CBP One appointment. These included: a Venezuelan young adult kidnapped and tortured by having his finger cut off; a Honduran mother kidnapped with her family and raped; a Venezuelan man kidnapped and shot in the head leading to the loss of his eye; Honduran teenage boys kidnapped and raped; a Latin American mother and her minor children sexually assaulted; a Colombian LGBTQI+ woman sexually assaulted by a Mexican official; and a Latin American man kidnapped and tortured by Mexican officials in Reynosa.[106]

Asylum seekers must not only contend with cartels, but also Mexican authorities. Human Rights First's research over the last year has confirmed, for example, that Mexican immigration authorities are apprehending migrants and people seeking asylum, including those waiting for or with CBP One appointments, separating families, committing abuses, and forcibly relocating them to southern Mexico where they are stranded, at risk, outside the CBP One app's geo-fence and unable to request an appointment. Humanitarian aid providers reported to Human Rights First that some people seeking asylum have missed their CBP One appointments because they were detained by Mexican authorities. For instance:[107]

---

[102] *Id.*

[103] *Id.*

[104] Human Rights First, "Human Rights Stain, Public Health Farce: Evasion of Asylum Law and Title 42 Abuse Must End — and Never Be Revived" (Dec. 15, 2022), https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/.

[105] Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived (Sept. 13, 2022), https://humanrightsfirst.org/library/fatally-flawed-remain-in-mexico-policy-should-never-be-revived/.

[106] Trapped, Preyed Upon, and Punished at 8.

[107] *Id.* at 21-22.

- An Afghan family with a CBP One appointment was extorted by Mexican immigration officers in the Mexico City and Tijuana airports in January 2024. The officers demanded the family open the CBP One app, took their phone, and threatened to eliminate their appointment if they did not pay them a bribe.

- A Venezuelan family with a CBP One appointment flew from Mexico City to Ciudad Juárez where they were questioned by Mexican immigration officers upon arrival who tore up the family's CBP One appointment print out, wrongly accusing them of fraud, and threatened to bus them to southern Mexico or deport them. Another officer eventually arrived and acknowledged their appointment and allowed them to leave in April 2024.

- An Ecuadorian mother and teenage son separated by Mexican immigration officers from her husband and eighteen-year-old son. After the freight train the family was traveling on was stopped as it approached Juárez in March 2024, they were caught by Mexican officers. The mother pleaded with the officers, indicating that they were a family and had documentation to prove it. The officers separated the family. She was left in Chihuahua with her minor son while her husband and 18-year-old son were forcibly transported to Tapachula. When Human Rights First interviewed the mother, the family had already been separated, and unable and to reunite, for a month.

- A Venezuelan family with minor children prevented from seeking U.S. asylum and instead detained by Mexican officers and transported to Tapachula in January 2024. The family was removed from a bus at the last checkpoint as they approached Reynosa. Mexican officers took their cell phones and transported them to a detention center. When the family asked immigration officers why they were being held and what was going to happen, the officers deceived them and said they would be taken to Mexico City to regularize their legal status. Instead, they were taken to the Reynosa airport and forcibly flown to Tapachula, bordering Guatemala, and forced to start their journey to seek U.S. asylum again.

VII.    The Interim Final Rule illegally traps Mexican asylum seekers in their own country of feared persecution, effectuating refoulement.

Glaringly, unlike the CLP Rule, which excepted Mexican nationals from its manner of entry bar, the Interim Final Rule does not adopt a similar exception.[108] People fleeing persecution in Mexico, a country that directly borders the United States, cannot wait. The Proclamation and Interim Final Rule's suspension on entry restricts access to asylum for Mexican asylum seekers, forcing them to remain at risk of persecution in their own country, equivalent to refoulement.

For Mexican individuals and families, the threat of persecution by those they are fleeing – such as violent cartels and other organized crime groups that exercise control over territory and often work in collusion with Mexican authorities – is still palpable as they are forced to continue to wait in northern Mexico in the hopes of finally having access to safety. Conditioning access to asylum on securing a limited, lottery-based CBP One appointment requires Mexican nationals to wait many months in danger in their country of feared harm, violating the Refugee Convention and Protocol.

---

[108] Interim Final Rule at 48,738.

he began to sexually harass them, leading Zenaida and Yaneth to fear the worst for themselves and their children. They managed to escape and fled directly to the Nogales Port of Entry where they had been sleeping the past five nights outside on the concrete. The grandmother expressed: "Why does no one hear us? We are so scared. We're afraid when people look at us and ask us where we're from. We cannot wait here."[114]

VIII.   The Interim Final Rule will disproportionately harm Black, Indigenous, and LGBTQI+ asylum seekers.

Black, Indigenous, LGBTQI+, HIV+, women, children, and other vulnerable groups, including people with disabilities or urgent medical conditions will continue to face particular and egregious barriers, dangers, and disparities in seeking asylum because of the Interim Final Rule, as they do under the CLP Rule. The Interim Final Rule and related restrictions deny equal access to asylum at ports of entry to most African, Indigenous, and other asylum seekers who are unable to use the CBP One app or wait for an appointment.

A.      Black asylum seekers

Due to the CLP Rule, the new Interim Final Rule, and other restrictions, Black asylum seekers are forced to wait at risk in Mexico where they are targets of anti-Black violence, discrimination, and harm by Mexican authorities. They are also at risk from violent cartels that control vast territory, often with the complicity of some Mexican authorities. In Reynosa, Haitian asylum seekers are also being targeted for kidnapping for ransom. Earlier this year, four Haitian asylum seekers were kidnapped and held by a cartel for six weeks, while Haitian pregnant women have been kidnapped and raped.[115]

As Human Rights First explained in a May 2024 report, Haitian Bridge Alliance ("HBA") reported that Mexican immigration officers and municipal police target Haitians and migrants and asylum seekers of African-descent for extortion, detention, and other harm as they transit through Mexico, including at airports and on buses. Over the last several months, Mexican immigration officers have targeted African migrants in Tijuana at specific hotels and have threatened to arrest, detain, and transfer the migrants and asylum seekers to southern Mexico if they refused to pay bribes to the officers.

Earlier this year, Mexican immigration officers unlawfully arrested and detained 45 Haitian asylum seekers with CBP One appointments in Tijuana for two hours outside the city. HBA's advocacy helped secure the release of nearly all of the victims, but Mexican authorities forcibly moved one family with three children to Tabasco in the south of Mexico who were waiting for their CBP One appointment. HBA also reports that between November 2023 and April 2024, Mexican authorities detained approximately 500 Haitian men, women, and children who were waiting for CBP One appointments in Tijuana and forcibly transferred them to Tabasco and Tapachula in the south of Mexico.

Discriminatory barriers to medical care facing Black asylum seekers and migrants in Mexico forced to wait under the CLP Rule have also resulted in the preventable deaths of Haitian asylum seekers. Some Haitians have been forced to wait with untreated chronic medical issues

---

[114] *Id.* at 9-10.
[115] Trapped, Preyed Upon, and Punished at 8-9.

in inhumane conditions for many months while waiting for CBP One appointments. For example:

- A 67-year old Haitian man died in Tijuana in November 2023 while waiting for a CBP One appointment. He had suffered paralysis due to three strokes but was unable to access medical care, as confirmed by the Haitian Bridge Alliance.

- A 36-year-old Ghanaian intending to seek U.S. asylum died in December 2023 outside the San Luis Potosí immigration jail shortly after having been released by Mexican immigration officers late at night. Mexican authorities reported that the Ghanaian man entered their facility at 9:00 p.m. and at around 11 p.m., paramedics arrived and he was already deceased. According to the state Attorney General's office, he died as a result of a heart condition, while other reporting indicates suspected hypothermia.

- A humanitarian aid worker confirmed that a Haitian woman who had been waiting in Reynosa to seek U.S. asylum died of health complications in December 2023 due to barriers in accessing urgent medical care.

- A humanitarian aid worker confirmed that a Haitian man who had been waiting with his wife and children in Reynosa for a CBP One appointment died of suspected diabetes-related complications in July 2023.

- A humanitarian aid worker confirmed that a Haitian woman waiting to seek asylum in the U.S. died in front of her two-year-old outside a migrant shelter in Reynosa in September 2023.

- The Haitian Bridge Alliance reported that in late August 2023, a Haitian mother who had been waiting with her husband and three children in Matamoros for a CBP One appointment died of a stroke after being hospitalized. The family had a CBP One appointment, but as the mother was critically ill it came too late.

- The Haitian Bridge Alliance confirmed that a Haitian man who had been waiting for a CBP One appointment in Tijuana died after suffering two strokes in June 2023. The Haitian Bridge Alliance organized a funeral for him.

- A humanitarian aid worker reported that in August 2023 a pregnant Haitian woman was forced by CBP to wait for two days at the Reynosa port of entry while experiencing pregnancy complications. She later lost her baby.

- A pregnant Haitian woman in her third trimester who was unhoused and living outside the entrance to a migrant shelter in Reynosa while waiting to seek U.S. asylum fell ill in July 2023. Seeking emergency medical care, a taxi took her to a private hospital; she was denied treatment. By the time a humanitarian aid worker brought her to a public hospital, she suffered a stillbirth.

B.    LGBTQI+ asylum seekers

The Interim Final Rule exacerbates and adds new barriers that further endanger LGBTQI+ and other people seeking asylum. The Interim Final Rule endangers LGBTQI+ people seeking

asylum by requiring them to wait months in Mexico to obtain a CBP One appointment where they face acute risks of anti-LGBTQI+ persecution and suffer kidnappings, sexual assault, and other harms due to their sexual orientation, gender identity, race, language, and nationality. It punishes and will contribute to the potential refoulement to persecution of LGBTQI+ people seeking asylum. In expedited removal, those found ineligible for asylum because of the Interim Final Rule's limitation on asylum eligibility will face an improperly high fear screening standard. As a result, LGBTQI+ asylum seekers from Venezuela and Colombia have been ordered deported while others risk refoulement to persecution. This is even if they are referred for a fear screening, as the Interim Final Rule's manifestation of fear standard disproportionately impacts LGBTQI+ refugees who may be hesitant to raise in Border Patrol encounters fears of harm that relate to their sexual orientation, gender identity or other persecution.[116]

Human Rights First documented cases of LGBTQI+ asylum seekers targeted for harm while stranded in Mexico under the CLP rule, some unable to access the CBP One app due to language barriers, and facing lack of access to safe housing, employment, medical care, and other basic services due to discrimination because of their gender identity, sexual orientation, as well as race, nationality, migratory status, and language barriers:[117]

- A Cuban HIV+ transgender woman and her husband waited nearly seven months for a CBP One appointment that never arrived. They were discriminated against by a migrant shelter on account of the woman's gender identity and sexual orientation. After their first night in the shelter, they were kicked out in the rain after dark and told the shelter did not have the right conditions to house them. The transgender woman is HIV+ and spent six months in Mexico unable to obtain medication, having been denied treatment by a clinic in Mexico City.

- A Venezuelan gay couple escaped a kidnapping, witnessed a violent assault, and lived in fear while waiting five months for a CBP One appointment. In September 2023, a Venezuelan gay man and his partner had been waiting in Matamoros for nearly five months trying to secure a CBP One appointment, living in fear that they would be kidnapped and harmed on account of their sexual orientation and status as migrants, as recounted to Human Rights First. They spent two months living in a tent in the Matamoros river encampment where they witnessed a violent assault on a family by the cartel and other situations of danger, motivating them to seek shelter elsewhere. They also escaped an attempted kidnapping in the city.

- A transgender migrant woman waiting in Ciudad Juárez to seek asylum was extorted by the cartel under threat of sexual exploitation: A young transgender woman waiting to seek asylum in the U.S. was targeted and forced by the cartel to pay them 1,500.00 Mexican pesos a week under threats of sexual exploitation. She was afraid she would be killed if she missed a payment and had not yet been able to safely seek asylum in the U.S. despite these serious protection issues in Mexico, as told to Las Americas Immigrant Advocacy Group in late August 2023.

- A French-speaking Senegalese lesbian woman traveling alone to seek U.S. asylum was unaware of and ultimately unable to use the CBP One app because it is not offered in

---

[116] U.S. Asylum Bans Strand LGBTQI+ Refugees.
[117] *Id.*

French. She survived an attempted sexual assault in the Mexican border city of Nogales, but remained trapped as the wait time to enter at the Nogales port of entry for those without appointments was six to seven months at the time.

- A Honduran trans woman who survived a sexual and physical assault in Honduras on account of her gender identity and who fears being killed if returned described the increasing desperation she felt waiting for a CBP One appointment: "I feel desperate. There are people who obtain appointments in 12 or 15 days, and I've been waiting for four months. You feel depressed. At the shelter, others are stressed. Another person cries and it's contagious — I do, too. All you think about is 'the appointment, the appointment.' I request it every day and check every day and still nothing. Tomorrow will be four months of waiting."

- A Turkish transgender male asylum seeker who does not speak a CBP One language reported to Human Rights First that he was unable to use the app to schedule an appointment at a port of entry due to the language barrier. He entered the United States between ports of entry in California and will now risk being barred from asylum despite his potential eligibility for asylum.

- A gay man from Senegal who was stoned and beaten while his boyfriend was murdered and only spoke Wolof and Fulani could not use the CBP One application. Because of the language barrier, he was not aware of the CBP One application or the asylum ban. He is now in Immigration and Customs Enforcement (ICE) detention, at risk of return to his persecutors because of the asylum ban.

- An LGBTQI+ and HIV+ Venezuelan young adult traveling alone to seek U.S. asylum was stranded in Matamoros without resources where he was living in a tent in an open-air encampment. As his phone had been stolen, and he had no financial resources to replace it, he was unable to access the CBP One app to request an appointment to enter at a port of entry. Blocked from accessing the port of entry without an appointment, he expressed despair at being trapped in danger.

C.    Indigenous asylum seekers

The Interim Final Rule, like the CLP Rule, punishes people who do not have CBP One appointments, yet the government has made it available only in English, Spanish, and Haitian Creole. This lack of equitable language access discriminates against and denies equal access to asylum to Indigenous and other asylum seekers who speak other languages by subjecting them to the Interim Final Rule's penalties.

The International Mayan League warned that conditioning asylum access on the CBP One app would further marginalize Indigenous individuals and especially endanger Indigenous girls, women, and LGBTQ+ people who are at heightened risk for sex and human trafficking. In June 2023, over 140 non-Indigenous allies, including many human rights and immigration organizations, wrote to DHS to underscore the disproportionate harms the manner of entry bar in the CLP Rule, mirrored in the Interim Final Rule, inflicts on Indigenous people and the insurmountable barriers Indigenous people face in using and accessing CBP One, and in

accessing ports of entry for those without appointments, as documented by Human Rights First's.[118] For example:

- A Mayan woman from Guatemala who is illiterate and speaks Akatek entered the United States between ports of entry without an appointment with her infant son. After the mother survived sexual assault in Guatemala, and family members were murdered, they received death threats from MS-13. While transiting Mexico by bus, they were stopped by armed, uniformed Mexican officials who beat the mother and threatened to kill her and her infant if she did not pay a bribe. She arrived near the U.S.-Mexico border terrified of further abuse by Mexican authorities and of being located by MS-13. She had no knowledge of CBP One, had never owned a smartphone, only speaks Akatek, and is illiterate. The family crossed into Arizona between ports of entry and would now risk potential return to persecution under the CLP Rule.[119]

- A Maya Ixil woman and her infant were blocked from accessing a port of entry multiple times despite written permission from DHS to present themselves there. A Maya Indigenous woman, the granddaughter of a survivor of the Ixil genocide in Guatemala, who only speaks Ixil, had not heard of the CBP One app and attempted to seek U.S. protection by crossing the Rio Grande to Eagle Pass, Texas. Once on U.S. soil, U.S. authorities blocked them from seeking protection and stranded them on the U.S. side of the riverbank overnight. Without being able to exercise their right to seek asylum, U.S. authorities forced them to cross back to Mexico where they were treated for hypothermia. After surviving this ordeal, the mother learned of the CBP One appointment system and attempted to secure an appointment for nearly two months but struggled due to limited internet access, technological and language barriers as the app is not available in any Indigenous language. The family attempted to seek protection at two ports of entry in Piedras Negras, Coahuila but were repeatedly blocked by Grupo Enlace, Mexican municipal employees, from accessing the port of entry despite permission from DHS to present. One Mexican agent even implied that she would have to pay a bribe, or they would deport her to Guatemala. During a later attempt, the family was again denied entry despite having a letter from DHS confirming their permission to present. The family was finally allowed to present at the port of entry and were processed into the country following significant intercession by U.S. non-profit groups. These aggressive tactics not only violated their right to seek asylum, but worsened the mental, emotional and spiritual state of an already traumatized mother and child.[120]

D.    Women and children seeking asylum

Barriers to asylum access imposed by the Interim Final Rule will harm women and children seeking asylum, who will be forced to wait in Mexico for a CBP One appointment or cross without authorization, subjecting themselves to the Interim Final Rule's bar to asylum. Women migrants in Mexico face gender-based violence, kidnappings, rape, human trafficking, extortion, harassment, difficulty reporting and accessing justice, and institutional and community violence according to the Instituto Nacional para las Mujeres en Migración. The United Nations Committee on Enforced Disappearances in its September 2023 report noted the increase in

---

[118] Refugee Protection Travesty at 38.
[119] Trapped, Preyed Upon, and Punished at 15.
[120] *Id.* at 11-12.

disappearances of girls, adolescents, and women in Mexico predominantly in the states of Mexico, Tamaulipas, Jalisco, and Guerrero.[121]

Seven of every 10 migrant girls, adolescents, and women have witnessed situations of exploitation, sexual violence, and human trafficking both in transit and while waiting in Mexico and are the target of human trafficking, according to a survey by Plan International Mexico in August 2023. Similarly, sexual crimes against girls and women as well as human trafficking of girls and women are the most recurrent crimes at the northern Mexico border, according to the International Organization for Migration's Mexico anti-trafficking specialist.
Sexual assault has become so commonplace that some women cynically refer to contraceptives as the "vaccine against Mexico" revealing their awareness that at some point during their journey, they are likely to survive sexual assault, as recounted by Las Americas Immigrant Advocacy Group in Ciudad Juárez in September 2023.[122]

Reports of sexual violence against migrants in Reynosa and Matamoros increased 70% during the last months of 2023 according to Doctors Without Borders, in addition to the already sharply escalating instances of kidnappings in Reynosa following the implementation of the ban. In January 2024, Doctors Without Borders teams in northern Mexico reported more cases of sexual violence than in any month of the previous year.[123]

For example, a Haitian unaccompanied teenage girl and three Haitian women seeking asylum survived an enforced disappearance by Mexican authorities who turned them over to cartel members who abused them physically and sexually. The teenage girl and three women were transiting to Reynosa by bus when armed men dressed as Mexican police officers stopped the bus in late December 2024. The Mexican police officers robbed them of their phones and placed them together in a car with black bags over their heads. They were turned over to members of the cartel and held captive for ransom. Cartel members attempted to rape the teenage girl and severely beat her with a stick for resisting. The three Haitian women were raped and beaten. They also witnessed other captive Haitian women who were pregnant and were beaten and raped.[124]

IX.    The Interim Final Rule's exceptions do not protect refugees.

Aside from presenting at a port of entry through a Secretary approved process, the Interim Final Rule provides exceptions for acute medical emergencies, imminent threats to life and safety, and victims of a severe form of trafficking. The Interim Final Rule does not provide any exception, unlike the CLP Rule, for failure of or inability to use the CBP One application.

These limited exceptions are insufficient to protect refugees, including vulnerable populations such as LGBTQI+ individuals, Black and Indigenous asylum seekers, women, and children, who face disproportionate harm in Mexico while blocked from seeking protection in the United States. People seeking protection face unremitting violence at the hands of Mexican authorities and cartels who often target them because they are migrants or asylum seekers. Human Rights First has documented the horrific abuses inflicted on migrants and asylum seekers when they are blocked, turned away, or left to wait in Mexico, including over 2,500 victims of murders,

---

[121] Inhumane and Counterproductive at 32-33.
[122] *Id.*
[123] Trapped, Preyed Upon, and Punished at 7.
[124] *Id.* at 9.



Human Rights First

# TRAPPED, PREYED UPON, AND PUNISHED

## One Year of the Biden Administration Asylum Ban



May 2024

STB_AR1_006278

Sharp escalations in targeted violence

*"They torture you and beat you like an animal."*[1]

**The asylum ban and related restrictions at U.S. ports of entry strand children and adults seeking U.S. asylum in Mexico where they are targeted for horrific and widespread abuses by cartels and Mexican authorities often acting in complicity with those cartels. Human Rights First has tracked reports of over 2,500 survivors of kidnapping, torture, rape, enforced disappearance, extortion, and other violent attacks against asylum seekers and migrants stranded in Mexico since the asylum ban took effect. As detailed below, and in our October 2023 report, this violence has risen sharply since the asylum ban was initiated.**

CBP One appointments are only available at eight ports of entry across the entire southwest border, concentrating people seeking asylum at these locations. In Reynosa, Matamoros, and Nuevo Laredo, Mexican border cities where the Department of Homeland Security (DHS) issues over 40% of its CBP One appointments, kidnappings, torture, and sexual assault by cartels of people seeking asylum, including those waiting for or with CBP One appointments, have risen since the ban took effect. These areas were already designated by the U.S. State Department as "Do Not Travel" locations due to life-threatening risks— designations that are akin to those issued for war zones. In Nuevo Laredo, the Strauss Center for International Security and Law has reported that conditions are so dangerous that migrant shelters continue to be closed due to "members of organized crime threatening and perpetrating violence against shelter staff and migrants." Reports of sexual violence against migrants in Reynosa and Matamoros increased 70% during the last months of 2023 according to Doctors Without Borders, in addition to the already sharply escalating instances of kidnappings in Reynosa following the implementation of the ban. In January 2024, Doctors Without Borders teams in northern Mexico reported more cases of sexual violence than in any month of the previous year.

In recent weeks, humanitarian aid workers in these areas have informed Human Rights First that the frequency and brutality of the kidnappings has only gotten worse. Aid workers recounted that men and women have suffered from horrific torture and sexual violence, including women gang raped and sexually assaulted in the presence of children. Migrant survivors of kidnapping in Tamaulipas also report extreme physical violence such as acid burns, fractures, beatings with a slab of wood, and even mentioned having witnessed homicides, as told to Doctors Without Borders. After suffering these horrors, children and their families remain terrified and trapped in danger. Aid workers reported to Human Rights First that they have observed that increased numbers of asylum seekers have missed their CBP One appointments because of these escalating abuses. Aid workers in Tamaulipas

---

[1] Quote from a Venezuelan asylum seeker kidnapped and tortured in Reynosa while waiting for a CBP One appointment.

continue to report concerns that they themselves are also at increased risk of violent attacks and threats due to their work with people seeking asylum and other migrants.

In Piedras Negras, Coahuila, another border city where people with CBP One appointments can access a U.S. port of entry, Doctors Without Borders reported cases of sexual violence, kidnappings, beatings, threats, and forced disappearance of family members in transit or at the border in 2023. A humanitarian aid worker informed Human Rights First that many people who arrive in Piedras Negras with CBP One appointments are kidnapped and as a result miss their appointments. West of Coahuila, the Mexican northern border state of Chihuahua recorded last year the highest number of kidnappings in three years. Kidnappings nearly tripled from 67 victims in 2022, during implementation of the Title 42 expulsion policy, to 181 victims in 2023, following implementation of the asylum ban and related restrictions on access to ports of entry. And yet, kidnappings are notoriously under-reported. The Mexican national anti-kidnapping commissioner stated last year that the *cifra negra* of kidnappings in Mexico remains high as only one in ten kidnappings are reported, as quoted by SN Digital Tlaxcala. A Ciudad Juárez prosecutor reported that all kidnappings in the city in 2023 were specifically perpetrated against migrants arriving in Ciudad Juárez, as organized criminal groups have focused on the kidnapping and smuggling of migrants.

Human Rights First has tracked reports of **over 2,500 survivors** of kidnapping, torture, rape, extortion, and other violent harm against people seeking asylum and migrants while stranded in Mexico as they wait to seek U.S. asylum in the year since the ban took effect. Of these, 1,300 survivors of violent harm were identified during the ban's first six months. Given the under-reporting of kidnappings and other crimes in Mexico and substantial increase in kidnappings in parts of the northern Mexico border reported by aid workers and Mexican authorities, this figure certainly represents the tip of the iceberg. In its prior reports on the asylum ban, Human Rights First documented numerous examples of adults, children and families who survived these harms while stranded in Mexico as they attempted to secure a CBP One appointment.

These included: a Venezuelan young adult kidnapped and tortured by having his finger cut off; a Honduran mother kidnapped with her family and raped; a Venezuelan man kidnapped and shot in the head leading to the loss of his eye; Honduran teenage boys kidnapped and raped; a Latin American mother and her minor children sexually assaulted; a Colombian LGBTQI+ woman sexually assaulted by a Mexican official; and a Latin American man kidnapped and tortured by Mexican officials in Reynosa.

Some recent examples of the targeting of people waiting to access U.S ports of entry in order to seek asylum over the last few months, include:

- **Members of a cartel kidnapped and tortured three Haitian men in Reynosa who were seeking asylum. The men were tortured during their abduction, including the forcible removal of teeth.** Two of the men were waiting for CBP One appointments and one missed his appointment on account of the kidnapping in April 2024.

- **Latin American[2] woman and her children were pulled off a bus while traveling from Monterrey to Reynosa by members of a cartel and kidnapped. The cartel members gang raped the mother** while holding the family captive in April 2024.

- **Venezuelan man was kidnapped in Reynosa while waiting for a CBP One appointment and physically brutalized for 10 days by members of a cartel.** In fear of being kidnapped again, he fled to the neighboring city of Matamoros after his release and crossed the Rio Grande to seek U.S. asylum protection. Although he had fled political persecution by the Venezuelan police, his claim of fear of return to Venezuela was ignored and he was expeditiously removed to Mexico without receiving a credible fear interview, as Jewish Family Services of San Diego reported.

- **Haitian unaccompanied teenage girl and three Haitian women seeking asylum survived an enforced disappearance by Mexican authorities who turned them over to cartel members who abused them physically and sexually.** The teenage girl and three women were transiting to Reynosa by bus when armed men dressed as Mexican police officers stopped the bus in late December 2024. The Mexican police officers robbed them of their phones and placed them together in a car with black bags over their heads. They were turned over to members of the cartel and held captive for ransom. Cartel members attempted to rape the teenage girl and severely beat her with a stick for resisting. The three Haitian women were raped and beaten. They also witnessed other captive Haitian women who were pregnant and were beaten and raped.

- **Latin American[3] pregnant woman was raped by members of a cartel in Reynosa after they kidnapped her and her husband in March 2024.** The kidnappers continued to rape her as she went into labor and her water broke. She was left on the street with her husband who was badly beaten, and soon after delivered her baby.

---

Indefinite wait in danger with access to U.S. ports of entry restricted

> *"I am afraid for my life here. Afraid that I will be killed, kidnapped, or that they'll do something to me."[4]*

In order to seek asylum at a port of entry, people must wait up to six to seven months and try *daily* to obtain an appointment on a glitchy, inequitable smartphone app, CBP One, that operates in essence like a daily lottery. Those facing acute risks who cannot safely wait in Mexico, or in some cases even use the CBP One app, have little to no meaningful access to

---

[2] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.
[3] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.
[4] Quote from a Honduran asylum seeker raped in Matamoros while waiting for a CBP One appointment and who was twice blocked from accessing the U.S. port of entry by Mexican officers.

present. One Mexican agent even implied that she would have to pay a bribe or they would deport her to Guatemala. During a later attempt, the family was again denied entry despite having a letter from DHS confirming their permission to present. The family was finally allowed to present at the port of entry and were processed into the country following significant intercession by U.S. non-profit groups. These aggressive tactics not only violated their right to seek asylum, but worsened the mental, emotional and spiritual state of an already traumatized mother and child.

## Equal access to asylum denied

**Black, Indigenous, LGBTQI+, HIV+, women, children, and other vulnerable groups, including people with disabilities or urgent medical conditions continue to face particular and egregious barriers, dangers, and disparities in seeking asylum due to the asylum ban. The asylum ban and related restrictions deny equal access to asylum at U.S. ports of entry to most African, Indigenous, and other asylum seekers who are unable to use the CBP One app or wait for an appointment.**

Black asylum seekers forced to wait at risk in Mexico continue to be targets of anti-Black violence, discrimination and harm by Mexican authorities. They are also at risk from violent cartels that control vast territory, often with the complicity of some Mexican authorities. In Reynosa, Haitian asylum seekers are now also being targeted for kidnapping for ransom. Earlier this year **four Haitian asylum seekers were kidnapped and held by a cartel for six weeks.**

Haitian Bridge Alliance (HBA) reported to Human Rights First that Mexican immigration officers and municipal police continue to target Haitians, and migrants and asylum seekers of African-descent. They are targeted as they transit through Mexico, including  at airports and on buses. Over the last several months, Mexican immigration officers have targeted African migrants in Tijuana at specific hotels. The officers threatened to arrest, detain, and transfer the migrants and asylum seekers to southern Mexico if they refuse to pay bribes to the officers. Earlier this year, **Mexican immigration officers unlawfully arrested and detained 45 Haitian asylum seekers with CBP One appointments in Tijuana for two hours outside the city.** HBA's advocacy helped secure the release of nearly all of the victims, but Mexican authorities forcibly moved one family with three children to Tabasco in the south of Mexico who were waiting for their CBP One appointment. HBA also reports that between November 2023 and April 2024, Mexican authorities **detained approximately 500 Haitian men, women, and children who were waiting for CBP One appointments in Tijuana and forcibly transferred them to Tabasco and Tapachula in the south of Mexico.**

Discriminatory barriers to medical care facing Black asylum seekers and migrants in Mexico have also resulted in the preventable deaths of Haitian asylum seekers. Some Haitians have been forced to wait with untreated chronic medical issues in inhumane conditions for many months while waiting for CBP One appointments.

- A 67-year old Haitian man died in Tijuana in November 2023 while waiting for a CBP One appointment. He had suffered paralysis due to three strokes but was unable to access medical care, as confirmed by the Haitian Bridge Alliance.

- A 36-year-old Ghanaian intending to seek U.S. asylum died in December 2023 outside the San Luis Potosí immigration jail shortly after having been released by Mexican immigration officers late at night. Mexican authorities reported that the Ghanaian man entered their facility at 9:00 p.m. and at around 11 p.m., paramedics arrived and he was already deceased. According to the state Attorney General's office, he died as a result of a heart condition, while other reporting indicates suspected hypothermia.

- A humanitarian aid worker confirmed that a Haitian woman who had been waiting in Reynosa to seek U.S. asylum died of health complications in December 2023 due to barriers in accessing urgent medical care.

- A humanitarian aid worker confirmed that a Haitian man who had been waiting with his wife and children in Reynosa for a CBP One appointment died of suspected diabetes-related complications in July 2023.

- A humanitarian aid worker confirmed that a Haitian woman waiting to seek asylum in the U.S. died in front of her two-year-old outside a migrant shelter in Reynosa in September 2023.

- The Haitian Bridge Alliance reported that in late August 2023, a Haitian mother who had been waiting with her husband and three children in Matamoros for a CBP One appointment died of a stroke after being hospitalized. The family had a CBP One appointment, but as the mother was critically ill it came too late.

- The Haitian Bridge Alliance confirmed that a Haitian man who had been waiting for a CBP One appointment in Tijuana died after suffering two strokes in June 2023. The Haitian Bridge Alliance organized a funeral for him.

- A humanitarian aid worker reported that in August 2023 a pregnant Haitian woman was forced by CBP to wait for two days at the Reynosa port of entry while experiencing pregnancy complications. She later lost her baby.

- A pregnant Haitian woman in her third trimester who was unhoused and living outside the entrance to a migrant shelter in Reynosa while waiting to seek U.S. asylum fell ill in July 2023. Seeking emergency medical care, a taxi took her to a private hospital; she was denied treatment. By the time a humanitarian aid worker brought her to a public hospital, she suffered a stillbirth.

**LGBTQI+ people seeking U.S. asylum are stranded in Mexico for months where they are targeted for harm due to anti-LGBTQI+ violence and their migratory status**. Despite these dangers, they are left at risk of being barred from asylum and returned to persecution if they

seek protection by crossing at or between ports of entry without a CBP One appointment. In its research over the last year, Human Rights First has encountered examples of vulnerable people in this population who waited months trying to secure a CBP One appointment while facing acute risks and violence in Mexico, including:

- Five LGBTQI+ asylum seekers from **Cuba, Honduras, and Mexico waited in Tijuana about five months** for a CBP One appointment but finally grew desperate for safety in January 2024 and decided to cross between U.S. ports of entry to seek asylum.

- **Cuban HIV+ transgender woman and her husband had been waiting nearly seven months** as of March 2024 but were unsuccessful at securing a CBP One appointment. While waiting in Matamoros they experienced an attempted kidnapping, which spurred them to enter the United States between ports of entry.

- **Honduran transgender woman had been waiting in Tijuana four months for a CBP One appointment** in February 2024, after already waiting eight months in southern Mexico for a one-year Mexican humanitarian visa which she hoped would protect her from return to persecution while transiting through Mexico.

- **Mexican transgender woman had been waiting in Tijuana seven months** for a CBP One appointment as of February 2024. Though Mexican asylum seekers are not subject to the asylum ban's penalties for entering without a CBP One appointment, access at ports of entry for those without appointments is restricted.

**Significant barriers** to the use of CBP One, including limited language access, disproportionately impact **Indigenous, many Black, and other asylum seekers** who do not speak English, Spanish, or Haitian Creole, the only three languages of the CBP One app. People seeking asylum who are illiterate, have limited language and digital literacy, or have disabilities that impede their ability to use the app, are also often denied equal access to ports of entry and asylum. So too are people with limited financial means to access daily internet or purchase a smartphone—a very real challenge for the many migrants who have told Human Rights First that their phones have been stolen by Mexican authorities and cartels or lost or damaged during their travels.

Unable to use the CBP One app, and unable to access ports of entry without appointments, many people cross between ports of entry to seek asylum, unaware of the consequences imposed by the ban. The asylum ban includes an exception for individuals unable to access or use the CBP One app due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. However, the rule specifically provides that this exception applies only to people who enter at ports of entry (yet, ironically, ports are generally inaccessible for those without CBP One appointments, making this exception largely illusory). Yet Indigenous, Black, and other asylum seekers who are unable to use CBP One for these reasons and cross between ports of entry risk the asylum ban's punishments. This report documents in the expedited removal section further below, individuals who were unable to use the CBP One app due to language barriers and illiteracy, were found to not

**STB_AR1_006291**

meet an exception, and were subjected to the asylum ban's heightened fear screening, including a Senegalese man who only speaks Wolof, a Nicaraguan illiterate man, and an Egyptian Arabic speaker. DHS's failure to apply the serious and ongoing obstacles exception to asylum seekers facing language barriers would endanger asylum seekers in the following situations:

- **Mayan woman from Guatemala who is illiterate and speaks Akatek crossed without an appointment with her infant son.** After the mother survived sexual assault in Guatemala, and family members were murdered, they received death threats from MS-13. While transiting Mexico by bus, they were stopped by armed, uniformed Mexican officials who beat the mother and threatened to kill her and her infant if she did not pay a bribe. She arrived near the U.S.-Mexico border terrified of further abuse by Mexican authorities and of being located by MS-13. She had no knowledge of CBP One, had never owned a smartphone, only speaks Akatek, and is illiterate. The family crossed into Arizona between ports of entry and now risks potential return to persecution under the ban.

- **Black Senegalese gay asylum seeker who speaks Wolof and Fulani at risk under the asylum ban.** The man's boyfriend was killed in Senegal, and he fled a stoning, beatings, and death threats because of his sexuality. Once in Mexico, he sought protection after crossing into the United States between ports of entry and was unaware of the asylum ban's consequences for entering without an appointment. He only speaks Wolof and Fulani, languages the CBP One appointment system is not available in and was unable to access the app. He is now in ICE detention and risks return to persecution under the ban.

- **Three Hazara Afghan men who speak Dari, and were unaware of the app, at risk under the asylum ban.** Three Hazara men, a persecuted ethnic and religious minority, fled Afghanistan after the fall of Kabul to the Taliban. Lacking any safe pathways to protection they crossed irregularly into the United States and immediately turned themselves in to seek asylum. They speak Dari and were unfamiliar with the CBP One app, which is not available in their language. Under the asylum ban, they now risk potential return to the Taliban and their certain deaths in Afghanistan. Even if they are subsequently found eligible for withholding of removal, they will be denied a path to permanent residence, citizenship and stability.

- **Turkish transgender male asylum seeker who does not speak a CBP One language** reported to Human Rights First that he was unable to use the app to schedule an appointment at a port of entry due to the language barrier, as he speaks Turkish. He crossed between ports of entry in California and will now risk being barred from asylum despite his potential eligibility for asylum.

- **Black Mauritanian human rights advocate who was unaware of, and does not speak CBP One languages, at risk under the ban.** Imprisoned for his anti-corruption work in Mauritania, the human rights advocate fears arrest, torture, and death if returned to Mauritania. He was unaware of the CBP One app or of the

STB_AR1_006292

asylum ban's consequences when seeking protection at the U.S. southwest border. As an Arabic and French speaker, he would not have been able to use the CBP One scheduling system. While in Mexico, he was robbed and beaten by gangs and extorted by Mexican police which motivated his crossing to the U.S. to seek protection. He now risks being barred from asylum and returned to persecution under the ban.

- **Indian Sikh family** fleeing persecution on religious grounds crossed between ports of entry into southern California. The family are Hindi speakers and were unaware of the CBP One app.

- **Black Senegalese man who speaks only Wolof at risk under the ban.** He fled torture and sexual assault in Senegal due to his imputed LGBTQI+ status. The man has limited literacy and only speaks Wolof. While on a bus in Mexico, armed men pulled him and other Black migrants off the bus and robbed them at gunpoint. Shortly after, Mexican immigration officers detained them and held them for four days before releasing them near the U.S. border and informing them they had ten days to leave the country. He entered the United States between ports of entry to seek asylum, was sent into ICE detention, and is at risk of return to persecution under the ban.

---

## Counterproductive to effective migration policy and refugee protection

The asylum ban is counterproductive to effective migration policy and refugee protection, setting a terrible example for other countries. Far from deterring people from irregularly crossing the southwest border, the ban and accompanying restrictions spur irregular crossings and cruelly punish people who cross, subjecting them to improper penalties that violate the Refugee Convention. The asylum ban diverts the time of asylum adjudicators from the merits of people's refugee claims, undermines the capacity to adjudicate asylum cases efficiently, and hampers U.S. integration by depriving people who qualify as refugees under U.S. law of a path to stability and citizenship.

As Human Rights First has documented in multiple reports, restrictionist policies that meter and limit access to U.S. ports of entry spur irregular crossings by at-risk people who cannot safely wait in Mexico. Over the last year, Human Rights First has interviewed many asylum seekers who have recounted that they crossed the border, or were contemplating doing so, due to their inability to seek asylum at a port of entry and the risks they face while waiting. Their accounts are detailed both in this report and in the prior four asylum ban reports issued by Human Rights First.

Such policies are also a boon to cartels and smugglers, who target migrants and asylum seekers left stranded in highly dangerous areas for kidnapping, violence and extortion. Indeed, the Chihuahua Attorney General stated in April 2024 that the increase in kidnappings and murders in Chihuahua is linked to the fact that organized crime groups have now taken up migrant smuggling

STB_AR1_006293



# INHUMANE AND COUNTERPRODUCTIVE

## Asylum Ban Inflicts Mounting Harm

October 2023

STB_AR1_006321

the factors that are motivating crossings. Cartels also exploit U.S. policies that ban, block or limit access to ports of entry and/or cause people to wait in Mexico and use and exploit misinformation to mislead and exploit individuals to cross into the United States outside of ports of entry.

## Asylum seekers report not applying for asylum in transit countries

People seeking asylum reported to Human Rights First and to humanitarian aid workers that they had not applied for asylum in other countries, and as a result did not wait to be denied asylum there as the asylum ban contemplates in blatant disregard of the risks and realities refugees experience in these countries. UNHCR's August 2023 protection monitoring in Honduras found that 100% of 175 migrants it interviewed had not previously sought asylum, and its protection monitoring in Guatemala earlier this year found that only 3% of people surveyed who had international protection needs had applied for asylum in Guatemala or in another transit country.

In an October 2023 amicus brief submitted in litigation in the 9th Circuit Court of Appeals challenging the ban, the union representing over 14,000 USCIS employees including asylum officers who conduct CFIs explained that:

Most of the countries through which asylum seekers transit en route to the U.S. southern border produce far more refugees than they accept, have inadequate asylum systems and are unable or unwilling to provide migrants with meaningful protection. Forcing asylum seekers to remain in these countries to apply for protection and wait for a denial before continuing on to the United States puts them at risk of experiencing violence as well as refoulement to persecution or torture. The notion that it would be safe and practicable to stay in a transit country long enough to apply for asylum and wait for a decision is inconceivable to the vast majority of asylum seekers.

People seeking asylum explained to Human Rights First researchers the reasons they reasonably believed they would not be safe in transit countries, due to fear of persecution, violence, mistreatment, and other abuse.

## Asylum ban endangers Black, Indigenous, LGBTQ+, women and children

The asylum ban continues to harm the most vulnerable refugees by conditioning access to asylum protection on financial resources, literacy, and proficiency in select languages in requiring use of the CBP One app to seek asylum. The ban denies equitable access to asylum and forces people to wait months within the app's geofencing in central and northern Mexico in inhumane conditions without their basic needs met where they are targeted for exploitation and life-threatening harm by both Mexican authorities and cartels. The asylum ban also punishes Black, Indigenous, LGBTQ+, survivors of gender-based violence and other vulnerable groups for not seeking asylum in countries where they will not be safe.

STB_AR1_006349

## Asylum ban risks lives of Indigenous and other asylum seekers

The asylum ban punishes people who do not have CBP One appointments, yet U.S. officials have made it available only in English, Spanish, and Haitian Creole. This lack of equitable language access discriminates against Indigenous and other asylum seekers who speak other languages by subjecting them to the ban's penalties.

Before the Biden administration issued the ban, the International Mayan League warned that the ban would further marginalize Indigenous persons and especially endanger Indigenous girls, women, and LGBTQ+ people who are at heightened risk for sex and human trafficking. In June 2023, over 140 non-Indigenous allies, including many human rights and immigration organizations, wrote to DHS to underscore the disproportionate harms the ban inflicts on Indigenous people and the insurmountable barriers Indigenous people face in using and accessing CBP One, as documented in Human Rights First's July report.

Amid the escalating increase of individuals crossing between ports of entry in August and September are nationals of countries who don't speak one of the few languages the CBP One app is available in. Restricted and blocked access at ports of entry renders the exception to use of CBP One due to a serious and ongoing obstacle, only applicable if someone enters through a port of entry, meaningless. As detailed later in this report, Indigenous families from Ecuador and Guatemala have been subjected to the asylum ban in expedited removal proceedings after crossing outside of ports of entry and have been denied interpretation in their primary language during credible fear interviews (CFIs), resulting in the deportation and imminent deportation of Indigenous people fleeing persecution.

For example:

- **An Indigenous woman from Guatemala and her one-year-old daughter are facing imminent deportation after undergoing a CFI in the FERM program in August 2023,** where they were interviewed in Spanish despite clear indications that there were communication issues.

- An Indigenous asylum seeker from Ecuador who was separated from his partner at the border received a negative CFI determination in ICE detention and **was ordered deported in July 2023 after being interviewed in Spanish—even though it is not his best language—while his partner, who was interviewed in Quiche, their native language, received a positive determination.**

- **An Indian Hindi-speaking man** entered the U.S. between ports of entry in Arizona in September 2023 not speaking any of the languages CBP One is available in.

- **A Guinean French-speaking woman** who entered the U.S. between ports of entry in Arizona in September 2023 relayed to Human Rights First that she heard mention of the

CBP One app and believed it was for Latin American asylum seekers as the app is not available in French.

## Asylum ban risks lives of Black families and individuals

Black asylum seekers forced to wait at risk in Mexico under the asylum ban continue to be targets of anti-Black violence and discrimination. Past Human Rights First reports have documented these harms against Black asylum seekers while stranded in Mexico under other policies that limited or denied them access to asylum.

Many Black individuals and families have untreated chronic medical conditions that are exacerbated during their migration journey and while forced to wait for prolonged periods in Mexico in inhumane conditions and without access to medical care due to discrimination and barriers to access. The Haitian Bridge Alliance has identified hundreds of Haitian asylum seekers, and particularly Haitian women, arriving to the northern Mexico border with significant medical vulnerabilities which precipitously deteriorate, including reproductive health issues, diabetes, and stroke-related conditions, **at times resulting in preventable deaths**. For example:

- **A Haitian man who had been waiting in Reynosa for a CBP One appointment with his wife and children** died **of suspected diabetes-related complications** in July 2023, as confirmed by a humanitarian aid worker.

- **A Haitian woman waiting to seek asylum in the U.S.** died **in front of her two-year-old outside a migrant shelter in Reynosa** in September 2023, as confirmed by a humanitarian aid worker.

- **A Haitian mother who had been waiting with her husband and three children for a CBP One appointment in Matamoros died in late August 2023 of a stroke** after being hospitalized. The family had finally received their CBP One appointment, but it was too late, the mother was critically ill, as confirmed by the Haitian Bridge Alliance.

- **A Haitian man who had been waiting for a CBP One appointment in Tijuana died after suffering two strokes** in June 2023, as confirmed by the Haitian Bridge Alliance which organized a funeral for him.

- **A Haitian pregnant woman was forced to wait by CBP at the Reynosa port of entry for two days in August 2023 while experiencing pregnancy complications and later lost her baby**.

- **A Haitian pregnant woman in her third trimester was denied medical care and lost her baby.** A pregnant woman in her third trimester was living outside a migrant shelter in Reynosa in July 2023 waiting to seek asylum in the U.S. when she fell ill. In an attempt to seek emergency medical attention, a taxi took her to a private hospital where she was denied access to medical care. By the time she received support from an advocate to reach a public hospital, she suffered a stillbirth.

STB_AR1_006351

Black asylum seekers continued to express fear of being targeted for harm while left to wait in Mexico for CBP One appointments. As included earlier in this report, African migrants have been targets of kidnappings in Sonoyta, Sonora, five kilometers from the border. For example:

- **A Haitian family lives in fear of harm while waiting to try to get CBP One appointment in Mexico City**: A Haitian woman, her husband, and two minor children recounted how they felt unsafe in Mexico City while they waited to obtain a CBP One appointment. On one occasion in June 2023, a group of Haitians outside the building where they were staying were attacked and robbed. The mother feared the perpetrators would enter the building and attack them, too, as recounted to Human Rights First researchers in September 2023.

- **A Haitian woman and her minor children faced discrimination in Mexico during four months of waiting for a CBP One appointment:** The mother described incidents of discrimination they experienced as migrants on account of the color of their skin. People threw trash at them while walking on the street and said racist things to them. Several times they were denied accommodation and were unable to rent a room for the night, as told to Human Rights First researchers in September 2023.

The Haitian Bridge Alliance has found that non-Spanish speaking communities of Black asylum seekers in Tijuana, such as Creole and French-speaking asylum seekers, are fearful of being apprehended and deported while waiting to seek asylum in the U.S. In addition, the asylum ban disparately harms many Black asylum seekers by imposing penalties on those who do not have CBP One appointments when the CBP One app is not even available in the languages spoken by many African and other Black asylum seekers. As a result, African asylum seekers unable to use the CBP One app, blocked by Mexican immigration officers from accessing the San Ysidro port of entry without a CBP One appointment, and at risk of anti-Black violence in Tijuana have begun to cross to the U.S. outside of ports of entry. In early October 2023, dozens of African migrants and asylum seekers from Guinea and Senegal crossed into California near the Tijuana port of entry.

## Asylum ban risks lives of women and girls

**Women migrants in Mexico face gender-based violence, kidnappings, rape, human trafficking, extortion, harassment, difficulty reporting and accessing justice, and institutional and community violence** according to the Instituto Nacional para las Mujeres en Migración. The Mexican national anti-kidnapping commissioner warned in July 2023 that among those kidnapped, there are **growing numbers of young people targeted** as reported by SN Digital Tlaxcala. The UN Committee on Enforced Disappearances in its September 2023 report noted the **increase in disappearances of girls, adolescents and women in Mexico** predominantly in the states of **Mexico, Tamaulipas, Jalisco and Guerrero. Seven of every 10 migrant girls, adolescents and women** have witnessed situations of **exploitation, sexual violence, and human trafficking** both in transit and while waiting in Mexico and **are the target of human trafficking**, according to a survey by Plan International Mexico in August 2023. Similarly, **sexual crimes against girls and women as well as human

**trafficking of girls and women** are the most recurrent crimes at the northern Mexico border, according to the International Organization for Migration's Mexico anti-trafficking specialist.

**Sexual assault has become so commonplace** that some women cynically **refer to contraceptives as the "vaccine against Mexico"** revealing their awareness that at some point during their journey, they are likely to survive sexual assault, as recounted by Las Americas Immigrant Advocacy Group in Ciudad Juárez in September 2023.

For example:

- **A Honduran mother was kidnapped with her family and survived a sexual assault while waiting to seek asylum in the U.S.:** A Honduran woman, her husband, and young daughter were kidnapped in Reynosa in September 2023 by members of a cartel who also **attempted to sexually assault** the mother. As she fought and screamed, her husband attempted to defend her and was **tied with cables, beaten, and seriously injured**, as reported to a humanitarian aid worker.

- **Honduran teenage boys kidnapped and sexually assaulted by the cartel while waiting to seek asylum in the U.S.:** Two 19-year-old and one 20-year-old Honduran male asylum seekers were kidnapped by the cartel in Reynosa in September 2023 and **sexually assaulted**. Since being released, they are suffering from severe acute stress and trauma on account of the sexual violence they survived, as told to a humanitarian aid provider.

- **A Latin American mother and her minor children were sexually assaulted while waiting to seek U.S. asylum:** In September 2023, a mother and her minor children were waiting to seek asylum in the U.S. and were kidnapped by the cartel in Reynosa. The **mother and children were sexually assaulted** by their kidnappers, which they reported to a humanitarian aid provider upon their release.

## Asylum ban risks lives of LGBTQ+ and HIV+ families and individuals

Leading U.S. organizations that represent and advocate on behalf of LGBTQ+ refugees have repeatedly raised dire concerns about the impact of the asylum ban on LGBTQ+ refugees and urged that the ban be rescinded. For example, the Human Rights Campaign, writing on behalf of its more than three million members and supporters nationwide, warned that the asylum ban would deny protection to many refugees, including LGBTQ+ people and people living with HIV, place LGBTQ+ migrants at active risk of facing the same dangers that they are trying to flee from, and is inconsistent with the Biden administration's demonstrated commitment to LGBTQ+ people around the globe.

The U.S. State Department has confirmed LGBTQ+ persons face widespread violence and mistreatment in Mexico. As documented in our July report on the asylum ban, the ban has placed LGBTQ+ individuals at risk of kidnapping, sexual violence, and death while forced to wait in Mexico for a CBP One appointment and blocked from accessing ports of entry by

CBP and Mexican authorities' actions to turn away, limit, and meter the processing of people without appointments.

For example:

- **A lesbian couple was sexually assaulted in Reynosa in September 2023 while waiting to secure CBP One appointments to approach the U.S. port of entry to seek asylum**. The women feared for their lives as they remained trapped in the city waiting for a CBP One appointment and due to restricted access to the U.S. port of entry on account of CBP's metering and Mexican authorities' gatekeeping for those with appointments, as recounted by a humanitarian aid worker in September 2023.

- **An ill Venezuelan HIV+ man in need of medical treatment was ordered removed by Border Patrol and returned to Mexico** after having entered between ports of entry from Matamoros. The Venezuelan man had struggled for two months to try to obtain a CBP One appointment while in Matamoros. During this time, he was without access to HIV treatment and was ill. He approached Mexican immigration authorities to plead his case for access to asylum protection through the port of entry and was told to cross the river into the U.S. Desperate to receive medical attention and reach safety, he crossed between ports of entry into Brownsville.

- **A trans migrant woman waiting in Ciudad Juárez to seek asylum was extorted by the cartel under threat of sexual exploitation:** A young transgender woman waiting to seek asylum in the U.S. has been targeted by the cartel and forced to pay them $1,500.00 Mexican pesos a week under threats of sexual exploitation. She is afraid she will be killed if she misses a payment. She has not yet been able to safely seek asylum in the U.S. despite these serious protection issues in Mexico, as told to Las Americas Immigrant Advocacy Group in late August 2023.

- **A gay couple escape kidnapping, witness violent assault, and live in fear while waiting five months for a CBP One appointment:** In September 2023, a Venezuelan gay man and his partner had been waiting in Matamoros for nearly five months trying to secure a CBP One appointment, living in fear that they would be kidnapped and harmed on account of their sexual orientation and status as migrants, as recounted to Human Rights First. They spent two months living in a tent in the Matamoros river encampment where they were witness to a violent assault on a family by the cartel and other situations of danger, motivating them to seek shelter elsewhere. They also escaped an attempted kidnapping in the city. While they have been continuing to wait because, they explained, they want to do things "the legal way," they have at times been on the brink of crossing the river to the U.S. to seek asylum and safety due to the dangers they continue to face as they wait in Mexico for a port of entry appointment.

- **A Venezuelan trans woman fleeing persecution was kidnapped in Reynosa:** A Venezuelan trans woman fleeing persecution and violence was kidnapped at the Reynosa bus terminal in August 2023. She recounted to Human Rights First researchers in September 2023 how she was held in a room with about 100 other adults and children of various nationalities and forced to witness the physical beatings of others.

She experienced sexual harassment and threats by cartel members on account of her gender identity. She witnessed women who were taken outside of the room by members of the organized criminal group while others discussed that the women were being sexually exploited. After being released, she experienced an attempted kidnapping in Reynosa before fleeing to Matamoros.

- **A Venezuelan seven-year-old child was kidnapped for three weeks, drugged, and survived sexual violence while waiting in Reynosa to seek asylum in the U.S.:** A seven-year-old child who identifies as LGBTQ traveling with his mother was kidnapped by the cartel while entering Reynosa by bus and held for three weeks in September 2023. The cartel **drugged the child and sexually assaulted him**. Upon payment of their ransom and release, the mother and child sought protection at a migrant shelter where the child experienced an **attempted sexual assault** by other migrant men when forced to separate from his mother and sleep in the area designated for men, as recounted to a humanitarian aid worker in September 2023.

- **A severely ill Venezuelan HIV+ man was left to wait in Mexico despite life-threatening medical needs.** The man was staying in the Matamoros River encampment while waiting to seek asylum in the U.S. and did not have access to HIV treatment. While in the encampment, his medical condition quickly deteriorated, and he was rushed to the hospital with the support of an aid provider. He later made it to the Brownsville port of entry in August 2023 while still critically ill where CBP forced him to wait despite advocates expressing that he will die on the bridge if denied urgent medical care, as recounted by a humanitarian aid worker in September 2023.

- **A Venezuelan HIV+ man** without access to HIV treatment was forced by CBP to wait three days and sleep outside on the Gateway International Bridge at the Brownsville port of entry in the heat and without access to shelter, food or water in August 2023.

---

## Asylum Ban and CBP One requirement turn away and meter asylum seekers at ports of entry

People seeking asylum should be allowed to do so in accordance with U.S. law, and swiftly processed in at ports of entry. Both before and after the asylum ban went into effect, humanitarian aid providers consulted in northern Mexico and Human Rights First researchers have spoken with countless asylum seekers who expressed – and continue to express – that they want to enter the U.S. through a port of entry to seek asylum. However, as documented in prior reports on the asylum ban, including Human Rights First's July 2023 report, CBP is limiting and restricting the number of CBP One appointments made available and the number of people without appointments allowed in at U.S. ports of entry. It is doing so by turning away, limiting, metering and/or leaving asylum seekers without appointments to "wait" in Mexico, often in real or virtual lines that barely move. In the wake of the asylum ban's implementation, Mexican authorities prevent people without CBP One appointments from freely approaching most U.S. ports of entry that accept CBP One appointments, as confirmed in the Strauss Center's August 2023 report on asylum processing at the U.S.-Mexico border. Mexican authorities have blocked access even to urgent medical cases and

## Mexican asylum seekers trapped in their own country of feared persecution

Mexican families and individuals fleeing persecution and violence have been trapped in northern Mexico in cities across the border unable to seek asylum despite not being subject to the asylum ban. As discussed earlier, CBP's metering and limited asylum processing at ports of entry of individuals without CBP One appointments, including Mexican nationals not required to have one under the rule to be eligible for asylum, and Mexican authorities' actions to block access to ports of entry have resulted in Mexican asylum seekers being forced to wait months in their own countries of feared persecution, akin to refoulment by denying access to territory to seek asylum. For example, the majority of people waiting to seek asylum on the Nogales municipal waiting list which has an estimated wait of four to five months are Mexican nationals who are not subject to the asylum. Many are fleeing after suffering harm and threats at the hands of brutal cartels that have national reach and exercise control over large parts of Mexico with the complicity of Mexican authorities.

As a consequence of this restricted and blocked access at ports of entry, Human Rights First has spoken with Mexican families and individuals who have struggled for months to secure a CBP One appointment and faced life-threatening risks and were targeted for harm. For example:

- **A Mexican LGBTQ+ asylum seeker was found dead** the first week of September in the apartment he was renting in Nogales. Since mid-July he had been on the waitlist of asylum seekers waiting to be processed by CBP at the Nogales port of entry administered by the Nogales municipality. His partner was already in the U.S. initiating an asylum request. The Nogales municipality informed the Kino Border Initiative of his death.

- **A Mexican five-year-old girl was sexually assaulted, and her uncles killed while waiting for CBP One appointments:** A family consisting of a mother, father, two teenage children, and a five-year old adult daughter, along with the father's two adult brothers, were kidnapped by people who identified themselves as members of a cartel in Reynosa in September 2023 while waiting to secure a CBP One appointment. The cartel **tortured and killed the two adult brothers** and **forced the family to witness the sexual assault of their five-year-old daughter**, as they subsequently recounted to a humanitarian aid worker. The family was released after relatives paid the ransom, but they remain in danger in Mexico and in need of critical trauma-related psychiatric care.

- **A Mexican man fleeing violence was kidnapped and tortured by the cartel in Reynosa while waiting to seek asylum in the U.S.:** While waiting to seek asylum in the U.S., a Mexican man was kidnapped in Reynosa in August 2023 and held by the cartel for one month. He was tortured and his finger was cut off with images sent to his relatives demanding immediate payment of a ransom, as confirmed by a humanitarian aid worker.

- **A Mexican family fleeing imminent harm and death threats by the cartel in Sonora, including a U.S. citizen child and his pregnant mother, are blocked from accessing protection at the Nogales port of entry:** A family from Sonora, Mexico, consisting of a U.S. citizen child, Lawful Permanent Resident father and pregnant mother without U.S. legal status fled imminent harm and death threats by the cartel when they approached the Nogales port of entry in August 2023. They were informed they would need to wait more than two months to be processed by CBP as they did not have CBP One appointments, despite not requiring one to seek asylum as a Mexican national. If they waited by the port, they would not only risk their lives but the lives of others waiting. As a result, they were denied access to asylum processing and were forced to transit Mexico to another port of entry and continue to risk their lives, as recounted by the Kino Border Initiative.

---

## Asylum ban and other punitive policies rig expedited removal and lead to deportation

The Biden administration is using the asylum ban in combination with expedited removal and other punitive policies to summarily deport people without an opportunity to apply for asylum and present their case, regardless of whether they could establish eligibility for refugee protection. These wrongful deportations violate U.S. and international law and return people to danger without access to the U.S. asylum system.

Under the asylum ban, nearly all asylum seekers who traveled through another country on their way to the United States are deemed ineligible for asylum unless they managed to secure a CBP One appointment, with highly limited exceptions. The ban applies in expedited removal credible fear screenings as well as full asylum adjudications before the immigration court or the U.S. Citizenship and Immigration Services (USCIS) asylum office. Those denied asylum in full adjudications may apply for lesser forms of protection such as withholding of removal and protection under the Convention against Torture, but these protections are far more difficult to secure and do not afford permanent status or a pathway to citizenship. Many who are not granted these other protections will be ordered deported even though they qualify for asylum under U.S. law.

Despite requests to provide information on the application of the asylum ban in expedited removal, immigration court hearings, and USCIS adjudications, the government has not provided this data. As asylum seekers held in ICE jails – where legal representation is scarce – are those most likely to be most quickly subjected to the asylum ban in full asylum adjudications, there is currently a dearth of information about the impact of the ban in full asylum adjudications. However, the use of the asylum ban in expedited removal has already led to disastrous consequences, including denial of an opportunity to apply for asylum for people who are entitled to a full adjudication of their claim under U.S. law and increased risk of refoulement in violation of U.S. and international law.



Human
Rights
First

# PRETENSE OF PROTECTION

## Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies



©Carl Juste/Miami Herald

August 2022

STB_AR1_006593

January 2021 through the end of December 2021, shows that immigration judges affirmed negative credible fear determinations for at least:

- **2,347 asylum seekers from Nicaragua** (affirming negative credible fear findings in 70.4 percent of immigration judge reviews conducted under the Biden administration);

- **1,795 asylum seekers from Haiti** (affirming negative credible fear findings in 77.8 percent of immigration judge reviews conducted under the Biden administration);

- **495 asylum seekers from Venezuela** (affirming negative credible fear findings in 46.4 percent of immigration judge reviews conducted under the Biden administration); and

- **260 asylum seekers from Guatemala** (affirming negative credible fear findings in 80 percent of immigration judge reviews conducted under the Biden administration).

The immigration court review process is riddled with flaws and due process violations. Judges often schedule CFI reviews within 24 hours of the initial determination—leaving asylum seekers with virtually no time to prepare or consult with counsel, bar attorneys from participating in reviews,[23] reject additional evidence or testimony, and interpret additional information asylum seekers did not have time or ability to present at the CFI as impugning their credibility. Attorneys and asylum seekers report that immigration judges sometimes limit reviews to a few questions and prevent asylum seekers from sharing additional information. Attorneys report that asylum seekers sometimes do not receive the credible fear decision and notes taken by the asylum officer prior to the immigration judge review, leaving them unable to identify or challenge errors in the record. They are at a major disadvantage even if they do receive these documents because the notes are in English, and a translation is not provided. Even in the rare instance where an asylum seeker does manage to secure counsel, attorneys are frequently not notified of an immigration judge review until the night before or not at all.

Moreover, there is enormous, unfair variation in outcomes depending on the immigration judge assigned to review the credible fear determination, with some judges affirming negative determinations in nearly every case.

Erroneous credible fear determinations and the inadequacy of immigration court review make clear that the Biden administration should avoid the use of expedited removal and, at a minimum, enhance safeguards to reduce the risks of erroneous negative credible fear determinations—rather than stripping out the few existing safeguards in the process.

---

[23] The regulation regarding CFI review does not explicitly guarantee the right to have counsel present at or participate in the review.

https://tucson.com/news/local/border/us-mexico-border-arizona-biden-order-asylum-seekers/article_461bd3a4-29b1-11ef-b884-5f9fc26ba81b.html

ALERT   TOP STORY   TOPICAL

# Border agents ignoring fear claims, migrants say, in violation of Biden order exception

**Emily Bregel**

Jun 15, 2024

NOGALES, Sonora — The exhausted couple sat on the ground outside the Mexican immigration office in the DeConcini port of entry on Friday morning, methodically re-lacing their shoes that officials had inspected, as their two daughters, ages 5 and 10, sat quietly beside them.

Gathering their belongings into small plastic bags provided by the immigration agency, the foursome walked out onto a bustling side street to join dozens of other recently returned migrants, mostly Mexican families with children.

Unrelated families consulted with one another, trying to figure out next steps after being returned to Mexico under President Joe Biden's June 5 executive order, which dramatically restricts access to asylum for migrants who enter the U.S. outside an official port of entry during busy times at the border.

Some of the newly deported migrants said they told Border Patrol agents they feared return to their home country — which is supposed to prompt a credible-fear interview, even under the new rule — but they were ignored and deported anyway.

## People are also reading...

1   **Don't sleep on the carne asada from The Quesadillas, which might be one of Tucson's best-kept secrets**

2   **Where to watch fireworks in Tucson this Fourth of July**

3   **Monsoon is here! 9 Tucson restaurants and bars to watch the weather**

STB_AR1_006704

"Are we in Nogales?" one woman from southern Mexico asked in Spanish. A mother from Chiapas with three children, ages 2, 7 and 12, asked how to find a safe taxi to the nearest airport. Her eyes brimming with tears, she described the dangers they'd fled and that they now must return to in San Cristóbal: the homes in her neighborhood burnt down by criminals with impunity, the bullet that whizzed by her eldest daughter's ear a few weeks ago.

Like the others, the family with two daughters, who asked to remain anonymous, were deported to Sonora through an expedited-removal process on Friday morning. They'd crossed into Arizona two days earlier, through the desert near Lukeville.

Fleeing violence in Mexico City, they said they intended to request asylum once they found a Border Patrol agent. But before they could ask, the agent told them that wasn't an option anymore, under the new asylum policy.

"They just told me we were going to be deported," the father said in Spanish. "They said the government changed the rules. They never let me talk so I could ask for asylum."

None of the five families who spoke with the Arizona Daily Star on Friday were aware of the new asylum restrictions until they crossed the border and surrendered to border agents. They now face a five-year ban on re-entry and possible criminal charges if they try again.

# Agents violating protections, advocates say

The Border Patrol has estimated it's returning 500 Mexican nationals daily to Nogales, Sonora, though it's difficult to track: Only about 200 per day appear to be going through official repatriation processing at Mexico's repatriation office in the DeConcini port, said Pedro De Velasco, director of education and advocacy for binational migrant-aid nonprofit Kino Border Initiative, which has a shelter in Nogales, Sonora. Some are being deported at night, when the office is closed, he said.

STB_AR1_006705

# *Far from Safety: Dangers and Limits to Protection for Asylum Seekers Transiting through Latin America*

**CGRS Report
April 2023**



# Center for Gender & Refugee Studies

STB_AR1_006757

# *Far From Safety: Dangers and Limits to Protection for Asylum Seekers Transiting Through Latin America*

This report was primarily researched and written by Felipe Navarro, with editorial contributions from Kate Jastram and Blaine Bookey. Alex Rodriguez provided research and production assistance. We would like to thank Karen Musalo, Melissa Crow, and Anne Peterson for their valuable feedback on an earlier iteration of information in this report that appears in CGRS's public comment for the proposed regulation, "Circumvention of Lawful Pathways," 88 Fed. Reg. 11704 (Feb. 23, 2023).

The **Center for Gender & Refugee Studies** is a national organization that provides legal expertise, training, and resources to advocates representing asylum seekers, litigates to expand protections for refugees, advances refugee law and policy, and uses domestic, regional and international human rights mechanisms to address the root causes of persecution.

Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
(415) 565-4877
http://cgrs.uchastings.edu ©

STB_AR1_006758

## Mexico

### Dangers for Asylum Seekers

Mexico is an unsafe country for many asylum seekers, who are targeted by both government authorities and criminal gangs. The Department of State recognizes that "[t]he press, international organizations, and NGOs [have] reported targeting and victimization of migrants and asylum seekers by criminal groups." There have been numerous instances of these groups extorting, threatening, or kidnapping asylum seekers and other migrants. "In many parts of the country, human smuggling organizations wield significant power, and media allege frequent collusion



among local authorities."[7] As reported by CGRS and other human rights organizations, there are several instances of documented violence against asylum seekers transiting or returned to Mexico, particularly women, children, LGBTQ+ individuals, and others who are particularly vulnerable.[8] Mexican immigration or law enforcement authorities are responsible for a large share of this violence and other crimes committed against asylum seekers.[9]

The combination of stringent immigration enforcement measures in Mexico and U.S. policies that restrict asylum seekers' access to the border have tragically resulted in many deaths. A recent example is the devastating fire that broke out at an immigration processing facility in Ciudad Juarez, Mexico, which claimed the lives of 39 individuals and injured many others. Shockingly, video footage of the incident shows uniformed officials passing by the flames without attempting to open the door or provide assistance to the trapped asylum seekers.[10]

### Deficiencies in the Asylum System

The U.S. government asserts that Mexico has become one of the top countries receiving asylum applications due to the government's efforts to strengthen its international protection system.[11] It is true that asylum applications have increased exponentially in Mexico over the last few years.[12] However, this dramatic increase in asylum applications does not indicate that more asylum seekers feel safe in Mexico and are choosing it as a destination. Rather, it coincides with the U.S. government's implementation of policies that severely restricted access to the U.S. territory and asylum system,[13] forcing thousands of individuals – particularly Black Haitian and African asylum seekers – to remain in a country through which they intended only to transit.[14]

In practice, Mexico's asylum system is overwhelmed despite efforts to increase its capacity. COMAR ("Comisión Mexicana de Ayuda a Refugiados"), Mexico's refugee agency, has modestly increased its staffing and field presence. Yet despite these efforts, the agency cannot meet the demand resulting from an increasing number of applications. COMAR's budget has increased over the years, but only modestly and not commensurate with the increase in asylum applications.[15] For 2023, COMAR was assigned a budget of around 2.5 million U.S. dollars. This represents only a 5.8 percent increase over the budget for 2022, and an 8.8 percent increase as compared with 2021.[16] In practice, the unprecedented number of asylum seekers in Mexico has overstretched COMAR's capacity to process

STB_AR1_006762

asylum requests.[17] This lack of capacity has become one of many obstacles to accessing international protection in Mexico.[18]

An illustration of COMAR's lack of capacity is the limited number of requests it adjudicates, in comparison with the total number of applications received. Between 2020 and 2022, COMAR resolved on average 32,189 cases per year, while it received 183,555 asylum applications during the same period.[19] Further, while COMAR granted asylum or complementary protection in around 74 percent of cases adjudicated, it is important to note that the agency treats asylum seekers differently depending on their nationality. For example, COMAR may grant protection to many Hondurans, Venezuelans, and Salvadorans, "while rejecting most applicants from Haiti, saying they do not qualify as refugees."[20] The approval rate among applicants for Haiti was only 12 percent in 2022.[21]

Additional barriers to accessing protection in Mexico include a limited period of 30 days to file asylum applications after entering the country,[22] as well as a series of practices and policies that prevent asylum seekers from filing their claims or obtaining proper support during the process. For instance, human rights organizations have documented cases where immigration agents have dissuaded asylum seekers from applying for refugee status and instead pressured them to agree to voluntary returns, "even when they said they would be at risk of violence and persecution in their home countries."[23] At airports, Mexican immigration authorities have turned around individuals intending to seek protection in Mexico.[24] Mexican authorities have also illegally expelled asylum seekers from the interior of the country and from its southern border.[25]

Further, Mexican law forces asylum seekers to remain in the jurisdiction in which they applied for protection during the duration of their proceedings.[26] This has caused a bottleneck of cases at Mexico's southern border. In 2021 and 2022, on average over 66 percent of those who applied for asylum in Mexico did so in Tapachula, Chiapas, where conditions are dire. Shelters in Chiapas have been stretched beyond their capacity, jobs are nearly impossible to find, and individuals waiting for appointments or decisions are provided little to no assistance, forcing many to live in the streets.[27] Asylum seekers in Tapachula are also prevented from accessing healthcare services, as providers often require them to provide documentation they do not have.[28] Further, not only have asylum seekers experienced violence in Tapachula, but many have also reported feeling unsafe due to its proximity to the Guatemalan border, where some of the gangs they have fled operate.[29]

### Detention

Mexico's immigration detention system presents another serious barrier to accessing or receiving protection. While the national Migration Law sets a maximum of 60 days for immigration detention, the implementing regulation provides that asylum seekers can be detained for the entire duration of their proceedings.[30]

Asylum seekers in detention face overcrowding, unsanitary conditions, lack of services, and inadequate food and healthcare, forcing many to drop their claims in order to be released.[31] Most of them never receive information about their right to apply for asylum or complementary protection while in detention.[32] During 2021, foreign nationals arriving at airports to seek protection were detained by Mexican migration authorities and held in detention for weeks, without any opportunity

STB_AR1_006763

to apply for asylum.[33] There have also been incidents of torture reported in immigration detention centers.[34]

**Discrimination and Access to Basic Services**

The asylum-seeking population in Mexico has also shifted over the last few years, with an increasing number of both Black and non-Spanish speaking applicants.[35] These asylum seekers face racism and increased xenophobia.[36] For example, as documented by CGRS and other organizations, discrimination and racial profiling prevents Haitian asylum seekers from accessing employment, housing, or even public transportation in Mexico.[37] Non-Spanish speakers face language barriers further prevent access to both the asylum system and services such as education and healthcare.[38]

In short, Mexico does not meet the requirements of a safe third country under U.S. law and international standards.

## Belize

**Deficiencies in the Asylum System**



Although Belize is a country with lower levels of violence, and greater respect for human rights than many of its nearby neighbors, its asylum system is barely functional. By December 2022, Belize had granted asylum to fewer than 100 individuals, resulting in a backlog of over 4,000 cases.[39]

Asylum seekers in Belize face an inaccessible and inefficient asylum system. First, the actual process is cumbersome as it involves a single Eligibility Officer who oversees gathering and reviewing claims before passing them on to the Refugee Eligibility Committee, a 9-member group that reviews only a limited number of cases at monthly meetings.[40] According to the Department of State, out of 640 positive recommendations, the Ministry of Immigration has granted asylum in only 15 percent of them.[41] Second, more than 50% of asylum seekers report not applying for asylum in Belize due to not knowing it was an option or not having information on how to do so, a clear barrier to accessing the system.[42]

Worse, there are also reports that Belizean authorities prevent asylum seekers from seeking protection or discriminate against them. For example, the Human Rights Commission of Belize reported that 26 individuals filed complaints for not being allowed to apply for refugee status in 2022, while the true number is believed to be much higher.[43] And while the Belizean Refugee Law recognizes the right to seek asylum regardless of the matter of entry into the country, there have been cases reported of asylum seekers being denied this opportunity because they entered irregularly.[44] During 2022, "the government repatriated Cuban nationals who claimed their lives or freedom would be threatened due to their opposition to the government. Belize and Cuba have an agreement that requires Belize to return to Cuba all irregular migrants with Cuban citizenship."[45] Additionally, one government study reported that 15 percent of asylum seekers claimed to have entered Belize irregularly after being rejected at ports of entry due to their nationality.[46]

6



# REFUGEE PROTECTION TRAVESTY

## Biden Asylum Ban Endangers and Punishes At-Risk Asylum Seekers

July 2023

STB_AR1_006842

humanitarian efforts in Mexico, and create funding programs beyond those already in existence, to ensure critical support for sustainable and longer-term faith-based, humanitarian, and other refugee reception in the United States — both along the U.S.-Mexico border and in destination communities across the country.

## The Asylum Ban Endangers Lives

People seeking asylum at the U.S. southwest border in the wake of the Biden administration's asylum ban face grave risks of violence as they struggle to secure CBP One appointments or risk the penalties the asylum ban inflicts if they attempt to approach a port of entry without an appointment or cross the border between U.S. ports of entry. Many are stranded and, instead of being swiftly processed at ports of entry as they should be under U.S. law, are left to wait for months for CBP One appointments in Mexico.  Many are, as a result, stranded in cities that the U.S. State Department has assessed as too dangerous for Americans to even visit. In these and other areas in Mexico, migrants and people seeking asylum — marked by their languages, accents, race, and lack of legal protection — are particular targets of kidnapping, torture, and other human rights abuses.

People seeking asylum — including women, children, and other vulnerable groups — face these grave risks as they wait to seek asylum under the Biden asylum ban. Local humanitarian workers in Reynosa, Tamaulipas, where kidnappings have been prevalent, stressed their concern over alarming incidences of rape and increased kidnappings in the last two months. Human Rights First researchers interviewed many people who suffered horrific harm and threats of violence as they waited in Mexico in the weeks following the implementation of the asylum ban on May 12.  For example:

- **A Honduran woman was raped while waiting for a CBP One appointment and turned away from a port of entry by Mexican officers despite the risk to her life.** Fleeing persecution, she was living alone in a makeshift tent in the Matamoros encampment for three months trying to obtain a CBP One appointment to seek asylum and was **violently raped in her tent at night** in late May 2023 by a man who cursed at her for being a migrant and **threatened to kill her** if she told anyone. She screamed for help, but no one came. Her rapist returned another night in early June 2023 and attempted to rape her again, but she defended herself and escaped the camp. Terrified, she filed a police report and attempted to access the U.S. port of entry in Matamoros after both attacks but was blocked from accessing the U.S. port of entry **both times by Mexican immigration officers** despite her evidence and testimony that she feared for her life. Instead, Mexican immigration officers questioned her as to whether she was in fact raped. She has **received death threats** related to her sexual assault by phone. She

was unaware of the asylum ban prior to being informed of it by a Human Rights First researcher, who also explained that she may be subjected to its penalties if she tries to seek asylum without an appointment.

**"I am afraid for my life here. Afraid that I will be killed, kidnapped, or that they'll do something to me.**

**In my country, I'm a professional. I had a career. I'm not coming to work. I came because my life was in danger. And something that had never happened to me – a rape – happened to me here."**

- A Latin American[1] man seeking asylum **suffered an enforced disappearance when he was kidnapped and tortured by Mexican officials in Reynosa while trying to secure a CBP One appointment.** He arrived at the U.S.-Mexico border in December 2022 and has been attempting to secure a CBP One appointment for **four months.** He was recently **beaten unconscious and subjected to an enforced disappearance when he was kidnapped by men dressed as Mexican officials in Reynosa**, according to information received by an attorney with Lawyers for Good Government in Reynosa. He managed to escape after one night, but due to the extreme physical violence, he continues to suffer from severe headaches, gastrointestinal issues, and other symptoms. He said: **"I constantly hear a loud ringing noise in my ears and it feels like the back of my head is inflating like a balloon. Because of these symptoms, I often want to be alone and feel like my pain and desperation are getting the best of me."** His kidnappers robbed him of his phone so he had to obtain a new smartphone in order to begin requesting a CBP One appointment once again. The man has been requesting a CBP One appointment every day since. After his escape, he went into hiding. However, **he saw two men following him**, so he relocated. He **does not go outside because he fears he will be found and tortured again**. He will be forced to leave his current housing arrangement soon and has nowhere else to go.

- A Latin American[2] woman was **kidnapped, trafficked, and raped and has been forced to wait at risk of harm in Mexico while trying to obtain a CBP One appointment, unable to seek U.S. asylum protection**. As she waited to seek U.S. asylum in Mexico, she was **kidnapped, held captive, and abused for about a month and a half, according to information received by** an attorney with Lawyers for Good Government in Reynosa.  She was able to escape her captors, only to be **taken and held captive a second time**.

[1] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.
[2] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.

**STB_AR1_006852**

She said: **"I was held captive at this house for about two months and I thought the only way I would leave the house was if I were dead."**

During her captivity, **her captors trafficked her to drug dealers who raped her on several different occasions.** She has been **in hiding** since her escape and has been requesting a CBP One appointment daily without success. She has been **unable to present at the port of entry** to seek U.S. asylum protection due to **Mexican immigration officers unlawfully blocking access** to individuals without CBP One appointments.

- **A Venezuelan women and child were kidnapped, and the mother was raped while waiting for a CBP One appointment. They were then denied access to the port of entry by Mexican officers. They risk the punishment of the asylum ban if they attempt to enter between ports of entry or present without a CBP One appointment.** The mother, her minor son, and adult sister attempted to obtain a CBP One appointment to seek asylum in mid-May 2023 when they were kidnapped and held for 12 days in Reynosa in June 2023. Their abductors **threatened to take their organs if their families didn't pay a ransom.**

  The women described being placed in a room with 50 people from China, Cuba, Ecuador, Honduras, Mexico, and Russia, including kids as young as two years old, all on top of each other. Their kidnappers threatened and beat people, including the children.

  "We **witnessed** them [the cartel] **taser men with electricity who screamed in pain right in front of us** and **severely beat** men if the transfer payment hadn't come through. **My son cried a lot, begging to leave.** They'd also give drugs to the teenage children."

  That first night, a cartel member raped the Venezuelan mother. "He **threatened to kill my son and sister** and threatened me to stay quiet. **We were terrified each time the door opened and our abusers entered. We prayed and prayed.**

  **We feel completely unsafe here in Mexico. We're terrified to go outside; afraid we'll be taken again."**

- **Venezuelan siblings waiting for a CBP One appointment were denied access to seek asylum at U.S. port of entry by Mexican officers, traveled to a different port of entry where they were kidnapped and tortured, and were again blocked from seeking protection by Mexican officers despite the risk to their lives.** Two Venezuelan young adults, one minor sibling, and their girlfriend arrived in Matamoros after the asylum ban went into effect. They had been trying to obtain a CBP One appointment to seek U.S. asylum since April. Access to the U.S. port of entry in Matamoros was blocked by Mexican immigration officers so they traveled to Reynosa in June, where they heard they may be able to access the port of entry. In Reynosa, they were intercepted by a car while

STB_AR1_006853

walking. The driver asked where they were from and then kidnapped and held them hostage for three days. During that time, they were all physically assaulted and the **women** were **tortured for ransom.**

The kidnappers threatened **"[i]f you don't pay, we'll cut off your fingers."**

The family's relatives paid the ransom and they were released. They live in constant fear, as their kidnappers took their photos. Following the kidnapping, they escaped Reynosa and returned to Matamoros. They attempted to present at the Matamoros port of entry to request asylum, explaining their fear and what had happened, but were **prevented from approaching the U.S. port of entry by Mexican immigration officers** who wrongly turned them away because they did not have a CBP One appointment.

- **A terrified Venezuelan family that suffered brutal kidnapping while waiting for a CBP One appointment is living in fear of further harm while forced to wait in danger.** The mother, father, and their adolescent and preschool-aged children who had been trying to obtain a CBP One appointment to seek U.S. asylum were **kidnapped** by a cartel in early June in Reynosa and held for 10 days. During their kidnapping, the mother was **sexually abused by a cartel member on two occasions.** The family also described witnessing intense beatings of migrant men and hearing their screams for pain, including one severely assaulted man who pled to his family by phone to send the money or he would be killed. "**It was horrible. You don't know if you'll get out alive. My kids cried and cried. They wanted to leave, wanted to cross [to the U.S.]; they didn't want to be here.**"

  After their release, the family had to register for CBP One again as the phone they had previously used to register was stolen by the cartel. **"We've been waiting for an appointment that doesn't arrive. It [the app] doesn't care about the risk [we face] or our human rights."**

  They managed to keep their other phone when they were released but **have been receiving threatening calls** demanding payment of more money. **"There is no authority here. There was no security. Even hotels aren't safe, they collaborate."**

  **"There is no sense of peace. I ask God to help us get out of here. My family is in danger here. At night you hear gunfire. We're terrified to go out on the street. We aren't safe here in Mexico. At least, thank God, we are alive."**

- **A Latin American[3] family was kidnapped and the mother raped while waiting for a CBP One appointment, but they are forced to continue to wait in danger.** The family,

including two elementary-school aged children, were kidnapped in Reynosa in late May and held for 13 days after trying for weeks **to obtain a CBP One appointment to seek U.S. asylum**. The family's relatives with young children were also kidnapped with them. While kidnapped, the mother **was sexually assaulted by cartel members**. She prayed they wouldn't sexually abuse her daughter. **"It was a difficult experience for the children. They didn't eat. They cried. They wanted to escape, but we couldn't."** After 13 days the family was released but the cartel kept their phones and money, so they had no resources to buy a smartphone to use the CBP One app. Nor could they approach the port of entry in Reynosa because it was blocked by Mexican authorities to those who don't have a CBP One appointment. They have been trapped in Reynosa. In late June 2023, they were able to borrow a phone and register on the CBP One app again and were still waiting for an appointment. **A few days after the family's relatives and their young children were released, they were kidnapped again.** At the time the family spoke with Human Rights First, their fates were still unknown.

- **A Venezuelan family was threatened, robbed, and their son nearly kidnapped while waiting for CBP One appointment, and were denied access to the port by Mexican officers.** The family, including a teenage son and young daughter, have been waiting one month in Matamoros to obtain a CBP One appointment to seek asylum. They rented a room where other migrant families were staying, where they thought they would be safe. One day at dawn, **masked men identifying themselves as members of the cartel in charge in Matamoros,** entered and ransacked the house, stealing the family's money, and **attempted to grab the teenage son**. The adult male in the family defended the son and the masked men threatened him, saying that **if they find him in Matamoros, they will kill him.** The family heard others in the house yelling as if being injured. The family fled and approached the port of entry explaining they were afraid for their lives.

  **Mexican immigration officers told them, "[i]t's not our problem."**

- **A Venezuelan woman is in hiding after experiencing attempted kidnappings while waiting for a CBP One appointment, yet was denied access to U.S. port by Mexican officers.** The woman, who is traveling alone, has been trying **to obtain a CBP One appointment since April 2023**. During the last days of Title 42, she attempted to seek U.S. asylum protection and was **laterally expelled by CBP** from Matamoros — where she entered — to **immediate harm in Reynosa.** Upon arrival to Reynosa alone, she experienced an **attempted kidnapping** by a taxi driver. She escaped and joined a group of other women who had also been expelled to walk together to the bus terminal, but **a black truck circled them and tried to abduct two women**. She traveled to Matamoros and **continued to request a CBP One appointment each day** in the wake of the asylum ban. She slept on the street outside a shelter and was informed that **a man who had her photo was looking for her**. She sought safety elsewhere and was told that two men who said they were her cousins **had come the night before to look for her.** She

STB_AR1_006855

fled to the Matamoros port of entry to try again to seek U.S. asylum, but **Mexican immigration officers blocked and informed her she needed a CBP One appointment**. She is **in hiding** and **afraid for her life**.

Many people waiting in Mexico to seek asylum are living in makeshift encampments with none of the necessary safeguards or systems in place to protect women, children, LGBTQ+, and other vulnerable people from being targets of abuse and violence. Local aid workers report instances of the cartel terrorizing the Matamoros camp in June 2023 as well as individuals and families facing heightened risk of kidnapping, rape, and other violent harm in the encampments and outside shelters in Reynosa.



Makeshift tents in the Matamoros encampment, June 2023.

- In early June 2023, two Haitian couples traveling with an 11-month-old infant told a Human Rights First researcher about extortion and dangers they had experienced in Mexico, including difficulties finding safe shelter and an **attempted kidnapping** they had experienced the day prior in Nogales as they approached the DeConcini Port of Entry. The father of the baby shared:

  **"We were walking toward here. A truck with three men stopped and they got out and started coming toward us. 'RUN!' I shouted to my wife and baby. We managed to escape."**

- A Colombian **elderly woman travelling alone was physically attacked and verbally assaulted** in the Matamoros camp by **a member of the cartel** who identified himself as the person in charge and whom others said was the leader. She immediately hid in another family's tent, pleading to be allowed to sleep there that night before escaping the camp the next day.

  **"The terror I felt that night was the worst in my life. They [the cartel] don't respect if you're an older woman, a child, a pregnant woman. People are taken from the camp and disappeared, and no one can say anything."**

- A **Mexican Indigenous mother** living alone in the Matamoros encampment with her **infant and three children** explained in May 2023 that her partner obtained a CBP One appointment two months prior but was unable to get one for all of them. As a result of CBP's policy to only process individuals with appointments, she stayed behind in the camp with their children as she tried to request a CBP One appointment daily. She explained that others in the camp knew she was now alone with her children and told of **an attempted sexual assault she experienced when a man entered her tent at night**. She also told of another man who **kept asking for her two elementary school-aged daughters** and the risk of kidnapping and trafficking they faced, forcing them to flee the camp.

- A **Haitian mother with two young daughters** who were living in an encampment in Reynosa while trying to obtain a CBP One appointment to request U.S. asylum shared that **she did not feel safe in Mexico** and that she **used a cable wire to tie her two daughters to her at night to prevent someone from taking them.**



Young Haitian child living in a tent in a
camp in Matamoros, Mexico, June 2023.

- **Lack of safety, fears that daughters will be kidnapped, and inability to secure CBP One appointment after two months leave family wondering how to cross to safety.** An Ecuadorean family with two teenage children and a six-year-old daughter fleeing threats of harm in Ecuador have been living in the Matamoros camp for two months, unable to obtain a CBP One appointment to seek asylum.

  "**We don't sleep. You have to keep one eye open. We use a cable wire to tie ourselves together at night and tie shut our tent. I'm afraid they'll take my girls.**"

  Her 17-year-old daughter's mental health has deteriorated: "**She cuts herself. She feels very unsafe here. There's no privacy. She asks why we can't leave. How can we cross?**" she told a Human Rights First researcher as her daughter showed her cut marks.

- **Venezuelan women and children fear kidnapping living on the street as they struggle for over two months to get CBP One appointments and are turned away by U.S. CBP officers and Mexican immigration officers at the port of entry.** The women, who are cousins and one of whom is a mother to one and four-year-old daughters, have been waiting for two and three months, respectively, trying to seek a CBP One

STB_AR1_006858

appointment. "We've been **sleeping on the street**. I worry for my one and four-year-old girls. They **cry from hunger most days. They're not sleeping**. A woman **photographed us yesterday and a black truck approached in the middle of the night** as we walked looking for where to sleep. We've been trying for [two and] three months to get a CBP One appointment.

**We're afraid. We can't continue like this.** We're trying to present ourselves to be processed and to put forward our case. We made it to the bridge and waited hours feet from the American officials, but **Mexican immigration removed us.**"

The next day, the women and children made it onto the bridge again and walked straight to speak with the CBP officers to share their fears and request protection. **CBP Officers informed them they couldn't help them.** One of the women indicated that an officer left and made a phone call. They were left waiting about 15 minutes before **Mexican immigration officers approached them on the bridge and removed them.**

- A Haitian man living in a tent in an open-air camp in Matamoros in June 2023 who has been trying to obtain a CBP One appointment for over one month shared his fears after observing a car stop at 3 a.m. and ask Haitians in the camp whether they wanted to work as they had jobs for them. The Haitians answered no. **He feared it was a ploy to kidnap them**. Some nights he observes a car drive past the encampment and park across the street.

**"Sometimes we don't sleep because we're obliged to not lose consciousness."**



Haitian camp in Matamoros, Mexico, June 2023.

Non-Mexicans presenting at ports of entry without a CBP One appointment who are subject to the asylum ban can later try to overcome the ban and be considered for asylum if they can prove that they (or a member of their family who they are traveling with) faced an "exceptionally compelling" circumstance, such as at the time of entry into the United States, faced an acute medical emergency; an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a "victim of a severe form of trafficking in persons," as defined by U.S. regulations.

The narrow **exceptions to the ban will not protect many refugees** and will often be impossible to prove. For instance, many asylum seekers in Mexico suffer horrific violence at the hands of Mexican government agents and cartels, with many targeted precisely because they are migrants or seeking asylum in the United States. Human Rights First has tracked over 13,000 reports of murders, kidnappings, rapes, and other violent attacks against migrants blocked in or expelled to Mexico due to Title 42 since President Biden took office. Amid this unremitting violence, asylum seekers in Mexican border regions so often face a serious risk to their safety that it is absurd to require an asylum seeker to establish an "imminent and extreme" threat to life or safety, and it is unclear how they could even prove to an adjudicator that they would have been kidnapped, raped, murdered, or otherwise harmed had they remained in danger for longer.

As is, people facing an urgent protection situation, including threats to their life or safety such as risk of sexual assault, kidnapping, torture or murder, as detailed above, have been left by U.S. officials to wait indefinitely in the wake of the Biden asylum ban as have people with urgent medical emergencies. For example:

- A Venezuelan woman who suffers from heart problems including myocardial ischemia and necrosis had been trying to obtain a CBP One appointment for three months when she **suffered a heart attack at the Matamoros port of entry** while trying to present to seek asylum. A doctor at the port of entry helped her. She told **Mexican immigration officers** that she had suffered a heart attack and had medical documents and tests confirming this diagnosis but **was told to move aside for people with CBP One appointments**.

- A Guatemalan mother in Tijuana fleeing threats to her and her children's life is ill and requires **dialysis treatment due to kidney failure** but has been unable to access asylum protection and has been left waiting to secure a CBP One appointment since May 2023.

- A local humanitarian worker who provides support to critical medical cases requiring access to the Reynosa port of entry was **harassed and threatened by CBP officers,** when attempting to support a **Haitian asylum-seeking man experiencing a medical emergency** who was hospitalized at a local hospital that was unable to provide the emergency treatment he needed. The worker requested access to the Reynosa port of entry for the Haitian man as had been customary for medical emergencies that required transport by ambulance just months prior under Title 42. The humanitarian worker was told by CBP officers at the limit line, "**This isn't our problem. If you want, you can bring him to wait in line.**" At this time, other vulnerable individuals waiting at the limit line to access the port without an appointment were being **forced to wait by CBP for over 72 hours in extreme heat** as they deprioritized persons waiting without CBP One appointments.

"**If I bring him to wait in this line without medical care, he will die,**" she said.

After advocacy by another local humanitarian worker, the ambulance transporting the critical case was approved to cross. Yet upon arrival at the port with the ambulance, the humanitarian worker and the Haitian man were harassed by CBP: **"It's you again?"** the CBP officer greeted the humanitarian worker who tried to explain the situation **but was silenced**. A CBP nurse said, "**You call this an emergency?**" and **removed the Haitian man's oxygen tubes and ordered him to stand up, lowering him from the bed and off the ambulance**. A CBP supervisor **refused to provide the Haitian man with a wheelchair and instead forced him to walk and to carry his luggage,** prohibiting the humanitarian worker from carrying it for him. The CBP supervisor accepted the man for processing and ordered the local humanitarian worker to leave, threatening her and saying she was prohibited from return:

"**You're already in trouble, so if you don't want to have more problems, leave. You are no longer allowed in this area.**"

## Asylum Ban Denies Asylum to Refugees Who Have No Knowledge of It

While some Biden administration officials have attempted to paint the asylum ban as the pivotal factor leading to decreased border crossings after the end of the Title 42 policy, multiple human rights and humanitarian monitors have learned, through speaking with many people waiting in Mexico to seek asylum, that during this period of time, waiting asylum seekers have actually been largely unaware of the asylum ban rule and its consequences. Since the Biden administration initiated its asylum ban in early May 2023, Human Rights First researchers and attorneys have spoken with over 300 people waiting to seek asylum across the southwest border with Mexico, including asylum seekers waiting in Matamoros and Reynosa, Tamaulipas; Ciudad Juárez, Chihuahua; Nogales, Sonora; and Tijuana, Baja California. **Overwhelmingly, the people seeking asylum who our researchers spoke with in the days and weeks after the asylum ban's implementation did not know what the asylum ban was and none understood the penalties it inflicts based on an individual's manner of entry to the United States.**

Multiple humanitarian monitors from various organizations have reported on asylum seekers' lack of information and knowledge about the asylum ban and its consequences. A June 2023 monitoring report issued by the International Rescue Committee (IRC) and six other organizations concluded that "[a]t observed ports of entry where monitors spoke with awaiting asylum seekers without CBP One appointments, many expressed confusion about the difference between Title 42 and the current process or were unaware of the new restrictions that make individuals requesting protection at a port of entry without a CBP One appointment, including themselves, presumptively ineligible for asylum. Humanitarian page



July 3, 2024

Via Federal e-Rulemaking Portal
https://www.regulations.gov

Daniel Delgado
Acting Deputy Assistant Secretary for Immigration Policy
Office of Strategy, Policy, and Plans
Department of Homeland Security

Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
Department of Justice

Re:    *Securing the Border,* 89 FR 48710 (June 7, 2024), USCIS Docket No. USCIS-2024-0006
       and *Presidential Proclamation,* 89 FR 48487 (June 3, 2024)

Dear Mr. Delgado and Ms. Reid:

The Center for Gender & Refugee Studies (CGRS) submits this comment in
response to USCIS Docket No. USCIS-2024-0006 *Securing the Border* (June 7, 2024)
(hereinafter "Interim Final Rule" or "Rule"). We include the following outline to
guide your review.

STB_AR1_007477

Yet, the Departments fail to explain how providing advance notice to asylum seekers would have been effectuated in the first place. In the wake of implementation of the Lawful Pathways rule, researchers found that people seeking asylum at our southern border "overwhelmingly" did not know what the rule was or the penalties it imposed based on an individual's manner of entry into the United States.[20] CGRS staff have encountered similar lack of knowledge among current asylum seekers about the instant Rule since it took effect. The Departments also do not explain why advance notice would even have mattered when smugglers are spreading lies about how to get to the United States. Given the extremely compelling reasons that continue to force people to flee in search of safety, and the malign influence of smugglers regardless of what border policies may be in place, it is speculative at best to assert that giving advance notice would have resulted in a surge of people to the border.

### B. The Good Cause Exception Does Not Apply Since Providing Notice Would Have Been Both Practicable and in the Public Interest

The Departments next assert that the Rule falls within the good cause exception to the APA's notice-and-comment and delayed-effective-date requirements because compliance would be both impracticable and contrary to the public interest. Rule 48762.

### 1. Providing notice was practicable

As noted in the Rule, findings of impracticability depend on the facts and the context. Rule 48762. Yet the Departments focus solely on reducing numbers at the border at all costs,[21] and avoiding a potential increase of asylum applicants, which, as pointed out above, is speculative in the first place. The Departments also fail entirely to consider that border management policies must comply with existing U.S. and international law designed to protect refugees. Instead, the Rule is forthright in presenting adherence to the law as a problem that the Departments feel they must overcome. For example, the Rule laments that:

> [Department of Homeland Security (DHS)]'s ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's

---

[20] Human Rights First, Refugee Protection Travesty (July 2023), at 21 (hereinafter HRF, Travesty), *attached*.

[21] As the Rule stresses, "The **critical** need to **immediately** implement more effective border management measures is described **at length** in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble." Rule 48762 (emphasis added).

STB_AR1_007485

negative credible fear determination, which requires additional time and resources. Rule 48762.

It is striking that this depiction of the problem is a description of the legally-required process, a decades-long feature of U.S. law that the Departments now treat as a bug.

As another example of its failure to situate the impracticability analysis in its proper context, the Rule frequently refers to U.S. policy as providing "real and perceived incentives" to migrate, Rule 48764, with little corresponding recognition of factors that force people to flee, regardless of how draconian U.S. border procedures may be.

## 2. Providing notice was in the public interest

Turning to the second prong of the good cause exception, the Departments assert that providing notice and delaying implementation would have been contrary to the public interest, again citing the possible increase in people coming to the border in anticipation of a policy change. Rule 48764. As noted above, the potential increase due to providing advance notice is speculative at best.

As further justification, the Departments point to smugglers who create a sense of urgency among migrants by overemphasizing the significance of recent or upcoming policy developments. Rule 48764. However, as noted above, the Departments also state that smugglers spread rumors and misrepresent facts, Rule 48764, which suggests that actual changes in policy are not needed for smugglers to drum up business. In invoking the negative role of smugglers, the Departments again fail to acknowledge the larger context that the more difficult it is to apply for asylum, the more likely it is that people will turn to smugglers in desperation to guide them through the labyrinth of obstacles before them.

The Departments' argument that asylum seekers from Mexico may have had "an additional perceived incentive" to "rush to the border" during a notice-and-comment period, Rule 48765, is particularly reprehensible. They thus acknowledge that, contrary even to the Lawful Pathways rule, direct *refoulement* of Mexican asylum seekers to their country of origin is a specific aim of the instant Rule.

The Departments' chief error here is a narrowly circumscribed view of the public interest, defined solely as reducing the number of people seeking asylum at the border. The Departments fail to acknowledge the public interest in complying with existing law and honoring our treaty commitments, particularly insofar as these international obligations

STB_AR1_007486

to address issues of fairness or to acknowledge very serious errors amounting to *refoulement* that have been documented as a result of the Lawful Pathways rule.[112] Further heightening the credible fear interview standard is inconsistent with the Departments' stated intent to "safeguard the rights of asylum seekers." Rule 48745. To the contrary, the experience of applying the Lawful Pathways rule should serve as a warning. It is not possible to safeguard rights while dramatically heightening the screening standard in a preliminary interview.

### 5.  The assertion that the Rule is necessary to quickly screen out nonmeritorious claims is built on inconclusive data and a misapprehension of the factors that lead to denial of asylum claims

The Departments claim that raising screening standards is necessary to quickly eliminate nonmeritorious claims. Rule 48745-46. However, nowhere in the Rule do the Departments point to any correlation between manner of entry and the ultimate determination of asylum eligibility. That is because the manner in which asylum seekers enter the United States says nothing about the *bona fide* nature of their claims. Instead, the Departments rely on inconclusive and outdated data to suggest that a disparity between positive credible fear findings and the percentage of asylum grants in the same period means most asylum claims lack merit. Rule 48746. The data does not prove what the Departments suggest it does.

First, as acknowledged in the Lawful Pathways rule, the majority of cases with positive credible fear interview findings in the relevant period have not been fully adjudicated by the asylum office or immigration court.[113] Nevertheless, the Departments have not adjusted their statistics to reflect that. Notably, in 2018 and 2019, two years of the period the Departments cited (fiscal years 2014–2019), several now-defunct or enjoined Trump administration policies were in place—including the prior transit ban and the Migrant Protection Protocols (MPP)—which led to improper denials. That period was also marred by several now-vacated decisions from Trump administration Attorneys General which were frequently applied to preclude applicants with claims based on domestic violence or family membership from obtaining asylum.[114] However, the Departments consider none of this

---

[112] HRF, Trapped.
[113] 88 Fed. Reg. 11716.
[114] *See Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018) ("*A-B- I*"), and *Matter of A-B-*, 28 I&N Dec. 199 (A.G. 2021) ("*A-B- II*"), vacated by *Matter of A-B-*, 28 I&N Dec. 307 (A.G. 2021) ("*A-B- III*"); *see also Matter of L-E-A-*, 27 I&N Dec. 581 (A.G. 2019) ("*L-E-A- II*"), vacated by *Matter of L-E-A-*, 28 I&N Dec. 304 (A.G. 2021) ("*L-E-A- III*").

STB_AR1_007513

context when alleging that positive credible fear interview rates far exceeded asylum grant rates and that those disparities reflect that claims lack merit.

Additionally, asylum claims may be denied for reasons other than the merits, such as poor interpretation, lack of counsel, and other procedural barriers. This is due to the numerous obstacles faced by asylum seekers in presenting their claims and the complicated nature of the asylum requirements which have led to inconsistent adjudications at all procedural levels.

Lack of counsel significantly affects asylum outcomes. In fact, the ability to find counsel is one of, if not the, single biggest factor in whether an applicant will be successful in their claim. Those who are represented are nearly five times more likely to win their cases than their unrepresented counterparts.[115] Those subjected to MPP during the period the Departments cite faced significant obstacles to obtaining or meeting with counsel which interfered with their abilities to present their claims.[116]

Given the correlation between legal representation and grants of relief, it is essential that asylum seekers be given every opportunity to obtain counsel. However, under the Rule, asylum seekers are required to prove their eligibility to apply for asylum by a preponderance of the evidence, a standard far exceeding what is required in regular asylum proceedings, at the credible fear screening stage, where most asylum seekers are unrepresented.

Additionally, the lack of clarity and inconsistent application of legal standards to asylum claims can lead to denials of relief. This frequently arises in the context of claims involving persecution based on membership in a particular social group. President Biden has identified the need to clarify and simplify these standards and bring them into alignment with international refugee law through additional rulemaking.[117] However, the Departments have still not proposed a rule addressing this fundamental issue.[118] This is

---

[115] *See* TRAC, "Record Number of Asylum Cases in FY 2019," (Jan. 8, 2020), *attached.*

[116] Of the 31,964 individuals in MPP removal proceedings as of May 2020, only 224 were represented (i.e., <1%). TRAC, "Details on MPP (Remain in Mexico) Deportation Proceedings by Hearing Location & Attendance, Representation, Nationality, Month & Year of NTA, Outcome, & Current Status"; American Bar Association, "ABA Testifies on 'Remain in Mexico' Policy" (Nov. 21, 2019); TRAC, "Access to Attorneys Difficult for Those Required to Remain in Mexico" (July 29, 2019), *attached*; Kate Morrissey, "Access to Attorneys May Be Additional Challenge for Asylum Seekers 'Remaining in Mexico,'" San Diego Tribune (Feb. 19, 2019).

[117] *See* Executive Order 14010.

[118] Fall 2023 Unified Agenda of Regulatory and Deregulatory Actions, Off. of Mgmt. & Budget, RIN 1125-AB13, *Clarifying Definitions and Analyses for Fair and Efficient Asylum and Other Protection Determinations.*

STB_AR1_007514

particularly harmful to *pro se* individuals who have neither the knowledge nor the resources to navigate the complexities of domestic asylum law and fully present their claims.

While the Departments claim that the rule is essential to "swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage," they cannot provide any rational explanation for how barring claims based on manner of entry will screen out unmeritorious claims. Instead, the Rule hinges on rejection of claims on bases that have nothing to do with the merits of the underlying fear-of-return claims. And, as discussed below, the Departments' other stated goals are not addressed by their implementation of this punitive bar to asylum.

### 6. The Rule does not address the Departments' stated goals of reducing administrative backlogs and deterring "irregular" migration and will impermissibly result in *refoulement*

The Rule requires asylum officers and immigration judges to apply the emergency border circumstances limitations in cases of asylum seekers who may have entered during periods in which the emergency is in place. Rule 48732. This is required regardless of whether an individual was actually apprehended during a time period in which the restrictions were in place. Rule 48732. As discussed below, broad application of the Rule will create insurmountable evidentiary obstacles for individuals seeking protection, and place new burdens on asylum offices and immigration courts, leading to further backlogs and inefficiencies.

### 7. The Rule's provisions for application of the bar beyond the border and beyond the emergency period will create new burdens for asylum seekers and adjudicators

Requiring application of the Rule to individuals who apply affirmatively at the asylum office or who are put into immigration court proceedings without first having a credible fear interview will further complicate the already labyrinthine asylum process.

### a. The Rule creates insurmountable evidentiary requirements for asylum seekers

Broad application of the Rule will create impossible evidentiary hurdles for asylum seekers. First, asylum seekers who entered the United States without inspection or arrived at a port of entry without an appointment during an emergency period will be required to prove by a preponderance of the evidence that they were not subject to the Rule, for example, that they were permitted to enter "based on the totality of the circumstances" or that they were

STB_AR1_007515

permitted to enter "due to operational considerations at the time of the entry or encounter."

If they fail that, then they will have to show that they met one of the exceptionally compelling circumstances *at the time of entry*. Because, due to existing backlogs, many of these cases will be adjudicated years after the date of entry, it is highly unlikely that applicants will be able to meet this burden. For example, absent concurrently issued medical documents, an applicant may not be able to show that it was more likely than not they *or a family member they were traveling with* were suffering from an "acute medical emergency" at the time they crossed the border. In transit and over time, evidence gets lost and relationships change, making the burden of proof insurmountable. It would be even more difficult to demonstrate that there was an immediate threat to their safety at the moment they crossed several years earlier.

Moreover, and as pointed out above, contrary to the Departments' implication that asylum seekers are sophisticated about the many nuanced requirements of U.S. asylum law and the various constantly changing border policies and will understand the policies in place at a given time, many of these individuals will have no idea about the emergency restrictions until well after they arrive in the United States. In fact, for many, particularly *pro se* individuals, the first time they will learn of the Rule and its evidentiary requirements will be when they arrive in court or at the asylum office, making it even more unlikely that they will have collected evidence to prove that they are not subject to the bar.

> **b. The Rule would create new burdens for asylum offices and immigration courts, increase backlogs, and lead to erroneous removal of individuals with meritorious claims**

Additionally, despite its focus on efficiency and eliminating the backlogs at the asylum office and immigration courts, the Rule will further burden both venues by creating new requirements and heightened, confusing, and vague standards for determining asylum eligibility that have nothing to do with the refugee definition and/or the underlying merits of the claim.

The Rule's requirements will further slow adjudications of these cases, because adjudicators will be required to probe into a new set of facts to determine: 1) manner of entry; 2) whether the applicant was "deemed subject to the limitations of an emergency period" or if the rule does not apply, and, if deemed subject to the limitations of an emergency period, and 3) whether the applicant can satisfy any of the exceptionally compelling circumstances. In the case of *pro se* individuals, this will mean that adjudicators will have to carefully question unrepresented individuals about the details of their journeys

STB_AR1_007516



FOUNDED IN 1986, RAICES IS THE LARGEST
IMMIGRATION LEGAL SERVICES PROVIDER IN TEXAS

RAICESTEXAS.ORG

July 5, 2024

Re: The Refugee and Immigrant Center for Education and Legal Services' Comment on the IFR by
the Department of Homeland Security (DHS) and the Executive Office for Immigration Review
(EOIR): "Securing the Border," Docket No: USCIS 2024-0006

Dear Mr. Delgado and Ms. Alder Reid:

      The Refugee and Immigrant Center for Education and Legal Services (RAICES) submits this
comment in response to the Interim Final Rule published in the Federal Register on June 6, 2024,
that bans most people from asylum protection in the U.S. and makes significant changes to the
credible fear process. *See* 89 Fed. Reg. 48710 (June 7, 2024) (IFR). The IFR recycles similar asylum
bans that were repeatedly struck down by federal courts as unlawful and must be immediately
rescinded.

      As explained below, the new asylum ban seeks to eliminate access to asylum for people at
the southern border and coastlines of the U.S. It exacerbates discriminatory harms specifically
against Black, Brown, Asian, Indigenous, and LGBTQ+ asylum-seeking people by escalating
unproven, unreliable, and unnecessary information collection. It circumvents U.S. law and treaty
obligations to refugees. And it implicates incalculable human harms and significant substantive and
procedural due process concerns that the Departments simply ignore. RAICES submits these
comments to the IFR not only to explain how the proposal is illegal and unconstitutional, but also to
share the obstacles faced by our clients—people and families fleeing persecution in their home
countries who are seeking asylum and protection in the U.S.

## I.      RAICES's Interest in the IFR.

      RAICES is a 501(c)(3) immigrant rights nonprofit founded in 1986 and headquartered in San
Antonio, Texas. RAICES staff, volunteers, and pro bono attorneys defend the rights of immigrant,
refugee, and asylum-seeking people and families; empower individuals, families, and communities;
and advocate for their liberty and justice. RAICES serves tens of thousands of non-citizens each year
through direct immigration legal services, social services, advocacy, community engagement,
refugee resettlement, and impact litigation. With operations throughout Texas and over 300 staff
members, RAICES is one of the largest legal service providers for low-income immigrant, refugee,
and asylum-seeking people in the country.

      RAICES provides direct representation to detained adults, detained families, and detained
unaccompanied minors—nearly all of whom are in some type of immigration court proceeding.
Through representation of these populations, as well as our extensive representation of non-detained
individuals, RAICES regularly serves non-citizens with matters before U.S. Department of
Homeland Security (DHS) and specifically Customs and Border Protection (CBP), Immigration and

STB_AR1_007522

Customs Enforcement (ICE), and the U.S. Citizenship and Immigration Services (USCIS) Asylum Office. RAICES also regularly conducts community presentations and pro bono training, and provides information and education to immigrants, impacted communities, and volunteers on appellate processes, procedures, and standards. It is because of our expertise, detailed above, that RAICES is uniquely positioned to comment on the Departments' IFR, which impedes our clients' ability to seek refuge and asylum in this country.

## II.    The IFR Violates Domestic and International Law.

The IFR violates and upends established asylum law by barring from asylum all adults and families who enter the U.S. via the southern border or coastline without a pre-scheduled appointment made via the CBP One smartphone app. The IFR also imposes illegal barriers by imposing a so-called "manifestation" requirement and heightening the standard for a CFI. These changes are egregious violations of U.S. and international law. We address each below.

The IFR's asylum ban eviscerates a fundamental right codified into U.S. law. Under 8 U.S.C. § 1158(a)(1), "[a]ny [non-citizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . .), irrespective of such [non-citizen's] status, may apply for asylum . . . ." The IFR openly defies this statutory directive by generally denying asylum to anyone who enters the U.S. between ports of entry—or who approaches a port of entry without a CBP One appointment.

The right to seek asylum is also well-established in international law. The Universal Declaration of Human Rights provides that "[e]veryone has the right to seek and to enjoy in other countries asylum from persecution[,]"[1] thus guaranteeing the right to seek and enjoy asylum in other states. The principle of non-refoulement lies at the foundation of the right to asylum, obligating states to refrain from removing an individual to a region where there is the risk of irreparable harm upon removal. As explained by the Office of the United Nations High Commissioner for Refugees (UNHCR): "The principle of non-refoulement is of particular relevance to asylum-seekers. As such persons may be refugees, it is an established principle of international refugee law that they should not be returned or expelled pending a final determination of their status."[2] The IFR violates these rights under international law just as it violates § 1158(a)(1).

Furthermore, the IFR perpetuates, if not exacerbates, a division, first created by the so-called "Circumvention of Lawful Pathways" rule, 88 Fed. Reg. 31,314 (May 11, 2023), between two different classes of people seeking asylum: (1) those who have a smartphone and access to the internet and are technologically literate; and (2) those who do not have these required items, skills or abilities and are not able to meet the burden imposed to qualify for the exception. This distinction places people that do not have access to technology in the prejudicial position of having a higher standard of proof to meet the definition of credible fear set forth in 8 U.S.C. § 1225(b)(1)(B)(v). U.S. asylum law does not permit this distinction. 8 U.S.C. § 1225(a)(1). By creating a class of asylum-seeking individuals to which the appropriate standard will be applied (the ones who have

---

[1] UN General Assembly, *Universal Declaration of Human Rights* art. 14.1 (Dec. 10, 1948), *available at* https://www.refworld.org/docid/3ae6b3712c.html.

[2] UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol* ¶ 6 (Jan. 26, 2007), https://www.unhcr.org/4d9486929.pdf.

smartphones and/or access to equivalent technology) and a class of asylum-seeking individuals to which a higher standard will be applied (those who do not have smartphones or are unable to prove by a preponderance of the evidence that they could not use the CBP One app), the IFR fails to equally apply the protections due to people seeking asylum under both U.S. and international law.

The IFR's changes to the credible fear process are likewise illegal. Under 8 U.S.C. § 1225(b)(1), asylum officers must apply a "significant possibility" standard in credible fear interviews. The IFR, however, instructs asylum officers to apply a preponderance of the evidence standard in determining whether someone is subject to the new asylum ban—and for those who are, it applies a novel "reasonable probability" standard to screen for withholding of removal and relief under the Convention Against Torture. People found subject to the bar's rule therefore *never* gain the benefit of the purposefully low standard set by Congress. The "manifestation" requirement also violates DHS's duties under § 1225.

### III. Requiring Use of the CBP One App Blocks Meaningful Access to Asylum and Discriminates Against Migrants of Color.

The IFR's ban applies to anyone—even people from Mexico—who enter via the southern border and coastline without making a pre-scheduled appointment using CBP One. The requirement to use CBP One is seriously flawed and does not reflect the reality of the immigrant experience at the border.

As an initial matter, the IFR requires a smartphone or other device capable of downloading the CBP One app. Unsurprisingly, due to their harrowing circumstances, many individuals seeking asylum at the border do not have smartphones capable of using the app.[3]

The IFR further assumes technological literacy in the use of smartphone applications, as the CBP One app requires an email account and the ability to check the account on an ongoing basis. It also requires that asylum-seeking individuals take a video of themselves and upload it to the app and have their GPS/geolocators on their phones turned on so that CBP can ensure they are not requesting an appointment from a location far from the border. Many people are unable to undertake these steps without assistance—and the app requires them to do so *every day* until they get an appointment, a process that often takes many months.[4]

Further, the CBP One app remains unable to read the faces of Black, Brown, Asian and Indigenous people seeking asylum.[5] Haitians and Africans are especially likely to fall victim to apparent algorithm bias in the technology on which the CBP One app relies. This effectively bars

---

[3] *E.g.*, Amnesty International, *CBP One—A Blessing or a Trap?* 38 (2024), https://www.amnestyusa.org/reports/cbp-one-a-blessing-or-a-trap/ ("*Blessing or Trap*"); Angela Gervasi, *DHS chief hails app as migrants cite issues* (Mar. 28, 2023), https://www.nogalesinternational.com/news/dhs-chief-hails-app-as-migrants-cite-issues/article_c56d6c90-c9d5-11ed-b58f-1f37b3a4d3f7.html.
[4] *See, e.g.*, Amnesty, *Blessing or Trap*; Arelis Hernandez, *Desperate migrants seeking asylum face a new hurdle: Technology*, Wash. Post (Mar. 11, 2023), https://www.washingtonpost.com/nation/2023/03/11/asylum-seekers-mexico-border-app/.
[5] Human Rights Watch, *We Couldn't Wait: Digital Metering at the US-Mexico Border* 20 (2024), https://www.hrw.org/report/2024/05/01/we-couldnt-wait/digital-metering-us-mexico-border.

large classes of individuals from effectively using the app to secure an appointment with CBP and, therefore, from seeking asylum. And by making the app the centerpiece of the asylum system, DHS and DOJ are further promulgating the racism that has long been a part of the U.S. immigration system.

Although the CBP One app has been required for non-Mexican people for the last year, it remains plagued by numerous other problems that DHS has made no attempt to fix. These problems illustrate the many barriers posed by the IFR and further impair an individual's ability to request asylum:

- The bandwidth of the application is saturated which causes delays in seeking and receiving appointments;
- The app is available only in Spanish, Haitian Creole, and English, while users must also navigate a separate site available only in Spanish, French, and English;
- Many error messages are available only in English;
- It is difficult to upload the required files;
- Many phones are unable to take video footage or pictures that are of the quality required by the app;
- People use the app but then are rejected because they did not have their GPS activated; and
- There is a thriving black market for appointments available only to the wealthiest refugees.[6]

Moreover, wait times for appointments now routinely run as long as many months. This leaves people seeking asylum stranded in highly dangerous conditions in northern Mexico, where they are at severe risk of rape, assault, torture, kidnapping, and death. Worse still, it leaves Mexican people seeking asylum stranded in the very country in which they are being actively persecuted—and it is not as if there are any countries between Mexico and the U.S. that could even theoretically provide shelter to such people. The app is, in short, a metering device used for the convenience of DHS that has deadly consequences for people forced to use it.

### IV.    The IFR Illegally Heightens the Standard People Seeking Asylum Must Meet in Their Credible Fear Interviews.

The IFR also imposes additional barriers in the credible fear process. Under the IFR, people seeking asylum must affirmatively "manifest" a fear—without any questions about fear from CBP agents. Further, it heightens the screening standard for withholding of removal and CAT relief to the unprecedented level of "reasonable probability." In other words, the IFR would turn the CFI, which is intended to be a low screening bar, into a merits hearing for anyone that does not use the CBP One application.

The "manifestation" requirement is not a screening device: it is a device to circumvent U.S. asylum law and remove people fleeing persecution without any kind of hearing. RAICES is already aware of cases in which people seeking asylum have shaken, cried, and experienced severe

---

[6] *See, e.g.*, HRW, *We Couldn't Wait*; Amnesty, *Blessing or Trap*; Human Rights First, *Trapped, Preyed Upon, and Punished* (2024), https://humanrightsfirst.org/library/trapped-preyed-upon-and-punished/.

insomnia—all strong physical signs of fear—yet nevertheless been removed. This is no surprise, as CBP and other government agencies have a long, unquestioned history of ignoring signs of fear.[7] The requirement is thus effectively a requirement that people *state* their fear. But most people are unable to do this for reasons including a lack of fluency in English or Spanish (the only languages routinely spoken by CBP agents); fear of uniformed government officials; the effects of traumatic experiences in their home country and while stranded in northern Mexico; and a lack of knowledge about U.S. asylum law. Further, there is a strong chance that a person will be ignored by CBP even if they *do* express a fear in words.

The introduction of the "reasonable probability" standard, meanwhile, violates procedural due process rights of individuals seeking asylum and fails to provide them with a meaningful and realistic opportunity to seek asylum protection. The intended purpose of the CFI stage is to serve as an initial screening interview with a low bar for passage. A person seeking asylum only needs to show that they have a "significant possibility" of qualifying for asylum at a CFI; they need not show they actually qualify for asylum. Courts have interpreted this standard to mean an applicant need show only a "10% chance" of proving a successful asylum claim. *Grace v. Whitaker*, 344 F.Supp.3d 96, 127-40 (D.D.C. 2018) (citing *United States v. Cardoza-Fonseca*, 480 U.S.421, 439-40 (1987)). This "first stage of the asylum eligibility process is intended to be a mere 'screening interview[,]' . . . during which '[t]he applicant need not show that he or she is in fact eligible for asylum – a 'credible fear' equates to only a 'significant possibility' that the alien would be eligible." *Kiakombua v. Wolf*, 498 F.Supp.3d 1, 39 (D.D.C. 2020) (K.B. Jackson, J.) (quoting *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1965 (2020)). Raising the standard from "significant possibility" to "reasonable probability" fear is a procedural due process violation, as it alters the intended purpose of the screening interview. It also violates the intended purpose of asylum and the well-established principle of non-refoulement. Under the IFR, many applicants will be returned to a country where they are likely to be subjected to persecution.

The credible fear system—including the change, made contemporaneously with the IFR, to reduce the pre-CFI consultation period to as little as four hours—will ensure that many people with strong claims are unable to satisfy the heightened standard. The higher standard requires preparation, given that it forces people to recount specific details, including both about who, how, and why they were persecuted or tortured or fear future persecution or torture and about why they did not approach the authorities in their country of origin. As people fleeing persecution, they do not have documents with them and find it exceedingly difficult to recount their full experiences because of the trauma those experiences caused. This is especially true for those held in CBP detention, which is retraumatizing, includes torturous conditions that prevent sleep, and exacerbate or create health problems. Even before the IFR, on average, CFI preparation for a single person necessitated more than an hour; the IFR has more than doubled the preparation time based upon RAICES' experience.

Many people who speak other languages also have no way, aside from a call with RAICES or another service provider, to know the function and purpose of a CFI. Although CBP facilities include some orienting signs with limited information, those signs are available only in Mandarin, Hindi, Spanish, and English—not French, Portuguese, Haitian Creole, Indigenous languages, or other

---

[7] *See, e.g.*, CGRS, *"Manifesting" Fear at the Border: Lessons from Title 42 Expulsions* (Jan. 30, 2024), https://cgrs.uclawsf.edu/sites/default/files/Manifesting%20Fear%202-pager.pdf; ProPublica, *When the Coast Guard Intercepts Unaccompanied Kids* (Dec. 7, 2023), https://www.propublica.org/article/when-the-coast-guard-intercepts-unaccompanied-kids.

languages spoken by people seeking asylum. Yet DHS now routes people who speak those languages to CBP custody, depriving them of any meaningful opportunity to become oriented to the U.S. asylum system.

Therefore, access to counsel is critical. Yet people held in CBP custody are typically given only one chance to telephone for advice; that period is often as short as five minutes; and the period is often provided outside of business hours, when RAICES and other service providers are not available. Moreover, when calls *are* during the business day, they are often received all at once—often as many as twelve at a time—diminishing our ability to answer the telephone and provide services to everyone who calls. In response to queries from RAICES, CBP has flatly refused to change these practices. The reduced, four-hour period will greatly exacerbate the difficulty in connecting with clients, making it functionally impossible for the vast majority of people to speak with counsel before a CFI.

When we are able to reach someone before a CFI, we are invariably excluded from the CFI itself, even if we have taken every step required by DHS to be present. We are also often excluded from subsequent reviews of negative determinations by an immigration judge (IJ Review). DHS now refuses to send us the CFI packet for IJ review, instead sending it only to USCIS—which will not send us the packet absent a wet client signature, which is nearly impossible to obtain from someone in CBP custody in a timely manner. Those reviews are often held outside business hours with next to zero notice to us. Thus, although the credible fear system is designed in ways that make access to counsel critical, it is also designed in ways that make access to counsel functionally impossible.

The lack of access to counsel is not the only DHS-created problem that causes people with strong claims to receive negative credible fear determinations. DHS also routinely mistreats children and families. For instance, CBP is only permitted to detain children for a maximum of 72 hours, with certain limited exceptions, but CBP routinely and unjustifiably violates that limitation. Indeed, RAICES has spoken to several children held in CBP custody for more than two weeks. And extended CBP detention causes children not to eat—because the available food is not suitable—and routinely causes health problems. CBP also fails to provide children adequate space to move; we are aware of at least one recent case in which a 1-year-old was reprimanded simply for walking. And at least at some facilities, CBP has detained female children in cells with both their father and other, unrelated single men.

CBP routinely separates families, often in ways that greatly complicate, or even prevent, family reunification. We have, for example, had to attempt to locate many mothers who CBP transferred and separated from the rest of their families. When we attempt to locate separated mothers, ICE tells us the mother is in CBP custody but not where, causing extreme and detrimental delay. Worse, when a mother is detained by CBP, CBP tells us that we cannot contact her without a G-28, which is difficult to have signed without first contacting the mother. Such separations and mistreatment place already traumatized people through unnecessary further trauma, increasing their fear of U.S. government agents and making it significantly less likely that they will be able to recount details sufficient to overcome a "reasonable probability" standard.

Proper interpretation is also often lacking during CFIs. Almost immediately after the IFR took effect, RAICES saw a case—by no means our first—in which CBP failed to provide an

interpreter during a CFI even though the interviewing asylum officer and the person seeking asylum were not fluent in any common language.

In addition, the USCIS Asylum Officers tasked with conducting the CFIs and issuing determinations are ill-equipped to conduct the additional analysis required in the IFR—including applying a preponderance of the evidence standard to determine whether someone is subject to the asylum ban. Stakeholders have repeatedly raised concerns about the competency of the officers and the training that they receive. In a recent Office for Civil Rights and Civil Liberties (CRCL) complaint, legal organizations who regularly represent clients in front of the Houston USCIS Asylum Office, which handles a significant number of cases from recent entries from the southern border, detailed systemic deficiencies in the CFI process, including deficiencies in the CFI lesson plan, failure of officers to conduct CFIs under current legal standards, failure to provide appropriate language interpretation, failure to interview vulnerable populations within appropriate agency guidelines, and continued interference with access to counsel.[8] It is concerning that these same officers would be tasked with applying a higher burden of proof.

For all of these reasons, none of which has any bearing on the merits of underlying claims, RAICES expects to see many people with strong claims receive negative CFIs. Indeed, that has been the case in the weeks since the IFR took effect. And although we have not yet seen many decisions on IJ review, we expect the number of affirmances of improper CFI denials to increase as well.

## CONCLUSION

RAICES strongly opposes the unduly harmful IFR because it obstructs meaningful opportunities for individuals to seek asylum and have their claims heard, in violation of both U.S. and international law. Populations at greatest and gravest risk are those who have already faced the disproportionate harms of disenfranchisement—namely, Black, Brown, Asian, Indigenous, and LGBTQ+ asylum-seeking individuals whose cases would have likely otherwise proven sound under the equitable application of codified federal law.

Our concerns, substantiated by precedent of similar asylum bans having been ruled unlawful by federal courts, have only been exacerbated in recent weeks by documented procedural due process violations that threaten the underpinnings of long-settled law and denies access to justice in the U.S. For these reasons, RAICES respectfully calls on DHS and EOIR to rescind the IFR without delay.

Respectfully submitted,

RAICES
P.O. Box 786100
San Antonio, TX 78278
Tel: 210-226-7722

---

[8] RAICES et al., *Systemic Deficiencies at the Houston Asylum Office in Assessments of Credible and Reasonable Fear Cause Harm and Irreversible Damage to Asylum Seekers* (Apr. 2022), *available at* https://nipnlg.org/sites/default/files/2023-04/2022_27April-CFI-complaint.pdf.

STB_AR1_007528



**National Immigrant Justice Center**            P 312.660.1370
111 W. Jackson Blvd.                            F 312.660.1505
Suite 800                                       immigrantjustice.org
Chicago, IL 60604

July 8, 2024

*Submitted via https://regulations.gov*

**Re: Comment on the Proposed IFR by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on "Securing the Border," Docket No. USCIS 2024-0006**

Dear Ms. Reid and Mr. Delgado:

The National Immigrant Justice Center (NIJC or "we") submits the following opposing the Interim Final IFR (IFR) titled "Securing the Border" issued by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) (together, "the agencies") on June 7, 2024. NIJC calls on DHS and EOIR to rescind the IFR in its entirety.

**NIJC's strong interest in the agencies' proposed changes**

NIJC is dedicated to ensuring human rights protections and access to justice for immigrants, refugees, and asylum seekers. NIJC provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education. Since its founding more than three decades ago, NIJC uniquely blends individual client representation with advocacy for broad-based systemic change.

Headquartered in Chicago, NIJC provides legal services through our staff and pro bono network to more than 10,000 individuals each year, including more than 800 asylum seekers, many of whom have entered the United States by crossing the U.S.-Mexico border. These individuals have survived persecution and torture in their home countries and many dangers throughout their journey to seek safety in the United States.

NIJC's clients include indigent, Black, Brown, Indigenous, and LGBTQ+ people seeking asylum who frequently have no avenue to seek safety but to approach the United States at the U.S.-Mexico border. We have served people forced to wait in Mexico to seek asylum in the United States under anti-asylum policies instituted by both the Trump administration and the Biden administration. In addition to our own direct representation, NIJC provides pro se support to asylum seekers. Our experience working directly with clients and advising pro se applicants makes it clear that the vast majority of asylum seekers lack the linguistic and legal skills to navigate the U.S. asylum system alone. They often lack the financial resources to hire private counsel for purposes of pursuing asylum.

The IFR's proposed changes are certain to severely and adversely impact the people NIJC serves. Many people seeking asylum are not familiar with U.S. asylum law and will not know that they must manifest a fear to claim asylum. Many others will be too scared to do so, given that they are fleeing persecution by government agents and will be facing uniformed, armed agents of the U.S. government at the relevant time. And as is clear from our experience under the Remain in Mexico policy and partner organizations' experiences with the U.S. Coast Guard, still

seekers to their bar and stripping them of asylum benefits, including the pathway to family reunification.

Third, the IFR leaves many outstanding questions in terms of what independent relief would disqualify families from availing themselves of this provision. If a spouse can independently win withholding like the principal, the agencies may find comfort in the fact that they have preserved family unity without needing to take any further action, though both spouses would live with the burdens inherent to withholding of removal—lack of access to basic social benefits, unstable employment authorization, inability to travel, and the risk of removal to a third country—for the rest of their lives. Here, as in other scenarios, the agencies would be better poised to preserve family unity by implementing the plain text of the INA.

Finally, the agencies disregard the ways in which the IFR will harm families and children long before final adjudications of relief. Expedited processes already have a deleterious impact on families, as derivative spouse and children are continuously haunted by the prospect of family separation were one member of the family not to win relief.[30] The IFR will compound those harms by adding more bars to an already punishing process. Even worse, they do so while families live with the new, yet familiar fear that DHS will begin jailing them again, in the name of deterrence. To tout this provision as a cure-all in this atmosphere—where the agencies are severely aggravating a process that already hurts families, while resurrecting the fear that they will undergo this process from detention—makes a mockery of family unity.

### 7) The agencies have failed to consider obvious alternatives.

The IFR fails to consider the obvious alternate option of expanding capacity to follow the INA's inspection requirement and its dictate that anyone arriving in the United States be allowed to apply for asylum. Because people presented with a safe pathway to seek asylum will choose that pathway, doing so would achieve the agencies' goal of curbing crossings between ports of entry. It would also discourage people from using smugglers, who are often exploitative and violent.

As a result, expanding capacity at ports of entry would, in the medium and long term, sharply reduce the resources that DHS feels the need to expend at the border.[31] This would be especially true if the agencies coordinate with state and local governments as well as non-governmental organizations and move away from the routine imprisonment of people fleeing persecution and torture.[32] Further, because increasing capacity at ports of entry would allow USCIS asylum

---

[30] First Focus on Children and the Young Center for Immigrant Children, *Fast Not Fair: Children Seeking Asylum are Fast-Tracked for Deportation* (Feb. 2023), https://www.theyoungcenter.org/fastnotfair.

[31] CBP has a history of failing to process asylum seekers even within its existing capacity. See Elliot Spagat, *Holding-cell stats raise questions about Trump asylum policy*, AP News (Feb. 13, 2020), https://apnews.com/article/texas-immigration-us-news-ap-top-news-laredo-6d32dd1fcda84a98bbf7c6455a2d6ae5 ("On March 14, according to one daily snapshot, 672 people were in custody at all 24 crossings, a 57% occupancy rate. San Diego's San Ysidro port of entry was 89% full, Hidalgo was overcrowded, and El Paso was nearly full. But Laredo was only 40% full, Brownsville was at 35%, and seven crossings, mostly in California, were empty."); WOLA, *The Futility of "Shutting Down Asylum" by Executive Action at the U.S.-Mexico Border* (June 4, 2024), https://www.wola.org/analysis/futility-of-shutting-down-asylum-by-executive-action-us-mexico-border/.

[32] *See* NIJC, *Solutions for a Humane Border Policy* (Jan. 17, 2023), https://immigrantjustice.org/staff/blog/solutions-humane-border-policy.

STB_AR1_007815

STB_AR1_007818

onto "hostile terrain," making crossing the US southern border so dangerous that it discourages people from ever trying. The policies intentionally funnel migrants through remote areas like the Sonoran Desert, where temperatures fluctuate between searing heat and icy cold, or through the fast-moving currents of the Rio Grande, where their lives could be at risk. Deterrence also includes punitive immigration policies and dangerous infrastructure, such as border walls, razor wire, armed soldiers, river buoys equipped with saw blades, and surveillance technology. Mexican criminal groups and corrupt state officials systematically target migrants for violence, while missing person reports are rarely resolved, and the human remains of migrants – even in known mass graves – remain unidentified.

Below are nine personal accounts provided by family members whose loved ones disappeared or died while attempting to join them in the United States. The accounts span the three decades of US border deterrence and are the result of a collaboration between Human Rights Watch and the Colibrí Center for Human Rights, which uses DNA testing to help identify the remains of missing migrants and supports families searching for missing loved ones. Some accounts use pseudonyms or first names to protect the families from retaliation.

While every story is unique, they share important commonalities. Each person who tried crossing the border without US authorization felt it was the only way to reunite with loved ones, achieve financial stability, or flee violence and seek safety. It took purpose, hope, and courage to make the journey. When people disappeared, the US Border Patrol provided families with little to no support. Indeed, there is no coordinated US government response to locate missing people in the borderlands. Additionally, after people disappeared, families were often targeted by extortionists, falsely claiming they captured or had information about missing family members, demanding ransom money.

Over the 30 years, groups estimate that between 10,000 and 80,000 people died at the border – the wide-ranging figure highlights the lack of information – with thousands more disappeared, mostly Brown, Indigenous, and Black migrants from Latin America. Deaths and disappearances have hit record highs under President Joe Biden's administration.

While the deterrence strategy has failed to reduce migration numbers, it has enriched criminal groups, including smugglers and kidnappers, and wasted billions of taxpayer dollars. For some border agents, tasked with carrying out these policies, the work has led to moral injury and even suicide.

STB_AR1_007820



eft 8 ( ft ( f(u ft(z x G ft ff (9 fift (fftt fffH(  ( ft(         ( f(yfyff8 ftH(f 8 8(g8 fu   8(  8 ftH(r ft ff F(  (jft9  8  (   F

H( (    (k  ft    (e 8 I e j u( 8(kft (m 8 ft

## u      .1

"I've had dreams where he returns," Angélica Pérez said. "In these dreams, I see him, and I get so excited that I wake up and ask for it to be true."

The last time Angélica spoke to her younger brother, Danny Pérez, was on November 25, 2015, one day before Thanksgiving. Danny was getting ready to cross the border from Mexico into the United States, to come home. He would never arrive.

Danny was born in Mexico, and he and his family migrated to Northern California in 2000 when he was 5 years old to reunite with their father and to seek a better quality of life. Angélica remembers dark,

STB_AR1_007821

Still in high school, Danny skateboarded, played soccer with a local team, and wrote and performed rap music with his friends. He was close to Angélica's oldest son, Alexander. In fact, Alexander would proudly say he had a big brother who was also his uncle.

When he turned 18, Danny decided to go to Mexico. In 2012, he rejoined his parents in Guanajuato, Mexico. When he arrived, he was full of ideas and energy. But after a failed attempt to launch an ice cream business with his father, and after struggling to get by in Mexico on low wages as a middle school English teacher, he decided to return to the United States.

He hired smugglers who said they would guide him through the desert mountains between the cities of Tecate and Tijuana.

"In his desperation, Danny thought that that was his only way in," Angélica said, "He called … and I asked, 'Are you sure it's safe? I'm scared.'"

Angélica remembers his answer: "Don't worry, I will go prepared," he said. "I will take food and energy bars with me. I'll even take medicine and ointment. I'm strong enough to do this."

She began to panic when, the following day, she had heard nothing from her little brother. He had promised to let her know when he started crossing. She called him, but he didn't pick up. The family began searching for Danny, calling US Immigration and Customs Enforcement (ICE), sharing Danny's last known GPS coordinates with Mexican authorities, and reporting Danny as a missing person. Angélica repeatedly typed in her brother's identifying information on government websites and searched through databases of the missing.

"It was ugly, having to see all of the unidentified bodies while at the same time asking God that we don't find him there," she said. "We did everything we possibly could to find him." They submitted DNA samples in both the United States and Mexico.

Like so many other loved ones who go missing in the borderlands, it may be impossible to know what happened to Danny.

"How do I say goodbye when we don't know anything about what happened?" Angélica asked.

STB_AR1_007822



l      (u8   ff  (yft  ft  8ff8(   (     H(  (u   8 ft

## .1        .

Hugo Patricio Tenezaca, 19, called his mother, Romelia Yuqui, in New York City to ask for her blessing. He was going to cross the Sonoran Desert into the US. He went missing on June 17, 2012.

Hugo had first crossed the desert in October 2009, the first time he left Ecuador to be with her in New York.

Romelia, who is a US lawful permanent resident, had left Ecuador when Hugo was a child in search of a better life after her then-husband—a police officer—abused her.

For two years, Hugo worked at a bookstore in Manhattan, helping to pay off the debt of his previous crossing. He spent his free time playing with his much younger brother and sister, painting, drawing,

STB_AR1_007823

me. I got down on the floor and cried. I told him, 'Hugo, don't go,' but he left."

In Quito, things didn't go as planned. Now that he'd lived in another country, his friends saw him as having money, began to take advantage of him, and ultimately beat him and stole from him. Meanwhile, Mayra was able to get a visa and went to the United States.

Hugo went to the US consulate and was at first approved for a visa to travel safely back to his mother. But then, Romelia recalled, his Ecuadorian passport was taken and US visa revoked for reasons the family do not understand. Without a legal way to migrate, Hugo became desperate. He and his mother contacted the same Guatemalan smuggler who had guided them across the first time and paid him US$14,000.

The journey was difficult, and he called Romelia often.

"Mom, we've arrived in Mexico, [and] it's not like when I crossed the first time," Hugo said. "The road is complete terrorism. The drug traffickers assaulted the group we were traveling with, and I got under the car and didn't allow anything to be stolen." It took Hugo nearly a month to reach the border.

Hugo called her from near Altar, Sonora, to let her know he was going to cross and to ask her to say a blessing for him. He would be walking for about five days, he said, and would arrive in about eight days. He said he loved her very much.

That was the last time she spoke to him.

Eight days passed, and Romelia started making phone calls to locate her son. No one gave her a straight answer. She was told he had disappeared, that he'd gotten lost looking for water, that he took off running, that he fell asleep and didn't wake up. She spoke to an Ecuadorian woman Hugo had met and befriended on the journey, who said she preferred to tell Romelia what had happened in person. She never did.

Romelia posted about Hugo on Facebook and lobbied the Ecuadorian consulates in New York and Arizona to help investigate. They were of no help.

STB_AR1_007824

Case 1:24-cv-01702-RC        Document 69        Filed 01/10/25        Page 903 of 1203

man called to say he couldn't come because the area was "too hot" with police activity. But there were no police.

Romelia said, "If they had told me, 'Your life in exchange for your son's, I would have given my life."



r    8(8 fi(e  ft ff8(  fi  (        8  (   ft ( f(i ft (      (   ftfi(  ft F(f 8    (f 8 ft 8 (j   ft (8 fi(h 8  ft (uft ft
w    ft  F(m ft Ge  ft ff8  (g         (  (l    8 (w    (g    ft fft ft ffftf(f    fift F(g    8fi F(    H( (    (u  8 ft

**s      .y        .s      .y**

In 1998, 17-year-old Bairon Fabrizzio Banegas Flores fled Honduras after his life had been threatened by a criminal group, leaving behind a note for his mother, Myrna: "Mommy, I'm going to the United States. Don't worry about me, I'm going to get there. When I do, I'll let you know."

STB_AR1_007825

because [as a pastor] I heal wounded hearts," he said.

Bairon gained trust in the immigrant community and, over time, became not only a faith leader but a counselor for those facing deportation or other immigration issues. When the church sent him to Louisville, Kentucky, he continued to advise members in his congregation on immigration issues.

When one member of the congregation was detained by Immigration and Customs Enforcement (ICE) in 2013, Bairon, who was also unauthorized, went to the office to advocate for the fellow immigrant. While he'd never had a problem with ICE in Bowling Green, the ICE officials in Louisville had a completely different attitude. ICE officials asked him to show proof of his legal status. When he couldn't produce any, they detained him and quickly deported him.

Myrna said. "I went to pick him up from the airport [in San Pedro Sula, Honduras,] and they arrived as if they were prisoners, as if they were criminals, chained up and all that…It was a terrible way [to treat them]."

He stayed in Honduras for six months, founding another church and working with local youth. But when one of his young daughters back in Kentucky became depressed, refusing to eat or come out of her room, he decided to go back to his family.

"I put my life in the hands of God, and I know he will help me and that I will make it to my daughter," Myrna remembers he said when she asked him if he was sure about making the journey.

The last time Myrna spoke to her son, he told her he had already made it across the border into Arizona and that the following day the smugglers would pick him up at an agreed upon meeting place.  She counted the days. She waited 8 days, then 10 days.

His family looked for him everywhere, but no one has heard from Bairon since. "At first it was very painful because he was always there—there wasn't a day in his life that he didn't call me or send a little text," Myrna said.

Bairon's absence has impacted his whole family, but especially his daughters. The oldest stopped going to church.

STB_AR1_007826



STB_AR1_007827

STB_AR1_007828

Maya L. shared an apartment in Mexico City with her family – her husband, mother, sisters and their children. Although they didn't have a lot of money, they had one another.

"Everything was OK until the pandemic came," Maya's sister, Bianca, said.

Like more than 100 million people around the world, Maya's husband, Marcus, lost his job when the city entered lockdown. The streets in one of the world's largest cities were suddenly empty. Marcus struggled to find work, even chasing down a "promising" opportunity in a nearby state only to be scammed. The family had less money than ever.

Marcus sold his car and used the money to cross the Sonoran Desert. He arrived in the United States without incident, quickly found work in Arizona, and began sending money home. But he and Maya missed one another, and they soon decided Maya would also go to the United States.

"Mom, I'm leaving," Maya said. "I'm going to build you a little house and we're not going to suffer anymore. I promise you I'll be back soon." She said she would come back in a couple of years.

Her mother was worried and wanted Maya to stay, but Maya had made up her mind. The day she left, her sister Bianca hugged Maya, squeezing her tight.

They knew from the news that crossing the border was dangerous, although they didn't know of anyone who had disappeared.

Once Maya arrived in Sonora, close to the border, she had to stay inside a safehouse and wait. Maya said the coyote seemed like a good person. That he was with his wife surprised her – migrating women experience a disproportionate level of sexual abuse, and having a woman around helped Maya feel safer.

Marcus had paid the smuggler US$2,000 and was to pay another $3,000 once Maya made it across into the United States. After seven days in the safehouse, Maya told her family that she would be crossing and that they would talk when she arrived.

STB_AR1_007829

The last time they called, the coyote said that Maya had died. Then he stopped picking up the phone.

Her family called the Mexican consulate, US immigration authorities, medical examiners' offices, and hospitals. No one could tell them what had happened to Maya. "It has been nine months without hearing from my sister, and it is like being dead, lifeless, because thinking about whether she is dead, whether they are prostituting her, whether someone has her . . . It is very exhausting to live with this daily," Bianca said.

Marcus, suffering due to her disappearance, was eventually hospitalized in a behavioral healthcare facility.

Extortionists targeted the family. One of the guides from the group hired to take Maya across the border contacted the family, promising to send a few coyotes out in search of her remains in exchange for almost $5,000. The smugglers promised to carry any remains to the highway so that Border Patrol agents could be called to collect them.

"We gave in," Bianca said. "The money was paid, [but] at the end of the day there was no response."

In a separate incident, not long after posting a notice about Maya on Facebook, some people contacted her family to tell them they'd kidnapped her and demanded a ransom of $1,170. They sent a doctored photo, splicing Maya's face from Facebook onto someone else's body. The family never sent any money.

"They started telling us that if [we didn't pay], they were going to kill her," Bianca said.

But Maya's family already suspects she is dead.

STB_AR1_007830



r 8 ft (x 8 8 8 A (f8    ( ( ft (    ft( (s ft (rft ft Fh ftfft  9ft (    H( (    (u  8 ft

" .u        •        •

Mateo Dolores Salazar Hernández had experience crossing the US-Mexico border. With family on both sides, Mateo, who lived in New Jersey and was known for his work ethic and optimism, had gone back and forth several times.

According to Mateo's wife, Gloria Benítez, Mateo came to the United States to build a better life for the family. He wanted to be able to save up enough money so that they would not have to rely on their children in old age.

Mateo set out for Mexico again in May 2018 to meet his new great-granddaughter and to see his granddaughter, Diana Salazar, who calls Mateo "Dad."  He also went to attend the wedding of his daughter, Virginia.

"When he was coming, I told myself, 'Finally, my little girl is going to meet my dad,'" Diana, who lived in Mexico at the time, said through tears.

STB_AR1_007831

Case 1:24-cv-01702-RC     Document 69     Filed 01/16/25     Page 910 of 1203

The family drove down from New Jersey to search swathes of the desert, which spans hundreds of miles, situated between mountain peaks on either side. They met up with Ángeles del Desierto. "Where are you?" Diana asked the desert of Mateo.

After three days of searching, they called it off. A few months later, the Salazar family searched again for three days, still finding nothing. They submitted their DNA to Colibrí in case it could be matched with someone's unidentified remains.

"My life changed, radically changed, when my husband went missing," Gloria said. "We had 42 years of marriage, and I remember that my children used to tell us, 'When you reach 50 years of marriage, we are going to throw you a party.' Now time goes on, those 50 years are going to arrive. Let's see if between now and our wedding anniversary we learn anything about what happened to him."

Gloria thinks about what would have happened if she'd gone with Mateo to Mexico as he'd suggested, that maybe he wouldn't have attempted to come back to the United States. But she has needed to be strong for her children, who have also struggled with what-ifs and accepting the loss of their father.

"I have another baby, now I have two," said Diana, who remembers waking up early on summer mornings to the sound of Mateo cutting the grass and singing. "My son is named Mateo, and the truth is, I don't lose hope that they will find him."

Virginia, who was grateful to have seen her father at her wedding, recalled a song her father used to sing when he would come over – "Después de Tanto," by José María Napoleón – often enlisting her now-husband to play the guitar in an impromptu karaoke session.

*Today after so many years of not seeing you, I found you/Today when I saw you among the people without you realizing it, I knew that you live in me/I don't know, I don't know if I can go on, far from you.*

*[Hoy después de tantos años de no verte, te encontré/Hoy al verte entre la gente sin que tú te dieras cuenta supe que vives en mí/No sé, no sé si pueda continuar lejos de ti ]*

STB_AR1_007832



i ft 8( fi (8( ff ft( f(u ft ( 8 ft( ft(t fft 8F( ft(ft 8 ( ft ft(fift ffifi9 (g 9 ( ( H( ( (u 8 ft

Ofelia Muñoz Valenzuela was from a small town, Ignacio de la Llave, in the coastal Mexican state of Veracruz. She disappeared at the US-Mexico border in 1997, when her daughter, Elena Gonzales, who today lives in New York, was just 14 years old.

Ofelia was locally famous as the "Güera Musiquera," a nickname that came from her love of music. "She did not play any instrument, nor did she dance, but she had music in her veins," Elena said about her mother. Not being able to dance or carry a tune did not stop Ofelia from trying. She would organize frequent dance parties in the town and stiffly move about on the dance floor.

"My dad was an alcoholic, he drank too much, and he always came home drunk and hit us," Elena said. "First he started with me and ended with my mom…. I think that was one of the reasons that caused her to decide to leave and emigrate."

When Elena was just two weeks old, her father ordered Ofelia to send their new baby away because of the sound of Elena's cries. From then on, Elena split her time between her grandmother's house in Veracruz City and her parents' home.

STB_AR1_007833

work and save money for Elena's quince. "'No matter what I have to do, I'm going to make sure your

When Elena's 15th birthday came on October 22, she remembers sitting on a piece of furniture outside her grandmother's house and waiting for hours for her mother. She thought maybe her mom hadn't been in touch because she wanted to surprise her. But Ofelia never came.

Later, Elena met with a man named Misael, who was among the migrants from her town who returned after failing to reach the US. Misael gave her Ofelia's identification documents. Misael told Elena that when her mother was first detained in the US, her hair was long and curly, like Elena's. But the detention center guards shaved her head because Ofelia wouldn't stop pulling out her own hair because of the stress. Presumably her mother was deported back to Mexico.

Years passed, and Elena eventually migrated to the US. She searched for her mother by word of mouth and on social media to no avail. Eventually someone told her to contact the Colibrí Center for Human Rights. In 2017, staff with Colibrí's Missing Migrants Program went to New York, where Elena lives, and collected a sample of her DNA to compare with DNA found from people who died crossing the US-Mexico border.

Twenty-one years after her mother disappeared, Elena learned her DNA was a match with that of a human skull found in Webb County, Texas.

Today, Elena is a musician. Like her mother, she has gravitated towards singing.

"I felt that singing was not my thing, but suddenly I took refuge in that, [in] singing," she said. When she sings, Elena remembers how her mother looked at her with pride and with joy. "That image is the one that I always sing to now. It's the one that I always see in front of me when I'm singing."



STB_AR1_007834



uft    ft( ft    8    (f8 (8 fi(fi ft(  (8 ft( ft        (      ftfi(fu  (8
    ft(   G( (   Gfu  (  ftft (  ft 8 (9    8 fi (ff        ff ftfi(   fift
fu    ft (z x (u ft  fift  (h    8 fi(y        (8 (   ft(z x Gr  ft  ff (9    fift F
    ft(   ft( ftff      ( f(98    ft (  ff    ftfi( ft ft(ft8  ( f(x 8  89ftF

STB_AR1_007835

.W          .W          .U

STB_AR1_007836

Case 1:24-cv-01702-RC     Document 69     Filed 01/16/25     Page 915 of 1203

This brother grew up in Chiapas, a southern Mexican state bordering Guatemala. Wagner studied at a university in Chiapas for a couple of semesters but stopped his studies because he lacked economic support and couldn't find work. He wanted decent-paying work and a better standard of living, something he said he saw in Hollywood movies, and decided to journey to the US.

When Wagner left Chiapas, Rony was still a small child, so he stayed behind.

Wagner's trip to Tucson, Arizona, was a harsh and dangerous one, he said, even though he was in good physical shape from working long hours in the mountains of Chiapas. He walked for eight days and nights in the desert with a group of other migrants. He knew he was one wrong move, a bad fall or twisted ankle, away from death. During the last two days, they went without water and food except for one can of tuna and one flour tortilla shared among the group.

A decade later, when Rony was 20 years old, he began making plans to also head north. In September, some boys he knew from town called him to ask if he wanted to cross with them. They were already in Sonora, a Mexican state bordering the US. And just like that, Rony left, traveling through Mexico alone, a nearly 2,000-mile journey that poses serious risks.

Rony made it safely to Sonora and prepared to cross the US-Mexico border near where his brother had crossed.

"You have to be healthy, mentally," Wagner told Rony over the phone. "You must make a good go of it, decisively, without worrying or something, because that also takes its toll on you. It's not easy to come – for example, if you have problems, your mind is elsewhere, then something bad will for sure happen to you." Wagner explained the risks. "This is not a game," Wagner told him.

"Yes, it's OK, brother," Rony responded. "We'll see each other over there."

They never spoke again.

As the days passed, Wagner and Rony's other family members started to worry. Rony's traveling companions provided differing accounts of what happened when Rony was left behind. They said that

STB_AR1_007837

Wagner said he prays, asking God where Rony is. "I can't believe a person is lost just like that and disappears into nowhere. That can't be possible," he said.

Wagner and his family still hold out hope that Rony is alive. From both sides of the US-Mexico border, they say they dream about seeing him smiling and musing, grateful to have seen him somehow. Then they feel the pain of loss all over again as they realize the dreams are not reality.

"I asked God to give me those dreams," Wagner said. "I wish that this dream would last forever and continue. Like a lifetime."



w    8(8 (   ( ft8  (  fif(   H( (      (u   8 ft

ñT

STB_AR1_007838

chronic illnesses. Rosita wanted to join her aunts, Rosa and Lili, in the United States to work to cover her parents' medical expenses. Her aunts are both legal permanent residents.

In April 2021, Rosita decided to make the journey with a neighbor and a cousin. They agreed to pay a smuggler US$7,500 to guide them.

In June, Rosita crossed the border into South Texas with a group of people, including her cousin. When the group arrived in Odessa, Texas, three days later, Rosita was not with them. "It's just that she couldn't stand walking anymore and so she stayed [behind]," Rosita's cousin said. "She said that she was going to turn herself in to immigration."

The aunts started calling Border Patrol, providing the approximate location for where their niece was last seen and asking if they would go find her. When Border Patrol answered, they said they would look later or that they had already looked. Dozens of calls and visits to the Mexican consulate also proved fruitless. It would take a local sheriff, who picked up the phone when Rosita's aunts called, going above and beyond to track down Rosita's remains.

"Here in Texas, no one is going to help, ma'am," Rosa remembers the sheriff saying. "That Border Patrol told you they were going to look for her, that is a lie. They don't do it. . .The body was found because a rancher alerted us that the body was there. When did [Border Patrol] go to pick it up? Not until they got around to feeling like it."

Lili and Rosa believe that if the Border Patrol had searched, agents may have found their niece alive.

Before her remains were found, the aunts traveled twice to Odessa, Texas, based on false sightings of their niece. They called or visited the Mexican consulate daily. They posted on Facebook and other social media. And they called organizations performing search and rescue at the border.

People tried to take advantage of their situation. On eight occasions, they received calls from people claiming they had kidnapped Rosita and demanding ransom. The scammers sent doctored photographs using Rosita's face from the missing person posts on Facebook.

STB_AR1_007839

travel to Tabasco to collect DNA from Rosita's mother. Their DNA was a match.

Lili and Rosa went to San Marcos, Texas, to see Rosita's remains. The coroner welcomed them and explained that they had tried to respect and care for the remains of their niece. She also gave the aunts Rosita's belongings.

"The only thing I can tell you is that my niece is fine," Lili said. "Wherever God has her, she is good. Because even though she has experienced something very difficult, when I entered [the room] I felt that peace, that tranquility."

Now, all the family have are memories, photos, and an altar in the house where Rosita grew up. Her little brother pours her a cup of Coca-Cola at mealtime and leaves it at the altar, along with her favorite pastry.



f ft  8 (  9      (  8    (8(  ff  ft( f(u ft  (f8  ft (k  8 9ft   (f ft  8 F(p  (e   ft ft F(g8  fu   8F(      H( (      (p   (t     8

STB_AR1_007840

One of his three daughters, María, used to help him in the kitchen. "He never wrote down any recipe or anything like that," she said. "In fact, he had it all in his head."

Those recipes are lost now.

For more than 15 years, Gualberto's children have wondered if their father is alive or dead. "It's like we're never going to have answers," María said.

Gualberto decided to cross the desert to accompany his youngest daughter, Tania, on the journey after the person who was supposed to accompany her backed out. He planned to join his three older children who were already living in Los Angeles.

The siblings were apprehensive about their father's arrival. They hadn't seen him in a long time, and he hadn't always been the easiest person to get along with—his daughters María, Yesenia, and Tania remember him being a rigid disciplinarian and not allowing the girls out of the house much or permitting them to see their boyfriends without their parents and siblings chaperoning.

On June 2, 2007, after walking three days and three nights through the Sonoran Desert, Gualberto and Tania crossed the US-Mexico border and were in Arizona, just a 5-minute walk from the highway near Nogales and Tucson, along with a large group of migrants. It was Gualberto's birthday.

The smugglers split the group into two, Tania in one and Gualberto in another. Tania's group walked about 10 feet ahead.

"I turned around because he wasn't that far behind me, and [saw] he was coming," Tania said. "My dad was in perfect condition." Five minutes later, Tania turned to look again, and he was gone.

"I tried helplessly to go back to look for him, but they wouldn't let me," she said. A friend of her father's traveling in the second group said Gualberto ran off after someone hit him. "From then on, I never saw my dad again," Tania said.

STB_AR1_007841

call the family were scammers who claimed to hold Gualberto captive. They asked for US$3,000. But when they refused to let one of Gualberto's daughters, Yesenia, speak to him, she refused to pay.

"It's a fraud," Yesenia said. "It's sad for the families, because you don't know if they really [have your loved one]."

STB_AR1_007842

y ( ft ft ( ft(fift8 F( ft(z ftfi(x 8 ft ( fi
ft fi(fift ft ft ffft( ff ft (8 fi(ff ft8 ft( ft( 8fft(8 fi
ft 8 ( 8 8 ( ( 8 ftF(8 ( ft (8 ( 8 ft
ffft (fu ( ft (8 8 H(y ft( ft ft
fi(8 ( ff ft8 ft( fi (fu ( ft( ft8 ff F
ft ff ftF(8 fi( ftff ft (ft H( ft ( ft(z x
ft ft ( ft 8 ft ( 8 F( ( ftftfi ( (fi (
(8( 8 ft ( ft ftff ( f(u 8 ( ff fi
ft( ( ( fftF( ff ( fi(9ft( 8 8 (
9 fift (8 fi( 8 ( ff ft H

STB_AR1_007843

wft  fift    ( (i 8  ft(u8  F(yft 8 F(  fi(8(    (  (x ft  ft  9 ft ( F(    F( (ff    ft    8 ft( ft( ft  ft(    ( 8 ft(fi ftfi(    ( (ff    ( ft
9  fift (    ft(    (8ff    ( ft(w  (k 8  fiftft( (    (e (x 8  ft l l    8 (w    ( 8 ff



This feature was written and researched by Ari Sawyer. Interviews with families were conducted by Perla Torres from the Colibrí Center. The website was designed by Maggie Svoboda. We thank the families for sharing their grief and their love with us.

u     ftff     (w        F(x 8     (p  ft

R

u 0 ” r  w ” 0

STB_AR1_007844

# Mexico 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Mexico during the year.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious government corruption; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, child, early, and forced marriage, femicide, and other forms of such violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant or systematic restrictions on workers' freedom of association, including crimes of violence and intimidation against workers.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

STB_AR1_007906

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at

https:www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:**  There were numerous instances of armed groups limiting the movements of migrants, including by threats and acts of kidnapping, extortion, and homicide.  Criminal groups dominated migrant smuggling operations and often kidnapped, threatened, and extorted migrants to pay a fee for facilitating northbound travel.  On August 17, international organizations in Ciudad Juárez reported an increase in extortion and kidnappings by smugglers.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, and other persons of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

STB_ART_007930

concern.

**Access to Asylum:**  Federal law provided for granting asylum, refugee status, or complementary protection to those fleeing persecution or facing possible threats to their life, security, or liberty in their country of origin.  The government had an established procedure for determining refugee status and providing protections.  The government worked with UNHCR to improve access to refugee status determinations, improve shelter and reception conditions for vulnerable migrants and asylum applicants, and support local integration programs (including access to school, work, and other social services) for those approved for refugee and complementary protection status.

**Abuse of Refugees and Asylum Seekers:**  The press, international organizations, and NGOs reported targeting and victimization of migrants and asylum seekers by criminal groups and in some cases by police, immigration officers, and customs officials.  There were numerous instances of criminal groups extorting, threatening, or kidnapping asylum seekers and other migrants.  In many parts of the country, human smuggling organizations wielded significant power, and media alleged frequent collusion among local authorities.  There were credible reports of gender-based violence against migrants.  There were also credible reports of officially recognized asylum seekers being denied movement across the country and detained by migration authorities.  Civil society groups reported

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

STB_AR1_007931

migration authorities did not provide information regarding access to request asylum and migratory regularization and, in some cases, dissuaded migrants from pursuing such alternatives.

The government did not detain migrant children and generally exempted accompanying adults from detention to preserve family unity. Child protection authorities lacked sufficient capacity to shelter and process migrant children and families, but the government made progress to improve shelter space for children and strengthen child protection authorities. During the year, the National System for Integral Family Development transferred 1.1 billion pesos ($67 million) to 26 states to strengthen their capacity to respond to child migration. In May, the government declared it had completed the construction of 58 of the 90 shelters planned.

The government increased efforts to target human smuggling organizations, with limited results. In November 2022, the Attorney General's Office arrested the Los Panchos human smuggling leader and main collaborators. The Attorney General's Office carried out arrests in Ciudad Juarez, Chihuahua; Silao, Guanajuato; and the state of Mexico. In May, the Attorney General's Office arrested three alleged smugglers in the state of Nuevo León. Authorities found 17 migrants with the smugglers and identified 11 others at a safe house.

Obstacles to accessing international protection related most closely to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

STB_AR_007932

# Congress of the United States

## Washington, DC 20515

March 21, 2024

The Honorable Alejandro Mayorkas
Department of Homeland Security
300 7th St. SW
Washington, D.C. 20024

Dear Secretary Mayorkas,

We write to follow up on our previous correspondence expressing serious concerns that the Biden administration's expanded use of the Customs and Border Protection mobile application (CBP One) is contravening the rights of asylum seekers and contributing to dysfunction within our immigration system. We call on the Department of Homeland Security (DHS) to take immediate steps to both improve CBP One and resolve accessibility issues to protect the safety of asylum seekers and support border communities and other cities that receive new arrivals.

A year has passed since the implementation of CBP One as the primary mechanism for managing asylum interview requests. While CBP has implemented minor changes to address serious glitches within the app, there are still several critical issues that require immediate attention and resolution. As asylum seekers remain in danger, CBP must address these access issues to ensure safe and humane asylum processing and relief for those at risk.

## CBP One Application Limits Access to Asylum

First and foremost, CBP's decision to require asylum seekers to use the still-faulty CBP One app fundamentally undermines the accessibility of the asylum process. Because individuals seeking asylum at our southern border are required to pre-schedule an appointment through the app, the current process obstructs the right to seek asylum by forcing individuals to remain in Mexico while waiting for their asylum cases to be heard. CBP One itself is technologically complex and has significant language limitations, creating inherent barriers for applicants who are not familiar with mobile devices or who speak a language other than the three currently offered in the app. We strongly believe the requirement to use CBP One to apply for asylum contradicts President Biden's Executive Order 14012 directive to "ensure full participation by immigrants and eliminate barriers to accessing government services."

## Emboldening Criminal Actors and Endangering Asylum Seekers

To date, many vulnerable individuals have been forced to wait in unsafe and impoverished Mexican border regions for an appointment through CBP One.[1] The appointment system operates like a lottery system, with far fewer appointments than needed. Individuals are only permitted to present their cases at ports of entry that can be hundreds of miles apart. For example, the DeConcini Port of Entry in Nogales, Arizona is the only port that accepts CBP One appointments in the 700 miles between Calexico, California, and El Paso, Texas, and it only

---

[1] *Inhumane and Counterproductive: The Expansion of Expedited Removal to the Interior and its Impact*, Human Rights First (October 2023), https://humanrightsfirst.org/wp-content/uploads/2023/10/Inhumane-and-Counterproductive-final-report.

accepts 100 appointments a day.[2] This limitation has resulted in prolonged waiting periods, sometimes extending up to six months, forcing families to wait in Mexico in areas rife with criminal activities, including kidnapping, extortion, robbery, and assaults. Requiring asylum seekers to wait for a rare CBP One appointment, available only in a limited number of ports of entry, inadvertently fuels gang violence as criminal groups exploit these vulnerable individuals for financial gain.

The difficulties with CBP One increase the likelihood that asylum seekers will rely on cartel-backed smugglers to enter the United States instead of applying through legal pathways. If these challenges continue, our country could see more tragedies like the June 2022 mass death incident in San Antonio, Texas, where 53 people died after being trapped in the back of a sweltering tractor-trailer. There is also strong evidence that smugglers themselves have been actively spreading misinformation to capitalize on CBP One's faulty implementation. Multiple organizations have reported that smugglers falsely claim that the app will soon be discontinued and suggest that crossing between ports of entry is quicker and more straightforward than waiting for an appointment. There have also been reports of unscrupulous shadow businesses that charge asylum seekers to register for appointments outside of eligible geographic areas in northern or central Mexico. Such deceptive practices, combined with insufficient CBP One appointment availability, confuse asylum seekers about their place in line. At minimum, CBP needs to improve agency communications and outreach to help asylum seekers avoid misinformation and exploitation and reliably navigate the CBP One app.

## Language Barriers

Another significant issue with CBP One is the language and technological barriers asylum seekers face. As you are well aware, the demographics of asylum seekers have diversified, including rises in extra-continental asylum seekers arriving at our southern border from Ukraine and Nepal among other countries. Notably, since its launch, CBP One has only been offered in English, Spanish, and Haitian Creole. Many asylum seekers who do not speak these languages find themselves at a significant disadvantage, struggling to access critical information and navigate our complex asylum process. One recent report identified that many African asylum seekers are completely unaware of the CBP One application, and those who are aware are unable to use it due to language barriers.[3]

Even for individuals who do speak one of the three main operating languages, the app can be difficult to understand. For example, accessing the Haitian Creole version of the app requires navigating initial questions in English or Spanish, and there are poor translations for critical and contextual words like "Customs." Moreover, the Spanish version of the app is not fully or accurately translated. While there have been additions to Russian and Portuguese language factsheets, these languages are not integrated into the app's core sections.[4] These limitations are extremely problematic because the app is the only way for arriving asylum seekers to schedule an appointment and get screened for asylum. Individuals who cannot use CBP One due to language barriers, technical failures, or other obstacles and present at a port of entry must demonstrate to often-skeptical CBP officials that it was not possible to apply through the app.[5]

---

[2] *A Line that Barely Budges: Nogales, Arizona,* Human Rights First (June 2023), https://humanrightsfirst.org/wp-content/uploads/2023/06/A-Line-That-Barely-Budges_Nogales-Arizona-1.pdf
[3] *Asylum Policies Harm Black Asylum Seekers,* Human Rights First (February 2024), https://humanrightsfirst.org/wp-content/uploads/2024/02/Asylum-Policies-Harm-Black-Asylum-Seekers-FACTSHEET-formatted.pdf
[4] *CBP One – Ficha Técnica (Portugu*ê*s),* U.S. Customs and Border Protection, https://www.cbp.gov/document/fact-sheets/cbp-one-ficha-tecnica-portugues



# TRAPPED, PREYED UPON, AND PUNISHED

## One Year of the Biden Administration Asylum Ban



May 2024

STB_AR1_008185

asylum ban's consequences when seeking protection at the U.S. southwest border. As an Arabic and French speaker, he would not have been able to use the CBP One scheduling system. While in Mexico, he was robbed and beaten by gangs and extorted by Mexican police which motivated his crossing to the U.S. to seek protection. He now risks being barred from asylum and returned to persecution under the ban.

- **Indian Sikh family** fleeing persecution on religious grounds crossed between ports of entry into southern California. The family are Hindi speakers and were unaware of the CBP One app.

- **Black Senegalese man who speaks only Wolof at risk under the ban**. He fled torture and sexual assault in Senegal due to his imputed LGBTQI+ status. The man has limited literacy and only speaks Wolof. While on a bus in Mexico, armed men pulled him and other Black migrants off the bus and robbed them at gunpoint. Shortly after, Mexican immigration officers detained them and held them for four days before releasing them near the U.S. border and informing them they had ten days to leave the country. He entered the United States between ports of entry to seek asylum, was sent into ICE detention, and is at risk of return to persecution under the ban.

---

## Counterproductive to effective migration policy and refugee protection

The asylum ban is counterproductive to effective migration policy and refugee protection, setting a terrible example for other countries. Far from deterring people from irregularly crossing the southwest border, the ban and accompanying restrictions spur irregular crossings and cruelly punish people who cross, subjecting them to improper penalties that violate the Refugee Convention. The asylum ban diverts the time of asylum adjudicators from the merits of people's refugee claims, undermines the capacity to adjudicate asylum cases efficiently, and hampers U.S. integration by depriving people who qualify as refugees under U.S. law of a path to stability and citizenship.

As Human Rights First has documented in multiple reports, restrictionist policies that meter and limit access to U.S. ports of entry spur irregular crossings by at-risk people who cannot safely wait in Mexico. Over the last year, Human Rights First has interviewed many asylum seekers who have recounted that they crossed the border, or were contemplating doing so, due to their inability to seek asylum at a port of entry and the risks they face while waiting. Their accounts are detailed both in this report and in the prior four asylum ban reports issued by Human Rights First.

Such policies are also a boon to cartels and smugglers, who target migrants and asylum seekers left stranded in highly dangerous areas for kidnapping, violence and extortion. Indeed, the Chihuahua Attorney General stated in April 2024 that the increase in kidnappings and murders in Chihuahua is linked to the fact that organized crime groups have now taken up migrant smuggling

STB_AR1_008200



# PRETENSE OF PROTECTION

Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies



©Carl Juste/Miami Herald

STB_AR1_008530

Krüger about the experience. The Guatemalan asylum seeker, whose primary language is not Spanish, reported to Krüger that CBP interviewed him about his fear of persecution by relying on the Spanish translation of the other asylum seeker and that he had trouble understanding. The asylum seeker forced to act as a translator told the other detained individuals that CBP officers had promised him assistance with his asylum case, if he translated for them.

*Failures to provide appropriate interpretation in fear screenings*

Asylum officers have routinely conducted CFIs in languages or dialects that asylum seekers do not fluently speak, particularly with asylum seekers who speak so-called "rare" languages or dialects for which interpreters are not readily available, resulting in erroneous negative fear determinations. Even where USCIS secures interpretation in the asylum seeker's primary language, some asylum seekers have been forced to proceed despite reporting that the interpreter did not speak the language competently or that they could not fully understand the translation. The administration must provide meaningful access to the credible fear process through competent interpretation, as required by Executive Order 13166 and the DHS, CBP, ICE, USCIS, DOJ, and EOIR language access plans.

However, existing USCIS guidance on interpretation in CFIs for rare language speakers is inadequate and ineffective. The guidance requires the Asylum Office to forego the CFI and issue a Notice to Appear if proper interpretation cannot be scheduled within 48 hours of the initial CFI. Instead, DHS has prolonged the detention of asylum seekers by repeatedly re-scheduling CFIs when it does not have available interpretation, including for many asylum seekers from African countries, Indigenous people from Guatemala, and Turkish nationals. Facing months of detention, asylum seekers are pushed to choose between indefinite detention and interpretation in a language they do not fluently speak. Indeed, the guidance also instructs the Asylum Office to schedule interviews regardless of whether an appropriate interpreter is available in order to determine whether the asylum seeker is "able to communicate" in another language with an available interpreter. The asylum officer—rather than the asylum seeker—has discretion to determine whether the individual can communicate in another language. Asylum seekers forced to proceed in languages they do not fluently speak through intimidation and coercion or because they fear repercussions if they express that they are having trouble sufficiently understanding are unable to fully convey their fear of persecution in the life-or-death circumstances of a CFI.

**USCIS's failure to provide correct interpretation during CFIs has disproportionately impacted detained asylum seekers from Africa, who have frequently reported being forced to proceed in their second or third language.** For instance, a detention visitation program volunteer reported to Human Rights First that since summer 2021 she has spoken with dozens of African asylum seekers detained in Louisiana who were forced to undergo CFIs in a language (typically French) that is not their native or best language and received negative determinations as a result. Some reported that when they stated that they were not comfortable speaking in French, they were required to proceed with the French interpreter and told, "This is what we have." In spring and summer 2021, asylum seekers from African countries detained at the Otay Mesa Detention Center proceeded with CFIs in English after being told that they would remain incarcerated for a long time if they did not, according to a legal service organization in California. In addition, asylum seekers have reported difficulty understanding interpreters who spoke in unfamiliar dialects, such as Brazilian Portuguese interpreters for Angolan asylum seekers and Senegalese or Mauritanian Pulaar interpreters for Guinean asylum seekers.

Some of the asylum seekers from African countries who received negative credible fear determinations after the government failed to provide interpretation in their best language include:

• **In June 2021, DHS deported a Burkinabe asylum seeker to Burkina Faso, where terrorist groups had attacked him and murdered his family members, after he was forced to undergo a CFI in French despite explaining that his best language is Bissa.** He was unrepresented at the CFI and could not fully understand the interpreter. The asylum officer determined that he did not have a credible fear of persecution or torture. The man told Human Rights First that he was in the process of consulting an attorney to challenge the decision when ICE deported him.

• **A gay Ghanaian asylum seeker who was attacked and threatened due to his sexual orientation and whose partner was murdered was deported in summer 2022 after the Arlington Asylum Office conducted the CFI with interpretation in Twi even though the asylum seeker's native language is Dangme and he does not fluently speak Twi, resulting in a negative credible fear determination.** When the asylum seeker informed the officer that Dangme is the language in which he communicates best, the officer informed him that it would take a long time to find a Dangme interpreter. Afraid his detention would be prolonged if he rescheduled the CFI, he agreed to proceed. The asylum officer did not include information about the asylum seeker's sexual orientation or persecution on account of his sexual orientation in the interview notes even though the asylum seeker shared this information with the interpreter, indicating the extent of the communication problems during the CFI. The CFI decision and notes also reflected other factual errors, according to a request for reconsideration filed by Immigration Equality and shared with Human Rights First, which was rejected by the Asylum Office.

• **An unrepresented Guinean torture survivor received a negative fear determination in June 2021 after he was interviewed in Portuguese despite requesting an interpreter for Mandinka, his native language.** He had been tortured in Guinea, resulting in the loss of two teeth and a head injury that continues to cause severe head pain. He told Human Rights First that he had significant trouble understanding the questions the asylum officer asked. A Portuguese interpreter who assisted Human Rights First noted that it was very difficult to understand him and that his attempt to speak Portuguese is "is a mix of Spanish and Portuguese and his native language." ICE detained him a total of nine months, including at the Winn Correctional Center, before releasing him in December.

• **An Angolan political activist and human rights defender who received a negative credible fear determination in May 2021 was forced to undergo a CFI in French, even though his best and native language is Lingala and Portuguese is the official language of Angola.** He told Human Rights First of his and other African asylum seekers' attempts to convey their story in French after being denied an interpreter in their best language: "We didn't know how to say torture, persecution." Due to his opposition to the ruling party and criticism of its human rights violations, the man was threatened by Angolan security forces and his wife was raped. The man's wife and daughters fled to the United States before him to also apply for asylum. In addition to the Asylum Office's failure to provide appropriate interpretation, the asylum officer preventing him from sharing important details of his asylum claim by cutting off the man's attempt to explain that the rape of his wife was in retaliation for his political activities. He was detained for eight months, including at the Winn Correctional Center, and finally released in December.

- **A 19-year-old Ivorian asylum seeker, who received a negative fear determination after being forced to complete a CFI in French—even though his native language is Mahouka—was also denied appropriate interpretation during a farcical immigration judge review that affirmed the decision.** The young man had fled the Ivory Coast after being kidnapped and tortured by armed men sent by the government in retaliation for his family's political activism. Over the course of four months, he informed the immigration court reviewing the negative determination *on 17 separate occasions* that he could not proceed without a Mahouka interpreter. He reported to Human Rights First that eventually, the judge told him he would "never leave" detention, if he didn't proceed with a French interpreter and then affirmed the negative determination. ICE detained the asylum seeker at the Winn Correctional Center for nearly nine months before releasing him in December.

- **In May 2021, the Asylum Office found that a 19-year-old asylum seeker who fled honor killing in Burkina Faso did not have a credible fear of persecution after interviewing him in French rather than his native language of Bissa.** The man was threatened with death for continuing a relationship with a woman who was forced into an arranged marriage with another man. The man's fear was particularly well-founded because one of his uncles had been stoned to death in similar circumstances. At the time of the CFI, which occurred in ICE custody, the man did not have legal representation and was not interviewed in Bissa, his native and best language. His attorney at the Refugee and Immigrant Center for Education and Legal Services (RAICES) informed Human Rights First that in the course of representing the asylum seeker, he was told by multiple interpreters that the man did not communicate well in French. Nonetheless, multiple requests for reconsideration filed by RAICES were denied by USCIS.

Limited or nonexistent access to interpretation and translated documents in detention also prevents asylum seekers from receiving basic information in advance of CFIs about their legal rights and what the interview will entail. A human rights activist from an African country who was detained in the Adelanto Detention Center in summer 2021 reported that legal information on CFIs was only provided in English and Spanish—even though many of the detained asylum seekers spoke only French or Haitian Kreyol. African asylum seekers who underwent the credible fear process at the Adams County Detention Center in Mississippi reported that information about CFIs was only provided in English and Spanish—whereas many only spoke other languages such as Bissa, French, Portuguese, Lingala, Mandinka, Mahouka, and Wolof—or was not provided at all.

Asylum seekers have also reported that they were subjected to CFIs with interpreters they could not understand because the interpreter did not speak the language competently or spoke a different dialect. In some instances, asylum seekers reported to the interviewing officer that they had trouble understanding the interpreter but were nonetheless forced to proceed with the CFI, resulting in erroneous negative fear determinations. Other asylum seekers reported that they did not inform the asylum officer that they could not understand the interpreter because they feared it would negatively impact their case. For example:

- **In August 2021, an asylum officer ignored the repeated pleas of a gay Brazilian asylum seeker that he could not understand the interpreter and found that the man did not have a credible fear of persecution even though he had been tortured and sexually assaulted by police in Brazil.** He told Human Rights First: "[The interpreter] didn't speak Portuguese well. I had problems understanding her questions, a lot of problems. I told the officer I had trouble understanding the interpreter, but the officer said to continue the

interview and if there was any information missing he'd ask again . . . the interpreter also interrupted me many times."

- **In April 2022, the Newark Asylum Office determined that a Nicaraguan asylum seeker who had been brutally beaten by police officers on multiple occasions and threatened with death did not have a credible fear of persecution, finding that his testimony was not credible after conducting the interview with an interpreter who the asylum seeker believes spoke a different dialect of Spanish and whom he could not fully understand.** He had fled Nicaragua after police and paramilitaries repeatedly kicked him and beat him with a rifle, threatened to kill him if he continued participating in political protests. He was hospitalized after this attack and could not walk on his own for months. When the asylum seeker expressed that he did not fully understand a question and asked the interpreter to repeat it, the asylum officer proceeded to a different question without clarifying, according to a declaration filed by the asylum seeker in immigration court and provided to Human Rights First by the law firm Cambria & Kline PC. The asylum seeker did not receive advance notice of the credible fear review, which caused him to miss the hearing and deprived him of an opportunity to challenge the erroneous determination before the immigration court.

- **In September 2021, ICE deported a Somali asylum seeker who had been tortured by a terrorist group due to his work as a government contractor and received a negative credible fear determination because the Somali interpreter was not competent to translate between English and Somali.** The man, who speaks English but requested a Somali interpreter because English is not his native language, reported to Human Rights First that the interpreter did not correctly translate his statements. For instance, when he stated that he was "tortured," the interpreter translated it as "they caused me problems." During a review of the negative fear determination, he tried to explain to the immigration judge why the determination was erroneous, but the judge accused him of contradicting himself and cut him off, stating that he only had 15 minutes for each review.

- **Around May 2022, an Angolan asylum seeker who underwent a CFI with a Portuguese interpreter who did not speak the same dialect, received a negative credible fear decision in which the asylum officer's notes do not reflect the fact that he had been tortured by Angolan government agents.** Though the man had significant difficulty understanding the interpreter, he did not inform the asylum officer of the interpretation issues because he had already requested Portuguese translation and feared it would negatively impact his case or credibility, according to a legal service provider who spoke with him. His attorney told Human Rights First that when she communicated with the asylum seeker through a Portuguese interpreter, the interpreter reported that the asylum seeker had difficulty communicating and, for example, did not understand the meaning of the word "harm."

*Confusing, hostile CFIs deny asylum seekers a fair opportunity to explain their fear of return*

Some asylum seekers who received erroneous negative fear determinations did not have a fair opportunity to explain why they are seeking asylum because of the confusing or hostile manner in which asylum officers conducted screenings. Asylum seekers reported that officers asked legal questions they could not understand, interrupted their answers, permitted interpreters to interrupt them, instructed them to answer questions with only a "yes" or "no," and barred them from explaining their response. With CFIs typically conducted telephonically, some asylum seekers had difficulty hearing asylum officers' questions, submitting copies of physical evidence, and explaining problems, including poor interpretation, during the interview.

Asylum seekers who received negative fear determinations who were subjected to hostile interviews or who were unable to fully communicate why they are seeking asylum in the United States due to the conduct of the fear screening include:

- **In March 2022, an asylum officer subjected a gay Salvadoran asylum seeker living with HIV to homophobic, hostile, and inappropriate questioning and wrongly determined that he did not have a reasonable fear of persecution.[4]** The asylum seeker, who was detained at the time of the interview, was interrogated by the asylum officer about his sexual orientation, including being told he **couldn't be gay because he didn't sound feminine and sounded "like a regular guy."** The asylum seeker reported to his attorney that when he told the asylum officer that he had been sexually assaulted as a child by gang members for being gay, the officer said, **"You're a liar. This is impossible.** They're not going to risk their lives just to rape you. That's how I know you're lying." The asylum seeker also reported that when he became confused by the asylum officer's questions, the officer again became angry and said, "Are you crazy? You're lying. You're a liar. If the judge sees this paperwork it'll be obvious that you're lying," according to the asylum seeker's declaration, which was submitted to the immigration court reviewing the negative fear determination and provided to Human Rights First by Immigration Equality. The immigration court overturned the negative determination in April 2022.

- **A Haitian asylum seeker received a negative credible fear determination in July 2021 after undergoing a CFI where he was instructed to respond only to the questions asked, preventing the man from sharing that he had been persecuted because of his sexual orientation.** The man was threatened at gunpoint for being gay and suspects that gang members murdered his friend because they misidentified him as his boyfriend. But during the telephonic interview with the San Francisco Asylum Office, the asylum officer failed to ask any questions about the man's sexual orientation and because of restrictions on providing additional information he was afraid to affirmatively bring up the persecution he had suffered on account of his sexuality. The immigration judge reviewing the case refused to consider the asylum seeker's testimony at the review about his sexual orientation, deciding that it was not credible because he had not mentioned it during the CFI, according to the Northwest Immigrant Rights Project.

- **In May 2021, an unrepresented Haitian asylum seeker fleeing political persecution was wrongly found not to have a credible fear of persecution after a flawed interview in which his repeated attempts to explain that he could not hear or understand the telephonic interpreter were ignored.** The man had fled death threats he received for his work campaigning to elect an opposition political candidate. He told Human Rights First that during the telephonic fear screening interview at the Adams County Detention Center, he tried to explain that he could not properly hear or understand the interpreter, but the interpreter ignored and frequently interrupted him, preventing him from responding fully to the questions. The immigration judge reviewing the negative fear determination failed to ask any questions before affirming the decision and did not allow the asylum seeker to speak at the review.

---

[4] The asylum seeker underwent a "reasonable fear interview," where he was required to establish a <u>reasonable possibility</u> that he would face persecution—a higher standard than the "significant possibility" standard for CFIs—because he had previously been removed from the United States and DHS reinstated his removal order when he re-entered, requiring him to pass a reasonable fear interview in order to apply for protection before the immigration court.



- **A gay Afro-Brazilian asylum seeker who was repeatedly raped and brutally beaten for his sexual orientation—and whose partner went missing—received a negative credible fear determination in June 2021 after the asylum officer repeatedly interrupted him when he was attempting to share the severe persecution he had experienced.** The asylum seeker reported to the Southeast Immigrant Freedom Initiative that the officer cut him off when he was describing his persecution and told him those details were not relevant. The asylum officer issued a negative credible fear determination after wrongly concluding that the asylum seeker "was never physically harmed," according to the CFI decision and notes reviewed by Human Rights First. The immigration court overturned the negative fear determination in September 2021.

- **In June 2021, the Houston Asylum Office subjected an Ecuadorian police informant who had been threatened with death because he assisted the police in Ecuador to a rushed CFI and barred his attorney from giving a statement.** During the CFI the asylum officer repeatedly interrupted the man, rushed through the interview after stating that he had 10 interviews to complete that day, and refused to permit the man's attorney, Sophia Genovese, to provide a clarifying statement at the end of the interview. The Asylum Office then determined that he did not have a credible fear of persecution. Genovese told Human Rights First that after the immigration court affirmed the negative fear determination, the Asylum Office reversed its erroneous decision, permitting the man to apply for asylum.

*Inherently intimidating nature of CFIs prevent some asylum seekers, including survivors of trauma, from fully sharing the reasons they fled*

DHS has typically conducted CFIs in ICE detention, often within days or weeks of an asylum seeker's arrival in the United States and generally with the asylum officer remotely interviewing by telephone. Very few detained asylum seekers who are subjected to the expedited removal process have access to services including legal representation and mental healthcare that can assist them to more fully explain the reasons they were forced to flee their homes. For many asylum seekers—including survivors of government-sponsored persecution, LGBTQ individuals, and people who have experienced sexual violence—undergoing CFIs in these circumstances is inherently intimidating and at times re-traumatizing due to fear, shame, and distrust of the asylum officer. As members of Congress noted when they rejected a 30-day asylum filing deadline, "[m]any [asylum seekers] are so traumatized by the kinds of persecution and torture that they have undergone [that] they are psychologically unprepared to [participate in any legal process]."

Asylum seekers prevented from fulling explaining why they are seeking asylum in the United States due to the inherently intimidating nature of the CFI and who received negative fear determinations as a result include:

- **A Haitian asylum seeker was too afraid and ashamed to reveal during a telephonic CFI in September 2021 that she had been raped by police officers in Haiti, resulting in a negative determination.** While detained at the T. Don Hutto Residential Center she managed to secure legal assistance from the University of Texas School of Law Immigration Clinic. At a credible fear review hearing she was able to explain why she had fled Haiti, and the immigration judge vacated the negative credible fear determination in October 2021.

- **An Iranian asylum seeker abducted and threatened with death by the Iranian government did not disclose details of his persecution during a CFI in spring 2022 because he feared that the information would be shared with the Iranian government.** After participating in anti-government protests, the man

had been detained in Iran by police, denied adequate food for days, forced to listen to the screams of other protesters as they were tortured, and threatened with death if he continued to participate in protests. After he secured counsel and learned that the information he shared with the Asylum Office would be kept confidential, the man felt safe sharing his story in a declaration submitted to the Asylum Office with a request for reconsideration that was provided to Human Rights First by his attorney Sophia Genovese with the New Mexico Immigrant Law Center. In July 2022, the Asylum Office reconsidered and found that the man had a credible fear of persecution.

- **In June 2021, a Cuban asylum seeker detained in California received a negative credible fear determination because he had not felt comfortable communicating to the asylum officer that he had been persecuted due to his sexual orientation.** The immigration judge affirmed the negative fear determination, according to an attorney who represents asylum seekers in California.

- **A Nicaraguan torture survivor did not report details of the harm he suffered during a CFI in July 2021 because he believed it would endanger his family in Nicaragua and received a negative fear determination as a result.** The man had been arrested and tortured for being an opposition leader and leading protests against the Ortega regime. Nicaraguan police detained, beat, burned, stripped him naked, and threatened to kill him. He experienced severe anxiety attacks while detained by ICE as a result of the torture he suffered in Nicaragua. During the CFI, which took place in detention, he feared that Nicaraguan authorities would find out about the information he shared with U.S. officials, according to the University of San Francisco Immigration & Deportation Defense Clinic and Migration Studies Program.

- **A Senegalese asylum seeker who fled Senegal after being attacked for his sexuality and was afraid to tell the asylum officer conducting the CFI that he is gay received a negative credible fear determination in August 2021.** He told Human Rights First that he was also intimidated when the interpreter told him to respond only with a "yes" or "no" when asked questions and instructed him to not offer any information that was not asked of him. The immigration judge who affirmed the negative determination prohibited him from speaking during the review. After he finally secured counsel, the Asylum Office denied his multiple requests to reconsider the erroneous negative fear determination.

- **Multiple Nicaraguan political activists who received negative credible fear determinations reported to Aldea—the People's Justice Center in 2021 that they had been afraid to speak during CFIs about their participation in political protests in Nicaragua because they believed they would be penalized by U.S. authorities for their political opposition work.** Their credible fear reviews with the immigration court lasted approximately two minutes. Requests for reconsideration filed by Aldea in fall 2021 were denied by the Asylum Office.

*Failures to provide legally required disability accommodations*

Asylum seekers have been forced to proceed with CFIs while suffering from health conditions and disabilities, including memory loss and other cognitive issues due to severe head injuries, that impeded their participation in the interview and unfairly resulted in negative credible fear determinations. Asylum seekers suffering from COVID-19, high blood pressure, and other conditions also reported that their health condition impaired their ability to share information during the CFI. The government's failure to provide reasonable accommodations for people with disabilities undergoing the credible fear process violates federal disability rights law. The cursory and intimidating nature of many telephonic CFIs

exacerbates these problems and makes it difficult for some asylum seekers to convey that they have a disability or health issue. However, even in instances where asylum seekers have informed DHS of their conditions, they have been forced to proceed with the interview.

Asylum seekers compelled to undergo a CFI without accommodations for a disability or severe health issue that interfered with their ability to describe the persecution they fear include:

• **In May 2021, DHS forced an unrepresented Angolan asylum seeker to proceed with a CFI at the Adams County Detention Center even though he had a severe headache and difficulty breathing due to COVID-19.** The man had fled Angola after he was beaten unconscious for refusing to join a political party. After interviewing him despite his illness and with a French interpreter, rather than his native language Kikongo, the asylum officer determined he did not have a credible fear of persecution. When Human Rights First interviewed him at Winn in December 2021, after seven additional months of detention, he said: "I don't know why I am in this situation . . . this is supposed to be a country of laws . . . they should abide by these laws."

• **The Asylum Office subjected an unrepresented Honduran asylum seeker with a traumatic brain injury—resulting from a severe beating he had suffered in Honduras—to a reasonable fear interview in November 2021 and determined that he was not credible because he struggled to describe the timeline of the many incidents of past persecution he had suffered.** He had fled Honduras after being repeatedly attacked and nearly killed by police officers and gang members who had murdered his family members. A legal service provider later assisted him in submitting a request for reconsideration based on the clear evidence of his disability present in the reasonable fear record, but the Asylum Office denied it and only agreed to schedule an additional interview after extensive advocacy by the organization. Even though his legal representative submitted a psychological evaluation diagnosing the asylum seeker with a cognitive disability affecting memory and sequencing, the Asylum Office again determined that the client was not credible because he confused the dates and order of events. The Asylum Office later reversed the negative fear determination in June 2022 after a complaint was filed with DHS CRCL.

• **In spring 2021, the Houston Asylum Office went forward with a CFI for a gay Angolan activist even though he expressed that he was suffering symptoms of COVID-19, pain from a recent physical assault, and psychological distress from conditions of detention, resulting in a negative credible fear finding.** The man told the asylum officer that he was experiencing anxiety and felt claustrophobic in the "tight space" where the telephonic interview was being conducted. The asylum officer proceeded with the CFI during which the man did not disclose that he is gay because he was afraid that the officer would inform others at the detention center of his sexuality. He feared that such disclosure would further endanger his life since in detention he had been threatened and harassed by people who called him homophobic slurs, according to his attorney at the Southeast Immigrant Freedom Initiative.

• **In February 2021, the Houston Asylum Office conducted a CFI with a Nicaraguan asylum seeker who had suffered a brain injury that resulted in memory loss, speech impediments, severe migraines, and difficulty concentrating.** The man had fled Nicaragua after being detained, beaten, stabbed, and tortured by police officers for participating in anti-government political marches. The Asylum Office ultimately reversed the negative credible fear determination after his attorney at the Refugee and Immigrant Center for Education and Legal Services submitted multiple requests for reconsideration detailing the effects of his

brain injury, which had resulted from a brutal attack by a Nicaraguan police officer. After the negative fear determination, he was needlessly detained for at least three additional months before the Asylum Office corrected its erroneous determination.

### *Lack of access to legal representation, particularly in detention*

Most asylum seekers cannot find attorneys to assist them during CFIs—especially if they are detained—which exacerbates due process barriers, discussed above, that prevent asylum seekers from fairly explaining their fear of persecution. Access to legal representation is extremely limited in detention, particularly in the remote regions where the Biden administration has transferred many asylum seekers—including in Georgia, Louisiana, and Mississippi. Many facilities are located hours from major cities and have some of the lowest attorney availability rates in the country, forcing asylum seekers subjected to expedited removal to undergo the process without legal representation or even basic information. In addition, the pace and unpredictability with which CFIs occur and frequent government transfers of asylum seekers between facilities in different states with little or no notice during the credible fear process make it even more difficult to find an attorney willing to provide representation.

Studies have repeatedly shown that legal representation ensures that more individuals receive asylum and other immigration relief that they are eligible for under U.S. law. Detained people represented by legal counsel are twice as likely to be granted relief by an immigration judge compared to people in detention without an attorney. **But as of June 2022, immigrants and asylum seekers in ICE detention with pending immigration court cases are two-and-a-half times less likely to be represented by counsel compared to individuals who have been released from detention (26.3 percent versus 65.8 percent)**, according to government data analyzed by Syracuse University's Transactional Records Access Clearinghouse. Asylum seekers undergoing expedited removal are even less likely to obtain counsel because of how quickly the process can take place.

**Even in instances where an asylum seeker obtains legal representation prior to a CFI, DHS has a pattern of failing to contact their attorney or pressuring the asylum seeker to proceed without counsel.** Multiple attorneys reported that the Asylum Office appeared to proceed with CFIs without pre-scheduling the interview or even attempting to contact them as they had no record of a missed call from the Asylum Office. The Asylum Office also sometimes conducts CFIs on weekends and outside of business hours making it difficult for the attorneys to attend. For instance, in December 2021, the Arlington Asylum Office conducted a CFI for a Human Rights First client at 7am on a Saturday without notice, thereby making it impossible for his attorney to attend the CFI. Another attorney, Sally Santiago with law firm Abogados Para Hispanos, reported that an asylum officer told her around summer 2021 that the Asylum Office was conducting CFIs on weekends regardless of whether they could reach asylum seekers' attorneys. Santiago said that DHS had also pressured at least a dozen of her asylum-seeking clients to go forward with a CFI without her present. ICE officers used disturbing tactics to conduct CFIs without counsel present such as threatening to throw asylum seekers into an *hielera* (the notoriously cold cells used by CBP to hold migrants and asylum seekers near the border) and threatening to deport or indefinitely detain them if they refused to proceed. For example:

- **A Peruvian asylum seeker received a negative credible fear determination in October 2021 after the Arlington Asylum Office failed to call his attorney, Bashir Ghazialam, when conducting the CFI.** The man had fled Peru after being violently beaten for refusing to promote a political candidate. The immigration

court conducting the CFI review did not provide notice that the review had been scheduled or call Ghazialam when it took place. The man, who suffers from severe mental illness, was detained until March 2022.

- **Around July 2021, a Nicaraguan asylum seeker went into hiding in Nicaragua after she was deported following an unfair CFI conducted without her attorney after an ICE officer at the Stewart Detention Center told her attorneys were not needed for the interview.** A teacher in Nicaragua, the woman had been arrested and jailed for supporting an opposition presidential candidate and refusing to intimidate people into voting for the ruling party. During the interview, the asylum officer asked complex legal questions, such as "what particular social group are you in?" and limited her to replying with "yes" or "no" to some questions. The immigration judge reviewing the decision prohibited her attorney from attending the review and affirmed the negative determination, according to attorney Sally Santiago with law firm Abogados Para Hispanos.

## Trump Administration's Weaponization of Expedited Removal Confirms Endemic Flaws

Government data obtained by Human Rights First confirms that following the Trump administration's weaponization of expedited removal through a series of illegal policies, regulations, and rulings, positive credible fear determination rates plummeted for asylum seekers from countries from which many refugees are fleeing. These include asylum seekers from Haiti and Central America who have continued to receive positive credible fear determinations at extremely low rates under the Biden administration despite high levels of persecution and violence in these countries. In addition, following these Trump administration policies, asylum officers also increasingly found that asylum seekers were not "credible" (*i.e.* they found that asylum seekers' claims were not believable). These **policies** disparately impacted many of the Black, Brown and Indigenous asylum seekers from countries targeted by the Trump administration. As a result, many refugees were wrongfully found not to have a credible fear of persecution and deported without an opportunity to apply for asylum in the United States. This life-threatening, political manipulation of expedited removal is yet another confirmation of the process' endemic flaws.

The Trump administration's attempts to weaponize the expedited removal process to deport refugees without an opportunity to apply for asylum included:

- Rulings by Trump-appointed Attorneys General attempted to limit asylum eligibility and the grounds to establish a credible fear of persecution, including, *Matter of A-B-* (2018), which targeted victims of domestic, gang-related and other violence by private actors. This decision particularly impacted and endangered asylum seekers fleeing El Salvador, Guatemala, and Honduras, where high rates of gender-based violence and femicides as well as violence inflicted by major gangs that control large parts of the country have driven high numbers of refugees to flee.

- In February 2017 and in April and September 2019, DHS issued credible fear lesson plans for USCIS officers conducting CFIs that unlawfully attempted to heighten the standard—set by Congress—for establishing a credible fear of persecution. A federal court later vacated the 2019 lesson plans in 2020, finding that they were unlawful.

# FAST, NOT FAIR: HOW EXPEDITED PROCESSES HARM IMMIGRANT CHILDREN SEEKING PROTECTION

 

Over the years, an increasing number of children and families[1] have arrived at the U.S. southern border seeking protection from persecution, violence, and abuse. Generally, when children and families arrive requesting legal protections, they must make their case to a judge in adversarial immigration court proceedings where a government attorney argues against their case, often without legal representation of their own. While unaccompanied children have some specific protections under law that acknowledge their needs based on their age and developmental stage, children in families must face the same complex and confusing immigration system that adults do, and protections for children generally are woefully inadequate.

One trademark of the immigration system is expedited processes, where individuals seeking asylum have a short period of time to make their claim for protection. Most recently, the Biden Administration finalized a new asylum rule that imposes strict timelines on families and individuals seeking asylum before U.S Citizenship and Immigration Services (USCIS) and immigration courts. Members of Congress have sought to extend or expand expedited processes through legislation.

Expedited processes for children seeking safety jeopardizes their rights and best interests, particularly rights to safety, liberty, and family integrity. They deny the reality of children's distinct developmental stages; the impact of trauma on their ability to build their case; their need for support from trusted adults, counsel and advocates; and instances where children are eligible for protection independent of their parent or legal guardian. Yet, our immigration system has repeatedly subjected children and families to expedited processes, and recent policies threaten to expand their use for children's cases.

While it is critical that children's cases be adjudicated as efficiently as possible, it should not be at the expense of ensuring that children have a full and fair opportunity to be heard and judges have the ability to exercise their discretion to set and extend case deadlines according to the specific and unique needs of each child. **We urge the government to engage in a wholesale reimagining of the immigration system for children founded on the principle that all children seeking protection in the United States must be able to participate in a holistic process of decision making that centers children and ensures that the child's best interests are the primary consideration in every decision.** As part of this reimagining, the U.S. government must **1) immediately end the use of expedited processes for everyone, but particularly for children in families; 2) have specialized corps of adjudicators for children's cases, which would include cases of children in families; and 3) train all adjudicators on substantive considerations for children's cases, and procedures to create a child-sensitive environment for adjudication.**

## As part of reimagining the U.S. immigration system for children, the government must:

1. Immediately end the use of expedited processes for everyone, but particularly for children in families.

2. Have specialized corps of adjudicators for children's cases, which would include cases of children in families.

3. Train all adjudicators on substantive considerations for children's cases, and procedures to create a child-sensitive environment for adjudication.

STB_AR1_008942

# FAST, NOT FAIR: HOW EXPEDITED PROCESSES HARM IMMIGRANT CHILDREN SEEKING PROTECTION

 

or psychological history often provides essential evidence for a meritorious asylum claim, but obtaining these services pro bono often entails wait times of many months. For children whose cases are tied to that of their parents, these child-specific considerations are rarely taken into account. While it is critical that children's cases be adjudicated as efficiently as possible, it should not be at the expense of ensuring that children have a full and fair opportunity to be heard and judges have the ability to exercise their discretion to set and extend case deadlines according to the specific and unique needs of each child.

## A history of trauma affects a child's navigation of removal proceedings

Many immigrant children have suffered trafficking, abuse, or other violence from events that occurred in their countries of origin, during their migration journey, or upon arriving in the United States.[14] In particular, child migration from Central America is frequently connected to gang violence, the erosion of human rights, violence in the home, and other grave danger in their countries of origin.[15] The resulting trauma histories, and often compounded trauma, exacerbate the gap that a child must bridge to participate in preparing a legal defense.

A trauma history can affect a child's ability or willingness to provide information about past incidents.[16] Children who have experienced trauma may have piecemeal or nonlinear memories of the harm they suffered, making it time-consuming to develop and corroborate their claims.[17] It often takes time for them to talk about their experiences. For many, the asylum process is the first time they ever discuss their experiences, and it is a process that requires time and patience — both to ensure a full understanding of their story and to avoid a process that inflicts additional and unnecessary harm on a child.

By forcing a child to address traumatic facts to meet a predetermined timeline rather than one that accounts for the child's age, development and trauma history, expedited processes ignore the significant impact of trauma on children, the ways in which trauma can delay a child's ability to assist their attorneys in preparing their cases, and ultimately obstruct decision-makers in the fact-finding process.

## Children and families need time to find counsel and adequately prepare their asylum cases

For children, access to legal representation is critical to ensuring that their stories and expressed wishes are effectively communicated and understood in their immigration proceedings. It is unreasonable to expect any person, especially a child, to understand the complexities of U.S. asylum law and lay out every element of their claim by themselves without representation. Yet, expedited processes deny children and families adequate time to find legal representation. For example, a January 2022 TRAC report analyzing Executive Office for Immigration Review (EOIR) data regarding the Biden Administration's Dedicated Docket program found that in the first seven months of the Dedicated Docket program in 2021, only 15.5% of asylum seekers had legal representation; for those who had been in the program longest, that percentage only went up

STB_AR1_008945

# FAST, NOT FAIR: HOW EXPEDITED PROCESSES HARM IMMIGRANT CHILDREN SEEKING PROTECTION

 

to 45%.[18]  In contrast, over 90% of respondents in asylum cases placed on a regular docket during that same time period had attorneys.[19] A December 2022 TRAC report analyzing EOIR data since the start of the program found that only 43% of all cases assigned to the Dedicated Docket had legal representation; representation significantly declines for cases more recently assigned to the docket, with only 6% of cases assigned between July and September 2022 represented.[20]

Consistent with prior research demonstrating the critical impact of legal representation on the ability of asylum seekers, particularly children, to obtain legal relief in immigration proceedings,[21] the inability to obtain legal representation has made it extremely difficult for families on the Dedicated Docket to win legal relief. Only 7% of cases on the Dedicated Docket that were closed in 2022 were granted asylum, compared with 52% of cases in regular proceedings.[22] Moreover, TRAC data shows that only 4.7% of those ordered deported during the first 7 months of the Dedicated Docket had legal representation.[23] On the other hand, of the mere 13 people granted asylum during that same time period, all of them had legal representation.[24]  Similarly, the UCLA report analyzing data for the Dedicated Docket in Los Angeles found that most of the families ordered removed in absentia did not have representation, while the vast majority of those families who were able to file applications for asylum or were able to get their cases transferred to a regular docket were represented.[25]

Even if a child or family can find counsel, children's developmental stages and trauma demand that a child have time to feel safe recounting sensitive facts that give rise to eligibility for immigration relief or adequately develop specific technical legal arguments for their case. An attorney's preparation of a case is extensive and often labor-intensive, requiring multiple steps to ensure a robust application for asylum **(see graphic)**. Expedited processes impede attorneys' ability to prepare children's and families' cases to ensure that those with meritorious claims for asylum will not be sent back into harm's way.

## Children should be able to pursue independent claims for asylum

By law, children may assert independent asylum claims, separate and distinct from the claims of their parents and guardians.[26] Expedited processes deny children in families the opportunity to make a claim for protection independent of their parent or legal guardian. A report on expedited removal by the U.S. Commission for International Religious Freedom found that children under 14 arriving with parents had few opportunities to make an independent claim for protection, as border patrol agents question only the parent on behalf of the child.[27] When asked about scenarios where children might have a claim independent from their parent or legal guardian, "border patrol agents responded . . . that they were confident that, since the child had made it to

STB_AR1_008946

## COMMISSIONERS

Thomas J. Reese, S.J.
*Chair*

Daniel Mark
James J. Zogby
*Vice Chairs*

Kristina Arriaga de Bucholz
Sandra Jolley
John Ruskay
Jackie Wolcott
Ambassador David N. Saperstein, *ex officio,* non-voting member

## AUTHORS OF THIS REPORT

Elizabeth Cassidy
*Co-Director for Policy and Research*

Tiffany Lynch
*Senior Policy Analyst*

invocation of general deterrence as a factor in custody determinations in all cases involving families; (3) appoint an expert Federal Advisory Committee to advise ICE on family detention centers; (4) designate a senior ICE official to coordinate and review family detention facility policies and engage with stakeholders; and (5) increase efforts to monitor the conditions at these centers and to ensure that detained families have access to counsel, social workers, educational services, and comprehensive medical care.[106]

A month later, Secretary Johnson announced additional reforms, stating that DHS would: (1) offer release through a bond or other mechanism to asylum-seeking families determined by USCIS to have credible fear; (2) use newly-established criteria to offer bond "at a level that is reasonable and realistic, taking into account ability to pay, while also encompassing risk of flight and public safety," and (3) have asylum officers conduct credible fear and reasonable fear interviews within a reasonable timeframe.[107]

USCIRF's visits to Dilley and Karnes followed the announced reforms. USCIRF was told that women and children were being released pursuant to the new policy, but that release decisions were not transparent or organized. However, USCIRF also was told by legal assistance providers at the detention facilities that more women and children were being detained at the facilities. USCIRF also was told that the women who were being released by ICE typically were being put in an electronic monitoring ATD program rather than receiving a bond, and then successfully appealing ICE's release decision to immigration judges, who ruled that they should be released through a bond.

## Problems Adjudicating Fear Claims of Mothers and Children

Adjudicating fear claims of mothers and children from Central America present unique problems. Asylum officers told USCIRF that these claims usually were related to gang violence, extortion, and domestic violence, and that many of the mothers are found to have a credible fear of persecution or torture.

However, legal assistance providers and other NGOs also told USCIRF that, in their view, some Central American mothers have been erroneously found not to have a credible fear of persecution or torture. They argue that when asylum officers have had to interview mothers with their child or children present, the women may have withheld information about their

*Adjudicating fear claims of mothers and children from Central America present unique problems.*

---

[106] U.S. Immigration and Customs Enforcement, *ICE Announces Enhanced Oversight for Family Residential Centers*, May 13, 2015

[107] Department of Homeland Security, *Statement by Secretary Jeh C. Johnson on Family Residential Centers*, June 24, 2015

STB_AR1_009421

fear claim because they were uncomfortable giving details in front of their children or feared upsetting them. To address this problem, USCIS told USCIRF that sometimes one asylum officer would watch the children as another asylum officer conducted the credible fear interview, and/or the asylum officer would ask a mother prior to the start of the credible fear interview if she would like to be interviewed in front of her children or separately.

Another complication is that children may have a separate fear claim from that of the parent. The First, Second, Sixth, Seventh, and Ninth Circuits have recognized that children's asylum claims should be treated differently from adult claims. These circuits have held that (1) a reduced threshold for persecution applies to children's cases, (2) objective evidence can establish a child's well-founded fear of persecution, and (3) persecution of a child's family member must be considered in evaluating whether the child suffered persecution. Positively, current USCIS practice is that if the mother does not establish credible fear of persecution or torture, the asylum officer will, with the mother's permission, interview her children to assess whether there may be other claims. All USCIS asylum officers are trained to interview children.

### The Honduran and Guatemalan Pilot Initiatives

Another DHS response to the Surge is a CBP/ICE effort known as "HPI" and "GPI," for the Honduran and Guatemalan Pilot Initiatives, which USCIRF learned about on a visit to McAllen, Texas. After being processed at McAllen Station, Hondurans and Guatemalans who do not claim fear are not immediately turned over to ICE for detention. Instead, they are taken to BP's Harlingen Station for "staging" and interviews by representatives of their consulates. They remain in BP custody for four or five days and are then are turned over to ICE for a day and removed, as compared to otherwise being in ICE custody for around 30 days. USCIRF was told that HPI and GPI are being used in the Rio Grande Valley, Laredo, and El Paso BP sectors, and being considered by Tucson. BP agents at McAllen with whom USCIRF met explained that the approach helps combat overcrowding and also "addresses the issue of coaching" since the individuals do not have contact with other ICE detainees and do not receive the Know Your Rights program. Although the agents stated that these individuals can still claim fear at any time up to removal, and, if one did so, s/he would be turned over to ICE and then USCIS, an effect of preventing individuals from learning about the right to seek asylum is troubling. DHS headquarters, however, disputed the BP agents' characterization and described the pilots as a tool to efficiently effectuate removals and reduce time in custody.

*BP agents at McAllen with whom USCIRF met explained that the approach helps combat overcrowding and also "addresses the issue of coaching" since the individuals do not have contact with other ICE detainees and do not receive the Know Your Rights program.*

STB_AR1_009422

**human rights first**

American ideals. Universal values.

FACT SHEET: APRIL 2019

# Allowing CBP to Conduct Credible Fear Interviews Undermines Safeguards to Protect Refugees

In 1996, Congress created an expedited removal process in which immigration officers may order the deportation of certain noncitizens charged as inadmissible without a full hearing. One component of this expedited removal process, the credible fear screening, is supposed to ensure that the United States does not summarily deport bona fide asylum seekers and that they have an opportunity to have their eligibility assessed by an immigration court. Immigration officers who conduct initial questioning of noncitizens must refer individuals who request asylum or indicate a fear of return for a credible fear interview with a trained asylum officer.

But Trump Administration officials have repeatedly complained about the rate at which asylum officers from the United States Citizenship and Immigration Service (USCIS) determine that asylum seekers meet the credible fear legal standard. White House senior advisor Stephen Miller is reported to have demanded that USCIS tighten, i.e. lower, the pass rate. The administration is reportedly considering a pilot program in which border officers from Customs and Border Protection (CBP), including Border Patrol, would conduct credible fear interviews, instead of trained USCIS asylum officers. Stephen Miller is reported to have argued that these interviews should be conducted by CBP agents because they will be "tougher" than USCIS asylum officers and will determine that fewer asylum seekers meet the credible fear standard.

Human Rights First urges the Trump Administration to abandon these plans, because:

- ☑ Assigning CBP to carry out these interviews runs afoul of federal regulations, which mandate that credible fear screenings fall under the jurisdiction of asylum experts at USCIS.

- ☑ CBP is tasked with immigration enforcement; its officers are not suited to carrying out sensitive, legally complex, non-adversarial screenings of often traumatized asylum seekers.

- ☑ Successive U.S. administrations deliberately separated refugee protection from immigration enforcement to ensure efficient, uniform and fair adjudication of asylum cases.

- ☑ CBP officers already often fail to even properly question and refer asylum seekers for fear screenings.

Authorizing CBP to conduct crucial fear screenings would increase the likelihood that refugees at risk of persecution are summarily deported to their home countries without an opportunity to apply for asylum. **Just as a hospital would not assign security guards to triage incoming patients in the emergency ward, CBP border officers should not make life-or-death decisions about refugees seeking protection at the border.**

## Under the Immigration and Nationality Act and Federal Regulations, Trained Asylum Officers Must Conduct Credible Fear Interviews

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, which amended the Immigration and Nationality Act (INA), created the expedited removal process and **directed that asylum officers conduct credible fear interviews**.

- Section 235 of the INA requires that trained asylum officers conduct interviews of noncitizens in expedited removal proceedings who have indicated a fear of persecution or intent to apply for asylum to determine if

STB_AR1_009545

they meet the criteria for demonstrating a "credible fear of persecution." The credible fear standard is defined in the statute as a "significant possibility" that the person will be able to demonstrate eligibility for asylum after a full hearing. Under the statute, the asylum officers who conduct these interviews must have "**professional training in country conditions, asylum law, and interview techniques**" and be supervised by an asylum officer with "**substantial experience adjudicating asylum applications**."

- Federal regulations specify that asylum officers must "receive special training in international human rights law, non-adversarial interview techniques, and other relevant national and international refugee laws and principles."

- 8 CFR § 208.2(a) **mandates that asylum officers within "RAIO [**Refugee, Asylum, and International Operations**] shall . . . have initial jurisdiction over credible fear determinations."** RAIO is the division within USCIS that houses the specially trained officers who conduct asylum adjudications.

- Senator Alan Simpson (R-Wy), one of the IIRIRA co-sponsors, repeatedly emphasized during Congressional debates on the summary nature of expedited removal proceedings that **"**a specially trained asylum officer**"** would conduct credible fear interviews, which he characterized as "the key" safeguard. In response to concerns that asylum seekers would be interviewed by "the guy at the border," Senator Simpson unequivocally stated, "that is simply not true. **This provision will only be administered by specially trained asylum officers** with translators. . . . **These are not low-level immigration officers.** This is not correct. These are highly trained individuals."

# CBP Border Officers are Not Suited to Conduct Sensitive, Non-Adversarial Credible Fear Interviews.

CBP officers carry out immigration enforcement functions. They determine whether noncitizens are admissible to the United States, and have discretion to place certain individuals they find to be inadmissible either in regular removal or expedited removal proceedings. For years, the CBP Inspector's Field Manual has made clear that the role of enforcement officers is to refer individuals who indicate a fear of persecution or intent to seek asylum for a credible fear interview with an asylum officer. **Transferring responsibility for credible fear screenings to CBP would eliminate this independent review by the specially trained USCIS asylum officers specifically established to screen refugees.**

**Given their roles in immigration enforcement, as well as instances of misconduct, CBP officers and Border Patrol agents are not suited to carry out sensitive, non-adversarial fear screenings.**

During fear screenings, asylum seekers are asked to recount details of often violent and traumatic events that led them to flee to the United States, including torture, beatings, and rape, or having witnessed the torture, beating, rape, or murder of others. Because of the sensitive nature of these interviews, credible fear screenings must be conducted in a non-adversarial manner that ensures asylum seekers are able to share information crucial to their claims. CBP officers are not well suited to carry out these sensitive interviews, as:

- Border Patrol agents have repeatedly used excessive force in encounters with migrants, threatened unaccompanied children, and some have pressured refugees who have crossed the border to not apply for asylum.

- **Some CBP officers have openly expressed skepticism of asylum claims, according to a recent report by** USCIRF, essentially pre-judging whether cases would be legally eligible for asylum or not. Some **officers**

# Crossing the Line

## Human Rights Abuses of Migrants in Short-Term Custody on the Arizona/Sonora Border

**A report documenting human rights abuses
suffered by migrants while in the custody of
the United States Border Patrol.
Compiled and published by No More Deaths
September 2008**



**No More Deaths
No Más Muertes**

STB_AR1_009572

*"Many migrants have told me that US Border Patrol agents would drink water and other liquids in front of them taunting them with it but not offering them a drink… knowing they were dehydrated."*

*- Jimmy Wells*

## Failure to Provide and the Denial of Water in the Field and Processing Centers

*Inadequate amounts of potable water available—Unsanitary distribution methods—Denial of water when requested, even by vulnerable populations—Refusal to provide water in spite of evidence of kidney damage and other serious ailments*

**One Liter for Eight People**
15. A male, age 25, from Chiapas, Mexico, reported that he and his group were only given one liter of water to share between 8 people. He also had severe blisters on his feet, and was sworn at and kicked in the chest by a Border Patrol agent.

**Pregnant Woman Denied**
16. Alejandra, a woman who was four months pregnant, reported being denied food and water while in Border Patrol custody. She also had four blisters and athlete's foot.

**No Water for Children**
20. 34 men and two children were repatriated after being in custody for 24 hours. They were given no food or water.

**No Water Received**
30. One male, age unknown, was in custody for eight hours and offered no food, water, or medical care before being repatriated at 9 pm. He witnessed the beating of two other migrants by Border Patrol agents while in the processing center.

STB_AR1_009583

# Failure to Provide and the Denial of Food in the Field and Processing Centers

*Agents throw away migrants' food, or feed it to their horses in front of them—Requests for sufficient amounts of food dismissed in processing centers—Children and pregnant women consistently denied access to adequate nutrition—Systematic denial of food exacerbates the implications of dehydration, rhabdomyolysis (kidney failure), and other serious ailments common among migrants*

**"I never met anyone who told me they received sufficient food while in Border Patrol custody."**

**- Deb Bergman**

**Families Go Hungry**

36. Five mothers with five young children were apprehended by the Border Patrol as they crossed the desert. They were not given food or water in the desert, on the bus, or in the processing center. Additionally, they were not examined for medical needs despite having spent three days in the desert and having young children with them.

59. Corbita reported that Border Patrol denied her and her daughters, Gaby and Juana, of food while they were in custody from 10 am until 8 am on the following day.

89. A group of 32 migrants including six women and two children were repatriated together. The group included a family of four from Georgia that had spent an entire night in Border Patrol custody and were not given food.

**10-Year-Old Deprived**

45. A female, age 10, was not given sufficient food or water during the seven hours she spent in a processing center.

**Pregnant Women Denied Food**

46. A female, age 24, who was also five months pregnant, was denied food by Border Patrol agents, despite her specific requests. When she was repatriated, she reported feeling faint and dizzy.

50. Two pregnant women, ages 22 and 16, were denied food and sufficient water while in custody. They reported verbal abuse by a Border Patrol agent.

**78 Hours Without a Meal**

47. A male, age 29, was detained for over 78 hours without receiving any food or water.

**Food Given, Then Taken Away**

78. Eighteen men, fourteen women and three young boys reported that they had been given food, but it was then taken away from them and thrown away.

No Más Muertes

# Failure to Provide Medical Treatment and Access to Medical Professionals

*Medications for pre-existing conditions like high blood pressure and diabetes confiscated and not returned—Open wounds, broken bones, and heat stroke go untreated before repatriation—Blisters that cover entire soles of feet and have become infected, requiring amputation due to lack of care—Migrants repatriated from hospital emergency rooms wearing hospital gowns and with unfilled prescriptions.*

*"I have treated hundreds of injuries among returned migrants who had received no medical care of any kind while in US custody."*

*- Jim Walsh*

**Pregnant Woman Falls, Goes Untreated**

103. A pregnant female, age 18, was experiencing pregnancy complications and stomach pain after falling. She had received no care while in Border Patrol custody.

**Bounding Pulse Signals Severe Dehydration**

106. Three males were given insufficient food and inadequate medical care. One of the males had a painful, dislocated knee, blisters on his feet, a red rash, and an unusually strong and bounding pulse—a sign of serious dehydration.

**Blood Pressure Medication Confiscated**

107. A male, age 50, reported being ill while in Border Patrol custody for nearly ten hours. Agents confiscated his blood pressure medication and did not return it, even upon repatriation. He was also denied sufficient food and water while in custody.

**Fingers Amputated**

122. A man, age 21, was repatriated with a serious injury to his hand that cut down to the bone; skin and muscle had been lost. He was told at the health center in Naco, Mexico, that it may have been too late to save his fingers, though if proper medical treatment had been given during the eight hours he spent in custody, the fingers could have been saved.

**Repatriated with Cactus Spine Lodged in Eye**

123. A man, age 28, was repatriated with a cactus spine in his eye, causing it to bleed. He had been in custody without receiving any treatment for the eye injury. No food and insufficient water were provided.

**Migrant Repatriated Delirious, Unable to Walk**

129. Mario, age 20, was repatriated with no concern paid to the fact that he was extremely weak and barely able to walk. Upon arrival at the No More Deaths aid station in Nogales, Mario was dizzy, agitated, and delirious, unable to name the country he was in. En route to a Nogales, Sonora hospital, his eyes began to roll back into his head. Prior to being taken into Border Patrol custody, Mario had gone 10 to 15 days without food in the desert.

**Coughing Up Blood**

141. Lorenzo was repatriated with severe lung problems and blood in his saliva. He arrived at the aid station complaining about pain in both sides of his chest, in his lungs. It hurt when he spoke and the pain reached all the way to his back. He was coughing up blood. He had received no medical treatment while in custody, and was immediately transported to a hospital.

**Appendix A**

**U.S. Department of Justice**

Immigration and Naturalization Service

### Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act

Statement by: _____

In the case of: _____

Date of Birth:_____        Gender (circle one):   Male   Female

At: _____        Date: _____

Before: _____
<div align="center">(Name and Title)</div>
In the _____ language.  Interpreter _____ Employed by_____

I am an officer of the United States Immigration and Naturalization Service.  I am authorized to administer the immigration laws and to take sworn statements.  I want to take your sworn statement regarding your application for admission to the United States.  Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States.  This may result in your being denied admission and immediately returned to your home country without a hearing.   If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to  me and the Immigration and Naturalization Service to make a decision.  It is very important that you tell me the truth.  If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country.  If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.   You will have the opportunity to speak privately and confidentially to another officer about your fear or concern.  That officer will determine if you should remain  in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Immigration and Naturalization Service.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Q:  Do you understand what I've said to you?

A.

Q.   Do you have any questions?

A.

Q.    Are you willing to answer my questions at this time?

A.

Q.  Do you swear or affirm that all the statements you are about to make are true and complete?

A.

Page 1 of _____                                   252                              STB_AR1_010151

**U.S. Department of Justice**

**Immigration and Naturalization Service**

**Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act**

Q:   Why did you leave your home country or country of last residence?

A.

Q.   Do you have any fear or concern about being returned to your home country or being removed from the United States?

A.

Q.   Would you be harmed if you are returned to your home country or country of last residence?

A.

Q.   Do you have any questions or is there anything else you would like to add?

A.

I have read (or have had read to me) this statement, consisting of _____ pages (including this page).  I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above-named officer of the Immigration and Naturalization Service.  I have initialed each page of this statement (and the corrections noted on page(s) _____).

Signature: _____

Sworn and subscribed to before me at _____
on _____.

_____
Officer, United States Immigration and Naturalization Service

Witnessed by: _____

Page _____ of _____

I-867B (4-1-97)

STB_AR1_010152

# ARTICLE

## RULES ARE MADE TO BE BROKEN: HOW THE PROCESS OF EXPEDITED REMOVAL FAILS ASYLUM SEEKERS

MICHELE R. PISTONE AND JOHN J. HOEFFNER*

Expedited removal, whereby a person arriving in the United States can be removed within forty-eight hours and barred from returning for up to five years without any judicial oversight or review,[1] is one of the greatest powers any agency of the United States government possesses. This power was originally granted to the Immigration and Naturalization Service (INS) in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).[2] Since the expedited removal provisions of IIRIRA became effective in April 1997, the INS and its successor agency, Customs and Border Protection (CBP) – a division of the Department of Homeland Security (DHS)[3] – have removed more than 500,000 persons from the United States via the expedited removal process.[4] This Article examines and explains the impact of the expedited removal process on genuine asylum seekers and explores possibilities for improving the system.

In addition to the potentially enormous consequences for individuals subject to expedited removal – genuine asylum seekers who are wrongly removed, for example, are by definition at risk of suffering persecution, torture or death – what makes the expedited removal authority perhaps

---

*   Michele R. Pistone is a Professor of Law, Director of the Clinical Program, and the founding Director of the Clinic for Asylum, Refugee and Emigrant Services at Villanova University School of Law. John J. Hoeffner, her husband, is an attorney residing in Villanova, Pa.

1.   INA § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A) (2005).

2.   Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 100 Stat. 3009 (codified in numerous sections of 8 U.S.C.).

3.   DHS was established by the Homeland Security Act of 2002. Pursuant to that Act, the INS was abolished on March 1, 2003, and its functions were absorbed by DHS, and distributed among its various sub-parts, such as CBP.

4.   *See* U.S. DEP'T OF HOMELAND SEC., 2003 YEARBOOK OF IMMIGRATION STATISTICS 149 (2004) (noting 421,976 expedited removals from 1997 to 2003).

STB_AR1_010371

completed forms lacked important information communicated by the applicant. Finally, several studies have documented instances of inspectors refusing to provide interpretive assistance.

### 1. *Inspectors Fail to Communicate Required Information*

CBP training materials state that secondary inspectors must use the I-867A & B forms "in every case in which an alien is determined to be subject to Expedited Removal."[38] The following paragraphs of the I-867A must be read to persons subject to expedited removal:

> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, barred from reentry for a period of 5 years or longer.

> This may be your only opportunity to present information to me and the Immigration and Naturalization Service [sic] to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.[39]

Nothing is more crucial in preventing the deportation of genuine asylum seekers via expedited removal than ensuring that the I-867A information is communicated; hence, the controlling regulation requires that the information be read out-loud by the secondary inspector or a translator.[40] The need to do this is particularly acute in the case of the paragraph that informs individuals that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their

------

38. USCIRF REPORT, vol. 2, *supra* note 11, at 13.
39. *See id.* at 252 (copy of I-867A); *see also id.* at 13 (noting obligatory paragraphs).
40. 8 C.F.R. § 235.3(b)(i) (2005) (stating "[t]he examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A"); *see* USCIRF REPORT, vol. 2, *supra* note 11, at 15 (noting that CBP's manual also expressly requires that the I-867A be read aloud).

home country." Many victims of persecution are from countries that tightly control information about the ability of victims of persecution to seek refuge in other countries. Thus, for this or other reasons, many applicants for admission are unaware of their right to ask for protection from return and must affirmatively be told about this right by the inspections officer.[41]

The same paragraph also contains important information stating that expressions of fear about returning home will be treated confidentially. Especially given the prevalence of post-traumatic stress disorder (PTSD) among true victims of persecution,[42] as well as the fear that inspectors may relay claims of persecution back to the home government (and thereby possibly endanger the applicant, if returned, or his or her family), many applicants may need to receive the assurance of confidentiality before they will communicate with their interrogators.

The other paragraphs of the I-867A form are also important and failure to read them reduces the accuracy of the secondary inspection process as well.[43] Unfortunately, if an inspector fails to read the form aloud, or any part of it, nothing is likely to be done because the omission will likely never be revealed; the file reviewed by supervisors does not require any assurance that the I-867A was read. It is perhaps unsurprising, then, that the form often is not read at all.

The recent report by USCIRF notes both the extent of the failure to read the I-867A aloud and the consequences of this omission. For example, with respect to the failure to read the paragraph informing the applicant of the availability of protection to people who face persecution, the report states:

> DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has

_____

41.  *See* Pistone & Schrag, *supra* note 23, at 25-26 (noting that eventual asylum seekers can even live in the United States for years without learning of the availability of asylum protection).

42.  *See, e.g.*, Mark Van Ommeren et al., *Culture, Trauma, and Psychotrauma Programmes*, 350 THE LANCET 595 (1997) (noting "increased rates of post-traumatic stress disorder . . . among Turkish, Palestinian, and Bhutanese survivors of torture"); Pistone & Schrag, *supra* note 23 at 49 n.272 (collecting studies showing elevated levels of PTSD among refugees). Victims of PTSD may be reluctant to discuss the source of their trauma, especially absent the establishment of a "trusting relationship" with an interrogator. *See* Derrick Silove et al., *Anxiety, Depression and PTSD in Asylum-Seekers: Associations with Pre-Migration Trauma and Post-Migration Stressors*, 170 BRIT. J. PSYCHIATRY 351, 351 (1997) (noting requirement of "trusting relationships"). A promise of confidentiality can be a start toward establishing that relationship, and thus a start toward communicating the information that may qualify one for asylum.

43.  For example, confusion about the expedited removal process is widespread even among people who have been through it. USCIRF REPORT, vol. 2, *supra* note 11, at 25. Thus, the paragraph noting that "[t]his may be your only opportunity to present information" may provide new information to applicants, which might be important in motivating them to talk of possible persecution, especially combined with the remaining paragraph's notification of apparent inadmissibility and warning of a five-year bar. *Cf.* Balasubramanrim v. INS, 143 F.3d 157, 162-63 (3d Cir. 1998) (noting that "an arriving alien who has suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country").

STB_AR1_010381

a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this information were seven times more likely to be referred for a credible fear determination than those who were not.[44]

The magnitude of these numbers is stunning, especially when one realizes that the officers knew that they were being observed by USCIRF staff and, as the USCIRF report notes, "It certainly seems likely that compliance with required policies could be greater and inappropriate behaviors would be fewer when observers were monitoring their interviews."[45] In all events, the demonstrated widespread disregard of the requirement that the I-867A be read aloud obviously represents a substantial failure.

2.  *Inspectors Order Expedited Removal Based on Incomplete Statements*

Inspection officers are also required to ask three questions found on the I-867B and record the answers. Those three questions, which are meant to elicit information relevant to whether a credible fear referral is warranted (and are therefore known as "fear" questions)[46] are:

- Why did you leave your home country or country of last residence?
- Do you have any fear or concern about being returned to your home country or being removed from the United States?
- Would you be harmed if you are returned to your home country or country of last residence?[47]

Despite their mandatory nature, every study of the expedited removal process and the mandatory questions shows that secondary inspectors repeatedly fail to ask, or fail to record the answer to, one or more of the questions.[48] The latest study, by USCIRF, found that between 5% and 15% of I-867B's

---

44.  USCIRF Report, vol. 1, *supra* note 11, at 6.
45.  USCIRF Report, vol. 2, *supra* note 11, at 30. The report continues by noting that "[t]hus, the rates of problems observed in this study likely underestimate the actual rate of problem behaviors and failures to adhere to established policies." *Id.* The phenomenon by which observers, by their mere presence, affect examined behaviors is known as the Hawthorne effect.
46.  *Id.* at 13.
47.  *Id.* The I-867B also contains a fourth mandatory question: "Do you have any questions or is there anything else you would like to add?" *Id.* at 253. This catch-all question may sometimes be considered a "fear" question, *see* USCIRF Report, vol. 1, *supra* note 11, at 55 (referring to the "four fear questions"), but its intended scope is broader – to make sure the applicant understands the process as much as to elicit further information. Perhaps the USCIRF report focuses on the first three questions for this reason. *See, e.g.*, USCIRF Report, vol. 2, *supra* note 11, at 13-16.
48.  *See* USCIRF Report, vol. 2, *supra* note 11, at 14-16; Opportunities Exist, *supra* note 14, at 39-40; Changes in the Process, *supra* note 5, at 43.

are incomplete in this manner.[49] A comparison with the 2000 GAO study suggests compliance with this requirement has declined considerably in recent years.[50] It is unclear whether the decline is due to a decrease in inspector diligence, a lessening of supervisory vigilance, or both. In any event, the trend is unmistakable, and is an unquestionably negative development.[51] Indeed, as discussed below in Part II(A)(5), the compliance failure in this particular respect is greater than the numbers above indicate: the USCIRF study found, through its direct observation of interviews, that the CBP's file record indicating the percentage of times that fear questions had been asked substantially overstated the actual level of compliance during the interviews.[52]

### 3.  *Inspectors Issue Removal Orders to Individuals who Express Fear During Secondary Inspections*

DHS regulations state the following:

> If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer *shall not proceed further* with removal of the alien until the alien has been referred for [a credible fear] interview by an asylum officer in accordance with 8 CFR 208.30.[53]

Both the GAO and USCIRF studies found evidence that this regulation has not always been obeyed. Thus, in a random sample of 365 case files reviewed by the GAO, seven case files indicated that an individual was ordered removed despite having expressed a fear of return.[54] USCIRF's study shows an even higher level of disregard for the regulation. In that study, "[o]ne in six aliens who expressed a fear of return during the Secondary Inspection interview were placed in Expedited Removal or allowed to withdraw their application for admission."[55] Withdrawal is at the discretion of immigration officers; however, the request for withdrawal of an application for admission must be made "strictly voluntar[ily]" by the applicant and "not be coerced in

---

49.   USCIRF REPORT, vol. 2, *supra* note 11, at 14-16 (indicating, at Table 2.1, that a file review showed approximately a 95% compliance rate for each question, meaning that a minimum of 5% and a maximum of 15% of all I-867B's failed to contain an answer to at least one fear question).

50.   OPPORTUNITIES EXIST, *supra* note 14, at 39-40.

51.   One related bright spot is that while the 1998 and 2000 GAO studies revealed incorrect forms being used by inspectors and accepted by supervisors in some instances, *see* OPPORTUNITIES EXIST, *supra* note 14, at 44; CHANGES IN THE PROCESS, *supra* note 5, at 43, the USCIRF study recorded no such instances.

52.   USCIRF REPORT, Vol. 2, *supra* note 11, at 15-16; *see* USCIRF REPORT, vol. 1, *supra* note 11, at 54.

53.   8 C.F.R. § 235.3(b)(4) (2005) (emphasis added).

54.   OPPORTUNITIES EXIST, *supra* note 14, at 40.

55.   USCIRF REPORT, vol. 2, *supra* note 11, at 29.

STB_AR1_010383

any way."[56] Distressingly, USCIRF's researchers witnessed several persons withdraw after expressing fear, with the withdrawals seemingly as a result of improper encouragement by inspectors.[57]

The issuance of expedited removal orders to individuals who express fear during secondary inspections is problematic because it violates the treaty obligation of *non-refoulement*, which prohibits the return of a refugee "from one state to another, especially to one where his or her life would be threatened."[58] Because secondary inspectors are not qualified to assess "fear" in the asylum context, as will be discussed in Part II(B)(5), they must not do so. Rather, they should simply record the applicants' expressions of fear and pass the cases on to asylum officers. As will be shown in Part II(B)(5), confusion among supervisors and upper-level managers appears to cause at least some of the confusion on the inspector level. Inspectors, therefore, may not deserve criticism for doing the wrong thing. Nonetheless, when inspectors evaluate and judge levels and types of fear, the wrong thing *is* being done.

4. *Inspectors Allow Sworn Statements to be Signed Without Being Verified*

Given the high stakes involved in removing individuals from the United States without a judicial hearing and barring them from returning to the country for up to five years, the regulations seek to ensure that all information about an applicant for admission that is recorded on the I-867B sworn statement is accurate and verified. To achieve this goal, the regulations have incorporated three safeguards into the inspection process.

First, inspectors are required to "have the alien read (or have read to him or her)" the statement as it is recorded on the form.[59] The regulations also contemplate the possibility that corrections will be made to the statement, thereby eliminating any errors, misstatements or misunderstandings between an applicant's stated answers and the written record. Finally, the regulations also require the applicant to "sign and initial each page of the statement and each correction."[60] This last requirement is an effort to have the applicant

---

56. USCIRF REPORT, vol. 1, *supra* note 11, at 5-6 (quoting CBP training materials) (internal quotation marks omitted); *see also* 8 C.F.R. § 235.4 (2005) (stating that "[t]he alien's decision to withdraw his or her application for admission must be made voluntarily, but nothing in this section shall be construed as to give an alien the right to withdraw his or her application for admission.").

57. USCIRF REPORT, vol. 1, *supra* note 11, at 5-6, 50-51; USCIRF REPORT, vol. 2, *supra* note 11, at 23-24; *See* Swarns, *supra* note 23, at A11 (noting report by the U.N. High Commissioner for Refugees describing "instances in which inspectors encouraged asylum seekers not to pursue asylum").

58. BLACK'S LAW DICTIONARY 1080 (8th ed. 2004); *see* Refugee Protocol, *supra* note 15, 19 U.S.T. 6224, 606 U.N.T.S. 267 (constituting U.S. treaty obligation). The Refugee Act of 1980 incorporated the United States' treaty obligation of *non-refoulement* into U.S. law. Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

59. 8 C.F.R. § 235.3(b)(2)(i) (2005).

60. *Id.*

confirm the truth of the statement,[61] much as a deponent in litigation is called upon to certify the truth of a deposition transcript after it is read to or by him.[62]

In practice, however, there is a major difference between signing an I-867 and signing a deposition transcript. The deposition transcript will almost always be in a language the deponent understands; the deposition, after all, purports to be his or her own words. The same is not true of the I-867. That form is written in English, which a substantial majority of persons caught in the expedited removal process do not speak. In fact, in the cases observed by the USCIRF researchers, it was possible to conduct interviews in English less than 20% of the time.[63]

The language difference does not present an insurmountable obstacle to fulfilling the purpose of the signature requirement. It simply means that the I-867 will have to be translated before it is signed. However, in practice, the I-867 often is signed without being translated.

Thus, the USCIRF study found that, while there was 100% compliance with the signature requirement,[64] 72% of the signers neither read their statement nor had it read to them.[65] This large majority signed the form in front of them – as people often do – without knowing or checking its contents. Contrary to the intent of the signature requirement, therefore, the presence of a signature does little to ensure the reliability of the sworn statement.

One might regard this as the failure of the signers, not the inspectors, given that typically the burden is on a signatory to make sure that he or she understands a document before signing it.[66] In this case, however, the burden is on the inspectors to be "absolutely certain . . . that the alien has understood the proceedings against him or her."[67] Moreover, in the majority of cases, it is impossible for signatories to read the document on his or her own initiative. Inspectors provide interpreters only when "necessary"[68] and, in the USCIRF study, interpretation was provided 81% of the time.[69] However, the statements were read back to the applicants only 17.7 % of the time,[70] meaning

---

61.   USCIRF REPORT, vol. 2, *supra* note 11, at 18.

62.   FED. R. CIV. P. 30(e), (f)(1).

63.   USCIRF REPORT, vol. 2, *supra* note 11, at 10 tbl. 1.4.

64.   *Id.* at 18. The 100% performance represents an improvement over prior measures of compliance with the signature requirement. *See* OPPORTUNITIES EXIST, *supra* note 14, at 41 tbl. 2.5 (noting compliance percentages as low as 95%); CHANGES IN THE PROCESS, *supra* note 5, at 44 (noting compliance percentages as low as 97%).

65.   USCIRF REPORT, vol. 2, *supra* note 11, at 19 tbl. 2.11.

66.   E. ALLAN FARNSWORTH, CONTRACTS § 4.26, at 295 (1982) (stating that "the law presumes that a person knows the contents of a document that he executes and understands at least the literal meaning of its terms," (internal quotation marks omitted)).

67.   CBP Inspector's Field Manual § 17.15(a).

68.   8 C.F.R. § 235.3(b)(2)(i) (2005) ("[I]nterpretative assistance shall be used if necessary to communicate with the alien.").

69.   USCIRF REPORT, vol. 2, *supra* note 11, at 10 tbl. 1.4.

70.   *Id.* at 19 tbl. 2.11.

STB_AR1_010385

that more than 63% of the time the signatories could not know what was in the document, and that this fact necessarily was known to the inspectors who had procured interpreters or themselves had to speak to applicants in a language other than English.

In the vast majority of cases, then, the signature establishes nothing more than that an applicant for admission sat in front of an inspector as the latter wrote up a sworn statement. The consequences of this general failure to treat the signature requirement as anything more than a technical exercise are substantial. First, an undetected misinterpretation or misunderstanding could result in a secondary inspector ordering removal of an applicant who has a viable asylum claim. Second, the same misunderstanding could cause a supervisor to approve a removal order he might otherwise reject. Third, because the I-867B will become part of the official record of the case sent on to credible fear interviews with asylum officers and will then be reviewed and often given substantial weight by immigration judges and government attorneys as they deliberate the merits of asylum claims, undetected misunderstandings could come back to haunt even persons who successfully avoid expedited removal.[71] Finally, the signature requirement and the requirement that inspectors be "absolutely certain . . . that the alien has understood the proceedings" have a secondary purpose of protecting the dignitary interests of applicants. As one scholar has written in a study of social security disability insurance, "claimant control over the processing of a claim . . . is important to the development of an adjudicatory process that maintains or fosters dignity and self-respect."[72] Allowing an applicant a chance to review his or her statement and to make changes to it before signing certainly could give the applicant the sense of control that can foster dignity.

### 5. *Inspectors Falsely Attribute Statements to Applicants*

USCIRF's recent congressionally-mandated study of the expedited removal process is "the first systematic evaluation of the Expedited Removal process utilizing direct observation of Secondary Inspection interviews with arriving aliens."[73] The results of USCIRF's study suggest that previous studies based mainly or exclusively on archival data[74] are very likely to have

---

71. *Id*. at 67-70 ("Our findings reveal that the Expedited Removal record created during the Expedited Removal process is in many cases used by immigration judges and DHS trial attorneys to impeach aliens' credibility and undermine their claim").

72. JERRY L. MASHAW, BUREAUCRATIC JUSTICE 133 (1983).

73. USCIRF REPORT, vol. 2, *supra* note 11, at 28.

74. *See, e.g.*, OPPORTUNITIES EXIST, *supra* note 14, at 32-33; CHANGES IN THE PROCESS, *supra* note 5, at 4; CENTER FOR HUMAN RIGHTS AND INTERNATIONAL JUSTICE, THE EXPEDITED REMOVAL STUDY: REPORT ON THE FIRST THREE YEARS OF IMPLEMENTATION OF EXPEDITED REMOVAL 1-2 (May 2000) [hereinafter EXPEDITED REMOVAL STUDY]. For years, except for the mandated GAO reports, which relied mainly on a review of paper files, the INS resisted almost all outside review of the expedited removal process. Indeed, for several years, it declined not only repeated requests to conduct "on-site observations of the process" but also, until 2000, "denied access to statistical data on expedited

substantially underestimated the rate of noncompliance with applicable regulations.

Thus, the USCIRF report states that "[s]tudy researchers found that the file often indicated that all four fear questions were asked of the alien, even when they were not."[75] The discrepancies were substantial. For example, the USCIRF researchers observed thirty-seven cases in which the first "fear" question was not asked. However, in thirty-two of those cases, the applicant's file nonetheless "incorrectly noted that the question had been asked and answered."[76] This suggests that actual noncompliance with the requirement to ask the first mandatory question on the I-867B was almost *seven* times the rate indicated by the record files.

### 6.  *Inspectors Fail to Include Important Information Conveyed by Applicants*

In some cases, inspectors fail to note significant information offered by the applicant on the I-867B.[77] The most egregious example of this occurs – with distressing frequency, according to USCIRF – when an individual expresses fear at secondary inspection but the officer fails to record the fear and orders expedited removal.[78]

The failure to record important information can create a problem even for an individual who passes secondary inspection and moves to a credible fear interview before an asylum officer and an asylum hearing before an immigration judge. Immigration judges often deny an asylum claim on the ground "that the applicant was not credible because the alien's testimony in court reflected additional detail not found in the original document from the port of entry."[79] Because the I-867B is "less than reliable" in constituting a comprehensive record of the applicant's statement, this ground may be factually wrong. Accordingly, secondary inspectors' failure to include significant facts on the I-867B may "lead to the incorrect removal of asylum seekers to countries where they may face persecution,"[80] even when an inspector decides against ordering expedited removal.

---

removal." *Id.* at 2. The one exception that was made to the veil of secrecy placed over the expedited removal process might well be regarded as the exception that proves the rule: the United Nations High Commissioner for Refugees was granted access to "more than 100 interviews with asylum seekers at airports," but only "on the condition that [its] report not be released to the public." Swarns, *supra* note 23, at A11 (discussing leaked report).

75.  USCIRF REPORT, vol. 1, *supra* note 11, at 55. For an explanation of the fourth "fear" question, see *supra*, note 47.

76.  USCIRF REPORT, vol. 2, *supra* note 11, at 15.

77.  *Id.* at 16.

78.  *Id.* at 20.

79.  USCIRF REPORT, vol. 1, *supra* note 11, at 57.

80.  *Id.* Although widespread, the practice of relying on the record created at secondary inspections has its detractors. *Id.* at 75 (stating that the sworn statement on the I-867B is not reliable, and therefore recommending that the form include a disclaimer noting that it is not a transcript and is "not intended to go into detail" (internal quotation marks omitted)); *see also* Aravinthan Balasubramanrim v. INS, 143 F.3d 157, 162-63 (3d Cir. 1998) (rejecting the reliance of the Board of

### 7. *Inspectors Fail to Provide Adequate Interpretive Assistance*

DHS regulations require that interpretive assistance be used, if necessary, at secondary inspection.[81] The authors of the USCIRF report were surprised to find that, "despite the presence of researchers observing Secondary Inspection interviews, our observers . . . noted that on more than one occasion aliens were refused interpreters . . . even when they requested them."[82] In this respect, the USCIRF report confirms findings by several other studies.[83]

Such refusals, even if only occasional, obviously are troubling. Not only do the refusals elevate the risk that an inspector will miss an applicant's statement of fear and issue a removal order, but they also could eventually hurt applicants who survive secondary inspection. A record compiled by an inspector struggling to get by without an interpreter, or including statements by an applicant struggling to communicate in an unfamiliar language, is clearly susceptible to being tainted by affirmative misstatements and crucial omissions. As noted above in Part II(A)(6), such problems can cause immigration judges to find credibility issues where none truly exist, and could thus ultimately result in the erroneous return of genuine asylum seekers to countries where they may be persecuted.

Moreover, much more than occasionally, inspectors provide inadequate interpretive assistance. In Los Angeles, for example, interpretation is provided by airline personnel nearly 25% of the time[84] and, as CBP itself recognizes, such interpretation can be problematic.[85] The potential problems include deliberate inaccuracy, as the national or quasi-national nature of many airlines can foster a bias among airline personnel against a person alleging persecution by the airline employee's state; unintentional incompetence, as an untrained interpreter may inappropriately summarize statements or attempt to resolve ambiguities on his or her own; and incompleteness, as an applicant may be reluctant to speak openly in front of a known state employee. An interpreter inadequate for any of these reasons can create the same difficulties as a complete failure to provide any interpreter at all.

### B. *Supervisory Review of the Expedited Removal Process Is Ineffective*

Supervisory review of expedited removal orders also suffers from serious shortcomings. This review must be performed by an official at or above "the

---

Immigration Appeals on the record of a secondary inspections interview because, *inter alia*, it "may not be reliable").

81. 8 C.F.R. § 235.3(b)(2)(i) (2005).
82. USCIRF REPORT, vol. 2, *supra* note 11, at 31.
83. *See, e.g.*, AMERICAN BAR ASSOCIATION, AMERICAN JUSTICE THROUGH IMMIGRANTS' EYES 10-11 (2004) (detailing instances of interpretive services being denied); Swarns, *supra* note 23, at A11 (citing confidential U.N. report stating that certified translators often were not provided for asylum seekers who did not speak English). *See also* EXPEDITED REMOVAL STUDY, *supra* note 74, at 72 (noting instance of inspectors refusing to believe applicants' inability to speak English).
84. USCIRF REPORT, vol. 2, *supra* note 11, at 11 tbl. 1.6.
85. CBP Inspector's Field Manual § 17.15(b)(3).

STB_AR1_010388

level of second line supervisor, or a person acting in that capacity."[86] It is conducted primarily through a review of the I-867B. In theory, no expedited removal orders can be carried out unless approved by a supervisor. Unfortunately, in practice, this requirement and other regulations are sometimes ignored. Moreover, other actions are taken as well – including actions by upper-level managers – that make supervisory review of expedited removal orders ineffective.

### 1.  *Supervisors Accept Incomplete Sworn Statements*

It has already been noted in Part II(A)(2) that secondary inspectors sometimes do not ask or do not record answers to the mandatory questions listed on the I-867B. The secondary inspectors' supervisors compound the error during their own review, by either failing to notice the omissions or simply ignoring the inspectors' errors.

This deficiency has persisted throughout the lifetime of the expedited removal program. The continued and increased existence of the problem, despite being specifically identified as an issue in government studies published in 1998, 2000, and 2005,[87] suggests a certain over-optimism among those proponents of expedited removal who thought that supervisory review would adequately approximate review by the Board of Immigration Appeals and the federal courts.

Indeed, this suggestion only becomes stronger as one becomes more familiar with the particulars of the I-867B. The space provided for answering, or at least to begin to answer, the mandatory questions of the I-867B is on the face of the form.[88] It seems impossible that one would overlook this space unless one has not looked at all. This suggests that the supervisors' failure to address the omissions is not only a problem in itself, but also a sign of larger problems – most of all, it suggests a general unsuitability of supervisors acting as "courts" of last resort.

### 2.  *In Some Cases, No Record Documents that Any Review Was Conducted*

The GAO has reported that supervisors at some of the busiest airports in the United States completely failed to review expedited removal orders in up to three percent of the cases.[89] In such cases, the failure to review an expedited removal order effectively constitutes a decision to deport the applicant based on the un-reviewed assessment of a single secondary inspection officer working in a demonstrably flawed system.

---

86.  8 C.F.R. § 235.3(b)(7) (2005).
87.  USCIRF REPORT, vol. 2, *supra* note 11, at 14-16; OPPORTUNITIES EXIST, *supra* note 14, at 39-40, 46; CHANGES IN THE PROCESS, *supra* note 5, at 43.
88.  *See* USCIRF REPORT, vol. 2, *supra* note 11, at 253 (copy of the I-867B).
89.  OPPORTUNITIES EXIST, *supra* note 14, at 40-41.

STB_AR1_010389

### 3. Supervisory Reviews Are Sometimes Conducted by Unauthorized Officials

As previously noted, a second line supervisor must perform supervisory review.[90] However, this requirement is sometimes violated when the supervisory review is conducted by "someone other than the second line supervisor [signing] the order of removal."[91] Presumably, the intent of this rule is to ensure that the review of a secondary inspector's removal order is conducted by someone who understands the importance (and finality) of the review, and is adequately trained to perform it. Too often, it seems, these assumptions do not reflect reality, but that unfortunate fact only underscores the seriousness of the failure to comply with the second line inspector rule. After all, as flawed as second line supervisor review seems to be, there is absolutely no reason to believe that an individual not empowered by the regulation to undertake the responsibility of review will perform even as well as a second line supervisor.

### 4. Supervisors Rely on Inadequate Telephonic Review of Records

CBP policies allow expedited removal orders to be approved by telephone if an appropriate supervisor is not present.[92] In practice, supervisory review in many airports is conducted by telephone at least occasionally and perhaps in the vast majority of cases. For example, eighty of the ninety-four case files at JFK International Airport in New York reviewed by the GAO included evidence of telephonic supervisory review.[93]

There are at least two problems with telephonic supervisory review. First, telephonic review inevitably lessens the overall quality of the review process. Second, telephonic review makes it impossible to conduct with confidence any systematic study of the review process.

The first problem results from the reality that a telephone conversation about a written record is not the same as compliance with the regulatory requirement that a supervisor review "the sworn statement and any answers and statements made by the alien"[94] unless these parts of the record are read verbatim over the telephone. It is, of course, theoretically possible to read the statement and answers verbatim over the telephone, but it is quite certain that it is not done very often. The supervisory review is by a "high level supervisor"[95] who has many other responsibilities; after all, out of every 10,000 persons who arrive at ports of entry, in only one or two cases, on

---

90. 8 C.F.R. § 235.3(b)(7) (2005).
91. OPPORTUNITIES EXIST, *supra* note 14, at 44.
92. *Id.* at 41; CBP Inspector's Field Manual § 17.15(b)(3).
93. OPPORTUNITIES EXIST, *supra* note 14, at 41.
94. 8 C.F.R. § 235.3(b)(7) (2005).
95. David A. Martin, *Two Cheers for Expedited Removal in the New Immigration Laws*, 40 VA. J. INT'L L. 673, 682 (2000).

STB_AR1_010390

average, will the supervisor be called upon to exercise his or her responsibility to review and approve orders for expedited removal.[96] Under these circumstances, when an inspector calls for approval of an expedited removal order, it is unlikely that the supervisor is leisurely waiting by the telephone, ready and willing to listen to a possibly lengthy verbatim reading of an applicant's statement. Rather, if the supervisor is available at all, the press of other demands likely encourages a less structured conversation, in which secondary inspectors, perhaps prompted by supervisors at certain points (e.g., "was there fear?," "did he sign it?," etc.), briefly and contemporaneously summarize their interviews.

Such summaries often could omit or mischaracterize important facts that a verbatim reading of the record would reveal. An abbreviated conversation, for example, easily could overlook a failure to answer one or more of the fear questions. Do abbreviated conversations of the sort posited here actually happen? Surely the demonstrated frequency with which fear questions actually do go unanswered, and the impossibility of overlooking the failure to answer if one actually conducted a verbatim reading, constitutes powerful circumstantial evidence that the answer is "yes." Moreover, for a proponent of telephonic review to argue that the answer is "no" would, if successful, be to win the battle but to lose the war over the appropriateness of the current system – it would mean that high level supervisors are approving deportations despite being expressly and routinely made aware that forms are incomplete in crucial respects.

More likely, we think, than that cynical view, is that abbreviated, i.e. non-verbatim, telephonic reviews are, above all, good faith responses to substantial time pressures. In addition, supervisors and secondary inspectors can find common ground in the fact that non-verbatim telephonic review has the additional bureaucratic appeal of lessening accountability on both ends of the line. When non-verbatim telephonic supervision is utilized, there is no written record of what is communicated to the supervisor. One cannot tell whether a supervisor made a mistake in evaluating the facts, or if the secondary inspector omitted or mischaracterized facts. Unfortunately, as the lack of accountability dawns on employees, the incentive to work carefully is lessened. Indeed, in the past and perhaps still, the lack of accountability was

---

96. Approximately 300 million people will arrive at U.S. ports in a given year. Approximately 3.3% of this group, or ten million people, will be directed to secondary inspections. Ten percent of this ten million, i.e., one million, will go through a long interview and truly be at risk of being immediately deported. In 2003, 43,336 of the latter group actually were ordered deported via expedited removal (almost double this number were given permission to withdraw). In other words, 4.3% of persons truly at risk of receiving expedited removal orders actually received them; .43% of persons diverted for any length to secondary inspections actually were deported via expedited removal; and .013% of persons – or 1.3 persons out of every 10,000 — who arrived hoping to enter the country were given expedited removal orders. *See* USCIRF REPORT, vol. 1, *supra* note 11, at 32 (statistical information); USCIRF REPORT, vol. 2, *supra* note 11, at 6 (noting 90% of persons sent to secondary inspection pass through quickly).

STB_AR1_010391

reinforced by the failure of supervisors to keep any record establishing that a review took place, despite training guidance recommending that approving officials keep a log of telephonic concurrence to ensure that all cases are properly approved. [97]

In sum, telephonic review thus not only fails as a means of conducting an effective review, it succeeds far too well in masking the particular source of any errors that may be made. Absent any changes in procedure, this baleful combination has the unfortunate consequence of making systematic review by others, including even higher-ranking CBP officials, both necessary *and* impossible.

### 5. *High-Level Managers and Supervisors Have Inexcusably Confused the Standard to be Applied When Applicants Express Fear in the Secondary Inspections Interview*

CBP claims that certain expressions of fear in an expedited removal hearing should *not* result in a referral for a credible fear determination. CBP's claim finds expression in section 17.15(b) of the CBP Inspectors' Field Manual, which authorizes inspectors to deport, via expedited removal, even persons who have expressed fear in response to the I-867B's fear questions when the fear "would clearly not qualify that individual for asylum."[98] This instruction is vulnerable on numerous grounds.

The first objection to allowing inspectors to evaluate the adequacy of an applicant's fear assertion is that it flatly contradicts the DHS regulation it is intended to facilitate. As noted previously, that regulation states:

> If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer *shall not proceed further* with removal of the alien until the alien has been referred for [a credible fear] interview by an asylum officer in accordance with 8 CFR 208.30.[99]

The statute this regulation is meant to implement states that, upon an expression of fear, "the officer *shall refer* the alien for an interview by an asylum officer. . . ."[100] As far as the action required upon an expression of fear is concerned, the regulation thus differs from the statute it is implementing only in that the regulation's command "not [to] proceed further" makes explicit what is obviously implicit in the statute.

A strict constructionist might hold that CBP's interpretations of the statute

---

97. Opportunities Exist, *supra* note 14, at 41.

98. CBP Inspector's Field Manual § 17.15 (2003); *see* USCIRF Report, vol. 1, *supra* note 11, at 6, 53-54; USCIRF Report, vol. 2, *supra* note 11, at 20.

99. 8 C.F.R. § 235.3(b)(4) (2005) (emphasis added).

100. INA § 235(b)(1)(A)(ii), 8 U.S.C. § 1225(b)(1)(A)(ii) (2005) (emphasis added).

STB_AR1_010392

and regulation are self-refuting. To claim, as CBP does, that the "shall" in the statute means "may" and that the unqualified direction in the regulation that an inspector "shall not proceed further" actually allows an inspector to proceed further might be characterized as a step through the looking glass into an Alice in Wonderland world where words "mean just what [we] choose [them] to mean – neither more nor less."[101] Our view is more flexible, though not infinitely so. Perhaps there is room to proceed further but, at the very least, one's call for flexibility must make sense in the larger statutory scheme.

Accordingly, to consider another example, calls to flexibly interpret the express statutory command that inadmissible persons without proper travel documents "shall [be] removed . . . without further hearing or review,"[102] might appropriately be viewed with at least initial skepticism. When engaging in statutory interpretation, one must always keep in mind the possibility that Congress actually meant exactly what it said. Certainly the government's position has always been that – except for certain expressly articulated exceptions – Congress meant exactly what it said when it framed the core expedited removal power to deport "without further hearing or review."

The same might be said of the proscription against "proceed[ing] further" once a fear is articulated. Indeed, just as the power to deport "without further hearing or review" is at the core of expedited removal's effectiveness, at the core of the asylum protection that provides the main exception to expedited removal's jurisdiction over travelers without papers is the ability to halt the process with an expression of fear. Thus, one might conclude that the rule and its exception each might be interpreted in the same way, as absolute in their respective spheres.

With its claim that secondary inspectors can "proceed further" in some cases, CBP has rejected this parallel interpretation. Whether such a position is sensible depends upon practical questions of implementation and the compatibility of the position with the overall regulatory scheme. Considered in the light of these concerns, the CBP policy is objectionable in the extreme.

Ironically, another section of the CBP Inspector's Field Manual best explains the most fundamental practical objection:

> The alien may convey fear of violence or harm, a need for protection, an indication of harm to, or disappearance of, relatives or associates, or dangerous conditions in his or her country. Even disputes of a personal nature sometimes may relate to asylum, such as domestic violence, sexual or child abuse, child custody problems, coercive marriage or family planning practices, or forced female genital mutilation. All officers should recognize that sometimes unusual cases have been found eligible for asylum that may not have initially appeared to relate

---

101.  LEWIS CARROLL, THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE, *in* THE ANNOTATED ALICE 129, 213 (2000) (quoting Humpty Dumpty).

102.  8 U.S.C. § 1225(b)(1)(A)(i) (2005).

STB_AR1_010393

to the five grounds contained in the definition of refugee, such as AIDS victims who face government persecution, land or money disputes with wealthy persons or persons in power, whistle blowers, witnesses to crime and even organized crime connections. Do not make judgment decisions concerning any fear of persecution, torture, or return. If in doubt, refer to an asylum officer for a determination. Any alien who by any means indicates a fear of persecution or return may not be removed from the United States until the alien has been interviewed by an asylum officer.[103]

To paraphrase, asylum determinations require the special training of asylum officers. Because inspection officers do not have that training, they must recognize their limitations and refrain from making any judgments when fear is mentioned, except the judgment to refer the matter to an asylum officer.

This recognition of the limitations of inspectors has long been understood as demanding a low fear threshold at secondary inspections. Thus, when the I-867B was being developed, an early draft included a fear question asking, "what is the nature of [your] fear or concern [about being sent home]?" The proposed question was eliminated from the form after it was noted that "inspectors lacked training that would enable them to distinguish between qualifying and non-qualifying types of fears."[104] Indeed, at the time, INS officials not only acknowledged inspectors' present lack of training in asylum law, they also expressed that "inspectors would not be trained in the nuances of asylum law" in the future.[105]

Time has proven this belief entirely well founded. Reports by the USCIRF and others confirm that secondary inspectors are still not trained in asylum law and thus remain unable to distinguish between qualifying and non-qualifying fears.[106] Under these circumstances, the only policy that sufficiently safeguards against the erroneous deportation of genuine asylum seekers is the one implied by the Field Manual quotation noted above: a sort of "beep test" in which, in the words of former INS General Counsel David Martin, once "the interviewee mentions fear of return, the beep sounds (figuratively) and the case is identified for referral to an asylum officer."[107]

The problem is that this understanding – which is the only understanding that can adequately protect genuine asylum seekers – has never been fully

---

103. CBP Inspector's Field Manual § 17.15(d) (2001).

104. A WELL-FOUNDED FEAR, *supra* note 6, at 217. For what it is worth, one of the authors of this Article (Pistone) was intimately involved with many of the events described in Professor Schrag's *A Well-Founded Fear*, and can often confirm his account based on first-hand knowledge. The path of the I-867B's development is one such event. *See id.* at 105-10.

105. A WELL-FOUNDED FEAR, *supra* note 6, at 216.

106. USCIRF REPORT, vol. 1, *supra* note 11, at 74; *see* Swarns, *supra* note 23, at 11 (noting report by the United Nations High Commissioner for Refugees that found inspectors "often lacked an understanding of asylum law").

107. Martin, *supra* note 95, at 681-82. Professor Martin was INS General Counsel from 1995 to 1998, the time period in which expedited removal was passed into law and implemented.

accepted within the immigration services; indeed, it has been actively resisted. Section 17.5(b) of the Manual, which authorizes an inspector to ignore an individual's assertion of fear when it "clearly would not qualify that individual . . . for asylum," constitutes the formal expression of the resistance. That section provides the legal grounding for a pattern of training and supervision that, from the start, has confused secondary inspection officers and caused an inconsistent and erroneous application of the fear standard.

Thus, the 2000 GAO study that found file evidence of erroneous deportation of individuals who asserted a fear also revealed evidence that inspection officers' training left them uncertain as to whether or not they were required to "refer any alien claiming a fear of returning to his/her country to an asylum officer."[108] Although at the time an INS official conceded that additional training and clarification of the fear standard might be needed,[109] based on the USCIRF study, five years later that confusion clearly persists.

For example, in twelve sample cases directly observed by the USCIRF staff, individuals who expressed fear – and who, therefore, "under DHS regulations . . . should have been referred for a credible fear interview"[110] – were not so referred.[111] In five of these cases, there was no basis whatsoever for concluding that the expressed fear was non-qualifying. In two other cases, USCIRF deemed the fear "ambiguous," making them precisely the kinds of cases that demand what the inspectors concededly lack – the ability to make nuanced legal judgments. Finally, while one case was not characterized by USCIRF, the report suggests that the claims of fear in four other cases were more suspect; in three of these four cases, the expressed fear related to economic hardship. However, experienced asylum practitioners often find that ostensibly "economic" cases may in fact offer grounds for asylum. A potential client may start by talking about economic hardship, for instance, and only later reveal membership in a persecuted ethnic group suffering from economic hardship rooted in the persecution of him or his group.[112]

In none of the twelve observed cases, accordingly, can the fear expressed

---

108. Opportunities Exist, *supra* note 14, at 43.

109. *Id*. at 40.

110. USCIRF Report, vol. 1, *supra* note 11, at 54.

111. USCIRF Report, vol. 2, *supra* note 11, at 21-23. Incidentally, "among the countries to which the 12 aliens who expressed fear were returned, five of them (of nine) are noted to have extrajudicial killings and human rights abuses in recent reports . . ., and two of the countries have significant limitations on religious expression . . .." *Id*. at 21.

112. Indeed, in recognition of this fact, the Credible Fear Manual of the U.S. Citizenship and Immigration Services, the component of DHS responsible for "service" functions such as the naturalization process, as well as evaluating asylum claims through its corps of asylum officers and immigration judges, *see* USCIRF Report, vol. 1, *supra* note 11, at 28, instructs those officers that "[t]he statement by an applicant that 'I left my country because I can't work' is insufficient to judge the merits of a case and should lead to further inquiry." USCIRF Report, vol. 2, *supra* note 11, at 29 n.29. *See* Lukwago v. Ashcroft, 329 F.3d 157, 168 (3d Cir. 2003) ("defin[ing] persecution as including . . . 'economic restrictions so severe that they constitute a real threat to life or freedom'" (quoting Lin v. INS, 238 F.3d 239, 244 (3d Cir. 2001))).

STB_AR1_010395

clearly be classified as non-qualifying. The best that can be said on behalf of the Field Manual standard allowing inspectors some discretion, is that its application yields secondary inspection results that are often, but not necessarily always, wrong. (Actually, the results *are* always wrong because an appropriate policy would require a credible fear referral upon any invocation of fear. Our point is that, even on its own terms, the Field Manual policy produces demonstrably erroneous decisions.) This entirely predictable result – predictable because inspectors so obviously lack the training (as well as the time) to distinguish properly among types of fear – illustrates the reason why a more demanding fear showing was rejected by the regulations of the parent agency in the first place, i.e., because it would necessarily introduce a disconcerting element of randomness into a process that does, after all, potentially involve life-or-death decisions.[113]

In addition to endangering genuine asylum seekers, the Field Manual's amended fear policy produces other entirely predictable harms as well. In Part II(A)(1), we discussed the paragraphs of the I-867A that must be read to all persons subject to expedited removal; the final mandatory paragraph bears re-reading:

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.[114]

The incompatibility of this paragraph with the fear position articulated in §17.15(b) of the Field Manual is jarring. As the I-867A indicates, CBP's approved policy is for a secondary inspector to promise an individual that "[i]f you fear or have a concern about being removed," "another officer [will speak to you] about your fear or concern" and that "[t]hat officer will determine if you should remain in the United States." In the twelve cases noted above (and in potentially thousands of unobserved cases) the following scenario occurred: an individual admitted a fear and was then ordered removed immediately by the very inspector who just promised the chance to talk "privately and confidentially" to another officer who would make the removal decision.

---

113.   Indeed, given the similarity of the stakes, the introduction of this element of randomness into the asylum process should be no more acceptable as a policy matter than were the standardless death penalty determinations invalidated by the Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 239 (1972) and *Gregg v. Georgia*, 428 U.S. 153, 199 (1976).

114.   *See* USCIRF Report, vol. 2, *supra* note 11, at 13, Box 2.1.

Given this scenario, the collateral consequences of the Field Manual's fear policy – to the reputation of the United States, to the coherence of the regulatory scheme, to the perceived fairness of the secondary inspection process, to the integrity of the process, to inspectors' own sense of integrity, to the willingness of inspectors to read a "mandatory" paragraph that they know is sometimes a lie, and to the development of an institutional culture that values truth-telling – are evidently serious and universally unwelcome. It is apparent that the managers responsible for development of the Field Manual did not think through all the collateral implications of the policy granting additional discretion, nor did they adequately appreciate the inability of secondary inspectors to make the distinctions the new policy required, or appropriately weigh the risks the policy creates for genuine asylum seekers. And, most fundamentally, they ignored the plain meaning of the regulation that their Field Manual ended up flouting, even though a plain meaning reading would yield a result both more consistent with the remainder of the regulatory scheme and more workable in practice, given the capabilities of secondary inspectors.[115]

### III. THE CONSEQUENCES OF CBP'S RULE-BREAKING ARE SIGNIFICANT

In Part III, we quantify the human toll of CBP's failure to follow the rules governing the treatment of possible asylum seekers in expedited removal. Our calculation is extremely conservative, and almost certainly underestimates the total number of genuine asylum seekers wrongly deported since the implementation of expedited removal. For example, we do not include in our calculation deportations via expedited removal of genuine asylum seekers caused by: (1) the inappropriate exertion of pressure on asylum seekers to withdraw their applications for admission;[116] (2) the failure to use interpreters or the use of inadequate or inappropriate interpreters;[117] (3) the conditions at secondary inspection, which are not conducive to full disclosure (e.g., the handcuffing and shackling of asylum seekers);[118] (4) the reliance by judges on inaccurate or incomplete sworn statements as the basis for making adverse credibility findings and denying asylum protection;[119] (5) the "push back" of asylum seekers at primary inspection;[120] (6) the failure of appropriate or sometimes any supervisors to review expedited removal orders and

---

115. A grant of discretion might be justified in extremely narrow circumstances, e.g., if an interviewee responded to the question, "Do you have any fear about being returned to your home country . . .?" by stating, "Yes, because I have a fear of flying." To this point, however, CBP has shown no ability or inclination to so confine the grant.

116. *See supra* notes 56-57 and accompanying text.

117. *See supra* Part II(A)(7).

118. Pistone & Schrag, *supra* note 23, at 61-63; *see also supra* note 23 and accompanying text.

119. USCIRF REPORT, vol. 1, *supra* note 11, at 44; USCIRF REPORT, vol. 2, *supra* note 11, at 67-70.

120. USCIRF REPORT, vol. 1, *supra* note 11, at 54-55; USCIRF REPORT, vol. 2, *supra* note 11, at 24. Such incidents can occur at a land crossing – although not at an airport, for example – as in the

  

**HUMAN RIGHTS WATCH**    ☰  **Summary**                                        f  🐦  ⤴  **DONATE NOW**

October 16, 2014

# "You Don't Have Rights Here"

US Border Screening and Returns of Central Americans to Risk of Serious Harm



Returned migrants at the Attention Center for the Returned Migrant, San Pedro Sula airport, Honduras. © 2014 Stephen Ferry for Human Rights Watch

## "You Don't Have Rights Here"

STB_AR1_010531

      DONATE NOW

credible fear interviews by CBP.

CBP has a proactive duty to initially screen migrants for fear of return to their country of origin when it apprehends them crossing the border and places them in expedited or reinstatement of removal. However, a migrant may be identified as fearing return to their country by an immigration official after they have left CBP custody and entered the custody of Immigration and Customs Enforcement (ICE), the agency responsible for more prolonged detention of migrants. ICE, however, does not have a duty to proactively screen all migrants in its custody for their fear of return. It is telling, then, that the majority of credible and reasonable fear referrals that USCIS received in 2011 and 2012 did not come from CBP, but from ICE and other immigration agencies that learn of migrants' fear of return on an ad-hoc basis. In 2012, for example, CBP referred only 615 of the 2,405 Hondurans who eventually were flagged for credible fear interviews by USCIS.[3] Approximately three-quarters of the credible fear referrals USCIS conducted in 2012 came from agencies other than the CBP, even though that year CBP was responsible for approximately 57 percent of all noncitizen apprehensions.

Migrants who feared returning to Honduras told Human Rights Watch about problems they encountered at all stages of the summary removal process: some said that US border officials ignored their expressions of fear and removed them with no opportunity to have their claims examined; others said border officials acknowledged hearing their expressions of fear but pressured them to abandon their claims. For those who were referred for "credible fear" interviews, some said they were intimidated and confused by the interview process and complex immigration court asylum proceedings that they had to navigate on their own while detained and without legal assistance.

When immigration officials place potential asylum seekers from Honduras and other Central American countries in summary removal without putting them into the "credible fear" process, the migrants have no opportunity to have an asylum officer or immigration judge consider their case. US immigration courts are badly backlogged, but many migrants apprehended in the interior of the country – and thus not subject to Customs and Border Protection custody – are able to present their defenses against removal from the United States, including any claims to asylum, before a decision-maker who can make a more thorough examination of their claims.

STB_AR1_010535

   

**Summary**         DONATE NOW

seriously flawed. Unlike "credible or reasonable fear" assessments, which usually last over 45 minutes and take place at least 48 hours after a migrant is in ICE custody, Border Patrol screening interviews occur in Border Patrol stations and are much shorter. Uniformed CBP officers are usually armed while apprehending migrants; when they interview the migrants a few hours or days later their holsters are empty but visible; they often conduct interviews in crowded settings, without confidentiality from family members or others. All of these factors appear to hamper the ability of officers to identify those in need of more in-depth screening. The migrants we interviewed said that the CBP officers whom they encountered seemed singularly focused on removing them from the United States, which impeded their ability to make their fears known.

One man who was deported in September 2014 told Human Rights Watch that when he informed a Border Patrol officer of the threats to his life in Honduras, "He told me there was nothing I could do and I didn't have a case so there was no reason to dispute the deportation.... I told him he was violating my right to life and he said, 'You don't have rights here.'"

Arriving migrants in expedited removal or reinstatement of removal are subject to mandatory detention under US law. In recent years, this has meant US immigration officials have exercised their discretion not to use these accelerated procedures for most arriving families with children, which would mean they would be mandatorily detained, opting instead to place families in removal proceedings before immigration judges. In 2009, facing lawsuits and under pressure from rights organizations, the Obama administration ended family detention at the T. Don Hutto Detention Center, which had 490 beds for the detention of migrant families with children. Since it was one of two migrant facilities in the country equipped to detain families with children (the other, in Berks, Pennsylvania, has 85 beds), this decision indicated an intention to drastically reduce the practice of detaining families.

Since that time, however, the US government has reversed its plans. In June 2014, the Department of Homeland Security (DHS) established two detention facilities in Artesia, New Mexico, and Karnes, Texas, with between 500 and 700 beds each to hold arriving families. In September 2014, DHS announced plans to contract with a private prison company, the Corrections Corporation of America, to build a 2,400-bed family detention facility in Dilley, Texas. The facilities now in operation have been used to detain families

STB_AR1_010536

  **Summary**                 DONATE NOW

If a noncitizen is found to have a credible fear, they may then apply for asylum as a defense against deportation in immigration court. Though the asylum seeker will be able to go before a judge to make their claim for protection, they have no right to a government-appointed lawyer to assist them. ICE may detain noncitizens going through these immigration court procedures for the duration of the deportation process on a discretionary basis, though some become eligible for release on bond or on their own recognizance once they are transferred to immigration court.

# IV. First-Hand Accounts: Asylum Seekers' Experiences in Expedited Removal

US Customs and Border Protection officers are required to screen people in expedited removal for fear of return to their country and, if the noncitizen expresses fear, refer them for a credible fear interview.[47] Despite this requirement, Human Rights Watch spoke with deportees who reported that they were not informed of the availability of protection or that they were not referred to an asylum officer for a credible fear interview after they told a Border Patrol agent they were afraid to return to their country.[48] Some would-be asylum seekers also reported that Border Patrol officers harassed, threatened, and attempted to dissuade them from applying for asylum.

Additionally, CBP officers conduct interviews about fear of return in a sometimes crowded and public enforcement setting and without confidentiality from family members or others, factors that appear to hamper the ability of the officers to identify those in need of more in-depth screening. Human Rights Watch observed the interview location for detainees at the McAllen Border Patrol station in Texas in July 2014. CBP officers showed Human Rights Watch a large public space in which they process migrants at a horseshoe-shaped table designed to accommodate multiple officer-migrant pairs in close proximity. Holding cells ring the room, with concrete floors and walls and toilets behind half-high barriers. CBP officers told and demonstrated to Human Rights Watch how they check their weapons before entering, but wear their uniform with holsters –

STB_AR1_010549

# THE GROWING HUMAN RIGHTS CRISIS

## ALONG WASHINGTON'S NORTHERN BORDER

STB_AR1_010702




Authors: Sarah Curry, Kendra Anderson, Angelina Snodgrass Godoy, Carolyn Pinedo Turnovsky / Editors: Pramila Jayapal and Sarah Curry

Graphic Design: Tracy Curley / Interactive Media: Otts Bolisay / Photography by: Alex Montalvo

Find this report online at: WeAreOneAmerica.org/northern-border

OneAmerica, formerly Hate Free Zone, is a 501(c)(3) non-profit organization that advances the
fundamental principles of democracy and justice by building power within immigrant comm

**STB_AR1_010703**



THE GROWING HUMAN RIGHTS CRISIS

ALONG WASHINGTON'S NORTHERN BORDER



2012
APRIL

STB_AR1_010704

STB_AR1_010705

April 17, 2012

This report is the product of a unique three-way partnership between OneAmerica, the University of Washington Center for Human Rights, and the residents and leaders of many communities living near Washington State's northern border.

In 2008 and 2009, we were invited to participate in a series of meetings convened by Washington's U.S. Senator Maria Cantwell with local law enforcement officials along the northern border who were themselves concerned with the increased presence of federal agents along the border and the undermining of community trust. We had also begun to hear many concerns about the Border Patrol's behavior, particularly towards people of color living and working in towns within 100 miles of the Canadian border. They had experienced themselves or heard stories of people too afraid to go to the courthouse to pay a fine, too mistrustful of the authorities to call 911, or too fearful to leave their home to attend church or go to the grocery store. They sought ways to educate and empower their neighbors to seek sustainable policy solutions, to improve the safety and well-being of all in border cities and towns.

For OneAmerica, responding to these requests was vitally important. OneAmerica's mission is to advance democracy and justice through building power in immigrant communities. We believe that building a healthy, just and vibrant democracy necessitates ensuring that immigrants are engaged in advocating for themselves and their communities. Through our diverse membership base comprised of immigrants who live in communities across the state, we have been able to identify problems that require education, documentation and, ultimately, policy change. Our approach is always based on research and fact-finding, and then elevated to determining positive solutions that will allow for fundamental human, civil and immigrant rights to be upheld.

For the UW Center for Human Rights, too, this partnership provided a valuable opportunity to support frontline human rights defenders working on issues of crucial importance to our state. Our mission is to educate the next generation of UW undergraduate and graduate students in the interdisciplinary field of human rights; to promote human rights as a core area of faculty and graduate research; and to engage productively with local, regional, national, and international organizations and policymakers to advance respect for human rights. In this context, we've been honored to work in partnership with OneAmerica and its community-based rights advocates. Our researchers have helped to document and analyze data gathered through OneAmerica's work and to identify human rights implications and some possible policy solutions.

The publication of this report culminates the first stage of a long process of organizing, educating, and empowering communities along Washington State's northern border to defend their human rights. To be truly successful, however, we must also convey the urgency and necessity for all Washingtonians to make our voices heard in defense of human rights for all people.

Pramila Jayapal
Executive Director
OneAmerica

Angelina Snodgrass Godoy
Director
UW Center for Human Rights

STB_AR1_010706

STB_AR1_010707

# Acknowledgments

THANK YOU TO THE IMMIGRANT WORKERS, FAMILIES, LEADERS, AND COMMUNITY MEMBERS who gave their time and shared their stories through interviews for this report. You opened your doors and hearts to us, and your courage and willingness to speak truth in the face of injustice should inspire all of us to work for a better tomorrow and a world where there are human rights for all. We are inspired and moved by the courage of affected workers and numerous volunteers, including the OneAmerica Skagit and Whatcom base groups, who spent countless days and evenings interviewing their friends and neighbors, visiting housing, and educating their communities on their human and civil rights. You are the very people that begin human rights movements.

A special thank you to the many court interpreters, social case workers, and health professionals for their anonymous contributions to the report and commitment to helping those they serve every day. We would like to recognize local organizations and leaders of faith that have been partners in outreach and education, and have opened safe spaces to the immigrant community. None of this work could have been possible without support from Church of the Assumption, Roca Fuerte Ministries, Lynden Evangel Assembly of God, Sea Mar Community Health Clinics, Washington State Migrant Council, La Iglesia de la Resureccion, El Camino de Emaus, Burlington Lutheran Church, Womencare Shelter, Islamic Society of Whatcom County, the Girl Scouts of Northwest Washington, and KSVR Local Radio in Mt. Vernon. Additionally, thank you to La Gloria Markets for your support in community outreach and other businesses that became central informational centers. Thank you to CAIR-WA for partnering with us on the May 2010 racial profiling hearing and preparing community member testimony that highlighted the Muslim Arab experience along the northern border.

A huge thanks to authors Sarah Curry and Kendra Anderson from OneAmerica and Angelina Snodgrass Godoy and Carolyn Pinedo Turnovsky, from the University of Washington Center for Human Rights. Additionally, deep recognition for the contributions of Ada Williams Prince, Scarlett Aldebot-Green, and Pramila Jayapal. We thank Katherine Beckett for her research assistance. A deep thank you to Ursula Mosqueira for providing key research when it was needed most, accompanying us into the field, and doing outreach and follow up. A special thank you to Alex Montalvo for your commitment to storytelling and the many hours of video interviewing, photography, and editing. Thank you to graphic designer Tracy Curley for turning our research into a beautifully designed document and Otts Bolisay for video, social media, and design work that takes our words off the page and launches them into the world for engagement and change.

Thank you to the Rights Working Group for in-depth trainings on Human Rights and Racial Profiling and sponsoring the May 2010 racial profiling hearing. We would like to recognize our partners in the Northern Borders Coalition, whose insights and work has strengthened this project immensely. To our collaborators at the University of Washington Center for Human Rights, your deep commitment to academic research rooted in the strong values of the Human Rights Framework has been invaluable.

OneAmerica is extremely grateful to the U.S. Human Rights Fund whose grant made this work possible.

STB_AR1_010708

STB_AR1_010709

THE GROWING HUMAN RIGHTS CRISIS

ALONG WASHINGTON'S NORTHERN BORDER

# Table of Contents

1   Executive Summary

**ONE**

9   Introduction
11   Landscape: Increased Enforcement Near Northern Border
16   Methodology

**TWO—Patterns of Abuse**

18   Border Patrol's Use of Racial Profiling
21   Dangerous Fusion: Collaboration Between Border Patrol and Local Law Enforcement
     and Other Agencies
25   CBP Creates Climate of Fear and Unsafe Communities

**THREE**

29   Conclusion and Key Recommendations
        Recommendations for Department of Homeland Security Customs
        and Border Protection
        Recommendations for the Department of Justice
        Recommendations for U.S. Congress
        Recommendations for Washington State

33   **Commentary by the University of Washington Center for Human Rights**

39   **References**

**APPENDIX**

41   A-Community Profiles
51   B-Documentation Form and Human Rights Card
52   C-People's Hearing Statement of Moral and Human Values


*Start with this one!*



**What are these things?**
You'll find these strange, black squares scattered around this program booklet. Search for "QR Code Reader" in your smartphones App Store, download one for FREE and start scanning!!

STB_AR1_010711



# Executive Summary

*This report documents the findings from 109 on-the-ground interviews, observation, two hearings, observation and research in border communities, all conducted over a period of approximately one year. The report shares the stories of many of the workers we met, and the transformation of their communities in the wake of the post-9/11 buildup of u.s. Border Patrol activity in the area. The majority of stories are marked by fear, mistrust, harassment, and abuse. They are rooted in specific—and avoidable—patterns of practice implemented by the U.S. Border Patrol, working in close coordination with Immigration and Customs and Enforcement and local law enforcement agencies.*

*In particular, this report calls attention to three interrelated patterns of practice.*

**First**, in its own independent operations, the Border Patrol engages in systematic profiling of religious and ethnic minorities.

**Second**, collaboration between Border Patrol and other agencies, including local law enforcement, emergency responders, and the courts, results in a confusing and dangerous fusion where vital services are perceived as immigration enforcement.

**Third**, these first two patterns result in a third: U.S. Border Patrol's behavior and dangerous partnerships with other agencies have created extensive fear and mistrust, leading to community members' unwillingness to call

911, access the courts, and even to leave their house to attend worship services or fulfill basic needs.

The report is divided into three distinct sections and also includes a final section providing commentary from the University of Washington Center for Human Rights:

Introduction, Landscape, and Methodology
Patterns of Abuse
Conclusion and Key Recommendations

# Section 1: Introduction, Landscape, and Methodology

Post 9/11: Increased Enforcement Near Northern Border

The patterns of abuse documented in this report reflect broader national trends in recent decades, whereby concerns about immigration and national security have resulted in the channeling of increased resources to the Department of Homeland Security (DHS). Some key statistics indicate the dramatic increase in enforcement along the northern border.

**Funding for Customs and Border Protection (CBP) soared post-9-11.** In fiscal year 2003, CBP was allocated $5.9 billion. In FY2007, CBP's budget ballooned to $7.7 billion and expanded another 52 percent to $11.7 billion in FY2012 (Batalova and Lee 2012).

**Since 9/11, the number of agents deployed along the northern border has increased dramatically**—from 340 in FY2001 to 2,069 in FY2010 (Congressional Research Service 2010). In Blaine sector, the focus of our report the number of agents increased from 48 in 2001 to 327 in 2010. There is now one CBP agent for every two miles of northern border compared to one agent for every 13 miles in 1999. Staffing has increased 589%, while apprehensions have decreased 75.6%—this is often a statistic cited for how increased enforcement has been effective. However, using decreasing apprehensions as a measure of border security ("prevention through deterrence") is problematic, as migration flows can be impacted by many factors including economic slowdowns. While much of the increased enforcement has been justified as necessary because of its connection to national security, a systematic review of all terrorism-related prosecutions occurring in Washington State since 9/11 show that of 43 prosecutions for terrorism in Washington State since 2001, zero have been referred to the courts by the Border Patrol.

**While Border Patrol, as the "men in green," may be more visible along the northern border, Immigration and Customs Enforcement's (ICE) role in detention and deportation, fueled by their soaring budget, cannot be overstated.** In FY 2003, the total ICE budget was $3.3 billion. By 2007, the budget had increased 44 percent to $4.7 billion. By 2012, it had climbed another 25 percent to $5.9 billion. ICE staffing has also grown steadily. In 2005, there were 15,000 employees. By 2009, staffing had increased nearly 27 percent with 19,000 employees.

A series of recent memos on prosecutorial discretion by ICE Director John Morton gives guidance to ICE agents, officers, and attorneys to use prosecutorial discretion at any point during the enforcement process, including when deciding who to question and stop, in order to utilize ICE resources to focus on threats to national security and public safety. However, this guidance has yet to be fully implemented with visible results on the ground. Current ICE and CBP practices only lead to a wider dragnet for deportation of people who are not threats to public safety.

**Immigrants are being deported in record numbers under the Obama Administration (about 400,000 a year).** The Administration is focused on "criminal aliens," but data shows that of all "criminal aliens" for whom ICE obtained a removal order last year, only 25% were for aggravated felonies. The remaining 75% of this category of people were deported under some other crime-related deportation ground which can include many low-level misdemeanors (e.g. shoplifting or minor traffic offenses).

**Individuals in deportation proceedings with criminal charges in Washington State's immigration courts is lower than the national rate** with only 13.3% of individuals in 2010 and compared to 16.5% nationwide. The majority of individuals in proceedings have only immigration charges.

## Methodology

**This report's dataset contains 109 interviews** that uncovered 135 incidents reported by Latinos and Muslims/Arabs across Skagit, Whatcom, and Snohomish counties.

**Two OneAmerica base group leaders and OneAmerica's Lead Organizer were trained in human rights documentation at American University's Law School in Washington, DC.** They then trained other members of the base groups and developed a shared methodology that all could use to document reported abuses.

**OneAmerica reached the community by doing our research where immigrants live and work.** Trained leaders knocked on doors at trailer parks and apartment complexes and visited migrant camps, worksites, and grocery stores. They contacted trusted institutions such as local churches, domestic violence service providers, a community health clinic, and a Spanish-language radio station, and asked for them to refer community members to the OneAmerica human rights hotline.



STB_AR1_010714

# Section 2: Patterns of Abuse

*Pattern of Abuse 1: Border Patrol's Use of Racial Profiling*

Our research documented numerous accounts of the Border Patrol engaging in apparent racial and religious profiling in the northern border region. In interviews, community members described a large number of incidents in which CBP stopped individuals for no discernible reason other than their appearance, accent, or perceived inability to speak English.

82 of the incidents reported to us involved being asked for papers by CBP either while driving or at a public location. Community members reported that without reason to suspect unlawful activity, the Border Patrol regularly approaches people who appear to be Latino for such questioning in numerous public locations including gas stations, ferry terminals, the Greyhound station, the Bellingham airport, or outside of Wal-Mart.

25 accounts from community members involved questioning by Border Patrol agents who had followed Latino drivers on the roads. Specifically, community members reported that CBP often waited outside fields and then followed workers when they left. In some case, individuals were followed to their homes.

In total, 63 incidents reported involved apparent racial profiling by CBP. There is a clear perception among community respondents that the Border Patrol selectively target certain ethnic groups with these practices. Community members who experienced these incidents consistently reported that the only explanation for their targeting was that they looked Latino or like "workers."

Our research also documented concerns about religious profiling among members of the Muslim community, both during border crossings and while driving in the border area.

*Pattern of Abuse 2: Dangerous Fusion—Collaboration Between Border Patrol and Local Law Enforcement and Other Agencies*

Many of the incidents reported did not arise from the Border Patrol's independent enforcement activities, but from the complex interface between Border Patrol and other federal and local agencies. Three types of cases emerged from our research, involving the Border Patrol's collaboration with local law enforcement, with 911 emergency services, and with local courts.

Border Patrol agents routinely provide backup and language interpretation when requested to do so by local police. About 38% of all incidents reported to OneAmerica involved CBP acting as interpreters. Once on the scene, Border Patrol agents routinely asked for the immigration status of the present individuals. Sometimes, Border Patrol only checked immigration status in these situations, failing to interpret at all.

As a result of these practices, requiring language access services during a routine traffic stop can result in detention and deportation. In over twenty cases community members reported individuals who were pulled over by local law enforcement for a broken taillight, loud muffler, or a failed turn signal had been detained when CBP arrived to interpret.

Border Patrol's "interpretation practices" raise concerns about racial and ethnic profiling. Because language interpretation is the most frequent justification for the Border Patrol's involvement in everyday policing, not all communities experience this level of immigration scrutiny—only those who are believed to speak Spanish. In many cases, even those who speak English are subjected to this scrutiny when they appear Latino or have a "Latino-sounding" last name.

STB_AR1_010715

**Fusion of local law enforcement with CBP has dire consequences for community safety.** As one community member, Ira, explained to us, "People are afraid to call the police for help because they know they are connected to immigration. It's hard to tell apart who is who because we feel they [local law enforcement and federal immigration] are the same."

**For the cities of Blaine, Lynden, and Sumas, the Border Patrol provides dispatch services for 911 calls, and on occasion arrives at the scene of the incident alongside – or even before – first responders.** As with driving incidents, although the Border Patrol's ostensible purpose in emergency situations is to provide interpretation and backup, they do not set aside their objective of immigration enforcement even in emergency situations.

**CBP collaborating with law enforcement either as emergency response personnel or as interpreters has had lethal consequences.** The February 2011 death of Alex Martinez and the June 2011 death of Benjamín Roldán Salinas are troubling examples of the dangerous effects of these practices. Had interpretation been provided by a neutral party in these instances, perhaps the outcomes would have been different.

**Numerous individuals reported Border Patrol's presence in or near courthouses, particularly in Lynden.** The selectivity of this tactic – the reported presence of agents on days when Spanish-language interpretation is provided, and their reported targeting of Latinos – suggests that this particular community's access to justice is weaker than that of other communities, raising concerns about equal protection under the 14th amendment.

*Pattern of Abuse 3: CBP Creates Climate of Fear and Unsafe Communities*

**Feelings of fear and anxiety were reported in nearly 70 percent of the incidents we documented.** Fear did not simply extend to immigration enforcement, but the community memebers were clearly fearful of the police, emergency services, and other agencies whose operations are vital to the health and safety of all people in our communities. Specific practices of the Border Patrol and its partner agencies, especially local law enforcement, have contributed to this climate.

**These practices have erected barriers to the trust and relationships necessary for effective crime-fighting in any community.** Communities find themselves unable to access vital services like emergency assistance and police protection.

**The outlined collaboration has also undermined the efforts of those seeking to protect victims of domestic violence or worksite abuses.** As one employee from a domestic violence agency along Washington's northern border told us, "There is intense fear among victims to call out of fear that their spouse, children, or others will be put in danger of deportation."

**If the court system represents one end of the community safety spectrum and calling 911 or the police represents the other end, migrant workers find themselves unable to trust the system at either entry point.** Resource-sharing and collaboration becomes a grave concern when it imperils communities' ability to enjoy basic civil liberties and defend their rights, even in situations that threaten their very lives.

**Along the northern border, there are mixed status families but also mixed status churches, schools, and neighborhoods.** Behavior by CBP is pervasive and causes anxiety for Latino children and residents. U.S. citizen children are deeply impacted by the climate of fear, the lack of access to services and protection, and, in some cases, by a parent's deportation.

**U.S. Citizen Latino youth struggle with how to process racial profiling incidents such as being asked for immigration papers.** These youth identify strongly with America and they struggle with how to deal with feelings of alienation and discrimination in their home country. They cannot reconcile what has happened to them or could happen to them with what they believe America to be.



# Section 3:

## Conclusion and Policy Recommendations

*The practices documented in this report suggest that communities of color in Washington State find themselves fearful of the very agencies that are entrusted with their protection, as a result of some systematic patterns of practice by CBP. The following are key policy recommendations contained in this report.*

### Recommendations for Department of Homeland Security Customs and Border Protection

☑Implement a CBP-wide sensitive locations policy similar to ICE that restricts enforcement at sensitive locations, including schools, hospitals, places of worship, public religious ceremonies, public demonstrations, and courthouses.

☑Implement a written policy that clearly outlines that CBP will not engage in enforcement during assistance with emergency checkpoints, health epidemics, or natural disasters.

☑CBP must bring its enforcement practices in line with Department of Homeland Security stated priorities to focus on individuals who are threats to public safety.

☑While the 100-mile rule is enacted by statute, reforms are necessary for operations in regions along the border. CBP agents should not arbitrarily stop, question or arrest individuals without reasonable suspicion or probable cause that the individual has entered the United States illegally.

☑CBP should adopt a policy barring the use of agency personnel and resources to perform civilian law enforcement functions and state and local police officials should not be engaged in Border Patrol operations. CBP should not respond to routine law enforcement calls such as traffic incidents or serve as emergency response. CBP should not serve as interpreters or, at a minimum, must develop a written code of conduct with clear expectations.

☑CBP must increase its transparency. CBP should provide transparent and accessible information on stops—even those that do not result in a deportable offense—as well as developing metrics other than apprehensions to measure the effectiveness of its policies.

☑All CBP officers should receive periodic use of force and de-escalation techniques training. Training should include specific instruction on U and T visas, asylum and refugee status, as well as Violence Against Women Act visas.

☑DHS Office of the Inspector General should undertake a broad investigation of CBP's practices.

### Recommendations for the Department of Justice

☑Reform the Department of Justice 2003 "Guidance Regarding the Use of Race by Law enforcement by Federal Law Enforcement Authorities" DOJ Guidance to improve protections for those affected by profiling practices at the border including prohibition of racial profiling based on national origin, language and religion, among other reforms.

☑Investigate CBP's interior enforcement practices in and outside courthouses and the use of CBP as interpreters or as emergency response and whether these practices limits meaningful access of Limited English Proficient individuals to 911, emergency services, and the courts under TITLE VI of the CIVIL RIGHTS ACT of 1964.

### Recommendations for U.S. Congress

☑Do not increase appropriations at the northern border until an investigation has been completed examining the use of resources along the northern border.

☑Move forward immediately with the reauthorization of the Violence Against Women Act, including the strongest protections possible for immigrant women by renewing and strengthening the U visa program.

☑Move forward swiftly with Comprehensive Immigration Reform that provides an earned path to legalization for the millions of undocumented immigrants in the U.S., which will offer relief to mixed status families, power to workers to end worksite exploitation, relief to scrupulous businesses who contribute to the economy; and clearer lines of communication between immi-

STB_AR1_010717



grants and law enforcement to improve community safety.

☑ Co-sponsor and pass the End Racial Profiling Act of 2011 (s.1670 & h.r. 3618), which would prohibit the use of profiling based on race, religion, ethnicity or national origin by any federal, state, local or Indian tribal law enforcement agency.

### Recommendations for Washington State

☑ State and local police should refrain from asking immigration status.

☑ State and local police should refrain from enforcing federal immigration laws, including by engaging in interior enforcement operations with Border Patrol agents and requesting translation assistance from Border Patrol. State and local law enforcement should also work to end practices and programs that undermine the bright line between federal immigration enforcement and local law enforcement, such as the Secure Communities program or the honoring of ice detainer holds by local governments.

☑ Local Law Enforcement Agencies should draft language access plans to ensure they meet title vi regulations. The use of cbp as interpreters should not be used as part of an agency's language access plan. A code of ethics for law enforcement interpreters should be developed by waspc.

☑ State legislature and local governments should support local police departments by prioritizing the resources local law enforcement offices need to provide language access.

☑ The Governor and Attorney General should monitor cbp's interior operations to ensure that the rights of Washington's residents are protected.

**STB_AR1_010718**

STB_AR1_010719



# Introduction

Northwest Washington is known for its dramatic beauty, with fields of tulips and snow-covered mountains. Fertile agricultural land allows for the cultivation of diverse fruits and vegetables, including raspberries, blueberries, broccoli, and mushrooms. In this area, as in many parts of Washington State, agriculture is a key contributor to the economic vitality of the region.

Much of the cultivation in this area is performed by immigrant workers, many of whom live with or without their families in migrant camps, in small cement houses with rooms that have either bunk beds or one bed for the whole family. Other workers live in the small towns and cities that dot the landscape. Wherever they live, these immigrant workers often work long, 10-16 hour days in the fields. They are generally paid by the pound. The work is extremely difficult, and while sometimes labeled as "unskilled work," in reality, farmers report that picking fruit and vegetables efficiently requires tremendous skill and experience. Workers are grateful for the opportunity to work, even though the work is difficult. As one woman explained in a recent interview, "We need the money for our families, and we are hard-working people who will do this work."

Workers hold various immigration statuses, as is the case across the country. Some are U.S. citizens who have lived in the area for a decade or more. Some are legal residents who have yet to get their citizenship. Some are undocumented and travel between multiple states, while others live in Washington State year-round and have for decades. In many cases, immigrants live in mixed-status families, meaning that one person may be undocumented, but relatives may be citizens or legal permanent residents.

Even as federal immigration reform policy has stalled in Congress, there has been a surge of resources toward increasing immigration enforcement both along the border and in the interior. As federal funding for Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) has increased, so has the activity of these agencies in the northern border region. Where previously it was perceived that because of the importance of agriculture to the area CBP would not enter the fields, one grandmother reports that immigration enforcement came into the field where her family works and grabbed her son by the neck. Workers also report an increased likelihood of getting picked up by immigration officials towards the end of the agricultural season, stating that CBP vehicles often sit outside of the fields during this time of year. Lately, smaller farms have begun nailing up "private property" signs in the hopes of combating this practice.

OneAmerica has been working to advance democracy and justice since 2001. We have worked on numerous issues involving immigrant rights over the past ten years. About three years ago, based on numerous reports of increased enforcement of CBP and ICE officials in the northern border region, we decided to document some of the racial profiling and abuses of human rights that were being reported by community members so that we could understand the scope and scale of these reports. We received training in human rights documentation that informed our methodology and interview practices. We also established a collaboration with the Center for Human Rights at University of Washington to bring additional expertise with human rights documentation and principles into the project.

This report documents the findings from over a year of on-the-ground interviews, observation, and research in border communities. It shares the stories of many of the workers we met and the transformation of their communities in the wake of the post-9/11 buildup of U.S. Border Patrol activity in the area. It is clear throughout that there is tremendous fear, mistrust, harassment, and abuse. It is also clear that there are specific—and

STB_AR1_010720

avoidable—patterns of abuse by the U.S. Border Patrol, working in close coordination with Immigration and Customs and Enforcement and local and federal law enforcement agencies.

In particular, this report calls attention to three problematic and interrelated patterns of practice. First, in its own independent operations, the Border Patrol engages in systematic profiling of religious and ethnic minorities. Second, collaboration between CBP and other agencies, including local law enforcement, emergency responders, and the courts, results in a confusing and dangerous fusion where vital services are perceived as immigration enforcement. Third, these first two patterns result in another: CBP's behavior and dangerous partnerships with other agencies have created extensive fear and mistrust, leading to community members' unwillingness to call 911, access the courts, and even leave their house to attend worship services or fulfill basic needs.

We believe strongly that no one should be afraid to call 911, suffer religious or racial profiling, or forfeit their rights because of where they live and work. We recognize that the anti-immigrant climate and the lack of comprehensive federal immigration policies that would resolve deep issues with our current immigration system play strongly into what happens on the ground. However, lack of federal comprehensive immigration reform is no reason to tolerate racial profiling or other practices that constitute human rights abuses.

To conclude this report, we will offer policy recommendations aimed at correcting these wrongs while still protecting our borders; improving CBP's ability to carry out its mission; and protecting the safety and rights of all who live in these communities.

## Washington's Northern Border

Washington State is covered by two Border Patrol sectors. The Blaine sector includes Western Washington, Alaska and Oregon, while the Spokane sector covers Eastern Washington, Idaho, and western Montana up to the Continental Divide. CBP asserts the authority to conduct stops not only at the border itself, but within a 100-mile radius of the border. For this reason, communities living near the border are subjected to a level of scrutiny not found elsewhere in the interior.

The incidents documented in this report take place in specific communities in the Blaine sector, where OneAmerica has an active presence. However, they did not occur in isolation. For example, here in Washington State, similar concerns have been reported on the Olympic Peninsula near Forks by the Forks Human Rights Group. And beyond our state, in 2011, a coalition of groups from Washington, New York, Maine, Wisconsin, Michigan, and Ohio formed to call national attention to the growing human and civil rights crisis in northern border communities. While local patterns of border enforcement vary, some identifiable patterns emerge, including the systematic targeting of people of color, especially Latino and Muslim American communities.



STB_AR1_010721

# Landscape: Post 9/11:

Increased Enforcement Near Northern Border

The Department of Homeland Security was created in direct response to the attacks of September 11, 2001, and, consequently, the activities of the agency are predominately cast in terms of national security. Since 9/11, national security concerns have resulted in the channeling of increased resources to Immigration and Customs Enforcement and to Customs and Border Protection for immigration enforcement.

## Customs and Border Protection (CBP)

The United States Border Patrol (USBP) is a branch of Customs and Border Protection (CBP) housed within the Department of Homeland Security (DHS). Its primary mission is to prevent "terrorists and terrorist weapons, including weapons of mass destruction, from entering the United States," to patrol the 8,000 miles of American international borders with Mexico and Canada, and to guard coastal waters around Florida and Puerto Rico (Border Patrol Website 2011, Nuñez-Neto 2008). The USBP first implemented a National Strategic Plan in 1994, when it was still part of INS (Immigration and Naturalization Service). In 2002, the Homeland Security Act merged interior and border enforcement functions of different agencies to form the Directorate of Border and Transportation Security (BTS) within the Department of Homeland Security. The 2002 Act subdivided BTS, and Border Patrol was placed within the Bureau of Customs and Border Protection (Nuñez-Neto 2008: 1).

Federal resources allocated to border control have increased markedly in recent decades, even as the strategies employed by border enforcement agents have changed. A study in 1993 commissioned by the Office of National Drug Control Policy concluded that the southwest border was excessively vulnerable to illegal immigration and recommended that the then-INS change its focus from arresting unauthorized immigrants to preventing their entry (Nuñez-Neto 2008). This operational strategy was known as "Prevention Through Deterrence." In other words, by increasing the number of agents and resources in a sector, the CBP intended to decrease the number of unauthorized mi-

grants apprehended. Using the decreasing number of apprehensions as evidence for effective border security policy is troubling as flows of migration are dependent on many conditions, including the political and economic conditions in the country of origin and the U.S. economy's labor demand. Economists have pointed out that apprehensions and labor demand mirror each other with economic slowdowns corresponding with decreasing numbers of apprehensions (Meissner and Kerwin 2009).



Blaine Sector Apprehensions & Staffing (1999-2011)

Source: CBP.gov U.S. Border Patrol Statistics

This emphasis on deterring unauthorized immigration is a key component of Border Patrol's strategy, and helps to explain the growth in funding for the agency during the past two decades despite CBP agents reporting boredom and little to do. In July 2011, Christian Sanchez, a CBP agent who transferred to Washington State from San Diego, testified in front of the Congressional Transparency Caucus about his experiences working on Washington's northern border region on the Olympic Peninsula:

> "When I arrived at my station there was rarely any casework to be done, if at all, so I just roved from X to X, wasting gasoline. Today this has not changed and there still is rarely any casework to do, if any, and we agents are bored. But what has changed is that the number of agents in an office that formerly completed its background support

duties with a staff of four has grown to over 40 and is still increasing. We are now refurbishing an existing building, for $8 million, as our new facility which will house 50+ agents."

Sanchez testified in front of Congress as a watchdog because he thought funding to CBP was not being used appropriately. Funding for Border Patrol multiplied sevenfold from 1980 to 1995, and then tripled from 1995 to 2003 (Nunez-Neto 2008; Reyes, Johnson and Van Swearingen 2002). In Fiscal year 2003, CBP was allocated $5.9 billion. In FY2007, CBP's budget ballooned to $7.7 billion and expanded another 52 percent to $11.7 billion in FY2012 (Batalova and Lee 2012).

In 2000, the Office of the Inspector General (OIG) in the Department of Justice published a report criticizing Border Patrol's performance at the northern border. But it was not until the tragic events of 9/11 that the security of the U.S.-Canada border was prioritized. Heightened fear and, in some cases, misinformation also played a role in the buildup. In 2002, the OIG in light of its earlier conclusions and prompted by the events of September 11, 2001, published a follow-up report urging the Border Patrol to revise its national strategy (U.S. Department of Justice 2002). Additionally, the 9/11 Commission pointed out that the northern border received little attention from

Congress or the White House prior to September 11, 2001 and that the northern border lacked a coherent strategy (9/11 Commission Report 2004). They recommended distributing CBP's manpower with more parity and rebalancing priorities, and suggested that Congress and the then-INS's focus on unauthorized immigration was myopic. A greater concentration of effort on "potential terrorist threats" was needed (Congressional Research Service 2011).

The USA PATRIOT ACT OF 2001 (P.L. 107-56) mandated that Border Patrol increase the number of agents along the northern border, and prescribed the improvement of monitoring technology. Since 9/11, the number of agents deployed along the northern border has increased from 340 in FY2001 to 2,069 in FY2010 (Congressional Research Service 2010). In Blaine sector, the number of agents increased from 48 in 2001 to 327 in 2010. In the Spokane sector, the number of agents increased from 39 to 255 during this time period. Both sectors thus experienced more than a six-fold increase in staffing between 2001 and 2010. This spike in personnel is partly due to the 2006 Intelligence Reform and Terrorism Prevention Act (P.L. 108-458) that "required that 20% of the Border Patrol's annual increases in manpower be assigned to the northern border" (Nunez-Neto: 21).



Source: CBP.gov U.S. Border Patrol Statistics

STB_AR1_010723

In reality, since FY2006 only 12% of the overall increase in manpower has been deployed to the northern border (Congressional Research Service 2010). Even so, in 2012, along the northern and southern borders there are now over 21,000 Border Patrol, double the 10,000 staffing the border in 2004 (Batalova and Lee 2012). **There is now one CBP agent for every two miles of northern border compared to one agent for every 13 miles in 1999.**

The new National Border Patrol Strategy, released in 2004, responded to these post 9-11 concerns. Following the formation of its new parent agency, U.S. Customs and Border Protection (CBP), the Border Patrol's priority mission is now aimed at enhancing national security and geared toward preventing the entry of terrorists and terrorist weapons, while maintaining its traditional objective of preventing unauthorized immigrants, individuals engaged in smuggling activities, narcotics, and other contraband from entering the United States (U.S. Customs and Border Protection 2004). While the Border Patrol acknowledges that most apprehended immigrants are just "economic migrants," the agency holds that the "everpresent threat" of terrorism and the possibility that potential terrorists could "employ the same smuggling and transportation networks, infrastructure, drop houses, and other support" and "use these masses of undocumented immigrants as cover for a successful cross-border penetration" justifies the focus on interior enforcement and its disparate effects on these economic migrants (National Border Patrol Strategy 2011).

The Department of Justice identifies particular challenges or threats to securing the border with Canada; factors such as the magnitude of the U.S.-Canada border, its varied and challenging geography, and the general lack of large United States population centers along the northern border, represent some of these challenges (U.S. Department of Justice 2002, Nunez-Neto 2008). To meet these, the Border Patrol emphasizes the need for cooperation with Canadian authorities, utilizing intelligence, and continued "testing, acquisition, and deployment of sensing and monitoring platforms… to effectively address the northern border threat situation" (U.S. Customs and Border Protection 2011: 17). Although resources allocated to the northern border have increased significantly since 9/11, the agency asserts that its ability to fulfill its missions at the northern border remains limited (U.S. Customs and Border Protection 2011).

However, a systematic review of all terrorism-related prosecutions occurring in Washington State since 9/11 show that **of 43 prosecutions for terrorism in Washington State since 2001, zero have been referred to**

**the courts by the Border Patrol,** suggesting that the agency's overzealous enforcement activities and ballooning are not only dangerous, but unnecessary.

## Immigration and Customs Enforcement (ICE)

While our report centers primarily on patterns of abuse that emerged from behavior by CBP, it is important to note the role of Immigration and Customs Enforcement (ICE). Soaring funding has also increased the presence of ICE in the northern border region. ICE operates within the interior—including the 100 mile zone—creating an influx of federal enforcement to the region. (For incidents reported involving ICE entering fields or even questioning a Latino student at his community college see appendix). ICE's interior enforcement functions include the investigation, detention, and removal of unauthorized immigrants. While CBP, as the "men in green," may be more visible along the northern border, ICE's role, fueled by their soaring budget, cannot be overstated.

In FY2003, the total ICE budget was \$3.3 billion. By 2007, the budget had increased 44 percent to \$4.7 billion. By 2012, it had climbed another 25 percent to \$5.9 billion. Their personnel has grown steadily as well. In 2005, there were 15,000 employees. By 2009, staffing had increased nearly 27 percent with 19,000 employees.

ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. *ICE Strategic Plan FY 2010-2014* lays out four mission priorities between fiscal years (FY) 2010 and 2014:

(1) Preventing terrorism and enhancing security;

(2) Securing and managing our borders;

(3) Enforcing and administering our immigration laws; and

(4) Constructing an efficient, effective agency.

Objectives outlined in the strategic plan include: ICE targeting aliens who pose a threat to national security for apprehension and removal from the United States (Objective 1.2); dismantling cross border criminal networks used for organized alien smuggling (Objective 2.2), human trafficking (Objective 2.3), and drug trafficking (objective 2.4); supporting the apprehension, detention and removal of *newly* arriving aliens seeking to enter illegally (Objective 3.1); prosecuting and removing criminals and gang members (Objective 3.3); and using resources wisely (Objective 4.4).

Landscape: Post 9/11

Starting in June 2011, ICE released a series of memos providing guidance on exercising prosecutorial discretion on who it investigates, detains, and removes. Prosecutorial discretion has existed for decades, but the Morton memo served as a firm reminder that resources used to detain and deport individuals should align with the agency's mission and prioritize the removal of individuals who constitute threats to national security and public safety. The 2011 memo advised ICE agents, officers, and attorneys that they have the authority to exercise prosecutorial discretion at all stages of the process, including before an individual's case goes to court. This includes decision on who to stop, question, or arrest and who to provide expedited removal. ICE Director John Morton outlined a number of factors to consider when determining whether to prosecute and remove an individual including: "the person's pursuit of education in the U.S.; the circumstances of the person's arrival in the U.S.; the person's length of presence in the U.S.; whether the person or any immediate relative has served in the armed forces; the person's ties and contributions to the community; whether the person has a U.S. citizen or permanent resident spouse, child, or parent; the person's age; and whether the person is likely to be granted some sort of temporary or permanent relief from removal."

On August 18, 2011 Secretary of DHS Janet Napolitano announced a plan to begin the implementation of the priorities outlined in the Morton memo—an interagency working group would convene to review nearly 300,000 pending removal cases to assess whether each case meets the high priority factors set forth in the June 2011 memo. Those cases would then be eligible for administrative closure. Three months later, in October 2011, Secretary Napolitano testified in front of the House of Representatives Judiciary Committee reiterating her earlier announcement that resources should be focused on DHS' highest priorities. She also shared that a benefit of exercising prosecutorial discretion would be that great resources could be directed at the border: "Likewise, the civil enforcement prioritization will enhance ICE's partnership with U.S. Customs and Border Protection (CBP). Over the past few years, ICE has worked closely with CBP to increase efforts to prevent illicit trade and travel across our borders. This partnership includes the dedication of ICE officers, agents, and detention facilities to the apprehension and detention of recent border crossers" (Napolitano 2011) This announcement is particularly concerning given the findings that are outlined in this report.

Recent data released by the Transaction Records Clearinghouse (TRAC) actually shows that ICE is not prioritizing "serious criminal aliens." Over 1 million people have been deported since the Obama Administration came into office, nearly 400,000 last year. The majority of the deportees last year were designated as "criminal aliens." But data shows that of all "criminal aliens" for whom ICE obtained a removal order last year, only 25% were for aggravated felonies. The remaining 75% of this category of folks were deported under some other crime-related deportation ground which can include many low-level misdemeanors (e.g. shoplifting or minor traffic offenses).

Examining deportation proceedings initiated during 2010 and 2011 tells a similar story. ICE is targeting relatively few criminals for deportation. Across the nation, in 2010, "criminal aliens" only accounted for 16.5% of individuals charged and constituted even less in 2011 (14.9%). Washington State has slightly lower proportion of individuals charged as criminals in deportation proceedings with 13.3% of individuals charged in 2010 and 13.8 % charged in 2011 (TRAC Database).

| DEPORTATIONS PROCEEDINGS INITIATED BY ICE IN U.S. AND WASHINGTON STATE IMMIGRATION COURTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **MOST SERIOUS ICE CHARGE** | **NUMBER** | | | | **PERCENT** | | | |
| | FY2010-U.S. | FY2010-WA | FY2011-U.S. | FY2011-WA | FY2010-U.S. | FY2010-WA | FY2011-U.S. | FY2011-WA |
| **TOTAL INDIVIDUALS CHARGED-U.S.** | 245,706 | 8,092 | 226,342 | 7095 | 100% | 100% | 100% | 100% |
| **NATIONAL SECURITY/ TERRORISM** | 42 | 0 | 30 | 0 | 0% | 0% | 0% | 0% |
| **CRIMINAL** | 40,500 | 1079 | 33,763 | 979 | 16.50% | 13.30% | 14.90% | 13.80% |
| **IMMIGRATION ONLY** | 201,340 | 6,955 | 188,770 | 6,075 | 81.90% | 85.90% | 83.40% | 85.60% |

Source: TRAC interactive database: U.S. Deportation Proceedings in Immigration Courts

STB_AR1_010725



In this context, the definition and tracking of removals of "criminal aliens" becomes almost meaningless because it is so broad. The numbers contradict DHS' priorities, the recent memos on prosecutorial discretion, and statements from the President, including comments made during his May 2011 speech in El Paso, Texas. As he addressed the community that had gathered near the southern border he said,"[W]e are focusing our limited resources on violent offenders and people convicted of crimes; not families, not folks who are just looking to scrape together an income."

STB_AR1_010726

# Methodology

This report draws on OneAmerica's history of organizing in immigrant communities in Washington State, and was made possible by established relationships of trust and mutual support between OneAmerica personnel, volunteers and research participants. Incidents were documented by OneAmerica's Lead Organizer and members of the OneAmerica Skagit and Whatcom base groups. The OneAmerica base groups consist of community members who are long time community activists and leaders. They work in the area as farmworkers, at housing service provider agencies or are religious leaders. They are deeply entwined in the local communities, living, working and attending church in the area. This project came into being because of the increasing number of reports from OneAmerica base group leaders from border communities, who reported concerns about widespread fear and anecdotes of abuse in their communities but lacked systematic informa-tion about the frequency of these incidents, the agencies responsible, and therefore how these concerns might be addressed.

In order to better understand and document the problem, and therefore to propose viable solutions, OneAmerica's Lead Organizer and two OneAmerica base group leaders were trained in human rights documentation at American University's Law School in Washington, DC in early spring 2011. They then trained other members of the base groups and developed a shared methodology that all could use to document reported abuses. This methodology drew on a shared incident form (*See Appendix-B*), and the establishment of a human rights card (*See Appendix-B*), and the establishment of a human rights hotline. In addition, digital recorders, flipcams, and cell phone cameras were used to record testimony. Throughout



STB_AR1_010727

2011, trainings were repeated as new volunteers and affected community members became involved in recording their own experiences. On weekends these trained leaders knocked on doors at trailer parks and apartment complexes and visited migrant camps. They also visited worksites and well-known grocery stores and businesses, and contacted trusted institutions such as local churches, domestic violence service providers, a community health clinic, and a Spanish-language radio station, and asked them to refer community members to the human rights hotline. Trained leaders also hosted "know your rights" presentations in the community and a fair with local service agencies.

As word got out that OneAmerica was collecting stories about human rights violations, immigrants increasingly called our Lead Organizer and base leaders' cell phone numbers to report incidents. Our leaders responded to each call received, and followed up by visiting the family to interview them or give more information. When incidents were first reported from a second hand source, like a friend or coworker or social service provider, leaders would then follow up by contacting the victim, his/her family, neighbors, and even the local church, to try to corroborate all accounts. The strength of the immigrant community's social networks in the northern border region, and the trust we established with key leaders, allowed us to follow up on second hand reports to make sure we recorded the facts accurately.

While we conducted countless informal conversations of community members and service providers, our dataset includes only the 109 interviews and 135 documented incidents that were recorded and utilized an incident form. While we did conduct 15 initial interviews with immigrants from Ukraine, Russia, Romania, China, and Canada as well as practicing Sikhs, they did not share racial profiling incidents or human rights concerns. The 109 interviews that the report is based on include only the interviews we conducted with members of the Latino and Muslim/Arab communities with the exception of an incident reported by a Cambodian man and an incident observed by a white member of the community.

The documentation used in the report is also limited to incidents that occurred in Skagit, Whatcom, and Snohomish counties. These include incidents that took place in the small border towns of Custer (5), Ferndale (6), Lynden (47), Sumas (2), Blaine (1), Everson (18), Nooksack (1), Maple Falls (1), Sedro Wooley (3), La Conner (1), the Blaine border crossing (4), and in the larger cities of Bellingham (29), Mount Vernon (10), Burlington (1), and Anacortes/Friday Harbor (4).

Additionally, we held two hearings where testimony was collected. In January 2012, OneAmerica and community partners hosted the People's Hearing in Lynden, WA, and testimony from faith leaders and community members provided at the hearing is included in the report. In May 2010, OneAmerica, Council on American Islamic Relations (CAIR-WA), and a national coalition, Rights Working Group, hosted a Racial Profiling Hearing in Burlington, WA. This hearing was essential as Latinos and Muslims testified about racial profiling encounters and provided urgency for moving forward with the Advancing Human Rights at the Northern Border project. While we include a few testimonies as community profiles in the appendix, these testimonies are not included in the body of the report as we had not yet developed and been trained in human rights methodology. In the weeks that followed the initial hearing, we utilized convenience and snow-ball/referral sampling. This resulted in interviewers delving deeply into the experience of the Latino community in Northwestern Washington. While the report centers on these experiences, we must note that it is clear from the initial hearing that the Muslim community has also been deeply affected by the increase in enforcement activity along the northern border.

In this report, we share the names of those who agreed to have their names published; some respondents preferred to only have their first name published, and others asked that we share their testimony anonymously. In the case that a respondent asked for their name to not be disclosed we have italicized the pseudonym the first time it is used.

Additionally, we collaborated with a team of sociologists at the University of Washington Center for Human Rights who helped conduct follow-up interviews with key informants and analyze the broader patterns revealed in the qualitative and quantitative data gathered through our fieldwork. UW researchers also helped document the broader history of the Border Patrol's buildup in the region, track prosecutions stemming from arrests in the Blaine sector, and seek access to information about Border Patrol activities through a Freedom of Information Act (FOIA) request, which remains pending today.



## Patterns of Abuse

## Pattern of Abuse 1:

Border Patrol's Use of Racial Profiling

**Public Transportation:
Questioned in the Midst of a
Medical Emergency**

Luz Aguilar's car was stopped as her family was boarding the Anacortes ferry. Luz's husband's hand had been severely cut and Luz and her family were in a desperate rush to catch the next ferry and seek emergency medical attention at a hospital; they had been told to do this by the doctor they'd consulted moments before. At the ferry, CBP stopped them to ask the whole family, including her U.S. citizen son Luis, for their papers.

"My husband was not well because he had a cut on the hand and I was taking him to the hospital. They [CBP] did not let us go fast even though we were carrying a note from the doctor. 'How is it that you are stopping us? You are seeing our work permit. We brought the immigration papers from our lawyer, the case number that we have been waiting for residency' and still they told us no. They made themselves seem crazy. Soon one more [Border Patrol agent] came and I got out of the car. I was very upset and I told him, 'You know that this is illegal. Right now I'm calling my lawyer.' I called my lawyer and I turned on the speaker of my cell phone and she told him, 'In this moment, let my clients go, because my clients are legal to be here in this country.' And that was the only way that they would let us leave—having the papers, and talking with my lawyer."

Luz has since adjusted her immigration status. Despite the fact that U.S. citizens are not required by law to carry proof of citizenship, she carries her son's birth certificate with her at all times.

Our research documented numerous accounts of the Border Patrol engaging in apparent racial and—in the case of Muslims—religious profiling in the northern border region. In interviews, community members described a large number of incidents in which CBP stopped individuals for no discernible reason other than their appearance, accent, or perceived inability to speak English. Furthermore, in instances when CBP was called in to allegedly assist other agencies with translation, including emergency personnel, the mere appearance of an individual or his/her accent triggered an immigration investigation by the present CBP agents; this variant of the apparent profiling activities and related issues will be covered in detail in section two.

Although the Border Patrol cannot detain people for questioning without probable cause – and absent reasonable suspicion of unlawful behavior, ethnic identity alone does not constitute probable cause – Border Patrol agents approach people for what the agency calls a "consensual and nonintrusive conversation," typically asking, "Where are you from?" or "Do you have papers?" In this context, many people are unaware of their right to refuse to answer the question. What's more, a response indicating foreign origin can be construed as probable cause, thus enabling the Border Patrol to detain the individual for further questioning.

In human rights terms, what is most worrisome about these tactics is the apparent use of ethnic characteristics to determine who is approached. Community members reported that without reason to suspect unlawful activity, the Border Patrol regularly approaches people who appear to be Latino for such questioning in numerous public locations including gas stations, the Anacortes and Friday Harbor ferry terminals, the Greyhound station, the Bellingham airport, or outside of Wal-Mart and a Mexican restaurant. In fact, 82 of the incidents reported to us involved being asked for papers by CBP either while driving or at a public location.

Other accounts from community members involved questioning by Border Patrol agents who had followed Latino drivers on the roads. Many community members, for example, told us stories about being followed by the Border Patrol from work for no apparent reason. In particular, community members reported that CBP often waited outside fields and then followed workers when they left. This type of incident, involving being followed by

STB_AR1_010729

CBP, was reported 25 times. Sometimes individuals were then pulled over for questioning related to their immigration status, not the way in which they were driving. Others were followed all of the way to their homes. All the accounts we received were additionally marked by some level of harassment—yelling, threats, intimidation, and even derisory laughter. Community members found these visits to their home, particularly when children were present, especially disturbing.

In other cases, Latino community members reported that Border Patrol agents arrived at their home looking for a specific individual, but then asked for the occupants' proof of immigration status. For example, one evening *Lorenzo and Julia* were startled by pounding on their front door and the shouts of Border Patrol agents demanding to be let inside their home. Their children were in their bedrooms asleep. Lorenzo opened the door and the agents asked for an individual, Pedro, who did not live in the house. Lorenzo and Julia explained that they did not know anyone by that name. The agents began searching the house. Once inside, the agents asked Lorenzo and Julia to show proof of their legal status. Unfortunately, Lorenzo and Julia are one of thousands of families in the U.S. with mixed legal status. The Border Patrol arrested Julia, who began crying out to her husband. The children woke up and ran into the living room where they became hysterical as they watched their mother led away.

Community members who experienced these incidents consistently reported that the only explanation for their targeting was that they looked Latino or like "workers." Hector is a legal permanent resident who has lived in Lynden for over twenty years. One day, while legally driving home with his three year-old U.S. Citizen son, he passed a CBP vehicle. After spotting Hector in his work truck, CBP made a U-turn and began following him home. Hector explained, "I was dirty, wearing a construction coat and a bright orange vest. I feel like I was racially profiled. I had respect for Border Patrol, but after [that day] I'm disappointed. They were treating me like a criminal in my own community." Hector reports that after following him home, seven CBP vehicles surrounded his house. CBP searched his truck and toolbox for drugs, finding nothing.

These stories raise important concerns about the apparent use of racial profiling by the Border Patrol. Community members overwhelmingly reported that such practices most frequently targeted people who appeared to be Latino, especially those with darker skin—in total, 63 incidents reported involved racial profiling by CBP. Through FOIA, UW researchers requested access to records of Border Patrol detentions that might allow us to systematically corroborate such claims, but that request remains pending. Even without access to the Border Patrol's own data about the ethnic attributes of those it detains, however, the clear

### Followed from Work

Laura Ventura works in the blueberry fields in Sumas and lives in Lynden with her seven-year-old daughter. During May 2011, Laura was leaving the field for the day with a friend. As she pulled out, a CBP vehicle pulled out behind her, it had been waiting on the edge of the field. Laura drove to her friend's house several miles away. The CBP vehicle continued to follow her and waited for her to leave her friend's driveway. CBP did not make any further contact nor did the officers attempt to approach Laura beyond following her and watching. Laura then drove into Lynden. After this extended interaction, it was not until then that CBP turned on their lights and began honking. Laura immediately pulled her car over and parked. When CBP approached, she asked in Spanish, "Why are you honking at me?" He did not answer her question or give her any indication that she was being targeted for any other reason than her appearance or place of work. Instead, he asked if she had papers to live in the United States. He then questioned her about drugs and weapons and searched her car. He found nothing. He then asked if she had a child or a husband living in the U.S. She did not tell him about her daughter. He then said, "Do you have family members or a friend that can pick up your car? Make sure that the person has papers, because if they don't I'm obligated to ask them and detain them as well."

Her boss from Sumas came to pick up her car. She was detained and taken to the Tacoma Detention Center. After some time, she was able to pay $5,000 in bail and was released. The stress Laura endured inside the detention center has resulted in chronic headaches, stress and anxiety, and pain and paralysis in the right side of her face.

### U.S. Citizen Teens Asked for Birth Certificates, Called Racial Slur

A mother and grandmother living in the northern border area, tells us about an incident involving her two teenagers, Mark and Maria, 16 and 17 year-old siblings who were born in the U.S. They were driving home from Sumas when a Border Patrol agent stopped them for speeding. Mark had left his driver's license at home by accident.

"My son called me to tell me that he had been pulled over without his license. I told him that it was alright that I would drive out to meet them with his license. When I arrived there were Border Patrol cars surrounding the area.  I had to drive back to the house for my kids' birth certificates because the Border Patrol officers were accusing them of being 'wetbacks' despite my kids telling the agents in English that they were American citizens. When I finally got to my kids I went up to the officers and said, 'You know what, my kids are American. If they weren't they wouldn't have said they were. This thing that you are doing here is called racism; just because you see that my kids are brown [Latino].' The officer replied, 'Sorry, but this is my job.'  And I said, 'Ok, but there was no reason for seven Border Patrol cars to come deal with my kids, with two minors.  You are treating them as if they were criminals.'"

 *Scan this code to hear Mark and Maria's mother tell their story.*

Pattern of Abuse 1: Border Patrol's Use of Racial Profiling



He responded by saying that he had been called to interpret by the police and that he knows that the men were not from here.

 *Scan this code to watch a video about Border Patrol interpreting for police.*

perception among community respondents is that the Border Patrol selectively targets certain ethnic groups with these practices. The reported use of racial epithets, as in the account on the previous page, (See "U.S. Citizen Teens Asked for Birth Certificates, Called Racial Slur") would appear to lend credence to such claims.

In addition, our research also documented concerns about religious profiling among members of the Muslim community, both during border crossings and while driving in the border area. As with Latino communities, selective targeting of Muslims raises the specter of unequal treatment.

It is important to note that these are not findings isolated to CBP's behavior in Northern Washington. Civil rights organizations throughout the United States have documented similar encounters, suggesting that a pattern of racial and religious profiling is embedded in current Border Patrol practice, if not in their stated policies.

> **Muslim College Student Experiences Religious Profiling at Border Crossing**
>
> Akin, A Somali college student at Western Washington University, likes to drive to Vancouver on the weekends. When he crosses back into the U.S. at Blaine, his car is often searched and he has to wait for hours. One weekend, he and another East African friend were driving from Vancouver back to Bellingham. His car was searched, his cell phone was held, and he was fingerprinted. He waited 6-7 hours. Akin, like many others in the Muslim community, would like to know if he is on a watchlist and if there is any way to get removed instead of going through the same process every time he travels. He feels singled out because of his religion.
>
> He told us:
>
> "I'm Somali, have my beard and was wearing my religious hat. I remembered and thought about how hard it was for me to get my citizenship, how much I wanted to be a U.S. Citizen and how proud I am to be one. I thought about how I waited six years to become a U.S. Citizen so that I wouldn't have to go through this. It just isn't right. If this is how we treat our citizens, maybe these papers aren't for me—the system, the people, they don't care to know about my culture and who we are. I felt harassed, discriminated, and excluded. If my name was Johansson and my skin color was different I don't think I would have had to go through this every time I cross the border. People cross this border every day. Thousands of people. Why can't I go like everyone else without fear of being stopped and harassed for hours?"

STB_AR1_010731

# Pattern of Abuse 2:

Dangerous Fusion: Collaboration Between Border Patrol and Local Law Enforcement and Other Agencies

---

Many incidents reported did not arise from the Border Patrol's independent enforcement activities, but from the complex interface between Border Patrol and other federal and local agencies. In this section, we discuss three types of cases emerging from our research, involving the Border Patrol's collaboration with local law enforcement, with 911 emergency services, and with local courts. Many in the Latino community, including non-immigrants, documented immigrants, and undocumented immigrants, now views local law enforcement, 911 emergency services, and the court system as inextricably connected to CBP—the *migra*. This fusion has dire consequences for community safety.

## Local Law Enforcement

Interviews with immigrant community members and conversations with Border Patrol officials confirmed the existence of a tight nexus of collaboration between local law enforcement and the Border Patrol.

According to John Bates, Chief of the Border Patrol's Blaine Sector, Border Patrol agents routinely provide backup and language interpretation when requested by local police. Because all Border Patrol officers are required to be conversant in Spanish, and many local law enforcement officers lack this ability, the Border Patrol asserts that such services are a useful way to bolster the effectiveness of local policing. Once on the scene, however, Border Patrol agents routinely ask the immigration status of the present individuals. Sometimes, Border Patrol only checks immigration status in these situations and fail to interpret at all. As a result of these practices, requiring language access services during a routine traffic stop can result in detention and deportation. Over twenty cases were reported of community members who were pulled over by local law enforcement for a broken taillight, loud muffler, or a failed turn signal and were detained when CBP arrived to interpret. About 38% of all incidents reported involved CBP acting as interpreters.

This, too, is related to concerns about racial and ethnic profiling. Because language interpretation is the most frequent justification for the Border Patrol's involvement in everyday policing, not all communities experience this level of immigration scrutiny – only those who are believed to speak Spanish. In many cases, as in the story of Jesus, even those who speak English are subjected to this scrutiny when they appear Latino (see p. 22 "Border Patrol Insists on "Interpreting")

*Eva's* story raises similar concerns. Last year, she told us that the Border Patrol detained almost all of her neighbors in the farm's migrant housing complex. According to her, the local police habitually waited alongside the road near the migrant housing, stopping people seemingly because they were La-

**Border Patrol "Interprets"-Father and Son Deported for Noisy Muffler**

Sira was on her way to the grocery store with her husband and youngest son when they were pulled over by local law enforcement for a noisy muffler.

"The Sheriff told us we were free to go as long as the owner of the car came to pick up the car. We called our son to come pick us up, but five minutes after calling him the Border Patrol arrived to the scene to interpret.

Realizing that we were in danger I started having a panic attack. My husband attempted to get help for me, but when he tried to get out of the car to ask for help they would threaten to arrest him by force if he didn't stay still. I started panicking even more, which caused me to get even sicker until I couldn't breathe. The CBP agents slammed their fists on the top of the car. After, they [finally] called the paramedics to assist me.

While the medics took care of me in the ambulance, my husband and oldest son were arrested by immigration officials. Even worse they did it in front of my youngest son Miguel who is 12 years old. To make matters worse, while the medics where assisting me, the Border Patrol kept on asking me where I lived and where my family could be located. They repeatedly asked if I had more family here and where they lived. They demanded an address. I refused to answer because I knew they would only harm my family more. What really upsets me that the three Border Patrol agents gave my [other] son Ramon a choice—either he could be arrested or I."

Sira's oldest son, Ramon, only came to the scene to pick up the car. He was questioned and deported along with his father.

STB_AR1_010732

---

**Border Patrol Insists on "Interpreting" for Latino Speaker**

On the afternoon of August 5th, 2011 Jesus and his nephew were driving home after work at a dairy in Sedro Wooley. One of the taillights was out and he was pulled over by local law enforcement. The police officer immediately asked, "Do you speak English?" Jesus replied that he did. While the officer was examining Jesus's driver's license and running his registration at his patrol car, a Border Patrol vehicle drove up and pulled in front of Jesus's truck, blocking him between the police car and CBP SUV. Jesus and his nephew were scared but tried to stay calm. As in many cases, it is unknown whether law enforcement called for assistance or if the Border Patrol viewed the incident and pulled over to assist.

The Border Patrol agent came to Jesus's window and asked him, "¿De dónde eres?"

Jesus replied in English, "I am from Bow, Washington."

Again the agent asked, "No, ¿de DONDE eres?"

Jesus said, "I am from Bow, Washington."

Frustrated, the agent then said "No, ¿de que parte de su país?" No, from where in your country?

Once more, Jesus replied in English, "No, I know, I am from Bow, Washington."

The Border Patrol officer was fed up. He demanded that Jesus show him his green card.

Jesus said, "Why? I know you are federal. I haven't done anything wrong."

The officer said angrily, "Why? Because I asked you. That's why." When Jesus didn't do anything, the Border Patrol agent asked them to both get out of the car so he could check for drugs.

Jesus asked him, "Why do we have to get out? There is no motive. You have no motive to search our car."

The officer said, "I saw you. That's my motive."

Jesus then said he wanted to speak with his lawyer and reached for his cell phone. He called his brother. The agent then stepped away from their truck and returned with the police officer. While Jesus was on the phone they began to question the nephew about his legal status. Jesus's nephew revealed that he was undocumented. Then the Border Patrol officer asked, "Are you trying to fix your legal situation?" Both men nodded that they were. The agent then told them that he would let them go just this one time, but if they ever saw them driving over here again, he would stop them and they wouldn't be so lucky.

---

tino. Latinos with lighter skin appeared to have fewer problems, but those with darker skin and more indigenous features were frequently pulled over. When someone didn't speak English, the local police called the Border Patrol to interpret and the Border Patrol asked for papers immediately. Those who didn't have papers were detained and deported. Eva told us she rarely leaves the house unless her U.S. citizen children come to visit and can accompany her. She lives, she told us, in a state of alto miedo (heightened fear).

These practices have sown mistrust of law enforcement among immigrant communities. As one community member, Ira, explained to us, "People are afraid to call the police for help because they know they are connected to immigration. It's hard to tell apart who is who because we feel they [local law enforcement and federal immigration] are the same."

## Emergency Services

For the cities of Blaine, Lynden, and Sumas, the Border Patrol provides dispatch services for 911 calls, and on occasion arrives at the scene of the incident alongside – or even before – first responders. As with driving incidents, although the Border Patrol's ostensible purpose in emergency situations is to provide interpretation and backup, they do not set aside their objective of immigration enforcement even in emergency situations. In one case, CBP was asked to assist local law enforcement by setting up checkpoints when a dangerous gunman was on the loose. While assisting with checkpoints during a crisis is merited; checking a mother and child's immigration status during such a critical moment for community safety sends the wrong signal about what kind of treatment immigrants can expect during an emergency.

As Chief Bates emphasized in public remarks, when the Border Patrol has reason to believe that someone is in the country illegally, they do not have discretion to walk away. This means that for Latino residents of these specific cities, calling 911 is about more than seeking emergency help; it can also result in the deportation and detention of anyone on the scene.

---

**Border Patrol Canvass Child's Birthday Party in Response to 911 Call**

Maria shared a story about a 911 call that led to the Border Patrol's arrival at a child's birthday party:

"The kids were outside running around and playing, and a little girl had an accident and fell between two cars in the driveway. The mother was worried her daughter wasn't ok and called 911, asking for an ambulance. The mother spoke English but gave her last name, which was Martinez. Shortly afterwards the ambulance, firemen, Sheriff, and Border Patrol arrived. The Border Patrol began to walk around the outside of the party asking people who they were and their names. The family members were U.S. Citizens, but many of their guests ran inside the home and closed the door. Now whenever those people have an accident they will be fearful to call 911 because the men in green will show up. They see police and Border Patrol as the same—as dangerous for our families."

---

STB_AR1_010733

One community member, Martín, expresses a prevailing sentiment towards 911 when he says simply, "For us, 911 as an emergency number is not possible; it no longer exists." Eva tells us clearly that she would never call 911, for fear of being deported. During interviews, 24 community members mentioned during interviews that they would be too scared to call 911.

Collaboration has had lethal consequences. In Lynden, Alex Martínez was fatally shot by local law enforcement and Border Patrol agents who arrived in joint response to a 911 call made by his Spanish-speaking father in February 2011. Martínez was mentally ill, and his family called for help when he began behaving erratically. When the Border Patrol arrived on the scene, the family reports, they asked about Alex's legal status. In the confusion that ensued, Alex, a U.S. citizen and a father himself, was shot 13 times. The family insists that the presence of so many law enforcement officers needlessly escalated a tense situation, contributing to its fatal outcome. Despite the family's requests for a thorough investigation, there has yet to be an independent review of CBP's involvement in the Martínez shooting.

Nor is this the only incident with a fatal outcome. Other sources have reported the results of Border Patrol collaboration with the U.S. Forest Service in Washington communities, including the June 2011 death of Benjamín Roldán Salinas. The Forest Service's work involves patrolling the forests of the Olympic Peninsula to ensure that salal pickers, many of them immigrant workers from Latin America, only harvest in areas for which they have been granted permits. Last June, when the Forest Service called the Border Patrol to interpret in an encounter with two salal pickers, Roldán Salinas fled by jumping into the Sol Duc River, where he drowned (SHAPIRO 2011). The Border Patrol lamented his death but insisted they were simply doing their job. Yet had interpretation been provided by a neutral party, perhaps the outcome would have been different.

## Courts

In our research, we heard numerous accounts of the Border Patrol's presence in or near courthouses, particularly in Lynden. Some accounts placed Border Patrol agents in the lobby just outside the courtroom; others said the agents were on the courthouse steps, or in the parking lot. Many suggested that the agents were particularly likely to be present on days when Spanish-language interpretation services were provided. As people exit the courthouse at the conclusion of their proceedings, the agents reportedly approach them and ask for papers. While those questioned would be within their rights to refuse to answer, under the circumstances—inside a courthouse, immediately following the conclusion of a judicial proceeding, approached by an agent of the law flashing a badge—it is questionable whether responses can be construed as fully voluntary.

*Carolina*, a trusted librarian in the community, advises community members not to go to the courthouse. In an interview, she reported that an undocumented woman who spoke only Spanish came to the library in a panic; she had received a letter informing her that she had jury duty at the Lynden court house. While jury duty is an opportunity to perform a civic duty for the community, the woman was terrified that she would never return home to her children if she went.

### Status Checked in Midst of Community Crisis

On May 20th, 2011 Maribel was driving with her 5 year-old daughter to their home in Bellingham. Police and Border Patrol vehicles were in the process of closing the street and there were many "men in green." Two of the Border Patrol agents motioned for her to slow down and roll down her window. They spoke to her in English and told her something that she interpreted as she needed to turn her car around. She was terrified and didn't understand exactly what the officers were trying to communicate to her. They asked, "Estás legal en este país?" (Are you legally in this country?) When Maribel didn't answer they demanded that she pull over and show her ID. When she showed her driver's license they again asked, "Estás legal en este pais?" When Maribel didn't say anything they tried asking her daughter's name and if she was a U.S. citizen. They took Maribel and her daughter to the station until her cousin arrived and took Maribel's daughter back home. Maribel spent 12 days in the Tacoma Detention Center.



 *Scan this code to watch a video about a tragic call to 911.*

STB_AR1_010734

---

**Border Patrol Common in Courts**

A court interpreter reported that Border Patrol has been working in the courts for a long time, she says, "In Lynden or Ferndale if you have to go to court for any reason, you're screwed. If you don't go, they will issue a warrant for your arrest, and if you do, you will get deported."

She reports that it's not only traffic court that is targeted. One incident happened when she was helping interpret for *Pablo* and his son in juvenile court:

"Two years ago in juvenile court, my least favorite [Border Patrol agent] of all was there. As soon as a father and son went into probation, he picked them up. When I asked him why he did that, he said something about 'illegals' and 'protecting the border.' I asked, 'Protecting the border from berry pickers?' I've watched the Border Patrol grow and grow here...they don't have enough to do."

*Scan this code to read a Seattle Weekly article about Border Patrol in the Olympic Penninsula*





Similarly, an incident was reported just outside the courthouse by a Guatemalan worker who had been ticketed by the police for driving a car with tinted windows. When he was pulled over, the police called the Border Patrol to interpret, and the Border Patrol asked him for his papers; he presented his work visa. He later went to the courthouse to pay the fine. As he was leaving, a different Border Patrol agent approached and asked if he had documentation. He again had to present his work visa.

*Agustín*, an agricultural worker who has lived in Everson for eight years, was also stopped outside the courthouse. Last January he was late to a doctor's appointment and was rushing. He was stopped by local police and given a speeding ticket. A few weeks later, as he left the courthouse after paying his fine, a Border Patrol agent walked towards him. The first question the officer asked him was "Tienes papeles?" Agustín says he was caught off guard and speechless, then stared at the officer in full uniform with a gun on his hip and simply told the truth. The Border Patrol agent detained him and called Immigration and Customs Enforcement to come pick him up. Agustín was detained for two months in the Tacoma Detention Center and deported.

In these communities, it is a well-known fact that accessing the courts, even to pay a fine or defend one's own rights, may lead to immigration scrutiny. This triggers a number of serious human rights concerns. The selectivity of this tactic – the reported presence of agents on days when Spanish-language interpretation is provided, and their reported targeting of Latinos – suggests that this particular community's access to justice is weaker than that of other communities, raising concerns about equal protection under the 14th amendment.

---

**Border Patrol Target Spanish Speakers**

Pastor *Gustavo*, a trusted community leader who runs a church in Bellingham, reported:

"I've seen three times where people were taken away [from the court houses]. One time a person asked me to translate in the court in Lynden. It was a small courthouse. The door was wide open and everybody can hear what is going on. There was a guy in the lobby area in civilian dressing. When we were at the exit ready to leave he presented his badge of the Border Patrol and asked the person to turn around. I asked him why is he stopping the person and what the problem is. But he told me not to get in the middle or he will arrest me for interfering in the law...It happens so fast and so quiet that nobody notices it—So [now] I suggest [to] people if they are getting stopped to pay whatever amount it is and not to go to court."

---

STB_AR1_010735

# Pattern of Abuse 3:

## CBP Creates Climate of Fear and Unsafe Communities

When we began the project we heard over and over that the communities along the northern border were living in fear. We heard stories of families hiding in their homes, afraid to drive to the grocery store because they might be detained while driving. Pastors spoke to us of declining church attendance, attributing the empty pews to communities' fear of being caught on the roads. Community service providers warned that many were afraid to ask for help, even in potentially life-threatening situations.

However, at the start, we did not know how much of this fear was caused by actual abuses, or generated by a lack of information or closed channels of communication between law enforcement and the immigrant community, or a result of isolated incidents that had been amplified or even exaggerated over time. Some implied that we simply needed to help educate community members to coax them from their homes.

This research, however, has documented the way in which specific practices of the Border Patrol and its partner agencies, especially local law enforcement, have contributed to the climate in which communities find themselves unable to access vital services like emergency assistance and police protection. These practices also erect barriers to the trust and relationships necessary for effective crime-fighting in any community.

For many anti-domestic violence advocates, these patterns are particularly worrisome. Research has documented the fact that Latina women are less likely than women of other ethnic groups to feel comfortable accessing services for victims of domestic violence; concerns related to their own immigration status or that of another household member are frequently part of the reason (DUTTON, ORLOFF, & HASS 2000, 2005; INGRAM 2007). In this context, the degree of collaboration we have documented in Washington State between the Border Patrol and law enforcement, and Border Patrol and 911 dispatch services, inevitably undermines the efforts of those seeking to protect victims of domestic violence. As one employee from a domestic violence along Washington's northern border told us, "There is intense fear among victims to call out of fear that their spouse, children, or others will be put in danger of deportation. In some cases, victims may want their partner deported, and in other cases not. The reality is that people are fearful to report domestic violence. What if they ask my husband for his papers? My 17 year old son? His girlfriend? Others in the home?"

Similarly, advocates of agricultural workers' rights find themselves hampered in their efforts to persuade communities to speak out about abuses in the fields. Although our research did not seek to document incidents of worksite abuse or poor labor conditions, stories of child labor, wage theft, and unsanitary working conditions arose frequently in our conversations

---

**Scared to Call Police to Report Domestic Violence**

*Lupita* reported to us:

"A 22 year-old friend of mine lives with her husband at her parent-in-law's house. Every time he beats her and she attempts to call the police the parents-in-law threaten to call immigration on her or tell the officers her immigration status…The domestic violence has gotten worse as time goes by. In fact, now she can't even talk over the phone because her husband and parents-in-law have the poor girl on lock-down. She is too young to live her life in fear whether she is documented or not."



 *Scan this code to watch a video about worker intimidation.*

STB_AR1_010736

Pattern of Abuse 3: CBP Creates Climate of Fear and Unsafe Communities

**Fear Realized:
Family Speparation**

*Sandra Morales* works at a migrant day care center in Lynden. The summer program is run out of a local church each summer and provides a quality early learning environment for about 70 children under the age of five while their parents work in the fields. Many of the children are U.S. citizens who move state to state according to the season. Sandra, who grew up in Lynden, works closely with the families. She told us that many immigrant families are frightened to drive because they know if they are pulled over immigration will be called. Last summer Sandra saw this practice of collaboration between the police and Border Patrol play out before her eyes when she called parents to come pick up their feverish toddler Sara.

"I work with immigrant families in Lynden and I know that they are afraid to go out. Last year we had an incident where parents were called to the Center because their child got sick and had a fever. So, they were on their way and they were pulled over. They called me at the Center and told me that they had been pulled over. They started panicking because they saw another car coming. I went to the spot and saw tons of cars – the police officers', Border Patrols' and some other. I was trying to explain to the officials that these parents are on their way to get their sick child and if they are taken away I will be responsible to take care of this child. The police officers didn't care. I was explaining to the officers that the child is in a difficult situation and needs attention."

Sara's father was deported, but her mother was allowed to stay. She struggled to adjust to life as a single parent. Sandra does not know what happened to Sara or how she is faring.

with undocumented workers. Under Washington State law, workers can legally claim certain rights regardless of their immigration status, yet overwhelmingly, workers said the authorities were not on their side. In some cases, employers or workers with legal status threatened undocumented workers and told them the police or emergency services could not be used by undocumented workers without consequences of deportation. If the court system represents one end of the community safety spectrum and calling 911 or the police represents the other end, migrant workers find themselves unable to trust the system at either entry point. Resource-sharing and collaboration becomes a grave concern when it imperils communities' ability to enjoy basic civil liberties and defend their rights, even in situations that threaten their very lives.

The Border Patrol has insisted that those who are law abiding have nothing to fear. In public statements, Chief Bates of the Blaine Sector has indicated that the mere fact that undocumented migrants fear deportation is not his concern; it remains his job to identify and detain them. Yet this oversimplifies the impact of the Border Patrol's behavior in a number of important ways.

As the cases documented here show, immigrant communities along Washington's northern border are characterized by multigenerational households with mixed immigration status. The effects of widespread fear, then, cannot be isolated to undocumented workers; even their U.S. citizen children, spouses, and family members experience harassment for no other reason than the color of their skin, and fear contact with law enforcement and emergency services because it might invite immigration scrutiny leading to the deportation of loved ones

Indeed, many of the incidents we documented left U.S. citizen children living in struggling single parent households or to be raised by extended family following the deportation of a parent.

For this reason, then, the suggestion that law-abiding Americans with legal authorization to be in the country are unaffected by these practices is simply false. U.S. citizen children are deeply impacted. Many children in Washington State's northern border region are struggling with the aftermath of their parent's deportation. Researchers from UC Davis and UC Berkeley Law School studied the impact of deportation on children concluded that the deportation of a parent causes the child to "suffer psychological harm, undergo behavioral changes, and experience serious declines in health, increased depression, sleeplessness, anxiety. . .plummeting grades and desire to drop out of school" (Baum, Jones, & Barry 2010).

It is not only the children of deported parents or undocumented immigrants who suffer stress because of the environment of collaboration created along the northern border. The reality is that along the northern border there are not just mixed status families, but mixed status churches, schools, and neighborhoods. The behavior by CBP is pervasive and causes anxiety for Latino children and residents. The story below is particularly telling as it demonstrates the psychological anxiety that even U.S. citizen children with no undocumented family members experience in this collaborative environment near the border.

STB_AR1_010737



Raquel, a local health advocate, shared a story with us about her daughter that demonstrates the psychological fear that many children and adults live under constantly. Raquel's daughter, *Emilia*, who was four years old, was playing with neighborhood children last summer when a local law enforcement vehicle showed up. One of the neighbors made a joke in poor taste to the children that they had to run because "la migra" (immigration) was coming to get them. The game immediately disbanded. Emilia burst into tears and ran frantically to the house to her mother and reported that the *Migra* was coming for her. Raquel explained to her daughter that both she and Emilia are U.S. Citizens, but she has not been able to dispel the fear in Emilia, who has also seen other youth from her church taken by CBP.

Raquel and Emilia like others who are documented or have grown up in the northern border region get nervous when they see local police or CBP driving through the neighborhood—they know what it could mean for their friends or members of the community. They also know that just because they are U.S. Citizens it doesn't mean they are exempted from facing racial profiling. Indeed, there have been numerous instances in Washington and across the state reported by immigration attorneys, some documented in successful lawsuits against federal agencies, that racial profiling of U.S. born Latino children and adults is increasingly common. For example, the neighbors of a U.S. citizen teenager reported that he was pulled over for speeding and CBP was called. He was detained in Tacoma for three days before he was released. Of course, the U.S. citizen teenagers on their way to zumba who were highlighted in section one were only released by CBP when their mother brought their birth certificates (*See Section 1*).

Youth struggle with how to process this unequal treatment. These Latino youth identify strongly with America and they struggle with how to deal with feelings of alienation and discrimination in their home country. They cannot reconcile what has happened to them or could happen to them with what they believe America to be. Luis is Luz's son (*See Section 1- Public Transportation: Questioned in the Midst of a Medical Emergency*). He tells us how he felt that day on the ferry when he was stopped and questioned even when they needed to get to the hospital. He routinely carries his birth certificate with him.

### Children Struggle After Mother Detained on Thanksgiving

It was Thanksgiving Day 2011 The house was filled with family and food and everyone was eager to sit down for dinner—especially siblings América, Cristina, Daniela, and Eliso, But they all waited for Analilia, the children's mother. It grew later and she still had not arrived. The excitement of the holiday died away and the family was only left with anxiety. That evening the phone rang. Analilia was at the Tacoma Detention Center. She told them what happened.

Analilia and her boyfriend Alberto were headed to Thanksgiving dinner when she was pulled over along Valley Road. She doesn't think she was speeding or "doing anything wrong." She had trouble understanding the officer who pulled her over because she only speaks Spanish. She did not have a driver's license that she could show. The Border Patrol was called. Alberto and Analilia were both detained and deported.The grandparents say that there has not yet been a day when América, Cristina, Daniela and Eliso do not ask for their mom and cry. It is particularly difficult on the children knowing the oldest is undocumented, like their mother.

STB_AR1_010738





*Scan this code to watch a video about racial profiling at the northern border.*



"You are questioned about your citizenship and you already have it and you were born here and you're just a kid and it kind of makes you feel like what is wrong with these people? Why are they treating me like this if i'm suposedly one of their kind…Furious, enraged, blazing with complete madness where I wanted to completely just throw something across the wall, just this anger frustration everything like that. It was just a bunch of emotions were coming through at the same time. . .What I really hate—is they [CBP] feel like everyone is part of the same thing…I hate the way they always try to intimidate people by calling them Mexican…We all come from a different background. That is what an American is. America is the combination of many races coming into one."

Both international human rights norms and a long tradition of Constitutional law in the United States have clearly established that some basic civil rights extend to all people in the United States, regardless of their immigration status. These include the rights to equal protection and due process as established under the 14th Amendment to the U.S. Constitution. While the Border Patrol has a legal obligation to protect the nation's borders and enforce immigration law, it does not have the authority to ignore the U.S. Constitution.

Feelings of fear and anxiety were reported in nearly 70 percent of incidents documented. This fear is a product of patterns of abuse—irrefutable incidents of racial and religious profiling occurring on a regular basis that have dire consequences on the well-being of Latino children and the overall community. The research documents fear of far more than fear of deportation. The level of fear expressed not simply of immigration enforcement, but of police, emergency services, and other agencies whose operations are vital to the health and safety of all people in our communities, whether they have legal immigration status or not, is certainly a grave concern.

STB_AR1_010739



# Conclusion and Key Recommendations

As discussed at the outset of this report, the justification for the post-9/11 buildup of Border Patrol in our communities was that the porous, difficult-to-police nature of the northern border constituted a site of particular vulnerability to international terrorism. A decade later, communities along the U.S.-Canadian border have been transformed, not only by the use of border enforcement tactics documented in this report, but also by the presence of a sophisticated surveillance network including cameras and sensors, Predator drones, Blackhawk helicopters, and other military-grade equipment. Ten years and hundreds of millions of dollars later, are we safer?

The practices documented in this report suggest that in fact, communities of color in Washington State find themselves fearful of the very agencies that are entrusted with their protection. What's more, however, a systematic review of all terrorism-related prosecutions occurring in Washington State since 9/11 show that not a single case has resulted from the activities of the Border Patrol in our state. **Of 43 prosecutions for terrorism in Washington State since 2001, zero have been referred to the courts by Border Patrol.**

We believe firmly that we must not trade away our rights for security. Documenting what is happening allows us to educate our policy makers so we can push together to change the situation. Based on our interviews, we have developed a list of policy recommendations to address the growing human rights crisis along Washington's northern border. To implement these recommendations, we will require political leadership and the will to ensure that America remains the great protector of liberty and justice for all.

## Key Recommendations

The policy recommendations below seek to address some of the serious concerns outlined in this report regarding patterns of abuse by CBP. CBP must serve in a way that protects national security, but also respects civil rights, constitutional requirements, and federal statutes and regulations, and contributes to the overall safety and vitality of the communities where they operate. Recommendations are also included for Congress, other federal agencies, and local government. These entities can also play a key role in addressing the growing human rights crisis along the northern border.

STB_AR1_010740

## RECOMMENDATIONS FOR DEPARTMENT OF HOMELAND SECURITY CUSTOMS AND BORDER PROTECTION

*The below recommendations were developed in partnership with the Northern Borders Coalition.*

☑ Implement a CBP-wide sensitive locations policy similar to ICE that restricts enforcement at sensitive locations, including schools, hospitals, places of worship, public religious ceremonies, public demonstrations, and courthouses.

☑ Implement a written policy that clearly outlines that CBP will not engage in enforcement during assistance with emergency checkpoints, health epidemics, or natural disasters.

☑ CBP must bring its enforcement practices in line with DEPARTMENT OF HOMELAND SECURITY priorities. Just as ICE has directed its officers and attorneys in the use of prosecutorial discretion, CBP should develop an enforcement policy that establishes (and provides training opportunities) regarding how CBP personnel are to carry out their duties in furtherance of DHS priorities.

☑ In particular, CBP should place lower priority on interior enforcement cases involving immigrants who are not recent entrants. CBP and ICE should be aware that many living in the 100 mile zone are long-rooted community members and exercise prosecutorial discretion.

☑ While the 100-mile rule is enacted by statute, reforms are necessary for operations in regions along the border. CBP agents should not arbitrarily stop, question or arrest individuals without reasonable suspicion or probable cause that the individual has entered the United States illegally.

☑ CBP should adopt a policy barring the use of agency personnel and resources to perform civilian law enforcement functions and state and local police officials should not be engaged in Border Patrol operations. CBP should not respond to routine law enforcement calls such as traffic incidents or serve as emergency response emergency. CBP should not serve as interpreters.

If CBP continues to serve as interpreters, they must develop a written code of ethics for interpreting that includes clearly states expectations for interpreters such as stating that interpreters will not ask immigration status and will not carry weapons.

A better solution would be for DHS to appropriate some resources specifically for trained interpreters who act separately from Border Patrol and simply interpret without providing any information to CBP or ICE.

☑ CBP must increase its transparency. CBP should provide transparent and accessible information on stops—even those that do not result in a deportable offense.

CBP should regularly make available other data in a generous and timely manner. FOIA requests should not be generally required to obtain statistics, policies, and data.

CBP should develop metrics other than apprehensions to measure the effectiveness of its policies and share them with the public.

☑ All CBP officers should receive periodic use of force and de-escalation techniques training. Training should include specific instruction on U and T visas, asylum and refugee status, as well as Violence Against Women Act visas.

☑ DHS Office of the Inspector General should undertake a broad investigation of CBP's practices.

## RECOMMENDATIONS FOR THE DEPARTMENT OF JUSTICE

☑ Reform the Department of Justice 2003 "Guidance Regarding the Use of Race by Law enforcement by Federal Law Enforcement Authorities" to improve protections for those affected by profiling practices at the border, including prohibition of racial profiling based on national origin, language and religion, among other reforms.

Expand the guidance to prohibit racial profiling based on national origin, language, and religion.

Eliminate the exception for "national security and border integrity," which weakens the ban on profiling at borders, ports of entry, and in border communities.

Expand the guidance to apply to local law enforcement.

Hold officers accountable by adding a mechanism that provides consequences for violating the Guidance.

☑ Investigate CBP's interior enforcement practices in and outside courthouses and the use of CBP as interpreters or as emergency response and whether these practices

STB_AR1_010741

limit meaningful access of Limited English Proficient individuals to 911, emergency services, and the courts under TITLE VI of the CIVIL RIGHTS ACT of 1964.

## RECOMMENDATIONS FOR U.S. CONGRESS

☑ Do not increase appropriations at the northern border, until an investigation has been completed examining the use of resources along the northern border.

☑ Move forward immediately with the reauthorization of the VIOLENCE AGAINST WOMEN ACT, including the strongest protections possible for immigrant women, by renewing and strengthening the U visa program.

☑ Move forward swiftly with COMPREHENSIVE IMMI-GRATION REFORM that provides an earned path to legalization for the millions of undocumented immigrants in the U.S., which will offer relief to mixed status families, power to workers to end worksite exploitation, relief to scrupulous businesses who contribute to the economy; and clearer lines of communication between immigrants and law enforcement to improve community safety.

☑ Co-sponsor and pass the END RACIAL PROFILING ACT OF 2011 (S.1670 & H.R. 3618), which would prohibit the use of profiling based on race, religion, ethnicity or national origin by any federal, state, local or Indian tribal law enforcement agency.

## RECOMMENDATIONS FOR WASHINGTON STATE

☑ State and local police should refrain from asking immigration status.

☑ State and local police should refrain from enforcing federal immigration laws, including by engaging in interior enforcement operations with Border Patrol agents and requesting translation assistance from Border Patrol. State and local law enforcement should also work to end practices and programs that undermine the bright line between federal immigration enforcement and local law enforcement, such as Secure Communities or the honoring of ICE detainer holds by local governments.

☑ Local Law Enforcement Agencies should draft language access plans to ensure they meet TITLE VI regulations. The use of CBP as interpreters should not be used as part of an agency's language access plan. A code of ethics for law enforcement interpreters should be developed by WASPC.

☑ State legislature and local governments should support local police departments by prioritizing the resources local law enforcement offices need to provide language access.

☑ The Governor and Attorney General should monitor CBP's interior operations to ensure that the rights of Washington's residents are protected.

STB_AR1_010743

# COMMENTARY:

## University of Washington Center for Human Rights



STB_AR1_010744

STB_AR1_010745

# COMMENTARY:
# University of Washington Center for Human Rights

The University of Washington Center for Human Rights (CHR) is gravely concerned about the human rights implications of the practices noted in OneAmerica's report, *The Growing Human Rights Crisis Along Washington's Northern Border*. The stories documented here suggest the use of detention and surveillance practices apparently guided by ethnic and linguistic profiling; a dangerously porous relationship between CBP's work and that of local law enforcement; and a disturbingly widespread climate of fear in immigrant and Latino communities near Washington's northern border.

The CHR recognizes the responsibility of the Border Patrol to safeguard this nation's borders. Yet the Border Patrol must carry out its work with full regard to internationally recognized human rights and fundamental rights enshrined in the U.S. Constitution. A number of the cases documented here suggest that such guarantees are routinely violated in these communities.

## Background

OneAmerica invited the CHR to collaborate on this project beginning in June 2011. Since that time, faculty and graduate students affiliated with the CHR have reviewed records of all interviews conducted by One America, including audio and video recordings as well as written notes, and conducted follow-up interviews with a select number of community members in Lynden and Bellingham.

In addition, to contextualize the practices community members reported, we sought information from the Border Patrol itself. We attended community meetings and roundtables with CBP officials when possible. We filed a Freedom of Information Act request, which remains pending. And we also sought an interview with Chief John C. Bates, Chief Patrol Agent in CBP's Blaine Sector, although we received no response to our request.

Lastly, using a database of records on federal law enforcement, we conducted a systematic review of 43 prosecutions for terrorism in Washington State to determine the extent to which these practices contributed effectively to the CBP's stated mission of keeping our communities safe.

## Human rights concerns raised by CBP practices in Washington State

Some of the routine CBP practices documented by OneAmerica and the CHR constitute rights violations in and of themselves; other practices create obstacles to the enjoyment of certain other rights by members of the Latino and Spanish-speaking populations along Washington's northern border.

### Right to freedom from discrimination

Many of the practices documented in this report raise grave concerns about the apparent use of racial profiling to target individuals for questioning about their immigration status due to perceived ethnic or linguistic traits. To the extent that these practices subject a particular ethnic group to unequal treatment, these practices are discriminatory, violating core human rights protections enshrined in international law.

STB_AR1_010746

Data gathered from interviews with community members suggests that members of the Latino community are subjected to greater scrutiny than other Washingtonians through practices related to CBP's provision of support services for other agencies. First, members of immigrant communities frequently report being brought into contact with Border Patrol as a result of the Border Patrol's provision of interpretation services for local law enforcement or other agencies. According to many interviewees, the Border Patrol's participation in such encounters often extends far beyond interpretation, as once on the scene they ask for proof of legal status. In this way, for those who are perceived to lack fluency in English, a routine traffic stop or other encounter with local law enforcement turns into an opportunity for immigration enforcement. Those who are not perceived as requiring interpretation are not subjected to scrutiny of their immigration status as part of their encounter with law enforcement. This constitutes unequal treatment.

Second, in CBP's Blaine sector, the Border Patrol plays a particularly unusual role as the dispatcher for 911 calls. Upon receiving a call, they dispatch civilian law enforcement or emergency services, and if requested, accompany as backup or to provide interpretation. Some interviewees reported that when they called 911, Border Patrol agents arrived alongside first responders, and asked about their immigration status. Others reported a reluctance to call 911, out of concern that emergency assistance would come accompanied by immigration enforcement. This policy may imperil immigrants' access to police protection, urgent medical attention, fire protection, and other emergency services. The human rights issues at stake include the right to equal protection of the laws, the right to health, the right to life, and the right not to suffer discrimination in the enjoyment of these rights.

These are key human rights principles. Article II of the American Declaration of the Rights and Duties of Man provides that "all persons are equal before the law and have the rights and duties established in this Declaration, without distinction as to race, sex, language, creed or any other factor."[1] While it is widely accepted under international law that states may establish mechanisms to control the flow of undocumented migrants into their territory, international human rights norms require that immigration laws be enforced without engaging in discriminatory practices.

In this regard, the Inter-American Court of Human Rights has stated the following:

> "States must abstain from carrying out any action that, in any way, directly or indirectly, is aimed at creating situations of de jure or de facto discrimination. This translates, for example, into the prohibition to enact laws, in the broadest sense, formulate civil, administrative or any other measures, or encourage acts or practices of their officials, in implementation or interpretation of the law that discriminate against a specific group of persons because of their race, gender, color or other reasons. In addition, States are obliged to take affirmative action to reverse or change discriminatory situations that exist in their societies to the detriment of a specific group of persons."[2]

In applying these principles to the specific context of immigration enforcement in the United States, the Inter-American Commission on Human Rights recently stated,

> "In the enforcement of immigration laws, the basic right to equal protection before the law and non-discrimination requires that States ensure that their immigration law enforcement policies and practices do not unfairly target certain persons based solely on ethnic or racial characteristics, such as skin color, accent, ethnicity, or a residential area known to be populated by a particular ethnic group. Furthermore, international human rights law not only prohibits policies and practices that are deliberately discriminatory in nature, but also those whose effect is to discriminate against a certain category of persons, even when discriminatory intent cannot be shown."[3]

The fact that in some cases, Latino immigrants experience discrimination related to their perceived[4] need

---

1        http://www.cidh.oas.org/Basicos/English/Basic2.American%20Declaration.htm

2 Inter-American Court of Human Rights, Juridical Condition and Rights of the Undocumented Migrants, Advisory Opinion OC-18/03, available at http://www.unhcr.org/refworld/docid/425cd8eb4.html, para 119

3 Inter-American Commission on Human Rights, Report on Immigration in the United States: Detention and Due Process, 30 December 2010, para 95

4 Several interviewees also suggested that the determination to call for interpretation appeared to be based on arbitrary criteria related to a person's

STB_AR1_010747

for interpretation is also important in human rights terms. The right to interpretation from the moment of initial arrest is guaranteed by the International Convention on Civil and Political Rights, Article 14(3) f, and by the American Convention on Human Rights, Article 8(2)a. This right is related to core due process protections enabling one to defend oneself, as elaborated in General Comment No. 32 of the United Nations Human Rights Committee, which stipulates,

> "Access to administration of justice must effectively be guaranteed in all such cases to ensure that no individual is deprived, in procedural terms, of his/her right to claim justice. The right of access to courts and tribunals and equality before them is not limited to citizens of States parties, but must also be available to all individuals, regardless of nationality or statelessness, or whatever their status, whether asylum seekers, refugees, migrant workers, unaccompanied children or other persons, who may find themselves in the territory or subject to the jurisdiction of the State party. … The guarantee is violated if certain persons are barred from bringing suit against any other persons such as by reason of their race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."[5]

In the cases documented in this report, however, what is at stake is not the availability of an interpreter, but the impartiality of that interpreter. Far from enabling limited English speakers to participate in judicial proceedings or access social services, CBP's particular form of "interpretation"—which reportedly often includes questions about legal status—creates an additional disincentive for communities to seek access to social services. At a time when, for example, many in law enforcement and anti-domestic violence communities are endeavoring to build trust and collaborative relationships with immigrant communities, these practices undercut public safety and public health priorities. And because these practices target Spanish speakers, leaving them more vulnerable than other groups, they also run afoul of antidiscrimination principles.

These same practices also threaten the enjoyment of other rights, enumerated below.

## Access to justice and due process rights

Numerous interviewees mentioned the presence of Border Patrol agents in or around courthouses; some respondents described them as stationed within the courthouse lobby while others placed the agents immediately outside. CBP agents approach people who are leaving the courthouse at the conclusion of their legal proceedings, and inquire as to their national origin. Although those questioned have the legal right to decline to respond, when approached by a uniformed agent in or near a courthouse, many immigrants feel compelled to answer. In this way, a routine visit to the courthouse, like a routine encounter with law enforcement, can become an immigration checkpoint.

These practices raise concerns about the extent to which immigrants' right to access justice and due process rights may be imperiled by overzealous immigration enforcement.

Article XVIII of the American Declaration of Rights and Duties of Man stipulates,

> "Every person may resort to the courts to ensure respect for his legal rights. There should likewise be available to him a simple, brief procedure whereby the courts will protect him from acts of authority that, to his prejudice, violate any fundamental constitutional rights ."[6]

Creating obstacles to the community's ability to access justice services constitutes an important violation of guarantees of equality before the law. In its Advisory Opinion on the "Juridical Condition and Rights of Undocumented Migrants," The Inter-American Court of Human Rights has emphasized that

> "for the 'due process of law' a defendant must be able to defend his interests effectively and in full procedural equality with other defendants…. To accomplish its objectives, the judicial process must recognize and correct any real disadvantages that those brought before the bar might have, thus ob-

perceived ethnic identity rather than actual mastery of the English language.
5 See Article 14, Section II. http://www1.umn.edu/humanrts/gencomm/hrcom32.html
6 Available at http://www.cidh.oas.org/Basicos/English/Basic2.American%20Declaration.htm

STB_AR1_010748

serving the principle of equality before the law and the courts and the corollary principle prohibiting discrimination. The presence of real disadvantages necessitates countervailing measures that help to reduce or eliminate the obstacles and deficiencies that impair or diminish an effective defense of one's interests."[7]

Clearly, the CBP's presence in or near courthouses constitutes a barrier to access for immigrants, and a violation therefore of their rights to equality before the law.

## Other associational rights

The cumulative effect of CBP practices creates widespread fear in the Latino communities near Washington's northern border. This has spillover effects that may be relevant to the exercise of other rights. For example, many respondents reported that the frequent use of traffic stops as the gateway to immigration enforcement led them to go to great lengths to avoid driving. In rural areas with limited public transportation, this curtails immigrants' ability to participate in key elements of family and community life, including attending social gatherings or community events, visiting friends, or even satisfying basic needs. The extent of this fear was so widespread that many spoke of limiting their visits to the supermarket, or asking others to buy groceries for them. One pastor spoke of his effort to take prayer services to immigrants in their homes, because they were otherwise too frightened to come out to worship.

While the Border Patrol justifies its practices in the name of a worthy objective—keeping our country safe from terrorism and drug trafficking—these findings suggest that the Border Patrol has systematically engaged in overzealous and arbitrary practices. Far from making anyone safer, these have undermined connections between communities and local police, imperiled immigrant families' access to the justice system, and left communities of color—including native-born U.S. citizens in some cases—effectively unable to enjoy some of the basic rights to which they are entitled under international human rights law, as well as the U.S. Constitution.

The Center for Human Rights congratulates OneAmerica on its important community-based human rights documentation and education work, and its mission of striving for justice for all, and urges Customs and Border Patrol to respond to these concerns in an open and transparent fashion.

---

7        Inter-American Court of Human Rights, Juridical Condition and Rights of the Undocumented Migrants, Advisory Opinion OC-18/03, available at http://www.unhcr.org/refworld/docid/425cd8eb4.html, para. 121

STB_AR1_010749



# References

Ammar, Orloff, Dutton, Hass. 2005. "Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA". *International Journal of Police Science & Management*, v7 n4 (Winter 2005): 230 – 244

Batalova, Jeanne & Lee, Alicia. March 2012. *U.S. in Focus: Frequently requested Statistics on Immigrants and Immigration in the U.S.* Migration Policy Institute.

Baum, J. Jones, R. & Barry, C. 2010. *In the Childs Best Interest?* University of California Davis and Berkeley Law Schools.

Customs and Border Protection. www.cbp.gov *U.S. Border Patrol Statistics.*

Dutton, Orloff, Hass, 2000, "Characteristics of Help-Seeking Behaviors, Resources, and Service Needs of Battered Immigrant Latinas: Legal and Policy Implications". *Georgetown Journal on Poverty Law and Policy*, v7 n2 (Summer 2000): 245 – 305.

Eben, Ingram, 2007, "A Comparison of Help Seeking Between Latino and Non-Latino Victims of Intimate Partner Violence". *Violence Against Women*, 2007, 13:159:

Haddal, Chad. 2010. *CRS Report for Congress. Border Security: The Role of the U.S. Border Patrol.* Congressional Research Service.

*ICE Strategic Plan FY 2010-FY 2014.* 2010. Immigration and Customs Enforcement. Accessed 4/1/12: http://www.ice.gov/about/overview/

Meissner, Doris and Kerwin, Don. (2009) *DHS and Immigration: Taking Stock and Correcting Course.* Migration Policy Institute.

Morton, John. 2011. U.S. Department of Homeland Security Immigration and Customs Enforcement. June 17, 2011. *Memo: Exercising Prosecutorial Discretion Consistent with the Civil*

Immigration *Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens.*

Napolitano, Janet. August 2011. Department of Homeland Security. August 18, 2011 Letter to Senator Durbin. Accessed 4/1/12: http://www.aila.org/content/default.aspx?docid=36684

Napolitano, Janet. October 2011. October 26, 2011. *Testimony of Secretary Janet Napolitano before the United States House of Representatives Committee on the Judiciary.* October 26, 2011. Accessed 4/1/2012: http://www.dhs.gov/ynews/testimony/20111026-napolitano-house-judiciary.shtm

Nuñez-Neto, Blas. 2008. *CRS Report for Congress. Border Security: The Role of the U.S. Border Patrol.* Congressional Research Service.

Obama, Barack. 2011. *Remarks by the President on Comprehensive Immigration Reform in El Paso, Texas.* May 10, 2011. Accessed 4/1/12: http://www.whitehouse.gov/the-press-office/2011/05/10/remarks-president-comprehensive-immigration-reform-el-paso-texas

Reyes, Johnson and Van Swearingen. 2002. *Holding the Line? The Effect of the Recent Border Build-Up on Unauthorized Immigration.* Public Policy Institute of California.

STB_AR1_010750

References

Rights Working Group. 2012. *Fact Sheet: Racial Profiling at the Border and the Department of Justice's 2003* "Guidance Regarding the Use of Race by Federal Law Enforcement Authorities"

Sanchez, Christian. 2011. *Testimony of Christian Sanchez Before the Congressional Transparency Caucus.* July 29, 2011.

Shapiro, Nina. 2011. Seattle Weekly. July 27, 2011. "Nowhere near the Border Patrol: How a flush government agency found trouble in the coastal home of *Twilight.*"

The 9/11 Commission. 2004. *The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States*, U.S. Government Printing Office.

TRAC Immigration. 2011. *ICE Targets Fewer Criminals in Deportation Proceedings.* Accessed 4/1/12: http://trac.syr.edu/immigration/reports/268/

TRAC Immigration. 2011. Data Tool: *U.S. Deportation Proceedings in Immigration Courts.* Accessed 4/1/2012: http://trac.syr.edu/php-tools/ immigration/charges/deport_filing_charge.php.

U.S. Department of Justice. 2002. *Follow-up Report on Border Patrol's Efforts to Improve northern border Security.* OIG Report No. I-2002-004. Office of the Inspector General.

U.S. Department of Homeland Security. 2004. *National Border Patrol Strategy.* Bureau of Customs and Border Protection.

U.S. Department of Homeland Security. 2011. *National Border Patrol Strategy.* Bureau of Customs and Border Protection.

STB_AR1_010751

# Appendix—A

*Community Profiles-Incidents Collected through Human Rights Documentation*

*All names written in italics have been changed to protect community member's identities. In some cases, individuals have preferred that only their real first name be used. Dates of incident written as Month/Day/Year signifies that the incident occurred within that month and those written as 1/1/Year means that it occurred within that year. Incidents are organized by city (Anacortes-Sumas).*

| COMMUNITY MEMBER (Names in italics are pseudonyms) | CITY | DATE OF INCIDENT | SUMMARY |
|---|---|---|---|
| Miguel Angel Gaitan and Benito Sanchez | Anacortes | 4/20/2011 | U.S. Citizen and Legal Permenant Resident go on trip to San Juan Islands and are followed and harassed twice by Border Patrol agents to prove immigration status at Anacortes Ferry Terminal. |
| *Gabriel* | Anacortes | 4/8/2011 | Father detained and deported after police stop him for broken taillight and ask for immigration status. He leaves behind U.S. Citizen child and pregnant wife. |
| Ramon | Bellingham | 8/12/2011 | Man knows many cases of CBP interpreting for local police and refuses to shop at Wal-Mart because Border Patrol often waits out in the parking lot watching community. |
| *Lupita* | Bellingham | 1/1/2011 | A woman tells us about her friend. 22 year-old victim of domestic violence doesn't leave house or call police for help because mother in law threatens to call immigration. |
| *Janette Berg* | Bellingham | 2/28/2012 | Teacher talks about targeting of youth and 4 young people she knows who were detained or deported. |
| Alejandro Pelayo | Bellingham | 11/20/2011 | Man pulled over various times by local police for no given reason and asked for his social security number or immigration status. Also has witnessed local police pulling over others and BP arriving shortly after. |
| *Aamir, Ihsan, and Mukakkir* | Bellingham | 9/28/2011 | Faith leader reported three Muslim men pulled over by local police and asked to prove immigration status. They left scared of retaliation and how it could affect their visas. |
| *Linda Fuller* | Bellingham | 9/27/2011 | Domestic Violence advocate tells how many victims are scared to call 911 because one of their family members may be detained by immigration. |

STB_AR1_010752

Appendix—A/ Community Profiles-Incidents Collected through Human Rights Documentation

| Elisa | Bellingham | 9/22/2011 | Domestic Violence Advocate shares many stories where victims are scared to call 911 out of fear of BP or police asking immigration status |
| Lori Ritter | Bellingham | 9/10/2011 | Domestic Violence Advocate discusses alternatives for Border Patrol interpretation or answering 911 calls. |
| Pastor Gustavo | Bellingham | 8/18/2011 | Pastor tells stories from his congregation including raids and fear to drive to church or call 911 for help. |
| Jorge | Bellingham | 8/1/2011 | Man detained and deported after local police call CBP for interpretation. He was bilingual in English-Spanish. |
| David | Bellingham | 7/23/2011 | Man describes context of fear, local police calling BP for interpretation, and family separation. Reports that recently community members were detained while shopping and in parking lot at Wal-Mart. |
| Jose Roberto Palma | Bellingham | 7/23/2011 | Observations and general sentiment of fear near border. He tells story of a church member who felt sick when she was walking through town and asked local police for help. He called her son to come pick her up and when he arrived, law enforcement asked the son for his immigration documents and detained him. |
| Rina And Juan Cruz | Bellingham | 7/23/2011 | Family verbally harassed and threatened by Border Patrol when they take a friend to the Greyhound Bus Station. Their friend is asked for immigration status, detained, and deported. |
| Jacinta | Bellingham | 6/3/2011 | Young woman deported after local police stop her for driving the wrong way on a street and call Border Patrol for interpretation. |
| Maribel | Bellingham | 5/20/2011 | Woman driving is waved to side of road by CBP while they close down street. They ask for her and 5 year-old daughter's immigration status and detain mother. While mother is in detention the child is so distraught her face became paralyzed from stress. |
| Jovita | Bellingham | 5/18/2011 | Mother of 2 U.S. Citizen children detained and deported after being stopped by local police on her way home from work. |
| Lorenzo | Bellingham | 5/10/2011 | Husband pulled over by local police because the "van was not his" and then asked for immigration status. He was detained by Border Patrol and separated from his 2 U.S. Citizen children and wife with severe medical conditions. |
| María Fernandez | Bellingham | 1/1/2011 | Mother tells story of son committing suicide after harsh conditions and treatment by law enforcement while being detained in local jail. |
| Carla | Bellingham | 1/1/2011 | Every time woman goes to Greyhound bus station, CBP approaches people in line with dark skin and asks for their papers. |
| Vicente | Bellingham | 9/1/2010 | Border Patrol enter man's home without warrant and threatens to take his kids if he doesn't tell them where his wife is. He is handcuffed and detained. |

STB_AR1_010753

| Pastor *Gustavo* | Bellingham | 8/1/2010 | Pastor went to courthouse with member of church, and the man is asked for papers and detained by agent in civilian clothes when exiting courtroom. This is third time he's seen this happen. |
|---|---|---|---|
| *Adán And Oscar* | Bellingham | 6/1/2010 | Store owners report local police follows dairy worker into Mexican grocery store, asks for papers, and detains him until Border Patrol arrives. Store is without clients for days. |
| Alan | Bellingham | 5/1/2010 | Three men are detained (one with 3 U.S. Citizen children) after being approached by Border Patrol while crabbing and asked for papers. |
| Jabir | Bellingham | 3/1/2010 | Muslim American stopped by Sheriff deputy and verbally harassed and asked what country he was from. |
| Adam | Bellingham | 8/1/2009 | Cambodian American stopped by CBP while driving and asked for papers. Discusses post 9/11 changes. |
| *Julia And Lorenzo* | Bellingham | 2/1/2009 | Mother detained in front of children when CBP enter looking for someone else. |
| Consuelo | Bellingham | 1/1/2012 | Local police visit home and ask U.S. Citizen grandmother for immigration documents. |
| Felix | Bellingham | 1/1/2012 | ICE visits wife at home and deceives her into taking them to her husband's work where they detain him. |
| *Lola* | Bellingham | 9/20/2011 | Court interpreter routinely sees CBP asking for people's papers inside and outside courts. She tells stories of racial profiling and environment of fear. |
| *Yaman* | Blaine Border Crossing | 9/23/2011 | Muslim American visited Canada often before 9/11. Now he is stopped at border for hours at a time and asked questions relating to Islam. |
| Gerson Nolasco | Blaine | 10/1/2008 | Legal Permanent Resident stopped by local police for driving slightly over speed limit and asked to prove his immigration status |
| Adette | Blaine Border Crossing | 3/1/2011 | Grandparents renew green card in Blaine and they are asked to show U.S. Citizen granddaughter's papers and not allowed to leave without showing her social security card. |
| *Akin* | Blaine Border Crossing | 8/21/2010 | Somali Muslim American college student stopped for hours at border crossing and searched. |
| Alex | Blaine Border Crossing | 5/2010-Ongoing | Testimony provided at May 2010 racial profiling hearing. He and his wife are Muslims and they must travel frequently across the Canadian border to visit her family. They are held for many hours at the border and questioned separately each time. His wife is often asked, "Did you know your husband is a terrorist?" Crossing the border and enduring intense stress each time is tearing apart their marriage. |
| *Saleh* | Blaine Border Crossing | Ongoing | Muslim man from Jordan is stopped every time he crosses. He thinks it is racial profiling because once they realize it is him they release him. He wants the country to be safe, but feels harassed. |

 STB_AR1_010754

Appendix—A/ Community Profiles-Incidents Collected through Human Rights Documentation

| | | | |
|---|---|---|---|
| *Susana* | Burlington | 6/1/2011 | Woman followed by ICE after leaving her home, pulled over, and boxed in. She is asked for immigration status, if she has children, and detained. |
| *Isabel and Ernesto* | Custer | 10/26/2011 | Undocumented dairy workers go to hospital after being beaten with belt at work by another worker and scared to call police out of fear that he will call immigration. |
| *Alfonso* | Custer | 3/1/2010 | Sheriff calls BP to interpret and father of 2 U.S. Citizen children is detained and deported. His pregnant wife gives birth to baby with medical issues-now struggling single mom. |
| *Felix* | Custer | 1/1/2010 | Bilingual English/Spanish speaking Father with 2 U.S. Citizen children is detained and deported after Sheriff calls BP to interpret. |
| *Ceferino* | Custer | 1/1/2008 | Bully documented worker beats coworker at dairy until he is unable to move and then calls Immigration and Border Patrol. The victim is detained. |
| *Carolina* | Custer | | Tells stories of families too fearful to call 911 and farm worker raids in the fields by their home. |
| *Veronica and Jesus* | Everson | 1/1/2012 | Blackhawk helicopter hovers over home and drug dogs search house after family is mistakenly accused of shoplifting. Father is asked for immigration status and detained in front of his family. |
| *Lilia* | Everson | 10/5/2011 | Often Sheriff and Border Patrol will park outside of Mexican Grocery Store for two hours. During this time they have no business. |
| Isabel | Everson | 9/2/2011 | Family of workers pulled over by local police and BP is called for interpretation. While they are being detained, Farmer arrives and convinces officers to let them go. |
| *Tracy* | Everson | 8/27/2011 | Advocate reports worksite raid in Everson where immigration transport vans take away field of workers. OneAmerica volunteers followed up with neighbors by field and there were no witnesses willing to speak. |
| *Andrea and María* | Everson | 8/18/2011 | Women raspberry workers share they stay close to the migrant camps where it's safe. CBP pull over people on their way home from working in fields. |
| Abel | Everson | 6/1/2011 | Father of 9 year-old U.S. Citizen daughter deported after local police call Border Patrol for interpretation. |
| *Patricia* | Everson | 1/1/2011 | Woman describes common worksite abuses happening in area and how workers are often denied wages for labor. |
| *Marlena* | Everson | 5/15/2010 | Indigenous woman is found crying and walking along road with her small child searching for her husband. He was detained with other workers while pruning berries. |
| *Eva Moreno* | Everson | 5/1/2010 | Woman shares CBP took nearly all her neighbors at the migrant housing complex. Local police waited roadside and stopped everyone with dark skin. If they didn't speak English, they called CBP to interpret and detained. |

STB_AR1_010755

| | | | |
|---|---|---|---|
| *Ralph Lopez* | Everson | 5/1/2010 | Man pulled over by CBP for making hand signal, asked for papers and detained. Also tells of CBP telling workers that if he saw them outside of the field he would arrest them. |
| *Sergio* | Everson | 1/1/2010 | Man's car slides off road in heavy rain storm and local police respond to scene. They call CBP for interpretation and he is detained, leaving 3 U.S. Citizen children and wife. |
| *Agustín* | Everson | 1/1/2010 | After paying speeding ticket at courthouse, man is approached outside by BP, asked for immigration documents, and detained. |
| Suzana | Everson | 1/1/2007 | Local police pull over farm workers on their way home from work and call CBP for interpretation. All are deported except for one woman with U.S. Citizen child. She is scared what will happen if she is stopped again. |
| *Octavio* | Everson | 1/1/2006 | Grocery store employee calls 911 after a woman steals client's car. CBP and police arrive and check immigration status of all people involved, detaining man whose vehicle was stolen and employee that called 911. Employee was deported, leaving 2 U.S. Citizen children. |
| *Lena* | Everson | 1/1/2002 | Store was robbed at gunpoint and owner called 911. No one responded for over 4 hours, and they wonder how they are supposed to feel safe when they aren't protected. |
| *Roberto and Gaspar* | Everson | 1/1/2000 | Two Guatemalans are grabbed and detained by Border Patrol while entering grocery store. They are released after their legal status is confirmed. |
| Magali | Everson | 1/1/2010 | CBP stand on edges of field and watch farmworkers while they work. Vehicles drive regularly through fields and visit area at night. |
| Josefina | Everson | 5/1/2010 | Husband detained for driving without a license. Family reports verbal harassment by Border Patrol to supervisor and is told they are just doing their job. |
| Martin Castro | Ferndale | 7/26/2011 | Man is asked for papers by local police and detained by Border Patrol. Describes deep fear of people to call 911 or seek help when in situations of domestic violence. |
| Teresa | Ferndale | 8/30/2011 | Woman pulled over by local police for not using turn signal and asked for her immigration status. |
| Noel | Ferndale | 8/18/2011 | Guatemalan resident pulled over three times and describes how if you don't speak English it gives them a reason to question your immigration status. |
| *Victor Sanchez* | Ferndale | 8/14/2011 | Mechanic's client pulled over by local police for broken taillight and detained after they call CBP for interpretation. He calls mechanic to pick up car and tell family. |

| | | | |
|---|---|---|---|
| *Francisco* | Ferndale | 1/1/2011 | Minor stopped by local police for traffic violation and is detained by Border Patrol. He is released from Tacoma Detention Center after they realize he is a U.S. Citizen. |
| Pastor Gil Alvarado | Ferndale | 1/1/1989 | Pastor of First Hispanic Church in Lynden detained because he drove people from his church to their home. |
| *Christian and Pana-filo* | La Conner | 10/14/2011 | Broccoli Farmworkers pulled over on their way to work by local law enforcement and asked for their immigration status. ICE was called and both were detained. |
| *Talia and Jose* | Lynden | 1/23/2009 | Husband pulled over by local police because his windows were too dark and officer called CBP for interpretation. He was deported, leaving behind pregnant wife. |
| Savaneno | Lynden | 11/1/2005 | Man paid speeding ticket and was called to return back to court. When he arrived, the clerk pointed him to the door and Border Patrol was waiting to detain him. |
| Hector | Lynden | 12/2/2011 | Construction worker and son followed by BP from his work to home. Over 6 BP vehicles arrived as they searched his car for drugs and asked him to prove ID. |
| Analilia and Alberto | Lynden | 11/28/2011 | Local Police pull over pregnant woman on way to Thanksgiving dinner and call Border Patrol. She is detained in front of her 5 year-old child and deported. Grandparents adopt her children. |
| *Serena Lopez* | Lynden | 11/14/2011 | 2 Tacoma men are pulled over by Lynden police on way to visit a friend and CBP arrive for interpretation. Friend comes quickly and is asked to interpret because BP isn't able. The car is searched with drug dogs and both men are detained. They are deported without signing voluntary departure. |
| Posilio | Lynden | 11/13/2011 | Brother and friend detained after being pulled over by local police. Border Patrol arrives shortly after. |
| Liz | Lynden | 10/9/2011 | When argument begins at Quinceañera party a guest calls 911 and local police and CBP arrive. More than 7 Border Patrol vehicles wait in parking lot until party is over, frightening everyone. |
| Mana | Lynden | 9/23/2011 | Many people pulled over by local police and detained by CBP. Tells story of woman pulled over on way to daycare and wasn't given opportunity to say bye to her kids. |
| *Ana Eugenia* | Lynden | 9/23/2011 | People don't report crimes or abuses out of fear local police will call immigration. Tells about how her neighbors and friends are stopped and then just disappear. |
| Carmen | Lynden | 8/18/2011 | Woman farmworker scared to leave camps because so many co-workers have been pulled over and deported for broken tail lights or other reasons. |
| *Dahlia Lopez* | Lynden | 8/15/2011 | Advocate reports woman detained after she is pulled over by local police for driving with a taillight out and they call CBP for interpretation. |

STB_AR1_010757

| Jorge Martinez | Lynden | 7/23/2011 | Family members and friends pulled over multiple times by local law enforcement and had their cars searched for drugs and immigration status checked. |
| Juan Jose Maldonado | Lynden | 7/23/2011 | Highlights stories of BP interpreting and mistrust of law enforcement. |
| *Pablo* | Lynden | 7/12/2011 | Father detained and deported after being pulled over on the way to courthouse for child custody hearing. He spoke English, yet local police called CBP for interpretation. |
| *Saul* | Lynden | 7/11/2011 | Man is asked for papers and detained while in line for domestic flight at Bellingham Airport. Family members worried frantic when they could not locate him. |
| Rosa | Lynden | 7/3/2011 | Woman describes how when familes in the community are separated "the kids are the ones that suffer". |
| *Carolina* | Lynden | 7/1/2011 | Scared woman goes to library to get advice on if she should attend courthouse to serve on jury. Staff can't tell her in good faith she won't be detained. |
| Hector | Lynden | 7/1/2011 | Legal Permanent Resident approached and asked to prove immigration status while pumping gas at a gas station. |
| Ira | Lynden | 7/1/2011 | Local police pull over young man for taillight out and call Border Patrol. They ask him for immigration status. |
| Sira | Lynden | 7/1/2011 | Family pulled over by local police because their "muffler is too loud." Border Patrol arrives for interpretation and detains the father and son. They give the son the option of being deported in place of his sick mother. |
| *Esmeralda* | Lynden | 6/23/2011 | Mushroom worker followed by 3 Border Patrol to her home. They ask for her husband and threaten to detain her while her children watch crying. |
| *Jacinta* | Lynden | 6/3/2011 | ICE enters home with warrant for someone who no longer lives there and detains 3 family members. |
| Erika | Lynden | 6/1/2011 | Latina woman pulled over because her taillight was out and he asked her if she needed interpretation. She replied no, and he let her leave. |
| *Laura Ventura* | Lynden | 5/24/2011 | Farm worker followed by Border Patrol after work. The agent signaled her to pull over by beeping horn, asked her for her immigration status, searched car for drugs, and then detained her. She suffered face paralysis in detention center. |
| Orlando | Lynden | 5/1/2011 | Teen farmworkers describes how U.S. Citizen kids are "safety blanket" for their parents, and drive with them wherever they go because they can speak English. There have been many car accidents where neighbors have been detained. |
| *Rosa* | Lynden | 5/1/2011 | Man is pulled over for speeding by local police. The 60 year-old grandmother in passenger seat is asked for papers, detained, and in deportation proceedings. |

STB_AR1_010758

| | | | |
|---|---|---|---|
| *Miguel Guzman* | Lynden | 4/20/2011 | Mechanic shares community's fear and mistrust of law enforcement in area, raids, and surveillance of community. |
| Ruth | Lynden | 3/23/2011 | Man pulled over by local police for a broken taillight and called Border Patrol for interpretation. When he showed his green card, they accused him of having a fake residency card. He feels he was racially profiled. Wife shares if she had to call 911 she would make her kids call in English. |
| Gilberto | Lynden | 3/1/2011 | Sheriff pulls over Guatemalan workers for driving with tinted windows and searches vehicle for drugs. He calls CBP for interpretation and they ask them to show their visas. When they go to pay ticket at courthouse they are approached by BP and again asked for papers. |
| Alejandro Perez Martinez | Lynden | 2/28/2011 | Mentally ill man shot and killed by BP and Local Law Enforcement after they respond to 911 call. CBP is on scene to interpret but fires gun. He is shot 13 times total by Border Patrol and Local Sheriff, handcuffed, and dragged 10 feet before given any health assistance. |
| Carlos | Lynden | 2/20/2011 | Legal Permanent Resident stopped by same Border Patrol three times and detained for a week and a half in Tacoma. |
| *Claudia* | Lynden | 1/1/2011 | Mother too scared to leave home for groceries and waits until her daughter visits every 8-10 days. |
| Marguerita | Lynden | 12/10/2010 | Woman's son is pulled off field by his neck while working and detained in front of other workers. |
| Angelina | Lynden | 7/1/2010 | Woman detained after she is pulled over by local police without driver's license and they call Border Patrol. |
| *Sandra Morales* | Lynden | 7/1/2010 | Parents stopped by local police while driving to pick up their sick baby from Day Care. Border Patrol arrives and detains father, leaving sick baby in their care temporarily. |
| Juan | Lynden | 7/1/2010 | Three Raspberry workers approached by Border Patrol while eating lunch on their break and asked for papers. |
| Bello | Lynden | 6/1/2010 | Father is detained and deported after paying a speeding ticket at courthouse. He is separated from wife and 2 U.S. Citizen children. |
| Rafael | Lynden | 4/1/2010 | Three family members are pulled over by local police for driving over speed limit. The driver only speaks Spanish and officer calls CBP for interpretation. Driver is detained and U.S. Citizen cousins are asked to prove immigration status. |
| *Iván* | Lynden | 5/22/2009 | Man goes to pay ticket at courthouse and as he exits courtroom is asked for papers and detained by ICE official in civilian clothes. |

STB_AR1_010759

| Irma | Lynden | 11/1/2006 | Husband is detained after local police pull over family for expired tags and call CBP for interpretation. |
| *Cristina Rodriguez* | Lynden | 6/1/2004 | Husband is detained after local police pull him over and call Border Patrol for interpretation. Simple things like going to grocery store or doctor make her nervous. |
| *Joel and Felipe* | Lynden | 7/1/2011 | Two men are detained after local police calls Border Patrol for interpretation. Bilingual family member tries to interpret and advocate for them. |
| Beverly | Lynden | 12/8/2011 | Latina legal permanent resident feels she is racially profiled after being stopped by Border Patrol and checked for papers without any reason given. |
| Beverly | Lynden | 12/1/2011 | Woman tries to call Lynden police and cannot find any number. She gets rerouted to Border Patrol and Bellingham Sheriff Department. |
| Jorge Martinez | Lynden | 7/23/2011 | Describes fear to drive and tells how at the end of raspberry season you see BP pick up workers after their shifts. |
| *Jaime* | Lynden | 1/1/2010 | Latino man is hit in car accident and CBP are the first to respond to the scene. They check the victim's immigration documents and detain him. |
| *Daniel* | Lynden | 1/1/2010 | A Caucasian woman runs a stop sign and hits a Latino man while driving. Five Border Patrol respond to the accident and ask the man for his immigration documents. |
| *Sofía and Luz* | Maple Falls | 4/1/2011 | Adult sisters walk their babies in strollers down the street and are approached by a CBP agent who asks for their IDs and age of their children. When they don't have IDs with them he makes them write their names in a notebook. The women leave scared. |
| Pastor Emilio Benites | Mt Vernon | 1/1/2004 | ICE arrives at Pastor's home and tries to coerce him to work for them to find out who is making fake IDs. They carry his photo and threaten to arrest him but don't. |
| Salvador Cruz | Mt. Vernon | 2/28/2012 | Describes community members' fear to drive or leave their homes. |
| *Rogelio* | Mt. Vernon | 9/1/2011 | Man is detained after he is pulled over by local police on his way to work and they call Border Patrol. |
| Diego Bernal | Mt. Vernon | 8/5/2011 | Farm worker tells of harsh working conditions including limited water and many youth from 3-16 years old laboring in fields. |
| *Rudolfo* | Mt. Vernon | 7/1/2011 | ICE arrives at home looking for someone who no longer lives there and asks immigration status of family members. They aggressively detain father in front of kids. |

| | | | |
|---|---|---|---|
| Eduardo | Mt. Vernon | 6/16/2011 | Student boxed in his parking spot at community college by an ICE agent and asked for his papers. |
| *Summer García* | Mt. Vernon | 9/1/2010 | Man hits deer and is too scared to call local police or tow truck for help because he thinks immigration may come. |
| *Fernando* | Mt. Vernon | 1/1/2010 | Latino man asked for papers and detained while standing outside Mt. Vernon Restaurant. |
| *María Trinidad* | Mt. Vernon | 5/1/2007 | ICE arrives to home without warrant and detains father in front of kids, won't tell them why he is being arrested. |
| Adrian | Mt. Vernon | 1/1/1996 | 15 years ago ICE raided popular Mt. Vernon restaurant, arresting all workers. Old incidents still contribute to current climate of fear. |
| Maria | Nooksak | 7/26/2010 | Little girl falls during a birthday party and mother calls 911. Border Patrol arrive with sheriffs and begin to wander the party. Many people leave. |
| Luis Aguilar | San Juans | 9/23/2011 | U.S. Citizen teenager must take birth certificate with him when he travels from San Juan Islands to Anacortes. Every time their family crosses he must wait hours and gets singled out by Border Patrol. |
| Luz Aguilar | San Juans | 9/23/2011 | Woman describes isolation of islands and checkpoints on ferries. Tells stories of being racially profiled every time their family leaves island. Once the officers held them for hours while her husband had a medical emergency and needed to go to the hospital. |
| *Lorena* | Sedro Wooley | 10/3/2011 | Latina woman racially profiled and mistakenly arrested by local police for shoplifting. She is now scared to call police for help. |
| Jesus | Sedro Wooley | 8/5/2011 | Dairy worker pulled over by local police for taillight out and BP arrives. Officers ask for their immigration status and threaten to arrest them if they ever see them again. |
| Raquel | Sedro Wooley | 4/11/2011 | Family nervous after church youth were detained by Border Patrol. Later, police arrive in neighborhood and woman's young U.S. Citizen daughter runs into the home crying when someone jokes that "the migra is coming". |
| Maricela | Sumas | 8/15/2011 | Woman, husband, and roommate are detained after being pulled over by local police on way to buy groceries. They aren't given reason and CBP comes to interpret. Only the woman isn't deported because they have 2 U.S. Citizen kids. |
| Mark and Maria | Sumas | 9/1/2009 | 16 and 17 year-old U.S. Citizen siblings are surrounded by 7 Border Patrol vehicles and have their car searched by drug dogs after being stopped without driver's license. Mom must bring birth certificates to prove status. |

STB_AR1_010761

# Appendix—B

*Sample Documentation Form and Human Rights Card*

---

### *NORTHERN BORDER STORIES:*

ONEAMERICA
With Justice for All

NAME OF PERSON (OR NICKNAME):

INTERVIEWED BY:

PHONE NUMBER:

LANGUAGE:

DATE/TIME OF INCIDENT:

FULL NAME OF THOSE AFFECTED:

REGION (PLEASE CIRCLE):

BORDER        WHATCOM        SKAGIT        SNOHOMISH        SAN JUAN ISLANDS        OLYMPIC PENINSULA

TYPE OF INCIDENT (PLEASE CIRCLE):

TRAFFIC        SHOPPING        WORK        HOUSE        B CROSSING        PEDESTRIAN STOP        OTHER____

ADDRESS OR STREET WHERE OCCURRED:

TYPE OF LAW ENFORCEMENT (PLEASE CIRCLE):

LOCAL POLICE        SHERRIFF        BORDER PATROL        ICE        STATE PATROL        OTHER _____

STORY: WHAT HAPPENED

HOW HAS THIS EVENT AFFECTED YOU/YOUR FAMILY EMOTIONALLY? DO YOU ACT DIFFERENT NOW?

STORY INCLUDES:        911 CALL        INTERPRETATION        COURTHOUSES        WORKSITE        FEAR        RP

WHAT ITEMS WERE CHECKED (PLEASE CIRCLE):

ID        LICENSE        REGISTRATION        IMMIGRATION DOCUMENTS        OTHER _____

DO YOU FEEL THIS HAPPENED DUE TO YOUR RACE, RELIGION, OR ETHNICITY?        YES        NO        (COMMENTS ON BACK)

WAS ANYONE DETAINED?        YES        NO

IF IN HOUSE, DID OFFICER HAVE WARRANT FOR ARREST?        YES        NO

A# IF IN DETENTION CENTER:

REFERRED TO:        NWIRP        OR        OA LAWYER REFERRAL _____

OA FOLLOW UP NEEDED:        VIDEO TESTIMONY        VOLUNTEER        OTHER_____

CAN WE SHARE YOUR STORY AS *COMPLAINT* WITH US DEPT OF CIVIL RIGHTS?        YES        NO

ANNONYMOUS        OR        WITH CONTACT INFO

## WHAT DO YOU SEE?
### REPORT HUMAN RIGHTS ABUSES

**LOOK** for **3** things:

officer's name and badge number

license plate numbers

location and time of incident

You have the **RIGHT** to live free and without fear

Local police **DO NOT** have the right to ask about your immigration status

**NO ONE** has the right to discriminate based on your race, religion or nationality

We **CAN** hold law enforcement accountable
BE the VOICE of JUSTICE for ALL

HUMAN RIGHTS LINE **360-755-5349**

## ¿QUÉ OBSERVAS?
### MANTENTE ATENTO Y REPORTE LOS ABUSOS DE LOS DERECHOS HUMANOS

**FÍJATE** en **3** cosas:

nombre y número de placa del oficial de migración o policía

número de placa de coche

lugar y hora del incidente

Tu tienes el **DERECHO** a vivir libre y sin miedo

La policía local **NO** tiene el derecho a preguntar sobre tu estatus migratorio

**NADIE** tiene el derecho a discriminarte por tu raza, religión o nacionalidad

Todos **PODEMOS** hacer que la ley se cumpla de manera responsable SÉ la VOZ de JUSTICIA PARA TODOS

LÍNEA DE LOS DERECHOS HUMANOS **360-755-5349**

STB_AR1_010762

# Appendix—C

*People's Hearing Statement of Moral and Human Values*

*As part of the data collection process we held two community hearings where community members testified. The below was signed on to by hearing attendees in response to the evening's testimony.*

After tonight's People's Hearing, it is clear that we are faced with a moral crisis in northern Washington. We may not have the legal authority to remedy the many abuses brought before us, but as faith leaders, service providers, teachers, lawyers, and community members we are compelled to state plainly with the people's authority that policies that deny immigrants' dignity and humanity are not the values of our community. Tonight we have heard many testimonies from community members who are scared to drive to work, the grocery, or to their child's school for fear of being pulled over and CBP called to the scene. We have heard that the community no longer feels like 911 is a phone number for them. It is this fear that cloaks our towns that weighs the heaviest on us. The harassment and profiling of Latino and Muslim community members that result in senseless deportations and the separation of families must end.

In light of this moral crisis, we must ask ourselves what do we as a community believe? Will we stand on the side of racial profiling, exclusion, and fear or do we stand for equality for all, welcoming our neighbors and keeping families together, and love?

## The People's Hearing's Statement of Moral and Human Values

**We believe** that every member of our community, authorized or not, possesses inherent dignity, value, and inalienable rights.

**We believe** in the value of our immigrant community members for their contributions—for their love of family, faith, courage, perseverance, hard work, and economic contributions.

**We believe** that families are the foundation of our community and that the love and stability of a strong family are two of the most important ingredients needed to raise thriving children who will carry us into a promising future. We value all families and children. We oppose policies that result in deportation and the unnecessary separation of families. We oppose policies that generate such fear that children's access to health, nutrition, or other social services may be limited.

**We believe** that any person of goodwill—no matter their race, religion, or status—who (like all of us) is pursuing the best life possible for themselves and their family should never be followed, harassed, or needlessly pulled over by law enforcement or CBP on the way to work, school, community health clinics, or church services.

**We believe** that community safety and emergency services are for everyone and that to keep us all safe there must be trust between law enforcement and the immigrant community. For this reason, we believe that a routine emergency call to 911 in Spanish should never result in CBP serving as back up or translation. A call in Spanish (or any other language) requesting help should never again result in deportation, death, or panic. We must find another way to provide language access services in our community.

**We stand united** tonight as we say that without our region's immigrant families and workers our economic and moral fabric would not be as strong—our communities would not be the same. We call on our neighbors to stand with us in asking for accountability from the Department of Homeland Security, the Department of Justice, and our local law enforcement agencies. We ask that policies that violate our human and moral values are ended so that everyone in our community can live with freedom from fear.



STB_AR1_010763

STB_AR1_010764




Authors: Sarah Curry, Kendra Anderson, Angelina Snodgrass Godoy, Carolyn Pinedo Turnovsky / Editors: Pramila Jayapal and Sarah Curry

Graphic Design: Tracy Curley / Interactive Media: Otts Bolisay / Photography by: Alex Montalvo

Find this report online at: WeAreOneAmerica.org/northern-border

OneAmerica, formerly Hate Free Zone, is a 501(c)(3) non-profit organization that advances the fundamental principles of democracy and justice by building power within immigrant communities

STB_AR1_010765

# Section 1: Introduction, Landscape, and Methodology

Post 9/11: Increased Enforcement Near Northern Border

The patterns of abuse documented in this report reflect broader national trends in recent decades, whereby concerns about immigration and national security have resulted in the channeling of increased resources to the Department of Homeland Security (DHS). Some key statistics indicate the dramatic increase in enforcement along the northern border.

**Funding for Customs and Border Protection (CBP) soared post-9-11.** In fiscal year 2003, CBP was allocated $5.9 billion. In FY2007, CBP's budget ballooned to $7.7 billion and expanded another 52 percent to $11.7 billion in FY2012 (Batalova and Lee 2012).

**Since 9/11, the number of agents deployed along the northern border has increased dramatically**—from 340 in FY2001 to 2,069 in FY2010 (Congressional Research Service 2010). In Blaine sector, the focus of our report the number of agents increased from 48 in 2001 to 327 in 2010. There is now one CBP agent for every two miles of northern border compared to one agent for every 13 miles in 1999. Staffing has increased 589%, while apprehensions have decreased 75.6%—this is often a statistic cited for how increased enforcement has been effective. However, using decreasing apprehensions as a measure of border security ("prevention through deterrence") is problematic, as migration flows can be impacted by many factors including economic slowdowns. While much of the increased enforcement has been justified as necessary because of its connection to national security, a systematic review of all terrorism-related prosecutions occurring in Washington State since 9/11 show that of 43 prosecutions for terrorism in Washington State since 2001, zero have been referred to the courts by the Border Patrol.

**While Border Patrol, as the "men in green," may be more visible along the northern border, Immigration and Customs Enforcement's (ICE) role in detention and deportation, fueled by their soaring budget, cannot be overstated.** In FY 2003, the total ICE budget was $3.3 billion. By 2007, the budget had increased 44 percent to $4.7 billion. By 2012, it had climbed another 25 percent to $5.9 billion. ICE staffing has also grown steadily. In 2005, there were 15,000 employees. By 2009, staffing had increased nearly 27 percent with 19,000 employees.

A series of recent memos on prosecutorial discretion by ICE Director John Morton gives guidance to ICE agents, officers, and attorneys to use prosecutorial discretion at any point during the enforcement process, including when deciding who to question and stop, in order to utilize ICE resources to focus on threats to national security and public safety. However, this guidance has yet to be fully implemented with visible results on the ground. Current ICE and CBP practices only lead to a wider dragnet for deportation of people who are not threats to public safety.

**Immigrants are being deported in record numbers under the Obama Administration (about 400,000 a year).** The Administration is focused on "criminal aliens," but data shows that of all "criminal aliens" for whom ICE obtained a removal order last year, only 25% were for aggravated felonies. The remaining 75% of this category of people were deported under some other crime-related deportation ground which can include many low-level misdemeanors (e.g. shoplifting or minor traffic offenses).

**Individuals in deportation proceedings with criminal charges in Washington State's immigration courts is lower than the national rate** with only 13.3% of individuals in 2010 and compared to 16.5% nationwide. The majority of individuals in proceedings have only immigration charges.

## Methodology

**This report's dataset contains 109 interviews** that uncovered 135 incidents reported by Latinos and Muslims/Arabs across Skagit, Whatcom, and Snohomish counties.

**Two OneAmerica base group leaders and OneAmerica's Lead Organizer were trained in human rights documentation at American University's Law School in Washington, DC.** They then trained other members of the base groups and developed a shared methodology that all could use to document reported abuses.

**OneAmerica reached the community by doing our research where immigrants live and work.** Trained leaders knocked on doors at trailer parks and apartment complexes and visited migrant camps, worksites, and grocery stores. They contacted trusted institutions such as local churches, domestic violence service providers, a community health clinic, and a Spanish-language radio station, and asked for them to refer community members to the OneAmerica human rights hotline.



STB_AR1_010714

# Section 2: Patterns of Abuse

*Pattern of Abuse 1: Border Patrol's Use of Racial Profiling*

Our research documented numerous accounts of the Border Patrol engaging in apparent racial and religious profiling in the northern border region. In interviews, community members described a large number of incidents in which CBP stopped individuals for no discernible reason other than their appearance, accent, or perceived inability to speak English.

**82 of the incidents reported to us involved being asked for papers by CBP either while driving or at a public location.** Community members reported that without reason to suspect unlawful activity, the Border Patrol regularly approaches people who appear to be Latino for such questioning in numerous public locations including gas stations, ferry terminals, the Greyhound station, the Bellingham airport, or outside of Wal-Mart.

**25 accounts from community members involved questioning by Border Patrol agents who had followed Latino drivers on the roads.** Specifically, community members reported that CBP often waited outside fields and then followed workers when they left. In some case, individuals were followed to their homes.

**In total, 63 incidents reported involved apparent racial profiling by CBP.** There is a clear perception among community respondents that the Border Patrol selectively target certain ethnic groups with these practices. Community members who experienced these incidents consistently reported that the only explanation for their targeting was that they looked Latino or like "workers."

Our research also documented concerns about religious profiling among members of the Muslim community, both during border crossings and while driving in the border area.

*Pattern of Abuse 2: Dangerous Fusion—Collaboration Between Border Patrol and Local Law Enforcement and Other Agencies*

Many of the incidents reported did not arise from the Border Patrol's independent enforcement activities, but from the complex interface between Border Patrol and other federal and local agencies. Three types of cases emerged from our research, involving the Border Patrol's collaboration with local law enforcement, with 911 emergency services, and with local courts.

**Border Patrol agents routinely provide backup and language interpretation when requested to do so by local police.** About 38% of all incidents reported to OneAmerica involved CBP acting as interpreters. Once on the scene, Border Patrol agents routinely asked for the immigration status of the present individuals. Sometimes, Border Patrol only checked immigration status in these situations, failing to interpret at all.

**As a result of these practices, requiring language access services during a routine traffic stop can result in detention and deportation.** In over twenty cases community members reported individuals who were pulled over by local law enforcement for a broken taillight, loud muffler, or a failed turn signal had been detained when CBP arrived to interpret.

**Border Patrol's "interpretation practices" raise concerns about racial and ethnic profiling.** Because language interpretation is the most frequent justification for the Border Patrol's involvement in everyday policing, not all communities experience this level of immigration scrutiny—only those who are believed to speak Spanish. In many cases, even those who speak English are subjected to this scrutiny when they appear Latino or have a "Latino-sounding" last name.

STB_AR1_010715

**Fusion of local law enforcement with CBP has dire consequences for community safety.** As one community member, Ira, explained to us, "People are afraid to call the police for help because they know they are connected to immigration. It's hard to tell apart who is who because we feel they [local law enforcement and federal immigration] are the same."

**For the cities of Blaine, Lynden, and Sumas, the Border Patrol provides dispatch services for 911 calls, and on occasion arrives at the scene of the incident alongside – or even before – first responders.** As with driving incidents, although the Border Patrol's ostensible purpose in emergency situations is to provide interpretation and backup, they do not set aside their objective of immigration enforcement even in emergency situations.

**CBP collaborating with law enforcement either as emergency response personnel or as interpreters has had lethal consequences.** The February 2011 death of Alex Martinez and the June 2011 death of Benjamín Roldán Salinas are troubling examples of the dangerous effects of these practices. Had interpretation been provided by a neutral party in these instances, perhaps the outcomes would have been different.

**Numerous individuals reported Border Patrol's presence in or near courthouses, particularly in Lynden.** The selectivity of this tactic – the reported presence of agents on days when Spanish-language interpretation is provided, and their reported targeting of Latinos – suggests that this particular community's access to justice is weaker than that of other communities, raising concerns about equal protection under the 14th amendment.

*Pattern of Abuse 3: CBP Creates Climate of Fear and Unsafe Communities*

**Feelings of fear and anxiety were reported in nearly 70 percent of the incidents we documented.** Fear did not simply extend to immigration enforcement, but the community memebers were clearly fearful of the police, emergency services, and other agencies whose operations are vital to the health and safety of all people in our communities. Specific practices of the Border Patrol and its partner agencies, especially local law enforcement, have contributed to this climate.

**These practices have erected barriers to the trust and relationships necessary for effective crime-fighting in any community.** Communities find themselves unable to access vital services like emergency assistance and police protection.

**The outlined collaboration has also undermined the efforts of those seeking to protect victims of domestic violence or worksite abuses.** As one employee from a domestic violence agency along Washington's northern border told us, "There is intense fear among victims to call out of fear that their spouse, children, or others will be put in danger of deportation."

**If the court system represents one end of the community safety spectrum and calling 911 or the police represents the other end, migrant workers find themselves unable to trust the system at either entry point.** Resource-sharing and collaboration becomes a grave concern when it imperils communities' ability to enjoy basic civil liberties and defend their rights, even in situations that threaten their very lives.

**Along the northern border, there are mixed status families but also mixed status churches, schools, and neighborhoods.** Behavior by CBP is pervasive and causes anxiety for Latino children and residents. U.S. citizen children are deeply impacted by the climate of fear, the lack of access to services and protection, and, in some cases, by a parent's deportation.

**U.S. Citizen Latino youth struggle with how to process racial profiling incidents such as being asked for immigration papers.** These youth identify strongly with America and they struggle with how to deal with feelings of alienation and discrimination in their home country. They cannot reconcile what has happened to them or could happen to them with what they believe America to be.



# Section 3:

Conclusion and Policy Recommendations

*The practices documented in this report suggest that communities of color in Washington State find themselves fearful of the very agencies that are entrusted with their protection, as a result of some systematic patterns of practice by CBP. The following are key policy recommendations contained in this report.*

## Recommendations for Department of Homeland Security Customs and Border Protection

☑Implement a CBP-wide sensitive locations policy similar to ICE that restricts enforcement at sensitive locations, including schools, hospitals, places of worship, public religious ceremonies, public demonstrations, and courthouses.

☑Implement a written policy that clearly outlines that CBP will not engage in enforcement during assistance with emergency checkpoints, health epidemics, or natural disasters.

☑CBP must bring its enforcement practices in line with Department of Homeland Security stated priorities to focus on individuals who are threats to public safety.

☑While the 100-mile rule is enacted by statute, reforms are necessary for operations in regions along the border. CBP agents should not arbitrarily stop, question or arrest individuals without reasonable suspicion or probable cause that the individual has entered the United States illegally.

☑CBP should adopt a policy barring the use of agency personnel and resources to perform civilian law enforcement functions and state and local police officials should not be engaged in Border Patrol operations. CBP should not respond to routine law enforcement calls such as traffic incidents or serve as emergency response. CBP should not serve as interpreters or, at a minimum, must develop a written code of conduct with clear expectations.

☑CBP must increase its transparency. CBP should provide transparent and accessible information on stops—even those that do not result in a deportable offense—as well as developing metrics other than apprehensions to measure the effectiveness of its policies.

☑All CBP officers should receive periodic use of force and de-escalation techniques training. Training should

include specific instruction on U and T visas, asylum and refugee status, as well as Violence Against Women Act visas.

☑DHS Office of the Inspector General should undertake a broad investigation of CBP's practices.

## Recommendations for the Department of Justice

☑Reform the Department of Justice 2003 "Guidance Regarding the Use of Race by Law enforcement by Federal Law Enforcement Authorities" DOJ Guidance to improve protections for those affected by profiling practices at the border including prohibition of racial profiling based on national origin, language and religion, among other reforms.

☑Investigate CBP's interior enforcement practices in and outside courthouses and the use of CBP as interpreters or as emergency response and whether these practices limits meaningful access of Limited English Proficient individuals to 911, emergency services, and the courts under TITLE VI of the CIVIL RIGHTS ACT of 1964.

## Recommendations for U.S. Congress

☑Do not increase appropriations at the northern border until an investigation has been completed examining the use of resources along the northern border.

☑Move forward immediately with the reauthorization of the Violence Against Women Act, including the strongest protections possible for immigrant women by renewing and strengthening the U visa program.

☑Move forward swiftly with Comprehensive Immigration Reform that provides an earned path to legalization for the millions of undocumented immigrants in the U.S., which will offer relief to mixed status families, power to workers to end worksite exploitation, relief to scrupulous businesses who contribute to the economy; and clearer lines of communication between immi-



grants and law enforcement to improve community safety.

Co-sponsor and pass the End Racial Profiling Act of 2011 (s.1670 & h.r. 3618), which would prohibit the use of profiling based on race, religion, ethnicity or national origin by any federal, state, local or Indian tribal law enforcement agency.

### Recommendations for Washington State

State and local police should refrain from asking immigration status.

State and local police should refrain from enforcing federal immigration laws, including by engaging in interior enforcement operations with Border Patrol agents and requesting translation assistance from Border Patrol. State and local law enforcement should also work to end practices and programs that undermine the bright line between federal immigration enforcement and local law enforcement, such as the Secure Communities program or the honoring of ice detainer holds by local governments.

Local Law Enforcement Agencies should draft language access plans to ensure they meet title vi regulations. The use of cbp as interpreters should not be used as part of an agency's language access plan. A code of ethics for law enforcement interpreters should be developed by waspc.

State legislature and local governments should support local police departments by prioritizing the resources local law enforcement offices need to provide language access.

The Governor and Attorney General should monitor cbp's interior operations to ensure that the rights of Washington's residents are protected.

STB_AR1_010718

STB_AR1_010719



# Introduction

Northwest Washington is known for its dramatic beauty, with fields of tulips and snow-covered mountains. Fertile agricultural land allows for the cultivation of diverse fruits and vegetables, including raspberries, blueberries, broccoli, and mushrooms. In this area, as in many parts of Washington State, agriculture is a key contributor to the economic vitality of the region.

Much of the cultivation in this area is performed by immigrant workers, many of whom live with or without their families in migrant camps, in small cement houses with rooms that have either bunk beds or one bed for the whole family. Other workers live in the small towns and cities that dot the landscape. Wherever they live, these immigrant workers often work long, 10-16 hour days in the fields. They are generally paid by the pound. The work is extremely difficult, and while sometimes labeled as "unskilled work," in reality, farmers report that picking fruit and vegetables efficiently requires tremendous skill and experience. Workers are grateful for the opportunity to work, even though the work is difficult. As one woman explained in a recent interview, "We need the money for our families, and we are hard-working people who will do this work."

Workers hold various immigration statuses, as is the case across the country. Some are U.S. citizens who have lived in the area for a decade or more. Some are legal residents who have yet to get their citizenship. Some are undocumented and travel between multiple states, while others live in Washington State year-round and have for decades. In many cases, immigrants live in mixed-status families, meaning that one person may be undocumented, but relatives may be citizens or legal permanent residents.

Even as federal immigration reform policy has stalled in Congress, there has been a surge of resources toward increasing immigration enforcement both along the border and in the interior. As federal funding for Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) has increased, so has the activity of these agencies in the northern border region. Where previously it was perceived that because of the importance of agriculture to the area CBP would not enter the fields, one grandmother reports that immigration enforcement came into the field where her family works and grabbed her son by the neck. Workers also report an increased likelihood of getting picked up by immigration officials towards the end of the agricultural season, stating that CBP vehicles often sit outside of the fields during this time of year. Lately, smaller farms have begun nailing up "private property" signs in the hopes of combating this practice.

OneAmerica has been working to advance democracy and justice since 2001. We have worked on numerous issues involving immigrant rights over the past ten years. About three years ago, based on numerous reports of increased enforcement of CBP and ICE officials in the northern border region, we decided to document some of the racial profiling and abuses of human rights that were being reported by community members so that we could understand the scope and scale of these reports. We received training in human rights documentation that informed our methodology and interview practices. We also established a collaboration with the Center for Human Rights at University of Washington to bring additional expertise with human rights documentation and principles into the project.

This report documents the findings from over a year of on-the-ground interviews, observation, and research in border communities. It shares the stories of many of the workers we met and the transformation of their communities in the wake of the post-9/11 buildup of U.S. Border Patrol activity in the area. It is clear throughout that there is tremendous fear, mistrust, harassment, and abuse. It is also clear that there are specific—and

STB_AR1_010720

avoidable—patterns of abuse by the U.S. Border Patrol, working in close coordination with Immigration and Customs and Enforcement and local and federal law enforcement agencies.

In particular, this report calls attention to three problematic and interrelated patterns of practice. First, in its own independent operations, the Border Patrol engages in systematic profiling of religious and ethnic minorities. Second, collaboration between CBP and other agencies, including local law enforcement, emergency responders, and the courts, results in a confusing and dangerous fusion where vital services are perceived as immigration enforcement. Third, these first two patterns result in another: CBP's behavior and dangerous partnerships with other agencies have created extensive fear and mistrust, leading to community members' unwillingness to call 911, access the courts, and even leave their house to attend worship services or fulfill basic needs.

We believe strongly that no one should be afraid to call 911, suffer religious or racial profiling, or forfeit their rights because of where they live and work. We recognize that the anti-immigrant climate and the lack of comprehensive federal immigration policies that would resolve deep issues with our current immigration system play strongly into what happens on the ground. However, lack of federal comprehensive immigration reform is no reason to tolerate racial profiling or other practices that constitute human rights abuses.

To conclude this report, we will offer policy recommendations aimed at correcting these wrongs while still protecting our borders; improving CBP's ability to carry out its mission; and protecting the safety and rights of all who live in these communities.

## Washington's Northern Border

Washington State is covered by two Border Patrol sectors. The Blaine sector includes Western Washington, Alaska and Oregon, while the Spokane sector covers Eastern Washington, Idaho, and western Montana up to the Continental Divide. CBP asserts the authority to conduct stops not only at the border itself, but within a 100-mile radius of the border. For this reason, communities living near the border are subjected to a level of scrutiny not found elsewhere in the interior.

The incidents documented in this report take place in specific communities in the Blaine sector, where OneAmerica has an active presence. However, they did not occur in isolation. For example, here in Washington State, similar concerns have been reported on the Olympic Peninsula near Forks by the Forks Human Rights Group. And beyond our state, in 2011, a coalition of groups from Washington, New York, Maine, Wisconsin, Michigan, and Ohio formed to call national attention to the growing human and civil rights crisis in northern border communities. While local patterns of border enforcement vary, some identifiable patterns emerge, including the systematic targeting of people of color, especially Latino and Muslim American communities.



STB_AR1_010721

# Landscape: Post 9/11:

Increased Enforcement Near Northern Border

---

The Department of Homeland Security was created in direct response to the attacks of September 11, 2001, and, consequently, the activities of the agency are predominantely cast in terms of national security. Since 9/11, national security concerns have resulted in the channeling of increased resources to Immigration and Customs Enforcement and to Customs and Border Protection for immigration enforcement.

## Customs and Border Protection (CBP)

The United States Border Patrol (USBP) is a branch of Customs and Border Protection (CBP) housed within the Department of Homeland Security (DHS). Its primary mission is to prevent "terrorists and terrorist weapons, including weapons of mass destruction, from entering the United States," to patrol the 8,000 miles of American international borders with Mexico and Canada, and to guard coastal waters around Florida and Puerto Rico (Border Patrol Website 2011, Nuñez-Neto 2008). The USBP first implemented a National Strategic Plan in 1994, when it was still part of INS (Immigration and Naturalization Service). In 2002, the Homeland Security Act merged interior and border enforcement functions of different agencies to form the Directorate of Border and Transportation Security (BTS) within the Department of Homeland Security. The 2002 Act subdivided BTS, and Border Patrol was placed within the Bureau of Customs and Border Protection (Nuñez-Neto 2008: 1).

Federal resources allocated to border control have increased markedly in recent decades, even as the strategies employed by border enforcement agents have changed. A study in 1993 commissioned by the Office of National Drug Control Policy concluded that the southwest border was excessively vulnerable to illegal immigration and recommended that the then-INS change its focus from arresting unauthorized immigrants to preventing their entry (Nuñez-Neto 2008). This operational strategy was known as "Prevention Through Deterrence." In other words, by increasing the number of agents and resources in a sector, the CBP intended to decrease the number of unauthorized mi-

grants apprehended. Using the decreasing number of apprehensions as evidence for effective border security policy is troubling as flows of migration are dependent on many conditions, including the political and economic conditions in the country of origin and the U.S. economy's labor demand. Economists have pointed out that apprehensions and labor demand mirror each other with economic slowdowns corresponding with decreasing numbers of apprehensions (Meissner and Kerwin 2009).



Blaine Sector Apprehensions & Staffing (1999-2011)

Source: CBP.gov U.S. Border Patrol Statistics

This emphasis on deterring unauthorized immigration is a key component of Border Patrol's strategy, and helps to explain the growth in funding for the agency during the past two decades despite CBP agents reporting boredom and little to do. In July 2011, Christian Sanchez, a CBP agent who transferred to Washington State from San Diego, testified in front of the Congressional Transparency Caucus about his experiences working on Washington's northern border region on the Olympic Peninsula:

> "When I arrived at my station there was rarely any casework to be done, if at all, so I just roved from X to X, wasting gasoline. Today this has not changed and there still is rarely any casework to do, if any, and we agents are bored. But what has changed is that the number of agents in an office that formerly completed its background support

STB_AR1_010722

Landscape: Post 9/11

duties with a staff of four has grown to over 40 and is still increasing. We are now refurbishing an existing building, for $8 million, as our new facility which will house 50+ agents."

Sanchez testified in front of Congress as a watchdog because he thought funding to cbp was not being used appropriately. Funding for Border Patrol multiplied sevenfold from 1980 to 1995, and then tripled from 1995 to 2003 (Nunez-Neto 2008; Reyes, Johnson and Van Swearingen 2002). In Fiscal year 2003, cbp was allocated $5.9 billion. In fy2007, cbp's budget ballooned to $7.7 billion and expanded another 52 percent to $11.7 billion in fy2012 (Batalova and Lee 2012).

In 2000, the Office of the Inspector General (oig) in the Department of Justice published a report criticizing Border Patrol's performance at the northern border. But it was not until the tragic events of 9/11 that the security of the U.S.-Canada border was prioritized. Heightened fear and, in some cases, misinformation also played a role in the buildup. In 2002, the oig in light of its earlier conclusions and prompted by the events of September 11, 2001, published a follow-up report urging the Border Patrol to revise its national strategy (u.s. Department of Justice 2002). Additionally, the 9/11 Commission pointed out that the northern border received little attention from Congress or the White House prior to September 11, 2001 and that the northern border lacked a coherent strategy (9/11 Commission Report 2004). They recommended distributing cbp's manpower with more parity and rebalancing priorities, and suggested that Congress and the then-INS's focus on unauthorized immigration was myopic. A greater concentration of effort on "potential terrorist threats" was needed (Congressional Research Service 2011).

The usa patriot act of 2001 (p.l. 107-56) mandated that Border Patrol increase the number of agents along the northern border, and prescribed the improvement of monitoring technology. Since 9/11, the number of agents deployed along the northern border has increased from 340 in fy2001 to 2,069 in fy2010 (Congressional Research Service 2010). In Blaine sector, the number of agents increased from 48 in 2001 to 327 in 2010. In the Spokane sector, the number of agents increased from 39 to 255 during this time period. Both sectors thus experienced more than a six-fold increase in staffing between 2001 and 2010. This spike in personnel is partly due to the 2006 Intelligence Reform and Terrorism Prevention Act (p.l. 108-458) that "required that 20% of the Border Patrol's annual increases in manpower be assigned to the northern border" (Nunez-Neto: 21).



Source: CBP.gov U.S. Border Patrol Statistics

STB_AR1_010723

In reality, since FY2006 only 12% of the overall increase in manpower has been deployed to the northern border (Congressional Research Service 2010). Even so, in 2012, along the northern and southern borders there are now over 21,000 Border Patrol, double the 10,000 staffing the border in 2004 (Batalova and Lee 2012). **There is now one CBP agent for every two miles of northern border compared to one agent for every 13 miles in 1999.**

The new National Border Patrol Strategy, released in 2004, responded to these post 9-11 concerns. Following the formation of its new parent agency, U.S. Customs and Border Protection (CBP), the Border Patrol's priority mission is now aimed at enhancing national security and geared toward preventing the entry of terrorists and terrorist weapons, while maintaining its traditional objective of preventing unauthorized immigrants, individuals engaged in smuggling activities, narcotics, and other contraband from entering the United States (U.S. Customs and Border Protection 2004). While the Border Patrol acknowledges that most apprehended immigrants are just "economic migrants," the agency holds that the "everpresent threat" of terrorism and the possibility that potential terrorists could "employ the same smuggling and transportation networks, infrastructure, drop houses, and other support" and "use these masses of undocumented immigrants as cover for a successful cross-border penetration" justifies the focus on interior enforcement and its disparate effects on these economic migrants (National Border Patrol Strategy 2011).

The Department of Justice identifies particular challenges or threats to securing the border with Canada; factors such as the magnitude of the U.S.-Canada border, its varied and challenging geography, and the general lack of large United States population centers along the northern border, represent some of these challenges (U.S. Department of Justice 2002, Nunez-Neto 2008). To meet these, the Border Patrol emphasizes the need for cooperation with Canadian authorities, utilizing intelligence, and continued "testing, acquisition, and deployment of sensing and monitoring platforms... to effectively address the northern border threat situation" (U.S. Customs and Border Protection 2011: 17). Although resources allocated to the northern border have increased significantly since 9/11, the agency asserts that its ability to fulfill its missions at the northern border remains limited (U.S. Customs and Border Protection 2011).

However, a systematic review of all terrorism-related prosecutions occurring in Washington State since 9/11 show that **of 43 prosecutions for terrorism in Washington State since 2001, zero have been referred to the courts by the Border Patrol,** suggesting that the agency's overzealous enforcement activities and ballooning are not only dangerous, but unnecessary.

## Immigration and Customs Enforcement (ICE)

While our report centers primarily on patterns of abuse that emerged from behavior by CBP, it is important to note the role of Immigration and Customs Enforcement (ICE). Soaring funding has also increased the presence of ICE in the northern border region. ICE operates within the interior—including the 100 mile zone—creating an influx of federal enforcement to the region. (For incidents reported involving ICE entering fields or even questioning a Latino student at his community college see appendix). ICE's interior enforcement functions include the investigation, detention, and removal of unauthorized immigrants. While CBP, as the "men in green," may be more visible along the northern border, ICE's role, fueled by their soaring budget, cannot be overstated.

In FY2003, the total ICE budget was $3.3 billion. By 2007, the budget had increased 44 percent to $4.7 billion. By 2012, it had climbed another 25 percent to $5.9 billion. Their personnel has grown steadily as well. In 2005, there were 15,000 employees. By 2009, staffing had increased nearly 27 percent with 19,000 employees.

ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration. *ICE Strategic Plan FY 2010-2014* lays out four mission priorities between fiscal years (FY) 2010 and 2014:

(1) Preventing terrorism and enhancing security;

(2) Securing and managing our borders;

(3) Enforcing and administering our immigration laws; and

(4) Constructing an efficient, effective agency.

Objectives outlined in the strategic plan include: ICE targeting aliens who pose a threat to national security for apprehension and removal from the United States (Objective 1.2); dismantling cross border criminal networks used for organized alien smuggling (Objective 2.2), human trafficking (Objective 2.3), and drug trafficking (objective 2.4); supporting the apprehension, detention and removal of *newly* arriving aliens seeking to enter illegally (Objective 3.1); prosecuting and removing criminals and gang members (Objective 3.3); and using resources wisely (Objective 4.4).

STB_AR1_010724

Landscape: Post 9/11

Starting in June 2011, ICE released a series of memos providing guidance on exercising prosecutorial discretion on who it investigates, detains, and removes. Prosecutorial discretion has existed for decades, but the Morton memo served as a firm reminder that resources used to detain and deport individuals should align with the agency's mission and prioritize the removal of individuals who constitute threats to national security and public safety. The 2011 memo advised ICE agents, officers, and attorneys that they have the authority to exercise prosecutorial discretion at all stages of the process, including before an individual's case goes to court. This includes decision on who to stop, question, or arrest and who to provide expedited removal. ICE Director John Morton outlined a number of factors to consider when determining whether to prosecute and remove an individual including: "the person's pursuit of education in the U.S.; the circumstances of the person's arrival in the U.S.; the person's length of presence in the U.S.; whether the person or any immediate relative has served in the armed forces; the person's ties and contributions to the community; whether the person has a U.S. citizen or permanent resident spouse, child, or parent; the person's age; and whether the person is likely to be granted some sort of temporary or permanent relief from removal."

On August 18, 2011 Secretary of DHS Janet Napolitano announced a plan to begin the implementation of the priorities outlined in the Morton memo—an interagency working group would convene to review nearly 300,000 pending removal cases to assess whether each case meets the high priority factors set forth in the June 2011 memo. Those cases would then be eligible for administrative closure. Three months later, in October 2011, Secretary Napolitano testified in front of the House of Representatives Judiciary Committee reiterating her earlier announcement that resources should be focused on DHS' highest priorities. She also shared that a benefit of exercising prosecutorial discretion would be that great resources could be directed at the border: "Likewise, the civil enforcement prioritization will enhance ICE's partnership with U.S. Customs and Border Protection (CBP). Over the past few years, ICE has worked closely with CBP to increase efforts to prevent illicit trade and travel across our borders. This partnership includes the dedication of ICE officers, agents, and detention facilities to the apprehension and detention of recent border crossers" (Napolitano 2011) This announcement is particularly concerning given the findings that are outlined in this report.

Recent data released by the Transaction Records Clearinghouse (TRAC) actually shows that ICE is not prioritizing "serious criminal aliens." Over 1 million people have been deported since the Obama Administration came into office, nearly 400,000 last year. The majority of the deportees last year were designated as "criminal aliens." But data shows that of all "criminal aliens" for whom ICE obtained a removal order last year, only 25% were for aggravated felonies. The remaining 75% of this category of folks were deported under some other crime-related deportation ground which can include many low-level misdemeanors (e.g. shoplifting or minor traffic offenses).

Examining deportation proceedings initiated during 2010 and 2011 tells a similar story. ICE is targeting relatively few criminals for deportation. Across the nation, in 2010, "criminal aliens" only accounted for 16.5% of individuals charged and constituted even less in 2011 (14.9%). Washington State has slightly lower proportion of individuals charged as criminals in deportation proceedings with 13.3% of individuals charged in 2010 and 13.8 % charged in 2011 (TRAC Database).

| DEPORTATIONS PROCEEDINGS INITIATED BY ICE IN U.S. AND WASHINGTON STATE IMMIGRATION COURTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| MOST SERIOUS ICE CHARGE | NUMBER | | | | PERCENT | | | |
| | FY2010-U.S. | FY2010-WA | FY2011-U.S. | FY2011-WA | FY2010-U.S. | FY2010-WA | FY2011-U.S. | FY2011-WA |
| TOTAL INDIVIDUALS CHARGED-U.S. | 245,706 | 8,092 | 226,342 | 7095 | 100% | 100% | 100% | 100% |
| NATIONAL SECURITY/ TERRORISM | 42 | 0 | 30 | 0 | 0% | 0% | 0% | 0% |
| CRIMINAL | 40,500 | 1079 | 33,763 | 979 | 16.50% | 13.30% | 14.90% | 13.80% |
| IMMIGRATION ONLY | 201,340 | 6,955 | 188,770 | 6,075 | 81.90% | 85.90% | 83.40% | 85.60% |

Source: TRAC interactive database: U.S. Deportation Proceedings in Immigration Courts

STB_AR1_010725



In this context, the definition and tracking of removals of "criminal aliens" becomes almost meaningless because it is so broad. The numbers contradict DHS' priorities, the recent memos on prosecutorial discretion, and statements from the President, including comments made during his May 2011 speech in El Paso, Texas. As he addressed the community that had gathered near the southern border he said,"[W]e are focusing our limited resources on violent offenders and people convicted of crimes; not families, not folks who are just looking to scrape together an income."

STB_AR1_010726

# Methodology

This report draws on OneAmerica's history of organizing in immigrant communities in Washington State, and was made possible by established relationships of trust and mutual support between OneAmerica personnel, volunteers and research participants. Incidents were documented by OneAmerica's Lead Organizer and members of the OneAmerica Skagit and Whatcom base groups. The OneAmerica base groups consist of community members who are long time community activists and leaders. They work in the area as farmworkers, at housing service provider agencies or are religious leaders. They are deeply entwined in the local communities, living, working and attending church in the area. This project came into being because of the increasing number of reports from OneAmerica base group leaders from border communities, who reported concerns about widespread fear and anecdotes of abuse in their communities but lacked systematic informa-

tion about the frequency of these incidents, the agencies responsible, and therefore how these concerns might be addressed.

In order to better understand and document the problem, and therefore to propose viable solutions, OneAmerica's Lead Organizer and two OneAmerica base group leaders were trained in human rights documentation at American University's Law School in Washington, DC in early spring 2011. They then trained other members of the base groups and developed a shared methodology that all could use to document reported abuses. This methodology drew on a shared incident form (*See Appendix-B*), and the establishment of a human rights card (*See Appendix-B*), and the establishment of a human rights hotline. In addition, digital recorders, flipcams, and cell phone cameras were used to record testimony. Throughout



STB_AR1_010727

2011, trainings were repeated as new volunteers and affected community members became involved in recording their own experiences. On weekends these trained leaders knocked on doors at trailer parks and apartment complexes and visited migrant camps. They also visited worksites and well-known grocery stores and businesses, and contacted trusted institutions such as local churches, domestic violence service providers, a community health clinic, and a Spanish-language radio station, and asked them to refer community members to the human rights hotline. Trained leaders also hosted "know your rights" presentations in the community and a fair with local service agencies.

As word got out that OneAmerica was collecting stories about human rights violations, immigrants increasingly called our Lead Organizer and base leaders' cell phone numbers to report incidents. Our leaders responded to each call received, and followed up by visiting the family to interview them or give more information. When incidents were first reported from a second hand source, like a friend or coworker or social service provider, leaders would then follow up by contacting the victim, his/her family, neighbors, and even the local church, to try to corroborate all accounts. The strength of the immigrant community's social networks in the northern border region, and the trust we established with key leaders, allowed us to follow up on second hand reports to make sure we recorded the facts accurately.

While we conducted countless informal conversations of community members and service providers, our dataset includes only the 109 interviews and 135 documented incidents that were recorded and utilized an incident form. While we did conduct 15 initial interviews with immigrants from Ukraine, Russia, Romania, China, and Canada as well as practicing Sikhs, they did not share racial profiling incidents or human rights concerns. The 109 interviews that the report is based on include only the interviews we conducted with members of the Latino and Muslim/Arab communities with the exception of an incident reported by a Cambodian man and an incident observed by a white member of the community.

The documentation used in the report is also limited to incidents that occurred in Skagit, Whatcom, and Snohomish counties. These include incidents that took place in the small border towns of Custer (5), Ferndale (6), Lynden (47), Sumas (2), Blaine (1), Everson (18), Nooksack (1), Maple Falls (1), Sedro Wooley (3), La Conner (1), the Blaine border crossing (4), and in the larger cities of Bellingham (29), Mount Vernon (10), Burlington (1), and Anacortes/Friday Harbor (4).

Additionally, we held two hearings where testimony was collected. In January 2012, OneAmerica and community partners hosted the People's Hearing in Lynden, WA, and testimony from faith leaders and community members provided at the hearing is included in the report. In May 2010, OneAmerica, Council on American Islamic Relations (CAIR-WA), and a national coalition, Rights Working Group, hosted a Racial Profiling Hearing in Burlington, WA. This hearing was essential as Latinos and Muslims testified about racial profiling encounters and provided urgency for moving forward with the Advancing Human Rights at the Northern Border project. While we include a few testimonies as community profiles in the appendix, these testimonies are not included in the body of the report as we had not yet developed and been trained in human rights methodology. In the weeks that followed the initial hearing, we utilized convenience and snowball/referral sampling. This resulted in interviewers delving deeply into the experience of the Latino community in Northwestern Washington. While the report centers on these experiences, we must note that it is clear from the initial hearing that the Muslim community has also been deeply affected by the increase in enforcement activity along the northern border.

In this report, we share the names of those who agreed to have their names published; some respondents preferred to only have their first name published, and others asked that we share their testimony anonymously. In the case that a respondent asked for their name to not be disclosed we have italicized the pseudonym the first time it is used.

Additionally, we collaborated with a team of sociologists at the University of Washington Center for Human Rights who helped conduct follow-up interviews with key informants and analyze the broader patterns revealed in the qualitative and quantitative data gathered through our fieldwork. UW researchers also helped document the broader history of the Border Patrol's buildup in the region, track prosecutions stemming from arrests in the Blaine sector, and seek access to information about Border Patrol activities through a Freedom of Information Act (FOIA) request, which remains pending today.

STB_AR1_010728



# Pattern of Abuse 1:

### Border Patrol's Use of Racial Profiling

**Public Transportation:
Questioned in the Midst of a
Medical Emergency**

Luz Aguilar's car was stopped as her family was boarding the Anacortes ferry. Luz's husband's hand had been severely cut and Luz and her family were in a desperate rush to catch the next ferry and seek emergency medical attention at a hospital; they had been told to do this by the doctor they'd consulted moments before. At the ferry, CBP stopped them to ask the whole family, including her U.S. citizen son Luis, for their papers.

"My husband was not well because he had a cut on the hand and I was taking him to the hospital. They [CBP] did not let us go fast even though we were carrying a note from the doctor. 'How is it that you are stopping us? You are seeing our work permit. We brought the immigration papers from our lawyer, the case number that we have been waiting for residency' and still they told us no. They made themselves seem crazy. Soon one more [Border Patrol agent] came and I got out of the car. I was very upset and I told him, 'You know that this is illegal. Right now I'm calling my lawyer.' I called my lawyer and I turned on the speaker of my cell phone and she told him, 'In this moment, let my clients go, because my clients are legal to be here in this country.' And that was the only way that they would let us leave—having the papers, and talking with my lawyer."

Luz has since adjusted her immigration status. Despite the fact that U.S. citizens are not required by law to carry proof of citizenship, she carries her son's birth certificate with her at all times.

Our research documented numerous accounts of the Border Patrol engaging in apparent racial and—in the case of Muslims—religious profiling in the northern border region. In interviews, community members described a large number of incidents in which CBP stopped individuals for no discernible reason other than their appearance, accent, or perceived inability to speak English. Furthermore, in instances when CBP was called in to allegedly assist other agencies with translation, including emergency personnel, the mere appearance of an individual or his/her accent triggered an immigration investigation by the present CBP agents; this variant of the apparent profiling activities and related issues will be covered in detail in section two.

Although the Border Patrol cannot detain people for questioning without probable cause – and absent reasonable suspicion of unlawful behavior, ethnic identity alone does not constitute probable cause – Border Patrol agents approach people for what the agency calls a "consensual and nonintrusive conversation," typically asking, "Where are you from?" or "Do you have papers?" In this context, many people are unaware of their right to refuse to answer the question. What's more, a response indicating foreign origin can be construed as probable cause, thus enabling the Border Patrol to detain the individual for further questioning.

In human rights terms, what is most worrisome about these tactics is the apparent use of ethnic characteristics to determine who is approached. Community members reported that without reason to suspect unlawful activity, the Border Patrol regularly approaches people who appear to be Latino for such questioning in numerous public locations including gas stations, the Anacortes and Friday Harbor ferry terminals, the Greyhound station, the Bellingham airport, or outside of Wal-Mart and a Mexican restaurant. In fact, 82 of the incidents reported to us involved being asked for papers by CBP either while driving or at a public location.

Other accounts from community members involved questioning by Border Patrol agents who had followed Latino drivers on the roads. Many community members, for example, told us stories about being followed by the Border Patrol from work for no apparent reason. In particular, community members reported that CBP often waited outside fields and then followed workers when they left. This type of incident, involving being followed by

**STB_AR1_010729**

CBP, was reported 25 times. Sometimes individuals were then pulled over for questioning related to their immigration status, not the way in which they were driving. Others were followed all of the way to their homes. All the accounts we received were additionally marked by some level of harassment—yelling, threats, intimidation, and even derisory laughter. Community members found these visits to their home, particularly when children were present, especially disturbing.

In other cases, Latino community members reported that Border Patrol agents arrived at their home looking for a specific individual, but then asked for the occupants' proof of immigration status. For example, one evening *Lorenzo and Julia* were startled by pounding on their front door and the shouts of Border Patrol agents demanding to be let inside their home. Their children were in their bedrooms asleep. Lorenzo opened the door and the agents asked for an individual, Pedro, who did not live in the house. Lorenzo and Julia explained that they did not know anyone by that name. The agents began searching the house. Once inside, the agents asked Lorenzo and Julia to show proof of their legal status. Unfortunately, Lorenzo and Julia are one of thousands of families in the U.S. with mixed legal status. The Border Patrol arrested Julia, who began crying out to her husband. The children woke up and ran into the living room where they became hysterical as they watched their mother led away.

Community members who experienced these incidents consistently reported that the only explanation for their targeting was that they looked Latino or like "workers." Hector is a legal permanent resident who has lived in Lynden for over twenty years. One day, while legally driving home with his three year-old U.S. Citizen son, he passed a CBP vehicle. After spotting Hector in his work truck, CBP made a U-turn and began following him home. Hector explained, "I was dirty, wearing a construction coat and a bright orange vest. I feel like I was racially profiled. I had respect for Border Patrol, but after [that day] I'm disappointed. They were treating me like a criminal in my own community." Hector reports that after following him home, seven CBP vehicles surrounded his house. CBP searched his truck and toolbox for drugs, finding nothing.

These stories raise important concerns about the apparent use of racial profiling by the Border Patrol. Community members overwhelmingly reported that such practices most frequently targeted people who appeared to be Latino, especially those with darker skin—in total, 63 incidents reported involved racial profiling by CBP. Through FOIA, UW researchers requested access to records of Border Patrol detentions that might allow us to systematically corroborate such claims, but that request remains pending. Even without access to the Border Patrol's own data about the ethnic attributes of those it detains, however, the clear

**Followed from Work**

Laura Ventura works in the blueberry fields in Sumas and lives in Lynden with her seven-year-old daughter. During May 2011, Laura was leaving the field for the day with a friend. As she pulled out, a CBP vehicle pulled out behind her, it had been waiting on the edge of the field. Laura drove to her friend's house several miles away. The CBP vehicle continued to follow her and waited for her to leave her friend's driveway. CBP did not make any further contact nor did the officers attempt to approach Laura beyond following her and watching. Laura then drove into Lynden. After this extended interaction, it was not until then that CBP turned on their lights and began honking. Laura immediately pulled her car over and parked. When CBP approached, she asked in Spanish, "Why are you honking at me?" He did not answer her question or give her any indication that she was being targeted for any other reason than her appearance or place of work. Instead, he asked if she had papers to live in the United States. He then questioned her about drugs and weapons and searched her car. He found nothing. He then asked if she had a child or a husband living in the U.S. She did not tell him about her daughter. He then said, "Do you have family members or a friend that can pick up your car? Make sure that the person has papers, because if they don't I'm obligated to ask them and detain them as well."

Her boss from Sumas came to pick up her car. She was detained and taken to the Tacoma Detention Center. After some time, she was able to pay $5,000 in bail and was released. The stress Laura endured inside the detention center has resulted in chronic headaches, stress and anxiety, and pain and paralysis in the right side of her face.

**U.S. Citizen Teens Asked for Birth Certificates, Called Racial Slur**

A mother and grandmother living in the northern border area, tells us about an incident involving her two teenagers, Mark and Maria, 16 and 17 year-old siblings who were born in the U.S. They were driving home from Sumas when a Border Patrol agent stopped them for speeding. Mark had left his driver's license at home by accident.

"My son called me to tell me that he had been pulled over without his license. I told him that it was alright that I would drive out to meet them with his license. When I arrived there were Border Patrol cars surrounding the area. I had to drive back to the house for my kids' birth certificates because the Border Patrol officers were accusing them of being 'wetbacks' despite my kids telling the agents in English that they were American citizens. When I finally got to my kids I went up to the officers and said, 'You know what, my kids are American. If they weren't they wouldn't have said they were. This thing that you are doing here is called racism; just because you see that my kids are brown [Latino].' The officer replied, 'Sorry, but this is my job.' And I said, 'Ok, but there was no reason for seven Border Patrol cars to come deal with my kids, with two minors. You are treating them as if they were criminals.'"

 *Scan this code to hear Mark and Maria's mother tell their story.*



He responded by saying that he had been called to interpret by the police and that he knows that the men were not from here.

 *Scan this code to watch a video about Border Patrol interpreting for police.*

perception among community respondents is that the Border Patrol selectively targets certain ethnic groups with these practices. The reported use of racial epithets, as in the account on the previous page, (See "U.S. Citizen Teens Asked for Birth Certificates, Called Racial Slur") would appear to lend credence to such claims.

In addition, our research also documented concerns about religious profiling among members of the Muslim community, both during border crossings and while driving in the border area. As with Latino communities, selective targeting of Muslims raises the specter of unequal treatment.

It is important to note that these are not findings isolated to CBP's behavior in Northern Washington. Civil rights organizations throughout the United States have documented similar encounters, suggesting that a pattern of racial and religious profiling is embedded in current Border Patrol practice, if not in their stated policies.

---

**Muslim College Student Experiences Religious Profiling at Border Crossing**

Akin, A Somali college student at Western Washington University, likes to drive to Vancouver on the weekends. When he crosses back into the U.S. at Blaine, his car is often searched and he has to wait for hours. One weekend, he and another East African friend were driving from Vancouver back to Bellingham. His car was searched, his cell phone was held, and he was fingerprinted. He waited 6-7 hours. Akin, like many others in the Muslim community, would like to know if he is on a watchlist and if there is any way to get removed instead of going through the same process every time he travels. He feels singled out because of his religion.

He told us:

"I'm Somali, have my beard and was wearing my religious hat. I remembered and thought about how hard it was for me to get my citizenship, how much I wanted to be a U.S. Citizen and how proud I am to be one. I thought about how I waited six years to become a U.S. Citizen so that I wouldn't have to go through this. It just isn't right. If this is how we treat our citizens, maybe these papers aren't for me—the system, the people, they don't care to know about my culture and who we are. I felt harassed, discriminated, and excluded. If my name was Johansson and my skin color was different I don't think I would have had to go through this every time I cross the border. People cross this border every day. Thousands of people. Why can't I go like everyone else without fear of being stopped and harassed for hours?"

STB_AR1_010731



November 13, 2014

VIA FEDEX AND E-MAIL




Megan H. Mack
Officer of Civil Rights & Civil Liberties
Department of Homeland Security
245 Murray Lane, SW
Building 410
Washington, D.C. 20528

John Roth
Inspector General
Department of Homeland Security
245 Murray Lane, SW
Building 410
Washington, D.C. 20528

**Re:     Inadequate U.S. Customs and Border Protection (CBP) screening practices block individuals fleeing persecution from access to the asylum process**



Dear Ms. Mack and Mr. Roth:

The undersigned organizations write to raise concerns regarding the failure by U.S. Customs and Border Protection (CBP) to properly screen individuals who flee to the United States and are taken into custody at the border, resulting in their unjust expedited removal to countries where they face persecution. Federal law states that when an individual apprehended at the border or point of entry expresses a fear of persecution, CBP must refer the individual to U.S. Citizenship and Immigration Services (USCIS) for a credible fear interview, the first step in the asylum process for those in the expedited removal process.[1] The National Immigrant Justice Center (NIJC), in collaboration with American Gateways, American Immigration Lawyers Association (AILA), the Center for Gender & Refugee Studies (CGRS), Centro Legal de la Raza, Human Rights First, Lawyers' Committee for Civil Rights of the San Francisco Bay Area (LCCR), the Texas Civil Rights Project, the Immigration Clinic of the University of Texas Law School, and the Women's Refugee Commission submit this complaint on behalf of 9 noncitizens who were denied the opportunity to seek asylum because of flaws in CBP's screening process. (*See* Exs. A-I, *Individual Complaints.*)





Concurrent with the filing of the attached individual complaints, AILA has separately filed a submission to the Office of Civil Rights and Civil Liberties (CRCL) with names and A-numbers for additional individuals who also were denied access to the asylum process. (*See* Ex. J, *AILA Chart of Individual Complaints.*) AILA filed a similar complaint in November 2013, and these additional cases supplement that complaint. (*See* Ex. K, *Letter to AILA from the CRCL acknowledging complaint filed on November 26, 2013*). In addition, advocates from signatory organizations and other legal service providers have provided affidavits explaining their firsthand observations of common shortcomings in CBP's screening and referral procedures. (*See* Exs. L-P, *Legal Service Provider Affidavits.*) Based on the attached complainants' affidavits, the cases collected




---

[1] *See* 8 U.S.C. § 1225(b)(1)(A)(ii).



**STB_AR1_010896**

## Observations of Legal Service Providers

The experiences of these individuals are not isolated incidents. AILA's members regularly hear similar accounts from their clients, and the organization has recently collected 14 case examples that illustrate problems with the CBP screening and referral process. These cases supplement 19 other cases that AILA submitted to CRCL in November 2013. *See* Exs. J-K. In addition, five legal service providers have provided affidavits summarizing their collective breadth of experience with the issue. *See* Exs. L-P. Their knowledge spans over a decade and covers diverse geographic regions:

- ➢ Denise L. Gilman, Immigration Clinic, University of Texas School of Law (Texas)
- ➢ Robin Goldfaden, Lawyers' Committee for Civil Rights of the San Francisco Bay Area (LCCR) (California)
- ➢ Benjamin Harville, Florence Immigrant and Refugee Rights Project (FIRRP) (Arizona)
- ➢ Stephanie Taylor, American Gateways (Texas)
- ➢ Eleni Wolfe Roubatis, Centro Legal de la Raza (California)

While the problems in the screening and referral process occur largely at the U.S.-Mexico border, these providers report they have encountered the same issues nationwide in their everyday work with asylum seekers. Highlights of their observations, detailed in the attached affidavits, include:

*Failure to screen for fear or acknowledge fear*
All the legal service providers have encountered individuals who received expedited orders of removal as a result of CBP's failure to screen for or acknowledge a fear of return. Wolfe Roubatis reports that "[m]any individuals with prior orders were not able to express a fear during their initial interviews with [CBP] because they were told…they had no option but to accept a removal order." According to Taylor, "it is not surprising that the complainants would have endeavored to express a fear of persecution before they were improperly subject to an expedited removal order" and that what should have been understood as a claim for asylum was instead ignored. Gilman observes, "In some cases, CBP agents improperly advise detainees about their claims, for example, indicating that fear of domestic violence or gangs will not qualify an individual for asylum and discouraging expression of fear."

*Use of intimidation and coercion*
Legal service providers also say that some asylum seekers are too afraid of CBP officers to raise their claims. Taylor reports that "[m]any recent arrivals report being afraid or intimidated by Border agents such that they do not feel safe disclosing their reasons for fleeing their home countries." Gilman adds that confusion and despair at being apprehended, detention conditions, and confidentiality or privacy concerns also make asylum seekers fearful of raising claims. She notes that some recent arrivals have reported being too afraid to raise a fear following "harsh and threatening" questioning by CBP officers who, in some cases, have even been physically abusive.

# The Legacy of Racism within the U.S. Border Patrol

By Katy Murdza, M.A. and Walter Ewing, Ph.D.

Special Report | February 2021


American Immigration Council

STB_AR1_011005

# About the Authors

Katy Murdza is the Advocacy Manager for the Immigration Justice Campaign at the American Immigration Council, where she focuses on legal advocacy and policy related to immigration detention across the country. She previously advocated for asylum-seeking mothers and children on issues including medical care, pregnancy, family separation, and access to counsel at the Dilley Pro Bono Project. Before earning a master's degree in International Policy and Development from the Middlebury Institute of International Studies, she assisted migrants on the U.S.-Mexico border with No More Deaths and served as a Peace Corps Volunteer in Panama.

Walter A. Ewing, Ph.D., is an Editor and Writer at the American Immigration Council. Walter has authored numerous reports for the Council, including *The Criminalization of Immigration in the United States* (co-written in 2015 with Daniel Martínez and Rubén Rumbaut), which received considerable press attention. He has also published articles in the *Journal on Migration and Human Security*, *Society*, the *Georgetown Journal of Law and Public Policy*, and the *Stanford Law and Policy Review*, as well as a chapter in *Debates on U.S. Immigration*, published by SAGE in 2012. Walter holds a Ph.D. in Anthropology from the City University of New York (CUNY).

# Acknowledgements

For their valuable advice on different aspects of the development of this report, we thank Royce Murray, Managing Director of Programs at the American Immigration Council, Jorge Loweree, Director Policy at the American Immigration Council, Caroline Walters, Staff Attorney at the American Immigration Council, and Alecs Cook, Policy Intern at the American Immigration Council. Finally, we also thank Melissa Cruz and Eric Gibble at the American Immigration Council for their work in the fact-checking, editing, and layout of this report.

# About the American Immigration Council

The American Immigration Council works to strengthen America by shaping how America thinks about and acts towards immigrants and immigration and by working toward a more fair and just immigration system that opens its doors to those in need of protection and unleashes the energy and skills that immigrants bring. Through its research and analysis, the American Immigration Council provides policymakers, the media, and the general public with information about how the immigration system works, the impact of policy proposals, and the crucial role that immigration plays in our communities and workplaces.

Visit us at www.AmericanImmigrationCouncil.org and www.ImmigrationImpact.com.

STB_AR1_011006

# Contents

Executive Summary                                                          4

Foundation in Racial Animus                                                6

The Creation of the Border Patrol and Its Racist Origins                   8

The Evolution of the Border Patrol                                         9

A Persistent Culture of Racism                                            13

A Cycle of Violence and Impunity                                          15

Perpetuation of Violence Through Systems                                  17

Conclusion                                                                19

Endnotes                                                                  20

**STB_AR1_011007**

# Executive Summary

Since its creation in 1924, the U.S. Border Patrol has been steeped in institutional racism and has committed violent acts with near impunity. The racial animus of U.S. immigration policy in the late nineteenth and early twentieth century formed the foundation for the agency. Federal laws banning Asian immigration were followed by the national origins quota system, which prioritized northern and western Europeans over the rest of the world. While not included in the original quotas, Mexicans, who previously could travel freely across the U.S.-Mexico border, began to experience increasing restrictions in the 1920s.

Congress created the Border Patrol in 1924 to patrol the northern and southern borders between ports of entry. Many officers came from organizations with a history of racial violence and brutality, including the Ku Klux Klan and the Texas Rangers, carrying over the culture of a racist "brotherhood" into the new agency.  In the Border Patrol's early days, it focused on the unlawful entry of Asian and European immigrants. However, in the 1930s enforcement began to shift to Mexican citizens entering along the southern border.

A culture of racism within the Border Patrol has persisted throughout its history. Repeated reports have surfaced of agents using racial slurs, sexual comments, and other offensive language. Various lawsuits and studies have demonstrated the Border Patrol's use of racial profiling in stops within the interior of the United States. Agents have maintained connections to the white supremacist movement and the paramilitary SWAT-style Border Patrol Tactical Unit has been deployed to crack down on protests of police brutality against Black people.

The Border Patrol began as a small agency, but its budget and deportations quickly skyrocketed. Over time, the agency targeted Mexican immigrants more aggressively, using a strategy of intensive enforcement directed at high-traffic areas. Beginning in the 1980s, the Border Patrol began a profound process of militarization and increased collaboration with other law enforcement agencies. The government began an official "prevention through deterrence" strategy in 1994, with the goal of making unlawful entry to the United States so dangerous as to discourage people from trying.  The September 11, 2001 terrorist attacks led to the restructuring of immigration agencies, putting the Border Patrol under the newly created Department of Homeland Security, further increasing the growth and militarization of the agency.

The Border Patrol continues to perpetuate violence in the form of killing, sexual assault, excessive force, and verbal degradation—all with impunity. Despite these problems, the Border Patrol has lowered hiring standards to pursue rapid staff expansion. The Border Patrol often perpetrates violence through less direct means, including medical abuse and neglect, inhumane custody conditions, and family separation.

Since its founding nearly 100 years ago, the Border Patrol has become a sprawling and immensely powerful law enforcement agency with a deeply entrenched culture of racism and abuse. Nevertheless, the agency has received ample funding from Congress and enjoys an extraordinary degree of independence. Revamping the agency will involve fundamentally reshaping how Border Patrol agents view themselves in relation to the different communities and groups of people they encounter along the border.

**STB_AR1_011008**

# Introduction

Since its creation roughly a century ago, the U.S. Border Patrol has been steeped in institutional racism and committed violent acts with near impunity. The agency was tasked from the very beginning with rounding up immigrants deemed "racially undesirable," namely migrants from China, other Asian countries, and nations in southern and eastern Europe. As time went on, migrants from Mexico and elsewhere in Latin America, the Caribbean Basin, and eventually Africa became the primary targets. Throughout its history, the Border Patrol has stereotyped and dehumanized the targets of its enforcement actions, often committing violence against them while suffering little or no legal consequences for this violence. The agency reveals little to the public or Congress about how it operates and largely gives its officers autonomy in the field. Border Patrol agents are rarely disciplined for misconduct, even when it results in death. Despite this lack of transparency and accountability, the budget, workforce, and arsenal of the agency have grown exponentially over the decades. The time is long overdue for vigorous oversight and strict adherence to the rule of law to rein in the Border Patrol's excesses. Just as importantly, the Biden administration and Congress must work to change the culture of the Border Patrol so that its agents no longer perceive of themselves as being in a purely adversarial relationship with the people they encounter along the border.

# Foundation in Racial Animus

U.S. immigration policy has been based on racial expulsion from its very foundations. Beginning in the latter half of the nineteenth century and lasting into the 1940s, nativism directed against non-white immigrants swept across the nation. More precisely, nativist ire was directed against any immigrants who were not from northern and western Europe. The Chinese were the first to bear the brunt of the nativist backlash with the passage of the Chinese Exclusion Act in 1882[1]. But eventually all Asians, as well as immigrants from southern and eastern Europe, were defined as racially inferior to U.S.-born Anglos to help justify subjecting them to stringent restrictions on their entry into the United States. As the decades wore on, similar prejudice was directed against Mexicans and other immigrants from Latin America and the Caribbean Basin who were deemed threatening to the cultural and economic interests of native-born people of western European descent. Eventually, once most Europeans began to be considered white, enforcement shifted to primarily target Mexican immigrants.

Chinese workers were aggressively recruited to come to the United States in the mid-1800s and were especially fundamental in the construction of the railroads. Once these projects were complete, racism and economic recession combined and reached a national tipping point in the 1880s.[2] The U.S. government justified the Chinese Exclusion Act by arguing that Chinese immigrants were taking jobs from native-born Americans and that they were inherently "savage, depraved, and lustful"—and therefore incapable of assimilation into U.S. society.[3] Chinese exclusion remained the official policy of the U.S. government until 1943.[4]

STB_AR1_011009

The first concerted federal attempt at border control began in the wake of the Chinese Exclusion Act, as the Mounted Guard of Chinese Inspectors were placed along the northern and southern borders to ensure that ineligible Chinese immigrants did not enter the country without inspection.[5] However, the outright exclusion of Chinese immigrants was just the beginning of a restrictionist immigration policy toward Asia.[6] While other Asian laborers temporarily replaced the Chinese, they too were soon excluded through a diplomatic agreement with Japan in 1907 and the "Asiatic Barred Zone" from Afghanistan to the Pacific established in the Immigration Act of 1917.[7]

While only immigrants from Asia were subject to blanket exclusion from the United States, nativists also targeted southern and eastern Europeans for severe immigration restrictions.[8] At the national level, this culminated in the Immigration Act of 1924, which created not only the Border Patrol, but also the discriminatory "national origins quota system." Under this system, the number of immigrants from any nation who could be admitted each year was limited to 2% of the number of foreign-born individuals of that nationality who lived in the United States at the time of the 1890 census (not counting most Asians who were entirely barred from entry).[9] The 1890 census was chosen because that was before millions of immigrants from Italy, Russia, Hungary, Greece, and other "undesirable" countries in southern and eastern Europe had started to arrive in the United States.[10]

As in the case of Chinese immigrants, European newcomers were commonly accused of being less intelligent and more prone to criminality, immorality, and disease than native-born Americans of northern and western European descent. Many Americans joined anti-immigrant associations and spoke out against the "degraded races"[11] of Europe. A 1920 U.S. House of Representatives report accompanying a bill that would temporarily suspend immigration described Italian immigrants as "small in stature and of a low order of intelligence," Dutch immigrants as "filthy un-American and often dangerous in their habits," [and] Polish immigrants as "physically deficient…exist[ing] in squalor and filth, mentally deficient, [and] socially undesirable."[12] This rhetoric was disguised in the pseudo-science of eugenics, which purports to prove scientifically that whites are inherently superior to other races and "race betterment" can be achieved through selective breeding.[13] While eugenic theories were widely discredited in scientific circles over the ensuing decades, the national origins quota system remained the bedrock of U.S. immigration policy until 1965.

**The Demonization of Mexican Immigrants**

In the early 1900s, Mexicans were subjected to the same racist stereotypes as all other "non-white" people. Yet Mexican immigrants were not subject to numerical restriction or outright exclusion from the United States because they met the labor needs of the agricultural sector in the southwest United States and the foreign policy interests of the federal government.[14] As a result, at the beginning of the twentieth century, Mexicans traveled freely between the United States and Mexico, allowing for socially unified binational border communities. But that began to change with passage of the Immigration Act of 1917, which doubled the head tax and imposed a visa fee, literacy test, and health examination on all foreigners seeking entry into the United States. Mexican nationals were exempt from these requirements until 1919, after which many began to enter without inspection to avoid them.[15] Even after these legal restrictions came into force,

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.    6

federal officials often ignored them in the case of Mexican migrant workers, who were pivotal to the southwestern economy of the United States.[16]

The list of restrictions on Mexican immigration began to grow during the 1920s. The Immigration Act of 1924 did not restrict Mexican immigration directly but removed the statute of limitations on deportation as a penalty for unauthorized entry into the country without a visa or inspection.[17] The 1924 Act also required that all immigrants pass through a port of entry, thereby creating—for the first time—the possibility that Mexicans could "illegally" enter the United States. This rapidly fueled a nativist discourse of Mexican immigrants as criminals, with the Commissioner General of Immigration stating in 1925 that their "first act upon reaching our shores was to break our laws by entering in a clandestine manner."[18] Another immigration official stated, "It is easier and sometimes appears even more necessary for [a wetback] to break other laws since he considers himself to be an outcast, even an outlaw."[19] Over time, the concept of the "illegal alien" melded with racist stereotypes about Mexicans in general.[20] Supporters of eugenics pushed for an end to Mexico's quota exemption, arguing that Mexicans were "mongrels" and "inassimilable racial inferiors."[21]

# The Creation of the Border Patrol and Its Racist Origins

It was against this backdrop that Congress created the Border Patrol in 1924 for the purpose of patrolling the border between inspection stations.[22] The agency was within the Department of Commerce and Labor, as part of the Bureau of Immigration, which was later combined with the Bureau of Naturalization to form the Immigration and Naturalization Service (INS).[23] Approximately one-quarter of new Border Patrol recruits were transferred from the Mounted Guard.[24] Many of the other new Border Patrol officers came from organizations with a history of racial violence and brutality, including the Ku Klux Klan and the Texas Rangers.[25]

While the racial violence of the Ku Klux Klan is notorious, the Texas Rangers also had a penchant for violence. The Rangers had abused their power through their repeated restructurings in the  nineteenth century, as informal security for white settlers against Indigenous nations in Mexican Texas, citizen soldiers defending the succeeded Republic of Texas against Mexico, and then as state police after the Civil War.[26] During the 1918 Porvenir massacre, a group of Rangers killed 15 Mexican men alleged to have participated in the raid of Brite Ranch.[27] A 1919 investigation by Texas legislator José Tomás Canales concluded that anywhere from 300 to 5,000 people—mostly of Mexican descent—had been killed by the Texas Rangers between 1910 and 1919.[28]

The Rangers carried their "masculine and highly racialized…tradition of violence" into the culture of the Border Patrol.[29] This included a brutal practice known as "revenge by proxy," in which agents killed anyone they believed to be of Mexican descent as revenge for crimes committed by perpetrators believed to be Mexican.[30] Nevertheless, Clifford Perkins—the first Border Patrol inspector in charge in El Paso, Texas—called the methods employed by the Rangers "rough but effective," contributing to a culture of impunity

that exists within the agency to this day.[31]

In the Border Patrol's early days, the agency focused on the unlawful entry of Asian and European immigrants from the northern border, since most illegal migration took place through Canada—not Mexico. However, in the 1930s and 1940s enforcement began to shift to the growing number of Mexican citizens entering the United States without inspection along the southern border.

From the beginning, the Border Patrol "brotherhood" has consistently perpetuated an internal culture of racism. To maintain whiteness within its ranks, the Border Patrol pushed out many officers who had close ties to the surrounding Mexican communities. In 1927 in the El Paso district, only one patrol inspector out of 34 was Mexican American.[32] Meanwhile, half of the Border Patrol officers in Laredo, Texas were of Mexican descent. The Border Patrol subsequently forced out all Mexican American officers in the Laredo district and replaced them with former Texas Rangers, thereby cutting ties with the local Mexican American elite.[33] While the agency later improved its hiring diversity, it has failed to meaningfully address the role of racism in its history.

Since the agency's inception, the Border Patrol has targeted people in border communities for enforcement on the basis of their physical appearance—what one officer described as "Mexican male; about 5'5" to 5'8"; dark brown hair; brown eyes; dark complexion"—or what immigration historian Kelly Lytle Hernández calls "Mexican Brown."[34] Since 1925, Congress has allowed the Border Patrol to arrest without a warrant any unauthorized immigrant who "enters [the United States] in the presence or view… of the officer."[35] The agency quickly defined this description of its jurisdiction as allowing arrests as far as 100 miles "back of the line," a surprising authority given its primary role enforcing civil law—not criminal law.[36] That same year, Border Patrol officers from the Del Rio, Texas station stopped 32,516 people for the purpose of screening them for immigration status within the interior of the United States. Stops overwhelmingly targeted males of Mexican descent over the age of 15, of which there were approximately only 3,750 living in the area.[37]

Racial profiling has long been used in the southwest United States despite the large percentage of U.S citizens of Latino heritage who live in the region. Some families of Mexican descent have lived in the southwest United States since it was a part of Mexico. Under the 1848 Treaty of Guadalupe Hidalgo, land that now includes but is not limited to the southern border states became part of the United States, and residents were given the option to relocate or become U.S. citizens.[38] This history makes profiling of people assumed to be of Mexican descent as "foreigners" within this geographical area particularly egregious.

## The Evolution of the Border Patrol

### Early Growth

The Border Patrol began as a small agency with relatively few resources but rapidly developed into a paramilitary federal law enforcement agency. Deportations soon began to skyrocket, with the Department of Labor requesting $10 million for its 1928 deportation budget—more than 10 times the amount used the

STB_AR1_011012

previous year.[39] A key development in the growth of the agency came in 1929, when Congress made unlawful entry a criminal misdemeanor instead of just a civil violation.[40] This significantly increased the risk of deportation for Mexicans who had been coming to the United States without authorization in order to avoid prohibitive requirements for lawful entry.[41]

In 1940, Congress moved the INS from the Department of Labor to the Department of Justice. In a two-year period, between 1939 and 1941, the Border Patrol's budget and staffing more than doubled from $1,735,000 to $3,883,400.[42] In order to fill these positions, the agency lowered its hiring requirements—a staffing practice that afflicts the agency to this day.[43] Between 1940 and 1943, Border Patrol stops skyrocketed from 473,720 to 9,389,551 for the overall U.S.-Mexico border region.[44] The agency's attempts to deport unauthorized immigrants of Mexican descent expanded into surveillance of all people of Mexican descent, including U.S. citizens and authorized immigrants.[45] Only .009% of the stops in 1943 resulted in apprehensions.[46]

**Prioritization of Enforcement Against Mexicans**

In another echo of things to come, the Border Patrol increased its enforcement activities in populated areas, thereby diverting border-crossers into more dangerous terrain. While this strategy allowed the Border Patrol to avoid detaining people in public view,[47] it also significantly increased the risk of injury and death for immigrants. It is estimated that, in the late 1940s, approximately one person died each day trying to cross the Rio Grande, including children.[48] This change was the beginning of a strategy that would continue throughout the history of the Border Patrol.

In 1943, the Border Patrol began assigning agents and resources disproportionately to the southern border, a strategy that continues to this day.[49] The following year, the agency deployed Special Mexican Deportation Parties throughout the country.[50] Around 43,000 Mexicans were deported from California alone in 1944.[51] Ranchers, attempting to maintain their labor source, asked why Mexicans were being targeted. The *El Paso Times* wrote that it "resent[ed] the singling out of Mexican aliens" when "hundreds of thousands of Europeans" were also in the country without immigration status.[52]

Alongside its new focus on Mexican immigrants, the Border Patrol remained involved in enforcement against Asian immigrants and Americans of Asian descent. During World War II, from 1942 to 1945, Border Patrol agents transported Japanese immigrants and Japanese Americans to internment camps.[53] Agents also served as guards in the eight camps run by the DOJ that housed Japanese immigrants considered to be potentially dangerous before being transferred to the more permanent U.S. Army camps.[54]

After World War II, the Border Patrol began a strategy of intensive enforcement directed at unauthorized Mexican migrants in high-traffic areas, under the blatantly racist name "Operation Wetback." In one raid in the Rio Grande Valley, 5,000 immigrants were apprehended in a single morning.[55]

To prevent repeated border crossing attempts, the Border Patrol cooperated with Mexican officials to arrange bus, train, air, and boat "lifts" into the interior of Mexico immediately after deportation from the

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.     9

United States. In 1956, Joseph Swing, commissioner of INS, testified to a Senate subcommittee that boatlifts served as a deterrent because "These interior Mexicans don't like sea water. I understand they get a little seasick."[56] An investigating committee of the U.S. House of Representatives called the boats a "penal hellship."[57] In one case, those forced onto the boatlift rioted because of these conditions, with 36 jumping from the ship, five of whom drowned.[58] An editorial in the *El Paso Herald* in 1953 defended American famers' right to hire Mexican workers and stated that "[The buslift policy] is an inhuman, outrageous, unMexican, and unAmerican procedure. It is trading in human misery."[59]

**The Establishment of the Modern Quota System**

The Immigration Act of 1965,[60] which eliminated the nationality-based quota system, created a 20,000-person limit for every Eastern Hemisphere country and a single immigration limit of 120,000 for all countries in the Western Hemisphere.[61] This amounted to the first numerical limit imposed on Mexican immigration and was the equivalent of a 40% reduction from the overall Western Hemisphere immigration rate at the time. This newly created limit ignored the powerful forces driving immigration from Mexico to the United States due to the geographical proximity and growing economic interdependence of the two countries.[62] In 1976, the overall Western Hemisphere quota was eliminated, and each country was limited to the same 20,000-person quota used for Eastern Hemisphere countries, further limiting legal immigration from Mexico.[63]

The Border Patrol continued to use racial profiling to determine who to stop for questioning. In 1975, the Supreme Court ruled in United States v. Brignoni-Ponce that while "apparent Mexican ancestry" could not be used as the sole reason a roving officer of the Border Patrol decided to make a stop, it was a relevant factor.[64] In later cases, the decision was expanded to pedestrian stops and "apparent Mexican ancestry" was expanded to "Hispanic appearance."[65] The Court also recognized the Border Patrol's ability to distinguish Mexican residents because they "commonly appear thin, their hands are rough and work-worn, their hair is cut in a characteristic fashion, and they are frequently dressed in full-cut and coarsely-woven material."[66] As Pablo Chapablanco points out, this is a description of "a poor rural laborer," regardless of ancestry. He further explains that while the description does not mention skin color, it is implied, as a person with "light skin color and blue eyes" who fit that description would be assumed to be "a white farmer" and would not be stopped.[67]

The next year, the Supreme Court allowed the Border Patrol to continue directing vehicles to secondary inspection at interior checkpoints without articulable suspicion of a violation of immigration law, despite the fact that the agency was basing these decisions on race. In his dissent, Justice William Brennan warned that "Every American citizen of Mexican ancestry and every Mexican alien lawfully in this country must know after today's decision that he travels the fixed checkpoint highways at risk."[68]

**The Militarization of the Border Patrol**

Beginning in the 1980s, the Border Patrol's institutional racism became more heavily weaponized as the agency began a profound process of militarization. The impetus for this change was a shift in the agency's

STB_AR1_011014

mission to include the interception of illegal drugs as well as the apprehension of undocumented immigrants. The agency was issued high-powered military rifles such as M-14s and M-16s, under the rationale that drug enforcement was a high-risk undertaking.[69] The border was equipped with electronic sensors, infrared radar, and closed-circuit television monitoring.[70] Between 1980 and 1988, the Border Patrol grew its fleet of helicopters from two to 22, most of which had been formerly used by the Army.[71] In 1984, the paramilitary SWAT-style Border Patrol Tactical Unit (BORTAC) was created to handle emergency situations and riots.[72] By 1990, each Border Patrol sector had an "Emergency Response Team" similar to BORTAC.[73]

The Border Patrol also increased collaboration with other law enforcement agencies and the military through INS participation in INTERPOL, the El Paso Intelligence Center, and the Southwest Border Drug Task Force.[74] Border Patrol agents were cross-designated to enforce drug and contraband laws, significantly broadening the agency's jurisdiction.[75] The Border Patrol even started to conduct joint operations with border state National Guard units and the U.S. Marines.[76] In 1989, a secretive Border Patrol-U.S. Marines joint operation was made public following a shootout with drug smugglers that started a fire that burned 300 acres of federal forest land.[77] And in 1990, the Border Patrol participated in the largest antidrug operation in Arizona's history with other federal agencies and the U.S. Marines.[78]

Lines between the Border Patrol and other law enforcement agencies were further blurred when the Immigration Act of 1990 granted INS officers general arrest authority under federal law.[79] New Mexico and Arizona granted Border Patrol state-level arrest authority as well, allowing for further racial discrimination in policing.[80] For example, 400 Border Patrol agents participated in the crackdown on the 1992 Los Angeles riots that occurred as a response to the brutal and racist police beating of Rodney King.[81] The agency's enforcement activities occurred in primarily Latino neighborhoods, leading to the deportation of 700 people, most of whom were never formally charged with riot-related offenses.[82]

**Prevention Through Deterrence**

In 1993, the Border Patrol had tested a strategy of concentrating agents along high-traffic areas of the border to prevent unauthorized immigrants from entering without inspection, instead of apprehending them after they had entered the country. The initiative, Operation Hold the Line, took place in El Paso.[83] The Border Patrol replicated this strategy with Operation Gatekeeper in 1994 in San Diego.[84] Operation Rio Grande in Brownsville, Texas and Operation Safeguard in Nogales, Arizona followed.[85]

Since fiscal year 1993—when the current strategy of concentrated border enforcement was first rolled out along the U.S.-Mexico border—the annual budget of the Border Patrol has increased more than ten-fold, from $363 million to nearly $4.9 billion as of FY 2020.[86] At the same time, the number of Border Patrol agents has skyrocketed from 4,139 in FY 2003 to 19,648 as of FY 2019.[87]

Rising anti-immigrant sentiment in the early 1990s led the Clinton administration to implement changes to Border Patrol strategy, such as instructing the Border Patrol to shift from apprehending people who had already entered the country to preventing unauthorized crossings in the first place. Building on the decades-

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.    11

old strategy of increased enforcement in populated areas, the government began an official "prevention through deterrence" strategy in 1994 with the goal of making unlawful entry to the United States so dangerous as to discourage people from trying.[88]

These operations worked to funnel undocumented immigrants through ever-more-dangerous terrain, leading to a dramatic increase in fatalities among border crossers. The remains of almost 8,000 people who died trying to cross the U.S.-Mexico border were found between 1998 and 2019.[89] The total death toll is likely much higher.

**Department of Homeland Security**

The September 11, 2001 terrorist attacks led to significant changes in the way the United States manages immigration enforcement. In 2003, Congress dismantled the INS and created the Department of Homeland Security (DHS), with three separate component immigration agencies. The Border Patrol was combined with the United States Customs Service to form U.S. Customs and Border Protection (CBP), while interior enforcement was assigned to U.S. Immigration and Customs Enforcement and immigration benefits to U.S. Citizenship and Immigration Services.[90] At that time, the Border Patrol's mission expanded from apprehending undocumented immigrants and disrupting drug smuggling to protecting the nation from terrorism.[91]

Since the creation of DHS, the budget of CBP has nearly tripled, rising from $5.9 billion in FY 2003 to a high of $17.1 billion in FY 2019.[92] Much of this budget has been used for further border militarization, including border fencing, surveillance technology, and unmanned aerial vehicles.[93]

Border militarization has been particularly harmful for Indigenous groups. For example, the Tohono O'odham Nation is bisected by a 62-mile section of the border. O'odham people face frequent harassment and interrogations, inability to travel to parts of their own territory, disrespect to their sacred landmarks and cemeteries, and militarized construction on their land without consent.[94]

The environmental consequences of border enforcement also disproportionately affect people of color. The Tohono O'odham Tribal Council has allowed for vehicle barriers along the border, but a full wall would prevent wildlife migration, destroy culturally significant plants including the saguaro cactus, prevent water access, and cause flooding.[95]

To begin the construction of such a wall, DHS contractors have erected steel bollards approximately 200 feet from Quitobaquito Springs, a sacred site for the Indigenous O'odham people. On two separate dates in September 2020, Border Patrol agents responded to O'odham women protesting wall construction in this location by yanking them apart from each other as they held hands, knocking them over, pointing stun guns at them, and arresting two of them.[96]

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.    12

# A Persistent Culture of Racism

Sociologist Daniel Martínez has described Border Patrol culture as one of "cruelty … that dehumanizes and demeans border crossers."[97] Former Border Patrol agent Jenn Budd has said that "In the academy they mandate and they teach the agents to use racist terms for migrants so that they see these people as 'others' and that they are not like them," and that "[a]s a trainee, if you aren't willing to use these terms, if you aren't willing to be harsh towards the migrants that you encounter, then you are judged by that, and that reflects on whether or not they'll retain you."[98]

Language that dehumanizes migrants is common in internal Border Patrol culture. Some agents have reported that the internal culture results in "pseudospeciation," in which a different cultural group is thought of as another species.[99] The Migrant Border Crossing Study surveyed over 1,000 recently deported Mexicans between 2010 and 2012.[100] Participants reported various "statements demonstrating prejudice against Latin Americans" made by CBP agents, most from the Border Patrol.[101] The statements included "wetback," "beaner," "filthy Indian," "dirty little Mexican woman," "Mexican pieces of shit," and "you just come over to pop your baby out."[102]

In 2012, a CBP use-of-force instructor reported to ICE's Office of Professional Responsibility that one of his colleagues had told a room of supervisors, "you tell all the guys that if they feel threatened, they can beat that tonk like a piñata until candy comes out," in contradiction with the agency's use of force policy.[103] A Border Patrol agent defined the word "tonk" in federal court as "the sound made when a 'wetback' is hit over the head with a flashlight."[104] Border Patrol agents have explained that agency policy requires paperwork to be completed after the use of weapons such as pepper spray, Tasers, or batons, so the use of a flashlight as a weapon is therefore favorable because it does not require paperwork. "Tonk water" is used to refer to water left in the desert for migrants by humanitarian volunteers, who themselves are called "tonk lovers."[105]

In 2014, a group of advocacy organizations filed a complaint with DHS oversight agencies on behalf of 116 unaccompanied immigrant children who had experienced abuse and mistreatment in CBP custody, including with the Border Patrol. In addition to physical and sexual abuse,[106] the accounts include "racially- and sexually-charged comments and death threats," including referring to children as "dog" and "piece of crap" and telling them they "contaminate this country."[107]

In early 2018, federal investigators found racist text messages sent by Matthew Bowen, a Border Patrol agent charged with running down a migrant with a pickup truck. The texts described migrants in racist terms including "tonks," "guats," "beaners," "savages," and "subhuman shit."[108] Bowen's attorney argued that this language was "commonplace throughout the Border Patrol's Tucson Sector" and "part of the agency's culture."

In 2019, *ProPublica* exposed a secret Facebook group for current and former Border Patrol agents, including Carla Provost, then the highest-ranking official within the agency. The three-year-old group was called "I'm

10-15," referencing the Border Patrol code for "aliens in custody." The agents joked about the deaths of migrants, throwing burritos at Latino members of Congress visiting a detention facility, and U.S. Congresswoman Alexandria Ocasio-Cortez engaging in sexual activity with a detained migrant. While four agents were ultimately fired for their involvement, CBP has done little to address the systemic nature of these issues.[109] Members of Congress have accused CBP of obstructing a congressional investigation of the Facebook group.[110]

The endemic racism within the Border Patrol is of particular concern given the agency's extraordinary powers not only along the physical border, but in a much larger border zone. The government continues to define the Border Patrol's jurisdiction as anywhere within 100 miles of the external boundaries of the United States, including the northern and southern borders and all coastlines. The Border Patrol operates roving patrols and temporary and permanent checkpoints inside this zone.[111] Two-thirds of the U.S. population and nine of its 10 largest cities are located within this area of surveillance.[112]

Much of the enforcement in the expansive "border zone" is unrelated to the agency's original mission. A dataset of all CBP arrests in Rochester Station in New York between 2006 and 2009 showed that over 93% of those arrested were not on their initial journey into the country. Furthermore, 84% of those arrested had been categorized as having black or medium complexion, raising concerns of racial profiling.[113]

The American Civil Liberties Union has filed repeated complaints of racial profiling against Latino, Indigenous, and Black residents of the border region at internal Border Patrol checkpoints.[114] A 2012 lawsuit argued that Border Patrol agents in the state of Washington stopped and questioned people based on the color of their skin and hair. The plaintiffs included Ernest Grimes, a Black U.S. citizen who a Border Patrol agent selected for a traffic stop in 2011. The agent approached the car, yelling, with his hand on his weapon and interrogated Grimes regarding his immigration status without ever providing a reason for the stop.[115]

In a survey conducted between 2006 and 2008, 22% of U.S. citizens and lawful permanent residents of Mexican descent in the Arizona border region reported having experienced or witnessed mistreatment by immigration officials. Participants reported incidents including immigration officials apprehending them without asking their immigration status, ordering them to lie down at gunpoint while they were out running for exercise, and shaking a ladder to throw them off while demanding identity documents. Participants also reported being detained and accused of smuggling while traveling with a minor relative of a lighter skin complexion.[116] In 2014, residents of Arivaca, Arizona conducted observations of the Border Patrol checkpoint at the entrance to their community. Latino-occupied vehicles were more than 26 times more likely to be required to show identification while passing through the checkpoint.[117]

Over the past few decades, the Border Patrol's long-standing focus on profiling Mexican citizens has grown to include people from Central America, and in smaller but growing numbers, the Caribbean and Africa.[118] Many of the Central Americans are Indigenous, including Afro-Indigenous.[119] In one week in 2019, agents from the Border Patrol's Del Rio sector encountered more than 500 African migrants, more than double the total of 211 encountered across the entire Southwest border in 2018.[120] Most of these asylum seekers transit through Mexico on their way to the U.S. border. The focus on profiling brown and Black immigrants remains

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.    14

unchanged, however. In 2014, DOJ guidance prohibited federal law enforcement agencies from discriminating based on race or ethnicity. [121] However, the guidance excludes "screening and inspection for border and transportation security" and "U.S. Border Patrol interdiction activities in the vicinity of the border."[122]

It appears the DOJ guidance has not changed much within the agency. In September 2020, the Border Patrol released a fictionalized 3-minute video of a Spanish-speaking man escaping from Border Patrol agents, then stabbing another man on its YouTube channel. The video ends with an ominous warning: "Every apprehension matters. Do you know who got away?"[123] The video associates Latino immigrants with violent crime and implies that each person who the Border Patrol pursues is a societal danger.

Border Patrol agents have also maintained connections to the white supremacist movement. In recent years, Border Patrol agents have expressed gratitude toward or interest in collaborating with modern white supremacist vigilante groups such as the Three Percent United Patriots, American Patriot III%, and the United Constitutional Patriots.[124]

The Border Patrol also played a prominent role in the Trump administration's response to racial justice protests across the United States. The protests were part of the Black Lives Matter movement and were largely initiated in response to police brutality targeting Black people in the United States, including the killing of George Floyd. In July 2020, BORTAC deployed to the streets of Portland, Oregon in the midst of these protests. Many Americans criticized the move, arguing that the protests did not qualify as the "emergent and high-risk incidents requiring specialized skills and tactics" for which BORTAC is intended.[125] Furthermore, state and local officials had not requested the support of federal agents. In some cases, BORTAC agents forced protestors into unmarked vans without identifying themselves or providing the reason for the arrest.[126] Sixty-six BORTAC agents were deployed to George Floyd's burial service in Pearland, Texas, and authorized to use deadly force.[127]

## A Cycle of Violence and Impunity

Violence and impunity within the Border Patrol have long been systemic problems. This abuse comes in many forms, from killing to sexual assault to use of excessive force to verbal degradation. It includes the denial of medical care and the forced separation of families. These issues go unaddressed because disciplinary mechanisms within the agency are weak and outside oversight of the agency is grossly inadequate.

Since 2010, over 100 people have been killed by the Border Patrol,[128] yet no Border Patrol agent has been held accountable in a meaningful way for these killings.  In contrast, murders of on-duty Border Patrol agents are relatively rare, with five occurring between 2003 and 2019.[129] Six people in Mexico have been killed by agents firing across the border from the U.S. side, including a minor shot 10 times in the back. In 2015, the Supreme Court ruled against extending the right to seek monetary damages from a federal official under certain circumstances to the context of a cross-border shooting. [130]

STB_AR1_011019

The DHS Office of the Inspector General (OIG) has documented 1,896 possible incidents of excessive force from FY 2007 to FY 2012, while acknowledging that they were unable to identify the total number of excessive force allegations due to data limitations.[131] A study found that Border Patrol agents were more likely to incur misconduct and disciplinary infractions than all other federal law enforcement; for example, six times more likely than FBI agents.[132] However, the study stated that it was "virtually impossible to assess the extent of corruption or misconduct in U.S. Customs and Border Protection…because most publicly available information is incomplete or inconsistent."[133] In 2012, top agency officials estimated that as much as 20% of CBP's agents and officers needed to be removed from the force.[134]

Between January 2012 and October 2015, data analyzed by the American Immigration Council found that 2,178 complaints of misconduct were filed against the Border Patrol.[135] It is likely that in many cases of abuse, the victim did not file a complaint, because of lack of knowledge on how to do so, language barriers, or fear of retaliation. Out of the 1,255 cases in which an outcome was reported, 95.9% resulted in "no action" against the officer or agent accused of misconduct.[136]

In 2019, an OIG investigation found that DHS did "not have sufficient policies and procedures to address employee misconduct."[137] The OIG report stated that DHS did not have "procedures for reporting allegations of misconduct, clear and specific supervisor roles and expectations, or clearly defined key discipline terms."[138]

Referencing the green color of Border Patrol uniforms, former CBP head of internal affairs James Tomsheck has stated that "The Green Line of silence is higher and wider than it's ever been before…[There is] a clear understanding on the part of the rank and file in the Border Patrol that if they should engage in whistleblower activities, or do anything to promote transparency, that they would be retaliated against in a way that would likely end their career."[139] In describing the Border Patrol's culture around misconduct, former agent Jenn Budd has said, "It's condoned. When it happens and somebody complains…everybody groups together…they protect each other, and they push everything out and they stay quiet."[140]

Despite these internal challenges, Congress approved a Border Patrol growth plan that resulted in an increase from 12,349 agents to 20,119 agents between 2006 and 2009.[141] To expand quickly, the Border Patrol lowered its hiring standards, which had already been the lowest among top federal law enforcement agencies, putting agents in the field before even completing their background checks. Then-CBP Commissioner W. Ralph Basham said, "I was very concerned when I was asked to grow the Border Patrol over that period of time. Normally you'd want a chance to make a careful plan. You want to choose very carefully people who are put into a tough environment like that we had on the southwest border."[142]

The Border Patrol's hiring practices have raised concerns that the agency is not properly screening out applicants who are likely to engage in misconduct. A 2012 Government Accountability Office report pointed out flaws in the agency's background checks and delays in the development of an Integrity Strategy.[143] The agency has admitted that they hired cartel members during the hiring surge.[144] Between 2005 and 2012, on average one CBP officer or agent was arrested per day. Arrests for job-related misconduct are extremely rare; 99% of arrests were for behavior unrelated to work, such as domestic violence or driving under the

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.     16

influence.[145]

In 2014, CBP separated employee corruption into "mission-compromising" and "non-mission-compromising," so that they would no longer have to report to Congress on the latter, which includes sexual assault of detained individuals.[146]

# Perpetuation of Violence Through Systems

The Border Patrol often perpetrates violence through less direct means. These include the denial of necessary medical care and inhumane detention conditions. Another—which was made policy under the Trump administration—is the forcible separation of children from their families.

**Medical Neglect and Abuse**

Medical neglect and abuse have long been a part of the violence the Border Patrol inflicts on immigrants. In a 2019 survey, 67% of mothers reported that their child was not seen by a medical provider while in CBP custody.[147] Fifty-eight percent of mothers who reported asking for medical care for their child while in CBP custody said that they did not receive it.[148] One mother reported that her daughter, who had been instructed by her doctor to bathe daily due to the high risk of infection associated with her kidney condition, was not allowed to change her clothing or shower for five days, resulting in a urinary tract infection.[149]

In December 2018, two children died in Border Patrol custody. Seven-year-old Jakelin died after contracting sepsis, which led to multiple organ failure due to lack of treatment over many hours. Eight-year-old Felipe died from untreated influenza.[150] Jakelin and Felipe were both from Indigenous Maya communities in Guatemala[151] and spoke the Indigenous languages of Q'eqchi' and Chuj, respectively.[152] The children were traveling with their fathers, who signed waivers stating that their children did not need medical care, in English with verbal Spanish translation, which they likely did not understand.[153]

Noncitizens who are Black and Indigenous often experience a language barrier when interacting with the Border Patrol. The Supreme Court has confirmed that proving meaningful access to government programs for people with limited English proficiency is a necessary part of avoiding discrimination based on national origin, which is prohibited by the Civil Rights Act of 1964.[154] Language access is also protected by the Department of Homeland Security's Language Access Plan.[155] However, Border Patrol agents frequently address Indigenous Central Americans in Spanish, do not understand which Indigenous language they speak, or are unable to obtain an interpreter.[156]

In 2019, an additional three children died in or shortly after release from the agency's custody.[157] Two of the children died of the flu and hundreds of people became ill in flu outbreaks in 2018 and 2019 after CBP rejected a Centers for Disease Control and Prevention recommendation to administer flu vaccinations.[158]

DHS has not cooperated with the House Committee on Homeland Security's investigations of child deaths

in CBP custody, providing incomplete and overly redacted documents even after the committee issued a subpoena.[159] The DHS Inspector General originally refused to testify to the committee on the issue.[160] A July 2020 Government Accountability Office report found that "CBP ha[d] not consistently implemented enhanced medical care policies and procedures" that had been issued in response to child deaths.[161] The report also found that even though CBP had been directed to report all deaths in custody, the agency only did so in 20 of 31 cases in fiscal years 2014 through 2019.[162]

**Inhumane Custody Conditions**

The brutal conditions in which the Border Patrol detains noncitizens, including children, are another type of violence inflicted by the agency. Conditions at Border Patrol stations and processing centers are known to be so inhumane that they are commonly referred to as "hieleras" (iceboxes) and "perreras" (dog pounds) by noncitizens and advocates.

A 2015 class-action lawsuit argued that the Tucson Sector Border Patrol was holding people in detention conditions that violated the Constitution.[163] The lawsuit described how detained individuals are: stripped of outer layers of clothing and forced to suffer in brutally cold temperatures; deprived of beds, bedding, and sleep; denied adequate food, water, medicine and medical care, and basic sanitation and hygiene items such as soap, sufficient toilet paper, sanitary napkins, diapers, and showers; and held virtually incommunicado in these conditions for days.[164]

In February 2020, a federal judge ruled that the facilities were "not designed to meet a [detained individual's] basic human needs, including sleeping, warmth, food, water, personal hygiene, and medical care for extended periods of time."[165]

**Family Separation**

Another violent aspect of Border Patrol policy concerns the separation of minor children from their parents. On April 6, 2018, Attorney General Jeff Sessions announced the Trump administration's "zero-tolerance policy."[166] The policy aimed to prosecute all adults who entered the United States without inspection. When Border Patrol sent parents to U.S. Marshals Service custody for prosecution, the agency separated their minor children and transferred them to Office of Refugee Resettlement (ORR) custody, where they were treated as unaccompanied minors.

The administration claimed that these separations were not the primary intent of the policy, but rather a necessary consequence of enforcing the law.[167] However, this argument failed to account for the fact that prosecutorial discretion is a necessary and long-standing part of law enforcement, including for illegal entry.[168]

Previously, the Border Patrol separated some children from their caregivers on the bases of doubting the safety of the child or the legitimacy of the parent-child relationship, frequently including cases in which a child was traveling with a close relative who was not their legal or biological parent. However, true cases of fraudulent families are extremely rare. Between April and October 2019, more than 310,000 family units were

STB_AR1_011022

encountered by CBP at the U.S.-Mexico border, only 238 of which—or 0.08%—were found to be fraudulent.[169]

Mass separations did not take place until the Trump administration launched a pilot program in El Paso between July and November 2017.[170] Although ORR was not informed of the pilot, the agency noticed an increase in children sent to its custody, especially very young children.

In many cases, the Border Patrol forcibly removed children from their parents' arms or took them with no warning while the parent and children were temporarily separated to be processed by the Border Patrol, receive medical attention, or shower.[171] Parents were given little or no information on why they were being separated from their children and whether or when they would see their children again. One asylum seeker committed suicide after being separated from his wife and 3-year-old son at the border.[172]

The government ignored warnings from mental health experts about the severe psychological damage the separations would cause. In June, the American Psychological Association urged the Trump administration to end family separation because of "multiple harmful effects of parent-child separation on children's emotional and psychological development and well-being."[173] Physicians for Human Rights has found that the policy "constitutes cruel, inhuman, and degrading treatment," and that at least in the 20 families that they evaluated, "rises to the level of torture."[174]

Although the Trump administration officially ended the zero-tolerance policy on June 20, 2018, and courts ordered the families reunited, family separation continues. DHS did not have the capability to track parents and children and reunify them—a limitation the agency was aware of at the time of the mass separations.[175] Out of approximately 5,500 separated children, many have still not been reunified, and the parents of 628 have not even been contacted.[176] Furthermore, children continue to be separated. The Texas Civil Rights Project has identified 939 children who were separated from an adult family member for zero-tolerance prosecutions since the official end of the program.[177] In 2020, parents detained at ICE's three family detention centers were threatened with separation. At Karnes County Family Residential, nearly half of the families threatened were Black, originating from Haiti, Angola, the Democratic Republic of the Congo, Sierra Leone, and Afro-Latino communities in Latin America.[178]

# Conclusion

Since its founding nearly 100 years ago, the Border Patrol has become a sprawling and immensely powerful law enforcement agency with a deeply entrenched culture of racism and abuse. Despite the opaque nature of its operations and a well-documented history of human rights violations, the agency has received ample funding from Congress and enjoys an extraordinary degree of independence in how it conducts itself. Particularly since 9/11, the agency has been able to shield itself from outside scrutiny in the name of "national security." But at its core, the Border Patrol's mission is and always has been to keep "undesirable" foreigners out of the United States. To this end, all foreigners can be viewed as potential threats, especially if they have dark skin and don't speak English as their first language.

STB_AR1_011023

The Legacy of Racism in the Border Patrol, February 2021

It will take a great deal of effort for lawmakers and the Biden administration to assert control over an agency that has enjoyed unchecked power for so long. Revamping the agency will involve much more than simply changing the law; it will involve fundamentally reshaping how Border Patrol agents view themselves in relation to the different communities and groups of people they encounter along the border.

# Endnotes

1.  22 Stat. 58 (Chapter 126)

2.  Erika Lee, *America for Americans* (New York, NY: Basic Books, 2019), 79-81.

3.  Erika Lee, *At America's Gates: Chinese Immigration During the Exclusion Era, 1882-1943* (Chapel Hill, NC: University of North Carolina Press, 2003), 33-35.

4.  Ibid., 17.

5.  Ibid., 52.

6.  Ibid., 44.

7.  Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 18.

8.  The literacy test provision of the 1917 Immigration Act was meant to decrease immigration from southern and eastern Europe but was largely unsuccessful. The Immigration Act of 1921 set a quota of 3% of the people of that nationality residing in the United States in 1910, reinforcing the predominance of western European immigrants. Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 19-20.

9.  Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* (Princeton, NJ: Princeton University Press, 2002), 144-145.

10. Ibid., 115, 144-145.

11. Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 19.

12. United States House of Representatives Committee on Immigration and Naturalization, *Temporary Suspension of Immigration,* Report No. 1109, December 6, 1920, https://curiosity.lib.harvard.edu/immigration-to-the-united-states-1789-1930/catalog/39-990100132720203941.

13. Peter Schrag, *Not Fit for Our Society: Immigration and Nativism in America* (Oakland, CA: University of California Press, 2010), ch. 3.

14. Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 50.

15. Ibid., 60, 64.

16. Erika Lee, *America for Americans* (New York, NY: Basic Books, 2019), 154.

17. Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 60.

18. Harry E. Hull, "Annual Report of the Commissioner General of Immigration to the Secretary of Labor," 1925, 13.

19. Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 149.

20. Ibid., 58.

21. Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 28.

22. U.S. Customs and Border Protection, "Border Patrol History," last modified July 21, 2020, https://www.cbp.gov/border-security/along-us-borders/history.

23. Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 26, 32; U.S. Citizenship and Immigration Services, "Organizational Timeline," updated July 30, 2020, https://www.uscis.gov/about-us/our-history/organizational-timeline.

24. Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 37-38.

25. Erika Lee, *America for Americans* (New York, NY: Basic Books, 2019), 162.

26. Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers,* (New York, NY: Oxford University Press), x-xii.

**STB_AR1_011024**

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.    20

27.  Nicholas Villanueva Jr., *The Lynching of Mexicans in the Texas Borderlands* (Albuquerque, NM: University of New Mexico Press, 2017), 124-127.

28.  Charles Houston Harris and Louis R. Sadler, *The Texas Rangers and the Mexican Revolution: The Bloodiest Decade 1910-1920* (Albuquerque, NM: University of New Mexico Press, 2007).

29.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 62.

30.  Ibid., 20, 58-61.

31.  Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 68.

32.  Ibid.

33.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 68.

34.  Ibid., 10.

35.  Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 56.

36.  Ibid.

37.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 53-54.

38.  Erika Lee, *America for Americans* (New York, NY: Basic Books, 2019), 149.

39.  Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 60.

40.  Ibid.

41.  Ibid., 67-68.

42.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 104.

43.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 106-107; Josiah McC. Heyman, *Why Caution is Needed Before Hiring Additional Border Patrol Agents and ICE Officers* (Washington, DC: American Immigration Council, April 24, 2017), https://www.americanimmigrationcouncil.org/research/why-caution-needed-hiring-additional-border-patrol-agents-and-ice-officers.

44.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 120.

45.  Ibid., 120-122.

46.  Ibid., 120.

47.  Ibid., 137.

48.  Ibid., 135

49.  Ibid., 116.

50.  Ibid., 117.

51.  Ibid.

52.  *El Paso Times*, "Why The Mexicans?," August 19, 1953.

53.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 103.

54.  National Park Service, *Confinement and Ethnicity: An Overview of World War II Japanese American Relocation Sites,* February 20, 2004, ch. 17, http://npshistory.com/series/anthropology/wacc/74/chap17.htm.

55.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 156.

56.  *Valley Evening Monitor*, "General Swing's 'Little Mexican Girl'," June 3, 1956.

57.  *U.S Congress, Hearings Before the Committee on Un-American Activities, House of Representatives, Eighty-fourth Congress, Second Session, Volume 3* (Washington D.C.: U.S. Government Printing Office, 1956).

58.  *Valley Evening Monitor*, "5 Drown in Jump From Wetback Ship Mercurio," August 27, 1956.

59.  *El Paso Herald*, "Alliance Against the Valley," October 5, 1953.

60.  79 Stat. 911, 1924

**STB_AR1_011025**

61.  Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton, NJ: Princeton University Press, 2004), 258.

62.  Ibid., 261.

63.  Ibid.

64.  United States v. Brignoni-Ponce, 422 U.S. 873, 886-887 (1975).

65.  Migrant Council v. Pilliod, 540 F.2d 1062, 1070 (7th Cir. 1976); Nicacio v. INS, 797 F.2d 700, 701 (9th Cir. 1985).

66.  United States v. Brignoni-Ponce, 422 U.S. 873, 886-887 (1975).

67.  Pablo Chapablanco, "'Traveling While Hispanic': Border Patrol Immigration Investigatory Stops at TSA Checkpoints and Hispanic Appearance," *Cornell Law Review* 104, no. 5 (July 2019): 1450-1451, https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=4806&context=clr.

68.  United States v. Martinez-Fuerte, 428 U.S. 543 (1976).

69.  Timothy J. Dunn, *The Militarization of the U.S.-Mexico Border 1978-1992* (Austin, TX: Center for Mexican American Studies, University of Texas at Austin), 53.

70.  Ibid., 41.

71.  Ibid., 43.

72.  U.S. Customs and Border Protection, "Border Patrol Tactical Unit (BORTAC)," May 2, 2014, https://www.cbp.gov/border-security/along-us-borders/operations/special-operations.

73.  Timothy J. Dunn, *The Militarization of the U.S.-Mexico Border 1978-1992* (Austin, TX: Center for Mexican American Studies, University of Texas at Austin), 81.

74.  Ibid., 41, 59.

75.  Ibid., 53.

76.  Ibid., 128.

77.  Ibid., 131.

78.  Ibid.

79.  Ibid., 81.

80.  Ibid.

81.  Ibid.

82.  Ibid., 82.

83.  Kelly Lytle Hernández, *Migra! A History of The U.S. Border Patrol* (Berkeley, CA: University of California Press, 2010), 228.

84.  Erika Lee, *America for Americans* (New York, NY: Basic Books, 2019), 281.

85.  Ibid.

86.  Carla N. Argueta, *Border Security: Immigration Enforcement Between Ports of Entry* (Washington, DC: Congressional Research Service, April 19, 2016), 11, https://fas.org/sgp/crs/homesec/R42138.pdf; U.S. Department of Homeland Security, *Budget-in-Brief*, FY 2018-FY 2021, https://www.dhs.gov/dhs-budget.

87.  U.S. Customs and Border Protection, U.S. Border Patrol Fiscal Year Staffing Statistics (FY 1992-FY 2019), 1, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Fiscal%20Year%20Staffing%20Statistics%20%28FY%201992%20-%20FY%202019%29_0.pdf.

88.  U.S. Border Patrol, "Border Patrol Strategic Plan 1994 and Beyond," July 1994, https://www.hsdl.org/?abstract&did=721845, 6.

89.  United States Border Patrol, Southwest Border Deaths by Fiscal Year, 1998-2019, https://www.cbp.gov/sites/default/files/assets/documents/2019-Mar/bp-southwest-border-sector-deaths-fy1998-fy2018.pdf.

90.  U.S. Citizenship and Immigration Services, "Organizational Timeline," updated July 30, 2020, https://www.uscis.gov/about-us/our-history/organizational-timeline.

91.  U.S. Customs and Border Protection, Office of Border Patrol, *National Border Patrol Strategy*, 2004, 2, https://www.hsdl.org/?view&did=457100.

92.  U.S. Department of Homeland Security, *Budget-in-Brief*, FY 2018-FY 2021, https://www.dhs.gov/dhs-budget.

93.  Greg Chen and Su Kim, *Border Security: Moving Beyond Past Benchmarks* (Washington, DC: American Immigration Lawyers Association, January 2013), http://www.aila.org/content/default.aspx?bc=25667|43061.

94.  Christina Leza, *Handbook on Indigenous Peoples' Border Crossing Rights Between the United States and Mexico* (Tucson, AZ: Alianza Indígenous Alliance Without Borders, April 2019), https://www.indigenousalliance.org/copy-of-home.

95.  Tohono O'odham Nation, "No Wall," February 19, 2017, http://www.tonation-nsn.gov/nowall; National Congress of American Indians, "Resolution #ECWS-17-002," February 2017, http://www.tonation-nsn.gov/wp-content/uploads/2017/02/ECWS-17-002-final.pdf.

96.  Teo Armus, "'You don't control the border': Indigenous groups protesting wall construction clash with federal agents," *The Washington Post*, September 23, 2020, https://www.washingtonpost.com/nation/2020/09/23/border-wall-construction-protests.

97.  Ed Pilkington, "'These are his people': inside the elite border patrol unit Trump sent to Portland," *The Guardian*, July 27, 2020, https://www.theguardian.com/us-news/2020/jul/27/trump-border-patrol-troops-portland-bortac.

98.  *MSNBC*, "Former Border Patrol agent 'not surprised' at racist, sexist report," July 2, 2019, https://www.msnbc.com/the-beat-with-ari/watch/fmr-border-patrol-agent-not-surprised-at-racist-sexist-report-63180869976; *MSNBC*, "Former Border Patrol agent: In the academy they teach agents to use racist terms for migrants," July 7, 2019, https://www.msnbc.com/am-joy/watch/fmr-border-patrol-agent-in-the-academy-they-teach-agents-to-use-racist-terms-for-migrants-63419973687.

99.  Todd Miller, *Border Patrol Nation: Dispatches from the Front Lines of Homeland Security* (San Francisco, CA: City Lights Publishers, 2014), 106.

100. Daniel E. Martinez, Jeremy Slack, and Josiah Heyman, *Bordering on Criminal: The Routine Abuse of Migrants in the Removal System* (Washington, DC: American Immigration Council, December 2013), https://www.americanimmigrationcouncil.org/research/bordering-criminal-routine-abuse-migrants-removal-system.

101. Josiah Heyman, Jeremy Slack, and Daniel E. Martinez, *Why Border Patrol Agents and CBP Officers Should Not Serve as Asylum Officers* (New York, NY: Center for Migration Studies, June 21, 2019), https://cmsny.org/publications/heyman-slack-martinez-062119.

102. Josiah Heyman, Jeremy Slack, and Daniel E. Martinez, *Why Border Patrol Agents and CBP Officers Should Not Serve as Asylum Officers* (New York, NY: Center for Migration Studies, June 21, 2019), https://cmsny.org/publications/heyman-slack-martinez-062119; Daniel E. Martinez, Jeremy Slack, and Josiah Heyman, *Bordering on Criminal: The Routine Abuse of Migrants in the Removal System* (Washington, DC: American Immigration Council, December 2013), https://www.americanimmigrationcouncil.org/research/bordering-criminal-routine-abuse-migrants-removal-system.

103. U.S. Immigration and Customs Enforcement Office of Professional Responsibility, "Report of Investigation – CBP 2019 070604," March 1, 2012, https://assets.documentcloud.org/documents/7007775/CBP-2019-070604-Redacted.pdf.

104. *United States of America vs. David Sipe*. 388 F. 3d 471 (5th Cir. 2004).

105. John Washington, "'Kick Ass, Ask Questions Later': A Border Patrol Whistleblower Speaks Out About Culture of Abuse Against Migrants," *The Intercept*, September 20, 2018, https://theintercept.com/2018/09/20/border-patrol-agent-immigrant-abuse.

106. National Immigrant Justice Center, Esperanza Immigrant Rights Project, Americans for Immigrant Justice, Florence Immigrant & Refugee Rights Project, and ACLU Border Litigation Project, "Systemic Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection," June 11, 2014, https://www.aclusandiego.org/cbp-child-abuse-foia.

107. The University of Chicago Law School International Human Rights Clinic, ACLU San Diego and Imperial Counties Border Litigation Project, ACLU Border Rights, "Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection," May 2018, https://www.dropbox.com/s/kx3zey3b6s5hmbu/CBP_1-Pager_final.pdf?dl=0.

108. Tim Dickinson, "'Guats', 'Tonks' and 'Subhuman Shit': The Shocking Texts of a Border Patrol Agent," *Rolling Stone*, June 13, 2019, https://www.rollingstone.com/politics/politics-news/matthew-bowen-border-patrol-trial-847878.

109. A.C. Thompson, "After a Year of Investigation, the Border Patrol Has Little to Say About Agents' Misogynistic and Racist Facebook Group," *ProPublica*, August 5, 2020, https://www.propublica.org/article/after-a-year-of-investigation-the-border-patrol-has-little-to-say-about-agents-misogynistic-and-racist-facebook-group.

110. Ibid.

111. Pablo Chapablanco, "'Traveling While Hispanic': Border Patrol Immigration Investigatory Stops at TSA Checkpoints and Hispanic Appearance," *Cornell Law Review* 104, Issue 5 (July 2019): 1448, https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=4806&context=clr.

112. American Civil Liberties Union, "The Constitution in the 100-Mile Border Zone," 2020, https://www.aclu.org/other/constitution-100-mile-border-zone.

113. New York Civil Liberties Union, *Justice Derailed: What Raids on New York's Trains and Buses Reveal about Border's Interior Enforcement Practices* (New York, NY: November 2011), https://www.nyclu.org/sites/default/files/publications/NYCLU_justicederailedweb_0.pdf.

114. Chris Rickerd, "Implemented Law Enforcement Best Practices for our Nation's Biggest Police Force," American Civil Liberties Union, November 5, 2012, https://www.aclu.org/fact-sheet/fact-sheet-implementing-law-enforcement-best-practices-our-nations-biggest-police-force

115. *Sanchez v. U.S. Office of Border Patrol*, Case No. 2:12-cv-05378-BHS, ECF No. 1, ¶ 7 (April 26, 2012, W.D. Wash. February 12, 2013).

116. Samantha Sabo, et al., "Everyday violence, structural racism and mistreatment at the US-Mexico border," *Social Science & Medicine,* 109 (2014), 66-74.

117. People Helping People, *Checkpoint Monitoring Report* (Arivaca, AZ: October 26, 2014), http://phparivaca.org/?page_id=1174.

118. Nancy Adossi, Ed.D., Tadios Belay, Carl Lipscombe, and Benjamin Ndugga-Kabuye, *Black Lives at the Border* (New York, NY: Black Alliance for Just Immigration, January 2018), http://baji.org/resources.

119. Tom Jawetz and Scott Shuchart, *Language Access Has Life-or-Death Consequences for Migrants* (Washington D.C.: Center for American Progress, February 20, 2019), https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants; NYU Law Immigrant Rights Clinic and Black Alliance for Just Immigration, *The State of Black Immigrants,* 2020, http://baji.org/resources.

120. Andrew Selsky and Patrick Whittle, "Record number of African migrants coming to Mexican border," *AP News*, June 16, 2019, https://apnews.com/article/429f04067c38428ba0d06749b53e6df0; U.S. Customs and Border Protection, "Del Rio Border Patrol Sector African Arrests top 1,100," July 19, 2019, https://www.cbp.gov/newsroom/local-media-release/del-rio-border-patrol-sector-african-arrests-top-1100; U.S. Customs and Border Protection, "U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector (FY2018-FY2019), https://www.cbp.gov/newsroom/media-resources/stats.

121. U.S. Department of Justice, *Guidance for federal law enforcement agencies regarding the use of race, ethnicity, gender, national origin, religion, sexual orientation, or gender identity*, December 2014, https://www.dhs.gov/sites/default/files/publications/use-of-race-policy_0.pdf.

122. Department of Homeland Security, "Fact Sheet: U.S. Department of Justice Racial Profiling Guidance," December 8, 2014, https://www.dhs.gov/news/2014/12/08/fact-sheet-us-department-justice-racial-profiling-guidance.

123. Nick Miroff, "The Border Patrol made this dramatized video showing migrant killing innocent victim in a dark alley," *The Washington Post*, September 4, 2020, https://www.washingtonpost.com/national/the-border-patrol-made-this-dramatized-video-showing-migrant-murdering-innocent-victim-in-a-dark-alley/2020/09/04/11ad3620-ee9c-11ea-a21a-0fbbe90cfd8c_story.html

124. Protect Democracy Project, "FOIA on Border Militias," https://protectdemocracy.org/project/foia-on-border-militias; Shane Bauer, "Undercover with a Border Militia," *Mother Jones*, Nov/Dec 2016, https://www.motherjones.com/politics/2016/10/undercover-border-militia-immigration-bauer; Alex Horton, "'George Zimmerman on steroids:' How armed 'militias' roam the border in legal grey areas," *The Washington Post*, April 25, 2019, https://www.washingtonpost.com/nation/2019/04/24/border-militias-legal-gray-areas-civilians-detaining-migrants-gunpoint.

125. U.S. Customs and Border Protection, "Border Patrol Tactical Unit (BORTAC)," February 2014, https://www.cbp.gov/sites/default/files/documents/Border%20Patrol%20Tactical%20Unit.pdf.

126. Hamed Aleaziz, Adolfo Flores, and Kendall Taggart, "Former Officials Say The Elite Border Patrol Unit Sent To Confront Portland Protestors is Like A 'Fish Out of Water'," *BuzzFeed News*, July 24, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/elite-ice-unit-versus-portland-protesters-controversy.

127. American Civil Liberties Union, "Documents Obtained By ACLU Reveal Border Patrol Agents Were Authorized To Use Deadly Force At George Floyd's Burial," October 1, 2020, https://www.aclu.org/press-releases/documents-obtained-aclu-reveal-border-patrol-agents-were-authorized-use-deadly-force.

128. Southern Border Communities Coalition, "Deaths by Border Patrol Since 2010," last updated July 23, 2020, https://www.southernborder.org/deaths_by_border_patrol.

129. Alex Nowrasteh, "Border Patrol Agent Deaths in the Line of Duty, 2003-2019" (Washington, DC: CATO Institute), https://www.cato.org/blog/border-patrol-agent-deaths-line-duty-2003-2019.

130. Hernández v. United States, 785 F.3d 117, 119 (5th Cir. 2015)

131. Department of Homeland Security Office of Inspector General, *CBP Use of Force Training and Actions to Address Use of Force Incidents*, OIG-13-114, September 2013, https://www.oig.dhs.gov/assets/Mgmt/2013/OIG_13-114_Sep13.pdf.

132. Alex Nowrasteh, *Border Patrol Termination Rates: Discipline and Performance Problems Signal Need for Reform* (Washington, DC: CATO

American Immigration Council © February 2021. The American Immigration Council is a non-profit, non-partisan organization.    24

Institute, November 2, 2017), http://www.cato.org/publications/policy-analysis/border-patrol-termination-rates-discipline-performance-problems-signal.

133. Ibid.

134. Garrett M. Graff, "The Border Patrol Hits a Breaking Point," *Politico*, July 15, 2019, https://www.politico.com/magazine/story/2019/07/15/border-patrol-trump-administration-227357.

135. Guillermo Cantor and Walter A. Ewing, *Still No Action Taken: Complaints Against Border Patrol Agents Continue to Go Unanswered* (Washington, DC: American Immigration Council, August 2, 2017), https://www.americanimmigrationcouncil.org/research/still-no-action-taken-complaints-against-border-patrol-agents-continue-go-unanswered.

136. Ibid.

137. Department of Homeland Security, Office of the Inspector General, *DHS Needs to Improve Its Oversight of Misconduct and Discipline*, OIG-19-48, June 17, 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-48-Jun19.pdf.

138. Ibid.

139. John Washington, "'Kick Ass, Ask Questions Later': A Border Patrol Whistleblower Speaks Out About Culture of Abuse Against Migrants," *The Intercept*, September 20, 2018, https://theintercept.com/2018/09/20/border-patrol-agent-immigrant-abuse.

140. *MSNBC*, "Former Border Patrol agent 'not surprised' at racist, sexist report," July 2, 2019, https://www.msnbc.com/the-beat-with-ari/watch/fmr-border-patrol-agent-not-surprised-at-racist-sexist-report-63180869976.

141. Josiah McC. Heyman, *Why Caution is Needed Before Hiring Additional Border Patrol Agents and ICE Officers* (Washington, DC: American Immigration Council, April 24, 2017), https://www.americanimmigrationcouncil.org/research/why-caution-needed-hiring-additional-border-patrol-agents-and-ice-officers.

142. Garrett M. Graff, "The Green Monster: How the Border Patrol became America's most out-of-control law enforcement agency," *Politico*, November/December 2014, https://www.politico.com/magazine/story/2014/10/border-patrol-the-green-monster-112220.

143. U.S. Government Accountability Office, *Additional Actions Needed to Strengthen CBP Efforts to Mitigate Risk of Employee Corruption and Misconduct,* December 2012, https://www.gao.gov/assets/660/650505.pdf.

144. Garrett M. Graff, "The Green Monster: How the Border Patrol became America's most out-of-control law enforcement agency," *Politico*, November/December 2014, https://www.politico.com/magazine/story/2014/10/border-patrol-the-green-monster-112220.

145. U.S. Government Accountability Office, *Additional Actions Needed to Strengthen CBP Efforts to Mitigate Risk of Employee Corruption and Misconduct,* December 2012, https://www.gao.gov/assets/660/650505.pdf.

146. Garrett M. Graff, "The Green Monster: How the Border Patrol became America's most out-of-control law enforcement agency," *Politico*, November/December 2014, https://www.politico.com/magazine/story/2014/10/border-patrol-the-green-monster-112220.

147. American Immigration Council, American Immigration Lawyers Association, Catholic Legal Immigration Network, Inc. Complaint to the Office for Civil Rights and Civil Liberties, Department of Homeland Security Office of the Inspector General, and Federal Bureau of Investigation Re: Deprivation of Medical Care to Children in CBP Custody, https://www.americanimmigrationcouncil.org/advocacy/medical-negligence-customs-and-border-protection-facilities.

148. Ibid.

149. Ibid.

150. United States House Committee on Homeland Security, Hearing on Children in CBP Custody: Examining Deaths, Medical Care Procedures, and Improper Spending, July 15, 2020, https://homeland.house.gov/activities/hearings/children-in-cbp-custody-examining-deaths-medical-care-procedures-and-improper-spending.

151. Tom Jawetz and Scott Shuchart, *Language Access Has Life-or-Death Consequences for Migrants* (Washington D.C.: Center for American Progress, February 20, 2019), https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants.

152. Ibid.

153. Rachel Nolan, "A Translation Crisis at the Border," *The New Yorker*, December 30, 2019, https://www.newyorker.com/magazine/2020/01/06/a-translation-crisis-at-the-border.

154. *Lau v. Nichols*, 414 U.S. 563 (January 21, 1974), https://cdn.loc.gov/service/ll/usrep/usrep414/usrep414563/usrep414563.pdf.

155. Department of Homeland Security, "Language Access at the Department of Homeland Security," February 28, 2012, https://www.dhs.gov/publication/dhs-language-access-plan.

**STB_AR1_011029**

American Immigration Council © February 2021.  The American Immigration Council is a non-profit, non-partisan organization.    25

The Legacy of Racism in the Border Patrol, February 2021

156. Tom Jawetz and Scott Shuchart, *Language Access Has Life-or-Death Consequences for Migrants* (Washington D.C.: Center for American Progress, February 20, 2019), https://www.americanprogress.org/issues/immigration/reports/2019/02/20/466144/language-access-life-death-consequences-migrants.

157. United States House Committee on Homeland Security, Hearing on Children in CBP Custody: Examining Deaths, Medical Care Procedures, and Improper Spending, July 15, 2020, https://homeland.house.gov/activities/hearings/children-in-cbp-custody-examining-deaths-medical-care-procedures-and-improper-spending.

158. Robert Moore, "CDC recommended that migrants receive flu vaccine, but CBP rejected the idea," *The Washington Post*, November 25, 2019, https://www.washingtonpost.com/immigration/cdc-recommended-that-migrants-receive-flu-vaccine-but-cbp-rejected-the-idea/2019/11/25/8aba198e-0fb8-11ea-b0fc-62cc38411ebb_story.html.

159. United States House Committee on Homeland Security, Hearing on Children in CBP Custody: Examining Deaths, Medical Care Procedures, and Improper Spending, July 15, 2020, https://homeland.house.gov/activities/hearings/children-in-cbp-custody-examining-deaths-medical-care-procedures-and-improper-spending.

160. Ibid.

161. U.S. Government Accountability Office, *CBP Needs to Increase Oversight of Funds, Medical Care, and Reporting of Deaths*, July 2020, https://www.gao.gov/products/GAO-20-536.

162. Ibid.

163. *Doe v. Wolf,* Case No. 4:15-cv-00250-DCB, ECF No. 1 (June 8, 2015, D. Ariz. 2015), https://www.americanimmigrationcouncil.org/sites/default/files/litigation_documents/doe_v_johnson_complaint.pdf.

164. American Immigration Council, "Challenging Unconstitutional Conditions in CBP Detention Facilities" (Washington, DC: 2020), https://www.americanimmigrationcouncil.org/litigation/challenging-unconstitutional-conditions-cbp-detention-facilities.

165. *Doe v. Wolf,* Case No. 4:15-cv-00250-DCB, ECF No. 482, pg 10, line 27-28 (February 19, 2020, D. Ariz. 2015), https://www.americanimmigrationcouncil.org/sites/default/files/litigation_documents/doe_v_johnson_findings_of_fact_and_conclusions_of_law.pdf.

166. U.S. Department of Justice, *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (April 6, 2018), https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry; U.S. Department of Justice, *Memorandum for Federal Prosecutors Along the Southwest Border* (April 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download.

167. Nicole Narea, "The Trump administration knew exactly what it was doing with family separations," *Vox*, October 7, 2020, https://www.vox.com/2020/10/7/21506059/trump-family-separations-sessions-rosenstein.

168. American Immigration Council, "The End of Immigration Enforcement Priorities Under the Trump Administration" (Washington, DC: March 7, 2018), https://www.americanimmigrationcouncil.org/research/immigration-enforcement-priorities-under-trump-administration.

169. U.S. Immigration and Customs Enforcement, "ICE HIS El Paso, USPB identify more than 200 'fraudulent families' in last 6 months," October 17, 2019, https://www.ice.gov/news/releases/ice-hsi-el-paso-usbp-identify-more-200-fraudulent-families-last-6-months.

170. U.S. House of Representatives Committee on the Judiciary, *The Trump Administration's Family Separation Policy: Trauma Destruction, and Chaos*, October 2020, 3, https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3442.

171. RAICES, "*The United States government kidnapped my son." Surviving Family Separation and Prolonged Family Detention: A Report on the Families of Karnes* (San Antonio, TX: July 2020), https://www.raicestexas.org/take-action/karnes-pro-bono-project/ms-l-report.

172. Jeffery C. Mays and Matt Stevens, "Honduran Man Kills Himself After Being Separated From Family at U.S. Border, Reports Say," *New York Times*, June 10, 2018, https://www.nytimes.com/2018/06/10/us/border-patrol-texas-family-separated-suicide.html.

173. Jessica Henderson Daniel and Arthur C. Evans, Letter to President Trump, American Psychological Association, June 14, 2018, https://www.apa.org/advocacy/immigration/separating-families-letter.pdf.

174. Hajar Habbach, Kathryn Hampton, and Ranit Mishori, *"You Will Never See Your Child Again": The Persistent Psychological Effects of Family Separation* (New York, NY: Physicians for Human Rights, February 2020), 5, 11, https://phr.org/our-work/resources/you-will-never-see-your-child-again-the-persistent-psychological-effects-of-family-separation.

175. U.S. Department of Homeland Security, Office of Inspector General, OIG-20-06, *DHS Lacked Technology Needed to Successful Account for Separated Migrant Families,* November 2019, https://www.oig.dhs.gov/sites/default/files/assets/2019-11/OIG-20-06-Nov19.pdf.

176. *Ms. L, et al., v. U.S. Immigration and Customs Enforcement, et al.,* Case No. 3:18-cv-00428-DMS-MDD, ECF No. 560, pg 8, line 6 (December 2, 2020, S.D. Cali. 2018).

STB_AR1_011030

177. Sarah Abdel-Motaleb, Roberto Lopez, and Andy Udelsman, "Family Separations Continue In South Texas, Years After They Allegedly Ended," *TCRP Mag*, October 21, 2020, https://news.txcivilrights.org/2020/10/21/family-separations-continue-in-south-texas-years-after-they-allegedly-ended.

178. RAICES, *"The U.S. Government Kidnapped my Son," Surviving Family Separation and Prolonged Family Detention: A Report on the Families of Karnes* (San Antonio, TX: July 2020), https://www.raicestexas.org/take-action/karnes-pro-bono-project/ms-l-report.

STB_AR1_011031

 

August 23, 2018

VIA ELECTRONIC MAIL

Cameron Quinn
Officer for Civil Rights and Civil Liberties
Department of Homeland Security
Washington, DC 20528

John V. Kelly
Acting Inspector General
Department of Homeland Security
Washington, DC 20528

Re:  **The Use of Coercion by U.S. Department of Homeland Security (DHS) Officials Against Parents Who Were Forcibly Separated From Their Children**

Dear Ms. Quinn and Mr. Kelly,

As partners in the Immigration Justice Campaign, the American Immigration Council ("Council") and the American Immigration Lawyers Association ("AILA") jointly file this complaint on behalf of numerous parents who were separated from their children while in Department of Homeland Security (DHS) custody pursuant to the Trump administration's "zero tolerance" policy, and then subject to extreme duress and coercion while in DHS custody. Over 2,600 minor children were forcibly separated from their parents; at the time of filing of this complaint, an estimated 366 parents remain outside the United States, having been deported without their children, and 565 children remain in government custody, still separated from their parents.[1]

A federal court has determined that the practice of separating children from their parents "shocks the conscience."[2] Medical[3] and psychological[4] experts have repeatedly expressed grave concerns about the deleterious and lasting impact that separation has had—and continues to have—on children and their parents. Republican and Democratic

---

[1] *See* Joint Status Report, Dkt 191 at 2, *Ms. L. v. ICE*, No. 18-cv428-DMS-MDD (S.D. Cal. Aug. 18, 2018), *available at* https://www.aclu.org/legal-document/ms-l-v-ice-joint-status-report-2.
[2] *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. June 26, 2018) (order granting preliminary injunction).
[3] ACP Objects to Separation of Children from their Parents at Border, American College of Physicians, May 31, 2018, *available at*: https://www.acponline.org/acp-newsroom/acp-objects-to-separation-of-children-from-their-parents-at-border (last accessed August 15, 2018).
[4] Alexander Miller, et al., (2018), *Understanding the mental health consequences of family separation for refugees: Implications for policy and practice*, American Journal of Orthopsychiatry, Vol 88(1) 2018, 26-37, *available at*: http://psycnet.apa.org/doiLanding?doi=10.1037%2Fort0000272.

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 1092 of 1203

The Use of Coercion by U.S. DHS Officials Against Parents Who Were Forcibly Separated From Their Children
American Immigration Council and AILA | August 23, 2018

Other parents reported intimidation by ICE officers while detained. One mother, D.P., described how an ICE officer nicknamed "The Deporter" physically intimidated her while trying to get her to sign a voluntary departure form, standing over her menacingly and shouting at her to sign.[48]

D.P.'s experience is particularly troubling, as she was also placed in solitary confinement and subject to starvation by officials at the Port Isabel Detention Center, after she shouted to draw the attention of a visiting official who was touring the facility. Another mother, A.E., was also threatened with solitary confinement while at the Port Isabel Detention Center, for crying frequently and for refusing to eat due to stress and trauma.[49] These stories are shared in greater detail below.

### **Stress from family separation and parents' lack of information about the credible fear process prevented many parents from participating meaningfully in the asylum process.**

The Constitution, federal statutes, and regulations guarantee asylum-seekers due process and specific procedures to safeguard their access to humanitarian protection and legal relief.[50] Over the past decade, numerous organizations have documented how DHS officials frequently fail to follow these rules and regulations, and in doing so violate domestic and international human rights laws.[51] Unfortunately, when asylum-seekers were subjected to family separation, the trauma of having a child forcibly removed from an asylum-seeking parent created an environment so coercive that parents were unable to participate meaningfully in the asylum process.

During credible fear interviews, separated parents were not informed of the role that asylum officers conducting the credible fear interviews played. Many parents reported not even knowing that the credible fear interview had anything to do with their request for asylum. Most of the separated parents were not told in advance what the purpose of the interview was. For many, the credible fear interview was their most substantial interaction with any immigration official after having been separated from their child. As a result, some parents spent large portions of the interview asking questions about their children and begging to see them. This perception was compounded by the failure of government officials to clarify the purpose of the interviews. Separated parents were not

---

[48] Declaration of D.P., August 5, 2018, on file with authors.

[49] Declaration of A.E., August 6, 2018, on file with authors.

[50] *See, e.g.*, 8 U.S.C. § 1158(a) (providing that any noncitizen "who is physically present in the United States or who arrives in the United States … may apply for asylum"); 8 U.S.C. § 1225(b)(1)(B)(ii) (providing that a noncitizen who expresses a fear of return must be given a credible fear interview); *Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir. 1996) ("The basic procedural rights Congress intended to provide asylum applicants . . . are particularly important because an applicant erroneously denied asylum could be subject to death or persecution if forced to return to his or her home country."); U.S. Const. Amend. V (protecting right to due process).

[51] *See, e.g.* American Immigration Council, et. al, *U.S. Customs and Border Protection's Systematic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border* (Jan. 13, 2017) (CRCL/OIG Complaint); U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, 20 (2016) (reporting that despite findings and recommendations in a 2005 study relating to primary inspection, USCIRF observers in 2016 continued to find "examples of non-compliance with required procedures" in CBP inspection interviews); Borderland Immigration Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the U.S.-Mexico Border*, 12 (2017), https://www.hopeborder.org/discretion-to-deny-1 (reporting that "it is commonplace for asylum seekers to be placed in expedited removal proceedings and summarily deported . . . despite expressing fear").

STB_AR1_011122

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 1093 of 1203

**The Use of Coercion by U.S. DHS Officials Against Parents Who Were Forcibly Separated From Their Children**
**American Immigration Council and AILA | August 23, 2018**

informed ahead of time that the officers had no knowledge of the whereabouts of their children nor authority to make any decisions about reunification.

One parent, D.P., said that she pled with the officer, saying, "I don't want anything, I just want my daughter. Please give me my daughter," something that she "repeated over and over again" while the officer seemingly grew increasingly angry with her.[52] Another parent, C.S., reported that she arrived at her credible fear interview in a state where her "mind was totally gone. I was only able to think about my daughters. I had barely eaten or had anything to drink for a long time because of the stress."[53] She repeatedly asked the interviewer where her children were.

Another mother, M.F., described that she omitted key information relating to her asylum case because she had been separated from her child.[54] She described that she was "scared that if I mentioned anything related to the MS-13 gang threats that my son received, they would take him away from me." She also reported being so preoccupied with her son's welfare during the credible fear interview that her "mind could not focus on anything other than the well-being of my son."

At least some parents, like M.F., also omitted information because they believed that to fully explain their story might prevent them from being reunified with their child. In many cases, parents were misinformed that they were being brought to speak to their child on the phone, only to find themselves—overwhelmed with disappointment—speaking with yet another government official with no knowledge about their children.

Given the psychological and physical duress suffered by parents separated from their children, and their ensuing preoccupation with the whereabouts and well-being of their children, many of the parents were denied any meaningful opportunity to participate in the credible fear process, in violation of the statutory right to apply for asylum.[55]

## Results of the Post-Reunification Survey.[56]

In the weeks leading up to the court's reunification deadline of July 26, 2018, hundreds of parents were reunified with their children and released on parole or through an alternatives to detention program. However, many parents, especially those with final orders of removal, were instead reunified with their children and sent to the South Texas Family Residential Center, a family detention center in Dilley, Texas. During the first three weeks of August 2018, while the parents remained in confinement, staff and

---

[52] Declaration of D.P., August 5, 2018, on file with authors.
[53] Declaration of C.S., August 6, 2018, on file with authors.
[54] Declaration of M.F., August 5, 2018, on file with authors.
[55] See, e.g., Campos, 43 F.3d at 1288. The ways in which the coercive environment affected asylum-seekers' ability to meaningfully participate in the asylum process is particularly troubling given the more than 366 parents who were deported prior to the Ms. L. court's June 26, 2018 order halting the removal of separated parents.
[56] The completed surveys are on file with the authors of this complaint, but to protect the mothers' privacy, the completed surveys have not been included. All quotations included in the "Results of the Post-Reunification Survey" section provided below come from mothers' responses to the question, "Is there anything else that you would like to share?"

STB_AR1_011123

# Symptoms of Trauma Among Political Asylum Applicants:  Don't Be Fooled[†]

By STUART L. LUSTIG, MD, MPH[*]

## I.  What is Post-Traumatic Stress Disorder?

Since 1981, mental health clinicians have recognized Post-Traumatic Stress Disorder (PTSD) as a psychiatric disorder that comprises a constellation of symptoms directly resulting from trauma.[1]    PTSD is diagnosed by psychiatrists, psychologists, psychiatric social workers, marriage and family therapists, and other mental health clinicians who have spent sufficient time with the trauma survivor to elicit the symptoms.    There are also many standardized interviews and survey instruments, used commonly in research settings, that can also generate this diagnosis.[2]

PTSD occurs only in trauma survivors, and, by definition, the trauma must be *perceived* as life threatening, and in many cases actually *is* life threatening.  Typical examples include torture, physical and sexual assaults, natural disasters, and motor vehicle accidents.  As a result of the trauma(s), the survivor suffers from symptoms such as unwanted memories, intrusive thoughts, nightmares, or flashbacks of the event.

Because these reminders of the original trauma are often quite disturbing, PTSD sufferers go to great lengths to avoid triggering any sort of reminder, and will therefore, by definition, shun places,

---

[†]  This article is a companion piece with Karen Musalo and Marcelle Rice's article.

[*]  University of California, San Francisco Department of Psychiatry, 401 Parnassus Ave Box 0984F, San Francisco CA 94143. slustig@ppi.ucsf.edu.

1.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL (3d ed. 1981).

2.  There are many examples: the Clinician Administered PTSD Scale (CAPS), the PTSD Reaction Index (PTSD-RI), the PTSD sections of the Structured Clinical Interview for DSM Disorders (SCID), and the Composite International Diagnostic Interview (CIDI).

725

STB_AR1_011439

than at baseline, which suggests that detention of asylum seekers exacerbates psychological symptoms.[7]

Less is known about psychiatric symptoms in asylum seekers who are children, but another Dutch study found that, based on data derived from initial intakes, PTSD and anxiety disorders were presumed present among 84 percent of the 129 child and adolescent asylum seekers evaluated by a multidisciplinary team in a specialized psychiatric clinic.[8] Depressive disorders were prevalent among 36 percent of the sample. For both diagnoses, unaccompanied minors seeking asylum were at significantly greater risk than were youngsters with families.

There are several obstacles to studying the unique effects of torture and maltreatment among political asylum seekers, not the least of which include distinguishing these effects from the emotional impact of migration itself, or the impact of detention, when applicable, as illustrated above. Although the exact origin of stress symptoms may be difficult to pinpoint, in an Australian study of post-traumatic stress among 196 Tamil refugees, asylum seekers and immigrants,[9] pre- and post-migration stress each accounted for 20 percent and 14 percent respectively of the variance in post-traumatic stress symptoms among the sample. In other words, migration and post-settlement stress are traumatic, but most of the symptoms are attributable to traumas reported in conjunction with alleged political persecution. Furthermore, symptoms of PTSD and other diagnoses, though by no means universal, are common among applicants for political asylum.

## III. Credibility in the Courtroom: How *Not* to Be Led Astray by Symptoms of Trauma

Unfortunately for survivors of trauma who are also seeking political asylum, telling and retelling the events of the past can be

---

7. Allen Keller, et al., *Mental Health of Detained Asylum Seekers*, 362 LANCET 1721-23, (Nov. 22, 2003).

8. Ingrid Burhorst & Elizabeth Batista Pinto Wiese, *The Mental Health of Asylum-seeking and Refugee Children and Adolescents Attending a Clinic in the Netherlands*, 44 TRANSCULTURAL PSYCHIATRY 596-613 (2007).

9. Kevin Bird, Patrick McGorry, P. Mohan, Derrick Silove, & Zachary Steel, *Pathways from War Trauma to Posttraumatic Stress Symptoms Among Tamil Asylum Seekers, Refugees, and Immigrants*, 12 J. TRAUMATIC STRESS 421-435 (1999).

STB_AR1_011442

extremely painful.  Just recounting the story is enough to trigger uncontrollable tears, panic attacks, or flashbacks of the event.  Thus, many asylum seekers may never actually recount all the details, particularly those that are shameful in their society, such as details of sexual violations.  Or they may tell incomplete versions, or versions that vary over time such that an affidavit prepared with the help of an attorney may differ from the story recounted to a mental health professional, or an adjudicator.   These inconsistencies can be indicative of a trauma story that is too painful to share in its entirety, but may be misinterpreted erroneously by adjudicators during an asylum hearing as a lack of credibility on the part of its victim.

In addition to the intentional filtering of information in affidavits to protect themselves from painful memories and shame, asylum seekers who have been traumatized may unintentionally omit key aspects of the story due to memory problems.  Memory problems which can affect credibility in the courtroom occur with PTSD, specifically with "dissociation," a psychiatric term used to describe a kind of numbing that occurs at the time of the trauma itself.  Someone who is dissociating may feel as though she is not in her body, but looking down on it while it is being raped or beaten, or he may feel that the assault is happening to someone else instead.  From the standpoint of adaptation, dissociation permits a person to endure a trauma that would otherwise be too horrific.  Dissociation  is like emotional and physical anesthesia.   However, despite its initially adaptive quality, a significant longterm problem with dissociation is that it makes it extremely difficult for people to make sense of what happened to them, in part because they simply do not remember the details.  The who/what/where/when/how of the details of the trauma are often lost to them.  Ironically, the dissociation caused by the trauma can adversely affect asylum applicants' credibility as they attempt, with difficulty, to describe the trauma.  Immigration Judges and Asylum Officers are understandably suspicious of factual accounts with conflicting, inaccurate, or missing data, but need to take into account the possibility that the very experience itself of severe trauma could be interfering with its description in an affidavit, an interview, or a courtroom.

Numbness associated with PTSD on an ongoing basis, rather than at the time of the trauma, may adversely affect the credibility of asylum seekers in the courtroom in a different way.   Many adjudicators understandably expect that survivors of trauma, particularly in its more horrific forms such as torture, will have such

STB_AR1_011443

*Applied Cognitive Psychology, Appl. Cognit. Psychol.* (2012)
Published online in Wiley Online Library (wileyonlinelibrary.com) **DOI**: 10.1002/acp.2868

# Credibility of Asylum Claims: Consistency and Accuracy of Autobiographical Memory Reports Following Trauma[†]

AMINA MEMON*

*Royal Holloway, University of London, Egham, Surrey, UK*

Summary: *Herlihy and colleagues (current issue) review the literature on the characteristics of autobiographical memory in asylum seekers who are presenting evidence of their traumatic experiences in the immigration courts with a view to finding a safe haven. In this commentary, I briefly discuss how the quality of the memory report may influence reliability and credibility judgements in individuals whose memories may be subject to post-traumatic stress disorder. Copyright © 2012 John Wiley & Sons, Ltd.*

Herlihy and colleagues review the literature on the characteristics of autobiographical memory in asylum seekers who are presenting evidence of their traumatic experiences in the immigration courts with a view to finding a safe haven. The goal of the review was to see how an understanding of autobiographical memory for traumatic events can inform the asylum process. In the UK, an asylum applicant is anyone who makes a request to be recognised as a refugee under the Geneva Convention (Convention, 1949).

Post-traumatic stress disorder (PTSD) is developed and maintained through the explicit memory of a particular event (Rubin, Berntsen, & Bohni, 2008), and there is an extensive literature on the subject (see Brewin, 2011). This is the first review of its kind to bring it together with other relevant work such as the work on the functions of autobiographical memory, research on the effects of PTSD and emotion on memory, and the burgeoning literature on deception detection to address a contemporary problem in society and one that is international, namely how to assess claims for asylum. The decision rests heavily on the perceived credibility of the applicant as well as the reliability of their account of persecution (Herlihy et al.).

One of the key themes that goes through this article is that each eyewitness has a unique reaction to a traumatic event and response to trauma is not only influenced by personality and coping style but also by language and culture. This is something that tends to be overlooked so often in the literature because our conclusions are heavily influenced by meta-analyses of experimental studies of memory in non-traumatised individuals of what Herlihy et al. refer to as 'upsetting experiences'. Not only do the studies lack external validity but also any policy implications that can be derived from the literature are restricted (Malpass et al., 2008), which means the impact of this type of research is limited too.

Moving on to PTSD and memory, in many respects, memories for traumatic events are not unlike memories for non-traumatic events (Alexander et al., 2005; Dalgleish, 2004; Brewin, 2011). Events that are of personal significance are rehearsed more often and are more likely to be recalled assuming they are integrated with narrative knowledge about the self

(Brewin & Holmes, 2003; Rubin et al., 2008). Both types of memories are subject to decay and the influence of schema over time in line with theories of reconstructive memory (Bartlett, 1932) and forgetting (Brainerd & Reyna, 2001). Autobiographical memories can also vary in their specificity (see Andrews, Brewin, Philpott, & Stewart, 2007; Holland & Kensinger, 2010 for reviews), and neural correlates of specific versus general memories have been identified (Holland, Addis, & Kensinger, 2011).

## CONSISTENCY AND ACCURACY OF MEMORY

There is a gap between what decision makers believe to be cues to credibility and what science tells us (Fisher, Brewer, & Mitchell, 2009). One cue that tends to be weighted too heavily when making judgments about both reliability (accuracy) as well as credibility (honesty) is whether a witness reports the same details when questioned repeatedly. Accuracy and consistency are not strongly related, so the perception that an inconsistent witness is unreliable is misleading (see Fisher et al., 2009; Odinot, Wolters, & van Giezen, 2012). Nevertheless, it is not uncommon for advocates to adopt questioning techniques to lower confidence and increase inconsistency in witness reports in order to undermine their credibility. One strategy may be to bait witnesses to lower the criterion for responding (for example, by asking very specific questions about peripheral details) to encourage low confidence responses (Fisher, Rivard, Leins, & Pludwinski, 2012). When asked about the confidence of their responses, a witness may then report that they are not very confident, and from this statement, the reliability and credibility of their evidence may be questioned.

There are a number of important points made in the Herlihy et al. review in relation to the consistency of testimony of asylum seekers. For example, the memory reports of asylum seekers may lack the very details that are indicative of reliability and credibility. In one study in which refugees granted leave to remain in the UK recalled a traumatic and non-traumatic event, a follow up interview between 3 and 32 weeks later indicated discrepancies in almost a third of questions, regardless of the nature of the event, with more inconsistencies in those displaying a higher level of trauma and when a longer time delay had elapsed (Herlihy et al., 2002). Traumatic memories may be more complex and detailed and associated with more vivid and detailed imagery increasing the likelihood of hypermnesia

*Correspondence to: Amina Memon, Royal Holloway, University of London, Egham, Surrey, UK.
E-mail: Amina.Memon@rhul.ac.uk
[†]Commentary on 'Just tell us what happened to you: autobiographical memory and seeking asylum'. DOI: 10.1002/acp.2852

Copyright © 2012 John Wiley & Sons, Ltd.

A. Memon

(see Brewin, 2011 for a review). There are a number of complicating factors such as whether the severity of PTSD symptoms leads to more or less accurate recall. Brewin (2011) suggests that increased symptoms may improve access to material in memory particularly with respect to events central in an individual's life, but reductions in symptoms may lead to forgetting (see Schraedley et al., 2002). Another complicating factor is that studies of delayed-onset PTSD indicate that memories of trauma can acquire characteristics at retrieval and can change during the course of PTSD treatment (Sutherland & Bryant, 2007).

## CONSISTENCY AS A DECEPTION STRATEGY

Consistency is often used as a strategy by people engaging in deliberate lies as a strategy to convince judges that they are speaking the truth (Granhag, Strömwall, & Jonsson, 2003). Moreover, rehearsal of lies can lead to overly scripted responses. Herein lies the problem, on the one hand, we have a heuristic (consistency) that is taken to be an indicator of truthfulness. However, someone who has rehearsed a lie may also provide a scripted response (Vrij, Granhag, & Porter, 2010). The difficulty in relying on non-verbal cues compounds this problem. Herlihy et al. refer to reviews of the literature to point out that non-verbal cues are unreliable. However, perceivers may be looking for the wrong cues in a given situation. Hartwig and Bond (2011) maintain that the behavioural differences between liars and truth tellers are very small, because people are skilled at deception and both liars and truth tellers work at creating a credible impression. Granhag and Hartwig (2012) argue that specific questioning strategies may need to be employed to get people to elicit cues that may then be used to assess credibility. However, the work of Herlihy et al. suggests that this may not work with individuals who are giving evidence as part of the asylum process, as these individuals may be coerced into concealing facts, for example by traffickers, and when giving a truthful account may have to engage in additional cognitive effort. Increasing cognitive load, a strategy that is used to detect deceit in liars may backfire because it may simply make the testimony of asylum seekers appear inconsistent. This then returns to the question of how best to interview asylum seekers and how to deal with inconsistencies in their accounts. The problem is compounded because the stakes are high for asylum seekers for whom it is so important that they are believed. It is because of this that asylum seekers may deliberately attempt to appear credible and use strategies to achieve this goal. Herlihy et al. suggest that asylum seekers may add details to a predominantly truthful statement to strengthen their case or omit details for fear of safety or to protect others. Thus cues to deception based on the level or specificity of detail and consistency are unlikely to be reliable. Doubts about 'being believed' may be critical to many people who have experienced trauma, such as torture or rape. Some evidence suggests that in a (non-asylum seeking) sample of rape victims, beliefs that one's memory about the rape is inadequate was associated with a reduced likelihood of pursuing a conviction (Hardy, Young, & Holmes, 2009). Perhaps in addition to 'deception', an 'underconfidence' in one's memories is also an area, which may need to be considered in the future.

## WHAT HAPPENS TO TRAUMATIC MEMORIES OVER TIME?

It is clear that like all types of memory, memory for traumatic events changes over time and further that this appears to be associated with the severity of PTSD symptoms (see Brewin, 2011). Again, there is a dearth of data on how mode of questioning might moderate these effects, although it appears to be the case that consistency can be improved by asking people about broader inclusive categories of events (Krinsley, Gallagher, Weathers, Kutter, & Kaloupek, 2003). This appears to be consistent with 'over general memory (OGM)' in people with PTSD where a response to a question is met with a general description or reference to a category of events rather than a specific episode. As pointed out by Herlihy et al., it is important to bear in mind that general memories are not necessarily non-credible, false or exaggerated. Schönfeld, Ehlers, Böllinghaus, and Rief (2007) suggest that OGM may be related to attempts to suppress trauma memories although as pointed out by Brewin (2011), the role in PTSD of OGM is as yet unclear.

The issue of stability of trauma memory is a key one, and this is directly relevant to the issue of whether memories remain consistent or are inconsistent over time. Brewin (2011) reviews studies that questioned rape survivors soon after a clearly specified event noting significant gaps in their memory initially but an improvement in recall 3 months on (Mechanic, Resick, & Griffin, 1998), possibly related to dissociative symptoms subsiding (see Zoellner, Sacks, & Foa, 2001). Engelhard, van de Hout, and McNally (2008) have shown high levels of memory inconsistency in their study of a sample of Dutch soldiers in Iraq. As indicated earlier, it is unlikely that there is a direct relationship between PTSD treatment and narrative organisation of memories.

Asylum applicants have to convince decision makers that the claim they are making is a credible one, and although the Office of the United Nations High Commissioner offers some guidance, there is a considerable discretion in individual decision making. Some judges have gone as far as saying that the asylum and appeal process is a lottery (Rami-Nogales, Schoenholtz, & Schrag, 2009). A project that examined the interviews and appeal hearings of female applicants seeking asylum in the UK noted that asylum decision makers often invoked factors such as delayed disclosure, inconsistencies in accounts, and a calm or overly emotional demeanour on the part of the female applicant to justify suspicion regarding allegations of rape (Baillot, Cowan, & Munro, 2012; see also Ellison & Munro, 2009; Bogner, Herlihy, & Brewin, 2007). Educating judges and jurors about the different ways in which a witness may respond to trauma and the complex effects on testimony may reduce reliance on witness demeanour in making decisions (Ellison & Munro, 2006).

As I have tried to illustrate here, the Herlihy et al. review represents a hugely important area and is of value to several fields within psychology including in autobiographical memory, traumatic stress and cross-cultural differences in human behaviour. Further, this work has direct translational implications for a range of disciplines from psychology and the legal profession to mental health policy. It is a timely and much warranted

Copyright © 2012 John Wiley & Sons, Ltd.



Available online at www.sciencedirect.com

ScienceDirect

Acta Psychologica 127 (2008) 645–653

acta
psychologica

www.elsevier.com/locate/actpsy

# Specificity of episodic and semantic aspects of autobiographical memory in relation to symptoms of posttraumatic stress disorder (PTSD)

Ali R. Moradi [a], Jane Herlihy [d], Gita Yasseri [a], Mehrnaz Shahraray [a], Stuart Turner [b], Tim Dalgleish [c,*]

[a] Teacher Training University, Tehran, Iran
[b] Trauma Clinic, London, UK
[c] Medical Research Council Cognition and Brain Sciences Unit, 15 Chaucer Road, Cambridge CB2 7EF, UK
[d] Centre for the Study of Emotion and Law, 7, Devonshire Street, W1W 5DY, London, UK

Received 6 November 2006; received in revised form 1 October 2007; accepted 12 November 2007
Available online 14 February 2008

**Abstract**

Two studies examined the relationship between the ability to access specific autobiographical material in memory and presence/symptoms of posttraumatic stress. In Study 1, a sample of refugees with a diagnosis of posttraumatic stress disorder (PTSD) completed the Autobiographical Memory Test (AMT) in which they had to generate specific *episodic* autobiographical memories in response to emotion-related cue words. Results showed that reduced specificity of memories on the AMT was associated with an increased frequency of trauma-related flashbacks but with reduced use of effortful avoidance to deal with trauma-related intrusions in the day-to-day. Study 2 examined retrieval of *semantic* autobiographical information from previous lifetime periods in groups of cancer survivors with posttraumatic stress and healthy controls. The cancer survivors were able to generate fewer specific semantic details about the personal past compared to the controls. The more symptomatic survivors showed the greatest memory impairment. The data from both studies are discussed in terms of compromised access to specific autobiographical material in distressed trauma survivors reflecting a process of affect regulation.
© 2007 Elsevier B.V. All rights reserved.

*Keywords:* Autobiographical memory; PTSD; Trauma; Refugee; Cancer

## 1. Introduction

One of the dominant psychological processes implicated in posttraumatic stress disorder (PTSD) is autobiographical memory (Brewin, 2007). A key symptom of the condition is intrusive recollection of the trauma itself (American Psychiatric Association, 1994, see also Holmes & Bourne, 2008). Furthermore, such intrusions often take the form of sensory-laden, highly emotive flashbacks and reliving experiences (Brewin, Dalgleish, & Joseph, 1996; Dalgleish, 2004). Intriguingly, despite such vivid remembering of the

trauma in all of its detail, exposed individuals experiencing such symptoms often find it relatively difficult to access the specific details of non-trauma related aspects of their autobiography. For example, their autobiographical recall of past episodes in response to cue words in laboratory tasks tends to be relatively generic, rather than focusing on individual events (see Moore & Zoellner, 2007; Williams et al., 2007, for reviews). This article reports two studies that investigate aspects of this phenomenon of reduced autobiographical specificity in trauma survivors. The first study uses the aforementioned cue word methodology (the Autobiographical Memory Test (AMT); Williams & Broadbent, 1986) and examines, for the first time to our knowledge, how performance on this episodic memory task relates to *individual* symptoms of PTSD. The aim is to test specific

* Corresponding author. Tel.: +44 1223 273685; fax: +44 1223 359062.
  E-mail addresses: j.herlihy@csel.org.uk (J. Herlihy), tim.dalgleish@mrc-cbu.cam.ac.uk (T. Dalgleish).

0001-6918/$ - see front matter © 2007 Elsevier B.V. All rights reserved.
doi:10.1016/j.actpsy.2007.11.001

STB_AR1_011452

nian (Turner, Bowie, Shapo, & Yule, 2003) using standard back translation procedures were used.

### 2.1.3. Procedure

Participants were interviewed twice with an interpreter by JH. The time between interviews ranged from 3 to 32 weeks. At the first interview the PDS and non-structured clinical interview were administered. At the second interview participants were given the AMT and asked to complete a translated form (Perrin, 2000; Turner et al., 2003) of the Beck Depression Inventory (BDI; Beck, Ward, Mendelson, Mock, & Erbaugh, 1961) – also translated using standard translation and back translation techniques – to assess current level of depressive symptoms.

## 2.2. Results

The demographic characteristics, PTSD symptom scores on the PDS, BDI scores, and AMS variables for the sample are presented in Table 1.

### 2.2.1. Symptoms of PTSD and the AMT

Our hypotheses were for there to be negative partial correlations between AMS and number and severity of those Criterion B symptoms indexing intrusive thoughts and images (Bl) and flashbacks (B3), and those Criterion C symptoms reflecting effortful avoidance (Cl and C2), with depressed mood partialled out. The relevant correlations are reported in Table 2. We also report correlations between the three symptom clusters of PTSD on the PDS (reexperiencing, avoidance, and hyperarousal) and AMT performance, as these clusters map most closely onto the previous literature that has looked at correlations between the avoidance and intrusion subscales of the IES and AMT performance (Williams et al., 2007). However, given the significant differences in composition between the IES subscales and the respective PTSD symptom clusters (see Section 2.3) we had no strong hypotheses regarding these three analyses which must therefore be regarded as exploratory. Consequently, we used a Bonferroni corrected level of alpha = .017.

Table 1
Age, PTSD symptoms on the Posttraumatic Diagnostic Scale (PDS), self-reported depression, and Autobiographical Memory Test specificity from Study 1

|  | Mean | SD |
| --- | --- | --- |
| Age | 38.51 | 14.73 |
| Sum of Criterion B scores | 9.24 | 3.52 |
| Intrusions symptom score [Bl] | 1.73 | 0.87 |
| Flashbacks symptom score [B3] | 1.78 | 0.92 |
| Cognitive avoidance [Cl] | 1.73 | 1.04 |
| Behavioural avoidance [C3] | 1.48 | 1.13 |
| Sum of Criterion C scores | 10.57 | 4.61 |
| Sum of Criterion D scores | 8.73 | 3.35 |
| BDI | 25.45 | 11.48 |
| No. specific first memories | 3.51 | 2.43 |

*Note*: BDI = Beck Depression Inventory.

Table 2
Partial correlations (unless specified) of PTSD symptomatology, and autobiographical memory specificity, with depressed mood partialled out, in Study 1

|  | No. specific first memories |
| --- | --- |
| Sum of Criterion B scores | −0.01 |
| Sum of Criterion C scores | 0.29 |
| Sum of Criterion D scores | 0.10 |
| Intrusions symptom score [B] | 0.07 |
| Flashbacks symptom score [B3] | −0.34* ($P$ = 0.04) |
| Cognitive avoidance score [Cl] | 0.54* ($P$ = 0.001) |
| Behavioural avoidance [C2] | 0.46* ($P$ = .006) |
| BDI[a] | −0.24 |

*Note*: * = Statistically significant correlations.
[a] This is a zero-order correlation.

As can be seen from the table, intensity/frequency of flashbacks was negatively associated with AMS, as predicted, with higher intensity and frequency of flashbacks related to lower levels of specificity on the AMT (with depression partialled out), in line with our hypothesis. However, there was no significant relationship between AMS and symptom Bl (intrusive thoughts and images). Contrary to our expectations, symptoms Cl and C2 (effortful avoidance) were *positively* associated with AMS, with greater self-reported effortful avoidance being associated with greater specificity on the AMT. There were no significant correlations between Criteria B, C or D symptom clusters.

## 2.3. Discussion

The aim of Study 1 was to examine the relationship between particular PTSD symptoms and reduced autobiographical memory specificity (reduced AMS) on the Autobiographical Memory Test (AMT). The results showed, first, that frequency/severity of flashbacks of the trauma (PTSD symptom B3; American Psychiatric Association, 1994) was significantly negatively associated with AMS with more flashbacks being associated with reduced AMS and, second, that effortful avoidance (PTSD symptoms Cl and C2; American Psychiatric Association, 1994) was positively associated with AMS with more avoidance relating to greater specificity, these effects were present after partialling out current levels of depression as assessed by the BDI. There were no other significant correlations.

This finding of a significant association between flashback frequency and reduced AMS is in line with both the affect regulation hypothesis and executive functioning accounts of performance on the AMT as outlined in Section 1. However, the failure to find support for our hypothesized association between symptom Bl (intrusive thoughts and images) in PTSD and AMS is puzzling. It is possible that the failure to obtain significant results in the present study is due to the use of a PTSD-only sample (rather than a trauma-exposed sample) where the range of symptom levels is narrower and/or a function of limited power due to the relatively restricted sample size. Another possibility is

STB_ART_011455

*A.R. Moradi et al. / Acta Psychologica 127 (2008) 645–653*

that the individual items of the PDS may vary considerably in their psychometric properties (to our knowledge, there are no data available on this issue) and it may be that item Bl has differential validity in some way relative to other items. This is a limitation of the present methodological approach.

Another alternative is that the gap between assessment of PTSD symptomatology and completion of the AMT (which was often several months) obscured a significant relationship. This seems less probable as all but three of the present samples had PTSD for more than 3 years, indicating that any major change in the levels of symptomatology over the relatively short interval between testing sessions was unlikely (the PDS has a strong test–retest reliability, in chronic samples; Foa et al., 1997). Furthermore, partialling out time between testing sessions did not substantially alter the pattern of results (for example, the three originally significant findings remained significant or very near-significant with time partialled out: $prs > .28$, $Ps < .06$). Nevertheless, the study would have been considerably improved if the PDS and the AMT had been completed in the same session and the results must therefore be taken as preliminary.

It is also interesting to consider the present data in the context of previous findings of significant negative relationships between AMS and the broader constructs of intrusion and avoidance (as usually measured by the respective subscales of the Impact of Event Scale (IES)) in traumatized samples (e.g. Kuyken & Brewin, 1995). Two questions need addressing: (a) why were there no significant relationships between AMS and the re-experiencing symptoms cluster (Criterion B symptoms) and the avoidance symptom cluster (Criterion C symptoms) in the present dataset? (b) How can we account for the finding of a significant *positive* relationship between symptoms Cl and C2 and AMS in the present data, given the finding of a negative relationship when the IES avoidance subscale has been used in prior studies? There are a number of possible factors that speak to these questions.

First, the content of the questions included in the intrusion and avoidance subscales of the IES does not map directly onto the respective symptom clusters in PTSD that were used here. In particular, the intrusion subscale of the IES is very heavily weighted towards automatic intrusive experiences, including questions tapping phenomena that are not in the DSM-IV, e.g. "I had trouble falling asleep because of pictures or thoughts that came into my mind". If it is the case that AMS only relates to automatically-generated intrusions of the trauma and not other aspects of reexperiencing, it may be that this preponderance of items assessing automatic intrusions on the IES accounts for the significant associations between the intrusion subscale and AMS in previous studies, despite the non significant relationship between the DSM-IV re-experiencing symptoms taken together and AMS in the present data.

Similarly, the IES avoidance subscale does not map closely onto the DSM-IV Criterion C symptoms that were used here. Again, there are IES items that assess experi-

ences not in the PTSD diagnosis in DSM-IV, e.g. "I felt as if it hadn't happened or it wasn't real". It may be that this discrepancy could account for the different patterns of data across studies. Secondly, the IES is a measure of frequency of symptoms and experiences whereas the PDS used in the present study assesses frequency and severity and this may have affected the results. Finally, the gap between testing sessions (as already noted) may have washed out some putatively positive findings although, when the number of days between testing sessions was partialled out of the analyses, the results were unaffected.

Although the current findings with the PTSD symptoms of controlled avoidance are not readily explained by the affect regulation hypothesis, they may be partially consistent with an executive account of AMT performance (e.g. Dalgleish et al., 2007). The proposal here is that individuals with depression or a history of trauma have difficulty inhibiting unwanted, automatically-generated distracting information (e.g. Barrett, Tugade, & Engle, 2004; Hasher & Zacks, 1979). This difficulty accounts, to some extent, for the fact that such individuals are troubled by intrusive thoughts and memories of past distressing events. But can also potentially explain reduced AMS on the AMT.

Specifically, the suggestion is that effortful hierarchical search of the autobiographical memory database for specific memories to word cues on the AMT will inevitably automatically activate other (non-specific) autobiographical mental representations (e.g. categorical and extended memories, and semantic associates of the cue word). These 'distracters' therefore need to be inhibited in order for the search for a specific memory to proceed. However, if there is difficulty with inhibiting automatically-generated distracting information (as there is in depression and those with a history of trauma; see Barrett et al., 2004) then there is a greater likelihood that these distracters generated on the AMT will be proffered as memory responses to the task, thus leading to fewer specific memories overall; in other words, depressed and traumatized individuals will exhibit reduced AMS (Dalgleish et al., 2007). This view of AMT performance, as with the affect regulation hypothesis, would also predict a significant association between reduced AMS and higher levels of automatic and intrusive recollection of the trauma in individuals with PTSD.

However, the executive approach would also indicate that individuals who were very effective at exercising cognitive control, for example, in the execution of controlled avoidance, would also perform well on the AMT, generating a higher proportion of specific memories. It may therefore be the case that the greater endorsement of the avoidance symptoms of PTSD assessed here actually reflects greater success at exerting controlled avoidance to deal with distressing trauma-related information and hence one might anticipate that it would be related to higher specificity on the AMT.

In sum, to the best of our knowledge, the current study is the first to consider individual symptoms of post-traumatic stress/PTSD in relation to AMS. Given that theoretical analysis of the AMS suggests that the effect

STB_AR1_011456

Suzuki Final 4 17 07                                    4/19/2007 12:58:03 PM

# UNPACKING PANDORA'S BOX: INNOVATIVE TECHNIQUES FOR EFFECTIVELY COUNSELING ASYLUM APPLICANTS SUFFERING FROM POST-TRAUMATIC STRESS DISORDER

CAROL M. SUZUKI*

> One need not be a chamber to be haunted —
> One need not be a house —
> The brain has corridors — surpassing
> Material place.[1]
>
> – *Emily Dickinson*

## Mohamed Ada Osman: A Composite Client

Mohamed Ada Osman[2] is a refugee from Darfur who is afraid that he will be killed if he is forced to return to his home country of the Sudan.[3]

---

* Associate Professor of Law, University of New Mexico School of Law. J.D., Columbia (1991). Robert M. Cover Clinical Teaching Fellow, Yale Law School (2001-03). I would like to thank Stephen Wizner, J. Michael Norwood, April Land, Laura Gomez, Jennifer Moore, and Dora Wang for their comments. I am grateful to Morgan Honeycutt, Jaime McKenna, Camille Pedrick Chavez, and Dawn Priestman for their tireless research assistance. I appreciate the comments given during presentations of drafts of this article at the UNMSOL faculty colloquium, the 10th Conference of the Asian Pacific American Law Faculty, and at Wayne State University Law School. I also thank Madelon Baranoski, Brett Dignam, Carroll Lucht, Charles Andy Morgan, Jean Koh Peters, J. L. Pottenger, Jr., Suellyn Scarnecchia, and Howard Zonana for their guidance.

1. EMILY DICKINSON, THE COMPLETE POEMS OF EMILY DICKINSON 333 (Thomas H. Johnson ed., Little, Brown & Co. 1960) (1890).

2. Mohamed Ada Osman is a composite client whose story is derived from those of asylum applicants from Darfur and other countries devastated by civil conflict.

3. The official name is Republic of the Sudan. *See* Bureau of African Affairs, U.S. Dep't of State, *Background Note: Sudan* (2006), http://www.state.gov/r/pa/ei/bgn/ 5424.htm.

STB_AR1_011673

events.[132]  It is stimulated by cues that remind the individual of the experience, such as questions related to a traumatic event.[133]  The amygdala causes trauma-related memories to be retrieved from the neural network holding the memories.[134]  A different part of the brain, the hippocampus, stores memory of time and space.[135]  The hippocampus brings together memory fragments when explicit memory is retrieved.[136]  Under traumatic stress, however, the hippocampus fails to properly store and anchor the memory.[137]  As a result, the encoding process is derailed, and memories of traumatic events are not stored in an organized manner.[138]  Instead, traumatic memory is stored as sensory fragments.[139]  Because of this phenomenon, individuals with PTSD have higher rates of short-term memory problems and dysfunction in learning and memory.[140]  High doses of adrenaline, produced during extremely traumatic events, can further lead to the impairment of memory storage.

There is a popular belief, termed "flashbulb memory," that details of a traumatic event are etched in a survivor's mind and that these details are therefore immutable.[141]  After all, the traumatic experience was highly significant and had a large impact on the

---

132. *See* Bessel A. van der Kolk, *The Body Keeps the Score: Approaches to the Psychobiology of Posttraumatic Stress Disorder*, *in* TRAUMATIC STRESS: THE EFFECTS OF OVERWHELMING EXPERIENCE ON MIND, BODY, AND SOCIETY 230 (Bessel A. van der Kolk et al. eds., 1996) [hereinafter *The Body Keeps the Score*].

133. *See Trauma and Memory*, *supra* note 127, at 295.

134. *See id.* at 293-94.

135. *See The Body Keeps the Score*, *supra* note 132, at 231.

136. Bremner, Krystal, Southwick & Charney, *supra* note 125, at 536 (citing S.M. Zola-Morgan & L.R. Squire, *The Primate Hippocampal Formation: Evidence for a Time-Limited Role in Memory Storage*, 250 SCIENCE 288-90 (1990)).

137. *See Trauma and Memory*, *supra* note 127, at 295.  PTSD may cause malfunction in the ability of the hippocampus to bring together sensory fragments into a narrative.  *See* Bremner, Krystal, Southwick & Charney, *supra* note 125, at 545.

138. *See* Amir, Stafford, Freshman & Foa, *supra* note 76, at 386.

139. *See Dissociation and the Fragmentary Nature of Traumatic Memories*, *supra* note 90, at 518.  *See also* Bessel van der Kolk, Onno van der Hart & Charles R. Marmar, *Dissociation and Information Processing in Posttraumatic Stress Disorder*, *in* TRAUMATIC STRESS: THE EFFECTS OF OVERWHELMING EXPERIENCE ON MIND, BODY, AND SOCIETY 303, 312 (Bessel A. van der Kolk et al. eds., 1996) [hereinafter *Dissociation and Information Processing in Posttraumatic Stress Disorder*].

140. *See* J.D. Bremner, et al., *Deficits in Short-Term Memory in Posttraumatic Stress Disorder*, 150 AM. J. PSYCHIATRY 1015 (1993).

141. This view has been found not to be entirely accurate.  *See Eyewitness Memory for Stressful Events*, *supra* note 63, at 223-24 (citing R. Brown & J. Kulik, *Flashbulb Memories*, *in* 5 COGNITION 73 (1977).  *See also* Sven-Åke Christianson & Martin A. Safer, *Emotional Events and Emotions in Autobiographical Memories*, *in* REMEMBERING OUR PAST: STUDIES IN AUTOBIOGRAPHICAL MEMORY 218, 223 (David C. Rubin ed., 1996) ("'[F]lashbulb' or 'video-camera' metaphors are misleading in suggesting the potential for perfect accuracy in remembering emotional events."); MCNALLY, *supra* note 19, at 53-57.

STB_AR1_011699

**HHS Public Access**

Author manuscript

*J Affect Disord.* Author manuscript; available in PMC 2017 September 01.

Published in final edited form as:
*J Affect Disord.* 2002 June ; 70(1): 1–17.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

# Are the neural substrates of memory the final common pathway in posttraumatic stress disorder (PTSD)?

**B.M. Elzinga**[a,b,*] and **J.D. Bremner**[c,d]

[a]Department of Clinical Psychology, University of Amsterdam, Roetersstraat 15, 1018 WB Amsterdam, The Netherlands [b]Department of Psychiatry, Vrije Universiteit, Amsterdam, The Netherlands [c]Departments of Psychiatry and Radiology, Emory Center for Positron Emission Tomography, Emory University School of Medicine, Atlanta, GA, USA [d]Atlanta VA Medical Center, Decature, GA, USA

## Abstract

A model for the posttraumatic stress disorder (PTSD) as a disorder of memory is presented drawing both on psychological and neurobiological data. Evidence on intrusive memories and deficits in declarative memory function in PTSD-patients is reviewed in relation to three brain areas that are involved in memory functioning and the stress response: the hippocampus, amygdala, and the prefrontal cortex. Neurobiological studies have shown that the noradrenergic stress-system is involved in enhanced encoding of emotional memories, sensitization, and fear conditioning, by way of its effects on the amygdala. Chronic stress also affects the hippocampus, a brain area involved in declarative memories, suggesting that hippocampal dysfunction may partly account for the deficits in declarative memory in PTSD-patients. Deficits in the medial prefrontal cortex, a structure that normally inhibits the amygdala, may further enhance the effects of the amygdala, thereby increasing the frequency and intensity of the traumatic memories. Thus, by way of its influence on these brain structures, exposure to severe stress may simultaneously result in strong emotional reactions and in difficulties to recall the emotional event. This model is also relevant for understanding the distinction between declarative and non-declarative memory-functions in processing trauma-related information in PTSD. Implications of our model are reviewed.

**Keywords**

Memory; Posttraumatic stress disorder (PTSD); Hippocampus; Amygdala; Prefrontal cortex

## 1. Introduction

Although most often the experience of a trauma does not lead to long-term psychological problems, some individuals continue to experience trauma-related symptoms long after a trauma occurred, often qualifying for a diagnosis of posttraumatic stress disorder (PTSD),

*Corresponding author. Tel.: + 31-20-525-6799; fax: + 31-20-639-1369. kp_elzinga@macmail.psy.uva.nl (B.M. Elzinga).

**STB_AR1_011946**

response (Orr et al., 1995; Shalev et al., 1997; Grillon and Morgan, 1999). Moreover, exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event induces strong sympathetic reactivity in PTSD-patients, even years after the trauma occurred (Blanchard and Buckley, 1999; Shin et al., 1999). Taken together, these studies indicate that automatic access to trauma-related information in PTSD-patients is disturbed, consistently resulting in strong physiological and emotional responses, and that the facilitated access is more strongly related to PTSD than to a history of exposure to trauma.

## 2.3. General memory impairment

PTSD is not only characterized by intrusive memories, but is also associated with general deficits in declarative memory, fragmentation of memories (both autobiographical and trauma-related), and trauma-related amnesia. Even though intrusions and amnesia may appear to be opposite phenomena, these may instead be interrelated processes in that the occupancy with intrusive memories may interfere with, and thus reduce, memory processing of other material. Several studies have established that patients with PTSD compared to traumatized subjects without a PTSD diagnosis have deficits in general declarative memory for information unrelated to the content of the trauma. Vietnam veterans with combat-related PTSD scored significantly lower (almost 50%) on the Wechsler Memory Scale (WMS)– Logical memory and the Selective Reminder Test compared to matched controls, without displaying any differences in IQ (Bremner et al., 1993a). In line with this, Vietnam veterans with PTSD have shown deficits in short-term memory as assessed with the Auditory Verbal Learning Test (AVLT) in comparison to veterans without PTSD (Uddo et al., 1993). Deficits in short-term and delayed declarative memory have also been found in adult survivors of childhood abuse (Bremner et al., 1995a), in rape victims with PTSD (Jenkins et al., 1998), and in child and adolescent patients with PTSD (Moradi et al., 1999). Veterans also manifested a significant decrement in retention of previously presented material following exposure to an intervening word list (Yehuda et al., 1995). In a study by Zeitlin and McNally (1991) PTSD-patients exhibited a general memory impairment for neutral information, whereas their memory for trauma-related information was enhanced, suggesting that intrusions of trauma-related material interfered with the encoding and retrieval of neutral information. Veterans with PTSD also exhibited more impairment in general cognitive functioning compared to veterans without this diagnosis (Barrett et al., 1996).

## 2.4. Trauma-related amnesia

Trauma-related amnesia is another memory failure that has been reported often by traumatized persons. In a survey about 25 studies a substantial proportion of individuals report having forgotten traumatic experiences for some period of time, especially from childhood (Scheflin and Brown, 1996). More than 30% of adults who had been sexually abused as children either failed to report or were amnesic for the event many years later (Williams, 1994). Although most of these studies suffer from methodological weaknesses related to the subjective nature of the reports, altogether these studies suggest that amnesia for a traumatic experience may occur at some point. The mechanism behind self-reported amnesia remains a controversial topic, however (Loftus et al., 1994; Freyd, 1996; Elzinga et al., 1998).

STB_AR1_011950

The distinction between conscious and nonconscious, implicit memory processes has played an important role in the understanding of trauma-related amnesia (Kihlstrom and Schacter, 1995; Elzinga et al., 2000). Based on this distinction, amnesia has been regarded as the absence of verbally accessible knowledge leaving only nonconscious, situationally accessible knowledge available (Brewin et al., 1996). Within this model amnesia may (partly) be seen as the result of a conscious strategy to avoid trauma-related information by disengaging attention from negative emotions associated with the traumatic event. Although clinical observations and subjective reports support the cognitive avoidance hypothesis, a study using the directed-forgetting paradigm in patients with PTSD as a result of childhood abuse was inconsistent with this idea (McNally et al., 1998). In this study, participants were presented trauma, positive and neutral words and were instructed to either remember or forget each word. Instead of exhibiting recall deficits for trauma-related words, the PTSD group exhibited recall deficits for the positive and neutral words they were supposed to remember (McNally et al., 1998). More generally, factors that are known to affect the depth of encoding and retrieval, including the degree to which information is elaborated, organized, and rehearsed, have been proposed to play a (additive) role in forgetting emotional information (Koutstaal and Schacter, 1997). As such, prohibitions against verbalizing and sharing information of traumatic experiences may undermine encoding, storage, and/or retrieval of traumatic memories (Freyd, 1996).

### 2.5. Recovered memories

There has been considerable controversy surrounding the validity of memories of childhood abuse that are recovered after they have been absent for a certain period (Bremner et al., 1996a; Pezdek and Banks, 1996). Reports of recovered memory have been criticized as representing possibly false memories of abuse suggested by over-zealous psychotherapists and by other influences in the media and popular culture (Lindsey and Read, 1994; Kihlstrom, 1995). Based on studies in normal subjects, consensus has been reached that under certain circumstances memories can be induced or altered by postevent interventions, including misinformation, suggestion, repeated imaging, and source confusion, especially in highly suggestible subjects (Ceci and Bruck, 1993; Zaragoza and Mitchell, 1996). In a study of Hyman and Billings (1998) approximately 25% of the students created false childhood memories after being encouraged to imagine the suggested childhood event. Interestingly, subjects with high scores on dissociative and imaginative capacities appeared to be more prone to create false memories.

Until now, only two studies have been conducted on false memories in patients with PTSD (Bremner et al., 2000; Clancy et al., 2000). In these studies, subjects were read lists of words, with each word in the list associated with a 'critical lure' not actually present in the list, but which is 'falsely remembered' in a substantial percentage of normal individuals. Women with abuse-related PTSD had a higher frequency of false recognitions of critical lures then women with abuse histories without PTSD, non-abused non-PTSD women, or men without abuse or PTSD (Bremner et al., 2000). PTSD women also showed a pattern of poorer memory for previously studied words, consistent with the findings of declarative memory deficits in PTSD. Clancy et al. (2000) found that women with recovered memories of childhood sexual abuse showed high levels of false recognition compared to other

STB_AR1_011951



# Overgeneral memory in asylum seekers and refugees

**PUBLISHED IN**
Journal of Behavior Therapy and Experimental Psychiatry, J. Behav. Ther. & Exp.
Psychiat. 45 (2014) 375-380
Published online April 2014  in Science Direct (sciencedirect.com) DOI:
10.1016/j.jbtep.2014.03.001

**AUTHORS**
Belinda Graham[1]
Jane Herlihy[2]
and
Chris R. Brewin[3]

[1]University College, London , University of Washington, Seattle
[2] Centre for the Study of Emotion and Law, London and University College, London
[3] University College, London


Requests for reprints should be addressed to Jane Herlihy, Centre for the Study of Emotion
and Law, 1, Quality Court, Chancery Lane, London, UK (e-mail: j.herlihy@csel.org.uk).

**ACKNOWLEDGEMENTS**
This study was supported by grants from the Department of Clinical, Educational and
Health Psychology at University College London and the University College London
Graduate School Fund. Recruitment was facilitated through the Traumatic Stress Clinic
(Camden & Islington NHS Foundation Trust), Forced Migration Trauma Service (Central
and Northwest London NHS Foundation Trust), Praxis Community Projects and the
Turkish Education Group. Thanks to Alex Zhu for coding data for inter-rater reliability.

The study was completed as part of the DClinPsy dissertation of the first author. For more
information see www.csel.org.uk.

**STB_AR1_012116**

**Graham, B.**, Herlihy, J. and Brewin, C. (2014). Overgeneral memory in asylum seekers and refugees. <u>Journal of Behavior Therapy and Experimental Psychiatry</u> 45: 375-380

There were no other significant differences between the groups. There was also no significant group difference in number of omissions, U = 155.5, p = .47 (two-tailed). There was no impact on significance of results when torture survivor status was included as a covariate.

## 4. DISCUSSION

### 4.1. Psychopathology and overgenerality.

High comorbidity limits interpretation of the independent associations of PTSD and depression with overgenerality. Following similar findings in other trauma exposed groups (e.g. Brown et al., 2012) when omissions were included in the analysis, those with PTSD retrieved a lower proportion of specific memories. Also, in common with previous studies with Western samples (see Williams et al., 2007) depression was associated with lower specificity.

Previous studies have shown that participants with PTSD also retrieve more general memories in the AMT. Combat veterans with PTSD retrieved more general memories (McNally, Litz, Prassas, Shin, & Weathers, 1994) and in two studies with assault survivors, one found that those with PTSD retrieved more categoric memories overall (Schönfeld & Ehlers, 2006) and after trauma memories were excluded from the analysis (Schönfeld et al., 2007). The current study found no difference in retrieval of categoric memories even at a trend level.

Extended memories have been excluded from analyses in previous studies due to low incidence (e.g. Schönfeld & Ehlers, 2006) or conflated with categoric memories into an overall variable of overgeneral memory. In the current study, extended memories were the least common type of memory given but still constituted 15% of responses. Participants

STB_AR1_012129

**Graham, B.**, Herlihy, J. and Brewin, C. (2014). Overgeneral memory in asylum seekers and refugees. <u>Journal of Behavior Therapy and Experimental Psychiatry</u> 45: 375-380

with PTSD produced a significantly higher proportion of extended memories overall. Much of the effect was statistically accounted for by those in that group who had experienced torture. In addition, reference to the content of responses given in the AMT supported the suggestion that many extended memories were accounts of extended trauma including torture. For example, "during the time I was in prison" and "when I was in detention".

The role of omissions has only recently been considered in some AMT studies (Griffith et al., 2009). Overall, significantly more omissions were recorded by refugees with PTSD in this study. Given the requirement for asylum seekers to disclose personal memories, this is a potentially important finding which merits further investigation. These omissions may reflect a memory problem or a reluctance to disclose trauma related memories. These possibilities cannot be further elucidated within the current study but should be investigated in future research.

4.2. Methodological limitations.

Despite its utility for comparisons, we acknowledge that categorical diagnosis of PTSD may be criticized in this population (Ramsay et al., 1993) and that there are some challenges to its validity across cultures (Jobson, 2009). High comorbidity with depression also means that interpretation of our results concerning PTSD cannot be reliably disentangled from the influences of depression. Discrete measures of individual symptom clusters in this study would have enabled more sophisticated and symptom specific analysis of factors underlying overgenerality. Measures of traumatic brain injury and experiences of early trauma were also not assessed.

Administration of the AMT in this study followed best-practice in terms of visual presentation of cues, blind coding, reliability testing and maximum response time.

STB_AR1_012130

BRITISH JOURNAL OF PSYCHIATRY (2007), 191, 75–81. doi: 10.1192/bjp.bp.106.030262

# Impact of sexual violence on disclosure during Home Office interviews

DIANA BÖGNER, JANE HERLIHY and CHRIS R. BREWIN

**Background**  Late disclosure or non-disclosure during Home Office interviews is commonly cited as a reason to doubt an asylum seeker's credibility, but disclosure may be affected by other factors.

**Aims**  To determine whether and how sexual violence affects asylum seekers' disclosure of personal information during Home Office interviews.

**Method**  Twenty-seven refugees and asylum seekers were interviewed using semi-structured interviews and self-report measures.

**Results**  The majority of participants reported difficulties in disclosing. Those with a history of sexual violence reported more difficulties in disclosing personal information during Home Office interviews, were more likely to dissociate during these interviews and scored significantly higher on measures of post-traumatic stress symptoms and shame than those with a history of non-sexual violence.

**Conclusions**  The results indicate the importance of shame, dissociation and psychopathology in disclosure and support the need for immigration procedures sensitive to these issues. Judgments that late disclosure is indicative of a fabricated asylum claim must take into account the possibility of factors related to sexual violence and the circumstances of the interview process itself.

**Declaration of interest**  None. Funding detailed in Acknowledgements.

To be granted asylum under the 1951 United Nations Convention Relating to the Status of Refugees, the asylum applicant has to show a 'well-founded fear of being persecuted in his or her country of origin for reasons of race, religion, nationality, membership of a particular social group, or political opinion' (United Nations High Commissioner for Refugees, 1992). Since there is often little documentary evidence about the asylum seeker, credibility of the individual is key. Late disclosure, or description of incidents in later interviews of which no mention was made in the first, is commonly cited as a reason to doubt an asylum seeker's credibility (see Asylum Aid, 1999). It is understandable that the addition of new evidence could be seen as evidence against the claimant's honesty. However, this assumption may fail to take into account other reasons for not disclosing at the outset. To date, there has been no empirical study on what affects asylum seekers' disclosure during legal interviews.

Many refugees who come to the UK have experienced or witnessed torture and organised violence (Burnett & Peel, 2001). Disclosure is specifically an issue with torture survivors owing to their difficulties of trust in other people (particularly those in authority) and their avoidance of painful memories (Medical Foundation for the Care of Victims of Torture, 2002). A meta-analysis revealed increased prevalence rates of post-traumatic stress disorder (PTSD) in refugees resettled in Western countries (Fazel et al, 2005). Symptoms of PTSD may be activated during the Home Office interview as a result of being reminded of the traumatic event, which in turn might reduce a person's ability to give a coherent account and might lead to non-disclosure.

There is also evidence that different trauma types are associated with different PTSD patterns. Two studies found a significant relationship between sexual torture and the avoidance criteria of PTSD (Ramsey

et al, 1993; Van Velsen et al, 1996). Van Velsen et al (1996) speculated that the intimate nature of the sexual attack and associated negative emotions, such as feelings of humiliation and shame, are likely to be critical elements leading to subsequent avoidance behaviour. However, this has not been specifically tested.

Refugees and asylum seekers often come from cultures with different attitudes towards sexuality. Sexual violence and rape are often taboo subjects and can bring about feelings of shame. Women who have been subjected to sexual assault may be shunned by their community and family if they admit to this and therefore may not disclose it in their asylum interview (United Nations, 1997; Burnett, 1999). Men also tend to underreport experiences of sexual violence (Peel et al, 2000). Feelings of shame have been mentioned in the literature as a factor affecting disclosure (Hill et al, 1993) and there have been several empirical studies demonstrating the relationship between shame and disclosure (Swan & Andrews, 2003; Hook & Andrews, 2005). There is also increasing evidence that shame may be linked to the course or onset of PTSD (Andrews et al, 2000; Leskela et al, 2002).

The study of different trauma types by Van Velsen et al (1996) suggested including a measure of dissociative phenomena in future research, as dissociation might be closely related to PTSD avoidance symptoms. Indeed, dissociative experiences are commonly reported by individuals with a diagnosis of PTSD (Ozer et al, 2003). Carlson & Rosser-Hogan (1991) found high levels of association between traumatic experiences and the severity of both traumatic stress and dissociative reactions in a group of 50 Cambodian refugees. However, dissociative responses not only occur as an aftermath of a traumatic event, but can also be experienced at the time of the trauma (peritraumatically; Weiss et al, 1995). Dissociative reactions might be activated during an anxiety-provoking event, such as the Home Office interview, which might affect disclosure.

The first aim of our study was to investigate the impact of sexual violence on refugees' and asylum seekers' reported post-traumatic stress symptoms, shame reactions, dissociative experiences and difficulties in disclosure during Home Office interviews. The second aim of the study was to explore more systematically the factors involved in refugees' and asylum

opportunity to do so; the interviewer was apparently more interested in factual details about their home country and how they got to the UK than what had happened to them or their families:

> 'I wanted to explain properly, but they just stopped me. They ask you to make it short and give yes or no answers. You don't get a chance to say much or explain to them. Therefore I did not go into much detail. But that affected me later [at the court] when I was asked why I did not tell them in the [Home Office] interview.' (PI5)

Five of the people who wanted to disclose also reported that they were asked similar questions repeatedly, which increased their stress levels and affected on their ability to disclose:

> 'When he asked me questions and I answered them he started cross-examining me. The more I said the more questions he asked me. It felt like he was trying to trick me. I felt nervous and stressed, which made it harder to talk for me.' (PI6)

Fifteen people reported that there are still things they have not told the Home Office about; 10 were men and women with a history of sexual torture, and most of them reported feelings of shame as a reason for non-disclosure ($n=7$):

> 'I wanted to keep things from my past private. I was scared that they would look at me badly and make me feel ashamed. I could not tell everything at the interview, but later on I was able to tell the court. They were nice at the court and made me feel more relaxed.' (PI21)

Other reasons included forgetting some details, which they were not able to mention subsequently in later interviews for fear it would affect their credibility ($n=2$); being unsure whether they could disclose details they were not directly asked about ($n=3$); and not being given the opportunity and the time to talk openly about their past traumatic experiences ($n=2$).

### Cultural factors affecting disclosure

Eight participants reported that there were things they have not talked about because in their culture it is considered wrong; all of them were men and women with a history of sexual violence. Most of them stated that in their culture sexual issues are not talked about, especially rape:

> 'At home you are not allowed to talk to other men you are not related to, you are not allowed to look any men in the eyes. So how could I have looked him [male Home Office official] in the eyes and told him what happened to me – it's a different culture.' (PI1)

Two individuals specifically mentioned feelings of shame associated with rape,

and that shame had prevented them from talking about the rape in the interview:

> 'There is a lot of shame associated with what I experienced. Shame in my culture prevents me from talking about this.' (PI7)

### Direct disclosure of sexual victimisation

Although data on disclosure of sexual victimisation were not specifically collected, further analysis of the transcripts revealed that of the 15 people with a history of sexual violence, 5 reported that they had disclosed sexual victimisation, including rape, during their Home Office interview, and 6 did not disclose it. It is unclear whether the remaining 4 specifically disclosed sexual victimisation. Interestingly, everybody who disclosed a history of sexual violence reported being prevented from talking about it further in the interview by the Home Office official.

## DISCUSSION

This study refined and extended previous findings by Van Velsen et al (1996) by demonstrating that there is a significant association between shame and PTSD avoidance symptoms, which suggests that shame might act as a mediator between a history of sexual violence and PTSD avoidance symptoms. Shame was also significantly associated with overall PTSD severity, which provides further evidence that shame might be linked to the course and onset of PTSD (Andrews et al, 2000; Leskela et al, 2002). The significant relationship between dissociation and PTSD avoidance symptoms confirms speculations by Van Velsen et al (1996). The results are also in line with research showing that dissociative experiences are commonly reported by individuals with a diagnosis of PTSD (Ozer et al, 2003). Furthermore, our analysis revealed that those who experienced higher levels of dissociative experiences during the Home Office interviews were those who had higher levels of shame.

Data from the qualitative interviews provide further evidence for the above findings. Perhaps one of the most striking findings was that 20 participants talked for the first time about their pre-migration trauma only after entering the UK, and of those, 13 talked to Home Office officials. These findings underscore the degree of avoidance associated with the experience of trauma and are likely to be very relevant to the large numbers of refugees coming to the

UK who have experienced or witnessed torture and organised violence (Burnett & Peel, 2001).

Many participants reported difficulties with disclosing personal details in their Home Office interview, and reasons frequently cited for this were negative emotions such as feeling too traumatised by past experiences or feelings of shame. Shame was especially salient for people with a history of sexual violence. Many of those reported that in their culture sexual issues are not discussed with others, and that this prevented them from disclosing sexual issues during their Home Office interview. This supports previous findings that shame is associated with difficulty in disclosure (Swan & Andrews, 2003; Hook & Andrews, 2005) and is consistent with Hill et al (1993) who found that sexual issues often remain too shameful to discuss, even in therapy.

Participants also reported experiencing psychological symptoms during Home Office interviews, such as dissociative experiences, flashbacks and avoidance behaviours (e.g. avoiding thoughts or feelings associated with the trauma and not being able to remember details), which had an impact on their ability to disclose. This suggests that people's psychological states should be routinely evaluated when assessing their ability to give a coherent personal history in an interview with officials.

Finally, it should be noted that although the difficulties with disclosure seemed to be persistent, many participants did express a willingness to talk to officials about their experiences. However, some described not being given the opportunity to do so or being prevented by the interviewer from discussing their experiences. One explanation could be vicarious traumatisation of the interviewers, which is a common phenomenon in people working with trauma survivors (Figley, 1995). Indeed, a multidisciplinary analysis of the decision-making process of the Canadian Immigration and Refugee Board showed that coping with vicarious traumatisation and uncontrolled emotional reactions was one of the factors having a negative impact on the board members' ability to evaluate credibility and on the overall conduct of hearings (Rousseau et al, 2002). This needs to be clarified by further research.

In summary, our results indicate that late disclosure or non-disclosure during Home Office interviews does not necessarily imply a lack of honesty on the asylum

STB_AR1_012460

Author's personal copy

Psychol. Inj. and Law (2017) 10:298–312
https://doi.org/10.1007/s12207-017-9305-7



# Assessing Trauma-Related Dissociation in Forensic Contexts: Addressing Trauma-Related Dissociation as a Forensic Psychologist, Part II

Bethany L. Brand[1] · Hugo J. Schielke[2] · Jolie S. Brams[3] · Rachel A. DiComo[1]

Received: 17 October 2017 / Accepted: 20 October 2017 / Published online: 20 December 2017
© Springer Science+Business Media, LLC 2017

**Abstract** Chronic dissociative reactions and dissociative disorders can occur following traumatic events and are associated with suffering and impaired functioning. Therefore, trauma-related dissociation could be part of the claims made in civil actions or contribute to mitigation or an insanity defense in criminal actions. Dissociative reactions to trauma, including dissociative disorders, are more common than most mental health professionals realize. Unfortunately, few professionals have training in the assessment of dissociation, and forensic experts may be unaware of research indicating that standard interpretations of well-regarded assessment instruments can result in inaccurate determinations of symptom exaggeration in cases with dissociation. This paper is the second paper of a two-part series that aims to expand assessors' knowledge about trauma-related dissociation (TRD) and enhance their ability to assess and present information about dissociation. In this article, we focus on the forensic assessment of TRD and discuss: dissociative symptoms; complex trauma; trauma-related disorders; an approach to assessment of TRD; trauma-related reactions that can impede the detection of TRD; and differential diagnosis of genuine versus feigned dissociation. In addition, we review research related to the validity and appropriate interpretation of the following measures in use with persons with TRD: Dissociative Experiences Scale, Multiscale Dissociation Inventory, Somatoform Dissociation Questionnaire, Trauma Symptom Inventory-2, Multidimensional Inventory of Dissociation, Structured Clinical Interview for Dissociative Disorders-Revised, Minnesota Multiphasic Personality Inventory-2, Personality Assessment Inventory, Structured Interview of Reported Symptoms, Test of Memory Malingering, and the Gudjonsson Suggestibility Scale.

**Keywords** Dissociation · Dissociative disorders · Trauma · Forensic · Personal injury · Malingering · PTSD

Although research and clinical interest in dissociation have increased exponentially in recent years, few mental health professionals receive training in the assessment of trauma-related reactions, and fewer still in the assessment of trauma-related dissociation (TRD) and the dissociative disorders (DDs; Brand, Armstrong, & Loewenstein, 2006; Cook, Dinnen, Rehman, Bufka, & Courtois, 2011; Cook & Newman 2014; Cook, Simiola, Ellis, & Thompson, 2017; Courtois & Gold, 2009). As a result, trauma-related disorders are frequently under-diagnosed or misdiagnosed by mental health and medical professionals (Şar, Akyuz, Ozturk, & Alioglu, 2013; Taubman-Ben-Ari, Rabinowitz, Feldman, & Vaturi, 2001). Forensic practitioners may be unaware of data indicating that standard interpretations of well-regarded assessment instruments can result in inaccurate determinations of symptom exaggeration in cases with dissociation. Additionally, they may not be aware of information that could

✉ Bethany L. Brand
  bbrand@towson.edu

  Hugo J. Schielke
  hugo.schielke@gmail.com

  Jolie S. Brams
  jsbrams@outlook.com

  Rachel A. DiComo
  rdicom1@students.towson.edu

[1]  Towson University, Towson, MD, USA

[2]  California Department of State Hospitals, Napa, CA, USA

[3]  Ohio State University, Columbus, OH, USA


**STB_AR1_012508**

Psychol. Inj. and Law (2017) 10:298–312    303

related shame is both a symptom of PTSD (APA, 2013) and a predictor of maintained PTSD (e.g., Andrews, Brewin, Rose, & Kirk, 2000; Feiring & Taska, 2005). Trauma-related shame and fear of mental health-related stigma can also negatively impact desire to engage with mental health treatment (e.g., Hoge et al., 2008) and to pursue litigation against perpetrators of assault and harassment.

**Distrust** Individuals who have experienced interpersonal trauma may have difficulty trusting that they will be treated fairly or that a good/fair outcome is even a possibility, and so may avoid taking the risks involved (e.g., increased psychological distress, possible social stigma) in discussing their trauma and/or symptoms. This can be problematic for the experts and attorneys who need to know about the details of trauma and its impact for court. Trauma can shatter positive expectancies such that survivors no longer expect favorable outcomes to their actions and future experiences, including potentially in litigation (Ehlers & Clark, 2000). This may be particularly difficult in relation to someone they believe unlikely to genuinely understand (or want to understand) their experiences.

**Avoidance** Another symptom of PTSD, avoidance of reminders of trauma because they are emotionally overwhelming, can also lead to a reluctance to talk about trauma and/or its impact (Brown, 2009; Ehlers & Clark, 2000). Avoidance is a core aspect of dissociative reactions and disorders.

**Dissociation** Discussions of trauma and trauma-related symptoms can be emotionally overwhelming and therefore trigger dissociative symptoms. For example, Lanius et al. (2002, 2005) found that reading survivors of trauma the written transcripts of their traumatic experience could provoke depersonalization, derealization, and distress. In persons with dissociative self-states, this can, at times, lead to a "switch" or shift of self-state from one dissociative self-state (DSS) to another that is amnestic to the trauma. Alternately, when asked to confirm a previously reported trauma, it is possible that the active self-state is fully amnestic for the events, and so the individual may disavow a previously reported event that actually occurred. As indicated above, the neurobiologically driven changes in brain activation patterns can influence dissociative individuals' level of emotional and physiological responses when discussing or recalling trauma, and likely also relate to these individuals' sometimes variable access to traumatic memories and recall of their own trauma-related symptoms. Finally, individuals who have experienced trauma at the hands of a person important to them (e.g., a significant other or family member) may be conflicted about both wanting acknowledgement and justice for the trauma perpetrated by the loved one, yet also want to protect that person and their relationship with them (DePrince et al., 2012).

**Difficulties with Attention and Memory** Poor attention, concentration, and difficulties with memory, particularly related to events around the trauma and its aftermath, are common in TRD (McKinnon et al., 2016; Parlar, Frewen, Oremus, Lanius, & McKinnon, 2016). Experts need to be informed that memory deficits, including dissociative amnesia, have been documented in the medical literature for more than a century for a wide range of traumas, including combat and genocides (Brewin, Kleiner, Vasterling, & Field, 2007; Loewenstein, 2014; Markowitsch, 2003). It is beyond the scope of this article to review the extensive research documenting that a substantial proportion of adult survivors of childhood trauma experience a period of partial or complete forgetting of the childhood trauma, although recent reviews are available (Barlow, Pezdek, & Blandón-Gitlin, 2017; DePrince et al., 2012). Research has established the reliability of recovered memories of trauma (reviewed in Brewin, 2012; Brewin & Andrews, 2017; Dalenberg, 2006). These difficulties in attention and memory can impede information gathering, preparing for trial, and the trial process itself. Memory lapses and inconsistencies in a deposition or testimony may work against a case for a psychological injury plaintiff, who may be penalized for the condition for which they are seeking damages unless this is meaningfully addressed by the plaintiff's experts and attorneys. Defense attorneys may also be impeded in presenting counter arguments to TRD claims, because the changing information may be difficult to contradict.

**Similarities Between Presentations of Trauma and Malingering** Trauma survivors can be highly motivated to convince evaluators that their symptoms are real, intense, and severely impairing, a phenomenon that has been described as akin to a "cry for help" (Courtois & Ford, 2013). In trying to ensure that their request for help is heard, Brown (2009) warns that trauma survivors may act in ways that are "hauntingly similar to that of malingerers" (p. 587) even though their behavior is driven by very different motives. Indeed, some individuals who have experienced disbelief from others may try to convince evaluators that their trauma and posttraumatic reactions are "real." This can come across as malingering to an evaluator, particularly when the individual's scores on some of the standard validity scales that are supposed to measure exaggeration and malingering are elevated (see below).

Furthermore, trauma-based symptoms can also appear extreme. For example, a survivor who is re-experiencing the smells, images, and feelings related to a trauma can appear to be suffering so dramatically that he/she may appear to be exaggerating. As Brown noted, the assessor may be confused when the same person who earlier has presented as highly dramatic later appears to have a contradictory presentation,

Author's personal copy

STB_AR1_012513

*Journal of Health & Biomedical Law, Vol. VI (2010): 37-63*
*© 2010 Journal of Health & Biomedical Law*
*Suffolk University Law School*

# Memory and Its Implications for Asylum Decisions[1]

Jessica Chaudhary, M.D.[2]

## Introduction

The following excerpt is taken from the book, *Do They Hear You When You Cry*, authored by Fauziya Kassindja, who writes of her harrowing journey from Togo, Africa, to the United States of America:

> "And you say you're from Togo?" "Yes." But I'd gone to school in Ghana. I'd told that to the lady officer. I was scared, confused. It didn't occur to me to explain it again. He put a piece of paper in front of me and handed me a pen. "Can you draw the flag for me?" he said. I took the pen. My hand was shaking. I drew the flag: five horizontal stripes with a star in a box in the upper right hand corner. No, the left corner. I was always confusing that. I knew my flag, but I knew Ghana's flag better. "That's not Togo's flag," he pronounced accusingly. "I made a mistake. The star goes in the other corner." "You don't know your own flag?" "Yes, I know my flag!" "Tell me the colors." "The stripes are green and yellow. The star is white and the box is red." "Those aren't the colors." "Yes they are! Those are the colors!" I may have put the star on the wrong side, but I did know the colors of my own flag! "You don't speak French, you don't know

---

[1] © Jessica Chaudhary, M.D. 2010.

[2] Yale University, Department of Psychiatry; B.A. Wellesley College with Honors (2002), M.D. University of Washington School of Medicine (2007). This article is the product of the author's study on the role of memory and its impact on credibility in immigration and asylum proceedings conducted jointly with the Yale School of Medicine, Department of Psychiatry, and the Yale Law School, Immigration Clinic. Special thanks to Dr. Howard Zonana, my mentor and faculty advisor. I am also extremely grateful to the following individuals who provided suggestions and invaluable guidance: Dr. Madelon Baranoski, Attorney Lory Rosenberg, Professor Jean Koh Peters, Professor Stephen Wizner, Professor Carroll Lucht, Professor Karen Musalo, and Professor Carol Suzuki.

**STB_AR1_012631**

46          JOURNAL OF HEALTH & BIOMEDICAL LAW          VOL. VI NO. 1

**Depression:**

**Negativity and a biased, overly pessimistic view of events relating to a person's sense of self**

**Anxiety:**

**Attention and concentration may be affected, restricting one's ability to process or comprehend an event fully, thereby remembering it incompletely**

**Post-Traumatic Stress Disorder:**

**Hyper-arousal, an overgeneralization of memory, or the overwhelming intrusion of traumatic memory into daily life**

**Table 2: Manifestations of Psychiatric Disease**

It has been hypothesized that in the instance of trauma, there is a flood of sensory information that can be overwhelming to the brain.[36] In this instance, the brain can store memory in fragmentary pieces as opposed to storing memory in a logical sequence.[37] When traumatic information is later recalled, it can be in the form of "dissociated mental imprints of sensory and affective elements."[38] A traumatized individual can suffer from global memory impairment, or amnesia, following a traumatic event.[39] The amnesia can be of the whole event or of parts of the event.

A study published in 2003 concluded that "brief, irreversible memory gaps are common in trauma survivors, whereas longer, progressive, and potentially reversible

[36] *See* Bessel A. van der Kolk & Rita Fisler, *Dissociation and the Fragmentary Nature of Traumatic Memories: Overview and Exploratory Study*, 8 J. TRAUMATIC STRESS 505, 505-06 (1995).

[37] *Id.* at 505-08 (discussing trauma victim's memory as potentially scattered, remembering some details while forgetting others).

[38] *See id.* at 505-13 (discussing effects of traumatic experiences on memory and global memory impairment of individuals).

[39] *Id.* at 509 (explaining PTSD victims, while often remembering vividly traumatic experiences, sometimes lose memories or have absences of memory of those instances). The time span for amnesia from such traumatic experiences ranges from hours to weeks or even years. *See id.* at 509. Recall is triggered when stimuli (sensory or affective) match the elements of sensory or affective elements associated with the causing trauma. *See id.* Individuals whom experience such traumatic events can often function "quite well" as long as associated feelings to the traumatic memory are not triggered. *Id.* at 510.

**STB_AR1_012640**

amnesia occurs among survivors who develop PTSD."[40]  The most important predictor
for PTSD is dissociative experience at the time of trauma.[41]  Dissociation and repression
of experiences can serve as protective mechanisms, as they "refer to a
compartmentalization of experience . . . stored in the memory as . . . sensory
perceptions."[42]    Dissociation can also lead to illogical sequence of memory and
inconsistent recall, as can repression, which may also serve as a protective mechanism
after a traumatic event.[43]

      Though repression and dissociation are sometimes used interchangeably, there
is a fundamental difference between the two. In *Trauma: Explorations in Memory*, Bessel
van der Kolk and Onno Van der Hart state:

> Repression reflects a vertically layered model of mind: what is repressed
> is pushed downward, into the unconscious. The subject no longer has
> access to it . . . . Dissociation reflects a horizontally layered model of
> mind: when a subject does not remember a trauma, its "memory" is
> contained in an alternate stream of consciousness.[44]

      Either through repression or dissociation, the mind has tried to
compartmentalize the memory.[45]    Through subsequent therapy, the individual can
attempt to retrieve repressed or dissociated memories, though this can be a difficult and
grueling process and often an impossible one.  While repression and dissociation still

---

[40] *See* Yoram Yovel et al., *Amnesia for Traumatic Events Among Recent Survivors: A Pilot Study*, 8 CNS
SPECTRUMS 676, 683-85 (2003) (discussing difference between memory gaps and amnesia).

[41] ARE HOLEN, A LONG-TERM OUTCOME STUDY OF SURVIVORS FROM A DISASTER:  THE
ALEXANDER L. KIELLAND DISASTER IN PERSPECTIVE (University of Oslo 1990).  *See also* Arieh
Y. Shalev et al., *Predictors of PTSD in Injured Trauma Survivors: A Prospective Study*, 153 AM. J.
PSYCHIATRY 219, 224 (1996) (noting the association between dissociative experience and PTSD).
Dissociation is an indicator of prior trauma.  *Id.*  Dissociation is also a stress-related behavior,
where traumatic experiences are split from other parts of the experienced individual's self, which
impairs the ability to reprocess and integrate the trauma.  *Id.*

[42] *See* van der Kolk & Fisler, *supra* note 36, at 510.

[43] *See* Yovel et al., *supra* note 40, at 676 (describing repression as driven by unconscious need to
forget traumatic experience).

[44] Bessel A. van der Kolk & Onno Van der Hart, *The Intrusive Past: The Flexibility of Memory and the
Engraving of Trauma*, *in* TRAUMA:  EXPLORATIONS IN MEMORY 168 (Cathy Caruth ed., Johns
Hopkins University Press 1995).

[45] *See* Constance Dalenberg, *Recovered Memory and the Daubert Criteria:  Recovered Memory as
Professionally Tested, Peer Reviewed, and Accepted in the Relevant Scientific Community*, 7 TRAUMA,
VIOLENCE, & ABUSE 274, 289-91 (2006) (reviewing results of neurobiological studies and
psychoanalytical theories of how the brain deals with trauma).

STB_AR1_012641

**UNHCR**
The UN Refugee Agency

**Comments of the United Nations High Commissioner for Refugees on the Interim Final Rule
from the U.S. Department of Homeland Security and U.S. Department of Justice:**

**"Securing the Border"**

**USCIS Docket No. USCIS-2024-0006; A.G. Order No. 5943-2024**

**Submitted 8 July 2024**

I.    Introduction ................................................................................................. 2

II.   Overarching Comments on the Interim Final Rule's Alignment with the 1951 Convention and the 1967 Protocol relating to the Status of Refugees ................................ 3

    A.    Relevant Foundational Principles of International Refugee Law............................ 3

    B.    Key Principles in Adjudication of Asylum Claims ................................................ 4

    C.    UNHCR's Overall Position on the IFR.................................................................. 8

III.  Observations on Specific Substantive Provisions of the Interim Final Rule .............10

    A.    Limitation on Asylum Eligibility.........................................................................10

    B.    Preserving "Family Unity" in Full Merits Adjudications.......................................13

    C.    Using "Emergency" to Justify Application of the Interim Final Rule ...................15

IV.   Observations on Specific Procedural Provisions of the Interim Final Rule...............16

    A.    Manifestation of Fear Requirement ..................................................................16

    B.    Limitation on Asylum Eligibility Applied Inappropriately ...................................17

    C.    Placing Responsibility on Asylum-Seekers to Demonstrate an Exception Based on "Exceptionally Compelling Circumstances"................................................................19

    D.    Elevated Thresholds in Asylum Pre-Screening ...................................................20

    E.    IJ Review of Negative Fear Determinations and Request for Reconsideration by USCIS...........................................................................................................................21

V.    Observations on the Characterization of Relevant International Law and Standards in the Interim Final Rule...................................................................................................23

    A.    On the United States' Non-Refoulement Obligations .........................................23

    B.    On the Non-Discretionary Nature of Asylum Under International Law ................24

VI.   Conclusion.....................................................................................................25

STB_AR1_012802

**UNHCR**
The UN Refugee Agency

seek asylum and placing individuals at risk of refoulement. No timeframe, such as that set forth by the IFR based on numbers of persons encountered, can overcome that fundamental legal flaw.

**UNHCR recommends** that the IFR be rescinded in its entirety. The right to seek asylum cannot be suspended based on emergency justifications. Blanket measures that do not protect against refoulement appropriately fail to meet international standards, and any measures to manage and address challenges related to the arrival of non-nationals at the border must be non-discriminatory and necessary, proportionate, and reasonable to a legitimate aim.

## IV.    Observations on Specific Procedural Provisions of the Interim Final Rule

### A.  Manifestation of Fear Requirement

Under the IFR, asylum-seekers subject to the Rule who are placed in expedited removal must affirmatively "manifest" a fear of return to their country of origin or removal or express an intention to apply for asylum or protection to access pre-screening.[77] Individuals found not to have "manifested" fear may be promptly removed, without any opportunity to present information about their potential claims for international protection to an asylum officer.[78] "Manifestation" may occur at any time in the expedited removal process and can be expressed verbally, non-verbally, or physically.[79] In the IFR's explanatory text, the Government indicates that it plans to notify asylum-seekers about the need to report any fear of return through signs and videos displayed in four languages[80] at detention facilities that hold people in expedited removal.[81]

UNHCR is concerned that this approach will lead to the refoulement of individuals entitled to refugee status—a point that the Government concedes in the explanatory text of the IFR, noting that the manifestation requirement may "engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection" and that "[i]n these cases, there may be costs to noncitizens that result from their removal."[82] Non-refoulement requires that, upon a non-national's appearance at a State's borders, the State identify whether that individual is or may be a refugee, and, if so, protect that individual from return to their country of origin. It is generally recognized that fair and efficient asylum procedures are an essential element in the full and inclusive application of the 1951 Convention. This allows States to identify those who qualify (and those who do not) under the refugee definition to protect against refoulement.[83]

---

[77] Interim Final Rule, *supra* note 1, at 48,771.
[78] *Id.*
[79] *Id.* at 48,740. According to the IFR's explanatory text, manifestations of fear may present through behaviors such as shaking, crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse. Immigration and Customs Enforcement, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule, Securing the Border* (June 4, 2024).
[80] These signs will be in the languages spoken by the most common nationalities encountered by CBP, which the IFR's explanatory text identifies as English, Spanish, Mandarin, and Hindi. The signs and videos are not made available in indigenous or other languages. Interim Final Rule, *supra* note 1, at 48,740; *see also* Immigration and Customs Enforcement, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule, Securing the Border* (June 4, 2024).
[81] Interim Final Rule, *supra* note 1, at 48,741.
[82] *Id.* at 48,767.
[83] Article 33(1) of the 1951 Convention codifies the fundamental principle of non-refoulement, which refers to the obligation of States not to expel or return (refouler) a person to territories where his or her life or liberty would be threatened. *See* Black's Law Dictionary 1157 (9th ed. 2009). *See also* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations under the 1951 Convention relating to the Status of Refugees and its 1967 Protocol*, (Jan. 26, 2007), http://www.unhcr.org/refworld/docid/45f17a1a4.html.



**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on "Securing the Border," Docket No. USCIS 2024-0006**

Dear Mr. Delgado and Ms. Reid:

Las Americas Immigrant Advocacy Center (Las Americas, or we) submits this comment in response to the interim final rule (IFR) published by the Department of Homeland Security (DHS) and Department of Justice (DOJ) in the Federal Register on June 7, 2024. That rule, misleadingly titled "Securing the Border," would ban refugees from seeking asylum in the United States and result in the *refoulement* of countless refugees to countries where they will be persecuted or tortured.

The IFR constitutes a brazenly political stunt that panders to hate groups at the expense of the lives and welfare of tens of thousands of people and that discards any pretense of this administration's previously stated commitments to abide by refugee law, restore full access to asylum at ports of entry, and ensure fair and humane asylum adjudications. The IFR operates similarly to the entry ban promulgated by the Trump administration in 2018 that was repeatedly struck down as unlawful by the federal courts. The IFR openly defies those decisions, usurps the role of Congress, and takes the United States farther out of compliance with international law. It must be rescinded immediately.

Policies enacted by DHS and DOJ under three successive administrations have created chaos, uncertainty, and deadly violence at the U.S.-Mexico border. The use of (unlawful) metering, the (unlawful) entry and transit bans, the (unlawful) Title 42 policy, the (unlawful) 2023 asylum ban, the creation of parole programs restricted to certain nationalities, the (unlawful) policies of removing and returning people from third countries to Mexico, and attempts to make (unlawful) substantive changes to asylum law are all examples of how the United States continues to exacerbate, rather than resolve, the challenges that exist at the border. Each time a punitive "deterrence" policy worsens the situation at the border, DHS and DOJ respond by ramping up the punishment they inflict on refugees. Each time, the result is, predictably, a situation that becomes still worse.

To offer just one example of the types of failures of DHS and DOJ policy and of the dangers that will be exacerbated under the proposed rule, Las Americas worked with one young woman who was deported under an expedited removal order and later gang raped by the very attackers she told DHS about in her credible fear interview. She later returned to the United States and was granted withholding of removal. Had her claim been correctly reviewed and

account and an individual account. Others will register just one member of the family and then be denied entry when they show up with their family members—Las Americas encountered at least one single mother traveling with her 12-year-old son who was denied entry by CBP after she showed up to her appointment with the child, stating it was because she did not register her son with CBP One. This occurred despite the fact that all ports of entry are equipped and well-trained in running in-person processing of families and have done so regularly without the use of CBP One up until January 2023.

The result is that large groups of people must wait in Mexico for extended periods of time, left in precarious positions and unable to plan ahead as to how long their wait will be and what resources they need. This wait forces them to rely on limited and often over-encumbered migrant spaces. Every person forced to wait in Mexico is faced with a risk of kidnapping, assault, rape, and murder; of exploitation by criminal groups and government officials; and of other issues caused by living in temporary conditions without security or regular access to food, clean water, and medical facilities. And each day that a person waits puts them at further risk for serious violence. Criminal elements in Mexico will kidnap people and hold them for ransom, draining a family's already limited resources and putting lives in danger. Many of the conditions that led people to flee their homes are replicated at the border. Las Americas has observed domestic abuse victims being abused again while waiting to be allowed to enter the United States. Some of Las Americas' clients were robbed in broad daylight by Mexican police officers while they were in Ciudad Juárez. Forcing people to wait before entering the United States only increases their vulnerability and the likelihood that they will face the same persecution from which they are fleeing. On July 2, 2024, after the announcement of the IFR and asylum suspension, Las Americas conducted a legal information session for 13 kidnapping victims held against their will by a criminal organization targeting migrants in Ciudad Juárez.

We also commonly see asylum seekers with health problems that make it even more untenable for them to wait in Mexico, particularly when they are forced to live in shelters, in camps, or on the street. All of these situations serve to exacerbate pre-existing conditions such as asthma, cerebral palsy, leukemia, other cancers, and other serious illnesses, including mental health concerns related to trauma experienced on the journey north. Access to medical care on the Mexican side of the border is limited for migrants. While community organizations help migrants access initial consultations with doctors, in most cases, these are general check-ups. When a referral to a specialist is necessary, access to that specialist is either cost-prohibitive, unavailable in the area, or not available to non-residents. In most situations, migrants are not afforded access to the medicine they need. The wait times at the border make it more likely that people living with illnesses will run out of life-saving medications and be unable to access refills.

Furthermore, the CBP One app often requires cell phone capabilities that people seeking asylum do not have. Some brands of cell phones, such as Huawei, fail to load the app effectively, and for those who are able to load it, frequent and mandatory updates are often required, limiting the user's capability of confirming daily their need for an appointment. Many people do not have the required operating system or memory for the CBP One app to function properly on their

phone. So when they try to register for an appointment through the app, the system kicks them out before they are able to complete the process. And by the time people have traveled all the way to the border, their cell phones are already very damaged (if not already stolen from them), and their touch screen capability does not match what is necessary to answer the questionnaire in the app. As a result, it can be difficult to take, save, then upload the photograph of the traveler. Once a technical issue arises, individuals are forced to start the registration process all over again from the beginning. Additionally, not everyone seeking asylum has the economic resources to pay for roaming data on their cell phone. It often falls to people assisting migrants to share data from their personal cell phones so that people can access the CBP One app.

In addition, the CBP One app continues to discriminate against people of color, especially Black, Brown, and Indigenous people. Because the app is only available in English, Spanish, and Haitian Creole, it inhibits speakers of Indigenous languages, asylum seekers who only speak a little Spanish, or those who speak less common languages or dialects by requiring these individuals to spend many more hours with the app and in search of translation assistance. Even applicants who speak Creole must first create an account through login.gov, which is only available in French, Spanish, and English. Once a login.gov account is created, the initial registration page for CBP One is only available in English, meaning that an applicant must agree to a long page of terms and conditions about the privacy of their information *in English* before they can get to the portions of the app that are translated. Most importantly, when entering information into the app, all answers must be in English. So, even Spanish and Haitian Creole speakers need assistance filling in their answers to the app's forms.

The system is even more obscure and difficult to access for particularly vulnerable migrants. Because it can take up to a week to find interpretation for the Indigenous languages, it is difficult to access translation of the questions and even more difficult to translate responses to the questions. These questions and answers must be entered before applicants are able to request an appointment at a port of entry. Our staff has put many resources toward helping people try to get appointments. Attorneys, caseworkers, and other aid workers conduct interviews with the people who speak indigenous or rare languages, using hard to find interpreters to gather the information the app requires. Because an appointment must be requested anew each day, people who are not English speakers, especially those who speak languages other than Spanish and Haitian Creole, find it very difficult to obtain an appointment using CBP One. The challenge of adequate translation services for these individuals is mirrored in EOIR proceedings, where hearings are routinely delayed as a result.

Once families obtain appointments, they are not always guaranteed the ability to cross the border. We have heard from families who have been turned back from the border, even though they are on time for a valid appointment. In other circumstances, we have also come across people who are granted appointments at a different port of entry far from where they are physically located, despite the app's purported use of geolocational technology. As a result, these individuals are forced to risk travel within Mexico, leaving them exposed to dangerous highway routes where migrants face a significant risk of violence and extortion by gangs and cartels

within Mexico. Mexican authorities do not issue and renew temporary humanitarian visas (known in Mexico as "FMMs") to the majority of migrants, despite the fact that these visas are required to access bus and airline travel, and they have set up checkpoints targeted at preventing refugees on the move from accessing public means of travel required to make it to their scheduled CBP One appointments.

When encountering particularly vulnerable families harmed by CBP One, Las Americas has attempted to work with the El Paso port of entry authorities to find a solution, but these efforts have not proved successful. Officers at the port of entry in El Paso often refuse to exercise their discretion to grant port parole in a reasonable manner. We have attempted to flag at least two separate cases to CBP Port of Entry officials via email in which we explained that there were exceptional circumstances interrupting our clients' access to CBP One. In one case, we raised that our client had been kidnapped in Juárez. In another case, our client had an infant living with a serious disability, and as a result, the app was unable to recognize the child's face. In both cases, CBP refused entry on the basis that DHS policy requires all access to ports be done via the app. Such unreviewable and erroneous exercises of discretion are the norm.

The IFR impermissibly fails to even consider these major, irremediable problems with the app, or the effect of the mandatory use of the app on people seeking asylum. Instead, it notes only that the app "creates efficiencies" for CBP.[3] But the convenience of DHS cannot possibly justify human harm and suffering on the scale caused by the IFR and its predecessor bans.

## III.    Withholding of Removal Is No Replacement for the Statutory Right to Asylum Eligibility

Limiting refugees to relief in the form of withholding of removal will continue to cause significant harm to refugees and the organizations that serve them. First, withholding of removal comes with a removal order and allows the government to remove a person to a third country. Additionally, there is no pathway to citizenship, and recipients must apply annually for work authorization, an application that is subject to frequent delays in adjudication. These factors mean that even people who are able to win withholding cases will face long-term limbo that is incompatible with the United States' obligations to allow refugees a path to permanence and resettlement in this country.

Second, withholding of removal causes family separation. In the ordinary course, a person who receives withholding of removal cannot petition for their family members to be considered as derivatives on their applications. And they likewise cannot travel abroad, even to a third country, to visit or reunite with family members. One Las Americas client who received withholding of removal, a young Indigenous woman from Guatemala, is worried she will not ever see her parents again. Were she to travel to see them—even to a country other than Guatemala—she would be barred from returning to the United States for ten years and subject to summary removal if she returned. This family separation is a significant hardship for her and her

---

[3] 89 Fed. Reg. at 48,737.

more critical by raising CFI standards. Yet again, the agencies never considered this consequence.

Further, the Rule makes necessary preparation time longer at the same time the agencies have reduced the consultation window. Even prior to the IFR, we have required a bare minimum of 2 hours with a client to be able to prepare them fully for a CFI, and a truly adequate period would stretch for several hours over multiple days. There is simply no way that we can walk someone through the now even more complicated, even more difficult CFI process in a shorter window—much less a fraction of 4 hours.

Even when we are able to speak with people before their CFIs, DHS policies make it impossible for us to attend the interviews in violation of 8 C.F.R. § 208.30(d)(4). The Houston asylum office does not give notice of the scheduling of fear interviews; even when we submit G-28s, we are not notified of interviews. In one case, we had one attorney on the phone with the asylum office seeking access to a CFI at the same time a second attorney emailed them requesting that we be able to attend the interview. We were assured that the asylum officer conducting the interview was trying to contact us—but we never heard from the officer, and we were excluded from the interview.

Clients with cognitive issues have a particularly difficult time in CFIs. Our client T. had a strong fear claim based on violence perpetrated against him in Jamaica because of his LGBTQ+ identity. ICE failed to document T.'s cognitive disability or to inform USCIS of that disability. USCIS also failed to provide any accommodations at the CFI. Both because he did not understand many questions during the CFI and because he had been persecuted by uniformed government officials in Jamaica, T. could not tell his story and was given a negative determination. Then, in his IJ review, T. was not allowed to provide any further information even though he was, at that time, prepared to do so. The IJ instead simply told him he lost his case. T was refouled to Jamaica as a result.

There are also plentiful procedural problems with how CFIs are conducted that prevent people with meritorious claims from telling their story. For example, in the Torrance County Detention Facility, CFIs are conducted over the phone in crowded, nonconfidential spaces, where asylum seekers must risk their stories being used against them by other people in the detention center with them if they share everything in the interview.

For example, Y. is a gay man from Senegal, a country that criminalizes same-sex sexual conduct. He was held in a private prison in the United States, was routinely shackled, and consistently felt very unsafe. Y. had spent his entire life working very hard to hide his sexual orientation from his family and from government officials. As a result, when Y. was asked about his fear of returning to Senegal by government officials while he was in jail, he did not feel safe disclosing his sexual orientation and fear of return. This reality and fear are common for individuals in custody with claims based on sexual abuse and sexual orientation-based harm. Y. failed his credible fear interview *even under prior standards*. Las Americas met with him before



**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on "Securing the Border," Docket No. USCIS 2024-0006**

Dear Mr. Delgado and Ms. Reid:

Las Americas Immigrant Advocacy Center (Las Americas, or we) submits this comment in response to the interim final rule (IFR) published by the Department of Homeland Security (DHS) and Department of Justice (DOJ) in the Federal Register on June 7, 2024. That rule, misleadingly titled "Securing the Border," would ban refugees from seeking asylum in the United States and result in the *refoulement* of countless refugees to countries where they will be persecuted or tortured.

The IFR constitutes a brazenly political stunt that panders to hate groups at the expense of the lives and welfare of tens of thousands of people and that discards any pretense of this administration's previously stated commitments to abide by refugee law, restore full access to asylum at ports of entry, and ensure fair and humane asylum adjudications. The IFR operates similarly to the entry ban promulgated by the Trump administration in 2018 that was repeatedly struck down as unlawful by the federal courts. The IFR openly defies those decisions, usurps the role of Congress, and takes the United States farther out of compliance with international law. It must be rescinded immediately.

Policies enacted by DHS and DOJ under three successive administrations have created chaos, uncertainty, and deadly violence at the U.S.-Mexico border. The use of (unlawful) metering, the (unlawful) entry and transit bans, the (unlawful) Title 42 policy, the (unlawful) 2023 asylum ban, the creation of parole programs restricted to certain nationalities, the (unlawful) policies of removing and returning people from third countries to Mexico, and attempts to make (unlawful) substantive changes to asylum law are all examples of how the United States continues to exacerbate, rather than resolve, the challenges that exist at the border. Each time a punitive "deterrence" policy worsens the situation at the border, DHS and DOJ respond by ramping up the punishment they inflict on refugees. Each time, the result is, predictably, a situation that becomes still worse.

To offer just one example of the types of failures of DHS and DOJ policy and of the dangers that will be exacerbated under the proposed rule, Las Americas worked with one young woman who was deported under an expedited removal order and later gang raped by the very attackers she told DHS about in her credible fear interview. She later returned to the United States and was granted withholding of removal. Had her claim been correctly reviewed and

parents. As a result, many refugees like her who should be granted asylum under U.S. law will languish in the United States in legal limbo, indefinitely separated from spouses and/or children who remain abroad in danger.

Third, as explained below, the IFR effectively bars many refugees from access to withholding of removal by imposing a "manifestation" requirement and raising the screening standard for withholding, and CAT claims to "reasonable probability."

Though Las Americas welcomes the fact that the IFR includes a limited exception for family unity that would allow an immigration judge to retroactively convert a grant of withholding into a grant of asylum to enable family unity, that exception will not ameliorate the problems associated with a limited grant of withholding. We and other organizations like us will still have to submit applications for would-be derivatives on an asylum case because the proposed rule's family unity exception would apply only at the end of proceedings. We would also have to expend resources to help applicants who have withholding of removal comply with supervision requirements that they might face and apply annually for work authorization. In states like Texas, where a valid work authorization is required for a driver's license, our clients would face ongoing perpetual harm from being relegated to withholding status and forced to live as second-class refugees. Most fundamentally, requiring people to meet the higher standard that applies to withholding applications means that many people will be deported to persecution and torture because, even though they could have met the well-founded fear standard contemplated by law, they cannot satisfy the higher burden for demonstrating eligibility for withholding of removal.

## IV.    The IFR Makes a Mockery of the Credible Fear Process

In addition to imposing an asylum ban, the IFR eliminates critical safeguards in the credible fear process. It removes the requirement that CBP ask people who arrive at the border whether they have a fear of return to their home country, instead requiring people to affirmatively manifest their fear to the satisfaction of a CBP agent or other immigration officer. For those subject to its asylum ban, the IFR also raises the screening standard for withholding of removal and CAT relief to a high and amorphous "reasonable probability" standard. These new, illegal policies interact with existing problems with the CFI process in ways that exclude many refugees from relief altogether.

Under the IFR, noncitizens are not even interviewed for credible fear unless they affirmatively manifest a fear of persecution. Based on our experience working with noncitizens seeking asylum, however, we know firsthand that manifesting a fear is at best an extremely difficult task. Non-citizens have normally traveled thousands of miles to reach the border, are tired and often starved, and have experienced significant trauma in their home country.  In addition, people who are fleeing from persecution by state or quasi-state actors are understandably afraid when encountering uniformed government officials. Many people seeking asylum do not, and will not, know of the manifestation requirement. And it is clear from prior

experience with "manifestation" requirements that CBP agents and other officials will simply ignore clear manifestations of fear.[4] The IFR considers none of this.

The "reasonable probability" standard, which directly conflicts with 8 U.S.C. § 1225(b), will result in mass *refoulement* for similar reasons. People fleeing for their lives do not stop to gather documentary evidence of their persecution. And in our experience, non-English speaking individuals may not share enough information during CFIs for multiple reasons that have nothing to do with the merits of their cases: they often have no knowledge of how the U.S. asylum system works and what information they need to share to demonstrate their eligibility to be considered for asylum. Those who are fleeing countries where they were threatened by people in uniform often have trouble sharing personal information with people in uniform. In addition, at the CFI phase, all people fleeing asylum remain traumatized, and very few are able or prepared to tell their full story, even if they understand the complexities of the CFI process. This is especially true of people who are detained by DHS prior to the CFI. People in detention also cannot meaningfully access friends and family, medical professionals, or others who might offer evidence supporting their claims. And for people who might nevertheless be able to relate at least parts of their story despite all of this, the raft of problems discussed below—including lack of access to counsel, interpretation problems, and routine DHS and DOJ malfeasance—mean that communicating events is exceedingly difficult at best. The higher the standard, the more people will be screened out as a result of these issues that have no bearing at all on the validity of underlying claims. Yet the IFR again ignores these facts—apparently because they are inconvenient for the agencies.

In addition, the IFR requires applicants to factually establish, at their credible fear interview, that they are eligible for asylum by proving an exception to the IFR's ban by a preponderance of the evidence. People will be unable to do so for the reasons above. And this feature of the IFR brazenly violates the requirement in 8 U.S.C. § 1225(b) that claims at the CFI stage be adjudicated under a "significant possibility" standard.

Meaningful access to counsel could blunt these problems. But contemporaneously with the IFR, DHS issued a new policy shortening the pre-CFI consultation period to as little as 4 hours. That will make it impossible for people undergoing CFIs to access counsel. We routinely work with people in ICE custody, and in order to even speak with a client, we have to email the detention center to request an appointment at a specific time. The detention centers often take 24-48 hours—or longer—to respond. Some detention centers also have policies, such as interviewing women only on certain days, that make scheduling especially difficult. Other centers use a system that allows only person-to-person calling—meaning that it is impossible to add an interpreter to the call if necessary. Because of these problems, clients sometimes received a CFI in the interim even with a 24-hour or 48-hour consultation period. The 4-hour period will make it impossible to meet with clients before CFIs, even as the IFR makes consultation even

---

[4] *See also, e.g.*, ProPublica, *When the Coast Guard Intercepts Unaccompanied Kids* (Dec. 7, 2023), https://www.propublica.org/article/when-the-coast-guard-intercepts-unaccompanied-kids.

more critical by raising CFI standards. Yet again, the agencies never considered this consequence.

Further, the Rule makes necessary preparation time longer at the same time the agencies have reduced the consultation window. Even prior to the IFR, we have required a bare minimum of 2 hours with a client to be able to prepare them fully for a CFI, and a truly adequate period would stretch for several hours over multiple days. There is simply no way that we can walk someone through the now even more complicated, even more difficult CFI process in a shorter window—much less a fraction of 4 hours.

Even when we are able to speak with people before their CFIs, DHS policies make it impossible for us to attend the interviews in violation of 8 C.F.R. § 208.30(d)(4). The Houston asylum office does not give notice of the scheduling of fear interviews; even when we submit G-28s, we are not notified of interviews. In one case, we had one attorney on the phone with the asylum office seeking access to a CFI at the same time a second attorney emailed them requesting that we be able to attend the interview. We were assured that the asylum officer conducting the interview was trying to contact us—but we never heard from the officer, and we were excluded from the interview.

Clients with cognitive issues have a particularly difficult time in CFIs. Our client T. had a strong fear claim based on violence perpetrated against him in Jamaica because of his LGBTQ+ identity. ICE failed to document T.'s cognitive disability or to inform USCIS of that disability. USCIS also failed to provide any accommodations at the CFI. Both because he did not understand many questions during the CFI and because he had been persecuted by uniformed government officials in Jamaica, T. could not tell his story and was given a negative determination. Then, in his IJ review, T. was not allowed to provide any further information even though he was, at that time, prepared to do so. The IJ instead simply told him he lost his case. T was refouled to Jamaica as a result.

There are also plentiful procedural problems with how CFIs are conducted that prevent people with meritorious claims from telling their story. For example, in the Torrance County Detention Facility, CFIs are conducted over the phone in crowded, nonconfidential spaces, where asylum seekers must risk their stories being used against them by other people in the detention center with them if they share everything in the interview.

For example, Y. is a gay man from Senegal, a country that criminalizes same-sex sexual conduct. He was held in a private prison in the United States, was routinely shackled, and consistently felt very unsafe. Y. had spent his entire life working very hard to hide his sexual orientation from his family and from government officials. As a result, when Y. was asked about his fear of returning to Senegal by government officials while he was in jail, he did not feel safe disclosing his sexual orientation and fear of return. This reality and fear are common for individuals in custody with claims based on sexual abuse and sexual orientation-based harm. Y. failed his credible fear interview *even under prior standards*. Las Americas met with him before

he was removed, and, after multiple meetings with him, he finally felt safe disclosing the true reason he fled Senegal. It was only because Las Americas could, at that point, file a request for reconsideration on Y.'s behalf that he was not refouled to Senegal.

To take another example, C. fled persecution inflicted in a rural area of Honduras. At Torrance, C. was given a CFI within hearing of other men from the same region, who could have passed C.'s story back to his persecutors. C. accordingly did not reveal the details of his experiences. C. never received the asylum officer's negative credible fear decision. He also did not receive Form I-863, even though a deportation officer falsely attested that a copy of that document had been given to C. He then had to wait 31 days for IJ review—and when that review came, the IJ simply skipped the issue whether C. was eligible for asylum, leaving that portion of the relevant form blank.

Violations of credible fear procedures are also extremely common at the El Paso Processing Center and the Otero County Processing Center. These systematic violations include the practice by Asylum Officers of attesting under signature that they have provided interviewees with fear packets when they have not actually done so. DOJ also frequently exceeds the 7-day maximum window for conducting IJ reviews of negative CFI determinations—and almost all IJs refuse to provide any relief for such violations.

Interpretation issues are rife everywhere.[5] We have routinely seen CFIs conducted in Spanish for people who are from predominantly Spanish-speaking countries but who themselves speak only an indigenous language. Even worse, when a person with no or very limited Spanish seeks IJ review of a denial based on denial of fair language access, IJs often refuse to believe that a language issue exists and instead affirm the asylum officer's finding without further inquiry.

The experiences of our client L. illustrate many of these problems. In Colombia, L. had been beaten, stabbed, and shot at by guerillas who demanded payment from her family, which ran a small grocery store. L. relocated within Colombia and twice reported the assaults to the authorities—all to no avail. During L.'s CFI, the interpreter demanded that L. provide "yes" or "no" answers to questions that called for detailed responses, repeatedly raised their voice at L. because of communication issues, and even accused L. of lying. At the end of the interview, L. told the asylum officer that the summary was incomplete and requested that she be able to add to it. In clear violation of 8 C.F.R. § 208.30(d)(6), the asylum officer denied L.'s request. During the IJ review, L. was again denied any opportunity to provide additional information. L. was then deported and refouled to Colombia even though DHS issued her with a discretionary NTA.

---

[5] *See, e.g.*, Rachel Nolan, *A Translation Crisis at the Border*, New Yorker (Dec. 30, 2019), https://www.newyorker.com/magazine/2020/01/06/a-translation-crisis-at-the-border.



July 8, 2024

*Submitted via* [https://www.regulations.gov](https://www.regulations.gov)

Daniel Delgado
Director of Immigration Policy
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Washington, DC 20528

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office of Immigration Review
U.S. Department of Justice
Falls Church, VA 22041

**Re: Comment on the Interim Final Rule by the Department of Homeland Security (DHS) and the Department of Justice (DOJ) on** ***Securing the Border*****, USCIS Docket No. USCIS-2024-0006**

Dear Director Delgado and Assistant Director Reid,

Americans for Immigrant Justice ("AI Justice") submits this comment in response to the interim final rule published by the Department of Homeland Security ("DHS") and Department of Justice ("DOJ") in the Federal Register on June 7, 2024 ("Interim Final Rule" or "IFR"). The IFR puts in place three extraordinary procedures during "emergency border circumstances," which aim to increase the speed in which DHS can dispose of fear claims by individuals fleeing persecution and harm; thereby "more quickly deliver[ing] meaningful consequences to more individuals who cross unlawfully."[1] The changes implemented in the IFR are predicated on deterring migrants and foreclosing asylum to more quickly remove individuals, undermining the protections created by Congress and risking the lives of asylum seekers for the sake of expediency.

---

[1] U.S. Dep't of Homeland Security and U.S. Dep't of Justice, *Securing the Border,* 89 Fed. Reg. 48,710, 48730 (June 7, 2024) (hereinafter "Securing the Border IFR").

**STB_AR1_013016**

colorable claim, to the extent that the Departments assess efficacy based on this factor alone, it is critical that more recent and precise data is relied upon.

The statistics that the Departments cite to justify an increase in the burden of proof are misleading.[17] The IFR cites the OHSS Enforcement Lifecycle Dataset in stating that between 2014-2019 less than 25% of positive credible fear cases resulted in a grant of protection or relief.[18] However, such statistics would appear to compare the grant rate against not only denials, but all other case dispositions, including cases that were administratively closed or otherwise disposed of—resulting in a skewed figure.[19] EOIR's own statistics show that in both fiscal year 2022 (59.8%) and 2023 (55%), the majority of people who established a credible fear claim were granted asylum if their case is decided on the merits of their protection claim.[20] This majority percentage paints a drastically different picture that the low rate consistently cited by the Departments to undergird their policy decisions in the IFR.

**Raising the Credible Fear Standard Will Also Increase the Risk of Asylum Seekers Being Returned to Persecution**

Through the IFR and accompanying policy changes, the DHS has instituted a constellation of barriers to make prevailing at the credible fear stage more difficult—not only by foreclosing asylum eligibility and heightening the burden of proof for establishing a credible fear in withholding of removal or CAT protections, but also by continuing to conduct fear screenings in CBP custody where access to counsel is extremely limited while simultaneously lowering the minimum consultation period to just four hours prior to a CFI.[21] Similar barriers created under the CLP rule have led to a significant decrease in positive credible fear determinations.[22] This

---

[17] *See, e.g.,* Human Rights First, *Rhetoric v. Reality: Biden Administration Should Correct Misleading Narrative on Asylum Eligibility* (Aug. 2023), *available at* https://humanrightsfirst.org/wp-content/uploads/2023/08/Asylum-grant-rates-fact-sheet-August -2023; Human Rights First, *Correcting the Record: The Reality of U.S Asylum Process and Outcomes* (Nov. 2023), *available at* https://humanrightsfirst.org/library/correcting-the-record-the-reality-of-u-s-asylum-process-and-outcomes/.

[18] Securing the Border IFR at 48746.

[19] *See generally,* Human Rights First, *Rhetoric v. Reality: Biden Administration Should Correct Misleading Narrative on Asylum Eligibility, supra* at 17.

[20] Executive Office for Immigrant Review Adjudication Statistics, *Asylum Decision and Filing Rates in Cases Originating with a Credible Fear Claim* (Oct. 2023), *available at* https://www.justice.gov/eoir/page/file/1062976/dl.

[21] U.S. Immigration and Customs Enforcement Memo, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule, Securing the Border* (June 4, 2024) (truncating the consultation period prior to a CFI to a minimum of 4 hours).

[22] Decl. of Blas Nuñez-Neto ¶ 7, *M.A. v. Mayorkas*, No. 1:23–cv–01843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1); *see also,* Human Rights First, *Correcting the Record, supra* at 17 (finding that "compared to those who have a regular credible fear screening, people subject to the asylum ban and its higher screening standard are more than three times as likely to fail their screenings and be ordered deported without a chance to apply for asylum").

STB_AR1_013021

drop in positive grant rates is a result of an orchestrated effort to reduce screen ins by erecting barriers to eligibility and attorney consultation, and by eroding due process protections. It is not an indication that these claims are non-meritorious. The DHS has crafted the conditions it needs to manufacture the results it wants, bolstering a narrative that supports additional restrictions to punish "false" asylum seekers and deter other migrants from attempting to seek safety.

The IFR establishes a new "reasonable probability" standard, which it defines as "substantially more than a reasonable possibility, but somewhat less than more likely than not."[23] This new standard is said to differ from the "reasonable possibility" standard utilized in the CLP by requiring a "greater specificity" to the individuals claim of fear which "targets information—specificity based on the noncitizen's own knowledge—that should generally be available at the screening stage."[24] The Departments rationalize that since most fear claims are based on past harms which inform a fear of return, individuals at the screening stage should be able to share specific and detailed testimony regarding past events of persecution and serious physical harm, the identities of their persecutors and the basis for their persecution, etc. The Departments go as far to state that "logic suggests" such information will be readily available.[25] However, the Departments ignore decades of scientific study regarding the impact of trauma on victims of persecution and torture and how such impacts manifest differently among individuals.

The Departments fail to consider the numerous psychological and even logistical barriers which serve to undermine an individual's ability to effectively and exactingly share information regarding their fear of persecution or torture. Psychological trauma is common among refugees and is shown to have profound and varying impacts on an individual's mental and emotional state.[26] As the Center for Victims of Torture explains, trauma can manifest in the asylum-seeking process in numerous ways, including:

- The asylum seeker's story contains ambiguities, to the point that it does not seem to add up.
- They answer some open-ended questions with one-word answers.
- They provide lengthy answers to other questions, but the answers are hard to follow—places, dates, and times blur.

---

[23] Securing the Border IFR at 48746.
[24] *Id.*
[25] *Id.* at 48748.
[26] Paskey, Stephen, *Telling Refugee Stories: Trauma, Credibility and the Adversarial Adjudication of Claims for Asylum,* 56 SANTA CLARA L. REV. 457, 461 (2016), *available at* https://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=2825&context=lawreview, citing that research on PTSD among refugees has found widely varying rates, with the prevalence of trauma ranging from 4% to 86% depending on sample size, country of origin, and other factors. Hollifield, M., Warner, T.D., Lian, N., Krakow, B., Jenkins, J.H., Kesler, J., Stevenson, J., & Westermeyer, J., *Measuring Trauma and Health Status in Refugees: A Critical Review*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 611–621 (2002).

STB_AR1_013022

- Their emotional behavior does not make sense; they show no emotion at all when discussing distressing events but exhibit significant emotion about things that seem mundane.
- They are not fully present, appearing to drift in and out mentally.
- Their story contains significant, seemingly inexplicable gaps.[27]

Asylum seekers may also be reluctant to share information about traumatic events for which they feel shame or physical or psychological pain in recalling past events.[28] This could lead to "overgeneralized" memory "a biological protective mechanism, allowing a trauma survivor to avoid recalling specific, painful details."[29] Those who have been harmed at the hands of government officials may shut down or refuse to disclose sensitive information to uniformed representatives of the U.S. government. While others may not feel comfortable disclosing certain information in from of their children, spouses, or within earshot of follow country-members detained nearby.

Robust scientific literature exists analyzing the impacts that trauma has on an individual's ability to describe in detail the specific facts of their past persecution and fears of future victimization. It is unreasonable for the Departments to expect for survivors of persecution and torture to be prepared to cogently speak in detail of past and future harm in a brief interview with a U.S. official, mere hours upon being taken into custody.

The experiences of AI Justice staff in consulting with and representing families in the FERM program anecdotally support the strong base of scientific research on this account. From May-August 2023, AI Justice provided legal orientation and representation to over fifty families enrolled in FERM. Even following a legal orientation which thoroughly explained the need to share specific and detailed information about past harms and fears of future persecution, it took considerable time to build rapport and trust in order for clients to begin to share the more sensitive details of their cases. In some instances, because of the short timeframe for consultation, we were unable to fully develop and prepare certain aspects of an individual's fear claim because of our client's inability to recall or retell certain information. Also, we commonly saw parents unwilling to divulge information to us because they were in their children's presence. We have also seen these patterns play out at subsequent fear interviews where details that were divulged to counsel are not shared with the Asylum Office because of fear, mistrust, or inability.

Raising the burden of proof in credible fear interviews based on an unfounded expectation that an individual should simply be able to share traumatic and sensitive details with a stranger without pause is wrong. To the contrary of the Departments' assertion, logic suggests that an asylum seeker would struggle to cogently lay out a strong claim for asylum unassisted during a

---

[27] The Center for Victims of Torture, *Designing a Trauma-Informed Asylum System in the United States* (2021) at 8, *available at* https://www.cvt.org/wp-content/uploads/2023/06/2.4.designing_a_trauma_informed_asylum_report.feb42021.pdf.
[28] *Id.* at 9.
[29] *Id.* at 8.

STB_AR1_013023

preliminary screening interview. As such, the less strenuous "significant possibility" standard is a more appropriate standard to support the aim of not erroneously screening out legitimate asylum seekers.

Additionally, the Departments state that they are "confident" that individuals who do not prevail through the heightened procedures of the IFR "are unlikely to meet their ultimate burden to establish eligibility" for withholding of removal or CAT.[30] This confidence is misplaced, and again predicated on a misconception of the overall asylum grant rates of a case adjudicated on the merits of the asylum claim and a misunderstanding of how trauma impacts memory.

**Restricting Access to Counsel Through a Truncated Consultation Window Will Also Increase the Risk of Asylum Seekers Being Returned to Persecution**

The challenges described above are further exacerbated by the Departments' decision to shorten the time period available to an individual to consult with an attorney or individual of their choosing to just four hours—an unrealistic time frame which effectively eliminates access to legal counsel.[31] Representation rates at the credible fear stage for individuals outside CBP detention are already startlingly low. Data available from the asylum processing rule cohorts showed a mere 1% representation rate,[32] while information available about the FERM program revealed only 2.6% of families had legal counsel.[33] The additional challenges faced by individuals undergoing the credible fear process in CBP custody, including the inability for legal counsel to enter CBP facilities, acquire signatures on representation agreements, initiate contact or return missed calls with potential or actual clients, etc. create further, almost insurmountable, obstacles.[34] This truncated time frame, which includes periods outside of normal business hours and weekend days, is patently insufficient to ensure the requisite right to consult established by the INA.[35]

---

[30] Securing the Border IFR at 48746.

[31] *Supra* at 21.

[32] *See,* Dep't Homeland Security Office of Homeland Security Statistics, *Asylum Processing Rule Cohort Reports, available at* https://www.dhs.gov/immigration-statistics/special-reports/asylum-processing-rule-report#:~:text=On%20May%2031%2C%202022%2C%20the,are%20not%20are%20promptly%20removed*; see also,* American Immigration Lawyers Association, *Policy Brief: Analysis of Proclamation and Interim Final Rule on "Securing the Border"* (June 5, 2024), *available at* https://www.aila.org/aila-files/D16AD362-535E-4CED-93B3-4009633E75A1/24060510.pdf?1717629643.

[33] Congresswoman Pramila Jayapal, *Jayapal, Barragán Inquiry Reveals 2.6% of Immigrant Families in Removal Process Have Legal Counsel* (Jan. 11, 2024), *available at* https://jayapal.house.gov/2024/01/11/jayapal-barragan-inquiry-reveals-2-6-of-immigrant-families-in-removal-process-have-legal-counsel/.

[34] *See, e.g.* Americans for Immigrant Justice, *The Biden Administration Must Immediately Stop Conducting Credible Fear Interviews in CBP Custody* (June 5, 2023), *available at* https://aijustice.org/2023/06/05/the-biden-administration-must-immediately-stop-conducting-credible-fear-interviews-in-cbp-custody/.

[35] INA § 235(b)(2)(B)(iv) ("An alien who is eligible for such interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof….").

STB_AR1_013024

July 8, 2024

Submitted via: https://www.regulations.gov.

Daniel Delgado, Director for Immigration Policy
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Washington, D.C. 20528

Lauren Alder Reid
Assistant Director
EOIR, Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041

**Re: Comment in Opposition to the Interim Final Rule entitled Securing the Border; USCIS Docket No. USCIS–2024–0006; RIN 1615–AC92; A.G. Order No. 5943–2024; RIN 1125–AB32**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid:

The undersigned are non-profit organizations that advocate for and/or directly represent non-citizens who are LGBTQ[1] or are living with HIV. We write in strong opposition to the Department of Homeland Security ("DHS") and the Executive Office for Immigration Review's ("EOIR," collectively with DHS, the "Departments") Interim Final Rule ("IFR" or "Rule") referenced above and urge the Departments to rescind the IFR in its entirety.[2]

## I.    <u>Introduction</u>

The IFR guts the U.S. asylum system by establishing another discriminatory process that applies a heightened asylum standard to refugees at the southern border. Although similar to the Departments' Circumvention of Lawful Pathways ("CLP Rule") asylum ban, the IFR has fewer exceptions, an even higher screening standard, and applies to Mexican refugees who will now be trapped in their country of origin with their persecutors unable to flee without the risk of penalty. Under the IFR, bona fide asylum seekers who are unable to obtain and wait for an appointment through the CBP One mobile application – unless the meet one of the very limited exceptions – will be presumed ineligible for asylum regardless of the merits of their claim.

The IFR will subject LGBTQ/H refugees to grave harm, either because it will result in the wrongful denial of meritorious queer and trans asylum claims, or because LGBTQ/H refugees will put their lives in danger trying to comply with the IFR's illegal requirements. LGBTQ/H asylum seekers

---

[1] We use "LGBTQ" and "queer and trans" as umbrella terms for people with diverse sexual orientations or gender identities, including people who identify as gay, lesbian, bisexual, transgender, queer, intersex, asexual, non-binary, and gender non-conforming. We refer collectively to LGBTQ people and people living with HIV as "LGBTQ/H."

[2] Where this comment includes linked material in footnotes, we request that the Departments <u>review the linked material in its entirety and consider it part of the record.</u>

1

identity] basis. LGBT forced migrants experience considerable shame and fear when disclosing their sexual orientation and gender identity, especially in recounting the instances of traumatic violence directed at their sexuality. For many LGBT forced migrants, the notion that they would receive help from governmental authorities on the grounds that they have suffered persecution based on SOGI is difficult to grasp until they have been outside their country of origin for an extended period. Complex PTSD makes it difficult for forced migrants to recount a history of traumatic events and it may take many years for the shame and fear to diminish sufficiently to allow a forced migrant to be able to seek help."[92]

It is not reasonable then to expect LGBTQ/H asylum seekers to be able to "shout out" a fear of returning to their countries of origin, even if explaining the reason behind the fear is not expected or required. As Drs. Shidlo and Ahola explain, many LGBTQ/H asylum seekers are psychologically prevented from seeking help because of trauma experienced due to their LGBTQ/H identities and this includes being able to make a spontaneous statement of fear to an immigration officer. When you add in the extra layers of timing or when the "shout" is expected to happen (at the end of an oftentimes harrowing journey to reach the U.S. border during which more abuse and trauma has most likely occurred) and a lack of confidentiality (due to detention conditions and the Rule's removal of any individualized screening or asylum advisal) it becomes clear that very few LGBTQ/H asylum seekers will be able to access a credible fear interview and subsequent protection in the United States if this shout test is allowed to go into effect. Instead LGBTQ/H asylum seekers will be sent back to conditions of significant harm, danger, and violence without a single question being asked of them.

For all of these reasons, the shout test is woefully insufficient to protect against the return of bona fide asylum seekers to persecution or torture, especially for vulnerable groups such as LGBTQ/H asylum seekers. By putting the onus on asylum seekers to "manifest" a fear to law enforcement officers within hours of being detained and while still in a detention setting, this Rule profoundly misunderstands the nature of trauma, the effects of persecution, and the realities of asylum seekers and what they are escaping from. The probability and risk that bona fide asylum seekers, especially bona fide LGBTQ/H asylum seekers, will be returned to danger is unacceptably high under the shout test. The elimination of a required affirmative fear screening and individualized asylum advisals for asylum seekers under the pretense of efficiency goes against this Administration's stated commitment to protect LGBTQ/H asylum seekers and refugees.

## VII.    The IFR Illegally Creates a New, Higher Protection Screening Standard that Will Result in LGBTQ/H People with Bona Fide Asylum Claims Being Refouled

Asylum seekers subject to expedited removal who express a fear of return must be referred for a preliminary fear screening conducted by an Asylum Officer. Given the circumstances of flight for refugees escaping violence, as well as the conditions under which screening interviews take place, Congress set the standard for asylum screening interviews or Credible Fear Interviews ("CFIs")

---

[92] Shidlo, Ariel; Ahola, Joanne, Forced Migration Review, Issue 42 (2013), 9-11, at 10, available at: https://ora.ox.ac.uk/objects/uuid:04c63cce-3c12-4310-b6f5-48ada2506114/files/m7f5877d072c0170987aaf13b907d78d0

STB_AR1_013050

deliberately low. The INA defines the CFI standard as "a significant possibility . . . that the alien **could** establish eligibility for asylum…"[93] In a recent ruling, the United States District Court for the District of Columbia emphasized that Congress used the word "could" in the credible fear definition to convey that, "a possibility, rather than certainty [of persecution] suffices at the credible fear stage of the asylum-eligibility process."[94] As the Judiciary Committee report to the House version of the bill explained, this was intentional to ensure that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution."[95] Senator Hatch further stated that "the conference report struck a compromise by rejecting the higher standard of credibility included in the House bill. The standard adopted in the conference report is intended to be a low screening standard for admission into the usual full asylum process."[96] The report also noted that the initial screening should "focus on two questions: is the alien telling the truth; and *does the alien have some characteristic that would qualify the alien as a refugee*"[97]

By law, anyone determined to have a credible fear of persecution cannot be deported without a full hearing on their asylum claim.  However, under the CLP Rule enacted in May 2023, and now under the IFR, refugees subject to these rules that cannot establish an exemption or exception, will now have to pass higher screening standards in order to have an opportunity to apply for protection. And even if they pass this higher standard, they will only be eligible for withholding of removal and Convention Against Torture (CAT) relief, even if they would otherwise qualify for asylum.

More specifically, under the IFR, asylum seekers must first demonstrate a "significant possibility that [they] would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances."  Notably, this inquiry is completely unrelated to the underlying merits of the applicant's asylum claim. In other words, LGBTQ/H asylum seekers who qualify for asylum will be denied an opportunity to apply for protection simply because of the way they entered the country. Only if they overcome this barrier — which will be impossible for many LGBTQ/H asylum seekers given the challenges outlined throughout this comment — can they then be screened under the "significant possibility" standard. Otherwise, they will be subjected to a brand new, more stringent "reasonable *probability*" screening standard which is defined as "substantially more than a reasonable possibility," (the heightened standard currently applied in the CLP Rule context), but "somewhat less than more likely than not," i.e., 51% chance of harm.

Raising the standard, especially given the conditions under which screening interviews generally take place, is unlawful and will result in bona fide LGBTQ/H refugees being returned to harm. Asylum screening interviews are usually performed in immigration detention in Customs and Border Protection ("CBP") custody where LGBTQ/H asylum seekers face high levels of mistreatment.[98] The vast majority of refugees have no access to an attorney in order to understand the

---

[93] 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added).

[94] *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 41 (D.D.C. 2020).

[95] 142 Cong. Rec. 25347 (1996).

[96] H.R. Rep. No. 104-469, at 158 (1996).

[97] 142 Cong. Rec. 25347 (1996).

[98] Immigration Equality, National Immigrant Justice Center, and Human Rights First, "No Human Being Should Be Held There" The Mistreatment of LGBTQ and HIV-Positive People in U.S. Federal Immigration Jails, June 2024, available at: https://immigrationequality.org/wp-content/uploads/2024/06/No-Human-Being-Should-Be-Held-There-THE-MISTREATMENT-OF-LGBTQ-AND-HIV-POSITIVE-PEOPLE-IN-U.S.-FEDERAL-IMMIGRATION-JAILS.pdf ("LGBTQ Detention Report")

STB_AR1_013051

process before their CFI takes place, which is usually held with an immigration officer over the phone through an interpreter, sometimes just days after the asylum seeker arrives in the U.S.[99]

Many LGBTQ/H asylum seekers – two-thirds of whom face sexual violence and other severe mistreatment on the journey to the U.S. according to one study[100] -- have serious health issues resulting from the journey that are untreated. Prescription medications are routinely confiscated by CBP, and refugees, including people with well controlled HIV are then forced to go without treatment for days or weeks, and sometimes even months.[101] Many queer asylum seekers are still reeling from the psychological impact of persecution in their home country which often includes, beatings, sexual assault, forced conversion therapy, "corrective" rape, the murder and suicide of other LGBTQ/H friends and partners, and a lifetime of homophobic abuse and rejection from family and communities. These traumas are compounded by inhumane detention conditions.[102]

There are other factors that can also impact an LGBTQ/H refugee's ability to tell their story during a screening interview that author organizations regularly encounter -- like the fear of disclosing LGBTQ/H status to government officials when an applicant suffered homophobic abuse at the hands of the authorities in their home country, insufficient privacy in detention facilities leading to homophobic and transphobic abuse by staff and other detained people, and lack of LGBTQ/H competency or other errors among immigration officers.[103] At the asylum screening stage, asylum seekers do not have the opportunity to present documentary evidence, expert opinions, or witnesses. That is why, recognizing these circumstances, Congress intentionally established the credible fear standard as a low bar.

Even under the more generous CFI standards, LGBTQ/H refugees with strong claims sometimes fail screening interviews. Author organizations have successfully gotten negative CFIs reversed in this context, with LGBTQ/H clients going on to win their asylum cases. Similarly, under previous regulations that unlawfully heightened the fear screening standards, LGBTQ/H refugees with bona fide claims for asylum have failed the higher screening standard, even though they would have passed the legally mandated CFI standard. For example, Ines is an Immigration Equality client who is a lesbian woman from Cuba. A Cuban police officer detained and physically assaulted Ines on the basis

---

[99] *See, e.g.,* Obstructed Legal Access: NIJC's Findings From 3 Weeks of Telephonic Legal Consultations in CBP Custody | National Immigrant Justice Center

[100] Amnesty International, *Mexico/Central America: Authorities turning their backs on LGBTI refugees*, 27 November 2017, available at: https://www.amnesty.org/en/latest/news/2017/11/mexico-central-america-authorities-turning-their-backs-on-lgbti-refugees/

[101] *See, e.g.,* LGBTQ Detention Report at 22-23; Immigration Equality to Assistant Director for ICE Health Services Corps Dr. Stewart D. Smith et a., Re: HIV-Positive Asylum Seekers Who Receive Grossly Negligent Medical Care in Immigration Detention and Are Particularly Vulnerable to COVID-19 Must Be Released Immediately. March 23, 2020. https://immigrationequality.org/wp-content/uploads/2020/09/Complaint-to-Office-of-Civil-Rights-and-Civil-Liberties-Re-HIV-Care-in-Detention-Facilities.pdf

[102] *See, e.g.,* LGBTQ Detention Report.

[103] *See e.g.,* CRCL Complaint, Systemic Deficiencies at the Houston Asylum Office in Assessment of Credible and Reasonable Fear Cause Harm and Irreversible Damage to Asylum Seekers, (Apr. 27, 2022), (CRCL Complaint, CFI and RFI Deficiencies) https://immigrationequality.org/wp-content/uploads/2022/04/2022_27April-CFI-complaint-1.pdf ; Human Rights First, Pretense of Protection, Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies, (Aug. 3, 2022) at 16-19, https://humanrightsfirst.org/library/pretense-of-protection-biden-administration-and-congress-should-avoid-exacerbating-expedited-removal-deficiencies/ ; Alex Mensing, Asylum Seekers Denied Basic Due Process and Access to Asylum at Torrance County Detention Facility, INNOVATION L. LAB., Feb. 1, 2023, https://innovationlawlab.org/press-releases/asylum-seekers-denied-basic-due-process-and-access-to-asylum-at-torrance-county-detention-facility/

STB_AR1_013052

of her sexual orientation and political opinion. On a different occasion, another Cuban police officer physically assaulted Ines because she is a lesbian and threatened her with arrest. When Ines sought asylum in the United States, the unlawful 8 C.F.R. § 208.13(c)(4) ("transit bar") was in effect. As a result, Ines was deemed not eligible for a CFI. She was given a reasonable fear interview ("RFI") instead under the heightened "reasonable possibility" screening standard. An asylum officer found that Ines did not have reasonable fear of persecution under the RFI's heightened standard. However, given that the travel ban was lifted and Ines was wrongfully given an RFI instead of a CFI, Immigration Equality worked for almost a year to get the negative determination overturned. The efforts were successful and Ines was placed in removal proceedings. Without substantial amounts attorney's assistance, Ines would never have gotten the chance to present her asylum case.

Identifying and advocating for clients who have been wrongfully denied at the fear interview stage has gotten progressively more difficult because asylum seekers in detention have such limited access to counsel and many are rushed through expedited removal processing. Although people are entitled to request an Immigration Judge review of their negative credible fear decision, these reviews are often cursory, with some asylum seekers prohibited from speaking, submitting evidence, or having their attorney speak on their behalf. Additionally, the ability of asylum seekers to request reconsideration of negative fear determinations with USCIS has been severely curtailed under recent regulation and this restriction is also included in the IFR.[104]

Further, forcing asylum officers and immigration judges to apply three distinct legal standards based on manner of entry and the application of conflicting asylum bans is likely to lead to legal errors and places further strains on an already overburdened system and asylum officers where the asylum backlog is in the millions. Already, asylum officers are diverted to conducting increasingly complicated fear screenings rather than adjudicating the merits of pending asylum cases. The changes also overburden attorneys trying to prepare clients for fear interviews during brief consultations, who will likely find it impossible to explain these complex rules and legal standards.

In short, this is an unlawful attempt to circumvent the CFI standard and the number of erroneous denials will skyrocket under the new higher standard. LGBTQ/H refugees who would normally qualify for asylum will instead be returned to countries of persecution.

## VIII. Under the IFP, LGBTQ/H Refugees Will be Left in Perpetual Limbo and Queer Families Will Be Separated.

LGBTQ/H refugees who would otherwise qualify for asylum, but are only eligible for withholding of removal and CAT relief under the IFR, with be left in perpetual limbo. This jeopardizes the long-term stability and integration of this already marginalized group. More specifically, LGBTQ/H refugees who are awarded withholding of removal or CAT relief will be denied the path to legal residence, stability, and citizenship that they would be entitled to through a grant of asylum. They will be unable to access certain benefits and will face barriers in obtaining and renewing their employment authorization. Moreover, they will be deprived of the ability to reunite with their families because, unlike asylum, withholding of removal and CAT do not enable refugees to bring their families to safety.

Author organizations have witnessed the devastating impact this can have on LGBTQ/H refugees firsthand. For example, Immigration Equality client Alexander was kidnapped, beaten, and

---

[104] Interim Final Rule at 48,770.

STB_AR1_013053



July 8, 2024

Daniel Delgado
Acting Deputy Assistant Secretary for Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Washington, D.C. 20528

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
U.S. Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041

*Submitted via regulations.gov*

**Re: Public Comment in Response to Interim Final Rule**

To Whom It May Concern:

On behalf of the Human Rights Campaign's more than three million members and supporters nationwide, we submit these comments to voice our strong opposition to an interim final rule that was recently jointly issued by the Department of Homeland Security and the Department of Justice (collectively, the "Departments") to require the immediate suspension of and ongoing limitations on the entry of noncitizens to the United States at the Southern Border between this country and Mexico (the "Interim Final Rule").[1]

As the nation's largest civil rights organization working to achieve lesbian, gay, bisexual, transgender, and queer (LGBTQ+) equality, we condemn this proposal, which if implemented would lead to unjust denials of asylum to refugees, including LGBTQI+ people,[2] and would decrease—not increase—the efficiency of the Departments in managing asylum cases. The Biden Administration has been the most pro-LGBTQI+ equality administration in American history, but this Interim Final Rule is not consistent with that demonstrated commitment to

---

[1] Securing the Border, 89 Fed. Reg. 48,710 (June 07, 2024) (codified at 8 C.F.R. § 208 et seq.).

[2] A phrase increasingly used by the federal government to be expressly inclusive of intersex people, who are individuals with innate variations in their physical sex characteristics that share common, underserved needs, as well as common challenges and experiences of social stigma, invisibility, and discrimination, with LGBTQ+ people that are rooted in restrictive norms and stereotypes regarding gender and sexual orientation. These individuals are estimated to make up as many as 1.7% of the global population. Melanie Blackless et al., *How Sexually Dimorphic Are We? Review And Synthesis*, 12 AM. J. HUMAN BIOLOGY 151 (2000). Throughout these comments, we use LGBTQI+ to refer to intersex people alongside sexual and gender minority people, outside of when particular studies and other sources reference only certain subpopulations.

STB_AR1_013094

standard screening process is more efficient than requiring CBP officers to complete additional training and guidance on the new manifestation of fear standard that should in theory not apply in the future as conditions at the Southern Border change.

The efficiency justification for these changes is therefore blatantly false. Again, removing the minimal steps required by CBP officers to accurately refer noncitizens to asylum officers for credible fear interviews in expedited removal cases *is only expected to save 20-30 minutes per case*. In reality, this new procedure will exacerbate efficiency issues by requiring operational changes to compensate for elimination of the preliminary screening to notify noncitizens of the expedited removal process and the need to affirmatively express their fear of persecution or torture.

> e. *Introducing a heightened standard for credible fear will unjustifiably deny meritorious claims of credible fear*

The higher standard of "reasonable probability" applied during the credible fear interview stage will also cause inefficiencies. The Departments argue that raising the standard will allow asylum officers to identify and dismiss noncitizens who they believe would not succeed at the full adjudication merits phase with an immigration judge. This encourages asylum officers to predict the likelihood of success at an adjudication stage, effectively superseding the immigration judges' role. This is similar in its flaws to the expansive duties of the CBP officers under the Interim Final Rule that require the officers to determine if a noncitizen has sufficiently manifested their fear during the noncitizen's first encounter with law enforcement.

For example, asylum officers are not being expected to change their questioning to elicit the new requirement for more specificity in asylum seekers' answers. Instead, the heightened standard falls on whether the information provided can reach the level of specificity needed when answering an asylum officer's questions. The Interim Final Rule claims that knowledge on the increased standard before an asylum officer should be information the noncitizens already have gathered during the initial expedited removal screening with a CBP officer. However, if the questions are not significantly different during the credible fear interviews and that initial screening, how will the persons seeking asylum understand that these similarly worded questions now require them to answer with a certain new level of specificity? Further, shortening the time between the expedited removal screening and the credible fear interview basically ensures that the noncitizen will not have legal representation to explain what the noncitizen needs to say to reach the reasonable probability threshold.

The Interim Final Rule relies on individual asylum officers to decide to either ask more questions to uncover the necessary information during the credible fear interview or learn how to ask their questions to efficiently gain the needed information. Additionally, this new standard is only for use during the emergency border circumstances, so asylum officers must adjust to applying the reasonable probability standard on occasion just to abandon that standard once the circumstances triggering the Interim Final Rule cease to exist. The Departments claim this new standard is not meant to change the "status quo" and is not applicable for anyone "outside the context of this rule."[37] But this does not change that the Interim Final Rule as written will undoubtedly cause

---

[37] 89 Fed. Reg. at 48,787, n.240.

confusion for both asylum officers and noncitizens who participate in credible fear interviews during and after periods where its provisions are in effect.

The Interim Final Rule also downplays the inefficiencies that will be caused by applying different screening standards to the same facts. The Departments claim that "facts relevant to whether a noncitizen is subject to the rule's limitation on asylum eligibility will only rarely be relevant to the inquiry into whether the noncitizen has a fear of persecution or torture." The Interim Final Rule erroneously separates the imminent threat the noncitizen suffered at the border with their future threat of persecution on return. The argument that the different standards for an imminent threat versus threat of refoulement apply is erroneous, in particular for those LGBTQI+ noncitizens fleeing from Mexico. By including Mexican asylum seekers in this Interim Final Rule, the imminent threat that caused the asylum seeker to flee their country is directly relevant to the probability of refoulement.

Effectively, the Interim Final Rule will place LGBTQI+ migrants at active risk of facing the same dangers that they are trying to flee from. While the Interim Final Rule allows an exception for those who face an imminent and extreme threat to life and safety in these countries, it would require vulnerable LGBTQI+ people seeking asylum to engage in research or otherwise be forced to predict the future. Violence can happen randomly and unexpectedly—perpetrators often do not announce an intent to harm ahead of time to where asylum seekers could determine and then be able to articulate the risks they face. Indeed, the Interim Final Rule could have the perverse effect of requiring that LGBTQI+ people and other asylum seekers expose themselves to more violent persecution before being able to seek refuge in the U.S.

The Interim Final Rule is likely to have a disproportionate impact on LGBTQI+ asylum seekers, many of whom are fleeing their homes because they are targeted due to their sexual orientation, gender identity, or both. Many of these transit countries enumerated by the Interim Final Rule, including Mexico and the "Northern Triangle" countries of Guatemala, Honduras, and El Salvador, have long, documented histories of severe violence being inflicted against LGBTQ+ people. For example, marginalization, gang violence, and brutal attacks against LGBTQ+ people are well documented in Northern Triangle countries. Furthermore, evidence that LGBTQI+ people from countries beyond the Northern Triangle like Russia and the DRC are now presenting themselves at the Southern Border seeking asylum.

Research by the Williams Institute using Asylum Prescreening System data demonstrates that many LGBT people seeking asylum within the United States have indeed experienced pervasive violence, hence their attempts to obtain refuge here.[38] Specifically, the Williams Institute found that at least 4,385 claims of fear coded as being related to LGBT status proceeded to an initial fear screening interview with an asylum officer between 2007 and 2017.[39] As noted previously, 98.4% of those interviews resulted in positive determinations for fear of persecution; additionally, 0.8% resulted in a positive determination for fear of torture, and 1.3% in positive determinations for fear of both persecution and torture.[40]

---

[38] SHAW ET AL., *supra* note 4.
[39] *Id.* at 5.
[40] *Id.*

July 8, 2024

Via Federal e-rulemaking portal, https:// www.regulations.gov

Re: Securing the Border, 89 FR 48719 (June 7 2024), DHS Docket No. USCIS-2024-0006

This is a comment on behalf of Refugees International regarding the Securing the Border Interim Final Rule, hereafter referred to as the IFR. Refugees International is an independent policy and advocacy organization focused on upholding the rights and needs of forcibly displaced people. The IFR disconnects asylum from the merits of persecution claims by denying access to asylum based on the number of border arrivals. Refugees International has observed first-hand how this undermines the right to seek asylum and the obligation against non-refoulement and recommends that the Departments withdraw the rule.

The fact that "the Departments do not have adequate resources to deliver timely consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in the United States" should have no relationship to the treatment of newly arriving asylum seekers whose right to remain has not yet been assessed (89 FR 48713). Why should a person fleeing persecution in Mexico be ineligible for asylum because of an inability of the United States, for diplomatic reasons, to remove Eastern Hemisphere migrants?  (89 FR 48722)  The IFR describes a "vicious cycle in which the border security and immigration systems cannot deliver timely…consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States…which then incentivizes more people to make the dangerous journey north…an increasingly lucrative source of income for dangerous TCOs" (89 FR 48714). But there is another vicious cycle at play as a result of this IFR: accesss to asylum is less and less about merits of claim and more arbitrary and discriminatory. The Interim Final Rule is motivated by the Departments' concern that too many people are seeking asylum, rather than whether individuals are eligible. Far from ensuring access to those with the strongest claims and speeding their adjudication on the merits, the new system allows only those with the means to wait for months for a CBP appointment access to the asylum system and shifts resources to increasingly complex credible fear screenings.[1]

There are two ways in which the IFR reduces access to asylum hearings on the merits: it raises the preliminary screening standard and it requires that asylum seekers "manifest fear" to be referred for preliminary screenings. The IFR justifies raising the preliminary screening standard with the claim that "most" people who pass credible fear screenings are denied asylum in immigration courts (89 FR 48728), a claim recently refuted by a report from TRAC showing that "two thirds of court asylum applicants" between 2014 and 2024 have been found legally entitled to remain in the United States (https://trac.syr.edu/reports/742/). The Departments acknowledge that the manifestation of fear requirement "could result in some noncitizens with meritorious claims not being referred to a credible fear interview" and instead removed, an impermissible

---

[1] The flawed metric the IFR uses for measure efficiency (see, for example, 89 FR 48739)  is the time period between encounter and referral to CFI and between negative CFI and removal, rather than any assessment of the length of the CFI interview itself. Thus improved efficiency has nothing to do with actual asylum adjudication. It simply reflects more limited time accorded to asylum seekers to access counsel while in custody.

STB_AR1_013148

violation of U.S. obligations under the Refugee Convention (89 FR 48744).[2]  Indeed, the Biden administration has evinced less concern than the Carter administration did forty-five years ago, before the passage of the Refugee Acy of 1980, when it conducted a study (albeit inadequate) to assess whether deported Haitians faced persecution upon return[3], or even than during the Eisenhower administration sixty years ago—before the U.S. acceded to the Refugee Convention—when deportations to Yugoslavia  (for example) were carefully monitored by the State Department. The Biden administration is returning Venezuelans and other third country nationals to Mexico with little concern about what happens to them there, often without their identify documents, separated from their families, and without copies of their removal orders.[4] Without any monitoring of the consequences of removal, it is unclear if the IFR's supposed "systemic efficiency" is "in the best interest" of the United States—an interest that includes a commitment to upholding human rights and providing humanitarian aid (89 FT 48736-7).

The IFR notes an increase in fear claims by Mexicans but, as it does throughout the IFR, refuses to consider whether the increase may be attributable to a documented rise in insecurity in Mexico.[5]  Mexicans asylum seekers that Refugees International interviewed after they had been removed to Nogales, Sonora under the IFR described fleeing specific, targeted violence. A woman who fled Guerrero with her seven year old daughter described crying while in CBP custody and saying that she feared return. Rather than referring her to a credible fear interview, a CBP officer told her to seek asylum in Mexico, that she was barred from the United States for five years (though not given a copy of her removal order), and warned not to try to re-enter the country unauthorized lest she be separated from her daughter. Another Mexican woman – who fled death threats-- told Refugees International that when she told a CBP officer that she wanted to seek asylum, he responded "that's what everyone says" and the new regulation made that impossible. She told Refugees International she was considering sending her daughter to the port of entry on her own and then trying to cross in a remote area of the desert – with the help of a smuggler—to evade detection. This is the perverse result of the IFR.

A better way to combat the TCOs the IFR condemns is to expand asylum seeker access at ports of entry and expand CBP One appointments. A better way to provide "timely relief or protection for those who warrant it" would be to establish "general rules or guidelines in lieu of case by case assessments" (89 FR 48738) that would allow officers can quickly *approve* certain cases –

---

[2] The IFR justifies eliminating questions about fear by citing the behavioral science concept of "acquiescence" (89 FR 48743) ignoring a significant amount of research showing how CBP officers intimidate traumatized people into obedience and submission to the process of removal, regardless of their well-founded fear of return. See for example, https://cmsny.org/wp-content/uploads/2019/06/Why-Border-Patrol-Agents-and-CBP-Officers-Should-Not-Serve-as-Asylum-Officers.pdf.
In general, the IFR shockingly approaches the absolute restriction on returning any human being to persecution as if it were a cost-benefit matter fulfillable through probabilistic accounting. "The benefits of this rule, which is consistent with all statutory and regulatory requirements and the United States' international law obligations, outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard"  (89 FR 48746).
[3] For a description of the State Department's 1979 study in Haiti, see Haitian Refugee Center v. Civiletti, https://casetext.com/case/haitian-refugee-ctr-v-civiletti
[4] IMUMI, Factsheet: Removal and Return of Non Mexican Nationals from the United States to Mexico. https://imumi.org/attachments/2024/Removal_an_Return_of_Non_Mexican_Nationals_from_the_US_to_Mx.pdf
[5] https://www.wola.org/wp-content/uploads/2023/09/Militarized-Transformation_-.pdf

something suggested by USCIS's own ombudsman.[6] These were not alternatives considered alongside restrictions on access to asylum based on a numerical quota and inconsistent with the explicit language of the Refugee Act of 1980 (allowing for access to asylum regardless of status) and Congressional intent in establishing the credible fear process in 1996 (with a low-threshold screening standard). For these reasons, the IFR should be withdrawn.


Yael Schacher, Ph.D.
Director for the Americas and Europe
www.refugeesinternational.org
Refugees International

**Refugees**
**International**

---

[6] https://www.dhs.gov/sites/default/files/2023-07/2023%20Annual%20Report%20to%20Congress_0.pdf, page 22.



July 8, 2024

*Submitted via: https://www.regulations.gov.*

Ur M. Jaddou
Director
U.S. Citizenship and Immigration
Services
U.S. Department of Homeland Security

David L. Neal
Director
Executive Office for Immigration
Review
U.S. Department of Justice

**FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**

**PHOENIX OFFICE**
P.O. Box 32670
Phoenix, AZ 85064
Tel: 602-307-1008
Fax: 602-340-0596

**TUCSON OFFICE**
P.O. Box 86299
Tucson, AZ 85754
Tel: 520-777-5600
Fax: 520-829-4154

www.firrp.org

**Re:    Comment Re: Securing the Border,
USCIS Docket No. USCIS-2024-0006, RIN 1615-AC92,
EOIR A.G. Order No. 5943-2024, RIN 1125-AB32**

Dear Director Jaddou and Director Neal,

The Florence Immigrant & Refugee Rights Project (Florence Project) respectfully submits this comment to strongly oppose the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and Department of Justice (DOJ), and Executive Office for Immigration Review's (EOIR) Interim Final Rule (hereinafter "Rule").

The Rule is one of many of the government's ongoing and pervasive efforts to unlawfully restrict asylum at the border. Instead of engaging in meaningful reforms that modernize and streamline initial identity screenings and intake processes while also meaningfully respecting the statutory right to seek asylum and basic human rights of asylum seekers, most of these efforts have been copycat facsimiles of those of the previous administration designed to limit asylum access and deter people seeking safety from even coming to the United States. Notably, in this Rule the Biden administration stretches the bounds of credulity to use authority known as 212(f) to illegally restrict asylum access. 212(f) was invoked twice by the Trump administration—first in the 2017 Travel Bans and then in Title 42 Expulsions—and twice found unlawful.[1]

Specifically, President Biden relies on a false premise of "emergency border circumstances" and an even more disingenuous claim that allowing people to seek asylum between ports—a right they have regardless of the manner of entering the U.S.—will be detrimental to the interests of the United States. The new Rule:

- creates an Asylum Ban for people crossing between ports by speciously tying asylum access to arbitrary numbers of encounters by U.S. Customs and Border Protection (CBP);

---

[1] *See, e.g.* Exec. Order 13769, 82 FR 8977 (Feb. 1, 2017); Exec. Order 13780, 82 FR 13209 (Mar. 9, 2017); Centers for Disease Control Order re: 42 U.S.C. §§ 265, 268 (Mar. 20, 2020).

**STB_AR1_013247**

"regular instances of erroneous, fabricated, and downright bogus information recorded" on key forms that provide the factual basis for the asylum claim.[21] Many of the forms contained internal discrepancies of the most basic information, "botching or switching names, as well as mangling dates, mistaking gender, and flubbing countries of origin."[22] The USCIRF found that in nearly 90% of the cases where asylum seekers stated that CBP agents did not ask whether the subject was afraid to return to his or her country of origin, "the record inaccurately indicated that it had been asked, and answered."[23]

This is consistent with our experience at the Florence Project, where we have also found that CBP unlawfully removed numerous people with claims of fear *even before* this Rule took effect. For example, Carlos[24] fled his home in southern Mexico after years of threats, extortion, and beatings by local gangs. He arrived at the U.S.-Mexico border near San Luis, Arizona and was taken into CBP custody. He explained to agents that he had a fear of return to Mexico. Instead of correctly allowing Carlos to proceed with a Credible Fear Interview (CFI) before USCIS, agents did not record his fear of Mexico of any of his paperwork and instead indicated that he came to the U.S. to "look for work." Carlos was then illegally expelled to Mexico, where he was threatened by cartel members. Likewise, our client Ivan endured harassment, threats, and beatings in a small border town because of his position as a former police officer. Cartel members physically attacked him near the port of entry, and he fled with his attackers in pursuit directly to CBP agents, who then detained him. Ivan, who had broken his arm and injured his jaw during the chase and detention, went to the hospital with CBP agents. He explained in detail how terrified he was of going back to Mexico. Instead of allowing him to proceed with his asylum application, CBP agents falsified his file to indicate that he did not have a fear of return and *directly returned him to the hands of the cartel members from whom he fled.* Ivan was then kidnapped and held for over a week in an abandoned house, where he was sexually assaulted, beaten, and starved. He then escaped and returned to CBP to ask for help, this time in fear that they would again ignore his pleas for help and return him to the people who tortured him.

We have already seen that shout tests fail and result in widespread refoulement and violations of people's rights. When Title 42 was in effect, families seeking protection in the U.S. also had to pass a shout test similar the one proposed in the Rule. The Center for Gender and Refugee Studies found that more than half of the families who were expelled under Title 42 had clearly expressed their fear to return but were summarily deported and not allowed to pursue asylum. "Instead, families disclosed that CBP officers verbally abused them, telling them to "shut up," declaring they had "no right" to an interview, or completely ignoring their attempts to communicate."[25]

We have witnessed the same pattern of CBP officers engaging in abusive language and ignoring people's claims since the Rule went into effect on June 5: most migrants deported to Nogales,

---

[21] Washington, John. 2019. "*Bad information. Border patrol arrest reports are full of lies that can sabotage asylum claims.*" (Aug. 11 2019) https://theintercept. com/2019/08/11/border-patrol-asylum-claim/.

[22] *Id.*

[23] Cassidy, Elizabeth, and Tiffany Lynch. *Barriers to protection. The treatment of asylum seekers in expedited removal.* US Commission on International Religious Freedom (2016) https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

[24] All names have been changed to protect privacy.

[25] Center for Gender and Refugee Studies, *"Manifesting" Fear At the Border: Lessons from Title 42 Expulsions,* (Jan. 2024) available at https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.

STB_AR1_013254

Sonora have told us that they voiced a fear of return to CBP agents but were ignored. One woman reported to our partner organization, the Kino Border Initiative, that she pleaded with agents not to deport her and showed agents the bruises she incurred at the hands of an angry persecutor who threatened her and her family. She was deported to Mexico without any paperwork and is again at risk of harm. Another client reported that, after expressing a fear of return, a CBP agent told them, "It's not my problem if your country or your president treats you badly, I'm going to send you back to your country." A third client tried to explain her fear of return to a CBP agent. She explained that she had a fear of return because her 16-year-old son had been beaten by an organized crime group. The agent did not believe her, did not record her statement of fear, and told her it wasn't his problem.[26]

Given CBP's well-documented past failures and its history of illegal return of those seeking asylum, *see* Attachs. A, B, and C, we are deeply concerned that this "shout test" will be nothing more than further cover for the agency to continue to illegally remove migrants who clearly state a fear of return. Since the Rule's implementation, the agency has already shown that it will continue to do just that, and indeed escalate the practice to increase the number of people wrongfully returned.

### V.    Raising the Standard For Initial Fear Screenings Directly Violates the Standard Set By Congress

As detailed above, the administration's "Shout Test" will make it so hundreds or thousands of asylum seekers with strong claims will not be allowed to proceed to the initial credible fear or reasonable fear screening interview, and instead will be quickly removed. And for those who do succeed in voicing a fear of return, the administration continues to push through an unlawful heightened standard for initial fear screenings. Like it did in May 2023, the Rule raised the standard to pass that initial screening from "significant possibility" (fraction of a 10 percent chance of persecution), a standard set by Congress and used for decades, to a heightened standard of "reasonable probability" (somewhat less than 51 percent chance of persecution)[27]. This change is illegal and harmful, as we noted in 2023. *See* Attach. A. Congress understood that the standard's threshold must be low because this is merely the initial screening of an asylum seeker's claim to determine whether their full claim will be heard by the administrative agency, e.g. U.S. Citizenship and Immigration Services or an Immigration Judge. At this stage, asylum seekers, particularly those who will be affected by this Rule, will have recently arrived after arduous and often horrifying journeys—tired, hungry, injured— and subjected to these screenings while in detention with limited or no access to an attorney, family, or friends, and often held without blankets in extremely cold holding areas, commonly

---

[26] Email from Kino Border Initiative Education and Advocacy Director Pedro de Velasco dated June 13, 2024, on file with authors.
[27] *Grace v. Whitaker*, 344 F. Supp. 3d 96, 127 (D.D.C. 2018), *aff'd in part, rev'd in part and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (describing the "significant possibility" standard at "one in ten chance of persecution, i.e., a fraction of ten percent."); *See also* NATIONAL IMMIGRANT JUSTICE CENTER, *New Biden Executive Action, Further Eviscerates The Rights To Seeks Asylum: Frequently Asked Questions About The Latest Anti-Immigrant Policy: Why is it Harmful to Heighten Fear Screening Standards*, June 5, 2024, https://immigrantjustice.org/staff/blog/new-biden-executive-action-further-eviscerates-right-seek-asylum-frequently-asked.

STB_AR1_013255



## *RAIO DIRECTORATE*

# INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA

## TRAINING MODULE

*This Page Left Blank Intentionally*

**RAIO Directorate**

<div style="border:1px solid">

# INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA

## Training Module

</div>

## MODULE DESCRIPTION

This module provides background information on torture, including what is meant by the term "torture," the motives and methods of torturers, and the recovery of survivors. The lesson focuses primarily on the effects of torture and severe trauma and how these effects can affect the interview process. Through discussion and practical exercises, you will gain exposure to effective interviewing techniques and the effects of secondary trauma.

Note: This lesson plan was originally developed in 1995 for use in training new Asylum Officers and has changed little since that time. It is based on the experiences of the authors in their work with refugees and was reviewed by several experts in the field of working with survivors of torture and other severe trauma, including Dr. Allan Keller, Dr. Antonio Martinez, Dr. Andrea Northwood, and Dr. Pamela Elizabeth. In addition, two individuals who work with survivors, one a survivor herself, gave invaluable input into the development of this lesson plan; they requested that their names not be included, however. A mock interview practical exercise that is used during the training is based on mock interview exercises developed by the clinical staff of the Bellevue-NYU Program for Survivors of Torture. Our thanks also to the staff at the Center for Victims of Torture in Minneapolis for their support of RAIO training efforts, and to all who have contributed to these training materials and to the trainings that are conducted for new RAIO officers and in the RAIO field offices.

## ENABLING PERFORMANCE OBJECTIVES

1. Recognize motives, forms, and effects of torture.

2. Identify symptoms of Post-Traumatic Stress Disorder or other trauma-related conditions.

3. Explain how different factors can impede communication during an interview with a survivor of torture.

4. Explain how interview techniques may be used to help elicit testimony from a survivor of torture or other serious trauma.

5. Recognize secondary trauma as it may arise in RAIO adjudications.

## RECOMMENDED READING

None

## ADDITIONAL RESOURCES

1. American Medical Association. (2016). *AMA principles of medical ethics*. AMA Code of Medical Ethics. Retrieved July 20, 2023, from https://www.ama-assn.org/delivering-care/ama-principles-medical-ethics

2. American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787

3. American Psychological Association. (2017). Ethical principles of psychologists and code of conduct (2002), amended effective June 1, 2010, and January 1, 2017. https://www.apa.org/ethics/code/.

4. Baranowski, K. A. (2020). Documenting human rights violations: An introduction to the psychological evaluation of asylum seekers. *Practice Innovations, 5*(1), 32-44.

5. Başoğlu, M. (2009). A multivariate contextual analysis of torture and cruel, inhuman, and degrading treatments: Implications for an evidence-based definition of torture. *American Journal of Orthopsychiatry, 79*(2), pp. 135-145.

6. Başoğlu, M., Özmen, E., Şahin, D., Paker, M., Taşdemir, Ö., Ceyhanli, A., Incesu, C., & Sarimurat, N. (1996). Appraisal of self, social environment, and state authority as possible mediator of posttraumatic stress disorder in tortured political activists. *Journal of Abnormal Psychology, 105*(2), 232-236.

7. Boyes, A. (2021, August 27). *What it really means to have self-compassion*. Psychology Today. Retrieved August 29, 2023, from https://www.psychologytoday.com/us/blog/in-practice/202108/what-it-really-means-have-self-compassion/

8. Brimbal, L., Meissner, C. A., Kleinman, S. M., Phillips, E. L., Atkinson, D. J., Dianiska, R. E., Rothweiler, J. N., Oleszkiewicz, S., & Jones, M. S. (2021). Evaluating the benefits of a rapport-based approach to investigative interviews: A

training study with law enforcement investigators. *Law and Human Behavior, 45*(1), 55-67.

9. Center for Victims of Torture. (n.d.). *Resources*. Retrieved August 21, 2023, from https://www.cvt.org/resources/

10. Friedman, E. H. (2007). *A failure of nerve: Leadership in the age of the quick fix.* Seabury Books.

11. Gorman, W. (2001). Refugee survivors of torture: Trauma and treatment. *Professional Psychology: Research and Practice, Special Section: Issues in the Treatment of Survivors of Political Torture, 32*(5), 443-451.

12. Hárdi, L., & Kroó, A. (2011). The trauma of torture and the rehabilitation of torture survivors. *Zeitschrift für Psychologie/Journal of Psychology, 219*(3), 133-142.

13. Jones, P. J., Levari, D. E., Bellet, B. W., & McNally, R. J. (2023). Exposure to descriptions of traumatic events narrows one's concept of trauma. *Journal of Experimental Psychology: Applied, 29*(1), 179-187.

14. Kira, I. A. (2017). A critical outlook at torture definition, structure, dynamics, and interventions. *Peace and Conflict: Journal of Peace Psychology, 23*(3), 328-333.

15. Kira, I. A., Aljakoub, J., Al Ibraheem, B., & Shuwiekh, H. A. M. (2022). Are torture survivors more resilient and develop higher PTG, than nontortured refugees?: The role of will to exist, live, and survive: A replication and extension, *Peace and Conflict: Journal of Peace Psychology*. https://doi.org/10.1037/pac0000639

16. Kira, I. A., Templin, T., Lewandowski, L., Clifford, D., Wiencek, P., Hammad, A., Mohanesh, J., & Al-haidar, A.-M. (2006). The effects of torture: Two community studies. *Peace and Conflict: Journal of Peace Psychology, 12*(3), 205-228.

17. Kjellenberg, E., Nilsson, F., Daukantaité, D., & Cardeña, E. (2014). Transformative narratives: The impact of working with war and torture survivors. *Psychological Trauma: Theory, Research, Practice, and Policy, 6*(2), 120-128.

18. Martinez, A., & Fabri, M. The dilemma of revictimization: Survivors of torture giving testimony. Retrieved from https://www.heartlandalliance.org/wp-content/uploads/sites/5/2016/02/the-kovler-center-the-dilemma-of-revictimization.pdf.

19. National Center for PTSD. (2007). *Working with trauma survivors: What workers need to know*. Retrieved August 1, 2023, from https://www.ptsd.va.gov/professional/treat/type/work_with_survivors.asp

20. Physicians for Human Rights. *Examining Asylum Seekers*.

21. Reicherter, D., Wang, S.-R., Ohrtman, T. N., Ndukwe, N., Vaatainen, S., Alcalay, S., & Brown, L. M. (2022). Implementation of trauma-informed best practices for international criminal investigations conducted by the United Nations Investigative Team to Promote Accountability for Crimes Committed by Da'esh/ISIL (UNITAD). *Psychological Injury and Law, 15*(4), 319-329.

22. Schippert, A. C. S. P., Grov, E. K., & Bjørnnes, A. K. (2021). Uncovering re-traumatization experiences of torture survivors in somatic health care: A qualitative systematic review, *PLoS ONE, 16*(2), 1-20. https://doi.org/10.1371/journal.pone.0246074.

23. Schubert, C. C., & Punamäki, R.-L. (2011). Mental health among torture survivors: Cultural background, refugee status and gender. *Nordic Journal of Psychiatry, 65*(3), 175-182.

24. United Nations. *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* (June 1987). (Discussed in RAIO Training module, *International Human Rights Law*)

25. Weschler, L. (1990). *A miracle, a universe: Settling accounts with torturers*. Penguin.

26. Wheeler, J. (2018, June 26). *Five pragmatic tools to become a nonanxious presence: Tips and tricks for being a mindful counselor*. Counseling Today. Retrieved August 18, 2023, from https://ct.counseling.org/2018/06/five-pragmatic-tools-to-become-a-nonanxious-presence-tips-and-tricks-for-being-a-mindful-counselor/

## CRITICAL TASKS

| Task Description |
| --- |
| Knowledge of policies and procedures for processing claims from survivors of torture |
| Knowledge of strategies and techniques for communicating with survivors of torture and other severe trauma |
| Skill in interacting with individuals who have suffered trauma (e.g., considerate, non-confrontational, empathetic |
| Skill in recognizing and managing secondary trauma |

## SCHEDULE OF REVISIONS

| Date | Section (Number and Name) | Brief Description of Changes | Made By |
| --- | --- | --- | --- |
| 1/31/2019 | Footer | Removed "draft" designation | Karrie Gurbacki |
| 12/20/2019 | Entire Lesson Plan | Minor edits to reflect changes in organizational structure of RAIO; no substantive updates | RAIO Training |
| 11/2/2023 | Entire Lesson Plan | Added recent research to Additional Resources; added information on triggers and related strategies, and on effects of secondary trauma; minor formatting changes; fixed typos and links | Survivors of Torture Lesson Plan Working Group |
| 4/24/2024 | Pages 1- 7 | Rebranding edits to remove specific training program mention and to update lesson plan objectives and linked KSAs. | RAIO Training |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

## TABLE OF CONTENTS

1   INTRODUCTION ..................................................................................................10

2   OVERVIEW........................................................................................................10

2.1  The Global Situation......................................................................................11
2.2  Common Experiences of Torture Survivors...................................................11
2.3  Treatment Centers .........................................................................................11
2.4  Sensitivity to Torture Survivors ....................................................................11

3   DEFINITION .....................................................................................................12

4   MOTIVES OF TORTURERS ...............................................................................13

5   FORMS OF TORTURE .......................................................................................14

5.1  Overview ........................................................................................................14
5.2  Methods ..........................................................................................................14

6   THE EFFECTS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA .......15

6.1  Overview ........................................................................................................15
6.2  Physical Effects .............................................................................................15
6.3  Psychological Effects .....................................................................................16
6.4  Post-Traumatic Stress Disorder (PTSD) .......................................................18
6.5  Other Factors .................................................................................................18

7   TRIGGERS .......................................................................................................19

8   RECOVERY FOR SURVIVORS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA .......19

8.1  Overview ........................................................................................................20
8.2  Factors Affecting Recovery............................................................................20

9   HOW TRAUMA-RELATED CONDITIONS CAN INTERFERE WITH THE INTERVIEW PROCESS
    21

9.1  Overview ........................................................................................................21
9.2  Effect on Interview Process............................................................................22

**10    INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA** ...........................24

10.1 Interview Techniques ................................................................................24

10.2 Documentation ........................................................................................28

**11    EFFECTS ON INDIVIDUALS WHO ARE CLOSE TO OR WHO WORK WITH SURVIVORS** ...........28

11.1 Overview ...............................................................................................28

11.2 Secondary Trauma ...................................................................................29

11.3 Family Members of Survivors ....................................................................29

11.4 Caregivers and Others ..............................................................................29

11.5 Officers in RAIO ....................................................................................29

        11.5.1 Effects that RAIO Officers Might Experience ....................................30
        11.5.2 Strategies to Cope with Secondary Trauma .......................................31

**12    SUMMARY** ................................................................................................32

**PRACTICAL EXERCISES** ........................................................................................34

**OTHER MATERIALS** ............................................................................................35

**SUPPLEMENT A – REFUGEE AFFAIRS DIVISION** ...........................................................36

Recommended Reading .......................................................................................36

Additional Resources .........................................................................................36

Supplements ....................................................................................................36

**SUPPLEMENT B – ASYLUM DIVISION** ......................................................................37

Recommended Reading .......................................................................................37

Additional Resources .........................................................................................37

Supplements ....................................................................................................37

Throughout this training module, you will come across references to adjudication-specific supplemental information located at the end of the module, as well as links to documents that contain adjudication-specific, detailed information. You are responsible for knowing the information in the referenced material that pertains to the adjudications you will be performing.

For easy reference, supplements for international and refugee adjudications are in pink and supplements for asylum adjudications are in yellow.

Officers in the RAIO Directorate conduct interviews primarily to determine eligibility for immigration benefits or requests; to corroborate information provided by applicants, petitioners, and beneficiaries; and/or to establish whether a person understands the consequences of their actions.

The RAIO Training modules of the RAIO Directorate – Foundations Training Program and the adjudication-specific training courses constitute primary field guidance for all officers who conduct interviews for the RAIO Directorate. The USCIS Policy Manual also provides guidance for officers when conducting interviews. There may be some instances where the guidance in the Policy Manual conflicts with guidance provided by the RAIO Directorate. If this is the case, you should follow the RAIO guidance. Further guidance regarding interviews for specific applications will be discussed during adjudication-specific trainings.

In this module, the term "interviewee" is used to refer to an individual who is interviewed by an officer in the RAIO Directorate for an official purpose.


# 1    INTRODUCTION

This lesson covers the definition of torture, the motives and methods of torturers, and the recovery of survivors. The lesson also discusses the effects of torture and severe trauma and how these effects can affect the interview process. The lesson offers interviewing techniques and discusses how you may be affected by secondary traumatization.[1]


# 2    OVERVIEW

---

[1] This lesson plan does not cover the legal definition or elements of torture for decision-making for protection under the Convention Against Torture (CAT).  Please refer to the Asylum Division lesson, *Convention Against Torture (CAT) Determinations*, for making legal determinations for protection under the Convention Against Torture (CAT) in the context of a merits interview, Reasonable Fear (RF), and Credible Fear (CF).

## 2.1    The Global Situation

Torture victims are any gender or age. The practice of torturing individuals is not limited to a particular political ideology; it is an abuse of power that covers the entire range of the political spectrum. Torture of prisoners is routine in many countries. Torture may occur while individuals are serving sentences for having committed crimes, are incarcerated pending judicial hearings, are detained without being formally charged, or are in the informal custody of another person (or persons) who have control over them.[2]

## 2.2    Common Experiences of Torture Survivors

Generally, the experiences of torture survivors are similar in that usually the victims have been abruptly taken away from their familiar "world," held in captivity where they were tortured, then escaped or were released. The specter of the tortured individual instills terror in the community. The victim is stigmatized, often ostracized.

In addition, torture survivors have all experienced a loss of control. Usually when faced with danger, an individual can fight or run; torture victims cannot do either of these and have no control over their lives and fate. This loss of control and helplessness often remains with the survivor long after the experience, as does the sense of estrangement and isolation.[3]

## 2.3    Treatment Centers

Because of the widespread use of torture and the problems encountered by survivors of torture, treatment centers for survivors are available throughout the United States and the world. The mental health field is learning more about the psychology of survivors of torture and developing treatments to specifically address the effects of their experiences. Examples of centers in the United States include: the "Center for Victims of Torture" in Minneapolis, the "Bellevue/NYU Program for Survivors of Torture" in New York, "The Marjorie Kovler Center for the Treatment of Survivors of Torture" in Chicago, and "Survivors International" in San Francisco.

## 2.4    Sensitivity to Torture Survivors

RAIO officers are not expected to be psychologists, but you can be sensitive to persons who have experienced torture and understand how the experience of torture can potentially inhibit applicants from fully expressing their claim.

---

[2] Note that the UN definition of torture, cited below, limits the definition to that which is performed by or with the consent of a public official.

[3] The Center for Victims of Torture website, https://www.cvt.org/; United Nations main website, https://www.un.org/en; and United Nations International Day in Support of Victims of Torture website, https://www.un.org/en/observances/torture-victims-day.

## 3    DEFINITION

Torture has been defined in a variety of ways by international organizations, healthcare providers, academics, and others. Generally speaking, torture has an element of deliberate intent by the perpetrator.

Article 1, United Nations Convention against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, 27 June 1987, states:

> "For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."[4]

(Adopted and opened for signature, ratification, and accession by General Assembly resolution 39/46 of 10 December 1984; entry into force on 26 June 1987; ratified by the US Senate in 1990; US became a party in 1994.)[5]

The World Medical Association, in its "Declaration of Tokyo," (1975), defines torture in the following manner:

> "For the purpose of this declaration, torture is defined as the deliberate, systematic or wanton infliction of physical or mental suffering by one or more persons acting alone or on the orders of any authority, to force another person to yield information, to make a confession, or for any other reason."

A more descriptive definition of torture is offered by Elena O. Nightingale, M.D., Ph.D., in "The Problem of Torture and the Response of the Health Professional":

---

[4] This definition of torture is for purposes of the Convention. Since only states are parties to the Convention, the focus is on severe harm inflicted by officials or individuals acting in official capacity.

[5] While the United States ratified the Convention Against Torture on October 21, 1994, subject to certain declarations, reservations, and understandings, and the Convention entered into force for the United States thirty days later, on November 20, 1994, the term "torture" is defined in U.S. immigration law by 8 C.F.R. § 208.18. However, this lesson plan is intended to demonstrate the variety of social and legislative contexts that consider torture for purposes of interviewing survivors of torture and other severe trauma. For further information on making legal determinations for protection under the Convention Against Torture (CAT), please refer to the Asylum Division lesson, *Convention Against Torture (CAT) Determinations*, as well as the background reading associated with that lesson.

"Torture is the deliberate infliction of pain by one person on another--that is the unique feature of torture. It is very different from the trauma that is suffered from a natural event, such as an earthquake or flood...

"There are at least four characteristics of torture that seem to be quite consistent. First, at least two persons are involved—a perpetrator and a victim, and often, though not always, they are face-to-face. Second, the torturer has complete physical control over the victim. This is important because the helplessness of the victim[s] remains with [them] long after the torture episode is over. Third, pain and suffering are an integral part of torture, but the main purpose is not really pain and suffering but rather humiliation and breaking of the will. Therefore, there are means of torture that do not involve physical pain and suffering, including sensory deprivation, continuous noise, light, hunger, cold, and so on. Finally, torture is a purposeful, systematic activity. In addition to breaking the will of the victim, the intent is to obtain information or a confession, to punish the victim, or to intimidate the victim and others. That is, the purpose is not only to destroy the person who is being tortured, but to have that person be a lesson to others so they will not do whatever the government that sanctions torture feels is not in its interests. And that's a very important component. The torture we are speaking about is the systematic government-sanctioned use of torture that is for political purposes."[6]

## 4    MOTIVES OF TORTURERS

"[T]he body [is] abused to gain access to the mind."[7] As detailed in the above definitions, torture involves the intentional infliction of physical and/or mental pain and suffering for a specific purpose. Torture is the means used to achieve that purpose. Torture is the purposeful attempt to destroy an individual's will in order to gain or maintain power, to silence someone, or simply because of opposition to who that person is or what they believe in. Although the immediate goal of torturers in some cases is to extract information, obtain a confession, or destroy the person as a participant in or leader of a group that the torturers oppose, in most cases the ultimate goal is to give an example for others; it is a means of destroying the emotional, spiritual, social, and political well-being of a group or community.

Torturers attempt to:

- destroy the personality of the victim

- weaken the individual, the family, the community, and/or the society

---

[6] Nightingale, E. O. (1990). The problem of torture and the response of the health professional. In J. Gruschow & K. Hannibal (Eds.), *Health services for the treatment of torture and trauma survivors* (pp. 8-9). Washington DC: American Association for the Advancement of Science.

[7] Denford, J. (1996). The treatment of survivors of torture. In D. Forrest (Ed.), *A glimpse of hell: Reports on torture worldwide* (p. 155). London: Amnesty International.

- create a climate of fear or apathy

Torture leaves the survivor as well as the family and community of the survivor feeling afraid, vulnerable, humiliated, intimidated, and isolated. Distrust among community members may also develop, diminishing supportive community ties.

# 5    FORMS OF TORTURE

## 5.1    Overview

While torture may take many forms, the methods utilized can be grouped into specific categories. The Center for Victims of Torture describes four categories of forms of torture: physical assaults, psychological torture, deprivation of humane conditions, and sensory over-stimulation.[8]

Despite specific professional ethical prohibitions, some medical personnel and psychologists have assisted in torture, devising methods of torture that maximize the long-term effects of torture and do not leave physical signs, which can impact torture survivors' attempts to obtain asylum. Medical personnel are often present when victims are being tortured to assure that the victims do not die. Their presence makes them culpable of crimes against humanity; it does not legitimate the acts being performed.

Though some methods of torture leave no physical marks, they may have devastating physical, neurological, and psychological effects, disabling the person for life.

## 5.2    Methods

Examples of methods of the four forms of torture include:

- Physical assaults:

  ➢ Sexual violence (adults and children are all victims of sexual violence)[9]

  ➢ Electric shocks to all parts of the body (most frequently to the genitalia)

  ➢ Beatings / Physical assault (the majority of torture victims are subjected to beatings)

  ➢ Burning the victim

---

[8] The Center for Victims of Torture (2023, August 25). *Effects of Torture*. Retrieved from https://www.cvt.org/resources/effects-of-torture/.

[9] Sexual violence other than rape can also have lasting psychological effects.

> ➢ Forcing the body into contorted positions or forcibly stretching it beyond normal capacity

- Psychological torture (e.g., threatening to harm or kill the victim or relatives of the victim; mock executions; witnessing or hearing the torture of others; forced nudity)

- Deprivation of humane conditions (e.g., depriving the victim of food, sleep, light, and protection from the elements)

- Sensory over-stimulation (e.g., exposure to powerful lights and/or constant/very loud noise, non-therapeutic administration of drugs)

The most common forms of torture are beatings and psychological torture, with most victims being subjected to some form of psychological torture.[10]

# 6    THE EFFECTS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA

## 6.1    Overview

Torture can have lasting physical and psychological effects. The most debilitating long-term effects of torture, however, tend to be psychological rather than physical. Symptoms affect a high percentage of survivors. This is also true of other forms of traumatic abuse, such as witnessing the assault, mutilation, or murder of others; experiencing the burning or bombing of communities; forced separation from loved ones; and other exposure to horrific sights or events. Cultural background plays a role in how the effects of torture are manifested for different groups, with some groups tending to present with more somatic[11] complaints, and other groups presenting more psychological symptoms.[12]

## 6.2    Physical Effects

There are many possible physical effects of torture. Physical effects include (but are not limited to) the following:

- Musculoskeletal pain

- Loss of use of body mobility (due to nerve damage, muscle damage, etc.)

- Loss of complete use of certain body functioning

- Loss of vision

---

[10] The Center for Victims of Torture (2023, August 25). *Effects of Torture*. Retrieved from https://www.cvt.org/resources/effects-of-torture/.

[11] Some cultures conceive the body and mind as inseparable, so report physical (somatic) complaints to communicate distress rather than identifying concerns as psychological.

[12] Schubert, C. C., & Punamäki, R.-L. (2011). Mental health among torture survivors: Cultural background, refugee status and gender. *Nordic Journal of Psychiatry, 65*(3), 175-182.

- Hearing loss

- Headaches

- Pregnancy

- Sexually transmitted diseases

- Scars (most forms of torture, however, do not leave lasting scars)

## 6.3    Psychological Effects

The psychological effects (and corresponding symptoms) of torture and other forms of severe trauma can include the following.[13]

**Emotional**

- blunted affect, or restricted affect (psychic numbing, showing no emotion or inappropriate emotion)

- depression

- panic disorders / panic attacks

- phobias

- anxiety

- suspiciousness; distrust

- detachment

- feelings of isolation / alienation

- feelings of guilt, shame, humiliation, worthlessness, or helplessness

- loss of confidence

- lack of interest in previously enjoyable activities

- anger (at those who perpetrated the trauma or those who were exempted)

- thoughts of death or suicide

**Psychosomatic**

- headaches

- pains for which there is no medical explanation

- nervousness

- insomnia or hypersomnia

---

[13] The following list is one of several ways of categorizing the effects of trauma on survivors.

- gastrointestinal complaints; diarrhea
- fainting
- sweating
- weakness; fatigue
- loss of appetite; weight loss or gain
- nightmares
- flashbacks
- reliving the physical pain of what happened

**Behavioral**

- hypervigilance
- excessive substance use
- aggressive behavior
- irritability
- withdrawal
- sexual dysfunction

**Mental**

- confusion
- loss of concentration
- loss of memory
- mental dullness
- attention blocking
- recurring thoughts of the traumatic event(s)
- dissociation[14]

It is important to note that although most psychological effects of torture are universal, some may vary somewhat across cultures, and some may be culture-specific. For example, to a Tibetan Buddhist, body fluids are considered to have a spiritual energy and

---

[14] "Disruption of and/or discontinuity in the normal integration of consciousness, memory, identity, emotion, perception, body representation, motor control, and behavior." This may present as blank stares, non-responsiveness to questions, losing track of questions, or appearing to behave as though reliving the traumatic event. American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787.

**STB_AR2_002959**

are not replenishable.[15] A form of torture which has been used against Tibetans is drawing blood and discarding it in an inappropriate manner. This can have severe psychological effects on the individual; their energy and spirit are irreversibly depleted.

Many of these psychological effects (as well as certain physical effects) can lead to a deterioration of the family structure and community ties. Social functioning of the individual is often impaired; this affects parenting skills, the ability to interact as a family member or part of a community, and the ability to hold a job and support oneself and one's family. The socioeconomic functioning of the entire community may suffer, as the effects of torture and other forms of severe trauma have a far-reaching impact on the community as well as the individual.

## 6.4   Post-Traumatic Stress Disorder (PTSD)

Although reactions to torture and other forms of severe trauma differ among individuals and cultures, the most common conditions are depression and Post-Traumatic Stress Disorder (PTSD). According to "The Dilemma of Revictimization: Survivors of Torture Giving Testimony" by Antonio Martinez, Ph.D., and Mary Fabri, Psy.D.,

> "The dynamics of the disorder are best understood by the interaction between two factors: the painful intrusive memories of the trauma, and the defenses used to ward off these memories. **The questioning during investigations, hearings, etc. is an extremely emotional event for the survivor. The story is rarely recounted without an actual sensory reliving of the experience (physical pain, tastes, sounds, smells). It is not simply a recollection of events.**"[16] (emphasis added)

## 6.5   Other Factors

There are other issues which may compound the effects of torture and other forms of severe trauma on survivors.

1. The survivor may be overwhelmed by grief or bereavement due to separation from and/or loss of loved ones that has occurred as a secondary consequence of the survivor's torture.

2. The survivor may experience an overwhelming sense of guilt, especially if they survived while others continued to be tortured or were killed after the survivor was freed, or if their torture was due to their association with the survivor. Survivors may feel that they were somehow to blame for their own torture or for the torture of others.

---

[15] Eisenman, Dr. David. Associate Medical Director, Bellevue/NYU Program for Survivors of Torture. Interview, 17 December 1997.

[16] Martinez, A., & Fabri, M. The dilemma of revictimization: Survivors of torture giving testimony. Retrieved from https://www.heartlandalliance.org/wp-content/uploads/sites/5/2016/02/the-kovler-center-the-dilemma-of-revictimization.pdf.

3. Survivors who have resettled in a country other than their own face difficulties adjusting to unfamiliar customs and a new language. They may also feel that they do not fit into the new environment. Their established position in their family and society may have been greatly altered by their resettlement, and they may feel a loss of purpose in their lives, especially if it is difficult for them to get and keep a job, and if economic survival is problematic for them.

4. Uncertain immigration status in the country of refuge can be very stressful for a survivor and can add greatly to their feeling of instability and uncertainty. The survivor may fear being deported and returned to the country where the abuse occurred. Waiting for a decision on a request for asylum or refugee status can be very stressful; being denied can have profound negative effect on a survivor.

5. The survivor may have a physical disability as a result of the torture / trauma that they experienced. The survivor may also, as noted above, be especially susceptible to illness.

# 7    TRIGGERS

As noted above, torture and other severe trauma can leave lasting psychological effects on survivors. Often, symptoms appear after a latency period and do not usually subside merely with the passing of time. A survivor may appear to be adjusting fairly well, only to have symptoms triggered without warning.

There are many possible triggers: an event may trigger painful memories or an individual may remind the survivor of the torturer. Even sounds and smells can trigger symptoms.

An interview could potentially trigger psychological or physical symptoms for some applicants as the required inquiries involve asking about trauma. Refer to Section 10.1, *Interview Techniques*, for interview techniques and strategies to utilize when an applicant is presenting with symptoms of distress following exposure to a trigger.

The implications for the interview are substantial. Recollections of the traumatic events, such as are required in the interview, can trigger symptoms. If the survivor was interrogated, the mere experience of the interview can remind the survivor of being interrogated where their life was dependent upon the whim of the interrogator. Uniformed security guards, a particular manner of questioning or particular questions, certain objects in the interview room or office environment, etc., can trigger memories of the trauma and cause "flashbacks" for the survivor. A survivor may be very fearful of symptoms being triggered during the interview.

# 8    RECOVERY FOR SURVIVORS OF TORTURE AND OTHER FORMS OF SEVERE TRAUMA

## 8.1    Overview

Research has revealed significant variability in individual responses to torture. Many torture survivors experience chronic psychological or physical symptoms, which range from mild to severe, while other torture survivors experience recovery from psychological and/or physical symptoms, as well as posttraumatic growth and increased resiliency. In recent years, specialized mental health treatments have been developed for survivors of torture in order to facilitate recovery from symptoms which cause distress and impair functioning.[17]

## 8.2    Factors Affecting Recovery

It is difficult to predict how a particular individual might heal from a torture experience. Psychologists have found, however, that the situations listed below may help in recovery.

**Certain situations can help in recovery**

- the survivor was an activist and was abused due to their activism

    - Such individuals tend to recover more easily than someone who was tortured merely to serve as an example or to get at others in the community.[18]

- the survivor holds strong religious beliefs

- the survivor is able to seek legal redress for the past abuse (for themselves, or to help others)

- the survivor has access to rehabilitation

- the survivor is in a supportive environment where they can be productive

    - Being in an environment that is permanently safe where there is no threat of future harm is important in recovery. Having regularized immigration status in the country of resettlement can add greatly to the feelings of safety and security of a survivor.

    - Being able to continue with normal family, social, and work-related functions without being viewed by others as having been somehow diminished by the past experiences can help in recovery.

    - In some instances, peers/the community may view the survivor as having been strong to have survived.

---

[17] See Additional Resources: Gorman (2001), Hárdi et al. (2011), Kjellenberg et al. (2014), Kira (2017), and Kira et al. (2006).

[18] See Additional Resources: Başoğlu et al. (1996), Kira et al. (2022), and Kira et al. (2006).

> ➤ Having someone who is easily accessible with whom the survivor feels comfortable talking about the experience can also help in recovery.

> ➤ The survivor has family with them in exile and/or is assured that their family is safe.

- certain cultural values can have a positive impact[19]

> ➤ For example, a survivor's belief in "karma" may help them to release feelings of revenge or anger toward the perpetrator: suffering is part of one's fate that one must accept; the perpetrator cannot escape their own fate because of their actions so justice will eventually prevail.

**Certain situations can have a negative impact on recovery**

- certain cultural values can adversely affect recovery

> ➤ For example, women who have been sexually abused in cultures that view such women as responsible for their own abuse have an especially difficult time accepting what happened to them and overcoming their shame.

- culture differences or "culture shock"—difficulty living in a culture that is different from one's own—can have a negative impact on recovery

- lack of economic resources can also have a negative impact on recovery

- bias and discrimination (such as anti-immigrant bias) can have an adverse impact on the recovery of those survivors who resettle in a country other than their own, or in an area that is culturally different from their own

- uncertain future can negatively impact recovery

> ➤ An uncertain future can negatively affect a survivor's rate of recovery. Survivors who are under the surveillance of their torturers may not know if or when they may be forced to again undergo torture. Even if survivors have resettled in another country and are out of immediate harm's way, their future may still be uncertain if they have no legal status in the country of resettlement or if their immigration status is pending.

# 9    HOW TRAUMA-RELATED CONDITIONS CAN INTERFERE WITH THE INTERVIEW PROCESS

## 9.1    Overview

---

[19] Cultural factors can also have a negative impact; see the section immediately below.

If an applicant is suffering from Post-Traumatic Stress Disorder or other trauma-related conditions, your ability to gather information on which to base a decision may be affected.[20]

An interview—even a job interview—can be a stressful experience for any individual. An interview as crucial to an individual's future as a refugee or asylum interview, by its very nature, is very stress-producing. Symptoms of trauma-related conditions are often exacerbated in stressful situations. Therefore, the interview can be extremely difficult for a survivor of torture or other severe trauma.

Undergoing questioning about the events that occurred can be very emotional for the survivor. The survivor can actually relive sensory experiences, such as sounds, smells, and physical pain. Various factors such as contact with persons in uniform (e.g., immigration inspectors, border patrol agents) or being questioned in a particular manner may trigger symptoms of Post-Traumatic Stress Disorder because this can remind the survivor of the individuals who harmed them. The survivor may feel robbed of power, vulnerable, and defenseless, similar to how they felt during the torture experience. The survivor may react in a variety of ways during the interview.

## 9.2    Effect on Interview Process

Often, the symptoms of PTSD that may be triggered in the survivor during the interview are experienced internally, and the survivor will not discuss this with those present. These symptoms, however, will have an impact on the survivor's ability to portray their claim.

**Survivor may avoid discussing events**

A survivor may use avoidance as a means of coping. They may do whatever necessary to avoid thinking about the events due to the humiliation and the emotional pain evoked. They may not wish to discuss the details of the experience with others, may not sleep to avoid having nightmares, or may isolate themself from others to avoid talking about past events. A survivor may also avoid contact with others from their country who may remind them of the experience. A survivor also may avoid such contact because they are fearful that "spies" associated in some way with their abusers may have "infiltrated" their community. (This is not an unrealistic fear, as there have been cases in which government agents from countries have developed ties to communities in resettlement countries in order to report information back to their governments on the activities of certain individuals.)

A torture survivor may be more willing to discuss the physical symptoms resulting from the experience(s) than the psychological symptoms.

**Survivor may have difficulty remembering events**

---

[20] See also Section 7, *Triggers*.

A survivor may have suffered brain damage as a result of abuse such as blows to the head and other forms of trauma. This may lead to cognitive problems and an inability to remember certain things.

Additionally, a survivor may have an emotional remembrance of what happened but may not remember the details. They may experience intense fears and anticipation of going through the experience but may not be able to remember what it was that happened. This may be due to:

- defensive techniques to avoid reliving the events, which include

  ➢ denial that events occurred

  ➢ minimizing the events

  ➢ blocking memory of the events

  ➢ dissociation

- overstimulation of the brain during the occurrence of the traumatic events so that the brain did not store all of the information

- confusion or distortion of memory due to anxiety (e.g., mixing up names and/or dates)

**Survivor may respond in unpredictable ways**

- They may lose composure. The question-and-answer format of the interview conducted by a stranger may remind the survivor of being interrogated and questioned for the "truth," and then punished for telling the truth or for lying. The survivor may see the interview as determining whether they will live or die. Even waiting to be interviewed may remind the survivor of waiting to be taken to be tortured.

- A torture survivor may manifest a wide variety of emotions when recounting past events. They may laugh at what appears to be inappropriate moments or may cry hysterically. The survivor may remember the details of the event(s) but be emotionally detached and recount events as if merely reciting a memorized story without any emotion at all.

- A torture survivor may avoid answering questions or may change the subject because they may be afraid of having an emotional outburst or a dissociation experience.

- A torture survivor may have difficulty following or tracking your questions or difficulty answering questions coherently. This can be due to severe concentration difficulties as a result of the memory problems listed previously.

- A torture survivor may avoid eye contact. Eye contact may be difficult for a torture survivor due to the experience of having been constantly watched while being detained and undergoing torture.

- A torture survivor may be unresponsive to questions you pose, even if they know the answers and could speak extensively on the topic.[21]

**Survivor may distrust the interviewing officer and may therefore avoid revealing certain information**

A torture survivor may have a distrust of others, particularly persons in positions of power or authority (e.g., USCIS officers). (Survivors may also distrust even family members and friends.) The survivor may be fearful of what you will do with the information obtained at the interview, and so may not fully disclose to the officer the experiences they had.

Often, a distrust of others helped survivors escape further abuse and survive in their countries. Therefore, survivors may attempt to protect themselves by distrusting others in other situations as well.

The effects listed above can also have an impact on interactions other than at the interview. Individuals who work with survivors in a counseling capacity are often not able to elicit all that happened to the survivor during the first few counseling sessions. In addition, a survivor may not have explained everything about the claim to their representative prior to the interview.[22] It is important to keep in mind how a trauma experience may impact an individual during the interview, and the way in which a trauma experience can manifest in an interview should not be a factor that creates doubt about an individual's credibility.

## 10    INTERVIEWING SURVIVORS OF TORTURE AND OTHER SEVERE TRAUMA

### 10.1    Interview Techniques

At every interview there is a potential for retraumatizing an applicant who may be a survivor of torture or other severe trauma. You must be aware of the effects of trauma on certain applicants and use this awareness in formulating interview strategies. You may have to modify your interview techniques to adapt to certain situations. Unfortunately,

---

[21] This type of response may give rise to credibility concerns related to the applicant's candor or responsiveness. Just like you need to consider an applicant's cultural or educational background in determining whether a response is credible, you must take into consideration the effects of torture and trauma on an applicant's ability to respond. See RAIO Training module, *Credibility*, which cites multiple court cases overturning lower decisions where the impact of torture was not properly considered in making a determination regarding the applicant's credibility.

[22] Consider the implications for the interview if applicants have not been able to fully explain their claim to their legal representative or counselor.

you will not always know who is a survivor and who is not a survivor. As noted above, some applicants will not fully disclose all information about their past to you. You should therefore treat each applicant as a possible survivor and attempt to be as sensitive as possible during all interviews.

Interview techniques that may be helpful include the following.

**Treat the applicant with humanity**

The manner in which you approach the applicant and the interview can greatly affect the way in which the applicant will respond and be able to express their claim at the interview.

You should attempt to build rapport as soon as you meet the applicant, for example by finding some way to connect with the applicant on a human level or connecting on issues not related to the torture experience. Setting the tone at the beginning of the interview can assist you in eliciting the necessary information throughout the interview and can assist the applicant in relating their claim.

**Try to help the person feel safe and in control**

- You should recognize the power differential that exists between the applicant and yourself and take care not to exploit it.

- You should explain the purpose and process of the interview, including the fact that you will be taking notes and the reason for taking notes. In this way, a survivor will know what they can expect during the interview, thus relieving some of the anxiety of the unknown.

- If the claim involves sexual abuse and you are not the same sex as the applicant, you can offer the applicant an opportunity to be interviewed by an officer of the same sex, if one is available.[23]

- You should start with easy topics in order to establish rapport.

- You can ask open-ended questions that give the applicant some control over the information they must give.

- You can acknowledge how difficult it may be for the applicant to answer certain questions; you can also give the applicant permission to let you know when something is too difficult.

---

[23] Sometimes just giving the applicant the opportunity to be interviewed by someone else can relieve some of the applicant's stress about the interview as it indicates that the asylum officer is sensitive to and understanding of the applicant's situation.

- You can acknowledge that an event may have been particularly traumatic for an applicant (e.g., "That must have been very difficult for you.")

- You can elicit sufficient detail to establish credibility and gain an understanding of the basis of the claim without probing too deeply into all the details of a painful experience.

- Questions such as "Was your life different after your experience? ...How?" can also give you further insight into the nature of the event as well as an understanding of the long-term effects of the experience on the applicant.

- If the applicant does not speak English and it is necessary for you to discuss issues with the interpreter, attorney or legal representative, dependents on the applicant's case, or anyone else at the interview, you should have the discussion translated to the applicant. This keeps the applicant informed of what is going on and can diminish the loss of control the applicant may feel.[24]

- You should respect a survivor's need to protect themself during the interview and should respect the survivor's need to have a sense of control during the interview. This is a major issue for survivors, as their control has been completely stripped from them in many situations; thus lack of control can be very unnerving.

**Be thorough but sensitive**

- You should explain to the applicant the process and roles of the individuals at the interview to reduce the feeling of anxiety.

- You can ask broader, open-ended questions in the beginning of the interview to give the applicant a feeling of control, then go back for details.

- You should not speak in a loud voice, should avoid changes in mood or attitude toward the applicant, should avoid reacting with disbelief, and should avoid being confrontational or argumentative with the applicant.

  ➢ It is important to remember that there is a range of behavior that a survivor may exhibit when confronted with discrepancies in their story. Some survivors may be able to explain the discrepancy in a rational manner, while others may become more confused. This may have very little to do with an attempt to fabricate a claim.

- You should approach the interview as a means of gathering information rather than as an interrogation, and should convey that message to the applicant by your manner.

---

[24] For additional information, see RAIO Training module, *Interviewing – Working with an Interpreter*.

- You should allow the applicant to ask questions or ask for clarification; the officer should rephrase questions that appear to be confusing or not understood by the applicant.

**Remember the purpose of the interview**

- You should be knowledgeable in human rights conditions in the applicant's country so that you can ask relevant questions and avoid unnecessary questions.

- You should give the applicant time to recompose themself if necessary during the interview, and to relate the account of their experiences in a manner that is the most comfortable for the applicant.

  ➢ At times after asking a question, it may be appropriate to allow the applicant several seconds of silence to organize their thoughts and determine how to answer a particularly difficult question. Although you may feel a need to fill in the silence by asking additional questions, it may be more beneficial to allow for the silence at particular times during the interview.[25]

  ➢ If an interview with a survivor of torture is particularly long or difficult, you can give the applicant an opportunity to take a break, get water, etc.

- You can emphasize mutual goals you and the applicant have.

- You should respond non-defensively if an applicant exhibits suspiciousness or distrust.

It is important to keep in mind that you may not be aware of what the applicant is going through during the interview and that you cannot change the manner in which the applicant presents themself. Rather, you must be aware of how you are conducting the interview and adapt your own behavior whenever necessary to be able to effectively elicit the applicant's claim.

**Respond to signs indicating that the applicant is experiencing distress related to triggers**

You can use techniques to mitigate the symptoms of distress experienced by the torture survivor after exposure to a trigger, including attending to the interviewee's nonverbal cues of distress, modeling how to cope with distress, and responding to their distress by promoting the positive and helping the interviewee feel safe. For example, when you notice the interviewee is tearful or that their voice is quavering, you can acknowledge their distress and allow them to talk or allow them to regain composure before proceeding to the next question. You can also remind the interviewee of the course of the interview and provide positive feedback for the interviewee's efforts during the interview. For

---

[25] For additional information, see RAIO Training module, *Interviewing – Eliciting Testimony*.

example, "I see this is difficult for you. Please take your time. It seems like you are working hard to answer these questions. I can see the effort you are making to complete this interview."

One effective strategy involves setting an intention to act as the non-anxious person in the room. Non-anxious person is an effective interview strategy conducted using the trauma-informed approach to obtain necessary information from individuals who have experienced trauma. The non-anxious person strategy involves the interviewer managing their emotional reactions when exposed to the emotional processes of others, maintaining a nonjudgmental perspective, focusing on engaging the applicant in the interview by active listening, and allowing the interviewee to tell their story by being curious, which empowers them. This strategy includes refraining from expressions of horror, disbelief, or distress in response to what the interviewee is saying; giving the outward appearance of calm and concern; and allowing the interviewee to express emotions while relating their story, which communicates to the interviewee that you can handle hearing the story.[26]

## 10.2    Documentation

Documentation of a survivor's experience from their country is usually not available; persons who practice torture usually do not leave written accounts of their actions, and physicians and psychologists who might provide treatment and/or documentation may themselves be harmed if caught. In addition, many in the medical profession may not be trained in recognizing the signs of torture. Furthermore, a survivor may be afraid to go to a doctor if a doctor was present during and involved in the torture. Although survivors are often not able to seek medical or psychological attention, some are able to obtain care and documentation of their abuse.

Documentation of physical symptoms and conditions, however, may not necessarily be able to verify the cause of the symptoms or conditions.

## 11    EFFECTS ON INDIVIDUALS WHO ARE CLOSE TO OR WHO WORK WITH SURVIVORS

## 11.1    Overview

Individuals who have relationships or work with survivors of torture or trauma may be impacted by the experience of survivors recounting stories of torture or trauma. The impact may be positive, for example posttraumatic growth, or negative, including but not limited to secondary traumatic stress and/or burnout. Additionally, the repeated exposure to descriptions of traumatic events can alter an officer's perception of the severity of

---

[26] See Additional Resources: Baranowski (2020), Brimbal et al. (2021), Friedman (2007), Reicherter et al. (2022), Wheeler (2018, June 26), and Schippert et al. (2021), for details regarding effective strategies for interviewing applicants, with histories of trauma, exhibiting signs of distress.

another's reported trauma. An officer's perception may be altered in a way that directly impacts the officer's analysis during the interview. To conduct objective interviews, officers must be aware of how they may be impacted by the experience in order to mitigate potential negative impacts that could inappropriately influence the analysis of an applicant's interview.[27]

## 11.2    Secondary Trauma

The term "secondary trauma" (also called "vicarious trauma") is used to refer to the psychological and physiological effects experienced by individuals who work with or are close to trauma survivors. Vicarious trauma can result from empathic engagement with trauma survivors and their trauma stories, combined with a commitment or responsibility to help them.[28] Symptoms of secondary trauma mimic the symptoms of PTSD. Secondary trauma is a normal reaction and is experienced in varying degrees by individuals who are in constant contact with survivors of trauma.

## 11.3    Family Members of Survivors

Secondary trauma may affect family members of the survivor as well as individuals who were closely associated with the survivor, such as a friend or colleague who escaped being tortured. (This is important to note when interviewing an applicant who is related to or closely associated with someone who was a victim of torture or other severe trauma.)

## 11.4    Caregivers and Others

Secondary trauma can affect individuals who work intensely or frequently with survivors, including service providers such as doctors, nurses, social workers, and mental health care providers.

## 11.5    Officers in RAIO

Although officers in RAIO do not have the same in-depth contact with torture survivors that certain service providers have, you may still be affected by the stress from continually interviewing applicants who have undergone hardships and may be survivors of torture or other forms of trauma. You must recognize how this stress may be affecting you and take steps to address problems that may arise as a result. It is important that you take care of your mental health while doing this work and reach out for available services to address problems that may arise as a result of secondary trauma.[29]  It is also essential to

---

[27] See Additional Resources: Jones et al. (2023) and Kjellenberg et al. (2014) for more details.

[28] Herman, J. L., & van der Kolk, B. A. (2020). *Treating complex traumatic stress disorders in adults: Scientific foundations and therapeutic models*. Guilford Publications.

[29] Through the Employee Assistance Program (EAP), RAIO staff have access to free and confidential counseling 24 hours per day, 7 days per week, to help handle difficult situations and manage stress. Seeking counseling services

establish healthy boundaries, such as taking needed breaks, and engage in self-care activities that promote relaxation and well-being.

Secondary trauma could also have an effect on your interactions with others and your work performance. Things to look out for are the potential for: decreasing objectivity, tolerance, patience, and the ability to listen dispassionately to others; overreaction or reaction with disbelief and sarcasm to stories of torture or other forms of abuse; and a decreased sense of personal accomplishment.

## 11.5.1 Effects that RAIO Officers Might Experience

Those who work with trauma survivors "may begin to show signs of stress disorders ranging from difficulty sleeping to PTSD symptoms such as intrusive thoughts and heightened reactivity."[30] Individuals who work with survivors can also experience the following effects:

**Burnout[31]**

The term "burnout" refers to the cumulative psychological strain of working with many different stressors. It often manifests as a gradual wearing down over time.

The factors that could lead to burnout include:

- Professional isolation
- Emotional drain from empathizing
- Complex client population
- Long hours with finite resources
- Ambiguous success
- Unreciprocated giving and attentiveness
- Failure to live up to one's own expectations for effecting positive change

The symptoms of burnout can include:

- Depression
- Cynicism
- Boredom

---

for mental health treatment does not disqualify you from working for the government or passing a background check.

[30] National Center for PTSD. (2007). *Working with trauma survivors: What workers need to know.* Retrieved August 1, 2023, from https://www.ptsd.va.gov/professional/treat/type/work_with_survivors.asp.

[31] *Id.*

- Loss of compassion
- Discouragement

**Compassion stress**[32]

Compassion stress refers to the stress of helping or wanting to help a trauma survivor. Compassion stress is seen as a *natural outcome* of knowing about trauma experienced by a client, friend, or family member, rather than a pathological process. It can be of sudden onset, and the symptoms include:

- Helplessness
- Confusion
- Isolation
- Secondary traumatic stress symptoms

**Compassion fatigue**[33]

Compassion fatigue is considered a more severe example of cumulative compassion stress. It is defined as "a state of exhaustion and dysfunction, biologically, physiologically, and emotionally, as a result of prolonged exposure to compassion stress."[34]

## 11.5.2  Strategies to Cope with Secondary Trauma

There are various ways you can prevent or treat secondary trauma, including getting regular physical exercise, adequate sleep, and proper nutrition, and talking to a counselor or other health professional. Taking regular breaks and being assigned to different types of tasks can also help. Practicing mindfulness and self-compassion can also help individuals working with survivors cope with difficult emotions and reduce trauma reactions.[35] It is also important to seek social support from a supportive environment of family and/or friends with whom to discuss feelings. In addition, anyone who is suffering from secondary trauma can connect with and share their experiences with co-workers who are likely to understand what they are going through more than anyone else might. Also, you are encouraged to reach out to your supervisor, as you feel comfortable, to discuss what options may be available for support.[36]

---

[32] *Id*.

[33] *Id*.

[34] *Id*. (citing Figley, C. R. (Ed.). (1995). *Compassion fatigue: Coping with secondary traumatic stress disorder in those who treat the traumatized.* New York: Brunner/Mazel.)

[35] See Additional Resources: Boyes (2021, August 27) for more details.

[36] Through the Employee Assistance Program (EAP), RAIO staff have access to free and confidential counseling 24 hours per day, 7 days per week, to help handle difficult situations and manage stress. Seeking counseling services

## 12    SUMMARY

Torture is practiced in many countries. It affects persons of all genders and ages, including children.

**Motive of Torturers**

- To give an example to others
- A means of destroying the emotional, spiritual, social, and political well-being of a group or community
- Torturers attempt to:
  - ➢ destroy the personality of the victim
  - ➢ weaken the individual, the family, the community, and/or the society

**Forms of Torture**

Torturers use a variety of methods of torture that leave long-lasting psychological damage but that do not usually leave lasting physical evidence.

- Psychological torture
- Sensory deprivation / Sensory overload
- Sexual violence
- Electric shocks
- Beatings
- Burns
- Forcing the body into contorted positions or forcibly stretching it beyond normal capacity
- Non-therapeutic administration of drugs

**Effects of Torture and Other Trauma**

Symptoms affect a high percentage of survivors. Symptoms exhibited by applicants suffering from trauma-related conditions may be physical or psychological and include:

- Emotional
- Psychosomatic
- Behavioral

---

for mental health treatment does not disqualify you from working for the government or passing a background check.

- Mental

Such symptoms can affect the RAIO officer's ability to elicit necessary information.

Post-Traumatic Stress Disorder (PTSD) and depression are the most common long-term reactions to torture and other forms of severe trauma.

Often, symptoms appear after a latency period and do not usually subside merely with time. Symptoms may be "triggered" without warning at any time. The rate of recovery for survivors varies from individual to individual and a variety of factors can influence the rate of recovery. However, survivors may never fully recover from a torture experience.

An applicant suffering from PTSD or other trauma-related condition may

- avoid discussing events

- have difficulty remembering events

- respond in unpredictable ways

- avoid revealing certain information

**Interviewing Survivors of Torture**

Officers need to be aware of the possible symptoms of trauma-related conditions and elicit information in the most effective and sensitive way possible.

- Treat the applicant with humanity

- Try to help the applicant feel safe / in control

- Be thorough but sensitive

- Remember the purpose of the interview

- Respond to signs indicating that the applicant is experiencing distress related to triggers

**Effects on Individuals who are Close to or Who Work with Survivors**

Individuals who work with trauma survivors, as well as family members and others who are close to trauma survivors, may experience secondary trauma, the symptoms of which are similar to those of PTSD. Other effects of secondary trauma can include burnout and compassion stress and fatigue.

## PRACTICAL EXERCISES

**Materials for Practical Exercises will be handed out at the training.**

---

**Practical Exercise # 1**

- **Title:**

- **Student Materials:**

---

# OTHER MATERIALS

**None**

## SUPPLEMENT A – INTERNATIONAL AND REFUGEE ADJUDICATIONS

The following information is specific to international and refugee adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

>      None

### ADDITIONAL RESOURCES

>      None

### SUPPLEMENTS

> **International and Refugee Adjudications Supplement**
>
> **Module Section Subheading**

## SUPPLEMENT B – ASYLUM ADJUDICATIONS

The following information is specific to asylum adjudications. Information in each text box contains adjudication-specific procedures and guidelines related to the section from the Training Module referenced in the subheading of the supplement text box.

### RECOMMENDED READING

> None

### ADDITIONAL RESOURCES

> None

### SUPPLEMENTS

> **Asylum Adjudications Supplement**

May 8, 2023

MEMORANDUM FOR THE FILE

FROM:                          Tricia Kennedy
                               Program Manager    TRICIA B KENNEDY    Digitally signed by TRICIA B
                                                                      KENNEDY
                                                                      Date: 2023.05.08 12:05:13 -04'00'
                               Office of Field Operations (OFO)
                               U.S. Customs and Border Protection (CBP)

SUBJECT:                       CBP One™ Application

I am the CBP One™ (CBP One) application Product Owner for OFO.  I have been in this role
since development started for this application in 2019.  I am responsible for providing and
prioritizing requirements for the Emerging Technology Team within the Office of Information
Technology (OIT).  I am also the lead for testing and deploying most of the capabilities within
the application, including the deployment of the ability of noncitizens to use the app to schedule
an appointment to present themselves at a land POE.  This memo provides certain data and
information about the CBP One application and that capability.  This information was confirmed
and relied upon in rulemaking.

## I.      CBP One Application Background

In October 2020, CBP launched the free CBP One mobile and desktop application to modernize
and streamline access to CBP services.  CBP One is intended to provide one common portal for
travelers and stakeholders to interact with CBP across a wide range of mission sets, with an
intuitive interface.  The application includes defined user roles for different functionality for
travelers, importers, brokers, carriers, International Organizations, and additional stakeholders to
improve access to and experience with CBP services.  From a traveler and trade perspective,
CBP One facilitates the advance submission and payment for Form I-94s, advance information
for biological or other permitted agriculture products for travelers, as well as the ability to
quickly create and submit manifests for bus passengers or schedule perishable inspections.  Key
capabilities for stakeholders and travelers include scheduling exams with live status updates and
chat capability, instant access to proof of admission status and remaining days for their
authorized length of stay and advance submission of import documents to streamline their
inspection upon arrival.

Since the app's launch, CBP has instituted several functionalities specific to noncitizens who
lack documents sufficient for admission (referred to throughout this memo as "migrants" or
"undocumented noncitizens").  Specifically, in February 2021, CBP One offered International
Organizations (IOs) the capability to check case status for individuals during the winddown of
the Migrant Protection Protocols (MPP).  In April 2021, CBP developed a capability to permit
IOs to assist individuals in submitting advance information and scheduling a time to present at a

Port of Entry (POE) to be considered for an exception to the Title 42 public health Order (Title 42 Order). This capability was fully available in both the mobile and desktop version of the application. These processes did not have the same geofencing and live photo requirement discussed below in the Submit Advance Information capability, given the role of trusted Non-Government Organizations (NGOs) in the process, as it was anticipated that their ability to interact with noncitizens before submitting information on would help limit potential fraud in using the app.

In April 2022, CBP added a capability to the app to allow certain Ukrainian nationals seeking parole into the United States under the Uniting for Ukraine program to directly submit advance information and schedule their arrival at a land Port of Entry. This capability was also made available in the mobile application and via the desktop version of the application.

As of October 2022 and augmented in January 2023, Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV) requesting to travel to the United States to seek parole under the CHNV parole processes utilize CBP One as part of the Advance Travel Authorization (ATA) process to provide passport information and a live photo to enable CBP to verify their identity and conduct law enforcement vetting prior to their travel to the United States. This ATA process was the first time that the live photo requirement was added to a CBP One functionality. The CHNV ATA process is only available via the mobile application due to the live photo requirement. A live photo utilizes software that verifies "genuine presence," or that the user is a live person. This software is not currently compatible with the desktop version and requires a mobile phone to complete.

## II.    CBP One Direct "Submit Advance Information" Capability

Up until January 12, 2023, only those noncitizens eligible for the U4U were able to directly submit their information and schedule an appointment at a POE. As referenced above, NGOs had access to the app to schedule appointments for noncitizens seeking exceptions to the Title 42 Order. On January 12, 2023, CBP transitioned away from NGO access, and moved to expand the ability to directly submit advance information and schedule an appointment to seek a Title 42 Order exception to all undocumented noncitizens. These appointments are available at 8 ports of entry on the Southwest Border.

Currently, this capability within the CBP One application, referred to as the "Submit Advance Information" capability, requires two distinct steps for users to obtain an appointment to present at one of the participating Ports of Entry.

1. The first step is for a user to create a registration either for themselves or for all members of a family group or otherwise traveling together as co-travelers. This step can be accessed and completed from anywhere, with no geofencing restrictions. Users must have a Login.gov authenticated identity to register, and there is no limit to the number of family members or co-travelers who can be included in that registration. CBP continues

to encourage families and groups to create one registration on behalf of the entire family or group. Users may generally create multiple accounts and multiple registrations. However, if a user creates a registration consisting of more than five individuals, the user may not create another registration under the same account. This limitation is designed to prevent fraudulent use of the app. Users must submit biographic and biometric information for each individual to be included in the registration, all of which is information which would otherwise be collected during primary and/or secondary processing at the POEs. This includes descriptive information such as: Name, Date of Birth, Country of Birth, City of Birth, Country of Residence, Contact Information, Addresses, Nationality, Employment history (optional), Travel History, Emergency Contact (optional), U.S. and Foreign Addresses, Familial Information (optional), Marital Status (optional), Identity Document (not a Western Hemisphere Travel Initiative (WHTI) compliant document) (optional), Gender, Preferred Language, Height (optional), Weight (optional), Eye Color and Photograph. The photo collected is a still photo, and is used for 1-to-1 facial matching during the scheduling step. A 1-to-1 facial matching means the photo submitted by users during the registration process described here is compared to subsequent photos submitted by the same user during the scheduling process described below. This photo matching helps prevent fraudulent use of CBP One by ensuring the same individual who registered is the same individual requesting an appointment. Once the registration is complete, the user will see a summary screen listing everyone in the registration, with each individual given unique confirmation numbers and provided instructions to request an appointment. The user will also receive a confirmation email with the same information as that displayed on the summary screen.

2. The second step is to request an appointment at a Port of Entry. The ability to schedule appointments opens at 11 a.m. ET each day. The user must be within the geofenced area to do this. The user will access the application, select "Submit Advance Information," and then select their previously completed registration. This will pull up all the co-travelers registered in the previous step and allow the user who created the registration to request an appointment for everyone in the registration. After review to ensure the user selects the correct registration (because, as described in Step 1, users may create multiple registrations), the user will select their desired Port of Entry. The CBP app will immediately respond if no appointments are available for the next thirteen days. If an appointment is available, the user will be asked to submit a live photo, which is subject to software that verifies "genuine presence" or that the user is a live person. The photo is also compared to the still photo submitted in the registration process using the 1-to-1 facial matching process described above. The live photograph is required only from the main account holder; other members of the family or group are not required to submit a live photograph. Next, the application will collect the latitude and longitude to ensure the user is within Central or Northern Mexico. Finally, if appointments are available, the user will be presented with a calendar to select a day and times. The app will only display dates and times available for the number of individuals in a particular submission. For example, if a user is scheduling appointments for a family of five, the app will only

provide date/time options when there are five appointments available.  Once selected, the user will be provided a confirmation screen with their appointment information and all individuals in their submission who have an appointment on the same day and time.  The user will also receive another confirmation email with the appointment information.  Users can cancel or reschedule their appointments through the application at any time.

The application is currently geofenced to only allow appointment scheduling for those located in Central and Northern Mexico.  This requirement allows individuals to remain in areas with increased support networks instead of congregating in already strained communities near the U.S./Mexico border.  Since the implementation of geofencing, various checks have been implemented through the workflow to detect whether a user is employing techniques to spoof their location. Additionally, in April 2023, CBP began conducting analysis on the potential use of automation techniques and has taken definitive steps toward addressing these issues. Detecting fraud and misuse and deploying countermeasures is an ongoing effort for CBP that will continue to be a priority.

Two major modifications have also been made to the desktop version of the application.

- On January 12, 2023, CBP eliminated the ability for undocumented noncitizens to access the desktop version of the application to submit information and schedule an appointment. This was eliminated since the requirement of a live photo cannot be completed via the desktop version. Additionally, in an attempt to limit noncitizens from congregating at the border in unsafe conditions, the application was geofenced to only allow appointment scheduling for those located in Central and Northern Mexico. The new requirement for geofencing to Central and Northern Mexico cannot be accomplished via a web browser. Finally, removing the desktop version ensured there is a singular method for migrants to submit their information and schedule appointments.
- On January 26, 2023, after a short transition period following the implementation of direct access to CBP One by noncitizens, CBP discontinued the capability for NGOs to access the desktop version of the app to schedule appointments.  The NGO access was removed based on information that such capability had been used to exploit undocumented noncitizens, including financial exploitation.

## CBP One Application Timeline For Capabilities Related to Undocumented Noncitizens



### III.    CBP One App Feedback on, and Evolution of Workflow and Technical Issues

CBP primarily receives reports of errors or other concerns through three mechanisms.  First, the CBP One email inbox, is the primary mechanism by which users send an inquiry or concern about any capability within the CBP One application.  Since CBP One has many capabilities and functionalities, and is available to a diverse audience, the inbox initially responds to the author by asking them to select the appropriate topic pertaining to their specific issue.  Emails related to the scheduling capability s are addressed by one of three teams: CBP Customer Service, Office of Information Technology, or the CBP One team within OFO.  My team is responsible for the overall management of this inbox.   CBP also receives reports of errors or issues through recurrent briefings and sessions with NGOs.  Third, CBP personnel both at local POEs and within CBP Headquarters receive direct email communications from the NGOs.

CBP has made several changes to the app in response to user feedback.  In particular, there have been several technical changes since February 2023.  When the advance scheduling functionality was implemented on January 12, 2023, it was originally implemented as a single workflow.  Therefore, in contrast to the process described above, from January 12, 2023 through February 23, 2023, the "Submit Advance Information" capability to register and schedule an appointment was completed in the same workflow.  In other words, all steps were completed at the same time: as part of the registration process, the user had to take a live photo and the app captured the phone's geolocation.  At that time, the user was immediately presented the option to schedule an appointment. If there were no available appointments during the initial registration, the user was required to return to CBP One at a later time to separately access the previously-submitted registration to schedule an appointment.  The user had to provide a new live photo, and the app re-verified the geolocation before the user could access the calendar again to seek an appointment.

During this initial period, users were experiencing a high number of error codes, or the app was "timing out," or "crashing," primarily around the process of submitting a photograph to verify liveness.  Through NGO assistance and user feedback, CBP was made aware that the registration process was having particular "timing out" issues for families with babies or young children.  While CBP had conducted internal load testing of the app prior to its launch, as well as testing in partnership with an NGO partner, such internal testing did not include testing the bandwidth of other technological platforms that supported the app.  Following the reports of error messages, CBP was able to identify that they were primarily caused by bandwidth/connectivity issues in our support services.  CBP utilizes a third-party software to verify liveness from a company called iProov through a Silicon Valley Innovation Program Pilot with the Department of Homeland Security.  Based on the significant demand and predefined service requirements with the vendor, iProov was forced to reduce the rate at which they were processing liveness verification, which created an excess number of errors for users as maximum bandwidth was exceeded.

For these reasons, CBP made the decision to reduce the requirement to validate liveness for each user during registration and scheduling and increase bandwidth for users. On February 18, 2023, CBP modified the process in an attempt to collect liveness and geolocation at the same time However, this change was not successful at reducing the errors users were experiencing. Therefore, CBP implemented a new workflow change on February 23, 2023, to separate the workflow into two distinct steps: registration and scheduling. This process is described above. This new workflow allowed for the removal of the liveness verification process from the registration completely, as the users could no longer schedule during that workflow. Liveness was now restricted to the scheduling workflow only, and only if the application found available appointments for the Port of Entry requested. This change has resulted in a smaller technical burden for the liveness software, and CBP has received feedback from NGOs that there are fewer reported errors as a result of the liveness detection, however users still experience errors in low bandwidth and connectivity scenarios and navigating the daily scheduling process. Users continue to utilize unauthorized old versions of the app to circumvent the changes. CBP has received feedback from NGOs and noncitizens that individuals attempt to access older version of the app that allows them to schedule via previous workflows with different photo requirements. They have reported using older versions has a perceived advantage to scheduling an appointment compared to those on newer versions.

During this same time frame, CBP also consolidated appointment slots to provide the same number of appointments per day, but with more available at a particular time, to make it easier for families to schedule an appointment. For example, Brownsville started with 5 different time slots. On February 16, 2023, based on a request from the OFO Operations Directorate, I combined those time slots into two larger time slots while maintaining the same number of appointments. CBP also continues to advise that all members of a family seeking to travel together make an appointment in a single submission, as families or groups who do not register together on one CBP One account may not be accommodated at the same POE or on the same date.

In addition, CBP has made and is continuing to make several changes or enhancements to the application to address technical concerns or enhance the user experience. Below is a list of some of those issues as well as their associated resolution and implementation date.

| Issue | Comments | Resolution | Date Resolved |
|-------|----------|------------|---------------|
| Log-on issues when Sharing Devices | When sharing devices, users were not logging out of their account, resulting in new users canceling or rescheduling the previous users existing appointments. | Enhancement implemented to mitigate this issue including requiring the user to sign out of their account when they close the application. | 1/24/2023 |

| | | | |
|---|---|---|---|
| Location Services - Users too close to the Border | The geofence needed a half mile buffer to address those users who were very close to U.S./Mexico border | Geolocation was adjusted to address this issue. | 1/24/2023 |
| Haitian Creole translation requested | NGOs requested Haitian Creole as a priority translation. | CBP One update with Haitian/Creole translation as of February 1, 2023. | 2/1/2023 |
| Certain biographical information, such as height and weight are unknown to many users | Users are not aware of their height and weight | Made these fields optional. | 3/6/2023 |
| Change the posting from 0900 to 1100 | NGOs requested we change the daily post of appointments to 1100 so the users do not have to get up so early | The posting and messaging was updated to 1100 eastern. | 3/8/2023 |
| More clearly explain reason for errors and reduce the instances of the spinning seal | | Modified error messages to more clearly explain the problem. | 4/4/2023 |
| Users can not delete duplicate registrations themselves. | Users with multiple registrations would like to delete the extra appointments. | Implemented ability to delete registrations to manage multiple registrations more easily under their account. | 4/4/2023 |
| Terms and Conditions are only in English | | Implemented translated terms and conditions. | 4/6/2023 |
| Upcoming Enhancements: | | | |
| Translate drop down menus to include Spanish and Haitian Creole | | | 5/11/23 |
| Program the app to replace special characters with English characters, consistent with backend data systems, to address the issue where users are using special characters in their names which results in an error is USEC. | | | 5/11/23 |

STB_AR2_007420

| | | | |
|---|---|---|---|
| Facilitate the auto-capture of data from passports, if applicable to facilitate user input and increase data integrity. | | | End May 2023 |
| Implement new software to better track errors and system performance | | | End of June 2023 |
| Enable capability to create registrations (only) via desktop app | | | Summer 2023 |

### IV.    CBP One Application Dashboard

In order to provide a common operating picture and for senior managers, the Office of Information Technology implemented a dashboard to consolidate data from multiple databases within the Automated Targeting System.  The data contains the following information about undocumented noncitizens as it relates to the CBP One capability on the Southwest Border:

- Number of appointments (by age, gender, nationality)
- Number of registrations (by Day and Group vs. Single)
- Number processed at a POE (by day, POE, age, gender, nationality)

Based on a review of the dashboard on April 18, 2023, CBP data on group and single scheduled appointments shows that, for appointments scheduled from March 8, 2023 through May 1, 2023, groups make up an average of 83% of the CBP One scheduled appointments.

| CBP One Dashboard Data Pull | | |
|---|---|---|
| *Data Pulled as of April 18, 2023* | | |
| Scheduled Entry Date | Percentage of Group Appointments | Percentage of Single Appointments |
| 05/01/2023 | 85% | 15% |
| 04/30/2023 | 88% | 12% |
| 04/29/2023 | 87% | 13% |
| 04/28/2023 | 89% | 11% |
| 04/27/2023 | 88% | 12% |
| 04/26/2023 | 88% | 12% |
| 04/25/2023 | 88% | 12% |
| 04/24/2023 | 90% | 10% |
| 04/23/2023 | 88% | 12% |
| 04/22/2023 | 92% | 8% |
| 04/21/2023 | 91% | 9% |

| | | |
|---|---|---|
| 04/20/2023 | 91% | 9% |
| 04/19/2023 | 86% | 14% |
| 04/18/2023 | 90% | 10% |
| 04/17/2023 | 84% | 16% |
| 04/16/2023 | 93% | 7% |
| 04/15/2023 | 94% | 6% |
| 04/14/2023 | 94% | 6% |
| 04/13/2023 | 92% | 8% |
| 04/12/2023 | 92% | 8% |
| 04/11/2023 | 94% | 6% |
| 04/10/2023 | 94% | 6% |
| 04/09/2023 | 91% | 9% |
| 04/08/2023 | 91% | 9% |
| 04/07/2023 | 92% | 8% |
| 04/06/2023 | 91% | 9% |
| 04/05/2023 | 88% | 12% |
| 04/04/2023 | 91% | 9% |
| 04/03/2023 | 91% | 9% |
| 04/02/2023 | 91% | 9% |
| 04/01/2023 | 91% | 9% |
| 03/31/2023 | 85% | 15% |
| 03/30/2023 | 84% | 16% |
| 03/29/2023 | 77% | 23% |
| 03/28/2023 | 73% | 27% |
| 03/27/2023 | 80% | 20% |
| 03/26/2023 | 77% | 23% |
| 03/25/2023 | 78% | 22% |
| 03/24/2023 | 79% | 21% |
| 03/23/2023 | 78% | 22% |
| 03/22/2023 | 79% | 21% |
| 03/21/2023 | 76% | 24% |
| 03/20/2023 | 77% | 23% |
| 03/19/2023 | 59% | 41% |
| 03/18/2023 | 70% | 30% |
| 03/17/2023 | 69% | 31% |
| 03/16/2023 | 79% | 21% |
| 03/15/2023 | 69% | 31% |
| 03/14/2023 | 75% | 25% |
| 03/13/2023 | 75% | 25% |
| 03/12/2023 | 68% | 33% |
| 03/11/2023 | 73% | 27% |
| 03/10/2023 | 73% | 27% |
| 03/09/2023 | 69% | 31% |

| 03/08/2023 | 60% | 40% |
|---|---|---|
| **Average** | **83%** | **17%** |

## V.    CBP Engagement with Stakeholders

CBP has remained in constant contact with the stakeholder community.  In particular, CBP has ensured that relevant NGOs have been briefed on the transition from the submission of information and scheduling of appointments away from the NGOs to direct submission by the undocumented noncitizens.  CBP conducted two formal briefings to the NGOs on January 11 and 13, 2023.  These introductory briefs were followed by 4 additional update briefings as well as 3 live training sessions, as of April 11, 2023.  In additional to these formalized briefings, numerous emails and phone calls were held with individual NGOs regarding issues and concerns.  A list of the dates and participants in each briefing is listed below.  Additionally, the most beneficial exchange of information occurs during every day conversations between the NGOs and the officials in OFO field offices, who communicate with the CBP One Program Manager at OFO HQ almost every day to address questions and issues as close to real-time as possible.  This communication occurs in person as well as both email and phone calls.

Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals.  Additionally, NGOs have discussed helping individuals complete their submissions and working with individuals during the scheduling process as best as possible.  NGOs have even requested information about the phone requirements to ensure they invest in adequate equipment for migrants to use.

- January 11, 2023 – CBP One Brief for IO Partners
- January 13, 2023 – CBP One Brief for IO Partners #2
- February 6, 2023 – Discussion: CBP One with NGOs
- February 22, 2023 – California Welcoming Task Force/DHS Biweekly Engagement
- March 14, 2023 – Live Training Session – CBP One (Laredo area NGOs)
- March 23, 2023 – Live Training Session – CBP One (Mexicali shelter NGOs)
- March 31, 2023 – CBP One Scheduling Discussion (RGV NGOs)
- April 10, 2023 – Live Training session – CBP One (Tijuana Shelter NGOs)

## VI.    Feedback and Studies on Racial Bias

CBP received feedback that CBP One was having particular issues recognizing individuals of color.  The vast majority of the feedback received from users and NGOs during in-person, phone, email, and formal briefings were challenges related to the registration process.  Neither CBP nor CBP One collects data on race or skin complexion, and CBP does not provide the third-party software provider any personally identifiable information.  However, as noted above, CBP and iProov determined that there were issues related to the bandwidth for liveness detection, and

made requisite app updates.  Following the app updates and increased bandwidth, iProov data provided to CBP shows the app is successfully verifying liveness around 80 – 90 percent of the time.  Additionally, CBP requested the results of previous analytics conducted on racial bias in iProov's genuine presence software.  IProov advised they conducted their own equality analysis and provided a summary statement of their findings, stating that "Across our global platform, differences in performance between ethnicities are of the order of tenths of a percent. These long-term averages are smaller than the variations we see month-to month for each ethnicity, and so it's unlikely they would be noticeable to users." Based on communications with IProov, CBP's understanding of the term "performance" is the "successful identification of genuine presence."

## VII.    Language and Disability Access

The CBP One advance information workflow is currently available in Spanish, English, and Haitian Creole.  Haitian Creole was added on February 1, 2023 based on stakeholder feedback that language access was a significant concern for the large Haitian population attempting to use this functionality.  The terms and conditions were translated in all 3 languages on April 6, 2023. However, not all drop-down menus are translated. CBP is working to translate the drop-down menus and terms of service, and anticipates that this will be completed by May 11, 2023. Additionally, CBP makes efforts to translate error messages, although I am not able to confirm that 100% of errors are translated.  The CBP One team is able to translate the vast majority of errors, unless it is a bug or stems from an independent system that CBP One does not control. For example, 500 and 403 errors are now translated.

CBP will continue to assess whether additional languages are warranted, based on user feedback and demographics encountered at the border.  CBP continues to monitor and evaluate language access in CBP One and will continue to respond to stakeholder feedback for additional languages as needed.  Initial analysis conducted in March 2023 indicated the current three languages account for 82% of the applications users with the next highest demand being Russian at 9%. CBP has not received any requests for the app to be translated into Russian, and does not intend on adding Russian currently.  Additionally, CBP is aware that Login.gov is currently not available in Haitian Creole.  I have asked members of CBP's Office of Information Technology to reach out to their contacts at Login.gov and submit a request for translation into Haitian Creole.

The CBP One app is also undergoing a section 508 compliance review, which will be complete by the end of May 2023.  CBP expects a final certification by the end of August 2023.  In the meantime, CBP is aware of multiple free iOS and Android assistive technologies that can be used to access the app, if needed.  For example, users can utilize free translate applications or other applications targeted to convert text to sound, provide magnification or translate into various languages.  There are also videos online in various languages that provide step-by-step instruction.  CBP is in the process of developing step-by step instructions in Spanish and Haitian Creole.

5/8/23, 9:29 AM
CBP Makes Changes to CBP One App | U.S. Customs and Border Protection
Case 1:24-cv-01702-RC   Document 69   Filed 01/10/25   Page 1196 of 1203


An official website of the United States government

Here's how you know

![U.S. Customs and Border Protection]

MENU

**Home** » **Newsroom** » **National Media Release** »

CBP Makes Changes to CBP One App

## Newsroom

### Accountability and Transparency

### Legal Notices

### Advisories

### Media Releases

### Photo Gallery

### Video Gallery

### Press Officers

### Publications

### Social Media Directory

### Speeches/Statements

### Spotlights

### Stats and Summaries

### COVID-19

### Newsroom

# CBP Makes Changes to CBP One App

STB_AR2_009346

**Release Date:** Fri, 05/05/2023 - 12:00

*App will expand number of appointments, allow for additional time, prioritize those first registered*

**WASHINGTON** — U.S. Customs and Border Protection today announced changes to the CBP One app to expand the number of appointments available, allow for additional time to complete requests, and prioritize those who have been waiting the longest. Scheduling an appointment in CBP One provides a safe, orderly, and humane process for noncitizens to access ports of entry rather than attempting to enter the United States irregularly.

CBP One will transition to a new appointment scheduling system on May 10 that will address previous volume issues around specific times in the day by making appointments available for 23 hours each day instead of at a designated time, allowing for more flexibility and access to the scheduling system. Noncitizens will receive notification to confirm their appointments after submitting their request. CBP will also increase the number of appointments available to approximately 1,000 each day, and will prioritize noncitizens who have waited the longest.

Specifically, CBP One App will now:

- **Allow for additional time to complete the appointment request.** Currently, all CBP One appointments become available at the same time each day. With these changes, noncitizens will no longer be required to access CBP One during that one short period of time to schedule an appointment. Instead, the appointment request process will have two steps, so requestors have ample time to make requests and confirm appointments at their convenience over the course of a day.
  - Noncitizens will be allowed to request appointments at any point during a full 23-hour period each day and, if allocated an appointment, will have another 23-hour period to confirm that appointment.
  - Allowing noncitizens a longer window of time to ask for and to confirm their appointment will reduce time pressure and dependency on internet speed and connectivity.

- **Expand the number of daily appointment allotments.** CBP will add additional appointments each day, totaling up to approximately 1,000 each day starting May 12, and continually evaluate expanding the number of available appointments as operations and efficiencies allow.

- **Cut out smugglers who are preying on noncitizens by prioritizing appointments for those who have been waiting the longest.** A percentage of daily available appointments will be allocated to the earliest registered CBP One profiles, so noncitizens who have been trying to obtain appointments for the longest time will be prioritized.

STB_AR2_009347

Importantly, these new changes will not change the way noncitizens initially register themselves, their families, or others via the CBP One app, nor does it change the requirements for individuals to confirm their appointments. The enhanced process will give noncitizens more time to navigate the appointment scheduling app, along with prioritizing noncitizens who have been waiting the longest for an appointment.

These changes will provide noncitizens with limited connectivity the same opportunity to schedule appointments to present themselves for inspection at Southwest Border ports of entry as those with better internet connections. CBP continues to advance innovative technologies and improve the delivery of its critical homeland security mission, including to streamline safe and efficient processes at ports of entry. CBP One remains a key part of the Department of Homeland Security's multi-pronged strategy to address migrant flows at the southwest border. By using CBP One for these appointments, we have increased our capacity to process noncitizens at ports of entry, a critical part of our commitment to safe, orderly, and humane migration processes.

Noncitizens must still be physically located within central or northern Mexico to both request and schedule an appointment via CBP One. Appointments are being offered at eight ports of entry: Brownsville, Paso Del Norte in El Paso, Eagle Pass, Hidalgo, and Laredo in Texas; Calexico and San Ysidro in California; and Nogales in Arizona.

More information on the CBP One mobile application, available in English, Spanish, Haitian Creole, Portuguese, and Russian, can be found at **https://www.cbp.gov/about/mobile-apps-directory/cbpone**. The CBP One application can be downloaded for free from the Apple and Google Application Stores as well from the CBP **website**.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the comprehensive management, control, and protection of our nation's borders, combining customs, immigration, border security, and agricultural protection at and between official ports of entry.*

**Tags: Biometrics, Border Security, Office of Field Operations**

**Last Modified: May 5, 2023**

Click 'Share This Page' button to display social media links.


Share This Page.

STB_AR2_009348



## **Media Contacts**

### **Office of Public Affairs**

⊘ **(202) 344-1780**

✉ **CBPMEDIARELATIONS**

**All Other Inquiries**
⊘ **(202) 325-8000**

[Return to top](#)

**Travel**    **Trade**    **Border Security**    **Newsroom**    **About CBP**    **Careers**

**Employee Resources**

    






STB_AR2_009349



CBP.gov

**An official website of the U.S. Department of Homeland Security**

# National Terrorism Advisory System

Accessibility

Accountability

DHS Components

FOIA

Forms

Inspector General

No FEAR Act

Privacy

Site Policies

The White House

USA.gov

Vulnerability Disclosure Program

**STB_AR2_009350**

Dated: January 10, 2025

Respectfully submitted,


Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

*Attorneys for Plaintiffs*

By: /s/ Lindsay Harrison
Lindsay Harrison (D.C. Bar #977407)
Mary E. Marshall (D.C. Bar #1739058)
Maura E. Smyles (D.C. Bar #90006775)*
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*lharrison@jenner.com*
*mmarshall@jenner.com*
*MSmyles@jenner.com*

Melissa Root*
Andrew L. Osborne *
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
353 N Clark St, Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*
*aosbourne@jenner.com*

*Attorneys for Organzational Plaintiffs*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

*Attorneys for Plaintiffs*

Tamara Goodlette
(D.C. Bar. No. TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.org*

Blaine Bookey*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
*bbookey@uclawsf.edu*

Ashley Alcantara Harris*
David A. Donatti
American Civil Liberties Foundation of Texas
P.O. Box 8306
Houston, TX 77288
T: 713-942-8146
*aharris@aclutx.org*

*Attorneys for Plaintiffs*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street NW
Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

Edith Sangueza*
Center for Gender and Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
*sanguezaedith@uclawsf.edu*

Robert Pauw*
Center for Gender and Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
*rpauw@ghp-law.net*

*Attorneys for Plaintiffs*

*\*Admitted via certificate of pro bono representation or pro hac vice*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Senior Counsel*

*Counsel for Defendants*

BRIAN C. WARD
*Senior Litigation Counsel*
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-9121
Email: brian.c.ward@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
*Senior Litigation Counsel*

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that Defendants are registered CM/ECF users and that service to Defendants will be accomplished by the CM/ECF system.

*/s/*    Lindsay Harrison
Lindsay Harrison