# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER, et al.

     *Plaintiff*,

v.

U.S DEPARTMENT OF HOMELAND
SECURITY, et al.

     *Defendants,*

And

STATE OF TEXAS,

     [Proposed] *Intervenor-Defendant.*

No. 1:24-CV-01702

---

## TEXAS'S MOTION FOR SUMMARY JUDGMENT OR
## IN THE ALTERNATIVE, AMICUS BRIEF IN SUPPORT OF DEFENDANTS

---

**TABLE OF CONTENTS**

Table of Contents ...................................................................................................... ii

Table of Authorities .................................................................................................. iii

Introduction .............................................................................................................. 1

Background ............................................................................................................... 1

   I.  Uncontrolled, Irregular Migration into the United States has Overwhelmed Existing Resources. ........................................................................................................... 1

   II. The President and Executive Branch Issue the IFR in Response to the Ongoing Border Crisis. ..................................................................................................... 3

Legal Standard ......................................................................................................... 4

Argument .................................................................................................................. 5

   I.  The Organizational Plaintiffs Lack Standing. .................................................... 5

   II. The IFR Satisfies the APA's Procedural Requirements. ..................................... 9

      A. Notice and Comment Would Have Been Impracticable. .................................. 10

      B. Notice and Comment Would Have Been Contrary to the Public Interest. ......... 11

   III. Plaintiffs Cannot Succeed on the Merits of Their APA Claims. ............................. 13

      A. The INA Vests the President and Executive Branch with Broad Discretion to Restrict the Entry of Migrants. ......................................................................... 13

      B. The IFR's Restrictions on Asylum Are Neither Contrary to Law nor Arbitrary and Capricious. ................................................................................................ 14

         i.  The Restrictions on Asylum Complies with the Law. ................................... 15

         ii. The Restrictions on Asylum Constitute Reasoned Rulemaking. ..................... 19

      C. The IFR's Requirement that Asylum Seekers "Manifest Fear" Is Neither Contrary to Law nor Arbitrary and Capricious. ................................................ 21

         i.  The Manifest Fear Requirement Complies with the Law. ............................ 22

         ii. The Manifest Fear Requirement Constitutes Reasoned Rulemaking. ............ 25

      D. The IFR's Heightened Probability Standard Is Not Arbitrary and Capricious....33

         i.  The IFR's Use of the "Reasonable Probability" Standard has been Carefully Developed from Past Practice and Procedure................................................ 34

         ii. The IFR's "Greater Specificity" Requirement Considers Asylum Seekers' Ability to Meet the Standard.......................................................................... 36

Conclusion ............................................................................................................... 37

ii

### TABLE OF AUTHORITIES

Cases

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
    659 F.3d 13 (D.C. Cir. 2011) .......................................................................................... 6

*American Trucking Assoc., Inc. v. Atchison, T. & S.F.R. Co.*,
    387 U.S. 397 (1967) ...................................................................................................... 34

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*,
    118 F. Supp. 3d 388 (D.D.C. 2015) ........................................................................... 4, 5

*Nat'l Ass'n of Home Builders v. E.P.A.*,
    667 F.3d 6 (D.C. Cir. 2011) ....................................................................................... 6, 7

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ...................................................................................................... 34

*Boykov v. INS*,
    109 F.3d 413 (7th Cir. 1997) ....................................................................................... 20

*Capital Area Immigrants' Rights Coal. ("CAIR") v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020) ......................................................................... 12, 13

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................................................................ 8

*Colorado Interstate Gas Co. v. FPC*,
    324 U.S. 581 (1945) ...................................................................................................... 34

*Ctr. for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C.Cir.2005) ....................................................................................... 8

*E. Bay Sanctuary Covenant v. Biden*,
    93 F.4th 1130 (9th Cir. 2024) ...................................................................................... 17

*E. Bay Sanctuary Covenant*,
    2023 WL 11662094 (9th Cir. Aug. 3, 2023) ............................................................... 17

*Envt'l. Def. Fund, Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) ..................................................................................... 25

*Equal Rts. Ctr. v. Post Properties, Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ..................................................................................... 6

*Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994) ....................................................................................... 6

*Fatin v. INS*,
    12 F.3d 1233 (3d Cir. 1993) .................................................................18

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ..........................................................................32

*FDA v. Alliance for Hippocratic Med.*,
    602 U.S. 367 (2024) ....................................................................5, 7, 8

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ..........................................................................13

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 ...................................................................................... 30

*Fon v. Garland*,
    34 F.4th 810 (9th Cir. 2022) ............................................................ 20

*Fresno Mobile Radio, Inc. v. F.C.C.*,
    165 F.3d 965 (D.C. Cir. 1999) ........................................................ 26

*Gall v. United States*,
    552 U.S. 38 ........................................................................................18

*Gallegos Trinidad v. Attorney General of U.S.*,
    2023 WL 6121768, at *2 (3d. Cir. Sept. 19, 2023).........................18

*Ghaly v. INS*,
    58 F.3d 1425 (9th Cir. 1995)............................................................ 20

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .................................................................... 6, 8

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*,
    709 F.3d 44 (D.C. Cir. 2013) .......................................................... 30

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ..............................................20, 23, 25

*I.N.S. v. Aguirre-Aguirre*,
    526 U.S. 415 (1999) ..........................................................................25

*Jifry v. F.A.A.*,
    370 F.3d 1174 (D.C. Cir. 2004)........................................................10

*Kaiser Found. Hosps. v. Sebelius*,
    828 F.Supp.2d 193 (D.D.C.2011) .....................................................5

*Kansas v. Biden*,
    2024 WL 2880404, at *15 (D. Kan. June 7, 2024) ......................... 9

*Kibinda v. Att'y Gen. of U.S.*,
    477 F.3d 113 (3d Cir. 2007) ...................................................................................18

*Kingman Park Civic Ass'n v. Bowser*,
    815 F.3d 36 (D.C. Cir. 2016) ................................................................................ 6

*Las Americas Immigrant Advocacy Ctr. v. Wolf*,
    507 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................... 26

*Li v. Att'y Gen. of U.S.*,
    400 F.3d 157 (3d Cir. 2005) ............................................................................... 20

*Lingeswaran v. U.S. Att'y General*,
    969 F.3d 1278 (11th Cir. 2020) ...........................................................................18

*M.A. v. Mayorkas*,
    No. 1:23 cv-01843-TSC (D.D.C. filed June 23, 2023) ........................................17

*M.M.V. v. Garland*,
    1 F.4th 1100 (D.C. Cir. 2021) .............................................................................. 9

*Mack Trucks, Inc. v. E.P.A.*,
    682 F.3d 87 (D.C. Cir. 2012) .............................................................................. 11

*Medellin v. Texas*,
    552 U.S. 491 (2008) .......................................................................................23, 24

*Mobil Oil Corp. v. Dep't of Energy*,
    728 F.2d 1477 (Temp. Emer. Ct. App. 1983) ..................................................... 11

*MobileTel, Inc. v. FCC*,
    107 F.3d 888 (D.C. Cir. 1997) ........................................................................... 26

*Moncrieffe v. Holder*,
    569 U.S. 184 (2013) ............................................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..................................................................................... passim

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ...........................................................................7

*New York Ctr. for For. Pol'y Affairs v. U.S. Dept. of State*,
    2024 WL 3400122, at *9 (D.D.C. July 12, 2024) ...............................................7

*O.A. v. Trump*,
    404 F.Supp.3d 109 ..............................................................................................16

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ..............................................................................23

*People for the Ethical Treatment of Animals v. USDA,*
   797 F.3d 1087 (D.C. Cir. 2015) ........................................................................ 6

*Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.,*
   489 F.3d 1279 (D.C. Cir. 2007) ........................................................................ 5

*Save Jobs USA v. U.S. Dep't of Homeland Sec.,*
   664 F. Supp. 3d 143 (D.D.C. 2023) .................................................................. 5

*Sepulveda v. U.S. Atty. Gen.,*
   401 F.3d 1226 (11th Cir. 2005) ........................................................................ 19

*Sluss v. United States Dep't of Justice, Int'l Prisoner Transfer Unit,*
   898 F.3d 1242 (D.C. Cir. 2018) ........................................................................ 22

*Sorenson Commc'ns, Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) .......................................................................... 11

*Southwest Ctr. for Biological Diversity v. United States Forest Serv.,*
   100 F.3d 1443 (9th Cir. 1996) .......................................................................... 30

*Stuttering Found. of Am. v. Springer,*
   498 F. Supp. 2d 203 (D.D.C. 2007) .................................................................. 5

*Andriasian v. INS,*
   180 F.3d 1033 ................................................................................................... 16

*Thiebaut v. Colo. Springs Utils.,*
   455 F. App'x 795 (10th Cir. 2011) .................................................................... 9

*Transactive Corp. v. United States,*
   91 F.3d 232 (D.C. Cir. 1996) ............................................................................ 34

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ..................................................................................... 5, 9

*Trump v. Hawaii,*
   585 U.S. 667 (2018) .................................................................................... 13, 14

*Viasat, Inc. v. Fed. Commc'ns Comm'n,*
   47 F.4th 769 ...................................................................................................... 6

*Wages & White Lion Invs. LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ........................................................................... 32

*WildEarth Guardians v. Jewell,*
   738 F.3d 298 (D.C. Cir. 2013) .......................................................................... 29

Constitutional Provisions & Statutes

U.S.C. § 1158(a)(1) ................................................................................................17

5 U.S.C. § 553 ..........................................................................................................9

5 U.S.C. § 553(b)(B) ..............................................................................................10

8 U.S.C. § 1101(a)(42)(A) .....................................................................................18

8 U.S.C. § 1158(a) ...........................................................................................14, 17

8 U.S.C. § 1158(a)(1) .............................................................................................14

8 U.S.C. § 1158(a)(1) .................................................................................15, 16, 17

8 U.S.C. § 1158(b) ..........................................................................................14, 17

8 U.S.C. § 1158(b)(1)(B)(i) ...................................................................................18

8 U.S.C. § 1158(b)(2) ............................................................................................17

8 U.S.C. § 1158(b)(2)(C) ................................................................................17, 18

8 U.S.C. § 1158(b)(2)(C) .......................................................................................14

8 U.S.C. § 1182(f) ..................................................................................................14

8 U.S.C. § 1185(a)(1) .............................................................................................14

8 U.S.C. § 1185(a)(1) .............................................................................................14

8 U.S.C. § 1225(b)(1)(B)(iv) .................................................................................22

8 U.S.C. § 1231 ......................................................................................................23

8 U.S.C.A. § 1225(b)(A)(i), (ii) ............................................................................25

8 U.S.C.A. § 1231(b)(3)(A) ...................................................................................23

8 U.S.C.A. § 1231(b)(3)(C) ...................................................................................23

Rules & Regulations

8 C.F.R. § 208.13(b)(2)(i) ......................................................................................18

Fed. R. Civ. P. 56(a) ................................................................................................4

