**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 24-1702 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 23, 45 |
| | : | | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

**Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment;**

**Granting in Part and Denying in Part Defendants' Cross-Motion for Summary**

**Judgment**

## I. INTRODUCTION

The Immigration and Nationality Act provides that any noncitizen who is physically present in the United States, regardless of whether he or she arrives at a designated port of entry, may apply for asylum. In 2024, the Department of Homeland Security and the Department of Justice jointly issued a Rule that, among other things, generally limits asylum to noncitizens who arrive at a port of entry. Two immigrant advocacy groups and twenty-eight individual asylum seekers challenge the Rule and its implementing Guidance as contrary to law and arbitrary and capricious. For the reasons discussed below, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendants' motion for summary judgment is granted in part and denied in part.

## II. BACKGROUND

### A. Statutory and Regulatory Background

Asylum is a form of protection that the Secretary of Homeland Security "may grant" to noncitizens physically present in the United States or at the border who cannot return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[1]  8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A); *see also id.* § 1158(a)(2), (b)(1)(A), (b)(2) (laying out additional eligibility criteria).  Asylum allows a noncitizen to live and work in the United States, creates a path to lawful permanent residency and citizenship, and enables some of the noncitizen's family members to seek derivative asylum.  *Id.* §§ 1158–59.  Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum" within one year of arrival.[2]  *Id.* § 1158(a)(1), (a)(2)(B).

---

[1] By its terms, the Immigration and Nationality Act gives the Attorney General the discretion to grant asylum.  But "[e]ffective March 1, 2003, the Immigration and Naturalization Service (INS), under the direction of the Attorney General, ceased to exist, and its functions were transferred to the Department of Homeland Security (DHS)."  *Vasquez v. Holder*, 602 F.3d 1003, 1006 n.3 (9th Cir. 2010) (citing the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002)); *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 195 n.10 (2d Cir. 2011).  Throughout this opinion the Court refers to the authority of the Secretary of Homeland Security.

[2] In general, noncitizens can apply for asylum in one of three ways.  If the noncitizen is not in any kind of removal proceeding, she may file an affirmative application for asylum.  8 U.S.C. § 1158(a)(1); 8 C.F.R. § 208.1(a)(1).  If she is subject to full removal proceedings under 8 U.S.C. § 1229a, she may file an application for asylum as a defense to removal.  *See* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b).  Finally, noncitizens subject to expedited removal may file an application for asylum as a defense to expedited removal.  *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f).  The third category is at issue in this case.

Noncitizens who arrive at the border without authorization or inspection are typically subject to expedited removal. *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); 8 U.S.C. § 1225(b)(1). But if a noncitizen expresses a fear of persecution or an intent to seek asylum, she is referred to a credible fear interview with a United States Citizenship and Immigration Services ("USCIS") asylum officer ("AO"). 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B); *see also* 8 C.F.R. § 235.3(b)(4). That interview functions as an initial screener for asylum and two other forms of protection from removal: statutory withholding of removal and protection under the Convention Against Torture ("CAT"). 8 U.S.C. § 1231(b)(3) (withholding of removal); *id.* § 1231 note (CAT protection); 8 C.F.R. §§ 208.16–.18, 1208.16–.18; *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 724–25 (D.C. Cir. 2022) (describing these forms of protection). Both statutory withholding of removal and CAT protection require an applicant to show that she will "more likely than not" be persecuted or tortured if removed. *Nasrallah v. Barr*, 590 U.S. 573, 575 (2020); *INS v. Cardoza-Fonesca*, 480 U.S. 421, 423 (1987); 8 C.F.R. § 208.16(c)(2). Unlike asylum, these protections do not entitle a noncitizen to any legal status in the United States, and both are mandatory, not discretionary, for those who qualify. *Huisha-Huisha*, 27 F.4th at 725.

If a noncitizen demonstrates eligibility for asylum, statutory withholding of removal, or CAT protection during her credible fear interview, she is placed in full removal proceedings, which encompass the right to counsel, the right to present and examine evidence, and the right to appeal. 8 U.S.C. §§ 1225(b)(1)(B)(v), 1229, 1229a, 1231(b)(3), 1252(a)–(b); 8 C.F.R. §§ 1003.12–.47, 208.16–.18, 1208.16–.18. If her claims for protection are rejected by the AO, she can request review by an immigration judge ("IJ"). 8 C.F.R. § 208.30(g); *see also id*. §§ 1003.42, 1208.30(g). If the IJ affirms the AO's negative finding, or if the noncitizen does not

request IJ review, she is subject to removal without further procedure.  8 U.S.C.

§ 1225(b)(1)(B)(iii); *see also* 8 C.F.R. § 235.3(b).

Over the past several years, the United States has experienced a surge of "unlawful

migration" at the southern land border.  *Securing the Border*, 89 Fed. Reg. 48710, 48712 n.5,

48722 (June 7, 2024); *see also* J.A. 1, 8, ECF No. 53.  In response, President Biden issued a

Proclamation "Securing the Border" on June 3, 2024, invoking his authority under sections

212(f) and 215(a) of the INA.  89 Fed. Reg. 48487; J.A. 1–14; *see also* 8 U.S.C. §§ 1182(f),

1185(a).  The proclamation generally suspended the entry of noncitizens at the southern border

during "emergency border circumstances," or until the seven-day average of noncitizen

"encounters" falls below 1,500 per day.  89 Fed. Reg. at 48491; J.A. 9–10.  The proclamation

defines "encounters" to mean "a noncitizen" who:

> (i)    is physically apprehended by [Customs and Border Patrol] immigration
>        officers within 100 miles of the United States southwest land border
>        during the 14-day period immediately after entry between ports of entry;
> (ii)   is physically apprehended by [Department of Homeland Security]
>        personnel at the southern coastal borders during the 14-day period after
>        entry between ports of entry; or
> (iii)  is determined to be inadmissible at a southwest land border port of entry.

J.A. 13.  Essentially the proclamation functions as a toggle: if there are over 1,500 border

crossings over a certain period of time, virtually every noncitizen who arrives at the southern

border cannot apply for asylum.  At the time the proclamation was issued, the 1,500-encounter

daily threshold had been continuously exceeded for almost four years.  Pls.' Mot. Summ. J. at 14,

44, ECF No. 23.

During the emergency border circumstances described in the proclamation, the only

noncitizens permitted to enter the United States at the southern border are U.S. nationals; lawful

permanent residents; unaccompanied children; "any noncitizen who is determined to be a victim

of a severe form of trafficking in persons" as defined in 22 U.S.C. § 7102(16); those who have a valid visa or other lawful permission to seek entry or admission, or who present at a port of entry pursuant to a pre-scheduled time or place; and those permitted to enter by a Customs and Border Patrol ("CBP") immigration officer based on "significant law enforcement, officer and public safety, urgent humanitarian, and public health interests" or "operational considerations."  J.A. 11–12.  On June 4, 2024, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") jointly published in the Federal Register an Interim Final Rule incorporating the proclamation.  89 Fed. Reg. 48710.  DHS also issued implementing guidance.  DHS, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border*, and Interim Final Rule,* Securing the Border (2024), available at https://bit.ly/3WDYeZ8 ("Guidance").

On September 27, 2024, President Biden issued an amended proclamation that altered the June proclamation in two ways.  Suppl. J.A. 208–13, ECF No. 69.  First, it increased the length of time that the encounter-based asylum ban would remain in place.  *Id.* at 210–11; *see also Securing the Border*, 89 Fed. Reg. 81156, 81164–66 (Oct. 7, 2024).  Second, it announced that unaccompanied children from non-contiguous countries would be included in the total count of daily encounters.  Suppl. J.A. 210–11; *see also* 89 Fed. Reg. at 81166–67.  DHS and DOJ jointly published a Final Rule incorporating the changes, which went into effect on October 1, 2024.  89 Fed. Reg. at 81156.  As relevant here, the Rule effects several changes to the way the government processes noncitizens' claims for protection at the southern border.[3]

---

[3] Because the differences between the Interim Final Rule and Final Rule are immaterial to this litigation, the Court refers to them collectively as the Rule.  *See* Suppl. Mem. in Supp. of Pls.' Mot. Summ. J. at 1, ECF No. 59 ("As relevant to Plaintiffs' claims, the [Final] Rule is identical to the IFR."); *see also* 89 Fed. Reg. at 81164–68 (describing changes between the Final Rule and Interim Final Rule); *Am. Maritime Ass'n v. United States*, 766 F.2d 545, 555 n.17 (D.C.

*First*, the Rule requires noncitizens seeking asylum to schedule a "time to appear" for processing at a specific port of entry. 89 Fed. Reg. at 81253. The only way to schedule an appointment is through a smartphone application, CBP One. *Id.* Without a scheduled appointment, most noncitizens are categorically ineligible for asylum unless they can demonstrate certain "exceptionally compelling circumstances." *Id.* at 81168. These exceptions include "an acute medical emergency," "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," and human trafficking. *Id.*

*Second*, under the Rule noncitizens must affirmatively manifest a fear of removal or repatriation to qualify for a credible fear interview. *Id.* at 81168, 81232–45; *see also* 8 U.S.C. § 1225(b)(1)(B)(v). Before, CBP officers proactively asked noncitizens in expedited removal proceedings whether they had any fear or concern of being removed. *Inspection and Expedited Removal of Aliens*, 62 Fed. Reg. 10312, 10318–19 (Mar. 6, 1997); 8 C.F.R. § 235.3(b)(2)(i). Pursuant to the Rule, officials no longer "provid[e] individualized advisals" on asylum. 89 Fed. Reg. at 81234. Nor do they ask noncitizens questions related to whether they have a fear of return. *Id.* The Rule defines "manifesting" fear as "express[ing] an intention to apply for asylum, express[ing] a fear of persecution or torture, or express[ing] a fear of return to the noncitizen's country or country of removal." *Id.* at 81233–34.

*Third*, the Rule raises the threshold for a noncitizen to demonstrate her eligibility for statutory withholding of removal or CAT protection. Under the Rule, a noncitizen must show a "reasonable probability" that she is entitled to either protection during her credible fear interview to be placed in full removal proceedings. *Id.* at 81245–50. This means, according to the Rule,

---

Cir. 1985) (acknowledging that the relevant provisions of an interim final rule and challenged final rule were identical).

"substantially more than a 'reasonable possibility' but somewhat less than more likely than not." *Id.* at 81168. The Rule also requires "greater specificity of the claim" than before, when noncitizens had to show only a "reasonable" or "significant possibility" of their eligibility for statutory withholding of removal or CAT protection. *Id.* at 81246–47.

*Fourth*, the Guidance establishes a four-hour minimum window for asylum seekers in DHS custody to consult with an attorney or other person before their credible fear interviews. Guidance at 4. Regulations from 1997 provided for a 48-hour consultation window; in 2023, DHS reduced the consultation period to 24 hours. 62 Fed. Reg. at 10320; DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023).