8 C.F.R. 208.31(c), (e) ...........................................................................................34

8 C.F.R. § 208.30(e)(8) ..........................................................................................22

83 Fed. Reg. 55,934 ...............................................................................................16

88 Fed. Reg. 11719–20 (same) ..............................................................................21

88 Fed. Reg. 31317–18 ........................................................................................................21

88 Fed. Reg. 31392–94 ........................................................................................................19

88 Fed. Reg. 31393 .............................................................................................................. 20

88 Fed. Reg. 31400–405 ......................................................................................................21

88 Fed. Reg. 31403 ...............................................................................................................21

89 Fed. Reg.  48744 ............................................................................................................. 29

89 Fed. Reg. 48711 ................................................................................................................. 4

89 Fed. Reg. 48722 ...............................................................................................................10

89 Fed. Reg. 48723 ...............................................................................................................10

89 Fed. Reg. 48723–24, 48751, 48765 ...............................................................................10

89 Fed. Reg. 48724 ...............................................................................................................10

89 Fed. Reg. 48725 ................................................................................................................11

89 Fed. Reg. 48718 ........................................................................................................ 15, 16

89 Fed. Reg. 48710 .............................................................................................................1, 3

89 Fed. Reg. 48710 (June 5, 2024) .......................................................................................1

89 Fed. Reg. 48717, 48736 ..................................................................................................15

89 Fed. Reg. at n. 220 ..........................................................................................................27

89 Fed. Reg. at n. 222 ..........................................................................................................27

89 Fed. Reg. 48712 ...........................................................................................................2, 10

89 Fed. Reg. 48715 ....................................................................................................4, 11, 16

Fed. Reg. 48745 .............................................................................................................34, 35

89 Fed. Reg. 48732 ...............................................................................................................10

89 Fed. Reg. 48733 ...............................................................................................................21

89 Fed. Reg. 48737 ...............................................................................................................21

89 Fed. Reg. 48738-39 ..........................................................................................................21

89 Fed. Reg. 48740 .............................................................................................................. 22

89 Fed. Reg. 48741 .............................................................................................................. 24

89 Fed. Reg. 48741–42 ........................................................................................................ 29

89 Fed. Reg. 48742 ........................................................................................... 28, 32, 33

89 Fed. Reg. 48743 ........................................................................................... 26, 27, 30, 31

89 Fed. Reg. 48743–44 .....................................................................................27

89 Fed. Reg. 48744 ........................................................................................... passim

89 Fed. Reg. 48745 ........................................................................................... 18, 33

89 Fed. Reg. 48746 ........................................................................................... passim

89 Fed. Reg. 48747 ........................................................................................... 36, 37

89 Fed. Reg. 48759 ........................................................................................... 9

89 Fed. Reg. 48763, 48765 ...............................................................................10

89 Fed. Reg. 48764 ........................................................................................... 12, 13

89 Fed. Reg. 48764–65 .....................................................................................12

89 Fed. Reg. 48765 ........................................................................................... 13

89 Fed. Reg. 55935 ...........................................................................................16

89 Fed. Reg.48739–45 ...................................................................................... 4

888 Fed. Reg. 31,314, 31,450 ...........................................................................17

INTRODUCTION[1]

The Interim Final Rule was promulgated by Defendants to try to stem the tide of dangerous and illegal border crossings. *See* Interim Final Rule with Request for Comments: "Securing the Border," 89 Fed. Reg. 48710 ( June 5, 2024), Agency/Docket No. USCIS-2024-0006 (the "IFR"). Now eleven individuals and two organizations that provide services to noncitizens and refugees seek vacatur of the IFR and its associated guidance documents. They claim the IFR's restrictions on asylum violate the APA because they exceed the government's statutory authority, because they are arbitrary and capricious, and because Defendants forewent a notice and comment period. Yet these claims fail for several reasons.

*First*, regardless of the merits of their claims, the organizational plaintiffs lack standing and should be dismissed from this case. *Second*, given the ongoing emergency at the border, notice and comment procedures would have been impracticable and contrary to the public interest. *Third*, no part of the IFR is contrary to law. Rather, its restriction on asylum adheres to and is authorized by the INA. Asylum is a discretionary benefit. No immigrant has a right to receive asylum. Instead, the INA gives the Attorney General the right to set limits on asylum eligibility that are consistent with the asylum statute, in addition to the authority to set "any other conditions or limitations on the considerations of an application for asylum" that are consistent with the INA. 89 Fed. Reg. 48710. *Fourth*, beyond the IFR adhering to statutory authority, each of the challenged aspects of the IFR is reasonable, and reasonably and thoroughly explained by Defendants.

BACKGROUND

I.    **Uncontrolled, Irregular Migration into the United States has Overwhelmed Existing Resources.**

Since 2021, the United States has witness unprecedented levels of migration at its southern

---

[1] Relegation to the status of amicus curiae would not adequately protect Texas's interests for the reasons Texas articulates in its prior briefing. *See* Dkt. 40 at 7 n. 3. However, should this Court deny intervention, Texas requests that this Court treat its motion for summary judgment as an amicus brief in support of Defendants.

border. According to the Department of Homeland Security ("DHS"), U.S. Customs and Border Protection completed approximately 1.7 million encounters at and between points of entry in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023. 89 Fed. Reg. 48712 n. 5. Each year exceeded the previous record high. *Id*. "This dramatic increase in encounters has coincided with a substantial and . . . persistent increase in the number of noncitizens making fear claims in recent years." *Id*. at 48722. From May 2023 to March 2024, approximately 54 percent of migrants encountered by federal authorities who were subject to expedited removal sought asylum through a fear of return claim. *Id*.

Because of these trends, DHS no longer has the capacity to "deliver timely decisions and timely consequences to all noncitizens encountered at the [southern border] who do not establish a lawful basis to remain." *Id*. at 48763. The U.S. Citizenship and Immigration Services' "affirmative asylum backlog has reached "almost 1.2 million cases and is growing." *Id*. at 48763. "At the end of the first quarter of FY 2024, there were over 2.7 million cases pending in the immigration courts." *Id*. "During FY 2023, immigration judges completed more cases than they ever had before in a single year;" nevertheless, "more than twice as many cases were received by the immigration courts as were completed." *Id*.

The situation has put great strain on the DHS's operational capacity. On multiple occasions, the high levels of migration maxed out federal and local resources, forcing migrants to stay in overcrowded facilities or sleep on sidewalks without shelter. In response, U.S. Border Patrol redirected personnel and resources from other responsibilities, such as such as protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel. Migration levels rose so high that U.S. Border Patrol closed multiple ports of entry along the border, including vehicular traffic and rail operations. *Id*. at 48726. The IFR notes, "[t]he United States Government fully understands the impacts of such closures on local communities on both sides of the border." *Id*. at 48725. But it was "a measure of last resort" that DHS was "compelled to take . . . to support frontline agents in a challenging moment." *Id*.

**II.      The President and Executive Branch Issue the IFR in Response to the Ongoing Border Crisis.**

On June 3, 2024,  in response to these circumstances, and relying on his broad discretion to manage immigration, President Biden signed the "Proclamation on Securing the Border," under sections 212(f) and 215(a) of the Immigration and Nationality Act (INA) to restrict the entry of certain individuals across the southern border.[2] This decision was based on a "finding that because the border security and immigration systems of the United States are unduly strained at this time, the entry into the United States for certain categories of [migrants] is detrimental to the interests of the United States."

The President introduced the Proclamation, accompanied by a "Fact Sheet,"[3] a Department of Homeland Security explainer,[4] and a 194-page Federal Register notice detailing the implementing rule. 89 Fed. Reg. 48710. These documents outline changes to border processing procedures during periods of high border encounters—defined as a seven-day consecutive average of 2,500 encounters or more, and remaining in effect until the Secretary determines the weekly average drops below 1,500 encounters.

The changes include: (1) migrants unlawfully crossing the border will generally be ineligible

---

[2] *A Proclamation on Securing the Border*, The White House (June 4, 2024), https://www.whitehouse.gov/briefing-room/presidential-actions/2024/06/04/a-proclamation-on-securing-the-border/.

[3] *Fact Sheet: President Biden Announces New Actions to Secure the Border*, The White House (June 4, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/04/fact-sheet-president-biden-announces-new-actions-to-secure-the-border/.

[4] *Fact Sheet: Presidential Proclamation to Suspend and Limit Entry and Joint DHS-DOJ Efforts*, U.S. *Dep't of Homeland Sec.* (June 4, 2024), https://www.dhs.gov/news/2024/06/04/fact-sheet-presidential-proclamation-suspend-and-limit-entry-and-joint-dhs-doj.

for asylum unless they meet exceptional circumstances or fall within outlined exceptions;[5] (2) migrants processed for expedited removal will be referred only for a credible fear screening if they express fear of return or an intent to apply for asylum; and (3) during high encounter periods, the standard for withholding of removal will be heightened to a finding of a reasonable probability of persecution.

Specifically, the IFR establishes a regulatory bar to asylum eligibility th at applies to certain individuals who unlawfully enter the United States during "emergency border circumstances,"[6] raises the screening standard for statutory withholding of removal to a "reasonable possibility" during such time, and adjusts to a "manifestation of fear" standard for expedited removal. 89 Fed. Reg. 48739–45.

## LEGAL STANDARD

In ordinary civil actions, summary judgment is appropriate when the pleadings and the evidence demonstrate "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, "when, as here, the court is reviewing a final agency action under the APA, the standard set forth in Rule 56(a) does not apply." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is

---

[5] The Proclamation and corresponding IFR apply broadly to all migrants but include specific exemptions. Those exempted are noncitizen nationals of the U.S., lawful permanent residents, unaccompanied minors, victims of severe human trafficking, and individuals with valid visas or lawful permissions. It also exempts members of the U.S. Armed Forces, government employees or contractors on official orders, and their accompanying family members. Additionally, those traveling under the visa waiver program or arriving through a process deemed appropriate by the Secretary of Homeland Security are also excluded. In certain cases, CBP officers may permit entry based on law enforcement needs, safety, humanitarian concerns, or operational considerations. *See generally supra* n. 1; 89 Fed. Reg. 48715.