\* \* \*

On January 20, 2025, President Trump issued an executive order shutting down the CBP One mobile application. *Securing Our Borders* § 7(a) (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders/ [https://perma.cc/L9D3-URKZ]. DHS immediately canceled all existing CBP One appointments. Pls.' Mot. TRO and Mem. Law in Supp. ("Mot. TRO") at 2, ECF No. 71. Since then, most noncitizens have been categorically unable to seek asylum at the southern border. *Id.* According to data posted on CBP's website, by February 2025 southern border "apprehensions" had decreased to under 300 per day. CBP, *CBP Releases February Monthly Update* (Mar. 12, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2025-monthly-update [https://perma.cc/8F3G-8UHY]. The Rule and Guidance, however, remain in effect.

## B.  Procedural Background

This case was initiated on June 12, 2024, when two immigrant advocacy groups, Las

Americas Immigrant Advocacy Center ("Las Americas") and Refugee and Immigrant Center for

Education and Legal Services ("RAICES"), filed a complaint challenging the Interim Final Rule.

Compl., ECF No. 1.  One month later, they filed an amended complaint, adding as plaintiffs

eleven noncitizens whose claims for protection were rejected under the Interim Final Rule and

Guidance.  First Am. Compl., ECF No. 14.  The amended complaint alleges that the Interim

Final Rule and Guidance violate the Immigration and Nationality Act and the Administrative

Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.  Id.*  Named as defendants are DHS; DOJ;

USCIS; CBP; U.S. Immigration and Customs Enforcement ("ICE"); the Executive Office for

Immigration Review ("EOIR"); Kristi Noem, Secretary of Homeland Security; Kika Scott,

Senior Official Performing the Duties of the Director of USCIS; Pete R. Flores, Acting

Commissioner for CBP; Caleb Vitello, Acting Director of ICE; Pamela Bondi, Attorney General;

and Sirce E. Owen, Acting Director of the EOIR (collectively, "Defendants").[4]  First Am.

Compl. ¶¶ 26–37.

The operative complaint encompasses five claims.  Count I alleges that the Rule's

limitation of asylum eligibility is contrary to the INA and the APA.  Second Am. Compl.

¶¶ 106–09, ECF No. 56.  Count II alleges that the heightened standard for establishing a credible

fear of persecution violates the INA and the APA.  *Id.* ¶¶ 110–14.  Count III characterizes "[a]ll

key aspects" of the Rule as arbitrary and capricious, in violation of the APA.  *Id.* ¶¶ 115–18.

Count IV alleges that Defendants failed to provide notice and an opportunity to comment on the

---

[4] Initially Plaintiffs named Biden administration officials as defendants, but pursuant to
Federal Rule of Civil Procedure 25(d) those officials have been substituted by their successors.

Interim Final Rule and that they failed to publish the Interim Final Rule and Guidance 30 days before their effective dates, as required by the APA. *Id.* ¶¶ 119–122. Count V alleges that the Guidance is arbitrary and capricious because it "makes meaningful access to a consultation and time to prepare for [a] credible fear interview effectively unavailable," and because Defendants failed to consider important aspects of the problem. *Id.* ¶¶ 123–29. For relief, Plaintiffs request vacatur of the Final Rule, Interim Final Rule, and Guidance; a declaratory judgment finding the Interim Final Rule and Guidance procedurally invalid and the Rule and Guidance contrary to law and arbitrary and capricious; an order vacating the removal orders issued to each of the individual Plaintiffs; for any individual Plaintiffs who have been removed, "an order paroling those Individual Plaintiffs into the United States for the duration of their removal proceedings so that they may apply for asylum, statutory withholding of removal, and/or CAT protection"; costs and attorneys' fees; and any other relief "the Court deems equitable, just, and proper." *Id.* at 38.

Plaintiffs moved for summary judgment, Pls.' Mot. Summ. J, and several advocacy groups filed briefs as amici curiae in support, *see* Br. Off. United Nations High Comm'r for Refugees as Amicus Curiae in Supp. of Pls.' Mot. Summ. J. ("Amicus Br. of UNHCR"), ECF No. 25-1; Br. Amicus Curiae Pub. Couns. in Supp. of Pls. ("Amicus Br. of Public Counsel"), ECF No. 26-1, Br. Amicus Curiae Human Rights First, Hope Border Inst., Immigrant Defenders L. Ctr., Kino Border Initiative, and Refugees Int'l in Supp. of Pls. ("Amicus Br. of Human Rights First"), ECF No. 27-1, Br. Amicus Curiae Nat'l Citizenship and Immigr. Servs. Council 119 in Supp. of Pls.' Mot. Summ. J. ("Amicus Br. of Council 119"), ECF No. 28-1. The State of Texas moved to intervene as a defendant, which the parties opposed. Texas' Opposed Mot. Intervene as Def., ECF No. 19; *see* Defs.' Opp'n to Mot. Intervene, ECF No. 34; Pls.' Opp'n to Texas's Mot. Intervene, ECF No. 35. The Court denied Texas's motion to intervene but

permitted Texas to file an amicus brief in support of Defendants.  Texas's Mot. Summ. J. or in the Alternative, Amicus Br. in Supp. of Defs., ECF No. 47; Order Den. State of Texas's Mot. Intervene; Den. in Part and Grant. in Part Texas's Mot. Summ. J. or in the Alternative, Amicus Br. in Supp. of Defs., ECF No. 84; Texas's Mot. Summ. J. or in the Alternative, Amicus Br. in Supp. of Defs., ECF No. 86.

Defendants filed a cross-motion for summary judgment and an opposition to Plaintiffs' motion for summary judgment.  Defs.' Cross-Mot. Summ. J., ECF No. 45.  Plaintiffs filed an opposition to Defendants' cross-motion, and Defendants filed a reply.  Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. ("Pls.' Opp'n"), ECF No. 48; Defs.' Reply in Supp. of Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 52.  The parties also filed a joint appendix.  J.A. Part 1, ECF No. 53; J.A. Part 2, ECF No. 53-1; J.A. Part 3, ECF No. 53-2; J.A. Part 4, ECF No. 53-3.

After that round of summary judgment briefing concluded, President Biden issued the amended proclamation and DHS and DOJ promulgated the Final Rule.  The Court granted Plaintiffs leave to amend the complaint to address the Final Rule, *see* Second Am. Compl., and both parties submitted supplemental briefing, Pls.' Suppl. Br. in Supp. of Pls.' Mot. Summ. J., ECF No. 59; Defs.' Suppl. Br. in Supp. of Defs.' Mot. Summ. J. ("Defs.' Suppl. Br."), ECF No. 62; Pls.' Suppl. Opp'n to Defs.' Cross-Mot. Summ. J., ECF No. 65; Defs.' Suppl. Reply Br. in Supp. of Defs.' Mot. Summ. J. ("Defs.' Suppl. Reply"), ECF No. 67.  The parties also submitted a supplemental joint appendix, *see* Suppl. J.A., ECF No. 69.

On January 23, 2025, Plaintiffs filed a motion for a temporary restraining order asking the Court to order the government to parole individual Plaintiff S.O. and her children, individual Plaintiffs W.O. and G.F., "into the United States at the Paso Del Norte port of entry . . . so that

they can pursue their claims for asylum."[5]  Mot. TRO at 1.  The Court denied the motion on the

grounds that, under the circumstances, it lacked the authority to order the government to parole

noncitizens into the United States.  Order Den. Mot. TRO, ECF No. 80; Mem. Op. Den. Mot.

TRO ("TRO Mem. Op."), ECF No. 81.

      After President Trump issued the executive order shutting down the CBP One app, the

parties submitted additional supplemental briefing.  Pls.' Suppl. Br. on the Impact of the

Termination of the CBP One Appointment System, ECF No. 74; Defs.' Second Supp. Br. in

Supp. of Defs.' Mot. Summ. J. ("Defs.' Second Suppl. Br."), ECF No. 77; Pls.' Reply Br. on the

Impact of the Termination of the CBP One Appointment System, ECF No. 78.  The parties'

cross-motions for summary judgment are now ripe for review.

### III.  LEGAL STANDARD

      Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the

pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In cases

involving review of final agency action under the Administrative Procedure Act, however, the

standard articulated in Rule 56 does not apply.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76,

89–90 (D.D.C. 2006).  In the APA context, agencies resolve factual issues and "the function of

the district court is to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did."  *See Occidental Eng'g

Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985).  Summary judgment thus serves as the

---

[5] Because of the sensitive nature of their claims for asylum, the individual Plaintiffs are
proceeding under pseudonyms and their supporting declarations have been filed under seal.  *See*
Order Grant. Pls.' Unopposed Mots. for Leave to Proceed Under Pseudonym and to File
Supporting Exs. Under Seal, ECF No. 61.

mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA.  *See Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A reviewing court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."'"  *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 43).  An agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416.  The Court's inquiry is generally confined to the administrative record.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

## IV.  ANALYSIS

### A.  Threshold Issues

Before reaching the merits, the Court must address three threshold issues.  First, whether Plaintiffs have standing to bring each of their claims.  Second, whether their notice-and-comment challenge to the Interim Final Rule is moot.  And finally, whether the challenged provisions of the Rule are severable.  The Court takes each issue in turn.

1. Standing

At the outset, at least one Plaintiff must have standing for each form of relief requested in the complaint. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012); *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). Standing is an "irreducible constitutional minimum" that requires a plaintiff to establish that he has suffered a concrete and particularized injury that is fairly traceable to the defendant's conduct and that is likely to be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In the procedural-rights context, the redressability requirement is relaxed. *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017). The party invoking the Court's jurisdiction has the burden of establishing standing. *Lujan*, 504 U.S. at 561. Because the challenged components of the Rule are severable, *see infra* pp. 27–29, at least one Plaintiff must demonstrate standing separately for the challenges to the limitation on asylum eligibility, the manifestation of fear requirement, and the heightened probability screening standard. Same with the Guidance.

The parties dispute whether Plaintiffs must show injury resulting from the Final Rule, or whether injury from the Interim Final Rule is sufficient. *See* Defs.' Suppl. Br. at 2–3. As a general matter, "it is clearly preferable . . . to review a set of claims in the context of an extant rather than a defunct rule." *Ass'n of Am. Physicians and Surgeons v. Sebelius*, 746 F.3d 468, 473 (D.C. Cir. 2014). Because at least one Plaintiff has standing to challenge each relevant component of the Final Rule, the Court assumes without deciding that Plaintiffs must show injury from the Final Rule. As discussed *infra* pp. 24–27, Plaintiffs' notice-and-comment challenge to the Interim Final Rule is moot, so the Court does not consider whether any Plaintiff has standing for that claim.

*a. Limitation on Asylum Eligibility and Manifestation of Fear Requirement*

At a high level, the Rule clearly applies to all of the individual Plaintiffs, each of whom has submitted an uncontroverted declaration establishing a colorable claim for asylum. *See* Exs. 1–10 to Pls.' Unopposed Mot. to Proceed Under Pseudonyms and File Supporting Exs. Under Seal, ECF Nos. 15-1–10 (declarations of D.G., E.R., P.S., D.C., A.E., E.D., T.R., S.G., J.C., and J.R., who were denied protection under the Interim Final Rule); Exs. 1–11 to Pls.' Unopposed Mot. to Proceed Under Pseudonyms and File Supporting Exs. Under Seal, ECF Nos. 57-1–11 (declarations of L.B., J.G., E.M., R.R., L.Q., S.O., J.N., E.C., J.E., R.C., and M.F., who were denied protection under the Final Rule); Second Am. Compl. ¶ 90. Several of the individual Plaintiffs' claims for protection were rejected after the Final Rule went into effect. *See generally* Pls.' Unopposed Mot. to Proceed Under Pseudonyms and to File Supporting Exs. Under Seal, ECF No. 57.