[6] The phrase "emergency order circumstances" refers to "situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States." 89 Fed. Reg. 48711.

supported by the administrative record." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007). Hence, "the function of the district court is a more limited one: 'to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Contreras-Sweet*, 118 F. Supp. 3d at 393 (quoting *Kaiser Found. Hosps. v. Sebelius*, 828 F.Supp.2d 193, 198 (D.D.C.2011)). This standard of review is "narrow;" and the court applying it "is not to substitute its judgment for that of the agency." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 664 F. Supp. 3d 143, 148 (D.D.C. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983)).

**ARGUMENT**

## I.    The Organizational Plaintiffs Lack Standing.

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 378 (2024). To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Id.* at 380. When a party invoking the Court's jurisdiction is not the direct object of the government action, standing is "'substantially more difficult'" to show. *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. at 562).[7]

An organization can establish standing by showing either "a cognizable injury to one or more of its members"—known as associational standing—or "by showing. . . an injury to itself"—known as organizational standing. *See Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 39 (D.C.

---

[7] At the outset, the IFR falls under the ambit of the inherently discretionary asylum scheme. The organizations here cannot leverage the incidental and indirect effects from this inherently discretionary scheme that is directed at third parties to manufacture standing. *See* INA § 208(b)(1) (providing that the Attorney General and Secretary of Homeland Security *may* grant asylum to refugees) (emphasis added); *Moncrieffe v. Holder*, 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal").

Cir. 2016). Here, the organizations assert only injuries to themselves. *See* Pltfs.' Amd. Compl. ("Dkt. 14") at ¶ 23 ("*Las Americas' mission* is significantly frustrated by the [IRF]."); *id.* ¶ 24 ("*RAICES' mission* is also frustrated by the [IRF].").

"To determine organizational standing, [courts] 'conduct the same inquiry as in the case of an individual.'" *Viasat, Inc. v. Fed. Commc'ns Comm'n*, 47 F.4th 769, 780–81 (D.C. Cir. 2022) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). "A mere 'setback to the organization's abstract social interests' is not enough" to show injury. *Viasat, Inc.*, 47 F.4th at 781 (quoting *Havens Realty Corp.*, 455 U.S. at 378). Rather, the organization "must prove that its 'discrete programmatic concerns are being directly and adversely affected.'" *Id.* (quoting *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)). Under the D.C. Circuit's two-part test for analyzing whether an organization suffered an injury, a court must determine "whether the agency's action or omission to act 'injured the [organization's] interest'" and "whether the organization 'used its resources to counteract that harm.'" *People for the Ethical Treatment of Animals*, 797 F.3d at 1094 (quoting *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)).

In other words, the organizations here must show more than a mere choice to divert resources; they must show that they were compelled to do so to avoid an injury caused by the defendant's conduct. *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011); *see also Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (rejecting the idea that a plaintiff organization has standing to sue based solely on its own decision about resource allocation and requiring that plaintiff be forced to divert resources to avoid an injury caused by defendant's conduct). For the expenditure of resources to constitute an injury here, the organizations must show that such spending was for "operational costs *beyond those normally expended to carry out its advocacy mission*." *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011) (quotation omitted) (emphasis added). The organizations do not do so here.

Rather, each organization's alleged Article III injury is premised on resource allocation

aimed at ensuring adequate advocacy for their clients against the backdrop of Defendants promulgating the IFR. *See, e.g.,* Dkt. 23-1, Decl. of Javier Hidalgo (RAICES) at ¶ 10 (IFR has "forced" organization to "divert [its] limited resources to preparing the relevant teams to properly and ethically represent clients impacted by the" IFR), *id.* (Organization has "also had to redirect staff resources"), *id.* ¶ 41 ("In addition to the substantive additional time that doing this extra work entails, we have also been forced to divert resources in order to reshape our training materials, both for our own staff and for *pro bono* attorneys and other volunteers."); Dkt. 23-2 Decl. of Jennifer Babaie (Las Americas) at ¶ 23 (IFR "has forced" organization to "divert limited resources away from individual representation to continue to meet the most urgent needs of the community. . ."), *id.* ¶ 26 ("[R]esources must be diverted to explaining the" IFR), *id.* ¶ 28 (organization has "also had to divert resources to overhaul the content of the legal presentations" it provides), *id.* ¶ 91 ("Las Americas has already diverted, and will continue to be forced to divert, significant resources to understanding the new Rule and Guidance. . .").

Yet these are the same types of injuries the medical-association plaintiffs claimed in *Alliance for Hippocratic Medicine*, and which the Supreme Court rejected for purposes of organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 393–96 (organizations contending that the have been "forced" by the FDA to "expend considerable time, energy, and resources" engaging in public advocacy and public education, and that these expenditures have come to the "detriment of other spending priorities"); *see also New York Ctr. for For. Pol'y Affairs v. U.S. Dept. of State*, 2024 WL 3400122, at *9 (D.D.C. July 12, 2024) (finding organization's allegations that it has to "track and address the effects" of the challenged action "do not establish that its daily operations are inhibited 'in a concrete way'") (quotation omitted); *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (association's "self-serving observation that it has expended resources to educate its members and others regarding [challenged statutory provision] does not present an injury in fact"); *id.* ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (quotation marks omitted)); *Ctr. for Law & Educ. v. Dep't of*

*Educ.*, 396 F.3d 1152, 1162 (D.C.Cir.2005) ("Here, the only 'service' impaired is pure issue-advocacy—the very type of activity distinguished by *Havens*." (citing *Havens Realty Corp.*, 455 U.S. at 379)).

Indeed, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *All. for Hippocratic Med.*, 602 U.S. at 394.

Nothing in the IFR prevents the organizations from working toward their stated missions of defending the "rights of immigrants and refugees," Dkt. 23-1 ¶ 3, or from providing "legal services to low-income immigrants." Dkt. 23-2 ¶ 3. In fact, the organizations remain free to counsel any migrants who enter the country illegally. To that end any "injury" to the organizations is self-inflicted, and stem from their own decisions about how to spend their money, time, and resources. "If the law were otherwise, an enterprising plaintiff would be able to secure" the right to challenge a governmental action without any otherwise cognizable injury "simply by making an expenditure" in response to the action. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see also All. for Hippocratic Med.*, 602 U.S. at 395 ("Indeed, that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies.").

To be sure, the organizational plaintiffs may have "sincere legal, moral, ideological, and policy objections" to the IFR. *All. for Hippocratic Med.*, 602 U.S. 367 at 396. But that is not enough to confer Article III standing. *All. for Hippocratic Med.*, 602 U.S. at 394 ("[A]n organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization[.]" (internal citations omitted). At most, the organizations plead only "setback[s] to [their] abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379; see also Dkt. 23–1 ¶ 44 ("All of these changes are fundamentally contrary to [RAICE's] *mission and vision*. . .")); Dkt. 23-2 ¶ 57 ("It is difficult for me to overstate the impact that this Rule and the Guidance

have had and will continue to have on Las Americas' clients, staff, operations, and *mission*."). So this court should find that they have failed to show an Article III injury.

The organizations may argue that if some of the individual plaintiffs seeking the same relief as the organizations have standing to sue, that this Court need not address the standing of the organizations at all. But there is nothing "*prohibit[ing]* the court from paring down a case by eliminating plaintiffs who lack standing or otherwise fail to meet the governing jurisdictional requirements." *M.M.V. v. Garland*, 1 F.4th 1100, 1110–11 (D.C. Cir. 2021) (citations omitted); *see also Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011) ("[N]othing in the cases addressing this principle suggests that a court *must* permit a plaintiff that *lacks* standing to remain in a case whenever it determines that a co-plaintiff has standing.") (emphasis in original). In fact, the Supreme Court recently counseled that "Article III does not give federal courts the power to order relief to any uninjured plaintiff," and that "[p]laintiffs must maintain their *personal interest*" in a case "at all stages of litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citations omitted) (emphasis added).

Following *TransUnion*, this Court should exercise its discretion and cut loose the organizational plaintiffs that lack standing. There are prudent reasons for doing so. Namely, "[n]arrowing th[is] case to its . . . viable parties" would not only "narrow[] the burden of adjudicating the relevant issues," but also aligns with the principle that unharmed plaintiffs "shouldn't piggyback on," and potentially benefit from, "injured plaintiffs' standing." *Kansas v. Biden*, 2024 WL 2880404, at *15 (D. Kan. June 7, 2024). Thus, this Court should find the organizational plaintiffs lack standing and dismiss them from this matter.

## II.  The IFR Satisfies the APA's Procedural Requirements.

Defendants did not contravene the APA by foregoing notice and comment. The APA generally requires federal agencies to submit substantive rules for a notice and comment period before being promulgated. *See* 5 U.S.C. § 553. The statute, however, identifies a number of exceptions to this norm, two of which were asserted in the IFR. *See* 89 Fed. Reg. 48759 (citing § 553(a)(1), (b)(B)). Texas takes no position regarding Defendants' invocation of the "foreign

affairs" exception and defers to Defendants' briefing on this matter, but it agrees that the emergency circumstances described in the IFR and established in the administrative record meet the evidentiary burden necessary for the "good cause" exception to apply because they show that notice and comment procedures would have been "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B).

### A.  Notice and Comment Would Have Been Impracticable

This Court has long recognized that agencies may utilize the "impracticality" prong of the "good cause" exemption, and decline to take public comment or institute a scheduled effective date, "in emergency situations" or when the administrative record establishes that the ensuing "delay could result in serious harm." *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004). The IFR passes this test. According to DHS, U.S. Customs and Border Protection experienced record high encounters at and between points of entry in FY 2021 thru the present. 89 Fed. Reg. 48712 n. 5. This, combined with a "persistent increase in the number of noncitizens making fear claims," 89 Fed. Reg. 48722, has overwhelmed the federal immigration system, birthing a "vicious cycle" of high irregular migration and government disfunction. *Id.*at 48763 (describing asylum backlog).

Absent changes introduced by the IFR, the situation poses a significant risk to human health and safety. Not only does it encourage noncitizens to undertake the dangerous journey north, 89 Fed. Reg. 48732, but the IFR documents multiple instances where high number of crossings maxed out federal and local resources, forcing migrants to stay in overcrowded facilities or sleep on sidewalks without shelter. 89 Fed. Reg. 48723–24, 48751, 48765. In response, U.S. Customs and Border Protection "redirected limited resources from other mission needs . . . to focus on processing apprehended noncitizens," 89 Fed. Reg. 48724, but this "decreased" the agency's "ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress." 89 Fed. Reg. 48723. It also diverted personnel from core responsibilities, such as protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel. 89 Fed. Reg. 48763, 48765.