As another court in this District has put it, "[t]here is no doubt that asylum is a valuable form of relief from removal and that affords the asylee benefits above and beyond avoiding removal, including, most notably, a path to lawful permanent resident status and citizenship." *O.A. v. Trump*, 404 F. Supp. 3d 109, 145 (D.D.C. 2019). Denial of a noncitizen's plausible asylum claim is therefore a concrete and particularized injury. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 20 (D.D.C. 2020); *see also Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1502 (D.C. Cir. 1988) (equally divided en banc court) (stating that noncitizens suffer an injury in fact if their "asylum claims have been processed in [an] illegal manner").

Defendants "acknowledge that the new individual Plaintiffs" added in the second amended complaint "have had aspects of the final Rule applied to them," Defs.' Suppl. Br. at 2–4, but argue that each individual Plaintiff's claim "should be dismissed as to portions of the Rule

and guidance to which they were not subjected," Defs.' Cross-Mot. Summ. J. at 22–24; *see also* Pls.' Suppl. Opp'n at 2 (noting that "Defendants do not dispute that at least one plaintiff has standing for each claim alleged in the complaint"). Not so. "Because only one plaintiff must have standing," as long as at least one Plaintiff can show a qualifying injury resulting from each challenged aspect of the Rule and at least one Plaintiff can show a qualifying injury resulting from the Guidance, in addition to causation and redressability, the Court can proceed without dismissing the other Plaintiffs. *See In re Navy Chaplaincy*, 697 F.3d at 1178 ("Because only one plaintiff must have standing, we have no need to consider the [defendant's] motion to dismiss certain [plaintiffs] from the appeal for lack of standing . . . .").

The Court concludes that at least Plaintiff S.O. has standing to challenge the Rule's limitation on asylum eligibility and manifestation of fear requirement. S.O. and her children, Plaintiffs W.O., and G.F., are Venezuelan nationals who fled political violence last April. *See generally* S.O. Decl., ECF No. 57-6. While fleeing through Mexico, S.O. was extorted, robbed, and threatened with forced prostitution. *Id.* ¶¶ 14–15. After unsuccessfully waiting five months for a CBP One appointment, S.O. and her children crossed into the United States without one on October 18, 2024. *Id.* ¶ 16. S.O. was not given a credible fear interview before being removed to Mexico, where she and her family continue to live in fear.[6] *Id.* ¶¶ 17–20; *see also* Mot. TRO at 4. S.O. and her family were impacted by at least two aspects of the Rule: the requirement that noncitizens must enter at a port of entry with a CBP One appointment to be eligible for asylum, and the manifestation of fear requirement.

---

[6] S.O. had an asylum appointment scheduled for January 25, 2025, but that appointment was canceled pursuant to President Trump's executive order shutting down CBP One. *See generally* Mot. TRO.

Because S.O., W.O., and G.F. sought and were denied asylum through allegedly unlawful procedures, they have identified a particularized and concrete interest. *See L.M.-M.*, 442 F. Supp. 3d at 20. And those procedures are connected to the substantive harm they faced—the rejection of their asylum claims and removal from the United States. *See Ctr. for Biological Diversity*, 861 F.3d at 184; *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) ("All that is necessary [for causation] is to show that the procedural step was connected to the substantive result."). So S.O., W.O., and G.F. have established causation. Their proffered injury is also redressable under the relaxed redressability standard: if the Rule were invalidated and their removal orders vacated, immigration officials could reach a different conclusion about their ultimate eligibility for protection. *See L.M.-M.*, 442 F. Supp. 3d at 21 ("It is possible that, if given another chance, the individual Plaintiffs [seeking asylum] will fare no better than they did the first time. The Court, however, need decide only whether an asylum officer 'could reach a different conclusion' . . . and that undemanding test is satisfied on the present record."). The Court therefore concludes that Plaintiffs S.O., W.O., and G.F. have standing to challenge the Rule's limitation on asylum eligibility and manifestation requirement. *See O.A.*, 404 F. Supp. 3d at 145 (holding that plaintiffs' declarations, which each "set[] forth facts sufficient to state a plausible claim to asylum" were "enough to establish an injury in fact that is fairly traceable to the challenged Rule and that would be redressed by invalidation of the Rule").

### b. Reasonable Probability Screening Standard

The Court is also satisfied that at least one individual Plaintiff has standing to challenge the reasonable probability screening standard. The Plaintiffs who were exposed to the reasonable probability screening standard are those who were referred for credible fear

interviews: L.B., J.G., E.M., R.R., A.L., J.L., and L.Q.  *See* Defs.' Suppl. Br. at 3.  Each of those

plaintiffs failed his or her credible fear interview and, at the time they submitted their

declarations, all but L.Q. had been removed.  *See* Second Am. Compl. ¶¶ 22–26; Pls.' Decls.,

ECF Nos. 57-1–11.

Although the Complaint states that "[t]he Individual Plaintiffs are noncitizens who came

to the United States to seek asylum, withholding of removal, and protection under the

Convention Against Torture," Second Am. Compl. ¶ 10, none of the Plaintiffs' declarations

contains a statement of intent to seek statutory withholding of removal or CAT protection

specifically.[7]  *See generally* Pls.' Decls., ECF Nos. 57-1–11.  Plaintiffs do, however, assert that

the individual Plaintiffs who received credible fear interviews under the Final Rule "failed

because of the heightened standards and the lack of opportunity to consult given the compressed

consultation period."  Pls.' Opp'n at 2.

It is not the Court's role to adjudicate the individual Plaintiffs' claims for statutory

withholding of removal or CAT protection.  *See O.A.*, 404 F. Supp. 3d at 145.  That said, the

Court is satisfied that at least one of L.B., J.G., E.M., R.R., and L.Q. has articulated a colorable

claim for those forms of protection.  Consider L.B., a Colombian national who has been

repeatedly raped and beaten by members of a paramilitary group because of her political

activism.  *See generally* L.B. Decl., ECF No. 57-1.  She fears that if she is removed to Colombia

and the paramilitary group finds her, she will be killed.  *Id.* ¶¶ 13, 18.  It is possible that L.B.

could establish that it is more likely than not that, were she removed to Colombia, she would

face persecution or torture.  Put another way, she could potentially establish her eligibility for

---

[7] The same is true of the Plaintiffs who had credible fear interviews but were removed
pursuant to the Interim Final Rule.  *See* Pls.' Decls, ECF Nos. 15-1–10.

statutory withholding of removal or CAT protection.  As with denials of asylum, the denial of a

noncitizen's plausible claim for those protections is a concrete and particularized injury.  *See*

*L.M.-M.*, 442 F. Supp. 3d at 20.  That L.B.'s claim for protection was denied is fairly traceable to

the Rule's heightened screening standard.  In procedural injury cases, that is enough to establish

causation.  *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005)

("[T]his Court assumes the causal relationship between the procedural defect and the final

agency action.").  And, as discussed above, a Court order vacating the heightened screening

standard and the removal orders issued to L.B. and the other individual Plaintiffs pursuant to that

standard may lead to those Plaintiffs ultimately obtaining statutory withholding of removal or

CAT protection.  Accordingly, at least one Plaintiff has standing to challenge the Rule's

reasonable probability screening standard.

### c.  The Guidance

The Court also finds that the organizational Plaintiffs and at least one individual Plaintiff

have standing to challenge the Guidance.  The Court begins its discussion with RAICES and Las

Americas, then turns to the individual Plaintiffs.

When an organization "claims standing only on its own behalf," as the organizational

Plaintiffs do here, "it must make the same showing required of individuals: an actual or

threatened injury that is fairly traceable to the defendant's allegedly unlawful conduct and likely

to be redressed by a favorable court decision."  *Am. Soc'y for the Prevention of Cruelty to*

*Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).  The organization must establish

that it suffers "a concrete and demonstrable injury to its activities, distinct from a mere setback to

the organization's abstract social interests . . . [and] the presence of a direct conflict between the

defendant's conduct and the organization's mission."  *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d

1249, 1255 (D.C. Cir. 2018) (cleaned up).  RAICES and Las Americas both provide consultations and legal representation to noncitizens in expedited removal proceedings.  Hidalgo Decl. ¶¶ 3–7, 19–36, ECF No. 23-1; Babaie Decl. ¶¶ 3–4, 9–12, ECF No. 23-2.  The Court concludes that both organizations have shown that the Guidance's four-hour consultation window materially impairs their ability to provide legal services to asylum seekers in DHS custody.

RAICES is the largest immigration legal services provider in Texas.  Hidalgo Decl. ¶ 5.  It provides free and low-cost legal services to underserved immigrant children, families, and individuals.  *Id.* ¶ 3.  According to RAICES, the Guidance's four-hour consultation window constitutes "a virtually impossible time frame" for them to provide pre-interview consultations because noncitizens "simply do not have enough time" to reach RAICES before their interviews take place.  *Id.* ¶¶ 22, 26, 31.  As a result, RAICES has a "routine inability to provide [credible fear interview] consultations," "a critical part of [RAICES'] service mission for individuals subject to expedited removal."  *Id.* ¶¶ 28, 33.  The "compression at the front end of the expedited removal process" caused by the Guidance also "forces [RAICES] to engage in much more work at the end of that process"—after noncitizens' claims for protection have been rejected—"where [RAICES'] ability to provide meaningful assistance and consultation to noncitizens is diminished."  *Id.* ¶ 35.

Las Americas provides free legal services to low-income immigrants in Texas, New Mexico, and Mexico.  Babaie Decl. ¶ 3.  The "heart" of one of Las Americas' "central" programs is "helping individuals in expedited removal proceedings through the credible fear process."  *Id.* ¶¶ 15, 46.  Las Americas has found "communicating with people in CBP custody . . . virtually impossible" because of the Guidance.  *Id.* ¶ 46.  "[B]ecause of the speed with which [credible

fear interviews] occur," Las Americas has stopped providing credible fear interview counseling to asylum seekers in CBP custody. *Id.* ¶¶ 47–49.

Both RAICES and Las Americas have articulated injuries to their missions that are analogous to the paradigmatic organizational standing injury described by the Supreme Court in *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 379 (1982). The Guidance's four-hour consultation period "directly affect[s]" the organizations' "core business activities" of providing counseling and legal services to noncitizens in expedited removal proceedings. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). In other words, there is a "direct conflict" between the organizations' mission to provide legal counseling to noncitizens seeking asylum and the shortened consultation window. *See Elec. Priv. Info. Ctr.*, 892 F.3d at 1255. The organizations have thus identified "substantial, tangible costs" that are cognizable injuries for the purposes of organizational standing. *O.A.*, 404 F. Supp. 3d at 142; *see also Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 40–41 (D.D.C. 2020) (collecting cases finding cognizable injuries where organizations showed that "their activities have been impeded" in some way (quoting *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006))).