In their motion for summary judgment, Plaintiffs challenge Defendants' use of the "good

cause' exception, but they never squarely confront the contention in the IFR that the notice and comment process would be impracticable. The closest Plaintiffs get is claiming that the D.C. Circuit *only* approved of bypassing notice and comment when the delay "would imminently threaten life or physical property"—the implication being that the current situation at the border does not. Dkt. 23 at 41 (quoting *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014)). This is wrong for a number of reasons. *First*, the argument ignores the dangers and suffering that migrants endure because of existing incentives and the strain on government resources, which the IFR identifies at length. *Second*, the D.C. Circuit acknowledged the possibility that other emergencies, such as a fiscal calamity, "could conceivably justify bypassing the notice and comment requirement;" it simply determined the record was "too scant" to establish such an exigency. *Sorenson Commc'ns*, 755 F. 3d at 707. That is not a problem here. *See, e.g.*, 89 Fed. Reg. 48725. The other argument Plaintiffs raise is that the border crisis has presented a pressing problem for years, but Defendants only acted recently. The flaw with this approach is it again minimizes the harm uncontrolled migration inflicts on noncitizens and citizens alike. Even assuming Defendants could have acted sooner (and in fact did not), the additional delay would incur significant human cost, which the irreparability prong is designed to prevent, as well as undermine the IFR's key objective, which is explained below.

**B. Notice and Comment Would Have Been Contrary to the Public Interest.**

The "contrary to public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose" of the promulgated rule. *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 95 (D.C. Cir. 2012). This occurs when "the very announcement of a proposed rule itself can be expected to precipitate activity" the regulation is designed to resolve and address. *Mobil Oil Corp. v. Dep't of Energy*, 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983). In this instance, Defendants drafted the IFR to alleviate the ongoing humanitarian crisis at the southern border by improving DHS's ability to process migrants and control entry into the United States. 89 Fed. Reg. 48715. Their experience, however, has been that "when official public announcements have been made regarding significant

upcoming changes in immigration laws . . . there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States." 89 Fed. Reg. 48764.

Defendants concluded based on the record before them that pre-promulgation notice and comment or a delayed effective date "would significantly increase the incentive, on part of migrants and others (such as smugglers)" to rush the border. 89 Fed. Reg. 48764. In support of this finding, Defendants cited multiple instances in recent years where the United States amended its immigration policy, either by choice or by court order, only to observe a surge in crossings leading up to the change. *See* 89 Fed. Reg. 48764–65. Migrants, it is explained, "respond to real and perceived incentives created by border management and immigration policies." *Id.* at 48764. Smugglers, meanwhile, "routinely prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey." *Id.* They "do so particularly when there is a change announced in U.S. policy," as the examples referenced in the IFR illustrate. *Id.*

Plaintiffs, in response, contest the sufficiency of the evidence underlying Defendant's assertion that publicizing the new policies ahead of time will alter migrants' behavior. Specifically, they dispute whether "people outside the United States understand the nuanced differences between the pre-Rule status quo and the Rule." Dkt. 23 at 41. But this argument attacks a strawman. Neither migrants nor smugglers need to dig into the weeds of a proposed regulation to appreciate that it will restrict access to the United States. *See East. Bay Sanctuary Covenant v. Trump* ("East Bay V"), 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018). The point that Defendants make in the IFR is that migrants "respond to real and perceived incentives." 89 Fed. Reg. 48764. The possibility that the new policies will prevent extended stays in the United States is sufficient to drive an uptick in border crossings. "Common sense dictates that the announcement of a proposed rule may . . . encourage those affected by it to act before it is finalized." *Capital Area Immigrants' Rights Coal. ("CAIR") v. Trump*, 471 F. Supp. 3d 25, 46 (D.D.C. 2020).

More relevant to this Court's analysis is that the IFR identifies recent examples where immigration services were swamped by a surge in border crossings because of a publicized change

in the country's immigration policies. In *CAIR v. Trump*, which Plaintiffs cite favorably, this Court considered a different asylum rule, also promulgated without notice and comment. 471 F. Supp.3d at 31. There, the Court rejected the government's invocation of the "good cause" exception but noted that the government's assertions would be "meaningful if Defendants explained that peaks or troughs in the data corresponded with regulatory or policy changes in the United States." *Id.* at 48. The IFR does exactly that. It ties spikes in the number of border crossings with anticipated changes in the laws and regulations that govern the border as well as asylum claims.

Indeed, Plaintiffs concede "that border crossings increased before the end of the Title 42 policy." Plaintiffs argue that this "was due to unique features of Title 42," but the record shows that migrants gathered in preparation for Title 42 being lifted. 89 Fed. Reg. 48764. The increase did not stem from the Title 42's lack of removal orders. In any event, Title 42 was not only the only policy change to prompt a jump in border crossings. When the Ninth Circuit vacated a stay of a nationwide injunction of the Migrant Protection Protocols ("MPP"), hundreds of migrants began amassing at points of entry almost immediately. 89 Fed. Reg. 48765. Plaintiffs make no effort at explaining why the trend that Defendants observed following the court's ruling on MPP would not apply here. Defendants had good reason to believe that publicizing the IFR in advance of its effective date would undermine its goal of reducing irregular entries into the United States. Their invocation of the "good cause" exception should be upheld.

## III.    Plaintiffs Cannot Succeed on the Merits of Their APA Claims.

### A. The INA Vests the President and Executive Branch with Broad Discretion to Restrict the Entry of Migrants.

The President has "broad discretion to suspend the entry of aliens into the United States." *Trump v. Hawaii*, 585 U.S. 667 (2018). And "foreign nationals seeking admission have no constitutional right to entry[.]" *Trump*, 585 U.S. at 670. To that end, it is long settled that "the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Trump*, 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)).

8 U.S.C. § 1182(f) authorizes the President to "suspend the entry of all aliens or any class of aliens" whenever he "finds" that their entry "would be detrimental to the interests of the United States." *See also id.* § 1185(a)(1) (granting the President authority to adopt "reasonable rules, regulations, and orders" governing entry or removal of aliens, "subject to such limitations and exceptions as [he] may prescribe."). Indeed, "by its terms, § 1182(f) exudes deference to the President in every clause." *Trump*, 585 U.S. at 684; *see also id.* at 712 ("[T]he President has *inherent* authority to exclude aliens from the country.") (Thomas. J., concurring) (emphasis in original).

Thus, when a President is concerned that the present status quo encourages dangerous and illegal border crossings and undermines the integrity of the Nation's borders, he has the inherent authority to determine that a temporary suspension of entry by migrants is in the national interest. *See* 8 U.S.C. §§ 1182(f), 1185(a)(1).

In the same way, the Executive Branch has broad discretion to regulate a migrant's eligibility for asylum. Congress has conferred on the Executive Branch the grant of authority to adopt limitations on asylum eligibility. 8 U.S.C. § 1158(a) states that "any alien" who arrives in the United States "*may apply*" for asylum "whether or not [the alien arrives] at a designated port of arrival." Id. (emphasis added). And 8 U.S.C. § 1158(b) permits the grant of asylum to an alien who meets the definition of a "refugee" and authorizes the Attorney General to "establish" by regulation "additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." *Id.*

In other words, the plain text and structure of the asylum statute separates the requirements and procedures for *applying* for asylum (*id.* § 1158(a)(1)), from the *granting* of asylum (*id.* § 1158(b)(2)(C)). Simply put, while allowing "any alien" to apply for asylum with little limitation, Congress affords the Executive Branch extensive authority to regulate *who* receives asylum so long as that regulation is "consistent with" the rest of § 1158. *Id.* § 1158(b)(2)(C).

## B. The IFR's Restrictions on Asylum Are Neither Contrary to Law nor Arbitrary and Capricious.

The INA authorizes the Attorney General and Secretary of Homeland Security to impose,

by rulemaking, extra limitations to asylum eligibility, if the limitations are consistent with section 208 of the INA. INA § 208(b)(2)(C). As Defendants assert, the limits on asylum imposed by the IFR does not conflict with the text or structure of section 208 of the INA. 89 Fed. Reg. 48717, 48736.

### i.    The Restrictions on Asylum Complies with the Law.

Plaintiffs have not showed, and cannot show, that the IFR conflicts with the asylum statute providing that any migrant "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival). . . may *apply* for asylum. . . ." 8 U.S.C. § 1158(a)(1) (emphasis added). The IFR *does not* prevent migrants from applying for asylum. It, instead, provides that during emergency border circumstances, *some* migrants entering across the southern border other than through a port of entry are presumed "ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist." 89 Fed. Reg. 48718. Examples of exceptionally compelling circumstances include when the migrant "demonstrates that they or a member of their family. . . with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) [are a] victim of a severe form of trafficking in persons." *Id*. And instead of specifically asking these migrants encountered and processed for expedited removal if they fear persecution or intend to apply for asylum, DHS will provide them with general notice of the process for seeking asylum. *Id*. These migrants will be referred for credible fear interviews only if they manifest "a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal." *Id*.

Those migrants subject to the IFR will receive a negative credible fear determination with respect to their asylum claims during the credible fear interviews and reviews, "unless there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist." *Id*. Categorically excluded from the IFR are noncitizen nationals in the U.S., lawful permanent residents, unaccompanied minors, victims of

severe forms of human trafficking, migrants with valid visas or other lawful permission to seek entry or admission into the U.S., migrants who present at a port of entry at a scheduled time, and migrants permitted to enter the U.S. by CBP officers based on the totality of the circumstances or based on operational considerations at the time of the encounter. 89 Fed. Reg. 48715.

Plaintiffs' reliance on *East Bay Sanctuary Covenant v. Biden ("East Bay III")* for the contention that there is a conflict between the asylum statute and IFR is misplaced. 993 F.3d 640, 669 (C.A.9 (Cal.), 2021). [8] On November 9, 2018, the DOJ and DHS jointly adopted an interim rule which, coupled with a presidential proclamation issued the same day, categorically rendered all migrants entering the U.S. from Mexico between ports of entry illegible for asylum. 83 Fed. Reg. 55,934. Migrants rendered ineligible for asylum under the rule automatically received negative credible-fear determinations in expedited removal proceedings. 89 Fed. Reg. 55935. In *East Bay III* the Ninth Circuit affirmed a district court preliminary injunction enjoining nationwide enforcement of the rule because it was contrary to law, since 8 U.S.C. § 1158(a)(1) permits migrants to apply for asylum "whether or not at a designated port of arrival." *see also O.A. v. Trump*, 404 F.Supp.3d 109, 146–52 (D.D.C., 2019) (vacating the rule for the same reasons). Here, unlike in *East Bay III*, the IFR does not categorically render all migrants entering the U.S. from Mexico between ports of entry ineligible for asylum; it establishes a *rebuttable presumption* during emergency conditions wherein *some* of these migrants are *presumed* to be ineligible for asylum. 89 Fed. Reg. 48718. The U.S. has long considered a migrant's manner of entry when deciding whether to grant asylum. *See Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (BIA 1987), *superseded in part by statute on other grounds as stated in Andriasian v. INS*, 180 F.3d 1033, 1043–44 (9th Cir. 1999).