The other two elements of Article III standing are also satisfied: the Guidance directly causes RAICES and Las Americas to provide legal services to fewer asylum seekers because it limits the time noncitizens have to access the organizations' services. And the organizations' injuries are redressable because were the Guidance to be vacated, noncitizens would once again

have 24 hours to seek their assistance.  The organizational Plaintiffs therefore have Article III standing to challenge the Guidance.[8]

The organizational Plaintiffs also satisfy the zone of interests test for statutory standing. A plaintiff's interests must "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Ctrl. Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  The test is a "tool for determining who may invoke the cause of action" in a statute.  *Id.* at 130.  Whether a plaintiff's interests fall within that zone is "not meant to be especially demanding": a suit is foreclosed "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statue that it cannot reasonably be assumed that Congress intended to permit the suit."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchack*, 567 U.S. 209, 225 (2012) (cleaned up).  Courts apply this test "in keeping with Congress's evident intent" in the APA "to make agency action presumptively reviewable."  *Id.* (quotation marks omitted).

Here, "Congress's concern for the availability of pro bono and low-cost legal services in removal proceedings is evident on the face of the INA."  *Cath. Legal Immigr. Network, Inc. v. Exec. Off. Immigr. Rev.*, 513 F. Supp. 3d 154, 173 (D.D.C. 2021); *see also, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iv) (providing noncitizens with the right to consult with a person of their

---

[8] The Court agrees with the Plaintiff organizations that *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) does not bar their standing.  *See* Pls.' Opp'n at 6–7.  There the D.C. Circuit held that organizations cannot invoke third-party standing to bring suits under the INA.  *Am. Immigration*, 199 F.3d at 1359, 1364; *see also Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 625 (D.C. Cir. 2020) ("*American Immigration* rejected third-party organizational standing . . . .").  The organizational Plaintiffs here assert their own injuries-in-fact, so *American Immigration*'s holding on third-party standing is inapposite.  *See Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. 22-cv-3118, 2023 WL 1438376, at *7 & n.6 (D.D.C. Feb. 1, 2023) (concluding the same); *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *4 (D.D.C. Jan. 25, 2019) (same).

choosing prior to a credible fear interview); *id.* § 1229(b)(2) (requiring noncitizens in removal proceedings to be provided a list of pro bono attorneys); *id.* § 1158(d)(4)(A)-(B) (requiring a list of immigration service providers to be distributed to asylum seekers along with a document advising of their right to counsel). The various provisions of the INA that provide for access to low-cost and pro bono legal services "make clear that Congress was concerned not merely about the right to counsel in removal proceedings, but with actual *access* to counsel." *Cath. Legal Immigr. Network, Inc.*, 513 F. Supp. 3d at 173 (emphasis in original). The consultation period itself indicates that Congress intended for asylum seekers to have the opportunity to seek assistance from organizations like RAICES and Las Americas before their credible fear interviews. *See Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 52 (D.D.C. 2020) ("On its own terms, then, the INA contemplates an important role for organizations like [such] Plaintiffs."). It "cannot reasonably be assumed that Congress intended to" prevent legal challenges from those same organizations. *Patchak*, 567 U.S. at 225 (quotation marks omitted).

Defendants argue that the Court lacks jurisdiction over the organizational Plaintiffs' claims under 8 U.S.C. § 1252, which generally limits district court review of expedited removal proceedings. *See* Defs.' Cross-Mot. Summ. J. at 18–20. They are wrong. The INA's systemic review provision, 8 U.S.C. § 1252(e)(3), expressly provides that courts in this District may review "whether . . . a written policy directive, written policy guideline, or written procedure" implementing expedited removal proceedings "is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3)(A). That describes the organizational Plaintiffs' claims. The Court is therefore satisfied that the organizational Plaintiffs may challenge the Guidance.

Additionally, at least one individual Plaintiff has demonstrated standing to challenge the Guidance. Pursuant to 8 U.S.C. § 1252(e)(3)(B), systemic challenges to expedited removal policies must be brought within 60 days. The Guidance went into effect on June 4, 2024, so the Court considers standing for the original individual Plaintiffs, whose claims were filed on July 12, 2024. *See* First Am. Compl. Of that group, several Plaintiffs who were given credible fear interviews were unable to reach counsel during the pre-interview consultation period. *See, e.g.*, A.E. Decl. ¶ 9, ECF No. 15-5 ("Before that [credible fear] interview, I never had an opportunity to speak to an attorney."); T.R. Decl. ¶ 11, ECF No. 15-7 ("I never got to speak to an attorney before this [credible fear] interview."); S.G. Decl. ¶ 11, ECF No. 15-8 (describing how he was able to call his mother while in CBP custody, but "did not get to speak to a lawyer before my interview").

Take Plaintiff J.R. She and her partner fled violence in Colombia, entering the United States without a CBP One appointment on Saturday, July 6, 2024. J.R. Decl. ¶¶ 1–8, ECF No. 15-10. J.R. received paperwork about her "possible deportation" at 9:30am that day. *Id.* ¶ 9. Around 3:00pm, she was given information about seeking asylum. *Id.* Her credible fear interview was at 9:00am the next morning, Sunday, July 7. *Id.* ¶ 10. J.R. never had the opportunity to make any calls before her credible fear interview, which she failed. *Id.* ¶ 9. The entire period between when J.R. entered the United States and her credible fear interview took place over the weekend and outside working hours.

As discussed, denial of a colorable asylum claim is a concrete and particularized injury.[9] J.R. has articulated such a claim. *See generally* J.R. Decl.; *id.* ¶ 11 ("I know that my

---

[9] When she signed her declaration in this lawsuit on July 11, 2024, J.R. had not yet been deported. *See* J.R. Decl. ¶ 13. Presumably she has since been removed from the United States.

husband and I will be killed if we return to Colombia."). J.R.'s failing her credible fear interview and being denied asylum is fairly traceable to the limited consultation period established by the Guidance. And the Court could grant relief that would redress J.R.'s alleged injury: were the Court to vacate J.R.'s negative determination, and were J.R. to reapply for asylum with additional time to consult with an attorney or other person before her credible fear interview, she may be granted protection from removal.

In concluding that J.R. has standing to challenge the Guidance, the Court is not suggesting that, but for the Guidance, she would have been granted asylum. *See Ctr. for Biological Diversity*, 861 F.3d at 185 (holding that, in procedural-rights cases, a plaintiff "need not show that 'court-ordered compliance . . . would alter the final [agency decision]" (second alteration in original) (quoting *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005))). Redressability in this context requires only that a plaintiff show "'that a revisitation of' the credible-fear inquiry '*could* reach a different conclusion.'" *L.M.-M.*, 442 F. Supp. 3d at 21 (quoting *Ctr. for Biological Diversity*, 861 F.3d at 185). J.R. has met that burden. The Court therefore concludes that at least one individual Plaintiff also has standing to challenge the Guidance.

### 2. Mootness

Next the Court considers whether it can adjudicate Plaintiffs' notice-and-comment arguments specific to the Interim Final Rule, which they acknowledge has been superseded. *See* Pls.' Suppl. Br. in Supp. of Pls.' Mot. Summ. J. at 1; Second Amended Compl. ¶¶ 89, 119–22. Defendants argue that the issuance of the Final Rule, which was promulgated after notice and

---

But because denial of J.R.'s asylum claim is a sufficient injury to satisfy Article III, her removal status is immaterial to the Court's analysis.

comment, moots this claim. Defs.' Suppl. Br. at 22–23; *see also* 89 Fed. Reg. at 81168–272

("Public Comments and Responses"). Plaintiffs respond that the Court can consider their notice-

and-comment challenge because certain individual Plaintiffs whose asylum claims were denied

pursuant to the Interim Final Rule were, and continue to be, harmed by the Interim Final Rule.

Pls.' Suppl. Opp'n to Defs.' Cross-Mot. Summ. J. at 12. The Court generally agrees with

Defendants.

The APA's procedural requirements apply to interim final rules, which constitute final

agency action while in effect. *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir.

2012) (rejecting the premise that an interim final rule's procedural errors are necessarily

harmless). But the D.C. Circuit has instructed that "the interim resolution is the final word from

the agency on what will happen up to the time of any different permanent decision." *Nat. Res.*

*Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). In other words, an interim rule

"marks the consummation of the agency's decisionmaking . . . unless and until it is superseded."

*Id.* at 80. In *Association of American Physicians and Surgeons v. Sebelius*, the D.C. Circuit

considered procedural and substantive challenges to an interim final rule that had been

"superseded by a rule promulgated after notice and comment" while the appeal was pending.

746 F.3d at 472–73. The court held that the challenges to the interim final rule were moot. *Id.* at

472. The same principle applies here. *See also Little Sisters of the Poor v. Pennsylvania*, 591

U.S. 657, 686 & n.14 (2020).

The Court also takes as instructive the procedural history of *Capital Area Immigrants'*

*Rights Coalition v. Trump* ("*CAIR*"), 471 F. Supp. 3d 25 (D.D.C. 2020). In that case a group of

individual asylum applicants and immigrant-services organizations challenged an interim final

rule that, like the Rule here, limited asylum eligibility. *Id.* at 31. The court held that the

government had violated the APA in issuing the interim final rule without notice and comment, and vacated the interim final rule on that basis. *Id.* at 44–57. The government appealed. *See E.B. v. Dep't of State*, 583 F. Supp. 3d 58, 63 n.5 (D.D.C. 2022). While the appeal was pending, the government issued a final rule with notice and comment that superseded the interim final rule. *Id.* The D.C. Circuit dismissed the government's appeal as moot. *I.A. v. Garland*, No. 20-5271, 2022 WL 696459 at *1 (D.C. Cir. Feb. 24, 2022) (per curiam) (holding that "the appellees' issuance of a joint final rule that supersedes the joint interim rule giving rise to the complaints in this case has rendered these appeals moot"); *see also* Opp'n to Defs.-Appellants' Mot. Dismiss and Vacate the District Court's Decisions at 7–8, *I.A. v. Garland*, No. 20-5271 (D.C. Cir. Sept. 20, 2021) ("Because the district court vacated the interim final rule solely for failure to follow notice-and-comment procedures, and the final rule superseded the interim final rule, there is no longer a live dispute before this Court."). The Court sees no reason to reach a different conclusion than the D.C. Circuit did under practically identical circumstances. *See also Am. Forest Res. Council v. Williams*, No. 21-601, 2022 WL 2290536, at *3 (D.D.C. June 24, 2022) ("Indeed it is not at all out of the ordinary for an agency to promulgate new rules to supersede or cure defects in the previous rules, thereby mooting challenges to the prior rules.") (citing cases), *aff'd*, 96 F.4th 417 (D.C. Cir. 2024).

Two last points. Where superseding agency actions repeat the same alleged procedural error, they "preserve, rather than moot, the original controversy." *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1111 (D.C. Cir. 1974). Here, though, Defendants did engage in notice and comment before issuing the Final Rule. Defs.' Suppl. Br. at 22. There is therefore no continuing violation. *See Organic Trade Ass'n v. U.S. Dep't of Agric.*, 370 F. Supp. 3d 98, 111 (D.D.C. 2019) (stating that "[a]gencies can moot claims against them by promulgating new rules that cure

previous procedural defects"). Finally, the D.C. Circuit has held that "[f]ailure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule.'" *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002)). The Court cannot grant that "normal" relief here because it cannot vacate and set aside a rule that is not in effect. There is, in other words, nothing to vacate.[10] Nor does the Court find that any of the exceptions to mootness may apply. Accordingly, the Court will deny as moot Plaintiffs' notice-and-comment challenge to the Interim Final Rule.