In any event, *East Bay III*, is nonbinding on this Court and wrongly decided. The Ninth Circuit wrongly conflated the ability to apply for asylum with eligibility to be granted asylum. *East Bay III*, 993 F.3d at 670 (holding that "[e]xplicitly authorizing a refugee to file an asylum

---

[8] Defendants adopt the same naming convention as the Rule for this decision, while not discussing or referencing East Bay I or II.

application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity."). This Court should reject the reasoning in *East Bay III* because a plain reading of 8 U.S.C. § 1158(a)(1) merely provides that migrants be permitted to apply for asylum—not that they are guaranteed to be eligible to be granted asylum. The asylum statute distinguishes between the two. *Compare* 8 U.S.C. 1158(a) (governing the categories of migrants who can apply for asylum), *with* 8 U.S.C. 1158(b) (governing the eligibility criteria for granting asylum). Contrary to the *East Bay III* reasoning, the asylum statute itself provides that some migrants may apply for asylum, U.S.C. § 1158(a)(1), but are ineligible for grants of asylum, 8 U.S.C. § 1158(b)(2). The IFR is an extension of same. *See* 8 U.S.C. § 1158(b)(2)(C) (expressly delegating to the Attorney General the authority to "establish additional limitations and conditions … under which an alien shall be ineligible for asylum….").

Plaintiffs also point to a district court decision in the Ninth Circuit, *East Bay Sanctuary Covenant v. Biden* ("*East Bay IV*"), a persuasive authority. 683 F.Supp.3d 1025, 1041–42 (N.D.Cal. 2023). The rule challenged in *East Bay IV* was published on May 16, 2023, and is similar to the IFR challenged in this action. Both establish a rebuttable presumption of ineligibility for asylum for *some* migrants who cross the southern border between ports of entry. 888 Fed. Reg. 31,314, 31,450. The district court in *East Bay IV* granted summary judgment to plaintiffs and vacated the rule after finding that any rule-based condition or restriction on asylum eligibility based on place of entry is contrary to law—irrespective of whether there are exceptions or a rebuttable presumption. 683 F.Supp.3d at 1041–42. That decision, however, was stayed pending appeal and, at the parties' joint request the appeal is held in abeyance while the parties engage in collusive settlement negotiations. *E. Bay Sanctuary Covenant*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023); *E. Bay Sanctuary Covenant v. Biden*, 93 F.4th 1130 (9th Cir. 2024) (mem.); *M.A. v. Mayorkas*, No. 1:23 cv-01843-TSC (D.D.C. filed June 23, 2023) (similar challenge, jointly stayed pending collusive settlement negotiations). The challenged rule in *East Bay IV* remains in effect, except as superseded by the IFR. This Court should find that *East Bay IV* decision is not persuasive because it is a nonbinding district court decision that was stayed and relied on the wrongly decided *East Bay III* decision.

Plaintiffs next argue that the IFR cannot add a rebuttable presumption to something that is mandatory. Dkt. 23 at 13 (citing *Gall v. United States*, 552 U.S. 38, 46–47 (2007)). This argument, such as it is, claims that since the government cannot bar asylum applications from those who do not enter through ports of entry it cannot make them show "extraordinary circumstance" to avoid such a bar. *Id.* But the IFR does not categorically bar asylum for anyone—it imposes a rebuttable presumption of ineligibility for asylum for *some* migrants entering the U.S. from Mexico between ports of entry.

Finally, Plaintiffs imagine that the "exceptionally compelling circumstances" conflicts with the refugee determinations for those with "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b)(2)(i). But migrants subject to the IFR who are found to be ineligible for asylum because they do not meet the exceptionally compelling circumstances exception are *separately* examined to determine whether they have a credible fear of persecution. 89 Fed. Reg. 48745. And even if they were not, there is no conflict between the "imminent and extreme threat to life or safety" and "well-founded fear of persecution" because "persecution" encompasses only "severe" and "extreme" conduct such as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *See, e.g., Gallegos Trinidad v. Attorney General of U.S.*, 2023 WL 6121768, at *2 (3d. Cir. Sept. 19, 2023) (quoting *Kibinda v. Att'y Gen. of U.S.*, 477 F.3d 113, 119 (3d Cir. 2007) (quoting *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993)).

Asylum applicants bear the burden of proof to show refugee status. 8 U.S.C. § 1158(b)(1)(B)(i). The Legislature has expressly delegated to the Attorney General authority to promulgate regulations that "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C). Imminence is a necessary factor in assessing an applicant's fear of persecution because the fear must be both subjectively genuine and objectively reasonable. *See Lingeswaran v. U.S. Att'y General*, 969 F.3d 1278, 1290 (11th Cir. 2020)) (citing *Sepulveda v. U.S. Atty. Gen.*, 401 F.3d 1226, 1230 (11th Cir.

2005). Nothing in the IFR conflicts with existing law or regulations governing well-founded fear of persecution determinations.

ii.    **The Restrictions on Asylum Constitute Reasoned Rulemaking.**

Plaintiffs claim the IFR is arbitrary and capricious because the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider [] important aspect[s] of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm,* 463 U.S. at 43. The text of the IFR proves otherwise.

*First*, the IFR does consider the harm facing migrants required to wait in Mexico until they secure an appointment at a port of entry, including LGBTQ+ people, Black migrants, Indigenous people, and women. Dkt. 23 at 17–18. Defendants already considered these concerns in the related 2023 rule with the same requirement, which is repeatedly referenced in the IFR (and Plaintiffs' Motion for Summary Judgment). *See* 88 Fed. Reg. 31392–94 (responding to comments on same). Defendants addressed these comments thusly:

> The Departments acknowledge these concerns but believe that only imminent and extreme threats to life or safety should constitute a per se ground to rebut the presumption of asylum ineligibility. For threats that are less imminent or extreme, noncitizens may attempt to demonstrate on a case-by-case basis that they otherwise present "exceptionally compelling circumstances" that overcome the presumption of ineligibility. Including lesser threats in the per se grounds for rebuttal would undermine the Departments' goal of incentivizing migrants to use lawful, safe, and orderly pathways to enter the United States or seek asylum or other protection in another country through which they travel.
>
> . . . threats cannot be speculative, based on generalized concerns about safety, or based on a prior threat that no longer posed an immediate threat at the time of entry. [] The term "extreme" refers to the seriousness of the threat; the threat needs to be sufficiently grave, such as a threat of rape, kidnapping, torture, or murder, to trigger this ground for rebuttal. [] Where the noncitizen is a member of a particularly vulnerable group (e.g., LGBT or HIV-positive people), their membership in such a group may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry. In response to the recommendation that the word "torture" be replaced with "severe pain and suffering," the Departments note that the imminent and extreme threats to life and

safety listed in the rule are not exhaustive and that this means of rebuttal may in certain circumstances encompass imminent and extreme threats of severe pain and suffering.

The Departments disagree that noncitizens will have to "predict the future" to rebut the presumption against asylum in this manner. For this per se rebuttal ground to apply, the noncitizen must demonstrate there was an imminent and extreme threat to life or safety, not that the feared harm was actively taking place or certain to occur. . . The Departments also note that "imminent" and "extreme" are standards that are commonly used in asylum adjudications. *See, e.g., Fon v. Garland*, 34 F.4th 810, 813 (9th Cir. 2022) ("[P]ersecution is an extreme concept" (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995))); *Li v. Att'y Gen. of U.S.*, 400 F.3d 157, 164 (3d Cir. 2005) ("[U]nfulfilled threats must be of a highly imminent and menacing nature in order to constitute persecution" (citing *Boykov v. INS*, 109 F.3d 413, 416-17 (7th Cir. 1997))). As already discussed. . . noncitizens may be able to rebut the presumption against asylum eligibility through credible testimony alone.

88 Fed. Reg. 31393.

That Plaintiffs disagree with Defendants conclusions does not mean that Defendants failed entirely to consider the issue. Indeed, even in the case cited by Plaintiffs referencing asylum seekers "forced to walk the plank," which was not specifically a reference to Mexico, the Court ultimately permitted the Executive Branch to continue expelling asylum seekers "but only to places where they will not be persecuted or tortured." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 735 (D.C. Cir. 2022). The IFR does the same with the exceptionally compelling circumstances exception.

*Second*, Plaintiffs claim that Defendants disregarded the risk of harm to Mexican nationals who must "*wait in the very country they are trying to flee.*" Dkt. 23 at 18 (emphasis in original). But the IFR expressly considered and addressed this concern:

Under this rule, Mexican nationals will still be eligible for asylum in some circumstances—they may present at a [port of entry] pursuant to a pre-scheduled appointment, or, if they are unable to wait in Mexico while scheduling an appointment, they may be able to establish an exception to the Proclamation or exceptionally compelling circumstances under the rule. Even if they are not able to do so, the rule does not preclude eligibility for statutory withholding of removal and CAT protection, and they will be able to seek such protection. In the absence of an exception, however, Mexican nationals should be ineligible for asylum under the rule because, during the emergency border circumstances described in the Proclamation and this rule, it is important to deter irregular entry by all noncitizens

> regardless of country of origin. And the above data make clear that additional
> incentives are necessary to encourage Mexican nationals to pursue the available
> lawful, safe, and orderly pathways, rather than entering the country unlawfully.

89 Fed. Reg. 48738-39. Again, that Plaintiffs do not like the conclusion Defendants reached does not mean that they failed entirely to consider the matter. Defendants considered Plaintiffs' concerns about Mexican nationals when adopting the IFR, so the IFR is not arbitrary and capricious.