### 3. Severability

Before proceeding to the merits, the Court must address one remaining threshold issue: whether the challenged provisions in the Rule are severable. Under the APA, courts can sever and set aside "only the offending parts of the rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). Whether a portion of a regulation is severable depends on two factors: the agency's intent, and if the rest of the regulation can function sensibly without that provision. *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22–23 (D.C. Cir. 2001); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). Defendants argue that each of the

---

[10] As discussed at *supra* pp. 5–7, each of the challenged provisions in the Final Rule originated in the Interim Final Rule. "[A]lthough announced in a rule that has now expired," the limitation on asylum eligibility, manifestation of fear requirement, and reasonable probability screening standard have "carried through to a regulation that remains operative today." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 92–93 (D.D.C. 2018). "It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action . . . the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016) (emphasis in original) (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994)). The challenged provisions present "question[s] with continuing consequences" for the individual Plaintiffs whose claims for protection were rejected pursuant to those provisions in the Interim Final Rule. *See Bauer*, 325 F. Supp. 3d at 92. The Court can, therefore, grant individual relief to those Plaintiffs.

challenged provisions in the Rule is intended to, and can, operate independently of the others.

Defs.' Cross-Mot. Summ. J. at 64–65; Defs.' Suppl. Br. at 25; Defs.' Second Suppl. Br. at 8–9.

Plaintiffs do not argue otherwise.  The Court agrees.

The issuing agencies' intent is clear from the face of the Rule, which contains a
comprehensive severability provision:

> As stated in [the Code of Federal Regulations,] the Departments intend for the
> provisions of the rule to be severable from each other and to be given effect to the
> maximum extent possible, such that if a court holds that any provision is invalid or
> unenforceable as to a particular person or circumstance, the other provisions will
> remain in effect as to any other person or circumstance.

89 Fed. Reg. at 81168; *see also Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C.

Cir. 2021).  The Rule continues, "the Departments intend for the 'reasonable probability'

screening standard to be used—even in the absence of a limitation of asylum eligibility . . . —to

screen for statutory withholding of removal and CAT protection claims."  89 Fed. Reg. at 81168.

Same with the "manifestation of fear procedures under 8 CFR 235.15."  *Id.*  And the Rule

expressly states that "the Departments intend for the limitation on asylum eligibility to be

severable from the manifestation of fear procedures, the reasonable probability standard, and the

Proclamation because the limitation on asylum eligibility operates independently of those

provisions and the Proclamation."  *Id.*

The Court also agrees with Defendants that the provisions at issue in this lawsuit can

operate independently from one another.  *See* Defs.' Cross-Mot. Summ. J. at 65.  The Rule's

limitation on asylum eligibility is totally distinct from the procedures to which noncitizens are

subjected once they arrive in the United States.  The manifestation of fear requirement, which

triggers whether a noncitizen is eligible for a credible fear interview, functions independently

from the screening standard that applies within that interview, and vice versa.  Accordingly, the

Court will separately consider Plaintiffs' challenges to the Rule's limitation on asylum eligibility, manifestation of fear requirement, and reasonable probability screening standard.

### B. Merits

The Court now turns to the merits. Defendants argue that the INA's structural review provision "does not authorize arbitrary-and-capricious or procedural APA challenges, only contrary-to-law challenges." Defs.' Cross-Mot. Summ. J. at 44–45. That provision provides that a court in this District can review "a regulation [dealing with expedited removal] . . . is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(ii). In the Court's view, that encompasses arbitrary and capricious review. For one thing, the APA is clearly a law that a regulation may violate. For another, the D.C. Circuit "'adopt[s] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Grace v. Barr*, 965 F.3d 883, 896 (D.C. Cir. 2020) (quoting *Make the Rd.*, 962 F.3d at 624)). The Court will therefore consider Plaintiffs' arbitrary and capricious arguments against the Final Rule.

For the reasons discussed below, the Court agrees with Plaintiffs that the Rule's limitation on asylum eligibility violates the INA, that the manifestation of fear requirement is arbitrary and capricious, and that the Guidance's four-hour consultation window is arbitrary and capricious. The Court rejects Plaintiffs' argument that the reasonable probability screening standard is arbitrary and capricious.

### 1. The Rule

#### a. Limitation on Asylum Eligibility

Plaintiffs challenge the Rule's limitation on asylum eligibility as "flatly inconsistent with Section 1158(a)(1)" of the INA. Pls.' Mot. Summ. J. at 11 (emphasis deleted). That provision

provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .*), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). The Rule bars asylum for noncitizens who arrive in the United States outside ports of entry during "emergency border circumstances" unless they can demonstrate a limited set of "exceptionally compelling circumstances." 89 Fed. Reg. at 48718, 81156, 81164. That facially conflicts with the INA. Other courts to consider similar place-of-entry-based bans on asylum have reached the same conclusion. *See, e.g., O.A.*, 404 F. Supp. 3d at 147–48. As one of those courts said, "[i]t would be hard to imagine a more direct conflict." *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1112 (N.D. Cal. 2018).

Courts "must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co*., 560 U.S. 242, 251 (2010) (internal citations omitted). As originally enacted, the INA required the Attorney General to establish "a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum." The Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified at 8 U.S.C. § 1158(a) (1980)). In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996). Among other things, IIRIRA amended section 1158 of the INA, adding text clarifying that asylum is available "whether or not" a noncitizen arrives "at a designated port of entry." 8 U.S.C. § 1158(a). In full, the operative provision now reads:

> Any alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

*Id.* § 1158(a)(1) (emphasis added).  Congress could not have been more clear that asylum is available to noncitizens who enter the United States outside ports of entry.  Every court to consider the issue agrees.  *E.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669–70 (9th Cir. 2021); *O.A.*, 404 F. Supp. 3d at 147–52; *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1041 (N.D. Cal. 2023).

Defendants emphasize that the INA provides that DHS and DOJ may establish "limitations and conditions" on asylum beyond those laid out by Congress.[11]  Defs.' Cross-Mot. Summ. J. at 24–25 (citing 8 U.S.C. § 1158(b)(2)(C) and (d)(5)(B)); *see also* 89 Fed. Reg. at 81162 (invoking the agencies' authority to establish additional conditions for asylum pursuant to 8 U.S.C. § 1158(b)(2)(C) and (d)(5)(B)).  True.  But the INA requires that those additional limits and conditions be "consistent with" the rest of section 1158: "The [Secretary of Homeland Security] may by regulation establish additional limitations and conditions, consistent with *this section*, under which an alien shall be ineligible for asylum under paragraph (1)."  8 U.S.C. § 1158(b)(2)(C) (emphasis added); *see also id.* § 1158(d)(5)(B) ("The [Secretary of Homeland Security] may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with *this chapter*.") (emphasis added).  To Defendants, this means only that any additional conditions cannot reflect any "noteworthy opposing, conflicting, inharmonious, or contradictory qualities."  Defs.' Cross-Mot. Summ. J. at 25 (citing Webster's Third New International Dictionary 484 (1993)).  The Court doubts that Congress intended for the Secretary's authority to be so capacious.  But even if it did, the Rule is

---

[11] Another provision in the INA gives the President the authority to, by proclamation, suspend the entry of "any aliens or any class of aliens into the United States" when he finds that their entry "would be detrimental to the interests of the United States."  8 U.S.C. § 1182(f).  The issuing agencies did not invoke that provision in issuing the Rule or Guidance, *see generally* 89 Fed. Reg. at 81162–64, so its scope is irrelevant here.  *See also* 89 Fed. Reg. at 81164 n.55.

nonetheless unlawful.  By conditioning asylum on a nonimmigrant's place of arrival, the Rule

conflicts with the INA in a "noteworthy" and "inharmonious" way.  *Cf. E. Bay*, 993 F.3d at 670

("Explicitly authorizing a refugee to file an asylum application because he arrived between ports

of entry and then summarily denying the application for the same reason borders on absurdity.").

Defendants argue that the Rule does not treat place of entry as dispositive in determining

eligibility because it carves out certain noncitizens from the limitation on asylum eligibility,

including those who can show "exceptionally compelling circumstances," and those who fall into

certain listed categories.  Defs.' Cross-Mot. Summ. J. at 29–30.  Adding more conditions to

asylum eligibility does not address the problem that place of arrival is, for most noncitizens,

determinative.  And, again, that conflicts with section 1158(a).  That a noncitizen's "failure to

present at a port of entry may be excused upon a showing of exceptionally compelling

circumstances[] does not address the reason why restricting asylum eligibility based on place of

entry conflicts with the law" because the "failure to present at a port of entry" is still dispositive

in many cases.  *E. Bay*, 683 F. Supp. 3d at 1041–42; *see also District of Columbia v. USDA*, 444

F. Supp. 3d 1, 25 (D.D.C. 2020); *Gall v. United States*, 552 U.S. 38, 45–47 (2007) (holding that

when the government cannot make an action mandatory, it also cannot require a showing of

"extraordinary circumstances" to justify departing from that action).  Same with the fact that the

Rule is inapplicable to some types of noncitizens, like lawful permanent residents.  Again: the

INA makes asylum available for "[a]ny" qualifying noncitizen regardless of where he enters the

United States.  8 U.S.C. § 1158(a)(1).  Nor is the Rule saved by the condition that a noncitizen

must schedule a time to appear for asylum processing through the CBP One application.[12]  *See*

---

[12] Because the Court finds that the CBP One appointment system does not affect the Rule's unlawfulness, the termination of the CBP One application has no effect on its holding.

Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. at 12 ("[U]nlawfully rationing asylum for noncitizens who present at ports by forcing them to make appointments through [CBP One] . . . does not somehow cure the illegal condition on those who enter between ports."). *Contra* Defs.' Cross-Mot. Summ. J. at 30.

"When the words of a statute are unambiguous, . . . judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (quotation omitted). The Court therefore does not consider Defendants' arguments about the INA's structure and history or their arguments about the government's discretion in ultimately granting asylum to any individual noncitizen.[13] *Cf.* Defs.' Cross-Mot. Summ. J. at 25–29. Maybe "in times of heightened border encounters" "practical and operational realities" should enable Defendants to condition the availability of asylum on where a noncitizen enters the United States. *Id.* at 25, 31. But unless and until Congress amends the INA, they cannot. *See* Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. at 10. Because the limitation on asylum eligibility exceeds the authority that Congress conferred on the Secretary of Homeland Security to "establish additional limitations and conditions" on asylum that are "consistent with" section 1158 of the INA, the Rule is "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A); 8 U.S.C. § 1158(b)(2)(C).