*Third*, in promulgating the IFR, Defendants did not fail to consider the contours and potential pitfalls of the CBP app. Dkt. 23 at 20. Indeed, Defendants already considered the *same* CBP One app accessibility and technical concerns in the related 2023 rule. 88 Fed. Reg. 31400–405. Defendants found that these concerns were unwarranted and that constant improvements were being made to increase accessibility. *Id*. For instance, the CBP One app is only available in English, Spanish, and Haitian Creole, but Defendants founds that 82% of users spoke one of these languages and it had not received a request to make the app available in the next most common language—Russian. 88 Fed. Reg. 31403. Defendants considered and rejected Plaintiffs' concerns given the existing 2023 rule and the emergency nature of the challenged IFR. *See* 89 Fed. Reg. 48733 n.171. Plaintiffs cannot show that Defendants ignored an important aspect of the problem, therefore, they cannot show that the IFR is arbitrary and capricious. *See also* 89 Fed. Reg. 48737 (finding the app "creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. [] Indeed, without CBP One, noncitizens could have longer wait times for processing at the POE depending on daily operational constraints and circumstances."); *see also* 88 Fed. Reg. 31317–18 (explaining the benefits of the CBP One app); 88 Fed. Reg. 11719–20 (same).

## C. The IFR's Requirement that Asylum Seekers "Manifest Fear" Is Neither Contrary to Law nor Arbitrary and Capricious.

The IFR includes a change to DHS's regulations that determine referral for a credible fear interview ("CFI"). Before the IFR, federal immigration agents established eligibility for a CFI

through a series of questions, after which if migrants responded to these questions affirmatively, they were referred for a CFI. Under the new rule, in lieu of these questions, USBP agents look for apprehended migrants to manifest fear in reaction to being informed that they are subject to removal to their home country. The IFR makes clear that "manifest fear" is meant to encompass any communication, verbal or non-verbal, that expresses a fear of harm due to removal to the migrant's country of origin or other country specified by § 1225. 89 Fed. Reg. 48740. Once migrants manifest fear, they are directed to an asylum officer for a CFI unless ineligible on statutory grounds. As for pre-CFI screening, the main difference between the new rule and the previous one is that while before migrants could express their fear of persecution in response to questioning, now migrants must express that fear without prompting.

Nothing in this requirement runs contrary to law. Under this framework, migrants who manifest a fear of return will continue to have their claims heard by asylum officers. *See* 8 C.F.R. § 208.30(e)(8). Beyond that, migrants will still have their credible fear determination reviewed by a supervisory asylum officer, and will be provided an opportunity to appeal their credible fear determination to an immigration judge. *Id*; INA § 235(b)(1)(B)(iii)(III).

### i. The Manifest Fear Requirement Complies with the Law.

Plaintiffs argue that the Manifest Fear requirement is "inconsistent with the withholding of removal statute and CAT [the UN Convention Against Torture]." Dkt. 23 at 31. Specifically, Plaintiffs believe that 1) the requirement will cause the United States to fall short of its treaty obligation to avoid non-refoulment—that is, the return of refugees to countries where they are likely to suffer persecution—and 2) violates the letter of 8 U.S.C. § 1225(b)(1)(B)(iv), which directs the Attorney General to provide information about the credible fear interview to "aliens who may be eligible." Dkt. 23 at 32. Neither argument has merit.

For starters, this Court should not scrutinize the IFR for consistency with non-self-executing treaties like the CAT. "Non-self-executing treaties constitute 'international law commitments,' but are not themselves part of 'binding federal law.'" *Sluss v. United States Dep't of Justice, Int'l Prisoner Transfer Unit*, 898 F.3d 1242, 1247 (D.C. Cir. 2018) (citing *Medellin v.*

*Texas*, 552 U.S. 491, 504 (2008)). Similarly, non-self-executing treaties are not themselves a source of domestically enforceable rights or obligations. *See Medellin*, 552 U.S. at 505–06. Rather, once ratified, non-self-executing treaties require additional, implementing legislation to give domestic effect to their substance. *Id.* The D.C. Circuit regards the CAT—including its non-refoulement section—as one such non-self-executing treaty that depends on implementing legislation to create domestically applicable law that could restrict federal immigration policy. *Omar v. McHugh*, 646 F.3d 13, 17 (D.C. Cir. 2011).

Thus, any reviewable conflict between the IFR and the CAT will arise from legislation that implements it. The D.C. Circuit has helpfully clarified that "[b]oth 'withholding of removal' and 'Convention Against Torture' relief are codified in 8 U.S.C. § 1231, and those two types of § 1231 relief differ from asylum relief in important ways." *Huisha-Huisha* 27 F.4th at 725. Accordingly, any conflict between the IFR and domestically enforceable obligations related to CAT will be found in § 1231.

Plaintiffs fail to identify any part of § 1231 that is incompatible with the Manifest Fear requirement. Nor is it obvious how they could. Non-refoulement is provided for by § 1231(b)(3), which restricts removal to "a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of [various protected characteristics]." 8 U.S.C.A. § 1231(b)(3)(A). Contextually, the non-refoulement provision functions as an exception to the countries to which migrants are otherwise removed as outlined in § 1231(b)(1), (2). By conditioning the non-refoulment exception on the Attorney General's judgment that a migrant's "life or freedom would be threatened," Congress entrusted how the United States meets its non-refoulment obligation to his broad discretion. As much as the statute supplies guidance, it places the burden to prove threats on migrants awaiting removal, not on the government. 8 U.S.C.A. § 1231(b)(3)(C) (requiring aliens to demonstrate their life or freedom would be threatened if removed according to § 1231(b)(1), (2)).

Plaintiffs point to materials published by the UN Council on Human Rights to argue that the United States's non-refoulement obligation under CAT exceeds what Congress has enacted to

"include[] an affirmative obligation to elicit information that could establish refugee status. Dkt. 23 at 31–32. However, guidance documents issued by foreign bodies are not authority in United States courts. *See generally Medellin*, 552 U.S. at 508–10, 516 (refusing even to accord precedential weight to ICJ judgments). In fact, the United States' interpretation of a treaty, not the UN's, "is entitled to great weight," *Id*. at 513. The IFR notes the CAT does not express an obligation to question migrants about their fear of persecution. 89 Fed. Reg. 48741. When the Senate ratified the CAT and Congress passed implementing legislation, it did not also subject the United States to guidance documents the UN would subsequently promulgate.

The one statutory passage that Plaintiff singles out to establish a conflict, § 1225(b)(1)(B)(iv), offers no conflict. That section merely requires information about the CFI be provided to "aliens who may be eligible," which Plaintiffs construe to include all migrants subject to expedited removal. Granting for a moment this overinclusive reading, because DHS posts information about the asylum process, including CFIs, in its detention facilities, 89 Fed. Reg. 48741, Defendants provide CFI-relevant information to all migrants it apprehends and processes, including those who do not manifest fear. Moreover, "aliens who may be eligible" is more sensibly read in light of § 1225(b)(A) to mean migrants who have passed the initial screening that subsection requires. Immigration officers may only refer migrants who have voiced an "intention to apply for asylum," expressed a "fear of persecution," or who belong to a class of aliens specially designated by the Attorney General under § 1225(b)(A)(iii). Only migrants who fall within one of these statutory categories "may be" eligible for a CFI because only qualifying migrants are permitted to be referred. Accordingly, Defendants have no duty to inform migrants who do not pass this initial screening because they do not manifest the requisite fear about a CFI they will never attend.

The IFR's Manifest Fear Requirement adheres to the statute and therefore within the scope of Defendants' authority. Under the previous rule, immigration officers carried out screening for "fear of persecution" by administering a questionnaire; now, during severe understaffing and emergency border conditions, officers watch and wait for migrants to manifest the requisite fear. Entirely absent from both § 1225 specifically and the INA generally is even a hint

that officers must prompt migrants to convey their desire to seek particular forms of immigration relief or their fear of persecution. If anything, the new practice is more faithful to statute, which accords eligibility for a CFI after "the alien indicates…a fear of persecution" or an "the alien indicates…an intention to apply for asylum." 8 U.S.C.A. § 1225(b)(A)(i), (ii). The active voice of this language implies that the onus is on migrants, not officers, to take the initiative to express fear. This Circuit's caselaw likewise emphasizes that withholding of removal and CAT relief are mandatory only after migrants sufficiently demonstrate that they qualify. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 725 (D.C. Cir. 2022) (collecting cases); *see also I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999) ("withholding is mandatory *if an alien establishes* that it is more likely than not that he would be subject to persecution on one of the specified grounds") (emphasis added).

Because the Manifest Fear Requirement matches § 1225's instruction that migrants themselves "indicate" their fears and intentions, it follows the letter of the statute and is not contrary to law.

> ## ii.    The Manifest Fear Requirement Constitutes Reasoned Rulemaking.

Next, Plaintiffs present four lines of argument in support of the claim that the IFR's manifestation requirement is arbitrary and capricious. The common thread tying these arguments together is that Plaintiffs believe the new rule is likely to lead to a larger number of migrants who have a genuine fear of persecution being denied a CFI or being sent back to countries where they face real danger of maltreatment. 23 Dkt. 23–31. The APA, however, directs courts to set aside regulation as "arbitrary and capricious" only if the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. That "highly deferential" standard "presumes the agency's action to be valid" and is not easily met. *Envt'l. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981). Plaintiffs do not meet it here.

> ### a.    The IFR grounded the Manifest Fear Requirement in an adequate consideration of the purposes of immigration law.

Defendants' rationale for the Manifest Fear Requirement "rest[s] on consideration of the relevant factors." *State Farm*, 463 U.S. at 43. While Plaintiffs' overriding concern is the potential for 'false negatives'—bona fide refugees turned away—Defendants balance that concern against a countervailing desire to prevent 'false positives'—migrants who do not sincerely fear persecution but pass screening. It is important that Defendants do so because federal immigration law encompasses both non-refoulement and border security through expeditious removal of illegal migrants as key objectives. *See* §§ 1225(a), (c); 1231(b); *Las Americas Immigrant Advocacy Ctr. v. Wolf*, 507 F. Supp. 3d 1, 18 (D.D.C. 2020) ("when Congress amended the INA to establish expedited removal, it unquestionably intended to permit the government to remove certain noncitizens from the United States expeditiously").

Failure to at least consider any core statutory objective is arbitrary and capricious. *See Fresno Mobile Radio, Inc. v. F.C.C.*, 165 F.3d 965, 971 (D.C. Cir. 1999). But Defendants are right to consider the negative impact on border security stemming from high rates of false responses to easily gamed questionnaires. And considering the astronomic surge in illegal crossings along the southern border Defendants are not wrong to prioritize border security more highly than other statutory objectives. Absent an express statutory ranking of priorities, "only the [agency] may decide how much precedence particular policies will be granted when several are implicated in a single decision." *MobileTel, Inc. v. FCC*, 107 F.3d 888, 895 (D.C. Cir. 1997). "When an agency must balance a number of potentially conflicting objectives…judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives"—here, border security— "and its decisionmaking process was regular." *Fresno Mobile Radio*, 165 F.3d at 971.