### b. Manifestation of Fear Requirement

The Rule also establishes that "rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, . . . [officials] will refer a noncitizen for a

---

[13] *Matter of Pula*, a Board of Immigrations Appeals decision upon which Defendants rely, *see* Defs.' Cross-Mot. Summ. J. at 28, predated IRRIRA's amendments to the INA and is therefore inapplicable to the issues raised in this litigation. *See E. Bay*, 354 F. Supp. 3d at 1112 ("The BIA's policy prior to *Matter of Pula* is immaterial to this question.") (discussing 119 I. & N. Dec. 47 (BIA 1987)).

credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to their country or the country of removal." 89 Fed. Reg. at 81168; *see* 8 C.F.R. § 235.15. That fear can "be manifested . . . verbally, non-verbally, or physically." 89 Fed. Reg. at 81237. Plaintiffs challenge the manifestation of fear requirement as a violation of international and federal law, and as arbitrary and capricious. *See, e.g.*, Pls.' Mot. Summ. J. at 22–32. Because the requirement risks different results for identically situated noncitizens, the Court agrees with Plaintiffs that it is arbitrary and capricious.

In conducting arbitrary and capricious review, all a court must determine is whether "the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021), so the scope of review is narrow. *State Farm*, 463 U.S. at 43. But if "[a]n alien appearing before one official may suffer deportation[] [and] an identically situated alien appearing before another may gain the right to stay in this country," then any rule or policy driving those outcomes is arbitrary and capricious. *Judulang v. Holder*, 565 U.S. 42, 58–59 (2011); *see also Grace*, 965 F.3d at 900.

The 1997 regulations displaced by the Rule required officials to provide individual advisals to each noncitizen, affirmatively ask questions designed to determine if the noncitizen qualifies for a credible fear interview, "clearly advise[]" the noncitizen that he may have no other opportunity to "present information concerning any fears or concerns about being removed," and convey that any information shared "will be heard confidentially." 62 Fed. Reg. at 10319; *see also* 89 Fed. Reg. at 81234. In issuing the manifestation requirement, DHS and DOJ labeled the 1997 procedure as "unduly suggestive." 89 Fed. Reg. at 81234, 81235; 8 C.F.R. § 235.3(b)(4).

That may be true. Even so, DHS and DOJ were obligated to replace that procedure with one that complies with the APA.

The Rule asserts that CBP officers have "experience and training" and "skills and expertise" that allow them to determine, sua sponte, which noncitizens have meritorious fear claims. 89 Fed. Reg. at 81238, 81239; *see also* 89 Fed. Reg. at 48744 ("As a result of [CBP immigration officers'] experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern."). The Rule further states that "DHS has provided guidance to CBP and ICE agents and officers on how to identify manifestations of fear." 89 Fed. Reg. at 81240, 81242. But the record contains no evidence of that guidance. Nor does it contain evidence showing that DHS officials can in fact filter meritorious and non-meritorious fear claims under the manifestation standard—let alone that they can do so consistently. *See* Pls.' Mot. Summ. J. at 27. Conclusory statements that officials are capable of accurately and consistently evaluating manifestations of fear are not enough. *Id.* at 28–29.

Plaintiffs point to the experience of individual Plaintiff D.G. as illustrative of how arbitrary the manifestation standard is in practice. *Id.* at 27–28. D.G., a Colombian national, fled gang violence with her husband and son. Decl. of D.G. ¶¶ 1, 6–7, ECF No. 15-1. They crossed the U.S. border without a CBP One appointment and, upon being captured by authorities, were separated on the basis of sex. *Id.* ¶¶ 7, 8. While in custody, D.G. mentioned her fear of returning to Colombia multiple times, but she was "ignored . . . every time" and was ultimately removed to Colombia without a credible fear interview. *Id.* ¶¶ 9–11. But D.G.'s husband, whose claim for asylum was *identical* to hers, was given a credible fear interview and remains in

the United States "awaiting an opportunity to seek protection." *Id.* ¶ 10.  The same is true of her son. *Id.*

This outcome is unsurprising, given that the manifestation of fear requirement has virtually no guardrails to ensure consistency.  For example, the Rule defines manifestation of fear at a high level of generality.  *See* 89 Fed. Reg. at 81237 ("Such indicators [of fear] include statements of fear; statements that the noncitizen was previously harmed in their home country or country of removal; evidence of physical injury consistent with abuse (e.g., bruises, scars); evidence of self-harm; or non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.").  And unlike the asylum officers who conduct credible fear interviews, CBP officials are law enforcement officers who are often "in an adversarial role against noncitizens."  Amicus Br. of Council 119 at 14–17.  Typically, CBP officers are armed, do not "share a common language with the noncitizens they encounter," and interact with noncitizens in "confined physical spaces," like vans and small rooms, which may discourage noncitizens from manifesting fear.  *See id.* at 16.  In contrast, asylum officers receive "substantial training in interviewing techniques designed to reliably elicit the information necessary to make legally sufficient determinations" including "a specialized training dedicated to torture" and training materials that "emphasize . . . the role a noncitizen's country of origin plays" in shaping his or her responses in an interview setting.  *Id.* at 10–12.

Nothing in the administrative record shows that comparable training is provided to the CBP officers now responsible for determining, without the aid of questioning, whether a noncitizen has manifested a qualifying fear.  *See id.* at 15; Pls.' Mot. Summ. J. at 27; Pls.' Opp'n at 22 ("[Defendants] never cite any evidence that officers can successfully identify fear of return,

particularly given that newly arrived asylum seekers are often 'tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear.'") (quoting 89 Fed. Reg. at 48744). A purely subjective standard risks arbitrariness. To the point, Plaintiffs and amici report that since the Interim Final Rule issued, noncitizens' manifestations of fear have been routinely ignored and rejected. Pls.' Mot. Summ. J. at 28–30; Amicus Br. of Council 119 at 15; Amicus Br. of Human Rights First at 12–24.

That said, some features of the Rule tend to support the government's position that CBP officials may accurately filter fear claims. Officers who are unsure whether a noncitizen has manifested a qualifying fear are instructed "to err on the side of referral," *see* 89 Fed. Reg. at 81240 (internal citation omitted), and noncitizens in DHS custody are supposed to be exposed to signage and, in some facilities, videos explaining that they may manifest fear at any time (although amici report that many noncitizens do not see or understand those signs and videos). 89 Fed. Reg. at 81239; Amicus Br. of Human Rights First at 13; *see also* E.C. Decl. ¶ 15, ECF No. 57-8. But the Court agrees with Plaintiffs that that is not enough to overcome the problem that "[b]y relying on subjective officer perceptions rather than objective procedures—such as standardized advisals and questioning—the manifestation requirement inevitably will result in systematic arbitrariness in whether a noncitizen is referred for a credible fear interview." Pls.' Mot. Summ. J. at 27.

The APA does not demand perfection, but it does require reasonableness. The Court is convinced that the manifestation requirement will lead to outcomes where "[a]n alien appearing before one official may suffer deportation[;] [and] an identically situated alien appearing before another may gain the right to" a credible fear interview. *See Judulang*, 565 U.S. at 58. "This,

the Supreme Court has warned, is precisely 'what the APA's "arbitrary and capricious" standard is designed to thwart.'"[14]  *Grace*, 965 F.3d at 900 (quoting *Judulang*, 565 U.S. at 59).

### c.  Reasonable Probability Screening Standard

Under the Rule, noncitizens in credible fear interviews are screened for statutory withholding of removal and CAT protection based on whether they show "a reasonable probability of persecution . . . or torture."  89 Fed. Reg. at 81168.  "[R]easonable probability" is defined to mean "substantially more than a 'reasonable possibility' but somewhat less than more likely than not."  *Id.*; 8 C.F.R. 208.35(b), 1208.35(b).  For many years, applicants for these protections were generally subject to the same screening standard as asylum applicants: if they could show a "significant possibility" of ultimate eligibility, they were placed in full removal proceedings.  Pls.' Mot. Summ. J. at 5–6 (citing 87 Fed. Reg. at 18078, 18084, 18091 (Mar. 29, 2022)); *see also* 8 U.S.C. § 1225(b)(1)(B)(v).  In 2023, the Biden administration issued a rule changing that standard to a "reasonable possibility."  *See* 88 Fed. Reg. at 11704, 31336–37, 31381 (Feb. 23, 2023).  Plaintiffs argue that the Rule's standard is arbitrary and capricious because "it represents an unexplained change from decades of practice and because Defendants failed to meaningfully consider whether the new standard will result in more individuals being wrongfully removed to persecution and torture."  Pls.' Mot. Summ. J. at 31.  The Court agrees with Defendants that Plaintiffs' arguments are tantamount to a policy disagreement.  *See* Defs.' Suppl. Br. at 21.

Plaintiffs characterize the new standard as untethered from the INA or any past practice or regulation, Pls.' Mot. Summ. J. at 33 n.22 (arguing that the standard "appears to have been

---

[14] Because the Court holds that the manifestation of fear requirement is arbitrary and capricious, it does not consider Plaintiffs' alternative arguments that the requirement also violates international and federal law.

invented out of whole cloth"), but it is undisputed that the INA does not require any particular screening standard for statutory withholding of removal and CAT protection.  Defs.' Cross-Mot. Summ. J. at 36; Pls.' Mot. Summ. J. at 32 (acknowledging that the "only standard mentioned by statute for use in credible fear interviews . . . refers to asylum specifically") (emphasis deleted); *see also* 89 Fed. Reg. at 81246 ("While Congress clearly expressed its intent that the 'significant possibility' standard be used to screen asylum claims, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2442 are silent as to what screening procedures are to be employed with respect to statutory withholding of removal and CAT protection.").  The reasonable probability standard is "intended to be straightforward."  89 Fed. Reg. at 81247.  And Defendants provided a legitimate rationale for the new standard: increasing efficiency by reducing the total number of noncitizens placed in full removal proceedings and by more accurately filtering in meritorious claims.  *See* Defs.' Cross-Mot. Summ. J. at 47, 54; 89 Fed. Reg. at 81160–61, 81246 (internal citation omitted) ("The Departments believe the reasonable probability screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR.").  The Rule also acknowledges that the issuing agencies were deliberately departing from their prior policy.  89 Fed. Reg. at 81160–61, 81245–46, 81248 (acknowledging and explaining the change specifically as it relates to the previous two screening standards); *see also id.* at 81248 (internal citation omitted) ("[T]he 'reasonable probability' standard . . . is similar to the 'significant possibility' and 'reasonable possibility' standards."); *Am. Fed'n of Gov't Emps.*, *AFL-CIO v. FLRA*, 25 F.4th 1, 5 (D.C. Cir. 2022).

That Defendants rejected a reasonable possibility standard in 2022 is not enough, on its own, to render this Rule's standard arbitrary and capricious. *See, e.g.*, *State Farm*, 463 U.S. at 42 (holding that agencies can change their policies); *see also* Defs.' Reply at 16 (describing how "[t]he chain of reasoning in this history" of the various screening standards "is clear"). In any case, the operative standard before this was the "reasonable possibility" standard adopted by Defendants in 2023. *See* Defs.' Suppl. Br. at 19; 89 Fed. Reg. at 11745–47 (explaining Defendants' initial decision to depart from the 2022 rule that had rejected a heightened screening standard). In issuing the Rule, Defendants reasonably explained why changed circumstances compelled them to depart from the 2023 standard. *See* 89 Fed. Reg. at 48747.