Accordingly, Defendants staked much of their reasoning for the Manifest Fear requirement on the propensity of pre-IFR questioning to elicit falsely positive answers. The IFR states that based on "nearly 30 years of [institutional] experience" DHS believes "when individuals are asked affirmative questions, such as those on Form I-867B, individuals are more likely to respond in the affirmative, *even if they do not have a fear of return or intention of seeking asylum*." 89 Fed. Reg. 48743.

Migrants who have an obvious incentive to say whatever it takes to avoid removal often glean the 'right answers' from individualized advisals, 89 Fed. Reg. 48744, especially so because outside groups often "coach noncitizens and advise them to listen for certain words in the language of particular advisals as a prompt to express fear." *Id.* at n. 222. The IFR also cites to behavioral science studies showing that individuals are likely to thoughtlessly answer questionnaire items in the affirmative whatever their actual opinions. *Id.* at n. 220. Both these studies, dealing with questionnaires in general, and DHS' institutional experience of the I-867 questions in particular constitute "relevant data" that support the Defendants' conclusion that proactive questioning leads to elevated rates of insincere avowals of fear by migrants.

The IFR also addresses every issue that Plaintiffs accuse it of having overlooked. For example, the IFR considered the possibility that some migrants with genuine fear may still fail to manifest it in a recognizable fashion. 89 Fed. Reg. 48743–44. It even cites to a slate of studies providing evidence that the pre-IFR questionnaire offered "important protections" to refugees, including all of the studies that Plaintiffs believe the Defendants did not adequately consider. *Compare* 89 Fed. Reg. 48743 n. 221 *with* 23 Dkt. 25–26 (citing the same studies). Yet unlike Plaintiffs, the IFR points out that, out of these, the single study to conclude a low rate of falsely affirmative responses to the pre-IFR questions was conducted using such a minuscule sample size as to render its results unreliable. 89 Fed. Reg. 48743 n. 221. Further, some of these studies are not probative of the conclusion that Plaintiffs wish to draw from them. The studies reporting a higher rate of fear avowals by migrants in response to questions only show that questioning coincides with higher fear avowals from all migrants and does not prove that migrants who sincerely fear persecution manifest fear at different rates when questioned.  Similarly, the IFR recognizes other points pressed by Plaintiffs; it notes that migrants apprehended crossing the border sometimes suffer from privations that could impede their ability to effectively communicate a fear of persecution, 89 Fed. Reg. 48744, and that some migrants can be reluctant to volunteer information. *Id.* But, unlike Plaintiffs, the Defendants believe these possibilities are offset by the ability of U.S. Border Patrol agents to recognize non-verbal indications of fear. In short, the IFR shows that the

Defendants considered every issue that Plaintiffs accuse it of ignoring. Defendants merely reached a conclusion contrary to that preferred by Plaintiffs.

### b. The IFR reasonably supposes federal immigration personnel can assess non-verbal cues.

Next, Plaintiffs claim the Manifest Fear requirement treats U.S. Border Patrol agents officers as mind readers, suggesting that for the requirement to be practical officers would need to "divine the reason behind" migrants' non-verbal cues. Dkt. 23 at 27. But the IFR simply asserts that federal immigration officers typically possess "extensive experience interviewing and observing [migrant] individuals" that allows them to "determine[e] appropriate follow up steps with regards to any behaviors or indicators of concern." 89 Fed. Reg. 48744. While noting this expertise is far from flawless, the IFR sensibly relies on the specialized skills of the men and women who staff the border to have developed above-average abilities to distinguish inarticulate fear from other responses. Any policy will inevitably rely to some degree on the in-moment judgment of immigration officers deployed on the ground. Defendants were not wrong to do so when promulgating the IFR.

Defendants observe that agent expertise in responding to cues is rooted in the large numbers of migrants that immigration officers process as part of their occupational duties. 89 Fed. Reg. 48744. The IFR states that in recent years U.S. Border Patrol apprehensions have totaled more than 2 million, and in February 2024 alone 33,000 migrants were processed for expedited removal. 89 Fed. Reg. 48742. The numbers of migrants processed for expedited removal in recent months exceed the number of border patrol agents employed by DHS.[9] Defendants did not unreasonably suppose that regular interactions with migrants fosters skills in understanding their behaviors, including non-verbal cues. Immigration officers already rely on their ability to discern behavioral cues when deciding whether to accept putative migrant families as genuine. 89 Fed.

---

[9] As of FY 2022 USCBP employed 19,357 Border Patrol agents. See "On a Typical Day in Fiscal Year 2022," USCBP, Updated June 21, 2024, https://www.cbp.gov/newsroom/stats/typical-day-fy2022

Reg. 48744. These assessments are necessarily impromptu and in making them officers must focus on tacit behaviors that either confirm or belie declarations by migrants of family status. They are thus highly analogous to the determinations the Manifest Fear Requirement envisions officers making. Thus, contrary to Plaintiff, the Defendants' confidence in their officers' training and judgment is neither unusually reliant on subjective officer appraisals as compared to the pre-IFR regulatory status quo nor unrooted in agency expertise.

Relatedly, the IFR also points out that at least one other branch of DHS, the Coast Guard, has used a manifestation approach to screen for several decades, *id.*, and that U.S. Border Patrol has used this approach when it enforced Title 42. 89 Fed. Reg. 48744 n. 226. This recent usage means that Defendants have deep institutional knowledge of the effectiveness of the Manifest Fear Requirement and their employees' ability to competently use it. They, therefore, can reasonably rely on this history of experience to inform their rulemaking.

Finally, even if the Court agrees with Plaintiffs that Defendants' confidence in their personnel is misplaced, the Manifest Fear Requirement would still stand on the ample justification that Defendants have provided for it. Recognition of non-verbal cues plays a relatively minor role in Defendants' rationale for the Manifest Fear Requirement. *Cf. WildEarth Guardians v. Jewell*, 738 F.3d 298, 319 (D.C. Cir. 2013) (stating Courts should not "flyspeck an agency'. . . analysis, looking for any deficiency no matter how minor"). The IFR supposes that officer recognition will mitigate the incidence of false negative removals of authentic refugees who fail to communicate a real fear of persecution, 89 Fed. Reg.  48744, but also points to other measures that will have this effect, such as informational signage. 89 Fed. Reg. 48741–42 More importantly, the IFR bases its argument for manifestation on the need to reduce false positive referrals of insincere migrants, which does not depend on the competence of personnel to recognize gestures. Thus, even if Plaintiffs were somehow right to belittle the perceptual competence of the brave men and women who protect our border, the Manifest Fear Requirement is still not arbitrary and capricious.

### c. The IFR appropriately considered the vast prior use of the Manifestation standard in developing the IFR.

Plaintiffs' contentions that Defendants ignored relevant data in developing the IFR fail, as the IFR cited to various policies and practices used by Defendants that establish a rational connection between Defendants' experience and the decision made to use the manifestation standard. An agency's action would not be arbitrary and capricious when it articulates a "rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43. Here, Plaintiffs argue that because: (1) Defendants did not consider unspecified data from the COVID-19 implementation of the manifestation standard by Defendants, and (2) DHS, in its prior use of the manifestation standard through its Coast Guard recorded low rates of migrants manifesting fear, this IFR must be arbitrary and capricious. *Compare,* Dkt. 23 at 26–27, 29–31, *with*, 89 Fed. Reg. 48746. But Plaintiffs' subjective belief that there are more meritorious protection claims based on extra-record evidence fails.

This Court should not entertain extra-record evidence proffered by Plaintiffs. "[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" *Hill Dermaceuticals, Inc. v. Food & Drug Admin.,* 709 F.3d 44, 47 (D.C. Cir. 2013); *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44 (1985) (noting that Courts reviewing an agency decision should be limited to the administrative record); *Southwest Ctr. for Biological Diversity v. United States Forest Serv.,* 100 F.3d 1443, 1450 (9th Cir. 1996). Regardless, Plaintiffs' citation to either metric involving only the Coast Guard (*See* Dkt. 23 at 31), in isolation, or a sample size of around one-hundred families (*id.*) does not meet Plaintiffs' burden.

In adopting the manifestation standard, Defendants cite to their "significant experience relating to the inspection of individuals seeking entry and admission into the United States," utilizing various examples in support thereof. 89 Fed. Reg. 48744. *First*, Defendants have broad experience observing and inspecting individuals; in support of this contention, the IFR cites Defendants' screening of nearly "1.1 million people at POEs every day" and "more than 2 million people on the SWB in FY 2023." 89 Fed. Reg. 48743. And during these screenings, "the Department's over 20,000 USBP agents have [gained] experience in both visual and verbal

assessments." *Id.* Contrary to Plaintiffs' claims, the IFR considered its long-standing experience in observation and inspection of individuals in determining it could reasonably implement the manifestation standard.

*Second,* Defendants through decades of experience in immigration proceedings, contemplated concerns about false "affirmative[s]" when they have used verbal inspection for meritorious claims. DHS, including through predecessor agencies, has consistently "been implementing the expedited removal provisions since 1997." *Id.* And through this experience, DHS determined that "when individuals are asked affirmative questions, such as those on Form I-867B, individuals are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum," thus creating false positives through verbal inspection. *See id.* As a result, based on its evaluation of the defects in verbal protocols, through its nearly three decades of experience, DHS identified the manifestation standard as the appropriate evaluative tool here.

*Third,* the IFR considered how Defendants have specifically used the manifestation standard during the COVID-19 crisis, when Defendants were similarly handling an "urgent, exigent circumstance[]—the global pandemic—while still allowing noncitizens an opportunity to seek protection." 89 Fed. Reg. 48744. Throughout this crisis, Defendants utilized the manifestation standard, and now intend to do so again. The IFR has again articulated a reasonable, experience-based justification for its IFR.

*Fourth*, and finally, after training personnel, the Coast Guard used the manifestation standard for over a decade. *See id.* In over a decade of experience, Coast Guard utilized the manifestation standard to evaluate "whether an at-sea protection screening interview is required for migrants interdicted at sea," throughout the nation's waters. *Id.* While Plaintiffs assert a lack of data, the IFR directed the public to four key examples of the Department's repeated use of either the manifestation standard, or visual inspection in justifying its need for the IFR. Thus, the manifestation standard should not be found arbitrary and capricious.