The Rule also addresses the various considerations that Plaintiffs raise, like noncitizens' "difficult[y] sharing information due to trauma, exhaustion, or translation availability" and "additional stress placed on vulnerable populations." *Id.* at 81246; *see* Defs.' Cross-Mot. Summ. J. at 55. *Contra* Pls.' Mot. Summ. J. at 33 (arguing that Defendants failed to consider that "asylum seekers often are unable or unlikely to discuss those details at that stage due to trauma and related considerations") (emphasis deleted). For one, the asylum officers who conduct credible fear interviews "have significant training and experience in engaging in non-adversarial interview techniques, working with interpreters, cross-cultural communication, and eliciting information from trauma survivors and other vulnerable populations." 89 Fed. Reg. at 81247; *see also supra* pp. 36. As Defendants pointed out in the Interim Final Rule, the reasonable probability standard "'is not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis.'" 89 Fed. Reg. at 81248 (citing 89 Fed. Reg. at 48748). Defendants additionally explained that credible fear determinations are reviewed by a supervisory AO before they become final and are subject to de novo review by an IJ (if the

noncitizen seeks such review), which "ensure[s] consistency and quality." *Id.* The Court does not agree with Plaintiffs that AOs are incapable of applying the new screening standard just because it is new. *Contra* Pls.' Opp'n at 25.

In issuing the Rule, Defendants explained that "the statutory expedited removal process is predicated on the requirement that noncitizens must explain their fear during a credible fear screening." 89 Fed. Reg. at 81246 (citing INA 235(b)(1)(B), 8 U.S.C. § 1225(b)(1)(B)). Noncitizens are responsible for establishing a credible fear of persecution; requiring specificity of that fear is not inconsistent with the INA. *See* 8 U.S.C. § 1225(b)(1)(B). And Defendants expressly determined that "the rule's benefits outweigh any potential marginal increase in the likelihood that a meritorious case would be missed or would fail under the rule's procedures." 89 Fed. Reg. at 81183.

Plaintiffs' arguments against the heightened screening standard amount a policy disagreement with the agencies that issued the Rule. Defs.' Suppl. Br. at 21. Competing views about policy do not render an agency's action arbitrary and capricious. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017). DHS and DOJ sufficiently articulated their reasoning for adopting the reasonable probability screening standard.

## 2. The Guidance

Under the INA, a noncitizen is entitled to "consult with a person or persons of [his or her] choosing prior to the [credible fear] interview . . . according to regulations prescribed by the" Secretary of Homeland Security. 8 U.S.C. § 1225(b)(1)(B)(iv). Implementing regulations provide that "[p]rior to the [credible fear] interview," noncitizens "shall be given time to contact and consult with any person or persons of [their] choosing," 8 C.F.R. § 235.3(b)(4)(ii), that they shall receive written notice of that right, *id.* § 235.3(b)(4)(i)(B), that they may have the person

consulted be "present at the interview," *id.* § 208.30(d)(4), that such consultation "shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, shall be at no expense to the government, and shall not unreasonably delay the process," *id.* § 235.3(b)(4)(ii). *See also* 8 U.S.C. § 1225(b)(1)(B)(iv) (providing that the "consultation shall be at no expense to the Government and shall not unreasonably delay the process"). The Guidance limits the consultation period to a minimum of four hours, beginning when the noncitizen is first given access to a telephone, between 7:00am and 7:00pm local time. *See* Guidance at 4.

Plaintiffs challenge the Guidance on two grounds. First, they argue that the four-hour window effectively eliminates the right to consult, which violates the INA. Pls.' Mot. Summ. J. at 35–37. Second, they claim that the Guidance is arbitrary and capricious because DHS "never considered the important fairness considerations that the consultation period is meant to protect." *Id.* at 37–48. The Court agrees with their second point.

Neither the INA nor its implementing regulations detail a specific period of time for pre-interview consultations. 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 235.3(b)(4)(ii). The INA provides only that the consultation "shall not unreasonably delay the process" and empowers DHS to proffer implementing regulations. 8 U.S.C. § 1225(b)(1)(B)(iv). Defendants point out that when the original 48-hour consultation window was adopted, the government processed around 3,000 credible fear interviews per year, and at the time the Rule was issued, the government was processing over 3,000 credible fear interviews per week. Defs.' Cross-Mot. Summ. J. at 38 (citing 89 Fed. Reg. at 48742). (Just before the Guidance went into effect, noncitizens had a 24-hour consultation window. Pls. Mot. Summ. J. at 9.)

In issuing the Guidance, DHS stated that "[l]engthy consultation periods, including the 24-hour consultation period, cause credible fear screenings to be delayed, increasing the amount of time noncitizens remain in immigration detention." J.A. Part 4 at 410 (Memorandum from Ted H. Kim, Associate Dir., Refugee, Asylum and Int'l Operations Directorate, U.S. Citizenship and Immigration Servs., to Jennifer Higgins, Deputy Dir., U.S. Citizenship and Immigration Servs., *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border IFR Apply*, (Jun. 4, 2024)). It continued: "Delays in the credible fear screening under such circumstances directly contribute to a situation where DHS's capacity can quickly become overwhelmed," which, combined with the emergency border circumstances described in President Biden's proclamation, "constitute unreasonable delay in the [credible fear] process." *Id.* But DHS does not explain how or why a 4-hour period is sufficient to provide noncitizens with a meaningful—or actual—opportunity for consultation. Nor do they provide any evidence that the 24-hour window caused unreasonable delays.

The Guidance states without support that the shortened consultation period provides an opportunity for noncitizens to have "in-depth" conversations before their credible fear interviews. *Id.*; *see also* Guidance at 2–4. But nothing in the administrative record shows that DHS gave any consideration to the practical availability of consultations within such a small window, especially given that "most asylum-seekers arrive to the United States in a particularly vulnerable situation, and may experience technical, psychological, and linguistic difficulties." Amicus Br. of UNHCR at 23; *see also* Amicus Br. of Public Counsel at 8 ("Without adequate time to try to consult with an attorney, a traumatized individual will not have had the modicum of preparation afforded refugees prior to implementation of the Rule."). The border facilities where most noncitizens are held before their interviews are remote and restrictive. Pls.' Mot.

Summ. J. at 35, 38 (describing "the extreme communication challenges posed by CBP holding facilities"). And the four-hour window could fall entirely outside of normal business hours because weekends and holidays are not excluded. Take Plaintiff J.R.: her consultation window fell on a Saturday, and her credible fear interview took place at 9:00am the next day. J.R. Decl. ¶ 9. She never had an opportunity to contact a lawyer or other person. *Id.* Even during non-holiday weeks, a noncitizen's consultation period could fall between 5:00 to 7:00pm one night and 7:00 to 9:00am the next morning. Outgoing calls from CBP facilities do not show a callback number, so prospective attorneys are generally unable to return calls placed outside of business hours. *Id.* at 35–36. And attorneys are not allowed to enter CBP facilities and do not have direct access to people detained there. Babaie Decl. ¶ 46. All of these circumstances compound to make access to consultations within a four-hour window difficult.

In setting the four-hour window, DHS expressly considered the burden that pre-interview consultations place on the immigration system, but did not expressly consider whether noncitizens would actually be able to consult. *See* Guidance A.R. 293 (noting, in document explaining the 48-hour consultation window, that the window gave a noncitizen time to "rest [and] collect his or her thoughts" in addition to contacting an outside person). Nor did DHS provide any evidence showing that the 24-hour window in fact caused unreasonable delays. *See generally* Guidance; *see also* Pls.' Mot. Summ. J. at 37–38. Granted, the 24-hour window necessarily pushes a noncitizen's credible fear interview to at least the day after he or she arrives in CBP custody. But because the four-hour consultation window need not be consecutive, that could happen under the Guidance, too.

Judicial review of agency action is limited to the "grounds that the agency invoked when it took the action," so the Court cannot consider any justifications for the Guidance offered in the

Rule, 89 Fed. Reg. at 81195–99.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cali.*,
591 U.S. 1, 20 (2020).  Defendants acknowledge as much.  89 Fed. Reg. at 81195 ("[B]ecause
this rule does not alter procedures governing consultation . . . concerns regarding those issues—
including that the minimum 4-hour consultation period violates [federal law] . . . or is
unreasonable—are outside the scope of this rulemaking."); *see also* Defs.' Suppl. Br. at 21–22
(acknowledging that the Guidance was "issued outside of the rulemaking context" so the "final
Rule does not alter the government's arguments concerning the legality of that guidance or its
reasonableness").  The Guidance itself lacks a reasoned justification for the four-hour
consultation window.

The Court sees one other fundamental problem.  On its own terms, the Guidance elicits
no limiting principle.  If the only value DHS considers is efficiency, what stops the agency from
adopting a one-hour consultation window?  Thirty minutes?  DHS failed to take into account the
purpose and people the consultation period serves.  *See* Pls.' Mot. Summ. J. at 37–38.  That is
"an important aspect of the problem" that the agency was obligated to consider.  *See State Farm*,
463 U.S. at 43.  Because the Guidance lacks reasoned analysis, it is arbitrary and capricious.[15]
*See Encino Motorcars, LLC v. Navarro*, 579 U.S. 221 (2016); 5 U.S.C. § 706(2)(A).

### C.  Remedy

That brings the Court to the question of remedy.  Neither party has argued that the
decreased number of encounters at the southern border—which have now fallen below the
threshold necessary to trigger "emergency border circumstances"—affects the relief available in
this case.  And nothing in the Court's holding depends on whether the emergency border

---

[15] The Court does not reach Plaintiffs' alternative argument that the Guidance is also
arbitrary and capricious because it was not published in the Federal Register 30 days before its
effective date.  *See* Second Am. Compl. ¶¶ 119–22.

circumstances are or are not in effect. The Court first addresses systemic relief and then addresses what relief to afford the individual Plaintiffs.

### 1. Systemic Relief

Because the limitation on asylum eligibility is contrary to law, the manifestation of fear requirement is arbitrary and capricious, and the Guidance is arbitrary and capricious, the Court concludes that they must be vacated and remanded to the issuing agencies under the APA. 5 U.S.C. § 706(2)(A). When an agency's action is unlawful, "'vacatur is the normal remedy.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)). Generally, "[t]he decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.32d 146, 150–51 (D.C. Cir. 1993) (quoting *Int'l Union, UMV v. FMSHA*, 920 F.2d 960, 966–67 (D.C. Cir. 1990)).

For the limitation on asylum eligibility, the issuing agencies "can't 'cure' the fact that [they] lack[] authority to take a certain action"—*i.e.*, to violate the INA—so "remand-without-vacatur" is unavailable. *Bridgeport Hosp.*, 108 F.4th at 980. In arguing for remand without vacatur, Defendants suggest that vacating any part of the Rule "'would significantly increase the incentive, on the parts of migrants and others (such as smugglers), to engage in actions' that would overwhelm agency resources at the border." Defs.' Cross-Mot. Summ. J. at 64 (quoting 89 Fed. Reg. at 48764–65). But because President Trump has shut down asylum processing at the southern border, that risk is at this point immaterial. *See generally Securing Our Borders*. Nor does the Court find that vacating the manifestation of fear requirement would be particularly

disruptive, given that the decrease in noncitizen encounters. The Court will therefore vacate both the limitation on asylum eligibility and the manifestation of fear requirement.