### d. The IFR's consideration of both health and safety and efficiency concerns support the manifestation standard.

The IFR's rationale and justification, to avoid "overcrowding," that causes "health and safety concerns," while prioritizing efficiency interests justify the manifestation standard; the IFR balanced these considerations against any false negatives as a result of the IFR and is thus not arbitrary and capricious. 89 Fed. Reg. 48742. An agency's decision rests within the "zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), when it's rule "rest[s] on a consideration of the relevant factors." *State Farm,* 463 U.S. at 43. When an agency action is "reasonable and reasonably explained," it is not arbitrary and capricious. *Wages & White Lion Invs. LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (quoting *Prometheus Radio*, 592 U.S. at 423).

Here, Plaintiffs contend that the "[r]ule does not adequately engage with the potential negative consequences for accuracy," prioritizing only efficiency. Dkt. 23 at 31. Plaintiffs contend that the IFR will "result in a greater proportion of individuals with meritorious claims being expeditiously removed." *Id.* And therefore, the IFR is "arbitrary and capricious*." Id.* But that is not the standard.

For Plaintiffs to prevail at this argument, Defendants needed to have "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [be] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. That is not the case here. Plaintiffs suggest that Defendants did not consider any negative implications of regarding use of the manifestation rule, citing the IFR's concession that "the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview." *Compare*, Dkt. 23 at 31 *with,* 89 Fed. Reg. 48744. Yet Plaintiffs omit the explanation that immediately followed:

> DHS recognizes that the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview. However, in light of the emergency border circumstances facing the Departments and addressed by the Proclamation and this rule, DHS believes the standard is appropriate and necessary. During emergency border circumstances, it is critical for the Departments to devote their

processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.

89 Fed. Reg. 48744.

The IFR passes APA muster for two reasons. *First*, Defendants, demonstrating precisely how their actions were not arbitrary and capricious, first balanced "overcrowding" causing "health and safety concerns," against the possibility of some inaccuracies, false negatives. In avoiding overcrowding, the IFR "balanc[es] the need to protect those who may wish to seek protection in the United States" against possible inaccuracies. 89 Fed. Reg. 48745.*Second*, the IFR contemplated increased "efficiency." The IFR considered how much time it could save and redirect to combatting the "emergency border circumstances." For example, before the IFR "[a]t a processing time of approximately 2 hours per person, USBP agents spent approximately 56,000 hours—the equivalent of approximately 2,333 calendar days—processing the approximately 28,000 expedited removal cases in March 2024 under the current process." 89 Fed. Reg. 48742.

And even in just adjusting the requirements relating to the I-867, "DHS anticipates that omitting the requirement to complete Form I-867A and I-867B will save about 20 to 30 minutes per noncitizen, providing DHS with—based on the number of cases in March 2024—approximately 14,000 extra personnel hours per month." 89 Fed. Reg. 48746. Through making even this one adjustment, along, notwithstanding the other efficiency gains, the IFR contemplates combatting the emergency. Ultimately, Defendants, considered how "overcrowding" causes "health and safety concerns," as well as the efficiency interests for the promulgation of the IFR, weighing them against the possibility of inaccurate assessments, deciding to implement a system that DHS, and even Defendants specifically, have used—some agencies, for over a decade. This remains "critical for avoiding overcrowding and ensuring safe conditions for those in custody." *See id.* This Court should not find the Manifestation standard arbitrary and capricious.

### D. The IFR's Heightened Probability Standard Is Not Arbitrary and Capricious.

In developing the IFR, Defendants' use of the heightened standard cannot be arbitrary and

capricious, as the IFR and record show that the heightened standard not only achieves increased "efficiency" and "deterrence," in response to the "emergency border circumstances," but also uses trained personnel to identify credible claims through years of training, even adding an extra layer of supervisory review for certainty. 89 Fed. Reg. 48746. A heightened standard, which has been used by the Defendants in previous rules, logically follows here and thus serves as a reasonable exercise of agency rulemaking.

      i.    **The IFR's Use of the "Reasonable Probability" Standard has been Carefully Developed from Past Practice and Procedure.**

Defendants have used a heightened standard in various similar contexts, which led to increased "efficiency" and "deterrence," necessitating the continued departure from the previous standard. *See* Circumvention of Lawful Pathways, 88 FR at 11743 (February 23, 2023) (citing 8 C.F.R. 208.31(c), (e)); *see also* Credible Fear and Reasonable Fear Review, 85 FR 36264, 36270 (June 15, 2020).

The Supreme Court has "fully recognize[d] that 'regulatory agencies do not establish rules of conduct to last forever.'" *State Farm*, 463 U.S. at 43 (citing *American Trucking Assoc., Inc. v. Atchison, T. & S.F.R. Co.,* 387 U.S. 397, 416 (1967)); *see also Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996); *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974) (citing *Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595 (1945)) (noting that courts will even "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.").

Although Plaintiffs contend that "[t]he Rule does not explain why the prior concerns that led Defendants to reject a heightened standard are no longer valid," Defendants have repeatedly used a heightened standard in response to the "emergency border circumstances," which afford Defendants "efficiency" and "deterrence" in unlawful migration. *Compare*, Dkt. 23 at 31. 89 *with*, Fed. Reg. 48745.

*First,* like the "reasonable probability" standard here, in past rules, Defendants have applied a "reasonable possibility" screening standard to claims for statutory withholding of

removal or CAT protection" and "in other contexts where noncitizens would also be ineligible for asylum." *Id.* Defendants implemented a heightened standard through the Circumvention of Lawful Pathways and Credible Fear and Reasonable Fear Review rules, which "ha[ve] validated Defendants' choice to use an elevated screening standard to narrowly focus limited resources on those who are likely to be persecuted or tortured and to remove those who are unlikely to establish eligibility for statutory withholding of removal or CAT protection." *Id.* Specifically, the heightened standard of a "reasonable possibility" has allowed Defendants to process "record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies." *Id.* Through applying the standard, here, Defendants will continue their use of a heightened standard from previous rules, only altering the threshold.

As conveyed, Defendants have been presented with "emergency border circumstances." *See id.* This means that creating a standard that more similarly mimics the ultimate findings would increase efficiency, while still permitting an asylum seeker to satisfy their burden through testimony alone.

The metrics alone from Defendants' application of the "reasonable possibility" standard speak strongly in favor of this application. That is, "[u]nder that rule, which uses a 'reasonable possibility of persecution or torture' screening standard for statutory withholding of removal and CAT protection claims, Defendants have processed record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies." 89 Fed. Reg. 48746. The heightened burden is based on reason.

*Second*, the heightened standard has increased "deterrence." According to the IFR, "[t]hose less likely to establish eligibility for statutory withholding of removal or CAT protection will be swiftly removed rather than being released and waiting years for a hearing, or in some cases, absconding and remaining in the United States unlawfully." *Id.* And this deterrent effect could lead to a "lower encounter levels as noncitizens and smugglers realize that the process is

35

functioning more effectively," as Defendants presently "face[s] a backlog of 2.7 million cases in removal proceedings"; this would permit Defendants to "counter this crisis through supporting a deterrence in organized crime, and unlawful migration, while protecting migrants' rights through still affording migrants long interviews with trained personnel to ensure accuracy." *Id.* As a result of the IFR's careful consideration of "efficiency" and "deterrence," on balance with protecting migrants' rights, this Court should not find the heightened standard arbitrary and capricious.

### ii. The IFR's "Greater Specificity" Requirement Considers Asylum Seekers' Ability to Meet the Standard.

Contrary to Plaintiffs' contentions, the IFR's "greater specificity" requirement should not only be considered reasonable, but also attainable—for valid claims. Plaintiffs contend that the greater specificity standard does not consider: (1) "that asylum seekers often are unable or unlikely to discuss those details at that stage due to trauma and related considerations," or (2) "that many asylum seekers are unable to provide specific details at initial screenings due to the sensitive nature of their claims." Dkt. 23 at 32–33. This is incorrect.

As the IFR emphasizes, personnel are trained to consider that asylum seekers may be unable or unlikely to discuss the trauma. Personnel receive training and hold experience with "asylum, statutory withholding of removal, and CAT protection screening standards" as well as "in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards." 89 Fed. Reg. 48747. Due to this considerable training, the personnel "are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage." *Id.* And to ensure the accuracy of the screening, there will be an additional supervisory review. *See id.* Because Defendants' personnel have adequate training to consider context of the asylum seeker's circumstances, as a whole, upon screening, the "greater specificity" standard is reasonable.

As to Plaintiffs' contentions that an asylum seeker may not be able to provide relevant details at the outset, relevant components of the testimony often include: (1) "whom they are afraid

of," (2) "and why." 89 Fed. Reg. 48747. To satisfy the standard, "[c]redible testimony alone can satisfy the noncitizen's burden and is sometimes the only available evidence of persecution or torture." *See id.* Through this reasonable threshold, trained personnel can identify valid claims that are based on individual threats, rather than generalized fears, which are insufficient. *Id.*

Plaintiffs cite *Kiakombua v. Wolf* for the assertion that an asylum seeker may not be prepared for the hearing and "is . . . more vulnerable, and more wary of government officials than an asylum applicant who appears for an interview before immigration authorities well after arrival." 498 F. Supp. 3d 1, 39 (D.D.C. 2020). However, Plaintiffs omit the Court's careful acknowledgement of federal statute, noting that the personnel are trained to determine whether one has a credible fear of persecution "taking into account the credibility of the statements" of the applicant in support of her claim and "such other facts as are known to the officer." *Id.* (citing § § 1225(b)(1)(B)(v), 1225(b)(1)(B)(i). Defendants' training of personnel to observe the "whom" and the "why," as well as helpful context explains the reasoning behind the IFR.

Despite Plaintiffs' concerns, the threshold remains low, and asylum seekers with valid claims will still be able to satisfy the threshold. This Court should not find the heightened standard arbitrary and capricious.

## CONCLUSION

For each of the reasons articulated above, Texas respectfully requests that this Court deny Plaintiffs' motion for summary judgment and grant instead Defendants' motion for summary judgment as well as Texas's motion for summary judgment, in the event Texas's intervention is granted.

Date: August 16, 2024.                    Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**RYAN D. WALTERS**
Chief, Special Litigation Division

*/s/Garrett Greene*
**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415
Kathleen.Hunker@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR PROPOSED
DEFENDANT-INTERVENOR
STATE OF TEXAS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 16, 2024 and that all counsel of record were served by CM/ECF.

*/s/ Garrett Greene*
GARRETT GREENE

38