For the Guidance, the Court again finds that the "exceptional remedy" of remand-without-vacatur is inappropriate. *See Bridgeport Hosp.*, 108 F.4th at 980 (internal citation omitted). Though it is possible that DHS will be able to justify the four-hour consultation window on remand, the consequences of vacatur will not be disruptive because, again, President Trump has shut down asylum processing at the southern border. *See generally Securing Our Borders*. While the Guidance is vacated, the preexisting 24-hour consultation window will be in effect. As discussed, Defendants have not presented any evidence that the 24-hour window is unworkable or that it caused unreasonable delays. The Court sees no issue with the normal remedy and will therefore vacate the Guidance. *See Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1223 (D.C. Cir. 2004).

Defendants argue that the Court can only vacate the Rule and Guidance as applied to the individual Plaintiffs. Defs.' Cross-Mot. Summ. J. at 57. That is flatly wrong. The D.C. Circuit has "made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alterations in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also O.A.*, 404 F. Supp. 3d at 153 ("[T]he Court would be at a loss to understand what it would mean to vacate a regulation, but only as applied to the parties before the Court. As a practical matter, for example, how could this Court vacate the Rule with respect to the organizational plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public? What would

appear in the Code of Federal Regulations?").  The INA expressly provides that courts in this

District may review "[c]hallenges on [the] validity of the [expedited removal] system."  *Grace*,

965 F.3d at 895 (alterations in original) (internal quotation omitted); 8 U.S.C. § 1252(e)(3).

Corollary to that review authority is the authority to order systemwide relief.  *See Grace*, 965

F.3d at 907–08.

Nor does the Court agree with Defendants that the INA's limitation on injunctions, 8

U.S.C. § 1252(f)(1), applies to vacatur orders.  *See* Defs.' Mot. Summ. J. at 57–59; *Florida v.

United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D. Fla. 2023) (holding the same); *Al Otro

Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022) (same).  That provision

states:

> Regardless of the nature of the action or claim or of the identity of the party or
> parties bringing the action, no court (other than the Supreme Court) shall have
> jurisdiction or authority to enjoin or restrain the operation of the provisions of part
> IV of this subchapter, [which includes § 1225,] . . . other than with respect to the
> application of such provisions to an individual alien against whom proceedings
> under such part have been initiated.

8 U.S.C. § 1252(f)(1).  Vacatur is not an injunction: it is "less drastic" because it "neither

compels nor restrains" agency action; all it does is "re-establish the status quo absent the

unlawful agency action."  *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (per

curiam); *see* Pls.' Opp'n at 37–38 (citing *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139,

165–66 (2010), *Texas*, 40 F.4th at 220, and *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C.

2020) (Jackson, J.)).  The Court can therefore order vacatur here.

### 2. Individual Relief

The individual Plaintiffs also ask that the Court vacate their negative credible fear

determinations and removal orders and order Defendants to parole them into the United States

"so that their claims can be processed in accordance with the law."  Pls.' Mot. Summ. J. at 45;

*see also* Second Am. Compl. at 38.  Vacatur of an expedited removal order allows a noncitizen who later enters the United States unlawfully to not be (1) processed for reinstatement of removal, (2) criminally prosecuted for illegal reentry, or (3) found inadmissible for being previously removed based on the vacated order.  8 U.S.C. §§ 1231(a)(5), 1326, 1182(a)(9)(A).  Parole, which is awarded at the discretion of the Secretary of Homeland Security, allows a noncitizen to temporarily remain in the United States while his application for admission is pending.  *Id.* § 1182(d)(5)(A).  Although a parolee "has 'liberty to roam the country,' the law considers him legally detained at the border within the government's custody until his immigration status is determined."  *Samirah v. O'Connell*, 335 F.3d 545, 547 (7th Cir. 2003).

Defendants argue that because the INA commits both removal and parole determinations to the Secretary of Homeland Security's discretion, this Court is prohibited from awarding either as a form of relief.  Defs.' Cross-Mot. Summ. J. at 59–60; *see* 8 U.S.C. § 1182(d)(5)(A).  The Court agrees that it cannot order that the individual Plaintiffs—almost all of whom have been deported—be paroled into the United States.  *See generally* TRO Mem. Op; Pls.' Decls.; *but see* J.R. Decl. at 3, ECF No. 15-10 (stating that Plaintiff J.R. remained in immigration custody in San Diego, California as of July 11, 2024); L.Q. Decl. ¶ 18, ECF No. 57-5 (stating that Plaintiff L.Q. remained in immigration custody in Laredo, Texas, as of October 31, 2024).  But the Court concludes that it does have the authority to vacate the individual Plaintiffs' removal orders, which were issued pursuant to unlawful provisions in the Rule and Guidance.  *See Kiakombua*, 498 F. Supp. at 57–58.

The Court starts with Plaintiffs' request for parole.  Courts are precluded from reviewing most decisions made discretionary by the INA.  8 U.S.C. § 1252(a)(2)(B)(ii).  And "[t]he Judiciary only possesses the power Congress gives it." *Kiyemba v. Obama*, 555 F.3d 1022, 1028

n.12 (D.C. Cir. 2009) ("*Kiyemba I*"), *vacated*, 559 U.S. 131 (2010), *reinstated after vacatur*, 605 F.3d 1046 (D.C. Cir. 2010).  Other courts have agreed that they lack the power to parole individual noncitizens physically located abroad into the United States.  *Gimmarco v. Kerlikowske*, 665 F. App'x 24, 25–26 (2d Cir. 2016); *Samirah*, 335 F.3d at 547; *Dugdale v. Customs & Border Patrol*, No. 14-cv-1175, 2015 WL 2124937, at *1 (D.D.C. May 6, 2025)).

Two courts in this district have, however, ordered parole in systemic review cases.  *See Grace v. Barr*, 344 F. Supp. 3d. 96, 141–42 (D.D.C. 2018), *rev'd in part and aff'd in part*, *Grace*, 965 F.3d 883; *Kiakombua*, 498 F. Supp. 3d at 57–59.  Those courts reasoned that they could order parole because no part of the INA specifically prohibited them from doing so.  One stated that "[b]ecause this case was brought under the [INA's] systemic challenge provision, the limit imposed on the relief available to a court under 1252(e)(1)(a)"—which generally prohibits injunctive relief in INA suits challenging the results of expedited removal proceedings—"does not apply."  *Grace*, 344 F. Supp. 3d at 143.  The other court put it like this: "[N]othing in the INA prevents this Court from enjoining the agency to take certain actions to remedy prior unlawful agency conduct."  *Kiakombua*, 498 F. Supp. 3d. at 58.

The problem with that position is that it elicits no limiting principle.  If the Court can order that Plaintiffs be *paroled* into the United States, what stops it from ordering the government to grant them *asylum*?  Yet in reviewing a systemic challenge to federal immigration policy, the D.C. Circuit held that a district court could enter a nationwide injunction because no part of the INA prohibited the district court from doing so.[16]  That suggests that, unless a

---

[16] In that case, the district court had ordered the government to "provide new credible-fear interviews to the twelve asylum seekers who brought this case."  *See Grace*, 965 F.3d at 906 (citing Order at 3, No. 18-cv-1853 (D.D.C. June 3, 2019)).  By the time the case was decided on appeal, the plaintiffs had already had their new credible fear interviews, so the only remedy at issue was the injunction.  *Id.* at 906–07.

particular remedy is expressly prohibited, any equitable relief is fair game in lawsuits brought under the INA's systemic review provision, 8 U.S.C. § 1252(e)(3).

Other cases also lend support to this position. The Supreme Court has "order[ed] [noncitizens] paroled into the country" in at least two cases: *Zadvydas v. Davis*, 533 U.S. 678 (2001), for one, and *Clark v. Martinez*, 543 U.S. 371 (2005), for another. But both *Zadvydas* and *Clark* involved the constitutional rights of noncitizens who were detained in the United States, not the statutory rights of noncitizens abroad. *See Kiyemba I*, 555 F.3d at 1027–28 (drawing this distinction). The Supreme Court has also stated in dicta that noncitizens pursuing immigration claims from abroad "who prevail can be afforded effective relief by facilitation of their return." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the Ninth Circuit has held that district courts can order the government to grant parole to noncitizens on a case-by-case basis to remedy constitutional violations. *Walters v. Reno*, 145 F.3d 1032, 1050–51 (9th Cir. 1998). This Court, too, has ordered the government to "consider[]" noncitizens' parole requests when those noncitizens brought a facial challenge to parole procedures and "made explicitly clear that they [we]re not seeking review of their individual parole determinations." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 136 (D.D.C. 2018).

But in *Kiyemba I*, the D.C. Circuit described "parole under 8 U.S.C. § 1182(d)(5)(A) [as] a remedy that can be granted . . . only in the exclusive discretion of the Secretary of Homeland Security." *Kiyemba I*, 555 F.3d at 1029 n.14. Even if the Court could generally order that noncitizens be paroled into the United States, the Court cannot do so here. President Trump's *Securing Our Borders* executive order shut down the CBP One application and effectively closed the southern border. Plaintiffs—including any who may still be in U.S. custody—will therefore

be unable to apply for asylum unless or until that executive order is also set aside or withdrawn, which falls outside the scope of this litigation.

The Court will, however, order Defendants to vacate the individual Plaintiffs' negative credible fear decisions and removal orders. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). Those decisions were issued pursuant to provisions of the Rule that, as discussed *supra*, are contrary to law and arbitrary and capricious. *See Grace*, 344 F. Supp. 3d at 145 ("The credible fear interviews of plaintiffs administered pursuant to the [challenged] policies . . . were fundamentally flawed. A Court Order solely enjoining these policies is meaningless for the removed plaintiffs who are unable to attend the subsequent interviews to which they are entitled.") (citations omitted); *see also Kiakombua*, 498 F. Supp. at 57–58 (similar). As discussed at *supra* pp. 27 note 10, the limitation on asylum eligibility and the manifestation of fear requirement were carried over from the Interim Final Rule, so those provisions present "continuing consequences" for the individual Plaintiffs who were subject to removal under the Interim Final Rule. *Bauer*, 325 F. Supp. 3d at 92. The Court's order therefore encompasses all of the individual Plaintiffs named in the second amended complaint.

The Supreme Court has recognized that there "is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. All of the individual Plaintiffs are entitled to a fair

shot at asylum, CAT protection, and statutory withholding of removal without the collateral consequences that would otherwise flow from their denials and removals in the first instance.[17]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (ECF No. 23) is granted in part and denied in part, and Defendants' cross-motion for summary judgment (ECF No. 45) is granted in part and denied in part. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.[18]

Dated: May 9, 2025                                        RUDOLPH CONTRERAS
                                                         United States District Judge

---

[17] Even though the Court is not setting aside the Rule's reasonable probability screening standard, it will nonetheless vacate the removal orders for the individual Plaintiffs who received credible fear interviews because those Plaintiffs were subject to the Guidance's arbitrary and capricious four-hour consultation window.

[18] Defendants request that the Court stay operation of any order granting Plaintiffs' motion for summary judgment for fourteen days to allow for review in the Court of Appeals. Defs.' Mot. Summ. J. at 65; *See E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810, 2023 WL 4729278, at *19 (N.D. Ca. July 25, 2023) (staying an order under similar circumstances). Because President Trump has separately shut down asylum applications at the southern border, the effects of the Court's order are unlikely to be disruptive. The Court will not stay operation of its order.